# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1-20-cr-142 |
| Plaintiff, | **AMENDED** MOTION TO DISMISS |
| v. | ORAL ARGUMENT REQUESTED |
| ALEXANDER SITTENFELD, a/k/a "P.G. Sittenfeld," | |
| Defendant. | |

## DEFENDANT'S *AMENDED* MOTION TO DISMISS THE INDICTMENT

Defendant Alexander "P.G." Sittenfeld hereby files an ***Amended*** Motion To Dismiss the Indictment reformatted to comply with the court's preferred page length. Counsel for Mr. Sittenfeld realized after filing that the memorandum of points and authorities concurrently filed herewith was misformatted to exceed the Court's preferred page length. This Amended Motion To Dismiss attaches a reformatted memorandum that is substantively identical to the previously-filed document.

Mr. Sittenfeld respectfully moves this Court to dismiss the indictment against him in full, or, in the alternative, to strike allegations of purported official acts that fail to satisfy the legal requirements for the offenses charged. As discussed in the attached memorandum of law, the indictment purports to charge bribery offenses, but the government's own factual allegations refute the charges and fail to show any federal offenses.

The factual allegations show that Mr. Sittenfeld did not engage in any quid pro quo agreement—he did not promise to exchange official actions for political contributions or

RITTGERS & RITTGERS
Attorneys at Law

12 East Warren Street
Lebanon, Ohio 45036
TEL (513) 932-2115
FAX (513) 934-2201

understand that he was expected to alter his official conduct because of those contributions. To the contrary, Mr. Sittenfeld affirmed his widely known, longstanding pro-development positions in the same conversations where undercover agents, posing as investors in an attempted sting, offered or provided contributions to his lawful, federally regulated political action committee. His alleged conduct is not a crime; it is a core feature of our democratic system. Accordingly, the charges must be dismissed.

Because this motion challenges the statutory and constitutional basis for the indictment and contends that the government has not charged a crime, Mr. Sittenfeld believes that oral argument would assist the Court. He requests that the Court set argument for February 22, 2020, or the earliest available date thereafter.

Respectfully submitted,

/s/ *Charles H. Rittgers*
Charles M. Rittgers
Charles H. Rittgers
Rittgers & Rittgers
12 East Warren Street
Lebanon, OH 45036
(513) 932-2115
charlie@rittgers.com

*Counsel for the Defendant*

Date: December 23, 2020

RITTGERS & RITTGERS
Attorneys at Law

12 East Warren Street
Lebanon, Ohio 45036
TEL (513) 932-2115
FAX (513) 934-2201

2

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

In our American democracy, elected public officials have always sought "support on the basis of their views and what they intend to do or have done" and have solicited money based on those views and promises. *McCormick v. United States*, 500 U.S. 257, 272 (1991). That is not a crime. It reflects appropriate and "unavoidable" conduct in our democracy "so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id*. The indictment in this case describes this everyday American democratic activity. It fails to state any federal offense.

Alexander "P.G." Sittenfeld is a Cincinnati City Council member with a long and established record of supporting economic revitalization projects. When approached by undercover law enforcement agents—posing as backers of a real estate developer on a specific project and offering political contributions—Mr. Sittenfeld pointed to his already well-known "pro-development" record and insisted that, if they wished to support him politically, "nothing can be a . . . quid pro quo." The government theorizes that Mr. Sittenfeld accepted the undercover agents' contributions to his lawful, federally regulated political action committee, the Progress and Growth PAC, in exchange for official acts to assist the development project. But the indictment's own allegations disprove that theory. They show that Mr. Sittenfeld *rejected* the agents' entreaties to link the contributions to his official conduct. Instead, Mr. Sittenfeld pointed to his record of voting for "every single development deal that's ever been put in front of me." The indictment thus makes clear that Mr. Sittenfeld's entire response to the sting reflected his pre-existing positions, not acquiescence to the undercover agents' persistent, unsuccessful efforts to link his official acts to $40,000 in PAC contributions.

This indictment fails as a matter of law for four core reasons:

*First*, the indictment fails to allege the legally necessary quid pro quo agreement in which Mr. Sittenfeld agreed to exchange an official act for a political contribution. To the contrary, the specific factual allegations in the indictment refute any suggestion that Mr. Sittenfeld agreed to perform an official act *in return for* contributions. Its allegations instead make clear that Mr. Sittenfeld intended to support the real estate development project *before* contributions were even discussed—consistent with his longstanding public positions on the type of development that is best for Cincinnati. Indeed, the indictment's only recitation of the words "quid pro quo" comes in the context of Mr. Sittenfeld's explicit *disavowal* of any quid pro quo. Indictment ¶ 14. These facts fail to show any agreement that his actions were in return for political contributions, as the law requires to convert ordinary political conduct into a federal criminal offense.

*Second*, the indictment fails to plead the necessary element of "specific official actions." As the Supreme Court has made clear, the types of conduct (other than his own vote) that Mr. Sittenfeld allegedly discussed with the undercover agents and a cooperating witness (CW) are insufficient. On the face of the indictment, his purported conduct involved only appropriate and commonplace attempts at persuasion of colleagues in the legislative process and nonspecific future actions.

These first two flaws infect all counts, including the overarching honest services wire fraud counts under 18 U.S.C. §§ 1343 and 1346 (Counts 1 and 2).

*Third*, the Hobbs Act charges under 18 U.S.C. § 1951 (Counts 4 and 6) fail for these reasons and because the Hobbs Act does not reach alleged bribery offenses.

*Fourth*, the bribery charges involving federally funded programs under 18 U.S.C. § 666 (Counts 3 and 5) fail because of the deficient quid-pro-quo and official-act allegations and because the factual allegations refute any intent to act "corruptly."

Mr. Sittenfeld vigorously disputes the government's narrative in the indictment. The government has cherry-picked excerpts from longer conversations with Mr. Sittenfeld that, taken as a whole, clearly establish that Mr. Sittenfeld is innocent of the charges against him. But the indictment is also notable for what it does *not* allege. This is not a case about personal gain—the government does not allege that money went into Mr. Sittenfeld's pockets. Nor does the government allege that his PAC received contributions that exceeded the federal limits, that he spent the contributions unlawfully, or that he failed to disclose the contributions publicly as required by law. Rather, the indictment alleges nothing more than that Mr. Sittenfeld engaged in the kind of routine conduct of elected officials in cities, counties, and states across the nation. Even assuming the truth of the allegations, as the Court must for this motion, his conduct is not criminal. The Court must dismiss the indictment in full.

## THE GOVERNMENT'S ALLEGATIONS

The indictment reflects highly selective excerpts from recorded conversations orchestrated by undercover law enforcement agents about a single real estate project in Cincinnati. The sting unfolded in two phases: the first unfolded in the fall of 2018; the second in the fall of 2019. In the first phase, Mr. Sittenfeld allegedly promised to "deliver the votes" in the City Council to support a real estate development, Project 1. In the second, he allegedly intended to be influenced and rewarded for other possible action that would benefit Project 1. In total, the agents provided $40,000 in PAC contributions. Indictment ¶ 8. The indictment, however, fails to link the contributions to Mr. Sittenfeld's official actions, and that is a fatal flaw.

### A.  Mr. Sittenfeld Rejects CW's Invitation To Accept Illegal Contributions.

Mr. Sittenfeld has served on the Cincinnati City Council since 2011. *See id.* ¶ 14. In February 2018, filings were made with the Federal Election Commission to organize the

Progress and Growth political action committee (PAC), which could lawfully accept contributions that Mr. Sittenfeld could direct to the campaigns of federal, state, and other local candidates he supported.[1]  *Id.* ¶ 7.  Federal Election Commission rules allow Mr. Sittenfeld to solicit contributions for this PAC, and they allow any person, including any limited liability company (LLC), to contribute up to $5,000 per year.  *See* 52 U.S.C. § 30116(a)(1); 11 C.F.R. § 110.1.  In September 2018, Mr. Sittenfeld solicited political contributions from the government's cooperating witness, CW, while aware of CW's unsuccessful attempts to secure an agreement from the City on Project 1.  Indictment ¶ 10.

On October 26, 2018, in beginning the first phase of the sting, CW spoke with Mr. Sittenfeld and said CW "knew two investors" interested in Project 1 who "could support" Mr. Sittenfeld.  *Id.* ¶ 12.  In fact, the "investors" were undercover law enforcement agents (UCE-1 and UCE-2), *id.* ¶ 5, and CW was "cooperating with and operating at the instruction of law enforcement."  *Id.* ¶ 4.  Mr. Sittenfeld suggested they connect before the November 2018 general election, which included a ballot measure that proposed restrictions for future contributions.  *Id.* ¶¶ 11-12.  On October 30, 2018, CW suggested that the investors could meet with Mr. Sittenfeld after the election, but Mr. Sittenfeld resisted, explaining that "he needed to do the things I need to do to be a successful candidate" and wanted to obtain the LLC contributions before election day, *id.* ¶ 13, when they were still lawful, *id.* ¶ 11.

On November 2, 2018, CW again called Mr. Sittenfeld and said that, although he and the investors could not contribute to Mr. Sittenfeld's campaign before election day, an investor in Project 1 could contribute $10,000 that week and then another $10,000 in a few weeks, but the investors would want to know from Mr. Sittenfeld that "it's gonna be a yes vote" on Project 1

---

[1]  FEC Form 1, Statement of Organization, Filing FEC-1206673 (Feb. 5, 2018), https://docquery.fec.gov/cgi-bin/forms/C00668640/1206673/.

"without a doubt." *Id.* ¶ 14. Mr. Sittenfeld had no idea that he was being clandestinely recorded, yet he refused, saying "nothing can be illegal," and "nothing can be a quid, quid pro quo" and that "I know that's not what you're saying either." *Id.* Mr. Sittenfeld explained that "I'm always super pro-development and revitalization of especially our urban core" and that in his first seven years on the Council, he had "voted in favor of every single development deal that's ever been put in front of me." *Id.* He also offered to show his "voting data" to the investors so that they would know they are investing in a "winning endeavor." *Id.*

### B. Mr. Sittenfeld Rejects UCE-1's Invitation To Accept Illegal Contributions.

On November 7, 2018, Mr. Sittenfeld met CW and UCE-1 for lunch and presented voting data showing that he was "politically popular throughout Cincinnati" and "likely to be the next mayor." *Id.* ¶ 15. Mr. Sittenfeld also stated that "every successful developer and business leader in Cincinnati" already "placed their bet with" him. *Id.* When UCE-1 said he wanted to make Project 1 "veto proof," Mr. Sittenfeld expressed confidence in his political abilities, saying he could "move more votes than any single other person." *Id.*

After lunch, UCE-1 reiterated that he "wanted enough City Council support for" Project 1 "to guarantee the development agreement could not be vetoed" by another public official. *Id.* ¶ 16. UCE-1 offered Mr. Sittenfeld $20,000 "to get that deal." *Id.* Mr. Sittenfeld did not agree. Instead, he said he would "talk to" the other public official "about it directly," and expressed confidence in his own ability to "deliver the votes" and "make it happen." *Id.* ¶¶ 16-17.

On November 21, 2018, Mr. Sittenfeld explained to UCE-1 the $5,000 legal limit on PAC contributions. *Id.* ¶ 18. He addressed UCE-1's concern about having his name connected to any contributions, noting that his own name was "not connected" with his PAC and that UCE-1's name would not be connected to any LLC contributions to the PAC either. *Id.* ¶¶ 17-18. UCE-1 later confirmed by phone that he would provide "two checks $5,000 to the PAC." *Id.*

¶ 19.

On November 28, 2018, Mr. Sittenfeld met UCE-1 and UCE-2. *Id.* ¶ 20. Mr. Sittenfeld said he was "ready to shepherd the votes as soon as" Project 1 came before the City Council. *Id.* He added that "I've already had [conversations] with my colleagues" about Project 1. *Id.* UCE-1 and UCE-2 provided Mr. Sittenfeld two checks for $5,000 each, *id.*—an amount within the legal limit on contributions from LLCs, *see* 52 U.S.C. § 30116(a)(1); 11 C.F.R. § 110.1—and Mr. Sittenfeld said that his name was "not connected to" the PAC, but the contribution "will, can certainly support and benefit me," Indictment ¶ 20.

On December 4, 2018, Mr. Sittenfeld talked to UCE-1 and said that the two checks apparently came from corporations, not LLCs. *Id.* ¶ 21. He asked UCE-1 to check with his "investors" and "give us the name" so that he could "double check to make sure the checks are from LLCs." *Id.* He did not cash the checks. *Id.* ¶ 39(e).

On December 17, 2018, Mr. Sittenfeld met UCE-1 and UCE-2 to receive replacement checks that complied with the LLC requirement. *Id.* ¶ 22. Mr. Sittenfeld thanked them for their contributions, and again expressed confidence in his political abilities with colleagues on both sides of the aisle, saying, "I can always get a vote to my left or a vote to my right." *Id.*

Later on December 17, Mr. Sittenfeld left CW a message thanking him for the introduction to UCE-1 and UCE-2, adding that he was "looking forward to doing what I can to help get [Project 1] across the finish line." *Id.* ¶ 23 (alteration in original).

## C. In Accordance With His Pro-Development Record, Mr. Sittenfeld Votes To Advance Project 1.

On March 14, 2019, UCE-1, and UCE-2 discussed Project 1 with Mr. Sittenfeld, noting that the project was "stuck in the City's Economic Development Department" because CW still needed a development partner. *Id.* ¶ 24. UCE-1 said he might try bringing Project 1 straight to

the City Council, and Mr. Sittenfeld responded: "let's do it." *Id.*

On May 2, 2019, Mr. Sittenfeld and CW spoke by phone about transferring Project 1 from the City to the Cincinnati Port Authority and agreed the transfer would be a positive development. *Id.* ¶ 25. Mr. Sittenfeld described himself as the "strategic piece to the downtown puzzle," stating that he "would be glad to champion" Project 1. *Id.* When UCE-1 called Mr. Sittenfeld on June 25, 2019, Mr. Sittenfeld similarly said that the transfer "was a good idea." *Id.*

On June 26, 2019, the City Council, including Mr. Sittenfeld, voted to approve the transfer of Project 1 from the City to the Port. *Id.* ¶ 26.

### D. Mr. Sittenfeld Again Rejects Illegal Contributions.

On July 8, 2019, Mr. Sittenfeld said to UCE-1 and UCE-2 that the transfer of Project 1 was "no sweat," and that he would nudge the City and the Port to "make haste on a development agreement." *Id.* ¶ 29. Beginning the second phase of the sting, UCE-2 asked Mr. Sittenfeld about possible statewide legislation that would allow a sports book to be run out of Project 1 while raising the barriers to competitors. *Id.* On September 19, 2019, Mr. Sittenfeld and UCE-1 spoke about their plans to meet and Mr. Sittenfeld said that he "wanted to be helpful with" Project 1. *Id.* ¶ 30.

On September 24, 2019, Mr. Sittenfeld and a staff member met UCE-1, UCE-2, and a third undercover agent (UCE-3). *Id.* ¶ 31. They discussed the possibility of legal sports betting in Project 1. *Id.* Mr. Sittenfeld said: "we got to make sure the sports betting thing goes through and the Cincinnati operation happens." *Id.* When the undercover agents asked Mr. Sittenfeld how to have a "controlled environment" for sports betting, Mr. Sittenfeld speculated they might be able to "use zoning code" or "some tool . . . within City limits." *Id.* UCE-3 said: "This is what I would like you to do. I don't mind what it costs. . . . So today, you hear me . . . we're gonna take care of you, not a problem. And then keep these guys (UCE-1 and UCE-2) in the

7

loop," to which the indictment alleges that Mr. Sittenfeld responded only: "yeah." *Id.* (alterations in original). After further discussion, UCE-3 gave Mr. Sittenfeld two checks. *Id.* ¶ 32. Mr. Sittenfeld replied to comments about the need for local control over gaming by saying he was "confident" of a solution, such as "zoning, bonding, other specs." *Id.*

On September 25, 2019, Mr. Sittenfeld followed up with UCE-1 to ensure that the previous day's checks complied with applicable legal requirements. *Id.* ¶ 33. He "was 'appreciative for your guys' generosity,'" but "needed to 'attribute each check to a name' for purposes of [Federal Election Commission] filings." *Id.*

On October 29, 2019, Mr. Sittenfeld met UCE-1 and UCE-2 to collect checks that complied with the relevant law. *Id.* ¶ 34. UCE-1 said he would send Mr. Sittenfeld the "names" and "which LLC he wanted them under." *Id.* Mr. Sittenfeld asked: "Where do you guys find these LLCs? Do I not want to know." *Id.* UCE-2 said: "Yeah, you probably don't." *Id.* Mr. Sittenfeld emphasized that the contributions had to "pass[] muster and" have "a person with a name," insisting on "real people, real LLCs," to which UCE-2 said "yes." *Id.* The group again discussed the sports-betting project and the prospect of *statewide* legislation, and UCE-1 stressed that "the first step of any of this is making sure [Project 1] goes through." *Id.* (alteration in original). Mr. Sittenfeld agreed on the importance of getting Project 1 through. *Id.*

Between November 2019 and February 2020, Mr. Sittenfeld spoke to the undercover agents by phone, saying that he was encouraging other Council members to support Project 1. *Id.* ¶ 35.

### E.  The Government Indicts Mr. Sittenfeld.

More than two years after the sting commenced, the government indicted Mr. Sittenfeld on six counts.  All of them assert that Mr. Sittenfeld's acceptance of contributions while

discussing his history of pro-development positions and assistance constituted bribery. Each count describes the conduct forming the basis for the charge by incorporating by reference the relevant factual allegations spelled out earlier in the indictment. *Id.* ¶¶ 36, 41, 43, 45, 47. Those factual allegations contradict and negate required elements of each offense. They refute, as a matter of law, the necessary explicit link between Mr. Sittenfeld's vote on Project 1 and the contributions. And apart from Mr. Sittenfeld's June 26, 2019 City Council vote to transfer Project 1 to the Port, which reflected his longstanding positions (not any quid pro quo)—the indictment alleges no specific and concrete official action that was promised that could support the charges. In short, the charged conduct is not a crime.

## LEGAL STANDARD

Whether the indictment's allegations state an offense is a question of law. Fed. R. Crim. P. 12(b)(3)(B). Dismissal is required if an indictment does not "assert facts which in law constitute an offense; and which, if proved, would establish *prima facie* the defendant's commission of that crime." *United States v. Rowold*, 429 F. Supp. 3d 469, 471-72 (N.D. Ohio 2019).

The indictment uses terms like "corruption" and "specific official action," but that is not enough where the charging instrument alleges specific facts that fail to constitute a crime. An indictment must allege "*facts* which in law constitute an offense." *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992) (emphasis added). Where "specific facts" negate an element or contradict the charge, dismissal is required. *See, e.g., United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) ("Although the Government is not required to set forth its entire case in the indictment, if the specific facts that are alleged fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation, the indictment fails to state an

offense."); *United States v. Landham*, 251 F.3d 1072, 1081-82 (6th Cir. 2001) (reversing district court's refusal to dismiss indictment charging criminal threats where the specific factual allegations made clear that a "reasonable observer" would not understand the defendant's alleged words as a threat).

## ARGUMENT

### I. THE HONEST SERVICES FRAUD CHARGES MUST BE DISMISSED.

The indictment's factual allegations fail to meet the stringent standards for honest services fraud, requiring dismissal of Counts 1 and 2. Section 1346 of Title 18 prohibits fraudulent schemes "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In *Skilling v. United States*, 561 U.S. 358, 408-09 (2010), the Supreme Court restricted Section 1346 to schemes to accept bribes or kickbacks in exchange for official action. In *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Court held that Section 1346 criminalizes the acceptance of benefits only if a public official makes or agrees to make a decision or take an action on an "identified," "specific," and "focused" "question or matter" that is "pending" or "may by law be brought" before him. *Id.* at 2368-74. And the act must be linked to the benefit: the official must "know[] that" the bribe "was given with the expectation that" he "would perform an 'official act' *in return*"—*i.e.*, a "*quid pro quo*." *Id.* at 2371 (emphasis added).

These holdings mean "the public official must agree that his official conduct will be *controlled* by the terms of the promise or the undertaking." *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (emphasis added). And the "official conduct" at issue cannot be the routine and ordinary business of governing: "setting up a meeting," "calling another public official," "hosting an event," "speaking with interested parties," or "expressing support" for a decision do

not qualify. *McDonnell*, 136 S. Ct. at 2368-72. To allow charges to proceed on such garden-variety political functions would expose the democratic system to overreaching and unfounded prosecutions. *Id.* at 2372-73.

Here, that is precisely the sort of criminalization of protected activity that the indictment charges. **First**, although the indictment labels Mr. Sittenfeld's conduct as "corruption," the facts it alleges show otherwise: they are inconsistent with any possible inference that Mr. Sittenfeld explicitly agreed that his official actions on Project 1 would be controlled by the contributions. Indeed, the indictment makes plain that Mr. Sittenfeld was *already* independently committed to pro-development positions. **Second**, most of the supposedly official actions in the indictment are not, in fact, "official actions" that can support a bribery charge under *McDonnell*, and thus the indictment fails to allege any offense based on them.

## A. The Indictment Fails To Allege An Explicit Quid Pro Quo Agreement.

The honest services fraud charges fail because the indictment's own factual allegations refute any suggestion that Mr. Sittenfeld agreed that the contributions would *control* his official actions. Because the allegations *disprove* an explicit quid pro quo, Counts 1 and 2 must be dismissed.

1. *Legal principles behind the explicit quid pro quo standard.* To avoid criminalizing routine political activity by elected officials, the government is required to plead a clear agreement for a quid pro quo. As the Supreme Court has explained, "campaigns must be run and financed," and candidates "constantly" solicit campaign funds "on the basis of their views and what they intend to do or have done." *McCormick*, 500 U.S. at 272. Legislators do not commit a federal crime, "when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after political contributions are solicited and received from those beneficiaries." *Id.* Rather, there must be "explicit" agreement that the

office holder's "official conduct will be *controlled* by the terms of the promise or undertaking." *Id.* at 273 (emphasis added); *accord Terry*, 707 F.3d at 612; *United States v. Blandford*, 33 F.3d 685, 696 & n.13 (6th Cir. 1994).

As *Blandford* explains, "explicit" in this context means "[c]*lear in understanding*," such that "the payor and payee were aware of" the "terms" "of the agreement between" them. 33 F.3d at 696 & n.13. Requiring an explicit quid pro quo to transform an otherwise lawful contribution into a bribe is essential to our system: any contrary rule would criminalize "conduct that in a very real sense is unavoidable" in a campaign for office. *McCormick*, 500 U.S. at 272. It would also transgress basic First Amendment, federalism, and due process principles.

*First*, political contributions are "political speech," and the First Amendment "give[s] the benefit of any doubt to protecting rather than stifling" that speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327, 360 (2010). When a public official seeks support for his campaign based on his record and platform, the First Amendment requires clear proof of an improper agreement. Otherwise, prosecutors could treat a routine feature of American democracy as a crime—even deploying undercover agents to create an illusory *appearance* of corruption.

*Second*, our federalist system curbs the reach of federal criminal statutes as applied to state and local officials. The federal government has no authority to "set[] standards of good government for local and state officials." *McDonnell*, 136 S. Ct. at 2373 (internal quotation marks and citation omitted); *see also, e.g.*, *United States v. Enmons*, 410 U.S. 396, 410-11 (1973) (rejecting "broad concept of extortion" that would lead to "an unprecedented incursion into the criminal jurisdiction of the States"). The ethics of elected officials should be regulated through administrative and ethical rules, not by federal prosecutors wielding broad criminal laws. *See*

*United States v. Sun-Diamond Growers*, 526 U.S. 398, 409-12 (1999); *McDonnell*, 136 S. Ct. at 2373.

*Third*, due process mandates that the government plead an explicit quid pro quo agreement. Public officials must be able to "arrange meetings for constituents, contact other officials on their behalf, and include them in events," or else they will be unable to "act appropriately on" constituents' concerns. *McDonnell*, 136 S. Ct. at 2372. A broad reading of bribery statutes would "cast a pall of potential prosecution over" "the most prosaic interactions" between officials and their constituents, leaving officials to "wonder whether they could respond to even the most commonplace requests for assistance," and leaving "citizens with legitimate concerns . . . [to] shrink from participating in democratic discourse," *id.* at 2372-73, or protected speech in the form of political contributions, *McCormick*, 500 U.S. at 272-74. To avoid sweeping in protected conduct, the Supreme Court has consistently construed corruption offenses narrowly, *see McDonnell*, 136 S. Ct. at 2372-73; *Skilling*, 561 U.S. at 408-11; *Sun-Diamond*, 526 U.S. at 406-12, including by allowing political contributions to be branded as bribes only "if the payments are made in return for an *explicit promise or undertaking* by the official to perform or not to perform an official act," *McCormick*, 500 U.S. at 273 (emphasis added) (Hobbs Act prosecution).

2. *The explicit quid pro quo standard forecloses the present charges.* Here, the specific facts alleged show only an office holder's promotion of his record, accomplishments, and planned actions when seeking or receiving contributions. That is not bribery, let alone the explicit quid pro quo agreement required for a criminal charge.

*Phase 1.* The first phase of the alleged scheme involved securing Council votes for Project 1. Indictment ¶¶ 9-23. The indictment's detailed factual allegations confirm that there

was no illicit agreement: Mr. Sittenfeld made clear his intent to take the alleged actions to promote Project 1 *independent* of the contributions from the undercover operatives.

Before any contributions were even mentioned, Mr. Sittenfeld favored Project 1's advancement. When CW said in October 2018 that Project 1 was "starting to heat up," Mr. Sittenfeld replied, "good." *Id.* ¶ 12. When CW first hinted at an improper exchange, Mr. Sittenfeld pushed back, saying he could not do that; he emphasized his record, describing how he had voted "in favor of every single development deal that's ever been put in front of me." *Id.* ¶ 14. And when he met the undercover agents for the first time on or about November 7, 2018, he merely showed them his "'political' data." *Id.* ¶ 15. That data showed why Mr. Sittenfeld was generally a "good bet[] and good investment[]" because the "voting data show[ed] that he is politically popular throughout Cincinnati, and . . . likely to be the next mayor." *Id.* These allegations establish that Mr. Sittenfeld sought support based on his popularity and positions. That is not a crime; if candidates cannot seek support based on their positions and likely electoral success, it is difficult to see how they can attract support at all. Nor does the purported agreement to "deliver votes," *id.* ¶ 16, change the analysis. Not only is persuasion of Council colleagues not an "official act," *see infra* Part I.B, it was linked here only to Mr. Sittenfeld's preexisting pro-development positions—not to contributions. That cannot amount to an *explicit* quid pro quo.

*Phase 2.* The second phase of the alleged scheme—where undercover agents importuned Mr. Sittenfeld to find a way to protect Project 1's possible sports-betting activity—fares no better. Indictment ¶¶ 28-35. The indictment alleges that Mr. Sittenfeld and the undercover agents discussed generic governmental acts that could insulate Project 1 from sport-betting competition in the same conversation as they discussed contributions. But the *simultaneous*

discussion of two topics does not support an inference of an explicit quid pro quo, as *McCormick* squarely held. 500 U.S. at 272 ("Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views *and what they intend to do or have done*," and Congress could not reasonably have made that activity a federal crime).

    3. *The absence of criminal conduct requires dismissal.* These flaws require the dismissal of the indictment. A case should not proceed when the factual allegations make clear that the indictment fails to charge a crime. *See United States v. Wilcox*, 2010 WL 55964 (W.D. Mich. Jan. 4, 2010) (dismissing one count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1), because indictment's factual allegations made clear that the conduct alleged to be fraudulent was not fraud within the meaning of the relevant statute). The government must charge a crime, and this indictment does not charge a criminal scheme to engage in honest services fraud. Accordingly, it must be dismissed. *See, e.g., Landham*, 251 F.3d at 1082-83 (holding that threat indictment that factually failed to allege a threat should have been dismissed).

## B. Aside From Mr. Sittenfeld's Own Vote, The Alleged Actions To Support Project 1 Are Not "Official Actions."

    Apart from Mr. Sittenfeld's own Council vote (for which no quid pro quo was properly alleged, *see supra* Part I.A.), the other activities allegedly discussed during the undercover sting meetings to support Project 1 do not qualify as "official acts" under *McDonnell*. 136 S. Ct. 2368-73. For this independent reason, if the Court does not dismiss all charges because of the absence of a quid pro quo, it must strike all allegations of purported official acts other than Mr. Sittenfeld's own vote. *See, e.g., United States v. Marlinga*, 2005 WL 517964, at *2-5 (E.D. Mich. Mar. 2, 2005) (citing Federal Rule of Criminal Procedure 7 to strike two portions of indictment charging that campaign contributions were illegal bribes because the allegations were irrelevant and potentially prejudicial); *United States v. Vastola*, 670 F. Supp. 1244, 1255 (D.N.J.

1987) (striking "narrative information in the preamble" that "contains irrelevant and vague language which may imply guilt by association or insinuate unalleged facts").

*First*, it is not a promise of an official act for Mr. Sittenfeld to say he could "deliver the votes" of other Councilmembers on Project 1. Indictment ¶¶ 15-17, 22. The indictment alleges that Mr. Sittenfeld could "talk to" his peers and that he was confident in his persuasive powers. *Id.* But *McDonnell* held that "calling another public official," "speaking with interested parties," and "expressing support" for a decision are not official actions. 136 S. Ct. at 2368, 2370-72. The charged acts here are even more clearly not "official actions" than in *McDonnell*: that case concerned an executive official, not a legislator attempting to persuade fellow legislators. An executive's influence over others can sometimes be official action. *See id.* at 2372. But a legislator like Mr. Sittenfeld can cast only his own vote. He can encourage, cajole or argue with his colleagues to vote one way or another. But what they do is up to them, notwithstanding his alleged statements of confidence in his abilities to persuade them. Legislators persuading other legislators to support legislation lies at the heart of our political system. As with "political logrolling"—"swapping one official act for another," *see United States v. Blagojevich*, 794 F.3d 729, 735-36 (7th Cir. 2015)—legislative persuasion does not deprive the citizens of a legislator's honest services; it constitutes honest services.

*Second*, the indictment alleges that Mr. Sittenfeld, when asked how to protect a hypothetical sports-betting operation from competition, said perhaps the "zoning code" or statewide legislation could be helpful. Indictment ¶¶ 29, 31. This allegation involves no "specific" and "identified" matter, let alone a concrete official act. *McDonnell*, 136 S. Ct. at 2369 (advancing a State's "economic development" is too nebulous to qualify as an "official action"). Besides, Mr. Sittenfeld has no official way to influence *statewide* legislation, nor could

16

the undercover agents reasonably think he did. *See supra* pp. 6-7.

*Third,* the indictment alleges that Mr. Sittenfeld continued to commit to "other potential official action to further Project 1." Indictment ¶¶ 28-35, 39(g). But the allegations do not deliver on this promise; they refer vaguely to zoning measures or "some tool . . . [to] create a controlled environment." *Id.* ¶ 31. They thus fail to allege anything "identified," "specific," or "focused." *McDonnell,* 136 S. Ct. at 2374. The allegations describing purported official acts other than Mr. Sittenfeld's own vote on Project 1 must therefore be struck.

## II. THE HOBBS ACT CHARGES MUST BE DISMISSED.

For the reasons above, the Hobbs Act charges, Counts 4 and 6, must be dismissed because the indictment fails to allege an explicit quid pro quo for a specific official act.

"The Hobbs Act criminalizes interference with interstate commerce by extortion (along with attempts or conspiracies to do so), and defines extortion as the obtaining of property from another, with his consent, . . . under color of official right," which "in the context of campaign contributions" requires proof of payments "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *United States v. Abbey,* 560 F.3d 513, 516 (6th Cir. 2009) (internal quotation marks and citations omitted). Like the honest services fraud charges, Counts 4 and 6 require "an *explicit* promise or undertaking by the official to perform or not perform an official act" "in return for" contributions. *McCormick,* 500 U.S. at 273 (emphasis added); *see also Evans v. United States,* 504 U.S. 255, 268 (1992). Because Counts 4 and 6 are predicated on and incorporate the same deficient factual allegations as Counts 1 and 2, they fail for the same reasons. *See* Indictment ¶¶ 43, 47.[2]

---

[2] Mr. Sittenfeld also objects to the indictment for its erroneous equation of bribery and under-color-of-official-right extortion. As Justice Thomas has explained, "extortion" under the Hobbs Act covers only the claim of right or acceptance of money or property "under the pretense

## III.   THE PROGRAM BRIBERY CHARGES MUST BE DISMISSED.

### A.  Section 666 Requires An Explicit Quid Pro Quo In The Campaign Context.

This Court must likewise dismiss Counts 3 and 5, which charge federal program bribery violations of 18 U.S.C. § 666(a)(1)(B) based on the same factual allegations. *See* Indictment ¶¶ 41, 45. As relevant here, Section 666 bars certain state and local officials from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any" government business. 18 U.S.C. § 666(a)(1)(B). In the context of Section 666 charges based on political contributions, the concerns underlying *McCormick*, *Terry*, and *Blandford* require the government to plead and prove facts that demonstrate an explicit quid pro quo agreement to accept contributions in exchange for specific official acts.

The Sixth Circuit has carved out political contributions from its general holding that Section 666 does not require a quid pro quo. *Abbey*, 560 F.3d at 521. *Abbey* recognized that the contribution context is "unique" in ways that affect Section 666's intent-to-be-influenced requirement because "*almost all lawful contributions are given to influence future legislative or executive actions.*" *Id.* at 516 (emphasis added). And *Abbey* pointed to *McCormick*'s quid pro quo requirement as necessary "to ensure that an otherwise permissible activity is not unfairly criminalized." *Id.* at 517; *see also, e.g.*, *Terry*, 707 F.3d at 613-14; *Blandford*, 33 F.3d at 693-97. Similarly, Section 666's intent-to-be-rewarded requirement must be construed to require a quid pro quo. *See United States v. Fernandez*, 722 F.3d 1, 20-26 (1st Cir. 2013). The "reward"

---

that the officer was entitled thereto by virtue of his office." *Ocasio v. United States*, 136 S. Ct. 1423, 1438 (2016) (Thomas, J., dissenting). Nothing of the kind is alleged here. Although this argument is foreclosed by *Evans*, Mr. Sittenfeld preserves it for possible appellate review.

wording simply "clarif[ies] that the *payment* of a bribe can occur after the act that is the subject of the bribe is completed." *Id.* at 23 (emphasis in original).

Ninety-one former state attorneys general agree that, in the context of contributions, Section 666 should require proof of an explicit quid pro quo. Amicus Br. for Former Attys. Gen., *Siegelman v. United States*, No. 09-182, 2009 WL 2943372, at *6-12 (U.S. Sept. 10, 2009). To the extent Section 666 contains any ambiguity, it must be construed to require an explicit quid pro quo in the contribution context. That interpretation is required by the rule of lenity, *see Skilling*, 561 U.S. at 410-11, and is necessary to avoid the fair notice, federalism, and First Amendment concerns addressed above. *See supra* pp. 12-13. Consequently, the Court must dismiss Counts 3 and 5 because the alleged facts fall short of an explicit quid pro quo.

**B. The Section 666 Charges Fail Because The Indictment Does Not Properly Allege Mr. Sittenfeld Acted With Corrupt Intent.**

Counts 3 and 5 must also be dismissed because the indictment's factual allegations are inconsistent with Section 666's requirement that Mr. Sittenfeld acted with "corrupt[]" intent. As *Abbey* explained, corrupt intent, even outside the political-contributions context, requires "an act done with an intent to give some advantage inconsistent with official duty and the rights of others." 560 F.3d at 520 n.7 (internal quotation marks omitted). Here, it means that the recipient "understands the payment as a bribe or gratuity." *Blagojevich*, 794 F.3d 729, 736. Although Counts 3 and 5 include the word "corruptly," Indictment ¶¶ 42, 46, that recitation is contradicted by the specific factual allegations making clear that Mr. Sittenfeld merely accepted contributions from those who purportedly supported him, while also supporting Project 1 as a matter of longstanding policy. That is consistent with ordinary lawful conduct; it is inconsistent with any notion that Mr. Sittenfeld performed his ordinary job duties with a corrupt intent. *See, e.g.*, *United States v. Rooney*, 37 F.3d 847, 854 (2d Cir. 1994) (reversing conviction and requiring

dismissal of Section 666 charge that could have "le[d] to the prosecution of a developer for simply negotiating the costs of construction and for driving hard bargains with federal funds at stake").

## IV. THE CHARGED STATUTES ARE VOID FOR VAGUENESS AS APPLIED.

Because the facts alleged in the indictment are inconsistent with core elements required to transform the routine receipt of political contributions into a federal bribery or extortion offense, all counts must be dismissed. But to the extent that this Court concludes that the statutes charged *could* be applied here, Mr. Sittenfeld argues that the statutes are unconstitutionally vague as applied to him. *See McDonnell*, 136 S. Ct. at 2375 (rejecting vagueness claim only because of the Court's narrow construction of the "official act" element); *United States v. Salisbury*, 983 F.2d 1369, 1377-80 (6th Cir. 1993) (multiple-voting statute was unconstitutionally vague as applied to the defendant).

### CONCLUSION

For the reasons in this memorandum, Mr. Sittenfeld respectfully requests that the Court (1) grant this motion and dismiss Counts 1-6 for failure to allege a valid explicit quid pro quo, or, in the alternative, (2) strike from the indictment all purported "official acts" (other than Mr. Sittenfeld's own vote) as invalid to support the charged crimes.

Respectfully submitted,

*/s/ Charles H. Rittgers*
Charles M. Rittgers
Charles H. Rittgers
Rittgers & Rittgers
12 East Warren Street
Lebanon, OH 45036
(513) 932-2115
charlie@rittgers.com

*Counsel for the Defendant*