## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**UNITED STATES OF AMERICA**

        **Plaintiff,**

    **v.**                         **Case No. 1:20–cr-142**
                                        **JUDGE DOUGLAS R. COLE**

**ALEXANDER SITTENFELD,**
    **a/k/a "P.G. Sittenfeld,"**

        **Defendant.**

## OPINION AND ORDER

The issue currently before the Court is not whether Alexander ("P.G.") Sittenfeld is innocent or guilty of the charges against him. Indeed, all agree that Sittenfeld is presumed innocent at this stage. Today's issue is narrower and more technical—namely, whether the Court should dismiss the Indictment (Doc. 3) against him on the grounds that it "fail[s] to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). For the reasons below, the Court concludes that the Indictment *does* state an offense, and thus **DENIES** Sittenfeld's Amended Motion to Dismiss the Indictment (Doc. 25).[1]

## BACKGROUND

At a 30,000-foot level, the facts alleged here involve a developer whose proposed project required Cincinnati City Council approval, but whose efforts to secure such approval had stalled for nearly two years. He then agreed to make (and

---

[1] This Opinion and Order also disposes of Sittenfeld's original Motion to Dismiss (Doc. 24). Because that Motion is substantively identical to Sittenfeld's Amended Motion to Dismiss (Doc. 25), the Court **DENIES** Sittenfeld's original Motion to Dismiss (Doc. 24) as **MOOT**.

get others to make) campaign contributions to a Council member, allegedly in exchange for help making those difficulties disappear. But before delving into the details, a word of caution: the allegations that follow in this section and throughout this Opinion and Order are just that—*allegations*. They are taken from the Indictment in this case, which contains only allegations—not *evidence*. The Court relies on those allegations here because the task before the Court is not to determine Sittenfeld's guilt or lack thereof, but rather to determine whether the Indictment, as alleged, is legally sufficient (i.e., states an offense or offenses). In undertaking that task, the Court must *assume* that the allegations in the Indictment are true, even though those allegations have not been (and might never be) proven true.

With that disclaimer, the Court now summarizes the facts alleged in the Indictment. The Indictment in this case outlines an undercover FBI operation spanning over a year. The sting unfolded in two phases. In the first phase, Sittenfeld allegedly agreed to "deliver" Cincinnati City Council votes for a real-estate-development project that had been awaiting City Council approval. (Indictment, Doc. 3, #32 ¶ 16). In the second phase, Sittenfeld allegedly agreed, again in exchange for campaign contributions, to facilitate legislative or regulatory changes that would enable legal sports betting at the development-project site, protected from competition. (*Id.* at #36 ¶ 31). This Opinion discusses each phase in turn.

## A.     Phase 1 of the Sting.

"Project 1" is a real estate development project located in downtown Cincinnati. A person whom the Indictment calls only "Cooperating Witness 1" ("CW") had a

financial interest in Project 1. He had been trying to develop the project since at least 2017. But, to do so, CW needed the Cincinnati City Council's formal approval.

In 2017, CW sent a letter to the City of Cincinnati requesting that the City enter a memorandum of understanding regarding the development of Project 1. When that didn't work, CW sought a development agreement with the City that would allow CW to develop Project 1. That didn't work either. Other efforts that CW undertook in 2017 and 2018 were likewise unavailing.

During this time, Alexander "P.G." Sittenfeld was an elected member of the Cincinnati City Council. On September 21, 2018, Sittenfeld contacted CW to request a $10,000 campaign donation in checks from multiple limited liability companies ("LLCs"). Sittenfeld was eager to receive the checks sooner rather than later because of an anticipated change in the law: before the November 6, 2018 general election, individuals were permitted to contribute $1,100 to Cincinnati candidates both individually and from as many LLCs as that individual owned. Issue 13 was placed on the ballot in 2018 in an effort to change that. It was a proposed Cincinnati Charter Amendment that would give individuals the choice of *either* giving up to $1,100 in campaign contributions individually *or* through an LLC, *but not* both or through multiple LLCs.

On or about October 26, 2018, less than two weeks before the 2018 election, CW spoke to Sittenfeld over the phone. CW informed Sittenfeld that Project 1 was "starting to heat up," to which Sittenfeld responded "good." (Indictment, Doc. 3, #29

3

¶ 12).[2] CW then said he knew two investors involved in Project 1 with access to capital and LLCs who could support Sittenfeld. But, unknown to Sittenfeld, these were not real investors. They were law enforcement agents posing as business partners of CW and financial supporters of Project 1. (The Indictment and this Opinion refer to these agent "investors" as UCE-1 and UCE-2.) Sittenfeld stated that he would love to meet with the Project 1 investors. Sittenfeld then mentioned that the law regarding LLCs was likely changing a week from next Tuesday, and that he would make himself available to meet with the investors before then. (*Id*.).

A few days later, on or about October 30, 2018, CW told Sittenfeld that UCE-1 would not be able to meet with Sittenfeld until November 7 or 8 (after the election). CW wanted to know if Sittenfeld was available to meet on one of those dates instead. Sittenfeld replied, "one challenge is that is obviously after … the deadline." (*Id*. at #29 ¶13). The "deadline" presumably referred to Election Day—the day that Issue 13 was expected to pass. Apparently understanding what Sittenfeld meant, CW offered to try to get others to support Sittenfeld financially.

Then CW raised Project 1. CW explained to Sittenfeld how another public official in Cincinnati was working against CW's efforts to strike a development deal with the City. (The Indictment and this Opinion refer to this other public official as "Public Official A.") Sittenfeld responded that he knew "a pretty good amount about it." (*Id*. at #30 ¶ 13). CW explained that because of this issue, he was trying to keep

---

[2] All dialogue in the Indictment is italicized, but this Opinion does not adopt that or several other formatting features of the Indictment. Apart from formatting, the quotes in this Opinion appear as they do in the Indictment unless indicated otherwise.

his name off the contributions. Sittenfeld responded that he had "obligations to do the things I needed to do [to] be a successful candidate," and that meant he wanted CW to support him financially. (*Id.*). Sittenfeld continued:

> But, I mean, the one thing I will say, is like, you know I mean, you don't want me to like, to be like, 'hey [CW], like, love you, but can't,' you know like; you know, look, I want, I want people to support me, that's like, if a candidate doesn't want people to support them, they're a shitty, dumb candidate. And, you know, I've been, obviously a lot of people have come through in a really big way and it's been awesome so far, and, I'd love, I'd love for you to be one of those people too.

(*Id.*). CW responded, "[w]e'll make something happen," to which Sittenfeld asked, "[y]ou can do it before LLC thing?" (*Id.*). (The Indictment doesn't say whether CW responded to this question.) Sittenfeld then listed several entities that had already contributed to him and said it would be "big" if CW could "round up five LLCs before next Tuesday." (*Id.*). After agreeing to meet CW and the investor for lunch on November 7, 2018, Sittenfeld told CW, "and then you're gonna deliver the goods before next Tuesday." (*Id.*).

On or about November 2, 2018, CW called Sittenfeld with some good news and some bad news. The bad: CW and UCE-1 would not be able to deliver the LLC checks before Election Day. The good: CW could get Sittenfeld $20,000 over the next few weeks, with $10,000 in the first week. But there was a caveat, explained CW: if the investors were going to pay Sittenfeld $10,000 by the next week,[3] they would want to

---

[3] The Indictment first says that CW told Sittenfeld he could get him $10,000 by "next week." (Indictment, Doc. 3, #30 ¶ 14). But on the next line of the Indictment, it indicates that CW told Sittenfeld he could get him the money by "this week." (*Id.*) The Indictment's switch to "this week," was likely a typo, however, because this discussion between CW and Sittenfeld occurred on Friday, November 2, 2018 and was referring to a meeting that occurred on Wednesday, November 7, 2018.

know that, for Project 1, it was "gonna be a yes vote, you know, without … a doubt."

(*Id.* at #30 ¶ 14). Sittenfeld allegedly responded:

> you know, obviously nothing can be illegal like … [legally][4] nothing can
> be a quid pro quo. And I know that's not what you're saying either. But
> what I can say is that I'm always super pro-development and
> revitalization of especially our urban core … And we can, we, we, we can
> discuss that more in person. But I'm not, I'm not sure; in seven years
> I've voted in favor of every single development deal that's ever been put
> in front of me.

(*Id.* at #30–31 ¶ 14). Sittenfeld then discussed meeting with CW's investors, stating

he would like five minutes to walk them through some of his "voting data" so they

could appreciate his "starting point." (*Id.* at #31 ¶ 14). Sittenfeld continued: "my

sense, is that it will give them some comfort … [t]hese guys want to know, I mean

look, people want to invest in a winning endeavor right? And I want to, I want [to]

give them the confidence and the comfort that that's what they're doing." (*Id.*).

The in-person meeting happened less than a week later. On or about November

7, 2018, Sittenfeld met CW and UCE-1 for lunch at a downtown Cincinnati

restaurant. During the meeting, they discussed the type of development agreement

that CW was looking for from the City for Project 1. Sittenfeld then said to UCE-1,

"you like making good bets and good investments," and proceeded to present UCE-1

his voting data. (*Id.* at #31 ¶ 15). The data showed that he was politically popular

throughout Cincinnati and that he was likely to be the next mayor. Sittenfeld told

UCE-1 that every successful developer and business leader in Cincinnati had

---

[4] The transcript reports the word as "illegally," but that would make no sense in context. The Court treats that as a transcription error, or an error in copying the transcript into the Indictment.

"already placed their bet" with him. (*Id.*). UCE-1 reiterated his interest in making Project 1 "veto proof," and Sittenfeld replied, "I can move more votes than any single other person, including [Public Official A]." (*Id.* at #31–12 ¶ 15).

Following lunch, Sittenfeld and UCE-1 walked to a private location where they continued to discuss Project 1. UCE-1 explained to Sittenfeld that CW's issues with Public Official A were causing UCE-1 some concerns. UCE-1 told Sittenfeld that UCE-1 wanted enough City Council support for Project 1 to guarantee that Public Official A could not veto the development agreement. He then offered Sittenfeld $20,000 "to get that deal." (*Id.* at ¶ 16). Sittenfeld responded, "[h]onestly, I can, I can deliv-, I can sit here and say, I can deliver the votes." (*Id.*). Sittenfeld further stated that he would "talk to Public Official A about it directly." (*Id.*).

UCE-1 then asked Sittenfeld how he wanted to receive the money. Sittenfeld initially proposed receiving eighteen LLC checks for $1,000 each before December 1. But he also mentioned that he had a PAC "that … no one's like snooping around in who's giving that there," and that a lot of people didn't even know he had it. (*Id.*). And any LLC or individual could give up to $5,000 to that PAC. But UCE-1 still had concerns about contributions in his name and LLC checks being traced back to him. Eventually, he and Sittenfeld agreed that the initial $10,000 out of the $20,000 would be paid in money orders attributed to other individuals' names. After they discussed getting the money to Sittenfeld by the last week in November, they allegedly had the following conversation:

Sittenfeld: Yea, no I appreciate it.

7

> UCE-1: 'Cause like I said, [Cooperating Witness] wants to get that development agreement you know and so if you can …
>
> Sittenfeld: We're gonna make it, we're, we're gonna make it happen
>
> UCE-1: If you can pull those votes together that's awesome
>
> Sittenfeld: Yea, yea, yea, we, we definitely can …

(*Id.* at #32–33 ¶ 17).

Sittenfeld and UCE-1 spoke again (this time, over the phone) on or about November 21, 2018. During the call, Sittenfeld suggested that UCE-1 should provide the money to a PAC that would benefit him but which his "name [was] not connected to." (*Id.* at #33 ¶ 18). Sittenfeld reassured UCE-1 that if the money went there instead of to his campaign directly, nothing about it would "ever be connected to [Sittenfeld] and no one will, you know, no one's going to be poking around for it to find" UCE-1's name on it. (*Id.*). The other advantage about the PAC, Sittenfeld explained, was that the campaign financing laws that governed it were not as strict as they were for direct campaign contributions. (*See id.*).

On November 28, 2018, Sittenfeld met UCE-1 and UCE-2 at a private location in downtown Cincinnati. The purpose of the meeting was for Sittenfeld to collect two checks for $5,000 each from UCE-1. During the meeting, Sittenfeld asked whether the UCEs had any new information about Project 1. He then stated:

> Look, I'm ready to shepherd the votes as soon as it gets to us at council. Just a matter of, and by the way, I mean if, if, like the Law Department is ever being sluggish drafting up the ordinances or anything. I can give a [sic], but at this point I'm kind of in like waiting mode until it gets to our part of the, part of the process

8

(*Id.* at #34 ¶ 20). Sittenfeld went on to state, "It's gotta happen, I mean, I've already, in the conversation I've already had with my colleagues …." [the Indictment does not include the rest of this quote] (*Id.*). Later in the conversation, UCE-1 provided Sittenfeld with two checks of $5,000 each.

On December 17, 2018, Sittenfeld met UCE-1 and UCE-2 again at a private location in downtown Cincinnati. The purpose of the meeting was to provide Sittenfeld with four checks, again in the amount of $5,000 each. Two of the checks were to replace the two $5,000 checks previously paid to Sittenfeld because those checks were from corporations and not from LLCs. Sittenfeld thanked UCE-1 after UCE-1 provided him the checks: "All, all a big help. No, this is huge." (*Id.* at ¶ 22). Then, shortly after Sittenfeld placed the four checks in his jacket pocket, Sittenfeld stated, "don't let these be my famous last words, but I can always get a vote to my left or a vote to my right." (*Id.*).

That night, Sittenfeld called CW and left the following voice message:

[CW], what's going on brother, PG. I just wanted to let you know how much I have really enjoyed getting to know [UCE-1] and [UCE-2]. No, uh, no surprise that you attract great dudes and talented investors and partners. But uh, looking forward to doing what I can to help get [Project 1] across the finish line. So, uh, never hesitate to reach out. Let me know how I can be helpful on that front. Talk to you soon my man.

(*Id.* at #35 ¶ 23).

In the following months, Sittenfeld discussed the progress of Project 1 with the UCEs several times. During one such meeting, on or about March 14, 2019, they discussed Project 1 being stuck in the City's Economic Development Department until CW found a development partner. When UCE-1 said they might have to bring the

project straight to the City Council, Sittenfeld responded, "let's do it." (*Id.* at #35 ¶ 24).

In the first half of 2019, they discussed and agreed that transferring the property associated with Project 1 from the City to the Port would help their development efforts. During one of these conversations, Sittenfeld told CW that he had been the "strategic piece to the downtown puzzle" and "would be glad to champion [Project 1]." (*Id.* at ¶ 25). On or about June 26, 2019, Cincinnati City Council voted to approve the transfer of Project 1 from the City to the Port. Sittenfeld voted in favor of the transfer.

## B. Phase 2 of the Sting.

Even after the transfer, CW continued to have difficulty negotiating a development agreement for Project 1, although now the difficulty was with Port officials, rather than the City Council. On or about July 8, 2019, UCE-1 and UCE-2 met with Sittenfeld. During the meeting, Sittenfeld stated that the approval of the transfer to the Port had been "no sweat." (*Id.* at #36 ¶ 29). He also assured the UCEs that he would nudge the City and the Port to "make haste on a development agreement." (*Id.*). UCE-2 and Sittenfeld also discussed another topic that could contribute to Project 1's success—namely, pending statewide legislation that would allow the UCEs to run a sports book out of Project 1, while increasing barriers of entry for competitors likewise looking to operate a sports book.

On or about September 24, 2019, Sittenfeld met UCE-1, UCE-2, and a third individual posing as a business partner and the boss of UCE-1 and UCE-2: UCE-3.

Like the other UCEs, UCE-3 was really an undercover law enforcement agent. The purpose of the meeting was to discuss placing a legal sports wagering facility within Project 1. After UCE-3 entered the room, Sittenfeld stated, "[UCE-3], we got to make sure the sports betting thing goes through and the Cincinnati operation happens." (*Id.* at #36 ¶ 31).

Sittenfeld and the UCEs also followed up on the earlier discussion regarding ways of obtaining a "controlled environment" for sports betting in Cincinnati. Rather than focusing on state legislation, though, the discussion focused on how that protection could be created at the City level. During that discussion, Sittenfeld said:

> So like you can use zoning code, you know, and be like something you know, we will only let this activity occur in places zoned for x, y, you know I mean, I'm just, I'm confident there's some tool that if really need be within City limits could create a controlled environment.

(*Id.* at #36–37 ¶ 31).

UCE-3 made clear that he wanted Sittenfeld's help in creating such a "controlled environment." He told Sittenfeld, "[t]his is what I would like you to do. This is what I would like you to do. I don't mind what it costs … So today, you hear me … we're gonna take care of you, not a problem. And then keep these guys [UCE-1 and UCE-2] in the loop." (Id. at #37 ¶ 31). Sittenfeld replied, "yeah." (*Id.*).

After Sittenfeld continued to discuss ways the City of Cincinnati could assist with Project 1, UCE-2 provided Sittenfeld with two $5,000 checks paid to the order of the PAC, while promising two more checks in the future, and Sittenfeld expressed his appreciation. The conversation continued with further discussion of what Sittenfeld could do as a City Council member "to advance the project through local control over

11

aspects of gaming." (*Id.* at ¶ 32). Sittenfeld agreed the City could provide a solution, stating, "[t]hat's the kind of thing, again, like you know, my mind goes to zoning, bonding, other specs." (*Id.*).

On or about October 29, 2019, Sittenfeld again met UCE-1 and UCE-2 at a private location in downtown Cincinnati. During the meeting, UCE-1 gave Sittenfeld the additional $5,000 checks that UCE-3 had promised. After UCE-1 provided the two checks to Sittenfeld, the following conversation ensued:

> UCE-1: I'll send you the names. I forgot to ask him [UCE-3] which LLC he wanted them under and I'll, I'll figure it out. I don't know even where they …
>
> Sittenfeld: Where do you guys find these LLCs? Do I not what to know?
>
> UCE-2: Yeah, you probably don't
>
> Sittenfeld: As long as it's like …
>
> UCE-2: Yeah, it'll pass, it'll pass the muster test
>
> Sittenfeld: As long as it passes muster and like a person with a name. My political enemies, like, not to freak you guys, but they like, they like poke around this shit.

(*Id.* at #38 ¶ 34).

Sittenfeld proceeded to discuss with the UCEs issues relating to local regulation of sports betting given certain proposed statewide legislation that was pending. During this discussion, UCE-1 stressed that "the first step of any of this is making sure [Project 1] goes through"; Sittenfeld responded, "Yea, the, the, the, the, the deal, of course, of course." (*Id.*). Later in the conversation, Sittenfeld again agreed that the most important thing was getting Project 1 through. And over the next

several months, from November 2019 to February 2020, Sittenfeld indicated to UCEs in recorded calls that he continued to pressure public officials to strike a development agreement for Project 1. (*Id.* at ¶ 35).

The grand jury eventually indicted Sittenfeld on (1) two counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 (Counts 1 and 2), (2) two counts of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (Counts 3 and 5); and (3) two counts of attempted Hobbs Act extortion under color of official right in violation of 18 U.S.C. § 1951(a), (b)(2) (Counts 4 and 6).

Sittenfeld filed a Motion to Dismiss (Doc. 24), and then an Amended Motion to Dismiss (Doc. 25), all six charges in the Indictment. The government filed an opposition (Doc. 28), and Sittenfeld a reply (Doc. 46). In seeking dismissal, Sittenfeld makes four arguments, each of which applies to one or more of the charges in the Indictment. First, he says that the government has failed to sufficiently allege an express quid pro quo, which he claims is a necessary element of all six counts asserted against him. Thus, that failure requires dismissal of the entire Indictment. Second, as to the honest services fraud charges (Counts 1 and 2) and Hobbs Act claims (Counts 4 and 6), Sittenfeld claims that, beyond allegations relating to Sittenfeld's own vote on Project 1, the Indictment fails to sufficiently allege any "official acts," which are a necessary element of the two alleged crimes. Third, Sittenfeld claims that the federal bribery charges (Counts 3 and 5) also fail for lack of sufficient allegations of "corrupt intent." And finally, he argues, almost in passing, that if the case can proceed forward

13

on what constitute, in his view, the very limited set of facts included in the Indictment, then the statutes are all void for vagueness.

The Court heard oral argument on the Motion on February 16, 2021. The Motion is now ripe for this Court's decision.

## LEGAL STANDARD

Whether an indictment states an offense is a question of law for the Court. *See* Fed. R. Crim. P. 12(b)(3)(B)(v); *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992). The requirement that an indictment state an offense stems from both the Constitution, *see* U.S. Const. amend. V–VI, and the Federal Rules of Criminal Procedure, *see* Fed. R. Crim. P. 7(c)(1). The primary purpose of the requirement is to ensure that the accused is informed "of the nature and cause of the accusation." U.S. Const. amend. VI. But it also helps effectuate the separate requirements (1) that a case proceeds against the accused only on crimes that have been presented to the grand jury, and (2) that an accused person shall not be subject to double jeopardy—i.e., successive prosecution for the same conduct. *See* U.S. Const. amend. V.

In terms of the required contents for a valid indictment, little has changed since *Hamling v. United States*, 418 U.S. 87, 117–18 (1974). In language that remains apropos today, the *Hamling* Court noted that the test for sufficiency includes both a legal and a factual component:

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. It is

14

> generally sufficient that an indictment set forth the offense in the words
> of the statute itself, as long as those words of themselves fully, directly,
> and expressly, without any uncertainty or ambiguity, set forth all the
> elements necessary to constitute the offence intended to be punished.
> Undoubtedly the language of the statute may be used in the general
> description of an offence, but it must be accompanied with such a
> statement of the facts and circumstances as will inform the accused of
> the specific offence, coming under the general description, with which
> he is charged.

*Id.* (quotations omitted). In other words, from a legal perspective, the indictment

must "contain[]," either directly or indirectly, the "elements of the offense charged,"

*United States v. Lee*, 919 F.3d 340, 349 (6th Cir. 2019) (quoting *Hamling*, 418 U.S. at

117), which typically can be set forth "in the words of the statute itself." *Hamling*,

418 U.S. at 117. An indictment that meets that requirement provides the defendant

notice of the charge against him (i.e., informs him of the elements that the

government would need to prove in order to convict him).

But as *Hamling* also noted, "fairly inform[ing] a defendant of the charge

against" him, 418 U.S. at 117, implicates factual considerations, as well. To be fairly

informed, a defendant must not only know the elements of the offense the government

has charged, but also have at least some understanding of "the facts and

circumstances" the government intends to rely on in establishing that element as to

that defendant—what *Hamling* calls the "specific offence"—so the defendant can

begin to prepare his defense, and also so that the defendant can know whether a

future prosecution violates double jeopardy by seeking to attack the same conduct

again.

That said, exactly *how much* factual information an indictment must provide

in order to satisfy the "specific offence" requirement is not an entirely straightforward

matter. *Superior Growers Supply* says that "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." 982 F.2d at 177; *accord United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001).

But there is little case law discussing exactly what "prima facie" means in this context. And, depending on how one understands that phrase, a prima-facie-case requirement is not much of a hurdle. After all, an indictment that says "the crime consists of performing acts A, B, and C, and defendant performed each of those acts" is to some extent an "assertion of facts" that "constitutes an offense"—it asserts that, as a matter of fact, the defendant performed each of acts A, B, and C, which under the statute is an offense. To be sure, such a statement is at best a general assertion of those facts, but neither *Superior Growers Supply*, nor *Landham*, nor any other case to which the parties have pointed, says much about the requisite level of specificity. And many Sixth Circuit cases suggest that not much is required. As long as an indictment is "accompanied by such facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged," that is sufficient. *United States v. McAuliffe*, 490 F.3d 526, 533 (6th Cir. 2007); *see also Lee*, 929 F.3d at 354 (holding that the indictment "contain[ed] sufficient facts" because it "notif[ied] Defendant of the charges against her and enable[d] her to plea double jeopardy if charged for the same crime and facts in a future proceeding"); *United States v. Olive*, 804 F.3d 747, 753 (6th Cir. 2015) ("An indictment is sufficient if it contains the elements of the charged offense and thereby

16

informs the defendant of the charges against him. It must also be specific enough to allow him to plead an acquittal or conviction as a bar to future prosecutions for the same offense."); *United States v. Bradley*, 917 F.3d 493, 504 (6th Cir. 2019); *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.") (alteration in original) (quoting *Hamling*, 418 U.S. at 117).

It appears the only additional information the specific offense requirement mandates is some indication of the relevant time period—when the alleged criminal conduct occurred. In *Anderson*, for example, the court observed that the "indictment clearly tracked the language of the statute." 605 F.3d at 411. That, the court held, was enough to satisfy *Hamling's* first requirement that the indictment contain "the elements of the offense charged and fairly inform[] [the] defendant of the charge against which he must defend." *Anderson*, 605 F.3d at 411 (quoting *Hamling*, 418 U.S. at 117). Then, the court noted that the indictment "included the relevant time period and the specific event that triggered the charge against [the defendant]." *Id.* According to the court, that satisfied *Hamling's* second requirement—that the indictment enable the defendant to plead double jeopardy in a future prosecution. *Id.* Because both of *Hamling's* requirements were satisfied, the court held that the Indictment sufficiently stated an offense. *Id.*

17

A Third Circuit case on which Sittenfeld relies, *United States v. Huet*, 665 F.3d 588 (3d Cir. 2012), suggests much the same standard. According to *Huet*, an indictment need only assert that the defendant performed each of the required statutory elements, and then state the time period during which that allegedly happened:

> Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of the violation under the statute, and specifies the time period during which the violations occurred.

*Id.* at 595.

The government argues for something like that standard here, which it claims the Indictment easily meets. (*See* Govt. Br., Doc. 28, #185 ("Because only notice of the charges is required, the government need not allege in the indictment the elements of proof (as opposed to the elements of the offense), and the Court may not assess the sufficiency of the evidence.") (quotation omitted)).

For his part, Sittenfeld does not seem to challenge that basic standard for specificity so much as he seeks to take advantage of an additional rule that he claims arises when the government goes beyond the type of "barebones" indictment described above. In other words, Sittenfeld largely concedes that, had the government merely set forth the statutory elements for the various charges, and then stated the time period during which Sittenfeld allegedly engaged in that conduct, that may well have been sufficient.[5] But, Sittenfeld notes, the government went further than that

---

[5] That is not to say that Sittenfeld does not challenge the standard at all. He seems to suggest that, where, as here, the conduct at issue (offering and accepting campaign contributions) is a constitutionally protected activity, there may be a greater requirement for specificity in the

here. It presented the Grand Jury with a "speaking indictment" that included a substantial number of additional facts beyond those that would appear to be required under *Hamling*. When faced with such a speaking indictment, Sittenfeld claims, the Court should subject it to a more exacting standard: "[W]here an indictment goes beyond reciting the elements of an offense and relies on particular factual allegations, the indictment must be dismissed if those factual allegations are legally insufficient or inconsistent with the alleged offense." (Sittenfeld Reply, Doc. 42, #331). Sittenfeld claims to find this standard in cases such as *Huet* and *Landham*.

The Court's concern with Sittenfeld's argument is twofold. First, the Court is unaware of any authority in the Sixth Circuit (or elsewhere) that explicitly recognizes this asserted distinction between a "speaking indictment" and a "non-speaking indictment." Sittenfeld has not pointed to any, though he argues that the distinction finds implicit support in cases such as *Huet* and *Landham*. The second problem is that Sittenfeld's argument incorrectly merges two distinct concepts—"legally insufficient" and "inconsistent with." That difference matters. The Court concludes that Sittenfeld is correct that an indictment is invalid if the factual allegations are "inconsistent with" the alleged offense. But the Court disagrees that an indictment is invalid merely because the factual allegations are "insufficient," in and of themselves, to show that the offense occurred.

Because the Court concludes this distinction is important, it merits a few more words. Essentially, this Court holds that something like the outdated *Conley v.*

---

indictment than would be the case for other types of crimes. As described below, to the extent greater specificity is required, that standard is met on the allegations here.

*Gibson*, 355 U.S. 41 (1957), standard from the civil context applies to criminal complaints. Under *Conley*, a civil plaintiff could defeat a motion to dismiss so long as the complaint set forth a valid legal theory, and there was some set of facts consistent with those in the complaint, under which the plaintiff could prevail. *Id*. at 45–46. A plaintiff's claim was subject to dismissal only if the facts alleged in the complaint showed, as a matter of law, that the plaintiff could not prevail on his or her claim.

The Court concludes that a similar standard applies to indictments. If the government alleges facts showing that, as a matter of law, the charged crime did *not* occur, then the indictment is invalid. Take *Landham*, for example. There, as to one of the counts at issue, the government would have needed to prove that the defendant had threatened to "kidnap" someone. *See* 251 F.3d at 1080. But the *only* someone at issue in that case was the defendant's daughter (there was a custody dispute), and under Kentucky law at the time, as the court noted, it was legally impossible to kidnap your own child. *See id.* at 1081. Similarly, the second offense there required a "threat." *See id.* But the indictment made clear that the sole statement at issue was a single statement that referred to *past* events, and thus as a matter of law could not constitute a *threat* (which refers to future events). *See id.* As to both of these offenses, then, factual allegations used to describe the "specific offence," *see Hamling*, showed that the government was "legally incapable" of prevailing on the charge. *Landham*, 251 F.3d at 1081; *see also United States v. Enmons*, 93 S. Ct. 1007 (1973) (indictment charging Hobbs Act extortion failed because the alleged conduct unequivocally fell outside the scope of the Act as a matter of law).

20

True, Sittenfeld also cites a few district-court cases where courts dismissed indictments as insufficient because either: (1) the indictments failed entirely to allege facts relating to essential elements of the charged offenses, *see United States v. Pimenta*, No. CV 14-649 (ES), 2015 WL 6502098, at *4 (D.N.J. Oct. 27, 2015); *United States v. Smith*, No. 3:08-CR-31-JMH, 2011 WL 2417051, at *3 (E.D. Ky. June 13, 2011); or (2) to the extent they alleged such facts, those facts were conclusory, *see United States v. Webb*, 24 F. Supp. 3d 432, 439–40 (M.D. Pa. 2014). But two observations. First, such cases appear inconsistent with the overwhelming weight of Sixth Circuit authority discussed above. *See McAuliffe*, 490 F.3d at 533; *Lee*, 929 F.3d at 354; *Olive*, 804 F.3d at 753; *Bradley*, 917 F.3d at 504; *Anderson*, 605 F.3d at 411. They also seem contrary to *Huet*, 665 F.3d at 595, which *Pimenta* and *Webb* purported to apply. Second, even were the Court to adopt Sittenfeld's suggested standard, it wouldn't do Sittenfeld much good. As explained below, the factual allegations in the Indictment are nowhere near as meager as those at issue in such cases.

In short, the Court concludes that Sittenfeld is correct that an indictment is subject to dismissal where it alleges conduct "inconsistent with" the charged crime (i.e., conduct that shows that the crime did *not* occur). But the Court does not agree that an indictment is invalid merely because the specific facts that it sets forth are insufficient, in and of themselves, to unequivocally show that a crime *did* occur.

That distinction makes sense. If the government has pled itself out of court— i.e., alleged facts showing that the charged crime necessarily did not occur—then it only makes sense to nip a case in the bud. There are no additional facts that the

21

government could introduce in such a case that would overcome the fatal flaw that the allegations themselves create. But, where the concern is that there are not yet *enough* facts in a speaking indictment, the same result does not follow. Even if the indictment is "light," that does not foreclose the possibility that the record, by the time the matter goes to a jury, will contain enough evidence to support a conviction.[6]

Structural considerations also support a deferential standard for judicial review of an indictment. When the government charges a defendant by indictment, a grand jury has already seen at least some of the government's evidence and concluded that probable cause exists to believe the defendant is guilty of the charges. That is important, as the grand jury acts "independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218 (1960). It is not assigned "to any of the branches" of government, but rather "is a constitutional fixture in its own right." *United States v. Williams*, 504 U.S. 36, 47 (1992) (quotation omitted). Accordingly, the grand jury is designed to serve "as a kind of buffer or referee between the government and the people." *Id.* This additional layer of protection perhaps explains why the Supreme Court has said that "[a]n indictment returned by a legally constituted and unbiased grand jury … is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). And it may also help

---

[6] There is perhaps one additional exception. If an indictment says "these are the facts, and there are no more," then it may be appropriate for the Court to ask whether the facts in the indictment, if proven, would suffice, in and of themselves, to show that the charged crime occurred. *See, e.g.*, *United States v. Ali*, 557 F.3d 715, 719–20 (6th Cir. 2009); *United States v. Levin*, 973 F.2d 463, 469–70 (6th Cir. 1992); *see also United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir.1998). But that is because in such a case the government has admitted, in the allegations in the indictment, that the indictment represents the full extent of its case.

explain why pleading standards are in some ways lower in criminal cases than they are in civil cases. *United States v. Rodriguez-Rivera*, 918 F.3d 32, 34 (1st Cir. 2019) (noting that the plausibility standard that now applies to civil complaints does not apply to criminal indictments).

In any event, the approach the Court applies to the task at hand is determining (1) whether the Indictment has alleged the statutory elements of each charged crime, and has included enough factual detail to satisfy *Hamling*'s specific-offence requirement (which isn't much, *see McAuliffe*, *Lee*, *Olive*, *Bradley*, *Anderson*, and *Huet*), and then (2) whether in adding facts to the Indictment, the government has included facts showing that the government cannot prevail on one or more of the charges in the indictment. As described below, the Court concludes that the Indictment sufficiently alleges the charged crimes under that standard.

## LAW AND ANALYSIS

While the Indictment contains six counts, those counts consist of two violations each of three separate statutes—honest services fraud, Hobbs Act extortion, and Section 666—all based on Phase 1 and Phase 2 of the sting operation. As to the honest services fraud and Hobbs Act charges, Sittenfeld's arguments for dismissal are basically identical. Thus, the Court addresses both statutes together. The Court then separately considers the Section 666 charge, before turning to Sittenfeld's constitutional arguments.

A.     **The Indictment States Honest Services Wire Fraud and Hobbs Act Extortion Charges.**

**1. General principles**

Sittenfeld argues that the honest services fraud and Hobbs Act charges against him require the government to plead facts demonstrating an explicit quid pro quo—"the receipt of something of value 'in exchange for an official act.'" *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (quoting *United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999)). Because, in Sittenfeld's view, the Indictment fails to allege an explicit quid pro quo, he contends that these charges are legally defective.[7] The government, on the other hand, maintains that the Indictment alleges facts demonstrating an explicit quid pro quo.

Some foundational principles inform the Court's analysis of this issue: It is a standard feature of our democracy that legislators "serve constituents and support legislation that will benefit" constituents. *McCormick v. United States*, 500 U.S. 257, 272 (1991) (alterations omitted). Yet another feature is that "[m]oney is constantly being solicited on behalf of candidates who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *Id.* That "everyday business" of American political life, the Supreme Court has held, cannot constitute a crime. *Id.* To hold otherwise would be to criminalize conduct that "in a very real sense is unavoidable so long as election campaigns are financed by private

---

[7] As described below, Sittenfeld also contends that the Section 666 charges require the government to prove this element. Because the analysis is somewhat different there, the Court considers that argument separately below.

24

contributions or expenditures"—the way they have been financed "from the beginning of the Nation." *Id.*

That said, there is a very real line between legitimate solicitation and bribery. *Id.* at 273. It is the role of our public-corruption statutes to police that line. But, in undertaking those policing efforts, courts have articulated requirements designed to ensure that those statutes do not (even inadvertently) sweep a wide swath of routine political behavior into their purview. One such requirement is that, where campaign contributions are involved, the government must prove the existence of an explicit quid pro quo to convict someone of bribery for honest services fraud or Hobbs Act extortion. In other words, the government must demonstrate that the contributions were made and received "in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* "In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *Id.*

Over time, the Supreme Court and other courts have fleshed out what this means. The Sixth Circuit, for example, has held that "no affirmative step towards the performance of the public official's promise need be taken." *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994). Put another way: "fulfillment of the quid pro quo is not an element of the offense." *Id.* The public official need only "agree that 'his official conduct will be controlled by the terms of the promise or the undertaking.'" *Terry*, 707 F.3d at 612. "So long as a public official agrees that payments will influence an official act, that suffices." *Id.* at 613. The official need not even *intend* to perform

25

the official act. *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016).[8] "What is needed is an agreement, full stop, which can be formal or informal, written or oral." *Terry*, 707 F.3d at 613.

The Sixth Circuit has further clarified what *McCormick* meant by the need to establish an "explicit" quid pro quo. "Explicit," explained the Sixth Circuit, "speaks not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated." *Blandford*, 33 F.3d at 696. "Put simply … by 'explicit' *McCormick* did not mean 'express.'" *Id.* The court then contrasted the dictionary definitions of the words, noting that "explicit" meant: "[n]ot obscure or ambiguous, having no disguised meaning or reservation. *Clear in understanding.*" *Id.* at 696 n.13 (alteration and emphasis original) (quoting Black's Law Dictionary 579 (6th ed. 1990)). "Express," on the other hand, meant "[d]eclared in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference. Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct." *Id.* (emphasis omitted) (quoting Black's Law Dictionary 580 (6th ed. 1990)).

It makes sense that the public-corruption statutes do not incorporate the above definition of "express." Otherwise, "the law's effect could be frustrated by knowing winks and nods." *United States v. Evans*, 504 U.S. 255, 274 (1992) (Kennedy, J.,

---

[8] Notably, *McDonnell* also said that the agreement need not be "explicit." 126 S. Ct. at 2371. But this Court does not read the Court's statement as overruling *McCormick*'s explicitness requirement. That is because the explicitness requirement in *McCormick* was grounded, at least in part, on the fact that *McCormick* dealt with campaign contributions. That was not the case in *McDonnell*, which dealt with gifts.

26

concurring in part and concurring in the judgment). To avoid that problem, as the Seventh Circuit has aptly noted, "'Nudge, nudge, wink, wink, you know what I mean' can amount to" a Hobbs Act or honest services fraud violation, "just as it can furnish the gist of a Monty Python sketch." *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (Easterbrook, J.).

"As most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess." *Terry*, 707 F.3d at 613. What matters are "'[m]otives and consequences, not formalities' ... and the trier of fact is 'quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.'" *Id.* (quoting *Evans*, 504 U.S. at 274).

### 2. The Indictment alleges an explicit quid pro quo.

With these principles in mind, the Court now considers whether the Indictment in this case adequately pleads an explicit quid pro quo. The Court holds that it does. Each count of the Indictment tracks the relevant statutory language and describes the elements of the offense. And each count sets forth facts (directly or by incorporation) detailing the manner in which Sittenfeld violated the statute.

Consider, for example, Counts 1 and 2 of the Indictment (alleging honest services fraud). The Indictment begins, as indictments usually do, by describing the offense in the words of the statute itself:

> Beginning on or about September 21, 2018 to on or about February 4, 2020 ... Sittenfeld ... knowingly devised and intended to devise a scheme

27

and artifice to defraud and deprive the citizens of the City of Cincinnati and the Cincinnati City Council of the honest services of Sittenfeld … through bribery and the concealment of material information.

(Indictment, Doc. 3, #39 ¶ 37). The Indictment then describes the purpose of the scheme:

for Sittenfeld to use his official position with Cincinnati City Council to enrich himself through corruption by seeking, receiving, accepting, and agreeing to receive and accept things of value from individuals supporting Project 1 in exchange for favorable specific official action.

(*Id.* at ¶ 38).

Next, the Indictment alleges that the scheme was carried out through the following manner and means: Sittenfeld contacted CW and UCE-1 and sought money from them knowing they had business before the City Council relating to Project 1; from November 28, 2018 to October 29, 2019, Sittenfeld received and accepted money from UCE-1 and others while Project 1 was pending before the City Council; Sittenfeld accepted checks from UCE-1 and UCE-3 totaling $40,000 addressed to a PAC for his benefit; and "Sittenfeld accepted and received money from UCE-1 and others knowing and believing that the money was given to Sittenfeld in exchange for Sittenfeld promising to provide and providing specific official action in his role as a public official relating to Project 1." (Indictment, Doc. 3, #40 ¶ 39a–f). Toward the end of Counts 1 and 2, the Indictment alleges:

In exchange for and because of the money accepted and received by Sittenfeld, Sittenfeld promised to and did provide specific official action relating to Project 1, [] include[ing] promising to 'deliver the votes' on matters before Cincinnati City Council relating to Project 1; promising to pursue official action that would advance Project 1; promising to pressure and advise, and pressuring and advising other public officials

28

to take official action relating to Project 1; and voting in the interests of Cooperating Witness 1, UCE-1, and UCE-1 with regards to Project 1.

(*Id.* at ¶ 39(g)).

The Court has little doubt that the allegations listed directly under the honest services wire fraud charges, including those just described, are sufficient to state an offense under Sixth Circuit case law. They identify the statute under which Sittenfeld is charged, they allege the essential elements of the statute, and they provide enough factual detail to (1) give Sittenfeld notice as to the charge against him; (2) enable him to prepare a defense; and (3) enable him to plead double jeopardy if applicable. That is all that an indictment must do to state an offense. *See McAuliffe*, 490 F.3d at 533; *Lee*, 929 F.3d at 354; *Olive*, 804 F.3d at 753; *Bradley*, 917 F.3d at 504; *Anderson*, 605 F.3d at 411. But the government didn't stop there in supporting its honest services fraud claims. It incorporated by reference 35 paragraphs spanning 13 pages of other allegations from earlier in the Indictment. The other charges in the Indictment collectively incorporate by reference all those allegations, too. (For each remaining offense, the first count incorporates those allegations relating to phase one of the scheme, while the second count incorporates those relating to phase two.) As a result, the allegations provide the basis and context for the specific allegations located under each count of the Indictment.

And, more to the point here, the allegations sufficiently plead an explicit quid pro quo for both phase 1 and phase 2 of the Indictment. They do so by way of big-picture narrative, a course of conduct spanning over a year, and specific interactions, all working in combination with each other.

29

Start with the big picture. The allegations paint a story of a real-estate-development project that was indefinitely stalled in the Cincinnati City Council. Yet, after taking no major action on the project for roughly two years, shortly after the campaign contributions at issue here, the Cincinnati City Council voted to approve the transfer of the project from the City to the Port. In fact, Sittenfeld himself voted in favor of the transfer. What changed? One inference that a person could draw from the allegations in the Indictment is that, in exchange for the contributions that he received, Sittenfeld "delivered the votes."

The timing of Sittenfeld's involvement is itself probative of whether there was a quid pro quo. Sittenfeld was a member of City Council all the while CW was trying and failing to generate movement on Project 1 in 2017 and 2018. The logjam broke only after CW began to connect Sittenfeld to CW's investors (and Sittenfeld's soon-to-be contributors). Those facts support the government's argument that there was an explicit quid pro quo.

Next, consider the course of conduct alleged in the Indictment. In both phases of the sting, the allegations assert that Sittenfeld would often solicit or accept campaign contributions from Project 1's investors while, in nearly the same breath, discussing his plans for Project 1. On November 7, 2018, for example, Sittenfeld met with CW and UCE-1 for lunch. At lunch, UCE-1 and Sittenfeld discussed Project 1, and after discussing it, UCE-1 offered to give Sittenfeld $20,000 in campaign contributions. On November 28, 2018, Sittenfeld met UCE-1 and UCE-2 in downtown Cincinnati. The purpose of the meeting was for Sittenfeld to collect two checks for

$5,000 each from UCE-1, and during that meeting, Sittenfeld discussed Project 1 with the UCEs. Sittenfeld met UCE-1 and UCE-2 again on December 17, 2018. And yet again, the UCEs discussed project 1 with Sittenfeld and gave him campaign contributions. The same pattern played out on September 24, 2019 and on October 29, 2019 during phase 2 of the sting. These allegations create at least a plausible inference that a "[c]lear ... understanding" existed between Sittenfeld and the UCEs: Sittenfeld would help the UCEs so long as they continued to support him financially. *Blandford*, 33 F.3d at 696 n.13.

Finally, consider what are arguably the most damning allegations contained in the Indictment: the recorded dialogue between Sittenfeld, CW, and the investors at these meetings. Sittenfeld's lunch meeting with UCE-1 on November 7, 2018 provides a good illustration. At that meeting, UCE-1 expressed his desire to Sittenfeld for a veto-proof vote on Project 1, and then offered Sittenfeld $20,000 "to get that deal." (Indictment, Doc. 3, #32 ¶ 16). Sittenfeld's alleged response? "Honestly, I can, I can deliv-, I can sit here and say, I can deliver the votes." (*Id.*). Here, "[n]o subtle winks and nods were needed." *Terry*, 707 F.3d at 615. A jury could reasonably infer that Sittenfeld's response constituted his acceptance of an *express* offer to guarantee official action in exchange for $20,000 in campaign contributions.

The same is true of conversations that occurred during Phase 2 of the sting. For example, on September 24, 2019, UCE-3 indicated to Sittenfeld that he wanted Sittenfeld to use the zoning code, as Sittenfeld had suggested, to enable a legal sports wagering facility within Project 1. (*Id.* at #36–37, ¶31). UCE-3 said "[t]his is what I

would like you to do. I don't mind what it costs … So today, you hear me … we're gonna take care of you, not a problem," to which Sittenfeld responded, "yeah." (*Id*.). Following further discussion about the project, UCE-3 provided Sittenfeld two $5,000 checks while promising two more checks in the future. A jury could reasonably infer an explicit quid pro quo from this exchange. Specifically, a jury could conclude that: (1) the checks were what UCE-3 was referring to when he said he was "gonna take care of" Sittenfeld; (2) the statement (and checks) were made in exchange for Sittenfeld's promise to support the project through official action; and (3) Sittenfeld signaled his acceptance of the offer by allegedly responding, "yeah."

And on October 29, 2019, Sittenfeld and the UCEs referenced "the deal" again. After UCEs provided Sittenfeld with $10,000 in checks, they "discussed issues with local regulation of sports betting given the proposed statewide legislation that was pending." (*Id*. at #38 ¶ 34). But UCE-1 made sure to remind Sittenfeld that the first step of any of this was "making sure [Project 1] goes through"; Sittenfeld responded, "Yea, the, the, the, *the deal*, of course, of course." (*Id*.) (emphasis added).

These dialogues arguably come close to depicting an *express* quid pro quo, let alone the lower showing required for an *explicit* one. One can readily identify at least the suggestion of an offer of campaign contributions in exchange for specific official action. And one can just as readily identify at least the suggestion of an acceptance. It follows a fortiori that, when combined with the big picture narrative and course of conduct that the allegations sketch, the Indictment alleges facts that could constitute an explicit quid pro quo.

32

To be sure, none of this means that Sittenfeld is guilty of the charges, even if the Indictment's factual allegations are true. Indeed, the Indictment also alleges facts that are favorable to Sittenfeld. Such facts include Sittenfeld's statement that he could not do anything illegal, like accept a quid pro quo, and the fact that the development project continued to stall even after the City transferred Project 1 to the Port, suggesting either that Sittenfeld was unable to deliver votes (which would not necessarily help him on the charges here, as it is "agreeing," not "doing," that matters), or that he never made any such explicit promise (which would help).

But these facts only underscore the need for the trier of fact to decide the ultimate question of Sittenfeld's guilt or innocence. As just one specific example, consider Sittenfeld's alleged statement to CW that "nothing can be a quid pro quo." (*Id.* at #31 ¶ 14). It is possible that Sittenfeld was being sincere when he said that. If so, that would suggest that Sittenfeld never intended to stray from the permissible side of the line separating legitimate contributions from illegal conduct. But it is also possible that Sittenfeld's statement constituted the classic "'[n]udge, nudge, wink, wink, you know what I mean." *Blagojevich*, 794 F.3d at 738. Which is true? "[T]he question is one of inferences taken from what the participants say, mean and do, all matters that" a jury is "fully equipped to assess." *Terry*, 707 F.3d at 613. A court ruling on a motion to dismiss, with only select quotes from longer audio recordings, and without the aid of live testimony, is not so equipped.

Sittenfeld's arguments to the contrary are not persuasive. Sittenfeld argues, for example, that for *McCormick's* "explicit" requirement "to have any meaning, it has

33

to require more than allegations of contributions and discussion of governmental action related only temporally." (Sittenfeld Reply, Doc. 42, #333) (emphasis added). Yet Sittenfeld cites no authority that supports this seemingly novel proposition. To be sure, "[w]ithout anything more, a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor." *Terry*, 707 F.3d at 615 (6th Cir. 2013) (citing *McCormick*, 500 U.S. at 272). So if the Indictment alleged *only* that Sittenfeld received campaign contributions from the UCEs and then took favorable official action on Project 1, that arguably would not be sufficient. Or, perhaps more accurately, such allegations might state an offense, but proving them wouldn't be enough, in and of itself, to convict. But that is not what the Indictment here alleges. Rather, it includes allegations of numerous in-person and telephone conversations spanning more than a year, some of which plausibly depict express agreements to exchange campaign contributions for specific official action.

Nor does the Court agree that the Indictment merely alleges that Sittenfeld gave general descriptions of his policy positions in the hopes of generating contributions from like-minded constituents. There is a difference between a public official who, in soliciting campaign contributions, says "I am pro-employment," and one who says "I promise you a government job." Being pro-development is one thing, but agreeing to support a specific development project (Project 1) through official action is something else, and the Indictment sufficiently alleges the latter.

34

The Court also disagrees with Sittenfeld's argument that his pre-existing, pro-development record forecloses an inference that he engaged in a quid pro quo regarding Project 1. This argument has both a factual problem and legal problem. As to the former, Sittenfeld's argument again fails to recognize the difference between a general position in favor of development and a promise of official action on a specific project, which is what the Indictment alleges and what federal bribery law prohibits. And as to the latter, even if it is true that Sittenfeld would have supported Project 1 anyway, that is legally irrelevant. *Cf. McDonnell*, 136 S. Ct. at 2371. "What is needed is an agreement, full stop." *Terry*, 707 F.3d at 613. That is, it is the intent to enter into an *agreement* that matters, not whether the public official would have taken the same steps even absent the contribution.

In sum, the Court concludes that the Indictment adequately alleges a quid pro quo. Notably, that is true even under Sittenfeld's proposed standard, which requires the Indictment, at least if it is a "speaking indictment," to allege sufficient facts on its face to allow a jury to find a quid pro quo without more. For the above reasons, the Court concludes that standard is met here. That is not to say that a jury *will* find a quid pro quo, even if the allegations prove true. But there appear to be sufficient facts, if true, to *allow* a jury to make such a finding, and in any event the government has asserted that more is forthcoming.

### 3. The Court Denies Sittenfeld's Request to Strike all Allegations of Official Action Other Than His Own Vote.

Sittenfeld mounts a second attack on the honest services fraud and Hobbs Act counts, or at least as to part of those counts. Specifically, Sittenfeld claims that, aside

from alleged promises regarding his own vote, the alleged actions to support Project 1 set forth in the Indictment are not "official acts" under *McDonnell*. 136 S. Ct. at 2368-73. The Court disagrees.

With respect to phase 1 of the sting, Sittenfeld takes issue with the government citing Sittenfeld's statements about his ability to "deliver the votes" for the project. (*See* Indictment, Doc. 3, #34 ¶ 22 ("Shortly after Sittenfeld placed the four checks in his jacket pocket, Sittenfeld stated he would get the votes for Project 1, explaining: 'don't let these be my famous last words, but I can always get a vote to my left or a vote to my right.'"); (*id.* at #32, ¶ 16 ("UCE-1 then told Sittenfeld that UCE-1 wanted enough City Council support for Project 1 to guarantee the development agreement could not be vetoed by Public Official A, and then offered Sittenfeld $20,000 'to get that deal.' Sittenfeld responded by promising UCE-1 that he would deliver City Council votes to support a development agreement for CW to develop Project 1. Specifically, Sittenfeld responded, 'Honestly, I can, I can deliv-, I can sit here and say, I can deliver the votes.'"))). Sittenfeld argues that his reference to "delivering votes" is merely a "generalized expression of confidence in his own political abilities" and is thus not an "official act" under *McDonnell*.

Sittenfeld's argument on this point is difficult to square with *McDonnell's* reasoning. As Sittenfeld concedes, "an official need only agree to perform a 'specific' and 'identified' official act, not perform it." (Sittenfeld Reply, Doc. 46, #341 (citing *McDonnell*, 136 S. Ct. at 2370). And *McDonnell* makes clear that the term "official act" extends to "pressur[ing] … another official to perform an 'official act,' or …

36

advis[ing] another official, knowing or intending that such advice will form the basis for an 'official act' by another official. 136 S. Ct. at 2372. An agreement to "deliver the votes" could be understood as a promise to pressure or advise other City Council members on how to vote (which is undoubtedly an "official act" by that other member) on the project at issue ("Project 1"). Understood that way, a promise to "deliver the votes" qualifies under *McDonnell*'s test for an "official act."

Sittenfeld offers two responses. First, he argues that the Indictment does not say *exactly* "what [] Sittenfeld intended or agreed to say, when he intend[ed] or agreed to say it, or to whom." (Sittenfeld Reply, Doc. 46, #341) (emphasis omitted). But it is not at all clear why Sittenfeld seems to think that matters. At the outset, it is worth remembering that, under the legal standard that applies to indictments, such details would be unnecessary, as even without them, Sittenfeld would have notice as to the charges against him and the ability to plead Double Jeopardy if applicable down the road. But even leaving that aside, *McDonnell* says nothing about requiring a description of exactly *what* a public official must say, *when* he must say it, or to *whom* he must have said it to support a conviction. It is enough under *McDonnell* if the public official simply agrees to pressure or advise another to perform an official act. And the statements that the government cites plausibly suggest that Sittenfeld may have agreed to do exactly that.

Sittenfeld counters by arguing that those statements do not show that he "pressured" or "advised," but merely indicate that he "express[ed] support" on a question or matter, (Sittenfeld Reply, Doc. 46, #342), which is something that

37

*McDonnell* allows. 136 S. Ct. at 2371. This argument, however, misunderstands the government's burden at this stage. As described above, the question is whether the alleged statements could only be understood as Sittenfeld *not* agreeing to exert pressure or advise his city council colleagues to vote a certain way. In other words, did the government plead itself out of court? On that front, Sittenfeld's statements here seem at least consistent with him having agreed to "pressure" or "advise." Whether, in fact, he "pressured" or "advised," or instead merely "express[ed] support," is something to be determined "from what the participants say, mean and do, all matters that juries are fully equipped to assess." *Terry*, 707 F.3d at 613.

Second, Sittenfeld claims that *McDonnell's* "pressure and advise" test applies to *executive* officials (*McDonnell* involved a Governor), but does not extend to officials on multi-member *legislative* bodies, such as Cincinnati's City Council. According to Sittenfeld, in multi-member deliberative bodies, using persuasion to build coalitions and garner support from colleagues is a necessary aspect of the job, and thus the pressure-or-advise language cannot be applied for fear that it would criminalize routine interactions between fellow legislators. That argument, though, goes too far. As Sittenfeld's counsel conceded during argument, under Sittenfeld's proffered standard, even an express agreement of this form—"if you pay me money I will lobby my fellow legislators for the bill you want"—would not be criminal conduct, as the legislator is only agreeing to attempt to persuade (or pressure or advise) fellow members. That cannot be a correct understanding of the law.

Moreover, it bears noting that it is not the persuasion itself that the government contends is the problem here, but rather the agreement to undertake the pressuring and advising on a specific pending matter *in exchange for campaign contributions*. It is the exchange—money for attempting (or agreeing to attempt) to get fellow legislators to vote a particular way—that gives rise to the illegality. To be sure, at trial, the government will be required to convince a jury that this linkage existed here, but as things stand now, the Court cannot conclude, based on the allegations in the Indictment, that such linkage is necessarily absent.

The alleged official acts at Phase 2 are perhaps a closer call, but the Court arrives at the same conclusion. According to the Indictment, during Phase 2, Sittenfeld made certain representations about the way in which official actions, such as local zoning, could be used to protect "a sports book in Project 1" from competition. (Govt. Br., Doc. 28, #193). In particular, Sittenfeld discussed ways to use the zoning code "to create a controlled environment 'within City limits' for sports betting." (*Id.*). Sittenfeld argues that these are just suggestions—not "focused and concrete" policy decisions, and thus cannot constitute "official actions."

But look again at *McDonnell's* definition of an "official act." As relevant here, it is a "decision or action" on a "specific and focused" matter "that is 'pending' or 'may by law brought' before a public official." *McDonnell*, 136 S. Ct. at 2372. And importantly, it is the "matter" that must be focused or concrete, *not* the "action." *Id.* at 2369. Here, the matter is "Project 1," which is a focused and concrete matter. And the Indictment alleges that Sittenfeld agreed to take action to "create a controlled

environment" for that matter. To be sure, the exact form that action would take was perhaps a bit up in the air (e.g., zoning vs. bonding vs. other regulatory efforts). But any of those would suffice to constitute "taking action" on the matter. In other words, an agreement that "I will get the votes to provide a controlled environment for Project 1 through regulatory efforts" could constitute an agreement to undertake an official act, even if the precise form of those regulatory efforts is unknown at the time the agreement is made. To hold otherwise would allow public officials to avoid criminality by the mere artifice of saying—"I'll get it done, I just can't tell you how."

## B.   The Indictment Sufficiently States a Section 666 Offense.

As relevant here, 18 U.S.C. § 666 bars certain state and local officials from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any" government business. Sittenfeld argues that, in campaign contribution cases, the same concerns that underlie *McCormick*, *Terry,* and *Blandford* require the government to plead and prove facts that demonstrate an explicit quid pro quo. The government responds that in *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009), and *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018), the Sixth Circuit held the opposite—that no quid pro quo was required to plead or prove federal funds bribery. Sittenfeld acknowledges *Abbey* and *Porter* but counters that they are not campaign contribution cases.

This is a difficult question. On the one hand, *Abbey* and *Porter* were unequivocal that a quid pro quo was not an element of a § 666 charge. On the other,

neither decision involved campaign contributions. And, in distinguishing *McCormick*, even *Abbey* recognized that "the campaign contribution context [is] unique because almost all lawful contributions are given to influence future legislative or executive actions." 560 F.3d at 516. But the Court need not resolve this question today because, as explained above, the indictment sufficiently alleges an explicit quid pro quo. Thus, even assuming § 666 requires a quid pro quo in the campaign-contribution context, that element is satisfied here.

For similar reasons, the Court finds unavailing Sittenfeld's alternative argument: that, regardless of the quid pro quo issue, the § 666 charges should be dismissed because the Indictment does not properly allege that he acted with "corrupt intent." In making this argument, Sittenfeld largely rehashes his arguments for why the Indictment does not allege an explicit quid pro. But, as explained above, the Indictment *does* allege an explicit quid pro quo. And while there may be some debate as to whether pleading an explicit quid pro quo is *necessary* to state a § 666 offense, there appears to be no debate that pleading a quid pro is *sufficient* to state a § 666 offense. *See Abbey*, 560 F.3d at 520; *accord United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) (Easterbrook, J.).

## C. Sittenfeld Has Failed To Show That The Statutes Under Which He Is Charged Are Void For Vagueness As Applied On The Allegations Here.

Sittenfeld's last argument is his shortest, taking up no more than a paragraph in either his opening brief or his reply. Perhaps surprisingly, then, it is also his boldest. He argues, "to the extent that this Court concludes that the statutes charged

*could* be applied here … the statutes are unconstitutionally vague as applied to him." (Sittenfeld Br., Doc. 25, #155). That argument fails to persuade for two reasons.

First, Sittenfeld's constitutional argument is skeletal at best, so he has arguably waived it. *See Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 184591, at *46 (S.D. Ohio Jan. 19, 2021) (noting that arguments raised in a skeletal fashion are waived and collecting cases in support).

Second, even putting that aside, the argument fails. To win on this argument, Sittenfeld must show that, as applied to his case, the statutes either (1) define their respective offenses "in such a way that ordinary people cannot understand what is prohibited, or (2) encourage[] arbitrary or discriminatory enforcement." *United States v. Kettles*, 970 F.3d 637, 649–50 (6th Cir. 2020) (quotation omitted). Essentially, Sittenfeld must show that the statutes failed to put him on "sufficient warning" that his alleged conduct was illegal. *Id.* He has not made that showing. He hasn't even really attempted to do so, and the Court doubts he could. To be sure, courts are still working out the full contours of the public corruption statutes, and there will always be close cases. But the Indictment here alleges an explicit quid pro that consists of accepting campaign contributions in exchange for specific official action. Again, these are just allegations. But if there is one thing that everyone knows federal bribery law prohibits, it is agreeing to undertake official action in exchange for campaign contributions. The Court declines to dismiss the Indictment on this ground.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Sittenfeld's Amended Motion to

Dismiss (Doc. 25).

    **SO ORDERED.**


March 1, 2021
**DATE**
                  **DOUGLAS R. COLE**
                  **UNITED STATES DISTRICT JUDGE**

43