# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-142** |
| **Plaintiff,** | : | |
| | : | **JUDGE COLE** |
| **v.** | : | |
| | : | **GOVERNMENT RESPONSE TO** |
| **ALEXANDER SITTENFELD,** | : | **DEFENDANT'S MOTION TO** |
| **a/k/a "P.G. Sittenfeld,"** | : | **COMPEL** |
| | : | |
| **Defendant.** | : | |
| | : | |

The United States respectfully submits this response to the Defendant's Motion to Compel Discovery. (Doc. 48 (PageID 355) ("Def. Mot.")). For the reasons set forth in the following memorandum, the Court should deny Defendant's motion.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
MEGAN GAFFNEY (NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov
E-mail: Megan.Gaffney@usdoj.gov

## **MEMORANDUM OF LAW**

The Indictment alleges that the Defendant solicited and accepted bribes during recorded meetings and conversations. This case will largely turn on the jury's assessment of those recordings, including recordings in which the Defendant accepted payments to his PAC while promising to "deliver the votes" for Project 1 and while agreeing to further efforts for a sports book in Project 1 through local regulations.

Among other materials, the Government has turned over all recordings with the Defendant. In addition, the Government has turned over or agreed to turn over substantial additional discovery, well before trial, despite no obligation to do so, including Jencks-Act-protected agent reports related to Project 1 in the Government's possession; recordings that mention the Defendant's name, but in which he was not a party; and recordings relating to Project 1, the CW, or the undercover agents ("UCEs"), again, where the Defendant was not a party.

The Defendant nevertheless moves this Court to compel production of these same materials, as well as: "all information related to inducements, threats, agreements and consideration for the CW"; "the Government's witness list"; "costs and expenditures related to this undercover operation"; "FBI policies, procedures and instructions related to [CW], agents, and this operation"; and "statements and communications from government agents made to the media, regardless of whether the statements were made public." (Def. Mot. at 2 (PageID 356)). In support, the Defendant generally categorizes the materials as relevant to bias, motivation, and credibility, and attaches affidavits of three lawyers, who opine broadly about the usefulness of early discovery.

Much of what the Defendant seeks to compel, the Government has already agreed to produce. For the remainder, the Defendant categorizes the information as exculpatory, without explanation, even though none of it relates to recordings involving the Defendant or his intent

during the recordings—the primary issue in dispute for the jury. Simply labeling these requests as "*Brady*" does not change the character of the information requested.

Finally, throughout his motion, the Defendant appears to argue the government's investigation of him was improperly motivated. The Defendant's assertions in this regard are baseless. Indeed, as described below, the Defendant was not an initial target of the government's investigation until his own conduct made him one. For these reasons, set forth below, the Defendant's motion should be denied.

## I. RELEVANT BACKGROUND

As the Indictment alleges, the Defendant was recorded accepting money to his PAC during meetings with undercover agents posing as Project 1 investors. This is largely undisputed. The central element at trial will be whether the Defendant accepted the payments with unlawful intent—*e.g.*, knowing the money was paid in exchange for official action or in connection with Project 1.

The Government has provided to the Defendant all recordings and communications in the Government's possession in which the Defendant is a party, along with substantial amount of early Jencks Act and other materials related to Project 1 and the Defendant. In addition, following a series of meetings with defense counsel to confirm the scope of the requests, the Government agreed to turn over hundreds of hours of recordings and additional Jencks Act materials relevant to other criminal investigations, simply because the recordings relate to Project 1 or involve the CW or the undercover agents. The Government agreed to produce these materials despite the fact the recordings—which do not involve the Defendant or the bribery scheme charged in the Indictment—are largely irrelevant to the charges. The Government is in the process of providing these recordings on a rolling basis and began producing these items before the filing of this motion.

2

The Government has also made clear to the Defendant that it is aware of its discovery obligations and cited binding Sixth Circuit law governing the timing for producing *Brady* and Jencks material, which foreclose much of what the Defendant requests here. (*See, e.g.,* Doc. 50 (PageID 480–85)). The Government even told defense counsel that it would endeavor to provide other materials in advance of what the law requires, consistent with the practice in this district. Nevertheless, despite no trial date or pretrial motions deadline, the Defendant filed the instant motion to compel, without reference or citation to binding case law governing these issues.

## II.     APPLICABLE LAW

"[I]n most criminal prosecutions, the *Brady* rule, Rule 16 and the Jencks Act, exhaust the universe of discovery to which the defendant is entitled." *United States v. Presser*, 844 F.2d 1275, 1285 n.12 (6th Cir. 1988); *United States v. Faller*, 1:13CR-00029-JHM, 2014 WL 12691595, at *3 (W.D. Ky. May 29, 2014) ("As opposed to the broad scope of discovery in civil cases as set forth in Fed. R. Civ. P. 26(b), the discovery available to a criminal defendant is relatively limited, and is generally dictated by three rules: (1) Fed. R. Crim. P. 16; (2) the Jencks Act, 18 U.S.C. § 3500, and (3) the doctrine set forth in *Brady v. Maryland*, 373 U.S. 83 (1963).").

**Rule 16.** Federal Rule of Criminal Procedure 16 "requires the government to disclose to the defense before trial only specific categories of evidence." *Presser*, 844 F.2d at 1284. This includes statements by the defendant; the defendant's criminal record; documents, photographs, or objects in the custody or control of the government and material to the defense, intended for use by the Government in its case-in-chief at trial, or obtained from or belonging to the Defendant; the results of any material mental or physical examinations performed on the Defendant; and expert disclosures. Fed. R. Crim. P. 16(a)(1). Rule 16(a)(2) "expressly exempts impeachment material subject to the Jencks Act from disclosure under its provisions." *Presser*, 844 F.2d at 1285.

3

*Brady v. Maryland.*   Under *Brady v. Maryland*, and its progeny, the Government is obligated to disclose information favorable to a criminal defendant that is "material either to guilt or to punishment."  373 U.S. 83, 87 (1963); *accord Kyles v. Whitley,* 514 U.S. 419, 432 (1995). That obligation extends to impeachment evidence when such evidence is material, meaning, when the evidence could be used to impeach the credibility of a government witness and "the reliability of [the] given witness may well be determinative of guilt or innocence[.]"  *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *United States v. Bagley,* 473 U.S. 667, 677 (1985).  The Sixth Circuit has explained that "[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial." *United States v. Bencs,* 28 F.3d 555, 560 (6th Cir. 1994) (citing *United States v. Agurs,* 427 U.S. 97, 112 n.20 (1976)).

Although *Brady* imposes certain obligations on the government, "*Brady* did not, however, create a constitutional right to discovery in a criminal prosecution."  *United States v. Kersey*, 494 F. Supp. 2d 669, 671 (S.D. Ohio 2006) (citing *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977)); *accord United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992), *abrogated on other grounds by Hampton v. United States*, 191 F.3d 695 (6th Cir. 1999).  Nor did *Brady* "give[] the defense a general right to pre-trial discovery of evidence impeaching defense witnesses, where the prosecution denies that any such material is exculpatory and material under *Brady*."  *Presser*, 844 F.2d at 1283.  Indeed, "the government typically is the sole judge of what evidence in its possession is subject to disclosure."  *Id*. at 1281; *United States v. Hale*, 95-5915,1997 WL 34697, at *2 (6th Cir. Jan. 28, 1997) (under *Brady* the government "must be assigned the primary responsibility of gauging whether [undisclosed evidence] constitutes evidence favorable to the accused and is therefore discoverable"); *United States v. Darwich*, 10-20705, 2011 WL 2518914, at *1 (E.D.

Mich. June 24, 2011) ("[W]hen a defendant makes a request for *Brady* material, it is the Government that decides which information must be disclosed" (internal quotations omitted)).

As for timing, "the *Brady* doctrine is not violated if *Brady* material is disclosed in time for its 'effective' use at trial." *Presser*, 844 F.2d at 1283; *see, e.g.*, *United States v. Todd*, 825 F. App'x 313, 320–21 (6th Cir. 2020). As the Sixth Circuit has explained, "so long as the defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated." *Presser*, 844 F.2d at 1283; *United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008) (withholding *Giglio* impeachment evidence until day before government witness testified not *Brady* violation because defendant had time to use for impeachment). Moreover, as set forth below, courts are clear that, unlike exculpatory *Brady* material, which could require pretrial investigation by the defense, impeachment evidence does not require substantial time to prepare for effective use at trial. *See, e.g., Kuehne*, 547 F.3d at 698; *United States v. Bashir*, 738 F. App'x 743, 749–50 (3d Cir. 2018); *United States v. Le*, 306 F. Supp. 2d 589, 592 n.5 (E.D. Va. 2004). Further, the defendant is not entitled to impeachment evidence of a witness who is not called by the government at trial. *United States v. Seymour*, 739 F.3d 923, 927 (6th Cir. 2014); *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994) (holding there was "no authority that the government must disclose promises of immunity made to individuals the government does not have testify at trial").

**The Jencks Act.** The Jencks Act, 18 U.S.C. § 3500(a), generally requires the government "to produce statements in its possession of witnesses who testify at a trial." *United States v. Short*, 671 F.2d 178, 185 (6th Cir. 1982). But the defendant has a right to such witness statements only after the witness has testified on direct examination. 18 U.S.C. § 3500(a); *United States v. Algie*, 667 F.2d 569, 571 (6th Cir. 1982). "The clear and consistent rule of this circuit is that the intent

of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial." *Presser*, 844 F.2d at 1283; *e.g.*, *United States v. Fletcher*, 295 F. App'x 749, 753 (6th Cir. 2008) ("[A]ny [Jencks Act] materials disclosed prior to trial exceeded the government's obligations under the Act.").

"When *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (quoting *Bencs*, 28 F.3d at 561). "Put another way: the Jen[c]ks Act trumps *Brady* where impeachment evidence is Jencks Act material." *United States v. Brazil*, 395 F. App'x 205, 215 (6th Cir. 2010); *United States v. Bell*, 2019 WL 3451222, at *4–5 (E.D. Mich. July 31, 2019) (denying defendant's request to "compel pretrial disclosure of *Brady* material that is also covered by the Jencks Act."). Indeed, "neither *Brady*, *Giglio*, nor Rule 16 gives a defendant the right to broad pre-trial discovery of impeachment evidence, the disclosure of which is instead controlled by the Jencks Act." *United States v. Musick*, 291 F. App'x 706, 727 (6th Cir. 2008). "[P]roviding the defense with such a broad right of pre-trial discovery would vitiate an important function of the Jencks Act, the protection of potential government witnesses from threats of harm or other intimidation before the witnesses testify at trial." *Presser*, 844 F.2d at 1285. Another purpose of the Jencks Act is "to prevent defendants from engaging in 'blind fishing expeditions' through the government's files." *Id*. at 1283.

## III. ARGUMENT

The Defendant's motion references broad requests for "*Brady* material." Later in the motion, he cites eleven categories of discovery material he seeks. But, as set forth below, the Defendant has failed to show that compelling disclosure of the requested material is appropriate. The motion should therefore be denied.

**A. The Defendant's Broad *Brady* Request Has No Merit.**

The Defendant moves broadly to compel "immediate disclosure" of materials he labels as "*Brady* material." (Def. Mot. at 14 (PageID 368)). In doing so, the Defendant's motion ignores several key factors, which show that the motion has no merit.

*First*, as the Government has made clear on numerous occasions to defense counsel, the Government is aware of its obligations and will produce any *Brady* and *Giglio* materials in time for effective use at trial—as the law requires. Under these circumstances, where the Government has asserted that it will timely produce all *Brady* and *Giglio* material, courts in this circuit deny broad requests for "*Brady* material." *See Faller*, 2014 WL 12691595, at *5 ("Courts, however, have decided that such general and broad requests do not serve as basis for *Brady* disclosure. Without a showing of a 'particularized need' for certain information, the *Brady* rule is not intended to be used as a fishing expedition for material that may help [the defendant] in preparation of his trial or other general reasons."); *Darwich*, 2011 WL 2518914, at *1 ("[T]he court will not issue an order compelling pre-trial discovery where, as here, the government has stated that it is aware of its obligations under *Brady*."); *United States v. Ingersoll*, 2014 WL 5420222, at *12 (E.D. Mich. Oct. 22, 2014) ("[W]here, as here, the Government has conceded that it is aware of its obligations under Rule 16, *Brady,* and *Giglio,* compelling pre-trial discovery is not warranted."); *United States v. Mohammad*, 2012 WL 1605472, at *2–3 (N.D. Ohio May 8, 2012) (denying defendant's motion because, "to the extent that these requests trigger the government's production obligations under *Brady. . . ,* the Jencks Act, 18 U.S.C. § 3500, or *Giglio. . .* the government has indicated that it is mindful of its discovery obligations and intends to meet them."); *United States v. Hill*, 2010 WL 4365521, at *2 (W.D. Ky. Oct. 27, 2010) ("[T]he government has represented to the Court

7

that it will comply with this obligation. Defendant's motion is too broad and the Court cannot order the government to disclose such evidence."). For this reason, the Defendant's motion fails.

*Second*, as set forth above, much of the discovery the Defendant seeks the Government has already agreed to produce. Pursuant to its Rule 16 obligations, the Government has turned over all recordings involving the Defendant—recordings that will drive the jury's assessment of the Defendant's intent when he received payments from the UCEs. But the Government also has provided early disclosure of hundreds of pages of Jencks-Act-protected agent reports to aid the defense's review of discovery, while under no obligation to do so. *See* Fed. R. Crim. P. 16(a)(2) (agent reports generally not discoverable except as provided by the Jencks Act). Further, the Government agreed to turn over hundreds of additional recordings in its possession from separate and unrelated corruption investigations, as requested by the Defendant—despite no showing that these recordings are relevant to the charges here. Thus, the Government is producing significantly more than is required by law; and the Government agreed to do so prior to the Defendant filing this motion. Yet, the Defendant moves to compel this same information anyway.

*Finally*, the Defendant's submission fails to make any distinction between exculpatory *Brady* information and impeachment *Brady* information (*i.e., Giglio* material). As the Sixth Circuit explained in *Presser*, "[i]mpeachment evidence need not be exculpatory in the traditional sense of tending to negate guilt. Rather, such material deals with the credibility of witnesses." 529 F.2d at 1278 (citing *Giglio*, 405 U.S. at 154). Throughout the motion, the Defendant indicates the specific discovery he seeks relates to credibility, bias, and motivation for the investigation— classic impeachment inquiries that do not rise to the level of *Brady* unless material. (*See, e.g.,* Def. Mot. at 8, 9, 14, 16 (PageID 362, 363, 368, 370)). Labeling these classic impeachment requests as "*Brady*" does not change the nature of the request.

8

The Government will produce such Jencks Act and *Giglio* impeachment information shortly before trial, consistent with the law. As established above, the Government must disclose Jencks Act impeachment material after a witness testifies[1] and non-Jencks Act *Giglio* impeachment material "in time for use at trial." *Presser*, 844 F.2d at 1283. Like Jencks Act material, "pure *Giglio* impeachment evidence . . . usually does not require substantial time to prepare for its effective use at trial." *United States v. Lujan*, 530 F. Supp. 2d 1224, 1255 (D.N.M. 2008). For example, "[w]hen the material at issue is pure impeachment material (*i.e.*, records of conviction, plea agreements, immunity agreements and the like), production of these materials a few days in advance of trial provides a defendant with ample opportunity for review and effective use of the impeaching evidence at trial." *Le*, 306 F. Supp. 2d at 592 n.5 (internal quotation marks omitted). "This conclusion is based on the fact that while *Giglio* material may have considerable impeachment value, the nature of that material usually does not require substantial advance time to prepare for its effective use at trial." *Id.*; *see Kuehne*, 547 F.3d at 698 (no *Brady* violation where impeachment evidence turned over "approximately one day before" witness testified); *Bashir*, 738 F. App'x at 750 (affirming district court's order to turn *Giglio* material over three days before trial); *United States v. Villarman-Oviedo*, 325 F.3d 1, 13 (1st Cir. 2003) (government did not violate *Brady*, *Giglio*, or the Jencks Act when it turned over witness's plea and cooperation agreement four days before trial); *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) ("[A]ppellees' right to a fair trial will be fully protected if disclosure [of impeachment evidence] is made the day that the witness testifies."); *United States v. Giampa*, 904 F. Supp. 235, 281–82 (D.N.J. 1995) (holding "there is no requirement that the Government provide *Giglio* material to Defendants prior to trial"). Courts thus treat Jencks Act and *Giglio* material similarly.

---

[1] The general practice in this district is for the Government to turn over Jencks Act material roughly a week before trial unless there are serious concerns for witness safety.

In this way, "*Giglio* impeachment evidence" is in contrast with "exculpatory evidence," which "may require significant pre-trial investigation in order to be useful to the defendant at trial." *Le*, 306 F. Supp. 2d at 592 n.5 (internal quotation marks omitted); *see, e.g., United States v. Tsoa*, 1:13cr137, 2013 WL 3242700, at *6 (E.D. Va. June 25, 2013) ("The standard discovery order provides that the Government will produce the first category of *Brady* materials, exculpatory evidence, promptly and that the Government will produce the second category of *Brady* materials, *Giglio* impeachment evidence, no later than 5 calendar days before trial."); *Giampa*, 904 F. Supp. at 281 ("The purpose of requiring disclosure of impeachment information is not to assist the defense in a general pretrial investigation[.]").[2]

Disclosure of impeachment material shortly before trial is important because it protects witnesses from unnecessary harassment and intimidation. Similar to the Jencks Act, "disclosure of *Giglio* material in useful form also serves . . . to identify the witnesses to whom the material relates, which, in turn, necessitates that the time of disclosure take into account such factors as the risk to witnesses." *Le*, 306 F. Supp. 2d at 592 n.5 (internal quotation marks omitted); *Lujan*, 530 F. Supp. 2d at 1256 ("Disclosure of *Giglio* material often identifies the witnesses to whom the material relates, and therefore, the court must take into account the risk to witnesses in early disclosure of *Giglio* evidence."). This includes "justifiable concerns regarding the risk of witness

---

[2] Both exculpatory *Brady* and impeachment *Brady* (*Giglio*) require a key component—materiality. Relevant here, impeachment information is only "material" *Brady* information if the reliability of the government's witness is "determinative of guilt or innocence[.]" *Giglio*, 405 U.S. at 153–54; *see, e.g., United States v. Benitez-Farias*, 4 F. App'x 364, 365 (9th Cir. 2001) (impeachment evidence not material under *Brady* where confidential source's "credibility was not critical to the government's case" because "[t]he transaction was tape-recorded[] and corroborated by pictures," and other impeachment evidence was used at trial); *United States v. Harper*, No. 11-20188-2, 2020 WL 6118557, at *5 (E.D. Mich. Oct. 16, 2020) (citing cases holding where impeachment evidence is "cumulative" or evidence against defendant is otherwise "overwhelming" the information is "not material"). This is important here because the overwhelming balance of relevant evidence in this case is recordings of the Defendant's own statements, which the jury will assess to determine the Defendant's intent when he accepted the payments at issue.

tampering in circumstances where there is no evidence that the life or safety of a prospective witness is in danger." *United States v. Coppa*, 267 F.3d 132, 138–39 (2d Cir. 2001). Further, the Government need only turn over *Giglio* material for witnesses called to testify, *Seymour*, 739 F.3d at 927, a decision often made shortly before trial.

For these reasons, in contrast to exculpatory *Brady* evidence, impeachment *Brady* (*Giglio*) evidence—whether Jencks Act material or not—need not be disclosed at this stage of the proceedings. The Defendant's motion for immediate disclosure of this information should therefore be denied.

### B. The Defendant's Specific Requests Similarly Fail.

The Defendant moves to compel eleven categories of evidence. (Def. Mot. at 16–17 (PageID 370–71)). For the reasons detailed below, the demands should be denied.

### (1) "all information regarding the undercover agents, their supervision and instruction to [CW]"

This broad request is based only on the hope that something of substance will result—the very definition of a fishing expedition. *See Presser*, 844 F.2d at 1283 ("[T]he [Jencks] Act was designed to prevent defendants from engaging in 'blind fishing expeditions' through the government's files."); *see also United States v. Warren*, 782 F. App'x 466, 472 (6th Cir. 2019) (broad requests indicate an improper "fishing expedition."). Courts do not permit inspection of agent files absent a showing by the Defendant that they contain "material evidence." *Driscoll*, 970 F.2d at 1482 (government need not turn over agent personnel files based on "speculative claim" that the "files might contain information important to his case"). The Defendant does not even attempt to argue how "all information regarding the undercover agents" is material. *United States v. Avila*, 15-cr-336, 2017 WL 1519384, at *2 (D. Colo. Apr. 27, 2017) (denying request for undercover agent information where, "given the lack of a developed argument or authority

supporting his request, Defendant has not shown that any undisclosed information is material to his guilt or punishment.") (citing *United States v. Lee Vang Lor*, 706 F.3d 1252, 1259 (10th Cir. 2013) ("*Brady* does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant.") (internal quotation marks omitted)). Further, this request assumes—falsely—that UCEs supervised or were in a position to instruct the CW.

### (2) "all information regarding times when [CW] violated instructions from his FBI handlers, including not recording calls"

As far as the Government knows, all information in the Government's possession relating to this request has been disclosed. As the defense is aware, since this has been the subject of correspondence with defense counsel, the agent notes provided to the Defendant indicate when the CW conducted a call that was not recorded.

### (3) "full and complete records of all statements by [CW] about Mr. Sittenfeld, including all statements that were not recorded"

This too has been the subject of numerous conversations with defense counsel. As the defense knows, the Government has already agreed to turn over statements and recordings by the CW referencing the Defendant that are in the Government's possession, even those irrelevant to the pending charges. *See* Fed. R. Crim. P. 16(a)(1)(A), (B) (requiring disclosure of a defendant's oral, written, or recorded statements).

### (4) "the Government's witness list"

As made clear to defense counsel, the Government will provide its witness list at the same time all parties' witness lists are due, which, based on the practice in this district, generally occurs shortly before trial or on the first day of trial, at the Court's discretion. *See United States v. Perkins*, 994 F.2d 1184, 1190–91 (6th Cir. 1993) ("Ordinarily, a defendant is not entitled to a list of the names and addresses of the government's witnesses."); *United States v. Ledesma*, 19-20216, 2020

WL 7075289, at *3 (E.D. Mich. Dec. 3, 2020) (denying motion to produce witness list 45 days before trial based on conclusory showing because '[i]t is well recognized that defendants cannot obtain lists of prosecution witnesses as a matter of right.'" (quoting *United States v. Kendricks*, 623 F.2d 1165, 1168 (6th Cir. 1980)).  The Defendant cites no authority or basis for compelling the Government to provide its witness list now.

      (5) **"costs and expenditures related to this undercover operation"/**
      (6) **"information related to how the UCEs spent and used money, including the penthouse and entertainment with females"**

The Defendant, in conclusory fashion, asserts that, "[i]nformation related to the costs and expenditures of this undercover operation . . . are exculpatory in nature as they impact bias, motivation, and credibility of the operation itself and government actors."  (Def. Mot. at 3 (PageID 357)).  The Defendant does not indicate how cost information is exculpatory.  *See Presser*, 529 F.2d at 1278 (impeachment "deals with the credibility of witnesses."); *Bagley*, 473 U.S. at 676–77 (impeaching credibility includes evidence of "bias and interest").  Nor does the Defendant even attempt to argue how any costs or expenditures show bias on behalf of any government actor; show any motivation that is in any way material to guilt or innocence; or relate in any way to the credibility of the operation or any government actors.

Such information has no bearing on the guilt or innocence of the Defendant in this case—that is, whether the Defendant acted with unlawful intent when he accepted payments for official action during recorded conversations.  Rather, it underscores a classic jury nullification argument—the undercover operation was not a prudent use of taxpayer money.  This argument, of course, is irrelevant to guilt or innocence, but could improperly give rise to jury nullification.  *See United States v. Rosga*, 3:10CR170, 2010 WL 4963033, at *2 (E.D. Va. Nov. 30, 2010) (denying defendant's request to "require the government to produce records pertaining to the cost of the

investigation" because of the "diversionary effect of such extraneous evidence more than outweighs its probative value"); *see also United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006) (presenting an inapplicable defense "is just an invitation to jury nullification" and is "a practice that is improper"). Such information is neither exculpatory nor impeachment information; rather, it is simply irrelevant.

### (7) "current DOJ and FBI policies, procedures and instructions related to [CW] and this operation"

To the extent this request (or the request in paragraph 6) relates to information the Defendant has provided to the Government, the Defendant is well-aware of the Government's inquiry (and was aware before the filing of this motion).[3]

Any broader request should be denied because this information is not exculpatory or impeaching, but rather is based on speculation or mere fishing. Courts deny these types of requests absent a showing of materiality, and the Court should do the same here. *See United States v. Mendez-Aguirre*, 666 F. App'x 448, 451 (6th Cir. 2016) (internal government policies not *Brady* because the defendant had not shown the information was "exculpatory or impeaching in a manner that would make them material"); *United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976) (district court properly denied discovery request for law enforcement reports because "the discovery motion could very well be viewed as a 'fishing expedition,' in the hope that some favorable evidence would turn up"); *United States v. Hamzeh*, 16-cr-21, 2018 WL 2754079, at *3-5 (E.D. Wis. June 8, 2018) (denying request for FBI policy manuals, guidance, memoranda, training manuals, and other guidance because not material to defense); *United States v. Reese*, 1:09 CR 00145, 2010 WL 2606280, at *20–21 (N.D. Ohio June 25, 2010), *adhered to on*

*reconsideration*, 2010 WL 3730148 (N.D. Ohio Sept. 17, 2010) (denying defense motion for ATF's policies and procedures because the request was "neither specific, material, nor reasonable, and instead, appear to originate in speculation"); *United States v. Pickard*, 787 F. Supp. 155, 159–60 (S.D. Ind. 1992) (denying as "too vague, broad and intrusive" and "not sufficiently specific" a discovery motion for "all regulations, policy directives or internal memoranda" pertaining to investigation by the agency).

### (8) "statements and communications from government agents made to the media, regardless of whether the statements were made public"

The Defendant seeks to compel production of any government statement to the media but fails to make any argument as to how such information is discoverable.  Rather, the Defendant merely argues, "this case is unusual in that the Government strategically and publicly began crafting its narrative through use of the news media and voluntarily made aspects of its case public, including the identity of its main cooperating witness." (Def. Mot. at 14 (PageID 368)).  This case is not unusual.  The United States Attorney had a press conference following the grand jury's Indictment; as U.S. Attorneys throughout the country do—in every federal district—when cases of particular importance to the public are charged.  And the Government did not "strategically and publicly" craft a narrative—it announced the charges in the Indictment.

Further, the Defendant has access to these statements (the defense included a link to the press conference in a court filing in this case).  *See United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) ("No *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available to defendant from another source.") (internal citations and quotation marks omitted).

15

**(9) "all recordings related to Project 1, the CW, and Mr. Sittenfeld in the Government's possession"**

As set forth above, the Government has agreed to turn over these recordings, despite the fact the Defendant has made no showing they are relevant to the charges.[4]

**(10) "all information related to inducements, threats, agreements, and consideration for [CW]"**

This category is classic impeachment evidence. Although not exculpatory, information related to inducements, threats, agreements, and consideration is *Giglio* material. *Le*, 306 F. Supp. 2d at 592 n.5 (citing "records of conviction, plea agreements, immunity agreements and the like" as examples of "pure impeachment material"). As established above, non-Jencks Act impeachment material must be produced in time for effective use at trial, which generally means shortly before trial. *See, e.g., Villarman-Oviedo*, 325 F.3d at 13; *Higgs*, 713 F.2d at 44. Similarly, the Government may not be compelled to produce Jencks Act impeachment material before a witness testifies, though the practice in this district is to disclose Jencks Act material shortly before trial. The Government needs to protect potential government witnesses from intimidation or harassment before trial. *Presser*, 844 F.2d at 1285; *Coppa*, 267 F.3d at 138–39.

For these reasons, the Government intends to provide to the Defendant the impeachment evidence noted above consistent with its obligations so that the Defendant may effectively use the information at trial. A motion to compel this information by the Defendant is thus unwarranted.

**(11)    "information related to [CW's] criminal record, including the sexual assault allegations"**

Like the impeachment material in paragraph 10, to the extent the Government has impeaching information relating to a witness's criminal record, it will provide the material to the Defendant consistent with its obligations.

The Government does not have any additional non-public information relating to sexual assault allegations.  Rather, as the Defendant is aware—given his own statements in recordings produced in discovery—the local prosecutor announced publicly that no criminal violations would result from these allegations.  Public reporting also indicates there are dueling civil actions, in which CW has asserted he is being extorted for money.  This information is publicly available to the Defendant the same as the Government.  *Clark*, 928 F.2d at 738 (information "available to defendant from another source" is not *Brady* requiring disclosure by the government).  Materials related to the allegations are therefore not properly subject to a motion to compel.

**C.  Investigation into the Defendant Was Properly Motivated.**

One final point requires addressing.  Throughout its motion, in varying contexts, the Defendant generally cites bias, predication, and improper motivations for investigating the Defendant as a basis for discovery without providing support for these claims.  Any suggestion that this investigation was biased or improperly motivated is utterly baseless.

The Government was involved in multiple public corruption investigations in the months leading up to the relevant period.  The Defendant was not initially a subject or target of an investigation.  Investigatory information, which has been produced in discovery, made clear that consensually recorded conversations with the Defendant could provide evidence relevant to public corruption investigations.  This included, but was not limited to, reports describing the Defendant soliciting contributions from CW, possibly through assistance from another.  As the investigation

17

developed, evidence including consensually-recorded conversations with the Defendant—which have been produced—warranted exploration.

In a recorded call on October 30, 2018, detailed in the Indictment, the Defendant stated he knew "*a pretty good amount about*" the CW's problems getting a development agreement from the City, namely, relating to issues with Public Official A. The Defendant nevertheless solicited contributions from the CW, stating he has "*obligations to do the things I need to do to be a successful candidate.*" The Defendant solicited contributions despite knowing CW's project would require City Council action in the future; despite knowing CW was having difficulty getting City support for the project; and despite knowing CW wanted the Defendant to meet with CW and one of his investors to help advance Project 1. While soliciting money under these circumstances, the Defendant then stated, "*the one thing I will say, is like, you know I mean, <u>you don't want me to like, to be like, 'hey [Cooperating Witness], like, love you, but can't,'</u> you know, like; you know, look, I, I want, I want people to support me . . . .*" The Defendant then asked the CW to "*round up five LLCs before next Tuesday.*" And he agreed to meet CW and the investor for lunch on November 7, 2018—after the Tuesday deadline—but added, "*and then you're gonna deliver the goods before next Tuesday,*" again indicating he expected campaign contributions from CW.

Then, during a follow-up call on November 2, 2018, the Defendant agreed to meet with UCEs after being offered a quid pro quo of money for votes on Project 1, and he explained that he would show the UCEs in person that they were investing in a "winning endeavor." The next interaction occurred on November 7, 2018, when the Defendant met with a UCE and accepted $20,000 knowing the money was paid in return for the "deal" in which the Defendant would deliver City Council votes for the Project 1 development agreement. The investigation into the

Defendant continued in the months that followed, as did separate corruption investigations into other public officials in Ohio.

The motivations for the investigation into the Defendant were thus quite clear—to investigate public corruption in the City of Cincinnati, which evolved into an investigation into the Defendant following his own corrupt actions during consensually-recorded calls. Thus, any attempt for discovery based on broad accusations relating to improper bias, predication, or motivations for investigating the Defendant have no basis in fact.

## IV. CONCLUSION

For these reasons, the Government requests that the Court deny the Defendant's motion to compel.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
MEGAN GAFFNEY (NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
Email: Emily.Glatfelter@usdoj.gov
Email: Megan.Gaffney@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Court's CM/ECF System this 3rd day of March 2021, which provides electronic notice to all parties.

*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorney

20