```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             -   -   -
 3

 4    UNITED STATES OF AMERICA,        :  Case No. 1:20-cr-142

 5            Plaintiff,               :  Motion To Dismiss

 6            - v -                    :  via GoToMeeting

 7    ALEXANDER SITTENFELD,            :  Tuesday, February 16, 2021

 8    a/k/a "P.G. Sittenfeld,"         :  2:00 p.m.

 9            Defendant.               :  Cincinnati, Ohio

10                             -   -   -

11                    TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE DOUGLAS R. COLE, JUDGE

13    For the United States:        MATTHEW C. SINGER, ESQ.
                                    EMILY N. GLATFELTER, ESQ.
14                                  MEGAN GAFFNEY, ESQ.
                                    U.S. Department of Justice
15                                  United States Attorney's Office
                                    221 East Fourth Street
16                                  Suite 400
                                    Cincinnati, Ohio  45202
17

18    For the Defendant:            CHARLES H. RITTGERS, ESQ.
                                    CHARLES M. RITTGERS, ESQ.
19                                  Rittgers & Rittgers
                                    12 East Warren Street
20                                  Lebanon, Ohio  45036
                                      and
21                                  MICHAEL R. DREEBEN, ESQ.
                                    O'Melveny & Myers, LLP
22                                  1625 Eye Street, NW
                                    Washington, DC  20006
23                                    and
                                    NEAL D. SCHUETT, ESQ.
24                                  Haughey & Niehaus, LLC
                                    121 W. High Street
25                                  Oxford, Ohio  45056
```

1    Law Clerk:              Shams H. Hirji, Esq.

2    Courtroom Deputy:       Scott M. Lang

3    Court Reporter:         M. Sue Lopreato, RMR, CRR
                             United States District Court
4                            Southern District of Ohio
                             100 East Fifth Street
5                            Cincinnati, Ohio  45202
                             513.564.7679
6

7                                -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S
 2              (In open court via GoToMeeting at 2:02 p.m.)
 3                            -  -  -
 4              COURTROOM DEPUTY:  Good afternoon.  This is Scott
 5     Lang, Judge Cole's courtroom deputy.  Looks like we have a lot
 6     of people listening in through their phones.  If you could
 7     please mute your audio on your phones, that would be very
 8     helpful.
 9         As for the parties to the case, I'm not seeing any video
10     from any of the counsel.
11         Okay.  All right.  Good.
12         Mr. Charlie H. Rittgers, are you --
13              MR. H. RITTGERS:  I'm here.
14              COURTROOM DEPUTY:  -- able to get video or no?
15              MR. H. RITTGERS:  I can see everybody.  I don't know
16     why --
17              MR. M. RITTGERS:  Bottom middle, Dad.  It says
18     camera.  Click on camera.
19              MR. H. RITTGERS:  It's up -- for me it's up on top,
20     but I'm clicking on camera.  I've hit the button about five
21     times here.
22              COURTROOM DEPUTY:  It's okay.  I'll let the judge
23     know that you are having problems with your video, but I have
24     a feeling he will be fine without you being on the video,
25     since you're not going to be the one that's going to be
```

1    proceeding on the motion.

2        I'm going to go through and make sure everyone on the

3    video portion can hear me.

4        Ms. Gaffney, can you hear me?

5            MS. GAFFNEY:  Yes.

6            COURTROOM DEPUTY:  Mr. Singer, can you hear me?

7            MR. SINGER:  Yes.

8            COURTROOM DEPUTY:  And Mr. Sittenfeld, can you hear

9    me?

10           MR. SITTENFELD:  Yes.

11           COURTROOM DEPUTY:  Mr. Charlie H. Rittgers, can you

12   hear me?

13           MR. H. RITTGERS:  I can.

14           COURTROOM DEPUTY:  Charlie M. Rittgers, can you hear

15   me?

16           MR. M. RITTGERS:  Yes.

17           COURTROOM DEPUTY:  Mr. Dreeben, can you hear me?

18           MR. DREEBEN:  I can.  Thank you.

19           COURTROOM DEPUTY:  And Sue, can you hear me?

20           THE COURT REPORTER:  Yes.  I can hear you.  Thank

21   you.

22           COURTROOM DEPUTY:  For those callers who joined, if

23   you could please mute your phones, we'd appreciate that.

24   There's going to be a lot of people on this call, so we want

25   to make sure that we don't have any issues with the audio.

```
 1          Mr. Singer, will Ms. Glatfelter be joining us?

 2               MR. SINGER:  Yes.  AUSA Glatfelter is here.

 3               COURTROOM DEPUTY:  She is.  Okay.  Is she in your

 4     office, or --

 5               MR. SINGER:  She is.

 6               COURTROOM DEPUTY:  Okay.  Are you ready to proceed?

 7               MR. SINGER:  The government's ready.

 8               COURTROOM DEPUTY:  Mr. Dreeben, are you ready?

 9               MR. DREEBEN:  We are, Your Honor.

10               COURTROOM DEPUTY:  In addition to obviously all the

11     callers, those who are participating by video, if you could

12     please mute your audio as well until you are speaking.  That

13     way, that will hopefully help alleviate any audio issues, and

14     I will let the judge know we are ready to proceed.

15               THE COURT:  Good afternoon.  We're here this

16     afternoon in the matter of the United States of America versus

17     Alexander Sittenfeld.  It's Case Number 1:20-cr-142, and we're

18     here this afternoon on the defendant's motion to dismiss the

19     indictment.

20          If I could ask counsel to please enter their appearances

21     for the record.

22               MR. SINGER:  Good afternoon, Your Honor.  Matt

23     Singer, Emily Glatfelter, and Megan Gaffney for the United

24     States.

25               THE COURT:  Good afternoon.
```

1          MR. DREEBEN:  Good afternoon, Your Honor.  Michael

2   Dreeben, with Charles H. and Charles M. Rittgers, for

3   Alexander "P.G." Sittenfeld.

4          THE COURT:  Good afternoon, Mr. Dreeben.

5      Well, a couple things before we get started.  First, I

6   will note that there are some people who are dialed in as well

7   this afternoon.  This is open court, albeit virtually open

8   court, but I will note for anyone listening that pursuant to

9   local rule, there is no recording allowed of today's session

10  of court.  So please turn off any recording devices that you

11  may be using.

12      And second, I know I do not need to tell this to counsel,

13  but for anyone else listening, the question today is not

14  whether the defendant in this action is innocent of the

15  charges.  The question is whether the indictment is

16  sufficient.

17      And today, there's going to be a lot of talk about the

18  allegations in the indictment.  I want to note up front that

19  these are allegations.  They have not been proven, and the

20  fact that the Court refers to these allegations today should

21  not be understood by anyone that the Court's suggesting or

22  implying that the allegations in the indictment are true.

23      Mr. Sittenfeld, as is the case with all criminal

24  defendants, is presumed innocent of all charges until such

25  time as he is proven guilty, and I certainly wouldn't want

1     anything the Court said today to suggest anything to the

2     contrary in that regard.

3         So with that, Mr. Dreeben, I assume you're speaking for

4     the defense today, given that you were the one who gave the

5     names for the appearance.  It is the defendant's motion, so I

6     would be happy to hear from the defendant at this point.

7         MR. DREEBEN:  Thank you, Your Honor.

8         We move to dismiss this indictment for the fundamental

9     reason that its allegations do not state the offenses charged.

10         The government has filed a detailed indictment in this

11     case, with multiple factual allegations about the interactions

12     of Mr. Sittenfeld, an elected member of the Cincinnati City

13     Council, with a confidential informant and undercover agents

14     acting as investors in a development project.

15         The Court can evaluate the legal sufficiency of these

16     allegations.  The question here is not solely, as the

17     government submits, whether the indictment provides adequate

18     notice.

19         The first legal topic that I want to talk about today is

20     why, when the government submits additional detailed

21     allegations, the Court has the power and a responsibility to

22     determine whether they state the offense charged.  We do not

23     believe that they do.

24         The fundamental flaw in this indictment is that it takes

25     actions that are customary in our democratic system, the

1     discussion of policies and actions that an elected official

2     has taken and intends to take, in the same conversations in

3     which funds are solicited for political campaign purposes.

4         As the Supreme Court recognized in *McCormick versus*

5     *United States*, and as I believe the government recognizes in

6     this case as well in its brief in opposition, the simultaneous

7     or near simultaneous discussions of the policies that an

8     elected official pursues and the actions that he intends to

9     take while soliciting campaign funds is not a criminal

10    offense.  The Court made that clear under the Hobbs Act.

11        I believe that the government agrees that the same

12    standard applies under the honest services charges in this

13    indictment, and we will argue that they equally apply under

14    the program bribery provisions under Section 666 of Title 18.

15         In our view --

16         THE COURT:  Mr. Dreeben, if I could interrupt just

17    briefly.

18         MR. DREEBEN:  Of course.

19         THE COURT:  Before we get into some of these more

20    specific questions, I was hoping you could help me a little

21    bit understand your proposed framework for assessing the

22    sufficiency of the Complaint.

23        And I think, as I read *Hamling*, going all the way back to

24    *Hamling*, it looks like there's sort of some sense of a general

25    offense and a specific offense and that you need to -- the

1    statute itself, I think the quote from *Hamling* is "The

2    language of the statute may be used in the general description

3    of an offense, but it must be accompanied with such a

4    statement of the facts and circumstances as will inform the

5    accused of the specific offense coming under the general

6    description with which he is charged."

7         So it seems like there's this concept running around of

8    kind of the general offense, which is the statutory elements

9    of an offense.  And then there's something about the specific

10   offense, and you need to give enough in the statement of facts

11   and circumstances to meet that.

12        And then, in doing so, as I think part of your argument

13   is, you may unwittingly get to a point where you've sort of

14   pled yourself out of court, almost sort of under an old

15   *Conley versus Gibson* notion of, well, now you've done it.

16   You've managed to set forth facts that show you don't have a

17   claim, and so you've kind of pled yourself out of court.

18        And I think, as I understand your argument, that's sort

19   of the argument you're making, that there's some set of facts

20   that the government needs to show.  And then, in doing so,

21   they may unwittingly go farther than they need to; or, in any

22   event, may, in setting forth facts, show some facts that are

23   inconsistent with criminality and thus have pled themselves

24   out of court.

25        So do I understand the general framework that you're

1    positing pretty well?

2            MR. DREEBEN:  Yes.  I think that that's exactly

3    right, that there's a hazy borderline on how much specificity

4    the government needs to provide in order to comply with the

5    general *Hamling* standard that Your Honor read.

6        But I think that it is clear that when the government

7    does go beyond that and provides specific facts, the question

8    for the Court is whether those specific facts add up to the

9    offense charged.

10       And that standard is well stated in a Third Circuit case

11   that we cited, which includes the following language:  "If the

12   specific facts that are alleged fall beyond the scope of the

13   relevant criminal statute, as a matter of statutory

14   interpretation, the indictment fails to state an offense."

15       And the Sixth Circuit has adopted that same principle and

16   applied it in a case in which an indictment was brought for

17   threats.  This is *United States versus Landham*, which we've

18   cited, that --

19           UNIDENTIFIED SPEAKER:  Thank you.  Thanks.

20           MR. DREEBEN:  -- and the Court's holding in that case

21   was not that the government had failed to allege the statutory

22   elements, which is the bare minimum, or describe the

23   circumstances and facts that it believed supported the charged

24   offense, but that, in fact, the language that it used to

25   allege threats failed to provide the necessary elements of the

1    crime and, in fact, fell outside of it.

2        And just briefly, it's worth noting that this was true in

3    two respects.  One, the government claimed that there was a

4    threat to kidnap the defendant's child.  And the Court looked

5    at the entire context of the charge and concluded that the

6    language actually referred to a custody battle, not to a

7    kidnapping claim.

8        And in a second threat allegation, the government claimed

9    that the defendant was threatening bodily harm, and the Court

10   read again the entire context of the specific language and

11   said, actually, the defendant was referring to past acts that

12   involved words, not future acts involving bodily harm.

13           THE COURT:  And I think that's a great point,

14   Mr. Dreeben, and I'd like to sort of focus on that line of the

15   case.  And I'd also like to focus on what you said in the

16   reply brief on page ID 331, which is page 3 of your reply

17   brief, where you say, quote, where an indictment goes beyond

18   reciting the elements of the specific offense and relies on

19   particular factual --

20           UNIDENTIFIED SPEAKER:  (Indiscernible).

21           THE COURT:  Could everyone please mute their phones

22   or video feed.  Thank you.

23       "Where an indictment goes beyond reciting the elements of

24   an offense and relies on particular factual allegations, an

25   indictment must be dismissed if those factual allegations are

1    legally insufficient or inconsistent with the alleged

2    offense."

3        And I'm wondering, it almost seems like those are two

4    different things, "legally insufficient" or "inconsistent

5    with."

6        And it seems to me that *Landham* is more of an

7    "inconsistent with" case.  In other words, in *Landham*, they

8    said, well, it's legally impossible for a parent to kidnap a

9    child; ergo, the allegations in the indictment prove that no

10   offense or no -- the charged offense did not occur.

11       And that seems to be different from a case where maybe

12   you're just saying, well, there aren't, you know, specific

13   facts for each of the elements.  It's insufficient in some

14   ways, but we're not saying we couldn't prove some additional

15   facts beyond those set forth in the indictment that would show

16   that the crime occurred.

17       And so I'm wondering if you can comment a little bit on

18   that, and if "legally insufficient" and "inconsistent with"

19   are sort of two different things and whether "inconsistent

20   with" might be the actual test here.  In other words, based on

21   what the government has alleged, is it legally impossible to

22   conclude that a crime occurred?

23           MR. DREEBEN:  Your Honor, I think that that is a

24   legitimate distinction, and it does apply to the element of

25   the kidnapping that you described, the legal impossibility.

1      I think that the Sixth Circuit went beyond that and also

2  said that the context revealed that this was a bad custody

3  battle, rather than an actual attempt to kidnap.

4      And in the second count that the Court (distorted audio),

5  where it looked at the specific language and concluded that

6  the defendant -- it said something like the things that have

7  been done to you with a Parker pen are worse than some other

8  things that have been done to you.

9      And the Court said, well, factually, things that are in

10  the past that have been done to you are not threats of future

11  bodily harm.  And the context reveals he's talking about words

12  that he's written down with a pen, rather than the threat of

13  bodily injury that was requisite for the statute.

14      THE COURT:  In both of those situations, Mr. Dreeben,

15  it seems like the facts alleged in the indictment showed that

16  it would be impossible to conclude that the crime occurred

17  when you prove the facts.

18      You know, if we take the government's allegations as

19  true, there's no longer any way you could possibly find that

20  the defendant had violated the law, right?  You would conclude

21  that about *Landham?*

22      MR. DREEBEN:  Yes, but I think that the case stands

23  for a slightly broader principle than that, which is that in

24  an area such as this, where you're dealing with curse speech

25  in the threats case -- and in our case, the government has

1    chosen to charge political contributions as part of a quid pro

2    quo -- there are First Amendment concerns that require the

3    government to plead with enough context so that the Court can

4    conclude that if the government proves everything that it

5    says, it will have met the legal standards for the criminal

6    offense.

7        And that's also a principle that the Sixth Circuit

8    recognizes in the *Superior Growers* case that --

9        THE COURT:  It will have or it may have?  That, I

10   think, is what I'm stuck on.  It will have proven the offense

11   or it may have proven the offense?

12       MR. DREEBEN:  Well, and I think that the language in

13   *Superior Growers* is "To be legally sufficient, the indictment

14   must assert facts which in law constitute an offense; and

15   which, if proved, would establish prima facie the defendant's

16   commission of that crime."

17       So it's, I believe, not a sufficiency of the evidence

18   test.  Surely the government would come back and say, We'll

19   have more evidence to introduce.  That's not the Court's role.

20   But the Court's role, I think, at this stage is to lay the

21   legal standard on top of the indictment and ask whether, if

22   the government proves what it has alleged, has it crossed the

23   threshold?  Has it provided the context so that in an area of

24   extreme sensitivity, the criminalization of politics, can the

25   Court conclude that the government has actually alleged the

1    crime charged?

2        And there are reasons, which I think we can talk about

3    later, and I do want to stay with this issue, but there are

4    reasons why it's particularly important that the government

5    not be free to make allegations that can take what we believe

6    is customary political activity and criminalize it unless it

7    meets the explicitness standard that the Supreme Court

8    articulated in the *McCormick* case, and it has overcome the

9    presumption of legitimacy that campaign contributions have in

10   our system, even when they are solicited -- and frequently

11   will be -- on the basis of what the political figure has done

12   or intends to do.

13       And the presumption --

14           THE COURT:  Well --

15           MR. DREEBEN:  -- of legitimacy language, I realize

16   this is the substantive point -- I'm sorry, Your Honor.

17           THE COURT:  Well, I just wanted to, you know, getting

18   beyond the standard a little bit and looking at what the

19   allegations are here in light of what you just said, that the

20   government needs to be able to show that if the allegations

21   were proven, it would constitute a crime.

22       And let me just take paragraph 16 of the indictment in

23   the first sentence.  Again, I want to stress these are

24   allegations.  "Following lunch, Sittenfeld agreed to 'deliver

25   votes' for the project in return for $20,000."

1      I mean, don't even go beyond that.  I mean, we can talk

2    about whether "deliver votes" is an official act or official

3    action.  Maybe that's where you're going to go on this.

4      But putting aside that question for now, would you agree

5    that that's enough to show the explicit quid pro quo, and so

6    the only question is whether, quote, deliver votes is an

7    official act?

8          MR. DREEBEN:  Well, I wouldn't in this indictment,

9    Your Honor.  I understand the thrust of the question.  And the

10   government, in that sense, has alleged that -- leaving aside

11   the official act question -- would constitute a quid pro quo.

12     But the government agrees, I believe, that the indictment

13   has to be read as a whole, not in isolated statements that

14   either are undermined or contradicted by other things that the

15   indictment alleges.

16     And here, our take on that paragraph is it has to be read

17   in the context of, A, the legal standard; and B, the prior

18   allegations.

19     The legal standard here is that, as the Supreme Court

20   said in *McCormick* and as the Sixth Circuit said in *Terry*, the

21   public official has to agree that his actions will be

22   controlled by the payment.  And if you look at that sentence

23   in isolation, that's what the government is trying to do.

24     If you look at the prior paragraphs of the indictment,

25   going back to paragraph 14, paragraph 15, what you see is that

1    Mr. Sittenfeld has already declared his support for

2    development projects, particularly in the urban core.

3        He has voiced that without any (audio distortion) the

4    government claims that there's any connection made to possible

5    campaign contributions.  In fact, when the confidential

6    witness proposed a transaction that the government has

7    characterized as a quid pro quo, Mr. Sittenfeld, by his own

8    terms, pushed back on it and said, No, there can't be anything

9    like that.  What I can tell you is what my positions and

10   policies are.

11       So our view --

12       THE COURT:  But Mr. Dreeben, I mean, so let's drill

13   down on that a little bit.  I mean, part of this seems like a

14   levels of generality issue.  I start with paragraph 16, you go

15   back to 15 and 14.

16       But then one can go further back.  And if you go to the

17   30,000-foot level, we've got a project that apparently was

18   permanently stalled, notwithstanding Mr. Sittenfeld's alleged,

19   you know, desire to always be supportive of such projects.

20   Whatever.  It was stalled.  And then a series of contributions

21   were made and, suddenly, it was un-stalled, right?  I mean,

22   that's what's alleged.  And again, I'm not saying that's true

23   facts, but that's what's alleged in the indictment from the

24   30,000-foot level.

25       You've got a project that's not going anywhere.  Campaign

1    contributions are made.  Things are said.  And then, all of a

2    sudden, the project starts moving.  That's also alleged,

3    right?

4            MR. DREEBEN:  Your Honor, I don't actually read the

5    indictment quite that way.  I mean, the first -- these setup

6    charges unfold in two stages.

7        In the first stage, and I'll refer to it as stage one,

8    and that's where the government pins its case on the "deliver

9    the votes" language in paragraph 16 we've been talking about.

10   That was delivering the votes on a development agreement, but

11   that development agreement does not happen.

12       What happens in the -- according to the indictment in the

13   second phase is the property is transferred to the Port.  And

14   then there's a separate set of events that are going on with

15   potentially having the Port -- which I believe, and I think

16   this is in the indictment -- (distorted audio) the property

17   for a dollar, with moving -- trying to move towards a

18   development agreement.  The indictment doesn't allege that

19   that happened either.

20       I don't think that the indictment is -- and to be candid,

21   Your Honor, it doesn't have to allege that Mr. Sittenfeld

22   succeeded in delivering the votes.  That's not the legal

23   standard.  We're not claiming that it is.  But I don't think

24   that the indictment, fairly read, says that the money came

25   along and that's what unstuck it.

1       I think what the indictment does, barely, is demonstrate

2   a firm commitment by a political figure to pro-development

3   policies and a willingness to engage on behalf of constituents

4   in support of those policies.  He's doing this for independent

5   reasons.  He's doing this, even according to the indictment,

6   because it's in his consistent political program as a council

7   member of Cincinnati.

8       And our fundamental submission on this part of the case

9   is that when a political figure has independently committed

10  himself to that view, the government cannot, without more than

11  there is in this indictment, claim that the political figure's

12  actions are controlled by or that he has agreed that they

13  won't be controlled by political contributions.

14      The one consistent through line through this indictment

15  is that Mr. Sittenfeld favors urban development.  He does that

16  before there's money on the table, he does it during the

17  conversations in which the money is offered by the

18  undercovers, and he does it at the end.

19      Added to that --

20          THE COURT:  But Mr. Dreeben, I mean, so in

21  paragraph 9, it says the CW had been trying to get a

22  development agreement since 2017 with no success.

23          MR. DREEBEN:  Correct.

24          THE COURT:  He wants a development agreement.  And

25  then, according to the indictment, at the meeting after which

1  campaign contributions are discussed, Sittenfeld agreed to

2  deliver votes to get that deal, which is a development

3  agreement, responded by -- I'm reading from 16. "Responded by

4  promising UCE-1 that he would deliver city council votes to

5  support a development agreement for CW to develop Project 1."

6      So the very development agreement that the indictment

7  alleges they couldn't get, notwithstanding Mr. Sittenfeld

8  allegedly being pro-business presumably in 2017, all of a

9  sudden, after campaign contributions, the indictment alleges

10 he's going to, quote, deliver the votes to get that very

11 development agreement. So I'm struggling a little here.

12      MR. DREEBEN: Well, he said that before, Your Honor.

13 I mean, if you look at paragraph 15, the third sentence

14 indicates that he would shepherd the votes for the project.

15     I mean, the point here is that even this indictment does

16 not deny; it proves that the defendant is pro-development, pro

17 this project. There's a significant sequence of events that

18 occurs, I think, before and during the set of dates in

19 question that culminate in the paragraph that we've been

20 talking about, and that is Mr. Sittenfeld wants campaign

21 contributions, and there's a change in the local law that will

22 affect how LLCs can contribute. He wants to get those

23 contributions.

24     I don't think the government would dispute that there's

25 nothing unlawful about doing that, and there is nothing

1     unlawful about soliciting funds in a conversation in which

2     you're talking about the policies being favored.

3          There really could not be any other way in our system of

4     procurement.  I think this is the framing point that we want

5     the Court to think about because political figures need to

6     solicit funds in order to run in elections and, to be

7     successful, are inevitably going to talk about their programs

8     and policies, and they're going to solicit funds from those

9     who will benefit from them and who favor them.  It would be a

10    strange --

11          THE COURT:  Mr. Dreeben, isn't there a difference

12    between saying, "I'm pro-business, and I'm pro-development,

13    and I've always voted for development" and "I can deliver the

14    votes for a development agreement on Project 1"?  That seems

15    to be two very different types of statements to me.

16          MR. DREEBEN:  Well, they go together in the sense

17    that in order to be pro-development, there's a necessity that

18    some action be taken to accomplish that.

19          And I wouldn't -- I'm not going to disagree with Your

20    Honor's distinction between the two, but I think that the

21    first is a higher level pro-business approach, and the second

22    is a more specific project orientation, but there's nothing

23    wrong with that.

24          I don't think the government is claiming that

25    paragraph 15 or even paragraph 14 constitutes a criminal

1    offense.  I think Your Honor zeroed in on the paragraph that

2    gives the government its strongest legs.  But what undercuts

3    the position that the government is taking is that the legal

4    standard is that he has to agree that his actions will be

5    controlled by the money.

6        And I think the undercover agent was trying to do that,

7    obviously, in the scripted language.  But what you have for

8    the defendant in this case is remaining consistent to the

9    position that he's articulated before the allegedly corrupt

10   offer came along.

11       And when you have, on the face of the indictment, a

12   political figure who has committed himself through a course of

13   action, and then you have a statement by the undercover agent

14   that tries to link the contributions to that action, and what

15   the political figure does is not to embrace that linkage but

16   just to return to the two things that he's legally,

17   legitimately entitled to do.  Number one, talk about his

18   pro-development policies, which are appealing to the

19   undercover agent and the witness for sure, and also then talk

20   about political support for him.

21       And I think it is correct that we should be talking about

22   the specific allegations in the indictment.  And I don't want

23   to go in a direction that Your Honor doesn't want to go, but

24   to draw back to the legal standard here, I think it's

25   important because *McCormick* recognized that if political

1    figures who are engaged in the inevitable activity in our

2    democratic system of soliciting funds while talking about what

3    they have done or what they plan to do were criminal, they

4    would have asked for a language far more clear from Congress.

5        I think, actually, they probably would have concluded

6    that criminalizing those two activities together would be a

7    First Amendment violation because there is simply no other way

8    for candidates to run.  Historically, the Court recognized

9    that's what they do.

10       And turning to the reasonableness as to the honest

11   services and Hobbs Act charges, and this is consistent with

12   longstanding jury instructions that the government has

13   supported, including in its brief in the *McDonnell* case, that

14   the mere simultaneity or the temporal coincidence of

15   solicitation and explanation of policies cannot be a crime.

16       So *McCormick* then went on to say it needs to be shown

17   that there's a payment that controls the actions of the

18   politician.  He needs to manifest that his intent is to be

19   controlled by the payments that he's getting.  Otherwise, what

20   you have is people who are running on their platforms and

21   seeking political contributions in order to do it.

22       So with that --

23           THE COURT:  Well, but when you say, you know,

24   evidence of control or an allegation relating to control, I

25   assume you just mean conduct that's consistent with the notion

1      that the person is being controlled by the campaign

2      contributions, right?

3              MR. DREEBEN:  Well, I think I would go farther than

4      consistent.  We are not arguing, as the government suggested,

5      that there needs to be an express agreement.  That would be

6      enough.  I think we all agree on that.  And I think there

7      isn't anything in this indictment that would reflect an

8      express agreement by Mr. Sittenfeld to the terms of the

9      undercover agents.

10         The government may contend that.  That's one of the

11     paragraphs in the indictment.  But I think they are relying

12     far more heavily on the instruction from *Evans* and language

13     that winks and nods are no way of evading the law.  Of course,

14     we don't think that winks and nods are a way of avoiding the

15     law.

16         But what we do think is that when you have factual

17     allegations on the government's own terms establish the

18     political things -- his pro-development posture, his statement

19     early on in the indictment that he would shepherd the votes --

20     there's a causation problem if what the government says is,

21     Well, then we offered money, and he agreed to do it.

22             THE COURT:  Even the first shepherding of the votes

23     comment was after a discussion of money, right?  I mean --

24             MR. DREEBEN:  But there's nothing illegal about that,

25     and I think that that's really our starting point.  And if the

1    government disagrees with this, I would be a little bit

2    surprised because *McCormick* goes in the opposite direction.

3    There needs to --

4            THE COURT:  But you would agree, wouldn't you,

5    Mr. Dreeben, that the mere fact that a politician does

6    something that the politician would have done anyway, if they

7    do it in exchange for money, that that can be -- in other

8    words, they don't have to change their --

9            MR. DREEBEN:  Yes.

10           THE COURT:  -- position, right?  You'd agree with

11   that?

12           MR. DREEBEN:  Yes.  Of course.  They don't have to

13   change their position, but there does need to be a factual

14   showing or, in this case, an allegation that would overcome

15   the causal problem that exists when a politician says, This is

16   what I'm gonna do, and then there's money offered.

17       This isn't coming from Mr. Sittenfeld, even according to

18   the indictment.  This is coming from the undercover agent, who

19   is trying to draw a link between the money and the vote, and

20   that comes on the heels of allegations that make it clear he's

21   already prepared to shepherd the votes.  And there's no

22   explicit linkage between shepherding the votes and the

23   campaign contributions that exist in those paragraphs.

24       There's an earlier paragraph in which Mr. Sittenfeld

25   makes clear, Of course there can't be any quid pro quo, and I

1      know that that's not what you're saying either.  Here's what I

2      think I can tell somebody.  I have been pro-development for

3      the seven years that I've been on the council, and I am a good

4      political investment because I enjoy support, I have polling

5      numbers, I'm likely to be the next mayor.

6          I think saying that those kinds of things could form the

7      basis for a criminal charge would be very threatening to the

8      way political figures interact with contributors.

9          THE COURT:  I agree.  But what if the statement is,

10     "Well, yeah.  If you contribute to me, I can get Project 1

11     through the city council"?

12         MR. DREEBEN:  That would be a much more damning

13     allegation than any that the government alleged in this

14     indictment.

15         THE COURT:  You would agree that would be a problem,

16     "If you give me money, I can get Project 1 through city

17     council"?

18         MR. DREEBEN:  Yes.  I think that that would be

19     difficult, but I think that that is -- that would be

20     expressed, and that's not what we have here because

21     Mr. Sittenfeld is not drawing that link.  At no point is he

22     drawing the link between campaign contributions and the

23     policies that he's well established.

24         And we can look at other portions in the indictment too.

25     After this Project 1 doesn't succeed, really there is no

1     approved development agreement, things are still stalled, and

2     there's a series of allegations that the government, I don't

3     even think, really is trying to link up to a criminal offense.

4          Paragraphs 24, 25, 26, et cetera, where Mr. Sittenfeld

5     continues to be supportive of the project.  He thinks it's

6     good for Cincinnati, and he's voicing the fact that he's been

7     pivotal to this, as you would expect a political figure to do

8     for actions that he believes will be beneficial for the city

9     and his constituents.

10          There is no allegation of soliciting campaign

11     contributions or offering campaign contributions during that

12     sequence.  So what you have is before the attempted linkage by

13     the undercover agent of campaign contributions and action,

14     Mr. Sittenfeld declares he's for it, and he can shepherd the

15     votes.

16          After it, when it doesn't really go through, he's still

17     on board with this project, beyond the terms of the indictment

18     itself.  And it's not until --

19          THE COURT:  But in paragraph 28, the government says

20     the reason for that is the money, right?  Because "In

21     September and October 2019, Sittenfeld received additional

22     payments from the UCEs, knowing and believing the payments

23     were made in connection with Project 1 and in return for

24     specific official action relating to obtaining a development

25     agreement from the Port" now, because it's been transferred to

1    the Port, "for Project 1 and for advancing legislation and

2    other potential official action to further Project 1."  So --

3         MR. DREEBEN:  Yes.

4         THE COURT:  -- agree with you that he's continuing to

5    be supportive, but they also say, We're alleging that it's

6    because he's receiving payments.

7         MR. DREEBEN:  Well, I think this is the difference

8    between the general allegations in the indictment, and the

9    government unquestionably knows how to allege conduct that it

10   believes is criminal, and then the facts that they provide to

11   back it up.

12     And when the facts that they provide to back it up

13   undercut it, then I think it's like *Landham*, where the

14   government alleged the elements of a threat and said that

15   there was a threat of bodily harm, but it provides the context

16   that supports this allegation, and it undercuts it rather than

17   confirms it.

18        THE COURT:  Yeah, but my concern is in *Landham*, those

19   statements legally -- it was legally impossible for those

20   statements to be threats because they were directed at

21   backward action.

22     I look at the alleged statements here and some of the

23   other allegations, like paragraph 35, that "Over the next

24   several months ... Sittenfeld indicated that he continued to

25   apply pressure and promised to apply additional pressure."

1      I mean, it isn't legally impossible that that's a crime.

2 It may not be, in and of itself, enough yet.  There may need

3 to be more that's shown.  But unlike *Landham*, it doesn't seem

4 to be legally impossible.

5      MR. DREEBEN:  I think *Landham* was different in the

6 way in which it was legally impossible.  Here the legal

7 impossibility is that absent the explicit connection, the

8 charge fails.  And the government, I don't think, can

9 cherry-pick the allegations that summarize what its theory of

10 the case is and then provide specific facts that undercut it.

11      THE COURT:  They didn't even have to do that, right?

12 They could have just listed the elements in the statute and

13 said in between 2017 and 2019, Sittenfeld did all those

14 things.

15      MR. DREEBEN:  But I think it would be a different

16 indictment had they done that, and we may have then moved to

17 say that under *Hamling* and other Supreme Court cases, this is

18 an instance in which further context needs to be pleaded in

19 order to sustain the indictment because of the First Amendment

20 implications and --

21      THE COURT:  You cited *Huet* from the Third Circuit --

22      MR. DREEBEN:  Correct.

23      THE COURT:  -- and *Huet* said, quote, Generally, an

24 indictment will satisfy these requirements where it informs

25 the defendant of the statute he is charged with violating,

1    lists the elements of the violation under the statute, and

2    specifies the time period during which the violations

3    occurred.

4           MR. DREEBEN:  Yes.

5           THE COURT:  So I suppose you might say it's a little

6    different here because it involves speech, and we have First

7    Amendment concerns lurking in the background and all that.  I

8    mean, I guess I get that, but --

9           MR. DREEBEN:  I would say two things, Your Honor.

10   One is that's the bare minimal standard in a context in which

11   you do not have to plead further context in order to establish

12   a criminal offense.

13       When the government has gone further, I don't think that

14   it can rely on just having satisfied or arguably satisfied the

15   bare minimal notice standards.  Then it becomes a

16   responsibility of the Court to determine whether there's

17   actually an offense alleged.

18       Let me give an example that may help illustrate this.

19   Suppose the government were charging a bank robbery which

20   would involve a forceful taking of a thing of value, and the

21   force that's needed is sufficient force to overcome the will

22   of the victim.

23       Suppose that the government brought an indictment, and it

24   charges it in the statutory language, and then it charges

25   facts that indicate that the bank robber used no force

1    whatsoever and no threat of force whatsoever.  The bank robber

2    was very polite and did nothing that constituted even implicit

3    threat of force.

4        I think that the Court could look at it and say that

5    they -- as you said earlier, although it's a civil context --

6    pleaded themselves out of court because they've alleged

7    sufficient facts to constitute the crime that, in fact, do not

8    constitute the crime.

9            THE COURT:  But I like your hypo, so let me tweak it

10   a little bit.  So instead -- exact same case -- the indictment

11   says, "Did things, including the following," and then lists a

12   bunch of stuff that isn't, in and of itself, enough.  But just

13   said, "Did things, including the following."

14       So maybe that missing force element is not listed yet in

15   the indictment.  Obviously, it would need to be proven to a

16   jury, but they've generally alleged that force was used

17   because that was one of the elements of the statute.  They've

18   generally alleged this defendant violated the statute.

19   They've generally alleged that force was used.

20       But the specific things they say, "include the

21   following."  And we all agree, well, those things, boy, that

22   isn't going to cut it.  But they said "include," so they

23   haven't pled themselves out of court yet because you could

24   prove other facts consistent with what they've said in the

25   indictment under which there may still be a crime.

1        Why wouldn't that work?

2        MR. DREEBEN:  Well, it's not this indictment, first

3    of all.  This indictment is not designed in that way.  And I

4    would have trouble with the sufficiency of an indictment in

5    the context that we're in now if what the government provides

6    as its foundation for an explicit quid pro quo doesn't satisfy

7    that standard.

8        This is where the second aspect of whether *Hamling* states

9    the entire theory of the case or not comes in.  There are

10   contexts in which the government needs to say more than would

11   satisfy a bare minimal indictment.

12       Look, we've all seen indictments in which the government

13   says, "On or about X date, the defendant possessed, with an

14   intent to distribute, a controlled substance," and that's good

15   enough.

16       But this is not that indictment, and I think that given

17   the legal sensitivities surrounding criminalizing the raising

18   of political contributions, this is a context in which it

19   would be appropriate for a Court to demand more.

20       And the government has gone beyond it.  It hasn't alleged

21   an indictment in which it says, "We have a lot more to say.

22   This is what we've said today, but there's, you know,

23   additional facts that we would use to satisfy the explicit

24   quid pro quo."

25       I think that if they have not satisfied it on this

1    indictment, the Court can dismiss this indictment, should

2    dismiss this indictment, and they can supersede.  If they have

3    not satisfied the applicable legal standard with what they

4    have charged here, but they think that they can, they can file

5    a superseding indictment.  And at that point, the Court can

6    evaluate whether they have crossed the relevant thresholds

7    that are necessary.

8        I don't think that we would be having this discussion

9    were it not for the backdrop of, A, the sensitivity of the

10   context here, the legal context; and B, the law that frames

11   it, most particularly *McCormick*, with its insistence on the

12   explicitness requirement in the First Amendment backdrop;

13   and C, the fact that the government chose to allege a great

14   deal of detail, including many quotations.  Not the quotations

15   from the entire calls, as Your Honor knows, but they've chosen

16   what they think meets the applicable legal standard.

17       And for the Court to simply look at that and conclude --

18   if the Court agrees -- this is not enough doesn't knock the

19   government out of the box.  It just means that if the

20   government has more that can cross that threshold, it should

21   do it.

22       And I come back to, again, this is not an indictment

23   where they just allege, you know, the language that's in the

24   sharking act -- you know, the scheme count and then the Hobbs

25   Act and program fraud count.  I'm not claiming that they

1    didn't satisfy the elements of the offense when they alleged

2    those counts.  They couldn't.  And if they had wanted to, they

3    could have tried doing an indictment with nothing more, saying

4    you have enough notice, you have time and place.

5         They did not do that, and I think they didn't do it for a

6    reason.  And the reason is that they wanted a speaking

7    indictment in which they can set forth their view of why this

8    conduct constitutes a crime.

9         Our view is that it doesn't constitute a crime under the

10   applicable and governing legal standards.  They may disagree,

11   as the summary in the paragraphs that Your Honor has focused

12   on suggests, but we think that there is a deeper principle

13   here, and the deeper principle requires that the Court take a

14   closer look and ask whether a political figure who has

15   declared his desire to support the development project can be

16   ensnared in the Hobbs Act, honest services, and program fraud

17   violations on the basis of statements from an undercover agent

18   that the political figure doesn't embrace or reject.

19        He continues doing what he has done all the way along.

20   He's pursuing two things.  He's pursuing a project that he has

21   declared as beneficial, and he is accepting and soliciting

22   campaign and political contributions because that's what you

23   need to do to be a successful politician.

24        And our fundamental --

25             THE COURT:  I've been keeping you talking a long

1    time, and I apologize.  These are all very interesting issues,

2    and I do want to get to your colleague from the United States

3    Attorney's Office here pretty soon.

4        I had a couple of additional questions.  And

5    specifically, you know, you've made an argument that the

6    things that are alleged are not -- other than the vote, other

7    than his own vote, are not official acts.

8            MR. DREEBEN:  Correct.

9            THE COURT:  I'd like to give you an opportunity to

10   address a couple of concerns the Court has in that realm on

11   that issue.

12       In particular, as I read *McDonnell*, it suggests that

13   agreeing to pressure other officials or advise other officials

14   with the intent that those officials undertake an official act

15   is or can be an official act for purposes of satisfying that

16   requirement.

17       And I guess when I see "deliver the votes" or some of the

18   other things, sometimes they actually use the pressuring and

19   advising language.  As I understand the argument, it would be

20   something along the lines that, well, other council members

21   can undertake an official act in the form of a vote.  So if

22   you pressure or advise them with regard to how they should

23   vote, that falls within the *McDonnell* official act language

24   under the pressuring and advising parts.  And I just wanted to

25   hear your response to that, if I could.

1          MR. DREEBEN:  So, Your Honor, I think you correctly

2     and accurately summarized *McDonnell*.  This is another area in

3     which I think the indictment has to be looked at closely, both

4     in its general language and in the specific facts that it uses

5     to try to back it up.

6          Our view on the legislative context is that the activities

7     fall into a different zone than an executive official or a

8     legislative official doing a cross-branch advice or advice

9     within the executive branch.

10         The Court needs to take into account that the nature of a

11    deliberative body, such as the council, is that people talk to

12    each other with a view towards persuasion, which is different,

13    I think, from advising, knowing that it will form the basis

14    for official action, or pressuring somebody else.

15         And I would locate what's at issue in the legislative

16    context in the spectrum that *McDonnell* laid out.  *McDonnell*

17    has the language that Your Honor has talked about and that the

18    indictment uses in two different contexts.  One, the honest

19    services charges; and second, in paragraph 35 Your Honor

20    already pointed to.

21         *McDonnell* said that hosting a meeting, having an event

22    are not official acts.  And it went a little bit further than

23    that too.  It said talking to other officials and expressing

24    support also are not official acts, unless it crossed the line

25    into the "pressure or advised" text.

1    And our submission is that in the context of legislative

2    deliberations, what's been alleged here even as "delivering

3    the votes" doesn't cross beyond talking to or supporting

4    particular projects and be transformed into the kind of

5    official act that *McDonnell* had in mind as potential --

6         THE COURT:  What phrasing would you use to describe

7    that line between permissible persuasive conversation or

8    discussion on the one hand and impermissible pressuring and

9    advising on the other?  How would you have the Court formulate

10   that standard?

11        MR. DREEBEN:  I would say that it has to go beyond

12   the ordinary deliberations that are characteristic of a

13   multimember legislative body.  And that does not include talk,

14   and it does not include conversation, which are two things

15   that the indictment actually alleges.

16        At one point, it says that Mr. Sittenfeld will talk to

17   Public Official A.  In another part of the indictment, it says

18   that he's already engaged in those, quote, conversations.  So

19   I think --

20        THE COURT:  So under your view, then, a city council

21   member could tell someone in Cincinnati, "If you pay me

22   $5,000, I will try to lobby my colleagues to vote in your

23   favor on this project," and that would not be criminal because

24   that's not an official act?

25        MR. DREEBEN:  Your Honor has posed a hard

```
1    hypothetical.  I think that that does go beyond what's in this
2    indictment because of the --
3            THE COURT:  But that wasn't my question.  I was using
4    your rule in trying to explore --
5            MR. DREEBEN:  Yes.
6            THE COURT:  -- and that's why I called it a
7    hypothetical.  But your rule leads ineluctably to that
8    conclusion.
9            MR. DREEBEN:  I don't know that it does lead
10   ineluctably to that conclusion.  I think that it turns on the
11   specifics of what's actually alleged.  And I think that in
12   this context, it falls short of going beyond the ordinary
13   process of deliberation and conversation you'd expect in a
14   legislative body, as compared to the sort of pressuring that
15   the *McDonnell* Court had in mind.  The *McDonnell* --
16           THE COURT:  But doesn't "deliver the vote" sort of
17   invoke that sort of going beyond -- you know, it's a sort of a
18   promise.  "I'll get those."
19       At least as alleged -- and again, this is all
20   allegations.  At least as alleged, it feels sort of like,
21   "Yeah, I'll go get those.  I'll do what it takes and get the
22   votes I need on this project."
23           MR. DREEBEN:  I think it reflects a politician's
24   confidence in his persuasive ability and no more.  And the
25   specifics are totally missing here.  There's no allegation
```

1     that he said, "I'm going to go talk to X, I'm going to go talk

2     to Y." There's no allegation that he actually said or did

3     anything.

4         I recognize that the law doesn't require that. An

5     agreement is sufficient. But if you're trying to determine

6     what the content of the agreement is, it can help to look at

7     what actually happened. And here, the government doesn't have

8     anything like that to help take this over the line.

9         There's one other place that I thought is relevant to

10    your hypothetical, which is the paragraph that you've already

11    pointed to, paragraph 35, which is the first time in the

12    indictment that the government uses the "pressure" language.

13    Doesn't actually use the "advise" language in the earlier part

14    of the indictment involving deliver the votes, and I will

15    acknowledge that they don't have to use this precise language

16    in order to charge him.

17        But the first time they use "pressure" is in

18    paragraph 35, and this is very nebulous. This says he

19    continued to apply pressure and promised to apply additional

20    pressure to public officials, quote, relating to a development

21    agreement for Project 1.

22        What I would focus on here as inadequate is what is the

23    meaning of pressure "relating to a development agreement for

24    Project 1"? The development agreement is not spelled out.

25    "Relating to" is an incredibly broad connection. It doesn't

1     indicate that there's any official conduct that's involved

2     there.

3         As Your Honor will recall, there are two parts of

4     *McDonnell*.  One, you need a specific, focused, concrete

5     question.  And the second is you need official action on it.

6         Even if the Court is prepared to say that you alleged

7     pressure, you know, you've got the action on it, there's

8     nothing specific here that falls into the "concrete, focused"

9     basket that *McDonnell* requires --

10            THE COURT:  But isn't it the development agreement?

11    Why isn't the development agreement on Project 1 the concrete

12    project?

13            MR. DREEBEN:  The development agreement is a

14    potentially vast set of governmental actions that are not

15    specified here.  But what I'm focusing on is that it says

16    "relating to."

17        I don't know what "relating to" means.  I think if Your

18    Honor does not dismiss this allegation, it may be appropriate

19    for the government either to tell us what it means or for the

20    Court to grant a bill of particulars because, at this point,

21    we have no idea what it thinks Mr. Sittenfeld did, and we have

22    no idea what it thinks it related to, and that --

23            THE COURT:  That was, I guess -- well, now, I still

24    have two questions left.  There will always be two questions

25    left.

1      But that was sort of where I was going is a lot of your

2   complaints seem to be the kind of complaints that could be

3   made with regard to an awful lot of indictments, like the one

4   for distribution that we talked about a little bit earlier.

5   And isn't the typical remedy for that a bill of particulars

6   rather than, you know, dismissal of an indictment?

7      MR. DREEBEN:  I think this is actually one of the few

8   paragraphs where I would say that we need some more precision

9   to have any idea what the government is talking about and in

10  order to meet the charges.

11     So we're not here making that motion today.  The motion

12  that we're making is actually based on all the details that

13  the government has chosen to lay out in the indictment, which

14  we think falls short of the criminal offense.

15     THE COURT:  And my last question, Mr. Dreeben, for

16  right now, at least, is with regard to the separate

17  allegations directed under 666(a)(1)(B).

18     MR. DREEBEN:  Yes.

19     THE COURT:  As I read *Porter*, a quid pro quo

20  requirement is -- there is no quid pro quo requirement for

21  666(a)(1)(B), so what does it matter whether they've

22  sufficiently alleged an explicit agreement or not?  You would

23  agree, I would think, that that isn't a requirement for a

24  666(a)(1)(B) charge?

25     MR. DREEBEN:  I actually would agree with the First

1    Circuit and language in the Second Circuit's opinion that is

2    otherwise.  But I recognize that in *Abbey*, the Sixth Circuit

3    confronted this question and resolved it, I think, incorrectly

4    and the court followed that in *Porter*.

5        We have a different argument on Section 666.  We're not

6    arguing for the identical quid pro quo requirement, but we do

7    think that there's language in 666 and the same policy

8    concerns that animated *McCormick* that do justify requiring an

9    objective screen before the Court allows a 666 charge to go to

10   the jury.  This is purely a subjective intent requirement.

11       So 666 has to have two intent requirements.  One is

12   "corruptly," the other is "intending to be influenced."  I

13   will leave aside the fact that the Supreme Court derived a

14   quid pro quo requirement from "intending to be influenced" in

15   the *Sun-Diamond* case in interpreting 18 U.S.C. 201.

16       But there is still also an actus reus element to

17   Section 666, which is there has to be a corrupt solicitation,

18   corrupt demand, or corrupt acceptance or corrupt agreement to

19   accept.

20       And our view is that taking into account the

21   considerations that inform the Supreme Court's decision in

22   *McDonnell*, there needs to be an objective basis for inferring

23   the corrupt conduct; that the government cannot simply go

24   forward and peer into somebody's mind and rely on an entirely

25   subjective approach to Section 666 without risking

1  criminalizing the very conduct that *McCormick* said is

2  protected.

3      So I would say that if the government could come forward

4  and say, Hey, in the same conversation, you know,

5  Mr. Sittenfeld touted his support for the following project,

6  and he asked for money, you can infer from that that he

7  intended to be influenced and he acted corruptly, then I think

8  that the same problem that the Court tried to avoid in

9  *McCormick*, and that the Sixth Circuit did recognize in *Abbey*

10 in connection with the Hobbs Act, not 666, would exist.

11     *Abbey* was not a political contributions case.  *Porter* was

12 not a political contributions case.  Why hasn't the Sixth

13 Circuit ever confronted this precise problem.  But it has said

14 that the meaning of "corruptly" in criminal law -- this is in

15 footnote 7 in *Abbey* -- "is an act done with an intent to give

16 some advantage inconsistent with official duty and the rights

17 of others."

18     That is classically the language from which courts derive

19 a form of a quid pro quo requirement in the bribery context.

20 So it means just bribery.

21     This is a quote from a Justice Scalia opinion, a

22 dissenting opinion, the *Aguilar* case, and it goes on to say

23 bribery that is more comprehensive because an act may be

24 corruptly done, though the advantage to be derived is offered

25 to another.

1     So our submission to the Court on this one is that 666

2   doesn't have an exclusive quid pro quo requirement as a form

3   of conduct that the government needs to allege and prove. But

4   it does require, with a gloss based on the *McCormick* policies,

5   that there be an objective foundation from which a jury could

6   infer corrupt action with an intent to be influenced.

7     And absent that, the statute is either unconstitutionally

8   vague or infringes upon First Amendment rights. And in order

9   to --

10     THE COURT: In that regard -- and then I promise this

11   is my last question so, Mr. Singer, please be ready to go.

12     But in that regard, wouldn't structuring the way in which

13   contributions are made, you know, using LLCs or using people

14   who are divorced from the people who are actually seeking the

15   benefit, wouldn't that give rise to some kind of inference of

16   sort of known wrongdoing, or at least potentially give rise to

17   that kind of inference?

18     And I understand jury closings are great things, and we

19   can do a lot in a jury closing, but we're at the motion to

20   dismiss an indictment stage. And so to me, it's just could

21   you, you know, possibly infer from that some kind of corrupt

22   conduct. And it seems like that might give you at least a leg

23   in that direction, doesn't it?

24     MR. DREEBEN: I think that in some cases,

25   surreptitious activity, concealment, deception is the kind of

1     thing that the government would point to to draw those

2     inferences.

3         What's different about this case is that the desire for

4     anonymity and protection came from the confidential informant,

5     who said right up front, I don't want my name associated with

6     these things because Public Official A is on my case.

7         And so when you have a political figure who is doing

8     legitimate activity -- there's no claim that the PAC is

9     unlawful.  There's no claim that the contributions were

10    unlawful.  In fact, scattered throughout this indictment are

11    several instances in which the defendant comes back and says,

12    I'm not really sure we can do this, you know.  We need names

13    for these LLCs.  They have to be real names, real LLCs.  And

14    the confidential witness and the undercover agents, who the

15    government is scripting, are the ones that say, I don't want

16    my name associated with this.

17        So I think that that removes some of the force of the

18    government's contention here that there was surreptitious

19    behavior that supports an adverse incurrence on the intent of

20    the defendant.

21        In this sense, I think the government has been reasonably

22    candid.  There's much more context in these telephone calls.

23    Not the purpose of this motion to address, but it's put enough

24    in this indictment to actually undercut some of the inferences

25    that the law would otherwise allow to be drawn and, in another

1    case, are legitimate inferences to be drawn.

2    So that's our submission on Section 666.  We recognize

3    it's a different statute.  It hasn't been construed in this

4    context, but we think that it would be illogical not to apply

5    the protections that *McCormick* thought were intrinsic to the

6    political system in the context of political contributions.

7    And other courts have recognized that.  There actually

8    have been cases in which the government has conceded that a

9    quid pro quo has to be pleaded under Section 666 in the

10   political contribution context.  The Eleventh Circuit

11   recognized that the government had done that in the *Siegelman*

12   case and in some other cases, and the Sixth Circuit just

13   hasn't confronted the issue.

14   THE COURT:  Thank you, Mr. Dreeben.  I will give you

15   an opportunity to say a few words in response to your

16   colleague.  But I think, in the interest of time, we should

17   probably hear from the government at this point.

18   MR. DREEBEN:  Thank you, Your Honor.

19   THE COURT:  Thank you.

20   Mr. Singer, is it you we're going to hear from?

21   MR. SINGER:  Yes, Your Honor.

22   THE COURT:  Good afternoon, Mr. Singer.

23   MR. SINGER:  Good afternoon.

24   THE COURT:  So we've talked quite a while already

25   with Mr. Dreeben.  Reactions?  Let's start with your view on

1   what the standard is.

2       I mean, it sounds to me like what the real motion here is

3   you guys could have had a lot skinnier indictment, and it may

4   have been subject to a bill of particulars, but it wouldn't be

5   subject to this motion.  But now you sort of, you know, shot

6   yourself in the foot, and you alleged a bunch of facts that

7   show that a crime didn't occur and that you've sort of pled

8   yourself out of court.

9       So what are your thoughts on, A, what's the standard; do

10  you think?  What standard should I use to review the

11  Complaint?

12      MR. SINGER:  So the government would submit that the

13  standard is, quite simply, what is set forth in *Hamling*,

14  repeated in *Lee*, that where the elements provide notice and

15  where the facts give the defendant the opportunity to plead

16  double jeopardy, that's all that is required at this stage.

17      The fact that additional facts were put in, additional

18  notice was provided does not all of a sudden transform it into

19  a situation where the government has to provide all of its

20  evidence, that it has to present its entire case in its

21  indictment because it simply provided additional notice.

22      There is no legal support for that that has been cited in

23  the defendant's brief.  And it's particularly telling, I

24  think, that none of the cases that the defendant cites to

25  support dismissal based on -- in other cases, like *Landham*,

1    where the Court dismissed after analysis of the language and

2    of the facts, none of them are in the political corruption

3    context.  None of them are in a situation where whether or not

4    a quid pro quo was adequately alleged is subject to dismissal

5    based on additional facts.

6         And the reason for that is because a quid pro quo is, in

7    itself, a fact-based analysis.  A fact-based analysis that

8    turns on all the facts and surrounding circumstances, and it

9    is one that the jury must determine.

10        It's unlike, for example, *Landham*, where the Court -- or

11   where the indictment alleged a threat, and then said "to wit,"

12   and then set forth the language of that threat.  And the Court

13   was able to assess that that language that they to witted was

14   enough to show that there was no threat.

15        THE COURT:  Well, but as I understand Mr. Dreeben,

16   he's saying -- kind of accepting that for present purposes, at

17   least, but saying, okay, well, in paragraph 16, you say

18   Sittenfeld agreed to deliver votes for the project in return

19   for $20,000, and then you go on for another four sentences,

20   and all those things show that he wasn't really promising to

21   do anything in return for the $20,000.  He was just saying

22   these are things that I will do, I guess, but not -- I think

23   the question is what gives rise to the "in exchange for" part

24   of that?

25        MR. SINGER:  What gives rise, Your Honor, is that the

1    jury's task, in assessing whether or not it was a quid pro

2    quo, is to consider all of the facts and circumstances to

3    determine whether it existed.  And so to pull out a particular

4    paragraph and to create an inference based on that paragraph

5    in the exclusion of not only all the other paragraphs in the

6    indictment, but which the way it would be presented at a

7    trial, the entire recording, all of the circumstances

8    surrounding the recording and the recordings before and after

9    that that gives that context, that gives the circumstances the

10   jury must consider in assessing it.

11           THE COURT:  So in your view, with regard to a claim

12   or a case like this one, having set forth the statutory

13   elements, are there any facts that the government could have

14   put in here that would have put it in the *Landham* type

15   situation, where it kind of pled itself out of court?

16      So as long as they say, "Sittenfeld agreed to deliver

17   votes for the project in return for $20,000," no matter what

18   they go on to say about what that actually means, about what

19   he actually did or anything else isn't going to boot them out

20   of court?

21           MR. SINGER:  So long as there are facts in there that

22   support the elements that are laid out and the allegations in

23   the indictment factually support those elements, then no.  I

24   think --

25           THE COURT:  Well, but that's the question.  Does it

1    factually -- what's your factual support for the statement

2    "Sittenfeld agreed to deliver votes for the project in return

3    for $20,000"?  What facts support this?

4      I think what Mr. Dreeben is saying is you read the rest

5    of the facts in that paragraph, it doesn't support that.  I

6    mean, you can say, "I disagree.  I think it does," but ...

7         MR. SINGER:  Well, I disagree.  I think it does.  But

8    I think that what the point is, that the jury is going to have

9    to hear that recording and make that determination.  And it's

10    not based on the cold words on a paper.  This is a paraphrase

11    and a summary of what are recordings of the actual evidence

12    that the jury would hear.  That's the evidence of the case and

13    that -- we have set forth --

14         THE COURT:  In that regard, why didn't you just stop

15    paragraph 16 after the first sentence?  What's the role of the

16    rest of that paragraph?

17         MR. SINGER:  The role of the rest of the paragraph is

18    to give context to the first sentence.

19         THE COURT:  Okay.  So that is the stuff that is

20    supposed to buttress the fact that he's agreeing to deliver

21    votes in return for $20,000.  That's your summary of the facts

22    that sort of buttress that; is that right?

23         MR. SINGER:  That's correct.

24         THE COURT:  And so if I look at it and say it doesn't

25    buttress that, should you lose at that point or not?

1    MR. SINGER:  No, because it's the jury's job to

2    assess that.  This indictment puts the defendant on notice

3    that these are the types of facts that support the

4    allegations.  They're not all the facts.

5    THE COURT:  You're saying the question of whether

6    some act is being done in return for money is just a topic

7    that the Court cannot address at the motion to dismiss an

8    indictment stage -- is that what I understand you to be

9    saying? -- because that's inherently a jury question that

10   can't be resolved by the Court at the motion to dismiss stage?

11   MR. SINGER:  That's correct, Your Honor.  The

12   language in evidence sets forth what an explicit quid pro quo

13   requires, and that is a payment of money in return for some

14   specific official action.  That is what the government has

15   alleged.

16   The facts that are introductory and the additional

17   paragraphs in the beginning set forth the notice, putting the

18   defendant on notice that these are the types of facts that are

19   going to support these allegations.  They are not all the

20   facts, though, but they do support the allegations.  And in

21   order to assess whether or not that's true, it is up to the

22   jury to analyze all these based on all the facts.

23   I would also -- I would disagree, as I think you noted,

24   as to whether or not the remainder of that paragraph doesn't

25   support its topic sentence.  What we have here is -- well, I

1    think it's worth backing up because, again, this paragraph is

2    not read in isolation.  It's read in the context of the

3    paragraph that preceded it.

4        And although inducement is not required under the *Evans*

5    standard, as *Evans* set forth, merely accepting a bribe,

6    knowing that it's being paid for some official action, is

7    sufficient in itself.  The allegations in the indictment lay

8    out quite clearly inducement from the start; namely,

9    paragraph 13, in which, I think as the Court noted, the

10   allegations suggest that the defendant knew that the

11   cooperating witness was having a hard time getting a

12   development project to go through.

13       Knowing that, while soliciting money and in the same

14   conversation as soliciting money, he says, you know, "You

15   don't want me to be like, 'Hey, Cooperating Witness, like,

16   love you, but can't,' you know ... I want people to support

17   me."  Well, a smart candidate does that.

18       This allegation shows that the cooperating witness is put

19   in a situation where he doesn't want this individual who is

20   going to vote on his project to say, "love you, but can't."

21   He feels like he needs to give money.

22       The conversation that followed a couple days later, a

23   very express quid pro quo was put out there.  We'll give you

24   $10,000, but we need to know it's "a yes vote ... without a

25   doubt."

1          THE COURT:  Which paragraph are you reading from,

2     Mr. Singer?

3          MR. SINGER:  That's paragraph 14.  This is the

4     paragraph in which the defendant claims that the exculpatory

5     response was that nothing could be a quid pro quo.

6          THE COURT:  Right.

7          MR. SINGER:  Again, this goes into all the facts and

8     circumstances that a jury must consider.

9       His response, It can't be a quid pro quo, but let me meet

10    you in person so I can show that I'm pro-development and that

11    you are investing in a winning endeavor.

12      So the jury could consider this in a lot of different

13    ways.  They could say, oh, he doesn't want a quid pro quo.

14    The jury could also say he just was offered a very express

15    illegal offer, and he still wants to go meet that person and

16    show that he's worthwhile and show that he is going to be able

17    to present a winning opportunity for this corrupt investor.

18    And then not only that --

19         THE COURT:  I think what Mr. Dreeben would say is,

20    yeah, that's all well and good.  But sort of, you know, in

21    politics, the way that people get elected is by finding other

22    people who share the same goals as the person running for

23    office.

24      So if it's a pro-development person who is running for

25    office, that person's going to try to find people who would

1    benefit from development in Cincinnati or are interested in

2    developing in Cincinnati.  And they're going to go and tell

3    those people, I want you to know that I'm a very

4    pro-development person.  And if I get elected, you can expect

5    there's going to be a lot of support for development.

6         And then those people who are pro-development give money,

7    and then the U.S. Attorney's Office comes in and says, well,

8    that's bribery, or that's honest services doctrine, or

9    whatever, you know.

10        It does seem like some lines need to be drawn, doesn't

11   it?

12             MR. SINGER:  So if the case were charged based on

13   those two paragraphs I just recited, then there would be

14   issues.  But the point is that these paragraphs are indicative

15   of intent, that they are part of all the facts and

16   circumstances that a jury must consider.

17        And so when the defendant meets with this individual a

18   week later, he knows he's a corrupt investor.  He knows the

19   guy is dirty.  That is part of the surrounding circumstances

20   that must be considered.

21        And so when that corrupt investor talks about what he

22   wants from a development project, and in the same conversation

23   they talk about campaign contributions, that's further

24   evidence of intent.  That's further evidence that they are

25   moving towards an agreement that could be corrupt.

1        And then when the defendant -- when the corrupt -- that

2    same corrupt investor says, "I'd like a deal.  We'll give you

3    $20,000, but we need to know that this project is going to be

4    veto-proof.  That means we're going to need six votes on this

5    project.  How can I get you that money so we can get that

6    deal," the jury could reasonably conclude, based on that, when

7    the response is, "I can deliver the votes," and then they talk

8    about how to get that $20,000 to the defendant, that when he

9    receives that, when he agrees to that, he's doing it knowing

10   that he's receiving a bribe.

11       And that is the fundamental link that I think the

12   defendant is missing.  They don't -- they have latched on to

13   this language that requires control, that they need to be

14   controlled by the agreement.

15       But I think what the law says, as set forth in *Evans* and

16   *Blandford* and *Terry*, is that by knowingly receiving what is a

17   bribe, they are agreeing to be controlled by that.

18       *Evans* said, "We hold today that the government" --

19           THE COURT:  Well --

20   (Indiscernible crosstalk.)

21           MR. SINGER:  -- "that a public official has obtained

22   a payment to which he's not entitled, knowing the payment was

23   made in return for official acts."

24       At the time --

25           THE COURT:  What do you say to the argument that,

1    well, the phrase "deliver votes" is not an official act?  I

2    mean, you would concede you need an official act, right?

3            MR. SINGER:  Absolutely.

4            THE COURT:  Okay.  And in your view, is "deliver

5    votes" an official act under *McDonnell*?

6            MR. SINGER:  It is, Your Honor.  It is a specific

7    question or matter.  We're talking about Project 1 --

8            THE COURT:  Okay.

9            MR. SINGER:  -- focused.  We're talking about a

10   development agreement, and it is an action on that specific

11   matter.  It is not only the vote from the defendant, but it's

12   his agreement that there will be other votes that will

13   accompany it; specifically, five other votes.

14           THE COURT:  How are the votes that other city council

15   members cast an official act of this defendant?

16           MR. SINGER:  So it will be -- again, this is a jury

17   question, but it will be up to the jury to determine what did

18   he mean by "deliver votes" based on the context, based on the

19   nature of the conversation.

20           THE COURT:  Well, I don't know.  You might have

21   thought it would have been a jury question in *McDonnell*, but

22   it turned out not to be, right?  I mean --

23           MR. SINGER:  Well, I don't think that's true, Your

24   Honor.  What the Court said in *McDonnell* is that the jury

25   instructions that were provided on official action were

1    incorrect because they were too broad.  It was remanded to

2    determine whether or not the facts that were set forth were

3    sufficient.

4        I think what *McDonnell* said is it's up to the jury, under

5    the facts of the case, to determine whether the public

6    official agreed to perform an official act at the time of the

7    alleged quid pro quo.  It's going to be up to the jury to --

8        THE COURT:  Hold on a second.  Do you think, once

9    *McDonnell* sort of further explicated what's required for an

10   official act, that in any way changed what's required to be

11   alleged in an indictment, or not?

12       MR. SINGER:  I don't, Your Honor.  The Sixth

13   Circuit's pattern jury instructions, they set forth the

14   standard in *McDonnell*.  It will be presented to the jury to

15   determine whether or not there was a question or matter,

16   whether or not it was specific in focus, and whether or not

17   the defendant took an action on a specific matter.

18       THE COURT:  But what if your indictment had said, you

19   know, "The government alleges that the official act was that

20   the defendant agreed to call the governor of the State of Ohio

21   and wish him a happy birthday," which, you know, it's got

22   nothing -- I mean, couldn't you plead yourself out of court on

23   the official act part?

24       MR. SINGER:  I suppose you could, Your Honor.  There

25   is some tension there with that -- the legal impossibility

1    type case that you were discussing previously with

2    Mr. Dreeben.  That's not where we are here.

3        A reasonable jury could hear "I will deliver votes,"

4    knowing that delivering votes is getting the votes of five

5    other city council members.  It means that I'm going to talk

6    to them.  I'm going to -- I will convince them that this

7    development agreement is one that needs to be supported.

8        But again, that is a --

9        THE COURT:  But it would seem like Mr. Dreeben would

10   say the first "I'm going to talk to them" is what city council

11   members do all the time and even under *McDonnell* is not an

12   official act, right?  I mean, just talking to somebody isn't

13   an official act.

14       MR. SINGER:  Correct.  But I don't know if the

15   defendant could deliver votes by talking to someone.  What

16   he's saying there, or a jury can conclude what he's saying is

17   that you will have six votes for your project.

18       He's saying that because he's confident that he can

19   shepherd votes, that he can -- a jury could reasonably

20   conclude that means that he can convince five other council

21   members that they too should support the project, and that is

22   done by pressuring and advising.

23       That is why that language -- I would submit that is why

24   that language was included in *McDonnell*.  It would be

25   inconsistent, I think, with how the Court views -- how the

1    Supreme Court has viewed corruption cases broadly to allow a

2    public official to be able to take money, as the hypothetical

3    that the Court presented to Mr. Dreeben sets forth, to take

4    money to go and convince their fellow legislators to support

5    the project and that not be illegal, that not be a bribe.

6            THE COURT:  So to take this a little bit out of

7    order, there's a question I wanted to ask before I forget it.

8        Near the end with Mr. Dreeben, we talked about the fact

9    that, you know, attempts to conceal or things like that might

10   give rise to an inference of corrupt behavior, illegality, or

11   surreptitiousness, or whatever you want to call it.

12       But Mr. Dreeben made an interesting point in response

13   that I hadn't thought of, which is it does seem here like

14   the -- even on the indictment, that the desire to avoid sort

15   of the public awareness of the link was driven more by a

16   desire on the part of the contributors to avoid potential

17   retribution from Public Official A than it was based on a

18   desire of the defendant to avoid public knowledge of the

19   contributions, or at least it certainly seems like it could be

20   read that way.

21       I just wondered if you had any thoughts about that.

22           MR. SINGER:  Yeah.  You know, Your Honor, it could

23   potentially could be read that way.  But it could also be read

24   as once the corrupt businessmen, the UCEs who are posing as

25   corrupt businessmen, offered $20,000, that it was the

1    defendant who came back and said, Well, how can we get 18

2    different LLCs to pay $20,000?

3        And it was the defendant who came back and said, Well, I

4    have this PAC that no one knows about, and it's not connected

5    to me.  That will protect you guys.

6        So the jury could reasonably conclude that he was

7    complicit in that, and he was very much --

8            THE COURT:  Well, there's nothing wrong with him

9    being complicit in trying to protect or shelter contributors

10   to his campaign from retribution from another public official,

11   is there?  That's not untoward conduct.

12           MR. SINGER:  I thought that the Court's question

13   related to whether or not that supports an inference of

14   intent, and I think it does.

15       You're right.  There is not -- in isolation, there's

16   nothing wrong with delivering votes.  In isolation, there's

17   nothing wrong with accepting a certain contribution in a way,

18   so long as it's consistent with how the FEC, states, or local

19   law allows contributions to be accepted.

20       But when it's knowing -- when it's received, knowing that

21   it's being paid for a bribe payment, and then the steps are

22   taken to keep the names of the bribe payers off of public

23   filings, then it supports an inference of intent, and it

24   supports an inference of a quid pro quo.

25           THE COURT:  The *Evans* standard that you keep going

1     back to, which is the public official accepted the money

2     knowing why it was paid, basically, which crime or crimes does

3     that standard apply to?  Is that all of them, or what element

4     is that going to?

5          MR. SINGER:  So that goes to whether or not there is

6     an explicit quid pro quo for the Hobbs Act and the Honest

7     Services Act.

8          THE COURT:  So that isn't a showing you need to make

9     under the 666(a)(1)(B) violation, right?

10         MR. SINGER:  That's correct, Your Honor.

11         THE COURT:  So it doesn't go to whether it was

12    corrupt?

13         MR. SINGER:  Well, I think it would.  So it is not an

14    element in the same way that the Hobbs Act and honest services

15    require the "in return for" type language.  But under 666,

16    you're right.  It requires corrupt.  And, again, that turns on

17    the defendant's intent, and the defendant knowingly receiving

18    a bribe payment would certainly be evidence that would support

19    that corrupt element.

20         THE COURT:  So as I understand part of what you're

21    saying, Mr. Singer, you're essentially saying, We've never

22    said this is everything we've got.  We think it's enough for

23    the indictment, but we've never said it's everything we've

24    got.  And if and when we get to trial, we understand what we

25    have to prove to a jury, and that's when this should all be

1    decided, not on the motion to dismiss.

2        Does that sort of encapsulate your argument?

3        MR. SINGER:  That's correct, Your Honor.  In fact, if

4    I could shine a light on one particular example in the

5    official action context, I think it would be helpful.

6        So there is a discussion on the latter part of the

7    indictment, in the factual portion, that discusses the zoning

8    change that would help a sports betting project be developed

9    through Project 1.

10        The allegations, they start on -- I'm focusing on

11    paragraph 29 of the indictment.  There's a discussion about

12    statewide legislation, and then there's a discussion about

13    increased barriers of entry for competitors to operate a

14    sports book.  So this is putting the defendant on notice as to

15    the sports book issue that will be addressed later.

16        Now, there is a lot more context, factual context,

17    evidence that relate to both of those.  There were subsequent

18    phone calls.  There were other discussions about how the

19    statewide legislation would play off the sports book and the

20    zoning-type changes between undercovers and the defendant.

21        So by the time that they reached, on paragraph 31, the

22    September 24, 2019 meeting, this issue had been discussed.

23        That's not the way the indictment reads because every

24    piece of evidence, every conversation has not been entered

25    into the indictment.  But it's all evidence that the jury

1    would consider in determining whether or not there is official

2    action with regard to the sports book.

3         THE COURT:  To me, you've now pointed the Court at

4    one of the sort of, in some ways, weaker or thinner parts of

5    the indictment.  I mean, what's the specific project, as that

6    term is used in *McDonnell*, that's at issue there?

7       I mean, what specific thing is either before the city

8    council or likely to come before the city council on which

9    Sittenfeld is promising to take action?

10      I mean, they're discussing, you know, how zoning works,

11   but where is the, "Oh, this piece of legislation is coming

12   before the city council on zoning, and we need you to do A, B,

13   or C with regard to that"?  That doesn't seem to be here.

14        MR. SINGER:  So the question or matter is Project 1.

15   The official action that would be taken in support would be

16   passing a zoning regulation that would limit competition so

17   that a sports book could be in Project 1.

18        THE COURT:  But where does he agree to -- where is

19   anything that suggests he's agreed to pass a zoning code?

20        MR. SINGER:  So he's discussing -- the language is in

21   discussing the steps that could be taken in paragraph 31 to

22   further this efforts to get the zoning code, to change the

23   code so that they could have sports betting.

24      And the response, directly after him proposing a change

25   to the zoning code is, This is exactly what I want you to do,

1    and we're going to take care of you because you're doing it.

2        So when they pay him -- when the undercovers paid the

3    defendant the PAC payments that afternoon and later, it's with

4    the understanding that he's receiving that money, knowing it

5    is being paid so that that zoning code issue can be taken care

6    of.

7        And the point is that although this paragraph references

8    the zoning code and the discussion about what they want

9    relating to a controlled environment, what the jury will have

10    to consider is all the recordings that discuss this, all of

11    the context.

12        And they also will have to consider that this isn't the

13    first time that he's dealt with these individuals.  By the

14    time we get to September 24, 2019, there is no question that

15    these individuals are corrupt.

16        And that is part of the context that the jury must

17    consider in determining when he received those PAC

18    contributions and was promised those PAC contributions.

19    Directly after saying that "I think we can limit competition

20    through a zoning code," and the undercover said, "I want you

21    to do that" and gives him money in response, that he is

22    knowingly receiving a bribe from this.  That's what the jury

23    could conclude.

24        THE COURT:  Thank you, Mr. Singer.  Is there anything

25    else you wanted to add?  I think you've kind of answered my

1    questions.

2            MR. SINGER:  Yes.

3            THE COURT:  Go ahead.

4            MR. SINGER:  I would just add that -- I think we

5    adequately set this forth in the briefing, but at its balance,

6    what the defendant is trying to do is, through a pretrial

7    ruling, resolve a jury issue without all the facts.

8        And there are no cases that the Court -- that the

9    defendant has cited, not a single corruption case that

10   supports that analysis.  Not *Menendez*.  The defendant cites

11   the *Pawlowski* case.  What the defendant did not note in citing

12   the *Pawlowski* -- I think it was *Pawlowski* and *Allinson* were

13   cited in the briefing, page ID 345.

14       This is -- first of all, this is the same case.  They're

15   charged in the same indictment.  The *Pawlowski* and *Allinson*

16   case are charged in the same indictment.  It's the same case.

17       What the defendant has presented is a post-trial brief on

18   these issues, and the Third Circuit and the Sixth Circuit have

19   different analysis of whether or not a quid pro quo is

20   required under 666.

21       But what's more important is what the defendant did not

22   present is the ruling on the motion to dismiss in the

23   *Pawlowski* and *Allinson* cases.  And in both of those, the

24   Court -- the same challenge was presented, whether or not 666

25   requires this explicitness standard, and the Court rejected it

1    and, in doing so, said, and I quote, Whether the facts alleged

2    in the indictment satisfy the meaning of an explicit quid pro

3    quo under *McCormick* or the definition of an official act under

4    *McConnell* are factual determinations to be resolved after the

5    government has presented its evidence at trial.

6       This is what the Court's holding was in response to a

7    similar motion to dismiss, and that is what the government

8    would argue is what is appropriate here.

9       THE COURT:  So basically -- I'm just trying to figure

10    out the minimum that you would need to be able to move forward

11    with an indictment against a public official.

12       So, basically, if the parties have identified some

13    project that may come before that official and they've

14    discussed it, and the official said something like, "Yeah,

15    generally, I'm on board with that," and then the person makes

16    the contribution, everything else can be inferred?  That's

17    enough, from your viewpoint, to get all the way to a jury?

18    You can just set that forth in an indictment, and this public

19    official, then, his or her fate is now in the hands of a jury?

20    Is that basically right?

21       MR. SINGER:  I think that would be right.  And I

22    think the reason we included the *Terry* indictment as an

23    attachment to our submission is that there's not a whole lot

24    there.  The only evidence relating to an agreement are fairly

25    boilerplate language that set forth the elements and the

1    manner and means.

2        And what is important is that a grand jury returned this

3    indictment.  A grand jury heard the evidence, was presented

4    the evidence.  And once the grand jury returns the indictment,

5    then, yes, it is up to the jury to determine these jury issues

6    and resolve whether or not there was an intent to engage in an

7    explicit quid pro quo.

8            THE COURT:  And now that I've managed, while you were

9    talking, to actually pull the relevant language from *McDonnell*

10   up in front of me, I wanted to circle back on the zoning

11   thing.

12           MR. SINGER:  Sure.

13           THE COURT:  Under *McDonnell*, it says there are,

14   quote, two requirements for an official act.  First, the

15   government must identify a question, matter, cause, suit,

16   proceeding, or controversy that may at any time be pending or

17   may, by law, be brought before a public official.

18       So once the project has been transferred to the Port,

19   which is in what you're calling, I think, phase two or stage

20   two or whatever, now the project itself is no longer in front

21   of the council.

22       But the question is, I guess, the zoning around that

23   project.  And it seems like the zoning is something that may

24   be pending or may be brought before the public official.  So

25   zoning in connection with the project might satisfy that.

1    And then it says, "Second, the government must prove that

2    the public official made a decision or took an action on that

3    question ... or agreed to do so."

4    So where is the agreement to do something about zoning?

5    And you're just saying that's inferred from where we are sort

6    of in the course of the relationship among all these people at

7    this time; is that right?

8    MR. SINGER:  I am, Your Honor.  They're in a meeting

9    in which the purpose of the meeting is to talk about how we

10    can get this sports book.

11    And the defendant says, Well, we can change the zoning

12    code.

13    And the corrupt businessman says, Well, that's what I

14    want you to do, and I'm going to give you money for it.

15    And I think what's important, *and McDonnell* says, on

16    page 2371, an agreement to take official action "need not be

17    explicit, and the public official need not specify the means

18    that he will use to perform his end of the bargain."  So they

19    don't have to lay out exactly what they're going to do.

20    And *Terry* was the same way.  At the time that the -- I

21    think it was July of 2007 that contributions were made.  The

22    motion for summary judgement that was requested from the

23    defendant was July 2008.  Specifics need not be hammered out

24    at the time of the agreement.  It's just that there was an

25    understanding.  We're going to do the zoning, and we're going

1   to pay you money for it.

2        THE COURT:  So it's your view that at the time the

3   payments that are listed in paragraph 32 occurred, an

4   objective person in the shoes of the person making those

5   payments would have understood that it was in exchange for an

6   agreement to do something about zoning?

7        MR. SINGER:  That's right.  That the --

8        THE COURT:  A reasonable jury could conclude that?

9        MR. SINGER:  The jury could conclude that the

10  defendant received that money with the understanding that the

11  official action in enacting a zoning change is what that money

12  is being paid for, at least in part.

13       THE COURT:  Thank you, Mr. Singer.  I'm happy to give

14  you more time.  I don't have anymore specific questions for

15  you, but I'm happy to give you more time if there's more you

16  want to address.

17       MR. SINGER:  Our briefing sets forth the issues.  So

18  unless the Court has any additional questions, the government

19  rests.

20       THE COURT:  Thank you, Mr. Singer.

21    Mr. Dreeben, I promised I'd give you an opportunity to

22  give me some parting thoughts here.  I would appreciate it if

23  we could keep it somewhat brief.

24    We've had an opportunity -- it's been very illuminating,

25  but an opportunity to talk at some length this afternoon but

1    would welcome additional thoughts, if you have any.  And in

2    particular, I'd like to ask you to respond to a couple of

3    points that Mr. Singer made.

4        First, Mr. Singer suggests that sort of as a matter of, I

5    don't know if you'd call it procedure or substance, but that

6    the Court can never decide, at the motion to dismiss an

7    indictment stage, whether the "in return for" element is met

8    based on the facts set forth in the indictment.

9        And second, he discussed the *Evans* standard of where the

10   public official accepts money, knowing why it was paid.  Or I

11   think another way to sort of rearrange that would be to say

12   what an objective person in the shoes of the person making the

13   contribution would have understood they were making that

14   contribution for.

15       So I'd like your thoughts on both of those topics, at

16   least, but I'm willing to hear other things that you might

17   have to say as well.

18           MR. DREEBEN:  Thank you, Your Honor.  Those happen to

19   be the first two points that I had on my list to address so we

20   are eye to eye on that.

21       First of all, I'm not sure that the government is

22   referring to the same *Menendez* opinion that we are.  There's a

23   lot of opinions in that case.  It's a District of New Jersey

24   case at 132 F.Supp. 635; and specifically, 641 through 644.

25       The Court does go through the heightened showings that

1    the First Amendment and *McCormick* require for quid pro quo,

2    and it goes on to dismiss several counts in the indictment for

3    failure to include the appropriate allegations that --

4         THE COURT:  What was the jump cite there,

5    Mr. Dreeben?  I got the 132 F.Supp.  What was the jump pages?

6         MR. DREEBEN:  It's 132 F.Supp. 3d.  635 is the

7    initial cite, and the jump cite is 641, where the Court

8    discusses the legal standards, and then at 643 through 644

9    dismisses three counts of the indictment and upholds two

10   others.

11        THE COURT:  Okay.

12        MR. DREEBEN:  So I think this is not a totally

13   unfamiliar process for a court to decide that the "in return

14   for" aspect is not there.  And this kind of, I think, will

15   dovetail into the *Evans* point.

16        *Evans* and *McCormick* have given rise to, I think, a

17   considerable amount of confusion in the lower courts because

18   both cases are ostensibly campaign contributions.  *McCormick*

19   uses the explicit language.  *Evans* doesn't walk that back, but

20   it does talk about the crime consisting of receiving money,

21   knowing that it's in return for a specific requested official

22   action.

23        The important point that I think is relevant here to Your

24   Honor's task on this motion is that this is not purely a

25   question of subjective intent.  The government's main theme in

1    its opposition is that, first of all, it has to do with *Lee*

2    and *Hamling*; and second, this is all a question of intent for

3    the jury.

4        But I don't think that that's quite right because the

5    legal standard here, I think, was clearly stated in a Second

6    Circuit case that the government cites and that we reply to

7    called *United States versus Silver*, and that is 948 F.3d 538.

8        And what *Silver* says is there doesn't actually have to be

9    a meeting of the minds between the politician and the

10   contributor.  It's not required that they actually agree.  But

11   what is required -- and I'm quoting here -- is "the intent the

12   official conveys to the payor; i.e., that he will take or

13   refrain from taking certain official action in return for

14   payment."

15       And it goes on to say what matters is what the official

16   manifested.  Did he manifest a willingness to take payment for

17   official action and inaction?

18       And if you lay that standard on top of the Port

19   interaction, which Mr. Singer talked about as an example of a

20   quid pro quo, you've got Mr. Sittenfeld talking about some --

21   before any mention of campaign contributions are there, he

22   wants to get sports betting in the project as a logical use

23   and for that financial consideration he (distorted audio).

24       And then you have the UC voluntarily trying to link the

25   two together, payment and the zoning.

1    I don't understand how the causal effect can be presented

2    when the intent that's been manifested by the public official

3    on this indictment is, I'm in favor of doing this through

4    zoning.  Leaving aside whether that's an official act, that's

5    what I want to do.

6    And the UC cited -- interjects his own gloss on it,

7    trying to link it to the payments.

8    I think that that falls short of showing, on the face of

9    the indictment, a manifestation that meets the *Evans* standard.

10    So on that basis, A, I think *Menendez* shows that the

11    Court does apply a First Amendment standard.  It does look for

12    more here than simply the bare minimal *Hamling* notice standard

13    when the government has gone beyond it at least; and B, the

14    *Silver* objective test is right.

15    *McDonnell* makes it clear that even if, like,

16    hypothetically, a public official was lying, and you say,

17    like, I've got my fingers crossed behind my back, I'm not

18    going to do what these guys want, I just want their money,

19    that's still a crime.  But what has to be shown is a

20    manifestation.

21    So those are the points that I wanted to make on response

22    to --

23         THE COURT:  Well, let me follow up on your

24    manifestation point with sort of a specific question and then

25    a general thought.

1          And the specific question is paragraph 31 and 32 of the

2     indictment.  And I guess focusing in particular on

3     Sittenfeld's allegedly responding, Yeah --

4          MR. DREEBEN:  Yeah.

5          THE COURT:  -- which maybe is a little ambiguous but

6     could be read as, you know, they say, "Well, we'll take care

7     of you.  What you've just described is what we want."  Plus

8     says, "We're going to take care of you, but that's what we

9     need."

10         Sittenfeld responds, "Yeah."

11         And then following further discussion, he accepts the

12    money.  So that's the sort of a specific thing, and I guess --

13    well, why don't you respond to that first.

14         MR. DREEBEN:  So I think that that is fatally

15    ambiguous in a context where you need an explicit quid pro

16    quo.  I don't think that it's enough to have statements that

17    are, on their face, not clear.

18         "So today you hear me ... we're gonna take care of you,

19    not a problem."  I don't know exactly what that means.  And

20    then the next --

21         THE COURT:  Those statements occur -- I guess this is

22    my broader question.  Those statements occur, as

23    Mr. Singer correctly points out, in the context of a

24    relationship that is, at this point, a year and a half-ish

25    old, where there's been a lot of previous conduct and dealings

1    and, you know, money going one way and things happening on

2    Project 1 the other way.

3        And, you know, don't we have to -- I mean, isn't it a

4    fair point we have to read these specific comments also

5    against the backdrop of a relationship?  And doesn't that make

6    you think it's at least a little bit a jury question more than

7    a judge question?

8             MR. DREEBEN:  Your Honor, Mr. Singer's submission was

9    that we've already established that these guys are corrupt.

10   Now, if the Court agrees with that on phase one, then that's

11   the predicate for his argument.

12       If it agrees with our submission that they haven't

13   crossed that line, then you've got guys who are aggressive,

14   but they're aggressive with a political figure who has

15   been longstanding -- his locked-in vision is I want to make

16   this project happen.

17       And again, the government kind of cherry picks this and

18   says, We'll focus on the sentence from the UCE and focus on

19   the acceptance of the money and forget about the fact that the

20   defendant has already volunteered what he wants to do.  He's

21   made it clear.

22       And I think that you have to ask yourself, in the context

23   of a political indictment like this, what is the political

24   figure supposed to do?  Is he supposed to say, when somebody

25   strays over the line every single time, like, "Whoa, that's

1    not me"?

2        He's already said to the confidential witness, "There

3    can't be any quid pro quos here."  He's engaged in a course of

4    conduct that he believes is legit.

5        I think that it -- the backdrop that I hope the Court

6    brings to the evaluation of this indictment is the point that

7    Your Honor made, which is that in this context, the government

8    shouldn't be able to take the contribution, the political

9    action by the political official who supports what the

10   contributors are doing, link the two, and say the jury can

11   infer intent.  That's our position on that statement.

12       I understand Your Honor's question about whether it goes

13   over the line enough to get to the jury.  We think it doesn't,

14   and that would be the issue on that paragraph.

15       On their reliance on *Terry*, I think *Terry* is a very

16   different case because there you have a judge who is engaging

17   in clearly improper conduct.  He's having *ex parte*

18   communications about how to decide a motion on behalf of

19   somebody who has made political contributions.  It's made

20   clear to him (distorted audio) corrupt.

21       That contrasts, I think, quite strikingly with what I

22   think this indictment shows, which is a political figure

23   connected to legitimate activities who is not doing things

24   that are out of school, out of step, and therefore don't

25   support the inference of something inappropriate in the

1    interaction as a whole.

2        So I think that *Terry* does actually have what is missing

3    in this case.

4        And I think the final comment that I would make in

5    response to the government is the points of *McDonnell* that

6    Your Honor was pointing to about zoning, I think, put the

7    zoning issue on the side of the line of too incipient, too

8    abstract, not meeting concrete, focused standard that the

9    Court was dealing with in *McDonnell*.

10       So *McDonnell*, on one end, says "Bob's For Jobs," a

11   general program of job searching.  As Your Honor correctly

12   pointed out, that's more like Mr. Sittenfeld's general

13   pro-development posture.

14       Then you have specific things, as in *McDonnell* always

15   doing research study on a particular product.  Who is going to

16   be involved in that research study?  That's on the specific

17   side.

18       In between those, I think, is something like this, where

19   you have Mr. Sittenfeld later saying, "I don't know.  Could be

20   zoning, could be bonding," doesn't really rise to a level of a

21   concrete, focused official act.  And therefore, if the Court

22   does not agree with us on the broader explicit conduct element

23   being missing here, then we submit that that's not the kind of

24   official act that should go to a jury, where a jury can be

25   permitted to find an official act when the legal standard is

1    not met.

2              THE COURT:  Thank you, Mr. Dreeben.

3         Well, certainly, both sides have given the Court a lot to

4    think about so I appreciate that.

5              MR. SINGER:  Your Honor?

6              THE COURT:  Go ahead, Mr. Singer.

7              MR. SINGER:  May I make one point?

8              THE COURT:  Sure.

9              MR. SINGER:  I just wanted -- I wasn't necessarily as

10   clear as I could have been on the *Menendez* point, and

11   Mr. Dreeben raised that.  There are a number of different

12   *Menendez* opinions out there, but it was that *Menendez* case

13   that Mr. Dreeben cited.

14        The government -- and I urge the Court to read that case.

15   It is interesting.  It does have substantial discussion

16   relating to First Amendment concerns.  It's in the Third

17   Circuit so, obviously, it's not applying Sixth Circuit law.

18        The reason that I made the statement that the defendant

19   has not cited to any cases in which the Court has applied a

20   motion to dismiss in this context, and I said that partially

21   with *Menendez* in mind, and that's because for the counts that

22   the Court did not dismiss, it was because -- this is page 643

23   of *Menendez*.  It was because that a particular paragraph -- in

24   large part, a particular paragraph in the indictment used the

25   *Evans* language, in that the campaign contributions were given

1    in exchange for specific requested exercises of public

2    authority.

3        That's the same language that we have used in this

4    indictment, that the contributions were made in return for

5    specific official action.

6        The counts that were dismissed, on the other hand, were

7    dismissed because they didn't include that language.  They

8    alleged that the funds were made in return for, quote, being

9    influenced in the performance of official acts as

10   opportunities arose.

11       So the Court was saying that those deserve dismissal

12   because those are not alleging an explicit quid pro quo, which

13   looks at specific official action.  But, rather, in the

14   campaign contract, the contribution context, they were

15   alleging an "as opportunities arose" theory, which made them

16   more generalized and not specific enough.

17       So that showed that while there were dismissed counts in

18   that case, the ones that were not dismissed are the ones that

19   mirrored the language that the government has used in this

20   indictment.

21           THE COURT:  I think Mr. Dreeben might say that, well,

22   you know, "zoning or things like that" or something sort of

23   sounds a little bit like an "as opportunities arise" kind of

24   allegation.

25           MR. SINGER:  So the zoning, that would go to the

1  official act.  This is whether or not the quid pro quo was

2  explicit or not.  And because the "quid" is campaign

3  contributions, the Court was looking at whether the

4  allegations adequately alleged that quid, whether the campaign

5  contributions were explicit for the quid pro quo.  The Court

6  held, because they used the *Evans* language, that it was.

7      THE COURT:  I will go read the *Menendez* case and see

8  if I can figure out what it says.  But I appreciate that,

9  Mr. Singer.

10     As the parties know, there are a couple of other motions

11  pending before the Court.  It was not the Court's intent to

12  explore those motions at this point, but just wanted to make

13  sure that the parties were in agreement for that.

14     Mr. Singer?

15         MR. SINGER:  Yes, Your Honor.

16         THE COURT:  Mr. Dreeben?

17         MR. DREEBEN:  Yes, Your Honor.

18         THE COURT:  Very good.  Well, then, I think I've

19  heard what I need from the parties.

20     Mr. Dreeben, if you want a last word, in light of what

21  you just heard Mr. Singer say, I'll give you 30 seconds since

22  I always feel like the defendant should have the last word on

23  their motion, but that's about it.

24         MR. DREEBEN:  Your Honor, I'm confident that in your

25  reading of *Menendez*, if you go back, that Mr. Singer pointed

1    to what favors him.  I think there is language in there that

2    also favors us.

3        And I think the broader point is that in a context of

4    this sensitivity, the Court does have the power and

5    responsibility to ensure that the government cannot simply

6    link a political action and contribution solicitation and say

7    it's all up to the jury.

8            THE COURT:  Very good.  All right.  Well, thank you

9    both.  Your papers were very helpful.  The argument today has

10   been very helpful to the Court so I appreciate your

11   preparation and your assistance with the Court's questions.

12       The Court will take the matter under advisement and issue

13   a decision as promptly as it can.

14       Scott, I think we're ready to stand in recess.

15       (Proceedings concluded at 3:57 p.m.)

16                            - - -

17                    C E R T I F I C A T E

18           I, M. SUE LOPREATO, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
19   proceedings in the above-entitled case.

20

     _/s/ M. Sue Lopreato___                ____March 5, 2021____
21   M. SUE LOPREATO, RMR, CRR              Date of Certification
     Official Court Reporter

22

23

24

25