```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF OHIO
 2                           WESTERN DIVISION
                               -  -  -
 3

 4       UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                        :
 5              Plaintiff,              : FINAL PRETRIAL CONFERENCE
                                        : Wednesday, June 1, 2022
 6              - v -                    :
                                        : 10:00 a.m.
 7       ALEXANDER SITTENFELD, a/k/a    :
            "P.G. Sittenfeld,"          :
 8                                      :
                Defendant.              : Cincinnati, Ohio
 9                               -  -  -
                         TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE
                               -  -  -
11

12       For the Plaintiff:           EMILY N. GLATFELTER, ESQ.
                                       MATTHEW C. SINGER, ESQ.
13                                     MEGAN GAFFNEY PAINTER, ESQ.
                                       U.S. Department of Justice
14                                     U.S. Attorney's Office
                                       221 E. Fourth Street, Suite 400
15                                     Cincinnati, Ohio  45202

16       For the Defendant:           CHARLES M. RITTGERS, ESQ.
                                       CHARLES H. RITTGERS, ESQ.
17                                     Rittgers & Rittgers
                                       12 E. Warren Street
18                                     Lebanon, Ohio  45036

19       Law Clerk:                   Jacob T. Denz, Esq.

20       Courtroom Deputy:            Scott M. Lang

21       Court Reporter:              M. Sue Lopreato, RMR, CRR
                                       Potter Stewart U.S. Courthouse
22                                     Southern District of Ohio
                                       100 East Fifth Street
23                                     Cincinnati, Ohio  45202
                                       513.564.7679
24

25
```

```
1                    P R O C E E D I N G S
2              (In open court at 10:04 a.m.)
3                        -  -  -
4         THE COURT:  Good morning.  We're here in open court
5   and on the record in the matter of United States of America
6   versus Alexander Sittenfeld, case number 1:20-cr-142.
7      We're here this morning for the final pretrial
8   conference.  Could I ask counsel to please enter their
9   appearances for the record.
10         MR. SINGER:  Good morning, Your Honor.  Matt Singer,
11   Emily Glatfelter, and Megan Gaffney Painter for the United
12   States.
13         THE COURT:  Good morning.
14         MR. C. MATTHEW RITTGERS:  Good morning, Your Honor.
15   Charlie M. Rittgers with Charlie. H. Rittgers for
16   P.G. Sittenfeld.
17         THE COURT:  Very good.  And, sir, you are
18   P.G. Sittenfeld?
19         THE DEFENDANT:  Yes, Your Honor.
20         THE COURT:  And you are represented by Charlie H.
21   Rittgers and Charlie M. Rittgers, who are seated with you in
22   court today?
23         THE DEFENDANT:  Yes, Your Honor.
24         THE COURT:  Very good.  All right.  In terms of where
25   we're at, it's the Court's understanding we've got a six-count
```

1    indictment.  Counts 1 and 2 are honest services wire fraud,

2    under 18 United States Code, Sections 1343 and 1346.  Counts 3

3    and 5 are bribery concerning programs receiving federal funds,

4    in violation of 18 United States Code,

5    Section 666(a)(1)(B).

6        And Counts 4 through 6 are attempted extortion under

7    color of official right, in violation of 18, United States

8    Code, Section 1951(a) and (b)(2).

9        Am I correct, Mr. Singer?

10           MR. SINGER:  Yes, Your Honor.

11           THE COURT:  Very good.  In terms of plea

12   negotiations, have the parties completed any potential plea

13   negotiations in this case, Mr. Singer?

14           MR. SINGER:  The government has extended a plea offer

15   in the fall of 2021.  That offer was rejected by defense

16   counsel.

17           THE COURT:  Would you like to make a record of that

18   offer?

19           MR. SINGER:  Yes, Your Honor.  The offer was to

20   recommendations relating to certain guideline stipulations,

21   and the government would cap their argument relating to a

22   potential term of imprisonment at 24 months, leaving the

23   defendant able to argue for a sentence of probation.

24           THE COURT:  Thank you, Mr. Singer.

25       Mr. Rittgers, can you confirm that you received that

1    offer from the United States Attorney's Office?

2              MR. C. MATTHEW RITTGERS:  That is accurate,

3    Your Honor.

4              THE COURT:  And have you conveyed that offer to your

5    client?

6              MR. C. MATTHEW RITTGERS:  Yes, I have.

7              THE COURT:  Have you discussed that offer with your

8    client?

9              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

10             THE COURT:  Mr. Sittenfeld, are you aware the

11   government made that offer?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Have you had an opportunity to discuss

14   that offer with your attorney?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Do you need any further opportunity to

17   discuss that offer with your attorneys further?

18             THE DEFENDANT:  I do not, Your Honor.

19             THE COURT:  And it is your intent to reject that

20   offer, is that right, sir?

21             THE DEFENDANT:  It is, Your Honor.

22             THE COURT:  Okay.  Very good.  All right.  Where are

23   we on discovery?  Are there any outstanding discovery issues,

24   Mr. Singer?

25             MR. SINGER:  I do not believe there are any

1  outstanding discovery issues.  There are some materials that

2  we are getting from the agent.

3      For example, we took some photographs that were produced

4  in the last discovery, not extensive by any means.  There may

5  be additional, for example, what we're considering a

6  demonstrative photo that shows where 435 was on the map,

7  little things like that.

8      There are particular Jencks Act statements relating

9  to -- that we are getting from the FBI that we have not

10  received yet, I think we discussed at our prior status, but

11  that will be minimal in nature.

12          THE COURT:  When is your plan to turn those over?

13          MR. SINGER:  When we receive them from the FBI.

14          THE COURT:  When do you anticipate that will be?

15          MR. SINGER:  Hopefully today.

16          THE COURT:  Very good.  Mr. Rittgers, either

17  Mr. Rittgers, any outstanding discovery issues you're aware

18  of?

19          MR. C. MATTHEW RITTGERS:  Nothing further than what

20  we've briefed, Your Honor.  Nothing further than what

21  Mr. Singer has already put on the record, I believe.

22          THE COURT:  Okay.  Thank you, Mr. Rittgers.  So in

23  terms of outstanding motions --

24          MR. SINGER:  Your Honor, if I may?

25          THE COURT:  Yes, Mr. Singer.

1          MR. SINGER:  I was going to address this later, but

2     we might as well address it now since we're talking about the

3     *Jencks* disclosure statement.

4          We received information relating to the undercover, which

5     is the subject of a prior motion relating to a protective

6     order, there are allegations of misconduct.

7          We discussed this on a number of calls.  The FBI OPR did

8     an internal investigation relating to the conduct.  We've

9     recently disclosed to defense counsel the results of that

10    investigation.

11         What we did not receive from the FBI was the actual

12    letter of sensor that was the result.  We did not receive

13    that.  It's the FBI's position that these are internal

14    FBI documents relating to their disciplinary process, and

15    they would not provide them to our office absent a court

16    order.

17         The government would not object to a court order with

18    regards to the letter that is in the FBI's possession at this

19    time.  That would give the government an opportunity to review

20    that and potentially submit it in camera to see if there are

21    any additional equally disclosures that are appropriate as a

22    result of that disclosure.

23         THE COURT:  Thank you, Mr. Singer.

24    Mr. Rittgers?

25         MR. C. MATTHEW RITTGERS:  Your Honor, we would make a

1    motion for a court order regarding what Mr. Singer just

2    mentioned.

3             THE COURT: Yeah. And the Court's going to order the

4    production of that letter. If it needs to be redacted, in

5    your view, Mr. Singer, I would propose that you submit it in

6    camera with proposed redactions, and explanation for any

7    proposed redactions, and then the Court will produce to the

8    other side whatever the Court ends up determining.

9             MR. SINGER: Thank you, Your Honor.

10            THE COURT: Very good. How quickly can you get that

11   to the Court if I get an order out today?

12            MR. SINGER: If the order's out today, I will send it

13   to the FBI as soon as it's received and, hopefully, we'll

14   receive it by the end of the day, if not by tomorrow.

15            THE COURT: All right. In terms of pending motions,

16   of which there have been a number of recent filings, I just

17   want to make sure that I've got all of this listed.

18       I think there's defendant's third motion to compel, which

19   is Document 99. Well, I think we've discussed that

20   previously, and I think I've said what I'm going to say on

21   that.

22            MR. SINGER: I believe the Court ruled on that at the

23   last status conference.

24            THE COURT: Mr. Rittgers, would you agree with that?

25            MR. C. MATTHEW RITTGERS: I would agree, Your Honor.

```
 1              THE COURT:  So I would move that one out.  Well, move
 2     it beyond what I've already said about it at the last status
 3     conference.
 4         There's the government's motion to preclude testimony,
 5     Document 100, with accompanying briefing.  There's defendant's
 6     motion to exclude proffered 404(b) evidence, which is
 7     Doc. 111.
 8         I'd like to talk about where we are on the status of
 9     briefing.  On all of these, I noticed there are oppositions to
10     some, so I'm wondering whether there's going to be replies or
11     not, or whether they're fully briefed.
12         So let me go through the list first, and then we can go
13     back and talk about each.
14         Government's motion in limine to preclude argument and
15     evidence supporting jury nullification, which is Doc. 113;
16     defendant's motion to exclude testimony of J.K., which is
17     Doc. 115; defendant's motion to enforce the rule of
18     completeness and Federal Rule of Evidence 106, which is
19     Doc. 120; defendant's amended motion to enforce the rule of
20     completeness and Federal Rule of Evidence 106, which is
21     Doc. 121, which I believe supersedes this Document 120, is
22     that correct, Mr. Singer?
23              MR. SINGER:  That's correct, Your Honor.
24              THE COURT:  All right.  So I have those five motions
25     as the motions that still require rulings.  Is that the
```

1    complete list, Mr. Singer?

2          MR. SINGER:  Yes, Your Honor.

3          THE COURT:  Mr. Rittgers?

4          MR. C. MATTHEW RITTGERS:  I believe so, Your Honor.

5          THE COURT:  Okay.  And in terms of where we're at in

6    briefing, I believe I've received the reply on the Doc. 100 of

7    the government's motion to preclude testimony.

8        With regard to the other ones -- well, what's your view

9    on where we're at on briefing on defendant's motion to exclude

10   proffered 404(b) evidence, Mr. Rittgers?

11         MR. C. MATTHEW RITTGERS:  Your Honor, I believe that

12   the government has filed a response on that motion, and we do

13   plan to file --

14         THE COURT:  I thought you filed -- have you not

15   responded to that, Mr. Singer?

16         MR. SINGER:  Your Honor, we have not yet responded to

17   the motion to exclude the 404(b) evidence.

18         THE COURT:  Okay.  I thought you had as well.  When

19   are you going to have a response on that, Mr. Singer?

20         MR. SINGER:  One moment, Your Honor?

21         THE COURT:  Yes.  It's the J.K. one, Mr. Rittgers, if

22   that --

23         MR. SINGER:  Yes, we have filed a response for J.K.

24   We had anticipated responding to that motion next Monday,

25   Your Honor.

```
1              THE COURT:  Next Monday, all right.

2         If the government's opposition is in by Monday,

3    Mr. Rittgers, when do you anticipate filing your reply?

4              MR. C. MATTHEW RITTGERS:  Your Honor, are we

5    referring to Monday, June 6?

6              THE COURT:  I think that's what we're referring to,

7    isn't that right, Mr. Singer?

8              MR. SINGER:  Yes, Your Honor.

9              MR. C. MATTHEW RITTGERS:  Your Honor, I believe we

10   can file a reply by Monday, June 13th.

11             THE COURT:  Any chance you can do it by Friday?

12             MR. C. MATTHEW RITTGERS:  We will do our best.  On

13   the 404(b) motion, we were not put on notice for the

14   particular subsection that the government intends to admit

15   this evidence, so we are anxious to hear their response so we

16   can reply.  Yes, we will try to get it to you by June 11th,

17   Your Honor.

18             THE COURT:  Okay.

19             COURTROOM DEPUTY:  June 10th, Judge.

20             THE COURT:  The 10th.

21             MR. C. MATTHEW RITTGERS:  The 10th.  Sorry.  Thank

22   you.

23             THE COURT:  Where are we on the government's motion

24   in limine to preclude argument and evidence supporting jury

25   nullification?  I don't believe there's an opposition, but I
```

 1    could be wrong.

 2            MR. C. MATTHEW RITTGERS:  There has not been a

 3    response, Your Honor.  We will file -- we intend to file a

 4    very brief response to that.

 5            THE COURT:  Okay.  Essentially saying you're not

 6    going to be arguing for jury nullification?

 7            MR. C. MATTHEW RITTGERS:  You're correct.

 8            THE COURT:  That's what I was hoping that was going

 9    to be.  All right.

10       Defendant's motion to exclude testimony of J.K., there

11    has been an opposition filed.  When do you anticipate having a

12    reply on that, Mr. Rittgers?

13            MR. C. MATTHEW RITTGERS:  Your Honor, two attorneys

14    have been out of the office for a while.  If we could have

15    Monday, June 13th, for that.

16            THE COURT:  June 13th?

17            MR. C. MATTHEW RITTGERS:  I'm sorry.  June 6th.  I

18    apologize.

19            THE COURT:  Yes.  That would be fine.  Defendant's

20    motion to enforce the rule of completeness of Federal Rule of

21    Evidence 106 -- well, the amended one one was filed yesterday.

22            MR. SINGER:  Yes, Your Honor.  I believe we could

23    have a response to that by Monday, June 6th.

24            THE COURT:  Okay.  Are you intending to file a reply,

25    Mr. Rittgers?

1   MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

2   THE COURT:  So the one that's fully briefed, I

3 believe, is the motion with regard to the experts; is that

4 right?

5   MR. SINGER:  Yes, Your Honor.

6   THE COURT:  So I'm concerned about that,

7 Mr. Rittgers.  I'm not sure that I've got enough information

8 about what these experts intend to testify to to perform my

9 gatekeeper function under *Daubert* and make an assessment

10 either about reliability or about relevance.

11  So it seems to me that there's a couple different ways we

12 could go about it, but I'm going to want to hear about what

13 the alleged -- what the proper opinions are going to be before

14 we're going to put it in front of a jury.

15  So we could take a break during the trial, voir dire the

16 expert then and make a determination.  But if you'd rather

17 have the determination in advance of trial, I would suggest we

18 get these experts in here next week and do a *Daubert* hearing

19 and hear what they have to say.

20  I understand that part of their opinion may be based on

21 evidence that gets elicited at trial, so it may be a little

22 harder to do it advance.

23  But from a planning standpoint, I can certainly

24 understand why you would want to have some guidance from the

25 Court coming in, so I'm going to leave it up to you about how

1     you would like to proceed.  But I'm not going to make my

2     question determinations with the jury sitting there and having

3     to deal with objections without having some sense of where the

4     things are going, so...

5             MR. C. MATTHEW RITTGERS:  Your Honor, could we have

6     24 hours just to think about this regarding whether or not it

7     would be taking a break during the jury trial and bringing the

8     expert in next week?

9             THE COURT:  Sure.  Yes.

10            MR. C. MATTHEW RITTGERS:  Thank you.

11            THE COURT:  And I can give you some broad outlines.

12    I mean, I'm struggling a little bit on this whole campaign

13    finance expert, what his role's going to be, why -- it's not

14    so much a reliability concern with regard to him as it is a

15    relevance concern.

16        I don't think your client is, as far as I understand it,

17    is asserting through a violated campaign finance law, so I'm

18    not sure why an explanation of campaign finance law would be

19    relevant to any issue before the jury.

20        And before you answer that, I know that another concern

21    that you've raised is that certain statements made in

22    connection with the announcement of the indictment, however

23    long ago, were in some way indicative of potential

24    misunderstanding of campaign finance laws.

25            But the press release surrounding the indictment, and the

1    press meeting surrounding the indictment, aren't going to be

2    issued before the jury, so I don't see any point in trying to

3    correct any potential misstatements that may have occurred

4    during that press hearing.

5        So I'm just really struggling.  If the answer is, well,

6    if the government's going to try to make something out of the

7    fact that these contributions went to a leadership PAC rather

8    than to a campaign fund, and they're going to try and suggest

9    there was something untoward about that, and the inference

10   should then thus be that your client had a guilty mens rea

11   because he was trying to hide it by chipping at funds to here

12   rather than there, and you want to come in and explain why

13   there's nothing untoward about the way in which that was done,

14   I guess I understand that.

15       But I don't have any reason, as I sit here now, to

16   anticipate that the government's going to be trying to create

17   an inference with the jury surrounding the way in which the

18   campaign funds were received.

19       So that's sort of the nature of my confusion around that.

20   Does that make sense, Mr. Rittgers?

21           MR. C. MATTHEW RITTGERS:  It does, Your Honor.  Do

22   you want me to respond, or --

23           THE COURT:  I would love to hear a response to that.

24           MR. C. MATTHEW RITTGERS:  We anticipate that the

25   government will show video and introduce wire audio recordings

1    where they are -- where they're portraying Mr. Sittenfeld

2    personally accepting a check from the undercover agents.

3        They will show audio and video where Mr. Sittenfeld says,

4    well, this is a PAC that nobody really knows about.  The press

5    isn't getting in and looking at the donations.  This is a PAC

6    that my name's not associated with on FEC filings.

7        The government will elicit testimony into evidence

8    indicating that Mr. Sittenfeld talked about specific or

9    general policy positions at the same time that a discussion

10   about fundraising was occurring.

11       They're going to elicit testimony and evidence about

12   bundling, where an individual goes out to his or her network

13   and gets a bunch of checks for an elected official or

14   candidate, and says I fundraised $10,000 for you.  That's

15   their whole predication in this particular case in making

16   Mr. Sittenfeld a target.

17       They're going to elicit -- I've got a list of 10 to

18   20 things similar to what I've just told Your Honor, and they

19   won't need to expressly say to the jury that that is illegal

20   or unethical.

21       Well, by the mere fact that they are introducing those

22   things that a layperson might think is nefarious, especially

23   with the atmosphere that they created in this undercover sting

24   operation, I think that -- I mean, in one of the most recent

25   filings, they said that they have, I believe, implied that

1     they're going to bring in evidence that Mr. Sittenfeld didn't

2     accurately report a gift, a baby gift, that he had received

3     from the undercover agent.  That's an FEC violation.

4               MR. C. HENRY RITTGERS:  It's not.

5               MR. C. MATTHEW RITTGERS:  It is not an FEC violation.

6     My dad is correct.  It's even confusing for me at times,

7     Your Honor.

8          I believe that -- and this is a non-express- -- I know

9     I'm not saying anything you don't know, Your Honor, this is a

10    non-express allegation without a plus factor.

11         And the government is attempting to have a group of

12    12 lay people determine a man's intent by showing them

13    atmospherics, and then preventing us from telling the

14    12 people, who have no idea how campaign finance works, that

15    all the things that occur are actually legal and ethical.

16         And it does not go directly to whether or not a bribe --

17    that there was a meeting of the minds under contract law, but

18    that in order to determine a man's intent, they are -- a jury

19    is going to look at all of the context surrounding this and

20    have a lot of questions about are you permitted to personally

21    solicit someone for a campaign donation or a PAC donation on a

22    leadership PAC?  Are you permitted to put your name on an FEC

23    filing?  Are you permitted to control that PAC?

24         And I think most people will think, because we hear about

25    dark money PACs, they're going to think, well, he screwed up.

1    He should not have done that and, therefore, we will then

2    imply later that if he's dirty there, untoward, or unethical

3    there, then he must be unethical, and he must have really

4    agreed to a bribe on this non-express case.

5            THE COURT:  But that would get into my other concern

6    about that testimony, which is -- start with the last part of

7    what you just said, which is you would like this expert to

8    instruct the jury with regard to the law of campaign finance.

9       I guess my concern on that front is, you know, generally

10   in trial there's one person who fills the role of informing

11   the jury of what the relevance was, and that's usually a

12   judge, it's not an expert witness.

13      And you just suggested that you intend to elicit a lot of

14   testimony about what is or is not allowed by FEC law and regs.

15   I mean, isn't that something that should be addressed by the

16   judge rather than by an expert witness?

17           MR. C. MATTHEW RITTGERS:  If Your Honor could give

18   them the instructions, preliminary and final instructions,

19   indicating that some of the things that I just mentioned, we

20   have a list of 10 to 20, are all permissible.

21      The issue -- and I probably misspoke slightly.  There's

22   not a specific FEC regulation or ethics law that will say

23   he -- Mr. Burns is not planning to testify to a specific law

24   because the law is, but the law doesn't expressly say that a

25   candidate can virtually solicit a campaign check.  There's

1     nothing in the law that expressly says that.

2          There's a body of regulation that precludes candidates

3     from doing certain things, and where there are omissions, it

4     is practice and the standard that it is permissible.

5          And Mr. Burns is a --

6               THE COURT:  That's right.  Now you've gotten into the

7     other area where I'm concerned, which is -- I mean, imagine if

8     your client were -- the government was prosecuting your client

9     for speeding from Cincinnati to Dayton on 75, right?

10         And you wanted to bring in an expert.  And your expert

11    was a highway patrol officer, says I patrolled that highway

12    for 20 years, and I'll tell you anything less than five miles

13    an hour over, they just don't pull people over.  And your

14    client was going two miles an hour over and says, that's

15    exactly my point, right?

16         That doesn't -- I'm not sure that an expert could testify

17    as to custom and practice, or if you brought in -- you know,

18    if that same patrol officer said, yeah, I spent days and days

19    and days out there.  I'll tell you every day, 98 percent of

20    the people who come by are going five miles an hour over.  So

21    what?

22         I mean, that doesn't change whether or not your client

23    was speeding, right?  I mean, it may give you a basis for a

24    selective prosecution claim, but that's not a claim for the

25    jury.

1    So I'm just trying to figure out the custom and practice

2    part, and how you intend to elicit relevant evidence with

3    regard to custom and practice, because if it isn't clearly

4    legal, right, the fact that a whole bunch of people are doing

5    it doesn't necessarily change the legality.

6         MR. C. MATTHEW RITTGERS:  But, Your Honor, based on

7    ethics opinions, United States Supreme Court opinions, it is

8    legal.  There's just not a particular law in the FEC

9    guidelines where Mr. Burns is going to say here's the

10   subsection that indicates you can personally solicit campaign

11   funds.

12        THE COURT:  Okay.  So he's going to, sort of -- I

13   think I'm back to my original trauma, where he's going to read

14   a bunch of court opinions, and synthesize them, and say my

15   understanding of the law as an expert in this field is that

16   the law allows A, B, and C.  But then I get back to my concern

17   about that should be the judge, not an expert witness.  You

18   see, I'm kind of stuck between these things.

19        MR. C. MATTHEW RITTGERS:  I understand.  This case,

20   or most of the reported cases here, or all of the reported

21   cases that we're aware of, there are express agreements.

22        And so therefore, when you have an express agreement,

23   there's not this concern that a juror is going to draw an

24   incorrect inference from something related to campaign

25   finance.

1        But this case is all about context.  And I don't know how

2   else the jury is going to understand the context from things

3   that we started talking about without somebody -- and whether

4   it's you, Your Honor, or an expert instructing them that

5   there's nothing that prohibits a candidate from personally

6   accepting a check, there's nothing that prohibits a candidate

7   from operating, in fact, he has to.

8        That is one area of law that is clear in the FEC.  He has

9   to control it.  It's his leadership PAC and -- while at the

10  same time he can't put his name on it.  And these jurors are

11  going to have questions as to whether or not it was operated

12  properly.

13       THE COURT:  Well, let me ask it this way, and maybe

14  this brings Mr. Singer into the conversation.

15       Are the legal points that Mr. Rittgers is concerned

16  about, are they undisputed?  I mean, do you agree with, for

17  example, the leadership PAC can't have Mr. Sittenfeld's name

18  on it, and yet the leadership PAC needs to be controlled by

19  Mr. Sittenfeld, and there's nothing improper about

20  Mr. Sittenfeld accepting checks that are to be directed

21  towards the leadership PAC?  Are those all propositions to

22  which the government agrees?

23       MR. SINGER:  Your Honor, I can't sit here and say

24  that I'm versed on the intricacies of FEC law.  It's not

25  relevant to what the jury is going to be instructed to do

 1    here.

 2        The issue is, so is there some regulation that discusses

 3    whether or not someone can have their name on the PAC and

 4    still control it?  I don't know.  Sitting here, I don't know.

 5    And I don't know how that's relevant either.

 6        What's relevant is, in recorded statements that will be

 7    put before the jury, the defendant said, "This is my PAC.  It

 8    benefits me."

 9            THE COURT:  I don't think Mr. Rittgers is disputing

10    that the payment of the money to the PAC, that Mr. Sittenfeld

11    would have understood that to be a benefit.  Am I wrong,

12    Mr. Rittgers?

13            MR. C. MATTHEW RITTGERS:  You're correct, Your Honor.

14            THE COURT:  So they're not disputing that.  Their

15    concern is that the government is going to portray this as

16    some kind of slight of hand in the way that the money was

17    funneled, and even just using the word "funneled" has some

18    connotation associated with it.

19        But that either directly or indirectly, you're going to

20    rely on something about the structuring to create an

21    implication of guilt that's not actually supported by the

22    fact, if people understand campaign finance law, which I

23    certainly agree, you know, the jury and lay juries are

24    unlikely to.  And, in fact, I would be the first to admit that

25    I don't know the intricacies of campaign financing laws, as I

1    sit here today.

2         So I understand the concern that Mr. Rittgers is raising,

3    that it would be inappropriate for the jury to draw some

4    inference of mal-intent from what appears to be, in some way,

5    shady structuring when, in fact, it isn't shady structuring.

6         And I don't think it's fair to Mr. Sittenfeld to have the

7    jury be in a situation of sitting there thinking, oh, I've

8    heard about PACs, so PACs are bad things, ergo, this was a bad

9    thing, right?  I mean, the government doesn't believe that's

10   fair either, I don't think.

11        MR. SINGER:  The government is not going to present

12   that evidence or argument.  But the intent is going to be

13   based on recordings, the defendant's statements in the

14   recordings, the context that's created through those

15   recordings.

16        THE COURT:  I completely understand, Mr. Singer, but

17   I do take Mr. Rittgers' point that somehow, either through the

18   Court or through somebody who can testify as to the ins and

19   outs of campaign finance law, if these things are, in fact,

20   entirely appropriate and legal, I agree the word "PAC" in

21   today's environment has some connotations associated with it.

22        And I don't think it's appropriate for those connotations

23   to go un-commented upon by anybody, and then potentially

24   create a false implication of guilty mens rea based on

25   somebody's belief that, oh, PACs are inherently bad and this

1    must have been illegal.  I mean --

2          MR. SINGER:  Your Honor, I think that the

3    government's proposed jury instruction say that, that the

4    defendant is allowed to receive, under the First Amendment,

5    PAC checks and campaign contributions.  That's permissible.

6    That's in our proposed jury instructions.  What the defendant

7    is not allowed to do is accept it in exchange --

8          THE COURT:  Quid pro quo.

9          MR. SINGER:  Quid pro quo.  And that's the law.  And

10    we have stipulated that that is an instruction that will be

11    appropriate for the jury, but the intricacies, the ins and

12    outs of regulations surrounding campaign finance law and

13    FEC law is a sideshow.

14          THE COURT:  I understand that, but I do think --

15    here's what I would suggest that the parties attempt to do.

16      If the parties can come up with some agreed preliminary

17    instruction that the Court can give the jury about the

18    appropriateness of having the leadership PAC, the

19    appropriateness of not having the defendant's name associated

20    with that PAC, the appropriateness of receiving checks, all

21    those things that Mr. Rittgers, I think is, in my view,

22    appropriately concerned about.

23      If we can have preliminary instructions to the jury so

24    that -- my other fear is they hear all this evidence, they

25    start forming opinions, and they get to the end of the trial,

1    and then they get these jury instructions that say, oh,

2    everything that you might think about PACs or have thought

3    about PACs in real life, it turns out isn't the problem here.

4    That may be too late.

5        So I'm either going to allow -- somebody is going to give

6    the jury some insight about whether or not this is -- whether

7    there's anything inappropriate about the structuring here.

8        And I completely get your point, Mr. Singer, and the

9    argument the government's going to make about the quid pro

10   quo.

11       And I agree with you, but I just don't want a jury

12   thinking there's something off about this structuring if, in

13   fact, everybody at both those tables agrees that there isn't

14   anything illegal or illicit or unethical about this

15   structuring here.  Does that make sense?

16           MR. SINGER:  Yes, Your Honor.

17           THE COURT:  And if the parties can come up with

18   agreed preliminary instructions, I'd be glad to give them,

19   otherwise, I'm going to be sort of inclined to allow at least

20   some testimony around that topic.

21       Now, I'm not inclined to allow testimony around the

22   topics of things like, for example, somebody coming in and

23   saying, oh, I've worked with campaigns for 20 years, or I've

24   worked with politicians for 20 years, and this is typical of

25   the way they interact with donors.

1        We're not doing that because that's, A, in my view,

2    unreliable, unless you can tie it to something more; and, B,

3    it's getting awfully close to instructing a jury on intent,

4    which isn't permissible under 704, so there's limits here.

5        I mean, we're not going to have somebody come in and sort

6    of wave the magic wand of expert and bless everything that

7    went on.  But if there are things that are clearly legal, that

8    may have, in the jury's -- a lay jury's mind, implications

9    that deal with the outing, I don't want that shadowing

10   deliberations in this case, okay?  Does that make sense?

11           MR. SINGER:  Understood.

12           THE COURT:  All right.  Now, I'm also, even though

13   it's not fully briefed, in the interest of trying to move this

14   along a little bit, I want to talk a little bit about the

15   motion to enforce the rule of completeness.

16       And I think what we need to do on that -- and I'm

17   certainly willing to hear the government's response on this

18   motion.  But I'm a little concerned about the motion up front,

19   so I might as well just lay out my concerns, and then we can

20   talk about what we're going to do.

21       The rule of completeness -- and I don't even know where

22   the government pointed this out.  It might have been in the

23   objections to the jury instructions.  But the rule of

24   completeness doesn't make inadmissible hearsay admissible.

25       I mean, there's about 10 million Sixth Circuit cases that

1  say that, some of which even say, even though this seems

2  unfair, this is the rule.  But that being said, not every

3  out-of-court statement is hearsay.

4      And my concern here is that some of the out-of-court

5  statements that Mr. Sittenfeld may or may not have made in the

6  parts of the recordings that the government doesn't intend to

7  play, you know, aren't hearsay.  They may be for the impact on

8  the listener, for example, and so I can give an easy example.

9      If Mr. Sittenfeld -- and I want to be clear to everyone

10  in the courtroom.  I have no reason to believe these are the

11  facts of this case.  This is a hypothetical.

12      But if Mr. Sittenfeld were sitting at a table and said,

13  look, I can't do anything -- I can't make any promises.  I

14  can't do anything that would violate campaign law.  I want to

15  be very clear.  For example, I can't sit here today and say if

16  you give me this amount of money, I'm going to get these

17  votes.  I can't do that.

18      And then the government wants to come in and clip the

19  beginning and the end, just put the part on that says if you

20  give me the money, I'll get the votes, that would be

21  completely contrary to the actual intent of the conversation.

22      And so if the question is what was the impact of that

23  intermediate part on the listener, you can't know without

24  having that entire exchange.

25      So that wouldn't be a hearsay statement, nor would it be

1    exculpatory.  It would be for the impact on the listener of

2    the entire context of the communication.

3         And I think, under the rule of completeness, that would

4    be allowable because it's not bringing in an exculpatory

5    statement, it's just providing context for the part that was

6    played.

7         Now, having said that, Mr. Rittgers, I am not of the view

8    that in a multi-month investigation, that the rule is going to

9    be if the government wants to use two minutes of audio, that

10   means that 20 hours of audio need to be played.

11        So if there are specific additional parts that you

12   believe, Mr. Rittgers, are not hearsay, and are needed to put

13   something that the government intends to play in context for,

14   for example, the impact on a listener, I'm willing to

15   entertain that.

16        But there's no way I'm going to say that there's a rule

17   that if the government, in a criminal prosecution, uses some

18   small portion of audio or video recordings, that means that

19   under some notion of completeness, the entirety of them needs

20   to be played.  You're going to need to tie it to specific

21   parts that you think need to be placed in context.

22        And I want to also be very clear that there's a whole

23   bunch of Sixth Circuit case law that I started with, that if

24   you're intending to use the additional parts for the truth of

25   the matter asserted, that's not allowable.

1    So, for example, I think one of the Sixth Circuit cases

2    involves somebody who says something about, yeah, that was my

3    gun that was used in the murder. And then at some other point

4    during the interview with police officers said, but I sold it

5    three months before the crime happened, you don't get to bring

6    in the "but I sold it three months before it happened" part

7    because that's an attempt to bring in hearsay. There you're

8    using it for the truth of the matter asserted.

9    So my only point is all of this stuff is very contextual

10   and very much specific to the nature of the additional parts

11   that you want to bring in.

12   If it's an exculpatory hearsay statement, it's not coming

13   in. But if it's being offered, as I said, for impact on the

14   listener as some other permissible use, that's an exception to

15   the hearsay rule generally, I'll at least hear what you have

16   to say on that.

17   Do you understand what I'm saying, Mr. Rittgers?

18   MR. C. MATTHEW RITTGERS: I do, Your Honor. The only

19   thing that I can think of that would be an express exculpatory

20   statement is in like a three-minute call that they'd have to

21   clip out the middle of, so I don't think we have that concern.

22   THE COURT: Okay. Well, and I don't know that you

23   guys are going to get to an agreement on this, I'm not

24   suggesting that. But I'm not going to have the jury listen to

25   20 hours of unstructured audio recordings of a whole bunch of

1     separate meetings.  I'm not doing that, so...

2         But I understand your concern, and I'm willing to try and

3     work with you if there are specific things, like the example

4     that I just gave.

5         And maybe the parties can work together and see if

6     there's -- in light of what I just said, if there's some kind

7     of agreement they can come to on that.

8         And I also want to be clear, this isn't -- A, no rulings

9     on motions in limine are final, and my preliminary rulings, we

10    have to wait and see what happens at trial.  But, B, this is

11    just based on what I've gotten looking at your motion and the

12    concerns I have about it, and without the benefit of the

13    government's response.

14        Although, I think -- is it in the objection to the --

15    someone from the government laid out Sixth Circuit case law

16    that the rule of completeness does not trump the hearsay rule.

17    I can't remember where that was, or maybe you didn't.  Maybe I

18    just found that on my own.

19            MR. SINGER:  Your Honor?

20            THE COURT:  Yes.  Go ahead.

21            MR. SINGER:  I didn't mean to interrupt, if you were

22    done?

23            THE COURT:  No.  You're good.

24            MR. SINGER:  I was going to address the rule of

25    completeness motion.

1          THE COURT:  Yes.

2          MR. SINGER:  I think the government would agree with

3     everything that you said.  That leaves us in the position of

4     should we respond to the motion as it's filed, or are you

5     seeking more from the defense, and then --

6          THE COURT:  No.

7          MR. SINGER:  -- we would respond to that?

8          THE COURT:  If you're comfortable with what I just --

9     that's my ruling, based on their motion without the benefit of

10    your response.  So I doubt your response would make it worse

11    for you.  I can't really imagine how that could be.

12       So if you're comfortable with that, that's what I meant,

13    you don't need to respond.

14         MR. SINGER:  Okay.

15         THE COURT:  Now, I guess if Mr. Rittgers has heard

16    something that I've said that he wants to reply to, I think he

17    could.  If you're not going to file a response, I don't mean

18    to, you know, prevent him from putting in further

19    argumentation in response to what I just said, but you don't

20    need to respond if you're comfortable with what I just said.

21         MR. SINGER:  We will assess whether or not a response

22    is appropriate, based on the Court's comments.

23         THE COURT:  Very good.

24         MR. C. MATTHEW RITTGERS:  Your Honor, my father had a

25    question.

```
 1              THE COURT:  Yes.

 2              MR. C. MATTHEW RITTGERS:  Based on what you

 3    indicated --

 4              THE COURT:  And you can both -- feel free,

 5    Mr. Rittgers, Senior.

 6              MR. C. HENRY RITTGERS:  Thank you, Your Honor.  With

 7    regard to being a little more explicit as to those portions

 8    that should be played in order to give them context, do you

 9    want those now ahead of trial so that you can see what we are

10    worried about and what we would want played?

11              THE COURT:  I think it would be helpful to the

12    progress of the trial.  Are there transcripts of all these

13    things?

14              MR. C. MATTHEW RITTGERS:  No, Your Honor.  There are

15    a number of FBI transcripts that are official, but not all

16    recordings are transcribed.

17              THE COURT:  And nobody has made even informal

18    transcriptions of them?

19              MR. C. MATTHEW RITTGERS:  We have them informal, yes,

20    Your Honor.

21              THE COURT:  But you don't want to share that with the

22    government?

23              MR. C. MATTHEW RITTGERS:  Well, I mean, they're truly

24    informal.  They're like an email, listening and typing.  It's

25    not even with a court reporter, Your Honor.  I'm fine sharing
```

1    it.  It's what the audio says.

2         THE COURT:  I mean, to the extent we all understand

3    they're not official transcripts, it may be easier for me to

4    review if I had, like, in yellow is the part the government

5    wants to play, and in green is the part we propose adding, or

6    something like that.  Even if it's in an unofficial

7    transcript, it would be a lot easier than sitting and

8    listening to audiotapes would be my only thing.

9         MR. SINGER:  Your Honor, if I may?

10        THE COURT:  Yes.

11        MR. SINGER:  We have reached out to a court reporting

12   service, and -- after hearing that the defendant had intended

13   to put in a lot of statements outside of what we consider to

14   be super relevant statements that we had already transcribed.

15     So we have a number of additional transcriptions that we

16   are finalizing.  They're informal as of now, but we are going

17   to be, obviously, providing them to defense counsel, and that

18   might help move this process along, having those transcripts

19   available.

20        THE COURT:  Mr. Rittgers?

21        MR. C. MATTHEW RITTGERS:  That would be wonderful,

22   Your Honor.

23        THE COURT:  All right.  So if the parties can submit

24   in advance of trial, you know, Mr. Rittgers, what he's

25   proposed adding.

1      And I understand that we may not be at a hundred percent

2  on knowing for sure what the government's putting on in its

3  case in chief, so I'm not suggesting this would necessarily be

4  bulletproof, but at least it will give me a chance to look at

5  it in advance of trial.

6      Anything we can do in advance of trial, I think, will

7  benefit all of the parties, in terms of keeping this trial

8  moving along in as seamless a fashion as it can.  So that is

9  where I was on that one.

10      It sounds like, Mr. Rittgers, I could make you the same

11  offer with regard to setting a time limit with regard to

12  opposition, so let me tell you where I'm at on jury

13  nullification that I'm not going to allow.

14      I'm certainly not going to have an instruction on jury

15  nullification, and I don't intend to allow the parties to

16  argue for hearing nullification.

17          MR. C. MATTHEW RITTGERS:  We might not file a

18  response, You Honor.

19          THE COURT:  Okay.

20          MR. C. MATTHEW RITTGERS:  I mean, we weren't planning

21  on arguing the response.

22          THE COURT:  Okay.  So my preliminary ruling is I

23  would grant -- but, yes, go ahead.

24          MS. GLATFELTER:  Your Honor, I have concern because

25  some of the arguments that are in the government's motion to

1   prevent jury nullification are echoed throughout separate

2   motions.

3      So while defendants somehow profess they're not intending

4   to elicit argument about these things, as an example, one of

5   our topics in the motion was it's not a defense that everyone

6   else was doing it or this is just how things work. We've

7   heard that today. We've heard that in the expert response.

8   So I would ask for a ruling on it.

9         THE COURT: Okay. I am happy to rule on it because I

10   agree, "this is the way it works" is not a defense to this

11   charge.

12      I thought I understood Mr. Rittgers to be acquiescing in

13   that, but maybe I misunderstood.

14         MR. C. MATTHEW RITTGERS: Your Honor, absolutely

15   agree. But definitely in terms of Mr. Burns, just to put

16   another wrinkle in while we're all here.

17      The J.K. motion, as an example, just so that we can put

18   that before the Court. If they put someone like J.K. on to

19   talk about, well, this is what -- well, this individual works

20   for collectivists all over, advice being relied on, on

21   cross-examination, I don't know what the government thinks to

22   elicit as testimony, but it could open the door for that.

23         THE COURT: I would agree with that. You know, in

24   terms of J.K. -- defendant's motion to exclude -- which is the

25   one that talks about the other people, is that the 404(b) one

1   or is that the J.K. one?

2        MR. C. MATTHEW RITTGERS: Other people in terms of?

3        THE COURT: The other, what's being called character

4   evidence. That was, I think, the 404(b) motion, right?

5        MR. C. MATTHEW RITTGERS: Probably, yes.

6        THE COURT: Yeah. I don't want to get ahead of

7   myself on too much of this stuff, although I will say with

8   regard to the 404(b) stuff, you know, we're not going to trot

9   a bunch of witnesses up to say things like, I don't know, he

10   didn't really say anything, but I sort of felt, I was getting

11   this sense that... you know, we're not doing that.

12     If there's other examples of similar conduct to what's

13   alleged in this case involving specific official acts and

14   campaign contributions tied to those specific official acts,

15   that's one thing, but we're not putting people on the stand to

16   say they subjectively felt like, I don't know, it was just in

17   the air. We're not doing that. That's not fair.

18     So when I went through some of the examples in the

19   404(b), some of them certainly seem to fall, at least in my

20   view, based on the description that was provided within the

21   latter category of, I don't know, it was just kind of an

22   atmospheric, or something along those lines, you know, that

23   isn't going to fly.

24     But that's just kind generally where I'm at. And I will

25   give written rulings on those things, but I'm just trying to

1    give you as much heads up as I can on how to prepare for

2    trial.

3        The government, you know, J.K., or with regard to -- I do

4    agree that on the 404(b), that to the extent that it's all

5    part of the same general alleged series of events, it's not

6    even technically 404(b) because it's not other acts.  It's

7    part of the same scheme or plan or -- alleged.  I want to be

8    very clear, alleged scheme or plan.

9        So if it's all within connection with the same general

10   time frame, the same campaign, the same whatever, you know, I

11   don't think that's 404(b).  I think that's unindicted conduct.

12       I think the question's going to be asked about why it's

13   unindicted, but -- separate issue, but it's unindicted conduct

14   involving the same general plan or scheme, and so I would not

15   call that 404(b), just so we're clear.

16       Mr. Rittgers, am I drawing lines that you're following?

17   I'm not asking whether you agree with them, but am I drawing

18   lines you're following?

19       MR. C. MATTHEW RITTGERS:  Yes, Your Honor, I'm

20   following.  It goes back to Mr. Burns.  In one of the recent

21   filings, which was on Monday or Tuesday of this week, the

22   government mentioned the term that you just said, which was

23   unindicted criminal conduct for soliciting campaign donations

24   from someone that does business in front of the city.  It's

25   not even an ethical violation, so why would it be criminal

1      conduct.

2          And so the same confusion that, I believe, the government

3      might have, the jurors are going to have that same confusion,

4      without understanding that a person is permitted -- a

5      candidate or an elected official is permitted to throw a

6      fundraiser with a group of industry leaders or lobbyists two

7      days before a vote and change their vote.

8          And so if the government is saying that this is uncharged

9      criminal conduct, that being an elected official in the City

10     of Cincinnati, they use the word "targeting."  Someone who

11     might have business in front of the city, it's not criminal

12     conduct, or an --

13         THE COURT:  I agree.  I think, as I've said from the

14     outset of this case, the difficulty is that candidates raise

15     money from people who may have subsequent business in front of

16     the office to which the candidate is seeking to be elected,

17     and there is nothing wrong or unethical about that.

18         It only becomes wrong or unethical if there's an

19     agreement, either expressly written down or tacitly arranged

20     through the phrase that, I think, Judge Easterbrook used was

21     "winks and nods," that there is an agreement in place that the

22     official will undertake some specific official action in

23     exchange for that campaign contribution.

24         And so the difficult task the jury is going to face in

25     this case is trying to assess whether this is just someone who

1    gave money in hopes that someone would get elected to office

2    and, generally, looked favorably upon that person, or if this

3    is someone who gave money in exchange for your client tacitly

4    agreeing to take some specific act.

5        And so I certainly do not intend to allow anyone to

6    suggest to the jury that the mere fact of taking or

7    accepting -- I shouldn't say taking, accepting a campaign

8    contribution from someone who has or may have business with

9    the office to which the candidate is seeking to be elected is,

10    in and of itself, in any way unethical, so does that --

11        MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

12        THE COURT:  And I recognize that can come up in a

13    variety of different ways, and so, you know, I'm going to be

14    trying to police that line.

15        And you guys are going to need to help me try to police

16    that line, because I may not be as attuned to the various

17    different ways in which that can come up.  But that is a line

18    I very much intend to police, because that's kind of the

19    difficult task we face in this case.

20        MR. C. MATTHEW RITTGERS:  Understood.

21        THE COURT:  All right.  So that's generally where I

22    am on these motions, some of which are not fully briefed.  And

23    I'm certainly not saying I'm set in stone on anything, other

24    than it sounds like we're generally -- if I could, it sounds

25    to me like we're generally in agreement on the jury

1    nullification thing, except you said you wanted a ruling,

2    because there's a lot of talk that there's some specific

3    things in there.

4        The rule of completeness thing, as I understand it, you

5    guys are going to try to take a crack at figuring out what you

6    want to add, and at least put it in front of me before this

7    trial, and I'll make a ruling on that.

8        The government's motion to preclude expert testimony,

9    you're going to get back to me within 24 hours about whether

10   you want to do a *Daubert* hearing next week, or some kind of

11   voir dire during trial.

12       The 404(b) thing, I sort of gave you some preliminary

13   thoughts, but I'm happy to write something up if that's

14   better.  And the J.K. thing, have I shared my preliminary

15   thoughts on J.K. or not?

16           MR. C. MATTHEW RITTGERS:  I believe tacitly but not

17   expressly.

18           THE COURT:  Well, I think that's a theme for this

19   trial is tacitly not expressly.  But yeah, it's sort of where

20   I am on the 404(b) thing.

21       I don't think there's anything wrong with targeting

22   people who may be inclined to contribute, for various reasons,

23   to campaign contributions; but, you know, I really don't know

24   what the person's going to say, so it's very hard for me to

25   rule in the abstract if --

1        You know, if somebody were to come in and say -- and,

2     again, for the benefit of everyone in the room, this is not

3     what the evidence says, or at least any evidence I've seen.

4        But if J.K. were to come in and say, oh, yeah, you know,

5     Mr. Sittenfeld told me to go out and propose these deals to

6     people, we'll do X in exchange for Y, that's different from

7     here are people who may be interested in your campaign because

8     they are people who have business before the city.

9        And I don't think there's, as far as I know, anything

10    wrong with the latter, but the former would be a violation of

11    the law, so...

12       It's a little hard in the abstract to say exactly what

13    J.K. is going to say, but if, to the extent the government

14    intends to try to create, sort of, the appearance of

15    misconduct based on the fact that a candidate may think, oh,

16    well, a potentially rich target pool is people who may have

17    business before the city and, therefore, we will take steps to

18    allow you to address any such implications, because I don't

19    think that implication is fair to your client.

20            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

21            Your Honor, I might have misspoke, and I apologize

22    for going back to what Ms. Glatfelter had spoken about with

23    ruling on the nullification motion.

24            THE COURT:  Yes.

25            MR. C. MATTHEW RITTGERS:  I think I indicated to the

1      Court that we are in agreement with all that.

2           Mr. Sittenfeld just reminded me there might have been a

3      part of that brief that indicated that Mr. Sittenfeld's public

4      pro-development stance was inadmissible, and I might be

5      quoting that incorrectly.

6           But there was -- in one of the motions, there was a Sixth

7      Circuit pattern jury instruction that indicates that it's not

8      a defense to bribery, that he would have done it without the

9      money.

10               THE COURT:  That is correct.

11               MR. C. MATTHEW RITTGERS:  I agree with that

12      statement.  However, on a non-express case, for a jury to have

13      to come to the determination as to why an elected official

14      might want to champion a project, they have to understand the

15      context and other reasons why that elected official would say,

16      you know what, I'll help you because this project is something

17      that I believe in.

18           And so if, to the extent -- and I might be incorrect, but

19      to the extent in that nullification motion there's some

20      argument or request that we are not permitted to show

21      Mr. Sittenfeld's public pro-development stance, then we would

22      not agree to that one part, Your Honor.

23               THE COURT:  Yeah.  Is that in the jury nullification

24      motion?  There's been such a flurry of filings, I'm not

25      completely up to speed on all of them, but...

1        MR. SINGER:  In the trial brief, Your Honor, we said

2   that would be admissible as evidence.  It just cannot be

3   argued as a defense.  I think that was our position.

4        THE COURT:  Right.  And I think I heard Mr. Rittgers

5   agree with that.

6      Well, since we're kind of powering through some issues,

7   one other issue that came up -- we'll talk about how we're

8   going to do the jury instructions, but one other issue that

9   came up that I want to give my preliminary thoughts on,

10  because I think it may impact the way in which you prepare for

11  trial, is in regard to this good faith defense.

12       As far as I can tell, and I'm willing to hear more

13  argument on it, there's not a freestanding good faith defense

14  in the sense of, oh, my client's basically a good guy, or my

15  client basically is pro-public, or my client has got

16  Cincinnati's best interest at heart.  If that's what you mean

17  by good faith, as far as I know, there isn't such a defense.

18       The way good faith comes up, and why the Sixth Circuit

19  has said it's not consistent with an intent to defraud, is

20  because of this type of hypothetical, where somebody -- I come

21  to you and I say, hey, I'd like you to invest with me.  I've

22  got this great idea.  I'm a hundred percent sure we're going

23  to get 20 percent return per year, right?

24       And if it turns out that I actually believe that, then

25  I'm not trying to defraud you because I don't have an intent

1    to defraud.  I could be wildly wrong, but if I have a

2    subjective honest belief that we're going to generate

3    20 percent returns, and I tell you that, that isn't consistent

4    with an intent to defraud.

5        But here -- so good faith is usually tied to some

6    specific statement, and whether that statement was said or

7    uttered in good faith.  And the Sixth Circuit said if it was

8    uttered in good faith, that's not consistent with an attempt

9    to defraud.

10       But that doesn't mean there's a freestanding good faith,

11   like I wake up with an optimistic view of Cincinnati's going

12   to be a great city, and so as long as I'm just pursuing that,

13   that means however I go about it, it doesn't violate any law.

14       So there isn't going to be -- and what I need you to

15   explain to me, in the context of this case, if you're seeking

16   a good faith instruction -- I think it's 10.04 or something,

17   but if you're seeking that pattern instruction, I would need

18   to know what statement that good faith is going to attach to.

19       In other words, what statement somebody is saying was

20   false but you honestly believe was true, and that's what I'm

21   not seeing in this case.

22       So as I sit here right now, I don't see a basis for a

23   good faith instruction, because I fear that it will be

24   interpreted by the jury as some kind of freestanding if you

25   find this is somebody who is acting with a good heart writ

1    large, that means you can't convict.

2        And, again, this isn't the facts of this case, but if the

3    facts showed that, in the interest of Cincinnati and with the

4    hope to make the city better, Mr. Sittenfeld entered an

5    expressed agreement or even a tacit agreement to exchange a

6    specific official act for campaign contributions, the fact

7    that he did so out of the belief that it would ultimately be

8    good for the city isn't a defense to the charges.  And so we

9    need to keep those apart.

10       And so that's where I'm, sort of, at on the good faith

11   question, just so you know.

12            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

13            THE COURT:  And I'm sorry, Mr. Singer, do you have

14   any questions about that, or Ms. Glatfelter?

15            MS. GLATFELTER:  Yes.  I had one question about a

16   previous statement you made about the expert issue.

17            THE COURT:  Sure.

18            MS. GLATFELTER:  And so as I understood it, you had

19   asked the government and defense counsel to work together on

20   whether there was a preliminary instruction that could be

21   given to --

22            THE COURT:  Avoid Mr. Burns testifying.

23            MS. GLATFELTER:  And so, in addition to, I guess,

24   they'll be coming back within 24 hours to tell us whether

25   we're going to have a *Daubert* hearing or not --

1          THE COURT:  Right.

2          MS. GLATFELTER:  -- and at the same time, we'll be

3     working on --

4          THE COURT:  Yes.  Thank you for bringing that up,

5     because I left Mr. Fitzgerald out.

6          With regard to Mr. Fitzgerald, I've got some -- what I

7     would want to know in a *Daubert* hearing or voir dire about

8     Mr. Fitzgerald is if he's going to be commenting on

9     investigative techniques, how somebody who, as far as I can

10    tell, you know, had a cup of coffee with the FBI 30 years ago

11    is going to be an expert on investigative techniques that the

12    FBI should use in campaign investigations, I'm struggling a

13    little bit, so...

14         MR. C. MATTHEW RITTGERS:  Understood, Your Honor.  I

15    mean, he was a special case agent for undercover operations,

16    and it was not -- the intent is not going to be to have

17    Mr. Fitzgerald indicate what procedures that might be relevant

18    to this particular sting operation, but more just a general

19    characters and education in terms of the control, scripted

20    calls, that would be the intent, Your Honor.

21         THE COURT:  Yeah.  I would need somebody to tie up

22    his experience from 30 years ago with it being relevant to

23    today.

24         And then, B, I would need somebody who could -- he would

25    have to explain to me how he can tie it to the specific

1    investigation that occurred here.  And I think he's going to

2    struggle to do that, to be honest, but that's what I would

3    want to hear about at a hearing with regard to him.

4        And with regard to these other topics, some of it -- you

5    know, I mean, I think he wanted to talk about -- I don't have

6    the motion, I don't think, in front of me right now, but it

7    was like how people interface with potential donors and

8    campaigns generally, or something like that.

9        Again, that runs directly into the problem that I've

10   raised already about, even if Mr. Sittenfeld was acting in a

11   manner consistent with the evolved custom of how candidates

12   interface with donors, that doesn't, in my mind, impact the

13   legality or illegality thereof.

14       In other words, even if 95 percent of the candidates are

15   doing it, that doesn't make 95 percent of candidates are

16   violating the law.  I mean, we just don't know, you know.

17           MR. C. MATTHEW RITTGERS:  I agree, Your Honor.  I

18   think it depends on how the government elicits testimony and

19   evidence in the case.

20       We anticipate that one of the themes that the government

21   will argue, probably expressly, is that Mr. Sittenfeld should

22   have known or did know that these undercovers were corrupt,

23   that these actors were corrupt, by pointing to examples in the

24   audio and video indicating, well -- they never stated they're

25   corrupt, but there are times when they say, well, yeah, he's

1    legitimized himself now.  UC3 worked in New Jersey, but he's

2    legitimized himself now.

3        And there will be evidence presented to where they offer

4    Mr. Sittenfeld money orders, which he declined.  There will be

5    evidence presented where they offered Mr. Sittenfeld corporate

6    checks, as opposed to LLC checks.

7        I believe that the relevance, the proposed relevance for

8    that testimony would be that that must be an indication to

9    Mr. Sittenfeld that these people are, therefore, corrupt.

10        And it would go to his -- I'm playing the government.  So

11    therefore, we wanted somebody, Mr. Fitzgerald or somebody

12    other than Mr. Sittenfeld himself, to say people on the

13    campaign trail offer cash.  I've frequently had to tell donors

14    what is legal and permitted and send checks back.

15        And it's not what the government is hoping the jury will

16    infer from these atmospherics, it is something that happens

17    every day, which is why Mr. Sittenfeld looked optimistically

18    on all of this and did not say, whoa, are you corrupt?  I'm

19    not going to deal with you anymore.

20        THE COURT:  I see.  And to the extent someone's been

21    involved in campaign finance for an extended period of time, I

22    would imagine that they may have some insights into how often

23    things like we got a check that we have to send back, which

24    happens in political campaigns all the time.

25        People get checks and realize, for whatever reason, they

1    can't accept it.  It's, as you said, from a corporation,

2    maybe, or whatever, or it can't be directed to this, or it's

3    in excess of the campaign contribution limits or, oh, you

4    forgot you gave this other check, we have to refund part of

5    this.

6        You know, I understand that.  And I think, if there's

7    going to be an attempt to argue that there's something

8    untoward about things like sending back those corporate

9    checks, yeah, I would think that that would open the door for

10   you putting on somebody who could explain that's a pretty

11   common occurrence in political campaigns.

12       MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

13       THE COURT:  So now let's get on to the mundane parts,

14   now that I've pontificated about the law for an extended

15   period of time.

16       So let's talk about the length of the trial.  It's

17   currently set for four weeks, June 21 to July 15.  You've

18   heard from the Court today a little bit about my intent,

19   probably, my intent to exclude at least some of the evidence

20   that we've heard about the parties intending to put on, but --

21   and so I don't know if you can take that into account yet.

22       I understand there may be some streamlining, if we can

23   present some things to the jury through instructions from the

24   Court, and things of that nature.

25       But what's the current estimate, from the government, as

1     to how long it believes its case in chief will last?

2          MR. SINGER: Your Honor, I think the government's

3     position is we think our case will be done in about a week.

4          THE COURT: Okay.

5          MR. SINGER: Give or take.

6          THE COURT: Mr. Rittgers, do you have any sense of

7     your case?

8          MR. C. MATTHEW RITTGERS: It won't be longer than a

9     week, Your Honor.

10         MR. C. HENRY RITTGERS: But what if it is, Judge?

11    What if it's ten days instead of five days?

12         THE COURT: Well, I'm here every day, and the jury

13    will be here every day, so...

14         MR. C. HENRY RITTGERS: Okay. We just don't want

15    to --

16         THE COURT: No, no. I might as well talk about this

17    now. We have pre-qualified the jury, not with respect to any

18    issue. I took what the parties said about, you know,

19    potential downsize, of trying to pre-screen for people who

20    have had exposure to this case. But we are pre-qualifying

21    that they are all people who could be here four weeks starting

22    June 21st.

23     So I don't believe, given what the parties have just

24    said, that there should be a problem with the jury, or losing

25    jurors after two weeks. We're not going to do that.

1     So everybody who comes for the voir dire will have been

2    pre-qualified as somebody who can be in a four-week jury trial

3    starting on June 21st.

4     Does that respond to your concern, Mr. Rittgers?

5     MR. C. HENRY RITTGERS:  It was just committing to the

6    Court that if we're only going to take five days, and then

7    find out, after the government presents its case, we may need

8    seven.

9     THE COURT:  Sure.  I'm not running a stopwatch, or a

10    sundial, or any kind of timer, so...

11     MR. C. MATTHEW RITTGERS:  And, Your Honor, just for

12    the Court, best guess, I think that we would be three days or

13    four days, Your Honor.  That's a guess.

14     THE COURT:  Okay.  So four weeks may be wildly over

15    estimated.  As I said, we will have a pre-qualified jury in

16    that regard, so I don't anticipate a problem.

17     And I'm not holding anyone -- these are estimates.  I'm

18    just trying to, sort of, get a sense.

19     Currently, we're set to start on June 21st, and that will

20    be voir dire.  I anticipate, given the size of the pool, I've

21    asked to have 85 people brought in who are pre-qualified on

22    time but are not pre-qualified on previous exposure to this

23    case.

24     So there's some potential we'll lose people.  There has

25    been some media interest in this case, so I can imagine we

1     would lose some potential jurors through exposure, or things

2     of that nature.

3          That's more than I would typically bring in, but do the

4     parties think that's enough, 85?

5               MR. C. MATTHEW RITTGERS:  I do, Your Honor.  The

6     defense does.

7               MR. SINGER:  Yes, Your Honor.

8               COURTROOM DEPUTY:  Your Honor, I believe she's

9     calling in 80.

10              THE COURT:  I'm sorry, 80, not 85.

11              MR. C. HENRY RITTGERS:  Then we're not.

12              THE COURT:  Now we got a problem, Mr. Rittgers says.

13         So the first days, I anticipate we will start voir dire

14    at 9:30.  I would like the attorneys to arrive at 9:00.  The

15    trial is scheduled for each subsequent day may vary, depending

16    on the Court's schedule but, generally speaking, my experience

17    with juries over the last year is they like to get going, and

18    they like to stay and get testimony done.

19         They prefer to have days taken off the end rather than

20    shorter days while they're going, so we're going to try and

21    accommodate that.

22         I would imagine we'll probably start around 9:00 or 9:15

23    most mornings.

24         Whatever time we're starting, I'd like the attorneys in

25    the courtroom 20 minutes before we start.  And I will be in

1    before we're going to bring the jury in, and I will ask both

2    sides if there's anything they want to put on the record, or

3    anything we need to discuss.  So please be there at least

4    20 minutes before trial is scheduled to start.

5         Generally speaking, we take one break in the morning

6    about halfway through, one break in the afternoon.  I try to

7    wrap up around 5:00, so what I tell people is about 4:30,

8    start thinking about is this a witness I can get done if we

9    stay until 5:15, maybe we will.

10         If it's a witness that's going to take until 6:00, where

11   would be a good breaking point for this witness.  Or if it's

12   4:30, and you just got done with somebody, might this be a

13   good time to break.  And if you would just want to suggest,

14   you know, Your Honor, this would be a good time to break for

15   the day.

16         Any time after 4:30, if you hit a spot where you feel

17   like this would be a good breaking point, feel free because,

18   you know, it doesn't make much sense to do another 15 minutes,

19   and then have to essentially repeat it the next day because

20   people have forgotten it overnight.

21         Usually, there's about an hour lunch break.  And I've got

22   a number of things that are scheduled for the lunch breaks, so

23   some of the lunch breaks may end up being more like an hour

24   and 15 or so, just because with a trial this long, you know,

25   there are a number of things that have to be taken care of in

1    other cases.

2        Have the parties done their witness list exchange yet?  I

3    think they're due on the 10th; is that right?

4            MR. SINGER:  Your Honor, the witnesses are due to the

5    Court on the 10th.

6            THE COURT:  Due to the Court, obviously, right.

7    Submitted, I should say.  You're giving them to the Court on

8    the 10th, right?

9            MR. C. HENRY RITTGERS:  Ex parte.

10           THE COURT:  Ex parte, you're right.  Yes.  Are we

11   doing separation of witnesses?

12           MR. C. HENRY RITTGERS:  Yes.

13           MR. SINGER:  Your Honor, just to be clear, except for

14   the case agent who will be sitting at counsel table.

15           THE COURT:  You can have one representative at trial,

16   yes, and that's the case agent.

17           MR. SINGER:  Thank you.

18           THE COURT:  What's the case agent's name?

19           MR. SINGER:  Special Agent Nathan Holbrook.

20           THE COURT:  Has the defense made any decision that

21   they want to share on whether or not Mr. Sittenfeld is

22   expected to testify at trial?

23           MR. C. MATTHEW RITTGERS:  We could share ex parte,

24   Your Honor, is that okay?

25           THE COURT:  Yes.

1          MR. C. MATTHEW RITTGERS:  What form would you like

2     that in, under seal, or just an email to Mr. Lang?

3          THE COURT:  Do you want to just come up and do it at

4     sidebar?

5          MR. C. MATTHEW RITTGERS:  Sure.

6       (This portion of the record was placed under seal by

7     order of the Court and filed separately.)

8          THE COURT:  In terms of exhibits, are there any

9     issues that we know of relating to admissibility of exhibits

10    or testimony beyond those that have already been briefed?

11         MR. SINGER:  No issues with exhibits, Your Honor.  We

12    just want to raise, there's been some discussions about

13    motions, we will be filing additional motions.

14         THE COURT:  Okay.  Great.

15         MR. C. MATTHEW RITTGERS:  Your Honor, I have a

16    question about exhibits.

17         THE COURT:  Yes.

18         MR. C. MATTHEW RITTGERS:  When -- if there is -- I

19    think I know the answer, but I just wanted to make sure that

20    I'm aware of the Court's preference.

21       If -- we don't know, obviously, how the government is

22    going to present its case, and so if there are exhibits that

23    we might use to refresh or to impeach on cross, I don't want

24    to overburden everybody with bind ers that might not be

25    necessary.  So we have probably 20 times the material that I

1    think would be necessary for cross-examining a particular

2    witness.

3        If it's impeachment or refreshing recollection, it's

4    difficult for us to anticipate without giving the Court

5    literally 2,000 more exhibits.

6        Is that something that would be a problem, if we hear

7    testimony from a witness, pull on our computer an impeachment

8    document or a refreshment document that's not on the exhibit

9    list?

10          THE COURT:  Mr. Singer?

11          MR. SINGER:  I'm thinking it needs to be on the

12    exhibit list, probably printed out so that they can be

13    presented to the witness in hard copy forms rather than

14    bringing up a laptop.

15          THE COURT:  Yeah.  How are you planning on using it

16    to refresh recollection, Mr. Rittgers?

17          MR. C. MATTHEW RITTGERS:  Yeah.  That's a good point.

18    If it's to reflect recollection, on the technology in Judge

19    Black's courtroom, is there a way for just the witness to see

20    that particular document, no one else, other than the Court?

21          THE COURT:  Yes, there is, although not if it

22    involves audio, we found.

23          COURTROOM DEPUTY:  Correct.

24          THE COURT:  If it's just written, yes.  It could be

25    shown to counsel, the Court, and the witness.

1          MR. C. MATTHEW RITTGERS:  I believe that there are --

2     right now we are including in our exhibit list documents that

3     we've received in discovery from the government, and it is

4     around 2,000 listed documents in Excel sheets.  And some

5     documents, for example, might be the five- or six-hundred page

6     document that's now in your chambers, Your Honor, on J.K.  So

7     these are not one-page documents.

8          I want to try to make the trial as efficient as possible

9     and effective as possible, so the timing and clarity, it might

10     be easier -- I don't know what a witness might say that the

11     government presents.

12          This is not for our witness on direct.  This is only for

13     cross-examination of their witnesses, if it would be

14     potentially easier or more efficient for us to say, okay,

15     instead of providing the Court in advance with

16     300 potential documents for J.K., as an example, if he

17     testifies to a very narrow scope, we might only need one.

18          THE COURT:  Yes.

19          MR. C. MATTHEW RITTGERS:  So I don't know what the

20     Court would prefer in terms of having everything dropped off

21     here in advance.

22          THE COURT:  Generally speaking, the Court does not

23     prefer having a truckload of documents that may or may not end

24     up being used at trial.

25          MR. C. MATTHEW RITTGERS:  Okay.

1          MR. C. HENRY RITTGERS:  Your Honor, is there an

2     exchange of exhibits prior to trial, or is that ex parte?

3          THE COURT:  I thought it was an exchange but,

4     Mr. Singer, is that not right?

5          MR. SINGER:  It's our understanding it's ex parte,

6     Your Honor.

7          THE COURT:  Okay.

8          MR. C. HENRY RITTGERS:  And if I may, Judge?

9          THE COURT:  Yes.

10          MR. C. HENRY RITTGERS:  As to materials that are used

11     for cross-examination, we will probably show those at the time

12     we're cross-examining the particular witness, not ahead of

13     time?

14          THE COURT:  Right.  That's what I would anticipate

15     usually the way cross-examination works.

16       Since you've raised refreshing recollection, I'll just

17     share one pet peeve so we can all avoid that.

18       Refreshing recollection does not consist of handing the

19     witness a document, and then asking the witness to read the

20     document into the record, so that's not refreshing

21     recollection.

22       Refreshing your recollection is you hand the witness a

23     document, the witness reads the document, you say does that

24     refresh your recollection, and then the witness testifies

25     without the document, based on his or her now refreshed

1    recollection.

2      For some reason, I've seen people do the, okay, well,

3    doesn't the document say X?  That isn't refreshed

4    recollection.  That's trying to read the document into the

5    record, so I'd prefer to avoid that.

6           All right.  How long do you anticipate the opening

7    statement is going to be for the government?

8           MR. SINGER:  Roughly 45 minutes, Your Honor.

9           THE COURT:  Okay.  Does the defense intend to give

10   their opening statement at the outset, or are they going to

11   wait until their case in chief?

12          MR. C. MATTHEW RITTGERS:  At the outset, Your Honor.

13          THE COURT:  How long do you anticipate yours is going

14   to go?

15          MR. C. MATTHEW RITTGERS:  Sixty minutes.

16          THE COURT:  Are you going to be using, Mr. Singer,

17   audiovisual equipment?

18          MR. SINGER:  We may, Your Honor.  We have not decided

19   yet.

20          THE COURT:  What about you, Mr. Rittgers?

21          MR. C. MATTHEW RITTGERS:  Yes, we intend to,

22   Your Honor.

23          THE COURT:  I'll have you talk with Scott.  I think

24   somebody's got a time to set up to go look at the

25   audiovisuals, I believe.

1          COURTROOM DEPUTY:  Yes.  We're going to after the

2    hearing, Judge.

3          THE COURT:  Be sure you're comfortable with how it's

4    going to work.

5          MR. SINGER:  Your Honor, we would also like an

6    opportunity to run through our audiovisuals.  Should we

7    coordinate with Scott?

8          COURTROOM DEPUTY:  Yes.

9          MR. SINGER:  Coordinate with Scott.  Great.  Thank

10   you.

11         MS. GLATFELTER:  Your Honor, on the topic of opening

12   statements, we had asked in our trial brief for the parties to

13   exchange, at least in advance, if they're going to use

14   exhibits or audio clips, that those be exchanged so that we

15   can raise any objections beforehand, not in front of the jury.

16         THE COURT:  Yeah.  I think that's a very good idea in

17   this case, since there seems to be some remaining

18   disagreements about the scope of things.  Please do exchange

19   any exhibits that you intend to use if you -- in your

20   openings.

21      To the extent -- I guess what I'd say, Mr. Rittgers, is

22   don't over promise on things, like you're going to hear from

23   an expert that says X, Y, Z if we haven't done a *Daubert*

24   hearing.

25      I just don't want you in a position where you can't

1   deliver, through no fault of your own, but through my fault

2   because I rule on legal issues, so word to the wise.

3           MR. C. MATTHEW RITTGERS:  Your Honor, on the audio

4   clips and exhibits for opening, sometimes during trial, I'll

5   have an exhaustive potential clips, or like a PowerPoint where

6   I can lead things, depending upon the government's opening.

7       So could I just have three or four days after they show

8   me what they plan to produce so that I can then coordinate and

9   tell them without overproducing?

10          THE COURT:  I think that seems fair to me.

11  Ms. Glatfelter, any objection to that?

12          MS. GLATFELTER:  We typically exchange them like the

13  day or two before a trial.  I mean, I think it's strange for

14  me to give that a week in advance, and then receive theirs,

15  you know, the day before or something.  I would --

16          THE COURT:  I understand.

17          MS. GLATFELTER:  -- a simultaneous exchange seems --

18          THE COURT:  Well, I take Mr. Rittgers' point that

19  he's responding to your opening.

20          MS. GLATFELTER:  Sure.  And if he has additional

21  ones, or something like that, we can --

22          THE COURT:  I'll tell you what.  Why don't you

23  produce yours at least three days before trial, Mr. Rittgers,

24  you produce yours.  I think you should have a pretty good

25  sense of where the government 's going to go through opening,

1   so 24 hours to kind of figure out what you're going to do, all

2   right?

3       And I know we've discussed some potential stipulations.

4   I don't know if they're actually stipulations, but talk about

5   some preliminary instructions.

6       Let me ask, are there going to be any stipulations in

7   this case, Mr. Singer?

8       MR. SINGER:  Yes, there are, Your Honor.  The parties

9   need to get going on negotiations, as far as that goes.  The

10  government will take the blame as far as moving forward, but

11  there is one stipulation we have come to, the authenticity of

12  evidence that has been produced.

13      THE COURT:  I think I saw that.

14      MR. SINGER:  But otherwise, we would be negotiating

15  and, hopefully, we'll get those to you in advance of trial.

16      THE COURT:  "Hopefully, we'll get those to you"?

17      MR. SINGER:  No.  We will definitely get them to you

18  in advance of trial, sufficiently in advance of trial, where

19  if you're able to raise any concerns, although I don't think

20  you will.

21      THE COURT:  All right.  Mr. Rittgers, your thoughts?

22      MR. C. MATTHEW RITTGERS:  Your Honor, we did send

23  over a number of stipulations, fairly rough stipulations, but

24  a number of them.  A lot of them would be very similar to the

25  requested preliminary jury instructions regarding the -- a

1    while ago.

2        Again, I know Mr. Singer's took credit for not -- there's

3    no negotiation, but a lot of it has to do with that, so we are

4    waiting to hear.

5            THE COURT:  Okay.

6            MR. C. HENRY RITTGERS:  Judge?

7            THE COURT:  Yes.  Go ahead, Mr. Rittgers.

8            MR. C. HENRY RITTGERS:  Maybe if we could have a date

9    certain by the time for which we all agree as to what the

10   stipulations would be would be great, maybe a week before

11   trial or something?

12           THE COURT:  Yeah, that would be the 14th, I think.

13   Why don't we say June 14th submit stipulations.  I think

14   that's a good idea.

15           MR. C. HENRY RITTGERS:  Thank you, Your Honor.

16           THE COURT:  In terms of the stipulations themselves,

17   each stipulation should be a separate pleading.  You know, we

18   stipulate the following, and then we have one fact, and each

19   one's a separate one.

20       The reason I want to do them separately is because,

21   during trial, to the extent there's a stipulation, somebody's

22   going to need to remind me to read it to the jury at the

23   appropriate time, so if you'd say, oh, we'd like the

24   stipulation read.  You can also make use of the stipulation

25   during closings, and so it's just a matter if each one is on a

1    separate piece of paper.

2        If you, at the end, want to amalgamate some for a

3    demonstrative part of your closing, that's fine.  With

4    stipulated evidence, I don't have a problem with that, but we

5    need the granularity up front.

6        *Jencks* material, it sounds like, has largely been

7    produced, but there's some limited amount that's still

8    outstanding.  Is that right, Mr. Singer?

9            MR. SINGER:  That is correct, Your Honor.

10           THE COURT:  And you're producing that on a regular

11   basis as it comes in?

12           MR. SINGER:  Yes.

13           THE COURT:  Mr. Rittgers, any comment on that?

14           MR. C. MATTHEW RITTGERS:  No, Your Honor.

15           THE COURT:  I assume there's no more remaining *Brady*

16   issues, Mr. Singer?

17           MR. SINGER:  Not from the government's perspective,

18   Your Honor.  If I may, Your Honor?

19           THE COURT:  You may.

20           MR. SINGER:  We do have the ex parte that we will be

21   submitting.  It's narrower in scope than potentially we had

22   initially thought, but we will be submitting that to the Court

23   within the next day or so.

24           THE COURT:  Okay.  Mr. Rittgers?

25           MR. C. HENRY RITTGERS:  Judge, what was Mr. Singer

1    saying, he's going to file an ex parte communication to the

2    Court?

3         THE COURT:  Yeah, for --

4         MR. C. HENRY RITTGERS:  I know it's accepted in

5    federal court, but aren't they going to give us a basis as to

6    why it's ex parte?

7         THE COURT:  I think that was the motion they filed

8    that I ruled on that said that they could submit something

9    ex parte.  Am I wrong, Mr. Singer?

10        MR. SINGER:  No.  That's correct, Your Honor.

11        THE COURT:  So I ruled on that, and said if the

12   government has a -- if the government, in good faith, can't

13   make a determination as to whether or not something

14   constitutes *Brady*, that they can submit it to the Court for

15   determination.

16        MR. C. HENRY RITTGERS:  Oh, we're just talking about

17   ex parte communication about *Brady*?

18        THE COURT:  Yes.

19        MR. C. HENRY RITTGERS:  I apologize.  I

20   misunderstood.

21        THE COURT:  No.  We're not generally going to do

22   ex parte communications in the case.

23        MR. C. HENRY RITTGERS:  That's good to know.

24        THE COURT:  Yeah.  In terms of jury instructions,

25   I've received both parties' jury instructions and proposed

1    verdict forms.

2        In terms of the supplemental jury instructions, remind me

3    what were the two topics of those?

4            MR. C. MATTHEW RITTGERS:  It was in good faith, Your

5    Honor.  The expert testimony, I believe, was --

6            THE COURT:  Okay.  Then the question was whether

7    there was going to be an expert witness.  Okay.  All right.

8            I know it's a difficult case on the jury instructions

9    because the parties have two, like, vastly different

10   structures of jury instructions, so I don't know -- often you

11   can kind of marry the jury instructions, but the problem here

12   is that the parties -- one side, I think it's the

13   government's, essentially has an eight-page jury instruction

14   that covers all of the Hobbs Act; and, you know, the other

15   side, I think, breaks it down more issue by issue.

16       I've gone through the jury instructions and the

17   objections, and I can tell you sort of where I am on the

18   objections.

19       But you get to two different spots.  If you start with

20   the defendant's jury instructions and then rule on the

21   government's objections, you end up at spot A.

22       If you start with the government's jury instructions and

23   rule on the defendant's objections, you end up at point B.

24   And there's a fair amount of substantive overlap, but there's

25   still some differences with regard to it just because of the

1   way the difference in the form, the way the parties submitted

2   it, and the granularity.  And I think there's a lot more

3   granularity in the defendant jury instructions.

4       By granularity, I just mean a lot more separate jury

5   instructions that were more combined on the government's side.

6   So I'm struggling a little bit of how to bring some sanity to

7   that process.

8       Any thoughts, Mr. Singer or Mr. Rittgers or

9   Ms. Glatfelter?

10          MS. GLATFELTER:  Sure.  We grouped them together -- I

11  can speak for the government's jury instructions.  We grouped

12  them together because that's how the Sixth Circuit proposed

13  for the Hobbs Act, and so the other instructions followed that

14  model.

15      But I've seen them done both ways, in terms of, you know,

16  breaking the elements down.  If the Court wished, I think we

17  could do that with each of the instructions.

18      We went with the Sixth Circuit pattern since those were

19  the ones available and followed that model, so...

20          THE COURT:  Okay.  Mr. Rittgers, your thoughts?

21          MR. C. MATTHEW RITTGERS:  Unfortunately, Your Honor,

22  I don't have much to add.

23          THE COURT:  All right.  Well, typically, the way I

24  would do jury instructions is -- because jury instructions may

25  depend, to some extent, on the evidence that's solicited at

1    trial, or, for example, whether or not experts are called at

2    trial.

3         Typically, what I would do is, as we get close to the

4    end, I would hold a charging conference after trial one day in

5    advance of closing, and kind of go through it with the parties

6    and come up with the final jury instructions so that the

7    parties have the jury instructions in advance of closing.

8         But we've waited, sort of, as late as we can during the

9    trial to make sure that the jury instructions match up with

10   the evidence that's actually been presented.

11        So do you think that's going to work here,

12   Ms. Glatfelter?  I guess you're the jury instruction person.

13             MS. GLATFELTER:  I do, Your Honor.  I think, maybe

14   what the Court is struggling a bit with, and we had this in

15   the fall, is that there are some parts in the instruction,

16   such as official act, which is repeated throughout.

17        I think, from an organizational standpoint, we just have

18   to make a decision whether you want to repeat it three times,

19   or whether it goes in the first one and you refer back, but

20   once the Court makes that decision, I think we all can follow.

21        I would say, rather than after trial one day, maybe we

22   would adjourn earlier, and we could prepare in advance that

23   this is going to be the charging conference day.

24        I think this one will probably take a little bit longer

25   than the typical charging conference, just because of the

1    amount of issues and the fact of some of the objections that

2    need to be resolved.

3              THE COURT:  Yeah.  And given what the parties have

4    said about anticipated duration, I think, if we have a

5    pre-qualified four-week jury, there should not be a problem

6    taking a day off at some point to do a charging conference, or

7    at least a half day off, so that makes a lot of sense.

8         Mr. Rittgers, is that acceptable to the defense?

9              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

10             THE COURT:  So there are some interesting jury

11   instruction issues.  Like I said, I've gone through the

12   objections, and I largely know where I'm at on the various

13   objections.

14        I don't think it will take all that long once we figure

15   out, you know, just sort of whether we're going to break them

16   up into separate instructions, or whether we're going to give

17   them more as a group.  So that's kind of the biggest issue in

18   my mind at this point.

19        I think I've got everybody's objections on the jury

20   instructions, right?  We're all done with that?  Good.

21        Any security considerations in this trial?  I'm not

22   anticipating any, but...

23             MR. C. HENRY RITTGERS:  This may be more

24   housekeeping.  I would like to keep our stuff, so we're not

25   hauling boxes or whatever we're going to have, at least I'm

1    old school, I have paper.

2       Is there a place where I can keep my stuff at night and

3    not worry about somebody tampering with it?

4             COURTROOM DEPUTY:  It can be kept in the courtroom.

5             THE COURT:  I think the courtroom's locked overnight.

6             MR. C. HENRY RITTGERS:  Excellent.  Thank you.

7             THE COURT:  I assume that that's the technical legal

8    term, "stuff."  Mr. Singer?

9             MR. SINGER:  One moment, Your Honor?

10            THE COURT:  Sure.

11            MR. SINGER:  Your Honor, may the parties approach

12    sidebar to discuss?

13     (This portion of the record was placed under seal by

14    order of the Court and filed separately.)

15            THE COURT:  We had a discussion off the record of

16    various security considerations, and we've got an agreement on

17    how we're going to handle issues that we've discussed.

18     Moving to the next item.  Will this case garner media

19    attention?  I assume the answer is yes.

20     And are there any specific arrangements that need to be

21    made with regard to that, in anyone's view, other than what we

22    have already discussed already?

23            MR. C. MATTHEW RITTGERS:  Nothing from the defense,

24    Your Honor.

25            MR. SINGER:  No, Your Honor.

1          THE COURT:  Very good.  Anybody anticipate any

2     special hearings outside the presence of the jury, other than

3     with regard to, potentially, this expert issue and voir dire,

4     expert voir dire?

5          MR. SINGER:  Not that I can think of right now,

6     Your Honor.

7          MR. C. MATTHEW RITTGERS:  We agree.

8          THE COURT:  Juror questionnaires.  Let's talk a

9     little bit about the jury process.  The jury questionnaires

10    are usually available one week prior to trial.

11       Regarding voir dire, who is going to conduct it for the

12    government?

13         MR. SINGER:  I am, Your Honor.

14         THE COURT:  Who is going to conduct it for the

15    defendant?

16         MR. C. MATTHEW RITTGERS:  I am, Your Honor.

17         THE COURT:  If I write Mr. Rittgers, that will be

18    helpful.

19         MR. C. MATTHEW RITTGERS:  Matthew.

20         THE COURT:  If there are any sensitive questions that

21    you would like the Court to propose to the panel so that you

22    don't need to, just let me know one week prior to trial what

23    those topics would be.  I will add them to my voir dire.

24       The way I've been doing voir dire is we bring everybody

25    in.  We have a number of them seated in the box, and then the

1    rest of them seated in the courtroom.

2        And I ask a relatively extensive set of questions that's

3    designed to elicit whether anybody has close family members

4    who are members of law enforcement, for example.  Or I suppose

5    in this case, you know, has anybody in here run for office, or

6    raised money for candidates, or things that one would

7    anticipate might be an issue in the case, and where you might

8    want to elicit whether someone has prior knowledge with regard

9    to those things.

10       It's a relatively extensive, as I said, voir dire that I

11   try to tailor to the issues that I see in a given case.

12       After I have completed my voir dire, I allow each of the

13   parties to conduct voir dire.  And, generally speaking, what I

14   would like the parties to do is conduct the voir dire from the

15   lectern.  So we'll set the lectern up to face the panel, and

16   you can talk to everybody.

17       I don't like if people ask specific jurors questions just

18   from out of the blue, like, hey, Juror 35, let's talk to you

19   for a moment.

20       Let's pose the questions to the entire venire, and then

21   if somebody raises their hand, if you want to follow up to get

22   more information from that person, absolutely that's

23   permissible.

24       But the other thing that I would say is, if there's an

25   answer or an omission on the juror questionnaire that you need

1     to follow up on that and for some reason I haven't, there's

2     something you saw on a jury questionnaire and you want to

3     follow up with that juror, that's fine.

4          But what I don't like is if counsel start trying their

5     case through voir dire.  If I could present evidence that this

6     and this and this, could you convict?  We're not going to do

7     that.  We're not going to do our closing as part of voir dire.

8          And I'm looking at everybody equally on that.  We're not

9     going to presell our theories of the case.  We're not going to

10    do any of that stuff.

11         This is supposed to be a relatively streamlined procedure

12    that's designed to allow us to seat a jury that's unbiased

13    with regard to the facts that they're going to hear in this

14    case.

15         I really want the parties to take that to heart and not

16    give a closing statement with a bunch of question marks in it

17    and then call it voir dire, okay?

18         After both sides have completed their voir dire, we'll

19    release the jury.  At that point, we'll do the jury selection

20    process.

21         We'll do for cause first, obviously, and go through, and

22    then we're going to do peremptories.  I'm thinking six for the

23    government, ten for the defendant on peremptories.  They will

24    be exercised as follows.

25         United States will exercise its first, the defendant will

1    do its first and second; the United States will then exercise

2    its second, the defendant will exercise its third and fourth;

3    the United States will then exercise their third, the

4    defendant will do fifth and sixth; then the United States

5    fourth, and defendant will do seventh and eighth; then the

6    United States fifth, the defendant ninth; then the United

7    States sixth, and the defendant tenth.

8        And basically, I've had people ask, do we have to strike

9    people that are already in the box?  The way we're going to do

10   this is it's going to be the 12 lowest number of jurors that

11   remain after the strikes will be the jury in the case.

12       So you can strike Juror Number 81, for all I care.

13   That's probably not going to change the jury if you strike

14   Juror Number 81, but I don't care.  You don't have to strike

15   the juror that's in the box.  You can use peremptories on any

16   juror you see fit.

17       Now the next topic I want to discuss is the number of

18   alternate jurors.  Typically, I would do two.  This is going

19   to be a four-week trial, I was contemplating the possibility

20   of adding one or two alternate jurors.  I'm now hearing that

21   this may be more like a two-week trial, so I don't know that

22   we need four alternate jurors.

23       The countervail intention in my mind is that, on the one

24   hand, you're asking people to donate a lot of their time, only

25   to tell them right when it gets to the part where they're

1     supposed to start deliberating that, instead, they're excused

2     to go home.  So that's a little bit offputting, I can imagine,

3     to people who have invested three to four weeks of their time.

4         Conversely, as everybody knows, I think there has been at

5     least a mild uptick in COVID numbers.  You know, there's

6     always the possibility we may lose one or more jurors during

7     the course of the trial.

8         I forget.  I think if we get down to, what is it, ten,

9     we're still okay?  Where is the Sixth Circuit at?  I don't

10    know that we need to -- I thought 11.  Is it 10 or 11?  I

11    think there's some case law that allows you in some unique

12    circumstances if people fall off the panel.  Am I wrong?

13            MR. SINGER:  I'm not sure, Your Honor.

14            MR. C. MATTHEW RITTGERS:  I don't know, Your Honor.

15            THE COURT:  Okay.  Well, in any event, what are

16    people's thoughts on how many alternates we should have,

17    Mr. Singer?

18            MR. SINGER:  Your Honor, given where we are with

19    COVID cases, three or four makes sense from the government's

20    perspective.

21            THE COURT:  Mr. Rittgers?

22            MR. C. MATTHEW RITTGERS:  We agree with that, Your

23    Honor.

24            THE COURT:  Three or four, which one?

25            MR. SINGER:  Let's go with four, Your Honor.

1          MR. C. MATTHEW RITTGERS:  We agree.

2          THE COURT:  So we'll do four alternates.  I think we

3     usually do one strike?

4          COURTROOM DEPUTY:  One for every two.

5          THE COURT:  One for every two?

6          COURTROOM DEPUTY:  Yes.

7          THE COURT:  So you will get two more strikes.  Both

8     the defense and the government will get two more strikes on

9     peremptories after.

10         So we'll seat the first 12, and then we'll move on to

11     alternates, and then -- yes, Mr. Rittgers, Senior?

12          MR. C. HENRY RITTGERS:  I understand we're addressing

13     the entire panel.  Are they going to be seated in a certain

14     manner so that we know who we're talking to?

15          THE COURT:  Sure.  I thought I mentioned this.  So

16     we'll have the first 16, 18?

17          COURTROOM DEPUTY:  I believe he has 16.

18          THE COURT:  So 16 in the box.  So the first 16 will

19     be seated in the box.  Everybody else will be seated in the

20     gallery, so you can set up to sort of face everybody.

21         They will be seated, obviously, in order of juror number.

22     Hopefully, they usually do a pretty good job of getting them

23     in order.

24         Of course, we're going to refer to everybody by their

25     juror numbers in connection with the voir dire so, you know,

1    Juror Number 23, you raised your hand, tell me more about X or

2    whatever.

3        And I'll try to remind them to identify themselves by

4    juror numbers, to speak up when asked questions so we know who

5    it is.  Does that answer your question, Mr. Rittgers?

6        MR. C. HENRY RITTGERS:  Yes.  Maybe I'm just being

7    too technical here, but will there be some kind of -- I assume

8    that in Judge Black's courtroom, it's going to be similar as

9    far as the makeup of this courtroom, correct?

10        THE COURT:  Well, you should go over and look at it.

11    I think you guys are going after.  It's substantially wider

12    than this courtroom.  I think there's three sets of benches

13    going across, or two sets of long benches.

14        COURTROOM DEPUTY:  Three.

15        MR. SINGER:  Three.

16        THE COURT:  So there's a lot more seating width-wise.

17        MR. C. HENRY RITTGERS:  So 16 in the box, and

18    number 17 goes in the front, 18, 19, 20, is that the way it

19    works?

20        THE COURT:  Usually.  Jennifer Webster's our jury

21    coordinator.  She brings them in, she tries to get them

22    seated, and then she calls up where 17 is, and then in this

23    row starts with this number, and then this row starts with

24    this number.  And she usually does a pretty good job, so you

25    should know who is sitting everywhere.

1        MR. C. HENRY RITTGERS:  Thank you, Your Honor.

2        THE COURT:  Juror note taking preferences,

3   Mr. Singer, Ms. Glatfelter?

4        MS. GLATFELTER:  Yes.  I think it is the practice in

5   the courthouse to allow jurors to take notes if they would

6   like to.

7        THE COURT:  Mr. Rittgers?

8        MR. C. MATTHEW RITTGERS:  Your Honor, our personal

9   preference is probably no note taking.

10        THE COURT:  Yeah.  I would tell you, that was unfair

11   to ask before I told you how I explain it.

12     The Court generally allows jurors to take notes, unless

13   you've got some pretty good arguments as to why you think it's

14   inappropriate in this case.

15     I do give cautionary instructions about not relying on

16   the notes in replacement of memory, not relying on somebody

17   else's notes over your own memory.

18     I understand there's always some risk that notes take on

19   some kind of a more authoritative character back in the

20   deliberation room, but I think with a two-week trial, it's a

21   lot to ask people to remember everything without taking any

22   notes, so I'm pretty strong in my mind to allow them to take

23   notes.

24     I don't allow them to take their notes with them outside

25   the courthouse.  They leave them in the courtroom during the

1     day.  They will have their notes back with them during

2     deliberations, but they'll have cautionary instructions about

3     the notes.  We supply, obviously, the notepads, and we keep

4     them at the end.  I know that.

5         Well, let's talk a little bit about masks.  What we've

6     been doing is, when we have the entire panel in, the whole

7     venire, we've been having them wear masks just because there's

8     80 people, 85 people in the courtroom.

9         But once trial gets started, I've sort of more been

10    leaving that up to the jurors themselves.  But I'm happy to

11    hear from the parties if they have a view on this, so

12    Mr. Singer?

13            MR. SINGER:  We would defer to the Court as far as

14    that goes, Your Honor.

15            MR. C. MATTHEW RITTGERS:  Your Honor, would the

16    attorneys during that process be permitted to have their masks

17    off?

18            THE COURT:  Yes.  I try to explain that to the venire

19    just because they're obviously seated close together, the

20    attorneys are -- I don't want anybody harboring ill will

21    towards the attorneys because they're not masked when the

22    panel is.

23        Yes, Mr. Rittgers?

24            MR. C. HENRY RITTGERS:  What about the individual

25    juror that might have a question?

1    THE COURT:  Yes.  So when they answer a question, I

2    ask them to pull their mask down to make it easier for you to

3    understand them, and even more importantly to make it easier

4    for our court reporter to understand them.

5    If I fail to do that, you will hear her gentle, dulcet

6    tones coming in and reminding me that it would help her if I

7    ask the jurors to pull down their masks.

8    Any other questions on that, Mr. Rittgers?

9    MR. C. HENRY RITTGERS:  No, Your Honor.

10    THE COURT:  Very good.  In terms of how I like to

11    conduct a trial.  For objections, please stand when you make

12    an objection, just so I can see who is making the objection.

13    If you'd just rise and say I object, just one word.  I

14    object, hearsay.  I object, relevance.  If I want more, I'll

15    ask you for more.

16    If, for some reason, you believe you need a sidebar, you

17    can ask for a sidebar, we can go over to sidebar and handle

18    whatever.

19    I personally think it's helpful if we try to keep

20    sidebars to a minimum, so if it's something that you think is

21    really crucial, let's do it.  But, you know, I just recently

22    had a jury trial that was sidebar every ten minutes, and I

23    think it's a little broken up for the jury when we do that.

24    So whatever counsel can do to minimize that is great.

25    I'm generally not going to hear much argument on the

1    objections.  You make the objections.  If, for some reason,

2    you really feel the need to make an argument, we can do that

3    at sidebar.  Generally speaking, I will rule pretty quickly on

4    the objections.

5        In terms of examination of witnesses, I'm assuming

6    counsel will conduct their examination of witnesses from the

7    lectern.

8        You can approach witnesses if you need to give them

9    something to refresh their recollection.  Before you leave the

10   lectern and head towards the witness, if you could give me a

11   heads up like, Your Honor, may I approach, or something like

12   that, that would be helpful and appreciated.

13       If you want to come around the lectern, and I guess some

14   people call it the one-arm rule, you know, stay within one arm

15   of the lectern one way or the other.  If you feel like that

16   helps you connect with the jury or whatever, that's fine.

17       I will say the mics are pretty directional, and if the

18   court reporter is having difficulty hearing you, that's going

19   to create a problem for her, which in turn creates a problem

20   for me, which will in turn create a problem for you.  So try

21   to make sure you're speaking into the mic from wherever you're

22   at, and I think everything will go all right.

23       I am hoping that counsel will instruct their witnesses to

24   answer questions in a courteous fashion.  Evasive answers,

25   disrespect to opposing counsel, I really like to try to keep

1    that to a minimum.

2        I'd appreciate your cooperation with regard to the

3    witnesses that you're kind of sponsoring by putting on the

4    stand to answer questions in an appropriate fashion.

5        And I expect counsel to extend the same courtesy to the

6    witnesses.  Importantly, counsel and the witnesses can't get

7    into a situation where they're talking over each other.

8        So if you're having a difficulty with someone who, in

9    your view, is not answering a question or answering too much

10   of a question and just going on and on and on, ask for my

11   help.  I will provide it.

12       The solution for that is not to start trying to clip the

13   witness's answers by talking over the witness while the

14   witness is still talking.  I will instruct witnesses to answer

15   the question that's been posed to them.

16       I'm not a big believer that you get to force somebody

17   into a yes or no by saying, well, I asked it as a yes or no

18   question.  Well, sometimes it's not a yes or no answer.

19   That's just the way it's going to be.  But if witnesses are

20   using that as an excuse to be evasive, I will assist in

21   preventing that.

22       There's a number of attorneys in here.  I'm assuming that

23   there's going to be one attorney who is responsible for each

24   witness.  And by responsible for witness, I mean will do the

25   direct on that witness or the cross-exam on that witness, and

1    then will also handle objections to whoever is doing the

2    direct or cross-examination for the other side.

3        So I don't want an attorney who is responsible for asking

4    the question, and a different one who is responsible for

5    objecting. If it's your witness, you can object with regard

6    to that witness as well.

7        When you're done with a witness, if you can tell me

8    before you just leave the lectern and walk and sit down. Just

9    say, Your Honor, we're finished with this witness or whatever.

10    Just let me know.

11        I'm fine if you want to leave the lectern and consult

12    with your cocounsel or your client about whether there are

13    more questions that should be asked. You could just say, Your

14    Honor, could I have a minute to consult, I'm happy to give it

15    to you.

16        It's just, generally, when people are leaving the

17    lectern, I like to have some sense of where they're headed and

18    why before they do it. If we follow that, I think we'll all

19    get along famously.

20        That was sort of what I had on my list. Are there other

21    questions that people would like to talk about today?

22        MR. SINGER: Not from the government, Your Honor.

23        MR. C. MATTHEW RITTGERS: Not from the defense,

24    Your Honor.

25        THE COURT: Okay. Well, obviously, we've got to get

1    that order on with respect to the FBI letter, and I'll try to

2    do that promptly.  You guys have some homework in terms of

3    getting back to me with regard to the experts.

4        Oh, there is one more matter on jury instructions.  So

5    preliminary instructions, absolutely can't wait for the

6    charging conference on those.  Let's get to what we can for an

7    agreement with regard to preliminary instructions.

8        I just give the standard Sixth Circuit preliminary

9    instructions, so if you guys want additional things -- and, as

10   I said, we are going to want some clarification around this

11   PAC stuff, either by way of preliminary instructions or by way

12   of expert.

13       I know we haven't figured out exactly which of those

14   we're going to do, but to the extent it's going to be

15   preliminary instructions, we need to get those hammered out

16   sooner rather than later.

17       With regard to what we're going to do at the close, I've

18   done it two ways so far.  So there's instructions as to the

19   substantive law, and then there's instructions about how the

20   jury should deliberate, right, like you should pick a

21   foreperson, and when you deliberate, you should listen to each

22   other and all that stuff.

23       I have, on a few occasions now, given the substantive law

24   instructions prior to closing.  So after the parties have

25   rested but prior to closing, I'll instruct them, the jury, on

1     the law, the substantive law, so that when the parties refer

2     to it in closing, they can say, as you've already heard from

3     the Court, blah blah blah blah blah, and then I'll finish up

4     with the here's how you guys get along in the jury room

5     instructions after closing.

6         Or alternatively, I've had cases where parties strongly

7     prefer doing the closings first, and then having all of the

8     instructions, substantive and procedural instructions, read

9     after the closings.

10        Of course, you've got the Court's jury instructions, so

11    you can say you will hear from the Court that blah blah blah

12    blah blah, and then I'll say it after.

13        I generally have felt like it's worked better if I get

14    the substantive instructions in advance of closings, and then

15    have closings, and then give the procedural instructions, but

16    I don't have a strong preference if the parties would prefer

17    to do it a different way so, Mr. Singer?

18         MR. SINGER:  Your Honor, I think we have a strong

19    preference for the former, where the jury is instructed about

20    the law, the parties will give their closing arguments, and

21    then the final instructions.

22         THE COURT:  Okay.  Mr. Rittgers?

23         MR. C. MATTHEW RITTGERS:  So substantive instruction

24    would be before the closing?

25         THE COURT:  Yes.  So after the defense rests, you

1  know, then I would read the substantive instructions.  Say,

2  you know, both sides have now rested.  I'm going to read you

3  some instructions about the law, then we'll hear closings from

4  the parties.

5      And then after the government's done with their rebuttal,

6  I would say I have just a few more instructions for you now,

7  and then those would all be the procedural ones, like select a

8  person to act as your foreperson, this person will speak for

9  you in court.  When you're deliberating, listen with an open

10  mind, reminder probably about the juror note taking and all

11  that just at the end.  Does that make sense?

12      MR. C. MATTHEW RITTGERS:  It does.  When, if ever,

13  would the jurors have your printed instructions?

14      THE COURT:  Thank you.  So the jurors will have -- so

15  while I'm reading them, the jurors have them, because I think

16  it's easier for people to follow if they both hear and read,

17  and some of these are pretty complicated.  So they will have a

18  copy, each of them will have a copy while I read it to them.

19      And then in the jury room for deliberations, there will

20  be one copy of complete instructions, both substantive and

21  procedural.  In other words, I just make a set of all the jury

22  instructions, and I just stop reading them at a point.  So

23  I'll say now we'll hear the closings.

24      But it's just one set of jury instructions.  All the

25  jurors will have that at their seats when I'm reading them,

1    but then back in the jury room, there will be one set of the

2    entire instructions that they can refer to during the

3    deliberations.  Does that make sense?

4         MR. C. MATTHEW RITTGERS:  It does, Your Honor.  May I

5    have one moment?

6         THE COURT:  Sure.

7         MR. C. MATTHEW RITTGERS:  Your Honor, we would prefer

8    the substantive instructions to be read after closing.

9         THE COURT:  Okay.  All right.  I will take that under

10   advisement.  I'll advise you as to what I'm going to do with

11   regard to that.  Any reason why, in particular, Mr. Rittgers?

12        MR. C. MATTHEW RITTGERS:  I think that having the

13   jurors hear the substantive instructions from a court,

14   obviously, they're an important figure who they should be

15   listening to, they might then come to a conclusion before

16   listening to argument because they are applying the facts of

17   the law as you give it to them and then might not be

18   interested in hearing argument.

19        THE COURT:  Mr. Singer, any response?

20        MR. SINGER:  Your Honor, the evidence is the evidence

21   that will be presented at trial.  Closing arguments are not

22   the evidence.

23        THE COURT:  Right.

24        MR. SINGER:  From the government's perspective,

25   having the instructions first will allow them to put the

1    arguments into better context.

2          THE COURT:  That has been my experience.  But I hear

3    what you're saying, Mr. Rittgers.  I'll take it under

4    advisement and let you know in advance of trial which way

5    we're going to do that.

6      Any other issues anybody wants to raise before the Court

7    before we adjourn, Mr. Singer?

8          MR. SINGER:  No, Your Honor.

9          MR. C. MATTHEW RITTGERS:  No, Your Honor.

10         THE COURT:  All right.  Thank you.  I think we're

11    ready to adjourn now.

12         (Proceedings concluded at 12:01 p.m.)

13                 - - -

14

15              C E R T I F I C A T E

16                 - - -

17      I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
is a correct transcript from the record of proceedings in the
18    above-entitled matter.

19

20    /s/ M. Sue Lopreato_____          June 8, 2022
M. SUE LOPREATO, RMR, CRR
21    Official Court Reporter

22

23

24

25