<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                            *   *   *
 3

 4   UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
 5           Plaintiff,             : Jury Trial, Day 5
                                    : Monday, June 27, 2022
 6           - v -                  :
                                    : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"           :
 8                                  :
             Defendant.             : Cincinnati, Ohio
 9
                            *   *   *
10    EXCERPTED PROCEEDINGS - CONTINUED CROSS NATHAN HOLBROOK

11   BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                            *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24

25
</pre>

1                    P R O C E E D I N G S

2              (In open court at 9:31 a.m.)

3                         *   *   *

4              CONTINUED CROSS-EXAMINATION

5    BY MR. C. HENRY RITTGERS:

6    Q.   Good morning.

7    A.   Good morning.

8    Q.   Agent Holbrook, I'd like to go back to where we left off

9    Friday and go to the November 2nd phone call.  That was where

10   you instructed Mr. Ndukwe to make a clear offer.  Do you

11   recall?

12   A.   Yes, sir.

13   Q.   Mr. Ndukwe -- I want to know if you agree with this --

14   told P.G. during that call that he, meaning Mr. Ndukwe, can

15   get $20,000 to P.G., right?

16   A.   May I refer back to the transcripts of that call,

17   counselor?

18   Q.   I'll help you out.  Turn to USA Exhibit 14B.  Go to

19   page 3.  It's about a third of the way down.

20   A.   Yes.

21   Q.   Now, at that point, Mr. Ndukwe was trying to link the

22   $20,000 donation to a yes vote, correct?

23   A.   Yes.

24   Q.   And you told him to say that, right?

25   A.   Yes.

1  Q.  And he -- or you had no reason to believe that P.G.

2  thought he was being recorded, correct?

3  A.  Correct.

4  Q.  You, based on your investigation prior to that phone

5  call, knew that Mr. Ndukwe and P.G. were friends, correct?

6  A.  My knowledge of the relationship was from Mr. Ndukwe.

7  Q.  What I'm asking is, through your investigation, you knew

8  they were friends, correct?

9  A.  I can only describe it as it was described to me by

10 Mr. Ndukwe.

11 Q.  Well, can you tell us what Mr. Ndukwe said?

12 A.  Yes.  He described the relationship as social though

13 friendly.  He also described it as a relationship that was

14 necessary for business.

15 Q.  Did he tell you that they had been to each other's

16 houses?

17 A.  I believe he referenced Mr. Sittenfeld had been to his

18 house once.  I don't remember if he told me if he had been to

19 Mr. Sittenfeld's house.  Mr. Sittenfeld, I think, had been to

20 his place.

21 Q.  All right.  So when Mr. Ndukwe told P.G. that there had

22 to be a yes vote -- I'm referring back to this November 2nd

23 phone call.

24 A.  Yes.

25 Q.  P.G., in response to Mr. Ndukwe was, "Obviously, nothing

1    can be illegal.  There can be no quid pro quo," correct?

2    A.   Yes.

3    Q.   And he followed that up by saying, "And I know that

4    that's not what you're saying either," correct?

5    A.   He said that, yes.

6    Q.   And Mr. Ndukwe agreed, correct?

7    A.   He responded in the affirmative, yes.

8    Q.   Thank you.  Now, during that same phone call, when he

9    said that there could be no quid pro quo, he told -- P.G. told

10   Mr. Ndukwe that he could definitely tell the investors that he

11   was definitely pro-development, correct?

12   A.   Yes.

13   Q.   And would you agree that an officeholder or candidate can

14   talk to a prospective donor about their policy positions?  Do

15   you agree with that?

16   A.   Generally speaking, I do agree with that.

17   Q.   It happens every day in American politics.  You agree

18   with that?

19   A.   Yes.

20   Q.   And at that time, you had no reason to believe that

21   Mr. Sittenfeld, P.G., knew that he was being recorded,

22   correct?

23   A.   No.

24   Q.   No, you had no reason to believe?

25   A.   I had no reason to believe that he understood he was

1    being recorded, yes.

2    Q.   Now, you would agree that your team decided to -- or

3    picked Nada as a place for the meeting, correct?

4    A.   Yes.

5    Q.   And that was scheduled for November 7th?

6    A.   Yes.

7    Q.   And the purpose of that meeting was to introduce Rob,

8    Mr. Ndukwe's investor, to P.G.?

9    A.   Yes.

10   Q.   And his role that he was playing, his persona, Rob's

11   persona, was that he was a big-time investor, and he was

12   interested in investing in 435 Elm Street, correct?

13   A.   Yes.  Correct.

14   Q.   Now, during that conversation over lunch at Nadas, Rob

15   told P.G. that he and his group of investors, they didn't live

16   in Ohio, correct?

17   A.   Yes.

18   Q.   And that they invested money all over the United States,

19   mainly the east coast?

20   A.   True.

21   Q.   And that they were considering supporting Ndukwe in his

22   redevelopment of 435 Elm?  Rob was saying that to P.G. during

23   this conversation at lunch, that he and his investors were

24   considering investing in Mr. Ndukwe's project of redeveloping

25   435 Elm?

1  A.  Yes.

2  Q.  But he also said that they were a little bit concerned

3  because they weren't familiar with the atmosphere here in

4  Cincinnati, politically or otherwise, correct?

5  A.  That's true, yes.

6  Q.  And they wanted to meet civic leaders like P.G. before

7  deciding to put $1.8 million in upfront costs in 435 Elm,

8  correct?

9  A.  Yes.

10 Q.  Now, during the same meeting at Nadas, when they -- when

11 Mr. Ndukwe was talking about his redevelopment plan of 435,

12 P.G. asked a bunch of questions regarding what was the plan,

13 correct?

14 A.  Yes.

15 Q.  Like demolishing the building?

16 A.  Yes.

17 Q.  Putting a hotel in it?

18 A.  Uh-huh.  Correct.

19 Q.  Have high-end apartments at the top of the building?

20 A.  Correct.  Yes.

21 Q.  Restaurant, retail office space, all that was discussed,

22 correct?

23 A.  That is correct, yes.

24 Q.  And after P.G. learned of all these details, and knowing

25 that Mr. Ndukwe was prepared to take a derelict building and

1    make it productive for the city, he said, "It's not a big

2    lift.  It's easy to support," correct?

3    A.   Yes.

4    Q.   He then went on to say, "If it's all that --" meaning

5    what Mr. Ndukwe said about what he was going to do with the

6    hotel and high-end restaurant and all that other stuff, P.G.

7    went on to say, "If it's all that, it's got my support,"

8    correct?

9    A.   Yes.

10   Q.   And shortly after that, he said that he could shepherd

11   the votes, correct?

12   A.   Yes.

13   Q.   Typical political stuff, would you say?

14   A.   No.

15   Q.   At this point in the conversation, there wasn't any

16   discussion of a donation of money; isn't that correct?

17   A.   Incorrect.

18   Q.   There was discussion?

19   A.   I believe so, yes.

20   Q.   After P.G. says he can shepherd the votes, P.G. tells Rob

21   that as far as 435 Elm Street is concerned, that he and his

22   colleagues appreciate that this isn't just a good development,

23   it's a strategic development; is that correct?

24   A.   Yes.

25   Q.   And you agree that 435 Elm Street is a strategic

1    location, costing the city taxpayers three or four hundred

2    thousand a year, correct?

3    A.   Yes.

4    Q.   I believe -- in fact, when P.G. mentions this to Rob that

5    it's a strategic development, that Rob agreed, is that right,

6    it's just south of the Convention Center?

7    A.   I believe so, yes.

8    Q.   P.G. also told Rob that he was investing in a good

9    partner, meaning Mr. Ndukwe, correct?

10   A.   Yes.

11   Q.   And he also, to reassure Rob that investing in Ndukwe, he

12   also told Rob -- P.G. told Rob that P.G.'s colleagues

13   respected Mr. Ndukwe?

14   A.   Yes.  That's true.

15   Q.   Now, later in the conversation, and I'm assuming this is

16   per your instructions or per the team get-together to decide

17   what they're going to say to P.G. during this meeting, the

18   subject changed a little bit because Rob brought up a concern,

19   right, a concern about the conflict between Mr. Ndukwe and

20   Mayor Cranley?

21   A.   Yes.

22   Q.   And when he brought that up, P.G. addressed his concerns

23   by telling him that Mayor Cranley likes development and would

24   not stand in the way, correct?

25   A.   Yeah.  I believe it was something along that lines, yes.

1    Q.   Now, the transcript ends before Rob and P.G. leave Nada,

2    correct?

3    A.   Yes.

4    Q.   And what's left out is approximately almost two minutes,

5    correct?

6    A.   I don't know how much time it would be left out by the

7    time that they walked across the street to the 580 Building.

8    Q.   Well, you would agree that the portion that the jury

9    doesn't have is where P.G. was ready to walk out the door

10   without asking or receiving a donation, correct?

11   A.   I don't know that.

12   Q.   Agent Holbrook, could you please turn to page 28 of

13   USC 15C?

14          MR. C. MATTHEW RITTGERS:  USA.

15   Q.   USA.

16   A.   Okay.

17   Q.   You would agree that it says that this transcript stops

18   at a 56:04?

19   A.   What exhibit number did you say?

20   Q.   I'm sorry.  Exhibit 15C.  It's page 28.

21   A.   Yes.

22   Q.   Now, Agent Holbrook, you agree, don't you, that the video

23   played to the jury last week still continues for another

24   minute and 54 seconds?  It goes from 56:04 to 57:58?

25   A.   I'm not following your question.

1  Q.  I apologize if I'm not clear enough.  I think you already

2  answered it, now that I'm thinking about it, that you don't

3  know how much was left off?  You don't know whether it was one

4  minute, three minutes, correct?

5  A.  That's true, I do not.

6      MR. C. HENRY RITTGERS:  Your Honor, at this time, I'm

7  asking permission to allow us to play what has already been

8  admitted, the rest of that tape from 56:04 to 57:58.

9      MS. GAFFNEY PAINTER:  No objection.

10     THE COURT:  You may do so.

11     MR. C. HENRY RITTGERS:  Thank you, Your Honor.

12     (Audio played.)

13 Q.  "Anything else I can help you with now," doesn't that

14 mean that he was ready to leave the meeting?

15 A.  I don't know.

16 Q.  But Rob wasn't going to let him leave, correct?  He

17 wanted to take him over to the 580 Building?

18 A.  Rob wasn't going to stop him from leaving.

19 Q.  I understand that.

20 A.  He invited him over to the 580 Building, that's correct.

21 Q.  Let me reword that, then.  He didn't want P.G. to leave,

22 correct, he wanted him to walk over to the 580 Building?

23 A.  Yes.  He wanted to continue to discuss the project.

24 Q.  Before we go to the 580 Building, I've got a couple

25 questions, maybe more, about the exhibits.  And I'm referring

1     now to USA 11C.

2           MR. C. HENRY RITTGERS:  Your Honor, this has already

3     been admitted into evidence.  May I put it on the Elmo so

4     everybody can see it?

5           MS. GAFFNEY PAINTER:  No objection, Your Honor.

6           THE COURT:  You may do so.

7           MR. C. HENRY RITTGERS:  Thank you, Your Honor.  I

8     apologize.

9     Q.   Now, looking at USA 11C, which is what we're all looking

10    at, you intentionally selected these individuals and numbers,

11    correct?

12    A.   I don't understand the question.

13    Q.   You prepared this exhibit, correct?

14    A.   I did not prepare this exhibit.

15    Q.   Well, who did?

16    A.   I'm going to assume the prosecution team did.

17    Q.   So this is a summary exhibit, correct, that would have

18    been prepared in conjunction with you for your testimony,

19    correct?

20    A.   This is an exhibit that reflects telephone numbers of

21    individuals related to this investigation that I obtained

22    through the course of the investigation.

23    Q.   Well, would you agree that this exhibit does not list

24    every person P.G. called, sent messages to, or spoke with

25    during the 18-month undercover operation?

1    A.   I would assume that's the case.

2    Q.   Okay.  I just wanted to make that clear.

3    A.   Okay.

4    Q.   Now I'm going to refer to USA 11A.

5         Also, let's talk about USA 11B.  You have both of them in

6    front of you, correct?

7    A.   I do.

8              MR. C. HENRY RITTGERS:  May I publish this?

9              THE COURT:  These are previously admitted?

10             MR. C. HENRY RITTGERS:  It has been previously

11   admitted.

12             THE COURT:  You may.

13             MR. C. HENRY RITTGERS:  Thank you, Your Honor.

14   Q.   Now, if I recall correctly, you remember telling us back

15   when you were testifying that the only calls that were omitted

16   were hang-up calls, dropped calls, redundant messages.  Do you

17   recall saying that when you were testifying?

18   A.   No.  I testified that those were examples of calls that

19   were not admitted.

20   Q.   That they were examples of calls?

21   A.   Yes.

22   Q.   That they were -- that they weren't put on this list?

23   A.   That's true, yes.

24   Q.   So this list should be all-inclusive as to all the calls

25   that were made in -- that relate to this investigation,

1    correct?

2    A.   No.  This isn't going to be all-inclusive of the

3    communication.

4    Q.   It should include, should it not, recorded calls between

5    Mr. Ndukwe and P.G.?

6    A.   This is a summary exhibit I didn't create, so I don't

7    determine what goes on this exhibit.

8    Q.   Well, looking at that exhibit, would you agree that there

9    are at least three phone calls that occurred between P.G. and

10   Mr. Ndukwe back in November 16 and November 27 that were

11   recorded?

12   A.   That were recorded?

13   Q.   Yes.

14   A.   If you could show me the line sheet.

15        MR. C. HENRY RITTGERS:  Your Honor, if I may, if I

16   could approach for one second just to hand him...

17        THE COURT:  Yes, you may.

18        MR. C. HENRY RITTGERS:  Thank you.  For the record,

19   I'm also going to be showing Agent Holbrook three transcripts

20   of recorded calls between P.G. and Mr. Ndukwe.

21        THE COURT:  Do you have copies for opposing counsel?

22        MR. C. HENRY RITTGERS:  I think.

23        MR. C. MATTHEW RITTGERS:  Are you going to refer to

24   the exhibit?

25        THE COURT:  Oh, it's in your exhibit binder?

```
1          MR. C. MATTHEW RITTGERS:  I believe so.

2          MR. C. HENRY RITTGERS:  I apologize.  I don't

3    remember the exhibit numbers.  I'm just using these to refresh

4    his memory.

5          THE COURT:  That's fine.  If you can just show them

6    to opposing counsel before you bring them up to the witness,

7    I'd appreciate it.

8          MR. C. HENRY RITTGERS:  I will.

9          THE COURT:  Thank you.

10          MR. C. HENRY RITTGERS:  May I approach, Your Honor?

11          THE COURT:  You may.

12   Q.  Agent Holbrook, I'm not going to ask about the contents,

13   I just want to know if you remember those recorded calls?

14   A.  Yes.

15   Q.  So those are recorded calls between Mr. Ndukwe and P.G.,

16   correct?

17   A.  Yes.

18   Q.  And they're not listed in your summary or in the

19   government's summary of phone calls or contacts; is that

20   correct?

21   A.  Yes.  That's correct.

22   Q.  Thank you.  Let's talk, if you don't mind, about USA

23   Exhibit A.

24          MR. C. HENRY RITTGERS:  May I publish it, Your Honor?

25   It's already been admitted into evidence.
```

1          THE COURT:  I didn't get a number on it.

2          MR. C. HENRY RITTGERS:  USA 11A.

3          THE COURT:  Yes, you may.

4   Q.  Would you agree that the descriptions of the events are

5   not totally accurate?

6          MS. GAFFNEY PAINTER:  Your Honor, the version of 11A

7   that's being displayed here is not the version of 11A that was

8   admitted into evidence.

9          THE COURT:  That is a fair point, yes.  Do you have

10  the version that was admitted into evidence?

11         MR. C. HENRY RITTGERS:  I do not, Your Honor.  Is it

12  because I have an exhibit number, is that the reason?

13         THE COURT:  No.  It's -- remember some reformatting

14  was done on the removing of shading, and things of that

15  nature?

16         MR. C. HENRY RITTGERS:  Oh.  No, I apologize, but I

17  do not have it.

18         THE COURT:  You should have it in the exhibit book

19  the government gave you.  You replaced their 11A, didn't you?

20         MR. C. MATTHEW RITTGERS:  I believe, Your Honor, we

21  did receive one copy, but it was a last minute change, and it

22  might be -- there's a binder --

23         THE COURT:  Mr. Rittgers, you can use this.

24         MR. C. HENRY RITTGERS:  Thank you, Your Honor.

25  Q.  So referring to USA Exhibit 11A, do you agree that the

1   events that are described are not totally accurate?

2   A.   You'll have to be more specific.

3   Q.   I will.  For example, on November 7th of 2018, which is

4   what we've been talking about at Nadas, and we're soon going

5   to be talking about what happened at 580, you have there,

6   "Sittenfeld meets with UC Rob in condo.  Sittenfeld texts UC

7   Rob," right?

8   A.   Yes.

9   Q.   But it doesn't say that UC Rob offered Sittenfeld $10,000

10  cash, does it?

11  A.   No.

12  Q.   I'm sorry?

13  A.   No.

14  Q.   So would it be fair to say that this chronology of the

15  events on USA Exhibit 11A is not totally accurate with

16  everything that transpired?

17  A.   No.  I wouldn't agree to that.  That's -- this exhibit is

18  not all-encompassing of every meeting and every contact.

19  Q.   All right.  Let's go to the meeting at the 580 Building.

20  I'm changing -- I'm going to a new subject.

21       We're going to return to the meeting of November 7th,

22  2018, after the lunch at Nadas, okay?

23  A.   Yes.

24  Q.   And that's where Rob wanted to take P.G. over to the

25  580 Building?

1    A.   Yes.

2    Q.   That was truly part of the plan, wasn't it, to take P.G.

3    over there?

4    A.   Yes.

5    Q.   And it's a controlled environment is the reason you

6    wanted to take him over there, correct?

7    A.   Correct.

8    Q.   And by the way, the rent on the 580 penthouse was about

9    $5,000 a month; is that correct?

10   A.   I don't remember the exact amount.  I believe it was less

11   than that.  I can look it up and get it back to you, the exact

12   amount, but I'm not sure, off the top of my head.

13   Q.   But we're close?

14   A.   I remember it's somewhere around the neighborhood of

15   $4,000, but I can't be more specific than that.

16   Q.   Okay.  Now, when they get over to the 580 Building, you

17   do agree that Rob offered P.G. $10,000 cash, correct?

18   A.   He offered Mr. Sittenfeld $20,000.

19        MR. C. HENRY RITTGERS:  Your Honor --

20   Q.   Well, if you could, please turn to USA 15C, turn to

21   page 30, please, and please go to the bottom of the page.

22   A.   Yes.

23   Q.   So my statement to you, or my question, was that Rob had

24   offered $10,000 cash, correct?  He told P.G. he brought

25   $10,000 cash to give to him?

1    A.   That's true, yes.

2    Q.   And, in fact, he offered that a couple times during this

3    meeting at 580, correct, $10,000 cash?

4    A.   Yes.

5    Q.   And he suggested to P.G. that, you know, the easiest

6    thing for us, meaning the undercovers, was to do cash, and for

7    P.G. to figure out how he would -- I think the words were

8    "interject it or put it wherever you want to."

9         And what I'm referring to is 15C, USA 15C, page 32.

10   A.   Ask your question again, counselor.

11   Q.   What I'm quoting -- I'm asking if you agree.  I'm quoting

12   Rob's statement to P.G., where he, again, says, "The easiest

13   thing for us, you know, to do cash and, you know, you can

14   figure it out how you interject it or put it wherever you want

15   to," right?

16   A.   Yes.

17   Q.   Meaning P.G. could stick the money in his pocket,

18   correct?

19   A.   Yes, if he wanted to.

20   Q.   And you would agree that cash is hard to trace, correct?

21   A.   Yes.

22   Q.   P.G. didn't take cash, did he?

23   A.   No.

24   Q.   And he never, ever took cash at any time during your

25   undercover agents -- from your agents, correct?

1    A.   That's correct.

2    Q.   And, in fact, your agents never again offered him cash

3    during this entire operation, correct?

4    A.   Yes.

5    Q.   And that's because they knew he wasn't going to take it?

6    A.   That's because the --

7    Q.   I just want to know -- go ahead.  I won't interrupt.

8    A.   Pardon?

9    Q.   No.  Go ahead.  I apologize.  I interrupted you.

10   A.   The UCEs, the undercover, they stay within -- they were

11   yakked.  It was decided early on that the bribes would be in

12   the form of checks to the PAC.  That's what they went with.

13   Q.   You mean early on before you offered P.G. cash, that was

14   when you decided that you were going to make donations to the

15   PAC or after P.G. did not take the cash?

16   A.   After.

17   Q.   Yeah.  Well, and also the reason was you knew that he

18   would never take cash, that's why it was never offered again,

19   correct?  You knew he wouldn't do it because he didn't do it

20   there.  He didn't do it in the privacy of the 580 penthouse,

21   correct?

22   A.   He was taking it in the PAC checks.

23   Q.   I'm sorry?

24   A.   He was taking the money in checks to the PAC.

25   Q.   We're talking cash, right?  We're just talking about

1  cash.  And the reason you never offered cash again, meaning

2  you, your agents, according to plan was because you knew he

3  was never going to take cash, correct?

4  A.  No, we didn't.

5  Q.  He wasn't going to accept it?

6  A.  No.  That's not true.

7  Q.  So why didn't you offer him cash again?  This was an

8  18-month investigation.  Why didn't you offer him cash again?

9  A.  Because in communication between Sittenfeld and Rob and

10 telephone calls, Mr. Sittenfeld made it clear to Rob that he

11 wanted to take the money in PAC checks because there would be

12 no headaches for Rob and no headaches for him.

13 Q.  Well, isn't it true that P.G. wanted PAC checks because

14 it was legal?

15 A.  No.

16 Q.  No?

17 A.  No.

18 Q.  You agree that the checks that we talked about last week,

19 there were eight of them, but the first four checks that,

20 eventually, Rob gave to him some six weeks later, you agree

21 that they were properly deposited in his PAC account, right?

22 A.  No.  They were deposited to evade and hide the source of

23 the funds.

24      Rob made it clear to Mr. Sittenfeld that the funds of the

25 checks were coming from the same 20 -- to the tune of 10 to

1    20,000 dollars that he stated in the meeting at the condo.

2         Also, in subsequent telephone calls, on November 26,

3    2018, he referred to the money -- the money orders were going

4    to be sent to his associate.  His name was Omar.

5         And then again, on November 28, 2018, Rob explained that

6    the money orders were funneled through Omar's account, and he

7    put them into LLC checks.

8         So it was clear that the money that funded the LLC checks

9    came from Rob but were in the name of other individuals.

10        And, in addition, in November 7, 2018, Mr. Sittenfeld was

11   making suggestions to put the money in other people's names.

12   Q.   We're going to come back to that, Agent Holbrook.

13        During this meeting at the 580 penthouse, there was some

14   discussion, when P.G. didn't take the cash, about donations

15   being made as money orders or cashier's checks, correct?

16   A.   That's correct.

17   Q.   And I believe it was a week later, maybe two weeks later,

18   after P.G. conferred with his treasurer and the lawyers who

19   were in control of or supervised his PAC, P.G. called Rob and

20   told Rob that he couldn't take money orders or cashier's

21   checks because they were same as cash, correct?

22   A.   That's correct.

23   Q.   Okay.  And then he told Rob that in order for a

24   legitimate donation to be made to the PAC, it has to be from

25   an LLC or a real human being, correct?

1    A.   I don't remember him saying legitimate.

2    Q.   I didn't say he said it was legitimate.  I said he was

3    trying to tell Rob how to make a correct donation to his PAC?

4    A.   No.

5    Q.   No?

6    A.   He was telling Rob how to make it look like it was

7    correct.

8    Q.   Let's turn to USA 18D.  Turn to page 2.  It's about

9    halfway down.

10   A.   Yes.

11   Q.   This is P.G. saying that it either needs to be a check

12   from a human being or a check from an LLC, correct?  Yes or

13   no?

14   A.   That's correct.  I'm just reading, counselor.

15   Q.   Well, let me ask you this:  Since P.G. was demanding that

16   the proper way to donate to his PAC was either through an LLC

17   or a human being -- strike that.

18        You guys came up with a different plan when P.G. was

19   demanding that the LLC checks be from a human being, correct?

20   He was asking you to donate in a proper legal form, and you

21   guys came up with a different plan?

22   A.   He was not asking to donate in the proper legal form.

23   Q.   Okay.  Well, let me ask you this:  On November 28th --

24   well, let's go to USA 20D, page 4, top of the page.

25   A.   Yes.

1    Q.   And this is on November 28th, right?

2    A.   It is, yes.

3    Q.   And that's when Rob gave P.G. two checks and assured him

4    that they were LLC checks, correct?

5    A.   Yes.

6    Q.   All right.  And would it be fair to say that you all were

7    trying to deceive P.G. by giving him corporate checks?  Those

8    were corporate checks, correct?

9    A.   No, that wasn't what we were trying to do.

10   Q.   Let me ask you this:  Did you know at the time that FEC

11   regs required that any donation to a PAC, at least his PAC,

12   had to be from an LLC?

13   A.   That was my understanding, yes.

14   Q.   And so instead of giving him a check written on an LLC,

15   you gave him a check written on a corporation, correct?

16   A.   Yes.

17   Q.   And you assured him -- not you, Rob assured him they were

18   from LLCs, correct?

19   A.   Yes.

20   Q.   And then, and then P.G. hands it to his treasurer or to

21   whomever, and they discovered that they were written on

22   corporations, correct?

23   A.   Yes.  Let me explain, if I may, counselor.

24        It -- when I received those checks from our undercover

25   unit, they were presented to me as LLC checks.  There was a

1    miscommunication somewhere in a group beyond my control.  So I

2    requested LLC checks.  I thought I had received LLC checks.  I

3    didn't know that they were corporation checks.

4    Q.   If you read at USA 20D, when Rob was assuring him that

5    these were LLCs, didn't P.G. point out that -- he questioned

6    whether they were really on LLCs because one of the checks

7    said Inc., meaning a corporation, correct?

8    A.   That's correct, yes.

9    Q.   And you, and Rob, and whoever else is on your team,

10   didn't pick that up that that was not an LLC check.  Is that

11   what you're telling us?

12   A.   There's other checks that we've used that don't say LLC,

13   that say Inc., that are actually LLCs.  The names are

14   irrelevant.

15   Q.   I want to make sure I heard that correctly.  And I

16   apologize.  I'm not trying to be --

17   A.   I'm sorry.

18   Q.   -- difficult.  Did you say that you have LLC checks that

19   actually have Inc., I-n-c, on them?

20   A.   That can happen.  They can have that name on the check

21   but still be officially registered as an LLC.  I'm just saying

22   as a matter of fact that can happen, that's my point.

23   Q.   Is it true that you all have those kind of checks that

24   are written off of -- supposedly, they're LLC checks that

25   designate that there is an Inc. in the name on the check?  Do

1    you all have that?

2    A.   I'm assuming that we do, yes.

3    Q.   You don't know for a fact.  On December 17th,

4    Agent Holbrook, Rob provided P.G. with four checks, correct?

5    A.   Yes.

6    Q.   And they were written on LLC accounts, correct?

7    A.   Yes.

8    Q.   The four checks represented donations to P.G.'s PAC,

9    correct, the Progress and Growth PAC?

10   A.   Yes.

11   Q.   You were aware that those checks were deposited in his

12   PAC account, correct?

13   A.   Yes.

14   Q.   You also agree that the checks that were deposited were

15   publicly listed on the FEC website, correct?

16   A.   Yes.

17   Q.   You would agree that not one penny of those monies were

18   used by P.G. to pay for clothing, mortgage payments, car

19   payments, or any other personal item.  Would you agree with

20   that?

21   A.   Not to my knowledge, he didn't use it for that.

22   Q.   He didn't use it for that.  Thank you.

23        Agent Holbrook, would you agree that P.G. wanted

24   donations -- he would have preferred donations to his mayoral

25   campaign fund, Sittenfeld For Cincinnati?  He actually said,

1    "I would prefer donations to that," correct?

2    A.   Yes.

3    Q.   Now, you would agree that your team preferred PAC

4    donations, it's more convenient, correct, is one reason?

5    A.   No.

6    Q.   Okay.  Let me ask you this:  Was the pretext for

7    preferring PAC donations was because there was a conflict

8    between Mayor Cranley and Mr. Ndukwe?

9    A.   Can you repeat that question, please?

10   Q.   Would you agree that the pretext that Rob gave P.G. for

11   preferring a PAC donation was because of the conflict between

12   Mayor Cranley and Mr. Ndukwe?

13   A.   I don't know if I fully understand your question.  Can

14   you ask again or reword it?  I'm confused on the question.

15   Q.   I'm trying to think how I can reword that to make it any

16   clearer.

17       I'm asking if Rob used the pretext for donating to P.G.'s

18   PAC was because of the conflict between Mr. Ndukwe and Mayor

19   Cranley?  We've talked about that, right, the conflict between

20   the two?

21   A.   Right.  It wasn't the pretext for them to donate to the

22   PAC.

23   Q.   Well, let me ask you this:  You would agree that Rob

24   said -- gave his reasoning that Rob, your team of investors,

25   did not want a bunch of his investor LLC checks to be tied

1   back to their support for Mr. Ndukwe, again, because of the

2   conflict between Mr. Ndukwe and Mayor Cranley.  Do you agree

3   with that?

4   A.   No, I can't.  It's --

5   Q.   Let's turn --

6   A.   I can explain to you if --

7   Q.   Let me -- let's turn to USA Exhibit 15C.  Turn to page 32

8   at the top.

9   A.   Okay.

10  Q.   This is Rob saying to P.G. that he doesn't necessarily

11  want to donate to P.G.'s mayoral campaign fund, "Because the

12  problem with the LLCs is still, like, at the end of the day,

13  like coming back with all those LLCs still kind of ties back

14  to us with the LLCs," correct?  He said that?

15  A.   That's true, yes.

16  Q.   And just so we have some context here, that was because

17  of Mr. Ndukwe's conflict with Mayor Cranley, where

18  Mayor Cranley, according to Mr. Ndukwe, was not happy with

19  Mr. Ndukwe supporting his opponent, Yvette Simpson, in the

20  last campaign for mayor, correct?  Yes or no?

21  A.   No.  I believe there's two issues being conflated here.

22  Rob said they didn't want to donate in LLCs because they

23  didn't want it to come back to them because of the illegal

24  activity that Rob was engaging in.

25       The issues with Cranley and Ndukwe --

1    Q.   Just a minute.  Where in these transcripts does Rob say

2    that, that he's concerned about the illegality?  Where does he

3    say that?

4    A.   I didn't say he said that.  I said that's why he did it.

5    Q.   Well, I'm not asking -- I'm asking what he said to P.G.

6    as the reason for donating to the PAC as opposed to P.G.'s

7    campaign for mayor, that's what I'm asking.

8         And the stated reason, correct me if I'm wrong, we're

9    looking at 15C, page 32, he gave that reason, "Because the

10   problem with LLCs is still, like, at the end of the day, like

11   coming up with all those LLCs still kind of ties us back with

12   the LLCs," right?  That's what he said?

13   A.   Yes.  Yes.

14   Q.   And to put it in context, this was because the group of

15   investors who were backing up Mr. Ndukwe did not want to upset

16   the apple cart, so to speak, because of the conflict between

17   the mayor and Mr. Ndukwe.  They were afraid of going for a

18   veto, that Mayor Cranley would veto the project, correct?

19   That was the whole reason?

20   A.   The LLC donations weren't related to the issue between

21   Mr. Ndukwe and Cranley.  The issue was they didn't want

22   Mr. Cranley to stop the development agreement at 435 Elm.

23   They're two separate issues.

24   Q.   Because the checks would be tied back to them, and they

25   were supporting Ndukwe?

1    A.   No.  They're two separate issues.

2    Q.   Okay.  Let's go on.  You were aware, at the time, the

3    difference between a PAC fund, P.G.'s PAC fund, and P.G.'s

4    fund for mayor, correct?

5    A.   Yes.

6    Q.   You knew the PAC fund was regulated by the FEC, yes?

7    A.   Yes.

8    Q.   Were you aware that the PAC funds that go into -- the

9    funds that are collected for the PAC cannot be used to support

10   P.G.'s campaign for mayor, correct?

11   A.   That's my understanding.

12   Q.   Yeah.  And you would agree that the funds that go into a

13   PAC account can only be used for charities.  He could send a

14   check to a charity out of that fund, correct?

15   A.   My knowledge in that area of PAC is not -- I'm not an

16   expert in that area of the PACs, what the PACs can be used

17   for.

18   Q.   This is part of your investigation, isn't it?

19   A.   The PAC was part of the investigation as a place to put

20   the checks beyond what the checks were used for.  It was

21   irrelevant to me because Mr. Sittenfeld told us it would have

22   still benefitted him a hundred percent.

23   Q.   Well, you would accept the fact if I told you that PAC

24   funds can only be used to send a check, let's say to a

25   charity, or send checks to other candidates.  You would agree

1    with that?

2    A.   They can be used to send checks to other candidates, yes.

3    Q.   And you agree that, as opposed to that, the funds that

4    are in the campaign for mayor, those funds can be used for

5    yard signs, advertisements on like television or radio and all

6    that.  Everything to do with a campaign, he can use those

7    funds for, correct?

8    A.   That's correct.

9    Q.   Let's focus on 2019, the year 2019.

10   A.   Yes.

11   Q.   In January of 2019, January 28th to be exact, P.G.

12   invited Rob and Brian to attend a fundraiser; is that correct?

13   A.   I believe so.

14   Q.   Let me help you out.  If you could flip to USA 23A.  I

15   don't know if that's in the jurors' binders or not.

16   A.   Did you say 23A?

17   Q.   I did.  It's on page 1.

18        MR. C. HENRY RITTGERS:  Your Honor, I believe this is

19   already admitted into evidence.

20        THE WITNESS:  Okay.  I'm there.

21        THE COURT:  Was 23A admitted, Ms. Gaffney Painter?

22        MS. GAFFNEY PAINTER:  Yes, it was, Your Honor.

23        MR. C. HENRY RITTGERS:  May I publish 23A?

24        THE COURT:  Yes.

25   Q.   Referring to USA 23A, "Hope hunting was good.  This

1   Wednesday when you're in town, I'm having a cosy event right

2   across the street at Via Vite.  You and Brian want to join?

3   Obviously, don't worry about donating, as you've already been

4   very generous," correct?

5   A.  Yes.

6   Q.  So he's not asking for more money from Rob or Brian,

7   correct?

8   A.  No.

9   Q.  In fact, isn't it true that during the entire year of

10  2019, P.G. did not ask for another donation or money from Rob,

11  from Brian, or from Vinny?

12  A.  Yes.

13  Q.  Now, in June of 2019, the City of Cincinnati transferred

14  control of 435 Elm to the port.  I mean, we've heard this last

15  week?

16  A.  That's correct, yes.

17  Q.  And Mr. Denning came in to testify on behalf of the

18  government --

19  A.  Yes.

20  Q.  -- to that transfer.  And the reason for the transfer was

21  how much money that was costing the city, that building,

22  435 Elm, correct?

23  A.  That's correct.

24  Q.  Now, the transfer was, I think, according to Mr. Denning

25  who testified, was to get that building off the books, off the

1    city books?

2    A.   That's correct.

3    Q.   And the transfer was a unanimous vote, if I heard that

4    correctly, and I know it was a 9-0 vote, right?

5    A.   That's right.

6    Q.   And that vote was not a vote on Mr. Ndukwe's proposal,

7    correct?

8    A.   That's correct.

9    Q.   And the vote was not to override a Cranley veto, was it?

10   A.   That's correct.

11   Q.   It was simply a vote to transfer ownership of 435 Elm to

12   the Port Authority?

13   A.   That's correct.

14   Q.   Now, let's turn to September 2019, okay?  I believe it

15   was during September, towards the middle of September, news

16   broke that there were allegations against Mr. Ndukwe about

17   sexual assault, correct?

18   A.   Yes.

19   Q.   And the -- you all knew that P.G. was supposed to attend

20   a meeting on September 24th in Columbus, correct?

21   A.   Yes.

22   Q.   And at your direction, Rob arranged a meeting in Columbus

23   under the pretext that Rob and Brian and Vinny were all going

24   to be in Columbus at the same time, correct?

25   A.   They actually were in Columbus on a different

1    investigation, so they were already there.

2    Q.   Okay.   So they said, Well, we'll be there if you want to

3    meet, right?

4    A.   That's right.

5    Q.   And P.G. agreed to attend this meeting at Rob's hotel

6    room, right?

7    A.   Yes.

8    Q.   And he said he had to do it early, like 5:30 or

9    something, because he had a dinner that he had to attend at

10   the convention he was at, right?

11   A.   Yes.

12   Q.   Now, he brought to this meeting his chief of staff, Chris

13   Dalton; did he not?

14   A.   He did.

15   Q.   And Chris Dalton was there the entire time of this

16   meeting, correct?

17   A.   He was.

18   Q.   Now, last week when you were testifying, and the -- not

19   only the video but the transcript of that meeting, that video

20   nor the transcript started at the very beginning of that

21   meeting, did it?

22   A.   That's correct.

23   Q.   Two sessions were left out consisting of 15 minutes

24   before we have a transcript of that meeting, correct?

25   A.   I don't know the time.

1  Q.  But that sounds right, two sessions?

2  A.  Two sessions.

3  Q.  Approximately 15 minutes.  If I'm wrong, Ms. Gaffney

4  Painter can correct me.

5  A.  It's reasonable, yeah.

6  Q.  Thank you.  Now, what was not given to the jury when you

7  were testifying to that video and to that meeting was -- what

8  was left out is where P.G. was expressing his concern about

9  these sex allegations, sexual assault allegations against

10  Mr. Ndukwe, correct?

11  A.  Yes.  All the parties were expressing concerns.

12  Q.  Exactly.  That was my next question.  Rob and Brian also

13  had the same concerns, right?

14  A.  That's right.

15  Q.  And the concerns were that because these allegations came

16  forward which, subsequently, by the way, were not proven, they

17  were dropped.

18      But anyway, the concern was that if the city was going to

19  be involved in deciding whether or not they would give tax

20  incentives or anything like that to the redevelopment of 435,

21  it would not play well to the public that the city was dealing

22  with someone who was under a cloud; is that correct?

23  A.  Generally speaking, yes, that's correct.

24      MR. C. HENRY RITTGERS:  May I have one second, Your

25  Honor?

1          THE COURT:  You may.

2     Q.   I can't remember how long that meeting lasted, I don't

3     know if you do.  Approximately 45 minutes, maybe?  I don't

4     remember.

5     A.   I don't remember either, sir.

6     Q.   Okay.  Where I'm driving at here is at the end of that

7     meeting, and I think it was caught on video, in fact, I know

8     it was, wouldn't you agree that P.G. was ready to leave but

9     Vinny asked him to stop, and with no prompt from P.G., Vinny

10    offers him two campaign checks, correct?

11         Just at the end, P.G. gets up to shake hands with Vinny.

12    He's ready to head out to his dinner, and Vinny stops him,

13    and --

14    A.   That's not my recollection, no, sir.

15         MR. C. HENRY RITTGERS:  All right.  Your Honor,

16    permission to play USA Exhibit 30F, session six, beginning at

17    three minutes and ending at 3:39?

18         THE COURT:  Has that previously been admitted?

19         MR. C. HENRY RITTGERS:  I believe it has, Your Honor.

20         THE COURT:  You may play it.

21    (Video played.)

22    Q.   Agent Holbrook, it's clear from what we just saw that he

23    was ready to leave, correct?

24    A.   Correct.

25    Q.   And it was clear that P.G. was not there at the meeting

1   to ask for or receive campaign contributions, correct?

2   A.  Ask me again, please.

3   Q.  I said it's clear that P.G. was not at the meeting, that

4   meeting there in the hotel room, to ask for or receive

5   campaign contributions, correct?

6   A.  That's a hard question for me to answer.  I don't know

7   what he expected, but they had talked about Vinny

8   supporting -- continued to support P.G. in previous telephone

9   calls.

10  Q.  Well, we can agree, at least, that at no time during this

11  meeting did he ask for a campaign contribution, correct?

12  A.  Yes.

13  Q.  We do agree on that, yes?

14  A.  Correct.  Yes.  Sorry.

15  Q.  Now, Agent Holbrook, you can agree with me, I hope, that

16  over the next couple of months, P.G. and Vinny exchanged phone

17  calls?

18  A.  Yes.

19  Q.  One of those phone calls was on December 9th, correct,

20  December 9th of 2019?

21  A.  Yes.

22  Q.  That's where Vinny called P.G., correct?

23  A.  I'm sorry?

24  Q.  I'm sorry.  Am I not loud enough?  I apologize.

25  A.  I have a hard time hearing you.

1   Q.   I'm sorry.  I'm very sorry.  Let me start over because I

2   think I lost my place here.

3        On December 9, Vinny called P.G., correct?

4   A.   He did, yes.

5   Q.   Yeah.  And Vinny, at that time, tells P.G., quote, if

6   there's something that's needed that, you know, I can help out

7   with, you let me know about that, correct?

8   A.   Yes.

9   Q.   And what Vinny is suggesting is that if P.G. wants money

10  or wants a campaign contribution, just let him know?

11  A.   Among many other things but, yes, that would be one of

12  them.

13  Q.   But P.G. didn't request any money, correct?

14  A.   Correct.

15  Q.   He didn't ask for any campaign donations, correct?

16  A.   That's correct.

17  Q.   He didn't ask for a trip to Miami?

18  A.   That's correct.

19  Q.   He didn't ask for a visit to Vinny's yacht?

20  A.   That's correct.

21  Q.   Instead, he just answers, "No, I think we're all good,"

22  right?  That's how he ended the conversation?

23  A.   Yeah.  I can't remember the words he said.

24  Q.   It doesn't matter but, more or less, he said no, I don't

25  need anything, correct?  He said no, I don't need anything?

1    A.   I don't think he said that.

2            MR. C. HENRY RITTGERS:  Your Honor, may I check

3    something?  I want to make sure I have that.

4            THE COURT:  You may.

5            MR. C. HENRY RITTGERS:  Your Honor, I would like

6    permission to play USA 37B.

7            THE COURT:  I'm sorry, play 7B?

8            MR. C. HENRY RITTGERS:  37B, Your Honor.

9            THE COURT:  37B.  Has it been admitted?

10           MR. C. HENRY RITTGERS:  I believe it's been admitted,

11   Your Honor.

12           THE COURT:  Yes.  It has been admitted.  You may play

13   it.

14           MR. C. MATTHEW RITTGERS:  It's the transcript.

15           THE COURT:  Oh, I'm sorry.

16           MS. GAFFNEY PAINTER:  37A is the recording, 37B is

17   the transcript, and both have been admitted into evidence.

18           THE COURT:  Thank you.  37A, you may play.

19           MR. C. HENRY RITTGERS:  May I have a second, Your

20   Honor?

21           THE COURT:  You may.

22   Q.   Instead of showing the video, I'll ask Agent Holbrook if

23   he could turn to page 5 of USA 37B, and go to the middle of

24   the page, please?

25   A.   37B?

1    Q.   37B, yes.

2    A.   What page, sir?

3    Q.   Page 5, middle of the page.

4    A.   Okay.  Yep.  I'm there.

5    Q.   Okay.  And do you see Mr. Sittenfeld's response when

6    Vinny asks him if there's something that's needed, you know, I

7    can help out with you, let me know about that?

8    A.   Yes.

9    Q.   And P.G.'s response was, "Okay.  I think we're good"?

10   A.   He said, "Okay.  I think we're all good," yes.

11   Q.   Okay.  Two days later, P.G. calls Vinny, correct, on

12   December 11th?

13   A.   Yes.

14   Q.   And during that conversation, Vinny said to P.G., "I

15   really appreciate it.  Is there anything you need?  You all

16   set?"  Do you remember that?

17   A.   Yes.

18   Q.   And P.G.'s response was -- he didn't ask for any money,

19   correct?  He didn't ask for any campaign funds, correct?

20   A.   He did not.

21   Q.   He didn't ask for a trip to Miami?

22   A.   No.

23   Q.   By the way, I'm only bringing up these trips because your

24   agents, Rob and Brian, at least six times during this

25   undercover operation had asked P.G. to go on trips to Miami,

1    Vegas, Nashville, correct?

2    A.   That's correct.

3    Q.   So instead of asking for anything, P.G. responded, "Nope.

4    We're good.  We're good.  Just be in touch," correct?

5    A.   Yes.

6    Q.   Thank you.  Now let's talk about the $27,000 in cash that

7    you paid to Mr. Ndukwe during this operation.

8    A.   Yes.

9    Q.   And you agree that there is no documentation as to why he

10   was paid, correct?

11   A.   That's not correct, no.

12   Q.   There is documentation as to why he was paid cash?

13   A.   In the request, it says CHS services.

14   Q.   Well, can we agree that there isn't any documentation as

15   to what services those were for, the 27,000 cash?

16   A.   Yes.  True.

17   Q.   Now, when you were testifying last week, I believe you

18   indicated that Mr. Ndukwe was paid for his time, what he did,

19   correct?

20   A.   Correct.

21   Q.   Did that time include flying on a private jet with Rob

22   and Brian to Miami?

23   A.   Yes.

24   Q.   Did it include going to hang out on a private yacht down

25   in Miami?

1    A.   Yes.

2    Q.   Did it include going to a high-end strip club called

3    Tootsies?

4    A.   I'm not familiar with the name of it but, yes, there was

5    a strip club involved.

6    Q.   Did it involve eating at the fancy restaurants there in

7    Miami?

8    A.   Yes.

9    Q.   Did it include the drinking of expensive cocktails down

10   there in Miami?

11   A.   Yes.

12   Q.   Would you agree that flying a private jet to Miami and

13   back, and staying in a nice hotel, drinking and eating at nice

14   places, going to a strip club, hanging out on the yacht, would

15   cost the taxpayers over a hundred thousand bucks?

16   A.   I don't know what the number of that is.

17   Q.   Would you agree that during this operation, that P.G.

18   introduced Rob and Brian to different civic and business

19   leaders in Cincinnati?

20   A.   Yes.

21   Q.   Okay.  Like the president of Xavier University?

22   A.   There were introductions.  When they're out at

23   restaurants, people would show up.  I don't remember specific

24   individuals.  Xavier, possibly.

25   Q.   But nonetheless, CEOs of different companies, et cetera?

1    A.   That's right.

2    Q.   All right.  Throughout that 17 months, your team went to

3    great lengths in order to ingratiate themselves as P.G.'s

4    friends, correct?

5    A.   Correct.

6    Q.   When P.G. joined Rob or Brian for, let's say, a meal or

7    drink, he often paid; did he not?  He often paid for those

8    meals?

9    A.   P.G.?

10   Q.   P.G.

11   A.   I don't believe so.

12   Q.   Are you saying he never paid for a meal or drinks when he

13   was out with Rob and Brian?

14   A.   I'm not saying he never paid.

15   Q.   Do you agree that he paid more than one time?

16   A.   Possibly.

17   Q.   And we're talking about maybe seven times where they were

18   at a restaurant or bar, correct, throughout this 18 months?

19   A.   Correct.

20   Q.   Yeah.  And during those seven or eight times, P.G. either

21   paid or he offered to pay for the meal and drinks, correct?

22   A.   I guess that's fair to say that either pay or offered to

23   pay.

24   Q.   And we already talked about your team offering him free

25   vacations to Miami, to Las Vegas and Nashville, correct?

1    A.   Correct.

2    Q.   And P.G. didn't accept those offers?  He didn't go?

3    A.   He didn't decline them.  He is always kind of open-ended.

4    He was interested in going on the vacations, so to say that he

5    declined them, I wouldn't agree with that.

6    Q.   Maybe that was too strong of a word.  He was being

7    polite.  He just never did go, correct?

8    A.   I don't know what his intentions were.

9    Q.   He didn't go?  He didn't go on any of those vacations

10   that were offered, correct?

11   A.   He did not go on any of those vacations.

12   Q.   P.G. offered your agents his home if they wanted a place

13   to stay, correct?

14   A.   That's correct.

15   Q.   Yeah.  He also invited Rob and Brian to his home for

16   dinner with some other guests, including the U.S. District

17   Attorney who was, at the time, the chief federal law

18   enforcement officer for the Southern District of Ohio,

19   correct?

20   A.   The U.S. District Attorney?

21   Q.   Yeah.

22   A.   Yes.

23   Q.   Now, as part of your investigation, you obtained P.G.'s

24   campaign running contributions for Sittenfeld For Mayor,

25   correct?

1    A.   Yes.

2    Q.   And you also obtained the running contribution totals for

3    his PAC, Progress and Growth PAC, correct?

4    A.   Yes.

5    Q.   And between those two funds, the record shows that there

6    were over 1,800 individual donations, correct?

7    A.   I don't know what the number is.

8    Q.   Well, I'm representing to you that there were over 1,800.

9    Would you accept that?

10   A.   No.

11   Q.   No?  All right.

12   A.   I can confirm, but I can't accept a number that you give

13   me, counselor.

14   Q.   It wasn't in the hundreds, it was well over 1,500.  Can

15   you accept that?

16   A.   Again, it's been a long time since I've looked at these

17   records.  I'm not going to accept a number that I'm not

18   familiar with.

19   Q.   Well, would you agree that of all those donations -- and

20   I'm representing to you that there were 1,800, that of all

21   those donations, only eight of those donations were what the

22   government claims to be bribes, correct?

23   A.   Yes.

24   Q.   And the eight donations were the checks that Rob provided

25   P.G. or Vinny provided P.G., correct?

1    A.   Counselor, you've referenced the 1,800 number again.  I

2    don't know if that number is accurate or not.  I can't agree

3    to that number.

4    Q.   That's okay.  Agent Holbrook, you agree that context

5    matters; do you not?

6    A.   Yes.

7    Q.   And in this case, that context includes P.G. didn't take

8    any cash, correct?

9    A.   That's correct.

10   Q.   That context includes P.G. didn't take any free

11   vacations?

12   A.   That's correct.

13   Q.   And the context includes P.G. introducing your agents to

14   multiple civic and business leaders, correct?

15   A.   Introducing is --

16   Q.   Introducing your agents as investors, which is what they

17   pretended to be, to different civic and business leaders?

18   A.   While they were in restaurants?

19   Q.   Yeah.

20   A.   It wasn't purposefully introducing them --

21   Q.   Well, they ran into them, but he --

22            THE COURT:  Okay.

23            MR. C. HENRY RITTGERS:  I apologize, Judge.  I

24   apologize.

25   A.   Yes, that's correct.

1   Q.   The context includes P.G. inviting Rob and Brian to his

2   home, correct?

3   A.   Yes.

4   Q.   The context includes P.G. paying for some of his meals

5   and drinks, and when he didn't, he offered to pay, correct?

6   A.   Yes.

7   Q.   That context includes inviting his chief of staff to the

8   September 24th meeting up there in Columbus, correct?

9   A.   Yes.

10   Q.   By the way, there's no claim here that the chief of staff

11   is involved in any corruption, is there?

12   A.   There is not.

13   Q.   And context that includes P.G. twice declining Vinny's

14   offer for more help if he needed it, meaning money, during

15   those two phone calls we went through, right?

16   A.   I'm sorry.  Ask me that again.

17   Q.   The context that we're talking about, the context

18   includes twice declining Vinny's offer for help he might need,

19   meaning P.G., meaning money?  We just went through that.

20   A.   Yes.

21   Q.   Context includes not asking your agents for any donations

22   in 2019, correct?

23   A.   Correct.

24   Q.   And that context also includes the multiple calls, the

25   multiple meetings with agents, your agents, in 2019, in which

1  P.G. did not request any donations or money, correct?

2  A.    That's correct.

3          MR. C. HENRY RITTGERS:  No further questions, Your

4  Honor.

5          THE COURT:  Thank you, Mr. Rittgers.

6      (Excerpt of proceedings concluded at 10:58 a.m.)

7                          *   *   *

8              C E R T I F I C A T E

9                        -  -  -

10     I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
   is a correct transcript from the record of proceedings in the
11 above-entitled matter.

12

13 /s/ M. Sue Lopreato_____              June 30, 2022_____
   M. SUE LOPREATO, RMR, CRR
14 Official Court Reporter

15

16                      INDEX

17 GOVERNMENT WITNESSES

18 NATHAN HOLBROOK

19 Continued Cross by Mr. C. Henry Rittgers..........Page 2

20

21

22

23

24

25