```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION
                           *   *   *
 3

 4   UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
 5            Plaintiff,            : Jury Trial, Day 6
                                    : Tuesday, June 28, 2022
 6            - v -                 :
                                    : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"           :
 8                                  :
              Defendant.            : Cincinnati, Ohio
 9
                           *   *   *
10   EXCERPTED PROCEEDINGS - TESTIMONY OF CHINEDUM K. NDUKWE

11   BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                         *   *   *

13   For the Plaintiff:         EMILY N. GLATFELTER, ESQ.
                                MATTHEW C. SINGER, ESQ.
14                              MEGAN GAFFNEY PAINTER, ESQ.
                                U.S. Department of Justice
15                              U.S. Attorney's Office
                                221 E. Fourth Street, Suite 400
16                              Cincinnati, Ohio  45202

17   For the Defendant:         CHARLES M. RITTGERS, ESQ.
                                CHARLES H. RITTGERS, ESQ.
18                              NEAL D. SCHUETT, ESQ.
                                Rittgers & Rittgers
19                              12 E. Warren Street
                                Lebanon, Ohio  45036
20
     Law Clerk:                 Jacob T. Denz, Esq.
21
     Courtroom Deputy:          Scott M. Lang
22
     Court Reporter:            M. Sue Lopreato, RMR, CRR
23                              513.564.7679

24                         *   *   *

25
```

```
 1                    P R O C E E D I N G S

 2               (In open court at 9:27 a.m.)

 3                        *   *   *

 4          THE COURT:  So does the government intend to call

 5   another witness?

 6          MR. SINGER:  Yes, Your Honor.  The government calls

 7   Chinedum Ndukwe.

 8          THE COURT:  Very good.

 9      (Government witness, CHINEDUM K. NDUKWE, sworn.)

10          THE COURT:  Good morning, Mr. Ndukwe.

11          THE WITNESS:  Good morning

12          MR. SINGER:  Your Honor, may I approach to begin the

13   examination?

14          THE COURT:  You may.

15                   DIRECT EXAMINATION

16   BY MR. SINGER:

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  Can you state your full name and spell it for the record,

20   please?

21   A.  Yes.  My name is Chinedum Kingsley Ndukwe,

22   C-h-i-n-e-d-u-m, K-i-n-g-s-l-e-y.  Last name is N-d-u-k-w-e.

23   Q.  Mr. Ndukwe, what do you do for a living?

24   A.  So I'm a real estate developer.

25   Q.  And can you describe what you do as a real estate
```

1    developer?

2    A.  Yeah.  Our company is Kingsley and Co.  I started that

3    back in, I want to say 2009.  We primarily -- I primarily find

4    underutilized pieces of real estate within the urban core,

5    primarily Columbus, Ohio and Cincinnati, Ohio.

6        And we create value by repositioning them and

7    redeveloping them into either limited service hotels, market

8    rate housing, affordable housing.  And that's what I've been

9    doing since I retired from the National Football League.

10    Q.  We'll get into that in a second.  Who owns Kingsley?

11    A.  I do.

12    Q.  And can you tell us about the company a little bit?

13    A.  Absolutely.  So I'm one of the few black owned real

14    estate developers in the State of Ohio.  We're a hundred

15    percent owned by myself and my family.

16        And I started it, you know, investing in single-family

17    homes and transitioned to larger, a little bit more

18    complicated mixed-use development deals.

19    Q.  Where did the name Kingsley come from?

20    A.  Obviously, it's my middle name, and it's a family name,

21    and it's been in my family for years.

22    Q.  Can you kind of walk through your background a little

23    bit?

24    A.  Absolutely.  So my parents are West African.  We're

25    Nigerian.  And they came over, I want to say in '74.  My

1    father was 30 years old, mother was 29, your classic immigrant

2    story.  They came to this country with absolutely nothing,

3    worked multiple jobs to provide for myself and my siblings.

4        My father is a mechanical engineer by trade, and my

5    mother is a registered nurse.  Both are now retired.

6        I'm one of four.  My oldest brother is a commander in the

7    U.S. Navy.  My older brother is a retired NFL veteran as well,

8    National Football League veteran.  He works in commercial real

9    estate in Columbus, Ohio.  And my baby sister is a public

10   health professional.  She's based in Virginia.

11       And for me, you know, I met my wife at the University of

12   Notre Dame.  We have three kids, and we are based here in

13   Cincinnati.

14   Q.   How about your professional background?

15   A.   Sure.  Well, I was fortunate enough to earn a scholarship

16   to the University of Notre Dame.  I originally grew up in the

17   west suburbs of Columbus, Ohio.

18       I studied business management and psychology at Notre

19   Dame and was drafted in the seventh round in 2007 to the

20   Cincinnati Bengals.  I was a lot skinnier then.  I played

21   defensive back.

22       And every year, really, you know, as a seventh round

23   pick, you have to make the team every single year, and so

24   that's what I did.  Every single year, I had to compete.  And

25   I was fortunate enough to play four seasons with the

NDUKWE – DIRECT

1    Cincinnati Bengals.  I had a cup of coffee or five games with

2    the Oakland Raiders.

3        And towards the end of my career, I started investing in

4    real estate because I knew that being a professional athlete

5    was not a long-term career.

6        And one of the things as a pro-athlete in Cincinnati, you

7    know, oftentimes you just get, you know, presented

8    opportunities to go to different events.  You'd be asked to go

9    to different fundraisers both for non-profits and political.

10       And I just made it a habit and a focus to really try to

11   build my network in Cincinnati because I knew I wanted to stay

12   here long-term.  And that's what I did.

13       So even as tired as I might have been after a practice, I

14   just decided to go and expand my network.  And, you know,

15   undoubtedly, at any kind of event, any kind of an opportunity

16   there was in the community, I always ended up finding myself

17   talking to commercial real estate developers.

18       And, you know, I began to grow my network and grow some

19   close friends that I have to this day and developed some good

20   mentors.

21   Q.  So when did you retire from the NFL?

22   A.  So I want to say my last year was that 2010, 2011 season,

23   I believe.  So, yeah, a total of five seasons in the NFL.

24   Q.  You touched on this a bit.  Can you kind of walk through

25   when you started getting into real estate?

1    A.   Yeah.  So I was first exposed to real estate through my

2    father, who worked a 9:00 to 5:00 job.  He worked for General

3    Electric and then an old car company called Saturn that's not

4    around anymore, and then was transferred up to Marysville,

5    Ohio, where he worked for Honda.

6         And, you know, in every place that we went, he always

7    worked a full day, but then he had a side hustle of investing

8    in real estate, single-family homes.

9         And so, you know, after my first year in the NFL, I made

10   a decision that, you know -- and honestly, getting run over a

11   couple of times by my teammates, I made the decision that, you

12   know, I really needed to build up another opportunity.

13        And I'd always studied and understood, you know, real

14   estate, and so I started investing in single-family homes

15   while I was still playing.  And then that's where we

16   transitioned to two-family homes, multifamily properties.

17        And then at that time, I really felt confident and had

18   some really good mentors that opened my eyes up to commercial

19   real estate, and so that's what I spend my time doing now.

20   Q.   How old were you when you first went full on into real

21   estate?

22   A.   You know, full on, I want to say 26, 27, in that age

23   range, I want to say.

24   Q.   And how old were you when you retired from football?

25   A.   You know, yeah, 26, 27.

NDUKWE – DIRECT

```
1    Q.   Okay.  Pro football players make good money, right?
2    A.   Yeah.  The first round picks are the ones that are
3    typically quarterbacks, but yeah.
4    Q.   Did you make enough money playing football to retire and
5    not work anymore?
6    A.   No.  No.
7    Q.   Do you have any other job right now, other than as a
8    full-time real estate developer?
9    A.   No.  I mean, that's what I do to feed my family, and
10   that's what I've been doing for the last few years.
11   Q.   So I think you touched on this a bit, but explain how you
12   went from transitioning from an NFL football player to a
13   full-time real estate developer.
14   A.   Yeah.  So, you know, real estate development, it really
15   is about getting out there and talking to people and really
16   cultivating good relationships.
17        Ultimately, those relationships would lead to
18   opportunities, and you talk to people.  I mean, so as a
19   developer, my primary role is really to find the opportunities
20   within real estate.
21        And so you have to have vision.  And, you know, those are
22   some of the traits that, you know, made me successful as a
23   player is that I could -- as a football player is that I could
24   find opportunities and see things as they developed.  And that
25   really transitioned me over to commercial real estate.
```

1     And so I primarily focused on distressed single-family

2  homes, properties that might have had, you know, issues or, I

3  guess you'd call them harrier properties, properties that

4  have, you know, difficulties; taxes, liens, or estate issues

5  with them.

6     And my strategy around that was because larger, more

7  established development companies really didn't spend the time

8  that it takes to really dig in and have conversations that

9  really would lead to getting in a position to have a clean

10 title.

11    And so that's what I spent time doing.  And I had success

12 at that.  And so that's what I did, for the most part.

13 Q.  Can you describe where Kingsley placed in the real estate

14 development community?

15 A.  Yeah.  I mean, we're a startup, I mean, by all stretch of

16 the imagination.  I mean, a lot of the people that we are now

17 competing against today -- we weren't competing against these

18 guys years ago, but now today have been around for

19 generations, for decades.

20    And, you know, what we do now is we do compete against

21 some of the larger commercial real estate development

22 companies.  But, you know, when I first got started, it was

23 myself and essentially a finance administrative assistant.

24    Now today our company's probably roughly six full-time

25 employees, including myself, so not a big organization, by any

1  means.

2      Typically, a lot of the legacy development companies in

3  Cincinnati have 30, 40, 50 plus employees but, you know, we

4  still do our best to hold our own.

5  Q.  How would you describe the real estate community in

6  Cincinnati?

7  A.  I mean, it's a close community, but it's also extremely

8  cutthroat, extremely competitive; and, you know, that

9  competitiveness is what has always driven me and intrigued me

10  about commercial real estate.

11      And it's just, you know, it's kind of a good old boys

12  network, to be honest with you.  A lot of the same developers

13  that have been here in Cincinnati have -- their families were

14  in it, their families before them were in it and, you know...

15  Q.  Did you have to interact at all with public officials

16  when you began your career in real estate development?

17  A.  Absolutely.  I mean, it was one of the things that I

18  learned very early on is that, you know, city councilmen,

19  politicians, county commissioners really have a direct impact

20  in, you know, real estate development through economic

21  development, really.  I mean, that's really where it is.

22      And so I learned early that, you know, it wasn't my

23  rules, but it was my understanding that in order to be, you

24  know, considered an impactful developer, to be in the know in

25  the community, you had to donate to politicians.  I mean,

1   that's a --

2   Q.   In your experience, why would public officials in

3   Cincinnati be so involved in real estate development deals?

4   A.   Well, I mean, honestly, the real estate developers in

5   Cincinnati, some of the bigger campaign contributors, I mean,

6   if you look at any of the lists, or if you're at any of those

7   fundraisers, the majority of the people that are there are

8   subcontractors, contractors, and developers, larger

9   institutions.  And they're influencing, you know, policies and

10  driving agendas, and that's what you see.

11  Q.   And did that impact you in any way as you were starting

12  your career in real estate development?

13  A.   Absolutely.  I mean, for me, you know, like I said, I

14  think I got started at 26, 27 full-time and, you know, you

15  look back and you see all these things that, you know, I was

16  doing then.  And, you know, it was just because of the way

17  that things were being done.

18       And, you know, it's tough to reflect on that and see

19  that.  And understanding and knowing what I know now, it's

20  just unfortunate that that was just the climate that I was

21  brought up in.

22  Q.   At some point, did the FBI approach you?

23  A.   Yes, they did.

24  Q.   Why did the FBI say they were reaching out to you?

25  A.   Well, they wanted to ask me about my campaign donations

1     and, you know, they initially reached out to me.  You know, I

2     had had a friend of mine who lived in Northern Kentucky at the

3     time, and I asked them, I said, hey, I just got this random

4     email from an fbi.gov address.  What do you think about this?

5          And he said, hey, listen, you know, whatever it is, you

6     don't want to go and talk to the FBI by yourself.

7          And so I asked him, well, who should I reach out to?  And

8     he said reach out to Scott Crosswell, who I did reach out to.

9     And I said, hey, Mr. Crosswell, would you mind, you know,

10    following up on this.

11         And Scott, from that point on, has been my family

12    attorney for years.  But yeah, that was initially what led us

13    to have an initial meeting.

14    Q.   And do you recall when this was?

15    A.   I don't.  Probably I want to say, you know, '17, maybe.

16    But if you have anything that can refresh my memory, I...

17    Q.   Absolutely.  Would a source report from around the same

18    time that you -- relating to a conversation you had with a

19    special agent refresh your recollection as to when you first

20    met with the government?

21    A.   It would.

22              MR. SINGER:  May I approach, Your Honor?

23              THE COURT:  You may.

24    Q.   If you can just review this and then hand it back.

25         Does that refresh your recollection around the time you

1    first met with the government?

2    A.   It does.  April 2018.

3    Q.   And you would have met with the government a little

4    before this initial source report; is that correct?

5    A.   That's correct.

6    Q.   So possibly March 2018?

7    A.   Yeah.

8    Q.   Did you enter any agreement with the government at the

9    time that you first met?

10   A.   Yeah.  So Scott Crosswell had insisted I sign a proffer

11   letter, I believe it's called and, you know, that was

12   something that he worked out with the attorneys that were

13   present at the time.

14   Q.   And what were the terms of the proffer?

15   A.   Well, as I interpreted them, you know, one, you know, you

16   had to tell the truth; and, two, if you didn't tell the truth,

17   you'd be prosecuted for those lies.

18   Q.   And was the other rule that if you said anything that

19   incriminated you directly, that the government couldn't use

20   that against you; is that right?

21   A.   Correct.  Yeah.

22   Q.   Okay.  So what did you tell the government during that

23   proffer?

24   A.   Well, I told the government the truth.  They asked about

25   campaign donations, and I told them that I had withdrawn

1    money, my own money into friends -- put them in the names of

2    friends and family and made donations to local politicians.

3    You know, I was very forthright about it.

4        I understand now that that was a mistake.  But that's

5    what I shared with the FBI, and that's what I shared with the

6    attorneys at the time.

7    Q.   And why did you do that?

8    A.   Well, honestly, that was just really how I understood

9    things were done, and that's how I understood that, you know,

10   campaign donations were made.

11       And, you know, again, I told you at the time it was just

12   myself, an employee.  But, you know, a lot of these other

13   developers and companies, I mean, they have their family

14   members, they have their employees.  They donate.  They all

15   donate.  They have, you know, siblings and children donate to

16   campaigns and politicians.

17       And, you know, at the time it was just me and -- you

18   know, I still get grief from my older brother that he would

19   receive, you know, Cranley For Mayor in the mail.  And he

20   said, you know, what is this?  I didn't do this.  And so I

21   shared that with the FBI, and they asked me, well, what did

22   you get in return?

23       And I think at the time, in 2018, you know, my thought

24   and feedback was I didn't get anything in return.  If

25   anything, my life has been significantly harder simply because

1     I just supported this lady by the name of Yvette Simpson.

2        And I supported Yvette Simpson because she was a friendly

3     acquaintance, and because it just seemed like the current

4     mayor at the time, who was John Cranley, Mayor Cranley was

5     really going out of his way to make things difficult for me.

6        And so at that point, when the government asked about,

7     well, you know, what you're describing to us and what's

8     happening, it's not right.  It's corrupt.

9        And, you know, reflecting back now and kind of going

10    through everything and just being a little bit more wiser than

11    I am today, and learning from all that experience, I mean, I

12    really felt like I was being preyed on and that, you know, my

13    ambition to be successful transitioning out of the NFL, you

14    know, I think, you know, you hear about this all the time with

15    athletes.

16       But I think this scenario, you know, it's so difficult

17    being an African American in this country, it's so difficult

18    being an entrepreneur in this country.

19       In Cincinnati, what I've learned is that being a black

20    man and being a businessman in commercial real estate, the

21    policies and the procedures and the challenges in the City of

22    Cincinnati to be successful, it's stacked against you.

23       And really, at the time, when I was asked would you be

24    willing to assist the government, I said absolutely.  And I

25    made the decision, and I did it willingly.  I wanted to fully

1    assist where I could.

2        And I just felt like, at the end of the day, the last

3    thing I wanted to do was have another small business person go

4    through what I did, get exposed to things I was exposed to.

5        And then, you know, at the end of the day, the last thing

6    that, you know, I wanted to make sure what happened is that,

7    you know, they wouldn't be able to do those things and try to

8    shake people down the way that they shook me down.  Yeah,

9    that's my opinion.

10   Q.   So before we get into your cooperation with the

11   government, following up on these checks.  So by putting these

12   checks in the names of friends and family, were you able to

13   exceed the limits that you could otherwise provide to these

14   public officials; is that right?

15   A.   Yes.  That's correct.

16   Q.   So this was an attempt to evade restrictions on how much

17   you could personally contribute; is that right?

18   A.   That's correct.

19   Q.   Okay.  And did you meet with these public officials at

20   the time that you gave them the checks?

21   A.   Yes, I did.  Multiple times.  I mean, I know that, you

22   know, one meeting in particular that always stands out to me

23   is that, you know, I met with, you know, John Cranley, who was

24   now the current -- who was now the former mayor.  He was

25   running for his first election.

1           I still remember giving him thousands of dollars of

2      contributions from my friends and family.  And he knew good

3      and well that all that money came from me directly and, you

4      know, so much that his aid and himself followed back up and

5      say we need names, we need address- -- or we need addresses,

6      we need occupations, you know.  And, you know, it's jarring to

7      really think about that at this stage today, yeah.

8      Q.   Did you describe anything else to the government when you

9      met with them in the proffer?

10     A.   Yeah, I did.  I mean, for me, you know, sitting down and

11     having a conversation with the federal government and the FBI,

12     and so I think I might have told -- I know I told them pretty

13     much everything I've ever even thought was remotely wrong in

14     my life.  I mean, I think I told them about parking tickets.

15          But one thing that I know stood out is that, you know,

16     I'd used my IRA in an improper way.  And I did that in a

17     situation where I needed funds to renovate my house.  I think

18     I -- or renovate an investment property.  I think I had been

19     turned down for a loan to do so.

20          And a buddy of mine needed money, and so I transferred

21     money through a self-directed IRA to a buddy of mine, and he

22     then sent money my way, which violates the rules and regs of

23     the IRA.

24          But I was very forthright with that when I met with the

25     FBI, and I -- you know, anything I thought remotely could have

1    been illegal, I shared with them at that time.

2    Q.   All right.  So what happened after the meeting with the

3    government in 2018?

4    A.   I left.  I mean, I know that a couple days later we

5    had -- Scott had followed back up with someone and, you know,

6    they had contacted me and said, hey, would you be willing to

7    work with us to rid out public corruption.  And I ended up,

8    you know, assisting on this case and other cases.

9    Q.   Was your work voluntary?

10   A.   A hundred percent.

11   Q.   Did you enter into any sort of agreement with the

12   government that required you to cooperate in exchange for not

13   being prosecuted for anything?

14   A.   No.

15   Q.   All right.  So why did you work with the FBI?

16   A.   Well, honestly, I just -- like I just shared with you, I

17   just felt like my experience as a small businessman trying to

18   make it in the City of Cincinnati as a minority business,

19   trying to make it and be successful that, you know, the way

20   that the politicians had impact on that, I wanted to -- you

21   know, at the end of the day, when I had the choice to do, you

22   know, do the right thing and I did it, and I wanted to make

23   sure that, you know, I was in a position to have an impact,

24   and I did.

25   Q.   Was there any particular agent with whom you worked?

1    A.    Nathan Holbrook was really the main point of contact.

2    Q.    And were you given any instructions at the time that you

3    started working at the direction of the FBI?

4    A.    Yeah.  He would advise us on -- advise me on who exactly

5    to record and record certain conversations.

6    Q.    Were you compensated for your work?

7    A.    Yeah, I was.  Yeah.

8    Q.    How much did you get paid over the course of the time

9    that you worked with the FBI?

10   A.    I believe it was roughly like $27,000.

11   Q.    Can you describe how that worked?

12   A.    Honestly, it was really sporadic.  I mean, you know,

13   Officer Nate would -- or Special Agent Holbrook would just

14   kind of pay me money.  I mean, that was pretty much it.

15   Q.    Did you ever ask to get paid?

16   A.    No, I didn't.

17   Q.    Did you ever expect to get paid?

18   A.    No, I didn't.

19   Q.    Were you ever told that you were going to get paid?

20   A.    No.  No, I never was.

21   Q.    Did you report these payments to the IRS at the time that

22   you received the payments?

23   A.    No, I did not.

24   Q.    Why is that?

25   A.    Well, it was under pretty strict direction that my

1    involvement wasn't to be disclosed publicly, it wasn't to be

2    disclosed privately; and, you know, I didn't disclose that to

3    my accountant.  I didn't disclose that to anybody except for

4    my attorney.

5    Q.  After the time that it became public that you had been

6    cooperating with the FBI, had you taken any steps to address

7    that?

8    A.  No.  My taxes have been amended, and since it became

9    public, myself and my accountant updated our -- my 2018 and

10   2019 tax returns to show that income.

11   Q.  Now, can you describe the work that you performed at the

12   direction of the FBI?

13   A.  Yeah.  I mean, for the most part, it was recording

14   conversations and discussions in and around specific real

15   estate projects that I was working on.  That was primarily it.

16   Q.  Was it difficult?

17   A.  Yeah.  I mean, you talk about the money.  I mean, at this

18   point, you know, the -- I didn't realize it was $27,000.  I

19   should have asked for significantly more money.  I mean, it

20   was extremely stressful, extremely difficult.

21       You know, at this time, I was trying to grow my business.

22   I was trying to manage my real investors.  You know, over the

23   period of time I was working with the FBI, I had gotten

24   married, I started a family so, yes, it was very difficult.

25   Q.  Were you told anything about the status of the

1    investigations that you were working on?

2    A.   No.

3    Q.   What were you told about the investigations?

4    A.   Honestly, I just knew that we were working on public

5    corruption cases, and that was pretty much it.

6    Q.   Were you provided instruction as to who to record?

7    A.   Yes.

8    Q.   Can you describe how that worked?

9    A.   Yeah.  Officer -- or Special Agent Holbrook would advise

10   me on, you know, who to record, what conversations to record.

11   It was pretty much, you know, record those conversations and

12   that was it.

13   Q.   At the time that you were working at the direction of the

14   FBI, did you have any concerns about the impact that this work

15   that you were doing would have on your life if it ever became

16   public?

17   A.   Absolutely.  Absolutely.  And, you know, for me as a

18   small business owner and, you know, it's kind of an unwritten

19   rule as an African American as well in business is that you

20   want to try to stay away from controversy.  You want to try to

21   avoid pissing people off.

22       And, you know, I knew that, you know, when this became

23   public, you know, it would do that.  It was very controversial

24   and, obviously, it's had an effect on people.

25       But, you know, I felt like it was the right thing to do.

1    I felt like it was the right thing to do for not just my

2    business, but other businesses that were being faced -- or

3    other business owners that were being faced to make those

4    decisions, those difficult decisions.

5         You know, at the end of the day, at the time when I was

6    donating a lot of money, it's not like I was -- you know,

7    yeah, I played in the National Football League, but I wasn't

8    rich.  You know, I wasn't -- I didn't have all this money to

9    throw around so much.  I just told you I had to use my IRA to

10   renovate an investment property.

11        But, you know, I felt like that was my understanding

12   about how things worked within the real estate development

13   space in Cincinnati, and I just wanted to be able to do

14   something about it.

15   Q.   At some point, did you begin pursuing development of a

16   property located at 435 Elm Street?

17   A.   I did.

18   Q.   Can you describe that?

19   A.   Yeah.  So, you know, I think I touched on my business

20   model of going after projects that were challenging from the

21   standpoint of, you know, complicated title issues, liens.

22        And, you know, 435 Elm is really, at the end of the day,

23   no different than a single-family home, from the standpoint of

24   it had all those issues.  It had complicated title issues.  It

25   had significant state, you know, title issues.

1     And at the end of the day, you know, after understanding

2    in the -- knowing that the motivation of the city was, at some

3    point in time over the next five, ten years that, you know,

4    the convention center block, what is now being called the

5    convention district, is going to be a priority of the current

6    administration and future administrations, I decided it was

7    worth the risk to explore acquiring a leasehold mortgage note.

8     And in its simplest terms -- and I don't know if I should

9    talk about that.

10   Q.  My next question was, what's the nature of your interest

11   in 435 Elm Street?

12   A.  Okay.  So 435 Elm -- and, again, it was a pretty

13   complicated situation but, at the end of the day, real estate,

14   high level, seems complicated but it's always in the details.

15    And after doing some due diligence on 435 Elm, I learned

16   that U.S. Bank, who was the leasehold mortgage note carrier,

17   so essentially they had a loan on the property, that they had

18   in their loan covenants, in their loan documents, they had

19   that if at any point the tenant, who was Ron Goldschmidt at

20   the time, at any point he had defaulted on his lease with the

21   City of Cincinnati, then U.S. Bank really had two things that

22   they could do.

23    They could step in into Ron Goldschmidt's position with

24   the lease and cure whatever was owed to the City of Cincinnati

25   and then negotiate a new lease.

1      And the period of the lease -- I think that Frost Brown

2   Todd represented U.S. Bank at the time, they had calculated

3   the years left on the lease was close to 37, 38 years.

4      And then they counted -- they calculated the total money

5   that was still owed to the city was in the $250,000 range.

6      So after I learned that, I believe I paid -- and I raised

7   money from friends and family like I typically do in all our

8   projects, close to I want to say $1.2, $1.3 million to

9   purchase that note. And then I anticipated another $150,000

10  that we're going to have to pay the city to renegotiate that

11  lease.

12     And so to be in the position to actually have a seat at

13  the table as an African American man in the City of

14  Cincinnati -- that I just told you it is very challenging to

15  be successful in business here. It's even more challenging to

16  be successful in commercial real estate development here.

17     And to be in a position that you would have an actual

18  seat at the table because, you know, that lease was just to

19  lease the building as is, but I was confident that when I was

20  in that position, the motivation of the city and the county

21  wouldn't be to release that. It was to put together a new

22  development deal, which is what I wanted to do.

23  Q.  So can you just describe what rights that you believed

24  came with the interest that you had purchased?

25  A.  Yeah. So we had the right -- U.S. Bank had the right to

1    cure and negotiate a new lease for the building at 435 Elm.

2    So there's an existing lease in place, and those were the

3    rights, and that leasehold mortgage note also controlled the

4    air rights above 435 Elm.

5        So it's rarely -- it is rare here and rare like type of

6    project in the City of Cincinnati to have air rights

7    associated with long-term leases but, at the end of the day,

8    it is pretty basic when it comes to real estate.

9    Q.   Do you recall when you purchased that interest?

10   A.   I believe in 2017, I want to say.

11   Q.   And ultimately, what was your plan for the property?

12   A.   Yeah.  So we had a plan of -- and taking a step back.  My

13   business model related to larger commercial projects that I

14   couldn't do independently.

15       It was really try to find out about these opportunities,

16   these public private opportunities, get an element of site

17   control in the project, and then, you know, bring in another

18   development partner after I had true site control to be able

19   to create value for Kingsley, for my company.

20       And so that was my plan was to tie up the property in a

21   new development agreement or a new long-term lease, and then

22   strategically bring in an experienced development partner and

23   put together a mixed-use development project made up of

24   retail, office, hotel and apartments.  And those apartments

25   would be workforce housing, and really make that a true

1    destination for the City of Cincinnati, and actually have a

2    major mixed-use development in downtown Cincinnati developed

3    by an African American.

4    Q.  Did you take any steps to pursue development?

5    A.  I did.

6    Q.  Can you describe those?

7    A.  Yeah.  After we had -- after my company had purchased the

8    leasehold mortgage note, I had reached out to, I think Oscar

9    Bedolla at the time of that.  He was the economic development

10   director at the City of Cincinnati at the time.

11        And, you know, it was Oscar's opinion that, you know, we

12   were in a really good position to be a logical candidate to

13   redevelop that site.

14        I reached out to Harry Black, who was the -- at the time,

15   the city manager, who was no longer there, who was no longer

16   there after that.  But yeah, we engaged the city quite a bit.

17   Q.  Do you recall when that was?

18   A.  I want to say it was early 2017.  As soon as we closed on

19   that mortgage note, I want to say we started letting the city

20   know that -- of our interest and our desire to redevelop it.

21   Q.  Do you recall submitting a letter to the city expressing

22   your desires?

23   A.  I believe so.

24   Q.  If you reviewed that letter, would it refresh your

25   recollection as to the precise date that you first reached out

1   to the city?

2   A.   Absolutely.

3           MR. SINGER:  May I approach, Your Honor?

4           THE COURT:  You may.

5   Q.   Did this refresh your recollection?

6   A.   It did.

7   Q.   So what was the date that you first reached out to the

8   city related to development?

9   A.   That was July 7th in 2017.

10  Q.   So can you kind of describe the significance of this

11  interest that you had purchased to your company?

12  A.   So at the time, it was one of the biggest risks that I

13  had taken personally, professionally, to make this investment.

14       And it was a very big deal.  And honestly, it still is to

15  this day and, you know, it's just -- it's disappointing, as we

16  sit right now, it's still in litigation.  But for me and my

17  company, it was a significant investment at the time.

18  Q.   All right.  So starting with 2017, can you describe your

19  negotiations with the city relating to the development at 435?

20  A.   Honestly, it just always seemed like, you know, I was

21  given the runaround.  It just seemed like the goalpost, no pun

22  intended, kept moving.  They were asking me to do things that

23  I don't believe they would have asked other developers.  It

24  just seemed that every time we met, it was something different

25  that they wanted and, you know, it just wasn't -- there wasn't

1    real progress that was being made.

2    Q.  Were there any specific terms that you were seeking from

3    the city relating to the development agreement?

4    A.  Well, for us, for me it was I want to -- I want the same

5    type of terms that any other person in a position to redevelop

6    a blighted building in downtown Cincinnati would have wanted.

7         Typically, there was a practice of selling a project or a

8    property -- as long as there was an economic impact of

9    creating jobs for Cincinnatians, you know, you would often see

10    that properties were sold to developers for a dollar.

11         Or if they weren't sold to a developer for a dollar,

12    they'd be sold for -- or there would be a long-term minimal

13    lease in the spirit of just redeveloping property.  And so

14    that was what I was thinking.

15         You know, I don't recall the exact terms at this very

16    moment, but I think those were the conversations that, hey, we

17    want to do what's been done in other downtown properties.

18    Q.  Do you believe a particular public official was hampering

19    your ability to reach an agreement with the city?

20    A.  Absolutely.

21    Q.  Can you describe that?

22    A.  I just think that -- for whatever reason, I think that

23    Mayor John Cranley at the time was making it very difficult,

24    for whatever reasons, you would have to ask him, but it just

25    seemed like he had his pulse or he had his hand on the -- you

1    know, he was very involved in every single real estate

2    development deal during this time that went on in the City of

3    Cincinnati.

4    Q.   Now, ultimately, this property was transferred from the

5    city to the port; is that right?

6    A.   That's right.

7    Q.   We'll get into that later, but did the plans for how you

8    wanted to develop 435 materially change from the time you

9    first started seeking negotiations with the city until it was

10   transferred to the port?

11   A.   No.

12   Q.   All right.  Do you know an individual named Alexander

13   P.G. Sittenfeld?

14   A.   I do.

15   Q.   How long have you known Mr. Sittenfeld?

16   A.   For a while.  I've known him for a while.  Exactly when

17   we first met, I couldn't tell you right now.

18   Q.   Can you describe the nature of your relationship with

19   Sittenfeld?

20   A.   Yeah.  I would call it a friendly acquaintance as well.

21   I mean, I -- you know, yeah, I would call it a friendly

22   acquaintance.  That's really what it was.

23        You know, we weren't -- we didn't hang out.  You know, I

24   think he might have been over to my house for a Super Bowl

25   party once.  I think I might have been over to his apartment

1    maybe once with a group of people, but we weren't -- by no

2    means were we, you know, best friends.

3    Q.   Prior to 2019, did you support Sittenfeld through

4    campaign contributions?

5    A.   I did.

6    Q.   Why?

7    A.   P.G. was young and, you know, seemed hungry and

8    ambitious, and he seemed like a likeable guy.  You know, for

9    me, I was young and hungry and ambitious in business, so I

10   think that it made sense to support him.

11        And like I said, the political climate at the time was

12   that, you know, you would be well served to have, you know,

13   city councilmen on your side, so I supported him as well as

14   some others.

15   Q.   Did you discuss your development projects with

16   Sittenfeld?

17   A.   Yeah, I did.  I did.

18   Q.   Why did you do that?

19   A.   Just in order to put things on city councilmembers'

20   radar.  I wanted to be sure that, you know, my projects were

21   on his radar.  It's not like I was doing tons of projects but,

22   obviously, I wanted to share with him projects from time to

23   time.

24   Q.   At any point in 2018, did Sittenfeld invite you to a

25   fundraiser?

```
 1    A.   Yes.

 2    Q.   Do you see those binders in front of you?

 3    A.   Yeah.

 4         MR. SINGER:  May I approach, Your Honor --

 5         THE COURT:  You may.

 6         MR. SINGER:  -- so I can show him which binder to

 7    look through.

 8    Q.   If you could turn to Tab 4A and 4B.

 9    A.   Okay.

10    Q.   Are you there?

11    A.   Yeah.  4A?

12    Q.   4A.  Do you recognize this?

13    A.   I do.

14    Q.   And what is it?

15    A.   It's an email that was sent from P.G. to me, an invite

16    for a fundraiser.

17    Q.   And how do you recognize it?

18    A.   Because it came from P.G.'s email.

19         MR. SINGER:  The government moves for admission of

20    USA 4A.

21         MR. C. MATTHEW RITTGERS:  I'm looking it up.  I

22    apologize.  No objection, Your Honor.

23         THE COURT:  USA 4A is admitted without objection.

24    Q.   Could you turn to 4B?

25    A.   Okay.
```

1    Q.   Do you recognize that?

2    A.   I do.

3    Q.   And what is it?

4    A.   It's an official invite to a P.G. Sittenfeld fundraiser.

5    Q.   Could you turn back to 4A.

6         Do you see the attachment at the bottom of that?

7    A.   Yep.

8    Q.   Turn back to 4B.

9         Do you recognize that as an attachment to the email that

10   was in 4A?

11   A.   Yes.

12        MR. SINGER:  Government moves for admission of

13   USA 4B.

14        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

15        THE COURT:  USA 4B is admitted without objection.

16        MR. SINGER:  Permission to publish 4A and 4B to the

17   jury, Your Honor?

18        THE COURT:  You may do so.

19   Q.   Mr. Ndukwe, can you please read the email from

20   Mr. Sittenfeld?

21   A.   "Hey, Chin, looking forward to catching up with you soon.

22   Let me know if there's a good day if I can take you out to

23   breakfast or lunch or dinner.

24        "I'm having my annual breakfast fundraiser for business

25   leaders, developers, and other civic leaders later this month,

1  on April 24th, at the Queen City Club.  An invitation is

2  attached, and I count on you to join us, and would you

3  consider supporting at the $2,200 level or a $5,000 level.

4      "In the new term at City Hall, I'm pretty squarely in the

5  middle of the council and in the middle of the action, so I'm

6  looking forward to sharing an update with everyone.

7      "I'll give you a call to follow up later this week.

8  How's the wedding planning coming?  Thanks, P.G."

9  Q.  Did you attend the April 24th Queen City fundraiser?

10  A.  I did.

11  Q.  And did you contribute to Sittenfeld in April of 2018?

12  A.  So I actually -- based on my experience, I actually

13  pulled my personal money again and gave that to a guy in my

14  office, who wrote a check in his name to P.G. Sittenfeld.

15      MR. SINGER:  Your Honor, at this point, we would move

16  for admission into evidence of a campaign finance report that

17  is currently listed at USA Exhibit 46C.  The parties have

18  stipulated to the authenticity of the document, and the

19  government is asserting that it's a public record.

20      MR. C. MATTHEW RITTGERS:  No objection.

21      THE COURT:  USA 46C is admitted without objection.

22      MR. SINGER:  Permission to publish to the jury,

23  Your Honor?

24      THE COURT:  You may do so.

25      MR. SINGER:  Miss Terry, can you please turn to

1   page 3 of this document.

2   Q.   All right.  Do you see that first line on that document,

3   at the very top, under "Full Name of Contributor"?

4   A.   Yes.  It's Tung Nguyen.

5   Q.   And who do you recognize Tung Nguyen to be?

6   A.   He was a former employee of mine.  He was a financial

7   analyst.

8   Q.   Is this the contribution that you were just discussing?

9   A.   It is.

10  Q.   If you work your way across to under "Name of Employer

11  Occupation," do you see that box?

12  A.   Yes.

13  Q.   Can you read that, please?

14  A.   "Associate, Kingsley Properties."

15  Q.   Did you tell Sittenfeld that you were contributing to him

16  through your employee?

17  A.   I did.

18  Q.   And was this contribution made in any way at the

19  direction of the FBI?

20  A.   No, it was not.

21  Q.   Did you report to Special Agent Holbrook after you

22  contributed to Sittenfeld in the name of your employee?

23  A.   I did.

24  Q.   Did you have any discussions with Sittenfeld about his

25  intention to run for any other office?

NDUKWE - DIRECT

1    A.   I did.

2    Q.   Can you describe those?

3    A.   Well, you know, P.G. -- and I'm not sure if he had

4    announced at that point in time or if he was talking about

5    announcing, but he had discussed his intention to run for

6    mayor of the City of Cincinnati.

7    Q.   Had you discussed with Sittenfeld the 435 Elm Street

8    project in 2018?

9    A.   I did.

10   Q.   What do you remember about that?

11   A.   So, you know, what I can recall now is that Ron

12   Goldschmidt, the gentleman that was in the lease with the City

13   of Cincinnati, who had defaulted on that lease, I had learned

14   that him -- his son had a relationship with P.G.

15       And so I had reached out to P.G. to see if he couldn't

16   assist in expediting the Goldschmidt family in stepping aside

17   to help facilitate a development.

18   Q.   Following that fundraiser in 2018 -- by the way, can you

19   just describe the fundraiser a little bit.  What do you recall

20   about that fundraiser?

21   A.   Yeah.  I mean -- first of all, the reason why -- and,

22   again, this is just to say it.  You know, I was so paranoid

23   about the keeping donations out of my name based on the blow

24   back that I had received from Mayor John Cranley for donating

25   to Councilwoman Yvette Simpson, so that was the motivation for

1    that.

2       And at that fundraiser, you know, it seemed like every

3    single major developer was in that room at the Queen City

4    Club.  And I brought Tung along, and we listened and heard the

5    vision and the plan that he had for the City of Cincinnati.

6    Q.   Following that fundraiser, do you recall any other

7    discussions with Sittenfeld relating to contributions?

8    A.   Yeah.  Yeah, I do.

9    Q.   Can you describe those?

10   A.   Well, I mean, you know, it was always around -- he was

11   always talking about, you know, raising money.  Is there a

12   specific conversation you're referencing?

13   Q.   Do you recall a time in the summer of 2018 where you

14   discussed contributions for Mr. Sittenfeld?

15   A.   Yes.

16   Q.   Can you describe that?

17   A.   Well, you know, on multiple occasions, he had talked

18   about raising money.  You know, I did receive a call on one

19   occasion about the fact that, hey, you know, my expectation is

20   that every developer -- and it's understanding that every

21   single developer was going to donate at least $10,000.  That's

22   one thing that, you know, I remembered.

23       And also about the fact that the campaign laws were

24   changing related to the giving limits and the LLCs.  I do

25   remember that.

1    Q.   Do you recall a meeting in which you represented a slide

2    deck or some data showing Mr. Sittenfeld's prospects in the

3    city?

4    A.   Yeah, I do.  I think that -- yeah, either someone on his

5    team or one of his fundraisers had put this almost like a

6    strategic plan together that -- excuse me.  Had put almost

7    like a strategic plan together that essentially showed that it

8    was not possible -- based on the data, that he wasn't going to

9    be the next mayor of Cincinnati, so yeah.

10   Q.   And did Sittenfeld solicit contributions from you at that

11   meeting?

12   A.   Yes.

13   Q.   All right.  So you mentioned a phone call that you

14   received.  Do you recall when that was?

15   A.   Not specifically, but in that year, though.

16        MR. SINGER:  Your Honor, permission to publish what's

17   already been introduced into evidence as USA Exhibit 6?

18        THE COURT:  You may do so.

19   Q.   Do you recognize this?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's my phone bill.

23        MR. SINGER:  Miss Terry, could you please go to

24   page 13 of the document.  Ms. Terry, do you mind blowing up

25   maybe the bottom third.

1    Q.    Do you see the very top phone call?

2    A.    Yes.

3    Q.    What is the date on that phone call?

4    A.    9/21.

5    Q.    And do you recognize that phone number?

6    A.    Yeah.  I believe that's P.G.'s.

7    Q.    And if you go all the way to the right, what's that

8    number?

9    A.    Three.

10          MR. SINGER:  Miss Terry, could you highlight the top

11    row.

12    Q.    Do you see the column that has the numbers?

13    A.    Yes.

14    Q.    What does that represent?

15    A.    The number of minutes.

16    Q.    Okay.  Does this refresh your recollection as to the time

17    that you had the phone call with Mr. Sittenfeld that you've

18    just described?

19    A.    Yeah, I do remember getting this call.  And that was when

20    I was at my architect's office at the time.  I actually

21    stepped out to take that call.

22        And I know that, you know, at the time, P.G. was going to

23    be brief.  He said, hey, I'm just going to need a second.  You

24    know, I just want to let you know that, you know, the majority

25    of the developers in Cincinnati are going to be giving me ten

1  grand.  You know, can I count on you for ten?  And I said

2  yeah.  Yeah.  Yeah, I'll figure it out.

3      So I mean for me, you know -- and, again, I know that I

4  was already assisting with the FBI, but that was just, again,

5  pretty jarring to hear that.

6      And I -- you know, after that call, I had let

7  Agent Holbrook know that, hey, I did get a call from P.G.

8  He's talking about, you know, the majority of the developers

9  in the City of Cincinnati are going to be raising money or are

10  going to be contributing $10,000.  And so I let him know about

11  that.

12  Q.  Can you describe what raising $10,000 meant for you?

13  A.  Well, honestly, the only thing it did is it brought back

14  my memories of essentially being in this whole space of

15  contributions.  I mean, it wasn't a good feeling.

16      You know, I'm focused on growing my business.  Like I

17  said, I was in my architect's office.  You know, as a small

18  business owner, and then having that additional layer of,

19  essentially, responsibility to contribute in order to make

20  developments happen in the city, I mean, it's not a good

21  feeling.

22  Q.  And so how did it make you feel in relation to 435

23  specifically?

24  A.  Well, obviously, I was like, I'm going to have to make

25  sure I get this done.  You know, that's what I mean.  I mean,

```
 1    that was my interpretation is that if all these developers are
 2    doing this, I have to also do this as well.
 3    Q.   Were there any other likely candidates for mayor at that
 4    time?
 5    A.   There were.  I believe it had been rumored that
 6    Christopher Smitherman was going to run.
 7    Q.   And had you received any solicitations for contributions
 8    from Mr. Smitherman?
 9    A.   I did.
10    Q.   Can you describe that?
11    A.   Yeah.  I very much donated to Christopher Smitherman in
12    the same capacity.  You know, one of those mentors that I
13    referenced was Albert Smitherman.  You know, he's another
14    local businessman that I had met during that transition.
15         And really, you know, along with other developers, I
16    mean, they really talked through how to go about donating to
17    these people in other people's names and LLCs and all of that.
18    Q.   Now, you mentioned you were, at that time, recording
19    conversations at the direction of the FBI; is that right?
20    A.   That's right.
21    Q.   Had you been instructed to record calls with Sittenfeld
22    at that time?
23    A.   No, I had not.
24    Q.   So you mentioned you reached out to Special Agent
25    Holbrook.  What happened next?
```

1  A.  Well, he had said to go ahead and start recording phone

2  calls.

3  Q.  And did you do that?

4  A.  I did.

5  Q.  And when did that start?

6  A.  Right away.  I mean, moving forward, I started recording

7  calls.

8       MR. SINGER:  Your Honor, permission to publish what

9  the jury has already been -- what's already been admitted to

10  the jury as USA 13A?

11       THE COURT:  You may do so.

12  (Audio played.)

13  Q.  Do you recall this conversation?

14  A.  I do.

15  Q.  Who were the participants in this phone call?

16  A.  Myself and P.G.

17  Q.  There's a reference to Rob.  Who is Rob a reference to?

18  A.  Rob is a reference to the undercover agent.

19  Q.  And had you met Rob before?

20  A.  I had.

21  Q.  What was the context of that?

22  A.  It was on a couple other investigations.

23  Q.  You made a reference to Cranley "fucking you left and

24  right."  What's that a reference to?

25  A.  It was a reference to some of the challenges that were

1    pretty much known within the city that, you know, he really

2    didn't want to see 435 Elm move forward with me, and he was

3    going out of his way to, in my opinion, to discourage me and

4    my abilities in certain circles that were important.

5         (Audio played.)

6    Q.   What did you understand the statement you referenced in

7    your network would round up a bunch of LLC checks to mean?

8    A.   That I needed to go out and get people to put money into

9    LLCs.

10   Q.   And what did you understand the statement, "You don't

11   want me to be like, sorry, Chin, love you but can't"?

12   A.   When I hear that statement, it's the epitome of my

13   motivation to assist.  It is that whether you donate or don't

14   donate, that it's going to have an impact on my advocacy for

15   you.  I mean, that's it.  I mean, to me that was very clear

16   that if I donated, he was going to support and be supportive

17   in my efforts, and if I didn't, he wasn't going to be

18   supportive.

19        (Audio played.)

20   Q.   Who did you understand North American to be a reference

21   to?

22   A.   It's North American Properties.  It's one of probably the

23   largest developer in the City of Cincinnati, one of the

24   largest developers in the country.

25   Q.   Who did you understand Uptown to be in reference to?

1    A.   Uptown Properties is owned by Dan Schimberg, is a pretty

2    significant developer in the City of Cincinnati.

3    Q.   Who do you believe Medpace was a reference to?

4    A.   That's a pretty significant corporation that's based in

5    Madisonville.

6    Q.   Is that in the City of Cincinnati?

7    A.   City of Cincinnati.

8    Q.   And who do you believe Healy was in reference to?

9    A.   Mike Healy, he's a local investor as well.

10   Q.   City of Cincinnati?

11   A.   City of Cincinnati.

12        (Audio played.)

13   Q.   What does the statement, "And then you're going to

14   deliver the goods before next Tuesday" mean to you?

15   A.   That I needed to have those LLCs before next Tuesday.

16   Q.   Now --

17   A.   Those contributions.  Sorry.

18   Q.   Now, did you continue to record telephone calls with

19   Sittenfeld moving forward?

20   A.   I did.

21        MR. SINGER:  Your Honor, permission to publish what's

22   previously been admitted into evidence as USA 21J.

23        THE COURT:  You may do so.

24        (Audio played.)

25   Q.   First of all, do you recall receiving that voicemail?

1    A.   No, but it's been a while.

2    Q.   And did you provide the recordings that you received to

3    Special Agent Holbrook?

4    A.   I did.

5    Q.   Okay.  At this time, were you aware whether or not Rob

6    and Brian had paid any contributions to Mr. Sittenfeld?

7    A.   No.

8    Q.   All right.  So what was the status of the 435 Elm Street

9    project as you entered 2019?

10   A.   It was, I mean, pretty much the same.  Not a lot had gone

11   on, and it was dragging.

12   Q.   Did there come a time that there was discussion about

13   moving the property from the city to the port?

14   A.   Yes.

15   Q.   Can you describe that?

16   A.   Yeah.  I believe I had gotten either a text or a call

17   from Laura Brunner, who was the CEO of the Port Authority.

18   She had said that she knew of my interest at 435 Elm, and she

19   wanted to work with me.  And I had known Laura for a few years

20   before that.

21       And that she assured me that she would be very, very

22   cooperative and, essentially, not -- I would be in a position,

23   because she knew that the city was asking me to get a partner,

24   and she alluded to the fact that the port would be that

25   partner for me.

1    And so, obviously, because of the complicated nuances

2    with the title of 435 Elm, the ultimate pathway to

3    redevelopment had -- for me had always been going through the

4    port to utilize their vehicles as a quasi public entity that

5    would help facilitate redevelopment.

6        So when she reached out to me and really urged me not to

7    contact city council people in opposition of the transfer, I

8    trusted in what she told me, and I didn't really engage

9    anybody to stop the transfer from the city to the

10   Port Authority.

11       MR. SINGER:  Your Honor, permission to publish what

12   has previously been admitted into evidence as 26A.

13       THE COURT:  You may do so.

14   (Audio played.)

15   Q.  Do you recall this conversation?

16   A.  I do.

17   Q.  Around what time do you recall that this conversation

18   occurred?

19   A.  I don't.  But after, obviously, I had started working

20   with the FBI.

21   Q.  Around what time did you start discussing with

22   Ms. Brunner transfer of the property from the city to the

23   port?

24   A.  Honestly, if you had something that could help refresh my

25   memory, that would be much appreciated.

1   Q.   Turn in your binder to 26B.

2   A.   You said 26?

3   Q.   26B.

4        MR. SINGER:  May I approach, Your Honor?

5        THE COURT:  You may.

6   Q.   Did that refresh your recollection as to the time you had

7   this conversation with Mr. Sittenfeld?

8   A.   It did.

9   Q.   When was it?

10  A.   So it was May of 2019.

11  Q.   Who were the participants in this call?

12  A.   Myself and P.G.

13  Q.   And was this around the time that you began considering

14  your support for transfer of the project from the city to the

15  port?

16  A.   That's correct.

17       (Audio played.)

18  Q.   There was a reference to, "From where we were with

19  Cranley."  What did you mean by that?

20  A.   Just referencing the challenges that I've had with the

21  mayor and the administration.

22  Q.   And then what did you mean by, "From where we are now,

23  we're hoping you'd help us out"?

24  A.   Well, there had just been progress.  It just seemed that

25  things had started to move forward.  Laura Brunner was

1    extremely engaging.  She wasn't before.  It just seemed like

2    things were starting to move.

3    Q.  Was it your understanding that Sittenfeld was helping

4    advance that progress in the city?

5    A.  Yes.  That was my understanding.

6    Q.  Now, prior to recording phone calls with Sittenfeld in

7    2018, was he involved at all in advancing the development

8    agreement of 435 in the city?

9    A.  No.

10       (Audio played.)

11   Q.  Was the 435 Elm ultimately transferred to the port?

12   A.  It was.

13   Q.  And what happened after the transfer?

14   A.  So after that transfer, I think that following week, I

15   had a meeting set up with Laura Brunner.  And at that time,

16   she -- in that meeting, she had handed me a paper that was a

17   mortgage release, it was a lien release.  And then she wanted

18   me to sign over my interest in 435 Elm.

19   Q.  Can you describe today whether or not you ever reached an

20   agreement with the port to develop 435?

21   A.  So this agreement hasn't been reached.  There's been no

22   agreements.  It's been -- it still continues to be litigated.

23       We just received -- my company's just received a

24   supportive ruling from a judge magistrate.  It's waiting in

25   the judge magistrate's office to be reaffirmed by the judge.

1    But honestly, you know, until there's a change in

2  leadership of the board -- I think Charlie Luken is the board

3  chair, and his law firm is Calfee, and they billed probably

4  $5 million of billable hours on this project.  I mean, there's

5  no incentive for them to settle anytime soon, so until that

6  board changes over, I don't see an agreement happening.

7        MR. SINGER:  No further questions at this time, Your

8  Honor.

9        THE COURT:  Thank you.  Would you like to take our

10  morning break now?

11        MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  Sounds

12  good.

13        THE COURT:  Ladies and gentlemen of the jury, it's

14  10:45.  Why don't you try to be back and ready to go by 11:05.

15    As I reminded you during all our breaks, please do not

16  discuss this case with each other.  Please do not do any

17  research about the facts or law at issue here.  Please do not

18  communicate with anyone else about this case, and please do

19  not let anyone else attempt to communicate with you.  If

20  anyone should attempt to do so, please let me know

21  immediately.

22    And please do not begin to form any final opinions on the

23  topics as to which you've been hearing evidence.  The time for

24  that will be after you've heard all of the evidence and heard

25  closing arguments.  So with that, you may take your morning

1    break.

2         (Jury out at 10:45 a.m.)

3         (Brief recess.)

4         THE COURT:  Are you ready to go with your

5    cross-examination?

6         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

7         THE COURT:  Very good.  All right.  Let's bring in

8    the jury.

9         While we're waiting, I'll just remind everyone in the

10   gallery about the Court's order about no use of electronic

11   devices in the courtroom.

12        (Jury in at 11:11 a.m.)

13        THE COURT:  Mr. Ndukwe, I'll remind you, sir, you

14   remain under oath.

15       Mr. Rittgers, you may proceed.

16        MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

17                   CROSS-EXAMINATION

18   BY MR. C. MATTHEW RITTGERS:

19   Q.  Mr. Ndukwe, you and P.G. first met back in 2010 at a

20   Bruegger's in Clifton.  Do you recall that?

21   A.  I believe so.

22   Q.  And before you ever made a single donation to P.G., you

23   two had become acquaintances back then in 2010 and '11 and

24   even 2012, right?

25   A.  Yeah.  He was an acquaintance.

1   Q.   And when you became interested in more of the commercial

2   real estate development, you had reached out to him, again,

3   before any donation had ever been made, and he introduced you

4   to Laura Brunner, who was then the president and CEO of the

5   Port Authority; is that correct?

6   A.   Honestly, I don't recall.

7   Q.   Would an email that P.G. sent to you and Mrs. Brunner

8   help refresh your recollection?

9   A.   Yeah.  I'm happy to take a look.

10   Q.   Could you, in the exhibit binder -- I might have it back

11   opened, but it's right behind you.

12        MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

13        THE COURT:  You may.

14   Q.   It's the second page of B100.

15        And if you flip to the second page, Mr. Ndukwe, there's

16   an email from P.G. to Laura Brunner, and I believe there's an

17   email address that is associated with you on that email,

18   correct?

19   A.   Yes.

20   Q.   Does that help refresh your recollection that back in

21   June of 2012, P.G. had introduced you to Mrs. Brunner back at

22   the Port Authority?

23   A.   Yes.

24   Q.   And you had never given him a single donation or anything

25   at that point, correct?

1    A.   Not that I recall.

2    Q.   Okay.  And you two, over the past 10 years, you

3    socialized together, correct?

4    A.   Define socialize.

5    Q.   Well, you've been out to drinks with P.G.?

6    A.   Maybe once, twice.

7    Q.   You've been to his apartment downtown?

8    A.   I can recall once.

9    Q.   He's been to your house?

10   A.   Condo for a Super Bowl party, yeah, I believe so.

11   Q.   You sent him pictures of your child right after your

12   child was born?

13   A.   I'm sorry?

14   Q.   You sent P.G. pictures of your child after your child was

15   born, via text?

16   A.   I'm a proud father.  I'm sure if someone connected with

17   me during that time, I shared a photo with them, yeah.

18   Q.   And he did the same thing.  He would send photos to you

19   of his first son George.  He sent pictures of George to you

20   via text?

21   A.   I don't recall that, but...

22   Q.   If you could flip to Defendant's Exhibit 76 in that

23   binder, it might help refresh your recollection a little.

24   A.   D76?

25   Q.   Yes.  Do you recall receiving that picture of the baby in

1    a hospital gown from P.G. about two years ago, two and a half

2    years ago?

3    A.   I do now from seeing the photo, yeah.

4    Q.   And you asked him something.  I think you said something

5    like, "How is mom doing," or something like that?

6    A.   Yeah.

7    Q.   And you had texted him pictures immediately after your

8    son was born too, I believe, on your chest, right?

9    A.   Like I said, I'm a very proud father.

10   Q.   Sure.

11   A.   So I did.

12   Q.   You two had gone to boxing matches together, I believe

13   down to The Banks here in Cincinnati.  Do you remember that?

14   A.   If you say so.

15   Q.   Over the years, you became a personal donor to P.G.,

16   correct?  You personally would donate in your name?

17   A.   Correct.

18   Q.   And even when P.G. ran for U.S. Senate, I think you

19   donated -- personally you donated $5,000, correct?  Do you

20   remember that?

21   A.   I believe so, but if you have anything you can show me

22   that can refresh my memory, I'd appreciate that.

23   Q.   Okay.  I will, if we need that.  You had served as a

24   host, on a host level, for fundraisers for P.G. in the past

25   too as well, right?

1    A.   I believe so.

2    Q.   Do you recall, even as early as March of 2017, being

3    listed as a host, and agreeing to be listed as a host at a

4    person by the name of Doug Groh's apartment for P.G.?

5    A.   I do.

6    Q.   And on that event, you said that you and your father were

7    going to support P.G. at that host level, correct?

8    A.   Honestly, I don't recall that, but...

9          MR. C. MATTHEW RITTGERS:  I'm going to refer to

10   what's been marked as Defense Exhibit 650.  I'm just going to

11   use it just to refresh Mr. Ndukwe's recollection.

12       And I'm going to hand Mr. Ndukwe Defendant's 650 and also

13   Defendant Exhibit 295, which is the attachment of this email.

14       Would you guys like a copy?  Okay.  Your Honor, would you

15   like a copy?  I have one on this one, but they're also in the

16   binders.

17       THE COURT:  They are in the binders?

18       MR. C. MATTHEW RITTGERS:  Yes, they are.  May I

19   approach, Your Honor, the witness?

20       THE COURT:  You may.

21    Q.   I'll give you a moment to review that.

22       THE COURT:  Is it 650, Mr. Rittgers?

23       MR. C. MATTHEW RITTGERS:  Yes, Your Honor, and 295

24   will accompany that.  I don't know why they're so far apart.

25    Q.   Does that help refresh your recollection of what you

NDUKWE - CROSS

1    stated to Mr. Sittenfeld back in March of 2017 about the

2    fundraiser?

3    A.   I do.

4    Q.   And it is true that you told Mr. Sittenfeld that your

5    father and you were going to support him, correct?

6    A.   From that email, yes.

7    Q.   You didn't say, "I'm giving my dad the money. It's all

8    my money." You said, "My father and I are going to support

9    you," correct?

10    A.   Yeah. That email -- should I read the email, or --

11    Q.   You can read it.

12    A.   "I'm playing catchup on my email. My father and myself

13    will support you at the $1,100 level. Feel free to place

14    names on invitations but no worries."

15    Q.   Thank you. And then Defendant's Exhibit 295 is that

16    invitation, I believe, that you're referring to, in which

17    you're listed as a host, "Please join hosts," and there are

18    several names, and you're one of the names, correct?

19    A.   That's correct.

20    Q.   And that was in March of 2017, right? If the email would

21    help you, I don't know that it's on there.

22    A.   Yeah, the date isn't on this, this document we're

23    reading.

24    Q.   That document, it says March 23rd, but there's not a

25    year, correct?

1    A.   There's no year.

2    Q.   But this corresponds to the email which is dated

3    March 2nd of 2017, right?

4    A.   You want me to read the email?

5    Q.   I'm just asking you if this was back in 2017; if you

6    recall?

7    A.   Yes.  This email thread is 2017.

8    Q.   Thank you.  You had also offered to host in 2018 for

9    P.G., correct?

10   A.   If you have something I can -- that could help refresh my

11   memory, I would greatly appreciate it.

12          MR. C. MATTHEW RITTGERS:  Sure.  Your Honor, this has

13   been previously marked and is in the exhibits as Defendant's

14   Exhibit 54.  May I approach, Your Honor?

15          THE COURT:  You may.

16   Q.   It's at the bottom, and there's a date on this text

17   thread between you and Mr. Sittenfeld.  Does that help refresh

18   your recollection as to you're asking him to be on the host

19   level at his next fundraiser?

20   A.   Yes.

21   Q.   That was January of 2018?

22   A.   Yes.

23   Q.   Was Agent Holbrook aware of that, do you know?  Did you

24   tell Agent Holbrook about that request in January of 2018?

25   A.   I don't recall.

1   Q.   Okay.   The FBI -- you began working with the FBI in

2   March of 2018, right?

3   A.   The specific dates -- that sounds about right, but...

4   Q.   And you referenced a donation to P.G., on direct, from

5   one of your associates, Tung, is it Nguyen?

6   A.   Nguyen, Tung Nguyen.

7   Q.   And Mr. Nguyen -- you indicated that you told P.G. that

8   that was actually your money, despite the donation being from

9   Mr. Nguyen.   Is that what I heard on direct?

10  A.   That's correct.

11  Q.   Did you tell Agent Holbrook that?

12  A.   Yeah, after the fact.

13  Q.   So that was not done at the FBI instruction, you just did

14  that after the proffer agreement that you had discussed with

15  these federal prosecutors?

16  A.   Yeah, I didn't.

17  Q.   What's odd to me about that is that the first phone call,

18  one of the first recorded phone calls -- do you remember when

19  you were testifying on direct, and the prosecutor played that

20  one segment in the October 30th phone call, and you mentioned

21  the fact that Albert Smitherman and Chris Smitherman were

22  telling you that they wanted the same guy to support them,

23  right?

24  A.   That's right.

25  Q.   The language you used with P.G. wasn't that they wanted

1    me to support them through that man.  The language you used

2    was they wanted that man, Mr. Nguyen, to support me too,

3    right?

4              MR. SINGER:  Objection.  Compound.  Multiple

5    questions in there.

6              THE COURT:  Can you rephrase?

7              MR. C. MATTHEW RITTGERS:  Sure.

8    Q.  The language you used with P.G. on a recorded call was

9    that Albert Smitherman and Christopher Smitherman wanted the

10   same guy, that being Mr. Nguyen, to support them too, correct?

11   A.  That's correct.

12   Q.  And P.G. had no idea you were recording his calls on

13   October 26th of 2018 or October 30th of 2018, right?

14   A.  That's correct.

15   Q.  And if there had been any wrongdoing in the past, you

16   could have said, do you remember that time when, and then

17   mentioned some fact that was wrong or corrupt on any recorded

18   call and see what P.G. had to say.  That could have been

19   stated, right?

20   A.  I'm a little confused by the question.  I'm sorry.

21   Q.  If it is true that P.G. actually knew that this money was

22   given to Mr. Nguyen and then donated to P.G. really from you

23   is what I believe I gathered on direct is that that was your

24   money.  It's the first I've heard of that, so I'm delving into

25   that.

1  A.  That's correct.  I did give one of my associates -- I

2  mean, listen, at the time, I was extremely paranoid about

3  putting my name, my personal name, on any contributions moving

4  forward just based on the experience I had had with

5  Mayor Cranley and Yvette Simpson that I disclosed to the

6  Court.

7  Q.  There were times when P.G. had refunded donations that

8  were given to you.  For example, when he ran for senate, he

9  lost that primary campaign, and he repeatedly texted you to

10 try to give you back and did give you back money that you had

11 donated, correct?

12 A.  I don't recall, but I'm happy to look at something if --

13 Q.  If you could look at Defendant's Exhibit 711, please.

14 A.  D711?

15 Q.  D711.

16        MR. C. MATTHEW RITTGERS:  Your Honor, if I may

17 approach, it might be in another binder.

18        THE COURT:  You may.  I don't think mine go up to

19 700.

20        MR. C. MATTHEW RITTGERS:  You know what, I might have

21 to approach.

22        THE COURT:  I'm just suggesting that mine do not go

23 up to 700 --

24        MR. C. MATTHEW RITTGERS:  I agree.  I have an

25 electronic format.  Can I display it for just the witness?

1          THE COURT:  It will show up on counsel table.

2     Q.  Mr. Ndukwe, this is an extraction of text messages

3     between your phone and P.G.'s phone, and I'm going to scroll

4     down to page 7.

5          THE COURT:  Can you speak up just a little bit,

6     Mr. Rittgers.

7          MR. C. MATTHEW RITTGERS:  Yes.  I'm scrolling -- it's

8     the phone extraction that I'm using to refresh his

9     recollection that we received from the government in

10    discovery.

11         THE COURT:  Very good.

12         MR. C. MATTHEW RITTGERS:  I'm scrolling down to

13    page 7.

14    Q.  Mr. Ndukwe, do you see -- I don't know if I can highlight

15    it, but where my hand cursor is, "Hey brother," on April 14th

16    of 2016.  Do you see that text exchange?

17    A.  Yes, I do.

18    Q.  And then even right below that, again, on April 26th,

19    "Hey, man, I still have this $2,300 check for you."

20         Does that refresh your recollection as to P.G. trying to

21    return donations back in 2016 to you that you had donated to

22    him?

23    A.  Yes.  Yeah.

24    Q.  Okay.  You served on other candidates' host committees as

25    well, correct?

1  A.  I believe so.

2  Q.  Mayor John Cranley is one example, right?

3  A.  Yeah.  If you say so.

4  Q.  You don't recall serving on Mayor Cranley's host

5  committees?

6  A.  I mean, you know, it seems like the host committee

7  process was, hey, can I put your name on there, and I probably

8  said yes to a number of people over the years, but... so yeah,

9  but --

10  Q.  Okay.

11  A.  -- honestly, I can't recall which fundraiser that you're

12  referring to at this moment.

13  Q.  You support a lot of candidates, some in Kentucky, some

14  in Columbus, some in Cincinnati?

15  A.  I have in the past, yes.

16  Q.  And to the tune -- in Kentucky and Columbus, to the tune

17  of $10,000 to $25,000, correct?

18  A.  If you have a list of my campaign contributions, I'm

19  happy to review.

20  Q.  Okay.  Well, let's talk about early 2018, okay, early

21  2018.

22  A.  Okay.

23  Q.  In January 2018, you were on the other end of a secretly

24  recorded phone call, that the FBI secretly recorded you,

25  correct?

1    A.   If you say so, sure.

2    Q.   Do you not know that, that James Semler had secretly

3    recorded you?

4    A.   Yeah.  No, I knew that.

5    Q.   Okay.  And you were ultimately approached, then, in

6    January of 2018 by the FBI, correct?

7    A.   Correct.

8    Q.   And after that secret recording and after you were

9    approached by the FBI, that's when you contacted a criminal

10   defense attorney by the name of Scott Crosswell, correct?

11   A.   So I'd actually reached out to another friend of mine,

12   who referred me to Scott, because he said, hey, if I was you,

13   I would not meet with anyone in the federal government by

14   yourself.  And so that's what I did.

15   Q.   And ultimately, you spoke with Mr. Crosswell, correct?

16   A.   That's correct.

17   Q.   And you consulted with him?

18   A.   That's correct.

19   Q.   And you ended up signing what we've already heard

20   referenced, which is a proffer agreement, correct?

21   A.   I signed a proffer agreement, that's correct.

22   Q.   All right.  And do you remember the date of the proffer

23   agreement?

24   A.   I don't, but if you have a date of it, I'm happy to take

25   a look.

```
 1          MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?
 2    This has previously been marked as Defendant's Exhibit 652.
 3    Q.  All right.  If you'd take a moment just to review this,
 4    and if you'd flip to the last page, you can see your signature
 5    and the dates on the first page?
 6    A.  Yes.  March 12, 2018.
 7    Q.  All right.  And this was something that we've discussed.
 8    It tells you that the federal government was investigating
 9    criminal activity related to structuring banking transactions,
10    money laundering, and aggravated identity theft, correct?
11    A.  I mean, if that's what it says, that's what it says.
12    Q.  Yeah.  It's right in front of you, in the first sentence.
13    Can you just agree and look to refresh your recollection
14    there?
15    A.  Okay.
16    Q.  Is that true?
17    A.  Is what true?
18    Q.  That they were alleging you of criminal activity
19    involving structured banking transactions, money laundering,
20    and aggravated identity theft?
21    A.  Those are all words that I did not hear at the time.
22    Scott Crosswell, my attorney, and the U.S. Attorney had come
23    to this proffer agreement that at the time, you know, I
24    signed.  I mean, so -- I mean, if it's in there, it's in
25    there, so...
```

1    Q.   Before you signed it -- you read everything before you

2    signed it, right?

3    A.   I mean, honestly, it was a pretty stressful time.  Yeah,

4    I read it but, you know, I signed it.

5    Q.   I have no doubt it was stressful.  And the reason I want

6    to get into this is to talk about how much pressure they

7    exerted over you.  I'm not doing this to embarrass you.

8    A.   That's not really -- that's not the stress I was talking

9    about, but...

10   Q.   Okay.

11   A.   I'm being honest with you.  Scott Crosswell and the

12   U.S. Attorney, they came to an agreement.  They're attorneys,

13   I'm not, and I signed an agreement before I started speaking

14   with them.

15   Q.   Can you look at the last page, please.

16        And above your signature, you actually expressly

17   acknowledge that you read this proffer agreement in its

18   entirety and reviewed every paragraph in this agreement,

19   correct?

20   A.   That's correct.

21   Q.   And that is your signature, correct?

22   A.   That is.

23   Q.   And you dated it March 13th of 2018, correct?

24   A.   That's right.

25   Q.   All right.  If you go back to the very first sentence,

1    the alleged criminal activity that you knew at the time, in

2    March of 2018, was structured banking transactions, money

3    laundering, and aggravated identity theft, correct?

4    A.   Like I said, I'm not an attorney.  Scott Crosswell is the

5    counsel.  He was the one that met with the U.S. Attorney's

6    Office and demanded that I have some type of agreement before

7    I started speaking with the FBI.

8    Q.   Is that what the document says that's in front of you?

9    A.   I mean, you have the document.  I mean --

10             MR. SINGER:  Asked and answered, Your Honor.

11             MR. C. MATTHEW RITTGERS:  He hasn't answered the

12   question, Your Honor.

13             THE COURT:  Yeah.  He hasn't answered.  As I

14   understand the question, the question is what does the

15   document say?

16             MR. C. MATTHEW RITTGERS:  Yes, the first sentence.

17             MR. SINGER:  Your Honor, the document is not in

18   evidence.  He gave it to him to refresh his recollection.  It

19   refreshed his recollection.  He just needs to ask the

20   question.

21             THE COURT:  So that objection is sustained.  As we

22   discussed, you can use documents to refresh his recollection,

23   but unless you're admitting this document into evidence, you

24   can't just have him read the document.

25        The question, I think, is does he recall now that the

1    proffer agreement involved whatever you just said.

2            MR. C. MATTHEW RITTGERS:  Okay.

3            THE COURT:  So you can ask a question about his

4    recollection, unless -- is this document in evidence?

5            MR. C. MATTHEW RITTGERS:  It's not, but I can move

6    for it to be entered into evidence.

7            MR. SINGER:  No objection, Your Honor.

8            THE COURT:  All right.  Defendant's Exhibit D652 is

9    admitted.

10            MR. C. MATTHEW RITTGERS:  Your Honor, if I may

11    display the first paragraph of Defendant's Exhibit D52?

12            THE COURT:  Did 652?

13            MR. C. MATTHEW RITTGERS:  652, yes, Your Honor.

14            THE COURT:  You may.

15    Q.  I've highlighted what we've been talking about,

16    Mr. Ndukwe --

17            COURTROOM DEPUTY:  Do you want it published?

18            MR. C. MATTHEW RITTGERS:  If the Court would allow it

19    to be published.

20            THE COURT:  You may.  Yes.  It's admitted.

21    Q.  Mr. Ndukwe, this is what the government told you they

22    were investigating you for, correct, structured banking

23    transactions, money laundering, and aggravated identity theft?

24    A.  Listen, none of that was ever discussed in our

25    discussion.  Scott Crosswell and the U.S. Attorneys had those

1    discussions.

2    Q.  All right.

3    A.  So...

4    Q.  Mr. Crosswell told you, and I assume when you read -- you

5    did read this, correct, before you signed it?

6    A.  I mean, I got to be honest, I vaguely remember this

7    document but, yeah, I did sign it.

8    Q.  This is the last page of this document, and that is your

9    signature, correct?

10    A.  That's correct.

11    Q.  And it says that you read it in its entirety and reviewed

12    every paragraph?

13    A.  Correct.  So yeah, that is my signature.  I vaguely

14    remember it, but yeah.

15    Q.  All right.  And in this document, the government is

16    telling you in this agreement that they won't use your

17    statement against you in their case in chief, but at trial, in

18    connection with your activities and offenses, they can use it

19    to cross-examine you, correct, your statements?

20    A.  If that's what it says.

21    Q.  I'm referring to page 2 of the document that you signed.

22    The proffer is, essentially, plea negotiations between your

23    criminal defense lawyer and you and the federal government,

24    correct?

25            MR. SINGER:  Objection, Your Honor.

```
 1            THE COURT:  What's the basis?

 2            MR. SINGER:  It's a mischaracterization.  It's not

 3    plea negotiations.

 4            MR. C. MATTHEW RITTGERS:  Your Honor, if I --

 5            THE COURT:  So let's stop.  So I think right now the

 6    question is what did he understand it to be.  And you've given

 7    him a question about what he understands it to be, so I'll

 8    allow him to answer whether he understands it to be plea

 9    negotiations.

10    A.  Yeah.  In the many conversations I had with the FBI and

11    the attorneys with my counsel present, never once did anybody

12    say that they were going to prosecute me for anything.

13        They wanted to ask -- they asked me about my donations.

14    They asked about is there anything else you want to tell us,

15    because a part of this is you've got to be truthful.  And if

16    you are truthful, then there's nothing that you say that could

17    be used against you.  So that's what I did.  I told them about

18    that.

19        And I told them -- "that" being the donations.  And I

20    told them about my utilization of the IRA that wasn't

21    according to the standard process.

22    Q.  Would you agree that this document, this is the only

23    right of the agreement between the federal prosecutor's office

24    and FBI and you that outlined --

25    A.  Yeah.  It's the only thing I ever signed.
```

1   Q.   They have never released you and said in writing anywhere

2   we're not going to prosecute you or any of your friends,

3   correct?

4   A.   Sorry.  I don't understand the question.

5   Q.   This document -- we'll just start with this.  This

6   document is the only thing --

7   A.   Is this the same question?  I'm sorry.

8           THE COURT:  Starting over.  Blank slate.  Ask the

9   question.  Listen to the question, see if you can answer it.

10  Q.   This is the only document that outlines your cooperation

11  with the federal government, correct?

12  A.   That's correct.

13  Q.   And if you look, the document itself says, "This proffer

14  is part of potential plea negotiations between the United

15  States, Mr. Ndukwe, and his counsel."  And I'm referring you

16  to page 2, paragraph 5, the first sentence.

17          MR. C. MATTHEW RITTGERS:  And if I could display it

18  for the jury, Your Honor?

19          THE COURT:  It already is.  But I think you misread

20  that.  I think it's "proffer as part of potential plea

21  discussions --" you said negotiations -- "between the United

22  States, Mr. Ndukwe, and his counsel."

23          MR. C. MATTHEW RITTGERS:  Thank you.

24  Q.   That's what the document says, right?

25  A.   Yes, that's what it says.

1  Q.   And it goes on to say, in the same paragraph, that you

2  understand that it does not bind the federal government or the

3  FBI to even enter into any plea agreement with you, correct?

4  A.   That's what it says.

5  Q.   And paragraph 7 in this document gives the United States,

6  the FBI, and the federal prosecutors, the express right to

7  pursue any and all investigative leads derived from your

8  statements.  And you know what that means, right?

9  A.   Yes.

10 Q.   Meaning if you told them that there was a banking

11 transaction between Fifth Third and yourself, Agent Holbrook,

12 one of the federal prosecutors can then subpoena the records,

13 and they could use those records against you, correct?

14 A.   Honestly, that sounds more like a legal question, and I'm

15 not an attorney.  But I don't know.

16 Q.   The government put in writing, and you agreed, and they

17 felt it important enough to put this in writing, that they

18 reserve the right to charge you with any federal offense,

19 crime, that becomes known to the United States in the course

20 of their investigation, correct?

21 A.   Yeah.  I mean, it looks like that's in there.

22 Q.   And then they tell you that they are also expressly

23 reserving the right to -- in your own trial, to impeach you or

24 cross-examine you with the statements that you gave them

25 pursuant to the proffer, that they can use those statements in

1    your own trial against you, correct?

2    A.   If that's what it says, then that's the case.

3    Q.   So with this agreement, they hold the possibility of

4    prosecution open, over your head, correct?

5    A.   I mean, honestly, like I just said before, Scott

6    Crosswell, my attorney, and the FBI and the state's attorney,

7    they're the ones that put this together.

8    Q.   On March 13th, do you remember sitting down with

9    Mr. Singer, Mrs. Glatfelter, and Agent Holbrook with

10   Mr. Crosswell?

11   A.   I do.  I believe so.

12   Q.   And they had questions for you during that meeting,

13   correct?

14   A.   That's right.

15   Q.   And that's when you talked about the IRA withdrawal,

16   correct?

17   A.   Yeah, using the IRA.

18   Q.   And that was a friend in Columbus received $5,000, and in

19   exchange for that, he gave money back through various banking

20   institutions to you under the reporting requirements of

21   $10,000, correct?

22   A.   Honestly, I don't recall the nuances of it, but I do

23   recall utilizing the IRA improperly.  And my understanding is

24   it's a fine that you have to pay, or something along those

25   lines, but yeah.

1   Q.  Structuring money.  You told the federal government that

2   you were complicit with your friend in structuring that money,

3   correct?

4           MR. SINGER:  Objection.  Mischaracterization.

5           MR. C. MATTHEW RITTGERS:  I'm asking him.

6           THE COURT:  Well, he's asking the question.  He's

7   asking what you told the government.

8   A.  I just told them the truth.  You know, I sat down with

9   them and I told them the truth of what's going on.  No one

10  ever used the word structuring.  No one ever used the word

11  money laundering.  No one ever used those words, but I did

12  tell them the truth.

13  Q.  And that is true.  The truth is is that your friend and

14  you kept the money under the $10,000 reporting requirement

15  limit when it came back to you, right?

16  A.  I don't recall that.

17  Q.  Okay.  When you filled out the IRA withdrawal request,

18  you had to put a stated reason, right?

19  A.  Again, it's been so long, I don't recall that.

20  Q.  Did the federal government or Agent Holbrook indicate

21  that they had gone and used their subpoena power to get that

22  IRA withdrawal request?

23  A.  If they did, you know, I don't remember that.

24  Q.  They talked to you about creating money orders and

25  cashier's checks to look different to hide the source of

1    funds, right?

2    A.   Yeah.  I disclosed that to them, yeah.

3    Q.   And by the way, none of those money orders, I think there

4    were -- and cashier's checks, there are almost 50 of them,

5    none of those were to P.G. Sittenfeld, correct?

6    A.   I'm not -- I don't recall.  I really don't.

7    Q.   Fifteen were to John Cranley, correct?

8    A.   That sounds about right.

9    Q.   Some of them were to a governor race down in Kentucky,

10   right?

11   A.   I believe so.

12   Q.   Some of them were to a mayoral race up in Columbus,

13   right?

14   A.   That's right.

15   Q.   Some of them were other elected officials here.  You

16   mentioned something about a J. Alexander's meeting, correct?

17   A.   Correct.  That sounds about right, yeah.

18   Q.   And at that J. Alexander's meeting, the government asked

19   your lawyer and you to follow up with other documentation from

20   that meeting.  There's a picture of you with some elected

21   officials, right?

22   A.   That's correct.

23   Q.   Not P.G.  He was not there, correct?

24   A.   No, he wasn't.

25   Q.   They asked you questions, and you talked to them about

1  wiring money to a habitual gambler in New York who was known

2  to win and lose hundreds of thousands of dollars at once,

3  correct?

4  A.   A friend of a friend, yeah.

5  Q.   And you indicated you didn't know what he needed the

6  money for, you thought he bought a house with it, but he wired

7  you money back?

8  A.   Correct.

9  Q.   After all these things were discussed, that's when the

10  FBI asked you if you'd work for them, correct?

11  A.   I don't remember the timing being like that.  You know,

12  they asked about what I was receiving in return for the

13  contributions, and I shared my experience.  And they asked if,

14  you know, I would be willing to assist.

15  Q.   And you started naming names right then in March 2018,

16  correct?

17  A.   What do you mean by naming names?

18  Q.   At that first meeting with these federal prosecutors and

19  Agent Holbrook, you mentioned John Cranley, correct?

20  A.   They actually mentioned the contributions to John

21  Cranley, yeah.

22  Q.   And you talked about John Cranley as well.  That was part

23  of the picture you provided was with you and Mr. Cranley,

24  correct?

25  A.   That's correct, yeah.

1  Q.  And there were other elected officials, names that you

2  also mentioned and that they mentioned, correct?

3  A.  That's correct.

4  Q.  And as we've already discussed, you mentioned elected

5  officials in Columbus, all the way as far south as Kentucky,

6  right?

7  A.  That's correct.

8  Q.  And you mentioned developers who you thought had bad

9  reputations, correct?

10  A.  No.  I don't recall that, but...

11  Q.  Jake and Alex Worm.  Do you remember talking to them

12  about Jake and Alex Worm in that meeting?

13  A.  I did share some experiences with -- they are partners of

14  mine, yes.

15  Q.  They were partners of yours, but that relationship has

16  ended, right?

17  A.  That's correct, yeah.

18  Q.  And you mentioned their names in that meeting, correct?

19  A.  I don't recall the specifics, but yeah.

20  Q.  You mentioned Matt Williams out of Columbus with the IRA

21  thing, right?

22  A.  Yes.

23  Q.  And Alicia Zubikowski, correct?

24  A.  Yes.

25  Q.  Friends of yours?

1   A.   Friends, yeah.

2   Q.   But you mentioned them in connection with this wiring

3   transactions, right?

4   A.   Yeah.  They'd asked me about the transactions, and I was

5   very transparent about who they went to and how I used the IRA

6   improperly.

7   Q.   There were lots of names mentioned with these federal

8   prosecutors and Agent Holbrook, none of them were P.G.'s, in

9   that meeting?

10  A.   Not that I recall.

11  Q.   And none of those people that were named in that meeting

12  have been charged, correct?

13  A.   Not that I can recall.

14  Q.   Nor have you been?

15  A.   Have I been charged?

16  Q.   You have not been charged is what I'm saying, correct?

17  A.   That's correct.

18  Q.   And to this day, the federal government, FBI, they have

19  not given you anything in writing saying, hey, we're not going

20  to charge you, don't worry about it?

21  A.   No.  No.  I've never -- the proffer agreement that I

22  signed way back when was the only document that I recall

23  signing.

24  Q.   Did you know that P.G. became a target of this

25  investigation in October of 2018?

```
 1              MR. SINGER:  Objection, Your Honor.  That's a term of

 2     art.

 3              THE COURT:  Well, fair point.  You want to explain

 4     what you mean by "target"?

 5     Q.  Do you know what target means?

 6     A.  Please explain.

 7     Q.  All right.  It -- I believe it means P.G. has become a

 8     person of interest of the FBI, and then when you have

 9     communication with him, it's supposed to be recorded, and they

10     set up an entire operation around him?

11     A.  I believe that was the timeline, I believe.

12     Q.  And so that September 21st phone call that the government

13     talked about on direct of 2018, you had been working with the

14     FBI at that point for half of a year, correct?

15     A.  I believe so.

16     Q.  There was -- that call was not recorded, correct?

17     A.  That he called me?  The call that he called me?

18     Q.  September?

19     A.  Yes, that is correct.  That was not recorded.

20     Q.  And you didn't have to record it because he wasn't a

21     target?

22     A.  Correct.

23     Q.  And there were then three calls that you initiated

24     between October 26th and November 7th, which was the Nada

25     lunch when you introduced Rob to P.G., correct?
```

1  A.  That sounds about right, but if you have anything that

2  can refresh my memory, I'm happy to take a look at it.

3  Q.  Sure.  Before we jump into those calls, the FBI Agent

4  Holbrook, or maybe other agents, they sat down with you, and

5  they talked to you about the personas of the individuals that

6  they wanted you to introduce to P.G., right?

7  A.  I'm sorry.  Persona like the people?  They mentioned that

8  they had undercover agents that were going to be represented

9  as my investors.  Is that what you're referring to?

10  Q.  Yes.  Thank you.  The fake story is Rob and Brian, right?

11  A.  That's correct.

12  Q.  And Rob and Brian were posing as your backers, your

13  financial backers, right?

14  A.  That's correct.

15  Q.  And these guys were from out of the state, correct?

16  A.  That's correct.

17  Q.  Rob, in particular, had cut his teeth in real estate

18  years and years ago down in Georgia, right?  That was the

19  story?

20  A.  I don't recall the specifics, but...

21  Q.  The overall sense is it's your deal, 435 Elm, but it's

22  Rob and Brian's money coming in to support you financially,

23  right?

24  A.  Essentially, yes.

25  Q.  And by the way, you had two other deals that were before

1    council in 2018 and 2019, correct?

2    A.   If you can tell me specifically which ones those were?

3    Q.   You put up a hotel in Mt. Auburn, right?

4    A.   I did.

5    Q.   You did a low-income housing project in Avondale?

6    A.   Yes, I did.

7    Q.   So there were two other projects that required city

8    support in 2018 and 2019, correct?

9    A.   That's correct.

10   Q.   No accusation of any wrongdoing or corruption on those

11   two projects that Rob and Brian were not involved in?

12   A.   So, in my opinion, I think the City of Cincinnati has

13   been extremely corrupt for a very long time, so I'm not sure

14   how to answer that statement other than that.

15   Q.   All right.  So Rob and Brian, out-of-town money, they can

16   invest wherever they want in the country, right?

17   A.   Okay.

18   Q.   I mean, do you agree with that?  That's the story?

19   A.   I guess I'm confused by the question.  Are you -- he's

20   asking the question about what the story of he -- what's the

21   question, I guess?

22             THE COURT:  Could you rephrase.

23             MR. C. MATTHEW RITTGERS:  I'll rephrase.

24   Q.   The story that Agent Holbrook wanted you to partake in is

25   that Rob and Brian were from out of town, and they could

1    invest their money anywhere, but they were considering

2    investing it here in 435 Elm, right?

3    A.   That's correct.

4    Q.   And so on 10/26, October 26th of 2018, and this is

5    corresponding with USA Exhibit 12B, you initiated a phone call

6    to P.G., correct?

7    A.   Is -- should I review, or would you mind pulling up 12B?

8         MR. C. MATTHEW RITTGERS:  Sure.  Could we please pull

9    up 12B.

10   Q.   All right.  You should see 12B, Mr. Ndukwe.  It's an FBI

11   transcript from October 26th of 2018.  I'm going to scroll

12   down, and it will show the participants, your name and

13   Mr. Sittenfeld's name, or both, appearing.  Does that help

14   refresh your recollection of this first phone call?

15   A.   Can we play the call?

16   Q.   Sure.  We can scroll down.  You can read as much as you

17   want.

18        THE COURT:  You should have 12B in one of the white

19   notebooks.

20        THE WITNESS:  I think it's on the screen, I believe.

21        THE COURT:  Yeah, but it's only in pieces.  You said

22   you wanted to see the whole thing.  It's in one of these

23   books, 12B.

24        MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

25        THE COURT:  You may.

1    A.   Please do.  There's like six books here.

2         THE COURT:  There's also one behind you, sir.

3    A.   Yep.

4    Q.   That Exhibit 12B reflects the first recorded call in this

5    undercover operation against P.G., which occurred on

6    October 26th of 2018, okay?

7    A.   Okay.

8    Q.   Before you initiated that call, you had spoken with Agent

9    Holbrook or other FBI agents, correct?

10   A.   That's right.

11   Q.   And that's when they talked about Rob and Brian with you,

12   and who they were going to be to P.G., how you were going to

13   introduce them, right?

14   A.   Well, no.  Actually, I don't know the timing, but what I

15   remember is having -- getting the call from P.G., him talking

16   about every other developer was going to donate $10,000, and

17   that was his expectation of me.

18        And then I also remember having this discussion around

19   LLCs and limits, and along those lines.

20   Q.   And in that call, October 26th, the first person to bring

21   up the term LLC was you to P.G., right?

22   A.   I don't recall that.

23   Q.   Can you take a quick look?  It's a very short call.  I

24   can tell you it's at the bottom of page 3, and you're

25   referring to Rob and Brian.

```
 1   A.   Yeah.  So -- "and I know they have a ton of different
 2   LLCs"?
 3   Q.   Yeah.
 4   A.   Is that what you're talking about?
 5   Q.   Yes.
 6   A.   Yeah.
 7   Q.   You're referring to Rob and Brian, right?
 8   A.   Well, I brought that up based on his request to put them
 9   in different LLCs.
10   Q.   I'm asking you, though, what you're referring to here, "A
11   ton of different LLCs," that one first, that was brought up by
12   you first on this phone call, right?
13   A.   In this specific call, yes.
14   Q.   Yeah.  And you're referring to your investors, which we
15   know now are undercover FBI agents, which is Rob or Brian,
16   right?
17   A.   That's correct.
18   Q.   And you also brought up a law change in November on this
19   phone call.  P.G. did not bring that up.  You brought that up
20   to P.G. on this very first phone call, "They're going to be
21   involved with 435 Elm, and we want to tee up getting them to
22   you before they change everything in November," right?
23   A.   On this specific call, yes.
24   Q.   And this is the first recorded phone call in this entire
25   case, right?
```

1    A.   With P.G., yes.

2    Q.   Yes.  And then on October 30th, which is the next tab,

3    it's 13B, four days later you initiated another phone call to

4    P.G. at the request of the FBI, correct?

5    A.   That's correct.

6    Q.   And you, again, tell P.G. that Rob and Brian might be

7    willing to invest in 435 Elm, correct?  It's at the top of

8    page 2, if you want to actually see the quote.

9    A.   That's correct.

10   Q.   And in this call, this is when you talk about John

11   Cranley treating you unfairly, right?

12   A.   I believe so.

13   Q.   And it's in this call that we heard that quote, "Love you

14   but can't," right?

15   A.   Do you know where that quote is?

16   Q.   Yeah.  I can find it for you, sure.  It's at the bottom

17   of page 2.

18   A.   Okay.

19   Q.   So on this call, the call begins with you telling P.G.

20   that the current mayor has been hurting you, correct?

21   A.   Correct.

22   Q.   And it goes into P.G. talking about how he loves what you

23   do as someone revitalizing the city and creating jobs, right?

24   A.   Correct.

25   Q.   And he's also talking about fundraising, and raising

1    money so that he can become a successful candidate, right?

2    A.   That's correct.

3    Q.   And when you tell him on this phone call that your

4    mentor, Albert Smitherman and Christopher Smitherman, had

5    called you to say that they want the same guy to support them

6    too, P.G. said, "That's weird and questionable legality."

7    That was his response?

8    A.   Yes.

9    Q.   And on the same call, you then mention again that these

10   guys, meaning Rob and Brian, they've got a ton of LLCs, right?

11   A.   That's right.

12   Q.   And you asked P.G. again on this call, "When is the drop

13   dead date for this LLC law change," right?

14   A.   That's right.

15   Q.   And that's your right to ask about a law change, correct?

16   A.   Well, he brought it up a number of times before.

17   Q.   On this phone call and the call before it, the person who

18   brought it up was you, right?

19   A.   I don't know about the call before, but...

20   Q.   October 26th?

21   A.   Oh, yeah.  Yeah.  Uh-huh.

22   Q.   And then there's a third phone call before the

23   November 7th meeting, on November 2nd, which corresponds in

24   your exhibit to 14B as in boy.

25   A.   Okay.

1    Q.   And this also was initiated by you at the request of

2    Agent Holbrook or the FBI?

3    A.   That's correct.

4    Q.   And it's on this call that Agent Holbrook told you to

5    make a clear offer to P.G., right?

6    A.   That's correct.

7    Q.   And after you make that offer, P.G. says, "No, there will

8    not be -- there cannot be a quid pro quo," correct?

9    A.   I mean, I think he used those words, but it's pretty

10   clear from that last call that he said "love you, but..." I

11   mean, to me it's clearly outlined there, his true intentions.

12   Q.   Would you agree with me that in order to become a

13   successful candidate, to win you need to raise money?

14   A.   So you're asking me if political candidates need to raise

15   money, I would say yes.

16   Q.   And P.G. was referring to raising money in that phone

17   call, correct?

18   A.   He was referring to raising money, that's correct.

19   Q.   Would you agree with me that if P.G. had not become

20   mayor, that he couldn't help you, that someone like John

21   Cranley could continue to hurt you in your project?

22   A.   Do you mind repeating the question?

23   Q.   Sure.  That if P.G. was not a successful candidate, if he

24   didn't raise money and didn't win his election, he would have

25   no way of helping you because he wouldn't have been the mayor?

1    A.   Okay.

2    Q.   Do you agree with that?

3    A.   I guess I still don't understand the question.

4    Q.   If the mayor's hurting your projects, would you agree

5    that he was, right?

6    A.   Mayor Cranley, yes.

7    Q.   Yes.  If P.G. was going to have the ability to help his

8    friend, he would have to be successful and actually become the

9    mayor.  If he wasn't the mayor, he couldn't help you, right?

10   A.   Well, so, again, you're saying we're friends.  I would go

11   on vacations with my friends.  I would have them over for

12   drinks, for beers.  I know, at least, the name of the

13   girlfriend or wife.  I mean, we weren't that type of friend.

14        I mean, I think we're friendly acquaintances is what I've

15   said before but, at the end of the day, I think there's plenty

16   of candidates that have won without raising a ton of money,

17   one being Stephanie Dumas.  She just won -- I think she raised

18   maybe five, ten grand and was elected to county commissioner.

19   Q.   $13,000.  Do you know who supported her?

20   A.   Was that --

21   Q.   It was $13,000 is what she raised.  Do you know who else

22   supported her?  P.G. Sittenfeld out of this Progress and

23   Growth PAC.  Did you know that?

24   A.   No, I didn't.

25   Q.   So the FBI tells you to tell P.G. that these guys are big

1    money out-of-town real estate guys, right?

2    A.   They said to introduce these guys to people as your

3    investors.

4    Q.   P.G.'s always been known as a pro-development guy in the

5    city, right?

6    A.   Yeah, that's what he said.  He said he was squarely in

7    the middle of multiple deals in downtown Cincinnati, that's

8    right.

9    Q.   And the first time you ever met Laura Brunner was through

10   P.G., before you had ever donated, right?  That was ten years

11   ago?

12   A.   I kind of wish I'd never met her, to be honest with you.

13   Sure.

14   Q.   All right.  I understand.  We can talk about Laura

15   Brunner for a second.  P.G., he -- you truly believe that she

16   was treating you differently, right?

17   A.   I just look at past projects with developers.

18   Q.   Yeah.  We can agree on this.  And P.G. heard those

19   concerns, and he went to Laura Brunner and was saying what is

20   going on here, right?  That's what he relayed back to you.

21   Why are you treating him like this?

22   A.   Listen, I wasn't privy to those conversations, so I can

23   only speak to the things that I know directly.

24   Q.   Well, on the phone calls, and we've heard some of them in

25   this courtroom today, P.G. was saying, yeah, when Ms. Brunner

1   said she won a $350,000 ground lease for this problem property

2   that you had the air rights to, P.G. said that's insane.

3   Those were his words, right?  Do you remember that?

4   A.  Was that played in court?  I don't recall hearing that

5   today.

6   Q.  No, not today.  But do you recall it just from your own

7   recollection and memory?

8   A.  If you want to play it, I'm happy to listen to it,

9   but...

10  Q.  All right.  We'll talk a little bit more about her in a

11  minute.

12      This project, 435 Elm, this was a no-brainer project for

13  the city and the county, right?

14  A.  Define no-brainer.

15  Q.  I mean, anyone in the region would want this building to

16  be revitalized?

17  A.  Yeah.  I'm biased because of my interest but, yeah, I

18  think it was in the best interest of the City of Cincinnati,

19  the county, and southwest Ohio.

20  Q.  It was costing the taxpayers $400,000 a year just in

21  maintenance costs, right?

22  A.  Yeah.  I still think it does cost the taxpayers money

23  every year.

24  Q.  I agree with you.  And the taxpayers now are supporting

25  the port, who is holding on to the property, because you guys

1    can't come to an agreement, right?

2    A.   That's correct.

3    Q.   So that $400,000 a year is now shared by the county and

4    the city taxpayers, right?

5    A.   I don't know the nuances but, yeah, someone's paying for

6    it.

7    Q.   And you mentioned the convention center.  What's the area

8    called now?

9    A.   I might have misspoken, but they have a specific name for

10   it.  It's convention block, or...

11   Q.   Yeah, I don't know.  I was literally asking you.  So the

12   convention area or block?

13   A.   That's right.

14   Q.   That's vital for our downtown, right?

15   A.   It is.

16   Q.   And, in part, because of tourism?

17   A.   That's right.

18   Q.   You know, people come here from out of state for these

19   conventions, and they walk out the door and what do they see?

20   They see 435 Elm sitting in that dilapidated state, right?

21   A.   That's right.

22   Q.   That thing's been a problem for years, before you even

23   got involved, right?

24   A.   Listen, I believe so but... yeah.  Yeah, that's right.

25   Q.   Back in 2018, when you had the air rights to 435 Elm, you

1    bought them in 2017 from U.S. Bank, right?

2    A.   I believe so, yes.

3    Q.   There was no other developer that was vying, that was

4    attempting to develop 435 Elm, it was just you, to my

5    knowledge?

6    A.   You know, I think a number of developers had looked at

7    it.  And what I had said before was for us being a small

8    business, that we have to take on complex deals in order to be

9    successful.

10       We just -- it's impossible for us to compete with larger

11   developers on some of the easier projects, so I can only speak

12   to that.

13   Q.   Were you aware of anyone in 2018 and 2019 who was

14   interested in helping revitalize that parcel?

15   A.   I think some other developers had looked at it, but I

16   don't recall.

17   Q.   No one else had the rights, the air rights to it, right?

18   A.   That's right.

19   Q.   And was part of the issue, the claimed issue by

20   Mrs. Brunner, she claimed, I believe, that two issues were

21   your experience and financial backing.  That was her claim,

22   right?

23   A.   She -- yeah.  She had said experience capacity as reasons

24   why.  I think she had mentioned some other ones, but yeah.

25   Q.   Did she think that Rob and Brian were able to come up

1    with tens of millions of dollars and help support this

2    redevelopment?

3               MR. SINGER:  Objection, Your Honor.

4               MR. C. MATTHEW RITTGERS:  I'll rephrase it.

5               MR. SINGER:  How would he know what Laura Brunner

6    thinks.

7               THE COURT:  Sustained.  You may rephrase.

8    Q.   Are you aware she was ever told by you or in your

9    presence that Rob and Brian were there to financially support

10   your project to the tune of millions of dollars?

11   A.   I don't believe so.  I wasn't present at whether those

12   were discussions.  I'm not sure what you're referring to.  If

13   you have something that I can review, I'm happy to do that.

14   Q.   I'm just asking you if you ever said to Laura the things

15   that were being said to P.G., which is that you had Rob and

16   Brian, Rob being this real estate developer for a long time,

17   and these investors with millions of dollars ready to support

18   your project.  Did she think that too?  Did she know that?

19   A.   Well, my business plan, which I think I had outlined

20   earlier, was to negotiate a development agreement with the

21   port or the city, and then bring in a strategic partner.  And

22   that's what I communicated to the city, that's what I

23   communicated to the Port Authority, and that's pretty much

24   been my business model for larger projects.

25   Q.   And part of the issue in 2018 and 2019 with Mrs. Brunner,

1    that she wanted you to have that partner at that point, she

2    didn't want to do it at a later point, right?

3    A.   Well, in my opinion, like I said, both with the city and

4    the Port Authority, depending on what the scenario was that

5    day, the goal moved for me to get to a development agreement.

6         So in that scenario, they would want -- they would have

7    rather me had a development partner before they would issue me

8    a development agreement.  I think that's -- is that what

9    you're asking?

10   Q.   That's exactly what I'm asking.

11   A.   Yeah.

12   Q.   So P.G. was told that you had a development partner in

13   Rob and Brian, right?

14   A.   That they're investors.  I've introduced them as

15   investors.

16   Q.   That had done real estate deals all over the country

17   previously?

18   A.   Yeah.  That had experience, yeah.

19   Q.   He was operating on a different set of information than

20   Mrs. Brunner?

21   A.   No.  I'm pretty sure I told P.G. that my goal was to get

22   a development agreement.  And I told anyone and everyone, as

23   I'll tell today, that our business model was to get a

24   development agreement and bring in strategic partners to help

25   fund developments.

1      That wasn't different with P.G., that wasn't different

2  with the City of Cincinnati, and that's not different with the

3  Port Authority.

4  Q.  Staying on Mrs. Brunner for a second.  You had a number

5  of phone calls in mid to late November of 2019 with P.G. about

6  this project, correct, 435 Elm?

7  A.  If you're saying so, yeah.

8  Q.  I can show you some transcripts.  They're not reflected

9  in summaries that we were given, but you do recall a lot of

10  phone calls with P.G. in late November of 2019 talking about

11  435 Elm and Mrs. Brunner?

12  A.  When you say a lot, do you want to just define that?

13  Q.  Yes.  There are four total?

14  A.  Okay.

15  Q.  November 15th, November 16th, November 27th, and then

16  December 10th.  So over about a 24-day period, four calls, all

17  recorded, where you and Mr. Sittenfeld are talking about him

18  trying to help you get 435 Elm developed.  Does that sound

19  about right?

20  A.  Yeah.  If they're recorded, then yeah, that makes sense.

21  Q.  And then the next day, on December 11th, you and P.G.

22  meet with a developer out of Columbus -- Rob and Brian are

23  gone -- and he sits down with a guy by the name of Mike

24  Schiff, right?

25  A.  That's correct.

1    Q.    And he's trying to now help facilitate a development at

2    435 Elm with a partnership that exists between you and Mike

3    Schiff.  Rob and Brian are gone.  They're not even at that

4    meeting, are they?

5    A.    No.

6    Q.    And Mike Schiff was going to be your partner in the

7    development agreement at 435 Elm.  That was the purpose of

8    this December 11th, 2019 meeting, right?

9    A.    Yes.

10   Q.    And that was, I believe, at P.G.'s office at City Hall?

11   A.    That's correct.

12   Q.    And that was recorded?

13   A.    I believe so.

14   Q.    He never expresses any concern about Rob and Brian being

15   gone.  He's sitting down with you, Mike Schiff, this guy out

16   of Columbus, who is a reputable developer and trying to get

17   the deal done here in the city with Laura Brunner, right?

18   A.    So I think the way that you're characterizing Rob and

19   Brian, I mean, to me they're investors.  That's how I

20   introduced Rob and Brian to people, were investors.

21        Mike Schiff has been a part of multiple, multiple

22   projects in the City of Columbus, complicated

23   mixed-development projects that I thought could be of value to

24   make an actual development happen.  So I just want to make

25   sure we're clear on that.

1    Q.   Sure.  And Mike Schiff's never supported P.G., correct?

2    A.   You'd have to ask Mike.

3    Q.   And he says, "Absolutely.  Let's get 435 Elm done.  Come

4    to my office."  P.G. Sittenfeld says this to you and Mike

5    Schiff, and you sit down in December 2019 to try to continue

6    to get progress on 435 Elm, right?

7    A.   That's correct.  We did visit P.G. at his office.

8    Q.   Jay Kincaid, he's a lobbyist that you had paid at one

9    time to lobby for you, right?

10   A.   That's correct.

11   Q.   And Jay Kincaid, you had paid him probably through

12   Kingsley, right?

13   A.   I believe so.

14   Q.   And at some point in time, I believe, you learned that he

15   was also being paid as a lobbyist for the Port Authority,

16   right?

17   A.   Yes.

18   Q.   So Jay Kincaid was taking Kingsley money as a lobbyist?

19   A.   Yeah.

20   Q.   And also being paid by the port to be the lobbyist for

21   you, Mr. Ndukwe and Kingsley, and the port, while you two are

22   in negotiations about a development deal; is that right?

23   A.   I guess he had a pretty good gig.

24        MR. C. MATTHEW RITTGERS:  May I have one moment, Your

25   Honor?

1          THE COURT:  You may.

2    Q.  Mr. Ndukwe, just a few more questions.  I'm sorry to go

3    back to this.

4      When you talked to Scott Crosswell, he advised you as to

5    what crimes you were facing before you walked in that meeting,

6    I assume, right?

7          MR. SINGER:  Objection.  He's asking what his

8    attorney advised him.

9          THE COURT:  Yeah.  Sustained.

10    Q.  The government mentioned on your direct that they paid

11    you $27,000 in cash between 2018 and 2020, right?

12    A.  That's correct.

13    Q.  And there's nothing in writing as to how you get paid or

14    why, right?

15    A.  That's correct.

16    Q.  And two years ago, in November of 2020, your name was in

17    the paper because the federal prosecutor's office said that

18    you were the cooperating witness in this case, right?

19    A.  That's correct.

20    Q.  So for two years now, your name has been out there in the

21    public domain, correct?

22    A.  That's correct.

23    Q.  And it was not until last week that Agent Holbrook did an

24    interview or interviewed you about the tax payments on the

25    $27,000, right?

NDUKWE – CROSS

1    A.   That's correct.

2    Q.   And it wasn't until last week that Agent Holbrook

3    interviewed you about the trip that Rob and Brian and you and

4    another elected official took down to Miami, correct?

5    A.   Define interview.  I don't recall having an interview

6    about a trip to Miami.

7    Q.   They didn't sit you down and ask you -- you guys were in

8    a VIP room at that place called Tootsies?

9    A.   That's correct, yeah.

10   Q.   And he was asking you questions about what money was

11   spent there?

12   A.   That's correct.

13   Q.   Last week?

14   A.   I believe so.

15   Q.   And that you guys flew down on a private jet and back,

16   right?

17   A.   That's correct.

18   Q.   And went out on a yacht?

19   A.   That's correct.

20   Q.   Stayed at nice hotels?

21   A.   I believe it was an apartment building, but yeah.

22   Q.   Stayed at a nice apartment.  Before P.G. was ever a

23   target in August of 2018, you were talking to Chris

24   Smitherman, and he says he doesn't want another white mayor,

25   and you said, "Absolutely.  I'm right there with you."  Do you

1    recall that?

2    A.   I don't recall that, but if you -- do you have something

3    I can refresh my memory?

4           MR. C. MATTHEW RITTGERS:  Sure.  I can refresh or

5    play, Your Honor.

6           THE COURT:  Has it been admitted?

7           MR. SINGER:  It's not been admitted into evidence,

8    Your Honor.

9           THE COURT:  Well, then, you're not playing it if it's

10   not been admitted.

11          MR. C. MATTHEW RITTGERS:  Can I refresh?

12          THE COURT:  You may.

13          MR. C. MATTHEW RITTGERS:  They didn't transcribe

14   this, but it's an audio, so I can play it on my computer with

15   headphones, which I believe we have.

16          MR. SINGER:  Your Honor, this is a recording from a

17   completely separate investigation.

18          THE COURT:  Well, I think he's using it to refresh

19   his recollection.  As to what, I'm not entirely clear, but...

20          MR. C. MATTHEW RITTGERS:  He doesn't recall if he

21   said he doesn't want another white mayor in August of 2018.

22          THE COURT:  Okay.  Well, not hearing an objection to

23   the question, so if you can refresh his recollection with

24   computer and headphones, I guess you can.

25          THE WITNESS:  Can I ask a question?

```
1            THE COURT:  Sure.

2            THE WITNESS:  So I'm trying to be very protected --

3    you're saying I'm putting headphones on?

4            THE COURT:  I guess.  I don't know.

5            MR. C. MATTHEW RITTGERS:  I was trying to do ear pods

6    or something, but it might not fit --

7            THE WITNESS:  Yeah.  I can't put someone else's ear

8    pods in my ears.  I'm sorry.

9    Q.  All right.  Do you recall saying that?

10   A.  I mean, if you're saying that I said it on a recorded

11   call, then I'm going to assume that that's the case.  So I'll

12   say yes, just to -- yeah.

13           MR. C. MATTHEW RITTGERS:  Okay.  All right.  I don't

14   have any further questions.

15           THE WITNESS:  But can I -- I mean, am I able to kind

16   of expand on that yes?

17           THE COURT:  You can if the government asks you to.  I

18   think you've answered the question.

19           THE WITNESS:  Okay.  All right.

20           THE COURT:  Mr. Rittgers, did you say you're done?

21           MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

22           THE COURT:  We do want to break, Mr. Singer, by

23   12:30.  So are you going to be able to be done in seven

24   minutes, or should we break now?

25           MR. SINGER:  We can break now, Your Honor.
```

1           THE COURT:  Okay.  So we need to break by 12:30

2    today.  It sounds like we're not going to get the redirect

3    done before then; is that right?

4           MR.  SINGER:  Your Honor, I just have a couple

5    questions, whatever the Court prefers.

6           THE COURT:  I want to break by 12:30 today, so if you

7    can be done before 12:30, we can do it; if you can't, we

8    should break.

9           MR. SINGER:  I think we can be done before 12:30.

10          THE COURT:  Okay.

11          MR. SINGER:  Sorry.  I misunderstood the question.

12          THE COURT:  That's all right.

13          THE WITNESS:  So is this portion over?

14          THE COURT:  I'm sorry, what?

15          THE WITNESS:  So he's asking me questions now?

16          THE COURT:  Right.  He's going to have an opportunity

17   to ask you some follow-up questions based on what Mr. Rittgers

18   asked you.

19          THE WITNESS:  Okay.  Sorry about that, Judge.

20          THE COURT:  You're good.  All right.

21          MR. SINGER:  Just a couple questions.

22                      REDIRECT EXAMINATION

23   BY MR. SINGER:

24   Q.  So you were asked about a trip to Miami --

25   A.  That's right.

1    Q.   -- do you remember that.  And was that trip taken at the

2    direction of the FBI?

3    A.   It was.

4    Q.   And it related to a completely separate investigation?

5    A.   That's correct.

6    Q.   And were there other individuals there that were part of

7    the investigation there?

8    A.   That's correct.

9    Q.   And that included another elected official?

10   A.   That's correct.

11   Q.   The phone call that you were just asked about with

12   regards to Mr. Smitherman, was that pursuant to a completely

13   separate investigation?

14   A.   That was.

15   Q.   And were you working at the direction of the FBI during

16   that?

17   A.   I was.

18   Q.   Now, you had testified about -- you were asked questions

19   about being on a host committee; is that right?

20   A.   That's correct.

21   Q.   You're a former Bengal player, seen as a celebrity among

22   certain circles; is that right?

23   A.   Quasi celebrity, but yes.

24   Q.   So did people tend to -- did public officials use you and

25   your name to help fundraise?

1  A.  Yes.  And I mentioned this before that I just felt like,

2  you know, now looking back on the years of this that, you

3  know, they took advantage of my motivation to be in this

4  circle so, yeah, that is -- that's correct.

5          MR. SINGER:  May I have one minute, Your Honor?

6          THE COURT:  You may.

7          MR. SINGER:  Nothing further.

8          THE COURT:  Thank you.  Mr. Rittgers?

9                  RECROSS-EXAMINATION

10 BY MR. C. MATTHEW RITTGERS:

11 Q.  Looking back now, this is after you talked to the federal

12 prosecutors and the FBI about all those misdeeds that we've

13 already discussed, right?

14         MR. SINGER:  Outside the scope, Your Honor.

15         THE COURT:  Well, you did ask him -- I'm sorry.  He

16 volunteered, in response to one of your questions, something

17 about looking back, so I'll allow the follow-up on it.

18 Q.  That's after the FBI and federal prosecutors held this

19 proffer agreement out that doesn't give you immunity from

20 prosecution, correct?

21 A.  So what I just said, I believe you're taking out of

22 context.

23     What I was referring to was the fact that, you know,

24 myself, other business people in the City of Cincinnati, you

25 know, there's been a culture of that expectation to give to

1    these politicians, and I think that's something that, at the

2    end of the day, was part of the reason why I wanted to help is

3    to eliminate that.

4              MR. C. MATTHEW RITTGERS:  No further questions, Your

5    Honor.

6              THE COURT:  Very good.  Mr. Ndukwe, sir, you can step

7    down.  Thank you for appearing here this morning.

8              THE WITNESS:  Thank you.

9         (Witness excused.)

10        (Excerpt of proceedings concluded at 12:25 p.m.)

11                        *   *   *

12                   C E R T I F I C A T E

13                       -  -  -

14        I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
15   above-entitled matter.

16

17   /s/ M. Sue Lopreato_____            _____July 2, 2022_____
     M. SUE LOPREATO, RMR, CRR
18   Official Court Reporter

19

20

21

22

23

24

25

```
 1                              INDEX

 2   GOVERNMENT WITNESS

 3   CHINEDUM NDUKWE

 4   Direct by Mr. Singer............................. Page 2
     Cross by Mr. C. Matthew Rittgers................. Page 48
 5   Redirect by Mr. Singer........................... Page 98
     Recross by Mr. C. Matthew Rittgers............... Page 100
 6

 7                           - - -

 8
                            EXHIBITS
 9
     GOVERNMENT EXHIBITS
10
     Exhibit                                 Admitted
11
      4A                                        30
12    4B                                        31
      46C                                       32
13

14

15                         - - -

16

     DEFENSE EXHIBITS
17
     Exhibit                                 Admitted
18
      D652                                      64
19

20                         - - -

21

22

23

24

25
```