```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION
                            *   *   *
3

4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
5            Plaintiff,             : Jury Trial, Day 6
                                    : Tuesday, June 28, 2022
6            - v -                  :
                                    : 9:00 a.m.
7    ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"           :
8                                   :
             Defendant.             : Cincinnati, Ohio
9
                            *   *   *
10    EXCERPTED PROCEEDINGS - TESTIMONY OF JAIME KINCAID

11   BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                           *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                           *   *   *

25
```

```
1                    P R O C E E D I N G S
2                (In open court at 3:09 p.m.)
3                         *   *   *
4           THE COURT:  Is the government prepared to call
5   another witness?
6           MR. SINGER:  Yes, Your Honor.  The government calls
7   Jaime Kincaid.
8           THE COURT:  Very good.
9        (Government witness, JAIME KINCAID, sworn.)
10          MR. SINGER:  Your Honor, may I approach to begin the
11  examination?
12          THE COURT:  You may.
13          MR. SINGER:  Thank you.
14                     DIRECT EXAMINATION
15  BY MR. SINGER:
16  Q.   Good afternoon.
17  A.   Good afternoon.
18  Q.   Can you state and spell your name for the record, please.
19  A.   Yeah.  My name is Jay Kincaid, J-a-y, K-i-n-c-a-i-d.
20  Q.   Mr. Kincaid, where do you work?
21  A.   I work at a real estate company called Kilcarnie
22  Properties.
23  Q.   And how long have you been doing that?
24  A.   Since January of 2021.
25  Q.   What did you do prior to working in real estate?
```

1   A.   Prior to that, I worked in politics for about a decade.

2   I had various positions.  I was a fundraiser chief of staff to

3   Mayor Cranley, and then worked as a lobbyist.

4   Q.   And what kind of work did you do as a lobbyist?

5   A.   So I represented, I would say mostly real estate

6   developers.

7   Q.   And what does a lobbyist do?

8   A.   So from my perspective, you know, first and foremost, it

9   was consulting with them to talk about, sort of, paths forward

10  to help them achieve their business goals.

11       And then second to that, once, sort of, a path was

12  settled on, if there were times where we had to interact with

13  government officials or government employees, I would often do

14  that.

15  Q.   When did you start working as a lobbyist?

16  A.   I began working as a lobbyist in June of 2017.

17  Q.   Now you mentioned work that you did for real estate

18  developers.  Did you provide consulting at all to public

19  officials?

20  A.   In a paid capacity?

21  Q.   In either capacity.

22  A.   Yeah.  So while I was working as a lobbyist, I continued

23  to have relationships with elected officials who would, at

24  times, call me and ask for advice.

25  Q.   Do you know an individual named Alexander P.G.

1  Sittenfeld?

2  A.  I do.

3  Q.  How do you know him?

4  A.  I met P.G. in late 2010, as he was first considering a

5  run for city council.  I was introduced to him as he was

6  making his rounds to meet with folks and talk about a

7  potential run.

8     At that time, I was just starting to consult on my own,

9  and he hired me at that time.  I believe he was maybe my first

10  or second client ever.

11  Q.  Can you just sort of describe the nature of your

12  relationship with Sittenfeld?

13  A.  Yeah.  So in 2011, I worked for him.  Around the same

14  time I met P.G., I also met my wife, whose family happened to

15  be close with the Sittenfelds.  So, you know, my

16  brother-in-law, lifelong friend with P.G.  My wife was friends

17  with P.G.'s sister, who was the wedding photographer for us.

18     And after I stopped working for him, continued to have a

19  relationship with him, a friendship.  I still consider P.G. a

20  friend.

21  Q.  Do you know an individual named Chinedum Ndukwe?

22  A.  I do.

23  Q.  And how do you know him?

24  A.  I met Chinedum -- I think the first time I ever met him

25  was election night in 2013.  John Cranley had just been

1    elected mayor, and there was a victory party that Chinedum was

2    at.  He was one of the last people at the party, and I was

3    introduced to him and met him that night.

4        Stayed in contact with him after Mayor Cranley took

5    office, and I was serving as the chief of staff through

6    sometime in 2014.  I don't recall exactly when.

7        And then there was a point in 2014 where Mayor Cranley

8    and Chinedum had a -- I would say a falling out over some

9    things that Chinedum -- over a disagreement of what John could

10   potentially do on behalf of Chinedum.

11       And so from that point on, that relationship had ended.

12   And because I was working for the mayor, I had no further

13   contact with Chinedum until 2017, when I started working as a

14   lobbyist.  He reached out to me and asked for help getting a

15   letter from the city about potentially working with him to

16   redevelop 435 Elm Street.

17  Q.  So when did you say you started working for Mr. Ndukwe?

18  A.  So in June of 2017, he reached out to me.  He engaged me

19  very briefly to help try to get this letter.  I don't think he

20  ever got it.  It was a very brief engagement.

21       And then I had no contact with him again until March of

22  2018.  A mutual friend of ours reached out and said, hey,

23  would you consider taking Chinedum on as a client.  I think he

24  could use the help.  And that's when Chinedum hired me.  I

25  worked for him from March of 2018 through April of 2019.

1   Q.   Were there specific projects that you helped Mr. Ndukwe

2   on?

3   A.   Yeah.  I helped on 435 Elm Street.  I helped him on his

4   hotel project in Mt. Auburn.  Those were specific ones.  And

5   then beyond that, he -- you know he was looking at various

6   deals, and so I gave advice and helped on those.

7        But the two that I did any amount of true lobbying on his

8   behalf were 435 Elm Street and his Mt. Auburn hotel.

9   Q.   I think you said you stopped working for him in April

10  2019.  Why did you stop working for him at that time?

11  A.   So at the beginning of April is when the City of

12  Cincinnati and the Port Authority began -- entered into

13  discussions for the sale of 435 Elm Street from the city to

14  the Port Authority.

15       At that time, the Port Authority was also a client of

16  mine.  And the CEO, Laura Brunner, came to me and said, hey,

17  because you have Chin as a client and you have us as a client,

18  and we are likely going to buy this, we're going to wall you

19  off from 435 Elm.  We're not going to talk to you about that.

20       And then several weeks later, she came back to me and

21  said, hey, we've discussed it.  It's highly likely that we're

22  going to buy this.  And because at the time that we buy it, we

23  will be adverse to Chinedum, we're going to ask you to choose,

24  either you stick with us as a client or stick with him as a

25  client, but you can't have both.  And so at that time, I ended

1    my relationship with Chinedum.

2    Q.   So during the period where you were working on Ndukwe's

3    behalf for purposes of 435, what type of work were you doing?

4    A.   So it was a combination of what I stated earlier, just

5    about my lobbying work in general.  It was giving him advice

6    on how to proceed, options on how he could proceed, whether

7    it's, you know, trying to get council to push for this, trying

8    to get career employees to push for it, how to approach the

9    mayor.

10        And then beyond that, it was representing him in meetings

11   with career employees, talking to elected officials on his

12   behalf, and just generally helping him navigate the process.

13   Q.   Can you describe any issues you were having advancing the

14   435 Elm Street project in the city?

15   A.   Well, I think that the challenge for Chin was that he had

16   never done a project this big.  And both career city employees

17   and elected officials had concerns about his ability to pull

18   it off, and so, you know, that was a big hurdle to try to

19   overcome.

20   Q.   Are you familiar with individuals named Rob Miller and

21   Brian Bennett?

22   A.   I am.

23   Q.   How do you know them?

24   A.   So Chinedum introduced me to them over drinks at the 21c.

25   I don't recall when that was.  But he introduced me to them as

1    his out-of-town partners.

2    Q.  Did you have any other personal interactions with them?

3    A.  So I met them the first time, had no personal interaction

4    with them for an extended period of time.

5        And then in April of 2019, I believe I had a lunch with

6    them that came about because I had -- in giving Chinedum

7    advice, I told him, hey, I think these guys' behavior is

8    hurting your chances of getting a deal, and you need to have a

9    conversation with them.  So that was the meeting.

10   Q.  So what were your impressions of Rob Miller and Brian

11   Bennett after meeting them in person?

12   A.  My impressions of Brian and Rob were that they were

13   incredibly peculiar for developers, in both their behavior and

14   their appearance, quite frankly.

15       They -- my experience in dealing with developers is that

16   they -- most developers -- no developer I'd ever worked with

17   had ever bragged to me about how much money they had, how much

18   money they made, what their bank account looked like.  And Rob

19   and Brian were doing that in an offputting way.

20       On top of it, they didn't look like any developer I'd

21   ever seen.  Most developers look like schlubs.  You know, they

22   show up to meetings in jeans and a T-shirt, you know, looking

23   like they just finished cutting their grass.

24       Rob and Brian were, I would say, well put together.  You

25   know, Rob had a perfectly groomed 5:00 shadow, was wearing,

1    you know, more gold jewelry than I'd ever seen any man wear,

2    with maybe the exception of Mr. T.  They just didn't look the

3    part, and they didn't feel -- something felt off about them is

4    what I'm saying.

5    Q.  Do you recall any conversations you had with Sittenfeld

6    about Rob Miller and Brian Bennett?

7    A.  I do.  So after P.G. first met with them, he called me

8    and we had a conversation about the meeting.

9        And what P.G. related to me was that Rob and Brian showed

10   up with $10,000 in cash, and -- but he had turned that down.

11   And then we had a conversation in which he said that, you

12   know, they were so over the top, do you think they might be

13   FBI agents.

14   Q.  Do you recall when that conversation occurred?

15   A.  I don't recall the exact timing of the conversation.  It

16   was, I think, sometime early in my time working for Chinedum,

17   so early to mid 2018.

18   Q.  Certainly prior to April 2019?

19   A.  Correct.

20   Q.  Do you recall any other conversations you had with

21   Sittenfeld about Rob Miller and Brian Bennett?

22   A.  I do.  I had conversations multiple times where I advised

23   him not to take any contributions from them.

24   Q.  And what was his response?

25   A.  You know, he listened, but I had the sense that he was

1    not going to take my advice.

2    Q.   Did you tell Sittenfeld why you thought he should steer

3    clear of Rob Miller and Brian Bennett?

4    A.   I did.  You know, at the time of these conversations, I

5    had heard several concerning stories about Rob and Brian's

6    behavior.  The first was them showing up with $10,000 in cash

7    to a meeting with P.G.

8        Second, I had been told by Jared Kamrass, who was raising

9    money for Mayor Cranley, that Brian and Rob had told him that

10   they were going to give, but they would need the mayor's

11   assurances that he would help them on 435 Elm Street.  And I'd

12   heard about a trip that Brian and Rob had taken another

13   councilmember on.

14       All three of those things were, I would say, in my

15   experience, highly unusual for a developer to do, or anyone to

16   do in a political setting.

17       And I felt like, taking all three of them together, it

18   was a huge flashing red stop sign that said there was just

19   something not right going on with these guys.

20       My advice to P.G. was not -- it wasn't criminal advice,

21   it was political advice.  I didn't think that he was doing

22   anything wrong.  I thought Brian and Rob were doing something

23   wrong, and that it was likely that they would be -- there was

24   a good chance that they would get in trouble.

25       And from a political standpoint, it seemed to me that it

1    was not worth the risk of having taken some amount of money

2    from them and being left holding the bag when they got in

3    trouble.

4    Q.  And was this one conversation or was this multiple

5    conversations?

6    A.  I had that conversation multiple times with P.G.

7    Q.  And do you recall when you had these conversations?

8    A.  I don't.  I spoke to P.G. often.  I don't recall exact

9    dates, but I would say certainly between April of -- or March

10   of '18 and April of 2019.

11   Q.  Do you recall any discussions you had with Sittenfeld

12   about 435 after the property was transferred to the port?

13   A.  I do.  So after the property was purchased by the Port

14   Authority, and I had -- I was no longer -- Chinedum was no

15   longer a client, it was just the port, P.G. would call me.  We

16   talked often.

17       And there would be regular occasions where he would ask

18   me, you know, what's going on with 435 Elm?  Can you help get

19   a meeting with this attorney or this person?  And he was sort

20   of generally checking in on it.

21       Every time we had those conversations, I -- my response

22   was, you know, you need to stop asking me about this.  You

23   need to stop talking about this.  I told you these guys are

24   bad news.

25   Q.  Did you have any conversations with Sittenfeld about

1    contributors hedging when considering contributions for

2    Sittenfeld?

3    A.   I did.

4    Q.   What does "hedging" mean?

5    A.   You know, in -- my understanding of it in the context of

6    those conversations with P.G. was that he wanted them to be

7    one hundred percent supportive of his campaign and not

8    supporting anyone else, any potential challengers.

9    Q.   Did you have any specific conversations that you can

10   recall around the November 2017 period?

11   A.   In November of 2017, late November 2017, this was after

12   Mayor Cranley had been reelected, P.G. was gearing up for a

13   mayoral run, we had breakfast.

14        And during the course of the conversation, he said to me

15   regarding Chip Gerhardt, who is another lobbyist in town, I'm

16   going to tell Chip that if he hedges on my campaign, I'm going

17   to hedge on his clients as mayor.

18   Q.   Did you have any discussions with Ndukwe about what

19   Sittenfeld had told you about hedging on contributions?

20   A.   Yeah.  I believe I did.  I don't recall the exact nature

21   of that conversation.

22   Q.   Do you recall a conversation that you had in

23   September 2019 relating to hedging and conversations you had

24   with Sittenfeld?

25   A.   With Chinedum?

1    Q.   Yes.

2    A.   I mean, I generally think I did, but I don't recall the

3    specifics.

4    Q.   If I gave you a transcript of that communication, would

5    it refresh your recollection?

6    A.   Sure.

7         MR. SINGER:  May I approach, Your Honor?

8         THE COURT:  You may.

9    Q.   So did that refresh your recollection as to whether you

10   had a conversation with Ndukwe in --

11   A.   Yeah.

12   Q.   -- September of 2019?

13   A.   Yes.  We -- I mean, we were discussing P.G.'s asking

14   Chinedum for contributions, not wanting Chin to give to

15   Christopher Smitherman.  And I said to Chinedum something

16   along the lines of, you know, P.G. doesn't want anyone

17   hedging.

18        MR. SINGER:  No further questions, Your Honor.

19        THE COURT:  Thank you.

20                    CROSS-EXAMINATION

21   BY MR. C. MATTHEW RITTGERS:

22   Q.   Mr. Kincaid, you and I have never talked at all about

23   this case, correct?

24   A.   Correct.

25   Q.   I did try, do you know that?

1    A.   Correct.

2    Q.   You were around City Hall for a pretty long time, right?

3    A.   So I served as chief of staff to Mayor Cranley for nearly

4    three years.

5    Q.   And before that, did I hear you say you were a fundraiser

6    for Mr. Cranley as well?

7    A.   Correct.

8    Q.   What time frame was that?

9    A.   So I -- going way back, I was a fundraiser campaign

10   manager for John's council campaign -- well, congressional

11   campaign in 2006, council campaign in 2007, and then a break.

12        In November of 2012, I started working as a campaign

13   manager on his mayoral campaign, so November of 2012 until he

14   took office in 2013.  And then I served as chief of staff from

15   December of '13 until, I think my last month was August of

16   '16.

17   Q.   And "chief of staff" means what?

18   A.   Someone who is in charge of the mayor's office.

19   Q.   In that role, you probably had the ability to understand

20   people's reputations in City Hall, other elected officials?

21   A.   Correct.

22   Q.   P.G.'s reputation, he was pro-development of our downtown

23   urban core?

24   A.   Yes.

25   Q.   He had a reputation as being an aggressive fundraiser but

KINCAID - CROSS

1    very ethical?

2    A.  I'm sorry.  I didn't hear.  What was the last part?

3    Q.  He had a reputation as being an aggressive fundraiser but

4    very ethical, correct?

5    A.  Yes.

6    Q.  He was always happy to engage people of all backgrounds

7    and walks of life, and brag about Cincinnati and try to get

8    investment dollars here in Cincinnati?

9           THE COURT:  Hang on.

10          MR. SINGER:  May we approach at sidebar, Your Honor?

11          THE COURT:  You may

12   SIDEBAR CONFERENCE

13          MR. SINGER:  Your Honor, we addressed in motions good

14   acts evidence.  It seems like the questions relate to good

15   acts unrelated to the specific parameters that the Court has

16   allowed for in their motion in limine order.

17          MR. C. MATTHEW RITTGERS:  I don't know what good act

18   I elicited.

19          THE COURT:  I thought he was talking about the way in

20   which Mr. Sittenfeld interfaced with constituents.  Is that

21   not what you understood he was asking about?

22          MR. SINGER:  I understood he was asking to -- started

23   talking about his reputation in the community, and then was

24   transferring to move over to, I think, the areas of -- related

25   to good acts.

1      MR. C. MATTHEW RITTGERS:  That was not my intent.

2      MR. SINGER:  Okay.  Apologies.

3  SIDEBAR CONFERENCE CONCLUDED

4      THE COURT:  Do you want to repose the same question,

5  or we can read it back, either way.

6      MR. C. MATTHEW RITTGERS:  Could you read it back.  I

7  just forgot what it was.

8      (The record was read by the court reporter.)

9  A.  Yes.

10 Q.  If I understood your testimony, and please correct me if

11 I didn't, you stopped working for Mr. Ndukwe, I believe in

12 April of 2019, right?

13 A.  Yeah.  I believe that's correct.

14 Q.  And that's because the port indicated that they were

15 likely to be the owners of at least the ground rights on

16 435 Elm at some point in the immediate future?

17 A.  Correct.

18 Q.  And they ultimately did -- the property was transferred,

19 as you know, to the port, I believe in June of 2019, right?

20 A.  Yes.

21 Q.  You continued to have some communication, I believe, with

22 the Port Authority and also Mr. Ndukwe during that time?

23 A.  Yes.

24 Q.  The Port Authority has done deals for a dollar in the

25 past on certain development projects, correct?

1   A.   I believe so.

2   Q.   435 Elm was a complicated project, to say the least,

3   right?

4   A.   It was.

5   Q.   Because of competing interests in the air rights and the

6   ground rights, that's one of the reasons?

7   A.   Yeah.  I would say in my experience at City Hall, and

8   during my time at City Hall and outside of City Hall, it was

9   one of the more complicated ownership structures.

10  Q.   When you were -- when you met with Rob and Brian, it was

11  your belief that they were the financial backing behind

12  Mr. Ndukwe, correct?

13  A.   I was told that they were partners in the deal.

14  Q.   And ultimately, as you continued to work through this

15  project in 2019 with the Port Authority, obviously, they were

16  actually not partners with Mr. Ndukwe, correct?

17  A.   Who wasn't?

18  Q.   Rob and Brian.

19  A.   I think it's come out that they were not.

20  Q.   Yeah.  And Ms. Brunner's claimed reasons for why she did

21  not enter into a partnership with Mr. Ndukwe were a few, and

22  I'm asking if you're aware of those.

23       One was Mr. Ndukwe's, what she said was his lack of

24  experience, correct?

25            THE COURT:  Is there an objection?

1     MR. SINGER:  Yeah.  Objection.  Laura Brunner's

2  claimed reasons, there's no foundation that he would know what

3  Laura Brunner's claims are.

4     THE COURT:  Can you lay the foundation first?

5     MR. C. MATTHEW RITTGERS:  Yes.

6  Q.  Mr. Kincaid, I believe that you testified on direct that

7  there were people in leadership positions in the city that

8  were worried about -- I think your language was, on direct,

9  and I think you used the words Chin wasn't able to pull it off

10  or something.  Do you remember that?

11  A.  Yeah.  I think I said that they had concerns about his

12  ability to do the deal.

13  Q.  And when you're talking about "they," are you talking

14  about people like Laura Brunner at the port?

15  A.  In that case, I was specifically talking about City of

16  Cincinnati employees and elected officials.

17  Q.  All right.  In 2019, you continued to work with the Port

18  Authority as a lobbyist, right?

19  A.  Yes.

20  Q.  Did you become aware of Ms. Brunner's concerns at that

21  time in 2019 about Mr. Ndukwe?

22  A.  Yes.

23  Q.  And what were those concerns that she said?

24  A.  I think, you know, it's obviously been a long time since

25  I talked to her about this, but my recollection is that she

1    had the same concerns about Chin's ability to pull off a deal.

2        Though having said that, she did -- she was willing to

3    work with him.  She asked him to come with a fully fleshed out

4    plan, a reasonable -- a pro forma, and that they would

5    seriously consider working with him.

6    Q.   And were you involved at all with P.G.'s interactions

7    with Mrs. Brunner or the port talking about why they should

8    get this deal done for the city?

9    A.   Involved like sitting in on the conversation?

10   Q.   Yes.

11   A.   No, not that I recall.

12   Q.   Were you involved at all, or were you aware of a meeting

13   that P.G. had in late -- in December of 2019 with a developer

14   named Mike Schiff up in Columbus and Mr. Ndukwe at P.G.'s City

15   Hall office about 435 Elm?

16   A.   No.

17   Q.   Do you still -- or, sorry.  Up until 2021, did you work

18   with the port as a lobbyist?

19   A.   I worked for the port through 2021.

20   Q.   Okay.  When someone hires a lobbyist, the type of

21   lobbyist that you are, it could be to help them with

22   introductions and access to people like the mayor, correct?

23   A.   Yes.

24   Q.   Or council members?

25   A.   Yes.

1    Q.  And that happens in this city and all over the United

2    States, correct?

3    A.  I mean, my experience is here, but it seems like it does

4    happen all over.

5    Q.  Bundling and fundraising is a common practice in our

6    privately-funded campaigns.  Are you aware of that?

7    A.  Yes.  Yes.

8              MR. C. MATTHEW RITTGERS:  I apologize, Your Honor.

9              THE COURT:  You're good.

10   Q.  Let me jump back a minute.  On direct, when you said you

11   told P.G. that you didn't like the way Rob and Brian were

12   behaving, one is because he had voluntarily told you, he said,

13   hey, these guys showed up with $10,000 in cash, and he thought

14   it was a little bit off, right?

15   A.  Yes.

16   Q.  And he disclosed that to you and said that's what

17   happened, he didn't hide that?

18   A.  Yeah.  He was completely open about that.

19   Q.  And there were also rumors swirling about a trip down to

20   Miami, Florida with various people, Rob and Brian being on it,

21   correct?

22   A.  Yes.

23   Q.  But at the same time, when you told P.G. to stay away

24   from them which, by the way, was sound advice as we sit here

25   today, you also didn't think P.G. was doing anything wrong, it

1   was just Rob and Brian might have maybe some --

2   A.   Yeah.   Like I said on the direct examination, my advice

3   to P.G. wasn't criminal advice, mine was political advice.

4       You know, I believed that P.G. was following the law when

5   he was raising money.   I believe that Rob and Brian were -- if

6   they had not crossed the line, were so reckless that they were

7   likely to cross the line.   And because of the rumors at City

8   Hall about the trips, and what I'd heard from Jared Kamrass

9   and what P.G. had told me, I thought these guys are so

10  reckless they're going to be caught.   And when they're caught,

11  you don't want to be the political candidate who took $20,000

12  or $40,000 from them.

13          MR. C. MATTHEW RITTGERS:   May I have one second, Your

14  Honor?

15          THE COURT:   You may.

16  Q.   Mr. Kincaid, shortly after you had that conversation,

17  which I believe was in March of 2019?

18  A.   Which conversation?

19  Q.   With P.G. saying, hey, you know, these guys were on a

20  trip, and you had already told me that they had offered you

21  $10,000?

22  A.   Yeah.

23  Q.   You met with Rob and Brian thinking --

24  A.   I --

25  Q.   Sorry.   Go ahead.

1   A.  I met with them in April.

2   Q.  So after you told P.G. to stay away from them, you did

3   meet with them yourself?

4   A.  I did.

5   Q.  And in that meeting, you said that John Cranley -- that

6   they can donate to John Cranley, correct?

7   A.  I don't believe I said that.  If I did, I don't recall

8   saying that.

9   Q.  Okay.  It's not unusual for a candidate to want an

10  individual to support only that candidate and not that

11  candidate's opponent?

12  A.  No, that's not unusual.

13  Q.  What was -- in 2014, you mentioned a 2014 falling out

14  that Mr. Ndukwe had with John Cranley.  What was that?

15  A.  So at some point, I don't recall when it happened,

16  Chinedum tore down a building in Clifton without a permit, and

17  was in -- was having problems at the city because of that.

18      And I believe it was potentially a criminal issue.  He

19  wanted the mayor to intercede on his behalf, and wanted me to

20  intercede on his behalf, and my understanding was make the

21  problem go away.

22      That didn't happen.  He was fined $25,000.  And at some

23  point after that came out, Chinedum called me on my City Hall

24  landline and said, I don't feel like I'm getting a return on

25  investment in my campaign contributions to the mayor.  And if

1    that doesn't change, I'll have to reconsider my position in

2    regards to giving in the future.

3        At that point, I said, Chinedum, I have to end this phone

4    call right now.  I hung up the phone.

5        As soon as I was able to get to the mayor, I don't know

6    if he was in a meeting or not, but the first chance I had to

7    speak with the mayor, I relayed this conversation to him.

8        And that was the point at which Mayor Cranley said, I'm

9    done with Chinedum.  We can't be interacting with someone who

10   expects us to take campaign contributions in exchange for

11   official work.

12           MR. C. MATTHEW RITTGERS:  No further questions, Your

13   Honor.

14           THE COURT:  Thank you, Mr. Rittgers.

15           MR. SINGER:  One second.  No further questions, Your

16   Honor.

17           THE COURT:  Thank you.  Sir, you may step down.

18       (Witness excused.)

19       (Excerpt of proceedings concluded at 3:42 p.m.)

20                        *   *   *

21

22                C E R T I F I C A T E

23                      -  -  -

24       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
25   above-entitled matter.

*KINCAID - CROSS*

1

2  /s/ M. Sue Lopreato_____          ____July 2, 2022____
   M. SUE LOPREATO, RMR, CRR
3  Official Court Reporter

4
                             INDEX
5
   GOVERNMENT WITNESS
6
   JAIME KINCAID
7
   Direct by Mr. Singer.............................. Page 2
8  Cross by Mr. C. Matthew Rittgers.................... Page 13

9
                           -   -   -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25