<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION
                            *   *   *
 3

 4   UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
 5           Plaintiff,             : Jury Trial, Day 3
                                    : Thursday, June 23, 2022
 6           - v -                  :
                                    : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"           :
 8                                  :
             Defendant.             : Cincinnati, Ohio
 9
                            *   *   *
10       EXCERPTED PROCEEDINGS - DIRECT OF NATHAN HOLBROOK

11      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                          *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                          *   *   *

25
</pre>

```
 1              P R O C E E D I N G S
 2         (In open court at 9:31 a.m.)
 3                   *   *   *
 4         MS. GAFFNEY PAINTER:  Your Honor, the government
 5    calls Nathan Holbrook.
 6       (Government witness, NATHAN HOLBROOK, sworn.)
 7         MS. GAFFNEY PAINTER:  May I proceed, Your Honor?
 8         THE COURT:  You may.
 9                   DIRECT EXAMINATION
10    BY MS. GAFFNEY PAINTER:
11    Q.   Special Agent Holbrook, will you please state and spell
12    your name for the record.
13    A.   Nathan Holbrook.  N-a-t-h-a-n, H-o-l-b-r-o-o-k.
14    Q.   Special Agent Holbrook, where do you work?
15    A.   I work for the Federal Bureau of Investigation at the
16    Cincinnati field office.
17    Q.   Is the Federal Bureau of Investigation sometimes referred
18    to as the FBI?
19    A.   It is.
20    Q.   What is your title?
21    A.   I'm a special agent.
22    Q.   Generally speaking, what are your responsibilities as a
23    special agent?
24    A.   I'm a case agent.
25    Q.   What is a case agent?
```

1  A.   A case agent is an FBI agent that is responsible for the

2  overall management of investigation.  They will largely direct

3  the focus of the investigation, determine what types of

4  investigative techniques will be deployed, what types of

5  evidence will be collected.

6       They will communicate with supervision, executive

7  management headquarters, information that's appropriate to the

8  investigation, and they also communicate with interested third

9  parties, for example, the United States Attorney's Office.

10          MR. C. HENRY RITTGERS:  I'm sorry, for example what?

11          THE WITNESS:  For example --

12          THE COURT:  He said, "For example, the United States

13  Attorney's Office."

14          MR. C. HENRY RITTGERS:  Thank you.

15  Q.   Special Agent Holbrook, how long have you worked as a

16  special agent with the FBI?

17  A.   Approximately 11 and a half years.

18  Q.   What did you do before you joined the FBI?

19  A.   I was in healthcare administration.

20  Q.   What training and education did you complete in order to

21  become an FBI agent?

22  A.   I have a bachelor's in science.  I have an MBA.  In

23  February 2011, I attended the FBI Academy in Quantico,

24  Virginia.

25  Q.   What types of cases have you worked since you joined the

1   FBI?

2   A.   My first assignment, in the Indianapolis field division,

3   I was assigned to a public corruption and white collar squad,

4   and I specifically worked public corruption cases, or at least

5   98 percent of the cases I worked were related to public

6   corruption.

7   Q.   Is that true for throughout your tenure, eleven and a

8   half years with the FBI?

9   A.   Yes.

10  Q.   Did there come a time when you became involved in a

11  criminal investigation of Alexander Sittenfeld, also known as

12  P.G. Sittenfeld?

13  A.   Yes.

14  Q.   At the time that you became involved in that

15  investigation, were you involved in other investigations as

16  well?

17  A.   I was.

18  Q.   What was your role in the Sittenfeld investigation?

19  A.   I was the case agent of that investigation.

20  Q.   You testified earlier that a case agent is responsible,

21  in part, for collecting evidence.

22       During the course of the Sittenfeld investigation, what

23  type of evidence did you collect?

24  A.   There were voluminous amounts of recordings, recording

25  conversations over telephones between undercovers, subjects

1     unwitting, in-person meetings between undercovers and sources.

2     There was text messages, emails, phone records, bank

3     statements, witness interviews.

4     Q.  How does a case agent open a case?

5     A.  Case agent opens a case by drafting a document that

6     describes the particular facts known to the case agent at that

7     time.  That document is then approved by the supervisor, and

8     depending on what type of investigation it is, there are

9     additional approvals.

10    Q.  Can a case agent open a case solely on his or her

11    discretion?

12    A.  They cannot.

13    Q.  Approximately when did the criminal investigation into

14    Mr. Sittenfeld begin?

15    A.  Approximately the end of October 2018.

16    Q.  Tell us how the investigation began in October of 2018.

17    A.  Sure.  In approximately August of 2018, I was informed by

18    an individual by the name of Mr. Chinedum Ndukwe that he had

19    recently met with Mr. Sittenfeld.

20         And during that meeting, Mr. Ndukwe said that

21    Mr. Sittenfeld requested Ndukwe to introduce him to

22    developers.

23         Mr. Ndukwe told Sittenfeld that he wanted to support

24    Sittenfeld, but he didn't want to do it in his own name.

25         Sittenfeld then told Mr. Ndukwe to speak with an

1  individual by the name of Jay Kincaid on how to do it

2  discreetly.

3      After that, on approximately September 12th of 2018,

4  there was a recorded telephone call.  That recorded telephone

5  call was between Mr. Ndukwe and Mr. Kincaid.  I reviewed that

6  recorded telephone call.

7      In that call, there was a conversation between Ndukwe and

8  Kincaid about the project that's been referenced as 435 Elm.

9  They also were discussing donating to political candidates,

10 and the pressure that Mr. Ndukwe was receiving from donating

11 to political candidates.

12     In particular were Mr. Sittenfeld and, at that time, the

13 individual who was considered to be Mr. Sittenfeld's political

14 opponent, or one of his political opponents.

15     Kincaid instructed Mr. Ndukwe that the elected official

16 referenced in this telephone call, if Mr. Ndukwe did not

17 donate to him, wouldn't hold it against him on a development

18 project.  But he told Mr. Ndukwe that Sittenfeld was good at

19 moving votes and making things difficult for people.  That was

20 on September 12th of 2018.

21     Shortly after that, on October 25, 2018, Mr. Ndukwe told

22 me again that Mr. Sittenfeld had requested $10,000 from Ndukwe

23 as campaign donations.

24     And at that point, I decided to instruct Mr. Ndukwe to

25 record a telephone call with Sittenfeld.

HOLBROOK - DIRECT

1    Q.  I'm going to take a step back and unpack some of what you

2    said.  Now, you mentioned that Mr. Ndukwe was a source.  What

3    is a source?

4    A.  A source is -- in the FBI, we refer to them as

5    confidential human sources, or CHSs.  You'll hear me refer to

6    CHS or source.  It's the same thing.

7        A source is an individual who has information or

8    evidence, or access to information or evidence that is

9    responsive to the FBI's mission of collecting evidence to

10    prosecute crimes.

11    Q.  Why do case agents work with sources?

12    A.  In some situations, particularly in public corruption,

13    it's hard for case agents to approach individuals and get

14    accurate information, for various reasons.

15        Sources already have placement and access to the

16    information, and they can gain that information, collect

17    evidence, and then they provide that to the case agent, who

18    can then move forward with an investigation.  So it allows us

19    to collect evidence that we otherwise wouldn't have access to.

20    Q.  Now, generally speaking, how does the FBI get sources?

21    A.  Generally speaking, I mean, there's two main ways.  We

22    can run across an individual just in our daily activities as a

23    case agent, or we can specifically target an individual based

24    upon information that we've collected.

25    Q.  Does the FBI compensate sources?

1    A.    Yes.

2    Q.    How does the FBI compensate sources?

3    A.    We compensate sources two primary ways, one being

4    monetary, the other being non-monetary.

5    Q.    What do you mean by "non-monetary"?

6    A.    Non-monetary would be things such as immigration status,

7    deportation stays, case consideration.

8    Q.    What do you mean by "case consideration"?

9    A.    Case consideration would be if an individual has some

10   criminal exposure, and they're working to -- working off their

11   criminal exposure by cooperating with an investigation.

12   Q.    Why does the FBI compensate sources?

13   A.    It depends.  There's different reasons that the FBI would

14   compensate sources.  It could be to motivate the source.  It

15   could be to provide the source compensation for the work and

16   the effort that they're putting into an investigation.

17   Q.    Who makes the decision whether or not to compensate

18   sources?

19   A.    The case agent or the handling agent.

20   Q.    What rules does the source have to follow while working

21   with the FBI?

22   A.    When we recruit a source, there are four primary

23   admonishments that we're required to give a source.

24        Those admonishments are that their cooperation with the

25   FBI is entirely voluntary; that the information they provide

HOLBROOK - DIRECT

1  the FBI must be truthful.  They can't take any actions on

2  behalf of the United States government without being

3  instructed to do so.

4      And then they are requested to protect their relationship

5  with the FBI, and we will do what we can to protect that

6  relationship, meaning we won't divulge that relationship

7  publicly.

8  Q.  What is the relationship between the case agent and the

9  source?

10  A.  In this situation, the case agent, myself, handled the

11  source.  What I mean by that, they provide the source with

12  instructions of what to do, what not to do, how to proceed

13  with assisting us in collecting evidence.

14  Q.  What happens if a source does not follow the case agent's

15  instruction?

16  A.  That happens.  At that point, it's -- the source is

17  admonished and there's a judgment call, depending on what the

18  issue is.

19      The case agent or the handling agent will look at the

20  issue at hand in the context of what occurred.  They'll make a

21  judgment based upon the context that the issue occurred, based

22  upon the FBI's operational needs to continue operating the

23  source.

24      So just because a source makes a mistake isn't

25  necessarily grounds to close that source.

1   Q.   Now, you testified early that Mr. Chinedum Ndukwe was a

2   source for the FBI.  Who was Mr. Ndukwe?

3   A.   Mr. Ndukwe is a local developer in the Cincinnati area.

4   He's a former NFL football player, and he was a source in this

5   investigation.

6   Q.   Is Mr. Ndukwe known by any nicknames?

7   A.   Yes.  He's commonly referred to as Chin.

8   Q.   What's a developer?

9   A.   The easy way I describe it is they're the quarterback of

10  a development project or a redevelopment project.  They get

11  the approvals, the financing, and see it from beginning to

12  completion.

13  Q.   At the time that Mr. Ndukwe provided the information to

14  you about Mr. Sittenfeld, how long had he been a source for

15  the FBI?

16  A.   I'm sorry.  Can you repeat that?

17  Q.   At the time Mr. Ndukwe provided the information to you

18  about Mr. Sittenfeld, how long had he been a source for the

19  FBI?

20  A.   Which information are you referring to?

21  Q.   Let me ask it this way.  Approximately when did

22  Mr. Ndukwe become a source with the FBI?

23  A.   That was approximately March of 2018.

24  Q.   How did Mr. Ndukwe become a source for the FBI?

25  A.   I arrived at the Cincinnati division in January of 2018

HOLBROOK - DIRECT

1    from the Indianapolis division.  My first day was

2    approximately January 4th, 2018, and within a couple of days,

3    my supervisor had assigned several public corruption cases

4    that were already opened on our squad to me.

5        I reviewed those cases.  And in one of those cases in

6    particular, there was information about Mr. Ndukwe, and the

7    fact that he had provided money orders and cashier's checks in

8    other people's names to local Cincinnati politicians.

9        Upon reviewing that case, at that time, I made a decision

10   that Mr. Ndukwe would be targeted for source recruitment.  I

11   advised my supervisor this was the direction I was going to

12   take this investigation, and he agreed with that.  So that was

13   determined, at that point, around the first week in January.

14       There is an individual whose name was on one of the money

15   orders, his name is James Semler.  I talked with James Semler,

16   that was approximately January 9th of 2018.

17       I asked him if he would make a recorded phone call with

18   Mr. Ndukwe for the purpose of setting up a meeting with

19   Mr. Ndukwe, which also would have been recorded, for the

20   purpose of collecting information about why he wrote the money

21   orders and the checks in other people's names, and generally

22   collecting information regarding that.

23       Mr. Semler called Ndukwe.  He refused to take the

24   meeting.  That didn't materialize.  That was on January 24th

25   of 2018.

1    That same day, I decided to call Ndukwe myself.  I

2    introduced myself as an FBI agent, and Mr. Ndukwe told me that

3    he would talk with me, but he wouldn't do anything without an

4    attorney.

5    Shortly after that, he asked -- well, on that same call,

6    he asked me to email an interview request to him, which I did.

7    Sometime after that, an attorney named Scott Crosswell

8    contacted me.

9    Scott and I set up a time to meet with Mr. Ndukwe and

10   conduct an interview.  At that interview was myself, my

11   colleague, Mr. Ndukwe, and Scott Crosswell.

12   During that interview, Mr. Crosswell requested to

13   continue the interview under a proffer agreement with the

14   United States Attorney's Office.  I provided Mr. Crosswell the

15   appropriate contact information.  That interview ended at that

16   point.

17   And then approximately mid-March 2018, there was an

18   interview at the United States Attorney's Office under a

19   proffer agreement with Mr. Ndukwe.

20   Q.   What's a proffer agreement?

21   A.   Simply put, a proffer agreement is an agreement between

22   the United States Attorney's Office and an individual that

23   states the information that the individual provides to the

24   United States Attorney's Office will not be used against that

25   individual, given that the information is provided that --

1    given the information provided is truthful.

2    Q.   And you mentioned these checks that were involved with

3    Mr. Ndukwe.  What was the year that those checks were issued?

4    A.   The money orders were issued in April of 2013, and the

5    cashier's checks were in October of 2013.

6    Q.   What happened after that proffer agreement in March of

7    2018?

8    A.   I met with Mr. Ndukwe, and I began to understand his

9    business, what he was doing in the City of Cincinnati.

10   Q.   At that point, when you met with Mr. Ndukwe, was he a

11   source for the FBI?

12   A.   Yes.

13   Q.   Was Mr. Ndukwe a source for the FBI throughout the

14   duration of the Sittenfeld investigation?

15   A.   He was.

16   Q.   At that same time, was he also providing information

17   about other matters?

18   A.   Yes, he was.

19   Q.   How was Mr. Ndukwe compensated?

20   A.   Mr. Ndukwe was paid.

21   Q.   How much did the FBI pay him?

22   A.   $27,000.

23   Q.   How was Mr. Ndukwe's compensation calculated?

24   A.   It was based upon how much work he had done previously.

25   And when I say "work," I mean assisting the FBI in the

1    investigation.  That could be recording telephone calls,

2    participating in the recorded meetings, things of that nature.

3    Q.   Was that work that he had done only for the Sittenfeld

4    investigation, or did that include work he had done for other

5    investigations?

6    A.   No.  That was multiple other investigations.

7    Q.   Was Mr. Ndukwe paid for work that he had done or work

8    that he was going to do in the future?

9    A.   He was paid for work that he had done.

10   Q.   How did you determine, generally speaking, Mr. Ndukwe's

11   compensation?

12   A.   We discussed compensation with sources.  There's no

13   definite, no specific logarithm or table that goes along with

14   that.  It's discretion of the case agent, and that's for

15   flexibility.

16        I based Mr. Ndukwe's compensation on how much he had

17   worked in a given period, and that was based upon, like I

18   mentioned earlier in my testimony, recordings, meetings,

19   information he provided generally assisting with an

20   investigation.

21   Q.   Was your compensation decision solely within your

22   discretion, or did you have to seek approval within the FBI?

23   A.   No.  My -- the payment to a source requires executive

24   management approval.

25   Q.   How was Mr. Ndukwe's compensation paid to him?

1    A.   It was paid in cash.

2    Q.   Is that typically how sources are paid?

3    A.   Yes.  It's very typical.

4    Q.   Why is that?

5    A.   As the FBI, if we're operating a source, and we want to

6    keep that relationship secret, it's hard to pay them with a

7    check from the FBI, so we pay them in cash.

8    Q.   Now, you testified that Mr. Ndukwe became a source with

9    the FBI in March of 2018.  After Mr. Ndukwe became a source,

10   did you meet with him?

11   A.   Yes.

12   Q.   When did you start meeting with him?

13   A.   That was the end of March, beginning of April of 2018.

14   Q.   During those early meetings at the end of March or

15   beginning of April of 2018, did Mr. Ndukwe mention anything

16   about Mr. Sittenfeld?

17   A.   The first time he referenced Mr. Sittenfeld was in

18   April of 2018.

19   Q.   Did you bring up Mr. Sittenfeld, or did Mr. Ndukwe bring

20   up Mr. Sittenfeld?

21   A.   I remember that I asked an open-ended question, something

22   such as, what else is going on in Cincinnati?  And then he

23   just referenced that Mr. Sittenfeld was requesting campaign

24   donations from LLCs.

25   Q.   What did you do in response to that information?

1    A.   Nothing specifically.  Around May of 2018, along with

2    multiple other telephone numbers, we requested toll records

3    for Sittenfeld's telephone number, among others, and that was

4    related to other investigations.

5    Q.   Did you take any other investigative steps in response to

6    that information?

7    A.   I did not.

8    Q.   Did there come a time, in the summer of that same year,

9    2018, that Mr. Ndukwe discussed Sittenfeld with you again?

10   A.   Yes.

11   Q.   When was that?

12   A.   That was August of 2018.

13   Q.   What did he say?

14   A.   That's when he said that he had met with Mr. Sittenfeld.

15   Mr. Sittenfeld had requested Mr. Ndukwe to introduce him to

16   developers.

17   Q.   What did you do in response to that information?

18   A.   I documented it.  Beyond that, I didn't do anything else

19   with it.

20   Q.   Now, did there come a time, in the fall of that year,

21   2018, that Mr. Ndukwe discussed Sittenfeld with you again?

22   A.   Yes.  That was October 25th of 2018.

23   Q.   What did he tell you then?  And I believe you testified

24   to some of this earlier.

25   A.   Yes.  He told me that Mr. Sittenfeld had requested

1    $10,000 from multiple LLCs, didn't care where the money came

2    from.

3    Q.   Did he mention any other telephone calls with you during

4    that conversation?

5    A.   Not that I can recall.

6    Q.   Now, you testified earlier that you had reviewed a

7    recording between Mr. Ndukwe and someone named Jay Kincaid.

8    Who is Jay Kincaid?

9    A.   At the time of this investigation, Jay Kincaid was a

10   lobbyist in Cincinnati.

11   Q.   Back in 2018, what was Mr. Kincaid's relationship to

12   Mr. Ndukwe?

13   A.   I believe, at this time, Mr. Ndukwe was paying

14   Mr. Kincaid as his lobbyist.

15   Q.   What is a lobbyist?

16   A.   A lobbyist is an individual that is an intermediary or a

17   go-between between a public individual like Mr. Ndukwe, a

18   developer, and he'll communicate with local political

19   officials, appointed public officials, and assist the citizen

20   in getting something done, whether it be a development, or

21   passage of some law, or some political issue.

22   Q.   Now, you mentioned this earlier in your testimony,

23   435 Elm.  What is 435 Elm?

24   A.   435 Elm is a building located in the Central Business

25   District in downtown Cincinnati.

HOLBROOK - DIRECT

1   Q.  If you could, please, turn in your binder and look at

2   your screen.  I'm showing you what's been marked for

3   identification as Government Exhibit USA 2C.

4       MS. GAFFNEY PAINTER:  And if you could, Ms. Terry,

5   this is multiple pages.

6   Q.  Special Agent Holbrook, do you recognize these?

7   A.  I do.

8   Q.  What are they?

9   A.  These are aerial photographs of the downtown area in

10   Cincinnati.

11   Q.  For the first two pages of USA 2C, are they fair and

12   accurate representations of the geographic relationship

13   between 435 Elm, the 580 Building, and the labeled restaurants

14   and bars there?

15       MS. GAFFNEY PAINTER:  Ms. Terry, if you could return,

16   please, to the first two pages of this exhibit.

17   A.  Could you repeat your question, Counselor?

18   Q.  Certainly.  And in case it is more convenient for you,

19   they're also in hard copy in your binder.  This is tab USA 2C.

20   Take your time, and when you're ready, just look up at me.

21      Now, for the first two pages of this exhibit, USA 2C, are

22   they fair and accurate representations of the geographic

23   relationship between 435 Elm, the 580 Building, and the

24   labeled restaurants and bars?

25   A.  They are.

1    Q.   For the next series of pages that appear in this exhibit,

2    are they fair and accurate representations of a segment of

3    Cincinnati as it appeared on May 23, 2022?

4    A.   Yes, they are.

5         MS. GAFFNEY PAINTER:   The government moves for the

6    admission of Government Exhibit USA 2C.

7         MR. C. HENRY RITTGERS:   No objection.

8         THE COURT:   Government Exhibit USA 2C is admitted

9    without objection.

10        MS. GAFFNEY PAINTER:   Thank you.   Ms. Terry, will you

11   please publish these photographs to the jury.

12      Excuse me, I should ask for permission first.   I

13   apologize, Your Honor.

14        THE COURT:   That's all right.

15        MS. GAFFNEY PAINTER:   May I have permission to

16   publish these exhibits?

17        THE COURT:   You may.

18   Q.   Special Agent Holbrook, you testified about a

19   conversation you had with Mr. Ndukwe on October 25, 2018.

20   What did you do in response to that conversation?

21   A.   I instructed Mr. Ndukwe to make a recorded telephone call

22   with Sittenfeld.

23   Q.   During this investigation, how did Mr. Ndukwe record

24   phone calls?

25   A.   Mr. Ndukwe was provided access to a system that the FBI

1    has.  Mr. Ndukwe can access that system with a code, and then

2    he can input a telephone number that he wants to call.  That

3    system would then record that telephone call and only that

4    telephone call.

5        And once it records, it is maintained in a system at the

6    FBI that the case agents and agents working the investigation

7    have access to.

8    Q.  Does this system used by the FBI record all of the calls

9    that Mr. Ndukwe makes, or just the ones that he specifically

10   activates?

11   A.  Just the one that he specifically activates it on.

12   Q.  What about incoming calls to Mr. Ndukwe.  Does this

13   system record those?

14   A.  The system can record incoming calls, but we were not

15   recording incoming calls with the way the system was set up

16   for Mr. Ndukwe.

17   Q.  Why is that?

18   A.  In order to record outgoing and incoming calls with this

19   system, you have to provide the individual with a different

20   telephone number.

21       In this situation in this case, Mr. Ndukwe has had his

22   telephone number for a number of years.  Everyone knows him to

23   have this telephone number.  It wouldn't have been wise to

24   change that number and then introduce that, so we just kept

25   with giving him only the ability to record outgoing calls.

1  Q.  What instructions did you give to Mr. Ndukwe regarding

2  recording phone calls?

3  A.  So I instructed him to record telephone calls of

4  individuals that were subject to investigations or individuals

5  that were unwittings.

6  Q.  What is an unwitting?

7  A.  An unwitting is a person who doesn't know that the

8  individual is a source, doesn't know that there is an

9  investigation, but they have access to information but aren't

10  necessarily committing any crimes.

11  Q.  Now, just to be clear, for these calls that Mr. Ndukwe

12  was recording, whose phone was he using to make these calls?

13  A.  He used his own personal telephone.

14  Q.  Now, you testified that Mr. Ndukwe told you about a phone

15  call between himself and Mr. Sittenfeld.  Was that call

16  recorded?

17  A.  On October 25th -- or, excuse me, which one?

18  Q.  Yes.  Let me orient you.  Referring to your conversation

19  that happened with Mr. Ndukwe at the end of October of 2018, I

20  believe you referenced that he told you about a call between

21  himself and Mr. Sittenfeld.  Was that call recorded?

22  A.  No.

23  Q.  Why was that call not recorded?

24  A.  Mr. Ndukwe, at that point, had not been instructed to

25  record telephone calls with Mr. Sittenfeld because

HOLBROOK - DIRECT

1   Mr. Sittenfeld wasn't, at that time, a subject or of interest

2   to the FBI.

3   Q.   What happened on October 26, 2018?

4   A.   I instructed Mr. Ndukwe to conduct a recorded telephone

5   call with Sittenfeld.

6   Q.   Was that call actually recorded?

7   A.   It was.

8   Q.   Now, if you would, please, turn in your binder to the tab

9   marked USA 12A.

10  A.   Yes.

11  Q.   Do you recognize this?

12  A.   I do.

13  Q.   What is it?

14  A.   This is a compact disk that contains a copy of the

15  October 26, 2018 call.

16  Q.   How do you know that?

17  A.   I reviewed this disk, and then I put my initials on it.

18          MS. GAFFNEY PAINTER:   The government moves now for

19  the admission of Government Exhibit USA 12A.

20          MR. C. HENRY RITTGERS:   No objection, Your Honor.

21          THE COURT:   USA 12A is admitted without objection.

22  Q.   Now, Special Agent Holbrook, will you please turn to the

23  tab in your binder marked USA 12B.

24  A.   Yes.

25  Q.   Do you recognize this?

1    A.   I do recognize this.

2    Q.   What is it?

3    A.   This is a transcript of a telephone call on October 26,

4    2018, between Mr. Ndukwe and Mr. Sittenfeld.

5    Q.   What was the process for preparing this transcript?

6    A.   The process with this transcript was we utilize a system

7    called start stops that allows us to be very specific about

8    where we are in listening to a recording.

9        We can back it up a specific amount of time, move it

10   forward a specific amount of time, depending what we want.

11   That allows us to be more accurate on transcripts.

12       I will complete a transcript using the start stop, or my

13   colleague will complete a transcript.  We review that

14   transcript, make the corrections, the edits.

15       I will have my colleague to review it, and vice versa,

16   and they will make any suggested edits to that transcript.

17   Q.   To the best of your ability, is this transcript accurate?

18   A.   Yes.

19       MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

20   testimony and the stipulation between the parties, the

21   government moves for the admission of Government Exhibit

22   USA 12B.

23       MR. C. HENRY RITTGERS:  No objection, Your Honor.

24       THE COURT:  USA Exhibit 12B is admitted without

25   objection.

1          MS. GAFFNEY PAINTER:  Your Honor, the next step would

2     be to distribute the transcript binders to the jury, provide

3     them the instructions that we have discussed, and then publish

4     the exhibit.

5          It could be a good time for a morning break, if that's

6     amenable to Your Honor, or we can continue on.

7          THE COURT:  Why don't we continue.  I'd like to try

8     and keep this moving forward.  Why don't you go ahead and

9     distribute the transcript books now.

10         So ladies and gentlemen of the jury, you're getting now a

11    compilation of transcripts.  It's very important -- it's not

12    clear that all these transcripts are going to be admitted into

13    evidence, so we need to, sort of, go one at a time through

14    these.

15         Please don't look at anything other than what you're

16    directed to look at, because we have to wait and see what

17    actually comes in.

18         So not everything in here will necessarily come into

19    evidence, but we're going to try and be very careful to direct

20    you to the parts that are being played, and you should only

21    look at that.  Don't look at other parts of the book.  Does

22    everybody understand?  Got it?  Good.

23         All right.  So can I see one of the books?

24         MS. GAFFNEY PAINTER:  May I approach, Your Honor?

25         THE COURT:  You may.  Thank you.  Okay.  So ladies

HOLBROOK - DIRECT

1     and gentlemen of the jury, as you can see, the tabs are marked

2     in here.  It will say like USA, one of them says 3F or 12B.

3         So when we refer to an exhibit, we're going to refer to

4     it by that number.  So if we say -- like I think we just

5     admitted 12B, and now we're going to play it, so we'll

6     instruct you to turn to 12B, and you can look at that

7     transcript.  And why don't we just turn to -- 12B is what

8     we've admitted, right?

9             MS. GAFFNEY PAINTER:  Yes.  That's correct.

10            THE COURT:  So why don't we turn to 12B just so you

11    can kind of see what it looks like and what we'll be doing

12    here.

13        Usually, there will be a cover sheet on the front, on the

14    first page, then you'll see the second page starts a

15    transcript that identifies a speaker and then what's said.

16    This is to help you when we play the audio so you can kind of

17    follow along in this.

18        But as I said, you know, you shouldn't flip to 14B and

19    look at 14B because what's been admitted is 12B, all right?

20    Okay.  So go ahead.

21            MS. GAFFNEY PAINTER:  Your Honor, before we publish

22    the exhibit, we would also like to request, in case I missed

23    it, that the jury should trust their ears over what they read.

24            THE COURT:  Yes.  Thank you very much.

25        So one other thing to keep in mind.  Every effort has

HOLBROOK - DIRECT

1    been made, as you heard, to try to make these transcripts

2    accurate.

3         But if you notice any differences between what you hear

4    on the recordings and what you read in the transcripts, you

5    must rely on what you hear in the recording, not what you

6    read, okay?

7         What you're hearing -- this is just a guide to help you

8    follow along, but what you hear is the evidence, all right?

9    Make sense, everybody?  Okay.  Any questions?  No questions.

10   Okay.  Good.  All right.

11        MS. GAFFNEY PAINTER:  With the Court's permission,

12   the government wishes to publish Government Exhibit USA 12A,

13   the corresponding transcript of which is USA 12B.

14        THE COURT:  Very good.  You may do so.

15        (Audio played.)

16   Q.   Special Agent Holbrook, there was a reference in

17   Government Exhibit USA 12A to "everything changing in

18   November."

19        What was going to happen in November of 2018 with respect

20   to political contributions?

21   A.   In November of 2018, there was an issue on the ballot

22   that the citizens of Cincinnati could vote on.  That issue was

23   referred to as Issue 13.

24        What the situation was at the time of that call, a person

25   could donate to a local candidate up to $1,100.  And if that

1  individual had LLCs, they could donate through as many LLCs as

2  they had up to $1,100.  Issue 13 closed that LLC loophole.

3      At that point, the individual could -- if it passed, the

4  individual could only donate $1,100 from themselves or from

5  the LLC, but they couldn't donate from both, and they could

6  not donate from multiple LLCs.

7  Q.  At the time of that phone call, what was the status of

8  Issue 13?

9  A.  Issue 13 had not passed.  It was going to be voted on, I

10  believe, November 6th.

11  Q.  What is an LLC?

12  A.  LLC is a limited liability corporation.

13  Q.  There was reference in USA 12A to "Rob and Brian."  Who

14  are Rob and Brian?

15  A.  Rob and Brian are undercover FBI agents.

16  Q.  Were Rob and Brian known as anything else during this

17  investigation?

18  A.  Yes.

19  Q.  What were they known by?

20  A.  Rob was also known as UCE, or undercover employee,

21  UCE 7157.  And Brian was known as UCE 7760.

22  Q.  Where did those numbers come from?

23  A.  Those are random numbers assigned to them by the FBI when

24  they complete their certification course.

25  Q.  What does it mean to be an FBI undercover agent?

1  A.  Not every FBI agent can work as an undercover.  An FBI

2  undercover agent is an FBI agent that has applied to and been

3  accepted to an intensive two-week certification course.

4      Once they complete that certification course, they are

5  then considered to be an undercover agent and can operate in

6  an undercover capacity.  What that means is they can operate

7  under an alias or a persona, as somebody else, not as an FBI

8  agent.

9      And that allows them the ability to infiltrate

10 organizations, groups, or develop relationships with

11 individuals under their alias for the purpose of gaining

12 information, intelligence, or evidence.

13     And they're in a position to collect that evidence

14 because the individual doesn't know they're FBI agents, so

15 they typically wouldn't voluntarily give me that information,

16 but an undercover, they would.

17 Q.  Why does the FBI use undercover agents?

18 A.  Well, just for that purpose.  It is a -- it's a tool in

19 the toolbox.  It's one method we have of collecting evidence.

20     The undercovers are particularly useful when the evidence

21 is in the conversations.  And it's those conversations that

22 FBI agents themselves don't have access to.

23 Q.  Who made the decision to involve Rob and Brian in this

24 investigation?

25 A.  I did.

1    Q.    Why did you make that decision?

2    A.    Just for the reasons stated.  Rob and Brian were actually

3    already in this area working as undercover agents, and I

4    brought them into this investigation to develop these

5    relationships, to have these conversations, and to determine

6    what was going on in the City of Cincinnati.

7    Q.    What were Rob and Brian's personas?

8    A.    In this investigation, they were wealthy investors.

9    Q.    What were they purportedly investing in?

10    A.    435 Elm.

11    Q.    Was the FBI actually investing money into the 435 Elm

12    project?

13    A.    No, they were not.

14    Q.    You mentioned that Rob and Brian were in the area working

15    on other investigations as well.

16         When did Rob and Brian begin participating in public

17    corruption investigations in the Cincinnati area?

18    A.    That was -- that began back in September of 2017.

19    Q.    When was the first time that Rob and Brian interacted

20    with the defendant?

21    A.    That was approximately February of 2018.

22    Q.    What was the context of that interaction?

23    A.    Related to another investigation, Rob and Brian were

24    being introduced to local Cincinnati political leaders by an

25    individual by the name of Sam Malone.

1        And Sam Malone had set up multiple meetings for Brian and

2    Rob, and one of those meetings happened to be with

3    Mr. Sittenfeld.

4    Q.   During that interaction between Mr. Sittenfeld and Rob

5    and Brian, did Mr. Sittenfeld ask how he could be helpful as

6    Rob and Brian thought through opportunities in Cincinnati?

7    A.   He did.

8    Q.   We just listened to a telephone call from October 26th,

9    2018.  What happened four days later, on October 30th, 2018?

10   A.   Mr. Ndukwe recorded a second telephone call with

11   Mr. Sittenfeld, at my direction.

12   Q.   Was that call recorded?

13   A.   It was.

14   Q.   If you could, please, turn to the tab in your binder

15   that's marked as USA 13A.

16        Do you recognize this?

17   A.   I do.

18   Q.   What is it?

19   A.   This is a disk containing a recording of the

20   October 30th, 2018 call.

21   Q.   How do you know that?

22   A.   I reviewed this disk, and I placed my initials on it.

23        MS. GAFFNEY PAINTER:  Your Honor, the government

24   moves for the admission of Government Exhibit USA 13A.

25        MR. C. HENRY RITTGERS:  No objection, Your Honor.

1          THE COURT:  USA 13A is admitted without objection.

2     Q.   Special Agent Holbrook, will you please turn to the next

3     tab in the binder that's marked USA 13B.

4     A.   Yes.

5     Q.   Do you recognize this?

6     A.   I do.

7     Q.   What is it?

8     A.   This is a transcript of the recorded telephone call on

9     October 30th, 2018 between Mr. Ndukwe and Mr. Sittenfeld.

10    Q.   You testified earlier about the process used to prepare

11    transcripts.  Was that same process used to prepare this

12    transcript?

13    A.   It was.

14    Q.   To the best of your ability, is this transcript accurate?

15    A.   Yes.

16         MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

17    stipulation between the parties and the testimony of Special

18    Agent Holbrook, the government moves for the admission of

19    Government Exhibit USA 13B.

20         MR. C. HENRY RITTGERS:  No objection, Your Honor.

21         THE COURT:  USA 13B is admitted without objection.

22         MS. GAFFNEY PAINTER:  Your Honor, may the government

23    publish Government Exhibit 13A?

24         THE COURT:  You may.  And ladies and gentlemen of the

25    jury, you may look, at this point, at 13B.  But remember my

1    admonition that to the extent there's any discrepancy between

2    what you read and what you hear, it's what you hear that

3    matters.

4       (Audio played.)

5    Q.  Special Agent Holbrook, there was a reference in

6    Government Exhibit USA 13A to "Smitherman."  Who is

7    Smitherman?

8    A.  At this time in the investigation, Smitherman is referred

9    to as -- it's Christopher Smitherman, who was a Cincinnati

10    city councilmember and vice mayor of Cincinnati.

11       It was generally suspected, at the time of the

12    investigation, that Mr. Smitherman would be running for mayor

13    of Cincinnati.

14    Q.  Also in Government Exhibit USA 13A, there was reference

15    to "Jay."  What was that in reference to?

16    A.  That's in reference to Jay Kincaid.

17    Q.  After reviewing this call, what instruction did you

18    provide to Mr. Ndukwe?

19    A.  After reviewing this call, I instructed Mr. Ndukwe to

20    make a third recorded telephone call to Mr. Sittenfeld.

21       And, in addition to that, I instructed Mr. Ndukwe to make

22    a very clear and obvious offer of money in exchange for votes

23    by Mr. Sittenfeld on 435 Elm.

24    Q.  You testified earlier about the procedure that was used

25    to record calls.  I want to clarify something that I'm not

1     sure that you covered.

2         What instruction did you provide to Mr. Ndukwe for

3     incoming calls of someone that you believe should be recorded?

4     A.  So, as I testified earlier, Mr. Ndukwe didn't have the

5     access, the way the system was set up, to capture incoming

6     calls.  So there's a couple things we can do to mitigate that.

7         We can -- you know, we instruct the source to not answer

8     that call and to call back later when it can be recorded on

9     the system.  We instruct the source to maybe send a text

10    message that says I'll call you back in 10 minutes.

11        If there starts to be a lot of back and forth, it

12    becomes -- we're afraid that it becomes a little suspicious,

13    and then sometimes, more as a last resort, to answer the call

14    and say I'm in a meeting, or I'm busy, I'll call you right

15    back.  So these are some of the techniques we use to mitigate

16    that.

17    Q.  Now, you testified that in response to the call that we

18    listened to at USA 13A, that you had provided instructions to

19    Mr. Ndukwe to place another recorded call.  Did that call

20    happen on November 2nd of 2018?

21    A.  It did.

22    Q.  Was that call recorded?

23    A.  Yes.

24    Q.  If you will, please, turn to tab USA 14A in the binder in

25    front of you.

HOLBROOK - DIRECT

1    A.   Yes.

2    Q.   Do you recognize this?

3    A.   I do.

4    Q.   What is it?

5    A.   This is a compact disk containing the November 2nd, 2018

6    recorded telephone call that was just referenced.

7    Q.   How do you know that?

8    A.   I reviewed this disk and, after review, I placed my

9    initials on it.

10         MS. GAFFNEY PAINTER:  Your Honor, the government

11   moves for the admission of Government Exhibit 14A.

12         MR. C. HENRY RITTGERS:  No objection, Your Honor.

13         THE COURT:  USA 14A is admitted without objection.

14   Q.   Special Agent Holbrook, will you please turn to tab

15   USA 14B.

16   A.   Yes.

17   Q.   I'm showing you there what's been marked for

18   identification as USA 14B.  Do you recognize this?

19   A.   I do recognize this.

20   Q.   What is it?

21   A.   This is a transcript of the November 2nd, 2018 call

22   between Mr. Ndukwe and Mr. Sittenfeld.

23   Q.   Did you review this transcript for accuracy?

24   A.   I did.

25         MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

1    stipulation between the parties and the testimony of Special

2    Agent Holbrook, the government moves for the admission of

3    Government Exhibit USA 14B.

4              MR. C. HENRY RITTGERS:  No objection, Your Honor.

5              THE COURT:  USA 14B is admitted without objection.

6              MS. GAFFNEY PAINTER:  Permission to publish

7    Government Exhibit USA 14A to the jury?

8              THE COURT:  You may.  And ladies and gentlemen of the

9    jury, at this point, you can turn to Exhibit 14B in the book.

10       Once again, to the extent there's any discrepancy between

11   what you hear and what you read here, it is what you hear that

12   matters.

13       (Audio played.)

14   Q.  Special Agent Holbrook, there was reference in USA 14A to

15   a "quid pro quo."  What does that phrase mean?

16   A.  It's a Latin phrase that basically means something for

17   something.  It's commonly used in public corruption

18   investigations, that term.

19   Q.  After this call that we just listened to, USA 14A, what

20   was the next step you took in the investigation?

21   A.  I contacted Rob and instructed him to travel to

22   Cincinnati for that meeting referenced in the telephone call.

23             MS. GAFFNEY PAINTER:  Your Honor, the next area of

24   exploration is this meeting, which features long recordings.

25   I'm presenting this as a possible opportunity for a morning

 1    break.

 2              THE COURT:  That sounds like a good idea.  All right.

 3    We will take our morning break at this point and be back

 4    probably, hopefully, before 11:00, but we'll see.  So why

 5    don't we excuse the jury.

 6        I'm sure you're getting sick of hearing this, but please

 7    do not discuss this case with your fellow jurors.  Please do

 8    not begin to form any opinions yourself about what the verdict

 9    should be.

10        Please do not do any kind of research, electronic or

11    otherwise, on any form of media, or the internet, or anything

12    else.  And other than that, we will see you when you get back

13    here.

14        (Jury out at 10:39 a.m.)

15              THE COURT:  Anything we need to put on the record

16    before we break?

17              MR. SINGER:  No, Your Honor.

18              MR. C. MATTHEW RITTGERS:  No, Your Honor.

19              MR. C. HENRY RITTGERS:  No, Your Honor.

20              THE COURT:  Very good.  Let's try to keep it short.

21    One issue that jurors have expressed in previous trials is the

22    breaks get to be a little long for them, so if we can try to

23    be back here -- so we can get the jury in by 11:00, if we

24    could be back here by no later than seven minutes before

25    11:00, or something like that, or five minutes before 11:00,

1    just so we can try and get the jury in.  Is that all right?

2    Is that going to work?

3            MR. C. HENRY RITTGERS:  It's okay with us.

4            THE COURT:  Very good.

5        (Brief recess.)

6            THE COURT:  Anything we need to address before we

7    bring the jury in, Mr. Singer?

8            MR. SINGER:  No, Your Honor.

9            THE COURT:  Mr. Rittgers?

10           MR. C. MATTHEW RITTGERS:  No, Your Honor.

11           THE COURT:  All right.  We're ready to bring them in.

12       Ms. Gaffney Painter, are we thinking most of the rest of

13   the day with Special Agent Holbrook?

14           MS. GAFFNEY PAINTER:  Yes, Your Honor.

15           MR. C. MATTHEW RITTGERS:  Your Honor, there's one UI,

16   just so the Court's aware, in this transcript, where we

17   believe it is audible and intelligible where something is

18   stated.  P.G. says, "It's good for the city."  It's not in the

19   transcript.  I just want the Court to be aware of that.

20           THE COURT:  Okay.  And that's in Exhibit 14B?

21           MR. C. MATTHEW RITTGERS:  I believe the next exhibit

22   they plan to introduce, which would be 14B, is that correct, I

23   believe?

24           MR. SCHUETT:  It would be the November 7th exhibit,

25   15C.

 1          THE COURT:  15C, I believe, is the transcript, and

 2    it's the unintelligible that's on what page?

 3          MR. C. MATTHEW RITTGERS:  I'll find it, Your Honor.

 4    Your Honor, it will be on page 38.

 5          THE COURT:  I see three UIs on that page.  Do you

 6    know which one you're referring to?

 7          MR. C. MATTHEW RITTGERS:  If you went four speakers

 8    up from the bottom, where it says:  "Sittenfeld:  Yeah, yeah,

 9    yeah."

10          THE COURT:  Okay.

11          MR. C. MATTHEW RITTGERS:  "Torpedo," and then there's

12    a UI, and it would be that one.

13          THE COURT:  Okay.  I will be primed for that.  I will

14    circle it right now.

15          MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

16          MR. SINGER:  Your Honor, may I ask what the

17    unintelligible language was again?

18          THE COURT:  The what?

19          MR. C. MATTHEW RITTGERS:  "They're not going to let

20    John torpedo a good development."

21       Your Honor, on this particular exhibit, is this something

22    that will go to the jury, and they will read this with the UI

23    in the transcript, and then how will that be corrected?  I'm

24    just asking procedurally.

25          THE COURT:  Well, is there any way to jump to that?

```
1          Could you go ask Scott to hold up on bringing the jury
2     in.
3          Is there any way we can jump to that or not?  It's
4     basically at the end.  Is there any way to just jump to that
5     or not?  It's 15C?
6               MR. C. MATTHEW RITTGERS:  The audio might be 15A.
7               THE COURT:  Or B.
8               MR. C. MATTHEW RITTGERS:  Or B.
9               THE COURT:  Is that the next one you're intending to
10    play, Ms. Gaffney Painter?
11              MS. GAFFNEY PAINTER:  Yes.  There are two recordings
12    from this day, one at the restaurant, one at the apartment.
13    The one in the restaurant is 14A, and then the one at the
14    apartment -- oh, I apologize.  We're talking about 15?
15              THE COURT:  Yes.
16              MS. GAFFNEY PAINTER:  I apologize.  15A is the
17    restaurant, 15C is the transcript, and 15B, I believe, is the
18    recording of the meeting at the apartment.
19              MR. SINGER:  We can play that now.
20              THE COURT:  Is 15C the transcript for both 15A and B?
21              MS. GAFFNEY PAINTER:  Yes.  I apologize.  It is
22    combined.
23              THE COURT:  I see.  Okay.  So can you jump to the end
24    of what I believe would be 15B?  They wanted to play something
25    and see if we can hear it.
```

```
 1              COURTROOM DEPUTY:  Oh.
 2         (Audio played.)
 3              THE COURT:  I can't make it out.  You're free to
 4    point that out to the jury.  I can't make it out.  You think
 5    it says what?
 6              MR. C. MATTHEW RITTGERS:  "Good development."
 7              THE COURT:  "Torpedo good development"?
 8              MR. C. MATTHEW RITTGERS:  Yeah.
 9              THE COURT:  I'm sorry.  I can't make that out.  I
10    would agree, it's unintelligible, but...
11              MR. C. MATTHEW RITTGERS:  It's on the wire, so we
12    know what it stated.  That might have helped us arrive at --
13              THE COURT:  No.  I understand.  And you're certainly
14    free to elicit from Mr. Sittenfeld that that is "good
15    development," that he said that.  I'm not saying he didn't say
16    that, I'm just saying I can't make it out on that recording.
17              MR. C. MATTHEW RITTGERS:  Thank you, Judge.
18    Understood.
19              THE COURT:  All right.
20         (Jury in at 10:59 a.m.)
21              THE COURT:  Ms. Gaffney Painter, you may continue.
22              MS. GAFFNEY PAINTER:  Thank you, Your Honor.  May I
23    proceed?
24              THE COURT:  You may.
25    BY MS. GAFFNEY PAINTER:
```

1    Q.   Special Agent Holbrook, before the break, we listened to

2    a call that was admitted into evidence as USA 14A.  You also

3    testified that prior to that call, you had instructed

4    Mr. Ndukwe to make a clear offer for money for votes.

5        Why did you provide Mr. Ndukwe with that instruction?

6    A.   I wanted it to be clear that Rob, who is playing the role

7    of an investor that is willing to bribe public officials, I

8    wanted it to be clear that it was a bribe offer and not be

9    ambiguous.

10   Q.   Within the call we played at Exhibit USA 14A, there was

11   reference to "discuss that more in person."  Did you decide to

12   take any investigative steps based on that line?

13   A.   Yes.

14   Q.   Why did you decide to move forward with an in-person

15   meeting?

16   A.   During that call, they agreed to meet.  They agreed --

17   Mr. Sittenfeld agreed to meet with Rob, and so we proceeded.

18   The next logical investigative step would be to move forward

19   with the meeting.

20   Q.   What happened in the investigation on November 7, 2018?

21   A.   There was a meeting in downtown Cincinnati, at Nada's,

22   between Mr. Ndukwe, Rob, and Mr. Sittenfeld.

23   Q.   What is Nada's?

24   A.   Nada's is a restaurant in downtown Cincinnati.

25   Q.   Who picked that location?

1    A.   I picked it.

2    Q.   Why?

3    A.   I selected that location because it was close to the

4    580 Building.  This is a building in which Rob had an

5    apartment.

6    Q.   Was the meeting at Nada's on November 7, 2018, recorded?

7    A.   Yes.

8    Q.   How was that meeting recorded?

9    A.   That meeting was recorded with an audio recording device.

10   It's a battery powered recording device which Rob had within

11   his control during that meeting.

12   Q.   Generally speaking, how do these sorts of recording

13   devices work?

14   A.   These recording devices are -- they're concealable.

15   They're activated by the user, and then they're deactivated by

16   the user.  They're sensitive, and they will record as long as

17   there's space to record on and as long as there's battery

18   power.

19   Q.   What instructions did you provide to Mr. Ndukwe before

20   this meeting at Nada's?

21   A.   I told Mr. Ndukwe just to be who he is, a developer

22   trying to develop 435 Elm, nothing different.

23   Q.   Have you reviewed the recording of the meeting at Nada's?

24   A.   Yes.

25   Q.   Will you please turn to Tab USA 15A.

HOLBROOK - DIRECT

1    A.  Yes.

2    Q.  I'm showing you there what's been marked for

3    identification as Government Exhibit USA 15A.  Do you

4    recognize this?

5    A.  I do.

6    Q.  What is it?

7    A.  This is a recording of the meeting I just referenced at

8    Nada's.

9    Q.  How do you know that?

10    A.  I reviewed this disk, and I placed my initials on it.

11        MS. GAFFNEY PAINTER:  The government moves for the

12    admission of Government Exhibit USA 15A.

13        MR. C. HENRY RITTGERS:  No objection, Your Honor.

14        THE COURT:  USA 15A is admitted without objection.

15    Q.  Before we seek permission to publish this, did this

16    meeting continue at a location other than Nada on that same

17    day?

18    A.  It did.

19    Q.  Where?

20    A.  It continued at Rob's apartment at the 580 Building.

21    Q.  Was that meeting recorded?

22    A.  It was.

23    Q.  Now, if you could, please, turn in your binder to tab

24    USA 15B.

25    A.  Yes.

HOLBROOK - DIRECT

1    Q.   I'm showing you there what's been marked for

2    identification as Government Exhibit USA 15B.  Do you

3    recognize this?

4    A.   I do.

5    Q.   What is it?

6    A.   This is a compact disk containing the continued meeting

7    at the apartment at the 580 Building.

8    Q.   How do you know that?

9    A.   I reviewed this and also placed my initials on the disk.

10        MS. GAFFNEY PAINTER:  Your Honor, the government

11   moves for the admission of Government Exhibit USA 15B.

12        MR. C. HENRY RITTGERS:  No objection.

13        THE COURT:  USA 15B is admitted without objection.

14   Q.   Special Agent Holbrook, turning now to what's been marked

15   for identification as USA 15A.  Do you recognize this?

16        THE COURT:  15A?

17   Q.   Excuse me, 15C.

18   A.   I do.

19   Q.   What is it?

20   A.   This is a transcript of the meeting at Nada's, and the

21   continued meeting at the 580 Building.

22   Q.   You testified earlier to the process of preparing these

23   transcripts.  Was that the same process that was used to

24   prepare this transcript?

25   A.   Yes, it was.

1  Q.  Is it accurate, to the best of your ability?

2  A.  It is.

3      MS. GAFFNEY PAINTER:  Your Honor, based on the

4  stipulations between the parties and Special Agent Holbrook's

5  testimony, the government moves for the admission of

6  Government Exhibit USA 15C.

7      MR. C. HENRY RITTGERS:  May we have one second, Your

8  Honor?

9      THE COURT:  You may, Mr. Rittgers.

10     MR. C. HENRY RITTGERS:  We are not objecting, Your

11  Honor.

12     THE COURT:  USA 15C is admitted without objection.

13     MS. GAFFNEY PAINTER:  Your Honor, the government

14  requests permission to publish USA 15A, and would like to note

15  for the record the specific timestamps that we intend to

16  present to the jury.

17     THE COURT:  Yes, please.

18     MS. GAFFNEY PAINTER:  We would request publishing

19  first on USA 15A, timestamp 11:41 to 16:22.

20     THE COURT:  Is that a portion of this transcript, is

21  that right, or what?

22     MS. GAFFNEY PAINTER:  We have fully transcribed the

23  portion that we are admitting into evidence, and they will

24  find that at 15C.

25     THE COURT:  Okay.  And what you just said you're

1    going to play is the entirety of the transcript at 15C or not?

2            MS. GAFFNEY PAINTER:  No.  So 15C contains both the

3    segments from the meeting at Nada's and also the recording in

4    the apartment.

5            THE COURT:  So why don't we help the jury, then.

6    What parts are the segments from Nada's; if you know?

7            MS. GAFFNEY PAINTER:  So you will see delineated

8    there in 15C timestamp 11:41 to 16:22.

9            THE COURT:  Ladies and gentlemen of the jury, I think

10   what she's saying is we're first going to hear what's,

11   essentially, reflected on the transcript from pages -- what's

12   marked at the top, in the right corner, see it says page 002

13   in the right corner up at the top?  And then I think it's

14   going to go to page 006, and then it will say transcript stops

15   16:22.

16      Do you see that on the page that's marked 006 on the top

17   right?  That's the portion they're going to play first.

18            MS. GAFFNEY PAINTER:  Thank you, Your Honor.

19            THE COURT:  Go ahead, Ms. Gaffney Painter.

20      (Audio played.)

21            MS. GAFFNEY PAINTER:  Your Honor, the government

22   requests permission to publish the next segment of the exhibit

23   time stamped 1:21:20 to 56:04.

24            THE COURT:  So that's going to go through page 28,

25   roughly, okay.  You may do so.

1    (Audio played.)

2         MS. GAFFNEY PAINTER:  May I proceed, Your Honor?

3         THE COURT:  You may.

4    Q.  At the time this proceeding was recorded, who was the

5    mayor of Cincinnati?

6    A.  John Cranley.

7    Q.  Now, there was reference in USA 15A to Goldschmidt.

8    Based on your participation in this investigation, who is

9    Goldschmidt?

10   A.  Goldschmidts were tenants in the 435 Elm building.

11   Q.  Now, did this meeting continue at a different location?

12   A.  It did.

13   Q.  Where did it continue?

14   A.  It continued at an apartment located in the 580 Building.

15   Q.  Who participated in that meeting in the apartment in the

16   580 Building?

17   A.  Rob and Mr. Sittenfeld.

18   Q.  What is the apartment in the 580 Building?

19   A.  Excuse me?  I'm sorry.

20   Q.  What is the apartment in the 580 Building?  What is that

21   referring to?

22   A.  It is an apartment that Rob is renting.  It's a

23   two-story, two-bedroom apartment that Rob was renting at the

24   580 Building.

25   Q.  Special Agent Holbrook, can you please turn in the binder

HOLBROOK - DIRECT

1    to the tab USA 5A.

2    A.  Yes.

3    Q.  Do you recognize these?

4    A.  Yes.  This is a photograph of the lobby of the

5    580 Building and outside of the 580 Building.

6    Q.  Are these exhibits fair and accurate representations of

7    the 580 Building and its lobby?

8    A.  They are.

9          MS. GAFFNEY PAINTER:  The government moves for the

10   admission of Government Exhibit 5A.

11          MR. C. HENRY RITTGERS:  No objection, Your Honor.

12          THE COURT:  USA 5A is admitted without objection.

13          MS. GAFFNEY PAINTER:  Your Honor, may we publish to

14   the jury?

15          THE COURT:  You may.

16          MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

17   Q.  Special Agent Holbrook, you testified that Rob rented

18   that apartment.  Who made the decision to rent the apartment?

19   A.  I did.

20   Q.  Why did you make that decision?

21   A.  We made the decision for credibility of the undercovers

22   as wealthy investors.

23   Q.  Were there any other reasons that you decided to permit

24   Rob to rent that apartment?

25   A.  Yes.  When conducting audio and audio/video recordings,

1    having the apartment provided us with a location that we could

2    control.

3        We could capture better audio and video quality and be

4    able to control that environment, as opposed to a public

5    location, which there's sometimes noise, pianos are playing,

6    background conversations, it becomes more difficult to hear

7    what the conversations are.

8    Q.   Was the apartment at the 580 Building furnished?

9    A.   Yes.

10   Q.   Who furnished the apartment?

11   A.   I did.

12   Q.   Who was responsible for maintaining the apartment?

13   A.   I was.

14   Q.   What did that entail?

15   A.   That entailed me doing a lot of sweeping, mopping,

16   cleaning out sinks, toilets; basic health -- you know, basic

17   household cleaning.

18   Q.   Was there surveillance equipment in the apartment?

19   A.   There was.

20   Q.   What surveillance equipment?

21   A.   There was audio and video recording devices.

22   Q.   Who placed that equipment?

23   A.   Myself, Brian, and Rob.

24   Q.   You mentioned video equipment.  Can you explain for us,

25   when a video is recorded, does the equipment break it up into

1    multiple files, or is it just one big file?

2    A.   Yes.  These video recording devices, they record audio

3    and video.  And the device itself breaks the recordings up

4    into sessions.

5        The purpose for that is for ease of transfer, so when the

6    videos are downloaded, transferred to a disk, something of

7    that nature, it makes it easier to transfer the recordings.

8        So you may see sessions, session one and session two,

9    they actually go together, but it looks like it's two separate

10   recordings.  I think it's noted in the transcripts.

11   Q.   Let's return to November 7, 2018.  You testified that the

12   meeting continued at the apartment in the 580 Building.

13       We have previously admitted into evidence Government

14   Exhibit USA 15B.

15           MS. GAFFNEY PAINTER:  Before we publish to the jury,

16   Your Honor, I'd like to put on the record what timestamps we

17   are admitting for this exhibit.

18           THE COURT:  Okay.

19           MS. GAFFNEY PAINTER:  The first timestamp is 2:20,

20   until the end of the session.  Special Agent Holbrook just

21   testified what "session" means.

22       And then we are admitting into evidence the 000, the

23   startup session, the next session, which ends then at 3:08.

24           THE COURT:  Thank you.

25           MS. GAFFNEY PAINTER:  Your Honor, in addition to 15B

1    and the transcript of 15C, the government has prepared a

2    demonstrative exhibit, which is marked solely for

3    identification as Government Exhibit USA 15D.

4        It is a combination of the transcript admitted as

5    USA 15C and the video admitted as USA 15B.  We would request

6    permission to publish this demonstrative to the jury.

7             MR. C. HENRY RITTGERS:  Your Honor, may we have a

8    second?

9             THE COURT:  You may.

10            MR. C. MATTHEW RITTGERS:  I apologize, Your Honor.

11   We're just curious what 15D is.  We just don't have it, and we

12   would just like to see it.

13            THE COURT:  I think it may be the video running side

14   by side with the transcript or what?

15            MS. GAFFNEY PAINTER:  Yes.  It's the video exhibit

16   that's already been admitted, and the transcript runs at the

17   bottom of the screen, the transcript that's already been

18   admitted as 15C.

19            MR. C. MATTHEW RITTGERS:  No objection.

20            THE COURT:  All right.  You may use 15D as a

21   demonstrative.

22       What that means, ladies and gentlemen of the jury, is

23   this is a demonstrative exhibit, so it's to help you visualize

24   things.  It will not be admitted into evidence.  It will not

25   be available to you in the jury room when you are

HOLBROOK - DIRECT

1    deliberating, but they are going to use it and refer to it in

2    the courtroom.

3            MS. GAFFNEY PAINTER:  Permission to publish, Your

4    Honor?

5            THE COURT:  You may.

6            MS. GAFFNEY PAINTER:  And just as a specific

7    instruction, please, Ms. Terry and Mr. Lang, when this exhibit

8    comes up, if you could press pause when the image appears, and

9    we'll stop there and then we'll proceed.  I have some

10   questions I'd like to ask.

11        Thank you, Ms. Terry.

12   Q.  So before we publish the rest of this demonstrative,

13   Special Agent Holbrook, I want you to look at the screen here.

14        What are we seeing in this screen shot?

15   A.  What you're seeing is -- directly in the bottom portion

16   of the screen, this is the countertop in the kitchen.  So this

17   recording device was located on the countertop in the kitchen,

18   and it's facing direct towards the living room area.

19        You see the TV and the sofa.  You see the steps that goes

20   up to the second floor.  And to the right of the screen, there

21   is a door that leads to the outside deck.

22   Q.  Is this camera you've just described hidden?

23   A.  Yes.

24            MS. GAFFNEY PAINTER:  Your Honor, with the Court's

25   permission, we would ask to resume the demonstrative.

```
 1            THE COURT:  You may.

 2       (Video played.)

 3            MS. GAFFNEY PAINTER:  Your Honor, you had expressed

 4       earlier that 12:15 might be a good time to break for lunch.

 5       It's now 12:11.

 6            THE COURT:  Yes.  Is the remainder of this, you're

 7       intending to play it?  Do you have any idea how long the

 8       remainder of this is?

 9       I mean, are you fine breaking for lunch now, or would you

10       prefer to complete this exhibit?

11            MS. GAFFNEY PAINTER:  Oh, I apologize.  There's four

12       minutes to play, so if we could play the four more minutes?

13            THE COURT:  Yes.  That may make more sense, yes.

14       (Video played.)

15            MS. GAFFNEY PAINTER:  Your Honor, the government

16       submits this would be a good time to take the lunch break.

17            THE COURT:  Very good.  All right.

18       Ladies and gentlemen of the jury, I think we're going to

19       break for lunch now.  If you could try to be back by no later

20       than 1:15, we'll get you in as quickly thereafter as we can.

21       I'd just like to remind you that it would be

22       inappropriate to start forming any opinions about this case.

23       Do not discuss this case even with your fellow jurors.

24       Certainly, do not communicate with anybody else about this

25       case.
```

1      Do not attempt to do any research on your own, or use

2   electronic devices to try to research the internet about the

3   charges or the facts of this case.

4      If anyone should attempt to discuss this case with you,

5   please bring it to my attention immediately, but do not

6   discuss it with your fellow jurors.

7      With that, have a good lunch.

8      (Jury out at 12:15 p.m.)

9      THE COURT:  Thank you for being mindful of the time,

10   Ms. Gaffney Painter.  I appreciate it.  We still anticipate

11   Special Agent Holbrook being on the stand for the remainder of

12   the day?

13      MS. GAFFNEY PAINTER:  Yes, Your Honor.

14      THE COURT:  Is there anything we need to discuss

15   before we break for lunch?

16      MS. GAFFNEY PAINTER:  No.  Thank you, Your Honor.

17      MR. C. HENRY RITTGERS:  Not on behalf of the defense,

18   Your Honor.

19      THE COURT:  All right.  Please try to be back by 1:10

20   or so, in case there's anything we need to discuss before we

21   bring the jury in.

22      (Lunch recess.)

23      THE COURT:  Is the government ready to proceed?

24      MR. SINGER:  One brief issue, Your Honor.

25      THE COURT:  Okay.

1          MR. SINGER:  There is a recording that we talked

2     about this morning.  At the request of defense counsel, we

3     have added it on.  It's a May 2 recording.  We don't have a

4     transcript for it, and we've been trying to snip it down, but

5     we may need -- our paralegal might need a little bit of time

6     to find it on the recording to play it where it needs to pick

7     up.

8          THE COURT:  Okay.

9          MR. SINGER:  Our clip spans from one to two, and the

10    clip that we want to follow includes that but it's more, so

11    she's going to have to bring it up to where two is and then

12    play it.

13         THE COURT:  I see.

14         MR. SINGER:  It's only a minute clip.

15         THE COURT:  How would anyone suggest we explain the

16    lack of a transcript for that?  Do we need to address that

17    with the jury?

18         MR. SINGER:  We would suggest that --

19         THE COURT:  It was added at defendant's request or

20    something?

21         MR. SINGER:  The parties have agreed to play this

22    portion --

23         THE COURT:  That's fine.

24         MR. SINGER:  -- and the lack of transcript, the jury

25    should not attribute any prejudice to either side based on a

1    lack of transcript.

2            MR. C. MATTHEW RITTGERS:  We have no objection, Your

3    Honor.

4            THE COURT:  Very good.  The parties have agreed to

5    play this additional part, and the jury should not attribute

6    the lack of a transcript to either party or attach any

7    significance to it.  All right.  Very good.

8       Is that it?

9            MR.  SINGER:  Yes, Your Honor.

10           THE COURT:  Mr. Rittgers?

11           MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

12           THE COURT:  Let's bring in the jury.  Are you good to

13   go, Special Agent Holbrook?

14           THE WITNESS:  Yes, sir.

15      (Jury in at 1:24 p.m.)

16           THE COURT:  Ms. Gaffney Painter, is the government

17   prepared to proceed?

18           MS. GAFFNEY PAINTER:  Yes, Your Honor.

19           THE COURT:  Please proceed.

20           MS. GAFFNEY PAINTER:  Thank you, Your Honor.

21   BY MS. GAFFNEY PAINTER:

22   Q.   Special Agent Holbrook, before the break, we played a

23   demonstrative, USA 15D.  There was a reference in that

24   demonstrative to $10,000 cash.

25      Was there, in fact, $10,000 of cash in the apartment at

1    the time that that conversation was recorded?

2    A.  There was.

3    Q.  Who funded that?

4    A.  The FBI.

5    Q.  There was discussion in that conversation of $1,100.

6    What is your understanding of what that's referencing?

7    A.  My understanding is that it's referencing the campaign

8    donation limits.

9    Q.  There was also reference in that conversation to a PAC.

10   Generally speaking, what is a PAC?

11   A.  PAC stands for political action committee.  It's a tool

12   used to raise funds for political issues.

13   Q.  There was also reference in that conversation to Jared.

14   Who is Jared?

15   A.  Jared Kamrass.

16   Q.  And at that time, what was Mr. Kamrass's relationship to

17   Mr. Sittenfeld?

18   A.  Jared Kamrass was working with Mr. Sittenfeld, assisting

19   Mr. Sittenfeld to raise funds into his campaign.

20   Q.  There was reference during that recording to Rob's phone

21   number.  Who acquired that phone?

22   A.  Rob did.

23   Q.  Why did Rob acquire that phone?

24   A.  Anything that an undercover agent purchases that's a

25   personal item like a telephone, they purchase that themselves

HOLBROOK - DIRECT

1  under their alias name.

2  Q.  Who funded the phone and the phone service?

3  A.  The FBI did.

4  Q.  How were calls recorded on that, on Rob's phone?

5  A.  The calls on Rob's phone were recorded by utilizing

6  what's called an essential T3.  It's commonly referred to as

7  wire taps.  But this was Rob consenting to have a wiretap on

8  this phone that recorded all incoming and outgoing telephone

9  calls and text message content.

10  Q.  How did the FBI keep records of communications with Rob's

11  phone?

12  A.  So the provider, in this case AT&T, based in the content

13  of the text messages and the telephone calls to a system that

14  the FBI contains.

15      I have access to that system, and I can access that

16  system, review those calls in their entirety, or I can filter

17  those calls by date range, by telephone number, and in various

18  other ways.

19  Q.  What about Brian, did he have a phone as well?

20  A.  Yes.

21  Q.  And was it acquired under similar circumstances as what

22  you described about Rob's phone?

23  A.  Yes.

24  Q.  And were Brian's communications recorded in the way you

25  just described?

1    A.   Yes.

2    Q.   If you could, please, in your binder, turn to tab USA 9A.

3    A.   Yes.

4    Q.   There you'll see what's been marked for identification as

5    Government Exhibit USA 9A.  Do you recognize this?

6    A.   I do.

7    Q.   What is it?

8    A.   This is a report that I created.  It's called a line

9    sheet.

10   Q.   What is a line sheet?

11   A.   A line sheet is a report from the system that I

12   referenced earlier that details communication between, in this

13   case, Rob, and individuals he's contacting.  In this case, the

14   numbers -- do you want me to continue, Counselor?

15   Q.   You can continue, certainly.

16   A.   On this particular line sheet is for Rob's telephone

17   number, and filtered out is the number ending in 2404 and

18   0901.

19        MS. GAFFNEY PAINTER:  Your Honor, the government

20   moves for the admission of Government Exhibit USA 9A.

21        MR. C. MATTHEW RITTGERS:  No objection.

22        THE COURT:  USA 9A is admitted without objection.

23        MS. GAFFNEY PAINTER:  With the Court's permission,

24   may we please publish the first page of Government Exhibit

25   USA 9A?

```
 1            THE COURT:  You may.

 2            MS. GAFFNEY PAINTER:  All right, Ms. Terry, if you

 3    wouldn't mind blowing up the top -- I'd say this is the top

 4    fourth of this document, page 1 of Exhibit USA 9A.

 5    Q.   Special Agent Holbrook, will you please direct your

 6    attention to the left-hand side of this and explain to us what

 7    you see here?

 8    A.   You see selection criteria, that's filter parameters

 9    that's on this line sheet.  And the target, that's the

10    telephone assigned to UCE 7157, which is Rob.

11            And then user defined, these are my filters that are

12    placed on the system to filter out telephone numbers that you

13    see there ending in 2404 and 0901.

14    Q.   Looking at that first telephone number that appears there

15    in your filters, what is the number that appears there?

16    A.   The number 513-365-2404 is the number associated with

17    Mr. Sittenfeld.

18    Q.   The number that appears below that, what is that number?

19    A.   513-679-0901, that is a number associated with Chris

20    Dalton.

21    Q.   Who is Chris Dalton?

22    A.   At the time of this investigation, he was

23    Mr. Sittenfeld's chief of staff.

24            MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.  May we

25    please go to page 2 of this exhibit.
```

1        And if you could, Ms. Terry, will you please highlight

2   the top fourth of this document.

3   Q.   All right.  Special Agent Holbrook, would you please

4   explain to us what information we're seeing here?

5   A.   Sure.  This block is what you would see for each contact

6   that Rob makes with an individual, whether it's a telephone

7   call or whether it's a text message.  The blocks are going to

8   be similar in the information that they have.

9   Q.   Can you please walk us through, starting with the

10  left-hand column, what information we're seeing here?

11  A.   Sure.  So session 1633, that's a number that is assigned

12  to each contact.  They are consecutive numbers, and each time

13  that there's a contact on that phone, whether it be a call, a

14  text, a hang-up, a disconnect, any contact, it will assign the

15  session number.

16       Underneath the session number, we see the date.  That's

17  the date that the call is made.  Underneath the date is the

18  start time.  That is the time of the call.  And you see there

19  it is in UTC.  That stands for coordinated universal time.

20       And all the information that we collect on T3s are in UTC

21  time because we collect telephone calls, generally speaking,

22  not in this investigation, across the FBI, from different time

23  zones, and we put them in UTC time, so it's kind of a uniform

24  starting point.

25       You have the stop times underneath that, which is the

1    time that the call was stopped, and then the duration.  But

2    you see the start and stop time is the same on this particular

3    contact, and the duration is zero, and that's because it is a

4    text message.

5    Q.   Special Agent Holbrook, what time zone is Cincinnati in?

6    A.   Eastern standard time zone.

7    Q.   Do you know the difference between coordinated universal

8    time and eastern standard time?

9    A.   Barely.  If you subtract four hours or five hours,

10   depending on whether it's daylight savings time.

11   Q.   Special Agent Holbrook, directing your attention now to

12   the second column here, beginning with the word

13   "classification," can you please explain to us, generally,

14   what appears in this column?

15   A.   Yeah.  So classification would be how we would classify

16   that particular contact.  We can deem something as pertinent,

17   non-pertinent, and there's a multitude of other selections

18   that we can utilize for the classification column.

19        Content is the next category that's selected by the

20   system, and here is the text message, a missed text message.

21        And then underneath that, you have primary language,

22   which was not relevant in this investigation.

23        Again, complete, which is another category with multiple

24   types of dropdown boxes.  Here complete means it's been

25   reviewed.  And then monitor ID was not utilized here.

1  Q.   Special Agent Holbrook, will you now proceed to the third

2  column here that begins with the word "direction," and explain

3  to us what information is contained here.

4  A.   Direction is the direction the contact came from relative

5  to the user of the phone.

6       So, for example, if direction says incoming, that means

7  the contact was from the -- coming in to Rob's phone.  If it's

8  outgoing, it would be going from Rob's phone to somebody else.

9       Underneath that, it says associate DN, that's the way of

10 saying telephone number.  The number that's going to be listed

11 there is the number that Rob made contact with.

12      And you'll know whether Rob made a contact or not based

13 upon the direction.  For example, this was an incoming contact

14 from 2404.

15      The next column is in and out digits.  It wasn't relevant

16 in this case.  We didn't utilize this.  This was just the

17 digits that were dialed for the contact.

18      The subscriber -- if you wanted to, we could put in the

19 subscriber of this telephone.  It wasn't necessary, so we

20 didn't use that category.

21      And then the participants, you see there there's Rob

22 Miller and Alexander Sittenfeld.

23 Q.   Beneath this blue box, you see a long rectangle that says

24 "content."  Can you just explain to us what we see here, and

25 the information that's contained underneath?

HOLBROOK - DIRECT

1   A.   Yeah.   So content -- SMS, this is a text message, and the

2   content is P.G. Sittenfeld.   So from this contact, we see that

3   Mr. Sittenfeld sent a text message to Rob's phone, and the

4   message was P.G. Sittenfeld.

5          MS. GAFFNEY PAINTER:   Thank you, Ms. Terry.

6   Q.   If you could, Special Agent Holbrook, would you please

7   turn to the tab in your binder marked USA 9B.

8   A.   Yes.

9   Q.   Do you recognize this?

10  A.   I do.

11  Q.   What is it?

12  A.   This is a line sheet for the telephone associated with

13  Brian, and the line sheet has filtered out telephone number

14  ending in 2404 and 0901.

15  Q.   How do you know that?

16  A.   I know that because I generated this document.

17         MS. GAFFNEY PAINTER:   Your Honor, the government

18  moves for the admission of Government Exhibit USA 9B.

19         MR. C. HENRY RITTGERS:   No objection.

20         THE COURT:   USA 9B is admitted without objection.

21  Q.   Now if you could, Special Agent Holbrook, please turn to

22  the tab in your binder for USA 9C.

23  A.   Yes.

24  Q.   Do you recognize this?

25  A.   I do.

1  Q.  What is it?

2  A.  This is another line sheet associated with a telephone

3  number used by undercover Vinny, and filtered out are the

4  telephone numbers ending in 2404 and 0901.

5  Q.  How do you know that?

6  A.  I generated this document.

7       MS. GAFFNEY PAINTER:  Your Honor, the government

8  moves for the admission of Government Exhibit USA 9C.

9       MR. C. HENRY RITTGERS:  No objection, Your Honor.

10      THE COURT:  USA 9C is admitted without objection.

11 Q.  Special Agent Holbrook, please turn to Tab USA 9D in your

12 binder.

13 A.  Yes.

14 Q.  Do you recognize this?

15 A.  I do.

16 Q.  What is it?

17 A.  Again, this is a line sheet associated with a telephone

18 number used by Chinedum Ndukwe, and filtered out are the

19 telephone numbers 2404 and 0901.

20 Q.  How do you know that?

21 A.  I know that because I generated this document.

22      MS. GAFFNEY PAINTER:  The government moves for the

23 admission of Government Exhibit USA 9D.

24      MR. C. HENRY RITTGERS:  No objection, Your Honor.

25      THE COURT:  USA 9D is admitted without objection.

HOLBROOK - DIRECT

1    Q.   Special Agent Holbrook, please turn to tab USA 9E in your
2    binder.
3    A.   Yes.
4    Q.   Do you recognize this?
5    A.   I do.
6    Q.   What is it?
7    A.   This is a line sheet associated with the telephone number
8    of UC Rob, and filtered out is the telephone number ending in
9    9049.
10   Q.   How do you know that?
11   A.   I know that because I generated this document.
12        MS. GAFFNEY PAINTER:  The government moves for the
13   admission of Government Exhibit USA 9E.
14        MR. C. HENRY RITTGERS:  No objection.
15        THE COURT:  USA 9E is admitted without objection.
16   Q.   Special Agent Holbrook, will you please turn to the tab
17   USA 11C.
18   A.   Yes.
19   Q.   Do you recognize this?
20   A.   I do.
21   Q.   What is it?
22   A.   This is a list of telephone numbers associated with the
23   various individuals involved in this investigation.
24   Q.   How do you know that these telephone numbers belong to
25   these individuals?

1    A.   A combination of ways.  Either they told me the telephone

2    number, or we obtained the number from another individual, or

3    we verified it through phone records.

4         MS. GAFFNEY PAINTER:  Your Honor, the government

5    moves for the admission of Government Exhibit USA 11C.

6         MR. C. HENRY RITTGERS:  No objection, Your Honor.

7         THE COURT:  Exhibit USA 11C is admitted without

8    objection.

9         MS. GAFFNEY PAINTER:  Ms. Terry and Mr. Lang, may we

10   please publish Government Exhibit 11C, if the Court allows it?

11        THE COURT:  You may do so.

12        MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

13   Q.   Special Agent Holbrook, during the course of this

14   investigation, did Rob and Brian have phone communications

15   with P.G. Sittenfeld?

16   A.   Yes.

17   Q.   Were these communications done on their undercover

18   phones?

19   A.   They were.

20   Q.   Turning back to November 7th, 2018, the day of the

21   meeting, what phone contact did Mr. Sittenfeld have with Rob?

22   A.   I recall a text message.

23   Q.   And if you could turn in your binder to the tab for

24   USA 15E.

25   A.   Yes.

HOLBROOK - DIRECT

1    Q.   Do you recognize this?

2    A.   I do.

3    Q.   What is it?

4    A.   This is a text message from Mr. Sittenfeld to Brian.

5    Q.   Did you review this exhibit for accuracy?

6    A.   I did.

7    Q.   What did you look to to confirm its accuracy?

8    A.   I looked at -- the source data for this particular text

9    message was the line sheets.

10   Q.   When you say "the line sheets," do you mean the line

11   sheets that were previously admitted as USA 9?

12   A.   Yes.

13        MS. GAFFNEY PAINTER:  The government moves for the

14   admission of Government Exhibit USA 15E.

15        MR. C. HENRY RITTGERS:  No objection, Your Honor.

16        THE COURT:  USA 15E is admitted without objection.

17        MS. GAFFNEY PAINTER:  Your Honor, with the Court's

18   permission, I would request that we publish the second page of

19   USA 15E.

20        THE COURT:  You may do so.

21   Q.   Special Agent Holbrook, what are we looking at here?

22   A.   This is a text message communication from Mr. Sittenfeld

23   to UC Rob.

24   Q.   And what date appears at the top of this?

25   A.   November 7, 2018.

1    Q.   What is the significance of the sides of the document?

2    A.   The left side, where it has Sittenfeld's name and

3    telephone number at the top, the communications on the left

4    side are going to be from Sittenfeld, and any communication on

5    the right side will be from Rob.

6         MS. GAFFNEY PAINTER:  Your Honor, may I approach the

7    witness with a revised exhibit, pursuant to conversations

8    we've had with defense counsel?

9         THE COURT:  You may.

10        MS. GAFFNEY PAINTER:  Apologies, Your Honor.  Bear

11   with me just a moment.

12      Your Honor, I have a copy of the three exhibits that were

13   the source of some conversation between the parties.  May I

14   approach and provide you and him with a copy?

15        THE COURT:  You may.  I was hoping I was getting one.

16   Thank you.

17      You may proceed.

18        MS. GAFFNEY PAINTER:  Thank you, Your Honor.

19   Q.   Special Agent Holbrook, I just handed you an exhibit

20   that's been marked for identification as Government Exhibit

21   USA 11A.  Do you recognize this?

22   A.   I have.  I mean, I do.  I'm sorry.  Excuse me.

23   Q.   What is it?

24   A.   This is a chronology of events beginning September 21,

25   2018, to December 23, 2019, that occurred in this

1    investigation.

2    Q.  Did you review this for accuracy?

3    A.  I did.

4    Q.  Are the entries in this exhibit based on other exhibits

5    in this case?

6    A.  Yes.

7         MS. GAFFNEY PAINTER:  Your Honor, the government

8    moves for the admission of Government Exhibit USA 11A.

9         MR. C. HENRY RITTGERS:  No objection, Your Honor.

10        THE COURT:  USA 11A is admitted without objection.

11   Q.  Special Agent Holbrook, directing your attention to

12   November 14, 2018, what phone contact did Mr. Sittenfeld have

13   with Rob or Brian that day?

14   A.  Mr. Sittenfeld left UC Rob a voicemail.

15   Q.  Was that message recorded?

16   A.  Yes.

17   Q.  If you could, please, turn in your binder to the tab

18   USA 16A.

19   A.  Okay.

20   Q.  Do you recognize this?

21   A.  I do.

22   Q.  What is it?

23   A.  This is a compact disk containing the November 14, 2018

24   call.

25   Q.  How do you know that?

1    A.   I know that because I've reviewed it, and I placed my

2    initials on the disk.

3         MS. GAFFNEY PAINTER:   The government moves for the

4    admission of Government Exhibit USA 16A.

5         THE COURT:   Mr. Rittgers?

6         MR. C. HENRY RITTGERS:   No objection, Your Honor.

7         THE COURT:   USA 16A is admitted without objection.

8    Q.   Special Agent Holbrook, will you please turn in your

9    binder to the tab USA 16B.

10   A.   Yes.

11   Q.   Do you recognize this?

12   A.   I do.

13   Q.   What is it?

14   A.   This is a transcript of the November 14, 2018 voice

15   message left by Sittenfeld on Rob's phone.

16   Q.   Have you reviewed it for accuracy?

17   A.   I have.

18        MS. GAFFNEY PAINTER:   Your Honor, pursuant to the

19   parties' stipulation and the testimony of Special Agent

20   Holbrook, the government moves for the admission of USA 16B

21   into evidence.

22        MR. C. HENRY RITTGERS:   No objection, Your Honor.

23        THE COURT:   USA 16B is admitted without objection.

24        MS. GAFFNEY PAINTER:   Your Honor, permission to

25   publish the exhibit to the jury?

 1          THE COURT:  You may do so.  And ladies and gentlemen

 2    of the jury, the transcript for the audio you're about to hear

 3    is at Tab 16B of your transcript book.

 4       Once again, though, to the extent you hear something

 5    different on the audio from what's in the book, go with the

 6    audio.

 7       (Audio played.)

 8    Q.   Special Agent Holbrook, the next day after this phone

 9    call, November 15, 2018, what happened in the investigation?

10    A.   November 15th, 2018, Sittenfeld met with Brian and

11    Ndukwe.

12    Q.   Was that meeting recorded?

13    A.   Yes.

14    Q.   Where was that meeting held?

15    A.   I'm not sure of this location.  It was in downtown

16    Cincinnati at a public establishment.

17    Q.   Who participated in that meeting?

18    A.   Brian, Mr. Ndukwe, and Mr. Sittenfeld.

19          MS. GAFFNEY PAINTER:  Your Honor, the government

20    would request permission to publish what has already been

21    admitted as USA 15E, just page 1?

22          THE COURT:  It's already been admitted?

23          MS. GAFFNEY PAINTER:  Yes.

24          THE COURT:  You may do so.

25          MS. GAFFNEY PAINTER:  Ms. Terry and Mr. Lang, may we

1    please publish USA 15A, just the first page.

2    Q.  Special Agent Holbrook, what are we looking at here?

3    A.  We're looking at a November 15, 2018 text message from

4    Mr. Sittenfeld to Brian.

5    Q.  I want to be clear.  The information that is depicted in

6    this exhibit, where did this information come from?

7    A.  Which exhibit?

8    Q.  The one we're looking at, 15E.

9        You testified earlier that the exhibits in USA series

10    nine were the line sheets.  Does this depict data that you

11    acquired from those line sheets?

12    A.  Yes.

13    Q.  So this is a visual depiction of what is also admitted in

14    a different exhibit; is that correct?

15    A.  That is correct.

16    Q.  Special Agent Holbrook, if you could turn in your binder

17    to tab USA 17A.

18    A.  Yes.

19    Q.  Do you recognize this?

20    A.  I do.

21    Q.  What is it?

22    A.  It is the November 15, 2018 meeting that was just

23    referenced.

24    Q.  How do you know that?

25    A.  I know that because I reviewed this, and I put my

1    initials on the disk.

2         MS. GAFFNEY PAINTER:  Your Honor, the government

3    moves for the admission of Government Exhibit USA 17A.

4         MR. C. HENRY RITTGERS:  No objection, Your Honor.

5         THE COURT:  USA 17A is admitted without objection.

6    Q.   Special Agent Holbrook, will you please turn to, in your

7    binder, USA 17B.

8    A.   Yes.

9    Q.   What is this?

10   A.   This is a partial transcript of the November 15th, 2018

11   meeting between Mr. Sittenfeld, Brian, and Mr. Ndukwe.

12   Q.   Have you reviewed it for accuracy?

13   A.   I have.

14        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

15   stipulations between the parties, and the testimony of Special

16   Agent Holbrook, the government moves for admission of USA 17B.

17        THE COURT:  Mr. Rittgers?

18        MR. C. MATTHEW RITTGERS:  No objection.

19        MR. C. HENRY RITTGERS:  No objection.

20        THE COURT:  USA 17B is admitted without objection.

21        MS. GAFFNEY PAINTER:  Your Honor, may we please

22   publish this to the jury?

23        THE COURT:  You may.  And is this a transcript that's

24   included, I believe it is in the book, correct?

25        MS. GAFFNEY PAINTER:  It is.  And I would like to

HOLBROOK - DIRECT

1    note for the record the timestamps that are reflected in this

2    exhibit.

3             THE COURT:  Very good.

4             MS. GAFFNEY PAINTER:  1:54:34 through 56:01.

5             THE COURT:  So ladies and gentlemen of the jury, this

6    would be at Tab 17B in your binder.

7        (Audio played.)

8    Q.  Special Agent Holbrook, will you please go to the tab in

9    your binder marked USA 18A.

10   A.  Yes.

11   Q.  Do you recognize this?

12   A.  Yes.  This is a compact disk with a November 21, 2018

13   voicemail.

14   Q.  How do you know that?

15   A.  I know that because I reviewed this disk.

16            MS. GAFFNEY PAINTER:  The government moves for the

17   admission of Government Exhibit USA 18A.

18            MR. C. HENRY RITTGERS:  No objection, Your Honor.

19            THE COURT:  USA 18A is admitted without objection.

20   Q.  Special Agent Holbrook, please turn to the tab in your

21   binder USA 18B.

22   A.  Yes.

23   Q.  Do you recognize this?

24   A.  Yes.  This is a November 21, 2018 transcript of a

25   voicemail left by Rob.

HOLBROOK - DIRECT

1    Q.   How do you know that?

2    A.   I know that because I've reviewed this transcript.

3    Q.   And have you reviewed it for accuracy?

4    A.   Yes.

5          MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

6    stipulation and Special Agent Holbrook's testimony, the

7    government moves for admission of USA 18B.

8          MR. C. HENRY RITTGERS:  No objection.

9          THE COURT:  USA 18B is admitted without objection.

10         MS. GAFFNEY PAINTER:  May we publish it to the jury?

11         THE COURT:  You may.  Ladies and gentlemen of the

12   jury, this transcript will be at 18B.

13        (Audio played.)

14   Q.   Special Agent Holbrook, please turn to the tab in your

15   binder marked USA 18C.

16   A.   Okay.

17   Q.   Do you recognize this?

18   A.   I do.

19   Q.   What is it?

20   A.   This is a compact disk containing another recording from

21   November 21, 2018.

22   Q.   How do you know that?

23   A.   I've reviewed this disk, and I've put my initials on it.

24         MS. GAFFNEY PAINTER:  The government moves for the

25   admission of Government Exhibit USA 18C.

```
 1              MR. C. HENRY RITTGERS:  No objection.

 2              THE COURT:  USA 18c is admitted without objection.

 3    Q.   Special Agent Holbrook, will you please turn to the tab

 4    USA 18D.

 5    A.   Yes.

 6    Q.   Do you recognize this?

 7    A.   Yes.

 8    Q.   What is it?

 9    A.   It's a transcript of the November 21, 2018 call between

10    Mr. Sittenfeld and Rob.

11    Q.   Have you reviewed this transcript for accuracy?

12    A.   Yes.

13              MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

14    stipulation between the parties and the testimony of Special

15    Agent Holbrook, the government moves for the admission of

16    USA 18D.

17              MR. C. HENRY RITTGERS:  No objection.

18              THE COURT:  USA 18D is admitted without objection.

19              MS. GAFFNEY PAINTER:  May we publish this to the

20    jury, Your Honor?

21              THE COURT:  You may.  It's 18D, correct?

22              MS. GAFFNEY PAINTER:  18D is the transcript.  18C is

23    the recording.

24              THE COURT:  All right.  So you can turn to your 18D

25    tab in your book there and then listen to the audio.
```

1        (Audio played.)

2   Q.   Special Agent Holbrook, there was reference in that call

3   at USA 18C to a PAC Progress and Growth.  During the course of

4   your investigation, did you review documents related to that

5   PAC?

6   A.   Yes.

7   Q.   If you could turn in your binder to tab USA 40A.

8   A.   Yes.

9   Q.   Do you recognize this?

10  A.   I do.

11  Q.   What is it?

12  A.   This is a statement of organization for the Progress and

13  Growth PAC, dated February 5, 2018.

14  Q.   Where did that document come from?

15  A.   This come from the FEC, the Federal Election Commission

16  website.

17        MS. GAFFNEY PAINTER:  The government moves for the

18  admission of Government Exhibit USA 40A.

19        MR. C. HENRY RITTGERS:  No objection, Your Honor.

20        THE COURT:  USA 40A is admitted without objection.

21        MS. GAFFNEY PAINTER:  Your Honor, permission to

22  publish this to the jury?

23        THE COURT:  You may do so.

24  Q.   Special Agent Holbrook, will you please turn to tab

25  USA 40B in your binder.

1    A.    Yes.

2    Q.    Do you recognize this?

3    A.    I do.

4    Q.    What is it?

5    A.    This is an FEC Form 3X, a report of receipts and

6    disbursements for the Progress and Growth PAC from

7    November 27th, 2018, through December 31st, 2018.

8    Q.    Where did that document come from?

9    A.    This document came from the FEC website.

10          MS. GAFFNEY PAINTER:  Government moves for the

11   admission of Government Exhibit USA 40B.

12          MR. C. HENRY RITTGERS:  No objection.

13          THE COURT:  USA 40B is admitted without objection.

14   Q.    Special Agent Holbrook, will you please turn in your

15   binder to the tab marked USA 40C.

16   A.    Yes.

17   Q.    Do you recognize this?

18   A.    I do.

19   Q.    What is it?

20   A.    This is an FEC Form 3X, report of receipts and

21   disbursements for the Progress and Growth PAC from 11/27/2018,

22   through December 31, 2018, and the box "amended" is checked on

23   this one.

24   Q.    Where did this document come from?

25   A.    The FEC website.

HOLBROOK - DIRECT

1    MS. GAFFNEY PAINTER:  Government moves for the

2    admission of Government Exhibit USA 40C.

3    MR. C. HENRY RITTGERS:  No objection, Your Honor.

4    THE COURT:  USA 40C is admitted without objection.

5    Q.  Special Agent Holbrook, will you please turn in your

6    binder to tab USA 40D.

7    A.  Yes.

8    Q.  Do you recognize this?

9    A.  I do.

10   Q.  What is it?

11   A.  This is FEC Form 3X, report of receipts and disbursements

12   for the Progress and Growth PAC.  This is dated July 1, 2019,

13   through December 31, 2019.

14   Q.  And where did this document come from?

15   A.  It came from the FEC website.

16   MS. GAFFNEY PAINTER:  The government moves for the

17   admission of Government Exhibit USA 40D.

18   MR. C. HENRY RITTGERS:  No objection, Your Honor.

19   THE COURT:  USA 40D is admitted without objection.

20   Q.  If you could, Special Agent Holbrook, turn to tab USA 40E

21   in your binder.

22   A.  Yes.

23   Q.  Do you recognize this?

24   A.  I do.

25   Q.  What is it?

1    A.   This is a screen shot from the Federal Election

2    Commission website of the Progress and Growth PAC.

3    Q.   For what years?

4    A.   For 2017 through 2018.

5    Q.   How do you know that?

6    A.   I've reviewed the website that this screen shot was taken

7    from.

8            MS. GAFFNEY PAINTER:   The government moves for the

9    admission of Government Exhibit USA 40E.

10           MR. C. HENRY RITTGERS:   No objection.

11           THE COURT:   USA 40E is admitted without objection.

12           MS. GAFFNEY PAINTER:   Permission to publish

13   Government Exhibit USA 40E to the jury?

14           THE COURT:   You may do so.

15   Q.   Special Agent Holbrook, five days after the call that we

16   listened to, which was USA 18C, on November 26, 2018, was

17   there phone contact between Mr. Sittenfeld and Rob?

18   A.   There was.

19   Q.   How do you know that?

20   A.   I know that because I've reviewed a phone call on that

21   date.

22   Q.   If you could, please, turn in your binder to USA 19A.

23   A.   Yes.

24   Q.   Do you recognize this?

25   A.   I do.

1    Q.   What is it?

2    A.   This is a compact disk containing an audio recording of a

3    call from Rob to Sittenfeld on November 26, 2018.

4    Q.   How do you know that?

5    A.   I know that because I've reviewed this disk and placed my

6    initials on it.

7         MS. GAFFNEY PAINTER:  The government moves for

8    admission of Government Exhibit USA 19A.

9         MR. C. HENRY RITTGERS:  No objection, Your Honor.

10        THE COURT:  USA 19A is admitted without objection.

11   Q.   Special Agent Holbrook, will you please turn in your

12   binder to USA 19B.

13   A.   Yes.

14   Q.   Do you recognize this?

15   A.   I do.

16   Q.   What is it?

17   A.   This is a transcript of the November 26, 2019 call

18   between Mr. Sittenfeld and Rob.

19   Q.   Have you reviewed it for accuracy?

20   A.   I have.

21        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

22   parties' stipulation and Special Agent Holbrook's testimony,

23   the government moves for the admission of Government Exhibit

24   USA 19B.

25        MR. C. HENRY RITTGERS:  No objection, Your Honor.

HOLBROOK - DIRECT

1        THE COURT:  USA 19B is admitted without objection.

2        MS. GAFFNEY PAINTER:  Your Honor, may we publish it

3    to the jury?

4        THE COURT:  You may.  And ladies and gentlemen of the

5    jury, there should be a Tab 19B in your transcript volume,

6    which you may now look at.

7        (Audio played.)

8    Q.  What happened two days later, on November 28, 2018?

9    A.  There was a telephone call from Mr. Sittenfeld to Rob.

10   Q.  If you could turn to your exhibit binder and go to the

11   tab marked USA 20A.

12   A.  Yes.

13   Q.  Do you recognize this?

14   A.  I do.

15   Q.  What is this?

16   A.  This is a disk containing the November 28th, 2018 phone

17   call from Mr. Sittenfeld to Rob.

18   Q.  How do you know that?

19   A.  I know that because I reviewed it, and I've placed my

20   initials on the disk.

21       MS. GAFFNEY PAINTER:  The government moves for the

22   admission of Government Exhibit USA 20A.

23       MR. C. HENRY RITTGERS:  No objection, Your Honor.

24       THE COURT:  USA 20A is admitted without objection.

25   Q.  Special Agent Holbrook, will you please turn to the next

1    tab, USA 20B.

2    A.   Yes.

3    Q.   Do you recognize this?

4    A.   I do.

5    Q.   What is it?

6    A.   This is a transcript of the November 28, 2018 call from

7    Mr. Sittenfeld to Rob.

8    Q.   And have you reviewed it for accuracy?

9    A.   Yes, I have.

10        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

11   stipulation between the parties and the testimony of Special

12   Agent Holbrook, the government moves for the admission of

13   Government Exhibit USA 20B.

14        MR. C. HENRY RITTGERS:  No objection.  Could we

15   approach the bench for one second?

16        THE COURT:  You may.

17   SIDEBAR CONFERENCE OFF THE RECORD

18        MS. GAFFNEY PAINTER:  Your Honor, forgive me, was

19   USA 20B admitted?

20        THE COURT:  If not, USA Exhibit 20B is admitted into

21   evidence without objection.

22        MS. GAFFNEY PAINTER:  Thank you.  Your Honor,

23   permission to publish Exhibit USA 20A to the jury?

24        THE COURT:  You may.  Ladies and gentlemen of the

25   jury, there should be a 20B in your volume of transcripts.

1          (Audio played.)

2     Q.   After that call, what happened on the same day,

3     November 28, 2018?

4     A.   There was an in-person meeting with Sittenfeld, Brian,

5     and Rob.

6     Q.   Where did that meeting take place?

7     A.   It took place in the apartment at the 580 Building.

8     Q.   Was that meeting recorded?

9     A.   Yes.

10    Q.   Please turn in your binder to tab USA 20C.

11    A.   Yes.

12    Q.   Do you recognize this?

13    A.   I do.  This is a disk containing the November 28, 2018

14    meeting just referenced.

15    Q.   How do you know that?

16    A.   I know that because I reviewed this disk, and I placed my

17    initials on it.

18          MS. GAFFNEY PAINTER:  The government moves for the

19    admission of Government Exhibit USA 20C.

20          MR. C. HENRY RITTGERS:  No objection.

21          THE COURT:  USA 20C is admitted without objection.

22    Q.   Special Agent Holbrook, if you will, please, turn to the

23    tab USA 20D.

24    A.   Yes.

25    Q.   Do you recognize this?

1    A.   I do.

2    Q.   What is it?

3    A.   This is a partial transcript of a November 28th, 2018

4    meeting between Rob, Brian, and Mr. Sittenfeld.

5    Q.   Have you reviewed it for accuracy?

6    A.   Yes, I have.

7         MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

8    parties' stipulation and Special Agent Holbrook's testimony,

9    the government moves for the admission of Government

10   Exhibit USA 20D.

11        MR. C. HENRY RITTGERS:  No objection.

12        THE COURT:  USA 20D is admitted without objection.

13        MS. GAFFNEY PAINTER:  Your Honor, may I have just a

14   moment to confer with my colleagues?

15        THE COURT:  You may.

16        MS. GAFFNEY PAINTER:  Thank you, Your Honor.

17     Before seeking permission to publish to the jury, I would

18   like to note for the record the specific timestamps that we

19   will be admitting here today.

20        THE COURT:  Very good.

21        MS. GAFFNEY PAINTER:  The first timestamp is 6:46

22   until 6:57.  Then in session two, 8:00 to 9:06; session four,

23   2:04 to 4:02; and also in session four, 7:40 to 9:04.

24     Your Honor, may I publish this exhibit to the jury?

25        THE COURT:  You may.

1          MS. GAFFNEY PAINTER:  And, Ms. Terry, we're starting,

2     as I said, at 6:46.  When we get to 6:57, will you please

3     pause it so the image remains on the screen.

4          THE COURT:  And there is Exhibit 20D in your

5     transcript binder.

6     (Video played.)

7     Q.   Special Agent Holbrook, directing your attention to the

8     screen here, we have paused the exhibit, I believe, at 6:57.

9     Who appears here in the center of the screen?

10    A.   That's Rob Miller.

11         MS. GAFFNEY PAINTER:  All right.  May we please

12    resume?

13         THE COURT:  You may.

14    (Video played.)

15         MS. GAFFNEY PAINTER:  Your Honor, before we proceed

16    to the next clip, may we please approach for a brief sidebar?

17         THE COURT:  Sure.

18    SIDEBAR CONFERENCE

19         MS. GLATFELTER:  I realize that there's been a sketch

20    artist that is in the courtroom, and we now have images of our

21    undercover officers displayed on the screen publicly.

22    I don't know if any sketch artist will be sketching from

23    the screen, but I just wanted to make clear that we would ask

24    for an order prohibiting that.

25    We do have some security and safety concerns regarding

1    our undercovers who are currently still involved in other

2    investigations, and so their image is being displayed on the

3    screen.

4        We're doing that so the jury can see, but we don't want

5    them sketched.  I'm saying that because it just occurred to

6    me, as I'm looking at the screen and we paused it.

7            THE COURT:  Well, the undercovers are also going to

8    be on the witness stand, aren't they?

9            MS. GLATFELTER:  They will, but we agreed pretrial

10   that there would be an order given not to sketch the

11   undercover officers.

12           THE COURT:  Oh, we did?

13           MS. GLATFELTER:  Yes.

14           MR. C. HENRY RITTGERS:  We did, Your Honor.

15           THE COURT:  All right.  So just instruct the sketch

16   artist, I guess, not to sketch the persons depicted on the

17   screen,  although if it's anything like the sketch they did of

18   me, I wouldn't be worried.  I'm sure others may feel that same

19   way, right?

20           MS. GLATFELTER:  I don't see that person in here

21   right now.

22           MR. C. MATTHEW RITTGERS:  I don't know who that

23   person was, I would have talked to him.

24           MS. GLATFELTER:  No.  I noticed because they were

25   sitting behind us, so I --

 1              THE COURT:  For the record, your hair is darker than

 2     it appeared.

 3              MS. GLATFELTER:  Do you think we need to do this

 4     right now, or --

 5              MR. SINGER:  We could ask to see if there's any

 6     sketch artist in the courtroom; if there's not, then --

 7              THE COURT:  I'll do that.  All right.

 8     SIDEBAR CONFERENCE CONCLUDED

 9              THE COURT:  So in a somewhat odd question, are there

10     any sketch artists currently sketching in the courtroom?

11     Seeing no one, okay.  You may continue.

12              MS. GAFFNEY PAINTER:  Thank you, Your Honor.  May we

13     please publish the next segment.

14          (Video played.)

15     Q.  Special Agent Holbrook, will you please turn in your

16     binder to USA 20F and USA 20G?

17     A.  Yes.

18     Q.  Do you recognize these?

19     A.  I do.

20     Q.  What are they?

21     A.  These are photographs of checks.  The first check is from

22     Avantis Enterprises, with an address below, written to

23     Progress and Growth PAC on November 27, 2018, and then --

24     Q.  Special Agent Holbrook, forgive me for interrupting you,

25     but I want to make sure that this is admitted into evidence

1    properly before we discuss it.

2    A.   Oh, I'm sorry.

3    Q.   Are these photographs fair and accurate representations

4    of the checks?

5    A.   Yes.

6         MS. GAFFNEY PAINTER:  Your Honor, the government

7    moves for the admission of Government Exhibits USA 20F and

8    USA 20G.

9         MR. C. HENRY RITTGERS:  No objection, Your Honor.

10        THE COURT:  USA 20F and USA 20G are admitted without

11   objection.

12   Q.   Special Agent Holbrook, let's go first to USA 20F.

13        MS. GAFFNEY PAINTER:  And if the Court indulges us,

14   may we please publish this to the jury?

15        THE COURT:  You may.

16   Q.   Directing your attention to the upper left-hand corner,

17   what appears there?

18   A.   The name of a business, Avantis Enterprises, and an

19   address located in Illinois.

20   Q.   What is Avantis Enterprises, Inc.?

21   A.   It's a company or a corporation that is operated by our

22   undercover unit.  It's not real.

23   Q.   What is the amount of this check?

24   A.   $5,000.

25   Q.   What appears in the lower right-hand corner?

1   A.   Just a signature.

2   Q.   Who provided this money?

3   A.   I provided this to Rob.

4   Q.   And is this one of the checks that was seen in the video

5   we just watched?

6   A.   Yes.

7   Q.   All right.  Now if we may turn to USA 20G.

8        Directing your attention to the upper left-hand corner,

9   what appears there?

10  A.   J&S Technologies, with an address in Naperville,

11  Illinois.

12  Q.   What is J&S Technologies?

13  A.   It is a made-up company that the undercover utilizes.

14  Q.   What is the amount of this check?

15  A.   $5,000.

16  Q.   What appears in the lower right-hand corner there?

17  A.   It appears to be the signature of Mark Davis.

18  Q.   Who provided this money?

19  A.   Excuse me?

20  Q.   Who provided the money for this check?

21  A.   The FBI provided the money for this check.

22  Q.   You just testified to events that occurred in November of

23  2018.  Will you please turn to what's been marked for

24  identification as USA 11D.

25  A.   Yes.

1    Q.   What is this?

2    A.   This is a calendar for the month of November 2018.

3         MS. GAFFNEY PAINTER:  Your Honor, the government

4    moves for the admission of Government Exhibit USA 11D.

5         MR. C. HENRY RITTGERS:  No objection, Your Honor.

6         THE COURT:  USA 11D is admitted without objection.

7    Q.   If you could, Special Agent Holbrook, could you turn to

8    Tab 21B.

9    A.   Yes.

10   Q.   Do you recognize this?

11   A.   Yes.

12   Q.   What is it?

13   A.   This is a text message from Mr. Sittenfeld to Rob.

14   Q.   Did you review it for accuracy?

15   A.   Yes.

16        MS. GAFFNEY PAINTER:  The government moves for the

17   admission of Government Exhibit USA 21B.

18        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

19        THE COURT:  USA Exhibit 21B is admitted without

20   objection.

21        MS. GAFFNEY PAINTER:  May we publish this for the

22   jury?

23        THE COURT:  You may.

24   Q.   Special Agent Holbrook, what's the date on USA 21B?

25   A.   December 3, 2018.

HOLBROOK - DIRECT

1    Q.   And who are the -- can you describe for us what we see

2    here?

3    A.   Yes.  On the left side, you see Sittenfeld's name and

4    telephone number.  On the right side of the top right corner

5    of the paper, you see UC Rob's name and telephone number.  And

6    then you see a text message that is from Mr. Sittenfeld to

7    UC Rob.

8    Q.   Will you please read the text message.

9    A.   Yes.  "Around tonight, or let me know when good to ring

10   you tomorrow."

11   Q.   Did Rob and Mr. Sittenfeld have a phone call the next

12   day, December 4, 2018?

13   A.   I believe so.

14   Q.   Was that call recorded?

15   A.   Yes, it was.

16   Q.   All right.  If you could turn to what's been marked for

17   identification as USA 21C.

18   A.   Yes.

19   Q.   Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   This is a December 4, 2018 call.

23   Q.   How do you know that?

24   A.   I reviewed this disk, and I've placed my initials on it.

25              MS. GAFFNEY PAINTER:  The government moves for the

1    admission of Government Exhibit USA 21C.

2          MR. C. MATTHEW RITTGERS:  Your Honor, are you ready?

3    Sorry.

4          THE COURT:  The copy in my book says December 3, 2018

5    call.  Is that just wrong?

6          MR. C. MATTHEW RITTGERS:  They didn't include the

7    transcript which is of this call in that folder, I don't

8    believe.  Oh, the date's wrong.  That's it.

9          THE COURT:  The date says 12/3/2018 on there.

10          MR. C. MATTHEW RITTGERS:  That was my confusion.  I'm

11    sorry.

12          MS. GAFFNEY PAINTER:  Your Honor, I think I know the

13    source of the confusion.  The date on the disk is December 4th

14    UTC time.  The call is actually December 3, 2018.

15          THE COURT:  I see.  The five hour -- so it was late

16    in the evening on December 3, which shows up as UTC time the

17    next day?

18          MS. GAFFNEY PAINTER:  Yes.  Yes.  And I -- let me

19    just have a brief moment, if I may, to confer?

20          THE COURT:  Yes.

21          MS. GAFFNEY PAINTER:  Your Honor, this might be a

22    good time for an afternoon break, and we can confer and make

23    sure that everything is clear before we continue.

24          THE COURT:  Okay.  Why don't we take a brief break.

25    Ladies and gentlemen of the jury, I would just remind you,

1    please do not form any opinions.  Please do not discuss this

2    matter with your fellow jurors during the break.  Please do

3    not use any electronic devices to do any research regarding

4    the case or regarding any of the charges in this case.  And

5    please do not communicate with anyone about the case.  If

6    anyone attempts to discuss the case with you, please bring it

7    to my attention.

8         With that, we'll go on break.

9         (Jury out at 2:41 p.m.)

10             THE COURT:  Is there anything the government needs to

11    put on the record before we go on break?

12             MS. GAFFNEY PAINTER:  No.  Thank you, Your Honor.

13             THE COURT:  Mr. Rittgers?

14             MR. C. MATTHEW RITTGERS:  No, Your Honor.

15             THE COURT:  You may take a break.  I was going to

16    talk with Mr. Greiner, who I see again, right, for

17    The Enquirer?

18             MR. GREINER:  Yes.

19             THE COURT:  I wanted to discuss something with you.

20    We can either discuss it at sidebar, or we can do it in open

21    court, I don't care.

22             MR. GREINER:  It's up to you.

23             THE COURT:  Why don't we just chat here.  Very good.

24    We can take a recess.

25         (Brief recess.)

```
 1              THE COURT:  Ms. Gaffney Painter, did you get the
 2    December 3 and December 4 thing sorted?
 3              MS. GAFFNEY PAINTER:  Yes, Your Honor.  I apologize.
 4    We have a way that we can explain it in front of the jury that
 5    explains and instructs them.
 6              THE COURT:  Very good.  Have you conferred with your
 7    colleagues, I mean the defense, about your explanation, or --
 8              MS. GAFFNEY PAINTER:  We have not, but I'm happy to
 9    do so.
10              MR. C. MATTHEW RITTGERS:  We're good.
11              THE COURT:  All right.  So we're ready to bring the
12    jury back in?
13              MS. GAFFNEY PAINTER:  Yes.  Thank you, Your Honor.
14              THE COURT:  Mr. Rittgers?
15              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.
16              THE COURT:  All right.  Let's bring the jury in.
17         (Jury in at 3:05 p.m.)
18              MS. GAFFNEY PAINTER:  The one way that we are able to
19    explain the discrepancy is by referring to the first page of
20    the transcript, which is 21D.
21              THE COURT:  Right.
22              MS. GAFFNEY PAINTER:  I think the most efficient way
23    would be to refer to the first page of 21D and display it
24    alongside page 9 of the exhibit -- one of the line sheets, to
25    walk him through and explain this discrepancy.
```

HOLBROOK - DIRECT

1              THE COURT:  Okay.

2              MS. GAFFNEY PAINTER:  But I would seek the Court's

3     permission and defense counsel's indulgence to display just

4     that first page before we seek to admit it into evidence, just

5     to allow us to explain the date discrepancy between the

6     date -- discrepancy between the date, the transcript, and the

7     line sheets.

8              MR. C. HENRY RITTGERS:  We don't have any objection,

9     Your Honor.

10             THE COURT:  Okay.  Very good.

11             MR. SINGER:  Your Honor, may I approach the witness

12    and give him a water?

13             THE COURT:  Oh, sure.

14             MS. GAFFNEY PAINTER:  Your Honor, may I approach the

15    podium and continue the examination?

16             THE COURT:  You may.

17    BY MS. GAFFNEY PAINTER:

18    Q.   Special Agent Holbrook, right before the break, there was

19    some confusion about dates, so I'd like to walk through some

20    evidence now to attempt to resolve it.

21    A.   Yes.

22    Q.   So you initially looked at USA 21C; is that correct?

23    A.   That's correct.

24    Q.   And what is the date that is written on that disk?

25    A.   The date on the disk is December 4th of 2018.

HOLBROOK - DIRECT

1    Q.   Okay.  Now if you could, turn to Tab 21D.

2         What is the date there that appears on 21D?

3    A.   December 3, 2018.

4         MS. GAFFNEY PAINTER:  Now, if I may, Your Honor,

5    request to publish just this first page of USA 21D, which has

6    not yet been admitted into evidence.

7         THE COURT:  You may do so.

8         MS. GAFFNEY PAINTER:  Thank you.  Ms. Terry, will you

9    please on the other screen publish page 9 of Exhibit 9A.

10   Q.   Special Agent Holbrook, I'd like to direct you to this

11   bottom portion of the page, which Ms. Terry has helpfully

12   blown up here.  And looking at this, what is the session

13   number on this?

14   A.   Session 1827.

15   Q.   Now, referring you back to this first page of USA 21D,

16   what is the session number that appears there?

17   A.   Session 1827.

18   Q.   Okay.  And that matches both of those exhibits, the

19   session number's the same, right?

20   A.   That is correct.

21   Q.   What is the date that appears on the line sheet -- again,

22   I'm referring you back to USA 9A, page 9.  What is the date

23   that appears there?

24   A.   December 4, 2018.

25   Q.   All right.  And what appears beneath December 4, 2018?

1   A.   It is the start time of this call, which is 1:13:04

2   UTC time.

3   Q.   Now, you testified earlier that there is a conversion

4   that is performed to get coordinated universal time into

5   eastern standard time.  Do you recall that testimony?

6   A.   Yes.

7   Q.   Okay.  So when you perform that calculation with this

8   coordinated universal time, approximately what results?  What

9   day do we end up in when we make that conversion?

10   A.   When you convert the UTC time on December 4th to eastern

11   standard time, it becomes December 3rd.

12   Q.   Okay.  So referring you back to USA 21D, the first page,

13   where we see the date December 3rd, 2018; is that correct?

14   A.   Yes.

15   Q.   All right.  Directing you back to USA 21C, which is the

16   disk that has December 4, 2018?

17   A.   Okay.

18   Q.   Regardless of the date that is printed on that exhibit,

19   have you listened to the recording that appears on that disk?

20   A.   Yes.

21   Q.   And does that recording correspond with the transcript

22   here at USA 21D?

23   A.   It does.

24   Q.   So the label that appears on USA 21C contains a

25   typographical error; is that right?

1  A.  That's true.  It's in UTC time.

2  Q.  Right.  So the call that we are referring to actually

3  occurred on December 3, 2018 eastern standard time?

4  A.  That's correct.

5       MS. GAFFNEY PAINTER:  Your Honor, I believe that that

6  addresses the discrepancy.

7       THE COURT:  So are you moving to admit 21C?

8       MS. GAFFNEY PAINTER:  Yes.

9       MR. C. HENRY RITTGERS:  No objection.

10       THE COURT:  USA Exhibit 21C is admitted without

11  objection.

12  Q.  Special Agent Holbrook, directing you again back to

13  USA 21D.  What is this?

14  A.  This is a transcript of a telephone call that occurred on

15  December 3, 2018.

16  Q.  And have you reviewed it for accuracy?

17  A.  Yes.

18       MS. GAFFNEY PAINTER:  Your Honor, the government

19  moves for the admission of USA 21D.

20       MR. C. HENRY RITTGERS:  No objection.

21       THE COURT:  USA 21D is admitted without objection.

22       MS. GAFFNEY PAINTER:  Your Honor, may we publish this

23  in front of the jury?

24       THE COURT:  You may.  Ladies and gentlemen of the

25  jury, there should be a Tab 21D in the transcript book.

1        Since we're back from a break, I will remind you, we're

2   going to play the audio.  To the extent you hear something

3   different on the audio from what you see in the transcript

4   book, you should go with what you hear and not with what you

5   read.

6        (Audio played.)

7   Q.  Special Agent Holbrook, there was a reference in USA 21C

8   to corporations versus LLCs.  What is your understanding of

9   the significance of that distinction in this context between

10  corporations and LLCs?

11  A.  My understanding is the PAC, the Progress and Growth PAC,

12  cannot accept checks from corporations, but they can accept

13  checks from LLCs.

14  Q.  What investigative steps did you take in response to this

15  phone call?

16  A.  I replaced these corporation checks with LLC checks.

17  Q.  And how many checks did you replace the corporation

18  checks with?

19  A.  Four.

20  Q.  In what amount?

21  A.  Total of $20,000.

22  Q.  All right.  If you could, please, turn in your binder to

23  USA 21E.

24       Do you recognize this?

25  A.  Yes.

1    Q.   What is it?

2    A.   This is a summary of text message communications between

3    Mr. Sittenfeld and Rob.

4    Q.   Did you review this for accuracy?

5    A.   I did.

6          MS. GAFFNEY PAINTER:  The government moves for the

7    admission of Government Exhibit USA 21E.

8          MR. C. HENRY RITTGERS:  No objection, Your Honor.

9          THE COURT:  USA 21E is admitted without objection.

10          MS. GAFFNEY PAINTER:  Your Honor, may we publish to

11    the jury?

12          THE COURT:  You may.

13    Q.   Special Agent Holbrook, will you please read the text

14    message exchange that appears here in Government Exhibit

15    USA 21E.

16    A.   Yes.  Beginning with Rob:  "I will be there on Monday."

17        Sittenfeld responds, "Great.  Drink after work or after

18    dinner?"

19        December 13, 2018, Rob texts:  "Whichever one works for

20    you."

21        Sittenfeld texts:  "How about 5:30 p.m., Ruby's, Sotto?

22    You tell me."

23        December 14, 2018, Rob texts:  "Let's do Sotto.  Drinks

24    or dinner?"

25        Sittenfeld texts:  "Unfortunately, I have a city related

1    dinner function at 7:00 p.m.  But 5:30 drinks at Sotto sounds

2    great, and it's on my calendar."

3    Q.   May we proceed?  I believe there's another page.

4    A.   Rob texts -- on December 16, 2018, Rob texts:  "Let me

5    know when you want to stop by and grab those checks tomorrow."

6         Sittenfeld texts:  "Want me to come to your place at

7    5:30 p.m. to get them, then we can head across the street to

8    Sotto for a drink?"

9         Rob's text says:  "Sure."

10        Sittenfeld texts:  "Great.  I'll call you when in the

11   building."  Sittenfeld texts again:  "Thanks so much."

12   Q.   So there's reference in this exhibit to "grab those

13   checks tomorrow."  Did Sittenfeld and Rob, in fact, meet up

14   the next day, December 17, 2018?

15   A.   Yes.

16   Q.   Who else attended that meeting?

17   A.   Brian.

18   Q.   Where was that meeting held?

19   A.   This was held at the apartment at the 580 Building.

20   Q.   Was that meeting recorded?

21   A.   Yes.

22   Q.   All right.  If you could, please, turn in your binder to

23   USA 21F.

24   A.   Yes.

25   Q.   Do you recognize this?

1    A.   I do.

2    Q.   What is it?

3    A.   This is a disk containing the December 17, 2018 meeting.

4    Q.   How do you know that?

5    A.   I know that because I reviewed this disk, and then I

6    placed my initials on it.

7         MS. GAFFNEY PAINTER:  The government moves for the

8    admission of Government Exhibit USA 21F.

9         MR. C. HENRY RITTGERS:  No objection.

10        THE COURT:  USA 21F is admitted without objection.

11   Q.   Special Agent Holbrook, also in front of you, behind Tab

12   USA 21G, could you please turn there and see if you recognize

13   what appears there?

14   A.   Yes.  This is a transcript for the December 17, 2018

15   meeting.

16   Q.   Have you reviewed it for accuracy?

17   A.   Yes.

18        MS. GAFFNEY PAINTER:  The government moves for the

19   admission of Government Exhibit USA 21G.

20        MR. C. MATTHEW RITTGERS:  Your Honor, I would just

21   like to reflect the fact that this is just a partial

22   transcript.

23        That's the only thing that I would like to make sure is

24   clear, that it's not the whole transcript of the interaction.

25        THE COURT:  It's not the full transcript of 21F, or

1    it's not -- or 21F is not the full conversation?

2         MR. C. MATTHEW RITTGERS:  I believe that 21F is not

3    the full conversation.  Thank you.

4         THE COURT:  Okay.  But 21G, you believe, is the full

5    transcript of 21F; is that right?  I'll ask you, Ms. Gaffney

6    Painter or Mr. Holbrook?

7         MS. GAFFNEY PAINTER:  Yes.  21G is the full

8    transcript of 21F.

9         THE COURT:  Okay.  So objection noted but overruled.

10   21G is admitted.

11        MS. GAFFNEY PAINTER:  Now, before we publish these

12   exhibits to the jury, I just want to specifically publish a

13   single page, with the Court's indulgence, from USA 21G.  This

14   is the transcript.

15        THE COURT:  Okay.

16   Q.  I'd like to go to page 2 of the transcript.

17        Now, Special Agent Holbrook, I'm directing your attention

18   to the brackets that appear at the top of the page.  What do

19   we see here?

20   A.  We see brackets that's in bold, and it states, "Begin

21   transcript 1D113-1 at 24:17."

22   Q.  What does 1D113-1 refer to?

23   A.  The 1D is how the FBI labels recordings, so it would be

24   1D1 all the -- up to however many recordings there are.  This

25   happens to be 1D113.  And the dash 1 is the first session of

1    that recording.

2    Q.  All right.  If we could go to the next page, page 3.  I'm

3    directing you to the brackets that appear at the top of the

4    page.

5    A.  Yes.

6    Q.  If you can, read the second set of brackets that appears

7    there?

8    A.  It states, "Begin transcription 1D113-2 at 10:03."

9    Q.  What is the significance of the dash 2 in that number?

10   A.  The dash 2 is the second session of that recorded

11   meeting.

12   Q.  So although the bracket above it ends at 25:06, and the

13   next bracket starts at 10:03, is it correct that this is not

14   going back in time but reflects the next session starting at

15   10:03?

16   A.  That is correct.

17          MS. GAFFNEY PAINTER:  The government requests that we

18   may publish this exhibit, publish the underlying recording and

19   the exhibit, so this 21F and 21G.

20          THE COURT:  Okay.  You may play 21F.  And ladies and

21   gentlemen of the jury, I believe 21G is a transcript that

22   should be in your transcript volume.

23      As Mr. Rittgers noted, and I think as Ms. Gaffney Painter

24   pointed out, this is a transcript of a part of the session

25   that appears to start at 24:17 into the session, is that

1    right, Ms. Gaffney Painter?

2            MS. GAFFNEY PAINTER:  That is correct, Your Honor.

3        (Video played.)

4    Q.   Special Agent Holbrook, will you turn in your binder to

5    USA 21I.

6    A.   Yes.

7    Q.   Do you recognize these?

8    A.   Yes, I do.

9    Q.   What are they?

10   A.   These were the four checks that Rob gave to Sittenfeld on

11   December 17, 2018.

12   Q.   Are these the actual checks, or photographs of those

13   checks?

14   A.   These are the photographs of the checks.

15   Q.   Are they fair and accurate representations of the checks

16   given to Sittenfeld on December 17, 2018?

17   A.   Yes.

18           MS. GAFFNEY PAINTER:  The government moves for the

19   admission of USA 21I.

20           MR. C. HENRY RITTGERS:  No objection, Your Honor.

21           THE COURT:  USA 21I is admitted without objection.

22           MS. GAFFNEY PAINTER:  Your Honor, may we have

23   permission to publish this to the jury?

24           THE COURT:  You may.

25   Q.   Let's look at page 1 of USA 21I.

HOLBROOK - DIRECT

1      Now, looking at the upper left-hand corner, what appears
2  there?
3  A.  A company by the name of Stirling Securities, followed by
4  an address in Naperville, Illinois.
5  Q.  What is Stirling Securities?
6  A.  It's a company that the FBI undercover unit creates.
7  Q.  What is the amount of this check?
8  A.  $5,000.
9  Q.  What appears on the lower right-hand corner?
10  A.  The signature, Kelly Harrison.
11  Q.  Who provided the funds for this check?
12  A.  FBI.
13  Q.  All right.  Let's turn now to page 2 of USA 21I.
14      Looking at the upper left-hand corner, what appears
15  there?
16  A.  The Orion Group.
17  Q.  What is the Orion Group?
18  A.  It's a company created by the FBI.
19  Q.  What is the amount of this check?
20  A.  The amount is $5,000.
21  Q.  What appears on the lower right-hand corner?
22  A.  The signature of Nathan Baker.
23  Q.  Who provided the funds for this check?
24  A.  The FBI did.
25  Q.  Let's now turn to page 3 of USA 21I.

109
HOLBROOK - DIRECT

 1          Looking at the upper left-hand corner, what appears
 2     there?
 3     A.   A company named CII, Incorporated, with an address in
 4     Elk Grove Village, Illinois.
 5     Q.   What is CII, Incorporated?
 6     A.   That is a company created by the FBI.
 7     Q.   What is the amount of this check?
 8     A.   The amount is $5,000.
 9     Q.   What appears on the lower right-hand corner here?
10     A.   The signature, Kate Collins.
11     Q.   Who provided the funds for this check?
12     A.   The FBI did.
13     Q.   All right.  Let's turn now to page 4 of USA 21I.
14          Looking at the upper left-hand corner, what appears
15     there?
16     A.   The name Anderson Management and Leasing.
17     Q.   What is Anderson Management and Leasing?
18     A.   This is the company created by the FBI.
19     Q.   What is the amount of this check?
20     A.   $5,000.
21     Q.   What appears on the lower right-hand corner?
22     A.   The signature of Mark Davis.
23     Q.   Who provided the funds for this check?
24     A.   The FBI.
25     Q.   Special Agent Holbrook, if you could turn in your binder

HOLBROOK - DIRECT

1    to the Tab USA 21J.

2        Do you recognize this?

3    A.   I do.

4    Q.   What is it?

5    A.   This is a compact disk containing a voice message left by

6    Mr. Sittenfeld.

7    Q.   How do you know that?

8    A.   I reviewed this disk, and I placed my initials on it.

9        MS. GAFFNEY PAINTER:  The government moves for the

10   admission of Government Exhibit USA 21J.

11       THE COURT:  Mr. Rittgers?

12       MR. C. HENRY RITTGERS:  Sorry, Your Honor.  No

13   objection.

14       THE COURT:  USA 21J is admitted without objection.

15   Q.   Now, if you could, Special Agent Holbrook, turn to the

16   next tab, which is USA 21K.

17   A.   Yes.

18   Q.   What is this?

19   A.   This is a transcript of that voice message left on

20   December 17, 2018, by Mr. Sittenfeld.

21   Q.   Have you reviewed this for accuracy?

22   A.   I have.

23       MS. GAFFNEY PAINTER:  The government moves for the

24   admission of Government Exhibit USA 21K.

25       MR. C. HENRY RITTGERS:  No objection, Your Honor.

HOLBROOK - DIRECT

1        THE COURT:  USA 21K is admitted without objection.

2        MS. GAFFNEY PAINTER:  May the government publish 21J

3  to the jury?

4        THE COURT:  You may.  And ladies and gentlemen of the

5  jury, I believe there's a Tab 21K in your transcript book.

6        MS. GAFFNEY PAINTER:  Your Honor, the dreaded phrase

7  you referenced yesterday of technical difficulties has arisen

8  again.

9        THE COURT:  Okay.

10       MS. GAFFNEY PAINTER:  We just need a moment.

11       THE COURT:  Sure.

12   (Pause in proceedings.)

13       MS. GAFFNEY PAINTER:  Your Honor, to attempt to

14  regain some efficiency, we would submit that since the audio

15  is not playing, that the jury be permitted to read the

16  transcript, of course, to have the audio published later when

17  the technical difficulties are resolved.

18       MR. C. HENRY RITTGERS:  No objection, Your Honor.

19       THE COURT:  Very good.  Ladies and gentlemen of the

20  jury, you can read 21K, the transcript, in your transcript

21  volume.

22   (Jurors reading transcript.)

23  Q.  In case this would also be helpful, Special Agent

24  Holbrook, will you read what appears here in the transcript?

25  A.  Yes.  "Chin, what's going on, brother?  P.G.

1      "I just wanted to let you know how much I have really

2    enjoyed getting to know Rob and Brian.  No surprise that you

3    attract great dudes and talented investors and partners, but

4    looking forward to doing what I can to help get 435 across the

5    finish line, so never hesitate to reach out.  Let me know how

6    I can be helpful on that front.  Talk to you soon, my man.

7    Hope fatherhood has been great.  And don't say anything but,

8    actually, I got some news to share with you along those lines.

9    Talk to ya."

10   Q.   Special Agent Holbrook, if you could turn in your binder

11   to Tab USA 21A.

12      Forgive me.  I may have misspoken.  Did I direct you to

13   USA 22A?

14   A.   No.

15   Q.   I apologize.  I misspoke.  If you could, please, turn to

16   USA 22A.

17   A.   Yes.

18   Q.   Do you recognize this?

19   A.   I do.

20   Q.   What is it?

21   A.   These are text message exchanges between Mr. Sittenfeld

22   and Rob.

23   Q.   Did you review it for accuracy?

24   A.   Yes, I did.

25           MS. GAFFNEY PAINTER:  The government moves for the

1    admission of Government Exhibit USA 22A.

2              MR. C. HENRY RITTGERS:  No objection, Your Honor.

3              THE COURT:  USA 22A is admitted without objection.

4              MS. GAFFNEY PAINTER:  Your Honor, may we publish this

5    for the jury?

6              THE COURT:  You may.

7    Q.   Now, Special Agent Holbrook, will you read for us just

8    the first text message that appears there?

9    A.   On January 16, 2019, Rob texts:  "The agreement for Elm

10   Street went to economic development yesterday."

11   Q.   What is your understanding of what Rob is referencing in

12   this text message?

13   A.   My understanding of this text message is Rob's referring

14   to the development agreement that Mr. Ndukwe was attempting to

15   get from the city went to the economic development department

16   on January 15, 2019.

17   Q.   And beneath that text message from Rob, what do we see?

18   A.   The text message response on January 17, 2019 from

19   Mr. Sittenfeld, and he liked the text message.

20   Q.   All right.  If you could, Special Agent Holbrook, turn to

21   the tab USA 22B.

22   A.   Excuse me.  Repeat it, please?

23   Q.   Could you please turn to Tab 22B.

24   A.   Okay.

25   Q.   Do you recognize this?

HOLBROOK - DIRECT

1    A.   I do.

2    Q.   What is it?

3    A.   It is an audio recording of a telephone call that

4    occurred on January 21, 2019.

5    Q.   And how do you know that?

6    A.   I reviewed this disk, and I placed my initials on it.

7         MS. GAFFNEY PAINTER:  The government moves for the

8    admission of Government Exhibit USA 22B.

9         MR. C. HENRY RITTGERS:  No objection, Your Honor.

10        THE COURT:  USA 22B is admitted without objection.

11   Q.   Will you please turn now to tab USA 22C.

12   A.   Yes.

13   Q.   Do you recognize this?

14   A.   I do.

15   Q.   What is it?

16   A.   This is a transcript dated January 21, 2019, of a

17   telephone call between Mr. Sittenfeld and Rob.

18   Q.   Have you reviewed this for accuracy?

19   A.   I have.

20        MS. GAFFNEY PAINTER:  The government moves for the

21   admission of Government Exhibit USA 22C.

22        MR. C. HENRY RITTGERS:  No objection.

23        THE COURT:  USA 22C is admitted without objection.

24        MS. GAFFNEY PAINTER:  Your Honor, may we publish this

25   for the jury?

HOLBROOK - DIRECT

1      THE COURT:  You may.  And ladies and gentlemen of the

2   jury, you should have a tab in your transcript volume that's

3   labeled 22C, and you can now review that.

4      (Audio played.)

5   Q.   Special Agent Holbrook, will you turn in your binder now

6   to USA 22D.

7   A.   Yes.

8   Q.   Do you recognize this?

9   A.   I do.

10  Q.   What is it?

11  A.   This is a disk dated January 21, 2019, with a recording

12  of a voicemail.

13  Q.   How do you know that?

14  A.   I reviewed the disk, and I placed my initials on it.

15      MS. GAFFNEY PAINTER:  The government moves for the

16  admission of Government Exhibit USA 22D.

17      MR. C. HENRY RITTGERS:  No objection.

18      THE COURT:  USA 22D is admitted without objection.

19  Q.   If you'll turn now, Special Agent Holbrook, to tab

20  USA 22E.

21      Do you recognize this?

22  A.   Yes.  This is a transcript of the January 21, 2019 voice

23  message.

24  Q.   Have you reviewed this for accuracy?

25  A.   Yes.

1    MS. GAFFNEY PAINTER:  The government moves for the

2    admission of Government Exhibit USA 22E.

3    MR. C. HENRY RITTGERS:  No objection.

4    THE COURT:  USA 22E is admitted without objection.

5    MS. GAFFNEY PAINTER:  Your Honor, may we publish this

6    for the jury?

7    THE COURT:  You may.  And ladies and gentlemen of the

8    jury, you have a Tab 22E in your transcript book that has the

9    transcript to which we just referred.

10   (Audio played.)

11   Q.  Special Agent Holbrook, will you please turn to USA

12   Tab 22F.

13   A.  Yes.

14   Q.  Do you recognize this?

15   A.  I do.

16   Q.  What is it?

17   A.  This is a disk containing a January 23, 2019 voice

18   message from Mr. Sittenfeld.

19   Q.  How do you know that?

20   A.  I reviewed this disk and placed my initials on it.

21   MS. GAFFNEY PAINTER:  The government moves for the

22   admission of Government Exhibit USA 22F.

23   MR. C. HENRY RITTGERS:  No objection.

24   THE COURT:  USA 22F is admitted without objection.

25   Q.  Special Agent Holbrook, will you turn now to Tab 22G.

1    A.   Yes.

2    Q.   What appears there?

3    A.   This is the transcript of that voice message.

4    Q.   In looking at the transcript, you testified earlier to

5    the process used to prepare transcripts.

6         Did the FBI prepare the transcript, or did someone else

7    prepare the transcript?

8    A.   This transcript was not completed by the FBI.

9    Q.   Can you describe the process for this transcript?

10   A.   Pardon?

11   Q.   Meaning, more specifically, have you reviewed this

12   transcript for accuracy?

13   A.   Yes.

14        MS. GAFFNEY PAINTER:   The government moves for the

15   admission of Government Exhibit USA 22G.

16        MR. C. HENRY RITTGERS:   No objection.

17        THE COURT:   USA Exhibit 22G is admitted without

18   objection.

19        MS. GAFFNEY PAINTER:   May we publish these exhibits

20   to the jury, Your Honor?

21        THE COURT:   You may.   Ladies and gentlemen of the

22   jury, 22G is in your transcript binder.

23        (Audio played.)

24   Q.   Moving now to January 30, 2019, was there a meeting of

25   investigative significance that day?

1    A.   Yes, there was.

2    Q.   All right.  If you could turn now to what's been marked

3    for identification as USA 23A.

4    A.   Yes.

5    Q.   Do you recognize this?

6    A.   Yes.

7    Q.   What is it?

8    A.   This is a series of text message exchanges between

9    Mr. Sittenfeld and Rob.

10   Q.   Did you review this exchange for accuracy?

11   A.   I did.

12        MS. GAFFNEY PAINTER:  The government moves for the

13   admission of Government Exhibit USA 23A.

14        MR. C. HENRY RITTGERS:  No objection, Your Honor.

15        THE COURT:  USA 23A is admitted without objection.

16        MS. GAFFNEY PAINTER:  May we publish, Your Honor?

17        THE COURT:  You may.

18   Q.   Special Agent Holbrook, what's the date on these text

19   messages?

20   A.   January 28, 2019.

21   Q.   All right.  Will you please read this text exchange to

22   the jury?

23   A.   Yes.  Text from Sittenfeld:  "Hope hunting was good.

24   This Wednesday, when you're in town, I'm having a cozy event

25   right across the street at Via Vite.  You and Brian want to

1    join?  Obviously, don't worry about donating, as you've

2    already been very generous."

3         Rob responds:  "What time?"

4         Sittenfeld texts:  "5:15 to 6:15 p.m.  Let me know if you

5    guys want to join."

6         Rob texts:  "We will stop by.  You want to grab a drink

7    after that?"

8         Sittenfeld texts:  "Cool.  Yeah.  A drink or dinner

9    sounds great.  I'll also call you later today to relay Cranley

10   convo."

11   Q.   Now, in regards to the meeting on January 30, 2019, where

12   was that meeting held?

13   A.   This meeting was held in the apartment at 580 Building.

14   Q.   Who attended that meeting?

15   A.   Sittenfeld, Rob, and Brian.

16   Q.   Was that meeting recorded?

17   A.   It was.

18   Q.   In front of you is what's been marked for identification

19   as Government Exhibit USA 23B.  Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   This is a disk containing the recorded meeting on

23   January 30, 2019.

24   Q.   How do you know that?

25   A.   I reviewed this disk, and I placed my initials on it.

HOLBROOK - DIRECT

1          MS. GAFFNEY PAINTER:  The government moves for the

2     admission of Government Exhibit USA 23B.

3          MR. C. HENRY RITTGERS:  No objection, Your Honor.

4          MR. C. MATTHEW RITTGERS:  No objection.  I just want

5     to note the middle, that this is just a segment of that

6     interaction again, Your Honor.

7          THE COURT:  So noted.  USA 23B is admitted without

8     objection.

9     Q.   Special Agent Holbrook, can you also turn to USA 23C.

10    A.   Yes.

11    Q.   What is this?

12    A.   This is a transcript of the January 30, 2019 meeting

13    between Mr. Sittenfeld, Rob, and Brian.

14         MS. GAFFNEY PAINTER:  The government moves for the

15    admission of Government Exhibit USA 23C.

16         MR. C. HENRY RITTGERS:  No objection.

17         THE COURT:  USA 23C is admitted without objection.

18    Ladies and gentlemen of the jury, there is a 23C in your

19    transcript binder.  You may now turn to that.

20         MS. GAFFNEY PAINTER:  Your Honor, if I may, before we

21    seek permission to publish, I'd like to note for the record

22    the timestamps.

23         THE COURT:  Yes.

24         MS. GAFFNEY PAINTER:  So first, we'll be playing

25    1D121-1, 8:41 to 10:24.

 1       We will be playing 1D121-2 from the beginning 00:00 to

 2  8:59.

 3       And finally, we will play 1D121-4, 3:54 to 5:35.

 4            THE COURT:  Thank you.

 5            MS. GAFFNEY PAINTER:  May we publish?

 6            THE COURT:  You may.

 7       (Video played.)

 8            THE COURT:  Can we stop, please?  What exhibit is it?

 9            MS. GAFFNEY PAINTER:  I believe that we started on

10  the second segment.  This is the second segment that appears.

11  This starts at session two.  I believe we need to go back to

12  session one, starting at 8:41.

13       Your Honor, to address the technical difficulty, it may

14  be a good opportunity for a recess because, in order to

15  address it, she may have to play audio, so...

16            THE COURT:  Okay.  Let's take a brief recess.

17       Ladies and gentlemen, we're almost to the point where

18  you're supposed to recite it back to me.

19       Please do not discuss this case with each other during

20  this break.  Please do not make any effort to research any of

21  the facts or the laws surrounding this case.  Please do not

22  communicate with anyone about this case.  If anyone should try

23  to communicate with you, please let me know immediately.

24       We are going to try and keep this brief, but technical

25  difficulties are technical difficulties, so we'll see what

1    happens.

2        (Jury out at 3:59 p.m.)

3        THE COURT:  How long do we think this is going to

4    take to address?

5        MS. TERRY:  Your Honor, it's in there.  I just didn't

6    name it right.  It's my fault.

7        THE COURT:  No, I'm not --

8        MR. SINGER:  Your Honor, this is one of the

9    recordings that was altered based on the discussion from last

10   night.  We weren't able to get the disk over in time to allow

11   it to be loaded into the trial record appropriately.

12       THE COURT:  Yeah.  I'm not ascribing fault.  I'm just

13   asking how long we need to get it cued up?

14       MS. TERRY:  It's ready.  I'm so sorry, Your Honor.

15       THE COURT:  Okay.  So why don't we take a brief

16   break.  Well, while they're taking a brief break, why don't we

17   talk about the game plan for the rest of the day and where you

18   see this going.

19     Just looking at the transcript book, it looks like

20   there's roughly still like 25 transcripts to get in.  I assume

21   we're going through all these?

22       MS. GAFFNEY PAINTER:  Yes, Your Honor.

23       THE COURT:  All right.  So it sounds like Special

24   Agent Holbrook will be on the stand again tomorrow morning?

25       MS. GAFFNEY PAINTER:  That is correct, Your Honor.

1          THE COURT:  In other words, we're introducing all of

2    these through Special Agent Holbrook?

3          MS. GAFFNEY PAINTER:  That's correct.

4          THE COURT:  Okay.  Do you have questions that are

5    going to go beyond that or, essentially, when we get to the

6    end of the transcripts, is that going to be about the end of

7    your time with the special agent?

8          MS. GAFFNEY PAINTER:  Yes.

9          THE COURT:  Do you have a sense of how much longer --

10   and you can remain seated.  Do you have a sense of how much

11   longer you anticipate it will take to get the rest of these

12   introduced?

13         MS. GAFFNEY PAINTER:  To hazard a guess, I would say

14   at least the morning tomorrow.

15         THE COURT:  Oh, really?

16         MS. GAFFNEY PAINTER:  Yes.

17         THE COURT:  Okay.  Do you have a sense of how long

18   you'll have him, I don't know which one I'm looking at, have

19   him -- thank you.  Have the special agent on the stand for

20   cross-examination?  I won't hold you to it, I'm just trying to

21   plan.

22         MR. C. HENRY RITTGERS:  Yes, I understand, Judge.  At

23   first, I thought it would take three or four hours.  Maybe I

24   can condense this to an hour, but I'm not promising.

25         THE COURT:  I understand.  I'm just trying to advise

1    the government whether they should have another witness to

2    call tomorrow afternoon, and it sounds like possibly yes is

3    the answer to that.

4            MS. GAFFNEY PAINTER:  Yes.  We are prepared to call

5    another witness, if time allows.

6            THE COURT:  Okay.  All right.  Well, why don't we

7    take a very brief break.  I think it's going to take a while

8    to reassemble the jury anyway, but try to just keep it to

9    stretch your legs, and if you need to take a break for some

10   reason, do that and we'll be back.

11       (Brief recess.)

12           THE COURT:  Ready to bring the jury back in?

13           MS. GAFFNEY PAINTER:  Yes, Your Honor.

14           THE COURT:  All right.  Let's bring the jury back in.

15       (Jury in at 4:11 p.m.)

16           THE COURT:  Is the government prepared to proceed,

17   Ms. Gaffney Painter?

18           MS. GAFFNEY PAINTER:  Yes.  Thank you, Your Honor.

19   May I approach the podium and continue the examination?

20           THE COURT:  You may.

21           MS. GAFFNEY PAINTER:  Your Honor, before the break,

22   the government had intended to publish the segments of the

23   video and transcript that had been admitted.  May we publish

24   them now for the jury?

25           THE COURT:  You may.  And just to bring the jury back

1    up to speed, I believe the transcript is at 23C; is that

2    correct?

3            MS. GAFFNEY PAINTER:  Yes, Your Honor.

4            THE COURT:  So ladies and gentlemen of the jury, you

5    may want to turn in your transcript volume to Exhibit 23C and,

6    shortly, we'll be playing the audio that should correspond to

7    that transcript.

8        (Video played.)

9            THE COURT:  Ladies and gentlemen --

10           MS. GLATFELTER:  Your Honor, we corrected the

11   transcript.

12           THE COURT:  Oh, you have?  Okay.  Sorry.  My mistake.

13   I was operating off an old transcript.  Thank you.

14       (Video played.)

15   Q.  Special Agent Holbrook, will you please turn back to

16   page 3 in that transcript.  This is USA 23C.

17   A.  Yes.

18   Q.  We see notations there in brackets.  And you had

19   testified earlier about sessions.  Is this an example of a

20   session break?

21   A.  Yes, it is.

22   Q.  There was reference in that video to a note from

23   U.S. Bank.  Based on your participation in this investigation,

24   what is your understanding of a note from U.S. Bank?

25   A.  This was at issue in regards to Mr. Ndukwe's financial

1    interest in the 435 Elm property.

2        Mr. Ndukwe purchased a note from U.S. Bank, and he

3    believes that gives him a financial interest in that property.

4    Q.  All right.  Let's move now to February 18, 2019.  Was

5    there a meeting of investigative significance that day?

6    A.  Yes, there was.

7    Q.  Was that meeting recorded?

8    A.  It was.

9    Q.  All right.  I'm showing you what's been marked for

10   identification as USA 24A.  Let me know when you turn to that

11   tab.

12   A.  Yes.

13   Q.  Do you recognize this?

14   A.  Yes.

15   Q.  What is it?

16   A.  This is a disk of a recorded meeting between

17   Mr. Sittenfeld, Rob, and Brian.

18   Q.  How do you know that?

19   A.  I've reviewed this recording on the disk, and I initialed

20   the disk.

21       MS. GAFFNEY PAINTER:  The government moves for the

22   admission of Government Exhibit USA 24A.

23       MR. C. MATTHEW RITTGERS:  No objection.

24       MR. C. HENRY RITTGERS:  No objection, Your Honor.

25       THE COURT:  24A is admitted without objection.

1   Q.   Now will you please turn to the tab marked USA 24B.

2   A.   Yes.

3   Q.   Do you recognize this?

4   A.   I do.

5   Q.   What is it?

6   A.   This is a transcript dated 2018 -- 'scuse me.

7   February 18, 2019.  It is a transcript of the recorded meeting

8   between Brian, Rob, and Mr. Sittenfeld.

9   Q.   Have you reviewed it for accuracy?

10  A.   Yes.

11        MS. GAFFNEY PAINTER:  The government moves for the

12  admission of Government's Exhibit USA 24B.

13        MR. C. HENRY RITTGERS:  No objection, Your Honor.

14        THE COURT:  USA 24B is admitted without objection.

15        MS. GAFFNEY PAINTER:  Your Honor, I would like to

16  note, before we request to publish, the timestamps for this

17  recording.

18        THE COURT:  Very good.

19        MS. GAFFNEY PAINTER:  54:14 to 1:01:51.

20     May we publish this to the jury, Your Honor?

21        THE COURT:  You may.  Ladies and gentlemen of the

22  jury, there should be a tab marked USA 24B in your transcript

23  binder.

24     (Audio recording.)

25  Q.   Let's move to March 14, 2019.  Was there a meeting of

1   investigative significance that happened that day?

2   A.  Yes, there was.

3   Q.  Who attended that meeting?

4   A.  Rob, Brian, and Mr. Sittenfeld.

5   Q.  Was that meeting recorded?

6   A.  Yes.

7   Q.  If you could turn now in your binder to the tab USA 25A.

8   A.  Yes.

9   Q.  Do you recognize this?

10  A.  I do.

11  Q.  What is it?

12  A.  It is a disk of the March 14, 2019 meeting.

13  Q.  How do you know that?

14  A.  I know that because I reviewed this disk, and I placed my

15  initials on it.

16      MS. GAFFNEY PAINTER:  The government moves for the

17  admission of Government Exhibit USA 25A.

18      MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

19      THE COURT:  USA 25A is admitted without objection.

20  Q.  Special Agent Holbrook, will you please turn to USA 25B.

21  A.  Yes.

22  Q.  Do you recognize this?

23  A.  I do.

24  Q.  What is it?

25  A.  This is a transcript of the March 14, 2019 meeting.

HOLBROOK - DIRECT

1     Q.   Have you reviewed it for accuracy?

2     A.   Yes, I have.

3        MS. GAFFNEY PAINTER:   The government moves for the

4   admission of Government Exhibit USA 25B.

5        MR. C. HENRY RITTGERS:   No objection, Your Honor.

6        THE COURT:   USA 25B is admitted without objection.

7        MS. GAFFNEY PAINTER:   Your Honor, before we request

8   permission to publish, I'd like to put on the record the

9   timestamps for this exhibit.

10        THE COURT:   You may do so.

11        MS. GAFFNEY PAINTER:   The first timestamp we'll be

12   playing is minute 23:41 to 24:40.   The second segment is

13   25:52 until 29:59.

14     Your Honor, may we publish this exhibit to the jury?

15        THE COURT:   Yes, you may.   Ladies and gentlemen of

16   the jury, you should have a USA 25B tab in your transcript

17   binder.

18     (Audio recording.)

19     Q.   Special Agent Holbrook, let's move now to March 28, 2019.

20   Was there a party of investigative significance that happened

21   that day?

22     A.   Yes, there was.

23     Q.   And where was that party held?

24     A.   It was held at the apartment of 580 Building.

25     Q.   Who attended that party?

1    A.    It was Rob, Brian, Vinny, Mr. Sittenfeld, other elected

2    officials, and undercover agents.

3    Q.    You mentioned Vinny.  Who is Vinny?

4    A.    Vinny is an undercover agent that was -- attended this

5    party that you referenced, I believe March 28th.

6         And Vinny showed up as just a cameo appearance, as kind

7    of playing the role of a boss investor type of individual

8    associated with Rob and Brian's group of friends.

9    Q.    Was that party recorded?

10   A.    Yes.

11   Q.    All right.  Let's move now to May 2, 2019.  Was there a

12   call between Sittenfeld and Ndukwe on that day?

13   A.    Yes, there was.

14   Q.    Was that call recorded?

15   A.    Yes.

16   Q.    Have you reviewed that recording?

17   A.    I have.

18   Q.    If you could turn now to USA 26A.

19   A.    Yes.

20   Q.    Do you recognize this?

21   A.    Yes.  This is the recording.

22   Q.    How do you know that?

23   A.    I reviewed this recording, and I placed my initials on

24   it.

25              MS. GAFFNEY PAINTER:  The government moves for the

1    admission of Government Exhibit 26A.

2              MR. C. HENRY RITTGERS:  No objection, Your Honor.

3              THE COURT:  USA 26a is admitted without objection.

4    Q.  Special Agent Holbrook, if you could turn to Tab USA 26B.

5    A.  Yes.

6    Q.  Do you recognize this?

7    A.  Yes.

8    Q.  What is it?

9    A.  It is the transcript of the May 2, 2019 call between

10   Mr. Sittenfeld and Mr. Ndukwe.

11   Q.  Have you reviewed this for accuracy?

12   A.  Yes, I have.

13             MS. GAFFNEY PAINTER:  Government moves for the

14   admission of Government Exhibit USA 26B.

15             THE COURT:  Mr. Rittgers?

16             MR. C. HENRY RITTGERS:  No objection.  I'm sorry,

17   Your Honor.

18             THE COURT:  USA 26B is admitted without objection.

19             MS. GAFFNEY PAINTER:  Your Honor, may we publish this

20   exhibit to the jury?

21             THE COURT:  You may.  And ladies and gentlemen of the

22   jury, you should have a Tab 26B in your transcript binder to

23   which you can turn now.

24             MS. GAFFNEY PAINTER:  Your Honor, I apologize.  It

25   appears we're having some more technical difficulties.  I also

1    notice the time, so...

2         THE COURT:  Yes.  This may be an appropriate time to

3    break for the day.

4         Ladies and gentlemen of the jury, I think we're going to

5    suspend the trial for today and pick it up again tomorrow.

6         If you can assemble in the jury assembly room shortly

7    before 9:00 tomorrow, we'll try to get you in as promptly

8    after 9:00 as we can.  Try to be there by 8:50 again, if you

9    could.  We'll try to get you in more promptly than we did this

10   morning.

11        I would just remind you -- I'm going to release you for

12   the evening, but please do not review any media accounts about

13   this trial or what happened today.  Don't read any newspaper

14   accounts, listen to any television or radio stories related to

15   this trial.

16        Please do not discuss this trial with anyone, family

17   members, anything of that sort.  Do not discuss this trial

18   with your fellow jurors yet.

19        Please do not start to form opinions of your own or do

20   any research this evening into the facts or law surrounding

21   this case.

22        If anyone should attempt to communicate with you

23   regarding this case, please bring it to my attention

24   immediately, but do not discuss it with your fellow jurors.

25        With that, I'm going to release you for the evening.  You

1    can leave your notepad and notes at your chair.  That's fine.

2        (Jury out at 4:52 p.m.)

3        THE COURT:  It looks like we have about 21 excerpts

4    left of video or audio recordings, if I'm seeing this

5    correctly, varying lengths, but...

6        MS. GAFFNEY PAINTER:  That sounds about right, Your

7    Honor.

8        THE COURT:  I may be a little surprised if we get it

9    all done by noon tomorrow, but you may be right.

10      Is there anything the parties want to discuss before we

11   recess for the evening?

12       MR. SINGER:  No, Your Honor.

13       MR. C. HENRY RITTGERS:  No, Your Honor.

14       THE COURT:  If we can try to be here before 9:00

15   tomorrow, if there's going to be anything that we need to

16   discuss.  Does anybody anticipate any issues tomorrow morning?

17       MR. SINGER:  Not that I can think of, Your Honor.

18       MR. C. HENRY RITTGERS:  No, Your Honor.

19       THE COURT:  So try to be here about five or ten

20   minutes before 9:00 so that we can get the jury in the jury

21   box pretty promptly in the morning.  I would like to try to

22   move through as much of this as we can tomorrow.

23      I would advise the government to have at least one

24   witness ready to go for tomorrow afternoon in the event that

25   we get done with Special Agent Holbrook.

HOLBROOK - DIRECT

1        And with that, Scott, I think we can adjourn for the

2    evening.

3            (Excerpted proceedings adjourned at 4:54 p.m.)

4                    *   *   *

5             C E R T I F I C A T E

6                    -  -  -

7        I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
8    above-entitled matter.

9

10   /s/ M. Sue Lopreato_____                July 25, 2022
     M. SUE LOPREATO, RMR, CRR
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2  GOVERNMENT WITNESS

 3  SPECIAL AGENT NATHAN HOLBROOK

 4  Direct by Ms. Gaffney Painter.......................  Page 2

 5


 6                             EXHIBITS

 7


 8  Exhibit                                   Admitted

 9  2C                                           19
    12A                                          22
10  12B                                          23
    13A                                          31
11  13B                                          31
    14A                                          34
12  14B                                          35
    15A                                          43
13  15B                                          44
    15C                                          45
14  5A                                           48
    9A                                           59
15  9B                                           64
    9C                                           65
16  9D                                           65
    9E                                           66
17  11C                                          67
    15E                                          68
18  11A                                          70
    16A                                          71
19  16B                                          71
    17A                                          74
20  17B                                          74
    18A                                          75
21  18B                                          76
    18C                                          77
22  18D                                          77
    40A                                          78
23  40B                                          79
    40C                                          80
24  40D                                          80

25
```

| | <u>Exhibits (cont'd)</u> | <u>Admitted</u> |
|---|---|---|
| 1 | | |
| 2 | 40E | 81 |
| | 19A | 82 |
| 3 | 19B | 83 |
| | 20A | 83 |
| 4 | 20B | 84 |
| | 20C | 85 |
| 5 | 20D | 86 |
| | 20F | 90 |
| 6 | 20G | 90 |
| | 11D | 92 |
| 7 | 21B | 92 |
| | 21C | 100 |
| 8 | 21D | 100 |
| | 21E | 102 |
| 9 | 21F | 104 |
| | 21G | 105 |
| 10 | 21I | 107 |
| | 21J | 110 |
| 11 | 21K | 111 |
| | 21A | |
| 12 | 22A | 113 |
| | 22B | 114 |
| 13 | 22C | 114 |
| | 22D | 115 |
| 14 | 22E | 116 |
| | 22F | 116 |
| 15 | 22G | 117 |
| | 23A | 118 |
| 16 | 23B | 120 |
| | 23C | 120 |
| 17 | 24A | 126 |
| | 24B | 127 |
| 18 | 25A | 128 |
| | 25B | 129 |
| 19 | 26A | 131 |
| | 26B | 131 |

- - -

20

21

22

23

24

25