## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 1:20-CR-142** |
| | : | |
| **v.** | : | **JUDGE COLE** |
| | : | |
| **ALEXANDER SITTENFELD,** | : | **GOVERNMENT RESPONSE IN** |
| **a/k/a "P.G. Sittenfeld,"** | : | **OPPOSITION TO** |
| | : | **DEFENDANT'S MOTION FOR** |
| **Defendant.** | : | **LEAVE TO CONDUCT** |
| | : | **FORENSIC EXAMINATION OF** |
| | : | **RELEVANT DEVICES OF** |
| | : | **JUROR X** |

The United States respectfully submits this response in opposition to the Defendant's Motion for Leave to Conduct Forensic Examination of Relevant Devices of Juror X.  (Dkt. 221, PageID 3611.)

A jury convicted the defendant on Counts Three and Four of the Indictment. Prior to the announcement of the verdict, the Court informed the parties that Juror X had made multiple Facebook posts about her jury service during the trial, and provided them with screenshots of the posts and comments.  Immediately after the verdict was announced, the Court conducted a hearing where it allowed defense counsel to question Juror X about her Facebook activity.  Dissatisfied with the verdict and dissatisfied with Juror X's answers at the hearing, the defense now asks this Court to sanction an extraordinary intrusion – the seizure and forensic examination of Juror X's electronic devices.  There is no basis for doing so.

1

To begin, the defense has never raised a colorable claim of external influence that would entitle them to a hearing under *Remmer* v. *United States*, 347 U.S. 227 (1954). The defense has not shown—nor could they—that Juror X's Facebook activity exposed her to extraneous information presenting a likelihood of affecting the verdict. Under the law, pure speculation is not enough. In any event, the defendant had a meaningful opportunity to investigate any possible prejudicial extraneous influence. At the hearing, in response to questioning by defense counsel, the juror testified that she did not read or review any articles about the case, nor did she discuss the facts of the case with anyone else or seek to do so.

Undeterred, the defendant now contends that Juror X lied under oath in an attempt to gain access to the juror's electronic devices and prove his speculative claim. But the juror's social media posts confirm the juror's testimony – not contradict it. The law does not authorize such a sweeping invasion of juror privacy under these circumstances. The defendant's motion should be denied.

## BACKGROUND[1]

Following the jury's verdict, the Court held a hearing during which defense counsel examined Juror X, under oath, about her social media postings. The relevant

---

[1] In a prior Government response filed under seal, the United States provided a recitation of facts, including the postings and post-verdict hearing. A more limited recounting of facts appears here, relevant to the defense's motion. In that prior response, the Government attached two exhibits – a copy of the screenshots provided to counsel on July 8th (Exhibit A) and a copy of the screenshots provided to counsel on July 11th (Exhibit B). As the Government explained, though the screenshots were provided on different days, the information within the screenshots showed they were taken on the same day. The Government reattaches those exhibits to this response.

question then—as it is now—was whether Juror X's social media postings constituted an extraneous influence that biased the jury's verdict. Juror X was questioned about extraneous influence – specifically, about an Instagram post from the *Cincinnati Enquirer* that a friend had posted. During this questioning, Juror X confirmed twice that she did not read or review articles about the case:



(Dkt. 212, PageID 3310 (emphases added).) Juror X's post-verdict testimony also was consistent with her voir dire responses regarding media exposure. After lunch, the Court said during voir dire:

---

[2] The defendant's own exhibits show this characterization of the post is not correct. While, at first glance, the post looks like an article, it is actually a link to the *Cincinnati Enquirer*'s Instagram page. (*See* Def. Ex. 8.) From there, a user would have to click on the "link in the bio" of the Instagram account in order to get to the "timeline" of the defendant's case. (*See id.*) Juror X's testimony here further confirms that she did not click the link.

> It's going to be very important that people not attempt to do any kind of research about this case. It's so important that the members of the jury decide the case based on the evidence that's actually presented at trial. So is there anybody who did any research over the lunch hour regarding this case, looked at news articles or anything, or called and talked to people about it? It's understandable, given that I didn't give an admonition before we broke, but I would just like to know if anybody did. Okay. So not seeing any hands.

(Dkt. 219, PageID 3435.) Juror X did not raise her hand, consistent with her post-verdict testimony, in which she said that she did not read any articles about the case, including her friend's post of a link to the *Cincinnati Enquirer*'s Instagram page.

Aside from confirming she was not exposed to extraneous influence, Juror X also testified that she did not communicate with other jurors about the case over social media:



(Dkt. 212, PageID 3308-09.) Juror X's social media posts corroborate her testimony, and do not show any communications with other jurors.

Juror X also testified that she did not communicate with anyone about the evidence in the case or her opinions about it. Specifically, Juror X stated:



(Dkt 212, PageID 3311.) Consistent with her testimony, Juror X also never revealed any evidence, never commented on the evidence, or expressed her opinion about the evidence though her social media posts. Rather, Juror X mostly posted about her schedule, the fact of her jury service, and compensation. These posts functioned more like announcements of her experiences as a juror, and did not include any specific details about the evidence or her opinion of the evidence. While Juror X posted a few comments about fellow jurors, at most, those comments expressed annoyance – they did not reveal any specifics about the case. In fact, Juror X obscured case-specific information in these posts.[3]

As Juror X explained, her posts reflected her understanding of the rules regarding social media use. Juror X testified that she understood that she could not post specific information about the case, but did not believe there was a prohibition on the use of social media or posting generally. (Dkt 212, PageID 3311

---

[3] For example, when Juror X posted "omg..honestly [Juror Y] shouldn't be on the jury because [Juror Y] hates anyone that shares the same profession as our person on trial. Not cool!" (Ex. A at 9), Juror X did not name the defendant's profession, which would have identified the case.

███████████████████████ Juror X's understanding was not inconsistent with the Court's instruction to the jury, which did not prohibit the use of social media, but instructed jurors to "not communicate with anyone *about the case* on your phone or computer, through email, text, messaging, social media, or any website, or any other means of communication." (Dkt. 219, PageID 3557-3558 (emphasis added).)[4] Consistent with her testimony about her understanding of the rules, Juror X did not post any specific information about the case on the social media account. For example, when a friend wrote, "Can't wait until you spill some details!", Juror X did not respond with any details. (Ex. B at 5 ("irk…it's a big one.").) When another friend wrote, "can't wait to hear all about it," Juror X said "in about 4 weeks.. if we're done by then." (Ex. B at 13.) Juror X never confirmed the case name, details about the parties, witnesses, or evidence in the social media posts. Nor did Juror X seek input from anyone about the case. In fact, Juror X actually took steps to hide a comment with the defendant's name that was posted by someone else to avoid further comments about the specific case. (*See, e.g.,* Dkt 212, PageID 3309 ███████

████████████████████████████████████████████████████

██████████████████████████ ; PageID 3310 ████████████████

█████████████████████████████████████████████████████ ;

---

[4] The Court gave similar admonishments to the jury throughout the case. (*E.g.* Dkt. 224, PageID 3862 ("I'm sure you're getting sick of hearing this, but please do not discuss this case with your fellow jurors. Please do not begin to form any opinions yourself about what the verdict should be. Please do not do any kind of research, electronic or otherwise, on any form of media, or the internet, or anything else. And other than that, we will see you when you get back here.").)

PageID 3311 ███████████████████████████████████████████

███████ ; PageID 3311 ████████████████████████████████████████ .

During the hearing, Juror X even showed defense counsel how she had hidden that specific comment on her account by displaying it on her phone for counsel during the hearing, and explained that she was ████████████████ after she showed them. (*Id.* at PageID 3311.)

After the hearing, the defense moved this Court to order Juror X to preserve her electronic communications.  In response to that request, the Court issued the following order to Juror X:



(Court Order, Dkt. 215, PageID 3337.)

When informed of the order, Juror X reported that there was nothing to preserve because Juror X had deleted the posts after the hearing.

The defense now moves this Court for an order to seize Juror X's "relevant devices" (which they later define as "any electronic device that Juror X used to make electronic communications"); demand Juror X's passwords to her phone, social media accounts, and email accounts; and have a forensic examiner search them to "prove juror bias."  This egregious invasion of Juror X's privacy is unwarranted under the law and this Court should deny the motion.

## ANALYSIS

As the Government explained in its prior response, the "no-impeachment rule," which prohibits juror testimony from impeaching a verdict, protects jurors and the verdicts they render from improper attack. *See Peña-Rodriguez* v. *Colorado*, 137 S.Ct. 855, 863-865 (2017) (detailing history of the no-impeachment rule). This rule is codified in the federal system as Federal Rule of Evidence 606(b).

As the Supreme Court has explained, "[t]his version of the no-impeachment rule has substantial merit" because "[i]t promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Peña-Rodriguez*, 137 S.Ct. at 865. Federal Rule of Evidence 606(b) "gives stability and finality to verdicts." *Id.*

The exceptions outlined in Rule 606(b) deal exclusively with "extraneous influences" on the jury. *Tanner* v. *United States*, 483 U.S. 107, 121 (1987). In the Supreme Court's view, exploration of extraneous influences "harmonize[s] with[] the weighty government interest in insulating the jury's deliberative process" because the "integrity of jury proceedings must not be jeopardized by unauthorized invasions[.]" *Id.* at 120. The Rule, and its exceptions, "seek[] to balance the preservation of the integrity of the jury system and the rights of the defendant." *Smith* v. *Nagy*, 962 F.3d 192, 200 (6th Cir. 2020) (internal quotation marks omitted).

8

To warrant inquiry of jurors, a defendant must provide a "colorable claim of extraneous influence" on the jury. *Id.* at 199-200; *accord United States* v. *Frost*, 125 F.3d 346, 377 (6th Cir. 1997). If the defendant raises such a claim, "the trial court must hold a *Remmer* hearing to afford the defendant an opportunity to establish actual bias."[5] *Smith*, 962 F.3d at 200 (internal quotation marks omitted). The hearing is referred to as a *Remmer* hearing in reference to the Supreme Court case *Remmer* v. *United States*, in which a juror was approached by an individual who told the juror he could profit if he returned a certain verdict. 347 U.S. 227, 228 (1954). The Supreme Court remanded the case with instructions to the lower court to hold a hearing on the incident, to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229-30. Later cases have explained that this hearing must provide a "meaningful opportunity" for the defense to demonstrate that

---

[5] The use of the word "bias" in these cases warrants explication. The Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury." U.S. Const. amend. VI. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner* v. *State of La.*, 379 U.S. 466, 472-73 (1965). Extraneous influences that affect the jury render the jury no longer impartial, and thus "bias" the jury. But, under the law, bias can refer to either extraneous influences or internal influences. *See, e.g.*, *Smith*, 962 F.3d at 199-200 (referring to external influence as bias); *United States* v. *Bailey*, 19-2280/2281/2354/20-1235, 2022 WL 2444930, at *10 (6th Cir. July 5, 2022) ("[E]ven if these remarks reveal bias, statements calling into question a juror's objectivity are internal"). Internal influences—even if they render a juror biased—cannot be properly explored post-verdict. *See Warger* v. *Shauers*, 574 U.S. 40, 51-52 (2014); *Tanner* v. *United States*, 483 U.S. 107, 117-28 (1987).

the extraneous influence was prejudicial.  *See United States* v. *Lanier*, 988 F.3d 284, 295 (6th Cir. 2021).

To maintain balance between the principles behind the no-impeachment rule and the rights of the defendant, the "critical" first question is whether an asserted influence on the jury is internal or external.  *Smith*, 962 F.3d at 201.  "'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room."  *Warger* v. *Shauers*, 574 U.S. 40, 51 (2014).  These categories are separated by a "bright line," delineating "jurors' taking into account their own wisdom, experience, and common sense when evaluating the evidence admitted at trial and, on the other hand, jurors' employing extraneous evidence such as news reports of the case being decided by the jurors, or physical news items being brought into the jury room."  *Thompson* v. *Parker*, 867 F.3d 641, 648 (6th Cir. 2017) (internal citations, quotation marks, and emphasis omitted). Only juror testimony about external influence is admissible – testimony about internal influence cannot be elicited or considered.  *See Tanner*, 483 U.S. at 117-18.

## I.    Juror X's Facebook activity does not raise a colorable claim of external influence.

As an initial matter, the defense has not shown—nor could they—that Juror X's Facebook activity raises a colorable claim of external influence.  "[A]n allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict," such as when the allegation "involv[es] claims of 'intentional improper contacts or contacts that had an

obvious potential for improperly influencing the jury.'" *United States* v. *Lanier*, 870 F.3d 546, 549-50 (6th Cir. 2017) ("*Lanier I*"). In other words, a defendant "must do more than simply raise the possibility of bias" to be entitled to a *Remmer* hearing. *United States* v. *Owens*, 426 F.3d 800, 805 (6th Cir. 2005). But that is all the defendant has ever done here. And that is not enough.

The defense has never explained how Juror X's Facebook activity suggests that she was exposed to extraneous information that "presents a likelihood of affecting the verdict." *Lanier I*, 870 F.3d at 549–50; *United States* v. *Rigsby*, 45 F.3d 120, 124 (6th Cir. 1995) (explaining that allegations of extraneous information require a hearing when there is "an obvious potential for improperly influencing the jury"). For example, without exploring the contents of the posts and comments, the defense cites the number of individuals from the Facebook communications as proof of extraneous influence. *See* Def. Mot. at 4 ("[I]t is clear that Juror X communicated with at least twenty-nine non-jurors in reference to her posts regarding her jury service on Mr. Sittenfeld's case."). But extraneous influence is more than a numbers game. *See Lanier I*, 870 F.3d at 549-50 (emphasizing that a *Remmer* hearing is required "only when the alleged contact presents a likelihood of affecting the verdict, such as when the allegation involves claims of intentional improper contacts or contacts that had an obvious potential for improperly influencing the jury" (brackets and internal quotation marks omitted)). The defense does not—and cannot—explain, for instance, how sixteen people "liking" or "loving" Juror X's post "I'm about to have a whole downtown Cincinnati adventure!! Have some time to kill!! #daytwoofjuryduty"

11

presents a likelihood of affecting the verdict. Nor can the defense explain how individuals replying "Miss your face juror [X] lol" or "Have a bless day" or "I love that you're making the most of this adventure! I can't wait to see all the fun places you go for lunch!" are colorable evidence of external influence that could prejudice the defendant. Finally, the mere fact that one of Juror X's Facebook friends posted a link to the *Cincinnati Enquirer*'s Instagram page, which itself hyperlinked to news articles about the case, does not give rise to a colorable claim of external influence. The defense does not—and cannot—show how Juror X's potential exposure to a news article presents a likelihood of affecting the verdict. *See, e.g.*, *United States* v. *Loughry*, 983 F.3d 698, 703-05 (4th Cir. 2020) *aff'd on rehearing en banc* 996 F.3d 729 (4th Cir. 2021) (affirming denial of evidentiary hearing where juror "liked" or "retweeted" tweets relevant to the case before the trial and went onto Twitter during the trial); *see also United States* v. *Frost*, 125 F.3d 346, 377 (6th Cir. 1997) (affirming district court's decision not to hold *Remmer* hearing based on speculative claim of extraneous influence, finding "no duty to hold a hearing on whether [the juror] even experienced an external communication regarding matters pending before the jury, much less whether a given external contact was prejudicial").

## II. The defendant had a meaningful opportunity to investigate Juror X's Facebook activity for extraneous influence.

Even if the mere existence of the posts and comments gives rise to a "colorable claim of extraneous influence," as the defense appears to argue, that colorable claim gets the defendant a *Remmer* hearing. *See Cunningham* v. *Shoop*, 23 F.4th 636, 651 (6th Cir. 2022). And that hearing has already happened. That the defense is

dissatisfied with the results does not entitle them to keep digging. A colorable claim of extraneous influence does not afford the defendant boundless license to seize a juror's computers and phones, acquire that juror's passwords, and search for "relevant evidence." The defense is entitled to a meaningful opportunity to investigate juror bias, not an opportunity to investigate in perpetuity. *See United States* v. *Aiyer*, 33 F.4th 97, 128 (2d Cir. 2022) ("[I]n the course of a post-verdict inquiry on [juror misconduct], when and if it becomes apparent that reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end." (ellipses omitted)).

As with his motion to contact all the jurors, the defendant depends on *United States* v. *Lanier* for his extraordinary request here. 988 F.3d 284 (6th Cir. 2021) ("*Lanier II*"). In that case, the Court explained what is required for a "constitutionally meaningful *Remmer* hearing." *Id.* at 295 (brackets omitted):

> To ensure an adequate investigation of jury bias, a *Remmer* hearing must be unhurried and thorough. The district court must permit all interested parties to participate at the hearing to comport with due process[.] Defense counsel must be allowed to question the jury, unless counsel for both parties concur that the court may conduct the questioning[.] District courts must allow for a meaningful investigation into the circumstances of the external communications, the impact of the communications on the jury, and whether or not the communications were prejudicial. The question is whether, given the indications of jury bias, the judge's inquiry was adequate, and adequacy is a function of the probability of bias; the greater that probability, the more searching the inquiry into juror bias is needed. . . . When there is evidence that, in the lead-up to a *Remmer* hearing, a juror has researched a case online or has electronically communicated with a third-party about the case, a district court must seek at minimum to preserve the relevant data and notify the defendants. Anything less flunks the Supreme Court's guarantee that defendants must have a meaningful opportunity to demonstrate these

communications circumstances, their impact, and whether or not the contact were prejudicial, in a hearing with all interested parties permitted to participate.

*Id*. at 295-96 (internal citations, quotation marks, and brackets omitted).

This is precisely what has already happened in this case. The Court notified the parties of the offending posts the same day they were discovered. The Court then obtained screenshots of Juror X's social media posts and the comments (thus preserving them), and provided them to the parties. The parties were then permitted to question both Juror X and Juror Y under oath. The questioning was unhurried and thorough – the defense was permitted to ask questions until they themselves said they had nothing more. And Juror X allowed and facilitated examination of her social media on her phone during the hearing, displaying the post that Juror X hid and answering questions about it, and the other comments and posts.

The defense's meaningful opportunity did not yield anything fruitful. Thus, they now seek seizure of Juror X's devices—phones, computers, tablets, whatever communicates electronically—and demand the passwords not only to the devices, but to all of Juror X's social media and email accounts. (Def. Ex. 1 at ¶¶ 18, 21.) They also request leave for a forensic examiner to "image, capture, and search" the devices for "relevant evidence," which they leave undefined. (*Id*. at ¶¶ 19, 23.) The defense asks this Court to authorize an astonishing invasion of juror privacy[6] – the kind of invasion that would otherwise require a search warrant. To justify this, the defense

---

[6] The Supreme Court has long recognized the importance of protecting jurors against harassment by dissatisfied litigants. *See, e.g.*, *McDonald* v. *Pless*, 238 U.S. 264, 267–268 (1915).

14

alleges that Juror X—like the juror in *Lanier*—"provided 'spurious and inconsistent testimony' about the case." The defense's reliance on *Lanier* for the need for a forensic examination is inapt and its characterization of Juror X's testimony is unfair and untrue. A closer look at the facts in *Lanier* and the facts here reveals that the inquiry in this case has been sufficiently probing based on the evidence and no further inquiry is required.

Start with *Lanier*. The juror there called a state prosecutor acquaintance and reported there was a problem with the deliberations. *Lanier I*, 870 F.3d at 548. After the prosecutor told the juror to inform the judge (which the juror failed to do), the prosecutor reported the telephone call to the court. *Id.* Despite a court officer reporting that the jurors were "clearly divided into two groups" and were "angry with each other," the jury returned a verdict of guilty the same day as the phone call. *Id.*

During a post-trial investigation, the defense discovered that the juror had also spoken with the prosecutor about her jury service during the first week of trial. *Id.* at 549. The defense moved to interview the jurors and for a new trial, which were denied. *Id.* at 548-49. On appeal, the Sixth Circuit remanded the case with instructions to the district court to hold a *Remmer* hearing. *Id.* at 551. As the court noted, "the juror intentionally contacted the third-party, specifically seeking [the prosecutor's] input about the case." *Id.* at 550. The court also found it relevant that, first, the prosecutor had informed the juror to tell the judge, but the juror did not; and second, the "jury came back with a verdict shortly after the juror's telephone call with the [prosecutor] even though very recently—indeed that very morning—the jury

15

apparently was divided into two groups and angry with each other." *Id.* at 550-51. The Sixth Circuit believed these facts suggested external influence and thus a *Remmer* hearing was required. *Id.* at 551.

On remand, the district court summoned the jurors to a hearing, and ordered them not to discuss or research the case. *Lanier II*, 988 F.3d at 287. Despite the order, the same juror texted the prosecutor before the hearing, requesting input and suggesting that the juror had researched the case online. *Id.* The prosecutor again reported the messages to the court. *Id.* The court failed to tell the defense, who found out at the *Remmer* hearing. *Id.*

Among other witnesses, the juror and the prosecutor testified at the hearing. *Id.* at 289. At the hearing, the juror "thrice denied that she had spoken about the case to anyone besides her husband during the trial or deliberations" before finally admitting she called the prosecutor "on the way to court one, one time and expressed my concern over the length of the case and how stressed I was." *Id.* at 289 (brackets omitted). She denied discussing the case on the phone, and she denied contacting anyone about the *Remmer* hearing. *Id.* at 290. When confronted with her text messages, she equivocated. *Id.* The juror twice denied having researched the case, but later admitted to searching online for the address of the courthouse and the logistical details of the proceeding. *Id.* Later phases of the saga also revealed other prevarications by the juror, including claiming that she deleted her web history at the instruction of her employer (who stated they did no such thing). *Id.* at 293.

In *Lanier*, the juror's deliberate outreach to a third party to discuss the case and her numerous lies to the court during and after the *Remmer* hearing were dispositive to the court's conclusion that the district court had erred in its approach. In determining that the defendants had not had a meaningful opportunity to investigate jury bias, the court noted:

> Cross-examining jurors and witnesses may sometimes suffice, but to repeat, the greater the doubts, the more probing the inquiry that is required. We might have reached a different outcome had [the juror] denied having ever researched the case or having reached out to others and there was no evidence to the contrary. But [the juror's] testimony was riddled with contradictions, and her text messages incontrovertibly confirm that the juror looked up the case online and contacted [the prosecutor].

*Id*. at 297 (internal citation, quotation marks, and brackets omitted).

Now turn to the facts here. Juror X's posts are announcements, not inquiries. She does not seek guidance on the case, nor advice on how to proceed. In the few instances where one of her friends mentions the defendant or the case, Juror X does not engage. In fact, as she testified, she "hid" a post of the defendant's name so no one in her network would be prompted to comment further (she not only explained this during her testimony, but voluntarily displayed her phone to the defense and "unhid" the post so they could review it). When a commenter asked directly "Is this for that PG Sittenfeld guy?," Juror X never responded. When someone posted an Instagram post from the *Enquirer* (which, when clicked, would lead to the Instagram account of the *Enquirer*), Juror X did not respond, nor did she click on it. Juror X made this clear during her testimony.

The defense attacks Juror X's testimony, claiming that it was, in the language of *Lanier*, "spurious and inconsistent." For example, they assert she lied when she said she did not answer any questions. The relevant exchange appears below:

COUNSEL:

JUROR X:



(Dkt. 212, PageID 3308-09.) Juror X then pulled out her phone and let the defense see it.

The defense has presented a table of six questions and Juror X's answers as evidence that she lied. First, only two of the six listed are actually questions. For those two questions—"You got jury duty?" and "Uh [emoji] oh jury it is then?"—Juror X replied with general information ("today is selection day" and "not yet…still waiting to see. But they told us what it[']s about."). (Ex. A at 11; Ex. B at 2.) Her responses do not reveal any specific facts about the case. Indeed, as she explained in the same answer they attack, she ▮▮▮▮▮▮▮▮▮▮ she was on, and provided only general answers about jury duty. This is consistent with the Court's suggestion, provided in preliminary instructions and quoted *infra*, that "you simply tell your family that you're sitting on a jury in federal court, and that you really can't discuss the matter further." (Dkt. 219, PageID 3556.)

Regardless, the defense does not explain how answering these questions (or, for that matter, any of the postings she made) demonstrate external influence. There is no evidence at all that Juror X sought any input from anyone about this case. She instead actively resisted any opportunity to receive such input, by hiding a post with the defendant's name and refusing to click on an Instagram post from the *Enquirer*. This is in direct contrast to the juror in *Lanier*, who actively sought input into the case she was deciding and repeatedly lied about it.

And yet the defense persists in labelling Juror X "dishonest by commission and omission" because she did not identify herself to the Court in response to the admonitions. The defense makes much of the Court's question of the jurors after lunch on the first day of jury selection:

> So, is there anybody who did research over the lunch hour regarding this case, looked at news articles or anything, or called and talked to people about it? It's understandable, given that I didn't give an admonition before we broke, but I would just like to know if anybody did. Okay. So not seeing any hands.

(Dkt. 219, PageID 3435.)

According to the defense, "[a]t the time of this admonishment, it appears that Juror X had already received both the Enquirer/Instagram post and the 'PG Sittenfeld guy' post." The defense calls Juror X's failure to raise her hand as "conceal[ment]" of Juror X's "online conduct." As an initial matter, an account "receiving" a post is distinct from when the account user sees it. Regardless, Juror X did not need to raise her hand because she did not do "research" on the case, she did not "look[] at news articles or anything", nor did she "call[] and talk[] to people about

19

it." The Court did not ask for a show of hands for jurors who went online. The Court did not ask if anyone had seen a social media post that, if clicked, would lead to another social media post that, if clicked again, would lead to a news article. The Court asked a specific question. And Juror X keeping her hand down was the appropriate response to that question.

The defense also labels Juror X as "dishonest" because she "never spoke up" after the Court provided admonishments throughout the trial. In the preliminary instructions to the jury, the Court said:

> And it is so very important that you decide this case based on the evidence that's presented in the next couple of weeks by the parties, rather than on what you might read in a newspaper or see on television. So to that end, I'd like to say just a few words about your conduct as jurors during this trial. You'll not be required to remain together while the Court is in recess; in other words, we're not sequestering the jury. But that being said, it is highly important that you strictly observe the rules that govern you during recess or adjournment so as to assure the parties have a fair trial by not allowing any outside information or incidents to influence your consideration of this case. First, do not decide any issue or form any opinion in this case until you've heard all the evidence, been instructed by the Court on the law, and retired to the jury room to deliberate. Until the case is submitted to you for deliberation, you are not to discuss the case with anyone, not even your fellow jurors.
>
>          *     *     *
>
> I'd suggest you simply tell your family that you're sitting on a jury in federal court, and that you really can't discuss the matter further. Likewise, once the presentation of the evidence is over and the case is submitted to you, you must discuss it only in the jury room with your fellow jurors. You can discuss this case with others after the verdict is announced, but not before. Second, since you must keep an open mind until you are instructed by the Court to begin your deliberations, it is important that you do not read newspaper or magazine articles, whether in paper or electronic form, or listen to radio, television, or other broadcasts about this case. Media accounts may be inaccurate, or they may contain matter which is not proper evidence for your

consideration.  You must base your verdict solely on what is brought before you here in court.

*    *    *

Try not to read the local newspaper while you're serving on the jury.  There may be some days this will be a story in the newspaper.  And even if you see the headline, it's just, you know, you may have gotten somebody's three-word take on where things stand, and that's – you know, you're going to need to work on it more in this case than sometimes jurors do in other cases to avoid being exposed to media, but it's very important to the trial that you do so.  Third, I know that many of you use cell phones, tablets, the internet, and other tools of technology.  Consistent with what I just said, you must not use these tools to communicate electronically with anyone about the case.  That includes your family and friends.  You must not communicate with anyone about the case on your phone or computer, through email, text, messaging, social media, or any website, or any other means of communication.  Likewise, you can't use the internet to do any research on your own.

*    *    *

Likewise, should you inadvertently read, see, or hear anything in the media concerning this case, you should inform the Court.  Fourth, to pick up on the point I just made, do not try to do any research or make any investigation of the case on your own.  In other words, don't consult the internet, website, social media, or use any other electronic types of tools or any other kind of tools to obtain information about this case or to help you decide this case.

(Dkt. 219, PageID 3554-58.)

There is no evidence that Juror X failed to follow these instructions.  There is no evidence that Juror X researched the case, discussed its merits, sought input from the outside, or read articles.  While Juror X posted generally about the case, she never confirmed she was serving on this particular jury, and never discussed the evidence or the parties or any facts at all about the case.  At most, Juror X posted her opinion of two of her other jurors.  That is not a violation of the Court's instructions such that it warrants her being labeled as a liar.  *See, e.g.*, *Loughry*, 983 F.3d at 707 (rejecting argument that juror's use of Twitter violated judge's instructions to avoid social

21

media since "any reasonable juror receiving the district court's instructions during trial would have concluded that social media was prohibited only in connection with the case").

The defense also points to the instructions provided by the Court during the trial as creating some affirmative obligation for Juror X to self-report. For example, before a break, the Court gave the following instruction:

> I'm sure you're getting sick of hearing this, but please do not discuss this case with your fellow jurors. Please do not begin to form any opinions yourself about what the verdict should be. Please do not do any kind of research, electronic or otherwise, on any form of media, or the internet, or anything else. And other than that, we will see you when you get back here.

(Dkt. 224, PageID 3862.)

There is absolutely no evidence that Juror X violated this admonition in any way. Her social media postings were not available to other jurors. (*See* Dkt. 212, PageID 3308.) Her postings did not suggest she had any opinion about what the verdict should be. And none of the postings suggest she did research on the case at all – in fact, she resisted the opportunity to do so when presented with the *Enquirer* Instagram post. She followed the instruction of the Court and had nothing to "speak up" about.

Far from being "spurious and inconsistent," Juror X testified credibly at the hearing and voluntarily displayed her phone to the defense. Juror X in no way has behaved like the juror in *Lanier*, and a more probing inquiry is not warranted here.

## **CONCLUSION**

Even assuming Juror X's social media posts constituted colorable evidence of external influence, the defense had a meaningful opportunity to explore any issues raised by them.  They received the posts and the comments, they saw her phone the day the posts were discovered, and they questioned her under oath until they had nothing more to ask.  Because they did not unearth what they hoped, they label Juror X a liar in an effort to get access to her personal electronic devices and communications.  This is a gross overreach motivated by the defense's dissatisfaction with the jury verdict.  This Court has the power to stop this and should do so by denying this motion, and their previous motion to contact all the jurors.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


*s/ Megan Gaffney Painter*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
MEGAN GAFFNEY PAINTER (NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
Email: Emily.Glatfelter@usdoj.gov
Email: Megan.Painter@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed with the Court via CM/ECF this 27th day of July, 2022, and electronic notice was provided to all parties.

*/s/ Megan Gaffney Painter*
MEGAN GAFFNEY PAINTER (NY 4849220)
Assistant United States Attorney