<pre>
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             *   *   *
 3

 4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                     :
 5            Plaintiff,             : Jury Trial, Day 5
                                     : Monday, June 27, 2022
 6            - v -                  :
                                     : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"            :
 8                                   :
              Defendant.             : Cincinnati, Ohio
 9
                             *   *   *
10       EXCERPTED PROCEEDINGS - TESTIMONY OF ROB MILLER

11      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                             *   *   *

13    For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                  MATTHEW C. SINGER, ESQ.
14                                MEGAN GAFFNEY PAINTER, ESQ.
                                  U.S. Department of Justice
15                                U.S. Attorney's Office
                                  221 E. Fourth Street, Suite 400
16                                Cincinnati, Ohio  45202

17    For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                  CHARLES H. RITTGERS, ESQ.
18                                NEAL D. SCHUETT, ESQ.
                                  Rittgers & Rittgers
19                                12 E. Warren Street
                                  Lebanon, Ohio  45036
20
      Law Clerk:                  Jacob T. Denz, Esq.
21
      Courtroom Deputy:           Scott M. Lang
22
      Court Reporter:             M. Sue Lopreato, RMR, CRR
23                                513.564.7679

24                             *   *   *

25
</pre>

1                    P R O C E E D I N G S

2                (In open court at 3:47 p.m.)

3                         *  *  *

4           THE COURT:  Does the government intend to call

5    another witness?

6           MS. GLATFELTER:  Yes, Your Honor.  We call Undercover

7    Agent Rob Miller.

8           THE COURT:  And ladies and gentlemen of the jury,

9    this would be another witness who will be testifying pursuant

10   to the name that was used during the investigation.

11       (Government witness, ROB MILLER, sworn.)

12                    DIRECT EXAMINATION

13   BY MS. GLATFELTER:

14   Q.  Good afternoon, sir.

15   A.  Good afternoon.

16   Q.  Can you please state and spell your undercover name.

17   A.  Rob, R-o-b.

18   Q.  And Miller as well?

19   A.  Yes.  Miller, M-i-l-l-e-r.

20   Q.  Are you currently employed, sir?

21   A.  I am, by the Federal Bureau of Investigations.

22   Q.  And in what capacity do you work there?

23   A.  I'm a supervisory special agent.

24   Q.  Does that mean that you hold a supervisor position?

25   A.  That's correct.

*MILLER - DIRECT*

1  Q.   Have you worked for the FBI for more than ten years?

2  A.   I have.

3  Q.   And what did you do before the FBI?

4  A.   I was an officer in the United States Army.

5  Q.   Now, during your career at at FBI, have you worked as an

6  undercover FBI agent?

7  A.   Yes, I do.

8  Q.   And can you explain to the jury the difference between a

9  case agent and an undercover agent?

10 A.   Sure.  An undercover agent is an employee.  It's either a

11 special agent with the FBI or a task force officer.  Some of

12 our local law enforcement become certified FBI undercovers.

13      And we are used in an FBI investigation when the case

14 agent that's running the case determines that they want to use

15 the undercover technique.

16 Q.   Okay.  And you referred to "case agent."  Have you served

17 as a case agent before?

18 A.   Yes, I have.

19 Q.   When you're in the role of case agent, what are your

20 duties?

21 A.   So as a case agent of an investigation, you are

22 responsible for -- you own that case.  It is your

23 responsibility to decide the direction of that case, what

24 evidence you're trying to collect, the direction of it, and

25 what you do in furtherance of that investigation.

1    Q.   You referred to an undercover operation as a "technique."

2    What did you mean by that?

3    A.   In an investigation, a case agent has the option of using

4    a lot of different techniques in their investigation.  They

5    can use historical records.  They can use interviews.  They

6    can use search warrants.  They can use Title III, wire

7    intercepts of telephones.  And an undercover operation is just

8    another technique that a case agent can choose to use in the

9    operation or in an investigation.

10   Q.   I'm sorry.  Can any FBI agent become an undercover?

11   A.   Yes.  It's an open canvas that you can apply to, go to

12   the certification course.

13   Q.   And in order to operate, you need to pass the

14   certification course?

15   A.   That's correct.

16   Q.   Have you earned that certification?

17   A.   Yes, I have.

18   Q.   And you've been involved in undercover operations since

19   obtaining that certification?

20   A.   Yes, I have.

21   Q.   Can you tell the jury, over the course of your career at

22   FBI, how many undercover operations you've been involved in?

23   A.   I would estimate that I've been involved in over 30.

24   Q.   Okay.  And how many of those have involved public

25   corruption investigations?

*MILLER – DIRECT*

1  A.  That I had a role in, probably 10 to 12.

2  Q.  Okay.  Generally, how many undercover operations are you

3  involved in at a particular time?

4  A.  It varies.  There's times where there's zero, and there's

5  been times where I've been involved in as many as four at one

6  time, so...

7  Q.  When you're involved in multiple at one time, how does

8  that affect your schedule?

9  A.  It's a balancing act, because the undercover program is,

10  for the most part, considered a collateral duty.  So most of

11  the agents who work undercover also work as normal case

12  agents, so it is a balancing of their case work and their

13  undercover work.  So it's a lot of scheduling, and trying to

14  make sure it works with when you can be at the place that you

15  need to be at any given time, so...

16  Q.  So you mentioned that you are a supervisory special

17  agent; is that correct?

18  A.  That's correct.

19  Q.  That's the right terminology?

20  A.  Yes.

21  Q.  And what particular area do you supervise?

22  A.  So I work in the undercover section for FBI headquarters

23  now in backstopping.  So the backstopping unit for

24  headquarters, they provide undercovers with everything to try

25  to make that undercover look real.

1        That includes their alias identifications, their

2    businesses, their bank accounts, their phones sometimes, their

3    cars; whatever may be necessary to help bolster that

4    undercover's persona.

5    Q.   And so you supervised that unit?

6    A.   I'm one of the supervisors in that unit.

7    Q.   Okay.  And you mentioned collateral duties before.  So

8    that's your day job, so to speak, and you're doing the

9    undercover work in addition to that?

10   A.   I am, correct.

11   Q.   Now, how do you become involved in a specific undercover

12   operation?

13   A.   The primary mechanism is every FBI field office has an

14   undercover coordinator.  Those undercover coordinators meet

15   with the case agents when they decide to start an undercover

16   operation as part of their case.

17       And that undercover coordinator will work with the

18   undercover section to draft what is called a canvas.  And that

19   canvas goes out to every undercover coordinator in the FBI

20   that gives kind of a general here's the type of case, here's

21   the type of person they're looking for, here's kind of the

22   general time commitment that they're estimating, and then it

23   gives a point of contact for the case agent.

24       Then the individual undercovers receive those, and they

25   can reach out directly to the case agent and have that

1    conversation to see, hey, is this the right person that the

2    case agent chooses to work their investigation.

3    Q.   And you mentioned the term "backstopping" before.  Can

4    you explain to the jury what the purpose of the backstopping

5    is?

6    A.   Sure.  It's to try to -- I mean, obviously, undercovers

7    are not who they are portraying themselves to be when they

8    walk in and meet with the subject of an investigation.

9         So depending on what they need to look like, and the

10   persona they need to present to the subjects and the people

11   they meet will determine what we do as far as backstopping,

12   including, like, where they're from, what their driver's

13   license, where it's from, what kind of car they're driving.

14   All those type of things go into it.

15   Q.   And does that even include things like credit cards in

16   the name of your undercover identity?

17   A.   Yes.  Absolutely.

18   Q.   Okay.  Let's say that you are in town for a multiday

19   operation.  How long do you stay in your undercover persona

20   during that operation?

21   A.   For -- it is case dependent, but for -- especially in a

22   sensitive case.  In a long-term case, usually, you stay in

23   role the entire time you are at the location that you're doing

24   undercover work.

25   Q.   So can you describe to the jury, as a practical matter,

1    what that means when you're coming into a place for an

2    undercover operation that's going to last a couple of days?

3    A.    Sure.  So from the time of whatever airport I am flying

4    out of, I am flying out as my alias identification.

5          So I'm flying out as Rob Miller.  I have Rob Miller's

6    driver's license.  I'm going through security and TSA as Rob

7    Miller.  I'm using Rob Miller's credit card to book my plane

8    ticket.  Rob Miller is checking into the hotel.  Rob Miller is

9    ringing the car.  Rob Miller is buying gas for that car.

10         Rob Miller is going to Starbucks to get coffee in the

11   morning.  And Rob Miller is the same person on the way out,

12   until I get back to my residence and then switch back.

13   Q.    Okay.  Well, why is it that you don't cut that off --

14   let's say your meeting ends, and your example, you go to

15   Starbucks afterwards.  How come you don't just switch out at

16   that time period?

17   A.    It's -- well, two reasons.  One is, you normally don't

18   have your other identifications and things with you, first of

19   all, because you're going through security under your alias.

20         But the main reason is you never know who you're going to

21   run into, who you're going to meet, especially in a long-term

22   investigation that you know is going -- or is expected to go a

23   long period of time, you just don't know who you're going to

24   meet or run into, so it could compromise the investigation by

25   trying to switch back and forth, and being one person the time

MILLER - DIRECT

1    you walk into Starbucks and the next time being a different

2    person, so...

3    Q.   At the same location?

4    A.   Correct.

5    Q.   Okay.  Now, are there skills that you work to cultivate

6    as an undercover agent, just basic skills, I mean?

7    A.   Yes.

8    Q.   What are those?

9    A.   Well, you know, the undercover has to be able to build a

10   relationship with the subjects and investigation, so a lot of

11   that is what we would consider rapport building or

12   ingratiation, building that level of trust.

13        A lot of it is, you know, you are constantly trying to

14   read that person and determine whether they are believing you,

15   whether you have an issue.  So it's a lot of reading the

16   person, developing them, trying to figure out their habits,

17   their likes, and building your plan to kind of mirror what you

18   think they like.

19   Q.   Okay.  And what about active listening?

20   A.   That's huge.

21   Q.   Can you describe how that plays in?

22   A.   Sure.  I mean, active listening is not only listening,

23   but it's taking in what they're saying and responding.

24        So if you, for instance, hear them say that they have a

25   very tight schedule and they've got to be home, then you know,

1    when you ask them for the next meeting, that you're going to

2    schedule it somewhere that's convenient for them.  Those type

3    of things that you're constantly listening, okay, what's going

4    to increase my chances that I will have the next meeting with

5    the subject of this investigation to keep it going and to

6    continue to build that relationship.

7        And a lot of that is you're constantly having to listen

8    to what they say and apply that to what your plan is going

9    forward.

10   Q.   And as an undercover, is it your job to prove the

11   allegations in an investigation?

12   A.   As an undercover, our job is to collect evidence or

13   collect intelligence, depending on the type of case.

14   Sometimes what we end up collecting actually proves that there

15   is not a crime being committed, or at least not one that we

16   can prove.

17       So we go in, like I said, to collect evidence and to

18   collect intelligence.

19   Q.   Now, how are undercover agents introduced in an

20   investigation?

21   A.   It depends.  It's normally -- well, I wouldn't say

22   normally.  It can go both ways, as an introduction from a

23   confidential human source, or what's commonly referred to as a

24   source, meaning that there is someone who is cooperating with

25   the FBI or with local law enforcement that somehow has access

1    or can make an introduction to the subjects, and that person

2    inserts or helps introduce the undercovers into the case.

3         Sometimes that may mean they just simply make a phone

4    call to set up a meeting, or it could be as much as that

5    person is your partner for the next year in that

6    investigation.

7         On the other side of that is what we would consider going

8    in cold, and that's where the undercover has to truly just

9    initiate the relationship, with no introduction from someone.

10   Q.   Have you done both in your career as an undercover?

11   A.   Yes, I have.

12   Q.   Now, a few minutes ago, you mentioned collecting evidence

13   as your primary duty.  How do you collect that evidence in an

14   undercover investigation?

15   A.   Primarily collected through the recordings that we make,

16   both audio and audio/video recordings when we're meeting with

17   subjects.

18   Q.   So in terms of these meetings, who decides if a meeting

19   occurs?

20   A.   The case agents.

21   Q.   And what about the location of a meeting, how do you

22   figure out where a meeting will take place?

23   A.   Twofold.  I mean, primarily, the case agent has told us

24   where they want the meeting to happen, and part of that would

25   depend on what we're hoping occurs at that meeting or what the

*MILLER – DIRECT*

1    plan is for -- the case agent has laid out for that next

2    meeting, because what factors into that is our ability to make

3    a recording, whether we need to set up audio/video recording

4    equipment or just audio.

5         So a lot of that will factor into where we have a

6    meeting; but, ultimately, that's the case agent's decision as

7    to where meetings occur.

8    Q.   And you mentioned sometimes it's driven by the subject of

9    the investigation?

10   A.   It is.  It is.

11   Q.   And can you explain what you mean by that?

12   A.   Sure.  If a subject has -- like the example I gave

13   earlier, if we know that they particularly like a certain

14   restaurant, or they -- a certain area of town is more

15   convenient or less convenient for them, then we will try to

16   suggest a meeting happen somewhere that's convenient for them

17   so that they are less likely to cancel on us or not show up

18   or, you know, them show up and be rushed.  We want to maximize

19   the amount of time and opportunity we have when we're meeting

20   with subjects.

21   Q.   So we talked about location.  How about how often are the

22   frequency of meetings?  Who makes that decision?

23   A.   The case agent.  Again, the case agent monitors

24   constantly, you know, every meeting we have.  The case agent

25   goes back and analyzes what happened at the previous meeting,

1    and then they develop the plan for, okay, here's what we want

2    to do next, here's when we want to do that.  And so it's part

3    of their overall plan is when they tell us to come into town.

4    Q.    Okay.  And for these meetings, do you prepare for the

5    meetings?

6    A.    We do.  The case agent will kind of give us a -- because

7    there's a lot of other pieces of the case happening, other

8    than the undercover operation, which we don't know about.

9         And so the case agent only tells us the pieces he feels

10   like we need to know, and how our piece fits into that overall

11   puzzle of the case that he's investigating.

12        So something may -- for instance, if we talked about

13   being introduced by a source, that source may have a meeting

14   that I need to know about because of something that happened,

15   so the case agent may tell me that information so that we talk

16   about the plan for my next meeting.

17   Q.    Okay.  And on the flip side, are there times where it's

18   better to go into a meeting and not know all of the things

19   happening in the case?

20   A.    There are.  There are times that the case agents don't

21   tell us information, and they shouldn't, because it would

22   be -- we don't want to respond unnaturally, what makes sense

23   for us to know something.

24        So if a subject says something, and I don't respond like

25   a normal person who just heard that for the first time, it can

1 be very -- it can be a very big telling sign to the subject

2 that, hey, something's not right here, like why would he know

3 that?  Why did he respond that way?

4  So there are pieces that the case agents intentionally

5 don't tell us because it wouldn't be natural for us to know

6 that information.

7 Q. Before a meeting, do you have a script, like a movie?

8 A. No.  We do not have a script.

9 Q. Why not?

10 A. Again, because we want the conversation to be very

11 natural.  So the case agent, prior to a meeting, will tell us

12 the objectives or what information he is trying -- he wants us

13 to -- the evidence he's trying to collect, or intelligence

14 that he's trying to gather, and we will formulate our own plan

15 of how we say that.

16  It's not like we go through a script of, okay, and then I

17 say X, Y, and Z, because that would come off every

18 unnaturally.

19  Every undercover kind of has a different style and a

20 different way they talk, and so for someone to write a script

21 for you would come across as very unnatural.

22 Q. Who makes decisions about when the undercover operation

23 ends?

24 A. The case agent and their management above them, as far

25 as -- and in cooperation with the prosecutors of the case,

1    depending on what type of case it is.  They decide, hey,

2    either the undercover operation is not gaining any evidence of

3    any intelligence value, and so we're going to shut it down.

4         They can say we have collected everything that we think

5    we need to collect and want to collect through the undercover

6    technique.

7         Or they can say, hey, we've decided to go a different

8    route.  We're going to use a different technique and,

9    therefore, we're shutting this operation down.

10   Q.   That's a conversation that occurs without you, right?

11   A.   Correct.

12   Q.   All right.  Let's talk about this investigation.  At some

13   point, did you become involved in an undercover operation

14   involving Mr. Sittenfeld?

15   A.   Yes, I did.

16   Q.   At that time, were you involved in other investigations

17   in the area?

18   A.   I was.

19   Q.   Okay.  And did you pivot to this at the case agent's

20   direction?

21   A.   Yes, we did.

22   Q.   Can you describe to the jury what your undercover persona

23   was or was supposed to be?

24   A.   Sure.  Myself and another undercover were posing as

25   investors that were working with a confidential human source.

1    The source was doing a real estate development project, and we

2    were helping finance that project.

3    Q.   And what did you do to convey that information to others?

4    A.   We -- I mean, we live that persona.  We make sure we try

5    to present ourselves as investors.  We -- obviously, the

6    source was huge, in that by he kind of bolstered that and told

7    everyone that we were backing his project, and that we had the

8    financial capabilities to do so.  And then we, again, try to

9    live that persona to make them see us in that light, so...

10   Q.   Okay.  Along those lines, where did you stay when you

11   were in town for this operation?

12   A.   Initially -- we ended up getting an apartment at the

13   580 Building, but we initially started, when we were working

14   the other investigations, we were still staying in hotels in

15   Cincinnati.

16   Q.   All right.  You said -- and you mentioned the

17   580 Building?

18   A.   Yes.

19   Q.   At some point, did you begin staying there?

20   A.   We did.  We ended up -- the case agent thought that it

21   would be a better idea for us to get an apartment at the

22   580 Building.

23   Q.   And what, if any, steps did you take regarding the 580 to

24   sort of make it official, make it your place to stay?

25   A.   We looked at several locations around Cincinnati as

1    potential undercover apartments, and we toured them, just like

2    anybody else that would look for an apartment.  We went and

3    met with the building managers in our AFIDs, in our alias IDs,

4    and ended up signing a lease for that unit under my alias ID.

5    Q.   And when you use "AFID," what do you -- do you use that

6    term?

7    A.   Yeah.  It's alias faults identification is the

8    abbreviation for AFID.  It is what we call our alias driver's

9    license or ID.

10   Q.   Now, you said you were staying at the 580 Building.

11   Where did you stay when you were off duty, so to speak?

12   A.   Once we had the apartment at the 580 Building, we always

13   stayed at the 580 Building.  We didn't -- it would look very

14   odd for us to go check into another hotel.

15        We wanted to seem like we -- the point of having the

16   apartment there was to make it look like we were really

17   committed to doing long-term work in the Cincinnati area and,

18   therefore, we wanted to have a presence there and be seen, so

19   we stayed there.  Once we had the apartment, we always stayed

20   there.

21   Q.   And was there any danger of compromising the

22   investigation if you stayed at a hotel after renting the

23   580 Building?

24   A.   In our opinion, definitely.  It could compromise, and it

25   could -- again, it's all those little things that if someone

1    sees you checking into the Marriott or the Hilton, and they

2    know that you have an apartment, it doesn't make sense.  Why

3    would you be checking into another hotel, so...

4    Q.  Now, when you were in Cincinnati, how did you communicate

5    with people?

6    A.  I had a covert cell phone.

7    Q.  Like an undercover phone?

8    A.  Yes.

9    Q.  How did you obtain that?

10    A.  I went and purchased it covertly.  So I purchased it,

11    again, in my covert identification, and the service was

12    through my covert identification.

13    Q.  Have you heard the term a "consensual T3"?

14    A.  Yes.

15    Q.  What does that mean?

16    A.  So -- I'll back up with just saying what a T3 is.  A

17    Title III, or intercept, is what the FBI uses to monitor the

18    telephone calls and text messages to a particular number.

19        Normally, to get that, you have to have a court order if

20    you're doing it on the subject in an investigation.

21        What we in -- the FBI does for informants and for

22    undercovers is we do what's called sometimes a consensual

23    Title III, which means we are signing a piece of paper that

24    either goes to the court or to the phone company that says we

25    are allowing the FBI to monitor all of the communications,

1    phone calls, or text messages to that particular phone number.

2       And so it's just a mechanism so that if a subject calls

3    your undercover phone, or your -- or texts you, that's

4    automatically captured through an electronic system, versus

5    having to use like a handheld recording device.

6    Q.  So you said it was -- it's captured in an electronic

7    system.  Is that so a case agent can access it while you're

8    working?

9    A.  They can access it while we're working, they can access

10    it while we're out of town.  If a subject calls me, and I'm

11    not in Cincinnati, the case agent immediately can go to the

12    system and review that call or text message.

13    Q.  All right.  As a supervisory FBI agent, I'm not sure I

14    used the right term there, what did you say to call it?

15    A.  Yeah, supervisory special agent.

16    Q.  So supervisory special agent, do you also have --

17    separate and apart from your undercover phone, do you also

18    have a work phone, like an FBI work phone?

19    A.  Yes.

20    Q.  Can you explain the difference to that to the jury?

21    A.  Sure.  Every FBI agent has a phone that is issued by the

22    FBI that is for their official use for communication with

23    work.  That means your official FBI email, load stuff on.

24       So that is -- you cannot use that phone when you're doing

25    covert activities because, again, if you give the subject or

1    anyone your phone number, and they run that, it's going to

2    come back associated with the FBI.

3         If they have -- you know, in this day and age, even your

4    Marriott rewards point number is tied to your cell phone

5    number.  So those things all have to be kept separate, and

6    they can't overlap, or else it could compromise an

7    investigation or compromise your alias identification.

8    Q.   And what about just the appearance of the phone.  I mean,

9    do you have a banner on your FBI work phone that says this is

10   the FBI, don't access?

11   A.   Well, there's a -- if you open up an FBI work phone, and

12   you don't have the code, it says if you found this phone, dial

13   202-324-1500, which is the FBI help desk, so yeah.

14   Q.   Okay.  So if you are on an undercover operation, and you

15   had that FBI phone, could that compromise the investigation?

16   A.   Sure.

17   Q.   So what do you do to cope with that situation when you're

18   in town for an undercover operation?

19   A.   When I'm working operationally, I only have my covert

20   operational phone with me.

21   Q.   Does that extend to your office, so to speak?  When

22   you're in town to do an undercover operation at a different

23   location than your home office, do you go to the local FBI

24   office?

25   A.   No.

1    Q.    And why not?

2    A.    Again, number one, I don't have FBI credentials that

3    would get me into the FBI, first.  And the second part is you

4    don't want to be seen going or coming from those locations.

5    Q.    So the 580 Building was your central location, for all

6    intents and purposes, when you're in town?

7    A.    Correct.

8    Q.    Now, when did you first meet the defendant?

9    A.    Originally, I met him for a brief meeting in February

10   2018.

11   Q.    Can you briefly describe the context of that meeting?

12   A.    We were -- had an individual in Cincinnati that was

13   introducing us to a lot of people.  At that time,

14   Mr. Sittenfeld was not a subject of the investigation, as far

15   as the undercover portion went.

16        This individual would line up dinner with numerous

17   elected officials in the Cincinnati area, and Mr. Sittenfeld

18   was one of the people that came by the restaurant that night

19   and was introduced to us.

20   Q.    Okay.  And did that change?  Did you start working on an

21   undercover operation related to Mr. Sittenfeld?

22   A.    Yes, we did.

23   Q.    And about what time period was that?

24   A.    The next time I met Mr. Sittenfeld was in November of

25   2018.

1    Q.   And what were the circumstances of that meeting?

2    A.   The case agents had notified us that their source that

3    was working the case had been requested to make a donation to

4    Mr. Sittenfeld, and he was working on the approval of the

5    435 Elm project, and they wanted us to go and meet with

6    Mr. Sittenfeld.

7    Q.   So going into the meeting, you were aware of those

8    previous phone calls with the source?

9    A.   Yes.

10   Q.   Now, who attended the lunch that you went to?

11   A.   It was myself, the source, Chin, and Mr. Sittenfeld.

12   Q.   And I apologize if I didn't hear it before, where did the

13   meeting take place?

14   A.   The lunch was at Nada, which was directly across the

15   street from the 580 Building.

16   Q.   And I assume Nada is a restaurant?

17   A.   Yes.

18   Q.   Okay.  Did you record this meeting at Nada?

19   A.   Yes, we did.

20   Q.   And were you limited to audio, or were you able to do

21   video at that meeting?

22   A.   The meeting, the portion that happened at Nada, was audio

23   only.  And then from when we finished at Nada, myself and

24   Mr. Sittenfeld walked across the street to the 580 Building,

25   to our apartment, and in that location we had audio and video

1    set up.

2    Q.   What, if anything, did Mr. Sittenfeld bring to the

3    meeting?

4    A.   To the meeting at Nada, he had a laptop computer with

5    him, which he showed me several slides demonstrating where he

6    felt he stood in the future mayor's race in Cincinnati.

7    Q.   So he came to the meeting prepared?

8    A.   Yes.

9    Q.   Now, did the meeting with Mr. Sittenfeld end at the

10   restaurant?

11   A.   No, it didn't.  We moved across the street to the

12   580 Building.

13   Q.   When you say "we," who are you referring to?

14   A.   Myself and Mr. Sittenfeld.  The source, Chin, did not go

15   with us from the restaurant to the apartment.

16   Q.   What happened -- generally speaking, what happened when

17   you got there?

18   A.   Pretty quickly, as soon as we -- I generally showed him

19   around the apartment.  It was the first time he had been in

20   there, and we immediately went to -- I told him that Chin had

21   told me that he wanted to give Mr. Sittenfeld $20,000.

22        MS. GLATFELTER:  All right.  Your Honor, at this

23   time, I ask the Court's permission to publish a portion of

24   Exhibit 15C, which is already admitted into evidence.  It's a

25   recording.

1          THE COURT:  You may do so.

2          MS. GLATFELTER:  And we're going to play from the

3     beginning until 2:12.

4          (Video played.)

5     Q.  All right.  The audio and the video were a little off in

6     this clip that we saw, right?

7          MS. GLATFELTER:  And if I may ask my cocounsel, or

8     let me ask Ms. Terry, what is the number of the exhibit for

9     the actual video clip without the transcript, can you tell me?

10          MS. TERRY:  I believe 15B.

11          MS. GLATFELTER:  15B.  All right.  And 15B is in

12     evidence, but I won't replay it here.  I don't want to waste

13     everyone's time here.

14     Q.  Do you recall this meeting?

15     A.  I do.

16     Q.  And where did this portion occur?

17     A.  That is inside the apartment that I rented at the

18     580 Building.

19     Q.  Who was present for the meeting?

20     A.  Myself and Mr. Sittenfeld.

21     Q.  Now, after this meeting, did you meet in person with

22     Mr. Sittenfeld again?

23     A.  After this meeting?

24     Q.  Uh-huh.

25     A.  Yes.  Multiple times.

1    Q.   Okay.  And did you meet with him on November 28th of

2    2018?

3    A.   Yes, I did.

4    Q.   What was the purpose of that meeting?

5    A.   Originally, at that first meeting, the -- we originally

6    said we were going to give him $20,000.  At the first meeting,

7    I only had $10,000, which was in cash.

8        Mr. Sittenfeld wanted it in a different format.  He

9    wanted it -- he had called me and told me to make it into a

10   check.

11       At one point, we discussed money orders.  And he came

12   back and corrected me and said, hey, I want it in a check from

13   an LLC.  And so the purpose of this meeting was to give him

14   two $5,000 checks from LLCs.

15   Q.   All right.  And where did this meeting occur?

16   A.   This meeting also happened in the apartment at the

17   580 Building.

18   Q.   And who was present for that?

19   A.   That meeting was myself, another undercover, and

20   Mr. Sittenfeld.

21   Q.   Who was the other undercover?

22   A.   Brian.

23   Q.   And what role did Brian have in this operation?

24   A.   Brian was essentially my business partner, so he was --

25   had the same role I had, as an investor in the project, or

1      financier of the project.

2      Q.   Did this meeting relate to the meeting that we just saw

3      on November 7th?

4      A.   Yes.

5           MS. GLATFELTER:  Your Honor, permission to publish a

6      portion of Exhibit 20C, which has been already admitted into

7      evidence?

8           THE COURT:  You may do so.

9           (Video played.)

10     Q.   While it's paused, can you identify who we're seeing on

11     the screen?

12     A.   That is myself on the right, and Mr. Sittenfeld in the

13     center of the screen.

14     Q.   All right.  And during this meeting, after this portion

15     about the voting, did you give anything to Mr. Sittenfeld?

16     A.   Yes.  I gave him two checks for $5,000 each.

17     Q.   And were the form of the checks, as far as you knew, in

18     the format that Mr. Sittenfeld had requested?

19     A.   Yes.

20     Q.   Was there a problem with the checks that you learned

21     later?

22     A.   Yes, there were.

23     Q.   Can you describe that to the jury?

24     A.   Sure.  Mr. Sittenfeld told me to make the checks out to

25     the Progress and Growth PAC, which we did, and that they had

MILLER - DIRECT

1    to be from registered LLCs.

2         The problem, the checks, the bank accounts that the

3    undercover unit sent us were actually from registered

4    corporations, not from LLCs and, therefore, I did not know

5    that at the time.

6         Mr. Sittenfeld called me, after he took those checks, and

7    let me know that the person that he had given the checks to

8    looked them up on the Secretary of State's website, and they

9    were actually registered corporations, not LLCs.

10   Q.   All right.  And at that time, when you found out that

11   these were the wrong checks, what did Mr. Sittenfeld request

12   that you do?

13   A.   Just that we correct the checks and send him checks that

14   were from LLCs.

15   Q.   Okay.  Not take back the checks, or turn down the checks,

16   but just change the checks?

17   A.   Correct.

18   Q.   All right.  Did you meet again with Mr. Sittenfeld to do

19   that?

20   A.   We did.

21   Q.   And when was that meeting?

22   A.   It was in the middle of December.

23   Q.   What was the purpose of that meeting?

24   A.   It was to replace the previous two we originally -- the

25   first meeting in November, the original amount was $20,000.

1    Up until that point, we had only given him $10,000.  And the

2    $10,000 we gave him were in checks that were in corporations,

3    not LLCs.

4        So the purpose of this meeting was to give him the total

5    $20,000, which were going to be four checks for $5,000 each,

6    all from registered LLCs.

7    Q.   And was the format of those checks in -- strike that.

8        The checks that you presented, were they in the format

9    that Mr. Sittenfeld had requested?

10   A.   Yes.  These four checks were made out to the PAC, as he

11   had requested.  They were $5,000 each, and they were from

12   registered LLCs.

13   Q.   Who was present for this meeting in December?

14   A.   The meeting in December, again, was myself, the other

15   undercover, Brian, and Mr. Sittenfeld.

16   Q.   Now, how many times had you met with Mr. Sittenfeld in

17   person at this point?

18   A.   At this point, I had met with him -- this was the fourth

19   meeting in person.

20   Q.   And fourth includes that time in February of 2018 that

21   you met him briefly?

22   A.   That's correct.

23   Q.   Now, leading up to this meeting, did you communicate with

24   Mr. Sittenfeld?

25   A.   Yes.

1          MS. GLATFELTER:  Your Honor, permission to publish

2     Exhibit 21E, which are text messages that have already been

3     admitted into evidence?

4          THE COURT:  You may do so.

5     Q.   Sir, can you take a look at Exhibit 21E?

6     A.   Yes.

7     Q.   Do you recognize those messages?

8     A.   I do.

9     Q.   And what are they?

10    A.   They're the text message correspondence between myself

11    and Mr. Sittenfeld.

12    Q.   Okay.  And which side of the page are your messages

13    depicted on?

14    A.   My messages are in blue.

15    Q.   And can you read us the first four?

16    A.   Both sides of the conversation?

17    Q.   Yes.  I'm sorry.  That was vague.

18    A.   I said:  "I will be there on Monday."

19         Mr. Sittenfeld said:  "Great.  Drink after work or after

20    dinner?"

21         I said:  "Whichever one works for you."

22         Mr. Sittenfeld replied:  "How about 5:30, Ruby's?  Sotto?

23    You tell me."

24         I replied:  "Let's do Sotto.  Drinks or dinner?"

25    Q.   All right.  Earlier in your testimony, we had talked

1     about how a location might be selected for a meeting.  How did

2     these text messages relate to that?

3     A.   They gave us an indication of when Mr. Sittenfeld would

4     be available, and where he would like to meet us, what would

5     be convenient for him.

6     Q.   And based on these text messages, where did he suggest to

7     have the meeting?

8     A.   Ruby's, which refers to Jeff Ruby's restaurant, or Sotto.

9     Both of those are on the same street and in the same general

10     area, downtown Cincinnati.

11     Q.   And did you choose one of the locations that

12     Mr. Sittenfeld had suggested?

13     A.   We did.  I said: "Let's do Sotto."

14         MS. GLATFELTER:  Okay.  Your Honor, permission to

15     publish a portion of Exhibit 21F, which has already been

16     admitted into evidence?

17         THE COURT:  You may do so.

18         MS. GLATFELTER:  Thank you.

19     (Video played.)

20     Q.   Sir, do you see the video on your screen?

21     A.   Yes.

22     Q.   And can you identify who we're seeing in the video at

23     this point?

24     A.   Right now in the video, you're looking at Brian's back

25     and Mr. Sittenfeld's to the right.

*MILLER - DIRECT*

1    Q.   Okay.  And were you pictured in the video earlier?

2    A.   I was.

3    Q.   What was the paper that you handed to Mr. Sittenfeld?

4    A.   So I handed him four checks for $5,000 each.  And then

5    one of the checks, the bank account still said -- the name of

6    the company said, I think it said C2 or C3, Inc.  But I gave

7    him the paperwork from the Secretary of State website, showing

8    that the company was actually registered as an LLC, the

9    account name just had not been changed.

10   Q.   Now, after this interaction -- you said it was when?

11   A.   This was in December.

12   Q.   So after December, did you stay in contact with

13   Mr. Sittenfeld in the early part of 2019?

14   A.   Yes, I did.

15   Q.   Okay.  And can you give us some examples of the type of

16   contact that you had with Mr. Sittenfeld in, you know, the

17   winter and early spring of 2019?

18   A.   Sure.  Any time I would -- there would be something that

19   would happen with the project, as far as the source, whether

20   he had a meeting or anything, I would usually -- either I

21   would initiate it and text Mr. Sittenfeld, and sometimes he

22   would initiate it and update me on the status of the project

23   at 435 Elm.

24   Q.   Okay.  So you had some phone contact?

25   A.   Yes.

MILLER - DIRECT

1    Q.   Did you also meet in person?

2    A.   We did.

3    Q.   Okay.  And during these times that you met in person, can

4    you briefly describe the type of discussion that you would

5    have about 435 Elm?

6    A.   Which time frame?  Where are we at on the time?

7    Q.   I'm sorry.  My question was vague.  In this early time

8    period of 2019, from January to, let's say April, when you

9    would meet with Mr. Sittenfeld, would you talk about 435 Elm?

10   A.   Yes.

11   Q.   Okay.  And what are the types of things -- can you give

12   the jury some examples of the types of things that you would

13   talk about?

14   A.   Mostly, at that point of it, it was the status of the --

15   Chin, the source, was trying to work out a development

16   agreement with the city.

17        And so it was usually the status, or what meetings he had

18   recently had, or what changes had happened since the last time

19   we had spoken, as far as the status of that project

20   Q.   And during these meetings, was he providing information

21   to you about the 435 Elm status?

22   A.   Yes.

23   Q.   Now, at some point during the spring, was there any

24   discussion of transferring the property?

25   A.   There was.

1   Q.   Okay.  Can you explain what happened to the jury?

2   A.   Sure.  The property was under the control of the City of

3   Cincinnati, and the discussion was it was going to actually be

4   under the control, or transferred from the city to the Port of

5   Cincinnati, and they would then be the entity that would be

6   controlling a development agreement with a future developer.

7        And so there was a lot of discussions on if that was

8   going to happen, and what our thoughts were about that

9   happening.

10  Q.   Okay.  Do you recall anything of investigative

11  significance that happened on June 25, 2018?

12  A.   I received a -- or I had a phone call with Mr. Sittenfeld

13  where he discussed that project being moved over to the port,

14  and asked me my thoughts on if I was okay with that happening.

15  Q.   And what did you tell him?

16  A.   Yes.  We felt that that was in our best interest.

17  Q.   Were there any technical difficulties with this phone

18  call?

19  A.   Yes.  So like we spoke about earlier, the consensual

20  Title III is designed to capture all the incoming calls and

21  outgoing calls to that phone number.

22       On this date, I believe it captured the initial part of

23  the call, but then I was notified after the call from the case

24  agent, when he went and reviewed it, that there was a

25  technical issue and, for whatever reason, the remainder of

1    that call was not captured.

2    Q.  All right.  So at the time, you didn't even know that the

3    phone call didn't record?

4    A.  No.  I have no ability to turn on or off the recording to

5    that phone number.

6    Q.  All right.  And so what actions did you take regarding

7    that situation?

8    A.  So when I was notified, I went back and wrote FE 302 in

9    the case management system for the FBI that documented the

10   correspondence during that phone call.

11           MS. GLATFELTER:  Okay.  Your Honor, may I approach

12   the witness to show him what's been marked as USA 27C?

13       I will not be asking for the admission, but I want to

14   make sure we're talking about the same document.

15           THE COURT:  So you just want him to identify it?

16           MS. GLATFELTER:  Yes.

17           THE COURT:  You may do so.

18   Q.  Was this the report that you talked about documenting the

19   phone call in?

20   A.  Yes.

21   Q.  Okay.  And did you have a chance to review that before

22   your testimony today?

23   A.  Yes, I did.

24   Q.  And do you recall when this was documented in relation to

25   the phone call?

*MILLER – DIRECT*

1    A.   The -- I think I drafted it the day after the phone call.

2    I'd have to look at the actual -- it was either a day or two

3    days after the phone call.  I can't remember exactly.

4    Q.   How about I bring it to you and make sure.

5    A.   Sure.

6          MS. GLATFELTER:  Your Honor, may I approach again?

7          THE COURT:  You may.

8    Q.   Here, I can take it back when you're done.

9       And when did you draft this?

10    A.   Two days after.  So the phone call was on June 25th, and

11    I drafted it on June 27th.

12    Q.   And you said that you were discussing the transfer of the

13    property at the port?

14    A.   Yes.

15    Q.   Okay.  And what did Mr. Sittenfeld ask you?

16    A.   He asked me if I was -- if we were comfortable with that,

17    if we were -- basically, if we were okay and supportive of

18    that transfer happening.

19    Q.   Okay.  And how did you respond?

20    A.   Yes.  We told him we thought that that was basically in

21    our best interest if that happened.

22    Q.   All right.  I want to fast forward to the fall of 2019,

23    to September specifically.

24    A.   Okay.

25    Q.   Did there come a point in time when you met with

1   Mr. Sittenfeld in Columbus, Ohio?

2   A.   Yes.

3   Q.   Where did you meet?

4   A.   We met at a hotel room.  I believe it was a Hilton in

5   Columbus, Ohio.

6   Q.   Do you recall who was present for the meeting?

7   A.   I do.  Myself, two other undercovers, Brian and Vinny,

8   Mr. Sittenfeld, and a member of Mr. Sittenfeld's staff.  I

9   don't recall his name.

10  Q.   Was there anything of investigative significance that

11  occurred during this meeting?

12  A.   During this meeting, we talked extensively about -- the

13  plan for 435 Elm had transitioned to not only a hotel, but

14  also to including a restaurant that would have a sports book,

15  allow sports betting, and that was something that the

16  undercover Vinny was particularly interested in.

17       And during this, it was the conversation of the status of

18  that, and Vinny provided Mr. Sittenfeld with two $5,000

19  checks, and told Mr. Sittenfeld that I would be delivering two

20  more $5,000 checks on his behalf in the future.

21  Q.   Now, after this meeting, did you have communications with

22  Mr. Sittenfeld?

23  A.   I did.

24  Q.   Can you describe to the jury the volume of those

25  communications?

*MILLER - DIRECT*

1   A.   During September and October, compared to our previous

2   correspondence, it was a lot higher volume than we had had in

3   a previous monthlong period, so...

4        MS. GLATFELTER:  Your Honor, permission to publish

5   Exhibit 31A, which has been previously admitted into evidence?

6        THE COURT:  You may do so.

7   Q.   Now, when you said the volume -- I'm going to paraphrase

8   here, but when you said the volume increased during this

9   meeting?

10  A.   Yes.

11  Q.   Is this an example of the type of communications you're

12  referring to?

13  A.   Yes, it is.

14  Q.   And were any of the communications that you had after

15  this meeting via text message?

16  A.   Yes, they were.

17       MS. GLATFELTER:  Your Honor, permission to publish

18  Exhibit 31J, which has previously been admitted into evidence?

19       THE COURT:  You may do so.

20       MS. GLATFELTER:  Ms. Terry, this is multiple pages,

21  right?

22       MS. TERRY:  Yes.

23  Q.   So if we can start with the first page.  If you can

24  review the contents of the first page, and let me know when

25  you're finished.

1    A.   Okay.

2         MS. GLATFELTER:  And the second page, Ms. Terry.

3    A.   Okay.

4    Q.   Then the next page.

5         MS. GLATFELTER:  And you can just leave it right

6    there.  Thank you.  Oh, can you put that back up on the

7    screen?  Sorry.  I was going to ask a few questions about

8    that.

9    Q.   Now, do these text messages relate to a topic that you

10   had discussed at the September 24th meeting in Columbus?

11   A.   Yes, it did.

12   Q.   How so?

13   A.   At the meeting in Columbus, we had discussed finding a --

14   replacing the source, Chin, with another developer on the

15   435 Elm project.

16   Q.   Okay.  And on the text message on the screen, which for

17   the record's reference is page 3 of Exhibit 31J, do you see

18   the reference to Dan?

19   A.   Yes.

20   Q.   Who is Dan?

21   A.   Dan is the individual Mr. Sittenfeld thought I should

22   consider partnering with on 435 Elm.

23   Q.   As the replacement for Chin?

24   A.   Yes.

25   Q.   Now, after the meeting in Columbus, did Mr. Sittenfeld

1 ask you for anything with respect to Vinny?

2 A. He asked me for Vinny's phone number.

3 Q. How did he request it?

4 A. By text message.

5   MS. GLATFELTER: Your Honor, permission to publish

6 Exhibit 32A, which has been previously admitted into evidence?

7   THE COURT: You may do so.

8 Q. And, sir, do you recognize this?

9 A. Yes.

10 Q. What is it?

11 A. This is the correspondence between myself and

12 Mr. Sittenfeld where -- again, Mr. Sittenfeld's on the left,

13 my texts are on the right, where he asked me for Vinny's phone

14 number.

15 Q. And can you read the top text message?

16 A. "Is there a good number to reach Vinny on? Have a quick

17 update for him."

18 Q. And then you respond with a telephone number?

19 A. Yes.

20 Q. Did you have to do anything before you responded with

21 Vinny's telephone number?

22 A. I notified the case agent, and I had to notify Vinny to

23 expect a phone call.

24 Q. Why?

25 A. Vinny -- I did not know where he was, or what his

1  schedule was, or whether he had his covert phone with him, so

2  I had to make sure he was prepared for it and was available.

3      And I don't know whether he had a consensual Title III on

4  his phone, so the case agents had to make arrangements for

5  however they were going to record that call.

6          MS. GLATFELTER:  One moment, Your Honor.

7      Just a few more questions.

8  Q.  Mr. Miller, during the time period of this investigation,

9  did you make a mistake in your personal life?

10 A.  Yes.

11 Q.  Can you just briefly describe that to the jury?

12 A.  Sure.  I had a personal relationship with someone

13 unrelated to the investigation in Cincinnati that was sexual

14 in nature, which caused an issue for the case as far as

15 reputation goes.  And because of that, I received a letter of

16 censure from the FBI.

17 Q.  Were you on duty or off duty at the time?

18 A.  I was off duty.

19 Q.  And is that what the letter you received for?

20 A.  Yes.

21 Q.  Okay.  And what was the title of the -- what was the

22 subject matter of the letter of censure?

23 A.  Unprofessional conduct off duty.

24         MS. GLATFELTER:  All right.  No further questions,

25 Your Honor.

1      THE COURT:  Thank you.  Mr. Rittgers?

2      MR. C. MATTHEW RITTGERS:  Your Honor, depending upon

3  when the Court wants to break for the day, considering it's

4  almost a quarter 'til.

5      I know I told you I was going to be very brief.  It might

6  be a little longer than 15 minutes, so...

7      THE COURT:  Why don't we get started and see how it

8  goes.

9                    CROSS-EXAMINATION

10 BY MR. C. MATTHEW RITTGERS:

11 Q.  Good afternoon.

12 A.  Good afternoon.

13 Q.  I would like to start with 2017.  Were you aware that

14 P.G. had been involved in trying to develop 435 Elm with a man

15 by the name of Ryan Goldschmidt and even Mr. Ndukwe in 2017?

16 A.  I didn't know anything about Mr. Sittenfeld or 435 Elm in

17 2017, I don't believe.

18 Q.  But during your conversations with Agent Holbrook or with

19 Mr. Ndukwe himself, were you ever told that in 2017, P.G. was

20 working to try to get 435 Elm redeveloped?

21 A.  No.

22 Q.  Were you told in conversations with Agent Holbrook or

23 with Mr. Ndukwe that Mr. Ndukwe had been a frequent fundraiser

24 for P.G.?

25 A.  No.  I did not know the status of Mr. Ndukwe's

1    contributions.

2    Q.  Were you aware that he had asked if he could be on the

3    host level of P.G.'s next fundraiser in January of 2018?

4    A.  No.  I was not aware of that.

5    Q.  Okay.  When you were speaking with the prosecutor, you

6    talked about your persona?

7    A.  Yes.

8    Q.  And the persona was that you and Rob and Vinny had money,

9    and you were ready to invest in Cincinnati?

10    A.  I was Rob.  So Rob, Brian, and Vinny, but yes, sir.

11    Q.  I apologize.

12    A.  No problem.

13    Q.  You and Brian and Vinny had money ready to invest in

14    Cincinnati?

15    A.  Yes, sir.

16    Q.  And the persona that was definitely told to P.G. was that

17    you had the financial capabilities to support Mr. Ndukwe's

18    435 Elm project?

19    A.  Correct.

20    Q.  And part of the persona was also that you were a little

21    bit uncomfortable telling your investors that their investment

22    in Cincinnati was safe, without going around and doing due

23    diligence and talking to people, right?

24    A.  We told them that we wanted to -- I wanted to be able to

25    tell my investors -- I think the word I used that it was

1   Cranley proof, referring to the mayor, because he had a

2   problem with Chin, with Mr. Ndukwe.

3   Q.   I'm talking at the Nada lunch on November 7th -- by the

4   way, on November 7th at the lunch at Nada, there were no

5   donations discussed at lunch, correct?

6   A.   No.

7   Q.   And at that lunch, P.G. said he could shepherd the votes,

8   right?

9   A.   I'd have to look at the transcript from the lunch.

10          MR. C. MATTHEW RITTGERS:  If you could, Scott.

11  Q.   This has been marked, sir, as USA 15C.  You can see it on

12  your screen, if you'd like.  And the reason we know this is at

13  lunch is because Mr. Ndukwe is there, and it's on page 9,

14  right?

15  A.   Where are we looking?

16  Q.   Here, I'll highlight it.  At the bottom, "You know I can

17  certainly shepherd the votes too," right?

18  A.   Right.

19  Q.   So that was at lunch?

20  A.   That was -- if you scroll to the top so I can see.  I

21  can't see what --

22  Q.   Sure.  I'll help you.  Mr. Ndukwe didn't go to 580?

23  A.   No.  Correct.  I'm just --

24  Q.   You want to know the date?

25  A.   Yes, from the transcript, correct.  Now I can see the

*MILLER - CROSS*

1    top, yeah, the date.  Yes, sir.  Correct.

2    Q.  So at lunch, P.G. vetted the project?

3    A.  I don't know what you mean by he vetted the project.

4    Q.  He asked if there was going to be a hotel that goes on

5    that parcel?

6    A.  Right.

7    Q.  And a hotel was a big deal for the City of Cincinnati

8    because the Convention Center needed hotel space around it,

9    correct?

10   A.  That's what he said, yes.

11   Q.  And Mr. Ndukwe said it too.  He said it would be huge for

12   the convention, right?

13   A.  Correct.

14   Q.  And I think you might have agreed at one point, even

15   finishing P.G.'s sentence or Mr. Ndukwe's sentence using the

16   term "Convention Center," correct?

17   A.  Correct.

18   Q.  And so he also asked about how much money you guys

19   thought you would put in to this problem property, which I

20   believe the response was $75 million?

21   A.  I don't recall exactly what the number was.

22   Q.  If you look on your screen, this is the same transcript,

23   page 8.  This is Mr. Ndukwe talking about how much money would

24   be in the deal, $75 million, right?

25   A.  That's what Mr. Ndukwe says will be required to develop

1    the whole project.

2    Q.  Sure.

3    A.  We don't say $75 million, but that's what he's saying for

4    the total development cost.

5    Q.  Sure.  And you guys were his backing.  That was your

6    persona --

7    A.  Correct.

8    Q.  -- for this deal.

9         But before that could happen, Mr. Ndukwe and, in turn,

10   you and Brian, had to do due diligence, so architects, zoning,

11   and Mr. Ndukwe talked about how just the due diligence would

12   be $1.8 million?

13   A.  I don't know the number you showed me on the transcript.

14   I can't confirm that, so...

15   Q.  Okay.  Do you see that at the bottom, page 6?

16   A.  Correct.  Yep.  I do.

17   Q.  So you and Mr. Ndukwe are telling P.G., hey, part of your

18   persona is, I believe, you cut your teeth in real estate

19   development deals out of Georgia, right?

20   A.  Correct.

21   Q.  And you've been doing real estate development deals for a

22   long time?

23   A.  Yes.

24   Q.  And you could invest your money anywhere you wanted in

25   any city around the country?

*MILLER - CROSS*

1   A.  Yes.

2   Q.  But you were considering Cincinnati?

3   A.  Correct.

4   Q.  And you were aware, at the time that you were considering

5   Cincinnati -- and this is an actual question.  Were you aware

6   the drain that this building had on the city?

7   A.  No.

8   Q.  You did not know that?

9   A.  No.

10   Q.  As you sit here today, did you know that that building

11   cost our city, actual dollars, $400,000 a year in actual

12   dollars?

13   A.  I have no idea.

14   Q.  You did agree that you talked about the Convention Center

15   to P.G.  Did you know the importance that it was strategically

16   for broader tourism in the area?

17   A.  Can you rephrase the question?  Are you asking me what he

18   told me, or what my understanding was?

19   Q.  Yeah.  Did you understand that that building, because of

20   the proximity to the Convention Center, that that building

21   impacted broader tourism in the entire region here?

22   A.  That topic came up every time we talked about the project

23   with every individual, so...

24   Q.  Were you aware that this had been a problem since

25   2000- -- for a decade?

1    A.  No.

2    Q.  Were you aware that in Cincinnati, the only interested

3    developer in 2018 was Mr. Ndukwe?

4    A.  No.

5    Q.  Were you aware that this building, 435 Elm, was embroiled

6    in litigation?

7    A.  I was aware that there was litigation.  My understanding

8    was that the current occupant was also trying to work through

9    developing it, meaning that Mr. Ndukwe would not have been the

10   only person.

11   Q.  And when Mr. Ndukwe purchased the air rights from

12   U.S. Bank in 2017, that meant the deal had to go through him,

13   right, he had the air rights?

14   A.  He had the air rights, but that did not guarantee a deal

15   had to go through him, was my understanding.

16   Q.  Someone would either have to pay him his air rights, or

17   they'd have to partner with him to do a deal.  There are two

18   choices, right?

19   A.  I don't know the -- I don't know the legal contract of

20   what was on there, or how that would be transferred.  I have

21   no idea.

22   Q.  How aware were you about the negotiations that Mr. Ndukwe

23   was having with Ms. Brunner, the head of the port?

24   A.  From the case agent, we knew generally what Mr. Ndukwe

25   was asking for in his development agreement with the city and

1   then later with the port.

2   Q.   And you're aware that with the port, and this is on some

3   of the recordings, Ms. Brunner was asking Mr. Ndukwe to pay

4   the port $350,000 a year in ground lease?

5   A.   Later.  So now we're in --

6   Q.   Yeah.

7   A.   -- September, October of -- no, actually, that would have

8   been summer of 2019, that time frame.

9   Q.   Or fall?

10  A.   When it was transferred to the port?

11  Q.   Correct.

12  A.   Yes.  I knew that the original development agreement that

13  Mr. Ndukwe was looking for was a one dollar a year lease, and

14  that number had significantly changed.  I don't remember the

15  exact dollar figure.

16  Q.   And that was -- Mr. Ndukwe told you that was odd to him.

17  That was unusual that the port would be asking for $350,000 a

18  year, correct?

19  A.   I don't know that Mr. Ndukwe told me that.

20  Q.   Let's go back to 2018.  When you were -- after P.G. had

21  vetted the project at Nada, asked about a hotel, how many

22  doors the hotel would have, how many square feet of office,

23  how much money you'd have into the deal, which he did do,

24  correct?

25  A.   He asked how much it would cost to develop it, yes.

1    Q.   And all the other things I just said, the hotel, how many

2    doors?

3    A.   I'd have to review the entire transcript, but he did

4    ask -- we did discuss the project and what the plan was.

5    Q.   Okay.  He said in that meeting at Nada at lunch that he

6    could shepherd the votes, right?

7    A.   Yes.

8    Q.   And part of the reason for your being at that lunch was

9    to talk to someone who had a better insight than you did as to

10   whether or not council or the mayor would support a project at

11   435 Elm?

12   A.   Are you asking me what my purpose for being --

13   Q.   Your persona, yes.  Your persona.

14   A.   My persona's purpose was to get assurances that we could

15   get the votes to make that project go.

16   Q.   And then when you go across the street to 580 --

17   A.   Yes.

18   Q.   -- the prosecutor highlighted a part at the end where

19   you're talking about trying to get a deal.  Do you remember

20   that?

21   A.   No.  I'm not sure which part you're referencing.

22   Q.   All right.  I believe it's on the bottom of page 29.  Can

23   you see this on your screen, sir?

24   A.   Yes.

25   Q.   So I believe that this was highlighted on your direct,

1    "What's the best way, the best way for us to get that deal,

2    you know what I mean, like?"  That was you, correct?

3    A.   That's me.

4    Q.   And P.G. goes back to discussing the development deals,

5    which is what had been discussed for the past hour, including

6    at lunch.  He's saying, "Do you know John Cranley is going to

7    veto it?"  The development deal is what he's referring to,

8    right, on the veto?

9    A.   Yes.

10   Q.   And so you're talking about, in your head -- you didn't

11   say it, but in your head, I believe, correct me if I'm wrong,

12   you're wanting to talk about a quid pro quo, right?

13   A.   I mean, if you scroll up above that, I say that Chin told

14   me we need to get P.G. $20,000, and so yes, right after that

15   is when we're discussing that.

16   Q.   But you didn't say quid pro quo, did you?

17   A.   No.  I didn't say quid pro quo.

18   Q.   You say "that deal," and P.G.'s response is, "I'm just,

19   do you guys know that he's going to try and veto it?"

20        He's going back to the development deal that you said

21   John Cranley might try to veto, right?

22   A.   He asked that question, yes.

23   Q.   And he already told you at the lunch that John loves

24   development, and even though he might have some beef with

25   Mr. Ndukwe, he still thinks that John would support a good

1  deal?

2  A.  Are you referring to a specific part where he said that,

3  or my inference?  I don't know what you're asking.

4  Q.  I mean, I can go to each part of the transcript but,

5  repeatedly, P.G. tells you that John Cranley is going to

6  support a good deal, right?  He's not going to block a

7  project?

8  A.  He says -- I think he refers to something like John

9  Cranley likes guys like you, referring to myself and my

10  business partner, I would assume, and that he did not think

11  that he would -- I don't know that he used the word he won't

12  block the deal.

13  Q.  All right.  And so this is the quote you're referring to.

14  "John loves guys like you.  People who choose to invest here,

15  they believe in it, they're revitalizing," that's what he's

16  referring to, right, revitalizing our downtown urban core?

17  A.  Right.

18  Q.  And that's after P.G. had asked what it was Mr. Ndukwe

19  and you wanted from the city, right?

20  A.  Correct.

21  Q.  And you talked about a CRA, right?

22  A.  Yes.

23  Q.  Which is the Community Reinvestment Act?

24  A.  Yes.

25  Q.  And the CRA that was discussed in this meeting before

1    P.G. said, hey, my colleagues will support this, even John

2    Cranley who might not like Mr. Ndukwe would support this, he

3    said he knew that because the CRA was normal, nothing abnormal

4    was competitive, right?  That's what he was told?

5    A.   I don't understand what question you're asking me.

6    Q.   I'm asking you if you recall P.G. vetting, asking

7    questions about what it was that you all wanted from the city

8    for this development deal?  Do you remember this conversation?

9    A.   Yes.

10   Q.   And Mr. Ndukwe told P.G., in this meeting at lunch at

11   Nada, that it was going to be a solid CRA, nothing out of the

12   ordinary, just competitive, right?

13   A.   Correct.

14   Q.   So P.G. then talks to you and Mr. Ndukwe about the fact

15   that even though sometimes his colleagues, council, might talk

16   a little crazy about CRAs, that if the deal is what you guys

17   have it teed up to be, meaning what you told him, that it's

18   easy to support.

19       And that's when he said, "Yeah, and I can shepherd the

20   votes too," meaning they'll support it too, right?

21   A.   I can't agree with that.  Like, you're paraphrasing a lot

22   of statements together.  I don't know where he said that.

23   Q.   All right.  Fair to say we hear people all the time,

24   elected officials talking about getting votes, going across

25   the aisle, getting a vote from their left or right?  Fair to

*MILLER - CROSS*

1    say we hear that?  There's nothing wrong with saying "I can

2    get the votes," correct?

3    A.   There's nothing wrong with saying that you support a

4    project, or --

5    Q.   Yeah.  We have people in our state house and U.S.

6    Congress and Senate that we call majority and minority whips.

7    Whips literally count votes.  They're called whips, like

8    whipping the votes, they're logrolling.  We do that every day

9    in our American democracy, right?

10            MS. GLATFELTER:  Your Honor, I was going to object to

11   the question, because we were waiting for the question for a

12   long time.

13            THE COURT:  Right.  What's the objection?

14            MS. GLATFELTER:  Argumentative.

15            THE COURT:  I'll allow it.  If you know.

16   A.   You'd have to re- -- I don't know where we were with the

17   senate.

18   Q.   Saying that you -- having elected officials saying "I can

19   get the votes or shepherd the votes" is something that is a

20   common occurrence that you've heard just by flipping on the TV

21   or the radio, right?

22   A.   It's a very common occurrence.  It's not associated with

23   a payment.

24   Q.   In that condo at the 580 Building on November 7th, you

25   offer P.G. $10,000 in cash, correct?

1    A.   Correct.

2    Q.   He turned it down?

3    A.   He wanted it in a different format.

4    Q.   He didn't take the cash?

5    A.   He did not take the cash.

6    Q.   All right.  And then he called someone, a compliance

7    person, and asked them questions about how he could accurately

8    report cash, correct?

9    A.   I don't know who he called.  He called someone and asked

10    can I take cash, and had a conversation about the means of how

11    that $10,000 needed to be put into the account.

12    Q.   And you all left that meeting with the impression, and

13    correct me if I'm wrong, that it could be either in money

14    orders or cashier's checks, I forget what it was, but that

15    that might be something that was permissible by law, correct?

16    Like P.G. was saying, hey, that might be all right doing it a

17    different way?

18    A.   P.G. was not comfortable with the cash because he felt

19    that that would raise red flags and didn't look good.  And he

20    thought that a money order would be the same as a check during

21    that meeting on November 7th.

22    Q.   And then he realized later he was wrong, that a money

23    order is the equivalent of cash, and so he called you and

24    said, hey, I can't take a money order?

25    A.   Correct.  He said a money order would go into the

1    account, and it would look just like cash going into the

2    account.

3    Q.   And that's when you all discussed the LLC checks,

4    correct?

5    A.   Correct.

6    Q.   But the LLC checks were first brought up -- LLCs and this

7    November law change -- in the very first recorded call in this

8    case, which was October 26th of 2018, right?

9    A.   I'm not sure.  I'd have to review the transcript on the

10   dates and what was brought up on that call.

11   Q.   Do you agree with me that the first recorded call on this

12   case was on October 26th of 2018?

13          MS. GLATFELTER:  Your Honor, I would just like him to

14   lay the foundation that this witness knows that call and has

15   seen that call and knows what this is about.

16          MR. C. MATTHEW RITTGERS:  That's where I'm going.

17          THE COURT:  I think we're on the same page.  All

18   right.

19   Q.   Sir, are you aware that the first recorded call in this

20   case and to Mr. Sittenfeld was on October 26, 2018?

21   A.   The first -- am I a part of this call?

22   Q.   It's between Mr. Ndukwe and P.G.

23   A.   Oh, I have no idea when that phone call happened, or the

24   details of it in -- where I could speak to it.

25   Q.   So you have no idea -- you did not know, as you sit here

*MILLER - CROSS*

1    today, that the LLC and the November law change was first

2    brought up by Mr. Ndukwe on that call?  You didn't know that?

3    A.   I don't know the details exactly when that was brought up

4    or who initiated it.

5    Q.   All right.  And so we're now in, I believe, late November

6    when you all discuss -- you tell P.G. that you're writing him

7    checks that are actually from an LLC, but it happens to be

8    from a corporation, correct?

9    A.   In late November, I give him two checks that, at the

10   time, I thought they were from LLCs, and then he checked, and

11   they were actually from corporations.

12   Q.   He had -- as a matter of routine, as part of his campaign

13   compliance, he had a law firm, an accountant, and other

14   compliance people that routinely go through these things, and

15   that's when he called you and said, hey, we checked, meaning

16   his team --

17            MS. GLATFELTER:  Objection, Your Honor.  Facts not in

18   evidence.

19            THE COURT:  Agreed.  Sustained.

20   Q.   Mr. Sittenfeld called you and said, hey, these aren't LLC

21   checks, right?

22   A.   Yes.

23   Q.   And he offered to vet them for you, the new checks that

24   you were going to donate to him.  He said, hey, if you want,

25   we can do that?

*MILLER - CROSS*

1    A.  He did.

2    Q.  And you told him that they were coming from your business

3    partners, correct?

4    A.  Correct.

5    Q.  The checks -- you talked to business partners because

6    business partners, what you're referring to are small

7    businesses which are often incorporated as LLCs, right?

8    That's your persona, that you have business partners in these

9    LLC corporations?

10   A.  I don't really understand the question.

11   Q.  Sorry.  You told P.G. that the new checks -- that you

12   talked to your business partners and would get them LLC

13   checks.  You apologized, correct, for the corporate mistake?

14   A.  Correct.

15   Q.  And you referenced your business partners to P.G. as

16   writing new checks for him?

17   A.  I told him that it was the same $10,000 that I would send

18   to one of my business partners and had him write a check out

19   of his -- one of his LLCs, I think, is the way it was relayed.

20   Q.  You had a phone call with Mr. Sittenfeld on November 26th

21   of 2018, correct?  Do you see that on the screen?

22   A.  Yes.  I see it.

23   Q.  That's USA 19B.  And you said to P.G., this is you:  "So

24   I've got one of our other business partners going to write

25   them out of his, we just sent him the (inaudible)," right?

*MILLER - CROSS*

1    A.   Correct.

2    Q.   And same thing, you're talking here about these LLC

3    checks in this meeting.  "Yeah, one of my, one of our other

4    business partners is going to write them out of his LLC versus

5    one of mine or Brian's companies," right?

6    A.   Correct.

7    Q.   And you know what bundling is in fundraising?

8    A.   Yes.

9    Q.   That a person can go to their universe or network of

10   friends and fundraise for a candidate by collecting checks and

11   handing them to a candidate, correct?

12   A.   Sure.

13   Q.   And they don't have to personally donate, the person who

14   is doing the fundraising or bundling?

15   A.   The person that is doing the bundling does not have to --

16   I don't know campaign finance law enough to make a comment on

17   that.

18   Q.   Okay.  All right.

19        THE COURT:  Mr. Rittgers, do you have a sense of is

20   it going to be a while yet, or --

21        MR. C. MATTHEW RITTGERS:  Your Honor, I think I'll be

22   ten minutes.

23        THE COURT:  Is that going to create a problem for any

24   member of the jury?  All right.  You may continue.

25        MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

1  Q.  In the 18 months of your investigation, you or Brian had

2  offered P.G. numerous invites to travel outside of Ohio,

3  correct?

4  A.  Correct.

5  Q.  And that was Miami, Las Vegas, Nashville, to name a few?

6  A.  Correct.

7  Q.  But he never traveled outside of Ohio?

8  A.  He did not.  Well, he never traveled outside of Ohio with

9  us.

10  Q.  Sure.  During that investigation, you all would meet with

11  P.G. in public establishments in the city, correct?

12  A.  Correct.

13  Q.  And he would introduce you to civic leaders, correct?

14  A.  I'm trying to think of -- he introduced us -- anyone we

15  ran into that he knew, he would introduce us to.

16  Q.  And he was not bashful about saying you guys were in town

17  as investors, real estate investors, in 435 Elm, right?

18  A.  Correct.

19  Q.  Do you remember being introduced to the CEO of the Duke

20  Convention Bureau?

21  A.  No.

22  Q.  Do you remember being introduced to Steve Leeper, the

23  head of 3CDC?

24  A.  He introduced us to a couple developers, but I don't

25  remember exactly which ones they were.  That was four years

1    ago, three and a half years ago, so...

2    Q.   And when you all were out at bars and restaurants, P.G.

3    often offered to pay, and at times he actually did pay,

4    correct?

5    A.   There were occasions that he offered to pay for drinks

6    and did.  I could think of one or two times, at least, that he

7    paid for drinks.

8    Q.   He offered Brian and you to stay at his house?

9    A.   He did.

10   Q.   And he even invited you over one time with several other

11   guests, including the U.S. Attorney for the Southern District

12   of Ohio, correct?

13   A.   He did.

14   Q.   In 2019, there was a text, I believe it was to you, where

15   P.G. had invited you to a fundraiser, it might have even been

16   at Via Vite, and he said:  "Don't worry about donating.  You

17   guys have been generous enough."  Do you remember that?

18   A.   I do.

19   Q.   And during the entirety of 2019, he never asked for a

20   single donation, correct?

21   A.   He never asked me for a donation in 2019, no.

22   Q.   In that Columbus meeting on September 24th of 2019, P.G.

23   was already up there, correct?

24   A.   He was.

25   Q.   And his chief of staff, Chris Dalton, was in the meeting

1    the entire time, right?

2    A.    I think he walked out of the room for a minute to go next

3    door and get a Coke, or something to that effect, but

4    basically he was there 90 percent of the meeting.

5    Q.    And the beginning of that meeting, Vinny is not present,

6    right?

7    A.    No, he is not.

8    Q.    And that's -- at the beginning of the meeting is when you

9    brought up the sports betting, sports book?

10    A.    I'd have to look at -- I can't remember the exact order

11    of who brought it up, but...

12    Q.    We don't have a transcript of that part, so we'll have to

13    go from memory.

14        Do you remember when you said that because of the mess

15    that things had become, and you're talking about the sexual

16    assault allegations against Mr. Ndukwe, that you might -- and

17    I'll use the actual language, "Cut your fucking losses."  Do

18    you remember that?

19    A.    I don't remember.

20    Q.    Essentially, what you were telling P.G. is that you're

21    not sure if Vinny would want to stay in Cincinnati because the

22    thing has gotten kind of messy, right?

23    A.    Correct.

24    Q.    And then a hypothetical conversation occurred when Vinny

25    entered the room, hypothetical being that they're zoning

1    around gambling, right, because gambling is not legal in Ohio?

2    A.   Correct.

3    Q.   You mentioned on direct the consensual sexual affair at

4    the taxpayer funded penthouse, right, with a woman?

5    A.   Yes.

6    Q.   And during that relationship, you used your identity as

7    an out-of-town wealthy real estate investor, that's what she

8    believed you were, correct?

9    A.   I kept the same persona with every person I met.

10   Q.   And that was a violation of your oath of office to the

11   FBI?

12   A.   No.

13          MR. C. MATTHEW RITTGERS:  May I have one moment, Your

14   Honor?

15          THE COURT:  You may.

16   Q.   You did not tell her your real identity, correct?

17   A.   Correct.

18   Q.   And so it was a lie to her, the person that you presented

19   yourself to be throughout that relationship?

20   A.   I never told anyone I ever met in Cincinnati anything --

21   my name was anything other than Rob Miller.

22   Q.   And your persona stayed the same, being an out-of-town

23   wealthy real estate investor, including in that relationship

24   that we just discussed?

25   A.   Correct.

 1          MR. C. MATTHEW RITTGERS:  No further questions.

 2          THE COURT:  Thank you.  Any redirect?

 3          MS. GLATFELTER:  I do, Your Honor.

 4          THE COURT:  How long?

 5          MS. GLATFELTER:  A couple of minutes.

 6          THE COURT:  Oh, okay.  That still falls within the

 7  10 minutes that Mr. Rittgers mentioned.

 8          MS. GLATFELTER:  Yes.  I certainly don't want to keep

 9  the jury here any longer.

10                     REDIRECT EXAMINATION

11  BY MS. GLATFELTER:

12  Q.  Mr. Miller, you were asked some questions about the

13  November 7th meeting, right --

14  A.  Yes.

15  Q.  -- do you remember those questions on cross-examination.

16          Mr. Sittenfeld, did he come prepared to the meeting?

17  A.  On November 7th?

18  Q.  Yes.

19  A.  Yes, he did.

20  Q.  And that was the meeting at Nada, right?

21  A.  Correct.

22  Q.  Did he bring anything with him?

23  A.  He brought his laptop, which he showed me slides for what

24  he showed where he thought he stood in the future mayor race

25  for the City of Cincinnati.

1    Q.   So the slides were not about what a great city Cincinnati

2    is, it was about investing in the defendant?

3    A.   Correct.

4    Q.   Did the defendant ever give you the checks back, say

5    nope, you know what, I don't need the money, just let's forget

6    it?

7    A.   No.

8    Q.   Did he accept it?

9    A.   Yes.

10   Q.   How much money total?

11   A.   Over the total course, it was $40,000.

12   Q.   During the November 7th meeting, did you talk about

13   435 Elm --

14   A.   Yes, we did.

15   Q.   -- at the condo.  I'm sorry.  Did you talk about 435 Elm

16   at the condo?

17   A.   Yes, I did.

18   Q.   Did you talk about $20,000 at the condo?

19   A.   Yes.

20   Q.   Estimate how far apart those conversations were or,

21   actually, were they in the same conversation?

22   A.   Same conversation and several minutes apart.

23            MS. GLATFELTER:  One moment, Your Honor.

24        No further questions.  Thank you.

25            THE COURT:  Thank you, Ms. Glatfelter.

1          Mr. Rittgers?

2                    RECROSS-EXAMINATION

3     BY MR. C. MATTHEW RITTGERS:

4     Q.   Rob, there's nothing out of the ordinary or illegal with

5     a candidate proclaiming that he thinks he's going to win the

6     election, correct?

7     A.   No.

8     Q.   And talking about Cincinnati being a great city, P.G.

9     actually tried to get you, I think, married off to keep you

10    here in Cincinnati, didn't he?  Do you remember those

11    comments?

12    A.   He, I think, at one point did offer to maybe look for a

13    wife for me, or something to that effect.

14    Q.   He wanted you guys to be here in the city, right?

15    A.   He at least presented that, it seemed that way.

16    Q.   And he routinely talked about things that were in the

17    best interest of the city?

18    A.   He did routinely talk about the best things about

19    Cincinnati, yes.

20    Q.   In particular, even 435 Elm, talking about how strategic

21    and important this was for the city to get this accomplished,

22    correct?

23    A.   He did talk about the importance of that project.

24              MR. C. MATTHEW RITTGERS:  May I have one moment?

25              THE COURT:  You may.

*MILLER – RECROSS*

1    Q.   The donations that you gave to P.G., they were donations

2    that you gratuitously offered to him and gave to him, correct?

3    A.   I was told, through the conversation that he had with

4    Mr. Ndukwe, that he had asked for money, and this was the

5    follow-up for that.  And I reference that Chin had told me

6    that he wanted $20,000.

7    Q.   But you were not aware about Mr. Ndukwe offering to be on

8    the host level of fundraising efforts for P.G.?

9    A.   I was not.

10   Q.   It's not odd, is it, that an elected official or

11   candidate for office, when they get a donation, to accept and

12   publicly report that donation on the FEC website?

13            MS. GLATFELTER:  I'm going to object, Your Honor.

14   This is outside the scope of redirect.

15            MR. C. MATTHEW RITTGERS:  No further questions, Your

16   Honor.

17            THE COURT:  Very good.  All right.  Sir, you may step

18   down.  Thank you for appearing this afternoon.

19            THE WITNESS:  Thank you, sir.

20       (Witness excused.)

21       (Excerpt of proceedings concluded at 5:13 p.m.)

22                      *   *   *

23

24

25

1                C E R T I F I C A T E

2                    - - -

3      I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
is a correct transcript from the record of proceedings in the

4  above-entitled matter.

5

6  /s/ M. Sue Lopreato_____            August 11, 2022
   M. SUE LOPREATO, RMR, CRR

7  Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2    GOVERNMENT WITNESS

 3    ROB MILLER

 4    Direct by Ms. Glatfelter........................... Page 2
      Cross by Mr. C. Matthew Rittgers................... Page 41
 5    Redirect by Ms. Glatfelter........................ Page 63
      Recross by Mr. C. Matthew Rittgers................. Page 65
 6

 7
                           EXHIBITS
 8

 9    GOVERNMENT EXHIBITS

10
      Exhibit                                    Admitted
11

12
      DEFENSE EXHIBITS
13
      Exhibit                                    Admitted
14

15
                           -  -  -
16

17

18

19

20

21

22

23

24

25
```