```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION
                            *   *   *
 3

 4   UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
 5            Plaintiff,            : Jury Trial, Day 10
                                    : Tuesday, July 5, 2022
 6            - v -                 :
                                    : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"          :
 8                                  :
              Defendant.            : Cincinnati, Ohio
 9
                            *   *   *
10   EXCERPTED PROCEEDINGS - TESTIMONY OF ALEXANDER P.G. SITTENFELD

11      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                          *   *   *

13   For the Plaintiff:         EMILY N. GLATFELTER, ESQ.
                                MATTHEW C. SINGER, ESQ.
14                              MEGAN GAFFNEY PAINTER, ESQ.
                                U.S. Department of Justice
15                              U.S. Attorney's Office
                                221 E. Fourth Street, Suite 400
16                              Cincinnati, Ohio  45202

17   For the Defendant:         CHARLES M. RITTGERS, ESQ.
                                CHARLES H. RITTGERS, ESQ.
18                              NEAL D. SCHUETT, ESQ.
                                Rittgers & Rittgers
19                              12 E. Warren Street
                                Lebanon, Ohio  45036
20
     Law Clerk:                 Jacob T. Denz, Esq.
21
     Courtroom Deputy:          Scott M. Lang
22
     Court Reporter:            M. Sue Lopreato, RMR, CRR
23                              513.564.7679

24                          *   *   *

25
```

```
 1                      P R O C E E D I N G S

 2                   (In open court at 1:02 p.m.)

 3                           *   *   *

 4           THE COURT:  Mr. Rittgers does the defense intend to

 5    call another witness?

 6           MR. C. MATTHEW RITTGERS:  P.G. Sittenfeld, Your

 7    Honor.

 8        (Defense witness, ALEXANDER P.G. SITTENFELD, sworn.)

 9           THE COURT:  You may begin, Mr. Rittgers.

10                       DIRECT EXAMINATION

11    BY MR. C. MATTHEW RITTGERS:

12    Q.   Could you please state your name for the record.

13    A.   My full name is Alexander Paul George Sittenfeld.  The

14    middle names are after my father, and I've gone by P.G. for my

15    entire life.

16    Q.   Where did you grow up?

17    A.   I grew up here in Cincinnati.

18    Q.   So that we can have a little bit of background, what did

19    your folks do for a living?

20    A.   My father first came to Cincinnati -- our family first

21    ended up in Cincinnati for my father to work at Procter &

22    Gamble.

23        He then later went on to work for the organization that's

24    now known as ArtsWave, and then became a financial advisor for

25    the remaining part of his career.
```

1      My mother was a career school teacher, a librarian, and

2   she also taught APR history.

3   Q.   When did you first get interested in politics?

4   A.   Probably different ways at different stages.  My parents

5   were very civically involved.

6      A lot of their discretionary time went towards

7   volunteering for things like educational causes and arts

8   organizations, and our family dinner table, when we were being

9   nice to each other, we would talk about civic affairs and what

10  was going on in the world.  So I think, sort of, a loose

11  foundation was established at that time.

12     As I got into high school and college, and just was

13  trying to pay attention to the world around me, got

14  increasingly interested, and then ultimately decided to run

15  for office.

16  Q.   Where did you go to high school and college?

17  A.   I went to Seven Hills High School for high school, the

18  school where my mother was a teacher, and I had her as my

19  teacher, and then I went to Princeton University for college.

20  Q.   When did you come back to Cincinnati?

21  A.   I came back to Cincinnati after graduate school, in -- it

22  was either July or August of 2009.

23  Q.   Can you tell us about your immediate family?

24  A.   My chosen family?

25  Q.   Yes.

SITTENFELD - DIRECT

1    A.   My wife Sarah, she and I have been married for a little

2    over six years and have been together for about a decade.  We

3    have a three-year-old son named George.  Mr. Seelbach

4    mentioned we have a dog named Oakley, who is very much a part

5    of the family, and we'll be welcoming our second child in

6    about two months.

7    Q.   What does Sarah do?

8    A.   Sarah is an oncologist.  Specifically, she's a radiation

9    oncologist, so she works for the University of Cincinnati's

10   Cancer Center.  She also teaches in the med school, or she's

11   faculty at the medical school for the University of

12   Cincinnati.  She is kind of above my pay grade, but she is --

13   she is cross-credentialed with Cincinnati Children's Hospital

14   Proton Center.

15   Q.   Was there a reason, back in 2018 and 2019, that you would

16   have had more time on weekday nights?

17   A.   Sure.  I'll try and, Your Honor, keep this relatively

18   brief.

19        When my wife was finishing medical school at the

20   University of Cincinnati, she wanted to train someplace that

21   she thought was world class, and near the top of her list was

22   the Cleveland Clinic.

23        My life, because of public service, was obviously very

24   much geographically rooted and anchored here in Cincinnati.  I

25   also wanted to support my wife in pursuing her professional

```
 1    dreams and aspirations.

 2         So she ranked the Cleveland Clinic at the top of her

 3    match list.  When you go to match for residency, you don't

 4    have control over where you're necessarily going to end up.

 5    She ended up matching at the Cleveland Clinic.

 6         We were already married by that point, so we said we

 7    will, for several years here, have a dual-city marriage, where

 8    we're both immersed in our professional obligations during the

 9    week, and then one of us is getting in the car and driving

10    four hours up or down I-71 to be with each other every single

11    weekend.

12         I think, in four years, we maybe missed two, maybe three

13    weekends together because of things like, you know, blizzardy

14    snow so... sorry.  To answer your actual question, because

15    Sarah was working in Cleveland during the week, yeah, I would

16    have had -- sort of evenings would have been more open.  If

17    we're in the same place, we have family dinner every single

18    night.

19    Q.   Where do you live now?

20    A.   We live here in Cincinnati.

21    Q.   And is it a home that you've known?

22    A.   Yeah.  We bought my childhood home, so that's where we

23    live.

24    Q.   When you got back to Cincinnati, what year was that, '09,

25    is that what you said?
```

*SITTENFELD - DIRECT*

1    A.   Yeah, the summer of 2009.

2    Q.   What did you do when you came back to Cincinnati in 2009?

3    A.   There was a woman who had been a magistrate in juvenile

4    court, and through that, she had worked a lot with kids and

5    students and young people.

6         By that point, she was working as a consultant for

7    Cincinnati Public Schools, and with her in the lead and me as

8    her deputy, we cofounded an education not-for-profit

9    organization focused on bringing additional partnerships into

10   some Cincinnati schools.

11   Q.   When did you first run for office?

12   A.   I first ran for office in the 2011 city election, and I

13   believe I would have announced that campaign, announced my

14   candidacy late in 2010.

15   Q.   How many times, ultimately, did you run?

16   A.   For city council?

17   Q.   Yes.

18   A.   I ran for city council three different times.

19   Q.   What is your least favorite part of campaigning?

20   A.   I mean, probably fundraising.  I think it's a tie

21   between -- and, again, I love public service and getting to,

22   you know, be there for people, but it is also an

23   around-the-clock endeavor.

24        You know, if I'm going to the grocery store to get paper

25   towels, most of the time you can count on a constituent being

1    there to totally, rightly and understandably, talk to you

2    about a pothole or an issue in their neighborhood.

3         So the days are long, and it squeezes your time with

4    family a little bit more than one might like, so that was not

5    my favorite part.

6         And then, as we heard a little bit ago, the fundraising

7    demands are significant.  Nobody runs for office because they

8    say I just love raising money so much.  You run because, you

9    know, you think you can help do something good for your

10   community.

11   Q.   Who, if you recall, helped you set up and register the

12   Progress and Growth PAC that we've heard about?

13   A.   Three people.  From my recollection, three people were

14   involved kind of from the beginning with that.

15        One was a lawyer named Micah Kamrass, another was his

16   brother, Jared Kamrass, and then another attorney named Paul

17   De Marco, so two lawyers and one campaign compliance expert.

18   Q.   What procedures did you have in place that were related

19   to compliance for that PAC?

20   A.   Well, both for the PAC and, I think, for all my campaign

21   accounts too, there would almost always be some blend or some

22   combination of a professional fundraising expert/compliance

23   expert, and then also an attorney, a lawyer at a reputable law

24   firm, in this case, Manley Burke.

25        And, you know, at one point, I had a professional CPA, so

1    I always tried to have, sort of, multiple balanced experts who

2    could make sure we were doing everything correctly.

3    Q.   Who was your professional CPA?

4    A.   A woman named Claire Fisher McKenna.

5    Q.   Who did she take over for?

6    A.   She took over for Mr. Kamrass.  I call him Jared.

7    Q.   Can you tell us why you fired him?

8    A.   In the fall of 2019, it came to my attention that he had

9    fabricated an email in this case.  It was an email that he had

10   sent to the individual we've known as Rob.

11       I found out that he had fabri- -- sort of concocted the

12   whole email, and it was a fake.  Talked to him about it.  He

13   acknowledged that's what happened, and I fired him for

14   dishonesty.

15   Q.   We heard a quote about the PAC, something to the effect

16   of the PAC benefits you.  Can you tell us how the PAC benefits

17   you?

18   A.   I think maybe around 110 people total, give or take a

19   few, made contributions to that PAC.  And anybody who would

20   make a contribution, from my vantage point, was helping the

21   PAC to do what it was set up to do.

22       And, again, the lion's share of what it was set up to do

23   was to make contributions to other candidates who I agreed

24   with and believed in, and also causes, charities,

25   not-for-profits that I believed in their mission.

SITTENFELD - DIRECT

1    Q.   Can you give us some examples of ways you could use it,

2    if you wanted to, for eat or travel?  What was that

3    requirement if you wanted to eat or travel?

4    A.   So I'll start by saying what the PAC couldn't do.  The

5    PAC could not directly support your own election hearing for a

6    particular office.  So if somebody wanted to run for mayor or

7    city council, that PAC could in no way, by yard signs or

8    advertisements or T-shirts or whatever that say, you know,

9    P.G. for city council or, you know, whoever for mayor.  What

10   it can do is support other candidates and causes.

11        And then you asked, I know, about travel and meals.  So

12   if I was going to Washington -- I'm trying to do two examples

13   that come to mind.

14        If I was flying to Washington, D.C. to speak at a

15   conference of other elected officials on sustainable energy,

16   the PAC could buy my plane ticket there.  If I then went out

17   for lunch with other elected officials, the PAC could pay for

18   that.

19        I recall also, I think there was an entrepreneurship

20   conference hosted by the Kauffman Foundation in Kansas City.

21   So that was another -- I mean, I don't recall very often it --

22   purchasing plane tickets.  I mean, those were the minority of

23   the overall expenses.

24   Q.   Back in 2018 and 2019, when your wife was in Cleveland,

25   how many meetings do you think you would hold on any given day

*SITTENFELD - DIRECT*

1    with a potential donor or constituent or other civic leader?

2    A.    It would definitely depend on the day.  But I like to

3    keep very busy, so both of my own volition, it's also what I

4    directed my staff to do.  I mean, I didn't like to have, sort

5    of, idle or empty days, so it would vary from day to day.

6         But for me to have a day where my first breakfast meeting

7    was at 7:30 a.m. with somebody, and my last event activity of

8    the day was having a beer with someone at -- again, this is

9    when my wife was not here, to be clear, was, you know, at

10   8:00 p.m.

11        And there might literally be, between meetings at City

12   Hall and meetings in the community outside of City Hall, a

13   dozen different meetings with one or multiple different people

14   at each one of those meetings, in as many different locations.

15        So -- and that wasn't every single day, but that was also

16   a pretty -- that was fairly typical, where there might be

17   eight, ten, twelve meetings in a single day.

18   Q.    What is a campaign house party?

19   A.    A campaign house party -- I know a lot of this might

20   sound weird to people who aren't as political, but this is

21   sort of, you know, so routine for people who are in politics.

22        A campaign house party is where somebody -- so this could

23   be a person who you go to church with.  It could be someone

24   who -- it could be an old family friend, it could be a

25   business colleague, says you're running for this office, and I

1    want to help you be successful.

2        So what I'm going to do is I'm going to -- I, the person

3    hosting a house party for you, is going to invite everyone in

4    my network.  I'm going to invite the people who go to my

5    church or synagogue.  I'm going to invite the people that I

6    work with.  I'm going to invite my neighbors.

7        All of those -- well, not all of those people, some of

8    those people then come to attend.  They usually -- you know,

9    you'll be sitting around someone's living room.  People that

10   don't want to stand will sit on the couches.  Other people

11   stand and lean against the walls.  There could be six people

12   in the living room, there could be 80 people packed into the

13   living room.

14       And you as the candidate will get up there -- and first,

15   the host might introduce and say some nice things about you,

16   why they decided to host a house party on your behalf.

17       You'll then get up and share here's my vision, here are

18   my policy views.  Here are the specific things that I'd like

19   to do if I'm fortunate enough to get elected to this office or

20   to stay in this office.

21       There's then a Q and A, where individual people who have

22   come there will raise their hand and say, you know, P.G., I

23   wanted to ask you about, you know, development, crime and

24   safety, neighborhood issues, maybe even an issue that a body

25   like city council doesn't directly address.  You then answer

*SITTENFELD - DIRECT*

1    their question to the best of your ability.

2        And then at the end of all of that because, hopefully,

3    you're getting -- you're trying to earn new supporters and

4    create new supporters, people who agree with the things you

5    said and liked you, will then write a campaign contribution in

6    support of your candidacy, and people who didn't like you will

7    quietly slip out the door, I guess.

8    Q.  Since the charges in this case, what jobs have you had?

9    A.  I have done a few assignments, several different

10   assignments as an independent contractor.  I've also pursued

11   several full-time positions that were very close to happening

12   but, ultimately, didn't, and the reason given was the pending

13   charges.

14   Q.  When did you first meet Mr. Ndukwe?

15   A.  I think I would have remembered this anyway but,

16   obviously, sitting here, like everybody else for the last two

17   weeks, has refreshed a lot too.

18       We were put in touch by a woman who I had known from

19   growing up.  She did an email introduction saying, hey, I

20   think you're both trying to do good things for the city.  You

21   should get to know each other.

22       She sent that email in the fa- -- I believe it was the

23   fall of 2010.  And then I do remember we met at that

24   Bruegger's Bagel in Clifton, I'm pretty sure it's still there,

25   in 2010 for the first time.

*SITTENFELD - DIRECT*

1   Q.   How would you describe your relationship over the past

2   10 years, 12 years?

3   A.   I regarded Chinedum as a friend.  You know, we were both

4   plenty busy, so we weren't see- -- it's not like with a

5   neighbor where, you know, you're waving over the fence to each

6   other.

7        But he would invite me to -- this is after he retired,

8   hey, do you want to go and watch the Bengals scrimmage

9   tonight?  Another time we did go catch a boxing match.  We

10  would get one-on-one meals that included breakfast, lunch,

11  dinner, drinks.

12       He did once ask me, hey, do you want to go and catch a

13  Cleveland Cavalier's basketball game together?  So he had said

14  you want to travel together to go do something social.  I

15  couldn't do it for scheduling reasons.

16       And then, as you've seen, as people have seen, we sent

17  each other pictures of our newborn sons, so a little bit

18  strange and difficult to hear some of what was said, but I

19  regarded him as a friend of mine.

20  Q.   How frequently did he donate or fundraise for your

21  campaigns?

22  A.   Chinedum donated -- so I first ran for office in 2011.

23  And I guess -- it was a new relationship at the time, but

24  after that, Chinedum donated, I believe, every single other

25  time I ran for office.

*SITTENFELD - DIRECT*

1      And it was -- I think sometimes it was at my request, and

2    other times it was him proactively saying P.G., I believe in

3    you. I want to be there for you. How can I help? So him

4    proactively donating, and he was always an incredibly generous

5    donor.

6    Q. Do you recall a time when he put in writing proactively

7    his request to donate on a host level?

8    A. I think there were multiple times. I can't remember. In

9    2017, I had -- I might have invited him to an event. I can't

10   remember if I asked him to be a host or not, but he wrote back

11   saying put me down as a host. And something I hadn't asked

12   him for, he said, by the way, my dad -- I think he said list

13   my dad as a host too.

14     And then in 2018, un-requested, unsolicited from me, he

15   texted me and said, hey, let me know -- I'm paraphrasing, so

16   if you want to refresh.

17          MR. C. MATTHEW RITTGERS: May I approach with a text?

18          THE COURT: You may.

19          MR. C. MATTHEW RITTGERS: It's been marked as

20   Defendant's Exhibit D54.

21   A. Do you want me to read this, or...

22   Q. Do you recognize that?

23   A. I do.

24   Q. May I have it back?

25   A. Yes. So this is him proactively saying to me, I want to

1    be a host for your future fundraisers.

2    Q.   Is this Exhibit D54 an accurate depiction of the text

3    messages between Mr. Ndukwe and you back in late 2017, up

4    through early 2018?

5    A.   Yes.  That's text messages between the two of us.

6         MR. C. MATTHEW RITTGERS:  Your Honor, we move to

7    admit this exhibit and publish for the jury.

8         MR. SINGER:  No objection.

9         THE COURT:  54?

10        MR. C. MATTHEW RITTGERS:  D54, Your Honor.

11        THE COURT:  Exhibit D54 is admitted without objection

12   and may be published to the jury.

13        MR. C. MATTHEW RITTGERS:  Thank you.

14   Q.   Can you see that on your screen?

15   A.   That's on my screen, yes.

16   Q.   So on what date in 2018 did he ask to be on a host level

17   of your next fundraiser?

18   A.   January 10th of 2018.

19   Q.   Who is the blue bubble and who is the gray bubble?

20   A.   I am the blue, and Chinedum would be the gray bubble,

21   sort of left aligned.

22   Q.   Do you recall a time when Mr. Ndukwe had donated to you,

23   but you wanted to give some of the money back after the

24   donation?

25   A.   Yes.  Chinedum -- it might have been 2015, it might have

1    been 2016, I don't recall the exact year.  He gave -- he made

2    a donation of $5,000.  I then, after the primary campaign,

3    went to give him $2,300 back.

4    Q.   And are those captured in text messages as well?

5    A.   Those are in text messages as well, yeah.  I think I

6    followed up with him.  He didn't respond immediately about my

7    wanting to give him $2,300 back, so I think there are two

8    texts in a row where I say, hey, I still have this $2,300 I'd

9    love to give back to you.

10   Q.   You heard testimony where Mr. Ndukwe had indicated that

11   you knew that his analyst who supported you was donating

12   Mr. Ndukwe's money, and it wasn't the analyst's money.  Do you

13   remember that?

14   A.   I remember him saying that.  It's absolutely not what I

15   remember happening in reality.

16   Q.   Do you remember something expressly and explicitly stated

17   in a recorded call about that analyst's donation?

18   A.   Yeah.  I remember him saying something along the lines of

19   remember when my analyst --

20   Q.   As opposed to guessing --

21   A.   Sure.

22        MR. C. MATTHEW RITTGERS:  If I may, Your Honor, this

23   has been previously admitted as USA 13B.  If I may display

24   that for him to see?

25        THE COURT:  You may.

SITTENFELD - DIRECT

1    Q.   This is page 2 of USA 13B, which is a recorded phone call

2    between Mr. Ndukwe and you on October 30th of 2018.  I've

3    highlighted a statement that he made to you in this phone call

4    about that analyst.

5         Did you know you were being recorded on October 30th of

6    2018?

7    A.   I didn't know I was being recorded on October 30th, or

8    any other time I was being recorded.

9    Q.   In this phone call, is it pretty explicit as to who

10   actually supported you in relation to that analyst?

11   A.   Yeah.  I mean, again, I regarded Chinedum as an old

12   friend and somebody I absolutely trusted.  I could not have

13   imagined in any universe that I was being recorded.

14        So I would have assumed, if he was -- you know, I think

15   probably Mr. Holbrook said something along the lines of, you

16   know, working off his debt or his exposure for things he had

17   done to the FBI, that he would have said on that call, hey

18   P.G., remember when I gave an analyst money to then give to

19   you?  And my response would have been no, I don't, and if

20   that's what happened, you know, let's refund that money.  But

21   that's explicitly not what he said.  He said "my analyst that

22   supported you."

23   Q.   Do you know when you first met Laura Brunner?

24   A.   It's possible, it's actually likely that I would have met

25   Laura Brunner informally sort of years back.  But I think any

*SITTENFELD – DIRECT*

1    sort of formal establishment of a relationship would have most

2    likely happened around the time that I got to city council, so

3    I'm assuming about a decade ago.

4    Q.    What type of relationship did you have with Mrs. Brunner?

5    A.    I think mutually supportive, collaborative.  She struck

6    me as a hard worker.  I think she thought I was a hard worker.

7         I think we both wanted to help the city grow, develop,

8    create jobs, so it was a good one, and one where we both

9    engaged each other pretty frequently.

10   Q.    What type of communications did you have with her over

11   the course of the past decade?

12   A.    She would, on a regular basis, ask for my feedback.  She

13   would come to my City Hall office to brief me on things.  She

14   would sometimes pull me into things that didn't directly have

15   to do with the immediate work of city council.

16        So I do remember, because it was kind of one of the last

17   interactions we had before all this situation, this national

18   urban thought leader and sort of how to create great cities, a

19   guy named Bruce Katz came to town.

20        And she had a big formal -- she had a big, sort of,

21   gathering that a lot of different people came to.  And then

22   she wanted to have one small breakfast.  She asked me to be

23   the only elected official at that one small breakfast.  So

24   there was a lot of engagement between the two of us.

25   Q.    Do you recall a time when -- and she actually testified

*SITTENFELD – DIRECT*

1    to this, when you emailed on top of a prior email to her,

2    persisting in your communication about a project?

3    A.   I do.  I mean, I don't know if it's fair or not fair to

4    say, hey, I haven't heard from you in three days, but that was

5    my level of, sort of, impatience.

6        I was trying to initiate a move forward, this project to

7    house homeless veterans.  We were looking for different sites.

8    We already had a partner non-profit philanthropic funding had

9    merged from it, so I was eager to get going, and after not

10   hearing from her pretty quickly, I sent her follow-ups saying

11   just... yeah.

12           MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

13           THE COURT:  You may.

14           MR. C. MATTHEW RITTGERS:  It's been marked as

15   Defendant's Exhibit D716.  May I approach the bench?

16           THE COURT:  Thank you.

17   Q.   I've handed you what's been marked as Defendant's

18   Exhibit 716.  Is that a fair and accurate depiction of the

19   emails between Mrs. Brunner and you back in September of 2019?

20   A.   Yes.  This is an email from my email to Laura Brunner's

21   email.

22           MR. C. MATTHEW RITTGERS:  Your Honor, move to admit

23   this exhibit.

24           MR. SINGER:  No objection, Your Honor.

25           THE COURT:  D716 is admitted without objection.  You

*SITTENFELD - DIRECT*

1    may publish it to the jury, please.

2            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

3    Q.   So we can see on Defendant's Exhibit 716 that you had

4    emailed Mrs. Brunner on September 3rd about some sites.  And

5    what's that in relation to?

6    A.   These were sites for -- the name of the organization I

7    was partnering with is the Veterans Community Project, so it

8    was in regard to that.

9    Q.   And then how many days later, I believe you testified to

10   this, but looking at the email, did you follow up with her?

11   A.   The difference between September 3rd and September 6th,

12   so three days.

13   Q.   Did you also have text messages with Mrs. Brunner about

14   this project?

15   A.   I did.

16           MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

17           THE COURT:  You may.

18           MR. C. MATTHEW RITTGERS:  And hand him what is marked

19   as Defendant's Exhibit 654.

20   Q.   Is Defendant's Exhibit 654 a fair and accurate depiction

21   of text messages between Mrs. Brunner and you back in August

22   of 2019?

23   A.   It is.

24           MR. C. MATTHEW RITTGERS:  Your Honor, move to admit

25   this exhibit.

*SITTENFELD - DIRECT*

1          THE COURT:  And the number again was?

2          MR. C. MATTHEW RITTGERS:  654, Your Honor.

3          THE COURT:  Is there any objection to Defendant's

4    Exhibit 654?

5          MR. SINGER:  Do you have a copy?

6          MR. C. MATTHEW RITTGERS:  We gave it to you.  It's in

7    the binder.

8          MR. SINGER:  No objection, Your Honor.

9          THE COURT:  D654 is admitted without objection.

10          MR. C. MATTHEW RITTGERS:  Permission to publish, Your

11    Honor?

12          THE COURT:  You may.

13    Q.  Are there things echoed in this text similar to the email

14    that we just referenced?

15    A.  Yes.  Laura Brunner saying the, "Hi.  We have 8.3 --"

16    that would be acres -- "in Mt. Airy, and 2.5 acres in

17    Sedamsville" was in reference to the same veterans project.

18    Q.  Did you have any big donors in that non-profit that were

19    donating to you?

20    A.  I don't believe there was a single donor involved in that

21    project that -- involved with that organization that ever made

22    a donation to me.

23    Q.  Why were you texting and emailing Mrs. Brunner about it

24    back in 2019?

25    A.  I thought it was important.  I thought it was good -- I

*SITTENFELD - DIRECT*

1    thought it was what -- that constituency that we wanted to

2    serve.  I thought it was what they were owed and deserved, and

3    I thought it was a positive good thing for the city.

4    Q.   Do you recall offering or introducing Rob and Brian to

5    Mrs. Brunner?

6    A.   I don't believe I introduced them to her, but I did offer

7    or suggest that they meet with her, yeah.

8    Q.   What other civic leaders did you introduce Rob and/or

9    Brian to when they were in Cincinnati?

10   A.   The very first time that we met was actually February of

11   2018, a former city council member had asked me to get

12   together with people whom he described as out-of-town

13   investors interested in projects in Cincinnati.  Sounded great

14   to me.  You know, we want to attract investment to our great

15   community and region, not lose investment.

16       So I went to that meeting at the former council member's

17   request, met Rob and Brian.  I think the meeting was maybe

18   around an hour.  It might have been more like 45 minutes.  I

19   needed to leave early to go visit my father, who was having

20   some health issues.

21       And while we were there -- I believe that meeting was at

22   J. Alexander's, a restaurant in Rookwood.  And while we were

23   there, the president of Xavier University walked by, so I

24   didn't hesitate to make sure everybody knew each other and

25   facilitate introductions.

SITTENFELD - DIRECT

1        Fast forwarding, we were in, I think, January of 2019, I

2   was meeting with Rob and Brian, and the person who runs the

3   Convention Center walked by.  I immediately sprung to my feet

4   and said, hey, person who runs the Convention Center, these

5   are people who want to bring what I think is a great asset

6   that our region desperately needs.  You guys meet each other.

7        There were other times when I suggested introducing them

8   to people and, for whatever reason, it didn't happen.  Maybe

9   they didn't take me up on it.  One person is Steve Leeper,

10  so -- who's probably the biggest -- who is the head of the

11  organization that might be the biggest developer in terms of

12  doing development in the city.  I thought he would be a great

13  person for them to meet.

14       Another time I was meeting with them, another of the most

15  successful and respected developers in town and beyond

16  Cincinnati, a guy named Dan Schimberg went by, so I did an

17  introduction to them.

18       So I would never hesitate to introduce them to civic

19  leaders when they crossed our paths, or suggest that they

20  should meet with them on their own time.

21  Q.   What was the name of the head of the Convention Center or

22  Convention Bureau?

23  A.   Rick Booth.

24  Q.   Is that on tape?

25  A.   That is on tape.  It's in one of the recordings, correct.

SITTENFELD - DIRECT

1    Q.   Did we hear it in this courtroom?

2    A.   It has not been played in this courtroom.

3    Q.   Do you recall inviting them to dinner at your house with

4    other civic leaders?

5    A.   Some of this -- it's weird to have both lived this and

6    then relived it being as engaged in this case as a person

7    might expect I would be, going through the discovery myself,

8    and then sort of re-reliving it sitting in the courtroom for

9    the last couple weeks.

10        So I knew I had invited them to dinner, from sitting in

11   the courtroom and listening to the tapes.  It sounds like I

12   invited them over to family dinner quite a bit, but I also --

13   there was a time when I invited them to dinner with a group

14   that turned out to mostly be attorneys.

15   Q.   And was there an attorney from the U.S. Attorney's Office

16   also invited?

17   A.   Yes.  I had invited the U.S. Attorney for the Southern

18   District of Ohio and his wife to that dinner.  It was a

19   strictly social dinner.  But yes, they were also invited, in

20   addition to Rob and Brian.

21   Q.   Was that on tapes?

22   A.   It is in a recording, not one that the government chose

23   to play.

24   Q.   Let's talk about 435 Elm.  When did you first get

25   involved with attempting to help facilitate a redevelopment of

*SITTENFELD – DIRECT*

1    435 Elm?

2    A.   At least 2017, a person who had a claim to the property,

3    the Goldschmidt family, and specifically a gentleman named

4    Ryan Goldschmidt, reached out asking for my assistance, kind

5    of trying to get it out of what was just an overall quagmire

6    of a situation, competing claims to the property, litigation.

7    And this is on top of the fact that this was a pretty derelict

8    building.

9         I don't know if it was already at that point, or as soon

10   as a year later, but dangerous, blighted, squatters, costing

11   the taxpayers of the community $4 million a decade.

12        So he reached out, and I recall pretty promptly saying,

13   hey, here's someone at the city who you can talk to to help

14   kind of move this forward.

15             MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

16             THE COURT:  You may.

17             MR. C. MATTHEW RITTGERS:  I'm going to approach with

18   Defendant's Exhibit 653.  It's in the binder.  Your Honor,

19   this is in the binder.  Would you like a copy of this?

20             THE COURT:  Fine.

21   Q.   Looking at this text exchange, can you tell us who this

22   text exchange is between?

23   A.   So in what I have here, the only texts are from Ryan

24   Goldschmidt.

25   Q.   And to whose phone?

SITTENFELD - DIRECT

1     A.  This is to my phone.

2     Q.  Is this a fair and accurate -- what is the date on this?

3     A.  November of 2017.

4     Q.  Is this a fair and accurate depiction of a text that Ryan

5     would have sent to you back on November 28th of 2017?

6     A.  Yes.

7          MR. C. MATTHEW RITTGERS:  Your Honor, we move to

8     admit this exhibit, Defendant's Exhibit 653.

9          MR. SINGER:  No objection.

10         THE COURT:  Defendant's Exhibit 653 is admitted

11    without objection.

12         MR. C. MATTHEW RITTGERS:  Permission to publish?

13         THE COURT:  You may.

14    Q.  So what is this in reference to?

15    A.  My wife often chides me for the amount of unread text

16    messages I have, so this is a good day for her to be at work

17    and not at court.

18         The reference is to him -- again, we've heard a lot

19    about -- and I was aware of, at the time, what a complicated

20    situation and property this was.

21         So this was him kind of trying to get my help for who he

22    could engage with at the city to -- I know this isn't a

23    word -- to de-quagmire the situation.

24    Q.  Were there also texts in mid 2018 between Mr. Goldschmidt

25    and you about 435 Elm?

1    A.   Yes.  I don't have the text memorized, but the general

2    gist of it was him reaching out.  By that point --

3    Q.   If you -- I apologize for interrupting.

4         MR. C. MATTHEW RITTGERS:  May I approach with the

5    actual text?  It's Defendant's Exhibit 136.  It's in the

6    binder.  Would you like a copy, Your Honor?

7         THE COURT:  Not if it's in the binder.

8    Q.   Looking at Exhibit D136, is this a fair and accurate

9    depiction of text messages between Ryan Goldschmidt and you

10   back in July of 2018?

11   A.   Yes.

12        MR. C. MATTHEW RITTGERS:  Your Honor, we move to

13   admit this exhibit, Defendant's Exhibit 136.

14        MR. SINGER:  No objection.

15        THE COURT:  Defendant's Exhibit 136 is admitted

16   without objection.  You may publish it for the jury.

17        MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

18   Q.   What do you recall from this text exchange that has been

19   marked as D136?

20   A.   I mean, rather than generally summarizing it, since it's

21   now in front of me, this was Ryan reaching out.

22        By this point, Chinedum had purchased the air rights to

23   435 Elm, was asserting those property rights, and I think the

24   two of them were trying to work things out.

25        So Mr. Goldschmidt describes it as an impasse and was

*SITTENFELD - DIRECT*

1    wondering if I could help the two of them figure something

2    out, and I responded saying glad to and suggesting a time.

3    Q.   How many months before that Nada meeting was this text

4    exchange?

5    A.   The Nada meeting was on November 7th of 2018, and this is

6    the beginning of July, so count the months; July, August,

7    September, October, four months.

8    Q.   How about Defendant's Exhibit 653, the text message where

9    it appears you and Ryan had discussed 435 Elm.  How long

10   before that Nada meeting was your involvement with Ryan

11   Goldschmidt on this property?

12   A.   About a year before that first meeting, before that

13   meeting at Nada.

14   Q.   Why would you be trying help 435 Elm get developed back

15   in 2017?

16   A.   I mean, it was a no-brainer slam dunk for the city to --

17   if this building had been anywhere, and somebody had tried to

18   engage me or I became aware of it, of course I would have said

19   how can I help fix up a blighted, dangerous building that's

20   incredibly costly to the taxpayers.

21        When you layer on top of that the fact that it is in the

22   heart of our downtown, I would always describe our downtown

23   as, you know, the welcome mat or the living room of the city.

24   People are coming from all different places, this is where

25   tourists are.

*SITTENFELD - DIRECT*

```
1          And not only was it in the living room of the city

2     downtown, it was also across the street from the Convention

3     Center.  It would never have occurred to me to not try and

4     roll up my sleeves and try and be helpful to a project like

5     435 Elm.

6     Q.   Going to the Nada meeting on November 7th.  Do you recall

7     what plans had been relayed and claimed by Rob, who we now

8     know is an FBI agent, and Mr. Ndukwe, on November 7th?

9     A.   Can you clarify?

10    Q.   Yes.  Do you remember who they said the general

11    contractor was?

12    A.   Sorry.  So yeah -- now I understand what you're asking.

13    They said, I believe, the general contractor was Turner.

14    Q.   Who is Turner?

15    A.   One of the largest general contractors in the country, if

16    not the world.  They said the architect was Elevar, one of the

17    most respected architectural firms, you know, locally and

18    beyond.  They talked about a hotel flag that was very

19    respected.  They talked about --

20    Q.   Who was the hotel?

21    A.   IHG or IGH.

22    Q.   If I showed you a transcript, if I have it, of that

23    November meeting, would that help refresh your recollection

24    about the actual hotel chain?

25    A.   Sure.
```

1    Q.   I might not have it.  Oh, yeah, I do.

2          MR. C. MATTHEW RITTGERS:  Your Honor, this has been

3    previously admitted.  It's USA 15C.  It's a transcript of the

4    November 7th meeting.  May I publish it?

5          THE COURT:  You may.

6    Q.   Does this refresh your recollection of what you were told

7    about the hotel?

8    A.   Then it would have been IHG.

9    Q.   And IHG would have built what type of hotel?

10   A.   My understanding was -- oh, sorry, an indigo hotel.

11   Q.   Were you told in this meeting how much money they planned

12   the total redevelopment to be?

13   A.   They represented that they would be able to pull off a

14   $75 million project.

15   Q.   When Mrs. Brunner testified about an equity piece, what

16   does that mean, equity piece?

17   A.   The people bringing the financial resources.

18   Q.   Who were you told would bring in the financial resources

19   throughout this entire sting operation?

20   A.    In that same November 7th luncheon, Rob said,

21   essentially, that they were the equity piece, and he

22   specifically referenced a group of 15 different people that

23   were their business partners, who were the people that would

24   be investing to help make this project happen.

25   Q.   Did Rob, in that meeting, express to you his past

1    experience in development?

2    A.   I recall him saying that he had been a developer doing

3    development deals, and a developer for many years and,

4    specifically, like all over the southeast of the United

5    States.  I think there's a line about him, quote, cutting his

6    teeth in Georgia or Savannah.

7    Q.   After you vetted this project on November 7th, you

8    indicated that you could get the votes.  Can you tell us why

9    you would say something like that?

10   A.   The project seemed like such a slam dunk no-brainer that

11   it was just me expressing my confidence to them, especially

12   because Chinedum's concerns about Mayor Cranley trying to

13   block and obstruct him.  I think they thought there were going

14   to be obstacles there that -- and I think I even said

15   something along those lines, even if Cranley had beef with

16   you, Chin, I don't think he's going to try and block a good

17   deal.

18       So my saying -- I mean, I said this is an easy deal to

19   support.  And I think I said, you know, I'm happy to rally my

20   colleagues, or whatever the exact language was during the

21   lunch, because it just -- it didn't occur to me that anybody

22   would be against something that was so clearly and

23   overwhelmingly a positive for the city and the region and the

24   taxpayers.

25   Q.   After hearing Mrs. Brunner testify in here last week, do

*SITTENFELD - DIRECT*

1    you now know what the disconnect was between Mrs. Brunner and

2    you back in 2019?

3    A.    Yeah.    I mean, that was somewhat revelatory sitting there

4    listening to that.

5         The story that I was told, in pretty significant detail,

6    about we've got Turner Construction, we've got Elevar.  We've

7    got a development team and equity partners that have done

8    deals all over the country, people who have been cutting

9    their -- cut their teeth years ago.  To me all of the pieces

10   were in place.  I did not know that this was a fiction from

11   the FBI.

12        Chinedum was, in addition to being my friend, a respected

13   developer, someone in good standing, so it never occurred to

14   me that he would be in a position where he was facilitating

15   this fiction.

16        And what I didn't understand fully, until hearing

17   Ms. Brunner, is that they did not tell that same story to her.

18   Q.    You mentioned a meeting back in February of 2018.  Were

19   there offers to help -- was that meeting recorded; if you

20   know?

21   A.    It was recorded.

22   Q.    Did you make offers to help Rob, and was Rob -- who was

23   at that meeting?

24   A.    It was Rob and Brian, and the former councilman who had

25   introduced us.

SITTENFELD - DIRECT

1    Q.   Have you listened to that recorded phone call?

2    A.   I have.

3    Q.   Did you make offers to help back in February 2018?

4    A.   Yeah.  In that first meeting that we had, one of the

5    things I said -- again, meeting people who I trusted, I

6    believed when they said we're here to look at opportunities to

7    invest in and make your city better.

8         Anyone who is, I think, doing a good job in their role,

9    that would get them excited.  So I specifically said to them,

10   and if someone wants to pull it up, they can, but close to the

11   exact quote was, let me know how I can help you all with

12   opportunities that you're thinking through.

13        I also offered to make specific introductions to them, I

14   believe, too, at the time, based on things they said they were

15   interested in, to the sheriff's office locally, and to the

16   director of the city's office of environmental quality.

17   Q.   Before that meeting and during that meeting, how many

18   times were campaign donations brought up?

19   A.   Zero.

20   Q.   Going back to the disconnect that you had between -- that

21   existed between Mrs. Brunner and you, do you recall what she

22   and Mr. Ndukwe were attempting to negotiate, and some of what

23   you knew as the sticking points?

24   A.   Yeah.  I mean, they ultimately collided over what they

25   both thought the ground lease for the 435 Elm property should

1    be.

2    Q.   Do you recall where Ms. Brunner's number was compared to

3    Mr. Ndukwe's?

4    A.   I do.

5    Q.   What were those numbers?

6    A.   They moved a little bit over time, but Ms. Brunner wanted

7    a $350,000 a year ground lease, which, from the get-go, struck

8    me as incredibly unusual for the port.

9         To the extent another of the calls that hasn't been

10   played -- that was recorded but has not been shared in this

11   courtroom, I said, that number is insane.  It's ridiculous.  I

12   used the word offensive to describe it.

13        Layered on top of that were concerns, which Ms. Brunner

14   brought up herself, that she might have been treating Chinedum

15   differently because he was black, and he was one of the only

16   black developers in the City of Cincinnati.

17        She offered this number of $350,000 a year.  Chinedum, I

18   think, started around $66,000 a year.  And all along the way,

19   I was saying, you know, just come together.  Let's get a deal

20   done.  This is good for the city.  Let's not let this get

21   stalled out.

22        There was a recorded phone call in which I asked

23   Chinedum, hey, Chinedum, would you go to $275,000 a year for a

24   ground lease?  So I actually went closer to Laura Brunner's

25   number than to a number of Chinedum's and his investors,

 1    fictional investors.

 2        And the reason I asked to do that was I just wanted to

 3    get it across the finish line.  I thought it would be, again,

 4    I've said this many times, but just a slam dunk no-brainer for

 5    the city.

 6        And it struck me that Ms. Brunner might be a little bit

 7    more stubborn about the situation than Chinedum.  And when I

 8    asked Chinedum would you do that $275,000 number, which is

 9    generally in between 66 and 350, he said yes.

10    Q.  We've heard questions about RFPs.  What is an RFP?

11    A.  A request for proposal.

12    Q.  Do you recall a specific statement back in January of

13    2019, on a recorded call between you and Rob, where you

14    actually discussed your brutally honest thoughts about RFPs?

15    Do you remember that statement?

16    A.  I remember it happening.  I don't remember the exact

17    quote.

18        MR. C. MATTHEW RITTGERS:  Your Honor, this has been

19    previously admitted as USA 23C.  It's a transcript of a

20    conversation between P.G. Sittenfeld, UC Rob, UC Brian.

21    Permission to publish?

22        THE COURT:  You may.

23    Q.  This is page 5.  This is on January 30th of 2019.  This

24    is in the recordings.

25        THE COURT:  You lost focus.

*SITTENFELD - DIRECT*

```
 1              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

 2              THE COURT:  I mean on the Elmo.

 3    Q.   Did you know you were being recorded in January of 2019?

 4    A.   No.

 5    Q.   So what did you tell the FBI about the RFP process and

 6    your beliefs about when they should be used or not?

 7    A.   Do you want me to read this, or...

 8    Q.   Sure.  Yeah.

 9    A.   "This is what Denning said.  So the one thing he said,

10    and this is where I would be happy to be helpful, but he was

11    like, I'm gonna look, and he was, he was like, I haven't even

12    looked at the redevelopment proposal.

13         "He was like, I'm gonna look at it, and if it's good,

14    like, let's make a deal.  He's like, and if it's not great,

15    the city could consider doing an RFP to see what other

16    developers are interested in it.  I mean, his pos- -- and this

17    is, like, what we want out of our administrator."

18    Q.   So what do you mean by that, that you want that out of

19    your administrator and city?

20    A.   Chinedum had the air rights to 435.  That gave him, sort

21    of, from my understanding, first right of refusal or lead

22    claim to being the developer for it.

23         So that meant that if he could submit a good proposal,

24    and from everything that I had been told, not knowing that

25    some of it was lies, was like, of course he's putting a good
```

*SITTENFELD - DIRECT*

1    proposal together.

2        The end of that was if he has not put a good proposal

3    together, then -- and Mr. Denning, Phil, puts out an RFP, then

4    the last thing I said is that's what we want out of our

5    administrators; that if you've got a good partner in hand to

6    bring a good project forward, you work with them. And if you

7    don't, then sure, opening it up to an RFP.

8    Q.   How did Mayor John Cranley's vendetta against Mr. Ndukwe

9    impact you throughout this?

10   A.   It didn't seem fair. You know, I mean, my motivation was

11   always can we redevelop, in a way that's good for this

12   community, a blighted, dangerous, costly building. So that

13   was sort of the foundation of everything.

14       But on top of that, several of the concerns we've heard

15   about, nobody should be treated unfairly because someone

16   doesn't like them, as Chinedum had relayed about John

17   Cranley's vendetta and positions.

18       Nobody should be treated unfairly because of the color of

19   their skin, as Chinedum relayed about Ms. Brunner's treatment

20   to him.

21       So I had all the motivation that I needed to move forward

22   something that was good for the community. But on top of

23   that, there were, sort of, twin additional motivators too.

24   Q.   After Rob and Brian left town and were no longer involved

25   with you, did you sit down with Mr. Ndukwe and a new partner

*SITTENFELD - DIRECT*

1    of his, or new to you, I should say?

2    A.  Yes, on --

3    Q.  Well, why would you do it, and when did that happen?

4    A.  On, I believe it was December 11th, 2019, Chinedum asked

5    if he and his, from what I understood, new development partner

6    could come and meet in my City Hall office.

7         They came and met in my City Hall office.  It was a

8    recorded meeting.  We haven't heard it here.  And I worked

9    with Chinedum and Mike Schiff the same as I would work with

10   Chinedum and Rob and Brian, the same as I would work with

11   Chinedum and Ryan Goldschmidt.  Whoever wanted to do something

12   good for the city, I was game to help.

13   Q.  I want to talk about some of the events we've heard in

14   the case.  I want to start with an unrecorded call, which, I

15   believe, occurred on September 21st of 2018.

16        What do you recall from that call on September 21st of

17   2018?

18   A.  I don't recall that call.

19   Q.  Well, do you believe that you would have asked Mr. Ndukwe

20   to fundraise $10,000?

21   A.  Seems absolutely plausible.  Again, this is a friend, a

22   long-time, very generous donor, and someone who in the same

23   year had said, hey, give me the -- let me know when I can

24   fundraise for you in the future.

25        So asking someone like that to fundraise and bundle for

*SITTENFELD – DIRECT*

1    me seems totally likely.

2    Q.   Did you know at the time that he had business in front of

3    the city, or was likely to?

4    A.   I think there was a sense with Chinedum -- and this is

5    true with a lot of the developers, they kind of always had

6    business in front of the city.

7         So I think, over the course of the time spent we've been

8    talking about here, I think Chinedum had three different total

9    projects.

10        At that exact moment could I have said, hey, he's got

11   this coming, or this just happened?  Not necessarily.  That

12   wouldn't have been on my mind on a call like that.  But the

13   notion that he would have had business before the city, sure.

14   Absolutely.

15   Q.   What date was the first recorded phone call?

16   A.   October 26th, 2018.

17   Q.   And how many recorded phone calls occurred before the

18   Nada lunch on November 7th?

19   A.   Three.

20   Q.   Who initiated all three of those calls?

21   A.   Chinedum, for each call, texted me and said, hey, can we

22   hop on the phone.

23   Q.   I want to jump to the second call on October 30th, where

24   we heard the quote "love you but can't."  Why did you say

25   that?

1    A.   Chinedum -- the context of that phone conversation was

2    that Chinedum was sharing with me and complaining, I think

3    justifiably so, that John Cranley, the quote which we've

4    heard, is trying to F me left and right; that John Cranley was

5    trying to block and sabotage him from bringing forward good

6    projects.

7         So that was me saying, Chinedum, you're trying to bring

8    projects forward that are good for the city.  I want to help

9    you bring forward projects that are good for the city, but I'm

10   only going to be around here if I'm successful in this race.

11        And it's actually not come out over the last couple of

12   weeks.  I was -- because of term limits, it was my last term

13   at City Hall so, quite literally, in order for me to be

14   someone that helped advance projects that were good for the

15   city, good for the community, that was only going to happen if

16   I became the next mayor.

17        The other piece is that, you know, Chinedum -- so that

18   call was on October 30th.  On October 26th, Chinedum had

19   proactively brought up, hey, P.G., I have these LLCs.  I want

20   to help fundraise for you.

21        Earlier in the year, before that, he had said, let me

22   know when your next fundraiser is so I can be part of the host

23   committee.

24        From everything I knew and understood, Chinedum was

25   already strongly and proactively in my corner.  The only thing

SITTENFELD - DIRECT

1    that he was trying to resolve was his wish, which I respected,

2    that he didn't want to donate in his own name, he wanted to

3    fundraise, and that's what he was trying to sort out.

4    Q.  Do you recall the date of the third and final call before

5    the November lunch?

6    A.  These dates are emblazoned in my brain.  November 2,

7    2018.

8    Q.  And what, if anything, on that call surprised you?

9    A.  A couple things actually surprised me.  Chinedum had

10   said, I want to raise you $10,000.  In that call, he then

11   said, I want to raise you $20,000.

12        That's -- politicians don't usually object when they get

13   responses like that.  I don't know many politicians that have

14   said no, no, no, raise me less money, but that still came as a

15   surprise.

16        He -- I said, you can do that over the next couple years?

17   He said no, the next couple weeks.  That surprised me.

18        And then the biggest surprise of all was him saying, you

19   know, we're going to want it to be a yes vote without a doubt,

20   because I had known Chinedum for eight years.  We had been

21   friends for eight years or, you know, an early introduction

22   had grown into a full-fledged friendship, and I had never once

23   known him to do something that came to my attention that

24   sounded untoward or unethical.

25   Q.  How did you respond when you heard that explicit

SITTENFELD – DIRECT

1    statement?

2    A.   I said nothing can be illegal, nothing can be a quid pro

3    quo.

4         And then because I viewed him as my friend and good

5    upstanding person, I believe the next words out of my mouth

6    were, and I know that's not what you meant either.  And I

7    meant that.

8         It never occurred to me the situation that he was in, so

9    I immediately also wanted to give my friend the benefit of the

10   doubt.

11   Q.   Why would you, after that, meet with the out-of-town

12   investor named Rob?

13   A.   After I said to Chinedum that nothing can be a quid pro

14   quo, and I know that's not what you meant either, he agreed.

15   And I kind of thought that put the issue to bed.

16        In retrospect, I obviously wish I had not taken as much

17   comfort from his affirming my comment as I did.

18        I also thought that he was probably misrepresenting the

19   person who I had encountered.  We talked a second ago, I had

20   met Rob nine months earlier.  He was someone who said, I want

21   to come here and invest and help your city.

22        In response to that, I said, let me know how I can be

23   helpful.  Not a single mention of campaign contributions.  And

24   nine months after that, I never called and said, hey, you

25   know, can you donate to me?  Will you come to this event?

*SITTENFELD - DIRECT*

1    Never occurred.

2         So the person he was talking about reintroducing me to, I

3    had already encountered, and nothing -- you know, I didn't

4    think he sounded like the person that Chinedum was

5    representing.

6         And then -- I mean, those were all important drivers.

7    But the biggest one might have been the fact that he was

8    talking about someone, and this was the lens through which I

9    always saw Rob and Brian, of people that wanted to back a

10   project that was good and important and needed for our city.

11        You know, if everyone who was, you know, odd or weird or

12   rough around the edges people just wrote off, there's a lot of

13   good stuff that could happen in the city that never would so,

14   of course, I wanted to meet with someone who said, I'm here to

15   make something good happen for Cincinnati.

16   Q.   At that lunch at Nada, how many times were donations

17   discussed at lunch?

18   A.   Specifically, I think zero.  I walked them through that

19   slideshow showing.  I think my quote was something along the

20   lines of -- I didn't know if they were going to be donors or

21   not.

22        So there's one quote where I said, If Chinedum convinces

23   you all to support someone, something like that.  I don't know

24   the exact quote.  But in terms of my saying, you know, like

25   asking them for a contribution, zero specifically.

*SITTENFELD - DIRECT*

1    Q.   During that lunch, you made statements like, "I can

2    deliver the votes.  I can shepherd the votes."  What do those

3    phrases mean in your line of work, or what you used to do for

4    work, I should say?

5    A.   Well, I think, in the specific context of that moment, I

6    was really just trying to express to Rob, who represented

7    himself to be an outsider, who maybe didn't understand how

8    things worked in Cincinnati and seemed jittery about John

9    Cranley blocking this project that I, after asking the

10   questions I asked and getting the answers that I got, almost

11   immediately thought, this thing is going to sail through City

12   Hall.

13       No one -- even the person who might have a vendetta

14   against Chinedum, no one's going to stand in the way of this.

15   They'll look like a fool, frankly, for trying to block an

16   awesome and necessary revitalization.

17       So my saying that was, I think, mostly an expression of

18   this is going to be easy, you guys.  I mean, no one is going

19   to stand in the way of this.

20       I think, more generally, I would say stuff like I can

21   shepherd the votes, I can deliver the votes, all the time.

22   I'm saying, you know, I'm glad to articulate my support for

23   something, and I think other people will see the logic, the

24   same logic that I do.

25   Q.   Do you remember talking, asking about something that was

*SITTENFELD – DIRECT*

1    referred to in that meeting as a CRA, and what you were told

2    about the CRA?

3    A.   Yes.  That they wanted what was a routine, commonplace

4    sort of set of incentives to be able to make the deal work, to

5    pencil the deal.

6         So, in other words, if they -- and sometimes developers

7    would do what I'm about to describe, by the way, and say, hey,

8    we've got this great project, but we're only going to be able

9    to pull it off if we get a huge amount of gap financing from

10   the city.

11        There was one, kind of, infamous project, where I think

12   the city -- and this was not spearheaded by me, but I think

13   the city bridged their gap with like $9 million, $9 million in

14   cash, to help pull off this other downtown project.

15        What Chinedum was saying is we don't need any of that.

16   We just need the same routine package that you all give to

17   other projects all the time.  And he was correct.  We did do

18   it all the time.

19   Q.   Back at the 580 Building, where Rob asked you to go after

20   lunch, do you remember when he said, "What is the best way for

21   us to get that deal"?

22   A.   I remember it from having experienced and reexperienced

23   that quote, yes.

24   Q.   Well, what was your response when he said "get that

25   deal"?

*SITTENFELD – DIRECT*

1    A.   I thought he -- we had been talking about the deal,

2    meaning the project, the development project, for -- you know,

3    off and on for the last hour.  I thought he was talking about

4    the development proposal.  So my immediate response was, do

5    you really think that John Cranley is going to try and veto

6    this.

7    Q.   We've heard innuendo about something called straw donors.

8    What is that?

9    A.   A straw donor is when somebody tries to give their own

10   cash or their own money to another person to then give it to a

11   candidate.

12   Q.   What was the date of the Nada lunch?

13   A.   November 7th, 2018.

14   Q.   When did the FBI agents get it right and donate to you

15   lawfully and legally with LLC checks?

16   A.   December 17, 2018.

17   Q.   So how many days is that?

18   A.   Forty.  Yeah, should be about 40.

19   Q.   All right.  During that time, were there statements made

20   to you -- well, starting on November 7th, what did Rob tell

21   you about his network of investors on November 7th?

22   A.   That there were 15 of them.

23   Q.   And then again -- and this has been previously admitted

24   and marked as USA 19B.

25        On November 26th, do you remember having a phone call

*SITTENFELD - DIRECT*

1   with Rob, where he discussed one or more of his business

2   partners writing you checks from the LLC?

3   A.   Yes.

4   Q.   Do you recall the exact quote?

5   A.   On November 26th?

6   Q.   Yes.

7   A.   I think it was --

8           MR. C. MATTHEW RITTGERS:  Instead of guessing, may I

9   publish, Your Honor, page 2?

10          THE COURT:  Yes.

11  Q.   All right.  Do you remember that phone call back in late

12  November, where Rob tells you -- what does Rob tell you about

13  the LLC checks?

14  A.   He said, "I've got another business partner."  And then

15  he said, "And I've got another business partner."

16  Q.   Do you remember the date when he gave you the LLC checks?

17  A.   December 17, 2018.

18  Q.   Do you remember the prosecutor mentioned something about

19  Omar?

20  A.   I do remember hearing the prosecutors talk about Omar.

21  Q.   What gender is that to you, Omar, male or female?

22  A.   I'm going to assume male.

23  Q.   All right.  On December 17th, this has been previously

24  marked as USA 21G, page 3, when he actually gives you these

25  checks on that day, who does he say cut the checks?

*SITTENFELD – DIRECT*

1    A.   "I had my girl in the office."

2    Q.   So he's referring to a woman in his office who wrote the

3    checks or ran the checks?

4    A.   Yeah.  Yes.

5    Q.   And did you ever make a statement about what you believed

6    Rob was doing in terms of how he was fundraising and bundling

7    and from whom?

8    A.   Yes.  My only comments ever were that these are coming

9    from -- and I'm paraphrasing, but this should be pretty close.

10   Q.   If I may, just so it's the exact.  I apologize for

11   interrupting.

12   A.   No problem.

13   Q.   USA 21D, previously been admitted.  December 3rd, which

14   is really December 4th, actually, we heard, page 2.

15        This is your statement.  Did you know you were being

16   recorded at the time?

17   A.   Again, I never, never knew once that I was being

18   recorded.

19   Q.   All right.  Well, what did you tell them about your offer

20   to help ensure that they actually donated lawfully and

21   legally?

22   A.   My understanding was only ever that this was coming from

23   their, quote, universe of buddies and investors.  That was

24   what I had communicated to Chinedum, who was what Rob had

25   represented in terms of what their universe of buddies and

1    investors was.  So I repeated that.

2        And then, I think, sort of all throughout emphasized, you

3    know, these need to be real human beings and real LLCs.

4    Q.  What did you offer to do on -- in December, after they

5    had improperly attempted to donate, and said, oh, man, I

6    thought those were LLCs?  What did you offer to do?

7    A.  To have me and my team vet the checks to make sure that

8    they were what they were representing them to be.

9    Q.  Did you continue, in the rest of 2018 and into some of

10   2019, to have communications with Mr. Ndukwe, Rob, and Brian?

11   A.  Yes.

12   Q.  Do you recall sending Rob and Brian, do you recall

13   sending them a holiday card?

14   A.  I did.

15   Q.  And this is behind you.  It's been previously marked as

16   Defendant's Exhibit 648.

17           MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

18           THE COURT:  You may.

19   Q.  I just handed you and took back what was marked as

20   Defendant's Exhibit 648.  What was that?

21   A.  It was a holiday card.

22   Q.  And where did we receive this?

23   A.  The government gave it to us a couple weeks ago.

24   Q.  Is this a fair and accurate depiction of the envelope

25   that you would have mailed the actual holiday card, and the

*SITTENFELD - DIRECT*

1    note that you wrote to Rob and Brian back in 2018?

2    A.   It is.

3    Q.   Or 2019.

4            MR. C. MATTHEW RITTGERS:  Move to admit Exhibit D648,

5    Your Honor.

6            MR. SINGER:  No objection.

7            THE COURT:  D648 is admitted without objection.

8    Q.   All right.  And so you sent a picture of Oakley and Sarah

9    and you.  Why is George not in that picture?

10           THE COURT:  Do you want that published to the jury,

11   Mr. Rittgers?

12           MR. C. MATTHEW RITTGERS:  Oh, thank you, Your Honor.

13   Yes, please.

14   A.   George is not on the scene yet.

15           MR. C. MATTHEW RITTGERS:  It's been published?

16           THE COURT:  It has now, yes.

17   Q.   Okay.  And then you wrote a note to Rob and Brian.  Is

18   that your handwriting, a note that you wrote to them?

19   A.   It is.

20   Q.   And you said, "It's been a pleasure growing our

21   friendship over '18.  Thanks for believing in Cincinnati's

22   potential"?

23   A.   I did.

24   Q.   I'm going to show you what's been marked as Defendant's

25   Exhibit D48.  It's text messages between Mr. Ndukwe and you.

*SITTENFELD - DIRECT*

1     Is Defendant's Exhibit D48 a fair and accurate depiction

2    of text messages between Mr. Ndukwe and you back in June of

3    2019?

4    A.  It is.

5         MR. C. MATTHEW RITTGERS:  Move to admit Defendant's

6    Exhibit D48, Your Honor.

7         MR. SINGER:  No objection.

8         THE COURT:  D48 is admitted without objection.

9    Q.  These guys, they presented some red flags, as you sat in

10   this courtroom for the past couple of weeks, fair?

11   A.  Yes.

12   Q.  Why did you continue to deal with them?

13   A.  The lens through which I viewed them was people who are

14   backing something that was good for the city, good for my

15   constituents, was going to be an indisputable positive for the

16   City of Cincinnati.

17      I also -- this is kind of a point of pride for me, across

18   nine years at City Hall is I engage with everybody from all

19   walks of life.

20      So if someone had minimal formal education, or if they

21   had fancy degrees, it didn't matter to me.  If somebody was

22   incredibly polished with their words, or was more rough around

23   the edges, I wasn't gonna write them off.

24      And then probably the biggest reason of all was Chinedum

25   re-facilitated, reintroduced this relationship.  I trusted him

*SITTENFELD - DIRECT*

1    as a person.  I trusted him as a friend.  I believed he was a

2    respected, reputable developer, and he took his credibility

3    and his trust and conferred it on them.

4        So that colored the lens through which I looked at them.

5    A respected, reputable friend of mine is saying you can trust

6    these guys, they're here to help your city.  They're here to

7    help turn around a blighted project.  That's why I stayed

8    engaged.

9    Q.  Why were you in Columbus on September 24th of 2019?

10    A.  There was a statewide -- there was a dinner of statewide

11    elected officials in Columbus that night.

12    Q.  Do you recall talking about zoning and regulation related

13    to legalized gambling?

14    A.  I do.

15    Q.  Why did you have that conversation?

16    A.  Vinny brought up his concerns about basically turning a

17    lot of people into gambling addicts.

18        So he said -- and I'm paraphrasing a little bit here, but

19    he said this, if you have it all over the city, you get in a

20    situation where people lose track, they forget that the money

21    is real, and they end up in a situation where they can't pay

22    their rent.

23        I always supported the notion of lawful, regulated sports

24    betting, but I never -- for reasons that align with what Vinny

25    said, about people turning into gambling addicts, I never

SITTENFELD - DIRECT

1    thought it should be on every street corner, in every gas

2    station, in every neighborhood.

3         And the way that you make sure that there's not sports

4    betting on every neighborhood, on every street corner, on

5    every gas station all throughout the city, is the zoning code.

6    Q.   You remember, and we heard it in this courtroom, Vinny

7    telling a story about mack trucks, right?

8    A.   I remember from having heard it last week.

9    Q.   I mean, you heard that, yet you still had a conversation

10   with him about zoning and regulation even though you heard

11   that.  Why?

12   A.   I wasn't -- in the moment, I wasn't totally clear what he

13   was saying or intending, but I knew what was motivating me,

14   which was I think lawful, regulated sports betting could be a

15   good amenity for the City of Cincinnati if the state regulates

16   it, but I do not support it popping up all across the city and

17   running rampant.

18   Q.   Whose decision was that to legalize gambling?

19   A.   The State of Ohio.

20   Q.   Do you recall the approximate last contact that you would

21   have had with Rob or Brian or Vinny?

22   A.   It was different times for each of them.

23   Q.   Approximately when did they kind of leave the scene?

24   A.   End of 2019, beginning of 2020.

25   Q.   Back in by the end of 2020, how many different donations

```
 1    had you received to your campaign account and your Progress
 2    and Growth PAC account?
 3    A.   About 1,800.
 4    Q.   And what cycle would that have been over?  How many years
 5    would that have been to get 1,800 different donations?
 6    A.   So that would have been starting from the day after
 7    election day in 2017, so from the very end of 2017 through
 8    2020.
 9    Q.   All 1,800 of those donations we had in discovery, you
10    know the FBI has those, correct?
11    A.   Correct.
12    Q.   How much money did you raise between the PAC and the
13    campaign account?
14    A.   Over a million dollars.  I don't have the exact number.
15    Q.   Were there times that you voted against big donors?
16    A.   Yes.
17    Q.   Were there times when you asked someone to donate to your
18    campaign, he or she declined, and yet you still helped them
19    when they had business before the city?
20    A.   Yeah.  Of course.  I mean, we heard a little bit of this
21    earlier.  Getting rejected by donors is a pretty common thing
22    for anyone who is a candidate, but I would always -- no matter
23    what a person's position on supporting my candidacy or not
24    was, if they were doing something that was good for the city,
25    I would always vote with them.
```

1    Q.  Do you know what percentage of the donations that we just

2    discussed were under $250?

3    A.  More than half.

4    Q.  And how do you know that?

5    A.  You asked me to look it up.

6    Q.  How many were under $50?

7    A.  Twenty to 25 percent of them.

8    Q.  So about 400?

9    A.  A little less, but yeah.

10   Q.  What would you have done if someone said, hey, we're

11   donating to you, but this is for your -- this is -- explicitly

12   tells you, hey, this is for your official action.  You have to

13   then do what we say?

14   A.  I would have done the same thing that I did the only time

15   across all these interactions and conversations that I did

16   here, which is saying no.  I did never, and I would never,

17   under any circumstance, sell my vote or trade my vote for a

18   campaign donation.

19   Q.  Who is Mike Schiff?

20   A.  A developer out of Columbus.

21   Q.  And why would you agree to sit down with Mr. Ndukwe and

22   Mr. Schiff to help 435 get developed when Rob and Brian were

23   out of the picture entirely?

24   A.  Again, I mean, I was appreciative for anybody who wanted

25   to help move a good project forward, so I don't want to

*SITTENFELD - DIRECT*

1    discount my understanding at the time of Rob and Brian saying

2    we're here to back something that's good for your city.

3        At the end of the day, I didn't care who wanted to help

4    make this happen, as long as somebody said my focus -- their

5    focus is I'm getting this across the finish line for your

6    city.

7            MR. C. MATTHEW RITTGERS:  I have no further

8    questions, Your Honor.

9            THE COURT:  Thank you, Mr. Rittgers.  It's about

10   2:25.  Would this be an appropriate time for our afternoon

11   break, Mr. Singer?

12           MR. SINGER:  Yes, Your Honor.

13           THE COURT:  Very good.  So ladies and gentlemen of

14   the jury, we will try to resume trial -- it's probably going

15   to be around 2:50, I would think, by the time we resume trial.

16       So at about 2:45, if you could assemble in the hallway,

17   and we'll try to get you in at about 2:50.

18       As I've mentioned repeatedly now, please don't discuss

19   this case amongst yourselves.  Please don't do any research

20   regarding the facts or law.  Please don't communicate with

21   anyone about this case or allow anyone to communicate with you

22   about it.  If anyone should attempt to, please let me know

23   immediately.

24       Other than that, please have an enjoyable afternoon

25   break.

```
 1            (Jury out at 2:24 p.m.)

 2            THE COURT:  Anything we need to discuss before we

 3      take a break, Mr. Singer?

 4            MR. SINGER:  No, Your Honor.

 5            THE COURT:  Mr. Rittgers?

 6            MR. C. MATTHEW RITTGERS:  Your Honor, could we

 7      approach at sidebar for a second?

 8            THE COURT:  Sure.

 9      SIDEBAR CONFERENCE

10            MR. C. MATTHEW RITTGERS:  We've kind of leaned into

11      the straw donor donation stuff, but I did want to put on

12      record that we were not on notice during indictment or 404(b)

13      notice that there was going to be some argument in this trial

14      about straw donations, but I felt like I had to deal with this

15      on direct.

16         I also -- it dawned on me today that there might be some

17      argument about an Ohio Ethics Commission violation related to

18      meals, and this is based on the cross-examination of

19      Mr. Seelbach.

20         And so we've not been put on notice of that either,

21      404(b) or in the indictment.  And so I don't know what their

22      inquiry might be, but if it has something to do with Ohio

23      ethics violation related to meals, I am objecting in advance

24      now and I just want to put that on the record.

25            MR. SINGER:  I think it's fair game on cross, Your
```

1    Honor.  He had multiple meals with these people at expensive

2    steakhouses, and he signed his ethics disclosure forms

3    without -- swearing that they were true and accurate without

4    listing those meals.  That's proper impeachment.

5           THE COURT:  I believe that would be proper

6    impeachment, and I would tend to allow it as impeachment.

7    Overruled on the objection.

8        Yes, Mr. Rittgers?

9           MR. C. HENRY RITTGERS:  Is the government going to

10   produce the receipts to those meals, and show what was --

11          MR. SINGER:  I'm going to ask him --

12          MR. C. HENRY RITTGERS:  -- who paid what?

13          THE COURT:  Okay.  One at a time.

14          MR. SINGER:  I'm going to ask him questions about it.

15          THE COURT:  Okay.

16          MR. SINGER:  Your Honor, since we're here.  We

17   discussed the issue relating to -- the civil ruling relating

18   to the text messages with regards to Mr. Seelbach; that the

19   attempted cross-examination of Mr. Seelbach related to these.

20          THE COURT:  Right.

21          MR. SINGER:  I would submit, Your Honor, that the

22   circumstances are different for this witness.  I think he

23   testified under oath that he was going to follow the laws of

24   the State of Ohio when he was sworn in.

25       The violation -- the city admitted that he violated Ohio

1    law, Ohio Ethics Law or Ohio Sunshine Laws and, in doing so,

2    prevented information from being -- to the public.

3        And in his role as a public official, I think that that

4    would be inconsistent with the oath that he took when he was

5    sworn in as a public official.

6            THE COURT:  What oath did he take when he was sworn

7    in?

8            MR. SINGER:  That he would follow the laws of the

9    United States, the State of Ohio, and the city charter.

10           MR. C. MATTHEW RITTGERS:  I mean, Your Honor, this

11   goes back to what we discussed with Mr. Seelbach.

12       We actually looked at lunch.  I mean, this is not a crime

13   of dishonesty.  These council members, five of them, were

14   relying on advice given to them by lawyers at the time that

15   they were permitted to do -- to text, and that it was not a

16   quorum or a text message was the actual issue.

17       It was not their decision, the council members, as to

18   whether or not there was going to be a settlement.  This was

19   not litigated by a trier of fact like a judge or a jury, and

20   it's not a felony, it's not a crime of dishonesty, it's what

21   it is, an Open Meetings Act violation.

22       And I think it's highly prejudicial to start talking

23   about that with the defendant on the stand, especially after

24   the motion in limine was granted, Your Honor.

25           THE COURT:  I agree.  I'm not going to let you go

1    into that.  All right.

2              Anything else we need to do?  Okay.

3              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

4    SIDEBAR CONFERENCE CONCLUDED

5              THE COURT:  We're going to recess, Scott.

6              MR. C. MATTHEW RITTGERS:  You can step down.

7              THE COURT:  You are still on the stand, though.

8         (Brief recess.)

9              THE COURT:  Are you ready to proceed, Mr. Singer?

10             MR. SINGER:  Yes, Your Honor.

11             THE COURT:  Very good.  Let's bring in the jury.

12        (Jury in at 2:47 p.m.)

13             THE COURT:  Mr. Singer, are you prepared to proceed?

14             MR. SINGER:  I am, Your Honor.  May I?

15             THE COURT:  Yes.

16                       CROSS-EXAMINATION

17   BY MR. SINGER:

18   Q.   Good afternoon.

19   A.   Good afternoon.

20   Q.   So you were a city council member for over nine years; is

21   that right?

22   A.   Around there, yes.

23   Q.   And I think you'd agree that being a public servant means

24   you have certain responsibilities; is that right?

25   A.   Yes.

1    Q.   And democracy's proper functioning requires elected

2    officials to serve the common good; is that right?

3    A.   Yes.

4    Q.   Citizens put their faith in democracy, or in the honesty

5    of public officials, right?

6    A.   Yes.

7    Q.   And they put their faith in the integrity of public

8    officials?

9    A.   Yes.

10   Q.   The public's trust in elected officials, it's necessary

11   for democracies to properly function.  Is that fair to say?

12   A.   I agree with that.

13   Q.   Now, citizens in a democracy have a right to know how the

14   government operates; is that right?

15   A.   I agree with that.

16   Q.   You've heard the saying that "sunshine is the best

17   disinfectant"?  You've heard that saying before?

18   A.   I have heard that.

19   Q.   It generally means it's in the public's interest to know

20   what the government is doing; is that right?

21   A.   Yes.

22   Q.   And that's a correct statement.  You believe in that,

23   right?

24   A.   I do.

25   Q.   And that includes the public having the right to know who

1    is contributing to public officials; is that right?

2    A.  Yes.

3    Q.  So if the public -- the public, if the citizens had no

4    clue who was funding political campaigns, the public would

5    lose trust in the system; is that right?

6    A.  I think that's probably right, yeah.

7    Q.  And --

8    A.  And it's why we have the system of reporting

9    contributions that we do, I suspect.

10    Q.  And secret contributions that are outside of the eyes of

11    the public, it's a recipe for corruption.  Is that fair to

12    say?

13    A.  I personally think that there should be transparency

14    around contributions.  I -- it's also why I, frankly, disagree

15    with rulings like *Citizens United*, where somebody can

16    anonymously give millions and tens of millions of dollars.

17    Q.  And it's city council's job to serve the interest of the

18    people of Cincinnati, right?

19    A.  Absolutely.

20    Q.  And city council should put the interests of the citizens

21    before their own interests, right?

22    A.  Yes.

23    Q.  Now, you took an oath before you were elected as a city

24    council member; is that right?

25    A.  I did.

SITTENFELD - CROSS

1    Q.   Do you remember what that oath is?

2    A.   Essentially, it was an oath to the city charter, the

3    state constitution, and the Constitution of the United States

4    of America.

5    Q.   And that oath was important, right?

6    A.   It was.  It is.

7    Q.   You took an oath before you testified today; is that

8    right?

9    A.   Correct.

10   Q.   The oath tells the public that you're -- when you were

11   sworn in as a city council member, your oath told the public

12   you will be a faithful servant; is that right?

13   A.   Yes.

14   Q.   All right.  You spent some time testifying about 435 Elm.

15   Before we get there, I just want to ask you a question.  I

16   want to make sure I understand.

17       Was it your testimony that you were not aware that when

18   Mr. Ndukwe's financial analyst contributed to you in 2018, you

19   were not aware that that was from Mr. Ndukwe; is that right?

20   A.   That's correct.

21   Q.   Now, this contribution was part of the fundraiser at the

22   Queen City Club; is that right?

23   A.   That's correct.

24   Q.   And you recall that?

25   A.   I do.

*SITTENFELD - CROSS*

1    Q.   And Mr. Ndukwe was present at the Queen City Club; is

2    that right?

3    A.   Correct.

4    Q.   But his name is not on any contributions during that

5    time.  Are you aware of that?

6    A.   Yes.  He did what ample oxygen has gone towards

7    explaining.  He fundraised rather than donating.  And I, as a

8    candidate, don't get to tell someone which of those options

9    they want to do.

10   Q.   So as part of the fundraising, it was your understanding

11   that he contributed in the name of his employee; is that

12   right?

13   A.   No.  My understanding was that he asked his employee to

14   fundraise --

15   Q.   I understand.

16   A.   -- on my behalf.  Yeah, so kind of the opposite of what

17   you said.

18   Q.   Okay.  I understand.  So you knew, in October 2018, that

19   Ndukwe was -- he was having problems getting the deal with the

20   city for 435; is that right?

21   A.   I think it was kind of -- again, that October 26, 2018

22   phone call.  He called -- it was either that one or the next

23   one, and had the line of, Mayor Cranley is trying to F me left

24   and right, and my reaction to that was not surprised.  I knew

25   that they had been sort of colliding and butting heads.

SITTENFELD - CROSS

1    Q.   You say you knew a pretty good amount about that, or

2    something along those lines; is that right?

3    A.   Yeah.  I was aware of it.

4    Q.   So you were aware that he was struggling getting any

5    traction in the city; is that right?

6    A.   Well, so I was aware that he and Mr. Ndukwe -- or, sorry,

7    that he and John Cranley were butting heads.

8         The struggling getting traction in the city, I probably

9    wouldn't agree with that because, concurrently, he had another

10   deal, a Mt. Auburn hotel project that was kind of zipping

11   through council.

12        Interestingly, the mayor, I think, was against that one

13   and kind of tried to obstruct it, and it still went forward.

14   So probably not the case that he was having trouble getting

15   traction.

16   Q.   He was having trouble getting traction with 435, though,

17   right?

18   A.   Yeah.  That's what he had shared.

19   Q.   Right.  So you were aware of that at the time that you

20   were asking him to raise money from his network of folks in

21   Columbus.  Is that fair to say?

22   A.   That he and John Cranley were butting heads?

23   Q.   You were aware that 435 was running into some

24   difficulties?

25   A.   I think, yeah.

SITTENFELD - CROSS

1    Q.   Okay.  Now, you mentioned the October 30th call on

2    direct.  Now, I think you said you raised 1,800 donations; is

3    that right?

4    A.   So over that particular cycle, so this is both campaign

5    contributions plus PAC contributions, which were totally

6    separate, of course, but the total volume over that three-year

7    period was very close to 1,800 individual contributions.

8    Q.   Totaling over a million dollars?

9    A.   The total, yes, would have been over that amount.

10   Q.   Now, in October 2018, the mayor's election was three

11   years away?

12   A.   It was a spring 2021 primary, so depending on where you

13   start the clock in 2018, anywhere from two and a half to more

14   years away, correct.

15   Q.   And you had not even -- you had not announced your

16   candidacy at that time?

17   A.   I had not.  Not official- -- I hadn't done like a

18   campaign kickoff.

19   Q.   You had intended to run, but it wasn't official?

20   A.   Correct.

21   Q.   Because it was really early in the process.  Is that fair

22   to say?

23   A.   You know, I know someone lamented a little bit -- it was

24   earlier in the process.  I know someone lamented a little bit

25   earlier the role that campaign fundraising plays in our

*SITTENFELD - CROSS*

1    democracy.

2        I would add to that list of lamentations that things

3    start really early.  You know, you run a campaign because you

4    want to get in there and govern, and do all the stuff that you

5    talked about on the campaign trail, but everything kind of

6    gets ratcheted up, so yeah, things do start very early.

7    Q.   Now, you mentioned the statement that you made to Ndukwe,

8    you don't want to be "like love you but can't," but you didn't

9    need to be mayor to help on 435, right?

10   A.   I guess, if you're going to help a project in the ways

11   that City Hall can help a project, and you are not a person

12   who is in some capacity at City Hall, it would be impossible

13   to help in those ways.

14   Q.   Well, you could have helped as a city council member when

15   the development agreement was put before the city, right?

16   A.   Yeah, and would have enthusiastically done so.  There was

17   never a development agreement put before the city.

18   Q.   So you didn't need to be mayor to help him with the

19   project?

20   A.   Correct.  What I was saying to him, given his sharing,

21   again, very justifiable frustration of the mayor, John Cranley

22   at the time, is trying to block and obstruct me, that's what I

23   was responding to.

24        MR. SINGER:  Can we pull up, it's 13B, please.

25        MS. TERRY:  13B?

*SITTENFELD - CROSS*

```
 1          MR. SINGER:  Yes.  Your Honor, permission to publish
 2     13B?  It's already been admitted.
 3          THE COURT:  You may.
 4          MR. SINGER:  Page 3.  I'm sorry.  Page 2.
 5     Q.  So I think what you told him, and I'm looking at that
 6     bottom paragraph there, and I'm just going to read it.
 7          "If you say look, I don't want to support you in the name
 8     of Chinedum Ndukwe, but some guy I've never met from Columbus
 9     is going to use a coup, you know, you know your network are
10     going to round up a bunch of LLC checks, like, that's great.
11     I actually don't care.
12          "But I mean, the one thing I will say is, you know, I
13     mean, you don't want me to be like 'hey, Chin, like love you
14     but can't'."  Did I read that correctly?
15     A.  You read that correctly.
16     Q.  Now, you could have helped him as a city council member,
17     correct?
18     A.  Yeah.  And did on this and other things, yes.
19     Q.  And he needed help -- he was going to need help soon,
20     right?  He said he was going to be presenting the development
21     agreement before the city; is that right?
22     A.  I think it was somewhat vague in terms of when he needed
23     help, but I also think, given our long relationship, given my
24     backing other good projects, I think he understood me to be at
25     the ready to help him do something good for the city at any
```

SITTENFELD - CROSS

1    juncture.

2    Q.   All right.  So there was some discussion about the

3    Issue 13, the November ballot initiative.  Do you recall the

4    November ballot initiative, Issue 13?

5    A.   I do.

6    Q.   And this is the initiative where the campaign donates --

7    donation laws previously allowed an individual to give both

8    $1,100 individually and in however many LLCs they wanted to

9    contribute; is that right?

10   A.   That's what it was before the change, correct.

11   Q.   And the new change would mean that an individual could

12   either give from themselves individually or from one LLC, but

13   not both?

14   A.   Correct.  Or go fundraise from their network.

15   Q.   Correct.  Just so as long as it was attributed to the

16   true source of the payor; is that right?

17   A.   Absolutely.

18   Q.   Now, this was, obviously, pretty popular in the city.  Is

19   that fair to say?

20   A.   I voted for it.

21   Q.   And you publicly supported it, right?

22   A.   Yeah.  So Mr. Seelbach was the sponsor of the legislation

23   to advance this reform.  I, at the time, chaired the committee

24   at City Hall that actually had to vote on any charter

25   amendment that would be put forward.

SITTENFELD - CROSS

1      So it needed my support to be put up before the

2  committee, and was glad to sponsor it.  I thought it was smart

3  legislation.

4  Q.  And one of the reasons it was good legislation is because

5  prior to the ballot initiative, a rich guy could just give

6  tons of money to a campaign, right?

7  A.  Yes.

8  Q.  And it would be really hard to figure out who gave what

9  money if they're all in different LLCs.  Is that fair to say?

10  A.  Probably that's not accurate.  So some of the people, I

11  hope they don't object to my naming their names, but people

12  like Dan Schimberg, Tom Fernandez, Tom Williams, people who --

13  by the way, all people who contributed in enormous ways to the

14  civic and economic fabric of Cincinnati.

15      If one of them had five or ten, or even more LLCs, and

16  they would donate from those LLCs, it wasn't -- it was clear

17  to anyone who was or wanted to pay attention, oh, these five

18  people -- or, sorry, these five LLCs are connected to one of

19  the individuals I just met, or plenty of other people.  So no,

20  it actually -- it wasn't some big mystery.

21  Q.  So it was less the mystery than the fact that certain

22  people had the ability to just flood a lot of money into the

23  campaigns.  Is that the opposition to the pre-Issue 13 law?

24  A.  I don't want to speak for Mr. Seelbach, but I think the

25  sense was, just because somebody has 20 LLCs doesn't

SITTENFELD - CROSS

1    necessarily mean they should be able to give 20 times the

2    amount of somebody with -- who is just themselves.

3         That being said, like so much in our system of democracy,

4    things that I would like to reform and I would have changed,

5    including my support of the very reform we're talking about,

6    what was in place at the time was lawful.

7    Q.   So you were behind this ballot initiative.  You thought

8    it was good policy, right?

9    A.   I voted for it, yes.

10   Q.   But at the same time, you were trying to raise as much

11   money from LLC checks before that November law change as you

12   could.  Is that fair to say?

13   A.   Absolutely.

14   Q.   You wanted to take advantage of that loophole before it

15   closed.  Is that fair to say?

16   A.   I guess your characterization of take advantage, I think

17   candidates lawfully trying to fundraise as much as they can,

18   given the system that we have and live in, I would say is

19   pretty standard.

20   Q.   All right.  Let's -- can you pull up --

21        MR. C. MATTHEW RITTGERS:  Your Honor, permission to

22   publish USA 14B?

23        THE COURT:  You may.

24   Q.   All right.  You testified about the November 2nd call

25   that was recorded that you had with Mr. Ndukwe, right?

*SITTENFELD - CROSS*

1    A.   Yes, sir.

2    Q.   And I think, before we get to that, on direct you

3    testified about how, although at the time, Rob and Brian --

4    well, were Rob and Brian, sort of, your typical investors that

5    you ran through in City Hall?

6    A.   So as you know, the only prior time I had ever met them

7    was, I believe, February 26th of 2018, so nine months earlier.

8    People who represented themselves as people who wanted to

9    invest in the City of Cincinnati, that's just not where my

10   brain went, could have ever thought, oh, these guys are

11   undercover FBI agents.

12       They came to town.  We sat down.  I remember some of the

13   things we talked about, as I mentioned earlier.  I remember

14   saying, hey, Brian, you've mentioned you have a green energy

15   business.  Can I help introduce you to the sheriff's office?

16   Can I help introduce you to a city department, because it

17   sounds like you might have something to contribute.  Never

18   once asked for donation.  Never came up.  They didn't discuss

19   it.

20       So, one, it did feel pretty routine, my hour-long

21   exposure to them; and, two, this is one of the things I really

22   liked about politics and public service.  People are weird.

23   I'm weird.  You know, you get to see the whole spectrum of

24   humanity.

25       So to pinpoint and isolate one group of people and be

SITTENFELD - CROSS

1    like, I'm never going to talk to them again because they're

2    too weird, like, you would never get to talk to another human

3    being, right? So yeah, nothing about that prior encounter

4    seemed out of the ordinary to me.

5    Q.   I think you testified that one of the reasons that you

6    trusted them is because of Mr. Ndukwe's relationship with

7    them; is that right?

8    A.   Yeah.  I mean, one of the things, among lots of things,

9    that's been really hard about this situation is how are any of

10   us supposed to, sort of, go through the world and navigate

11   life if the people that we believe are friends, the people

12   we're excited to share pictures of our newborn child with,

13   might be spinning a total, sort of, fictional story and

14   universe to you.  I could have never imagined that.

15         MR. SINGER:  So let's -- can we go to page 3 of USA

16   14B, please.

17   Q.   Now, about a third of the way down the page, Mr. Ndukwe

18   says:  "But good news is, I'll be able to get you close to

19   $20,000 over the next couple."

20         And then he says:  "You know, and these guys that are

21   doing the deal on 435 Elm, you know, they're, they're, you

22   know, they don't really fuck around.  They're very specific."

23         So this is in reference to Rob and Brian, right?

24   A.   Yes.

25   Q.   So then at the bottom of the page, he -- Mr. Ndukwe says

*SITTENFELD - CROSS*

1    what he means by "they're very specific," doesn't he?

2    A.   Yes.

3         MR. SINGER:  Can you blow up just that last

4    paragraph, please?  Thank you, Ms. Terry.

5    Q.   He says:  "So and then for, for, and then for this

6    meeting with Rob next week."

7         Now he's talking about the in-person meeting that you had

8    already scheduled to sit down with Rob; is that right?

9    A.   That is what he's talking about.  I can't remember if it

10   was already scheduled or not scheduled on this call.

11   Q.   He says:  "And then for this meeting with Rob next week,

12   I'm pretty sure he can get you ten this week."

13        And he says:  "You know, the biggest thing is, you know,

14   if we do the ten, I mean, they're gonna want to know that when

15   it comes time to vote on 435, like whenever that, I don't know

16   if it's a year, two years, three years, that it's gonna be a

17   yes vote, you know, without, without a doubt."

18        That is a very express tie between what Rob wants to do

19   next week and give you $10,000, and a yes vote without a

20   doubt; is that right?

21   A.   I think it's the only express thing of that nature across

22   all of the recordings, both those played and unplayed.

23   Q.   All right.  So at this time, at least one thing is very

24   clear.  When you meet with Rob, he's going to offer you money

25   for a yes vote on 435 Elm.  That's what Ndukwe is saying; is

*SITTENFELD - CROSS*

1    that right?

2    A.   I know I can't ask Ms. Terry to go to the next page, but

3    no- --

4    Q.   We'll get there.

5    A.   My answer to your question is not at all.  It was so

6    aberrant and unusual for someone who -- again, like forget

7    just the friend piece, and all of the trust and mutual respect

8    that goes into a friendship.

9         This was also -- and I think the government has kind of

10   conveyed and shared some of this -- a developer, respected,

11   reputable, in good standing.

12        So when you hear someone say something that seems so out

13   of character with who you believe you know them to be, you

14   say, wait a minute, I'm paraphrasing a little bit, like, you

15   don't sound like the Chinedum whom I know and admire and

16   respect and want to help flourish in this city.

17        So when I then said to him no on the express comment that

18   you just made, again, I've some of this committed to mind but

19   not all of it.

20        The next line, "And I know that's not what you're saying

21   either," that's me saying to my friend, like, you sound like

22   you just misspoke in some really strange way.

23        If he had then said no, no, no, P.G., let's cook up some

24   corrupt- -- oh, what's going on here?  He said:  "Okay.  I

25   hear ya.  I hear ya."  I wish to God that had not given me as

1    much comfort and clarity as it did, but I thought I had just

2    resolved that with him.

3    Q.   So this was Ndukwe delivering a message on behalf of Rob,

4    right?

5    A.   I knew Rob from one one-hour meeting.

6    Q.   Sure.

7    A.   He seemed completely normal.  The person I was talking to

8    was my friend.  It all sounded like there was a disconnect.

9    Q.   He said these guys are very specific.  And then Ndukwe

10   said, Then for this meeting with Rob next week, he's going to

11   have $10,000 for you, but he is going to want to know that

12   it's gonna be a yes vote without a doubt?

13   A.   I think -- may I, Mr. Singer?

14   Q.   Can I just ask my question real quick.  That's what he

15   said.  Does that -- well, I guess I will ask you, is that your

16   understanding of what the words say?

17   A.   I think the thing that it feels like you're sort of

18   separating is you make it seem like here's Chinedum, this

19   upstanding, respected pillar of a developer, and then across,

20   you know, the ocean, are these corrupt, sketchy guys.

21        That's not how it was presented.  This is I, Chinedum,

22   respected person, old trusted friend, these are my chosen

23   partners.  These are the people I am bringing in to help fix

24   and revitalize your city.

25        So because of my knowledge of who Chin was, because of my

*SITTENFELD - CROSS*

1    belief in him, part of my brain was also Chinedum doesn't want

2    to be connected and attached to corrupt people.  You can

3    understand why someone would think that about an old respected

4    friend.

5        And, again, I had no clue, and I don't think any member

6    of this community or the public did, that Chinedum wasn't

7    really getting to act of his own volition.  He was under

8    enormous pressure because of a situation that I was not aware

9    of.

10   Q.   What I'm asking you about is what Chinedum actually said.

11   He said, When Rob meets you next week, he's going to have

12   $10,000, and he's gonna want to know it's a yes vote without a

13   doubt.  That set off alarm bells; did it not?

14   A.   That's absolutely what he said.  And what I'm telling you

15   is both what I understand now and also what I understood and

16   felt and believed in the moment, which was Chinedum, I know

17   that's not what you meant either.  This isn't who you are.

18   Q.   But you understood what those words meant at the time

19   that you heard them; is that right?

20   A.   Clearly, that's why I said, "Nothing can be illegal.

21   Nothing can be a quid pro quo."

22       MR. SINGER:  Okay.  Let's -- can we move to the next

23   page, please.

24       And, Ms. Terry, can you please just blow up maybe the

25   first -- yeah, right there is good.

SITTENFELD - CROSS

1    Q.   So you say nothing -- you are offered a very express

2    $10,000 for votes.  And your response is: "Obviously, nothing

3    can be illegal, like nothing can be a quid pro quo, and I know

4    that's not what you're saying either.  But what I --"

5         And he cuts you off, "Yeah," in the middle of your

6    sentence -- "can say is that I'm super pro-development and

7    revitalization of especially our urban core"; is that correct?

8    A.   That is true.  I would never, did never, would never

9    accept a quid pro quo or some illegal bargain, but I'm proud

10   of my voting record and my service to the city, and that

11   included those public policy decisions of wanting to do

12   projects just like 435 Elm.

13   Q.   And 435 is a development project, right?

14   A.   Correct.

15   Q.   And the aim of 435 was to revitalize the urban core of

16   downtown; is that right?

17   A.   Absolutely.

18   Q.   And what Mr. Ndukwe was saying that Rob was asking was

19   $10,000 for help with this development project to revitalize

20   our urban core, 435; is that right?

21   A.   Yes.  And I realize we're retracing some ground.  But

22   when I say to him, "I know that's not what you're saying

23   either," I guess, the direction they're going, I don't -- and

24   what we've heard about these being scripted lines, scripted

25   phone conversations, why his follow-up, instead of being,

1  "Okay, no.  I hear ya.  I hear ya," wasn't no, no, no, I

2  really do mean a quid pro quo.  I said -- I clarified what did

3  surprise me, and he then agreed with that.

4  Q.  He said:  "Yeah."

5     And then you say:  "I'm super pro-development and

6  revitalization of especially our urban core," which is

7  435 Elm.  And then he says: "I hear ya.  I hear ya," right?

8  A.  My understanding was only ever that he was saying, "Okay,

9  no.  I hear ya.  I hear ya" in response to the totality of

10  what I had just said one second before.

11  Q.  And then you quickly transition to, "And we can discuss

12  that more in person"; is that right?

13  A.  Uh-huh.

14  Q.  And then he says:  "Okay.  Okay, my guy, perfect,

15  perfect."  He didn't ask you another question, and then you

16  say:  "But I'm not, I'm not sure.  I'm not there.  I, in seven

17  years, have voted in favor of every single development deal

18  that's ever been put in front of me"; is that right?

19  A.  I did say that.

20  Q.  So Mr. Ndukwe says that Rob is going to offer you $10,000

21  for a development deal, but he wants a yes vote.

22     And seconds later, you say: "I voted in favor of every

23  development deal that's ever been put in front of me"; is that

24  right?

25  A.  I stated what my long-time public policy positions were,

1    yes.

2           MR. C. MATTHEW RITTGERS:  Okay.  Can we get rid of

3    this one and then blow up maybe just the bottom third.

4    Actually, just the statement just above that.  I'm sorry.

5    Q.  So from there, you guys discussed -- you set up the

6    meeting, right?  You talk about when we're going to meet, is

7    that fair to say, just prior to this blowup?

8    A.  I believe so, as I read it.

9    Q.  You offered to come downtown and -- or to Rookwood, and

10   Ndukwe says no, we can meet downtown.

11          And then you offer, without a question:  "Okay.  Let

12   me -- do you think -- I think also meeting these guys, I

13   should, I should -- if we can take five minutes and walk them

14   through some of the voting data just so they can appreciate

15   the starting point that I'm beginning this endeavor in."  Is

16   that a fair reading of that?

17   A.  I did say -- it's an exact reading, yes.

18   Q.  Thank you.  So you had just been offered a very expressed

19   quid pro quo, and your intention was to meet with these guys

20   and spend some time showing what your starting point is; is

21   that right?

22   A.  Yes.  I would say, once again, I think you're kind of

23   skipping over a pretty significant piece, which is someone

24   saying something very unusual for them, my rejecting it, my

25   saying to them I don't believe that's what you meant, and them

*SITTENFELD - CROSS*

1    agreeing, so kind of skipping over the baloney of the

2    sandwich.

3    Q.   We didn't skip over that.  We went through that, and now

4    we're going through what you said after that; is that correct?

5    A.   After those things, yes.  The comment you just read, I

6    absolutely said.

7    Q.   Okay.  And then this last statement, "Look, these guys,

8    these guys want to know.  I mean, look, people want to invest

9    in a winning endeavor, right?  And I want to give them the

10   confidence and the comfort that that's what they're doing"; is

11   that right?

12   A.   Yes.

13   Q.   So what you're saying there is you want to give Rob

14   confidence and comfort that he is going to be investing in a

15   winning endeavor, right?

16   A.   Yes.

17   Q.   And the winning endeavor would be the 435 Elm Street

18   project; is that right?

19   A.   In that particular context, yeah, that looks right.

20   Q.   Now, you believe these guys, you believe Rob and Brian

21   were out-of-town investors, right?

22   A.   Yes.

23   Q.   And I think you'll agree that it's not in the city's

24   interest to do business with corrupt businessmen.  Is that

25   fair to say?

SITTENFELD - CROSS

1   A.   Correct.

2   Q.   And you had a choice at this point.  You could have gone

3   ahead and met with Rob on November 7th, right?

4   A.   Yes.

5   Q.   Or you could have declined, right?

6   A.   I didn't believe them to be corrupt businessmen, both

7   from my own direct interaction and from mister -- from

8   Chinedum conferring his trust on them, and from Chinedum sort

9   of correcting and backing away from what he said.

10  Q.   All right.  So you have that lunch on November 7th; is

11  that right?

12  A.   We did have that lunch.

13  Q.   And during that lunch, you talked about 435?

14  A.   We did.

15       MS. SINGER:  Ms. Terry, would you mind pulling up

16  15C, please.

17       Your Honor, permission to publish to the jury?

18            THE COURT:  You may.

19            MR. SINGER:  Can you scroll down to page 6.  All

20  right.

21  Q.   So at the bottom of the page, let's go to the middle.  Do

22  you see where you say: "So what's the latest on 435?"  Do you

23  see that?

24  A.   I do.

25  Q.   That was sort of the initiation of your lunch

*SITTENFELD - CROSS*

1   conversation about the 435 Elm deal; is that right?

2   A.   Yes.

3   Q.   Okay.  And then Chin says -- Mr. Ndukwe says, I think the

4   last to second comment that he makes in the last sentence,

5   "And then at that point, we're going to make our proposal for

6   a development agreement."  Do you see that?

7   A.   I apologize.  Can you orient me?

8   Q.   Sure.  It's --

9   A.   I see it.  I see it.

10  Q.   Okay.  Now, at this point, Mr. Ndukwe had not submitted

11  any development agreement to the city; is that right?

12  A.   Not to my knowledge.

13  Q.   Okay.  So you didn't have the opportunity to review any

14  filing or documents that they presented to the city because

15  they hadn't been presented; is that right?

16  A.   That's correct.

17  Q.   So you're basing your knowledge on what Mr. Ndukwe is

18  telling you right now?

19  A.   Yes, when -- whether it was Mr. Ndukwe or any number of

20  other respected developers who had done other good projects

21  for the city, if someone sits down with me in my office over

22  breakfast, over a drink, and they say Turner Construction is

23  my GC, IHG is going to be my hotel flag, Elevar is going to be

24  my architect, I've got these great equity partners who are

25  going to help us finance the deal, I would never think this

1   person is lying to me.

2   Q.  All right.  Let's look at that last paragraph.  He says:

3   "We're gonna make a proposal to the city, basically, to them,

4   hey, we wanna get this for a dollar, or work out some

5   long-term lease of some sort for a minimal amount, or we're

6   gonna need X, Y, and Z"; is that right?

7   A.  That's what's on the transcript.

8   Q.  So you know at this point he wants this for cheap.  He

9   wants either a sale for a dollar, or he wants a minimal lease,

10  or a lease with a minimal payment; is that right?

11  A.  That's what he said, yes.

12  Q.  All right.  And then you proceeded to discuss the

13  development deal in a little more detail; is that right?

14  A.  You're referring to the CRA gap financing, anything else

15  that they might need to be able to pull the project off?

16  Q.  That's what I'm talking about, yes.

17  A.  Yes, I asked those.  You know, was it a demolition or

18  not, those were all things I asked.

19  Q.  Okay.  So now let's --

20          MR. SINGER:  Can we go to page 9, please.

21  Q.  And so after that discussion, this is when you say: "I

22  can shepherd the votes"; is that right?

23  A.  Yes.  After asking -- meetings like this were actually so

24  common, sometimes they'd happen in your City Hall office,

25  sometimes they would happen over a meal or a lunch at Nada,

1   even.

2       After -- so there were probably, I don't know, maybe a

3   dozen questions you would ask to basically glean does this

4   person have their stuff together.  Are they bringing forward a

5   project that's good for the city and in the city's interest,

6   and can they pull it off, especially if you're a respected,

7   reputable developer.

8       If someone, you know, is a yes across the board to those

9   dozen questions, I would imagine nearly a hundred out of a

10  hundred times that my answer would be great.  You know, I'm

11  supportive of this, happy to express my support to my

12  colleagues so that they know where I stand, things like that.

13  Q.   And just to reflect back on the conversation you had with

14  Ndukwe on November 2nd, votes is what Rob was gonna want to

15  know about at this meeting; is that right?

16  A.   Playing this back in slow motion now, and the -- sort of

17  the nature to which things are scripted, I absolutely believe

18  you.  That's not what I understood.

19  Q.   Well, I think you testified just a couple minutes ago

20  that you recognized that when Chin said Rob was going to want

21  a yes vote without a doubt for $10,000, is that that was a

22  very express quid pro quo offer, correct?

23  A.   Yes.  Which I then rejected, clarified, and clarified

24  that it was not, in fact, what he meant.

25  Q.   What they wanted, what Rob was going to want was votes

*SITTENFELD - CROSS*

1    for 435 Elm; is that right?

2    A.   No.  That's what I clarified.

3    Q.   What Ndukwe said was that Rob was gonna want votes for

4    435 Elm, right?

5    A.   I apologize, Your Honor.  Yes, they said that.  That is

6    the comment that I clarified.

7    Q.   I understand your position.

8    A.   Thank you.

9    Q.   Now, Ndukwe had a real interest in 435, right?

10   A.   My understanding was always that he had the air rights to

11   the building, which, I mean, when you're talking about

12   downtown, there's only one way to go so, yes, that is a very

13   important property claim.

14   Q.   And your discussion, would it surprise you -- I know you

15   probably have not stop-watched it, but would it surprise you

16   to know that from the time you first said, "Let's talk about

17   435," until the time that you said, "I can shepherd the

18   votes," is about 6:20.  Would that surprise you?

19   A.   Depending on how -- no, that wouldn't surprise me at all.

20   I guess, depending on how fast someone talks, how slow they

21   speak, how longwinded they are, how not, somebody could answer

22   the key -- I mean, there were probably developers who would

23   come into your City Hall office, they knew everything that you

24   would ask before you would even ask it.

25        They would run down -- you would have scheduled a

SITTENFELD - CROSS

1    15-minute meeting, and three minutes later you'd be looking

2    about and say, well, we can talk about the weather for the

3    next 12.

4        People could usually -- especially a seasoned, respected

5    person like Mr. Ndukwe, could communicate the vitals and the

6    essentials pretty quickly.

7    Q.   Okay.  But 6:20 seconds seems reasonable.  Is that fair

8    to say?

9    A.   I definitely take your word for it, that that's how long

10   this was.

11   Q.   Now, the development agreement ultimately was presented

12   to the city in January of 2019; is that right?

13   A.   That sounds right.

14   Q.   And so at that point, the economic development department

15   would have all the information that was provided, correct?

16   A.   Yes.  That sounds right.

17   Q.   And they would make an assessment of the project based on

18   that information; is that right?

19   A.   I think so, yeah.

20   Q.   And then when the project is presented to the port, they

21   would receive a packet of information relating to the project,

22   right?

23   A.   Yes.

24   Q.   And then they would assess that.  Is that fair to say?

25   A.   I believe so.

*SITTENFELD - CROSS*

1    Q.   Okay.  And these are the professionals in the city --

2    economic development professionals in the city that are most

3    equipped to assess development projects; is that right?

4    A.   So yes and no.  I have great respect for people like

5    Mr. Denning, but one example, which is probably pretty

6    relevant to this very case, is during the same period of the

7    sting, one of Mr. Ndukwe's other projects was a Mt. Auburn

8    hotel deal.

9        The professionals who you've referenced, who I have the

10   utmost respect for the work they do to try and do the kind of

11   stuff I wanted to do, revitalize the city, they brought

12   forward a plan, an incentive plan for Mr. Ndukwe's hotel

13   project that the elected leadership disagreed with.

14       So a majority of city council, and I believe it was

15   bipartisan if not tripartisan, said we respectfully hear the

16   advice that the professionals you're referencing are giving,

17   but we disagree.  We don't think it's in the best interest of

18   the city.

19       You know, Mr. Flynn, whose testimony started this trial,

20   he was kind of known at City Hall for disagreeing with the

21   professional civil servants, so -- always respected their hard

22   work.  I think they mostly got it right, but, as is the case

23   with all of us, they weren't right a hundred percent of the

24   time.

25   Q.   Is it fair to say that economic development's assessment

SITTENFELD - CROSS

1    lasted longer than 6:20 seconds?

2    A.   Yeah.  I would expect Phil Denning, or one of Phil

3    Denning's deputies, to be going, you know, line by line

4    looking at a pro forma, doing other stuff, thinking, you know;

5    but yeah, so I assessed it in a way that was how I always

6    assessed things as an elected official.

7         The civil servants were probably much more so in the

8    weeds, but I also can't speak for them.  There might have been

9    projects where they looked at it from -- if something from

10   North American Properties came through, they might have been

11   able to do their vetting of them in two minutes.  I don't

12   know.  That would be a question for someone like Mr. Denning.

13   Q.   But based on this, what you said is that you would

14   shepherd the votes, right, and that's votes before city

15   council?

16   A.   This project sounded like a home run to me.  Yes.

17   Q.   Okay.  So after you talked about 435, that's when you

18   broke out the political data; is that right?

19   A.   There might have been some stuff in between there, but

20   that happened in the same lunch, absolutely.

21   Q.   Okay.  You called it "the political stuff"; is that

22   right?

23   A.   You'll have to show me the quote, Mr. Singer.

24   Q.   Sure.

25   A.   But I believe you.

*SITTENFELD - CROSS*

1    MR. SINGER:  Can we go down to page 20, please.  And then if

2    we could blow up the top third.

3    Q.  You see there, you say:  "This this, this is political

4    stuff."  Do you see that?

5    A.  Yes.

6    Q.  And then you say:  "In the event Chinedum is successful

7    in twisting your arm to be supportive of someone, I want you

8    to know that I think it's a -- you like making good bets and

9    good investments."  Do you see that, that's what you said?

10   A.  I did say that.

11   Q.  And when you said "supportive of someone," you're talking

12   about support with contributions; is that right?

13   A.  Yeah.  So on the October 26, 2018 phone call, Chinedum

14   had brought up, I want to raise money for you.  I want to

15   raise money for you from LLCs.  I want to do it from my

16   business partners and from my network.

17       I did not go into this meeting -- I didn't know if his

18   network of people ultimately would be supportive or not, so

19   that's why it wasn't when Chinedum is successful, it was in

20   the event.

21       I didn't know, but as was mentioned earlier, very few

22   donors say, oh, this person's headed towards a losing

23   election, how can -- let me back them with campaign support.

24   So you want to try and communicate to people that you have a

25   good shot at winning the office that you're pursuing.

91

*SITTENFELD - CROSS*

1    Q.   Chinedum had already told you five days prior that they

2    were going to get you $20,000, right?

3    A.   I clearly was unsure, that's why I said in the event.

4    Q.   And then he said: "And they'll give you $10,000 next

5    week," right?

6    A.   He said that.

7    Q.   "And you will get a yes vote without a doubt"?

8    A.   He said that, yes.

9    Q.   And that was five days prior?

10   A.   November -- yeah.

11   Q.   So you had some expectation that you were going to get

12   some money; isn't that right?

13   A.   When you're in an early relationship with potential

14   donors, it doesn't -- being presumptuous in that way doesn't

15   really make sense.

16   Q.   This is not your typical, potential donor.  Is that fair

17   to say?

18   A.   I guess you would have to clarify what you mean by that.

19   Q.   This is a potential donor that had just offered you a

20   very specific quid pro quo, right?

21   A.   That was not my understanding of either of these donors.

22   I mean, as you know, Mr. Ndukwe had been a long time

23   enthusiastic proactive donor, and I had never, ever once known

24   him to do or intend anything corrupt.

25             MR. SINGER:  All right.  So in the middle of your

1    presentation -- can we move down to page 23, please.

2    Q.  This is during the presentation in which you're trying to

3    convince Rob to be supportive of someone; is that right?

4    A.  Yes.

5          MR. SINGER:  Can you please blow up maybe the top

6    half of this page, please.

7    Q.  It got cut off at the top, and I can show you the top

8    part if you think it's helpful.

9      Do you see this is the tail end of Rob's conversation,

10    where he says: "So we wanna try to get 435 up being

11    veto-proof, you know."  Do you recall that?

12    A.  I mean, I recall it from having heard the recordings many

13    times, and having read this.

14    Q.  Okay.

15    A.  And just to your comment one moment ago, if there's a

16    question about something that needs the full context, I'm more

17    context better than less.

18    Q.  So he talks to you about 435 being veto proof.  You said

19    you don't have a machine.  But then your fourth statement

20    down, you say: "But, like, I can move more votes than any

21    single other person"; is that right?

22    A.  I did say that.

23    Q.  So in the context of Rob saying we're going to need -- at

24    least they perceive that they're going to need a lot of votes

25    for this, your response was, "I can move more votes than

1    anybody"; is that right?

2    A.   Yes.  If -- really of anybody.  It doesn't matter if

3    they're an out-of-town investor who wants to revitalize a

4    major downtown property, or anything else that I thought was

5    good for the city and would have believed in.

6         If somebody came to me and said, hey, we're concerned

7    that the mayor, or whoever else, is going to try and block and

8    obstruct them, and I believe their project was good and would

9    have the support of the majority of elected officials at City

10   Hall, I would absolutely try and give them that confidence and

11   to say to them, you know, I hope that by using my own voice

12   and expressing my own reason for supporting something, other

13   people will take that logic too.

14   Q.   All right.  You wrap up the meeting.  You guys walk

15   across the street to the condo; is that right?

16   A.   Again, I mean, you would have to tell me how much stuff

17   happened in between.  But after lunch -- because there was

18   kind of a lot of skipping around rather than offering all the

19   recordings in the full context; but, ultimately, after we left

20   the restaurant, yes, we went across the street to the

21   580 Building.

22   Q.   So you go across the street to the 580 Building.

23        MR. SINGER:  Can you pull that up, page 29, please.

24   Q.   Do you see, at the top of the page there, Rob says: "So

25   he doesn't want his name on anything," he's talking about Chin

SITTENFELD - CROSS

1    there, right?

2    A.   Sorry.  How many lines down are you?

3    Q.   Sure.  There, you got it.

4    A.   Got it.  Got it.

5    Q.   "So he doesn't want his name on anything," he's talking

6    about Chin, right?

7    A.   "So he doesn't want his name on anything?

8         "Right.

9         "And, umm, and we typically don't either."

10        Yeah, my understanding would have been that that was

11   Chinedum and Rob and Brian.

12   Q.   So nobody wants their names on any contributions.  Is

13   that fair to say?

14   A.   That's my understanding.

15   Q.   And you say, "Right right"; is that right?

16   A.   Yes.  I probably -- I definitely say it here.  I might

17   have even been doing -- I probably say right right as a filler

18   in sort of, you know, the interpersonal back and forth when

19   human beings are talking to each other.  Right right is, you

20   know, you're talking, and I'm still in front of you.

21   Sometimes it might mean yes, and sometimes it might mean I'm

22   still here, you know, there's no wax in my ears.

23   Q.   You weren't necessarily affirming what they were saying,

24   you were just acknowledging that they made a statement?

25   A.   Yes.  Mr. Singer, I'm sure you know what I mean.

*SITTENFELD - CROSS*

```
 1    Sometimes when you're engaging with someone, they might
 2    actually be saying something you disagree with, and you say
 3    right right, I'm hearing you, right?
 4    Q.   Yeah.  I understand.
 5    A.   Right.
 6         MR. SINGER:  Could you go back, same page.  All
 7    right.  Let's just blow up until, "Right.  Understood."
 8         MS. TERRY:  Can you say that one more time?
 9         MR. SINGER:  Yes.  How about the first half of the
10    page, please.
11    Q.   All right.  So this includes the same two lines, "So he
12    doesn't want his name on anything, and typically we don't
13    either."
14         And then Rob says:  "You know, we usually try to figure
15    out creative ways to do something."
16         And you say:  "Right.  Understood."
17         Now, the creative way to do something is to have
18    contributions that don't have their names on them, right?
19    A.   No.  I presume that meant fundraising, bundling, going to
20    your universe of investors and buddies to raise -- to
21    fundraise.
22    Q.   He had never said anything about bundling during your
23    conversation at lunch; is that right?
24    A.   Maybe not.  That didn't impact my understanding of it,
25    except also where Chinedum started the whole conversation.
```

*SITTENFELD - CROSS*

1    Q.   And there is a difference between not putting your name

2    on something and bundling, right?

3    A.   What I understood them to be saying was, as we've heard,

4    Chinedum, and by extension Rob, felt like they were being

5    punished, obstructed, blocked by Mayor Cranley.  That had them

6    feeling skittish, from what they communicated to me at the

7    time.

8        So the lawful way, in our democratic system of privately

9    financed campaigns, is rather than, you know, you, Matt

10   Singer, need to write a contribution, you can say I'm going to

11   go to my colleagues, I'm going to go to my neighbors.  That

12   was always my understanding of what they were -- the intent

13   was.

14   Q.   That wouldn't necessarily be a creative way for someone

15   who wants to support you to pay you money, though, right?

16   A.   I'm not sure I follow what you're saying.

17   Q.   So I think what he says here is, "He doesn't want his

18   name on anything, and typically we don't either," saying we

19   don't want our name on any contributions, right?

20   A.   Correct.

21   Q.   And then he says: "But usually, we try to figure out a

22   creative way to do something," right?  That's not bundling,

23   that's finding a way to get you money without their name on

24   it, right?

25   A.   I guess you're asking me a question about what Rob

SITTENFELD - CROSS

1    believed to be creative.  I don't know what Rob thought was

2    creative.  It sounds --

3    Q.  Fair enough.

4    A.  My understanding was he thought -- you know, my mother

5    always had liked the expression "fools' names and fools' faces

6    often appear in public places."

7         Having a donor want privacy, not want their name to end

8    up in the newspaper, that was actually pretty common and

9    pretty typical.  So nothing he was saying about wanting to

10   raise from his network but not make the contributions himself,

11   none of that sounded very surprising or out of step with the

12   past experiences.

13   Q.  I think you testified earlier that it's in the public's

14   interest to know who is contributing to campaigns, right?

15   A.  Yeah, so you do know who contributed.  If somebody goes

16   to -- if I go to my neighbor Phil, and I say Phil, I'm --

17   we're saving for Georgia's kindergarten, or we want to take a

18   vacation, but I know someone who I think would be a great

19   candidate for public office, will you write them a check for

20   $50?

21        Phil is the donor, and Phil's name appears in what gets

22   reported, whether it's with the FEC or local filings.  And

23   that's what always happened in this situation.

24   Q.  Well, let's get back to that.  We'll get back to that.

25              MR. SINGER:  Can we pull up the second half of this

*SITTENFELD - CROSS*

1  conversation?  All right.

2  Q.  So Rob says: "Like, we want to help.  We want to make

3  sure, we want to really get this Cranley thing.  I would feel

4  comfortable telling my guys, like, hey, we're in this deal

5  with Chin if I know we're Cranley proof."

6      Now, that's a reference to the veto proof number of votes

7  for 435 that you previously talked about at the lunch; is that

8  right?

9  A.  Yes.

10  Q.  All right.  And then he says: "So with that, like Chin

11  told me hey, you know, I want to try and get P.G. $20,000.

12      "And I'm like, hey man, I I'm I'm, if if if we can get

13  this deal done, like let's fuckin' do it."

14      So that $20,000, that's the same number that Chin brought

15  up in the November 2nd call, right?

16  A.  That's correct.

17  Q.  And in the November 2nd call, it was Chin presented an

18  offer where Rob was going to offer money in return for a yes

19  vote on 435, right?

20  A.  That is what Chinedum was trying to convey.

21  Q.  Well, he made a very express quid pro quo offer, right?

22  A.  Yeah.  It's not where the understanding between him and

23  me ended, but it was what was intended to be scripted.

24  Q.  I'm just talking about what Chinedum said to you.

25  A.  That's what he said, yes.

*SITTENFELD - CROSS*

1  Q.   So Rob says:  "Chin told me I want to try and get P.G.

2  $20,000, and I'm like, hey, if we can get this deal done,

3  let's do it."

4       And then he says:  "What's the best way, what's the best

5  way for us to get that to you to get that deal?"

6       Now, this is, again, $20,000 to get the deal done; is

7  that right?

8  A.   That is played back, yes, that is what I understand Rob

9  to have meant from the moment of now.

10 Q.   Well, so this is the second time in five days that you

11 are offered a very express $20,000 to get a deal done; is that

12 right?

13 A.   I didn't -- when he said deal, I didn't think he was

14 talking about a deal of campaign contributions for some sort

15 of official action --

16 Q.   He was asking --

17 A.   -- which is why I responded as I did.

18 Q.   He was asking for $20,000 because they need votes to make

19 it Cranley proof, right?

20 A.   You're saying what his intent was.

21 Q.   I'm saying what his words said.

22 A.   That seems to be right.  That's not what I understood.  I

23 understood him to be talking about, you know, are we going to

24 get blocked by Cranley.  So I then say:  "Do you guys actually

25 think that John Cranley is going to try and veto it?"

SITTENFELD - CROSS

1    Q.   So $20,000 for votes to make it Cranley proof is a quid

2    pro quo, and your response is, "Are you sure he's going to

3    veto it," right?

4    A.   I did not understand him to be trying to offer money for

5    votes.

6    Q.   I think you just testified that his words were that he

7    wanted $20,000 for a deal that would make 435 Cranley proof;

8    is that right?

9    A.   I'm saying what I understand your scripters of this, sort

10   of, intent to be from this moment.

11        When I heard in the context of this conversation, no,

12   that's absolutely not what I understood or I would have

13   responded to that directly.

14   Q.   Well, you recognized it directly the first time you heard

15   it, right, on November 2nd?

16   A.   I did.

17   Q.   And then the same deal was made to you in person, right?

18   A.   That was what you're conveying about Rob's intent, yes.

19   Q.   And then your response was, "Are you sure he's going to

20   veto it," right?

21   A.   That's what I thought we were talking about.

22   Q.   "Are you sure you're going to need six votes," right?

23   That's what your question is?

24   A.   My question was -- so he's talking about this deal and

25   their fear that John Cranley was going to try and obstruct

*SITTENFELD - CROSS*

1    them.  And my response was directly to that.

2        If I had ever understood what you're saying the intent

3    was, I would have instantly said the exact same thing to Rob

4    that I'd said to Chinedum.

5    Q.  But that's not what you said.  You asked him if he was

6    going to veto it, and then when he said, "Well, we don't

7    really know," then you said, "I can deliver the votes," right?

8    A.  Is that --

9        MR. SINGER:  Ms. Terry, can you go on to the next

10   one, please.

11   Q.  Rob explains, in response to your question, "Are you sure

12   he's going to veto it?"  Rob explains, "I don't know.  Maybe."

13       And then you respond, "Honestly, I can sit here and say I

14   can deliver the votes."

15   A.  I think the word "deal" had been referenced, I don't

16   know, more than two dozen times over the last hour.

17       I understood them to be talking about a development deal

18   that I believe was a slam dunk for the city.  So when he's

19   raising concerns about is the mayor going to block us because

20   of his vendetta against Chinedum, that's what I'm responding

21   to.

22   Q.  So you're responding to the $20,000 for the development

23   deal?

24   A.  No.  Absolutely not.  I was in no way conflating, or

25   understanding those two things to be conflated.  I know this

1    is going back and for- -- fast forwarding a little bit, but

2    Chinedum was a long-time friend, an incredibly generous donor

3    to me, and somebody who I trusted and respected.

4        And in the fall of 2019, nearly one year later, when

5    there were accusations or allegations of sexual assault

6    against my long-time friend, my incredibly generous donor,

7    somebody who I trusted, I immediately said, I think we need to

8    pause his projects with his involvement.

9        I mention that to say any -- and that was just based on

10   an allegation. If I had in any way understood what, you know,

11   with a year and a half of, sort of, reliving some of this in

12   slow motion, I understand where you're coming from.

13       But if in that instant, if I'd at all believed that there

14   was some corrupt bargain that they were trying to pull me

15   into, I would have said the same thing I said to Chinedum,

16   book-ending that entire year.

17   Q.   So after you say you will deliver the votes --

18            MR. SINGER:  You can take that down.  Can you blow

19   that up.

20   Q.   Do you see the bottom of the page, you talk about, "John,

21   John loves guys like you."

22       And then you say:  "You know, like people who choose to

23   invest here, they believe in it, they're revitalizing, so I

24   can get it done"; is that right?

25   A.   That's what I said.

SITTENFELD - CROSS

1    Q.   You can deliver the votes, right?

2    A.   I think it was a re-articulating what had kind of been

3    the theme throughout the conversation of you all are even with

4    the beef between Chinedum and John Cranley.  I think you all

5    are fretting and worrying about something that's not an actual

6    worry; that even the person who might personally dislike

7    Chinedum isn't going to stand in the way of this deal, being

8    the development deal.

9    Q.   And so in response to you saying:  "I can get it done,"

10   Rob says:  "So what's the best way to get -- so like, I mean,

11   I brought $10,000 cash with me because Chin was like, hey, I

12   was like buddy, I'm not going to be able to pull $20,000 out

13   of the bank this week, but..."

14        So Rob is saying here, "I've got $10,000 here in cash,"

15   right?

16   A.   That seems to be the case.

17   Q.   And that also is consistent with what Ndukwe offered on

18   November 2nd.  He was going to have $10,000 with him when you

19   guys meet on November 7th, right?

20   A.   You would have to go back to it.  I'm not sure.  I think

21   he said we're going to try and raise $20,000 over the next

22   couple weeks.  I'm not sure if they sort of talked through the

23   logistics of the fundraising they wanted to do.

24   Q.   We can go back to it.

25        MR. SINGER:  14B, please, page 3, bottom paragraph.

1    Q.  Ndukwe says:  "For this meeting with Rob next week, I'm

2    pretty sure he can get you ten this week," right?

3    A.  Yes.

4         MR. SINGER:  So can we go back to 15C.  Blow up the

5    bottom, please.

6    Q.  Rob says:  "I've got $10,000 in cash with me."  That's

7    consistent with what Chin said on November 2nd, correct?

8    A.  Yes.

9    Q.  The $10,000 that Chin told you he was going to bring for

10   yes votes without a doubt; is that right?

11   A.  Yes.

12        MR. SINGER:  Can we go to the next page, please.

13   Let's blow up your response.

14   Q.  "Well, whose name can stuff be in?"  That's your

15   response, right?

16   A.  Yes.

17   Q.  So he's got $10,000 in cash that he wants to give you,

18   and your response is, "Whose name can stuff be in"; is that

19   right?

20   A.  Yes.

21   Q.  You didn't say why do you have $10,000 in cash?  You

22   didn't say that, did you?

23   A.  I did not say that.  I obviously ended up declining to

24   take the cash.  I think people have a lot of confusion

25   sometimes over campaign finance rules.

SITTENFELD - CROSS

1        So people would do things like give over the legal limit,

2    people would give for the primary and the general when they

3    were only supposed to give for the primary -- when they were

4    only supposed to give for one of those.  They would give from

5    corporate checks when they were supposed to only give from

6    LLCs.

7        So I understood him to be someone trying to, you know,

8    maybe not very sophisticated about campaign finance rules,

9    which put him in good stead, which is why I then called my

10   campaign finance expert to say what volume of cash is a

11   campaign allowed to accept.  And then when it seemed not

12   compliant, not allowable, obviously declined it.

13   Q.   So you're saying it's typical for a donor to come with a

14   bag of $10,000 in cash and offer you that as a campaign

15   contribution; is that right?

16   A.   No.  I mean, I've certainly had donors who have made

17   contributions in cash but in much, much lower amounts.  It is

18   normal for individuals to be confused about how to properly

19   donate.

20   Q.   In the context of someone who had just offered you money

21   for -- to get a deal, to have $10,000 in cash is outrageous

22   behavior.  Is that fair to say?

23   A.   There's a -- I thought Rob wanted -- and this was -- my

24   own language reflects this, wanted to make a campaign

25   contribution.

*SITTENFELD - CROSS*

1     Wanting to make it in cash was absolutely unusual.  It

2     didn't sound like something I was used to, which is why I call

3     and check with my campaign finance compliance person,

4     ultimately decide this is not a compliant way of making a

5     contribution and declining to accept it.

6     Q.  You took the money, just in a different form, right?

7     A.  No.  Absolutely not.

8     Q.  You took $10,000 in cash -- or you took $10,000 in PAC

9     checks on November 28th, right?

10    A.  No.  As you recall, we were given two checks.

11    Conversation all the way through had been real individuals,

12    real LLCs, people from your universe of buddies and investors.

13        And as part of the vetting of -- our vetting process,

14    including campaign fundraising compliance person, fundraising

15    experts, lawyers at a law firm, when we found out that those

16    were corporate checks, not allowable to accept, that was the

17    next in a series of things we turned down because they were

18    not made in a compliant way.

19    Q.  So let's walk through this thing.  He offers you $10,000

20    in cash on November 7th, right?

21    A.  Correct.

22    Q.  You then determine that maybe we can do it in money

23    orders, right, $10,000 in money orders?

24    A.  Thought that, and then realized that that was also not

25    allowable.

SITTENFELD - CROSS

1    Q.   Okay.  And this $10,000 was the first installment of the

2    $20,000, right?

3    A.   It was $10,000 that they wanted to contribute.

4    Q.   Right.  So for money orders.  Then they wrote you the

5    checks on November 28th, which were in corporations names

6    rather than LLCs, right?

7    A.   My understanding is that they had raised this money from

8    their universe of people.

9    Q.   That's not what I asked.  They handed you checks on

10   November 28th, right?

11   A.   They did.  They did.

12   Q.   $10,000?

13   A.   Correct.

14   Q.   You couldn't cash them because they weren't into LLCs,

15   right?

16   A.   Well, you could have cashed them, but it --

17   Q.   You couldn't deposit them in your PAC account?  I'm

18   sorry.

19   A.   You could have deposited them in the PAC account, but it

20   wouldn't have been lawful and compliant, so we shredded them.

21   Q.   So you ended up getting the $20,000 on September 17th,

22   correct?

23   A.   Yes.

24   Q.   In LLC checks?

25   A.   Correct.

*SITTENFELD - CROSS*

1    Q.   To your PAC?

2    A.   Correct.  From my understanding, affirmed by Rob, their

3    universe of buddies and investors.

4    Q.   Rob handed them to you, right?

5    A.   Yes.

6    Q.   So getting back to the $10,000 in cash.  He tried to give

7    you $10,000 in cash, you didn't just walk out of the condo at

8    that time, right?

9    A.   I did not.

10   Q.   You didn't try to cut off all ties with Rob?

11   A.   I did not.

12   Q.   You didn't separate yourself completely from the whole

13   situation?

14   A.   I did not.

15   Q.   You began trying to figure out how they can get you

16   checks, or get you the $10,000 in a way that's not cash,

17   right?

18   A.   I saw them as individuals who are trying to back a

19   project that was good for the city.  They seemed, again, and

20   this was -- there were a lot of people like this, didn't know

21   all the details of proper campaign finance compliance, so

22   trying to walk them through how they could make appropriate

23   lawful donations.

24   Q.   You had never had a conversation about campaign finance

25   compliance with Rob, up to the time you -- your entire

1    experience with them, you never had a campaign finance

2    conversation with Rob up to this point; is that right?

3    A.   Before November 7th?

4    Q.   Yes.

5    A.   This is the first time I'd met him, so this is the first

6    time -- sorry, this is the first time he tried to donate.

7         So when a donor tries to make a contribution, and they're

8    not doing it in a compliant way, you walk them through.  You

9    know, an example of this --

10   Q.   Sure.

11   A.   -- I would have had donors who -- the contribution limit

12   for local city elections was $1,100.  Somebody might not have

13   known that, and they give me a check for $1,500.  So you walk

14   them through and say, hey, we can either refund you $400, or

15   we can shred this check, and then you can make a new

16   contribution for $1,100.

17        So things like that happened, again, not infrequently,

18   just because these rules can be confusing.  And as the

19   candidate, my team, we were happy to walk people through how

20   to do it the proper way.

21   Q.   Sure.

22        MR. SINGER:  Could we go to page 31, please.

23   Q.   Right in the middle of the page, you say: "Umm, I mean,

24   honestly, the easiest thing would probably be, uh, the easiest

25   thing would probably be, you know, 18 hopefully.  Yeah, like

1    18.  I don't know if there are 18 LLCs, if there are 18 LLCs

2    checks"; is that right?

3    A.   Correct.

4    Q.   All right.  So 18 LLC checks times $1,100, that's about

5    $20,000 to your campaign; is that right?

6    A.   Yeah.  So the legislation that Mr. Seelbach sponsored,

7    had the voters passed it overwhelmingly on whatever election

8    day that year was, November 6th, November 7th, it didn't then,

9    is my recollection.

10       It didn't then take effect until December 1st, meaning

11   that if Rob wanted to donate $20,000, he could lawfully do so

12   if he and his universe of development partners had 18 LLC

13   checks.

14       That was kind of the common practice of what developers

15   would do under the old set of rules.

16   Q.   Sure.  So your next comment, about three quarters of the

17   way down, "I don't know if that's doable.  One thing, there

18   is, it's, I mean, obviously, like money directly into a

19   campaign is the most valuable thing."

20       You'd rather have money directly to your campaign, right?

21   A.   Yes.  I can't remember if this came up with you or with

22   Charlie.  Money that is a direct campaign contribution, it can

23   support your direct pursuit of an office that you might be

24   running for.

25       A PAC contribution cannot do that.  So I think most

*SITTENFELD - CROSS*

1    candidates would probably pretty much overwhelmingly prefer

2    campaign contributions.

3    Q.   Well, timely mention of the PAC.  So your next sentence

4    is, "I do have a PAC that, one, no one's like snooping around

5    in who's giving there that, Jo, I mean, I think, frankly, a

6    lot of people don't even know that I have it."

7         So this is the first time you introduce the process of

8    contributing to the PAC, right?

9    A.   Right.  So both Chinedum and Rob had made clear that they

10   wanted to be able to fundraise without their -- not doing so

11   in their name; again, a totally lawful practice.

12        So this is me responding to their desire for not having

13   their name end up in the newspaper.  There's a lot I recognize

14   that's strange and weird about politics.

15        One of the things that's kind of strange and weird about

16   politics is that journalists will often review the list of

17   people who donate directly to a campaign but, for whatever

18   reason, it's much less common for them to review a list of

19   people who are donating to a PAC.  The same information is

20   equally public and out there.

21        Every -- so even as I say I had this PAC, but no one is

22   snooping around about us giving there, it's not because that

23   information wasn't in any way not public.

24        Any individual could have gone on the Federal Election

25   Commission website, maybe three clicks of a mouse, and see

1     every single cent into and out of the PAC.

2         So it was mostly my responding to their desire to be able

3     to fundraise not in their own name.

4     Q.   It wouldn't be on that website if the contribution wasn't

5     attributed to them, right?

6     A.   The contribution that's on the website is the person who

7     the donation is from.

8     Q.   It's the person who whoever filed the filing attributes

9     the payment to, right?  It's supposed to be who it's from; is

10    that right?

11    A.   No.  So if you raised money for someone, if your neighbor

12    was also named Phil, and you said Phil, will you write a check

13    for a hundred dollars?  Phil's name is in the filing because

14    the donation is from Phil.

15    Q.   All right.  So let's go back to 31.  Then you ask at the

16    bottom, "What are you, what what's what are you guys most

17    comfortable with," right?

18    A.   Yeah.  They seemed very skittish about making

19    contributions in their own name.

20            MR. SINGER:  Okay.  Let's go to 32 now.  Can you blow

21    up the top third.

22    Q.   And then Rob says again, "The easiest thing for us is to,

23    you know, to do cash," right?  Do you see that?

24    A.   I do.

25    Q.   And then about the middle of the page, you say:  "I mean,

SITTENFELD - CROSS

1    if an individual, if if as a technicality it is attributed to

2    that individual, and they agree that that's where it came

3    from, then that's, you know, yeah."

4        So there's two things there.  It has to be attributed to

5    someone, right?

6    A.   Yes.

7    Q.   And then they have to -- you're saying they have to agree

8    that that's where the money came from, right?

9    A.   Yeah.  If a person donates, they need to say and take

10   ownership of the fact this donation is from me.

11   Q.   But someone agreeing, when asked it came from you, is

12   different than them actually being the true source; is that

13   right?

14   A.   If someone lied, yeah, that would be them -- you might

15   know this better, but I would assume that would be them

16   committing some sort of straw donor violation.

17       So yeah, I would absolutely expect that every donation

18   that was reported, the person who agreed and said yes, this

19   donation is from me, or the fundraiser who is bundling those

20   monies, would tell the truth.

21           MR. SINGER:  Okay.  All right.  Let's get out of

22   that.  Can you move to the next page?  I'm sorry.

23   Q.   On the top of the page there, that's when you make a

24   phone call, right?

25   A.   Yes.

*SITTENFELD - CROSS*

1  Q.  All right.  And you have conversation.  And then after

2  you -- it says or phone call ended, the last sentence is, "If

3  you had like, you know, like John Doe as a person that

4  something could be attributed to, could they do a check, or?"

5       And Rob says:  "I mean, ultimately, it's gonna be the

6  same $10,000 or $20,000," right?

7  A.  That's what it says.

8  Q.  So roughly, the $10,000 is the $10,000 in cash that he

9  has with him, right?

10  A.  Yes, which, as we've discussed, I obviously didn't

11  accept.

12       MR. SINGER:  Let's go to 34, please.  Can we just do

13  the bottom half of this page.

14  Q.  So here again, Rob says:  "We can do the first quicker

15  probably if we do just money orders from, you know, John Doe

16  and get you ten of those."

17       And you say:  "But a real, real person," right?

18  A.  Yes.

19  Q.  It has to be more than a real person; is that right?

20  It's got to be the true source of the funds?

21  A.  Yes.

22  Q.  It can't be just any real person, it has to be the true

23  source of the funds; is that right?

24  A.  Correct.

25  Q.  Okay.  And then you say:  "Who is part of your guys'

1    network"?

2    A.   Correct.

3    Q.   And then Rob says:  "Yeah.  Well, yeah, yeah.  I mean,

4    it's our collective, you know.  I mean, it's that same $10,000

5    that will just get converted into names," right?  He's talking

6    about the same $10,000 he's got right there?

7    A.   He says that.  As you can tell, I'm accepting a phone

8    call at that moment.

9         It was never my understanding, and nothing that was ever

10   communicated by me, other than that this was them lawfully

11   fundraising from their universe of buddies and investors.

12        And that also seemed to be what Rob echoed in prior

13   conversations, after I had declined the offer to contribute to

14   the campaign or the PAC via cash or money orders.

15             MR. SINGER:  Can we drop down to page 38, please.

16   Q.   All right.  So you talked about -- you discussed ways

17   that they can get you the $10,000 in another form.  Do you

18   recall that?

19   A.   Yeah.  I very much wanted to make sure that they were

20   doing it in a proper, compliant way.  So in the midst of that

21   interaction with Chinedum's fellow investor and backer of the

22   435 project, I called my campaign fundraising and compliance

23   person to see what worked.

24        And in that interaction, I'm -- well, I misunderstood, as

25   did my compliance person, and left that meeting thinking that

SITTENFELD - CROSS

1    you actually were allowed to donate, you can tell me, I think

2    it was maybe cashier's checks to the campaign.

3         Found out that wasn't true, so called Rob to explain,

4    hey, you can't make lawful compliant contributions in that way

5    either.

6    Q.   Now, ultimately, you set up a meeting that we're going to

7    get together at the end of November, right?

8    A.   That sounds right, yeah.

9    Q.   Do you recall that?

10   A.   That sounds right, yeah.

11   Q.   And then as you're leaving the meeting, the part that's

12   blown up, you say:  "Yeah, no --"

13        Oh, at the top, it says, "It doesn't have to be mailed."

14   There's a discussion about whether they could give it to you

15   in person, or whether they could just mail you the checks,

16   right?

17   A.   Correct.

18   Q.   And you say:  "Yeah.  No, I appreciate it."

19        And Rob says:  "Because like I said, Chin wants to get

20   that development agreement, you know, and so if we can --"

21        And your response is:  "We're gonna make, we're gonna

22   make it happen"; is that right?

23   A.   Yes.

24   Q.   Now, again, Mr. Ndukwe had not submitted his development

25   agreement to the city; is that right?

SITTENFELD - CROSS

1    A.   At that point, not to my knowledge.

2    Q.   You had seen no finalized pro forma?

3    A.   I'm not sure I would ever have seen a finalized pro

4    forma.  As we kind of discussed the separate roles of the

5    elected officials and the professional staff of the economic

6    development department, you know, council members reviewing

7    the pro formas wasn't our role.

8    Q.   All right.  So you had a number of other conversations

9    with Rob.  Let's focus on a telephone call you had on

10   November 21, 2018.  Do you recall that?

11   A.   Yeah.  I mean, you can refresh me, but I think I mostly

12   recall it.

13        MR. SINGER:  Pull that up.  I'm sorry.  18B, page 2,

14   please.  All right.  So that first paragraph, yeah, can you

15   just blow that up.

16   Q.   Then you see in the middle, on the far right, you talk

17   about Rob killing it with the ladies.  And then you say:

18   "So even the money orders --" do you see that?

19   A.   Yes.

20   Q.   "So even the money orders, the money orders are,

21   obviously, like the equivalent of cash, and there's caps on

22   the amount of cash that the campaign can take.  So tell me if

23   this will be doable.  There is a PAC, the Progress and Growth

24   PAC," right?

25   A.   Yes.  Again, I had not understood at the time that money

*SITTENFELD - CROSS*

1    orders were the equivalent of cash, couldn't be donated above

2    certain limits. So my team and I wanted to make sure this was

3    all compliant, called, let him know to correct that

4    understanding from where we left things a couple weeks

5    earlier.

6    Q. And that Progress and Growth PAC was the PAC that we were

7    referencing that we just talked about on November 7th; is that

8    right?

9    A. Yes, that's my PAC.

10          MR. SINGER: All right. And then that big paragraph

11   in the middle, can you blow that up, please.

12   Q. So then you explain, "It needs to either be a check from

13   a human being or a check from an LLC. Now, that said, if it

14   goes to the Progress and Growth PAC instead of to Sittenfeld

15   for Cincinnati, nothing about it in any way will ever be

16   connected to me, and no one will, umm, you know, no one's

17   going to be poking around for it to find your names on it"; is

18   that right?

19   A. Yes. I did say that. That, again, was this sort of

20   weird quirkiness of journalists not digging through a list of

21   who gives to PACs the same way that they do who gives directly

22   to a campaign, and their wish for as much, sort of, anonymity

23   was lawful.

24          And the -- again, I think some of this has been discussed

25   a little bit already, this sort of weird rule but the rule

SITTENFELD - CROSS

1    nonetheless, that my name, it's actually not allowed to be on

2    the PAC. I mean, if it was lawful to call it the P.G.

3    Sittenfeld PAC, I probably would have done so. That wasn't

4    allowed.

5       And then I also wasn't the treasurer. So in the

6    statement of incorporation, or statement of organization, my

7    name's not on that anywhere.

8    Q. But this is something that you are affirmatively telling

9    Rob, "Nothing about the payments into the PAC will ever be

10    connected to me"; is that right?

11    A. Yeah. I think what I was trying to communicate was their

12    desire to not, you know, end up with their names in the

13    newspaper. That was the main point I was trying to make.

14    Q. You knew that they didn't want their names on anything,

15    right?

16    A. Yeah. They, along with Chinedum, had repeatedly, and I

17    think understandably, stressed that they did not want to

18    continue to be on the receiving end of a vendetta, and that

19    made them prefer fundraising route to the direct making

20    donations from them.

21    Q. Although Rob told you it was going to be the same

22    $10,000, right, the same $20,000?

23    A. I mean, he said that. As we've said in the last one, I'm

24    receiving and already on the phone by the time he makes that

25    last comment.

SITTENFELD - CROSS

1      It's also in direct contradiction both to the

2   contributions that I actually ultimately received, and Rob's

3   comments November 26th, saying I've got one business partner,

4   and then I've got another business partner.  My saying on

5   December 4th, this is from your universe of buddies and

6   investors, et cetera.

7          MR. SINGER:  20D, please.

8   Q.  Do you recall meeting with Rob and Brian on

9   November 28th, right?

10  A.  I do.

11  Q.  This is the meeting where they gave you the checks, the

12  $10,000 in checks that were not from LLCs; is that right?

13  A.  Yes.  I mean, they thought they were from LLCs.  I

14  believed them when they said it, but my team, my compliance

15  and legal team vetted them and found out they weren't.

16          MR. SINGER:  Okay.  Can we go to page 2, please.  And

17  then about just under the "much at all," can you blow that up.

18  Q.  So you raised 435 Elm, right?  You say:  "Anything new on

19  the 435 front," right?

20  A.  Yes.

21  Q.  And then Rob and Brian says -- Rob says:  "I mean, Chin

22  seems to think --"

23          And Brian says:  "He's very positive."

24          And then you say:  "Look, I'm ready to shepherd the votes

25  as soon as it gets to us at council."  You brought that up on

1     your own, right?

2     A.   Yeah.  I know the conversation earlier on direct with

3     Ms. Brunner, anytime I believed in a project, I was pretty

4     impatient about things, so my following up to say, hey, you

5     all are trying to do this thing, it's going to be awesome for

6     Cincinnati, what's the status of things.

7     Q.   And the purpose of this meeting was for Rob to give you

8     the $10,000, right?

9     A.   I mean, that's at least part of the purpose of them

10     wanting to meet up, yes.

11           MR. SINGER:  Okay.  Can we move down to page 3.  The

12     bottom third of the page, please.  Just a little bit more up.

13     Q.   So then you continue to have a conversation until,

14     ultimately, you say:  "Umm, were you guys able to get stuff

15     sorted out?"  That's a reference to getting sorted out the

16     payment of the $10,000, right?

17     A.   Yeah.  My -- I mean, it was kind of an ongoing dialogue

18     across these calls, some of which you're showing, some of

19     which you're not, in terms of my walking them through, as I

20     would do for a lot of donors, here's how you are allowed to

21     make a proper campaign contribution or PAC contribution.

22     Q.   And then you say:  "I want to make sure no headaches for

23     me, but also make sure there are no headaches for you," right?

24     A.   Correct.  Yeah.  I mean, if you don't make a proper

25     contribution, absolutely.

*SITTENFELD - CROSS*

1  Q.  And then again you repeat, "And this way, as I told him,

2  this PAC, my name is not -- I mean, this will -- can certainly

3  support and benefit me, but my name is not connected to me in

4  any way."

5      So you repeat the same thing you told them on the prior

6  call, right?

7  A.  Yeah.  And I didn't get into reason why but, as you and I

8  just discussed, my name was not allowed to be on the PAC.

9  Q.  So then Brian says:  "Right."

10     Then you say:  "No one will ever know this," right?

11  A.  Yes.

12  Q.  No one will ever know that they just gave you $10,000; is

13  that right?

14  A.  Yeah.  Absolutely.  Sorry.  I didn't know you were

15  waiting.  It's written right there.

16  Q.  So there ultimately were PAC filings, right, related to

17  these contributions?

18  A.  Yes.

19  Q.  The $20,000 you received from Brian and Rob, and then the

20  $20,000 you received in September and October of 2019, right?

21  A.  All reported on the FEC website.

22  Q.  And none of those contributions reported Rob Miller,

23  right?

24  A.  The contributions weren't from them.

25  Q.  Rob Miller's name is not on those contributions, right?

*SITTENFELD - CROSS*

1    A.  It would be improper, and I presume not lawful, to report

2    the name of somebody who the donation wasn't from.

3    Q.  Rob gave you the checks in December 2017?

4    A.  He handed me the checks.  It would have -- if Rob had

5    said this check is from me with my money, then that's what

6    would have been put in the thing.  If that's not the case, and

7    you do that, that would be unlawful.

8          MR. SINGER:  All right.  So let's talk about -- you

9    can pull it down, Ms. Terry.  Thank you.

10   Q.  I think we discussed that in January 2019, 435 Elm was

11   finally presented to the economic development department,

12   right?

13   A.  That's my understanding.

14   Q.  Formally presented to the city.  And then you had a

15   series of conversations with Rob about conversations that you

16   were having with other public officials relating to 435; is

17   that right?

18   A.  I think it was mostly -- that sounds right.  I think the

19   main ones that I recall were since they were very freaked out

20   about Cranley trying to sabotage the project, I think I had

21   one conversation with Cranley.  I think I had another

22   conversation with Phil Denning, the one that was referenced

23   earlier.

24   Q.  Okay.  And then you met with Rob and Brian on

25   January 30th; is that right?

1   A.   Yes.  There was -- I met with them that month on

2   January 9th, and then we met again on January 30th.

3   Q.   Okay.  And at that January 30th meeting, they gave you a

4   gift, right?

5   A.   They did give me a gift.

6   Q.   It was a bottle of scotch, right?

7   A.   Yeah.

8   Q.   And a box of cigars?

9   A.   They did.

10       MR. SINGER:  Can you please pull up for

11  identification purposes USA 23D.

12  Q.   Do you recognize this?

13  A.   I do.  This is probably the interaction and the moment

14  from the sting that hurts the most, or kind of gets my blood

15  boiling a little bit.

16       I had shared with them that my wife was expecting our

17  first child.  And Brian then says how is your wife doing?  How

18  is her pregnancy going?  And they say, This is our little

19  congratulations over the fact that you are an expectant

20  father.

21       I've never smoked a cigar in my life, and I don't drink

22  scotch.  If someone invites me to a dinner party, and I bring

23  a bottle of wine, it's costing 20 bucks, at the most.  The

24  only time I ever see cigars are in the gas station.

25       This gift was given to intentionally try and get me to

1    accept something that cost over the 70 dollar limit for

2    reporting gifts.

3         You know, my wife and I have gotten married in the past,

4    we've had children, people are allowed to give gifts.  It's

5    just as simple as reporting it.  Because they gave me two

6    things that I've never consumed and don't enjoy, I didn't

7    include them on my financial disclosure.

8         I wish I had, because it would have been no big deal.

9    But the fact that these gifts were given to me deceptively,

10   using a celebration of fatherhood and becoming a dad, I had

11   talked -- we had all talked about -- they talked to me about

12   their kids.

13        I remember one particular thing from a recording we

14   haven't heard, where Brian is talking about his son being a

15   baseball player, and having aspirations to go to the majors or

16   the minors, or play college baseball, but he had gotten an

17   injury, and how tough that is as a father to see your kid, you

18   know, not fulfilling their dreams.

19        Rob had talked to me about stuff like taking his kids

20   camping or hunting.  And I was really excited about becoming a

21   dad.

22        I also, four months after these charges were brought, I

23   lost my own father to cancer quickly.  There is not a single

24   day I don't wish I could hear his voice, talk to him.  I know

25   he's here with me, but the notion that the role of fatherhood

*SITTENFELD - CROSS*

1   was used to try and do this, it's something that's hard for me

2   to understand.

3   Q.   Well, you agree that you have an obligation to disclose

4   gifts over 75 dollars; is that right?

5   A.   Absolutely.  And I should have -- rather than politely

6   accepting something that I didn't actually want, I should have

7   asked and said, you know, can I see a receipt, or can you tell

8   me what these are.  It didn't occur to me that these things

9   would cost over that amount.

10  Q.   You're aware that scotch can be expensive, right?

11  A.   I guess it's sort of like a book, you know.  A book can

12  cost a dollar ninety-nine on Amazon, or you can have the

13  Gutenberg bible.

14       I'm not familiar with scotch at all.  I don't think I've

15  ever consumed scotch in my life, so the notion that scotch

16  would cost over 70 dollars, that's incredibly foreign to me.

17  Q.   You consume an expensive whiskey, though, right?

18  A.   No.

19  Q.   Isn't your favorite drink at Jeff Ruby's an old fashioned

20  sweet?

21  A.   Sure.

22  Q.   With Bulleit whiskey?

23  A.   I would -- yes.

24  Q.   That's a pretty expensive drink, isn't it?

25  A.   To get -- I mean, yes, that is expensive.  But to drink

1    one, I would assume that drink would cost ten bucks, and that

2    would be a bit of an indulgence.

3    Q.  So you have an obligation under Ohio law to -- it's your

4    burden under Ohio law, is it not, to determine whether a gift

5    exceeds the maximum; is that right?

6    A.  Absolutely.  Rather than getting caught up in the moment,

7    thinking this is a nice gesture to celebrate the coming role

8    of fatherhood, I should have paused and slowed down and

9    confirmed the cost of these gifts and then reported them.

10   Q.  And they were -- I mean, the gifts, you now know, were

11   $482, right?

12   A.  We learned in discovery, when the government gave the

13   receipt, that these were way over the 70-dollar limit.

14   Q.  And you didn't file your financial disclosures until July

15   of 2020, right?

16   A.  Until July of 2020?

17   Q.  Yes.  July 2020.

18   A.  I would need to go back -- yeah, for July of 2020 for the

19   prior 2019, that sounds right.

20   Q.  Okay.  And in those disclosures, you have to swear or

21   affirm that they're correct; is that right?

22   A.  Yeah.  I think there's some word in there, I think,

23   that's knowingly.  So I absolutely did not know that I had

24   received -- I didn't know I had received gifts that cost over

25   that reporting limit until the government turned over that

128

*SITTENFELD - CROSS*

1    receipt in discovery.

2    Q.   But, again, you know that you have an obligation and a

3    burden to determine what gifts exceed that dollar amount,

4    right?

5    A.   Yes.

6    Q.   And you didn't do it?

7    A.   I should have asked for a receipt.

8    Q.   And then you swore that your disclosures were correct; is

9    that right?

10   A.   Knowingly that it was -- that based on what I knew at the

11   time, yes, it was accurate at the time.

12   Q.   Well, you can't put your head in the sand, right?  That's

13   not consistent with Ohio law?

14   A.   So what you do is, you're allowed to receive gifts, you

15   just need to report them, is you file an amended report.  My

16   counsel said, you know, resolve this case and then file an

17   amended report.  We included that in one of our pretrial

18   motions.

19        The other thing, I know we're maybe getting a little bit

20   far afield here, is I have to accurately report the source of

21   a gift.

22        In this case, I thought this was a celebration of the

23   role of -- the role that I think is sacred, of becoming a

24   father.  And I thought it was them, the people who were

25   celebrating that coming role were Rob Miller and Brian

1    Bennett.  Those are fictional characters.

2        So when we filed this amended report with the Ohio Ethics

3    Commission, we're going to need to somehow resolve how I can

4    make sure I'm telling the truth, and saying these were

5    reported -- sorry.  These were gifts from people, but I

6    can't -- you have to tell the truth about who gave them to

7    you.

8    Q.  You didn't know they were fictional characters at the

9    time that you filed your financial disclosures, right?

10   A.  Correct.  I also didn't know these were over 70 dollars,

11   and I should have absolutely followed up to ask.

12   Q.  And if you'd attributed it correctly, you would have had

13   to put Rob Miller and Brian Bennett on your disclosures,

14   right?

15   A.  Absolutely.  And I wouldn't have hesitated to do so.

16   Again, receiving gifts, you know, it's allowable, but as you

17   said starting out, Mr. Singer, you know, transparency is

18   important, so you just say I received a gift.  These were who

19   I got it from.  It would have been a very easy resolution.  I

20   just didn't know what the costs were.

21       And, you know, not once in all the recorded conversations

22   do I say, oh, I love cigars.  I love scotch.  These were given

23   with the particular design -- I wish I'd slowed down to

24   clarify the costs, because they're not -- I took them, I

25   received them to be polite, not out of -- and because I

*SITTENFELD - CROSS*

1    thought this was a moment of human kindness and connection and

2    celebrating fatherhood.  I didn't know what it was actually

3    intended to do.

4    Q.   Now, you had multiple dinners at Jeff Ruby's steakhouse,

5    right, with Rob and Brian?

6    A.   Yeah.

7    Q.   It's fair to characterize Jeff Ruby's is a fancy

8    steakhouse?

9    A.   It is a fancy steakhouse.

10   Q.   Pretty expensive?

11   A.   Yes, I think so.

12   Q.   Steaks are expensive?

13   A.   Steaks are expensive.

14   Q.   Most expensive steaks, probably a hundred bucks, right?

15   A.   I'll take your word for it, yeah.

16   Q.   Close to it?

17   A.   I haven't been there in a very long time, but I believe

18   you.

19   Q.   Drinks are expensive, sides are expensive, right?

20   A.   Yes.

21   Q.   And you've been there on multiple occasions with Brian

22   and Rob, right?

23   A.   Yeah.  So we went to -- I think this was usually at their

24   suggestion or places Mr. Holbrook thought would sort of be

25   strategic.

*SITTENFELD - CROSS*

1      We ate at Jeff Ruby's.  We ate at Branch, a place in East

2  Walnut Hills.  We went to a dive bar called Knockback Nats.  I

3  got a beer with maybe Rob at one point at Woodburn, Woodburn

4  Brewery.

5      So yeah, I think in almost every interaction, I either

6  paid, offered and tried to pay.  Sometimes there was splitting

7  of bills.  There were also other instances, including the very

8  first one, where they might have been ordering nicer stuff or

9  fancy stuff; and, you know, again, this is our very first

10  interaction, I had an ice water and then left.

11  Q.  Do you recall going to Jeff Ruby's on February 18, 2019?

12  A.  I know that interaction happened, yeah.

13  Q.  Okay.  You didn't order ice water that night, right?

14  A.  You could refresh me on what I ordered.

15  Q.  Well, you sat there for two hours and had dinner, right?

16  A.  I don't -- I remember one interaction with them where I

17  think we ordered sushi, and then I think maybe I picked up the

18  bill or maybe we split the bill.  So you can tell me what I

19  ordered.

20  Q.  You had dinner at least one time in 2019 at Jeff Ruby's

21  where you didn't pay the bill.  Is that fair to say?

22  A.  Yeah.  That's definitely possible.

23  Q.  And do you -- I think Brian testified that the bills were

24  generally around $300 when you guys went to Jeff Ruby's?

25  A.  He testified to that, that the government -- we were

SITTENFELD - CROSS

1    interested in information around the cost of the sting

2    operation.  The government didn't turn anything over.

3        What I do recall was that there would be instances, and I

4    also know this -- again, I want to fight for myself in this

5    case and in this situation as much as I possibly can, so I've

6    listened to every recording where they would say, We're going

7    to get together at Jeff Ruby's, and we're going to start with

8    a meeting with P.G. Sittenfeld.

9        So let's say I went, and I had a ten dollar old fashioned

10   or Manhattan, as you said.  And then I leave, and Brian and

11   Rob stay, and they have an expensive steak with Chinedum or

12   other individuals around Cincinnati.

13       So when Brian talks about $400 bills, I don't know if I

14   was an ice water that night, or if Brian and I split a steak,

15   as we did one night.

16   Q.   You've ordered steaks with Rob and Brian at Ruby's

17   before, right?

18   A.   Yeah.  I'm sure I did.

19   Q.   Did you ever disclose a meal on your ethics form that

20   cost over $100?

21   A.   I don't recall a meal where my consumption would have

22   been over that.  I'm glad to look at a receipt, or something

23   like that; but, again, I remember either paying for meals,

24   splitting meals.  There might have been one where I had it

25   again.  I'd welcome you refreshing me.

*SITTENFELD - CROSS*

1   Q.   Did you ever ask how much was that?

2   A.   Well, I think you try and be mindful, as -- if I order a

3   cheeseburger, look at the bill, said this is a really

4   expensive cheeseburger, not one I would usually eat on my own,

5   cost 22 bucks.

6        I mean, one, I tried to either pay or always offered to

7   pay and be mindful of what was being ordered.  And I don't

8   know who else was joining them later that contributed to the

9   ultimate tabs.

10  Q.   But you are aware that if you had a meal with Rob and

11  Brian that was over a hundred dollars, you would have had to

12  have reported that, right?

13  A.   That's correct.

14  Q.   And you never did anything to determine whether or not

15  your bill exceeded that amount; is that right?

16  A.   No, that's not what I said.  I tried to be mindful of

17  looking at what was being ordered as you go.

18  Q.   Including when you order expensive steaks?

19  A.   Sure.  And, again, I'm sincerely glad for you to refresh.

20  I remember one occasion when Brian and I got a steak and, you

21  know, this sounds like Lady and The Tramp splitting a noodle

22  or something, but he and I split a steak.  I don't think a lot

23  of men do that at Jeff Ruby's.  So yeah, I mean, I did try and

24  be pretty mindful.  If you order -- and inflation has driven

25  things crazy too so I haven't been to Jeff Ruby's in a very

1    long time.

2        But if at the time you order a $60 steak, and Brian and I

3    split that steak, I think it was probably on separate plates,

4    my share would be $30.  And I may well have paid for that $30

5    too, including often picking up the tab for them.

6        I recall paying for them and their orders at Jeff Ruby's,

7    Knockback Nats, Sotto, and Woodburn, and that may well be

8    close to half of the total interactions.

9    Q.   You're talking about picking up some drinks, right?

10   A.   And food.  It was drinks and/or food.

11   Q.   You remember meeting Vinny at the opening day party,

12   right?

13   A.   Yeah.  As he said, kind of a fleeting interaction amongst

14   a pretty large group of people flowing in and out, other

15   elected officials, people who I thought were part of their

16   network that were FBI undercover actors, but -- so he was one

17   of the folks there.

18   Q.   And you've talked about Vinny, he's a colorful character,

19   right?

20   A.   Yeah.

21   Q.   And you've talked about Vinny on a number of occasions in

22   your meetings with Rob and Brian after opening day; is that

23   right?

24   A.   Yeah.  He was -- he, like them, was represented to me as

25   a real estate investor who was backing 435, a project I

*SITTENFELD - CROSS*

1      thought was great for the city.

2          We would joke around a lot about, you know, what Vinny's

3      past was.  It kind of felt to me like a persona or a schtick,

4      so -- and I said some of this too, but Rob -- Brian more would

5      be like oh, yeah, he's like out of The Sopranos, or like out

6      of GoodFellas, so it was kind of almost joking as we went

7      about this person almost being like a character out of a TV

8      show.

9              MR. SINGER:  Let's look at a couple of those.  Can

10     you pull up 26D, please, page 3.

11     Q.   So right under "Begin Transcript."

12         "And Brian was saying that Vinny was like, you know, used

13     to make his money in the dark arts and cleaned it up," right?

14     A.   I did say that, yeah.

15     Q.   It's a pretty straightforward statement, right?

16     A.   Yeah.

17     Q.   And then Rob says:  "Yeah."  And you say:  "I don't

18     care," right?

19     A.   That if somebody used -- again, a lot of this stuff that

20     you all have not shared, so there's a lot of, sort of like a

21     joking tenor.  Sometimes, admittedly, there was locker room

22     banter and humor, and things like that.

23         But if somebody used to do something that was not

24     aboveboard and legitimate, but now they have cleaned up their

25     act, they are doing things in an aboveboard by-the-book way,

1    and on top of that they say, hey, I'm here to help make a

2    blighted, condemned, dangerous building come back to life in a

3    positive way for your city, I'm not going to hold their

4    however many years ago their past might have been against

5    them.

6              MR. SINGER:  Let's blow up the bottom of the page

7    there.  I'm sorry.  Not this part.  Just that whole middle

8    section, please.  That's fine.

9    Q.   So this is where you talk about he works out of Newark,

10   he's in a lot of real estate deals.  And Rob says:  "A lot of

11   union stuff.  A lot of guys, a lot of --" and you say:  "Waxed

12   a few guys," right?

13   A.   I think I probably meant whacked.  Waxed sounds odd,

14   right, in retrospect, but I also -- and, again, you can play

15   the tape if you want to.

16        This is clearly a joke.  If I thought I was sitting down

17   with someone who actually murdered people, I would get out of

18   there faster -- I mean, I like to think I'm brave and have

19   backbone in certain regards, but I don't want to be around

20   murderers, so this was a sort of like Sopranos like style

21   joke.

22   Q.   One would hope, right?

23   A.   Absolutely.  I mean, Mr. Singer, you encounter different

24   people sort of than I do, but I would never break bread with,

25   invite to meet my wife and my baby son, someone who I believed

SITTENFELD - CROSS

1    had ever been a murderer.  You can absolutely say P.G., you

2    have a bad sense of humor, you're making bad jokes, but this

3    is a joke.

4              MR. SINGER:  Okay.  28B, please.

5              THE WITNESS:  Your Honor, I don't want to be a diva

6    here.  I don't know if my attorney can give me a bottle of

7    water.  He probably wants me to talk less so that I need less

8    water.

9              THE COURT:  You may approach.

10             THE WITNESS:  Is that okay?  Thank you.  Thank you

11   very much.

12             MR. SINGER:  Ms. Terry, can you blow up maybe two

13   thirds of the -- the top two thirds, please.

14   Q.   So this is another instance where you're talking about

15   Vinny, right?

16   A.   Yes.

17   Q.   Brian says:  "He's really driving the sports book money

18   side of it," right?

19   A.   Yes.

20   Q.   Then sort of describe Vinny's persona.  And then, again,

21   you say:  "Waxing people in the '80s," right?

22   A.   Again, whacking, not waxing, I would assume conjures very

23   odd imagery but, again, also clearly a joke.  Maybe a dumb

24   one, maybe a stupid one, but this is me joking.

25             THE COURT:  Mr. Singer, are you anticipating these

SITTENFELD - CROSS

1    being published to the jury?  Just ask if you want it and

2    we'll review that.

3              MR. SINGER:  Thank you, Your Honor.

4              THE COURT:  Yep.

5    Q.   Now, at this point, going back to 435, the project had

6    been transferred from the city to the port, right?

7    A.   Yes.  I believe June 26, 2019.

8    Q.   And economic development had determined that a

9    development agreement directly with -- relating to 435, it

10   just wasn't in the public's interest, right, that's one of the

11   reasons that they transferred it to the port?

12   A.   I think that's maybe not quite right.  I think they

13   understood Chinedum to kind of be in the driver's seat because

14   of the air rights.

15        And many of us -- if you want to be a city where you're

16   saying we're a city of opportunity for everybody, you can't be

17   a city where you only have white people developing big

18   projects.

19        So I think the fact that he represented the diversity

20   that we strive for in terms of creating a prosperous growing

21   city, the fact that he had the air rights, I think the

22   expectation -- actually, I know this was the expectation from

23   other recordings that I've listened to that the government

24   made and shared with us.

25        The expectation was that the property would be

1    transferred to the port so that they could wipe the more than

2    $1 million in back taxes and tax liens, but that it was

3    absolutely Mr. Ndukwe who would still be the partner.

4        There was a recording where Laura Brunner and Chinedum

5    Ndukwe are like, it's the two of us, we're moving forward, and

6    that's going to be the arrangement.

7    Q.   Well, Phil Denning, in economic development, they

8    assessed the development agreement that was submitted to the

9    city, right?

10   A.   And I think they thought that the combination of Chinedum

11   plus the port, and the tools that they can bring to clearing

12   tax liens, that's the combination.

13   Q.   Well, they just transfer the money to the port or the

14   line to the port, right?

15   A.   No, Mr. Singer, there was a conversation between Laura

16   Brunner and Chinedum, where Laura specifically references her

17   conversations with Phil Denning.

18   Q.   Ultimately, though, Phil Denning testified here that the

19   economic development department was not going to enter into a

20   development agreement with Mr. Ndukwe, right?

21   A.   Again, I think they thought there was a better

22   arrangement because of the role that the port can play

23   clearing back taxes.

24       It wasn't saying no to Chinedum; and, you know, there are

25   other instances in discovery where Phil Denning goes to

1    Mayor Cranley and says, hey, how about doing this process

2    without an RFP.

3        So no, the city did not deem Chinedum to not be up to the

4    task of doing this, they just thought the combination of a

5    partnership with a port, with the port, and the tools that

6    they could bring would create a more successful outcome.  And

7    I agreed with that.

8    Q.   All right.  So September 24, 2019, you met with Rob,

9    Brian, Vinny, right?

10   A.   Yes.  I did meet with them.  I told them I was coming up

11   for a dinner of other elected officials from around the state,

12   and they asked if we could meet before I went off to my

13   dinner.

14   Q.   And they gave you two $5,000 checks, and promised two

15   more, right?

16   A.   Yes.  Vinny gave me two checks to the PAC for $5,000

17   each.

18   Q.   And after that, you started calling Vinny, right?

19   A.   Yes.

20   Q.   You started calling Vinny directly?

21   A.   Yes.  We had a number of phone conversations.

22   Q.   Okay.  And then October 29, 2019, you met with Brian and

23   Rob, and they gave you those two extra checks, right?

24   A.   Correct.

25           MR. SINGER:  All right.  Can you pull up 33B, please,

SITTENFELD - CROSS

1    page 4.  Actually, can you go back to page 3.  I'm sorry.

2    Bottom of the page there, if you can just blow that up.

3        Your Honor, permission to publish to the jury?

4        THE COURT:  You may.

5    Q.  Do you see where Rob says:  "Oh, I need to give you those

6    checks"?  Do you see that?

7    A.  Yes.  Fourth from the bottom, yes.

8    Q.  And he says, "Vinny will fuckin' run me over with a car

9    if I don't," right?

10   A.  Rob said that.

11   Q.  Rob said that.

12   A.  Because it's in a recording, I did not believe that Vinny

13   would literally run him over with a car if he didn't give him

14   the checks.  I took that to be joking, jocular, bantery

15   language.

16   Q.  A reference to what you knew about Vinny as being in the

17   dark arts, maybe?

18   A.  No.  I thought it was a joke.  I've never met and can't

19   fathom somebody running someone over with a car because they

20   don't hand over lawful PAC contributions.  That's beyond my

21   imagination.

22   Q.  It was a joke because of Vinny's reputation.  Is that

23   fair to say?

24   A.  It was a joke because of the kind of jokes that happened

25   about Vinny and, you know, his sort of, you know, Joe Pesci,

1    Tony Soprano, sort of like his schtick.

2    Q.  But you'd only met Vinny really -- well, at the opening

3    day party, and then on September 24th, right?

4    A.  Yes.  And from those two interactions, it never once

5    occurred to me that he would run somebody over with his car.

6    Q.  It didn't once occur to you that he had ties to organized

7    crime?

8    A.  It just -- it was -- in my conversations with him, he

9    never said anything along those lines.  He represented himself

10    as an investor in a project that was great for the community

11    that I represented.

12       Again, it's just hard for me to -- I love my wife, I love

13    my son, I love my chief of staff.  I would not have taken my

14    chief of staff in to a place where I thought somebody might

15    run you over with a car if things don't go right.  It was --

16    we were joking.  It was a schtick.  I mean, I can't imagine

17    Rob was being serious when he said this.

18    Q.  It was a joke based on his reputation.  Is that fair to

19    say?

20    A.  It was a -- yeah.  I think it was a -- yeah.  I think it

21    was a joke based on the sort of, like, schtick persona of his

22    reputation.

23         MR. SINGER:  Can you go to page 3, please, at the

24    top.  I'm sorry.  Page 4 at the top.

25    Q.  This is when they give you the checks, right?

SITTENFELD – CROSS

1    A.   Yeah.

2    Q.   They give you two more checks.  You say:  "Thank you,

3    guys."

4         Rob says:  "I'll send you the names.  I forgot to ask him

5    which LLC."

6         You said:  "Yeah."  And then you say:  "Where do you guys

7    find these LLCs?  Do I not want to know?"

8         And Brian says:  "Yeah, you probably don't."

9         And you say:  "As long as it's like --"

10        And Brian says:  "Yeah, it'll pass.  It'll pass the

11   muster test."

12        And you say:  "As long as it passes muster and like a

13   person with a name," right?

14   A.   Yes.  So there might be a theme of my making bad jokes

15   here.  I think they thought that I was, uptight might be the

16   right word, because they had, again, always what I understood

17   to be donations that would be compliant, lawful contributions

18   to a campaign or to a PAC.

19        They tried to make them in cash, that wasn't compliant,

20   so I turned it down.  They tried to donate in money orders.  I

21   turned that down.  They tried to donate in cashier's checks.

22   I turned that down.  They tried to donate in corporate checks

23   that they didn't even know were corporate checks.  We caught

24   those, shredded the checks, vetted them.

25        Because all of that had happened one year earlier, I

*SITTENFELD - CROSS*

1    think they thought, oh, this guy is really into making sure

2    that he's accepting lawful, compliant, allowable

3    contributions.

4         So it was sort of like, do I not want to know?  They

5    understood not only did I want to know, I did know and I had

6    to know.  We followed up to say who is the individual from

7    your universe of buddies and investors which each one of these

8    LLCs is attributable to, and then reported all of that in

9    public filings transparently to the Federal Elections

10   Commission.

11        So joking here precisely because I did the opposite, I

12   did want to know, we did know, and we reported it.

13   Q.   You followed up with Rob, right?

14   A.   Correct.

15            MR. SINGER:  All right.  Can you go to 33D, please,

16   page 2, the bottom half of the page, please.

17            Permission to publish to the jury, Your Honor?

18            THE COURT:  You may.

19   Q.   All right.  Your first line here:  "I mean, is he like,

20   is he like, I mean, I've got a sister in Providence.  Like, is

21   he, is it like, you know, Mafia type?"

22        And Brian says:  "So it's funny, umm, as close as we are,

23   I've always kind of respected that."

24        You say:  "Yeah."

25        Brian says:  "I'm gonna say yes."

1       You say:  "By the way, I don't, I don't really care."

2       You asked straightforward, is this guy in the Mafia.  He

3   says yeah, and you say "I don't really care"; is that right?

4   A.   That's definitely what's said here.  Again, I would say

5   if you were to play and include the totality of times we kind

6   of talked about and joked about Vinny, might see and read a

7   little bit differently but, yeah, that's what I say right

8   here.

9   Q.   Do you want to listen to it?

10  A.   I defer to you, Mr. Singer.

11       MR. SINGER:  Let's listen to it.  Can you pull up

12  33C, please.  Actually, would you mind pulling the transcript

13  up again.

14       Can you pull up 33C and play it starting at 54:24.

15       It's the first session that was admitted into evidence.

16       (Audio played.)

17  Q.   That was sort of the tenor of the conversation, right?

18  A.   Okay.

19  Q.   You were just having a regular conversation about Vinny.

20  Is that fair to say?

21  A.   Yeah.  And I guess I was also saying, like so much in

22  this, this was after two other examples where I think you

23  might have agreed with me, we're joking about who he was and

24  how he seemed.  Again, not --

25  Q.   This was a pretty straightforward, "Is he in the Mafia?"

*SITTENFELD - CROSS*

1   And they said "yeah," and you said "I don't care"; is that

2   right?

3   A.   I think, by that point -- again, going back to the did he

4   wax, wax guys in the '80s, I think I thought this was like a

5   schtick that we must have joked around about; and, again, I

6   just can't emphasize enough, I would never take my chief of

7   staff, who is like a surrogate little brother to me.

8       And later in the calls we might yet get to, I think I

9   talk about him, like, visiting my family in Providence.  I

10  would not expose my family to someone who I thought might put

11  them in danger in any way.

12       MR. SINGER:  Your Honor, may we approach at sidebar?

13       (Sidebar held off the record.)

14       THE COURT:  Ladies and gentlemen of the jury, I'm

15  advised there are about another 30 minutes of questions left.

16       So there's a couple of possibilities.  We could just

17  power through and do another 30 minutes of questions, or we

18  could take a brief break and resume, or we could suspend and

19  start again tomorrow.

20       In some ways, it probably makes more sense to try to get

21  through this witness and have him done, if people are all

22  right.

23       So is there anyone who could not go right now for another

24  30 minutes and would like to take a break?

25       A JUROR:  I would like a break.

1          THE COURT:  You're fine, you're saying?  I don't know

2     what you're saying.

3          A JUROR:  No.  I was just saying five minutes.

4          THE COURT:  Oh, yes, we can take a very, very brief

5     break.  So just take a break and try and resume, line back up

6     in the hallway as soon as you can, and we will try and knock

7     out this last 30 minutes.

8          As always, all the standard admonitions.  Don't discuss

9     the case amongst yourself.  Don't communicate or do any

10    research.  We'll get you back in here as quickly as we can.

11         (Jury out at 4:56 p.m.)

12         (Brief recess.)

13         THE COURT:  Let's bring the jury in.

14         (Jury in at 5:05 p.m.)

15         THE COURT:  Thank you, members of the jury, for

16    keeping that brief.  I appreciate that.

17         Mr. Singer, you may continue.

18         MR. SINGER:  Thank you, Your Honor.

19    BY MR. SINGER:

20    Q.   Let's go to the fall of 2019.  You received the $10,000

21    from Vinny in September, right?

22    A.   Correct.

23    Q.   I think you testified after that $10,000, you started

24    reaching out to Vinny directly, right?

25    A.   That's correct.

*SITTENFELD - CROSS*

1    Q.   Do you remember placing a call on November 15, 2019,

2    asking to meet up with Vinny in New York?

3    A.   I do remember that call, mostly from hearing it last

4    week, or a week or two weeks ago.

5           MR. SINGER:  Can you please pull up 35D, please.

6           Permission to publish, Your Honor?

7           THE COURT:  You may.

8           MR. SINGER:   Page 2.

9    Q.   So Vinny -- you recall in the conversation, Vinny's

10   talking about -- well, you ask him if he was going to be

11   around in early December, and you wanted to meet up in

12   New York; is that right?

13   A.   That's correct.

14   Q.   And Vinny mentions a yacht, and you say -- this is at the

15   bottom.

16           MR. SINGER:  Will you blow up the bottom third.

17   Q.   -- "I wanna be, I wanna, I wanna, I wanna be you when I

18   grow up."

19           And he says:  "You want to be old, fat, and bald?"

20           And you say:  "No.  I want to be a baller like you,"

21   right?

22   A.   I absolutely said that.  I'm like kind of a dork, right.

23   Like when you're having an interplay with someone, and they're

24   self-effacing you, so "I'm old and fat and bald."

25           "No.  I want to be a baller like you."

1      I mean, there are a lot of ways in which I'm probably a

2    weird or unusual person, but that sort of banter and interplay

3    I've had with ten thousand people in my life.

4    Q.  You thought that --

5    A.  If --

6    Q.  Go ahead.

7    A.  If I really wanted to be a baller, you don't become a

8    wonky city councilperson.  No one has ever accused a dorky

9    policy geeky city councilman of being a baller so, again,

10   there was just an ongoing sort of banter, I think, in a lot of

11   these communications.

12   Q.  You were a candidate for the U.S. Senate, right?

13   A.  I was, a quite unsuccessful one.

14   Q.  You thought Vinny was the boss, though, right?

15   A.  No.  I think I thought he was the -- another of the

16   backers of the 435 Elm redevelopment property.

17   Q.  So it's your testimony that Brian and Rob did not portray

18   Vinny as the boss?

19   A.  I guess they kind of did.  It was very -- especially in

20   the moment -- again, dissecting these beat by beat, I think I

21   kind of understand where you're headed.  But in the moment,

22   no.  Rob -- and I guess I also don't know exactly what you

23   mean by "the boss."

24      Rob said I do real estate deals all over the country and

25   especially in the southeast, and I'm -- I Rob, am getting on a

1    plane to Hawaii, and then I'm going over to Budapest.

2        Brian owned his own -- as these fictions were represented

3    to me and I believed them, Brian owned his own green energy

4    company.  He did a ton of work for the federal government.

5        Vinny used to have a sports book, and now he's into real

6    estate investment.  They each kind of seemed like their own

7    person.

8    Q.  But you started reporting to Vinny rather than Rob,

9    right?

10   A.  I would pretty strongly disagree with the reporting to.

11   Across nearly a decade at City Hall, I think the majority of

12   the things I sponsored, and the things I fought for, were for

13   people who were never political donors, things like

14   increasing -- expanding bus access, things like increasing

15   affordable housing.

16       I would report to those stakeholders as frequently and as

17   thoroughly and as passionately, despite them never being any

18   donor anywhere in sight, as my follow-up was to Vinny.

19   Q.  But you would tell Vinny about how you were pressuring

20   Laura Brunner, right?

21   A.  I think I would relay to him the dispute between Laura

22   and Chinedum, and my pushing all parties to get what I

23   believed to be a really good project across the finish line.

24   Q.  Well, you recall saying, "I am putting pressure on Laura

25   Brunner," right?

1  A.   I'm happy for you to show me the exact thing.  I think I

2  was very clear with everybody, Vinny, Laura herself, Chinedum,

3  and anybody else that would ask me, I have real concern that

4  two things might foil a home run no-brainer project.

5       One was her treating him differently because of the color

6  of his skin.  That should cause a person to be alarmed and

7  extra engaged.

8       Two, I was worried that if she, for that reason or for

9  another reason, tried to go in a different direction, that

10  things would end up embroiled in litigation.  And, you know,

11  I'm no longer in politics.  I'm sure I'll never be in politics

12  again.  I still love this city.  This is still where my wife

13  and I are raising our family.

14       I lament that that prediction was correct, by her trying

15  to obstruct and not come to a reasonable middle ground,

16  actually even closer to Laura's side than to Chinedum, Rob,

17  Brian, and Vinny's side.

18       By her declining to do that, the exact litigation

19  scenario that I predicted unfolded and, as we sit here today,

20  there is still a blighted, condemned, vacant building that

21  should be a gleaming tower that created jobs, and it's not.

22  Q.   Now, I think you testified on direct that you had a

23  meeting with Mr. Ndukwe and Mike Schiff on December 11th; is

24  that right?

25  A.   Chinedum asked to come to my office.  I think it was kind

1    of a spur of the moment thing, which -- this is when you are

2    friends with someone, it's not a big surprise when they give

3    you a buzz and say, hey, can I stop by?  The days are very

4    full, which is why the meeting was, I believe, only

5    15 minutes.

6        So with very little warning, on December 11th of 2019,

7    Chinedum, Mike Schiff, and somebody named Mr. Patel, I

8    believe, came by my office, where it was me, as well as a

9    couple of City Hall aids.

10   Q.  And I think you testified on direct that Rob and Vinny

11   were out of the picture at this point, but you continued to be

12   engaged because of your belief in the project; is that right?

13   A.  Well, Chinedum represents -- so Rob and Vinny -- sorry.

14   Rob, Brian, and Vinny had represented themselves as people who

15   were in deals all over the country.  They did seem a little

16   bit like people who kind of had short attention spans, so if

17   they had on a dime said, hey, we're going to remove ourselves

18   from this deal and now be in something else, that wouldn't

19   have surprised me.

20       I think the thing that was murky or confusing was that

21   Chinedum very much represented in that meeting that sort of,

22   you know, Mike is in now.  He's the guy.  He's the capital,

23   and he's the development partner.

24   Q.  And you called Vinny that day, right?

25   A.  December 11th?

SITTENFELD - CROSS

1    Q.   Yeah.

2    A.   Possibly.

3    Q.   And then you called him again on December 23rd, right?

4    A.   Yeah.  I think we had maybe December 9th, December 11th,

5    and December 23rd, we had conversations that month.

6    Q.   Now, those checks that you received in September from

7    Vinny and October from Brian and Rob, you reported those to

8    the FEC, right?

9    A.   All of the checks from them were reported to the Federal

10   Elections Commission.

11   Q.   And Rob's name was not reported, right?

12   A.   Again, you're not allowed to report a check that's not

13   from that person and say it is.

14   Q.   It's a simple question.  Rob's name was not recorded?

15   A.   Correct, because he wasn't the donor.

16   Q.   Brian's name was not recorded?

17   A.   Definitely not.

18   Q.   And Vinny was not recorded?

19   A.   Nope.  Yep, you're correct.

20            MR. SINGER:  No further questions, Your Honor.

21            THE COURT:  Thank you, Mr. Singer.

22        Any redirect, Mr. Rittgers?

23            MR. C. MATTHEW RITTGERS:  Very briefly, Your Honor.

24            THE COURT:  All right.

25

```
 1                         REDIRECT EXAMINATION

 2   BY MR. C. MATTHEW RITTGERS:

 3   Q.   Is there a section on the FEC website that says who

 4   fundraised or bundled this money for you?

 5   A.   There is not.

 6   Q.   If you had put Rob's name on the FEC website, would that

 7   have been a federal offense?

 8   A.   Yes.  You can't misrepresent who the actual donor is, so

 9   my understanding of Rob -- again, we've sort of hit all of

10   those different beats but, repeatedly, both things I said and

11   things he said, saying this is fundraising from my universe of

12   buddies and investors.  If I had attributed a check from

13   someone in their network to him, and it wasn't from him,

14   that's a violation.  You're not allowed to do that.

15   Q.   You hired a CPA, you testified to.  What was her name?

16   A.   Her name is Claire Fisher McKenna, her maiden name,

17   married name.

18   Q.   What was her role when you hired her as a certified CPA?

19   A.   Her -- so this was after I fired Jared.  I thought let's,

20   you know, sort of increase the compliance operation and

21   efforts even more, someone who is a professional CPA,

22   obviously excellent credentialed background, it was to sort of

23   do what Jared had previously been doing in a -- separate from

24   but in collaboration with the law firm, which was also hired

25   to make sure everything was compliant, lawful.
```

SITTENFELD - REDIRECT

1    Q.   What was her title in relation to the PAC and campaign?

2    A.   I believe she became the treasurer for the PAC.

3    Q.   And as a matter of procedure and course, were there

4    things that she did, no matter who donated to you or

5    fundraised and bundled, in terms of follow-up to confirm who

6    should be attributed to each LLC check?

7    A.   Yes.  Yes, there were things she would do if we

8    received -- if somebody went out and did lawful fundraising,

9    and they're raising from their network of neighbors, business

10   partners, fellow churchgoers, and we obviously don't know

11   those people.

12        So if we get a check from, you know, Main Street, LLC,

13   she would follow-up -- sometimes I would follow-up to say,

14   hey, who is the person, the person who is doing the bundling,

15   doing the fundraising?  Who is the person who this donation is

16   actually from?  Who is it attributable to?  And she and the

17   law firm would both do that.

18   Q.   How did she do that with respect to the 2019 checks that

19   you were just asked about?

20   A.   So Claire, incredibly credentialed, very smart, but was

21   new to politics.  I actually didn't think that was a bad

22   thing.  I thought teaming up with a professional CPA was a

23   good idea for me too.

24        So I think I drafted some language for her to sort of,

25   you know, here's how you can follow up with a donor.  She then

1    did reach out to Rob directly, in no uncertain terms to say,

2    you know, thank you for these donations that we've received.

3    P.G. is very appreciative.  We're very appreciative.  I'm

4    paraphrasing.  Can you please confirm who each check is from

5    so that we can make a lawful, appropriate, accurate filing

6    with the FEC, which is what we then did.

7    Q.  Are you aware of whether or not Rob actually responded to

8    your CPA treasurer with names?

9    A.  He responded -- if you wanted to show me the email, but

10   he responded saying here's who -- I can't remember if he had

11   maybe mentioned it to me or if he hadn't yet.  But he either

12   followed up or confirmed this LLC contribution is from this

13   real individual human being.

14   Q.  Was Claire interviewed by the FBI, to your knowledge?

15   A.  Claire was interviewed by the FBI.

16   Q.  How do you know that?

17   A.  Because I read her 302, which is -- sorry.  I mean, I've

18   been living in this bizarre world.  That's -- I believe a 302

19   is the name when somebody gives -- sits down for a formal

20   interview with the prosecutors and the FBI.  The FBI

21   interviewers' recording of that is called a 302.

22   Q.  What job opportunities did you have post college?

23   A.  The most immediate one --

24        MR. SINGER:  Objection, Your Honor.  Outside the

25   scope.

SITTENFELD - REDIRECT

1          THE COURT:  I agree.

2          MR. C. MATTHEW RITTGERS:  He was asking about the

3     baller stuff, and I just -- he had opportunities to go make

4     money, and he came back here.  That was the only point of it

5     about the baller stuff.

6          THE COURT:  You can answer that question.

7          THE WITNESS:  Thank you, Your Honor.  It's a very

8     short answer.  I mean, I knew I wanted to come back to my

9     hometown.  I think there was an eye towards getting involved

10    in public service.  But when I was in graduate school, I won a

11    scholarship to go to graduate school in the United Kingdom.

12      There was a program that Google had for people who were

13    on my scholarship.  And I participated -- the summers between

14    my two years of graduate school, I participated in this

15    program at Google.  They offered me employment to stay on

16    there.

17      I think I said something along the lines of, you know, if

18    you guys want to open Google Cincinnati, I'd be very tempted

19    but, short of that, I want to be back in my hometown, so I

20    turned that down and came back and got involved with the

21    education and non-profit we talked about earlier.

22          MR. C. MATTHEW RITTGERS:  I have no further

23    questions, Your Honor.

24          THE COURT:  Thank you, Mr. Rittgers.

25          MR. SINGER:  Nothing from me, Your Honor.

*SITTENFELD – REDIRECT*

1          THE COURT:  Very good.  Mr. Sittenfeld, you can step

2     down.

3          THE WITNESS:  Thank you, Your Honor.

4       (Witness excused.)

5       (Excerpt of proceedings concluded at 5:21 p.m.)

6                    *   *   *

7             C E R T I F I C A T E

8                    -  -  -

9       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
        is a correct transcript from the record of proceedings in the
10      above-entitled matter.

11

12      /s/ M. Sue Lopreato_____            August 11, 2022_____
        M. SUE LOPREATO, RMR, CRR
13      Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                            INDEX

 2   DEFENSE WITNESS

 3   ALEXANDER P.G. SITTENFELD

 4   Direct by Mr. C. Matthew Rittgers................... Page 2
     Cross by Mr. Singer............................... Page 60
 5   Redirect by Mr. C. Matthew Rittgers................ Page 154

 6

 7
                             EXHIBITS
 8

 9   GOVERNMENT EXHIBITS

10   Exhibit                                         Admitted

11

12

13   DEFENSE EXHIBITS

14   Exhibit                                         Admitted

15   54                                                 15
     716                                                19
16   654                                                21
     653                                                26
17   136                                                27
     648                                                50
18   48                                                 51

19

20                             -   -   -

21

22

23

24

25
</pre>