```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                            *   *   *
 3

 4   UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
 5            Plaintiff,            : Jury Trial, Day 1
                                    : Tuesday, June 21, 2022
 6            - v -                 :
                                    : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"          : *** REDACTED ***
 8                                  :
              Defendant.            : Cincinnati, Ohio
 9
                            *   *   *
10           EXCERPTED PROCEEDINGS - REDACTED VOIR DIRE

11      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                            *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                            *   *   *

25
```

1                    P R O C E E D I N G S

2              (In open court at 10:11 a.m.)

3                         *   *   *

4        THE COURT:  Well, good morning, ladies and gentlemen.

5    Let me start with the key thing up front.  First, can everyone

6    hear me all right?  If you can't hear me, please raise your

7    hand and let me know if there's any point during the hearing

8    where you can't hear me, just please hold up your hand and

9    we'll address it.

10        I'd like to welcome you all here this morning and thank

11   you for coming in.  I realize that being here in court this

12   morning may present some degree of inconvenience for all of

13   you, but I assure you that your presence is of the utmost

14   importance to the proceedings that are beginning here today.

15        My name is Douglas Cole, and I'm one of the judges on

16   this Court.  Before I make a few preliminary remarks about the

17   case, I'd also like to introduce you to some of the other

18   court personnel who are here in the courtroom this morning.

19        So first, we have Scott Lang.  He's my courtroom deputy.

20   Shortly, he will be administering the oath to all of you as

21   prospective jurors.  And for those of you who are selected to

22   serve on the jury, he will also be administering your oath to

23   serve as members of the jury.

24        He will also be administering the oath to witnesses who

25   testify throughout the trial, and he helps me keep track of

1    everything that's going on with the exhibits and other things

2    during the course of this trial.

3        He'll open and close the court, and will take care of

4    recesses, and he'll adjourn for us at the end of the day, so

5    you'll hear a fair amount from him if you're selected for the

6    jury.

7        In front of me is Sue Lopreato.  She's my court reporter.

8    She takes down every word that's spoken during the course of

9    these proceedings on what's called a stenotype machine.

10       It's sort of amazing to watch.  The machine in front of

11   her is not a typewriter.  It has multiple keys that can be

12   pressed in combination, almost like chords on a piano, and

13   each one of those different sets of chords is a different

14   sound, and so she's phonetically taking down everything that's

15   said by anyone during the course of these proceedings.

16       It is sort of, as I said, amazing to watch, and Sue is a

17   master of that particular instrument.  So I sometimes find

18   myself just watching what's going on with her, and that's a

19   problem.  I shouldn't do that, but okay.

20       Jacob Denz is my law clerk for this matter.  He's going

21   to be assisting me with any necessary legal research issues

22   that may come up, and he's going to be here throughout the

23   trial.  I have a couple of other clerks as well, and they may

24   be here from time to time.

25       In a few moments, I'm going to introduce you to the

1   people who are seated at the counsel tables in front of the

2   bench, but I first want to talk a little bit about why you're

3   here this morning.

4       So we're soon going to begin a process that's called voir

5   dire, by which we're going to determine which 16 of you will

6   be chosen to sit as jurors in this case.

7       Before we start the actual process, though, I'd like to

8   tell you just a little bit about how it's going to proceed and

9   what's going to happen this morning.

10      So let me start with this.  When you came in today, you

11  were given a juror number.  For purposes of the voir dire

12  process this morning, that number is your name.

13      Sue is going to be taking down everything anyone says

14  this morning, and we don't want your names to be in the record

15  so that we can preserve your anonymity.  Accordingly, I'll be

16  referring to you only by your number, and you should do the

17  same.

18      So I might say Juror Number 9, tell me more about your

19  answer to that question.  You should also refer to yourselves

20  by your numbers and not your names when you speak up.

21      So, for example, if I say did I see another hand up in

22  the back row?  You might say yes, I'm Juror 54, and I raised

23  my hand.  Does everybody get it?  We just use your numbers

24  instead of your names.

25      Since we're talking about anonymity, I also wanted to

1     mention one other thing on that front.  I know that each of

2     you were kind enough to answer some supplementary questions on

3     questionnaires that you mailed back in.

4         As we'll discuss, your answers to those questions play an

5     important role in helping us select a jury that is fair and

6     impartial, which is the whole point for the proceeding for

7     this morning.

8         I wanted to let you know that the lawyers for the parties

9     have received the information, but we ask both the government

10    and defense counsel to return the documents to us for

11    destruction after completion of the voir dire process.

12        I know sometimes people worry about their confidential

13    information being out there, and I wanted to assure you that

14    we do everything we can to protect it.

15        That being said, as we'll discuss further in just a few

16    minutes, the trial for which you have been called today is a

17    matter that has garnered some public attention.

18        Members of the local media will likely be attending

19    trial, and some of them are in the overflow room today to

20    listen and potentially report on the jury selection process.

21    Let me say right at the outset they have every right to be

22    here and to report on this trial.

23        One hallmark of our system of criminal justice in this

24    country is that trials are conducted in public.  There are no

25    secret tribunals that meet behind closed doors to decide the

1    guilt or innocence of those accused of a crime.

2        Rather, the process takes place in full public view,

3    although oftentimes few members of the public or the media

4    exercise the right to be present.

5        In this case, though, there are reasons to believe that

6    they will be doing so.  So as I've already mentioned, while

7    they have every right to be here, I just wanted you to be

8    aware of that as well.  And one reason I raise it is there may

9    be times when I ask questions where you would prefer to keep

10   the answer private.

11       For example, you may have some medical condition that you

12   believe would preclude service on a jury that you might not

13   want to share that publicly.  That is understandable, and I

14   will discuss shortly the process that we will use to make sure

15   that you can share that confidential information, as to which

16   the Court has an obligation to inquire, without making it

17   public if you don't wish to do so.

18       And I'll also note that members of the media have

19   requested the supplemental jury questionnaires that were

20   filled out, and we're going to talk a little bit about what

21   we're going to do with regard to that.

22       There are some potential public access rights there but,

23   as I've already said, you also have some rights to keep

24   information confidential, and so we'll discuss with you what

25   we're going to do on that front.

1    Well, with that out of the way, I'd like to say just a

2    few words about the jury process and the jury selection

3    process. Those of you who are chosen to serve on the jury for

4    this matter will have an indispensable and unique function to

5    perform.

6    You will be carrying out a mandate of the United States

7    Constitution, which states that any person accused of a crime

8    in this country is entitled to a fair trial by an impartial

9    jury.

10    Thus, under the Constitution, it will be up to you, if

11    you are selected, to decide the outcome of this case. Not

12    only is your presence here a necessity, but it is also an

13    opportunity for you as citizens to participate in a function

14    of the government of this country that is fundamental to the

15    democratic process.

16    So let me thank you for your participation, and please

17    know that everyone involved in this case, on both sides,

18    shares in that gratitude for your service.

19    Before talking about exactly how we're going to proceed

20    this morning, I also want to introduce you to the parties

21    you'll be seeing in this case.

22    You are here today as prospective jurors in the case of

23    the United States of America versus Alexander Sittenfeld, who

24    is also known as P.G. Sittenfeld.

25    Representing the United States today are Assistant United

1    States Attorneys Matthew Singer, Megan Gaffney Painter, and

2    Emily Glatfelter.  And at counsel table with them is Special

3    Agent Nathan Holbrook.

4        The defendant in this case is Alexander Sittenfeld, who

5    is also known, as I said, as P.G. Sittenfeld.  Representing

6    Mr. Sittenfeld today are attorneys Mr. Charles M. Rittgers --

7    and you'll see why, in a second, I said M. Rittgers, Charles

8    H. Rittgers.

9            MR. C. HENRY RITTGERS:  Good morning.

10            THE COURT:  Neal Schuett.

11            MR. SCHUETT:  Good morning.

12            THE COURT:  And seated at counsel table with them is

13   Elias --

14            MR. DEMEROPOLIS:  Demeropolis.

15            THE COURT:  Thank you -- Demeropolis.  I'm sensing

16   that isn't the first time, Mr. Demeropolis, you've had that.

17            MR. DEMEROPOLIS:  You always knew when my name got

18   called because the teacher hesitated.

19        (Laughter.)

20            THE COURT:  All right.  A criminal case usually

21   starts with a charging document, and it's called the

22   indictment.  You may have heard that term "indictment" before.

23   It's just a charging indictment in a criminal case.  Here the

24   indictment charged the defendant, Alexander Sittenfeld, with

25   four counts.

1        The first and second counts in the indictment are two

2    counts of honest services wire fraud.  The third count is

3    bribery concerning programs receiving federal funds.  And the

4    fourth count is attempted extortion under color of official

5    right.

6        If you are selected for the jury, I will tell you more

7    about what those counts mean and what the elements of the

8    alleged crimes are.  Importantly, though, and I want to stress

9    this, the defendant, Mr. Sittenfeld, has pled not guilty to

10   all of these charges.

11       So consistent with what I mentioned a little earlier, the

12   jury's job in this case will be to decide, based on the

13   evidence presented at trial, and solely the evidence presented

14   at trial, whether the government has carried its burden of

15   showing that Mr. Sittenfeld is guilty of one or more counts of

16   that indictment.

17       With the introductory remarks out of the way, I mentioned

18   I was going to tell you a little bit more about the process by

19   which we'll pick the jury.  The process itself is called voir

20   dire.

21       And voir dire requires the Court to ask questions to

22   determine whether you should participate as a juror in this

23   case, or whether it would be better to excuse you from service

24   in this case.

25       Although the words "voir dire" literally mean to see and

1    to say, they have come to mean to speak the truth.  And that's

2    exactly what you must do in response to the questions posed by

3    the Court and counsel this morning.  You must speak the truth.

4        Now, as I noted earlier, it is possible that providing

5    answers to some of the questions this morning in open court

6    may make you feel uncomfortable.

7        If providing your answer to any particular question would

8    make you uncomfortable for any reason, you may ask to approach

9    the bench, and we can discuss your answer to that question in

10    private.

11        However, it may be necessary for me or for the attorneys

12    to ask questions that may seem personal or embarrassing to

13    you.  Please do not hold that against the attorneys or their

14    clients.  The attorneys have strong obligations in this case,

15    and they are entitled to ask questions that they think are

16    important in ensuring that we impanel a fair and impartial

17    jury.

18        Before we start with those questions, though, I'm going

19    to ask my courtroom deputy to administer an oath.  The oath is

20    simply to make certain that your answers to the questions we

21    ask are complete and truthful.

22        So would all prospective jurors please rise and raise

23    your right hand and take the oath on voir dire.

24        (Prospective jurors sworn.)

25           THE COURT:  Now that you've been sworn in, we are

1    going to begin the voir dire process itself and, as I said,

2    this is the process by which the jury will be chosen.

3        The process itself is simple enough. I will ask you some

4    questions, and then the lawyers for each side will also ask

5    you some questions. The questions are designed to make sure

6    that you have no bias or prejudice for or against either side.

7        Now, as I mentioned, some of these questions may seem

8    personal. Please do not take offense at such questions. It

9    may be necessary to inquire into areas about which you are

10   sensitive in order to determine your ability to be fair and

11   impartial.

12       Remember that voir dire means to speak the truth. As I

13   said, if your answer to a question is, for any reason,

14   embarrassing to you or you don't want to share it in public,

15   we can definitely deal with that at sidebar.

16       But if your answer to a question indicates that you might

17   have a bias, please do not hesitate to answer the question

18   truthfully. Your own desire to participate in this case

19   cannot outweigh the fact that fairness and impartiality of

20   each juror are crucial to a fair trial.

21       The questions will be addressed to everyone, both those

22   in the jury box and those in the back of the courtroom. After

23   I've completed asking you all of my questions, and the lawyers

24   have each had an opportunity to question you further, we'll

25   take a recess so that the parties can confer with me, and

1    Mr. Lang will then announce the numbers of those of you who

2    are selected to serve as a juror.

3        Now, let me note right up front, not all of you are going

4    to be selected, which is probably welcome news to many of you.

5    We called roughly 80 people this morning and, as I've already

6    said, only 16 will be selected for the jury.

7        If you are not chosen, let me say right at the outset

8    that is not a reflection on your character, your integrity, or

9    your fitness to serve.

10       Each side is afforded multiple opportunities to excuse

11   jurors for any reason or for no reason at all.  And as I've

12   already noted, we only need 16 jurors, and there are obviously

13   a lot more people than that here.  So if you're excused,

14   please do not feel slighted or offended.

15       Once we've seated 16 jurors, we'll have our jury, and

16   those 16 people will be sworn into jury duty.

17       All right.  So let's start with a few questions.  I'm

18   going to start with a procedural matter.  The case is expected

19   to take two to three weeks to try.  The Court will generally

20   start at 9:00 a.m. or 9:30 in the morning and will try to end

21   around 5:00 p.m.

22       The lunch break is usually from around noon until around

23   1:00 p.m., and we typically take two 15-minute breaks, one

24   midmorning and one midafternoon.

25       We may not meet every day.  Our start times and end times

1    may be different on particular days, but that is generally how

2    the trial will proceed.

3        And once the trial is over, jury deliberations take as

4    long as they take for the jury to reach a unanimous

5    conclusion.

6        Now, I raise all that because, in a second, I'm going to

7    ask whether that schedule creates a hardship for anyone.  But

8    before I ask that question, let me explain the difference

9    between an inconvenience and a hardship.

10       I know that serving on a jury might be an inconvenience

11   for each of you.  You didn't really have it planned for this

12   week to be sitting in court.

13       But a hardship is something like, oh, I have a vacation

14   coming up later next week and we've already bought tickets.

15   Or I'm having surgery later this week, or a family member is.

16   Or I have an important business meeting that just can't be

17   rescheduled; that type of thing.

18       And I know that you were already asked about this on a

19   supplemental questionnaire, but I just want to check again now

20   that we're all here this morning.

21       Is there anyone who has a hardship that they believe

22   means that they could not serve on a jury in this matter?  If

23   so, please raise your hands.

24       And for all of my questions, if your answers are yes,

25   please raise your hand, and please make sure that I say your

```
1    juror number before you put your hand down.

2         Is there anyone with a hardship?  Okay.  Juror Number 16,

3    Juror Number 1, Juror Number 5.  Sir, number?

4              PROSPECTIVE JUROR 18:  18.

5              THE COURT:  18.

6              PROSPECTIVE JUROR 20:  20.

7              PROSPECTIVE JUROR 24:  24.

8              THE COURT:  24.  Number?

9              PROSPECTIVE JUROR 32:  32.

10             THE COURT:  32.  33, I take it?  In the middle.

11             PROSPECTIVE JUROR 41:  41.

12             THE COURT:  41?

13             PROSPECTIVE JUROR 41:  Yes.

14             THE COURT:  Yes.

15             PROSPECTIVE JUROR 45:  45.

16             THE COURT:  Yes, sir?

17             PROSPECTIVE JUROR 53:  53.

18             THE COURT:  Yes?

19             PROSPECTIVE JUROR 57:  57.

20             THE COURT:  Yes?

21             PROSPECTIVE JUROR 58:  58.

22             THE COURT:  Yes?

23             PROSPECTIVE JUROR 59:  59.

24             THE COURT:  Yes, middle?

25             PROSPECTIVE JUROR 71:  71.
```

```
 1              PROSPECTIVE JUROR 73:  73.

 2              PROSPECTIVE JUROR 74:  74.

 3              THE COURT:  Okay.  What we're typically going to do,

 4      once people have raised their hand, we're going to get a

 5      little more information with respect to that.

 6          Juror Number 1, if you could share the nature of the

 7      hardship?

 8              PROSPECTIVE JUROR 1:  Recently, my husband had an

 9      illness, and he's the only one working right now, and I'm not

10      sure I can afford all this.

11              THE COURT:  So you have a job where you wouldn't be

12      paid if you're on jury duty, is that right, ma'am?

13              PROSPECTIVE JUROR 1:  I am not working now, but I

14      will be.

15              THE COURT:  I see.  Okay.  Juror Number 5?

16              PROSPECTIVE JUROR 5:  We got an international guest

17      visiting us from July 11th until July 25th, and I have a work

18      commitment.

19              THE COURT REPORTER:  I can't hear her.

20              THE COURT:  If, when you give additional information,

21      if you could stand and pull down your mask just to make it

22      easier for the court reporter.  Thank you.

23              PROSPECTIVE JUROR 5:  So you heard the first one?

24              THE COURT:  Yes.  The international guest from

25      July 11th through July 25th, was it?
```

1           PROSPECTIVE JUROR 5:  July 11th through 25th, yes.  I

2     work on a communications team, and we have a website delivery

3     in the summer that has a lot of work that needs done.

4           THE COURT:  And you say you're on a team for that?

5           PROSPECTIVE JUROR 5:  Yes.  I lead the communication

6     team overseeing it at Miami University.

7           THE COURT:  I think the July 11th part, as I

8     understand it, we should be done well in advance of July 11th.

9     Is there something you need to do in preparation for the

10    person being here?

11          PROSPECTIVE JUROR 5:  No.

12          THE COURT:  Thank you, ma'am.  Juror Number 16?

13          PROSPECTIVE JUROR 16:  I found out on Friday that my

14    85-year-old father's prostate cancer is back, so I don't know

15    what they are going to do to even treat him, but I was just

16    worried that if they were going to go into surgery, I would be

17    unavailable.

18          THE COURT:  I see.  I'm very sorry to hear that,

19    ma'am.  Juror Number 18?

20          PROSPECTIVE JUROR 18:  There are several days I'm

21    going to be responsible for picking up my daughter from her

22    babysitter, and that's at 4:30.  Tomorrow is the one day, and

23    there's two or three other days for sure.  And I'm the backup

24    if something happens and we need to pick her up.

25        Secondarily, it's the end of the fiscal June 30th at

1    work, and I'm highly involved in setting budgets

2    [indiscernible].

3              THE COURT:  Thank you, sir.  Juror 20?

4              PROSPECTIVE JUROR 20:  It's work, where I work, and I

5    don't have a backup at work to actually do my job, so...

6              THE COURT:  What kind of work is that, ma'am?

7              PROSPECTIVE JUROR 20:  I'm data entry for a specialty

8    infusion pharmacy.

9              THE COURT:  Okay.  Juror Number 24?

10             PROSPECTIVE JUROR 24:  Yes.  We farm, and we're still

11   trying to get stuff done.  My husband travels out of town

12   also, because we both work the farm together, so when he's out

13   of town, I'm going to have to be the one trying to get

14   everything done before I even go to work.

15             THE COURT:  What kind of farm is it, ma'am?

16             PROSPECTIVE JUROR 24:  We do fruits and vegetables.

17             THE COURT:  So is this like planting season or not?

18             PROSPECTIVE JUROR 24:  Well, we're replanting right

19   now, and we're getting ready to harvest sweet corn too.

20             THE COURT:  Juror 32?

21             PROSPECTIVE JUROR 32:  One of my reasons is work.

22   But the primary reasons is my cousin's kid.  She just got

23   diagnosed with DIPG, so I'm her -- when she's not around, she

24   just had a baby as well, so I'm also a mode of transportation

25   to get the kid to the healthcare if the father is out of town

 1    in Texas.

 2              THE COURT:  And, I'm sorry, you said it was your

 3    sister's child?

 4              PROSPECTIVE JUROR 32:  It's my cousin's child.

 5              THE COURT:  Your cousin's child.  And you're the

 6    means of transportation to the clinic or hospital or whatever?

 7              PROSPECTIVE JUROR 32:  Yes, for her treatment.  If

 8    there was something she had to do with the baby and her

 9    husband's out of town, she calls me.

10              THE COURT:  Okay.  Juror 33?

11              PROSPECTIVE JUROR 33:  Yes.  This creates a financial

12    burden in my house.  I'm the only one working between me and

13    my wife.

14              THE COURT:  And you don't receive compensation if you

15    would be serving on a jury, is that right, sir?

16              PROSPECTIVE JUROR 33:  No, sir.

17              THE COURT:  Juror 41?

18              PROSPECTIVE JUROR 41:  I have a medical reason that I

19    don't really want to talk about publicly.

20              THE COURT:  Okay.  Could I ask you to come up to

21    sidebar, ma'am.

22    SIDEBAR CONFERENCE

23    ████████████████████████████████████████

24    █████████████████████████████████████████████

25    ████████████████████████████████████████████████████████



SIDEBAR CONFERENCE CONCLUDED

       THE COURT:  Juror 45?

       PROSPECTIVE JUROR 45:  I'm primary care for my three kids.  My husband works full-time.

       THE COURT:  And they're at home for the day?

       PROSPECTIVE JUROR 45:  I have a grandparent watching them today, but it's not really feasible ongoing.

       THE COURT:  Young kids?

       PROSPECTIVE JUROR 45:  Yes.

       THE COURT:  Juror 53?

1      PROSPECTIVE JUROR 53:  Yeah.  Just basically, I just

2  need to work.  I work, and I have ten employees, and that

3  combined income with me and my wife, I just can't miss any

4  days.

5      THE COURT:  And you, likewise, would not receive

6  compensation if you were serving on a jury; is that right?

7      PROSPECTIVE JUROR 53:  It would definitely put our

8  family in hardship.

9      THE COURT:  But I mean at your job, you wouldn't be

10  compensated?

11      PROSPECTIVE JUROR 53:  No.  I wouldn't be

12  compensated.

13      THE COURT:  Okay.  Thank you.  Juror 57?

14      PROSPECTIVE JUROR 57:  I have two.  I'm an

15  administrator in a school building.  I have two interviews

16  coming up on Thursday and Friday for other buildings.

17      THE COURT:  So you're interviewing for different

18  positions, you mean, or you're interviewing people to work at

19  your building?

20      PROSPECTIVE JUROR 57:  I will be hiring two

21  additionals.

22      THE COURT:  Juror 58?

23      PROSPECTIVE JUROR 58:  Yes.  In discussing with

24  Jennifer beforehand, she advised that I should tell you that

25  the things that are listed in my questionnaire as potential

1   burdens are not actual burdens.  The duty of jury service far

2   outweighs those items.

3            THE COURT:  Okay.  So --

4            PROSPECTIVE JUROR 58:  So there is no --

5            THE COURT:  So you're retracting things that we might

6   have gotten from your jury questionnaire?

7            PROSPECTIVE JUROR 58:  That's correct.

8            THE COURT:  Thank you, sir.  Juror 59?

9            PROSPECTIVE JUROR 59:  I'm the only one in my

10  position at work, and we just had our new period start, and my

11  boss can help me with it but, really, I'm the one responsible

12  for these reports.

13           THE COURT:  What kind of position is it?

14           PROSPECTIVE JUROR 59:  I'm a WIC support personnel.

15           THE COURT:  What is it you do, data entry?

16           PROSPECTIVE JUROR 59:  Data entry, also submitting

17  the state's WIC information.

18           THE COURT:  Is WIC information due like at the end of

19  the month or the beginning of the month?

20           PROSPECTIVE JUROR 59:  So we do period reports, and

21  then submit to states to have items added to their approved

22  product list.

23           THE COURT:  And is there a period report that's

24  coming due?

25           PROSPECTIVE JUROR 59:  Yes.

```
 1              THE COURT:  And when is it due?

 2              PROSPECTIVE JUROR 59:  It's coming in today and due

 3    at the end of the week.

 4              THE COURT:  And you said your boss can do it?

 5              PROSPECTIVE JUROR 59:  She can.  I get compensated

 6    for up to two weeks, but that's also part of it.  She wears

 7    many hats.

 8              THE COURT:  Okay.  Thank you.  Juror 71?

 9              PROSPECTIVE JUROR 71:  I am one of the only people

10    who do my job.  I work healthcare IT, and I manage about

11    4,800 devices, and I'm actually the only person right now who

12    can do what I do.

13              THE COURT:  So the hospital's going down this

14    morning, then, I take it?

15       (Laughter.)

16              PROSPECTIVE JUROR 71:  They're good until probably

17    tomorrow afternoon.

18              THE COURT:  I understand.  Okay.  Thank you very

19    much, sir.  Juror 73?

20              PROSPECTIVE JUROR 73:  I just recently accepted a new

21    position with a new company.  My start date is July 5th.  If

22    this trial went, you know, beyond July 5th, I'm afraid the

23    company might not onboard me, and then I would have a

24    financial impact.

25              THE COURT:  Thank you.  Juror 74?
```

```
 1          PROSPECTIVE JUROR 74:  I hold two jobs.  My first
 2    job, I am a nurse in a surgery center, and if I am not there,
 3    then the patient cannot be intubated.
 4        And then I also work in an emergency department, where
 5    staffing is super low.  Also, I only get paid for two days out
 6    of jury duty.
 7          THE COURT:  Thank you.  And, as I said, when the
 8    parties have an opportunity, they may want to follow up on
 9    some of the answers that you've given to some of these
10    questions.  But I appreciate you responding to that question.
11        So let's move on.  As I just told you, the government is
12    represented in this case by Matthew Singer, Megan Gaffney
13    Painter, and Emily Glatfelter.  They work in the United States
14    Attorney's Office.
15        Then we have Mr. Nathan Holbrook, who is a special agent
16    with the Federal Bureau of Investigation, who is also at
17    counsel table.
18        Are you, or is any member of your immediate family
19    personally acquainted with, related to by blood or marriage,
20    or connected in any way with any of those people?  So it would
21    be Mr. Singer, Ms. Glatfelter, Ms. Gaffney Painter, or
22    Mr. Holbrook.  Anyone?
23        Does any panel member know anyone who works for the
24    United States Attorney's Office?
25        Does any panel member know anyone who works for the
```

```
 1    Federal Bureau of Investigation?

 2              MR. C. HENRY RITTGERS:  I believe I saw a hand.

 3              THE COURT:  I'm sorry.  Stand up, ma'am.

 4    Juror number, please.

 5              PROSPECTIVE JUROR 74:  74.  I believe I was neighbors

 6    with Elias.

 7              THE COURT:  How long ago, ma'am?

 8              PROSPECTIVE JUROR 74:  It was probably 10 years ago.

 9    We were in high school.

10              THE COURT:  Did you know Mr. Demeropolis?

11              PROSPECTIVE JUROR 74:  We were in the same graduating

12    class.

13              THE COURT:  Okay.  And you were 74.  The other hand,

14    58, I think it was?

15              PROSPECTIVE JUROR 58:  Yes, 58.  I have a cousin that

16    is not a member of the FBI, but he is a member of the secret

17    service.  I don't know how different branches work, so...

18              THE COURT:  Thank you.  Sir, number?

19              PROSPECTIVE JUROR 29:  Juror Number 29.  I'm an

20    acquaintance of Elias Demeropolis as well.

21              THE COURT:  Mr. Demeropolis gets around, it sounds

22    like.  Okay.  All right.

23          (Laughter.)

24              THE COURT:  How are you acquainted with

25    Mr. Demeropolis?
```

1          PROSPECTIVE JUROR 29:  I used to play a card game

2     with him quite a while ago, and we've known each other for, on

3     and off, 15-ish years.

4          THE COURT:  Okay.  Thank you.  Yes, ma'am?

5          PROSPECTIVE JUROR 37:  37.  I was not fast enough to

6     say that I am acquaintances, not good friends, with a

7     gentleman who works in the building, Tom Vanderlieu.

8          THE COURT:  Works in this building?

9          PROSPECTIVE JUROR 37:  Yes.

10          THE COURT:  Do you know what Mr. Vanderlieu's job is?

11          PROSPECTIVE JUROR 37:  He works in the library.

12          THE COURT:  Okay.  Is there a hand back there, ma'am?

13     No?  All right.  Any other hands?  All right.

14        As I already said, at the other table up front here is

15     the defendant, Mr. Sittenfeld, who is represented by Charles

16     M. Rittgers, Charles H. Rittgers, Neal Schuett, and apparently

17     everyone's best friend, Mr. Demeropolis.

18        (Laughter.)

19          THE COURT:  Are you, or is any member of your

20     immediate family personally acquainted with, related to by

21     blood or marriage, or connected in any way with the defendant,

22     Mr. Sittenfeld?  All right.

23        What about any of the other people who I just introduced

24     who were seated at counsel table?  And those who have already

25     told me about Mr. Demeropolis don't need to.

1          Yes, Juror Number 3?

2          PROSPECTIVE JUROR 3:  Yes.  I'd like to say

3     something.  I guess, about four years ago, I did meet the

4     defendant, and it was at Walnut Hills High School.  I and my

5     husband know Brian Garry, who he personally knows, and I have

6     shaken hands with him before.

7          THE COURT:  So you've shaken hands with

8     Mr. Sittenfeld?

9          PROSPECTIVE JUROR 3:  Yes.

10         THE COURT:  Did you say your husband personally knows

11    him?

12         PROSPECTIVE JUROR 3:  No.  My husband and me

13    personally know Brian Garry, who knows him.

14         THE COURT:  Oh, I see.  Spell that last name.

15         PROSPECTIVE JUROR 3:  ███████████.

16         THE COURT:  No.  The person you just said you knew.

17         PROSPECTIVE JUROR 3:  Oh, Brian Garry.  I think it's

18    G-a-r-r-y, I think.

19         THE COURT:  Oh, Garry.  Okay.  Thank you.  Anyone

20    else?  Any other hands?

21       Are you, or is any member of your immediate family

22    involved in the criminal justice system in any capacity?  So

23    do they work for the courts, you provide -- you worked as a

24    lawyer in criminal defense, anything along those lines?  Yes?

25    Juror Number?

```
 1                PROSPECTIVE JUROR 48:  48.  My brother-in-law is a
 2       retired police officer from Cincinnati.
 3                THE COURT:  And you said it was your brother-in-law?
 4                PROSPECTIVE JUROR 48:  Uh-huh.
 5                THE COURT:  How long ago did he retire?
 6                PROSPECTIVE JUROR 48:  Fifteen years.
 7                THE COURT:  In the middle?
 8                PROSPECTIVE JUROR 57:  Juror 57.  My brother-in-law
 9       is an Ohio State Patrol, and I work as a school resource
10       officer.  I work in the Clermont County Sheriff's Department.
11                THE COURT:  Anything about that makes you feel like
12       you couldn't be unbiased in a criminal --
13                PROSPECTIVE JUROR 57:  No.
14                THE COURT:  Yes, 58?
15                PROSPECTIVE JUROR 58:  My grandfather was a police
16       officer.  I never knew him.  He's deceased before I was born.
17                THE COURT:  Okay.  Yes, ma'am?
18                PROSPECTIVE JUROR 40:  I'm Juror 40.  My husband's a
19       retired police sergeant with the Cincinnati Police Division.
20                THE COURT:  Anything about that make you feel like
21       you're biased in favor of or against law enforcement?
22                PROSPECTIVE JUROR 40:  No, sir.
23                THE COURT:  Very good.  Yes, Juror Number --
24                PROSPECTIVE JUROR 29:  29.
25                THE COURT:  -- 29?
```

```
 1              PROSPECTIVE JUROR 29:  I have a sister that works for

 2       a legal firm.  She's a lawyer, works for UnitedLex.

 3              THE COURT:  UnitedLex, are you saying?

 4              PROSPECTIVE JUROR 29:  Which is a legal redaction

 5       coverage, from what I understand.

 6              THE COURT:  Oh, okay.  Does she represent criminal

 7       defendants?

 8              PROSPECTIVE JUROR 29:  I'm not sure of the nature of

 9       the cases that she does or what or how she's involved.

10              THE COURT:  Anything about that make you feel like

11       you would be biased one way or another in this case?

12              PROSPECTIVE JUROR 29:  No, sir.

13              THE COURT:  All right.  Very good.  Juror Number --

14              PROSPECTIVE JUROR 13:  Juror Number 13.

15              THE COURT:  Okay.

16              PROSPECTIVE JUROR 13:  I'm a recent retiree from -- I

17       worked as a school crossing guard, which is an employee of the

18       Cincinnati Police Department, as well as the Cincinnati Public

19       Schools.

20              THE COURT:  Okay.  Anything about that experience

21       make you biased one way another with regard to the criminal

22       justice system?

23              PROSPECTIVE JUROR 13:  No, sir.

24              THE COURT:  Yes, ma'am?

25              PROSPECTIVE JUROR 55:  Juror Number 55.  My husband,
```

1     his sister and her husband are both police officers.

2            THE COURT REPORTER:  I can't hear her, Judge.

3            THE COURT:  She said she's got family members who are

4     police officers, is that right, ma'am?

5            PROSPECTIVE JUROR 55:  Yes.

6            THE COURT:  You said it was sister and

7     brother-in-law?

8            PROSPECTIVE JUROR 55:  Yes.

9            THE COURT:  Okay.  Is there anything about that that

10    makes you feel biased towards or against the government in any

11    way?

12           PROSPECTIVE JUROR 55:  No.

13           THE COURT:  In a criminal case?

14           PROSPECTIVE JUROR 55:  No.

15           THE COURT:  All right.  Yes, ma'am?

16           PROSPECTIVE JUROR 45:  45.  My brother-in-law is a

17    patent attorney.

18           THE COURT:  He's a what kind of an attorney?

19           PROSPECTIVE JUROR 45:  Patent.

20           THE COURT:  No involvement with the criminal justice

21    system, right?

22           PROSPECTIVE JUROR 45:  No, sir.

23           THE COURT:  Okay.  Very good.  Yes, sir?

24           PROSPECTIVE JUROR 30:  30.  My brother-in-law is a

25    correctional prison guard.

1          THE COURT:  Anything about that give you any bias one

2     way or the other about the criminal justice system, in your

3     mind, sir?

4          PROSPECTIVE JUROR 30:  No, sir.

5          THE COURT:  Do any of you know me or my staff, which,

6     as I said, Mr. Lang, Ms. Lopreato, or my law clerk, Mr. Denz?

7        All right.  It's impossible to predict exactly who is

8     going to testify as witnesses at a trial.  I have a list that

9     may be overinclusive, but I'm going to read a series of names.

10    It's a relatively lengthy series of names.

11       So as you hear the names, if you think, oh, this is

12    someone I know, just put that in your mind, and you might as

13    well put your hand up.  Maybe I'll just stop if I start seeing

14    a bunch of hands up, and we'll deal with it as we go through.

15       As I said, it's a relatively lengthy list of names.

16    Where possible, I'm going to provide some background on the

17    person, just because a lot of people have the same names, and

18    so it might be a different person than the one you're

19    thinking.

20       So the first one is Kevin Flynn, who is a former

21    Cincinnati City Councilmember.  Anybody know Kevin Flynn?

22       Phil Denning, an executive vice president of the

23    Cincinnati Port Authority?

24       Nathan Holbrook -- oh, we've already gone and said

25    Mr. Holbrook's name, but I'll say it again, Nathan Holbrook,

```
 1    FBI Special Agent?
 2         Chinedum Ndukwe, a former Cincinnati Bengal and real
 3    estate developer?
 4         Jaime, or Jay, Kincaid?  Jared Kamrass?  Claire McKenna?
 5         Laura Brunner, president of the Cincinnati Port
 6    Authority?
 7         Chris Cicchinelli, president and CEO of Pure Romance?  Is
 8    that a hand?
 9              PROSPECTIVE JUROR 75:  75.  I cater for him.
10              THE COURT:  You catered for Chris Cicchinelli?
11              PROSPECTIVE JUROR 75:  Yes.
12              THE COURT:  How long ago was that?
13              PROSPECTIVE JUROR 75:  I've been doing it for ten
14    years.
15              THE COURT:  Oh, so it's an ongoing arrangement?  How
16    often, like?
17              PROSPECTIVE JUROR 75:  I would say every six weeks.
18              THE COURT:  Okay.  Your juror number again?  I'm
19    sorry.
20              PROSPECTIVE JUROR 75:  75.
21              THE COURT:  Yes, ma'am?
22              PROSPECTIVE JUROR 45:  Do you have any more
23    information on Claire McKenna?
24              THE COURT REPORTER:  Number?
25              THE COURT:  Your juror number?
```

```
1              PROSPECTIVE JUROR 45:  45.

2              MR. C. MATTHEW RITTGERS:  She's a CPA accountant and

3    lives in Hamilton County.  She's approximately 40 years old.

4              PROSPECTIVE JUROR 45:  Okay.

5              THE COURT:  Moving along.  David Spalding, vice

6    president and general manager of Turner Construction Company?

7        Jeff Berding, co-CEO of Football Club Cincinnati?  Oops,

8    sorry, a hand's up.  Yes, ma'am?

9              PROSPECTIVE JUROR 40:  Juror 40.  He's a client of

10   our law firm.

11             THE COURT:  Which one is, Jeff Berding?

12             PROSPECTIVE JUROR 40:  Jeff Berding.

13             THE COURT:  And you work at a law firm?

14             PROSPECTIVE JUROR 40:  I do.

15             THE COURT:  In what capacity?

16             PROSPECTIVE JUROR 40:  I'm a legal assistant to a

17   litigation partner.

18             THE COURT:  And Mr. Berding is a client of your firm?

19             PROSPECTIVE JUROR 40:  Yes, and my boss.

20             THE COURT:  You personally have worked on matters for

21   him?

22             PROSPECTIVE JUROR 40:  Correct, yes.

23             THE COURT:  Thank you, ma'am.  Charles Gerhardt of

24   Government Strategies Group?  Oh, Juror 40?

25             PROSPECTIVE JUROR 40:  40.  Is this Chip Gerhardt?
```

1    He used to work at my firm. Is that the same person?

2         MR. C. MATTHEW RITTGERS: Yes. It's the government's

3    witness, but yes, Your Honor.

4         THE COURT: Okay.

5         PROSPECTIVE JUROR 40: Thank you.

6         THE COURT: He was an attorney at your firm, ma'am?

7         PROSPECTIVE JUROR 40: Yes, sir, he was.

8         THE COURT: Can somebody help me. Is it Nguyen Thanh

9    Tung?

10        MR. SINGER: I believe Nguyen Thanh Tung.

11        THE COURT: Do it again.

12        MR. SINGER: Nguyen Thanh Tung.

13        THE COURT: Tung Nguyen?

14        MR. SINGER: Yes.

15        THE COURT: So what's the first name?

16        MR. SINGER: I think it's switched around.

17        THE COURT: I have it as Nguyen Thanh Tung. Anyone?

18    Okay.

19      Tom Hagins, a small business owner?

20      Brian Tome, pastor of Crossroads church? Yes, Number 16?

21        PROSPECTIVE JUROR 16: I worked at Crossroads.

22        THE COURT: You work at Crossroads?

23        PROSPECTIVE JUROR 16: Not now, but I did. I worked

24    very closely with Brian.

25        THE COURT: How long ago was that, ma'am?

```
1              PROSPECTIVE JUROR 16:  12 years now, and I'm still
2       friends in the community with him.
3              THE COURT:  Okay.  So you currently or still know
4       Mr. Tome, and might see him from time to time?
5              PROSPECTIVE JUROR 16:  Yes, correct.
6              THE COURT:  Yes?  Juror Number?
7              PROSPECTIVE JUROR 44:  Juror Number 44.  I was a -- I
8       attended Crossroads, and Brian Tome was my pastor, and my dad
9       worked with him a little bit as well.
10             THE COURT:  Do you currently attend Crossroads?
11             PROSPECTIVE JUROR 44:  Not recently, no, Your Honor.
12             THE COURT:  How long has it been since you attended
13      Crossroads?
14             PROSPECTIVE JUROR 44:  Since 2018, 2019.
15             THE COURT:  Have you seen Pastor Tome since then?
16             PROSPECTIVE JUROR 44:  No, Your Honor.
17             THE COURT:  Okay.  Thank you.  Juror 45?
18             PROSPECTIVE JUROR 45:  45.  I attend Crossroads, and
19      my brother is in a small group with Brian Tome.  Oh, and my
20      sister-in-law works at Crossroads with Brian Tome.
21             THE COURT:  Okay.  Claire Blankemeyer, executive
22      director of Green Light Cincinnati?  Yes, 45?
23             PROSPECTIVE JUROR 45:  I went to college with her and
24      have seen her over the last couple of years at various places.
25      We have mutual friends.
```

1          THE COURT:  Thank you.  Dan Meyer, CEO of Nehemiah

2     Manufacturing?

3          Chris Hikel, that's H-i-k-e-l, an Airbnb operator?

4          Dustin Grutza, cofounder of the company OGGO, O-G-G-O?

5          Donald Jordan, a Cincinnati Police Officer?

6          Ron Henlein of People Working Cooperatively?

7          Matt Alter, a Cincinnati firefighter and union president?

8          Charlie Key, cofounder and CEO of Losant?

9          Mike Burke, owner of Zips Cafe?

10         Luke Blocher, former deputy city solicitor for the City

11    of Cincinnati?

12         Chris Seelbach, a former Cincinnati City Councilmember?

13         Claire Fisher, who worked on one of Mr. Sittenfeld's

14    campaigns?

15         John Curp, C-u-r-p, the current interim city manager for

16    the City of Cincinnati?

17         Ed Fitzgerald, former Ohio gubernatorial candidate?

18         Eric Gardner of Gardner Street Commercial Real Estate

19    Group?

20         Derek G. Street of Gardner Street Commercial Real Estate

21    Group?

22         Caleb Burns, an attorney?

23         Michael Fischer, former CEO of Children's Hospital?

24         Chris Dobrozsi, mayor of Montgomery, Ohio?

25         Paul DeMarco, an attorney?

1        Brett Caller, real estate developer?

2        Dan Schimberg, the CEO of Uptown Rentals?

3        Debbie Brant, former Cincinnati Ballet board chair?

4        Scott Knox, an attorney and board member for Equality

5   Cincinnati?

6        I see a hand.  Go ahead, ma'am.

7            PROSPECTIVE JUROR 40:  Juror 40.  I used to work with

8   Scott.

9            THE COURT:  Thank you, ma'am.  Yes, sir?

10            PROSPECTIVE JUROR 54:  Juror 54.  I've used Scott

11   Knox for legal matters before.

12            THE COURT:  I'm sorry.  I can't quite hear you.

13            PROSPECTIVE JUROR 54:  I've used Scott Knox, used him

14   as an attorney.

15            THE COURT:  And your number was 54?

16            PROSPECTIVE JUROR 54:  Correct.

17            THE COURT:  How long ago was that, sir?

18            PROSPECTIVE JUROR 54:  Four years, probably.

19            THE COURT:  You've used him on more than one

20   occasion?

21            PROSPECTIVE JUROR 54:  Yes.

22            THE COURT:  Is he your current attorney?  If you

23   needed an attorney, he would be who you'd call?

24            PROSPECTIVE JUROR 54:  I would probably call him,

25   yes.

1              THE COURT:  Okay.  Thank you.  If I say this name

2     wrong, whoever can correct me, Mohsin Masud, a real estate

3     developer?

4         Steve Leeper, the head of 3CDC?

5         Peg Wyant, the owner and founder of Grandin Properties?

6         Tim Burke, an attorney -- oh, I'm sorry, was that a hand?

7              A JUROR:  No.

8              THE COURT:  Tim Burke, an attorney?

9         Moreleen Rouse, R-o-u-s-e?

10        Jennie Rosenthal?  Andi Levenson?  Rick Reynolds?  And

11    Mike Schiff, a real estate developer?

12        As I mentioned, this case involves charges of honest

13    services wire fraud, bribery concerning programs receiving

14    federal funds, and one count of attempted extortion under

15    color of official right.

16        As I've already said, Mr. Sittenfeld has pled not guilty

17    to all of these charges, I just want to remind you of that.

18        But my question is, does any panel member have prior

19    knowledge or information about this case or the offenses with

20    which the defendant is charged?  And this would include

21    knowledge gained from personal contacts, from the media, or

22    from the internet?

23        So anybody who has got any preexisting knowledge of these

24    types of charges, honest services wire fraud, bribery

25    concerning programs receiving federal funds, attempted

1    extortion under the color of official right, or any panel

2    member who has any prior knowledge about this case, please

3    raise your hands.  Okay.  All right.

4        So some of you who are further up can put your hands down

5    for a bit because it's going to take me a second to get there.

6        So it's 3, 4, 5, 6, and juror number?

7            PROSPECTIVE JUROR 15:  15.

8            THE COURT:  15.  I'm sorry.  I skipped you, ma'am.

9            PROSPECTIVE JUROR 10:  10.

10           THE COURT:  Now we'll go to the back.  So who back

11   there?  Yes, sir?

12           PROSPECTIVE JUROR 25:  25.

13           THE COURT:  25.

14           PROSPECTIVE JUROR 32:  32.

15           THE COURT:  32.  Ma'am, is it 40?

16           PROSPECTIVE JUROR 43:  43.

17           PROSPECTIVE JUROR 42:  42.

18           THE COURT:  Oh, is 42 up?  Okay.

19           PROSPECTIVE JUROR 41:  41.

20           THE COURT:  41.  Yes?

21           PROSPECTIVE JUROR 40:  40.

22           THE COURT:  Yeah.  I thought I saw 40.  All right.

23   So it's 40, 41, 42, 43, and --

24           PROSPECTIVE JUROR 47:  47.

25           THE COURT:  -- 47, I think that's the next number.

1    58, and then I think -- what number are you?

2          PROSPECTIVE JUROR 62:  62.

3          THE COURT:  What number are you?

4          PROSPECTIVE JUROR 65:  65.

5          THE COURT:  Okay.  So 62, and then 65, and then 66.

6          PROSPECTIVE JUROR 68:  68.

7          THE COURT:  68.

8          PROSPECTIVE JUROR 69:  69.

9          THE COURT:  69.  Oh, looks like I skipped one, it

10    looks like.  Yes?

11          PROSPECTIVE JUROR 63:  63.

12          THE COURT:  63.  Okay.  Well, I don't want you to

13    share what you believe you may know about the case if it's

14    something about this case, because then the other people here

15    will have also kind of have heard that information.

16       So let me just -- I'm going to ask in somewhat vague

17    terms to start with, and then we'll figure out how much more

18    information we want to elicit.

19       So Juror Number 3, is it knowledge about these types of

20    charges or about this case in particular?

21          PROSPECTIVE JUROR 3:  It's about the charges through

22    the internet, and that type of stuff.

23          THE COURT:  Okay.  Can you give me more of the

24    context in which you happen to be looking in the newspaper

25    charges?

```
 1              PROSPECTIVE JUROR 3:  Through the media, news, that

 2    kind of stuff.

 3              THE COURT:  Press stuff about this case, or what?

 4              PROSPECTIVE JUROR 3:  Yeah.

 5              THE COURT:  I see.  And did the stories that you

 6    recall reading about this case include discussion of the

 7    charges, and the allegations and things?

 8              PROSPECTIVE JUROR 3:  Yes.  It was me and my best

 9    friend, and we were discussing it.

10              THE COURT:  So you discussed this matter?

11              PROSPECTIVE JUROR 3:  Yes.  We're very politically

12    involved.

13              THE COURT:  Okay.  As I said, the parties may have

14    follow-up questions too.  I'm doing the initial foray here.

15         Juror Number 4, is it about this case?

16              PROSPECTIVE JUROR 4:  Yes.

17              THE COURT:  And is it based on media stories?

18              PROSPECTIVE JUROR 4:  News coverage.

19              THE COURT:  Okay.  Based on the news coverage, do you

20    currently have an opinion one way or the other about this

21    case?

22              PROSPECTIVE JUROR 4:  No.

23              THE COURT:  Do you think having read those stories

24    would interfere with your ability to listen to evidence during

25    this trial and reach a fair decision?
```

1           PROSPECTIVE JUROR 4: No.

2           THE COURT: If I were to tell you that you can't rely

3 on anything you read in the newspaper or saw on TV, and you

4 have to just do it based on what you heard in the courtroom

5 during this trial, do you think you would be able to do that?

6           PROSPECTIVE JUROR 4: Yes.

7           THE COURT: Juror Number 5?

8           PROSPECTIVE JUROR 5: The same, through the media.

9           THE COURT: And it's this case?

10           PROSPECTIVE JUROR 5: Yes.

11           THE COURT: Have you begun to form any opinion about

12 this case based on what you read?

13           PROSPECTIVE JUROR 5: No.

14           THE COURT: If I told you the same questions I asked

15 Juror Number 4, if I told you just decide the case based on

16 what you hear and put out of your mind anything you read in

17 the newspaper, do you think you could do that?

18           PROSPECTIVE JUROR 5: Yes.

19           THE COURT: Anything about what you've read in the

20 newspaper or seen on TV that makes you think you'd be in any

21 way unfair either to the government or Mr. Sittenfeld in this

22 case?

23           PROSPECTIVE JUROR 5: No.

24           THE COURT: Juror Number 6?

25           PROSPECTIVE JUROR 6: Yeah, through the news media

1    and radio, and that type of stuff.

2          THE COURT:  Okay.  About this case?

3          PROSPECTIVE JUROR 6:  About this case.

4          THE COURT:  I'll ask you those same questions.  Have

5    you started to form an opinion about the way this case should

6    come out?

7          PROSPECTIVE JUROR 6:  No.

8          THE COURT:  If I told you to put that all out of your

9    mind and focus just on what you just heard, could you do that?

10         PROSPECTIVE JUROR 6:  Yes.

11         THE COURT:  Anything about what you've read so far

12    make you believe you would be unfair either to the government

13    or to Mr. Sittenfeld in connection with this case?

14         PROSPECTIVE JUROR 6:  No.

15         THE COURT:  All right.  Juror Number 15?

16         PROSPECTIVE JUROR 15:  Yes.  Media, radio, and I read

17    a lot, mostly news today both locally and nationally.

18         THE COURT:  And part of that includes some coverage

19    of this issue?

20         PROSPECTIVE JUROR 15:  Yes.

21         THE COURT:  Based on that coverage, have you started

22    to form an opinion one way or another about this case?

23         PROSPECTIVE JUROR 15:  Kind of hard not to, so I

24    would say yes.

25         THE COURT:  Okay.  And without telling me what your

1    opinion is, is it -- are you going to start this trial with a

2    belief one way or the other, and then you're going to have to

3    be convinced the other way?

4           PROSPECTIVE JUROR 15:  I would say no.  I think I can

5    be impartial.

6           THE COURT:  Okay.  And sometimes, you know how it is,

7    you get some information, you think, oh, it looks this way,

8    but then you get the full story and it looks a different way.

9     If I tell you you've got to put out of your mind, I mean

10   completely out of your mind, anything you read in the

11   newspaper and just listen to what you hear from the witnesses,

12   and see the exhibits that are used by both sides in this case,

13   and that's the only thing you can rely on in coming to a

14   decision, do you think you're going to be able to do that, or

15   is there enough in your head from these news stories that you

16   think I just can't do that?

17         PROSPECTIVE JUROR 15:  No.  I think I can put it

18   aside.

19         THE COURT:  As I said, people may have follow-up

20   questions about that, but thank you very much.

21     Juror Number 10?

22         PROSPECTIVE JUROR 10:  This morning on Channel 9

23   news, I heard --

24         THE COURT:  Don't tell me what you heard.  You heard

25   something about this matter; is that right?

 1          PROSPECTIVE JUROR 10:  Yeah.  I don't watch a lot of

 2    TV, so I don't know a lot about it.

 3          THE COURT:  Based on what you heard, do you have a

 4    view one way about who should prevail in this trial?

 5          PROSPECTIVE JUROR 10:  No, because I don't know

 6    anything about it.

 7          THE COURT:  Is there anything that you heard on the

 8    radio today that you just couldn't put out of your mind?

 9          PROSPECTIVE JUROR 10:  No.

10          THE COURT:  Juror 25?

11          PROSPECTIVE JUROR 25:  I heard about it when the

12    investigation started, and yesterday on Channel 5 news

13    pertaining to this case.

14          THE COURT:  So two news stories, basically; is that

15    right?

16          PROSPECTIVE JUROR 25:  Yeah.

17          THE COURT:  And based on what you heard in those news

18    stories, have you started forming opinions about who is right

19    or wrong in this case?

20          PROSPECTIVE JUROR 25:  No.

21          THE COURT:  Did you hear anything that you're just

22    not going to be able to put out of your mind if I tell you

23    you've got to just decide it based on what you hear from the

24    witnesses, are you going to be able to do that?

25          PROSPECTIVE JUROR 25:  No.

```
 1              THE COURT:  Well, if I tell you you've got to decide

 2     just based on what you hear from the witnesses, could you do

 3     that?

 4              PROSPECTIVE JUROR 25:  No.

 5              THE COURT:  Juror 32?

 6              PROSPECTIVE JUROR 32:  Just the news and the media as

 7     well.

 8              THE COURT:  How many stories, you think?

 9              PROSPECTIVE JUROR 32:  Actually, it's just been

10     popping up a couple days ago.  I just talked about it with my

11     parents and stuff, that's about it.

12              THE COURT:  Okay.  During the conversations you had

13     with your parents, did you express an opinion about -- and

14     don't tell me what the opinion is, but did you express an

15     opinion about what the outcome of the trial should be, in your

16     mind?

17              PROSPECTIVE JUROR 32:  Yes.

18              THE COURT:  You did.  So you have formed some belief

19     about what you think the outcome should be?

20              PROSPECTIVE JUROR 32:  A tiny bit.

21              THE COURT:  Okay.  Is that going to mean that -- and,

22     again, I don't want to know which way you're leaning, but is

23     somebody going to have a little bit of an extra obstacle over

24     what I tell you it should be, because instead of starting at

25     ground zero, you're starting one way or the other?
```

```
 1            PROSPECTIVE JUROR 32:  No.  I think I'll be able to

 2      look past that.

 3            THE COURT:  If I tell you you have to put out of your

 4      head, anything you may have heard or seen during these media

 5      stories, do you think you would be able to do that?

 6            PROSPECTIVE JUROR 32:  Yes.

 7            THE COURT:  And decide this case solely based on the

 8      evidence that's presented here?

 9            PROSPECTIVE JUROR 32:  Yes.

10            THE COURT:  Juror 40?

11            PROSPECTIVE JUROR 40:  Hello.

12            THE COURT:  Oh.

13         (Laughter.)

14            THE COURT:  All right.  Juror 40?

15            PROSPECTIVE JUROR 40:  When this all came out in

16      2019, whenever it was, I heard about it, but then it kind of

17      went away.

18         A couple weeks ago, people I work with, I work with a law

19      firm, said I wonder if you're going to be on the

20      P.G. Sittenfeld's trial or jury.  It would be interesting, was

21      all that was said.

22         I didn't read anything about it.  I didn't familiarize

23      myself.  But in the past 24 hours, I mean, phones are blowing

24      up, and it's been all over the news, and I did see it, but I

25      have no opinion.
```

 1          THE COURT:  Okay.  So you have no opinion.  So
 2    nobody's starting at an advantage or disadvantage, in your
 3    mind?
 4          PROSPECTIVE JUROR 40:  No.
 5          THE COURT:  And if I told you you had to put out of
 6    your mind everything you learned outside of the courtroom and
 7    only focus on what you hear here, do you think you could do
 8    that?
 9          PROSPECTIVE JUROR 40:  I believe I can.
10          THE COURT:  All right.  Juror 43?
11          PROSPECTIVE JUROR 43:  Just I heard it on the news.
12          THE COURT:  Okay.  Based on what you heard on the
13    news, do you have any opinion about who should win?
14          PROSPECTIVE JUROR 43:  No.
15          THE COURT:  If I told you you need to decide it just
16    based on the evidence you hear in the courtroom, you're going
17    to be all right with that.
18          PROSPECTIVE JUROR 43:  Yeah.
19          THE COURT:  Oh, I skipped 41 and 42.  Juror 41?
20          PROSPECTIVE JUROR 41:  I just heard news coverage.
21          THE COURT:  Has it created any opinion one way or the
22    other?
23          PROSPECTIVE JUROR 41:  No, sir.
24          THE COURT:  All right.  You could decide this case
25    based solely on the evidence you hear?

1          PROSPECTIVE JUROR 41:  Yes, sir.

2          THE COURT:  42?

3          PROSPECTIVE JUROR 42:  I've heard about it on the

4     news, and through my past employment, I've been following with

5     the PACs and whatnot.

6          THE COURT:  Stand up, sir.  You've been involved with

7     PACs, you said?

8          PROSPECTIVE JUROR 42:  Yes.

9          THE COURT:  And what's been your involvement with

10    PACs?

11         PROSPECTIVE JUROR 42:  Well, I was a present

12    principal officer of a Teamsters Union and Joint Council 26 of

13    Cincinnati, which supports people in Hamilton County and the

14    state house both, and I know a little bit about PACs and how

15    they work.

16         THE COURT:  Okay.  And so in your capacity, were you

17    in charge of helping decide --

18         PROSPECTIVE JUROR 42:  Yes.

19         THE COURT:  -- how to make political contributions?

20         PROSPECTIVE JUROR 42:  Yes.

21         THE COURT:  How long did you do that?

22         PROSPECTIVE JUROR 42:  At least from '08 through

23    2019, or 2021, I should say, before I retired.

24         THE COURT:  Okay.  And in that capacity, did you

25    personally interact with candidates running for office?

```
 1              PROSPECTIVE JUROR 42:  Some.  No one in this

 2    courtroom, but yes.

 3              THE COURT:  Sure.  But as part of that, did you

 4    personally interact with candidates who might be seeking

 5    contributions?

 6              PROSPECTIVE JUROR 42:  Yes.

 7              THE COURT:  And without telling me anything about

 8    what your opinion might be substantively, did you form an

 9    opinion about, like, campaign fundraising and those types of

10    activities?

11              PROSPECTIVE JUROR 42:  Certainly.

12              THE COURT:  And do you think that might color your

13    view of evidence that you hear at trial in this matter?

14              PROSPECTIVE JUROR 42:  Yes.

15              THE COURT:  Thank you, Juror 42.

16         Juror 47?

17              PROSPECTIVE JUROR 47:  I just read an article last

18    night.

19              THE COURT:  Just one article?

20              PROSPECTIVE JUROR 47:  Yes, sir.

21              THE COURT:  Based on that article, did you form an

22    opinion about who should win at this trial?

23              PROSPECTIVE JUROR 47:  No, I did not.

24              THE COURT:  If I told you you had to decide this

25    matter based solely on the evidence you hear in court, do you
```

```
 1    think you could do that?

 2                PROSPECTIVE JUROR 47:  Yes.

 3                THE COURT:  Juror 58?

 4                PROSPECTIVE JUROR 58:  Yes.  I've -- when the story

 5    first broke, I've read several articles of -- up until now.

 6    And yesterday, I was watching the morning news and saw some

 7    coverage of it and turned it off right away.

 8                THE COURT:  Based on the information you've seen in

 9    the media, you've begun to form an opinion about who should

10    prevail at this trial?

11                PROSPECTIVE JUROR 58:  I would say based on that,

12    yes.  But, as you've said several times, I'm able to put that

13    aside.

14                THE COURT:  You think you could put aside -- if I

15    told you, look, if you're selected for the jury, you've got to

16    start right here in the middle, and you've got to go with what

17    you hear in the courtroom and what I tell you the law is, do

18    you think you're going to have any trouble with that?

19                PROSPECTIVE JUROR 58:  I will have no trouble with

20    that.

21                THE COURT:  And do you feel as though you're biased

22    either in favor of or against the government or Mr. Sittenfeld

23    at this moment?

24                PROSPECTIVE JUROR 58:  No.

25                THE COURT:  Thank you, Juror 58.  Juror 62?
```

 1           PROSPECTIVE JUROR 62:  I've read three or four

 2     articles in the last week.

 3           THE COURT:  Has that given you an impression about

 4     who you think should prevail at this trial?

 5           PROSPECTIVE JUROR 62:  Yes.

 6           THE COURT:  Okay.  Without telling me in whose favor

 7     you might currently be leaning, do you have a strong inkling,

 8     or you just think, oh, I bet at the margins, it's going to

 9     come out this way?

10           PROSPECTIVE JUROR 62:  Strong inkling.

11           THE COURT:  Okay.  Would it be difficult for you to

12     put aside that strong inkling and decide this case based

13     solely on the evidence that you hear in court?

14           PROSPECTIVE JUROR 62:  I think so, because one of the

15     articles talked about the evidence --

16           THE COURT:  Don't tell me what it said.

17           PROSPECTIVE JUROR 62:  I'm not.  It was just what was

18     permissible and what was not, on both sides.

19           THE COURT:  Okay.  And you think you'd have a hard

20     time putting that aside if you were selected as a juror in

21     this case?

22           PROSPECTIVE JUROR 62:  I do.

23           THE COURT:  Thank you, Juror 62.  Juror 63?

24           PROSPECTIVE JUROR 63:  I read the local news every

25     day.

```
1              THE COURT:  So as part of reading the local news

2    every day, from time to time, you might have seen an article

3    about Mr. Sittenfeld; is that right?

4              PROSPECTIVE JUROR 63:  Yes.

5              THE COURT:  Based on what you read, do you have a

6    belief one way or the other about how this trial should come

7    out?

8              PROSPECTIVE JUROR 63:  No.

9              THE COURT:  If I told you you needed to decide -- act

10   as a juror and decide based solely on the evidence that you

11   heard in this courtroom, do you think you're going to be able

12   to do that?

13             PROSPECTIVE JUROR 63:  Yes.

14             THE COURT:  Thank you, Juror Number 63.  Juror 65?

15             PROSPECTIVE JUROR 65:  Just various news articles and

16   television.

17             THE COURT:  Any idea of how many?

18             PROSPECTIVE JUROR 65:  Three or four the last few

19   days.

20             THE COURT:  Based on anything you've read there, do

21   you have a strong belief about how this trial should come out?

22             PROSPECTIVE JUROR 65:  I do not.

23             THE COURT:  Do you have any real belief about how

24   this trial should come out?

25             PROSPECTIVE JUROR 65:  I do not.
```

1          THE COURT:  If I tell you you've got to decide based

2    solely on the evidence you hear in court, do you think you

3    could do that too?

4          PROSPECTIVE JUROR 65:  Yes.

5          THE COURT:  Thank you, Juror 65.  Juror 66?

6          PROSPECTIVE JUROR 66:  I read the newspaper,

7    generally.  I read a fair amount about it when it first broke,

8    also on television.

9          THE COURT:  Okay.  Based on what you've read and/or

10   heard on television, as you sit here today, sir, do you have a

11   belief as to who should prevail at this trial?

12         PROSPECTIVE JUROR 66:  No, sir.

13         THE COURT:  Do you feel as though you're biased

14   either in favor of or against the government, or in favor of

15   or against Mr. Sittenfeld at this time?

16         PROSPECTIVE JUROR 66:  No, sir.

17         THE COURT:  And if you need to decided this case

18   based solely on the evidence that you saw presented in this

19   courtroom, do you think you could do that?

20         PROSPECTIVE JUROR 66:  Yes, sir.

21         THE COURT:  Thank you, Juror 66.  Juror 68?

22         PROSPECTIVE JUROR 68:  Yes, sir.  I've been aware of

23   this since 2019, when it first broke.

24         THE COURT:  And have you been following it?

25         PROSPECTIVE JUROR 68:  Yes.

1          THE COURT:  So you had some interest in it?

2          PROSPECTIVE JUROR 68:  Yes.

3          THE COURT:  Okay.  And based on what you read, do you

4     have an initial belief about who should prevail at this trial?

5          PROSPECTIVE JUROR 68:  Yeah.

6          THE COURT:  Do you think it would be hard for you to

7     put that aside and decide this case based solely on the

8     evidence you hear in court?

9          PROSPECTIVE JUROR 68:  Honestly, yes.

10          THE COURT:  As you sit here today, you sort of have,

11     at least, an initial belief one way or the other, is that

12     right, ma'am?

13          PROSPECTIVE JUROR 68:  And some strong thoughts on

14     campaign financing, yes.

15          THE COURT:  Thank you, Juror 68.  Juror 69?

16          PROSPECTIVE JUROR 69:  I heard the story when it

17     broke a couple years ago, and then recently following just the

18     last couple days.

19          THE COURT:  Based on what you've read, do you have a

20     belief about who should prevail at this trial?

21          PROSPECTIVE JUROR 69:  No.

22          THE COURT:  Okay.  If I told you you need to decide

23     your verdict based solely on the evidence that you hear in

24     this courtroom, is there anything about what you've read that

25     would make that difficult?

```
 1              PROSPECTIVE JUROR 69:  No.

 2              THE COURT:  As you sit here today, do you feel biased

 3      at all, either in favor of or against the government, or in

 4      favor of or against Mr. Sittenfeld?

 5              PROSPECTIVE JUROR 69:  No.

 6              THE COURT:  Thank you, Juror 69.  I think that was

 7      everybody on that one.  Oops, there's another hand.

 8              PROSPECTIVE JUROR 38:  Juror 38.

 9              THE COURT:  Yes, Juror 38?

10              PROSPECTIVE JUROR 38:  I basically heard it in 2019,

11      and then last night on the news.

12              THE COURT:  Is there anything about what you've read

13      that makes you feel like the government or Mr. Sittenfeld

14      should prevail at this trial?

15              PROSPECTIVE JUROR 38:  No.

16              THE COURT:  As you sit here now, you don't feel

17      biased one way or the other; is that right?

18              PROSPECTIVE JUROR 38:  No.  I'm not biased.

19              THE COURT:  Do you feel you could decide this case

20      based solely on the evidence presented in the courtroom?  Do

21      you think you could do that?

22              PROSPECTIVE JUROR 38:  Yes.

23              THE COURT:  Thank you, Juror 38.  All right.

24          Does any panel member have any personal interest of any

25      kind in this case or in the defendant, or do you know anyone
```

1     who may have such a special interest?

2         So, for example, if your brother was one of

3     Mr. Sittenfeld's biggest supporters in an election or,

4     conversely, your sister ran against Mr. Sittenfeld in a race,

5     that might give you an interest in Mr. Sittenfeld, that type

6     of thing.

7         Is there anybody who feels as though they have any kind

8     of personal interest in this case of any kind?

9         Has any panel member served as a juror in the federal or

10    state court, either in civil or criminal matters?

11              PROSPECTIVE JUROR 37:  What do you mean by state

12    court?

13              THE COURT:  Well, I just mean if you've been involved

14    in a court of common pleas action as a juror, and sat with --

15              PROSPECTIVE JUROR 37:  Municipal court in Clermont

16    County in 2002.

17              THE COURT:  Oh, 2002.  Okay.  And you were Juror 37?

18              PROSPECTIVE JUROR 37:  37.

19              THE COURT:  We've got some more hands.  Yes, sir?

20    Stand up, please.  I can't hear you.

21              PROSPECTIVE JUROR 25:  I was selected to serve on a

22    jury in Hamilton County courthouse.

23              THE COURT:  You're Juror 25.  You were selected to

24    serve on a jury in Hamilton County courthouse; is that right?

25              PROSPECTIVE JUROR 25:  And then the grand jury.

1           THE COURT:  And the grand jury.  How long were you in

2     the petit jury in Hamilton County?

3           PROSPECTIVE JUROR 25:  Eight years.

4           THE COURT:  And what kind of case was it?

5           PROSPECTIVE JUROR 25:  Assault case.

6           THE COURT:  Assault case.  Criminal case?

7           PROSPECTIVE JUROR 25:  Yes.

8           THE COURT:  Anything about that experience that you

9     think would make it difficult for you to serve as a juror on

10    another jury?

11          PROSPECTIVE JUROR 25:  No.

12          THE COURT:  All right.  Very good.  I see another

13    hand.  Yes, 58?

14          PROSPECTIVE JUROR 58:  Yes, 58.  I was called to jury

15    duty, I was not selected as a juror, at the Hamilton County

16    Courthouse.

17          THE COURT:  How long ago was that, sir?

18          PROSPECTIVE JUROR 58:  Approximately five years ago,

19    maybe six.

20          THE COURT:  And you didn't serve; is that correct?

21          PROSPECTIVE JUROR 58:  I didn't.  I was not a juror.

22    I was never selected.

23          THE COURT:  Very good.  Yes?

24          PROSPECTIVE JUROR 63:  Juror 63.  I was the alternate

25    juror on a civil case in Greene County in 2008.

1              THE COURT:  Anything about that experience that

2      colored your view of serving on a jury?

3              PROSPECTIVE JUROR 63:  No.

4              THE COURT:  Thank you, Juror 63.  Yes, sir?

5              PROSPECTIVE JUROR 30:  30.  For Hamilton County

6      criminal and civil about 20 years ago.

7              THE COURT:  Anything about that experience color your

8      view of being on a jury?

9              PROSPECTIVE JUROR 30:  No, sir.

10             THE COURT:  Yes sir?

11             PROSPECTIVE JUROR 6:  I'm Juror 6.  I was on the

12     Hamilton County grand jury about seven years ago.

13             THE COURT:  How long did you serve on the grand jury?

14             PROSPECTIVE JUROR 6:  It was for two weeks.

15             THE COURT:  That's a little different process than

16     this.

17             PROSPECTIVE JUROR 6:  Yes.

18             THE COURT:  Do you think you could keep it separate,

19     in your mind?  Here we're hearing from both sides.  Usually,

20     the grand jury, you usually hear from the prosecution.

21             PROSPECTIVE JUROR 6:  Yes.

22             THE COURT:  Anything about that color your view about

23     the criminal justice system in any way?

24             PROSPECTIVE JUROR 6:  No.

25             THE COURT:  Thank you.  In the back?

1              PROSPECTIVE JUROR 38:  38.  I have been on three

2       juries in Warren County.

3              THE COURT:  Court of common pleas?

4              PROSPECTIVE JUROR 38:  Yes.

5              THE COURT:  Criminal, civil, both?

6              PROSPECTIVE JUROR 38:  Civil.

7              THE COURT:  Okay.  Anything about that color your

8       experience in a way that you would think would make it

9       difficult to serve on another jury?

10             PROSPECTIVE JUROR 38:  I don't think so.

11             THE COURT:  Thank you.  In the back?

12             PROSPECTIVE JUROR 51:  51.  I served on the grand

13      jury for Hamilton County.

14             THE COURT:  Grand jury for Hamilton County?

15             PROSPECTIVE JUROR 51:  Yes.

16             THE COURT:  How long ago was that, ma'am?

17             PROSPECTIVE JUROR 51:  It was about four years ago.

18             THE COURT:  Okay.  Anything about that experience you

19      think would make it difficult to serve on a jury here today?

20             PROSPECTIVE JUROR 51:  No, sir.

21             THE COURT:  Thank you.  Yes, ma'am?

22             PROSPECTIVE JUROR 69:  Number 69.  I served in

23      Hamilton County jury.  It was a rape case.

24             THE COURT:  Anything about that experience color your

25      view about serving on a jury?

1              PROSPECTIVE JUROR 69:  No.

2              THE COURT:  Yes, sir?

3              PROSPECTIVE JUROR 42:  42.  I was here in federal

4    court, I don't know, 12, 15 years ago with Judge Spiegel.  I

5    stayed all day, because he excused us, and then there was a

6    pleading.

7              THE COURT:  So you didn't serve on a jury, is that

8    right, sir?

9              PROSPECTIVE JUROR 42:  Did not serve.  Kept all day

10   and then excused.

11             THE COURT:  Any other hands?  All right.  Not seeing

12   any.

13        Putting aside service on a jury or on a grand jury, has

14   any panel member been involved in a criminal proceeding in

15   some other capacity; for example, as a victim, as a witness,

16   or as a charged party?

17             THE COURT:  All right.  Start here, 4?

18             PROSPECTIVE JUROR 4:  For OVI.  I was the defendant.

19             THE COURT:  Anything about that experience color your

20   view of the criminal justice system?

21             PROSPECTIVE JUROR 4:  No.

22             THE COURT:  You think it would make it hard to sit

23   and be a juror on judgment in some other criminal case?

24             PROSPECTIVE JUROR 4:  No.

25             THE COURT:  Okay.  Juror 3, did your hand go up?

1          PROSPECTIVE JUROR 3:  Yeah.  It was domestic violence

2     about back in '95.

3          THE COURT:  And what was your participation in that?

4          PROSPECTIVE JUROR 3:  What?

5          THE COURT:  Were you a witness?

6          PROSPECTIVE JUROR 3:  No.  It was me.  I was the

7     defendant.

8          THE COURT:  You were the defendant, okay.  Did

9     anything about that color your view one way or another about

10    the criminal justice system?

11         PROSPECTIVE JUROR 3:  I was affected by it, yes,

12    because it involved a -- very personal.

13         THE COURT:  Sure.  Does it give you a view either in

14    favor of or against the government in a criminal case, the

15    fact that you've been --

16         PROSPECTIVE JUROR 3:  In favor.

17         THE COURT:  In favor of the government, you think?

18         PROSPECTIVE JUROR 3:  Yes.

19         THE COURT:  Okay.  Thank you.  Yes, in the middle

20    here, or front row?

21         PROSPECTIVE JUROR 26:  26.  I was a bank teller at

22    Fifth Third and was a witness to one of a fraudulent checks

23    twice, was called on the stand once.

24         THE COURT:  So you served as a witness in a case?

25         PROSPECTIVE JUROR 26:  Uh-huh.

1        THE COURT:  Okay.  Was that generally an all right

2   experience serving as a witness in that case?

3        PROSPECTIVE JUROR 26:  It was nerve racking, but I

4   did it.

5        THE COURT:  Okay.  Anything about that experience you

6   think would make it difficult to serve as a juror in a case?

7        PROSPECTIVE JUROR 26:  Not really.  It was kind of an

8   in and out kind of thing.  It wasn't very long.  The judge got

9   me in and out.  It was a little nerve racking, but I got

10  through it.

11       THE COURT:  I can imagine.  Thank you, ma'am.  Other

12  hands?  Yes, sir?

13       PROSPECTIVE JUROR 57:  57.  I've been in juvenile

14  court because of school issues with juveniles.

15       THE COURT:  Okay.  As a witness, or --

16       PROSPECTIVE JUROR 57:  As an administrator.

17       THE COURT:  Okay.  Anything about that color your

18  experience with the criminal justice system?

19       PROSPECTIVE JUROR 57:  No.

20       THE COURT:  Okay.  Yes, directly behind him?

21       PROSPECTIVE JUROR 74:  74.  I was a witness to a

22  patient that had drug problems.

23       THE COURT:  In a criminal proceeding?

24       PROSPECTIVE JUROR 74:  Yes.

25       THE COURT:  How long ago was that?

1          PROSPECTIVE JUROR 74:  Three or four years ago.

2          THE COURT:  Anything about that experience color your

3     view about the criminal justice system?

4          PROSPECTIVE JUROR 74:  No.

5          THE COURT:  Do you think it would make it difficult

6     for you to serve as a juror for any reason?

7          PROSPECTIVE JUROR 74.  No.

8          THE COURT:  Thank you, 74.  73?

9          PROSPECTIVE JUROR 73:  I was called as a witness in

10    the State of California in an arson case.

11         THE COURT:  Okay.  How long ago was that, sir?

12         PROSPECTIVE JUROR 73:  About eight years ago.

13         THE COURT:  And was that fact testimony or expert

14    testimony?

15         PROSPECTIVE JUROR 73:  It was expert testimony.

16         THE COURT:  Okay.  And do you --

17         PROSPECTIVE JUROR 73:  It was not related to the

18    arson itself.  It was -- I testified for a credit card

19    authorization and how that process worked.

20         THE COURT:  I see.  Okay.  Anything about that

21    experience that you think would make it difficult to serve as

22    a juror in this case?

23         PROSPECTIVE JUROR 73:  No.

24         THE COURT:  Thank you, Juror 73.  72?

25         PROSPECTIVE JUROR 71:  71.

1              THE COURT:  71?

2              PROSPECTIVE JUROR 71:  My brother just finished a

3    court case for custody.

4              THE COURT:  Okay.  Were you a participant in that?

5              PROSPECTIVE JUROR 71:  Not directly, but indirectly,

6    yes.

7              THE COURT:  That wouldn't be a criminal matter,

8    obviously?

9              PROSPECTIVE JUROR 71:  No.

10             THE COURT:  Anything about that color your view of

11   the criminal justice system one way or the other?

12             PROSPECTIVE JUROR 71:  Not for criminal cases, but

13   for that, yes.

14             THE COURT:  So about custody disputes and how they're

15   handled?

16             PROSPECTIVE JUROR 71:  Yes.

17             THE COURT:  That is an issue that sometimes people

18   have strong opinions about.  Obviously, this case doesn't

19   involve custody issues.

20       Is there anything about your experience with that case

21   that you think would color your ability to sit as a juror on

22   this case?

23             PROSPECTIVE JUROR 71:  It's hard to know.  I would

24   say yes.

25             THE COURT:  Oh, really?

```
1          PROSPECTIVE JUROR 71:  Yep.

2          THE COURT:  So give me an example of what.

3          PROSPECTIVE JUROR 71:  I just don't truthfully trust

4     the justice system with some things that I've dealt with that,

5     so yeah.

6          THE COURT:  Okay.  Thank you very much.  Juror 58?

7          PROSPECTIVE JUROR 58:  May I approach?

8          THE COURT:  Yes.

9     SIDEBAR CONFERENCE

10    ████████████████████████

11    ██████████████████████████████████████████

12    ████████████████████████████████████████████

13    ███████████████████

14    ██████████████████████████████████

15    █████████████████████████████████████████

16    █████████████████████████

17    ██████████████████████████████████████████████

18    ████████████████████

19    ██████████████████████████

20    █████████████████████████████████████

21    █████████████████

22    ██████████████████████████████

23    SIDEBAR CONFERENCE CONCLUDED

24         THE COURT:  Do we have some other hands yet?

25         PROSPECTIVE JUROR 48:  48.  I served as a witness on
```

1     a criminal case.

2            THE COURT:  How long ago was that, ma'am?

3            PROSPECTIVE JUROR 48:  Six years.

4            THE COURT:  What kind of case?

5            PROSPECTIVE JUROR 48:  Child endangerment.

6            THE COURT:  Anything about that experience you think

7     would color your view about serving as a juror in this case?

8            PROSPECTIVE JUROR 48:  No.

9            THE COURT:  Thank you, Juror 48.  Juror 16?

10           PROSPECTIVE JUROR 16:  I testified this year for a

11    city case.  I'm a school counselor, so...

12           THE COURT:  Anything about that experience you think

13    would make it difficult to serve?

14           PROSPECTIVE JUROR 16:  No.

15           THE COURT:  All right.  I think we've already gotten

16    answers to this one, but if anybody didn't answer it before.

17    Is anyone or any member of your immediate family a member of a

18    law enforcement agency, which would include municipal police,

19    county sheriff, state highway patrol, military police, any

20    federal law enforcement agency, either at the present time or

21    in the past?

22       Anybody who has already mentioned their connection to law

23    enforcement doesn't need to repeat it.  So does anybody who's

24    got one who hasn't been raised?  Yes?

25           PROSPECTIVE JUROR 20:  My brother was in the military

1     police, and my brother is a retired police officer.

2              THE COURT:  Okay.  Anything about that makes you bias

3     in favor of or against the government?

4              PROSPECTIVE JUROR 20:  No.

5              THE COURT:  Thank you.  Juror 1?

6              PROSPECTIVE JUROR 1:  I have a sheriff's deputy in my

7     extended family, and my husband is retired from Cincinnati

8     private police.

9              THE COURT:  Okay.  Have you discussed like criminal

10    matters and things with those folks?

11             PROSPECTIVE JUROR 1:  No.

12             THE COURT:  Either your husband, or your --

13             PROSPECTIVE JUROR 1:  My husband sometimes, but...

14             THE COURT:  Has it given you a strong view about, oh,

15    if somebody gets charged, that means they're guilty, or

16    anything like that?

17             PROSPECTIVE JUROR 1:  No.

18             THE COURT:  Is there anything about that that you

19    think would make it difficult for you to serve as a juror in a

20    case like this?

21             PROSPECTIVE JUROR 1:  No.

22             THE COURT:  Thank you.  Yes, sir?

23             PROSPECTIVE JUROR 29:  29.  One thing I forgot to

24    mention about my sister.  Prior to her current work, she did

25    serve in this building, I do not know under which judge, as

```
1     some -- as a legal assistant of some kind.  I do not know the

2     exact nature of her work.

3               THE COURT:  Okay.  For a judge in this building?

4               PROSPECTIVE JUROR 29:  Correct.

5               THE COURT:  Thank you.

6               PROSPECTIVE JUROR 29:  I think it was roughly 10,

7     maybe 11 years ago.

8               THE COURT:  Thank you.  Yes?

9               PROSPECTIVE JUROR 47:  Juror 47.  In 2002, 2003, I

10    was elected to [indiscernible] the central intelligence

11    agency.

12              THE COURT:  Okay.  Yes, sir?

13              PROSPECTIVE JUROR 44:  Juror Number 44.  My dad and

14    grandpa both were in the military, and then my stepmother was

15    a retired Cincinnati Police Officer.

16              THE COURT:  Okay.  Were they in the military police,

17    or just the military?

18              PROSPECTIVE JUROR 44:  Just Army and Navy.

19              THE COURT:  So with respect to did you say it was

20    your mother was in the --

21              PROSPECTIVE JUROR 44:  Step.  Dad's wife.

22              THE COURT:  Your dad's wife was a police officer.

23    Okay.  Anything about that make you bias or in favor of or

24    against law enforcement?

25              PROSPECTIVE JUROR 44:  No, Your Honor.
```

```
 1              THE COURT:  Do you think you'd have any difficulty

 2    putting that aside and just listen to the evidence you just

 3    hear in this case?

 4              PROSPECTIVE JUROR 44:  No, Your Honor.

 5              THE COURT:  Thank you, Juror 44.  Yes?

 6              PROSPECTIVE JUROR 63:  Juror 63.  My nephew was a

 7    corrections officer in the State of Virginia a few years ago,

 8    he isn't any longer.  And my former brother-in-law was a

 9    military police working for Wright Patterson Air Force Base

10    about 25 years ago.

11              THE COURT:  Okay.  Anything about that make you feel

12    bias either in favor of or against law enforcement?

13              PROSPECTIVE JUROR 63:  No.

14              THE COURT:  Do you think you might have any

15    difficulty putting aside anything you might have learned

16    through those relationships and focus just on the testimony

17    and evidence you hear in court in this matter?

18              PROSPECTIVE JUROR 63:  I don't even remember

19    anything.

20              THE COURT:  Very good.  All right.  Other hands?

21              PROSPECTIVE JUROR 14:  14.  My cousin's husband is a

22    detective, and he also -- he's also a Cincinnati Police

23    Officer.

24              THE COURT:  Currently now?

25              PROSPECTIVE JUROR 14:  Yes.
```

 1          THE COURT:  Okay.  Is it somebody you see a lot?  Are

 2     you close to this person?

 3          PROSPECTIVE JUROR 14:  No.  I'm close to my cousin,

 4     but I don't see her husband a lot.

 5          THE COURT:  Have you spent a lot of time discussing

 6     policing with your cousin's husband?

 7          PROSPECTIVE JUROR 14:  No.

 8          THE COURT:  Is there anything about any conversations

 9     you've had with your cousin's husband or with your cousin that

10     you think would make it difficult for you to sit here and

11     assess evidence that's presented in court?

12          PROSPECTIVE JUROR 14:  No.  She's not allowed to

13     speak of it either, so...

14          THE COURT:  Very good.  Beyond anything that anyone

15     has disclosed up 'til now, have you or any member of your

16     immediate family had an experience with the criminal justice

17     system that you feel was unfair?

18       We all have life experiences that vary somewhat from each

19     other, and I expect you'll bring your different life

20     experiences and your common sense with you to your work as

21     jurors.

22       But sometimes, certain life experiences may make it more

23     difficult for you to listen to the facts of a case with an

24     open mind.

25       For example, this case involves municipal government,

1    real estate development projects, and campaign fundraising.

2    Some people may have strong opinions or may have had either

3    good or bad experiences involving those types of topics.

4        Perhaps candidates have asked you for money in the past

5    and you have not liked that, or perhaps you've sought

6    municipal or government approval for some kind of plan or

7    project and found it harder to get than you thought.  Or

8    perhaps you've asked officeholders for help, only to be turned

9    down.

10        Things like that could give you a view about the campaign

11    fundraising process or the way in which municipal government

12    works when it comes to real estate development projects, that

13    type of thing.

14        Do any of you have any life experiences that you believe

15    would make it difficult for you to listen to the facts of this

16    case with an open mind?

17        What about any views on politicians, generally?  Does

18    anyone believe that all politicians are good, no matter what,

19    or all politicians are corrupt, no matter what, such that you

20    would be unable to fairly judge Mr. Sittenfeld and decide

21    whether he's innocent until proven guilty?

22        In other words, if you think, oh, I just think all

23    politicians are corrupt, it might be difficult for you to hold

24    the government to their standard of proof.

25        Conversely, if you believe that all public servants are

1    honest all the time, that might make it difficult for you to

2    conclude that the government has proven its case against

3    Mr. Sittenfeld beyond a reasonable doubt.

4       So with that by way of backdrop, does anybody have any

5    life experiences in that situation that would make it

6    difficult for that?  Yes, sir?

7           PROSPECTIVE JUROR 18:  Juror Number 18.  My spouse is

8    a municipal official.

9           THE COURT:  What kind of official?

10          PROSPECTIVE JUROR 18:  She's a village councilperson

11    at our residence.

12          THE COURT:  And what village is that, sir?

13          PROSPECTIVE JUROR 18:  Greenhills.

14          THE COURT:  How long has she been a councilmember?

15          PROSPECTIVE JUROR 18:  Since 2018.

16          THE COURT:  I assume she had to run for that, right?

17          PROSPECTIVE JUROR 18:  She was appointed to an open

18    seat, and then she ran in 2020 unopposed, but we ran a

19    campaign.

20          THE COURT:  Okay.  As part of that, did she have to

21    engage in any fundraising of any kind?

22          PROSPECTIVE JUROR 18:  We did not do fundraising.

23          THE COURT:  Okay.  Do you think anything about

24    that -- without sharing what the view might be, but do you

25    think anything about that colors your view about what

1  candidates do or need to do, or anything about getting

2  elected?

3          PROSPECTIVE JUROR 18:  I don't know a lot of the

4  specific electoral process, but I think, in general, that

5  would bias me in one direction just having a personal

6  connection.

7          THE COURT:  Sure.  Thank you.  Anyone else?  Thank

8  you, Juror 18.

9      As I'll tell the members of the jury later, once the jury

10  is selected, in a criminal case, it's the government's job to

11  prove that the defendant is guilty beyond a reasonable doubt.

12      If the government fails to do so, the defendant is not

13  guilty.  Would any member of the panel be unable to find

14  Mr. Sittenfeld not guilty if the government fails to prove its

15  case against him beyond a reasonable doubt?

16      In other words, does anybody think that's just too high

17  of a burden for the government?  I'm just going to go with

18  what I think, rather than beyond a reasonable doubt?

19      Conversely, would any member of the panel be unable, for

20  any reason, to find Mr. Sittenfeld guilty if the evidence

21  proves that Mr. Sittenfeld is guilty beyond a reasonable

22  doubt?  In other words, if anybody says, ahh, I can't vote to

23  convict another person, I don't think I can do that no matter

24  what the evidence says.

25      Does any panel member refuse to recognize organized

1    federal, state, or local government?

2        Does any panel member have any feeling, thought,

3    inclination, premonition, prejudice, religious belief or

4    persuasion or bias which might influence or interfere, in your

5    view, with your full and impartial consideration of the

6    evidence, and which might influence you either in favor of or

7    against the defendant or the government in this case?  Yes,

8    sir?

9            PROSPECTIVE JUROR 29:  Number 29.  I don't think I

10   have a bias one way or the other, but in the interest of full

11   disclosure, I did previously work at one of the news stations

12   in town.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR 29:  That was -- it ended in 2015.

15           THE COURT:  What was your role there?

16           PROSPECTIVE JUROR 29:  Production assistant, graphic

17   designer, just general various work doing stuff in the studio.

18           THE COURT:  As you can tell, we're getting to the

19   broader questions here, so we're almost done.

20       Is there any reason, in your mind, why you cannot hear

21   and consider the evidence and render fair and impartial

22   verdicts?  Anybody says I just can't do it?

23       Can you take the law as the Court instructs you, without

24   any reservation whatsoever, and apply those instructions to

25   the facts of this case as you find them?  In other words, as a

1    juror, it will be your job to apply the law as the Court gives

2    it to you, even if you disagree with it.

3        If you do not believe that you can do this; that is, if

4    you cannot promise to follow the law as the Court gives it to

5    you, please hold up your hand.

6        During this trial, the jury will be the sole judge of the

7    facts, and the Court will be the sole judge of the law.  Can

8    you accept that proposition?

9        If you cannot accept the proposition that the jury will

10   be the sole judge of the facts, but that the Court will be the

11   sole judge of the law, please hold up your hand.

12       If you are selected as a juror in this case, can you

13   extend the presumption of innocence to the defendant; that is,

14   can you presume the defendant is innocent of the charges

15   unless and until guilt is established by a proof which

16   convinces you beyond a reasonable doubt?

17       If you have any doubts about your ability to do that,

18   please hold up your hand.

19       Beyond what we've discussed already with regard to the

20   media stories, has any panel member formed or expressed any

21   opinion as to the guilt or innocence of Mr. Sittenfeld?

22       Does any panel member have any transportation problem

23   that you think would interfere with your participation as a

24   juror in this matter?

25       Does any panel member have any medical or disability

```
1    problems, such as a difficulty hearing or seeing, that you
2    think might interfere with your service as a juror or,
3    frankly, any other medical problem which could affect your
4    service on a jury?
5        And anyone who has already provided an answer to that
6    question need not.  Yes, sir?
7             PROSPECTIVE JUROR 53:  Anxiety.
8             THE COURT:  Juror Number?
9             PROSPECTIVE JUROR 53:  53.
10            THE COURT:  Okay.  Would you like to discuss it
11   further at sidebar, sir, or are you all right?
12            PROSPECTIVE JUROR 53:  I'm hanging in there now.  My
13   anxiety is through the roof right now, so I'm ashamed to say
14   it.
15            THE COURT:  Okay.  No, that's all right.  It can be a
16   stressful experience.  Do you take any prescription for
17   anxiety?
18            PROSPECTIVE JUROR 53:  I think I need one now.  I'm
19   ready for it right now.
20       (Laughter.)
21            THE COURT:  Are you under treatment for anxiety, sir?
22            PROSPECTIVE JUROR 53:  Yes.
23            THE COURT:  Others may want to follow up on that,
24   sir, but that was Juror 53.  Anyone else, a medical issue?
25   Yes, ma'am?
```

1          PROSPECTIVE JUROR 68:  Juror 68.  I have an ongoing

2     knee issue.  You have a copy of my physical therapy schedule.

3          THE COURT:  Okay.  Thank you.  You just gave it to

4     the jury coordinator this morning; is that right?

5          PROSPECTIVE JUROR 68:  Yes.

6          THE COURT:  Okay.  Anyone else?

7          PROSPECTIVE JUROR 55:  55.  I am almost seven months

8     pregnant.

9          THE COURT:  Oh, congratulations.  Now, it's only two

10    weeks...no, I'm just kidding.

11       (Laughter.)

12         PROSPECTIVE JUROR 59:  59.  I also have anxiety.  I

13    am medicated; but, you know, like, therapy is great, though.

14         THE COURT:  Okay.  You think that would make it

15    difficult to serve on a jury, ma'am?

16         PROSPECTIVE JUROR 59:  No.

17         THE COURT:  Okay.  Yeah, I don't -- and feel free not

18    to share medical problems or issues that won't, in your view,

19    interfere with your service as a juror.

20       There are going to be some slides or audiovisual

21    presentations, and we can certainly accommodate and move

22    people to where they can see better, but if you have problems

23    seeing or hearing, that might be something you might want to

24    think about.  Very good.  All right.

25       Finally, can any of you -- finally, that's a good word,

1    right?  Finally, can any of you think of any matter that you

2    should call to the Court's attention that we've not already

3    discussed that may have some bearing on your qualifications as

4    a juror, or that even to the slightest degree may prevent you

5    from rendering a fair and impartial verdict based solely upon

6    the evidence and my instructions as to the law?  So that's

7    sort of a last catchall question.

8        Okay.  I think what we should do right now is take a

9    brief break.  I want to talk to the attorneys.  As I said,

10   they're going to have some questions for you as well.  But

11   we've been going at this a while.  I imagine everybody might

12   want to stretch or take a walk.

13       Can we get Jen to take them back to the jury assembly

14   room?

15              MS. WEBSTER:  How long, Judge?

16              THE COURT:  Oh, you're right there.  Did you stay

17   here the whole time?

18              MS. WEBSTER:  I did.

19              THE COURT:  Oh, that's nice.  Thank you.  She usually

20   doesn't stay here the whole time, in fairness to me, but okay.

21   All right.  Thanks, Jen.  You can walk them back.

22       (Prospective jurors out at 12:05 p.m.)

23              THE COURT:  Well, as I feared may happen, that took

24   longer than typically it takes the Court part of the voir

25   dire.  Now we're at 12:05.

1      I don't know how long the parties intend to go.  I

2    don't -- I'm soliciting thoughts on probably the best path

3    forward, given that it's 12:05, and we've just gotten to the

4    end of the Court's questions.  Ms. Glatfelter?

5         MS. GLATFELTER:  Yes, Your Honor.  I would suggest we

6    give the jurors an hour break for lunch.  This will allow us

7    time to go through the information we have already and

8    streamline our voir dire.

9      And I would suggest probably, realistically, on the

10    schedule, we would maybe use an afternoon break to pick the

11    jury, instruct them with the preliminary instructions, and

12    then we could argue objections after that.

13      I just don't think with -- I think Mr. Rittgers says his

14    opening was an hour, mine will be 45 minutes or so.  I don't

15    know that it's realistic that we're going to get to them

16    today.

17         THE COURT:  I was afraid of that, yeah.

18         MS. GLATFELTER:  Unless you see it differently.

19         MR. C. MATTHEW RITTGERS:  My opening might be even an

20    hour and 20, an hour and 30 minutes, Your Honor, so I don't

21    see it happening.

22         THE COURT:  So the proposal on the table is that we

23    give the venire an hour-ish for lunch.  It will probably be

24    1:20, realistically, by the time we get people back in the

25    courtroom, and then proceed with the party voir dire at that

1       point, and then call it for the day and start -- call it for

2       them for the day, we'll take care of the remaining things we

3       need to take care of, and then do openings starting tomorrow.

4           Is that the proposal, Ms. Glatfelter?

5               MS. GLATFELTER:  Yes.  That would be mine.  I think

6       it's realistic.

7               THE COURT:  Mr. Rittgers?

8               MR. C. MATTHEW RITTGERS:  I agree, Your Honor.

9               THE COURT:  All right.  Sounds like a good plan,

10      then.  Well, we could probably just release them from where

11      they're at and tell them to be back by --

12              COURTROOM DEPUTY:  I could just tell Jen to have them

13      back by 1:10, 1:15.

14              THE COURT:  Okay.  All right.  That sounds like a

15      plan.  Is there anything that we need to address before we

16      break for lunch?

17              MS. GLATFELTER:  Just, Your Honor, so we understand

18      the process.  When we do hardships and causes, would Your

19      Honor -- would we do those together?  How could we be most

20      efficient in presenting that information to you?

21              THE COURT:  So I treat hardship as a cause.

22              MS. GLATFELTER:  Okay.

23              THE COURT:  So I will do those as part of the for

24      cause.  What I intend to do is identify the jurors who are --

25      first, going to identify the jurors who we're going to remove

1    for cause, which will include hardship or bias, or things of

2    that nature, personal relationships.

3         And then after we've done the for cause challenges and

4    I've ruled on those, we'll move on to the peremptories.  And I

5    think I gave you the order in which we're going to do those.

6    It's one for the government, two for the defendant, until we

7    get down to one, one, one left.  And then there will be the

8    challenges.  I think there's four challenges for the

9    alternates.

10        There's one challenge for each two alternates, so the

11   government has two challenges on alternates, and the defense

12   has two challenges on alternates.  And the jury will be the

13   lowest 16 members that are left at the end of that challenge

14   process.

15        So I've been asked before, you know, can we do a

16   peremptory on Number 69?  I don't care.  Use it for whomever,

17   but 69 might not really end up, realistically, in the jury box

18   anyway, so think about that, but it will be the 16 lowest

19   numbers that are left.

20        Any questions?  All right.  I think we can break for

21   lunch.

22              MS. GLATFELTER:  Thank you.

23        (Lunch recess.)

24              THE COURT:  Counsel, anything we need to put on the

25   record before we bring the jury in?

1           MR. C. MATTHEW RITTGERS:  Just a couple things.  If

2      you could alert the jury who the marshals are, and it's just a

3      common practice that they are in the courtroom.

4           THE COURT:  Oh, okay.  Sure.

5           MR. C. MATTHEW RITTGERS:  Another thing, and this

6      might not matter because they're not impaneled, but an

7      admonishment about --

8           THE COURT:  The media admonishment.  Yes.  I didn't

9      realize we were leaving for lunch or I would have done that.

10     I should have done that.

11          MR. C. MATTHEW RITTGERS:  Your Honor, are you going

12     to inquire -- because I saw a lot like calling on phones.  It

13     might have been for nothing, but I guess I don't know.

14          THE COURT:  Yes.  I will inquire.

15          MR. SINGER:  Just a question on follow-up, Your

16     Honor?

17          THE COURT:  Yes.

18          MR. SINGER:  If there's a particular juror that we

19     have a question about that does not require sidebar, can we

20     just ask the question directly to the juror?

21          THE COURT:  If it's a follow-up on something that

22     I've already heard from, then yeah.

23          MR. SINGER:  Some comments we would like to have at

24     sidebar.  Can I ask them to stand up and just come to sidebar?

25          THE COURT:  Yes.  How many of those do you have?

```
 1          MR. SINGER:  Two.

 2          THE COURT:  Okay.

 3          MR. C. MATTHEW RITTGERS:  Your Honor, on the asking

 4   the jury a specific question, I do have some follow-up about

 5   the media.  We are okay with having that conversation, even

 6   though I know it probably will not be in a very favorable

 7   light, but is that something I can ask openly?

 8          THE COURT:  Well, what I don't want you to do is

 9   elicit their description of what they may have read so that

10   all the other jurors can hear it.

11      If you want to do it at sidebar with some of them, you

12   can do it.  I just don't want to further taint the jury pool

13   by giving incomplete discussions of what may have been in

14   media accounts that are now in first or second or third hand,

15   you know.

16          MR. C. MATTHEW RITTGERS:  Sure.  Can it be a general

17   discussion about media, and things like what they read or

18   listen to?

19          THE COURT:  Designed to go in what direction?

20          MR. C. MATTHEW RITTGERS:  So we understand they might

21   have bias, or we might want to use a peremptory on them based

22   on what they listen to or read, and their feelings about the

23   case.

24          THE COURT:  Any thoughts?

25          MR. SINGER:  I was going to ask an open-ended
```

1    question about media as well, so...

2          THE COURT:  I think that's fine.  I guess, if we can

3    try to avoid eliciting their discussion or description of what

4    they remember the story was about, because then all the other

5    jurors are going to hear that too, and any potential bias will

6    then be spread.

7      If you feel the need to inquire with regard to a specific

8    juror about what it is they recall reading, I prefer to do

9    that at sidebar just to minimize the taint, unless the parties

10   think we shouldn't do that.

11         MR. SINGER:  The government agrees with that, Your

12   Honor.

13         THE COURT:  I just don't want to further --

14         MR. C. MATTHEW RITTGERS:  I think we should then

15   sidebar everyone that said that they had read or listened to

16   the media on the case.

17     We need to know what they've read and listened to, and I

18   would like a lot of questions on how that's impacted their

19   opinions of the case.

20         MR. SINGER:  Your Honor, a number of them said that

21   they are able -- have no opinion about the case, that they

22   could be fair and impartial jurors.

23         THE COURT:  I mean, I guess you're entitled to

24   inquire about it.  My concern is a lot of them, it sounds

25   like, read one or two stories that they sort of recall

1    reading, and I don't know that they even remember much about

2    it.

3        But if you want to inquire, I guess we could bring them

4    one at a time.  If we're going to do that, I would suggest we

5    set up in chambers, and then bring them serially into chambers

6    so we can do it relatively quickly.

7        MR. C. MATTHEW RITTGERS:  That would be our

8    preference, Your Honor.

9        THE COURT:  Okay.  Mr. Singer, any strong objections?

10    It's going to take longer.

11        MR. SINGER:  I don't think it's necessary, but I

12    defer to the Court.

13        THE COURT:  Well, I do want to be sensitive to

14    Mr. Rittgers' concern on this front.  How many was it?  Let me

15    see.  I've got the list here.

16        MS. GLATFELTER:  Twenty.

17        THE COURT:  I had 21 on my list.

18        MR. C. MATTHEW RITTGERS:  We had 21, Your Honor.

19        THE COURT:  All right.  Well, it seems like a lot,

20    but we can do that, I guess.  Anything else before we bring

21    the venire back?

22        MR. SINGER:  Should I just hold off on all questions

23    about media, then?

24        THE COURT:  Why don't we just do that with the ones

25    you've raised.  We can do it all, and you can each ask your

1    questions.  Is that acceptable to the government?

2             MR. SINGER:  I would like to ask a sort of open-ended

3    question about the source of the media, but won't get into

4    specifics about media relating to this.

5             THE COURT:  Okay.  Do you want to do the media during

6    the government's voir dire, or yours, or what?

7             MR. C. MATTHEW RITTGERS:  We could do it immediately,

8    whatever.  We defer to the Court.

9             THE COURT:  You want to just do that?

10            MR. C. MATTHEW RITTGERS:  That's fine.  Your Honor,

11   Rob Junas was not mentioned in the people to call, and is he

12   not going to be called?

13            MR. SINGER:  He's not on our witness list.

14            MR. C. HENRY RITTGERS:  I'm sorry?

15            MR. C. MATTHEW RITTGERS:  He's not on the list.

16   Okay.  We're just clarifying.

17            THE COURT:  We're good?

18            MR. C. MATTHEW RITTGERS:  Yes.

19            THE COURT:  Let's bring in the jury.

20        (Prospective Jury in at 1:23 p.m.)

21            THE COURT:  So ladies and gentlemen of the panel, the

22   venire, hope you've had a pleasant lunch.

23        I know that sometimes when you're sitting at lunch, all

24   of the sudden things occur to you that you wish you would have

25   said in response to some question earlier.

1        Is there anybody who happened to recall anything further

2   in furtherance to the questions that I asked this morning that

3   they would like to raise?  Yes, sir?  Juror Number

4        PROSPECTIVE JUROR 50:  50.  I'm on reporting to

5   probation of OVI and leaving the scene of the accident.  I

6   talked to Julie [sic].  I didn't know if I should be

7   mentioning it to you or not.

8        THE COURT:  Thank you very much, sir.  I appreciate

9   it.

10       MS. WEBSTER:  It was a misdemeanor.

11       THE COURT:  Okay.  Thank you.  Ma'am in the back?

12       PROSPECTIVE JUROR 69:  Juror 69.  I'm a licensed

13   realtor.  I was a Star One realtor for seven years, and I know

14   Mark Schupp.

15       THE COURT:  You know Mark who?

16       PROSPECTIVE JUROR 69:  Mark Schupp.

17       MR. C. HENRY RITTGERS:  I'm sorry, Judge, who was it?

18       PROSPECTIVE JUROR 69:  Mark Schupp, the last one that

19   you mentioned.

20       THE COURT:  Thank you.  Anyone else have anything

21   additional they wanted to raise?

22     As I mentioned, this is one of those cases where there's

23   been some media attention.  You saw those in the answers to

24   some of the questions we had a little bit earlier this

25   morning.

1          The parties would like to inquire a little bit further as

2     to the potential jurors who have been exposed to media

3     stories, and yet, at the same time, as I mentioned, I don't

4     want people giving their account of what they may have seen

5     because it's important that we decide this case solely based

6     on the evidence presented in the courtroom, so I don't want

7     someone else -- you're sitting here, and you're listening to

8     someone else say what they've read and, all of a sudden,

9     you've got that information too.

10          So what I intend to do at this point is take the people

11     who responded yes on the media question, which was about 20 of

12     you, and we're going to, one at a time, just kind of file

13     back, and then the parties will be able to ask additional

14     questions that they have about that topic without the rest of

15     the members of the pool hearing what's said.

16          So that's not necessarily a typical part of this, but

17     it's not at all surprising, in light of what we've -- you

18     know, the fact that this case has gotten a little more media

19     attention.

20          I also did just want to mention, you've probably seen a

21     rotating cast of personnel in blue blazers sitting by the

22     door.  That's typical of all trials.  They're court security

23     officers who are coming in and out.  I should have described

24     that as part of the courtroom process, too, when we got

25     started.

1     And then the final thing, I didn't realize that we were

2    going to break for lunch. We kind of talked about a plan and

3    came up with that as a plan.

4     It's going to be very important that people not attempt

5    to do any kind of research about this case. It's so important

6    that the members of the jury decide the case based on the

7    evidence that's actually presented at trial.

8     So is there anybody who did any research over the lunch

9    hour regarding this case, looked at news articles or anything,

10    or called and talked to people about it?

11     It's understandable, given that I didn't give an

12    admonition before we broke, but I would just like to know if

13    anybody did. Okay. So not seeing any hands.

14     All right. So the jurors, I'll just have -- Jacob will

15    come out and announce the next number. There's a relatively

16    large number of about 20 people. Starting with 3, 4, 5, 6,

17    we'll bring you back one at a time, and Jacob will bring you

18    back.

19     So Juror Number 3, if you want to come back now.

20    SIDEBAR CONFERENCE IN CHAMBERS

21     THE COURT: We're back here with Juror Number 3 to

22    talk about what media she may have seen or discussed with

23    friends. So I don't know who wants to go first.

24     Mr. Singer, do you want to go for the government, or

25    whoever is doing it for the government?

1        MR. SINGER:  Sure.  Can you just describe the media

2    that you have either read or listened to relating to this

3    matter?

4        PROSPECTIVE JUROR 3:  Yeah.  It's been on like social

5    media, like different things like that.  I heard it on the

6    news.  We heard it back a couple, few years ago, and it was

7    discussed, and just things like that.  I mean, we really

8    didn't form a lot of opinion but, you know, we have discussed

9    it, which I mean by "we" is me and my husband.

10       And as I was saying out there earlier, me and my husband

11   are involved politically, like we're friends with Brian Garry,

12   Michelle Dillingham, and there are a handful of a number of

13   other people that we know.

14       MR. SINGER:  Is there anything specific about what

15   you read or what you heard about that you can tell us about?

16       PROSPECTIVE JUROR 3:  Just about bribes, things like

17   that.  I mean, I kind of like put it in my head and out of my

18   head.  I really try not to follow that stuff too much but,

19   yeah, I've been exposed to it.

20       I mean, you know, I would go in and go, oh, okay.  And my

21   husband, he has his opinion, what do you think, those kinds of

22   things, you know.

23       MR. SINGER:  Do you think you'll consider the content

24   from what you were exposed to when you're considering the

25   evidence in this case?

1          PROSPECTIVE JUROR 3:  I would be probably -- how

2     would you put it.  I would try to be bias, not, you know,

3     think about it.  But I mean, I have been exposed to it, I will

4     say that.  It's out there.

5          MR. SINGER:  Do you think you would be able to set

6     aside and get out of your mind what you've read and heard when

7     you're listening to the evidence in the case?

8          PROSPECTIVE JUROR 3:  Yeah.  Sure can, yes.

9          MR. SINGER:  Would you say -- I think you mentioned

10    that you were really politically involved.  Could you describe

11    that a little bit?

12         PROSPECTIVE JUROR 3:  Like me and my husband, like

13    Michelle Dillingham, for instance, like about her gun

14    violence, and stuff like that.  I went down for her rally and

15    carried signs, and things like that, even though I live in

16    Brown County.

17       Like I said, we met a few years back and, like I said, we

18    keep in contact with each other, and we meet up here and there

19    and talk and stuff.

20         MR. SINGER:  When you say you "meet up," you meet up

21    with --

22         PROSPECTIVE JUROR 3:  Just friends, casually go see

23    her, go to a cafe, those kind of things.

24         MR. SINGER:  For political support rallies, is that

25    what you're saying?

1              PROSPECTIVE JUROR 3:  Yeah.  I've done that, too,

2      with her, yes.

3              MR. SINGER:  When you say you go and meet political

4      candidates when you go to --

5              PROSPECTIVE JUROR 3:  We just know them because

6      we're -- how would you put it.  We're good friends with them

7      socially.  Sometimes, yeah, it can be political.  It depends.

8      I mean, we live in Brown County.  We can't do much down here,

9      but we do try to show our support with her, or something that

10     interests me, like the gun -- you know, the gun violence

11     thing.  I mean, that to me was important.

12             MR. SINGER:  Can you describe that a little bit?

13     What is it about that issue in particular that has made you

14     politically active?

15             PROSPECTIVE JUROR 3:  Just different things.  I've

16     always been, especially up in Brown County and then down here.

17     And, like, Michelle Dillingham, we've been friends.  We met,

18     we seemed to click and everything.

19         Same with Brian Garry.  He has a lot of causes on his

20     homelessness, you know, and stuff like that, helping people,

21     and things like that.  We donated clothes, you know, for them,

22     and stuff like that.

23             MR. SINGER:  Do you think you'll be thinking about

24     your own experiences in politics when you're hearing the

25     evidence in this case?

1          PROSPECTIVE JUROR 3:  It would be hard, yes, to be

2     honest with you.  I'm just being honest.

3          MR. SINGER:  You might just have it in the back of

4     your mind --

5          PROSPECTIVE JUROR 3:  Yes.

6          MR. SINGER:  -- as you hear evidence and you're

7     listening to evidence?

8          PROSPECTIVE JUROR 3:  Yes.

9          MR. SINGER:  I think you're saying it would be hard

10    for you to not consider that, at least to a certain extent?

11         PROSPECTIVE JUROR 3:  Right.

12         MR. SINGER:  I understand.  No further questions.

13         THE COURT:  Mr. Rittgers?

14         MR. C. MATTHEW RITTGERS:  Yes.  Thank you.  We'll

15    refer to her as Juror Number 3?

16         THE COURT:  Yes, Juror Number 3.  Refer to her by her

17    number, please.

18         MR. C. MATTHEW RITTGERS:  What sorts of news articles

19    do you remember, or radio or TV did you watch or listen to, if

20    you recall?

21         PROSPECTIVE JUROR 3:  Well, like this morning on NPR,

22    they were talking about it, as me and my husband's driving me.

23    It's just all around.  It was on the news.  You look up on

24    Google, you see it, that kind of stuff.

25         MR. C. MATTHEW RITTGERS:  Was the discussion that

1   your husband and you had, was there any discussion as to

2   whether or not P.G. might be guilty or not guilty?

3           PROSPECTIVE JUROR 3:  No, there wasn't.

4           MR. C. MATTHEW RITTGERS:  Just in general, what the

5   accusations were?

6           PROSPECTIVE JUROR 3:  Yes.  That's what it was, yes.

7           MR. C. MATTHEW RITTGERS:  Did you have discussions

8   with other people about the --

9           PROSPECTIVE JUROR 3:  No.

10          MR. C. MATTHEW RITTGERS:  Okay.  Is there something

11  that you think that I should know, representing P.G., about

12  what you've thought about or what you've talked about already?

13          PROSPECTIVE JUROR 3:  No.

14          MR. C. MATTHEW RITTGERS:  Okay.  I don't have any

15  further questions, Your Honor.

16          THE COURT:  Very good.  Thank you.  You may go back

17  out, ma'am.

18      Jacob, will you bring in Juror Number 4.

19      So I'll just note, for the record, that took about seven

20  or eight minutes.  There's 20 people.  At that rate, there's

21  two hours of this, so just be mindful.

22          MR. C. MATTHEW RITTGERS:  This is Number 4?

23          THE COURT:  Yes.  Anything that can be done to

24  streamline it would be much appreciated, I'm sure by the 80

25  sitting out in the courtroom as well.

1          Sir, have a seat, Juror Number 4.

2          Mr. Rittgers, do you want to go first this time?

3          MR. C. MATTHEW RITTGERS:  Sure.  Good afternoon, sir.

4     You mentioned the reason -- I know you know why you're in

5     here.  I think you know this.  It's because you knew of news

6     and watching news and media about the accusations in this

7     case?

8          PROSPECTIVE JUROR 4:  Yeah.

9          MR. C. MATTHEW RITTGERS:  Can you tell us what you

10    heard and what you watched?

11         PROSPECTIVE JUROR 4:  I just follow the news, like,

12    on an evening basis.  And I just recall when the arrest was

13    made, like it made the news, and just kind of never thought

14    anything about it again, really, until, like, I started seeing

15    stories on it yesterday too; but besides that, just seeing it

16    on the news.

17         MR. C. MATTHEW RITTGERS:  Did you read any of those

18    stories or listen to the news coverage about it?

19         PROSPECTIVE JUROR 4:  Yeah.  I believe I've probably

20    read some articles on like WLWT, the app.

21         MR. C. MATTHEW RITTGERS:  Fair to say the news

22    articles weren't very favorable to Mr. Sittenfeld?

23         PROSPECTIVE JUROR 4:  I mean, I don't know one way or

24    another, you know, just the stories, you know, that I've read.

25         MR. C. MATTHEW RITTGERS:  Okay.  After reading those

1    stories, I mean, you retained some of the facts after you read

2    them?

3            PROSPECTIVE JUROR 4:  Yeah.

4            MR. C. MATTHEW RITTGERS:  Does that -- are those in

5    your mind still?  Does that still kind of impact the way you

6    think about P.G.?

7            PROSPECTIVE JUROR 4:  I mean, not really.  I

8    realize -- you know, I feel like, you know, the authorities

9    must have figured they had evidence to, you know, charge him;

10   but, you know, I don't know what all those details are, or any

11   of the other information.

12           MR. C. MATTHEW RITTGERS:  On the articles that you

13   read, there were some articles that talk about various things.

14   Do you remember kind of the general topics that they were

15   talking about?

16           PROSPECTIVE JUROR 4:  One thing that comes to mind

17   that I know that a Bengals player was in the story.  That's

18   kind of another thing I recall about it.

19           MR. C. MATTHEW RITTGERS:  Okay.  Anything else you

20   can recall about it?

21           PROSPECTIVE JUROR 4:  Not off, no.

22           MR. C. MATTHEW RITTGERS:  You mentioned WLWT, I

23   believe?

24           PROSPECTIVE JUROR 4:  Yeah.

25           MR. C. MATTHEW RITTGERS:  Any radio that you listen

1    to?

2          PROSPECTIVE JUROR 4:  Yeah.  I listen to WLW.  And

3    I've heard them talking about it on there a little bit.

4          MR. C. MATTHEW RITTGERS:  Bill Cunningham?

5          PROSPECTIVE JUROR 4:  Yeah.

6          MR. C. MATTHEW RITTGERS:  Was that in the past week?

7          PROSPECTIVE JUROR 4:  No.

8          MR. C. MATTHEW RITTGERS:  A couple years ago?

9          PROSPECTIVE JUROR 4:  Yeah.

10          MR. C. MATTHEW RITTGERS:  Talking about the

11   corruption downtown?

12         PROSPECTIVE JUROR 4:  Yeah.  And I can't even

13   remember if it was specific to this case or maybe a couple

14   other councilmembers.

15         MR. C. MATTHEW RITTGERS:  When you heard you were

16   called for this case, when you were in the courtroom, does

17   that kind of impact the way in which you look at P.G.?

18         PROSPECTIVE JUROR 4:  No.

19         MR. C. MATTHEW RITTGERS:  All right.  No further

20   questions, Your Honor.

21         THE COURT:  Mr. Singer?

22         MR. SINGER:  Do you think you can be a fair and

23   impartial juror?

24         PROSPECTIVE JUROR 4:  Yes.

25         MR. SINGER:  Do you think you can listen to the

1      Court's instructions and follow them?

2            PROSPECTIVE JUROR 4:  Yes.

3            MR. SINGER:  I don't have anything else.

4            THE COURT:  Thank you.  Thank you, sir.

5      Juror Number 5, Jacob.

6            MR. SINGER:  Your Honor, this is actually something I

7      was going to ask to come to sidebar.

8            THE COURT:  Sure.  Oh, this person you were going to

9      ask?

10           MR. SINGER:  Yes.

11           THE COURT:  Any objection?

12           MR. C. HENRY RITTGERS:  No.

13           MR. C. MATTHEW RITTGERS:  No.

14           THE COURT:  Good afternoon, Juror Number 5.

15           PROSPECTIVE JUROR 5:  Good afternoon.

16           THE COURT:  Mr. Singer, do you want to go first?

17           MR. SINGER:  Can you just describe the media that you

18     heard that relate to this case?

19           PROSPECTIVE JUROR 5:  Yeah.  Back when there was the

20     first news about it in late 2019, I just heard the news about

21     it, the story about possible corruption in city council.

22           MR. SINGER:  Do you recall any of the content which

23     you read?

24           PROSPECTIVE JUROR 5:  Yeah.  I recall it.  It was

25     related to political action committee donations for receiving

1    favorable awards for contracts, I think, like construction

2    contracts.

3            MR. SINGER:  Do you think the information that you've

4    learned from the media that you were exposed to, do you think

5    it will impact your ability to be a juror in this case?

6            PROSPECTIVE JUROR 5:  No.

7            MR. SINGER:  It won't distract you or find yourself

8    comparing the evidence you hear at trial with what you heard

9    or read?

10           PROSPECTIVE JUROR 5:  I suspect that what I heard in

11   the news is surface, and that through a trial, you'd get more

12   details, so I would expect that the detailed information would

13   be more influential than news.

14           MR. SINGER:  Okay.

15           MR. C. MATTHEW RITTGERS:  He took all my questions.

16   You've answered them.

17           MR. SINGER:  Can I follow up?

18           THE COURT:  Yes.  You can follow-up on your other

19   issue too.

20           MR. SINGER:  There was another issue I wanted to ask

21   you about, and since you're here.

22           PROSPECTIVE JUROR 5:  Yeah.

23           MR. SINGER:  You mentioned there's a work commitment

24   situation that might be a hardship.  Do you mind describing it

25   for us a little bit more?

1          PROSPECTIVE JUROR 5:  Yeah.  We're delivering a

2    pretty significant web overhaul this summer in three phases.

3    The first phase is due at the end of June, the next phase is

4    due toward the middle, end of July, and I'm one of the key

5    people on content development for that.

6          MR. SINGER:  How much of a hardship would this be for

7    you personally and financially if you serve on this jury?

8          PROSPECTIVE JUROR 5:  Not financially.  Time-wise,

9    I'll be doing a lot of work at night, I expect, to keep up.

10         MR. SINGER:  Do you think it would be a distraction

11   at all, your work issue, with your service as a juror?

12         PROSPECTIVE JUROR 5:  I wouldn't imagine, no.

13         MR. SINGER:  If the trial continues longer than maybe

14   it's expected, would that become an issue for you?

15         PROSPECTIVE JUROR 5:  My bigger concern is our guest

16   who is visiting starting July 11th, but you said it wouldn't

17   last that long.  I would hope it wouldn't.  You know, we tend

18   to do like long weekends to travel with her when she visits.

19         MR. SINGER:  Okay.

20         THE COURT:  Where is she from?

21         PROSPECTIVE JUROR 5:  Germany.

22         THE COURT:  Oh, nice.

23         MR. SINGER:  Nothing further.  Thank you.

24         THE COURT:  Any follow-up on that, Mr. Rittgers?

25         MR. C. MATTHEW RITTGERS:  No.  Thank you, Your Honor.

1           THE COURT:  Thank you, Juror Number 5.

2           THE LAW CLERK:  Number 6?

3           THE COURT:  Yes.  Juror Number 6.  Mr. Rittgers, you

4   want to go first this time?

5           MR. C. MATTHEW RITTGERS:  Sure.  The reason you're in

6   here is because you mentioned that you had seen some news

7   coverage.  I believe you mentioned not only news, but also

8   radio news.

9           PROSPECTIVE JUROR 6:  Yes.

10          MR. C. MATTHEW RITTGERS:  Can you tell us a little

11  bit about what you heard?

12          PROSPECTIVE JUROR 6:  Gosh.  Well, I mean, I used to

13  listen to radio.  I mean, like news, 700WLW, so I probably

14  heard a bunch of that when the story first broke, was that two

15  or three years ago?

16          MR. C. MATTHEW RITTGERS:  Couple years back.

17          PROSPECTIVE JUROR 6:  Yeah.  So that's what -- just

18  hearing, you know, news coverage, talk shows, you know,

19  opinions on that from the various shows, and stuff like that.

20          MR. C. MATTHEW RITTGERS:  Like Bill Cunningham, or...

21          PROSPECTIVE JUROR 6:  Yeah.  That and -- yes.

22  Uh-huh.

23          MR. C. MATTHEW RITTGERS:  On the news coverage, did

24  you see anything recently, like in the past week, or anything

25  like that?

1          PROSPECTIVE JUROR 6:  Probably, yes.  Well, yeah.  I

2     mean, yes.  I mean, I have seen stuff come across, obviously.

3     I mean, it's a big story, so...

4          MR. C. MATTHEW RITTGERS:  Sure.

5          PROSPECTIVE JUROR 6:  Probably about a week -- so the

6     past week, I kind of realized that this might be the case, and

7     so I kind of begged off really reading about too much of stuff

8     like that because I'm like, you know, I don't really want to

9     know any more than I need to, right?

10         MR. C. MATTHEW RITTGERS:  Right.

11         PROSPECTIVE JUROR 6:  So yes, I'm aware of the

12    coverage and that.

13         MR. C. MATTHEW RITTGERS:  Is there anything that you

14    think the government or P.G.'s counsel should know about what

15    you've read or the way in which that -- like your thought

16    process is currently, as you sit here right now, about the

17    charges, the validity of them?

18         PROSPECTIVE JUROR 6:  Like, if they're -- do I have

19    an opinion on them?  Is that what you're --

20         MR. C. MATTHEW RITTGERS:  Yeah, just based on what

21    you've read and heard about.

22         PROSPECTIVE JUROR 6:  I mean, I'm pretty open minded,

23    so I don't, really.  I mean, obviously, you think oh, wow,

24    it's a big deal, so you think big charges.  I mean, there's a

25    lot going on, but I don't -- in terms of not knowing the full

1    story, so I don't know, right?

2              MR. C. MATTHEW RITTGERS:  Okay.

3              PROSPECTIVE JUROR 6:  I mean, I wouldn't say that I

4    couldn't balance my opinion or balance each side, I guess, is

5    what I'm saying.

6              MR. C. MATTHEW RITTGERS:  Okay.  Thank you.  Thanks

7    for sharing that.

8              MR. SINGER:  Do you think you could be a fair and

9    impartial juror?

10             PROSPECTIVE JUROR 6:  I think I could.

11             MR. SINGER:  Do you think you could follow the

12   Court's instruction and base your decision only on the

13   evidence presented at trial?

14             PROSPECTIVE JUROR 6:  I think so, yes.

15             MR. SINGER:  No further questions.

16             THE COURT:  Thank you, Juror Number 6.

17             THE LAW CLERK:  Is 10 next?

18             THE COURT:  Yes.  Juror Number 10?

19             PROSPECTIVE JUROR 10:  Yes.

20             THE COURT:  All right.  Mr. Singer, you want to go

21   first?

22             MR. SINGER:  Yes.  I think you responded that you had

23   heard or seen some media relating to this case; is that right?

24             PROSPECTIVE JUROR 10:  Right.

25             MR. SINGER:  Can you describe the contents of the

1    media that you heard?

2            PROSPECTIVE JUROR 10:  The only thing was this

3    morning, when I was getting ready and walking by the TV,

4    Julie O'Neill on Channel 9 was mentioning, I don't know if his

5    name is J.D., J.P., I don't -- I don't watch TV.  That's all I

6    heard.  I just wanted to be honest about it.

7            MR. SINGER:  Have you formed any opinions about this

8    case at all?

9            PROSPECTIVE JUROR 10:  I don't know what it's about,

10   but no.

11           MR. SINGER:  Do you think you can be fair and

12   impartial?

13           PROSPECTIVE JUROR 10:  Absolutely.  Yes, sir.

14           MR. SINGER:  No further questions.

15           MR. C. MATTHEW RITTGERS:  Did you hear anything on

16   the radio?

17           PROSPECTIVE JUROR 10:  No.  I have Sirius.  I don't

18   listen to the radio, really.

19           MR. C. MATTHEW RITTGERS:  Thank you.

20           THE COURT:  Thank you.

21           THE LAW CLERK:  Number 15?

22           THE COURT:  Yes.  Juror Number 15, sir?

23           PROSPECTIVE JUROR 15:  Yes, I am.

24           THE COURT:  Mr. Rittgers, I believe this time you go

25   first.

 1              PROSPECTIVE JUROR 15:  Can I take this off?

 2              THE COURT:  Yes, sir.

 3              MR. C. MATTHEW RITTGERS:  Hi, sir.  The reason why

 4      you're back here is because you mentioned you listened to the

 5      radio, I believe, and read some news articles.  Can you tell

 6      us what you heard and read?

 7              PROSPECTIVE JUROR 15:  I mean, well, obviously, when

 8      it all happened, I was just reading.  I'm retired now, so I'm

 9      constantly on the internet.

10          Between that, I read The Enquirer, I listen to WLW Radio,

11      Fox News, CNBC once in a while.  I try to get a little bit of

12      both sides of everything as far as what's going on both

13      locally and nationally, so I have heard about the charges.

14          And, you know, I've read something about the -- I think

15      the ex-Bengal player, I can't remember how to pronounce his

16      name, you know, things like that.

17              MR. C. MATTHEW RITTGERS:  And being that you're a

18      former Cincinnati Public Schools and Cincinnati Police

19      Department as well?

20              PROSPECTIVE JUROR 15:  Nope.

21              MR. C. MATTHEW RITTGERS:  Oh, you're not?

22              PROSPECTIVE JUROR 15:  No.

23              MR. C. MATTHEW RITTGERS:  I have the wrong juror.

24              PROSPECTIVE JUROR 15:  You have the wrong person.

25              MR. C. MATTHEW RITTGERS:  Glad I asked you.  You work

1    at a law firm?

2              PROSPECTIVE JUROR 15:  No.

3              MR. C. MATTHEW RITTGERS:  I asked the wrong question.

4              PROSPECTIVE JUROR 15:  Oh for two.

5              THE COURT:  Where do you work?

6              PROSPECTIVE JUROR 15:  I work for Humana.  I was in

7    their mail order pharmacy.  That was my last job before I

8    retired.

9              MR. C. MATTHEW RITTGERS:  I'm glad I asked you that.

10       The news you watch and listen to, did that impact like

11   the way you walked in and looked at P.G. Sittenfeld today?

12             PROSPECTIVE JUROR 15:  No, I can say not at all,

13   although -- and I want to be as forthright as I can here.

14             THE COURT:  Yes.

15             MR. C. MATTHEW RITTGERS:  Sure.

16             PROSPECTIVE JUROR 15:  I had an incident last night.

17   I play in a golf league on Monday, six or seven of us sitting

18   around.  They were having a beer.  It was killing me not to

19   because I knew I had to be here.

20       I had told my partner that, you know, depending on

21   whether I get selected for this jury, and I didn't know what

22   the case was for sure, but it's pretty easy to guess, that I

23   might have to get a sub for a few weeks.

24       Well, one of the other guys said, oh, I bet you're on the

25   P.G. Sittenfeld trial.  And a couple of my buddies made jokes.

1    And, you know, I kind of laughed at it.

2        And then another guy said, hey, we shouldn't even be

3    talking about this in front of him.  And I said, yeah, let's

4    just drop it.  But that happened last night, but other than

5    that...

6            MR. C. MATTHEW RITTGERS:  Would it be tough if your

7    verdict wasn't what your buddies think it would be, to go back

8    and play golf with them?

9            PROSPECTIVE JUROR 15:  No, not at all.

10           MR. C. MATTHEW RITTGERS:  All right.

11           PROSPECTIVE JUROR 15:  I'm my own person.

12           MR. C. MATTHEW RITTGERS:  You're Juror 15?  I have

13   terrible note taking and I apologize.

14           PROSPECTIVE JUROR 15:  That's okay.

15           MR. C. MATTHEW RITTGERS:  But thank you.  I have no

16   further questions, Your Honor.

17           MR. SINGER:  I have in my notes that you had

18   mentioned that you had formed an opinion based on the media?

19           PROSPECTIVE JUROR 15:  I said it was hard not to form

20   an opinion.

21           MR. SINGER:  Okay.

22           PROSPECTIVE JUROR 15:  As far as I'm concerned, when

23   I read The Enquirer and some of those articles, and you listen

24   to talk radio, and you're getting kind of a different version

25   or, you know, they're all different.

1      You know, I don't want to say fake news, or anything like

2    that, but every news piece is slanted one way or another, in

3    my opinion.  So I try to be informed about the stuff I read,

4    so I don't mind reading, you know, different sides of a thing.

5    And since I'm kind of a news junky, I read a lot.

6      But yeah, I probably did have an opinion formed but, as I

7    told the judge, I honestly believe I can put all that aside

8    and just start from when I walk into the courtroom.

9           MR. SINGER:  So you believe you could be a fair and

10   impartial juror?

11          PROSPECTIVE JUROR 15:  I do believe that.

12          MR. SINGER:  And you will follow the Court's

13   instructions --

14          PROSPECTIVE JUROR 15:  To the letter.

15          MR. SINGER:  -- and the evidence just as presented in

16   this case?

17          PROSPECTIVE JUROR 15:  Yes.

18          MR. SINGER:  Thank you, sir.

19          THE COURT:  Thank you, sir.  Juror Number 25?

20          PROSPECTIVE JUROR 25:  Yes, sir.

21          THE COURT:  Mr. Singer, I believe it's you this time.

22          MR. SINGER:  So you've heard or read some media

23   relating to this case; is that right?

24          PROSPECTIVE JUROR 25:  Heard, yes.

25          MR. SINGER:  Can you just describe the content?

1          PROSPECTIVE JUROR 25:  It was a long time ago that I

2    heard that he was being investigated.  And last night on

3    Channel 5, they had that the trial was starting for the

4    corruption and bribery or something.

5          MR. SINGER:  Have you formed any opinion as to guilt

6    or innocence?

7          PROSPECTIVE JUROR 25:  I haven't heard any facts.

8          MR. SINGER:  So you think you could be a fair and

9    impartial juror?

10          PROSPECTIVE JUROR 25:  Yeah.

11          MR. SINGER:  Do you think you will follow the Court's

12    instructions relating to the law and base your decision only

13    on the evidence in this case?

14          PROSPECTIVE JUROR 25:  Yes.

15          MR. C. MATTHEW RITTGERS:  I don't have any questions

16    for you.

17          PROSPECTIVE JUROR 25:  Oh, come on.

18       (Laughter.)

19          THE COURT:  Juror 32?

20          MR. SINGER:  32?

21          THE COURT:  That's what I have.  What do you have?

22          MR. SINGER:  I've got 42.

23          THE COURT:  I have 32 next.

24          MR. SINGER:  Okay.

25          PROSPECTIVE JUROR 32:  Hello.

1          THE COURT:  Hello.  Are you Juror 32?

2          PROSPECTIVE JUROR 32:  Yes, sir.

3          THE COURT:  Very good.  Mr. Rittgers?

4          MR. C. MATTHEW RITTGERS:  Good afternoon, ma'am.

5          PROSPECTIVE JUROR 32:  Hi.

6          MR. C. MATTHEW RITTGERS:  Hi.  You know why you're

7   here.  We were just asking to see if you could tell us what

8   you've read, what you listened to, just so we know if that

9   made you form an opinion about the case.

10          PROSPECTIVE JUROR 32:  Basically, what I got from it

11  in a long-about way is -- I'm not like politically correct, or

12  anything like that, but he basically paid for votes is what I

13  got from it.

14          MR. C. MATTHEW RITTGERS:  From what you read?

15          PROSPECTIVE JUROR 32:  Yes.

16          MR. C. MATTHEW RITTGERS:  There was -- that he was

17  probably guilty based on what you read?

18          PROSPECTIVE JUROR 32:  Yes.  Based on what I read,

19  yes.

20          MR. C. MATTHEW RITTGERS:  Do you think that impacts

21  the way in which you might view the facts in the case?

22          PROSPECTIVE JUROR 32:  I mean, not really.  I don't

23  see it.  But I haven't seen anything, like he said earlier,

24  like hardcore and like facts, so I can't say anything until I

25  know it's like right in front of me is basically --

1          MR. C. MATTHEW RITTGERS:  Okay.

2          PROSPECTIVE JUROR 32:  Yeah.  I don't really know how

3    to answer questions.  I get very nervous, so...

4          MR. C. MATTHEW RITTGERS:  That's fair.  I appreciate

5    you speaking with us.  Those are the only questions that I

6    have.

7          THE COURT:  Mr. Singer?

8          MR. SINGER:  Do you think you're going to be thinking

9    about those facts --

10          PROSPECTIVE JUROR 32:  Yes.

11          MR. SINGER:  -- when you hear the evidence, and maybe

12    comparing what you read before with the evidence?

13          PROSPECTIVE JUROR 32:  Yes.  I can already tell you

14    that would happen.

15          THE COURT:  Thank you.

16          PROSPECTIVE JUROR 32:  Thank you.  I'm all good?

17          THE COURT:  Yes, you are.  I think 38 is next?

18          THE LAW CLERK:  Oh, shoot.  I have 40.

19          THE COURT:  Yeah.  38 was at the end of the list.

20          THE LAW CLERK:  Oh, yeah.

21          THE COURT:  Juror Number 40, right here.  Oh, Juror

22    Number 40, who knows everybody.

23       (Laughter.)

24          THE COURT:  Okay.  Mr. Singer?

25          MR. SINGER:  Hi.  Can you just describe the content

1    that you've heard or read about this case?

2              PROSPECTIVE JUROR 40:  Probably initially, when

3    everything started in 2019.  I mean, it was big news, and you

4    want to know what I heard?

5              MR. SINGER:  Yeah.

6              PROSPECTIVE JUROR 40:  What he's being charged with?

7              MR. SINGER:  Whatever you learned through reading or

8    listening to media.

9              PROSPECTIVE JUROR 40:  That he has been charged with

10   accepting money for favors.  That's pretty much it, in a

11   nutshell.  I heard it, and I just really kind of forgot about

12   it.  COVID hit.  And then I got summoned to jury duty.

13        And I didn't give it a thought.  An attorney at work

14   said, I wonder if you're going to be on P.G. Sittenfeld's

15   trial.  And I'm like, wow, that's crazy.  And he looked at the

16   date, and he said it could be.

17        So at that point, I decided not to read anything or look

18   at anything because I just decided not to do that until

19   yesterday, when my phone -- you know, I was in Florida until

20   yesterday.

21        My phone, when I got off the plane, just was blowing up

22   with stuff, you know, WLWT or whatever.  And then it was on

23   the news this morning, and I heard the same thing again,

24   nothing really more or less.

25              MR. SINGER:  Okay.  Thank you.

```
 1              THE COURT:  Mr. Rittgers?

 2              MR. C. MATTHEW RITTGERS:  I was going to ask you this

 3    anyway.  You heard some things in a law firm?

 4              PROSPECTIVE JUROR 40:  Uh-huh.

 5              MR. C. MATTHEW RITTGERS:  ██████████████████

 6    ████████████████████

 7              PROSPECTIVE JUROR 40:  ████

 8              MR. C. MATTHEW RITTGERS:  █████████████████████

 9    ████████████████████████████████  He might

10    testify.

11              PROSPECTIVE JUROR 40:  Okay.

12              MR. C. MATTHEW RITTGERS:  ███████████████████

13    █████████████████████████████████████████████

14    █████████████████████████████████████

15    ███████████████████████████████

16              PROSPECTIVE JUROR 40:  ████████████████████

17    ████

18              MR. C. MATTHEW RITTGERS:  Gotcha.

19              PROSPECTIVE JUROR 40:  ████████████████████

20    ████████████████

21              MR. C. MATTHEW RITTGERS:  Yes.

22              PROSPECTIVE JUROR 40:  ██████████████████████

23    █████████████████████████████████████████████

24    ███████████████████████████████

25              MR. C. MATTHEW RITTGERS:  ██████████████████
```

1       ████

2               PROSPECTIVE JUROR 40:  ████████████████████

3       ██████

4               MR. C. MATTHEW RITTGERS:  Okay.  ████████

5       ███████████████████████████

6               PROSPECTIVE JUROR 40:  No.

7               MR. C. MATTHEW RITTGERS:  Okay.  All right.

8               PROSPECTIVE JUROR 40:  No.  ████████████

9       ████████████████████████████████████

10      █████████████████████████

11              MR. C. MATTHEW RITTGERS:  Okay.  All right.  Thank

12      you.

13              THE COURT:  As you sit here right now, do you have a

14      view as to whether Mr. Sittenfeld is guilty or not guilty?

15              PROSPECTIVE JUROR 40:  No.

16              THE COURT:  ██████████████████████

17      ████████████████████████████████████

18      ████

19              PROSPECTIVE JUROR 40:  I'm too old to care.

20      Honestly, I don't care.

21              THE COURT:  Any follow-up questions?

22              MR. SINGER:  Do you think you could be fair and

23      impartial?

24              PROSPECTIVE JUROR 40:  Yes, sir.

25              THE COURT:  Thank you, ma'am.

1              PROSPECTIVE JUROR 40:  Okay.  Thank you.

2              THE LAW CLERK:  Now I have 38.

3              THE COURT:  Okay.  Juror 38?

4              PROSPECTIVE JUROR 38:  Uh-huh.

5              THE COURT:  Mr. Rittgers?

6              MR. C. MATTHEW RITTGERS:  Good afternoon.  You know

7    why you're here.  We're just here to ask what it is that

8    you've read or listened to about the case.

9              PROSPECTIVE JUROR 38:  Okay.  Well, I remember from

10   2019, because it was on the news a lot, and his name is just

11   really unusual, and so whenever you hear it, you go, oh, yeah,

12   I remember that.

13       And last night, I just was flipping on the TV.  I was at

14   work.  And I heard today they were going to select the jury,

15   and I was like, oh.  Oh.

16       And then I was at work and, like I said, I don't really

17   know how to work the TV, and it kind of went off, so then I

18   got on my phone and read about that he was charged with four

19   things.

20             MR. C. MATTHEW RITTGERS:  Thanks for telling us that.

21             PROSPECTIVE JUROR 38:  Oh, yeah.  That's okay.

22             MR. C. MATTHEW RITTGERS:  Is there anything that you

23   read that you think you wouldn't be able to put out of your

24   mind, or that might impact the way you look at him or the

25   facts in the case?

1          PROSPECTIVE JUROR 38:  I don't think so.

2          MR. C. MATTHEW RITTGERS:  Okay.

3          PROSPECTIVE JUROR 38:  I don't think so, because the

4    only one that I really understood was the bribery.  The other

5    two things, I didn't.  I don't even know for sure what they

6    are.

7          MR. C. MATTHEW RITTGERS:  Okay.  All right.  Thank

8    you.

9          PROSPECTIVE JUROR 38:  You're welcome.

10          THE COURT:  Mr. Singer?

11          MR. SINGER:  No questions.

12          THE COURT:  Thank you, ma'am.

13          PROSPECTIVE JUROR 38.  Okay.

14          THE LAW CLERK:  41?

15          THE COURT:  41, yes, then 42 and 43.  Juror 41?

16          PROSPECTIVE JUROR 41:  Yes.

17          THE COURT:  Very good.  Mr. Singer?

18          MR. SINGER:  Hi, ma'am.  Would you mind just

19    describing some of the media you've heard or listened to and

20    what the content was?

21          PROSPECTIVE JUROR 41:  You know, it was just kind of

22    like, I have the news on in the morning, you know, when you're

23    getting ready for work.

24       So it's more like in the background just hearing about,

25    you know, this trial is going to happen, and this is what it's

1   about, and these are what the charges are.  So I mean, nothing

2   really in depth.

3           MR. SINGER:  Did you -- do you think you formed any

4   opinions based on what you've heard?

5           PROSPECTIVE JUROR 41:  No.

6           THE COURT:  Do you think you could be fair and

7   impartial?

8           PROSPECTIVE JUROR 41:  Oh, yeah.

9           THE COURT:  Mr. Rittgers?

10          MR. C. MATTHEW RITTGERS:  I don't have any questions.

11          THE COURT:  Very good.  Thank you, ma'am.

12          PROSPECTIVE JUROR 41:  Okay.  Thank you.

13          THE COURT:  42, Jacob?

14          THE LAW CLERK:  Perfect.

15          THE COURT:  Juror 42?

16          PROSPECTIVE JUROR 42:  Yes, sir.

17          THE COURT:  All right.  Mr. Rittgers?

18          MR. C. MATTHEW RITTGERS:  Good afternoon.

19          PROSPECTIVE JUROR 42:  Good afternoon.

20          MR. C. MATTHEW RITTGERS:  You mentioned that you've

21  read or listened to some media, some coverage about the case,

22  that's why you're back here.  So what is it that you heard?

23  Can you tell us what you heard about?

24          PROSPECTIVE JUROR 42:  I follow it all from Tamaya

25  Dennard to Jeff Pastor to P.G.  I watched and followed it all.

```
 1              MR. C. MATTHEW RITTGERS:  Honest man.
 2              PROSPECTIVE JUROR 42:  Well, I was politically
 3     involved when I worked.  ████████████████████████████
 4     ████████████████████████████
 5              MR. C. MATTHEW RITTGERS:  Yes.
 6              PROSPECTIVE JUROR 42:  I know how the system works.
 7              MR. C. MATTHEW RITTGERS:  What are your thoughts
 8     based on what you've read and heard about P.G.?
 9              PROSPECTIVE JUROR 42:  If I have to be honest, I
10     think he's guilty.
11              MR. C. MATTHEW RITTGERS:  Yeah?
12              PROSPECTIVE JUROR 42:  Yeah.
13              MR. C. MATTHEW RITTGERS:  And that's based on what
14     you've read, and --
15              PROSPECTIVE JUROR 42:  Yeah.  Yeah.  I'm just being
16     honest, yeah.
17              MR. C. MATTHEW RITTGERS:  That's why we're here.
18              PROSPECTIVE JUROR 42:  Yeah.  I kind of know how the
19     system works.
20              MR. C. MATTHEW RITTGERS:  Well, knowing that, do you
21     think that it would be a little bit -- you might not be the
22     best juror for this type of case?
23              PROSPECTIVE JUROR 42:  I think it would be very hard
24     for me to be, you know.
25              MR. C. MATTHEW RITTGERS:  Yeah.
```

```
 1          PROSPECTIVE JUROR 42:  ████████████████████
 2   ████████████████████████████████████████████████
 3   ███████████████████████████████████  I just, you
 4   know...
 5          MR. C. MATTHEW RITTGERS:  Okay.  Thank you for your
 6   honesty.
 7          PROSPECTIVE JUROR 42:  Yeah.
 8          THE COURT:  Wait, wait, wait.
 9          MR. SINGER:  No questions.  Thank you.
10          PROSPECTIVE JUROR 42:  I was trying to run too quick.
11   Thank you very much.
12       (Laughter.)
13          THE COURT:  Thank you.
14          MR. C. MATTHEW RITTGERS:  What number is this, Judge?
15          THE COURT:  This is 43.  You're Juror 43?
16          PROSPECTIVE JUROR 43:  Yes, sir.
17          THE COURT:  Mr. Singer, I think you're up.
18          MR. SINGER:  Yes, ma'am.  Hi.
19          PROSPECTIVE JUROR 43:  Hi.
20          MR. SINGER:  You noted that you had heard or seen
21   some media?
22          PROSPECTIVE JUROR 43:  Yeah.
23          MR. SINGER:  Can you kind of describe that, what the
24   content was?
25          PROSPECTIVE JUROR 43:  Just from the news report that
```

1    he was being charged back in -- and it was from like 2019 and

2    being brought to trial now.  That's all.  I don't follow the

3    news very well.

4            MR. SINGER:  Have you formed any kind of opinions --

5            PROSPECTIVE JUROR 43:  No, sir.

6            MR. SINGER:  -- about guilt or innocence?

7            PROSPECTIVE JUROR 43:  Nope.

8            MR. SINGER:  Do you think you would be a fair and

9    impartial juror?

10            PROSPECTIVE JUROR 43:  Sure.  I try.

11            MR. SINGER:  Do you think you'll listen to the

12    Court's instructions relating to the law?

13            PROSPECTIVE JUROR 43:  Do I have a choice?

14            THE COURT:  You always have a choice.

15            PROSPECTIVE JUROR 43:  He's more important than I am,

16    so yeah.

17            THE COURT:  Mr. Rittgers?

18            MR. C. MATTHEW RITTGERS:  He took all my questions.

19            THE COURT:  Thank you, ma'am.

20            PROSPECTIVE JUROR 43:  Thank you.

21            THE COURT:  Juror 47, Jacob.  And if you guys have

22    one on your list that I'm skipping, just let me know.  I tried

23    to get all the numbers down.

24            MR. C. MATTHEW RITTGERS:  Mr. Sittenfeld is the one

25    who took the better list than I did, but I had after 47 on my

1    list, I have 58, 62.

2         THE COURT:  Yes.

3         PROSPECTIVE JUROR 47.  Hello.

4         THE COURT:  You're Juror 47?

5         PROSPECTIVE JUROR 47:  47

6         THE COURT:  Mr. Singer, I think you're up.

7         MR. SINGER:  Can you just describe some of the media

8    you heard or listened to in this case?

9         PROSPECTIVE JUROR 47:  Yeah.  So yesterday I was

10   meeting with my leadership at work just preparing to be out of

11   the office and mentioned that I'd be at jury selection, and

12   someone -- my HR manager said, oh, I bet it's this case.

13      I never heard of it, but she sent me a link to an

14   article, which I perused last night just to -- yes, in fact,

15   there's jury selection today.

16        MR. SINGER:  Have you formed any opinions about this

17   case based on that article?

18        PROSPECTIVE JUROR 47:  No.

19        MR. SINGER:  Do you think you'll be thinking about

20   the facts from that article when you're trying to listen to

21   the evidence in this case?

22        PROSPECTIVE JUROR 47:  I do not.

23        MR. SINGER:  Do you think you can be fair and

24   impartial?

25        PROSPECTIVE JUROR 47:  Yes, I do.

1          MR. SINGER:  You'll listen to the Court's

2     instruction?

3          PROSPECTIVE JUROR 47:  Absolutely.

4          MR. C. MATTHEW RITTGERS:  I'll be pretty brief.  Do

5     you remember what article it was?

6          PROSPECTIVE JUROR 47:  I don't.  I mean, I was pretty

7     busy, so I didn't have a lot of time.  I just looked at what

8     the charges were and kind of skimmed it to see the dates, and

9     that was kind of that.  WCPO, if I had to guess.

10          MR. C. MATTHEW RITTGERS:  Okay.  Anything that you

11     think that you gleaned from that, or any other news source, or

12     discussion with anyone that might impact your judgment?

13          PROSPECTIVE JUROR 47:  No.

14          MR. C. MATTHEW RITTGERS:  Thank you.

15          THE COURT:  58, Jacob?

16          THE LAW CLERK:  58, yes.

17          THE COURT:  You're Juror 58?

18          PROSPECTIVE JUROR 58:  Yes, I am.

19          THE COURT:  Mr. Rittgers?

20          MR. C. MATTHEW RITTGERS:  Good afternoon, sir.

21          PROSPECTIVE JUROR 58:  Good afternoon.

22          MR. C. MATTHEW RITTGERS:  Thanks for your honesty

23     throughout the entirety and coming up to sidebar.

24          PROSPECTIVE JUROR 58:  Yes.

25          MR. C. MATTHEW RITTGERS:  You mentioned that you've

1     read things, or maybe listened to things on the radio or seen

2     things on TV about the case already?

3          PROSPECTIVE JUROR 58:  Oh, yeah.  I'm sure I have.

4     I -- go ahead.  I'm sorry.  I'll wait for the question.

5          MR. C. MATTHEW RITTGERS:  You follow the news a lot,

6     I gathered from back there.  Were you one of the people who

7     said that you had -- you were aware of the news when the

8     indictment broke a couple years back?

9          PROSPECTIVE JUROR 58:  Oh, well, yeah.  I mean, it's

10    difficult not to see it.  Do you want me to take my mask off?

11         THE COURT:  You can, yes.

12         MR. C. MATTHEW RITTGERS:  Sure.

13         PROSPECTIVE JUROR 58:  Yeah, it's difficult not to,

14    not to have seen -- all the local news stations covered it.

15    It was all over the radio.

16         MR. C. MATTHEW RITTGERS:  What do you think about the

17    coverage you saw or heard?

18         PROSPECTIVE JUROR 58:  I was thinking about that out

19    there while waiting to come in.

20         MR. C. MATTHEW RITTGERS:  You knew what was coming?

21         PROSPECTIVE JUROR 58:  I don't -- you know, when it

22    gets down to the details, I don't know what was covered.  I

23    remember it being covered, and I remember it being just about

24    everywhere, especially for a few weeks, it was, you know,

25    pretty constant.

1          MR. C. MATTHEW RITTGERS:  Yeah.

2          PROSPECTIVE JUROR 58:  But I don't know what actually

3  was covered.  You know, it was just, hey, the FBI's involved

4  and, you know, this is going on.  I don't remember any of the

5  details of what I read.

6          MR. C. MATTHEW RITTGERS:  Okay.

7          PROSPECTIVE JUROR 58:  Or, you know, what I read.

8  And I discussed it with friends as well, but that was years

9  ago.  It wasn't until I got the jury packet that I started

10  thinking what's out there, you know?  I'm like, what's out

11  there?  Oh, gosh, I wonder if it's this, so...

12          MR. C. MATTHEW RITTGERS:  Okay.  I have no further

13  questions.

14          THE COURT:  Mr. Singer?

15          MR. SINGER:  Have you formed any opinions as to guilt

16  or innocence?

17          PROSPECTIVE JUROR 58:  As I answered before, I think

18  at one point -- and this is more, you know, with discussions

19  with friends, I likely have, but I think it's very important

20  to realize that that's discussions with friends.  And it's

21  certainly not -- right now today, I'm a clean slate.

22          MR. SINGER:  So you're saying previously you might

23  have had an opinion, but right now you don't have any opinion?

24          PROSPECTIVE JUROR 58:  Well, the -- yes.  The charges

25  are pretty serious.  I remember that being part of it.  Just

1    given the nature of the charges, it is difficult to not get a

2    little bit emotional about, you know, what the charges are.

3        I mean, if it turns out to be true, then, you know, it's

4    a horrible thing.  But if it turns out that the prosecution

5    hasn't done their job, then, you know, this whole thing was

6    for nothing.

7        MR. SINGER:  So do you think you can be a fair and

8    impartial juror?

9        PROSPECTIVE JUROR 58:  I do believe that, absolutely,

10    I can be.

11        MR. SINGER:  Do you think you can set your prior

12    feelings aside and just follow the Court's instructions on the

13    law and only consider the evidence that's presented at trial?

14        PROSPECTIVE JUROR 58:  Absolutely.  That's my job as

15    a juror.  I mean, that's the foundation of our American

16    society is a trial by jury.  That's what separates us from

17    other countries and other forms of government.

18        MR. SINGER:  No further questions.

19        THE COURT:  So you said you may have, at one point,

20    formed an opinion.  Would this be kind of like sitting around

21    drinking beers with buddies, and somebody says, oh, what about

22    this?  And you say, oh, I bet he did it or I bet he didn't do

23    it, something like that?  It's just kind of

24    conversational-like?

25        PROSPECTIVE JUROR 58:  Uh-huh.

```
1              THE COURT:  Is that fair?

2              PROSPECTIVE JUROR 58:  Yes.

3              THE COURT:  Do you feel at all attached, as you sit

4    here today, to whatever opinion may have been expressed at any

5    point?

6              PROSPECTIVE JUROR 58:  No.  No.  It's important that

7    he -- it's important that I go into this without anything that

8    was previous, you know, carrying no baggage.

9              THE COURT:  And you said if they prove the charges,

10   it's pretty serious stuff.  But does that also mean that you

11   recognize that it's important to hold the government to their

12   burden of proof?

13             PROSPECTIVE JUROR 58:  Absolutely.  Absolutely.  I

14   mean, these are serious.  I don't know what the penalties are,

15   but his life's on the line out there.

16             THE COURT:  Okay.  Any follow-up questions,

17   Mr. Rittgers?

18             MR. C. MATTHEW RITTGERS:  No, Your Honor.

19             THE COURT:  Mr. Singer?

20             MR. SINGER:  Are penalties something that you would

21   consider when you are assessing the evidence in the case?

22             PROSPECTIVE JUROR 58:  No.

23             MR. SINGER:  What might happen as far as a sentence,

24   or anything like that?  Is that something that would be in

25   your head when you're considering whether someone is guilty or
```

1  innocent?

2      PROSPECTIVE JUROR 58:  No.  I was just describing the

3  magnitude of the charges.  I don't know what they are, but it

4  doesn't really matter.  It doesn't change guilty or innocent.

5  I'm just mentioning that it should be something that should be

6  taken -- this is something that should be taken very

7  seriously.

8      THE COURT:  Thank you, sir.

9      PROSPECTIVE JUROR 58:  All right.

10      THE COURT:  I have 62 next.  Are you Juror 62?

11      PROSPECTIVE JUROR 62:  Yes.

12      THE COURT:  Mr. Singer?

13      MR. SINGER:  Hi.

14      PROSPECTIVE JUROR 62:  Hi.

15      MR. SINGER:  Can you just describe some of the media

16  you heard or listened to and what the content was?

17      PROSPECTIVE JUROR 62:  So I've read probably four or

18  five articles within the last week.  And what I said before,

19  to clarify.  I think hearing some evidence that would be

20  permissible and some that would not, it's hard to forget

21  hearing that or understanding that, so...

22      MR. SINGER:  So you think you might be comparing some

23  of the evidence that you had read or heard about when you're

24  listening to the evidence that you actually hear at trial?

25      PROSPECTIVE JUROR 62:  That's correct.

1          MR. SINGER:  And you think you'll have a hard time

2     just getting out of your head and forgetting it?

3          PROSPECTIVE JUROR 62:  (Nods affirmatively.)

4          THE COURT REPORTER:  Is that yes?

5          PROSPECTIVE JUROR 62:  Yes.

6          THE COURT:  Mr. Rittgers?

7          MR. C. MATTHEW RITTGERS:  Your Honor, I don't have

8     any further questions on that.

9          THE COURT:  Thank you.

10         MR. C. MATTHEW RITTGERS:  Thank you.

11         THE LAW CLERK:  63?

12         THE COURT:  That's what I've got.  And then 65?

13         THE LAW CLERK:  Yes.

14         THE COURT:  You're Juror 63?

15         PROSPECTIVE JUROR 63:  Yes.

16         THE COURT:  Very good.  Mr. Rittgers, I think it's

17    your turn.

18         MR. C. MATTHEW RITTGERS:  Good afternoon.  You know

19    why you're back here, I think you do.  Could you tell us what

20    you've read and what you've heard about in the news media

21    about the case.

22         PROSPECTIVE JUROR 63:  Well, I read there is a case,

23    and it sparked my attention because it said jury selection

24    would be a day that I knew I would be here.

25         And I know that there are some charges against

1     Mr. Sittenfeld.  I don't really understand, you know, what

2     they're called, so I don't know what they mean.  And he says

3     that he's innocent, and that's about it.

4           MR. C. MATTHEW RITTGERS:  Okay.  Thank you.

5           THE COURT:  Mr. Singer?

6           MR. SINGER:  Do you think you would be a fair and

7     impartial juror in this case?

8           PROSPECTIVE JUROR 63:  Yes.

9           MR. SINGER:  Nothing further.

10          THE COURT:  Thank you.

11          THE LAW CLERK:  65 and then 66?

12          THE COURT:  That's what I have.

13          MR. C. MATTHEW RITTGERS:  Hi.  Good afternoon.

14          THE COURT:  Juror 65?

15          PROSPECTIVE JUROR 65:  Yes, sir.

16          THE COURT:  All right.  Mr. Singer?

17          MR. SINGER:  Yes.  Can you just describe some of the

18    media you've heard and seen, and what the content was?

19          PROSPECTIVE JUROR 65:  Yes.  This morning, just

20    having coffee before coming here, saw on the news really more

21    so that it was -- this was a big case, a pivotal case for the

22    future of politics.  I forget what the professor's name, but

23    somebody from U.C. spoke as well.  I think that was on

24    Channel 5 that I saw that on this morning.

25      And then just that there was a no contes- -- or not

1    guilty plea is what I had read as well.  I'm trying to

2    remember it.  That's all I can remember off the top of my

3    head.

4            MR. SINGER:  Do you think you'd have a hard time not

5    comparing what you have read or seen with the evidence that

6    will be presented in this case?

7            PROSPECTIVE JUROR 65:  I do not, no.

8            MR. SINGER:  Do you think it will distract you at

9    all?

10           PROSPECTIVE JUROR 65:  I do not, no.

11           MR. SINGER:  Do you think you can be fair and

12   impartial?

13           PROSPECTIVE JUROR 65:  Yes.

14           MR. SINGER:  Okay.

15           MR. C. MATTHEW RITTGERS:  The professor that was

16   talking about future politics --

17           PROSPECTIVE JUROR 65:  Yeah.

18           MR. C. MATTHEW RITTGERS:  -- what was he talking

19   about?

20           PROSPECTIVE JUROR 65:  He, from what I can remember,

21   had just said that what Mr. Sittenfeld had done -- if I'm

22   remembering it correctly, was that it was illegal what he had

23   done.

24       And I think that was Professor Nevin from U.C., if I

25   remember that correctly, and then went on to say that this was

1    an important case for politics moving forward.

2          MR. C. MATTHEW RITTGERS:  Just the way in which like

3    our democracy works --

4          PROSPECTIVE JUROR 65:  Yes, how things are handled,

5    how things are done and viewed.

6          MR. C. MATTHEW RITTGERS:  Does that impact your

7    thoughts about being a juror on the case?

8          PROSPECTIVE JUROR 65:  It does not, no.

9          MR. C. MATTHEW RITTGERS:  I appreciate your honesty.

10   Thank you very much.

11         THE COURT:  Thank you.

12         PROSPECTIVE JUROR 65:  Thanks.

13         THE COURT:  Juror 66, 68, and 69?

14         THE LAW CLERK:  Yes.

15         THE COURT:  Okay.  Juror Number 66?

16         PROSPECTIVE JUROR 66:  Yes, sir.

17         THE COURT:  All right.  Mr. Singer?

18         MR. SINGER:  Hi, sir.  Can you just describe some of

19   the media that you've heard or listened to, and what the

20   content was?

21         PROSPECTIVE JUROR 66:  Most of it was back in 2019,

22   and I'll tell you, with everything that's happened since then,

23   you know, the pandemic, I'm part Ukrainian, and with that war,

24   that's -- I don't remember much of the details.

25        I remember we had a string of poli- -- I think it was

1    three politicians who were indicted, and then very brief

2    report on Channel 5 last night, and I thought they were very

3    objective, you know, just Walter Cronkite-like -- I'm dating

4    myself -- you know, just the facts.

5         THE COURT:  Do you think you can be a fair and

6    impartial juror in this case?

7         PROSPECTIVE JUROR 66:  Yes, sir.

8         MR. SINGER:  Do you think you can follow the Court's

9    instructions on the law?

10        PROSPECTIVE JUROR 66:  Yeah.  I feel very blessed to

11   be an American.

12        THE COURT:  Mr. Rittgers?

13        MR. C. MATTHEW RITTGERS:  You can base your decision

14   on the evidence that came before you in the courtroom and not

15   anything you hear outside of it?

16        PROSPECTIVE JUROR 66:  Correct.  Yep.  They've been

17   really -- the judge has been really clear about that.

18        MR. C. MATTHEW RITTGERS:  Thank you.

19        THE COURT:  Very good.  Thank you, sir.  Are you

20   Juror 68?

21        PROSPECTIVE JUROR 68:  Yep.  I'm 68.

22        THE COURT:  All right.  Have a seat.  Mr. Rittgers?

23        MR. C. MATTHEW RITTGERS:  Good afternoon.

24        PROSPECTIVE JUROR 68:  Hi.

25        MR. C. MATTHEW RITTGERS:  What types of news coverage

1    did you read or listen to about the case?

2         PROSPECTIVE JUROR 68:  Probably just about everything

3    since, you know, when this all broke.  2019, we had been

4    living in Hyde Park, so I was really familiar, you know, with

5    everything going on with city council, just all of that.

6      So we -- my husband and I always kept up with that kind

7    of information, so internet, that nasty Nextdoor app now.  It

8    used to be half decent but now has turned into rot.  I'm

9    trying to think.  We didn't get the newspaper back then, it

10   was mostly just internet things.

11        MR. C. MATTHEW RITTGERS:  So you've heard stuff for a

12   couple years about the case?

13        PROSPECTIVE JUROR 68:  Yeah.

14        MR. C. MATTHEW RITTGERS:  Based on those things, does

15   that impact your opinion of P.G.?

16        PROSPECTIVE JUROR 68:  I must admit, a little bit.  I

17   did meet him personally once.  I remember him coming to our

18   house when he was doing a door to door.  And I think that was

19   his first run for councilman so...

20      You know, my husband and I were both really impressed

21   with him, so it was disappointing to hear, you know, when he

22   was arrested in 2019 because, you know, he was probably the

23   least I would have expected, you know, for something like that

24   to happen, so...

25        MR. C. MATTHEW RITTGERS:  Do you think that you could

1    view the testimony and the evidence that you hear in the

2    courtroom and give him a fair trial if you were to sit on the

3    jury?

4            PROSPECTIVE JUROR 68:  I don't know.  I think you've

5    got many more educated people in this room that probably

6    haven't been following this as much as I have.  I mean, I'm

7    always going to have some implicit bias, and I don't know how

8    to get above that.  But that's going to be the hard part for

9    me is to try to always, you know, stay in my lane, you know

10   what I mean?

11           MR. C. MATTHEW RITTGERS:  Okay.  That's very honest.

12   Thank you.

13           THE COURT:  Mr. Singer?

14           MR. SINGER:  Nothing.

15           THE COURT:  Thank you, ma'am.

16           PROSPECTIVE JUROR 68:  Thank you.

17           THE COURT:  Juror 69?

18           PROSPECTIVE JUROR 69:  Yes.

19           THE COURT:  All right.  Mr. Singer?

20           MR. SINGER:  Hi, ma'am.

21           PROSPECTIVE JUROR 69:  Hi.

22           MR. SINGER:  Can you just describe the media that

23   you've heard or read and describe what the content was?

24           PROSPECTIVE JUROR 69:  Can I take this off?

25           THE COURT:  Yes, you can.

1       PROSPECTIVE JUROR 69:  I just remember when it all

2   came out a couple of years ago.  Nothing specific that I

3   remember, other than it was a pretty big story.  And then just

4   in the last couple of days, it's just kind of been all

5   over the -- if you've got the TV or the radio on, you're

6   hearing it, so...

7       MR. SINGER:  Do you think you could be a fair and

8   impartial juror in this case?

9       PROSPECTIVE JUROR 69:  I think I can.  You know, I'd

10  like to hear facts.

11      MR. SINGER:  Yeah.  You think you could follow the

12  Court's instructions and listen to -- base your decision only

13  on the evidence that's presented in this trial?

14      PROSPECTIVE JUROR 69:  Uh-huh.

15      THE COURT:  Is that a yes, ma'am?

16      PROSPECTIVE JUROR 69:  Yes.

17      THE COURT:  Just for the court reporter.

18      PROSPECTIVE JUROR 69:  Sorry.

19      THE COURT:  That's all right.

20      MR. C. MATTHEW RITTGERS:  Any discussions over lunch

21  with any of the prospective jurors about the case?

22      PROSPECTIVE JUROR 69:  No.

23      MR. C. MATTHEW RITTGERS:  Anything that you read or

24  heard about that you think might impact the way in which you

25  view P.G.?

1      PROSPECTIVE JUROR 69:  Just the things that, you

2   know, you hear in the media; but, you know, I don't believe

3   everything I hear in the media.

4      MR. C. MATTHEW RITTGERS:  All right.  Thank you.

5   Thanks for being honest.

6      THE COURT:  Thank you, ma'am.

7      PROSPECTIVE JUROR 69:  That's it?

8      THE COURT:  That's it.

9      MR. SINGER:  Your Honor, we have just one other

10   individual we'd like to talk to at sidebar.  Would it make

11   sense to do this now?

12      THE COURT:  Might as well.

13      MR. SINGER:  Okay.  It's Juror Number 22.

14      THE COURT:  Any objection?

15      MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

16      THE COURT:  Juror 22, Jacob.

17      MR. C. HENRY RITTGERS:  Are we finished?

18      MR. C. MATTHEW RITTGERS:  On the media.

19      THE COURT:  Just for the media.  Are there others you

20   would like to talk about?

21      MR. C. MATTHEW RITTGERS:  Not that I know of, Your

22   Honor.

23      THE COURT:  Are you Juror 22?

24      PROSPECTIVE JUROR 22:  Yes.

25      THE COURT:  I think Mr. Singer has a follow-up

```
 1    question.
 2            MR. SINGER:  A follow-up question.  ███████████
 3    ████████████████████████████████████████████████████████████
 4    ██████████████████████████████████████████
 5            PROSPECTIVE JUROR 22:  Yes.
 6            MR. SINGER:  Will you just describe that for us?
 7            PROSPECTIVE JUROR 22:  ██████████████████████████
 8    ████████████████████████████████████████████████████████████
 9    ██████████████████████████████████████████████████
 10   ████████████████████████████████████████████████████████████
 11   ████████████████████
 12           MR. SINGER:  Okay.  Is it active in any sort of way?
 13   Do you have meetings?
 14           PROSPECTIVE JUROR 22:  Yeah.  It's a national
 15   organization.
 16           MR. SINGER:  Okay.
 17           PROSPECTIVE JUROR 22:  Meetings, occasionally by
 18   Facebook, or things like that.
 19           MR. SINGER:  And in what way is the organization
 20   pushing its goals?  Do you have like a lobbying group that you
 21   work with?
 22           PROSPECTIVE JUROR 22:  Grassroots efforts.
 23           MR. SINGER:  I'm sorry, grassroots?
 24           PROSPECTIVE JUROR 22:  Yeah.  A hundred percent.  No
 25   lobbying.
```

1        MR. SINGER:  Can you describe a little more what the

2  goals are?

3        PROSPECTIVE JUROR 22:  ███████████████████████

4  ████████████████████████████████████████████████████

5  ███████████████████████████████████████████

6  ██████████████████████████████████████████████

7        THE COURT:  Let me ask it this way.  So the

8  Constitution provides for the ability to amend the

9  Constitution.  That's one of the things that's in the

10  Constitution, right?

11        PROSPECTIVE JUROR 22:  Yes.

12        THE COURT:  And one way you can amend the

13  Constitution is by having a convention of the states is --

14        PROSPECTIVE JUROR 22:  Yes.  It could either be done

15  by Congress or by this convention of states.

16        THE COURT:  ████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ███████████████████████████████████████████████

20        PROSPECTIVE JUROR 22:  It's kind of all over the

21  place.  That's a lot of discussion.  ██████████████████

22  ██████████████████████████████████████████  That's

23  the big one that seems -- that the group seems to agree on.

24        THE COURT:  I see.  So various people have --

25        PROSPECTIVE JUROR 22:  Outside of that, it goes all

```
 1    over the place.

 2            THE COURT:  -- various different ideas about what

 3    would happen if?

 4            PROSPECTIVE JUROR 22:  Exactly.

 5            THE COURT:  ████████████████████████████████

 6    ██████████████████████████████████████████████

 7    ██████████████

 8            PROSPECTIVE JUROR 22:  Yes.

 9            THE COURT:  And generally speaking -- well, do you

10    have a sense of why the group thinks that would be a good

11    thing?

12            PROSPECTIVE JUROR 22:  ████████████████████████

13    ████████████████████████████████████████

14    ██████████████████████████████████████████████

15    ██████████████████████

16            THE COURT:  Okay.

17            MR. SINGER:  ████████████████████████████████

18    ████████████████████████████████████████

19    ██████████

20            PROSPECTIVE JUROR 22:  ████████████████████

21    That's one thing that I've been interested in.

22            MR. SINGER:  Anything else?

23            PROSPECTIVE JUROR 22:  No, nothing specific.

24            MR. SINGER:  Okay.

25            PROSPECTIVE JUROR 22:  ████████████████████████
```

1     ███████████████████████████████████████████

2     ██████████████████████

3           MR. SINGER:  Anything relating to federal law

4     enforcement?

5           PROSPECTIVE JUROR 22:  No.

6           MR. SINGER:  Okay.

7           MR. C. MATTHEW RITTGERS:  Being P.G.'s counsel, a

8     former elected official, a former politician, is there

9     anything that ██████████████████████████████████████

10    ██████████████████████ would that impact the way in which you could

11    view him in a trial like this one?

12          PROSPECTIVE JUROR 22:  Which is a no.  I hadn't even

13    thought about it until you brought me in here.

14          MR. C. MATTHEW RITTGERS:  All right.  That's my only

15    question.  Thank you.

16          PROSPECTIVE JUROR 22:  Yeah.  My involvement has

17    been -- it's just been very small since I started at the end

18    of January.

19          MR. C. MATTHEW RITTGERS:  Thank you.

20          PROSPECTIVE JUROR 22:  Because I participated in some

21    group discussions and learning about it but, no, there's

22    nothing that I see.

23          THE COURT:  Thank you, sir.

24          MR. C. MATTHEW RITTGERS:  Thank you.

25          THE COURT:  And you're juror number?

1          PROSPECTIVE JUROR 22:  22.

2          THE COURT:  Thank you.  Very good.  You can return.

3          PROSPECTIVE JUROR 22:  Thank you.

4          MR. SINGER:  Nothing further.

5          THE COURT:  No one you guys want to talk to at

6     sidebar?

7          MR. C. MATTHEW RITTGERS:  Correct.

8          THE COURT:  All right.  Let's reconvene in the

9     courtroom.

10    SIDEBAR CONFERENCE IN CHAMBERS CONCLUDED

11         THE COURT:  We think we're down one, so we're just

12    waiting for one more to return.

13    Okay.  At this point, as I mentioned, the parties are now

14    going to have an opportunity to ask a few follow-up questions.

15    I think Mr. Singer is going to do the voir dire on behalf

16    of the government, and then Mr. Rittgers may ask you some

17    questions on behalf of Mr. Sittenfeld.  Mr. Singer?

18         MR. SINGER:  Thank you, Your Honor.

19    Good afternoon.  My name is Matt Singer.  I'm an attorney

20    for the United States.  Thank you for being here.

21    Trial of peers.  It's the bedrock principle of our

22    system.  It is a fundamental value of our society, and we

23    really appreciate you all being here today, especially in

24    these challenging times.

25    You are all wearing masks.  We're hopefully on the tail

1   end of this pandemic, but getting through this has been

2   difficult, so we really appreciate you being here.

3       I'm going to ask the questions to the group, and then I'm

4   going to follow up with some of you individually.  I don't

5   mean to pry.  It's part of the process.  And I get it, it's

6   not fun standing up in front of a room full of strangers and

7   answering questions, but it's part of a process to select a

8   jury that is fair and impartial for the defendant and the

9   government.

10      If you're selected, the Court's going to explain to you

11  the law, and you'll be asked to agree to render a verdict

12  based only on the law, as instructed by the Court, and the

13  evidence that you hear at trial.

14      Our goal is to find 16 individuals who will be a good fit

15  for this case.  Many of you won't be selected.  That's not

16  going to be everybody.  Some of you, I'm sure, after what is

17  already a long day, you're going to be relieved to be leaving.

18  If you didn't get picked, it's not personal.  It's just part

19  of the process.

20      I'm going to start with COVID.  Just briefly, does anyone

21  have any COVID-related concerns that they believe would

22  prevent them from being a fair and impartial juror in this

23  case?  What's your juror number, sir?

24          PROSPECTIVE JUROR 53:  53.  Pretty much my anxiety

25  started with this COVID stuff a couple years ago, so it's --

1    I'm wearing this mask because I just got over COVID maybe two

2    weeks ago, so I'm positive -- I'm not positive, I'm negative,

3    but still it's -- that was pretty much the cause of my

4    anxiety.

5            MR. SINGER:  So are you able -- and we can step to

6    sidebar if you would be more comfortable?

7            PROSPECTIVE JUROR 53:  No.

8            MR. SINGER:  Are you able to describe why this fear

9    would prevent you from being fair and impartial?

10           PROSPECTIVE JUROR 53:  Being here today, this is what

11   I was talking about earlier.  This is the most people I've

12   been around since all this started.

13       My job, pretty much, you know, I can see two or three

14   people and then I'm gone.  So this is the first time I've been

15   in a crowd of people since COVID started.  That's what pretty

16   much started my anxiety, yeah.

17           MR. SINGER:  Okay.  Thank you for that.  Anyone else?

18   Okay.  All right.

19       The Court has already asked you several questions about

20   law enforcement.  I just want to follow up on a couple of

21   those.

22       Have you, a family member, or close friend, ever had any

23   contact with law enforcement officials that has caused you to

24   form any negative opinions about law enforcement?

25       Have you ever been questioned as part of an investigation

 1     by any law enforcement agency, be it federal, or state, or

 2     local, and was there anything about that interaction that left

 3     you not really trusting the criminal justice system?  Anybody?

 4         So this case is going to involve the testimony of law

 5     enforcement agents, FBI agents, in particular.  And you must

 6     evaluate a law enforcement officer who testifies as an

 7     individual and not automatically reject or accept their

 8     testimony.

 9         Does anyone have any views about law enforcement that

10     might spill over into this case that will prevent them from

11     assessing the credibility or the testimony of any law

12     enforcement witness?

13         Would you have any difficulty giving testimony by a law

14     enforcement witness the same consideration that you would give

15     to any other witness?

16         And you understand that law enforcement officers are like

17     anybody else, they occasionally make mistakes.  Well, the fact

18     that a law enforcement officer made an error in their personal

19     life, would that cause you to automatically disbelieve their

20     testimony?  All right.

21         Federal agents use a lot of different investigative

22     techniques to get evidence in any investigation.  Does anyone

23     have any expectation about the types of techniques or the

24     types of evidence that they would expect to see at trial?

25         Any expectation about any type of law enforcement

1    technique or any type of evidence that they would expect to

2    see?  Anybody?  Okay.

3        One of the evidence collecting techniques used in this

4    case is an undercover operation.  What that means is that

5    there are undercover FBI agents who are involved in this

6    investigation.

7        Now, this is a lawful investigative technique used by law

8    enforcement.  Does anyone have any opinions about the use of

9    undercover FBI agents to gather evidence in an investigation?

10       Does anyone have any negative feelings about the use of

11   undercover agents?

12       Does anyone feel like there's something wrong with the

13   FBI or any other law enforcement organization or entity using

14   fictitious identities in order to further an investigation?

15       Do you have any opinions about the use of decoys or

16   deceptions in a criminal investigation that would make it

17   difficult for you to serve as a juror in this case?

18       All right.  So I'm not seeing anyone raising their hands

19   or anyone shaking their heads.  So if this type of evidence is

20   deemed admissible, everyone is comfortable with fairly

21   considering this type of evidence?  I see heads nodding yes.

22       Some of the evidence you're going to hear in this case is

23   audio testimony from individuals who are cooperating witnesses

24   who are working with law enforcement.

25       Again, this is a lawful, investigative technique that is

1     used by law enforcement to prevent crime and detect crime.

2         Do you have any views about this technique, about the use

3     of cooperating witnesses, that would make it difficult for you

4     to consider the evidence in this case?

5         Do you have any opinions about a cooperating witness who

6     might have done something wrong themselves but who are now

7     working on behalf of law enforcement?

8         So if this type of evidence is deemed admissible,

9     everyone is comfortable relying on this type of evidence and

10    considering it fairly according to the Court's instructions?

11    All right.

12        Politics.  This case involves politics, everybody's

13    favorite topic.  Have you or a close family member ever

14    contributed to a political campaign or political cause?

15    Hands.  Yes.  We finally have hands.

16        (Laughter.)

17             MR. SINGER:  Can you stand up, please?

18             PROSPECTIVE JUROR 5:  5.

19             MR. SINGER:  Can you just describe, without getting

20    into any details outside of what I asked, was this a political

21    candidate?

22             PROSPECTIVE JUROR 5:  Uh-huh.

23             MR. SINGER:  And how recent?

24             PROSPECTIVE JUROR 5:  2018.

25             MR. SINGER:  Over the last 10 years, are you a

1    frequent contributor to campaigns?

2            PROSPECTIVE JUROR 5:  No.

3            MR. SINGER:  Was this a federal candidate, or a state

4    or local candidate?

5            PROSPECTIVE JUROR 5:  Presidential.

6            MR. SINGER:  Okay.  Thank you.  Anybody else?

7            PROSPECTIVE JUROR 18:  Juror Number 18.

8        I have given to gubernatorial candidates in the past, a

9    long time ago, as I mentioned before.

10            MR. SINGER:  Do you think your political

11    contributions will impact your ability to be fair and

12    impartial?

13            PROSPECTIVE JUROR 18:  I don't think so.

14            MR. SINGER:  Thank you.  Somebody else in the back

15    there?

16            PROSPECTIVE JUROR 63:  Juror 63.  I have --

17            THE COURT REPORTER:  I can't hear her.

18            THE COURT:  Can you speak a little louder, ma'am?

19    I'm sorry.

20            PROSPECTIVE JUROR 63:  I've made various

21    contributions.  The most recent was probably a few months ago

22    for a local campaign.

23            MR. SINGER:  Okay.  And where is local for you?

24            PROSPECTIVE JUROR 63:  I guess it would be considered

25    Hamilton County, Cincinnati.

         1              MR. SINGER:  Okay.  And are you a frequent

         2    contributor to campaigns?

         3              PROSPECTIVE JUROR 63:  Maybe two or three times a

         4    year, depending on the issues and the candidates.

         5              MR. SINGER:  Do you think that your political

         6    activism will impact your ability to be a fair and impartial

         7    juror in this case?

         8              PROSPECTIVE JUROR 63:  No.

         9              MR. SINGER:  Okay.  Thank you.  Anybody else?  Yeah,

        10    in the back?

        11              PROSPECTIVE JUROR 29:  I'm 29.  I contributed in 2018

        12    to a senatorial candidate in Texas.

        13              MR. SINGER:  In Texas, you say?

        14              PROSPECTIVE JUROR 29:  Uh-huh.

        15              MR. SINGER:  I assume you live here locally now?

        16              PROSPECTIVE JUROR 29:  I do.

        17              MR. SINGER:  You haven't made any contributions

        18    locally?

        19              PROSPECTIVE JUROR 29:  No.

        20              MR. SINGER:  Yes?

        21              PROSPECTIVE JUROR 37:  37.  I contribute annually to

        22    the Ohio Society of CPAs' PAC.

        23              MR. SINGER:  It's a political action committee?

        24              PROSPECTIVE JUROR 37:  Yes.

        25              MR. SINGER:  Are you active with the political action

1    committee?

2         PROSPECTIVE JUROR 37:  Only when it comes to making

3    phone calls to my representatives.

4         MR. SINGER:  Okay.  So -- and what is the -- what are

5    the goals and aims of this particular PAC?

6         PROSPECTIVE JUROR 37:  It's for protection of our

7    profession.

8         MR. SINGER:  Okay.  Thank you.  Anybody else?

9         PROSPECTIVE JUROR 42:  42.  I'm particular to local

10   city instead of national.

11        MR. SINGER:  Okay.  Individual behind?

12        PROSPECTIVE JUROR 58:  Juror 58.  I'm not a regular

13   contributor, but I have contributed to a regular civil rights

14   fund, civil rights organization.

15        MR. SINGER:  Okay.  Thank you.  Anybody else?

16        PROSPECTIVE JUROR 52:  Juror 52.  My husband and I

17   will contribute to a presidential campaign.

18        MR. SINGER:  Every presidential cycle?

19        PROSPECTIVE JUROR 52:  Pretty much.

20        MR. SINGER:  Okay.

21        PROSPECTIVE JUROR 59:  59.  Not in campaign, per se,

22   but an organization that helps inform voters.

23        MR. SINGER:  Can you describe the name of that

24   organization?

25        PROSPECTIVE JUROR 59:  It's Rock the Vote.  They want

1     people to be informed when they go to the polls.

2          MR. SINGER:  Are you active in that organization?

3          PROSPECTIVE JUROR 59:  No.  It was a one-time thing.

4          MR. SINGER:  All right.  Anybody else?  Yeah, in the

5     back?

6          PROSPECTIVE JUROR 66:  Number 66.  I regularly

7     contribute to presidential, usually senatorial candidates, and

8     sometimes local.

9          MR. SINGER:  Where is local for you?

10          PROSPECTIVE JUROR 66:  City of Cincinnati, Hamilton

11     County.

12          MR. SINGER:  Okay.  And you regularly contribute to

13     local politics?

14          PROSPECTIVE JUROR 66:  I'm a little bit more federal

15     senator than I am local.

16          MR. SINGER:  Okay.  Do you contribute to Cincinnati

17     City Council candidates?

18          PROSPECTIVE JUROR 66:  Not recently, that I can

19     remember.

20          MR. SINGER:  Okay.  Anybody else?  Ma'am?

21          PROSPECTIVE JUROR 23:  23.  I'm not a regular

22     contributor, but I have given money toward national political

23     causes in the past few months.

24          MR. SINGER:  Okay.  Thank you.

25          PROSPECTIVE JUROR 63:  63.  I do have a recurring

1     contribution.  It's very, very small, and I just have never

2     turned it off.  I wanted to be honest to tell you, but there

3     is something there to a political party.

4            MR. SINGER:  I appreciate that.  Thank you.  All

5     right.  Anybody else?  Have you or a close family member ever

6     organized or hosted a political fundraiser?

7         Have you or a close family member ever attended a

8     political rally?

9            PROSPECTIVE JUROR 3:  Juror Number 3.  Yes, I have.

10           MR. SINGER:  Can you describe that?

11           PROSPECTIVE JUROR 3:  Recently, not too long ago.  It

12    was on gun violence.

13           MR. SINGER:  Okay.  Thank you.  Anybody else?

14           PROSPECTIVE JUROR 57:  Juror 57.  I attended to check

15    off my bucket list to --

16           THE COURT REPORTER:  I can't hear him.

17           MR. SINGER:  Can you say that again?

18           PROSPECTIVE JUROR 57:  Yeah.  I checked off my bucket

19    list the president coming in, or the past president.  I would

20    attend their rallies when they were speaking, so I checked it

21    off my bucket list.

22           MR. SINGER:  So any time a president comes into town,

23    you'll go and see him speak?

24           PROSPECTIVE JUROR 57:  Yeah, or a presidential

25    candidate.

1          MR. SINGER:  Okay.  Anybody else?  Ma'am, or sir?

2          PROSPECTIVE JUROR 44:  Juror Number 44.  I've done

3     some, like, live rallies, protests, all that stuff.

4          MR. SINGER:  Okay.

5          PROSPECTIVE JUROR 44:  That was it.

6          MR. SINGER:  Sir?

7          PROSPECTIVE JUROR 6:  Juror 6.  Probably about

8     20 years, 25 years ago, I went to like a political rally.

9          MR. SINGER:  Okay.  Anybody else?

10         PROSPECTIVE JUROR 42:  42.  I've been to political

11    rallies for political candidates.

12         MR. SINGER:  Yes?

13         PROSPECTIVE JUROR 66:  Juror Number 66.  I was

14    campaigning, the same gentlemen who spoke before, issues and

15    sometimes candidates.

16         MR. SINGER:  Has anyone ever volunteered to work for

17    a political campaign, a candidate's political campaign?

18         PROSPECTIVE JUROR 63:  Juror 63.  For a presidential

19    campaign.

20         THE COURT REPORTER:  They need to speak up.  I can't

21    hear them.

22         THE COURT:  I know this is hard.  The jurors don't

23    have mics like the rest of us do.  It's a pretty big room, and

24    for people in the back in particular, if you can keep your

25    voice up.

1        Sue is trying desperately to get everybody's words down

2    on the record, so it would just be helpful if you could speak

3    up just a little bit.  Thanks.

4             PROSPECTIVE JUROR 63:  It was 14 years ago.

5             MR. SINGER:  Okay.

6             PROSPECTIVE JUROR 42:  42.  Every election.

7             MR. SINGER:  Ma'am?

8             PROSPECTIVE JUROR 16:  I'm Juror 16.  I worked on a

9    political campaign in the '80s.

10            MR. SINGER:  Okay.  In the '80s?

11            PROSPECTIVE JUROR 16:  Yes.

12            MR. SINGER:  Yes?

13            PROSPECTIVE JUROR 55:  Number 55.  I did some in high

14   school, but I don't remember what it was for.

15            MR. SINGER:  You don't remember what it was for?

16            PROSPECTIVE JUROR 55:  No.

17            MR. SINGER:  Made a lasting impression?

18       (Laughter.)

19            MR. SINGER:  Anybody else?  Okay.

20      Has anyone voted in the City of Cincinnati in the last

21   10 years?  Would you mind just standing up if you have?

22            PROSPECTIVE JUROR 23:  You said voted, right?

23            MR. SINGER:  Yes.  Can you say what your juror number

24   is?

25            PROSPECTIVE JUROR 23:  It's 23.

1              A PROSPECTIVE JUROR:  Are you talking in the city or

2      just Hamilton in general?

3              MR. SINGER:  Just the City of Cincinnati.

4              PROSPECTIVE JUROR 40:  40.

5              PROSPECTIVE JUROR 45:  45.

6              PROSPECTIVE JUROR 46:  46.

7              PROSPECTIVE JUROR 54:  54.

8              PROSPECTIVE JUROR 53:  53.

9              PROSPECTIVE JUROR 51:  51.

10             PROSPECTIVE JUROR 66:  66.

11             PROSPECTIVE JUROR 16:  16.

12             THE COURT:  There's one more back behind Mr. Singer

13     there.

14             PROSPECTIVE JUROR 68:  68.

15             MR. SINGER:  68.  Thank you.  All right.  Have you, a

16     family member, or close friend ever run for or served in an

17     elected position in any municipal, state, or federal

18     government?  No politicians here?  Right here.

19             PROSPECTIVE JUROR 45:  45.  I have a good friend that

20     her father was a judge for the, I think it was for the court

21     of common pleas.

22             MR. SINGER:  In Hamilton County?

23             PROSPECTIVE JUROR 45:  Yeah.

24             MR. SINGER:  How long ago was that?

25             PROSPECTIVE JUROR 45:  He didn't get re-elected the

```
 1    last election, but I believe is running again coming up, so...
 2              MR. SINGER:  Okay.  Anyone else?  Sir?
 3              PROSPECTIVE JUROR 44:  Juror Number 44.  We have some
 4    close family friends that have senators around here.
 5              MR. SINGER:  So senators at the state level?
 6              PROSPECTIVE JUROR 44:  Yes, sir.
 7              MR. SINGER:  Are they local here?
 8              PROSPECTIVE JUROR 44:  Yes, sir.
 9              MR. SINGER:  Okay.  Anybody else?
10              PROSPECTIVE JUROR 58:  Juror Number 58.  Is it
11    possible that I approach?
12              MR. SINGER:  Certainly.
13    SIDEBAR CONFERENCE
```

14 ████████████████████████████████████████
15 ████████████████████████████████████████
16 ████████████████████████████████████████
17 ████████████████████████████████████████
18 ███████████
19 ████████████████████████████████████████
20 ████████████████████████████████████████
21 ██
22 ████████████
23 ███████████████████████████
24 █████████████████
25 ████████████████████████████████



14    SIDEBAR CONFERENCE CONCLUDED

15         MR. SINGER:  So during this trial, you may learn that

16    a witness or defendant is a member of a particular political

17    party.

18         If you learn about a witness or the defendant's

19    affiliation with a political party, could that affect your

20    ability to be fair and impartial in this case?

21         Is there anything about one political party that's going

22    to prevent you from being fair and impartial?

23              PROSPECTIVE JUROR 26:  I think it would be.

24              MR. SINGER:  Would you be prefer to step to the

25    sidebar, or do you want to --

```
 1                PROSPECTIVE JUROR 26:  No.  I just feel like --

 2                THE COURT:  Juror number?

 3                PROSPECTIVE JUROR 26:  I'm sorry.  26.  I just feel

 4      like I could have thoughts about one compared to another

 5      political party, so -- and they're not necessarily positive.

 6                MR. SINGER:  Okay.  Do you feel that if the Court

 7      instructed you on the law, that you would follow the law as

 8      instructed?

 9                PROSPECTIVE JUROR 26:  I could probably do to the

10      best of my ability, but it doesn't mean that it's not going to

11      enter in anyway.

12                MR. SINGER:  You're saying you're having a hard time

13      being fair and impartial based on these beliefs?

14                PROSPECTIVE JUROR 26:  I believe so.

15                MR. SINGER:  Okay.  Anybody else feel that way?

16          All right.  As the Court noted, this evidence will touch

17      on real estate and real estate development.  Does anyone work

18      in the field of commercial real estate?

19                PROSPECTIVE JUROR 39:  I don't -- I'm sorry.  I'm 39.

20      I don't work in commercial, but I do work in residential.

21                MR. SINGER:  Okay.  How long have you been working in

22      residential real estate?

23                PROSPECTIVE JUROR 39:  About a year and a half.

24                MR. SINGER:  And what's the nature of your job?

25                PROSPECTIVE JUROR 39:  I'm with Comey and Shepard
```

1    here in Cincinnati, all completely residential sales.  I don't

2    know how else to describe it.

3            MR. SINGER:  Okay.  Anybody else?  Yeah?

4            PROSPECTIVE JUROR 45:  I'm also a realtor --

5            THE COURT:  Number?

6            PROSPECTIVE JUROR 45:  Oh, sorry.  I'm 45.  I also do

7    residential, but I make contact regularly with commercial

8    brokers, realtors.

9            MR. SINGER:  Okay.  Do you feel like you have some

10   expertise in commercial real estate?

11           PROSPECTIVE JUROR 45:  Considering that my husband is

12   obsessed with it, possibly.  We talk about real estate every

13   single day.

14           MR. SINGER:  Do you think you would have a hard time

15   separating the expertise you've learned in your job with the

16   evidence that you're going to hear at trial in this case?

17           PROSPECTIVE JUROR 45:  I don't think so.

18           MR. SINGER:  Okay.

19           PROSPECTIVE JUROR 45:  No.

20           MR. SINGER:  Do you think you can be a fair and

21   impartial juror?

22           PROSPECTIVE JUROR 45:  Yes, except I have kids, so...

23   but yes.

24           MR. SINGER:  Your hesitation is your family

25   commitments?

```
 1              PROSPECTIVE JUROR 45:  Yes.

 2              MR. SINGER:  I understand.  Does anyone work in the

 3    field of city planning or development, or interact regularly

 4    with local government in their jobs?  Okay.

 5         So let's talk about the nature of the charges briefly.

 6    Some people have really strong opinions about certain criminal

 7    laws.  Some people believe that marijuana should be legalized.

 8    Some people believe that certain rights relating to firearms

 9    should be recognized more fully.

10         Does anyone have any thoughts about politics and bribery

11    involving campaigns that would make it hard for you to be a

12    fair and impartial juror in this case?

13         Does anyone have an opinion about the FBI investigating

14    crimes related to bribery?

15         Does anyone think the FBI should not investigate bribery?

16         If the judge instructs you that a public official

17    agreeing to accept a campaign contribution in exchange for

18    taking a specific official action by the public official is a

19    crime, could you apply the law as instructed by the Court?

20         A couple more questions, then I'm stepping down.

21         In this case, you're going to have to determine someone's

22    intent.  What kind -- talk to me now.  What kinds of evidence

23    do you all consider when you're trying to determine someone's

24    intent?  Anybody?

25              PROSPECTIVE JUROR 45:  45.  Their history.
```

1              MR. SINGER:  Okay.  So the background?

2              PROSPECTIVE JUROR 45:  Yes.

3              THE COURT:  Anything else?  Ma'am?

4              PROSPECTIVE JUROR 68:  68.  You've got to set the

5      context.

6              MR. SINGER:  I'm sorry?

7              PROSPECTIVE JUROR 68:  You've got to set the context,

8      though, because sometimes listening to the entire piece and

9      not just a portion of it.  And a lot of times now, hearing the

10     voice recordings, you're not seeing the people's face in

11     there.  You know, we tend to use them so, you know, body

12     language, which sometimes can change the entire meaning of

13     what they're saying.

14             MR. SINGER:  Okay.  Anybody else?  Anyone have any

15     thoughts?

16         What about their conduct?  What about past actions of

17     conduct?  Is that something that you would consider to

18     determine someone's intent in any specific moment?  Does

19     anyone have any thoughts on that?

20         Can you use someone's conduct to evaluate their intent?

21     I hear some yeses.

22         Have you ever experienced a situation where someone says,

23     I'd rather not talk about that on the phone, let's talk about

24     it in person?  Anyone familiar with that type of situation?

25         Does anyone have any thoughts about when that would be

1    used, or if there's any meaning behind that?  Ma'am?

2         PROSPECTIVE JUROR 61:  I'm 61.  It was my daughter

3    wanting to tell me she was pregnant in person.

4       (Laughter.)

5         PROSPECTIVE JUROR 61:  So that's what happened.

6         MR. SINGER:  In the back?

7         PROSPECTIVE JUROR 50:  I'm 50.  When it's something

8    important, you want to go in person.

9         PROSPECTIVE JUROR 5:  Number 5.  They don't want to

10   be on public record.

11        MR. SINGER:  I'm sorry?

12        PROSPECTIVE JUROR 5:  Number 5.  They don't want to

13   on public record.

14        MR. SINGER:  Can you explain that a little bit?

15        PROSPECTIVE JUROR 5:  If you work in a job where your

16   business is a matter of public record, and you wouldn't want

17   to put it in documentation where it's subject to public record

18   laws.

19        MR. SINGER:  So if you're trying to maybe hide

20   something?

21        PROSPECTIVE JUROR 5:  Yeah.

22        PROSPECTIVE JUROR 29:  Juror 29.  It goes to -- if

23   that's -- your job deals with some kind of controlled

24   information, especially stuff that could be stolen, you know,

25   espionage of some kind.

1          MR. SINGER:  Okay.

2          PROSPECTIVE JUROR 65:  65.  I work in healthcare, so

3     sometimes I cannot give information over the phone just

4     according to the hospital to consent to that type of

5     information.

6          MR. SINGER:  Okay.  All right.  So you will hear

7     recorded conversations in this case, but you're not going to

8     hear every minute that was recorded during the course of the

9     investigation.  You would be here for weeks and weeks if that

10    were the case.

11        Does anyone have any problem deciding a case unless

12    they've heard every single minute of all the recordings, even

13    small talk about favorite sports teams, or ordering food, or

14    other sorts of matters that are not directly relevant to the

15    case?  Would anyone have any problem with that?

16        Does anyone think, I need to hear every minute to be a

17    fair and impartial juror in this case?

18        So you all are comfortable assessing the evidence based

19    on what is presented to you?

20        All right.  One last question, and it's going to be

21    another catchall.  Is there anything else, based on anything

22    that I've said or anything that Judge Cole has said, that we

23    need to be aware of that would make you unable to be fair and

24    impartial in this case?

25        Okay.  I don't have anything else.  Thank you.

 1          THE COURT:  Thank you, Mr. Singer.  Mr. Rittgers?

 2          MR. C. MATTHEW RITTGERS:  Good afternoon.  My name is

 3  Charlie Rittgers, as you heard.  I practice law with my

 4  father, my mother, a lot of other lawyers.

 5      The main office is up in Lebanon, Ohio, in Warren County.

 6  We have a few folks from Warren County up there.  One of my

 7  biggest fears in jury trials is having someone who -- I don't

 8  do divorce and neither does my dad, but there are a few

 9  divorce lawyers in the firm, including my mom.

10      Does anyone know the firm of Rittgers and Rittgers,

11  especially if you've been on the other side of some divorce

12  contest with Rittgers and Rittgers?  Okay.

13      We run everything through a conflict check, but I just

14  wanted to be sure.

15      I have the honor of representing P.G. Sittenfeld with my

16  dad, with Neal Schuett, Elias, who is in our firm but not a

17  lawyer.

18      This is his wife, Sarah.  Sarah, do you mind just

19  standing up?  Thank you.  Sarah and P.G. have a 2-year-old at

20  home, and she works full-time.  She will probably not be here,

21  other than today or maybe one other time.  Is anyone going to

22  hold that against P.G. or the way they view this case if she's

23  not in the courtroom while we hear the evidence?  All right.

24      There are five stages of trial.  And the first is this

25  stage.  And this is the only stage where we all get to speak.

1    The second stage of trial is opening statements, which is

2    when both sides discuss what they think the evidence will

3    show.

4    The third stage is when you actually hear evidence from

5    the witness stand up here next to the judge.

6    The fourth stage is closing arguments, where the sides

7    argue what they think the evidence showed.

8    And then the final stage is jury instructions, when

9    you'll deliberate for a verdict.

10   This is our only chance to speak with you.  We all heard

11   some laughter when we were in the back in the judge's

12   chambers.  I'm glad you all got to talk and get to know each

13   other a little bit.  And I hope that we can have a

14   conversation today so that I'm not doing all the talking.

15   We are in this grand room, and everyone probably has

16   anxiety.  I do.  I'm sure every one of counsel does trying to

17   get people to talk and the blinking eye.

18   But if there's some silence when I'm asking questions,

19   can somebody throw me a lifeline and just talk to me?  Just

20   break the silence for me.

21           A PROSPECTIVE JUROR:  I will.

22   (Laughter.)

23           MR. C. MATTHEW RITTGERS:  Thank you.  Brutal honesty.

24   Brutal honesty.  What does that mean to you, brutally honest?

25   Anybody ?  Yes, sir?

1          PROSPECTIVE JUROR 44:  Juror Number 44.  Stuff you

2     need to hear but might not want to hear.

3          MR. C. MATTHEW RITTGERS:  Thank you.  Who else?  Yes,

4     ma'am?

5          PROSPECTIVE JUROR 51:  Juror 51.  The truth, the

6     whole truth, and nothing but the truth.

7          MR. C. MATTHEW RITTGERS:  Thank you.

8          PROSPECTIVE JUROR 61:  I agree with her.

9          MR. C. MATTHEW RITTGERS:  And what's your juror

10    number?

11         PROSPECTIVE JUROR 61:  61.

12         MR. C. MATTHEW RITTGERS:  Brutal honesty.  What I

13    would like to talk about are some of the things we've

14    already -- we all know, in general, some of the topics we

15    might hear.

16        And what I'm looking for is if, at the end of this case,

17    what I don't want, my biggest fear is someone sends me like a

18    Facebook message, or we might talk after the verdict and,

19    like, Charlie, why did you leave me on this jury?  I hate

20    politicians.

21        Is there anyone, hearing just the little bit you've heard

22    about what we might hear all together from this witness stand,

23    there's something that just doesn't sit in your belly about

24    campaign finance, for example?

25        What are people's thoughts about elected officials and

1     campaign promises, raising money to try to get elected?  Can

2     someone throw me that lifeline?  Yes, ma'am?

3             THE COURT:  Number?

4             PROSPECTIVE JUROR 68:  68.  It's a field -- I feel

5     that it has become increasingly complex with all the tiny

6     little rules.

7         I'm married to a banker, which means we can't contribute.

8     We agree, politically, that probably works out for the best,

9     but we can't contribute to anything.

10        So -- but personally, you know, watching this and, as a

11    political science major years and years ago watching this

12    field, it's just so complex anymore.

13        And there seems to be only a select few, let's say, that

14    can run for office anymore.  I know a lot of people may not

15    agree with me, but that's just my view and my observation over

16    the years.

17            MR. C. MATTHEW RITTGERS:  Thank you for sharing that.

18    Anyone else, thoughts about people who want to run for office,

19    candidates raising money, asking for donations, how does that

20    sit with you?  What are your thoughts about it?  Yes, ma'am?

21            PROSPECTIVE JUROR 55:  55.  To me I think it just

22    depends on their personal gain and what are you trying to get

23    out of this -- [indiscernible].

24            THE COURT:  Can you speak up a little bit, ma'am?

25            PROSPECTIVE JUROR 55:  What are you trying to get out

1    of the situation if I decide to donate to your cause, what is

2    the end result for you?

3        So what is -- even though you're doing this for other

4    people, what is your personal gain, because everybody always

5    has a personal gain.

6            MR. C. MATTHEW RITTGERS:  Thank you.  Thank you for

7    sharing that.  Anyone else?  This is going to be a screen

8    that's opened up.  We're going to hear on tapes a lot -- lots

9    of discussions, raising money, asking for donations, donations

10   being offered -- yes, ma'am?

11           PROSPECTIVE JUROR 16:  Juror 16.

12           MR. C. MATTHEW RITTGERS:  Thank you.

13           PROSPECTIVE JUROR 16:  I feel like it's kind of

14   inevitable, because if -- otherwise, we can't level the

15   playing field of the people that can run for office;

16   otherwise, it can only be rich people, so if we could, you

17   know, finance our campaigns through contributions.

18           MR. C. MATTHEW RITTGERS:  Thank you.  Thank you.

19   Anyone else?

20           PROSPECTIVE JUROR 26:  Juror 26.  I just have a hard

21   time trusting.  If you put my name to a campaign, is it going

22   to go towards good stuff or bad stuff?  So it's just harder to

23   trust, especially nowadays, you just hear too much.  And

24   sometimes, I just -- I have a hard time trusting it.

25           MR. C. MATTHEW RITTGERS:  Just the mere fact that

1    candidates --

2         PROSPECTIVE JUROR 26:  The mere fact of politicians,

3    giving them money, and where are we going to go, where is it

4    going to go?  You know, is it going to benefit, you know, the

5    good, the bad, and the ugly.

6         MR. C. MATTHEW RITTGERS:  Is the fact that there will

7    be discussion about raising money, and donations, donations to

8    P.G. Sittenfeld, would that impact the way you would view this

9    case?

10        PROSPECTIVE JUROR 26:  I'm not sure.  It would have a

11   lot to do with, I guess, the little stuff of it.  It's just me

12   and my personal -- what I've actually saw, read, or whatever,

13   about your money going where you believe it's going to.  Is it

14   really going there?  Are you fully really trusting people that

15   are telling you they're doing this?  It's just a trust thing,

16   I think, with me.

17        MR. C. MATTHEW RITTGERS:  Thank you.  Thank you for

18   sharing this.  Yes, ma'am?

19        PROSPECTIVE JUROR 61:  61.  I'm kind of along the

20   same lines as her.  Like, you know, you can raise millions of

21   dollars, but do they spend all of that millions of dollars?

22   And if not, where does that extra money go?  Does it go back

23   to the people, or does it go for something else?

24        MR. C. MATTHEW RITTGERS:  People like the people who

25   donated, if it's not spent, or...

1          PROSPECTIVE JUROR 61:  Correct.  Like where does that

2     extra money go?

3          MR. C. MATTHEW RITTGERS:  Thank you.  Thank you for

4     talking to me.

5       Anyone here think that politicians, elected officials,

6     candidates for office should not go out and ask for donations?

7          PROSPECTIVE JUROR 39:  I'm number 39.  To be honest,

8     I don't know much about campaigning, but for me, I'm not going

9     to give even 20 bucks to somebody like Donald Trump, who is

10    already a billionaire.

11      You would have to make a really good impact on me, and I

12    would have to know that you really need that campaign money

13    for me to give you my money.

14      I think it's wrong for people who already have boatloads

15    of it to go out and ask from me because it kind of brings

16    back, well, what are you really using it for?

17      You have plenty that you could use and do all the

18    campaigning in the world that you want to do, but now you're

19    going out and asking people to fund it for you, so kind of my

20    opinion on that.

21         MR. C. MATTHEW RITTGERS:  And thank you for sharing

22    that.  Thank you for throwing me the lifeline.  Did I see

23    another hand?  If you scratch your ear, I'm probably going to

24    call on you, so...

25      (Laughter.)

1          MR. C. MATTHEW RITTGERS:  Any other thoughts you have

2     about the whole process which we call our American democracy,

3     which is private and public campaign?  Yes, sir?

4          PROSPECTIVE JUROR 15:  Juror Number 15.  My only

5     issue with donating to politicians in general is the way the

6     money was spent.  If it was spent to bash the other guy, but

7     I'm going to tell you how great you are.

8          MR. C. MATTHEW RITTGERS:  Thank you.  Yes, sir?

9          PROSPECTIVE JUROR 37:  37.

10          MR. C. MATTHEW RITTGERS:  Sorry.  Ladies first.

11     Sorry.

12          PROSPECTIVE JUROR 37:  My only concern is I feel

13     like, as the years have gone on, with campaign contributions

14     it goes back to you scratch my back, I'll scratch yours.

15        And that has led to politicians going astray from what's

16     best for the common good and what's best for the handful of

17     people that have deep pockets.  And hopefully, if I am

18     selected, this will kind of help me to see otherwise.

19          MR. C. MATTHEW RITTGERS:  Thank you for sharing that.

20          PROSPECTIVE JUROR 50:  Now may I speak?

21          MR. C. MATTHEW RITTGERS:  Yes, sir.  Sorry.

22        (Laughter.)

23          PROSPECTIVE JUROR 50:  Juror 50.  I'm just an

24     uneducated country boy, but I don't understand your question,

25     in a way, because in my heart, where I grew up, and all my

1    life, why do I care what you or anyone else does with what I

2    felt in my heart to donate to you?

3        Because first, the word donate, I don't understand

4    where -- maybe I'm out of line.  I don't know.  But if you

5    give somebody something, you're supposed to give it from your

6    heart.  You're not supposed to worry about what he did with

7    it.

8        That's just the way I view it, so it's just an opinion.

9    I thought donating it meant donating it.  Let it go.  Leave it

10   alone.  Thank you.

11       MR. C. MATTHEW RITTGERS:  Thank you.  Thank you for

12   sharing.  Yes, ma'am?

13       PROSPECTIVE JUROR 23:  I'm 23.  Small donors, you

14   know, grassroots fundraising, because I feel like that's the

15   voice of the people.

16       My elderly father-in-law lived with my family until he

17   passed a couple years ago, and what I saw was a lot of

18   automated monthly donations that he wasn't aware of

19   consistently coming out of his account.

20       And so it seems like there's a little bit of advantage

21   taking of that that sometimes happens with older folk.

22       MR. C. MATTHEW RITTGERS:  Thank you.  We talked a

23   little bit about the media, the press.  Can someone talk to me

24   about their thoughts about whether or not the media gets all

25   the facts?

1   (Laughter.)

2   [Indiscernible crosstalk.]

3   MR. C. MATTHEW RITTGERS: So I think we can all agree

4 that what is in the media might not be, one, all the facts, or

5 even true facts. Can we agree on that?

6   MANY JURORS: Correct.

7   MR. C. MATTHEW RITTGERS: That will save me a lot of

8 questions. The judge will be happy.

9  We've heard a little bit about some legal terms. What

10 I'd like to just briefly talk about are a few legal terms;

11 burden of proof, reasonable doubt, and the presumption of

12 innocence.

13  You know, we have symbols in this courtroom. In this

14 country, our flag, symbol of freedom. We have folks in here,

15 veterans, who served to make sure that we are a free country.

16 One of those freedoms that we hear about in civics class when

17 we're little is that we're innocent unless and until proven

18 guilty by the government.

19  And so as P.G. sits here right now, he is innocent. And

20 we all -- and I'm a part of this, despite my being a defense

21 lawyer. When we hear something sometimes on the news, when

22 someone's accused of something, we sometimes jump to the

23 conclusion of, I wonder what they did, or that's really bad

24 that they did that.

25  And the presumption, the feeling of the presumption.

1    When you walked in the courtroom today, you might have looked

2    at Judge Cole and think he's going to preside over the case

3    and make the rulings, and the government is going to prosecute

4    the case.

5        And when you look over here at P.G., you should say, I

6    wonder what that innocent man has been accused of doing?  And

7    it's really, really hard to think that way, especially in

8    light of the way our media is in this country.

9        And frankly, statistics.  I mean, a lot of people who are

10   accused are actually guilty.  I'll admit that.  But this

11   presumption of innocence and applying it is what makes our

12   jury system work.

13       Can someone describe to me Lady Justice?  Has anyone seen

14   Lady Justice?  A lot of statues of Lady Justice, another

15   symbol.  Yes, ma'am?

16            PROSPECTIVE JUROR 79:  79.  She's supposed to be

17   blind.

18            MR. C. MATTHEW RITTGERS:  Yeah.  Blindfolded.

19            PROSPECTIVE JUROR 79:  Yeah.

20            MR. C. MATTHEW RITTGERS:  Yeah.  Anyone know what

21   she's holding in her hands?

22            PROSPECTIVE JUROR 79:  Scales.

23            MR. C. MATTHEW RITTGERS:  Scales.  And there are

24   other symbolisms in -- thank you -- in Lady Justice.  And

25   those scales are a symbol of the burdens of proof.

1   When money is at stake -- and some folks have, I think,

2 spoken about sitting on civil juries. That's when money is

3 being fought over like a car crash.

4   When money is at stake, if the scales are tipped ever so

5 slightly, it's called the preponderance, more likely than not,

6 then that party prevails. The burden of proof is called

7 preponderance. That's when money is at stake.

8   When the government tries to come into a home and take a

9 child away, that is called clear and convincing evidence. So

10 obviously, clear and convincing is much more than just

11 50 percent.

12   But the highest proof in the land, before you label

13 someone a criminal and put their liberty at stake, it's called

14 beyond a reasonable doubt.

15   And some people think that that proof is -- makes my job

16 too easy and their job too hard because it is a very high

17 proof. If you can use reason and logic to come up with one

18 reason, logical reason that what they're claiming isn't true,

19 the judge will tell you at the end the law on this, but

20 reasonable doubt will tell you that that's a not guilty

21 verdict.

22   What are your thoughts on that, that high of a standard

23 in a case like this? Can someone talk about the burden of

24 proof and reasonable doubt? Yes, ma'am?

25     PROSPECTIVE JUROR 61: 61 again.

         1              MR. C. MATTHEW RITTGERS:  Thank you.

         2              PROSPECTIVE JUROR 61:  You know, I've always viewed

         3    it as prosecutors have to prove 100 percent.  If not, then you

         4    have to go with not guilty.  That's the way I feel about it,

         5    because if they present all this information, but you're

         6    really not sure he did it or didn't do it, then you have to

         7    say he's not guilty.

         8              MR. C. MATTHEW RITTGERS:  Thank you.  I want to ask

         9    you a hard follow-up question.

        10              PROSPECTIVE JUROR 61:  Oh, no.  Don't do that.

        11         (Laughter.)

        12              MR. C. MATTHEW RITTGERS:  What if you have reason to

        13    doubt, but you think he's probably guilty, would you be

        14    comfortable --

        15              PROSPECTIVE JUROR 61:  Well, if they didn't prove it,

        16    then he's not guilty.

        17              MR. C. MATTHEW RITTGERS:  Thank you.  Thank you for

        18    talking to me.

        19         Does anyone disagree with that, that notion, you think

        20    someone probably is guilty, or even clear and convincingly,

        21    but the government didn't prove it beyond a reasonable doubt,

        22    are people comfortable saying not guilty if that is the case.

        23              PROSPECTIVE JUROR 26:  I think that would be

        24    difficult.

        25              MR. C. MATTHEW RITTGERS:  Thank you.  And I

1    appreciate your honesty.  Oh, your juror number?

2             PROSPECTIVE JUROR 26:  26.  Yeah, I think that would

3    be difficult.

4             MR. C. MATTHEW RITTGERS:  Can you tell me more about

5    it?

6             PROSPECTIVE JUROR 26:  I mean, I guess -- I don't

7    know.  I don't have any thoughts of guilty right now anyway;

8    but, like she said, it would have to be very convincing to me

9    for -- to be proved or not.  But if they prove it, they'd have

10   to really work hard to change my mind.

11            MR. C. MATTHEW RITTGERS:  If they prove guilt?

12            PROSPECTIVE JUROR 26:  Yeah.

13            MR. C. MATTHEW RITTGERS:  You raised another

14   important point.  The government goes first.  So folks who

15   have had children or are teachers, kids understand how

16   important primacy is.

17       They'll run at the playground, or to go to their moms and

18   dads to try to tell who started the fight, who took the

19   cookie, whatever it is.

20       And so another fear -- and I appreciate that, of you

21   bringing this to my attention -- is that they go first.  They

22   went first already in voir dire.  They put their case on

23   first, their witnesses on first.  In closing, they go first.

24   And the reason for that is because they have the burden.

25            And so if P.G. and our entire defense team decided not to

1    put on a single piece of evidence, if the trial ended right

2    now, everyone's verdict would have to be unanimous not guilty

3    because nothing has been presented.  He's innocent as he sits

4    here right now, and he doesn't have to put on a single shred

5    of evidence for a number, number of reasons.  But thank you

6    for bringing that up.

7        Juror 15, can you talk a little bit more about what you

8    just said and follow-up on what I said in terms of, do you

9    think it would -- can you follow the law as the judge

10   describes it at the end about that, even if you thought he's

11   probably guilty but I still have reasons to doubt?

12       Mr. Singer mentioned intent.  So you're going to be asked

13   to look into his mind --

14           PROSPECTIVE JUROR 15:  Yes.

15           MR. C. MATTHEW RITTGERS:  -- because there's

16   agreement in this case that there is not anything that is

17   expressly stated, they agree, so you're going to have to look

18   into intent to determine his intent.

19           PROSPECTIVE JUROR 15:  And they also talked about

20   like the reporting, and stuff like that, because nowadays, a

21   lot of things are put out of context.

22       So listening to recordings and stuff without putting into

23   the right context, I mean, like you said, you asked do we need

24   to know everything?  I don't need to know everything, but I

25   need to know if that was in the right context because, a lot

1    of times, everything that's going on, you know, that everybody

2    talks about and everything, is that the right context?  Did

3    someone read into that wrong or hear that wrong?  Are we

4    listening to it right?  Are we getting it right?  So it's kind

5    of difficult to even to come up with a guilty or not guilty

6    without, you know, having a crystal ball and knowing what's

7    going to happen.

8         MR. C. MATTHEW RITTGERS:  Thank you.  Therefore, for

9    reasons that I can't say, we cannot control how much of all

10   these tapes are played.

11        And so is anyone going to fault P.G. if you don't hear

12   parts of the tapes that you think you should hear?

13        PROSPECTIVE JUROR 61:  If we don't hear what's on the

14   tape, then we don't know what we're hearing.

15        THE COURT:  What is your number?

16        PROSPECTIVE JUROR 61:  61.  Sorry

17        THE COURT:  Thank you.

18        PROSPECTIVE JUROR 61:  If you only hear a portion of

19   it, we don't even know what the rest of it is so, you know.

20        MR. C. MATTHEW RITTGERS:  Yes, ma'am?

21        PROSPECTIVE JUROR 45:  45.  I wouldn't fault him if

22   it was something they were presenting; if you were presenting

23   it and leaving parts out, that's different.

24        MR. C. MATTHEW RITTGERS:  I'm going to -- thank you.

25   There are times where we are prohibited from bringing the

1    entirety of certain interactions, both sides.

2        And I tend to agree that the majority of context should

3    be heard.  I just want to make sure, because of the burden

4    being on them, the proof -- it's their tapes, their videos,

5    that if there's a question like, man, I really wish I'd heard

6    that video, seen that video, you're not going to fault P.G.

7    for that because it's outside of our control.  It's their

8    tape.

9        We've all heard of the Fifth Amendment, which is that you

10    don't have to testify.  A defendant does not have to testify.

11    It's kind of a Catch-22 because some people think, well, if

12    he's got something to hide, that's when he won't talk; but if

13    there's nothing to hide, why wouldn't he just get on the stand

14    and tell us that?

15        But the Catch-22 is, well, if he gets on the stand, of

16    course he's going to say whatever he can because he's going to

17    try to save himself.

18        Anyone have thoughts on that, about whether or not you --

19    thoughts about P.G. testifying?  There have got to be thoughts

20    on P.G. testifying.  Yes, sir?

21        PROSPECTIVE JUROR 29:  29.  If he was allowed to

22    testify and he didn't, and he revealed mitigating

23    circumstances for something that would be left out because he

24    did not testify, that would be different for me.

25        Conversely, if, for example, he did indeed not want to

1    incriminate himself, I can truly understand that due to the

2    Fifth Amendment.

3         MR. C. MATTHEW RITTGERS:  Thank you.  Thank you.

4    Yes, ma'am?

5         PROSPECTIVE JUROR 79:  79.  I just think it's

6    important to point out again.  I mean, if he's not going to

7    testify, he doesn't have the burden.  They have the burden.

8    So if he does or doesn't, it really shouldn't matter.

9     I mean, we're looking at evidence, and it's their job to

10   show us that he's guilty, not his job to show us that he's

11   innocent.

12        MR. C. MATTHEW RITTGERS:  Thank you.  Thank you very

13   much for sharing that.  Anyone else agree?  Thoughts?

14     There are over 80 people that walked in these doors

15   today, with 80 different life experiences.  That's what makes

16   a jury great.  It's the communal common sense that each one of

17   us individually brings, the reason and logic that we get from

18   our own life experiences.  And we're in a foreign setting.

19     This is going to be, I hope, a very simple last question.

20   My question is, just by a show of hands, will everyone promise

21   me that you'll do three things.

22     You will not check your common sense at the door when you

23   come in here, and your life experiences; that you'll follow

24   the judge's instructions that he gives you at the end of this

25   case, and that you will not let go of something that you know

1    to be true in your heart, based on your reason and common

2    sense, just to be congenial to just get a verdict.  Will

3    everyone promise me that?  You had it up already.

4        Thank you.  I have no further questions.

5            THE COURT:  Thank you, Mr. Rittgers.  Okay.  I think

6    we can take a break now, or did you have additional questions,

7    Mr. Singer?

8            MR. SINGER:  No.

9            THE COURT:  I think we can take a break now, have the

10   jury go up.  We're just going to confer with the attorneys for

11   a bit, and you can bring them back.  We'll send you a message

12   when we're ready.

13       (Prospective jurors out at 3:28 p.m.)

14           THE COURT:  Do the parties need a break, or...

15           MR. C. MATTHEW RITTGERS:  Your Honor, can we have

16   five minutes to talk about --

17           THE COURT:  Five minutes.  Let's try to keep it to

18   five minutes.

19       (Brief recess.)

20           THE COURT:  So that was a long five minutes.  Why

21   don't we go through and see what we've got for cause on here.

22       Does the government want to start with for cause showing

23   first for hardship, hardship or for cause, let's do both at

24   the same time.

25           MS. GAFFNEY PAINTER:  Certainly.  So Juror Number 1,

1      she referenced that her husband is ill and is at home, and she

2      didn't think she could afford to do jury service, so we

3      believe she was appropriate to strike for cause.

4              MR. C. MATTHEW RITTGERS:  Your Honor, I defer.

5              THE COURT:  Yeah.  Her husband was not working.  She

6      was looking for work, and I have her as hardship.

7              MR. C. MATTHEW RITTGERS:  Okay.

8              THE COURT:  So she will be struck on hardship or for

9      cause, however you want to talk about it.  Next, government?

10             MS. GAFFNEY PAINTER:  Juror Number 3 had mentioned

11     that it would be hard for her not to consider what she had

12     been exposed to.

13         She mentioned having met the defendant.  She talked about

14     reading a lot of news reports on the internet, and indicated

15     that it would be difficult for her to set that aside, so we

16     need to strike her for cause.

17             MR. C. MATTHEW RITTGERS:  Your Honor, I believe that

18     she said that she could be fair and impartial when we were on

19     the record in your chambers.

20             THE COURT:  Yeah, she did, when we were back in

21     chambers, say that she believed that -- what did she say?

22             MR. SINGER:  Your Honor, I believe she said she would

23     be comparing the facts from the newspaper articles with the

24     evidence at trial, and that would make it difficult for her to

25     assess the evidence.

1           MR. C. MATTHEW RITTGERS:  That wasn't her.

2           THE COURT:  I don't think that was Number 3.

3           MR. C. MATTHEW RITTGERS:  That was 32.

4           THE COURT:  I think Number 3 said she had discussed

5     it, I believe, with her husband.

6           MR. SINGER:  I'm sorry.  It was she had her

7     involvement in her political affiliations that would make it

8     difficult for her to separate from the evidence in the case.

9           THE COURT:  I'm not going to strike her for cause.  I

10    have that, back in chambers, that she was rehabilitated and

11    said that she thought she could set it aside.  I'm not

12    striking her for cause.

13       Next one?

14          MS. GAFFNEY PAINTER:  Your Honor, Juror Number 16 had

15    mentioned that her father-in-law's cancer had returned, and

16    that she was concerned about his surgery.

17       She also mentioned that she had some -- she attends

18    Crossroads church with one of the witnesses, Brian Tome, and

19    so for those bases, we felt she was a cause strike.

20          MR. C. MATTHEW RITTGERS:  Your Honor, I believe what

21    she said regarding her father's cancer, she mentioned that she

22    didn't know if she would have to leave, potentially, because

23    of the cancer, because it sounded like he was just diagnosed.

24          THE COURT:  Is it Pastor Tome?

25          MR. C. MATTHEW RITTGERS:  Pastor Tome.

1              THE COURT:  Is Pastor Tome going to testify?

2              MR. C. MATTHEW RITTGERS:  Possibly.

3              THE COURT:  She sounded like she had a work

4    relationship with Pastor Tome and continues to be a friend

5    with him.

6              MR. C. MATTHEW RITTGERS:  She did.

7              THE COURT:  I'm inclined to strike her for cause if

8    you can't tell me Pastor Tome's not going to testify.

9              MR. C. MATTHEW RITTGERS:  Could I have one moment,

10   because he's out of town.

11             THE COURT:  And I'm a little worried just about her

12   father having cancer too.  It sounded like that diagnosis was

13   recent, and she had some concern about that, so...

14             MR. C. MATTHEW RITTGERS:  Your Honor, he could

15   testify.

16             THE COURT:  Yeah.  I'm going to strike her for cause.

17   It sounded like she's got an ongoing current relationship with

18   him; that they have worked together in the past and continue

19   to be pretty good friends.

20      I'm afraid she would have a difficult time separating

21   that from whatever testimony he may have given.  So 16 is gone

22   for cause.  Next?

23             MS. GAFFNEY PAINTER:  Your Honor, we have 18.  He

24   mentioned that he is responsible for picking up his daughter

25   in Finneytown for multiple days of this trial.

1    He also mentioned at the end of fiscal year, I believe

2    June 30th, that he had a lot of work responsibility.

3    He also asserted that he would have a bias and would be

4    unable to set that aside in order to be fair.  We would move

5    to strike him for cause.

6            THE COURT:  Mr. Rittgers?

7            MR. C. MATTHEW RITTGERS:  I defer to the Court, Your

8    Honor.

9            THE COURT:  I'm going to strike him for cause.  Next?

10           MS. GAFFNEY PAINTER:  Your Honor, the next cause

11   strike that we propose is Juror Number 24.  She is a farmer.

12   She indicated that she had harvesting responsibilities for her

13   small business.

14           THE COURT:  I believe harvesting of sweet corn and

15   replanting of fruit trees.

16           MR. C. MATTHEW RITTGERS:  She did mention that, Your

17   Honor.  I don't know if she said that she couldn't sit as a

18   result of that.

19           THE COURT:  She did say that her husband, I think, is

20   out of town or something, and so she's doing all the work on

21   the farm right now, is what I had down.

22   I'd be inclined to strike her for cause, unless it gives

23   you significant heartburn, Mr. Rittgers?

24           MR. C. MATTHEW RITTGERS:  Defer to the Court, Your

25   Honor.

1           THE COURT:  Okay.  I'm going to strike 24 for cause.

2    Next one?

3           MS. GAFFNEY PAINTER:  Your Honor, the next juror we

4    submit should be struck for cause is Juror 26.

5       She mentioned that she has bias about one political party

6    over another, and that she would have difficulty setting that

7    aside, having a hard time being impartial when it came to

8    references to one party over the other, so we submit she

9    should be struck for cause.

10          THE COURT:  Mr. Rittgers?

11          MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

12          THE COURT:  Juror 26 is struck for cause.

13          MS. GAFFNEY PAINTER:  Your Honor, the next juror we

14   would propose striking for cause is Juror 29, who is a

15   long-time acquaintance of one of the members of the --

16          THE COURT:  You have to say his name.

17          MS. GAFFNEY PAINTER:  I know.  Mr. Elias is what I

18   have down.  Forgive me.  Forgive me, Mr. Elias.  Sorry.  Based

19   on that, we would move to strike for cause.

20          MR. C. MATTHEW RITTGERS:  Your Honor, the prosecutor

21   mentioned that accurately, that it was a long-time

22   acquaintance, is what he said, and he said he could be fair

23   and impartial, so we don't believe that that's a challenge for

24   cause.

25          THE COURT:  How well does your paralegal know him?

1          MR. DEMEROPOLIS:  I haven't seen him in probably

2     10 years.

3          MS. GAFFNEY PAINTER:  Your Honor, if I may?

4          THE COURT:  Yes.

5          MS. GAFFNEY PAINTER:  Our recollection is that

6     Juror 29 mentioned 15 years, which is a long time to be an

7     acquaintance.

8          THE COURT:  Yeah.  Let me look.  I think that was a

9     different juror was the one who went to school or was in his

10    graduating class.

11         MR. DEMEROPOLIS:  Yeah.  That was a different juror,

12    Your Honor.

13         MR. C. HENRY RITTGERS:  That was a female.

14         THE COURT:  That was a female juror who lived in his

15    neighborhood.  Oh, he did say that you guys had known each

16    other for 15 years.  Is that --

17         MR. DEMEROPOLIS:  I haven't seen him in person in

18    over 10 years.

19         THE COURT:  I'm going to strike him.  There's a lot

20    of jurors here.  If we've got a 15-year relationship, I

21    appreciate what Mr. Demeropolis is saying, but I'm going to --

22    29 is stricken for cause.  Next?

23         MS. GAFFNEY PAINTER:  Your Honor, the government

24    submits that Juror 32 should be struck for cause.  She

25    mentioned first that she needed to transport her cousin's

1     child, possibly, to necessary healthcare.

2        But, more importantly, when we were in the back, she

3     expressed that she was biased and did not believe she could

4     set that aside, so we believe she should be struck for cause.

5              MR. C. MATTHEW RITTGERS:  We agree.

6              THE COURT:  32 is struck for cause.

7              MS. GAFFNEY PAINTER:  The next juror that we believe

8     should be struck for cause is Juror 33.  That is a gentleman.

9     He's the only one working.  His wife doesn't work.  And I

10    believe that he's not compensated for the time he spends here,

11    so we believe he should be struck for cause.

12             MR. C. MATTHEW RITTGERS:  No objection.

13             THE COURT:  33 is struck for hardship.

14             MS. GAFFNEY PAINTER:  Your Honor, the next juror we

15    submit to strike for cause is Juror 40.  She works at a law

16    firm.  She has worked with one of the witnesses, Scott Knox.

17             THE COURT:  I think it was more than one.

18             MS. GAFFNEY PAINTER:  Yes.  There were multiple

19    witnesses, actually.

20             THE COURT:  Chip somebody.

21             MR. C. MATTHEW RITTGERS:  Gerhardt.

22             MS. GAFFNEY PAINTER:  Mr. Gerhardt as well, so we

23    submit she should be struck for cause.

24             MR. C. MATTHEW RITTGERS:  Your Honor, she said she

25    could be fair and impartial.  She was very clear in chambers

 1    about her opinions, and I thought -- I mean, you're the judge

 2    of credibility, Your Honor, but she was very credible in terms

 3    of the clean slate.

 4            THE COURT:  Yeah.  I was concerned about her, based

 5    on the answers she provided out here.  I thought, in chambers,

 6    she made it pretty clear that she thought she could put that

 7    all aside.  I'm not inclined to strike her for cause.

 8            MS. GAFFNEY PAINTER:  Your Honor, the next juror we

 9    submit should be struck for cause is Juror 41, who came at

10    sidebar and expressed her medical concerns.

11            THE COURT:  Yeah.  Mr. Rittgers, any objection?

12            MR. C. MATTHEW RITTGERS:  No, Your Honor.

13            THE COURT:  41 is stricken for cause or hardship,

14    however you want to do it.  Next?

15            MS. GAFFNEY PAINTER:  Next juror we believe should be

16    struck for cause is Juror 42, based on his comments back in

17    chambers.  He said he believed the defendant was guilty based

18    on what he read, so we believe he should be struck for cause.

19            MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

20            THE COURT:  42 is struck for cause.

21            MS. GAFFNEY PAINTER:  Next juror we believe should be

22    struck for cause is Juror 44, who attends Crossroads church,

23    knows the pastor, who is a possible witness at this trial, so

24    we believe she should be struck for cause.

25            MR. C. MATTHEW RITTGERS:  This is an actual question.

1    Was there just that she went to Crossroads?

2              THE COURT:  It's a he, and he did go to Crossroads,

3    and --

4              MR. C. MATTHEW RITTGERS:  Oh, yeah.

5              THE COURT:  44 is struck for cause.

6              MS. GAFFNEY PAINTER:  And for similar reasons, we

7    believe that Juror 45 should be struck for cause.  She

8    mentioned that she not only attends Crossroads, but her

9    brother is in a small group with the pastor, who may be called

10   to testify.  So we would submit that she should be struck for

11   cause.

12       Oh, also, may I add, she has three kids, and she's the

13   primary childcare.

14             THE COURT:  She's the primary childcare for three

15   children at home, yes.  That was the first one.

16             MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

17             THE COURT:  45 is struck for cause.

18             MS. GAFFNEY PAINTER:  The next juror we believe

19   should be struck for cause is Juror 53.  That gentleman

20   expressed he has been diagnosed with anxiety, has a great deal

21   of anxiety, and we believe that it would be quite a hardship

22   to make him attend this trial, so we believe he should be

23   struck.

24             THE COURT:  He also said he needs work, but...

25             MR. C. MATTHEW RITTGERS:  We agree, Your Honor.

1          THE COURT:  All right.  53 is struck for cause.

2          MS. GAFFNEY PAINTER:  The next juror we believe

3     should be struck for cause is Juror 54.  He used the witness,

4     Scott Knox, for his legal services.  I believe he answered in

5     the affirmative that that was his attorney so, for that

6     reason, we believe he should be struck for cause.

7          MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

8          THE COURT:  54 is struck for cause.

9          MS. GAFFNEY PAINTER:  Forgive me, Your Honor.  May I

10    have just a moment?

11         THE COURT:  Sure.

12         MS. GAFFNEY PAINTER:  Thank you, Your Honor.

13    Juror 57, we believe, should be struck for cause.  He

14    says he has interviews scheduled.  He works in school

15    administration and he has interviews scheduled.  We believe he

16    should be struck for cause.

17         MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

18         THE COURT:  57 is struck for cause.

19         MS. GAFFNEY PAINTER:  The next juror we believe

20    should be struck for cause is Juror 62, who, by his own

21    account, is too biased to be an impartial juror in this trial.

22         MR. C. MATTHEW RITTGERS:  No objection.

23         THE COURT:  62 is struck for cause.

24         MS. GAFFNEY PAINTER:  The next juror we would submit

25    should be struck for cause is Juror 68.  She mentioned that

1   she has implicit bias, and that she would be unable to set

2   that aside to be fair and impartial, so we submit she should

3   be struck for cause.

4          MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

5          THE COURT:  68 is struck for cause.

6          MR. C. HENRY RITTGERS:  Is it 68, Your Honor, or 69?

7          THE COURT:  Yeah, 68.

8          MS. GAFFNEY PAINTER:  Your Honor, the next juror we

9   submit should be struck for cause is Juror 71.  He mentioned

10  that his brother had been in a custody court case, and that,

11  he believed, would bias him, and that he did not trust the

12  system, so we believe he should be struck for cause.

13         MR. C. MATTHEW RITTGERS:  No objection.

14         THE COURT:  71 is struck for cause.

15         MS. GAFFNEY PAINTER:  Juror 73, we believe, should be

16  struck for cause.  He mentioned that he has a brand new job,

17  he starts on July 5th, and he's quite concerned that if it

18  goes long, he won't be able to do that job.

19         THE COURT:  Yep.  Juror 73 is struck for cause

20  without objection, Mr. Rittgers, is that right?

21         MR. C. MATTHEW RITTGERS:  That's correct, Your Honor.

22         MS. GAFFNEY PAINTER:  The next juror we believe

23  should be struck for cause is Juror 74, who is neighbors with

24  Mr. Elias and has a relationship of some sort with Mr. Elias.

25         MR. C. MATTHEW RITTGERS:  No objection.

1          THE COURT:  74 is struck for cause.

2          MS. GAFFNEY PAINTER:  And then may I have just a

3    moment to confer, Your Honor?

4          THE COURT:  You may.

5          MS. GAFFNEY PAINTER:  That's all from the

6    government's side.  Thank you.

7          THE COURT:  Any additional strikes for cause,

8    Mr. Rittgers?

9          MR. C. MATTHEW RITTGERS:  Your Honor, my dad

10   mentioned that he had a note that Number 20 might have a

11   hardship.  I don't have that in my notes.

12         THE COURT:  Number 20 does have a hardship.

13   Number 20's hardship is no backup at work.  She's a document

14   manager, I believe, for WIC, and was doing the -- wasn't she

15   the WIC one, Jacob, or not?  I know she's got no backup at

16   work, she said that.

17         COURTROOM DEPUTY:  She does work for WIC.

18         THE COURT:  She works for WIC.

19         MR. C. MATTHEW RITTGERS:  What is WIC?

20         THE COURT:  It's a federal program.  Does the

21   government have any objection to striking 20 for cause?

22         MR. SINGER:  No, Your Honor.

23         THE COURT:  20 is struck for cause.  Others,

24   Mr. Rittgers?

25         MR. C. MATTHEW RITTGERS:  I don't believe so, Your

1    Honor.

2              MR. C. HENRY RITTGERS:  If we may have one second.

3              THE COURT:  I've got a couple I want to ask about.

4    What about the young lady who is seven months pregnant?

5              MR. SINGER:  What number was she, Your Honor?

6              THE COURT:  55.  She seemed to have some concerns

7    about that.

8              MR. C. MATTHEW RITTGERS:  There's no objection from

9    the defense, Your Honor.

10             MS. GAFFNEY PAINTER:  For cutting her for cause, no

11   objection from the government.

12             THE COURT:  55 is struck for cause.  And then I had

13   Juror 1, something about an illness.  Is she taking care of

14   her husband or something, is that Juror 1?

15             MS. GAFFNEY PAINTER:  Your Honor, we struck Juror 1,

16   yes.

17             THE COURT:  Oh, I didn't circle it.  There we go.

18   Okay.  Did I strike 11 for cause?  That was the father who had

19   the prostate cancer?

20             MS. GAFFNEY PAINTER:  16.  You did.  That's Juror 16

21   whose father-in-law had prostate cancer.

22             THE COURT:  Oh, that's a six.  Okay.  Hang on.

23             MS. GAFFNEY PAINTER:  Your Honor, would it assist if

24   I ran through what I have?

25             THE COURT:  No, not quite yet.  I'm trying to see why

1  I have 11 with a hardship.  Probably because I misread the 16.

2  Okay.

3        THE LAW CLERK:  Judge, just regarding Number 20.  I

4  have it in my notes that it was Number 59 who was the WIC

5  person.

6     Number 20 is also some data entry person who said she had

7  no backup at work, so just in case you were thinking different

8  people.

9        THE COURT:  Okay.  That's fine.  I have in my notes

10  that 37 knew one of the witnesses.

11        MS. GAFFNEY PAINTER:  Your Honor, if I may.  She

12  indicated she knew Tom Vanderlieu, who worked in this

13  building's library.  That's the notes I have.

14        THE COURT:  Oh, that was it?

15        MS. GAFFNEY PAINTER:  Yes.

16        THE COURT:  Okay.  Thank you.  And then the only

17  other one I had was there was this person who caters for

18  Mr. Cicchinelli.  I think it was Juror 75.

19     Does anybody have a concern that this sounded like a

20  long-term business relationship?  She caters every six weeks,

21  I think, she said.

22        MS. GAFFNEY PAINTER:  We have no objection to

23  striking her for cause.

24        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

25        THE COURT:  All right.  75 is stricken for cause.  I

1  think, maybe somebody already said this, 79 is the person who

2  knew Mr. Demeropolis?

3            MR. DEMEROPOLIS:  Yes, Your Honor.

4            THE COURT:  Juror 79, is that wrong?

5            MR. DEMEROPOLIS:  That was 74.  I think ▮▮▮▮▮▮▮▮.

6            THE COURT:  So▮▮▮▮▮▮▮, that doesn't --

7            MR. DEMEROPOLIS:  No, Your Honor.

8            THE COURT:  All right.  Then I've got a bad note

9  here.  Let me see what caused that.

10            COURTROOM DEPUTY:  Judge, Juror Number 69, I believe

11  she said she knew one of the witnesses, is it Mark Schiff?

12            THE COURT:  Oh, she was the realtor, and she knew

13  Mark Schiff because she had been a realtor; is that right?

14  Does anybody else have a note on her?

15            MR. C. MATTHEW RITTGERS:  What number?

16            THE COURT:  69.

17            MS. GAFFNEY PAINTER:  We do, Your Honor.  We have a

18  note that she believed that she knew Mark.  I thought it was

19  Schopp, maybe, that she was saying.

20            THE COURT:  Schiff, yeah.

21            MS. GAFFNEY PAINTER:  I know Schiff is on the witness

22  list, but there seemed to be some confusion as to which

23  name --

24            THE COURT:  Oh, is there also a Schopp?

25            MS. GAFFNEY PAINTER:  No, not on the witness list,

1    but perhaps somebody that she knows.  It wasn't entirely

2    clear.

3            COURTROOM DEPUTY:  She did say Mark, and I think she

4    said something to the effect of Schupp or Schepp.

5            THE COURT:  Yeah.  Schupp or Schepp or something.  I

6    think we're fine there.  I doubt we're going to get to 69

7    anyway.

8        All right.  Well, here's what I have that we struck.  I

9    have 1, 3, 16, 18 --

10           MR. C. MATTHEW RITTGERS:  Your Honor, I don't think

11   3 was struck.

12           COURTROOM DEPUTY:  We did not strike 3.

13           THE COURT:  Thank you.  So I have 1, 16, 18, 20, 24,

14   26, 29, 32, 33, 41, 42, 44, 45, 53, 54, 55, 57, 62, 68, 71,

15   73, 74, and 75.

16           MS. GAFFNEY PAINTER:  That comports with our notes as

17   well.

18           MR. C. MATTHEW RITTGERS:  Same, Your Honor.

19           THE COURT:  All right.  So who is the government

20   challenging on a peremptory?

21           MR. SINGER:  Your Honor, with our first peremptory,

22   we are going to strike Number 3.

23           THE COURT:  Juror Number 3 is stricken.  Defendant

24   has the next two.

25           MR. C. MATTHEW RITTGERS:  Your Honor, we would strike

1      Number 4 and Number 7, Your Honor.

2              THE COURT:  The only thing I'll note, and I just want

3      to put it on the parties' radar screen.  Juror 5 did raise the

4      fact that she's going to have to do a lot of work at night.

5      Are we comfortable keeping her on the jury?

6              MR. C. MATTHEW RITTGERS:  The defense is, Your Honor.

7              MR. SINGER:  I think it was a pretty good argument

8      for a for cause, given the work commitment that she has, and

9      the level of attention that she's going to have to put on her

10     job for the next several weeks.

11             MR. C. MATTHEW RITTGERS:  Your Honor, that question

12     was expressly asked of her, and she said she would be fine,

13     with that question being posed to her by yourself.

14             THE COURT:  Yes.  Well, I raise it -- my concern is

15     she's going to end up holding it potentially against somebody,

16     I don't know whom but, you know...

17             MR. C. MATTHEW RITTGERS:  She mentioned that

18     July 11th date, which we're not going to go on that July 11th

19     date.

20             MR. SINGER:  I thinks July 11th relates to the time

21     that the international student is going to be staying with

22     her.

23             MR. C. MATTHEW RITTGERS:  That's right.

24             MR. SINGER:  I think her work commitment stands

25     throughout the entire trial.

1          THE COURT:  It does.  She did say in chambers that

2     she thought she could get it done at night.  It was going to

3     take a lot of work.

4          MR. SINGER:  The issue is, Your Honor, to your point,

5     we wouldn't want her to hold it against one of the parties if

6     she perceives that that's the reason that the case is going on

7     longer.

8          MR. C. MATTHEW RITTGERS:  But, Your Honor, that's not

9     listed.  The for cause challenge --

10          THE COURT:  I know.

11          MR. C. MATTHEW RITTGERS:  -- is can she be fair and

12     impartial, and she expressly answered your question in

13     chambers.

14          THE COURT:  Okay.  All right.  I agree she answered

15     the question that way.  All right.  I just wanted to put it on

16     people's radar screen.

17       All right.  Government's second peremptory?

18          MR. SINGER:  5, Your Honor.

19          THE COURT:  That took care of that.  All right.

20     Defendant's third and fourth?

21          MR. C. MATTHEW RITTGERS:  Your Honor, Number 12 and

22     13, Your Honor.

23          THE COURT:  12 and 13.  Government's third?

24          MS. GAFFNEY PAINTER:  Just one moment, Your Honor.

25          MR. SINGER:  22, Your Honor.

1          THE COURT:  Government strikes Juror Number 22.  Your

2     next two, Mr. Rittgers?

3          MR. C. MATTHEW RITTGERS:  Your Honor, may I have just

4     one second?  Sorry.  Number 15, Your Honor.

5          THE COURT:  15?

6          MR. C. MATTHEW RITTGERS:  Yes, please.

7          THE COURT:  Juror 15 is struck.

8          MR. C. MATTHEW RITTGERS:  And one second.  I'm sorry.

9     I'm not good with my notes.  Hold on.  25, Your Honor.

10          THE COURT:  Mr. Rittgers, Mr. Singer?

11     <u>SIDEBAR CONFERENCE OFF THE RECORD</u>

12          THE COURT:  I'm sorry.  It was 15 and what?

13          MR. C. MATTHEW RITTGERS:  Your Honor, 15 and 25.

14          MR. SINGER:  Where are we, Your Honor?

15          THE COURT:  Fourth.

16          MR. SINGER:  Number 9, Your Honor.

17          THE COURT:  Number 9.  Two more for Mr. Sittenfeld.

18          MR. C. MATTHEW RITTGERS:  We've got four more,

19     correct, Your Honor?

20          THE COURT:  Well, your next two.  I'm sorry.

21          MR. C. MATTHEW RITTGERS:  I'm sorry.  It scared me.

22     Could I just have one second, Your Honor?

23          THE COURT:  You could.

24          MR. C. MATTHEW RITTGERS:  Your Honor, Number 6 and

25     Number 8, Your Honor.

1          THE COURT:  Juror 6 and 8.  Government's fifth?

2          MR. SINGER:  One moment, Your Honor, please.  28,

3     Your Honor.

4          THE COURT:  28 is stricken.  One for Mr. Sittenfeld?

5          MR. C. MATTHEW RITTGERS:  Your Honor, Number 17.

6          THE COURT:  Government's sixth and final?

7          MR. SINGER:  35, Your Honor.

8          MR. C. MATTHEW RITTGERS:  Your Honor, just so that we

9     are absolutely certain, I have -- that would be 15

10    peremptories, right, that have been taken?

11         THE COURT:  That is correct.

12         MR. C. MATTHEW RITTGERS:  And in the first 40 jurors,

13    I have nine for cause challenges, which would be 24 total,

14    plus 12, we would be at Juror Number 36 right now, correct, in

15    terms of the last juror seated?

16         THE COURT:  I'm at Juror 36.

17         MR. C. MATTHEW RITTGERS:  So the last juror seated in

18    the box of 12 would be Number 36, as it stands?

19         THE COURT:  We're seating 16.

20         MR. C. MATTHEW RITTGERS:  But the peremptories would

21    be the last four in the box?

22         THE COURT:  The alternates.

23         MR. C. MATTHEW RITTGERS:  The alternates, that's what

24    I meant.  Sorry.  The last four in the box would be our

25    alternates?

1          THE COURT:  Yes.

2          MR. C. MATTHEW RITTGERS:  Okay.

3          MR. C. HENRY RITTGERS:  Judge, could we have one

4    minute, please?

5          THE COURT:  Sure.

6          MR. C. MATTHEW RITTGERS:  Your Honor, Number 36.

7          THE COURT:  Juror 36 is stricken.

8       So I have the 12 selected as 2, 10, 11, 14, 19, 21, 23,

9    27, 30, 31, 34, and 37.

10         MS. GAFFNEY PAINTER:  That comports with our notes,

11   Your Honor.

12         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

13         THE COURT:  Okay.  For the next four, there's -- it

14   will be currently, as things stand, I believe it would be 38,

15   39, 40, and 43.  Is that what you have, Ms. Gaffney Painter?

16         MS. GAFFNEY PAINTER:  Your Honor, the next four

17   jurors we have are 38, 39, 40 and 43.

18         THE COURT:  Mr. Rittgers, is that what you have, sir?

19         MR. C. MATTHEW RITTGERS:  Yes, sir.  38, 39, 40, 43.

20         THE COURT:  Yes.  All right.  So we're going to go

21   one, one, one, one on the remaining challenges.  Government

22   first.

23         MR. SINGER:  39, Your Honor.

24         THE COURT:  39 is stricken.  Mr. Sittenfeld?

25         MR. C. MATTHEW RITTGERS:  Your Honor, are we just

1    limited to those four?

2              THE COURT:  No.  No, absolutely not.

3              MR. C. MATTHEW RITTGERS:  Okay.  So right now the

4    government took 39?

5              THE COURT:  Right.  So 38, 40, 43, and 46 as things

6    currently stand, with 47, 48, and 49 being the next drop-ins.

7              MR. C. MATTHEW RITTGERS:  38, 40, 46?

8              THE COURT:  Right now it's 38, 40, 43, 46, and then

9    47, 48, and 49 are available as drop-ins if people strike.

10             MR. C. MATTHEW RITTGERS:  Your Honor, Number 44.  Oh,

11   Number 44 is not even a part of it.  Sorry.

12             THE COURT:  44 was struck for cause.

13             MR. C. MATTHEW RITTGERS:  Thank you.  Sorry.  Pass

14   for cause, or no peremptory challenge being used.

15             THE COURT:  You're passing?

16             MR. C. MATTHEW RITTGERS:  Passing.

17             THE COURT:  Government?

18             MR. SINGER:  40.

19             THE COURT:  So 40 is struck.  So the four right now

20   would be 38, 43, 46, and 47.

21             MR. C. MATTHEW RITTGERS:  And the next would be?

22             THE COURT:  48.

23             MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

24        Your Honor, Number 47.

25             THE COURT:  47 is stricken.

```
1              MR. C. MATTHEW RITTGERS:  Was 47 --

2              THE COURT:  What's that?  I'm sorry.

3              MR. C. MATTHEW RITTGERS:  Your Honor, I'm looking at

4    my notes.  I don't even know if 47 was -- yes, Your Honor.

5    Yes, 47 is stricken.

6              THE COURT:  Okay.

7              MR. C. MATTHEW RITTGERS:  Sorry.

8              THE COURT:  So I have the remaining four as 38, 43,

9    46, and 48.

10             MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

11             MS. GAFFNEY PAINTER:  That comports with our notes,

12   Your Honor.

13             THE COURT:  So just so we have complete clarity.  The

14   16 people seated in the jury box will be as follows: 2, 10,

15   11, 14, 19, 21, 23, 27, 30, 31, 34, 37, 38, 43, 46, and 48.

16             MS. GAFFNEY PAINTER:  That's what we have as well,

17   Your Honor.

18             MR. C. MATTHEW RITTGERS:  Same, Your Honor.

19             THE COURT:  All right.  I think we're ready to --

20   well, let's talk a little bit about the fact it's 10 'til

21   5:00.  I don't see a whole lot of benefit in reading jury

22   instructions today and then sending them home.

23        I think what I'd like to do is identify the members who

24   have been seated, swear them as jurors, admonish them not to

25   do any research, read any news articles, that type of thing.
```

1           But then I would propose that we read the preliminary

2      instructions to them tomorrow immediately before openings.  I

3      don't think it would take more than 15 minutes anyway, and I

4      just think that would be better for them to hear it right

5      before openings.  Any objections from the government?

6           MS. GAFFNEY PAINTER:  None from the government, Your

7      Honor.

8           MR. C. MATTHEW RITTGERS:  None from the defense, Your

9      Honor.

10          THE COURT:  All right.  So I think we have a game

11     plan.  Let's bring in the panel.

12       (Prospective jurors in at 4:51 p.m.)

13          THE COURT:  I'm going to -- first, I'd like to thank

14     you all for your patience.  I know this has been a long day.

15       I appreciate your patience with all the questions that

16     you've been asked.  It's been an involved process, but it's an

17     important part of this process, so I do very much want to

18     thank you for your attention and for your honesty today.

19       I'm going to read off 16 numbers.  If I read off your

20     juror number, if you could please stand, I would appreciate

21     it.  So Jurors 2, 10, 11, 14, 19, 21, 23, 27, 30, 31, 34, 37,

22     38, 43, 46, and 48.

23       Okay.  So directing questions to you 16.  I know we've

24     all asked you a lot of questions today, and we've been

25     attempting to discern your ability to make your determinations

1    in this case free from any bias or any sympathy for either

2    side.

3        I know you've been asked a lot of questions, varied

4    questions, but it's quite possible you were not asked certain

5    questions that may have bearings on you for qualifications.

6        So I just want to ask you now:  Can the 16 of you promise

7    to decide this case strictly on the facts as developed from

8    the witness stand, and exhibits admitted into evidence, and

9    the law as I give it to you?  Can you all do that?

10       (Jurors all said yes.)

11           THE COURT:  Can you promise to keep an open mind and

12   not discuss the case with anyone, including your fellow

13   jurors, until you are ordered to retire to the jury room to

14   deliberate?  Anyone who can't do that?  Okay.

15       Can any of you think of any reason why you could not be

16   fair and impartial in carrying out your duties in this trial?

17       Finally, is there any reason at all why any of you feel

18   you could not or should not serve on this jury?

19       I take it from your silence that you feel you would be a

20   fair and impartial juror.  Thank you.  We now have a jury.

21       So I want to thank all of you who are not selected for

22   coming today.  It's impossible to determine at the outset how

23   many prospective jurors must be questioned before a jury can

24   finally be impaneled.

25       Jury service is one of the most important activities of

1    being a United States citizen, and I very much appreciate your

2    willingness to serve.

3        Even though you might not have been selected to serve on

4    this case, your participation in the jury selection process

5    has been an important contribution to the workings of this

6    Court, and those of you who are not selected are now excused

7    and may leave the courtroom with the Court's sincere thanks

8    and appreciation.

9        So the 16 numbers I called, please stay here.

10       (Prospective jurors out at 5:01 p.m.)

11           THE COURT:  You may be seated.

12       (Impaneled jury sworn.)

13           THE COURT:  Well, special thanks to you.  It was a

14   long process for everybody, but it's going to be a little bit

15   longer process for you.

16       I didn't tell you this at the outset, we just run it

17   24 hours a day until we're done, so...

18       (Laughter.)

19           THE COURT:  We're at the end of a long day here, so I

20   think what makes sense is we're going to come back tomorrow

21   morning and get a start then.

22       I'm going to read you some preliminary instructions in

23   the morning that will give you some things to think about, and

24   then the parties are going to go to opening statements, and

25   then the government will start putting on what's called its

1    case in chief.  But I'll tell you more about that in the

2    morning.

3         There is one matter, though, that we do need to address

4    before you leave for today.  It's in light of the fact that,

5    as we've already discussed, there's a fair amount of interest

6    in this case.

7         We've had some lengthy discussion with some potential

8    jurors, I can't recall if it was anyone in the box or not,

9    about having been exposed to media about this.

10         And it is so very important that you decide this case

11    based on the evidence that's presented in the next couple of

12    weeks by the parties, rather than on what you might read in a

13    newspaper or see on television.

14         So to that end, I'd like to say just a few words about

15    your conduct as jurors during this trial.  You'll not be

16    required to remain together while the Court is in recess; in

17    other words, we're not sequestering the jury.

18         But that being said, it is highly important that you

19    strictly observe the rules that govern you during recess or

20    adjournment so as to assure the parties have a fair trial by

21    not allowing any outside information or incidents to influence

22    your consideration of this case.

23         First, do not decide any issue or form any opinion in

24    this case until you've heard all the evidence, been instructed

25    by the Court on the law, and retired to the jury room to

1    deliberate.

2        Until the case is submitted to you for deliberation, you

3    are not to discuss the case with anyone, not even your fellow

4    jurors.

5        And that last one sometimes catches people by surprise,

6    so I want to say it again.  Don't even discuss this case with

7    your fellow jurors.

8        You'll probably be going out to lunch with each other,

9    things like that.  You're free to talk about anything.  Don't

10   discuss this case, because you need to deliberate as a whole

11   once all the evidence is in, not do partial deliberations, oh,

12   what did you think about what this person said, or what did

13   you think about what that person said?  That waits until all

14   the evidence is in and until closing arguments has occurred.

15       Likewise, it would be improper for you to allow anyone to

16   discuss this case in your presence.  You must not talk to the

17   parties, attorneys, witnesses, or me, under any circumstances,

18   about this case.  You can't even discuss the case with your

19   families in the evening.

20       And I know that can be difficult and, you know, I've just

21   got to tell you, it's an important part of a fair trial is

22   that you not go home and rehash it with your families because

23   the problem is, in the rehashing, you start forming opinions

24   about things and locking in, and you don't have all the

25   evidence yet.

1       So it's so very important that you not start sort of

2    reformulating in your mind and discussing with others until

3    all the evidence is in.

4       I'd suggest you simply tell your family that you're

5    sitting on a jury in federal court, and that you really can't

6    discuss the matter further.

7       Likewise, once the presentation of the evidence is over

8    and the case is submitted to you, you must discuss it only in

9    the jury room with your fellow jurors.  You can discuss this

10    case with others after the verdict is announced, but not

11    before.

12       Second, since you must keep an open mind until you are

13    instructed by the Court to begin your deliberations, it is

14    important that you do not read newspaper or magazine articles,

15    whether in paper or electronic form, or listen to radio,

16    television, or other broadcasts about this case.

17       Media accounts may be inaccurate, or they may contain

18    matter which is not proper evidence for your consideration.

19    You must base your verdict solely on what is brought before

20    you here in court.

21       So, you know, I guess what I'd say is, given the interest

22    in this case, don't watch the local news while you're serving

23    on this jury.

24       Try not to read the local newspaper while you're serving

25    on the jury.  There may be some days this will be a story in

1    the newspaper.  And even if you see the headline, it's just,

2    you know, you may have gotten somebody's three-word take on

3    where things stand, and that's -- you know, you're going to

4    need to work on it more in this case than sometimes jurors do

5    in other cases to avoid being exposed to media, but it's very

6    important to the trial that you do so.

7         Third, I know that many of you use cell phones, tablets,

8    the internet, and other tools of technology.  Consistent with

9    what I just said, you must not use these tools to communicate

10   electronically with anyone about the case.  That includes your

11   family and friends.

12        You must not communicate with anyone about the case on

13   your phone or computer, through email, text, messaging, social

14   media, or any website, or any other means of communication.

15        Likewise, you can't use the internet to do any research

16   on your own.  It's always sort of tempting.  I get a kick out

17   of the shows on television where the judge, in the middle of

18   the trial, will go out to the scene of the accident and say, I

19   figured out what's going on.  That isn't the way it works in

20   court.

21        What you get to think about and decide based on the court

22   is what you see and hear while you're in court, so you can't

23   be going out trying to do any research on your own, you can't

24   be going on the internet trying to do any research on your

25   own.

1        If anyone should try to talk to you about this case,

2   bring it to the Court's attention immediately, but don't

3   discuss it with your fellow jurors.

4        I do not anticipate there will be such attempts, but even

5   inadvertent statements in your presence dealing with the trial

6   should immediately be brought to the Court's attention.

7        Likewise, should you inadvertently read, see, or hear

8   anything in the media concerning this case, you should inform

9   the Court.

10       Fourth, to pick up on the point I just made, do not try

11   to do any research or make any investigation of the case on

12   your own.  In other words, don't consult the internet,

13   website, social media, or use any other electronic types of

14   tools or any other kind of tools to obtain information about

15   this case or to help you decide this case.  Please do not try

16   to find any information from any source outside the confines

17   of this courtroom.

18       Fifth, please do not converse, whether in or out of the

19   courtroom, with any of the parties, or their attorneys, or any

20   witnesses.  By this I mean not only do not talk about this

21   case, but do not talk at all, even to pass the time of day.

22   In no other way can the parties be assured of the absolute

23   impartiality to which they are entitled from you as jurors.

24       I assure you you will not be considered rude for failing

25   to talk to someone involved in this case.  Everyone is bound

1    by the same rule.

2        So if you run into one of the people seated at counsel

3    table, and they just kind of turn their back and walk away,

4    they're not being rude, they're just observing the same rule

5    that I just gave you, all right?

6        So you're going to find that nobody wants to talk to you

7    in the courthouse for the next couple of weeks.  That's by

8    design.  We just want you to hear what the witnesses have to

9    say and what the exhibits have to show you.

10       Finally, as I noted at the outset, do not attempt to form

11   any opinion until all the evidence has been presented.  In

12   that way, every parties' evidence will receive equal

13   consideration from you.

14       When you retire to the jury room for your deliberations

15   after the Court has instructed you on the law, then you will

16   fully and freely discuss the evidence so as to arrive at a

17   unanimous verdict at that time.

18       If, for some reason, you find you're unable to report for

19   duty due to an emergency, please call our jury commissioner,

20   Jennifer Webster, and I think you have her number -- do they

21   have her number?

22            COURTROOM DEPUTY:  I believe they should.

23            THE COURT:  Do you have her number?  Nodding heads

24   you have her number, okay.

25       You can also call my chambers, and that's available on

1    the website, Douglas Cole Chambers, if you can't get ahold of

2    Jennifer Webster.

3        So that's what's called the admonishment.  A shorter

4    version of that I will give to you every time we take a break

5    because it's just that important that I need to remind you all

6    the time that you shouldn't be doing research, and equally

7    importantly shouldn't be forming opinions until you've seen

8    and heard all the evidence that's going to be presented in

9    this case.

10       So with that, I'm going to send you home for the evening.

11    We're going to get a start at -- do we have a couple of things

12    to take care of in the morning before?

13       Why don't we have you assemble in Room 913B at 9:15, if

14    you could.  And we'll plan on starting as close to 9:30 as we

15    can.  There are a couple matters that I need to discuss with

16    the attorneys.

17       And you're going to find that there are oftentimes where

18    we need to take a break, for some reason, to discuss matters

19    with the attorneys.

20       It's not anything you need to be concerned about, but

21    it's just trial management issues, and things of that nature.

22    So we will try and be as efficient as possible.  I know that

23    the attorneys will try and be as efficient as possible.

24       Let me state at the outset, we so much appreciate your

25    service, and we so much appreciate the attention that you're

1    going to provide over the next couple of weeks in connection

2    with your service as jurors.

3        So thank you very much, and we will see you tomorrow

4    morning.

5        (Jury out at 5:11 p.m.)

6       (Voir dire proceedings concluded at 5:11 p.m.)

7                  *  *  *

8

9              C E R T I F I C A T E

10               -  -  -

11      I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
is a correct transcript from the record of proceedings in the

12    above-entitled matter.

13

14    /s/ M. Sue Lopreato_____           ____July 20, 2022____
       M. SUE LOPREATO, RMR, CRR

15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25