```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             *   *   *
 3

 4    UNITED STATES OF AMERICA,        : Case No. 1:20-cr-00142-1
                                       :
 5             Plaintiff,              : Jury Trial, Day 7
                                       : Wednesday, June 29, 2022
 6             - v -                    :
                                       : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a      :
        "P.G. Sittenfeld,"             :
 8                                      :
               Defendant.              : Cincinnati, Ohio
 9
                             *   *   *
10       EXCERPTED PROCEEDINGS - TESTIMONY OF LAURA BRUNNER

11      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                           *   *   *

13    For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                  MATTHEW C. SINGER, ESQ.
14                                MEGAN GAFFNEY PAINTER, ESQ.
                                  U.S. Department of Justice
15                                U.S. Attorney's Office
                                  221 E. Fourth Street, Suite 400
16                                Cincinnati, Ohio  45202

17    For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                  CHARLES H. RITTGERS, ESQ.
18                                NEAL D. SCHUETT, ESQ.
                                  Rittgers & Rittgers
19                                12 E. Warren Street
                                  Lebanon, Ohio  45036
20
      Law Clerk:                  Jacob T. Denz, Esq.
21
      Courtroom Deputy:           Scott M. Lang
22
      Court Reporter:             M. Sue Lopreato, RMR, CRR
23                                513.564.7679

24                           *   *   *

25
```

```
 1                    P R O C E E D I N G S

 2              (In open court at 11:39 a.m.)

 3                        *   *   *

 4         THE COURT:  Does the government intend to call

 5    another witness?

 6         MS. GAFFNEY PAINTER:  Yes, Your Honor.  The

 7    government will call Laura Brunner.

 8         THE COURT:  Very good.

 9       (Government witness, LAURA BRUNNER, sworn.)

10         MS. GAFFNEY PAINTER:  May I proceed, Your Honor?

11         THE COURT:  You may, Ms. Gaffney Painter.

12                    DIRECT EXAMINATION

13    BY MS. GAFFNEY PAINTER:

14    Q.   Ms. Brunner, will you please state and spell your name

15    for the record.

16    A.   Laura Brunner, L-a-u-r-a, B-r-u-n-n-e-r.

17    Q.   Ms. Brunner, where do you work?

18    A.   At the Port of Greater Cincinnati Development Authority,

19    otherwise known as the port.

20    Q.   What is the port?

21    A.   We are a quasi-governmental economic development

22    organization, so we are created under the Ohio Revised Code as

23    a Port Authority, and we have broad economic development

24    powers.  There are about -- probably about 60 port authorities

25    in the State of Ohio.  Ours was created jointly by the City of
```

1    Cincinnati and Hamilton County.

2    Q.   Now, you mentioned the word "quasi-governmental."  What

3    do you mean by that?

4    A.   So authorities -- if you think of something like a

5    housing authority or transportation authority, authorities are

6    meant to be separate and independent from the government, from

7    either a state or local government, but they're formed by

8    governments to execute on behalf of the public good similarly

9    to government.

10   Q.   What is your title at the port?

11   A.   I'm the president and CEO.

12   Q.   Is that an elected position?

13   A.   No.

14   Q.   How did you get that position?

15   A.   I applied for the job almost a little more than ten and a

16   half years ago.

17   Q.   Prior to working at the port, what did you do?

18   A.   Most recently, I was the executive vice president at

19   Al Neyer, which is a commercial real estate development firm.

20   Q.   What is your educational background?

21   A.   I have an undergraduate degree in accounting from Indiana

22   University.

23   Q.   Now, generally speaking, what are your responsibilities

24   as the port's president and chief executive officer?

25   A.   Well, it starts with setting a strategy, deciding what

1    our organization is going to do.  We have very broad powers,

2    so we have the opportunity to use those in different ways.

3        We have specifically gotten into the real estate business

4    since I took over ten and a half years ago.  There are other

5    port authorities that run ports, like in Cleveland and Toledo,

6    they actually have ports on the lake.

7        Other port authorities manage bus systems.  Some of them

8    manage airports, and some of them -- probably the vast

9    majority in the State of Ohio are focused just on public

10   finance but, years ago, we decided to focus on real estate

11   revitalization.

12       So my primary job is to set the strategy, and then to

13   hire the people, manage the people to do the work, report to

14   the board.

15   Q.   You mentioned a board.  What is the board?

16   A.   So in a quasi-governmental and an authority like ours, as

17   I mentioned, the city and the county have established our

18   organization, and they each appoint five members to the board.

19       So I report directly to a board, specifically to the

20   chairman of the board.  There are five appointments, like,

21   citified by the county, and they each have four-year terms.

22   Q.   Who appoints the members of the board?

23   A.   The mayor makes the recommendation to city council, who

24   votes on the members there being appointed by the city.  And

25   then for -- the county commissioner president makes

BRUNNER - DIRECT

1    recommendation to the other two county commissioners for their

2    election as well.

3    Q.   What is the mission of the port?

4    A.   So we are focused on what we call broken real estate.  In

5    our county, we have hundreds, probably thousands of acres of

6    property that is being underutilized, and that's for a variety

7    of reasons.

8         It could be that there's contamination on the property.

9    It could be that it's vacant and blighted, been abandoned by a

10   previous owner.  It could be that there are tax liens on it

11   that make it unattractive for the private sector.

12        So we're in the process of taking title to real estate

13   that is in bad condition, for a number of different reasons,

14   and returning it to productive use so that it returns back to

15   the tax rolls.

16        And while we're doing that, we're focused in a couple of

17   different ways.  We are focused on bringing back residents

18   into the city and the county, filling the neighborhoods back

19   up with people living in the vacant homes, and we're focused

20   in neighborhood business districts to revitalize those that

21   have had many buildings that have been empty for a long time.

22        And then we also are focused on -- within our industrial

23   strategy, we are focused on taking old, sometimes abandoned,

24   very often just underutilized contaminant real estate and

25   getting it all cleaned up so we can attract new manufacturing

1    companies here with really good jobs.

2    Q.  You used the expression, when you just spoke, "tax

3    rolls."  What is that?

4    A.  So different jurisdictions, whether it's the city or a

5    village or the county, rely on different kinds of revenue to

6    support the services that they provide to the citizens.

7        Specifically, in the City of Cincinnati, income tax is a

8    very significant part of the tax of the revenue of the city,

9    so having more people live here and pay income tax, or people

10   working in the city at a manufacturing company pay income tax

11   helps the city.

12       And then also, when we have people -- when we fix up

13   property, whether it's a house or a commercial business

14   property or a manufacturing company with -- a manufacturing

15   site, when there's capital investment back in there, then

16   there's going to be property taxes paid again, which then

17   helps the county and all the jurisdictions that rely on

18   property taxes to help fund their work.

19   Q.  What is the relationship of the port to the City of

20   Cincinnati?

21   A.  That's -- it's complicated.  So I -- as I mentioned, I

22   work directly for a board, but we've got a lot of different

23   stakeholders that we're responsible to and accountable to and

24   partner with, so the city is obviously one of our most

25   significant, I'll use the word partnerships, even though there

BRUNNER - DIRECT

1    isn't a direct line of authority from me to anybody at the

2    city.

3        The city does make, as I mentioned, appointments to my

4    board, so that's a very important part of my -- of our

5    operations, and then they provide funding.

6        When I started, the funding that the city provided, the

7    city and the county each provided to my organization, was over

8    75 percent of our operating funds.

9        But over time, over the last ten and a half years, I've

10   diversified the revenue in a number of different ways, so now

11   it's about ten percent.

12       So we're not relying on them as much for our operating

13   revenue, but we are a -- we do receive grants for our real

14   estate investments from both the city and the county as well.

15   Q.  Again, generally speaking, what is the relationship of

16   the port to Cincinnati City Council?

17   A.  So I would say we spend more of our time with -- my staff

18   and me with the administration than we do with the elected

19   officials.

20       We're working through planning and zoning and economic

21   development and the legal department, so we work with a lot of

22   different departments.  I meet monthly with the city manager,

23   so we spend a lot of time on -- at the administration level.

24       And then I have monthly meetings.  I have, over the last

25   decade, generally, monthly meetings with the mayor as to

1    updates of what's happening there.

2        With regard to the city council, I generally have

3    quarterly meetings with city council members, updating them on

4    what's happening.  That's one layer of activity.

5        I also -- we always invite all the council members to

6    ribbon cuttings and ground breakings and other forums and

7    events that we have to, you know, A, help them see what we're

8    doing; and, B, show signs of appreciation and give them

9    speaking opportunities because of the funding that they

10    provide to us.

11        I give presentations, or members of my staff give

12    presentations at council committee meetings, I would say, you

13    know, on average three times a year.  And then we often make

14    presentations during budget hearings, asking -- showing

15    appreciation for previous funding and asking for continued

16    funding.

17        And then on a -- I would say other conversations with

18    council members are really on an ad hoc basis and not

19    especially frequent.

20    Q.   Now, you mentioned the mayor.  What is the relationship

21    of the port to the mayor, again, generally speaking?

22    A.   Well, the mayor is a more important relationship than the

23    members of the council because the mayor is the one that

24    presents his budget to the council, so you really have to

25    start with having funding inside of the mayor's budget before

BRUNNER – DIRECT

1    it will go to council for approval.  And the mayor is the one

2    that takes forward board appointments to the council members

3    for consideration.

4        And other than that, the -- it's really, you know, my

5    meetings with the mayor are generally update meetings, making

6    sure that there's alignment on our strategy and the areas that

7    we're focusing on, answering questions.

8    Q.   Now, you mentioned earlier in your testimony that the

9    port has a number of tools available to it to foster

10   development.  What are some of those tools?

11   A.   So the -- all the port authorities in the State of Ohio

12   have a broad set of public finance tools.  One of those is

13   that when we own real estate, we are not subject to sales tax

14   on construction materials, so we often work with private

15   developers.

16       And if you look on the auditor's website, we own, for

17   example, many buildings downtown.  So the developer, the owner

18   of the real estate, will transfer title to us, and we will

19   hire them to do the work, the renovation project, or sometimes

20   a new build like the Kroger Building.  And we will confer,

21   based on that, tax exemption certificates.

22       And then we require that they hold it for at least four

23   years so that they don't flip it quickly.  Those are -- there

24   are other tools like that, a bond bond, we can issue TIF debt,

25   and all of those collectively are meant to encourage economic

1    development.

2         Project -- big economic development projects, especially

3    when you get to the downtown area, have what we always call a

4    gap, that the money that the -- the equity and debt that the

5    project can support exceeds or is less than the cost there

6    would be required.

7         So often, developers will go to a number of sources,

8    whether it's getting tax credits or tax abatements, they're

9    always looking for ways to fill a gap in financing, and we are

10   one of those tools.  We provide a layer.

11        And so to the extent we are saving a developer $500,000

12   in tax, that's less money that the city, for example, would

13   have to put in if they were really motivated to encourage this

14   project to go forward.

15   Q.   You mentioned TIF debt.  What does that mean?

16   A.   So there's something called tax increment financing that

17   is often used in real estate development and, generally

18   speaking, if you take a piece of property that's worth a

19   hundred thousand dollars right now, and you're going to put a

20   million dollars investment in it, if you put it into a tax

21   increment financing transaction, you're agreeing that the

22   valuation for property tax stays at $100,000.  So the county

23   is just going to get taxed on $100,000, not $1,100,000, for a

24   period of time.

25        So that saves the owner money, that difference that

1    they're not paying in property tax, and they can use that as

2    part of their capital stock to pay for the construction costs.

3    And we will issue debt to cover that.

4         That's a -- not a, you know, very detailed explanation,

5    but it's a way to, once again, take -- nobody's writing a

6    check.  It's just that people are saying we agree we'll make

7    less money for a few years on this project in order to help

8    pay for the cost of it so that it happens later, and we'll get

9    our money later.

10   Q.   You mentioned the transfer of title.  What are the

11   practical effects of the city transferring a property to the

12   port?

13   A.   Our ownership means we take full responsibility for

14   maintenance.  You know, it depends on what kind of property it

15   is; all the responsibilities of real estate ownership, you

16   know, including deciding what to do with it from that time on.

17   Q.   Are you familiar with a property at 435 Elm in

18   Cincinnati?

19   A.   Yes, I am.

20   Q.   Now, back in the summer of 2019, what happened with

21   respect to 435 Elm and the port?

22   A.   The city transferred title of that property to the port.

23   Q.   Prior to the transfer of 435 Elm to the port, did you

24   have any conversations with anyone in community and economic

25   development about 435 Elm?

1    A.   Yes.

2    Q.   With whom did you have those conversations?

3    A.   I think the only person I spoke with about it was Phil

4    Denning.

5    Q.   What did you discuss with Mr. Denning about 435 Elm prior

6    to its transfer?

7    A.   He asked me if I would be willing to take control of this

8    property and manage its redevelopment going forward.

9    Q.   What did you say in response to that?

10   A.   I said that I would have to do some due diligence before

11   I could answer that question.

12   Q.   At the time that 435 Elm was transferred to the port,

13   what was your understanding of its status?

14   A.   That it was in horrible shape physically; that the

15   building itself was in horrible shape; that it would have to

16   be demolished for future development.  At that time, there

17   were squatters in the building.  There were two different

18   pieces of litigation that surround it.

19        It is attached to three other properties, so I knew that

20   future demolition would require the negotiation of cooperative

21   agreements with three other property owners.

22   Q.   At the time that 435 Elm was transferred to the port, did

23   anyone have any ideas for redevelopment?

24   A.   I -- I'm sure -- I'm sure they did.

25   Q.   Were you aware of anyone who had ideas about

1  redevelopment for 435 Elm at the time it was transferred to

2  the port?

3  A.  I knew, at or around the time that it was transferred to

4  the port, that one's -- at least one developer was -- had

5  drawings done for -- with ideas for the redevelopment.

6  Q.  Who was that developer?

7  A.  Chinedum Ndukwe.

8  Q.  After 435 Elm was transferred to the port, did you review

9  these materials from Mr. Ndukwe?

10  A.  Yes.

11  Q.  What was your assessment of his plan at the time you

12  first reviewed it?

13  A.  Well, over the course of months, I saw many different

14  iterations of plans from him, but they were never satisfactory

15  and complete.

16  Q.  Can you explain what you mean by that?

17  A.  Well to -- so when we transfer any property, if I can

18  explain this, maybe.  Whether we're selling a house in

19  Evanston or Avondale, or a vacant piece of ground in a

20  business district, or a big 20-acre manufacturing site, no

21  matter what real estate we own, we have a very thorough review

22  process, because we take very seriously our mission, our goal

23  to return property to its highest and best use.

24      And we want neighborhoods to have quality houses built in

25  the neighborhood.  We want the community to accept what's

*BRUNNER – DIRECT*

1   going to be built there, so we're really very choosey.  So

2   we -- in a plan that's presented to us, we have to know what

3   is going to be built there with quality design that is -- that

4   the neighborhood would approve of.

5       We have to know how much it would cost, and whether those

6   costs have been estimated by a quality contractor.

7       We have to know that the developer or the potential buyer

8   of the property has a financing in place, and we need to know

9   a timeline for the completion.

10      And depending on the use, we want to know how they reach

11  their assumptions.  If you're going to tell me you're going to

12  build a hotel, I want to know how -- why you're so confident

13  that a hotel would be successful, and at what rates you could

14  charge for that hotel.  So there are market studies that would

15  have to be done to help out and get that.

16      And then all of those things go into a financial pro

17  forma that gets presented to us that helps us evaluate the

18  quality of the proposal.

19  Q.   And coming back to Mr. Ndukwe's proposal at this time,

20  and under those factors you evaluated, what was your initial,

21  sort of, assessment of his proposal?

22  A.   I think, throughout the whole process, he had pretty

23  pictures, and he never had costs that I was confident in.  He

24  never had rental rates that I was confident in, hotel rents

25  that I was -- rates that I was confident in.

*BRUNNER - DIRECT*

1      He never shared who a contractor would be.  He never

2  shared who a hotel, if it was going to be a hotel, who that

3  flag would be.  He never shared where the money was coming

4  from, either the debt or the equity.  I never knew how much

5  money he was putting in.

6      And the financial pro formas that he showed me over a

7  period of months changed very dramatically.

8  Q.  Did you discuss Mr. Ndukwe's plan with anyone who worked

9  at the port?

10  A.  Yes.

11  Q.  Who, do you recall?

12  A.  Well, it would have been quite a few people.  At the

13  beginning, probably Melissa Johnson, Todd Castellini, Chris

14  Rucht.  I'll start with those three, at the vice president

15  level.

16      And then later Phil Denning joined the port, and he was

17  involved in conversations with them as well.

18  Q.  Did you discuss Mr. Ndukwe's plan with anyone outside of

19  the port?

20  A.  Well, he had -- I would have discussed it with my

21  attorneys, and then he had a host of parties that he brought

22  to multiple meetings over a period of months.

23  Q.  Do you recall any of those parties that attended those

24  meetings?

25  A.  Yes.  Jim McGraw was the first one, John Curp at one

1    point, Andy Brossart, Richard Hatton.  He had an attorney at

2    Frost Brown named Fred.  I can't remember his last name.  He

3    had members of his staff that could have changed over time.

4    He had Tom Fernandez, the architect.  And that's all I can

5    recall right now.

6    Q.   What did you tell Mr. Ndukwe about his proposed plan for

7    435 Elm at the beginning, after you had assessed it?

8    A.   That he needed -- he was missing the very first

9    fundamental piece of the puzzle, which was a qualified

10   development team.

11       I told him from the very beginning, you cannot build an

12   80 or 100 million dollar project here.  You have no experience

13   here.  You have to find development partners to come to the

14   table with you.

15   Q.   What are development partners?

16   A.   So there are -- it would be him approaching a qualified,

17   experienced development firm, either in town or bringing one

18   in from another city, that had done projects of this size in

19   an urban environment.

20       And that would have required him to negotiate what was in

21   it for him and what was in it for them, how much money was he

22   putting in, how much money were they putting in.

23       And I didn't care so much about that, what percentage

24   interest he would have.  I was entirely focused on we have to

25   have -- I've got a responsibility that this building is going

1    to be redeveloped in a quality way.

2        Whatever we build here is going to be here for another

3    hundred years.  It has to be the right product and built at a

4    really high quality.  And he had no experience to give me

5    confidence that he could do that himself.

6    Q.   Let's turn now to Mr. Sittenfeld.  Did you ever have

7    conversations with Mr. Sittenfeld about the 435 Elm project?

8    A.   Yes, I did.

9    Q.   If you could, there are multiple white binders in front

10   of you on the table.  We're looking for the binder that has

11   tab USA 44B in it.

12        MS. GAFFNEY PAINTER:  May I approach to assist the

13   witness?

14        THE COURT:  You may.

15   A.   I have it.

16   Q.   Thank you.  Ms. Brunner, we're looking at what's been

17   marked for identification as USA 44B.  Do you recognize this?

18   A.   Yes.

19   Q.   What is it?

20   A.   It is a printout of my AT&T phone bill log.

21   Q.   And how do you know that?

22   A.   Because I'm the one that went through the very difficult

23   task of figuring out how to print it.

24        MS. GAFFNEY PAINTER:  Your Honor, the government

25   moves for the admission of Government Exhibit USA 44B.

1        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

2        THE COURT:  USA 44B is admitted without objection.

3    Q.  The conversations that you had with Mr. Sittenfeld about

4    435 Elm, did you have one conversation or many conversations?

5    A.  Many.

6    Q.  What did you and Mr. Sittenfeld discuss about 435 Elm?

7    A.  Well, I think there was really just one very simple

8    theme, which was that he wanted me to enter into some kind of

9    agreement with Mr. Ndukwe, and he wanted me to do it at as

10   close to one dollar as I possibly -- wanted me to do it for a

11   dollar.

12   Q.  What did Mr. Sittenfeld tell you about 435 Elm and

13   Mr. Ndukwe's proposed project?

14   A.  That he felt that this was an important corner for

15   redevelopment, and he thought it was very important for our

16   city to have a black developer do the project.

17   Q.  Now, you mentioned the property for a dollar.  Is this

18   something that the port does or has done, provide property for

19   a single dollar?

20   A.  No.  In the course of ten and a half years, I think we've

21   sold 20 -- we've sold over a thousand parcels in Hamilton

22   County in the last ten and a half years, and I think we've

23   sold 22 of them or so for a dollar.

24       And those are single-family lots in the Mill Creek

25   corridor that we have sold to neighboring homeowners who are

1   taking care of vacant land.  So we set up a dollar a lot

2   program for that community, where there really was no market

3   value, and -- to help them have ownership of the property they

4   were already taking care of.

5   Q.   And for those deals, where you offered the property for a

6   dollar, what were the considerations that you weighed before

7   engaging in those transactions?

8   A.   That there would -- there had been no market activity in

9   those communities for a very long time, and that we could hold

10  the properties for another ten years and nobody would buy them

11  from us, so that it was -- we worked with the community in

12  the -- actually, they're the ones that approached us to ask

13  for consideration of this so that they could have more

14  ownership of their neighborhood.

15  Q.   Going back to the considerations that you weigh on the

16  port before you engage in transactions, is sort of these

17  community values something that is considered when you are

18  evaluating a transaction on behalf of the port?

19  A.   Very much so.

20  Q.   Returning to your communications with Mr. Sittenfeld

21  about 435 Elm, what was your reaction to these communications?

22  A.   I think, probably, in the first couple of times, it was

23  fine, and I just assured him, yes, I'm talking to Chin.  He is

24  not in a place where I'm comfortable moving forward.  I've got

25  this.  You know, like, I'm on it.

BRUNNER - DIRECT

1      But then over time, they became more frequent and perhaps

2   more aggressive, and my reaction was I -- once again, I have

3   this.  This is my responsibility to determine the highest and

4   best use, and I'm doing my best.

5   Q.   When you say "aggressive," what do you mean?

6   A.   They're just too frequent, and too long, and too direct.

7   Q.   After 435 Elm was with the port, what options did you

8   consider with regards to a development deal for that property?

9   A.   Well, I told Chin from the beginning -- when he came to

10  me and he had purchased a note, and he felt that that gave him

11  the rights to get this property at such a discounted price,

12  and I told him from the very beginning, I'm sorry that you

13  paid so much money for this note.  It has no value.  And

14  that's unfortunate for you.  I will give you an opportunity to

15  make money on this project, to be a part of the development

16  team.

17      I will not start engaging with anybody else and give you

18  time to put together -- you know, to find partners and put

19  together an adequate proposal.

20      So that was one track that was going on throughout this

21  whole time frame was just basically meeting with him and

22  hoping that he would come through.

23      Meanwhile, as I mentioned, we had a lot of other things

24  to consider with the property, including getting the squatters

25  out of it, and resolving litigation with a previous -- that we

1    inherited from the City of Cincinnati with a previous tenant.

2        And the other piece of litigation surrounding this

3    property was with Chin himself.  And I tried to get him to

4    sign a waiver on that, which he refused to do, so his

5    litigation itself has stood in the way of our redevelopment so

6    far.

7        At the beginning, when he first came to me, he was going

8    to demolish the property himself, which surprised me, because

9    he does not have a demolition company.  And I had explained to

10   him the bonding for a project of that size would be very

11   significant.

12       And he said that he had identified another demolition

13   contractor somewhere in the country that he was going to

14   purchase and bring to town.

15       And then even as recently as the last couple of months,

16   he's now filed -- or maybe the last month, he's now filed an

17   injunction to prevent us from the demolition of the building.

18       So the litigation with him has slowed the progress, but

19   we have continued to work on the cooperative agreements that

20   are necessary for demolition with the other three property

21   owners.

22       We have written the bid specs for demolition, as soon as

23   we're able to move forward with those, and we've applied for a

24   grant from the State of Ohio to assist us in paying for the

25   demolition.

BRUNNER - DIRECT

1    Q.   When you were considering the different options for

2    435 Elm, did you consider, at any point, an RFP?

3    A.   Yes, I did.  I did.  And I know, to your earlier

4    question, I did also met with Steve Leeper from 3CDC to ask

5    him if he'd be willing to review responsive to an RFP once I

6    got to that point, and he agreed that he would do that.  So

7    that's one other person I did talk to.

8         But we were never in a position to move that far ahead

9    because no -- we would not do an RFP until we had that

10   property demolished.  That is a very significant part of the

11   work that we do is the horizontal, we call it cleanup, of a

12   property to do the demolition.

13        I'm sure the building has asbestos in it.  We have to do

14   remediation and demolition and in-site clearance, and then

15   you've got a nice, clean piece of property that you're more

16   likely to have success with when you do an RFP, rather than

17   sending out this lovely building in its current condition,

18   saying, hey, who the heck wants to come in and take a swipe at

19   this.

20   Q.   What is an RFP?

21   A.   It's a request for proposal that would be sent to

22   qualified developers, developers that had experience in this

23   size, a project in urban environments, in other cities.

24   Q.   And what is the goal of an RFP?

25   A.   Competition, and in getting the best ideas possible.

1    Q.   Now, during your conversations with Mr. Sittenfeld about

2    435 Elm, did you communicate that you were considering an RFP?

3    A.   I do not recall that.

4    Q.   While you were considering Mr. Ndukwe's proposal for

5    435 Elm, what were some of the other ideas you had to move the

6    project forward?

7    A.   Well, we were focused on the physical asset and, like I

8    said, resolving litigation, getting the property -- getting

9    the squatters out, which we did, resolving the other piece of

10   litigation, which we did.

11        We emptied the building.  We worked with non-profits, and

12   donated a significant amount of the personal property that was

13   in the building to non-profits, and secured the building.

14        And we spent an awful lot of time working on these

15   cooperative agreements, especially with Whex Garage, which is

16   immediately adjacent.

17        And then the garage has two skywalks, one to the Hyatt

18   Regency and one to the Convention Center, so those are the

19   other two agreements we had to have in place that would allow

20   us to demolish the skywalk when we demolished the building

21   itself.

22        So we did not spend very much time -- I probably had a

23   few people, over the course of three years, reach out to us

24   expressing interest in being the developer, but we've never

25   moved forward on putting that at the highest priority because

1    we had to focus on litigation before we could do that.

2    Q.   At any point in your conversations with Mr. Ndukwe, did

3    you discuss a ground lease?

4    A.   Yes.

5    Q.   What's a ground lease?

6    A.   So a ground lease would allow the port -- under a ground

7    lease, the port would retain ownership of the land for the

8    future, and then lease the property aboveground for the

9    construction of a new building to a private party.

10        So they would own the building, and then pay rent for the

11   ground.  That is important in places -- on properties that are

12   so significant to our city.

13        And I felt that with the Convention Center District

14   there, that it was important for the public sector.  And we

15   are part of the public sector and, you know, working

16   collaboratively with the city and the county and the

17   Convention of Visitors Bureau, and now 3CDC and others,

18   that -- it's going to be a bigger group of people that, for

19   the long-term, are going to decide what we want these

20   properties around the Convention Center to look like, so

21   having ownership of that property for the long-term would be

22   important.

23   Q.   What was Mr. Ndukwe's reaction to the proposal of a

24   ground lease?

25   A.   Very unfavorable.

1    Q.   Did you ever discuss the possibility of a ground lease

2    for 435 Elm with Mr. Sittenfeld?

3    A.   I'm sure I did, because I know, over the course of these

4    months with Chin, he at one point -- like I said, he presented

5    many different options and kind of crazy proposals.

6         And at one point, he did say, I'll pay $66,000 a year,

7    instead of my proposed, I think, $330,000.  And so part of my

8    conversations with Mr. Sittenfeld regarded what I was going to

9    charge him and what he -- whether he deemed that to be fair.

10   Q.   What was Mr. Sittenfeld's reaction to the ground lease

11   proposal; if you recall?

12   A.   I don't recall specifically.

13   Q.   How does the port generally, under your leadership,

14   balance the community interest, the highest and best use of

15   the property, with any sort of profit motivation?

16   A.   It's always a challenge, but what we often do is -- it's

17   not easy to determine the value of property that we own

18   because it's often in places where there hasn't been a lot of

19   market activity.

20        So what we often do is say to the person that wants to

21   buy property from us, whether it's a house, or a small

22   commercial property, or something large like this, we say put

23   a financing proposal to give us a -- give us a financing

24   proposal.  We want you, the private sector, to make money.

25        We want -- don't want to charge you so much that it is

1    not a good transaction for you; but yet, on the other hand, we

2    cannot unjustly enrich you and just start giving property

3    away, because that is favoring the few instead of the many,

4    and where we can charge more, what we would call market value,

5    then we're able to take those proceeds and invest in our work.

6         So we're trying to -- we know we lose a lot on some

7    properties, and we're going to lose less on other properties,

8    so we rely on the financial proposals that are given to us to

9    have a conversation about reasonable profit for the private

10   sector versus what we think.  You know, we're often debating

11   those two things against each other.

12        MS. GAFFNEY PAINTER:  May I have just a moment, Your

13   Honor?

14        THE COURT:  You may.

15   Q.  Ms. Brunner, returning to your communications with

16   Mr. Sittenfeld about 435 Elm, what was your perception of

17   those communications?

18   A.  That he wanted me to enter into an agreement with

19   Mr. Ndukwe, regardless of whether I thought it was a good idea

20   or not.

21        MS. GAFFNEY PAINTER:  No further questions, Your

22   Honor.

23        THE COURT:  Thank you.  Mr. Rittgers, I'll note the

24   time is 12:20.  Do you have a sense of how long your

25   cross-examination will be?

 1          MR. C. MATTHEW RITTGERS:  It might be best to break,

 2    Your Honor, for lunch.  I just don't want to hold people up.

 3          THE COURT:  Sure.  Very good.  You'll be able to

 4    return after lunch?

 5          THE WITNESS:  Yes.

 6          THE COURT:  Ladies and gentlemen of the jury, I

 7    think, at this point, we're going to take our lunch break.

 8    We'll try to start by 1:30.  It's 12:20 right now.  Please be

 9    back by 1:20 so we can summon you down and try and get started

10    by 1:30.

11       As I've mentioned on multiple occasions, and I'm sure

12    you're probably sick of hearing, please do not do any research

13    on this case.  Please do not discuss with each other the

14    testimony or evidence that you see.

15       Please do not communicate with anyone about the case.

16    Please do not allow anyone to communicate with you about the

17    case.  If anyone should attempt to, please let me know

18    immediately.

19       And please do not start to form any final opinions about

20    the facts or evidence that you've heard to date.  That will

21    await all of the evidence, instruction on the law, and the

22    closing argument.

23       And with that, have a good lunch.

24       (Jury out at 12:20 p.m.)

25          THE COURT:  Is there anything we need to discuss

```
 1    before we break for lunch?

 2            MS. GAFFNEY PAINTER:  I don't believe so, Your Honor.

 3            MR. C. MATTHEW RITTGERS:  I don't think so, Your

 4    Honor.

 5            THE COURT:  All right.  Please try to be back by

 6    1:15, 1:20, so if there's anything we need to talk about, we

 7    can get the jury in by 1:30 and get started.

 8        All right.  We can break.

 9        (Lunch recess.)

10            THE COURT:  Is there anything we need to discuss

11    before we bring the jury in?

12            MS. GAFFNEY PAINTER:  Not from the government, Your

13    Honor.

14            MR. C. MATTHEW RITTGERS:  Not from the defense, Your

15    Honor.

16            THE COURT:  Okay.  Is the jury assembled?

17        (Jury in at 1:28 p.m.)

18            THE COURT:  Ladies and gentlemen of the jury, I hope

19    you had an enjoyable lunch.

20        I think, when we left, we were getting ready for

21    Mr. Rittgers' cross-examination.  Mr. Rittgers, you can

22    proceed.

23            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

24

25
```

1           CROSS-EXAMINATION

2    BY MR. C. MATTHEW RITTGERS:

3    Q.   Good afternoon, Mrs. Brunner.

4    A.   Good afternoon.

5    Q.   You and I have never talked about this case or your

6    testimony, correct?

7    A.   Correct.

8    Q.   On direct examination, when the prosecutor was asking you

9    some questions, I just wanted to highlight a couple things,

10   and correct me if I'm wrong.

11        The City of Cincinnati and the port have -- that's the

12   most significant partnership that the port has is with the

13   City of Cincinnati, correct?  I know it's not a technical

14   partnership, but...

15   A.   No.  I can't say it's more important than the

16   relationship I have with the county.

17   Q.   Okay.  I thought maybe it's one of the most significant

18   partnerships that the port has --

19   A.   Clearly, among some other --

20   Q.   -- is with the city?

21   A.   Clearly, one of the most significant relationships is

22   with the city.

23   Q.   And there's no direct line that you have with someone in

24   particular with the city, although you do meet with people

25   like the economic development director and some of the

BRUNNER - CROSS

1    individual council members directly at times?

2    A.   There is no direct -- I have no accountability to anybody

3    at City Hall.

4    Q.   In 2019, when this property was transferred to the Port

5    Authority for a dollar, there was, to your knowledge, one

6    developer interested in redevelopment of 435 Elm, correct?

7    A.   I was aware of one.

8    Q.   And that was Mr. Ndukwe?

9    A.   Yes.

10   Q.   And I believe you went through a list of factors, when

11   you were talking on direct -- do you need water?  Sorry.  I

12   thought you --

13   A.   Huh-uh.

14   Q.   Okay.  Sorry -- that you wanted to see before you could

15   approve a development.  Do you recall that?

16   A.   Yes.

17   Q.   And one of them was reputable contractor, right?

18   A.   Yes.

19   Q.   One of them was financing in place?

20   A.   Yes, of that, and equity.

21   Q.   And equity.  The third, I believe, was -- you mentioned a

22   hotel, and you mentioned that it shouldn't have just been like

23   saying a hotel.  You wanted to know if there was an actual

24   flag, like what type of hotel would agree to come there?

25   A.   Yes.

1   Q.   Architect was mentioned, correct?

2   A.   Yes.

3   Q.   And you already mentioned equity, which I have later in

4   my list.

5        Were you aware about these guys named Rob and Brian?

6   A.   I knew that Chin had investors.  I never knew their

7   names.  He never shared with me who his partners were.

8        I never knew whether the initial purchase of this note

9   that he made was just him or other people.  I never knew

10  exactly what the relationship was with Mike Schiff so, no, he

11  never shared with me any of his partnerships, if you will.

12  Q.   Is it -- were you ever told that he had the backing of an

13  out-of-town real estate developer named Rob, who had the

14  ability to come up with millions of dollars to invest in

15  435 Elm?

16  A.   Honestly, I thought that these two out-of-town

17  individuals were investors.  I was never told they were

18  developers.

19       He had other -- like this Mike Schiff from Columbus that

20  he brought in, claiming that he was a developer.  But the

21  out-of-towners that I heard of, I always heard referred to as

22  investors, never as developers.  Certainly, never with any --

23  I was never presented with any qualifications that they had as

24  developers, and he never represented they were to be his

25  development partners.

1    Q.   Were you ever told that Turner Construction was likely to

2    be the contractor?

3    A.   I was told that by Chin, and was told by Dave Spaulding

4    of Turner that he had not made -- that Chin was

5    overrepresenting the conversations that they had had.

6    Q.   Had you been told that IHG Hotels wanted to put an indigo

7    hotel in at 435 Elm?

8    A.   I don't recall if he ever gave me the brand of a hotel, a

9    flag.

10   Q.   And I believe you might have mentioned this, but on the

11   equity piece, you were never told that Rob and Brian had a big

12   group of out-of-town --

13   A.   No, because frankly, he never --

14   Q.   -- investors, for lack of --

15   A.   In the pro formas that he gave me, that changed

16   dramatically, he changed the amount of equity.  And it wasn't

17   that much.  I mean, he was relying on tax credits, the TIF --

18   well, not really tax credits.  The TIF I mentioned earlier, I

19   think he was relying on that for $15 million.

20        But, I guess, to answer your question, the amount of

21   equity he was going to put in this changed with each of his

22   different pro formas he gave to me, and he never, ever shared

23   with me who those parties were.

24   Q.   During your conversations with P.G., did you ever become

25   aware of the fact that he, P.G., and you were operating on two

1    different sets of information?

2    A.   I specifically asked P.G. at one point in a text

3    whether -- Mr. Ndukwe called me and said that his investors

4    were friends of P.G.'s, and they were calling -- I can't

5    remember if they were calling P.G., I'm sorry, Mr. Sittenfeld,

6    or if he was calling them.

7         I asked him to clarify whether he was friends with these

8    investors, because that's what I was hearing from Mr. Ndukwe,

9    but I never knew what those relationships were.

10        And to your bigger question, I never had conversations

11   with Mr. Sittenfeld about the substance of what Mr. Ndukwe was

12   proposing to me.  It was simply he wanted him in control, and

13   then let him go do his thing and get his whole team in place.

14        And I kept saying I have to have a plan.  It all has to

15   be done before I give him control.

16   Q.   Because you didn't think that there was a team in place

17   at the time?

18   A.   I knew there wasn't a team in place.  I went as late as

19   January to Columbus with Chin and Mike Schiff, and I was told

20   that that -- I think that was in January, I could be wrong.  I

21   was told then that that was his development partner.

22        And we went up there to tour, and I figured out that,

23   really, he's not a developer, he also is an investor.  He has

24   a stake in a lot of real estate investment in downtown

25   Columbus, but he wasn't the developer.

1      So then I pushed Mike Schiff on who would the developer

2  be, and he said he would get a local development partner.  And

3  to my knowledge, he approached at least two or three local

4  developers that declined to partner with him.

5      So, you know, I don't think that there was separate sets

6  of information.  I think it was, A, the information was

7  changing a lot, and it was never very clear.

8  Q.  On the separate sets of information, you don't know what

9  P.G. was told by Rob or Mr. Ndukwe, correct?

10  A.  No.  I was never a party to any conversations.

11  Q.  You don't know if he was told that it was an indigo

12  hotel, you don't know if he was told there was a $75 million

13  deal, you don't know if he was told that Turner Construction

14  was going to be the contractor for this project, correct?

15  A.  No.  But I know that I told him I did not have a plan

16  that was satisfactory, and that the financing was all over the

17  place.

18  Q.  Okay.  I believe you ended your direct talking about P.G.

19  calling you many times about 435 Elm, correct?

20  A.  Yes.

21  Q.  You and P.G., in 2018 and 2019, you talked on the phone

22  about various topics, correct?

23  A.  Not so -- well, yes.

24  Q.  And you text on occasion?

25  A.  Yes.  It was more on the phone than it was by text, yes.

BRUNNER - CROSS

1    Q.   Sometimes you'd email?

2    A.   Probably.  I don't have direct --

3    Q.   But you talked on the phone more than email and text?

4    A.   With him in particular, yes.  I think there was more

5    phone conversation than there was written.

6    Q.   And you had known P.G. for many years?

7    A.   Yes.

8    Q.   In fact, back in the summer of 2018, you and P.G. were

9    emailing about opportunity zone funding and planning for the

10   region.  Do you recall that?

11   A.   I'm sorry, we were emailing about what?

12   Q.   Opportunity zone funding and planning for our region.

13   A.   Oh, I don't remember the opportunity zone conversation in

14   particular, but that doesn't surprise me that we would have,

15   or -- that summer, there were a lot of conversations with a

16   lot of different people talking about that.

17   Q.   All right.  And that summer, you invited leaders and

18   council members to do a port tour, correct, tour industrial

19   sites?

20   A.   We did tours every month or six weeks for a couple years,

21   and we invited administration and elected officials from the

22   city and the county, and a lot of other dignitaries.

23   Q.   Do you recall an email that P.G. included you on, where

24   he was encouraging other council members to go on the port

25   tour because he was the only one that went?

BRUNNER - CROSS

1    A.   I recall him, after he came on our tour -- I don't know

2    if it was that social media post or an email from the council

3    members, but I remember him saying something positive about

4    the results of the tour and encouraging others to participate.

5         MR. C. MATTHEW RITTGERS:  Your Honor, if I may

6    approach?  This is Defendant's Exhibit 105.

7         THE COURT:  You may.

8    Q.   Mrs. Brunner, if you could take a look at that.

9    A.   Yes.  As I said, I remember he did something positive

10   after that.

11   Q.   And so after looking at that document, Defendant's

12   Exhibit 105, you can now say that P.G. emailed council, and I

13   believe you were on the email, encouraging them to do that

14   tour so they can actually put their feet on the ground or eyes

15   on the port's property projects, correct?

16   A.   Yes.

17   Q.   There were also times in 2019 where you would email P.G.

18   about development deals on port sites, and tell him your

19   thoughts about tax abatements and CRAs, correct?

20   A.   I don't remember anything specific on those subjects.

21        MR. C. MATTHEW RITTGERS:  Your Honor, if I may

22   approach?

23        THE COURT:  You may.

24        MR. C. MATTHEW RITTGERS:  This has been previously

25   marked as Defendant's Exhibit 103.

1  Q.  Ms. Brunner, have you had a moment to review that?

2  A.  Yes.

3  Q.  And so this is an email, you to P.G., talking about TIF

4  funding and a CRA, correct?

5  A.  Yes.  It doesn't reference what project it was, so I --

6  but it's a pretty general statement, but yeah.

7  Q.  It might have been the Brown field, which the old

8  brewery -- I forget which one, but the --

9  A.  I don't think it would have been Hudepohl, but...

10  Q.  Hudepohl, that's what I was thinking about.

11  A.  I don't know.

12  Q.  But the timing, this was January 2019?

13  A.  Yes.

14  Q.  And just so that we're clear, you are emailing P.G.

15  discussing the TIF being for 20 years, CRA for 65 percent at

16  15 years?

17  A.  I can't -- so I'm emailing him, and I can't tell what's

18  at the top there, if that's -- that looks like that's him

19  emailing me.

20  Q.  Oh, he forwarded this email from me to you, so...

21  A.  Oh, oh, that's right.  Yes.  Yes, it's an email to me.  I

22  don't know if it was following -- it would have been initiated

23  by something, either a phone call or an email.  I'm obviously

24  answering some kind of question.  I just don't recall the

25  question.

1   Q.   And you tell him that you're going to circle back with

2   him after you have a couple more council meetings, and you

3   thank him for his input and guidance, correct?

4   A.   Uh-huh.  Yes.

5   Q.   And this was not about 435 Elm, correct?

6   A.   No.

7   Q.   You would, on occasion, schedule meetings with P.G.

8   proactively, and other council members, to update them on port

9   projects, correct?

10  A.   Yes.

11  Q.   Do you remember when Bruce Katz came to town?  Who is

12  Bruce Katz?

13  A.   Bruce Katz is an international author and thought leader

14  that I brought to town for three days for a series of meetings

15  and presentations, and invited a number of different elected

16  officials and business leaders and community leaders.  P.G.

17  was one of those I invited for, at least, one of the sessions.

18  Q.   And even for a small breakfast with you, Mr. Denning,

19  Bruce Katz, and P.G., it was just the four of you, correct?

20  A.   Was it?  Okay.  I don't recall that being that makeup,

21  but that doesn't surprise me.

22  Q.   Okay.  And there were times where he would invite you to

23  meet with other civic leaders in town to collaborate and then

24  talk about the region, correct?

25  A.   Yes.

1    Q.  He proactively reached out to you and someone at the

2    Regional Chamber of Commerce to help facilitate a meeting for

3    leaders all around the region, correct?

4    A.  Yes.

5    Q.  And there were times when P.G. would even email you when

6    he thought things were moving too slowly with the port or

7    responsiveness, correct?

8    A.  I do not recall that on any kind of regular basis, other

9    than two specific projects.  That was not a normal course for

10   him to say I'm moving too slowly.

11   Q.  Was one of them the Mt. Airy Homeless Veterans Project?

12   A.  No, that was not my project.  He was asking for sites,

13   suggestions of sites for a project he was spearheading.

14   Q.  And in that --

15   A.  Unless you're saying he thought I wasn't replying to his

16   question fast enough?

17   Q.  Yes.  Do you recall that?

18   A.  No.  But I'm assuming that's what he's saying.

19   Q.  Okay.  I'll show it to you.

20   A.  Because it was not our project, it was his.

21          MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

22          THE COURT:  You may.  Thank you.

23          MR. C. MATTHEW RITTGERS:  May I approach the witness?

24          THE COURT:  Yes.

25   Q.  Ms. Brunner, I handed you what's been marked as

1    Defendant's Exhibit 716.

2        Let me know when you've taken a look at that.

3    A.   Yes.

4    Q.   There's an email from P.G. to you about his desire to go

5    look at certain site locations, and then there's another email

6    three days later, where he follows up on top of that email,

7    and you said, "Shoot, I missed this.  I'll get back to you on

8    Monday"?

9    A.   Yes.

10   Q.   So P.G. was -- he didn't have a response email on top of

11   his own email before your response, correct?

12   A.   Yes.

13   Q.   And he also texted you about this.  Do you recall him

14   texting you about this Sedamsville and Mt. Airy?

15   A.   I know I have a text regarding, like, number of sites or

16   acres or something, yes.

17   Q.   Yeah.  In fact, in that email, I think it might even be

18   referenced, 8.3 acres and 2.5?

19   A.   Uh-huh.

20   Q.   And that's also -- P.G. would text you about that, and

21   that was -- you were aware that that was for a non-profit

22   Veterans Community Project, correct?

23   A.   Yes.  I would say, you know, not following up in three

24   days isn't exactly being delinquent, but...

25   Q.   I'm not saying that you were.  I'm just saying that P.G.

1    was just persistent with his request for a response?

2    A.   In this case, yes, he was.

3    Q.   And this had nothing to do with 435 Elm, correct?

4    A.   No.

5    Q.   And P.G. emailed you months after this email, following

6    back up, asking these folks from the Veterans Community

7    Project to come tour themselves these projects, and he was

8    just doing it to give them other options.  He wasn't asking

9    for a partnership from the port, he just wanted them to see it

10   for options; is that correct?

11   A.   I believe so, yes.

12   Q.   Even emailing you the day after Christmas, December 26th,

13   on that project?

14   A.   I do not recall.

15   Q.   Is it fair to say that P.G. and you, during 2018 and

16   2019, had conversations about a lot of different topics?

17   A.   I would say -- I don't know what "a lot" is.  That's a --

18   I'm gonna say a hard thing to answer.

19   Q.   Would you say that, in terms of the importance for the

20   region, 435 Elm was high on the list?

21   A.   I think that 435 is a very important part of our downtown

22   and our Convention Center District.

23   Q.   Another reason P.G. was contacting you many times, that

24   you're aware of, is because he believed -- you were aware that

25   P.G. believed you might have been treating Mr. Ndukwe

1    differently?

2    A.   He accused me of treating him differently.

3    Q.   Who is "he"?

4    A.   Both Mr. Ndukwe and Mr. Sittenfeld.

5    Q.   Okay.  And so that could be another reason why

6    Mr. Sittenfeld was reaching out to you during that time,

7    correct?

8    A.   To accuse me of not treating Mr. Ndukwe fairly?

9    Q.   I mean, yeah.  I'm asking you if you were aware of that.

10   A.   Yes.  I think that was part of the theme of his phone

11   calls to me.

12   Q.   In 2019, and even in 2020, it was still your preference

13   to work a development agreement with Mr. Ndukwe and not do a

14   request for proposal, correct?

15   A.   No.  As we moved into late 2019 and then in early '20,

16   after we went -- we went through a few -- we had some bumps in

17   the road there.

18        One of them was the challenges with Mike Schiff, and the

19   other was my concerns with Chin, and comments he was making in

20   the community accusing me of being racist.

21   Q.   And P.G. was trying to mend that relationship?

22   A.   I don't know if he was trying to mend it, or he was

23   trying to pressure me into overlooking the differences and

24   moving forward.

25            MR. C. MATTHEW RITTGERS:  May I approach the witness,

1    Your Honor?

2            THE COURT:  You may.

3    Q.   This is Defendant's Exhibit 717.

4        Ms. Brunner, can you look at the line just above your

5    signature.  You were indicating to Mr. Ndukwe and Mr. Schiff

6    that working with, as you said, Chin, has always been

7    preferable, correct?

8    A.   Are you saying that it says that on here somewhere?

9    Q.   Right above -- you see the signature that says "Laura"?

10   A.   Oh, uh-huh.

11   Q.   You see the sentence right above that?

12   A.   Uh-huh.

13   Q.   That's what you're telling Mike Schiff and cc'ing

14   Mr. Ndukwe?

15   A.   I think that's consistent with what I've been saying

16   today, that from the very beginning, from the moment I had

17   this property, the perfect world would have been to have Chin

18   be a part of a development team.

19       It would have been an opportunity for him to recover some

20   of the investment that he made, if not more than his

21   investment, and it would be great to have a significant -- a

22   black developer play a significant role in a significant

23   project.

24       But -- and that's what I'm saying 'til the end.  It would

25   have been preferable, but he didn't do anything I asked him to

1    do.

2    Q.  That email was in late 2019, correct?

3    A.  Yes.

4    Q.  You were unaware -- in 2019, you were trying to negotiate

5    a partnership between the port and Mr. Ndukwe, correct?

6    A.  It wasn't going to be a partnership.  There would have

7    never been joint ownership.  I'm using partnership as joint

8    ownership.

9    Q.  Okay.

10    A.  What we talked about from the very beginning is the

11    potential of me agreeing to lease this property to him under

12    this ground lease, and have him with a group of developers

13    who -- obviously, would have to have the equity partners there

14    too -- would do the development.

15    Q.  And he had offered you, at least at one point, $66,000

16    per year for that ground lease, correct?

17    A.  Yes.

18    Q.  You were unaware of any legal issues that he had with the

19    FBI during this time, correct?

20    A.  I was -- well, by this time, in December, I was aware of

21    his other criminal charges.

22    Q.  He wasn't charged.  Are you talking about the sexual

23    assault allegations?

24    A.  Yes.

25    Q.  You were aware of the sexual assault allegations in

*BRUNNER - CROSS*

1    September of 2019?

2    A.   Yes.

3    Q.   But you were unaware of any admissions that he gave the

4    prosecutors or the FBI related to federal criminal charges?

5    A.   Correct.

6    Q.   Would you have been spending that time and energy trying

7    to negotiate a joint ownership agreement had you been aware of

8    that?

9    A.   If I had known he had approached the FB- --

10        MS. GAFFNEY PAINTER:  Objection, Your Honor.  It's

11   hypothetical, and she also testified earlier that there was no

12   joint ownership.

13        THE COURT:  Sustained.

14   Q.   435 Elm cost the City of Cincinnati, before the transfer,

15   $400,000 per year in maintenance costs.  Did you know that?

16   A.   I don't know the precise number.  It was a significant

17   amount, and that excludes the delinquent real estate taxes

18   that were on the property as well.

19   Q.   Which were over a million dollars?

20   A.   Yes.

21   Q.   So when the property gets transferred to the port, you

22   all at the port have the ability to do things with the

23   delinquent real estate taxes, correct?

24   A.   We managed the county land bank, and the land bank has

25   the authority to clear delinquent taxes when it takes title to

*BRUNNER - CROSS*

 1    property.

 2    Q.   But the maintenance costs, which you are now, I assume,

 3    aware of, they continue to drain now the port's finances.

 4    That hasn't gone away just because it was transferred to the

 5    port, correct?

 6    A.   Correct.

 7    Q.   So that's to the tune of $400,000 a year, as we sit here

 8    today?

 9    A.   I'm not going to speculate as to the exact amount

10    because, obviously, the building's vacant now, there isn't

11    electricity.  We've managed the costs down from the time we

12    took ownership, so I cannot tell you the exact amount, but

13    it's not $400,000 a year.

14    Q.   Property's blighted, you would agree with me?

15    A.   Yes.

16    Q.   In disrepair?

17    A.   Yes.

18    Q.   It is directly across the street from our Convention

19    Center?

20    A.   Yes.

21    Q.   So any time someone comes in from out of town to go

22    there, they see this property with paper and boarded up?

23    A.   Well aware of it.

24    Q.   I'm just making sure everyone else is aware.  As we sit

25    here today, if we walked west, we would see all this, correct?

*BRUNNER – CROSS*

1    A.   Correct.

2    Q.   And you're in litigation currently in Hamilton County

3    Common Pleas Court with Mr. Ndukwe's company, Kingsley, about

4    this property, 435 Elm, correct?

5    A.   Yes.

6    Q.   And there's a dispute over whether or not he has the air

7    rights.  I believe you claim that -- go ahead.

8    A.   I do not think I can answer that.  I don't think I should

9    answer that question.  We have a dispute as to his interest in

10   the property.  I don't think I should say anything more than

11   that, due to the litigation.

12        MR. C. MATTHEW RITTGERS:  Thank you.  May I have one

13   minute, Your Honor?

14        THE COURT:  You may.

15        MR. C. MATTHEW RITTGERS:  I have no further

16   questions, Your Honor.

17        THE COURT:  Thank you, Mr. Rittgers.  Ms. Gaffney

18   Painter?

19        MS. GAFFNEY PAINTER:  Just a brief redirect, Your

20   Honor.

21        THE COURT:  Very good.

22        MS. GAFFNEY PAINTER:  May I approach the podium?

23        THE COURT:  You may.

24

25

REDIRECT EXAMINATION

BY MS. GAFFNEY PAINTER:

Q.  Ms. Brunner, you were asked a series of questions about Rob and Brian, and I believe you testified there was a distinction between a developer versus an investor.  Can you please explain that distinction to us?

A.  Yes.  This morning, when I listed some of the activities that a developer undertakes for property, you have to find a piece of property.  You have to get title to the property.

You have to do environmental assessments of the property. You have to do a design.  You have to cost it.  You have to do this financial pro forma and test all these assumptions.  You have to raise debt and equity, and hire a contractor.  Those are all activities of a developer that are completely separate from who owns the project.

The developer that I just described that did all of those things may not have any equity in it.  They don't own it at all.  They just get paid a developer fee, or they might put $2 million of their money in and they own all of it.

Or if the equity that's required for that project is $4 million, and they only have $2 million, then they find somebody else to invest with them, and they share the ownership 50/50, each putting in $2 million.

So the ownership of the project, which means the share of the profits in the future, and the way you split the money

1    when you sell it, that all depends on equity, who's got the

2    money in it.

3        Now, sometimes one of those partners might have a -- more

4    money personally, and so they can sign a guarantee for the

5    debt, so they get paid some for that.  So there are other ways

6    in which you kind of split responsibilities and benefits, but

7    all of that, those are just equity partners.

8        You know, and nowhere in this, you know, discussion, in

9    these discussions with Mr. Sittenfeld were we talking about

10   who the developer was, and that was my concern from the very

11   beginning is who actually has the skill to do this.

12   Q.   You referenced, on cross-examination, changes to the

13   pro forma.  Can you give us just some examples of how

14   Mr. Ndukwe's pro forma was changing?

15   A.   Yes.  The first, most complete pro forma that he gave to

16   me was multiple pages, and he showed what the costs were going

17   to be, the debt, equity had already been put in there, not who

18   the parties were, so I didn't know any -- if there were any

19   commitments behind it.

20       But then the pro forma said, okay, I think it was about

21   $88 million.  This project is going to cost $88 million.

22   We're going to sell it year nine.

23       And mister -- Kingsley, Chinedum's profit, his profit was

24   going to be $27.6 million.  So I said to him, well, if you're

25   going to make $27.6 million when you sell this in nine years,

1  you can surely afford to pay me the $330,000 of ground payment

2  that I'm asking for.

3      So he said, oh, hmmm.  That didn't go so well.  He came

4  back eight days later with a pro forma that magically now said

5  that he was going to make $4.6 million instead of

6  $27.6 million.  And then a few months later, I got one from

7  him that says he was going to make $5.8 million.

8      So all of the numbers were changing to such a great

9  degree, I had no confidence in them.

10  Q.  You were asked a series of questions on cross-examination

11  about contact you had with Mr. Sittenfeld in 2018, 2019, 2020.

12      Was the communication you had with Mr. Sittenfeld about

13  435 Elm different in kind from those communications?

14  A.  Yes.

15  Q.  How so?

16  A.  I had -- Mr. Sittenfeld was one of the many council

17  members I had a good relationship with.  And we talked.  You

18  know, we cared a lot about the city.  We talked a lot about

19  different things.  He's a big picture thinker and cared

20  deeply, so we had a lot of very productive conversations.

21      And I will say these conversations about 435 Elm were

22  completely out of context with the rest of my communication

23  with him.

24          MS. GAFFNEY PAINTER:  No further questions, Your

25  Honor.

1    THE COURT:  Thank you.

2    MR. C. MATTHEW RITTGERS:  Very briefly.  May I

3  approach, Your Honor?

4    THE COURT:  You may.

5    MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

6    RECROSS-EXAMINATION

7  BY MR. C. MATTHEW RITTGERS:

8  Q.   Ms. Brunner, were you aware that Rob cut his teeth in

9  Georgia doing real estate development decades ago?

10  A.   I never heard these names.  Never heard of Rob until the

11  newspapers, you know, whenever this all -- this whole case

12  came out in the newspapers.

13    I did not know he -- I just knew there were investors.  I

14  never knew their names.  I was never told anything about them.

15  Q.   In that first pro forma that you mentioned on redirect,

16  you mentioned that there was no commitment behind him in that

17  pro forma.  You're referring to money, correct?

18  A.   I'm saying that -- well, that he had -- it was an Excel

19  spreadsheet.  It did not give any details of where the -- if

20  he had bank financing, if he had equity commitments or not.

21  Q.   Equity commitments could be somebody like out-of-town

22  investors with --

23  A.   Oh, yes.

24  Q.   -- millions of dollars?

25  A.   Yes.  But he never shared that with me.  He never said I

BRUNNER - RECROSS

1    have investors.  He never told me.  When Mike Schiff came to

2    town, you know, it was just like "my partners."  I said what

3    is he doing?  And he kept telling me he's a developer.  And

4    I'm, like, no, he's not a developer.  It sounds like he's an

5    investor.

6        So then I didn't know what these other two guys were.

7    And, honestly, I didn't know if those other two guys were

8    investors in 435, or -- because Chin was buying up multiple

9    properties in different locations.  I didn't know what was

10   going on, honestly.

11   Q.   In all your communications with P.G., you could tell that

12   he cared deeply about the City of Cincinnati?

13   A.   Yes.

14          MR. C. MATTHEW RITTGERS:  Thank you.  I have no

15   further questions Your Honor.

16          MS. GAFFNEY PAINTER:  No re-redirect, Your Honor.

17          THE COURT:  Very good.  Ma'am, you may step down.

18   Thank you.

19       (Witness excused.)

20       (Excerpt of proceedings concluded at 2:01 p.m.)

21                  *  *  *

22              C E R T I F I C A T E

23                  - - -

24       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
25   above-entitled matter.

```
1

2      /s/ M. Sue Lopreato_____                August 11, 2022
       M. SUE LOPREATO, RMR, CRR
3      Official Court Reporter

4

5                                 INDEX

6      GOVERNMENT WITNESS

7      LAURA BRUNNER

8      Direct by Ms. Gaffney Painter........................  Page 2
       Cross by Mr. C. Matthew Rittgers....................  Page 29
9      Redirect by Ms. Gaffney Painter.....................  Page 48
       Recross by Mr. C. Matthew Rittgers..................  Page 51
10

11
                                EXHIBITS
12
       GOVERNMENT EXHIBITS
13
       Exhibit                                             Admitted
14
       44B                                                    18
15

16
       DEFENSE EXHIBITS
17
       Exhibit                                             Admitted
18

19                              -  -  -

20

21

22

23

24

25
```