```
 1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                              *   *   *
 3

 4    UNITED STATES OF AMERICA,       : Case No. 1:20-cr-00142-1
                                      :
 5           Plaintiff,                : Jury Trial, Day 10
                                      : Tuesday, July 5, 2022
 6           - v -                    :
                                      : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a     :
        "P.G. Sittenfeld,"            :
 8                                    :
             Defendant.               : Cincinnati, Ohio
 9
                              *   *   *
10      EXCERPTED PROCEEDINGS - CONTINUED TESTIMONY OF JOHN CURP

11    BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                            *   *   *

13    For the Plaintiff:         EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17    For the Defendant:         CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
      Law Clerk:                 Jacob T. Denz, Esq.
21
      Courtroom Deputy:          Scott M. Lang
22
      Court Reporter:            M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                            *   *   *

25
```

Proceedings recorded by stenotype; transcript
produced by computer-aided transcription.

```
1                    P R O C E E D I N G S
2                (In open court at 10:13 a.m.)
3                         *   *   *
4         (Jury in at 10:13 a.m.)
5             THE COURT:  Ladies and gentlemen of the jury, first
6    of all, I hope you had an enjoyable 4th of July weekend.
7         There have been some things that have occurred in this
8    trial that have led to delays that I hope you won't attribute
9    to any party, just some unexpected things have come up.
10        We are trying to do the best we can, given the current
11   situation, and try to make this as convenient and efficient
12   and safe for all of you as we possibly can.
13        I very much appreciate the patience that you've
14   demonstrated to date, and your attention to the trial, and we
15   will move forward here in trying to keep things moving along
16   for you as best we can.
17        So I think when we left off, Ms. Glatfelter was
18   cross-examining Mr. Curp, and I believe the government is
19   ready to proceed this morning with cross-examination.
20   Ms. Glatfelter?
21            MS. GLATFELTER:  Yes, Your Honor, we are.  May I
22   proceed?
23            THE COURT:  You may.
24            MS. GLATFELTER:  Thank you.
25        (JOHN CURP, previously sworn, resumes witness stand.)
```

1          CONTINUED CROSS-EXAMINATION
2    BY MS. GLATFELTER:
3    Q.   Good morning, Mr. Curp.
4    A.   Good morning.
5    Q.   So when we left off, I'd like to take maybe 30 seconds to
6    ask you a few questions to go back to where we left off on
7    Wednesday.
8         So I believe, on Wednesday, you were talking about your
9    experience working for the City of Cincinnati?
10   A.   Yes.  If I may, Your Honor, I believe our understanding
11   was you were going to make a statement on the record regarding
12   the attorney/client privilege issue.
13   Q.   Yes.  And I will get to that.
14   A.   Okay.  Thank you.  I just want to be sure that's covered
15   before we get there.
16   Q.   Yes.  Certainly.  So you were talking about your
17   experience with the City of Cincinnati; is that right?
18   A.   Correct.
19   Q.   Okay.  And you currently are the interim city manager,
20   right?
21   A.   Yes.
22   Q.   And one of the departments you oversee is the economic
23   development department?
24   A.   Correct.
25   Q.   And we talked about how that's staffed with career public

1    servants, meaning they're not elected officials?
2    A.   Correct.
3    Q.   Okay.  And one of the tools that the city can use in the
4    economic development department is an RFP, right?
5    A.   Yes.
6    Q.   An RFP is something that the city might use to increase
7    competition?
8    A.   Yes.  An RFP is not competitive bidding in the context of
9    buying or, you know, building a bridge or a road, but it's a
10   process used to get proposals.
11   Q.   Right.  And so you might get different ideas for the
12   project through the RFP --
13   A.   Yes.
14   Q.   -- generally.  Or you might get a difference in --
15   because of those ideas, a difference in price for the city?
16   A.   You know, it depends.  Yes.
17   Q.   Just generally speaking?
18   A.   Generally, right.
19   Q.   Okay.  And so outside of city council, you left in
20   around -- I'm sorry, city council -- City of Cincinnati, you
21   left in around 2014; is that right?
22   A.   Yes.
23   Q.   And during that time, you worked in private practice
24   until you became the interim city manager, right?
25   A.   Yes.

1 Q. And you've represented Mr. Sittenfeld before?
2 A. Yes.
3 Q. He's a close friend?
4 A. Yes.
5 Q. And in 2019, you were working for a law firm, right?
6 A. Yes.
7 Q. Okay. And in that capacity, you represented Mr. Ndukwe
8 and his company, Kingsley?
9 A. Yes. I don't recall what year exactly, but I did
10 represent him.
11 Q. Okay. And specifically, that representation encompassed
12 aspects of 435 Elm?
13 A. Yes.
14 Q. All right. Now, we left off on Wednesday when I had
15 showed you an email, and you had expressed concerns about
16 attorney/client privilege.
17     So I'm representing to you that I have received, in
18 writing, Mr. Ndukwe's waiver of his company, Kingsley, and
19 himself. He has waived attorney/client privilege with respect
20 to that email.
21     I've also spoken to counsel for Mr. Schiff. Mr. Schiff
22 and his company, Schiff Capital, have likewise raised [sic]
23 any claim of privilege relating to that email, to the extent
24 that they had one.
25         THE COURT: You said "raised." Did you mean waived?

1  Q.  Waived.  Sorry.
2  A.  Yes.
3  Q.  And that's the representation that you wanted me to make
4  on the record?
5  A.  Yes.  Thank you.
6  Q.  Okay.  And you recognize that the client, in this case
7  Mr. Ndukwe and his company, and to the extent applicable
8  Mr. Schiff and his company, they are the holders of the
9  privilege?
10 A.  Yes.
11 Q.  Okay.  So if they waive privilege, you can discuss what
12 they authorized you to talk about?
13 A.  Yes.
14 Q.  All right.  Now, the email I had shown you was about some
15 discussions involving the port, specifically Ms. Brunner,
16 right?
17 A.  Yes.
18 Q.  We'll get to the specifics in a minute.
19     And you relayed information from the port back to
20 Mr. Ndukwe?
21 A.  Yes.
22 Q.  Okay.  Now -- so the email, I see you have a copy in
23 front of you.
24     Do you recall sending this email in 2019?
25 A.  I have not seen my emails.  I left the firm, and I have

```
 1    not seen my emails, so I'm, I guess, relying on the fact that
 2    you have these, so...
 3    Q.   Okay.  Well, let's start --
 4    A.   I remember this meeting, and I remember generally what it
 5    was about --
 6    Q.   Okay.  But --
 7    A.   -- but --
 8    Q.   So do you see your email address on the email?
 9    A.   Yes.
10    Q.   Okay.  That was your email address in December of 2019?
11    A.   Yes.
12    Q.   All right.  And you see the email address of Mr. Ndukwe
13    and Mr. Schiff?
14    A.   Yes.
15    Q.   Those were their email addresses that you used to
16    communicate with them?
17    A.   Yes.
18    Q.   Okay.  And was it your practice to keep your clients
19    informed of things related to their -- to your representation
20    of them?
21    A.   Yes.
22    Q.   Okay.  And with respect to this meeting, you see it was
23    sent on December 19, 2019?
24    A.   Yes.
25    Q.   And the email references the meeting that you had on that
```

1  date?
2  A.  Yes.
3  Q.  So the contents of this email were made around the same
4  time of the meeting?
5  A.  Yes.
6  Q.  All right.  And would this email accurately reflect your
7  impressions and your information regarding that meeting?
8  A.  Generally, yes.
9          MS. GLATFELTER:  Your Honor, at this time, I'd move
10 to admit the email as the next Government's Exhibit USA 49,
11 under Rule 803, as either a present sense impression or a
12 recorded recollection.
13         MR. C. MATTHEW RITTGERS:  No objection, Your Honor.
14         THE COURT:  What number is it, USA 49?  USA 49 is
15 admitted without objection.
16         MS. GLATFELTER:  Your Honor, permission to publish?
17         THE COURT:  You may do so.
18 Q.  Mr. Curp, do you see the email that we were discussing on
19 your screen?
20 A.  Yes.
21 Q.  What is the date of this email?
22 A.  December 19, 2019.
23 Q.  And this email recounts your conversation with
24 Ms. Brunner?
25 A.  Yes.

1  Q.   Can you read the two sentences -- the second paragraph,
2  starting with the sentence "I do not believe"?
3  A.   "I do not believe that she has any interest in pursuing
4  an RFP.  The politicos have boxed her into dealing with us
5  exclusively for the foreseeable future."
6  Q.   Okay.  And by "politicos," you're referencing elected
7  officials?
8  A.   Yes.
9  Q.   By "boxing her in," is that synonymous with, you know,
10 putting her in a corner or backing her into a corner?
11 A.   Well, that fits with our litigation strategy and with our
12 development strategy.  So I believe, at that time, if we had
13 given both strategy we were employing at that time, that we
14 had forced her to deal with Mr. Ndukwe.
15 Q.   Exclusively?
16 A.   Hopefully exclusive in our RFP process.
17           MS. GLATFELTER:  All right.  Your Honor, permission
18 to publish to the witness and the jury what has previously
19 been admitted as USA 11A?
20           THE COURT:  You may do so.
21           MS. GLATFELTER:  Ms. Terry, if we could go to the
22 last page, and the bottom three entries right there.
23 Q.   Sir, do you see the date of these entries are December of
24 2019?
25 A.   Yes.

1  Q.  And that middle entry is December 23, 2019, "Sittenfeld
2  contacts Laura Brunner."  Do you see that?
3  A.  Yes.
4  Q.  This email that we were talking about, can you tell us
5  where that fits in time-wise with this chronology?
6  A.  The email that I sent was December 19.
7  Q.  All right.  So it would be between the December 11th and
8  December 23rd entry?
9  A.  Yes.
10            MS. GLATFELTER:  One moment, Your Honor?
11            THE COURT:  Yes.
12            MS. GLATFELTER:  Those are all my questions.  Thank
13  you.
14            THE COURT:  Thank you.
15                      REDIRECT EXAMINATION
16  BY MR. C. MATTHEW RITTGERS:
17  Q.  Mr. Curp, now that privilege has been waived, can you
18  tell us the concerns that your client and you had about why
19  Mrs. Brunner was treating him unfairly?
20            MS. GLATFELTER:  Your Honor, I just want to clarify,
21  for this witness, the privilege has been waived with respect
22  to this email only.
23            THE COURT:  Very good.
24  Q.  Were you -- I'm sorry.
25  A.  And so, again, my understanding, when we discussed this,

1    was that the business and litigation strategy that was
2    encompassed in this entire message was part of the waived
3    privilege.
4            MR. C. MATTHEW RITTGERS: That's what I heard on
5    direct, Your Honor.
6            THE COURT: I'm not going to order you to answer, as
7    I have not ordered you to answer any question all along.
8        I think the privilege, and your understanding of your
9    obligations as an attorney, should guide your willingness to
10   answer this question.
11   Q.   Are you comfortable in answering that question, Mr. Curp?
12   A.   Yes.  My understanding of the waiver, as represented by
13   Ms. Glatfelter, is that I could speak to the litigation and
14   real estate strategy that's related to the full content of
15   that email.
16   Q.   Can you give us a little bit more context about that
17   email, and the ways in which you had concerns about
18   Mrs. Brunner's treatment of Mr. Ndukwe at that time?
19   A.   Certainly.  So this property -- Mr. Ndukwe owned a
20   mortgage interest, and essentially two to three floors of the
21   building, so we had two strategies.
22       One was that the port could not proceed without
23   acknowledging that right that he had in that air space.  And
24   if they were to issue an RFP, that would mean that they were
25   challenging that right and would give us the basis to pursue

1    litigation against the Port Authority.
2         The other part is that Mr. Ndukwe believed that the port
3    was prejudiced against black developers, and especially
4    against Mr. Ndukwe.
5         So at the same time we were pursuing the development
6    strategy of convincing council members on two fronts; one,
7    that it was a good project, one that he had indisputable
8    rights to the space.  And third, that the port's history of
9    black developers deserved the port to favor him to develop
10   this project.
11        The litigation strategy was very simple, which was we
12   were going to challenge the legal right that he had in the
13   mortgage rights to that -- the floor, as well as the federal
14   civil rights claim against the port for their discrimination
15   against black developers.
16   Q.   And I assume that you talked to more than just one
17   council member.  There were other civic leaders that you
18   talked to about this during that time, correct?
19   A.   Correct.
20   Q.   Can you tell us -- the prosecutor mentioned on direct
21   [sic] that there was one tool, RFPs are one tool that can be
22   used.  Can you describe situations, I mean back when you were
23   a city solicitor, when RFPs were not used?
24   A.   Well, I wouldn't -- an RFP issued where there are
25   disputed property rights is not a productive exercise --

1  Q.  Why?

2  A.  -- and that was my position.

3      Because a developer is not going to waste the time and
4  energy to put together a proposal, build out costs, build out
5  project specs, prepare a development if they don't have a
6  clear property right that they are going to be able to pursue
7  at the end of the process.

8  Q.  As we sit here today, three years later, three years
9  later, are you familiar with any RFP that has been issued for
10 435 Elm?

11 A.  No, I'm not.

12 Q.  When did Mr. Ndukwe purchase the air rights to 435 Elm?

13 A.  I don't know the exact time.  It was prior to him seeking
14 our representation on the case.

15 Q.  Back on -- this email was dated in December of 2019, I
16 believe, correct?

17 A.  Yes.

18 Q.  Mr. Ndukwe had what -- for what we've learned in here, a
19 new partner.  Who was that?

20 A.  Michael Schiff was the only other person I worked with on
21 this project.

22 Q.  So at this time -- do you recall a meeting where
23 Mr. Schiff and Mr. Ndukwe sat down in the City Hall office
24 with Mr. Sittenfeld?

25 A.  I wasn't at that meeting.

1  Q.  Okay.  Were you aware that that meeting occurred?
2  A.  I don't recall.
3  Q.  Did Mrs. Brunner express her interests to you at that
4  time, in terms of whether or not she actually wanted to issue
5  an RFP or work with the person who had the air rights?
6  A.  Can you state that again?  I'm sorry.
7  Q.  Sure.  Did she express to you her desire to work with
8  Mr. Ndukwe as a partner and Mr. Schiff as a partner?
9  A.  Yes.  At the time that we received this case in our firm,
10 we were perceived as a litigation firm.  And Ms. Brunner
11 mentioned to me the fact that she was disappointed that
12 Mr. Ndukwe was taking a litigation track on this case, and
13 that she was interested in working with them.
14      And we, again, took the threat of an RFP as a lever in a
15 business negotiation of the case.
16          MR. C. MATTHEW RITTGERS:  May I have one moment, Your
17 Honor?
18          THE COURT:  You may.
19          MR. C. MATTHEW RITTGERS:  I have no further
20 questions, Your Honor.
21          MS. GLATFELTER:  No recross, Your Honor.  Thank you.
22          THE COURT:  Very good.  Mr. Curp, you're free to step
23 down.  Thank you.
24      (Witness excused.)
25

```
 1          (Excerpt of proceedings concluded at 10:28 a.m.)

 2                            *   *   *

 3                       C E R T I F I C A T E

 4                            -   -   -

 5       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
 6   above-entitled matter.

 7


 8   /s/ M. Sue Lopreato                        August 11, 2022
     M. SUE LOPREATO, RMR, CRR
 9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

DEFENSE WITNESS

JOHN CURP

Cont'd cross by Ms. Glatfelter...................... Page 3
Redirect by Mr. C. Matthew Rittgers.................. Page 10

EXHIBITS

GOVERNMENT EXHIBIT

Exhibit                                              Admitted

49                                                       8

- - -