```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                              *   *   *
 3

 4   UNITED STATES OF AMERICA,     : Case No. 1:20-cr-00142-1
                                   :
 5            Plaintiff,           : Jury Trial, Day 7
                                   : Wednesday, June 29, 2022
 6            - v -                :
                                   : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a   :
       "P.G. Sittenfeld,"          :
 8                                 :
              Defendant.           : Cincinnati, Ohio
 9
                              *   *   *
10     EXCERPTED PROCEEDINGS - TESTIMONY OF JOHN CURP

11   BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                            *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                            *   *   *

25
```

1                    P R O C E E D I N G S

2              (In open court at 2:47 p.m.)

3                        *   *   *

4         THE COURT:  All right.  Let's bring the jury in.

5         (Jury in at 2:47 p.m.)

6         THE COURT:  Mr. Rittgers, does the defense intend to

7    call a witness?

8         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  John

9    Curp.

10        (Defense witness, JOHN CURP, sworn.)

11        THE COURT:  You may proceed, Mr. Rittgers.

12                   DIRECT EXAMINATION

13   BY MR. C. MATTHEW RITTGERS:

14   Q.  Good afternoon, Mr. Curp.

15   A.  Good afternoon.

16   Q.  Could you please state your name for the record.

17   A.  John Phillip Curp.

18   Q.  What do you do for a living?

19   A.  I am the interim city manager for the City of Cincinnati.

20   Q.  Since when?

21   A.  January 19th, I think, of 2021 -- or, 2022 of this year.

22   Q.  Let's go back to 2008.  What was your job at that point

23   in time?

24   A.  In 2008, I was appointed the city solicitor for the City

25   of Cincinnati.

1   Q.   And what is the city solicitor?

2   A.   The city solicitor is the chief legal counsel for the

3   City of Cincinnati.  Part of my responsibilities were that I

4   was the chief prosecutor for the city, in addition to being

5   the general counsel for the city.

6        As a part of that responsibility, I advised the city

7   manager, the mayor, and the council individually.  And part of

8   city council's rules gave me a direct attorney/client

9   relationship with each member of council.

10  Q.   How long did you serve in that role as city solicitor?

11  A.   Until approximately February of 2014.

12  Q.   And without getting into any specific legal advice, what

13  were the primary sources of law that you would rely on when

14  giving legal advice to council members or the mayor?

15  A.   The City of Cincinnati is a home-ruled community governed

16  by its own charter, which is our city's constitution, also

17  relied upon the laws or statutes of the State of Ohio and the

18  United States Constitution.

19  Q.   During those years, 2008 to 2014, when you were the city

20  solicitor, were you aware of conversations that occurred

21  between individual council members and developers?

22  A.   Yes.  The developers, or any interested party working

23  with council members was part of the business at City Hall.

24  Q.   How were you aware that those conversations were

25  occurring?

1   A.   Depending on the legislation in front of council,

2   interested parties, including developers, would present to

3   council in the form of committee hearings.

4       They would interact directly with council members.  You

5   would see them in the hallways, you know, on the third floor,

6   which is where council chambers are.

7   Q.   Do you know what the Port Authority is?

8   A.   Yes.

9   Q.   Who was the head of the Port Authority back in 2011 and

10  2014?

11  A.   Laura Brunner.

12  Q.   Were you aware of interactions that Mrs. Brunner had with

13  individual council members back at that time?

14  A.   Yeah.  The Port Authority is created by a creature of the

15  county and the city.  We formed the Port Authority many years

16  ago.

17      Ms. Brunner would routinely appear before council to

18  discuss projects that the port was working on, and would

19  interact with council members and provide them briefings of

20  projects that the port had that was with the city.

21  Q.   How common was it for Ms. Brunner to interact with

22  council members on an individual, one-on-one basis?

23  A.   You know, I wasn't in all the individual meetings, but

24  she was -- you know, you would see her frequently on the third

25  floor of council.

1    Q.  After 2014, what did you do for employment between your

2    job now as interim city manager and after you left the city

3    solicitor office?

4    A.  So I was a partner at the law firm of Blank Rome.

5    Q.  And in that role at a private law firm, did you continue,

6    on occasion, to have ongoing involvement related to developers

7    and city council members?

8    A.  Yes.  My role at the firm was to handle most of the local

9    government work that came in the office.

10    Q.  During that time, were you involved -- and I'm not asking

11    specific people or projects, but were you involved in small

12    meetings outside of the council floor with developers and

13    council members?

14    A.  Yes.

15    Q.  How frequent or common was that, in your experience?

16    A.  It just depended on the nature of the project and how

17    much, you know, work or information that individual

18    legislators would need.

19    Q.  In your experience both as city solicitor and also as a

20    private attorney, how common was it for developers to seek

21    specific individual council members' advice, maybe with their

22    lawyer or maybe with a lobbyist?

23    A.  I'd say it's fairly common.  Nearly every development

24    project required some form of legislation to pass through city

25    council, so I think it was very common.

1  Q.  In your experience as a solicitor and also on the other

2  side, on the private side, how common was it for council

3  members to express whether or not there were enough votes to

4  pass certain development deals?

5  A.  Yeah.  In my role as the solicitor, depending on the

6  project and if I was, kind of, the lead executive on the

7  project, it would be common for me to talk to council members

8  and, on behalf of the administration, essentially count votes

9  to see what support the legislation would have in passing

10  through council.

11     So I would frequently have conversations with individual

12  members of council to ask them if the votes were here for this

13  project; and, if not, what issues were of concern that might

14  help the administration advance the legislation.

15  Q.  How common was it, in your experience both in private

16  practice and also as a solicitor, to hear council members

17  express their confidence in getting votes?

18  A.  Especially if asked, they would tell me how many votes

19  they thought they had and, depending on the issue, how they

20  could get one or two more votes, depending on what they

21  thought were the crucial elements of the legislation that you

22  needed more or less support.

23  Q.  When did 435 Elm first become on your radar in your

24  capacity at any point?

25  A.  Sure.  When I came to the city in 2008, the property was

1    already a trouble spot in the city.  The city convention

2    facilities have been long believed to be kind of obsolete or

3    losing its competitiveness, mostly because of the Millennium

4    Hotel that was across the street that was not meeting

5    standards that was necessary to attract conventions to the

6    city.

7        435 Elm was across the street from there and considered

8    to be a prime development site.  It had a problem tenant in

9    the building that had property rights that the city couldn't

10   control.

11       So we were always working, looking for partnerships or

12   development opportunities to assist the current occupant to

13   move on, or find some way to take control of the property so

14   we could make it a part of the development portfolio around

15   the Convention Center.

16   Q.   Do you recall when P.G. was first elected to council?  Do

17   you remember the year?

18   A.   I believe probably around 2011.

19   Q.   During that time, 2011 through when you left in 2014, was

20   435 Elm on your radar in the city?

21   A.   Yes.

22   Q.   How often would you interact with or brief P.G. when you

23   were the solicitor during that time, 2011 to '14?

24   A.   Sure.  Councilmember Sittenfeld was one of our more

25   engaged council members, so we probably had a regular weekly

1    standing meeting where I would update him on all the issues

2    that were affecting the city to the law department.

3    Q.   And relative to his colleagues, how was he in terms of

4    his proactiveness and interest in legislation?

5    A.   I would say that probably two or three council members

6    out of nine that I had regular standing meetings with.  And

7    some council members had limited interest in, you know, law

8    departments, what we were working on, what our agenda was at

9    the moment.  Others would direct me to just contact them if

10   there were issues that I thought they should be aware of.

11   Q.   How frequently would council members come to you, and I'm

12   talking about any council members, complaining about

13   bureaucratic red tape or delays that constituents might be

14   feeling?

15   A.   Yeah.  I think that was a regular part of being a

16   director of a department at the city.  Council members had

17   direct access to all the department directors.

18       Because I was the attorney for council and for individual

19   council members, I would on a, you know, daily, weekly basis

20   be in contact with council members who had constituent issues

21   or questions about any given project I was working on.

22   Q.   Who else could council members or did council members go

23   to if there were projects that were stalled, that they

24   believed were stalled?

25   A.   Usually dependent on where council members thought where

*CURP - DIRECT*

1    the project was tied up.  So there was a city manager and two

2    assistant city managers, each of them had responsibilities for

3    different projects in the city.  I worked with all three of

4    them on different projects, so it was, again, a regular part

5    of our interaction.

6        Communications could come through those three

7    administrators, or the development director would bring issues

8    to us.  And sometimes the complaints were if the law

9    department was working too slow on a particular contractor

10    issue, and they would come directly to me.

11    Q.  How common was it for the city to -- and I'm using the

12    term "partnership" loosely, but partner with the Port

13    Authority?

14    A.  I would say that the city and the port are partners.

15    Again, they are our commercial and industrial economic

16    development arm of the city, in partnership with the county,

17    so I think, you know, we were in regular contact with them on

18    projects that were important for the city.

19    Q.  How frequently was it for council members, on a small

20    group sort of basis or individual basis, to reach out directly

21    to the head of the port, like Laura Brunner?

22    A.  You know, I don't know individual conversations, but I

23    would expect that they were contacting the port and other --

24    our other development partners, 3CDC, on a regular basis to

25    get updates on projects.  And those organizations engaged

1    council members directly.  Anyway, so a lot of those

2    conversations would be around the administration.

3    Q.   So you mentioned 3CDC and the port.  People at 3CDC and

4    the port would regularly engage council members directly, is

5    that what --

6    A.   That was customary.

7              MR. C. MATTHEW RITTGERS:  I have no further

8    questions, Your Honor.

9              THE COURT:  Thank you, Mr. Rittgers.  Ms. Glatfelter?

10             MS. GLATFELTER:  Thank you.  Yes.  May I inquire?

11             THE COURT:  You may.

12                        CROSS-EXAMINATION

13   BY MS. GLATFELTER:

14   Q.   Good afternoon, Mr. Curp.

15   A.   Good afternoon.

16   Q.   We've never met before.  My name is Emily Glatfelter.

17        You are the interim city manager for the City of

18   Cincinnati?

19   A.   Correct.

20   Q.   And before that, you worked as a private attorney, I

21   think you said, at a law firm?

22   A.   Yes.

23   Q.   And the city has an economic development department,

24   right?

25   A.   Yes.

1  Q.  And it's staffed with career public servants?

2  A.  Correct.

3  Q.  And by "career public servants," we mean people that work

4  there, they're not elected officials?

5  A.  Yes.  The city administration is civil service outside

6  the political arm of the city, which is council.

7  Q.  And you depend on those career employees to evaluate

8  development projects in that economic development department?

9  A.  Correct.

10 Q.  And those career employees make assessments of what's in

11 the city's best interest based on a number of factors, right?

12 A.  Yes.

13 Q.  They vet proposed deals?

14 A.  Yes.

15 Q.  The city has tools for trying to find the best developer

16 for projects; for example, in your work for the city, you've

17 heard of the term RFP before, I assume?

18 A.  Yes.

19 Q.  That means a request for proposal, right?

20 A.  Correct.

21 Q.  And in the context of development projects, government

22 entities can put out an RFP to interested parties to submit

23 proposals, right?

24 A.  Yes.

25 Q.  And one of the purposes of an RFP is to increase the

1    competition, right?

2    A.  Yes.

3    Q.  So the government can get the best deal for the city --

4    A.  Correct.

5    Q.  -- right.  Whether that's price, or maybe that's the idea

6    of the development, the purpose of the RFP is so the

7    government can make a choice about what's best; is that right?

8    A.  Correct.

9    Q.  And those RFPs, essentially, result in competition

10    amongst the developers in the context of a development

11    project?

12    A.  Yes.

13    Q.  Would you agree it's in the government's interest to use

14    RFPs?

15    A.  Yes.

16    Q.  And, in fact, this year, the city was planning to do an

17    RFP for a third-party vendor to find a permanent city manager

18    position, right?

19    A.  I have -- because of my role in the city as the interim

20    city manager, I've been excluded from that process.

21    Q.  Okay.  Are you aware that they were going to put out an

22    RFP for that, though?

23    A.  Yes, I'm aware.  I've been following it closely.

24    Q.  Thank you.  Now, you're familiar, you said on direct

25    examination, with the 435 Elm location in general, correct?

1    A.   Yes.

2    Q.   And is it true that you represented Mr. Ndukwe in

3    meetings with Ms. Brunner?

4    A.   Correct.

5    Q.   And you've also represented the defendant personally?

6    A.   Yes.

7    Q.   And you consider him a friend?

8    A.   Yes.

9    Q.   One of those meetings where you represented Mr. Ndukwe in

10   front of Ms. Brunner happened in December of 2019.  Does that

11   sound about right?

12   A.   That sounds about right.

13   Q.   Okay.  And after that meeting, you typically would

14   provide Mr. Ndukwe feedback regarding the meeting; is that

15   right?

16   A.   Correct.  I believe, yes.

17   Q.   And regarding this meeting that happened on December 19,

18   2019, you actually sent him an email regarding what happened

19   at the meeting?

20   A.   At this point, you know, Mr. Ndukwe was a client of

21   myself and the firm, and I'm not able to disclose

22   attorney/client information.

23   Q.   Sure.  Would an email that Mr. Ndukwe provided to the

24   government refresh your memory regarding this?

25   A.   Without a waiver from the client to myself and to the

1    firm, I'm uncomfortable answering any attorney/client

2    communications.

3              MS. GLATFELTER:  Your Honor may we approach at

4    sidebar?

5              THE COURT:  You may.

6    SIDEBAR CONFERENCE

7              MS. GLATFELTER:  Thank you, Your Honor.  I have

8    copies.  Mr. Ndukwe provided us with communications a while

9    back regarding his interactions with Mr. Curp.  He wasn't even

10   sure he understood their relationship.

11      But in the context of that meeting, he said he doesn't

12   believe Ms. Brunner has any -- first of all, I don't think

13   this information is privileged here.  He's reporting on his

14   meeting with Ms. Brunner.

15      And he said, "I do not believe that she has any interest

16   in pursuing an RFP.  The politcos have boxed her in to dealing

17   with us exclusively for the foreseeable future."

18              THE COURT:  Has Mr. Ndukwe waived whatever privilege

19   he has in this letter?

20              MS. GLATFELTER:  With -- for this letter, yes.

21              THE COURT:  And how would I know that?

22              MS. GLATFELTER:  We could -- I guess we could ask

23   him.

24              MR. SINGER:  Call Scott Croswell.

25              MS. GLATFELTER:  Yeah.  We can contact his attorney,

1    and --

2         MR. SINGER:  We specifically asked him.  He provided

3    these documents to us.  We said there's some material in here

4    that's got attorney/client labeled on top, and he told me that

5    he was waiving privileges for purposes of this.  But we could

6    take a recess and call.

7         THE COURT:  So I'm a little uncomfortable -- I'm not

8    suggesting anyone is misrepresenting anything to me.  I'm a

9    little uncomfortable not hearing directly from the client.

10        And I think the witness may also be a little

11   uncomfortable.  And I don't know what he believes he needs in

12   order to feel that there's a valid waiver of the

13   attorney/client privilege.

14        I'm not inclined, without something further, to instruct

15   him to answer a question based on the representation that the

16   government has just made.

17        So I'm happy to explore the issue further.  I do believe

18   Mr. Ndukwe can waive the privilege.  I believe this witness

19   could be convinced that he has waived the privilege, but I'm

20   not inclined to tell him to answer the question.

21        MS. GLATFELTER:  Could we take a brief recess to get

22   Mr. Ndukwe's attorney on the phone to speak with the Court and

23   also Mr. Curp?

24        THE COURT:  It would be better if Mr. Ndukwe himself,

25   I think.

1          MS. GLATFELTER:  Sure.

2          THE COURT:  That would be up to the attorney.  I

3     mean, whatever he's comfortable with, in terms of the

4     privilege being waived, I'm going to end up being comfortable

5     with, because I believe he's raised a legitimate concern, and

6     I think it needs to be addressed.

7          MS. GLATFELTER:  Okay.

8          THE COURT:  So in terms of the flow of your

9     examination, you think we should do this now?  We can do that.

10    That's fine.

11        Or if there are other things you can do -- I don't want

12    to tell you how to do your cross-examination, I'm just looking

13    to you for direction.  Would you like to take a break now,

14    or --

15         MS. GLATFELTER:  I would like to take a break.  I

16    think this is important.  I actually do not think this part of

17    -- I don't think this communication is privileged.

18        We can get Mr. Ndukwe and Mr. Croswell, or whatever will

19    satisfy him.  I think this directly goes towards what we've

20    been talking about this morning, and the idea about limiting

21    competition, and who it was that was boxing Ms. Brunner in on

22    a deal in the year 20- --

23         THE COURT:  Again, if you don't believe it's

24    privileged, and if you believe he's going to agree with you

25    it's not privileged, I don't object to you showing him that

1  and asking him whether the part you want to solicit

2  information on would be privileged.  But if he says yes, then

3  we're going to need to do something.

4       MS. GLATFELTER:  Sure.  Maybe we could take a brief

5  break.  I can show him the communication, ask him, and we

6  could, in the meantime, get Mr. Ndukwe on the phone.  Whatever

7  would satisfy him.  I don't want him to be uncomfortable, and

8  I certainly understand the Court's concern.

9       THE COURT:  Okay.  Well, then, it sounds like we're,

10 unfortunately, going to need to take a brief break.

11      Are there other -- well, I assume you believe Mr. Ndukwe

12 will just give a blanket waiver of any privilege issues, or is

13 this the only --

14      MS. GLATFELTER:  This is the only one I want to show

15 him, and this is the email that he provided to our case agent.

16      THE COURT:  Okay.  All right.  So I think we need to

17 take a break, then.

18 SIDEBAR CONFERENCE CONCLUDED

19      THE COURT:  Ladies and gentlemen, as I mentioned at

20 the beginning of the trial, sometimes issues come up

21 unexpectedly that need to be addressed outside the presence of

22 the jury.  One such issue has just arisen.

23      And so while I know we were just on a break,

24 unfortunately, I'm going to need to ask you to go back up to

25 the jury room.  And I don't think it will take too long to

1    address, but I'm not entirely certain.  So we will summon you

2    back down when we can proceed.

3        As I mention every time we take a break, please don't

4    discuss this case amongst yourselves.  Please don't

5    communicate with anybody about the case, or let anyone

6    communicate with you.

7        Please do not do any research on any aspect of the case.

8    Please don't look at any media accounts regarding the case,

9    and please don't begin to form any final opinions about the

10   case until all the evidence at closing.

11       So with that, we're going to, unfortunately, take another

12   brief recess.

13       (Jury out at 3:09 p.m.)

14       THE COURT:  So you raised an issue of attorney/client

15   privilege.  The government has represented to me that they

16   believe Mr. Ndukwe has waived the privilege, but I don't

17   intend to force you to answer a question without you being

18   able to have an opportunity to ascertain that to whatever

19   level of satisfaction you need.

20       So I think the way we're going to proceed is

21   Ms. Glatfelter is going to show you the document to which she

22   was referring.

23       She intends to, as I understand it, elicit your testimony

24   only with respect to one small part, and it may be that you

25   believe that part is not subject to privilege.

1          If you believe it may be, and would like to confer with

2     Mr. Ndukwe and/or his counsel in this case, we can address

3     that separately, so it's sort of a two-step procedure.  Does

4     that make sense to you, sir?

5               THE WITNESS:  Yes.

6               MS. GLATFELTER:  I left my document there.

7               THE COURT:  You may grab your document.

8               MS. GLATFELTER:  I don't know if your client -- I'm

9     happy to provide him -- I made a copy, but I didn't know if we

10    needed to wait until his determination before I handed out

11    copies?

12              THE COURT:  I think it's probably smart to do that.

13              MS. GLATFELTER:  Yes.

14              THE WITNESS:  So this is a communication I would have

15    only had with him, with the client.

16              THE COURT:  The only question I'm asking you -- I'm

17    not asking you right now to reveal the contents of that, or

18    say anything about it.

19         The only question that's pending right now is the one

20    from me to you, which is you raised concerns, without having

21    seen the statement, about the possibility of attorney/client

22    privilege.

23         Now having seen the statement, do you remain concerned

24    about attorney/client privilege?

25              THE WITNESS:  Yes.

1          THE COURT:  Okay.  So then I think what we need to do

2    is take a break to allow Mr. Curp to confer with Mr. Ndukwe.

3        Is Mr. Ndukwe's counsel all right, or do you need to

4    confer with Mr. Ndukwe directly?

5          THE WITNESS:  Well, I guess, from my view, Blank

6    Rome's counsel is not here.  I'm no longer with the firm, and

7    so the privilege obviously belongs to the client.

8        And I think, from my perspective, the informed consent of

9    a client that he's waiving the privilege is what I need.

10          THE COURT:  Okay.  So I think we need to take a break

11    and see if we can arrange some communications.

12          THE WITNESS:  And with all due respect, there's

13    another lawyer in my firm that is on this communication too,

14    so his involvement is likely necessary as well, since he's

15    remaining partner at the firm.

16          THE COURT:  Very good.

17          MS. GLATFELTER:  Yes.  I believe that doesn't change

18    the fact that it's Mr. Ndukwe's call in terms of whether he

19    waives the privilege.

20          THE COURT:  Oh, absolutely.  I don't want to speak

21    for -- Mr. Curp's decisions about attorney/client privilege

22    are very personal.

23          THE WITNESS:  I agree the privilege belongs to the

24    client.

25          THE COURT:  So why don't we take a break, and you see

1    if you can arrange whatever communications need to occur with

2    Mr. Ndukwe.

3         THE WITNESS:  And, again, with all due respect,

4    there's another party on the phone, which is his development

5    partner, who was working within the context of that

6    attorney/client relationship as well, Mr. Schiff.

7         THE COURT:  Your firm had an attorney/client

8    relationship with him as well?

9         THE WITNESS:  They were co-developers on the project,

10   yes.

11        THE COURT:  That wasn't my question.  My question

12   was, did your firm have an attorney/client relationship with

13   Mr. Schiff?

14        THE WITNESS:  We did not have a contract with

15   Mr. Schiff.  I don't think we did.

16        THE COURT:  Okay.  All right.

17        MS. GLATFELTER:  Your Honor, we have a witness room

18   outside.  I don't know how you'd like us -- what would be the

19   best way, or Mr. Curp's preference, for facilitating this?

20      We're happy to get Mr. Croswell and Mr. Ndukwe on the

21   phone and let Mr. Curp have that conversation.  I just don't

22   know if -- whatever he's amenable to.  If he'd like --

23        THE COURT:  Is that going to be sufficient, if

24   Mr. Ndukwe waives it, or do you now have concerns about

25   Mr. Schiff as well?

1          THE WITNESS:  Mr. Schiff as well, yes.

2          THE COURT:  So you're saying that the relationship

3     wasn't just with Mr. Ndukwe?

4          THE WITNESS:  The contract with the firm was with

5     Kingsley Development, and Mr. Schiff was the co-developer

6     participating in the project with Kingsley as -- and I don't

7     know how they've divided fees, but I believe that I was

8     working with both of them as co-developers on the project.

9          THE COURT:  I see.  Do you know who Blank Rome's

10    general counsel is?

11         THE WITNESS:  In Philadelphia at the moment.  I don't

12    know a name, in particular.

13         THE COURT:  Oh, okay.  Well, how would you suggest we

14    proceed, Ms. Glatfelter?

15         MS. GLATFELTER:  Yes, Your Honor.  As we mentioned,

16    Mr. Ndukwe has waived the privilege related to this email.

17    We're happy to get him on the phone and facilitate that.

18       I believe that the witness has said that Blank Rome

19    didn't have a contract separately with Mr. Schiff and the

20    privilege related to Kingsley, which is Mr. Ndukwe's sole

21    company.

22       And so I think Mr. Ndukwe is in the position to waive

23    that privilege.  And I believe that Mr. Curp's relationship

24    with Mr. Ndukwe extended before and after Mr. Schiff's

25    participation in this project.

1          THE COURT:  Okay.  All right.  So what I would

2     suggest is we take a recess.  Mr. Curp, you can use these

3     chambers right over here.  I think Ms. Glatfelter can arrange

4     for you to make a phone call to someone, and we can see if we

5     can get to somewhere where you're comfortable.

6        As I said, I'm not going to sit here and order you to

7     provide testimony that you believe would infringe the

8     attorney/client privilege, and I appreciate that's a decision

9     the attorneys have to make.

10          Let's take a brief recess.

11        (Brief recess.)

12          THE COURT:  So it's the Court's understanding that

13    we've not been able to completely resolve the potential

14    privilege issue with regard to the question that's pending

15    before Mr. Curp.

16        Is that the government's understanding as well,

17    Ms. Glatfelter?

18          MS. GLATFELTER:  Yes, based on our discussion.

19          THE COURT:  Mr. Rittgers?

20          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  I wasn't

21    privy to it, but...

22          THE COURT:  Okay.  So I think the prudent thing to do

23    at this juncture is to dismiss the jury for the day to see if

24    we can resolve the outstanding issue with regard to privilege

25    before we move forward with Mr. Curp's further examination.

1      It would be the Court's intent, since the last thing I

2  did before they left the room was admonish them anyway, to

3  just release them and bring them back at 9:00.

4      Mr. Rittgers, yes?

5      MR. C. HENRY RITTGERS:  Judge, there is another

6  issue.  Even if the waiver of the conflict comes about, it's a

7  hearsay issue.

8      THE COURT:  Well, I mean, he can testify as to what

9  his impression was at the meeting.  He can sit on the stand

10  and testify as to what his impression was at the meeting.  And

11  then if he reports a different impression than was in the

12  document, he can be impeached using the document, I think.

13      Ms. Glatfelter?

14      MS. GLATFELTER:  Yes.  I also believe this is a

15  recorded recollection that could be introduced into evidence

16  if we chose.  It could also be read to the jury.

17      THE COURT:  Yeah.  Well, we can talk about that,

18  possibly.

19      All right.  So I think what we're going to do is send the

20  jury home.  That's where I was.

21      Last thing I did before they left was admonish them.  If

22  either side wishes, I could bring them back and admonish them

23  again, but they've been admonished a lot already, so...

24      MR. C. HENRY RITTGERS:  We're not interested in that.

25  I think they get the picture.

1          THE COURT:  Okay.  Scott, we can release the jury.

2     Please ask them to be back at the normal time tomorrow.

3          Mr. Curp, sir, you can step down.  The one thing I

4     would tell you is that you remain on the stand, so please do

5     not confer with anybody regarding your testimony, other than

6     as needed to confer with general counsel at the firm if you

7     have a privilege issue, or something of that nature.

8          THE WITNESS:  Okay.

9          THE COURT:  And you may step down, sir.

10          THE WITNESS:  Okay.

11     (Witness excused for the day.)

12          THE COURT:  Mr. Rittgers?

13          MR. C. MATTHEW RITTGERS:  What time would you like

14     him back tomorrow?

15          THE COURT:  If you could be back by, say, 9:00 in the

16     morning.  Can you do that?

17          THE WITNESS:  Yes.

18          THE COURT:  That would be great.  Thank you.

19          THE WITNESS:  Thank you.

20     (Witness excused.)

21     (Excerpt of proceedings adjourned at 4:12 p.m.)

22                         *   *   *

23

24

25

1      C E R T I F I C A T E

2        - - -

3    I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
  is a correct transcript from the record of proceedings in the

4  above-entitled matter.

5

6  /s/ M. Sue Lopreato_____      August 11, 2022

  M. SUE LOPREATO, RMR, CRR

7  Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3      DEFENSE WITNESS

4      JOHN CURP

5      Direct by Mr. C. Matthew Rittgers.................... Page 2
       Cross by Ms. Glatfelter............................. Page 10

6

7

8

9

10                              -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25