<pre>
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             *   *   *
 3

 4    UNITED STATES OF AMERICA,     : Case No. 1:20-cr-00142-1
                                    :
 5            Plaintiff,            : Jury Trial, Day 7
                                    : Wednesday, June 29, 2022
 6         - v -                    :
                                    : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a   :
       "P.G. Sittenfeld,"           :
 8                                  :
              Defendant.            : Cincinnati, Ohio
 9
                             *   *   *
10         EXCERPTED PROCEEDINGS - RULE 29 MOTION

11    BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                             *   *   *

13    For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                  MATTHEW C. SINGER, ESQ.
14                                MEGAN GAFFNEY PAINTER, ESQ.
                                  U.S. Department of Justice
15                                U.S. Attorney's Office
                                  221 E. Fourth Street, Suite 400
16                                Cincinnati, Ohio  45202

17    For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                  CHARLES H. RITTGERS, ESQ.
18                                NEAL D. SCHUETT, ESQ.
                                  Rittgers & Rittgers
19                                12 E. Warren Street
                                  Lebanon, Ohio  45036
20
      Law Clerk:                  Jacob T. Denz, Esq.
21
      Courtroom Deputy:           Scott M. Lang
22
      Court Reporter:             M. Sue Lopreato, RMR, CRR
23                                513.564.7679

24                             *   *   *

25
</pre>

```
 1                    P R O C E E D I N G S
 2               (In open court at 2:01 p.m.)
 3                        -   -   -
 4          THE COURT:  Does the government intend to call
 5   another witness?
 6          MR. SINGER:  No, Your Honor.
 7          THE COURT:  So you're resting?
 8          MR. SINGER:  Yes, Your Honor.
 9          THE COURT:  So should we take a brief break?
10          MR. C. MATTHEW RITTGERS:  Just a brief one.
11          THE COURT:  Ladies and gentlemen of the jury, the
12   government is resting its case, which means it's not calling
13   any further witnesses at this time.
14      There's usually a little work that we need to do before
15   the defense starts to put on its case, so we need to have a
16   little conversation, and that will give you an opportunity to
17   have a break.
18      We will be in contact when we're ready to go.  It may
19   take a little longer than usual, just because we're switching
20   from one case to another here.  I imagine you would be back by
21   2:30.
22      I would remind you not to discuss -- the government's
23   case has rested.  The case is certainly not over, so please do
24   not discuss it amongst yourselves.  Please do not do any
25   research.  Please do not communicate with anyone on the case.
```

1       If anyone attempts to communicate with you, please let me

2  know, and please do not form any final opinions.  While the

3  government has rested its case, Mr. Sittenfeld still has to

4  put on his.

5       The time for deliberating and forming opinions will be

6  after all that is done.  So have a good afternoon break.

7       (Jury out at 2:03 p.m.)

8            THE COURT:  Mr. Rittgers, do you have a motion to

9  make?

10           MR. C. MATTHEW RITTGERS:  I believe it's Mr. Schuett,

11 Your Honor.

12           THE COURT:  Very well.  Mr. Schuett?

13           MR. SCHUETT:  May I approach?

14           THE COURT:  You may.  Is the jury clear, Scott?

15           COURTROOM DEPUTY:  Yes.

16           MR. SCHUETT:  May I proceed, Your Honor?

17           THE COURT:  You may.

18           MR. SCHUETT:  Your Honor, at this time we would make

19 a motion for judgment of acquittal pursuant to Rule 29 on all

20 six counts.

21       As part of our arguments, my thought was to go through it

22 how it was grouped on the indictment 1, 2, 3, 5, 4, 6.

23           THE COURT:  Very good.

24           MR. SCHUETT:  I also intended to probably refer to

25 things like in the indictment as phase one and phase two, if

1    that makes sense to the Court as well.

2              THE COURT:  It does.

3              MR. SCHUETT:  I intended to walk through the six

4    counts separately in those bundles before addressing the

5    underlying quid pro quo that kind of is at the foundation of

6    all six, Your Honor.

7              THE COURT:  Very good.

8              MR. SCHUETT:  Your Honor, we believe that the motion

9    for acquittal should be granted on all six counts to start

10   because, aside from the stipulations, there's not sufficient

11   evidence presented by the government to meet the standard,

12   even though it is a lower standard here in Rule 29.

13        On Counts 1 and 2, the issue to address, to begin with,

14   would be that the scheme or artifice to defraud in this case

15   as it relates to honest services, Your Honor, the government

16   has failed to provide sufficient evidence, even on a Rule 29

17   standard, that there was this scheme or artifice to deprive

18   another of honest services by Mr. Sittenfeld.

19        As we heard, he published through the FEC the checks that

20   he received.  Those were publicly disclosed checks.  He did

21   not conceal those checks in any way.

22        The names that were provided on those checks are the ones

23   that were assigned on the FEC website.  If there was a scheme

24   to defraud, one would assume that he would have just taken the

25   cash that was offered to him.  He did not accept that.

1        There was discussions of cashier's checks that would have

2   been the equivalent of cash, and he did not accept that.  Then

3   there was the issue with the corporation checks versus the LLC

4   checks.  Again, if there was some sort of scheme to defraud, a

5   scheme to materially conceal, none of those were taken.

6        Mr. Sittenfeld, on multiple occasions, asked for the

7   names of real people and real LLCs, which were then provided

8   to the FEC and the --

9        THE COURT:  Mr. Schuett, let me ask you a question,

10  if I could.

11       So if he took even a legal contribution in exchange for a

12  tacit agreement to provide some specific official action,

13  would that not suffice to show a scheme to defraud for

14  purposes of Counts 1 and 2?

15       MR. SCHUETT:  If I'm understanding what you're

16  saying, if there's a tacit bribery argument or agreement, that

17  that would constitute a scheme to defraud.  Is that the

18  question?

19       THE COURT:  That's what I'm asking.  Is that

20  sufficient scheme to defraud for purposes of an honest

21  services violation?

22       MR. SCHUETT:  I think the law is pretty clear that if

23  that existed, yes, that that would -- bribery can be a scheme

24  to defraud.  Obviously, we believe that that has not been

25  proven, which I was going to discuss later, but --

1          THE COURT:  Sure.

2          MR. SCHUETT:  -- if I understand what the Court's

3     asking, yes, bribery could constitute a scheme to defraud.  I

4     think the law is pretty clear on that.

5          THE COURT:  Okay.  I just wanted to make sure that I

6     was understanding correctly.  Thank you.

7          MR. SCHUETT:  Your Honor, he's not charged with any,

8     as we've discussed at great length at times, any FEC

9     violations, certainly nothing related to straw donors.

10        And I mean, if you look at the evidence that has been

11    presented, it wasn't exactly clear.  There was discussion at

12    one point of the cash, but then Rob later said that someone --

13    that he was giving him a check that was written from his

14    partner and his partner's LLC.

15        So on that point, we would argue that that scheme to

16    defraud has not been established.  Again, we'll address the

17    quid pro quo later, Your Honor.

18         THE COURT:  Even on a scheme to defraud front, I

19    think you'd agree, we have to take the evidence, at this

20    stage, in the light most favorable to the government; isn't

21    that right?

22         MR. SCHUETT:  We do, Your Honor, whether or not any

23    rational trier of fact would believe that the element had been

24    met, yes, sir.

25         THE COURT:  Hasn't there been testimony that he was

1    aware that the names on the checks didn't match the actual

2    source of funds, at least on a couple of occasions?  I thought

3    Mr. Ndukwe testified to that, didn't he?

4          MR. SCHUETT:  I don't remember Mr. Ndukwe -- I

5    remember discussion from Rob that at least that had been

6    asserted.  I mean, if you looked at the transcripts or watched

7    the video, that it's not exactly that clear.

8      There are discussions of going to his network to retrieve

9    LLC checks, not that it was some sort of the same cash, per

10    se, but that they were going to their network funds to present

11    these LLCs.

12          THE COURT:  I guess, with regard to Mr. Ndukwe, it

13    was that Mr. Sittenfeld knew that the money that Mr. Ndukwe's

14    associate at work provided was, in fact, the source of that

15    funds of Mr. Ndukwe.  That's what Mr. Ndukwe testified, I

16    think, right?

17          MR. SCHUETT:  We're talking about Tung Nguyen?

18          THE COURT:  Yes.

19          MR. SCHUETT:  Sorry, Your Honor.  That's not before

20    the Court on these charges, Your Honor.  That's not part of

21    the scheme for Count 1 or Count 2.  And whatever the jury

22    wants to give that weight for intent certainly doesn't allow

23    the government to meet their Rule 29 obligations for Counts 1

24    and 2, Your Honor.

25          THE COURT:  Okay.

1      MR. SCHUETT:  Moving on to Counts 4 and 6 for the

2  extortion.  Again, separate from quid pro quo bribery, to

3  discuss just generally.

4      We would submit there's no evidence offered that he used

5  any sort of threats or violence towards the undercover agents

6  to have them hand over donations.

7      I understand that when you're in a position, an official

8  elected position, there could be, perhaps, an undertone of

9  coercion when it's connected to that office.

10      But if you look at the conversations between

11  Mr. Sittenfeld and Rob, there is not some sort of element of

12  do this or else.  There is not a coercive environment.

13      Most of the time, Mr. Sittenfeld is very collegial,

14  they're joking, they're laughing.  There is not an effort by

15  Mr. Sittenfeld, nor evidence has been presented of an effort

16  by Mr. Sittenfeld, to create a coercive environment.  In fact,

17  in 20- --

18      THE COURT:  What about the statement, "I don't want

19  you to be in a situation where I'm like no, Chin, I love you

20  but can't"?  How is that not coercive?

21      I mean, how can it be that a rational trier of fact

22  couldn't maybe find that to be coercive?  Not saying that I

23  find it to be coercive, but that isn't the standard, right?

24      MR. SCHUETT:  Understood, Your Honor.  On that

25  particular call and statement, if I understand correctly,

1    Counts 4 and 6 relate to the exchange between Rob and the UCEs

2    and Mr. Sittenfeld, not Mr. Ndukwe.

3        So that statement, for whatever value it may or may not

4    carry, does not inform the Court on the sufficiency of

5    evidence that would be needed for an extortive charge with the

6    agents, Your Honor.

7        THE COURT:  So you're saying that statement can't

8    form the basis for the charges that are set forth in 4 and 6;

9    is that right?

10        MR. SCHUETT:  As written in the indictment, correct,

11    Your Honor.

12        THE COURT:  Okay.

13        MR. SCHUETT:  It's certainly listed in the general

14    scheme, but it's not listed in the actual Counts 4 and 6,

15    those related to the UCE donations.  Mr. Ndukwe, in that

16    conversation, no money was exchanged, there wasn't any

17    official acts, there wouldn't --

18        THE COURT:  Well, but what if Mr. Ndukwe had shared

19    with Rob and Brian that statement, couldn't you have the

20    indirect effect of --

21        MR. SCHUETT:  Potentially, I suppose.  But the burden

22    was on the government to present that evidence.  We certainly

23    didn't hear that, Your Honor.

24        So I would -- again, I would say there's not a nexus to

25    connect that statement from Mr. Sittenfeld to Mr. Ndukwe to

1    the extortion charges that exist in Counts 4 and 6, Your

2    Honor.

3              THE COURT:  Okay.

4              MR. SCHUETT:  As I was stating, in 2019,

5    Mr. Sittenfeld doesn't even solicit donations.  I think it was

6    pretty clear that Vinny, in September of 2019, he wasn't

7    solicited to provide donations.

8         Later, Rob volunteered again that they were going to give

9    donations.  There was not solicitation.  There was no coercive

10   environment.  And so for those reasons, we would suggest to

11   the Court that, again, discussing quid pro quo later, that the

12   extortive element there is not present.

13        There was no fear.  And even just because he is an

14   elected official, he wasn't taking any action as that elected

15   official to create an extortion-type environment, Your Honor.

16             THE COURT:  So with regard to phase one, phase two,

17   do you think there has to be a separate threat in phase -- I

18   guess what you're calling phase two, or I guess Count 6, there

19   has to be a separate threat to form a basis for liability

20   under Count 6?

21             MR. SCHUETT:  The dates within the indictment are

22   separate, Your Honor.  It's not a continuing course of -- and

23   they give two very different dates that these charges are

24   supposed to have occurred.

25        So I would argue that, given the different scope of dates

1    that they've presented that, yes, there would need to be a

2    separate extortive action or environment.

3           THE COURT:  I have too many books.

4           MR. SCHUETT:  Your Honor, if I may also grab the

5    indictment?  I didn't bring it up here.

6           THE COURT:  I've got the indictment.  That's what I

7    was looking for.

8       You're pointing out that in Count 6, for example, it says

9    from July 8, 2019, to on or about February 5, 2020,

10   Mr. Sittenfeld knowingly, and then goes on.

11      So you're saying they have to point to some conduct that

12   occurred between those two dates?

13          MR. SCHUETT:  As I understand the notice they

14   provided, yes, sir.

15          THE COURT:  Okay.  As opposed to Count 4, which is

16   predicated on conduct that occurred from on or about

17   September 21, 2019, to on or about September 17, 2019?

18          MR. SCHUETT:  That is correct, Your Honor.  That's

19   our position.

20          THE COURT:  Very good.  All right.  I can understand

21   that.

22          MR. SCHUETT:  Moving on, then, to the last coupling

23   of Counts 3 and 5, which lead to the program with federal

24   funds.

25      I wanted to reassert at this point, I know it hadn't been

1     decided earlier that, given that this is a campaign donation

2     case, that for these particular charges, there is going to

3     need to be an explicit quid pro quo.

4        Even as the statute is written, it does say there needs

5     to be a specific intent to act corruptly and be influenced by,

6     because there's a presumptive idea and legitimacy to campaign

7     donations in order for that to be corrupt, and the influence

8     by should be read as an explicit quid pro quo.

9           THE COURT:  But not express, you'd agree?  He's being

10    explicit but not express, right?

11          MR. SCHUETT:  Correct, Your Honor.  It's my

12    understanding that between the Sixth Circuit and Supreme Court

13    has made it very clear that it does not need to be express.

14    It does need to be explicit, though, Your Honor.

15          THE COURT:  Okay.

16          MR. SCHUETT:  And so I did want to turn to the

17    concept, then, of the quid pro quo.

18        Your Honor, obviously, there are profound constitutional

19    implications in this case when we are dealing with free

20    speech, political speech, something that has been the hallmark

21    of this country, one of the first protected right that we list

22    in the Bill of Rights, and the chilling effect that it can

23    have if politicians are not allowed to engage with

24    constituents.

25        Donations are seen as, on innuendo or vague statements,

1    to be corrupt.  There's also federalism concerns, with

2    the U.S. Government coming in and telling local officials,

3    based on vague inferences, that they are committing federal

4    crimes.

5        It's obviously clear that not every donation, as the

6    Court said in *Terry*, is a bribe in sheep's clothing.

7        There is a general expectation in this country that some

8    future favorable action is not enough to prove quid pro quo.

9    Seeking donations from donors and individuals with businesses

10   in front of the legislative body that you happen to be on is

11   not, in itself, enough to be quid pro quo.

12       It's not a crime, even if there's temporal proximity, in

13   and of itself.  The fact that there was a donation, and then

14   an act close in time, without more, is not quid pro quo.

15       We want our politicians to be serving their constituents

16   and supporting legislation.  They want to be able to talk with

17   them about their policy considerations and, obviously, those

18   campaigns need to be financed.

19       So there's obviously a danger here, and it's unrealistic

20   to believe that a legislator can commit a crime when they lay

21   out the benefits for their constituents, when they hear from

22   donors that may have business in front of the legislative

23   body --

24           THE COURT:  What about the statement "I'll shepherd

25   the votes"?

1          MR. SCHUETT:  Yes, Your Honor.  We would argue that,

2     as noted by this Court, could be read in multiple different

3     ways.

4          THE COURT:  But isn't that exactly the point?  It

5     could be read in multiple different ways, so then isn't it the

6     jury's job to --

7          MR. SCHUETT:  Your Honor, at this point, I would

8     actually argue that is a failure of the state to provide

9     sufficient evidence.  There was a specific official act

10    discussed because the specific official act has to be

11    pressure, convincing someone to vote, as opposed to expressing

12    support.

13        And if it was just expressing support, then they haven't

14    met their burden, right?  Because if it's just I support a

15    project, or I support a policy, or I support crossing the

16    aisle to shake hands in a bipartisan way --

17         THE COURT:  Well, but it's enough if it's just even

18    an "I'll vote yes."  It doesn't have to be I'll get the whole

19    council to agree, right?  Wouldn't it be an official act --

20    and I'm not saying that the evidence shows this.

21        But if Mr. Sittenfeld were to agree to vote himself in a

22    particular way, he doesn't have to be able to deliver the

23    whole council in order for it to be an official act, does he?

24         MR. SCHUETT:  Well, no.  If he had said I will vote,

25    but he didn't, one, Your Honor; and two, that it has to be in

1 exchange for the money, which also, we would argue, has not

2 been linked.

3  So I think the vagueness in this situation actually, it

4 goes against -- the government had the burden to prove

5 sufficient evidence that this was a specific official act, and

6 they haven't done so.  And --

7  THE COURT:  Isn't it that one conversation where it's

8 like, well, I don't know if it's going to come in front of you

9 in six months, or a year, or two years, but we need to know

10 it's a yes when it does type thing?  You know the comment to

11 which I'm alluding?

12  MR. SCHUETT:  Yes, Your Honor.  And I mean, again,

13 "can deliver the votes" is unclear.  Again, the nexus to be

14 controlled by money is lacking as well.  And so, you know,

15 again, somewhat of a team, this is like you take out a

16 context, maybe, right, but they need to provide that nexus.

17 They haven't done so.

18  And we would argue that those vague statements in 2018,

19 about delivering votes and shepherding votes, do not rise to

20 the level of sufficient evidence to prove, even at this

21 juncture, even with a Rule 29 threshold, to send that matter

22 to the jury.

23  As far as 2019, there's no statements being made by

24 Mr. Sittenfeld regarding official acts.  Again, it was he

25 stood up to leave, or while he got up, he shook hands.  It

1    sounded like he was leaving. It was, hey, come over here.

2    There was not a nexus. There wasn't an official act, or even

3    a specific official act that was discussed.

4        At that meeting, there was general discussion of how

5    government works, and how zoning works, and when a city can

6    handle certain things through licensing.

7        Though if you look at the entirety of that, that video, I

8    believe it's 30F, as in Frank, while we only saw truncated

9    versions, there's an entire discussion in session one that

10   we've heard about multiple times but we didn't hear.

11       And in that, Rob and Brian are priming that concept of

12   sports betting, and their concerns about Mr. Ndukwe as the

13   face. And then they come in, and they start talking about it

14   again.

15       And Vinny starts talking about how he's frustrated that

16   it's going to be on a statewide level, which Mr. Sittenfeld

17   then discusses he has no power in that, the way it works, and

18   explains the mechanics of how it works; state, local, when

19   they can zone and when they can't. But there's no commitment

20   to any official act.

21       The most that you get is that Mr. Sittenfeld says he can

22   put them in touch with Dan, which would just be setting up a

23   meeting, which is not a specific official act.

24       And Vinny, when he says, hey, we're going to take care of

25   you, which isn't illicit, in and of itself. That just means

1    we want to donate.

2        He says what I want you to do is keep Rob updated.

3    Again, that's not a specific official act.  That's just

4    relaying information.

5        And so we would submit there's not a specific official

6    act at all.  It was in the indictment for Counts 2, 5, and 6,

7    but that are in that phase two that would rise the level --

8    even on a Rule 29 level to go to the jury, Your Honor.

9        As far as the in exchange for, we would also argue that

10   there is not, one, an explicit quid pro quo, in that the

11   agreement would be clear and understanding, unambiguous, that

12   Mr. Sittenfeld expressed a manifest -- or manifested an intent

13   to be controlled by the money for a specific official act.

14       And on that level would argue that then, because the quid

15   pro quo is sort of the foundation for all six, that not

16   showing the explicit clear understanding, and the fact that

17   we're talking about what does deliver the votes means goes to

18   that point, Your Honor, that there's not an explicit

19   understanding on what it means.

20       And the government hasn't shown enough evidence to rise

21   to that level.

22       For that reason, Your Honor, we would ask that you grant

23   the motion on all six counts.

24           THE COURT:  Thank you, Mr. Schuett.

25       Would the government like to respond?

1           MR.  SINGER:  Yes, Your Honor.

2           If I may, I'm just going to address the topics as

3     they were raised by the defense.

4           THE COURT:  Sounds good.

5           MR. SINGER:  As to the honest services fraud relating

6     to a scheme to defraud in Counts 1 and 2, that is rolled up in

7     the quid pro quo.  If there is a quid pro quo, then it

8     necessarily is a concealment from the public, and that in

9     itself indicates that intent to defraud.

10         As for Counts 4 and 6, the defense raised a lack of

11    threats or inducement.  That's the holding of the *Evans* case,

12    Your Honor.

13         Supreme Court said in *Evans* that there is no inducement

14    element for extortion under color of official right.

15         The Court said this is the holding, where a public

16    official knowingly receives a bribe, that satisfies the Hobbs

17    Act under color of official right.  There is no inducement

18    element.  It's not like the other prongs, the other types of

19    extortion.

20         THE COURT:  So are you saying the elements for 4 and

21    6 are identical to 1 and 2 or what?

22         MR. SINGER:  For purposes of bribery, yes.  Honest

23    services bribery and extortion under color of official right,

24    that's why the case law -- there's so much overlap on the case

25    law for color of official right bribery cases and honest

1     services bribery cases.

2          THE COURT:  I thought that was a problem, if you have

3     two crimes that have exactly the same elements.

4          MR. SINGER:  They don't have -- the bribery prong is

5     the same.  They have different jurisdictional elements.

6          THE COURT:  Oh, I see.  Okay.

7          MR. SINGER:  So for honest services fraud, there must

8     be a wire, or there must be some affect on interstate commerce

9     for the Hobbs Act.

10          THE COURT:  Okay.

11          MR. SINGER:  But the Supreme Court is very clear that

12     there is no inducement.  The inducement comes by the fact that

13     they're public officials, and so there is an innate presence

14     and authority over the decisionmaking that creates an

15     imbalance.

16          THE COURT:  In the presence of a quid pro quo?

17          MR. SINGER:  Yes.  Yes.

18          THE COURT:  Okay.

19          MR. SINGER:  And so wherever a public official

20     knowingly receives a bribe, that's enough to satisfy the

21     elements both for honest services fraud and the extortion

22     count.

23      For Counts 3 and 5, the 666 charges, the Sixth Circuit is

24     clear that there is no quid pro quo requirement, that the

25     Sixth Circuit looks at the elements of the -- the statutory

1  language when determining the elements, and the statutory

2  language includes a corrupt intent to either be influenced or

3  rewarded in connection with business that's before the city.

4  Now, this is a campaign contribution case, so as the

5  Court has recognized in the jury instructions that we filed,

6  the business has to be specific business. So it would mirror

7  the -- sort of the specific official action in that regard

8  that has to relate to a specific project or a specific

9  business, otherwise, it would be a more general business that

10  would be allowable under 666.

11  But that element is satisfied here, Your Honor, because

12  the 435 Elm Street project is the subject matter of both

13  Counts 3 and Count 5.

14  So all of the conversations relating to money in exchange

15  for some business before the city, it all relates to the

16  specific business that is advancing the 435 Elm Street

17  project.

18  THE COURT: With respect to Count 5 and the 2019/'20

19  time frame, where are you getting -- I'm looking at, I guess

20  it's Count 3, but I assume the elements are the same,

21  corruptly solicited and demanded.

22  So are you saying that what occurred in the hotel room,

23  where in the video it appeared Mr. Sittenfeld was getting up

24  to leave, and then Vinny raised the two checks, are you saying

25  something -- where am I going to find the soliciting or

1     demanding in that -- well, let me start with this.

2         Is that what you're saying was the soliciting or

3     demanding, was that vignette?

4              MR. SINGER:  No, Your Honor.  I don't believe Count 5

5     has solicitation language.  The solicitation comes from -- is

6     in Count --

7              THE COURT:  Count 5, corruptly solicited and demanded

8     for his own benefit, and accepted and agreed to accept a thing

9     of value from a person intended to be influenced and rewarded

10    in connection.

11             MR. SINGER:  So we charged in the conjunctive, Your

12    Honor.  I think the evidence will show that he accepted and

13    received the money corruptly and in exchange or in connection

14    with the business of the city.

15             THE COURT:  Oh, it says "and" in the indictment.  It

16    says, Corruptly solicited and demanded for his own benefit and

17    accepted and agreed to accept, so you're saying it's an "or"?

18             MR. SINGER:  Well, when it goes to the jury, it will

19    be an "or."

20             THE COURT:  Oh.  Okay.  Why is that?  This isn't the

21    quote from the statute, or what?

22             MR. SINGER:  Well, it is a quote from the statute,

23    Your Honor, but we include more language in the indictment.

24             THE COURT:  Oh, I see.

25             MR. SINGER:  The jury can decide any one of those.

1    They don't have to find that each one of them occurs.

2              THE COURT:  So you're saying he did A and B, and both

3    A and B are wrong, but if either A or B happened, that would

4    be --

5              MR. SINGER:  Correct.

6              THE COURT:  So you're focused on the intending to be

7    influenced and rewarded?

8              MR. SINGER:  Correct.

9              THE COURT:  Okay.

10             MR. SINGER:  And the corrupt intent when it's

11   accepted or agreed to accept.

12             THE COURT:  Okay.

13             MR. SINGER:  So there is no quid pro quo requirement,

14   and so I'll address the --

15             THE COURT:  For Count 5?

16             MR. SINGER:  For Counts 3 and 5, Your Honor.

17             THE COURT:  But for 1, 2, 4, and 6, there is?

18             MR. SINGER:  Correct.

19             THE COURT:  Okay.

20             MR. SINGER:  And I think the Court's analysis in

21   denying the motion to dismiss, this is instructive here.  As

22   you know, the speaking indictment, with a lot of the same

23   recordings that were played here, are contained in the

24   indictment.  The Court found that based on just the limited --

25   that the lesser amount of evidence that was provided in the

1   indictment, that a reasonable jury could find that there was a

2   quid pro quo both for the 2018 exchange in Counts 1, 3, and 5,

3   and the 2019 exchange for 2, 4, and 6.

4           THE COURT:  Okay.

5           MR. SINGER:  I'm happy to answer any questions the

6   Court has relating to that, otherwise, I will sit down.

7           THE COURT:  Very good.

8           MR. SINGER:  Thank you, Your Honor.

9           THE COURT:  Mr. Schuett, anything further?

10          MR. SCHUETT:  Yes, Your Honor, if I may?

11          THE COURT:  You may.

12          MR. SCHUETT:  I'll address the matter that Mr. Singer

13  just left on.  Corrupt intent, or corrupt intent to be

14  influenced by, when read in the lens of a campaign donation,

15  can only mean one thing, which is explicit quid pro quo,

16  because there's a presumption of legitimacy for campaign

17  donations and speech.  And so to cross the line, the courts

18  have been clear you need explicit quid pro quo.

19      So while the statute -- and *Abbey* certainly addressed is

20  it a requirement in all cases?  No.  But in this case, it is,

21  because their own -- this isn't a plus factor case, Your

22  Honor.  We don't have gifts.

23      And on all of the cases that have been cited by the

24  government so far have been plus factor cases.  And so we

25  don't have that.  And at the close of their evidence, we don't

1    have that.

2        And so inherently, it must be an explicit quid pro quo in

3    this particular case, under these particular facts, and with

4    the law being what it is for campaign donations, that they can

5    only have a corrupt intent to be influenced by with campaign

6    donations if it's an explicit quid pro quo.

7        As far as the Hobbs Act, I would note that it was as if

8    they knowingly received a bribe, and which would call back to

9    they haven't shown that he knowingly received a bribe.

10        There are two -- there's a lot to unpack there in that

11    phrase that they still haven't shown, so even if they haven't

12    shown generalized extortion, they also haven't shown that he

13    knowingly received a bribe for all of the reasons that I've

14    already articulated, Your Honor.

15        If there's no further questions, again, we would ask that

16    you dismiss all counts.

17            THE COURT:  Thank you, Mr. Schuett.

18            MR. SCHUETT:  Thank you, Your Honor.

19            THE COURT:  Well, I think, at the end of the day, I

20    knew this motion was coming, not surprisingly, and I think, as

21    things stand right now, the statements that we've heard from

22    the various witnesses, there's sufficient ambiguity in them

23    that a jury could find -- certainly, I don't think is

24    compelled to find, but could find that a quid pro quo exists.

25        And I think, if that is the case, that would defeat the

1    motion as to all six of the counts, so the Court, on the

2    record right now, is denying the request for a Rule 29 motion.

3        I think the government has presented sufficient evidence

4    to go to the jury on all six counts.  I'll note that, unlike

5    *Dimora*, or a lot of the other cases, certainly, the conduct

6    here that's been presented by the government doesn't seem as

7    explicitly egregious as some of the conduct that has occurred

8    in other cases.  But as the parties are also aware, there is

9    case law there suggesting that wink wink nudge nudge is enough

10   to suggest the existence of an agreement.

11       And in light of where the case law is on what's necessary

12   to show an agreement, I believe that, at least right now, the

13   government has shown enough to get to the jury, so I'm going

14   to deny the motion.

15       With that, we can take a very brief break.  How long do

16   you need to be in a position to start with your case,

17   Mr. Rittgers?

18           MR. C. MATTHEW RITTGERS:  Should not be long, Your

19   Honor.  Have to take a quick break and make sure the witness

20   is here.

21           THE COURT:  So can we try to get started by 2:45?

22   That will only be about 10 minutes.  Is that enough for

23   everybody?  Okay.  Very good.  Let's take a recess.

24       (Brief recess.)

25           THE COURT:  And I should make clear on the record, I

1   realized I hadn't before I left, Mr. Schuett, that the Court's

2   denial -- it comes up mid-trial, oral motions.  The Court's

3   denial of the Rule 29 is not prejudiced, of course, to the

4   defendant's ability to renew the motion at the end of the

5   trial.

6           MR. SCHUETT:  Understood, Your Honor.  Thank you very

7   much.

8           (Excerpt of proceedings concluded at 2:47 p.m.)

9                           *   *   *

10                  C E R T I F I C A T E

11                         -  -  -

12      I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
    is a correct transcript from the record of proceedings in the
13  above-entitled matter.

14

15  /s/ M. Sue Lopreato_____          ____August 24, 2022____
    M. SUE LOPREATO, RMR, CRR
16  Official Court Reporter

17

18

19

20

21

22

23

24

25