```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                              -  -  -
 3

 4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                     :
 5            Plaintiff,             : Jury Trial, Day 11
                                     : Wednesday, July 6, 2022
 6            - v -                  :
                                     : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"           :
 8                                   :
              Defendant.             : Cincinnati, Ohio
 9
                              -  -  -
10           JURY INSTRUCTIONS AND CLOSING ARGUMENTS

11    BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                            -  -  -

13    For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                  MATTHEW C. SINGER, ESQ.
14                                MEGAN GAFFNEY PAINTER, ESQ.
                                  U.S. Department of Justice
15                                U.S. Attorney's Office
                                  221 E. Fourth Street, Suite 400
16                                Cincinnati, Ohio  45202

17    For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                  CHARLES H. RITTGERS, ESQ.
18                                NEAL D. SCHUETT, ESQ.
                                  Rittgers & Rittgers
19                                12 E. Warren Street
                                  Lebanon, Ohio  45036
20
      Law Clerk:                  Jacob T. Denz, Esq.
21
      Courtroom Deputy:           Scott M. Lang
22
      Court Reporter:             M. Sue Lopreato, RMR, CRR
23                                513.564.7679

24                            -  -  -

25
```

1                    P R O C E E D I N G S

2              (In open court at 9:00 a.m.)

3                         -  -  -

4         THE COURT:  We're here this morning in the matter of

5    the United States of America versus Alexander Sittenfeld, case

6    number 1:20-cr-142.

7         We're meeting in chambers for a continuation of the

8    charging conference and, in particular, to allow any party who

9    wants to, I assume it would be defense, since they're

10   instructions that were tendered by the government.

11        The government tendered three instructions last night as

12   additions to the jury instructions.  The Court has met with

13   the parties and reviewed the instructions and some

14   modification to include in the jury instructions.

15        And the purpose of this meeting in chambers is to allow

16   the defense to preserve their objections to those instructions

17   to the extent they wish to do so.  Mr. Schuett?

18        MR. SCHUETT:  Yes, Your Honor.  Thank you.

19        The first instruction that was raised regarding law

20   enforcement techniques.  We do object to that being included.

21   We don't believe that is necessary and draws undue attention

22   to a matter that was not brought up on entrapment, and so

23   would object to that.

24        As far as the second one that was dealing with, I guess,

25   as the phrase jury nullification and selective prosecution.

1    Again, do object.  Again, drawing attention the jury should be

2    spending on the facts of this case from matters that were not

3    necessary and were not brought up during trial, Your Honor.

4              THE COURT:  Which instruction did that get added to?

5    I think it's on page 19, is that right, the last paragraph?

6              MR. SCHUETT:  That is correct, Your Honor.  It came

7    in under "Defining the Charged Crimes and Related Matters on

8    Introduction," which is on page 19, that is correct, Your

9    Honor.  That last paragraph.

10             THE COURT:  So you're objecting to page 16, and the

11   last paragraph of page 19; is that correct?

12             MR. SCHUETT:  Yes, Your Honor, that is correct.

13             THE COURT:  Does the government wish to respond on

14   the record in any way?

15             MS. GLATFELTER:  No, Your Honor.  We've made our

16   arguments through our filing.

17             THE COURT:  Very good.  All right.  Thank you

18   everybody.  Appreciate it.  Off the record.

19         (Off the record.)

20             THE COURT:  All right.  So the other matter is it's

21   the Court's understanding that the defendant is resting their

22   case at this point; is that correct?

23             MR. C. MATTHEW RITTGERS:  That's correct.  Defendant

24   rests.

25             THE COURT:  Does the government intend to put on

1    rebuttal witnesses?

2         MS. GLATFELTER:  No, Your Honor.

3         THE COURT:  So both parties have rested.  Does

4    defense wish to make any motion?

5         MR. SCHUETT:  Yes, Your Honor.  At this time, we

6    would renew our Rule 29 motion for judgment of acquittal.  We

7    would ask to incorporate all prior arguments herein and ask

8    that, again, all six counts be dismissed for failure of

9    sufficient evidence at this time, Your Honor.  Thank you.

10        THE COURT:  Very good.  Does the government wish to

11   respond in any way on the record?

12        MS. GLATFELTER:  We would incorporate our previous

13   arguments to this effect, yes.

14        THE COURT:  Okay.

15        MR. SCHUETT:  Your Honor, the only thing to add to, I

16   guess, to make sure it's on the record, since we discussed it

17   off the record, that it was our understanding we could do this

18   in chambers, and the government would, if an appeal is

19   necessary, not argue that we in any way waived our Rule 29

20   arguments, Your Honor.

21        MS. GLATFELTER:  Yes.  The government understands

22   that and agrees that we would not make any argument that they

23   failed to preserve their Rule 29 motion based on the timing of

24   that motion.

25        THE COURT:  Okay.

1           MR. C. MATTHEW RITTGERS:  Your Honor, one other

2      thing.  I don't want to interrupt my colleagues' closing, but

3      I do want to preserve and make sure that we're not waiving

4      anything for the record.

5           If there are arguments related to straw donor donations,

6      conduit donations, we do believe that that's a material

7      prejudicial defect from the indictment.

8           And assuming the government will put on the record that

9      we're not waiving an appealable issue related to that

10     prejudicial material defect, by objecting now, which I'm

11     doing, rather than in the middle of his closing, if that's an

12     argument that they intend to make, then we won't object in the

13     middle of closing.

14          MR. SINGER:  That's preserved.

15          THE COURT:  So you're agreeing that they're not

16     waiving any objection; is that right?

17          MR.  SINGER:  That's correct.

18          THE COURT:  All right.  Very good.  Anything else?

19          MR.  SINGER:  One other issue, Your Honor.  In

20     defendant's exhibit binder, and their data poster board that

21     they intend to present during opening, we would object to

22     it --

23          THE COURT:  Closing?

24          MR. SINGER:  I'm sorry, during closing, we would

25     object to it, Your Honor.

```
 1                THE COURT:  What is it?

 2                MR. SINGER:  Can I show you?

 3                THE COURT:  Yes, you may.

 4                MR. C. MATTHEW RITTGERS:  It's the different burdens

 5     of proof.

 6                MR. SINGER:  So there's two issues with it, Your

 7     Honor.  One, the burden of proof is -- the Court gives an

 8     extensive instruction on the burden of proof.

 9          And it's very clear and very concise, and it lays out the

10     foundations for the burden of proof, and that's not consistent

11     with that chart.

12          The other issue is, at the top, it sets forth an

13     incorrect standard of law.

14                THE COURT:  Oh, right.  Yeah, I mean --

15                MR. C. MATTHEW RITTGERS:  What does it say at the

16     top?

17                THE COURT:  "He accepted bribes and it decided his

18     vote, he's guilty beyond a reasonable doubt."

19                MR. C. MATTHEW RITTGERS:  Oh, I don't think the

20     poster board, it's in there.  That's not on the poster board.

21     I can get the poster board.  I'll show you.  May I, Judge?

22                THE COURT:  Yes, you may.

23          (Pause in proceedings.)

24                MR. C. MATTHEW RITTGERS:  This is the poster board,

25     Your Honor.
```

1              THE COURT:  I see.  Just so we're clear on the

2      record.

3              MR. SINGER:  I see, Your Honor.

4              MR. C. MATTHEW RITTGERS:  But that is what was in

5      the -- I don't know why that was typed in.  Maybe at one

6      point, it will go back to the poster board.

7              MR. SINGER:  Okay.  I mean, the issue goes to the

8      burden of proof, then.  The Court's instructions say proof

9      beyond a reasonable doubt does not mean proof beyond all

10     possible doubt.

11        And possible doubts, or doubts based purely on

12     speculation, are not reasonable doubts.  None of that is

13     incorporated into this chart.

14        The reasonable doubt is doubt based on reasoning and

15     common sense.  This sets a standard that it's just not

16     consistent with the Court's instruction, and it conflates what

17     the burden of proof actually is.  The jury should be relying

18     on what the Court instructs it as far as the burden of proof.

19             THE COURT:  Well, I mean, guilty beyond a reasonable

20     doubt is a higher standard than clear and convincing, right?

21             MR.  SINGER:  It is, Your Honor.  But there's a lot

22     that's, sort of, baked into that --

23             MR. C. MATTHEW RITTGERS:  It's the truth.

24             MR. SINGER:  -- that's not represented in the poster.

25             MR. C. MATTHEW RITTGERS:  Well, it's the instruction

1    I'll be referring to and the jury will be referring to.  It's

2    just a demonstrative to let them know it's the highest burden

3    in the land.

4           THE COURT:  Yeah.  I'm going to overrule the

5    objection.

6           MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

7           THE COURT:  Okay.  Anything else we need to address

8    before closing?

9           MR. SINGER:  No.

10          THE COURT:  All right.  Great.  I'll be out as soon

11   as our printer gets caught up.

12          MR. C. MATTHEW RITTGERS:  Thank you.

13       (Off the record.)

14          THE COURT:  So I'm informed that the instructions are

15   just about printed.

16       Any reason we shouldn't bring in the jury?  How long

17   before they're going to be here, Scott?

18          COURTROOM DEPUTY:  The jury?

19          THE COURT:  No, the instructions.

20          COURTROOM DEPUTY:  Five minutes, or less than five

21   minutes.

22          THE COURT:  Okay.

23          COURTROOM DEPUTY:  I have most of them.

24          THE COURT:  Do you have enough to hand out to the

25   jury?

1           COURTROOM DEPUTY:  Looks like it.  Yes.  I have 14.

2           THE COURT:  All right.  Why don't we bring in the

3    jury.  Is there anything the government wants to put on the

4    record before we bring in the jury?

5           MR. SINGER:  No, Your Honor.

6           THE COURT:  Mr. Rittgers?

7           MR. C. MATTHEW RITTGERS:  No, Your Honor.

8           THE COURT:  All right.  Let's bring in the jury.

9       (Jury in at 9:11 a.m.)

10          THE COURT:  Ladies and gentlemen of the jury, I hope

11   you've had a restful evening.  We're now back on the record

12   for the continuation of the trial.  Does the defense intend to

13   call any further witnesses?

14          MR. C. MATTHEW RITTGERS:  No, Your Honor.  The

15   defense rests.

16          THE COURT:  Very good.  Does the government intend to

17   call any witnesses in rebuttal, Mr. Singer?

18          MR. SINGER:  No, Your Honor.

19          THE COURT:  So, ladies and gentlemen of the jury,

20   that means that you have heard all of the evidence that you're

21   going to hear in this case.  Both sides have now rested.

22      The way we intend to move forward is I'm going to ask my

23   courtroom deputy to hand out the jury instructions.

24      We're going to read the jury instructions which, as I've

25   said all along, the Court is going to instruct you on the law.

1    You've heard a lot of evidence, but you haven't heard yet what

2    the law is, so I'm now going to instruct you on the law.

3    We're going to read through these jury instructions.

4       And then once you have been instructed on the law, the

5    parties will give you closing arguments that will help, in

6    their view, synthesize the facts that you've heard, and apply

7    the law that you're about to hear to those facts, and give you

8    some things to think about when you are deliberating.

9       So we'll move forward with that, and then the Court will

10   have some final instructions before you retire to deliberate.

11   That will be part of the jury instructions here, but we'll get

12   to that in just a second.

13      So we're going to now read the jury instructions.

14      Does everybody have a copy?  The reason I've handed these

15   out is, I know some people -- it's easier.  There's going to

16   be a fair amount of reading here.  Sometimes it's easier to

17   listen while you're reading yourself.

18      I will ask that you sort of try to keep pace as I'm

19   reading them to you, and not get distracted and start reading

20   ahead or falling behind.  I'll try to read at a prompt pace

21   and move through these pretty quickly.

22      So General Rules Introduction is on page 4 of the

23   materials you've got.

24      Members of the jury, now it is time for me to instruct

25   you about the law that you must follow in deciding this case.

1    I will start by explaining your duties and the general rules

2    that apply in every criminal case.  Then I will explain the

3    elements, or parts, for each of the crimes that the defendant

4    is accused of committing.

5         Then I will explain some rules that you must use in

6    evaluating particular testimony and evidence.  And last, I

7    will explain the rules that you must follow during your

8    deliberations in the jury room and the possible verdicts that

9    you may return.

10        Please listen very carefully to everything I say.

11        Jurors' Duties.  You have two main duties as jurors.  The

12   first one is to decide what the facts are from the evidence

13   you saw and heard here in court.

14        Deciding what the facts are is your job, not mine.  And

15   nothing that I've said or done during this trial was meant to

16   influence your decision about the facts in any way.

17        Your second duty is to take the law that I give you,

18   apply it to the facts, and decide if the government has proved

19   the defendant guilty of one or more of the charged crimes

20   beyond a reasonable doubt.

21        It is my job to instruct you about the law, and you are

22   bound by the oath that you took at the beginning of the trial

23   to follow the instructions that I give you, even if you

24   personally disagree with them.

25        This includes the instructions that I gave you before and

1    during the trial, and these instructions.  All the

2    instructions are important, and you should consider them

3    together as a whole.

4       The lawyers may have talked about the law during their

5    arguments, or they may talk about the law during their

6    arguments, but if what they say is different from what I say,

7    you must follow what I say.  What I say about the law

8    controls.

9       During the course of trial, you may have heard lawyers or

10    witnesses refer to something called discovery.  This is a

11    legal term that is relevant to the Court and the parties.  It

12    is not an issue for you to consider.

13       Perform these duties fairly.  Do not let any bias,

14    sympathy, a prejudice that you may feel toward one side or the

15    other influence your decision in any way.

16       Presumption of Innocence, Burden of Proof, Reasonable

17    Doubt.  As you know, the defendant, Alexander Sittenfeld, has

18    pled not guilty to the crimes charged against him in the

19    indictment.

20       The indictment is not any evidence at all of guilt.  It

21    is just the formal way that the government tells the defendant

22    what crime he is accused of committing.  It does not even

23    raise any suspicion of guilt.

24       Instead, the defendant starts the trial with a clean

25    slate, with no evidence at all against him, and the law

1    presumes that he is innocent.  This presumption of innocence

2    stays with him unless the government presents evidence here in

3    court that overcomes the presumption and convinces you beyond

4    a reasonable doubt that he is guilty.

5        This means the defendant has no obligation to present any

6    evidence at all or to prove to you in any way that he is

7    innocent.  It is up to the government to prove that a

8    defendant is guilty, and this burden stays on the government

9    from start to finish.

10        You must find the defendant not guilty unless the

11   government convinces you beyond a reasonable doubt that he is

12   guilty.

13        The government must prove every element of the crimes

14   charged beyond a reasonable doubt.  Proof beyond a reasonable

15   doubt does not mean proof beyond all possible doubt.  Possible

16   doubts, or doubts based purely on speculation, are not

17   reasonable doubts.

18        A reasonable doubt is doubt based on reason and common

19   sense.  It may arise from the evidence, the lack of evidence,

20   or the nature of the evidence.

21        Proof beyond a reasonable doubt means proof which is so

22   convincing that you would not hesitate to rely and act on it

23   in making the most important decisions in your lives.

24        If you are convinced the government has proved the

25   defendant guilty beyond a reasonable doubt, you will say so by

1    returning a guilty verdict on that count.  If you are not

2    convinced, you will say so by returning a not guilty verdict

3    on that count.

4        Evidence Defined.  You must make your decision based only

5    on the evidence that you saw and heard here in court.  Do not

6    let rumor, suspicions, or anything else that you may have seen

7    or heard outside of court influence your decision in any way.

8        The evidence in this case includes only what the

9    witnesses said while they were testifying under oath, the

10   exhibits that I allowed into evidence, and the stipulations to

11   which the lawyers agreed.  Nothing else is evidence.

12       The lawyers' statements and arguments are not evidence.

13   Their questions and objections are not evidence.  My legal

14   rulings are not evidence.  And my comments and questions

15   during trial are not evidence.

16       During the trial, I did not let you hear the answers to

17   some of the questions that the lawyers asked.  I also ruled

18   that you could not see some of the exhibits that the lawyers

19   wanted you to see, and sometimes I ordered you to disregard

20   things that you saw or heard, or I struck things from the

21   record.  You must completely ignore all these things.  Do not

22   even think about them.

23       Do not speculate about what a witness might have said or

24   what an exhibit might have shown.  These things are not

25   evidence, and you are bound by your oath not to let them

1    influence your decision in any way.

2        Make your decision based only on the evidence, as I've

3    defined it here, and nothing else.

4        Consideration of Evidence.  You are to consider only the

5    evidence in this case.  You should use your common sense in

6    weighing the evidence.  Consider the evidence in light of your

7    everyday experience with people and events, and give it

8    whatever weight you believe it deserves.

9        If your experience tells you that certain evidence

10   reasonably leads to a conclusion, you are free to reach that

11   conclusion.  In our lives, we often look at one fact and

12   conclude from it that another fact exists.

13       In law, we call this an inference.  A jury is allowed to

14   make reasonable inferences unless otherwise instructed.  Any

15   inferences you make must be reasonable and must be based on

16   the evidence in the case.  The existence of an inference does

17   not change or shift the burden of proof from the government to

18   the defendant.

19       Direct and Circumstantial Evidence.  Now, some of you may

20   have heard the terms direct evidence and circumstantial

21   evidence.  Direct evidence is simply evidence like the

22   testimony of an eyewitness which, if you believe it, directly

23   proves a fact.

24       If a witness testified he saw it raining outside, and you

25   believed him, that would be direct evidence that it is

 1    raining.

 2        Circumstantial evidence is simply a chain of

 3    circumstances that indirectly proves a fact.  If someone

 4    walked into the courtroom wearing a raincoat covered with

 5    drops of water and carrying a wet umbrella, that would be

 6    circumstantial evidence from which you could conclude that it

 7    was raining.  It is your job to decide how much weight to give

 8    the direct and circumstantial evidence.

 9        The law makes no distinction between the weight that you

10    should give to either one, nor it says that one is any better

11    evidence than the other.  You should consider all the

12    evidence, both direct and circumstantial, and give it whatever

13    weight you believe it deserves.

14        Credibility of Witnesses.  Another part of your job as

15    jurors is to decide how credible or believable each witness

16    was.  That is your job, not mine.  It is up to you to decide

17    if a witness's testimony was believable, and how much weight

18    you think it deserves.

19        You are free to believe everything that a witness said,

20    or only part of it, or none of it at all, but you should act

21    reasonably and carefully in making these decisions.

22        Let me suggest some things for you to consider when

23    evaluating each witness's testimony.  Ask yourself if the

24    witness was able to clearly see or hear the events.  Sometimes

25    even an honest witness may not have been able to see or hear

1    what was happening and may make a mistake.

2        Ask yourself how good the witness's memory seemed to be.

3    Did the witness seem able to accurately remember what

4    happened?  Ask yourself if there was anything else that might

5    have interfered with the witness's ability to perceive or

6    remember the events.  Ask yourself how the witness acted while

7    testifying.

8        Did the witness appear honest, or did the witness appear

9    to be lying?  Ask yourself if the witness had any relationship

10   to the government or the defendant, or anything else to gain

11   or lose from the case, that might influence the witness's

12   testimony.

13       Ask yourself if the witness had any bias, or prejudice,

14   or reason for testifying that might cause the witness to lie

15   or to slant the testimony in favor of one side or the other.

16       Ask yourself if the witness testified inconsistently

17   while on the witness stand, or if the witness said or did

18   something, or failed to do or say something, at any other time

19   that is inconsistent with what the witness said while

20   testifying.

21       If you believe the witness was inconsistent, ask

22   yourselves if this makes the witness's testimony less

23   believable.  Sometimes it may, other times it may not.

24       Consider whether the inconsistency was about something

25   important or about some unimportant detail.  Ask yourself if

1    it seemed like an innocent mistake, or if it seemed

2    deliberate.  Ask yourselves how believable the witness's

3    testimony was, in light of all the other evidence.

4        Was the witness's testimony supported or contradicted by

5    other evidence that you found believable.  If you believe that

6    a witness's testimony was contradicted by other evidence,

7    remember that people sometimes forget things, and that even

8    two honest people who witness the same event may not describe

9    it in exactly the same way.

10        These are only some of the things you may consider in

11    deciding how believable each witness was.  You may also

12    consider other things that you think shed some light on the

13    witness's believability.  Use your common sense and your

14    everyday experience in dealing with other people, and then

15    decide what testimony you believe and how much weight you

16    think it deserves.

17        Law Enforcement Techniques.  You have heard evidence

18    about the government's use of undercover agents.  The

19    government is permitted to use undercover agents to

20    investigate possible criminal activities and to use undercover

21    techniques like those employed here.

22        You should consider the evidence obtained through the use

23    of undercover agents, together with and in the same way you

24    consider the other evidence.

25        Number of Witnesses.  One more point about the witnesses.

1    Sometimes jurors wonder if the number of witnesses who testify

2    makes any difference.  Do not make any decisions based only

3    the number of witnesses who testified.  What is more important

4    is how believable the witnesses were, and how much weight you

5    think their testimony deserves.  Concentrate on that, not the

6    numbers.

7        Lawyers Objections.  There's one more general subject

8    that I want to talk to you about before I begin explaining the

9    elements of the crime charged.

10       The lawyers for both sides objected to some of the things

11   that were said and done during the trial.  Do not hold that

12   against either side.

13       The lawyers have a duty to object whenever they think

14   that something is not permitted by the rules of evidence.

15   Those rules are designed to make sure that both sides receive

16   a fair trial.

17       And do not interpret my rulings on their objections as

18   any indication of how I think the case should be decided.  My

19   rules are based on the rules of evidence, not on how I feel

20   about the case.

21       Remember that your decision must be based only on the

22   evidence that you saw and heard here in court.

23       Defining the Charged Crimes and Related Matters

24   Introduction.  That concludes the part of my instructions

25   explaining your duties and the general rules that apply in

1    every criminal case.

2        In a moment, I will explain the elements of the crime

3    that the defendant is accused of committing.  But before I do

4    that, I want to emphasize the defendant is only on trial for

5    the particular crimes charged against him in the indictment.

6    Your job is limited to deciding whether government has proved

7    each crime charged against the defendant.

8        During the course of the trial, you may have heard

9    evidence about the conduct of other individuals, including

10   other public officials, and you may wonder if their conduct

11   did, or did not, violate any laws.

12       You may also wonder whether they will, or will not, be

13   charged with a crime.  You should not concern yourselves with

14   these matters.

15       In your deliberations, you should consider only whether

16   Mr. Sittenfeld violated the laws that the indictment charges

17   him with violating.

18       Defendant Charged with Multiple Crimes.  The defendant

19   has been charged with several crimes.  The number of charges

20   is no evidence of guilt, and this should not influence your

21   decision in any way.  It is your duty to separately consider

22   the evidence that relates to each charge, and to return a

23   separate verdict for each one.

24       For each charge, you must decide whether the government

25   has presented proof beyond a reasonable doubt that the

1    defendant is guilty of that particular charge.  Your decision

2    on one charge, whether it is guilty or not guilty, should not

3    influence your decision on any of the other charges.

4         Introduction to the Counts.  The indictment charges

5    Mr. Sittenfeld with six counts.  Counts 1 and 2 allege that he

6    violated 18 United States Code, Sections 1343 and 1346, which

7    is referred to as the crime of honest services wire fraud.

8         Count 3 and Count 5 charge him with bribery concerning

9    programs receiving federal funds, in violation of 18 United

10   States Code, Section 666.

11        Finally, Count 4 and Count 6 charge Mr. Sittenfeld with

12   attempted extortion under color of official right, in

13   violation of 18 United States Code, Section 1951.

14        Each of these three crimes has certain elements that

15   define that particular crime.  The Court will instruct you as

16   to the elements of each of these three crimes.

17        So Counts 1 and 2, as labeled here, are 18 United States

18   Code, Sections 1343 and 1346, which is called honest services

19   wire fraud.

20        Count 1 and Count 2 each charge that Mr. Sittenfeld

21   committed honest services wire fraud, in violation of

22   18 United States Code, Sections 1343 and 1346, through a

23   scheme that began on or about September 21, 2018, and

24   continued through on or about February 4, 2020.

25        Because Count 1 and Count 2 charge the same violation,

1    the same elements apply to each of the counts.  However, as I

2    instructed you earlier, you must separately consider the

3    evidence that relates to each count, and return a separate

4    verdict for each one.

5        That is, for each count, you must decide whether the

6    government has presented proof beyond a reasonable doubt that

7    the defendant is guilty of that particular count.

8        To establish that Mr. Sittenfeld is guilty of the crime

9    charged in Count 1 or Count 2, you must find that the

10   government has proved beyond a reasonable doubt that on or

11   about the dates referenced above, each and every one of the

12   following elements occurred as to that Count.

13       First, that Mr. Sittenfeld knowingly devised or

14   participated in a scheme to defraud the public of its right to

15   his honest services as a public official through bribery.

16       Second, that the scheme included a material

17   misrepresentation or concealment of a material fact.  Here the

18   government alleges that the material misrepresentation or

19   concealment consisted of failure to disclose the bribery

20   scheme.

21       Third, that Mr. Sittenfeld had an intent to defraud.

22       And fourth, that Mr. Sittenfeld used wire, radio, or

23   television communications, or caused another to use wire,

24   radio, or television communications in interstate commerce in

25   furtherance of the scheme.

1          In Count 1, the government relies on a communication that

2     allegedly occurred on November 21, 2018, to meet this element.

3          In Count 2, the government relies on a communication that

4     allegedly occurred on September 25, 2019, to meet this

5     element.

6          Now I will give you more detailed instructions on some of

7     the terms or phrases that are used in those elements.

8          The first element that the government must prove is that

9     Mr. Sittenfeld knowingly devised or participated in a scheme

10    or artifice to defraud the public and the government of their

11    rights to his honest services through the use of bribe.

12         A scheme is any plan or course of action formed with the

13    intent to accomplish some purpose.  Here the scheme alleged in

14    the indictment for Count 1 and Count 2 is a bribery scheme.

15         Thus, to find Mr. Sittenfeld guilty of this offense, you

16    must find that he devised or participated in a plan or course

17    of action involving bribes.

18         Public officials owe a fiduciary duty to the public.

19    That means the official has a duty of honesty and loyalty to

20    act in the public's interest, not for his or her own

21    enrichment.

22         If a public official devises or participates in a bribery

23    scheme, that official violates the public's right to his or

24    her honest services.  That is because the official outwardly

25    purports to be exercising independent judgement in performing

1    his or her official work, but instead has received benefits

2    for the outcome or deed.

3        The public is defrauded because the public is not

4    receiving what it expects and is entitled to, namely, the

5    public official's honest services.

6        As I have been discussing the term bribery scheme, let me

7    define further what I mean by bribery.

8        Bribery is a situation where a person, who I will refer

9    to as the payor, has agreed to provide or has actually

10   provided a thing or things of value to a public official in

11   return for the public official agreeing to undertake or

12   undertaking a specific official action.

13       This is sometimes referred to as a quid pro quo, which is

14   a Latin phrase meaning "this for that" or "these for those."

15       A bribery exchange can include either, one, a public

16   official's solicitation of things of value in exchange for

17   performing or agreeing to perform specific official action;

18   or, two, a public official's receipt of things of value when

19   the public official knows that the person who gave the thing

20   of value was doing so in return for the public official

21   performing or agreeing to perform a specific official act.

22       It is immaterial whether or not the payor actually

23   provides the thing of value, and whether or not the public

24   official ultimately performs this specific official action, or

25   even whether the public official intends to undertake that

1    action at the time he receives the payment.

2        For example, if a public official secured a contribution

3    by falsely representing that, in exchange for the

4    contribution, he would vote a particular way on a particular

5    issue, it would still be bribery even if the public official

6    in fact did not intend to vote that way on that issue.

7        The government need not show that the quid pro quo was

8    expressed; that is, the government need not show that

9    Mr. Sittenfeld actually said something to the effect of,

10   quote, I promise to perform this official act in exchange for

11   that thing of value.

12       That is because, if that were the case, if the law

13   required a showing of an express quid pro quo, then the law's

14   effect could be frustrated by knowing winks and nods.

15       At the same time, though, while the government need not

16   prove that the quid pro quo was express, the government must

17   prove that the quid pro quo was explicit.

18       In other words, the government must show that the

19   contours of the proposed exchange were clearly understood by

20   both the public official and the payor, even if the proposed

21   exchange was not communicated between them in express terms.

22       On that front, the government may establish a public

23   official's intent to exchange an official action for the thing

24   of value by circumstantial evidence.

25       This can include, for example, Mr. Sittenfeld's words,

1    conducts, acts, and all the other surrounding circumstances

2    disclosed by the evidence, as well as any rational or logical

3    inferences that you may draw from those surrounding

4    circumstances.

5        While bribery requires either, one, that the public

6    official intended to exchange a thing of value from the payor

7    for a specific official action from the public official; or,

8    two, that the public official knew that the payor intended to

9    exchange the thing of value for a specific official act from

10   the public official, there is no requirement that each payment

11   be correlated with a specific official act, so long as the

12   public official understood that the agreement was to take a

13   specific official action on the payor's behalf when the

14   opportunity presented itself.

15       It is not a defense to bribery for the public official to

16   claim that he would have lawfully performed the official act

17   in question even without the payor having promised to provide,

18   or having provided, the thing of value.

19       In other words, it is not a defense that, in exchange for

20   the offer or promise of a thing of value from the payor, the

21   public official undertook or promised to undertake an official

22   act that is actually lawful, desirable, or even beneficial to

23   the public, or is an action that the public official intended

24   to undertake anyway.

25       The offense of honest services fraud is not concerned

1    with the wisdom or results of the public official's decisions,

2    but rather with the manner in which the public official makes

3    his or her decisions.

4        So, for example, if a public official promised to vote in

5    a certain way in exchange for a payment, it would still be

6    bribery, even if the public official already intended to vote

7    that way, even apart from the payment.

8        At the same time, you may, but are not required to,

9    consider whether the public official would have performed the

10   official act in question, even in the absence of payment, as a

11   factor in deciding whether the performance of the official act

12   supports an inference that the public official intended to

13   enter into an explicit quid pro quo.

14       Also, it is not necessary for the government to prove

15   that the bribery scheme actually succeeded, or that

16   Mr. Sittenfeld actually took any official act in the course of

17   the scheme.

18       Rather, what the government must prove is that

19   Mr. Sittenfeld knowingly devised or participated in a scheme

20   or artifice to defraud the public and the government of their

21   rights to a public official's honest services through bribe.

22       Also, because people rarely act for a single purpose, the

23   government need not show that Mr. Sittenfeld undertook, or

24   promised to undertake, the official action only because of the

25   offer or acceptance of the thing of value.

1    Rather, if you find that Mr. Sittenfeld solicited or

2    received a thing of value in exchange for promising to

3    perform, or performing, a specific official action, then it

4    makes no difference if Mr. Sittenfeld may also have had

5    another lawful motive for undertaking that official action.

6        That said, you may, but are not required to, consider

7    whether Mr. Sittenfeld had some other lawful motive for

8    undertaking the official action as a factor in deciding

9    whether Mr. Sittenfeld's performance of the official act

10   supports an inference that he intended to enter an explicit

11   quid pro quo agreement.

12       The term "official act" means any decision or action on

13   any question, matter, cause, suit, proceeding, or controversy,

14   which may at any time be pending, or which may by law be

15   brought before any public official, in such official's

16   official capacity, or in such official's place of trust or

17   profit.

18       This definition of official act has two parts.  First,

19   the evidence must show a question, matter, cause, suit,

20   proceeding, or controversy that may at any time be pending or

21   may by law be brought before a public official.

22       A question, matter, cause, suit, proceeding, or

23   controversy must involve a formal exercise of governmental

24   power, and it must be something specific and focused.

25       Second, the government must prove that the public

1   official made a decision or took an action on that question or

2   matter, or agreed to do so.

3       The decision or action may include using an official

4   position to exert pressure on another official to perform an

5   official act.  Actual authority over the end result is not

6   controlling.

7       Under this definition, some acts do not count as official

8   acts.  For example, setting up a meeting, calling another

9   public official, or hosting an event would not, standing

10  alone, qualify as an official act.

11      Mr. Sittenfeld need not have a direct role in the

12  official act; an indirect role is sufficient.

13      As described above, Mr. Sittenfeld need not have actually

14  performed the identified official act, or even intended to do

15  so.

16      Rather, it is sufficient if Mr. Sittenfeld agreed to

17  perform a specific official act in exchange for a thing of

18  value, or if he received a payment knowing it was provided to

19  him in exchange for his agreement to perform a specific

20  official act.

21      Moreover, Mr. Sittenfeld need not have specified the

22  means that he would use to perform his end of the bargain.

23  You may, for example, conclude that an agreement was reached

24  if the evidence showed that Mr. Sittenfeld received a thing of

25  value knowing it was given to him with an expectation that he

1    would perform a specific official act in return.

2        A thing of value includes things possessing intrinsic

3    value, whether tangible or intangible, that the person giving

4    or offering, or the person soliciting or receiving considers

5    to be worth something.

6        A thing of value could include a campaign or political

7    action committee, or PAC, contribution, so long as the

8    contribution was solicited or received in exchange for

9    specific official acts.

10        That said, while a campaign contribution to a PAC could

11    be a thing of value for purposes of establishing a bribe, not

12    all campaign contributions are bribes.

13        As a general matter, political contributions are a

14    legitimate part of our system of privately financed elections.

15    Absent an explicit quid pro quo agreement, donors are free to

16    offer, and public officials are free to accept, donations that

17    are motivated by a generalized hope that the donation may

18    result in some form of favorable treatment.

19        Likewise, a public official is free to solicit or accept

20    contributions, even from persons who have business pending

21    before the public official.

22        Moreover, there's nothing inherently wrongful for the

23    public official taking official acts that advance the interest

24    of a contributor, even if those official acts occur shortly

25    before or after the public official solicits or receives a

1    contribution.

2        But if the public official has entered an explicit quid

3    pro quo agreement, as that term was defined above, in

4    soliciting or accepting such a contribution, or if the public

5    official knows that the donor believes that the public

6    official has entered such an agreement, then the contribution

7    is a bribe.

8        And in deciding whether an explicit quid pro quo

9    agreement exists, you may, but are not required to, consider

10   whether the closeness in time between the solicitation or

11   acceptance of the contribution on the one hand, and the

12   official act on the other, gives rise to an inference that

13   such an agreement exists.

14       To act with intent to defraud means to act with an intent

15   to deceive or deprive the public and government of their right

16   to a public official's honest services.

17       A misrepresentation or concealment is material if it has

18   a natural tendency to influence or is capable of influencing

19   the decision of the public or government agency that has

20   employed the public official.

21       The fraud or misrepresentation may consist of the

22   concealment or failure to disclose the thing or things of

23   value that the public official has solicited, received, or

24   agreed to receive, or the public official's implicit false

25   pretense to his governmental employer or the public that he

1  remains loyal to the employer's or the public's interest.

2  In terms of the fourth element, wire communication

3  includes communications that occur by telephone.  To cause

4  wire, radio, or telephone communications to be used is to do

5  an act with knowledge that the use of the communications will

6  follow in the ordinary course of business, or where such use

7  can reasonably be foreseen.

8  The term "interstate commerce" includes wire, radio, or

9  television communications which crossed a state line.

10  It is not necessary that the government prove all of the

11  details concerning the precise nature and purpose of the

12  bribery scheme set forth in the indictment, or that the

13  material transmitted by wire, radio, or television

14  communications was itself false or fraudulent, or that the

15  alleged scheme actually succeeded in defrauding anyone, or

16  that the use of the wire, radio, or television communications

17  was intended as the specific or exclusive means of

18  accomplishing the alleged fraud, or that someone relied on the

19  misrepresentation or false statement, or that the defendant

20  obtained money or property for his own benefit.

21  If you are convinced that the government has proved all

22  of these elements as to Count 1, or as to Count 2, or as to

23  both, you will say so by returning a guilty verdict on that

24  count or counts.

25  If you have a reasonable doubt about any one of the

1   elements as to Count 1, or as to Count 2, or as to both, then

2   you must find Mr. Sittenfeld not guilty of that count or

3   counts.

4       And that was a lot, ladies and gentlemen, and I'll tell

5   you -- I'm going to tell you in a bit, I'll tell you up front.

6   You are going to have a copy of the jury instructions back in

7   the jury room so that you can refer to it.

8       I would imagine that the parties may be also referring to

9   these jury instructions during closing. I recognize that was

10  a lot of words. There's going to be a lot of words with

11  respect to the next one.

12      It's important that you listen, but I just wanted to

13  reassure you, you will have a copy of these to refer to during

14  your deliberations.

15      Count 3 and Count 5, 18 United States Code, Section 666.

16  Count 3 and Count 5 each charge Mr. Sittenfeld with bribery

17  concerning programs receiving federal funds, in violation of

18  18 United States Code, Section 666.

19      The difference between the two counts is that Count 3

20  asserts a violation that allegedly occurred, quote, from on or

21  about September 21, 2018, to on or about December 17, 2018.

22      Count 5, on the other hand, asserts a violation that

23  allegedly occurred, quote, from on or about July 8, 2019, to

24  on or about February 5, 2020.

25      Because Count 3 and Count 5 charge a violation of the

1    same statute, the same elements apply to both counts.

2    However, as I instructed you earlier, you must separately

3    consider the evidence that relates to each count, and return a

4    separate verdict for each one.

5        For each count, you must decide whether the government

6    has presented proof beyond a reasonable doubt that the

7    defendant is guilty of that particular count.

8        For each of Count 1 and Count 5, you must find that the

9    government has proved each and every one of the following

10   elements beyond a reasonable doubt.

11       First, that at the time alleged in the count,

12   Mr. Sittenfeld was an agent of the City of Cincinnati.

13       Second, that Mr. Sittenfeld solicited, demanded,

14   accepted, or agreed to accept a thing of value from another

15   person.

16       Third, that Mr. Sittenfeld acted corruptly with the

17   intent to be influenced or rewarded in connection with

18   specific business, transaction or series of transactions

19   involving the City of Cincinnati City Council and the

20   435 Elm Street project.

21       Fourth, that this business, transaction or a series of

22   transactions, involved a thing with a value of $5,000 or more.

23       And finally, that the City of Cincinnati, in a one-year

24   period, received benefits of more than $10,000 under any

25   federal program involving a grant, contract subsidy, loan,

1    guarantee, insurance, or other assistance.

2        The one-year period must begin no more than 12 months

3    before the defendant committed these acts, and must end no

4    more than 12 months afterwards.

5        The parties in this case have stipulated that this fifth

6    element is met as to both Count 3 and Count 5.  This is the

7    only element as to which the parties have stipulated.

8        Now I will give you more detailed instruction on some of

9    these terms.

10        As to the first of the five elements set forth above, an

11    agent is a person who is authorized to act on behalf of the

12    City of Cincinnati, including an employee, officer, or

13    representative.  A member of Cincinnati City Council is an

14    agent of the City of Cincinnati.

15        As to the second element, that Mr. Sittenfeld solicited,

16    demanded, accepted, or agreed to accept a thing of value from

17    another person, a thing of value may be tangible property,

18    intangible property, or services of any dollar value, so long

19    as it has value.  The term "thing of value" includes

20    contributions to a campaign or political action committee, or

21    PAC, account.

22        The government is not required to prove that the thing of

23    value that the defendant allegedly illegally solicited,

24    demanded, accepted, or agreed to accept was federal benefits,

25    or that the illegal acts directly affected the federal

1    benefits that the entity received.

2        Rather, the government is required to prove only that the

3    defendant solicited, demanded, accepted, or agreed to accept a

4    thing of value while he was an agent of an entity that

5    received in excess of $10,000 in federal benefits.

6        Finally, the government is not required to prove that the

7    defendant knew that the entity received in excess of $10,000

8    in federal benefits.

9        In deciding whether something constitutes a thing of

10   value, it is not necessary for the government to prove that

11   the defendant personally benefitted from the receipt of that

12   thing.

13       As to the third element, that the defendant acted

14   corruptly with the intent to be influenced or rewarded in

15   connection with a specific business, transaction or series of

16   transactions, involving the City of Cincinnati City Council

17   and the 435 Elm Street project, the Court further instructs

18   you that, to prove this element in the context of political

19   contributions like those at issue here, the government must

20   prove beyond a reasonable doubt that there was a quid pro quo

21   agreement between the parties, where

22   Mr. Sittenfeld intended to provide the contributor, in

23   exchange for the contributions, some advantage inconsistent

24   with official duty and the rights of others.

25       And on that front, the agreement, once again, need not be

1    express, but it must be explicit; that is, that the government

2    must show that the contours of the proposed exchange were

3    clearly understood by both the public official and the payor,

4    even if the proposed exchange was not communicated between

5    them in express terms.

6         Unlike the case as to Counts 1 and 2, however, the

7    government need not prove that such an agreement existed as to

8    any specific official act; rather, it is enough that an

9    agreement existed.

10        So, for example, the agreement could be something as

11   nebulous as, if you contribute to me, I will use my official

12   power to take care of you once I am in office.

13        That is because, in such a case, the public official

14   would be promising to use his influence in the payor's favor

15   in exchange for the contribution, even though the public

16   official is not identifying any specific official action.

17        If you find, from your consideration of all the evidence,

18   the government has proved each of these elements beyond a

19   reasonable doubt as to the count you are considering, then you

20   should find the defendant guilty of that count.

21        If, on the other hand, you find from your consideration

22   of all the evidence the government has failed to prove any one

23   of these elements beyond a reasonable doubt as to that count

24   or as to the count you are considering, then you should find

25   the defendant not guilty of that count.

1      Count 4 and Count 6.  Counts 4 and 6 each charge

2   Mr. Sittenfeld with attempted extortion under color of

3   official right, in violation of 18 United States Code,

4   Section 1951.  The two counts differ only as to date.

5      Count 4 alleges that a violation occurred from on or

6   about September 21, 2018, to on or about December 17, 2018.

7      Count 6 alleges that a violation occurred from on or

8   about July 8, 2019, to on or about February 5, 2020.

9      Because Count 4 and Count 6 each charge the same type of

10  crime, the same elements apply to both crimes.  However, as I

11  instructed you earlier, you must separately consider the

12  evidence that relates to each count, and return a separate

13  verdict for each of the two counts.

14     For each, you must decide whether the government has

15  presented proof beyond a reasonable doubt that the defendant

16  is guilty of that particular count.

17     As to each of Count 4 and Count 6, you should return a

18  verdict of not guilty, unless you find that the government has

19  proved each and every one of the following four elements

20  beyond a reasonable doubt.

21     First, that Mr. Sittenfeld was a public official.

22     Second, that Mr. Sittenfeld obtained, accepted, agreed to

23  accept, or received property that he was not lawfully entitled

24  to from another person with that person's consent.

25     Third, that Mr. Sittenfeld knew that the property that he

1    obtained, accepted, agreed to accept or received, was being

2    offered or provided to him in exchange for either, one,

3    undertaking a specific official action; or, two, him agreeing

4    to undertake a specific official action.

5        Fourth, that as a result, interstate commerce was or

6    would have been affected in any way or degree.

7        Now I will give you more detailed instructions on the

8    terms used in these four elements.

9        The term "public official" means a person with a formal

10   employment relationship with the government.

11       The term "property" means money or other tangible or

12   intangible things of value that can be transferred, including

13   campaign or PAC contributions.

14       The phrase the defendant knew the property that he

15   obtained, accepted, agreed to accept, or received, was being

16   offered or provided to him in exchange for either, one,

17   undertaking a specific official action; or, two, him agreeing

18   to undertake a specific official action may include the

19   conduct of taking a bribe, where the word bribe is defined in

20   the same manner as it was in connection with the instructions

21   I gave you for honest services wire fraud.

22       Consistent with those earlier instructions, I remind you

23   that, one, efforts to buy favor or generalized good will do

24   not necessarily amount to bribery.

25       For example, bribery does not include gifts given in the

1    hope that at some unknown unspecified time a public official

2    might act favorably in the giver's interest.

3        Second, gifts exchanged solely to cultivate friendship

4    are not a bribe.  Things of value given in friendship and

5    without expectation of anything in return are not bribes.

6        Third, it is not a defense to bribery that a public

7    official would have done the official act anyway, even without

8    the receipt of the property.  At the same time, you may, but

9    are not required to, consider whether the public official

10   would have performed the official act in question, even in the

11   absence of payment, as a factor in deciding whether the

12   performance of the official act supports an inference that the

13   public official intended to enter into an explicit quid pro

14   quo.

15       The term "official act" has a specific meaning.  It does

16   not include anything and everything that an official does in

17   his official capacity.

18       The term official act does, however, extend to any

19   decision or action on any question, matter, cause, suit,

20   proceeding, or controversy, which may at any time be pending,

21   or which may, by law, be brought before any public official,

22   in such official's official capacity, or in such official's

23   place of trust or profit.

24       This definition of official act has two parts.  First,

25   the evidence must show the existence of a question, matter,

1    cause, suit, proceeding, or controversy that may at any time

2    be pending or may, by law, be brought before a public

3    official.  A question, matter, cause, suit, proceeding, or

4    controversy must involve a formal exercise of governmental

5    power, and it must be something specific and focused.

6         Second, the government must prove that the public

7    official, here Mr. Sittenfeld, made a decision or took an

8    action on that question or matter, or that the public official

9    agreed to do so.  The decision or action may include using an

10   official position to exert pressure on another official to

11   perform an official act.  Mr. Sittenfeld need not have had

12   actual authority to perform the act in question.

13        Under this definition, some acts do not count as official

14   acts.  For example, setting up a meeting, calling another

15   public official, or hosting an event does not, standing alone,

16   qualify as an official act.

17        Mr. Sittenfeld need not have any direct role in the

18   official act; an indirect role is sufficient.

19        Conduct affects interstate commerce if it in any way

20   interferes with or changes the movement of goods, merchandise,

21   money, or other property in commerce between different states.

22   Any effect at all on interstate commerce is enough.

23        You should find that Mr. Sittenfeld attempted to affect

24   interstate commerce if, one, he obtained money that was

25   provided by a law enforcement agency as part of an

1    investigation; and, two, the money appeared to belong to a

2    business or individual involved in real estate development,

3    either as the developer or an investor.  And, three, the

4    business or individual appeared to customarily purchase goods

5    from outside the State of Ohio, or engaged in business outside

6    the State of Ohio.

7         It is not necessary for you to find that there was an

8    actual effect on interstate commerce.  Mr. Sittenfeld need

9    only have attempted to affect interstate commerce.

10        To obtain a conviction on this charge, the government

11   need not prove that the bribery agreement was stated in

12   express terms, for otherwise the law's effect could be

13   frustrated by knowing winks and nods.  A bribery agreement is

14   satisfied by something short of a formalized and thoroughly

15   articulated contractual arrangement.

16        That said, as I previously stated in connection with

17   Counts 1 and 2, while a bribery agreement need not be express,

18   it must be explicit, by which I mean that the government must

19   show that the contours of the proposed exchange were clearly

20   understood by both the public official and the payor, even if

21   the proposed exchange was not communicated between them in

22   express terms.

23        Second, the government need not prove that

24   Mr. Sittenfeld ultimately performed the official act.

25        Third, the government need not prove that the property

1    was exchanged only for an official act. Because people rarely

2    act for a single purpose, if you find the property was

3    exchanged at least, in part, for an official act, then it

4    makes no difference that Mr. Sittenfeld may have also had

5    another separate lawful purpose for exchanging the property.

6         Fifth, the government need not prove that Mr. Sittenfeld

7    had the actual power to effectuate the end for which he

8    accepted or induced payment; it is sufficient that

9    Mr. Sittenfeld exploited a reasonable belief that he had the

10   power to do so.

11        If you are convinced the government has proved all of the

12   above-stated elements, consistent with the definitions that I

13   provided regarding those elements, either as to Count 4, or as

14   to Count 6, or as to both, you will say so by returning a

15   guilty verdict on that count or counts.

16        If you have a reasonable doubt about any one of these

17   elements as to either Count 4, or as to Count 6, or as to

18   both, then you must find Mr. Sittenfeld not guilty of that

19   count or counts.

20        Campaign contributions to public officials, or to PACs

21   with which a public official is associated, are generally

22   protected by the First Amendment, unless they qualify as bribe

23   payments.

24        For campaign or PAC contributions to qualify as bribe

25   payments, they must be part of an explicit promise or

1    understanding by the public official.  This instruction

2    governs when campaign contributions can be bribe payments

3    relevant to Counts 1 through 6.

4         For Counts 1, 2, 4, and 6, acceptance by an elected

5    official of a campaign contribution, by itself, does not

6    constitute bribery, even if the person making the contribution

7    has business pending before the official.

8         However, if a public official receives or obtains the

9    contribution, or agrees to do so, knowing or believing that

10   the contributor is giving the contribution in exchange for the

11   public official undertaking or agreeing to undertake a

12   specific requested exercise of his official powers, the public

13   official has committed bribery, even though the money or

14   property to be given to the official is in the form of a

15   campaign or PAC contribution.

16        Similarly, Counts 3 and 6, the public official's

17   acceptance of a campaign or PAC contribution, by itself, does

18   not constitute bribery, even if the person making the

19   contribution has business pending before the official.

20        However, if a public official solicited, demanded,

21   accepted, or agreed to accept the contribution, in exchange

22   for his agreement to be influenced or rewarded in connection

23   with either specific business, or a transaction or series of

24   transactions of the City of Cincinnati, he has committed

25   bribery concerning Counts 3 and 5, even though the money or

1    property to be given to the official is in the form of a

2    campaign or PAC contribution.

3        Given the various testimony you've heard regarding

4    campaign contributions and campaign finance law during the

5    course of this trial, the Court further instructs you that the

6    indictment in this case does not charge Mr. Sittenfeld with

7    violating any campaign finance law.

8        You should understand that in our system of privately

9    funded political campaigns, candidates for office may solicit

10   and accept contributions, including contributions to the

11   PAC in this case.

12       Moreover, there's nothing inherently improper about

13   bundling campaign contributions.  "Bundling" means that a

14   single person collects checks from one or more other donors

15   and then delivers those contributions to a candidate.

16       Bundling is permissible so long as each contribution

17   accurately reflects the true source of funds.  In other words,

18   there's nothing wrong, for example, with Person A delivering

19   contributions to a candidate on behalf of Person B and

20   Person C, so long as person B and person C are the true

21   sources of the funds delivered to the candidate in their name.

22       However, it is not permissible for a candidate to accept

23   contributions from Person A on behalf of Person B and

24   Person C if the candidate knows that Person B and Person C are

25   not true sources of the funds.

1      There is also nothing necessarily improper under campaign

2  finance law about a candidate merely discussing his positions

3  regarding an issue with a campaign contributor, including on

4  the same occasion as the candidate accepts a contribution or

5  discusses campaign contributions.

6      And there is not necessarily anything improper under

7  campaign finance law about soliciting contributions from

8  individuals or entities who have business pending before a

9  political body on which the candidate serves or may serve.

10      That said, as I've explained to you in much more detail

11  in connection with the elements of the various charges

12  actually at issue in this case, if a candidate has entered an

13  explicit quid pro quo agreement in exchange for a

14  contribution, that would give rise to criminal liability under

15  the charges at issue here.

16      Separately, the Court also instructs you that the fact

17  that Mr. Sittenfeld's PAC, the Progress and Growth PAC, did

18  not bear his name was not improper, but was instead required

19  by campaign finance law.

20      Nor is there anything improper about the fact that the

21  PAC bore Mr. Sittenfeld's initials.  There is likewise nothing

22  improper about Mr. Sittenfeld exercising control over the PAC

23  in this case.

24      Again, the indictment in this case does not charge

25  Mr. Sittenfeld with violating any law or regulation regarding

1      campaign finance.  As I have instructed you, Mr. Sittenfeld is

2      only on trial for the offenses charged in the indictment.

3          In your deliberations, you should consider only whether

4      Mr. Sittenfeld violated the laws that the indictment charges

5      him with violating, and not whether he violated, or did not

6      violate, any other laws, including any campaign finance laws.

7          Next I want to say a word about the dates mentioned in

8      the indictment.  The indictment charges that Counts 1 and 2

9      happened beginning on or about September 21, 2018, until on or

10     about February 4, 2020.

11         The indictment charges that Counts 3 and 4 -- and I think

12     that should be 3 and 5.  Oh, I'm sorry, 3 and 4, that's right.

13     I'm sorry.  It is 3 and 4 -- happened beginning on or about

14     September 21, 2018, until on or about December 17, 2018.  The

15     indictment charges that Counts 5 and 6 happened beginning on

16     or about July 8th, 2019, until February 5, 2020.

17         In each instance, the government does not have to prove

18     that the crimes happened on those exact dates, but the

19     government must prove that the crimes happened reasonably

20     close to those dates.

21         Next, I want to explain something about proving a

22     defendant's state of mind.  Ordinarily, there's no way that a

23     defendant's state of mind can be proved directly, because no

24     one can read another person's mind and tell you what that

25     person is thinking.

1        But a defendant's state of mind can be proved indirectly

2    from the surrounding circumstances.  This includes things like

3    what the defendant said, what the defendant did, how the

4    defendant acted, and any other facts or circumstances in

5    evidence that show what was in the defendant's mind.

6        You may also consider the natural and probable results of

7    any acts the defendant knowingly did or did not do, and

8    whether it is reasonable to conclude that the defendant

9    intended those results.  This, of course, is all for you to

10    decide.

11        Defendant's Testimony.  You have heard the defendant

12    testify.  Earlier, I talked to you about the credibility or

13    believability of the witnesses, and I suggested some things

14    for you to consider in evaluating each witness's testimony.

15    You should consider those same things in evaluating the

16    defendant's testimony.

17        Witness Testifying to Both Facts and Opinions.  You have

18    heard the testimony of some witnesses who testified to both

19    facts and opinions.  Each of these types of testimony should

20    be given the proper weight.

21        As to the testimony on facts, consider the factors

22    discussed earlier in these instructions for weighing the

23    credibility of witnesses.

24        As for the testimony on opinions, you do not have to

25    accept anyone's opinions.  In deciding how much weight to give

1    the opinions, you should consider the witness's experiences

2    and how he or she reached his or her conclusions, along with

3    other factors discussed in these instructions for weighing the

4    credibility of witnesses.

5        Remember that you alone decide how much of a witness's

6    testimony to believe and how much weight it deserves.

7        Testimony of a Witness Under Reduced Criminal Liability.

8    You have heard the testimony of Chinedum Ndukwe and Jared

9    Kamrass. You have also heard that the government signed a

10   proffer agreement in which the government promised not to use

11   any truthful information that the witnesses provided to the

12   government to prosecute those persons.

13       It is permissible for the government to make such a

14   promise, but you should consider Mr. Ndukwe's and

15   Mr. Kamrass's testimony with more caution than the testimony

16   of other witnesses. Consider whether their testimony may have

17   been influenced by the government's promise.

18       Do not convict the defendant based on the unsupported

19   testimony of such a witness, standing alone, unless you

20   believe their testimony beyond a reasonable doubt.

21       Secondary Evidence Summaries. During the trial you have

22   seen or heard evidence in the form of charts. This summary

23   was admitted in evidence, in addition to the material it

24   summarizes, because it may assist you in understanding the

25   evidence that has been presented.

1      But the summary itself is not evidence of the material it

2  summarizes, and is only as valid and reliable as the

3  underlying material it summarizes.

4      Other Acts of the Defendant.  You have heard testimony

5  that the defendant committed other acts than the ones charged

6  in the indictment.

7      If you find that the defendant did those acts, you can

8  consider the evidence only as it relates to the government's

9  claim on the defendant's intent.  You may not consider it for

10  any other purpose.

11      Remember the defendant is on trial here only for the

12  charges contained in the indictment, not for other acts.  Do

13  not return a guilty verdict unless the government has proved

14  the crimes charged in the indictment beyond a reasonable

15  doubt.

16      Stipulations.  The government and the defendant have

17  agreed, or stipulated, to certain facts, therefore, you must

18  accept the following stipulated facts as proved.

19      It is hereby stipulated and agreed to by the parties that

20  the City of Cincinnati received federal benefits in excess of

21  $10,000 under a federal program involving federal assistance

22  during both the 12-month calendar year of 2018 and the

23  12-month calendar year of 2019.

24      It is also stipulated that, in calendar years 2018 and

25  2019, the City of Cincinnati was a local government in the

1    State of Ohio, and Mr. Sittenfeld was an elected official

2    serving on Cincinnati City Council and was paid by the City of

3    Cincinnati.

4        Redactions.  The Court's rules require that certain

5    information be redacted from exhibits.  You should not draw

6    any inference from the fact that an exhibit is redacted or, in

7    other words, it has material that is blacked out.

8        And with that, we have reached the end of the preliminary

9    instructions.  I'm sure you're sad to hear that.  I'm

10   certainly sad to stop reading.

11       At this point, we are going to hear closing arguments

12   from the parties, and then I will have a few last -- and it is

13   much fewer than what we've had today, a few last instructions

14   for you to begin your deliberations.

15       So Ms. Gaffney Painter?

16       MS. GAFFNEY PAINTER:  Your Honor, excuse me for

17   interrupting.  This is really just for the sake of the record.

18   When you were reading instructions on page 32 in the third

19   paragraph.

20       THE COURT:  Yes.

21       MS. GAFFNEY PAINTER:  Just a slight misstatement.  I

22   believe you said for each of Count 1 and Count 5, but what's

23   written there is Count 3 and Count 5, and I just wanted to

24   afford the Court the opportunity to clarify that.

25       THE COURT:  Thank you very much.  If I misspoke, I

1    apologize.

2         Ladies and gentlemen, let me make one thing clear.  To

3    the extent I said anything different from what's in these, and

4    I've said a lot of words in the last hour, it's the words in

5    here that control.

6         But Ms. Gaffney Painter is undoubtedly correct that it is

7    Counts 3 and 5 that charge Mr. Sittenfeld with a violation of

8    18 United States Code, Section 666, and so the elements on

9    page 32 and 33, those five elements apply to Counts 3 and 5.

10   If I said anything differently while reading the instructions,

11   I was mistaken.  Thank you.

12         MS. GAFFNEY PAINTER:  Thank you, Your Honor.

13         THE COURT:  How long does the government anticipate

14   its closing will take, Mr. Singer?

15         MR.  SINGER:  Hour and a half.

16         THE COURT:  I think now may be a good time, then, to

17   take our brief morning break.  I anticipate the government's

18   closing, when we come back, will take us about to lunchtime.

19         So why don't we take a break and try to be back here

20   by -- if you could be prepared to enter the courtroom by

21   10:30, that would be about 20 minutes.

22         And we're very close to the part where you can begin

23   deliberating and I'll quit giving this admonition, but one

24   last time for old times' sake.

25         You cannot discuss this case amongst yourselves.  You

1    cannot attempt to do any research regarding this case.  Do not

2    communicate with anyone about the case.  If anyone should

3    attempt to communicate with you, please let me know as soon as

4    possible.

5         And do not begin to form opinions.  As I said, we're very

6    close to having all the evidence and arguments, and we're

7    close to the time when it will be appropriate for you to begin

8    forming and expressing opinions, but we're not quite there

9    yet, so please do not do so during this break.

10        We will see you back shortly after 10:30.

11        (Jury out at 10:12 a.m.)

12        THE COURT:  You may be seated.  I just didn't want

13   any jurors sitting through closing thinking they needed a bio

14   break, Mr. Singer.

15        MR. SINGER:  I appreciate that, Your Honor.

16        THE COURT:  Is there anything we need to discuss

17   before we take a brief break?  All right.  Try to be back

18   before 10:30.

19        (Brief recess.)

20        THE COURT:  Anything we need to discuss before we

21   bring in the jury?

22        MR. SINGER:  No, Your Honor.

23        MR. C. MATTHEW RITTGERS:  No, Your Honor.

24        THE COURT:  And we're good with the plan, we'll do

25   closing and then break for lunch?

1        MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

2        THE COURT:  Very good.  Let's bring in the jury.

3      (Jury in at 10:31 a.m.)

4        THE COURT:  Mr. Singer are you ready to proceed?

5        MR. SINGER:  Yes, Your Honor.

6        THE COURT:  You may do so.

7        MR. SINGER:  Thank you.

8    Good morning.  May it please the Court, defense counsel,

9  members of the jury.

10    A public official may not agree to accept a bribe.  That

11  means a public official may not agree to accept money knowing

12  that it's given in return for a specific official action.

13    A public official may not receive a bribe.  This means a

14  public official may not receive money knowing that it was

15  given in exchange for a specific official action.  This is

16  what the defendant has done here.

17    The bribe offers were clear.  Money in return for

18  official action to advance the development project at

19  435 Elm Street.

20    On November 7th, 2018, the defendant was offered $20,000

21  to get that deal.  Six votes to make the development agreement

22  veto proof.  The defendant agreed to deliver the votes.  He

23  knew, at the time that the money was offered, that it was

24  offered in exchange for votes on 435 Elm Street.  That

25  satisfied the elements.

1        On September 24, 2019, he agreed to accept two checks,

2    plus two more in the future, knowing that they were given and

3    in return for advancing 435 Elm Street project to include

4    action relating to the advancement of a sports book on the

5    property.

6        The defendant was a member of city council, and the

7    people of Cincinnati entrusted the defendant with the power

8    and the privilege of representing their interests.

9        And with that power and privilege comes a very simple

10    responsibility.  Do not use it to corruptly benefit yourself.

11    Don't use your ability to pick winners and losers in the city

12    through your vote to expand your own political power through

13    contributions.

14        A public official providing on service must further the

15    public's interest, not the interest of corrupt investors.

16        But Mr. Sittenfeld's own words show that he was working

17    for Rob, he was working for Brian, he was working for Vinny to

18    bribe payors.

19        And when their interest conflicted with professionals in

20    the city and professionals in the port, time and again,

21    Mr. Sittenfeld sided with the bribe payors.

22        This is the culmination of the case, where you take all

23    the evidence you've heard, and your instincts, and your common

24    sense, the same common sense you use in your everyday lives,

25    and apply that to the law that governs the charges in this

1    case.

2        This is where the government explains how the evidence

3    comes together.  Now, you've heard a lot of recordings.  We're

4    not going to replay all the recordings.  We're not going to go

5    through all the evidence.  You've been listening intently for

6    the last two and a half weeks.

7        But we're going to highlight important evidence and apply

8    that evidence to the law that you just heard as instructed by

9    the Court.

10        Now, there are six counts; two honest services wire fraud

11    counts, two attempted extortion counts, and two counts called

12    bribery concerning programs receiving federal funds.

13        As for the honest services fraud.  These are unique in

14    that, unlike the other counts, it's a scheme.  It covers the

15    entire period.  Both counts cover the entire period.  They're

16    separate counts because there was a wire that's attached to

17    each of the counts.  We'll go through that.

18        Attempted extortion, there are two counts.  One in

19    September 21, 2018, to December 17, 2018.  That's Count 4.

20        Count 6 was July 8, 2019, to February 5, 2020.  Now, the

21    honest -- as we go through the evidence, you'll see the

22    standard for the honest services fraud counts and the standard

23    for the attempted extortion are the same when it comes to

24    whether or not the defendant accepted a bribe or received a

25    bribe.

1      Counts 3 and 5 are a little different, the standard is a

2  little different, so we'll go through that.  This is how it's

3  going to break down.

4      We're going to go through the law relating to honest

5  services and extortion, and apply that law to those counts.

6  Because there's overlap in both the evidence that supports the

7  counts and the standard that applies, we're going to go

8  through those together.  And then at the end, we'll go through

9  Counts 3 and 5.

10      In the end, with regard to the honest services and the

11  attempted extortion count, there is a simple question.  Did

12  Mr. Sittenfeld agree to accept or receive money knowing it was

13  in exchange for specific official action.

14      So these are the elements for honest services wire fraud

15  that the Court just read.  They break down like this.

16  Elements one, two, and three all wrap into a single concept,

17  and they're all satisfied if you find, beyond a reasonable

18  doubt, that Mr. Sittenfeld knowingly received a bribe.

19      I'll explain why that is.  Element one deals with knowing

20  participation and a scheme to defraud the public.  When a

21  public official participates in bribery, the public is

22  defrauded because it is entitled to honest services.  So

23  receiving a bribe violates element one.

24      Element two is satisfied when a public official fails to

25  disclose or conceals a bribery scheme.  So if there is a

1    bribery scheme, the public official is no longer representing

2    and being loyal to the public's interest, and the concealment

3    of that establishes element two.

4        Element three is the same.  It goes to the intent to

5    defraud, and a public official has the intent to defraud when

6    he receives a bribe.

7        So elements one, two, and three are all satisfied if you

8    find that the defendant knowingly accepted or received a

9    bribe.

10       Element four deals with the jurisdictional element, and I

11   will address that separately.  All right.

12       So this really turns on what is bribery.  The Court just

13   gave you extensive instructions on bribery.  These

14   instructions apply both to the honest services and attempted

15   extortion count, but it includes a public official's receipt

16   of things of value when the public official knows that the

17   person who gave the thing of value is doing so in return for

18   the public official performing or agreeing to perform a

19   specific official act.

20       It is sufficient if Mr. Sittenfeld agreed to perform the

21   act in exchange for something of value, or received the

22   payment knowing it was provided in exchange for his agreement

23   to perform specific official action.

24       Now this is the quid pro quo.  The Court's instructions

25   have defined it as "this for that"; money, a contribution for

1    official action, a vote, official action advancing 435.

2        Now, the Court instructed that because this is a campaign

3    contribution case, the agreement must be explicit, but that

4    does not mean express.  It does not mean that the two parties

5    have to say I am giving you this in exchange for your vote.

6        Yes, I am receiving it because you gave me the money and

7    I'm giving you the vote in return.  That's not how people

8    talk, and that's not what the law requires.

9        An explicit quid pro quo is where there's a clear

10   understanding between the parties.

11       And the Court instructed you that in determining whether

12   there is a quid pro quo, you must assess all the facts and

13   circumstances.

14       You have to use your common sense, and you look at the

15   words and the conduct and the context, and that's how you

16   determine whether or not the elements were established.

17       So those are elements one, two, and three of honest

18   services.

19       Element four.  This is the wire.  The Court instructed

20   you that a wire communication includes communication by

21   telephone.

22       And the two phone calls at issue here are on November 1,

23   2018, and September 25, 2019.  I'm going to go through those

24   calls and show how they further the scheme.

25       But for purposes of this element for right now, those

1     phone calls were from Mr. Sittenfeld to Rob, an investor

2     outside of the state, to a phone number with an out-of-state

3     area code, using a provider located outside the state.  This

4     element is satisfied.

5          So, again, that leaves us with the question did

6     Mr. Sittenfeld agree to accept or receive money knowing that

7     it was in exchange for specific official action.

8          Again, the same standard applies to attempted extortion.

9     There are four elements.  Element one, that Mr. Sittenfeld was

10    a public official.  As pursuant to the parties' stipulation,

11    he was elected, serving on city council, and was paid by the

12    City of Cincinnati.

13         You heard testimony from Mr. Flynn about the role of the

14    council member within city council as a member of an employee

15    of the city.  That element is established.

16         Element two, that Mr. Sittenfeld obtained, accepted,

17    agreed to accept or receive property not lawfully entitled to.

18    That means he didn't get it pursuant to his work or job, from

19    another person with that person's consent.

20         These are the four checks the defendant received in

21    December 2018.  These are the four checks he received in

22    September and October 2019.  He received that property.  This

23    element is established.

24         Element four.  That as a result, interstate commerce was

25    or would have been affected in any way or degree.  Now, as the

1    Court just instructed, this is established where the money

2    obtained was provided by a law enforcement agency as part of

3    an investigation.  That's true here.  The FBI provided the

4    money.

5        The money appeared to belong to a business or individual

6    involving real estate development either as a developer or

7    investor.  That's established here as well.

8        That the business or individual appeared to customarily

9    purchase goods from outside or engage in business outside of

10   the state.  You heard ample evidence of all of this.  Element

11   four is established.

12       So that leaves three, and this should look familiar,

13   pursuant to the Court's instruction, that bribery under

14   element three is the same as bribery under honest services.

15       So where does that leave us?  Back to the simple

16   question, did Mr. Sittenfeld agree to accept or receive money

17   knowing that it was given for specific official action.

18       All right.  Let's go through the evidence to show how

19   this is established beyond all reasonable doubt.

20       You heard testimony from Mr. Ndukwe.  He testified about

21   a call he received on September 21, 2018.  The defendant

22   solicited $10,000 in contributions from LLC checks, and he

23   wanted them paid before the November LLC change, the change in

24   the law that limits the ability of individuals to give both

25   from themselves and from an LLC.  Mr. Sittenfeld asked Ndukwe

1    to round up that money and get it to him.

2        You heard Mr. Ndukwe testify that this was a big act for

3    him.  Although he contributed in the past, this was a lot of

4    money for a small business owner, and he was feeling immense

5    pressure at the time.  His project was stalled in the city,

6    and he was also being solicited for contributions from another

7    candidate for mayor.

8        He had also been told you can't hedge.  You can't hedge

9    with Mr. Sittenfeld.  You can't give to both.  That's not in

10   your interest.  So he was stuck.  He was in a bad place, and

11   in that context, told Special Agent Holbrook.

12       Special Agent Holbrook assessed the evidence, including

13   the evidence he knew that hedging for Mr. Sittenfeld could

14   mean that your project would not advance.

15       This led to a recorded call on October 30, 2018.

16       (Audio played.)

17       MR. SINGER:  All right.  So what's the context of

18   this call?  Ndukwe starts out with, I'm struggling with 435.

19   Cranley is just trying to screw me left and right because I

20   support another candidate.  I'm going to need some help, is

21   essentially what he's saying.  435 is an issue for me and it's

22   not going well.  It's in that context that Sittenfeld makes

23   the solicitation.

24       Now, of course, candidates can solicit contributions.

25   It's not illegal in itself, of course, as the Court

1    instructed.  But what can't happen is when the solicitation is

2    tied to official actions, and with the context at 435 is ripe,

3    is an issue that Mr. Ndukwe needs help with, what does

4    Sittenfeld say?

5        He says, "Look, if you say I don't want to support you in

6    the name of Chinedum Ndukwe, but some guy I've never met from

7    Columbus is going to use, you know, you know, your network are

8    going to round up a bunch of LLC checks, that's great, I

9    actually don't care.

10       "But I mean, the one thing I will say is, you know, I

11   mean, you don't want me to be like, hey Chin, like love you

12   but can't."

13       You heard Mr. Ndukwe testify about what that meant.  Use

14   your common sense about what that meant.  He's asking for

15   money.  He's asking to round up LLC checks, thousands of

16   dollars in LLC checks.  "You don't want me to be like, love

17   you but can't."

18       The implication is clear and confirmed by Ndukwe.

19   Support him, that's what he wants; but don't support him, love

20   you but can't.  When your issues are up before the city, like

21   435 comes before the city, love you but can't.  That's how Mr.

22   Ndukwe took it.  That's what commons sense dictates.

23       Now, you heard Mr. Sittenfeld testify that what he meant

24   was that he won't be able to help as mayor.  What you did not

25   hear in that call was any reference to Mr. Sittenfeld's

1    candidacy as mayor.  Not a single mention nowhere.  Not once.

2       What they discussed was 435 Elm, and they discussed

3    rounding up money.  This is a corrupt solicitation.  It is a

4    direct tie between the solicitation of money and Sittenfeld's

5    help in his official capacity.

6       And it is entirely consistent with other evidence that

7    you've heard.

8       You saw this email from Mr. Sittenfeld to Jared Kamrass.

9    The email related to fundraising by his likely mayoral

10    opponent, Christopher Smitherman, to Mr. Sittenfeld.

11       Mr. Sittenfeld said, We need to stop the developers from

12    supporting both of us.  When Kamrass explained what that

13    meant, based on his experience and his conversations with

14    Mr. Sittenfeld was that he was going to tell the developers

15    you support him, and you'll get supported; if you don't, you

16    won't be supported when he becomes mayor.

17       You heard the same thing from Jay Kincaid.  Jay Kincaid,

18    he testified about hedging, what it means to hedge.  What it

19    means to tell somebody you can't support both me and the other

20    guy.

21       He testified about Mr. Sittenfeld's plan to threaten the

22    lobbyists.  If he hedges on my campaign, I'll hedge on his

23    client when I'm mayor.  That is a direct tie between money and

24    action taken in an official capacity.  Just like "love you but

25    can't," it's an abuse of power.  Based on this, Special Agent

1     Holbrook decided to introduce the undercovers.

2         And as the Court instructed, law enforcement is -- it is

3     a law enforcement technique that is permitted.  The government

4     is permitted to use undercover agents to investigate possible

5     criminal activity, and you should review it and assess it the

6     same as any other evidence.

7         Following the October 30th call, Mr. Ndukwe called

8     Mr. Sittenfeld on November 2nd.  This is the relevant portion

9     of that call.

10        (Audio played.)

11         MR. SINGER:  All right.  Now, let's walk through

12    that.  Mr. Ndukwe says, "They're going to be able to get you

13    close to $20,000," and then he transitions.

14        "For this meeting with Rob next week --" so he's talking

15    when we meet next week, when Ndukwe and Sittenfeld and Rob sit

16    down next week -- "I'm pretty sure he can get you ten.  But

17    the biggest thing is, if we do the ten, they're gonna want to

18    know, when it comes down to a vote on 435 Elm in the next

19    year, two years, three years, that it's gonna be a yes vote

20    without a doubt."

21        This is about as an express quid pro quo as you can hear,

22    "When we meet next week, they'll have $10,000 -- he'll have

23    $10,000, but he's gonna want to know that it's a yes vote

24    without a doubt."

25        Alarm bells should be going off.  This is a bribe offer,

1    plain and simple.  What was the response?

2        "As you know, obviously, nothing can be illegal, like

3    illegally, nothing can be a quid pro quo, and I know that's

4    not what you're saying either."  That is exactly what he was

5    saying.  He was offering a quid pro quo.

6        Ndukwe says, "Yeah."  Sittenfeld says, "Can I, can I

7    say -- but what I can say is that I'm always super

8    pro-development and revitalization of especially our urban

9    core."

10       So he gets offered a plain bribe offer, and his response

11   is, "I'm super pro-development --" 435 Elm Street was a

12   development project -- "and revitalization of especially our

13   urban core."

14       435 Elm Street was a development project aimed at

15   revitalizing the urban core.  This is the quid -- I'm sorry,

16   this is the quo.

17       The quid is the money.  The quo is the 435.  This is

18   exactly what Ndukwe was saying Rob is going to want.

19       Mr. Sittenfeld then says, "And we can discuss that more

20   in person."  So he was offered an express quid pro quo, and

21   said, "And we can discuss that more in person," which they

22   did.

23       Before that, before moving on, he says, "But I'm not

24   sure.  I'm not there.  In seven years, I voted in favor of

25   every single development deal that's ever been put in front of

1    me."

2       Again, he's offered a bribe offer for a yes vote, and his

3    response is, I vote yes on these all the time.  Let's meet in

4    person and talk about it.

5       Now yesterday, you heard testimony that, yeah, by

6    Mr. Ndukwe, in response to Mr. Sittenfeld saying that nothing

7    could be illegal, that meant that the quid pro quo went away,

8    that it was never actually offered.

9       He said, "I wish it had not given me comfort and clarity,

10    that yeah."  That is inconsistent with the context of this

11    conversation.  He was offered a bribe, and then he said I will

12    do the things you want me to do for the money.

13       And it didn't stop there.  After they plan out when

14    they're going to meet, Mr. Sittenfeld says, I'd like to show

15    some voting data so they can appreciate the starting point I'm

16    beginning with.

17       And then he says, "Look, these guys want to know, I mean,

18    look, people want to invest in a winning endeavor, right, and

19    I want to give them the confidence and the comfort that that's

20    what they're doing."

21       To be clear, he wants to give the bribe payor the

22    confidence and comfort that they're investing in a winning

23    endeavor.  The bribe payor.  This is an elected public

24    official.

25       Based on this call, one thing was very clear, Rob wanted

1    to buy the votes. He wanted to give money for votes. It was

2    clear, it was unambiguous. And Mr. Ndukwe said, "Rob's going

3    to have the $10,000 when they meet next week, and he's going

4    to want a yes vote without a doubt."

5         This is what the defendant knew going into that

6    November 7th lunch. He made a choice. He showed up. He knew

7    he was going to be offered a bribe, and he showed up. This

8    was his choice. This is one of the many times the defendant

9    was given a choice, every time he had leaned into the bribe

10   payors.

11        So you heard the recording of the lunch meeting at Nada

12   and the meeting at the condo that followed. Now, that entire

13   recording is in evidence. Feel free to listen. There was

14   small talk at the beginning of the conversation, and they

15   quickly transition to discuss 435 Elm.

16        Mr. Ndukwe says -- describes the project, says we're

17   going to want to get this for a dollar or work out some

18   long-term lease of some sort of minimal amount, but we're

19   going to need X, Y, and Z.

20        And he goes through certain factors, certain elements,

21   certain specs of what they're doing and what their plans are.

22        Now, bear in mind, at this time, no proposal had been

23   submitted to the city. There was no development agreement.

24   There had been no assessment by the development professionals

25   in the economic development department, no pro forma, no

1    assessment of the development partners, possible development

2    partners, no feasibility analysis, nothing.

3        It was Mr. Sittenfeld sitting with the developer and his

4    investor, and they were telling him what they want.

5        Go back and listen to the recording, six minutes and

6    20 seconds later, sitting with a guy who offered a bribe five

7    days earlier, wanting a yes vote without a doubt,

8    Mr. Sittenfeld says, "It's got my support.  You know, I can

9    certainly shepherd the votes."

10        So he goes into this meeting knowing that Rob's got money

11    and he's going to want votes.  After talking for a little over

12    six minutes, he gives him the votes.

13        After further discussion, Mr. Sittenfeld transitioned.

14    He had his slides, and he was going to show why he was going

15    to be -- why he's popular in the city.

16        And he says, "In the event that, umm, Chinedum is

17    successful in twisting your arm to be supportive of

18    someone --" supportive meaning provide the money, provide

19    contributions -- "I want you to know that I think it's you

20    like making good bets and good investments."

21        Good investments.  The same language he used on

22    November 2nd.  He wanted to give them the confidence and the

23    comfort that they were investing in a winning endeavor.  Now

24    he wants to show why he's a good investment.

25        The discussion continued.  Rob stated -- he talked about

1    how Cranley was an issue, and that they wanted -- they need it

2    to be Cranley proof because Cranley had it out for Mr. Ndukwe.

3    This was the subject that Mr. Ndukwe raised on the

4    October 30th call that you just heard.

5        And in the context of discussing these issues with

6    Cranley, and Mr. Sittenfeld giving his pitch for why he should

7    be supportive, Mr. Sittenfeld said, "But like I can move more

8    votes than any single other person."  So as he's talking about

9    raising money, he's also talking about moving votes.

10       As he wrapped up his pitch, he says, "I just wanted to

11   make my case."  Then they walk across the street to the condo.

12       (Video played.)

13          MR. SINGER:  All right.  This is the second express

14   quid pro quo in five days.  On November 2nd, money for votes.

15       On November 7th, "I want to try and get P.G. $20,000,"

16   says Chin.

17       Rob says, "Hey, man, if we can get this deal done, let's

18   do it.  What's the best way to get that to you, $20,000, to

19   get that deal?"  And the deal is to make 435 Cranley proof.

20   Veto proof.  Six votes.  "What's the best way to get that to

21   you to get that deal?"  Money for votes.

22       Sittenfeld's response showed that he knew exactly what

23   the offer was.  He said, "You guys know he's going to try and

24   veto it?  Do you guys really think that you're going to need

25   six votes?"  It's a logical response when the offer is money

 1    for six votes.

 2        Rob says, "I don't know.  Maybe."  But he said

 3    previously, My investors want to know that we have confidence

 4    that this thing's going to go through.

 5        And Sittenfeld says, "I can sit here and say I can

 6    deliver the votes."  I can deliver the six votes that you're

 7    offering me $20,000 for.

 8        Directly after saying "I can deliver the votes," and

 9    talking about how he was going to talk to Cranley to get him

10    on board, Rob says, "So what's the best way to get it to you?

11    I've got $10,000 in cash with me."

12        Directly after saying he can deliver the votes and he can

13    get it done, Rob says, well, I've got $10,000 in cash.  How do

14    I get you the $20,000?

15        The response was not, are you crazy?  $10,000 in cash?

16    It was, whose name can stuff be in.

17        And then they spent the next ten minutes talking about

18    all the ways that they could get the $20,000 broken up into

19    two different increments to Mr. Sittenfeld in a way that would

20    keep Rob's name off of it.

21        At the end of the conversation, Rob reaffirms, "Chin

22    wants to get that development agreement, you know, and so if

23    you can, we're going to make it, we're going to make it

24    happen."

25        All right.  The Court's instructions, that Mr. Sittenfeld

1    agreed to perform a specific official act in exchange for a

2    thing of value, that's bribery.  That's exactly what he did on

3    that recording.  He agreed to deliver votes in exchange for

4    $20,000.  That's bribery.  It violates the honest services

5    count.  That's Count 1 for purposes of this one.

6         He also violated the attempted extortion, Count 4.  He

7    knew that the property that he agreed to accept was being

8    offered in exchange for official action.  He knew the money

9    was being offered in exchange for the votes that he promised

10   to give.

11        November 21st was a follow-up call.  This is the wire

12   that's connected to the wire fraud count, where Mr. Sittenfeld

13   directs Rob where to pay the money, the PAC, the Progress and

14   Growth PAC.

15        You saw the meeting on November 28th.  This was the

16   meeting where Rob was going to pay the initial payment, the

17   initial $10,000 to the PAC.

18        As soon as Mr. Sittenfeld walks in, they make some small

19   talk.  He transitions, "Anything new on the 435 property?"

20        Rob says, "No, we're just kind of waiting.  I mean, Chin

21   seems to think --" Brian says, "He's very positive."

22        Mr. Sittenfeld, unprompted, "Look, I'm ready to shepherd

23   the votes as soon as it gets to us, to council."

24        Shepherd the votes, the exact same phrase he used on

25   November 7th, the exact same phrase that he used when he knew

1    that Rob was going to offer him an express quid pro quo.  Rob

2    says, "Yeah."

3         Sittenfeld, "Just a matter of -- and by the way, I know

4    it's like the law, whose ever being sluggish, drafting up the

5    ordinances or anything.  I can give a -- but at this point,

6    I'm kind of like in waiting mode until it gets to our part of

7    the process."

8         Nothing he can do.  He can't vote yet, but he's in

9    waiting mode, and he'll be ready.

10        At the end of the conversation, Brian asks, "Well, is

11   this money, is it going to be able to -- is this going to be

12   able to help you?"

13        He says, "Yes.  Yes.  One hundred percent."

14        You saw a recording from the December 17th meeting.  They

15   give him the $20,000 in checks.  The first $10,000, you'll

16   recall, the FBI messed up.  They didn't put them in LLCs.

17   They had to write new checks.

18        December 17th, they provide $20,000 in checks.

19   Mr. Sittenfeld says, "Oh, all the big help."  And then when

20   they talk about 435, he says, "Don't let these be my famous

21   last words, but I can always get a vote to my left or a vote

22   to my right.  All we have to do is count to five.  Cranley

23   will be there."

24        You heard the voicemail the defendant sent to Mr. Ndukwe

25   that same night, that same evening after receiving the

1    $20,000.

2         "I just want to let you know how much I really enjoyed

3    getting to know Rob and Brian.  No surprise that you attract

4    great dudes and talented investors and partners, but I'm

5    looking forward to doing what I can to help get 435 across the

6    finish line."  He's got his task, get 435 across the finish

7    line.

8         A couple things, though.  Rob and Brian are not great

9    dudes.  They're bribe payors.  Aside from a brief meeting nine

10   months prior, at this point Mr. Sittenfeld has had three

11   interactions with Rob.

12        On November 7th, he was offered $20,000 for votes.  On

13   November 28th, he gave him $10,000 in checks.  December 17th,

14   he gave him $20,000 in checks.

15        He's not a great dude.  He's a bribe payor.  And he's not

16   a talented investor.  Mr. Sittenfeld doesn't know Rob.  He

17   doesn't know what kind of an investor he is, but he's going to

18   get 435 across the finish line.

19        Once he's received these checks, he's received a payment

20   knowing it was provided to him in exchange for his agreement

21   to perform a specific official act.

22        By December 17th, by the time he receives that money,

23   knowing that it was given for his vote, he's violated the

24   honest services fraud statute.

25        So there's two ways that he's violated the statute here.

1      By agreeing to accept the money knowing it was in exchange for

2      a vote, and then ultimately receiving the money knowing that

3      it was in exchange for a vote.

4          The four elements of honest services fraud in Count 1 are

5      established beyond a reasonable doubt; same with attempted

6      extortion.

7          By December 17th, he knew that the property that he

8      received was being offered and provided in exchange for

9      specific official action.  All the recordings that you have

10     heard, and all the transcripts you've seen support this

11     conclusion.  Count 4 is established.

12         Now, a couple things to remember, pursuant to the Court's

13     instructions.  You've heard a lot about supporting development

14     projects, the merits of 435 Elm, whether or not it was good,

15     or whether or not it was bad.

16         It's not a defense to bribery for the public official to

17     claim that he would have lawfully performed the official

18     action even without the pay, or having promised to provide, or

19     having provided a thing of value.

20         This case is not about whether or not it was a good

21     project or a bad project, whether it was good for the public.

22     It's not about whether the defendant is popular, or liked, or

23     has got good ideas as a public official, or whether he should

24     have supported the project anyway.  It doesn't matter.

25         What matters is that he knew the money that he was

1    accepting was a bribe payment, and he took it.  That itself

2    satisfies the elements.

3         Another point from the Court's jury instructions.  It is

4    immaterial whether or not the public official ultimately

5    performed the official action, that's why the elements are

6    established now, at the time that he accepts and receives the

7    money.  And that makes sense, right?

8         The example the Court gives, if a public official secured

9    a contribution by falsely representing that, in exchange for

10   the contribution, he would vote a particular way on a

11   particular issue, it would still be bribery, even if the

12   public official in fact does not intend to vote that way in

13   the issue.

14        This turns on whether he knew it was offered as a bribe.

15   And he did.  And he accepted it.

16        All right.  So you have heard a lot about bundling in

17   this case, bundling contributions, whether or not that's

18   permissible, the extent and when it's permissible.  The Court

19   makes clear that bundling contributions is not impermissible.

20   There's no dispute to that.  This is in the Court's

21   instructions.

22        What's important is it doesn't matter.  At the end of the

23   day, what matters is the thing of value, where it comes from,

24   whether it was bundled properly, whether the true source was

25   Rob and was not attributed properly.

1        At the end of the day, what matters is the thing of value

2   that he was getting in return for his promise.  That's what

3   matters.  Whether it was properly bundled is really beside the

4   point.

5        But, but where the defendant took steps to hide the

6   source of the payment, that is evidence of his intent.  It

7   corroborates the fact that the agreement was corrupt.  It

8   makes sense that someone would want to hide a bribe payment.

9        So if the evidence shows that the defendant was

10  protecting Rob's interest and not wanting his names on things,

11  protecting the source of funds, that goes to his intent.  And

12  you heard quite a bit of that.

13       Slides you've seen previously.  Rob says he brought

14  $10,000 in cash with him.  Sittenfeld responds, "Well, whose

15  name can stuff be in?"  It's Rob's $10,000.  He's got it with

16  him right then.  Coming up with names to put it in doesn't

17  change the fact that it's Rob's money.

18       The next call out, "I do have a PAC that, one, no one's

19  like snooping around in who's giving there, that Jo.  I mean,

20  I think, frankly, a lot of people don't even know that I have

21  it."

22       This is the first time he introduces the PAC.  No one's

23  looking at it, no one really knows he has it.

24       Here Rob tells -- Mr. Sittenfeld asks, "If you had, you

25  know, like John Doe was a person that something could be

1    attributed to, could they do a check?"

2        Rob says, "It's going to be the same $10,000 or $20,000."

3        You heard a number of times Mr. Sittenfeld say, "Well,

4    it's got to be a real person."  A real person?  That's not

5    what matters.  What matters is if the person is the true

6    source.

7        If it isn't, then this is an attempt to hide who the

8    bribe payor is, or at least the inference could be so drawn.

9        Again, Rob says, "It's the same $10,000 that just gets

10   converted in names."

11       You heard a call on November 21, 2018.

12       (Video played.)

13           MR. SINGER:  "It's not connected to me.  No one's

14   going to be poking around to find your names."

15       November 28th, when Mr. Sittenfeld received the first

16   $10,000, he again says, "This PAC, my name is not -- I mean,

17   this will, can certainly support and benefit me, but my name

18   is not connected to it in any way."

19       Sittenfeld says, "No one will ever notice."  No one's

20   going to know about the payment.

21       These are the four checks entered into evidence.  These

22   are the four names they were attributed to on filings.  No

23   Rob.  No Brian.  No one will ever know this.

24       So as the Court's instruction just showed, and I just

25   went through whether or not the official action was ever

1    ultimately performed is not -- it's immaterial, pursuant to

2    the Court's instructions.

3         But the evidence shows that after receiving the $20,000,

4    Mr. Sittenfeld did, indeed, attempt to fulfill his end of the

5    bargain.  He got to work.

6         The development agreement is submitted to the city on

7    January 16th and, at that point, Mr. Sittenfeld began pushing

8    hard for the undercover's interest in getting an agreement for

9    435 Elm Street in the months that followed.

10        He did this in the face of, frankly, opposition from the

11   economic development department.  You heard testimony from

12   Phil Denning.  They made the determination that the proposal

13   that was submitted by Mr. Ndukwe was not in the public's

14   interest.

15        Again, Mr. Ndukwe was seeking the sale for a dollar.

16   This was not approved by economic development, but

17   Mr. Sittenfeld was pursuing the interest of Rob and Brian

18   throughout the months that followed.

19        He had conversations with the mayor and updated Rob

20   relating to those conversations.  He had conversations with

21   Phil Denning, including discussions about whether there would

22   be an RFP, an RFP which would put the project up, see if there

23   is other competition in the market.

24        Mr. Sittenfeld says, "It obviously seems like the

25   worst-case scenario."  They don't want another person to swoop

1    in and say we'd love to do this.

2       There is discussion on February 18, 2019 about economic

3    development's pushback. They didn't want to sell it to him

4    for a dollar because there are -- there might be -- structural

5    issues might be not as bad as they had originally thought.

6       And there's discussion about going the council route.

7    Rob says Jay, Jay Kincaid, who is assisting Mr. Ndukwe as a

8    lobbyist on 435, he's like, hey, let's continue working

9    economic development. Let's continue to push through economic

10   development to try and get a development deal.

11      But then he says, "We may, we may have to go around them

12   and bring it through council first."

13      Rob's saying we might have to get enough votes that we

14   don't even need the economic development department because

15   they're not helping us here.

16      What does Mr. Sittenfeld say? Let's do it. Let's do

17   that. Let's go the council route. I've already promised the

18   votes, and I've got them, so let's go the council route.

19      We don't need the -- we don't need to follow the

20   recommendations of the development professionals hired in the

21   City of Cincinnati to assess the agreement. Let's just push

22   it through council. That's his proposal, or that's his

23   response.

24      He reaffirmed that on May 2nd. This is when -- these

25   were the initial discussions about whether or not the property

1    should be transferred to the port.

2       Rob says, "That's before the port thing came up, and

3    we're just kind of discussing overall, you know, what are we

4    going to do?  What's the best option?  How do we get this

5    thing going?"

6       And Chinedum was like, "Hey, let's just --"

7    Mr. Sittenfeld says, "Go the council route."  And then he

8    said, "I offered."

9       He offers to just ram it through council.  And then he

10    says later he doesn't necessarily agree with -- no one

11    necessarily wants to tick off the bureaucrats.  He disagrees

12    with that.  Let's take on the bureaucrats, the bureaucrats in

13    economic development, who are assessing whether or not it's an

14    appropriate development agreement.

15       You heard the call on May 2nd between Mr. Sittenfeld and

16    Mr. Ndukwe.  The positive development they're talking about is

17    the transfer to the port.  Mr. Ndukwe supports this.

18       And he says, "From where we were --" which is dealing

19    with Cranley.  This is the fact that Cranley was mucking

20    things up, at least in Mr. Ndukwe's mind -- "to where we are

21    now and kind of having to get you to help us out type of

22    thing, I mean, don't get me wrong, we're going to need some

23    assistance."

24       What does Sittenfeld say, "Oh, yeah.  I -- this, I, as

25    you know, I've been the strategic piece of the downtown

1    puzzle.  I'll be glad to champion for this.  I think it will

2    be great."

3         He is the strategic piece.  Mr. Ndukwe testified about

4    this, said prior to October 2018, prior to when he started

5    recording calls, the defendant was not helping push for a

6    development proposal on behalf of Mr. Ndukwe.

7         Now he's a strategic piece.  He's the champion for the

8    project.  What changed?  $20,000 in December 2018.  The

9    property was transferred to the port in June 2018.

10        In a meeting on July 8, 2019, they discussed the vote on

11   the port.  Mr. Sittenfeld said, "Rob and I talked before the

12   agreement with the port piece, which was no sweat."  This is

13   in reference to a call that Rob testified there were technical

14   difficulties and the entire call was not captured.

15        But Mr. Sittenfeld called Rob the day before -- I'm

16   sorry, Rob called Mr. Sittenfeld, and they talked about it the

17   day before the vote.  And Rob said, Yeah, I support this

18   transfer and, ultimately, Mr. Sittenfeld voted for it.

19        All those actions, all those steps that Mr. Sittenfeld

20   was doing in the spring and summer of 2019, they're not

21   necessary to find the charges, but they sure do show that the

22   agreement was there.

23        Now, you heard quite a bit in the late summer and early

24   fall about the sports book.  But Mr. Ndukwe mentioned the

25   sports book during that first meeting, that November lunch

1    meeting, as part of the plan.

2        But throughout the middle and the end of 2019, you heard

3    conversations about limiting competition.  They wanted the

4    sports book and hotel property that would be 435 Elm, and they

5    wanted to be the only game in town.

6        You also heard recordings where they were discussing the

7    legislation at the state level, and then what local

8    legislation could be to help limit the competition based on

9    what happens at the state level.

10       There's a call in August 2019 between Sittenfeld and Rob,

11   that paragraph at the top, they discuss the stateside with the

12   sports betting part.

13       And then Rob says, "Vinny and I were thinking at the

14   local level through, you know, some legislation, we can

15   basically accomplish what we need to accomplish.  And so at

16   some point, I don't know where you are, I know you're super

17   busy."

18       And then he says, "Maybe me and you can sit down with

19   Vinny at some point how to discuss that a little bit, and what

20   the options are, what the options are at the local level."

21       And Rob said, "Vinny was really impressed with you, you

22   know, wants us to keep supporting you."

23       Sittenfeld says, "Yeah, yeah.  No.  I like Vinny a lot."

24       Then he says, "You know, I agree, obviously, a lot of

25   your guys play just at the local level anyway, we can exert

1    more control."

2        So in this conversation, Vinny wants to meet.  They want

3    to talk about ways to control competition for the sports book

4    at the local level, and Vinny wants the support, he wants to

5    provide support.  He wants to give more money.

6        In a lot of ways, this mirrors the November 7th and the

7    November 2nd exchange.  There was a meeting on September 24,

8    2019, and this is the information Mr. Sittenfeld had going

9    into that meeting; limit competition, limit it at the local

10   level, support.

11       Now, at this point, what should be clear is that Rob and

12   Brian and Vinny are bad news.  Rob and Brian have already

13   offered bribes.  They pay bribes.

14       You heard from Jared Kamrass.  He talked about what

15   Mr. Sittenfeld said about Rob and Brian prior in the -- after

16   the initial bribe payments.  He thought they were sketchy

17   guys.  He thought they were slimy guys.  So he's telling Rob

18   that they're good buddies, and they're good friends.  He's

19   telling Jared Kamrass that they're sketchy.  And he's right.

20   They were sketchy.  They're bribe payors.

21       He was so concerned that he asked Kamrass if he thought

22   they were FBI agents.  That's not how real estate people act.

23   But that didn't stop Mr. Sittenfeld from pushing their

24   interest, and it didn't stop Mr. Sittenfeld from meeting with

25   Rob, Brian, and Vinny in a hotel room in Columbus on

1    September 24th.

2         You also heard Mr. Jay Kincaid testify.  He testified

3    that he warned Mr. Sittenfeld, do not take any money from Rob

4    or Brian.  He said he had multiple conversations with

5    Mr. Sittenfeld, and he repeated the same thing.

6         One, they offered you $10,000 in cash.  That should be a

7    red flag.

8         Two, they paid Kamrass $15,000 in cash for help for an

9    elected official, pursuant to a second investigation, but this

10   is information that Kincaid presented to Mr. Sittenfeld as to

11   why he should stay away.

12        And three, there were rumors that the under- -- that Rob

13   and Brian took another elected official on a trip to Miami.

14   Again, this was pursuant -- the testimony is this was pursuant

15   to a separate investigation.

16        But this is three pieces of information that Mr. Kincaid

17   had, and that he expressed to Sittenfeld as the reasons you

18   need to stay away from these guys.

19             MR. C. MATTHEW RITTGERS:  Your Honor, the second

20   reason was -- I object.  The second reason, I've tried to sit

21   here, but that was in 2020 after the indictment came out, and

22   that's not what Mr. Kincaid testified to.

23             MR. SINGER:  It is what Mr. Kincaid testified, that's

24   what Mr. Kamrass --

25             THE COURT:  Can you go up a little bit, Sue.

1         MR. C. MATTHEW RITTGERS: The statement that the

2 $15,000 in cash was known to P.G. at the time Mr. Kincaid and

3 P.G. had some conversation is not what the testimony was, Your

4 Honor.

5         MR. SINGER: Can I respond?

6         THE COURT: You can. I don't remember that testimony

7 one way or the other, so...

8         MR. SINGER: Mr. Kincaid testified that there are

9 three reasons why he told him to stay away. The second reason

10 was he knew information from Kamrass that he had gotten 10 to

11 15,000 dollars in cash.

12         THE COURT: I just -- I'm sorry. I mean, I just

13 don't recall. You can take it out on your close, I just don't

14 recall the testimony.

15         MR. C. MATTHEW RITTGERS: Thank you, Your Honor.

16         MR. SINGER: Now, Jay Kincaid described Rob and Brian

17 as highly unusual and a huge flashing red stop sign. There

18 was something not right about these guys, and they were going

19 to get in trouble.

20     And he warned Mr. Sittenfeld not to take their

21 contributions, but that was ignored. Mr. Sittenfeld leaned

22 in. Again, he had a choice. Should he meet with Rob and

23 Brian and Vinny in September 2019, and he did.

24     (Video played.)

25         MR. SINGER: So they go directly into talking about

1    sports betting and limiting competition.  They also talk about

2    finding out about Mr. Ndukwe.  You heard about separate

3    allegations that they are aware of relating to Mr. Ndukwe.

4        Mr. Sittenfeld says, It's going to sound disloyal what

5    I'm proposing, he said, but the situation doesn't look good.

6        And they talk about how to get rid of Mr. Ndukwe so he

7    could keep pursuing the deal through the undercovers.  He

8    said, "I got your guys' back on this a hundred percent."

9        He then recommends, "You should take the project over."

10       Then they get into discussions about what they need from

11   the city, how can they limit competition at the local level.

12       Mr. Sittenfeld says, "Like, we can't do less than the

13   state, but we can do more than the state, because these guys

14   actually want a controlling environment."

15       He says, "And, by the way, most of my constituents don't

16   want this shit on every corner and, like, people like the idea

17   of gambling in a discreet, designated, controlled, classy

18   environment."

19       (Audio played.)

20       MR. SINGER:  All right.  So let's go through that.

21   Mr. Sittenfeld says, "We can use the zoning code, you know,

22   and be like something, you know, we'll only let this activity

23   occur in places like zones for X, Y.

24       "I'm just confident there's some tool that we really need

25   be within city limits could create a controlled environment."

1    He then says, "I think it's politics and good policy.  I don't

2    know if you want me to start looking at that."

3        Vinny says, "That's what I want you to do.  That's what I

4    would like you to do."

5        Then he says, "I don't mind what it costs.  So you hear

6    me today, we're going to take care of you, not a problem, and

7    keep these guys in the loop."

8        Mr. Sittenfeld again says he doesn't like what's going on

9    with Mr. Ndukwe.

10        (Audio played.)

11        MR. SINGER:  So this is Mr. Sittenfeld telling his

12    plan.  This is the solution.  This is how we can limit

13    competition in the city.  And it ends with Vinny collecting

14    two checks, telling him that these are two of four, the other

15    two are coming.

16        Mr. Sittenfeld says, "I'm very appreciative.  That means

17    a lot."  Again, he says, "The other two are coming."

18        Before he leaves, again, they reiterate, "How can we

19    limit this competition in the city?"

20        Mr. Sittenfeld says, "My mind goes to zoning and bonding,

21    but I'm confident."

22        Back to the elements.  Agreeing to perform a specific

23    official act in exchange for a thing of value, or receiving a

24    payment knowing it's provided for a specific official action.

25    It's the same as attempted extortion.

1          Now, this is another instruction you received from the

2     Court.  The quid pro quo need not be express; that is, the

3     government need not show that Mr. Sittenfeld actually said

4     something to the effect, I promise to perform this official

5     act in exchange for that thing of value, otherwise, the law

6     would be frustrated by winks and nods.  Instead, there must be

7     a clear understanding based on the parties' communications.

8          September 25th is the wire that's connected to the honest

9     services charge.  This is where they talk about the money.

10    Mr. Sittenfeld references the payments that he received before

11    and wants names who to attribute the checks to.  He reaches

12    out directly to Rob.

13         October 29th, there's a call with Vinny where he

14    references the next two checks.

15         (Audio played.)

16          MR. SINGER:  And then they meet on the 29th of

17    October.

18         (Audio played.)

19          MR. SINGER:  He gives him the checks, "As long as it

20    passes muster, like with a person with a name."

21         All right.  During that meeting, they talk about 435.

22    The first step is making sure that 435 goes through.  They've

23    got the zoning piece.  They've got the sports betting piece.

24    It's up in the air, but we want to make sure 435 is going to

25    go through.

1      Here Brian's saying, "State legislation may change.
2  There might be a local option, we don't really know, but that
3  would put you back in the game."
4      Count 2, the honest services fraud count.  Now, this is
5  the -- the evidence in this is different than Count 1.
6  Count 1 was express.  The offer was express, $20,000 to get a
7  deal.
8      This is based on all the facts and circumstances, all the
9  evidence, considering the fact that going into that meeting on
10 September 24th, what did Mr. Sittenfeld know.
11     They wanted a local solution for sports betting.  Vinny
12 wanted to support him.  What did they talk about?  The local
13 solution for sports betting and Vinny's support.  They don't
14 need to say I'm giving you this for that.  It's all the facts
15 and circumstances.
16     He knew they were bribe payors when they walked in the
17 door.  He knew they wanted to give him money.  And he knew
18 they wanted something in return.  And that's exactly what
19 happened.  So today, we're gonna take care of you, and he
20 walked out with $10,000 in checks.
21     When he met them again a month later, he walked out with
22 $10,000 more, after they talked about local sports betting and
23 getting the deal done for 435.
24     Same goes for the attempted extortion on Count 6.  It's
25 the same analysis.  He received those checks knowing that they

 1    were given for official action relating to 435.

 2        All right.  So, again, crimes are established at this

 3    point beyond a reasonable doubt.  The subsequent steps, the

 4    filings that didn't include Rob or Brian or Vinny, the

 5    attempts by the defendant to pressure Laura Brunner at the

 6    port to further their interest, it's evidence to show that the

 7    agreement happened.  It's corroborating evidence.

 8        What you've heard establishes it.

 9        What happens going forward just further confirms it.

10        He doesn't care what -- "do I want to know where the LLC

11    checks come from?

12        "As long as it passes muster, like a person with a name."

13    These are the checks.  These are people with names.  None of

14    them are Rob, Brian, or Vinny.

15        So it's at this point, after Mr. Sittenfeld receives

16    these contributions from Vinny, that he starts reaching out to

17    Vinny directly.

18        And what did Mr. Sittenfeld know about Vinny?  Well,

19    there's a strong inference that he had a dirty background.

20    Seems like the kind of person you'd want to distance yourself

21    from rather than embrace.

22        Multiple discussions about Vinny, his back story, and

23    what he used to be involved in, culminating in October 29,

24    2019, where Mr. Sittenfeld just comes out and asks, "Is it

25    like, you know, Mafia type?"

 1          Brian says, "I've always kind of respected that.  I'm
 2     going to say yes."
 3          Mr. Sittenfeld says, "By the way, I don't really care."
 4     He's in the Mafia, I don't really care; or was in the Mafia, I
 5     don't really care.
 6          This is a summary exhibit that was submitted into
 7     evidence.  It shows the transition once those checks were
 8     received in September and then October, and then
 9     Mr. Sittenfeld begins reaching out to Vinny.
10          And you can see close contacts between when Sittenfeld
11     talks to Vinny and he talks to Laura Brunner at the port.
12     He's giving regular updates.  He's going straight to Vinny.
13          Tries to meet up with Vinny in New York.  He says, "I
14     want to be like you.  I want to be a baller like you."
15          (Audio played.)
16          MR. SINGER:  "Forced her to move forward."  This is
17     Laura Brunner at the port.  She's a development professional
18     at the port.
19          She made the assessment that the development agreement
20     that Mr. Ndukwe was seeking was not the highest and best use
21     of the property, that selling it to him for a dollar was not
22     the highest best use of the property.  This was consistent
23     with the assessment made by the economic development
24     department.
25          And yet Mr. Sittenfeld pressured her time and again to

1    get her, according to her testimony, to just give it to Chin,

2    to just give it to Mr. Ndukwe.

3         Again, whether or not that is the right decision how

4    435 should have been treated by the port is, ultimately,

5    beside the point. What matters is that Mr. Sittenfeld was

6    acting on behalf of Vinny, doing the very things he had agreed

7    to do for the money.

8         (Audio played.)

9         MR. SINGER: Mr. Sittenfeld continued to call Vinny,

10   was very, very close to the situation, tries to introduce him

11   to a friend in Rhode Island, characterized Vinny as "my

12   friend" at the bottom. Again, talks about meeting up. He's

13   leaning into Vinny.

14        (Audio played.)

15        MR. SINGER: He has the ability to pressure her.

16   Mr. Sittenfeld has the ability to pressure Laura Brunner. And

17   that's exactly what he was doing. The call's continuing.

18        (Audio played.)

19        MR. SINGER: The top quote, Vinny says, "In my

20   opinion, 435 is me in Cincinnati for the long haul, you know

21   what I'm saying?"

22        Mr. Sittenfeld says, "Which we want big time, big time."

23   Vinny doesn't seem like the type of person that you would want

24   in Cincinnati.

25        Mr. Sittenfeld gives Vinny an update about a meeting that

1    he had.  He's keeping Vinny in the loop.  Everything that

2    happens with 435, he's keeping Vinny in the loop.

3         (Audio played.)

4         MR. SINGER:  Again, these recordings in themselves

5    are just Mr. Sittenfeld keeping up with Vinny.  But what they

6    do is they support the conclusion that was reached above, that

7    he received that money knowing it was in return for advancing

8    435 Elm, that he was fulfilling his end of the bargain.

9    Despite what development professionals were saying, he was

10   pursuing the interest of the bribe payors.

11        It is based on that evidence that the honest services

12   fraud counts and the attempted extortion counts have been

13   proven beyond a reasonable doubt.

14        All right.  Now I'm going to go through Counts 3 and 5.

15   Like I said, the evidence is the same, the evidence that

16   supports are the same.  The elements are a little different.

17   I'm just going to highlight those differences.

18        There are five elements.  The first one, that at the time

19   alleged in the count, Mr. Sittenfeld was an agent of the City

20   of Cincinnati.

21        The Court defines "agent" as a person authorized to act

22   on behalf of the city, including an employee, an officer, or

23   representative, and a member of city council is an agent of

24   the City of Cincinnati.

25        The parties have stipulated Mr. Sittenfeld was an elected

1    official serving in Cincinnati, paid by the City of

2    Cincinnati.  This element is established.

3         Two, that Mr. Sittenfeld solicited, demanded, accepted,

4    or agreed to accept a thing of value from another person.

5    Again, the four checks in December of 2018, the two checks in

6    September 2019, and the two checks in October 2019.

7         This also includes potentially the solicitation "love you

8    but can't" in October 30th, 2018.  That element is

9    established.

10        Four, that the business transactions or series of

11   transactions involved a thing of value of $5,000 or more.  You

12   heard testimony that Mr. Ndukwe invested around $1.2 million

13   for his interest in 435 Elm, and that it was a development

14   project worth millions.  That element is established.

15        Element five, this is the element for which there's a

16   stipulation.  The parties have stipulated that Cincinnati

17   received benefits of more than $10,000 from the federal

18   government during the relative periods.  That element's

19   established.

20        That leaves element three, that Mr. Sittenfeld acted

21   corruptly with the intent to be influenced or rewarded in

22   connection with a specific business, transaction, or series of

23   transactions involving the City of Cincinnati and the

24   435 Elm Street project.

25        Now, this requires an explicit quid pro quo, but it's a

1    little different.  I'm going to quote the Court's instruction,

2    The government must prove beyond a reasonable doubt that there

3    was a quid pro quo agreement between the parties, whereby

4    Mr. Sittenfeld intended to provide the contributor, in

5    exchange for the contributions, some advantage inconsistent

6    with official duty and the rights of others.

7        They need not be expressed, but it must be explicit.

8        Unlike the other counts, there is no official action

9    requirement.  So the official action requirement requires that

10   there be some formalized agreement, like a vote, and that the

11   defendant either took an action or agreed to take an action on

12   that formalized and specific government action.

13       So votes led to passing legislation are official actions.

14       Pressuring other officials to perform official actions

15   also qualify as official actions.

16       And we saw that in the counts relating to the November 7,

17   2018, deliver the votes.  A vote is an official action.  It is

18   something that, as a council member, it is a formalized

19   process that he must do that is part of his duties as a city

20   council member.

21       Similarly, advancing a development agreement in the City

22   of Cincinnati by pressuring public officials is official

23   action.  Making changes to the zoning code is official action.

24       Under Counts 3 and 5, there is no official action

25   requirement.  Rather, it must be in connection with the

1  business or transaction of the city and 435 Elm.  This element

2  is established.

3      The evidence shows that the defendant corruptly solicited

4  Mr. Ndukwe on October 30th; that he agreed to accept $20,000

5  in exchange for delivering votes on November 7th; that he

6  received that same $20,000 in exchange for delivering votes on

7  December 17th.

8      These are explicit quid pro quos intending to be

9  influenced in connection with the 435 Elm Street project.

10      Rob wanted it veto proof, and that's what he said he

11  would deliver.  That's Count 3.

12      And it's the same analysis for Count 5.  He agreed to

13  accept and receive $10,000 on September 24th, 2019, and

14  received another $10,000 on October 29th.  Again, intent to be

15  influenced in connection with the advancement of the

16  435 Elm Street project.  That was his intent when he received

17  it, changing the laws, making sure the 435 Elm deal goes

18  through.  This is how he was intending to be influenced in

19  connection with those payments.

20      Counts 3 and 5 are proven beyond a reasonable doubt.

21      Thank you for your time and attention over the past week.

22  It can be difficult to sit as a juror, for many reasons.  Your

23  service is appreciated.

24      In the end, this is a simple case.  Did the defendant

25  agree to receive or receive contributions knowing they were

1    given in return for official action relating to 435 Elm?  The

2    answer is yes.

3        In the opening, my colleague, AUSA Glatfelter, asked for

4    three things; to pay attention to the evidence, to follow

5    Judge Cole's instructions on the law, and to use your common

6    sense in applying the law to the evidence.

7        The government submits that based on these three things,

8    the evidence, the law, and your common sense, there's only one

9    reasonable conclusion in this case, that the defendant is

10   guilty beyond a reasonable doubt for all six counts.

11       Thank you.

12       THE COURT:  Thank you, Mr. Singer.

13       Ladies and gentlemen of the jury, as you can see, it's

14   about 12:20 right now.  I think we're going to break for lunch

15   and resume at about 1:30.  So if you can be back in the

16   hallway by no later than, say, 1:25, and we'll start at 1:30.

17       We are now that much closer to the finish line, but that

18   makes the admonition all the more important.  You've heard the

19   government's closing, its summary of the evidence, and its

20   arguments.

21       You've not yet heard from the defense, so it's even more

22   important that you not discuss this case amongst yourselves or

23   begin to form any opinions.  You've heard one side of the

24   story.  There's the other side coming after lunch.

25       Please do not do any investigation on your own.  Please

1    do not communicate with anyone about the case.  If anyone

2    should attempt to communicate with you, please bring it to my

3    attention immediately.

4         Other than that, have an enjoyable lunch, and we will

5    resume about 1:30.  Thank you.

6         (Jury out at 12:18 p.m.)

7              THE COURT:  Anything we need to discuss before we

8    break?

9              MR. SINGER:  No, Your Honor.

10             MR. C. MATTHEW RITTGERS:  No, Your Honor.

11             THE COURT:  Let's take a recess for lunch.

12        (Lunch recess.)

13             THE COURT:  Are you ready to proceed, Mr. Rittgers?

14             MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

15             THE COURT:  Why don't we bring in the jury.

16        (Jury in at 1:29 p.m.)

17             THE COURT:  Is the defense prepared to proceed with

18   closing?

19             MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

20             THE COURT:  You may do so.

21             MR. C. MATTHEW RITTGERS:  Thank you.

22        Before rendering a verdict in this case, you're going to

23   have to apply the law that the judge gives you that we've

24   already heard, and you'll have it with you, in paper, back in

25   the jury room, applying the law to the facts.

1        You all will be explaining to each other in the

2   deliberation room the reasons why you feel the way you do.

3        And so for the next 30 or 45 minutes, I would like to

4   talk about some of the facts we've heard in this case, and how

5   they apply to the law that you have in your hand and you'll

6   have in the jury room.

7        Everything in this case comes down to intent.  Everything

8   comes down to what P.G. intended.  And you're being asked to

9   look into the mind of another and determine that intent.  And

10  it comes down to whether or not he intended to be corrupt.

11       It comes down to whether or not P.G. wanted to partake in

12  a corrupt barter.  And so we all know, because of our life

13  experiences and common sense, that context matters.

14       And we can sit here, and we have over the past two weeks,

15  and we have heard snippets of recordings, partial recordings.

16  You can see in the transcript things that are cut out.  The

17  timeline starts when they want it to start.

18       And we have not heard all the context.  And I'd like to

19  talk a little bit about that with you here, because context

20  provides the truth.

21       There are a lot of things in this case that are not in

22  dispute, and one of them is so important that the judge wrote

23  it in the jury instructions on page 46.

24       And the judge tells us the law, which is that there is

25  nothing necessarily improper under campaign finance law about

1    a candidate merely discussing his positions regarding an issue

2    with a campaign contributor, including on the same occasion as

3    the candidate accepts a contribution or discusses campaign

4    contributions.

5         And there is not necessarily anything improper under

6    campaign finance law about soliciting contributions from

7    individuals or entities who have business pending before a

8    political body on which the candidate serves or may serve.

9         And we know this from our common experiences.  I mean,

10   town hall meetings, candidates go to homes for fundraisers.

11   They're on TV.

12        You can have a meeting as a candidate with a constituent,

13   or a potential fundraiser or donor, and you can sit down in a

14   room of two people or a room of 200 people, or on TV to

15   20 million people, and you can say things like, hey, if you

16   vote for me, I think we can get the votes and get the Keystone

17   Pipeline passed.

18        Another example that I think I might have brought up in

19   opening was if -- take West Virginia.  I'm just giving an

20   example that is not this case.  A candidate for governor,

21   senator in West Virginia can sit down with the owner of a coal

22   mine, and that candidate can express a specific or general

23   policy position, that being we want to deregulate the

24   environmental regulations around clean air or energy, sitting

25   down with a coal minor owner and say but in order for me to be

1    a successful candidate and win, I need your donation.  That's

2    permissible.

3        Saying things in this country about -- if you're an

4    elected official about getting the votes, shepherding the

5    votes, that is an everyday occurrence.  If it wasn't

6    permitted, he wouldn't have said it.

7        We have minority and majority whips in every single body,

8    in the states and in Washington, D.C. federally; vote

9    counting, shepherding votes, whipping votes, that's all part

10   of the process.

11       But the government brings us these things to act as if it

12   is a bad thing.  But the judge's instructions tell us that

13   candidates can speak about their specific and general policy

14   positions at the same time they're accepting or even

15   soliciting donations.  It happens every day.

16       Other things that are not in dispute.  It is not disputed

17   that P.G. turned down cash, and yet we hear the government

18   continue to argue about a creative way to keep Rob, Brian, or

19   Mr. Ndukwe's name off things.

20       Folks, names are not on cash.  I mean, if a person is

21   corrupt, and the whole entire -- everything we have to

22   consider is did he intend to be corrupt, cash is not

23   traceable.  You don't have to put it in a bank account.

24   People don't, typically.  There are no names on cash.

25       If you are a corrupt person, and you don't believe you're

1    being recorded, you take cash.  That's how you keep your name

2    off things.

3        These FBI agents, all of them, are highly trained.  They

4    know, they can interpret and read how far they can push

5    somebody.  And if they thought P.G. would have accepted cash

6    at a later date in a smaller amount, they would have offered

7    it.  Again, they thought he was going to accept cash when they

8    offered it on November 7th, and he said no.  No.

9        If you want to keep your name off things, and if you are

10   corrupt, if you have the intent to be corrupt, you take cash.

11       It's not in dispute the facts that show us how P.G. was

12   obsessed with compliance of the PAC in his campaign.

13       He turned down money orders.  He turned down cashier's

14   checks.  And then when these guys tell him that they have LLC

15   checks from their business partners, universe of buddies,

16   P.G., because he has compliance procedures in place, catches

17   that that check is actually a corporate check and shreds it.

18       And they say, oh shucks, oh man, I thought it was an LLC

19   check.  I don't know if they really did or didn't, but he

20   caught it and didn't cash the corporate check.

21       We heard, it's not in dispute, that when P.G. found out

22   that his treasurer, Jared Kamrass, was dishonest -- P.G. did

23   not know about this $15,000 in cash that Jared Kamrass had

24   pocketed that was intended for Mayor Cranley until this case,

25   discovery came to us.  He had no idea.

1        He fired him because he found out he had been dishonest

2    about a campaign compliance issue.  I mean, is that how a

3    corrupt person acts?

4        If you are corrupt, would you fire someone over

5    dishonesty on a campaign finance issue, and then hire a woman

6    by the name of Claire Fisher, who we've heard referenced, who

7    was a certified CPA, who was interviewed by the FBI.

8        We can all agree that if they had anything to show in an

9    email, a text, with Signal, we found out they had all the

10   Signal messages from Kamrass after he said yeah, they had them

11   all.

12       If they had anything, bank accounts, credit cards, Claire

13   Fisher said yeah, here, you can -- they have subpoena power.

14   You can see everything.  If there was anything, she would have

15   been in there, and so credit card statement, bank statement,

16   in email, a text message, phone calls.

17       P.G. hired a reputable local law firm from the beginning,

18   Manley Burke.  When he found out that his treasurer, who said

19   that he was an expert in campaign compliance was dishonest, he

20   fired him and hired a certified CPA.

21       We hear the government highlight the fact that a

22   candidate expresses his ability to win office.  For what

23   purpose?  I mean, every candidate, candidates that are losing

24   in the polls always say don't trust the polls, I'll win.  And

25   if they are ahead in the polls, they say look at the polls,

1    trust the polls.

2        I mean, that's what candidates do.  Their job is to say,

3    hey, I'm going to win.  Support me.  Invest in me.  People

4    truly don't want to support someone who they think is gonna

5    lose.

6        It's not in dispute, despite what I think I heard on the

7    previous closing, that P.G. was doing everything that he could

8    to try to help 435 Elm before he met Rob and Brian.  And this

9    is an exhibit, two exhibits, that you'll have in the back.

10        And the first is Defendant's Exhibit 653, which is a text

11    message between a guy by the name of Ryan Goldschmidt and P.G.

12    about 435 Elm a year before this Nada lunch.

13        I mean, John Curp testified that this was on the city's

14    radar for years.  P.G. -- this is the guy -- there were -- he

15    and his father claimed to be equity stakeholders in this

16    project.

17        And this is a text message from 2017, clearly a follow-up

18    from Goldschmidt after meeting with P.G., talking about P.G.'s

19    attempt to get 435 redeveloped, which is what we want out of

20    our elected officials when we have a problem property is to

21    roll up their sleeves and get in the weeds.

22        And we also know that P.G. enthusiastically agreed to sit

23    down with the two main stakeholders in 2018, which were

24    Mr. Ndukwe and Ryan Goldschmidt, well before the Nada Lunch.

25        This is Defendant's Exhibit 136, which you will have in

1    the back.  This is in July of 2018, so we are now five months

2    before this Nada meeting and, at this point, Mr. Ndukwe has

3    the air rights, Mr. Goldschmidt and his father believe that

4    they have the ground rights.

5        And Mr. Goldschmidt texts P.G., and he says, Hey, can you

6    sit down with Chinedum and me to discuss 435?

7        P.G. says, I'm happy to, exclamation mark.

8        The donations that the FBI are putting at issue in this

9    case and that November 7th lunch isn't on his radar.  I mean,

10   he had met with these guys in February, because they met with

11   hundreds of people in Cincinnati, and he offered -- we don't

12   have that audio, but he offered to help in that meeting in

13   February, anything you need, let me know.

14       They talked about green energy, and -- actually, kind of

15   a little bit of a different story, but green energy and other

16   investments.  Let me know how I can help.  There was never a

17   discussion about a potential donation before the meeting.

18       P.G. went and sat down with them.  Never a discussion

19   during the meeting.  P.G. said let me know, I'd be happy to

20   help.  If you guys are interested in Cincinnati, I'd be happy

21   to help.

22       And we know that P.G. was interested in 435 Elm, in

23   helping Mr. Ndukwe, in particular, and Mr. Goldschmidt.  He is

24   enthusiastically ready and willing to sit down and meet with

25   these guys, do anything he can to help.

1          And we heard that's how things work every day in the

2     city.  Developers can go directly to a council member on the

3     third floor.  They can go with their lawyer, they can go with

4     a lobbyist, or they can go alone.

5          And they sit down and meet with council members one on

6     one all the time.  And they ask questions.  Typically, council

7     members want to know what type of project is this, they ask

8     10 to 12 questions, figure it out and say, I can get the vote,

9     or I don't support it.  Maybe I don't support it because I

10    don't think it's good for the city.

11         And then the developer can go back and say, I'm going to

12    change the proposal.  And then you go back to council, and you

13    say okay, how about this?  Yeah, I'll support that.  Let me

14    see about my colleagues.  These meetings happen routinely

15    every day.

16         Context about 435 Elm matters.  And we've heard a lot

17    about it -- well, we've heard a little bit about it from the

18    government.  I think we can all agree 435 Elm was a problem

19    property, still is a problem property for the region, the

20    county, and the city.

21         And the judge -- it is not a defense to accepting a bribe

22    to say, well, I would have done it anyway.  That is not what

23    we are saying.  There was no bribe that he intended.  He did

24    not intend to accept any bribes.  He would never have sold his

25    vote for anything.

1      A defense is like I killed somebody but... but it was

2    self-defense.  The context, though, for 435 Elm helps us

3    understand his intent.

4      And so the judge puts this in the instructions -- this is

5    on page 27 of the jury instructions and, again, actually on

6    the next page, page 28 -- that you don't have to but you may

7    consider what motivations P.G. had in wanting to help 435 Elm.

8      You can consider the fact that he wanted to help 435 Elm

9    before he ever met these guys; that he wanted to help

10   Mr. Ndukwe before he ever met these guys; that he wanted to

11   help a developer out of Columbus, who came in really in the

12   shoes of Rob and Brian with Mr. Ndukwe after these guys left,

13   even into 2020.

14     And so it goes to his intent, this context, what intent

15   did he have to help.  Why did we spend all this time in

16   showing that P.G. wanted to help.  There were a lot of reasons

17   that he wanted to help 435 Elm that are very obvious.

18     And the judge, even on the next page says, maybe it's the

19   prior page, essentially, the same thing, which is that you can

20   use -- you can use whether or not P.G. wanted to help 435 Elm,

21   and the reasons why he wanted to use it to infer, to assume

22   what his intent is, which is what your job is going to be, to

23   try to assume and consider what P.G. intended.

24     And, again, it goes back to whether or not he intended to

25   act corruptly.  And you can use the facts and circumstances

1    surrounding 435 Elm to come to that conclusion.

2        We heard the government talk about RFPs a lot, request

3    for proposals.  And that's one thing we don't have to guess

4    about on P.G.'s intent because he said it on a call, where he

5    didn't even know he was being recorded, to Rob and Brian --

6    and, by the way, there were a lot of calls that we don't have

7    here that were P.G. to Chinedum and Chinedum to P.G., normal

8    calls.

9        If they were bad for P.G., we would have heard them.

10    There are tons of calls that aren't on that chart.  That is

11    not an inclusive chart.

12        But this is P.G. talking to Rob and Brian, indicating

13    exactly what we heard Mr. Denning say, and P.G. repeats the

14    fact that, look, if it's a good deal, great; if it's not

15    great, the city could consider doing an RFP to see what other

16    developers were interested.  I mean, his position -- he stops,

17    "And this is, like, what we want out of our administrators."

18        So P.G. is telling Rob and Brian, he is speaking out loud

19    to them, not even knowing he's being recorded, obviously, that

20    this administrator, Phil Denning, who told him, hey, if it's a

21    good deal for the city, great, let's do it; if it's not, then

22    we're going to do an RFP to see if anyone else is interested.

23        And P.G. said out loud to Rob and Brian, this is like

24    what we want out of our administrator.  If it's a good deal

25    for the city do it; if it's not, do an RFP.

1       As we sit here today, and Mrs. Brunner said this when she

2   testified, no RFP has happened.  P.G. has been off council now

3   for almost two years.  They've not done an RFP.

4       Mr. Ndukwe has the air rights to this property.  The port

5   challenges that.  They don't believe -- I think the port now

6   doesn't believe that he had the air rights or has the air

7   rights.

8       No RFP has been done, as we sit here today, yet they

9   bring all this stuff up about an RFP.  We have his words right

10  here about what he actually said and what he believed, which

11  is what's good for the city.

12      You will hear this, if you watch the videos and read even

13  the partial transcripts, P.G. constantly says what's good for

14  the city, the public, my constituents.  That is a frequent

15  term you hear constantly throughout these recordings.

16      It's also not in dispute that P.G. believed and was told

17  that Mayor Cranley had a vendetta against Mr. Ndukwe.  It's

18  not in dispute.  Mr. Ndukwe testified to it, P.G. testified to

19  it, Mrs. Brunner testified to it.

20      And so another reason why an elected official might want

21  to step in and say I want to help a project go forward that's

22  good for the city is because someone is attempting to carry

23  out a vendetta that isn't right.

24      And I mean, that was stated by almost every witness, that

25  Mayor Cranley was upset and having -- and had a vendetta

1     against Mr. Ndukwe because Mr. Ndukwe had supported his

2     opponent in 2017.

3         But if we think about what would a corrupt person say

4     when asked -- when everybody knows in the city, and it's this

5     agreement that everyone believes that Mayor Cranley has this

6     vendetta against Mr. Ndukwe.

7         If a corrupt person is asked or is told, hey, we're

8     worried.  We're worried that Mayor Cranley is going to veto

9     this project, what would a corrupt person say?

10        Maybe yeah, you know what, I can help prevent that, but

11    it depends how much you're going to donate to me, and then

12    I'll see.

13        He says you don't have to worry about Mayor Cranley, John

14    Cranley, John.  He says that repeatedly November 7th, almost

15    every single time they bring up this veto proof need, he

16    speaks the truth and his desire, which is to give these people

17    who have out-of-town money that they can invest -- he believed

18    that they can invest anywhere in the United States, the

19    comfort to actually come in here, support Mr. Ndukwe, and do a

20    project that nobody else in the city wanted to touch.

21        This thing has been sitting around for ten years.  No

22    other developers were interested in this thing, and we know

23    that also because it sits there like it is today.

24        And so P.G. speaks the truth to them and says you don't

25    have to worry about John.  Yeah, he can be prickly, had some

1    quotes, like he might have a vendetta against Mr. Ndukwe, but

2    even Mayor Cranley will support this.  He tells them that

3    repeatedly on November 7th.  It's the opposite of what a

4    corrupt person would do.  Don't worry about it.  He will

5    support this.

6        It is also not in dispute the disconnect that existed

7    between P.G. and Laura Brunner.  I mean, that -- these two

8    were operating on completely different sets of facts.  And it

9    was P.G.'s -- P.G. being naive and believing a lie that he was

10   told by the FBI that they had -- that they were the equity

11   piece, that they had millions of dollars ready to invest in

12   Cincinnati, that Turner Construction was the general

13   contractor, that indigo hotels was ready to go, they had a

14   letter of intent.

15       Laura Brunner was ultimately confused when I was asking

16   her those questions on the stand.  She and P.G. had a good

17   working relationship for ten years.

18       And this one project, the FBI came in, meddled in local

19   affairs, and created this lie that P.G. believed, which was

20   that they had a 75 -- the ability to back a $75 million

21   project with a hotel with Turner Construction, a nice

22   architect.  That was his disconnect.  Shame on him for

23   believing them, but this is what they told him.

24       And these are the same questions that will be asked in

25   any lunch meeting, breakfast meeting, coffee, on the third

1    floor of City Hall.

2        They tell P.G. -- and this is USA 15C.  They tell P.G.

3    that Elevar is the architect.  It's a very reputable

4    architect.  The man's name is Tom Fernandez.  Mr. Ndukwe tells

5    him they're going to have $1.8 million just into the due

6    diligence, talking about zoning and lawyers and architects and

7    getting bids.

8        They tell P.G. that by the fourth quarter of next year,

9    they want to tear the building down.  They tell him that

10   they've got a letter of intent with a good office tenant; that

11   they were talking to IHG Hotels, that they want to build an

12   indigo hotel there, that they want to do high-end apartments.

13       P.G. asks how many square feet will it be.  He asks about

14   the total proposal for the development.  They tell him Turner,

15   Turner Construction, a very reputable general contractor, is

16   involved; that it's going to be close to a $75 million deal.

17       They tell him that they're going to have 140 units, hotel

18   rooms, which is critical for the convention center, 30,000

19   more square feet of office, a co-working space with a group

20   out of Columbus named Serendipity.

21       One of the most important things for the city is this

22   thing called a CRA.  P.G. asks about a CRA.  They say yeah, a

23   solid CRA, nothing out of the ordinary but just competitive.

24   It's going to activate that corner, which we all know is

25   important, the Convention Center corner.

1      They don't need gap financing.  That is a very big deal

2   because the city does that on occasion, but that is like a

3   bigger lip.  They're just saying we want a competitive, normal

4   CRA, nothing out of the ordinary.

5      And that's when P.G. tells them the truth, which is that

6   if it's land that has derelict buildings sit on it, and it

7   isn't productive for the city, it's not a big lift.

8      These guys had pretended, Rob and Brian, that they didn't

9   know the environment in Cincinnati, they weren't from here.

10  We don't know if we want to come in and spend that

11  $1.8 million on due diligence if your colleagues are just

12  going to shoot this thing down.

13     And P.G. tells them, it's got my support, and I can

14  shepherd the votes too.  You are allowed to say I can get the

15  votes.  You are allowed to say I can shepherd the votes.  And

16  he vets the project, and after he vets it, he says it's got

17  the support of my colleagues and me.  Bring your money to

18  Cincinnati and invest here.

19     And you know what?  Rob knew it too.  Rob knew how

20  important this was to the city, despite what they said on the

21  stand, "I don't know.  I don't know the details."

22     P.G. is expressing, in this November 7th meeting, the

23  fact that this is a strategic development for the city, and he

24  says, "We can't have that parcel sitting at --" and Rob

25  finishes his sentence -- "across the street from the

 1      Convention Center."  They knew it.  They knew how important

 2      that was to downtown.

 3          And we've heard it -- it's throughout this

 4      November 7th meeting, where P.G. tells these guys that they

 5      don't have to worry about John Cranley.  And the prosecutor,

 6      on this November 7th meeting, points to back at the 580

 7      Building this quote, Rob saying, "What's the best way for us

 8      to get that to you to get that deal, you know what I mean,

 9      like?"

10          P.G. goes right back to the development deal.  And if you

11      look at this transcript and the video, you will see that

12      "deal" is used about 20 times, and it is always a development

13      deal.  That's what they're referring to.

14          When they say that, P.G. jumps right to John Cranley

15      trying to veto it.  And that's when the agent Rob says, "No.

16      Well, I don't know.  Maybe," and they talk about, again, the

17      deal, and Chin being a face of the deal, and this vendetta

18      that Cranley has.

19          Everyone also agrees something else that's not in

20      dispute.  The only express quid pro quo in the case is P.G.

21      saying there will not be anything that is illegal, and that

22      there will not be a quid pro quo.  That is the only express

23      quid pro quo in the entire case.  And it's P.G. saying that

24      there won't be one.

25          I believe it's also not in dispute that the people who

1    cared about 435 Elm in the city were Mrs. Brunner, Mr. Ndukwe,

2    and P.G. Sittenfeld.  Not the FBI agents.  They actually

3    didn't concern themselves with any of the details related to

4    435 Elm and the drain that this was on the city.  It was not

5    their concern at all.

6        This investigation, this is the federal government.  They

7    have the power to search cell phones, electronic devices,

8    computers.  If they believed that there was evidence of

9    corruption anywhere, they get it.

10       And they've admitted that they had bank records, credit

11   card records, PAC records, campaign records, texts, Signal

12   communications that we now know they also had.

13       If there was anything, any indication of corruption, it

14   would be before you.

15       So when you're back in the jury room, and if you're

16   thinking I wish we had anything, it is not P.G.'s burden.  It

17   is their case, and so that burden rests solely with the

18   government.

19       If you're looking for a transcript, like I wish I knew

20   what was said there, that is their burden.  Those are their

21   tapes that they cut, and it's their transcripts.

22       We heard -- you know, the agents are trained to be

23   observant, to recall details, and yet when asked on the stand

24   about very simple things, like we heard all this stuff about

25   Vinny's cameo appearance at the opening day party, those are

1      the longest wires and videos in the entire case.  You didn't

2      hear a single one of them.

3          Vinny says, "I don't know if there are as many people at

4      that party as there are in this courtroom.  Don't know if

5      there were 100, 50, or 10.  Don't know."  Throws his hands up.

6          If P.G. Sittenfeld was there late into the night with

7      women or liquor, they would have had every detail down before

8      they testified.  He said, "I have no idea.  P.G. left early,

9      had one beer and left early," so we didn't hear a single wire

10     or video from there.

11         Agent Holbrook was asked about the trip to Miami,

12     Florida, was it more or less than $100,000?  Don't know.  Flew

13     private.  Private jet.  They talked about high-end strip

14     clubs.

15         What is not in dispute is that P.G. never traveled.  He

16     was invited to travel six times.  Never traveled.  The lack,

17     the lack of detail when -- you know, Brian testifies they're

18     in a hotel room on September 24th, and when asked -- when

19     P.G. went to shake Vinny's hand to get up and leave, there's

20     no mention of donation.  I didn't see it.  I don't know.  I

21     didn't see it.

22         These guys prepare for their testimony, which you're

23     allowed to do, watch the video.  I mean, it's just... there

24     was an FBI censure letter for Rob using the 580 Building,

25     claiming he's a wealthy out-of-town investor, having a sexual

1    relationship with someone here in the penthouse.  Gets

2    censured by the FBI.

3        That September 24, 2019 meeting, I believe that you have

4    that.  I believe you have the entire video.  That's the only

5    one that is a partial transcript where you also have the

6    entire video.  All the other partial transcripts are also

7    partial videos.

8        But even in the government's closing, you know, we hear

9    little snippets about that September 24, 2019 meeting.  And,

10   you know, if hindsight is 2020, and when you sit in here and

11   have things highlighted and sewn together, you know, we can

12   look in hindsight and have regrets.

13       The September 24th meeting that I believe you do have a

14   video, the first 15 minutes are not in your transcript.  And

15   what happens in that first 15 minutes, and you can see it, is

16   Brian asking P.G. about the sexual assault allegations.

17       They are asking him.  They're saying, we're in Nashville,

18   tell us what's happening in Cincinnati.  They are bringing

19   that out of him.

20       And P.G. did voice his concern about the allegations, and

21   there are some -- actually, you can watch the video.  He says

22   repeatedly two things.  One, that Chin is his friend; and,

23   two, he deserves the presumption of innocence, in that first

24   15 minutes that is, I believe, in evidence, but is not in the

25   transcript.

1      And the FBI agents, again in the video but not in your

2   transcript, they tell P.G. that, in light of these

3   allegations, that they're working to buy Chin out of 435 Elm.

4   They say that they're going to treat him fairly, and their

5   quote is, it will be in, quote, Chin's best interest.  They

6   cut all this out, the first 15 minutes, intentionally remove

7   it from the transcripts.

8      And P.G. says that he wants to tell Chin as his friend to

9   keep his head up, despite this being a long road, to keep his

10   head up.  It's not in the transcript.

11      So after they talk about the sexual assault allegations,

12   which were just that, allegations, that's when Rob said --

13   this is also not in the transcript, said, "Like yeah, here we

14   are going to go -- it's probably two options.  It's either

15   like, hey, we're comfortable, and we really like this deal and

16   this whole sports book side of it and everything, and we're

17   staying in, and there --"

18      P.G.:  "Right."

19      -- "decide that if not, and the mess it's become and

20   we're not comfortable with is it's probably the opposite.

21   We've wasted a lot of fuckin' time and money, and we're gonna

22   cut our fuckin', our losses."

23      That's not in the transcript.  It is in the video if you

24   watch the first 15 minutes.

25      The transcript, USA 30B starts 15 minutes in the

1    exchange, with P.G. saying something to Vinny about --

2    actually, there's like a minute introduction of Vinny, and

3    then they cut out a minute and like nine seconds or something.

4        And then it starts again with P.G. saying, "We've got to

5    make sure the sports book passes."  The first thing in your

6    transcript is P.G. mentioning a sports book.

7        What you'll see in the video is Rob mentioning the sports

8    book on four occasions in that first 15 minutes, and

9    threatening to abandon the millions of dollars they plan to

10   put in Cincinnati if they don't get some assurances that a

11   sports book can go through.

12       What's kind of wild about that is that P.G. has no

13   control on whether or not sports betting is going to be

14   legalized in the State of Ohio.  None.  And, in fact, in that

15   meeting he says, you know, I can introduce you to someone in

16   Columbus, a female name, and I forget who it was.

17       Everybody knows, everybody in that meeting, P.G. has no

18   control whether or not gambling can become legal in Ohio.

19       What everybody also knows is that every municipality and

20   city in this country would put some sort of controlled

21   environment around gambling if it gets passed at a state

22   level.  Las Vegas has it, even New Jersey has it.

23       And when this closed environment is mentioned to P.G.,

24   what they talk about repeatedly, and this is in the

25   transcript, are people who are suffering from gambling

1    addictions.

2         And P.G. never says, yeah, I'll give you the only one.

3    We can make sure you're the only one, make sure you have a

4    monopoly.  He never says that.

5         What he says is, yeah, I think the public at large would

6    want that too, meaning some sort of controlled environment.

7    He said, I don't think the public at large would want a

8    gambling house on every single corner, in the gas stations.

9    It's a hypothetical conversation to try to keep these guys

10   invested in Cincinnati.

11        A person with corrupt intent, that's the question.  We

12   have, after Jared Kamrass -- Mr. Kamrass entered into a

13   proffer agreement.  He then wore a wire, and he wore a wire

14   just like other people, on phone calls with P.G. and in

15   in-person meetings with P.G.

16        And they had discussions.  They even had discussions --

17   there was another indictment where it became very clear in

18   Cincinnati that these guys, Rob and Brian, were FBI agents.

19   Another indictment came out before P.G. was charged.

20        And they have a discussion, Jared Kamrass and P.G.

21   P.G. has no idea Kamrass is on a wire.  He had no idea he took

22   that money that was intended for John Cranley.

23        And in that discussion, Kamrass admits it, P.G. said,

24   "Yeah, that's weird that they're FBI agents, but we didn't do

25   anything illegal."

1      "Didn't do anything illegal."  I mean, if that doesn't go

2    to a person's intent.  I mean, he's on a wire talking to a guy

3    he doesn't even know is mic'd up that he's known for ten

4    years.

5      Kamrass entered a proffer, and the judge has a jury

6    instruction related to Mr. Kamrass and Mr. Ndukwe.  Because it

7    is -- these proffer agreements, the government can exert so

8    much control over a witness with these proffers.

9      This instruction, I might not have the page right, but

10    it's in the early 50s.  The judge's instruction tells us, this

11    is "Testimony of a Witness Under Reduced Criminal Liability,"

12    that's the title of this proffer.

13      "You should consider Mr. Ndukwe's and Mr. Kamrass's

14    testimony with more caution than the testimony of other

15    witnesses.  Consider whether their testimony may have been

16    influenced by the government's promise."

17      And so Mr. Kamrass and Mr. Ndukwe, probably their

18    lawyers, they talked to the federal prosecutors.  The only

19    thing that they get in writing is this proffer agreement.  The

20    other things that are stated we're not privy to, and all we

21    have is this writing.

22      And the proffer that was admitted into evidence is 652,

23    and it's signed by the over signatures of Mrs. Glatfelter and

24    Mr. Singer, Mr. Ndukwe and his lawyer, and you'll have this in

25    evidence.

1       I mean, Mr. Ndukwe went to Notre Dame.  He does complex

2    business deals and developments.  He is under immense pressure

3    during this time.  When the federal government reaches out to

4    him, they actually, in early January, they did a report call

5    on him with a former employee of his, and then they say, We

6    suspect you of criminal activity.

7       They specifically said that they alleged criminal

8    activity involving structured banking transactions, money

9    laundering, and then aggravated identity theft.  And then what

10   they do -- just to be clear, he did not reach out to the FBI.

11      They did a recorded call on him.  Then they said we want

12   to interview you.  Then his lawyer talks to the prosecutors

13   and the agents, and then they enter into this proffer.

14      They tell him in this document the proffer's part of

15   potential plea negotiations, but it doesn't force them to

16   enter into a plea with him.  They expressly reserve the right

17   to prosecute him.  They have not given him another document.

18   This is the only document in writing that they've given him.

19      And you'll have it in evidence.

20      Jared Kamrass and Chinedum Ndukwe were facing federal

21   prison time, and they have all the incentive in the world to

22   work with the federal government, every motivation in the

23   world.

24      Other things that are not in dispute.  There are over

25   1,800 donations in this cycle between 2017 and 2020.  1,800

1    different donations.  And the only donations that are in

2    dispute are the ones that the FBI agents gave to P.G.

3        And they have, again, all these records.  They have

4    interview powers.  They can go to -- they did.  They talked to

5    developers.  They talked to people who donated.

6        If there was anyone that would come in here and say

7    something different than what you heard from P.G., or that

8    could hurt P.G. in any way, you would have heard from them.

9    1,800 donations.

10        It's also not in dispute that the government claims that

11    there were three crimes.  They claim three crimes were

12    committed and ended in 2018.  And then nothing happens for a

13    year.

14        What happens is the sexual assault allegations arise.

15    P.G. says, "I might pause all Mr. Ndukwe projects in front of

16    the city because of the accusations.  It's a distraction.  It

17    doesn't look good for the city," literally saying I'm not

18    controlled by the money.

19        And there's a call in the fall of 2019 that's not

20    recorded but there was a 302, a summary, mentioned about it,

21    where P.G. said, "I might pause all of these projects in front

22    of the city.  I just want to see how the dust settles.  It's

23    not right right now to put these through."  Doing what is best

24    for the city.

25        The government argues that if somebody is rough around

1   the edges, doesn't speak the way they want them to speak, then

2   you can't have any interaction with them.  That's not what the

3   law says.

4        The law says that as long as you know that you are not

5   going to do something corruptly, you have the ability to

6   interact with anyone, all walks of life.  And that's what P.G.

7   always did because he knew he could control his own actions.

8        If elected officials could only interact with the person

9   that the federal government says speaks a certain way and has

10  a specific type of criteria, a lot of things would not happen,

11  and a lot of good people would be left out in cities and

12  governments.

13       We heard from people, and P.G. himself, that he had

14  meetings, 10, 12 meetings a day, that any time that he felt

15  there was red tape or bureaucracy, he would go to an

16  administrator or whatever department that he thought there was

17  a lag in.

18       If they had anybody that they had interviewed,

19  administrators, other constituents, to disagree, to dispute

20  that, they would have brought them in here.

21       This is how P.G. operated with everybody when he thought

22  it was something that was good for the city.  Same with P.G.

23  saying he voted against donors.  People would donate to him,

24  he'd vote against them.

25       People who didn't donate to him, even after requesting,

1    he would donate -- I'm sorry, he would help their project.  If

2    they had anything to dispute that, we would have heard it.

3        Everything in this case comes down to whether or not P.G.

4    had corrupt intent.  Every single count.  All six.  Did he

5    have the corrupt intent, an explicit quid pro quo?

6        And the judge gave us specific instructions related to

7    all these campaign contributions.  This is page 44.

8        And this is probably one of the clearest statements

9    related to all six counts, that a bribe, quid pro quo, this

10   for that that we've heard exchange for, that's all six counts.

11   Exchange for a quid pro quo bribe, those are all the same

12   thing.

13       And it's what did he know?  What did he intend for all of

14   them?  Was he acting with the intent to be corrupt?

15       The judge gave us these instructions, which is the law,

16   which is that it is not bribery to solicit donations from

17   somebody who has business before the city.

18       It's repeated again here for the other counts,

19   Counts 3 and 5, accepting donations from someone with business

20   before the city isn't actually commonplace.  It's not illegal.

21       There's nothing wrong for candidates soliciting money

22   into a PAC, and there's actually more instructions about this

23   particular type of PAC in your jury packet, which we'll talk

24   about in a minute.

25       There's nothing inherently improper about bundling, which

1    we've all heard about, bundling and fundraising, bundling a

2    bunch of checks.  It is the fundraiser's or donor's choice to

3    say I don't want to personally donate, I just want to bundle

4    and fundraise, which is the story that they told P.G.

5        We talked about this one already, which is that you can

6    discuss your specific and general policy positions at the same

7    time you're discussing donations and contributions.

8        We heard about this on direct.  There's nothing

9    improper -- P.G. was not permitted to put his name on

10   FEC filings.  The law didn't permit him to do that.  And so

11   when he says "my name's not connected with this," not

12   associated with it, that is the truth.

13       And, again, if P.G. -- if they all wanted to hide names

14   and everything, that's fine.  You can just take the cash and

15   hide the names.  You want to hide names, P.G. wouldn't be

16   introducing these people to civic leaders when they're out at

17   restaurants as the investors in 435 Elm.

18       He wouldn't be offering to make introductions for these

19   people, introducing them to the head of -- Steve Leeper, who

20   is the head of 3CDC, inviting them over to dinner with the

21   U.S. Prosecutor as the investors in 435 Elm by name.

22       But the government -- this last sentence in this

23   instruction specifically says that you're only to consider

24   what the charges are, not all this other stuff that we've

25   heard about, but I do believe that I should deal with it,

1    which is this accusation about straw donors.

2        And it's like a lot of other things in this case.  We

3    have proof in their words, the agent's words, about what they

4    told P.G. on November 26th in this transcript, USA 19B.

5        Right before they give him checks, donations, Rob tells

6    him his business partners -- I mean, this theme about their

7    business partners starts on November 7th.  They say they have

8    up to 15 guys, business partners, lots of small businesses and

9    LLCs.  If they believe -- these guys, again, are highly

10   trained.

11       If they believe P.G. was corrupt, just hey, look, I'm

12   going to give you a fake name, which you can put down in the

13   FEC filing but they didn't donate.  It's actually my money.

14   They're telling him that it's his business partners.  I mean,

15   they expressly stated it.

16       They believe that he would have accepted straw donations.

17   All you got to do is just say it.  Hey, we're amongst friends.

18   This is my money.  I'm giving you fake names, but you can

19   write these down, no one will know.  They tell him it's his

20   business partners.

21       And it's the same thing with Mr. Ndukwe on USA 13B.  He

22   tells P.G., he repeats that it was his analyst who supported

23   him.  He doesn't say I supported you but I gave you the name

24   of my analyst.  It's expressly stated.

25       And we know what P.G. thought, this is really on

1    December 4th but the transcript says December 3rd.  So now

2    we're in December of 2018.  No donations have been accepted

3    because they've attempted to donate improperly.

4        And P.G. says -- he makes -- he offers them.  He says,

5    look, we checked.  These are corporations not LLCs.  They say,

6    oh man, all that stuff.

7        P.G., again, having no idea he's being recorded, tells us

8    his intent.  It's expressed.  He says, Look, you know, your

9    universe of buddies and investors, and if you want to like

10   give us a name, he's offering them to give him a name.

11       If P.G. had written down, as the government has continued

12   to suggest, that Rob or Brian gave him these checks, it would

13   be a federal offense.

14       Claire Fisher followed up in writing with these guys,

15   hey, what names are attributable?  And they're telling him.

16   P.G.'s saying it's their universe of buddies, they say it's

17   their business partners, they gave him the names.  You can't

18   find that on the Secretary of State website.  That's how

19   campaign bundling and fundraising works.

20       Every one of the six counts, as I've said, comes back to

21   whether or not P.G. acted with corrupt intent.  Was there an

22   explicit quid pro quo agreement that he actually knew about

23   and wanted to enter into.

24       And it's like all this, the things on the peripheral that

25   the government is highlighting are -- you know, we heard about

1     the receipts for dinner.  Well, actually, sorry, not the

2     receipts for dinner.

3          They were asking P.G. about the dinners.  The dinners are

4     on recordings.  They have the credit card receipts.  We do

5     not.  I don't have the credit card -- I have P.G.'s, when he

6     paid.  Everybody agreed P.G. offered to pay or paid for dinner

7     and drinks.

8          If as they suggested, that these receipts were greater

9     than a hundred dollars of P.G.'s consumption, they would have

10    brought them in.  They're on a wire.

11         P.G. had a steak one time, and he split it with Brian.

12    He has burgers, beers.  He had a Manhattan.  These are

13    one-offs.  If they had something that they are implying with

14    innuendo, they would have brought it in.  I don't have their

15    receipts.

16         The scotch and cigars.  Scotch and cigars.  P.G. does not

17    smoke cigars.  He does not drink scotch.  If they thought he

18    would have taken cash, they would have just given him cash;

19    but, instead, they spring this on him and say, oh, our little

20    congratulations.  And this tape, I believe, is cut off, where

21    they talk for minutes about parenthood and childhood.

22         All they had to say -- they control the script.  If they

23    really believed he was corrupt, all they had to say -- they

24    just had to interject one fact, hey, it's a $200 bottle of

25    scotch.  That's all they had to say.  They didn't.  That's all

1    they had to say.  And they didn't say it because they knew

2    that -- by the way, P.G. could still accept a gift, all he had

3    to do was just report it.

4        Any element -- if you have any reason to doubt any

5    element, and these are very long instructions, any logical

6    reason to doubt any element, it is a not guilty verdict on

7    that count.

8        And again, going back to the mile high.  If you don't

9    believe P.G. acted with corrupt intent, it's not guilty on

10   every count.

11       And this is on page 7 of your jury instructions, which is

12   titled "Presumption of Innocence, Burden of Proof, and

13   Reasonable Doubt."  It is the government's burden to prove

14   every single element.  If there is a question on any element,

15   it is their burden, it is not P.G.'s.

16       Reasonable doubt is a fairly difficult, amorphous term,

17   and the judge's instruction is proof beyond a reasonable doubt

18   means something that is so convincing that you would not

19   hesitate to rely and act on it in making the most important

20   decisions in your own life.

21       We've all seen Lady Justice with the blindfold.  I think

22   we talked about it in voir dire, with the scales.  When money

23   is at stake, all you have to do is tip the scale slightly, and

24   that's the burden of proof.  It's called a preponderance, more

25   likely than not.

1          And we talked a little bit about the other burdens, like

2     clear and convincing evidence in voir dire, and maybe even in

3     opening, which is, I mean, clear and convincing.  It's what it

4     says it is.

5          Proof beyond a reasonable doubt.  Before you label

6     someone in this country a criminal and put their liberty at

7     stake, it is the highest burden.

8          And this is just a demonstrative chart.  P.G. might not

9     like this, what I'm going to say.  Your verdict does not mean

10    that you find him to be innocent.  It just means that you have

11    reason to doubt whether or not he acted with corrupt intent.

12         A jury doesn't have the ability to say he's innocent.  I

13    mean, I actually believe it, but your verdict is just not

14    guilty beyond a reasonable doubt.

15         And this chart tells us how high a burden reasonable

16    doubt is.  Even clear and convincing, if it does not go beyond

17    a reasonable doubt, is a not guilty verdict.

18         You can think, yeah, I think in some way he's probably

19    guilty, but if you still have logic, common sense, and reason

20    as to whether or not everything the government says is true,

21    it's a not guilty verdict.

22         And, again, it's because of the stakes, people that fight

23    for this, the presumption of innocence, freedom in this

24    country.

25         We don't know why things happen in life.  You all are

1       from five counties, and you come in here with different life

2       experiences.  There were 85 of you in the back, and you were

3       picked to be on this jury.

4           And your common sense and logic, I think, will drive you

5       to a just verdict.

6           One other thing that I use just to try to discuss

7       reasonable doubt is an example of something that I call the

8       cat and the mouse.

9           And, again, everyone can have their own reason to doubt.

10      You don't have to agree on the same reason to doubt.

11          So imagine -- it's kind of silly, but I think it helps

12      demonstrate reasonable doubt.

13          Imagine that there's a box, with a cat and a mouse in the

14      box.  And no one can tamper with the box, and it's a safe box.

15      And you leave, and you come back.  There are no holes in the

16      box, and it's just the cat.  The mouse is gone.

17          Beyond a reasonable doubt, I think we can agree, as long

18      as the box wasn't tampered with, the cat ate the mouse.

19          But imagine with me you leave, same set of facts.  You

20      come back, and there's a hole in the box.  There's a hole in

21      the box.  The cat could have eaten a hole in the box and the

22      mouse walked out.  The mouse could have eaten a hole in the

23      box and walked out.  The cat could have eaten the mouse, but

24      you have reason to doubt as to whether or not the cat ate the

25      mouse.

1    And so what I wrote down were some of the things that I

2    believe go directly to whether or not there was corrupt

3    intent, and reasons to doubt corrupt intent, which is, again,

4    this all comes down to P.G.'s intent.

5    And one reason that I wrote down is cash.  I've got bad

6    handwriting.  P.G. did not take cash.  Corrupt people take

7    cash.  It's not traceable.  He refused money orders and

8    cashier's checks.  He didn't even take a corporate check.

9    His compliance with the local law firm and his treasurer

10    was such that he even caught the corporate check that either

11    the FBI intentionally gave him or legitimately missed, and I

12    don't know which it was.

13    And each one of these can be a hole.  And, again, you

14    don't have to agree with each other's reason to doubt, but if

15    you have reason to doubt based on your common sense and logic,

16    it's not guilty.

17    Refused requests to travel on six occasions.  Invited

18    them to his house with the federal prosecutor.  Introduced

19    these guys using their fake names, the names he thought they

20    actually had, to civic leaders in the community, people we've

21    already discussed, the head of Xavier, Convention Bureau.

22    Offering to make introductions to other people, like

23    administrators like Phil Denning, like Laura Brunner.

24    The fact that the only expressed quid pro quo in the

25    entire case is P.G. saying that there will not be.  The fact

1    that in 2017, P.G. was working to help 435 get redeveloped

2    before he ever met these guys.

3        And after he thought that Mike Schiff was Mr. Ndukwe's

4    new partner, he met with Mr. Schiff and Mr. Ndukwe.  It's what

5    we want out of our elected officials, to roll up their

6    sleeves, get in the weeds to help a project that is much

7    needed for a region and city.

8        Firing Jared Kamrass because of his dishonesty.  Kamrass

9    then recording him, without his knowledge, after another

10   indictment, and P.G. saying, "Yeah, that's weird, but I didn't

11   do anything illegal."  His own statement.

12       Hiring a certified CPA after firing Kamrass, who we

13   didn't hear from, who spoke with the FBI.

14       The partial recordings, the partial transcripts, the need

15   for more context.  If you need more context, if you have

16   reason to doubt and you want more context if you're back there

17   after a couple hours, that also is reasonable doubt.

18       The card that P.G. sent, that we received from the

19   government, to Rob Miller and Brian Bennett.  He sent a card,

20   with his dog Oakley and his wife to these two guys who he had

21   invited over to dinner at his house, again, one time with the

22   federal prosecutor.  And a statement to them, "Thanks for

23   believing in Cincinnati's potential."

24       I cannot stand back up.  And I don't belong in the jury

25   room.  This case has been with me for almost two years, and I

1    obviously believe very strongly about it, and this is it.

2         So you guys have a very important job to do, and I

3    believe you will find P.G. not guilty of all counts.

4              THE COURT:  Thank you, Mr. Rittgers.

5         Ladies and gentlemen of the jury, as I mentioned at the

6    outset of the trial, because the government bears the burden

7    of proof, it gets to go both first and last in closing.

8         So now the government has an opportunity to do what's

9    called a rebuttal.  And that will be the last thing you hear

10   from the parties in this case.

11        We've been going about an hour and 15.  Do people want to

12   keep going, or would you like to take a break?  Anybody need a

13   break?  Do you need a break?  All right.

14        Are you ready to continue?

15             MS. GAFFNEY PAINTER:  May I request the Court's

16   indulgence for just a five-minute restroom break.

17             THE COURT:  Well, if we're going to do that, then I

18   think we should let the jury have a restroom break as well.

19   Why don't you try to be back as quickly as we can.  We'll take

20   a brief recess.

21        Once again, standard admonition for the last time, but

22   please don't discuss this case amongst yourselves, do any

23   research, or communicate with anybody about the case.

24        And we'll try to get you back in here very promptly, so

25   please be back as quickly as you can.

```
1              (Jury out at 2:43 p.m.)
2                   THE COURT:  Anything we need to discuss?
3                   MR. SINGER:  No, Your Honor.
4                   MR. C. MATTHEW RITTGERS:  No, Your Honor.
5                   THE COURT:  All right.  Let's take a brief recess.
6              (Brief recess.)
7                   THE COURT:  Are you ready to continue?
8                   MS. GAFFNEY PAINTER:  Thank you, Your Honor.  Yes.
9                   THE COURT:  Let's bring in the jury.
10             (Jury in at 2:53 p.m.)
11                  THE COURT:  Ms. Gaffney Painter, are you ready to
12        proceed?
13                  MS. GAFFNEY PAINTER:  Yes, Your Honor.  May I
14        approach the podium?
15                  THE COURT:  You may.
16                  MS. GAFFNEY PAINTER:  Ladies and gentlemen, the
17        burden of proving this case beyond a reasonable doubt, that is
18        the government's and the government's alone.
19            We embrace it.  We are not afraid of it.  And it is the
20        same burden used in every criminal courtroom in this country,
21        from Maine to Hawaii.  The burden is ours, and we know it.
22            And while the burden never shifts to the defendant, where
23        a defendant has offered evidence or arguments, you are
24        entitled to evaluate that evidence and those arguments with
25        the same level of scrutiny that you would apply to any of the
```

1    government's arguments and any of the government's evidence.

2        So let's walk through some of the arguments raised by the

3    defense in this case.

4        In the defense's argument to you, he kept referring to a

5    corrupt person.  Corrupt person.  We are not here to decide if

6    Mr. Sittenfeld is a corrupt person.  That is not the question

7    before you.

8        We do not sit in judgment in criminal courts and decide

9    who is a good person and who is a bad person.  That is not

10   your job.  You are not deciding if he's a corrupt person.

11       You're deciding if the elements of these specific

12   offenses have been met by the government, and that the

13   evidence proves them beyond a reasonable doubt.

14       Similarly, at this trial, you've heard some about the

15   consequences of Mr. Sittenfeld's actions, and the people who

16   may be affected by the consequences of those actions.

17       And you know from the jury instructions that you are not

18   to let any bias, sympathy, or prejudice that you may feel

19   towards one side or the other influence your decision in any

20   way.

21       Mr. Rittgers spoke to you about cuts in the transcripts.

22   Well, first of all, both November 7th and September 24th, the

23   critical days that my colleague outlined for you where these

24   agreements were made and where Mr. Sittenfeld agreed to those

25   corrupt bargains, those are entirely in evidence.  You can

1    listen to and watch the entirety of those interactions.

2         For November 7th, 2018, that's USA 15F and USA 15G.  And

3    if you want to listen to the entirety of the recording, and

4    hear them ordering salads with dressing on the side, and

5    ordering fish tacos, and discussing how fun Nashville is for a

6    trip with your buddies, you are able to do so.

7         For September 24, 2019, USA Exhibit 30F, that's the

8    entire interaction, and you can listen to it all.

9         Now, Rob, Brian, Vinny, I believe Special Agent Holbrook

10   as well, testified that when the undercover officers are

11   interacting with people, they have a recording device on their

12   person and it runs.  It runs for hours.  It runs through their

13   dinners.  It runs through their bar trips.  It runs through

14   their karaoke.

15        And the evidence before you is the evidence before you.

16   As you know from the instructions, you must make your decision

17   based only on the evidence that you saw and heard here in

18   court.

19        And you have been instructed do not speculate about what

20   a witness might have said or what an exhibit might have shown.

21        The government submits to you that the evidence that is

22   admitted to you for your review is sufficient to meet the

23   elements beyond a reasonable doubt.

24        There was reference to the undercover officers in this

25   case, and some reference to the techniques that were used in

1    this investigation.  Sophisticated players require

2    sophisticated techniques.

3        When Mr. Ndukwe offered Mr. Sittenfeld a bribe,

4    Mr. Sittenfeld said on the phone line, "Nothing can be a quid

5    pro quo," but then he wanted to meet in person, where we

6    submit to you he assumed, incorrectly, that the chances of

7    being recorded were slimmer.

8        You heard from Mr. Kamrass that when Mr. Sittenfeld read

9    an article about the FBI investigating public corruption, his

10    response was to move his communications with Mr. Kamrass to an

11    encrypted app called Signal.

12        If you want to root out corruption, you have to see what

13    the elected officials say when they think they're alone in a

14    room, or condo, or a bar with rich developers with business

15    before the city.

16        And you may disagree with the technique of using

17    undercover officers, but as the judge has instructed you, the

18    government is permitted to use undercover agents to

19    investigate possible criminal activity, and to use undercover

20    techniques like those employed here.

21        You should consider evidence obtained through the use of

22    undercover agents together with and in the same way you

23    consider the other evidence.

24        I want to turn now to the subject of compliance.  This

25    was raised in the defense closing.

1          There's a transcript that the government admitted at

2     USA 33B.  It's page 7.  And Mr. Sittenfeld uses a line in that

3     exchange.  He says, quote, if you meet the technical spirit of

4     the law, unquote.

5          Now, he's referencing 435 Elm partnering with a V.W. Hall

6     in order to get sports gambling.  Depending on how the state

7     legislation pans out, he's saying, look, an option for 435 is

8     that you could partner with a V.W. Hall, and this could be a

9     way that you could get gambling.

10          And he talks about "meeting the technical spirit of the

11     law."  I want you to keep that phrase in mind as we discuss

12     compliance and his efforts at compliance.

13          So on October 29, 2019, when he's meeting with Rob and

14     Brian, he says, quote, where do you guys find these LLCs?  Do

15     I not want to know?  As long as it passes muster and like a

16     person with a name.  My political enemies, like that's pretty

17     cute guys, but like they like poke around this shit.

18          That's the transcript, USA 33B.

19          And in the same meeting, he says to them, "So, so besides

20     not asking real people, real LLCs."  Rob says, "Yes," and

21     Sittenfeld says, "All right."

22          They went into the people that Mr. Sittenfeld had hired

23     to do compliance, the big law firm, the CPA.  But compliance

24     is only as good as the information that you provide to the

25     compliance professionals that you've hired.  If you're not

1    providing them with all of the relevant information, then

2    their advice doesn't necessarily mean you are in compliance.

3        Now, there is no evidence presented at this trial that

4    Mr. Sittenfeld told his lawyers and accountants that he had

5    some bribe payments and how should he record them.

6        And, in fact, the evidence of this trial actually shows

7    that he didn't tell his compliance people the whole story.

8        Now, remember on November 7th, in the condo, in the condo

9    meeting, he calls Mr. Kamrass on his cell phone.  And the

10   defense has represented Mr. Kamrass was his compliance guy.

11       Here's what he says to Kamrass, and this is recorded, you

12   can listen to it, "So if I had a friend who is like, hey, I

13   want to raise you $10,000, and then we went and got ten $1,000

14   cashier's checks from ten of his friends, that's the better

15   way to go?"

16       That's not an accurate representation of what's going on

17   there.  Rob isn't saying I'm going to go out and raise $10,000

18   for you from 10 of my friends.  He says I have $10,000 in cash

19   right here, right next to me.  He isn't going to raise it.  He

20   already has it.  It's right there.  It's the same $10,000.

21   But when he calls his compliance guy, he isn't honest about

22   the circumstances that he's in.

23       Go to the PAC documents.  These are in evidence as

24   USA 40A through USA 40E.  Now, there in the PAC documents, you

25   see the LLCs, and you see the names that were provided by Rob.

1    Ask yourself, when looking at those PAC documents, how would

2    anyone know that the payment went to Mr. Sittenfeld from Rob

3    and Brian and Vinny?  None of their names appear.

4        What appears are LLCs that are associated with a real

5    human name so it passes the smell test.  It passes the inquiry

6    that may be done by his political enemies, but it doesn't mean

7    that it's correct or compliant.

8        When Rob tells Mr. Sittenfeld in their meeting that we

9    don't want our names on anything, we don't like having our

10   names on anything, what does Mr. Sittenfeld say?

11       He doesn't say I'm sorry, that's the law, and I care

12   about compliance.  No.  He says, "Whose names can things be

13   in?"  That's his response.

14       Defense argued that Mr. Sittenfeld was trying to help

15   with 435 Elm before the October calls that you've heard and

16   that are in evidence.

17       Well, that's not consistent with what Mr. Ndukwe said.

18   Mr. Ndukwe said that Mr. Sittenfeld wasn't really assisting

19   with the project until October.

20       And if he were assisting with the project, and he was

21   very enthusiastic about it, why would he say to Mr. Ndukwe,

22   "Love you, Chin, but can't"?  Why would his enthusiasm wane if

23   he thought it was such a great project?  Why would there come

24   a point where he would stop supporting it?  He wasn't

25   supporting 435 Elm in anything really but words until he got

1    paid off.

2         There was a reference to Mr. Sittenfeld meeting with Rob

3    and Brian in February of 2018, that he had had a meeting with

4    them, they had been introduced by a politician, and he had

5    extended himself as, you know, if you ever need anything in

6    the city, just come to me, I'm willing to help you.

7         Well, political talk, political talk is cheap.  Political

8    action, that's what will cost you.  So when Mr. Sittenfeld

9    approaches Mr. Ndukwe in the spring and summer of 2018, around

10   the same time that that text message was sent that the defense

11   showed you, he says the developers are all giving $10,000, and

12   he's pressuring him to give him $10,000.

13        It's one thing to say, yeah, contact me if ever you need

14   help.  It's another thing to condition your assistance on

15   receiving donations.

16        And you know from the testimony that there were comments

17   to Mr. Kincaid about a lobbyist, and that Mr. Sittenfeld was

18   going to hedge -- if the lobbyist clients or the lobbyist

19   hedged on Mr. Sittenfeld's next race, well, he would hedge on

20   the lobbyist's clients when he became mayor.

21        And Special Agent Holbrook testified that he heard a call

22   between Mr. Kincaid and Mr. Ndukwe about hedging, and that he

23   shouldn't hedge with Mr. Sittenfeld because that would have

24   consequences for him in the future.

25        Mr. Sittenfeld knew about 435 Elm before the November 7th

1    meeting.  There was no urgency to any of his assistance, to

2    the extent that he offered any.

3         And Mr. Ndukwe told you that Mr. Sittenfeld was not

4    involved at all in advancing 435 Elm before the recorded

5    calls.  What got him moving?  What got him motivated?  What

6    resulted in a six-minute vetting and a promise to deliver the

7    votes?  A promise of $20,000.

8         There was reference to Mr. Sittenfeld's friendship with

9    Mr. Ndukwe, wanting to help him.  Well, if you go back to the

10   September 24, 2019 meeting, where they are discussing the

11   sexual assault allegations for Mr. Ndukwe, Mr. Sittenfeld

12   says, quote, the irony is even though Chin introduced us, I've

13   seen and talked to you guys so much more.

14        He says to Rob and Brian and Vinny, quote, I've got your

15   guys' back on this a hundred percent.  He says, quote, even if

16   you -- even if this most recent thing hadn't happened, you

17   guys don't need him as the front man.

18        Now, he communicated in that meeting that he -- that Rob,

19   Brian, and Vinny had gotten their use out of Mr. Ndukwe, and

20   that they could set him aside, and that Mr. Sittenfeld's

21   loyalty was to them, not to Mr. Ndukwe, not to Mr. Ndukwe

22   keeping the project or staying with it.  But since they had

23   gotten the use they needed out of him, now it was time to

24   replace him.

25        And you know from the testimony that the lawsuits that

1    are the subject of these allegations, they were filed in

2    September of 2019.  Now, by October of 2019, Mr. Ndukwe had

3    been cleared of criminal charges.  You know that from a call

4    between Mr. Sittenfeld and Rob on October 24th, 2019.  There's

5    reference to Deters clearing him criminally.  The transcript

6    is USA 31L.

7        And Rob communicates to Mr. Sittenfeld that they're going

8    to let Mr. Ndukwe make the decision about remaining with the

9    project, that they want to stay with him.

10       And yet even though the allegations have been resolved,

11   the criminal side, Mr. Sittenfeld is pushing Rob and Brian and

12   Vinny to meet with Dan Schimberg, a replacement developer,

13   "You should meet with Dan."

14       It's Vinny who communicates to Mr. Sittenfeld that we

15   shouldn't kick a man while he's down, and we don't want to

16   abandon Mr. Ndukwe.

17       It's not Mr. Sittenfeld's loyalty to Mr. Ndukwe.  It's

18   Mr. Sittenfeld's loyalty to the people who have paid him the

19   bribe payments.

20       And you see this over the course of this case.

21   Mr. Sittenfeld's loyalty attaches to whoever gave him the last

22   check.  So when Rob and Brian give him the checks, he's

23   calling them.  He's giving them updates.  He's talking to them

24   about the development plan.  He's keeping them more in the

25   loop than Mr. Ndukwe.

1          And then once Vinny pays him, then he starts cutting out

2    Rob and Brian, and he's calling Vinny all the time, and giving

3    Vinny the updates, and telling Vinny things before he tells

4    Rob and Brian, even though he's had a longer relationship with

5    Rob and Brian.  His loyalty extends only so far as who paid

6    him the last check.

7          There was a reference by defense counsel in the

8    November 7th meeting that Mr. Sittenfeld was telling them the

9    truth when they said you don't have to worry about John

10   Cranley, and asking questions about whether John Cranley was

11   going to veto the project, that he was just speaking truth to

12   them and providing guidance.

13         I submit to you that that was not that.  It was, instead,

14   haggling over how many votes they were purchasing with the

15   $20,000.  He needed to understand was he getting five votes or

16   was he getting six?

17         Mr. Flynn told you five votes is a simple majority, but

18   if you want to overcome a veto, the mayor's veto, you need

19   six.

20         So his questions about Cranley, and whether or not he's

21   going to veto, is him trying to, as they're negotiating this

22   corrupt bargain, how many votes do I actually have to get you

23   for this money, five or six?

24         There was reference in defense arguments and throughout

25   this trial about what was best for the city.  And you know

1      from the jury instructions that public officials owe a

2      fiduciary duty to the public, and that means that the officer

3      has a duty of honesty and loyalty to act in the public's

4      interest, not for his or her own enrichment.

5          And you also know from the jury instructions, at page 26,

6      that it's not a defense that in exchange for the offer or

7      promise of a thing of value from the payor, the public

8      official understood or promised to undertake an official

9      action that is actually lawful, desirable, or even beneficial

10     to the public, or is an action that the public official

11     intended to undertake anyway.

12         The instructions make clear that the law cares about the

13     manner in which a public official makes his or her decisions,

14     and that people rarely act for a single purpose.

15         If Mr. Sittenfeld had, in fact, dual motivations, if he

16     believed that 435 Elm was a great project for the city, but if

17     he also had money as the motivator, even as a partial

18     motivator, that is a crime.

19         But I would like to dispute the premise that the 435 Elm

20     deal, as it was conceived, was actually good for the city.

21         Ms. Brunner and Mr. Denning, long-time professionals

22     familiar with real estate development, they testified that it

23     was far from clear that Mr. Ndukwe's plan was best for the

24     city.  Mr. Blocher essentially said that as well.

25         Mr. Kincaid, who was Mr. Ndukwe's lobbyist for the

1    435 Elm project, testified that Mr. Ndukwe had never done a

2    project this big, and there was some concern about that, and

3    that concern was with City of Cincinnati employees and other

4    elected officials.

5         Generally speaking, how do we determine that something is

6    actually the best?  The way we do that, typically, is through

7    competition.

8         You want to know who the fastest runner in the world is,

9    you put the best runners on a track, you make them race each

10   other, and whoever wins, well, that person is declared the

11   best.

12        So if Mr. Sittenfeld actually cared about what was best

13   for the city, he would welcome competition for 435 Elm.  He

14   would welcome it because it would be an opportunity for the

15   best option for the city to be selected for multiple options.

16   But he doesn't want competition.

17        You heard a lot of testimony about RFPs.  Defense

18   mentioned RFPs as well, request for proposals.  Ms. Brunner

19   explained to you that's a way to increase competition, where

20   when you have a property, you approach other developers and

21   you say, well, what would you do with this space?  How would

22   you best utilize this opportunity?  What is the highest and

23   best use in your view, experienced developer?  And then that

24   allows the selecting entity to review and see what is actually

25   best for the city.  That's what an RFP is.

1      Now, the defense in the closing showed you a little clip

2   about Mr. Denning is considering an RFP, and that's what we

3   want from our officials.  He showed you that part.

4      But he didn't show you the rest of that same day

5   conversation.  So Mr. Sittenfeld tells Brian and Rob, on

6   January 30th, that Mr. Denning is considering an RFP.

7      But then he also tells them that Mr. Denning is, quote,

8   politically realistic, unquote, and isn't going to want a

9   public fight.

10      So the cleanest thing would be a good proposal, pretty

11   routine, reasonable acts, move it forward.  This is USA 23C.

12   He tells Brian and Rob that an RFP would be, quote, the

13   worst-case scenario, unquote.

14      And then later on in this case, when he's reporting his

15   efforts to Vinny on December 23, 2019, and let me just pause

16   here.

17      The defense keeps representing that this meeting in

18   Columbus between Mike Schiff and Mr. Ndukwe happened when Rob

19   and Brian were long gone, I believe, is the phrase they kept

20   using.

21      I mean, wherever they were, Mr. Sittenfeld was reporting

22   all his activity to Vinny, including after that meeting date.

23      So when Mr. Sittenfeld reports to Vinny on December 23,

24   2019, he says, quote, and the other thing I feel good about

25   because, you know, she kind of threatened are we gonna, are we

1     gonna do an RFP?  If the proposal isn't good, are we gonna go

2     to an RFP?  And I feel quite good that things are not heading

3     in that direction, which, by the way, I mean, it would have

4     been, I think it would have invited lawsuits and just like it

5     would have been a not, not good direction, unquote.

6          No competition.  That's not good for the city.  That's

7     good for the developers who bought off the defendant.  If

8     there is only one racer on the track, that racer wins the

9     race, but it doesn't mean that racer is the best.

10    They showed you parts in their closing from the so-called

11    vetting that Mr. Sittenfeld did at that lunch at Nada, the

12    six minutes and 20 seconds of vetting the project.

13    He asked some questions but, as you know, there was no

14    development proposal at that time, no documents.  It was these

15    representations he was getting over lunch.

16    And the argument that they were trying to make and what

17    Mr. Sittenfeld, I believe, was testifying to yesterday is that

18    that was sufficient.  That was sufficient for an elected

19    official.  You could review a project in three minutes, based

20    on a three-minute meeting in his office, he would be prepared

21    to support or not support a development proposal based on a

22    very brief conversation.

23    But how do you square that with the testimony that they

24    have elicited and the arguments they have made about how

25    Mr. Sittenfeld was always in the weeds.  He went to all the

1    biweekly meetings.  He talked to all the officials.  He had

2    regular contact with Ms. Brunner.  He was really engaged in

3    development projects.

4        How do you square those two ideas, that he could simply

5    vet a project in six minutes, but also really enjoyed rolling

6    up his sleeves and getting into the details?

7        Remember, in multiple recordings, he says repeatedly over

8    and over and over that the plan, whatever it is, whatever it

9    is that Mr. Ndukwe presents, it just has to be reasonable,

10   good enough.

11       He says to Vinny, he even says the development plan just

12   needs to be, quote, a real one, unquote.  That's USA 38B.

13   This isn't about what's best for the city.  It's about his end

14   of the corrupt bargain.

15       He has to be able to actually deliver the votes, so the

16   proposal can't be ridiculous.  The proposal has to at least

17   seem to be real, reasonable, good enough, because, again,

18   remember he hasn't just promised his vote, he's promised the

19   votes of his colleagues, and he's got to be able to convince

20   them to vote with him.  That's his end of the corrupt bargain.

21   That's what Rob and Brian have purchased from him.

22       His concern with the plan, his concern with all of this

23   is the cover story that he's going to use to try and fulfill

24   his end of the bargain.  He needs a good cover story.  He

25   needs a passable cover story.  It's not about what's best for

1    the city.  It's about what he can sell to the other people on

2    council.

3         There was reference to, in the closing, a

4    September 24, 2019 meeting between Vinny and Rob and Brian in

5    the hotel room, and a discussion of how the state hadn't yet

6    passed sports gambling; that there was some uncertainty about

7    the future status of that state legislation, whether or not

8    gambling would be permitted.

9         This is the jury instructions at page 35, "It is enough

10    that an agreement existed.  So, for example, the agreement

11    could be something as nebulous as, 'if you contribute to me, I

12    will use my official powers to take care of you once I am in

13    office.'

14         "That is because, in such a case, the public official

15    would be promising to use his influence in the payor's favor

16    in exchange for the contribution, even though the public

17    official is not identifying any specific official action."

18         But you know from reviewing that recording and the

19    transcript, he's talking about zoning, he's talking about

20    licensing, he's talking about what he, within his authority,

21    will be able to do if at some point at state level that

22    legislation is passed.

23         He is trying to fulfil what they want, which is an

24    exclusive sports book, and they want to have the city's

25    mechanism used in their favor to make sure they're the only

1    game in town.  And that's what he's discussing with them.

2    That's what he's offering.  And that's what preceded his

3    knowing receipt of the bribe from Vinny on that same

4    videotape.

5        There was discussion in closing about a disconnect

6    between Ms. Brunner and Mr. Sittenfeld, that there was an

7    information gap between the two of them.

8        Now, Mr. Sittenfeld himself testified himself that he was

9    in frequent contact with Ms. Brunner.  They had meetings

10    frequently.  They respected each other's work ethic.  He

11    contacted her quite often on all kinds of projects.

12        Now, in all of the contacts between Mr. Sittenfeld and

13    Ms. Brunner, and all of the pressure, her word pressure, that

14    he was putting on her about 435 Elm, Ms. Brunner testified

15    Mr. Sittenfeld didn't discuss the substance of the deal with

16    her.

17        He didn't mention Turner, or the architect, or the hotel

18    flag.  He didn't use any of these details.  The details that

19    he found so critical to his six-minute vetting of the project,

20    why didn't he raise them with Ms. Brunner and say what's the

21    hesitation?  This project sounds great.  Here's all this

22    information that I have.  He didn't share any of that with

23    her, despite frequent contacts.

24        If he vetted the deal, and he believed in the merits, why

25    didn't he raise any of them in his conversations with her?

1       And you know from Ms. Brunner's testimony, yes, she and

2   Mr. Sittenfeld were in frequent contact about all kinds of

3   things and all kinds of projects.

4       But she testified that the contact that Mr. Sittenfeld

5   had with her over 435 Elm was different, in kind, from those

6   previous communications.  It was pressure.  She felt pressure

7   to do this deal even though, in her estimation, it was not in

8   the best interest of the city.

9       There's reference to Mr. Ndukwe and his proffer

10  agreement, and the pressure that defense contends arose from

11  that.

12      So as you know from the testimony, Mr. Ndukwe was

13  approached by the FBI about some checks that were donations in

14  other people's names five years before the interview occurred.

15      And then he comes in, and he signs a proffer agreement,

16  and he agrees to tell the truth.  And he tells the government

17  about way more than the checks.  He tells them about

18  everything.  I believe his phrase was even his parking

19  tickets.

20      And under the terms of the agreement, none of that could

21  be used against him.  It was his opportunity to provide

22  information and to demonstrate his good faith and his honesty

23  with the U.S. Attorney's Office.  And then after that proffer,

24  he begins working with the FBI.

25      And the term, the phrase they used was "immense

1    pressure," that he felt immense pressure from the government.

2    But that is not what Mr. Ndukwe testified to.  Mr. Ndukwe did

3    not perceive a debt to the government or the FBI.  He told you

4    why he assisted the FBI.

5        "You know, at the end of the day, when I had the choice

6    to do, you know, do the right thing and I did it, and I wanted

7    to make sure that, you know, I was in a position to have an

8    impact, and I did."

9        He also testified that when Mr. Sittenfeld said on a

10   call, "You don't want me to be like sorry, Chin, love you but

11   can't," he called that the "epitome of my motivation to

12   assist.  If I donated, he would support me; and if I didn't,

13   he wasn't going to be supportive," and Mr. Ndukwe was tired of

14   it, and he was participating in an investigation to stop this

15   practice.  It was not because he felt immense pressure through

16   the proffer agreement or the letter.

17       In fact, the only immense pressure that Mr. Ndukwe

18   testified to came from the defendant in the months preceding

19   the recorded calls, when the defendant kept approaching him

20   for $10,000 donations.

21       There's reference in closing to nothing being wrong with

22   the PAC, and that's right.  There's nothing inherently wrong

23   with the PAC, unless it's your repository for bribes.

24       And let's go through what Mr. Sittenfeld said about the

25   PAC.  November 21, 2018, "There's a PAC, the Progress and

1    Growth PAC, that my name is not connected to.  One, basically

2    no one knows about it; and two, my name is in no filings, no

3    paperwork, and no anything is connected to it."

4        November 21, that same call, "It either needs to be a

5    check from a human being or a check from an LLC.  Now that

6    being said, if it goes to this Progress and Growth PAC,

7    instead of Sittenfeld For Cincinnati, nothing about it in any

8    way will be ever connected to me.  No one will, umm, you know,

9    no one is gonna be poking around it to find your names on it."

10       And then in the November 28th, 2018 meeting, "In this

11   way, as I told him, this PAC, my name is not, I mean, this

12   will, can certainly support and benefit me, but my name is not

13   connected to it any way, and no one will ever know this."

14       Why did Mr. Sittenfeld start this PAC?  Well, he told

15   you.  At the September 24th, 2019 meeting, he said, "Well, so

16   interestingly, the LLC thing, the, you can no longer give

17   directly to the campaign."  That's why he started this PAC.

18   And that is consistent with the other evidence you heard here.

19       Now, Issue 13 that closed this LLC loophole, that was

20   introduced to city council in February of 2018.  Mr. Seelbach

21   introduced that valid initiative, testified to that.

22       And you know from Mr. Seelbach's testimony that he had

23   spoken with Mr. Sittenfeld about that ballot initiative before

24   he introduced it, and he said that Mr. Sittenfeld was a

25   hundred percent behind it.

1      So the same month that Issue 13 was introduced to

2  council, February of 2018, that's the same month that

3  the Progress and Growth PAC was created.

4      And if you go to the Statement of Organization for the

5  PAC, that's USA 40A, and you'll see the initiation date.  Same

6  month.

7      There's reference to introduction to civic leaders, that

8  if Mr. Sittenfeld felt that Brian and Rob were bad guys, they

9  wouldn't have introduced them to civic leaders.

10      Well, in the very first meeting, the very first meeting

11  other than the politician meeting in February of 2018, the

12  very first real substantive meeting between Mr. Sittenfeld and

13  Rob, that's on November 7, 2018, Rob says repeatedly how they

14  don't want their names on anything.  They don't want to be

15  associated with donations.

16      He even references a story how Brian won't even sign in

17  to political fundraisers because of putting his name down.  He

18  just doesn't want his name associated with anything.  And

19  Mr. Sittenfeld testified he knew that Rob and Brian were very

20  skittish about their names appearing on anything.

21      Well, first, Mr. Sittenfeld wasn't afraid to introduce

22  them to civic leaders or have the U.S. Attorney at his dinner

23  party because he had some assurances that they were not going

24  to walk up and advertise that they had given all of this money

25  to Mr. Sittenfeld, given their aversion to having their names

1    on anything.

2        But besides that, you can guarantee that these

3    introductions that Mr. Sittenfeld made to various civic

4    leaders that he ran into wasn't, hey, you should meet these

5    guys.  They just gave me $20,000.

6        But also isn't introducing Rob and Brian to civic leaders

7    and inviting them to dinner with the U.S. Attorney also

8    consistent with someone who wants to show off to the investors

9    that he has very powerful friends, and that he has the power

10   that they are interested in purchasing.

11       There was reference to campaign finance law, you know,

12   that he's not accused of violating any campaign finance law.

13       You've heard a lot in this case about bundling.  This

14   case isn't about bundling.  And, you know, bundled or not, you

15   can't take bribes.  Bribes don't become okay because you

16   bundle them.

17       This case is about bribery, and bribery is not

18   acceptable, even if the recording of those bribes is meeting

19   the technical spirit of the law.

20       There was a lot of reference to Mr. Sittenfeld turning

21   down cash and money orders and corporate checks and LLC checks

22   and all of that.

23       You know, each opportunity that Mr. Sittenfeld was

24   presented with, from the cash, to the money orders, to the

25   checks, the corporate checks, the LLC checks, those were all

1    opportunities, opportunities for him to say no, to not accept

2    the donation, and to do what he felt was right for the city

3    without the donation.

4       There was plenty of time, right?  The mayor's race was

5    years and years away.  He could have said to Rob and Brian and

6    Vinny, you know what?  I welcome your support, just not right

7    now, because we've just discussed the things that I'm going to

8    do for you because I believe in this project, so just hold

9    off.

10      No.  Every time he was presented with the opportunity, he

11   either took it, or tried to figure out the best way for him to

12   take it.

13      Remember on cross, Mr. Kamrass was asked about the

14   transactional donors list.  And they elicited on

15   cross-examination, well, there's nothing wrong with the

16   transactional donor list because donors, or potential donors,

17   can just say no.

18      Well, I submit to you that that applies equally to the

19   defendant.  Each one of those opportunities he could have said

20   no, and he didn't.

21      And if he has all these donations, 1,800 donations, a

22   million dollars, huge war chest, why not just say no?  It's

23   not that he was desperate for the money or needed it.  He

24   could have waited, waited until the business was done with the

25   city and then taken the donation with a clean conscience, but

1    he didn't do that.

2       The people of Cincinnati entrusted Mr. Sittenfeld by

3    voting for him and, in return, he owed them honesty and

4    loyalty to act in the public's interest.  And when he took

5    bribes, he violated that duty.

6       And now you have your own duty, to apply the evidence

7    that is before you to the instructions provided by Judge Cole,

8    and we submit to you that when you do this, you will reach the

9    only just verdict in this case, the defendant is guilty of all

10    counts.

11       THE COURT:  Thank you, Ms. Gaffney Painter.  Ladies

12    and gentlemen of the jury, do they still have the jury

13    instructions, Scott?

14       COURTROOM DEPUTY:  They should.

15       THE COURT:  So I'm now turning back to the few

16    remaining instructions that I've got for you.

17       You've heard the last that you're going to hear from the

18    parties in this case.  It now is going to you, so I'm starting

19    at page 57 of the jury instructions.  It's labeled

20    "Instructions For Beginning Deliberations."  I'll give you a

21    moment to get turned to that page.

22       Now that you've heard closing arguments from each party,

23    let me finish up by explaining some things about your

24    deliberations in the jury room and your possible verdicts.

25       The first thing you should do in the jury room is choose

1     someone to be your foreperson.  This person will help to guide

2     your discussions and will speak for you here in court.

3          Once you start deliberating, do not talk to the court

4     security officers stationed outside your room, or to me, or to

5     anyone else except each other about this case.

6          If you have any questions or messages, you must write

7     them down on a piece of paper, sign them, and then give them

8     to the court security officer.

9          The officer will give them to me, and I will respond as

10    soon as I can.  I may have to speak with the lawyers about

11    what you have asked, so it may take me some time to get back

12    to you.  Any questions or messages normally should be sent to

13    me through your foreperson.

14         You will have a copy of the exhibits that were admitted

15    into evidence with you in the jury room.  We will also provide

16    a device that will allow you to play any audio or video files

17    that were admitted into evidence.

18         The courtroom deputy will provide those materials shortly

19    after you begin deliberations, and can answer any questions

20    you have about how to play the audio or video files.

21         One more thing about messages.  Do not ever write down or

22    tell anyone, including me, how you stand on your votes.  For

23    example, you would not write down or tell anyone you were

24    split six six, or eight four, or whatever your vote happens to

25    be.  That should stay secret until you are finished.

1       When you arrive at a verdict, you will notify the court

2  security officer, who will inform the Court.

3       Experiments, Research, Investigation, and Outside

4  Communications.  Remember that you must make your decision

5  based only on the evidence that you saw and heard here in

6  court.

7       During your deliberations, you must not communicate with

8  or provide any information to anyone by any means about this

9  case.  You may not use any electronic device or media or

10  application such as a telephone, cell phone, smartphone,

11  iPhone, or computer, the internet, any internet service, or

12  any text or instant messaging service, any internet chat room,

13  blog, or website such as Facebook, LinkedIn, YouTube, Twitter,

14  Instagram, WhatsApp, Snapchat, or any other similar electronic

15  service, to communicate to anyone any information about this

16  case, or to conduct any research about this case until I

17  accept your verdict.

18       In other words, you cannot talk to anyone on the phone,

19  correspond with anyone, or electronically communicate with

20  anyone about this case.  You can only discuss the case in the

21  jury room with your fellow jurors during deliberations.

22       I expect you will inform me as soon as you become aware

23  of another juror's violation of these instructions.

24       You may not use these electronic means to investigate or

25  communicate about the case because it is important that you

1    decide this case based solely on the evidence presented in

2    this courtroom.

3        Information on the internet or available through social

4    media might be wrong, incomplete, or inaccurate.  Even using

5    your smartphones, tablets, and computers, and the news and

6    social media apps on those devices, may inadvertently expose

7    you to certain notices, such as popups or advertisements, that

8    could influence your consideration of the matters you've heard

9    about in this courtroom.

10       You are only permitted to discuss this case with your

11   fellow jurors during deliberation because they have seen and

12   heard the same evidence you have.

13       In our judicial system, it is important you are not

14   influenced by anything or anyone outside of this courtroom,

15   otherwise, your decision may be based on information known

16   only by you and not your fellow jurors or the parties in this

17   case.  This would unfairly and adversely impact the judicial

18   process.

19       A juror who violates these restrictions jeopardizes the

20   fairness of these proceedings, and a mistrial could result,

21   which would require the entire trial process to start over.

22       Unanimous Verdict.  Your verdict, whether it is guilty or

23   not guilty, must be unanimous as to each count.

24       To find the defendant guilty of a particular count, every

25   one of you must agree that the government has overcome the

1    presumption of innocence with evidence that proves his guilt

2    beyond a reasonable doubt as to that count.

3        To find him not guilty of a particular count, every one

4    of you must agree the government has failed to convince you

5    beyond a reasonable doubt as to that count.

6        Either way, guilty or not guilty, your verdict must be

7    unanimous as to each count.

8        Duty to Deliberate.  Now that all the evidence is in and

9    the arguments are completed, you are free to talk about the

10   case in the jury room.

11       In fact, it is your duty to talk with each other about

12   the evidence, and to make every reasonable effort you can to

13   reach unanimous agreement.

14       Talk with each other.  Listen carefully and respectfully

15   to each other's views.  Keep an open mind as you listen to

16   what your fellow jurors have to say.

17       Try your best to work out your differences.  Do not

18   hesitate to change your mind if you are convinced the other

19   jurors are right and that your original position was wrong.

20       But do not ever change your mind just because other

21   jurors see things differently, or just to get the case over

22   with.  In the end, your vote must be exactly that, your own

23   vote.  It is important for you to reach unanimous agreement,

24   but only if you can do so honestly and in good conscience.

25       No one will be allowed to hear your discussions in the

1    jury room, and no record will be made of what you say, so you

2    should all feel free to speak your minds.

3        Listen carefully to what the other jurors have to say,

4    and then decide for yourself if the government has proved the

5    defendant guilty beyond a reasonable doubt.

6        Punishment.  If you decide the government has proved the

7    defendant guilty, then it will be my job to decide what the

8    appropriate punishment should be.  Deciding what the

9    punishment should be is my job, not yours.  It would violate

10    your oaths as jurors to even consider the possible punishment

11    in deciding your verdict.

12        Your job is to look at the evidence and decide if the

13    government has proved the defendant guilty beyond a reasonable

14    doubt.

15        Verdict Form.  I have prepared a verdict form that you

16    should use to record your verdict.  The form reads as follows.

17    I have a copy of it up here.  You'll see there are each count

18    and, as you know, there are six counts.

19        Each count has a section, and it's quite straightforward

20    below.  I'll just use Count 1 as an example.  It lists the

21    statute.  Count 1 is the honest services wire fraud count.

22    How do you find the defendant, Alexander Sittenfeld, aka P.G.

23    Sittenfeld, as to Count 1, guilty or not guilty?  And there's

24    a spot to put an X.  There's only one spot because it has to

25    be unanimous, so you all have to agree.  So you're going to

1    just put an X after guilty or not guilty.  The same with

2    regard to Count 2 through Count 6.

3        And then on the last page, there's a thing that says the

4    foregoing constitutes the unanimous verdict of the jury.

5    There's a line for the date, and then a line for the

6    foreperson and all the other jurors to sign and to put their

7    juror numbers.

8        So you sign on the line, put your juror number beneath

9    it.  Your all's jurors numbers right now are 1 through 16.  A

10   couple jurors are missing.  Jurors 8 and 11 won't show up on

11   here because we don't have Jurors 8 and 11 anymore, but use

12   your juror number when you fill out the verdict form.

13       And I guess that's what it says here.  If you decide the

14   government has proved a given count against Mr. Sittenfeld

15   beyond a reasonable doubt, say so by having your foreperson

16   mark the appropriate place on the form.

17       If you decide the government has not proved that count

18   against him beyond a reasonable doubt, say so by having your

19   foreperson mark the appropriate place on the form.  Each of

20   you should then sign the form.  There's a spot for the date,

21   and then it should be returned to me.

22       Court Has No Opinion.  Let me remind you of one thing

23   that I said to you earlier.  Nothing that I have said or done

24   during this trial was meant to influence your decision in any

25   way.  You decide for yourselves if the government has proved

1       the defendant guilty beyond a reasonable doubt of any of the

2       charged crimes.

3            Juror Notes.  Remember that if you elected to take notes

4       during the trial, your notes should only be used as memory

5       aids.  You should not give your notes greater weight than your

6       independent recollection of the evidence.

7            You should rely upon your own independent recollection of

8       the evidence, or lack of evidence, and you should not be

9       unduly influenced by the notes of other jurors.

10           Notes are not entitled to any more weight than the memory

11      or impression of each juror.  Whether you took notes or not,

12      each of you must form and express your own opinion as to the

13      facts of this case.

14           Last instruction, Written Instructions.  Finally, to the

15      extent that you need to refer to these written instructions,

16      you may do so.

17           One copy of the written form of the instructions on law I

18      have just given you will be available to you in the jury room.

19      You are invited to use these instructions in any way that will

20      assist you in your deliberations and at arriving at a verdict.

21           These written instructions, which are in exactly the same

22      language as I've given them to you orally, represent the law

23      that is applicable to the facts, as you find the facts to be.

24           So that's the end of the reading of the instructions.

25      There is one more little wrinkle.  So a jury in a criminal

1    matter, a deliberating jury consists of 12 people.  We started

2    with 16.  We're down to 14.  However, that means Jurors 15 and

3    16 are now going to be excused from the process.

4       But you're not excused entirely yet, because if something

5    were to happen with -- one of the other jurors couldn't

6    continue deliberations, we may need to recall you.

7       So I'm going to excuse you, but I will give you a call

8    once the verdict is in.  And until the verdict is in, I'm

9    going to ask you to honor the admonition not to discuss this

10   case with anyone, or to do any research, or communicate with

11   anyone about the case, in case we may need to recall you.

12      But you may leave with the Court's sincere thanks for

13   your participation over the last two weeks, and your

14   understanding that you may yet be called back to serve again.

15      Thank you very much.

16      (Alternate jurors excused.)

17         THE COURT:  Leave your notes or anything behind.

18   Thank you.  Thank you very much.

19      With that last little wrinkle, then, I think we can also

20   excuse the other members of the jury to begin their

21   deliberations, which will be in the deliberation room, not the

22   bigger room where you sometimes gather, but the deliberation

23   room where you kept your stuff at the end of the day.  Do you

24   know where you're going?  Okay.

25      With that, I think we can excuse the jury to begin their

 1    deliberations.

 2        (Jury out at 3:44 p.m.)

 3            THE COURT:  Anything else that we need to discuss at

 4    this point, Mr. Singer?

 5            MR. SINGER:  No, Your Honor.

 6            THE COURT:  Mr. Rittgers?

 7            MR. C. MATTHEW RITTGERS:  Your Honor, I'm just

 8    curious about the procedure, where you want us.

 9            THE COURT:  I believe Scott has your contact

10    information?

11            MR. C. MATTHEW RITTGERS:  You do.

12            THE COURT:  I mean, I'd prefer that you be within

13    10 or 15 minutes of the court at any time until we have a

14    verdict; but, other than that, you're free to move about,

15    so...

16            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

17            MS. GLATFELTER:  Your Honor, do you have a

18    preference, I don't know the procedure in terms of whether the

19    Court expects us to appear in the morning, and you bring the

20    jury back in here, or in the evening?

21            THE COURT:  No.  I don't anticipate bringing the jury

22    back in, unless we receive a question from the jury.  If we

23    receive a question from the jury, I'll transmit the question

24    to you, contact all counsel, and then we will come in and

25    discuss on the record how we would like to handle that

1    question.

2        So that's the only reason I want you to be relatively

3    close by, in case we have a question that comes up, so it

4    doesn't take too long to get back to the jury.  But other than

5    that, I don't bring the jury in at the beginning and end of

6    the day.  Any other questions?

7        MR. C. MATTHEW RITTGERS:  Your Honor, just curiosity.

8    At some point, do you mind telling us when you're going to ask

9    them about staying past --

10        THE COURT:  Yeah.  I just realized I didn't instruct

11    them on that.  When Scott takes up the evidence, he's going to

12    tell them they're in charge of their own schedule in terms of

13    when they start and finish for the day.

14        We'll ask them to advise us when they leave for the day

15    but, beyond that, give us a sense of when they're going to

16    start the next day, but that's the plan.  I should have told

17    them that.  It wasn't in the instructions, so I didn't read

18    them.  The only thing not covered.

19        MR. C. MATTHEW RITTGERS:  And then if they do that,

20    we'll be notified so then we can leave?

21        THE COURT:  Yes.

22        MR. C. MATTHEW RITTGERS:  Okay.  Thank you.

23        (Proceedings adjourned at 3:47 p.m.)

24                        -  -  -

25

```
 1                    C E R T I F I C A T E

 2                         -  -  -

 3         I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
      is a correct transcript from the record of proceedings in the
 4    above-entitled matter.

 5

 6    /s/ M. Sue Lopreato_____              August 24, 2022_____
      M. SUE LOPREATO, RMR, CRR
 7    Official Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```