```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION

 3
                           - - -
 4   UNITED STATES OF AMERICA,      .  Case Number 1:20-cr-00142-1
                                    .
 5              Plaintiff,          .
                                    .   IN CAMERA HEARING
 6         - v -                    .
                                    .
 7   ALEXANDER SITTENFELD, a/k/a    .  Wednesday, August 17, 2022
     "P.G. Sittenfeld,"             .
 8                                  .  11:30 a.m.
                Defendant.          .  Cincinnati, Ohio
 9   . . . . . . . . . . . . . .

10
                   REDACTED TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12

13   For the Plaintiff:

14   EMILY N. GLATFELTER, ESQ.
     MATTHEW C. SINGER, ESQ.
15   MEGAN GAFFNEY PAINTER, ESQ.
     United States Attorney's Office
16   221 East Fourth Street, Suite 400
     Cincinnati, Ohio  45202
17

18   For the Defendant:

19   CHARLES M. RITTGERS, Esq.
     GUS J. LAZARES, ESQ.
20   NEAL D. SCHUETT, ESQ.
     Rittgers & Rittgers
21   12 East Warren Street
     Lebanon, Ohio  45036
22

23   Law Clerk:          Tim Lanzendorfer, Esq.

24   Courtroom Deputy:   Scott M. Lang

25   Court Reporter:     Maryann T. Maffia, RDR
```

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Good morning.  We're here this morning in

 3   Case Number 1:20 -- well, United States of America versus

 4   Alexander Sittenfeld.  It's Case 1:20-cr-142.

 5          And we're here this morning to provide an opportunity

 6   to interview two additional members of the jury on a very

 7   limited scope of inquiry, which is the question of whether or

 8   not extraneous information became part of the jury

 9   deliberations at any time in this case.

10          Can I ask counsel to please enter their appearances

11   for the record.

12          MR. SINGER:  Matt Singer, Megan Gaffney Painter, and

13   Emily Glatfelter for the United States.

14          THE COURT:  Good morning.

15          MR. RITTGERS:  Good morning, Your Honor.  Charlie

16   Rittgers, Gus Lazares, and Neal Schuett for P.G. Sittenfeld.

17          THE COURT:  Good morning.

18          Let me start by apologizing for being late.  We had a

19   sentencing run a little long this morning, so my apologies for

20   that.

21          As I understand the way we're going to proceed this

22   morning, we're going to do one of these jurors -- interview

23   one of these jurors by videoconference.  The other juror is

24   going to appear live.  I do appreciate the parties'

25   cooperation in terms of allowing the one juror to appear by
```

1    videoconference to minimize the imposition that we're putting

2    on these jurors.

3            And I think we're starting with the videoconference

4    juror; is that right?

5            COURTROOM DEPUTY:  Yes, Your Honor.

6            THE COURT:  Okay.  Are the parties prepared to

7    proceed, or are there things we need to discuss before we

8    start?

9            MS. GLATFELTER:  Your Honor, just two brief, sort of,

10   housekeeping matters.  One, if we need to object during the

11   testimony, how would the Court prefer that we do that?  With

12   the jurors in the room, or do we just need to stand and make

13   an objection?

14           THE COURT:  Yeah, just treat it like a normal witness

15   examination.

16           MS. GLATFELTER:  Okay.  The second one is just to

17   clarify.  I think during the post-verdict hearing the

18   government didn't really have an opportunity to talk to the

19   witnesses, but we would request the opportunity to ask

20   questions if necessary.

21           THE COURT:  Absolutely.  And I thought I provided an

22   opportunity for the government to ask questions.  If I didn't,

23   it was my intent to, so I apologize.

24           MS. GLATFELTER:  We didn't feel the need that we

25   needed to at that time either, but we wanted to reserve that

1    opportunity today.

2            THE COURT:  Very good.

3            MS. GLATFELTER:  Thank you.

4            THE COURT:  Mr. Rittgers, anything we need to discuss

5    before we begin?

6            MR. RITTGERS:  Your Honor, it might be longer than

7    the few issues that the government just raised.  Don't shoot

8    the messenger.  I'm reading what I've been -- and I apologize

9    that I'm looking at my phone, Your Honor.  My notes are on my

10   phone because I've printed some of the raw material.

11           We thank the Court for the opportunity to question

12   these jurors.

13           Our request originally was for leave pursuant to

14   local Rule 471 to speak with any and all jurors freely outside

15   of court before this hearing.

16           We also challenged the constitution of that local

17   rule, Your Honor, as you're aware, and ask for a forensic

18   examination of Juror Number █'s phone, an issue that now has

19   been filed, the mandamus, on Monday.

20           We intended to question jurors under oath only after

21   we had the opportunity for the forensic examination, as well

22   as speaking with the jurors before a hearing on our own so

23   that we could do our own due diligence.  Without it, we do not

24   believe that this hearing is a meaningful opportunity to

25   explore her bias under *Lanier,* Your Honor.

1        That being said, we don't want to waive any rights,

2 and we are participating in the hearing today.

3        We understand that the Court intends to strictly

4 apply Federal Rule 606(b) in the hearing, but we also believe

5 that the standard under the present scenario, given *Lanier*, is

6 broader:  specifically, that we should be able to do a

7 meaningful investigation into the circumstances of external

8 communications, the impact of communications on the jury, and

9 whether or not the communications were prejudicial.

10        The question is whether, given the indication of jury

11 bias, this inquiry is adequate, and the adequacy is a function

12 of the probability of bias.  The greater that probability, the

13 more searching and inquiry into is there a bias, as you know

14 from *Lanier*, Your Honor.

15        Before we start, I know the Court -- I believe the

16 Court indicated before, right after the verdict in this case,

17 that you spoke with the jurors.  We would respectfully ask, if

18 the Court is willing to share, what was stated in that room,

19 if we're not permitted to speak with the jurors individually,

20 if the Court is willing to share with us any of the

21 conversation or substance that was discussed when you spoke

22 with the jury -- if you did.  I could be wrong.

23        THE COURT:  Yes.  So you mean -- when I mentioned

24 that before the last hearing where you talked to the jury, I

25 went up and talked to the jury?

1          MR. RITTGERS:  Yes, Your Honor.

2          THE COURT:  Sure.  I'll put that on the record.

3          So typically after a jury trial is over, I go up and

4    talk to the jury, in all cases, and just ask them about their

5    experience, are there things that we could do to make the

6    experience more pleasant, things for the jury, whether they

7    have any questions about the way in which trials operate, do

8    they have any experiences they wish to share with the Court

9    about how the trial went or any questions they have about why

10   this happened or why that happened.

11          I talk to them about how the court reporter does his

12   or her job of taking down what everybody says.  We sometimes

13   talk about how the steno machine works.  I don't recall if we

14   ended up talking about that here.

15          I think I did inquire a little bit about any concerns

16   that people may have had about COVID in light of the fact that

17   one of our jurors, as everybody here knows, did test positive

18   during the course of the trial.

19          Gosh, I don't remember discussing anything else other

20   than near the end, I released them, I told them they were free

21   from the admonishment not to talk to anybody about the case

22   and they could discuss their experience as jurors with the

23   case, that the admonitions I'd given them during trial were at

24   an end, that they were free to read newspaper articles, talk

25   with their friends or family about their experience as jurors,

1     their thoughts on the case.

2         I think I may have mentioned that, in light of the

3     public interest, reporters or media may attempt to track them

4     down. You know, I told them that I certainly wasn't telling

5     them they couldn't talk to newspaper reporters, but that they

6     may want to think about how that would play out and whether

7     they wanted to or not, that they weren't required to, and I

8     was not telling them they couldn't. So we talked about that.

9         And then I believe I excused the jury at that point

10    and asked the two jurors that we were going to talk with to

11    remain behind after those jurors left. The other jurors left,

12    and then I individually brought the two jurors in and told

13    them that the -- well, I told the first juror that we had

14    discovered that there had been some Facebook posts that seemed

15    to relate to the trial by that juror and that the parties had

16    some questions about those. I told the other juror that she

17    had been mentioned in comments on a Facebook post and so the

18    parties had some questions about. I told them that I was

19    going to bring them down and we were going to ask some

20    questions in chambers.

21         So that was the full extent of my recollection of

22    that conversation.

23         MR. RITTGERS: Thank you, Your Honor. I appreciate

24    you sharing that.

25         THE COURT: Absolutely. Any follow-up questions on

```
 1    that, Mr. Rittgers?
 2              MR. RITTGERS:  No, Your Honor.
 3              THE COURT:  Any follow-up questions from the
 4    government?
 5              MS. GAFFNEY PAINTER:  No.  Thank you, Your Honor.
 6              THE COURT:  Okay.
 7              MR. RITTGERS:  This is a procedural question, Your
 8    Honor.
 9              THE COURT:  Sure.
10              MR. RITTGERS:  In light of the mandamus that was
11    filed Monday on Rule 29 and Rule 33, is that stayed or is --
12    are we on a different timeline as a result of the mandamus?
13              THE COURT:  I thought I saw a motion for extension of
14    time to file your response.  It certainly seems to me that it
15    would make sense to try and get hammered out what the evidence
16    is going to be with regard to the juror misconduct issue
17    before proceeding on that, but I would hear from the
18    government if they have a different view.
19              MS. GLATFELTER:  We don't oppose at this point, Your
20    Honor.
21              THE COURT:  So I'm going to grant the requested
22    extension.  If it turns out that for some reason there needs
23    to be an additional extension in your view, you're free to
24    file a motion for an extension at that point and I'll rule on
25    that, but I'm granting the currently pending motion for
```

1    extension of time on those post-trial motions.

2            MR. RITTGERS:  Thank you, Your Honor.

3            Your Honor, in light of the fact that the Sixth

4    Circuit places a burden on the defendant in showing that the

5    verdict was tainted by any extraneous information, we'd ask

6    again -- and I know this is -- I don't want to relitigate

7    anything, but would it be possible for us to speak with these

8    individual jurors before they take sworn testimony today?

9            THE COURT:  Speak with the jurors?

10           MR. RITTGERS:  Yes.

11           THE COURT:  No.

12           MR. RITTGERS:  Yes, individually.  Okay.

13           And is there any -- we would respectfully request a

14   modification to that local rule so that even after this

15   hearing we can speak with jurors.  I assume that's denied

16   based on what just --

17           THE COURT:  Yeah.  I made a stand on the order that I

18   put out with regard to that.  You know, as I noted, if

19   something comes out during testimony today that gives further

20   basis to believe that additional inquiry is warranted, we can

21   revisit that.  But at this point I'm not waiving the local,

22   the admonition -- the prohibition in the local rule with

23   regard to juror contact.

24           MR. RITTGERS:  Thank you, Your Honor.  May I have one

25   minute to confer?

```
 1              THE COURT:  You may.
 2              MR. RITTGERS:  Do we know which juror is the virtual?
 3              COURTROOM DEPUTY:  Number ▮.
 4              THE COURT:  Number ▮.
 5              MR. RITTGERS:  Thank you, Your Honor.
 6  (Pause in proceedings.)
 7              MR. RITTGERS:  Nothing else, Your Honor.
 8              THE COURT:  Very good.
 9       Anything further from the government?
10              MR. SINGER:  No, Your Honor.
11              THE COURT:  All right.  Let's proceed then.  So Juror
12  ▮ is going to appear by video; is that right?
13              COURTROOM DEPUTY:  I have to dial in.
14              THE COURT:  Okay.
15              Given that you have the burden, Mr. Rittgers, I was
16  assuming you would go first.
17              MR. RITTGERS:  Thank you, Your Honor.
18  (Pause in proceedings.)
19              MS. GLATFELTER:  Your Honor, while we're dialing in,
20  I just wanted to put on the record and clarify -- thank you
21  for your recollection on that.  You did give us the
22  opportunity to ask questions; we just didn't ask any.  So I
23  wanted to clarify and make sure that I made that correction.
24              THE COURT:  Thank you.
25              MS. GLATFELTER:  Thank you, Your Honor.
```

1          THE COURT:  Off the record for a second.

2      (Discussion off the record.)

3          THE COURT:  I'll just note for the record that this

4    hearing is subject to at least a temporary seal.  I'm going to

5    see what comes out in the testimony, but I'm going to at least

6    temporarily seal it.

7          THE COURT:  So now we're logged in, Scott?

8          COURTROOM DEPUTY:  Hold on a second.

9    (Pause in proceedings.  Juror Number █ attending via

10   videoconference.)

11         THE COURT:  Is this Juror Number █?

12         Ma'am, this is Judge Cole.  We don't see you on

13   screen right now.  Do you have a camera you could turn on on

14   your end?

15         JUROR NUMBER █:  Yeah.  Hold on.

16   (Pause in proceedings.)

17         THE COURT:  I think you just need to turn on your

18   camera.

19         JUROR NUMBER █:  Hold on one second.

20   (Pause in proceedings.)

21         THE COURT:  Very good.  Ma'am, can you hear me?

22         JUROR NUMBER █:  Yes.

23         THE COURT:  And just to confirm, ma'am, you are Juror

24   Number █ from the Sittenfeld trial; is that right?

25         JUROR NUMBER █:  Yes.

```
 1                THE COURT:  Okay.  I appreciate your willingness to

 2     appear via videoconference this morning, and I'd just like to

 3     say at the outset -- I want to make it very clear to you.  You

 4     are not in any way in any trouble.  There is nothing about

 5     you.  You were just sort of selected kind of a little bit at

 6     random with regard to some additional questions about what

 7     went on in the jury room.  In particular, I'm going to allow

 8     the parties to ask you questions in a little bit, but the

 9     questions are going to be directed at the extent to which, if

10     any, that extraneous information, in other words, information

11     from outside the Court, became part of the deliberations among

12     the jury.

13                So, for example, they might ask:  Oh, did anyone say

14     "I heard this on the radio" or "I read this in the newspaper"

15     and try to interject facts that were not facts that were

16     presented in court?

17                That's generally going to be the nature of the

18     conversation this morning.  Do you understand that, ma'am?

19                JUROR NUMBER ▮:  Yes.

20                THE COURT:  Okay.  Well, what I'd like to do is swear

21     you in, if I could do that?

22                So Scott, could you take care of that, please?

23                COURTROOM DEPUTY:  Yes.

24     (Juror Number ▮ was duly sworn by the courtroom deputy.)

25                JUROR NUMBER ▮:  Yes.
```

1          COURTROOM DEPUTY:  Thank you.

2          THE COURT:  So Juror Number ▮, Mr. Rittgers is going

3    to start with some questions on behalf of Mr. Sittenfeld, and

4    then the government may have some follow-up questions as well.

5          So Mr. Rittgers, you may proceed.

6          MR. RITTGERS:  Thank you, Your Honor.

7                          EXAMINATION

8    BY MR. RITTGERS:

9    Q.   Good morning.  My name is Charlie.  Obviously, we know

10   each other from the trial.  As Judge Cole indicated, you're

11   not in trouble at all.  And, in fact, we asked if we could

12   speak with you because we thought you might be extremely

13   honest.  So that's why you're here and I guess what you get

14   for us thinking that you're going to be really honest with us.

15   So thank you very much for appearing.

16        Are you aware of any -- and you're permitted, as the judge

17   told you after the verdict, since the verdict came out, you

18   and other jurors are permitted to have looked at media and

19   news media since the verdict came out.  There have been some

20   news articles, although I'm not sure to the extent at which

21   they've talked about detail about one of the jurors, Juror

22   Number -- well, a juror making comments about other jurors.

23        Are you aware of any of that on the social media?

24   A.   Yes and no.  I know that, um, Juror ▮, when she was

25   discharged for us to go in for deliberations, she had said she

1  would be the one doing that if they -- you know, she wanted to

2  switch with somebody, and she picked me, and I said no.  So

3  she could be part of that.  She says, "Well, if I get" -- you

4  know, because she's █, she would put it on Facebook and

5  whatever.  That's the only thing I remember.  But that wasn't

6  back in the deliberation room.  That was back in the room.

7  Q.  And so Juror █ -- if you remember the courtroom, if you

8  were facing that jury box, were --

9      So I know that we're referring to the same juror, █████

10  ████████████████████?

11  A.  ████████████████████████████.

12  Q.  And so that Juror █ if I recall correctly, she was not

13  part of the deliberations, right?

14  A.  No, she was not.

15  Q.  The jury room,I believe it was on the 9th floor?

16  A.  Yes.

17  Q.  Is that -- so Juror █, she was talking with you and

18  presumably other jurors in the jury room before the

19  deliberations talking about how she wanted to be able to go on

20  social media?

21  A.  No.  She was upset that she was Juror █ and she wasn't

22  going to be able to go back and deliberate.  So she was upset

23  about that, and she says, "Well, if I have to go after sitting

24  through all this, and I have a voice, I'll put it out there"

25  type thing.

```
 1   Q.  Gotcha.  Gotcha.  One of the jurors posted comments on

 2   Facebook during the trial, and some of the comments on her

 3   Facebook posts referenced P.G. Sittenfeld.  And she also made

 4   comments like "I wish this person's tongue would fall out,"

 5   speaking about another juror.

 6   A.  Oh.

 7   Q.  Yeah.  Were you aware of any of that?

 8   A.  No.

 9   Q.  It was --

10        MR. RITTGERS:  Your Honor, may I describe to her the

11   juror so that I can have a conversation whether or not she

12   knows if that juror was on the phone during deliberations or

13   during trial?

14        THE COURT:  Yes.

15   Q.  This juror would have been ███████████████████████

16   ██████.

17   A.  Hold on.  Okay.  Female?

18   Q.  Yes.

19   A.  Okay.

20   Q.  And she made -- one of the reasons why we asked to speak

21   with you, she made some comments about you, and so we wanted

22   to know from you if you had seen her on her phone during

23   deliberations or if she had -- she was interacting with people

24   on Facebook from the beginning of the trial.  Some people even

25   posted, like, a *cincinnati.com* article on her Comments after
```

1    she had checked in at the federal courthouse.

2        So what we're wondering is if she mentioned to anyone,

3    that you're aware of, things that she had heard, like, through

4    the news or speaking to someone at her house.  Can you tell --

5    A.  Um, no.  She wouldn't have said anything for me to hear

6    after she brought to my attention I had ADD, and I just

7    laughed it off.  I'm not shocked, let me put it that way.  But

8    no, I didn't hear it.

9    Q.  Did you see her on her phone during the deliberations?  Do

10   you remember her getting on --

11   A.  Yeah.  I seen her on it, but I don't know what she was

12   doing on it.

13   Q.  So during the deliberations, she was on her phone at times

14   while you were deliberating?

15   A.  Mm-hmm.

16       THE COURT:  Is that a yes, ma'am?

17       JUROR NUMBER █:  Yes.  I'm sorry.

18   Q.  And we're talking about the juror ████████████████████

19   ████████████████████████████████?

20   A.  Yes.  ████████?

21   Q.  I believe that's correct.

22   A.  Mm-hmm.

23   Q.  And so when we -- and I apologize for belaboring this, but

24   when you say she was on her phone, she actively had her phone

25   out while you all were deliberating about a verdict in the

1  jury room?

2  A.  Yes.  She had her phone out towards the end.  I don't know

3  what she was doing or who she was talking to, but she actually

4  was in a hurry to get it done, I think, the way she portrayed.

5  And I was sitting fairly close to her.

6  Q.  One of her comments on Facebook said something how about

7  she was so glad that it was the weekend.  And I believe the

8  verdict came out on a Friday.  Did she make any comments about

9  something that she wanted to do on the weekend or someone she

10 had talked to that she had plans with?

11             MS. GLATFELTER:  Your Honor, I'm going to object.

12             THE COURT:  It's sustained.

13             JUROR NUMBER █:  I don't --

14             THE COURT:  Ma'am, you don't need to answer that

15 question.

16 Q.  Would the juror ███████████████, the one that we're

17 talking about, or any other jurors, to your knowledge, would

18 they talk about other jurors?  Did you hear anything where

19 there was --

20             MS. GLATFELTER:  Objection, Your Honor.  It's not

21 relevant as to whether they're talking about other jurors.

22             THE COURT:  Sustained.

23             Mr. Rittgers, the purpose of this examination is to

24 allow you to inquire whether any extraneous information from

25 media sources, for example, became part of the jury

1  deliberations, and I'd ask you to limit your questions to

2  those topics.

3       MR. RITTGERS:  Thank you.

4  Q.  As I mentioned earlier, we have some information from the

5  Facebook posts from that juror ███████████████  that

6  people had commented on her page, and at least one comment was

7  a *cincinnati.com* article link.  Did that juror, ███████████

8  ██████████, did she ever mention to you any article that she

9  had read or a news story that she had heard about?

10 A.  No.

11 Q.  Did any juror -- not just -- I'm not just limiting this to

12 the woman to your left.  And you don't have to name the

13 particular juror.  But was there any commentary about things

14 that were read, news articles, television media or newspapers,

15 about the Sittenfeld trial?

16 A.  No.  Um, no.  The only thing close to it is -- maybe I

17 shouldn't mention it.  Um, no, she didn't.  But yeah, she was

18 on her phone.

19 Q.  What was close to it?  I mean, you can -- that's why

20 you're here, is to be -- the only -- there's -- you can't get

21 in trouble for anything, nor can another juror, for what you

22 tell us.  The only thing that could happen is if P.G. could

23 get a new trial.  So we're just here for brutal honesty.

24     So what would be close to that?

25 A.  One of the ladies could not make her mind up.  I mean, she

1    was on the fence from when she finally --

2              MS. GLATFELTER:  Your Honor, I'm going to object --

3              THE COURT:  Yes.

4              Hang on one second, ma'am.  So I want to explain

5    something to you, ma'am.  We're not inquiring into the way in

6    which deliberations proceeded or what anyone said about

7    whether the verdict should be guilty or not guilty or anything

8    of that nature.  The only question is whether people in the

9    jury room were discussing information about this case that was

10   not presented at trial.

11             So, for example, if someone were to say, "Well, I

12   don't know what they might have said at trial, but what I read

13   in the newspaper last night was that the real facts are this,"

14   something like that would be information that we would like to

15   know.

16             Other than that, the reasons people were voting one

17   way or another or whether they didn't want to do this or

18   didn't want to do that, we're not asking you about that at

19   all.

20             Does that make sense, ma'am?

21             JUROR NUMBER ▮:  Yes.

22             THE COURT:  Okay.  So now Mr. Rittgers can re-ask his

23   question, but he's only attempting to ask you whether people

24   were referring to information that was not presented in this

25   courtroom and instead was presented -- or they tried to

1    interject it based on things they heard outside of the

2    courtroom.

3           So go ahead, Mr. Rittgers.

4    Q.  So it doesn't have to -- as the judge said, it doesn't

5    have to be media accounts, though.  It could be "I was talking

6    to my spouse" or "I was talking to a friend at Starbucks."  It

7    can be anything like that.  And if it influenced the reason

8    why they voted, that's why we're here, is to talk about that.

9    Can you tell us that?

10   A.  Yeah.  Like I said, I knew she was on her phone.  I didn't

11   hold on conversations with her much at all, but she did -- you

12   know, she -- that's all I really know, is she was on her

13   phone.

14   Q.  And I believe you were talking about another juror, ███

15   ███████████████████████, who was having a tough time coming

16   to a decision.  And again, nothing that changed her mind about

17   something that she heard in the courtroom, the juror -- I

18   think we're talking about a third juror now who was having a

19   tough time coming to a decision?

20   A.  Uh-huh.

21   Q.  Did she mention something that might have influenced her

22   from outside the courtroom?  Anything?

23   A.  No, I don't believe so.

24   Q.  You recall during trial the stairway that you would go up

25   and down from the 9th to the 8th floor?

1    A.   Yes.

2    Q.   And there was a bathroom in that -- next to that

3    stairwell?

4    A.   Yes.

5    Q.   And then sometimes you and other jurors would line up in

6    that hallway leading into the courtroom?

7    A.   Yes.

8    Q.   On breaks, I believe a lot of the female jurors and male

9    jurors, they would use the bathrooms on the 8th floor?  Do you

10   remember that?

11   A.   No -- oh, well, I guess.  I don't believe -- we used the

12   one up to the 9th, a lot of us, so...

13   Q.   Do you remember hearing people like the press in the

14   hallway talking about their interpretation of the witness

15   testimony while you were standing in the hallway with other

16   jurors?

17   A.   Yeah.

18   Q.   And so --

19   A.   Not, I mean --

20   Q.   I'm sorry to interrupt you.  Go ahead.

21   A.   No.  I said yeah, I heard them.  I didn't pay much

22   attention to it.  I just tried to shut it down on my end.

23   Q.   But you were aware at the time during the trial as you

24   were standing in the hallway that people from the press were

25   interpreting their opinions about what they heard from the

```
 1   witness stand in your presence and other jurors' presence?
 2   A.  Yes.  They were usually talking on the phone.
 3   Q.  And did you use the 8th floor bathroom at all?  You were
 4   allowed to.  I'm just asking because it came to mind.
 5   A.  One time, I think.
 6   Q.  And in there, did you hear people --
 7   A.  You say I can't --
 8   Q.  Go ahead.  I'm sorry.
 9   A.  No, not in the bathroom, I did not.  I would hear them
10   coming around the corner because I'd be standing -- I went
11   down fairly early, and I would be standing there.
12   Q.  Do you remember approximately where you would line up in
13   terms of how -- you would have been the ██████████████████,
14   right?
15   A.  I was ██████.
16   Q.  ████████████████████████████?
17   A.  Yes.
18   Q.  And would you remember if I showed you pictures of what
19   some of those people looked like who were commenting about how
20   they interpreted the facts in the courtroom when you were in
21   the hallway?
22   A.  I might, but I wouldn't swear to it because --
23          MS. GLATFELTER:  Your Honor --
24   A.  -- I kind of ignored them.
25          MS. GLATFELTER:  -- I'm going to object to far
```

1  outside the scope of this particular hearing.  We're supposed

2  to be focused on what happened during the deliberation

3  process.  Now we're talking and we're introducing pictures of

4  possible media people in the hallway during trial?  This is

5  far afield.

6          THE COURT:  Well, it does go to, at least as

7  Mr. Rittgers has set it up, as to whether there may have been

8  some commentary that the jurors heard outside the walls of the

9  courtroom, so I'm going to allow him some latitude here.

10          MR. RITTGERS:  Thank you.

11 Q.  Without having to go into specific details about what you

12 heard from folks in the hallway who were either talking to

13 each other or on their cell phones, do you recall that

14 happening almost every day when you all were lined up in the

15 hallway?

16 A.  No, not every day.  It was -- usually, it was in the days

17 that we were waiting and they were trying to get into the

18 courtroom but wanting to talk on their phones to somebody

19 prior to going in, so...

20      But, like I said, I knew what they were talking about.  I

21 just didn't pay attention to what they were saying.  I

22 couldn't tell you.

23 Q.  Okay.  But you do recall that it was their interpretation

24 of what they had heard in the courtroom?

25 A.  Yeah.  And I remember Scott one time pushed them, and he

1    had them go back away from us because they were all right

2    there in the front where the men's room was.  He came out and

3    told them "No, you got to go down a way."

4    Q.  Do you recall anyone being interviewed?  There are a

5    couple of people that have indicated to us that there were

6    actual interviews of pundits, like talking heads, by the press

7    near you all while you were lined up.

8    A.  No, I don't.

9    Q.  Did any of the -- I believe the woman ███████████████

10   would meet with --

11   A.  Yeah.

12   Q.  Number █ would meet with Number █, and those two would

13   text each other, Number █ and Number █.

14   A.  Prob -- I didn't know they were texting each other.  I

15   knew people were on the phone, but...

16   Q.  And I don't know what they were doing in the -- I mean,

17   they would text each other and, like, meet at Starbucks before

18   the day started.

19   A.  Right, but --

20   Q.  Are you aware of any jurors having each other's cell

21   phones aside from Number █ and Number █, just cell phone

22   numbers?

23   A.  No, I didn't -- like I said, I was up there beside her in

24   our break room or whatever, and that's when I see her bringing

25   her phone out as soon as she walked out of there.  But what

```
 1  she was doing, I didn't know.
 2  Q.  Was there a spot -- did you leave your phone somewhere
 3  during the deliberations before you were going in, you
 4  personally?
 5  A.  Oh, me personally?  I turned it off when I entered the
 6  courtroom -- I mean the courthouse until time to leave and I'd
 7  turn it back on.
 8  Q.  Could you tell if Juror Number █'s phone was on during the
 9  deliberations?
10  A.  No, not for sure.
11  Q.  It just looked like she was reading it, from what you
12  could tell?
13  A.  That was my -- during deliberations?  Yeah, she was back
14  there reading it.  She was on her phone.
15  Q.  Reading something, and you're just not sure what?
16  A.  Yeah, I don't know.  Right.
17  Q.  Did she or anyone else mention "Hey, I was talking to
18  so-and-so and, you know, this is why I think our verdict
19  should be X"?
20  A.  No.  I mean, not from --
21  Q.  Go ahead.
22  A.  Not that I heard.
23  Q.  Is there anything that would lead you to believe that
24  someone was on social media or reviewing news articles about
25  the case at any point?  It doesn't have to be in the
```

```
 1   deliberation room, but while you were, like, waiting in the

 2   break room or had the pizza lunch?

 3   A.  No.  No.  I never -- if they did, they did it very well

 4   without me knowing it.

 5   Q.  ██████████████████████████████████████, she said

 6   something about one of the jurors being extremely biased

 7   against people who were of the same profession as P.G.

 8       Was there comments about how that -- how people outside of

 9   the 16 of you, or 12 of you, would believe the verdict, what

10   the verdict should be?

11           MS. GLATFELTER:  Your Honor, I'm going to object to

12   the process of deliberations and this being outside the scope

13   of this particular hearing.

14           THE COURT:  Yeah, I'm going to sustain that.  And

15   I'll add, I don't even understand what the question was, so...

16           But it's sustained.

17   Q.  Knowing that I represent P.G. and in my position, is there

18   anything that you think would be important for me to know as I

19   sit here today?

20           THE COURT:  About extraneous information in the jury

21   room.

22   A.  No, that I can think of.

23   Q.  Were there other --

24   A.  I know --

25   Q.  Go ahead.  I'm sorry.  I keep interrupting.
```

```
 1   A.   ████████ might know more, the other juror.  I kind of stayed

 2   to myself.

 3   Q.   ███████████████████████?

 4   A.   Yeah.  Wait, wait.  I was thinking the other -- yeah,

 5   ████████.

 6   Q.   Okay.

 7   A.   She might know.

 8   Q.   Have you talked to ████████ after the verdict?

 9   A.   I talked to no jurors after the verdict.  I work in a

10   medical building.  I kept up with them by knowing their number

11   instead of their name on all of them just about, except

12   ████████.

13   Q.   Is there a reason why you think ██████████████ might

14   know about Number █?

15   A.   Um, yeah.  They were closer together.  Like, they would

16   stand, one room -- we had two rooms, one where ███████████sat,

17   and then down the hall we -- another one.  So people were

18   split up there.  So her and ████████ would go down to that one,

19   where most of them usually went to the other one or that one

20   that --

21   Q.   Did you ever hear from Number █ about her thoughts about

22   what the verdict should be before the deliberations?

23   A.   No.

24            MR. RITTGERS:  May I have one moment, Your Honor?

25            THE COURT:  You may.
```

```
 1   (Pause in proceedings.)
 2          MR. RITTGERS:  I have no further questions, Your
 3   Honor.
 4          THE COURT:  Thank you, Mr. Rittgers.
 5          Does the government have any questions for this
 6   witness?
 7          MS. GAFFNEY PAINTER:  Briefly, Your Honor.
 8          THE COURT:  You may.
 9          MR. RITTGERS:  Thank you.
10          THE COURT:  Thank you.
11                        EXAMINATION
12   BY MS. GAFFNEY PAINTER:
13   Q.  Good afternoon.  As you know, I'm Megan Gaffney Painter,
14   and I represented the United States at the trial.  I just have
15   a few questions for you.
16       So you mentioned seeing Juror Number █ on her phone during
17   deliberations; is that right?
18   A.  No, not -- you mean back in the room?  Yes.
19   Q.  Let's separate out during breaks versus during
20   deliberations.  When you and the other jurors were
21   deliberating -- and, again, we don't want to know anything
22   that was said -- did you see Juror Number █ on her phone
23   during the deliberations?
24   A.  Yes.
25   Q.  Did you ever see what was displayed on Juror Number █'s
```

1  phone during deliberations?

2  A.  No.

3  Q.  Did Juror Number █ reference any conversations she had had

4  with others outside of the courtroom about the case at any

5  point?

6  A.  No.

7  Q.  And Juror Number █ did not reference any conversations she

8  had with anyone else about the case during deliberations; is

9  that right?

10 A.  Right.

11 Q.  Did Juror Number █ during deliberations reference any news

12 articles she had read about the case?

13 A.  Not that I can recall.

14 Q.  Did Juror Number █ reference during deliberations any

15 research she had done about the case outside of the courtroom?

16 A.  Not that I recall.

17 Q.  Now, you mentioned that you had heard some media comments

18 in the hallway when you were lined up to return to the

19 courtroom.  Did anything that you heard from those members of

20 the media affect your assessment of the evidence in this case?

21 A.  No.

22 Q.  Did you tell any of the other jurors what you heard the

23 members of the media say in the hallway?

24 A.  No.

25 Q.  Throughout the course of this trial but especially during

1   deliberations, did you follow the Court's instructions?

2   A.  Yes.

3           MS. GAFFNEY PAINTER:  May I have just a moment, Your

4   Honor?

5           THE COURT:  You may.

6   (Pause in proceedings.)

7           MS. GAFFNEY PAINTER:  One additional question.

8   Q.  Did any of the other jurors discuss what they had heard

9   the media say in the hallway during deliberations?

10  A.  Not with me, no.

11          MS. GAFFNEY PAINTER:  No further questions, Your

12  Honor.  Thank you.

13          THE COURT:  Thank you.

14          Mr. Rittgers?

15          MR. RITTGERS:  Very briefly, Your Honor.

16                      EXAMINATION

17  BY MR. RITTGERS:

18  Q.  The prosecutor mentioned that -- asked you about what

19  other jurors I believe had -- if they said anything about the

20  media in the hallway.  I believe you told us that you were

21  ████████████████████████████  to come into the courtroom?

22  A.  Yes.

23  Q.  There were other jurors that were in much closer earshot

24  than yourself to those conversations that were being had; is

25  that correct?

1  A.  Yes, probably.

2  Q.  And that happened on more than one occasion, that you

3  heard people speaking about their interpretations of what went

4  on in the courtroom while you were in the hallway?

5  A.  Yes.

6  Q.  The prosecutor asked you a question about if other jurors

7  had mentioned something that they had heard.  That was one of

8  the questions, I believe.  I get the sense that there might

9  have -- from your answer, that there might have been, kind of,

10  factions of people speaking on their own in deliberations

11  without the whole group or outside of deliberation room?  I'm

12  talking about jurors.

13          MS. GLATFELTER:  Objection, Your Honor.

14          THE COURT:  Sustained.

15          Ma'am, you don't need to answer that question.

16  Q.  Is there anything that you want to add based on the

17  prosecutor's questions to you?

18  A.  Not that I can think of.

19  Q.  Thank --

20  A.  Back in the deliberation room, we, um --

21          THE COURT:  Ma'am, before you say anything further, I

22  don't want you to talk about the process of deliberations, in

23  other words, you know, how it went or what you felt about

24  other jurors or how you thought the process was going.  The

25  questions are strictly limited to whether there was extraneous

1  information that was interjected into the deliberations.  So

2  other than references to news articles or conversations that

3  people had with people that, you know, were outside the

4  courtroom, things like that, that's all we're asking you

5  about.  So I'd ask you not to comment on the deliberations

6  beyond that.  Do you understand that, ma'am?

7           JUROR NUMBER ▮:  Yes.

8           THE COURT:  Okay.

9           Go ahead, Mr. Rittgers.

10 Q.  With what the judge just indicated, is there something

11 that you would like to say within those bounds?

12 A.  No.

13          MR. RITTGERS:  No further questions, Your Honor.

14          THE COURT:  Thank you.

15          And ma'am, I think we're done.  The only thing I

16 would note is that, at least for the time being, this is

17 what's called an *in camera* proceeding, which means that this

18 is sealed.  It may be unsealed at a certain point, so you may

19 see media account references to this down the road.  But at

20 least for the time being, I'd ask you not to discuss the

21 contents of this hearing with anyone else unless and until you

22 hear it's been unsealed.  All right?

23          JUROR NUMBER ▮:  Yes.

24          THE COURT:  Thank you very much.  And thank you

25 again, ma'am, for your willingness to participate.  I will

1   tell you, typically this -- you know, once you're done with

2   the jury deliberations, typically you're done in the case.  I

3   apologize that it didn't work out that way this time, but I do

4   appreciate your willingness to appear here today.  So thank

5   you very much.

6           JUROR NUMBER ▮:  You're welcome.

7           THE COURT:  Very good.  All right.  Bye-bye.

8           JUROR NUMBER ▮:  Bye.

9           THE COURT:  All right.  So are you turning off the

10  videoconference?

11          COURTROOM DEPUTY:  Yes.

12          THE COURT:  Okay.  I just -- so it's still displayed

13  on the screen there.

14  (The videoconference concluded at 12:16 p.m.)

15          THE COURT:  Okay.  Let's bring in the next juror.

16          And Mr. Rittgers, I would just say, you know, I

17  appreciate you trying to probe the edges, but I'm trying to be

18  pretty adamant about the limitation that I imposed in the

19  order, and I'm going to continue to be fairly insistent about

20  observing that boundary.  It's not directed at you personally.

21  I understand you're representing a client, but I've sort of

22  ruled what I ruled, and I'm not revisiting that at this point.

23          MR. RITTGERS:  I understand, Your Honor.  Thank you.

24          THE COURT:  Thank you.

25  (Pause in proceedings.  Juror Number ▮ entered the courtroom

```
 1   at 12:20 p.m.)
 2           THE COURT:  You can just follow Scott over here.
 3           COURTROOM DEPUTY:  If you'll just stop there and
 4   raise your right hand?  Your right hand.
 5           JUROR NUMBER ▮:  Oh, God.
 6   (Juror Number ▮ was duly sworn by the courtroom deputy.)
 7           JUROR NUMBER ▮:  Yes.
 8           COURTROOM DEPUTY:  Have a seat up there, please.
 9           THE COURT:  You may be seated.  Good morning, ma'am.
10           JUROR NUMBER ▮:  Good morning.
11           THE COURT:  Am I correct that you were Juror Number ▮
12   in the Sittenfeld matter?
13           JUROR NUMBER ▮:  Yes.
14           THE COURT:  Okay.  And there's going to be a few
15   questions for you this morning, but I want to just start by
16   saying something.  First of all, it's very unusual to have a
17   proceeding at which jurors come and testify after a trial.
18   It's just not typically something that happens.  Something
19   sort of odd happened in this case, and there were some
20   comments by one of the jurors on social media during the
21   course of the trial, and so that's led to some questions about
22   whether or not extraneous information may have been introduced
23   during deliberations.
24           And what I mean by extraneous information would be
25   information about this case that didn't come from inside the
```

1   four walls of the courtroom, but somebody saying "I don't

2   know, I read in the newspaper last night" or "I don't know, I

3   heard a television story about this case that this happened or

4   that happened."  So it's information that didn't come from the

5   witness stand that somehow nonetheless became part of jury

6   deliberations.

7         So the reason that you're here this afternoon, with

8   sincere appreciation from the Court, is to allow the parties

9   to ask you questions about that topic and that topic alone.

10  And I want to tell you going in, there's no indication that

11  you're in any kind of trouble, you can't be in any kind of

12  trouble based on your testimony that you give today.  This is

13  just strictly to try to figure out whether or not outside

14  information somehow made its way into the jury deliberations.

15  That's the only thing that I'm going to allow the attorneys to

16  ask you questions about.

17        They're not asking you questions about why you voted

18  one way or another or why anybody else voted one way or

19  another or what the deliberations were or anything like that.

20  It's only about whether outside information may have made its

21  way into the jury room.

22        Do you understand what I'm saying?

23        JUROR NUMBER ▊:  Yes.

24        THE COURT:  Okay.

25        So with that, Mr. Rittgers, you may begin.

```
 1              MR. RITTGERS:  Thank you, Your Honor.
 2                          EXAMINATION
 3   BY MR. RITTGERS:
 4   Q.  Thanks for coming in.  As the judge indicated, you're not
 5   in trouble at all.  Randomly, we picked two jurors just to
 6   talk to as opposed to --
 7   A.  You randomly picked two jurors?
 8   Q.  We got the choice.  So, as I told the other juror, we
 9   picked two people that we thought might be really honest.  And
10   to be very honest with you, we already spoke with Juror Number
11   ██ who indicated that she and you had each other's cell phones.
12   So that's why you're one of the two that we picked to get to
13   talk to.
14       Are you aware about any of the social media posts that she
15   had been posting during the trial?  Juror Number ██?
16   A.  Clarify that.
17   Q.  She -- there was some -- on Facebook, Juror Number ██, who
18   would have been seated ████████████ posted some things
19   on Facebook.  She would check into the courthouse during
20   deliberations, talk about the fact that she was seated as
21   Juror Number ██, said some things like she wished Juror Number
22   ██'s tongue would fall out, Juror Number ██ didn't know about,
23   you know, comfortable silence.  She made some references to a
24   few other jurors -- I forget exactly -- someone about having a
25   bias against politicians essentially, and a few other things.
```

1    So she was on Facebook commenting, which is why we now are

2 doing some inquiries.  And we've talked to her -- Juror Number

3 ▮ -- briefly.  She indicated that she and you had each other's

4 cell phones.  So that's one of the reasons why we picked you

5 just to talk to you.

6    As long as you're honest today, there's absolutely nothing

7 --

8 A.  Oh, I'm going to be honest.  But I want to explain

9 something.

10 Q.  Yeah.

11 A.  The only reason she had my cell phone and I had hers was

12 because we met for coffee at Starbucks.  That was it.  I know

13 better than to do anything like that.  I don't have any social

14 media, never had social media, never had Facebook.  I don't do

15 that.  That's just not who I am or my character.

16    Now, what I do know is she mentioned --

17    Did I see it?  No.

18    She mentioned that she had a Facebook and something about

19 a tongue falling out.  I don't know.  That's all I remember.

20 That's not something I focused on.  That's the honest truth.

21 Q.  When did she mention that?

22 A.  This was early on, I think, very early on.  But it had

23 nothing to do with the trial, per se, not that I know of

24 anyway.

25 Q.  When you say she mentioned that, she mentioned that she

1   said something about a juror's -- wanting a juror's tongue to

2   fall out to you while you all were seated during the trial?

3   A.   Not during the trial.  We were upstairs in the lunchroom.

4   Q.   I apologize.  Not in the courtroom, but during the time

5   when we were having the trial.

6   A.   Yes.

7   Q.   Is that fair?

8   A.   Yeah, yeah.  But she didn't say it directly to me.  She's

9   sitting here, I'm sitting here, and this other fellow is

10  sitting here, the other two gals are here.  She just said it.

11  So it wasn't directed at me, per se.  It was just -- she just

12  said it.

13  Q.   She said that she was posting something about it?

14  A.   No.  She said -- she was on her phone, and she had said

15  about her tongue falling out, or something like that.  She had

16  said that.  But it wasn't directed at anybody.  It was just

17  she said it, sitting there on her phone.

18  Q.   Gotcha.  There is a Court -- not Judge Cole.  There is an

19  opportunity potentially that there might be a download of a

20  cell phone, and you can see deleted things on a cell phone,

21  not on yours --

22          MS. GLATFELTER:  Objection, Your Honor.  This is not

23  relevant for this witness in terms of explaining to her what

24  other things may happen.

25          THE COURT:  Where are you going with this,

 1    Mr. Rittgers?

 2              MR. RITTGERS:  Well, I'm just letting her know the

 3    basis for future questions to her and honesty and how that --

 4              JUROR NUMBER █:  What future questions?  I have

 5    nothing to hide.  What -- what am I here for?  I have nothing

 6    to hide.

 7    Q.  Yeah.  So during the deliberations, and that's in the room

 8    when you guys are talking about the verdict, there -- we are

 9    asking if anyone mentioned anything about "I was talking to my

10    spouse last night" or "I read something on the news."  Because

11    one of the comments on Juror Number █'s Facebook post about

12    this was a *cincinnati.com* link.

13    A.  I don't know anything about any of that.

14    Q.  I know you're not on social media, but did she ever

15    mention anything?  Or did anyone ever say --

16    A.  Oh, no, no, no, no.  Not to me, no.  Not to me.

17    Q.  Were there conversations that she was having with others

18    where you weren't privy to them?

19    A.  I don't know.  To be honest, I don't know.  There was

20    always -- went to lunch, there was always four or five of us.

21    We didn't talk about really anything.  Family?  I mean, no,

22    not that I'm aware of, not that I can sit and say yes.  No, I

23    can't.

24    Q.  Did people talk about the media presence?

25    A.  Outside?

```
 1    Q.   Yeah.

 2    A.   A little bit.

 3    Q.   Can you tell us about that?

 4    A.   Um, okay.  Let me think.  That Melvin -- wait a minute.

 5    He's on Channel 9.  He was always outside.

 6    Q.   A male reporter?

 7    A.   Male reporter.  I can't think of his name, but I said,

 8    "Oh, my God, he's on Channel 9, I've seen him before" when he

 9    was walking through and he was outside when we come out for

10    lunch that one time.  That was about it.  Is that what you're

11    asking?

12    Q.   Sort of.  I mean, did you hear them talking when you all

13    were lined up in the hallway about their interpretation of

14    what was going on in the courtroom?

15    A.   No.

16    Q.   Okay.  You were aware that they were in the same hallway

17    as you, right?

18    A.   A few times.  A few times.  Not always.  Are you talking

19    about when we was lined up?

20    Q.   Yeah.

21    A.   They weren't always there.  They would walk back and

22    forth.

23    Q.   And they were sometimes on the phone talking about their

24    interpretation of what was happening in the courtroom?

25    A.   Who?
```

1   Q.   The news media --

2   A.   The jurors or the media?

3   Q.   Media or even non-media, people that weren't jurors, in

4   your presence.

5   A.   Not sure about conversations on phones or anything like

6   that, to be honest with you.  I don't know.

7   Q.   Okay.

8   A.   Am I supposed to have heard something?  Because I -- I

9   don't remember.  I didn't have my phone out in the hallway.

10  Q.   Yeah.  I'm not asking if you were on your phone.  I'm

11  asking about what you heard when you were waiting in the

12  hallway about people's interpretations about what happened in

13  the courtroom.

14  A.   Nothing comes to mind, to be honest.  I really don't

15  remember.  I don't -- nothing comes to mind.  Must not have

16  been that important or I would remember it.

17  Q.   Okay.  So you don't even remember seeing people in the

18  hallway very frequently while you were lined up there?

19  A.   There was people walking back and forth here and there.

20  Q.   Okay.  But you don't remember hearing anything?

21  A.   Hearing?

22  Q.   Their conversations.

23  A.   Not really, nothing -- I mean, no.  I mean, I'm sure

24  people were talking, but I don't remember a certain

25  conversation or anything.

1  Q.  How about in the bathroom on the 8th floor?  When that

2  would be used by you or other jurors, did you hear comments in

3  there?

4  A.  On the 8th floor?

5  Q.  This bathroom right here outside the courtroom.

6  A.  Nothing comes to mind, to be honest with you.  Nothing

7  sticks out in my mind.

8  Q.  Do you recall using that bathroom right outside this

9  courtroom?

10  A.  Down the hall to the left?

11  Q.  Yeah.

12  A.  Yes.

13  Q.  And there were other people in the bathroom, not just

14  jurors, correct?

15  A.  Gosh, I don't remember.  To be honest, I do not remember

16  that.  I don't recall that, no.  I do not remember that.  I

17  think one juror and I went in there, but I couldn't even tell

18  you who that was.

19  Q.  How many text messages do you think you have on your phone

20  with Juror Number █, if we were to receive that phone?

21  A.  Two, three, tops.

22  Q.  Just two or three?

23  A.  Yeah.

24  Q.  Okay.  And in those text messages, what you're telling us

25  today in sworn testimony is that there would be nothing about

```
 1   the trial in those text messages?
 2   A.  No.  You can see them right now.  No, absolutely not.
 3            MR. RITTGERS:  Would the Court permit?
 4            THE COURT:  No.
 5       I mean, you don't mind, ma'am?
 6            JUROR NUMBER █:  This is a company phone, first off.
 7   But I can swear to you -- no.  We talked about meeting at
 8   Starbucks.  That is it.  That's it.  There is nothing that I
 9   have, not --
10            MS. GLATFELTER:  Your Honor, part of our responses,
11   part of our discussion here has been juror privacy.
12            THE COURT:  Right.
13            MS. GLATFELTER:  She has sworn she's had messages
14   about Starbucks.  That's it.  I don't think we need to subject
15   her to looking through her phone for text messages for this
16   inquiry.
17            THE COURT:  Yeah.
18            I don't think we need to, ma'am.  If you're -- if you
19   don't -- if it doesn't bother you at all and it's just a few
20   text messages and you wouldn't mind showing them to
21   Mr. Rittgers, but I don't want you to feel that you have to,
22   because you definitely do not have to.
23            JUROR NUMBER █:  I don't have to, I don't have to,
24   but I can assure you that -- seriously, that's all it was.  I
25   was, like, ten minutes late.  We were supposed to meet at,
```

1   like, eight o'clock or something.  I was, like, "I'm running

2   ten minutes late," or something like that.  "No worries."

3   Nothing about the trial.  I guaranty it, guaranty it.  No.

4   That's not who I am.  No.

5   Q.  Have you spoken with Juror Number █ since the verdict?

6   A.  Number █?  Yes -- since -- after the verdict?

7   Q.  Yeah.

8   A.  Yes, once.

9   Q.  Was it about her social media posts?

10  A.  No.  Actually, I take that back.  It was twice.  She come

11  out -- I was on my way home, and I guess she and another juror

12  was here.  She was walking to her car, and she had called.

13  She said, "Oh, my God.  The judge talked to me."

14      I said, "Well, what about?  Are you in trouble?"

15      And she said, "I don't know."  She said, "I think it's

16  about my Facebook."

17      And, to be honest with you, I don't remember what else.

18  It was cut very, very short.

19          MR. RITTGERS:  Your Honor, may I have one moment?

20          THE COURT:  You may.

21          JUROR NUMBER █:  But there was nothing else about

22  that.

23  (Pause in proceedings.)

24          JUROR NUMBER █:  I don't remember any of these

25  conversations, for God's sake.  This is the least thing on my

```
 1   mind.
 2   (Pause in proceedings.)
 3   (By Mr. Rittgers)
 4   Q.  I assume you liked Juror Number █?
 5   A.  Yes.  She seemed like a good gal.
 6        MS. GLATFELTER:  Your Honor, I'm going to object to
 7   the relevance.
 8        THE COURT:  Yeah.  Where are we going with this,
 9   Mr. Rittgers?
10        MR. RITTGERS:  Just a little bit of leeway just to
11   ask a couple of questions, or I can move on.
12        MS. GLATFELTER:  Mr. Rittgers has had a lot of leeway
13   today.
14        MR. RITTGERS:  May I ask a question, Your Honor?
15        THE COURT:  You may ask a question, Mr. Rittgers.
16   Q.  Ma'am, did you see Juror Number █ on her phone during the
17   deliberations?
18   A.  During deliberations?
19   Q.  Yeah.
20   A.  I don't believe so, but I wasn't watching her the whole
21   time.  I was not watching her the whole time.
22        MR. RITTGERS:  I have no further questions, Your
23   Honor.
24        THE COURT:  Thank you, Mr. Rittgers.
25        MS. GAFFNEY PAINTER:  Briefly, Your Honor, if I may?
```

```
 1              THE COURT:  You may.

 2                        EXAMINATION

 3   BY MS. GAFFNEY PAINTER:

 4   Q.  I'm Megan Gaffney Painter.  I represented the United

 5   States at trial, as you know.  I just have one or two

 6   questions for you.

 7   A.  Sure.

 8   Q.  During the deliberations, did any juror reference or speak

 9   about anything outside of the courtroom:  a conversation with

10   someone about the case, a news article, research they had done

11   on the internet, anything outside of what was presented in the

12   courtroom?

13   A.  I don't think so.  I don't -- I wasn't approached with it,

14   let's put it that way.  I really can't say.  I don't -- I

15   don't think so.  I don't remember anything like that.  Nothing

16   sticks out in my mind.  No.

17              MS. GAFFNEY PAINTER:  No further questions, Your

18   Honor.

19              THE COURT:  Thank you.

20              MR. RITTGERS:  No further questions, Your Honor.

21              THE COURT:  Very good.

22              Ma'am, well, thank you for coming in.  I do want to

23   again tell you that I apologize that your jury duty extended

24   beyond the confines of just deliberating and returning a

25   verdict.  The Court very much appreciates your service.  The
```

1    Court appreciates your willingness to appear today.  This is

2    very unusual.  It was unfortunately a result, as Mr. Rittgers

3    said, of some social media posts that one of the jurors did

4    during trial.  It's just incumbent upon us to try to

5    investigate that a little bit to see if there was any external

6    influence on the verdict.  That was the only reason you're

7    here today.  So it had nothing to do with your service.  It's

8    not designed to reflect on you in any way.  We just needed

9    that additional information.  But I very much appreciate you

10   coming here this afternoon.

11              JUROR NUMBER ▮:  Thank you.

12              COURTROOM DEPUTY:  Admonish?

13              THE COURT:  Oh, ma'am, one other thing.  At least for

14   right now, this hearing being conducted is what's called *in

15   camera*, which means -- as you see, the court is empty.  So

16   this is sealed for right now.  It may be that once we've had a

17   chance to review what people said today we're going to unseal

18   this, so you may see media accounts down the road about the

19   testimony that was provided here today.  But until that

20   happens, I would ask you not to discuss what happened during

21   this hearing with anybody else.  Okay?

22              JUROR NUMBER ▮:  I won't.  But I do have to ask a

23   question.

24              THE COURT:  Sure.

25              JUROR NUMBER ▮:  If I may?

1       THE COURT:  You may.

2       JUROR NUMBER █:  Me coming in here today is a

3   question of integrity, and I would like to know why you have

4   singled me out amongst all the jurors.  That's really a

5   concern to me.  This is embarrassing to begin with that all

6   this even happened, and I want to know why I was singled out.

7       THE COURT:  And let me address that, and then

8   Mr. Rittgers may want to say something as well.

9       So as you observed during your testimony, you heard

10  from one of the other jurors that a couple of jurors got

11  questioned after the hearing.  Mr. Rittgers, on behalf of his

12  client, asked to be able to talk with all of the remaining

13  jurors.  I thought that would be too big an imposition on all

14  of these people who have already given time from their lives

15  to participate in the criminal justice system.

16      So I issued an order allowing them to pick,

17  essentially at random, two jurors from the remaining ten to

18  talk to after we talked to the two who were most directly,

19  kind of, involved, either because one was the comment on

20  social media and one was the juror about whom she had said

21  something on social media.  So those two were talked to, which

22  left ten of the 12 jurors.

23      And I said rather than talk to all ten and bring them

24  all in and inconvenience them all, could you pick two to do

25  that, and he picked two jurors.  And I think, as he said, he

1  picked you, in part, because one of the jurors we talked to

2  had mentioned that she had texted with you.  I think that's

3  all it was.

4      So it wasn't any way a reflection on you; it was more

5  a reflection on information that had been gleaned from those

6  other two jurors.  Does that make sense?

7      JUROR NUMBER █:  Yes.  And is everybody satisfied, or

8  will I be called back?

9      THE COURT:  Oh, you're done testifying.  I mean,

10  there may be -- they may ask to follow up with some other

11  jurors.  I don't know, and I don't know -- we'll have to rule

12  on that.  But I think for right now this is over and that's

13  all you'll have to do.  Again, I do apologize that you had to

14  come down.

15      JUROR NUMBER █:  Thank you.

16      THE COURT:  All right.  Very good.

17  (Juror Number █ exited the courtroom.)

18      THE COURT:  You may be seated.

19      Mr. Rittgers, anything further?

20      MR. RITTGERS:  Your Honor, we would just make a

21  motion, based on what the juror testified to, to preserve her

22  phone.

23      THE COURT:  Preserve whose phone?

24      MR. RITTGERS:  Juror Number █'s phone.  We'd also --

25      THE COURT:  On what grounds?

1          MR. RITTGERS:  She indicated that she -- we didn't

2   have an opportunity to see the phone, and she did indicate

3   there were back-and-forth text messages with Juror Number ▌,

4   who we know was --

5          THE COURT:  About meeting for coffee, yeah.

6          MR. RITTGERS:  That's what she said.

7          THE COURT:  Yeah.  That motion is overruled.

8          MR. RITTGERS:  And, Your Honor, based on the fact

9   that Juror Number ▌ -- there is testimony now and evidence

10  Juror Number ▌ was on her phone during deliberations, at the

11  end of the deliberations, ultimately voted to convict on two

12  counts, and Juror Number ▌ indicated she heard people talking

13  about their interpretation of witnesses and testimony when

14  they were lined up in the hallway, we would renew our motion

15  for a forensic evaluation.

16         THE COURT:  Well, I don't see how the latter in any

17  way relates to the forensic evaluation of the phone.  What

18  does press comments have to do with a forensic evaluation of a

19  phone?

20         MR. RITTGERS:  I agree with you on that.

21         THE COURT:  Okay.  So you're predicating it on the

22  fact that one of the two jurors today testified that Juror ▌

23  was on -- may have been on her phone at some point during

24  deliberations.  But as the juror who testified today said, she

25  has no idea what was displayed on the phone.  I guess for all

1   she knows it could have been her playing a game on her cell

2   phone during deliberations.

3           MR. RITTGERS:  It's possible.  But at this point, we

4   know that Juror Number ▓ was on her phone at the end of

5   deliberations.  Juror Number ▓ was communicating with third

6   parties throughout the trial from the beginning of *voir dire*.

7   Third parties were mentioning P.G. Sittenfeld on her Comments.

8   Third parties were putting URL links to *cincinnati.com*

9   articles which were very disfavorable to Mr. Sittenfeld --

10          THE COURT:  Links or link?  You used plural.

11          MR. RITTGERS:   Cincinnati.com link.

12          THE COURT:  It was a single link, right?

13          MR. RITTGERS:  But there were multiple articles in

14  that link.  That page was dominated by Sittenfeld news, and

15  every single article was absolutely against Sittenfeld.

16          THE COURT:  Well, that link, I believe, was the first

17  day of trial, right?

18          MR. RITTGERS:  It might have been.

19          THE COURT:  So you're saying that the articles on

20  that link on the first day of trial were negative to

21  Mr. Sittenfeld?

22          MR. RITTGERS:  Horribly negative.  I mean, without

23  any objective -- I belive Your Honor would say that -- I think

24  it was three or four of the six that were seen within that

25  link were absolutely negative towards Sittenfeld.

```
 1              THE COURT:  Okay.

 2              MS. GLATFELTER:  The question in the hearing today

 3    was whether there was any extraneous influence.  That is the

 4    question.  They have proven no additional extraneous influence

 5    to justify looking at a juror's cell phone.  There is nothing.

 6    Even if she was looking at something on her phone, it did not

 7    influence the deliberations, as we've heard from every single

 8    juror that has testified under oath.  The Court has already

 9    found her credible in regard to whether she clicked on the

10    link or not, and there is nothing here that has changed the

11    credibility on that matter.

12              THE COURT:  Mr. Rittgers?

13              MR. RITTGERS:  I won't relitigate what we've already

14    briefed.  Juror Number █ has deleted things.  We know all

15    that, and I won't get more into that here.

16              I had mentioned the standing up outside the hallway,

17    and I conflated it with needing the forensic, which I agree

18    with you, Your Honor.  But I do mention that again because

19    Juror Number █ and █ -- or Juror Number █ and █ who testified

20    today, from my understanding of where all these conversations

21    were taking place, would have been farther away than at least

22    11 or 12 jurors to communications about interpretations of

23    what lawyers and other talking heads had to say about what

24    they were interpreting was happening inside the courtroom.

25              At least now we have one juror who doesn't have much
```

1    of a recollection, although she recognized as people there and

2    talking to the press corps.  Another juror has at least enough

3    recollection to know that there were comments about these

4    talking heads' interpretation of what was happening inside the

5    courtroom during the trial and at multiple points during the

6    trial within earshot of jurors and in much closer earshot to

7    many other jurors who we have not spoken with or inquired.

8            So we would ask to inquire with those other jurors.

9            MS. GLATFELTER:  Again, the question is whether there

10   is extraneous influence that affected the deliberations.  We

11   --

12           Regardless of the fact that the media is making

13   comments, whether the media is making comments, posting

14   articles, the question is whether the jurors considered that

15   information during their deliberations.  Every witness we've

16   had in here, every juror has testified that there was no

17   extraneous influence.  Just because the media is out there

18   doesn't mean it translates into an extraneous influence.

19   There is no further basis for inquiry, and there is no further

20   basis for a forensic exam of anyone's phone.

21           THE COURT:  Yeah.  So where the Court is at this

22   point -- obviously, I've allowed some inquiry into the jury.

23   It's very unusual to allow inquiry with individual jurors

24   after a verdict has been returned.  Out of an abundance of

25   caution, I have allowed some limited inquiry here with regard

1 to, at this point, four members of the jury.  I recognize that

2 it's an odd situation where a juror was posting on social

3 media during trial.  I believe I have relatively extensively

4 outlined my views on that topic in the opinions that I've

5 issued to date with respect to the extent to which they

6 provide the basis for further inquiry.  I have allowed further

7 inquiry as to two additional jurors.  I've not heard anything

8 during the inquiry today that would change my view with

9 respect to the need for additional inquiry.

10    So, obviously, Mr. Rittgers you are free to include

11 in your post-trial motions argument based on the Facebook

12 comments by one of the jurors and the extent to which you

13 believe they may have undermined the verdict.  I'm not

14 precluding you from making arguments in that regard.

15    But in terms of the need for additional evidence, I

16 believe that nothing that I've heard today has changed my view

17 that the evidence-gathering phase of this should be over, and

18 so I'm not inclined to allow additional evidence-gathering

19 from the jurors on this topic.

20    Of course you have preserved your objection to

21 whether you've had an opportunity to have a meaningful

22 investigation of the potential for jury bias.  You know, you

23 can certainly present that argument in your post-trial

24 motions.  To the extent an appeal is necessary down the road,

25 you can certainly present that argument on appeal.

1          But the Court believes that the evidence-gathering

2     phase of this, at least with respect to interviewing jurors

3     about what happened in the jury room, should be and is over.

4          I'll note that, and I think we just saw with regard

5     to the juror who was here today, that these jurors see this as

6     an immense invasion of their privacy.  They see it as casting

7     a shadow on their integrity.  Despite the Court's best efforts

8     to make it clear to this juror that this proceeding was in no

9     way meant to do that, I think it's inherently problematic to

10    bring jurors in to discuss what happened in the jury room

11    after a trial is over because I think it leads them to believe

12    that in some way they did not faithfully discharge their

13    duties as jurors.

14          And, you know, beyond Juror Number █, who I think was

15    violating the admonition that was given by the Court

16    repeatedly during trial, you know -- and we've already

17    discussed and will continue to discuss the impact, if any, of

18    that on the verdict.  But I just don't think there is any

19    reason to believe that any of these jurors did not faithfully

20    discharge their duties as jurors.

21          And even with regard to Juror Number █, as I've

22    already found, I believe she was credible in saying she had

23    not clicked on that link and that she had not considered

24    extraneous information, again without prejudice to your

25    ability to continue to raise that in post-trial motions.

1          But I'm just really hesitant to allow further inquiry

2    of these jurors recognizing the impact that it has on them.

3    We've already asked them to give two and a half weeks of their

4    life to the criminal justice system here, and I think this

5    needs to be at an end.  So that's where I'm at on this,

6    again, without prejudice to your ability to raise the

7    substance of any of the evidence that we've already received

8    in post-trial motions.

9          So do the parties understand where I am on this at

10   least?

11         Mr. Rittgers?

12         MR. RITTGERS:  Yes, Your Honor.

13         THE COURT:  Very good.

14         MS. GLATFELTER:  Yes, Your Honor.

15         THE COURT:  Any questions?

16         MS. GLATFELTER:  Not from the government.

17         THE COURT:  Okay.  There is one additional issue.  I

18   believe -- you know, the Federal Rules don't really provide

19   for this type of proceeding, so it's all a little bit of

20   reasoning by analogy, but I think there may be witness fees

21   that are due to both the witness who testified by video and

22   the witness who showed up, and that there may be some mileage

23   charges that are due.  I am informed that I don't think the

24   Court can pay that.

25         Is that right, Scott?

```
 1              COURTROOM DEPUTY:  We cannot pay the jurors out of
 2     the juror fund for them coming in.  They would need to be
 3     treated as witnesses for reimbursement.
 4              THE COURT:  Okay.  So there is no -- this is a rare
 5     enough occurrence that there isn't a little box that I can
 6     check to get these people paid the fees to which I believe
 7     they're entitled.  So I think since --
 8              Mr. Rittgers, since it was Mr. Sittenfeld that
 9     requested this -- you know, I don't think the fees are
10     meaningful, but I think I'm going to need to attach them to
11     you -- or to your client.
12              MR. RITTGERS:  We have no objection.
13              THE COURT:  Okay.  Very good.  I just don't really
14     know what to do about it beyond that.  Very good.
15              Anything else we need to put on the record before we
16     close the proceedings today?
17              The government?
18              MS. GLATFELTER:  No, Your Honor.  Thank you.
19              MR. RITTGERS:  No, Your Honor.
20              THE COURT:  Very good.  All right.  Thank you,
21     everyone.
22              COURTROOM DEPUTY:  All rise.  Court is in recess.
23
24     (The proceedings concluded at 12:50 p.m.)
25
```

1              **C E R T I F I C A T E**

2

3      **I CERTIFY THAT THE FOREGOING IS A REDACTED TRANSCRIPT FROM**

4  **THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.**

5

6  **/s/Maryann T. Maffia     September 6, 2022**

7  **Maryann T. Maffia, RDR**
   **Official Court Reporter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25