<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                             *   *   *
 3

 4   UNITED STATES OF AMERICA,    : Case No. 1:20-cr-00142-1
                                  :
 5            Plaintiff,          : Jury Trial, Day 2
                                  : Wednesday, June 22, 2022
 6        - v -                   :
                                  : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a  :
       "P.G. Sittenfeld,"         :
 8                                :
              Defendant.          : Cincinnati, Ohio
 9
                             *   *   *
10       EXCERPTED PROCEEDINGS - TESTIMONY OF PHILIP DENNING

11     BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                           *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                           *   *   *

25
</pre>

```
 1                    P R O C E E D I N G S

 2              (In open court at 3:04 p.m.)

 3                        *   *   *

 4         THE COURT:  Does the government intend to call

 5    another witness?

 6             MR. SINGER:  Yes, Your Honor.  The government calls

 7    Phil Denning.

 8             THE COURT:  Very good.

 9        (Government witness, Phil Denning, sworn.)

10             MR. SINGER:  May I proceed, Your Honor?

11             THE COURT:  You may.

12                     DIRECT EXAMINATION

13    BY MR. SINGER:

14    Q.   Good afternoon.

15    A.   Good afternoon.

16    Q.   Can you please state your name and spell it for the jury,

17    please.

18    A.   Yes.  My name is Philip Denning, P-h-i-l-i-p,

19    D-e-n-n-i-n-g.

20    Q.   Mr. Denning, where do you work?

21    A.   Where do I work now?

22    Q.   Yeah.

23    A.   I work for the Port of Greater Cincinnati Development

24    Authority.

25    Q.   What is the Port of Greater Cincinnati Development
```

1   Authority?

2   A.   The port is a quasi-public economic development agency

3   which focuses on redevelopment of blighted property, the

4   creation of jobs and, specifically, industrial jobs in

5   Hamilton County.

6   Q.   Is it generally called the port?

7   A.   The port, yes.

8   Q.   So if I call it "the port," you understand what I'm

9   talking about?

10  A.   Yes.

11  Q.   And what is your role with the port?

12  A.   I'm an executive vice president, and I focus most of my

13  time on neighborhoods and neighborhood development.

14  Q.   Can you describe what you do as an executive vice

15  president with the port?

16  A.   Certainly.  The -- one of the oddities of the port is

17  that we have a few entities.

18       For example, one of the managed entities that we take

19  care of is the Hamilton County Land Bank which you may have

20  heard about, and it focuses on blighted and vacant properties.

21       And, in addition to management of the land bank, I focus

22  on -- I manage a team of 10 or 15 staff that focus on

23  commercial development and residential development, new

24  construction, and affordable housing.

25  Q.   Can you just describe what the land bank does?

1    A.    Yes.  The land bank is a separate entity created by the

2    State of Ohio that has its own board.  And the land bank's

3    role, really, is to take abandoned property and move it back

4    to productive use and find new investment for it.

5    Q.    Prior to working with the port, where did you work?

6    A.    I worked for the City of Cincinnati, and specifically the

7    department of community and economic development.

8    Q.    What did you do with the community and economic

9    development department?

10   A.    My most recent role there was the director of the

11   department.  But I was in a number of varying roles over my

12   five or six years at the City of Cincinnati.

13   Q.    And is that department generally called the economic and

14   development department?

15   A.    Yes.  And you may hear it short-handed to DCED.

16   Q.    Thank you.  And what does the economic development

17   department do?

18   A.    The department of community and economic development has

19   a role that is, in a lot of ways, similar to the port, focused

20   on economic development, job creation, attracting private

21   investment.  There are a number of neighborhoods and places

22   inside our county or city that don't experience growth or

23   investment, and so it's to change that.

24   Q.    And how does it attempt to change that?

25   A.    The City of Cincinnati has a variety of tools focused on

1  real estate and job creation, job creation, tax credits, real

2  estate development incentives like tax abatements or tax

3  increment financing, and so using those tools and a few

4  others, essentially attracting investment to the city.

5  Q.   Okay.  Before we get into those, can you kind of walk us

6  through your employment history with the economic development

7  department?

8  A.   Yes.  I first started with the city -- I'm not going to

9  remember the year, off the top of my head, 2014 or 2015, and I

10  was an economic development associate, or senior economic

11  development officer, and my job was focused on brokering deals

12  in new investment on a smaller level.

13      After a year or so, there had been a fair bit of turnover

14  inside the department, and I was asked to lead a new group

15  called the major projects division, so I accepted that role.

16      And the major projects division was new to the city's

17  structure, and it focused on major projects and, specifically,

18  in downtown, Pendleton, and Over-the-Rhine.  There was so much

19  investment happening, and challenges in some of those

20  neighborhoods that, you know, needed a new division.  So I

21  took that position, major projects division manager.

22      Then after a year or so in that position, the director

23  position became available, and I was asked by the then manager

24  to continue leading the entire department.

25  Q.   And can you describe what your role was as the director

1   of the economic development department?

2   A.  Yes.  Fairly high number of items that were touching the

3   department; tax abatements for smaller buildings that are

4   being developed, tax increment financing, larger development

5   incentives for bigger projects, like the MLK exchange

6   development project.

7       The department of community and economic development also

8   managed the city's parking assets, so all of the on-street

9   meters, city-owned parking garages.

10      And then lastly, the City of Cincinnati is an entitlement

11  community, as designated by the federal government, which

12  means that the Department of Housing and Urban Development,

13  HUD, assigns CDBG funds annually to the city, in the

14  neighborhood of 16 or 17 million dollars, and the allocation

15  of those funds and their compliance is also managed by the

16  department.

17  Q.  The 16 or 17 million dollars that you referenced from the

18  federal government, does that include the years 2018 and 2019?

19  A.  Yes.

20  Q.  And what year did you take on that role as the director

21  of economic development?

22  A.  That would have been at the end of 2017, and the

23  beginning of 2018 was when I became interim in that position,

24  and was finally full-time director in early 2018.

25  Q.  And how long did you remain in that role?

1    A.   About two years.

2    Q.   And what position did you you take when you left as the

3    director of economic development?

4    A.   My current position, as I stated, now is executive vice

5    president at the port.

6    Q.   Okay.  So you left the economic development department

7    job and went straight to the port; is that correct?

8    A.   That's correct.

9    Q.   During the time that you worked with the economic

10   development department, did a developer ever seek what's

11   called a development agreement with the city for a project?

12   A.   Yes.

13   Q.   Can you describe what a development agreement is?

14   A.   Certainly.  A development agreement is a longer contract

15   between a developer and the city for a smaller project that

16   would renovate a smaller building, something like a tax

17   abatement would suffice.

18        A development agreement is typically a more -- reserved

19   for a more complex transaction, and it states what the city is

20   going to provide to -- as an incentive for a project, and then

21   obligates the developer or business to provide something

22   typically in return.

23        So if the city is selling land to a developer, or giving

24   tax abatements, that would be described with some specificity.

25   And then if the city expected in return, they'll get a certain

1    number of jobs, or they'll get a certain type of investment,

2    development investment or job creation outcome, that would be

3    specified, and there's obligations on both parties.

4    Q.  Can you describe how a development agreement moves its

5    way through the city?

6    A.  Yes.  It is a fairly -- it can be a fairly lengthy path.

7    The majority of that time is inside -- just inside the

8    administration.

9         There is a project or a business that wants to invest or

10   grow inside the city, and they'd reach out to the development

11   department, typically a staff person that manages one

12   particular neighborhood and the affairs of that neighborhood.

13        And the first step after understanding what a developer

14   is interested in, they would submit an application.  And that

15   application asks for quite a lot of information detailing what

16   the project is, what the expected investment will be, and how

17   many jobs will be created, and what the wages of those jobs

18   are.

19        And so there's a fair bit of negotiation back and forth,

20   information gathering from between the staff person and a

21   developer or a business.

22        Ultimately, once all the criteria has been met, that

23   development agreement process travels up to a division

24   manager, where some more questions are asked and vetting is

25   done.  And then up to a deputy division manager or a deputy

1    director, and then, ultimately, to the director for decision,

2    confirmation, other information, and then travels to -- from

3    the director to the city manager as -- once that is -- if it

4    is going to be recommended for incentive or for passage.

5    Q.   You mentioned details of the project that the developer

6    provides.

7         What does the staff, and then broadly as it moves through

8    the department, what types of information is economic

9    development looking for from the development agreement

10   applications?

11   A.   The staff person really -- you know, everyone up to the

12   director is looking for surety that, in exchange for a public

13   benefit, you know, limited public dollars, public tax dollars,

14   that the public is going to get something in return.

15        And so as part of that process, staff spend their time

16   making sure that if the developer, in this case a developer,

17   or it could be a business investment too, but the developer is

18   saying they want a tax abatement for a project, does the

19   developer have site control?  Do they actually own the site

20   that they're talking about?  Do they have sufficient financing

21   to complete the project?  Not just, you know, I've got a

22   letter from a bank that says I'm interested but, you know,

23   with approval terms, you know, yes, you are approved for this

24   amount.

25        And then, certainly, does the developer or business have

1    the, you know, demonstrated capacity to complete the project.

2         The last thing that the public wants to do is incentivize

3    a project that can't ultimately get completed for one of those

4    reasons or for others.

5    Q.   You mentioned financing.  What level of specificity is

6    the economic development department looking for in terms of

7    financing when it assesses a development agreement?

8    A.   The department would typically ask for a number of

9    financial models from a proposing developer, a pro forma

10   demonstrating sources and uses of the development project, a

11   capital stack demonstrating every one of these sources of

12   capital that the developer has or will have in order to

13   finance the construction of the project, a 10-year financial

14   pro forma that shows, on a 10-year projection, how well the

15   project is going to cash flow.

16        And that's -- part of the negotiation is for every -- for

17   the most part, every incentive that the city is offering, you

18   know, it was a but for agreement; that is to say, but for the

19   investment of the public, would this project not happen, and

20   so looking at that pro forma to understand does this project

21   really actually need a tax abatement in order to commence

22   construction.

23   Q.   I think you also mentioned capacity, capacity of the

24   developer.  Is that what you meant by that?

25   A.   Yes.  Yes.  If the developer has -- you know, if they've

1    completed one small residential development, or one house, but

2    are then planning to -- proposing to develop a much larger

3    development, you know, that can be cause for concern about

4    does the developer have the capacity to complete.

5    Q.   Ultimately, all the factors you just described, is there

6    one sort of underlying goal or analysis that you're looking

7    for in the economic development department to determine

8    whether or not a particular development agreement is

9    appropriate?

10   A.   Actually, I've never -- I think --

11   Q.   Can I ask it another way?

12   A.   Yes.

13   Q.   Is there an assessment as to whether or not the

14   development agreement will ultimately be a good decision for

15   the public?

16   A.   Yes.  That's probably -- a fair answer is that,

17   ultimately, if the public is making investments or spending

18   public funds, is what the public is getting in return worthy

19   of that investment, and will it result in -- with certainty in

20   the project happening, the jobs being created.

21   Q.   All right.  So what happens to a development after it

22   works its way through the economic development department,

23   what happens next?

24   A.   Once the department of community and economic development

25   has vetted a project and has come to terms with the developer,

1    there's a development agreement drafted.

2        That agreement is sent -- presented to the city manager,

3    considered by the city manager, and then at the discretion of

4    the city manager, forwarded to city council for consideration.

5    Q.   And when the development agreement makes its way to city

6    council, what does city council do?

7    A.   This may be different now than it was when I was at the

8    city; but, typically, it would be referred to -- that item

9    would be referred to a committee, and so it would go to a city

10   council -- bigger city council meeting, it would be referred

11   to one of the committees.

12       And the following week, something like the budget and

13   finance committee would consider that item, and ask questions

14   or discuss that item amongst themselves.

15   Q.   And during the time you were at the economic development

16   department, what was city council's role when a developer was

17   seeking the development agreement through the economic

18   development department?

19   A.   Typically at, for example, those budget and finance

20   committee meetings, city council people would ask questions of

21   the department about underwriting, or project need, or the

22   number of jobs being created or, you know, which neighborhood

23   a project is in.

24       And if the developer was present at the council meeting,

25   the council could ask -- avail the same questions of the

1      developer.

2      Q.   Great.  All right.  During the time you were with the

3      economic development department, do you recall whether a

4      developer ever sought to develop property located at 435 Elm

5      Street in downtown Cincinnati?

6      A.   Yes.

7      Q.   And do you recall who the developer was who was seeking

8      development of that property?

9      A.   Yes.  It was Mr. Chinedum Ndukwe.

10     Q.   Okay.  Can you describe the property located at 435 Elm

11     Street?

12     A.   435, the property at the intersection of Elm and Sixth

13     Street is, I would say, a three-story retail building, with a

14     four-story office above a portion of it.

15          At my time in the city, it was in fairly severe

16     disrepair.  It was owned by the City of Cincinnati.

17               MR. SINGER:  I'd like to show, for identification

18     purposes, USA Exhibit 2A.  It's on the monitor right now.

19               THE WITNESS:  I don't see anything on my monitor.

20               THE COURT:  His monitor is not displaying.  Scott,

21     are you turning it on?

22               MR. SINGER:  Can we just scroll through those

23     photographs, 435 Elm Street.

24     Q.   Do you recognize the images marked for identification

25     purposes as USA Exhibit 2A?

1    A.   Yes.

2    Q.   And what is it?  What are these photos of?

3    A.   These are photos of the 435 Elm property.

4    Q.   And how is it that you recognize these photographs as

5    that?

6    A.   I have -- I've been in the building.  And in my time at

7    the city, recognize them from that time.

8    Q.   Are these true and accurate photographs of the property

9    located at 435 Elm Street during the time that you were at the

10   economic development department?

11   A.   Yes.

12        MR. SINGER:  Your Honor, the government moves USA 2A

13   into evidence.

14        THE COURT:  Mr. Rittgers?

15        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

16        THE COURT:  USA 2A is admitted without objection.

17   Just for the record, it's a six-page document.

18        MR. SINGER:  Permission to publish to the jury, Your

19   Honor?

20        THE COURT:  You may, Mr. Singer.

21   Q.   Can we start at page 1.  Can you just describe what we're

22   looking at here?

23   A.   Yes.  This is the front door to the retail portion and

24   the entrance lobby of the building at 435 Elm.

25   Q.   Page 2.  What are we looking at here?

1   A.   This is the same building.  It's an overall shot, shot

2   from the east.

3   Q.   Okay.  Next picture.  And what is this a photograph of?

4   A.   This is the same building, with the addition of the

5   public skywalk that connects across the top over the street.

6   Q.   Do you see the 435 in the bottom left-hand corner there?

7   A.   Yes.

8   Q.   Is that the address of the building?

9   A.   Yes.

10   Q.   Next picture.  What are we looking at here?

11   A.   Same property, just zoomed in on the retail storefronts.

12   Q.   Okay.  Next picture.  And here?

13   A.   Same property from the north.

14   Q.   Last one.  What are we looking at?

15   A.   435 Elm.

16   Q.   Thank you.  Did Mr. Ndukwe have any interaction with the

17   economic development department related to 435 Elm Street?

18   A.   Yes.  Yes.

19   Q.   Can you describe that, please?

20   A.   Mr. Ndukwe was interested in developing the building, or

21   the site.

22   Q.   Was your understanding, based on the information that

23   you'd received from Mr. Ndukwe, that he had a property

24   interest in the property at 435 Elm Street?

25   A.   No.

1  Q.  Okay.  Can you describe that?

2  A.  Yes.  And I'll be a little careful, because this is

3  currently in litigation between the port and Mr. Ndukwe.

4     But at the time of his interest in developing the

5  property, my recollection is that he did not have sufficient

6  interest in the property to be a -- have a developable

7  interest in the property.

8  Q.  What was Mr. Ndukwe seeking from the economic

9  development -- or from the City of Cincinnati with regard to

10  435 Elm Street?

11  A.  Mr. Ndukwe was seeking site control, the ownership of the

12  site.

13  Q.  And do you recall when Mr. Ndukwe first started pursuing

14  an agreement with the city relating to 435 Elm Street?

15  A.  Yes.

16  Q.  And when was that?

17  A.  The date, I'm not going to remember, but Mr. Ndukwe sent

18  a letter to the department specifically stating his interest

19  in entering into an MOU, or a memorandum of understanding,

20  with the department to redevelop the property.

21  Q.  If I showed you that letter, would it refresh your

22  recollection as to the date of when the letter was sent?

23  A.  Yes.

24     MR. SINGER:  Your Honor, may I approach?

25     THE COURT:  You may.

DENNING - DIRECT

1    Q.   Can you review that?

2    A.   Yes.  So this is July 7, 2017.

3             MR. SINGER:  May I approach, Your Honor?

4             THE COURT:  You may.

5    Q.   So did this refresh your recollection?

6    A.   Yes.  Thank you.

7    Q.   Okay.  When was that again?

8    A.   That was July 7th, 2017.

9    Q.   Thank you.  You mentioned a memorandum of understanding.

10   What is a memorandum of understanding?

11   A.   A memorandum of understanding, generally, is a

12   non-binding legal document with, essentially, promises about

13   something to be done.

14   Q.   And in your experience, does the city typically enter

15   into a memorandum of understanding relating to large scale

16   development projects?

17   A.   Not typically, no.  That is a non-traditional path.

18   Q.   And during the time you were at the economic development

19   department, did there come a time when Mr. Ndukwe was seeking

20   a development agreement with the city?

21   A.   My understanding is that he was seeking a development

22   agreement, but that did not happen.

23   Q.   Can you describe that?

24   A.   Yes.  As I mentioned earlier, the typical process at the

25   time was for staff within the department to enter into

1    negotiations, conversations with an interested developer and,

2    essentially, fulfill all of the information needs they were

3    going to need to make and present to their superiors to make a

4    decision about when to sell or enter into a development

5    agreement, or something of that nature.

6         And staff within the department simply never reached the

7    point at which they were comfortable and had enough

8    information to recommend that a development agreement would be

9    their next course of action.

10   Q.   Can you describe whether there were issues relating to

11   the 435 property, generally?

12   A.   The property condition itself?

13   Q.   Yes.

14   A.   Yes.  The property was in disrepair.  The roof was

15   leaking.  There were active tenants in the building who had,

16   you know, various issues with the property.  Parts of the

17   building were failing.  You know, the freight elevators were

18   failing, and the cables were rusting, and kind of a whole

19   number of issues related to the lack of upkeep and maintenance

20   over the 20 or 25 years prior by the then occupant, tenant.

21   Q.   Were there any other issues with the property that made

22   entering a development agreement with any developer difficult?

23   A.   Yes.  In addition to those issues, kind of the condition

24   issues that I mentioned, the footprint of the building and the

25   design, the layout of the building was outdated and, all

1   together, it typically called for something like a demolition,

2   which is expensive and creates another financial hurdle to

3   development.

4   Q.   What ultimately happened with the 435 Elm Street property

5   during the time you were with the economic development

6   department?

7   A.   So ultimately, because of the condition issues, it was

8   a -- quite a large liability that was borne by my department

9   at the time to maintain and upkeep.

10       And in addition to being the subject of litigation

11  between previous tenants and city attorneys, it was kind of an

12  unfunded mandate.

13       The department didn't get budgeted dollars to take care

14  of a failing facility like this, and so it was a drain on very

15  limited resources within the department, and so, ultimately,

16  the property was sold to the port to maintain and hold on to

17  find the -- patiently find the right development partner or

18  entity.

19  Q.   And can you describe how that happened, the transfer to

20  the port?

21  A.   That was a property sale agreement, and that process

22  would have happened around budget time, again, because it was

23  kind of a two-pronged approach.  It was both a budgetary item

24  but also a capacity item, so it happened around the time of

25  the city budget in June.

1     And at that time, city council -- an item was presented

2    to city council for consideration to sell the property,

3    transfer the property, that is, from the city to the port for

4    one dollar, and after which the port would be responsible for

5    its maintenance, liability, and conditions.

6    Q.  Do you recall presenting before the budget and finance

7    committee relating to the transfer of the property from the

8    city to port?

9    A.  I don't have specific recollection of that but, yes, I'm

10   sure that I presented during a budget finance committee

11   hearing of some sort during that time.

12        MR. SINGER:  Your Honor, we have a stipulation

13   relating to the admissibility of a video.

14        THE COURT:  Yes.

15        MR. SINGER:  Would you like me to read that

16   stipulation or present it to you?

17        THE COURT:  Yes, could you present it to me.  Let me

18   just take a look at it.  Is this one that I already have?

19        MR. SINGER:  You do.

20        THE COURT:  Oh, I can pull it up from here, then.

21   Okay.  You can read it or I can, either way, Mr. Singer.

22        MR. SINGER:  Would you like me to read it, Your

23   Honor?

24        THE COURT:  You can.

25        MR. SINGER:  "The parties stipulate to the

1    admissibility of the 1:20 video of Phil Denning's statement

2    before the City of Cincinnati Budget and Finance Committee on

3    June 24th, 2019.

4         "It is further stipulated and agreed that this

5    stipulation may be introduced into evidence as an exhibit, and

6    the facts herein stipulated have the same status, dignity, and

7    effect as the undisputed testimony of a credible witness."

8              THE COURT:  Thank you, Mr. Singer.

9         Ladies and gentlemen of the jury, I mentioned at the

10   outset, there may be some facts that are stipulated to.  With

11   regard to stipulated facts, you are to accept those stipulated

12   facts as true and proven.

13             MR. SINGER:  Your Honor, permission to publish USA 2I

14   to the jury?  2I is the video that reflects the stipulation.

15             THE COURT:  Mr. Rittgers, any objection?

16             MR. C. MATTHEW RITTGERS:  No, Your Honor.

17             THE COURT:  Very good.

18        (Video played.)

19   Q.   Do you recall that testimony?

20   A.   Yes.

21   Q.   There was a reference to Convention Place Mall.  What is

22   that a reference to?

23   A.   Convention Place Mall is the second name, I guess, for

24   435 Elm.  The complex itself is known as Convention Place

25   Mall.

1    Q.   And we just heard it in the recording, but can you

2    describe why it is you recommended the sale of 435 Elm Street

3    for a dollar?

4    A.   Yes.  Just as I said, it was a liability for the

5    department financially and also legally.  And I had forgotten,

6    until I heard that, that because of the large amount of back

7    taxes that the building owed, was delinquent on, it's likely

8    that the port or the land bank would have been involved in a

9    successful redevelopment in any case.

10   Q.   And did city council ultimately vote to sell the

11   435 Elm Street property to the port?

12   A.   Yes.

13   Q.   And were you present during that meeting?

14   A.   Yes.

15   Q.   Do you recall the date the property was voted on by city

16   council?

17   A.   I do not recall.

18   Q.   Okay.  Do you remember what the city council vote was?

19   A.   I recall it was a yes but, other than that, the vote

20   breakdown, I honestly don't recall.

21   Q.   Would the minutes of City Hall on the date that the sale

22   was made, would that refresh your recollection?

23   A.   Yes.

24        MR. SINGER:  Permission to approach, Your Honor?

25        THE COURT:  You may.

*DENNING - DIRECT*

1    Q.  Can you reference page 1 and page 18, the tab right

2    there?

3    A.  Yes.  Okay.

4         MR. SINGER:  May I approach?

5         THE COURT:  You may.

6    Q.  Did this refresh your recollection as to the date that

7    city council voted on the transfer?

8    A.  Yes.  And the votes were yes.

9    Q.  Do you recall what the date was?

10    A.  I didn't actually look at the date.  I'm sorry.  I was

11    looking at the number.

12    Q.  Can you tell me what the votes were?

13    A.  The votes were all yes.

14    Q.  Okay.  Do you know Mr. P.G. Sittenfeld?

15    A.  Voted yes.

16         MR. SINGER:  May I approach?

17         THE COURT:  You may.

18    A.  I apologize.  I haven't been following the assignment.

19    Thank you.  So June 26th.  Thank you.

20    Q.  June 26th of what year?

21    A.  Of 2019.

22    Q.  Thank you.  So I think you just testified that the

23    property was ultimately sold to the port for a dollar; is that

24    correct?

25    A.  Yes.

1    Q.   Do you recall whether this was the same term that

2    Mr. Ndukwe was seeking with the city in his discussions with

3    the economic development department?

4    A.   I do not recall specific terms, actually, of Mr. Ndukwe's

5    as it pertains to the cost or amount of a sale.

6    Q.   Okay.  And what was the impact of the sale of the

7    property to the port?

8    A.   The immediate impact on the city was the removal of a

9    large financial burden, and so that's a significant public

10   benefit.

11        And then since that time, it has been at the port,

12   managed by the port.  The tenants were cleared, and it is

13   being kind of prepped for development.

14   Q.   At some point after the transfer, did you change jobs

15   from economic development to the port?

16   A.   Yes.  So it was about five months after this was sold

17   that the idea was first approached of me from Laura Brunner,

18   the CEO of the port, and it was after that, in January of

19   2020, that I started at the port.

20   Q.   Okay.  After the property was transferred to the port,

21   was there a possibility that it could return back to city

22   council for any reason?

23   A.   It would be unlikely for the property itself to transfer

24   it back to the city for any reason, although with the

25   development project, there might be something else that city

1    council would have had to -- a development incentive, for

2    example, would have had to be considered by city council.

3    Q.   That's what I was getting at.  Is there some issue

4    relating to the project that could ultimately bring the

5    essence of that issue back to city council?

6    A.   Yes.  Yes.  Ultimately, if the project's found a

7    development proposal that was real and vetted, that if the

8    developer were needed -- were going to need a development

9    incentive like a tax abatement, or something like that, then

10   that item would come back to -- in front of city council

11   related to this property.

12   Q.   Was Mr. Ndukwe ultimately able to negotiate a development

13   agreement with the port related to the property?

14   A.   No.

15   Q.   During the time you were with economic development, do

16   you recall any discussions you had with then Councilman

17   P.G. Sittenfeld regarding the 435 Elm Street project?

18   A.   Yes.

19   Q.   Can you describe what you recall of those conversations?

20   A.   I recall one or two phone conversations with

21   Mr. Sittenfeld that were primarily focused on process for the

22   building, the building's development option.

23   Q.   Any specifics about the conversation that you recall?

24   A.   It was -- again, it was mainly focused on process and,

25   you know, what is going to -- you know, what are the

1    department's next steps.

2        For context, you know, in my time at the department, I

3    had instituted an RFP process, request for proposals process,

4    to elicit competitive bids for properties.  And we had

5    instituted that and had been using it, and so most of the

6    conversations with Mr. Sittenfeld, I believe, was about that.

7    Q.   Do you recall any discussion related to Mr. Ndukwe's

8    interest in the property?

9    A.   Yes.  Vaguely.  My recollection was Mr. Sittenfeld

10   asking, again, about process, and what is the process for

11   Mr. Ndukwe to get control of the property or develop the

12   property.

13   Q.   Now, I think you testified that Mr. Ndukwe had some

14   interest in the property; is that correct?

15   A.   I wouldn't --

16   Q.   Can I ask a different question?

17   A.   Yes.

18   Q.   How would you describe Mr. Ndukwe's interest in the

19   property?

20   A.   At the time, I'm going to have to say I don't recall

21   exactly when he -- Mr. Ndukwe, that is -- had purchased a

22   mortgage cure.

23       But without getting too technical, one of the tenants in

24   the building had defaulted on a mortgage.  The mortgage holder

25   had a right to cure that default.  And my understanding was

DENNING - DIRECT

1    that Mr. Ndukwe had purchased that right to cure the default.

2        And so this topic is, again, subject of litigation today

3    between Mr. Ndukwe and the port, but the interest is -- I

4    don't believe there is an interest.

5    Q.   So with that backstop, during the time you were with

6    economic development, was it your perspective that

7    Mr. Ndukwe was going to be the developer of the project based

8    on the relationship he had with 435 Elm Street?

9    A.   For clarity, this is at my time at the port?

10   Q.   During your time in economic development.

11   A.   Oh, in economic development.  Yes.  My understanding was

12   Mr. Ndukwe had not demonstrated sufficient capacity, finances,

13   or other plans necessary to present a development project to

14   city council.

15   Q.   And that was from the perspective of the economic

16   development department; is that correct?

17   A.   Yes.

18            MR. SINGER:  May I consult?

19            THE COURT:  You may.

20   Q.   One quick follow-up.  You've mentioned a litigation, I

21   believe, relating to the port and Mr. Ndukwe.

22       Does that have anything to do with any criminal charges?

23   Is that a civil matter relating to --

24   A.   Yes.  My understanding is that is a separate -- that's

25   just a separate matter.

1    Q.   A completely separate civil matter?

2    A.   Correct.

3    Q.   Not related to the reason you're testifying here today?

4    A.   Correct.  Yes.  Yes.  Completely separate.

5            MR. SINGER:  No further questions.

6            THE COURT:  Thank you, Mr. Singer.

7        Mr. Rittgers your witness.

8            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. C. MATTHEW RITTGERS:

11   Q.   Good afternoon, Mr. Denning.

12   A.   Hi, there.

13   Q.   Now that you've seen that video on the floor of council,

14   you're fairly familiar with the recommendation that you made

15   back then?

16   A.   Yes.

17   Q.   And, in part, part of the recommendation was because the

18   city was saddled with that property for quite a long time?

19   A.   Yes.

20   Q.   And it cost the city roughly $400,000 a year just in

21   maintenance costs, which was draining the budget and finances

22   of the city?

23   A.   That's correct.

24   Q.   It also was a bit of a hazard for the public, even maybe

25   the tenants, because of the condition of the building?

1    A.   Yes, the building, when it was still owned by the City of

2    Cincinnati, had occupants, tenants, tenants and subtenants.

3    And that was a situation which the department wasn't capable

4    or really built to handle.

5    Q.   And that's why, ultimately, you stood on the floor and

6    you recommended to council to transfer the building to the

7    Port Authority?

8    A.   That's correct.

9    Q.   And that would be fairly typical, in your role as the

10    economic development director, to speak to council about what

11    your beliefs were regarding a transfer to the port?

12    A.   Yes.

13    Q.   And those were -- that was your belief.  I mean, those

14    were your beliefs based on what your department and you

15    actually knew about the building?

16    A.   That's correct.  And --

17    Q.   And -- sorry.  Go ahead.  I apologize.

18    A.   No, that's okay.  Typically, I would appear to council

19    with information that my staff had presented about a project

20    or such, so yeah.

21    Q.   And the dollar transfer to the port was, I think your

22    words were it was a steal for the city, right, the transfer?

23    A.   Right.  Correct.  It was relieving a significant public

24    burden.

25    Q.   Because it was costing us, the taxpayers, roughly

1   $4 million every decade?

2   A.   Yes.

3   Q.   The costs, just because this property was transferred to

4   the port, given the state it's in today, those don't go away.

5   The port still has costs every day with that property,

6   correct?

7   A.   Yes.

8   Q.   And the port's mission, where you are now, is to help

9   revitalize, I think you mentioned light industrial jobs, even

10  sometimes residential homes?

11  A.   Uh-huh.

12  Q.   Commercial buildings like 435 Elm, correct?

13  A.   Yes.

14  Q.   And this particular building at 435 Elm was strategic, in

15  that it was right across the street from our Convention

16  Center?

17  A.   Yes.  It is directly south of the Convention Center.

18  Q.   And I believe at the time, in 2018, to the east of the

19  Convention Center, there stood a hotel called Millennium?

20  A.   Yes.

21  Q.   Which is gone.  Was this property, was it something that

22  would have been helpful for the port, if there was a

23  successful development agreement, to get a hotel on this

24  property because of where it was located?

25  A.   Unfortunately, that's a more complicated answer.

1    Certainly, getting the property developed again would be the

2    best, you know, best-case scenario for the western side of

3    downtown, and the size of the property is fairly small.  It

4    looks bigger, but it's kind of an L-shaped property, so a

5    hotel is a potential use.  It could have been other uses as

6    well.

7    Q.   At the port, were you -- I should ask.  Were you

8    personally familiar with any studies done regarding our

9    Convention Center with the Convention Bureau, or anything like

10   that?

11   A.   Yeah, vaguely.  I'm sure that over the past couple of

12   years, I've read, you know, an HVS study, or something about

13   convention -- hotel convention redevelopment.

14   Q.   And, in general terms, we -- Cincinnati's Convention

15   Center competes with other convention centers within, you

16   know, a 150-mile radius?

17   A.   Yes.

18   Q.   Indianapolis, Louisville, Columbus?

19   A.   (Nods affirmatively.)

20   Q.   And it's important for a Convention Center to have nice

21   and usable hotel space near the Convention Center, right?

22   A.   Yes.

23   Q.   And it helps with broader tourism for the region?

24   A.   Absolutely.  With perception, visitors visiting the

25   convention facility, certainly.

1    Q.   Tax base, jobs?

2    A.   Yes.

3    Q.   I know there's very limited things that you can say

4    because you're at the port, and the property is currently in

5    litigation in state court, civil litigation.

6         The port's position, and correct me if I'm wrong, is that

7    Mr. Ndukwe does not possess air rights; is that right?

8    A.   Yes.

9    Q.   And his position is that he does possess air rights,

10   correct?

11   A.   Honestly, I'm uncomfortable speaking to his position.

12   Q.   Okay.  There's an argument over whether or not he

13   possesses air rights on that property?

14   A.   That's my understanding, yes.

15   Q.   You mentioned the defunct mortgage.  You said that he

16   purchased a mortgage.  Was it from U.S. Bank in 2017?

17   A.   That's my understanding, yes, it was from U.S. Bank.

18   Q.   If today the port's -- if the port had a good proposal,

19   where someone said they had $75 million to develop that

20   property, would that be a good thing to try to dive into and

21   successfully complete?

22   A.   It seems like the answer would be yes, although my answer

23   would probably be a little more vague than that because I

24   would say that you would probably want to talk to 3CDC, who is

25   managing the redevelopment of the Convention Center district.

1    But, generally, attracting more private investment to the

2    corner or the district is beneficial, yes.

3    Q.   To help revitalize downtown?

4    A.   Yes.  Yep.

5    Q.   Our county and region?

6    A.   (Nods affirmatively.)

7         MR. C. MATTHEW RITTGERS:  No further questions, Your

8    Honor.

9         THE COURT:  Thank you, Mr. Rittgers.

10   Mr. Singer, any redirect?

11        MR. SINGER:  Just two brief questions, Your Honor.

12        THE COURT:  Very good.

13                   REDIRECT EXAMINATION

14   BY MR. SINGER:

15   Q.   I think you testified that it was the determination of

16   economic development that, when you were assessing the

17   property, ultimately, you went and determined whether it was

18   in the public interest; is that right?

19   A.   Yes.

20   Q.   And despite all the issues relating to the property, was

21   it the assessment of economic development at the time that the

22   development agreement pursued by Mr. Ndukwe was not in the

23   public interest?

24   A.   That is a fair assessment.

25        MR. SINGER:  No further questions.

1            THE COURT:  Thank you, Mr. Singer.

2        Mr. Rittgers, any further questions?

3            MR. C. MATTHEW RITTGERS:  May I have one moment, Your

4     Honor?

5            THE COURT:  You may.

6            MR. C. MATTHEW RITTGERS:  I have no further

7     questions, Your Honor.  Thank you.

8            THE COURT:  Thank you.  Sir, you may step down.

9     Thank you for being here today.

10           THE WITNESS:  Thank you.

11        (Witness excused.)

12        (Excerpt of proceedings concluded at 3:54 p.m.)

13                        *   *   *

14                C E R T I F I C A T E

15                        -   -   -

16        I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
      is a correct transcript from the record of proceedings in the
17     above-entitled matter.

18

19     /s/ M. Sue Lopreato_____                  August 31, 2022
      M. SUE LOPREATO, RMR, CRR
20     Official Court Reporter

21

22

23

24

25

```
1                          INDEX

2   GOVERNMENT WITNESSES

3
    PHILIP DENNING
4
    Direct by Mr. Singer............................    Page 2
5   Cross by Mr. C. Matthew Rittgers.................    Page 28
    Redirect by Mr. Singer..........................    Page 33
6

7


8                         EXHIBITS

9   GOVERNMENT EXHIBITS

10

11  Exhibit                                     Admitted

12  2A                                               14

13

14                     -   -   -

15

16

17

18

19

20

21

22

23

24

25
```