```
1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION
                             *   *   *
3

4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
5              Plaintiff,           : Jury Trial, Day 10
                                    : Tuesday, July 5, 2022
6         - v -                     :
                                    : 9:00 a.m.
7    ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"           :
8                                   :
               Defendant.           : Cincinnati, Ohio
9
                             *   *   *
10    EXCERPTED PROCEEDINGS - TESTIMONY OF LUKE BLOCHER

11   BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                           *   *   *

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                           *   *   *

25
```

Proceedings recorded in stenotype.
Transcript produced with computer-aided transcription.

```
 1                        P R O C E E D I N G S
 2                    (In open court at 10:28 a.m.)
 3                              *   *   *
 4           MR. C. MATTHEW RITTGERS:  Your Honor, Luke Blocher,
 5   who I believe is here.  May I check to see if he's in the
 6   hall?
 7           THE COURT:  You may.
 8           MR. C. MATTHEW RITTGERS:  Thank you.
 9       (Defense witness, LUKE BLOCHER, sworn.)
10           THE COURT:  You may proceed.
11                         DIRECT EXAMINATION
12   BY MR. C. MATTHEW RITTGERS:
13   Q.  Good morning.  What is your full name for the record?
14   A.  My full name is Lucas Rames Blocher.
15   Q.  Where do you currently work?
16   A.  The Taft law firm.
17   Q.  And where did you work back in 2018 and 2019?
18   A.  I worked in the law department for the City of
19   Cincinnati.
20   Q.  In what role?
21   A.  I was the deputy city solicitor.
22   Q.  And can you tell us what duties the deputy city solicitor
23   had, especially in relation to the economic development
24   department?
25   A.  So my duties included general management of the
```

1    department, but then also sort of oversight of all of the
2    transactional parts of the office, which included all the work
3    around economic development and real estate.
4    Q.   How common was it for a council member to come to you and
5    discuss legislation back when you were a deputy city
6    solicitor?
7    A.   Well, I think there's two parts to that question.  One
8    is, I think council members can request legislation, like any
9    member, like mayor or city manager.
10        And then from time to time, because I was, sort of, the
11   main person to discuss economic development-related issues,
12   and I was the person who explained at the public meetings the
13   terms of the deals and how they worked, I would, from time to
14   time, get questions about them from people and house members.
15   Q.   Outside of council floor individually?
16   A.   Yes.  It was more common in council, but it happened
17   outside of council too.
18   Q.   Back in 2018 and 2019, can you tell us who the head of
19   the economic development department was?
20   A.   Yes.  It was Philip Denning.
21   Q.   What role did you have in reviewing or drafting something
22   called a transmittal or an ordinance?
23   A.   I think the easiest way to explain that is that for every
24   ordinance that comes before the council, there's an ordinance
25   which is the actual legal document, and the law department

1   drafts that.
2         And my staff would -- you know, if it was an economic
3   development-related ordinance, my staff would draft it and I
4   would review it. Sometimes I would draft it but, in general,
5   I would review it and approve it.
6         And then a transmittal would be drafted by the department
7   who was putting forward the ordinance, usually in a
8   development context, was the development department, and that
9   was -- that came together with the ordinance when it was put
10  forth to council.
11            MR. C. MATTHEW RITTGERS: Your Honor, may I approach
12  the witness?
13            THE COURT: You may.
14            MR. C. MATTHEW RITTGERS: And I'm showing you what's
15  been previously marked as Defendant's Exhibit D4, which is a
16  transmittal, and Defendant's Exhibit D2, which is the
17  ordinance.
18  Q.   Do you recognize those two documents?
19  A.   I do.
20  Q.   And could you tell us what D4 is?
21  A.   D4 is the transmittal that accompanied the D2 ordinance.
22  Q.   Is that a fair and accurate copy of the transmittal for
23  435 Elm to the port?
24  A.   As far as I can tell, it looks to be, yes.
25  Q.   On that transmittal, is that something that you would

1  have reviewed?
2  A.  The transmittal, I would have reviewed in the context of
3  presenting -- being a part of the council meetings which would
4  discuss it.  And so I would review it to be able to discuss
5  what was inside of it, and also I would have reviewed it when
6  it went final to be submitted.
7  Q.  On the transmittal, can you tell who sponsored the
8  transfer to the port?
9  A.  When you say sponsor, I'm not sure exactly what you mean
10 by that.
11 Q.  What does it mean to sponsor legislation?
12 A.  Okay.  I guess, when I would use that term, any piece of
13 legislations that comes through the city, there's some
14 constituent part of the city that's saying I want this to
15 happen and puts it forward, whether it be a council member,
16 whether it be a mayor, whether it be the city manager.
17     And then within the city manager, you have all the
18 departments that report up to the city manager so, oftentimes,
19 they'll come from a specific department through the city
20 manager.
21 Q.  By looking at D4, can you tell who sponsored that
22 transfer to the port?
23 A.  I think this was -- this came from the city manager,
24 which is indicated at the top of the document.  And by the
25 nature of the way it's -- the final page, there's a copy to

1  Philip Denning, the director of the department, and that would
2  have been a common practice to note that this came, sort of
3  through the development department, came up through -- up from
4  the development department, up to the city manager's office,
5  to city council for consideration.
6           MR. C. MATTHEW RITTGERS:  Your Honor, may I approach
7  the witness stand again just to take back the document?
8           THE COURT:  You may.
9           MR. C. MATTHEW RITTGERS:  May I have permission to
10 publish D4, Your Honor?
11          THE COURT:  Are you moving to admit it?
12          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.
13          MS. GLATFELTER:  No objection.
14          THE COURT:  Defendant's Exhibit D4 is admitted
15 without objection and may be published to the jury.
16 Q.   Can you see that on your screen up there, Mr. Blocher?
17 A.   Yes.
18 Q.   And so can you tell us who the city manager was at the
19 time?
20 A.   Yes.  It was Patrick Duhaney.
21 Q.   And by looking at this document, can you tell us who
22 sponsored this transfer to the port?
23 A.   I guess, using the terminology of sponsor that we just
24 discussed, I would say the city manager has put forward this
25 legislation to propose transferring this property.

1  Philip Denning, the director of the department, and that would
2  have been a common practice to note that this came, sort of
3  through the development department, came up through -- up from
4  the development department, up to the city manager's office,
5  to city council for consideration.
6           MR. C. MATTHEW RITTGERS:  Your Honor, may I approach
7  the witness stand again just to take back the document?
8           THE COURT:  You may.
9           MR. C. MATTHEW RITTGERS:  May I have permission to
10 publish D4, Your Honor?
11          THE COURT:  Are you moving to admit it?
12          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.
13          MS. GLATFELTER:  No objection.
14          THE COURT:  Defendant's Exhibit D4 is admitted
15 without objection and may be published to the jury.
16 Q.   Can you see that on your screen up there, Mr. Blocher?
17 A.   Yes.
18 Q.   And so can you tell us who the city manager was at the
19 time?
20 A.   Yes.  It was Patrick Duhaney.
21 Q.   And by looking at this document, can you tell us who
22 sponsored this transfer to the port?
23 A.   I guess, using the terminology of sponsor that we just
24 discussed, I would say the city manager has put forward this
25 legislation to propose transferring this property.

1   Q.   And then after the transmittal, what part -- what's the
2   law called, the actual transfer, the legal document?
3   A.   Generally, I think -- well, generally, it's either
4   purchase, or sale, or sale agreement.
5   Q.   And what does the ordinance stand for that you have up
6   there marked as Defendant's Exhibit D2?
7   A.   The ordinance is the actual legal agreement -- the legal
8   authorization from the city council authorizing the city to
9   transfer property --
10  Q.   And --
11  A.   -- in this case.
12  Q.   Oh, sorry.
13  A.   No.  I'm sorry.
14  Q.   Go ahead.
15  A.   No.  I just said in this case.  That's all I said.
16  Q.   Oh.  Is this something that you would have also reviewed
17  in your role as a deputy city solicitor?
18  A.   Yes.
19  Q.   Do you see your initials anywhere on that document?
20  A.   Yes.  My initials are on the upper right-hand corner.
21  Q.   And what is that?
22  A.   The practice, at the time I was in the city solicitor's
23  office, was the solicitor's office would draft all the
24  ordinances, and the city solicitor, herself or himself, or a
25  deputy would initial it before they send it off to be

1   submitted for final -- you know, to be considered final.
2   There would be a wet ink initialing of the ordinance as a,
3   sort of, final signoff.
4   Q.  Is that a fair and accurate copy of the ordinance that
5   transferred 435 Elm from the city to the port?
6   A.  Yes.  I believe, yes, it is.
7   Q.  And inside that document, is there a discussion as to the
8   reasons why this property was transferred to the port?
9   A.  I believe there is.  And if you could let me review it
10  quickly, I can --
11  Q.  It's the top of page 2, I believe.
12  A.  Okay.  Yes.  In the top of page 2, yes, it describes --
13  it gives one of the reasons for transferring property.
14              MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?
15              THE COURT:  You may.
16              MR. C. MATTHEW RITTGERS:  I'll move to admit this
17  exhibit and publish, Your Honor.
18              MS. GLATFELTER:  No objection.
19              THE COURT:  Defendant's Exhibit D2 is admitted
20  without objection and may be published for the jury.
21  Q.  Mr. Blocher, I'm going to show you what is on the top of
22  page 2 on this document that you testified you reviewed.
23      Is that what you were referring to in terms of some of
24  the reasons why the property at 435 Elm was transferred from
25  the city to the port?

1  A.  Yes.

2  Q.  Is that common, ordinary practice of the city to put the

3  reasons in the actual ordinance for transfers?

4  A.  Yes.  It was a normal practice to -- and, again, this is

5  the, sort of, official legislative action of the city saying

6  why they're doing something, and so it was common practice to

7  say in the ordinance this is why we did this.

8  Q.  And these reasons that were stated here, in part, on the

9  top of page 2, those facts, that would have come from the city

10 economic development department, I assume?

11 A.  Correct.

12 Q.  Was there anything unusual, back in 2019, when this was

13 transferred from the city to the port?

14 A.  I don't really know exactly how to answer that question,

15 but nothing -- I suppose I can say nothing is coming to mind.

16 Q.  Okay.  Was it unusual to transfer properties for a dollar

17 from the city to the port back when you were deputy city

18 solicitor?

19 A.  I don't know how -- I would say that it wasn't unusual to

20 transfer properties for a dollar, as a general matter, in

21 economic development transactions in which there was a larger

22 value involved than the value of the property that was -- the

23 city was trying to achieve.

24 Q.  And can you state some of those reasons why the city

25 would do that?

1    A.   Again, I think, as a general matter, the city either --
2    in the sense like this, the city has property that has its
3    own, sort of, negative value in some ways, and then -- but it
4    could be redeveloped by another party.
5        Or there's a larger redevelopment project that's
6    happening that requires a significant amount of city incentive
7    to be possible, and one of those incentives is transferring
8    the property for a dollar.
9    Q.   Just because a property is transferred to the port, do
10   the maintenance costs go away?
11   A.   Can you read that last part again?
12   Q.   The maintenance cost that we looked at on page 2 of this
13   document were $400,000 a year. Do those costs go away when it
14   gets transferred to the port?
15   A.   I wouldn't think so.
16   Q.   If we could talk about P.G. relative to other council
17   members briefly. How is he in terms of his communication and
18   involvement relative to the other council members with you as
19   the deputy city solicitor?
20        THE COURT: Hang on one second.
21        MS. GLATFELTER: Your Honor, objection. May we have
22   a quick sidebar, please?
23   SIDEBAR CONFERENCE
24        MS. GLATFELTER: Your Honor, I believe this is
25   irrelevant, given the pretrial rulings and the discussion

1   we've had over the last few days in terms of what evidence
2   would be relevant for the defendant to put on.
3          This is essentially 404(b) evidence -- on one side, it
4   could be 404(b) evidence.  On the other side, it's comparison
5   to other legislators.  What's relevant here is what the
6   defendant did in this case relative to 435.
7              MR. C. MATTHEW RITTGERS:  Your Honor, we just heard
8   the government's case in chief that P.G. was very involved,
9   and all I'm asking this witness is to testify to how involved
10  he was in the past with other deals.
11             THE COURT:  Are you going to go through specific
12  instances?
13             MR. C. MATTHEW RITTGERS:  I was not going to go into
14  specific deals.
15             THE COURT:  Okay.  I mean, I think it's consistent
16  with some of the testimony we've already heard from other
17  witnesses about the extent to which Mr. Sittenfeld was
18  involved in economic development activities.  I'm going to
19  allow you a little leeway, but I'm assuming you're not going
20  to go into --
21             MR. C. MATTHEW RITTGERS:  Into a specific deal, I'm
22  not.
23             THE COURT:  And this is going to be relatively --
24             MR. C. MATTHEW RITTGERS:  Yes.
25             THE COURT:  Okay.

1         MS. GLATFELTER: Your Honor, that's what makes it
2 relevant, if it's related to a specific economic development
3 similar to this one, just generally how he was -- just
4 generally how he is as a legislator is irrelevant.
5         THE COURT: Well, I'm going to allow it in.
6         MR. C. MATTHEW RITTGERS: Thank you.
7 SIDEBAR CONFERENCE CONCLUDED
8         THE COURT: You may proceed.
9 BY MR. RITTGERS:
10 Q. Mr. Blocher, relative to other counsel members, how
11 active was P.G. in terms of his communication and questions to
12 you related to legislation development?
13 A. I would say that -- I mentioned earlier there was a
14 couple settings which I engaged with people, there was at
15 council meetings, at committee meetings, and then occasionally
16 outside of those.
17     I think, in both settings, he was, as a general matter,
18 more active than most of his colleagues, during the time that
19 I was there, at least.
20 Q. How common was it for a council member to come to you and
21 inquire about complaints that they might have been receiving
22 related to delays, or what we might refer to as bureaucratic
23 red tape?
24 A. It was not as uncommon as I would like, because it was my
25 people who were doing that work, in a lot of instances, but it

1  did happen from time to time.  We tried to improve on that
2  over time, but it would still happen from time to time
3  Q.  How frequent was it for the city to partner with the port
4  on difficult developments?
5  A.  I can say that the Port Authority has pretty unique
6  powers under state law, and so it was not uncommon for the
7  city, and is not uncommon even today for the city, to partner
8  with the Port Authority in ways that both parties can use
9  their unique authority to help make a project happen.
10            MR. C. MATTHEW RITTGERS:  I have no further
11  questions, Your Honor.
12            THE COURT:  Thank you, Mr. Rittgers.
13            MS. GLATFELTER:  May I inquire, Your Honor?
14            THE COURT:  You may, Ms. Glatfelter.
15            MS. GLATFELTER:  Thank you.
16                       CROSS-EXAMINATION
17  BY MS. GLATFELTER:
18  Q.  Good morning.
19  A.  Good morning.
20  Q.  You said that you worked for the city in 2018 and 2019?
21  A.  Correct.
22  Q.  And that was a career position, right, a career public
23  servant position, as opposed to an elected official?
24  A.  Correct.
25  Q.  And that was as the deputy solicitor general?

1   A.  Deputy city solicitor was the title.
2   Q.  Deputy city solicitor.  Your responsibilities in that
3   role included economic development, I believe, we heard?
4   A.  Yeah.  My staff and me were involved in the drafting and
5   negotiating of economic development agreements.
6   Q.  All right.  And in that role in working with economic
7   development, as a general matter, your job is to serve the
8   city, do what's in the best interest of the city?
9   A.  The city is my client, so yes.
10  Q.  So you're working to serve the city in the best way that
11  you can?
12  A.  I certainly thought I was doing that, yes.
13  Q.  You said you worked with economic development, including
14  people like Phil Denning, right?
15  A.  Yes.
16  Q.  And Phil Denning is also someone who is a career public
17  servant, distinguishable from elected officials?
18  A.  Yes.
19  Q.  All right.  And the economic development department,
20  their role was evaluating -- part of their role was evaluating
21  proposed projects?
22  A.  Yes.
23  Q.  And in evaluating those proposed projects, they would
24  determine what was in the city's best interest?
25  A.  I believe that's an accurate way to describe it.

```
1    Q.   And one of the projects that they evaluated in 2019, as
2    we just heard with the ordinance, was 435 Elm, right?
3    A.   Correct.
4    Q.   So you were aware, at the time when that property was
5    transferred, that Mr. Ndukwe was interested in developing
6    435 Elm, right?
7    A.   I was aware, yes.
8    Q.   All right.  And you were aware at that time that
9    Mr. Ndukwe, in developing that project, sought certain things,
10   like he wanted the property for a dollar, right?
11   A.   I don't know that.  I wasn't involved in those
12   discussions with him directly.
13   Q.   Okay.  Mr. Blocher, were you interviewed by the FBI in
14   relation to this matter?
15   A.   Yes.
16   Q.   Would it help refresh your memory to review a report of
17   that interview?
18   A.   Sure.
19            MS. GLATFELTER:  May I approach, Your Honor?
20            THE COURT:  You may.
21   Q.   I'm not trying to be tricky here.
22   A.   No.  Sure.
23   Q.   I'm just asking you, at the time that property was
24   transferred, you were aware that Mr. Ndukwe wanted that
25   property for a dollar?
```

1  A.  After having that refresh my memory, I do recall that
2  he -- I had heard that that was happening, he was out there
3  advocating for that.
4  Q.  And he did not want a competitive process, right?
5  A.  That was what I had heard, yes.
6  Q.  And despite having an interested developer interested in
7  435 Elm, the city made the decision to transfer the property
8  to the port, right?
9  A.  Yes.
10 Q.  And that was because it was public servants' belief that
11 was in the best interest of the city?
12 A.  I think that reflected the best judgment of the city
13 administration, yes.
14         MS. GLATFELTER:  One moment, Your Honor.
15     No further questions.
16         THE COURT:  Thank you, Ms. Glatfelter.
17         MR. C. MATTHEW RITTGERS:  No questions, Your Honor.
18         THE COURT:  Very good.  Mr. Blocher, you're free to
19 step down.
20     (Witness excused.)
21     (Excerpt of proceedings concluded at 10:48 a.m.)
22                         *  *  *
23
24
25

```
 1                    C E R T I F I C A T E

 2                           -  -  -

 3        I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
 4   above-entitled matter.

 5


 6   /s/ M. Sue Lopreato_____                      August 12, 2022
     M. SUE LOPREATO, RMR, CRR
 7   Official Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1         INDEX

2    DEFENSE WITNESS

3    Luke Blocher

4    Direct by Mr. C. Matthew Rittgers..................  Page 2
     Cross by Ms. Glatfelter............................  Page 13
5

6
                              EXHIBITS
7

8    DEFENSE EXHIBITS

9
     Exhibit                                             Admitted
10
     D4                                                       6
11   D2                                                       8

12

13                           - - -