```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             -   -   -
 3

 4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                     :
 5              Plaintiff,           : Jury Trial, Day 1
                                     : Tuesday, June 21, 2022
 6          - v -                    :
                                     : 9:00 p.m.
 7    ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"            :
 8                                   :
                Defendant.           : Cincinnati, Ohio
 9
                             -   -   -
10

11                  TRANSCRIPT OF PROCEEDINGS

        BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE
12
                             -   -   -
13

14    For the Plaintiff:        EMILY N. GLATFELTER, ESQ.
                                MEGAN GAFFNEY PAINTER, ESQ.
15                              MATTHEW C. SINGER, ESQ.
                                U.S. Department of Justice
                                U.S. Attorney's Office
16                              221 E. Fourth Street, Suite 400
                                Cincinnati, Ohio  45202
17
      For the Defendant:        CHARLES M. RITTGERS, ESQ.
18                              CHARLES H. RITTGERS, ESQ.
                                NEAL D. SCHUETT, ESQ.
19                              GUS J. LAZARES, ESQ.
                                Rittgers & Rittgers
20                              12 E. Warren Street
                                Lebanon, Ohio  45036
21
      Law Clerk:                Jacob T. Denz, Esq.
22
      Courtroom Deputy:         Scott M. Lang
23
      Court Reporter:           M. Sue Lopreato, RMR, CRR
24                              513.564.7679

25                           -   -   -
```

1                    P R O C E E D I N G S

2              (In open court at 9:16 a.m.)

3                          -  -  -

4         THE COURT:  Good morning.  We're here this morning in

5    the matter of the United States of America versus Alexander

6    Sittenfeld.  It's case number 1:20-cr-142.  We're here this

7    morning for trial.

8       Could I ask counsel to please enter their appearances for

9    the record.

10        MR. SINGER:  Matt Singer, Megan Gaffney Painter, and

11   Emily Glatfelter for the United States.

12        THE COURT:  Good morning.

13        MR. SINGER:  Also at counsel table, Kelly Terry, a

14   paralegal in our office, and Special Agent Nathan Holbrook.

15        THE COURT:  Good morning.

16        MR. C. MATTHEW RITTGERS:  Good morning, Your Honor.

17   Charlie M. Rittgers, Charlie H. Rittgers, Neal Schuett,

18   counsel for Mr. Sittenfeld, and Elias Demeropolis, who also

19   works in our law firm.

20        THE COURT:  Very good.  Good morning, all.

21      And, sir, you are P.G. Sittenfeld, right?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  Very good.  Well, there are a few

24   preliminary matters that I wanted to discuss before we move

25   on, and I just want to elicit thoughts on the best way to

1   proceed with regard to the various things that we need to get

2   done today.

3      First, I think you saw I did put a media policy order on

4   the docket yesterday, or at some point over the weekend.

5      The second thing I just wanted to check, I just want to

6   make sure who is doing the opening for each side, because it's

7   something I address in my script.  Is it Mr. Singer or

8   Ms. Glatfelter?

9         MS. GLATFELTER:  I am, Your Honor.

10        THE COURT:  Ms. Glatfelter, okay.

11        MR. C. MATTHEW RITTGERS:  I am, Your Honor.

12        THE COURT:  Okay.  Third, I'm wondering where we are

13   on the campaign finance opening instructions.  I saw the

14   competing instructions.  I guess I just don't know yet where

15   we're at on that issue.

16      I think that may also underlie some of what I think may

17   be the government's objections with regard to opening

18   statements too, some of those same topics.

19      I know you put in competing instructions.  Have the

20   parties made any additional progress toward some shared

21   understanding of how we're going to discuss campaign finance

22   issues?

23        MR. SINGER:  It appears that the parties are pretty

24   far apart as to how this should be instructed preliminarily,

25   Your Honor.

```
1              THE COURT:  Would you agree with that, Mr. Rittgers?

2              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

3              THE COURT:  So I think where I'm at is, I think we're

4    better off sort of waiting to see how it comes in from the

5    government's side, and then dealing with it from the expert

6    witnesses, Mr. Burns, I think it was, on the defense side.

7         What I'm not clear on yet is the extent to which the

8    government is going to rely on sort of inferences that could

9    be drawn from the way in which this is structured.

10        And I think it's a very fair concern that Mr. Rittgers

11   has raised on behalf of his client, but I don't know if the

12   government intends to do that.

13        And I guess my concern is, if the Court puts too much

14   focus on the structure of the financing up front, and it turns

15   out that's not really an issue in the government's case, it

16   could be misleading to the jury that I've spent the time doing

17   that.

18        And so what I'd like to do is sort of see how it comes

19   in, and then either during the defense case, I can give

20   instructions, or my preliminary inkling would be to have

21   Mr. Burns address whatever we need to in terms of sort of

22   resetting the table on the campaign finance side, if that ends

23   up being an important part of the case.

24        And I appreciate that, you know, that that ends up

25   letting the government go first, but that's sort of the nature
```

1    of the criminal trial, and often things come in on sort of a

2    more rebuttal setting in a trial setting anyway.

3        So I think that's probably the best way, from the Court's

4    perspective, to deal with that, given that the parties are

5    quite a ways apart, and I don't know that the Court is well

6    enough versed on campaign finances to write my own jury

7    instruction for a preliminary matter, so that's what I intend

8    to do on that.

9        In terms of the jury questionnaires, I did see the

10    government's response on that issue.

11        Is anyone here from <u>The Enquirer</u> this morning?  I don't

12    think so.  What I intend to do on that, for the time being, is

13    that -- I haven't ruled on the motion yet, I just got the

14    government's response.

15        Obviously, this is an issue that could have been teed up

16    a long time ago and wasn't, but we're at where we're at right

17    now.

18        The Court's concern, just to be blunt, is we sent out

19    juror questionnaires to all the prospective jurors.  And at

20    the very top of it, in bolded language, explains to them that

21    their answers on the jury questionnaires are going to be

22    confidential.

23        I don't think it would be a good first step in this trial

24    to sort of retract a promise that we made to the jurors.  In

25    light of some of the case law I've seen, we may want to

1    revisit exactly what we say about confidentiality on the jury

2    questionnaire, but be that as it may, that's the juror

3    questionnaire that went out.

4        At the very least, it would be the Court's intent to

5    allow members of the panel to identify information that they

6    believe is sensitive or that they would not want shared.

7        I guess what I'd say in that context is that, as you'll

8    see during voir dire, I'm going to tell the jurors that if

9    there are parts of their answers to their questions that they

10   do not wish to share in public, we can do it at sidebar.

11       I think they should be given that same opportunity with

12   respect to the information that's on their questionnaire.

13       I also believe that, in light of the media interest in

14   this trial, I'm a little concerned about having too much

15   information about the jurors out during the course of the

16   trial, just because my concern is, even if we redact names and

17   addresses, there's sufficient, shall we call it,

18   non-identifying and yet somehow still identifying information.

19       So if somebody works at a shop that's got four or five or

20   ten people, and one of them was gone Tuesday, or one of them

21   has been gone for a week, it's going to be pretty evident to

22   the other people, at least in that shop, who the juror is.

23       And my concern is that if the identity of the jurors gets

24   out one way or another, given the public interest in this

25   case, we're going to lose control of exactly what information

1    those jurors receive.  And I think that has some due process

2    implications for the defendant.

3        So we can talk about -- and I'm sure we'll have

4    The Enquirer here to talk about as well, we can talk about

5    whether after the trial, it may be more appropriate to share

6    that information, and I do believe that there are aspects of

7    this that are public.

8        But given the nature of the interest in this case, it

9    would be my intent not to share information that could lead to

10   identification of the jurors during trial, just to make sure

11   that we can help them focus on the evidence that they're

12   hearing here, rather than information that they may be

13   receiving from other sources outside of the courtroom.

14       Does anybody have any comment on that they want to make?

15           MR. SINGER:  Nothing from the government, Your Honor.

16           THE COURT:  With regard to the witnesses.  One thing

17   I do during voir dire is I go through all the witnesses and

18   try to make sure whether anybody knows any one of the people

19   who's likely to testify at trial.

20       It's a relatively extensive list.  I think there's some

21   51 names on there, but I want to just check and make sure, are

22   there any names that are not on that list, any names that have

23   come to light that may be in addition to the ones that the

24   parties have provided to the Court?

25           MR. SINGER:  No additional witnesses.  There are

1  witnesses that we could remove based on some stipulations that

2  we received from defense counsel.

3  THE COURT: Oh, that would be ideal. Okay. Are you

4  prepared to give me a list of those names?

5  MR. SINGER: Yes, Your Honor.

6  THE COURT: Hang on one second. Go ahead,

7  Mr. Singer.

8  MR. SINGER: Number 3, Luz Lopez.

9  THE COURT: Thank you.

10  MR. SINGER: And then four and five.

11  THE COURT: Jamaal King and Mr. Holbrook?

12  MR. SINGER: No, no. I'm sorry, Your Honor. The

13  Verizon and the Fifth Third Bank custodians.

14  THE COURT: I'm sensing my list may not be the same

15  as yours, so if you'd give me the names.

16  MR. SINGER: Yes, Your Honor. So Luz Lopez, and then

17  we had two placeholders for two records custodians.

18  THE COURT: Oh, I think, since it's a little harder

19  to identify those for voir dire purposes, records custodian

20  wasn't really going to probably ring any bells, so... go

21  ahead.

22  MR. SINGER: And then Supervisor Special Agent Jamaal

23  King, so just those two names.

24  THE COURT: Those two names are out?

25  MR. SINGER: Yes.

1          THE COURT: Any additional witnesses, Mr. Rittgers?

2          MR. C. MATTHEW RITTGERS: Your Honor, the only

3    potential additional witness would be Jacob Dietrich.

4          THE COURT: And then I have a question. One side had

5    a Jaime Kincaid, and the other has a Jay Kincaid, and I was

6    just wondering, are those the same person?

7          MR. SINGER: I think it's the same person, Your

8    Honor.

9          MR. C. MATTHEW RITTGERS: I would agree.

10          THE COURT: Okay. I don't believe -- I want to just

11    confirm, though. I don't believe we've received any

12    additional voir dire questions that the parties wanted the

13    Court to pose. Is that correct, Mr. Singer?

14          MR. SINGER: That's correct, Your Honor.

15          THE COURT: Mr. Rittgers?

16          MR. C. MATTHEW RITTGERS: That's correct.

17          THE COURT: And did the parties have any additional

18    preliminary jury instructions, besides the campaign finance

19    issue? I saw the recording of transcript instruction.

20    Anything beyond that?

21          MR. SINGER: No, Your Honor.

22          MR. C. MATTHEW RITTGERS: Your Honor, we spoke

23    briefly on ex parte at the last final pretrial. Could we

24    approach briefly on that one issue?

25          THE COURT: Yes.

1    SIDEBAR CONFERENCE

2         THE COURT:  We're in chambers with defense counsel.

3    Go ahead, Mr. Rittgers.

4         MR. C. MATTHEW RITTGERS:  Your Honor, we spoke at the

5    final pretrial regarding whether or not Mr. Sittenfeld would

6    testify, and that -- our thought that he will has not changed.

7         However, regarding preliminary jury instructions,

8    this might have been a precaution that was not necessary, but

9    I just want to make sure that in the preliminary instructions,

10   it is still discussed that he has the right not to testify and

11   he might not testify.

12        THE LAW CLERK:  We do have that.

13        MR. C. MATTHEW RITTGERS:  Thank you.  I'm sorry,

14   Judge.

15        THE COURT:  We do.  No, not at all.

16   SIDEBAR CONFERENCE CONCLUDED

17        THE COURT:  One other topic that I need to address,

18   although we shouldn't need to worry about it too much, in

19   light of the additional questions we asked the venire, is the

20   time of the trial.

21        We originally, when we sent out the questionnaire, I

22   think checked for a four-week period during the final

23   pretrial.  It seemed like the parties were thinking it may be

24   shorter than that.

25        I do address that briefly in my remarks to the jury.  So

1    do the parties have any different sense, as we sit here this

2    morning, as to how long this trial is likely to take?

3            MR. SINGER:  Your Honor, consistent with what we said

4    at the final pretrial conference, I think our case will be

5    about a week.

6            MR. C. MATTHEW RITTGERS:  Your Honor, I think the

7    entirety of the trial will be -- this is my guess, obviously,

8    will be finished nine working days, so by Friday of next week,

9    is my guess.

10           THE COURT:  By Friday of next week?

11           MR. C. MATTHEW RITTGERS:  That's my guess.

12           THE COURT:  So that will take us into the holiday

13   weekend?

14           MR. C. MATTHEW RITTGERS:  I think it's possible.  And

15   I know nobody knows how quickly things will go on, but I think

16   it's possible we will do closing even as early as Thursday or

17   Friday morning.

18           THE COURT:  Oh, okay.  All right.  Interesting.  Very

19   good.

20       And then the last topic I have, but then I would be

21   willing to listen to the parties if there are additional

22   things we should discuss, is the government's objections to

23   the defendant's opening statement.

24       I think, Ms. Glatfelter, that was you?

25           MS. GLATFELTER:  Yes, Your Honor.  I was trying to

1    think this morning of an efficient way to do this.  I grouped

2    our objections based on hearsay, misleading transcripts, and

3    jury nullifications.  And I have a list of those objections

4    for the Court and for defense counsel.

5        I might suggest that I provide them, everybody has a

6    chance to look at those objections and then respond, if the

7    Court felt like that was the best way to do it.  It might be

8    inefficient to go slide by slide here.

9        I will say, with respect to the transcripts that are

10   quoted in the defendant's slides, I have a couple of visual

11   aids for the Court.  And I think they're important because

12   when I first looked at the slides, I didn't realize the

13   impropriety there.

14       So when I was reading the quotes, they didn't make sense

15   to me because I didn't recognize them, and we've been working

16   on the transcripts.

17       And so when I went back, they were cut and pasted from

18   pages.  So there were pages of transcript missing, and the

19   quotes were made to look like they were the same sentence.

20       And I have some of the egregious examples pointed out in

21   highlighted transcripts for the defense and for the Court,

22   because I wanted to illustrate why we're making these

23   objections.

24            THE COURT:  I appreciate that.  It might be easier

25   for me to get a sense of this if there's a copy I could look

1    at, or just one example.

2              MS. GLATFELTER:  Yes.  If I may approach, Your Honor?

3              THE COURT:  You may.  And, obviously, start with your

4    colleague.

5              MS. GLATFELTER:  In here, I have a list of our

6    objections, and I numbered the PowerPoint slides to correspond

7    because I originally received with numbers, and then I have

8    the same packet for the Court.

9              THE COURT:  Can you give me an example of what you

10   were just talking about?

11             MS. GLATFELTER:  Yes.  If we turn to exhibit which is

12   marked on the front of USA 15C, and we look at page 30 of that

13   transcript, this is one of our exhibits.

14             THE COURT:  Okay.

15             MS. GLATFELTER:  This corresponds to Slide 38, which

16   is in the numbered packet I provided to the Court and defense

17   counsel.

18        So the first part of that slide starts with, "John, John

19   loves guys like you.  Yeah."  Then it has the next sentence.

20        And then the slide actually jumps back to page 24 of this

21   transcript for the rest of the slide.  There are no ellipsis,

22   or anything to indicate that there's a break in conversation.

23        So the yellow highlights indicate what's missing for all

24   of the other pieces of the slides.  But in this case, I wanted

25   to highlight actually the difference in pages.

1    So if you look at page 30, Slide 38 starts there, and

2    then you have to jump back to page 24, which is where the

3    second part of that slide comes from.

4    There are eight slides like that, Your Honor, in this

5    PowerPoint.  In addition, there are probably 10 to 15 slides

6    with inadmissible hearsay.

7    These are not government exhibits.  They are blatant

8    hearsay, with no exception that applies, like state of mind or

9    what the Court pointed out, and so we object to those too.

10   So in the first part of the packet, I provided a list of

11   our objections for the Court's consideration and for defense

12   counsel's response when appropriate.

13   And then the third category are slides which evoke jury

14   nullification.  There are a couple what I would consider

15   entrapment light instructions.

16   Again, I don't know exactly what defense counsel is going

17   to argue, but there's a slide in there which appears like the

18   defense is going to argue, you know, you're not going to hear

19   about search warrants, or you're not going to hear about

20   subpoenas, they didn't do this in the investigation.

21   And pursuant to my understanding of the Court's ruling on

22   Friday, sort of an entrapment light impeaching the

23   investigation is not a valid argument here.

24   And, again, this is opening statement.

25        THE COURT:  Well, opening statement technically

1        shouldn't be argument at all.

2                MS. GLATFELTER:  Right.

3                THE COURT:  It should be a preview of the evidence.

4            I take it, Mr. Rittgers, this is the first you're seeing

5        these objections?

6                MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  May I?

7                THE COURT:  Sure.

8                MR. C. MATTHEW RITTGERS:  Or do you not want me too?

9                THE COURT:  No.  Go ahead.

10                MR. C. MATTHEW RITTGERS:  I know as much as you know

11        right now.  Slide 38, if you would like me to add ellipsis,

12        this is an opening statement.

13            I think that the government would right now tell the

14        Court that the November 7th transcript in its entirety is

15        going to be admitted in their case in chief; is that correct?

16                MS. GLATFELTER:  No, it's not, Your Honor.

17                MR. C. MATTHEW RITTGERS:  These quotes are going to

18        be cut out of the November 7th transcript?

19                MS. GLATFELTER:  No.  These quotes will be there, but

20        the slides are misleading.

21            And I'm going to object at this point.  You know, we were

22        supposed to exchange slides, and they were supposed to be

23        admissible.

24            I'm objecting to the defense changing these slides, or

25        putting in new slides that I then have to review.  I spent

1   several hours going through this last night, that wasted my

2   time, when I was preparing for opening statement.

3       And so I understand that the defendant provided these on,

4   I guess, Sunday night at 9:00, which took two hours for our

5   system to download.

6       But I spent a bulk of yesterday looking at these quotes.

7   I didn't think that I would have as many objections as I did,

8   but as I started looking at the transcripts, I was upset,

9   because these are extremely misleading, and I don't think it's

10  appropriate to allow a simple ellipses to be put in there to

11  indicate you're moving four pages back in this transcript.

12      MR. C. MATTHEW RITTGERS:  Your Honor, I'm going to be

13  discussing what was said in this meeting.  The government

14  admits that every single one of these quotes that is on the

15  slide -- and I can put them in order when they come out.

16  That's not the important part of the slide.

17      Every single one of these words that is on the slide will

18  be admitted in their case in chief.  That is the truth.

19      And so if these quotes should be reordered in the time

20  frame on that particular meeting of when P.G. said it, and put

21  a break, and I can explain to the jury that this was not

22  stated in succession, because when something is stated in

23  succession on these slides, Your Honor, it would just say the

24  individual's name one time, and there would be just a block

25  quote.

 1          These are different parts of the slide in this part of my

 2     opening, which I don't want to have to disclose my entirety of

 3     my opening to the government, is certain statements that P.G.

 4     says that they will hear, the jury, that will be presented by

 5     the government in the government's chase in chief, and that's

 6     not disputed.

 7          THE COURT:  Yeah.  Well, that's not disputed, I

 8     guess, with respect to the slides that are marked misleading

 9     transcript excerpts.  I assume the parts that are marked

10     hearsay are not parts that the government will be introducing?

11          MS. GLATFELTER:  Correct.

12          MR. C. MATTHEW RITTGERS:  Really?

13          THE COURT:  So that's Slides 10, 16, 17, 18, 19, 21,

14     22, 25, 27, 50, 51, 52, 53, and it goes on.

15          MS. GLATFELTER:  Yes.

16          THE COURT:  Those are all statements the government

17     will not be putting in, is that right, Ms. Glatfelter?

18          MS. GLATFELTER:  That's correct.

19          MR. C. MATTHEW RITTGERS:  Your Honor, 16, 17, and 18

20     are emails from Ms. Brunner, Mr. Ndukwe, and P.G. Sittenfeld.

21     And Ms. Brunner and Mr. Ndukwe are testifying; is that

22     correct?

23          MS. GLATFELTER:  That is true, but those statements

24     are hearsay.  There's not an exception --

25          MR. C. MATTHEW RITTGERS:  I can talk to them and

1     admit to each comment of the emails.

2         MS. GLATFELTER: No. They can talk about the

3     content, or they can talk about what's in the emails, but

4     unless there's a hearsay exception, the document itself is not

5     coming in. So these documents are not going to be shown to

6     the jury, unless I'm missing something.

7         THE COURT: Well, let's look at Slide 16. So this is

8     an email from P.G. Sittenfeld to Laura Brunner and --

9         MR. C. MATTHEW RITTGERS: Mr. Ndukwe.

10        THE COURT: -- Mr. Ndukwe. Thank you, Mr. Rittgers.

11      On what basis would you contend it's admissible,

12     Mr. Rittgers?

13        MR. C. MATTHEW RITTGERS: Well, Your Honor, I think

14     that if Ms. Brunner or Mr. Ndukwe testify this is a fair and

15     accurate depiction of an email setting up an introduction back

16     in 2012, that this would be an admissible document for the

17     jury to --

18        THE COURT: Well, so to be admissible, it needs to be

19     authentic, I agree.

20        MR. C. MATTHEW RITTGERS: Right.

21        THE COURT: So they can authenticate it. But then it

22     also needs to be substantively admissible. So what's the

23     basis -- I mean --

24        MR. C. MATTHEW RITTGERS: On relevance.

25        THE COURT: Well, right, but it's an out-of-court

1    statement.  Is it not being offered for the truth of the

2    matter asserted, or -- what's the purpose for which it will be

3    offered?

4        It sounds like it's not going to be sponsored by the

5    government.  The government could sponsor it as an admission

6    by your client, but you can't put in Mr. Sittenfeld's

7    out-of-court statement for the truth of the matter asserted

8    because they're not admissions of a party opponent, so you

9    need something else.  What --

10            MR. C. MATTHEW RITTGERS:  Neal, do you have any

11    thoughts on that?

12            MR. SCHUETT:  I don't know if you want to go line by

13    line.  I mean, generally, it looks like it's just for notice

14    that they're trying to introduce them.  I don't know that any

15    of it needs to be offered for the truth of the matter

16    asserted, but clearly that this was the introduction point,

17    Your Honor.

18        I don't think any of the statements are actually to prove

19    Mr. Ndukwe's NFL career and the stats, that merely this was an

20    event to provide notice to both parties to link them together,

21    Your Honor, so I would say it's not hearsay because it's not

22    for the truth --

23            THE COURT:  So --

24            MR. SCHUETT:  -- intent on the listener and

25    subsequent acts.

1          THE COURT:  What's your response on that,

2    Ms. Glatfelter?  I mean, it does look --  for example, let's

3    just take one sentence.

4        "He's already been a standout citizen, a community

5    volunteer, particularly through the Ndukwe Foundation."  I

6    don't know that anybody's trying to prove that as a matter of

7    fact.

8        Isn't the point of this email just to show that on

9    June 26th, there was an introduction from P.G. Sittenfeld that

10   introduced Ms. Brunner and Mr. Ndukwe?

11          MS. GLATFELTER:  Your Honor, I have no idea, because

12   I have the slide itself.  I don't know the basis, until I just

13   heard that right now, what the purpose of this was.  It's from

14   2012, which is many years before the actions in this case, and

15   it is the defendant's statement.

16       And so if he's -- I would say that he's still offering it

17   for the truth but, you know, they can ask Laura these

18   questions, Laura Brunner these questions, and ask her if he

19   were introduced, I don't think she would deny that.

20       But in terms of putting emails in, you know, whether

21   there's a good faith basis to believe that these are going to

22   come into evidence is also a question.  What's the relevance

23   of this?

24          THE COURT:  Mr. Rittgers or Mr. Schuett, whoever is

25   going to respond, I take it you're at a little bit of a

1    disadvantage in that you're seeing this now.  And I'm

2    certainly not faulting Ms. Glatfelter, given the time in which

3    the exchange of all this occurred.

4        Are you going to be in a position to go through these

5    right now, or how would you like to proceed on this?

6            MR. C. MATTHEW RITTGERS:  Your Honor, whatever is

7    most efficient for the Court.  I know the jury is here.  On

8    this particular slide, I mean, it is actually contrary to what

9    we would think is the truth.  This is not offered for the

10   truth of the matter on this particular slide.  I mean, it's

11   just --

12           THE COURT:  Well, so we can either start talking

13   about individual slides, or...

14       I think the first thing we should do is come up with a

15   game plan for how we're going to deal with the fact that there

16   are objections to about 30 of the -- is that about half the

17   slides?

18           MS. GLATFELTER:  Yes, Your Honor.  I think that's

19   fair.

20           THE COURT:  Roughly half the slides.

21           MS. GLATFELTER:  I would say, from the government's

22   perspective, you know, it's one thing to talk about this in

23   opening, and to talk about the beginning of the relationship.

24       It's quite another to put in a document, where there may

25   not be an evidentiary basis for the document to come in, and

1    creating that in front of the jury, when there's no basis for

2    that to come into evidence later.

3         So if that is the purpose of the slide, the defendant is

4    still free to talk about that relationship in opening

5    statement.  The question is whether they can put a document in

6    front of the jury that has no basis for coming into evidence.

7         And so many of these hearsay objections are about that.

8    There are text messages, there are all sorts of things.  The

9    defendant can still talk about the relationship.  He can talk

10   about, you know, the reason -- perhaps the reason behind some

11   of these slides, but these actual documents aren't going to

12   come into evidence.

13             THE COURT:  Are they coming into evidence?

14             MR. C. MATTHEW RITTGERS:  If the Court allows it,

15   Your Honor.  I'm definitely going to show this to Ms. Brunner

16   and Mr. Ndukwe, when they're on the stand, to identify this

17   email.

18             MS. GLATFELTER:  For what purpose?  They're not --

19             MR. C. MATTHEW RITTGERS:  Just notice of the

20   introduction by P.G. Sittenfeld.  It bolsters the credibility

21   of the statement.

22        If a lawyer stands up and tells the jury they were

23   introduced by P.G. in 2012, and there's no supporting

24   documentation of it, it is not quite as credible, including

25   testimony when Ms. Brunner is on the stand.

1    Obviously, she can hide that I could use it to impeach

2    her, but I could also ask her to just identify it.

3         THE COURT:  But you're going to admit them into

4    evidence like they would go back to the jury room type thing,

5    or what?

6         MR. C. MATTHEW RITTGERS:  I mean, potentially.  I

7    would not be opposed to that, Your Honor.

8         THE COURT:  Evidence of what?

9         MR. C. MATTHEW RITTGERS:  Just the notice of the fact

10   that they had this introduction.

11        THE COURT:  All right.  Well, this is also the first

12   I'm seeing this, so I think I'm going to need to go through

13   these exhibits too and kind of try to figure out where I'm at

14   on them.

15   I think the voir dire process is going to take some time

16   anyway, so what I might suggest is that we get started with

17   voir dire, and then at some point -- I don't know if voir dire

18   will get over before lunch or not but, at some point, we'll

19   take a lunch break, and that will give me an opportunity to

20   review these materials, and then before we do openings,

21   obviously, we can circle back and address this.  That will

22   also give Mr. Rittgers and/or Mr. Schuett a chance to collect

23   their thoughts on these as well.

24   I hear what you're saying, Ms. Glatfelter, and I do

25   intend to address these before opening.

1          Let me just also just say that I know that if we start

2     mixing some of these slides, you may need some time,

3     Mr. Rittgers, to readjust your opening in light of that, so I

4     intend to make sure the parties all have sufficient time to do

5     what they need to do in connection with this case.

6          MS. GLATFELTER:  We understand that, Your Honor.  My

7     purpose in objecting to these is not to trick the defense, or

8     do anything like that.  It's basically to make sure they're

9     efficient, and they're not standing and objecting to every

10    slide in this PowerPoint presentation before we start.

11         THE COURT:  I appreciate that, Ms. Glatfelter.

12         MR. C. MATTHEW RITTGERS:  Your Honor, it's our

13    understanding that the government is not presenting any

14    audio/video text mes- -- any PowerPoint presentation in their

15    opening.

16         MS. GLATFELTER:  Yes, that's correct.

17         THE COURT:  Very good.

18         MS. GLATFELTER:  Thank you.

19         THE COURT:  All right.  So I think we have a plan for

20    that.  I'm going to put this aside for now.

21         Are there any other topics we should address before we

22    bring in the jury?

23         MR. SINGER:  One housekeeping.  We would propose that

24    at the end of each day, the parties who are going to put a

25    witness on the next day tell the other side what witnesses

1    will be called that day, and if that -- if it happens to be

2    the weekend, that the parties will alert the other side of the

3    witnesses that will be called by noon on Saturday, just as a

4    matter of procedure.

5              THE COURT:  Mr. Rittgers?

6              MR. C. MATTHEW RITTGERS:  Yeah, we have no objection

7    to that, Your Honor.

8              THE COURT:  Very good.  So ordered.  I think that's

9    in keeping with practice anyway, so that makes sense.

10        Mr. Rittgers, did you have any additional matters you

11   wish to discuss?

12             MR. C. MATTHEW RITTGERS:  Your Honor, I don't know if

13   this is what you would like to discuss at this time.

14        The government's first witness, Kevin Flynn, I would just

15   like to discuss one thing on that matter.  It doesn't have to

16   be now, it could be later, whatever the Court's preference.

17             THE COURT:  Tell me what the matter is, and we can

18   talk about whether we need to discuss it now or later.

19             MR. C. MATTHEW RITTGERS:  Sure.  The Court is not

20   privy to the 302, which is the FBI summary of what he talked

21   to the government about.

22        The government intends to elicit testimony from Mr. Flynn

23   about his personal belief.  He is a private lawyer and

24   citizen.  He served on council between '13 and '17.

25        They plan to elicit testimony from him about his opinions

1   regarding what responsibilities a council member should have

2   as it relates to the charter and Ohio ethics.

3       His opinion conflicts with the city solicitor.  The city

4   solicitor actually is the person who had to have malpractice

5   insurance for giving advice to council members and the mayor.

6       His personal opinion conflicts with the city solicitor's

7   office on the governmental structure, and who -- what power

8   lies where in terms of his interpretation of the city charter

9   related to development deals, and that's why they're planning

10  on calling him.

11      And I just wanted the Court to be aware of that, because

12  I'm not sure it was clear on the motions.

13          MS. GAFFNEY PAINTER:  Your Honor, I'm happy to

14  respond to that.  As you know, the government's disclosure

15  obligations are much broader than what necessarily will be

16  brought out in testimony.

17      So what's contained in the 302 is not necessarily what we

18  intend to bring out.  And let me assure the Court and defense

19  counsel we are not planning to ask those types of questions.

20          MR. C. MATTHEW RITTGERS:  So it's my understanding

21  that he's going to testify to what he knew was typical just

22  within his own personal purview of a council member?

23          MS. GAFFNEY PAINTER:  May I respond, Your Honor?

24          THE COURT:  You may.

25          MS. GAFFNEY PAINTER:  Yes.  Mr. Flynn will be

1  offering, essentially, a civics lesson to the jury.  He will

2  be explaining how many people serve on council, how many

3  constitute a majority, the role of the mayor, the different

4  departments in the city; providing a backdrop for all of us,

5  you know, on the intricacies of city government.

6      He will not be offering anything specific about the

7  defendant.  He will not be talking about specific development

8  deals.  He will make clear, when he's discussing, the sort of

9  general pathway of a development deal, that this is just

10  generally speaking.

11      It's not specific.  There are different ways that this

12  may be done but, generally speaking, this is the pathway of a

13  development project through city council.

14          MR. C. MATTHEW RITTGERS:  Your Honor, and the

15  pathway, the specific pathway that he's going to testify to is

16  that a council member should -- if that council member hears

17  from a developer, that council member should only go to the

18  city manager and nowhere else.

19      That is what he's going to testify to, which is in direct

20  conflict with the city solicitor's office.

21          MS. GAFFNEY PAINTER:  Your Honor, he's not going to

22  testify to that.

23          THE COURT:  Okay.  Well, it sounds like this concern

24  may or may not arise.  So, Mr. Rittgers, I guess I would just

25  say when Mr. Flynn is on the stand, be ready to go.  And I

1    hear what you're saying and, you know, we'll deal with it if

2    and when we need to.

3              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

4              THE COURT:  All right.  Anything else, Mr. Rittgers?

5              MR. C. MATTHEW RITTGERS:  No, Your Honor.

6              THE COURT:  Okay.

7        There's some folks in the gallery.  I think all those

8    seats are spoken for with potential jurors so, at this point,

9    I'm going to have to ask people to vacate the seats in the

10   back.

11             MR. C. MATTHEW RITTGERS:  Your Honor, one

12   housekeeping matter?

13             THE COURT:  Sure.

14             MR. C. MATTHEW RITTGERS:  After the panel and both

15   sides ask questions, could we have just five or ten minutes

16   just to confer so that -- before the sidebar?

17             THE COURT:  Oh, absolutely.  Yes.  We're going to

18   take time and make sure we do this right.  I do that in every

19   voir dire.  I give people time to consult before we come to

20   sidebar.

21             MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

22             THE COURT:  So, generally speaking, the way it's

23   going to proceed is I'm going to ask a series of questions --

24   well, I'm going to welcome them to the court today, ask them a

25   series of questions, and then I'm going to give each side an

1      opportunity to ask additional follow-up questions.

2          And at that point, I'm going to excuse the venire, give

3      the parties some time to kind of discuss amongst themselves.

4      And then we'll come together, we'll do the for cause

5      challenges first, then we'll do the peremptories after that,

6      with the panel not here, and then we'll bring the panel back

7      in and let them know who has been selected, all right?

8          Anything further from you, Ms. Glatfelter, or Mr. Singer?

9      I don't know who --

10             MR. SINGER:  No, Your Honor.

11             THE COURT:  All right.  Very good.  I think we can

12     bring in the jurors, Scott.

13         While we're waiting for them to come in, you saw what I

14     said about the sealed order and UCE-1 and all that.  I want to

15     make clear, if he's a witness on the stand, I'm not closing

16     the courtroom and information will come out consistent with

17     what I put in that sealed order.  Is that clear?

18             MR. SINGER:  Understood, Your Honor.

19             THE COURT:  Sue, this is off the record.

20         (Off the record.)

21         (Prospective jurors in at 10:03 a.m.)

22         (Transcript of Voir Dire filed at Docket No. 219.)

23     (Jury out at 5:11 p.m.)

24             THE COURT:  All right.  So on the Court's agenda, I

25     think the topics that we still need to address sometime before

1    we do opening is what's going to be on the slides in the

2    opening statement.  I think that's probably the key issue that

3    we still need to address at this point.  So how do the parties

4    propose going about that?

5          MR. C. MATTHEW RITTGERS:  Your Honor, can Neal sit

6    right here while we do that?  We can go right through the

7    list, Your Honor, if the government...

8          THE COURT:  Okay.  Jacob, can I have those materials

9    back?

10         MR. C. MATTHEW RITTGERS:  Your Honor, with the

11    Court's permission, can I have aid here from a person who is

12    more --

13         THE COURT:  Oh, absolutely.

14         MR. C. MATTHEW RITTGERS:  Thank you.

15         MR. SCHUETT:  Does the Court have a copy of the

16    objections to the defendant's PowerPoint?

17         THE COURT:  The Court does have a copy of the

18    objections.

19         MR. SCHUETT:  Would the Court prefer that we just

20    work our way down that list, or does the Court have a

21    different preference?

22         THE COURT:  Seems to make some sense to me.

23         MR. SCHUETT:  All right.  Then we'll be starting with

24    Slide Number 10.

25         THE COURT:  Since it's the government's objection,

1    why don't we start with the government's objection to Slide

2    Number 10.

3            MS. GLATFELTER:  Yes, Your Honor.  We believe these

4    text messages are not going to be admissible at trial.  We

5    actually don't even have any context for the messages.

6    They're not authentic.  We haven't stipulated to that, and

7    they contain hearsay within hearsay.

8        They appear to be offered for -- well, I don't know why

9    they're offered, but there's no stipulation to authenticity

10   and, as near as we can tell, there's no exception that would

11   apply for hearsay.

12           THE COURT:  Thank you.  Do you have a sponsoring

13   witness, Mr. Schuett?

14           MR. C. MATTHEW RITTGERS:  These are P.G. Sittenfeld

15   and a guy by the name of Ryan Goldschmidt.  Mr. Sittenfeld is

16   part of those communications --

17           THE COURT:  Is Mr. Sittenfeld going to authenticate

18   these text messages?

19           MR. C. MATTHEW RITTGERS:  Yes.

20           THE COURT:  He's going to authenticate the text

21   messages on the stand, right?

22           MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

23           MS. GLATFELTER:  It doesn't matter if he

24   authenticates them.  They still have to be not hearsay.  And

25   so he could testify about the information that's conveyed, but

1  whether these come in as exhibits, they still need to surpass

2  any hearsay objection.  He can't offer his own statements,

3  regardless of whether he takes the stand or not.

4          THE COURT:  No.  I understand that he can't offer

5  them for the truth of the matter asserted.

6          MR. C. MATTHEW RITTGERS:  And, Your Honor, yeah.  I

7  mean, this is showing that he knew he was involved with --

8  this is a tenant, Ryan Goldschmidt, before the undercover

9  operation began back in 2017, where P.G. is getting involved

10  in helping 435 Elm before he was ever approached by an

11  undercover agent.

12      I mean, I can go through my opening, but that's why

13  they're being offered, not because of any truth.

14          MS. GLATFELTER:  They are offered exactly for the

15  truth that he was involved in the project from the beginning,

16  and these were his thoughts and feelings about the project.

17  That's exactly why it's being offered.

18          MR. SCHUETT:  Your Honor, if I may?

19          THE COURT:  You may, Mr. Schuett.

20          MR. SCHUETT:  The one on the left says November 28,

21  2017, if I'm reading this correctly.  Those are the text

22  messages from Ryan.

23          MR. C. MATTHEW RITTGERS:  That's correct.

24          MR. SCHUETT:  I think, if you look at them for the

25  11/28/2017, on the left-hand side it expresses, "Great

1    catching up."  I don't know that -- or in the excitement for

2    what the future holds, I don't think that's really offered for

3    the truth of the effect on the listener what Mr. Sittenfeld

4    then did.

5        The next text message is just contact information, so

6    there's no real truth matter asserted that were being offered

7    there.

8        And then the one on the right-hand side, for July 6,

9    2018, there's some questions, which wouldn't be hearsay, but

10   then also more state of mind, if you're looking at

11   Mr. Goldschmidt.

12       If you look at Mr. Sittenfeld's response, there's a

13   question so, again, not asserting any truth value.  I mean, as

14   far as whether or not he was happy to do it, I suppose that is

15   an expression of his state of mind, though, again, it doesn't

16   sound like it's being offered for the truth of the matter

17   asserted, Your Honor.

18           THE COURT:  I mean, I take it it's being offered to

19   show that R.G. and Mr. Sittenfeld were in contact as of --

20           MR. SCHUETT:  November 28, 2017.

21           THE COURT:  -- November 28, 2017 and July 6, 2018; is

22   that right?

23           MR. SCHUETT:  Yes, Your Honor.

24           THE COURT:  Isn't that just sort of res gestae?

25           MS. GLATFELTER:  I think they're offering this for

1    the truth.  They're talking about Chin, the government's

2    witness in here, and they're talking about the context of

3    what's happ- -- it's still hearsay.

4        They're trying to get in the contents of this

5    information, and he can talk about that in opening if this is

6    a subject matter he wants to talk about, but whether the

7    document and the text messages come in is a different

8    question.

9            MR. SCHUETT:  Your Honor, the statement with

10   Mr. Ndukwe is a question.  It's not a statement, it's a

11   question.

12       "Was wondering if perhaps you would have some time the

13   week of the 16th or 20th to meet up with Chinedum and myself

14   to discuss the property at Fifth and Elm?"

15       It's a question.  This circuit has said that a question

16   is to facilitate an answer and seek information.  It's not

17   asserting a truth value, Your Honor, and therefore, we would

18   say it's not a hearsay issue because -- by definition it's not

19   hearsay because it's not offered for the truth.

20           THE COURT:  Yeah.  I'm going to allow that slide.

21       And just to be clear for the record, I don't believe it's

22   hearsay.  I don't believe it's being offered for the truth of

23   the matter asserted.

24       I believe it's being offered to show the fact of a

25   preexisting relationship between some person named R.G. and

1    Mr. Sittenfeld.  I do believe it needs to be authenticated,

2    and I'm taking you at your word that it will be authenticated.

3          MR. C. MATTHEW RITTGERS:  I wrote that down to have

4    him authenticate on the stand, Your Honor.

5          MR. SCHUETT:  I believe the next matter is Slide 16.

6          THE COURT:  Can we do a quick sidebar?

7    SIDEBAR CONFERENCE OFF THE RECORD

8          THE COURT:  Slide 16?

9          MS. GLATFELTER:  Same hearsay objections, Your Honor.

10          MR. C. MATTHEW RITTGERS:  Your Honor, we're not

11    offering it to prove that Mr. Ndukwe played for five seasons

12    in the NFL, or that he's a great community volunteer, or

13    anything like that.

14          THE COURT:  Yeah.  I'm overruling the objection.  Is

15    it going to be authenticated?

16          MR. C. MATTHEW RITTGERS:  Yes, by probably

17    Mrs. Brunner, but I can have Mr. Sittenfeld do it if she does

18    not.

19          THE COURT:  Okay.  What's next, Slide 17?

20          MS. GLATFELTER:  Your Honor, we object to hearsay for

21    the next couple of slides.

22      We don't know why these are being offered, and so we're

23    objecting to these until we understand the context.

24          MR. C. MATTHEW RITTGERS:  Your Honor, I mean, I'm not

25    trying to prove that Ms. Brunner loved him.  It's just the

1    fact that she actually met with him.  This is her email, and

2    so I just wanted to show that she met with him back in 2012.

3            THE COURT:  And to what end?

4            MR. C. MATTHEW RITTGERS:  Why is that important?  The

5    relevance of that is a couple -- one, the government already

6    suggested, even in their voir dire, this case is going to be

7    about, like, relationships, and how close Mr. Sittenfeld felt

8    with people who were asking him questions on wires and on

9    telephone calls.

10       The government said, you know, speak in person.  They try

11   to make a friend of Chin's arrangement.  We are agreeing a

12   friendship occurred with Mr. Ndukwe and Mr. Sittenfeld, and

13   this helps show that, that he helped facilitate things for

14   him, and they thought of each other as well.  Mr. Sittenfeld

15   thought he was his friend.

16           THE COURT:  Yeah, I'm going to allow 17 and 18.

17           MS. GLATFELTER:  Your Honor, we object on multiple

18   grounds here.  First, it's irrelevant.  It's a text message

19   that is of Mr. Ndukwe, and he is holding his newborn son.

20       I think it's inappropriate for this to be in a slide,

21   regardless of whether there are any hearsay objections to the

22   slide, and it would be impermissible under 403 grounds as

23   well.

24           MR. C. MATTHEW RITTGERS:  Your Honor, the same

25   reason.  I'm not offering it -- I'm just -- Mr. Sittenfeld and

1    Mr. Ndukwe, the friendship is critical for what Mr. Sittenfeld

2    would have been comfortable saying, if he believed that this

3    was his friend, on a wire.

4         MS. GLATFELTER:  They are introducing this photograph

5    to embarrass Mr. Ndukwe or put personal information about

6    them.  There's no reason for this text message to come in.

7    They can make this point without the text message.  I'm

8    objecting to it on 403 grounds.

9         MR. C. MATTHEW RITTGERS:  Your Honor, I'm introducing

10   the same photograph that Mr. Sittenfeld gave to Mr. Ndukwe, a

11   little baby on Mr. Sittenfeld's chest.  It's just to show

12   their relationship.

13        THE COURT:  So who is going to be the sponsor of --

14        MR. C. MATTHEW RITTGERS:  This is to Mr. Sittenfeld

15   and this is Mr. Ndukwe, so I would assume either one of them.

16        THE COURT:  And, Ms. Glatfelter, why do you believe

17   it would be embarrassing to Mr. Ndukwe?

18        MS. GLATFELTER:  This is a personal photo.  His child

19   is in the photo.  He is not the subject of this trial, and to

20   have a personal photo of the defendant out there introduced as

21   an exhibit, shown to the jury, is improper.

22        MR. C. MATTHEW RITTGERS:  Your Honor, he was actually

23   operating knowing that everything was being monitored.  This

24   is October of, I believe, 2018.  He knew what was happening

25   when he sent it to Mr. Sittenfeld.

1          MS. GLATFELTER:  The evidence will show he was not

2     recording interactions with Mr. Sittenfeld until the end of

3     October, when he was instructed by FBI.

4          There's no reason for this to be in a PowerPoint, and

5     there is probably limited at all probative value of this.

6     They can ask the question.

7          THE COURT:  Well, it does tend to show that

8     Mr. Sittenfeld may have believed that he had a close personal

9     relationship with Mr. Ndukwe.

10         I'm not -- I'm at a little bit of a disadvantage because

11    everybody out there knows all the evidence in this case, and I

12    know very little of it, so it's a little hard for me to put

13    all this stuff in context, and that's why I'm struggling here

14    a little bit.

15         MR. C. MATTHEW RITTGERS:  It's about their

16    friendship, Your Honor.  I mean, the government is going to

17    say -- there were things that were expressly stated on the

18    wire, and there were a lot of things that were refused to be

19    stated.

20         And the government is going to say, I believe, well,

21    sometimes people get nervous on the phone.  We already heard

22    some of that.

23         It's like, if these guys were that close, and there's no

24    indication that Mr. Sittenfeld knew he was on a wire, like

25    showing this relationship, that he belie- -- it goes to what

1    Mr. Sittenfeld believed what that relationship was.  It's

2    comforting.

3            MS. GLATFELTER:  Your Honor, this is argumentative.

4    This is opening statement.  This might be an appropriate

5    argument to make in closing statement, and to argue the slides

6    this way, but this is opening statement.

7        He can talk about him being a close friend, or that he

8    was an acquaintance, but he doesn't need to put up a slide

9    like this and explain or argue to the jury that this proves

10   that they're close friends.

11           MR. C. MATTHEW RITTGERS:  I'm not going to argue

12   that.  I'm going to state a fact, and use this to show it

13   without argument, that this text message was sent to

14   Mr. Sittenfeld on October 2018.

15           THE COURT:  I'm going to overrule the government's

16   objection on that.  I agree, Mr. Rittgers or Mr. Schuett.  I

17   don't know who I agree at this point, but...

18       Next is Slide 21.

19           MS. GLATFELTER:  Your Honor, I think Slide 20 and 21,

20   even if they surpassed your --

21           THE COURT:  Wait, 20?

22           MS. GLATFELTER:  I'm sorry, was 20 not on my list?

23   It should have been on my list.

24           THE COURT:  20 was on your list as well?

25           MS. GLATFELTER:  It should have been.

1          MR. SCHUETT:  It's on the list later.

2          MS. GLATFELTER:  It's on the list later.  I was going

3     in order of --

4          THE COURT:  Oh, I'm sorry.

5          MS. GLATFELTER:  We can go in order of the hearsay.

6     I apologize, Your Honor.

7          THE COURT:  Okay.  All right.

8          MR. C. MATTHEW RITTGERS:  21?

9          THE COURT:  21 is the next.

10          MS. GLATFELTER:  21, this card contains hearsay, the

11     defendant's statements.

12          MR. C. MATTHEW RITTGERS:  This is Rob and Brian, Your

13     Honor, are the undercover agents.  This is what we got from

14     the government in discovery.

15          MS. GLATFELTER:  That doesn't make it be admissible,

16     Your Honor.

17          MR. C. MATTHEW RITTGERS:  It goes back to the

18     closeness.  I don't care if Mr. Sittenfeld really looked

19     forward to seeing these people.  I mean, it's like looking

20     forward to the year ahead.

21       I mean, I'm not offering it for Mr. Sittenfeld saying he

22     looks forward to the year ahead and for them believing in

23     Cincinnati.  It's for the closeness, the relationship, his

24     comfort in being able to speak with these guys.

25          MS. GLATFELTER:  Your Honor, it is offered for the

1    truth.  That is his statement, and that is why he is sending

2    this card.  This card is offered for the truth to show that,

3    and so, like --

4              THE COURT:  So you're saying the "growing our

5    friendship" part is being offered for the truth that --

6              MS. GLATFELTER:  Yes.

7              THE COURT:  -- in 2018, he believed their friendship

8    was growing?

9              MS. GLATFELTER:  The card itself, they're offering to

10   prove that point, that that is what --

11             THE COURT:  Well, no, but the fact you send a holiday

12   card may prove what you believe the nature of a relationship

13   to be, right?

14     So the fact that you send a holiday card to a person may

15   indicate something about what you believe your relationship

16   with that person to be, independent of whatever the contents

17   of the card are.

18     So, you know, his list of who he sends holiday cards to

19   could -- wouldn't be being offered for the truth of the matter

20   asserted.  I guess, at some level it would be, but it's being

21   offered to show the nature of the relationship, and he thinks

22   he's got a personal relationship with these people, and we

23   think that's important.

24     What I still keep circling back to is why is the nature

25   of their relationship relevant?  Or why is the nature of what

1    Mr. Sittenfeld believes their relationship to be relevant?

2          MR. C. MATTHEW RITTGERS:  A couple things.  One, the

3    government is going to say this was a corrupt secretive

4    relationship.

5        But two, the comfort level that Mr. Sittenfeld actually

6    felt with these people matters because of the things that he

7    would have been willing to say if he truly believed in that

8    friendship, which is what I think these things are showing.

9        When they asked him questions, like him saying there will

10   be no quid pro quo, or him refusing to expressly answer a

11   corrupt-like question when they're in person, having no idea

12   he's on a wire.

13       If this was someone he just met, or he'd only met five

14   times and didn't think they were friends, the argument from

15   the government would be, well, he wasn't that comfortable with

16   them, they didn't know, like this is new to him.

17       These are things that he states thinking that these guys

18   are his friends, and there's nothing expressly stated that's

19   corrupt.

20          MS. GLATFELTER:  The government will not be arguing

21   that.  The government will be arguing it's precisely because

22   he received $40,000 in campaign contributions that he was

23   close to these people after meeting them.

24       I think this card was sent less than a month after he

25   received the campaign contributions, so ...

```
1              THE COURT:  Well, then, I guess you can use it to
2      make that argument, right?
3              MS. GLATFELTER:  Yes, Your Honor.
4              THE COURT:  Okay.  I'm going to allow the card.  I'm
5      sorry, Slide 21?
6              MS. GLATFELTER:  Slide 22 and 25, we also believe --
7              MR. C. MATTHEW RITTGERS:  Same slide, Your Honor.
8      I'm sorry.  I just wanted to let him know it's a duplicative
9      slide.
10             THE COURT:  Oh, it is a duplicative slide?  All
11     right.  Very good.
12             MS. GLATFELTER:  We believe contained inadmissible
13     hearsay.  We don't know why they're being offered.
14             MR. C. MATTHEW RITTGERS:  Your Honor, this is -- just
15     so the Court is aware.  This is a text from Mr. Ndukwe and
16     Mr. Sittenfeld, both of which are going to testify.  This is
17     obviously well before the sting operation.
18         And it will go to why the government claims that there
19     was an unrecorded phone call with Mr. Sittenfeld on
20     September 21st of 2018, and this will be -- the effect that
21     this text had on Mr. Sittenfeld is very relevant to what they
22     claim happened on that call.
23             THE COURT:  Nine months later?
24             MR. C. MATTHEW RITTGERS:  Yeah.  I mean, he's saying,
25     "Keep me posted on the next fundraiser.  I'd like to be on the
```

1    host level." The government claims that next time

2    Mr. Sittenfeld asks him something on an unrecorded call is

3    September, on the fundraiser of $10,000. That's the

4    government's case.

5         And so if Mr. Sittenfeld heard this the same year nine

6    months earlier, and he had not asked Mr. Ndukwe to give a

7    fundraiser, goes directly to the perception of this text to

8    him.

9              THE COURT: Who is "him" in that sentence?

10             MR. C. MATTHEW RITTGERS: Mr. Sittenfeld. The

11   government claims that -- their case is that Mr. Sittenfeld

12   asked Mr. Ndukwe to fundraise $10,000 for him in September.

13   It's an unrecorded call, but it might not be disputed.

14        But one of the reasons why he asked him, and is

15   comfortable asking him, would be the effect this had on

16   Mr. Sittenfeld. The gray bubble, Your Honor, "Keep me posted

17   on the next fundraiser. I'd like to be on the host level" is

18   from Mr. Ndukwe to Mr. Sittenfeld.

19        And there's no fundraising efforts conducted on that

20   level between this time and this unrecorded call, where the

21   government claims Mr. Ndukwe was asked to fundraise $10,000.

22             THE COURT: Yeah. I think I agree with Mr. Rittgers.

23   I'm going to allow that.

24             MS. GLATFELTER: Your Honor, I just want to note for

25   the record and state for the record our understanding that

1     many of these things are going to be authenticated by

2     Mr. Sittenfeld and through his testimony.  And if that turns

3     out not to be true, then what's going to --

4           THE COURT:  Well, we're going to have a huge problem

5     at that point.

6           MR. C. MATTHEW RITTGERS:  Understood.  I understand.

7           THE COURT:  You understand?

8           MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

9           THE COURT:  Okay.  You're nodding your head, but it's

10    going to be a big problem.

11          MR. C. MATTHEW RITTGERS:  I understand.  I mean, I

12    can disclose to the government that in an ex parte at the

13    final pretrial, I told the judge that Mr. Sittenfeld was going

14    to testify, so it's not like a new thing.

15          MS. GLATFELTER:  Well, that's fine too, but he needs

16    to authenticate these documents.

17          MR. C. MATTHEW RITTGERS:  Sure.  There is --

18          MS. GLATFELTER:  So we're offering them.  I mean,

19    we're putting them --

20          MR. C. MATTHEW RITTGERS:  Well, we're -- they're

21    doing that.  Yes, he will authenticate.

22          THE COURT:  Let's get this straight for the next

23    couple weeks.  Sue can only take down one person at a time, so

24    you can't talk over each other.  You each have to let the

25    other one finish.  Does that make sense?

1    MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

2    THE COURT:  Okay.  So where were we at there?

3 Ms. Glatfelter, what was the point you were making, that

4 Mr. Sittenfeld needs to authenticate these?

5    MS. GLATFELTER:  Yes.  I still think that the text

6 messages from Mr. Ndukwe are hearsay, but --

7    THE COURT:  I understand that.  I've overruled that.

8 But I understand your authentication point.  I've been assured

9 that one party to this communication will be testifying and

10 will be able to authenticate the documents.

11    MS. GLATFELTER:  Thank you, Your Honor.

12    THE COURT:  Okay.  So what's the --

13    MS. GLATFELTER:  27.  On 27, the last line comes from

14 a recording that implicates one of the waiver issues that we

15 had that the government's not introducing.

16    MR. C. MATTHEW RITTGERS:  Your Honor, if I may?

17    THE COURT:  You may.

18    MR. C. MATTHEW RITTGERS:  The government and the FBI

19 redacted that transcript so that that waiver issue was

20 resolved, and there's a redacted transcript.

21  Just because the government doesn't plan to introduce

22 this transcript doesn't mean that I can't ask or my father

23 couldn't ask Agent Holbrook or an undercover agent about that

24 statement that he made to Mr. Sittenfeld on that date.

25    MS. GLATFELTER:  Assuming it's not hearsay.  This is

1    taken out of context, and I am making the point to the Court

2    we're not offering the January 9th recording, so I don't know

3    what the context is.

4          THE COURT:  Well, but wait.  I don't know who Rob and

5    Brian are.

6          MR. C. MATTHEW RITTGERS:  They're undercover agents.

7          MR. SCHUETT:  So it can't be for the truth --

8          THE COURT:  So they're not the money, really, right?

9          MR. C. MATTHEW RITTGERS:  No.

10         MS. GLATFELTER:  No.  I'm making the point, Your

11   Honor, that we are not introducing this, and I did not -- I

12   don't know what the defendant's purpose is in some of this,

13   so...

14         THE COURT:  That's a fair question.  What's the

15   defendant's purpose?

16         MR. C. MATTHEW RITTGERS:  You want me to disclose the

17   purpose of this, Your Honor, for opening?

18         THE COURT:  Unless it's a problem?  I mean...

19         MR. C. MATTHEW RITTGERS:  It's not.  It goes to, you

20   know, the reason in which Mr. Sittenfeld decided to support a

21   project is going to be determined on the actual verdict in

22   this case.

23      And so if the things that he says to undercover agents,

24   if he believes that they are actually investors with the money

25   behind Mr. Ndukwe, the government's going to claim that.

1     I don't know why I wouldn't be able to tell them that in

2   opening statement.  That's the whole part of the government's

3   scheme.

4          THE COURT:  I don't believe it's being offered for

5   the truth, so my question, though, is what's it relevant to?

6          MR. C. MATTHEW RITTGERS:  P.G.'s state of mind that

7   they are actually investors there to back Mr. Ndukwe's

8   development deal at 435 Elm.

9          THE COURT:  And that would matter because why?

10          MR. C. MATTHEW RITTGERS:  Because of the actions that

11   then he took, and his responses to their answers, which is at

12   all times relevant to the undercover operation on the tapes.

13          THE COURT:  And why does the government believe it's

14   any way prejudicial?

15          MS. GLATFELTER:  Your Honor, I just don't think it's

16   admissible, and so I don't know -- when he's saying that it

17   goes to Mr. Sittenfeld's state of mind, it's a quote from an

18   undercover.

19          THE COURT:  At a meeting where Mr. Sittenfeld was

20   present, right?

21          MR. C. MATTHEW RITTGERS:  Yes.

22          MS. GLATFELTER:  Right.  But wouldn't that be a

23   statement from Mr. Sittenfeld that we're talking about?

24          THE COURT:  Well, I assume that -- well, I don't

25   understand it yet because I haven't seen the evidence.

1  I assume what Mr. Rittgers is arguing at some level is

2  that when this person, who Mr. Sittenfeld believed to be a

3  friend of Mr. Ndukwe's, was introduced to him and was

4  discussing things with him, that this was the factual

5  background against which Mr. Sittenfeld was operating when he

6  was deciding how to interact with these people, whether to

7  accept money, what he was saying, all those things.

8  So it creates the context in his mind for what the

9  relationship was against which he was acting, but maybe I'm

10  misunderstanding.

11  MR. C. MATTHEW RITTGERS:  Much more articulately than

12  I was stating.  Yes, Your Honor, you're correct.

13  MS. GLATFELTER:  I understand that as stated.

14  THE COURT:  Okay.  So I'm going to overrule that

15  objection.

16  MS. GLATFELTER:  The next hearsay objections are to

17  Slides 50 and 51.

18  THE COURT:  Well, my first objection is I'm too old

19  to read them.

20  MR. C. MATTHEW RITTGERS:  Your Honor, 51 is a little

21  bit of a bigger blowup on 50.

22  THE COURT:  Thank you.

23  MR. C. MATTHEW RITTGERS:  On 50, it's just two cards

24  that says they're independent appraisers.  It's like the

25  appraisers' business cards.

 1            THE COURT:  I see.

 2            MR. C. MATTHEW RITTGERS:  And these guys appraised

 3    the value of the ground rights on 435 Elm, which -- and they,

 4    I believe -- I don't know yet, but I believe we've issued a

 5    subpoena to the marshals for both of these individuals.  This

 6    is their appraisal at 435 Elm, which is project one in this

 7    case.

 8            THE COURT:  And what's the objection to it?

 9            MS. GLATFELTER:  The objection was hearsay, because

10    we don't know -- and authentication.  We have no idea where

11    these documents came from, and they appear to be offered for

12    the truth, and so --

13            MR. C. MATTHEW RITTGERS:  They came from -- oh, I'm

14    sorry.  I'm sorry.  I apologize.

15            MS. GLATFELTER:  -- looks like the first two pages.

16    I'm sorry.  I do see these do come from the government's

17    discovery.  I withdraw that authentication.  I apologize.  I

18    didn't see it on the slide down there.  Yes.

19            THE COURT:  Okay.  So then your objection is what?

20            MS. GLATFELTER:  Hearsay, and that these are offered

21    for the truth.  We don't know how they're going to be, I

22    guess, introduced.

23            THE COURT:  They do appear to be offered for the

24    truth of the matter asserted.  Do they come within hearsay

25    objection, or do you dispute they're being offered for the

1    truth of the matter asserted?

2         MR. C. MATTHEW RITTGERS:  I don't know, Your Honor.

3    Your Honor, a part of me, to be very honest, wanted me to

4    offer it for this $57,000 actual truth.  If I'm understanding

5    this correctly, if these appraisers come in and testify and

6    authenticate this document, they can't talk about the $57,000

7    value they placed on this building.

8         THE COURT:  Well, that would still be hearsay.  This

9    document would still be hearsay.  It may fall within an

10   exception to the hearsay rule.

11   I mean, I have no idea, again, what any of these

12   documents are.  This may be a business record.  I don't know.

13   I don't know what it's created for, what it was used for.  I

14   know nothing about it.

15        MR. C. MATTHEW RITTGERS:  Developer in connection

16   with Mr. Ndukwe created it using his third-party appraisers,

17   who then created the document.  I don't know how the

18   government got it, because I got it from them in discovery,

19   but...

20        THE COURT:  Well, look, it's clearly the case that

21   Mr. Gardner and Mr. Street could be subpoenaed to come in and

22   be asked if they ever performed a lease value analysis of a

23   certain property.

24   And they could testify that they did, and they could say,

25   yeah, it was $57,000.

1          And then if the government challenges it as recent

2     fabrication, you could come up with a contemporaneous written

3     statement to disprove that impeachment.

4          There's a variety of different ways you could use this.

5     I'm just trying to figure out what hearsay exception you're

6     arguing for this, if there is one.

7          Maybe it's a business record.  Maybe it was submitted

8     with a loan application.  Maybe whatever and somebody relied

9     on it as a business -- I don't know because, again, I don't

10    know these documents or the context in which they arise.

11         So far, based on what I'm hearing, I believe

12    Ms. Glatfelter is right, that this is an out-of-court

13    statement being offered for the truth of the matter asserted,

14    and no one has articulated a hearsay exception that applies to

15    it yet, but I'm willing to listen to it if you have one.

16              MR. C. MATTHEW RITTGERS:  The only one would be, Your

17    Honor, the first page of this document, which is not on here.

18    The first page of this document has Mr. Ndukwe's company and

19    another developer company stamped on the top right.

20         So it would be used to understand Mr. Ndukwe's state of

21    mind for why he believed he was being treated unfairly in this

22    project.

23              THE COURT:  Well, look, so far, based on what I'm

24    hearing, 51 I would exclude, but I don't think there's any

25    reason -- on 52, you refer to the fact of the third-party

1    appraisal with the $57,000 per year thing.

2        If these people are going to come and testify that they

3    did an analysis and made $57,000 a year, there's nothing wrong

4    with putting a slide up.  I just don't think you can excerpt

5    an out-of-court statement and use it as a document, because I

6    do agree, it's hearsay.

7        It may be that if and when they testify -- I just don't

8    know much about this document yet, so it may be there's an

9    applicable hearsay exception.  I'm not hearing anything yet,

10   but I'm going to strike 51.

11            MR. C. MATTHEW RITTGERS:  And 50, Your Honor?

12            THE COURT:  Do you have a problem with the business

13   cards just in terms of --

14            MR. C. MATTHEW RITTGERS:  It has the lease on it.

15   It's very small.  I'll take it out.  It's the same thing.

16            THE COURT:  Oh, yeah.  The left side of 50.

17            MR. C. MATTHEW RITTGERS:  Yeah.

18            THE COURT:  Right.  But if you want to say you're

19   going to hear from people and want to use a business card --

20   are you going to have a problem with business cards,

21   Ms. Glatfelter?

22            MS. GLATFELTER:  No, Your Honor.

23            THE COURT:  So if you want to say here's two people

24   you're going to hear from, and what you're going to hear from

25   them is this, and then go to Slide 52, that's fine, but 51's

1    out for now, okay?

2              MR. C. MATTHEW RITTGERS:  Yes.

3              THE COURT:  All right.  What next?

4              MS. GLATFELTER:  52 and -- well, 52 was based on the

5    previous ones, which I think Your Honor has clarified, so we

6    can skip 52.

7              THE COURT:  Well, yeah, 52 and 53, if they've got

8    witnesses who are going to sit on the stand and say we did an

9    appraisal and it was $57,000 a year, I think they can preview

10   that in the opening that they're going to have that.

11             MS. GLATFELTER:  Yes, Your Honor.  I think the

12   objection -- there's a specific one for 53, which was P.G.'s

13   suggestion to Mr. Ndukwe, on 53.  If he's going to testify to

14   this, then obviously, we have a good faith basis to believe

15   this is going to come in, and then --

16             MR. C. MATTHEW RITTGERS:  Yeah, it's in the

17   recordings.  I mean, it's actually on a wire.

18             THE COURT:  Okay.  51 is out.  What's next?

19             MS. GLATFELTER:  56 and 57 are a group of text

20   messages from the defendant involving Ms. Brunner.

21             MR. C. MATTHEW RITTGERS:  Your Honor, this is

22   Ms. Brunner, who is the head of the Port Authority, and

23   Mr. Sittenfeld.  This is establishing their long-term

24   relationship.

25        To fill the the Court in, I believe the government is

1    going to say that Mr. Sittenfeld was improperly reaching out

2    to Ms. Brunner, because the port controls the property at

3    issue in this case, and so they're going to say that that was

4    atypical for him to do something like that, reach out to the

5    head of the Port Authority, and he was doing it because he had

6    been paid these PAC donations by Mr. Ndukwe and the undercover

7    agents.

8         These texts establish that Mr. Sittenfeld was reaching

9    out to her on a frequent basis about a number of other issues,

10   not just 435 Elm.  It establishes their relationship.

11        THE COURT:  Is the government going to argue that

12   Mr. Sittenfeld did something atypical with Ms. Brunner in the

13   way he communicated with regard to this project?

14        MS. GLATFELTER:  It may come out during testimony,

15   depending on what Ms. Brunner says.  It may come out in her

16   testimony.  I'm not sure what she would say.

17        We've been mindful of the Court's order in terms of her

18   communication with other people, and I don't know if it would

19   be a comparison, so that's why I was a little bit vague there.

20   I'm sorry.

21        THE COURT:  I'm going to allow it, subject to

22   authentication.  Is this Mr. Sittenfeld's phone?

23        MR. C. MATTHEW RITTGERS:  Yes, Your Honor, and

24   Ms. Brunner's.

25        THE COURT:  Somebody is going to authenticate this?

1          MR. C. MATTHEW RITTGERS:  I'll ask her to, but if

2     not, I'll have him do it.

3          THE COURT:  Okay.

4          MS. GLATFELTER:  58 is part of the transcript from a

5     session that we're not introducing into evidence.

6       We also have a further objection.  We can just handle,

7     actually, the transcript objections below, because this is a

8     misleading transcript based on omitting material parts of the

9     conversation.

10      In addition, it's hearsay because we're not offering this

11    portion, this session.

12         MR. C. MATTHEW RITTGERS:  Your Honor, I do agree --

13    the government sent these transcripts.  I went back through

14    them and looked, and we were working on some transcripts where

15    there were notes, it appears.

16      And so I can tell the Court right now, with the

17    government, blocks of transcripts that I'm going to put -- if

18    they want the whole block with the delineation and separation

19    for the next block, I can do that.

20      This particular one, though, I was not necessarily

21    prepared to argue that it was -- is this one, Ms. Glatfelter,

22    not inclusive of the flow of the conversation?

23         MS. GLATFELTER:  I'm sorry.  What was your question?

24         MR. C. MATTHEW RITTGERS:  Was this one like taken out

25    of order?

```
 1          MS. GLATFELTER:  Yes.

 2          THE COURT:  She says it's also listed as a misleading

 3   transcript excerpt on page 2 of the objections.

 4          MR. C. MATTHEW RITTGERS:  So for 58, I can just read

 5   you the transcript, Your Honor.  Do you want me to talk about

 6   that part first?

 7          THE COURT:  Sure.

 8          MR. C. MATTHEW RITTGERS:  So if we went to -- Your

 9   Honor, the government gave you an exhibit listed as USA 30B.

10          THE COURT:  30B?

11          MR. C. MATTHEW RITTGERS:  30B, the top right, there's

12   1D154 right above that little yellow sticker.

13          THE COURT:  Okay.  I've got it.  Thank you.

14          MR. C. MATTHEW RITTGERS:  And then if you flip to

15   page 19, I believe that's what this is referring to.

16      What I would propose, U.C. Vinny, if you go halfway down

17   the page, right below where Mr. Sittenfeld says "right."

18          THE COURT:  Got it.

19          MR. C. MATTHEW RITTGERS:  I would take -- I don't

20   know what he's referring to, "like it's keno," so I would

21   just -- do you see Vinny from the word "they"?

22          THE COURT:  You lost me.

23          MR. C. MATTHEW RITTGERS:  Sorry.  UCE Vinny --

24          MS. GLATFELTER:  Your Honor, this is actually from a

25   different session.  This is not the right part of this
```

```
 1    transcript.  This goes with the next session.

 2              MR. C. MATTHEW RITTGERS:  Oh.

 3              MS. GLATFELTER:  So 58 actually comes from a portion,

 4    a video clip before the third UCE enters the room.

 5              MR. C. MATTHEW RITTGERS:  Yeah, that's correct.

 6              MS. GLATFELTER:  And so we're not putting this --

 7    this is not a transcript that's our exhibit, and it is also

 8    misleading.  I'm just going to --

 9              THE COURT:  So you're not using this at all?

10              MS. GLATFELTER:  Correct.  And I'm going to object to

11    any of these transcript slides being changed overnight, and

12    then I have to review them again tomorrow morning to make sure

13    that they're accurate.  I think these should be stricken.

14       If they want to play a part of a recording that the Court

15    determines is not hearsay, that's fine.  But putting a

16    misleading transcript in front of the jury, particularly --

17    anyway, I will object to any modification of these slides.

18              MR. C. MATTHEW RITTGERS:  Your Honor, one thing, if I

19    may.  September 24th of 2019, I believe you are indicating you

20    are not playing that for the jury, September 24th of 2019?

21    That's your entire case.

22              MS. GLATFELTER:  No.  We're not playing that

23    particular session.

24              MR. C. MATTHEW RITTGERS:  Oh, you're going to cut the

25    first part out?
```

1    MS. GLATFELTER:  There is multiple sessions.  This is

2    talk that occurs before the UC-3 enters the room.

3    MR. C. MATTHEW RITTGERS:  Your Honor, what happened

4    on September 24th of 2019, Mr. Sittenfeld's in Columbus with a

5    meeting with other people across the state.  They ask him to

6    come to a hotel.  This is the entirety of the last three

7    counts from 2019.

8    The beginning, of how they set up Mr. Sittenfeld's mind

9    to think about this man coming in, Vinny, is exactly what this

10   transcript shows in terms of what P.G. heard and what he said

11   literally minutes later when this man entered the room.

12   He is speaking with two undercover agents, Rob and Brian,

13   on September 24th in this part of the transcript, and they're

14   telling him things like what you see in front of you on this

15   slide.

16   If that slide is somehow out of order in terms of the

17   quote, I can do a block quote that is directly out of this

18   transcript.

19   But that is what Mr. Sittenfeld heard right before the

20   video that they're going to show the jury, where Vinny starts

21   talking about a controlled environment.

22   I mean, it goes to what Mr. Sittenfeld believed and

23   thought he was dealing with in terms of Vinny.

24   THE COURT:  So you're offering it for his state of

25   mind in connection with dealing with Vinny?

1          MR. C. MATTHEW RITTGERS:  Yes.  And, Your Honor, on

2     rule of completeness, I also -- I don't want to throw more mix

3     into it but, yeah, I think it's inappropriate to let the jury

4     just hear that second half of a meeting that lasts about

5     60 minutes because they don't like what's said in the first

6     half of the meeting, which is Mr. Sittenfeld talking about

7     potentially he's considering asking questions about should he

8     pause on Mr. Ndukwe's projects in front of the city.

9          It goes directly to his intent as to whether or not he's

10     being controlled by money, what they tell Mr. Sittenfeld about

11     whether or not they might pull out of this project before they

12     interject a third undercover agent.  That's the beginning of

13     the meeting, and they want to cut that out, apparently.

14          MS. GLATFELTER:  Your Honor, I think this is a larger

15     issue.  The transcript here is inaccurate.  As I understood

16     the rule of completeness order from the Court, it was whether

17     a line was -- or a part was inconsistent.

18          This is part of the conversation that occurs before the

19     undercover -- third undercover enters the room, and they're

20     talking about whatever, but this is an inaccurate transcript.

21          It's another issue if they wanted to play the video, and

22     there's some admissible basis for the video, but putting a

23     transcript like this, that's misleading to the jury.

24          THE COURT:  But you got to tease apart your

25     objections, though.  You're kind of right now to me, you're

1   mushing them together.

2          MS. GLATFELTER:  I'm sorry.

3          THE COURT:  So I understand the objection about this

4   being a misleading representation of a transcript, and I

5   understand your objection about needing to review it in the

6   morning if it is, in fact, misleading and they want to change

7   it.

8       But I also understood you to be making a separate

9   objection, which is there's no admissible basis for the first

10  part of the meeting in which you're going to be playing the

11  second part of the meeting.

12      So I just think we're better off if we kind of discuss

13  those separately and kind of try to keep them separate.

14         MS. GLATFELTER:  Sure.  Your Honor, if I may?

15         THE COURT:  Yes.

16         MS. GLATFELTER:  And I should clarify.  My cocounsel

17  reminded me that we will be putting the entire recording in

18  evidence, so the entire recording from the 24th will be in

19  evidence.  We're only going to play a portion of it, and the

20  transcript we have for the portion of it.

21         THE COURT:  You're admitting the entirety of the

22  September 24, 2019?

23         MS. GLATFELTER:  So I'm withdrawing my hearsay

24  objection.  That's what my cocounsel was reminding me of.  So

25  I apologize, Your Honor.

1          THE COURT:  So your concern is only about it being

2    misleading?

3          MS. GLATFELTER:  Yes, Your Honor.

4          MR. C. MATTHEW RITTGERS:  We can fix that very

5    easily.  If I could find this quote, I'll just block the

6    quote.  I mean, the most important thing is --

7          MR. DEMEROPOLIS:  I have it.

8          MR. C. MATTHEW RITTGERS:  Could you tell me what page

9    it is?

10          MR. DEMEROPOLIS:  It's page 8.

11          THE COURT:  Page 8 of 30B?

12          MR. C. MATTHEW RITTGERS:  Page 8, Your Honor.  This

13    might not mesh.  We got new transcripts this past week.

14          And yes, we are referring to that same one, 1D154,

15    which is 30B, yes.

16          THE COURT:  And what page?

17          MR. C. MATTHEW RITTGERS:  He might be looking at a

18    transcript we got a few months ago.

19          MS. GLATFELTER:  This portion is not in Exhibit 30B.

20          MR. C. MATTHEW RITTGERS:  Oh, it's not.  That was cut

21    out of 30B.  We have a transcript that was provided by the

22    government, Your Honor, which would be in our exhibits, which

23    is D661, which is a transcript that they provided to us.

24          THE COURT:  All right.  I have D661 in front of me.

25          MR. C. MATTHEW RITTGERS:  Your Honor, if you would go

1    to page 8 of D661.

2          THE COURT:  Okay.

3          MR. C. MATTHEW RITTGERS:  And if you go down, if you

4    scroll down to the 7157, the third reference of that.

5          THE COURT:  Yeah.

6          MR. C. MATTHEW RITTGERS:  It says, "Yeah, like, yeah

7    like"?

8          THE COURT:  Yep.

9          MR. C. MATTHEW RITTGERS:  That's the slide to a tee.

10         THE COURT:  How is that misleading?  It seems to be

11   an exact replication of that eight lines of the slide on

12   page PGS 010293.

13         MS. GLATFELTER:  I'm sorry, Your Honor, we're trying

14   to find it.  If the Court finds that it's accurate, my

15   apologies.  It wasn't in our exhibit in 30B, and that was part

16   of the reason.  And if I'm mistaken on that, I apologize, Your

17   Honor.

18         THE COURT:  It's page PGS 010293 in Exhibit 661.

19         MS. GLATFELTER:  Okay.  Your Honor.

20         THE COURT:  And this is the transcript that you're

21   going to be submitting as evidence; is that right?

22         MS. GLATFELTER:  No, it's not.  This is not our

23   transcript.

24         MR. C. MATTHEW RITTGERS:  That's your transcript.

25         MS. GLATFELTER:  I know.  But we're not submitting it

1    as evidence.  To clarify, Your Honor, as part of discovery, we

2    provided them transcripts.  We have selected portions, a large

3    portion of the meeting, but that part of the transcript is not

4    in our exhibits.

5         THE COURT:  But I thought I just heard you say,

6    Ms. Glatfelter, that the entirety of this conversation was

7    going to be submitted.  Just this video, you mean, or what?

8         MS. GLATFELTER:  Yes.  We're not going to play the

9    entire video.  We're going to play the portion that matches up

10   with our transcript, but the entire video will be in evidence.

11       So I withdrew my objection to the video.  Now that he's

12   showing me the portion of the transcript he's referring to, I

13   understand, and I will withdraw that.

14        THE COURT:  All right.  So we've sort of been moving

15   through the inadmissible hearsay parts, and now we've sort of

16   shot down to misleading transcript excerpts.

17       But I think it makes sense to finish up with 60, 63, 64,

18   and 65, which are still hearsay, I believe?

19        MS. GLATFELTER:  Yes.  In addition, 63 and 64 are two

20   portions of the January 30th meeting.  As background, the

21   January 30th meeting is where the undercovers gave

22   Mr. Sittenfeld the bottle of scotch and cigars.  After that --

23        THE COURT:  Can I ask one quick setup question?

24        MS. GLATFELTER:  Yes.  Of course.

25        THE COURT:  Why are you objecting to 63 and not 62?

1    What changed between 62 and 63?

2            MS. GLATFELTER:  I believe -- let me pull up the

3    slide here.

4            MR. C. MATTHEW RITTGERS:  May I help?  I know it

5    better.

6            THE COURT:  Oh, okay.

7            MR. C. MATTHEW RITTGERS:  Is this we're on scotch and

8    cigars?

9            THE COURT:  63 has an arm in it.

10           MR. C. MATTHEW RITTGERS:  63 and 64.  So the

11   government did a transcript of -- and, Your Honor, this has

12   been briefed.  This is the scotch and cigars.

13       At the very end of 62, Slide 62, is where the

14   government's transcript ends but the video does not.  And

15   so Slide --

16           THE COURT:  Oh, is this a reference to a video that's

17   going to play on this slide?

18           MR. C. MATTHEW RITTGERS:  Yes.

19           THE COURT:  Oh, okay.  I see.

20           MR. C. MATTHEW RITTGERS:  And 63 and 64, it keeps

21   playing.  The entirety of 63 and 64, they talk about babies,

22   and birthing, and childhood.

23       And the government is arguing that this scotch and cigars

24   was because they made one quote in four minutes, which was,

25   "You've worked our ass off for us."  Then they stopped their

1    transcript in the video at that quote and didn't keep playing

2    all the baby talk.  And so that's what 63 and 64 are, is the

3    baby talk.

4         MS. GLATFELTER:  Your Honor, he makes that point

5    before they say congratulations, whatnot.  So we have no

6    objection to 62, which can include some of that context.

7         63 and 64, and the Court can watch the videos if defense

8    provided the video versions, the defendant's talking about his

9    wife's pregnancy, and how she's doing, and whether she's ill,

10   and this --

11        MR. C. MATTHEW RITTGERS:  Yes.

12        MS. GLATFELTER:  -- goes on in 63 and 64.

13        MR. C. MATTHEW RITTGERS:  Yes.

14        MS. GLATFELTER:  So these are video clips.  I think

15   they go to jury nullification.

16        I understand the point about -- I understand the part

17   about the gifts, and there's no objections to that.  That's

18   the first part of the video.  We agree on that.  But there's

19   minutes here of the defendant just talking about his wife's

20   pregnancy.

21        MR. C. MATTHEW RITTGERS:  Your Honor, they've argued

22   in briefings in this case.  We've argued that Mr. Sittenfeld's

23   intent was and belief that this was a gift about his wife's

24   giving birth and being pregnant.  And they are now cutting out

25   the last two minutes there of -- it's all of them.  It's Rob

1    and Brian, the undercover agents, and Mr. Sittenfeld talking

2    about pregnancy.  And they want to cut that out and argue to

3    the jury that this gift was because he's corrupt.

4         THE COURT:  Okay.  I haven't seen 63 or 64.  Did you

5    submit electronic versions of these or not?

6         MR. C. MATTHEW RITTGERS:  It's in the PowerPoint,

7    Your Honor, that I sent you.  To play it, if you hit the space

8    bar, they'll play.

9         THE LAW CLERK:  That appears to be correct.

10        THE COURT:  Okay.  I'll take a look at it and email

11   the parties tonight about 63 and 64.

12        MS. GLATFELTER:  Number 65 is an objection, a hearsay

13   objection.  This appears to be offered for the truth.

14        THE COURT:  I just want to make sure I understand the

15   government's argument.  So there's gifts that are given from

16   two people, two undercover agents, to Mr. Sittenfeld?

17        MR. C. MATTHEW RITTGERS:  That's correct.

18        THE COURT:  And the question is what's the purpose of

19   the gifts, and there's a bunch of conversation around the

20   gifts, and the two competing notions are that it's either

21   congratulations for the impending or just completed?

22        MR. C. MATTHEW RITTGERS:  Impending.

23        THE COURT:  Impending --

24        MR. C. MATTHEW RITTGERS:  Birth.

25        THE COURT:  -- birth of a child, versus it being a

1    thank you for having carried out one half of the quid pro quo,

2    or both, possibly.

3       And the government's view is that only snippets of that

4    conversation are needed to understand what the gifts are for?

5         MS. GLATFELTER:  No, Your Honor.  Our argument is

6    that it was also offered as a thank you.

7         THE COURT:  Sure.

8         MS. GLATFELTER:  And it was offered for both

9    purposes.  The first part of the video -- there's three clips.

10   The first part of the video captured all of that.  It captures

11   that part of the conversation.

12      And then when Your Honor watches the second and third,

13   it's a clip about personal pregnancy and baby stuff.  I mean,

14   it's just --

15        THE COURT:  Doesn't that go to suggesting that the

16   whole context for this gift was more about the pregnancy and

17   the impending childbirth than it was about the other thing?

18   It doesn't exclude it, of course.  I mean, it could be both.

19        MS. GLATFELTER:  And the government's not arguing

20   it's exclusively for as a thank you.  It would be arguing

21   their both purposes.  So I don't understand why the second

22   part, which they move on past the gift, okay?

23        THE COURT:  All right.  I'll take a look.  I mean, I

24   will tell you, I do take the argument that if people are going

25   to have excerpts of conversations, it may make some sense to

1    have more rather than less of a conversation.

2        If the question is what were people taking out of the

3    conversation, or what did they understand an arrangement to

4    be, it certainly seems to me like more context helps jurors

5    decide what the nature of the conversation was rather than

6    hurting.

7        And it just seems like, in a lot of spots here, we're

8    arguing for the jurors hearing less of the conversation, and

9    making a decision about overall tone and context based on

10   smaller chunks rather than larger chunks, and I guess I'm just

11   not entirely clear on why that is, but...

12       MS. GLATFELTER:  I understand the Court's statement.

13   I disagree with the second and third video clips.  I think

14   they're very prejudicial, and they're used for jury

15   nullification.

16       THE COURT:  Okay.  I'll take a look at them.

17       MR. C. MATTHEW RITTGERS:  Your Honor, just so the

18   Court is aware.  The only reason why there are two clips and

19   not one is because there was a brief reference, and so we just

20   clipped it into two.

21       THE COURT:  I see.  Thank you.  And then the last one

22   is 65.

23       MS. GLATFELTER:  Yes, Your Honor.  I'm not sure what

24   65 is, and I'm not sure.

25       MR. C. MATTHEW RITTGERS:  We can take it out.

1           THE COURT:  65 is removed.  Okay.  65 has been

2      removed.

3           MR. SCHUETT:  Your Honor, question.  We were

4      discussing back and forth on 59.  60 is the video that's

5      referenced, just on my notes, whether that was also withdrawn

6      or ruled on?

7           MS. GLATFELTER:  Yes, Your Honor.  That was

8      withdrawn.

9           THE COURT:  Okay.

10          MR. SCHUETT:   Thank you.

11          MR. C. MATTHEW RITTGERS:  So, Your Honor, remove 50,

12     51, possibly I could keep the right side in of 50, which I

13     might not.  Remove 65, and then the Court will inform us about

14     63, 64?

15          THE COURT:  Jacob?

16          THE LAW CLERK:  That's what I have.

17          THE COURT:  Okay.  Now we're on to misleading

18     transcript excerpts.

19        So now we start back over.

20          MR. C. MATTHEW RITTGERS:  I might be able to clean

21     these up pretty quickly, Your Honor.  What number?

22          THE COURT:  I don't know, it starts with Slide 29.

23     I'm just looking at the government's objections, so...

24          MR. C. MATTHEW RITTGERS:  Slide 29.  I'll have to

25     give -- if they want the entirety of this clip, which I'm fine

1    to give, it might turn into like two slides, and I'll just

2    tell you where I'm going to clip it so that the Court's aware.

3              THE COURT:  Okay.

4              MR. C. MATTHEW RITTGERS:  If you look at Government

5    Exhibit USA 13B.

6              THE COURT:  Okay.  Oh, wait.  We're back on the

7    government's exhibits.  Okay.  13B.

8              MR. C. MATTHEW RITTGERS:  If you go to page 2.  If

9    you go down to the third Mr. Ndukwe reference, "Yeah so"?

10             THE COURT:  Yep.

11             MR. C. MATTHEW RITTGERS:  I mean, I can put that

12   first sentence in there about "friends up in Columbus," but I

13   would first start at, "Here's the deal, P.G.," and let it go

14   down all the way through page 3, "Mr. Ndukwe:  Absolutely."

15      And I will do that as Slide 29, but I'm letting her know

16   it might turn into two or three slides.  I have to put it all

17   in there.

18             THE COURT:  But it's the exact transcript?

19             MR. C. MATTHEW RITTGERS:  This exact transcript.

20             MS. GLATFELTER:  Your Honor, what am I going -- I

21   mean, we'll have to verify these.

22      I object to this.  I object to have to spend my time

23   reviewing these transcripts for accuracy when they were done

24   in a manner which is misleading.

25             MR. C. MATTHEW RITTGERS:  Well, your Honor --

1          MS. GLATFELTER:  If I may finish.  There are no

2     ellipsis or anything to show that these conversations and

3     these statements were separate.  After every line, there's

4     something missing, and that was intentionally done.

5          MR. C. MATTHEW RITTGERS:  No, it was not.  Well, Your

6     Honor, one, these are statements that are important to pull

7     out and show the jury.

8          The very next slide -- this is 29.  The very next slide,

9     Slide 30, is the entirety of this transcript.  It's the whole

10    call.

11         So I mean, as I indicated to the Court, I'll take page 2

12    from that "Here's the deal, P.G.," all the way down to page 3,

13    on the first "absolutely."

14         THE COURT:  So is Government's Exhibit USA 13B going

15    to be admitted at trial?

16         MS. GLATFELTER:  13B, yes.

17         THE COURT:  Okay.  So, Mr. Rittgers, you know, rather

18    than put Ms. Glatfelter in a spot where she has to verify the

19    transcript, is there some reason you couldn't just take 13B

20    and put it on an Elmo while the phone call is playing?

21         MR. C. MATTHEW RITTGERS:  I don't know if it would be

22    very effective putting this on an Elmo and trying to have the

23    jurors read.  I mean, there's just so much on a page.  I mean,

24    it would be the same thing for me --

25         Your Honor, I will personally go through every word of

```
1    this, and go through and start at, "Here's the deal, P.G.,

2    it's like."  And it will go every single word here through

3    page 3, at the very top, where it says, "Mr. Ndukwe:

4    Absolutely."

5            THE COURT:  All right.  Well, I'm going to allow you

6    to do that, but --

7            MR. C. MATTHEW RITTGERS:  I will do it.

8            THE COURT:  -- you get problems if it's not right, if

9    it's not done right.

10           MR. C. MATTHEW RITTGERS:  I don't want to be in your

11   ire.

12           THE COURT:  How long have you had these transcripts?

13           MR. C. MATTHEW RITTGERS:  These that we're

14   referencing?  This week.  These transcripts?

15           MR. SINGER:  The content.

16           MR. C. MATTHEW RITTGERS:  We've had content for a

17   long, long time, but the transcripts have been slightly edited

18   that we got literally in the last seven days these transcripts

19   that were referenced.

20           MS. GLATFELTER:  Your Honor --

21           THE COURT:  You know, we're creating difficulties

22   that don't need to exist because of doing things like taking

23   ellipsis out, and other things.

24      I take Ms. Glatfelter's point on that.  It's a little

25   frustrating, this late in the game, to take transcript
```

1    excerpts and kind of mix them up and match them up on the page

2    just to say things different from what they say in their

3    original form.

4        I'm fully supportive of your right to put on a defense,

5    but I'm not supportive of anybody's rights to sort of mess

6    with the transcripts, and that applies equally to all the

7    parties.

8            MR. C. MATTHEW RITTGERS:  Sure.

9            THE COURT:  And I'm just a little concerned about how

10   to do this without -- how many slides is it that

11   Ms. Glatfelter is going to have to review for accuracy if we

12   allow you to do this?

13           MR. C. MATTHEW RITTGERS:  Your Honor, I count --

14           THE COURT:  I mean, 59 we looked at, and it looks

15   like 59 was right the way it was, right?

16           MR. C. MATTHEW RITTGERS:  I haven't had time to go

17   through every single one of these, but I did look at some, and

18   I think they're based off of actual notes, to be honest.  But

19   what's the next one on the list?

20           MR. SCHUETT:  33.

21           THE COURT:  Well, it's 33, 34, 35, and 36, so it's a

22   bunch of them.

23           MS. GLATFELTER:  Your Honor, there are huge

24   variations between these.  I mean, these aren't even on the

25   same page.

```
 1              MR. C. MATTHEW RITTGERS:  Here's what I can do, Your
 2    Honor.  On 33, 34, 35, 36, USA 15C, I'll make it very simple
 3    and I'll cut this way back.  It will actually be a briefer
 4    presentation.
 5         USA 15C, if you flip to page 6, very bottom,
 6    "Mr. Ndukwe," that paragraph, that would be a slide.
 7              THE COURT:  Which?  "And basically we got, we have
 8    probably one point," that one?
 9              MR. C. MATTHEW RITTGERS:  Yep.
10              THE COURT:  So it's going to be only that last
11    paragraph on page 6 of Mr. Ndukwe, that's it?
12              MR. C. MATTHEW RITTGERS:  That's correct.
13              THE COURT:  Okay.  Well, and that's going to replace
14    the 33, 34, 35, and 36?
15              MR. C. MATTHEW RITTGERS:  Slide 34, I'm going to tell
16    you --
17              THE COURT:  No, no.  Wait.
18              MR. C. MATTHEW RITTGERS:  Sorry.
19              THE COURT:  What's that paragraph going to replace?
20              MR. C. MATTHEW RITTGERS:  Well, these slides, 33, 34,
21    35, and 36, I just created new slides by the government's
22    transcript that they gave me today, and I blocked them so that
23    I can go in there right now with what they're going to be.
24              THE COURT:  Okay.  So this paragraph is going to be
25    33, you're saying?
```

1            MR. C. MATTHEW RITTGERS:  Yes.

2            THE COURT:  Okay.

3            MR. C. MATTHEW RITTGERS:  Slide 34, next page, bottom

4     paragraph.  That would be slide 34.

5            THE COURT:  Just the bottom paragraph, "Yeah yeah,

6     complete demo, straight to the ground," that paragraph?

7            MR. C. MATTHEW RITTGERS:  Correct.

8            THE COURT:  And that's it?

9            MR. C. MATTHEW RITTGERS:  And that's it on Slide 34.

10           THE COURT:  The entirety of that paragraph?

11           MR. C. MATTHEW RITTGERS:  That's correct.

12           THE COURT:  Okay.

13           MR. C. MATTHEW RITTGERS:  So Slide 35, Your Honor --

14           THE COURT:  Yes.

15           MR. C. MATTHEW RITTGERS:  -- would be if you go down,

16    it goes to the third reference of Mr. Ndukwe, "It's probably

17    it right now," on page 8.

18         And it will go from "it's probably it right now," down to

19    the Mr. Ndukwe comment, "Probably close to, if we do $30,000,

20    uh, for our existing office tenant, put another 15 for that

21    co-working banquet F seating space."  That would be Slide 35.

22           THE COURT:  So again, it's going to be page 8,

23    starting with "it's probably it right now," our numbers?

24           MR. C. MATTHEW RITTGERS:  Yes.

25           THE COURT:  Down to "probably close to"?

```
1              MR. C. MATTHEW RITTGERS:  That's correct.

2              THE COURT:  And that's going to be Slide?

3              MR. C. MATTHEW RITTGERS:  35.

4              THE COURT:  35, okay.

5              MR. C. MATTHEW RITTGERS:  36, next page.

6              THE COURT:  Okay.

7              MR. C. MATTHEW RITTGERS:  Starting with the, "Yeah, a

8    solid CRA," it's about a third of the way down "Mr. Ndukwe."

9              THE COURT:  Yep.

10             MR. C. MATTHEW RITTGERS:  Going down through

11   Mr. Sittenfeld, three up from the bottom, "And, you know, can

12   certainly shepherd the votes too."  I think that's supposed to

13   say "I," but I don't know.

14             THE COURT:  That's 36, and it's going to be the

15   entirety of that?  The only ellipsis being the ellipsis that

16   are shown in the transcript itself; is that right?

17             MR. C. MATTHEW RITTGERS:  That's correct, Your Honor.

18   If that doesn't fit on one slide, can I do a continued and put

19   it on a second?

20             THE COURT:  Yes.

21             MR. C. MATTHEW RITTGERS:  Okay.  Slide 37,

22   Your Honor, if you flip to page 24.

23             THE COURT:  What's the objection on Slide 37?

24             MS. GLATFELTER:  There's no objection, Your Honor.

25             THE COURT:  There's no objection.
```

 1          MR. C. MATTHEW RITTGERS:  This would go to -- yeah, I

 2     believe on 38, there's objections, correct?

 3          THE COURT:  Yes.

 4          MR. C. MATTHEW RITTGERS:  Those are -- would the

 5     Court permit me to put ellipsis in between these, because

 6     these are statements throughout this meeting?

 7        And the reason why I did P.G. P.G. P.G., if P.G. had said

 8     all that at the same time, it would have just been a full

 9     paragraph.  But those are statements throughout the meeting

10     where he's talking about this development agreement and Mr.

11     Cranley.

12          THE COURT:  Where is it in the transcript?

13          MS. GLATFELTER:  It starts on page 30 for the top

14     two, and then it goes backwards four pages to page 25.

15          MR. C. MATTHEW RITTGERS:  All right.  We'll do

16     block quotes.

17          THE COURT:  Yeah.  I don't want us going backwards

18     without indicating -- I mean, I think it's only fair you keep

19     it in the chronological order of the conversation that

20     occurred.

21          MR. C. MATTHEW RITTGERS:  Okay.  Slide 38 -- well,

22     I'm talking about different issues with the jury at these

23     times, but Slide 38 would be on page 24, Your Honor.

24          THE COURT:  Where on 24?

25          MR. C. MATTHEW RITTGERS:  The top from

1    Mr. Sittenfeld.

2          THE COURT:  "Like, but I will look"?

3          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

4          THE COURT:  Through?

5          MR. C. MATTHEW RITTGERS:  Through if you go down

6    speaking people one, two, three, four, five six,

7    "Mr. Sittenfeld, ellipsis, has some beef with Chin or

8    whatever, I don't think he's going to stand in the way of a

9    good deal."

10         THE COURT:  All right.  That's 38?

11         MR. C. MATTHEW RITTGERS:  That will replace Slide 38.

12   I don't know --

13         MS. GLATFELTER:  Your Honor?

14         THE COURT:  Yes, Ms. Glatfelter?

15         MS. GLATFELTER:  Slide 58, and you go to Government's

16   Exhibit 30B.

17         MR. C. MATTHEW RITTGERS:  So 39 is fine.

18         THE COURT:  No objection to it, that I've seen, at

19   least so far.

20         MS. GLATFELTER:  It's on page 19.

21         MR. C. MATTHEW RITTGERS:  Of 58?

22         THE COURT:  I think we're on 58 now.

23         MR. C. MATTHEW RITTGERS:  Oh, I thought we already

24   talked about this one.

25         THE COURT:  Is this the one we talked about?

1          MS. GLATFELTER:  Yes, Your Honor.  So I'm sorry.  I
2    was jumping ahead there.
3          THE COURT:  So 58 and 59 are both withdrawn, or is
4    59 still there?
5          MS. GLATFELTER:  No, 59 is still in there.
6          THE COURT:  So 58 is good.
7          MS. GLATFELTER:  So page 19.  And then I think it
8    actually skips about 10 pages and goes to the end.
9          MR. C. MATTHEW RITTGERS:  Which slide are we on?
10         THE COURT:  I think we're on 59.
11         MS. GLATFELTER:  So the first part I've highlighted.
12   The highlighting in yellow is what's missing from the slide.
13         THE COURT:  Okay.  And this is in government's
14   exhibit what?
15         MS. GLATFELTER:  Government's Exhibit 30B, page 19
16   and page 29.
17         THE COURT:  30B page what?
18         MS. GLATFELTER:  19 and 29.
19         THE COURT:  Okay.
20         MS. GLATFELTER:  So the highlighting shows what's
21   missing from the slide.
22         MR. C. MATTHEW RITTGERS:  Slide 58, Your Honor.
23         THE COURT:  No.  We're on 59.  58 has been taken care
24   of.  So we're on 59, which corresponds to page 19 of
25   Exhibit 30B.

1      MR. C. MATTHEW RITTGERS:  So 59, Your Honor, we could

2  go from -- if you go to page 19, start at UCE Vinny, which --

3  where he says, "Like it's keno," although if the government

4  permits me to just not put that in, because I don't even know

5  what he's referring to, keno.

6      MS. GLATFELTER:  It's a type of lottery machine

7      MR. C. MATTHEW RITTGERS:  It's a type of what?

8      MS. GLATFELTER:  It's a type of gambling machine.

9      MR. C. MATTHEW RITTGERS:  I mean, we can put that in

10  there.  I'll include that, the "UC Vinny:  Like it's keno.

11  They have no idea..."

12      THE COURT:  Okay.

13      MR. C. MATTHEW RITTGERS:  Through, "And so what we

14  learned in Rhode Island was it needs to be super controlled."

15      THE COURT:  Okay.

16      MR. C. MATTHEW RITTGERS:  That would be Slide 59,

17  right?

18      THE COURT:  Okay.

19      MR. C. MATTHEW RITTGERS:  And then one more slide,

20  which would be, I guess, after 59, the next page.

21      THE COURT:  Starting with?

22      MR. C. MATTHEW RITTGERS:  It's an ellipsis, and it's,

23  "What's that, what's that --"

24      THE COURT:  Yep, field dash.

25      MR. C. MATTHEW RITTGERS:  That block quote from

```
 1    UCE Vinny.

 2              THE COURT:  Through where, just that block quote?

 3              MR. C. MATTHEW RITTGERS:  That's it.  Okay.

 4              THE COURT:  Okay.  That's going to be the slide after

 5    58?

 6              MR. C. MATTHEW RITTGERS:  That would be the slide

 7    after 58.

 8              THE COURT:  Is that it?

 9              MS. GLATFELTER:  And then the end, that's also

10    missing text, so the last part goes from page 29.

11              THE COURT:  I don't think that's going to be there

12    anymore, is it?

13              MR. C. MATTHEW RITTGERS:  Which one, Slide 59?

14              THE COURT:  The last conversation of Slide 59.

15              MS. GLATFELTER:  Are you taking that out?

16              THE COURT:  Slide 59 is completely out, I think,

17    right?

18              MR. C. MATTHEW RITTGERS:  I have a Slide 60.  Sorry.

19    I guess that would be 61.

20              THE COURT:  What?

21              MR. C. MATTHEW RITTGERS:  Sorry, Your Honor.  There's

22    one more slide that I would like to create, so it would be

23    Slide 61, I guess, after -- if you go to the very last page.

24              THE COURT:  Just stop for a second.  So your current

25    59 is being removed and replaced?
```

```
 1              MR. C. MATTHEW RITTGERS:  Entirely.  Yes.

 2              THE COURT:  And it's being replaced by two

 3    conversations, one of which is a conversation on page 19 that

 4    starts with, "Like it's keno," and ends with, "And so what we

 5    learned in Rhode Island," that one, right?

 6              MR. C. MATTHEW RITTGERS:  That's 59.

 7              THE COURT:  And then there's going to be a new slide

 8    that you're adding, which is the block quote on page 20, which

 9    is ellipsis, "What's that, what's that thing, deal dash," it's

10    just going to be that paragraph, and that's going to be a

11    slide, right?

12              MR. C. MATTHEW RITTGERS:  That will be a slide.

13              THE COURT:  But other than that, all of 59 -- the

14    current 59 is gone?

15              MR. C. MATTHEW RITTGERS:  Yes, but the last part,

16    that's picked up again on line 29.  This is why these are

17    broken like this, the transcripts.

18              THE COURT:  Okay.  So there is going to be another

19    slide?

20              MR. C. MATTHEW RITTGERS:  There will be one more

21    slide.

22              THE COURT:  And what is that slide?

23              MR. C. MATTHEW RITTGERS:  Last page.

24              THE COURT:  Of 30B?

25              MR. C. MATTHEW RITTGERS:  Page 29, yes.  UCE Vinny
```

1    with Mr. Sittenfeld's answer, "I think it should be very high

2    financially" period.

3          THE COURT:  So that's going to be another new slide?

4          MR. C. MATTHEW RITTGERS:  Yeah, if that's what the

5    Court would prefer, then yes.

6          THE COURT:  Yes.  So that's just going to be those

7    two lines?

8          MR. C. MATTHEW RITTGERS:  It would be

9    Mr. Sittenfeld's response to --

10         THE COURT:  Right.

11         MR. C. MATTHEW RITTGERS:  So it's like four lines.

12         THE COURT:  Okay.  All right.  Now jury nullification

13    slides.

14         MS. GLATFELTER:  I can't remember if we discussed 20

15    or not.  I think we did.

16         THE COURT:  We discussed 20L with regard to jury

17    nullification.  I think this is going to the nature of the --

18    is this the text that went from Mr. Sittenfeld to Mr. Ndukwe?

19         MR. C. MATTHEW RITTGERS:  These texts went to the

20    agents, Your Honor.

21         THE COURT:  Went to the agents, okay, but they're to

22    show the relationships between?

23         MR. C. MATTHEW RITTGERS:  Yes.

24         THE COURT:  Yeah, they're permissible.  Okay.  What

25    else?

1         MS. GLATFELTER:  Slide 40, Your Honor.  I believe

2    slide -- there's several slides.  Again, I don't know exactly

3    what's going to be said, so I'm doing this sort of in a

4    vacuum.  But these look like the entrapment light argument

5    that we had moved in limine about and the Court had ruled on

6    on Friday, so 40 and 49.

7         MR. C. MATTHEW RITTGERS:  That's just facts, Your

8    Honor, what's going to come out at trial.

9         THE COURT:  Is somebody going to testify to all this?

10        MR. C. MATTHEW RITTGERS:  Yeah.  It's on tape, so I

11   would assume all their witnesses will agree to it or be

12   impeached.

13        MS. GLATFELTER:  This also is argumentative.

14        MR. C. MATTHEW RITTGERS:  No.  I'm not gonna -- the

15   decisions were made about bundling on the first recorded call

16   to Mr. Ndukwe on October 26th.

17      How much to donate was one of the first three recorded

18   calls, and we know Mr. Ndukwe is the one who said it because

19   it's on the tape, $20,000.

20      And Mr. Sittenfeld's response was, "Wow, over the next

21   couple of years?"  And he says, "No, couple days."  That's the

22   facts.

23      Number 3, the undercover agents -- Mr. Sittenfeld, in the

24   first meeting, said that PAC donations are the most valuable.

25   They end up attempting to donate improperly three or four

1    times, and then after saying they don't want their names

2    associated with it, they donate to his PAC.  That's the facts.

3            MS. GLATFELTER:  Your Honor, I understand the

4    defendant's argument.  I think that's an entrapment argument.

5    He's arguing for the jury to say what he did doesn't matter

6    because the government made suggestions.  That's what this

7    argument is, or the government --

8            THE COURT:  In the who in the who made the decisions,

9    who's the who?

10           MR. C. MATTHEW RITTGERS:  In here, I mean, I'm

11   assuming that the FBI told Mr. Ndukwe to offer the LLC

12   bundling to Mr. Sittenfeld.

13       All I can say in my opening is that here, on the first

14   recorded call, Mr. Ndukwe talked about these guys having a ton

15   of capital sources and LLCs, and we want to donate through the

16   LLCs before the law change thing in November.

17       The $20,000, all I can say is what is in the tapes and

18   what we'll hear, which is that Mr. Ndukwe says, "They want to

19   give you 20,000."

20       Mr. Sittenfeld's response is, "$20,000 in the next couple

21   of years?  I'd be entirely grateful."  He says, "No, no, the

22   next couple weeks."  So that "they" would be Mr. Ndukwe or the

23   undercover agents.  I don't know who made the call, but

24   Mr. Ndukwe is saying this, which account is really the

25   undercover agents and Mr. Ndukwe.

1          THE COURT:  And these phone calls are coming in?

2          MS. GLATFELTER:  The phone calls are coming in, but

3    it's basically an inducement argument --

4          THE COURT:  Well, it's not an argument, it's just a

5    description of the evidence.

6          MS. GLATFELTER:  Sure, except for the first question

7    on the slide.

8          THE COURT:  Yeah.  Strike the first question.

9    Slide 40, strike the question.

10          MR. C. MATTHEW RITTGERS:  Can I ask the question or

11   not?

12          THE COURT:  You know, I think it's -- if you're just

13   summarizing what happened on the calls, you can say whoever,

14   Bob and Ryan, or whatever their names were, are the ones who

15   specified the form of their donations, how much to donate.  If

16   it's just going to be a summary of what happened on the call,

17   you can do that.

18          MS. GLATFELTER:  Page 49, I don't know what the

19   import of this slide is.

20          THE COURT:  I thought 48 was the next.  Did we

21   already deal with that?

22          MS. GLATFELTER:  Oh, I'm sorry, Your Honor.  I

23   skipped one.

24      Yes, I think this is a jury nullification argument, that

25   the Court is going to instruct the jurors that it doesn't

1    matter, as long as it personally benefitted him.

2       And so they're asking the jury to reject this type of

3    case because he didn't benefit personally from it.

4          MR. C. MATTHEW RITTGERS:  I'm not going to ask the

5    jury that, Your Honor.  These are the facts.  They are

6    undisputed.  People are going to want to know did he have

7    money in his pocket.  Did Mr. Sittenfeld's own personal bank

8    account get any of this money.  Did he commingle these funds

9    with his campaign funds.  They're going to want to know that.

10         THE COURT:  What is that relevant to?

11         MR. C. MATTHEW RITTGERS:  His intent and corruption.

12   They're facts, Your Honor.  The fact that Mr. Sittenfeld did

13   not put any of this money in his own pocket.  They offered him

14   cash.  They offered him cash.  That's going to be on the

15   tapes.

16      Jurors are going to want to know, does the government

17   believe that this commingled with his campaign funds?  They do

18   not.

19         THE COURT:  And that goes to what, though?

20         MR. C. MATTHEW RITTGERS:  His intent and corruption.

21         THE COURT:  I'll email you about that one.  I'm a

22   little concerned about that.

23         MR. C. MATTHEW RITTGERS:  Your Honor, telling the

24   jury that none of these funds went -- it's a fact.  They

25   didn't go into his pocket or got commingled into his campaign

1    account.

2            THE COURT:  I guess I don't dispute it's a fact.  I

3    guess I'm wondering what it's relevant to?

4        I mean, would it have been relevant if he gave the money

5    to charity or something?  I mean, would that have been

6    relevant?

7            MR. C. MATTHEW RITTGERS:  I think the jurors are

8    going to say -- go ahead.

9            MR. SCHUETT:  Your Honor, if I may?

10            THE COURT:  You may.

11            MR. SCHUETT:  Given that this is a non-express case,

12    and we need to look at their actions, motives, circumstances,

13    it's not jury nullification to say the cash didn't go to,

14    because this is not a plus factor case, right?

15        If this had been cash into his pocket, that certainly

16    would have been an action that would have said, well, that

17    shows his corrupt intent.

18        Here there was not.  They did -- if I may, they offered

19    him cash and cashier's checks.  He rejected it.  So if the

20    jury is going to have to judge his intent based on inferences

21    or actions, then these would be relevant to the context of

22    that intent to whether or not he was controlled by an

23    agreement, whether he had a corrupt exchange, or was corruptly

24    influenced by an exchange of money.

25            THE COURT:  So you're saying that if the money had

1       gone into his pocket, the government would be arguing --

2            MR. SCHUETT:  I would presume that they would be

3       arguing that that was the proof of the intent to show

4       corruption, like most other cases that we can cite to.  In

5       fact, that is what they argue, right?

6            They say, look, it went into his pocket, or he's not

7       disclosing funds, which in this case he did, so that these

8       would be sort of the absence of intent, if that makes sense;

9       rebuts intent, if that's a better phrase.

10           MS. GLATFELTER:  Your Honor, the case law is clear,

11      the law is clear, that the benefit under the law is a

12      personal -- or is a benefit to the defendant.

13           The defendant said, in his own words on the tape, that

14      these payments benefit him, and so this is -- however it's

15      presented, and particularly on this slide, or how they're

16      going to present it with these three things, they're asking

17      the jury to consider those because it's not as egregious as

18      some case -- they're trying to make a comparison to some other

19      case that would be more egregious, right?

20           And really what that is about is the financial wealth of

21      the person taking the bribe.  So go ahead, and we'll prosecute

22      cases where there are people who need the money to put in

23      their pocket, and it's not worth prosecuting people who are of

24      means and only want to put it in their campaign war chest.  I

25      mean, that's the message that it's sending.

```
1              THE COURT:  But I take Mr. Schuett's point, that if

2    he had put it in his pocket, you guys would be trumpeting that

3    case, right?

4              MS. GLATFELTER:  But it would be a different case

5    because it wouldn't be a campaign contribution case.

6              THE COURT:  Well, it could still be on the services

7    wire fraud, couldn't it?

8              MS. GLATFELTER:  Yes, of course.  I'm just saying the

9    standards would be different because we're talking about cash,

10   we're talking about campaign donations, and so that's why --

11             THE COURT:  Right.  But isn't the problem here that

12   we need to figure out his intent, what his intent was in

13   accepting this money, whether there was a quid pro quo --

14             MS. GLATFELTER:  Yes, Your Honor.

15             THE COURT:  -- right?  So if he had taken the money

16   and put it in his pocket, you'd say, well, that shows his

17   intent.  So why doesn't taking the money and not putting it in

18   his pocket show something about intent?

19        If taking the money and putting it in his pocket shows

20   something about intent, why isn't taking it and not putting it

21   in your pocket also show something about intent, just not the

22   message that you would want the jury to take?

23             MS. GLATFELTER:  No.  I understand the Court's point.

24   I think it's being used here as a nullification argument that

25   the jury --
```

1          THE COURT:  I'm going to allow 48.  What is 49?  Why

2     are we looking at search and seizure warrants?

3          MR. C. MATTHEW RITTGERS:  It's just the government

4     had those powers in this case.  They've got Mr. Sittenfeld's

5     credit card accounts, they got his bank accounts, and it

6     supports the previous slide, that if they had seen commingling

7     or him syphoning money off the --

8          THE COURT:  49 is out.  What's 66?

9          MS. GLATFELTER:  They're pictures of family photos.

10          THE COURT:  What is the purpose for the photos?

11          MR. C. MATTHEW RITTGERS:  Just to show who he is, and

12     he's going to testify that he's got a pregnant wife and a dog

13     and kid.  He lives in Cincinnati, Ohio, where he grew up, and

14     give a quick background while he's on the stand.

15          THE COURT:  I think 66 is out.

16          MS. GLATFELTER:  Your Honor, I don't have specific

17     objections for the FEC slides.  I just note that -- and the

18     Court discussed it this morning, the danger of.  I hope the

19     argument's not going to be that we promised information about

20     FEC law in opening statements so, therefore, we must put a

21     witness on who can explain this to the jury.

22          THE COURT:  Well, as I've said I think multiple times

23     now, it is certainly the Court's intent that if the government

24     is going to try and create the appearance of some kind of

25     impropriety in the fact that this money went to PACs, and I

1    know we already heard in voir dire today people are familiar

2    with the idea of PACs.  We heard from one of the jurors about

3    having contributed to PACs, and we know what happens with

4    money and PACs.

5        I mean, there is -- as I said on a number of occasions, I

6    believe there is some latent background belief about sort of

7    the propriety or impropriety of contribution to PACs, and one

8    way or another we are going to inform the jury about the law

9    surrounding PACs.

10       So if the parties can't agree, and it appears they

11   haven't been able to agree, on a jury instruction that

12   explains that law, somebody is going to put it in context.

13       But I don't know.  I mean, candidate name, candidate

14   control, is the government planning to make an argument about

15   whether or not, in the leadership PAC, the candidate's name

16   can appear on it, or the candidate can control it, is that --

17           MS. GLATFELTER:  No.  The only arguments, or the only

18   evidence that will be will be the defendant's statement, where

19   he's talking about and he's telling the undercover officers

20   that the PAC is not in his name and no one knows it exists.

21   We're not going to argue anything about leadership PACs.

22           THE COURT:  So I guess, Mr. Rittgers, what I would

23   say to you is, as I said in the order, the press conference

24   isn't coming in.

25           MR. C. MATTHEW RITTGERS:  I understand.

1          THE COURT:  And so having a shadowboxing match with a

2     press conference transcript that's not coming in --

3          MR. C. MATTHEW RITTGERS:  What's that, Your Honor,

4     this?

5          THE COURT:  If that's for the purposes this opening

6     statement is about, oh, they misstated whether the

7     county --

8          MR. C. MATTHEW RITTGERS:  No, no, no.

9          THE COURT:  -- thing could be on it --

10          MR. C. MATTHEW RITTGERS:  Absolutely not.

11          THE COURT:  -- or...

12          MR. C. MATTHEW RITTGERS:  It is the jury is going to

13     see and hear statements which Ms. Glatfelter already heard.

14     This is a secret PAC.  Nobody knows about it.  That's because

15     his name is not on the PAC in FEC filings.

16        They're going to hear those statements, which are true

17     statements, and they're going to have a question, well, if his

18     name's not on the FEC filings, which they won't know unless

19     someone testifies to it, like P.G. or someone else, they're

20     going to say, well, why is he controlling it?  If it's not --

21     you know, they're going to have a lot of questions about this

22     PAC.

23        And the FEC says that names do not go on PACs, but the

24     candidates still control their own PACs, and that's not at all

25     about the press conference.

1          THE COURT:  Do you dispute that that's the way

2     leadership PACs work?

3          MS. GLATFELTER:  Your Honor, as we noted in our

4     instruction, this isn't a leadership PAC.  The defendant's not

5     a federal candidate.  He can't have a leadership PAC.

6          MR. C. MATTHEW RITTGERS:  He's technically --

7          THE COURT:  Wait.

8          MS. GLATFELTER:  So he can't have a leadership PAC,

9     and so it is a gray area what kind of PAC the defendant had.

10    He certainly -- there are leadership PACs, and those

11    candidates are official sponsors so their names do appear on

12    the documents, and so that's not what the defendant had.

13       So all of this business about leadership PACs, I think

14    it's confusing for the jury because it actually didn't exist

15    in this case.

16         MR. C. MATTHEW RITTGERS:  It's technically called a

17    non-connected committee PAC.  If you're a federal candidate,

18    that's when they call it a federal leadership PAC.

19       Because he was not a federal candidate, it's the

20    non-connected committee PAC.  And these PACs are governed by

21    the same regulations of the FEC law, which is that names

22    are -- we have two senators in Ohio, Rob Portman and Sherrod

23    Brown.  They both have one of these PACs, regulated by the --

24         THE COURT:  But they're both federal candidates.

25         MR. C. MATTHEW RITTGERS:  That's true.  There is a

1    Cincinnatus PAC that is a non-connected PAC, same rules apply.

2         THE COURT:  Stop for a second.  You agree there's

3    such a thing as a non-connected committee PAC?

4         MS. GLATFELTER:  Yes.  That is the type of PAC, I

5    believe, that he checked or was checked.

6         THE COURT:  Okay.  And would the phrase "candidate

7    name equals no, candidate control equals yes" apply to a

8    non-connected committee PAC?

9         MR. C. MATTHEW RITTGERS:  Yes.

10        THE COURT:  I know your answer.

11        MR. C. MATTHEW RITTGERS:  Oh, sorry.

12        MS. GLATFELTER:  I don't know the answer to that

13   question, Your Honor, truthfully, because leadership PACs

14   allow the sponsor to be involved a little bit more,

15   non-committed do not.

16       And I think this is -- we don't have to argue this

17   tonight, Your Honor, but I don't know that we can speak about

18   that because there are certain rules that are different for

19   leadership PACs which allow someone to control and which allow

20   someone to have a hand in it and allow someone to spend money

21   in a certain way.  Those kind of rules are different and don't

22   apply to a non-connected committee PAC.

23       And so that's why it was difficult for the government to

24   come up with an instruction we could agree on because some of

25   those principles don't apply to non-leadership PACs.

1          THE COURT:  Well, what's your proposal for how the

2     jury is going to learn whether or not there was something

3     inappropriate about the fact that Mr. Sittenfeld's name was

4     not on this PAC and yet he seemed to be exerting control over?

5          Can we start with would the government agree that there

6     was nothing improper about that from a campaign finance law

7     perspective?

8               MS. GLATFELTER:  With him exerting control over it?

9               THE COURT:  But not having his name on it.

10              MS. GLATFELTER:  He didn't have his name on it

11    because it was not a leadership -- one moment, Your Honor.

12         Your Honor, I don't know if he is permitted to, or the

13    level of control he's allowed to have with PACs.

14         I think the type of PAC that he had was a non-connected

15    PAC for five candidates, and so -- or that would support five

16    or more candidates, and so I don't know the level of degree

17    that allowed the defendant to have and so we are staying away

18    from it.

19         I plan on telling the jurors in opening statements this

20    is not about PACs, this is not about campaign finance laws.

21    It's not about the rules or who can do what.  The only

22    relevance it has is because that was the form of the bribe

23    payments.  And so you'll hear those statements made by the

24    defendant talking about a PAC, and that that PAC benefitted

25    him.

1          And that's what I'm going to tell the jurors tomorrow.

2     That's what's important is that the defendant agreed that it

3     would benefit him.  That's all that matters in this case.

4          MR. C. MATTHEW RITTGERS:  Your Honor, what the jury

5     will see and hear is that Mr. Sittenfeld says, about his PAC,

6     that his name is not associated with it.

7          And that the secretive discussions that we've been

8     hearing already, it connotates corruption or malfeasance.

9     There are videos that are set up where they personally hand

10    Mr. Sittenfeld PAC checks, which is permissible, but jurors

11    don't know that.

12         And so if no one mentions whether that's permissible or

13    not, the fact that we're showing the jury a video of a

14    candidate actually receiving a check in his hand --

15         THE COURT:  My frustration at 6:30 the night before

16    openings is that a lot of this seems to have been back-end

17    loaded into about the last week before trial.  It seems like

18    there's a bunch of disputes about campaign finance law.

19         I'm not even sure there's disputes, but I'm not sure the

20    government is disputing that there was anything improper about

21    Mr. Sittenfeld receiving a check in hand.

22         Is the government suggesting there is anything improper

23    about that?

24         MS. GLATFELTER:  No, Your Honor, not at all.

25         MR. C. MATTHEW RITTGERS:  I was just going to tell

1    the jury that.

2         THE COURT:  Right.  So the things that we all agree

3    on, why can't we figure out a way to tell the jury that?

4         Everybody here agrees that there's nothing wrong with

5    Mr. Sittenfeld receiving checks in hand.

6         Everyone here agrees, if they do, that there's nothing

7    wrong with Mr. Sittenfeld's name not being associated with

8    that.

9         As I understood those audio excerpts, the point of

10   Mr. Sittenfeld's name not being associated with this

11   particular PAC was not anything about campaign finance law, it

12   was about so that alleged enemies of the people who were

13   making the contributions, they wouldn't know that

14   contributions had been made to Mr. Sittenfeld, is that not

15   correct?

16         MR. C. MATTHEW RITTGERS:  The alleged enemies.  He

17   said he has alleged enemies, Mr. Sittenfeld, but...

18         THE COURT:  Oh, okay.  So people wouldn't know that

19   these people had given money to his benefit because it might

20   redound to their detriment to be known as contributors to him,

21   is that the idea?

22         MR. C. MATTHEW RITTGERS:  Yeah, "The press have been

23   poking around in it.  My name is not associated with it or

24   connected to it," per Sittenfeld.

25         THE COURT:  But the government isn't saying there's

1    anything untoward about that, I don't think, and I don't think

2    Mr. Sittenfeld is saying anything other than if you give it

3    here, it will be less apparent to the press, which may make it

4    less apparent to other people.  Is that fair?

5          MR. C. MATTHEW RITTGERS:  I would agree with that.

6    The jurors are going to want to know is that permitted, is

7    that allowed.

8          MS. GLATFELTER:  I'm sorry, Your Honor.  I missed

9    that.

10          THE COURT:  Well, the question was was it allowed.

11    Was it allowed for Mr. Sittenfeld not to have his name on that

12    PAC from the government's perspective?

13          MS. GLATFELTER:  Is it allowed for him -- he can't

14    have the name on it.  He cannot have the name on his PAC.

15          THE COURT:  All right.  So you would agree that he

16    cannot have his name on it?

17          MS. GLATFELTER:  That's correct.

18          THE COURT:  You would agree that there's nothing

19    improper about him accepting a check by hand that's destined

20    for the PAC on which his name does not appear?

21          MS. GLATFELTER:  I think the caveat for that is that

22    unless it's a bribe payment, but under campaign finance law,

23    right, like --

24          THE COURT:  Sure.  No, I get that.

25          MS. GLATFELTER:  That's the difficulty for us in

1     agreeing to some of these things in terms of the limits,

2     because it does matter if they're valid checks or not.

3         So yes, he can take it in his hand, and we're not arguing

4     that there's anything wrong with him picking up the checks.

5         THE COURT: Okay. Well, I guess what I'd say is, you

6     know, you've heard what the government had said. I think it

7     would be prudent for you to skinny down those slides to things

8     that it seems like both parties agree on with respect to the

9     structuring here, such as, for example, the fact that the

10    government will admit there was nothing wrong with him

11    accepting these checks by hand, you know, but just the form of

12    that, right?

13        I mean, if it's a bribe payment, they're still going to

14    object to it being a bribe, but they won't object to the form

15    of the payment, right?

16        MR. C. MATTHEW RITTGERS: Right. I mean, are we

17    referring to Slide 4?

18        THE COURT: I mean, I think that's Slide 4, right?

19        MR. C. MATTHEW RITTGERS: Yeah.

20        THE COURT: And I think it sounds like I heard

21    Ms. Glatfelter say that the government would agree that on a

22    PAC of the type that Mr. Sittenfeld had here, his name could

23    not be --

24        MR. C. MATTHEW RITTGERS: Right.

25        THE COURT: -- associated with it?

```
1              MR. C. MATTHEW RITTGERS:  Right.

2              THE COURT:  Which is, I think, one of these?

3              MR. C. MATTHEW RITTGERS:  It is Slide 3.

4              THE COURT:  And are you admitting that although his

5    name wasn't on it, he could still control it, Ms. Glatfelter?

6              MS. GLATFELTER:  I don't know that I'm permitted to

7    make that agreement.  I don't know if he's permitted to -- I

8    don't know the degree of control he can have under a

9    non-leadership PAC under the law.

10             THE COURT:  And what about the question on bundling.

11   Is there a problem with bundling, in the government's view?

12   Is there anything odd about that?

13      I know there's inference about the bribe that you may

14   want to have them draw from the bundling, but is there

15   anything inherently wrong with bundling as a matter of

16   campaign finance law?

17             MR. SINGER:  I mean, the issue, Your Honor, would be

18   if the check is actually in the name of someone else.

19             THE COURT:  Right.

20             MR. SINGER:  If I go up and say, hey, I'm going to

21   raise these ten checks from these ten guys, and those ten guys

22   say, yeah, you can take these and provide them so long as they

23   are attributed appropriately to the people whose funds they

24   actually came from, then, to my understanding, that that is --

25             THE COURT:  Well, is the government making any
```

1      allegation in this case that that did not occur here?

2          MR. SINGER:  I think the allegation in this case is

3      that the defendant knew that the money was coming from the

4      undercovers, and the names that were affiliated with them were

5      not the people whose checks -- not the people whose check they

6      came from.  So they came from the undercovers.  The

7      undercovers' names are not on those checks.

8          THE COURT:  So the proceeds were purported to be from

9      a person and entity other than the person or entity who was

10     actually making the contribution; is that correct?

11         MR. C. MATTHEW RITTGERS:  No, that is not.  That was

12     never stated anywhere.  It was not.

13         MR. SINGER:  It's not been charged.

14         MR. C. MATTHEW RITTGERS:  No.  It wasn't even stated.

15     They never said -- what the judge is asking, did the

16     undercover agent say these checks are really not from the

17     people that we're telling you they're attributable to, which

18     is not true.

19       P.G. and his staff asked for the names to attribute to

20     the checks, and there are some emails where they're confirming

21     the names that are on the FEC website.

22         MR. SINGER:  The undercover said, "It's the same

23     money from the same place."

24         MR. C. MATTHEW RITTGERS:  No.

25         MR. SINGER:  He did, on November 7th, said --

```
 1          MR. C. MATTHEW RITTGERS:  When he was talking about
 2   the cash --
 3          THE COURT:  All right.  Stop.
 4          MR. C. MATTHEW RITTGERS:  Sorry.
 5          THE COURT:  It's been a really long day, and we're
 6   about to lose our court reporter, so I really don't want to
 7   have to say that again.  I'd like to get this wrapped up so we
 8   can move on.
 9       So what -- I'm not even sure I understand what the
10   dispute is anymore.
11          MR. SINGER:  Your Honor, you were asking me if
12   bundling was okay.
13          THE COURT:  Yes.  And then I understood you to be
14   saying there was some allegation here that the person or
15   entity whose name was on the check was not, in fact, the
16   source of funds for the check; is that right?
17          MR. SINGER:  Correct.  That was an inference that the
18   jury could make relating to these checks.
19          THE COURT:  Okay.
20          MR. C. MATTHEW RITTGERS:  That's fine.  That's straw
21   donor stuff, it's not bundling.  I'm just going to talk about
22   bundling.  That's straw donor stuff.
23          THE COURT:  And bundling, as I understand it, refers
24   to a person bringing checks from multiple different people?
25          MR. C. MATTHEW RITTGERS:  Yes.
```

1          THE COURT:  And presenting them as a package to a

2     candidate?

3          MR. C. MATTHEW RITTGERS:  Yes.  Fundraising bundling.

4          THE COURT:  Is there anything wrong from the

5     government's perspective -- putting aside the question of

6     source of funds, is there anything wrong with the act of

7     bundling?

8          MR. SINGER:  So long as it otherwise comports with

9     FEC and campaign finance law regarding limits, regarding

10    accurate attribution, then no, I do not believe there's

11    anything, per se, wrong with just accepting checks and then

12    being the conduit by which --

13         THE COURT:  So if I give the candidate $5,000, and

14    that's the limit, there's nothing wrong with me going out to

15    four of my friends and also getting $5,000 checks from them,

16    so long as they're actually the source of the checks, and I'm

17    not paying them back for giving me the checks, and I can bring

18    all five of those checks and hand them to the candidate?

19         MR. SINGER:  Correct.

20         THE COURT:  And the government would agree with that?

21         MR. SINGER:  Yes.

22         THE COURT:  It sounds to me like there's actually a

23    fair amount of agreements here.

24         MR. C. MATTHEW RITTGERS:  I agree.

25         THE COURT:  But I think the candidate control thing,

1    it sounds like, is a problem, so I would, at least for now, I

2    think you're better off taking that off, but...

3        And I don't know what this FEC -- so this is pages from

4    an FEC website.  What's the purposes of those on pages 5

5    and 6?

6            MR. C. MATTHEW RITTGERS:  It's a publicly available

7    website for the PAC that it's issued, Your Honor.

8        The second page just highlights four of the eight checks

9    that were publicly recorded on the website.

10           THE COURT:  And why are you highlighting those four

11   checks?

12           MR. C. MATTHEW RITTGERS:  They were four of the eight

13   that were at issue.  I could have done all eight, but just for

14   brevity, I didn't.  All eight were publicly on the --

15           THE COURT:  It's a little late in the day to talk

16   about brevity, Mr. Rittgers, but I'll take your word for it.

17           MR. C. MATTHEW RITTGERS:  They have an example of

18   what it looks like, that is fec.gov.  All eight of -- the

19   government agrees, all eight of the checks, their entire

20   amount, was publicly posted on the fec.gov website.

21           THE COURT:  For purposes of opening, I'm going to

22   allow it.  I don't want you to talk about this question of

23   candidate control, since there appears to be some confusion

24   yet around that, and I do not have time tonight to figure out

25   my view of the correct answer on that question, so I would ask

1    you not to refer to the candidate control aspect.

2       But it sounds like there is agreement on the bundling and

3    the personal delivery of the checks, and the candidate name

4    not being on the PAC, so you can introduce those topics in

5    your opening.

6       Are there any other issues that we need to discuss with

7    regard to openings?  I need to send you emails on two slides.

8    Anything else from the government?

9            MR. SINGER:  No, Your Honor.

10           THE COURT:  Mr. Rittgers?

11           MR. C. MATTHEW RITTGERS:  No, Your Honor.

12           THE COURT:  I will send you emails as quickly as I

13    can on those remaining slides.

14       Please be here, I think we'll say let's be here by 8:45

15    tomorrow just to deal with whatever we may need to deal with

16    before the jury comes in at 9:00.

17       What else do we have to deal with tomorrow, anything?

18           MR. C. MATTHEW RITTGERS:  Not from defense.

19           THE COURT:  Anything from the government?

20           MS. GAFFNEY PAINTER:  Your Honor, tomorrow we will be

21    seeking the admission of transcripts.  We have conferred with

22    defense counsel, and we've stipulated to the accuracy of those

23    transcripts.

24       There is one line about which we could reach no

25    agreement, so we intend to present that segment of the

1    recording and the transcript to the Court, and allow the Court

2    to decide if it's appropriate.

3            THE COURT:  Okay.  Let's meet at 9:00, then, and it's

4    a relatively short excerpt?

5            MS. GAFFNEY PAINTER:  It's one word.

6            THE COURT:  All right.  We'll meet at 9:00 tomorrow

7    and hope to have the jury in by 9:30.

8            (Proceedings adjourned at 6:46 p.m.)

9                            -  -  -

10

11                   C E R T I F I C A T E

12                            -  -  -

13       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
14   above-entitled matter.

15

16   /s/ M. Sue Lopreato_____              September 30, 2022
     M. SUE LOPREATO, RMR, CRR
17   Official Court Reporter

18

19

20

21

22

23

24

25