<pre>
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                              -  -  -
 3

 4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                     :
 5            Plaintiff,             : Jury Trial, Day 2
                                     : Wednesday, June 22, 2022
 6         - v -                     :
                                     : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"           :
 8                                   :
              Defendant.             : Cincinnati, Ohio
 9
                              -  -  -
10                    TRANSCRIPT OF PROCEEDINGS

11    BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                            -  -  -

13    For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                  MATTHEW C. SINGER, ESQ.
14                                MEGAN GAFFNEY PAINTER, ESQ.
                                  U.S. Department of Justice
15                                U.S. Attorney's Office
                                  221 E. Fourth Street, Suite 400
16                                Cincinnati, Ohio  45202

17    For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                  CHARLES H. RITTGERS, ESQ.
18                                NEAL D. SCHUETT, ESQ.
                                  Rittgers & Rittgers
19                                12 E. Warren Street
                                  Lebanon, Ohio  45036
20
      Law Clerk:                  Jacob T. Denz, Esq.
21
      Courtroom Deputy:           Scott M. Lang
22
      Court Reporter:             M. Sue Lopreato, RMR, CRR
23                                513.564.7679

24                            -  -  -

25
</pre>

```
 1                    P R O C E E D I N G S

 2               (In open court at 9:05 a.m.)

 3                        -  -  -

 4         THE COURT:  Good morning.  We're here this morning in

 5   the matter of the United States of America versus Alexander

 6   Sittenfeld.  It's case number 1:20-cr-142.  We're here for the

 7   second day of trial.

 8      It's the Court's understanding we're going to start the

 9   day with openings from each side, and then move into

10   presentation of witnesses.  Am I correct in that, Mr. Singer?

11         MR. SINGER:  Yes, Your Honor.

12         THE COURT:  Mr. Rittgers?

13         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

14         THE COURT:  Does the government have some idea of how

15   many witnesses it intends to put on today, Mr. Singer?

16         MR. SINGER:  Depending how long openings go, most

17   likely two, but we may get into the third witness today.

18         THE COURT:  And what have the parties been doing?

19   Have you given Mr. Rittgers notice of who the witnesses are

20   today?

21         MR. SINGER:  Yes, Your Honor, we talked about it

22   yesterday evening.

23         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

24         THE COURT:  Very good.  Well, before we bring in the

25   jury, first let me ask the parties are there any topics that,
```

1    from your perspective, we need to address this morning?

2         MR. SINGER:  One housekeeping issue, Your Honor.  We

3    raised yesterday a very small transcript discrepancy that we

4    have.

5         THE COURT:  Right.

6         MR. SINGER:  We've got a clip here.  It's 10 seconds

7    long of the transcript that has the word at issue highlighted.

8         THE COURT:  Okay.

9         MR. SINGER:  We can present it to you if you would

10   like to listen to it before the jury is seated.

11        THE COURT:  I would like to do that.  Let's first get

12   the agenda here for morning.  So I've got transcript as one of

13   the issues.  Any other issues, Mr. Rittgers?

14        MR. C. MATTHEW RITTGERS:  No, Your Honor.  Given the

15   length of both openings, I would just suggest maybe taking a

16   short break after the government's opening so we can set up

17   our media equipment.

18        THE COURT:  Sure.  That seems appropriate.

19        MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

20        THE COURT:  So a couple other housekeeping matters

21   that I had just to put on the agenda, then we'll take care of

22   the word in the transcript.

23        First, at some point, we were talking about preliminary

24   instructions about defendant's election not to testify.  Given

25   what I understand the status to be, do we want to have a

1    preliminary instruction about the defendant's election not to

2    testify?  I'm happy to give it as a pattern instruction, but

3    it sounds like it won't apply, so...

4         MR. C. MATTHEW RITTGERS:  We would prefer that you

5    give it, Your Honor, just out of a pattern instruction, even

6    though he's going to testify.

7         THE COURT:  Okay.  Thank you.  Another topic I wanted

8    to address was I wasn't sure I understood the stipulation with

9    regard to the transcripts.

10     Are the transcripts going to be admitted as evidence in

11    the case?

12         MR. SINGER:  Government will be moving to admit the

13    transcripts as evidence.

14         MR. C. MATTHEW RITTGERS:  And, Your Honor, this goes

15    back to the briefing on the rule of completeness, and so we

16    didn't want to force the government to have to bring in

17    someone to authenticate the transcripts, like the

18    stenographer, which is why the government and the defense

19    tried to work together to craft something related to the

20    accuracy of the transcripts that might be played without

21    stipulating to the admissibility.

22     So we will continue and maintain our objection with

23    regard to the admissibility of transcripts.

24         THE COURT:  So the stipulation that the parties filed

25    was not intended to be a stipulation as to the admissibility

1    of the transcript as evidence?

2              MR. C. MATTHEW RITTGERS:  Correct, because of the

3    partial nature of those transcripts.

4              THE COURT:  Jacob, can you email me the stipulation?

5              COURTROOM DEPUTY:  It should be in there, Judge.

6              THE COURT:  Thank you.  So I'm going to read from the

7    stipulation, and this is where it got confusing for me.

8         So it says, "Before trial, the parties will jointly

9    request a preliminary instruction.  If you notice any

10   differences between what you heard on the recordings and what

11   you read in the transcripts, you must rely on what you heard,

12   not what you read," which is a modified part of the Sixth

13   Circuit pattern instruction.  I'm fine with that.

14        And then it says, "If during trial, the parties believe

15   there's discrepancy between any recording admitted into

16   evidence --" so that's saying the recording will be admitted

17   into evidence -- "and the transcripts, the parties and the

18   Court will determine whether discrepancy is non-material or

19   material.

20        "If the discrepancy is non-material, according to the

21   Court, the transcript will be admitted as an exhibit."

22        So I took from that that the parties were stipulating

23   that the transcript would be admitted, and it struck me as odd

24   that the only ones that would be admitted were the ones where

25   there was a dispute as to the content.

1    So I assume that there must have been a default

2  background rule that wasn't expressed but was intended that

3  said that all transcripts would be admitted if there was no

4  dispute.

5    And then with respect to the disputed ones, if it's a

6  non-material discrepancy, it would be admitted; if it was a

7  material discrepancy, it wouldn't be admitted, but now you're

8  telling me something different so I'm confused.

9    MR. C. MATTHEW RITTGERS:  I understand, Your Honor.

10  Neal?

11    MR. SCHUETT:  Your Honor, I think the issue was there

12  were some accuracy issues that we wanted to work out, so we

13  didn't want to say they were all admitted and now we have a

14  dispute, so that was part of the issue.

15    THE COURT:  But with respect to the ones that there

16  was no dispute, were you agreeing that they would be admitted

17  as exhibits?

18    MR. SCHUETT:  Given that we have stipulated that

19  they're accurate, it's my understanding in this circuit that

20  they will be admitted, Your Honor.  There's nothing to stand

21  in the way as long as they're accurate.

22    The Sixth Circuit says as long as they're accurate and

23  non-prejudicial, they're accurate, they're non-prejudicial.

24    THE COURT:  Well, I think the Sixth Circuit pattern

25  instruction with regard to transcripts says that the

1    transcripts are not the evidence, that the recording is the

2    evidence.

3        MR. SCHUETT:  Correct.  Based on the law that the

4    parties talked about, that if it is found to be accurate, it's

5    practice to let them go back, and then if there are

6    discrepancies, they should rely on the recording.

7        THE COURT:  Okay.  So to the Court, the only

8    distinction is whether or not they're going to be able to go

9    back to the jury room during deliberation.

10       So do I understand you to be agreeing to that.  To the

11   extent the transcripts are stipulated as accurate, they can be

12   admitted and go back to the jury room with deliberations.

13       And that with respect to any one where there's a

14   discrepancy, if it's non-material, if the Court rules it's

15   non-material, that can also go back to the jury room, but if

16   it's a material discrepancy, it can't go back, is that --

17       MR. SCHUETT:  That is correct, Your Honor, though we

18   would maintain for the record our motion that an incomplete

19   transcript is prejudicial, though, again, the Sixth Circuit

20   says the prejudicial issue is the accuracy, so just to note

21   that for the record, Your Honor.

22       THE COURT:  Okay.  Is that your understanding as

23   well, Mr. Singer?

24       MR. SINGER:  It's my understanding if the recording

25   is admitted into evidence, and there's an accurate transcript

1   that the parties have stipulated to, that will also be

2   admitted into evidence.  All of it goes back to the jury.

3          THE COURT:  Okay.  All right.  Then I think we're on

4   the same page.  Yeah?  Okay.

5       So I think we're ready, at this point, to do the portion

6   of the transcript and see if we can ascertain what the word

7   is.

8          MR. SINGER:  May I approach, Your Honor?

9          THE COURT:  You may.  Go ahead, Mr. Singer.

10         MR. SINGER:  I'm sorry, Your Honor --

11         THE COURT:  Go ahead.

12         MR. SINGER:  -- to play the recording?

13         THE COURT:  Well, tell me what the discrepancy is

14  around it and then play the recording.

15         MR. SINGER:  Okay.  I see.  If you turn to the second

16  page of the transcript, the portion that is blocked off is the

17  portion that is on the thumb drive that we provided, and then

18  the discrepancy is the word, I've highlighted it, "I've."

19         THE COURT:  That's the entire discrepancy is with

20  respect --

21         MR. SINGER:  That's the discrepancy.  I think it's

22  the defense position that it's "it's."

23         MR. SCHUETT:  That is correct, Your Honor.

24         THE COURT:  Okay.  And did you give me the thumb

25  drive, or how were you planning on --

1          COURTROOM DEPUTY:  I've got it.

2          MR. C. MATTHEW RITTGERS:  Your Honor, just to

3   clarify.  It's "I've," it cuts out, and then it's "it's."  So

4   it would say I've, ellipsis, it's been.

5          THE COURT:  I see.  So you admit the word I've, or

6   contraction I've, and --

7          MR. C. MATTHEW RITTGERS:  I believe it's I've, break,

8   it's.

9          THE COURT:  Okay.

10          MR. SINGER:  I'm sorry.  That wasn't my understanding

11   of the discrepancy.

12          MR. C. MATTHEW RITTGERS:  No, I'm not -- and that

13   might have been mis-communicated.  I'm not saying that the

14   government is trying to misinterpret or misrepresent.

15          THE COURT:  So is it all right to play it in open

16   court from your perspective?

17          MR. SINGER:  Sure.

18          THE COURT:  Okay.  Can you play it.

19      (Audio recording played in open court.)

20          THE COURT:  Play it again.

21      (Audio recording played in open court.)

22          THE COURT:  Just one more time.

23      (Audio recording played in open court.)

24          THE COURT:  I believe the transcript is accurate.  I

25   don't hear "it's" in there.  Having said that, I don't see

1    there's any reason you can't argue to the jury if you want,

2    but the word -- they should listen, and if they hear it

3    differently, they can go with what they hear on the recording,

4    but I don't think that this transcript is inaccurate.  I would

5    intend to admit this pursuant to the parties' stipulation.

6        I just realized that last night I promised to send you

7    some remaining thoughts on some slides, and I failed to do

8    that, so where are we at on those slides?  Do you need

9    direction from the Court yet?  I apologize.

10            MR. C. MATTHEW RITTGERS:  No problem, Your Honor.  It

11   was just two slides, I believe.  And it was the slide related

12   to the scotch and cigars gift.  There were three videos in

13   total.  And the objection, I believe, was playing the second

14   and third video.

15            THE COURT:  That's right.  I need to go back and

16   listen to those once again.  I'm going to take a brief recess

17   before the jury comes in.  I assume you can just cut those if

18   we need to cut those, those slides?  You can just skip over

19   them?

20            MR. C. MATTHEW RITTGERS:  If we have to cut the

21   slides, we can cut them, and that's the discussion about --

22            THE COURT:  Right.  I know.  I apologize.  It

23   completely slipped my mind.  All right.  Let's take a brief

24   recess.

25        (Brief recess.)

1        THE COURT:  I've now had an opportunity to review the

2   material on Slide 63 and 64.  Can the government remind me

3   what the nature of their objection to those slides is?

4        MS. GLATFELTER:  Yes.  It was both hearsay and a 403

5   objection.

6        THE COURT:  And what's the nature of the 403

7   argument?

8        MS. GLATFELTER:  That information is cumulative to

9   the other information in the previous recordings, so there's

10  one recording that covers the subject.

11      Going into the personal details for two additional

12  segments is just emphasizing those personal details.  The jury

13  already has that information in the first recording.  There's

14  nothing added by those second and third recordings.

15      MR. C. MATTHEW RITTGERS:  Your Honor, the first clip

16  is a gift that is given to Mr. Sittenfeld, which is scotch and

17  cigars.  It's a very brief video recording where the

18  undercover agents indicate to Mr. Sittenfeld that this gift is

19  a congratulations because his wife is pregnant.

20      The government stops the transcript and the video right

21  after the line, "You've worked your ass off for us."

22      What is then missing is a few minutes of back and forth

23  discussion, which goes to P.G.'s thoughts in his mind as to

24  what these gifts were for, and they talk about childhood and

25  parenthood and pregnancy for under five minutes.

1      I mean, we have 20 hours of tapes here, it's under five

2  minutes where they're talking about childhood and parenthood,

3  which now that one line, which it might be more magnified in

4  the first clip, becomes a little less magnified when you get

5  the full context of that interaction.

6          MS. GLATFELTER:  Your Honor, I just wanted to make

7  clear that the beginning portion, I don't believe which is

8  included in the first slide of the defendant's, they're

9  talking about the project.

10      So they talk about the project, they exchange the gift,

11  and then there are these other segments that they want to add

12  about his wife's pregnancy, all right?

13      So they've clipped the portion about the 435 discussion,

14  and then they've added three minutes back about the pregnancy.

15  And I think that's 403 cumulative.  Certainly in opening

16  statements, it is.

17          MR. C. MATTHEW RITTGERS:  This is just opening

18  statements.  I'm highlighting after the gift is shown, the

19  discussion that flows after the gift, which is where that one

20  comment is on all the baby talk and parenthood talk.

21      So it's the government's position that this was a bribe

22  because he said, "You worked your ass off for us," and there's

23  five minutes of discussion about childhood and pregnancy and

24  parenthood, and the government wants to cut half of that

25  discussion out.

1        If the government wants to play the entirety of this and

2    the transcript in their trial, we have no objection.

3        THE COURT:  Yeah.  It's opening.  I'm going to allow

4    it, but I don't think there's -- I don't know if the

5    government is making a hearsay objection, but I don't think

6    there's a hearsay issue.

7        The fact that it's cumulative, two minutes or three

8    minutes of additional time in openings, so I'm not too swayed

9    by the cumulativeness issue.

10        And with regard to 403(b), the government hasn't

11    identified what the prejudice they think would exist as a

12    result of playing that.  So I guess I'd be willing to hear

13    you, Ms. Glatfelter, but I haven't heard anything about

14    prejudice yet.

15        MS. GLATFELTER:  Sure.  I think this goes -- I'm

16    sorry for not clarifying.  I think this goes to sympathy.  I

17    think that the underlying purpose of showing these clips is

18    what was done in voir dire also, to talk about the defendant's

19    wife's pregnancy, and here to put that in front of the jury

20    again.

21        I think that the Court is going to instruct the jury at

22    the end of this case that they can't consider sympathy.  It's

23    improper.  They consider the evidence before the Court.

24        And so while we can articulate, perhaps, a reason why

25    this evidence might come in, I think it's 403.  It's

1    cumulative here.

2           THE COURT:  All right.  I'm going to overrule that

3    and allow that to be played during the openings.  Does that

4    take care of all the outstanding issues?

5           MR. C. MATTHEW RITTGERS:  I believe it does, Your

6    Honor.

7           THE COURT:  Okay.  Mr. Singer, I know the government

8    filed papers with regard to the jury questionnaire issue.

9       I just want to let you know I'm planning, during the

10   first jury break, to hear from the movant on that issue, so if

11   the government wants to present anything further on that

12   issue, we'll be addressing that during the jury break.

13          MR. SINGER:  Thank you, Your Honor.

14          THE COURT:  All right.  Are we ready to bring in the

15   jury?

16          MS. GLATFELTER:  Yes, Your Honor.  Thank you.

17          COURTROOM DEPUTY:  Judge, we're missing one.

18          THE COURT:  Oh, we're not ready to bring in the jury

19   yet.  Do we have any ETA on the missing one?

20          COURTROOM DEPUTY:  I do not.  We can take a break,

21   and I can look into it.

22          THE COURT:  Okay.  I guess we're going to take a

23   break and try to find our juror.

24      (Brief recess.)

25          THE COURT:  I'm advised we have a complete jury, so I

1    think we're ready to proceed.

2         (Jury in at 9:46 a.m.)

3         THE COURT:  Ladies and gentlemen of the jury, I hope

4    you had a restful evening and are looking forward to our trial

5    starting this morning.

6        I'm going to give a few preliminary instructions now

7    before we hear from the parties this morning, and then we'll

8    hear from the parties and then move on to the witnesses.

9        Ladies and gentlemen, the following remarks are intended

10   to serve as your introduction to the trial in which you are

11   participating.

12       These comments are not a substitute for the detailed

13   instruction on the law and the evidence that I will give you

14   at the conclusion of this case before you retire to

15   deliberate, rather these remarks are a simple explanation of

16   your duties and responsibilities and the basic principles of

17   law that are likely to be involved in this case.

18       Your purpose as jurors is to find and determine the

19   facts.  Under our system of criminal procedure, you are the

20   sole judge of the facts.  If at any time I should make any

21   comment regarding the facts, you are at liberty to disregard

22   it.

23       It is especially important that you perform your duty of

24   determining the facts diligently and consciously, for

25   ordinarily there is no means of correcting an erroneous

1    determination of the facts by the jury.

2        On the other hand and with equal emphasis, I instruct you

3    that the law as given by the Court constitutes the only law

4    for your guidance.  It is your duty to follow the law as I

5    give it to you, even though you may disagree with the law.

6        So let me start with a procedural matter.  If you want to

7    take notes during the course of the trial, you may do so.

8    There should be a pen and pad of paper for each of you to use

9    if you like.

10       However, it is difficult to take detailed notes and pay

11   attention to what the witnesses are saying at the same time.

12   If you do take notes, be sure that your taking of notes does

13   not interfere with your listening to and considering all the

14   evidence.

15       Also, if you take notes, do not discuss them with anyone

16   before you begin your deliberations.  Do not take the notes

17   with you at the end of the day.  Be sure to leave them -- are

18   we going to leave them here, Scott, or in the jury room, the

19   notes?

20           COURTROOM DEPUTY:  It doesn't matter.

21           THE COURT:  Okay.  Be sure to leave them in the jury

22   room before you leave at the end of the day.

23       If you choose not to take notes, remember it is your own

24   individual responsibility to listen carefully to the evidence.

25   You cannot give this responsibility to someone who is taking

1    notes.  Notes should only be used to refresh the recollection

2    of the juror who took the notes.

3        You should not use your notes in jury deliberations to

4    prove to other jurors that your notes are, in fact, what a

5    witness actually said.  It is only your impression of what the

6    witness said.  We depend on the judgment of all members of the

7    jury.  You are all responsible for remembering the evidence in

8    this case.

9        Remember that notes are only aids to memory and should

10   not be given precedent over your own independent recollection

11   of the facts.  You must not allow your note taking to distract

12   your attention from the proceedings.

13       You will notice that we do have an official court

14   reporter making a record of the trial.  However, you will not

15   have typewritten transcripts of this record available to you

16   to use in reaching your decision in this case.

17       You are to determine the facts in this case solely from

18   the evidence, which consists of the testimony of witnesses and

19   the exhibits that are received into evidence.

20       Questions asked by the attorneys are not evidence.  Only

21   the answers given by the witnesses are evidence.  Statements

22   and arguments made by the attorneys are not evidence.  They

23   may, however, enter in agreements or stipulations as to facts

24   that are not disputed, and if they do, you are to accept those

25   agreed-upon facts as evidence.

1          On occasion, I may tell you that I'm taking judicial

2     notice of certain facts.  You may then accept those facts as

3     true, but you are not required to accept them.  It is up to

4     you to decide what inferences are to be drawn from the

5     evidence and to decide what facts are established by the

6     evidence.

7          You are to consider only the evidence in this case.  But

8     in your consideration of the evidence, you are not limited to

9     the bald statements of the witnesses.  In other words, you are

10    not limited solely to what you see and hear as the witnesses

11    testify.

12         You are permitted to draw, from the facts which you find

13    have been proved, such reasonable inferences as you feel are

14    justified in light of your experience.

15         You may not consider as evidence anything you may have

16    read or heard about the case outside the courtroom, whether

17    before or during the trial.  Please do not try to seek out

18    information about this trial from any source outside the

19    confines of this courtroom.

20         This means that during the trial, you must not conduct

21    any independent research about this case, the matters in this

22    case, and the individuals and agencies involved in the case.

23         In other words, you should not consult dictionaries or

24    reference materials, search the internet, websites, social

25    media, or use any other electronic or other tools to obtain

1    information about this case or to help you decide this case.

2         Now I'm going to talk a little bit about direct and

3    circumstantial evidence.  Some of you may have heard the terms

4    direct evidence and circumstantial evidence.

5         Direct evidence is simply evidence like the testimony of

6    an eyewitness which, if you believe it, directly proves a

7    fact.  If a witness testified that he saw it raining outside,

8    that would be direct evidence that it is raining.

9         Circumstantial evidence is simply a chain of

10   circumstances that indirectly proves the fact.  If someone

11   walked into the courtroom wearing a raincoat covered with

12   drops of water and carrying a wet umbrella, that would be

13   circumstantial evidence from which you might conclude it was

14   raining.

15        It is your job to decide how much weight to give the

16   direct and circumstantial evidence.  The law makes no

17   distinction between the weight that you should give to either

18   one, nor does it say that either is any better evidence than

19   the other.  You should consider all the evidence, both direct

20   and circumstantial, and give it whatever weight you believe it

21   deserves.

22        Another part of your job as jurors is to decide how

23   credible or believable each witness is.  That is your job, not

24   mine.  It is up to you to decide if a witness's testimony was

25   believable, and how much weight you think it deserves.

1      You are free to believe everything that a witness said,

2  or only part of it, or none of it at all, but you should act

3  reasonably and carefully in making these decisions.  Let me

4  suggest some things for you to consider in evaluating each

5  witness's testimony.

6      Ask yourself if the witness was able to clearly see or

7  hear the events.  Sometimes even an honest witness may not

8  have been able to clearly see or hear what was happening and

9  make a mistake.

10      Ask yourself how good the witness's memory seemed to be.

11  Did the witness seem accurately to remember what happened.

12  Ask yourself if there was anything else that may have

13  interfered with the witness's ability to perceive or remember

14  the events.

15      Ask yourself how the witness acted while testifying.  Did

16  the witness appear to be honest, or did the witness appear to

17  be lying.

18      Ask yourself if the witness has any relationship with the

19  government or the defendant, or anything to gain or lose from

20  the case that might influence the witness's testimony.

21      Ask yourself if the witness had any bias, prejudice, or

22  reason for testifying that might cause the witness to lie or

23  slant testimony in favor of one side or the other.

24      Ask yourself if the witness testified inconsistently

25  while on the witness stand, or if the witness said or did

1     something at any other time that is inconsistent with what the

2     witness said while testifying.

3          If you believe the witness was inconsistent, ask yourself

4     if this makes the witness's testimony less believable.

5     Sometimes it may, other times it may not.  Consider whether

6     the inconsistency was about something important, or about some

7     unimportant detail.  Ask yourself if it seemed like an

8     innocent mistake or if it seemed deliberate.

9          And ask yourself how believable the witness's testimony

10    is in light of all the other evidence.  Was the witness's

11    testimony supported or contradicted by other evidence that you

12    found believable.

13         If you believe that a witness's testimony was

14    contradicted by other evidence, remember that people sometimes

15    forget things, and that even two honest people who witness the

16    event may not describe it exactly the same way.

17         These are only some of the things you may consider in

18    deciding how believable each witness was.  You may also

19    consider other things that you think shed light on the

20    witness's believability.  Use your common sense and your

21    everyday experience in dealing with other people, and then

22    decide what testimony you believe and how much weight you

23    think it deserves.

24         Now, the defendant, Mr. Sittenfeld, may or may not

25    testify at this trial.  A defendant has the absolute right not

1    to testify.  The fact that he may not testify should not be

2    considered by you in any way.  Do not even discuss it in your

3    deliberation.  Remember that it is up to the government to

4    prove the defendant guilty beyond a reasonable doubt.  It is

5    not up to the defendant to prove that he is innocent.

6        Sometimes evidence will be admitted through what is

7    called a limited purpose only.  When I instruct you that an

8    item of evidence has been admitted for a limited purpose, you

9    must consider it only for the limited purpose and no other

10   purpose.

11       No statement, ruling, remark, or comment that I may make

12   during the course of the trial is intended to indicate my

13   opinion as to how you should decide the case, or influence you

14   in any way in your determination of the facts.

15       At times, I may ask questions of witnesses.  If I do, it

16   is for the purpose of bringing up matters which I feel should

17   be brought out, and not in any way to indicate my opinion

18   about the facts, or to indicate the weight I feel you should

19   give to the testimony of the witness.

20       I may also find it necessary to admonish the attorneys.

21   If I do, you should not show prejudice toward an attorney or

22   his or her client because I have found it necessary to

23   admonish that attorney.

24       During the trial, it may be necessary for me to confer

25   with the attorneys from time to time out of your hearing

1    concerning questions of law or procedure that require

2    consideration by the court alone.

3        On some occasions, you may be excused from the courtroom

4    as a convenience to you and to us while I discuss such matters

5    with the attorneys, but we will try to limit such

6    interruptions as much as possible.

7        You should remember at all times, though, the importance

8    of the matter you are here to determine, and be patient, even

9    though the case may seem to go slowly.

10       The parties may sometimes present objections to some of

11   the testimony or to the evidence.  It is the duty of an

12   attorney to object to evidence that he or she believes may not

13   properly be offered, and you should not be prejudiced in any

14   way against an attorney who makes objections, or against the

15   party whom the attorney represents.

16       At times, I may sustain objections or direct that you

17   disregard certain testimony or exhibits.  You must not

18   consider any evidence to which an objection has been sustained

19   or that I've instructed you to disregard.

20       Let's talk a little bit about the presumption of

21   innocence and the burden of proof.  The defendant has pled not

22   guilty to the crimes charged in the indictment.  The

23   indictment is not any evidence at all of guilt, it is just the

24   formal way that the government tells the defendant what crimes

25   he is accused of committing.  It does not even raise any

1    suspicion of guilt.

2        Instead, the defendant starts the trial with a clean

3    slate, with no evidence at all against him, and the law

4    presumes he is innocent.  This presumption of innocence stays

5    with him unless and until the government presents evidence

6    here in court that overcomes the presumption, and convinces

7    you beyond a reasonable doubt that the defendant is guilty.

8        This means that the defendant has no obligation to

9    present any evidence at all, or to prove to you in any way

10   that he is innocent.  It is up to the government to prove that

11   he is guilty, and this burden stays on the government from

12   start to finish.

13       You must find the defendant not guilty of a given count

14   unless the government convinces you beyond a reasonable doubt

15   that he is guilty of the count.  To do that, the government

16   must prove every element of a crime charged beyond a

17   reasonable doubt.

18       Proof beyond a reasonable doubt does not mean proof

19   beyond all possible doubt.  Possible doubts, or doubts based

20   purely on speculation, are not reasonable doubts.

21       A reasonable doubt is based on reason and common sense.

22   It may arise from the evidence, the lack of evidence, or the

23   nature of the evidence.

24       Proof beyond a reasonable doubt means proof that is so

25   convincing that you would not hesitate to rely and act on it

 1    in making the most important decisions in your own lives.

 2         If you are convinced the government has proved the

 3    defendant guilty beyond a reasonable doubt, you will say so by

 4    returning a guilty verdict.

 5         If you are not convinced, you will say so by returning a

 6    not guilty verdict.

 7         With regard to the charges here, the defendant,

 8    Mr. Sittenfeld, is charged with six counts in the indictment.

 9    I believe yesterday I mistakenly said four counts.  That was

10    my mistake.

11         He has pled not guilty to all six counts.  Let me note

12    that the government must prove each of the counts separately;

13    that is, if you find the government has proven the necessary

14    elements for one count, that does not mean that the defendant

15    is guilty of the other counts.

16         Likewise, if you find the government has failed to prove

17    one count, that does not mean that you must find the defendant

18    not guilty as to the other counts.

19         Rather, you should treat each count separately and decide

20    whether the government has proven all of the necessary

21    elements as to that count.

22         At the end of the trial, before you deliberate, I will

23    explain each of the charges, and the elements that the

24    government needs to prove for each, in extensive detail.  For

25    now let me just note that, as I've already mentioned, there

1    are six counts here.

2         The first and second counts are two counts of honest

3    services wire fraud.  In each of these two counts, the

4    government alleges that Mr. Sittenfeld, an elected member of

5    the Cincinnati City Council, knowingly devised and intended to

6    devise a scheme to defraud the citizens of Cincinnati and the

7    Cincinnati City Council of his honest services.

8         The third and fifth counts are two counts of bribery

9    concerning programs receiving federal funds.  These two counts

10   charge Mr. Sittenfeld with corruptly soliciting and accepting

11   a thing of value from a person while intending to be

12   influenced in connection with local government business.

13        The fourth and sixth counts are two counts of attempted

14   extortion under color of official right.  These two counts

15   charge Mr. Sittenfeld with knowingly attempting to obstruct,

16   delay, and affect commerce by extortion.

17        As I mentioned, I will explain all of that in more detail

18   later in the trial.

19        I'd like to say just a few words about your conduct as

20   jurors.  We've covered all this before I sent you home last

21   night, so I'll try to streamline it a little bit.

22        But as we've discussed, you have a number of

23   responsibilities in ensuring that the parties receive a fair

24   trial.

25        First, you must not decide any issue or form any opinion

1    in this case until you've heard all the evidence, been

2    instructed by the Court on the law, and retired to the jury

3    room to deliberate.

4        Second, you cannot allow anyone to discuss this case in

5    your presence outside this courtroom.  You must not talk to

6    the parties, attorneys, witnesses, or to me, under any

7    circumstances.  Nor can you talk to anyone else, such as

8    family or friends, about this case.

9        The only people with whom you can discuss the case are

10   your fellow jurors.  But even on that front, you cannot

11   discuss it with them until the presentation of the evidence is

12   over and the case is submitted to you.

13       So once again, don't begin discussing this like during

14   breaks or at lunch, or what the evidence just was, anything

15   like that.

16       After the verdict is announced, you can discuss the case

17   with others, but not before.  And this prohibition on

18   communications with others extends to electronic

19   communications through cell phones, tablets, or other similar

20   devices.

21       More specifically, you may not communicate with anyone

22   about the case on your phone or computer, through email, text

23   messaging, social media, any website, or any other means of

24   communication, and that would include, you know, any posting

25   on any kind of social media.

1        Even if you're not back and forth communicating, you

2   can't say, oh, here's what I heard today, anything of that

3   nature.

4        Third, since you must keep an open mind until instructed

5   by the Court to begin your deliberations, as I already noted,

6   it's important you do not read or listen to any media accounts

7   about this case.

8        Such accounts may be inaccurate, or they may contain

9   matter which is not proper evidence for your consideration.

10  You must base your verdict solely on what is brought to your

11  attention in court.

12       If anyone tries to talk to you about this case, please

13  bring it to the Court's attention immediately, but do not

14  discuss it with fellow jurors.

15       Likewise, if you inadvertently read, see, or hear

16  anything in the media, inform the Court.

17       Fourth, do not try to do any research or undertake any

18  investigation of the case on your own.  This includes not

19  personally exploring any of the sites that we may discuss at

20  trial, nor can you access materials such as the internet,

21  websites, or social media, or use any or electronic or other

22  tools to obtain information about this case or help you decide

23  the case.

24       Fifth, please do not converse, whether inside or outside

25  the courtroom, with any of the parties or their attorneys or

1    any witness.  By this I mean not only do not talk about the

2    case, but do not talk to them at all, even to pass the time of

3    day.  In no other way can the parties be assured of the

4    absolute impartiality to which they are entitled from you as

5    jurors.

6        I assure you you will not be considered rude for failing

7    to talk to someone involved in this case.  Everyone is bound

8    by the same rule.

9        Finally, as I said at the outset, do not attempt to form

10    any opinion until after all the evidence has been presented.

11        The trial is going to proceed in the following order.

12    First, the parties have the opportunity to make opening

13    statements.  The government has the opportunity to go first.

14    The defendant will then have an opportunity to make his

15    opening statement.

16        What a party says in opening statements is not evidence.

17    The statements simply serve to introduce the evidence the

18    party making the statement intends to produce at trial.

19        Second, after the openings are over, the government will

20    introduce evidence in support of the charges contained in the

21    indictment.

22        Third, after the government has presented its evidence,

23    the defendant may present evidence but is not obliged to do

24    so.

25        The burden is always on the government to prove every

1    element of the offenses charged beyond a reasonable doubt.

2    The law never imposes on a defendant in a criminal case the

3    burden of calling any witnesses or introducing any evidence.

4        Fourth, after the defendant rests his case, the

5    government will have an opportunity to present what is called

6    a rebuttal case or, in other words, provide additional

7    evidence in response to new topics or new evidence that the

8    defendant introduced.  While the government can do so, though,

9    it has no obligation to do so.

10        Fifth, I will instruct you on the applicable law.

11        And finally, at the conclusion of the evidence, and after

12    I've instructed you on the applicable law, each party will

13    have the opportunity to present oral argument in support of

14    its case to you, the jury.

15        These are called closing arguments.  What is said in a

16    closing argument is not evidence, just as what is said in

17    opening statements is not evidence.  But while the arguments

18    are not evidence, they are designed to allow the parties to

19    present to you their contention as to what they believe the

20    evidence has shown and what inferences they believe you should

21    draw from that evidence.

22        In terms of order, just like with the evidence, the

23    government goes first on its closing, followed by the

24    defendant, and then the government has a right to provide

25    rebuttal argument if it wishes.

1          After closing arguments, I will give you some final

2     instructions, and then you will retire to the jury room to

3     deliberate until you reach a unanimous verdict.

4          I'll explain a lot more about that process at the end of

5     the trial.  I just want to note up front that your verdicts on

6     each of the six counts must be unanimous.

7          So as I just noted, we'll begin by affording

8     Ms. Glatfelter an opportunity to make an opening statement, in

9     which she will explain the issues in the case and summarize

10    the facts that she expects the evidence will show from the

11    government's point of view.

12         When she finishes, Mr. Rittgers will have an opportunity

13    to present his opening statement on behalf of Mr. Sittenfeld.

14         Again, the opening statements of the parties are not

15    evidence in the case, nor are they instructions on the law,

16    which will come only from me.

17         Nevertheless, these statements and arguments are intended

18    to help you understand the issues and the evidence to be

19    presented in this case, as well as the positions taken by both

20    sides.

21         You may see some charts during the opening statements of

22    the parties.  The charts are not evidence.  They are simply to

23    assist you in following what the parties are saying during

24    their opening statements.  Therefore, you should not consider

25    any charts that are presented by the parties during their

1    opening arguments as evidence during your deliberations.

2        So I ask that you now give Ms. Glatfelter your close

3    attention, as I recognize her for the purpose of making her

4    opening statement.

5        MS. GLATFELTER:  Thank you, Your Honor.

6        May it please the Court, opposing counsel, ladies and

7    gentlemen of the jury.  Good morning.

8        This case is about an ambitious politician who sold his

9    service and betrayed the citizens that he was elected to

10   serve.

11       In short, the evidence will show that the defendant

12   exchanged his power for money.  It's illegal to do that.

13   it's called bribery.

14       It's illegal for a politician to receive campaign

15   contributions knowing that they're in exchange for his

16   official action, his specific official action.

17       And the evidence will show that's exactly what the

18   defendant did in this case, because he got caught, and he got

19   caught on tape doing it.

20       During this trial, you're going to hear the defendant's

21   own words.  Right after he agreed to exchange $20,000 for a

22   vote on a local project, the defendant said, "I can deliver

23   the vote."

24       Later, when the defendant received those contributions,

25   some of those contributions, he said, "I'm ready to shepherd

1    the votes as soon as it gets to council."

2        When he picked up additional checks a few weeks later, he

3    said, "Don't let these be my famous last words, but I can

4    always get a vote on my left and my right."

5        After he received two more checks later in the fall of

6    2019, he said, "Your nickels are greatly appreciated."

7        And when the project that he exchanged a campaign

8    contribution for, when that project encountered difficulties,

9    he said, and excuse my language, this is a quote, "I'm on it

10    like stink on shit."

11        This case is straightforward.  It boils down to a basic

12    question.  Did the defendant accept campaign contributions

13    knowing that they were in exchange for his specific official

14    action.

15        At a broad level, the evidence in this case will show

16    that there was a local developer, and he had a project called

17    435 Elm.  That project required the approval of city council.

18        But the developer's efforts to get that approval had

19    stalled for nearly 18 months.  And the evidence will show that

20    the defendant, who is a member of city council at the time,

21    made a deal with the developer's investors to make those

22    difficulties go away.

23        They gave him campaign contributions in exchange for a

24    vote.  And after receiving these campaign contributions, the

25    evidence will show that the defendant tried to get the project

1    moving.  Six months after receiving those contributions, the

2    defendant helped the investors by voting to sell the property.

3    The defendant's actions did not stop with the vote.

4         After receiving $20,000 more in contributions, the

5    defendant pressured another government official to take action

6    favorable to the investors.

7         In short, the evidence in this case will show over an

8    18-month period, that the defendant exchanged $40,000 in

9    campaign contributions for his action on the 435 Elm project.

10        Now, the evidence in this case is going to show that

11   these campaign contributions were important for the defendant,

12   and that's because he had aspirations to seek a higher office,

13   which meant that he needed to raise more money for a larger

14   campaign.

15        The evidence will show that the defendant had been a

16   politician who was elected to serve on city council for the

17   City of Cincinnati for over a decade.

18        And as an elected member of council, he was instructed to

19   serve the public.  In fact, every day for the last ten years,

20   he received a salary to do that.  He was paid a salary to

21   serve the citizens of Cincinnati and, in return, he owed the

22   public a duty of honesty and a duty of loyalty.

23        A politician violates his duty to the public when he

24   engages in bribery, when he exchanges his power for money.

25   And the evidence will prove that's what the defendant did in

1    this case.  The United States will prove it, through the

2    defendant's own words and actions, in context, captured on

3    recordings that you will see and you will hear during this

4    trial.

5         Now, members of the jury, as Judge Cole explained to you,

6    you're going to hear a lot of evidence during the course of

7    this trial, but this is fundamentally a simple case, and we

8    are going to do our best to respect your time, your summer,

9    and we're going to streamline that as much as we can.

10        My job in opening statement, as Judge Cole said, is a

11   preview.  It's just a preview of the type of evidence you're

12   going to see and you're going to hear in this case.  And to do

13   that, I'm going to break this down into three parts.

14        First, I'm going to start with an overview of what the

15   evidence is going to show in this case, the specific facts.

16   And then I'm going to talk about how the United States will

17   provide that evidence to you, what form you're going to see,

18   and how you're going to hear it.  And finally, a very brief

19   overview of the charges against the defendant.

20        Now, while I do these three things, I'm going to refer to

21   my notes, and that's because I want to be very precise with my

22   words as I talk about the evidence you're going to see and

23   hear during this trial.

24        Before I get started on my overview of the evidence, I

25   want to take a minute to mention a few brief concepts to keep

1    in mind as you hear the evidence in this case and to

2    contextualize my overview.

3         Now, you'll hear me use terms like "development" and

4    "redevelopment project."  And you'll hear those kinds of terms

5    throughout the trial.  But that's not because you need to

6    understand the intricacies of a development project or a

7    redevelopment project.  Rather, you'll hear those terms

8    because that is the subject of the bribe in this case.  That's

9    what the money was paid for, a development project.

10        Likewise, you're going to hear about campaign

11   contributions.  More specifically, you're going to hear about

12   contributions to what is known as a political action

13   committee, or a PAC, for short.

14        But let me be clear.  This case is not about PACs.  It's

15   not about the limits of those PACs, or the rules that apply to

16   those PACs.  Rather, you're going to hear about campaign

17   contributions and a PAC because the evidence will show that's

18   the form of the bribe that was paid in this case.

19        And the defendant said that these contributions would

20   specifically benefit him, and the government has an obligation

21   to prove that.

22        All right.  So let me get started on an overview of what

23   the evidence will show.

24        Now, during the relevant time period, which in this case

25   is 2018 to 2019, it's roughly an 18-month period of time, the

1     evidence will show that during that period of time, the

2     defendant was a member of city council in the City of

3     Cincinnati.  The council has nine members.  They are elected

4     by the citizens of Cincinnati.

5          And for legislation to pass out of council, it takes five

6     votes, takes a majority.  But there's also a mayor for the

7     City of Cincinnati, and the mayor can veto that legislation.

8     To override the mayor's veto, it takes six votes.

9          Now you'll hear that, in terms of real estate, the City

10    of Cincinnati is what's called a developed city.  That means

11    if someone wants to build something within the city, there's

12    not a lot of undeveloped land to use.

13         So what that means is that the person would most likely

14    have to purchase something that's already built, and they

15    would have to repurpose it, or they would have to redevelop it

16    in some way.

17         But that also means that city council and the mayor have

18    a big role to play in development projects in the city.  For

19    example, the city might own the land that the developer wants

20    to use to build something on, all right?

21         And so they might have to go to the city and ask for the

22    city to sell that land or to lease it to them, and city

23    council would have to approve that.

24         The city might need to change the zoning to allow the

25    specific type of project to be built on the land they want to

1    use, all right.

2         And for bigger projects, the developer may want certain

3    or they may need tax incentives, so they might need city

4    council's approval for those tax incentives.  That is a city

5    council item they would have to vote on.

6         Now, against this backdrop, you're going to hear about an

7    aspiring local developer named Mr. Ndukwe.  Mr. Ndukwe goes by

8    the nickname Chin, and that's how we'll refer to him

9    throughout this opening, and that's how you'll hear him

10   referred to during this trial.

11        He's a retired professional football player.

12        Now, Chin had purchased a financial interest in a piece

13   of property that we're going to refer to throughout this trial

14   as 435 Elm.

15        That piece of property is downtown, in the City of

16   Cincinnati.  It's actually in the heart of the city.  You'll

17   see maps and aerials and photos of it during trial.

18        Mr. Ndukwe, or Chin, wanted to redevelop this piece of

19   real estate, but he needed the city's help to do it because

20   the city owned that piece of property.  And he needed the sale

21   of the property approved by city council.

22        But in 2018, Chin's project was stalling.  He wanted a

23   development agreement with the city so he could go forward and

24   develop that piece of land, but he was not even close to

25   obtaining one.

1          The defendant knew Chin, and the defendant had known Chin

2     for several years.  The defendant had actually solicited

3     contributions from Chin on many occasions, and Chin had given

4     him financial contributions for his campaigns in the past.

5          Now, you'll hear in the fall of 2018, the defendant

6     called Chin to solicit $10,000 in contributions.  And for

7     context, this was in September of 2018.  We'll talk about

8     these dates throughout trial, but just to give you an

9     overview.

10          This September 2018 call led to a series of additional

11     calls later in the fall.  These calls provide some context to

12     the evidence that you're going to hear at trial.

13          During these calls between Chin and the defendant, the

14     defendant confirmed that he knew about Chin's 435 Elm project

15     and his difficulties getting approval because the mayor was

16     supposedly holding up the project.

17          The defendant also told Chin that Chin needed to

18     financially support him.  Specifically, the defendant told

19     Chin that he has obligations to do the things he needs to be

20     to be a successful candidate, and he wanted Chin to support

21     him.

22          The defendant said, and I quote, "You don't want me to be

23     like, Chin, I love you but..." in the context of knowing that

24     Chin was seeking a development agreement for 435 Elm that

25     would later be voted on by the city, the defendant said to

1    Chin, "You don't want me to be like, I love you Chin, but..."

2    you'll hear that entire conversation during trial.

3        The defendant told Chin to round up five LLC

4    contributions before the deadline.  Now, LLC just refers to a

5    limited liability company.  It's a type of entity that is

6    permitted to make political contributions.

7        The evidence will show that by "deadline," the defendant

8    was referring to election day in 2018, in the fall.  And

9    that's when a ballot measure would likely pass that would

10   limit the amount of LLC contributions that a Cincinnati

11   candidate could receive from an individual.

12       If the ballot measure passed, city council could only

13   receive one LLC check per person going forward.

14       Now, the details of the ballot measure are not important.

15   What's important is that the defendant was using it to

16   pressure Chin for additional contributions before the

17   deadline.

18       Indeed, during one of these calls that you'll hear, the

19   defendant confirmed, and I quote, "You'll deliver the goods

20   before Tuesday."

21       During the last call in the series, Chin said his

22   investors would not be able to meet with the defendant before

23   Tuesday's deadline, however, they wanted to contribute.

24       He said if his investors were going to contribute, "his

25   investors" meaning the 435 Elm investors were going to

1     contribute to the defendant, Chin said that they wanted to

2     know that it was going to be a yes vote for sure on 435 Elm.

3         Now, the defendant responded, "Obviously, nothing can be

4     illegal. Illegally nothing can be a quid pro quo, and I know

5     that's not what you're saying either."

6         The defendant told Chin that he was super

7     pro-development, though, and they would discuss it more in

8     person.

9         And he also told him he wanted to give the investors

10     confidence that they were investing in a winning endeavor.

11         Chin, the defendant, and one of Chin's investors,

12     Rob Miller, met in person about five days later. That's on

13     November 7, 2018.

14         During this meeting, the defendant agreed to deliver the

15     votes regarding 435 Elm in exchange for $20,000 in campaign

16     contributions. The evidence will show that this meeting

17     occurred in two parts.

18         The first part occurred in a downtown restaurant with the

19     defendant, Chin, and his investor, Rob, that I just told you

20     about.

21         The second part of the meeting happened in Rob's private

22     condo near the restaurant after Chin had left.

23         The evidence will show that, based on the preceding call,

24     the defendant went to that meeting knowing what the investors

25     wanted. They wanted a yes vote on 435 Elm in exchange for

1    contributions.

2       And during the lunch meeting, they discussed the type of

3    development agreement Chin was looking for from the city for

4    435 Elm, including that he wanted the property sold to him for

5    a dollar.

6       After indicating that he would shepherd the votes, the

7    defendant showed Rob, the investor, his political information

8    in the context of Rob providing financial support.

9       The defendant told Rob, "You like making good bets and

10   good investments," and he proceeded to show Rob why the

11   defendant was a good investment.

12      He showed them a chart which he claimed demonstrated that

13   he would be the next mayor.  And he told Rob that every

14   successful developer and business leader in Cincinnati had

15   placed their bets with him.

16      Rob told the defendant they wanted to ensure that 435 Elm

17   was veto proof.  In response, the defendant assured him that

18   he could move more votes than any single other person,

19   including the mayor.

20      After lunch, when Chin left, that left the defendant

21   alone with Rob, and they walked back to Rob's condo in

22   downtown Cincinnati, and they had a private conversation about

23   435 Elm.

24      Rob explained that Chin's issues with the mayor were a

25   concern for him, and told the defendant that he wanted enough

1    city council support for 435 Elm to guarantee that the

2    development agreement could not be vetoed by the mayor.  And

3    then he offered the defendant $20,000 to get that deal.

4        The defendant did not turn down Rob's offer.  The

5    defendant did not decline it.  Rather, he accepted it, saying,

6    "I can deliver the votes."

7        The discussion then transitioned to the form of the

8    contributions.  Rob asked the defendant how he wanted to

9    receive the money.  And the defendant suggested 18 LLC checks,

10   each for $1,100, before December 1st.

11       He also mentioned that he had a PAC that no one was

12   snooping around in, and any LLC or individual could give up to

13   $5,000, which was the limit.

14       After Rob voiced concern about the contributions in his

15   name, and LLC checks being connected to him, they agreed that

16   the initial contributions, the initial $10,000 out of the

17   $20,000, would be paid in money orders attributed to the names

18   of other people.

19       At the end of the meeting, directly after they discussed

20   getting the money to the defendant by the last week of

21   November, they reconfirmed the deal, and the defendant said he

22   was going to make it happen.

23       However, after the meeting, the defendant called Rob, and

24   told him that there was a problem with the money orders.  But

25   the defendant explained there was another option, and the

1    defendant told Rob about the PAC again.

2         Specifically, the defendant told Rob there is a PAC

3    that's not connected to his name in filings or paperwork, and

4    the defendant said that no one knows about it.

5         The defendant said if the money went to the PAC, nothing

6    about it would be connected to him, and no one would poke

7    around for the names of the investors.

8         The defendant then said he wanted to make sure he was

9    doing this right, and also wanted to protect the investors.

10        The defendant reconfirmed the information about the PAC

11   several times.  For example, on another occasion, he told Rob

12   and Rob's business partner, you will learn is an individual

13   named Brian Bennett, his name is not connected to the PAC in

14   any way.  And he said, and I quote, "No one will ever know

15   this."

16        But he made clear that the contributions to the PAC would

17   benefit him a hundred percent.  That's what he said.

18        The evidence will show that after the defendant's

19   agreement to deliver the votes in exchange for the campaign

20   contributions, the defendant accepted money on multiple

21   occasions.  The evidence will show that when he did, he

22   reconfirmed the agreement with the investors.

23        For example, in late November 2018, when the defendant

24   received the first installment of the two $5,000 checks, the

25   defendant told Rob and Rob's business partner, Brian Bennett,

1     "Look, I'm ready to shepherd the votes as soon as it gets to

2     city council."

3         And he explained that he was basically in waiting mode

4     until the project got to council, but to let him know if the

5     legal department at the city was stalling.

6         Likewise, on December 17, 2018, when the defendant picked

7     up four checks, two replacement checks from the earlier

8     meeting and two new checks, for a total of $20,000, the

9     defendant told Rob and Brian that the contributions were huge.

10     They were a big help.  And then he, again, promised to deliver

11     the votes.

12         He said, "Don't let these be my famous last words, but I

13     can always get a vote to my left or a vote to my right."

14         The defendant's actions in this case give meaning to the

15     words he spoke.  The evidence will show that.

16         For example, as you hear the evidence in this case,

17     consider the timeline of these events.

18         For example, the evidence will show that the defendant

19     met Rob for lunch on November 7th.  How quickly did he agree

20     to the deal?

21         The evidence will show by December 17th, a little less

22     than a month and a half later, when he had received $20,000.

23     He had only met Rob three times, including on that particular

24     day.

25         The defendant treats Rob like an acquaintance he had met

1    three times, or a wealthy businessman who he had just received

2    $20,000 from.

3         Now, it's also important to evaluate evidence of the

4    defendant's actions about the 435 Elm project after he

5    received the campaign contributions in this case.

6         The evidence will show that the defendant's commitment to

7    the deal he made through his subsequent actions, which

8    included, one, trying to move the project; and, two, reporting

9    his actions back to the investors of the project.

10         For example, you'll hear that the defendant took the

11   following actions after the campaign contributions were

12   received.  First, he spoke to the mayor about 435 Elm, and

13   reported the results of his conversation with the mayor back

14   to Rob.

15         He contacted the head of the city's economic development

16   department, Phil Denning, about 435 Elm, and he reported the

17   results of that conversation back to Rob.

18         Now, let me pause here.  The actual substance of these

19   conversations may not be as important as the fact that they

20   occurred.  The fact that the defendant made the effort to go

21   out and have these conversations about 435 Elm for the

22   investors, it's evidence you'll want to make sure you consider

23   and that you hear during trial.

24         Now let's talk more about the additional evidence you'll

25   hear about the defendant's actions.

1     When Chin, Rob, and Brian decided that having the city

2 sell 435 Elm to the port, which I'll get to in a minute, was

3 in their best interest, the defendant advocated for that at

4 city council. And when the sale of 435 Elm to the port

5 reached council, council unanimously approved the sale for one

6 dollar.

7     For his part, the defendant didn't abstain from the vote.

8 He didn't tell anyone about the $20,000 he had received in

9 campaign contributions. Rather, the evidence will show that

10 he voted for the sale.

11     In fact, the day before the vote, the evidence will show

12 the defendant actually called Rob to make sure that the sale

13 was what he wanted.

14     Now, let me pause for a moment to give you context about

15 the port. The port is a quasi-governmental agency, and

16 although it sounds like something connected to the Ohio River,

17 it's not. It's actually created under Ohio law, and it's a

18 community and economic development agency that essentially

19 mends broken real estate.

20     It's governed by a board and a president, not the mayor.

21 And one of the advantages of the port is that it can clear a

22 property it owns, in this case 435 Elm, of back taxes that the

23 owner would normally have to pay.

24     So having city council vote to sell the property to the

25 port could erase any back taxes, and may be advantageous for a

1  property, and it would keep the project moving forward without

2  the mayor's interference.

3      The evidence will show that after the 435 Elm was sold to

4  the port, the defendant continued to demonstrate his

5  commitment to the deal.

6      The evidence will show that in August, he began

7  pressuring the president of the port, someone named Laura

8  Brunner, for action on 435 Elm.  And you'll hear her testimony

9  during trial.

10     This pressure continued through November and December of

11 2019, and he reported his efforts to pressure Ms. Brunner back

12 to the investors.  I'll come back to that pressure in a

13 moment.

14     But first I want to tell you about the second phase of

15 this agreement.  The evidence will show that after he

16 delivered the votes in June of 2019, the defendant continued

17 to work with investors on a second phase of 435 Elm, during

18 which time the defendant received another $20,000, for a total

19 of $40,000 in campaign contributions.

20     Specifically, the second phase involved a sports book.  A

21 sports book just refers to a legal sports betting venue where

22 people can place bets on sports.  Rob and Brian told the

23 defendant they wanted to operate a sports book out of 435 Elm

24     And they told him they were interested in establishing an

25 exclusive sports book, meaning they wanted to limit their

1    competition by increasing the barriers of entry for

2    competitors.

3        They explained to the defendant that while they were

4    pursuing legislative assistance at the state level, they were

5    also interested at what could be done at the city level to

6    make their sports book plan successful.

7        This culminated in a meeting where the defendant met with

8    Rob, Brian, and their boss, Vinny, on September 24th, 2019, in

9    a hotel room in Columbus.

10        During that meeting, the defendant accepted $10,000 more

11    in contributions from Rob and Brian's boss, Vinny.

12        The evidence will show that the defendant went into the

13    meeting knowing that he would meet their boss, and the

14    evidence will show what he knew about their boss before the

15    meeting, including whether he had questionable business

16    practices in the past.

17        When Vinny entered the room of that meeting, the

18    defendant said, "We've got to make sure the sports book

19    betting thing goes through and that Cincinnati operation

20    happens."

21        During the meeting, they discussed how Vinny, Rob, and

22    Brian could have an exclusive sports betting venue in

23    Cincinnati, and how they could keep out the competition.

24        The defendant talked about zoning ordinances, and zoning,

25    and how they could use zoning code as a tool to create a

1    controlled environment, meaning without competition.

2        Vinny told him he didn't care what it cost him, that they

3    would take care of the defendant.

4        And during the discussion, Vinny pulled the defendant

5    aside and give him two $5,000 checks for the PAC, and promised

6    two more in the future.

7        The defendant didn't turn down the PAC checks, he chose

8    to accept them.  And he said, "I'm very appreciative of

9    these."

10        The conversation then continued to how they could advance

11    the sports betting facility through the city's controlling of

12    zoning or bonding.

13        Now, you'll learn during this trial, besides the sports

14    book, the September 24th, 2019 meeting is important because

15    the defendant also discussed some allegations in a civil

16    lawsuit that had been made against Chin.  And while the

17    allegations themselves are not important, the defendant's

18    actions relating to his allegations are.

19        The evidence will show that the defendant's conduct

20    showed a special loyalty to the investors who had paid him.

21        During the conversation, the defendant told Rob and Brian

22    and Vinny that he a hundred percent had their backs.

23        The defendant went on to explain that while Chin first

24    introduced them, he was really closer to Rob and Brian, even

25    though the evidence will show he had met them less than a year

1    before.

2        He urged them to take over the 435 Elm project and get

3    rid of Chin.  In fact, he offered to set them up with a

4    replacement for him.

5        Following this meeting in September of 2019, the evidence

6    will show the defendant reconfirmed his commitment to the

7    investors through persistent contact and efforts related to

8    435 Elm.

9        And then on October 28th, he began reaching out -- this

10   is the defendant, began reaching out to Vinny directly and

11   reporting the work that he had done on 435 Elm.

12       In these conversations, which you'll hear during trial,

13   the evidence will show the defendant began using the word "we"

14   when he discussed the 435 Elm project, like he was part of the

15   team.

16       And he told Vinny that he wanted to be, quote, a baller

17   like Vinny.  They also discussed more contributions during

18   these conversations.  When Vinny told the defendant that he

19   was bringing him two more nickels, the defendant told Vinny

20   that his nickels were greatly appreciated.

21       And when Rob delivered the nickels, the two checks, the

22   evidence will show that the defendant reconfirmed his

23   commitment later that evening to Rob about the project.

24       After receiving those two other nickels, the evidence

25   will show that the defendant continued to apply pressure to

1    the public official at the Port Authority with respect to

2    435 Elm.  This is the pressure regarding Ms. Brunner that I

3    talked about earlier.

4        The defendant also continued to contact Vinny and explain

5    what he was doing.  For example, two weeks after receiving the

6    checks, the defendant told Vinny that he knew about the

7    problem with the port, and he thought he had the problem

8    solved.

9        He told Vinny about a pretty intense conversation he had

10   with Ms. Brunner, and told her she needs to make it happen.

11       During another phone call, Vinny asked the defendant if

12   he was taking care of that situation with the port, and the

13   defendant said, excuse my language, he was all over it "like

14   stink on shit."

15       And he told Vinny that Ms. Brunner needed to understand

16   that she was a hundred percent accountable to the elected

17   officials, and that they controlled her budget.

18       He told Vinny that he was staying close to the situation,

19   and we're going to take care of it.  We are going to take care

20   of it.  These conversations occurred until the end of

21   December.

22       Now, what the defendant didn't know at the time was that

23   Rob, Brian, and Vinny were undercover FBI agents who were

24   recording their interactions with the defendant, which brings

25   me to the next part, how the United States will prove that the

1    defendant committed the crimes charged by the grand jury, and

2    that's through principally two types of evidence you're going

3    to hear.  Those are recordings and witnesses.

4        So I want to start with the first category, and tell you

5    a little bit about the recordings.  You're going to hear a lot

6    of recordings during this trial, and those recordings are

7    going to break down into three basic categories.

8        First, you're going to hear audio recordings of the

9    meetings, like when the defendant met Rob and Chin for lunch

10   on November 7th.

11       You're going to hear audio recordings of phone calls,

12   like when the defendant reported to Vinny how he was

13   pressuring Ms. Brunner.

14       And you're going to see some video recordings that

15   occurred at a condo, at Rob's condo, and in the hotel room in

16   Columbus.

17       This is the primary evidence in the case.  You're going

18   to hear the defendant's own words, and you're going to hear

19   what the defendant said when he thought he was talking

20   confidentially, behind closed doors, in the condo, in the

21   hotel room.

22       As I noted a moment ago, there were undercover FBI agents

23   assisting the case agent, Nathan Holbrook, with his

24   investigation.  This investigation technique is called an FBI

25   undercover operation.

1     And you'll hear that an undercover operation is just

2  another evidence collection technique.  It's a legitimate

3  method used by law enforcement in a variety of contexts, where

4  undercover FBI agents adopt a persona to facilitate that

5  evidence collection.

6     It's an effective technique you'll hear in public

7  corruption investigations because it allows you to find out

8  what a politician is saying in person.

9     Recordings of meetings in person are very difficult,

10  you'll hear, to obtain without undercover agents wearing a

11  wire.

12     In this case, Rob, Brian, and Vinny were posing as

13  wealthy investors of the 435 Elm project, and they portrayed

14  these personas when they met with the defendant.

15     Now, in terms of collecting evidence, you'll hear that

16  the undercover agents recorded their interactions with the

17  defendant through the use of undercover phones or recording

18  devices.

19     And those recordings will allow you to hear unfiltered

20  the words of the defendant when he didn't know his words would

21  be heard in a courtroom by a jury.

22     You'll be able to assess his words and actions in their

23  full context to reach a verdict in this case.

24     Now, I'm not going to play these recordings during my

25  opening statement.  That's because I want to play those

1    recordings with the witness on the stand so you can have the

2    full context of them.

3          You'll hear, though, during trial, with the benefit of

4    witness testimony, a little caveat, though.  While we're going

5    to play a lot of recordings for you, we're not going to play

6    every minute of a recording, and the reason being, sometimes

7    these interactions lasted for a few hours, and you'll hear

8    that they only yielded a few minutes of pertinent discussion.

9          You see, part of the job of an undercover FBI agent, in

10   collecting evidence, is to build a rapport with the defendant

11   so he would talk to them, so they made small talk.

12         So, for example, if the defendant was meeting Rob and

13   Brian at a restaurant, the entire interaction was recorded,

14   from ordering food, to talking about baseball or current

15   events, but only five to ten minutes pertained to the 435 Elm

16   project.

17         Now, in addition to recordings, you'll also hear from

18   witnesses.  You're going to hear from government officials who

19   have worked at city council and who have worked for the

20   Port Authority.

21         You're going to hear from Kevin Flynn and Laura Brunner.

22   They'll tell you about city council and the Port Authority,

23   how both work and operate.  And they'll tell you about

24   development projects in general so you have a basic

25   understanding of how they work and the general approval

1     process so you can put the rest of the evidence in context.

2     And Laura Brunner will also tell you about the specific

3     interaction she had with the defendant about 435 Elm.

4          Now you're also going to hear from law enforcement

5     witnesses.  You're going to hear from the FBI undercover

6     agents, and you're going to hear from the case agent, and they

7     will tell you about the evidence that they collected in this

8     case.

9          You're also going to hear from sources like Chin.  Chin

10    was working as a source for the FBI.  And you'll hear that he

11    was providing information to the FBI, and at the direction of

12    the FBI, he was recording his interactions.

13         What that means is that he was already working for the

14    FBI when he received that call in September of 2018.  He told

15    the FBI about it, and then they gave him further instructions

16    about recording later calls.

17         During the time that he was working with FBI, he was paid

18    for the work that he was doing and the hours that he put in,

19    but 435 was his real project.  The FBI undercover agents used

20    his project as cover so they could pose as his investors.

21         But I want to be clear, the FBI never invested money in

22    435 Elm, or had a financial interest in that property at any

23    time.

24         Chin's role here was to introduce the undercover FBI

25    agents so they could have conversations with the defendant.

1    And once he did that, it was the undercover agents who
2    primarily interacted with the defendant.

3         For example, Chin was not present when the undercover
4    FBI agents gave money to the defendant, or when he reconfirmed
5    the deals with them.

6         And you'll also hear from civilian witnesses who had
7    interactions with the defendant either about the $40,000,
8    about 435 Elm, or his relationship with the investors.

9         And all of these witnesses have different pieces of the
10   story.  You can think of it like pieces of a puzzle and, at
11   the end of this case, when all of those pieces are in place,
12   you'll have a clear and powerful picture of the defendant's
13   conduct in this case from which you can make a decision.

14        Now we will use this evidence to prove beyond a
15   reasonable doubt the charges in the indictment.  And as the
16   judge told you, a federal grand jury has indicted the
17   defendant on six counts; the two counts of honest services
18   fraud, the two counts of attempted extortion under color of
19   right, and the two counts of bribery concerning federal funds.

20        These are public corruption charges, and the judge will
21   give you very detailed instructions at the end of this case
22   about the elements of those charges.  And you should pay close
23   attention to those instructions and follow those instructions.

24        But they boil down to a basic question here, and that's
25   did the defendant accept campaign contributions knowing that

1 they were exchanged for specific official action regarding the

2 435 Elm project.

3     As you hear the evidence in this case, there are four

4 important concepts to keep in mind, and this will help you

5 contextualize the evidence as you hear it during trial.

6     The bribery agreement does not have to be in express

7 terms. So what that means is that the bribery -- that bribery

8 does not require the defendant to use special words. It can

9 be an understanding that is clear, otherwise, someone could

10 get around the law by using winks and nods.

11     The flip side of that concept is that someone can't avoid

12 the law by simply saying a few magic words like "this is not

13 bribery," while their subsequent words and action show a

14 bribery agreement.

15     In terms of a preview of the evidence, I wanted to tell

16 you that, because that means you're not going to hear a tape

17 where Rob says will you take this bribe to perform this

18 specific official action, and the defendant responds, why yes,

19 I will take that bribe.

20     It will be more subtle, and you'll have to use the

21 judge's instructions, with your common sense, to evaluate the

22 defendant's words and actions.

23     Second, the politician doesn't have to ultimately perform

24 the official act. So along those lines, it doesn't matter if

25 the defendant had the power to effectuate the official action.

1      It only matters what the defendant promised to do.

2          Third, it doesn't matter if the defendant would have made

3      the same decision anyway.  People rarely act for a single

4      purpose, and it makes no difference that the defendant may

5      have had another separate, even lawful, reason for his action

6      if one of those reasons was because of the $40,000 in campaign

7      contributions.  That is sufficient.

8          Along those lines, we're not going to present evidence to

9      you about whether 435 Elm was a good project for the city or

10     was a bad project for the city, because the merits of the

11     project will not matter.

12         What matters is is one of those reasons, what matters is

13     whether the defendant's actions about 435 was because he

14     received the contributions, and those formed one of the

15     reasons he made his decision.

16         Finally, a bribe can be any kind of money or property

17     that benefits a politician.  So it can be cash in the pocket,

18     it can be a check in a bank account, or it can be campaign

19     contributions, like this case.

20         I'm almost done here, but I want to spend one or two

21     minutes to make clear what this case is not about, to ensure

22     we're all on the same page.

23         So I've talked a lot about what this case is about.  Let

24     me tell you what it's not about.

25         It's not about the defendant's performance as a city

1    council member.  It's not about party affiliation.  This case

2    is not about your personal feelings, or anyone's personal

3    feelings about the policies or the politics of the defendant.

4    It's not about whether the defendant is a good guy or a bad

5    guy.  It's not about whether you have sympathy for the

6    defendant or his family.

7         This is a criminal trial, like any other, and the

8    question is, did the defendant commit the crimes that he is

9    charged with.

10        I want to be very clear that this case also is not about

11   the propriety of campaign contributions, limits, types, or

12   specific rules about contributions.

13        You will hear recordings involving discussions about

14   contributions because that was the form of the bribe payment

15   in this case, and the government has to prove that those

16   payments benefitted the defendant in some way.

17        And on those recordings, the defendant explains how they

18   benefitted him.  But like them or not, campaign contributions

19   are a core part of our political system, and there's nothing

20   wrong a with a politician soliciting a campaign contribution,

21   or asking someone to fundraise for them.

22        Similarly, there's nothing wrong with a public official

23   meeting with constituents about an issue.  We want that as a

24   society.

25        But what a public official can't do is agree to exchange

1    campaign contributions for his specific official action on a

2    project.  That's illegal.  That's bribery.  And that is what

3    the evidence will show that the defendant did.

4        At the end of this trial, when all of the evidence is in,

5    we will have another opportunity to come before you and speak

6    to you again about what the evidence shows when compared to

7    the judge's instructions.

8        Between now and then, I want to ask you to do three

9    things.  First, pay very careful attention to the evidence as

10   it comes in.

11       Second, follow whatever instructions the Court gives you.

12       And third, use your common sense and your good judgment,

13   the same things you use in your everyday lives as Ohioans.

14       And if you do these three things, at the end of the case,

15   when all of the evidence is in, I submit that each and every

16   one of you will conclude beyond a reasonable doubt the

17   defendant broke the law, and because of what he did, he's

18   guilty as charged.

19       Thank you.  We appreciate your service.

20       THE COURT:  Thank you, Ms. Glatfelter.

21       Well, we've been going for a bit, ladies and gentlemen of

22   the jury, so I think we're going to take a brief break to

23   allow everyone to stretch your legs before we hear from

24   Mr. Rittgers on behalf of Mr. Sittenfeld, so let's take a

25   brief recess.

1     As I've said multiple times, and I will say multiple

2 times throughout this trial, please, during this break, do not

3 begin to discuss the case with your fellow jurors.  Do not do

4 any research with any media.  Do not do any research with any

5 electronic devices.

6     Please do not begin to form any opinions.  You've not

7 heard any evidence.  You've heard one opening, and there's a

8 lot of evidence to be heard down the road.  You'll have plenty

9 of chances to discuss and deliberate after all the evidence is

10 in, so until that time, please do not form any opinions.

11     (Jury out at 10:56 a.m.)

12     THE COURT:  Mr. Rittgers, can you remind me how long

13 your opening is going to be?

14     MR. C. MATTHEW RITTGERS:  Your Honor, I believe it

15 will be between an hour and 20 or an hour and 30 minutes.

16     THE COURT:  Okay.  It's an unfortunate time.  It's

17 11:00 right now.  Obviously, I don't want to break you in the

18 middle of your opening.

19     Do you think we should just run the jury a little late

20 and take a lunch break after your opening?

21     MR. C. MATTHEW RITTGERS:  That would be my

22 preference, Your Honor.

23     MR. SINGER:  Sounds good.

24     THE COURT:  So let's try to keep this break short.  I

25 know you need to get set up for your presentation.

1        Is Mr. Greiner in the courtroom?

2              MR. GREINER:  Yes, Your Honor.

3              THE COURT:  Mr. Greiner, you wanted to be heard on

4   your motion?

5              MR. GREINER:  Yes, Your Honor.

6              THE COURT:  Mr. Rittgers, please feel free to do

7   whatever you need to do to get set up while this is going on.

8        Mr. Greiner?

9              MR. GREINER:  Your Honor, I conferred with

10  Mr. Singer, and I think we might be basically in agreement.

11             THE COURT:  Oh, okay.

12             MR. GREINER:  We have no objection to redacting the

13  names and home addresses of the jurors on juror

14  questionnaires.

15             THE COURT:  My concern beyond that is that there are

16  certain -- you're asking for the entire venire of just the

17  petit jurors?

18             MR. GREINER:  Our primary concern is the 16 in the

19  box.

20             THE COURT:  Okay.  So that's one thing I wondered.  I

21  think what I would want to do is a couple things.

22        First, I'd want to give them the opportunity to remove

23  any information.  As you know, during the public process,

24  there are times when jurors approach and discuss things at

25  sidebar, such as medical conditions or things like that.

1        There are questions on the questionnaire that ask for

2    information that I think a juror could say I'd rather give

3    that at sidebar.

4        And so my concern is that they should have an opportunity

5    to redact that information, especially in light of the fact

6    that the questionnaire says at the very top it will all be

7    confidential, they may have given information about medical

8    conditions of themselves, or family members, or things of that

9    nature that I think it's only fair they have an opportunity to

10   redact.

11            MR. GREINER:  Fair enough.

12            THE COURT:  So that's concern number one.  And then

13   concern number two is that even if we remove the name and

14   address, I think one of the questions may be occupation on the

15   supplemental questionnaire and, you know, if somebody works at

16   a place they've identified, like -- and I'll just give a

17   made-up example.  I work at Fran's Hair Salon, or something

18   like that.  And there's only six people there, or seven

19   people, and everybody knows who is missing, I'm just afraid it

20   may become public who the members of the jury are.

21       And my concern about that is that they may -- people may

22   not be able to help themselves and start approaching these

23   jurors and trying to discuss the case with them, given the

24   media attention that's out there.

25       So even if the jurors are not reading the media, and I

1    don't believe they will, in light of the admonishment I've

2    given them, I'm just afraid it may cause inadvertent, almost

3    jury tampering; not intentional, but inadvertent, if the

4    identities of the jurors become public, and that's the concern

5    I have.

6              MR. GREINER:  I understand your concern, Your Honor.

7    Just a couple of things.  The juror service is not subject to

8    confidentiality.

9              THE COURT:  I understand that.

10             MR. GREINER:  It just isn't.  So we were willing to

11   make some accommodations in terms of personally identifiable

12   information, but not because -- that's an accommodation.

13        In terms of jury tampering, Your Honor, you admonished

14   the jury, and you'll admonish them again, that if they are

15   approached by anyone to immediately, you know, report that to

16   the Court.

17        We believe that that is a reasonable means to prevent and

18   address your concerns, and that to withhold the questionnaires

19   in their entirety, or even to redact beyond medical

20   information, is no problem.

21        I mean, I think the public is interested in the

22   demographics of the jury and, you know, who is going to decide

23   this case, what do they look like, you know, what are they all

24   about.  And, you know, I think occupation is part of that.  Is

25   this primarily blue collar, is this primarily white collar.

1          So I don't think the occupation is, you know, perhaps --

2          THE COURT:  Sure.  If it says auto mechanic, for

3     instance, that's fine --

4          MR. GREINER:  Right.

5          THE COURT:  -- because that's not identifiable.

6          MR. GREINER:  Or if they work at Procter & Gamble.  I

7     mean, that doesn't really identify them.

8          THE COURT:  Sure.

9          MR. GREINER:  So I hear what you're saying on that.

10    But I will start with the premise that this is not a matter of

11    confidentiality that they are serving in this capacity, and we

12    should work from that presumption, not from the presumption

13    that we shouldn't upset their -- the confidentiality of their

14    jury service, because it's not confidential, for one.

15          THE COURT:  And I'm not -- well, I do note there's

16    some law around this.  There's a little something for

17    everybody in the law.

18        I don't necessarily disagree with what you're saying.  I

19    guess I'm trying to figure out a way to give the information

20    to you or your client in a way that doesn't upset the

21    proceedings of the trial.

22          MR. GREINER:  We don't want to do that.

23          THE COURT:  And I appreciate that.  I do.  You know,

24    I guess it sounds like you think it's more -- it's necessary

25    to have it now rather than, as opposed to once the jury

1    verdict is announced because, obviously, once the verdict is

2    announced, these concerns are very, very different from what

3    they are right now.

4         MR. GREINER:  Right, but the public interest moves on

5    as well.

6         THE COURT:  Sure.  Do you want to be heard,

7    Mr. Singer?

8         MR. SINGER:  Your Honor, as you noticed in our

9    filing, we didn't take a position as to the steps the Court

10   should take as far as this goes.

11      We really raised issues relating to the law.  And I think

12   the Court has some discretion, obviously, in this area to

13   protect the interests of the jurors, while recognizing the

14   right to the public for this information.  So we refer to the

15   good judgment of the Court.

16        THE COURT:  Okay, Mr. Singer.

17      Mr. Greiner, I've heard what you had to say.  I want to

18   make sure I understand.

19      You would be satisfied with the petit jury that is

20   seated, those questionnaires; is that right?

21        MR. GREINER:  Yes, Your Honor.

22        THE COURT:  I will look at those questionnaires this

23   evening and see what, if anything, I can do with that, and

24   I'll try to give -- if I'm not going to give you the

25   questionnaires, I'll try and give you a written decision so

 1    that you can do whatever it is you're going to do with that

 2    written decision.

 3              MR. GREINER:  I appreciate it.  I'm sorry I wasn't

 4    here yesterday.  I was in Columbus in front of Judge Morrison.

 5    She said to say hello.

 6              THE COURT:  Very good.  All right.  Thank you,

 7    Mr. Greiner.  I appreciate it.

 8         Let's take a very brief break ourselves.

 9         Mr. Rittgers, how much time are you going to need?

10              MR. C. MATTHEW RITTGERS:  Just a few minutes, three

11    to five minutes.

12              THE COURT:  Okay.  Let's take a brief break.

13         (Brief recess.)

14              THE COURT:  Are we ready to proceed, Mr. Rittgers?

15              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

16              THE COURT:  Very good.  Anything anybody want to put

17    on the record before we proceed?

18              MR. SINGER:  No, Your Honor.

19              THE COURT:  I just will remind you, we are getting

20    close to the witness presentation part, so I will remind both

21    parties that we are doing separation of witnesses, so... all

22    right.  I think we're ready to bring in the jury.

23              COURTROOM DEPUTY:  They should be on their way,

24    Judge.

25              THE COURT:  Mr. Rittgers, before we begin, I'm going

1     to inquire whether it's going to present a hardship to any

2     jurors to push lunch until 1:00, just in case somebody has

3     blood sugar issues, or anything like that.

4            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

5            THE COURT:  You said it would take about an hour and

6     a half, so it would be about 1:00?

7            MR. C. MATTHEW RITTGERS:  That's my guess, Your

8     Honor.

9            THE COURT:  Thank you.

10        (Jury in at 11:31 p.m.)

11           THE COURT:  Ladies and gentlemen, I apologize.  That

12    took a little longer than anticipated.  We ran into the most

13    terrifying phrase in the English language, "technical

14    difficulties."  I think we have our courtroom technology

15    working again.

16        Mr. Rittgers advises that his presentation will take

17    about an hour and a half, and so I'm just wondering, is there

18    anyone for whom taking a lunch break at 1:00, rather than at

19    noon, is going to present an issue, anyone on the jury?  Can

20    we do that?  We are good to go?  All right.

21        So why don't we start, Mr. Rittgers.  It's your turn to

22    make an opening.

23           MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

24        Good morning.  Everything in life requires context.  And

25    we talked a little bit about it in voir dire.  Partial truth

1    is no truth at all.

2         And so what I'd like to do for the next hour and a half

3    or so is put some things in context that you're going to hear

4    during this case.

5         The government has already said that they agree that this

6    case is not about campaign finance, not about campaign

7    contribution limits, not the form of the donation.  And it's

8    not about that because there is nothing untoward about the

9    contributions in terms of the form, the amounts.  So that is

10   true.  That's not what the case is about.

11        But you're going to hear and see certain things that are

12   important for us to discuss, and the way in which that's

13   regulated under what's called Federal Election Commission law,

14   FEC law.

15        And I hope everyone can see this on your screen.

16        We're going to hear that a person who wants to

17   financially contribute to a candidate has three choices, and

18   it is not the candidate's choice to make, it's the person who

19   wants to contribute.

20        A lot of folks don't contribute, and that's completely

21   fine.  But for folks who want to contribute, there are three

22   choices, and they're in front of you on your screens right

23   now.

24        A person can personally donate and give money to a PAC,

25   or to a candidate's campaign.  Those are two separate things,

1    which we'll talk about in a minute.

2        A person can fundraise or bundle, and those terms are the

3    same thing.  Literally, bundling would be going around and

4    getting ten checks, as an example, from ten different people,

5    putting them together, and saying here are ten checks that I

6    fundraised for you.  I bundled them together, and I got them

7    from these ten individuals, individual one through ten.

8    That's called bundling or fundraising.

9        The person who is doing the fundraising is not required

10   to personally donate him or herself.  That's not required.

11   And the candidate cannot force them to personally donate

12   themselves.

13       The third option is, obviously, you can fundraise and

14   bundle, and also personally donate yourself.

15       FEC law says that a candidate on this type of PAC, the

16   PAC that Mr. Sittenfeld -- and I'll call him P.G. a lot during

17   this trial because of my comfort with him.

18       I'll give you a quick aside.  I might say to Mr. Ndukwe,

19   he's referred to in tapes as Chin, or Chinedum, so I will

20   interchange calling people Mr. or Mrs. sometimes but,

21   hopefully, I will be very clear.

22       FEC law governing this type of PAC tells candidates that

23   they are not permitted to put their name on an FEC website for

24   the PAC.

25       And so P.G.'s PAC was called Progress and Growth PAC.

1      And Progress and Growth PAC was publicly available on fec.gov.

2      And every penny that went into the PAC, and every penny that

3      was written out of the PAC, was publicly available and

4      properly written down and recorded.  The FEC would not let him

5      put his name in these filings, and that's the law.

6          So when the government, FBI agents, ask whether or not

7      their name will appear.  One, that's your right.  If you don't

8      want to donate to a candidate's campaign, and we'll hear in a

9      minute, that was P.G.'s preference, and we'll talk about why

10     in a minute, you have a right to say I want to fundraise or

11     bundle, I'd rather do it to your PAC.

12         And so when he tells them that his name is not associated

13     with his PAC, it is not in any FEC filings, the press is not

14     going to the Progress and Growth PAC and snooping around,

15     that's what you'll hear in these conversations.  And I would

16     love to jump right to the tapes, but I want to give us some

17     quick context first.

18         A candidate is also permitted to personally accept

19     campaign donations hand to hand.  The reason why I say that is

20     because we are going to see video where the government sets up

21     a video, and they personally hand Mr. Sittenfeld, P.G.,

22     checks, campaign donations.

23         The FEC says not only can a candidate personally accept a

24     campaign donation check, but a candidate can also personally

25     accept a PAC donation check, the Progress and Growth PAC, they

1      can personally accept that and put it in their pocket.

2          It happens all the time, at restaurants, at houses.

3      There are candidates that do fundraising at country clubs.  We

4      don't have that here, but I just want everyone to be aware

5      that there's no dispute that personally accepting these

6      donations is not in any way wrong.

7          This is an example, and it's an actual screen shot of the

8      Progress and Growth PAC.  And the reason why I chose this

9      screen shot is because there are four donations that are at

10     issue, and each one is $5,000.

11         Four were given by FBI agents in 2018, on December 17th,

12     by the way, in 2018.  And four more were given at various

13     times in 2019.  This particular screen shot, we were able to

14     show four on the FEC website all together.

15         And you'll hear these particular donations if we hear

16     from -- and we might -- Mr. Sittenfeld.  At the time, P.G. had

17     a PAC treasurer, and she's, I believe, a CPA, an accountant.

18         And it was routine, anytime that P.G. would receive a

19     PAC donation from an LLC check, they had checks in place.  And

20     he said, "I want the team to make sure that the checks are

21     attributable to the proper individual."

22         These names, Jason Myers, Nathan Wright, William Cheske,

23     and Lisa Hunt were given to P.G.'s campaign team by the

24     undercover agents.  They told him that those were the names

25     associated and attributable to each one of the checks, and so

1    that's what they put on the FEC filing.

2        Campaign donations are much more valuable to a candidate

3    than a PAC donation, this type of PAC. We've heard like dark

4    money PACs, and super PACs. That is not this type of PAC.

5    This type of PAC, and the way it's governed under FEC law, can

6    be used for a few things.

7        The majority of the expenditures for this type of PAC

8    were used for giving to non-profit organizations, other

9    candidates, and then P.G. could use it for lunch, or travel,

10   if he was going to speak with a potential constituent or

11   donor. And these are publicly available, what was spent,

12   every penny, on this PAC, on this public website.

13       The number one use was giving to other candidates.

14   Number two use was giving to non-profits and charities in the

15   areas. That's this type of PAC.

16       The reason that's important is because P.G. said

17   expressly, on November 7th, the first time he met Rob, who we

18   now know is an undercover agent, he said, hey, campaign

19   donations are obviously more valuable but, ultimately, 40 days

20   later, and we'll talk about why, they end up donating to his

21   PAC.

22       But he told them campaign donations were the most

23   valuable to him because he can use those to run and be a

24   successful candidate, mailers, TV, if he wanted to, his

25   campaign staff. He can't do that with this PAC, and he's not

1     accused of commingling any of these funds either.

2         435 Elm, we've heard it referenced.  435 Elm, if we walk

3     four blocks west of here, we would see it on Fourth and Elm.

4     And these five pictures on your screen were taken several

5     years ago of 435 Elm.  But this is exactly how it looks -- not

6     exactly, but it looks like this today.  It's still a vacant

7     building.

8         The reason 435 Elm is such an important piece of property

9     for the region as a whole, and the county and city, is because

10     of how close it is to our Convention Center.

11         And there have been studies that we, the City of

12     Cincinnati, the county, and the port works the entire region,

13     southwest Ohio, that our Convention Center is losing business

14     to other cities because we don't have the capacity of nice

15     hotel space around it.

16         And so Indianapolis, Columbus, Louisville, the studies

17     have shown that we are losing out on tax dollars in

18     conventions coming into Cincinnati.  So this parcel is very,

19     very strategic for the region.

20         And the people in the city knew it, the leaders, the

21     administration.  You might even hear from a guy by the name of

22     John Curp, who was a city solicitor and now he's an interim

23     city manager.  This was on the city's radar since 2008, at a

24     minimum.  It was on P.G.'s radar well before he met these

25     guys.

1      These are text messages between a guy by the name of Ryan

2    Goldschmidt and P.G.  And if you look at the dates which have

3    been blown up, the first is November 28th of 2017, and the

4    second is July 6th of 2018.

5      The first meeting with one of these so-called investors

6    was on November 7th of '18, so we are talking four months

7    after this July 6th text.

8      Ryan Goldschmidt and his father claimed that they had a

9    tenancy right, that they had the right to occupy 435 Elm.  And

10   435 Elm was embroiled in litigation for a very long time,

11   including as early as 2016.

12      So Ryan Goldschmidt and P.G. are texting.  P.G. had

13   shared in a meeting -- this is a reference of P.G. sharing in

14   a meeting people that he and his father could speak with in

15   the city to try to help move this forward for the region so

16   that it doesn't just sit there, dilapidated, across from our

17   Convention Center, before he met any undercover agents, before

18   there's an accusation that there was any untoward conduct with

19   Mr. Ndukwe.

20      And the July 6th of 2018 text, we can see that

21   Mr. Goldschmidt, Ryan, said, "Hey, can you meet up with

22   Chinedum and myself to discuss the property at Fifth and Elm?"

23      P.G. says, "Happy to," and he throws out a date.  This is

24   long before any accusation of misconduct.

25      And so P.G. was involved with the one family who claimed

1   that they had ground rights, and Mr. Ndukwe, who he thought

2   was his friend, before he was ever approached by anyone from

3   the federal government.

4       And the reason this was on city radar for so long, we're

5   going to hear from Philip Denning, Mr. Denning. And this is a

6   quote from him from June of 2019. But the reason it's

7   important is because these facts, the facts that the city was

8   struggling with this property, also went back many years.

9       This is the ultimate transfer of the property to the

10  port. It was a unanimous nine-oh vote in city council,

11  transfer to the port. And you will not hear that there was

12  any urging or pressuring from P.G. to any council member. It

13  was a no-brainer project, and that is why council voted

14  nine-oh to transfer this to the port.

15      The port has the ability to do things the city cannot

16  when you have an under-vitalized property that is in dire need

17  of vitalization, so they transferred to the Port Authority.

18      And we can hear Mr. Denning's actual speech on council

19  floor, and that's the word that you just saw, we're going to

20  hear them, I hope.

21      (Audio played)

22      MR. C. MATTHEW RITTGERS: So Mr. Denning, at the

23  time, he was the city economic development director. And the

24  development director spoke on council floor, this was in 2019,

25  but these numbers were fairly close for the prior several

1 years.

2     This was a problem property, with maintenance issues. It

3 was an eyesore right across from our Convention Center, and it

4 was draining the city to the tune of $4 million over a decade,

5 so they wanted to revitalize it and get it off the books.

6     And ultimately, council passed an emergency ordinance,

7 which you'll see on your screen now, and I'll blow up the part

8 that discusses the reason this was transferred to the port in

9 June of 2019, which echoes some of the things we've already

10 heard, which is that this was costing the city $400,000 a

11 year.

12     P.G. and many others had this on their radar, and as we

13 could see from those texts, was trying to help with this

14 project that to this day has not been completed and is still

15 in lawsuits and litigation.

16     We've heard a very short reference, I believe, to the

17 mayor and Mr. Ndukwe. And Mr. Cranley, who was the mayor from

18 2013 to 2021, I should say Mr. Ndukwe believed, because I

19 don't know. But Mr. Ndukwe definitely believed, and you'll

20 hear in the tapes, that Mr. Cranley had a vendetta against him

21 because Mr. Ndukwe had supported Mr. Cranley's opponent,

22 Yvette Simpson, in 2017 for mayor.

23     P.G. heard this from his friend, and took Mr. Ndukwe's

24 concerns very seriously. You'll hear this on the tape, that

25 the mayor, Mr. Cranley, during all times relevant in this case

1    had a vendetta against Mr. Ndukwe, and was hurting his ability

2    to get a project that was vital for a region in downtown off

3    the ground.

4        Back in 2012, Mr. Ndukwe was considering getting into

5    development. And he and P.G. had known each other for two

6    years at the time. P.G. introduced Mr. Ndukwe to the head of

7    the port back in 2012, when Mr. Ndukwe was considering

8    development. So their relationship and friendship went back a

9    very long time. They were very comfortable with each other.

10       Some of the quotes the prosecutor mentioned in opening,

11   you will have to hear because I don't want to misquote, but I

12   don't think that they were accurate in terms of the

13   friendship. You will hear P.G. call Mr. Ndukwe his friend

14   throughout these tapes.

15       This is after Ms. Brunner, the head of the Port

16   Authority, met Mr. Ndukwe. And this is P.G. responding to

17   Ms. Brunner, this was all 2012, talking about Mr. Ndukwe

18   becoming a great asset to the community.

19       P.G. and Chinedum were not just business acquaintances.

20   They also, I think, I don't know, I can't speak for Chinedum,

21   considered themselves friends. P.G. thought of him as a

22   friend. And I'm showing these just to show the friendship.

23       When Mr. Ndukwe had his child, he sent P.G. a picture

24   right after the birth. And the same with P.G., not just to

25   Mr. Ndukwe, but also to the undercover agents.

1      And I'm showing you these from Chinedum and his child,

2    and P.G. and his child, to show the friendship and the comfort

3    level that everybody, and that includes the FBI agents with

4    Mr. Sittenfeld ultimately, and the friendship that was

5    believed to be true.

6      This is a holiday card in 2018 written to FBI agents,

7    where P.G. tells them, "Looking forward to the year ahead.

8    Thanks for believing in Cincinnati's potential."

9      Before the operation ever started, the undercover sting

10   operation, Mr. Ndukwe had been someone who had donated to

11   P.G., had fundraised for him, and in -- this is in Jan- --

12   sorry.

13     Yes, the text that I want to refer to is January 10th of

14   2018, nine months, but the same year the government claims

15   that there -- and there was an unrecorded call in September of

16   2018, where Mr. Ndukwe says P.G. asks him if he wants to

17   fundraise $10,000 for him, and that probably happened.

18     This text nine months earlier is between Mr. Ndukwe and

19   Mr. Sittenfeld.  And Chinedum says, "Keep me posted on the

20   next fundraiser.  I'd like to be on the host level."

21     And we will hear that fundraisers can happen, you know,

22   like a physical location, like I mentioned, like over dinner,

23   or at a country club, where people come in and the host

24   actually says they can set a price for being cohost, or being

25   supporters, or being friends.

1    And the host is a bundler.  The host says, okay, I've got

2    20 of my business acquaintances, or friends, or business

3    partners, or family, and they can bundle the checks together,

4    not personally donate -- that would be choice number two --

5    and be on a host level fundraiser, at a location or not, just

6    to fundraise.

7    The government, I believe in their opening, indicated

8    that Mr. Ndukwe, the reason why he was working with the FBI is

9    because of a problem with the stalled project.  The reason we

10   know that is not true, it is because in January of 2018, nine

11   months before this recorded phone call, the FBI contacted

12   Mr. Ndukwe, and they said that they were investigating him for

13   various crimes.

14   They said they were investigating him.  He had been

15   suspected of aggravated identity theft, money laundering, and

16   structuring banking transactions.

17   So after he was contacted in January of 2018, he hired a

18   criminal defense lawyer and, shortly thereafter, he went in,

19   and he actually met with some of the federal prosecutors who

20   are before you today, and Agent Holbrook, and he confessed to

21   various crimes.

22   He confessed to making false statements on federal

23   documents to the structured banking transactions, forgery, or

24   aggravated identity theft, and making contributions in the

25   name of another.  That's like straw donor donations.

1        And they sat down.  They had several meetings after this

2    in 2018.  And I say they sat down, Mr. Ndukwe, the

3    prosecutors, Agent Holbrook, and he went through people that

4    he believed he could record and catch for crimes.

5        He had known P.G. for eight years.  P.G. was never --

6    there were targets.  There were plenty of targets that he

7    pointed the finger at, and said -- and I'm not -- it probably

8    is true, but it was not P.G.

9        So how did P.G. become a target?  Well, in that

10   September, Mr. Ndukwe had been working with the federal

11   government now for six months recording people, meeting with

12   the federal prosecutors and the agent.  He will admit, Agent

13   Holbrook, P.G. does not become a target until October of 2018,

14   and there were plenty of other targets.

15       The claim is is that the unrecorded phone call in

16   September makes him a target for asking someone to fundraise

17   $10,000.

18       And one of the reasons why P.G. might have asked his

19   friend to fundraise is because, one, he had asked nine months

20   earlier; two, he had fundraised and donated to him in previous

21   campaigns.

22       And I mean, there were campaigns where he actually

23   donated an amount that would have been permissible.  P.G. lost

24   a gubernatorial campaign and refunded Mr. Ndukwe money back

25   after it was too much after campaigning.  These guys had known

1    each other for eight years.

2        When Mr. Ndukwe began working with the FBI between 2018

3    and 2020, they paid him cash payments to the tune of $27,000

4    between 2018 and 2019.  And there is nothing in writing as to

5    why they're paying him these cash payments.  There's nothing

6    in writing as to whether or not he is entitled to more cash

7    payments.

8        And just on June 18th of this year, four days ago, they

9    did an interview -- first cash payment was in 2018, and they

10   said why didn't you pay federal taxes?  He said, I thought I

11   couldn't tell anyone.

12       And he -- this is a man who worked with these FBI agents

13   on a monthly basis for years, and asked them questions,

14   because what they do when someone cooperates is they then

15   control people, and they create each -- who these actors are

16   going to be.

17       And when I say "actors," I'm talking about Rob and Brian,

18   the undercover FBI agents.  They create their persona.

19   Mr. Ndukwe didn't make that up.  He was told what to say by

20   Agent Holbrook and by the undercover agents.

21       The judge read the accusations at the beginning of this,

22   the scheme that Mr. Sittenfeld -- this is the accusation, his

23   scheme in soliciting donations, and that was in the

24   preliminary instruction.

25       I want to talk about what we know the actual plan

 1    personas were in this fake scheme.  Rob and Brian, as the

 2    prosecutor mentioned, were investors in a problem property

 3    that no other developer at the time was interested in in

 4    Cincinnati.

 5        Mr. Ndukwe purchased air rights in 2017 for this property

 6    from U.S. Bank because the property was in foreclosure, and

 7    U.S. Bank maintained that they had the right to the air.  That

 8    was their claim.

 9        And so the reason, I believe, the ground was transferred

10    to the city was because of all the back taxes.  That's how the

11    city obtained the ground rights.  So everybody knew that a

12    deal, that a development agreement at 435 Elm would go to

13    Mr. Ndukwe.  He had the air rights.  And he had them in 2017.

14        And that means if you want to build anything into the

15    air, he should be involved.  He can sell them, or he can be

16    involved in the development.

17        The plan was Rob and Brian are there to support this

18    development, that they were the money.  Mr. Ndukwe had three

19    projects in front of the city at this time, three.  This was

20    one of them.  The other one was a low-income housing project

21    and a hotel deal up in Mt. Auburn.

22        No accusation, none, that there's anything untoward,

23    unethical, or bribery in the two projects that he had before

24    council, which included with P.G. and the rest of council

25    members.  No accusation of anything wrong in that at all,

1    those two.  But the no-brainer project, which is 435 Elm, that

2    Rob and Brian got involved in, that's the only claim of a

3    problem.

4        So how do we know that they said, hey, we're the

5    out-of-town money.  We've got this.  We're going to be the

6    gasoline that makes the engine go?

7        Well, the very first call, Mr. Ndukwe -- and this is,

8    again, Mr. Ndukwe is doing what Agent Holbrook is telling him

9    to do.

10        So the plan is Rob and Brian are going to be the capital

11    sources, the investors, behind 435 Elm.  And their persona as

12    investors, and being ready and willing to develop 435 Elm,

13    that was not just to P.G., that was to everybody who they had

14    contact with.

15        November 7th, they tell him that this is going to be a

16    $75 million deal, they tell P.G.  Rob, the undercover agent,

17    and Chinedum tell P.G. they got a $75 million deal they're

18    getting together.

19        January 9th, "It's Chin's deal.  We're the money," which

20    we know they really were not, obviously.

21        So now that we have a little bit of background about

22    435 Elm, I want to start going into the transcripts, and

23    listen to audio and watch video.

24        The first -- I don't remember if it was mentioned, but in

25    the first phone call, Mr. Ndukwe says that things were heating

1    up at 435 Elm.  This is the first recorded call.

2        There are three recorded calls that happened before this

3    November 7th lunch at Nada, and P.G. says, "Good.  Yeah."  I

4    mean, everyone in the city that was aware of 435 Elm wanted

5    this thing to be developed.  And that's in there because I

6    thought they were going to use that in their opening.

7        October 30th, this gives us context about Chin's

8    relationship with Cranley.  This is a recorded call between

9    P.G. and Chin, where Mr. Ndukwe says, "Here's the deal.

10   Here's the deal.  It's like I don't know how much you know

11   about Cranley, he's just trying to fuck me left and right

12   because I supported Yvette Simpson," which might be true.

13       P.G. says, "I know a pretty good amount about it."

14       They continue to talk about people who are pressuring

15   Mr. Ndukwe to support them, and P.G. says, "Yeah, that's weird

16   and questionable legality."  He thinks he's talking to an old

17   friend and doesn't even know he's on a recording.

18       And in this same call is the context of the "love you but

19   can't" quote that we did hear in the government's opening.  It

20   is in the context of P.G. being able to help his friend if he

21   actually is successful, and in order to be successful, he has

22   to raise money in order to then successfully run to become the

23   next mayor.

24       And so this is the quote, and we're going hear it all in

25   a minute, and it's -- this is continued from the previous

1    slide.  It's right after Mr. Ndukwe talking about

2    Mayor Cranley hurting him.

3        And it's also after Mr. Ndukwe -- sorry, P.G. tells Chin

4    that in order to be a successful candidate, he's got to raise

5    money.

6        Here's the call.

7        (Audio played.)

8        MR. C. MATTHEW RITTGERS:  So that's the entirety of

9    the call, and there's a lot of discussion about before next

10   Tuesday and the LLC law change.  If you notice, the date of

11   this call is October 30th.

12       There was a call four days before it on October 26th that

13   we have that's recorded, and that is when Rob and Brian or

14   Agent Holbrook tell Mr. Ndukwe to tell P.G. that they want to

15   get this in through LLCs before the law changed, which is

16   their right, and we're going to listen to that call, October

17   26th, in one minute.  But they tell him.  The first recorded

18   call is October 26th, four days before this, and they say

19   we've got lots of LLCs.  We want to get this in before the law

20   changes.  And we're going to hear that in a minute.  So this

21   conversation we've already heard referenced is out of order.

22       This is a phone call on November 2nd of 2018.  It's the

23   third recorded phone call before the lunch on November 7th.

24   And, again, Chin and P.G. have known each other for eight

25   years.

1       And this is not Chin's doing, this is the FBI telling him

2   to say something that sounds untoward.  There's a script, and

3   it's planned.

4       And so when Mr. Ndukwe says something that sounds

5   improper, "I don't know if it's next year, two years, three

6   years, that it's going to be a yes vote, you know, without a

7   doubt.  I've shared that with them, that, hey, I've known P.G.

8   for years, all this stuff, but they're, like, all right.

9   Well, get his attention."

10      And P.G. hears that, and P.G. says, "Nothing can be

11  illegal, like illegally nothing can be a quid pro quo.  I know

12  that's not what you're saying either."  He's known him for

13  eight years.

14      And Mr. Ndukwe agrees.  Mr. Sittenfeld and Mr. Ndukwe

15  agree on this phone call on November 2nd.  There's a

16  suggestion made.  He says no.  He says, "Okay.  No.  I hear

17  you.  I hear you."  There's an actual express agreement on

18  this phone call, and we can hear it.

19      (Audio played.)

20          MR. C. MATTHEW RITTGERS:  A couple things there, and

21  then we're going to jump into the November 7th meeting.

22      One is, elected officials or candidates for office can

23  say that they're going to win.  They can also relay their

24  confidence in their colleagues.

25      Rob and Brian were claiming that they weren't from here,

1    that they didn't know council, that they didn't know John
2    Cranley.  They didn't know if -- they could invest anywhere in
3    the country, in any city, and they wanted to know if this city
4    and county and region would support a development deal at
5    435 Elm, which we all know now is a no-brainer project.

6        A candidate has the ability, and we hear it.  In our
7    House and Senate, we have people called whips that count
8    votes, majority whips, minority whips, and they count votes,
9    saying I'm confident that I can get the votes to pass
10   universal healthcare, or to build the wall, or whatever it is.

11       That is permissible for a candidate and an elected
12   official, especially when someone is saying I'm from out of
13   town.  I don't know if I want to put my money here.  Will it
14   be supported.

15       And so what we hear in this first meeting on November 7th
16   is P.G. vetting the project.  And he asks them questions.  And
17   I'm talking now about Rob and Chinedum.  He asks them what
18   they want from the city.

19       And you're going to hear, they say ordinary, competitive,
20   nothing out of the ordinary, normal CRA, which is Community
21   Reinvestment Act.

22       He says -- they talk about a hotel, they talk about it
23   being next to the Convention Center.  I mean, these guys know
24   that.

25       So at this lunch, now we're at November 7th, at an

1    in-person meeting, we will hear Mr. Ndukwe say to

2    Mr. Sittenfeld that after they just do their due diligence,

3    talking about builders and architects and going through

4    zoning, they think they're going to have $1.8 million into it.

5        And he's referencing this next to Rob, who is the money

6    guy, who is not from here, who then says, "Well, I don't know

7    if we -- we're worried about the mayor, ultimately.  We're

8    worried.  Are people going to support this?"  They're asking

9    elected officials.  An elected official is permitted to

10   express his confidences both in a project and himself, and his

11   colleagues, and the mayor.

12       Same lunch, still doing the vetting.  I don't know the

13   truth to this, but what P.G. hears is that they have a strong

14   letter of intent from an office tenant that this -- back in

15   2018, they're talking to a hotel group, and that they're

16   thinking about putting high-end condos on top of this blighted

17   property that's hurting the city to the tune of $400,000 a

18   year.

19       This November 7th is 40 days before P.G. properly records

20   the PAC donations that are at issue in 2018 in this case,

21   which happened on December 17th.  We'll talk more about that

22   shortly.

23       He continues to vet the project at this lunch, which is

24   at Nada, which is a block north of here, in a public spot.

25   And you'll hear it on the tapes.  It's loud in there, and

1    there are people around.

2        P.G. doesn't hide the fact that he's with Chinedum, and

3    that Chinedum's there with a potential investor, the investor

4    in 435 Elm.  There's no hiding that.

5        And you'll hear some comments that, at the end of this,

6    it's a $75 million deal for this region.  That's the claim.

7    Mr. Ndukwe says, "Look, this is going to be a huge win if we

8    can do that next to the Convention Center."

9        P.G. asks how many units in the hotel?  140.  He's

10    vetting it.

11        It's still early in the lunch before they go across the

12    street, P.G. asks about a CRA.  This is the Community

13    Reinvestment Act.  This is what you really need from the city.

14    And they tell him nothing out of the ordinary, but just

15    competitive.

16        And P.G. then comforts them right then and there with his

17    support and the support of his colleagues, "Tax abatements for

18    the abatement.  I've never had an issue with that."

19        By the way, a candidate's permitted to tell others their

20    stance from the past.  P.G. was the top two vote getters in

21    the last two elections, youngest ever on council in the first

22    election they ran.  And so we hear candidates say, when

23    they're behind in the polls, they're still going to win.  And

24    that's what candidates do when they run for office.  They say

25    no, no, no, don't belive the polls.  I'm going to win.

1        So yeah, P.G. did say yeah, I'm going to be the next

2   mayor.  And P.G. was ambitious.  What he says here, he tells

3   them what has always been his actions, which is for the

4   abatement, "I've never had an issue with that, if it's land.

5   But otherwise, as you know, it has a derelict building sitting

6   on it and isn't productive for the city, that not's a big

7   lift."

8        And that's when he says -- this is continued.  It just

9   didn't fit on the slide.  "And even some of my colleagues --"

10   now he's giving confidence -- "talk kind of crazy talk about

11   the CRAs.  They're routine.  So yeah, I can certainly shepherd

12   the votes too.  My colleagues are going to support it."

13        Let me go back for one second.

14        So after the vetting of the project, the lunch lasts

15   about 57 minutes, everyone stands up, and Chinedum leaves, and

16   P.G.'s ready to leave.

17        And Rob, the undercover agent, says to P.G., "Hey, can

18   you come across the street with me real quick?"  And they're

19   truly ready to leave.  P.G. has no idea what he's going to do

20   across the street, but he says, "Sure, I'll come across the

21   street with you."  And there's videos of that.

22        And across the street, and it's continued from the lunch,

23   there's a new, a pretend worry that Rob, the investor, has

24   about actually putting all this money in our region.  And he's

25   talking to one of our elected officials.

1      And the worry is the mayor, who P.G. obviously already

2  has on his radar, especially with regarded to Chinedum, is

3  going to veto a project because Chinedum's got his name on it.

4  That's the new FBI undercover agent's story.

5      And we'll hear what P.G. says about the mayor. He tells,

6  at the lunch, his friend, that the mayor actually likes

7  development, and so if the project is what they claim it to

8  be, that they don't have to worry about the mayor. The

9  mayor's not going to stand in the way of a good deal.

10      If this project is competitive, nothing out of the

11  ordinary, its actually $75 million, across from the Convention

12  Center, he's saying you don't need a veto for the vote. Don't

13  worry about John Cranley. It's like two trains passing in the

14  night.

15      This is across the street with the agent, same sort of

16  thing. "I'm worried about, we want this to be Cranley proof."

17      And this is when the agent is saying things that would --

18  a corrupt person would say, oh, yeah, you give me the money,

19  I'll get you the Cranley proof votes. Two trains passing in

20  the night.

21      The agent, "What's the best way for us to get that to

22  you, to get that deal, you know what I mean?"

23      P.G., "Do you guys know he's going to veto it?" After he

24  already told them at the lunch that he was not going to veto

25  it, not to worry about it. And this is upstairs in the 580

1    building.  It's just a block north of here.

2       (Audio played.)

3        MR. C. MATTHEW RITTGERS:  This is after P.G. had told

4    him at the lunch that they don't even have to worry about the

5    mayor.

6       We're going to see and hear from the evidence that these

7    three things, the form of the donation, which is LLC bundling,

8    and I'm going to jump into that October 26th call.  That was

9    first requested and mentioned by the government, or their

10    actors.  The amount that they wanted to donate, also the

11    government.  2019, you'll never hear P.G. even ask for a

12    donation.

13       And the third, making donations to the PAC.  It is their

14    right.  A person that wants to financially support a candidate

15    does not -- he cannot force someone to say you've got to also

16    donate to me in addition to your fundraising or bundle.

17    That's not his choice.

18       He can't say -- he did say, I would prefer my campaign

19    donations, but he can't say you don't -- he cannot tell them

20    they have to donate to the campaign.  And they say,

21    ultimately, that they'll donate to his PAC.

22       And we know this.  This is the October 26th call.  When

23    we heard that October 30th call that I said was out of

24    context, this is the very first recorded call between Chinedum

25    and P.G.

1          And it's on October 26th, and this is what the FBI tells

2      him to say to P.G., which is that they, meaning Rob and Brian,

3      "They got a ton of LLCs, and I was going to talk to Jay about

4      this, but I want to see if there's a way to tee up getting you

5      with them before they change everything in November."  That's

6      the law change which, again, it's a donor's rights.

7          And that's coming from the FBI and their agents to say

8      LLCs.  These are -- he is not just making this up.  They meet

9      and script things and plan things.  "We want to do it before

10     the law change in November."  This is the first recorded call.

11         And then we already heard on this October 30th call,

12     where he then, again, mentions the LLCs and asks about the

13     drop dead date.  And they actually pick a date, I think right

14     after it.

15         The amount of the donation.  We heard this in the call

16     already.  Mr. Ndukwe says to Mr. Sittenfeld that he can help

17     raise 20, and he's referring to thousand dollars, over the

18     next couple of -- oh, sorry.

19         The beginning of the slide, where I should have started,

20     Mr. Ndukwe says that "he's going to be able to get you close

21     to $20,000 in the next couple..." and he stops.

22         P.G.'s response down here is that he would be incredibly

23     grateful if Mr. Ndukwe fundraises $20,000 over the next couple

24     of years.

25         And Mr. Ndukwe, again, acting on behalf of the FBI and

 1    what they tell him to say is, "No, no, no.  It's going to be

 2    over the next couple of weeks."

 3         P.G. in that first meeting tells them on tape what is

 4    most valuable, and we know why, which is campaign donations,

 5    obviously.  Like money directly into a campaign is the most

 6    valuable thing.

 7         So what happens?  Well, the undercover agent, Rob, offers

 8    P.G. cash, $10,000.  P.G. does not know he's on a wire,

 9    doesn't know he's being recorded.  You can hear him call a

10    campaign finance compliance person and ask what you're

11    permitted to report and accept as a candidate to a campaign or

12    a PAC.

13         And he hangs up the phone, and he apologizes, says he's

14    got to be aboveboard, and you can't accurately report that.

15    There's a limit of how much cash you can take from

16    individuals.  He says no.

17         So next Rob says we've got -- there are two things that

18    he says, and I only have one slide for this, but cashier's

19    checks and money orders.

20         They say something like, hey, you can figure out how to

21    interject them, I think that was the language, meaning P.G.

22         And he calls him back -- this is after the November 7th

23    meeting, after he checks with finance teams and lawyers and

24    accountants, and he says, hey -- he's apologetic.

25         He's like, I cannot do that.  He never took money orders

 1    or cashier's checks, and he tells them, "No, I can't take

 2    cashier's checks or money orders."  So he turns that down.

 3        So the next thing they do -- I'm talking about the FBI

 4    agent, Rob, who is an investor.  They said, okay -- this is

 5    after P.G. has repeatedly said you can't do it these first

 6    three ways, but if you want to, which they kept saying they

 7    wanted to, there's a lawful legal way, and it's through LLC

 8    checks, if that's your choice, or you can just write a check.

 9        LLCs are limited liability corporations, I think.  It's

10    like small businesses.  You know, like a big -- it's odd, like

11    corporations like Procter & Gamble or Kroger can't write

12    checks to candidates, but these small businesses, LLCs, can.

13    And so that's what they're referring to is like small

14    businesses that are incorporated.

15        So the agent says, "Hey, we've got LLC checks for you,"

16    and they write them out.  And they give them to him.  I think

17    this is now December, and P.G. says thank you.

18        And he has compliance checks in his campaign.  The checks

19    don't say LLC or corporation.  You can just write a check that

20    says Kroger.  Some of us might know that that's a corporation,

21    but it doesn't -- you can't tell.

22        And here's the trick.  Two of the checks were actually

23    corporations, but they didn't say it on the check.  And these

24    guys told him that they were LLC checks.

25        But even with that, P.G. never cashed them.  In fact, on

1    a recorded phone call, or on a wire, he says he actually

2    shredded them.  And he apologized to these people for making

3    them jump through all these hoops, and he shredded the checks.

4    Didn't take corporate checks, even though it didn't say

5    corporation on it.

6        And here's a call between Rob and P.G. on December 4th,

7    related to one of these incorrect donations.  And it puts

8    things in context later in this case too.

9        (Audio played.)

10        MR. C. MATTHEW RITTGERS:  All right.  So in that

11    call, P.G. is talking to the undercover agent, Rob.  And he

12    tells him, hey, if you want to check with your universal

13    buddies and investors to make sure that these individuals who

14    you're bundling and fundraising from actually are doing it

15    from an LLC, or just let me know their names and we'll check.

16        Ultimately -- that's December.  That will put some other

17    things in context in 2019 that you'll hear, that kind of

18    debacle with attempting to donate improperly.

19        You've already heard Ms. Brunner referenced, and she was

20    the head of the port, president and CEO.  Ms. Brunner, I

21    think, has been the head of the port for about a decade.

22        And I believe the reference was that P.G. was pressuring

23    her about 435 Elm.  Well, we're going to hear that P.G.

24    actually was communicating to her and nudging her about a lot

25    of things that the city needed to get done.

1     And before I get to her, this -- there's no dispute in

2     this case.  No money in P.G.'s personal pocket.  No money in

3     his personal bank account.  No donation commingled with any

4     campaign funds.  That is not in dispute.

5     Ms. Brunner, she too believes that Mr. Ndukwe has

6     backing, is ready to do a deal.  And the issue in the

7     negotiations -- Ms. Brunner is trying to create a partnership

8     with Mr. Ndukwe, and the issue is the ground lease amount,

9     because she and the port maintain the ground lease,

10    Mr. Ndukwe had the air rights.

11    So Ms. Brunner and Mr. Ndukwe were trying to come to

12    terms on a partnership.  There was a third-party appraisal

13    that set -- and the third-party appraisal is actually later, I

14    think 2020, where the third-party appraisal, which was

15    Mr. Ndukwe and another partner of his, in 2020 had had an

16    independent appraiser do this for $57,000.

17    And Mr. Ndukwe's offer to Ms. Brunner was $66,000.  And

18    she had said to him that she thought $350,000 was the most

19    appropriate.

20    P.G., who is getting information from both sides,

21    Ms. Brunner, city economic development director, Mr. Ndukwe,

22    this amount, this lease amount would directly impact their

23    investors, Rob and Brian.

24    And there's a reference in one of the tapes, a suggestion

25    from P.G. to Mr. Ndukwe.  P.G. says to Chin, could you get a

1    deal done at 275 per year?  And the claim is that he's doing

2    his bidding because of PAC donations.

3        This is what they claimed the property would ultimately

4    look like if developed.  As we've seen, this is what the

5    property looks like today, as we sit here today, and looked

6    like for many years.

7        Now, with Ms. Brunner, this pressure comment that we've

8    already heard, these are text messages.  I asked P.G. if he

9    had contact with Ms. Brunner about other things in addition to

10   435 Elm, things that were going on in the city that were

11   important for the city.

12       And he got these texts.  I'm just going to highlight a

13   few.  There's a lot, a pdf, and these are P.G.'s

14   communications with Mrs. Brunner.

15       The first one, March of 2017, "Hi P.G., I just sent you

16   an email at work about Hudepohl.  Call me if you have

17   questions."

18       Hudepohl is a redevelopment.  I believe it's what's

19   called a brownfield site, where you have contaminants in the

20   soil.  And there's federal funding for it, and the port was

21   trying to clean it so it would be ready for redevelopment.

22       P.G. was getting in the weeds, rolling up his sleeves

23   with her on this deal, and we have that actually in emails as

24   well.  I highlight the following text from the port tour.

25       Mrs. Brunner invited council members, commissioners, and

1  civic leaders to go on a tour, to actually go around, put

2  boots on the ground, and to see the site that the port owns.

3      And the reason why I highlighted that is that we'll hear

4  from testimony that P.G. was the only one on council that went

5  on that tour.

6      There is a de facto thing that happens when certain

7  people are the ones that are very involved in development.

8  Some people are very involved in animal rights.  People kind

9  of get their niche.

10      P.G. was the only one on that tour, and he then invites

11  all his council members, says, "Hey, this is great.  Everyone

12  should do it.  Go get boots on the ground."

13      The third text, "Hi, can you have breakfast --" this is

14  Mrs. Brunner to P.G. -- "with Bruce Katz?"  This is 2020.

15      Bruce Katz is a preeminent expert on urban planning

16  revitalization.  The breakfast had four people, Phil Denning,

17  the city economic development director, P.G., Mrs. Brunner,

18  and this guy who is in from out of town, the expert on

19  redevelopment and revitalization.

20      The fourth one, 2019, moving back one, "We have

21  8.3 in Mt. Airy and 2.5 in Sedamsville."  That's Mrs. Brunner

22  telling P.G. about acreage of certain sites that they have.

23      We have emails, and I believe she'll testify to it, P.G.

24  was actually very persistent with her about this.  We have

25  emails where she actually apologized to him, because he would

 1    follow up on top of an email and say, hey, what's going on

 2    with these sites, and she says, "Oh, sorry.  I'll get back to

 3    you on Monday."  That's her response after two previous emails

 4    to P.G.

 5        He goes, he meets the employee of the port.  He puts his

 6    boots on the ground on these sites, looking at a development

 7    project for homeless veterans, and -- you know, this is a

 8    non-profit.  And he has boots on the ground on these sites,

 9    urging her, saying send me this information.  She actually

10    even apologizes in writing.

11        And ultimately, on December 26, there's an email between

12    Mr. Sittenfeld and Mrs. Brunner, the day after Christmas,

13    where he's talking -- again, this is, I believe, about four

14    months, yes, four months after this text, where the veterans

15    project -- national heads are coming into town, and he says,

16    "Hey, can I take them to these sites?  I think I personally

17    found a better site that's not a port property, but I would

18    still like to give them options."

19        The point of all this is that he is very involved, very

20    ambitious, and very involved and hardworking.  And it didn't

21    matter what it was.  If he thought there was this cog in the

22    wheel and red tape, he would absolutely get involved.  And

23    that context does matter.

24        So I mean -- before we jump our eyes on that.  On

25    September 24th, there's a meeting you've already heard

1    referenced at a hotel in Columbus.

2        What happens before that is relevant, not because I

3    believe it to be true.  So on September 19th of 2019, and

4    you'll hear this on the recordings and referenced,

5    Mr. Ndukwe's accused of sexual assault.  And it's all over the

6    papers.

7        I am not here to speak about any of the validity of that.

8    Frankly, it might be false.  But the reason why it is

9    important is because it goes to his intent.  And when that new

10   fact is introduced, he considers pausing any Ndukwe project in

11   front of the city because it might be a distraction.

12       He says things like, you know, everyone deserves to be

13   innocent until proven guilty.  But this is a distraction,

14   potentially, and he's considering whether or not he should

15   pause project.

16       And so, in fact, October 19, there's another unrecorded

17   call, which we will hear the description as on or about

18   October 16th of 2019, Mr. Ndukwe conducted a non-recorded

19   telephone call to P.G. Sittenfeld.

20       The purpose of Mr. Ndukwe's call was to confront

21   Mr. Sittenfeld about reported comments Sittenfeld made about

22   Ndukwe.  Ndukwe heard from Steve Hemburger, who is a

23   developer, that Sittenfeld said that any development project

24   related to Ndukwe should not be presented to City Hall.

25       Sittenfeld made the comment following accusations made

1    against Ndukwe.  Sittenfeld defended himself by citing there

2    were a lot of negative things out there about Ndukwe.

3        Ndukwe said that Sittenfeld told Ndukwe the public

4    comments made by Hamilton County Prosecutor Joe Deters has

5    changed his perception because, ultimately, a month later,

6    after he had considered pausing everything, the head

7    prosecutor down here decided not to bring charges.

8        So when they had this call, P.G.'s like, look, these

9    comments by this head prosecutor has changed by perception of

10   things.  But the fact that this entered his mind means, like,

11   I don't know if the city would want partnerships because of

12   this distraction goes into the thing that we're going to hear

13   next.

14       September 24th of 2019, P.G.'s already in Columbus with

15   leaders from around the State of Ohio, and they knew it.  And

16   they ask him if they can come meet Vinny, who has already been

17   referenced.  Sports book has already been referenced,

18   potential gambling.  And I will correct some things now that

19   we heard in opening.

20       What happens is -- this is after the very beginning of

21   this meeting is P.G. talking to these guys with his chief of

22   staff in the room, and they picked a location for

23   atmospherics, a hotel.  And they handed him checks at the end

24   of the meeting, which is completely fine to accept.

25       But in the meeting, the very beginning of the meeting,

1    the first segment is when P.G. is talking about potentially

2    pausing projects that Mr. Ndukwe has before the city because

3    of this fact.

4         Actually, I don't think it's going to be in the

5    transcript of the video that you'll all see, but it goes to

6    his intent, and you're going to hear about it from people on

7    the witness stand.

8         And so what do they do in this meeting?  They say -- this

9    is at the beginning of the meeting, also probably won't be

10   played, but it will be on cross-examination, I assume.

11        Rob, undercover, he says to P.G., "I realize this is in

12   relation to this sexual assault allegation against

13   Mr. Ndukwe," that they have jitters, essentially, about this

14   deal.

15        And he's saying, "It's either like, hey, we're

16   comfortable and really like this deal and this whole sports

17   book side of it and everything, and we're staying in --" and

18   he goes on to say -- "or we waste a lot of F'ing time and

19   money, and we're just going to cut our losses."

20        P.G. says, "I don't think you guys should do that, not

21   invest in our region."

22        And so what happens next is a hypothetical discussion

23   about gambling.  Gambling does not get approved down here at

24   City Hall.  P.G., when he was on council, he had no say in any

25   of that.  That goes to the state house up in Columbus.

1        And the way that it is introduced in this meeting, one,

2   after this conversation about them maybe cutting their losses

3   and leaving and not investing all this money in this blighted

4   project that is hurting our city, because the money didn't go

5   away when the port took it over.

6        The port gets funding from the county and the city. So

7   that cost $400,000 a year and is still there. And so when

8   these guys tell P.G., hey, we might cut our losses and not

9   invest here, but this sports gambling stuff might make us more

10  comfortable, that's how they start the conversation.

11       Then they open up this word "controlled environment."

12  They never say monopoly. They never say they want to be the

13  only one. They talk about it under the guise of being

14  concerned about gambling addicts, and they create imagery in

15  this video about that's why they want it.

16       And then at the very end, they say something about

17  competition. And P.G. says, "There's a good public argument

18  for all of that." That's his response.

19       There isn't a city or municipality in this country that

20  wouldn't put some sort of regulation zoning on gambling. And

21  if it gets passed in the state, even Las Vegas, when Nevada

22  passed it, there is certain zoning and regulation, when

23  gambling gets passed, up in Columbus.

24       So this is when Vinny gets introduced to the meeting,

25  where P.G.'s chief of staff is, on September 24th.

         Vinny says -- he mentioned keno, which I think is a
gambling-type thing, "They have no idea the burden that's
gonna be and the public outcry when nitwit keeps going to the
gas station losing his money every ten minutes because he's
putting money on a horse, or he's putting money on a game.
He's betting the first, first pass."

         Brian, another undercover agent:  "He can't pay his
rent."

         Vinny:  "He can't pay his rent."

         P.G.:  "Right."

         Vinny:  "Now they're all gonna be pissed off that that's
going like that."

         P.G. says:  "By the way, I'm not convinced the public at
large wants that version of things anyway."

         Vinny:  "No, of course not."

         Sittenfeld:  "Right."

         Vinny:  "So what we learned in Rhode Island was it needs
to be super controlled."

         They introduced the control based on they can pick the
script.  It's their script.  It's their pretend story.  So
they said we need a monopoly, period, or we're out.

         They say they want a controlled environment because of
the burden, the public outcry, and gambling addicts.

         P.G. says -- here he said -- Vinny goes on to build this
up, "It's not real money, so people lose, people lose track.

1    People lose track and it's not real.  So I'm not convinced.

2    So that's why I --" Vinny -- "would prefer Cincinnati to have

3    a controlled environment."  He expressly states why he wants a

4    controlled environment right there.

5         And at the end of the conversation, I'm going to play

6    parts of the video here right now, Vinny puts this in after

7    they've been talking now for over 30 minutes, maybe even an

8    hour, "I think it should be very high financially.  I think it

9    should cost a lot of money to get into this so that you keep

10   people out of it, keep it controlled, you limit access, you

11   limit competition."

12        P.G.'s response is:  "And there's a good public argument

13   for all of that."

14        He's entertaining their comments about whether or not

15   there will be zoning in Cincinnati.  They never said they want

16   to be the only one.  They never said they need a monopoly.

17   And they put this in at the very end, and P.G. doesn't say

18   yeah, I'll do that.  He says, "There's a good public argument

19   for all of that."

20        And this is the hotel room that they set up, knowing he's

21   in Columbus, and they have chicken wings.

22        (Audio played.)

23            MR. C. MATTHEW RITTGERS:  That's one clip.  This is

24   progressing through the meeting.

25        (Audio played.)

1          MR. C. MATTHEW RITTGERS:  2019, we heard from the

2   judge's preliminary instructions, that one of the accusations

3   is that P.G. created a scheme to solicit money from these

4   undercover agents.  You will never, ever hear him ask for a

5   single penny in 2019.

6          And in 2019 -- by the way, he can ask.  He can say do you

7   guys want to fundraise?  He can ask someone if they want to

8   donate.  He can put it on a billboard, donate here now.

9          They then donate to his PAC again in 2019.  And P.G.

10  properly records it.  In fact, that's what we saw at the

11  beginning, the recorded checks.  His campaign staff asks who

12  the names are attributed to.  He gets the names from them.

13         And P.G.'s wife gets pregnant in 2019.  So they come to

14  him -- and this is on video, and they give him a gift.  And

15  they say it's our congratulations for your pregnancy, for your

16  wife's pregnancy.  We're going to watch this in a minute.

17         And the reason this is coming into evidence is because

18  the government's contention is that there's one line in there

19  where they say, "You've been working your ass off for us," and

20  it's part of the bribe.

21         And then in 2019, they sit down with P.G., and we're

22  going to watch it on video.  They talk about his wife's

23  pregnancy, and they put a box of cigars and bottle of scotch

24  in front of P.G.

25         There are 20 hours of interactions.  There's never an

1 interaction where P.G. drinks scotch.  Does he like scotch?

2 He doesn't.  He doesn't smoke cigars.  He doesn't smoke

3 tobacco.  And they put this in front of him.

4  And P.G., a candidate and an elected official, is

5 permitted to accept gifts, but if they're over $70, they're

6 supposed to report them.  And so they didn't tell him the

7 value.  They'll have the receipts that they'll show us.

8  His mistake was not saying how much is this?  He doesn't

9 drink scotch or smoke cigars, and he didn't turn away their

10 gift, and here's the video.

11  (Video played.)

12   MR. C. MATTHEW RITTGERS:  I believe the government's

13 transcript and video cuts off shortly after the words "you

14 worked your ass off."

15  But they continue, this goes to P.G.'s thoughts and their

16 interaction with him about childhood and parenthood, and

17 that's what they continue to talk about, but I don't know if

18 you'll have that back with you.

19  And they continue to talk about this.

20  (Audio played.)

21   MR. C. MATTHEW RITTGERS:  The government has admitted

22 in their opening that there is no express bribe on any tape,

23 20 hours of tape.  No express quid pro quo.  The time that's

24 actually mentioned is very early, when P.G. expressly states

25 that there will not be, and Mr. Ndukwe agrees.

1    So you're going to be asked to go inside his head and

2   determine his intent.  And you heard on this tape, "I've got

3   to invite you guys over to dinner."  P.G. got people together

4   all the time, Ms. Brunner, people that you'll hear about

5   throughout this case.

6    P.G. even invited over the U.S. Attorney with these

7   undercover agents at the same time.  And you're going to be

8   asked to determine what he thought these guys were.  If he

9   thought that they were aboveboard and not corrupt, if he

10   thought he was doing anything wrong.

11    He introduced them publicly, out in the public to civic

12   leaders all over town as the investors behind Chin and

13   435 Elm.  Steve Leeper at 3CDC, on the tape, "Hey, Steve, I'd

14   really like you to meet these guys."

15    Steve Leeper and 3CDC is a huge non-profit that does

16   development in Cincinnati, would love you to meet these guys.

17   Introduces them to the head of the Convention Center.  His

18   name is Rick Booth.  And P.G. introduces Rob and Brian to Rick

19   Booth.

20    P.G. was very pro-development.  I can think of one deal

21   where he was not, and you may or may not hear from this

22   witness.

23    There was a deal in Oakley, a development in Oakley with

24   FC Cincinnati, our soccer team.  And there's a potential

25   witness the government has said, his name is Jeff Berding.

1    He's the president and CEO of FC Cincinnati.

2    FC Cincinnati, the owners, are some of the wealthiest

3    individuals and powerful individuals in this area, hundreds of

4    millions of dollars, and they had donated over several years

5    to P.G.

6    In late 2017, November of 2017, FC Cincinnati was trying

7    to get a bid with the MLS for a major league soccer team.  And

8    in order to get that, one of the two requirements was to have

9    a site ready spot, and they picked Oakley.

10   P.G. was open, on the public record, about his opposition

11   to this, for many reasons, most of which were too many open

12   questions, giving too much leverage to these people.

13   In collection, these people donated $60,000 or more to

14   P.G.'s campaigns in previous years.  Mr. Berding is their

15   voice, the CEO and president.  He voted no.

16   And ultimately, they came -- FC Cincinnati actually got

17   the bid because it actually passed through council, five-three

18   or six-three, and they wanted to put the stadium then downtown

19   in the west end.

20   And P.G. wanted them to pay their fair share of taxes.

21   The stadium is owned by the port, but the owners can reap the

22   benefits, profitability from using this for stadium things,

23   like concerts or soccer team, but they don't have to pay

24   property taxes.

25   So he's instrumental in negotiating that these owners pay

1   their fair share, which is $25 million to Cincinnati Public

2   Schools, which they would not have had to pay.  You know, and

3   the claim that Mr. Berding makes now is that P.G., on a phone

4   call -- FC Cincinnati bought a lot of land on the west end.

5   And they made a mistake.  They bought land they didn't know

6   there was a 17-year lease on, and the ballet, a non-profit,

7   had the lease.

8        And there's this everyone's pressuring everybody to try

9   to get a deal done at the last minute.  FC says it's going to

10  cost us $500,000 a week or a month if we delay zoning.  The

11  ballet says there's nowhere for us to go.

12       Mr. Berding claims that on a phone call with the chair of

13  the non-profit, P.G. said, "Well, then just give the ballet

14  $10 million so they can relocate."  That didn't happen, but

15  that's what he might plan.

16       He's the voice and the mouthpiece for some of the

17  wealthiest individuals in southwest Ohio that P.G. thumbed his

18  nose at.

19       P.G. was a hardworking, ambitious candidate and elected

20  official at one time who always did what he thought was best

21  for the City of Cincinnati.  And when there's a cog in the

22  wheel, when there's too much red tape, people knew who to come

23  to.

24       So I hope -- you will hear from a lot of people who talk

25  about why people came to him on development deals, like we

1    talked about like the veterans project, or anything to get the

2    cog out of the wheel and get unstuck.

3        And yes, he was involved in 435 Elm.  The project was

4    draining the county and city to the tune of $4 million every

5    ten years.  He believed his friend was being treated unfairly

6    by the mayor, and he believed that that was his job.

7        And after you hear all the evidence, I believe you'll

8    find him not guilty of all counts.

9        THE COURT:  Thank you, Mr. Rittgers.

10    Is now an appropriate time to break for lunch?

11        MR. SINGER:  Yes, Your Honor.

12        MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

13        THE COURT:  Okay.  Ladies and gentlemen of the jury,

14    we've completed the openings.  Now would be a time to break

15    for lunch.

16        It's about 10 after 1:00 right now.  Why don't you try to

17    reassemble shortly after 2:00, like around 2:05 or so in the

18    jury assembly room upstairs.  Enjoy your lunch.

19        Please remember don't talk with anyone about this case.

20    Don't do any research about this case.  Don't communicate with

21    anyone about the case.  If anyone should try to communicate

22    with you about the case, please let me know.

23        And have a good lunch, and we'll see you when you get

24    back.

25        (Jury out at 1:08 p.m.)

```
 1          THE COURT:  Is there anything we need to discuss on

 2    the record before we break?

 3          MR. SINGER:  No, Your Honor.

 4          MR. C. MATTHEW RITTGERS:  No, Your Honor.

 5          THE COURT:  There is one thing I did want to note.

 6    Sometimes after lunch -- I noticed in the last trial,

 7    sometimes after lunch can be a sleepy time for people on the

 8    jury who are forced to sort of sit and listen and not

 9    interact, which can be difficult when you're sitting there,

10    and there's something about a courtroom environment that seems

11    hushed or something.

12       In any event, if when you are interviewing a witness, you

13    notice that there's a juror who appears to be nodding off for

14    any reason, just what we've done in previous trials is to ask

15    for a sidebar, I'll tell the jury they can stand up and

16    stretch while we're at sidebar, and we'll just do a sidebar

17    and come back.  So just be mindful of that, all right?

18       All right.  With that, we can adjourn for lunch.

19       (Lunch recess.)

20          THE COURT:  All right.  Is there anything we should

21    discuss before we bring the jury back in, Mr. Singer?

22          MR. SINGER:  Not from the government.

23          MR. C. MATTHEW RITTGERS:  No, Your Honor.

24          THE COURT:  Very good.  Scott, could you bring the

25    jury back.
```

*FLYNN - DIRECT*

```
 1         (Jury in at 2:24 p.m.)

 2         THE COURT:  I'd like to congratulate you all on

 3   passing the first day obstacle course.  Every day it gets a

 4   little harder.

 5      We're now at the point where the government is going to

 6   call its witnesses.

 7      Would the government like to call its first witness,

 8   please?

 9         MS. GAFFNEY PAINTER:  Yes, Your Honor.  Thank you.

10   The government calls Kevin Flynn.

11         THE COURT:  Very good.  Good afternoon, Mr. Flynn.

12         THE WITNESS:  Good afternoon.

13      (Government witness KEVIN FLYNN, sworn.)

14         THE COURT:  You may proceed.

15                      DIRECT EXAMINATION

16   BY MS. GAFFNEY PAINTER:

17   Q.  Mr. Flynn, will you please state and spell your name for

18   the record.

19   A.  Kevin Flynn, F-l-y-n-n.

20   Q.  Mr. Flynn, what is your profession?

21   A.  I'm retired now.  I'm a retired real estate lawyer,

22   retired adjunct law professor at the College of Law, and

23   retired city council member.

24   Q.  Back in 2015, what did you do?

25   A.  I was a practicing lawyer, as well as a member of
```

 1    Cincinnati City Council.

 2    Q.   How long did you serve as a Cincinnati City Council

 3    member?

 4    A.   Four years.

 5    Q.   How did you become a Cincinnati City Council member?

 6    A.   I was elected in the election of 2013.

 7    Q.   How many council members are there on city council?

 8    A.   Nine.

 9    Q.   How many council members constitute a majority?

10    A.   Five.

11    Q.   Is that also sometimes referred to as a simple majority?

12    A.   Yes, because there are certain activities, certain

13    nuances of the law that require a super majority, or six or

14    seven votes.

15    Q.   Who is the official head and representative of the city

16    for all purposes, except as outlined in the city charter?

17    A.   The official head is the mayor.

18    Q.   What is the city charter?

19    A.   City charter's kind of the Constitution of the city.  It

20    sets forth the basic framework of how the city government is

21    to operate.

22    Q.   In 2018 and 2019, who served as the mayor of Cincinnati?

23    A.   That would have been John Cranley.

24    Q.   What are some of the powers and responsibilities of the

25    mayor?

*FLYNN - DIRECT*

1    A.  The mayor presides over council meetings, signs

2    legislation and/or vetoes legislation, a lot of ceremonial

3    activities as far as ribbon cuttings, and new projects being

4    developed, as well as sort of being the face of the city.

5    Q.  Now, you mentioned a veto.  What's a veto?

6    A.  So a veto is a power that the executive, in this case the

7    mayor, has to nix, to stop legislation from going forward

8    that's been voted on by a majority of council.

9    Q.  Now, if the mayor vetoes something that has been approved

10    by city council, is that the end for whatever it is that has

11    been vetoed?

12    A.  No.  So the mayor has, I believe, four days to veto

13    legislation.  If it is vetoed, it will go back on the calendar

14    docket, or the calendar for council, I believe three -- the

15    next three regularly-scheduled meetings, two or three

16    regularly-scheduled meetings, at which time council can take

17    it up and try to overcome the veto with a super majority.

18    Q.  And how would city council overcome a veto?

19    A.  So if six members of counsel determine that the law

20    should go forward, notwithstanding the mayor's veto of it, it

21    would become law without the mayor's signature.

22    Q.  How many votes does it take of council members to

23    override the mayor's veto?

24    A.  Six.

25    Q.  Other than the mayor and city council members, are there

*FLYNN - DIRECT*

1  any other high level officials in Cincinnati city government?

2  A.   So the CEO and the chief administrative officer of the

3  city is the city manager.

4  Q.   What is the city manager?

5  A.   So the city manager is -- and really, Cincinnati was one

6  of the original adopting cities of management of this type,

7  and it's to take -- the idea is to have professional

8  management by a city manager who is not a politician, is not

9  elected, is rather appointed because of their expertise.

10 Q.   And what are some of the things that the city manager

11 oversees?

12 A.   So the city manager oversees really the workings of the

13 entire government as the CEO, including all of the or most of

14 the departments and offices under his office.

15 Q.   Now, you mentioned overseeing departments.  What are

16 departments?

17 A.   So within the City of Cincinnati, different areas of

18 jurisdiction would fall into the different departments.  So

19 there's a water works department that handles water.  There's

20 the department of community and economic development, which

21 oversees ongoing economic transactions development in the

22 city.  There's the fire department, the police department,

23 storm water sewers, and the list goes on, the department of

24 law, et cetera.

25          MS. GAFFNEY PAINTER:  Your Honor, may I approach?

```
 1              THE COURT:  You may.
 2    Q.   Mr. Flynn, in front of you I have placed what's been
 3    marked for identification as Government Exhibit USA 1B.  Do
 4    you recognize this?
 5    A.   Yes.
 6    Q.   Excuse me.  I mean 1A.
 7    A.   Yes.
 8    Q.   Forgive me.  I believe I do mean 1B.
 9    A.   1A is the structure, 1B is the planning.
10    Q.   Okay.  Forgive me.  All right.  I'm showing you what's
11    been marked for identification as Government Exhibit USA 1A.
12    Do you recognize this?
13    A.   Yes.
14    Q.   What is it?
15    A.   It is a diagram table of organization, if you will, of
16    the city, and it provides for the input of city council and
17    the mayor to the city manager, and then the city manager flows
18    through to a number of the departments that we were just
19    talking about in the testimony, although some of these have
20    other direct reporting is under something other than the city
21    manager.
22         So, for example, parks has a board of park commissioners.
23    The employees of parks are still city employees, and so
24    therefore, the city manager has a role with regard to those,
25    but the direct structure goes through the independent board.
```

1      So parks has an independent board, recreation has an

2  independent commission, planning commission, the Board of

3  Health, are all sort of outliers in the scenario of the city

4  manager being the direct overseer of those.

5  Q.  Now, have you reviewed Government Exhibit USA 1A for

6  accuracy?

7  A.  Yes.

8          MS. GAFFNEY PAINTER:  The government moves for

9  admission of Government Exhibit USA 1A.

10          THE COURT:  Mr. Rittgers?

11          MR. C. MATTHEW RITTGERS:  Your Honor, we don't have

12  an objection to that.

13          THE COURT:  USA 1A is admitted without objection.

14          MS. GAFFNEY PAINTER:  Your Honor, permission to

15  publish the exhibit?

16          THE COURT:  You may.

17          MS. GAFFNEY PAINTER:  Ms. Terry, will you please

18  publish Exhibit USA 1A.

19  Q.  Mr. Flynn, if you could describe what we're looking at

20  here in Government Exhibit USA 1A?

21  A.  Yes.  As previously discussed, this is a table of

22  organization for the city.  It's not exhaustive as to the

23  departments.  Some of the departments may be offices within a

24  department, but it's an example of the basic table of

25  organization in the city.

*FLYNN - DIRECT*

1   Q.   Directing your attention to the bottom line of this

2   exhibit, there are three entries here with asterisks.  Can you

3   please explain what that indicates to the jury?

4   A.   So as previously stated, the department of health and the

5   department of parks have separate boards that represent them,

6   recreation commission, and I believe the planning commission.

7        We didn't put city planning with an asterisk, but those

8   two fall under the jurisdiction of a commission.

9   Q.   Let's talk about some of the specific departments.

10  Generally speaking, what does the finance department do?

11  A.   So the finance department is the city's checkbook.  It

12  collects the taxes and other revenues for the city, and pays

13  the bills the city incurs, as well as within the finance

14  department is the budget office, which develops the city's

15  budget for the following years.

16  Q.   What does public services do?

17  A.   Public services, they like to refer to themselves as the

18  city's everyday department.  You run into public service

19  workers more often from the city than any other department.

20  They're the ones that collect the garbage, that shovel the

21  snow in the winter, that patch the holes in the street when

22  there's the -- the spring thaw occurs.

23       So they touch the -- they cut the grass.  They touch the

24  lives of people every day.

25  Q.   What does buildings and inspections do?

1    A.   So buildings and inspections, if you have a project that

2    you want to build, the building permits come through the

3    buildings and inspections office, as well as the other end.

4    If there's a problem property that is violating codes, for

5    example, the inspections department will come out and,

6    perhaps, write a citation relative to that.

7    Q.   What does city planning do?

8    A.   City planning administers the zoning code, as well as

9    hears requests for variances from the city zoning code.

10   Q.   What is zoning?

11   A.   Zoning is the concept that the city needs to be planned

12   out, so that you have the more dense uses within one district,

13   going all the way to, you know, restricting land for parkland

14   or single-family residences.  So it covers the whole gamut of

15   how property can be used in the city.

16   Q.   What does the law department do?

17   A.   The law department's the city's lawyers.  They represent

18   the city in all its legal matters, all of the departments in

19   their legal matters, as well as the city manager, the mayor,

20   and council.

21   Q.   Does the law department have any role or responsibility

22   for drafting laws or ordinances?

23   A.   That's another portion of what they do is they have the

24   sole responsibility for drafting those ordinances, all --

25   Q.   Of all -- excuse me.  I interrupted you.  Please.

*FLYNN - DIRECT*

1    A.   So an ordinance is the legislative act that a council

2    will take to create law in the city.

3    Q.   What does community and economic development do?

4    A.   Community and economic development is the department in

5    the city that is the liaison with all of the neighborhoods, as

6    well as the place where a person wanting to do business with

7    the city, as far as creating, rehabbing, or building a new

8    building would go to them to see how the city could help that

9    person create the development within the city.

10   Q.   Now, you mentioned development.  What does development

11   mean in this context?

12   A.   So Cincinnati's a build-out city.  So typically,

13   development is either tearing down some old buildings and then

14   putting up new ones, or rehabilitating existing structures

15   into a greater use for the city.

16   Q.   Now, generally speaking, what role does city government

17   play in real estate development?

18   A.   Well, it's very difficult to develop property in the

19   city.  One, there's a lot of bureaucracy to work through; but,

20   two, simply it is just plain more expensive and more difficult

21   to do work in the city.

22        So community and economic development will oftentimes

23   offer tax breaks, offer some kind of incentive to get them to

24   develop in the city so the city continues to grow, so that we

25   continue to expand our tax base, so that we can continue to

1   offer the services that are necessary in the city.

2   Q.   During your time as a council member, did you have

3   occasion to vote on development deals with the city?

4   A.   I was surprised, when I got to council, that that is

5   probably the majority of the votes that we took on the four

6   years I was on council, that every development field that had

7   any kind of city incentive in it comes through city council to

8   be approved.

9   Q.   I want to talk now about the general pathway of a city

10  development project where there are those incentives you

11  testified to being sought from the City of Cincinnati.

12       Now I'm showing you what's been marked for identification

13  as Government Exhibit USA 1B.  Do you recognize this?

14  A.   Yes.

15  Q.   What is it?

16  A.   It is a flow chart, if you will, of how an idea that

17  someone has as a private developer ends up coming to fruition

18  in the City of Cincinnati.

19  Q.   How do you know that?

20  A.   Because I've looked at this stuff.

21       MS. GAFFNEY PAINTER:  The government moves for the

22  admission of Government Exhibit USA 1B.

23       MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

24       THE COURT:  Government Exhibit USA 1B is admitted

25  without objection.

1          MS. GAFFNEY PAINTER:  Your Honor, may I publish the

2   exhibit?

3          THE COURT:  You may.

4          MS. GAFFNEY PAINTER:  Ms. Terry, will you please

5   publish Government Exhibit USA 1B.

6   Q.  Mr. Flynn, let's walk through this document that's being

7   displayed now.  If you'll start up at the upper right-hand

8   corner of this diagram, what is a developer?

9   A.  The developer is the private entity, non-profit entity or

10  for-profit entity or individual that has an idea to do a

11  project in the city that will somehow increase the utility of

12  that property.

13  Q.  If a developer wants to develop real estate within city

14  limits, what's the first step when it comes to city

15  government?

16  A.  So if they're going to ask for any kind of assistance

17  from the city, they will generally meet with the community and

18  economic development, someone in that department to discuss

19  the plan and then to discuss what the needs might be.

20  Q.  And when you say "plan," what are you referring to,

21  again, just generally?

22  A.  So any project, any real estate project of any magnitude

23  has a plan associated with it.  So it's going to, you know,

24  look at the end use, and what that project -- I hate to define

25  the term in terms of that, but whatever the deal is that the

*FLYNN - DIRECT*

1    developer is putting forth, the plan would be how you get from

2    point A to point B.

3    Q.   And what happens next after the developer presents the

4    plan to community and economic development?

5    A.   So yes, they would -- and there's a formal application

6    process that CVCC does.  They will then send something out to

7    the other departments, indicating that this project is moving

8    forward, and are there any concerns that the other departments

9    may have that need to be addressed with the developer before

10   it goes further.

11   Q.   Can you explain that a bit more, about the consultation

12   with other departments?

13   A.   So you might think that the fire department, for example,

14   shouldn't really have a role to play in connection with the

15   development project.  That seems somewhat counterintuitive.

16       However, you know, the fire department has to be able to

17   service -- if it's a residential development, for example,

18   they have to be able to get to those residences in times of

19   emergency need, whether it be a medical emergency or a fire.

20       And if, for example, that project might be within the

21   flood plane, or in an area where the trucks, the fire trucks

22   would have to travel through flooding to get there because of

23   the Ohio River's periodic flooding, the fire department might

24   well object to that on that basis.  So that's why each of

25   these departments need to touch a project so that the city can

1    act with one voice.

2    Q.   After community and economic development confers with

3    other departments and approves the plan, what's the next step?

4    A.   So they will create the deal points, if you will, of the

5    transaction, and then they will get with the law department to

6    put those deal points in to a form of a development agreement

7    with a supporting ordinance to be approved by council.

8    Q.   After the ordinance is drafted, what happens next?

9    A.   It then gets introduced generally by the city manager.

10   It gets put on the agenda by the mayor, and then in the course

11   of the meeting, it will be referred to a committee of council

12   for a formal public hearing relative to it.

13   Q.   And you testified to this, but just to be clear, who

14   decides the agenda for city council?

15   A.   So the mayor has that authority and that power and that

16   responsibility under the city's charter.

17   Q.   Now, if the mayor puts a project plan on the agenda, what

18   happens next?

19   A.   So it gets referred to a committee.  That's all that

20   happens when it first comes before council.

21   Q.   What happens after the committee receives it?

22   A.   The committee chair will then schedule a hearing relative

23   to the ordinance that's before it, will allow people to come

24   in and testify relative to it.

25        Typically, they will even have someone from the

*FLYNN - DIRECT*

1    department of community and economic development explain to

2    the committee what the transaction is that they're being asked

3    to approve.

4    Q.   What happens when that hearing is concluded?

5    A.   When that hearing is concluded, the committee chair will

6    take a vote of the members of the committee.  If it passes, it

7    gets sent back through the clerk's office to be put on the

8    agenda by the mayor for approval by the full council.

9    Q.   Generally speaking, what type of information is provided

10   to council members before they vote on a project plan?

11   A.   Typically, it's just the development agreement.  There

12   may be a briefing that was given to staffs of council members

13   very shortly before those items would come up on the agenda.

14   Q.   Now, if a majority of city council members vote for the

15   plan, what happens next?

16   A.   It then gets presented to the mayor for signature if the

17   mayor approves it, or vetoing if the mayor doesn't approve it.

18   Q.   If the mayor approves it and signs it, what happens?

19   A.   It becomes law upon signature by the mayor.

20   Q.   If the mayor vetoes it, what happens?

21   A.   Again, it goes back to council then, and if council wants

22   to bring it back up, and they can garner six votes in favor of

23   it, that's what's called overriding the mayor's veto.

24   Q.   So it's --

25   A.   It becomes law.  It's notwithstanding the mayor's veto.

1    Q.   Excuse me for interrupting you.  So if six council

2    members vote to approve the project, what happens?

3    A.   It becomes law.

4         MS. GAFFNEY PAINTER:  May I have a moment, Your

5    Honor?

6         THE COURT:  You may.

7         MS. GAFFNEY PAINTER:  No further questions.

8         THE COURT:  Thank you.  Mr. Rittgers, your witness.

9         MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

10                   CROSS-EXAMINATION

11   BY MR. C. MATTHEW RITTGERS:

12   Q.   Good afternoon, Mr. Flynn.

13   A.   Good afternoon, Mr. Rittgers.

14   Q.   We know each other?

15   A.   Yes.

16   Q.   But we've never talked about your testimony or this case;

17   is that correct?

18   A.   That is correct.

19   Q.   Let's talk briefly.  You mentioned, I believe, on your

20   direct, you mentioned bureaucracy and red tape?

21   A.   Yes.

22   Q.   You'd agree sometimes government moves a little too

23   slowly?

24   A.   Yes.

25   Q.   And you mentioned there's lots of moving parts?

*FLYNN - CROSS*

1    A.   Yes.

2    Q.   There are certain people on council -- and you served on

3    council between 2013 and 2017, right?

4    A.   Correct.

5    Q.   And P.G. was on council at the same time?

6    A.   Yes.

7    Q.   And there were certain people on council that had

8    de facto roles, people that were known for certain things,

9    whether it be in animal cruelty, or development, people were

10   just known for certain things on council, right?

11   A.   Some were, yes.

12   Q.   Would you agree that P.G. was known as someone that could

13   get things done in the city, get things through council?

14   A.   Yes.

15   Q.   And the exhibits that you just referenced on direct,

16   USA 1A and 1B, with the charting of the structure and the

17   planning structure, even though that is how that is designed

18   on those two slides, developers would have direct contact with

19   council members early in the process, and also mid or late in

20   processes, correct?

21   A.   Generally, early in the process.  I for one was a council

22   member that never turned down a meeting with anyone.  I would

23   meet with them in my council offices to discuss whatever they

24   wanted to discuss.  Sometimes developers didn't have any clue

25   what the process was.

1    Q.  But even those who did might still want to meet with you

2    early?

3    A.  Yes.

4    Q.  And you know Dan Schimberg?

5    A.  Yes.

6    Q.  Very big developer?

7    A.  Yes.

8    Q.  Honest man?

9    A.  Yes.

10   Q.  Ethical guy?

11   A.  Yes.

12   Q.  And he, I believe, runs Uptown Properties?

13   A.  Correct.

14   Q.  And he would, on occasion, reach out to council members

15   like you or like P.G., to start the process of talking about a

16   potential development agreement?

17   A.  I can't ever remember Dan doing that with me.

18   Q.  I'm going to show you what's been marked as Defense

19   Exhibit D698.

20       Take a moment and look at that exhibit, Mr. Flynn.

21   A.  Okay.  Yeah.

22   Q.  That's an email from Mr. Schimberg, talking about a

23   potential project that he might have up in Mt. Auburn.  And

24   the reason I have it is because it was sent to P.G., and it

25   happens to also be sent to you and Bill Fischer.

FLYNN - CROSS

1        Who is Bill Fischer?

2    A.   Bill Fischer was, at the time, a staff member at the

3    department of community and economic development.  He was a

4    senior kind of planner.

5    Q.   And so this email is a fair and accurate copy of what was

6    sent to you, Bill, and P.G.?

7    A.   I would assume so.  I don't have any recollection of

8    this.  It was seven years ago or so, and it was sent to the

9    city council address.

10        MR. C. MATTHEW RITTGERS:  Do you have any objection

11   to this being displayed for the jury?

12        MS. GAFFNEY PAINTER:  Is defense moving to admit this

13   into evidence?

14        THE COURT:  I don't know.

15        MR. C. MATTHEW RITTGERS:  Okay.  I'll just talk about

16   the email, Your Honor.

17        THE COURT:  Okay.  Did you say D698?

18        MR. C. MATTHEW RITTGERS:  That's correct.

19        THE COURT:  Do I have it?

20        MR. C. MATTHEW RITTGERS:  It is not -- that's in the

21   cross folders.  It is not part of -- it is added on to our

22   exhibits, I believe.

23        THE COURT:  Okay.  Was it supplied to me or not?

24        MR. C. MATTHEW RITTGERS:  Oh, Your Honor, I'm sorry.

25   May I approach?

```
 1              THE COURT:  You may.
 2              MR. C. MATTHEW RITTGERS:  Sorry about that.
 3              THE COURT:  No worries.  Go ahead.
 4    Q.  Mr. Flynn, this would be an example of a reputable
 5    developer reaching out to you, another council member, and
 6    also someone in the city economic development department to
 7    start a process off, right?
 8    A.  Yes.
 9    Q.  And this is a guy who knew the process.  He was not --
10    A.  Well, and, again, I've known Dan Schimberg for 30 years.
11    You know, I think at this point, it was more of a conceptual
12    idea.
13    Q.  Sure.
14    A.  But yeah.  He reached -- obviously reached out to me to
15    discuss it.
16    Q.  And that was you and someone at the city economic
17    development department, not the city manager's office, right?
18    A.  Right.
19    Q.  And so that was just a preliminary discussion about his
20    thoughts about an upcoming project that he might some day have
21    in front of city council, and he asked if you wanted to meet,
22    correct?
23    A.  Yes.
24    Q.  And that would not be atypical?
25    A.  No.
```

FLYNN - CROSS

1    Q.   And it's permitted and ethical and fine to meet?

2    A.   Yes.

3    Q.   When you served on council between 2013 and 2017, there

4    were certain things that were important to you when you were

5    on council, right?

6    A.   Yes.

7    Q.   And when you got off council in 2017, there was some

8    unfinished business that you had that you passed on to P.G.

9    Do you remember that?  And I can show you the --

10   A.   Are we talking --

11   Q.   This would be the wheelchair accessible taxicabs.

12   A.   Yes.

13   Q.   And so in 2017 -- and that's because you knew P.G. would

14   help get this passed?

15   A.   P.G. offered, yes.  The reason that it was still

16   lingering was the State of Ohio did not allow for wheelchair

17   accessible taxis, so we had to change the state law.  By the

18   time we got the state law changed, I was off council.

19   Q.   And it wasn't for, I think, seven months before it

20   ultimately passed, right?

21   A.   I believe that's correct.

22   Q.   But you passed that responsibility on to P.G. to sponsor

23   when you were off council, and he was one of nine council

24   members, right?

25   A.   Well, I think P.G. offered to do that, yes.

*FLYNN - CROSS*

1    Q.   But you didn't have to pass it to -- you could have had

2    anybody help you with that legislation, correct?

3    A.   I would assume anybody would, yes.

4    Q.   Okay.  And he worked with you when you are a citizen, off

5    council, to make sure that this ultimately was passed?

6    A.   Yes.  Although not in the form that I wanted it to, it

7    passed.

8    Q.   Do you blame P.G. for that form?

9    A.   I don't blame him for that.  I would just say that, you

10   know, the legislation got changed, in my opinion, not for the

11   better.

12   Q.   Okay.  But that was not P.G.'s fault, the legislation

13   being changed?

14   A.   I don't know that.

15   Q.   He and his staff would work with you during that

16   seven-month period on this particular legislation, as needed,

17   to try to help sponsor this and get it passed, right?

18   A.   Or, for example, the funding for assisting in the

19   creation of wheelchair accessible vans, taxi vans, the funding

20   in the city level for that came out of my office budget when I

21   did not replace a staff member for two years.  And so we voted

22   to put that money into a trust fund to assist with that.

23        The support was supposed to be limited and, basically,

24   when the legislation went through, the support was more than

25   doubled and allowed for fewer vehicles to be on the road.

*FLYNN - CROSS*

1   Q.   And this is funding we're talking about that the city had

2   to get from the state?

3   A.   No.  This is money that the city already had in its

4   coffers, because I had legacied that money in out of my office

5   budget.

6          MR. C. MATTHEW RITTGERS:  All right.  May I have one

7   moment, Your Honor?

8          THE COURT:  You may, Mr. Rittgers.

9   Q.   Mr. Flynn, the city solicitor's office, the law

10  department, there is a city solicitor, correct?

11  A.   Yes.

12  Q.   And the city solicitor is the person who would give

13  advice to council members about what they can and cannot do in

14  their capacity as council members?

15  A.   That's one of the things that, if you ask them, they

16  would do, yes.

17  Q.   And the mayor would go to them for advice as well, right?

18  A.   I would assume so.

19  Q.   In 2021, there was a memo related to the structure, some

20  of the things we just talked about, based on the city charter

21  that the city solicitor and city manager wrote, correct?

22  A.   I'm not sure what you're talking about, Mr. Rittgers.

23  Q.   I'm referring to an op-ed that you wrote where you

24  disagreed with the way in which the solicitor and the manager

25  interpreted our charter for how the structure of government

*FLYNN - CROSS*

1   is?

2   A.   Yes.

3   Q.   And was that discussed when you met with the prosecutors

4   in preparation for this case?  Is that how they came to

5   contact you?

6   A.   That was not discussed.

7   Q.   That memo that was written -- and you know what I'm

8   referring to now.  It was written by city manager Paula Boggs

9   Muething and city solicitor Andrew Garth, correct?

10  A.   Correct.

11  Q.   And they wrote that memo, and you wrote a public response

12  to it, where these people who actually do tell council members

13  and the mayor what that structure should be, you disagreed

14  with that structure, right?

15  A.   I don't disagree with the structure.  I disagreed with

16  their characterization that the -- I believe their opinion was

17  that the mayor was the CEO.

18  Q.   You strongly disagreed with their analysis in their

19  memorandum as it relates to the power that is vested within

20  the city governmental structure?

21  A.   I'm not sure what that question --

22        MR. C. MATTHEW RITTGERS:  May I approach, Your Honor,

23  just briefly?

24        THE COURT:  You may.

25  Q.   This has been marked as D699.  And so, Mr. Flynn, D699 is

1    the op-ed that you wrote on February 12th of 2021?

2    A.   Yes.

3    Q.   You said you have tremendous respect for Mayor John

4    Cranley, in the first paragraph?

5    A.   Yes.

6    Q.   And you also have great respect for sitting manager Paula

7    Boggs Muething, and the city solicitor Andrew Garth?

8    A.   Yes.

9    Q.   Paula Boggs Muething -- sorry, Andrew Garth, who is the

10   solicitor, it would be Andrew Garth's role to tell council and

11   the mayor where the power structure lies in things like that

12   chart, correct?

13   A.   Depending on who the -- this is one of the problems that

14   the city solicitor's office has is that sometimes they're

15   requested or required to represent different interests in the

16   city, so the --

17        As I explained earlier on direct, they represent the

18   city, but they also represent the mayor, and they also

19   represent council.  Sometimes they represent individual

20   council members.  They also represent the departments.

21        And so depending on who asked for that memo, as you know

22   as a lawyer, you write for your client.

23        And so if the law department was writing that memo at the

24   request of the mayor, then they're going to be trying to write

25   persuasively in favor of a position that their client, the

1    mayor, wanted put forth.

2    Q.  The point being is that the memo was written.  They said

3    this is where the power rests in our governmental structure.

4    "They" being the city solicitor's office, which tells council

5    members and the mayor how they can act, what they can

6    ethically do, and you disagreed with that memo, correct?

7    A.  I disagreed with that memo; but, again, I don't think

8    that memo was telling city council how they could act.

9    Q.  Well, you say here that the mayor has a role, city

10    council has a role, city manager, through the department of

11    economic development, has the primary role in economic

12    development transactions occurring in our city?

13    A.  Yes.

14    Q.  And you reference council throughout this in your

15    disagreement with how this memorandum was written?

16    A.  No.  My disagreement was that they said that the mayor

17    was the CEO of the city, and it's clearly not.  The plain

18    words of the charter indicate that, in fact, the city manager

19    is the CEO, the administrative code, and is res- -- and the

20    city manager is responsible for those departments that report

21    through him.

22        The administrative code provides that the department of

23    community and economic development reports to the city

24    manager.

25    Q.  And that was the disagreement, what you just described,

1    between the city solicitor and you and your end, right?

2    A.   Yes.

3    Q.   And are you familiar with 435 Elm?  Are you familiar with

4    the project 435 Elm?

5    A.   I know where it is, yes.

6    Q.   Do you remember it being a problem back when you were on

7    council?

8            MS. GAFFNEY PAINTER:  Your Honor, I object.  This is

9    well beyond the scope of direct.

10           THE COURT:  It is well beyond the scope of direct.

11   You can recall him in your case, I guess, if you want to

12   elicit this testimony.

13           MR. C. MATTHEW RITTGERS:  I have no further

14   questions, Your Honor.

15           MS. GAFFNEY PAINTER:  No redirect.  Thank you, Your

16   Honor.

17           THE COURT:  Very good.  Mr. Flynn, you're free to

18   leave.  Thank you for appearing today, sir.

19           THE WITNESS:  Thank you, Your Honor.

20      (Witness excused.)

21           THE COURT:  Does the government intend to call

22   another witness?

23           MR. SINGER:  Yes, Your Honor.  The government calls

24   Phil Denning.

25           THE COURT:  Very good.

 1          (Government witness, PHIL DENNING, sworn.)

 2               MR. SINGER:  May I proceed, Your Honor?

 3               THE COURT:  You may.

 4                         DIRECT EXAMINATION

 5    BY MR. SINGER:

 6    Q.   Good afternoon.

 7    A.   Good afternoon.

 8    Q.   Can you please state your name and spell it for the jury,

 9    please.

10    A.   Yes.  My name is Philip Denning, P-h-i-l-i-p,

11    D-e-n-n-i-n-g.

12    Q.   Mr. Denning, where do you work?

13    A.   Where do I work now?

14    Q.   Yeah.

15    A.   I work for the Port of Greater Cincinnati Development

16    Authority.

17    Q.   What is the Port of Greater Cincinnati Development

18    Authority?

19    A.   The port is a quasi-public economic development agency

20    which focuses on redevelopment of blighted property, the

21    creation of jobs and, specifically, industrial jobs in

22    Hamilton County.

23    Q.   Is it generally called the port?

24    A.   The port, yes.

25    Q.   So if I call it "the port," you understand what I'm

1   talking about?

2   A.   Yes.

3   Q.   And what is your role with the port?

4   A.   I'm an executive vice president, and I focus most of my

5   time on neighborhoods and neighborhood development.

6   Q.   Can you describe what you do as an executive vice

7   president with the port?

8   A.   Certainly.  The -- one of the oddities of the port is

9   that we have a few entities.

10       For example, one of the managed entities that we take

11  care of is the Hamilton County Land Bank which you may have

12  heard about, and it focuses on blighted and vacant properties.

13       And, in addition to management of the land bank, I focus

14  on -- I manage a team of 10 or 15 staff that focus on

15  commercial development and residential development, new

16  construction, and affordable housing.

17  Q.   Can you just describe what the land bank does?

18  A.   Yes.  The land bank is a separate entity created by the

19  State of Ohio that has its own board.  And the land bank's

20  role, really, is to take abandoned property and move it back

21  to productive use and find new investment for it.

22  Q.   Prior to working with the port, where did you work?

23  A.   I worked for the City of Cincinnati, and specifically the

24  department of community and economic development.

25  Q.   What did you do with the community and economic

1    development department?

2    A.   My most recent role there was the director of the

3    department.  But I was in a number of varying roles over my

4    five or six years at the City of Cincinnati.

5    Q.   And is that department generally called the economic and

6    development department?

7    A.   Yes.  And you may hear it short-handed to DCED.

8    Q.   Thank you.  And what does the economic development

9    department do?

10   A.   The department of community and economic development has

11   a role that is, in a lot of ways, similar to the port, focused

12   on economic development, job creation, attracting private

13   investment.  There are a number of neighborhoods and places

14   inside our county or city that don't experience growth or

15   investment, and so it's to change that.

16   Q.   And how does it attempt to change that?

17   A.   The City of Cincinnati has a variety of tools focused on

18   real estate and job creation, job creation, tax credits, real

19   estate development incentives like tax abatements or tax

20   increment financing, and so using those tools and a few

21   others, essentially attracting investment to the city.

22   Q.   Okay.  Before we get into those, can you kind of walk us

23   through your employment history with the economic development

24   department?

25   A.   Yes.  I first started with the city -- I'm not going to

1    remember the year, off the top of my head, 2014 or 2015, and I

2    was an economic development associate, or senior economic

3    development officer, and my job was focused on brokering deals

4    in new investment on a smaller level.

5        After a year or so, there had been a fair bit of turnover

6    inside the department, and I was asked to lead a new group

7    called the major projects division, so I accepted that role.

8        And the major projects division was new to the city's

9    structure, and it focused on major projects and, specifically,

10   in downtown, Pendleton, and Over-the-Rhine.  There was so much

11   investment happening, and challenges in some of those

12   neighborhoods that, you know, needed a new division.  So I

13   took that position, major projects division manager.

14       Then after a year or so in that position, the director

15   position became available, and I was asked by the then manager

16   to continue leading the entire department.

17   Q.  And can you describe what your role was as the director

18   of the economic development department?

19   A.  Yes.  Fairly high number of items that were touching the

20   department; tax abatements for smaller buildings that are

21   being developed, tax increment financing, larger development

22   incentives for bigger projects, like the MLK exchange

23   development project.

24       The department of community and economic development also

25   managed the city's parking assets, so all of the on-street

1    meters, city-owned parking garages.

2        And then lastly, the City of Cincinnati is an entitlement

3    community, as designated by the federal government, which

4    means that the Department of Housing and Urban Development,

5    HUD, assigns CDBG funds annually to the city, in the

6    neighborhood of 16 or 17 million dollars, and the allocation

7    of those funds and their compliance is also managed by the

8    department.

9    Q.   The 16 or 17 million dollars that you referenced from the

10   federal government, does that include the years 2018 and 2019?

11   A.   Yes.

12   Q.   And what year did you take on that role as the director

13   of economic development?

14   A.   That would have been at the end of 2017, and the

15   beginning of 2018 was when I became interim in that position,

16   and was finally full-time director in early 2018.

17   Q.   And how long did you remain in that role?

18   A.   About two years.

19   Q.   And what position did you you take when you left as the

20   director of economic development?

21   A.   My current position, as I stated, now is executive vice

22   president at the port.

23   Q.   Okay.  So you left the economic development department

24   job and went straight to the port; is that correct?

25   A.   That's correct.

DENNING - DIRECT

1   Q.  During the time that you worked with the economic

2   development department, did a developer ever seek what's

3   called a development agreement with the city for a project?

4   A.  Yes.

5   Q.  Can you describe what a development agreement is?

6   A.  Certainly.  A development agreement is a longer contract

7   between a developer and the city for a smaller project that

8   would renovate a smaller building, something like a tax

9   abatement would suffice.

10      A development agreement is typically a more -- reserved

11  for a more complex transaction, and it states what the city is

12  going to provide to -- as an incentive for a project, and then

13  obligates the developer or business to provide something

14  typically in return.

15      So if the city is selling land to a developer, or giving

16  tax abatements, that would be described with some specificity.

17  And then if the city expected in return, they'll get a certain

18  number of jobs, or they'll get a certain type of investment,

19  development investment or job creation outcome, that would be

20  specified, and there's obligations on both parties.

21  Q.  Can you describe how a development agreement moves its

22  way through the city?

23  A.  Yes.  It is a fairly -- it can be a fairly lengthy path.

24  The majority of that time is inside -- just inside the

25  administration.

1          There is a project or a business that wants to invest or

2     grow inside the city, and they'd reach out to the development

3     department, typically a staff person that manages one

4     particular neighborhood and the affairs of that neighborhood.

5          And the first step after understanding what a developer

6     is interested in, they would submit an application.  And that

7     application asks for quite a lot of information detailing what

8     the project is, what the expected investment will be, and how

9     many jobs will be created, and what the wages of those jobs

10    are.

11         And so there's a fair bit of negotiation back and forth,

12    information gathering from between the staff person and a

13    developer or a business.

14         Ultimately, once all the criteria has been met, that

15    development agreement process travels up to a division

16    manager, where some more questions are asked and vetting is

17    done.  And then up to a deputy division manager or a deputy

18    director, and then, ultimately, to the director for decision,

19    confirmation, other information, and then travels to -- from

20    the director to the city manager as -- once that is -- if it

21    is going to be recommended for incentive or for passage.

22    Q.   You mentioned details of the project that the developer

23    provides.

24         What does the staff, and then broadly as it moves through

25    the department, what types of information is economic

1    development looking for from the development agreement

2    applications?

3    A.   The staff person really -- you know, everyone up to the

4    director is looking for surety that, in exchange for a public

5    benefit, you know, limited public dollars, public tax dollars,

6    that the public is going to get something in return.

7         And so as part of that process, staff spend their time

8    making sure that if the developer, in this case a developer,

9    or it could be a business investment too, but the developer is

10   saying they want a tax abatement for a project, does the

11   developer have site control?  Do they actually own the site

12   that they're talking about?  Do they have sufficient financing

13   to complete the project?  Not just, you know, I've got a

14   letter from a bank that says I'm interested but, you know,

15   with approval terms, you know, yes, you are approved for this

16   amount.

17        And then, certainly, does the developer or business have

18   the, you know, demonstrated capacity to complete the project.

19        The last thing that the public wants to do is incentivize

20   a project that can't ultimately get completed for one of those

21   reasons or for others.

22   Q.   You mentioned financing.  What level of specificity is

23   the economic development department looking for in terms of

24   financing when it assesses a development agreement?

25   A.   The department would typically ask for a number of

DENNING - DIRECT

1    financial models from a proposing developer, a pro forma

2    demonstrating sources and uses of the development project, a

3    capital stack demonstrating every one of these sources of

4    capital that the developer has or will have in order to

5    finance the construction of the project, a 10-year financial

6    pro forma that shows, on a 10-year projection, how well the

7    project is going to cash flow.

8        And that's -- part of the negotiation is for every -- for

9    the most part, every incentive that the city is offering, you

10   know, it was a but for agreement; that is to say, but for the

11   investment of the public, would this project not happen, and

12   so looking at that pro forma to understand does this project

13   really actually need a tax abatement in order to commence

14   construction.

15   Q.   I think you also mentioned capacity, capacity of the

16   developer.  Is that what you meant by that?

17   A.   Yes.  Yes.  If the developer has -- you know, if they've

18   completed one small residential development, or one house, but

19   are then planning to -- proposing to develop a much larger

20   development, you know, that can be cause for concern about

21   does the developer have the capacity to complete.

22   Q.   Ultimately, all the factors you just described, is there

23   one sort of underlying goal or analysis that you're looking

24   for in the economic development department to determine

25   whether or not a particular development agreement is

*DENNING - DIRECT*

1    appropriate?

2    A.   Actually, I've never -- I think --

3    Q.   Can I ask it another way?

4    A.   Yes.

5    Q.   Is there an assessment as to whether or not the

6    development agreement will ultimately be a good decision for

7    the public?

8    A.   Yes.  That's probably -- a fair answer is that,

9    ultimately, if the public is making investments or spending

10   public funds, is what the public is getting in return worthy

11   of that investment, and will it result in -- with certainty in

12   the project happening, the jobs being created.

13   Q.   All right.  So what happens to a development after it

14   works its way through the economic development department,

15   what happens next?

16   A.   Once the department of community and economic development

17   has vetted a project and has come to terms with the developer,

18   there's a development agreement drafted.

19        That agreement is sent -- presented to the city manager,

20   considered by the city manager, and then at the discretion of

21   the city manager, forwarded to city council for consideration.

22   Q.   And when the development agreement makes its way to city

23   council, what does city council do?

24   A.   This may be different now than it was when I was at the

25   city; but, typically, it would be referred to -- that item

1    would be referred to a committee, and so it would go to a city

2    council -- bigger city council meeting, it would be referred

3    to one of the committees.

4       And the following week, something like the budget and

5    finance committee would consider that item, and ask questions

6    or discuss that item amongst themselves.

7    Q.   And during the time you were at the economic development

8    department, what was city council's role when a developer was

9    seeking the development agreement through the economic

10   development department?

11   A.   Typically at, for example, those budget and finance

12   committee meetings, city council people would ask questions of

13   the department about underwriting, or project need, or the

14   number of jobs being created or, you know, which neighborhood

15   a project is in.

16      And if the developer was present at the council meeting,

17   the council could ask -- avail the same questions of the

18   developer.

19   Q.   Great.  All right.  During the time you were with the

20   economic development department, do you recall whether a

21   developer ever sought to develop property located at 435 Elm

22   Street in downtown Cincinnati?

23   A.   Yes.

24   Q.   And do you recall who the developer was who was seeking

25   development of that property?

1    A.   Yes.  It was Mr. Chinedum Ndukwe.

2    Q.   Okay.  Can you describe the property located at 435 Elm

3    Street?

4    A.   435, the property at the intersection of Elm and Sixth

5    Street is, I would say, a three-story retail building, with a

6    four-story office above a portion of it.

7       At my time in the city, it was in fairly severe

8    disrepair.  It was owned by the City of Cincinnati.

9         MR. SINGER:  I'd like to show, for identification

10   purposes, USA Exhibit 2A.  It's on the monitor right now.

11        THE WITNESS:  I don't see anything on my monitor.

12        THE COURT:  His monitor is not displaying.  Scott,

13   are you turning it on?

14        MR. SINGER:  Can we just scroll through those

15   photographs, 435 Elm Street.

16    Q.   Do you recognize the images marked for identification

17   purposes as USA Exhibit 2A?

18    A.   Yes.

19    Q.   And what is it?  What are these photos of?

20    A.   These are photos of the 435 Elm property.

21    Q.   And how is it that you recognize these photographs as

22   that?

23    A.   I have -- I've been in the building.  And in my time at

24   the city, recognize them from that time.

25    Q.   Are these true and accurate photographs of the property

1   located at 435 Elm Street during the time that you were at the

2   economic development department?

3   A.   Yes.

4        MR. SINGER:  Your Honor, the government moves USA 2A

5   into evidence.

6        THE COURT:  Mr. Rittgers?

7        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

8        THE COURT:  USA 2A is admitted without objection.

9   Just for the record, it's a six-page document.

10       MR. SINGER:  Permission to publish to the jury, Your

11  Honor?

12       THE COURT:  You may, Mr. Singer.

13  Q.   Can we start at page 1.  Can you just describe what we're

14  looking at here?

15  A.   Yes.  This is the front door to the retail portion and

16  the entrance lobby of the building at 435 Elm.

17  Q.   Page 2.  What are we looking at here?

18  A.   This is the same building.  It's an overall shot, shot

19  from the east.

20  Q.   Okay.  Next picture.  And what is this a photograph of?

21  A.   This is the same building, with the addition of the

22  public skywalk that connects across the top over the street.

23  Q.   Do you see the 435 in the bottom left-hand corner there?

24  A.   Yes.

25  Q.   Is that the address of the building?

1    A.   Yes.

2    Q.   Next picture.  What are we looking at here?

3    A.   Same property, just zoomed in on the retail storefronts.

4    Q.   Okay.  Next picture.  And here?

5    A.   Same property from the north.

6    Q.   Last one.  What are we looking at?

7    A.   435 Elm.

8    Q.   Thank you.  Did Mr. Ndukwe have any interaction with the

9    economic development department related to 435 Elm Street?

10   A.   Yes.  Yes.

11   Q.   Can you describe that, please?

12   A.   Mr. Ndukwe was interested in developing the building, or

13   the site.

14   Q.   Was your understanding, based on the information that

15   you'd received from Mr. Ndukwe, that he had a property

16   interest in the property at 435 Elm Street?

17   A.   No.

18   Q.   Okay.  Can you describe that?

19   A.   Yes.  And I'll be a little careful, because this is

20   currently in litigation between the port and Mr. Ndukwe.

21       But at the time of his interest in developing the

22   property, my recollection is that he did not have sufficient

23   interest in the property to be a -- have a developable

24   interest in the property.

25   Q.   What was Mr. Ndukwe seeking from the economic

1    development -- or from the City of Cincinnati with regard to

2    435 Elm Street?

3    A.   Mr. Ndukwe was seeking site control, the ownership of the

4    site.

5    Q.   And do you recall when Mr. Ndukwe first started pursuing

6    an agreement with the city relating to 435 Elm Street?

7    A.   Yes.

8    Q.   And when was that?

9    A.   The date, I'm not going to remember, but Mr. Ndukwe sent

10   a letter to the department specifically stating his interest

11   in entering into an MOU, or a memorandum of understanding,

12   with the department to redevelop the property.

13   Q.   If I showed you that letter, would it refresh your

14   recollection as to the date of when the letter was sent?

15   A.   Yes.

16            MR. SINGER:  Your Honor, may I approach?

17            THE COURT:  You may.

18   Q.   Can you review that?

19   A.   Yes.  So this is July 7, 2017.

20            MR. SINGER:  May I approach, Your Honor?

21            THE COURT:  You may.

22   Q.   So did this refresh your recollection?

23   A.   Yes.  Thank you.

24   Q.   Okay.  When was that again?

25   A.   That was July 7th, 2017.

1    Q.   Thank you.  You mentioned a memorandum of understanding.

2    What is a memorandum of understanding?

3    A.   A memorandum of understanding, generally, is a

4    non-binding legal document with, essentially, promises about

5    something to be done.

6    Q.   And in your experience, does the city typically enter

7    into a memorandum of understanding relating to large scale

8    development projects?

9    A.   Not typically, no.  That is a non-traditional path.

10   Q.   And during the time you were at the economic development

11   department, did there come a time when Mr. Ndukwe was seeking

12   a development agreement with the city?

13   A.   My understanding is that he was seeking a development

14   agreement, but that did not happen.

15   Q.   Can you describe that?

16   A.   Yes.  As I mentioned earlier, the typical process at the

17   time was for staff within the department to enter into

18   negotiations, conversations with an interested developer and,

19   essentially, fulfill all of the information needs they were

20   going to need to make and present to their superiors to make a

21   decision about when to sell or enter into a development

22   agreement, or something of that nature.

23        And staff within the department simply never reached the

24   point at which they were comfortable and had enough

25   information to recommend that a development agreement would be

1    their next course of action.

2    Q.  Can you describe whether there were issues relating to

3    the 435 property, generally?

4    A.  The property condition itself?

5    Q.  Yes.

6    A.  Yes.  The property was in disrepair.  The roof was

7    leaking.  There were active tenants in the building who had,

8    you know, various issues with the property.  Parts of the

9    building were failing.  You know, the freight elevators were

10   failing, and the cables were rusting, and kind of a whole

11   number of issues related to the lack of upkeep and maintenance

12   over the 20 or 25 years prior by the then occupant, tenant.

13   Q.  Were there any other issues with the property that made

14   entering a development agreement with any developer difficult?

15   A.  Yes.  In addition to those issues, kind of the condition

16   issues that I mentioned, the footprint of the building and the

17   design, the layout of the building was outdated and, all

18   together, it typically called for something like a demolition,

19   which is expensive and creates another financial hurdle to

20   development.

21   Q.  What ultimately happened with the 435 Elm Street property

22   during the time you were with the economic development

23   department?

24   A.  So ultimately, because of the condition issues, it was

25   a -- quite a large liability that was borne by my department

1    at the time to maintain and upkeep.

2        And in addition to being the subject of litigation

3    between previous tenants and city attorneys, it was kind of an

4    unfunded mandate.

5        The department didn't get budgeted dollars to take care

6    of a failing facility like this, and so it was a drain on very

7    limited resources within the department, and so, ultimately,

8    the property was sold to the port to maintain and hold on to

9    find the -- patiently find the right development partner or

10   entity.

11   Q.  And can you describe how that happened, the transfer to

12   the port?

13   A.  That was a property sale agreement, and that process

14   would have happened around budget time, again, because it was

15   kind of a two-pronged approach.  It was both a budgetary item

16   but also a capacity item, so it happened around the time of

17   the city budget in June.

18       And at that time, city council -- an item was presented

19   to city council for consideration to sell the property,

20   transfer the property, that is, from the city to the port for

21   one dollar, and after which the port would be responsible for

22   its maintenance, liability, and conditions.

23   Q.  Do you recall presenting before the budget and finance

24   committee relating to the transfer of the property from the

25   city to port?

1    A.  I don't have specific recollection of that but, yes, I'm

2    sure that I presented during a budget finance committee

3    hearing of some sort during that time.

4           MR. SINGER:  Your Honor, we have a stipulation

5    relating to the admissibility of a video.

6           THE COURT:  Yes.

7           MR. SINGER:  Would you like me to read that

8    stipulation or present it to you?

9           THE COURT:  Yes, could you present it to me.  Let me

10   just take a look at it.  Is this one that I already have?

11         MR. SINGER:  You do.

12         THE COURT:  Oh, I can pull it up from here, then.

13   Okay.  You can read it or I can, either way, Mr. Singer.

14         MR. SINGER:  Would you like me to read it, Your

15   Honor?

16         THE COURT:  You can.

17         MR. SINGER:  "The parties stipulate to the

18   admissibility of the 1:20 video of Phil Denning's statement

19   before the City of Cincinnati Budget and Finance Committee on

20   June 24th, 2019.

21     "It is further stipulated and agreed that this

22   stipulation may be introduced into evidence as an exhibit, and

23   the facts herein stipulated have the same status, dignity, and

24   effect as the undisputed testimony of a credible witness."

25         THE COURT:  Thank you, Mr. Singer.

1          Ladies and gentlemen of the jury, I mentioned at the

2     outset, there may be some facts that are stipulated to.  With

3     regard to stipulated facts, you are to accept those stipulated

4     facts as true and proven.

5               MR. SINGER:  Your Honor, permission to publish USA 2I

6     to the jury?  2I is the video that reflects the stipulation.

7               THE COURT:  Mr. Rittgers, any objection?

8               MR. C. MATTHEW RITTGERS:  No, Your Honor.

9               THE COURT:  Very good.

10     (Video played.)

11     Q.   Do you recall that testimony?

12     A.   Yes.

13     Q.   There was a reference to Convention Place Mall.  What is

14     that a reference to?

15     A.   Convention Place Mall is the second name, I guess, for

16     435 Elm.  The complex itself is known as Convention Place

17     Mall.

18     Q.   And we just heard it in the recording, but can you

19     describe why it is you recommended the sale of 435 Elm Street

20     for a dollar?

21     A.   Yes.  Just as I said, it was a liability for the

22     department financially and also legally.  And I had forgotten,

23     until I heard that, that because of the large amount of back

24     taxes that the building owed, was delinquent on, it's likely

25     that the port or the land bank would have been involved in a

1    successful redevelopment in any case.

2    Q.   And did city council ultimately vote to sell the

3    435 Elm Street property to the port?

4    A.   Yes.

5    Q.   And were you present during that meeting?

6    A.   Yes.

7    Q.   Do you recall the date the property was voted on by city

8    council?

9    A.   I do not recall.

10   Q.   Okay.  Do you remember what the city council vote was?

11   A.   I recall it was a yes but, other than that, the vote

12   breakdown, I honestly don't recall.

13   Q.   Would the minutes of City Hall on the date that the sale

14   was made, would that refresh your recollection?

15   A.   Yes.

16        MR. SINGER:  Permission to approach, Your Honor?

17        THE COURT:  You may.

18   Q.   Can you reference page 1 and page 18, the tab right

19   there?

20   A.   Yes.  Okay.

21        MR. SINGER:  May I approach?

22        THE COURT:  You may.

23   Q.   Did this refresh your recollection as to the date that

24   city council voted on the transfer?

25   A.   Yes.  And the votes were yes.

DENNING - DIRECT

1    Q.   Do you recall what the date was?

2    A.   I didn't actually look at the date.  I'm sorry.  I was

3    looking at the number.

4    Q.   Can you tell me what the votes were?

5    A.   The votes were all yes.

6    Q.   Okay.  Do you know Mr. P.G. Sittenfeld?

7    A.   Voted yes.

8              MR. SINGER:  May I approach?

9              THE COURT:  You may.

10   A.   I apologize.  I haven't been following the assignment.

11   Thank you.  So June 26th.  Thank you.

12   Q.   June 26th of what year?

13   A.   Of 2019.

14   Q.   Thank you.  So I think you just testified that the

15   property was ultimately sold to the port for a dollar; is that

16   correct?

17   A.   Yes.

18   Q.   Do you recall whether this was the same term that

19   Mr. Ndukwe was seeking with the city in his discussions with

20   the economic development department?

21   A.   I do not recall specific terms, actually, of Mr. Ndukwe's

22   as it pertains to the cost or amount of a sale.

23   Q.   Okay.  And what was the impact of the sale of the

24   property to the port?

25   A.   The immediate impact on the city was the removal of a

1    large financial burden, and so that's a significant public

2    benefit.

3        And then since that time, it has been at the port,

4    managed by the port.  The tenants were cleared, and it is

5    being kind of prepped for development.

6    Q.  At some point after the transfer, did you change jobs

7    from economic development to the port?

8    A.  Yes.  So it was about five months after this was sold

9    that the idea was first approached of me from Laura Brunner,

10   the CEO of the port, and it was after that, in January of

11   2020, that I started at the port.

12   Q.  Okay.  After the property was transferred to the port,

13   was there a possibility that it could return back to city

14   council for any reason?

15   A.  It would be unlikely for the property itself to transfer

16   it back to the city for any reason, although with the

17   development project, there might be something else that city

18   council would have had to -- a development incentive, for

19   example, would have had to be considered by city council.

20   Q.  That's what I was getting at.  Is there some issue

21   relating to the project that could ultimately bring the

22   essence of that issue back to city council?

23   A.  Yes.  Yes.  Ultimately, if the project's found a

24   development proposal that was real and vetted, that if the

25   developer were needed -- were going to need a development

1    incentive like a tax abatement, or something like that, then

2    that item would come back to -- in front of city council

3    related to this property.

4    Q.   Was Mr. Ndukwe ultimately able to negotiate a development

5    agreement with the port related to the property?

6    A.   No.

7    Q.   During the time you were with economic development, do

8    you recall any discussions you had with then Councilman

9    P.G. Sittenfeld regarding the 435 Elm Street project?

10   A.   Yes.

11   Q.   Can you describe what you recall of those conversations?

12   A.   I recall one or two phone conversations with

13   Mr. Sittenfeld that were primarily focused on process for the

14   building, the building's development option.

15   Q.   Any specifics about the conversation that you recall?

16   A.   It was -- again, it was mainly focused on process and,

17   you know, what is going to -- you know, what are the

18   department's next steps.

19        For context, you know, in my time at the department, I

20   had instituted an RFP process, request for proposals process,

21   to elicit competitive bids for properties.  And we had

22   instituted that and had been using it, and so most of the

23   conversations with Mr. Sittenfeld, I believe, was about that.

24   Q.   Do you recall any discussion related to Mr. Ndukwe's

25   interest in the property?

DENNING - DIRECT

```
 1    A.   Yes.  Vaguely.  My recollection was Mr. Sittenfeld

 2    asking, again, about process, and what is the process for

 3    Mr. Ndukwe to get control of the property or develop the

 4    property.

 5    Q.   Now, I think you testified that Mr. Ndukwe had some

 6    interest in the property; is that correct?

 7    A.   I wouldn't --

 8    Q.   Can I ask a different question?

 9    A.   Yes.

10    Q.   How would you describe Mr. Ndukwe's interest in the

11    property?

12    A.   At the time, I'm going to have to say I don't recall

13    exactly when he -- Mr. Ndukwe, that is -- had purchased a

14    mortgage cure.

15         But without getting too technical, one of the tenants in

16    the building had defaulted on a mortgage.  The mortgage holder

17    had a right to cure that default.  And my understanding was

18    that Mr. Ndukwe had purchased that right to cure the default.

19         And so this topic is, again, subject of litigation today

20    between Mr. Ndukwe and the port, but the interest is -- I

21    don't believe there is an interest.

22    Q.   So with that backstop, during the time you were with

23    economic development, was it your perspective that

24    Mr. Ndukwe was going to be the developer of the project based

25    on the relationship he had with 435 Elm Street?
```

DENNING - DIRECT

1   A.   For clarity, this is at my time at the port?

2   Q.   During your time in economic development.

3   A.   Oh, in economic development.  Yes.  My understanding was

4   Mr. Ndukwe had not demonstrated sufficient capacity, finances,

5   or other plans necessary to present a development project to

6   city council.

7   Q.   And that was from the perspective of the economic

8   development department; is that correct?

9   A.   Yes.

10          MR. SINGER:  May I consult?

11          THE COURT:  You may.

12  Q.   One quick follow-up.  You've mentioned a litigation, I

13  believe, relating to the port and Mr. Ndukwe.

14     Does that have anything to do with any criminal charges?

15  Is that a civil matter relating to --

16  A.   Yes.  My understanding is that is a separate -- that's

17  just a separate matter.

18  Q.   A completely separate civil matter?

19  A.   Correct.

20  Q.   Not related to the reason you're testifying here today?

21  A.   Correct.  Yes.  Yes.  Completely separate.

22          MR. SINGER:  No further questions.

23          THE COURT:  Thank you, Mr. Singer.

24     Mr. Rittgers, your witness.

25          MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

DENNING - CROSS

CROSS-EXAMINATION

BY MR. C. MATTHEW RITTGERS:

Q.   Good afternoon, Mr. Denning.

A.   Hi, there.

Q.   Now that you've seen that video on the floor of council,

you're fairly familiar with the recommendation that you made

back then?

A.   Yes.

Q.   And, in part, part of the recommendation was because the

city was saddled with that property for quite a long time?

A.   Yes.

Q.   And it cost the city roughly $400,000 a year just in

maintenance costs, which was draining the budget and finances

of the city?

A.   That's correct.

Q.   It also was a bit of a hazard for the public, even maybe

the tenants, because of the condition of the building?

A.   Yes, the building, when it was still owned by the City of

Cincinnati, had occupants, tenants, tenants and subtenants.

And that was a situation which the department wasn't capable

or really built to handle.

Q.   And that's why, ultimately, you stood on the floor and

you recommended to council to transfer the building to the

Port Authority?

A.   That's correct.

*DENNING - CROSS*

1    Q.   And that would be fairly typical, in your role as the

2    economic development director, to speak to council about what

3    your beliefs were regarding a transfer to the port?

4    A.   Yes.

5    Q.   And those were -- that was your belief.  I mean, those

6    were your beliefs based on what your department and you

7    actually knew about the building?

8    A.   That's correct.  And --

9    Q.   And -- sorry.  Go ahead.  I apologize.

10   A.   No, that's okay.  Typically, I would appear to council

11   with information that my staff had presented about a project

12   or such, so yeah.

13   Q.   And the dollar transfer to the port was, I think your

14   words were it was a steal for the city, right, the transfer?

15   A.   Right.  Correct.  It was relieving a significant public

16   burden.

17   Q.   Because it was costing us, the taxpayers, roughly

18   $4 million every decade?

19   A.   Yes.

20   Q.   The costs, just because this property was transferred to

21   the port, given the state it's in today, those don't go away.

22   The port still has costs every day with that property,

23   correct?

24   A.   Yes.

25   Q.   And the port's mission, where you are now, is to help

1    revitalize, I think you mentioned light industrial jobs, even

2    sometimes residential homes?

3    A.    Uh-huh.

4    Q.    Commercial buildings like 435 Elm, correct?

5    A.    Yes.

6    Q.    And this particular building at 435 Elm was strategic, in

7    that it was right across the street from our Convention

8    Center?

9    A.    Yes.  It is directly south of the Convention Center.

10   Q.    And I believe at the time, in 2018, to the east of the

11   Convention Center, there stood a hotel called Millennium?

12   A.    Yes.

13   Q.    Which is gone.  Was this property, was it something that

14   would have been helpful for the port, if there was a

15   successful development agreement, to get a hotel on this

16   property because of where it was located?

17   A.    Unfortunately, that's a more complicated answer.

18   Certainly, getting the property developed again would be the

19   best, you know, best-case scenario for the western side of

20   downtown, and the size of the property is fairly small.  It

21   looks bigger, but it's kind of an L-shaped property, so a

22   hotel is a potential use.  It could have been other uses as

23   well.

24   Q.    At the port, were you -- I should ask.  Were you

25   personally familiar with any studies done regarding our

1  Convention Center with the Convention Bureau, or anything like

2  that?

3  A.   Yeah, vaguely.  I'm sure that over the past couple of

4  years, I've read, you know, an HVS study, or something about

5  convention -- hotel convention redevelopment.

6  Q.   And, in general terms, we -- Cincinnati's Convention

7  Center competes with other convention centers within, you

8  know, a 150-mile radius?

9  A.   Yes.

10  Q.   Indianapolis, Louisville, Columbus?

11  A.   (Nods affirmatively.)

12  Q.   And it's important for a Convention Center to have nice

13  and usable hotel space near the Convention Center, right?

14  A.   Yes.

15  Q.   And it helps with broader tourism for the region?

16  A.   Absolutely.  With perception, visitors visiting the

17  convention facility, certainly.

18  Q.   Tax base, jobs?

19  A.   Yes.

20  Q.   I know there's very limited things that you can say

21  because you're at the port, and the property is currently in

22  litigation in state court, civil litigation.

23      The port's position, and correct me if I'm wrong, is that

24  Mr. Ndukwe does not possess air rights; is that right?

25  A.   Yes.

DENNING - CROSS

1    Q.   And his position is that he does possess air rights,

2    correct?

3    A.   Honestly, I'm uncomfortable speaking to his position.

4    Q.   Okay.  There's an argument over whether or not he

5    possesses air rights on that property?

6    A.   That's my understanding, yes.

7    Q.   You mentioned the defunct mortgage.  You said that he

8    purchased a mortgage.  Was it from U.S. Bank in 2017?

9    A.   That's my understanding, yes, it was from U.S. Bank.

10   Q.   If today the port's -- if the port had a good proposal,

11   where someone said they had $75 million to develop that

12   property, would that be a good thing to try to dive into and

13   successfully complete?

14   A.   It seems like the answer would be yes, although my answer

15   would probably be a little more vague than that because I

16   would say that you would probably want to talk to 3CDC, who is

17   managing the redevelopment of the Convention Center district.

18   But, generally, attracting more private investment to the

19   corner or the district is beneficial, yes.

20   Q.   To help revitalize downtown?

21   A.   Yes.  Yep.

22   Q.   Our county and region?

23   A.   (Nods affirmatively.)

24        MR. C. MATTHEW RITTGERS:  No further questions, Your

25   Honor.

1          THE COURT:  Thank you, Mr. Rittgers.

2      Mr. Singer, any redirect?

3          MR. SINGER:  Just two brief questions, Your Honor.

4          THE COURT:  Very good.

5                    REDIRECT EXAMINATION

6  BY MR. SINGER:

7  Q.   I think you testified that it was the determination of

8  economic development that, when you were assessing the

9  property, ultimately, you went and determined whether it was

10  in the public interest; is that right?

11  A.   Yes.

12  Q.   And despite all the issues relating to the property, was

13  it the assessment of economic development at the time that the

14  development agreement pursued by Mr. Ndukwe was not in the

15  public interest?

16  A.   That is a fair assessment.

17          MR. SINGER:  No further questions.

18          THE COURT:  Thank you, Mr. Singer.

19      Mr. Rittgers, any further questions?

20          MR. C. MATTHEW RITTGERS:  May I have one moment, Your

21  Honor?

22          THE COURT:  You may.

23          MR. C. MATTHEW RITTGERS:  I have no further

24  questions, Your Honor.  Thank you.

25          THE COURT:  Thank you.  Sir, you may step down.

1    Thank you for being here today.

2         THE WITNESS:  Thank you.

3      (Witness excused.)

4         THE COURT:  Would the government like to take a brief

5    break?

6         MR. SINGER:  You read my mind, Your Honor.

7         THE COURT:  Okay.  I think a brief break may be a

8    good idea.  We'll allow the jury to stretch your legs a little

9    bit.  We'll try to keep it pretty brief, though.

10     (Jury out at 3:55 p.m.)

11         THE COURT:  You may be seated.

12      Is there anything anybody wishes to discuss on the record

13    before we take a break?

14         MR. SINGER:  Your Honor, we have a number of

15    stipulations that we will want to read into the record prior

16    to the next witness testifying.

17         THE COURT:  Okay.  Are they this group of

18    stipulations that you provided to the Court?

19         MR. SINGER:  They have been provided to the Court.

20    They relate to financial records -- or, I'm sorry, phone

21    records.

22         THE COURT:  So I'm a little confused by the

23    stipulations.  So the stipulations don't seem to me to be as

24    to facts.  They seem to be stipulations as to the

25    admissibility of exhibits.

1          MR. SINGER:  That's correct, Your Honor.

2          THE COURT:  I'm a little concerned that if we read it

3     to the jury and tell the jury that the stipulation may be

4     treated as credible and undisputed evidence, that they're

5     going to think that it means the document that's admitted is

6     credible and undisputed evidence, which I'm not sure that -- I

7     mean, the stipulation as to the admissibility of the exhibit

8     doesn't necessarily mean it's a stipulation as to the truth of

9     everything that's stated in the exhibit.

10         MR. SINGER:  Your Honor, I think we're comfortable,

11    so long as you're comfortable, with us just publishing it to

12    the jury based on those stipulations moving forward --

13         THE COURT:  I would be more comfortable with that,

14    because I felt like reading it to the jury may have confused

15    them with regard to the transcript or the video that we just

16    saw.

17       So if this is just a series of exhibits, I would suggest

18    that, you know, the government can just now, while we're on

19    the record, move for the admission of these exhibits.

20       I'll ask Mr. Rittgers if there's an objection, and if

21    there's not, they will be admitted, and then you can just use

22    them as evidence and publish them to the jury.

23         MR. C. HENRY RITTGERS:  Your Honor, are we talking

24    about the summary, the three summary exhibits that you guys

25    intended --

1          MR. SINGER:  No.  We're talking about the

2     stipulations that we executed relating to bank --

3          MR. C. MATTHEW RITTGERS:  Isn't the judge -- I'm

4     sorry.  I think the judge is asking about the exhibits on top

5     of that.

6          THE COURT:  No, no.  I was just asking if these

7     stipulations go to the admissibility of exhibits.  Rather than

8     doing a stipulation, why not just move to admit the exhibit to

9     which this stipulation relates, and if there's no objection,

10    I'll admit it and it will be evidence.

11         MR. C. MATTHEW RITTGERS:  There might be objections

12    to the exhibits, but these relate to the tapes and the partial

13    parts of the tapes, right?

14         MR. SINGER:  These relate to the financial records

15    that we'll be put -- or the phone records that we'll be

16    putting in.

17         THE COURT:  Why don't we use an example.  Give me one

18    example of what we're talking about, Mr. Singer.

19         MR. SINGER:  So we have a stipulation relating to the

20    admissibility of Verizon phone records.  It's page 6 of 9.

21         THE COURT:  Okay.  So read that for the record.

22         MR. SINGER:  "The parties stipulate to the

23    admissibility of Verizon phone records produced by the

24    government in discovery for Kingsley Investment Group, phone

25    number 614-753-1491, which was used by Chinedum Ndukwe, and

1    Deborah Coyne, phone number 513-365-2404, which was used by

2    Alexander P.G. Sittenfeld.

3        "It is further stipulated and agreed that this

4    stipulation may be introduced into evidence as an exhibit, and

5    that the facts herein stipulated have the same status,

6    dignity, and effect as to undisputed testimony of credible

7    witnesses."

8            THE COURT:  Okay.  So did this stipulation relate to

9    a particular exhibit?

10           MR. SINGER:  It relates to evidence that -- yes, it

11   does.

12           THE COURT:  And what is the label on that particular

13   exhibit?

14           MR. SINGER:  USA 6, Your Honor.

15           THE COURT:  So as I understand it, the parties have

16   stipulated to the admissibility of USA 6.  But let me just ask

17   Mr. Rittgers, do you have any objection to the admission of

18   USA 6?

19           MR. C. MATTHEW RITTGERS:  We do not, assuming that

20   that corresponds -- I just haven't checked.  I believe them,

21   but no, based on what he said that the exhibit is.

22           THE COURT:  Okay.  So USA 6 is admitted without

23   objection.

24       Now, my understanding is that a number of the rest of

25   these stipulations are similarly tied to a particular

1    government exhibit as to which the parties have stipulated to

2    admissibility.

3          MR. SINGER:  There are, Your Honor.  There are

4    certain facts in this particular stipulation that relate to

5    the use of the phone number, which is a fact.

6          THE COURT:  Oh, that's right.  Okay.  So we will need

7    to read that to the jury.

8          MR. SINGER:  We can just read that part, and we can

9    just mark this as an exhibit and it will be evidence that goes

10   back with the jury.

11         THE COURT:  That's a fair point.  The one we did

12   before didn't have that, where there were facts in the

13   stipulation.

14      Are most of these stipulations going to have facts in

15   them that are in addition to the government exhibit?  Okay.

16   So then it probably will be better to just read them to the

17   jury, and then explain that they relate to a particular

18   government exhibit.

19      I think we may need to do that.

20         MR. SINGER:  Okay.

21         THE COURT:  And it's all of these after 15 or 16?

22   Oh, you don't have my book.  It's a bunch of, like, "The

23   parties stipulate the audio/video and documents produced by

24   the government in discovery are authentic for purposes of

25   901," or is that not one of them?

```
 1            MR. SINGER:  That is one of the entire group.  That
 2    relates more to whether or not these documents are -- that the
 3    materials are authentic, rather than the admissibility for the
 4    jury, so I think that one is a little different than the other
 5    ones.
 6            THE COURT:  So here's what I would propose.  I will
 7    let you read the stipulation, and then I will tell the jury
 8    what fact that they should take from that stipulation as being
 9    undisputed evidence by stipulation of the parties.  So I think
10    I can manage that.  Okay.
11        You want to do that when we bring the jury back in,
12    you're saying?  Is that a good time?
13            MR. SINGER:  Yeah.  We can do that.
14            THE COURT:  All right.  What's the government's plan
15    for the rest of the afternoon?
16            MR. SINGER:  Your Honor, we were going to call case
17    agent Special Agent Nathan Holbrook.  He is a long witness, a
18    very in-depth witness.  From the government's perspective, it
19    makes sense to maybe start with him tomorrow morning.
20        If we could read the stipulations into the record now,
21    and then start with Special Agent Holbrook in the morning.
22            THE COURT:  Okay.  Mr. Rittgers?
23            MR. C. HENRY RITTGERS:  No objection to that.
24            THE COURT:  Okay.  So it sounds like the parties are
25    in agreement.
```

1     Can you tell the Court the plan for tomorrow?  You just

2  said that Mr. Holbrook will be a relative involved witness.

3  How many witnesses does the government plan on putting on

4  tomorrow?

5          MR. SINGER:  It's the government's estimation that

6  he's going to testify the whole day.

7          THE COURT:  The whole day?

8          MR. SINGER:  Yes.

9          THE COURT:  And do you think that would also include

10  cross, or do you anticipate the cross -- and I know that's

11  going to be hard for you.  How long do you anticipate the

12  direct going?  Let me ask it that way.

13          MR. SINGER:  Direct will probably go all day, Your

14  Honor.

15          THE COURT:  The direct will go all day?

16          MR. SINGER:  Yes.

17          THE COURT:  All right.  Then I think it probably

18  makes sense -- the one thing I would say is be mindful that I

19  would like to try and take a break for the jury every hour and

20  a half to two hours.

21     So if we start at 9:00 in the morning, try to take a

22  break sometime around 10:30, try to take a break around noon

23  for lunch.  I want you to take a break where it makes sense to

24  take a break, but if you can try and plan it out so that every

25  hour and a half or so we can take a break, I think that would

1    be helpful to the jury.

2          MR. SINGER:  Will do.

3          MS. GLATFELTER:  Your Honor, would you like us to

4    suggest a break to the Court, or should we wait for your --

5          THE COURT:  Yes.  No, no.  Just be mindful of the

6    time.  If you're not sufficiently mindful, the Court will

7    suggest it to you.  But yeah, I'll try to be -- if you can try

8    to be mindful of time, you know, just generally around 10:30,

9    if we start at 9:00.

10       Is 9:00 a good starting time tomorrow?

11         MR. SINGER:  Yes, Your Honor.

12         THE COURT:  Is 9:00 a good starting time?

13         MR. C. MATTHEW RITTGERS:  What time?  I apologize,

14   Judge.

15         THE COURT:  Is 9:00 a good starting time tomorrow?

16         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

17         THE COURT:  It sounds like the witness is going to

18   take all day, so I would like to try and get him done

19   tomorrow, so we if start by 9:00, which means we should be

20   here by 8:45?

21         MR. C. MATTHEW RITTGERS:  8:45.

22         MR. SINGER:  Great.

23         THE COURT:  After we take a brief break, we'll bring

24   the jury back in, read the stipulations, and then we'll break

25   for the day.

1          Anything else we need to discuss, Mr. Singer?

2               MR. SINGER:  No, Your Honor.

3               THE COURT:  Mr. Rittgers?

4               MR. C. HENRY RITTGERS:  Maybe after the jury has

5     gone, one issue.

6               THE COURT:  Very good.

7          (Brief recess.)

8               THE COURT:  Did we discover anything else we need to

9     talk about before we bring the jury out?

10              MR. SINGER:  Just relating to the stipulations, Your

11    Honor, unless you think differently, the one that is 2 of 9,

12    page ID 2866, related to authenticity.

13              THE COURT:  Right.

14              MR. SINGER:  I don't know if that's something that

15    necessarily needs to be read to the jury.

16              THE COURT:  So does this relate to specific exhibits?

17              MR. SINGER:  It's everything that the government has

18    produced to the defense counsel.

19              THE COURT:  Is there any way I can identify it for

20    the record?

21              MR. SINGER:  They won't be objecting to it.  I can

22    read it.

23              THE COURT:  I mean, we don't need to do it to the

24    jury because, once again, I don't want the jury to take from

25    this that the contents of all those things that are stipulated

1    as being undisputed and all that.  So we can do that not in

2    the jury's presence, if Mr. Rittgers is comfortable with that.

3                MR. C. MATTHEW RITTGERS:  I am, yes, Your Honor.

4                THE COURT:  So just for the record, "The parties

5    stipulate that the audio, video, and documents produced by the

6    government in discovery are authentic for purposes of Federal

7    Rule of Evidence 901."

8        And the Court has accepted that stipulation, so all such

9    materials that have been produced by the government shall be

10   deemed authentic for purposes of this trial, all right?

11       And then the rest of them you want to read, Mr. Singer,

12   is that right?

13               MR. SINGER:  Yes, Your Honor.

14               THE COURT:  Okay.  One of them seems to be related to

15   defense exhibits.

16               MR. SINGER:  Yes, Your Honor.  There's one other one

17   that would fall under this category, I think.

18               MR. C. MATTHEW RITTGERS:  Those are photographs, Your

19   Honor.  They don't need to be read into the record.  I defer

20   to the Court.

21               THE COURT:  Okay.  So the parties have stipulated to

22   the admissibility of Exhibits D11 up to D18; is that right?

23               MR. C. MATTHEW RITTGERS:  That's correct, Your Honor.

24               THE COURT:  Mr. Singer is that correct?

25               MR. SINGER:  That's correct, Your Honor.

1          THE COURT:  So any problem with me introducing into

2     the record now, even though it's the government's case in

3     chief?

4        Do you want me to wait and put them in when it's the

5     defendant's case, or are you fine with them going in now?

6          MR. SINGER:  So is the idea that we will read the

7     stipulations, and then the underlying exhibits will be read

8     into the record?

9          THE COURT:  No, no, no.  I'm now just talking about

10    the one that say Exhibits D11 to D18.  Since there are no

11    facts in there that the jury needs to hear, I was just going

12    to admit them for the record in this case, unless you prefer

13    to wait until it's their case in chief.

14       So Defense Exhibits D11 to D18 are admitted into the

15    record in this case.

16       And also, Scott, what was the video we played right

17    before the break?

18          COURTROOM DEPUTY:  USA 2I.

19          THE COURT:  I think USA 2I was what a previous

20    stipulation related to, and I don't know if I technically said

21    2I was admitted, so just for the record, although it's already

22    been played, Government Exhibit 2I is admitted.

23       Well, I should have asked.  I believe there was no

24    objection, is that right, Mr. Rittgers?

25          MR. C. MATTHEW RITTGERS:  There was not an objection,

1    Your Honor.

2         THE COURT:  Okay.  So Government Exhibit 2I is

3    admitted without objection.

4      So I believe that leaves these other stipulations, which

5    is going to be, I believe, pages 3, 4, 5, and 6 and 7 of 9.

6    Is that what you have, Mr. Singer?

7         MR. SINGER:  I'm sorry.  Can you say that again, Your

8    Honor?

9         THE COURT:  Sure.  I believe that the ones we still

10   need to address for the jury are labeled at the top as page 3

11   of 9, page 4 of 9, page 5 of 9, page 6 of 9, and page 7 of 9.

12   I believe we've already dealt with page 8 of 9, and I just

13   dealt with page 9 of 9.

14        MR. SINGER:  That's correct, Your Honor.

15        THE COURT:  And then have we dealt sufficiently with

16   the separate stipulation, which goes to the transcripts, or

17   how are we going to deal with that?  That was the issue we

18   discussed this morning about the transcripts.

19        MR. C. MATTHEW RITTGERS:  We would propose doing it

20   after the jury's released, and I believe either my father or

21   Neal might be able to have a discussion on that, but it might

22   be more lengthy.

23        THE COURT:  Okay.  So let's bring the jury in and

24   deal with pages 3 through 7 of 9 of the stipulations.

25        MR. SINGER:  So that exhibits that underlie these,

1    that are tied to these stipulations --

2           THE COURT:  Do you have them?

3           MR. SINGER:  We do, although it's a little -- so for

4    the phone records, we have them.  There is a Fifth Third Bank

5    account, and the -- there are portions that are admitted

6    through different witnesses, so that kind of jumps around a

7    little bit.

8           THE COURT:  Which stipulation?  What page is that at?

9    It's page 5 of 9, I believe; is that right?

10          MR. SINGER:  It is 5 of 9, that's correct.

11          THE COURT:  Well, what do you mean it jumps around?

12   You're stipulating to the admissibility, so it should be a

13   complete exhibit, even if different witnesses testify about

14   it.

15          MR. SINGER:  It is, but we have marked them in

16   various places throughout our exhibit list, so the checks, for

17   example, that came from the grand jury subpoena and relating

18   to the checks in November are one exhibit number, and then the

19   checks introduced from the September checks, for example, are

20   introduced as a different exhibit number.

21          THE COURT:  I understand.  But there must be a

22   collection of exhibit numbers to which this stipulation are --

23          MR. SINGER:  There are.  If you could just give us

24   two minutes to kind of make sure we have that full list?

25          THE COURT:  Sure.  Okay.

1          MR. SINGER:  Your Honor, could we do the one

2    stipulation tomorrow?

3          THE COURT:  Sure.

4          MR. SINGER:  So we don't have to waste everybody's

5    time.

6          THE COURT:  That's fine.  And as I understand it, the

7    one labeled page 3 of 9 doesn't have an exhibit associated

8    with it?

9          MR. SINGER:  That's correct.

10         THE COURT:  So then 4 of 9 is probably not going to

11   have an exhibit associated with it either; is that right?

12         MR. SINGER:  That's right.

13         THE COURT:  And then 5 of 9 is the one we're going to

14   put off until tomorrow?

15         MR. SINGER:  Yep.

16         THE COURT:  And 6 of 9, the facts are going to relate

17   to the telephone number being assigned to each of those two

18   people?

19         MR. SINGER:  Along with USA 6 and USA 7.

20         THE COURT:  Thank you.  Those are the phone records?

21         MR. SINGER:  Yes.

22         THE COURT:  Oh, the first phone number was a phone

23   that was used both by Mr. Ndukwe and Ms. Coyne; is that right?

24         MR. SINGER:  No.  The first phone number is under

25   Kingsley Investment Group, which was used by Chinedum Ndukwe.

1    The second phone --

2              THE COURT:  And Ms. Coyne, it looks like.

3              MR. SINGER:  Those are two separate --

4              THE COURT:  Looks like the second phone number was

5    used by Mr. Sittenfeld, unless I'm reading something off?

6              MR. SINGER:  Yes, but it is a phone record that is

7    under the name of Deborah Coyne.  The grand jury subpoena --

8              MR. C. MATTHEW RITTGERS:  It's the in-law.

9              THE COURT:  I see.  So there's one that is Kingsley

10   Investment Group, which has a phone number, and that phone was

11   used by Mr. Ndukwe.  And the other one is a phone number

12   that's assigned to Ms. Coyne but was used by Mr. Sittenfeld?

13             MR. C. MATTHEW RITTGERS:  Correct.

14             THE COURT:  Do I understand correctly?

15             MR. C. MATTHEW RITTGERS:  Correct, Your Honor.

16             THE COURT:  And then page 7 of 9 is going to just be

17   one phone number, and it's going to probably have an

18   associated exhibit; is that right?

19             MR. SINGER:  USA 8.

20             THE COURT:  USA 8.  Okay.  And I believe that's done,

21   right?

22             MR. SINGER:  That's it, Your Honor.

23             THE COURT:  Okay.  So we have a plan?

24             MR. SINGER:  We have a plan.  Thank you.

25             THE COURT:  All right.  Do we want to bring the jury

1    back in?  Okay.  Let's bring the jury back in.

2         (Jury in at 4:32 p.m.)

3         THE COURT:  Ladies and gentlemen of the jury, while

4    you were out, we took care of a little bookkeeping here, and I

5    think we have a plan for the rest of the afternoon, which is

6    we're going to read some stipulations into the record now.

7         We're not going to have any more witnesses this

8    afternoon, so we're going to get out a little bit early this

9    afternoon, and we'll start tomorrow at 9:00 with another

10   witness in the government's case.  But we just want to take

11   care of these stipulations now.

12        As I instructed you at the outset, the facts that are

13   stipulated too, it means that you should accept them as true

14   and proven.

15        The government and/or Mr. Sittenfeld may refer to these

16   stipulations at various points during the trial.  If they

17   refer back to a stipulation, you should deem that to be a fact

18   that's been established by credible evidence.

19        So go ahead, Mr. Singer.

20        MR. SINGER:  Thank you, Your Honor.  "The parties

21   stipulate that the City of Cincinnati received federal funds

22   in excess of $10,000 under a federal program involving federal

23   assistance during both the 12-month calendar year of 2018 and

24   the 12-month calendar year of 2019.

25        "It is further stipulated and agreed that this

 1    stipulation may be introduced into evidence as an exhibit, and

 2    that the facts herein stipulated have the same status,

 3    dignity, and effect as the undisputed testimony of a credible

 4    witness."

 5         THE COURT:  So let me just stop you there for a

 6    second, Mr. Singer, and just explain to the jury that to the

 7    extent -- just to use this as an example.

 8         To the extent that there is some issue in this trial

 9    where it matters whether the City of Cincinnati has received

10    federal benefits in excess of $10,000 during a 12-month

11    calendar year period, which may be one element, certainly not

12    the only element but may be one element of one of the charges

13    here, you can deem that fact to have been proven at trial.  Do

14    you see how that works?  Makes sense?

15         Okay.  Go ahead, Mr. Singer.

16         MR. SINGER:  "The parties stipulate that in calendar

17    years 2018 and 2019, the City of Cincinnati was a local

18    government in the State of Ohio, and Defendant Alexander

19    Sittenfeld was an elected official serving on Cincinnati City

20    Council, and was paid by the City of Cincinnati.

21         "It is further stipulated and agreed that this

22    stipulation may be introduced into evidence as an exhibit, and

23    the facts herein stipulated have the same status, dignity, and

24    effect as the undisputed testimony of credible witnesses."

25         THE COURT:  Are you going to go on?

1          MR. SINGER:  Yes.

2          THE COURT:  6, right?

3          MR. SINGER:  Yes, page 6 of 9.  "The parties

4    stipulate to the admissibility of the Verizon phone records

5    produced by the government in discovery for Kingsley

6    Investment Group, phone number 614-753-1491, which was used by

7    Chinedum Ndukwe; and Deborah Coyne, phone number 513-365-2404,

8    which was used by Alexander P.G. Sittenfeld.

9      "It is further stipulated and agreed that this

10   stipulation may be introduced into evidence as an exhibit, and

11   that the facts herein stipulated have the same status,

12   dignity, and effect as the undisputed testimony of credible

13   witnesses."

14          THE COURT:  Mr. Singer, does that stipulation relate

15   to any particular exhibits?

16          MR. SINGER:  Yes, Your Honor.  This relates to

17   USA Exhibit 6 and USA Exhibit 7.

18          THE COURT:  Are you moving for the admission of those

19   exhibits?

20          MR. SINGER:  I am, Your Honor.

21          THE COURT:  Any objection?

22          MR. C. MATTHEW RITTGERS:  No, Your Honor.

23          THE COURT:  USA 6 and USA 7 are admitted without

24   objection.  Those exhibits will be phone records from Verizon.

25   And what the stipulation means is that if you see in one of

1    those phone records the phone number, for example,

2    614-753-1491, you can assume it's been proven to you that that

3    phone number belongs to Kingsley Investment Group, and that

4    that phone number is used by Chinedum Ndukwe, okay? That's

5    what the stipulation means.

6        I'm sure that the parties may refer to this stipulation

7    from time to time again, but when you -- that's just been

8    established. They don't have to keep establishing that that

9    phone number belongs to that person. All right.

10       Go ahead, Mr. Singer.

11           MR. SINGER: Thank you, Your Honor. This is the last

12   one for this evening.

13       "The parties stipulate to the admissibility of AT&T phone

14   records produced by the government in discovery for Laura

15   Brunner, 513-702-5927, which was used by Laura Brunner.

16       "It is further stipulated and agreed that this

17   stipulation may be introduced into evidence as an exhibit, and

18   that the facts herein stipulated have the same status,

19   dignity, and effect as the undisputed testimony of credible

20   witnesses."

21           THE COURT: Mr. Singer, does that stipulation relate

22   to any particular exhibit?

23           MR. SINGER: Yes, Your Honor, USA Exhibit 8.

24           THE COURT: Are you moving for the admission of that

25   exhibit?

```
 1              MR. SINGER:  Yes, Your Honor.

 2              THE COURT:  Any objection, Mr. Rittgers?

 3              MR. C. MATTHEW RITTGERS:  No, Your Honor.

 4              THE COURT:  USA 8 is admitted without objection, and

 5    the jury is advised that to the extent those AT&T phone

 6    records refer to telephone number 513-702-5927, that is the

 7    phone number for Laura Brunner, and it is the phone that

 8    Ms. Brunner used.

 9              MR. SINGER:  Thank you, Your Honor.

10              THE COURT:  Is that it for the jury this afternoon?

11              MR. SINGER:  Yes, Your Honor.

12              THE COURT:  Okay.  So we're going to release you

13    early today.  We are going to start at 9:00 tomorrow, so try

14    to be here -- well, is there anyone for whom being here by

15    8:50 will present a problem?  All right.  Seeing no one,

16    please be here by 8:50.  Where do they assemble?

17              COURTROOM DEPUTY:  Jury assembly room, 914B.

18              THE COURT:  Please assemble in 914B by 8:50.  We'll

19    try to bring you down promptly at 9:00 and begin.

20         I need to give you your favorite admonition.  Please do

21    not begin to form any opinion about anything you've heard in

22    this case.  Please do not discuss this matter or any of the

23    evidence you've heard with anyone, including your fellow

24    jurors, including family members, including anyone you meet on

25    the street, anything of that nature.  You just can't
```

1    communicate about this case.

2         Please do not do any research on your own by any

3    electronic means or any other means with regard to any of the

4    information that you've heard today, or with regard to the

5    charges that are at issue in this case.  The only evidence

6    that you should consider is the evidence that you'll hear in

7    this courtroom.  And it's very important that you not try and

8    do any separate investigation on your own.

9         Finally, to the extent anyone should approach you to

10   attempt to discuss this case, please advise the Court that

11   that has occurred, but do not discuss it with your fellow

12   jurors, all right?

13        Everybody have a good night.

14        (Jury out at 4:39 p.m.)

15        THE COURT:  Was there another matter we wished to

16   discuss on the record this afternoon?  I believe it was

17   related to one of the other stipulations?

18        MR. C. MATTHEW RITTGERS:  Your Honor, we mentioned it

19   earlier this morning, and it was about -- we didn't want to

20   force the government to have to bring the stenographer about

21   the accuracy of those exhibits, but we also don't want to

22   remove our objections about the rule of completeness.

23        Mr. Schuett has a memo regarding segments that the

24   government -- I believe what you gave us in Agent Holbrook's

25   agent binder is what you intend to produce with him and

 1    nothing more in terms of the tapes?

 2          MS. GAFFNEY PAINTER:  Your Honor, I know, according

 3    to your standing order, that parties are to address the Court

 4    and not each other.

 5          THE COURT:  Yes.

 6          MS. GAFFNEY PAINTER:  So may I respond to that?

 7          THE COURT:  You may, yes.

 8          MS. GAFFNEY PAINTER:  The portions that we have

 9    identified as exhibits in the binder are the portions that we

10    intend to admit through Special Agent Holbrook.

11          MR. C. MATTHEW RITTGERS:  Thank you.  There's a memo

12    that we put together with what we think should also be played

13    with that, pursuant to the rule of completeness.  Am I correct

14    on that?

15          MR. SCHUETT:  Yes.  Your Honor, if I may.  As a call

16    back to the motion in limine ruling, you had deferred some

17    judgment on our motions regarding 8033 and rule of

18    completeness to see what was or was not played.

19       And so I styled it as a bench brief.  I can send that

20    to -- I can file that.  I can email it to both parties.  Did

21    you want to wait until this was actually an issue in front of

22    the jury?

23       We just didn't know how you wanted -- we presumed that

24    you would want to -- not tonight, so that you could look at

25    it, which is fine.

1          THE COURT:  Is this material that we anticipate will

2     be played tomorrow?

3          MR. SCHUETT:  Based on what we were given in that

4     folder, yes, it is.

5          THE COURT:  So I guess my concern is, at this

6     juncture, even if additional material should be played -- I

7     guess I don't know how the government is anticipating playing

8     this material.

9       Do you have the whole transcript and you're just going to

10    play time portions of it, or how do you have it prepared for

11    use for the jury?

12         MS. GAFFNEY PAINTER:  There are two exhibits for

13    which we will seek to admit the entire audio recording but

14    will play just a segment for the jury and note it as such

15    within a transcript.

16      And for the rest of the audio portions that we intend to

17    admit, if they are edited or redacted in some way, we intend

18    to admit those, just those portions.

19      Now, all of these redactions and cuts will be noted in

20    the transcript.  We make it very clear in the transcript what

21    time stamp we're starting at and what time stamp we're

22    stopping at.

23         THE COURT:  So let me just stop you there for a

24    second.  So are your additions with respect to things where

25    the government is admitting the entirety of the transcript but

1     only playing portions of it, or do you also have parts where

2     the government has -- where the government's exhibit is not

3     the entirety of the transcript?

4          MR. SCHUETT:  I understand the question.  Our

5     objection is to the truncation or their stopping a transcript,

6     you know, and then perhaps starting it again, like we saw with

7     the scotch and cigars event.

8          THE COURT:  Okay.  So I guess I didn't ask that

9     question very artfully.  It sounds to me like there are like

10    what I'll call two categories of exhibits that the government

11    has.

12    Category 1 is exhibits where the government is admitting

13    the entirety of a conversation as an exhibit but proposing to

14    publish to the jury only portions of it, even though the

15    entire thing is admitted.

16    But there are other exhibits, this is category two, as to

17    which the entirety of the government's exhibit is a portion of

18    a conversation.

19    So if the Court were to say, oh, government, go on and

20    play additional parts, they may not be able to because they

21    don't have it in their exhibit.

22    So I'm wondering, are all of your objections only as to

23    category one, or are some of them as to category two as well?

24         MR. SCHUETT:  If I'm understanding, I think it's --

25    really the issue is category two, which I understand they

1    wouldn't have prepared because it's something they've trimmed.

2        So, again, that was part of the issue, how we wanted to

3    address that, which is why we're bringing it up now.

4            THE COURT:  No.  I appreciate it.  I guess I'm just

5    not sure how the government would prepare new -- even if the

6    Court were to say yes, as a matter of completeness, it should

7    be played now and there isn't a hearsay problem with it, or

8    something of that nature, just as a matter of trial procedure,

9    how would all that get done by tomorrow, I guess is my

10   question?

11           MR. SCHUETT:  I mean, I don't have that answer,

12   unfortunately.  Again, that was why I wanted to address is

13   this something that we're supposed to be objecting in the

14   moment?  You know, is there a manner that you want us to

15   approach that now?

16           THE COURT:  Well, I guess -- I mean, I thought what

17   we had discussed at the final pretrial conference was that the

18   government was going to indicate what portions it was going to

19   play, and then you were going to indicate in advance what

20   additional portions you would want played, and then I was

21   going to try and sort that out.  But maybe that isn't what

22   people took out of the final pretrial.  That's fine.  I'm just

23   trying to figure out where we're at now.

24       Even if I were to agree with you, I'm just not sure how

25   we could implement it by tomorrow.  I guess I can give you a

1    standing objection to the truncation of the exhibits, but I

2    just don't know what else we can do at this juncture.  Do you

3    have any ideas, Ms. Gaffney Painter?

4         MS. GAFFNEY PAINTER:  Well, first, Your Honor, just

5    two points I'd like to clarify for the record.

6         First of all, there is a third category of recordings.

7    Those are complete recordings that will be admitted in their

8    entirety, and they will be played in their entirety, just so

9    we're understanding the universe of recordings that we're

10   admitting here.

11        THE COURT:  Yeah.  I don't believe Mr. Sittenfeld has

12   any objection to category three.  I was just trying to

13   distinguish between categories one and two, as to which he has

14   objections.

15        MS. GAFFNEY PAINTER:  Absolutely.  I just wanted that

16   to be clear so that everybody is --

17        THE COURT:  That's fine.

18        MS. GAFFNEY PAINTER:  And second, when you referenced

19   the final pretrial conference, that was the government's

20   understanding, that by producing the exhibit binders to the

21   defense and very clearly delineating where these cuts were

22   made, that was their opportunity to come to us and say we

23   believe under the rule of completeness this is an unfair edit.

24        So we would request whatever steps are taken, they are

25   taken promptly and not in front of the jury, when they've been

1    on notice since they received the binders what we intended to

2    admit.

3           THE COURT:  When did they receive the binders, just

4    for the record?

5           MS. GAFFNEY PAINTER:  Last Thursday, Your Honor.

6           MR. C. MATTHEW RITTGERS:  Four days ago.  Thursday

7    night, four days ago.  So we've prepared this memorandum that,

8    I think, is not long, and we just highlight a couple things

9    that we think should be played additionally, and how the Court

10   wants to deal with that, obviously defer.

11          THE COURT:  Well, do you have a copy of the memo?

12          MR. SCHUETT:  Yes.

13          THE COURT:  Can you provide a copy to Mr. Singer and

14   his team?

15          MR. SCHUETT:  I can email it right now to everybody.

16          THE COURT:  You don't have a hard copy of it?

17          MR. SCHUETT:  I do not have a hard copy.

18          THE COURT:  Can you email it to my chambers and to

19   the government attorneys, please.

20          MR. SCHUETT:  Yes.

21          MR. SINGER:  Your Honor, can chambers print us off a

22   copy?  We don't have a computer with internet access here.

23          THE COURT:  Sure.

24          MS. GAFFNEY PAINTER:  Your Honor, just as a proposal

25   for moving forward.  Would it be appropriate to, perhaps,

1     adjourn for the evening, go back and get our computers, we see

2     what they're proposing, and then we address it perhaps

3     tomorrow morning, rather than waiting here for this?

4          THE COURT:  Well, my only concern on that,

5     Ms. Gaffney Painter, is if they are relatively short adds on

6     relatively few transcript excerpts, and the Court is inclined

7     to include them, if I rule on that tonight, your tech people

8     may have an opportunity to address that tonight; whereas, if I

9     wait until tomorrow morning, I don't see how your tech people

10    would be in a position to do it.

11        So I would like to just get a sense of kind of the

12    magnitude of what we're talking about here.

13        MS. GAFFNEY PAINTER:  Certainly.

14        MR. C. MATTHEW RITTGERS:  And, Your Honor, at least

15    as to bucket one, which is -- if I recall correctly, it is --

16    we have the transcripts in entirety but only a portion could

17    be played.  That might be able to be resolved fairly quickly

18    if we could just play more of that clip.

19        THE COURT:  Right.  But Mr. Schuett indicated that

20    most of them, as I understood it, were in bucket two, which is

21    ones where the government doesn't even have, necessarily, with

22    it in the courtroom the additional material that you want

23    played.

24        Bucket one, the government has it, so if I were to order

25    it played, presumably we could figure out how to make that

1   happen.  But bucket two, tomorrow I don't know that we could

2   make that happen because I don't know if they have the

3   entirety of those transcripts.

4         MR. C. MATTHEW RITTGERS:  Understood.  If I may, Your

5   Honor, we had transcripts that were provided from the

6   government many, many, many months ago.

7         The most recent trial ready transcripts are the trimmed

8   ones, so there is a possibility always go back to the

9   lengthier transcripts, because they do exist with greater

10   volume than the ones that are the trial transcripts.  That's

11   the ones we've been basing a lot of our stuff off of.

12         THE COURT:  I understand that, Mr. Rittgers, but I

13   anticipate that what the government is planning on doing is

14   playing video or audio clips from a flash drive or some other

15   type of device that probably has preselected snippets.

16         And if you were to say, oh, add four seconds to that, I

17   would assume it may not be on a flash drive, so they'd have no

18   way to add four seconds to that unless we put the additional

19   four seconds on tonight.

20         So that's what I'm trying to figure out is, with respect

21   to the ones that are in bucket one, they've got the whole

22   transcript.  So if I say play an additional four seconds, they

23   can just hit play and they'll get another four seconds.

24         But with regard to the ones where they don't have the

25   whole transcript, they won't be able to play another four

1      seconds.  Does that make sense?

2            MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

3            THE COURT:  So I'm just trying to figure out how much

4      falls in which category.

5            MR. C. MATTHEW RITTGERS:  Understood.

6            MR. SCHUETT:  While we're waiting on that, Your

7      Honor, if I may?

8         I anticipate tomorrow, with Special Agent Holbrook, that

9      the government will be offering those secondary evidence

10     summaries that were also a point of contention in the motion

11     in limine.

12        Did you want us to deal with that as they come up, now,

13     or tomorrow morning?

14           THE COURT:  Well, I guess what's hard to know, as I

15     said in my ruling on the motion in limine, I believe that the

16     summaries are admissible if they fairly and accurately

17     summarize material that is too voluminous to conveniently

18     present in court.

19        And I still, as I sit here right now, don't really know

20     if I have a basis for knowing one way or the other how

21     voluminous the material is and how fair the summary is.

22        So if you can identify for me a good way to come to speed

23     on that, I'd be glad to take a shot at it.

24           MR. SCHUETT:  I didn't know, since we were here

25     outside the presence of the jury, look at those summaries now

1    to get that preliminary ruling, or if we needed to ask each

2    one the questions in here --

3              THE COURT:  That's fair.

4              MR. SCHUETT:  -- do that.  That's not relating

5    tomorrow's argument --

6         (Indiscernible crosstalk.)

7              THE COURT:  That's fair.  Are the summary exhibits in

8    the government's exhibits books?

9              MS. GAFFNEY PAINTER:  Yes, they are, Your Honor.

10             THE COURT:  What are they?

11             MS. GAFFNEY PAINTER:  Bear with me a moment to refer

12   to the exhibit list.

13             MR. SCHUETT:  I believe it's 11A, B, C, and 31.

14             MS. GAFFNEY PAINTER:  Yes, that comports.

15             THE COURT:  11A, B, C, and 31; is that right?

16             MS. GAFFNEY PAINTER:  Yes, although there are many

17   31s, so bear with me just a moment.  It's 31A.

18             THE COURT:  Ms. Gaffney Painter, the only one in

19   31 that looks to me to be a compilation or summary would be

20   31A.  Do you have a different view?

21             MS. GAFFNEY PAINTER:  No, that's correct, Your Honor.

22             THE COURT:  So it's 11A, B, C, and 31A; is that

23   right?

24             MS. GAFFNEY PAINTER:  Yes.  That's our understanding

25   of their objection, yes.

1              THE COURT:  Is that the correct objection,

2      Mr. Schuett?

3              MR. SCHUETT:  For 31, Your Honor, 31A as in apple?

4              THE COURT:  Yes.

5              MR. SCHUETT:  Yes, sir.

6              THE COURT:  Yes.  Let me start with what would be a

7      relatively easy one first.  11C, that just appears to be a

8      collection of phone numbers and assigned users.

9              MR. SCHUETT:  No objection to 11C.

10             THE COURT:  So it's really 11A, B, and 31A; is that

11     right?

12             MR. SCHUETT:  Yes, sir.

13             THE COURT:  They all look to be very similar, so I

14     think we can probably deal with them collectively.

15         What's the nature of the objection to A, which appears to

16     be sort of a timeline of some of the context between

17     Sittenfeld and Ndukwe, and it's creating a timeline of when

18     those calls occurred, which I assume came from the Verizon

19     phone records.  Am I right, Ms. Gaffney Painter?

20             MR. SCHUETT:  I'm sorry.  Your Honor, are you on 11A

21     or 31A?

22             THE COURT:  I'm on 11A.  What was the basis for

23     preparing 11A, Ms. Gaffney Painter, if you know?

24             MS. GAFFNEY PAINTER:  Your Honor, in 11A, we

25     identify, as you see in the right-hand column, which exhibit

1       this entry on the timeline is based on.  I believe -- I

2       apologize.  I believe you had a specific question.

3                   THE COURT:  I'm asking what are you purporting to

4       summarize or compile here?  What is this?

5                   MS. GAFFNEY PAINTER:  This is a combination of phone

6       records, of phone recordings, of meeting recordings.

7                   THE COURT:  No.  That's not my question.  That's the

8       source of the information.  What are you purporting to compile

9       here?

10          Is this an exhaustive list of all the contacts between

11      Sittenfeld and Ndukwe between September 21, 2018 and

12      December 23, 2019, or what is it this is purporting to be a

13      summary or compilation of?

14                  MS. GAFFNEY PAINTER:  Yes.  A chronology of contacts

15      for this particular time period.

16                  THE COURT:  So it's all contacts between

17      Mr. Sittenfeld and Mr. Ndukwe between those dates.  Is that

18      what you're saying?

19                  MS. GAFFNEY PAINTER:  Well, I want to be clear.  It's

20      just the interactions or the contacts that we were introducing

21      into evidence.  There may be other contacts that are not

22      embodied in this summary.

23                  THE COURT:  So it's a chronology of all of the

24      contacts between Mr. Sittenfeld and Mr. Ndukwe that the

25      government is introducing into evidence in this case is what

1    11A is; is that right?

2         MS. GAFFNEY PAINTER:  Well, it's broader than that.

3    There's also contact with UC Rob, UC Brian, UC Vinny, and

4    Ms. Brunner are also contained on this.  So it's broader than

5    Mr. Ndukwe.

6         THE COURT:  So describe for me what it is, then.

7    It's all contacts between who and whom?

8         MS. GAFFNEY PAINTER:  It's relevant contacts in our

9    investigation between Sittenfeld and other relevant witnesses

10   in this investigation between these dates.

11        THE COURT:  Okay.  All of them that you deem relevant

12   between September 21, 2018 and December 23, 2019, but then why

13   is 11B, looks to me to be an overlapping time frame.  Is it --

14   what's listed on 11B that's not on 11A?

15        MS. GAFFNEY PAINTER:  So 11B is a more detailed

16   accounting.  It includes the duration of the contact.  It

17   includes the time in eastern standard time that the contact

18   was made, so it is a more detailed snapshot of 11A.

19        THE COURT:  So every line entry on 11B also appears

20   on 11A, although the converse isn't true; is that right?

21        MS. GAFFNEY PAINTER:  That's my understanding, Your

22   Honor.

23        THE COURT:  And it just provides additional details

24   about one of those calls.

25        So, for example, the first line on 11B is October 28,

1    2019, at 3:26 p.m., "Sittenfeld asks UC Rob for UC Vinny's

2    number."

3        So on October 28, 2019, we should see a call from

4    Sittenfeld to UC Rob; is that right?

5            MS. GAFFNEY PAINTER:  Yes.

6            THE COURT:  Or a text.  I guess it's a text?

7            MS. GAFFNEY PAINTER:  Yes.  So if you're going to

8    page 2 of 11A.

9            THE COURT:  Yes.

10           MS. GAFFNEY PAINTER:  And you go five lines from the

11   bottom, you'll see Sittenfeld texts UC Rob, you see a 32A,

12   same date, same reference source.

13           THE COURT:  And then where -- on the next line on 11B

14   is UC Rob responds to Sittenfeld's request.  Where is that on

15   11A?

16           MS. GAFFNEY PAINTER:  So it is contained, in that it

17   would be in that same exhibit 32A.  That's a text exchange.

18   So if you need to --

19           THE COURT:  I see.  So it's not really Sittenfeld

20   texts UC Rob, but there's an exchange of text messages between

21   Sittenfeld and UC Rob?

22           MS. GAFFNEY PAINTER:  Yes, that's right.  We could

23   add that qualifier if that's helpful.

24           THE COURT:  So in 11A, every time it says "Person A

25   texts Person B," it might, in fact, refer to a text exchange

1    between Person A and Person B?

2        MS. GAFFNEY PAINTER:  My understanding is the

3    initiation is correct.  You would not see Sittenfeld text

4    UC Rob, when the actual truth is Rob texted Sittenfeld and

5    then he responded.

6        THE COURT:  I see.  But when it says, "Person A texts

7    Person B," that may also include a response from Person B to

8    Person A?

9        MS. GAFFNEY PAINTER:  That's correct.  And you would

10   see that level of detail on 11B, which may not necessarily be

11   embodied in 11A.

12       THE COURT:  So the first four on 11B are all part of

13   that one line of 11A, it looks like?

14       MS. GAFFNEY PAINTER:  Yes, that's correct.  This is

15   the essence of the text exchange that occurs on October 28th.

16       THE COURT:  Gotcha.  Okay.  And, Mr. Schuett, what's

17   the nature -- now that we have an explanation of 11A and 11B,

18   what's your concern about it?

19       MR. SCHUETT:  Well, I mean, first, Your Honor, they

20   are cherry picked in some sense because there are -- I mean,

21   if you look at the October 28th, 2019 event we were just

22   looking at that's in 11B, at the start, that has text messages

23   with UC Rob.  11A just says, "Sittenfeld calls UC Vinny."

24       I mean, that text does not reflect what is in and

25   everything that happened on October 28, 2019.  But there are

 1    also significant events in November of 2019 and December of

 2    2019 with Mr. Ndukwe that aren't on 11A at all, and meetings

 3    that were had and discussions that were had.

 4         So there is some cherry picking on what events were put

 5    into this chronology and then also expanded in 11B and 31A,

 6    which we would argue creates it as an argument and may be

 7    something that they could use in closing argument as a

 8    pedagogical device, if they wanted to highlight certain

 9    things, but should not go back to the jury in the form it is

10    in.

11         Moreover, the only name highlighted is Sittenfeld.  It's

12    in bold, it's in red.  And there are certain events, not all

13    events, that are blue.  Presumably, all of those are devices

14    to draw the jury's attention to the name Sittenfeld to those

15    particular dates, which I would submit have to do with the

16    exchange of checks, the vote of the city council vote in June;

17    again, elements of this government's case.

18         So we would argue that this is, in fact, argument in the

19    way it's presented.  I know it may just seem like it's red

20    font but, I mean, it's an argument, drawing their names --

21    they didn't put UC Rob ever in red text.  They didn't

22    highlight dates, or even include that Mr. Sittenfeld rejected

23    their checks.  That's not mentioned at all.

24         So while this may be a pedagogical device for closing, we

25    would object that this is a summary, a secondary summary,

1    based on *Bray* and 106.  It should go back to the jury because

2    it's requiring inferences and arguments.  It's also cherry

3    picking.

4          MR. C. MATTHEW RITTGERS:  Your Honor, may I add one

5    thing just as an example?

6          THE COURT:  Sure.

7          MR. C. MATTHEW RITTGERS:  On 11A, if you look at

8    November 21st of 2018, "Sittenfeld calls UC Rob."  He was

9    returning Rob's call back.  So like that same day, Rob called

10    Sittenfeld, but it looks like Sittenfeld is initiating the

11    contact.

12      So when you leave things out of here, when you don't

13    include all the contacts, there is a perception as who's

14    contacting who is off.

15          THE COURT:  Now that I've seen these exhibits and

16    have an explanation -- what is 31A, Ms. Gaffney Painter?  Is

17    it like 11B, or is it...

18          MS. GAFFNEY PAINTER:  Your Honor, my understanding is

19    that it's similar to 11B.  It's summarizing communications

20    that appear in Exhibit 31.

21      So there are a number of exhibits underneath 31 that form

22    the basis of this, and this exhibit synthesizes those records

23    into a timeline.

24          THE COURT:  Synthesizes a portion of those records, I

25    take it the portions the government thinks is relevant.  Is

```
 1    that fair?

 2          MS. GAFFNEY PAINTER:  I don't believe that it's

 3    synthesized in parts, because if you look at the records in

 4    31, this is 31B through N, these are specific texts, audio

 5    recordings, call transcripts, text exchanges, and they are

 6    embodied in this chart.  It is not a selection.  It is not a

 7    subset of those records.  It represents those records.

 8          THE COURT:  And so I guess, Mr. Schuett, to go back

 9    to you for a second.  You mentioned, I think we were on 11A,

10    and you said November 21, 2018, it says, "Sittenfeld calls

11    UC Rob," and you said that was actually in response to a call

12    from UC Rob to Sittenfeld.

13       If I looked at 18C, though, that would only be the call

14    from Sittenfeld to Rob, not the one from Rob to Sittenfeld.

15    Am I understanding correctly?

16          MR. SCHUETT:  That is part of the concern, yes, Your

17    Honor.  Also with 31A, I mean, again, our concern with red

18    text.

19       And then the blue banner at the top is not contained in

20    the Exhibit 31.  They're highlighting an event that is

21    relevant to an element of their case, and we think that's an

22    argument.

23          THE COURT:  I'm trying to separate things here a

24    little bit.  So this is a correct summary of the exhibit that

25    is listed there.  You just think 18C should have more
```

1   information than it does, it sounds like, or you think there

2   should be another exhibit that has the call from UC Rob to

3   Sittenfeld?

4           MR. SCHUETT:  We would submit that on accuracy it

5   shouldn't be cherry picked.  If they're going to list

6   everything as a chronology, it should list everything that

7   occurred.  This is cherry picking.  And then there's the

8   separate concern of the presentation with the blue and the

9   red.

10          THE COURT:  Well, and I think what I understand,

11  Ms. Gaffney Painter, correct me if I'm wrong, is they, the

12  government, are saying this is not cherry picking, it is

13  everything that the government is going to introduce into

14  evidence in this case.  So that may be cherry picking.  The

15  government may introduce some evidence and not other evidence.

16      But the compilation lists exhaustively every

17  communication that the government is going to introduce into

18  evidence, is that correct, Ms. Gaffney Painter?

19          MS. GAFFNEY PAINTER:  That's correct, Your Honor.

20  And that is the function of that call log, to show the jury

21  and all the parties and the Court where this information came

22  from.

23          MR. SCHUETT:  And my apologies.  This is just for 31A

24  that we are discussing?

25          THE COURT:  No, we're on 11A right now.

 1          MR. SCHUETT:  11A?

 2          THE COURT:  Yes.  So I think they're saying 11A

 3     includes every conversation between Sittenfeld and the other

 4     listed folks that the government is introducing as evidence in

 5     trial in this case.

 6          So 11A is not a cherry pick.  The underlying evidence may

 7     be a cherry pick.  The government may not be introducing every

 8     conversation into evidence, but to the extent it has

 9     introduced a conversation into evidence, it is including it on

10     the compilation.

11          So the compilation is an exhaustive list of the subset

12     that the government is introducing.  Does that make sense?

13          MR. SCHUETT:  I do understand.  Yes, Your Honor.

14          THE COURT:  So what's your objection to that?  So the

15     compilation isn't cherry picked.  You don't like the evidence

16     they're putting in, but the compilation isn't cherry picked.

17          MR. SCHUETT:  But, Your Honor, the secondary evidence

18     summaries are supposed to be something that is summarizing

19     complex and difficult evidence, and is to materially assist

20     the jurors for the better understanding of that evidence.

21     We'd argue it doesn't do that.

22          Moreover, again, even if they just want to list -- so

23     this is some sort of diagram or code to find a particular

24     exhibit, they don't need to highlight Mr. Sittenfeld's name in

25     red.  They don't need to put the blue banner to highlight the

1     specific events that are elements of their case.

2        It could just be a black and white list that is a summary

3     to say if you're trying to find what happened on October 24,

4     2019, you go look at 31K, but it's not.

5             MS. GAFFNEY PAINTER:  Your Honor, may I propose a

6     path forward that I think might end the logjam?

7             THE COURT:  Yes.

8             MS. GAFFNEY PAINTER:  The government is -- we can go

9     back and remove the red color, if that's the issue that brings

10    us here today.  We're also happy to triple check these

11    summaries and make sure that every contact between these dates

12    is embodied in these charts to make sure that we aren't cherry

13    picking from the cherry picking, or whatever the argument is,

14    so I think that we could move this forward.

15            THE COURT:  What about the blue banners, are you...

16            MS. GAFFNEY PAINTER:  We can change that to a gray,

17    if that -- because these are events, or we can remove the

18    gray, if that becomes an issue.

19            MR. SCHUETT:  Your Honor, if I may?  We offered

20    earlier a black and white copy that didn't have any banners,

21    any red.  That was not accepted.

22       I mean, that's what we proposed earlier.  But if we can

23    just neuter any drawing attention to certain things, then that

24    would have been something that we could have worked on, but I

25    would just join in that motion that that's what is done.

1          MS. GAFFNEY PAINTER:  That's what I propose.  And I

2     apologize to Mr. Schuett.  I haven't seen this summary that he

3     has presented to us.  He may have sent it to a colleague and I

4     haven't seen it yet.

5          THE COURT:  Well, it sounds like the parties may be

6     on the way to some kind of agreed resolution, which will make

7     the Court happy; if not, we'll deal with it tomorrow.

8          But I do think, if removing the red from Mr. Sittenfeld's

9     name and removing the blue from the certain entries resolves

10    the dispute and addresses those concerns, it seems like a

11    pretty good resolution to me.

12         And, of course, during closing, you can highlight

13    particular parts in your presentation to the jury, they won't

14    go back to the jury room, but you can certainly do that during

15    closing.

16         MS. GAFFNEY PAINTER:  Thank you, Your Honor.

17         THE COURT:  Are you doing this tonight right now?  By

18    "this" I mean the bench brief, Mr. Singer or Ms. Gaffney

19    Painter?

20         MS. GAFFNEY PAINTER:  That is correct, Your Honor.

21         THE COURT:  Okay.  I'm not sure I understand what

22    this bench brief is, Mr. Schuett, so maybe you can help me.

23         So let's just look at Number 1, Mr. Sittenfeld's original

24    encounter with undercover agents.  There's a statement that's

25    listed there.  Is that the statement you propose adding, or

1      what is this?  I don't understand.

2            MR. SCHUETT:  Yes, Your Honor.  The statements that

3      are included in the brief were the ones that we were proposing

4      be included on the record.

5            THE COURT:  So there's some snippet that the

6      government intends to play from a February 2019 encounter with

7      undercover agents, and whatever that snippet is, the next line

8      after it is, "How can I be helpful as you guys think through

9      opportunities you might be exploring in Cincinnati?"

10           MR. SCHUETT:  I don't know that they are offering

11     anything from February of 2018 on that particular statement.

12     It's my understanding that Mr. Sittenfeld was not a target at

13     that point, so I don't -- that one I don't -- I would not --

14     no, I don't think they intend to offer anything from that

15     date.

16           THE COURT:  Well, then, how under the rule of

17     completeness -- I don't understand.  You're adding new

18     conversations through the rule of completeness, or what?

19           MR. SCHUETT:  The context of -- so when they move

20     forward, it's been a contention of the government that their

21     first meeting with Mr. Sittenfeld was because of Mr. Ndukwe in

22     October of 2018.  That is not actually true.  They had prior

23     conversations in February of 2019.

24           THE COURT:  Well, but to the extent there's a dispute

25     about what was actually true, I think we've got a bunch of

1    people sitting in a box that are supposed to sort that out,

2    and you guys can present the competing versions of it.

3        I'm not going to make factual determinations about

4    disputed issues of fact as an evidentiary ruling.

5            MR. SCHUETT:  Understood, Your Honor.

6            THE COURT:  So the second one -- so these are

7    statements from some conversation as to which the government

8    is introducing part of the conversation, and you would propose

9    adding these statements, Mr. Schuett?

10           MR. SCHUETT:  That's my understanding, Your Honor.

11           THE COURT:  Is this like the next part of some

12   conversation?  I'm a little at sea here because I don't know

13   what's going on.

14           MR. SINGER:  Can I address?

15           THE COURT:  Mr. Singer, that would be great.

16           MR. SINGER:  As you guys were discussing the other

17   issue, I was paging through.

18           THE COURT:  Okay.

19           MR. SINGER:  It appears to me, and Mr. Schuett can

20   correct me if I'm wrong, but the only one that I can see that

21   relates to the rule of completeness would be Number 3, which

22   is Roman Numeral III page 3.  And this is the gift transcript,

23   or recording, that was played in opening.

24           THE COURT:  Right.  That was already played in the

25   opening, and I already ruled on that.  So I think --

1          MR. SINGER:  That's the only one that relates to the

2     rule of completeness, as far as I can tell.

3          THE COURT:  Is that correct, Mr. Schuett?

4          MR. SCHUETT:  My understanding of the government's

5     intention to what they intend to play, it does appear that one

6     would be solely the rule of completeness.

7        This was also in response to Your Honor's ruling on this

8     statement that we intend to offer that could be exculpatory,

9     and if there's another reason and state of mind under 8033,

10    Your Honor.

11         THE COURT:  Well, right.  But to the extent they're

12    admissible as evidence, I don't know that that allows you to

13    play them during the government's case in chief.

14       If they're admissible as evidence, you can circle back

15    and say, well, the government wanted you to hear this.  Here's

16    the rest of it.  As long as it's admissible you can play it.

17       But I think the only way you can force the government to

18    play things in their case in chief that you would want added

19    would be through the rule of completeness.

20         MR. SCHUETT:  I understand, Your Honor.  We just

21    wanted that clarity before that process began.

22       So if I understand what Your Honor is saying, 3 has been

23    ruled on so is, I guess, moot at this point that we will get

24    to play that as far as the rule of completeness.

25       And the rest we should deal with as matters of

1     cross-examination or other presentations that may deal with

2     potential evidentiary issues at that time. Is that correct?

3           THE COURT: Yes.

4           MR. SCHUETT: Okay. I just wanted to make sure I

5     understand how you wanted to proceed. These are the ones that

6     we thought would come up, so I thought I would present it now

7     before we disrupted the trial process.

8           THE COURT: That's fine. And during

9     cross-examination, there may be evidentiary issues. I'm not

10    saying I necessarily agree with you that these are admissible,

11    and you may need a sponsoring witness for them, and you may

12    need to wait for your case to do it.

13       But assuming the witness on the stand is the person who

14    is participating in the phone call or the conversation, and

15    assuming it's admissible, I guess you could, at least, use it

16    for impeachment.

17       I don't know if the government's going to stand firm on

18    the you've got to introduce evidence through your own case

19    part or not, but... Mr. Singer?

20          MR. SINGER: Was the question whether we're going to

21    introduce --

22          THE COURT: Well, no. I mean, look, if there's

23    something that's admissible that comes up on cross, I'd think

24    the general practice would just be it's admitted.

25       You know, if it's only admissible for impeachment, then

1    it isn't admitted.  But if it's admissible as evidence,

2    technically, I guess, you can make somebody recall that

3    witness during their case in chief because they shouldn't be

4    introducing evidence through your case but, boy, is that a

5    rule that's ignored to the point of, you know, non-existence.

6              MR. SINGER:  Can we confer on this overnight, Your

7    Honor?

8              THE COURT:  Yes.

9              MR. SINGER:  As far as that goes?

10             THE COURT:  Yes.

11             MR. SINGER:  Because it doesn't necessarily implicate

12   the rule of completeness.

13             THE COURT:  Yes.  So I think the one that does is 3.

14   And so is there any way the government can just play the

15   complete conversation on 3?

16             MR. SINGER:  I guess that's the question, Your Honor.

17   What I'm taking from the conversation is that based on your

18   ruling related to the opening, that these subsequent minutes

19   of the recording related to the gift are now admissible

20   pursuant to the rule of completeness, although we have not

21   played that portion of the recording yet.

22        And if we put something on the exhibit list, it's not

23   necessarily that we're going to put in every piece of evidence

24   that we put in on our exhibit list.

25             THE COURT:  Right.

 1          MR. SINGER:  So we're a little bit confused as to

 2    where we are now.

 3          THE COURT:  So where we are is if you're going to

 4    play the material with respect to the gifts, I would like you

 5    to play the full content that was played during the opening;

 6    if you're not, you don't need to.

 7       But I think that, in my mind, it completes that

 8    conversation in a fair manner, and I think just where we're at

 9    now, you know, I think that's the best path forward.

10       So other than that, I don't think I've ruled on anything

11    here.  But to the extent you're going to play that snippet,

12    play the parts from those PowerPoints too, which I believe you

13    have, right?  You have those PowerPoint snippets because you

14    got the PowerPoint, right?

15          MR. SINGER:  So pull the snippets from their

16    PowerPoint?

17          MR. C. MATTHEW RITTGERS:  Your Honor, they might not

18    have the most recent one yet.  Yeah, they would have that.  If

19    not, email me, and I will get that.

20          THE COURT:  They have the PowerPoint, don't they?

21          MR. C. MATTHEW RITTGERS:  Yes.  That was objected to.

22    I just want to make sure -- I'm sorry.  I'm tired.  Yes, they

23    have it.

24          THE COURT:  They objected to it.  I overruled it,

25    allowed you to play it.  But, in any event, I believe they

1    have the source content and can add it to their audio file for

2    playing purposes.

3        And of course, you don't have to elicit testimony about

4    any portion you don't want to elicit testimony about,

5    Mr. Singer, okay?

6        So does everybody understand where I'm at on this?

7            MR. SCHUETT:  I believe so, Your Honor.

8            THE COURT:  Mr. Singer?

9            MR. SINGER:  Yes, Your Honor.

10           THE COURT:  Okay.  And everybody has got their

11   objections preserved.

12       And with respect to the rest of this, I guess we'll have

13   to deal with the rest of it after Mr. Singer and his

14   colleagues have had an opportunity to review this memo and

15   figure out where we're going.

16       But it sounds like they're not really rule of

17   completeness stuff, so then I think it just becomes an

18   evidentiary question on cross exam and/or in your case in

19   chief.

20       With that said, is there anything further the parties

21   wish to discuss this evening?

22           MR. SINGER:  No, Your Honor.

23           MR. C. MATTHEW RITTGERS:  Your Honor, the first

24   bucket that we were talking about, going back to the rule of

25   completeness.

1          You know, for example, the September 24, 2019 hotel

2     meeting, I believe the government is attempting -- well, is

3     intending, I should say, to play just a portion of that

4     meeting and not the entirety of a 55-minute meeting that is --

5     well, you heard in the opening statement, has to do with

6     Mr. Sittenfeld pausing projects before the city and the way in

7     which they led up to Vinny entering.  I don't think they're

8     going to include any of that in their presentation.  I just

9     want the Court to be aware of that.

10          THE COURT:  Yeah.  And I think I sort of ruled on

11     that in my motion in limine ruling and at the final pretrial.

12          I do not believe the rule is that the government

13     introduces two minutes of a call, that means they have to

14     introduce the entire 55 minutes.  I just don't think that's

15     the way it works.

16          I mean, there are undercover investigations that involve

17     literally thousands of hours of recorded material.  And to

18     suggest that because the government introduce five minutes of

19     a thousand hours of video means that all thousand hours comes

20     in is sort of going to bring undercover investigation trials

21     to a sort of screeching halt, I think.  So I don't understand

22     the rule of completeness to require them to put everything in.

23          As I said at the final pretrial, to the extent there is

24     something else that dramatically changes the context of the

25     snippet that the government intends to play such that it would

1    be misleading to present it to the jury, I actually think

2    there may even be a 403(b) argument that -- you know, the

3    example I gave where if your client had said there's no way

4    I'm going to say something like if you give me a contribution,

5    I'll get you the votes.

6        And the government just says, I won't play the part where

7    he says if you give me the contribution, I'll give you the

8    votes.  I think that's a 403(b) problem probably, because it's

9    unfairly prejudicial in light of the conversation immediately

10   surrounding it.

11       But I don't think that leads necessarily to a rule that

12   says the entire 55-minute meeting needs to be introduced, so

13   I'm not inclined to do that.

14       But if there are examples like the one I just gave, that

15   was the opportunity I was trying to give you guys after the

16   final pretrial, to identify instances where you thought that

17   was the case, and I haven't seen those yet, so... yes,

18   Mr. Singer?

19           MR. SINGER:  None of those are included in here.

20           THE COURT:  It appears to me to be the case that that

21   is not the contents of the bench brief that I just received

22   today, is that right, Mr. Schuett?

23           MR. SCHUETT:  Your Honor, it is a marriage of the two

24   different motions in limine that we had discussed with the 803

25   and 106, I would agree with your statement, yes, sir.

1          THE COURT:  Okay.  Anything else, Mr. Rittgers?

2          MR. C. MATTHEW RITTGERS:  No, Your Honor.

3          THE COURT:  All right.  I think we can recess for the

4     night

5          (Proceedings adjourned at 5:22 p.m.)

6                    -   -   -

7                C E R T I F I C A T E

8                    -   -   -

9     I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
      is a correct transcript from the record of proceedings in the
10    above-entitled matter.

11

12    /s/ M. Sue Lopreato_____          _____September 30, 2022_____
      M. SUE LOPREATO, RMR, CRR
13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2
OPENING STATEMENTS

3
By Ms. Glatfelter..............................    Page 32
4   By Mr. C. Matthew Rittgers.....................    Page 69

5   GOVERNMENT WITNESSES

6
KEVIN FLYNN
7
Direct by Ms. Gaffney Painter..................    Page 116
8   Cross by Mr. C. Matthew Rittgers...............    Page 130

9   PHILIP DENNING

10  Direct by Mr. Singer...........................    Page 142
Cross by Mr. C. Matthew Rittgers...............    Page 168
11  Redirect by Mr. Singer.........................    Page 173

12                             EXHIBITS

13
GOVERNMENT EXHIBITS

14
Exhibit                                          Admitted
15
1A                                                   121
16  1B                                                   125
2I                                                   184
17  6                                                    191
7                                                    191
18  8                                                    193

19  DEFENSE EXHIBITS

20  D11 to D18                                           184
D698
21  D699

22

23

24

25