1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION
                            -  -  -
3

4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
5              Plaintiff,           : **Jury Trial, Day 3**
                                    : Thursday, June 23, 2022
6          - v -                    :
                                    : 9:00 a.m.
7    ALEXANDER SITTENFELD, a/k/a    :
       "P.G. Sittenfeld,"           :
8                                   :
               Defendant.           : Cincinnati, Ohio
9
                            -  -  -
10                    TRANSCRIPT OF PROCEEDINGS

11     BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                          -  -  -

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               Official Court Reporter
                                 Potter Stewart U.S. Courthouse
24                               100 East Fifth Street
                                 Cincinnati, Ohio  45202
25                               513.564.7679

```
 1                        P R O C E E D I N G S

 2                  (In open court at 8:56 a.m.)

 3                            -  -  -

 4           THE COURT:  Good morning.  We're once again here this

 5      morning in the matter of the United States of America versus

 6      Alexander Sittenfeld.  It's case number 1:20-cr-142.  We're

 7      here for the third day of trial.

 8           Is there anything we need to address before we bring the

 9      jury in?

10           MR.  SINGER:  Yes, Your Honor.  We have a number of

11      issues, some of which we discussed last night relating to the

12      bench memo.

13           That one that's related to the bench memo that the

14      defendant filed last night or presented to the Court last

15      night, and subject to our discussions related to additional

16      transcripts and recordings that they would like to be played.

17      I think there were nine total.  We didn't substantively

18      address any of them.

19           Is it the Court's preference to go through these?  Some

20      of them we have addressed and that we will be presenting

21      through our case agent a couple.

22           One we're going to cut a portion of, and then a

23      significant number of them we believe there are no hearsay

24      exceptions to, and we would object to them being played in our

25      case in chief.
```

1          We can argue over admissibility in the defense case, if

2     they want to present it then.  I don't know that we need to

3     argue about that now, but we would object to them being put

4     into the government's case.

5          THE COURT:  I think I agree with everything you just

6     said, in the sense -- I'm not sure I agree with your argument

7     on admissibility, but I agree that I don't intend to allow the

8     defense to, highjack is a strong word but, you know,

9     supplement the government's case with their case.

10         If they want to introduce additional portions of the

11    tapes in their case, and there are exceptions to hearsay and

12    the evidence is otherwise admissible, I will allow them to

13    introduce it in their case.

14         But that's something that seems to me we can discuss when

15    they're going to put on their case and we don't need to

16    address now.

17         My intent would be to -- other than the portion we talked

18    about, which is the rule of completeness issue, which I think

19    under 106 does come in at the same time as the evidence is

20    introduced.

21         As we discussed last night, I think the rest of them are

22    not about rule of completeness, but rather were just their

23    desire to have additional evidence, which may or may not be

24    admissible, and I don't think it's appropriate to have that

25    put on in your case in chief anyway.  So I think we can defer

1    that conversation until their case.

2        But I'm glad to hear further from you on that, and also

3    will hear from the Rittgers on that, so...

4            MR. SINGER:  That sounds good to the government.  The

5    only thing I would note is the one clip related to the rule of

6    completeness, we're actually not going to present that now in

7    our case in chief.

8            THE COURT:  Okay.

9            MR. SINGER:  So that segment relating to the gifts,

10   we're not going to play.

11           THE COURT:  Okay.  Well, then, of the nine, that was

12   one of them, I believe.

13           MR. SINGER:  That's correct.

14           THE COURT:  So you're not going to play that, so then

15   the rule of completeness doesn't come in to play at all with

16   regard to that.

17       And I think, with regard to the other eight, the question

18   wasn't rule of completeness so much as admissibility, and I

19   believe that will be an issue for their case in chief.

20           MR. SINGER:  Correct.

21           THE COURT:  But I would hear from the Rittgers, I

22   don't know which, Charlie H. or Charlie M., would you like to

23   be heard?

24           MR. C. MATTHEW RITTGERS:  No, Your Honor.

25           THE COURT:  Okay.

```
 1              MR. SINGER:  We had to create new transcripts for

 2    that section that we're now playing.  We also have transcript

 3    binders, Your Honor, for each juror.

 4              THE COURT:  Okay.

 5              MR. SINGER:  For the audio, in particular, to play

 6    them both at the same time was a challenge, so we have a

 7    tran- -- all the transcripts that we're admitting into

 8    evidence, we have a transcript binder for the jurors.

 9         We swapped out the new transcripts.  I'll provide copies

10    of the new transcripts to defense counsel.  We'll have to put

11    a new one in the original binder, but that is --

12              THE COURT:  And the new one is to add material that

13    Mr. Rittgers identified yesterday as material that he'd --

14              MR. SINGER:  That was actually to delete material

15    that we're not going to put in.

16              THE COURT:  Oh, I see.  Okay.  So you're not offering

17    certain transcripts into evidence?

18              MR. SINGER:  Correct.

19              THE COURT:  Okay.

20              MR. SINGER:  One of the proposals from the defense

21    was an extension of a section of a May 2nd clip that we had

22    already had in.  We don't have a transcript for that, but

23    we're willing to continue playing that section that they want

24    to play, so I'll lay this out here.

25         On May 2nd, we have a minute clip, and they requested
```

1    that we play the next minute or so.  We're happy to play that

2    next minute.  We have to recut it, and we're sort of in the

3    process of doing that right now, but we don't have a

4    transcript for that portion.

5           THE COURT:  Mr. Rittgers?

6           MR. SINGER:  And the transcript that was provided in

7    the document yesterday, it's not usable.  It's not accurate.

8           MR. C. HENRY RITTGERS:  I have just one question, and

9    that is, is the government proposing to give the transcripts

10    to the jurors, all of them, before we hear testimony as to

11    each transcript?

12           THE COURT:  I think, as I -- well, I'll ask

13    Mr. Singer.

14           MR. SINGER:  We'll, we've got binders.

15           MS. GAFFNEY PAINTER:  Your Honor, when we presented

16    these transcripts, we were intending to seek not only the

17    limiting instruction the parties agreed to, but also an

18    instruction from the Court to the jurors that they are not to

19    go to the next tab until you have admitted that exhibit and

20    they are permitted to do so, so that they would work -- rather

21    than continually interrupting the trial to give them new

22    transcripts, we would instruct them just not to look ahead

23    until that exhibit is admitted.

24           THE COURT:  Mr. Rittgers?

25           MR. C. HENRY RITTGERS:  I don't like it.  I think

1    there's no guarantee that they won't go forward.  I think

2    that, as each transcript is discussed by their agent, then

3    that transcript should be given to the jury if they want to

4    give it to the jury at that time.

5         THE COURT:  Are these transcripts that are being

6    admitted by stipulation or not?

7         MS. GAFFNEY PAINTER:  Well, this brings us back to

8    the contents of the stipulation.  These are transcripts that

9    both parties have agreed are accurate.  So the government was

10   intending to admit those transcripts into evidence, as we

11   discussed last evening.

12        MR. C. MATTHEW RITTGERS:  Your Honor, my

13   understanding was that the Court's order was we will listen to

14   the audio in court, and if there's any discrepancy between the

15   transcript and the audio, that we would raise it to you at

16   that time.

17        And, for example, I mean, even this morning, there was a

18   November 2018 interaction we were listening to.  There's

19   something where it just cuts out, the unintelligible, it just

20   says UI.  And it says, "It's a good development for the city,"

21   and that's cut out.

22        So that would be an example where the jurors are reading

23   the transcripts.  Some people are more visual than audible,

24   and it doesn't even say that in the transcript.  We would

25   bring that to your attention after hearing it played in open

1    court, and then object to a discrepancy between the tapes and

2    transcripts.

3         THE COURT:  So now I'm confused.  I had understood

4    your colleague to be suggesting that the transcript be handed

5    out at the time the audio is being played, but now I

6    understand you to be saying that even if we do that, there's

7    problems with the transcripts.

8      So now what are you proposing as the way in which we put

9    this information in front of the jury?

10        MR. C. MATTHEW RITTGERS:  I believe that counsel

11   needs to, especially now that things have been clipped out of

12   transcripts that I haven't seen yet, I think that we should

13   have an opportunity to hear something played in open court

14   while we see the transcript, before the government can move to

15   present that to the jury.

16        THE COURT:  So now there's not a stipulation as to

17   the transcripts?  I thought there was a stipulation as to the

18   transcripts?

19        MR. C. MATTHEW RITTGERS:  My understanding as to the

20   stipulations as to the transcripts was solely so that the

21   government didn't have to bring a stenographer in for

22   authenticity purposes, but we were going to deal with any

23   accuracy or discrepancy issues in open court.  That was my

24   understanding.

25        THE COURT:  I thought there was some -- maybe I'm

1    wrong.  I thought there were some transcripts as to which

2    there was no dispute as to the accuracy.

3         MR. C. MATTHEW RITTGERS:  I don't know what the

4    government's planning on playing right now and what they've

5    cut out.  And there are certain things in these transcripts

6    that are, you know, missing; that if we hear it in open court,

7    we'll jot it down and say, you know, this is not included in

8    the transcripts.

9         THE COURT:  So who's the "we" when we hear in open

10   court?  Is that going to be the jury, or just the Court and

11   counsel?

12        MR. C. MATTHEW RITTGERS:  Court and counsel.

13        THE COURT:  This is new and different from what we've

14   discussed.  I'm a little confused.

15        MR. SINGER:  It's inconsistent with the stipulation.

16   We've stipulated to the accuracy of the transcripts.  We've

17   cut out less than a minute of one transcript, I've got a copy

18   of it here, of the new transcript here.  We didn't add any,

19   just deleted certain portions that we're now not going to

20   play.

21        THE COURT:  I mean, Mr. Rittgers, I'll refer you to

22   the stipulation that was filed before this trial began,

23   "Unless specifically noted by the parties during trial, the

24   parties agree to the accuracy of the government's transcripts

25   of recordings played at trial."  So what did that mean?

```
 1          MR. C. MATTHEW RITTGERS:  The "during trial" part is

 2    what I believe would be our opportunity to object, because we

 3    would then hear what's played in open court and compare it to

 4    the transcripts as we read along.

 5          THE COURT:  Well, you're supposed to specifically

 6    note parts of the transcript that you think are not accurate.

 7    It says, "Unless specifically noted, the parties --" what does

 8    it mean -- "the parties agree to the accuracy"?  What does

 9    that mean?

10          MR. C. MATTHEW RITTGERS:  Your Honor, to be very

11    frank, I was not involved in the communication between

12    Mr. Sittenfeld and Mr. Schuett on this.

13          THE COURT:  Well, Mr. Schuett is here, right?  So,

14    Mr. Schuett, what does that mean, "The parties agree to the

15    accuracy"?

16          MR. SCHUETT:  Yes, Your Honor.  Mr. Singer and I were

17    discussing there are some places where it does say you, I, and

18    if -- at least my understanding was, if we felt that that was

19    something that was intelligible, that could be addressed.

20      I believe there was also built into the stipulation a

21    jury instruction to go by what they hear instead of what they

22    read.

23          THE COURT:  Yes.

24          MR. SCHUETT:  So we were -- because we got some of

25    the transcripts, again, on Thursday, to go through everything
```

1    was hard.  We did try to focus in on ones that we thought were

2    material and address those before the stipulation.

3        But it was my understanding that if something came up

4    that we thought was material, as opposed to, for example, a

5    CVB as in boy in the transcript, instead of CVV, or something

6    like that, which may be immaterial; that if a material issue,

7    where things like the UI, unintelligible, could be addressed

8    at that moment.  And so that is my understanding of what we

9    were doing.

10       But again, there is also the instruction that says trust

11   their ears.

12           THE COURT:  Absolutely.

13           MR. SCHUETT:  And I think part of this is just

14   procedure how to handle that issue, as opposed to a

15   disagreement that somehow the trial transcripts are inherently

16   inaccurate, but how we handle things like UI when it is

17   intelligible.

18           THE COURT:  Okay.  So you understood that you were

19   stipulating to the accuracy of the transcripts; is that right?

20           MR. SCHUETT:  Unless it was something that came up

21   that we thought was material, because we didn't know

22   everything that they were going to play or not play.  So if it

23   came up and it was material, that we would have the ability to

24   address that because it was material, as opposed to, say,

25   immaterial things about --

1          THE COURT:  Okay.  So under that view, then, it seems

2     like it would be appropriate for the jury to have the

3     transcripts, and then if somebody raises an issue, we can

4     address that issue with the jury.  And, of course, I will

5     instruct them to rely on what they hear and not what they

6     read.

7       But it seems like this whole stipulation contemplates the

8     jury having the transcripts at the time the audio is read

9     because, otherwise, the instruction doesn't even make any

10    sense.

11         MR. SCHUETT:  It would certainly happen at some

12    point.  I don't know if it was contemplated contemporaneous

13    with when they were hearing it, but if they would happen at

14    some point and be comparing them, that is true, Your Honor.

15         MR. SINGER:  Your Honor, it would be wildly

16    inefficient to play a recording, and then play it again with

17    them having the transcripts.

18         THE COURT:  I agree.  How many minutes are we

19    anticipating playing of audio or video?

20         MR.  SINGER:  Total minutes, Your Honor?

21         THE COURT:  Yes.

22         MR. SINGER:  Hours.  The November 7th recording in

23    itself is an hour.

24         THE COURT:  Okay.  Well, so what I'm going to do is

25    I'm going to provide the jury with the notebooks, the

1    transcripts, and I'm going to specifically instruct them not

2    to look at any tab, other than the tab that's being played at

3    the given time.  If anybody notices anybody flipping through

4    the books, please bring it to my attention.  But I'll pretty

5    strictly advise them that they need to just try to follow

6    along with what's going on, and not peek ahead, or do anything

7    of the sort, keep up with what's being played in court as it's

8    being played.

9          Your objection to that is noted, Mr. Rittgers.

10         MR. C. HENRY RITTGERS:  Thank you, Your Honor.

11         THE COURT:  But from an efficiency standpoint, I

12   don't see any other way around it.

13         Now, to the extent the parties believe that there is a

14   discrepancy, I think, probably what the appropriate thing to

15   do would be to object, stop the playing, deal with the

16   discrepancy, and move on, unless somebody has a different

17   idea.  Mr. Singer?

18         MR. SINGER:  That sounds good.

19         THE COURT:  Mr. Rittgers?

20         MR. C. HENRY RITTGERS:  We don't have a problem with

21   that, Your Honor.

22         THE COURT:  Very good.

23         MR. C. MATTHEW RITTGERS:  Would it also be possible,

24   Your Honor, just so that we don't interrupt, to do it at the

25   very end, after it stops just come at sidebar, just in case.

1  We don't want to interrupt.

2      THE COURT:  Sure.  That's fine.  I would prefer that,

3  I just didn't want to deprive you of the opportunity to

4  address it immediately if you want.

5      I think, in some ways it makes more sense to do it at the

6  end, and then we could fix it.  But if you feel the need to do

7  it on the fly, I don't want to interrupt your ability to do

8  that.

9      MR. C. MATTHEW RITTGERS:  Thank you.

10      MR. SINGER:  The other issue is, Your Honor, we

11  addressed the summaries, removed bold and shading.

12      THE COURT:  Good.

13      MR. SINGER:  Provided that to defense counsel.

14      MR. C. HENRY RITTGERS:  That is correct, and we're

15  fine with the edits.

16      MR. SINGER:  Great.

17      THE COURT:  So the summaries are now going to be

18  admitted without objection; is that right?

19      MR. C. HENRY RITTGERS:  Well, I didn't say that.  I

20  didn't say that, no.  But if the Court is inclined to admit

21  them, assuming that they're admissible, we don't have a

22  problem with the form that they have taken.

23      They've taken out all the red for Sittenfeld, they've

24  taken the blue banners out.  It's just a neutral document.

25      MR. C. MATTHEW RITTGERS:  But there's narration in

1      there that we will make an objection.

2           MR. C. HENRY RITTGERS:  Yeah, there is narration in

3      there, evidently, that we will object to.

4           THE COURT:  Well, when are you going to do that?

5           MR. C. HENRY RITTGERS:  Well, do you want us to

6      handle that now?  What are we talking about here?

7           MR. C. MATTHEW RITTGERS:  Your Honor, it's the same

8      thing we talked about, I believe we were on record yesterday,

9      where they would designate certain events when they happened.

10          And so, for example, you know, one, we don't think that

11     this timeline is too voluminous that needs to be summarized.

12          THE COURT:  Yeah, the Court disagrees on that

13     objection, so that objection is overruled.

14          MR. C. MATTHEW RITTGERS:  Okay.  And then the other

15     contextually, when I refer to narration.  For example, we now

16     have one thing in here, which I believe is new from yesterday.

17     The November 21st, 2018 was one example I gave yesterday for

18     the Court.

19          THE COURT:  What exhibit are you looking at,

20     Mr. Rittgers?

21          MR. C. MATTHEW RITTGERS:  11A, Your Honor.

22          THE COURT:  Okay.  And what date?

23          MR. C. MATTHEW RITTGERS:  November 21st of 2018.

24          THE COURT:  Okay.

25          MR. C. MATTHEW RITTGERS:  So when we were discussing

1    yesterday on the record and gave the Court one example where

2    the document says, "Sittenfeld calls UC Rob."

3         THE COURT: Yes.

4         MR. C. MATTHEW RITTGERS: Today, because I raised

5    that yesterday, I believe now it says, November 21st, 2018,

6    "UC Rob leaves Sittenfeld a voicemail." That gives this more

7    context.

8         And what I'm telling the Court, without going through

9    every single one, is that when you leave that stuff out, which

10   now that particular date has that in there, that this does not

11   accurately reflect who initiated contact with who because

12   there's so much left out of this.

13        This is not a complete contact list for the time frame

14   from September 21st of '18, through December 23rd of 2019. It

15   was selected based on what I know they plan to play in open

16   court, but this document leaves out other contacts.

17        THE COURT: I understand that. I had understood from

18   the government yesterday that this is a complete list of the

19   communication that the government is going to be introducing

20   at trial. Am I incorrect in that understanding?

21        MR. SINGER: That's correct. And we made the

22   addition in response to the defendant's concern about that

23   particular issue.

24        THE COURT: So it only purports to summarize, as I

25   understand it, the evidence that the government is putting in,

1    and I believe -- unless you've got some basis for suggesting

2    otherwise, I believe it is an accurate summary of the

3    communications that the government intends to put in, which I

4    believe to be too voluminous to conveniently -- well, I

5    believe are sufficiently voluminous that this would be helpful

6    to the jury in organizing it.

7       I mean, I don't know that it purports to be the entire

8    chronology. It's a chronology of the communications that the

9    government deems to be relevant.

10      And if you deem other things to be relevant and you think

11    this chronology is incomplete, that's certainly an argument

12    you can make to the jury, that the government is cherry

13    picking what they're putting in front of you, this is an

14    incomplete and misleading chronology, once you admit that,

15    whatever, that's fine.

16      But I think, you know, if the government wrote a book,

17    and they put a table of contents in front of the book, and

18    it's got Chapters 1 through 17, and you say, you know, there

19    really should have been a Chapter 18 and 19, that's not a

20    complaint about the table of contents, that's a complaint

21    about the book.

22      And I think this summary is a table of contents of the

23    government's case, and so I think it's accurate in what it

24    purports to be, I just think you think the book should be more

25    complete.

1          MR. C. MATTHEW RITTGERS:  I don't disagree, Your

2     Honor, in terms of the purporting to be.

3          We would respectfully request that the Court instructs

4     the jury that this is not the all-inclusive list of

5     communications between these dates, and this was selected by

6     the government to show what they've shown them in court, but

7     it's not inclusive of all these contacts, because the jury

8     looking at this document does not know that.  It just says

9     chronology.

10          THE COURT:  Right.  So I assume, at some point, the

11     government is going to try to introduce this through some

12     witness, and they're going to ask the witness to identify what

13     this document is.  And the witness will explain what this

14     document is, and then they'll move to admit it.

15          If the witness's explanation is not sufficiently close to

16     what I just said, I will supplement what the witness said and

17     explain to the jury that this is a chronology of the

18     communications that the government is producing, and it

19     doesn't purport to be all of the communications between

20     Mr. Sittenfeld and these persons.  So I would assume the

21     witness will admit that but, if not, it would be made clear to

22     the jury.

23          MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

24          THE COURT:  Okay.

25          MR. SINGER:  Two more issues, Your Honor.  We have

1     the final stipulation that we were going to put in.

2          THE COURT: I'm starting to wonder what the value of

3     those is but, okay. All right. What's that?

4          MR. SINGER: So this is a stipulation relating to

5     specific records, and there are exhibits that are attached to

6     this. Last night we wanted some time to determine which

7     exhibits were connected.

8          THE COURT: Oh, the Fifth Third one, right?

9          MR. SINGER: Right.

10         THE COURT: Yes. All right. I believe that's page 5

11    of 9, is that right?

12         MR. SINGER: That's correct, Your Honor.

13         THE COURT: And so what did you find out about that?

14         MR. SINGER: We have five exhibits that relate to

15    this stipulation.

16         THE COURT: Okay.

17         MR. SINGER: Government Exhibit 30E, 33E, 41A, 41B,

18    and 41C.

19         THE COURT: Okay. And the entirety of those exhibits

20    is bank records; is that right?

21         MR. SINGER: That's correct, Your Honor.

22         THE COURT: Okay. So is the government moving for

23    the admission of 30E, 33E, 41A, 41B, and 41C?

24         MR. SINGER: Yes, Your Honor.

25         THE COURT: Any objection?

1          MR. C. MATTHEW RITTGERS:  No, Your Honor, not for

2     those bank records.  I haven't had time to cross-reference it,

3     but I purport that that is what they are.

4          THE COURT:  Okay.  So Government Exhibits USA 30E,

5     33E, 41A, 41B, and 41C are admitted without objection.

6          MR. C. MATTHEW RITTGERS:  Your Honor, I have them

7     pulled up now.  I have the -- what were they?

8          THE COURT:  30E, 33E.

9          MR. C. MATTHEW RITTGERS:  Thank you.

10          THE COURT:  41A.

11          MR. C. MATTHEW RITTGERS:  We have no objection.

12          THE COURT:  All right.  So those five exhibits are

13     admitted without objection.

14       Is there any factual information, I guess, that those

15     accounts belong to the Progress and Growth PAC that needs to

16     be told to the jury; is that right?

17          MR. SINGER:  Yes, Your Honor.

18          THE COURT:  Okay.  So when we bring the jury in, we

19     can tell them there's one more stipulation, and we'll explain

20     what that's all about.

21          MR. SINGER:  Great.

22          THE COURT:  Any other issues, Mr. Singer?

23          MR. SINGER:  One final issue, Your Honor.

24       Yesterday, during cross-examination of one of the

25     government's witness, the defense started getting into good

1    acts of the defendant.  This is the subject of a motion in

2    limine.  We did not object, but putting the Court on notice

3    that we are going to object to that sort of questioning moving

4    forward.

5            THE COURT:  The fact that the money was going to

6    non-profits, and things like that?

7            MR.  SINGER:  And the advocacy for a particular bill

8    that was supportive of the --

9            THE COURT:  Of the wheelchair taxicab?  Yeah.

10           MR. C. MATTHEW RITTGERS:  Your Honor, we anticipate,

11   for example, that the prosecution might call Mrs. Brunner, the

12   head of the port, for example.

13       And they're going to indicate, I believe, elicit

14   testimony from her that P.G. was in the weeds with her, and

15   even pressuring her on the 435 Elm development.

16       And so if we open up that, we believe opens up the door

17   to talk about other things that Mr. Sittenfeld was in the

18   weeds with her about.

19       Whether or not they're good is immaterial and not

20   something that really matters to the jury.  It's the fact that

21   he was in the weeds on other things with her, pressuring her

22   and urging her to do other things, not just 435 Elm.  That's

23   their normal course of business.

24       So we're not offering it for the good acts purpose.  I

25   just want the Court to be aware of that, for someone like

1    Mrs. Brunner.

2              THE COURT:  Okay.  I've heard the parties.  I mean, I

3    do think that, to the extent the government's going to elicit

4    testimony that would seem to suggest that there was something

5    atypical about the way in which Mr. Sittenfeld approached this

6    project, when, in fact, it is not atypical but is similar to

7    the way in which he approached Ms. Brunner in other projects,

8    I think that's a fair point to make to the jury, so we'll just

9    see how the evidence comes in.

10             MR. SINGER:  That's good.

11             THE COURT:  Anything else, Mr. Singer?

12             MR.  SINGER:  That's it from the government,

13   Your Honor.

14             THE COURT:  Anything from the Rittgers?

15             MR. C. MATTHEW RITTGERS:  No, Your Honor.

16             THE COURT:  Very good.  We're going to need to break

17   for lunch around no later than 12:15.  I've got some calls

18   scheduled in other matters.

19        So just in terms of planning out your breaks for the day,

20   if you could try to take the lunch break no later than, say,

21   12:15.  Just be mindful.  I don't know who is doing the

22   witness, Ms. Gaffney Painter?

23             MS. GAFFNEY PAINTER:  I am, Your Honor.

24             THE COURT:  So just be mindful, as we get close to

25   noon time, that I need to break sort of by 12:15, no later.

 1            MS. GAFFNEY PAINTER:  I'll do my best.  Thank you,

 2    Your Honor.

 3            THE COURT:  Very good.  I think we're ready to bring

 4    in the jury.

 5            MS. GAFFNEY PAINTER:  Your Honor, while we're

 6    waiting, may the government approach and put the exhibit

 7    binders on the witness stand?

 8            THE COURT:  Sure.

 9        (Jury in at 9:21 a.m.)

10            THE COURT:  Ladies and gentlemen of the jury, let me

11    start by apologizing that it took so long to get you in here

12    this morning.

13        The parties and the Court were discussing ways to

14    streamline some of the presentation of things, and it took

15    longer.  So our efforts to streamline ended up causing some

16    delay this morning, and that's the Court's fault.  Don't blame

17    either of the parties.  It's my fault that we're getting

18    started a little late, so I do apologize.

19        Secondly, I hope you all were able to avoid watching the

20    television, the news, and reading the newspaper this morning.

21    Anybody inadvertently read anything?  All right.

22        I think we're ready to continue, and I believe we're

23    going to start with a stipulation, one remaining stipulation;

24    is that right?

25            MR. SINGER:  Yes, Your Honor, one stipulation.

1          "The parties stipulate to the admissibility of the Fifth

2     Third account records for the Progress and Growth PAC, account

3     number ending in 5217, that were produced by the government in

4     discovery.

5          "It is further stipulated and agreed that this

6     stipulation may be introduced into evidence as an exhibit, and

7     that the facts herein stipulated have the same status,

8     dignity, and effect as the undisputed testimony of credible

9     witnesses."

10              THE COURT:  Mr. Singer, does that stipulation apply

11     to any specific exhibits?

12              MR. SINGER:  Yes, Your Honor.

13              THE COURT:  What exhibits are those?

14              MR. SINGER:  It applies to USA 30E, USA 33E, USA 41A,

15     USA 41B, and USA 41C.

16              THE COURT:  Thank you, Mr. Singer.  And the

17     government is moving to admit those exhibits?

18              MR.  SINGER:  Yes, Your Honor.

19              THE COURT:  Any objection, Mr. Rittgers?

20              MR. C. HENRY RITTGERS:  No objection, Your Honor.

21              THE COURT:  All right.  So those five exhibits, 30

22     and 33E, 41A, 41B, and 41C are admitted without objection.

23          Ladies and gentlemen of the jury, what that means is, at

24     some point, you may see bank records from a Fifth Third

25     account ending in account number 5217, and you can take it as

1    established that those are the bank records for the Progress

2    and Growth PAC, all right?  All right.  Very good.

3        Does the government intend to call another witness,

4    Ms. Gaffney Painter?

5            MS. GAFFNEY PAINTER:  Yes, Your Honor.  The

6    government calls Nathan Holbrook.

7            THE COURT:  Very good.

8        (Government witness, NATHAN HOLBROOK, sworn.)

9            MS. GAFFNEY PAINTER:  May I proceed, Your Honor?

10           THE COURT:  You may.

11                       DIRECT EXAMINATION

12   BY MS. GAFFNEY PAINTER:

13   Q.   Special Agent Holbrook, will you please state and spell

14   your name for the record.

15   A.   Nathan Holbrook.  N-a-t-h-a-n, H-o-l-b-r-o-o-k.

16   Q.   Special Agent Holbrook, where do you work?

17   A.   I work for the Federal Bureau of Investigation at the

18   Cincinnati field office.

19   Q.   Is the Federal Bureau of Investigation sometimes referred

20   to as the FBI?

21   A.   It is.

22   Q.   What is your title?

23   A.   I'm a special agent.

24   Q.   Generally speaking, what are your responsibilities as a

25   special agent?

1  A.  I'm a case agent.

2  Q.  What is a case agent?

3  A.  A case agent is an FBI agent that is responsible for the

4  overall management of investigation.  They will largely direct

5  the focus of the investigation, determine what types of

6  investigative techniques will be deployed, what types of

7  evidence will be collected.

8      They will communicate with supervision, executive

9  management headquarters, information that's appropriate to the

10  investigation, and they also communicate with interested third

11  parties, for example, the United States Attorney's Office.

12      MR. C. HENRY RITTGERS:  I'm sorry, for example what?

13      THE WITNESS:  For example --

14      THE COURT:  He said, "For example, the United States

15  Attorney's Office."

16      MR. C. HENRY RITTGERS:  Thank you.

17  Q.  Special Agent Holbrook, how long have you worked as a

18  special agent with the FBI?

19  A.  Approximately 11 and a half years.

20  Q.  What did you do before you joined the FBI?

21  A.  I was in healthcare administration.

22  Q.  What training and education did you complete in order to

23  become an FBI agent?

24  A.  I have a bachelor's in science.  I have an MBA.  In

25  February 2011, I attended the FBI Academy in Quantico,

1    Virginia.

2    Q.   What types of cases have you worked since you joined the

3    FBI?

4    A.   My first assignment, in the Indianapolis field division,

5    I was assigned to a public corruption and white collar squad,

6    and I specifically worked public corruption cases, or at least

7    98 percent of the cases I worked were related to public

8    corruption.

9    Q.   Is that true for throughout your tenure, eleven and a

10   half years with the FBI?

11   A.   Yes.

12   Q.   Did there come a time when you became involved in a

13   criminal investigation of Alexander Sittenfeld, also known as

14   P.G. Sittenfeld?

15   A.   Yes.

16   Q.   At the time that you became involved in that

17   investigation, were you involved in other investigations as

18   well?

19   A.   I was.

20   Q.   What was your role in the Sittenfeld investigation?

21   A.   I was the case agent of that investigation.

22   Q.   You testified earlier that a case agent is responsible,

23   in part, for collecting evidence.

24        During the course of the Sittenfeld investigation, what

25   type of evidence did you collect?

HOLBROOK - DIRECT

1    A.   There were voluminous amounts of recordings, recording

2    conversations over telephones between undercovers, subjects

3    unwitting, in-person meetings between undercovers and sources.

4    There was text messages, emails, phone records, bank

5    statements, witness interviews.

6    Q.   How does a case agent open a case?

7    A.   Case agent opens a case by drafting a document that

8    describes the particular facts known to the case agent at that

9    time.  That document is then approved by the supervisor, and

10   depending on what type of investigation it is, there are

11   additional approvals.

12   Q.   Can a case agent open a case solely on his or her

13   discretion?

14   A.   They cannot.

15   Q.   Approximately when did the criminal investigation into

16   Mr. Sittenfeld begin?

17   A.   Approximately the end of October 2018.

18   Q.   Tell us how the investigation began in October of 2018.

19   A.   Sure.  In approximately August of 2018, I was informed by

20   an individual by the name of Mr. Chinedum Ndukwe that he had

21   recently met with Mr. Sittenfeld.

22        And during that meeting, Mr. Ndukwe said that

23   Mr. Sittenfeld requested Ndukwe to introduce him to

24   developers.

25        Mr. Ndukwe told Sittenfeld that he wanted to support

1    Sittenfeld, but he didn't want to do it in his own name.

2        Sittenfeld then told Mr. Ndukwe to speak with an

3    individual by the name of Jay Kincaid on how to do it

4    discreetly.

5        After that, on approximately September 12th of 2018,

6    there was a recorded telephone call.  That recorded telephone

7    call was between Mr. Ndukwe and Mr. Kincaid.  I reviewed that

8    recorded telephone call.

9        In that call, there was a conversation between Ndukwe and

10   Kincaid about the project that's been referenced as 435 Elm.

11   They also were discussing donating to political candidates,

12   and the pressure that Mr. Ndukwe was receiving from donating

13   to political candidates.

14       In particular were Mr. Sittenfeld and, at that time, the

15   individual who was considered to be Mr. Sittenfeld's political

16   opponent, or one of his political opponents.

17       Kincaid instructed Mr. Ndukwe that the elected official

18   referenced in this telephone call, if Mr. Ndukwe did not

19   donate to him, wouldn't hold it against him on a development

20   project.  But he told Mr. Ndukwe that Sittenfeld was good at

21   moving votes and making things difficult for people.  That was

22   on September 12th of 2018.

23       Shortly after that, on October 25, 2018, Mr. Ndukwe told

24   me again that Mr. Sittenfeld had requested $10,000 from Ndukwe

25   as campaign donations.

1        And at that point, I decided to instruct Mr. Ndukwe to

2   record a telephone call with Sittenfeld.

3   Q.   I'm going to take a step back and unpack some of what you

4   said.   Now, you mentioned that Mr. Ndukwe was a source.   What

5   is a source?

6   A.   A source is -- in the FBI, we refer to them as

7   confidential human sources, or CHSs.   You'll hear me refer to

8   CHS or source.   It's the same thing.

9        A source is an individual who has information or

10  evidence, or access to information or evidence that is

11  responsive to the FBI's mission of collecting evidence to

12  prosecute crimes.

13  Q.   Why do case agents work with sources?

14  A.   In some situations, particularly in public corruption,

15  it's hard for case agents to approach individuals and get

16  accurate information, for various reasons.

17       Sources already have placement and access to the

18  information, and they can gain that information, collect

19  evidence, and then they provide that to the case agent, who

20  can then move forward with an investigation.   So it allows us

21  to collect evidence that we otherwise wouldn't have access to.

22  Q.   Now, generally speaking, how does the FBI get sources?

23  A.   Generally speaking, I mean, there's two main ways.   We

24  can run across an individual just in our daily activities as a

25  case agent, or we can specifically target an individual based

1    upon information that we've collected.

2    Q.   Does the FBI compensate sources?

3    A.   Yes.

4    Q.   How does the FBI compensate sources?

5    A.   We compensate sources two primary ways, one being

6    monetary, the other being non-monetary.

7    Q.   What do you mean by "non-monetary"?

8    A.   Non-monetary would be things such as immigration status,

9    deportation stays, case consideration.

10   Q.   What do you mean by "case consideration"?

11   A.   Case consideration would be if an individual has some

12   criminal exposure, and they're working to -- working off their

13   criminal exposure by cooperating with an investigation.

14   Q.   Why does the FBI compensate sources?

15   A.   It depends.  There's different reasons that the FBI would

16   compensate sources.  It could be to motivate the source.  It

17   could be to provide the source compensation for the work and

18   the effort that they're putting into an investigation.

19   Q.   Who makes the decision whether or not to compensate

20   sources?

21   A.   The case agent or the handling agent.

22   Q.   What rules does the source have to follow while working

23   with the FBI?

24   A.   When we recruit a source, there are four primary

25   admonishments that we're required to give a source.

1    Those admonishments are that their cooperation with the

2  FBI is entirely voluntary; that the information they provide

3  the FBI must be truthful.  They can't take any actions on

4  behalf of the United States government without being

5  instructed to do so.

6    And then they are requested to protect their relationship

7  with the FBI, and we will do what we can to protect that

8  relationship, meaning we won't divulge that relationship

9  publicly.

10  Q.   What is the relationship between the case agent and the

11  source?

12  A.   In this situation, the case agent, myself, handled the

13  source.  What I mean by that, they provide the source with

14  instructions of what to do, what not to do, how to proceed

15  with assisting us in collecting evidence.

16  Q.   What happens if a source does not follow the case agent's

17  instruction?

18  A.   That happens.  At that point, it's -- the source is

19  admonished and there's a judgment call, depending on what the

20  issue is.

21    The case agent or the handling agent will look at the

22  issue at hand in the context of what occurred.  They'll make a

23  judgment based upon the context that the issue occurred, based

24  upon the FBI's operational needs to continue operating the

25  source.

HOLBROOK - DIRECT

1        So just because a source makes a mistake isn't

2   necessarily grounds to close that source.

3   Q.   Now, you testified early that Mr. Chinedum Ndukwe was a

4   source for the FBI.  Who was Mr. Ndukwe?

5   A.   Mr. Ndukwe is a local developer in the Cincinnati area.

6   He's a former NFL football player, and he was a source in this

7   investigation.

8   Q.   Is Mr. Ndukwe known by any nicknames?

9   A.   Yes.  He's commonly referred to as Chin.

10  Q.   What's a developer?

11  A.   The easy way I describe it is they're the quarterback of

12  a development project or a redevelopment project.  They get

13  the approvals, the financing, and see it from beginning to

14  completion.

15  Q.   At the time that Mr. Ndukwe provided the information to

16  you about Mr. Sittenfeld, how long had he been a source for

17  the FBI?

18  A.   I'm sorry.  Can you repeat that?

19  Q.   At the time Mr. Ndukwe provided the information to you

20  about Mr. Sittenfeld, how long had he been a source for the

21  FBI?

22  A.   Which information are you referring to?

23  Q.   Let me ask it this way.  Approximately when did

24  Mr. Ndukwe become a source with the FBI?

25  A.   That was approximately March of 2018.

1    Q.   How did Mr. Ndukwe become a source for the FBI?

2    A.   I arrived at the Cincinnati division in January of 2018

3    from the Indianapolis division.  My first day was

4    approximately January 4th, 2018, and within a couple of days,

5    my supervisor had assigned several public corruption cases

6    that were already opened on our squad to me.

7         I reviewed those cases.  And in one of those cases in

8    particular, there was information about Mr. Ndukwe, and the

9    fact that he had provided money orders and cashier's checks in

10   other people's names to local Cincinnati politicians.

11        Upon reviewing that case, at that time, I made a decision

12   that Mr. Ndukwe would be targeted for source recruitment.  I

13   advised my supervisor this was the direction I was going to

14   take this investigation, and he agreed with that.  So that was

15   determined, at that point, around the first week in January.

16        There is an individual whose name was on one of the money

17   orders, his name is James Semler.  I talked with James Semler,

18   that was approximately January 9th of 2018.

19        I asked him if he would make a recorded phone call with

20   Mr. Ndukwe for the purpose of setting up a meeting with

21   Mr. Ndukwe, which also would have been recorded, for the

22   purpose of collecting information about why he wrote the money

23   orders and the checks in other people's names, and generally

24   collecting information regarding that.

25        Mr. Semler called Ndukwe.  He refused to take the

HOLBROOK - DIRECT

1    meeting.  That didn't materialize.  That was on January 24th

2    of 2018.

3        That same day, I decided to call Ndukwe myself.  I

4    introduced myself as an FBI agent, and Mr. Ndukwe told me that

5    he would talk with me, but he wouldn't do anything without an

6    attorney.

7        Shortly after that, he asked -- well, on that same call,

8    he asked me to email an interview request to him, which I did.

9    Sometime after that, an attorney named Scott Crosswell

10   contacted me.

11       Scott and I set up a time to meet with Mr. Ndukwe and

12   conduct an interview.  At that interview was myself, my

13   colleague, Mr. Ndukwe, and Scott Crosswell.

14       During that interview, Mr. Crosswell requested to

15   continue the interview under a proffer agreement with the

16   United States Attorney's Office.  I provided Mr. Crosswell the

17   appropriate contact information.  That interview ended at that

18   point.

19       And then approximately mid-March 2018, there was an

20   interview at the United States Attorney's Office under a

21   proffer agreement with Mr. Ndukwe.

22   Q.   What's a proffer agreement?

23   A.   Simply put, a proffer agreement is an agreement between

24   the United States Attorney's Office and an individual that

25   states the information that the individual provides to the

*HOLBROOK - DIRECT*

1    United States Attorney's Office will not be used against that

2    individual, given that the information is provided that --

3    given the information provided is truthful.

4    Q.   And you mentioned these checks that were involved with

5    Mr. Ndukwe.  What was the year that those checks were issued?

6    A.   The money orders were issued in April of 2013, and the

7    cashier's checks were in October of 2013.

8    Q.   What happened after that proffer agreement in March of

9    2018?

10   A.   I met with Mr. Ndukwe, and I began to understand his

11   business, what he was doing in the City of Cincinnati.

12   Q.   At that point, when you met with Mr. Ndukwe, was he a

13   source for the FBI?

14   A.   Yes.

15   Q.   Was Mr. Ndukwe a source for the FBI throughout the

16   duration of the Sittenfeld investigation?

17   A.   He was.

18   Q.   At that same time, was he also providing information

19   about other matters?

20   A.   Yes, he was.

21   Q.   How was Mr. Ndukwe compensated?

22   A.   Mr. Ndukwe was paid.

23   Q.   How much did the FBI pay him?

24   A.   $27,000.

25   Q.   How was Mr. Ndukwe's compensation calculated?

1    A.   It was based upon how much work he had done previously.

2    And when I say "work," I mean assisting the FBI in the

3    investigation.  That could be recording telephone calls,

4    participating in the recorded meetings, things of that nature.

5    Q.   Was that work that he had done only for the Sittenfeld

6    investigation, or did that include work he had done for other

7    investigations?

8    A.   No.  That was multiple other investigations.

9    Q.   Was Mr. Ndukwe paid for work that he had done or work

10   that he was going to do in the future?

11   A.   He was paid for work that he had done.

12   Q.   How did you determine, generally speaking, Mr. Ndukwe's

13   compensation?

14   A.   We discussed compensation with sources.  There's no

15   definite, no specific logarithm or table that goes along with

16   that.  It's discretion of the case agent, and that's for

17   flexibility.

18        I based Mr. Ndukwe's compensation on how much he had

19   worked in a given period, and that was based upon, like I

20   mentioned earlier in my testimony, recordings, meetings,

21   information he provided generally assisting with an

22   investigation.

23   Q.   Was your compensation decision solely within your

24   discretion, or did you have to seek approval within the FBI?

25   A.   No.  My -- the payment to a source requires executive

1    management approval.

2    Q.   How was Mr. Ndukwe's compensation paid to him?

3    A.   It was paid in cash.

4    Q.   Is that typically how sources are paid?

5    A.   Yes.  It's very typical.

6    Q.   Why is that?

7    A.   As the FBI, if we're operating a source, and we want to

8    keep that relationship secret, it's hard to pay them with a

9    check from the FBI, so we pay them in cash.

10   Q.   Now, you testified that Mr. Ndukwe became a source with

11   the FBI in March of 2018.  After Mr. Ndukwe became a source,

12   did you meet with him?

13   A.   Yes.

14   Q.   When did you start meeting with him?

15   A.   That was the end of March, beginning of April of 2018.

16   Q.   During those early meetings at the end of March or

17   beginning of April of 2018, did Mr. Ndukwe mention anything

18   about Mr. Sittenfeld?

19   A.   The first time he referenced Mr. Sittenfeld was in

20   April of 2018.

21   Q.   Did you bring up Mr. Sittenfeld, or did Mr. Ndukwe bring

22   up Mr. Sittenfeld?

23   A.   I remember that I asked an open-ended question, something

24   such as, what else is going on in Cincinnati?  And then he

25   just referenced that Mr. Sittenfeld was requesting campaign

1    donations from LLCs.

2    Q.  What did you do in response to that information?

3    A.  Nothing specifically.  Around May of 2018, along with

4    multiple other telephone numbers, we requested toll records

5    for Sittenfeld's telephone number, among others, and that was

6    related to other investigations.

7    Q.  Did you take any other investigative steps in response to

8    that information?

9    A.  I did not.

10   Q.  Did there come a time, in the summer of that same year,

11   2018, that Mr. Ndukwe discussed Sittenfeld with you again?

12   A.  Yes.

13   Q.  When was that?

14   A.  That was August of 2018.

15   Q.  What did he say?

16   A.  That's when he said that he had met with Mr. Sittenfeld.

17   Mr. Sittenfeld had requested Mr. Ndukwe to introduce him to

18   developers.

19   Q.  What did you do in response to that information?

20   A.  I documented it.  Beyond that, I didn't do anything else

21   with it.

22   Q.  Now, did there come a time, in the fall of that year,

23   2018, that Mr. Ndukwe discussed Sittenfeld with you again?

24   A.  Yes.  That was October 25th of 2018.

25   Q.  What did he tell you then?  And I believe you testified

1    to some of this earlier.

2    A.   Yes.  He told me that Mr. Sittenfeld had requested

3    $10,000 from multiple LLCs, didn't care where the money came

4    from.

5    Q.   Did he mention any other telephone calls with you during

6    that conversation?

7    A.   Not that I can recall.

8    Q.   Now, you testified earlier that you had reviewed a

9    recording between Mr. Ndukwe and someone named Jay Kincaid.

10   Who is Jay Kincaid?

11   A.   At the time of this investigation, Jay Kincaid was a

12   lobbyist in Cincinnati.

13   Q.   Back in 2018, what was Mr. Kincaid's relationship to

14   Mr. Ndukwe?

15   A.   I believe, at this time, Mr. Ndukwe was paying

16   Mr. Kincaid as his lobbyist.

17   Q.   What is a lobbyist?

18   A.   A lobbyist is an individual that is an intermediary or a

19   go-between between a public individual like Mr. Ndukwe, a

20   developer, and he'll communicate with local political

21   officials, appointed public officials, and assist the citizen

22   in getting something done, whether it be a development, or

23   passage of some law, or some political issue.

24   Q.   Now, you mentioned this earlier in your testimony,

25   435 Elm.  What is 435 Elm?

1    A.   435 Elm is a building located in the Central Business

2    District in downtown Cincinnati.

3    Q.   If you could, please, turn in your binder and look at

4    your screen.  I'm showing you what's been marked for

5    identification as Government Exhibit USA 2C.

6         MS. GAFFNEY PAINTER:  And if you could, Ms. Terry,

7    this is multiple pages.

8    Q.   Special Agent Holbrook, do you recognize these?

9    A.   I do.

10   Q.   What are they?

11   A.   These are aerial photographs of the downtown area in

12   Cincinnati.

13   Q.   For the first two pages of USA 2C, are they fair and

14   accurate representations of the geographic relationship

15   between 435 Elm, the 580 Building, and the labeled restaurants

16   and bars there?

17        MS. GAFFNEY PAINTER:  Ms. Terry, if you could return,

18   please, to the first two pages of this exhibit.

19   A.   Could you repeat your question, Counselor?

20   Q.   Certainly.  And in case it is more convenient for you,

21   they're also in hard copy in your binder.  This is tab USA 2C.

22   Take your time, and when you're ready, just look up at me.

23        Now, for the first two pages of this exhibit, USA 2C, are

24   they fair and accurate representations of the geographic

25   relationship between 435 Elm, the 580 Building, and the

HOLBROOK - DIRECT

1    labeled restaurants and bars?

2    A.   They are.

3    Q.   For the next series of pages that appear in this exhibit,

4    are they fair and accurate representations of a segment of

5    Cincinnati as it appeared on May 23, 2022?

6    A.   Yes, they are.

7         MS. GAFFNEY PAINTER:  The government moves for the

8    admission of Government Exhibit USA 2C.

9         MR. C. HENRY RITTGERS:  No objection.

10        THE COURT:  Government Exhibit USA 2C is admitted

11   without objection.

12        MS. GAFFNEY PAINTER:  Thank you.  Ms. Terry, will you

13   please publish these photographs to the jury.

14     Excuse me, I should ask for permission first.  I

15   apologize, Your Honor.

16        THE COURT:  That's all right.

17        MS. GAFFNEY PAINTER:  May I have permission to

18   publish these exhibits?

19        THE COURT:  You may.

20   Q.   Special Agent Holbrook, you testified about a

21   conversation you had with Mr. Ndukwe on October 25, 2018.

22   What did you do in response to that conversation?

23   A.   I instructed Mr. Ndukwe to make a recorded telephone call

24   with Sittenfeld.

25   Q.   During this investigation, how did Mr. Ndukwe record

1    phone calls?

2    A.   Mr. Ndukwe was provided access to a system that the FBI

3    has.  Mr. Ndukwe can access that system with a code, and then

4    he can input a telephone number that he wants to call.  That

5    system would then record that telephone call and only that

6    telephone call.

7         And once it records, it is maintained in a system at the

8    FBI that the case agents and agents working the investigation

9    have access to.

10   Q.   Does this system used by the FBI record all of the calls

11   that Mr. Ndukwe makes, or just the ones that he specifically

12   activates?

13   A.   Just the one that he specifically activates it on.

14   Q.   What about incoming calls to Mr. Ndukwe.  Does this

15   system record those?

16   A.   The system can record incoming calls, but we were not

17   recording incoming calls with the way the system was set up

18   for Mr. Ndukwe.

19   Q.   Why is that?

20   A.   In order to record outgoing and incoming calls with this

21   system, you have to provide the individual with a different

22   telephone number.

23        In this situation in this case, Mr. Ndukwe has had his

24   telephone number for a number of years.  Everyone knows him to

25   have this telephone number.  It wouldn't have been wise to

1    change that number and then introduce that, so we just kept

2    with giving him only the ability to record outgoing calls.

3    Q.   What instructions did you give to Mr. Ndukwe regarding

4    recording phone calls?

5    A.   So I instructed him to record telephone calls of

6    individuals that were subject to investigations or individuals

7    that were unwittings.

8    Q.   What is an unwitting?

9    A.   An unwitting is a person who doesn't know that the

10   individual is a source, doesn't know that there is an

11   investigation, but they have access to information but aren't

12   necessarily committing any crimes.

13   Q.   Now, just to be clear, for these calls that Mr. Ndukwe

14   was recording, whose phone was he using to make these calls?

15   A.   He used his own personal telephone.

16   Q.   Now, you testified that Mr. Ndukwe told you about a phone

17   call between himself and Mr. Sittenfeld.  Was that call

18   recorded?

19   A.   On October 25th -- or, excuse me, which one?

20   Q.   Yes.  Let me orient you.  Referring to your conversation

21   that happened with Mr. Ndukwe at the end of October of 2018, I

22   believe you referenced that he told you about a call between

23   himself and Mr. Sittenfeld.  Was that call recorded?

24   A.   No.

25   Q.   Why was that call not recorded?

1    A.   Mr. Ndukwe, at that point, had not been instructed to

2    record telephone calls with Mr. Sittenfeld because

3    Mr. Sittenfeld wasn't, at that time, a subject or of interest

4    to the FBI.

5    Q.   What happened on October 26, 2018?

6    A.   I instructed Mr. Ndukwe to conduct a recorded telephone

7    call with Sittenfeld.

8    Q.   Was that call actually recorded?

9    A.   It was.

10   Q.   Now, if you would, please, turn in your binder to the tab

11   marked USA 12A.

12   A.   Yes.

13   Q.   Do you recognize this?

14   A.   I do.

15   Q.   What is it?

16   A.   This is a compact disk that contains a copy of the

17   October 26, 2018 call.

18   Q.   How do you know that?

19   A.   I reviewed this disk, and then I put my initials on it.

20         MS. GAFFNEY PAINTER:  The government moves now for

21   the admission of Government Exhibit USA 12A.

22         MR. C. HENRY RITTGERS:  No objection, Your Honor.

23         THE COURT:  USA 12A is admitted without objection.

24   Q.   Now, Special Agent Holbrook, will you please turn to the

25   tab in your binder marked USA 12B.

1    A.   Yes.

2    Q.   Do you recognize this?

3    A.   I do recognize this.

4    Q.   What is it?

5    A.   This is a transcript of a telephone call on October 26,

6    2018, between Mr. Ndukwe and Mr. Sittenfeld.

7    Q.   What was the process for preparing this transcript?

8    A.   The process with this transcript was we utilize a system

9    called start stops that allows us to be very specific about

10   where we are in listening to a recording.

11        We can back it up a specific amount of time, move it

12   forward a specific amount of time, depending what we want.

13   That allows us to be more accurate on transcripts.

14        I will complete a transcript using the start stop, or my

15   colleague will complete a transcript.  We review that

16   transcript, make the corrections, the edits.

17        I will have my colleague to review it, and vice versa,

18   and they will make any suggested edits to that transcript.

19   Q.   To the best of your ability, is this transcript accurate?

20   A.   Yes.

21        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

22   testimony and the stipulation between the parties, the

23   government moves for the admission of Government Exhibit

24   USA 12B.

25        MR. C. HENRY RITTGERS:  No objection, Your Honor.

1          THE COURT:  USA Exhibit 12B is admitted without

2     objection.

3          MS. GAFFNEY PAINTER:  Your Honor, the next step would

4     be to distribute the transcript binders to the jury, provide

5     them the instructions that we have discussed, and then publish

6     the exhibit.

7          It could be a good time for a morning break, if that's

8     amenable to Your Honor, or we can continue on.

9          THE COURT:  Why don't we continue.  I'd like to try

10    and keep this moving forward.  Why don't you go ahead and

11    distribute the transcript books now.

12         So ladies and gentlemen of the jury, you're getting now a

13    compilation of transcripts.  It's very important -- it's not

14    clear that all these transcripts are going to be admitted into

15    evidence, so we need to, sort of, go one at a time through

16    these.

17         Please don't look at anything other than what you're

18    directed to look at, because we have to wait and see what

19    actually comes in.

20         So not everything in here will necessarily come into

21    evidence, but we're going to try and be very careful to direct

22    you to the parts that are being played, and you should only

23    look at that.  Don't look at other parts of the book.  Does

24    everybody understand?  Got it?  Good.

25         All right.  So can I see one of the books?

1          MS. GAFFNEY PAINTER:  May I approach, Your Honor?

2          THE COURT:  You may.  Thank you.  Okay.  So ladies

3     and gentlemen of the jury, as you can see, the tabs are marked

4     in here.  It will say like USA, one of them says 3F or 12B.

5          So when we refer to an exhibit, we're going to refer to

6     it by that number.  So if we say -- like I think we just

7     admitted 12B, and now we're going to play it, so we'll

8     instruct you to turn to 12B, and you can look at that

9     transcript.  And why don't we just turn to -- 12B is what

10    we've admitted, right?

11         MS. GAFFNEY PAINTER:  Yes.  That's correct.

12         THE COURT:  So why don't we turn to 12B just so you

13    can kind of see what it looks like and what we'll be doing

14    here.

15         Usually, there will be a cover sheet on the front, on the

16    first page, then you'll see the second page starts a

17    transcript that identifies a speaker and then what's said.

18    This is to help you when we play the audio so you can kind of

19    follow along in this.

20         But as I said, you know, you shouldn't flip to 14B and

21    look at 14B because what's been admitted is 12B, all right?

22    Okay.  So go ahead.

23         MS. GAFFNEY PAINTER:  Your Honor, before we publish

24    the exhibit, we would also like to request, in case I missed

25    it, that the jury should trust their ears over what they read.

1          THE COURT:  Yes.  Thank you very much.

2      So one other thing to keep in mind.  Every effort has

3  been made, as you heard, to try to make these transcripts

4  accurate.

5      But if you notice any differences between what you hear

6  on the recordings and what you read in the transcripts, you

7  must rely on what you hear in the recording, not what you

8  read, okay?

9      What you're hearing -- this is just a guide to help you

10 follow along, but what you hear is the evidence, all right?

11 Make sense, everybody?  Okay.  Any questions?  No questions.

12 Okay.  Good.  All right.

13          MS. GAFFNEY PAINTER:  With the Court's permission,

14 the government wishes to publish Government Exhibit USA 12A,

15 the corresponding transcript of which is USA 12B.

16          THE COURT:  Very good.  You may do so.

17      (Audio played.)

18 Q.  Special Agent Holbrook, there was a reference in

19 Government Exhibit USA 12A to "everything changing in

20 November."

21      What was going to happen in November of 2018 with respect

22 to political contributions?

23 A.  In November of 2018, there was an issue on the ballot

24 that the citizens of Cincinnati could vote on.  That issue was

25 referred to as Issue 13.

1    What the situation was at the time of that call, a person

2    could donate to a local candidate up to $1,100.  And if that

3    individual had LLCs, they could donate through as many LLCs as

4    they had up to $1,100.  Issue 13 closed that LLC loophole.

5    At that point, the individual could -- if it passed, the

6    individual could only donate $1,100 from themselves or from

7    the LLC, but they couldn't donate from both, and they could

8    not donate from multiple LLCs.

9    Q.    At the time of that phone call, what was the status of

10   Issue 13?

11   A.    Issue 13 had not passed.  It was going to be voted on, I

12   believe, November 6th.

13   Q.    What is an LLC?

14   A.    LLC is a limited liability corporation.

15   Q.    There was reference in USA 12A to "Rob and Brian."  Who

16   are Rob and Brian?

17   A.    Rob and Brian are undercover FBI agents.

18   Q.    Were Rob and Brian known as anything else during this

19   investigation?

20   A.    Yes.

21   Q.    What were they known by?

22   A.    Rob was also known as UCE, or undercover employee,

23   UCE 7157.  And Brian was known as UCE 7760.

24   Q.    Where did those numbers come from?

25   A.    Those are random numbers assigned to them by the FBI when

1     they complete their certification course.

2     Q.   What does it mean to be an FBI undercover agent?

3     A.   Not every FBI agent can work as an undercover.  An FBI

4     undercover agent is an FBI agent that has applied to and been

5     accepted to an intensive two-week certification course.

6          Once they complete that certification course, they are

7     then considered to be an undercover agent and can operate in

8     an undercover capacity.  What that means is they can operate

9     under an alias or a persona, as somebody else, not as an FBI

10    agent.

11         And that allows them the ability to infiltrate

12    organizations, groups, or develop relationships with

13    individuals under their alias for the purpose of gaining

14    information, intelligence, or evidence.

15         And they're in a position to collect that evidence

16    because the individual doesn't know they're FBI agents, so

17    they typically wouldn't voluntarily give me that information,

18    but an undercover, they would.

19    Q.   Why does the FBI use undercover agents?

20    A.   Well, just for that purpose.  It is a -- it's a tool in

21    the toolbox.  It's one method we have of collecting evidence.

22         The undercovers are particularly useful when the evidence

23    is in the conversations.  And it's those conversations that

24    FBI agents themselves don't have access to.

25    Q.   Who made the decision to involve Rob and Brian in this

HOLBROOK - DIRECT

1   investigation?

2   A.   I did.

3   Q.   Why did you make that decision?

4   A.   Just for the reasons stated.  Rob and Brian were actually

5   already in this area working as undercover agents, and I

6   brought them into this investigation to develop these

7   relationships, to have these conversations, and to determine

8   what was going on in the City of Cincinnati.

9   Q.   What were Rob and Brian's personas?

10  A.   In this investigation, they were wealthy investors.

11  Q.   What were they purportedly investing in?

12  A.   435 Elm.

13  Q.   Was the FBI actually investing money into the 435 Elm

14  project?

15  A.   No, they were not.

16  Q.   You mentioned that Rob and Brian were in the area working

17  on other investigations as well.

18       When did Rob and Brian begin participating in public

19  corruption investigations in the Cincinnati area?

20  A.   That was -- that began back in September of 2017.

21  Q.   When was the first time that Rob and Brian interacted

22  with the defendant?

23  A.   That was approximately February of 2018.

24  Q.   What was the context of that interaction?

25  A.   Related to another investigation, Rob and Brian were

1    being introduced to local Cincinnati political leaders by an

2    individual by the name of Sam Malone.

3         And Sam Malone had set up multiple meetings for Brian and

4    Rob, and one of those meetings happened to be with

5    Mr. Sittenfeld.

6    Q.   During that interaction between Mr. Sittenfeld and Rob

7    and Brian, did Mr. Sittenfeld ask how he could be helpful as

8    Rob and Brian thought through opportunities in Cincinnati?

9    A.   He did.

10   Q.   We just listened to a telephone call from October 26th,

11   2018.  What happened four days later, on October 30th, 2018?

12   A.   Mr. Ndukwe recorded a second telephone call with

13   Mr. Sittenfeld, at my direction.

14   Q.   Was that call recorded?

15   A.   It was.

16   Q.   If you could, please, turn to the tab in your binder

17   that's marked as USA 13A.

18        Do you recognize this?

19   A.   I do.

20   Q.   What is it?

21   A.   This is a disk containing a recording of the

22   October 30th, 2018 call.

23   Q.   How do you know that?

24   A.   I reviewed this disk, and I placed my initials on it.

25             MS. GAFFNEY PAINTER:  Your Honor, the government

1    moves for the admission of Government Exhibit USA 13A.

2         MR. C. HENRY RITTGERS:  No objection, Your Honor.

3         THE COURT:  USA 13A is admitted without objection.

4    Q.   Special Agent Holbrook, will you please turn to the next

5    tab in the binder that's marked USA 13B.

6    A.   Yes.

7    Q.   Do you recognize this?

8    A.   I do.

9    Q.   What is it?

10   A.   This is a transcript of the recorded telephone call on

11   October 30th, 2018 between Mr. Ndukwe and Mr. Sittenfeld.

12   Q.   You testified earlier about the process used to prepare

13   transcripts.  Was that same process used to prepare this

14   transcript?

15   A.   It was.

16   Q.   To the best of your ability, is this transcript accurate?

17   A.   Yes.

18        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

19   stipulation between the parties and the testimony of Special

20   Agent Holbrook, the government moves for the admission of

21   Government Exhibit USA 13B.

22        MR. C. HENRY RITTGERS:  No objection, Your Honor.

23        THE COURT:  USA 13B is admitted without objection.

24        MS. GAFFNEY PAINTER:  Your Honor, may the government

25   publish Government Exhibit 13A?

1       THE COURT:  You may.  And ladies and gentlemen of the

2   jury, you may look, at this point, at 13B.  But remember my

3   admonition that to the extent there's any discrepancy between

4   what you read and what you hear, it's what you hear that

5   matters.

6       (Audio played.)

7   Q.  Special Agent Holbrook, there was a reference in

8   Government Exhibit USA 13A to "Smitherman."  Who is

9   Smitherman?

10  A.  At this time in the investigation, Smitherman is referred

11  to as -- it's Christopher Smitherman, who was a Cincinnati

12  city councilmember and vice mayor of Cincinnati.

13      It was generally suspected, at the time of the

14  investigation, that Mr. Smitherman would be running for mayor

15  of Cincinnati.

16  Q.  Also in Government Exhibit USA 13A, there was reference

17  to "Jay."  What was that in reference to?

18  A.  That's in reference to Jay Kincaid.

19  Q.  After reviewing this call, what instruction did you

20  provide to Mr. Ndukwe?

21  A.  After reviewing this call, I instructed Mr. Ndukwe to

22  make a third recorded telephone call to Mr. Sittenfeld.

23      And, in addition to that, I instructed Mr. Ndukwe to make

24  a very clear and obvious offer of money in exchange for votes

25  by Mr. Sittenfeld on 435 Elm.

1    Q.   You testified earlier about the procedure that was used

2    to record calls.  I want to clarify something that I'm not

3    sure that you covered.

4         What instruction did you provide to Mr. Ndukwe for

5    incoming calls of someone that you believe should be recorded?

6    A.   So, as I testified earlier, Mr. Ndukwe didn't have the

7    access, the way the system was set up, to capture incoming

8    calls.  So there's a couple things we can do to mitigate that.

9         We can -- you know, we instruct the source to not answer

10   that call and to call back later when it can be recorded on

11   the system.  We instruct the source to maybe send a text

12   message that says I'll call you back in 10 minutes.

13        If there starts to be a lot of back and forth, it

14   becomes -- we're afraid that it becomes a little suspicious,

15   and then sometimes, more as a last resort, to answer the call

16   and say I'm in a meeting, or I'm busy, I'll call you right

17   back.  So these are some of the techniques we use to mitigate

18   that.

19   Q.   Now, you testified that in response to the call that we

20   listened to at USA 13A, that you had provided instructions to

21   Mr. Ndukwe to place another recorded call.  Did that call

22   happen on November 2nd of 2018?

23   A.   It did.

24   Q.   Was that call recorded?

25   A.   Yes.

1    Q.   If you will, please, turn to tab USA 14A in the binder in

2    front of you.

3    A.   Yes.

4    Q.   Do you recognize this?

5    A.   I do.

6    Q.   What is it?

7    A.   This is a compact disk containing the November 2nd, 2018

8    recorded telephone call that was just referenced.

9    Q.   How do you know that?

10   A.   I reviewed this disk and, after review, I placed my

11   initials on it.

12        MS. GAFFNEY PAINTER:  Your Honor, the government

13   moves for the admission of Government Exhibit 14A.

14        MR. C. HENRY RITTGERS:  No objection, Your Honor.

15        THE COURT:  USA 14A is admitted without objection.

16   Q.   Special Agent Holbrook, will you please turn to tab

17   USA 14B.

18   A.   Yes.

19   Q.   I'm showing you there what's been marked for

20   identification as USA 14B.  Do you recognize this?

21   A.   I do recognize this.

22   Q.   What is it?

23   A.   This is a transcript of the November 2nd, 2018 call

24   between Mr. Ndukwe and Mr. Sittenfeld.

25   Q.   Did you review this transcript for accuracy?

1   A.   I did.

2         MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

3   stipulation between the parties and the testimony of Special

4   Agent Holbrook, the government moves for the admission of

5   Government Exhibit USA 14B.

6         MR. C. HENRY RITTGERS:  No objection, Your Honor.

7         THE COURT:  USA 14B is admitted without objection.

8         MS. GAFFNEY PAINTER:  Permission to publish

9   Government Exhibit USA 14A to the jury?

10        THE COURT:  You may.  And ladies and gentlemen of the

11  jury, at this point, you can turn to Exhibit 14B in the book.

12        Once again, to the extent there's any discrepancy between

13  what you hear and what you read here, it is what you hear that

14  matters.

15        (Audio played.)

16  Q.   Special Agent Holbrook, there was reference in USA 14A to

17  a "quid pro quo."  What does that phrase mean?

18  A.   It's a Latin phrase that basically means something for

19  something.  It's commonly used in public corruption

20  investigations, that term.

21  Q.   After this call that we just listened to, USA 14A, what

22  was the next step you took in the investigation?

23  A.   I contacted Rob and instructed him to travel to

24  Cincinnati for that meeting referenced in the telephone call.

25        MS. GAFFNEY PAINTER:  Your Honor, the next area of

1    exploration is this meeting, which features long recordings.

2    I'm presenting this as a possible opportunity for a morning

3    break.

4              THE COURT:  That sounds like a good idea.  All right.

5    We will take our morning break at this point and be back

6    probably, hopefully, before 11:00, but we'll see.  So why

7    don't we excuse the jury.

8         I'm sure you're getting sick of hearing this, but please

9    do not discuss this case with your fellow jurors.  Please do

10   not begin to form any opinions yourself about what the verdict

11   should be.

12        Please do not do any kind of research, electronic or

13   otherwise, on any form of media, or the internet, or anything

14   else.  And other than that, we will see you when you get back

15   here.

16        (Jury out at 10:39 a.m.)

17             THE COURT:  Anything we need to put on the record

18   before we break?

19             MR. SINGER:  No, Your Honor.

20             MR. C. MATTHEW RITTGERS:  No, Your Honor.

21             MR. C. HENRY RITTGERS:  No, Your Honor.

22             THE COURT:  Very good.  Let's try to keep it short.

23   One issue that jurors have expressed in previous trials is the

24   breaks get to be a little long for them, so if we can try to

25   be back here -- so we can get the jury in by 11:00, if we

1    could be back here by no later than seven minutes before

2    11:00, or something like that, or five minutes before 11:00,

3    just so we can try and get the jury in.  Is that all right?

4    Is that going to work?

5              MR. C. HENRY RITTGERS:  It's okay with us.

6              THE COURT:  Very good.

7         (Brief recess.)

8              THE COURT:  Anything we need to address before we

9    bring the jury in, Mr. Singer?

10             MR. SINGER:  No, Your Honor.

11             THE COURT:  Mr. Rittgers?

12             MR. C. MATTHEW RITTGERS:  No, Your Honor.

13             THE COURT:  All right.  We're ready to bring them in.

14        Ms. Gaffney Painter, are we thinking most of the rest of

15    the day with Special Agent Holbrook?

16             MS. GAFFNEY PAINTER:  Yes, Your Honor.

17             MR. C. MATTHEW RITTGERS:  Your Honor, there's one UI,

18    just so the Court's aware, in this transcript, where we

19    believe it is audible and intelligible where something is

20    stated.  P.G. says, "It's good for the city."  It's not in the

21    transcript.  I just want the Court to be aware of that.

22             THE COURT:  Okay.  And that's in Exhibit 14B?

23             MR. C. MATTHEW RITTGERS:  I believe the next exhibit

24    they plan to introduce, which would be 14B, is that correct, I

25    believe?

HOLBROOK - DIRECT

1          MR. SCHUETT:  It would be the November 7th exhibit,

2     15C.

3          THE COURT:  15C, I believe, is the transcript, and

4     it's the unintelligible that's on what page?

5          MR. C. MATTHEW RITTGERS:  I'll find it, Your Honor.

6     Your Honor, it will be on page 38.

7          THE COURT:  I see three UIs on that page.  Do you

8     know which one you're referring to?

9          MR. C. MATTHEW RITTGERS:  If you went four speakers

10    up from the bottom, where it says:  "Sittenfeld:  Yeah, yeah,

11    yeah."

12          THE COURT:  Okay.

13          MR. C. MATTHEW RITTGERS:  "Torpedo," and then there's

14    a UI, and it would be that one.

15          THE COURT:  Okay.  I will be primed for that.  I will

16    circle it right now.

17          MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

18          MR. SINGER:  Your Honor, may I ask what the

19    unintelligible language was again?

20          THE COURT:  The what?

21          MR. C. MATTHEW RITTGERS:  "They're not going to let

22    John torpedo a good development."

23        Your Honor, on this particular exhibit, is this something

24    that will go to the jury, and they will read this with the UI

25    in the transcript, and then how will that be corrected?  I'm

1    just asking procedurally.

2          THE COURT:  Well, is there any way to jump to that?

3      Could you go ask Scott to hold up on bringing the jury

4    in.

5      Is there any way we can jump to that or not?  It's

6    basically at the end.  Is there any way to just jump to that

7    or not?  It's 15C?

8          MR. C. MATTHEW RITTGERS:  The audio might be 15A.

9          THE COURT:  Or B.

10         MR. C. MATTHEW RITTGERS:  Or B.

11         THE COURT:  Is that the next one you're intending to

12   play, Ms. Gaffney Painter?

13         MS. GAFFNEY PAINTER:  Yes.  There are two recordings

14   from this day, one at the restaurant, one at the apartment.

15   The one in the restaurant is 14A, and then the one at the

16   apartment -- oh, I apologize.  We're talking about 15?

17         THE COURT:  Yes.

18         MS. GAFFNEY PAINTER:  I apologize.  15A is the

19   restaurant, 15C is the transcript, and 15B, I believe, is the

20   recording of the meeting at the apartment.

21         MR. SINGER:  We can play that now.

22         THE COURT:  Is 15C the transcript for both 15A and B?

23         MS. GAFFNEY PAINTER:  Yes.  I apologize.  It is

24   combined.

25         THE COURT:  I see.  Okay.  So can you jump to the end

1    of what I believe would be 15B?  They wanted to play something

2    and see if we can hear it.

3         COURTROOM DEPUTY:  Oh.

4      (Audio played.)

5         THE COURT:  I can't make it out.  You're free to

6    point that out to the jury.  I can't make it out.  You think

7    it says what?

8         MR. C. MATTHEW RITTGERS:  "Good development."

9         THE COURT:  "Torpedo good development"?

10        MR. C. MATTHEW RITTGERS:  Yeah.

11        THE COURT:  I'm sorry.  I can't make that out.  I

12   would agree, it's unintelligible, but...

13        MR. C. MATTHEW RITTGERS:  It's on the wire, so we

14   know what it stated.  That might have helped us arrive at --

15        THE COURT:  No.  I understand.  And you're certainly

16   free to elicit from Mr. Sittenfeld that that is "good

17   development," that he said that.  I'm not saying he didn't say

18   that, I'm just saying I can't make it out on that recording.

19        MR. C. MATTHEW RITTGERS:  Thank you, Judge.

20   Understood.

21        THE COURT:  All right.

22      (Jury in at 10:59 a.m.)

23        THE COURT:  Ms. Gaffney Painter, you may continue.

24        MS. GAFFNEY PAINTER:  Thank you, Your Honor.  May I

25   proceed?

1      THE COURT:  You may.

2   BY MS. GAFFNEY PAINTER:

3   Q.  Special Agent Holbrook, before the break, we listened to

4   a call that was admitted into evidence as USA 14A.  You also

5   testified that prior to that call, you had instructed

6   Mr. Ndukwe to make a clear offer for money for votes.

7      Why did you provide Mr. Ndukwe with that instruction?

8   A.  I wanted it to be clear that Rob, who is playing the role

9   of an investor that is willing to bribe public officials, I

10  wanted it to be clear that it was a bribe offer and not be

11  ambiguous.

12  Q.  Within the call we played at Exhibit USA 14A, there was

13  reference to "discuss that more in person."  Did you decide to

14  take any investigative steps based on that line?

15  A.  Yes.

16  Q.  Why did you decide to move forward with an in-person

17  meeting?

18  A.  During that call, they agreed to meet.  They agreed --

19  Mr. Sittenfeld agreed to meet with Rob, and so we proceeded.

20  The next logical investigative step would be to move forward

21  with the meeting.

22  Q.  What happened in the investigation on November 7, 2018?

23  A.  There was a meeting in downtown Cincinnati, at Nada's,

24  between Mr. Ndukwe, Rob, and Mr. Sittenfeld.

25  Q.  What is Nada's?

1    A.   Nada's is a restaurant in downtown Cincinnati.

2    Q.   Who picked that location?

3    A.   I picked it.

4    Q.   Why?

5    A.   I selected that location because it was close to the

6    580 Building.  This is a building in which Rob had an

7    apartment.

8    Q.   Was the meeting at Nada's on November 7, 2018, recorded?

9    A.   Yes.

10    Q.   How was that meeting recorded?

11    A.   That meeting was recorded with an audio recording device.

12    It's a battery powered recording device which Rob had within

13    his control during that meeting.

14    Q.   Generally speaking, how do these sorts of recording

15    devices work?

16    A.   These recording devices are -- they're concealable.

17    They're activated by the user, and then they're deactivated by

18    the user.  They're sensitive, and they will record as long as

19    there's space to record on and as long as there's battery

20    power.

21    Q.   What instructions did you provide to Mr. Ndukwe before

22    this meeting at Nada's?

23    A.   I told Mr. Ndukwe just to be who he is, a developer

24    trying to develop 435 Elm, nothing different.

25    Q.   Have you reviewed the recording of the meeting at Nada's?

HOLBROOK - DIRECT

1   A.   Yes.

2   Q.   Will you please turn to Tab USA 15A.

3   A.   Yes.

4   Q.   I'm showing you there what's been marked for

5   identification as Government Exhibit USA 15A.  Do you

6   recognize this?

7   A.   I do.

8   Q.   What is it?

9   A.   This is a recording of the meeting I just referenced at

10  Nada's.

11  Q.   How do you know that?

12  A.   I reviewed this disk, and I placed my initials on it.

13        MS. GAFFNEY PAINTER:  The government moves for the

14  admission of Government Exhibit USA 15A.

15        MR. C. HENRY RITTGERS:  No objection, Your Honor.

16        THE COURT:  USA 15A is admitted without objection.

17  Q.   Before we seek permission to publish this, did this

18  meeting continue at a location other than Nada on that same

19  day?

20  A.   It did.

21  Q.   Where?

22  A.   It continued at Rob's apartment at the 580 Building.

23  Q.   Was that meeting recorded?

24  A.   It was.

25  Q.   Now, if you could, please, turn in your binder to tab

1    USA 15B.

2    A.   Yes.

3    Q.   I'm showing you there what's been marked for

4    identification as Government Exhibit USA 15B.  Do you

5    recognize this?

6    A.   I do.

7    Q.   What is it?

8    A.   This is a compact disk containing the continued meeting

9    at the apartment at the 580 Building.

10   Q.   How do you know that?

11   A.   I reviewed this and also placed my initials on the disk.

12          MS. GAFFNEY PAINTER:  Your Honor, the government

13   moves for the admission of Government Exhibit USA 15B.

14          MR. C. HENRY RITTGERS:  No objection.

15          THE COURT:  USA 15B is admitted without objection.

16   Q.   Special Agent Holbrook, turning now to what's been marked

17   for identification as USA 15A.  Do you recognize this?

18          THE COURT:  15A?

19   Q.   Excuse me, 15C.

20   A.   I do.

21   Q.   What is it?

22   A.   This is a transcript of the meeting at Nada's, and the

23   continued meeting at the 580 Building.

24   Q.   You testified earlier to the process of preparing these

25   transcripts.  Was that the same process that was used to

1    prepare this transcript?

2    A.   Yes, it was.

3    Q.   Is it accurate, to the best of your ability?

4    A.   It is.

5         MS. GAFFNEY PAINTER:  Your Honor, based on the

6    stipulations between the parties and Special Agent Holbrook's

7    testimony, the government moves for the admission of

8    Government Exhibit USA 15C.

9         MR. C. HENRY RITTGERS:  May we have one second, Your

10   Honor?

11        THE COURT:  You may, Mr. Rittgers.

12        MR. C. HENRY RITTGERS:  We are not objecting, Your

13   Honor.

14        THE COURT:  USA 15C is admitted without objection.

15        MS. GAFFNEY PAINTER:  Your Honor, the government

16   requests permission to publish USA 15A, and would like to note

17   for the record the specific timestamps that we intend to

18   present to the jury.

19        THE COURT:  Yes, please.

20        MS. GAFFNEY PAINTER:  We would request publishing

21   first on USA 15A, timestamp 11:41 to 16:22.

22        THE COURT:  Is that a portion of this transcript, is

23   that right, or what?

24        MS. GAFFNEY PAINTER:  We have fully transcribed the

25   portion that we are admitting into evidence, and they will

1  find that at 15C.

2  THE COURT:  Okay.  And what you just said you're

3  going to play is the entirety of the transcript at 15C or not?

4  MS. GAFFNEY PAINTER:  No.  So 15C contains both the

5  segments from the meeting at Nada's and also the recording in

6  the apartment.

7  THE COURT:  So why don't we help the jury, then.

8  What parts are the segments from Nada's; if you know?

9  MS. GAFFNEY PAINTER:  So you will see delineated

10 there in 15C timestamp 11:41 to 16:22.

11 THE COURT:  Ladies and gentlemen of the jury, I think

12 what she's saying is we're first going to hear what's,

13 essentially, reflected on the transcript from pages -- what's

14 marked at the top, in the right corner, see it says page 002

15 in the right corner up at the top?  And then I think it's

16 going to go to page 006, and then it will say transcript stops

17 16:22.

18 Do you see that on the page that's marked 006 on the top

19 right?  That's the portion they're going to play first.

20 MS. GAFFNEY PAINTER:  Thank you, Your Honor.

21 THE COURT:  Go ahead, Ms. Gaffney Painter.

22 (Audio played.)

23 MS. GAFFNEY PAINTER:  Your Honor, the government

24 requests permission to publish the next segment of the exhibit

25 time stamped 1:21:20 to 56:04.

```
 1              THE COURT:  So that's going to go through page 28,
 2    roughly, okay.  You may do so.
 3         (Audio played.)
 4              MS. GAFFNEY PAINTER:  May I proceed, Your Honor?
 5              THE COURT:  You may.
 6    Q.   At the time this proceeding was recorded, who was the
 7    mayor of Cincinnati?
 8    A.   John Cranley.
 9    Q.   Now, there was reference in USA 15A to Goldschmidt.
10    Based on your participation in this investigation, who is
11    Goldschmidt?
12    A.   Goldschmidts were tenants in the 435 Elm building.
13    Q.   Now, did this meeting continue at a different location?
14    A.   It did.
15    Q.   Where did it continue?
16    A.   It continued at an apartment located in the 580 Building.
17    Q.   Who participated in that meeting in the apartment in the
18    580 Building?
19    A.   Rob and Mr. Sittenfeld.
20    Q.   What is the apartment in the 580 Building?
21    A.   Excuse me?  I'm sorry.
22    Q.   What is the apartment in the 580 Building?  What is that
23    referring to?
24    A.   It is an apartment that Rob is renting.  It's a
25    two-story, two-bedroom apartment that Rob was renting at the
```

1    580 Building.

2    Q.  Special Agent Holbrook, can you please turn in the binder

3    to the tab USA 5A.

4    A.  Yes.

5    Q.  Do you recognize these?

6    A.  Yes.  This is a photograph of the lobby of the

7    580 Building and outside of the 580 Building.

8    Q.  Are these exhibits fair and accurate representations of

9    the 580 Building and its lobby?

10   A.  They are.

11        MS. GAFFNEY PAINTER:  The government moves for the

12   admission of Government Exhibit 5A.

13        MR. C. HENRY RITTGERS:  No objection, Your Honor.

14        THE COURT:  USA 5A is admitted without objection.

15        MS. GAFFNEY PAINTER:  Your Honor, may we publish to

16   the jury?

17        THE COURT:  You may.

18        MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

19   Q.  Special Agent Holbrook, you testified that Rob rented

20   that apartment.  Who made the decision to rent the apartment?

21   A.  I did.

22   Q.  Why did you make that decision?

23   A.  We made the decision for credibility of the undercovers

24   as wealthy investors.

25   Q.  Were there any other reasons that you decided to permit

HOLBROOK - DIRECT

1  Rob to rent that apartment?

2  A.   Yes.  When conducting audio and audio/video recordings,

3  having the apartment provided us with a location that we could

4  control.

5      We could capture better audio and video quality and be

6  able to control that environment, as opposed to a public

7  location, which there's sometimes noise, pianos are playing,

8  background conversations, it becomes more difficult to hear

9  what the conversations are.

10 Q.   Was the apartment at the 580 Building furnished?

11 A.   Yes.

12 Q.   Who furnished the apartment?

13 A.   I did.

14 Q.   Who was responsible for maintaining the apartment?

15 A.   I was.

16 Q.   What did that entail?

17 A.   That entailed me doing a lot of sweeping, mopping,

18 cleaning out sinks, toilets; basic health -- you know, basic

19 household cleaning.

20 Q.   Was there surveillance equipment in the apartment?

21 A.   There was.

22 Q.   What surveillance equipment?

23 A.   There was audio and video recording devices.

24 Q.   Who placed that equipment?

25 A.   Myself, Brian, and Rob.

1    Q.  You mentioned video equipment.  Can you explain for us,

2    when a video is recorded, does the equipment break it up into

3    multiple files, or is it just one big file?

4    A.  Yes.  These video recording devices, they record audio

5    and video.  And the device itself breaks the recordings up

6    into sessions.

7        The purpose for that is for ease of transfer, so when the

8    videos are downloaded, transferred to a disk, something of

9    that nature, it makes it easier to transfer the recordings.

10       So you may see sessions, session one and session two,

11   they actually go together, but it looks like it's two separate

12   recordings.  I think it's noted in the transcripts.

13   Q.  Let's return to November 7, 2018.  You testified that the

14   meeting continued at the apartment in the 580 Building.

15       We have previously admitted into evidence Government

16   Exhibit USA 15B.

17           MS. GAFFNEY PAINTER:  Before we publish to the jury,

18   Your Honor, I'd like to put on the record what timestamps we

19   are admitting for this exhibit.

20           THE COURT:  Okay.

21           MS. GAFFNEY PAINTER:  The first timestamp is 2:20,

22   until the end of the session.  Special Agent Holbrook just

23   testified what "session" means.

24       And then we are admitting into evidence the 000, the

25   startup session, the next session, which ends then at 3:08.

1          THE COURT:  Thank you.

2          MS. GAFFNEY PAINTER:  Your Honor, in addition to 15B

3    and the transcript of 15C, the government has prepared a

4    demonstrative exhibit, which is marked solely for

5    identification as Government Exhibit USA 15D.

6          It is a combination of the transcript admitted as

7    USA 15C and the video admitted as USA 15B.  We would request

8    permission to publish this demonstrative to the jury.

9          MR. C. HENRY RITTGERS:  Your Honor, may we have a

10   second?

11         THE COURT:  You may.

12         MR. C. MATTHEW RITTGERS:  I apologize, Your Honor.

13   We're just curious what 15D is.  We just don't have it, and we

14   would just like to see it.

15         THE COURT:  I think it may be the video running side

16   by side with the transcript or what?

17         MS. GAFFNEY PAINTER:  Yes.  It's the video exhibit

18   that's already been admitted, and the transcript runs at the

19   bottom of the screen, the transcript that's already been

20   admitted as 15C.

21         MR. C. MATTHEW RITTGERS:  No objection.

22         THE COURT:  All right.  You may use 15D as a

23   demonstrative.

24         What that means, ladies and gentlemen of the jury, is

25   this is a demonstrative exhibit, so it's to help you visualize

HOLBROOK - DIRECT

1    things.  It will not be admitted into evidence.  It will not

2    be available to you in the jury room when you are

3    deliberating, but they are going to use it and refer to it in

4    the courtroom.

5         MS. GAFFNEY PAINTER:  Permission to publish, Your

6    Honor?

7         THE COURT:  You may.

8         MS. GAFFNEY PAINTER:  And just as a specific

9    instruction, please, Ms. Terry and Mr. Lang, when this exhibit

10    comes up, if you could press pause when the image appears, and

11    we'll stop there and then we'll proceed.  I have some

12    questions I'd like to ask.

13       Thank you, Ms. Terry.

14    Q.  So before we publish the rest of this demonstrative,

15    Special Agent Holbrook, I want you to look at the screen here.

16       What are we seeing in this screen shot?

17    A.  What you're seeing is -- directly in the bottom portion

18    of the screen, this is the countertop in the kitchen.  So this

19    recording device was located on the countertop in the kitchen,

20    and it's facing direct towards the living room area.

21       You see the TV and the sofa.  You see the steps that goes

22    up to the second floor.  And to the right of the screen, there

23    is a door that leads to the outside deck.

24    Q.  Is this camera you've just described hidden?

25    A.  Yes.

 1           MS. GAFFNEY PAINTER:  Your Honor, with the Court's

 2    permission, we would ask to resume the demonstrative.

 3           THE COURT:  You may.

 4        (Video played.)

 5           MS. GAFFNEY PAINTER:  Your Honor, you had expressed

 6    earlier that 12:15 might be a good time to break for lunch.

 7    It's now 12:11.

 8           THE COURT:  Yes.  Is the remainder of this, you're

 9    intending to play it?  Do you have any idea how long the

10    remainder of this is?

11        I mean, are you fine breaking for lunch now, or would you

12    prefer to complete this exhibit?

13           MS. GAFFNEY PAINTER:  Oh, I apologize.  There's four

14    minutes to play, so if we could play the four more minutes?

15           THE COURT:  Yes.  That may make more sense, yes.

16        (Video played.)

17           MS. GAFFNEY PAINTER:  Your Honor, the government

18    submits this would be a good time to take the lunch break.

19           THE COURT:  Very good.  All right.

20        Ladies and gentlemen of the jury, I think we're going to

21    break for lunch now.  If you could try to be back by no later

22    than 1:15, we'll get you in as quickly thereafter as we can.

23        I'd just like to remind you that it would be

24    inappropriate to start forming any opinions about this case.

25    Do not discuss this case even with your fellow jurors.

1    Certainly, do not communicate with anybody else about this

2    case.

3        Do not attempt to do any research on your own, or use

4    electronic devices to try to research the internet about the

5    charges or the facts of this case.

6        If anyone should attempt to discuss this case with you,

7    please bring it to my attention immediately, but do not

8    discuss it with your fellow jurors.

9        With that, have a good lunch.

10       (Jury out at 12:15 p.m.)

11            THE COURT:  Thank you for being mindful of the time,

12   Ms. Gaffney Painter.  I appreciate it.  We still anticipate

13   Special Agent Holbrook being on the stand for the remainder of

14   the day?

15            MS. GAFFNEY PAINTER:  Yes, Your Honor.

16            THE COURT:  Is there anything we need to discuss

17   before we break for lunch?

18            MS. GAFFNEY PAINTER:  No.  Thank you, Your Honor.

19            MR. C. HENRY RITTGERS:  Not on behalf of the defense,

20   Your Honor.

21            THE COURT:  All right.  Please try to be back by 1:10

22   or so, in case there's anything we need to discuss before we

23   bring the jury in.

24       (Lunch recess.)

25            THE COURT:  Is the government ready to proceed?

HOLBROOK - DIRECT

1          MR. SINGER:  One brief issue, Your Honor.

2          THE COURT:  Okay.

3          MR. SINGER:  There is a recording that we talked

4    about this morning.  At the request of defense counsel, we

5    have added it on.  It's a May 2 recording.  We don't have a

6    transcript for it, and we've been trying to snip it down, but

7    we may need -- our paralegal might need a little bit of time

8    to find it on the recording to play it where it needs to pick

9    up.

10          THE COURT:  Okay.

11          MR. SINGER:  Our clip spans from one to two, and the

12   clip that we want to follow includes that but it's more, so

13   she's going to have to bring it up to where two is and then

14   play it.

15          THE COURT:  I see.

16          MR. SINGER:  It's only a minute clip.

17          THE COURT:  How would anyone suggest we explain the

18   lack of a transcript for that?  Do we need to address that

19   with the jury?

20          MR. SINGER:  We would suggest that --

21          THE COURT:  It was added at defendant's request or

22   something?

23          MR. SINGER:  The parties have agreed to play this

24   portion --

25          THE COURT:  That's fine.

```
 1              MR. SINGER:  -- and the lack of transcript, the jury

 2      should not attribute any prejudice to either side based on a

 3      lack of transcript.

 4              MR. C. MATTHEW RITTGERS:  We have no objection, Your

 5      Honor.

 6              THE COURT:  Very good.  The parties have agreed to

 7      play this additional part, and the jury should not attribute

 8      the lack of a transcript to either party or attach any

 9      significance to it.  All right.  Very good.

10         Is that it?

11              MR.  SINGER:  Yes, Your Honor.

12              THE COURT:  Mr. Rittgers?

13              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

14              THE COURT:  Let's bring in the jury.  Are you good to

15      go, Special Agent Holbrook?

16              THE WITNESS:  Yes, sir.

17         (Jury in at 1:24 p.m.)

18              THE COURT:  Ms. Gaffney Painter, is the government

19      prepared to proceed?

20              MS. GAFFNEY PAINTER:  Yes, Your Honor.

21              THE COURT:  Please proceed.

22              MS. GAFFNEY PAINTER:  Thank you, Your Honor.

23      BY MS. GAFFNEY PAINTER:

24      Q.  Special Agent Holbrook, before the break, we played a

25      demonstrative, USA 15D.  There was a reference in that
```

 1    demonstrative to $10,000 cash.

 2         Was there, in fact, $10,000 of cash in the apartment at

 3    the time that that conversation was recorded?

 4    A.   There was.

 5    Q.   Who funded that?

 6    A.   The FBI.

 7    Q.   There was discussion in that conversation of $1,100.

 8    What is your understanding of what that's referencing?

 9    A.   My understanding is that it's referencing the campaign

10    donation limits.

11    Q.   There was also reference in that conversation to a PAC.

12    Generally speaking, what is a PAC?

13    A.   PAC stands for political action committee.  It's a tool

14    used to raise funds for political issues.

15    Q.   There was also reference in that conversation to Jared.

16    Who is Jared?

17    A.   Jared Kamrass.

18    Q.   And at that time, what was Mr. Kamrass's relationship to

19    Mr. Sittenfeld?

20    A.   Jared Kamrass was working with Mr. Sittenfeld, assisting

21    Mr. Sittenfeld to raise funds into his campaign.

22    Q.   There was reference during that recording to Rob's phone

23    number.  Who acquired that phone?

24    A.   Rob did.

25    Q.   Why did Rob acquire that phone?

HOLBROOK - DIRECT

1    A.   Anything that an undercover agent purchases that's a

2    personal item like a telephone, they purchase that themselves

3    under their alias name.

4    Q.   Who funded the phone and the phone service?

5    A.   The FBI did.

6    Q.   How were calls recorded on that, on Rob's phone?

7    A.   The calls on Rob's phone were recorded by utilizing

8    what's called an essential T3.  It's commonly referred to as

9    wire taps.  But this was Rob consenting to have a wiretap on

10   this phone that recorded all incoming and outgoing telephone

11   calls and text message content.

12   Q.   How did the FBI keep records of communications with Rob's

13   phone?

14   A.   So the provider, in this case AT&T, based in the content

15   of the text messages and the telephone calls to a system that

16   the FBI contains.

17        I have access to that system, and I can access that

18   system, review those calls in their entirety, or I can filter

19   those calls by date range, by telephone number, and in various

20   other ways.

21   Q.   What about Brian, did he have a phone as well?

22   A.   Yes.

23   Q.   And was it acquired under similar circumstances as what

24   you described about Rob's phone?

25   A.   Yes.

HOLBROOK - DIRECT

1  Q.  And were Brian's communications recorded in the way you

2  just described?

3  A.  Yes.

4  Q.  If you could, please, in your binder, turn to tab USA 9A.

5  A.  Yes.

6  Q.  There you'll see what's been marked for identification as

7  Government Exhibit USA 9A.  Do you recognize this?

8  A.  I do.

9  Q.  What is it?

10  A.  This is a report that I created.  It's called a line

11  sheet.

12  Q.  What is a line sheet?

13  A.  A line sheet is a report from the system that I

14  referenced earlier that details communication between, in this

15  case, Rob, and individuals he's contacting.  In this case, the

16  numbers -- do you want me to continue, Counselor?

17  Q.  You can continue, certainly.

18  A.  On this particular line sheet is for Rob's telephone

19  number, and filtered out is the number ending in 2404 and

20  0901.

21         MS. GAFFNEY PAINTER:  Your Honor, the government

22  moves for the admission of Government Exhibit USA 9A.

23         MR. C. MATTHEW RITTGERS:  No objection.

24         THE COURT:  USA 9A is admitted without objection.

25         MS. GAFFNEY PAINTER:  With the Court's permission,

1    may we please publish the first page of Government Exhibit

2    USA 9A?

3               THE COURT:  You may.

4               MS. GAFFNEY PAINTER:  All right, Ms. Terry, if you

5    wouldn't mind blowing up the top -- I'd say this is the top

6    fourth of this document, page 1 of Exhibit USA 9A.

7    Q.   Special Agent Holbrook, will you please direct your

8    attention to the left-hand side of this and explain to us what

9    you see here?

10   A.   You see selection criteria, that's filter parameters

11   that's on this line sheet.  And the target, that's the

12   telephone assigned to UCE 7157, which is Rob.

13       And then user defined, these are my filters that are

14   placed on the system to filter out telephone numbers that you

15   see there ending in 2404 and 0901.

16   Q.   Looking at that first telephone number that appears there

17   in your filters, what is the number that appears there?

18   A.   The number 513-365-2404 is the number associated with

19   Mr. Sittenfeld.

20   Q.   The number that appears below that, what is that number?

21   A.   513-679-0901, that is a number associated with Chris

22   Dalton.

23   Q.   Who is Chris Dalton?

24   A.   At the time of this investigation, he was

25   Mr. Sittenfeld's chief of staff.

  1           MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.  May we

  2    please go to page 2 of this exhibit.

  3        And if you could, Ms. Terry, will you please highlight

  4    the top fourth of this document.

  5    Q.   All right.  Special Agent Holbrook, would you please

  6    explain to us what information we're seeing here?

  7    A.   Sure.  This block is what you would see for each contact

  8    that Rob makes with an individual, whether it's a telephone

  9    call or whether it's a text message.  The blocks are going to

 10    be similar in the information that they have.

 11    Q.   Can you please walk us through, starting with the

 12    left-hand column, what information we're seeing here?

 13    A.   Sure.  So session 1633, that's a number that is assigned

 14    to each contact.  They are consecutive numbers, and each time

 15    that there's a contact on that phone, whether it be a call, a

 16    text, a hang-up, a disconnect, any contact, it will assign the

 17    session number.

 18        Underneath the session number, we see the date.  That's

 19    the date that the call is made.  Underneath the date is the

 20    start time.  That is the time of the call.  And you see there

 21    it is in UTC.  That stands for coordinated universal time.

 22        And all the information that we collect on T3s are in UTC

 23    time because we collect telephone calls, generally speaking,

 24    not in this investigation, across the FBI, from different time

 25    zones, and we put them in UTC time, so it's kind of a uniform

HOLBROOK - DIRECT

1    starting point.

2        You have the stop times underneath that, which is the

3    time that the call was stopped, and then the duration.  But

4    you see the start and stop time is the same on this particular

5    contact, and the duration is zero, and that's because it is a

6    text message.

7    Q.   Special Agent Holbrook, what time zone is Cincinnati in?

8    A.   Eastern standard time zone.

9    Q.   Do you know the difference between coordinated universal

10   time and eastern standard time?

11   A.   Barely.  If you subtract four hours or five hours,

12   depending on whether it's daylight savings time.

13   Q.   Special Agent Holbrook, directing your attention now to

14   the second column here, beginning with the word

15   "classification," can you please explain to us, generally,

16   what appears in this column?

17   A.   Yeah.  So classification would be how we would classify

18   that particular contact.  We can deem something as pertinent,

19   non-pertinent, and there's a multitude of other selections

20   that we can utilize for the classification column.

21       Content is the next category that's selected by the

22   system, and here is the text message, a missed text message.

23       And then underneath that, you have primary language,

24   which was not relevant in this investigation.

25       Again, complete, which is another category with multiple

1    types of dropdown boxes.  Here complete means it's been

2    reviewed.  And then monitor ID was not utilized here.

3    Q.   Special Agent Holbrook, will you now proceed to the third

4    column here that begins with the word "direction," and explain

5    to us what information is contained here.

6    A.   Direction is the direction the contact came from relative

7    to the user of the phone.

8         So, for example, if direction says incoming, that means

9    the contact was from the -- coming in to Rob's phone.  If it's

10   outgoing, it would be going from Rob's phone to somebody else.

11        Underneath that, it says associate DN, that's the way of

12   saying telephone number.  The number that's going to be listed

13   there is the number that Rob made contact with.

14        And you'll know whether Rob made a contact or not based

15   upon the direction.  For example, this was an incoming contact

16   from 2404.

17        The next column is in and out digits.  It wasn't relevant

18   in this case.  We didn't utilize this.  This was just the

19   digits that were dialed for the contact.

20        The subscriber -- if you wanted to, we could put in the

21   subscriber of this telephone.  It wasn't necessary, so we

22   didn't use that category.

23        And then the participants, you see there there's Rob

24   Miller and Alexander Sittenfeld.

25   Q.   Beneath this blue box, you see a long rectangle that says

1    "content."  Can you just explain to us what we see here, and

2    the information that's contained underneath?

3    A.   Yeah.  So content -- SMS, this is a text message, and the

4    content is P.G. Sittenfeld.  So from this contact, we see that

5    Mr. Sittenfeld sent a text message to Rob's phone, and the

6    message was P.G. Sittenfeld.

7              MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

8    Q.   If you could, Special Agent Holbrook, would you please

9    turn to the tab in your binder marked USA 9B.

10   A.   Yes.

11   Q.   Do you recognize this?

12   A.   I do.

13   Q.   What is it?

14   A.   This is a line sheet for the telephone associated with

15   Brian, and the line sheet has filtered out telephone number

16   ending in 2404 and 0901.

17   Q.   How do you know that?

18   A.   I know that because I generated this document.

19             MS. GAFFNEY PAINTER:  Your Honor, the government

20   moves for the admission of Government Exhibit USA 9B.

21             MR. C. HENRY RITTGERS:  No objection.

22             THE COURT:  USA 9B is admitted without objection.

23   Q.   Now if you could, Special Agent Holbrook, please turn to

24   the tab in your binder for USA 9C.

25   A.   Yes.

*HOLBROOK - DIRECT*

1   Q.   Do you recognize this?

2   A.   I do.

3   Q.   What is it?

4   A.   This is another line sheet associated with a telephone

5   number used by undercover Vinny, and filtered out are the

6   telephone numbers ending in 2404 and 0901.

7   Q.   How do you know that?

8   A.   I generated this document.

9        MS. GAFFNEY PAINTER:  Your Honor, the government

10  moves for the admission of Government Exhibit USA 9C.

11       MR. C. HENRY RITTGERS:  No objection, Your Honor.

12       THE COURT:  USA 9C is admitted without objection.

13  Q.   Special Agent Holbrook, please turn to Tab USA 9D in your

14  binder.

15  A.   Yes.

16  Q.   Do you recognize this?

17  A.   I do.

18  Q.   What is it?

19  A.   Again, this is a line sheet associated with a telephone

20  number used by Chinedum Ndukwe, and filtered out are the

21  telephone numbers 2404 and 0901.

22  Q.   How do you know that?

23  A.   I know that because I generated this document.

24       MS. GAFFNEY PAINTER:  The government moves for the

25  admission of Government Exhibit USA 9D.

1    MR. C. HENRY RITTGERS:  No objection, Your Honor.

2    THE COURT:  USA 9D is admitted without objection.

3  Q.  Special Agent Holbrook, please turn to tab USA 9E in your

4  binder.

5  A.  Yes.

6  Q.  Do you recognize this?

7  A.  I do.

8  Q.  What is it?

9  A.  This is a line sheet associated with the telephone number

10  of UC Rob, and filtered out is the telephone number ending in

11  9049.

12  Q.  How do you know that?

13  A.  I know that because I generated this document.

14    MS. GAFFNEY PAINTER:  The government moves for the

15  admission of Government Exhibit USA 9E.

16    MR. C. HENRY RITTGERS:  No objection.

17    THE COURT:  USA 9E is admitted without objection.

18  Q.  Special Agent Holbrook, will you please turn to the tab

19  USA 11C.

20  A.  Yes.

21  Q.  Do you recognize this?

22  A.  I do.

23  Q.  What is it?

24  A.  This is a list of telephone numbers associated with the

25  various individuals involved in this investigation.

1    Q.   How do you know that these telephone numbers belong to

2    these individuals?

3    A.   A combination of ways.  Either they told me the telephone

4    number, or we obtained the number from another individual, or

5    we verified it through phone records.

6            MS. GAFFNEY PAINTER:  Your Honor, the government

7    moves for the admission of Government Exhibit USA 11C.

8            MR. C. HENRY RITTGERS:  No objection, Your Honor.

9            THE COURT:  Exhibit USA 11C is admitted without

10   objection.

11           MS. GAFFNEY PAINTER:  Ms. Terry and Mr. Lang, may we

12   please publish Government Exhibit 11C, if the Court allows it?

13           THE COURT:  You may do so.

14           MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

15   Q.   Special Agent Holbrook, during the course of this

16   investigation, did Rob and Brian have phone communications

17   with P.G. Sittenfeld?

18   A.   Yes.

19   Q.   Were these communications done on their undercover

20   phones?

21   A.   They were.

22   Q.   Turning back to November 7th, 2018, the day of the

23   meeting, what phone contact did Mr. Sittenfeld have with Rob?

24   A.   I recall a text message.

25   Q.   And if you could turn in your binder to the tab for

1    USA 15E.

2    A.   Yes.

3    Q.   Do you recognize this?

4    A.   I do.

5    Q.   What is it?

6    A.   This is a text message from Mr. Sittenfeld to Brian.

7    Q.   Did you review this exhibit for accuracy?

8    A.   I did.

9    Q.   What did you look to to confirm its accuracy?

10   A.   I looked at -- the source data for this particular text

11   message was the line sheets.

12   Q.   When you say "the line sheets," do you mean the line

13   sheets that were previously admitted as USA 9?

14   A.   Yes.

15        MS. GAFFNEY PAINTER:  The government moves for the

16   admission of Government Exhibit USA 15E.

17        MR. C. HENRY RITTGERS:  No objection, Your Honor.

18        THE COURT:  USA 15E is admitted without objection.

19        MS. GAFFNEY PAINTER:  Your Honor, with the Court's

20   permission, I would request that we publish the second page of

21   USA 15E.

22        THE COURT:  You may do so.

23   Q.   Special Agent Holbrook, what are we looking at here?

24   A.   This is a text message communication from Mr. Sittenfeld

25   to UC Rob.

1    Q.   And what date appears at the top of this?

2    A.   November 7, 2018.

3    Q.   What is the significance of the sides of the document?

4    A.   The left side, where it has Sittenfeld's name and

5    telephone number at the top, the communications on the left

6    side are going to be from Sittenfeld, and any communication on

7    the right side will be from Rob.

8         MS. GAFFNEY PAINTER:  Your Honor, may I approach the

9    witness with a revised exhibit, pursuant to conversations

10   we've had with defense counsel?

11        THE COURT:  You may.

12        MS. GAFFNEY PAINTER:  Apologies, Your Honor.  Bear

13   with me just a moment.

14        Your Honor, I have a copy of the three exhibits that were

15   the source of some conversation between the parties.  May I

16   approach and provide you and him with a copy?

17        THE COURT:  You may.  I was hoping I was getting one.

18   Thank you.

19        You may proceed.

20        MS. GAFFNEY PAINTER:  Thank you, Your Honor.

21   Q.   Special Agent Holbrook, I just handed you an exhibit

22   that's been marked for identification as Government Exhibit

23   USA 11A.  Do you recognize this?

24   A.   I have.  I mean, I do.  I'm sorry.  Excuse me.

25   Q.   What is it?

HOLBROOK - DIRECT

```
 1    A.   This is a chronology of events beginning September 21,
 2    2018, to December 23, 2019, that occurred in this
 3    investigation.
 4    Q.   Did you review this for accuracy?
 5    A.   I did.
 6    Q.   Are the entries in this exhibit based on other exhibits
 7    in this case?
 8    A.   Yes.
 9         MS. GAFFNEY PAINTER:  Your Honor, the government
10    moves for the admission of Government Exhibit USA 11A.
11         MR. C. HENRY RITTGERS:  No objection, Your Honor.
12         THE COURT:  USA 11A is admitted without objection.
13    Q.   Special Agent Holbrook, directing your attention to
14    November 14, 2018, what phone contact did Mr. Sittenfeld have
15    with Rob or Brian that day?
16    A.   Mr. Sittenfeld left UC Rob a voicemail.
17    Q.   Was that message recorded?
18    A.   Yes.
19    Q.   If you could, please, turn in your binder to the tab
20    USA 16A.
21    A.   Okay.
22    Q.   Do you recognize this?
23    A.   I do.
24    Q.   What is it?
25    A.   This is a compact disk containing the November 14, 2018
```

1    call.

2    Q.  How do you know that?

3    A.  I know that because I've reviewed it, and I placed my

4    initials on the disk.

5         MS. GAFFNEY PAINTER:  The government moves for the

6    admission of Government Exhibit USA 16A.

7         THE COURT:  Mr. Rittgers?

8         MR. C. HENRY RITTGERS:  No objection, Your Honor.

9         THE COURT:  USA 16A is admitted without objection.

10   Q.  Special Agent Holbrook, will you please turn in your

11   binder to the tab USA 16B.

12   A.  Yes.

13   Q.  Do you recognize this?

14   A.  I do.

15   Q.  What is it?

16   A.  This is a transcript of the November 14, 2018 voice

17   message left by Sittenfeld on Rob's phone.

18   Q.  Have you reviewed it for accuracy?

19   A.  I have.

20        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

21   parties' stipulation and the testimony of Special Agent

22   Holbrook, the government moves for the admission of USA 16B

23   into evidence.

24        MR. C. HENRY RITTGERS:  No objection, Your Honor.

25        THE COURT:  USA 16B is admitted without objection.

 1          MS. GAFFNEY PAINTER:  Your Honor, permission to

 2   publish the exhibit to the jury?

 3          THE COURT:  You may do so.  And ladies and gentlemen

 4   of the jury, the transcript for the audio you're about to hear

 5   is at Tab 16B of your transcript book.

 6      Once again, though, to the extent you hear something

 7   different on the audio from what's in the book, go with the

 8   audio.

 9      (Audio played.)

10   Q.  Special Agent Holbrook, the next day after this phone

11   call, November 15, 2018, what happened in the investigation?

12   A.  November 15th, 2018, Sittenfeld met with Brian and

13   Ndukwe.

14   Q.  Was that meeting recorded?

15   A.  Yes.

16   Q.  Where was that meeting held?

17   A.  I'm not sure of this location.  It was in downtown

18   Cincinnati at a public establishment.

19   Q.  Who participated in that meeting?

20   A.  Brian, Mr. Ndukwe, and Mr. Sittenfeld.

21          MS. GAFFNEY PAINTER:  Your Honor, the government

22   would request permission to publish what has already been

23   admitted as USA 15E, just page 1?

24          THE COURT:  It's already been admitted?

25          MS. GAFFNEY PAINTER:  Yes.

```
 1              THE COURT:  You may do so.

 2              MS. GAFFNEY PAINTER:  Ms. Terry and Mr. Lang, may we

 3      please publish USA 15A, just the first page.

 4      Q.   Special Agent Holbrook, what are we looking at here?

 5      A.   We're looking at a November 15, 2018 text message from

 6      Mr. Sittenfeld to Brian.

 7      Q.   I want to be clear.  The information that is depicted in

 8      this exhibit, where did this information come from?

 9      A.   Which exhibit?

10      Q.   The one we're looking at, 15E.

11              You testified earlier that the exhibits in USA series

12      nine were the line sheets.  Does this depict data that you

13      acquired from those line sheets?

14      A.   Yes.

15      Q.   So this is a visual depiction of what is also admitted in

16      a different exhibit; is that correct?

17      A.   That is correct.

18      Q.   Special Agent Holbrook, if you could turn in your binder

19      to tab USA 17A.

20      A.   Yes.

21      Q.   Do you recognize this?

22      A.   I do.

23      Q.   What is it?

24      A.   It is the November 15, 2018 meeting that was just

25      referenced.
```

1    Q.   How do you know that?

2    A.   I know that because I reviewed this, and I put my

3    initials on the disk.

4         MS. GAFFNEY PAINTER:  Your Honor, the government

5    moves for the admission of Government Exhibit USA 17A.

6         MR. C. HENRY RITTGERS:  No objection, Your Honor.

7         THE COURT:  USA 17A is admitted without objection.

8    Q.   Special Agent Holbrook, will you please turn to, in your

9    binder, USA 17B.

10   A.   Yes.

11   Q.   What is this?

12   A.   This is a partial transcript of the November 15th, 2018

13   meeting between Mr. Sittenfeld, Brian, and Mr. Ndukwe.

14   Q.   Have you reviewed it for accuracy?

15   A.   I have.

16        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

17   stipulations between the parties, and the testimony of Special

18   Agent Holbrook, the government moves for admission of USA 17B.

19        THE COURT:  Mr. Rittgers?

20        MR. C. MATTHEW RITTGERS:  No objection.

21        MR. C. HENRY RITTGERS:  No objection.

22        THE COURT:  USA 17B is admitted without objection.

23        MS. GAFFNEY PAINTER:  Your Honor, may we please

24   publish this to the jury?

25        THE COURT:  You may.  And is this a transcript that's

```
 1    included, I believe it is in the book, correct?

 2           MS. GAFFNEY PAINTER:  It is.  And I would like to

 3    note for the record the timestamps that are reflected in this

 4    exhibit.

 5           THE COURT:  Very good.

 6           MS. GAFFNEY PAINTER:  1:54:34 through 56:01.

 7           THE COURT:  So ladies and gentlemen of the jury, this

 8    would be at Tab 17B in your binder.

 9      (Audio played.)

10    Q.  Special Agent Holbrook, will you please go to the tab in

11    your binder marked USA 18A.

12    A.  Yes.

13    Q.  Do you recognize this?

14    A.  Yes.  This is a compact disk with a November 21, 2018

15    voicemail.

16    Q.  How do you know that?

17    A.  I know that because I reviewed this disk.

18           MS. GAFFNEY PAINTER:  The government moves for the

19    admission of Government Exhibit USA 18A.

20           MR. C. HENRY RITTGERS:  No objection, Your Honor.

21           THE COURT:  USA 18A is admitted without objection.

22    Q.  Special Agent Holbrook, please turn to the tab in your

23    binder USA 18B.

24    A.  Yes.

25    Q.  Do you recognize this?
```

1   A.   Yes.  This is a November 21, 2018 transcript of a

2   voicemail left by Rob.

3   Q.   How do you know that?

4   A.   I know that because I've reviewed this transcript.

5   Q.   And have you reviewed it for accuracy?

6   A.   Yes.

7        MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

8   stipulation and Special Agent Holbrook's testimony, the

9   government moves for admission of USA 18B.

10       MR. C. HENRY RITTGERS:  No objection.

11       THE COURT:  USA 18B is admitted without objection.

12       MS. GAFFNEY PAINTER:  May we publish it to the jury?

13       THE COURT:  You may.  Ladies and gentlemen of the

14  jury, this transcript will be at 18B.

15       (Audio played.)

16  Q.   Special Agent Holbrook, please turn to the tab in your

17  binder marked USA 18C.

18  A.   Okay.

19  Q.   Do you recognize this?

20  A.   I do.

21  Q.   What is it?

22  A.   This is a compact disk containing another recording from

23  November 21, 2018.

24  Q.   How do you know that?

25  A.   I've reviewed this disk, and I've put my initials on it.

1          MS. GAFFNEY PAINTER:  The government moves for the

2     admission of Government Exhibit USA 18C.

3          MR. C. HENRY RITTGERS:  No objection.

4          THE COURT:  USA 18c is admitted without objection.

5     Q.  Special Agent Holbrook, will you please turn to the tab

6     USA 18D.

7     A.  Yes.

8     Q.  Do you recognize this?

9     A.  Yes.

10    Q.  What is it?

11    A.  It's a transcript of the November 21, 2018 call between

12    Mr. Sittenfeld and Rob.

13    Q.  Have you reviewed this transcript for accuracy?

14    A.  Yes.

15         MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

16    stipulation between the parties and the testimony of Special

17    Agent Holbrook, the government moves for the admission of

18    USA 18D.

19         MR. C. HENRY RITTGERS:  No objection.

20         THE COURT:  USA 18D is admitted without objection.

21         MS. GAFFNEY PAINTER:  May we publish this to the

22    jury, Your Honor?

23         THE COURT:  You may.  It's 18D, correct?

24         MS. GAFFNEY PAINTER:  18D is the transcript.  18C is

25    the recording.

*HOLBROOK - DIRECT*

1          THE COURT:  All right.  So you can turn to your 18D

2     tab in your book there and then listen to the audio.

3          (Audio played.)

4     Q.   Special Agent Holbrook, there was reference in that call

5     at USA 18C to a PAC Progress and Growth.  During the course of

6     your investigation, did you review documents related to that

7     PAC?

8     A.   Yes.

9     Q.   If you could turn in your binder to tab USA 40A.

10    A.   Yes.

11    Q.   Do you recognize this?

12    A.   I do.

13    Q.   What is it?

14    A.   This is a statement of organization for the Progress and

15    Growth PAC, dated February 5, 2018.

16    Q.   Where did that document come from?

17    A.   This come from the FEC, the Federal Election Commission

18    website.

19          MS. GAFFNEY PAINTER:  The government moves for the

20    admission of Government Exhibit USA 40A.

21          MR. C. HENRY RITTGERS:  No objection, Your Honor.

22          THE COURT:  USA 40A is admitted without objection.

23          MS. GAFFNEY PAINTER:  Your Honor, permission to

24    publish this to the jury?

25          THE COURT:  You may do so.

HOLBROOK - DIRECT

1    Q.   Special Agent Holbrook, will you please turn to tab

2    USA 40B in your binder.

3    A.   Yes.

4    Q.   Do you recognize this?

5    A.   I do.

6    Q.   What is it?

7    A.   This is an FEC Form 3X, a report of receipts and

8    disbursements for the Progress and Growth PAC from

9    November 27th, 2018, through December 31st, 2018.

10   Q.   Where did that document come from?

11   A.   This document came from the FEC website.

12        MS. GAFFNEY PAINTER:  Government moves for the

13   admission of Government Exhibit USA 40B.

14        MR. C. HENRY RITTGERS:  No objection.

15        THE COURT:  USA 40B is admitted without objection.

16   Q.   Special Agent Holbrook, will you please turn in your

17   binder to the tab marked USA 40C.

18   A.   Yes.

19   Q.   Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   This is an FEC Form 3X, report of receipts and

23   disbursements for the Progress and Growth PAC from 11/27/2018,

24   through December 31, 2018, and the box "amended" is checked on

25   this one.

1    Q.  Where did this document come from?

2    A.  The FEC website.

3          MS. GAFFNEY PAINTER:  Government moves for the

4    admission of Government Exhibit USA 40C.

5          MR. C. HENRY RITTGERS:  No objection, Your Honor.

6          THE COURT:  USA 40C is admitted without objection.

7    Q.  Special Agent Holbrook, will you please turn in your

8    binder to tab USA 40D.

9    A.  Yes.

10    Q.  Do you recognize this?

11    A.  I do.

12    Q.  What is it?

13    A.  This is FEC Form 3X, report of receipts and disbursements

14    for the Progress and Growth PAC.  This is dated July 1, 2019,

15    through December 31, 2019.

16    Q.  And where did this document come from?

17    A.  It came from the FEC website.

18          MS. GAFFNEY PAINTER:  The government moves for the

19    admission of Government Exhibit USA 40D.

20          MR. C. HENRY RITTGERS:  No objection, Your Honor.

21          THE COURT:  USA 40D is admitted without objection.

22    Q.  If you could, Special Agent Holbrook, turn to tab USA 40E

23    in your binder.

24    A.  Yes.

25    Q.  Do you recognize this?

HOLBROOK - DIRECT

1    A.   I do.

2    Q.   What is it?

3    A.   This is a screen shot from the Federal Election

4    Commission website of the Progress and Growth PAC.

5    Q.   For what years?

6    A.   For 2017 through 2018.

7    Q.   How do you know that?

8    A.   I've reviewed the website that this screen shot was taken

9    from.

10        MS. GAFFNEY PAINTER:  The government moves for the

11    admission of Government Exhibit USA 40E.

12        MR. C. HENRY RITTGERS:  No objection.

13        THE COURT:  USA 40E is admitted without objection.

14        MS. GAFFNEY PAINTER:  Permission to publish

15    Government Exhibit USA 40E to the jury?

16        THE COURT:  You may do so.

17    Q.   Special Agent Holbrook, five days after the call that we

18    listened to, which was USA 18C, on November 26, 2018, was

19    there phone contact between Mr. Sittenfeld and Rob?

20    A.   There was.

21    Q.   How do you know that?

22    A.   I know that because I've reviewed a phone call on that

23    date.

24    Q.   If you could, please, turn in your binder to USA 19A.

25    A.   Yes.

HOLBROOK - DIRECT

1   Q.  Do you recognize this?

2   A.  I do.

3   Q.  What is it?

4   A.  This is a compact disk containing an audio recording of a

5   call from Rob to Sittenfeld on November 26, 2018.

6   Q.  How do you know that?

7   A.  I know that because I've reviewed this disk and placed my

8   initials on it.

9        MS. GAFFNEY PAINTER:  The government moves for

10  admission of Government Exhibit USA 19A.

11       MR. C. HENRY RITTGERS:  No objection, Your Honor.

12       THE COURT:  USA 19A is admitted without objection.

13  Q.  Special Agent Holbrook, will you please turn in your

14  binder to USA 19B.

15  A.  Yes.

16  Q.  Do you recognize this?

17  A.  I do.

18  Q.  What is it?

19  A.  This is a transcript of the November 26, 2019 call

20  between Mr. Sittenfeld and Rob.

21  Q.  Have you reviewed it for accuracy?

22  A.  I have.

23       MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

24  parties' stipulation and Special Agent Holbrook's testimony,

25  the government moves for the admission of Government Exhibit

HOLBROOK - DIRECT

1    USA 19B.

2           MR. C. HENRY RITTGERS:  No objection, Your Honor.

3           THE COURT:  USA 19B is admitted without objection.

4           MS. GAFFNEY PAINTER:  Your Honor, may we publish it

5    to the jury?

6           THE COURT:  You may.  And ladies and gentlemen of the

7    jury, there should be a Tab 19B in your transcript volume,

8    which you may now look at.

9       (Audio played.)

10   Q.   What happened two days later, on November 28, 2018?

11   A.   There was a telephone call from Mr. Sittenfeld to Rob.

12   Q.   If you could turn to your exhibit binder and go to the

13   tab marked USA 20A.

14   A.   Yes.

15   Q.   Do you recognize this?

16   A.   I do.

17   Q.   What is this?

18   A.   This is a disk containing the November 28th, 2018 phone

19   call from Mr. Sittenfeld to Rob.

20   Q.   How do you know that?

21   A.   I know that because I reviewed it, and I've placed my

22   initials on the disk.

23          MS. GAFFNEY PAINTER:  The government moves for the

24   admission of Government Exhibit USA 20A.

25          MR. C. HENRY RITTGERS:  No objection, Your Honor.

1              THE COURT:  USA 20A is admitted without objection.

2    Q.   Special Agent Holbrook, will you please turn to the next

3    tab, USA 20B.

4    A.   Yes.

5    Q.   Do you recognize this?

6    A.   I do.

7    Q.   What is it?

8    A.   This is a transcript of the November 28, 2018 call from

9    Mr. Sittenfeld to Rob.

10   Q.   And have you reviewed it for accuracy?

11   A.   Yes, I have.

12            MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

13   stipulation between the parties and the testimony of Special

14   Agent Holbrook, the government moves for the admission of

15   Government Exhibit USA 20B.

16            MR. C. HENRY RITTGERS:  No objection.  Could we

17   approach the bench for one second?

18            THE COURT:  You may.

19   SIDEBAR CONFERENCE OFF THE RECORD

20            MS. GAFFNEY PAINTER:  Your Honor, forgive me, was

21   USA 20B admitted?

22            THE COURT:  If not, USA Exhibit 20B is admitted into

23   evidence without objection.

24            MS. GAFFNEY PAINTER:  Thank you.  Your Honor,

25   permission to publish Exhibit USA 20A to the jury?

```
 1              THE COURT:  You may.  Ladies and gentlemen of the

 2    jury, there should be a 20B in your volume of transcripts.

 3         (Audio played.)

 4    Q.   After that call, what happened on the same day,

 5    November 28, 2018?

 6    A.   There was an in-person meeting with Sittenfeld, Brian,

 7    and Rob.

 8    Q.   Where did that meeting take place?

 9    A.   It took place in the apartment at the 580 Building.

10    Q.   Was that meeting recorded?

11    A.   Yes.

12    Q.   Please turn in your binder to tab USA 20C.

13    A.   Yes.

14    Q.   Do you recognize this?

15    A.   I do.  This is a disk containing the November 28, 2018

16    meeting just referenced.

17    Q.   How do you know that?

18    A.   I know that because I reviewed this disk, and I placed my

19    initials on it.

20              MS. GAFFNEY PAINTER:  The government moves for the

21    admission of Government Exhibit USA 20C.

22              MR. C. HENRY RITTGERS:  No objection.

23              THE COURT:  USA 20C is admitted without objection.

24    Q.   Special Agent Holbrook, if you will, please, turn to the

25    tab USA 20D.
```

HOLBROOK - DIRECT

1    A.   Yes.

2    Q.   Do you recognize this?

3    A.   I do.

4    Q.   What is it?

5    A.   This is a partial transcript of a November 28th, 2018

6    meeting between Rob, Brian, and Mr. Sittenfeld.

7    Q.   Have you reviewed it for accuracy?

8    A.   Yes, I have.

9         MS. GAFFNEY PAINTER:  Your Honor, pursuant to the

10   parties' stipulation and Special Agent Holbrook's testimony,

11   the government moves for the admission of Government

12   Exhibit USA 20D.

13        MR. C. HENRY RITTGERS:  No objection.

14        THE COURT:  USA 20D is admitted without objection.

15        MS. GAFFNEY PAINTER:  Your Honor, may I have just a

16   moment to confer with my colleagues?

17        THE COURT:  You may.

18        MS. GAFFNEY PAINTER:  Thank you, Your Honor.

19     Before seeking permission to publish to the jury, I would

20   like to note for the record the specific timestamps that we

21   will be admitting here today.

22        THE COURT:  Very good.

23        MS. GAFFNEY PAINTER:  The first timestamp is 6:46

24   until 6:57.  Then in session two, 8:00 to 9:06; session four,

25   2:04 to 4:02; and also in session four, 7:40 to 9:04.

1          Your Honor, may I publish this exhibit to the jury?

2               THE COURT:  You may.

3               MS. GAFFNEY PAINTER:  And, Ms. Terry, we're starting,

4     as I said, at 6:46.  When we get to 6:57, will you please

5     pause it so the image remains on the screen.

6               THE COURT:  And there is Exhibit 20D in your

7     transcript binder.

8          (Video played.)

9     Q.   Special Agent Holbrook, directing your attention to the

10    screen here, we have paused the exhibit, I believe, at 6:57.

11    Who appears here in the center of the screen?

12    A.   That's Rob Miller.

13              MS. GAFFNEY PAINTER:  All right.  May we please

14    resume?

15              THE COURT:  You may.

16         (Video played.)

17              MS. GAFFNEY PAINTER:  Your Honor, before we proceed

18    to the next clip, may we please approach for a brief sidebar?

19              THE COURT:  Sure.

20    SIDEBAR CONFERENCE

21              MS. GLATFELTER:  I realize that there's been a sketch

22    artist that is in the courtroom, and we now have images of our

23    undercover officers displayed on the screen publicly.

24         I don't know if any sketch artist will be sketching from

25    the screen, but I just wanted to make clear that we would ask

```
 1    for an order prohibiting that.

 2       We do have some security and safety concerns regarding

 3    our undercovers who are currently still involved in other

 4    investigations, and so their image is being displayed on the

 5    screen.

 6       We're doing that so the jury can see, but we don't want

 7    them sketched.  I'm saying that because it just occurred to

 8    me, as I'm looking at the screen and we paused it.

 9          THE COURT:  Well, the undercovers are also going to

10    be on the witness stand, aren't they?

11          MS. GLATFELTER:  They will, but we agreed pretrial

12    that there would be an order given not to sketch the

13    undercover officers.

14          THE COURT:  Oh, we did?

15          MS. GLATFELTER:  Yes.

16          MR. C. HENRY RITTGERS:  We did, Your Honor.

17          THE COURT:  All right.  So just instruct the sketch

18    artist, I guess, not to sketch the persons depicted on the

19    screen,  although if it's anything like the sketch they did of

20    me, I wouldn't be worried.  I'm sure others may feel that same

21    way, right?

22          MS. GLATFELTER:  I don't see that person in here

23    right now.

24          MR. C. MATTHEW RITTGERS:  I don't know who that

25    person was, I would have talked to him.
```

 1          MS. GLATFELTER:  No.  I noticed because they were

 2     sitting behind us, so I --

 3          THE COURT:  For the record, your hair is darker than

 4     it appeared.

 5          MS. GLATFELTER:  Do you think we need to do this

 6     right now, or --

 7          MR. SINGER:  We could ask to see if there's any

 8     sketch artist in the courtroom; if there's not, then --

 9          THE COURT:  I'll do that.  All right.

10     SIDEBAR CONFERENCE CONCLUDED

11          THE COURT:  So in a somewhat odd question, are there

12     any sketch artists currently sketching in the courtroom?

13     Seeing no one, okay.  You may continue.

14          MS. GAFFNEY PAINTER:  Thank you, Your Honor.  May we

15     please publish the next segment.

16          (Video played.)

17     Q.  Special Agent Holbrook, will you please turn in your

18     binder to USA 20F and USA 20G?

19     A.  Yes.

20     Q.  Do you recognize these?

21     A.  I do.

22     Q.  What are they?

23     A.  These are photographs of checks.  The first check is from

24     Avantis Enterprises, with an address below, written to

25     Progress and Growth PAC on November 27, 2018, and then --

1    Q.   Special Agent Holbrook, forgive me for interrupting you,

2    but I want to make sure that this is admitted into evidence

3    properly before we discuss it.

4    A.   Oh, I'm sorry.

5    Q.   Are these photographs fair and accurate representations

6    of the checks?

7    A.   Yes.

8         MS. GAFFNEY PAINTER:  Your Honor, the government

9    moves for the admission of Government Exhibits USA 20F and

10   USA 20G.

11        MR. C. HENRY RITTGERS:  No objection, Your Honor.

12        THE COURT:  USA 20F and USA 20G are admitted without

13   objection.

14   Q.   Special Agent Holbrook, let's go first to USA 20F.

15        MS. GAFFNEY PAINTER:  And if the Court indulges us,

16   may we please publish this to the jury?

17        THE COURT:  You may.

18   Q.   Directing your attention to the upper left-hand corner,

19   what appears there?

20   A.   The name of a business, Avantis Enterprises, and an

21   address located in Illinois.

22   Q.   What is Avantis Enterprises, Inc.?

23   A.   It's a company or a corporation that is operated by our

24   undercover unit.  It's not real.

25   Q.   What is the amount of this check?

*HOLBROOK - DIRECT*

1     A.   $5,000.

2     Q.   What appears in the lower right-hand corner?

3     A.   Just a signature.

4     Q.   Who provided this money?

5     A.   I provided this to Rob.

6     Q.   And is this one of the checks that was seen in the video

7     we just watched?

8     A.   Yes.

9     Q.   All right.  Now if we may turn to USA 20G.

10        Directing your attention to the upper left-hand corner,

11     what appears there?

12     A.   J&S Technologies, with an address in Naperville,

13     Illinois.

14     Q.   What is J&S Technologies?

15     A.   It is a made-up company that the undercover utilizes.

16     Q.   What is the amount of this check?

17     A.   $5,000.

18     Q.   What appears in the lower right-hand corner there?

19     A.   It appears to be the signature of Mark Davis.

20     Q.   Who provided this money?

21     A.   Excuse me?

22     Q.   Who provided the money for this check?

23     A.   The FBI provided the money for this check.

24     Q.   You just testified to events that occurred in November of

25     2018.  Will you please turn to what's been marked for

*HOLBROOK - DIRECT*

1       identification as USA 11D.

2       A.   Yes.

3       Q.   What is this?

4       A.   This is a calendar for the month of November 2018.

5              MS. GAFFNEY PAINTER:  Your Honor, the government

6       moves for the admission of Government Exhibit USA 11D.

7              MR. C. HENRY RITTGERS:  No objection, Your Honor.

8              THE COURT:  USA 11D is admitted without objection.

9       Q.   If you could, Special Agent Holbrook, could you turn to

10      Tab 21B.

11      A.   Yes.

12      Q.   Do you recognize this?

13      A.   Yes.

14      Q.   What is it?

15      A.   This is a text message from Mr. Sittenfeld to Rob.

16      Q.   Did you review it for accuracy?

17      A.   Yes.

18             MS. GAFFNEY PAINTER:  The government moves for the

19      admission of Government Exhibit USA 21B.

20             MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

21             THE COURT:  USA Exhibit 21B is admitted without

22      objection.

23             MS. GAFFNEY PAINTER:  May we publish this for the

24      jury?

25             THE COURT:  You may.

1    Q.   Special Agent Holbrook, what's the date on USA 21B?

2    A.   December 3, 2018.

3    Q.   And who are the -- can you describe for us what we see

4    here?

5    A.   Yes.  On the left side, you see Sittenfeld's name and

6    telephone number.  On the right side of the top right corner

7    of the paper, you see UC Rob's name and telephone number.  And

8    then you see a text message that is from Mr. Sittenfeld to

9    UC Rob.

10   Q.   Will you please read the text message.

11   A.   Yes.  "Around tonight, or let me know when good to ring

12   you tomorrow."

13   Q.   Did Rob and Mr. Sittenfeld have a phone call the next

14   day, December 4, 2018?

15   A.   I believe so.

16   Q.   Was that call recorded?

17   A.   Yes, it was.

18   Q.   All right.  If you could turn to what's been marked for

19   identification as USA 21C.

20   A.   Yes.

21   Q.   Do you recognize this?

22   A.   I do.

23   Q.   What is it?

24   A.   This is a December 4, 2018 call.

25   Q.   How do you know that?

HOLBROOK - DIRECT

1    A.   I reviewed this disk, and I've placed my initials on it.

2         MS. GAFFNEY PAINTER:  The government moves for the

3    admission of Government Exhibit USA 21C.

4         MR. C. MATTHEW RITTGERS:  Your Honor, are you ready?

5    Sorry.

6         THE COURT:  The copy in my book says December 3, 2018

7    call.  Is that just wrong?

8         MR. C. MATTHEW RITTGERS:  They didn't include the

9    transcript which is of this call in that folder, I don't

10   believe.  Oh, the date's wrong.  That's it.

11        THE COURT:  The date says 12/3/2018 on there.

12        MR. C. MATTHEW RITTGERS:  That was my confusion.  I'm

13   sorry.

14        MS. GAFFNEY PAINTER:  Your Honor, I think I know the

15   source of the confusion.  The date on the disk is December 4th

16   UTC time.  The call is actually December 3, 2018.

17        THE COURT:  I see.  The five hour -- so it was late

18   in the evening on December 3, which shows up as UTC time the

19   next day?

20        MS. GAFFNEY PAINTER:  Yes.  Yes.  And I -- let me

21   just have a brief moment, if I may, to confer?

22        THE COURT:  Yes.

23        MS. GAFFNEY PAINTER:  Your Honor, this might be a

24   good time for an afternoon break, and we can confer and make

25   sure that everything is clear before we continue.

1         THE COURT:  Okay.  Why don't we take a brief break.

2    Ladies and gentlemen of the jury, I would just remind you,

3    please do not form any opinions.  Please do not discuss this

4    matter with your fellow jurors during the break.  Please do

5    not use any electronic devices to do any research regarding

6    the case or regarding any of the charges in this case.  And

7    please do not communicate with anyone about the case.  If

8    anyone attempts to discuss the case with you, please bring it

9    to my attention.

10        With that, we'll go on break.

11        (Jury out at 2:41 p.m.)

12        THE COURT:  Is there anything the government needs to

13   put on the record before we go on break?

14        MS. GAFFNEY PAINTER:  No.  Thank you, Your Honor.

15        THE COURT:  Mr. Rittgers?

16        MR. C. MATTHEW RITTGERS:  No, Your Honor.

17        THE COURT:  You may take a break.  I was going to

18   talk with Mr. Greiner, who I see again, right, for

19   The Enquirer?

20        MR. GREINER:  Yes.

21        THE COURT:  I wanted to discuss something with you.

22   We can either discuss it at sidebar, or we can do it in open

23   court, I don't care.

24        MR. GREINER:  It's up to you.

25        THE COURT:  Why don't we just chat here.  Very good.

1    We can take a recess.

2        (Brief recess.)

3        THE COURT:  Ms. Gaffney Painter, did you get the

4    December 3 and December 4 thing sorted?

5        MS. GAFFNEY PAINTER:  Yes, Your Honor.  I apologize.

6    We have a way that we can explain it in front of the jury that

7    explains and instructs them.

8        THE COURT:  Very good.  Have you conferred with your

9    colleagues, I mean the defense, about your explanation, or --

10        MS. GAFFNEY PAINTER:  We have not, but I'm happy to

11    do so.

12        MR. C. MATTHEW RITTGERS:  We're good.

13        THE COURT:  All right.  So we're ready to bring the

14    jury back in?

15        MS. GAFFNEY PAINTER:  Yes.  Thank you, Your Honor.

16        THE COURT:  Mr. Rittgers?

17        MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

18        THE COURT:  All right.  Let's bring the jury in.

19        (Jury in at 3:05 p.m.)

20        MS. GAFFNEY PAINTER:  The one way that we are able to

21    explain the discrepancy is by referring to the first page of

22    the transcript, which is 21D.

23        THE COURT:  Right.

24        MS. GAFFNEY PAINTER:  I think the most efficient way

25    would be to refer to the first page of 21D and display it

1    alongside page 9 of the exhibit -- one of the line sheets, to

2    walk him through and explain this discrepancy.

3            THE COURT:  Okay.

4            MS. GAFFNEY PAINTER:  But I would seek the Court's

5    permission and defense counsel's indulgence to display just

6    that first page before we seek to admit it into evidence, just

7    to allow us to explain the date discrepancy between the

8    date -- discrepancy between the date, the transcript, and the

9    line sheets.

10           MR. C. HENRY RITTGERS:  We don't have any objection,

11   Your Honor.

12           THE COURT:  Okay.  Very good.

13           MR. SINGER:  Your Honor, may I approach the witness

14   and give him a water?

15           THE COURT:  Oh, sure.

16           MS. GAFFNEY PAINTER:  Your Honor, may I approach the

17   podium and continue the examination?

18           THE COURT:  You may.

19   BY MS. GAFFNEY PAINTER:

20   Q.   Special Agent Holbrook, right before the break, there was

21   some confusion about dates, so I'd like to walk through some

22   evidence now to attempt to resolve it.

23   A.   Yes.

24   Q.   So you initially looked at USA 21C; is that correct?

25   A.   That's correct.

1    Q.    And what is the date that is written on that disk?

2    A.    The date on the disk is December 4th of 2018.

3    Q.    Okay.  Now if you could, turn to Tab 21D.

4          What is the date there that appears on 21D?

5    A.    December 3, 2018.

6          MS. GAFFNEY PAINTER:  Now, if I may, Your Honor,

7    request to publish just this first page of USA 21D, which has

8    not yet been admitted into evidence.

9          THE COURT:  You may do so.

10         MS. GAFFNEY PAINTER:  Thank you.  Ms. Terry, will you

11   please on the other screen publish page 9 of Exhibit 9A.

12   Q.    Special Agent Holbrook, I'd like to direct you to this

13   bottom portion of the page, which Ms. Terry has helpfully

14   blown up here.  And looking at this, what is the session

15   number on this?

16   A.    Session 1827.

17   Q.    Now, referring you back to this first page of USA 21D,

18   what is the session number that appears there?

19   A.    Session 1827.

20   Q.    Okay.  And that matches both of those exhibits, the

21   session number's the same, right?

22   A.    That is correct.

23   Q.    What is the date that appears on the line sheet -- again,

24   I'm referring you back to USA 9A, page 9.  What is the date

25   that appears there?

1    A.   December 4, 2018.

2    Q.   All right.  And what appears beneath December 4, 2018?

3    A.   It is the start time of this call, which is 1:13:04

4    UTC time.

5    Q.   Now, you testified earlier that there is a conversion

6    that is performed to get coordinated universal time into

7    eastern standard time.  Do you recall that testimony?

8    A.   Yes.

9    Q.   Okay.  So when you perform that calculation with this

10   coordinated universal time, approximately what results?  What

11   day do we end up in when we make that conversion?

12   A.   When you convert the UTC time on December 4th to eastern

13   standard time, it becomes December 3rd.

14   Q.   Okay.  So referring you back to USA 21D, the first page,

15   where we see the date December 3rd, 2018; is that correct?

16   A.   Yes.

17   Q.   All right.  Directing you back to USA 21C, which is the

18   disk that has December 4, 2018?

19   A.   Okay.

20   Q.   Regardless of the date that is printed on that exhibit,

21   have you listened to the recording that appears on that disk?

22   A.   Yes.

23   Q.   And does that recording correspond with the transcript

24   here at USA 21D?

25   A.   It does.

1    Q.   So the label that appears on USA 21C contains a

2    typographical error; is that right?

3    A.   That's true.  It's in UTC time.

4    Q.   Right.  So the call that we are referring to actually

5    occurred on December 3, 2018 eastern standard time?

6    A.   That's correct.

7         MS. GAFFNEY PAINTER:  Your Honor, I believe that that

8    addresses the discrepancy.

9         THE COURT:  So are you moving to admit 21C?

10        MS. GAFFNEY PAINTER:  Yes.

11        MR. C. HENRY RITTGERS:  No objection.

12        THE COURT:  USA Exhibit 21C is admitted without

13   objection.

14   Q.   Special Agent Holbrook, directing you again back to

15   USA 21D.  What is this?

16   A.   This is a transcript of a telephone call that occurred on

17   December 3, 2018.

18   Q.   And have you reviewed it for accuracy?

19   A.   Yes.

20        MS. GAFFNEY PAINTER:  Your Honor, the government

21   moves for the admission of USA 21D.

22        MR. C. HENRY RITTGERS:  No objection.

23        THE COURT:  USA 21D is admitted without objection.

24        MS. GAFFNEY PAINTER:  Your Honor, may we publish this

25   in front of the jury?

```
 1              THE COURT:  You may.  Ladies and gentlemen of the

 2     jury, there should be a Tab 21D in the transcript book.

 3         Since we're back from a break, I will remind you, we're

 4     going to play the audio.  To the extent you hear something

 5     different on the audio from what you see in the transcript

 6     book, you should go with what you hear and not with what you

 7     read.

 8         (Audio played.)

 9     Q.  Special Agent Holbrook, there was a reference in USA 21C

10     to corporations versus LLCs.  What is your understanding of

11     the significance of that distinction in this context between

12     corporations and LLCs?

13     A.  My understanding is the PAC, the Progress and Growth PAC,

14     cannot accept checks from corporations, but they can accept

15     checks from LLCs.

16     Q.  What investigative steps did you take in response to this

17     phone call?

18     A.  I replaced these corporation checks with LLC checks.

19     Q.  And how many checks did you replace the corporation

20     checks with?

21     A.  Four.

22     Q.  In what amount?

23     A.  Total of $20,000.

24     Q.  All right.  If you could, please, turn in your binder to

25     USA 21E.
```

1    Do you recognize this?

2    A.  Yes.

3    Q.  What is it?

4    A.  This is a summary of text message communications between

5    Mr. Sittenfeld and Rob.

6    Q.  Did you review this for accuracy?

7    A.  I did.

8         MS. GAFFNEY PAINTER:  The government moves for the

9    admission of Government Exhibit USA 21E.

10         MR. C. HENRY RITTGERS:  No objection, Your Honor.

11         THE COURT:  USA 21E is admitted without objection.

12         MS. GAFFNEY PAINTER:  Your Honor, may we publish to

13    the jury?

14         THE COURT:  You may.

15    Q.  Special Agent Holbrook, will you please read the text

16    message exchange that appears here in Government Exhibit

17    USA 21E.

18    A.  Yes.  Beginning with Rob:  "I will be there on Monday."

19         Sittenfeld responds, "Great.  Drink after work or after

20    dinner?"

21         December 13, 2018, Rob texts:  "Whichever one works for

22    you."

23         Sittenfeld texts:  "How about 5:30 p.m., Ruby's, Sotto?

24    You tell me."

25         December 14, 2018, Rob texts:  "Let's do Sotto.  Drinks

1    or dinner?"

2        Sittenfeld texts:  "Unfortunately, I have a city related

3    dinner function at 7:00 p.m.  But 5:30 drinks at Sotto sounds

4    great, and it's on my calendar."

5    Q.  May we proceed?  I believe there's another page.

6    A.  Rob texts -- on December 16, 2018, Rob texts:  "Let me

7    know when you want to stop by and grab those checks tomorrow."

8        Sittenfeld texts:  "Want me to come to your place at

9    5:30 p.m. to get them, then we can head across the street to

10   Sotto for a drink?"

11       Rob's text says:  "Sure."

12       Sittenfeld texts:  "Great.  I'll call you when in the

13   building."  Sittenfeld texts again:  "Thanks so much."

14   Q.  So there's reference in this exhibit to "grab those

15   checks tomorrow."  Did Sittenfeld and Rob, in fact, meet up

16   the next day, December 17, 2018?

17   A.  Yes.

18   Q.  Who else attended that meeting?

19   A.  Brian.

20   Q.  Where was that meeting held?

21   A.  This was held at the apartment at the 580 Building.

22   Q.  Was that meeting recorded?

23   A.  Yes.

24   Q.  All right.  If you could, please, turn in your binder to

25   USA 21F.

1   A.   Yes.

2   Q.   Do you recognize this?

3   A.   I do.

4   Q.   What is it?

5   A.   This is a disk containing the December 17, 2018 meeting.

6   Q.   How do you know that?

7   A.   I know that because I reviewed this disk, and then I

8   placed my initials on it.

9        MS. GAFFNEY PAINTER:  The government moves for the

10  admission of Government Exhibit USA 21F.

11       MR. C. HENRY RITTGERS:  No objection.

12       THE COURT:  USA 21F is admitted without objection.

13  Q.   Special Agent Holbrook, also in front of you, behind Tab

14  USA 21G, could you please turn there and see if you recognize

15  what appears there?

16  A.   Yes.  This is a transcript for the December 17, 2018

17  meeting.

18  Q.   Have you reviewed it for accuracy?

19  A.   Yes.

20       MS. GAFFNEY PAINTER:  The government moves for the

21  admission of Government Exhibit USA 21G.

22       MR. C. MATTHEW RITTGERS:  Your Honor, I would just

23  like to reflect the fact that this is just a partial

24  transcript.

25       That's the only thing that I would like to make sure is

1    clear, that it's not the whole transcript of the interaction.

2            THE COURT:  It's not the full transcript of 21F, or

3    it's not -- or 21F is not the full conversation?

4            MR. C. MATTHEW RITTGERS:  I believe that 21F is not

5    the full conversation.  Thank you.

6            THE COURT:  Okay.  But 21G, you believe, is the full

7    transcript of 21F; is that right?  I'll ask you, Ms. Gaffney

8    Painter or Mr. Holbrook?

9            MS. GAFFNEY PAINTER:  Yes.  21G is the full

10   transcript of 21F.

11           THE COURT:  Okay.  So objection noted but overruled.

12   21G is admitted.

13           MS. GAFFNEY PAINTER:  Now, before we publish these

14   exhibits to the jury, I just want to specifically publish a

15   single page, with the Court's indulgence, from USA 21G.  This

16   is the transcript.

17           THE COURT:  Okay.

18   Q.  I'd like to go to page 2 of the transcript.

19      Now, Special Agent Holbrook, I'm directing your attention

20   to the brackets that appear at the top of the page.  What do

21   we see here?

22   A.  We see brackets that's in bold, and it states, "Begin

23   transcript 1D113-1 at 24:17."

24   Q.  What does 1D113-1 refer to?

25   A.  The 1D is how the FBI labels recordings, so it would be

*HOLBROOK - DIRECT*

1    1D1 all the -- up to however many recordings there are.  This

2    happens to be 1D113.  And the dash 1 is the first session of

3    that recording.

4    Q.  All right.  If we could go to the next page, page 3.  I'm

5    directing you to the brackets that appear at the top of the

6    page.

7    A.  Yes.

8    Q.  If you can, read the second set of brackets that appears

9    there?

10   A.  It states, "Begin transcription 1D113-2 at 10:03."

11   Q.  What is the significance of the dash 2 in that number?

12   A.  The dash 2 is the second session of that recorded

13   meeting.

14   Q.  So although the bracket above it ends at 25:06, and the

15   next bracket starts at 10:03, is it correct that this is not

16   going back in time but reflects the next session starting at

17   10:03?

18   A.  That is correct.

19        MS. GAFFNEY PAINTER:  The government requests that we

20   may publish this exhibit, publish the underlying recording and

21   the exhibit, so this 21F and 21G.

22        THE COURT:  Okay.  You may play 21F.  And ladies and

23   gentlemen of the jury, I believe 21G is a transcript that

24   should be in your transcript volume.

25        As Mr. Rittgers noted, and I think as Ms. Gaffney Painter

```
 1    pointed out, this is a transcript of a part of the session

 2    that appears to start at 24:17 into the session, is that

 3    right, Ms. Gaffney Painter?

 4          MS. GAFFNEY PAINTER:  That is correct, Your Honor.

 5       (Video played.)

 6    Q.   Special Agent Holbrook, will you turn in your binder to

 7    USA 21I.

 8    A.   Yes.

 9    Q.   Do you recognize these?

10    A.   Yes, I do.

11    Q.   What are they?

12    A.   These were the four checks that Rob gave to Sittenfeld on

13    December 17, 2018.

14    Q.   Are these the actual checks, or photographs of those

15    checks?

16    A.   These are the photographs of the checks.

17    Q.   Are they fair and accurate representations of the checks

18    given to Sittenfeld on December 17, 2018?

19    A.   Yes.

20          MS. GAFFNEY PAINTER:  The government moves for the

21    admission of USA 21I.

22          MR. C. HENRY RITTGERS:  No objection, Your Honor.

23          THE COURT:  USA 21I is admitted without objection.

24          MS. GAFFNEY PAINTER:  Your Honor, may we have

25    permission to publish this to the jury?
```

```
 1              THE COURT:  You may.

 2    Q.   Let's look at page 1 of USA 21I.

 3         Now, looking at the upper left-hand corner, what appears

 4    there?

 5    A.   A company by the name of Stirling Securities, followed by

 6    an address in Naperville, Illinois.

 7    Q.   What is Stirling Securities?

 8    A.   It's a company that the FBI undercover unit creates.

 9    Q.   What is the amount of this check?

10    A.   $5,000.

11    Q.   What appears on the lower right-hand corner?

12    A.   The signature, Kelly Harrison.

13    Q.   Who provided the funds for this check?

14    A.   FBI.

15    Q.   All right.  Let's turn now to page 2 of USA 21I.

16         Looking at the upper left-hand corner, what appears

17    there?

18    A.   The Orion Group.

19    Q.   What is the Orion Group?

20    A.   It's a company created by the FBI.

21    Q.   What is the amount of this check?

22    A.   The amount is $5,000.

23    Q.   What appears on the lower right-hand corner?

24    A.   The signature of Nathan Baker.

25    Q.   Who provided the funds for this check?
```

1    A.   The FBI did.

2    Q.   Let's now turn to page 3 of USA 21I.

3         Looking at the upper left-hand corner, what appears

4    there?

5    A.   A company named CII, Incorporated, with an address in

6    Elk Grove Village, Illinois.

7    Q.   What is CII, Incorporated?

8    A.   That is a company created by the FBI.

9    Q.   What is the amount of this check?

10   A.   The amount is $5,000.

11   Q.   What appears on the lower right-hand corner here?

12   A.   The signature, Kate Collins.

13   Q.   Who provided the funds for this check?

14   A.   The FBI did.

15   Q.   All right.  Let's turn now to page 4 of USA 21I.

16        Looking at the upper left-hand corner, what appears

17   there?

18   A.   The name Anderson Management and Leasing.

19   Q.   What is Anderson Management and Leasing?

20   A.   This is the company created by the FBI.

21   Q.   What is the amount of this check?

22   A.   $5,000.

23   Q.   What appears on the lower right-hand corner?

24   A.   The signature of Mark Davis.

25   Q.   Who provided the funds for this check?

1    A.   The FBI.

2    Q.   Special Agent Holbrook, if you could turn in your binder

3    to the Tab USA 21J.

4         Do you recognize this?

5    A.   I do.

6    Q.   What is it?

7    A.   This is a compact disk containing a voice message left by

8    Mr. Sittenfeld.

9    Q.   How do you know that?

10   A.   I reviewed this disk, and I placed my initials on it.

11        MS. GAFFNEY PAINTER:  The government moves for the

12   admission of Government Exhibit USA 21J.

13        THE COURT:  Mr. Rittgers?

14        MR. C. HENRY RITTGERS:  Sorry, Your Honor.  No

15   objection.

16        THE COURT:  USA 21J is admitted without objection.

17   Q.   Now, if you could, Special Agent Holbrook, turn to the

18   next tab, which is USA 21K.

19   A.   Yes.

20   Q.   What is this?

21   A.   This is a transcript of that voice message left on

22   December 17, 2018, by Mr. Sittenfeld.

23   Q.   Have you reviewed this for accuracy?

24   A.   I have.

25        MS. GAFFNEY PAINTER:  The government moves for the

1    admission of Government Exhibit USA 21K.

2            MR. C. HENRY RITTGERS:  No objection, Your Honor.

3            THE COURT:  USA 21K is admitted without objection.

4            MS. GAFFNEY PAINTER:  May the government publish 21J

5    to the jury?

6            THE COURT:  You may.  And ladies and gentlemen of the

7    jury, I believe there's a Tab 21K in your transcript book.

8            MS. GAFFNEY PAINTER:  Your Honor, the dreaded phrase

9    you referenced yesterday of technical difficulties has arisen

10   again.

11           THE COURT:  Okay.

12           MS. GAFFNEY PAINTER:  We just need a moment.

13           THE COURT:  Sure.

14       (Pause in proceedings.)

15           MS. GAFFNEY PAINTER:  Your Honor, to attempt to

16   regain some efficiency, we would submit that since the audio

17   is not playing, that the jury be permitted to read the

18   transcript, of course, to have the audio published later when

19   the technical difficulties are resolved.

20           MR. C. HENRY RITTGERS:  No objection, Your Honor.

21           THE COURT:  Very good.  Ladies and gentlemen of the

22   jury, you can read 21K, the transcript, in your transcript

23   volume.

24       (Jurors reading transcript.)

25   Q.  In case this would also be helpful, Special Agent

1    Holbrook, will you read what appears here in the transcript?

2    A.   Yes.  "Chin, what's going on, brother?  P.G.

3         "I just wanted to let you know how much I have really

4    enjoyed getting to know Rob and Brian.  No surprise that you

5    attract great dudes and talented investors and partners, but

6    looking forward to doing what I can to help get 435 across the

7    finish line, so never hesitate to reach out.  Let me know how

8    I can be helpful on that front.  Talk to you soon, my man.

9    Hope fatherhood has been great.  And don't say anything but,

10   actually, I got some news to share with you along those lines.

11   Talk to ya."

12   Q.   Special Agent Holbrook, if you could turn in your binder

13   to Tab USA 21A.

14        Forgive me.  I may have misspoken.  Did I direct you to

15   USA 22A?

16   A.   No.

17   Q.   I apologize.  I misspoke.  If you could, please, turn to

18   USA 22A.

19   A.   Yes.

20   Q.   Do you recognize this?

21   A.   I do.

22   Q.   What is it?

23   A.   These are text message exchanges between Mr. Sittenfeld

24   and Rob.

25   Q.   Did you review it for accuracy?

*HOLBROOK - DIRECT*

1    A.  Yes, I did.

2         MS. GAFFNEY PAINTER:  The government moves for the

3    admission of Government Exhibit USA 22A.

4         MR. C. HENRY RITTGERS:  No objection, Your Honor.

5         THE COURT:  USA 22A is admitted without objection.

6         MS. GAFFNEY PAINTER:  Your Honor, may we publish this

7    for the jury?

8         THE COURT:  You may.

9    Q.  Now, Special Agent Holbrook, will you read for us just

10   the first text message that appears there?

11   A.  On January 16, 2019, Rob texts:  "The agreement for Elm

12   Street went to economic development yesterday."

13   Q.  What is your understanding of what Rob is referencing in

14   this text message?

15   A.  My understanding of this text message is Rob's referring

16   to the development agreement that Mr. Ndukwe was attempting to

17   get from the city went to the economic development department

18   on January 15, 2019.

19   Q.  And beneath that text message from Rob, what do we see?

20   A.  The text message response on January 17, 2019 from

21   Mr. Sittenfeld, and he liked the text message.

22   Q.  All right.  If you could, Special Agent Holbrook, turn to

23   the tab USA 22B.

24   A.  Excuse me.  Repeat it, please?

25   Q.  Could you please turn to Tab 22B.

*HOLBROOK - DIRECT*

1    A.   Okay.

2    Q.   Do you recognize this?

3    A.   I do.

4    Q.   What is it?

5    A.   It is an audio recording of a telephone call that

6    occurred on January 21, 2019.

7    Q.   And how do you know that?

8    A.   I reviewed this disk, and I placed my initials on it.

9         MS. GAFFNEY PAINTER:  The government moves for the

10   admission of Government Exhibit USA 22B.

11        MR. C. HENRY RITTGERS:  No objection, Your Honor.

12        THE COURT:  USA 22B is admitted without objection.

13   Q.   Will you please turn now to tab USA 22C.

14   A.   Yes.

15   Q.   Do you recognize this?

16   A.   I do.

17   Q.   What is it?

18   A.   This is a transcript dated January 21, 2019, of a

19   telephone call between Mr. Sittenfeld and Rob.

20   Q.   Have you reviewed this for accuracy?

21   A.   I have.

22        MS. GAFFNEY PAINTER:  The government moves for the

23   admission of Government Exhibit USA 22C.

24        MR. C. HENRY RITTGERS:  No objection.

25        THE COURT:  USA 22C is admitted without objection.

1        MS. GAFFNEY PAINTER:  Your Honor, may we publish this

2   for the jury?

3        THE COURT:  You may.  And ladies and gentlemen of the

4   jury, you should have a tab in your transcript volume that's

5   labeled 22C, and you can now review that.

6       (Audio played.)

7   Q.  Special Agent Holbrook, will you turn in your binder now

8   to USA 22D.

9   A.  Yes.

10   Q.  Do you recognize this?

11   A.  I do.

12   Q.  What is it?

13   A.  This is a disk dated January 21, 2019, with a recording

14   of a voicemail.

15   Q.  How do you know that?

16   A.  I reviewed the disk, and I placed my initials on it.

17        MS. GAFFNEY PAINTER:  The government moves for the

18   admission of Government Exhibit USA 22D.

19        MR. C. HENRY RITTGERS:  No objection.

20        THE COURT:  USA 22D is admitted without objection.

21   Q.  If you'll turn now, Special Agent Holbrook, to tab

22   USA 22E.

23       Do you recognize this?

24   A.  Yes.  This is a transcript of the January 21, 2019 voice

25   message.

*HOLBROOK - DIRECT*

1    Q.   Have you reviewed this for accuracy?

2    A.   Yes.

3         MS. GAFFNEY PAINTER:  The government moves for the

4    admission of Government Exhibit USA 22E.

5         MR. C. HENRY RITTGERS:  No objection.

6         THE COURT:  USA 22E is admitted without objection.

7         MS. GAFFNEY PAINTER:  Your Honor, may we publish this

8    for the jury?

9         THE COURT:  You may.  And ladies and gentlemen of the

10   jury, you have a Tab 22E in your transcript book that has the

11   transcript to which we just referred.

12        (Audio played.)

13   Q.   Special Agent Holbrook, will you please turn to USA

14   Tab 22F.

15   A.   Yes.

16   Q.   Do you recognize this?

17   A.   I do.

18   Q.   What is it?

19   A.   This is a disk containing a January 23, 2019 voice

20   message from Mr. Sittenfeld.

21   Q.   How do you know that?

22   A.   I reviewed this disk and placed my initials on it.

23        MS. GAFFNEY PAINTER:  The government moves for the

24   admission of Government Exhibit USA 22F.

25        MR. C. HENRY RITTGERS:  No objection.

```
 1           THE COURT:  USA 22F is admitted without objection.

 2    Q.   Special Agent Holbrook, will you turn now to Tab 22G.

 3    A.   Yes.

 4    Q.   What appears there?

 5    A.   This is the transcript of that voice message.

 6    Q.   In looking at the transcript, you testified earlier to

 7    the process used to prepare transcripts.

 8         Did the FBI prepare the transcript, or did someone else

 9    prepare the transcript?

10    A.   This transcript was not completed by the FBI.

11    Q.   Can you describe the process for this transcript?

12    A.   Pardon?

13    Q.   Meaning, more specifically, have you reviewed this

14    transcript for accuracy?

15    A.   Yes.

16           MS. GAFFNEY PAINTER:  The government moves for the

17    admission of Government Exhibit USA 22G.

18           MR. C. HENRY RITTGERS:  No objection.

19           THE COURT:  USA Exhibit 22G is admitted without

20    objection.

21           MS. GAFFNEY PAINTER:  May we publish these exhibits

22    to the jury, Your Honor?

23           THE COURT:  You may.  Ladies and gentlemen of the

24    jury, 22G is in your transcript binder.

25         (Audio played.)
```

1    Q.   Moving now to January 30, 2019, was there a meeting of

2    investigative significance that day?

3    A.   Yes, there was.

4    Q.   All right.  If you could turn now to what's been marked

5    for identification as USA 23A.

6    A.   Yes.

7    Q.   Do you recognize this?

8    A.   Yes.

9    Q.   What is it?

10   A.   This is a series of text message exchanges between

11   Mr. Sittenfeld and Rob.

12   Q.   Did you review this exchange for accuracy?

13   A.   I did.

14        MS. GAFFNEY PAINTER:  The government moves for the

15   admission of Government Exhibit USA 23A.

16        MR. C. HENRY RITTGERS:  No objection, Your Honor.

17        THE COURT:  USA 23A is admitted without objection.

18        MS. GAFFNEY PAINTER:  May we publish, Your Honor?

19        THE COURT:  You may.

20   Q.   Special Agent Holbrook, what's the date on these text

21   messages?

22   A.   January 28, 2019.

23   Q.   All right.  Will you please read this text exchange to

24   the jury?

25   A.   Yes.  Text from Sittenfeld:  "Hope hunting was good.

 1    This Wednesday, when you're in town, I'm having a cozy event

 2    right across the street at Via Vite.  You and Brian want to

 3    join?  Obviously, don't worry about donating, as you've

 4    already been very generous."

 5        Rob responds:  "What time?"

 6        Sittenfeld texts:  "5:15 to 6:15 p.m.  Let me know if you

 7    guys want to join."

 8        Rob texts:  "We will stop by.  You want to grab a drink

 9    after that?"

10        Sittenfeld texts:  "Cool.  Yeah.  A drink or dinner

11    sounds great.  I'll also call you later today to relay Cranley

12    convo."

13    Q.  Now, in regards to the meeting on January 30, 2019, where

14    was that meeting held?

15    A.  This meeting was held in the apartment at 580 Building.

16    Q.  Who attended that meeting?

17    A.  Sittenfeld, Rob, and Brian.

18    Q.  Was that meeting recorded?

19    A.  It was.

20    Q.  In front of you is what's been marked for identification

21    as Government Exhibit USA 23B.  Do you recognize this?

22    A.  I do.

23    Q.  What is it?

24    A.  This is a disk containing the recorded meeting on

25    January 30, 2019.

*HOLBROOK - DIRECT*

1  Q.  How do you know that?

2  A.  I reviewed this disk, and I placed my initials on it.

3      MS. GAFFNEY PAINTER:  The government moves for the

4  admission of Government Exhibit USA 23B.

5      MR. C. HENRY RITTGERS:  No objection, Your Honor.

6      MR. C. MATTHEW RITTGERS:  No objection.  I just want

7  to note the middle, that this is just a segment of that

8  interaction again, Your Honor.

9      THE COURT:  So noted.  USA 23B is admitted without

10  objection.

11  Q.  Special Agent Holbrook, can you also turn to USA 23C.

12  A.  Yes.

13  Q.  What is this?

14  A.  This is a transcript of the January 30, 2019 meeting

15  between Mr. Sittenfeld, Rob, and Brian.

16      MS. GAFFNEY PAINTER:  The government moves for the

17  admission of Government Exhibit USA 23C.

18      MR. C. HENRY RITTGERS:  No objection.

19      THE COURT:  USA 23C is admitted without objection.

20  Ladies and gentlemen of the jury, there is a 23C in your

21  transcript binder.  You may now turn to that.

22      MS. GAFFNEY PAINTER:  Your Honor, if I may, before we

23  seek permission to publish, I'd like to note for the record

24  the timestamps.

25      THE COURT:  Yes.

HOLBROOK - DIRECT

```
1          MS. GAFFNEY PAINTER:  So first, we'll be playing
2    1D121-1, 8:41 to 10:24.
3       We will be playing 1D121-2 from the beginning 00:00 to
4    8:59.
5       And finally, we will play 1D121-4, 3:54 to 5:35.
6          THE COURT:  Thank you.
7          MS. GAFFNEY PAINTER:  May we publish?
8          THE COURT:  You may.
9       (Video played.)
10          THE COURT:  Can we stop, please?  What exhibit is it?
11          MS. GAFFNEY PAINTER:  I believe that we started on
12   the second segment.  This is the second segment that appears.
13   This starts at session two.  I believe we need to go back to
14   session one, starting at 8:41.
15      Your Honor, to address the technical difficulty, it may
16   be a good opportunity for a recess because, in order to
17   address it, she may have to play audio, so...
18          THE COURT:  Okay.  Let's take a brief recess.
19      Ladies and gentlemen, we're almost to the point where
20   you're supposed to recite it back to me.
21      Please do not discuss this case with each other during
22   this break.  Please do not make any effort to research any of
23   the facts or the laws surrounding this case.  Please do not
24   communicate with anyone about this case.  If anyone should try
25   to communicate with you, please let me know immediately.
```

1          We are going to try and keep this brief, but technical

2     difficulties are technical difficulties, so we'll see what

3     happens.

4          (Jury out at 3:59 p.m.)

5          THE COURT:  How long do we think this is going to

6     take to address?

7          MS. TERRY:  Your Honor, it's in there.  I just didn't

8     name it right.  It's my fault.

9          THE COURT:  No, I'm not --

10         MR. SINGER:  Your Honor, this is one of the

11     recordings that was altered based on the discussion from last

12     night.  We weren't able to get the disk over in time to allow

13     it to be loaded into the trial record appropriately.

14         THE COURT:  Yeah.  I'm not ascribing fault.  I'm just

15     asking how long we need to get it cued up?

16         MS. TERRY:  It's ready.  I'm so sorry, Your Honor.

17         THE COURT:  Okay.  So why don't we take a brief

18     break.  Well, while they're taking a brief break, why don't we

19     talk about the game plan for the rest of the day and where you

20     see this going.

21          Just looking at the transcript book, it looks like

22     there's roughly still like 25 transcripts to get in.  I assume

23     we're going through all these?

24         MS. GAFFNEY PAINTER:  Yes, Your Honor.

25         THE COURT:  All right.  So it sounds like Special

 1    Agent Holbrook will be on the stand again tomorrow morning?

 2              MS. GAFFNEY PAINTER:  That is correct, Your Honor.

 3              THE COURT:  In other words, we're introducing all of

 4    these through Special Agent Holbrook?

 5              MS. GAFFNEY PAINTER:  That's correct.

 6              THE COURT:  Okay.  Do you have questions that are

 7    going to go beyond that or, essentially, when we get to the

 8    end of the transcripts, is that going to be about the end of

 9    your time with the special agent?

10              MS. GAFFNEY PAINTER:  Yes.

11              THE COURT:  Do you have a sense of how much longer --

12    and you can remain seated.  Do you have a sense of how much

13    longer you anticipate it will take to get the rest of these

14    introduced?

15              MS. GAFFNEY PAINTER:  To hazard a guess, I would say

16    at least the morning tomorrow.

17              THE COURT:  Oh, really?

18              MS. GAFFNEY PAINTER:  Yes.

19              THE COURT:  Okay.  Do you have a sense of how long

20    you'll have him, I don't know which one I'm looking at, have

21    him -- thank you.  Have the special agent on the stand for

22    cross-examination?  I won't hold you to it, I'm just trying to

23    plan.

24              MR. C. HENRY RITTGERS:  Yes, I understand, Judge.  At

25    first, I thought it would take three or four hours.  Maybe I

1    can condense this to an hour, but I'm not promising.

2        THE COURT:  I understand.  I'm just trying to advise

3    the government whether they should have another witness to

4    call tomorrow afternoon, and it sounds like possibly yes is

5    the answer to that.

6        MS. GAFFNEY PAINTER:  Yes.  We are prepared to call

7    another witness, if time allows.

8        THE COURT:  Okay.  All right.  Well, why don't we

9    take a very brief break.  I think it's going to take a while

10   to reassemble the jury anyway, but try to just keep it to

11   stretch your legs, and if you need to take a break for some

12   reason, do that and we'll be back.

13       (Brief recess.)

14       THE COURT:  Ready to bring the jury back in?

15       MS. GAFFNEY PAINTER:  Yes, Your Honor.

16       THE COURT:  All right.  Let's bring the jury back in.

17       (Jury in at 4:11 p.m.)

18       THE COURT:  Is the government prepared to proceed,

19   Ms. Gaffney Painter?

20       MS. GAFFNEY PAINTER:  Yes.  Thank you, Your Honor.

21   May I approach the podium and continue the examination?

22       THE COURT:  You may.

23       MS. GAFFNEY PAINTER:  Your Honor, before the break,

24   the government had intended to publish the segments of the

25   video and transcript that had been admitted.  May we publish

HOLBROOK - DIRECT

1    them now for the jury?

2          THE COURT:  You may.  And just to bring the jury back

3    up to speed, I believe the transcript is at 23C; is that

4    correct?

5          MS. GAFFNEY PAINTER:  Yes, Your Honor.

6          THE COURT:  So ladies and gentlemen of the jury, you

7    may want to turn in your transcript volume to Exhibit 23C and,

8    shortly, we'll be playing the audio that should correspond to

9    that transcript.

10       (Video played.)

11         THE COURT:  Ladies and gentlemen --

12         MS. GLATFELTER:  Your Honor, we corrected the

13   transcript.

14         THE COURT:  Oh, you have?  Okay.  Sorry.  My mistake.

15   I was operating off an old transcript.  Thank you.

16       (Video played.)

17   Q.  Special Agent Holbrook, will you please turn back to

18   page 3 in that transcript.  This is USA 23C.

19   A.  Yes.

20   Q.  We see notations there in brackets.  And you had

21   testified earlier about sessions.  Is this an example of a

22   session break?

23   A.  Yes, it is.

24   Q.  There was reference in that video to a note from

25   U.S. Bank.  Based on your participation in this investigation,

1    what is your understanding of a note from U.S. Bank?

2    A.   This was at issue in regards to Mr. Ndukwe's financial

3    interest in the 435 Elm property.

4         Mr. Ndukwe purchased a note from U.S. Bank, and he

5    believes that gives him a financial interest in that property.

6    Q.   All right.  Let's move now to February 18, 2019.  Was

7    there a meeting of investigative significance that day?

8    A.   Yes, there was.

9    Q.   Was that meeting recorded?

10   A.   It was.

11   Q.   All right.  I'm showing you what's been marked for

12   identification as USA 24A.  Let me know when you turn to that

13   tab.

14   A.   Yes.

15   Q.   Do you recognize this?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is a disk of a recorded meeting between

19   Mr. Sittenfeld, Rob, and Brian.

20   Q.   How do you know that?

21   A.   I've reviewed this recording on the disk, and I initialed

22   the disk.

23        MS. GAFFNEY PAINTER:  The government moves for the

24   admission of Government Exhibit USA 24A.

25        MR. C. MATTHEW RITTGERS:  No objection.

```
1          MR. C. HENRY RITTGERS:  No objection, Your Honor.

2          THE COURT:  24A is admitted without objection.

3    Q.  Now will you please turn to the tab marked USA 24B.

4    A.  Yes.

5    Q.  Do you recognize this?

6    A.  I do.

7    Q.  What is it?

8    A.  This is a transcript dated 2018 -- 'scuse me.

9    February 18, 2019.  It is a transcript of the recorded meeting

10   between Brian, Rob, and Mr. Sittenfeld.

11   Q.  Have you reviewed it for accuracy?

12   A.  Yes.

13          MS. GAFFNEY PAINTER:  The government moves for the

14   admission of Government's Exhibit USA 24B.

15          MR. C. HENRY RITTGERS:  No objection, Your Honor.

16          THE COURT:  USA 24B is admitted without objection.

17          MS. GAFFNEY PAINTER:  Your Honor, I would like to

18   note, before we request to publish, the timestamps for this

19   recording.

20          THE COURT:  Very good.

21          MS. GAFFNEY PAINTER:  54:14 to 1:01:51.

22       May we publish this to the jury, Your Honor?

23          THE COURT:  You may.  Ladies and gentlemen of the

24   jury, there should be a tab marked USA 24B in your transcript

25   binder.
```

*HOLBROOK - DIRECT*

1           (Audio recording.)

2    Q.   Let's move to March 14, 2019.  Was there a meeting of

3    investigative significance that happened that day?

4    A.   Yes, there was.

5    Q.   Who attended that meeting?

6    A.   Rob, Brian, and Mr. Sittenfeld.

7    Q.   Was that meeting recorded?

8    A.   Yes.

9    Q.   If you could turn now in your binder to the tab USA 25A.

10   A.   Yes.

11   Q.   Do you recognize this?

12   A.   I do.

13   Q.   What is it?

14   A.   It is a disk of the March 14, 2019 meeting.

15   Q.   How do you know that?

16   A.   I know that because I reviewed this disk, and I placed my

17   initials on it.

18           MS. GAFFNEY PAINTER:  The government moves for the

19   admission of Government Exhibit USA 25A.

20           MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

21           THE COURT:  USA 25A is admitted without objection.

22   Q.   Special Agent Holbrook, will you please turn to USA 25B.

23   A.   Yes.

24   Q.   Do you recognize this?

25   A.   I do.

1    Q.   What is it?

2    A.   This is a transcript of the March 14, 2019 meeting.

3    Q.   Have you reviewed it for accuracy?

4    A.   Yes, I have.

5         MS. GAFFNEY PAINTER:  The government moves for the

6    admission of Government Exhibit USA 25B.

7         MR. C. HENRY RITTGERS:  No objection, Your Honor.

8         THE COURT:  USA 25B is admitted without objection.

9         MS. GAFFNEY PAINTER:  Your Honor, before we request

10   permission to publish, I'd like to put on the record the

11   timestamps for this exhibit.

12        THE COURT:  You may do so.

13        MS. GAFFNEY PAINTER:  The first timestamp we'll be

14   playing is minute 23:41 to 24:40.  The second segment is

15   25:52 until 29:59.

16        Your Honor, may we publish this exhibit to the jury?

17        THE COURT:  Yes, you may.  Ladies and gentlemen of

18   the jury, you should have a USA 25B tab in your transcript

19   binder.

20        (Audio recording.)

21   Q.   Special Agent Holbrook, let's move now to March 28, 2019.

22   Was there a party of investigative significance that happened

23   that day?

24   A.   Yes, there was.

25   Q.   And where was that party held?

*HOLBROOK - DIRECT*

1    A.   It was held at the apartment of 580 Building.

2    Q.   Who attended that party?

3    A.   It was Rob, Brian, Vinny, Mr. Sittenfeld, other elected

4    officials, and undercover agents.

5    Q.   You mentioned Vinny.  Who is Vinny?

6    A.   Vinny is an undercover agent that was -- attended this

7    party that you referenced, I believe March 28th.

8         And Vinny showed up as just a cameo appearance, as kind

9    of playing the role of a boss investor type of individual

10   associated with Rob and Brian's group of friends.

11   Q.   Was that party recorded?

12   A.   Yes.

13   Q.   All right.  Let's move now to May 2, 2019.  Was there a

14   call between Sittenfeld and Ndukwe on that day?

15   A.   Yes, there was.

16   Q.   Was that call recorded?

17   A.   Yes.

18   Q.   Have you reviewed that recording?

19   A.   I have.

20   Q.   If you could turn now to USA 26A.

21   A.   Yes.

22   Q.   Do you recognize this?

23   A.   Yes.  This is the recording.

24   Q.   How do you know that?

25   A.   I reviewed this recording, and I placed my initials on

*HOLBROOK - DIRECT*

1    it.

2              MS. GAFFNEY PAINTER:  The government moves for the

3    admission of Government Exhibit 26A.

4              MR. C. HENRY RITTGERS:  No objection, Your Honor.

5              THE COURT:  USA 26A is admitted without objection.

6    Q.   Special Agent Holbrook, if you could turn to Tab USA 26B.

7    A.   Yes.

8    Q.   Do you recognize this?

9    A.   Yes.

10   Q.   What is it?

11   A.   It is the transcript of the May 2, 2019 call between

12   Mr. Sittenfeld and Mr. Ndukwe.

13   Q.   Have you reviewed this for accuracy?

14   A.   Yes, I have.

15             MS. GAFFNEY PAINTER:  Government moves for the

16   admission of Government Exhibit USA 26B.

17             THE COURT:  Mr. Rittgers?

18             MR. C. HENRY RITTGERS:  No objection.  I'm sorry,

19   Your Honor.

20             THE COURT:  USA 26B is admitted without objection.

21             MS. GAFFNEY PAINTER:  Your Honor, may we publish this

22   exhibit to the jury?

23             THE COURT:  You may.  And ladies and gentlemen of the

24   jury, you should have a Tab 26B in your transcript binder to

25   which you can turn now.

1          MS. GAFFNEY PAINTER:  Your Honor, I apologize.  It

2     appears we're having some more technical difficulties.  I also

3     notice the time, so...

4          THE COURT:  Yes.  This may be an appropriate time to

5     break for the day.

6          Ladies and gentlemen of the jury, I think we're going to

7     suspend the trial for today and pick it up again tomorrow.

8          If you can assemble in the jury assembly room shortly

9     before 9:00 tomorrow, we'll try to get you in as promptly

10    after 9:00 as we can.  Try to be there by 8:50 again, if you

11    could.  We'll try to get you in more promptly than we did this

12    morning.

13         I would just remind you -- I'm going to release you for

14    the evening, but please do not review any media accounts about

15    this trial or what happened today.  Don't read any newspaper

16    accounts, listen to any television or radio stories related to

17    this trial.

18         Please do not discuss this trial with anyone, family

19    members, anything of that sort.  Do not discuss this trial

20    with your fellow jurors yet.

21         Please do not start to form opinions of your own, or do

22    any research this evening into the facts or law surrounding

23    this case.

24         If anyone should attempt to communicate with you

25    regarding this case, please bring it to my attention

1       immediately, but do not discuss it with your fellow jurors.

2           With that, I'm going to release you for the evening.  You

3       can leave your notepad and notes at your chair.  That's fine.

4           (Jury out at 4:52 p.m.)

5           THE COURT:  It looks like we have about 21 excerpts

6       left of video or audio recordings, if I'm seeing this

7       correctly, varying lengths, but...

8           MS. GAFFNEY PAINTER:  That sounds about right, Your

9       Honor.

10          THE COURT:  I may be a little surprised if we get it

11      all done by noon tomorrow, but you may be right.

12          Is there anything the parties want to discuss before we

13      recess for the evening?

14          MR. SINGER:  No, Your Honor.

15          MR. C. HENRY RITTGERS:  No, Your Honor.

16          THE COURT:  If we can try to be here before 9:00

17      tomorrow, if there's going to be anything that we need to

18      discuss.  Does anybody anticipate any issues tomorrow morning?

19          MR. SINGER:  Not that I can think of, Your Honor.

20          MR. C. HENRY RITTGERS:  No, Your Honor.

21          THE COURT:  So try to be here about five or ten

22      minutes before 9:00 so that we can get the jury in the jury

23      box pretty promptly in the morning.  I would like to try to

24      move through as much of this as we can tomorrow.

25          I would advise the government to have at least one

1    witness ready to go for tomorrow afternoon, in the event that

2    we get done with Special Agent Holbrook.

3        And with that, Scott, I think we can adjourn for the

4    evening.

5            (Proceedings adjourned at 4:54 p.m.)

6                        -   -   -

7                C E R T I F I C A T E

8                        -   -   -

9        I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
10   above-entitled matter.

11

12   /s/ M. Sue Lopreato_____          ____September 30, 2022____
     M. SUE LOPREATO, RMR, CRR
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2     GOVERNMENT WITNESSES

3     **Special Agent Nathan Holbrook**

4     Direct by Ms. Gaffney Painter........................  Page 25

5


6                                  EXHIBITS

7     GOVERNMENT EXHIBITS

8
      Exhibit                                        Admitted
9
      2C                                                42
10    12A                                               45
      12B                                               46
11    13A                                               54
      13B                                               54
12    14A                                               57
      14B                                               58
13    15A                                               66
      15B                                               67
14    15C                                               68
      5A                                                71
15    9A                                                82
      9B                                                87
16    9C                                                88
      9D                                                89
17    9E                                                89
      11C                                               90
18    15E                                               91
      11A                                               93
19    16A                                               94
      16B                                               94
20    17A                                               97
      17B                                               97
21    18A                                               98
      18B                                               99
22    18C                                              100
      18D                                              100
23    40A                                              101
      40B                                              102
24    40C                                              103
      40D                                              103
25

| Exhibits (cont'd) | Admitted |
|---|---|
| 40E | 104 |
| 19A | 105 |
| 19B | 106 |
| 20A | 106 |
| 20B | 107 |
| 20C | 108 |
| 20D | 109 |
| 20F | 113 |
| 20G | 113 |
| 11D | 115 |
| 21B | 115 |
| 21C | 123 |
| 21D | 123 |
| 21E | 125 |
| 21F | 127 |
| 21G | 128 |
| 21I | 130 |
| 21J | 133 |
| 21K | 134 |
| 21A | |
| 22A | 136 |
| 22B | 137 |
| 22C | 137 |
| 22D | 138 |
| 22E | 139 |
| 22F | 139 |
| 22G | 140 |
| 23A | 141 |
| 23B | 143 |
| 23C | 143 |
| 24A | 150 |
| 24B | 150 |
| 25A | 151 |
| 25B | 152 |
| 26A | 154 |
| 26B | 154 |
| 30E | 20 |
| 33E | 20 |
| 41A | 20 |
| 41B | 20 |
| 41C | 20 |

- - -