```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION
                          -  -  -
 3

 4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                     :
 5            Plaintiff,             : Jury Trial, Day 4
                                     : Friday, June 24, 2022
 6          - v -                    :
                                     : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"           :
 8                                   :
              Defendant.             : Cincinnati, Ohio
 9
                          -  -  -
10                 TRANSCRIPT OF PROCEEDINGS

11     BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                          -  -  -

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24                          -  -  -

25
```

1              P R O C E E D I N G S

2          (In open court at 8:55 a.m.)

3                  -  -  -

4       THE COURT:  Good morning.  We're here this morning in

5  the matter of the United States of America versus Alexander

6  Sittenfeld.  It's case number 1:20-cr-142.  We're here to

7  resume the trial in the matter.

8       Before we bring in the jury, I did just want to note on

9  the record, and I think you received an email this morning.  I

10  did end up sharing some demographic information about the jury

11  with The Enquirer in response to the motion that they filed.

12       And I have provided both parties to the lawsuit with this

13  demographic information that I provided to the jurors as well.

14  You received that?

15          MR. SINGER:  Your Honor, I saw the notice go through

16  on ECF.

17          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

18          THE COURT:  Very good.  Is there anything we need to

19  discuss before we bring in the jury this morning?

20          MS. GAFFNEY PAINTER:  Very briefly, Your Honor.

21  Today the government intends to offer into evidence a

22  recording that is quite long.

23       I was asking the Court if it would be all right if I sat

24  down while that recording played?

25          THE COURT:  Sure.

```
1              MS. GAFFNEY PAINTER:  Thank you.

2              THE COURT:  Anything else we need to discuss before

3     we bring in the jury?

4              MS. GAFFNEY PAINTER:  No.  Thank you.

5              MR. C. HENRY RITTGERS:  No, Your Honor.

6              THE COURT:  And it sounds like we had a near miss

7     with a juror this morning, in terms of almost riding up the

8     elevator with one of the parties.

9         To that person's credit, they ended up taking a different

10    elevator, so that was good.  And it was Mr. Sittenfeld, I

11    think.  It does seem like the jurors are taking that

12    obligation seriously.  It was reported to me, so that's all

13    good.

14        Are all the jurors here, Scott?

15             COURTROOM DEPUTY:  Checking on that now.  They're on

16    their way down.

17             THE COURT:  Ms. Gaffney Painter and Mr. Singer, just

18    in terms of planning, does the government have a sense of --

19    as of now, given how long it's taken to get to where we're at,

20    when it's likely you would be resting your case, or not

21    really?

22             MR.  SINGER:  It's a little hard to tell, Your Honor.

23             THE COURT:  Sure.

24             MR. SINGER:  I think we'll certainly have a better

25    sense after the current witness is done.  May we revisit after
```

1    that?

2           THE COURT:  Yes.  Absolutely.  I'm just trying to

3    plan ahead a little bit here.

4        I should also let the parties know I have a plea hearing

5    in another matter at 12:30 today, so we're going to need to be

6    mindful of the time around that time.

7        I don't think it will impact how long lunch needs to be,

8    but we may need to start lunch around 12:30 and return around

9    1:30 or so.

10           MR. SINGER:  Sure.  That's fine.

11        (Jury in at 9:01 a.m.)

12           THE COURT:  Good morning, ladies and gentlemen of the

13    jury.  I hope you had a restful evening and avoided the

14    temptation to watch news or read the newspapers.

15        We're back, and we did a little better job of getting

16    started promptly this morning.  So we're going to pick up

17    where we left off with the government's case.

18        And Special Agent Holbrook, I'll remind you, sir, that

19    you remain under oath.

20           THE WITNESS:  Yes, Judge.

21           THE COURT:  You may proceed.

22           MS. GAFFNEY PAINTER:  Thank you, Your Honor.

23                   CONTINUED DIRECT EXAMINATION

24    BY MS. GAFFNEY PAINTER:

25    Q.   Special Agent Holbrook, good morning.

1    A.   Good morning.

2    Q.   Yesterday, we went through a lot of recordings.

3    A.   Yes.

4    Q.   And I'd like to go back to November 7, 2018.

5         Will you please go in your exhibit binder to tab USA 15F.

6    A.   Yes.

7    Q.   Do you recognize this?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   This is an audio recording that occurred in the

11   restaurant on November 7, 2018.

12   Q.   And how do you know that?

13   A.   I know that because I've reviewed this disk, and I placed

14   my initials on it.

15        MS. GAFFNEY PAINTER:  The government moves for the

16   admission of Government Exhibit USA 15F.

17        THE COURT:  Any objection?

18        MR. C. HENRY RITTGERS:  I'm trying to find that.

19        MR. C. MATTHEW RITTGERS:  It's an audio.

20        MR. C. HENRY RITTGERS:  It's the audio?

21        THE COURT:  Audio recording at the restaurant.

22        MR. C. HENRY RITTGERS:  No objection, Your Honor.

23        THE COURT:  USA 15F is admitted without objection.

24   Q.   Special Agent Holbrook, will you please turn to the next

25   tab in your binder, USA 15G.

1   A.   Yes.

2   Q.   Do you recognize this?

3   A.   I do.

4   Q.   What is it?

5   A.   This is a video and audio recording of the events that

6   occurred in the apartment on November 7, 2018.

7   Q.   How do you know that?

8   A.   I know that because I reviewed this disk, and I placed my

9   initials on it.

10       MS. GAFFNEY PAINTER:   The government moves for the

11  admission of Government Exhibit USA 15G.

12       MR. C. HENRY RITTGERS:   No objection, Your Honor.

13       THE COURT:   USA 15G is admitted without objection.

14  Q.   To help orient us all.  Yesterday, the government

15  admitted USA 15A and 15B.  Those were segments of the meeting

16  at the Nada restaurant, and those were segments of the meeting

17  at the apartment.  Do you recall that, Special Agent Holbrook?

18  A.   Yes.

19  Q.   These recordings, 15F and 15G, is the entire recording

20  for both the Nada meeting and the entire recording for the

21  interaction in the apartment; is that right?

22  A.   That is correct.

23       MS. GAFFNEY PAINTER:   Okay.  Your Honor, yesterday we

24  had some technical difficulties playing a voicemail that was

25  admitted into evidence as USA 21J, with its transcripts at

1    USA 21K.

2         May we publish this exhibit to the jury at this time?

3              THE COURT:  That's the one that, I believe, you had

4    the special agent read to the jury; is that right?

5              MS. GAFFNEY PAINTER:  Yes.  That's correct.

6              THE COURT:  Yes, you may do so.  Ladies and gentlemen

7    of the jury, it will be 21K in your binder.

8         (Video played.)

9         MS.  GAFFNEY PAINTER:  Your Honor, before we ended

10   yesterday, we were attempting to publish USA 26A, with the

11   transcript at USA 26B, and we encountered some technical

12   difficulties.

13        These exhibits have been admitted into evidence, and we

14   would request permission to publish this at this time to the

15   jury?

16             THE COURT:  You may do so.  It will be 26B, ladies

17   and gentlemen of the jury.

18        (Audio played.)

19   Q.  Special Agent Holbrook, there was a reference in USA 26A

20   to Laura Brunner.  Who is Laura Brunner?

21   A.  Laura Brunner is the executive director of the port.

22   Q.  What is "the port"?

23   A.  The port is a quasi-governmental redevelopment agency

24   that focuses on taking blighted property, and they have

25   financing tools that they can utilize to return the blighted

1    property back to its highest and best use.

2    Q.    The call we listened to at USA 26A happened on May 2,

3    2019.  What else of investigative significance happened on

4    May 2, 2019?

5    A.    Mr. Sittenfeld met with Rob on that date.

6    Q.    Did anyone else attend that meeting?

7    A.    No.

8    Q.    Was that meeting recorded?

9    A.    Yes.

10   Q.    If you could, please, turn in your binder to tab USA 26C.

11   A.    Yes.

12   Q.    Do you recognize this?

13   A.    I do.

14   Q.    What is it?

15   A.    This is a recording of the May 2, 2019 meeting between

16   Mr. Sittenfeld and Rob.

17   Q.    How do you know that?

18   A.    I reviewed this disk, and I placed my initials on the

19   disk after review.

20         MS. GAFFNEY PAINTER:  The government moves for

21   admission of USA 26C.

22         MR. C. MATTHEW RITTGERS:  Your Honor, I would just

23   like to note, for the record, that it's a partial recording;

24   it's not the entire interaction.

25         THE COURT:  I imagine Ms. Gaffney Painter will make

1     that clear in just a second here.

2             MR. C. MATTHEW RITTGERS:  Thank you.

3             THE COURT:  So are you objecting or just noting that?

4             MR. C. MATTHEW RITTGERS:  No objection.

5             THE COURT:  USA 26C is admitted without objection.

6     Q.   Special Agent Holbrook, will you please turn to the tab

7     in your binder marked USA 26D.

8     A.   Yes.

9     Q.   Do you recognize this?

10    A.   I do.

11    Q.   What is it?

12    A.   It is a transcript of the May 2, 2019 recording.

13    Q.   And have you reviewed it for accuracy?

14    A.   I have.

15            MS. GAFFNEY PAINTER:  The government moves for the

16    admission of Government Exhibit USA 26D.

17            MR. C. HENRY RITTGERS:  No objection, Your Honor.

18            THE COURT:  USA 26D is admitted without objection.

19    Q.   Before we publish this exhibit and have the jury review

20    the transcript, I would like to note the time stamps for the

21    record.

22        And I would also like to draw the Court's attention to

23    this is a clip we have discussed that the defendant had

24    requested a broader range to be played.  And we have that

25    broader range, it just will not be in the transcript.

 1         And I believe that what Your Honor had proposed was an

 2    advice to the jury about how to interpret that.

 3         THE COURT:  I see.  Okay.  So with this clip, there's

 4    going to be some additional material played as to which you

 5    don't have a transcript.  Don't attribute the lack of a

 6    transcript to any party; it's no party's fault.

 7         There's part of it where you're just going to have to

 8    hear and do your best to kind of listen and hear what's said.

 9    It won't exactly match the transcript that you're looking at.

10         You may proceed.

11         MS. GAFFNEY PAINTER:  Thank you, Your Honor.  And now

12    I will note for the record the time stamps that we will be

13    playing.

14         First, we will be playing 21:33 to 23:01.  That will be

15    transcribed.  And then we will continue to play, at the

16    defendant's request, until 24:19.

17         The second clip will be 38:55 to 39:48.

18         The third clip is 1:25:38 to 1:26:04.

19         Your Honor, may we publish to the jury?

20         THE COURT:  You may.

21         (Audio played.)

22    Q.  Special Agent Holbrook, there was reference in USA 26C to

23    "Jay."  Who is Jay?

24    A.  Jay Kincaid.

25    Q.  Let's move now to June 25, 2019.  Was there a call that

*HOLBROOK - CONT'D DIRECT*

1    day between Rob and Sittenfeld?

2    A.   There was.

3    Q.   Was that call recorded?

4    A.   It was not recorded in its entirety.

5    Q.   Why is that?

6    A.   There was a technical delivery issue on the provider's

7    end that caused that call to drop.  I think we're familiar

8    with calls dropping when we're talking to someone.  That was

9    the same issue here.

10        It was out of the control of the case agent, and it was

11   out of the control of Rob, who made the call.

12   Q.   The next day, June 26, 2019, what happened in Cincinnati

13   City Council?

14   A.   This was the date that the Cincinnati City Council voted

15   to transfer the 435 Elm property to the port.

16   Q.   If you could, please, turn in your exhibit binder to the

17   tab marked USA 3C.

18   A.   Yes.

19   Q.   Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   This is a memo, with a following city ordinance regarding

23   the transfer.

24   Q.   How do you know that?

25   A.   I've reviewed this document.

*HOLBROOK – CONT'D DIRECT*

1          MS. GAFFNEY PAINTER:  The government moves for the

2    admission of Government Exhibit USA 3C.

3          MR. C. HENRY RITTGERS:  No objection.

4          THE COURT:  USA 3C is admitted without objection.

5    Q.  Now, Special Agent Holbrook, if you could, please, turn

6    to the tabs USA 3D and USA 3E.

7    A.  Yes.

8    Q.  Do you recognize these?

9    A.  I do.

10   Q.  What are they?

11   A.  3D is the city council minutes from June 26, 2019.

12         And 3E is an excerpt of that city council meeting on

13   June 26, 2019.

14   Q.  How do you know that?

15   A.  I have reviewed this disk and put my initials on it.

16         MS. GAFFNEY PAINTER:  The government moves for the

17   admission of Government Exhibits USA 3D and 3E.

18         MR. C. HENRY RITTGERS:  No objection, Your Honor.

19         THE COURT:  USA 3D and 3E are admitted without

20   objection.

21   Q.  Now if you could, Special Agent Holbrook, please turn to

22   tab USA 3F.

23   A.  Yes.

24   Q.  Do you recognize this?

25   A.  I do.

1    Q.   What is it?

2    A.   This is a partial transcript of the June 26, 2019 city

3    council meeting.

4    Q.   Have you reviewed it for accuracy?

5    A.   I have.

6          MS. GAFFNEY PAINTER:  The government moves for the

7    admission of Government Exhibit USA 3F.

8          MR. C. HENRY RITTGERS:  No objection.

9          THE COURT:  USA 3F is admitted without objection.

10         MS. GAFFNEY PAINTER:  Your Honor, permission to

11    publish this exhibit to the jury?

12         THE COURT:  3F, or which exhibit?

13         MS. GAFFNEY PAINTER:  I apologize.  USA 3E.

14         THE COURT:  You may do so.

15         MS. GAFFNEY PAINTER:  Before we begin, I would just

16    like to note, for the record, which portions of this exhibit

17    have been transcribed.

18       From 1:40:18 to 1:40:40.

19       And the second piece that is transcribed is 1:43:43 to

20    1:44:51.

21         THE COURT:  And 3F, I think, is available to the

22    jurors in the transcript book; is that right?

23         MS. GAFFNEY PAINTER:  That's correct.

24         THE COURT:  Ladies and gentlemen, I believe it's the

25    first tab in the transcript binder.

1          MS. GAFFNEY PAINTER:  And, Your Honor, one more

2     procedural matter.

3          We will be opening a large complete file and then

4     dragging to the relevant time portion.  It may be approximate

5     where the drag drops, but those timestamps I gave are the

6     timestamps for the transcript.

7          THE COURT:  Thank you.

8     A.   Counselor, may I clarify something?

9     Q.   Certainly.

10    A.   The disk actually contains the entire city council

11    meeting, as opposed to that clip of it, so I want to clarify

12    that.

13         MS. GAFFNEY PAINTER:  May we proceed with

14    publication?

15         THE COURT:  You may.

16    (Audio played.)

17    Q.   Special Agent Holbrook, directing your attention to

18    Government Exhibit USA 3D, which is already in evidence, the

19    minutes of the council meeting --

20         MS. GAFFNEY PAINTER:  With the Court's permission,

21    I'd like to display page 18 of already admitted USA 3D?

22         THE COURT:  You may do so.

23    Q.   Special Agent Holbrook, I'm directing you to page 18,

24    item number 201901098, and it is located at the bottom of the

25    page that is displayed, which is page 18 of USA 3D.

4-15

1      Will you please read this for the jury?

2    A.   Yes.  "Item 201901098, ordinance emergency, dated

3    6.19.2019, submitted by Patrick Duhaney, city manager,

4    authorizing the city manager to execute a sale agreement with

5    the Hamilton County Land Reutilization Corporation and the

6    Port of Greater Cincinnati Development Authority, pursuant to

7    which the City of Cincinnati will sell for one dollar the

8    property located at 435 Elm Street, in the Central Business

9    District of Cincinnati, commonly known as Convention Place

10   Mall, together with the adjacent pocket park, in order to

11   facilitate the redevelopment of the property and the

12   remediation of existing hazardous conditions at the site."

13   Q.   Special Agent Holbrook, let's move now to July 8, 2019.

14   If you could turn in your binder to the tab marked USA 28A.

15   A.   Yes.

16   Q.   Do you recognize this?

17   A.   I do.

18   Q.   What is it?

19   A.   This is a disk containing a July 8th, 2019 meeting

20   between Mr. Sittenfeld, Brian, and Rob.

21   Q.   How do you know that?

22   A.   I reviewed this disk, and I placed my initials on the

23   disk after review.

24        MS. GAFFNEY PAINTER:  The government moves for the

25   admission of Government Exhibit USA 28A.

1      MR. C. HENRY RITTGERS:  No objection, Your Honor.

2      THE COURT:  USA 28A is admitted without objection.

3   Q.  Special Agent Holbrook, will you please turn now to the

4   tab in your binder marked USA 28B.

5   A.  Yes.

6   Q.  Do you recognize this?

7   A.  I do.

8   Q.  What is it?

9   A.  This is a transcript dated July 8, 2019, of the recorded

10  meeting.

11  Q.  Have you reviewed it for accuracy?

12  A.  I have.

13      MS. GAFFNEY PAINTER:  The government moves for the

14  admission of Government Exhibit USA 28B.

15      MR. C. HENRY RITTGERS:  No objection.

16      THE COURT:  USA 28B is admitted without objection.

17      MS. GAFFNEY PAINTER:  Your Honor, we seek permission

18  to publish to the jury, but before doing so, we'd like to put

19  the timestamps into the record.

20      THE COURT:  Please do so.

21      MS. GAFFNEY PAINTER:  The first segment we will be

22  publishing is 46:09 to 47:20.

23      The second segment is 1:06:17 to 1:08:42.

24      The third segment is 1:10:38 to 1:11:16.

25      THE COURT:  It says 18 in mine.  16?

1          MS. GAFFNEY PAINTER:  Oh, forgive me, Your Honor.  It

2     should be 18 and not 16.

3          THE COURT:  Very good.

4          MS. GAFFNEY PAINTER:  Thank you.  May we publish this

5     to the jury?

6          THE COURT:  You may.

7       (Audio played.)

8     Q.   There was reference in 28A to a sports book.

9          What is your understanding as to what a sports book is in

10    the context of this investigation?

11    A.   My understanding is that sports book is, in this context,

12    was a legal sports gambling facility that was going to be

13    placed in the 435 Elm project.

14         And by way of background, in May of 2018, the United

15    States Supreme Court struck down a law that paved the way for

16    states to make their own decisions on sports gaming.

17         And during the course of the investigation, the Ohio

18    General Assembly was debating on if they wanted sports

19    gambling to be legal in the state and how they were going to

20    legislate that.

21    Q.   There was also discussion in Government Exhibit USA 28A

22    of Vinny.  Prior to this meeting, what decision did you make

23    about the participation of Vinny?

24    A.   Prior to this meeting, we decided that we were going to

25    introduce Vinny into the investigation as an investor, and

1    particularly an investor in the sports book side of 435 Elm.

2    Q.   Let's go now to August 20, 2019.

3         If you could, please, turn to the tab in your binder

4    marked USA 29A.

5    A.   Yes.

6    Q.   Do you recognize this?

7    A.   I do.

8    Q.   What is it?

9    A.   This is a disk containing an audio recording between

10   Mr. Sittenfeld and Rob on August 20, 2019.

11   Q.   How do you know that?

12   A.   I recorded this disk -- or, excuse me.  I reviewed this

13   disk, and I placed my initials on it.

14        MS. GAFFNEY PAINTER:  The government moves for

15   admission of Government Exhibit USA 29A.

16        MR. C. HENRY RITTGERS:  No objection.

17        THE COURT:  USA 29A is admitted without objection.

18   Q.   Now, Special Agent Holbrook, if you could, please, turn

19   to Tab USA 29B.

20   A.   Yes.

21   Q.   Do you recognize this?

22   A.   I do.

23   Q.   What is it?

24   A.   It is an August 20, 2019 transcript of that recording

25   from Mr. Sittenfeld and Rob.

*HOLBROOK - CONT'D DIRECT*

1    Q.   Have you reviewed it for accuracy?

2    A.   Yes, I have.

3         MS. GAFFNEY PAINTER:   The government moves for the

4    admission of Government Exhibit USA 29B.

5         MR. C. HENRY RITTGERS:   No objection.

6         THE COURT:   USA 29B is admitted without objection.

7         MS. GAFFNEY PAINTER:   Your Honor, we would request

8    permission to publish, but before doing so, would like to note

9    on the record the timestamps that will appear in the

10   transcript.

11        THE COURT:   You may do so.

12        MS. GAFFNEY PAINTER:   We will start at the beginning,

13   00:00, and play to 00:07.

14        The second segment is 41:6:36.   And the final segment is

15   6:59 until the end.   May we publish?

16        THE COURT:   You may.   Ladies and gentlemen of the

17   jury, you should have a 29B tab in your transcript binder.

18        (Audio played.)

19   Q.   Let's move nine days ahead, to August 29, 2019.

20        Now, if you could turn in your binder to the tab marked

21   USA 29C.

22   A.   Yes.

23   Q.   Do you recognize this?

24   A.   Yes.

25   Q.   What is it?

*HOLBROOK - CONT'D DIRECT*

1   A.   This is a disk that contains an audio recording from

2   August 29, 2019, of a telephone call between Mr. Sittenfeld

3   and Mr. Ndukwe.

4   Q.   How do you know that?

5   A.   I reviewed this disk and placed my initial on it.

6        MS. GAFFNEY PAINTER:   The government moves for the

7   admission of Government Exhibit USA 29C.

8        MR. C. HENRY RITTGERS:   No objection.

9        THE COURT:   USA 29C is admitted without objection.

10  Q.   Special Agent Holbrook, please turn to the tab USA 29D.

11  A.   Yes.

12  Q.   Do you recognize this?

13  A.   I do.

14  Q.   What is it?

15  A.   This is a transcript of the August 29, 2019 telephone

16  call between Mr. Sittenfeld and Ndukwe.

17  Q.   Have you reviewed it for accuracy?

18  A.   I have.

19       MS. GAFFNEY PAINTER:   Your Honor, the government

20  moves for admission of Government Exhibit USA 29D.

21       MR. C. HENRY RITTGERS:   No objection.

22       THE COURT:   USA 29D is admitted without objection.

23       MS. GAFFNEY PAINTER:   Your Honor, may we publish this

24  to the jury?

25       THE COURT:   You may.

*HOLBROOK – CONT'D DIRECT*

```
 1          (Audio played.)
 2     Q.   Let's move now to September 19, 2019.  If you could turn
 3     in your binder to what's been marked for identification as
 4     USA 29E.
 5     A.   Yes.
 6     Q.   Do you recognize this?
 7     A.   I do.
 8     Q.   What is it?
 9     A.   This is a disk containing a recorded telephone call
10     between Rob and Mr. Sittenfeld.
11     Q.   How do you know that?
12     A.   I reviewed this disk, and I placed my initials on it.
13          MS. GAFFNEY PAINTER:  The government moves for the
14     admission of Government Exhibit USA 29E.
15          MR. C. HENRY RITTGERS:  No objection.
16          THE COURT:  USA Exhibit 29E is admitted without
17     objection.
18     Q.   Special Agent Holbrook, if you could turn to the next
19     tab, USA 29F.
20     A.   Yes.
21     Q.   Do you recognize this?
22     A.   I do.
23     Q.   What is it?
24     A.   This is a transcript of the September 19, 2019 recorded
25     call between Mr. Sittenfeld and Rob.
```

*HOLBROOK - CONT'D DIRECT*

1    Q.   Have you reviewed it for accuracy?

2    A.   Yes.

3        MS. GAFFNEY PAINTER:  The government moves for the

4    admission of Government Exhibit USA 29F.

5        MR. C. HENRY RITTGERS:  No objection, Your Honor.

6        THE COURT:  USA 29F is admitted without objection.

7        MS. GAFFNEY PAINTER:  Your Honor, may we publish this

8    exhibit to the jury?

9        THE COURT:  You may.  And ladies and gentlemen of the

10   jury, you should have a tab that's marked 29F in your

11   transcript book.

12       (Audio playing.)

13   Q.   Special Agent Holbrook, also in September 2019, were

14   there lawsuits of significance to Mr. Ndukwe filed that month?

15   A.   Yes, there was.

16   Q.   Did those lawsuits, and the allegations within them,

17   receive publicity?

18   A.   Yes, they did.

19   Q.   All right.  Let's move now to September 24, 2019.  What

20   happened of investigative significance that day?

21   A.   Mr. Sittenfeld and his chief of staff, Chris Dalton, met

22   with Vinny, Rob, and Brian, in a hotel room in Columbus.

23   Q.   Why was the meeting held in Columbus?

24   A.   The meeting was held in Columbus because, as we just

25   heard, Mr. Sittenfeld was going to be there for an event.

*HOLBROOK - CONT'D DIRECT*

1      And in addition to that, Vinny, Rob, and Brian had

2  already planned to be in Columbus on a related but separate

3  investigation.

4  Q.  Why was the meeting in a hotel room?

5  A.  They didn't have an apartment or condo in Columbus, so

6  that's where they stayed, in a hotel room.

7  Q.  Were there any investigative advantages afforded by

8  having the meeting in a hotel room?

9  A.  Yes.  So in addition to that, the hotel room was quiet.

10  It was private.  It provided an environment to capture quality

11  audio and video recordings, and it's an environment that we

12  could control, as opposed to a public restaurant or a public

13  place that would be loud and difficult to hear the

14  conversations.

15  Q.  Was that meeting recorded?

16  A.  It was.

17  Q.  How was that meeting recorded?

18  A.  The meeting was recorded with both audio and audio/video

19  recording devices.

20  Q.  Were those audio and audio/video recording devices

21  hidden?

22  A.  Yes.

23  Q.  Will you please turn to your binder to the tab USA 30A.

24  A.  Yes.

25  Q.  Do you recognize this?

1    A.   I do.

2    Q.   What is it?

3    A.   This is a disk containing the video recording of the

4    September 24, 2019 meeting.

5    Q.   How do you know that?

6    A.   I've reviewed this disk and placed my initials on it.

7         MS. GAFFNEY PAINTER:  The government moves for the

8    admission of Government Exhibit USA 30A.

9         MR. C. MATTHEW RITTGERS:  Your Honor, this is just a

10   clarification.  Is that the entirety of the interaction, 30A,

11   or just parts of it?

12        THE COURT:  Ms. Gaffney Painter?

13        MS. GAFFNEY PAINTER:  Bear with me just a moment.

14   May I confer with my colleagues?

15        THE COURT:  You may.

16        MS. GAFFNEY PAINTER:  Your Honor, to clarify, so 30A

17   is the video recording that contains particular excerpts.

18        The entire video recording of the entire interaction is

19   USA 30F, which we will also be seeking to admit into evidence,

20   and we can do that now, if that's convenient.

21        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

22   Q.   So Special Agent Holbrook, will you please turn to

23   Tab 30F.

24        THE COURT:  Well, I don't think I've admitted 30A,

25   yet, so...

```
 1              MS. GAFFNEY PAINTER:  I apologize.

 2              THE COURT:  I understand you to be saying no

 3     objection to 30A?

 4              MR. C. MATTHEW RITTGERS:  30A, that's the segments?

 5              THE COURT:  That's the portions.

 6              MR. C. MATTHEW RITTGERS:  Subject to our rule of

 7     completeness motions.  But outside of that, no objection, Your

 8     Honor.

 9              THE COURT:  USA 30A is admitted, subject to the

10     objection that Mr. Rittgers just raised.

11              MS. GAFFNEY PAINTER:  Thank you, Your Honor.

12     Q.   Special Agent Holbrook, now will you please turn to

13     tab USA 30F.

14     A.   Yes.

15     Q.   Do you recognize this?

16     A.   Yes.

17     Q.   What is it?

18     A.   This is a disk containing the video recording of the

19     September 24, 2019 meeting in Columbus.

20     Q.   Is this the entire recording?

21     A.   Yes.

22     Q.   How do you know it is what you just said it was?

23     A.   I reviewed this recording and placed my initials on it.

24              MS. GAFFNEY PAINTER:  Your Honor, the government

25     moves for the admission of Government Exhibit 30F.
```

```
 1              MR. C. HENRY RITTGERS:  No objection, Your Honor.

 2              THE COURT:  USA 30F is admitted without objection.

 3    Q.   Special Agent Holbrook, will you please turn in your

 4    exhibit binder to tab USA 30B.

 5    A.   Yes.

 6    Q.   Do you recognize this?

 7    A.   Yes.

 8    Q.   What is it?

 9    A.   This is a transcript, partial transcript, of the recorded

10    meeting on September 24, 2019.

11    Q.   And have you reviewed it for accuracy?

12    A.   I have.

13              MS. GAFFNEY PAINTER:  The government moves for the

14    admission of Government Exhibit USA 30B.

15              MR. C. HENRY RITTGERS:  Subject to our objection.

16              THE COURT:  I'm sorry.  I didn't hear you, sir.

17              MR. C. HENRY RITTGERS:  I apologize, Judge.  Subject

18    to our objection.

19              THE COURT:  Okay.  I'm going to admit it over the

20    objection of Mr. Sittenfeld, so USA 30B is admitted.

21              MS. GAFFNEY PAINTER:  Your Honor, before I request

22    permission to publish this to the jury, I'd like to put on the

23    record the timestamps.

24              THE COURT:  You may do so.

25    Q.   And Special Agent Holbrook, to clarify these, you
```

*HOLBROOK - CONT'D DIRECT*

1    testified yesterday about sessions.  Can you, again, explain

2    to us what sessions are?

3    A.   Yes.  So the recording devices that capture video

4    recordings, they cut the video recordings into sessions.  The

5    device does it, it's not us doing it, because it's for the

6    ease of transfer if it's downloaded or transferred to working

7    copies.

8    Q.   So where there exists a session break -- for instance, in

9    the transcript we will publish shortly to the jury, there is

10   reference to session four ending and then session five

11   beginning.

12        Does that session break cut out any content in the video?

13   A.   No.  When the device cuts the recordings into sessions,

14   they're still continuous, it's just they're in different

15   blocks.

16        MS. GAFFNEY PAINTER:  Your Honor, may I now put the

17   timestamps from the transcript into the record?

18        THE COURT:  You may.

19        MS. GAFFNEY PAINTER:  So from session two, we will

20   play from minute 7:08 to minute 7:54.

21        From session two, we will play from 9:17 to 10:06.

22        From session three, we will play from eight seconds to

23   6:50.

24        Also from session three, we will play from 7:16 until the

25   end of session three.

*HOLBROOK – CONT'D DIRECT*

1      We will then play all of session four, all of session

2   five.

3      And then session six, we will play from the beginning of

4   session six until the end of the transcript, which is at 6:34.

5          THE COURT:  Very good.  And, Ms. Gaffney Painter,

6   that sounds like it's going to be a relatively lengthy period

7   of time, so if you would like to be seated at counsel table

8   while it plays, you may.

9          MS. GAFFNEY PAINTER:  Thank you very much, Your

10  Honor.  May we publish this to the jury?

11         THE COURT:  You may.

12     (Video played.)

13         MS. GAFFNEY PAINTER:  Your Honor, may I approach the

14  podium and continue the examination.

15         THE COURT:  I wonder if this might be -- well, do you

16  have a few follow-up questions on this?

17         MS. GAFFNEY PAINTER:  No.  This could be a good spot

18  for a break.

19         THE COURT:  It's about 10 'til 11:00.  So why don't

20  we take our morning break now, and we'll try to keep it

21  relatively brief and try to have you back in the courtroom by,

22  say, 10 after 11:00 or so.

23     I just would remind you, as I've reminded you on every

24  occasion, please don't discuss the case with your fellow

25  jurors.  Please do not do any research on your own, by

1      electronic means or otherwise, regarding the facts or

2      testimony you should hear.

3          If anyone should attempt to communicate with you

4      regarding this case, please let us know.  And other than that,

5      have a good break.

6          (Jury out at 10:51 a.m.)

7              THE COURT:  Anything counsel wish to discuss before

8      we take a break?

9              MR. SINGER:  No, Your Honor.

10             MR. C. HENRY RITTGERS:  No, Your Honor.

11             THE COURT:  All right.  Why don't we take a brief

12     recess as well.

13         (Brief recess.)

14             THE COURT:  Are we ready to proceed, Counsel?

15             MR. SINGER:  Yes, Your Honor.

16             MR. C. HENRY RITTGERS:  Yes, Your Honor.

17             THE COURT:  All right.  Let's bring in the jury.

18         (Jury in at 11:11 a.m.)

19             THE COURT:  Ms. Gaffney Painter, are you ready to

20     proceed?

21             MS. GAFFNEY PAINTER:  Yes.  Thank you, Your Honor.

22     BY MS. GAFFNEY PAINTER:

23     Q.  Special Agent Holbrook, will you please turn in your

24     exhibit binder to the tab marked USA 30E.

25     A.  Yes.

*HOLBROOK - CONT'D DIRECT*

1    Q.   Do you recognize these?

2    A.   I do.

3    Q.   What are they?

4    A.   They are photocopies of checks and a deposit slip.

5         MS. GAFFNEY PAINTER:  Your Honor, pursuant to a

6    stipulation earlier in the trial, we've previously admitted

7    bank records from Fifth Third Bank, that was USA 41A and

8    USA 41B.

9         This exhibit is an excerpt from those records that have

10   already been admitted.  The government moves for the admission

11   of Government Exhibit USA 30E.

12        MR. C. HENRY RITTGERS:  No objection, Your Honor.

13        THE COURT:  USA 30E is admitted without objection.

14        MS. GAFFNEY PAINTER:  May we publish to the jury?

15        THE COURT:  You may.

16   Q.   All right.  Let's start with the first page here of

17   USA 30E.

18        What is on this first page?

19   A.   This is a photocopy of a check.

20   Q.   And before the break, we watched a video exhibit.  What

21   is the relevance of this check to the video exhibit that we

22   watched before the break?

23   A.   This is one of the checks that was provided to

24   Mr. Sittenfeld from Vinny.

25   Q.   All right.  What appears here on the top left corner?

1    A.   The name of an LLC, Blue Stone Logistics.

2    Q.   What is Blue Stone Logistics, LLC?

3    A.   Blue Stone Logistics is an LLC that is controlled by the

4    FBI.

5    Q.   Who is this check made out to?

6    A.   The Progress and Growth.

7    Q.   What is the amount of this check?

8    A.   $5,000.

9    Q.   All right.  Let's proceed to the second page, please.

10        Now, if you could, what are we looking at here on this

11   second page?

12   A.   This is the back of the check after it was deposited into

13   a Fifth Third Bank account.

14   Q.   All right.  If we could proceed to the third page,

15   please.

16        What is this?

17   A.   This is a check dated November 24, 2019.

18   Q.   And was this one of the checks that was given to

19   Mr. Sittenfeld by Vinny in the previous video exhibit?

20   A.   Yes, it was.

21   Q.   All right.  What appears here at the top left corner?

22   A.   The name of an LLC, Midway Development Group.

23   Q.   What is Midway Development Group, LLC?

24   A.   This is an LLC that is controlled by the FBI.

25   Q.   Who is this check made out to?

*HOLBROOK - CONT'D DIRECT*

1    A.   Progress and Growth.

2    Q.   What is the amount of the check?

3    A.   $5,000.

4    Q.   Let's go to the fourth page.  What are we seeing here?

5    A.   This is the back side of the Midway Development Group

6    check, as it was deposited into the Fifth Third Bank account.

7    Q.   All right.  And if we could go to the fifth page of the

8    exhibit, please.  What are we looking at here?

9    A.   This is a deposit slip that records the deposits of the

10   previous two checks.  You see on the right side two deposits

11   in the amount of $5,000, for a total of $10,000, into a Fifth

12   Third Bank account.

13   Q.   Thank you.  The day after the meeting that we watched,

14   and that would be September 25, 2019, did Sittenfeld text Rob?

15   A.   Excuse me.  Can you repeat that question?

16   Q.   Certainly.  The day after the meeting we watched, so that

17   would be September 25, 2019, did Sittenfeld text Rob?

18   A.   Yes, he did.

19   Q.   All right.  If you could turn in your exhibit binder to

20   the tab marked Exhibit 31B?

21   A.   Yes.

22   Q.   Do you recognize this?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   This is a text message exchange between Sittenfeld and

 1    Rob.

 2    Q.  Have you reviewed it for accuracy?

 3    A.  I have.

 4         MS. GAFFNEY PAINTER:  The government moves for the

 5    admission of Government Exhibit USA 31B.

 6         MR. C. HENRY RITTGERS:  No objection.

 7         THE COURT:  Exhibit 31B is admitted without

 8    objection.

 9         MS. GAFFNEY PAINTER:  May we publish this exhibit?

10         THE COURT:  You may.

11    Q.  If you could, Agent Holbrook, will you read what is

12    displayed here on 31B?

13    A.  Yes.  On September 25, 2019, Mr. Sittenfeld sent a text

14    message to Rob, at 8:10 a.m., and the text message states:

15    "You got a quick second by phone?  Two quick questions."

16    Q.  Was there a subsequent phone call that same day between

17    Rob and Sittenfeld?

18    A.  Yes, there was.

19    Q.  Was that call recorded?

20    A.  Yes.

21    Q.  Did you review that recording?

22    A.  I did.

23    Q.  All right.  If you will turn, please, to the tab in your

24    binder marked USA 31C.

25    A.  Yes.

*HOLBROOK - CONT'D DIRECT*

1    Q.   Do you recognize this?

2    A.   I do.

3    Q.   What is it?

4    A.   This is a disk containing a recorded telephone call

5    between Mr. Sittenfeld and Rob.

6    Q.   How do you know that?

7    A.   I've reviewed this disk, and I placed my initials on it.

8           MS. GAFFNEY PAINTER:  The government moves for the

9    admission of Government Exhibit USA 31C.

10          MR. C. HENRY RITTGERS:  No objection.

11          THE COURT:  USA 31C is admitted without objection.

12   Q.   Special Agent Holbrook, please turn to the tab marked

13   USA 31D.

14   A.   Yes.

15   Q.   Do you recognize this?

16   A.   I do.

17   Q.   What is it?

18   A.   This is a transcript of the September 25, 2019 call

19   between Rob and Mr. Sittenfeld.

20   Q.   Have you reviewed it for accuracy?

21   A.   I have.

22          MS. GAFFNEY PAINTER:  The government moves for the

23   admission of Government Exhibit USA 31D.

24          MR. C. HENRY RITTGERS:  No objection, Your Honor.

25          THE COURT:  USA 31D is admitted without objection.

*HOLBROOK - CONT'D DIRECT*

```
1          MS. GAFFNEY PAINTER:  Your Honor, permission to

2    publish USA 31C to the jury, and allow them to follow along

3    with the transcript at USA 31D?

4          THE COURT:  You may do so.  Ladies and gentlemen of

5    the jury, there should be a tab marked 31D, as in dog, in your

6    transcript book.

7          ( Audio played.)

8    Q.   Special Agent Holbrook, there was reference in

9    USA Exhibit 31C to a Nathan Wright.  Who is Nathan Wright?

10   A.   Nathan Wright is my alias.

11   Q.   For what purpose?

12   A.   To operate the LLCs that were previously referenced, Blue

13   Stone Logistics and Midway Development Company, as well as the

14   associate bank accounts.

15   Q.   There was reference in USA 31C to Jason Myers?

16   A.   Jason Myers was the alias of my partner at that time,

17   Special Agent Kenneth J. Hurst.

18   Q.   Was there also phone contact between Rob and Sittenfeld

19   on September 25th and 26th, 2019?

20   A.   Yes, there was.

21   Q.   All right.  If you could turn in your binder to what's

22   been marked for identification as Government Exhibit USA 31F.

23   A.   Yes.

24   Q.   Do you recognize this?

25   A.   I do.
```

1    Q.  What is it?

2    A.  This is a recorded call from Mr. Sittenfeld to Rob.

3    Excuse me.  Yes, that's correct.

4    Q.  How do you know that?

5    A.  I've reviewed this, and I have placed my initials on the

6    disk.

7          MS. GAFFNEY PAINTER:  The government moves for the

8    admission of Government Exhibit USA 31F.

9          MR. C. HENRY RITTGERS:  No objection.

10          THE COURT:  USA 31F is admitted without objection.

11   Q.  Now, if you could, Special Agent Holbrook, please turn to

12   USA 31G.

13   A.  Yes.

14   Q.  Do you recognize this?

15   A.  I do.

16   Q.  What is it?

17   A.  It is the transcript of the call from Mr. Sittenfeld to

18   Rob on September 25, 2019.

19   Q.  Have you reviewed it for accuracy?

20   A.  Yes.

21          MS. GAFFNEY PAINTER:  Government moves for the

22   admission of Government Exhibit USA 31G.

23          MR. C. HENRY RITTGERS:  No objection.

24          THE COURT:  USA Exhibit 31G is admitted without

25   objection.

*HOLBROOK - CONT'D DIRECT*

1    Q.   Special Agent Holbrook, if you could turn to the tab

2    marked USA 31H.

3    A.   Yes.

4    Q.   Do you recognize this?

5    A.   I do.

6    Q.   What is it?

7    A.   This is a recorded telephone call between Mr. Sittenfeld

8    and Rob that occurred on September 26, 2019.

9    Q.   How do you know that?

10   A.   I've reviewed this disk, and I've placed my initials on

11   it.

12        MS. GAFFNEY PAINTER:  Your Honor, the government

13   moves for the admission of Government Exhibit USA 31H.

14        MR. C. HENRY RITTGERS:  No objection.

15        THE COURT:  USA 31H is admitted without objection.

16   Q.   Special Agent Holbrook, if you could turn to the next

17   tab, 31I, and look at what is identified there.

18   A.   Yes.

19   Q.   Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   This is a transcript of the recording between

23   Mr. Sittenfeld and Rob on September 26, 2019.

24   Q.   Have you reviewed it for accuracy?

25   A.   Yes, I have.

 1          MS. GAFFNEY PAINTER:  Your Honor, the government

 2    moves for the admission of Government Exhibit USA 31I.

 3          MR. C. HENRY RITTGERS:  No objection.

 4          THE COURT:  USA 31I is admitted without objection.

 5          MS. GAFFNEY PAINTER:  Your Honor, the government

 6    would request the opportunity to publish USA 31F and USA 31H,

 7    the recordings, and allow the jury to review the transcripts

 8    that have been admitted as USA 31G and USA 31I.

 9          THE COURT:  Very good.  So ladies and gentlemen of

10    the jury, you should have a tab labeled 31G, and then another

11    one labeled 31I, and the government is going to play the

12    accompanying audio for both of those.

13       (Audio played.)

14    Q.  Special Agent Holbrook, if you could turn to the tab in

15    your binder marked USA 31J.

16    A.  Yes.

17    Q.  Do you recognize this?

18    A.  I do.

19    Q.  What is it?

20    A.  This is a series of text message exchanges between

21    Mr. Sittenfeld and Rob.

22    Q.  Is it an accurate depiction of the underlying line

23    sheets?

24    A.  Yes, it is.

25          MS. GAFFNEY PAINTER:  The government moves for the

1    admission of Government Exhibit USA 31J.

2            MR. C. HENRY RITTGERS:  No objection, Your Honor.

3            THE COURT:  USA 31J is admitted without objection.

4            MS. GAFFNEY PAINTER:  Your Honor, may we publish this

5    exhibit?

6            THE COURT:  You may.

7    Q.  Special Agent Holbrook, will you please read the texts

8    that are displayed here?

9    A.  Yes.  On September 29, 2019, Sittenfeld texts:  "For

10   dates to meet with the guy I mentioned, October 7th doable?

11   Or sometime week of October 14?"

12       September 30 of 2019, Rob texts:  "I am trying to

13   reschedule some things the week of the 14th."

14       Sittenfeld likes Rob's text.  Sittenfeld texts:  "Great.

15   Just let me know."

16   Q.  Is there a second page to this exhibit?

17   A.  It's not displayed, so I didn't know if I was reading

18   them.

19   Q.  All right.

20           MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

21   A.  Proceed?

22   Q.  Yes, please.

23   A.  October 3, 2019, Sittenfeld texts:  "Once you know if you

24   can make it in the week of October 14th, I'll get you and Dan

25   together.  Preferable on my end if it's not the day of

*HOLBROOK - CONT'D DIRECT*

1    October 15th."

2        October 4th, 2019, Rob texts:  "I am trying to move this

3    other meeting.  I will let you know as soon as they confirm."

4        Same day, Sittenfeld likes Rob's text.

5        October 9, 2019, Sittenfeld texts:  "Let me know if you

6    could come into town and for dinner next Wednesday,

7    October 16th."

8        October 11, 2019, Sittenfeld texts:  "16th doable?  If

9    not, no worries.  Trying to simultaneously pin down your and

10   Dan's schedules to move forward."

11       Rob texts:  "Sorry, I was -- I thought I was going to be

12   able to move things around, but I couldn't.  I won't be able

13   to get there next week."

14       Sittenfeld texts:  "Understood.  You still want to try

15   another time, or even by phone with Dan?"

16   Q.   Special Agent Holbrook, will you turn to the tab marked

17   USA 31K.

18   A.   Yes.

19   Q.   Do you recognize this?

20   A.   I do.

21   Q.   What is it?

22   A.   It is an October 24, 2019 telephone call between Rob and

23   Mr. Sittenfeld.

24   Q.   How do you know that?

25   A.   I've reviewed this disk and placed my initials on it.

1          MS. GAFFNEY PAINTER:  The government moves for

2    admission of Government Exhibit USA 31K.

3          MR. C. HENRY RITTGERS:  No objection.

4          THE COURT:  USA 31K is admitted without objection.

5    Q.   Special Agent Holbrook, if you could turn to the next tab

6    in the binder, 31L.

7    A.   Yes.

8    Q.   Do you recognize this?

9    A.   I do.

10   Q.   What is it?

11   A.   This is a transcript of the October 24, 2019 call between

12   Rob and Mr. Sittenfeld.

13   Q.   Have you reviewed it for accuracy?

14   A.   Yes, I have.

15         MS. GAFFNEY PAINTER:  The government moves for the

16   admission of Government Exhibit USA 31L.

17         MR. C. HENRY RITTGERS:  No objection.

18         THE COURT:  USA 31L is admitted without objection.

19         MS. GAFFNEY PAINTER:  Your Honor, may we publish to

20   the jury, but before doing so note for the record the

21   timestamps of this exhibit?

22         THE COURT:  You may do so.

23         MS. GAFFNEY PAINTER:  So the timestamps will be the

24   beginning of the file to 4:45.  And then the next timestamp is

25   4:52 until the end.

*HOLBROOK - CONT'D DIRECT*

```
 1            THE COURT:  Very good.  Ladies and gentlemen of the

 2    jury, you should have a 31L in your transcript book.

 3       (Audio played.)

 4    Q.  Special Agent Holbrook, will you please turn in your

 5    binder to the tab marked USA 31M.

 6    A.  Yes.

 7    Q.  Do you recognize this?

 8    A.  I do.

 9    Q.  What is it?

10    A.  It is a series of text message exchanges between

11    Mr. Sittenfeld and Rob.

12    Q.  Is it an accurate depiction of the underlying line sheets

13    that were previously admitted?

14    A.  Yes, it is.

15            MS. GAFFNEY PAINTER:  The government moves for the

16    admission of Government Exhibit USA 31M.

17            MR. C. HENRY RITTGERS:  No objection, Your Honor.

18            THE COURT:  USA 31M is admitted without objection.

19            MS. GAFFNEY PAINTER:  May we publish to the jury,

20    Your Honor?

21            THE COURT:  You may.

22    Q.  Special Agent Holbrook, will you please read the text

23    message exchange that is displayed?

24    A.  Yes.  October 25, 2019, Sittenfeld texts:  "Any word on

25    coming in next week?"
```

1    October 27, 2019, Sittenfeld texts: "Gonna make it into

2  town this week?"

3    Rob texts: "Yes. Tuesday."

4    Sittenfeld texts: "Want to plan on a late-ish dinner,

5  7:45?"

6    Rob texts: "Sounds good. I think Brian is going to

7  drive up."

8    Sittenfeld likes Rob's text.

9  Q.  Special Agent Holbrook, we've gone through phone calls

10  and text messages from September 25th through

11  October 27, 2019.

12    If you could turn in your binder to what's marked for

13  identification as USA 31A.

14    THE COURT: You mean 32A or 31A?

15    MS. GAFFNEY PAINTER: 31A.

16    THE COURT: Oh, okay.

17  A.  Yes.

18  Q.  Do you recognize this?

19  A.  I do.

20  Q.  What is this?

21  A.  This is a timeline of communications between

22  Mr. Sittenfeld and Rob.

23  Q.  Did you review this for accuracy?

24  A.  Yes, I have.

25  Q.  Now, does it list all of of the communications that

*HOLBROOK - CONT'D DIRECT*

1   occurred between Sittenfeld and Rob during this time period?

2   A.   It does not.

3   Q.   What are some examples of communications that are not

4   included in USA 31A?

5   A.   Hang-ups, duplicate sessions, disconnects.

6          MS. GAFFNEY PAINTER:   The government moves for the

7   admission of Government Exhibit USA 31A.

8          MR. C. HENRY RITTGERS:   No objection, Your Honor.

9          THE COURT:   USA 31A is admitted without objection.

10         MS. GAFFNEY PAINTER:   May we publish for the jury,

11  Your Honor?

12         THE COURT:   You may.

13  Q.   Special Agent Holbrook, if you could turn in your binder

14  to the tab marked USA 11B.

15  A.   Yes.

16  Q.   Do you recognize this?

17  A.   Yes.

18  Q.   What is it?

19  A.   This is a chronology of communications between UC Rob,

20  Sittenfeld, Vinny, and Laura Brunner.

21  Q.   Between what dates?

22  A.   From October 28, 2019, to December 23, 2019.

23  Q.   Have you reviewed this for accuracy?

24  A.   Yes, I have.

25         MS. GAFFNEY PAINTER:   The government moves for the

*HOLBROOK – CONT'D DIRECT*

1    admission of Government Exhibit USA 11B.

2          MR. C. HENRY RITTGERS:  No objection, Your Honor.

3          THE COURT:  USA 11B is admitted without objection.

4    Q.   Now, does the exhibit that appears at USA 11B contain

5    every communication between these dates?

6    A.   It does not.

7    Q.   What are some examples of communications that are not

8    included in this exhibit?

9    A.   Examples of what I've previously testified to;

10   duplicative sessions, hang-ups, dropped calls, things of that

11   nature.

12   Q.   Let's go to October 28th and 29th, 2019.

13         If you could turn to what's been identified in your

14   binder as USA 32A.

15   A.   Okay.

16   Q.   Do you recognize this?

17   A.   Yes, I do.

18   Q.   What is it?

19   A.   This is a series of text message exchanges between

20   Mr. Sittenfeld and Rob.

21   Q.   Have you reviewed it for accuracy against the previously

22   admitted line sheets?

23   A.   Yes, I have.

24         MS. GAFFNEY PAINTER:  The government moves for the

25   admission of Government Exhibit USA 32A.

1     MR. C. HENRY RITTGERS:  No objection, Your Honor.

2     THE COURT:  USA 32A is admitted without objection.

3     MS. GAFFNEY PAINTER:  Your Honor, may we publish just

4     the first page of this exhibit to the jury at this point?

5     THE COURT:  You may.

6   Q.  Special Agent Holbrook, will you please read for the jury

7   what appears here on the first page of USA 32A?

8   A.  Yes.  October 28, 2019, Sittenfeld texts:  "Is there a

9   good number to reach Vinny on?  Have a quick update for him."

10     Rob texts:  "401-283-8585."

11     Rob texts again:  "I called him.  He was going into a

12   meeting but said he would be available between 6:00 and 8:00."

13     Sittenfeld texts:  "I'll be free to ring him at 7:30 p.m.

14   Thx."

15   Q.  Let's step away from that for a moment.  Did Sittenfeld,

16   in fact, call Vinny?

17   A.  Yes.

18   Q.  Was that call recorded?

19   A.  Yes.

20   Q.  I'm showing you, when you turn in your binder to

21   Exhibit USA 32B, what's been marked for identification as

22   USA 32B.

23   A.  Yes.

24   Q.  Do you recognize this?

25   A.  I do.

*HOLBROOK - CONT'D DIRECT*

1    Q.   What is it?

2    A.   This is an October 28, 2019 recording of a voicemail from

3    Mr. Sittenfeld to Vinny.

4    Q.   How do you know that?

5    A.   I've reviewed this disk, and I placed my initials on it.

6         MS. GAFFNEY PAINTER:  The government moves for the

7    admission of Government Exhibit USA 32B.

8         MR. C. HENRY RITTGERS:  No objection, Your Honor.

9         THE COURT:  USA 32B is admitted without objection.

10   Q.   If you could, Special Agent Holbrook, turn to the next

11   tab in your binder, and that is USA 32C.

12   A.   Yes.

13   Q.   Do you recognize this?

14   A.   I do.

15   Q.   What is it?

16   A.   This is a transcript of the voice message to Vinny from

17   Mr. Sittenfeld on October 28, 2019.

18   Q.   Have you reviewed it for accuracy?

19   A.   Yes.

20        MS. GAFFNEY PAINTER:  The government moves for the

21   admission of Government Exhibit USA 32C.

22        MR. C. HENRY RITTGERS:  No objection.

23        THE COURT:  USA 32C is admitted without objection.

24        MS. GAFFNEY PAINTER:  Your Honor, may we publish this

25   exhibit to the jury and allow them to review the transcript?

1          THE COURT:  You may.  Ladies and gentlemen of the

2     jury, the transcript's at 32C.

3          (Audio played.)

4     Q.   On October 29, the next day, was there a call between

5     Vinny and Sittenfeld?

6     A.   Yes.  Mr. Sittenfeld called Vinny.

7     Q.   Was that call recorded?

8     A.   Yes, it was.

9     Q.   All right.  If you could turn in your binder to the tab

10    marked USA 32D.

11    A.   Yes.

12    Q.   Do you recognize this?

13    A.   Yes.  This is the October 29th -- this is a disk

14    containing the October 29, 2019 call.  I've reviewed this

15    disk, and I've placed my initials on it.

16          MS. GAFFNEY PAINTER:  Your Honor, the government

17    moves for the admission of Government Exhibit USA 32D.

18          MR. C. HENRY RITTGERS:  No objection, Your Honor.

19          THE COURT:  USA 32D is admitted without objection.

20    Q.   Now, Special Agent Holbrook, could you please turn to the

21    tab marked USA 32E.

22    A.   Yes.

23    Q.   Do you recognize this?

24    A.   I do.

25    Q.   What is it?

*HOLBROOK - CONT'D DIRECT*

1    A.   This is a transcript of an October 29, 2019 call between

2    Vinny and Mr. Sittenfeld.

3    Q.   Have you reviewed it for accuracy?

4    A.   Yes, I have.

5         MS. GAFFNEY PAINTER:  Your Honor, the government

6    moves for the admission of Government Exhibit USA 32E.

7         MR. C. HENRY RITTGERS:  No objection.

8         THE COURT:  USA 32E is admitted without objection.

9         MS. GAFFNEY PAINTER:  Your Honor, may we publish

10   these exhibits to the jury?

11        THE COURT:  You may.  Ladies and gentlemen of the

12   jury, there should be a transcript tab marked 32E.

13        (Audio played.)

14   Q.   Special Agent Holbrook, on that call, there was a

15   reference to meeting up with Rob and Brian.  Did that meeting

16   happen?

17   A.   Yes, it did.

18        MS. GAFFNEY PAINTER:  All right.  If we could pull

19   back up USA 32A, which has been previously admitted into

20   evidence but, instead, this time publish page 2, if the Court

21   allows it?

22        THE COURT:  You may.

23   Q.   Special Agent Holbrook, will you please read the text

24   exchange that's displayed here?

25   A.   Yes.  October 29, 2019:  "What location for tonight?" was

1  the text by Mr. Sittenfeld.

2      Rob texts:  "Just come to the apartment whenever, and we

3  will do Sotto's or Ruby's."

4      Sittenfeld texts:  "Great.  Will be there between 7:30

5  and 7:45."

6      Rob texts:  "Vinny said he missed your call, but he is

7  available after 2:00 today."

8      Sittenfeld texts:  "Just got to lobby."

9      Rob texts:  "On the way."

10      Sittenfeld texts:  "Take your time."

11  Q.  Where was this meeting held between Sittenfeld, Rob, and

12  Brian?

13  A.  This meeting began at the apartment at the 580 Building.

14  Q.  Was that meeting recorded?

15  A.  Yes.

16  Q.  If you could turn to the tabs in your binder marked

17  USA 33A and USA 33C.

18  A.  Yes.

19  Q.  Do you recognize these?

20  A.  I do.

21  Q.  What are they?

22  A.  33A is a disk that contains a video recording inside the

23  apartment of the 580 Building on October 29, 2019.

24  Q.  And what is 33C?

25  A.  33C is also a recording of a continuation of the

*HOLBROOK – CONT'D DIRECT*

1    October 29, 2019 meeting after they left the apartment at the

2    580 Building.

3    Q.   How do you know that?

4    A.   I have reviewed both of these exhibits, the disk, and I

5    have placed my initials on them.

6         MS. GAFFNEY PAINTER:   Your Honor, the government

7    moves for the admission of Government Exhibits USA 33A and

8    USA 33C.

9         THE COURT:   Any objection, Mr. Rittgers?

10        MR. C. HENRY RITTGERS:   No.   I'm sorry, Your Honor.

11   No objection.

12        THE COURT:   USA 33A is admitted without objection,

13   and USA 33C is admitted without objection.

14   Q.   If you could, Special Agent Holbrook, turn to tab

15   USA 33B.   And then when you are finished reviewing that,

16   please turn to USA 33D.

17   A.   Yes.

18   Q.   Do you recognize these?

19   A.   I do.

20   Q.   What are they?

21   A.   33B is a transcript of the video recording that occurred

22   inside the apartment at the 580 Building.   And Exhibit 33D is

23   a transcript of an audio recording after they left the

24   apartment and went to a local restaurant.

25   Q.   Have you reviewed both of these for accuracy?

1    A.   Yes, I have.

2         MS. GAFFNEY PAINTER:  Your Honor, the government

3    moves for the admission of Government Exhibit USA 33B and

4    USA 33D.

5         MR. C. HENRY RITTGERS:  No objection, Your Honor.

6         THE COURT:  USA 33B is admitted, and USA 33D is

7    admitted, both without objection.

8         MS. GAFFNEY PAINTER:  Your Honor, in recognition of

9    the time, I believe that, perhaps, publishing these exhibits

10   after lunch may be the most efficient way to proceed.

11        THE COURT:  You want to play them all together?

12        MS. GAFFNEY PAINTER:  Yes.

13        THE COURT:  Which makes sense.

14        MS. GAFFNEY PAINTER:  Yes.

15        THE COURT:  Okay.  So ladies and gentlemen of the

16   jury, I actually have a hearing in another matter that's

17   coming up shortly, so we're going to need to take a break for

18   lunch now.

19        And I think it's unlikely that we'd be able to resume

20   before 1:30, so if you can reassemble in the jury room shortly

21   after 1:15, around 1:20, and we'll try to get you back down

22   here by 1:30.

23        I would just remind you, I know you're breaking for

24   lunch, and I know you're probably sick of hearing this

25   admonition, but please do not discuss this case with each

1    other.

2        Please don't do any research on the internet or any other

3    way with regard to the facts or claims at issue here.  Please

4    do not communicate with anyone outside the jury about the case

5    either, and if anyone attempts to communicate with you about

6    the case, please let me know.

7        With that, have a good lunch.

8        (Jury out at 12:11 p.m.)

9        THE COURT:  Thank you for being mindful of the time,

10    Ms. Gaffney Painter.  I appreciate that.

11        Is there anything we need to discuss before we break for

12    lunch?

13        MR. SINGER:  No, Your Honor.

14        MR. C. HENRY RITTGERS:  No, Your Honor.

15        THE COURT:  Very good.  We'll take a brief recess for

16    lunch.  As you heard, I have a plea hearing that starts at

17    12:30, so I imagine it's going to be, at the earliest, 1:15 or

18    1:20 before I can be back here, so just try to be here a

19    little before 1:30.

20        MS. GAFFNEY PAINTER:  Your Honor, for the convenience

21    of the parties for the plea, should we remove the --

22        THE COURT:  We're not doing the plea here.

23        MS. GAFFNEY PAINTER:  Oh, great.  Thank you.

24    (Lunch recess.)

25        THE COURT:  Is counsel ready to proceed?

*HOLBROOK – CONT'D DIRECT*

1          MR. SINGER: Yes, Your Honor.

2          MR. C. HENRY RITTGERS: Yes, Your Honor.

3          THE COURT: All right. Let's bring in the jury.

4      My proceeding ran a little long. I apologize.

5      (Jury in at 1:38 p.m.)

6          THE COURT: Ms. Gaffney Painter, are you ready to

7  proceed?

8          MS. GAFFNEY PAINTER: Yes. Thank you, Your Honor.

9      Your Honor, before the lunch break, the government had

10  moved into evidence Government Exhibits USA 33A and USA 33C,

11  and had also admitted the corresponding transcripts,

12  Government Exhibit USA 33B and Government Exhibit USA 33D.

13      The government seeks permission to publish these exhibits

14  and would like to note on the record the timestamps that we

15  will be publishing.

16          THE COURT: You may do so.

17          MS. GAFFNEY PAINTER: For Government Exhibit USA 33A,

18  the timestamps are for file 1D158-1, starting at 8:12 to 9:33.

19      In that same first session, we are then playing 36:53 to

20  the end of session one.

21      We will then play the beginning of session two to 2:20.

22      For Government Exhibit USA 33D, the government will be

23  publishing 1D161-1, that's session one, at 54:24 to 55:43.

24      The government will then publish 1:03:10 to 1:07:55.

25      And the government will finally publish 1:11:40 to

1    1:12:55.

2         And, Your Honor, before we publish, may I have

3    permission, since this is a longer clip, to sit during the

4    publication?

5              THE COURT:  You may.

6              MS. GAFFNEY PAINTER:  Thank you.

7              THE COURT:  Ladies and gentlemen of the jury, they're

8    now going to play, it should be 33B and 33D would be the

9    accompanying transcripts, and they are side by each in your

10   volume of transcripts there.

11        (Video played.)

12             MS. GAFFNEY PAINTER:  Your Honor, may I approach the

13   podium and continue the examination?

14             THE COURT:  You may.

15   BY MS. GAFFNEY PAINTER:

16   Q.   Special Agent Holbrook, there was a reference to checks

17   during that meeting back in the 580 Building.  Will you please

18   turn in your exhibit binder to the tab marked USA 33E.

19        Do you recognize this?

20   A.   I do.

21   Q.   What is?

22   A.   It is one of the checks that was given to Mr. Sittenfeld

23   on October 29, 2019.

24   Q.   And what about the other pages of the exhibit?

25   A.   There's the back of the first check, and then there's a

1    second check that was also provided to Mr. Sittenfeld on

2    October of 2019.  And then there's a deposit ticket for the

3    checks.

4            MS. GAFFNEY PAINTER:  Your Honor, previously,

5    pursuant to a stip, the parties agreed to admission of the

6    Fifth Third records, which were then admitted at USA 41A and

7    USA 41B.

8        The exhibit here, USA 33E, is a subsection of those

9    records that have previously been admitted.

10       The government moves for the admission of USA 33E.

11           THE COURT:  Has the witness described the total of

12   it, or did you only want the first few pages?  I'm not clear

13   what's going on right now.

14           MS. GAFFNEY PAINTER:  I just wanted him to

15   acknowledge what the exhibit is and that he has reviewed it.

16       And then these records have come from a subset of records

17   that have already been admitted.

18           THE COURT:  I see.

19           MS. GAFFNEY PAINTER:  And so now I'm moving for the

20   admission of this subset of records, which is USA 33E.

21           THE COURT:  Okay.  So so far, he's identified two

22   checks and a deposit statement.  I'm just -- there appear to

23   be more parts to this.

24           MS. GAFFNEY PAINTER:  Yes.  I can have him walk

25   through the remainder of the pages, if that would be helpful?

4-57

*HOLBROOK - CONT'D DIRECT*

1              THE COURT:  That's all right.  If there's no

2    objection -- any objection to the admission?

3              MR. C. MATTHEW RITTGERS:  No, Your Honor.

4              THE COURT:  All right.  USA 33E is admitted without

5    objection.

6              MS. GAFFNEY PAINTER:  May we publish this exhibit for

7    the jury?

8              THE COURT:  You may.

9    Q.   All right.  Special Agent Holbrook, looking at this

10   exhibit here of USA 33E, what appears in the top left-hand

11   corner here?

12   A.   It's the name of an LLC, IN2IT Global Corporation, with

13   an address.

14   Q.   What is IN2IT Global Corporation, LLC?

15   A.   This is a limited liability corporation that is

16   controlled by a confidential unit source.

17   Q.   And who is it made out to?

18   A.   The Progress and Growth.

19   Q.   And what is the amount of this check?

20   A.   It's $5,000.

21   Q.   All right.  Could we please go to the third page of this

22   exhibit.

23        What appears at the top left-hand corner of this page?

24   A.   An LLC named Four Kross USA, LLC.

25   Q.   And what is Four Kross USA, LLC?

1    A.    This is an LLC that is controlled by a confidential unit

2    source.

3    Q.    What is the amount of this check?

4    A.    The amount is 5,000.

5    Q.    And who is the check made out to?

6    A.    Progress and Growth.

7          MS. GAFFNEY PAINTER:   Now, Ms. Terry, will you please

8    publish the subsequent pages of this exhibit.

9    Q.    Special Agent Holbrook, the pages that follow, those

10   records that appear there, what do these records show?

11   A.    Could you be more specific?

12   Q.    Certainly.  The records that follow the two copies of the

13   checks, what action does it indicate has happened to the

14   checks that we've previously looked at?

15   A.    The checks were deposited into the account of Progress

16   and Growth.

17   Q.    Special Agent Holbrook, will you turn to what's been

18   marked for identification as USA 34A.

19   A.    Yes.

20   Q.    Do you recognize this?

21   A.    Yes.

22   Q.    What is this?

23   A.    This is a recording on November 14th of 2019 of a

24   voicemail left by Mr. Sittenfeld.

25   Q.    How do you know that?

```
1    A.   I have reviewed this disk, and I've placed my initials on

2    it.

3         MS. GAFFNEY PAINTER:  The government moves for the

4    admission of Government Exhibit USA 34A.

5         THE COURT:  Mr. Rittgers?

6         MR. C. HENRY RITTGERS:  I'm sorry.  No objection.

7         THE COURT:  USA 34A is admitted without objection.

8    Q.   Now, Special Agent Holbrook, if you'll turn to tab

9    USA 34B.  Do you recognize this?

10   A.   Yes.

11   Q.   What is it?

12   A.   This is a transcript related to the November 14, 2019

13   voice message.

14   Q.   Have you reviewed it for accuracy?

15   A.   I have.

16        MS. GAFFNEY PAINTER:  The government moves for the

17   admission of Government Exhibit USA 34B.

18        MR. C. HENRY RITTGERS:  No objection, Your Honor.

19        THE COURT:  USA 34B is admitted without objection

20   Q.   Special Agent Holbrook, if you could, turn to the tab in

21   your binder to USA 34C.

22   A.   Yes.

23   Q.   Do you recognize this?

24   A.   This is a November 14, 2019 call between Mr. Sittenfeld

25   and Rob.
```

1    Q.   How do you know that?

2    A.   I had reviewed the disk, and I placed my initials on it.

3             MS. GAFFNEY PAINTER:  The government moves for

4    admission of Government Exhibit USA 34C.

5             MR. C. HENRY RITTGERS:  No objection, Your Honor.

6             THE COURT:  USA 34C is admitted without objection.

7    Q.   Special Agent Holbrook, will you please turn to the tab

8    marked USA 34D.

9    A.   Yes.

10   Q.   Do you recognize this?

11   A.   I do.

12   Q.   What is it?

13   A.   This is a transcript of the November 14, 2019 call

14   between Mr. Sittenfeld and Rob.

15   Q.   Have you reviewed it for accuracy?

16   A.   I have.

17            MS. GAFFNEY PAINTER:  The government moves for the

18   admission of Government Exhibit USA 34D.

19            MR. C. HENRY RITTGERS:  No objection, Your Honor.

20            THE COURT:  USA 34D is admitted without objection.

21            MS. GAFFNEY PAINTER:  Your Honor, the government

22   seeks permission to publish Government Exhibit USA 34A first,

23   and then Government Exhibit USA 34C next.

24            THE COURT:  Very good.  Ladies and gentlemen of the

25   jury, you're now going to hear two audio clips.  The

1    transcription for the first one appears at 34B in your binder.

2        And the transcription for the second one appears at the

3    tab labeled 34D in your binder, which would be right after

4    34B.

5        (Audio played.)

6    Q.  Special Agent Holbrook, the next day, November 15, 2019,

7    was there phone contact between Sittenfeld and Vinny?

8    A.  Did you say November 15, 2019?

9    Q.  November 15, 2019.

10   A.  Yes.

11   Q.  If you could, please, turn to the tab of your binder

12   that's marked USA 35A.

13   A.  Yes.

14   Q.  Do you recognize this?

15   A.  I do.

16   Q.  What is it?

17   A.  It is a November 15, 2019 voicemail left by

18   Mr. Sittenfeld for Vinny.

19   Q.  How do you know that?

20   A.  I reviewed this disk, and I placed my initials on it.

21        MS. GAFFNEY PAINTER:  Your Honor, the government

22   moves for the admission of Government Exhibit USA 35A.

23        MR. C. HENRY RITTGERS:  No objection.

24        THE COURT:  USA 35A is admitted without objection.

25   Q.  Special Agent Holbrook, if you can turn to the next tab,

```
 1    USA 35B.

 2    A.  Yes.

 3    Q.  Do you recognize what appears there?

 4    A.  I do.

 5    Q.  What is it?

 6    A.  This is a transcript of the November 15, 2019 voice

 7    message left for Vinny by Mr. Sittenfeld.

 8    Q.  Have you reviewed this for accuracy?

 9    A.  I have.

10         MS. GAFFNEY PAINTER:  The government moves for the

11    admission of Government Exhibit USA 35B.

12         MR. C. HENRY RITTGERS:  No objection.

13         THE COURT:  USA 35B is admitted without objection.

14    Q.  Special Agent Holbrook, if you could turn to the tab

15    marked USA 35C.

16    A.  Yes.

17    Q.  Do you recognize this?

18    A.  Yes.  This is a November 15, 2019 call between

19    Mr. Sittenfeld and Vinny.

20    Q.  How do you know that?

21    A.  I have reviewed this disk, and I have placed my initials

22    on it.

23         MS. GAFFNEY PAINTER:  The government moves for the

24    admission of Government Exhibit USA 35C.

25         MR. C. HENRY RITTGERS:  No objection.
```

1          THE COURT:  USA 35C is admitted without objection.

2    Q.   Special Agent Holbrook, if you could turn to the next

3    tab, USA 35D?

4    A.   Yes.

5    Q.   What appears there?

6    A.   This is the transcript of the November 15, 2019 call

7    between Mr. Sittenfeld and Vinny.

8    Q.   How do you know that?

9    A.   I have reviewed this transcript.

10         MS. GAFFNEY PAINTER:  The government moves for the

11   admission of Government Exhibit USA 35D.

12         MR. C. HENRY RITTGERS:  No objection.

13         THE COURT:  USA 35D is admitted without objection.

14         MS. GAFFNEY PAINTER:  Your Honor, the government

15   seeks permission from the Court to publish both of the

16   recordings that were just admitted, that is USA 35A and

17   USA 35C.

18         THE COURT:  You may do so.  Ladies and gentlemen of

19   the jury, you should have a tab in your transcript book that

20   is labeled USA 35B, followed by USA 35D, which should be the

21   transcripts that correspond to the audio you're about to hear.

22     Of course, to the extent there's any discrepancy, it's

23   the audio that governs.  You may play it.

24     (Audio played.)

25   Q.   Special Agent Holbrook, directing your attention to

1    November 27, 2019, was there phone contact between Sittenfeld

2    and Vinny on that day?

3    A.   Yes, there was.

4    Q.   If you could turn in your binder to the tab marked

5    USA 36A.

6    A.   Yes.

7    Q.   Do you recognize this?

8    A.   Yes.

9    Q.   What is it?

10   A.   This is a disk containing the November 27, 2019 call

11   between Vinny and Mr. Sittenfeld.

12   Q.   How do you know that?

13   A.   I've reviewed this disk, and I've placed my initials on

14   it.

15         MS. GAFFNEY PAINTER:  The government moves for the

16   admission of Government Exhibit USA 36A.

17         MR. C. HENRY RITTGERS:  No objection, Your Honor.

18         THE COURT:  USA 36A is admitted without objection.

19   Q.   Special Agent Holbrook, if you would, please, turn to the

20   tab marked USA 36B.

21   A.   Yes.

22   Q.   Do you recognize this?

23   A.   Yes.

24   Q.   What is it?

25   A.   This is a transcript of the November 27, 2019 call

*HOLBROOK – CONT'D DIRECT*

1    between Mr. Sittenfeld and Vinny.

2    Q.   Have you reviewed it for accuracy?

3    A.   I have.

4         MS. GAFFNEY PAINTER:  The government moves for the

5    admission of Government Exhibit USA 36B.

6         MR. C. HENRY RITTGERS:  No objection.

7         THE COURT:  USA 36B is admitted without objection.

8         MS. GAFFNEY PAINTER:  Your Honor, may we publish this

9    exhibit to the jury?

10        THE COURT:  You may.  Ladies and gentlemen of the

11   jury, there should be a tab marked 36B in your transcript

12   book.

13        (Audio played.)

14   Q.   Special Agent Holbrook, directing your attention to

15   December 9, 2019, was there phone contact between Sittenfeld

16   and Vinny that day?

17   A.   Yes, there was.  Vinny called Mr. Sittenfeld that day.

18   Q.   If you could turn in your binder to the tab marked

19   USA 37A.

20   A.   Yes.

21   Q.   Do you recognize this?

22   A.   I do.

23   Q.   What is it?

24   A.   It is the December 9, 2019 call from Vinny to Sittenfeld.

25   Q.   How do you know that?

1    A.   I have reviewed this disk, and I've placed my initials on

2    it.

3         MS. GAFFNEY PAINTER:  The government moves for the

4    admission of Government Exhibit USA 37A.

5         MR. C. HENRY RITTGERS:  No objection.

6         THE COURT:  USA Exhibit 37A is admitted without

7    objection.

8    Q.   Now, Special Agent Holbrook, if you could turn to the tab

9    marked USA Exhibit 37B.

10   A.   Yes.

11   Q.   Do you recognize this?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a transcript to the November 9, 2019 call between

15   Sittenfeld and Vinny.

16   Q.   Did you review it for accuracy?

17   A.   I did.

18        MS. GAFFNEY PAINTER:  The government moves for the

19   admission of Government Exhibit USA 37B.

20        MR. C. HENRY RITTGERS:  No objection.

21        THE COURT:  USA 37B is admitted without objection.

22        MS. GAFFNEY PAINTER:  Your Honor, permission to

23   publish to the jury?

24        THE COURT:  You may.  Ladies and gentlemen of the

25   jury, there should be a tab in your transcript volume that

```
 1    says USA Exhibit 37B, to which you can turn now.

 2         (Audio played.)

 3    Q.   Special Agent Holbrook, was there phone contact between

 4    Sittenfeld and Vinny on December 11, 2019?

 5    A.   Yes, there was.  Mr. Sittenfeld called Vinny on that

 6    date.

 7    Q.   Could you please turn to the tab in your binder marked

 8    USA 38A.

 9    A.   Yes.

10    Q.   Do you recognize this?

11    A.   Yes.

12    Q.   What is it?

13    A.   This is a disk containing the December 11, 2019 call

14    between Sittenfeld and Vinny.

15    Q.   How do you know that?

16    A.   I reviewed the disk, and I placed my initials on it.

17         MS. GAFFNEY PAINTER:  The government moves for the

18    admission of Government Exhibit USA 38A.

19         MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

20         THE COURT:  USA 38A is admitted without objection.

21    Q.   The next tab, Special Agent Holbrook, is USA 38B.  Do you

22    recognize what appears behind that tab?

23    A.   Yes.

24    Q.   What is it?

25    A.   This is a transcript of the December 11, 2019 telephone
```

1    call between Mr. Sittenfeld and Vinny.

2    Q.  Did you review it for accuracy?

3    A.  I have.

4         MS. GAFFNEY PAINTER:  The government moves for the

5    admission of Government Exhibit USA 38B.

6         MR. C. HENRY RITTGERS:  No objection, Your Honor.

7         THE COURT:  USA 38B is admitted without objection.

8         MS. GAFFNEY PAINTER:  Your Honor, may we publish this

9    exhibit to the jury?

10        THE COURT:  You may.  Ladies and gentlemen of the

11   jury, there should be a tab in your book that's labeled 38B,

12   as in boy.

13        (Audio played.)

14   Q.  Special Agent Holbrook, was there phone contact between

15   Vinny and Sittenfeld on December 23, 2019?

16   A.  Yes, there was.

17   Q.  Was it recorded?

18   A.  Yes.

19   Q.  If you could turn in your binder to the tab marked

20   USA 39A.

21   A.  Yes.

22   Q.  Do you recognize this?

23   A.  I do.

24   Q.  What is it?

25   A.  This is a disk containing the December 23, 2019 call

1    between Mr. Sittenfeld and Vinny.

2    Q.   How do you know that?

3    A.   I reviewed this disk, and I placed my initials on it.

4        MS. GAFFNEY PAINTER:  The government moves for the

5    admission of Government Exhibit USA 39A.

6        MR. C. HENRY RITTGERS:  No objection, Your Honor.

7        THE COURT:  USA 39A is admitted without objection.

8    Q.   If you could, Special Agent Holbrook, turn to the next

9    tab in your binder, which is USA 39B.

10    A.   Yes.

11    Q.   Do you recognize this?

12    A.   I do.

13    Q.   What is it?

14    A.   This is a December 23, 2019 transcript of a telephone

15    call between Mr. Sittenfeld and Vinny.

16    Q.   Have you reviewed it for accuracy?

17    A.   I have.

18        MS. GAFFNEY PAINTER:  The government moves for the

19    admission of Government Exhibit USA 39B.

20        MR. C. HENRY RITTGERS:  No objection, Your Honor.

21        THE COURT:  USA 39B is admitted without objection.

22        MS. GAFFNEY PAINTER:  Your Honor, may we publish this

23    exhibit for the jury?

24        THE COURT:  You may.  Ladies and gentlemen of the

25    jury, I believe the last tab in your book is USA 39B.

1     (Audio played.)

2     MS. GAFFNEY PAINTER:  Your Honor, the government

3 previously admitted Government Exhibit USA 11B.  I would

4 request permission to publish this exhibit to the jury.

5     THE COURT:  You may do so.

6 Q.  Special Agent Holbrook, directing your attention to the

7 column that appears here on USA 11B marked "time."

8     What appears here in this column?

9 A.  This would be the time of the event in eastern standard

10 time.

11 Q.  Was there any conversion required to get it to eastern

12 standard time?

13 A.  Yes.  It was converted from UTC to eastern standard time.

14 Q.  Did you review these conversions for accuracy?

15 A.  Yes.

16     MS. GAFFNEY PAINTER:  Your Honor, may I have just a

17 moment?

18     THE COURT:  You may.

19     MS. GAFFNEY PAINTER:  No further questions, Your

20 Honor.

21     THE COURT:  Okay.  Mr. Rittgers, are you prepared to

22 start your examination?

23     MR. C. HENRY RITTGERS:  I believe I am, Your Honor.

24     THE COURT:  Very good.

25

HOLBROOK - CROSS

1

2                         CROSS-EXAMINATION

3     BY MR. C. HENRY RITTGERS:

4     Q.   Agent Holbrook, we've already heard from you yesterday

5     that, being the case agent, you were the one that supervised

6     all the undercovers and Mr. Ndukwe?

7     A.   I'm sorry?

8     Q.   I said we heard yesterday that you, being the case agent,

9     you were in charge of supervising everybody, your undercover

10    agents and Mr. Ndukwe?

11    A.   That's correct.

12    Q.   And as case agent, you collected bank records, credit

13    reports, everything through your subpoena power; is that

14    correct?

15    A.   Yes.

16    Q.   And you also interviewed a number of witnesses, correct?

17    A.   Yes.

18    Q.   And for each event, when you interview a witness or

19    subpoenaed a phone record, or what have you, you write what's

20    called a 302, what you all refer to as a 302?

21    A.   Yes.  If I interview a witness, I will complete a 302.

22    If it's serving a subpoena, it's not initially a 302, it could

23    be an imported document, or something like that.

24    Q.   Okay.  When you receive the documents, do you issue a

25    302?

HOLBROOK - CROSS

1   A.   Yes.

2   Q.   And when you do a 302 after interviewing a witness, you

3   do that almost immediately after you interview the witness,

4   correct?

5   A.   I try to do that within a couple of days after the

6   interviews.  It's -- some agents, you know, have a different

7   approach to that, but I try to do it within a couple days.

8   Q.   And when you write these 302s, they're your summaries of

9   what you recall what that witness said to you?

10  A.   That is correct.

11  Q.   So in addition to your summaries, did you record any

12  statements?  I'm not talking about during the operation, I'm

13  talking about with any witness.

14  A.   There's -- I'm thinking of the investigation in its

15  entirety.  Umm...

16  Q.   Let me help you out.

17  A.   Yes.  I appreciate that.  Thank you.

18  Q.   No problem.  Did you record Mr. Ndukwe when he confessed

19  to multiple federal crimes?  Did you record that statement?

20  A.   No, I did not.

21  Q.   Did you record Jared Kamrass when he confessed to

22  pocketing the $15,000 cash that your agents gave to him that

23  was supposed to be delivered to a different campaign, that

24  being of Mayor Cranley?

25  A.   That was not recorded.

HOLBROOK - CROSS

```
 1   Q.   Did you record any of the other witnesses that have been
 2   listed here or that the judge told the prospective jurors
 3   about, like Mr. Berding, Ms. Brunner, any of those witnesses?
 4   Did you record any of those statements?
 5   A.   No.
 6   Q.   Did you have Mr. Ndukwe, when he confessed to these
 7   federal crimes, did you have him write out a witness
 8   statement?
 9   A.   I don't remember Ndukwe confessing to federal crimes.
10   Q.   We'll get into that in a minute.  So the answer is you
11   did not have Mr. Ndukwe write out any type of statement --
12   A.   No.
13   Q.   -- is that correct?
14   A.   That is correct.
15   Q.   And the same with Kamrass, Jared Kamrass, you didn't have
16   him write out a statement?
17   A.   No.
18   Q.   Or anybody else you interviewed, like Mrs. Brunner of the
19   port?
20   A.   No.
21   Q.   Would you agree with me, Agent Holbrook, that recording a
22   witness's statement or a criminal confession is more accurate
23   than your summary.  Would you agree with that?
24   A.   I would agree with that statement, yes.
25   Q.   Thank you.  Same with if you have a witness, or someone
```

HOLBROOK - CROSS

1    confessing to a crime and they write out a statement, wouldn't

2    that be more accurate than your summary?

3    A.    That would be correct.

4    Q.    Thank you.  So just so that we're all clear, the only

5    record of what a potential witness said to you is memorialized

6    in your summary, correct?

7    A.    Correct.

8    Q.    Thank you.  When you testified yesterday, and correct me

9    if I'm wrong, please, you indicated that you came to

10   Cincinnati the beginning of 2018?

11   A.    Yes.  That's correct.

12   Q.    And if I recall correctly, you said that there was an

13   investigation already underway by the undercover agents,

14   correct?

15   A.    That's correct.

16   Q.    And that started back in 2017?

17   A.    Yes.  That's correct.

18   Q.    And then when you came on duty, so to speak, when you

19   transferred to Cincinnati, your agents, not necessarily the

20   undercover agents that we've been talking about the last two

21   days, but FBI agents discovered that Mr. Ndukwe had committed

22   some crimes; is that correct?

23   A.    There were allegations of potential crimes.  And I want

24   to make note that the undercover agents that were in

25   Cincinnati in 2017 was unrelated to anything that Mr. Ndukwe

*HOLBROOK - CROSS*

1    was doing or we were doing with Mr. Ndukwe at that time.

2    Q.   Yeah.  Gotcha.  But what I asked you is that when you

3    came to Cincinnati, during that first couple of months, the

4    FBI discovered that Mr. Ndukwe had committed some crimes.  Yes

5    or no?

6    A.   No.  There was an articulable factual basis for a case

7    that was open on Ndukwe.  The investigation was for the

8    purpose of collecting evidence to determine if a potential

9    crime was committed.  So to say that a crime was committed at

10   the time the case was open, I am unable to say that.

11   Q.   Would you please refer to Defendant's Trial Exhibit

12   D652, please.

13            THE COURT:  All those over there.

14            MR. C. MATTHEW RITTGERS:  It's open to it.

15            THE COURT:  Oh, okay.

16            MS. GAFFNEY PAINTER:  Your Honor, may we request a

17   copy of this document?

18            MR. C. MATTHEW RITTGERS:  It's in the exhibit

19   binders.

20            MS. GAFFNEY PAINTER:  Which is?

21            MR. C. HENRY RITTGERS:  I'll give you a copy.

22   BY MR. C. HENRY RITTGERS:

23   Q.   Agent Holbrook, do you recognize that document?

24   A.   Yes.  I know what this document is.

25   Q.   What is that?  Tell us.

1    A.   This document is a document dated March 12, 2018.  It

2    appears to be a proffer agreement between the United States

3    Attorney's Office and Mr. Ndukwe and his attorney.

4    Q.   Do you agree that it's a fair and accurate example of the

5    proffer agreement?

6    A.   Probably is.  I don't draft proffer agreements.

7    Q.   I didn't ask you if you drafted it.  I asked you if you

8    recognized it?

9    A.   I recognize it.

10   Q.   And do you agree that it's fair and accurate?

11   A.   In this situation, I would agree with that, yes.

12   Q.   Thank you.

13         MR. C. HENRY RITTGERS:  Judge, I would ask that

14   Defendant's Trial Exhibit D652 be admitted into evidence.

15         MS. GAFFNEY PAINTER:  Your Honor, the government

16   objects on hearsay grounds.

17         THE COURT:  Let's do a sidebar.

18   SIDEBAR CONFERENCE

19         THE COURT:  Can you explain more the basis of your

20   objection?

21         MS. GAFFNEY PAINTER:  Your Honor, this is a document

22   that was drafted by an Assistant United States Attorney, not

23   the witness who is testifying.  It is offered for the truth of

24   the matter asserted, which is the terms of the agreement

25   between Mr. Ndukwe and the government, and there's no

1    recognizable hearsay exception that makes it appropriate to

2    introduce this exhibit through this witness.

3         MR. C. HENRY RITTGERS:  I asked him if he was aware

4    of it, and it's impeachment material.

5         THE COURT:  Well, but as impeachment material, that's

6    different from admitting it as an exhibit.  If you want to

7    admit it as an exhibit, I think you need to lay a foundation.

8    I don't even think he can authenticate it.

9       He said it's similar to proffer agreements he's seen

10   before, but I don't know that he knows the terms of this

11   proffer agreement, so there's the foundation problem.

12      But then even if you get beyond that, I think you do have

13   a hearsay problem, at least with regard to this witness saying

14   much about this document.

15      If you want to use it for impeachment purposes, I think

16   you can do that, but I don't think it's admissible at this

17   point as evidence.

18         MR. C. HENRY RITTGERS:  So I cannot publish it then?

19         THE COURT:  Right.

20         MR. C. HENRY RITTGERS:  All right.

21         MR. C. MATTHEW RITTGERS:  He's reviewed it, so you

22   can cross-examine him.

23         MS. GAFFNEY PAINTER:  I'm sorry, Your Honor.  I

24   didn't hear what your question was.

25         THE COURT:  I didn't ask a question.

1          MS. GAFFNEY PAINTER:  I see.

2          THE COURT:  Okay.  I just wondered, he's going to use

3    it for impeachment purposes, and I wondered what your view on

4    that is going to be.

5          MS. GAFFNEY PAINTER:  My view is that that violates

6    608.  This would be extrinsic evidence of impeachment, and I

7    don't understand how this document that he didn't draft or

8    adopt impeaches this witness.

9          THE COURT:  So now that's my next concern is how is

10   it impeachment?  What is it you're trying to impeach this

11   witness about?

12         MR. C. HENRY RITTGERS:  I want to bring out the fact

13   that this witness used Mr. Ndukwe, who committed acts that are

14   of dishonesty, and spelled out in the government's initial

15   proffer --

16         MR. C. MATTHEW RITTGERS:  May I, for one second?

17         MR. C. HENRY RITTGERS:  Yes.

18         MR. C MATTHEW RITTGERS:  Special Agent Holbrook has

19   admitted that, as part of this investigation, he's reviewed

20   this document.

21         And you might have to lay a little bit more foundation

22   and indicate -- before he makes him a cooperating witness, he

23   has to look at their background to determine if they're a good

24   person to become a cooperating witness, and part of that would

25   be reviewing documents like this.

1    And this document says certain things in it that would be

2    important for him, Agent Holbrook, to know before he

3    determined whether or not Mr. Ndukwe should become a

4    cooperating agent.

5         THE COURT:  Okay.  So if the inquiry is going to go

6    to what steps did he take to determine whether Mr. Ndukwe

7    would be an appropriate cooperating witness to use in

8    connection with an investigation, and what background

9    investigation did he do, and things like that.

10        And if he testifies, in some manner, inconsistent with

11   the information that you have from some other source, then I

12   think you could use that other source to impeach the answers

13   that he gives to those questions.  But you haven't asked those

14   questions yet, and I don't know what he does to try and vet --

15        MR. C. HENRY RITTGERS:  I gotcha.

16        MS. GAFFNEY PAINTER:  But, Your Honor, it goes to the

17   admissibility of the document.

18        MR. C. MATTHEW RITTGERS:  We're not asking for

19   admissibility.

20        MS. GAFFNEY PAINTER:  You're not?

21        THE COURT:  I'm not admitting it, no.

22        MS. GAFFNEY PAINTER:  Okay.

23        THE COURT:  While we're at sidebar, there's one other

24   thing I wanted to address.

25        We've been advised that, in light of the *Dobbs* decision,

*HOLBROOK - CROSS*

1  which came out this morning, there may be protests planned at

2  courthouses around the country, including potentially at this

3  courthouse.

4      I'm trying to get more information as to whether there's

5  been anything identified for this courthouse. I don't have

6  any reason to believe it yet, but our chief judge has

7  indicated that some courthouses, we believe Dayton, there may

8  be a protest.

9      If there's a protest, if there's noise, we may need to

10  talk about whether we should suspend the trial for the day.

11  The chief has authorized administrative leave for employees

12  starting at 3:00 today, so that would suggest there may be

13  disruptions at some courthouse.

14      So I'm asking everybody to be mindful, if we start

15  hearing things, that may be what that is, and we may want to

16  revisit whether we want to suspend the trial at that point.

17          MS. GAFFNEY PAINTER: Thank you.

18          MR. C. HENRY RITTGERS: Is the *Dobbs* decision *Roe v.*

19  *Wade*?

20          THE COURT: It came out this morning. It overturned

21  *Roe versus Wade*.

22          MS. GLATFELTER: Your Honor, may I have one moment to

23  talk to my cocounsel before we go back?

24          THE COURT: You may.

25          MS. GLATFELTER: About this issue. Thank you.

```
 1              THE COURT:  Off the record.

 2         (Off the record.)

 3              THE COURT:  Back on the record.

 4         MS. GAFFNEY PAINTER:  Your Honor, one other issue to

 5    raise about this document.

 6         Mr. Rittgers has been characterizing these as crimes that

 7    Mr. Ndukwe committed.

 8              THE COURT:  Right.

 9         MS. GAFFNEY PAINTER:  If you look at the text of this

10    document, it's referencing alleged criminal activity.

11              MR. C. MATTHEW RITTGERS:  We'll get into crimes in a

12    minute.  Sorry.

13              MS. GAFFNEY PAINTER:  So even for the impeachment

14    purposes, this isn't truth that he has committed these crimes.

15    It is a reference to an agreement discussing the protections

16    affording him to discuss these alleged crimes.

17              THE COURT:  Right.  But I imagine what Mr. Rittgers

18    is going to ask is, you know, are there characteristics of

19    people who serve as cooperating witnesses.

20         For example, are you concerned if they may have been

21    charged with a crime, is that something you look into, or

22    things like that.

23              MS. GAFFNEY PAINTER:  Yes.

24              THE COURT:  But -- and I don't know.  I don't know

25    what criteria the FBI uses for deciding whether someone is a
```

1    cooperating witness.  I would assume Special Agent Holbrook

2    would know the answer to that, so it's hard for me to answer

3    these questions.  I don't know what's impeachable or not.

4            MS. GAFFNEY PAINTER:  Certainly.

5            THE COURT:  Yeah.  Okay.  We're all on the same page?

6            MR. C. MATTHEW RITTGERS:  Thank you, Judge.

7            THE COURT:  All right.  Very good.

8    SIDEBAR CONFERENCE CONCLUDED

9            THE COURT:  I'm sorry, Mr. Rittgers, you may

10    continue.

11            MR. C. HENRY RITTGERS:  Thank you, Your Honor.

12    BY MR. C. HENRY RITTGERS:

13    Q.   Agent Holbrook, you indicated yesterday, I believe, about

14    sources, correct?

15    A.   Yes.

16    Q.   And there are a couple kinds of sources.  One might be

17    someone who has committed a crime, correct?

18    A.   Yes.

19    Q.   And when you check into a source, a source that you have

20    to supervise, you look into their background, do you not?

21    A.   Yes.

22    Q.   And you want to determine whether that person is going to

23    be a reliable source?

24    A.   Yes.

25    Q.   And you're going to determine what crimes they have

HOLBROOK - CROSS

1    committed if they have committed a crime, correct?

2    A.   That is correct.

3    Q.   And so back in March of 2018, Mr. Ndukwe, through his

4    attorney, came to the U.S. Attorney's Office and was

5    interviewed by you and Ms. Glatfelter and Mr. Singer, correct?

6    A.   That is correct.

7    Q.   And during that period of time, he gave what I think you

8    guys call a proffer agreement, correct?

9    A.   Correct.

10   Q.   And the proffer agreement is where someone confesses to

11   acts that they have committed in order to hopefully get

12   favorable treatment from the government, or a lesser sentence

13   if they committed a crime?

14   A.   That's not my understanding of a proffer agreement.

15   Q.   Would you kindly tell us what your understanding is?

16   A.   Yes.  My understanding is a proffer agreement, as I

17   testified earlier, is an agreement between the United States

18   Attorney's Office and an individual.

19        And what it states is that individual will provide

20   truthful information to the United States Attorney's Office,

21   and the information that they provide truthful can be used

22   against them.

23   Q.   Can be used against them, correct.  And you can use the

24   information that is given to you during that proffer to go

25   investigate that individual further, correct?

HOLBROOK - CROSS

1    A.   It's not my understanding.

2    Q.   Did Mr. Ndukwe, as I understand it, did he admit to

3    evading campaign finance limits by creating straw donors,

4    creating money orders in other people's names and giving them

5    to candidates?

6    A.   He didn't use the term "straw donor."  He told me that he

7    gave money orders and cashier's checks to local politicians in

8    other individuals' names.

9    Q.   And he told you that he was doing that to evade campaign

10   finance limits; is that correct?

11   A.   Yes.

12   Q.   And that was back in 2013, correct?

13   A.   Excuse me.  I think I misspoke.  Could you ask me that

14   previous question?

15        MR. C. HENRY RITTGERS:  Could I ask the court

16   reporter to repeat my question, please.

17        (The record was read by the court reporter.)

18   A.   Counsel, I wrote a report on that interview.  Could you

19   provide that to me to refresh my memory?

20   Q.   I don't have it available.

21        MR. C. MATTHEW RITTGERS:  We will pull it up right

22   now.

23        MR. C. HENRY RITTGERS:  I apologize for the delay,

24   Your Honor.

25        THE COURT:  Oh, not at all.  Mr. Rittgers, would now

*HOLBROOK - CROSS*

1    be a good time to take the afternoon break, since we're

2    switching over, and we'll get the technology hooked up and all

3    that?

4              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

5              MR. C. HENRY RITTGERS:  Thank you.

6              THE COURT:  Ladies and gentlemen, it's shortly after

7    3:00.  I think it is a good time to take a break anyway.

8        I would just remind you not to discuss this case with

9    each other, not to attempt to do any research regarding the

10   facts or the laws surrounding this case, not to communicate

11   with anyone, use electronic devices or otherwise about this

12   case.

13       And please do not begin to form opinions about any of the

14   charges at issue here.  All of the evidence is certainly not

15   in yet.

16       With that, why don't we take -- oh, and I should tell

17   you, if anyone attempts to communicate with you regarding this

18   case, please bring it to my attention immediately.

19       With that, we'll take our afternoon break.

20       (Jury out at 3:07 p.m.)

21             THE COURT:  One of the witnesses that one of the

22   parties subpoenaed has some concerns about the subpoena, so

23   I'm just --

24             COURTROOM DEPUTY:  Defendants.

25             THE COURT:  One of the witnesses that defendant

1    subpoenaed for the trial has some concerns about the scope of

2    the subpoena and has asked to be heard on that.  And so I

3    anticipate doing that in chambers here.

4        I think they wanted to know more about the scope of the

5    testimony that's intended to be elicited.  I don't think it's

6    appropriate for the government, at this juncture, to hear the

7    scope of the testimony that you intend to elicit, but I'll

8    make a further determination on that once we've conferred on

9    an ex parte basis with the subpoenaed witness and defense

10   counsel.

11       So my plan is to meet in chambers with the subpoenaed

12   witness and defense counsel, but I'm willing to hear from the

13   government on that if they have an objection.

14            MS. GLATFELTER:  We don't have any objection to

15   proceeding although, at some point, we may want to discuss the

16   admissibility of the testimony.

17            THE COURT:  Sure.

18            MS. GLATFELTER:  We understand that to be a separate

19   question.

20            THE COURT:  Absolutely.  Okay.  So if I can have at

21   least one of the Messrs. Rittgers for the break while the

22   other works on whatever technology issue.

23       With that, we'll take a brief recess, unless there's

24   anything else we need to discuss before we do so,

25   Mr. Singer, Ms. Gaffney Painter?

1          MR. SINGER:  Nothing, Your Honor.

2          THE COURT:  Very good.

3      (The following portion of the record was placed under

4  seal by the Court and filed separately.)

5      (Brief recess.)

6          THE COURT:  Mr. Rittgers, have you had an opportunity

7  to figure out whatever the technology is?

8          MR. C. HENRY RITTGERS:  We're going to go with the

9  Elmo to avoid any further delay, number one.

10     Number two, with my opponent's permission, I've given the

11  302 that I was referencing to Agent Holbrook.  He's familiar

12  with it now.

13         THE COURT:  Do I have a copy of it as well or not?

14         MR. C. HENRY RITTGERS:  Do we have another copy?

15         COURTROOM DEPUTY:  I had made three and I gave you

16  the other two.

17         THE COURT:  How long is it?

18         MR. C. HENRY RITTGERS:  Do you want to take a look

19  while the jury is coming in?

20         THE COURT:  Yeah.  Why don't I take a gander at it.

21     I'll note there's some marks and highlighting.  Is that

22  the way it was produced to you?

23         MR. C. HENRY RITTGERS:  I don't intend to introduce

24  it as evidence.  I'm just going to question him about it.

25         THE COURT:  For what purposes?

1      MR. C. HENRY RITTGERS:  I'm going to question him.

2  This is part of his investigation.

3      THE COURT:  All right.  We'll see how it goes.

4      Scott, you can bring in the jury.

5      (Jury in at 4:09 p.m.)

6      THE COURT:  Ladies and gentlemen of the jury, the

7  technology was, if this can be imagined, even less cooperative

8  than we thought, but we think we've got it figured out well

9  enough to continue so, Mr. Rittgers, you may continue.

10      MR. C. HENRY RITTGERS:  Thank you very much, Your

11  Honor.

12  BY MR. C. HENRY RITTGERS:

13  Q.  Agent Holbrook, you've had a chance to review your 302,

14  correct?

15  A.  Yes, sir, I have.

16  Q.  And the date of entry at the top is April 2, correct, at

17  the very top, front page?

18  A.  Yeah.  So the date of this interview is on March 13th.

19  Q.  I was going to get to that.

20  A.  Oh, I'm sorry.  I'm sorry.  Yes, that's correct.

21  Q.  The date of entry?

22  A.  Yes.

23  Q.  And you recognize this now, do you not?

24  A.  I do.

25  Q.  And you're correct, the meeting that this 302 was

1    produced for was a meeting that was on March 13th of 2018?

2    A.   Yes.  Correct.

3    Q.   And during that meeting, you're aware that Mr. Ndukwe was

4    shown 25 money orders dated April 12th of 2013, and nine

5    cashier's checks dated October 22nd of 2013?

6    A.   Yes.  That's correct.

7    Q.   And Mr. Ndukwe told you that, in April of 2013, that he

8    attended a meeting with Mr. Cranley, Mr. Smitherman, and

9    possibly Charlie Wilber; is that correct?

10   A.   Winburn.  Yes, that's correct.

11   Q.   Thank you.  At this meeting, Mr. Ndukwe told you that he

12   provided Cranley and Smitherman and Winburn campaign donations

13   in the form of money orders funded by him under the names of

14   friends and family, correct?

15   A.   That's correct.

16   Q.   Now, in doing this, and during this meeting back in March

17   of 2018 with Mr. Ndukwe, he admitted to evading the campaign

18   finance limits, right?

19   A.   Yes.

20   Q.   And I believe you do know that it's a violation of

21   52 U.S. Code, Section 30122, which is titled "Contributions in

22   the Name of Another is Prohibited"?

23   A.   I did not know that statute, but I know that you are

24   correct, that is prohibited.

25   Q.   Thank you.  By the way, none of these money orders or

*HOLBROOK - CROSS*

1    cashier's checks went to P.G. Sittenfeld, correct?

2    A.   That is correct.

3         MR. C. HENRY RITTGERS:  I apologize, Your Honor.  I

4    thought I was...

5    Q.   In this document that you had summarized, where you

6    summarized this meeting with Mr. Ndukwe, he admitted, did he

7    not, to giving a friend of his, a Matt Williams who lives in

8    Columbus, $5,000 in exchange for Mr. Williams structuring

9    $35,000 back to him in cash?

10   A.   I'm not sure if -- the way it reads is Williams

11   structured the cash withdrawals from a bank and then gave the

12   cash to Ndukwe, so I'm not sure --

13   Q.   Let me help you.

14   A.   Yeah.  Thanks.

15   Q.   Mr. Ndukwe sent $40,000 that he took out of his IRA

16   account, correct, to his friend Matt?

17   A.   Correct.

18   Q.   And Matt kept $5,000 of that, correct?

19   A.   That is correct.

20   Q.   And then Matt returned $35,000 to Mr. Ndukwe by using

21   different bank accounts to avoid reporting requirements,

22   banking reporting requirements, correct?

23   A.   Yes.  That's what's documented here.

24   Q.   Thank you.  And you agree that that's structuring banking

25   transactions?  Do you agree with that?

HOLBROOK - CROSS

1    A.   I mean, I want to answer your question and be responsive.

2    I'm not that familiar with banking fraud.  I don't work those

3    cases.  And I'm not an attorney, so I want to answer the

4    questions the best I can based upon that knowledge.

5    Q.   If I were to tell you that it was a violation of

6    structuring banking transactions, you would agree with that?

7    A.   Say it again.  I'm sorry.

8    Q.   I said if I were to represent to you that what we just

9    talked about?

10   A.   Uh-huh.

11   Q.   Where his friend sent $35,000 back from different bank

12   accounts, you would agree that that's a violation of federal

13   law, correct, structurally?

14   A.   Possibly, yes.  I'm not familiar with that law.

15   Q.   Thank you.  Would you also agree that creating money

16   orders in other people's names and forging their signature can

17   be prosecuted under a federal crime of forgery?

18   A.   Yes.

19   Q.   Would you also agree that forging, using other people's

20   identity, forging their signatures, is also a federal offense

21   of aggravated identity theft?

22   A.   I don't doubt that you're accurate.  I'm not familiar

23   with this area of law.

24   Q.   Thank you.  There also in the 302, where I believe you

25   indicated that Mr. Ndukwe told you that a friend of his,

1    female, had a husband in New York, the State of New York that

2    was a big-time gambler, losing hundreds of thousands of

3    dollars a year, and that Mr. Ndukwe sent him money, do you

4    remember; is that correct?

5    A.   Yes.  Yes.

6    Q.   You never followed up with how much money that was

7    transferred to his friend?

8    A.   No.

9    Q.   Never did?

10   A.   Never did.

11   Q.   You think that wasn't something you needed to know when

12   you vetted Mr. Ndukwe to become a cooperating witness?

13   A.   No.  I don't believe so.

14   Q.   Also in your 302, Mr. Ndukwe admitted to lying when he

15   withdrew money from his retirement account, his IRA; is that

16   correct?

17   A.   States an IRA account.

18   Q.   In fact, what we talked about earlier, the $40,000 that

19   he had sent to his friend Matt, who then kept five and sent

20   $35,000 back to him, that came from his IRA account, correct?

21   A.   That's correct.

22   Q.   And you were aware, are you not, that in order to

23   withdraw funds from your IRA account at an early age, that you

24   have to fill out a written statement as to the reason for

25   withdrawing that money, correct?

HOLBROOK - CROSS

1    A.   I'm not aware of that but, again --

2    Q.   You accept that as true?  Are you aware that that crime

3    is prosecuted a lot in federal courts?  Are you aware of that?

4    A.   I am not aware of that.

5    Q.   Okay.  Thank you.  By the way, Mr. Ndukwe's attorney was

6    also in that meeting when Mr. Ndukwe told you all that stuff,

7    correct?

8    A.   Yes, he was.

9    Q.   So after he admitted to these different crimes, he agreed

10   to cooperate with you; is that correct?

11   A.   Shortly thereafter, I can't remember the time frame, but

12   it was -- yes, he agreed to cooperate.

13   Q.   And I take it when he began cooperating with you, you and

14   your team debriefed him as to who you all thought he could

15   catch in a crime?

16   A.   That's not exactly true.  May I explain?

17   Q.   Oh, yeah.

18   A.   We initially began meeting -- it was myself, began

19   meeting with Mr. Ndukwe.  It was about understanding who

20   Mr. Ndukwe knew, not necessarily for criminal investigations,

21   but trying to understand the connections, the political

22   environment in Cincinnati, who knows who, so to speak, try to

23   understand the various business projects he's involved in.

24        There was a, you know, an investigation that was of

25   specific relevance at that time that I had in mind to utilize

1    Mr. Ndukwe on it, so...

2    Q.   But you did ask him, in your debriefing session, as to

3    who might be in the community that you thought he could

4    capture or -- capture.  I take that back.  But who he could

5    lead your investigating team to as possible violators?

6    A.   I think it's more appropriate to say we were asking him

7    questions about potential areas of public corruption, as

8    opposed to who he could catch.

9    Q.   Okay.

10   A.   We're looking more for evidence, as opposed to a specific

11   individual.

12   Q.   Well, I take it that people were discussed, right?

13   A.   Yes.

14   Q.   And the people that were discussed did not include

15   P.G. Sittenfeld, correct?

16   A.   That is correct.

17   Q.   And, again, that was in March that you had this

18   discussion?

19   A.   That is correct.

20   Q.   Thank you.

21   A.   End of March, beginning of April time frame.

22   Q.   Now, my understanding is that at the time Mr. Ndukwe

23   turned into a cooperating witness, you knew that he had three

24   development projects in front of the city, correct?

25   A.   Yes.  I believe that was the case.

*HOLBROOK - CROSS*

1    Q.   And one of those was what we've been talking about here

2    for two days, this 435 Elm Street, correct?

3    A.   Yes.

4    Q.   And you were aware that Mr. Ndukwe got interested in

5    435 Elm Street back in 2016?

6    A.   Yes.  That sounds accurate.

7    Q.   And you're aware that -- again, I think this was

8    discussed, but you were aware that he had purchased the air

9    rights to 435 Elm Street during a foreclosure proceeding

10   against the owners, correct?

11   A.   I believe so, yes.

12   Q.   And just so that we all know what air rights means, that

13   means that if anybody wanted to build -- that building was

14   ripped down, and if anybody wanted to build there, they would

15   have to go through Mr. Ndukwe, correct, because he had a right

16   to do that?

17   A.   That is correct.

18   Q.   Now, we've heard evidence here yesterday about the

19   condition of 435 Elm Street.  Remember that?

20   A.   I do.

21   Q.   And my question is were you aware of the condition of

22   435 Elm Street when Mr. Ndukwe began working for you?

23   A.   I understood that to be a building in significant

24   disrepair.

25   Q.   Were you also aware of how significant 435 was to the

1    urban core of Cincinnati?

2    A.   Yes.

3    Q.   Were you aware that it was south of the Convention

4    Center, correct?

5    A.   Correct.

6    Q.   And you were aware that it -- the city was losing

7    convention business?

8    A.   That's my understanding.

9    Q.   And you also were aware that that building was costing

10   300 to 400,000 dollars a year for the city to maintain?

11   A.   Yes, sir.

12   Q.   And you were also aware that it was over a million

13   dollars in back taxes?

14   A.   Yes, sir.

15   Q.   And you were also aware that city officials wanted 435 to

16   be redeveloped because it was good for the city, correct?

17   A.   City officials?

18   Q.   City officials.

19   A.   I was aware that city officials wanted to move it off

20   their book as a liability.

21   Q.   Well --

22   A.   Yeah, that's my understanding.

23   Q.   That's a correct statement.  I agree with that.  But you

24   also agree that they wanted this property, which is in this

25   urban core of Cincinnati, to be redeveloped so it could start

1    producing income.  It could produce -- I apologize.  Go ahead.

2    A.   No.  Please finish your question.

3    Q.   It could produce revenue not only in paying taxes to the

4    city, but bringing in tourists, bringing in convention

5    business, correct?

6    A.   Sure.  That makes sense, yes.

7    Q.   When city council decided, I believe it was in July of

8    2019, and we just heard this evidence today that they wanted

9    to sell to the port 435 Elm for a buck, that all nine council

10   people had voted in favor of that?

11   A.   That's correct.

12   Q.   And that was a no-brainer vote, correct?

13   A.   That's defense counsel's words.

14   Q.   But it was.  I mean, it was clearly advantageous to move

15   it on over to the port to clear tax liens and whatever other

16   liens may be on it, correct?

17   A.   Advantageous for the city, yes, sir.  I agree with that.

18   Q.   We'll change topics here for a second.

19       In order to operate this sting, Rob and Brian, or really

20   the FBI, created a false narrative, correct?

21   A.   Created what?

22   Q.   Created a false narrative, meaning they introduced

23   themselves as big-time investors.  That was part of the

24   scheme, right?

25   A.   Yes, sir.  Yes, that's correct.

HOLBROOK - CROSS

1    Q.   And they represented to everybody that they were the

2    money behind Mr. Ndukwe's project?

3    A.   That's correct.

4    Q.   Now, you agree -- in pretending that they were investors,

5    you agree that Rob and Brian lied to P.G.  It was a lie.  They

6    were not really investing in Mr. Ndukwe's project, correct?

7    A.   That's correct.

8    Q.   But the lie was is that they were the money behind it?

9    A.   That's correct, yes.

10   Q.   They lied to other city officials, didn't they?

11   A.   Yes.  If you're referencing they're pretending to be

12   somebody they're not as a lie, then yes, that is true.

13   Q.   Not only pretending that they're somebody they're not,

14   but also pretending that they were the money behind

15   435 Elm Street to redevelop it?

16   A.   That is correct.

17   Q.   So this lie was perpetuated for at least 18 months during

18   this operation, correct?

19   A.   Yes, counselor, but let me be clear that what you're

20   referring to as a lie is an FBI investigative technique that's

21   been used for years.  It is legal and lawful to do so.

22   Q.   I am not suggesting that it --

23   A.   Okay.  I want to be clear.

24   Q.   But I think you had already testified to that yesterday.

25        Well, my question is is that during this 18 months, while

*HOLBROOK - CROSS*

1    you all were representing -- "you all" being your agents

2    representing themselves being the big money behind 435 and

3    Ndukwe, no one knew that Mr. Ndukwe confessed to acts of

4    dishonesty, did they?

5        And what I'm referring to is what we just went through,

6    what you said in your 302.  No one knew that?

7    A.   Well, he told us about it.  I don't know if that's

8    dishonest.

9    Q.   Well, I should say no one outside of your team and the

10   prosecutors, no one outside of that small group knew that

11   Mr. Ndukwe had admitted to acts of dishonesty to crimes.  Is

12   that true?

13   A.   Potential crimes.  Dishonesty, I hesitate to agree with.

14   Q.   Oh.  So forging somebody's name is not a crime of

15   dishonesty?

16   A.   Again, it gets into an area that I'm just not that

17   familiar with.

18   Q.   Well, do you think that when the city and the port and

19   P.G. were thinking of tax incentives and other incentives to

20   get this strategic piece of property redeveloped, 435 Elm, did

21   you think that it was kind of important for all those people

22   to know what was going on, that this was a lie?

23   A.   It was an undercover operation to -- I can't agree to

24   calling it a lie.

25   Q.   So your investigation or targeting of Mr. Sittenfeld

HOLBROOK - CROSS

```
 1    started when Mr. Ndukwe claimed that Mr. Sittenfeld had

 2    requested him to fundraise $10,000, correct?

 3    A.   That's incorrect.

 4         MR. C. HENRY RITTGERS:  Let me have one second, Your

 5    Honor.

 6       I apologize, Your Honor.

 7            THE COURT:  You're fine.

 8            MR. C. HENRY RITTGERS:  If I may speak to --

 9            THE COURT:  You may.

10            MS. GAFFNEY PAINTER:  Thank you.

11            MR. C. HENRY RITTGERS:  Your Honor, may I approach

12    the witness?

13            THE COURT:  You may.

14            MR. C. HENRY RITTGERS:  Would the Court like a copy?

15            THE COURT:  I would.  Thank you.

16    BY MR. C. HENRY RITTGERS:

17    Q.   Now, this is a 302 -- I'm sorry.  Have you had a chance

18    to review it?  Are you familiar with it?

19    A.   Yes, I am familiar with this document.

20    Q.   And this is -- let me back up a little bit so the jury

21    understands.

22       It's my understanding, under your protocols and the

23    attorney general's protocols for targeting a domestic person,

24    doing an investigation, you have to do an assessment, correct,

25    of that individual?
```

HOLBROOK - CROSS

1    A.   I'm not following you.

2    Q.   Do you have to do an assessment before you decide to

3    target someone?

4    A.   What do you mean by assessment?

5    Q.   Well, I always assumed that that's FBI parlance.  Do you

6    have to do an investigation?

7    A.   So if -- let me answer the question this way and see if

8    this is where you're going to.

9    Q.   Fair enough.

10   A.   For the FBI to identify an individual as a subject, there

11   is required an articulable factual basis that a crime has been

12   committed or may have been committed, is being committed or

13   may have been committed, or will be committed or may be

14   committed.  That's what is required to predicate someone as a

15   subject of the FBI.  Is that fair enough?  Does that answer

16   your questions?

17   Q.   Yeah.  That's fair enough.

18   A.   Okay.

19   Q.   But as a result, do you do an investigation prior to

20   that?

21   A.   I wouldn't call it an investigation.  I mean, we can come

22   across information through open sources, through a different

23   source where there's not an investigation going on, so it

24   doesn't have to be an investigation into the individual.

25        And when you say an investigation, I'm thinking that it's

*HOLBROOK - CROSS*

```
 1    a -- you know, a technical official FBI investigation.

 2         Maybe to your word, it might be better to call it an

 3    assessment would be fair, I guess, would be a fair way to

 4    phrase it.

 5    Q.   So when your team decided to target Mr. Sittenfeld, it

 6    was because -- and I'm looking at the synopsis.  Do you see

 7    that there at the bottom?

 8         And you wrote, "P.G. called CHS," and that's Mr. Ndukwe,

 9    correct?

10         "P.G. called CHS for $10,000 campaign donation," correct?

11    A.   You asked me two questions back to back.  I'm not sure

12    which one --

13    Q.   I want to know whether the synopsis that you put down

14    here -- and I apologize if I'm not being very clear.

15    A.   Okay.

16    Q.   The synopsis on your 302 --

17    A.   This is not a 302.

18    Q.   This document, this is a 302 or a case agent summary?

19    A.   This document is referred to as an FD1023.  I commonly

20    refer to it as a source reporting document.  I just didn't

21    want it to be called a 302.

22    Q.   You did not want to call it a 302?

23    A.   It's not a 302, that's all I was telling you.

24    Q.   I gotcha.  I gotcha.  But anyway, the synopsis says,

25    "P.G. called CHS --" who is Mr. Ndukwe?
```

HOLBROOK - CROSS

1    A.   That's correct.

2    Q.   -- "for $10,000 campaign donation," right?

3    A.   Yes, sir.

4    Q.   And as a result of that, you began your investigation of

5    P.G. Sittenfeld, correct?

6    A.   That's incorrect.  This did not -- first, let me back up.

7    You asked me a question earlier about this, we started

8    targeting Mr. Sittenfeld in September 2018.  That's not true.

9    Q.   I take that back.  It's October.  What I'm driving at

10   here -- maybe I can help both of us out.

11   A.   I can answer the question much quicker if you want me to

12   tell you when Mr. Sittenfeld became a subject.  Is that

13   better?

14   Q.   Sure.

15   A.   Mr. Sittenfeld become a subject on October 30, 2018.

16   Q.   Okay.  But the reason he became a suspect, or what have

17   you, was because of this call that is in your synopsis saying

18   that Sittenfeld had requested Ndukwe to fundraise $10,000,

19   correct?

20   A.   That is not the reason.  This -- in this source reporting

21   document, this is not the information that resulted in us

22   predicating Mr. Sittenfeld as a subject of an investigation.

23        That did not happen until October 30th of 2018, is when

24   Mr. Sittenfeld becomes the subject of the investigation.

25   Q.   Well, as a result of Mr. Sittenfeld requesting Mr. Ndukwe

4-104

HOLBROOK - CROSS

1    to fundraise, you directed and instructed Mr. Ndukwe to call

2    Mr. Sittenfeld on October 26th, correct?

3    A.   It's partly correct.  I need to expand just a bit so I

4    can be more clear.

5        There was a series of events that culminated in

6    September -- well, I should say October 25th of 2018 that made

7    Mr. Sittenfeld interesting to the FBI because he had potential

8    information regarding other investigations that were ongoing.

9    Q.   Who had that information?

10   A.   Mr. Sittenfeld.  I suspected Mr. Sittenfeld had

11   information that would be relevant to the FBI regarding other

12   ongoing investigations.

13   Q.   But you never approached Mr. Sittenfeld requesting

14   information, did you?

15   A.   That's true.

16   Q.   So instead of asking Mr. Sittenfeld for information, you

17   directed Mr. Ndukwe to make a phone call to Mr. Sittenfeld on

18   October 26th.  It's one of the things we all heard, right?

19   A.   Yes, Counselor.  And the reason is it's common that

20   people in positions, elected officials -- well, really, it

21   could be developers or anybody, is not likely to either speak

22   to us or provide us the full story or accurate information.

23       So if we utilize sources or undercover agents, they can

24   obtain information that may be more accurate.  The person may

25   be likely to tell them versus telling us, so I deployed that

HOLBROOK - CROSS

1    technique to obtain information.

2    Q.   Correct me if I'm wrong.  Up until that point,

3    Mr. Sittenfeld was not a suspect of breaking any law, correct?

4    A.   Correct.

5    Q.   And so not being a sus- -- I mean, are you saying that

6    you don't approach citizens that may help you without first

7    recording a call to see if they're going to admit to some

8    crime or anything?

9    A.   Certainly, we do.  Yeah, it depends on the situation.

10   You have to take the totality of the circumstances and what --

11   and it's a judgment call on the case agent, what technique is

12   best to ascertain or uncover or obtain the information that

13   you're looking for.  So it's not always the same answer every

14   time.  It has to be taken in context.

15   Q.   At that time, I'm talking about in October of 2018, did

16   you know that asking a friend or a business acquaintance, that

17   it was not against the law to fundraise if you're a candidate?

18   Are you aware that that's not against the law?

19   A.   Yes, sir.

20   Q.   You knew it at that time?

21   A.   Uh-huh.

22   Q.   All right.  So let's turn to October 26th, when

23   Mr. Ndukwe made the phone call to Mr. Sittenfeld per your

24   instructions?

25   A.   Yes, sir.

HOLBROOK - CROSS

1    Q.   And I take it that there was no information or contact

2    between September 21st, when Mr. Sittenfeld had contacted

3    Mr. Ndukwe, and October 26th.  Is that your understanding?

4    A.   Contact between who?

5    Q.   Phone calls between the two of them.

6    A.   Two of?  I'm sorry.  I'm trying to --

7    Q.   That's okay.  Between Mr. Ndukwe and Mr. Sittenfeld?

8    A.   There might have been a contact made between that time,

9    but I'm not sure.

10   Q.   Would that have been -- I'm sorry, I didn't mean to cut

11   you off.

12   A.   It might have been --

13            THE COURT:  Wait.  You can't both talk at the same

14   time.

15            THE WITNESS:  Sorry, Judge.

16            MR. C. HENRY RITTGERS:  I apologize, Judge.

17   Q.   It wasn't -- it would have been something you would have

18   reported in the different phone calls that we all saw being

19   introduced into evidence, correct?

20   A.   Are you asking if it was a recorded phone call?

21   Q.   No, no.  Just a phone call, phone contact.

22   A.   Between Mr. Sittenfeld and Mr. Ndukwe between the

23   September 21st and October 26th?

24   Q.   Yeah.

25   A.   The one call that I'm aware of -- again, it wasn't

1    recorded -- was on September 21st.

2    Q.   Right.

3    A.   And my confusion, I just wanted to be clear, between

4    September 21st and then October 25th, I'm not sure off the top

5    of my head there's any contacts between Mr. Ndukwe and

6    Mr. Sittenfeld, whether it's a hang-up or what.  I just wanted

7    to be clear, so that's all.

8    Q.   Thank you.  Well, you did obtain Mr. Sittenfeld's phone

9    records, correct?

10   A.   Yes.

11   Q.   And I take it you reviewed them?

12   A.   Yes.  But obviously, I don't have them committed to

13   memory.

14   Q.   Let me ask you this:  If there had been a phone call from

15   Ndukwe to Sittenfeld or from Sittenfeld to Ndukwe between

16   September 21st and October 26th, you would have noted that

17   based on those phone records, correct?

18   A.   Yes.  All I'm saying, Counselor, is, I just want to be

19   clear.  I didn't want to answer that there was no contact

20   because it could have -- there may have been someone called --

21   one party called the other party and the call didn't go

22   through, that's all I'm saying.

23   Q.   Gotcha.  Thank you.  So now turning to the October 26th

24   call.  You instructed Mr. Ndukwe to inform Mr. Sittenfeld that

25   the 435 Elm Street project was heating up, correct?

1    A.   Yes, sir.  That's correct.

2    Q.   And Mr. Sittenfeld's response was good, right?

3    A.   That's my recollection.

4    Q.   And Mr. Ndukwe --

5    A.   Counselor, could I pull up that transcript that we were

6    discussing?

7    Q.   Sure.

8    A.   Okay.

9    Q.   I have no objection.

10   A.   Let me -- if someone could help me with the exhibit

11   number?

12        MR. C. MATTHEW RITTGERS:  12B.

13   Q.   12B.

14   A.   Thank you.  Counselor, I'm ready.  Thank you.

15   Q.   I think we covered the main points almost, except for

16   one.

17   A.   Okay.

18   Q.   You gave instructions.  You told him to tell P.G. that

19   435 was heating up, correct?

20   A.   Yes.

21   Q.   And P.G. said it was good, good that it was heating up.

22   And then you told him to tell P.G. that he had a lot of --

23   that he had out-of-town investors with a lot of LLCs, correct?

24   A.   That's correct.

25   Q.   And why did you instruct him to say that he had a lot

1   of -- he had investors with a lot of LLCs?

2   A.   Yeah.

3   Q.   Why did you instruct him to say that?

4   A.   Thank you.  So the purpose of that call was to introduce

5   Mr. Sittenfeld to Rob and Brian.  That was the whole purpose

6   of it.

7       And the reason that the LLCs was referenced in there was

8   because I knew Mr. Sittenfeld was raising funds from LLCs, so

9   it was a reason that he'd be interested in talking to Rob and

10  Brian because he's fundraising.

11      The LLCs was just to -- as a reason to introduce

12  Mr. Sittenfeld to Rob and Brian.  Otherwise, if Ndukwe called

13  Sittenfeld and said, hey, I know Rob and Brian, would you like

14  to meet them?  It really wouldn't make a lot of sense, so

15  that's why the LLCs was mentioned.

16  Q.   Okay.  So P.G. Sittenfeld said okay.  So then you

17  instructed Mr. Ndukwe to make another call on October 30th?

18  A.   That's correct.

19  Q.   All right.  And during that call is when Mr. Ndukwe

20  indicated that he was, I think his word, sideways with

21  Mayor Cranley, correct?

22  A.   Correct.

23  Q.   And because he was sideways with Mayor Cranley, he didn't

24  want any donation to Mr. Sittenfeld to come back to him,

25  because he was afraid that Mayor Cranley would veto his

HOLBROOK - CROSS

1   projects that were in front of the city?

2   A.   That's correct.

3   Q.   And in response to that, Mr. Sittenfeld said, I don't

4   care if it's in your name or if it's in your group of business

5   associates and friends, correct?

6   A.   Correct.

7   Q.   And there's nothing illegal with that, is there?

8   A.   If the business associates are donating with their money

9   and their name, you are correct.

10  Q.   So the next phone call -- and I believe you said -- well,

11  next phone call was November 2nd?

12  A.   November what?

13  Q.   November 2nd?

14  A.   Yes, sir.

15  Q.   And I believe you told us -- I can't remember whether it

16  was this morning or yesterday when we were talking about this,

17  that you wanted Mr. Ndukwe to make a clear offer, correct?

18  A.   Yes.  A clear offer of money for votes, yes.

19  Q.   Yes.  So Mr. Ndukwe, per your instructions -- by the way,

20  when these calls are made, are you or another FBI agent

21  sitting with Mr. Ndukwe?

22  A.   No.

23  Q.   He's making it all on his own?  He's just recording it

24  and he's making it on his own?

25  A.   Yes.  He can --

*HOLBROOK - CROSS*

1    Q.   No one is sitting next to him giving him instructions?

2    A.   No.  I can't remember a time in this investigation that I

3    was ever in the same location as Mr. Ndukwe making a call.

4         And the reason is he's busy, you know, it's not like it's

5    hard to get to the same place.  So no, to answer your

6    question, I was not there.

7    Q.   Just curious.

8    A.   Yeah.

9    Q.   You said during this phone call, again, per your

10   instructions, that Mr. Ndukwe said that he could raise

11   20,000 bucks?

12   A.   Yes.

13   Q.   In donations, right?

14   A.   Yes.

15   Q.   And Mr. Sittenfeld was very happy about that, and he

16   thought -- correct me if I'm wrong, he thought that that would

17   take a couple years for these investors to donate 20,000

18   bucks, right?

19        MS. GAFFNEY PAINTER:  Your Honor, objection.  Special

20   Agent Holbrook can't testify to what Mr. Sittenfeld thought.

21        THE COURT:  Sustained.

22        MR. C. HENRY RITTGERS:  Did I say that?

23        THE COURT:  I think you did.

24        MR. C. HENRY RITTGERS:  I apologize.

25   Q.   I'll rephrase the question.  Agent Holbrook, Mr. Ndukwe

*HOLBROOK - CROSS*

 1    told Mr. Sittenfeld that he had good news for him.  And he

 2    said that the good news was that he -- his investors can come

 3    up with $20,000 in donations, correct?

 4    A.   Did he say donations?  I don't believe they say

 5    donations.  It says -- may I read it to you?

 6    Q.   Sure.

 7    A.   It says, "But the good news is, I'll probably be able to

 8    get you close to $20,000 over the next couple."

 9    Q.   But it's all in reference to donations, correct?  It's

10    not $20,000 that he's going to give him in cash, it was

11    donations, that's what he was referencing, correct?

12    A.   Not necessarily.

13    Q.   Well, would you agree that Mr. Sittenfeld was surprised

14    when he was told that Mr. Ndukwe's investors can come up with

15    $20,000?

16         MS. GAFFNEY PAINTER:  Objection, Your Honor.  Special

17    Agent Holbrook can't testify to the emotional state of

18    Mr. Sittenfeld.

19         THE COURT:  Sustained.

20    Q.   Did Mr. Sittenfeld reply to this $20,000 -- by the way,

21    that $20,000 was $10,000 more than Mr. Sittenfeld had

22    requested for Mr. Ndukwe to raise, correct?

23    A.   Yes.

24    Q.   And when Mr. Ndukwe, per your instructions, said that he

25    can get $20,000, that was a number that you had instructed

HOLBROOK - CROSS

1   Mr. Ndukwe to say to Mr. Sittenfeld?

2   A.   Actually, that's incorrect.  I instructed Mr. Ndukwe to

3   say $10,000.  He got confused and said $20,000.

4   Q.   Really?

5   A.   Yeah.

6   Q.   And when Mr. Ndukwe said $20,000, Mr. Sittenfeld said

7   great.  He can get $20,000 in two years, whatever, that would

8   be wonderful, correct?

9   A.   Something like that, yes.

10  Q.   And then in response to that, Mr. Ndukwe said, "No, not

11  two years, two weeks," correct?

12  A.   Yes.

13  Q.   Now, it's at this point when Mr. Ndukwe was following

14  your instructions to get a clear offer, money for a vote,

15  right?

16      So during this phone conversation, Mr. Ndukwe says but,

17  but these guys are going to want a yes vote whether it's this

18  year, next year, three years down the road, correct?

19  A.   Yes, something like that.

20  Q.   And he was tying that to the 20,000 bucks, which is what

21  you wanted, right?  He was tying the $20,000 donation to a yes

22  vote?

23  A.   Yes, that's correct.

24  Q.   That's what he was telling Mr. Sittenfeld, correct?

25  A.   Yes.  Correct.

*HOLBROOK - CROSS*

1    Q.   And at that point, Mr. Sittenfeld said immediately,

2    "There can be no quid pro quo," correct?

3    A.   He said, "Obviously, nothing can be illegal, like

4    illegally, nothing can be a quid pro quo."

5    Q.   Meaning he wasn't going to trade a yes vote for a $20,000

6    campaign donation, correct?  That's what it means?

7    A.   I think it means he made a statement that nothing can be

8    a quid pro quo, and he is correct.

9    Q.   Would you agree that the only explicit agreement in this

10   entire case is where Mr. Sittenfeld said he was not -- that

11   there was going to be no quid pro quo, and Mr. Ndukwe

12   acknowledged that and said, "Yeah, yeah"?

13          MS. GAFFNEY PAINTER:  Objection, Your Honor,

14   reference to "explicit."

15          THE COURT:  Fill me in.

16          MS. GAFFNEY PAINTER:  May we go to sidebar?

17          THE COURT:  Yes.

18   SIDEBAR CONFERENCE

19          MR. SINGER:  Explicit is a legal term that is a form

20   of art, and the jury will be instructed as such per the jury

21   instructions.

22          THE COURT:  Oh, I see.  Okay.  So it's actually an

23   element of the offense?

24          MR. SINGER:  Yes.

25          THE COURT:  Oh, I see.

1          MR. C. MATTHEW RITTGERS:  Can he not ask if it's a

2    factual question and also an element?

3          THE COURT:  So the problem is, if you use the

4    phrasing from the statute, it's not going to be clear whether

5    the witness is using the term in common parlance or as it's

6    used in the statute, so you have to be very careful to not

7    inadvertently get testimony that appears to directly read on

8    to the statute from the witness.

9      It's a legal conclusion as an element of the offense.  It

10   would be asking him to give a legal conclusion, which he can't

11   do.

12         MR. C. MATTHEW RITTGERS:  Couldn't there be a

13   limiting instruction on it where it's a factual question?

14         MR. C. HENRY RITTGERS:  I'll rephrase the question.

15   I'll withdraw that question, and I'll just ask him if it was a

16   clear statement that he wasn't.

17   SIDEBAR CONFERENCE CONCLUDED

18   Q.   I'm going to rephrase that question.

19   A.   Yes, sir.

20   Q.   When Mr. Sittenfeld told Mr. Ndukwe that there was going

21   to be no quid pro quo --

22   A.   No.  He didn't say that.  He said, "Nothing can be a quid

23   pro quo."  He didn't say there can be no quid pro quo.

24   Q.   I'm not quoting exactly.

25   A.   Okay.  Well, there's a big difference.

HOLBROOK - CROSS

1          THE COURT:  All right.  Again, you can't talk over

2     each other.

3          THE WITNESS:  Sorry.

4          MR. C. HENRY RITTGERS:  I apologize, Judge.

5     Q.   You can phrase it.  What was that again?

6     A.   He said, "Illegally, nothing can be a quid pro quo."

7     Q.   And Mr. Ndukwe's response was, "Yeah, yeah, yeah,"

8     correct?

9     A.   Yeah.

10    Q.   And that was a clear rejection of Mr. Sittenfeld wanting

11    to exchange his vote for a $20,000 donation, correct?

12    A.   Absolutely not.

13         MR. C. HENRY RITTGERS:  Judge, may we approach for a

14    second, one second?

15         THE COURT:  Okay.

16    SIDEBAR CONFERENCE OFF THE RECORD

17         THE COURT:  Counsel noted the time.  It's 5:05 and it

18    is a Friday.  He suggested he still has a fair amount of time

19    to go with the cross-examination of this witness.

20         We've been hoping to maybe get the cross-examination

21    completed, but it doesn't look like that's going to happen, so

22    I think this is an appropriate time to break for the weekend.

23         I know that I always do an admonition whenever we break,

24    but it takes on a little bit more significance, so I'd like to

25    talk about it a little bit longer right now because we're

1    going to be gone for two days.

2        And I know that with people at home for the next couple

3    of days, the possibility to be inadvertently exposed to media

4    stories, or for curiosity to get the better of one when you're

5    home for a couple of days.

6        I just really want to stress that it is important to a

7    fair trial that you not seek out information from other

8    sources about other people's perceptions about what's going on

9    at trial, and that you not seek out or attempt to do any type

10   of investigation on your own, whether through media stories or

11   otherwise, about anything that's been discussed during this

12   trial or about the charges; that you not communicate with

13   anyone, and I'm sure that to the extent some of your friends

14   know you're on a jury, they might have questions about how has

15   it been going, or things of that nature.

16       It's really very important -- you don't need to be rude,

17   but that it's just important that you tell them that you

18   really can't discuss what's going on at trial.  You're happy

19   to talk to them about it after it's all over, whatever, but we

20   just can't be in a situation where we don't know what sources

21   of information you may have received from outside this

22   courtroom.

23       It's so important to both parties that this case be

24   decided on the information that you receive in this courtroom,

25   rather than information that one of you may have received from

```
 1    somebody else.

 2         So I do really want to stress that it's important that

 3    you not communicate with anyone, and that if anyone should

 4    attempt to communicate with you about this case, that you

 5    bring it to the Court's attention on Monday, but that you

 6    don't discuss it with other jurors or anything else.

 7         We can talk to the Court, and if one of you inadvertently

 8    reads or hears or sees something, we can talk about whether

 9    that's important or not.

10         But with that, I'm going to release you for the weekend.

11    We will start up, if you can try to be here at 9:00 on Monday,

12    there may be some issues that the parties need to discuss.

13    But today we actually did a pretty good job, I think, of

14    getting you into the courtroom shortly after 9:00.

15         It is the Court's hope -- I know we're running long days.

16    I am trying to get this done as quickly as I can.  I know this

17    is an imposition on everybody's time, and I do appreciate your

18    service, and I know the parties appreciate your service on

19    this jury, so we will try to keep moving things along as

20    efficiently as we can.

21         Please know that if you get here by 9:00, we've all been

22    here for a while before that to try and get things done before

23    you get here, so we are trying to do what we can do, and we

24    will continue to do that.

25         So everybody have a good weekend, and we look forward to
```

1    seeing you on Monday.

2              COURTROOM DEPUTY:  Judge, should it be 8:50?

3              THE COURT:  No.  I think if you can assemble by 9:00

4    in the jury room, I sincerely doubt we'll be bringing you in

5    at 9:02.  If you're here by 9:00, I think we'll be able to get

6    started relatively promptly on Monday morning.

7        (Jury out at 5:09 p.m.)

8              THE COURT:  As I understand between the parties, you

9    are going to provide Mr. Sittenfeld's attorneys a list of the

10   witnesses you intend to call on Monday by noon tomorrow; is

11   that right?

12             MR. SINGER:  That's correct, Your Honor.

13             THE COURT:  And I imagine you've already provided

14   them notice of who you intended to call next because that

15   person arguably was going to go on this afternoon; is that

16   right?

17             MR.  SINGER:  That is correct.

18             THE COURT:  Okay.  And, as I understand it, you're

19   thinking that hopefully by Monday sometime you'll have a

20   better sense of what your schedule looks like for the week and

21   when you may be resting your case; is that right?

22             MR.  SINGER:  That's correct, Your Honor.

23             THE COURT:  Very good.  Thank you, Mr. Singer.

24       Is that your understanding, Mr. Rittgers, of the way this

25   is going to proceed?

```
 1              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

 2              MR. C. HENRY RITTGERS:  Yes.

 3              THE COURT:  Is there anything the parties wish to

 4    discuss on the record before we recess for the weekend?

 5              MS. GLATFELTER:  Yes, Your Honor.  We do need to talk

 6    to our case agent about scheduling, because he has been the

 7    contact for a few of our witnesses.  So I would ask the

 8    Court's permission just about scheduling, to make sure that's

 9    taken care of over the weekend, not to talk about any

10    substance or any testimony.

11              THE COURT:  Any objection?

12              MR. C. MATTHEW RITTGERS:  None, Your Honor.

13              THE COURT:  Okay.  Subject to the constraint that you

14    just set forth, that sounds fine.

15              MS. GLATFELTER:  Thank you, Your Honor.

16              THE COURT:  Anything else?

17              MS. GLATFELTER:  No, Your Honor.

18              THE COURT:  Anything from the defense?

19              MR. C. HENRY RITTGERS:  No, Your Honor.

20              THE COURT:  Very good.  You guys all have a good

21    weekend as well.  Please try to be in the courtroom maybe like

22    by 10 'til 9:00 on Monday so we can deal with anything we need

23    to before we bring in the jury.

24              MR. C. HENRY RITTGERS:  Thank you, Your Honor.

25              THE COURT:  All right.  We can recess.
```

1          (Proceedings adjourned at 5:11 p.m.)

2                        -   -   -

3                C E R T I F I C A T E

4                        -   -   -

5     I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
      is a correct transcript from the record of proceedings in the
6     above-entitled matter.

7

8     /s/ M. Sue Lopreato_____              ___September 30, 2022____
      M. SUE LOPREATO, RMR, CRR
9     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2       GOVERNMENT WITNESSES

3       **Special Agent Nathan Holbrook**

4       Continued Direct by Ms. Gaffney Painter..........   Page 4
        Cross by Mr. C. Henry Rittgers...................   Page 71

5

6       GOVERNMENT EXHIBITS

7                            EXHIBITS

        Exhibit                                        Admitted

8

        15F                                                5
9       15G                                                6
        26C                                                9
10      26D                                                9
        3C                                                12
11      3D                                                12
        3E                                                12
12      3F                                                13
        28A                                               16
13      28B                                               16
        29A                                               18
14      29B                                               18
        29C                                               19
15      29D                                               20
        29E                                               21
16      29F                                               22
        30A                                               25
17      30F                                               26
        30B                                               26
18      30E                                               30
        31B                                               33
19      31C                                               34
        31D                                               34
20      31F                                               36
        31G                                               36
21      31H                                               37
        31I                                               38
22      31J                                               39
        31K                                               41
23      31L                                               41
        31M                                               42
24      31A                                               44
        11B                                               45
25      32A                                               46
        32B                                               47

| | |
|---|---|
| 32C | 47 |
| Exhibit (cont'd) | Admitted |
| 32D | 48 |
| 32E | 48 |
| 33A | 51 |
| 33C | 51 |
| 33B | 52 |
| 33D | 52 |
| 33E | 57 |
| 34A | 59 |
| 34B | 59 |
| 34C | 60 |
| 34D | 60 |
| 35A | 61 |
| 35B | 62 |
| 35C | 62 |
| 35D | 63 |
| 36A | 64 |
| 36B | 65 |
| 37A | 66 |
| 37B | 66 |
| 38A | 67 |
| 38B | 68 |
| 39A | 69 |
| 39B | 69 |

- - -