```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION
                           -   -   -
3

4    UNITED STATES OF AMERICA,     : Case No. 1:20-cr-00142-1
                                   :
5            Plaintiff,            : Jury Trial, Day 5
                                   : Monday, June 27, 2022
6          - v -                   :
                                   : 9:00 a.m.
7    ALEXANDER SITTENFELD, a/k/a   :
       "P.G. Sittenfeld,"          :
8                                  :
             Defendant.            : Cincinnati, Ohio
9
                           -   -   -
10                    TRANSCRIPT OF PROCEEDINGS

11   BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

12                         -   -   -

13   For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
                                 MATTHEW C. SINGER, ESQ.
14                               MEGAN GAFFNEY PAINTER, ESQ.
                                 U.S. Department of Justice
15                               U.S. Attorney's Office
                                 221 E. Fourth Street, Suite 400
16                               Cincinnati, Ohio  45202

17   For the Defendant:          CHARLES M. RITTGERS, ESQ.
                                 CHARLES H. RITTGERS, ESQ.
18                               NEAL D. SCHUETT, ESQ.
                                 Rittgers & Rittgers
19                               12 E. Warren Street
                                 Lebanon, Ohio  45036
20
     Law Clerk:                  Jacob T. Denz, Esq.
21
     Courtroom Deputy:           Scott M. Lang
22
     Court Reporter:             M. Sue Lopreato, RMR, CRR
23                               513.564.7679

24

25
```

```
1                    P R O C E E D I N G S

2              (In open court at 9:31 a.m.)

3                         -  -  -

4         THE COURT:  We're meeting in chambers before court on

5    Monday, at the request of the government, to discuss some

6    matter related to an upcoming witness.

7         MS. GLATFELTER:  Your Honor, if I may?

8         THE COURT:  You may.

9         MS. GLATFELTER:  We believe our undercover officers,

10   we have three of them, and they'll be beginning to testify

11   today.

12      So I wanted to ask a few procedural questions, and then I

13   also had a question regarding the specific letter of censure

14   order under seal, and just to make sure that we're all on the

15   same page of that.

16         THE COURT:  Okay.

17         MS. GLATFELTER:  So the first one is, I understand

18   that we're going to be testifying pursuant to court order,

19   which is Docket Number 77.

20      We've provided the defense counsel the true identifiers

21   of the undercovers, but pursuant to the court order, the

22   undercovers will be testifying under their pseudonym, and

23   we're not eliciting any details that would identify them, such

24   as their home office or, you know, the area where they're

25   from.  This is consistent with prior testimony, and I have
```

1 some samples about that, for a moment.

2  So prior to their testimony, we would ask the Court to

3 instruct the sketch artist not to sketch if they're in the

4 room, and enforce the court order, which is outside the room

5 about cell phones, not taking pictures or likeness.

6  The reason for this is that while these individuals will

7 be testifying here in court, the broadcasting or the

8 dissemination of their images could cause them safety harms

9 regarding the investigations that they're currently involved

10 in.  All are involved in other matters besides this currently,

11 and because of this, ask this Court to follow the same

12 procedures.

13  As a reminder, we discussed at the pretrial, but we will

14 also be asking to seal the videos showing their images, and

15 replacing those videos with videos where their images are

16 redacted, like there's a bubble over their head.

17   THE COURT:  In the record, right?

18   MS. GLATFELTER:  Yes.  And finally, or I guess third,

19 the third issue is, at the time of the testimony, courts

20 typically instruct the jury that they are -- that these

21 undercovers are testifying by the pseudonym that they used in

22 the case.  I have an example from a recent case where --

23   MR. C. HENRY RITTGERS:  We're going to use Rob?

24   MS. GLATFELTER:  Yes.  And we've all stipulated to

25 this and agree, but I wanted to make sure we gave the Court an

1    example.

2         So this is a recent case from Florida, and on the back

3    page is an example of how the Court has instructed the

4    undercovers, instructed the jury regarding the undercovers, so

5    on the back of the last page.

6         I anticipate this will be later this morning or after

7    lunch, but I didn't want to spring this all on the Court right

8    before their testimony.  I wanted to make sure --

9              THE COURT:  No.  I appreciate that.

10             MS. GLATFELTER:  I wanted to make sure the Court was

11   thinking about these issues ahead of time.

12        So the final issue is the specific one related to UC Rob

13   and the letter of censure.

14             THE COURT:  Can I just stop you for one second?

15             MS. GLATFELTER:  Yes.

16             THE COURT:  Just looking at this, I only know them as

17   UC Rob, UC Vinny, and UC Brian.  I don't have a last name.

18   Should I be using a last name or just UC Rob?

19             MS. GLATFELTER:  So Rob is Rob Miller.  Brian is

20   Brian Bennett.  Vinny is only Vinny because the defendant

21   didn't know him by his last name.

22             MR. C. MATTHEW RITTGERS:  Bruno, I thought, was

23   mentioned.

24             MS. GLATFELTER:  Our understanding is that he didn't

25   know the last name.

```
 1              MR. C. MATTHEW RITTGERS:  Okay.

 2              MS. GLATFELTER:  That only being because if those

 3     names are used in court, they have to burn that identity and

 4     come up with different ones, and so he --

 5              THE COURT:  Do you not want me to use the last names?

 6              MS. GLATFELTER:  We already know that Rob Miller and

 7     Brian Bennett have to be burned, so...

 8              THE COURT:  Oh, okay.

 9              MS. GLATFELTER:  But Vinny didn't think that his last

10     name was out there and could be used again.  If you think

11     otherwise, then --

12              MR. C. MATTHEW RITTGERS:  I don't know how I know it

13     was Bruno, if that is what he was using.  I didn't make that

14     up.

15              MS. GLATFELTER:  Yes.  I appreciate that.  So why

16     don't we use Vinny, and then I'll let Vinny know, so that he

17     is prepared for that, but if we could just use his first name.

18     Does that answer your questions?

19              THE COURT:  Yes.  So sketch artist, no pics, juror

20     instruction.  Was there one before that?

21              MS. GLATFELTER:  No.

22              THE COURT:  Okay.

23              MS. GAFFNEY PAINTER:  We're placing in the record,

24     though.

25              MS. GLATFELTER:  Oh, we're placing in the record,
```

1    yeah.

2            THE COURT:  Yeah.  I've already ordered that, I

3    think.

4            MS. GLATFELTER:  Yes.  It's sort of a reminder to us

5    to remember to do that too.

6        And then along those lines, if there are any personal

7    details that are listed accidentally, we'll ask for those

8    portions of the record to be sealed upon the conclusion of

9    their testimony.

10           THE COURT:  Okay.

11           MS. GLATFELTER:  The final issue is regarding the

12   letter of censure.  One of the issues we litigated pretrial

13   was whether the defendant could impeach UC-1 regarding the

14   letter, or Rob Miller regarding the letter of censure.

15       We understand that the Court said the defendant could put

16   strict limitations on the type of information that could be

17   elicited.  We understand the Court's order and appreciate

18   considering this pretrial, and we will abide by that.

19       We wanted to understand what the defendant's limitations

20   are in cross-examination, consistent with the Court's order.

21   So we have disclosed, per our discussion with the Court, the

22   redacted copy.

23           THE COURT:  Yes.

24           MS. GLATFELTER:  I provided an additional redacted

25   copy, because I recognized last night that defendant has in

1     their exhibit book the actual disclosure letter, so letter

2     regarding all of the matters that we sought the Court's

3     assistance on regarding disclosure, including the letter of

4     censure, and then the UC's statement.

5         So this is marked as an exhibit in their exhibit book.

6     And so we wanted to be clear about whether this was

7     admissible, and if it's not admissible, how it could be used

8     in front of the jury.

9              MR. C. HENRY RITTGERS:  May I say something?

10             THE COURT:  You may, Mr. Rittgers.

11             MR. C. HENRY RITTGERS:  I don't intend to use the

12     censure letter at all, other than to mention it.

13             MS. GLATFELTER:  Yes.  He will admit it, and he will

14     talk about it, but...

15             MR. C. HENRY RITTGERS:  And I'd also like to note two

16     other things.  I'm going to address Rob and Brian as Rob and

17     Brian, if that's okay?

18             THE COURT:  That's fine by me.

19             MR. C. HENRY RITTGERS:  The other thing is is that,

20     quite frankly, other people in the office read about their

21     real identities and where they're from.  I did not.  I'm not

22     saying I don't know, but I can't remember whether one's from

23     Nashville, or from Asheville, or from Savannah.

24             MR. C. MATTHEW RITTGERS:  He doesn't know.

25             MR. C. HENRY RITTGERS:  I really don't know.  But the

1    point is that maybe sometime during my cross-examination, I

2    may mention that your investors were everywhere and mention a

3    few cities.  It's not intended to -- are you with me?

4            MS. GLATFELTER:  Yeah.

5            THE COURT:  And that was, I think, part of the cover

6    story was that the investors were from Nashville and Savannah.

7            MS. GLATFELTER:  Absolutely.  It's more like details

8    about their home offices and FBI, where they've been for that

9    many years.

10           MR. C. MATTHEW RITTGERS:  He doesn't know anything,

11   Judge.

12           MR. C. HENRY RITTGERS:  I don't know and I don't

13   care.

14           MS. GLATFELTER:  So I guess there's no issue about

15   this letter will not be shown to the jury.

16           MR. C. HENRY RITTGERS:  The only way that it would be

17   is if he starts bucking me on something.

18           MS. GLATFELTER:  Okay.  Understood.

19           THE COURT:  So are we good?

20           MS. GLATFELTER:  Yes.  There are further redactions

21   that probably needed to be made, and so I wanted to address

22   this.

23           THE COURT:  Anything else, Mr. Rittgers?  Oops, two

24   hands went up.

25           MR. C. HENRY RITTGERS:  The other thing as to -- and

1    I read the Court order carefully as to what I can ask.

2        I'm going to ask him whether it's true that he had a

3    consensual relationship, or sexual affair is what I was going

4    to use.  Is there any problem with affair?

5            MR. C. MATTHEW RITTGERS:  Your Honor, I just wanted

6    to alert you to some tech issues.  I know Scott's aware of

7    this.

8        The issues we were having on Friday is that we are not

9    able to display anything from any of the defense counsel

10   tables tech-wise.

11           THE COURT:  Because of the wiring or what?

12           MR. C. MATTHEW RITTGERS:  Yeah.  It's something with

13   the court system.

14           COURTROOM DEPUTY:  It's the -- well, the last thing

15   he explained to me, Richard St. John, is that for whatever

16   reason, their specific computer does not work with the system.

17           THE COURT:  Can you do it from the prosecution table?

18           MR. C. MATTHEW RITTGERS:  Potentially, or if this is

19   still an issue -- they're trying to reset the whole stack

20   right now.

21       If this is still an issue, I was wondering if I could

22   stand at the podium, because I have tested my actual computer

23   at the podium.

24       Obviously, I'm not going to be addressing a witness, but

25   I can be right next to my father when he's doing cross.  And

1    when I'm doing cross myself, I can just do it myself without

2    help, just so the jurors know the tech issues weren't, I don't

3    think, on our end.  They just do not work, and they worked

4    previously with the system.

5          MR. C. HENRY RITTGERS:  I'm a technological idiot.

6          THE COURT:  No.  That's fine.  Does the government

7    have any objections to that?

8          MS. GLATFELTER:  No.  Our computers are quite

9    difficult themselves as well, so we understand.

10         THE COURT:  In fact, is there maybe an extension

11    cable we could get from the prosecution table to the defense

12    table so they could plug in?

13         COURTROOM DEPUTY:  I could ask them if there's an

14    adapter plug that goes.

15         THE COURT:  Like a 10 foot or 15 foot extended.

16         MR. C. MATTHEW RITTGERS:  Sure.

17         MS. GLATFELTER:  Is it the kind of input that they

18    have on their computer?

19         MR. C. MATTHEW RITTGERS:  We have an adapter that

20    works for the HDMI input.  I just wanted you to know that in

21    advance.

22         THE COURT:  That's fine.

23         MR. C. MATTHEW RITTGERS:  And then, since we're all

24    here talking about the agents, are they going to be permitted

25    to go back through the same videos that Agent Holbrook already

1    put in the record?

2         THE COURT:  I'm hoping not.  Well, let me see what

3    the plan is.

4         MS. GLATFELTER:  The plan would be not to go over all

5    of the videos in their entirety.  I think the witnesses would

6    talk about, depending on the witness, it could be one, it

7    could be three or four, and those would be small snippets of

8    the parts, but -- to explain that they were there and a part

9    of the conversation.

10        But by no means all of them, and by no means the ones we

11   play, all of those, in particular --

12        MR. C. MATTHEW RITTGERS:  Wait.  You're talking about

13   showing the beginning of the snippet, or are you going to,

14   like a highlighted portion of the government's part of that

15   interaction to try to highlight certain things with witnesses?

16        MS. GLATFELTER:  We'll go -- it could be the

17   beginning of the call, just depending.  For example, a call

18   between Vinny and the defendant, we might start at the

19   beginning and play a minute and ask them about the

20   conversation.

21        There might be another one where we ask for minutes two

22   to three to play and ask them questions.

23        MR. C. MATTHEW RITTGERS:  I don't want to interrupt

24   you guys when you're putting your presentation on.  I just

25   want to bring it up now.

1          I mean, they're interpretations of what happened on the

2    call, our belief is the best evidence is just the content of

3    the call.

4          MS. GLATFELTER:  These individuals were participants

5    in the conversations, and they can talk about what was asked

6    or what they said.

7          MR. C. MATTHEW RITTGERS:  Okay.  All right.

8          THE COURT:  I mean, I hope you're not going to elicit

9    testimony or trying to elicit testimony about what

10   Mr. Sittenfeld was thinking when he was saying things, because

11   that's going to be the same objection from them that you guys

12   were making.

13         MS. GLATFELTER:  Of course.

14         THE COURT:  Rightfully so.

15         MS. GLATFELTER:  Of course.

16         THE COURT:  Okay.  Go ahead, Mr. Rittgers.

17         MR. C. MATTHEW RITTGERS:  Sorry, Your Honor.  We are

18   pairing down our witness list, but they're assuming -- I know

19   you're probably going to talk about the juror issue right now,

20   but assuming the jurors don't know two names, we would

21   respectfully request to add two names to the witness list, and

22   I have those two names right now.

23         THE COURT:  Okay.

24         MR. C. MATTHEW RITTGERS:  It's Christie Bryant Kuhns,

25   K-u-h-n-s is the last name, and Cameron Means, M-e-a-n-s.

```
 1            THE COURT:  And do you have any context around that?

 2    I mean, both names are unique enough that it's probably not a

 3    problem, but...

 4            MR. C. MATTHEW RITTGERS:  Yeah, they're local in the

 5    community.  I mean, I don't know if there's -- I can't

 6    remember right now their profession or anything.

 7            THE COURT:  Okay.

 8            MR. C. MATTHEW RITTGERS:  And I don't know if it

 9    would be relevant to their testimony or anything.  It's not

10    like the CEO of Children's Hospital or something.

11            THE COURT:  No.  I understand.  Just in terms of

12    identifying which Christie Kuhns, in case somebody knows a

13    Christie Kuhns but not the Christie Kuhns, I didn't know.

14    It's unlikely, given these names are pretty -- if it were Bob

15    Miller, I'd be more concerned.

16            MR. C. MATTHEW RITTGERS:  She goes by Christie Bryant

17    Kuhns, so that might help.

18            THE COURT:  Okay.  That helps.  And Cameron Means?

19            MR. C. MATTHEW RITTGERS:  Cameron Means.

20            THE COURT:  All right.  I will check.  Are there

21    other issues, Mr. Rittgers?

22            MR. C. MATTHEW RITTGERS:  Just two more, Judge.

23            THE COURT:  Okay.

24            MR. C. MATTHEW RITTGERS:  One is Caleb Burns, just

25    scheduling-wise, I'm bringing it to your attention.  He was
```

1    our expert on FEC, just so we can keep that on the radar.

2              THE COURT:  Yep.

3              MR. C. MATTHEW RITTGERS:  And then the other one is

4    404(b).  The government told us, I believe yesterday, that one

5    of their potential witnesses today is Jay Kincaid, and they

6    said, out of the abundance of caution, they were telling us

7    about a potential 404(b) that he might testify to, which I

8    believe the allegation is, and correct me if I'm wrong, is

9    that Mr. Kincaid would say that Mr. Sittenfeld told

10   Mr. Kincaid that if Chip Gerhardt did not support

11   Mr. Sittenfeld, then Mr. Sittenfeld would hurt Mr. Gerhardt's

12   clients.  And I believe that's the piece of 404(b) that was

13   disclosed yesterday.

14      Now that the Court has seen the video and testimony here,

15   and has a better context for Mr. Sittenfeld's operandi with

16   these agents, I was just wondering if the Court is willing to

17   entertain discussing these 404(b), or what the government's

18   considering other bad acts, including, for example, Jared

19   Kamrass, you know, who -- that's the guy who worked with

20   Sittenfeld's campaign.

21      And I believe the proposed testimony is, and I can see in

22   the exhibit binders, is that this is the target list of

23   individuals, some of which had business in front of the city,

24   some of which did not, lists from prior mayoral campaigns that

25   Kincaid had worked on.

1    Kincaid worked for people in Tennessee all the way up

2    through northern Ohio, and he was sharing lists with

3    Sittenfeld.  And some of these people had business in front of

4    the city.  There are emails between Sittenfeld and Kincaid.

5

6    For example, one email, two people had said they wanted

7    to donate.  P.G. said, "Hey, did they donate?"

8    Kincaid responds, "No, not yet."

9    Sittenfeld says, "Okay.  Let's make sure they don't

10   flake."

11   So I anticipate things like that, they're going to

12   attempt to elicit that.  Again, I don't want to object every

13   time on the record, but I also want to preserve the objections

14   based on what the Court has heard so far, and based on the

15   fact that that's all legal fundraising, I was just renewing

16   all that for the Court.

17   MR. SINGER:  So there's a couple issues there.  The

18   first one relates to Mr. Kincaid.  We do not believe this is

19   404(b) evidence.  I think, consistent with the Court's ruling

20   on relating to J.K., Jared Kamrass, the defendant's actions

21   relating to the same mayoral cycle relating to fundraising,

22   although essentially not illegal in itself, are consistent

23   with the actions that he took relating to the charges in the

24   indictment, and it's all part of their res gestae.  So that

25   was the Kamrass piece of it.

1      Kincaid is similar, although arguably more relevant,

2  particularly now.  There was argument in opening and on cross

3  relating to the government's motivations for starting this

4  investigation in the first place.

5      And one of the things that the agent considered and I

6  think he testified to was conversation that he listened to

7  between Ndukwe and Jay Kincaid relating to fundraising and

8  Sittenfeld.

9      And Mr. Kincaid will come in and testify that there

10 was -- Sittenfeld had told him that he didn't want candidates

11 hedging in the mayoral race.  There were two candidates,

12 Mr. Sittenfeld and Mr. Smitherman, and he didn't want people

13 hedging by contributing to both.

14     And that was what he told Sittenfeld with regards to

15 who he -- in the context of who he should -- or what he told

16 Mr. Ndukwe in the context of who Ndukwe should contribute to.

17 He said you should not contribute to Smitherman in your name

18 because it could impact you with regards to Mr. Sittenfeld.

19     The genesis of that advice was a conversation that

20 Kincaid had with Sittenfeld relating to fundraising for the

21 same mayoral campaign in which Sittenfeld told him, "Tell Chip

22 Gerhardt that if he hedges on me for my mayoral campaign, I

23 will hedge on his clients when I become mayor."

24     And it was based on that information that Sittenfeld told

25 Kincaid directly, and other conversations that prompted

1    Kincaid to give the advice to Ndukwe that don't hedge as far

2    as this goes, you're going to need to contribute to -- you

3    don't want to contribute to Smitherman in your name.

4         THE COURT:  And which count -- because that doesn't

5    sound like a quid pro quo, but it may go to extortion or

6    something, I suppose.

7         MR. SINGER:  So on October 30th, when Ndukwe called

8    Sittenfeld in a recorded call, and they talk about 435, and

9    Sittenfeld says, "You're going to have to come up with some

10   LLC checks.  I don't care where it comes from, but you don't

11   want me to be like love you, Chin, but can't," that is a

12   suggestion that you don't want me to say I can't support your

13   project, which is consistent with this advice and what the

14   case agent knew about not wanting to hedge as far as

15   contributions go.

16     So it all goes to the defendant's intent, and it goes to

17   rebut arguments made in opening statements and

18   cross-examination relating to the case agents and the initial

19   start of the investigation.

20        THE COURT:  Okay.  Go ahead.

21        MR. C. MATTHEW RITTGERS:  Well, on the factual

22   matter, Your Honor, the case agent was not aware of that, I

23   assume, until yesterday or at all ever.

24        MR. SINGER:  Well, he was aware of he had heard the

25   call between Kincaid and Ndukwe in September 2018 relating to

1    hedging, and that conversation that I just described about

2    Kincaid advising Ndukwe you don't want to give to Sittenfeld's

3    opponent in your name.

4             THE COURT:  Well, so I mean, I'm not hearing anything

5    yet that makes me inclined to change the ruling that I put

6    down, but I want to be very clear about what I said in there,

7    which is I don't want witnesses trotted in here to say, based

8    on their own speculation that, I don't know, the hairs on the

9    back of my neck went up, I felt like something was off, I felt

10   like...

11        You know, if they were going to testify as to specific

12   proposed exchanges, or things like that, I'll support this

13   project in exchange for X, or things that sound in that

14   nature, or arguably threats, because there are extortion

15   claims here.

16        So if there's a threat if you don't give to me, these

17   following bad things are going to happen to you in this

18   mayoral cycle, that's what I said is okay.  I don't want

19   people just saying I got a bad feeling from this guy, or

20   anything along those lines, all right?

21             MR. SINGER:  And that's why this is fundamentally

22   different from the notice that we gave relating to Chip

23   Gerhardt, for example, where your order was that this

24   individual subjective feeling relating to what Sittenfeld told

25   him could be potentially 403.

1          That's not the situation we're talking about here.  This

2     is just the defendant's statement directly to someone else,

3     and that person is going to testify about that statement.

4          THE COURT:  Okay.  And, Mr. Rittgers, I appreciate

5     what you're saying and, as I've said repeatedly throughout the

6     last year of this trial, I do think there are difficult issues

7     here because, as you have pointed out effectively in

8     connection with the defense, politicians raise money and that

9     happens.

10         And politicians don't want donors to flake out and not

11    give money that they have suggested they may give.  And I

12    don't think there's anything inherently inappropriate about

13    that.

14         But I just -- at some level, that's a matter for argument

15    for the jury, and I don't know that when you've got conduct

16    that can be interpreted multiple different ways, I'm just not

17    sure it's the Court's job to say which of those ways it should

18    be interpreted.  I think it's the jury's job to find the fact.

19         And so I'm inclined to allow the government, consistent

20    with the opinion that I've already issued, to elicit

21    testimony, although not about subjective feelings on the part

22    of the person who heard it, but relaying conversations that

23    could be understood is proposing quid pro quos or

24    extorted-type threats from Mr. Sittenfeld, his own words.

25         And you are certainly free to argue that they should be

1    understood the other way, you know, and -- I don't know.  It's

2    a difficult issue, but that's still where I'm at.

3            MR. C. MATTHEW RITTGERS:  What's the best way to

4    preserve for the record without interrupting their flow with

5    every question?

6            THE COURT:  I mean, do you guys have a problem with

7    just a standing objection on this 404(b) issue that's sort of

8    been briefed and argued already?

9            MR. SINGER:  Not at all, Your Honor.  I think the

10   record is preserved right now.  We're not going to make any

11   claim that this is not preserved for purposes of appeal or

12   anything.

13           THE COURT:  So I understand the current state of

14   affairs is you guys have a standing objection to the extent

15   that the Court is allowing in other-acts evidence relating to

16   other potential donors in this case, and that the government

17   will not argue waiver of that issue on appeal.

18           MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

19       Your Honor, this is back to the transcripts.

20           THE COURT:  Okay.

21           MR. C. MATTHEW RITTGERS:  Several months ago, the

22   government gave us FBI transcripts, which were a fuller

23   version of what they have admitted in their case in chief, and

24   at the final pretrial, that's when you talked to the parties

25   about what might you want to play.

1      Thursday before trial is when we got the prosecutor's

2  snippets of what they intended to play at trial.  And we've

3  asked over the weekend, now that we've seen what they

4  introduced, if they would, for example, agree to accuracy of

5  the FBI transcripts that they provided to us in discovery

6  many, many months ago, which is what we've been operating off

7  of, and they have refused to do that.

8      And I just want the Court to be aware that there might be

9  times where we might have to stop and have a witness watch a

10  video and read through the transcript and say mark down any

11  errors, you know, that's our only choice, so...

12      MR. SINGER:  I don't think we refused to do that.  I

13  think we said that to the extent a transcript is admissible

14  and that it's accurate, then we're not going to object.

15      The problem is, we just received the -- we did a lot of

16  work, even with the transcripts that we turned over years ago,

17  to make sure that they were trial ready, to make sure that

18  certain names were correct, to make sure -- we actually made

19  changes to one of the transcripts that was proposed at the

20  defendant's objection, and the version of the transcript that

21  they sent us did not have that change.

22      We can't have multiple versions of the same transcripts,

23  one of which we've already admitted as accurate, and then have

24  another version of the same transcript provided to the jury.

25      MR. C. MATTHEW RITTGERS:  There's one word that we

1    did ask to have changed in one transcript; but, I mean, we can

2    change it, that's fine.

3            MR. SINGER:  I was still --

4            MR. C. MATTHEW RITTGERS:  I'm sorry.  I'm sorry.

5            MR. SINGER:  But, you know, even small -- and there

6    weren't -- even small, little issues throughout a transcript,

7    even non-material ones, we went through and we made certain

8    changes to them.

9        We just weren't in a position Saturday afternoon to open

10   up a recording and go through every line to make sure that all

11   the issues that were corrected had been corrected to make sure

12   that the two transcripts are consistent.  And the case agent

13   can't do it because he's testifying.

14       So it's not a matter of objecting to the transcript

15   itself.  It's just here we are Saturday before trial.  I think

16   the Court, at the final pretrial conference proposed, I think

17   justifiably, that if you're going to use a transcript, send it

18   to the other side, tell them what portion you're going to use,

19   and then the parties can agree to it pretrial, which is what

20   we did.

21       So now we're in the middle of trial, we're not in a

22   position to -- even though we think it's probably 95 percent

23   accurate or 99 percent accurate, we're not in a position now

24   to review it for accuracy.

25           THE COURT:  I mean, one frustration that I've

1    discovered in my time sitting on this side of the table rather

2    than that side of the table is that in these criminal cases,

3    for whatever reason, all the discovery is really back-end

4    loaded.  And this is just another version of that same

5    problem.

6         You know, I really wish, putting aside this case that,

7    systemically, we could figure out some way to exchange things

8    further in advance so that we don't have to do these things in

9    the middle of trial.  We may need to revisit that at some

10   point but, I think at this point, given where we're at, sounds

11   like what you're proposing to do is about the best thing we

12   can do.

13        And I understand why the government isn't going to agree

14   in blank to, you know, transcripts that they've not had a

15   chance to review, but it is just a little bit frustrating how

16   late in the cycle a lot of this stuff gets disclosed and

17   things.

18        All right.  So since we're back here already, I was going

19   to address this anyway.  I'm trying to plan ahead in terms of

20   the schedule.  I'm not asking anyone to share what witnesses

21   are coming on, or anything inconsistent with the timetable and

22   calendar, or timetable for disclosure that we had already

23   agreed on.

24        But do you have a sense, Mr. Singer, how much longer the

25   government's case is going to take?

1          MR. SINGER:  We talked about that this weekend.  I'm

2     a little unclear how long the cross-examination of the case

3     agent is going to be, and I think that's probably going to

4     drive a lot of things.  But assuming that it -- around an

5     hour, I think.

6          MR. C. HENRY RITTGERS:  I actually thought I could do

7     it in an hour Friday, until he started bucking me on

8     questions.

9          THE COURT:  Okay.  Let's not go back to that.  Let's

10    assume that it's going to be a couple hours this morning.

11         MR. SINGER:  So I think probably Wednesday morning,

12    potentially Wednesday afternoon.

13         THE COURT:  So sometime Wednesday, you anticipate

14    resting; is that right?

15         MR.  SINGER:  That's our best projection.

16         THE COURT:  I'm not holding anybody to anything.  To

17    the extent you're comfortable disclosing -- and I'm not asking

18    for names of witnesses or anything else, but do you have a

19    sense -- nothing I'm holding you to -- of how long your case

20    is going to be?

21         MR. C. MATTHEW RITTGERS:  My guess, Your Honor, would

22    be one and a half to two days.  That's my guess, two days.

23         THE COURT:  So then it looks like it would go through

24    Friday, probably, at least.

25         MR. C. MATTHEW RITTGERS:  If you want charging

1    conference.

2         THE COURT:  I'm just trying to figure out when to do

3    the charging conference.  That's exactly what I'm trying to

4    do.

5         So I'm wondering if Thursday night might be the time, or

6    whether we want to give the jurors a longer weekend and take

7    Tuesday and do the charging conference, and then do closings

8    on Wednesday, or finish up your case Wednesday morning and do

9    the charging conference.

10        It's not clear to me your case is going to be done by the

11   end of day Friday, but it may be.

12        MR. C. MATTHEW RITTGERS:  I hope so.

13        THE COURT:  You hope so.  So then we could give the

14   jurors Tuesday off, do the charging conference on Tuesday and

15   do closings on Wednesday, or we could do Thursday night

16   charging conference.  I'm just trying to get a sense of what

17   people want to do.  I'm trying to be responsive, so...

18        MS. GLATFELTER:  Sure.  Your Honor, I think, at the

19   pretrial we had discussed unless -- you know, I think there's

20   substantial disagreement on the jury instructions, and it

21   is --

22        THE COURT:  I think there is too.

23        MS. GLATFELTER:  I would just say, in my experience,

24   easy charging conferences on the 922(g), for example, might

25   take one or two hours.  I think this charging conference could

1    take several.

2        I don't know if we are also trying to fit in the voir

3    dire of Caleb Burns and prepare for the defense case.  I don't

4    think that's reasonable for the government on the evening

5    after trial.

6        So I think what I might suggest is Thursday noon we

7    re-evaluate and decide whether we hold it on Friday, tell the

8    jurors to come back on Tuesday and hear the rest of the

9    defense case or do the charging conference.

10            THE COURT:  Yeah.  And that was the other thing I was

11    going to suggest is that there may be some interest on the

12    part of the jury, given that it's Independence Day weekend, to

13    have the Friday off rather than the Tuesday.

14        But let's keep in mind, I think it does make some sense,

15    I think Ms. Glatfelter is correct that I'm anticipating this

16    charging conference taking longer than some do, and so we

17    should try to find a day that's least disruptive to the

18    defense's presentation of its case.

19        So the Court is flexible whether we do it Friday or

20    Tuesday, but I think it does makes some sense to do it during

21    the day, rather than try to do it in the evening after trial,

22    just because I anticipate running longer, and our court

23    reporter may be a little worn out if this goes 'till 8:00 or

24    9:00 at night.

25            MR. C. MATTHEW RITTGERS:  Your Honor, on Thursday

1    afternoon, for example, if we only have one more witness,

2    maybe we could take the afternoon on Friday to do it.

3          THE COURT:  Sure.  Something like that.  All right.

4    So we'll try to be flexible around that and figure it out, but

5    just be mindful that we do still need to have a somewhat

6    involved charging conference.

7       Anything else we should discuss?  All right.  Let's get

8    out and get going.

9       (Off the record.)

10          THE COURT:  Mr. Rittgers, are you ready to proceed,

11   or do you need another minute there?

12          MR. C. HENRY RITTGERS:  I believe I am, Judge.

13       I'm ready, Judge.

14          THE COURT:  Bring in the jury.

15       (Jury in at 9:30 a.m.)

16          THE COURT:  Ladies and gentlemen of the jury, welcome

17   back.  I hope you had an enjoyable weekend, and I hope you

18   managed to avoid any media accounts of the case, or anything

19   of the sort.

20       You'll note that one of your members is absent.  It was a

21   dental emergency, and so that juror has been excused from

22   service to take care of a tooth issue that came up over the

23   weekend.

24       So with that, I think we left off with the

25   cross-examination of Special Agent Holbrook, and we intend to

1    continue with that now.

2        Special Agent Holbrook, I'll remind you, sir, that you

3    remain under oath.  Mr. Rittgers, you may proceed when you're

4    ready.

5            MR. C. HENRY RITTGERS:  Thank you, Your Honor.

6                    CONTINUED CROSS-EXAMINATION

7    BY MR. C. HENRY RITTGERS:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   Agent Holbrook, I'd like to go back to where we left off

11   Friday and go to the November 2nd phone call.  That was where

12   you instructed Mr. Ndukwe to make a clear offer.  Do you

13   recall?

14   A.   Yes, sir.

15   Q.   Mr. Ndukwe -- I want to know if you agree with this --

16   told P.G. during that call that he, meaning Mr. Ndukwe, can

17   get $20,000 to P.G., right?

18   A.   May I refer back to the transcripts of that call,

19   counselor?

20   Q.   I'll help you out.  Turn to USA Exhibit 14B.  Go to

21   page 3.  It's about a third of the way down.

22   A.   Yes.

23   Q.   Now, at that point, Mr. Ndukwe was trying to link the

24   $20,000 donation to a yes vote, correct?

25   A.   Yes.

*HOLBROOK - CONT'D CROSS*

1    Q.  And you told him to say that, right?

2    A.  Yes.

3    Q.  And he -- or you had no reason to believe that P.G.

4    thought he was being recorded, correct?

5    A.  Correct.

6    Q.  You, based on your investigation prior to that phone

7    call, knew that Mr. Ndukwe and P.G. were friends, correct?

8    A.  My knowledge of the relationship was from Mr. Ndukwe.

9    Q.  What I'm asking is, through your investigation, you knew

10   they were friends, correct?

11   A.  I can only describe it as it was described to me by

12   Mr. Ndukwe.

13   Q.  Well, can you tell us what Mr. Ndukwe said?

14   A.  Yes.  He described the relationship as social though

15   friendly.  He also described it as a relationship that was

16   necessary for business.

17   Q.  Did he tell you that they had been to each other's

18   houses?

19   A.  I believe he referenced Mr. Sittenfeld had been to his

20   house once.  I don't remember if he told me if he had been to

21   Mr. Sittenfeld's house.  Mr. Sittenfeld, I think, had been to

22   his place.

23   Q.  All right.  So when Mr. Ndukwe told P.G. that there had

24   to be a yes vote -- I'm referring back to this November 2nd

25   phone call.

HOLBROOK - CONT'D CROSS

```
1    A.   Yes.

2    Q.   P.G., in response to Mr. Ndukwe was, "Obviously, nothing

3    can be illegal.  There can be no quid pro quo," correct?

4    A.   Yes.

5    Q.   And he followed that up by saying, "And I know that

6    that's not what you're saying either," correct?

7    A.   He said that, yes.

8    Q.   And Mr. Ndukwe agreed, correct?

9    A.   He responded in the affirmative, yes.

10   Q.   Thank you.  Now, during that same phone call, when he

11   said that there could be no quid pro quo, he told -- P.G. told

12   Mr. Ndukwe that he could definitely tell the investors that he

13   was definitely pro-development, correct?

14   A.   Yes.

15   Q.   And would you agree that an officeholder or candidate can

16   talk to a prospective donor about their policy positions?  Do

17   you agree with that?

18   A.   Generally speaking, I do agree with that.

19   Q.   It happens every day in American politics.  You agree

20   with that?

21   A.   Yes.

22   Q.   And at that time, you had no reason to believe that

23   Mr. Sittenfeld, P.G., knew that he was being recorded,

24   correct?

25   A.   No.
```

1    Q.  No, you had no reason to believe?

2    A.  I had no reason to believe that he understood he was

3    being recorded, yes.

4    Q.  Now, you would agree that your team decided to -- or

5    picked Nada as a place for the meeting, correct?

6    A.  Yes.

7    Q.  And that was scheduled for November 7th?

8    A.  Yes.

9    Q.  And the purpose of that meeting was to introduce Rob,

10   Mr. Ndukwe's investor, to P.G.?

11   A.  Yes.

12   Q.  And his role that he was playing, his persona, Rob's

13   persona, was that he was a big-time investor, and he was

14   interested in investing in 435 Elm Street, correct?

15   A.  Yes.  Correct.

16   Q.  Now, during that conversation over lunch at Nadas, Rob

17   told P.G. that he and his group of investors, they didn't live

18   in Ohio, correct?

19   A.  Yes.

20   Q.  And that they invested money all over the United States,

21   mainly the east coast?

22   A.  True.

23   Q.  And that they were considering supporting Ndukwe in his

24   redevelopment of 435 Elm?  Rob was saying that to P.G. during

25   this conversation at lunch, that he and his investors were

*HOLBROOK - CONT'D CROSS*

1    considering investing in Mr. Ndukwe's project of redeveloping

2    435 Elm?

3    A.   Yes.

4    Q.   But he also said that they were a little bit concerned

5    because they weren't familiar with the atmosphere here in

6    Cincinnati, politically or otherwise, correct?

7    A.   That's true, yes.

8    Q.   And they wanted to meet civic leaders like P.G. before

9    deciding to put $1.8 million in upfront costs in 435 Elm,

10   correct?

11   A.   Yes.

12   Q.   Now, during the same meeting at Nadas, when they -- when

13   Mr. Ndukwe was talking about his redevelopment plan of 435,

14   P.G. asked a bunch of questions regarding what was the plan,

15   correct?

16   A.   Yes.

17   Q.   Like demolishing the building?

18   A.   Yes.

19   Q.   Putting a hotel in it?

20   A.   Uh-huh.  Correct.

21   Q.   Have high-end apartments at the top of the building?

22   A.   Correct.  Yes.

23   Q.   Restaurant, retail office space, all that was discussed,

24   correct?

25   A.   That is correct, yes.

1    Q.   And after P.G. learned of all these details, and knowing

2    that Mr. Ndukwe was prepared to take a derelict building and

3    make it productive for the city, he said, "It's not a big

4    lift.  It's easy to support," correct?

5    A.   Yes.

6    Q.   He then went on to say, "If it's all that --" meaning

7    what Mr. Ndukwe said about what he was going to do with the

8    hotel and high-end restaurant and all that other stuff, P.G.

9    went on to say, "If it's all that, it's got my support,"

10   correct?

11   A.   Yes.

12   Q.   And shortly after that, he said that he could shepherd

13   the votes, correct?

14   A.   Yes.

15   Q.   Typical political stuff, would you say?

16   A.   No.

17   Q.   At this point in the conversation, there wasn't any

18   discussion of a donation of money; isn't that correct?

19   A.   Incorrect.

20   Q.   There was discussion?

21   A.   I believe so, yes.

22   Q.   After P.G. says he can shepherd the votes, P.G. tells Rob

23   that as far as 435 Elm Street is concerned, that he and his

24   colleagues appreciate that this isn't just a good development,

25   it's a strategic development; is that correct?

1    A.   Yes.

2    Q.   And you agree that 435 Elm Street is a strategic

3    location, costing the city taxpayers three or four hundred

4    thousand a year, correct?

5    A.   Yes.

6    Q.   I believe -- in fact, when P.G. mentions this to Rob that

7    it's a strategic development, that Rob agreed, is that right,

8    it's just south of the Convention Center?

9    A.   I believe so, yes.

10   Q.   P.G. also told Rob that he was investing in a good

11   partner, meaning Mr. Ndukwe, correct?

12   A.   Yes.

13   Q.   And he also, to reassure Rob that investing in Ndukwe, he

14   also told Rob -- P.G. told Rob that P.G.'s colleagues

15   respected Mr. Ndukwe?

16   A.   Yes.  That's true.

17   Q.   Now, later in the conversation, and I'm assuming this is

18   per your instructions or per the team get-together to decide

19   what they're going to say to P.G. during this meeting, the

20   subject changed a little bit because Rob brought up a concern,

21   right, a concern about the conflict between Mr. Ndukwe and

22   Mayor Cranley?

23   A.   Yes.

24   Q.   And when he brought that up, P.G. addressed his concerns

25   by telling him that Mayor Cranley likes development and would

1    not stand in the way, correct?

2    A.   Yeah.  I believe it was something along that lines, yes.

3    Q.   Now, the transcript ends before Rob and P.G. leave Nada,

4    correct?

5    A.   Yes.

6    Q.   And what's left out is approximately almost two minutes,

7    correct?

8    A.   I don't know how much time it would be left out by the

9    time that they walked across the street to the 580 Building.

10   Q.   Well, you would agree that the portion that the jury

11   doesn't have is where P.G. was ready to walk out the door

12   without asking or receiving a donation, correct?

13   A.   I don't know that.

14   Q.   Agent Holbrook, could you please turn to page 28 of

15   USC 15C?

16            MR. C. MATTHEW RITTGERS:  USA.

17   Q.   USA.

18   A.   Okay.

19   Q.   You would agree that it says that this transcript stops

20   at a 56:04?

21   A.   What exhibit number did you say?

22   Q.   I'm sorry.  Exhibit 15C.  It's page 28.

23   A.   Yes.

24   Q.   Now, Agent Holbrook, you agree, don't you, that the video

25   played to the jury last week still continues for another

*HOLBROOK - CONT'D CROSS*

1    minute and 54 seconds?  It goes from 56:04 to 57:58?

2    A.   I'm not following your question.

3    Q.   I apologize if I'm not clear enough.  I think you already

4    answered it, now that I'm thinking about it, that you don't

5    know how much was left off?  You don't know whether it was one

6    minute, three minutes, correct?

7    A.   That's true, I do not.

8         MR. C. HENRY RITTGERS:  Your Honor, at this time, I'm

9    asking permission to allow us to play what has already been

10   admitted, the rest of that tape from 56:04 to 57:58.

11        MS. GAFFNEY PAINTER:  No objection.

12        THE COURT:  You may do so.

13        MR. C. HENRY RITTGERS:  Thank you, Your Honor.

14        (Audio played.)

15   Q.   "Anything else I can help you with now," doesn't that

16   mean that he was ready to leave the meeting?

17   A.   I don't know.

18   Q.   But Rob wasn't going to let him leave, correct?  He

19   wanted to take him over to the 580 Building?

20   A.   Rob wasn't going to stop him from leaving.

21   Q.   I understand that.

22   A.   He invited him over to the 580 Building, that's correct.

23   Q.   Let me reword that, then.  He didn't want P.G. to leave,

24   correct, he wanted him to walk over to the 580 Building?

25   A.   Yes.  He wanted to continue to discuss the project.

1  Q.  Before we go to the 580 Building, I've got a couple

2  questions, maybe more, about the exhibits.  And I'm referring

3  now to USA 11C.

4      MR. C. HENRY RITTGERS:  Your Honor, this has already

5  been admitted into evidence.  May I put it on the Elmo so

6  everybody can see it?

7      MS. GAFFNEY PAINTER:  No objection, Your Honor.

8      THE COURT:  You may do so.

9      MR. C. HENRY RITTGERS:  Thank you, Your Honor.  I

10  apologize.

11  Q.  Now, looking at USA 11C, which is what we're all looking

12  at, you intentionally selected these individuals and numbers,

13  correct?

14  A.  I don't understand the question.

15  Q.  You prepared this exhibit, correct?

16  A.  I did not prepare this exhibit.

17  Q.  Well, who did?

18  A.  I'm going to assume the prosecution team did.

19  Q.  So this is a summary exhibit, correct, that would have

20  been prepared in conjunction with you for your testimony,

21  correct?

22  A.  This is an exhibit that reflects telephone numbers of

23  individuals related to this investigation that I obtained

24  through the course of the investigation.

25  Q.  Well, would you agree that this exhibit does not list

*HOLBROOK - CONT'D CROSS*

1    every person P.G. called, sent messages to, or spoke with

2    during the 18-month undercover operation?

3    A.   I would assume that's the case.

4    Q.   Okay.  I just wanted to make that clear.

5    A.   Okay.

6    Q.   Now I'm going to refer to USA 11A.

7         Also, let's talk about USA 11B.  You have both of them in

8    front of you, correct?

9    A.   I do.

10             MR. C. HENRY RITTGERS:  May I publish this?

11             THE COURT:  These are previously admitted?

12             MR. C. HENRY RITTGERS:  It has been previously

13    admitted.

14             THE COURT:  You may.

15             MR. C. HENRY RITTGERS:  Thank you, Your Honor.

16    Q.   Now, if I recall correctly, you remember telling us back

17    when you were testifying that the only calls that were omitted

18    were hang-up calls, dropped calls, redundant messages.  Do you

19    recall saying that when you were testifying?

20    A.   No.  I testified that those were examples of calls that

21    were not admitted.

22    Q.   That they were examples of calls?

23    A.   Yes.

24    Q.   That they were -- that they weren't put on this list?

25    A.   That's true, yes.

1    Q.   So this list should be all-inclusive as to all the calls

2    that were made in -- that relate to this investigation,

3    correct?

4    A.   No.  This isn't going to be all-inclusive of the

5    communication.

6    Q.   It should include, should it not, recorded calls between

7    Mr. Ndukwe and P.G.?

8    A.   This is a summary exhibit I didn't create, so I don't

9    determine what goes on this exhibit.

10   Q.   Well, looking at that exhibit, would you agree that there

11   are at least three phone calls that occurred between P.G. and

12   Mr. Ndukwe back in November 16 and November 27 that were

13   recorded?

14   A.   That were recorded?

15   Q.   Yes.

16   A.   If you could show me the line sheet.

17        MR. C. HENRY RITTGERS:  Your Honor, if I may, if I

18   could approach for one second just to hand him...

19        THE COURT:  Yes, you may.

20        MR. C. HENRY RITTGERS:  Thank you.  For the record,

21   I'm also going to be showing Agent Holbrook three transcripts

22   of recorded calls between P.G. and Mr. Ndukwe.

23        THE COURT:  Do you have copies for opposing counsel?

24        MR. C. HENRY RITTGERS:  I think.

25        MR. C. MATTHEW RITTGERS:  Are you going to refer to

1    the exhibit?

2            THE COURT:  Oh, it's in your exhibit binder?

3            MR. C. MATTHEW RITTGERS:  I believe so.

4            MR. C. HENRY RITTGERS:  I apologize.  I don't

5    remember the exhibit numbers.  I'm just using these to refresh

6    his memory.

7            THE COURT:  That's fine.  If you can just show them

8    to opposing counsel before you bring them up to the witness,

9    I'd appreciate it.

10           MR. C. HENRY RITTGERS:  I will.

11           THE COURT:  Thank you.

12           MR. C. HENRY RITTGERS:  May I approach, Your Honor?

13           THE COURT:  You may.

14   Q.  Agent Holbrook, I'm not going to ask about the contents,

15   I just want to know if you remember those recorded calls?

16   A.  Yes.

17   Q.  So those are recorded calls between Mr. Ndukwe and P.G.,

18   correct?

19   A.  Yes.

20   Q.  And they're not listed in your summary or in the

21   government's summary of phone calls or contacts; is that

22   correct?

23   A.  Yes.  That's correct.

24   Q.  Thank you.  Let's talk, if you don't mind, about USA

25   Exhibit A.

1        MR. C. HENRY RITTGERS:  May I publish it, Your Honor?

2   It's already been admitted into evidence.

3        THE COURT:  I didn't get a number on it.

4        MR. C. HENRY RITTGERS:  USA 11A.

5        THE COURT:  Yes, you may.

6   Q.   Would you agree that the descriptions of the events are

7   not totally accurate?

8        MS. GAFFNEY PAINTER:  Your Honor, the version of 11A

9   that's being displayed here is not the version of 11A that was

10  admitted into evidence.

11       THE COURT:  That is a fair point, yes.  Do you have

12  the version that was admitted into evidence?

13       MR. C. HENRY RITTGERS:  I do not, Your Honor.  Is it

14  because I have an exhibit number, is that the reason?

15       THE COURT:  No.  It's -- remember some reformatting

16  was done on the removing of shading, and things of that

17  nature?

18       MR. C. HENRY RITTGERS:  Oh.  No, I apologize, but I

19  do not have it.

20       THE COURT:  You should have it in the exhibit book

21  the government gave you.  You replaced their 11A, didn't you?

22       MR. C. MATTHEW RITTGERS:  I believe, Your Honor, we

23  did receive one copy, but it was a last minute change, and it

24  might be -- there's a binder --

25       THE COURT:  Mr. Rittgers, you can use this.

HOLBROOK - CONT'D CROSS

1            MR. C. HENRY RITTGERS:  Thank you, Your Honor.

2    Q.   So referring to USA Exhibit 11A, do you agree that the

3    events that are described are not totally accurate?

4    A.   You'll have to be more specific.

5    Q.   I will.  For example, on November 7th of 2018, which is

6    what we've been talking about at Nadas, and we're soon going

7    to be talking about what happened at 580, you have there,

8    "Sittenfeld meets with UC Rob in condo.  Sittenfeld texts UC

9    Rob," right?

10   A.   Yes.

11   Q.   But it doesn't say that UC Rob offered Sittenfeld $10,000

12   cash, does it?

13   A.   No.

14   Q.   I'm sorry?

15   A.   No.

16   Q.   So would it be fair to say that this chronology of the

17   events on USA Exhibit 11A is not totally accurate with

18   everything that transpired?

19   A.   No.  I wouldn't agree to that.  That's -- this exhibit is

20   not all-encompassing of every meeting and every contact.

21   Q.   All right.  Let's go to the meeting at the 580 Building.

22   I'm changing -- I'm going to a new subject.

23        We're going to return to the meeting of November 7th,

24   2018, after the lunch at Nadas, okay?

25   A.   Yes.

1  Q.  And that's where Rob wanted to take P.G. over to the

2  580 Building?

3  A.  Yes.

4  Q.  That was truly part of the plan, wasn't it, to take P.G.

5  over there?

6  A.  Yes.

7  Q.  And it's a controlled environment is the reason you

8  wanted to take him over there, correct?

9  A.  Correct.

10  Q.  And by the way, the rent on the 580 penthouse was about

11  $5,000 a month; is that correct?

12  A.  I don't remember the exact amount.  I believe it was less

13  than that.  I can look it up and get it back to you, the exact

14  amount, but I'm not sure, off the top of my head.

15  Q.  But we're close?

16  A.  I remember it's somewhere around the neighborhood of

17  $4,000, but I can't be more specific than that.

18  Q.  Okay.  Now, when they get over to the 580 Building, you

19  do agree that Rob offered P.G. $10,000 cash, correct?

20  A.  He offered Mr. Sittenfeld $20,000.

21        MR. C. HENRY RITTGERS:  Your Honor --

22  Q.  Well, if you could, please turn to USA 15C, turn to

23  page 30, please, and please go to the bottom of the page.

24  A.  Yes.

25  Q.  So my statement to you, or my question, was that Rob had

1    offered $10,000 cash, correct?  He told P.G. he brought

2    $10,000 cash to give to him?

3    A.   That's true, yes.

4    Q.   And, in fact, he offered that a couple times during this

5    meeting at 580, correct, $10,000 cash?

6    A.   Yes.

7    Q.   And he suggested to P.G. that, you know, the easiest

8    thing for us, meaning the undercovers, was to do cash, and for

9    P.G. to figure out how he would -- I think the words were

10   "interject it or put it wherever you want to."

11        And what I'm referring to is 15C, USA 15C, page 32.

12   A.   Ask your question again, counselor.

13   Q.   What I'm quoting -- I'm asking if you agree.  I'm quoting

14   Rob's statement to P.G., where he, again, says, "The easiest

15   thing for us, you know, to do cash and, you know, you can

16   figure it out how you interject it or put it wherever you want

17   to," right?

18   A.   Yes.

19   Q.   Meaning P.G. could stick the money in his pocket,

20   correct?

21   A.   Yes, if he wanted to.

22   Q.   And you would agree that cash is hard to trace, correct?

23   A.   Yes.

24   Q.   P.G. didn't take cash, did he?

25   A.   No.

*HOLBROOK - CONT'D CROSS*

1   Q.   And he never, ever took cash at any time during your

2   undercover agents -- from your agents, correct?

3   A.   That's correct.

4   Q.   And, in fact, your agents never again offered him cash

5   during this entire operation, correct?

6   A.   Yes.

7   Q.   And that's because they knew he wasn't going to take it?

8   A.   That's because the --

9   Q.   I just want to know -- go ahead.  I won't interrupt.

10  A.   Pardon?

11  Q.   No.  Go ahead.  I apologize.  I interrupted you.

12  A.   The UCEs, the undercover, they stay within -- they were

13  yakked.  It was decided early on that the bribes would be in

14  the form of checks to the PAC.  That's what they went with.

15  Q.   You mean early on before you offered P.G. cash, that was

16  when you decided that you were going to make donations to the

17  PAC or after P.G. did not take the cash?

18  A.   After.

19  Q.   Yeah.  Well, and also the reason was you knew that he

20  would never take cash, that's why it was never offered again,

21  correct?  You knew he wouldn't do it because he didn't do it

22  there.  He didn't do it in the privacy of the 580 penthouse,

23  correct?

24  A.   He was taking it in the PAC checks.

25  Q.   I'm sorry?

1    A.   He was taking the money in checks to the PAC.

2    Q.   We're talking cash, right?  We're just talking about

3    cash.  And the reason you never offered cash again, meaning

4    you, your agents, according to plan was because you knew he

5    was never going to take cash, correct?

6    A.   No, we didn't.

7    Q.   He wasn't going to accept it?

8    A.   No.  That's not true.

9    Q.   So why didn't you offer him cash again?  This was an

10   18-month investigation.  Why didn't you offer him cash again?

11   A.   Because in communication between Sittenfeld and Rob and

12   telephone calls, Mr. Sittenfeld made it clear to Rob that he

13   wanted to take the money in PAC checks because there would be

14   no headaches for Rob and no headaches for him.

15   Q.   Well, isn't it true that P.G. wanted PAC checks because

16   it was legal?

17   A.   No.

18   Q.   No?

19   A.   No.

20   Q.   You agree that the checks that we talked about last week,

21   there were eight of them, but the first four checks that,

22   eventually, Rob gave to him some six weeks later, you agree

23   that they were properly deposited in his PAC account, right?

24   A.   No.  They were deposited to evade and hide the source of

25   the funds.

*HOLBROOK - CONT'D CROSS*

1       Rob made it clear to Mr. Sittenfeld that the funds of the

2   checks were coming from the same 20 -- to the tune of 10 to

3   20,000 dollars that he stated in the meeting at the condo.

4       Also, in subsequent telephone calls, on November 26,

5   2018, he referred to the money -- the money orders were going

6   to be sent to his associate.  His name was Omar.

7       And then again, on November 28, 2018, Rob explained that

8   the money orders were funneled through Omar's account, and he

9   put them into LLC checks.

10      So it was clear that the money that funded the LLC checks

11  came from Rob but were in the name of other individuals.

12      And, in addition, in November 7, 2018, Mr. Sittenfeld was

13  making suggestions to put the money in other people's names.

14  Q.  We're going to come back to that, Agent Holbrook.

15      During this meeting at the 580 penthouse, there was some

16  discussion, when P.G. didn't take the cash, about donations

17  being made as money orders or cashier's checks, correct?

18  A.  That's correct.

19  Q.  And I believe it was a week later, maybe two weeks later,

20  after P.G. conferred with his treasurer and the lawyers who

21  were in control of or supervised his PAC, P.G. called Rob and

22  told Rob that he couldn't take money orders or cashier's

23  checks because they were same as cash, correct?

24  A.  That's correct.

25  Q.  Okay.  And then he told Rob that in order for a

```
1    legitimate donation to be made to the PAC, it has to be from

2    an LLC or a real human being, correct?

3    A.   I don't remember him saying legitimate.

4    Q.   I didn't say he said it was legitimate.  I said he was

5    trying to tell Rob how to make a correct donation to his PAC?

6    A.   No.

7    Q.   No?

8    A.   He was telling Rob how to make it look like it was

9    correct.

10   Q.   Let's turn to USA 18D.  Turn to page 2.  It's about

11   halfway down.

12   A.   Yes.

13   Q.   This is P.G. saying that it either needs to be a check

14   from a human being or a check from an LLC, correct?  Yes or

15   no?

16   A.   That's correct.  I'm just reading, counselor.

17   Q.   Well, let me ask you this:  Since P.G. was demanding that

18   the proper way to donate to his PAC was either through an LLC

19   or a human being -- strike that.

20        You guys came up with a different plan when P.G. was

21   demanding that the LLC checks be from a human being, correct?

22   He was asking you to donate in a proper legal form, and you

23   guys came up with a different plan?

24   A.   He was not asking to donate in the proper legal form.

25   Q.   Okay.  Well, let me ask you this:  On November 28th --
```

1    well, let's go to USA 20D, page 4, top of the page.

2    A.   Yes.

3    Q.   And this is on November 28th, right?

4    A.   It is, yes.

5    Q.   And that's when Rob gave P.G. two checks and assured him

6    that they were LLC checks, correct?

7    A.   Yes.

8    Q.   All right.  And would it be fair to say that you all were

9    trying to deceive P.G. by giving him corporate checks?  Those

10   were corporate checks, correct?

11   A.   No, that wasn't what we were trying to do.

12   Q.   Let me ask you this:  Did you know at the time that FEC

13   regs required that any donation to a PAC, at least his PAC,

14   had to be from an LLC?

15   A.   That was my understanding, yes.

16   Q.   And so instead of giving him a check written on an LLC,

17   you gave him a check written on a corporation, correct?

18   A.   Yes.

19   Q.   And you assured him -- not you, Rob assured him they were

20   from LLCs, correct?

21   A.   Yes.

22   Q.   And then, and then P.G. hands it to his treasurer or to

23   whomever, and they discovered that they were written on

24   corporations, correct?

25   A.   Yes.  Let me explain, if I may, counselor.

*HOLBROOK - CONT'D CROSS*

1      It -- when I received those checks from our undercover

2  unit, they were presented to me as LLC checks.  There was a

3  miscommunication somewhere in a group beyond my control.  So I

4  requested LLC checks.  I thought I had received LLC checks.  I

5  didn't know that they were corporation checks.

6  Q.  If you read at USA 20D, when Rob was assuring him that

7  these were LLCs, didn't P.G. point out that -- he questioned

8  whether they were really on LLCs because one of the checks

9  said Inc., meaning a corporation, correct?

10  A.  That's correct, yes.

11  Q.  And you, and Rob, and whoever else is on your team,

12  didn't pick that up that that was not an LLC check.  Is that

13  what you're telling us?

14  A.  There's other checks that we've used that don't say LLC,

15  that say Inc., that are actually LLCs.  The names are

16  irrelevant.

17  Q.  I want to make sure I heard that correctly.  And I

18  apologize.  I'm not trying to be --

19  A.  I'm sorry.

20  Q.  -- difficult.  Did you say that you have LLC checks that

21  actually have Inc., I-n-c, on them?

22  A.  That can happen.  They can have that name on the check

23  but still be officially registered as an LLC.  I'm just saying

24  as a matter of fact that can happen, that's my point.

25  Q.  Is it true that you all have those kind of checks that

1    are written off of -- supposedly, they're LLC checks that

2    designate that there is an Inc. in the name on the check?  Do

3    you all have that?

4    A.   I'm assuming that we do, yes.

5    Q.   You don't know for a fact.  On December 17th,

6    Agent Holbrook, Rob provided P.G. with four checks, correct?

7    A.   Yes.

8    Q.   And they were written on LLC accounts, correct?

9    A.   Yes.

10   Q.   The four checks represented donations to P.G.'s PAC,

11   correct, the Progress and Growth PAC?

12   A.   Yes.

13   Q.   You were aware that those checks were deposited in his

14   PAC account, correct?

15   A.   Yes.

16   Q.   You also agree that the checks that were deposited were

17   publicly listed on the FEC website, correct?

18   A.   Yes.

19   Q.   You would agree that not one penny of those monies were

20   used by P.G. to pay for clothing, mortgage payments, car

21   payments, or any other personal item.  Would you agree with

22   that?

23   A.   Not to my knowledge, he didn't use it for that.

24   Q.   He didn't use it for that.  Thank you.

25        Agent Holbrook, would you agree that P.G. wanted

*HOLBROOK - CONT'D CROSS*

1   donations -- he would have preferred donations to his mayoral

2   campaign fund, Sittenfeld For Cincinnati?  He actually said,

3   "I would prefer donations to that," correct?

4   A.   Yes.

5   Q.   Now, you would agree that your team preferred PAC

6   donations, it's more convenient, correct, is one reason?

7   A.   No.

8   Q.   Okay.  Let me ask you this:  Was the pretext for

9   preferring PAC donations was because there was a conflict

10  between Mayor Cranley and Mr. Ndukwe?

11  A.   Can you repeat that question, please?

12  Q.   Would you agree that the pretext that Rob gave P.G. for

13  preferring a PAC donation was because of the conflict between

14  Mayor Cranley and Mr. Ndukwe?

15  A.   I don't know if I fully understand your question.  Can

16  you ask again or reword it?  I'm confused on the question.

17  Q.   I'm trying to think how I can reword that to make it any

18  clearer.

19       I'm asking if Rob used the pretext for donating to P.G.'s

20  PAC was because of the conflict between Mr. Ndukwe and Mayor

21  Cranley?  We've talked about that, right, the conflict between

22  the two?

23  A.   Right.  It wasn't the pretext for them to donate to the

24  PAC.

25  Q.   Well, let me ask you this:  You would agree that Rob

1    said -- gave his reasoning that Rob, your team of investors,

2    did not want a bunch of his investor LLC checks to be tied

3    back to their support for Mr. Ndukwe, again, because of the

4    conflict between Mr. Ndukwe and Mayor Cranley.  Do you agree

5    with that?

6    A.   No, I can't.  It's --

7    Q.   Let's turn --

8    A.   I can explain to you if --

9    Q.   Let me -- let's turn to USA Exhibit 15C.  Turn to page 32

10   at the top.

11   A.   Okay.

12   Q.   This is Rob saying to P.G. that he doesn't necessarily

13   want to donate to P.G.'s mayoral campaign fund, "Because the

14   problem with the LLCs is still, like, at the end of the day,

15   like coming back with all those LLCs still kind of ties back

16   to us with the LLCs," correct?  He said that?

17   A.   That's true, yes.

18   Q.   And just so we have some context here, that was because

19   of Mr. Ndukwe's conflict with Mayor Cranley, where

20   Mayor Cranley, according to Mr. Ndukwe, was not happy with

21   Mr. Ndukwe supporting his opponent, Yvette Simpson, in the

22   last campaign for mayor, correct?  Yes or no?

23   A.   No.  I believe there's two issues being conflated here.

24   Rob said they didn't want to donate in LLCs because they

25   didn't want it to come back to them because of the illegal

*HOLBROOK - CONT'D CROSS*

```
 1    activity that Rob was engaging in.
 2         The issues with Cranley and Ndukwe --
 3    Q.  Just a minute.  Where in these transcripts does Rob say
 4    that, that he's concerned about the illegality?  Where does he
 5    say that?
 6    A.  I didn't say he said that.  I said that's why he did it.
 7    Q.  Well, I'm not asking -- I'm asking what he said to P.G.
 8    as the reason for donating to the PAC as opposed to P.G.'s
 9    campaign for mayor, that's what I'm asking.
10         And the stated reason, correct me if I'm wrong, we're
11    looking at 15C, page 32, he gave that reason, "Because the
12    problem with LLCs is still, like, at the end of the day, like
13    coming up with all those LLCs still kind of ties us back with
14    the LLCs," right?  That's what he said?
15    A.  Yes.  Yes.
16    Q.  And to put it in context, this was because the group of
17    investors who were backing up Mr. Ndukwe did not want to upset
18    the apple cart, so to speak, because of the conflict between
19    the mayor and Mr. Ndukwe.  They were afraid of going for a
20    veto, that Mayor Cranley would veto the project, correct?
21    That was the whole reason?
22    A.   The LLC donations weren't related to the issue between
23    Mr. Ndukwe and Cranley.  The issue was they didn't want
24    Mr. Cranley to stop the development agreement at 435 Elm.
25    They're two separate issues.
```

HOLBROOK - CONT'D CROSS

1  Q.  Because the checks would be tied back to them, and they

2  were supporting Ndukwe?

3  A.  No.  They're two separate issues.

4  Q.  Okay.  Let's go on.  You were aware, at the time, the

5  difference between a PAC fund, P.G.'s PAC fund, and P.G.'s

6  fund for mayor, correct?

7  A.  Yes.

8  Q.  You knew the PAC fund was regulated by the FEC, yes?

9  A.  Yes.

10  Q.  Were you aware that the PAC funds that go into -- the

11  funds that are collected for the PAC cannot be used to support

12  P.G.'s campaign for mayor, correct?

13  A.  That's my understanding.

14  Q.  Yeah.  And you would agree that the funds that go into a

15  PAC account can only be used for charities.  He could send a

16  check to a charity out of that fund, correct?

17  A.  My knowledge in that area of PAC is not -- I'm not an

18  expert in that area of the PACs, what the PACs can be used

19  for.

20  Q.  This is part of your investigation, isn't it?

21  A.  The PAC was part of the investigation as a place to put

22  the checks beyond what the checks were used for.  It was

23  irrelevant to me because Mr. Sittenfeld told us it would have

24  still benefitted him a hundred percent.

25  Q.  Well, you would accept the fact if I told you that PAC

*HOLBROOK – CONT'D CROSS*

1    funds can only be used to send a check, let's say to a

2    charity, or send checks to other candidates.  You would agree

3    with that?

4    A.  They can be used to send checks to other candidates, yes.

5    Q.  And you agree that, as opposed to that, the funds that

6    are in the campaign for mayor, those funds can be used for

7    yard signs, advertisements on like television or radio and all

8    that.  Everything to do with a campaign, he can use those

9    funds for, correct?

10    A.  That's correct.

11    Q.  Let's focus on 2019, the year 2019.

12    A.  Yes.

13    Q.  In January of 2019, January 28th to be exact, P.G.

14    invited Rob and Brian to attend a fundraiser; is that correct?

15    A.  I believe so.

16    Q.  Let me help you out.  If you could flip to USA 23A.  I

17    don't know if that's in the jurors' binders or not.

18    A.  Did you say 23A?

19    Q.  I did.  It's on page 1.

20        MR. C. HENRY RITTGERS:  Your Honor, I believe this is

21    already admitted into evidence.

22        THE WITNESS:  Okay.  I'm there.

23        THE COURT:  Was 23A admitted, Ms. Gaffney Painter?

24        MS. GAFFNEY PAINTER:  Yes, it was, Your Honor.

25        MR. C. HENRY RITTGERS:  May I publish 23A?

1          THE COURT:  Yes.

2     Q.   Referring to USA 23A, "Hope hunting was good.  This

3     Wednesday when you're in town, I'm having a cosy event right

4     across the street at Via Vite.  You and Brian want to join?

5     Obviously, don't worry about donating, as you've already been

6     very generous," correct?

7     A.   Yes.

8     Q.   So he's not asking for more money from Rob or Brian,

9     correct?

10    A.   No.

11    Q.   In fact, isn't it true that during the entire year of

12    2019, P.G. did not ask for another donation or money from Rob,

13    from Brian, or from Vinny?

14    A.   Yes.

15    Q.   Now, in June of 2019, the City of Cincinnati transferred

16    control of 435 Elm to the port.  I mean, we've heard this last

17    week?

18    A.   That's correct, yes.

19    Q.   And Mr. Denning came in to testify on behalf of the

20    government --

21    A.   Yes.

22    Q.   -- to that transfer.  And the reason for the transfer was

23    how much money that was costing the city, that building,

24    435 Elm, correct?

25    A.   That's correct.

*HOLBROOK - CONT'D CROSS*

1  Q.  Now, the transfer was, I think, according to Mr. Denning

2  who testified, was to get that building off the books, off the

3  city books?

4  A.  That's correct.

5  Q.  And the transfer was a unanimous vote, if I heard that

6  correctly, and I know it was a 9-0 vote, right?

7  A.  That's right.

8  Q.  And that vote was not a vote on Mr. Ndukwe's proposal,

9  correct?

10 A.  That's correct.

11 Q.  And the vote was not to override a Cranley veto, was it?

12 A.  That's correct.

13 Q.  It was simply a vote to transfer ownership of 435 Elm to

14 the Port Authority?

15 A.  That's correct.

16 Q.  Now, let's turn to September 2019, okay?  I believe it

17 was during September, towards the middle of September, news

18 broke that there were allegations against Mr. Ndukwe about

19 sexual assault, correct?

20 A.  Yes.

21 Q.  And the -- you all knew that P.G. was supposed to attend

22 a meeting on September 24th in Columbus, correct?

23 A.  Yes.

24 Q.  And at your direction, Rob arranged a meeting in Columbus

25 under the pretext that Rob and Brian and Vinny were all going

1    to be in Columbus at the same time, correct?

2    A.   They actually were in Columbus on a different

3    investigation, so they were already there.

4    Q.   Okay.  So they said, Well, we'll be there if you want to

5    meet, right?

6    A.   That's right.

7    Q.   And P.G. agreed to attend this meeting at Rob's hotel

8    room, right?

9    A.   Yes.

10   Q.   And he said he had to do it early, like 5:30 or

11   something, because he had a dinner that he had to attend at

12   the convention he was at, right?

13   A.   Yes.

14   Q.   Now, he brought to this meeting his chief of staff, Chris

15   Dalton; did he not?

16   A.   He did.

17   Q.   And Chris Dalton was there the entire time of this

18   meeting, correct?

19   A.   He was.

20   Q.   Now, last week when you were testifying, and the -- not

21   only the video but the transcript of that meeting, that video

22   nor the transcript started at the very beginning of that

23   meeting, did it?

24   A.   That's correct.

25   Q.   Two sessions were left out consisting of 15 minutes

1    before we have a transcript of that meeting, correct?

2    A.   I don't know the time.

3    Q.   But that sounds right, two sessions?

4    A.   Two sessions.

5    Q.   Approximately 15 minutes.  If I'm wrong, Ms. Gaffney

6    Painter can correct me.

7    A.   It's reasonable, yeah.

8    Q.   Thank you.  Now, what was not given to the jury when you

9    were testifying to that video and to that meeting was -- what

10   was left out is where P.G. was expressing his concern about

11   these sex allegations, sexual assault allegations against

12   Mr. Ndukwe, correct?

13   A.   Yes.  All the parties were expressing concerns.

14   Q.   Exactly.  That was my next question.  Rob and Brian also

15   had the same concerns, right?

16   A.   That's right.

17   Q.   And the concerns were that because these allegations came

18   forward which, subsequently, by the way, were not proven, they

19   were dropped.

20        But anyway, the concern was that if the city was going to

21   be involved in deciding whether or not they would give tax

22   incentives or anything like that to the redevelopment of 435,

23   it would not play well to the public that the city was dealing

24   with someone who was under a cloud; is that correct?

25   A.   Generally speaking, yes, that's correct.

```
1              MR. C. HENRY RITTGERS:  May I have one second, Your
2    Honor?
3              THE COURT:  You may.
4    Q.   I can't remember how long that meeting lasted, I don't
5    know if you do.  Approximately 45 minutes, maybe?  I don't
6    remember.
7    A.   I don't remember either, sir.
8    Q.   Okay.  Where I'm driving at here is at the end of that
9    meeting, and I think it was caught on video, in fact, I know
10   it was, wouldn't you agree that P.G. was ready to leave but
11   Vinny asked him to stop, and with no prompt from P.G., Vinny
12   offers him two campaign checks, correct?
13        Just at the end, P.G. gets up to shake hands with Vinny.
14   He's ready to head out to his dinner, and Vinny stops him,
15   and --
16   A.   That's not my recollection, no, sir.
17             MR. C. HENRY RITTGERS:  All right.  Your Honor,
18   permission to play USA Exhibit 30F, session six, beginning at
19   three minutes and ending at 3:39?
20             THE COURT:  Has that previously been admitted?
21             MR. C. HENRY RITTGERS:  I believe it has, Your Honor.
22             THE COURT:  You may play it.
23        (Video played.)
24   Q.   Agent Holbrook, it's clear from what we just saw that he
25   was ready to leave, correct?
```

HOLBROOK - CONT'D CROSS

1    A.   Correct.

2    Q.   And it was clear that P.G. was not there at the meeting

3    to ask for or receive campaign contributions, correct?

4    A.   Ask me again, please.

5    Q.   I said it's clear that P.G. was not at the meeting, that

6    meeting there in the hotel room, to ask for or receive

7    campaign contributions, correct?

8    A.   That's a hard question for me to answer.  I don't know

9    what he expected, but they had talked about Vinny

10   supporting -- continued to support P.G. in previous telephone

11   calls.

12   Q.   Well, we can agree, at least, that at no time during this

13   meeting did he ask for a campaign contribution, correct?

14   A.   Yes.

15   Q.   We do agree on that, yes?

16   A.   Correct.  Yes.  Sorry.

17   Q.   Now, Agent Holbrook, you can agree with me, I hope, that

18   over the next couple of months, P.G. and Vinny exchanged phone

19   calls?

20   A.   Yes.

21   Q.   One of those phone calls was on December 9th, correct,

22   December 9th of 2019?

23   A.   Yes.

24   Q.   That's where Vinny called P.G., correct?

25   A.   I'm sorry?

1    Q.   I'm sorry.  Am I not loud enough?  I apologize.

2    A.   I have a hard time hearing you.

3    Q.   I'm sorry.  I'm very sorry.  Let me start over because I

4    think I lost my place here.

5         On December 9, Vinny called P.G., correct?

6    A.   He did, yes.

7    Q.   Yeah.  And Vinny, at that time, tells P.G., quote, if

8    there's something that's needed that, you know, I can help out

9    with, you let me know about that, correct?

10   A.   Yes.

11   Q.   And what Vinny is suggesting is that if P.G. wants money

12   or wants a campaign contribution, just let him know?

13   A.   Among many other things but, yes, that would be one of

14   them.

15   Q.   But P.G. didn't request any money, correct?

16   A.   Correct.

17   Q.   He didn't ask for any campaign donations, correct?

18   A.   That's correct.

19   Q.   He didn't ask for a trip to Miami?

20   A.   That's correct.

21   Q.   He didn't ask for a visit to Vinny's yacht?

22   A.   That's correct.

23   Q.   Instead, he just answers, "No, I think we're all good,"

24   right?  That's how he ended the conversation?

25   A.   Yeah.  I can't remember the words he said.

1    Q.   It doesn't matter but, more or less, he said no, I don't

2    need anything, correct?  He said no, I don't need anything?

3    A.   I don't think he said that.

4         MR. C. HENRY RITTGERS:  Your Honor, may I check

5    something?  I want to make sure I have that.

6         THE COURT:  You may.

7         MR. C. HENRY RITTGERS:  Your Honor, I would like

8    permission to play USA 37B.

9         THE COURT:  I'm sorry, play 7B?

10        MR. C. HENRY RITTGERS:  37B, Your Honor.

11        THE COURT:  37B.  Has it been admitted?

12        MR. C. HENRY RITTGERS:  I believe it's been admitted,

13   Your Honor.

14        THE COURT:  Yes.  It has been admitted.  You may play

15   it.

16        MR. C. MATTHEW RITTGERS:  It's the transcript.

17        THE COURT:  Oh, I'm sorry.

18        MS. GAFFNEY PAINTER:  37A is the recording, 37B is

19   the transcript, and both have been admitted into evidence.

20        THE COURT:  Thank you.  37A, you may play.

21        MR. C. HENRY RITTGERS:  May I have a second, Your

22   Honor?

23        THE COURT:  You may.

24   Q.   Instead of showing the video, I'll ask Agent Holbrook if

25   he could turn to page 5 of USA 37B, and go to the middle of

1    the page, please?

2    A.   37B?

3    Q.   37B, yes.

4    A.   What page, sir?

5    Q.   Page 5, middle of the page.

6    A.   Okay.  Yep.  I'm there.

7    Q.   Okay.  And do you see Mr. Sittenfeld's response when

8    Vinny asks him if there's something that's needed, you know, I

9    can help out with you, let me know about that?

10   A.   Yes.

11   Q.   And P.G.'s response was, "Okay.  I think we're good"?

12   A.   He said, "Okay.  I think we're all good," yes.

13   Q.   Okay.  Two days later, P.G. calls Vinny, correct, on

14   December 11th?

15   A.   Yes.

16   Q.   And during that conversation, Vinny said to P.G., "I

17   really appreciate it.  Is there anything you need?  You all

18   set?"  Do you remember that?

19   A.   Yes.

20   Q.   And P.G.'s response was -- he didn't ask for any money,

21   correct?  He didn't ask for any campaign funds, correct?

22   A.   He did not.

23   Q.   He didn't ask for a trip to Miami?

24   A.   No.

25   Q.   By the way, I'm only bringing up these trips because your

1    agents, Rob and Brian, at least six times during this

2    undercover operation had asked P.G. to go on trips to Miami,

3    Vegas, Nashville, correct?

4    A.   That's correct.

5    Q.   So instead of asking for anything, P.G. responded, "Nope.

6    We're good.  We're good.  Just be in touch," correct?

7    A.   Yes.

8    Q.   Thank you.  Now let's talk about the $27,000 in cash that

9    you paid to Mr. Ndukwe during this operation.

10   A.   Yes.

11   Q.   And you agree that there is no documentation as to why he

12   was paid, correct?

13   A.   That's not correct, no.

14   Q.   There is documentation as to why he was paid cash?

15   A.   In the request, it says CHS services.

16   Q.   Well, can we agree that there isn't any documentation as

17   to what services those were for, the 27,000 cash?

18   A.   Yes.  True.

19   Q.   Now, when you were testifying last week, I believe you

20   indicated that Mr. Ndukwe was paid for his time, what he did,

21   correct?

22   A.   Correct.

23   Q.   Did that time include flying on a private jet with Rob

24   and Brian to Miami?

25   A.   Yes.

1   Q.   Did it include going to hang out on a private yacht down

2   in Miami?

3   A.   Yes.

4   Q.   Did it include going to a high-end strip club called

5   Tootsies?

6   A.   I'm not familiar with the name of it but, yes, there was

7   a strip club involved.

8   Q.   Did it involve eating at the fancy restaurants there in

9   Miami?

10  A.   Yes.

11  Q.   Did it include the drinking of expensive cocktails down

12  there in Miami?

13  A.   Yes.

14  Q.   Would you agree that flying a private jet to Miami and

15  back, and staying in a nice hotel, drinking and eating at nice

16  places, going to a strip club, hanging out on the yacht, would

17  cost the taxpayers over a hundred thousand bucks?

18  A.   I don't know what the number of that is.

19  Q.   Would you agree that during this operation, that P.G.

20  introduced Rob and Brian to different civic and business

21  leaders in Cincinnati?

22  A.   Yes.

23  Q.   Okay.  Like the president of Xavier University?

24  A.   There were introductions.  When they're out at

25  restaurants, people would show up.  I don't remember specific

1    individuals.  Xavier, possibly.

2    Q.  But nonetheless, CEOs of different companies, et cetera?

3    A.  That's right.

4    Q.  All right.  Throughout that 17 months, your team went to

5    great lengths in order to ingratiate themselves as P.G.'s

6    friends, correct?

7    A.  Correct.

8    Q.  When P.G. joined Rob or Brian for, let's say, a meal or

9    drink, he often paid; did he not?  He often paid for those

10   meals?

11   A.  P.G.?

12   Q.  P.G.

13   A.  I don't believe so.

14   Q.  Are you saying he never paid for a meal or drinks when he

15   was out with Rob and Brian?

16   A.  I'm not saying he never paid.

17   Q.  Do you agree that he paid more than one time?

18   A.  Possibly.

19   Q.  And we're talking about maybe seven times where they were

20   at a restaurant or bar, correct, throughout this 18 months?

21   A.  Correct.

22   Q.  Yeah.  And during those seven or eight times, P.G. either

23   paid or he offered to pay for the meal and drinks, correct?

24   A.  I guess that's fair to say that either pay or offered to

25   pay.

*HOLBROOK - CONT'D CROSS*

1    Q.  And we already talked about your team offering him free

2    vacations to Miami, to Las Vegas and Nashville, correct?

3    A.  Correct.

4    Q.  And P.G. didn't accept those offers?  He didn't go?

5    A.  He didn't decline them.  He is always kind of open-ended.

6    He was interested in going on the vacations, so to say that he

7    declined them, I wouldn't agree with that.

8    Q.  Maybe that was too strong of a word.  He was being

9    polite.  He just never did go, correct?

10    A.  I don't know what his intentions were.

11    Q.  He didn't go?  He didn't go on any of those vacations

12    that were offered, correct?

13    A.  He did not go on any of those vacations.

14    Q.  P.G. offered your agents his home if they wanted a place

15    to stay, correct?

16    A.  That's correct.

17    Q.  Yeah.  He also invited Rob and Brian to his home for

18    dinner with some other guests, including the U.S. District

19    Attorney who was, at the time, the chief federal law

20    enforcement officer for the Southern District of Ohio,

21    correct?

22    A.  The U.S. District Attorney?

23    Q.  Yeah.

24    A.  Yes.

25    Q.  Now, as part of your investigation, you obtained P.G.'s

*HOLBROOK - CONT'D CROSS*

1     campaign running contributions for Sittenfeld For Mayor,

2     correct?

3     A.   Yes.

4     Q.   And you also obtained the running contribution totals for

5     his PAC, Progress and Growth PAC, correct?

6     A.   Yes.

7     Q.   And between those two funds, the record shows that there

8     were over 1,800 individual donations, correct?

9     A.   I don't know what the number is.

10    Q.   Well, I'm representing to you that there were over 1,800.

11    Would you accept that?

12    A.   No.

13    Q.   No?  All right.

14    A.   I can confirm, but I can't accept a number that you give

15    me, counselor.

16    Q.   It wasn't in the hundreds, it was well over 1,500.  Can

17    you accept that?

18    A.   Again, it's been a long time since I've looked at these

19    records.  I'm not going to accept a number that I'm not

20    familiar with.

21    Q.   Well, would you agree that of all those donations -- and

22    I'm representing to you that there were 1,800, that of all

23    those donations, only eight of those donations were what the

24    government claims to be bribes, correct?

25    A.   Yes.

1    Q.   And the eight donations were the checks that Rob provided

2    P.G. or Vinny provided P.G., correct?

3    A.   Counselor, you've referenced the 1,800 number again.  I

4    don't know if that number is accurate or not.  I can't agree

5    to that number.

6    Q.   That's okay.  Agent Holbrook, you agree that context

7    matters; do you not?

8    A.   Yes.

9    Q.   And in this case, that context includes P.G. didn't take

10   any cash, correct?

11   A.   That's correct.

12   Q.   That context includes P.G. didn't take any free

13   vacations?

14   A.   That's correct.

15   Q.   And the context includes P.G. introducing your agents to

16   multiple civic and business leaders, correct?

17   A.   Introducing is --

18   Q.   Introducing your agents as investors, which is what they

19   pretended to be, to different civic and business leaders?

20   A.   While they were in restaurants?

21   Q.   Yeah.

22   A.   It wasn't purposefully introducing them --

23   Q.   Well, they ran into them, but he --

24           THE COURT:  Okay.

25           MR. C. HENRY RITTGERS:  I apologize, Judge.  I

*HOLBROOK - CONT'D CROSS*

1    apologize.

2    A.   Yes, that's correct.

3    Q.   The context includes P.G. inviting Rob and Brian to his

4    home, correct?

5    A.   Yes.

6    Q.   The context includes P.G. paying for some of his meals

7    and drinks, and when he didn't, he offered to pay, correct?

8    A.   Yes.

9    Q.   That context includes inviting his chief of staff to the

10   September 24th meeting up there in Columbus, correct?

11   A.   Yes.

12   Q.   By the way, there's no claim here that the chief of staff

13   is involved in any corruption, is there?

14   A.   There is not.

15   Q.   And context that includes P.G. twice declining Vinny's

16   offer for more help if he needed it, meaning money, during

17   those two phone calls we went through, right?

18   A.   I'm sorry.  Ask me that again.

19   Q.   The context that we're talking about, the context

20   includes twice declining Vinny's offer for help he might need,

21   meaning P.G., meaning money?  We just went through that.

22   A.   Yes.

23   Q.   Context includes not asking your agents for any donations

24   in 2019, correct?

25   A.   Correct.

*HOLBROOK - REDIRECT*

1    Q.   And that context also includes the multiple calls, the

2    multiple meetings with agents, your agents, in 2019, in which

3    P.G. did not request any donations or money, correct?

4    A.   That's correct.

5          MR. C. HENRY RITTGERS:  No further questions, Your

6    Honor.

7          THE COURT:  Thank you, Mr. Rittgers.

8    Ms. Gaffney Painter, any redirect?

9          MS. GAFFNEY PAINTER:  Yes, briefly, Your Honor.

10         THE COURT:  Very good.

11         MS. GAFFNEY PAINTER:  May I proceed?

12         THE COURT:  You may.

13                    REDIRECT EXAMINATION

14   BY MS. GAFFNEY PAINTER:

15   Q.   Special Agent Holbrook, at the beginning of cross on

16   Friday, you were asked questions about recording witness

17   interviews and proffers.  Do you recall those questions?

18   A.   I do.

19   Q.   At the time of this investigation, was it the policy of

20   the FBI to record witness interviews?

21   A.   No.

22   Q.   At the time of this investigation, was it the policy of

23   the FBI to record proffers?

24   A.   No.

25   Q.   Did you follow those policies in this case?

1  A.  Yes.

2  Q.  Is there a difference to the FBI between a witness and a

3  subject?

4  A.  Yes.

5  Q.  Can you explain that to us, briefly?

6  A.  Yes.  A subject is an individual that's alleged to be

7  engaged in some criminal activity that we are collecting

8  evidence about.

9      A witness is someone who has information that is related

10  to a criminal activity that we are collecting information

11  about.  They're not a subject, is not someone that is alleged

12  to have done any particular crime.

13  Q.  Special Agent Holbrook, on Friday, you were asked a lot

14  of questions about what Mr. Ndukwe told you during his

15  proffer.  Do you recall those questions?

16  A.  Yes.

17  Q.  You were asked about Mr. Ndukwe making political

18  contributions in other people's names.  Mr. Rittgers, I

19  believe, even asked you about a federal statute,

20  52 U.S.C. 30122.  Do you recall those questions?

21  A.  I remember that, yes.

22  Q.  So Special Agent Holbrook, what are straw donors?

23  A.  Straw donors are -- they're donations that are funded by

24  a person, but it is recorded in another individual's name.

25  Q.  All right.  With the Court's permission, I would like to

*HOLBROOK - REDIRECT*

1    direct your attention to what has already been admitted as

2    USA 15C at page 33.

3            MS. GAFFNEY PAINTER:  Now, Ms. Terry, will you please

4    blow up from near the top, where it says, "Sittenfeld: (As

5    speaking on cell phone)," until the line, "Sittenfeld:  Right

6    right, okay."

7    Q.  Special Agent Holbrook, it's also displayed on your

8    screen.  Could you please read this exchange that's been

9    highlighted here?

10   A.  I do not see it on my screen.  Wait a minute.  I think my

11   screen was turned off.

12           THE COURT:  There you go.

13   A.  Ask your question again, please.

14   Q.  Certainly.  Special Agent Holbrook, will you please read

15   for us this exchange beginning with, "Sittenfeld:  (As

16   speaking on cell phone)," to "Sittenfeld:  Right right, okay."

17       Do you see it blown up on your screen right there?

18   A.  Yes.  "Hey, question.  Can someone give -- I mean, can

19   someone give $1,100 in cash?  So what if someone raised from

20   10 people, uh, $1,100 each, and said this is who it's

21   attributed to?  Does that, does that start to, like, send up?

22       "Yeah, yeah, okay.  Do you want me to ask him?  Do you

23   guys -- so, well, actually, Jared, let me call you back.

24   Okay.  Okay.  Bye.  (Phone call ended).  Umm, if you had, you

25   know, like John Doe as a person that something could be

*HOLBROOK - REDIRECT*

1    attributed to, could they do a check?

2        "UC Rob:  Ultimately, it's gonna be the same $10,000 or

3    $20,000.

4        "Sittenfeld:  Right.

5        "UC Rob:  So I mean, I can get money orders in...

6        "Sittenfeld:  Right.

7        "UC Rob:  However many names.

8        "Sittenfeld:  Right.

9        "UC Rob:  But as far as like personal checks, that would

10   be a little...

11       "Sittenfeld:  Right right, okay."

12   Q.  Can you continue the rest of the line, please?

13   A.  "Okay.  And then what timeline do you want to do this

14   on?"

15       MS. GAFFNEY PAINTER:  Ms. Terry, staying with this

16   USA Exhibit 15C, could you please go up to page 34, and it

17   continues on to page 35.

18       Will you please blow up, we're at the bottom of line 34,

19   with the line begins with "UC Rob:  Yeah.  Well, yeah yeah,"

20   can you blow that up?

21       And could you on the next page blow up until the line,

22   "UC Rob:  Yeah, yeah."

23   Q.  All right.  Special Agent Holbrook, will you please read

24   the exchange that appears here?

25   A.  Yes.  "UC Rob:  Yeah.  Well, yeah yeah.  I mean, it's our

1    collective, you know. I mean, it's the same $10,000 that'll

2    just get converted in, in names for...

3    "Sittenfeld: This is Jared (Sittenfeld accepts telephone

4    call). Hey Jared, I just wonder a little bit, is there

5    anything like when, when it gets deposited into an account,

6    does it say like it was cash or no? Is -- do you think is a

7    cashier's check better? Yeah. I mean, I just -- I mean,

8    having, having never deposited that much cash into a campaign

9    before, I just didn't know if like the bank, if any like flag

10    goes up at the bank, or something like that.

11    "Really? So you think, but so -- so if I had -- so if I

12    had a friend who was like, hey, I wanna raise you $10,000, and

13    then he went and got, umm, ten $1,000 cashier's checks from

14    ten of his friends, that that's the better way to go? Okay.

15    Okay. I think that's doable. Okay. I'll be in touch. All

16    right. Thanks. Bye. (Telephone call ends). That seems to

17    be the way to go.

18    "UC Rob: Okay.

19    "Sittenfeld: As long as the individuals are real human

20    beings, obviously.

21    "UC Rob: Yeah yeah."

22    Q. Special Agent Holbrook, on cross-examination, you were

23    asked questions about the end of the lunch at Nada, and the

24    transition to the apartment at 580 Building. Do you recall

25    those questions?

*HOLBROOK - REDIRECT*

1    A.   Yes.

2         MS. GAFFNEY PAINTER:  Ms. Terry, staying with

3    USA Exhibit 15C, could you please publish page 24.

4         All right.  And if you could highlight for us the line

5    that starts "UC Rob:  We're backing these," and then continue

6    through "UC Rob:  That way."

7    Q.   Special Agent Holbrook, will you read this exchange for

8    us, please?

9    A.   "UC Rob:  We're backing these guys up.  Well, I mean,

10   yeah yeah.  I mean, after lunch we can walk across the street

11   and maybe you, you and I can talk for a second.

12        "Sittenfeld:  Yeah.  (Unintelligible).

13        "UC Rob:  That way he doesn't have to be in the middle of

14   it, but uh."

15   Q.   Thank you.  Special Agent Holbrook, returning now to the

16   questions that you received about Mr. Ndukwe's proffer.  Where

17   do public corruption cases fall on the list of the FBI's

18   priorities?

19   A.   In the FBI, across all 56 field divisions, public

20   corruption is referred to as a national threat priority, which

21   means it is top of the list.

22        In addition to that, in the Cincinnati field division,

23   public corruption is the number one criminal priority.

24   Q.   What is the focus of public corruption investigations by

25   the FBI?

*HOLBROOK - REDIRECT*

1    A.   Elected public officials and people in positions of

2    public trust.

3    Q.   Special Agent Holbrook, you were asked a series of

4    questions about what's previously been admitted as USA 11A.

5    Do you recall those questions?

6    A.   Yes.

7         MS. GAFFNEY PAINTER:   Ms. Terry, if we could, just

8    publish the first page of USA 11A.

9    Q.   Now, Special Agent Holbrook, directing your attention to

10   the right-hand column, does this column outline the exhibit

11   from which the entry on the chronology comes from?

12   A.   Yes.

13   Q.   And you have reviewed this for accuracy?

14   A.   I have.

15        MS. GAFFNEY PAINTER:  All right.  Thank you,

16   Ms. Terry.

17   Q.   Special Agent Holbrook, you were asked questions about

18   the apartment at the 580 Building.  Do you recall those

19   questions?

20   A.   Yes.

21   Q.   And was that apartment used for just this investigation

22   alone or for other investigations as well?

23   A.   It was not.  It was used for other investigations.

24   Q.   There was a reference on cross-examination -- there was a

25   series of cross-examination questions about a trip that

1    Mr. Ndukwe took to Miami.  Do you recall those questions?

2    A.   I do.

3    Q.   Was there an elected official on that trip with

4    Mr. Ndukwe?

5    A.   Yes, there was.

6    Q.   And did Mr. Ndukwe go on that trip at the direction of

7    the FBI?

8    A.   Yes, he did.

9    Q.   There were some questions to you about a conflict between

10   Mr. Ndukwe and Mr. Cranley, and you testified that they were

11   two separate issues.  I believe you wanted an opportunity to

12   explain that.  Do you wish to explain that further?

13   A.   Yes.  The issue is Mr. Ndukwe and Mr. Cranley were at

14   odds from back in, I believe, approximately 2013, because

15   Mr. Ndukwe supported Mr. Cranley's opponent in a campaign

16   election.

17        I can't remember the year.  It might have been later than

18   that.  That was the premise for wanting the development

19   agreement for 435 Elm to be, as Rob used the term, Cranley

20   proof.  They wanted six votes to be able to veto, or to get

21   past any veto the mayor would have.

22        The LLCs, when Rob referenced the LLCs not being in their

23   names, it was because they did not want the LLCs -- the money

24   going into his accounts to be traced back to them.  So they're

25   two separate issues.

*HOLBROOK - REDIRECT*

1    Q.   Special Agent Holbrook, you were asked about a line about

2    human beings that came from previously admitted USA 11D.  Do

3    you recall that question?

4    A.   I do.

5         MS. GAFFNEY PAINTER:  All right.  If we could, with

6    the Court's permission, publish what has already been admitted

7    as USA 11D on the second page.

8         THE COURT:  You may.

9         MS. GAFFNEY PAINTER:  Forgive me if I misspoke.  18D.

10   If you could, Ms. Terry, I'm looking at the center of the

11   second page of USA 11D.  Highlight the block --

12        THE COURT:  I think you mean 18D.

13        MS. GAFFNEY PAINTER:  I'm sorry, 18D.  Highlight the

14   middle there, "Sittenfeld so the so."

15   Q.   Special Agent Holbrook, will you read this highlighted

16   text here?

17   A.   "So the -- so where -- and again, I really wanted to be

18   thorough about this before getting back to you.  It needs to

19   be either a check from a human being or a check from an LLC.

20        "Now, that being said, umm, if -- uh, if it goes to this

21   Progress and Growth PAC instead of to Sittenfeld for

22   Cincinnati, uh, nothing about it in any way will be ever be

23   connected to me, and no one will umm, you know, no one is

24   going to be poking around for it to find your names on it.

25        "And then, because of the higher limit, if there were

*HOLBROOK – REDIRECT*

1      either four LLCs, or two LLCs and two individuals, or

2      something like that, it could just be four checks for $5,000

3      total."

4              MS. GAFFNEY PAINTER:  Thank you, Ms. Terry.

5      Q.   Special Agent Holbrook, you were asked a series of

6      questions about the PAC.  Do you recall those questions?

7      A.   Yes.

8      Q.   Who first raised the idea of donating to the PAC?

9      A.   Mr. Sittenfeld did.

10     Q.   Special Agent Holbrook, you were asked about a series of

11     contacts in December of 2019 between Sittenfeld and Vinny.  Do

12     you recall those questions?

13     A.   I do.

14     Q.   In December of 2019, had Sittenfeld received $20,000 from

15     Rob and Brian just two months before?

16     A.   Yes.

17     Q.   Special Agent Holbrook, you were asked a series of

18     questions about the start of this investigation and various

19     phone calls between Mr. Ndukwe and Mr. Sittenfeld.  Do you

20     recall those questions?

21     A.   I do.

22     Q.   All right.  Let's turn first to the call on October 30,

23     2018.  It's been previously admitted as USA 13A and the

24     transcript is USA 13B.

25          Let's go to the bottom, please, of page 2 and the top of

1    page 3, if the Court permits it?

2            THE COURT:  You may do so.

3            MS. GAFFNEY PAINTER:  All right.  Ms. Terry, if you

4    could highlight the bottom of page 2 of 13B, that block of

5    texts.  And if you could highlight it through the top of the

6    line that appears there on page 3.

7    Q.  Special Agent Holbrook, will you please read what appears

8    here?

9    A.  Yes.  "Sittenfeld:  So but what that means is I don't

10   really get, like if -- if you say look, I don't want to

11   support you in the name of Chinedum Ndukwe, but some guy I've

12   never met from Columbus is going to use a coup, you know, you

13   know, your network are going to round up a bunch of LLC

14   checks, like, that's great.  I actually don't care.

15           "But I mean, the one thing I will say is like, you know,

16   I mean, you don't want me to be like hey, Chin, like love you

17   but can't, you know, like, you know, I mean, like, you know,

18   like I, I, I want people to support me, that's like..."

19   Q.  At the time that you reviewed this phone call, what was

20   the significance to you of, "You don't want me to be like hey,

21   Chin, like love you but can't"?

22   A.  I took that to mean that Mr. Sittenfeld was trying to

23   raise funds from Mr. Ndukwe, and I took that statement to mean

24   if you don't give me the funds, you don't want me to be like,

25   hey, love ya, but I can't help you out.

*HOLBROOK - REDIRECT*

1    And then shortly after these statements, he goes on to

2    state like how his other developers' competition, how much

3    they have donated to the campaign.

4    Q.  All right.  Staying with USA 13B, if we could go, please,

5    to page 4.

6         MS. GAFFNEY PAINTER:  Now, if you could, please,

7    Ms. Terry, about halfway down the page, we see a block of

8    texts, "Sittenfeld:  All right, 11:45 a.m." about halfway down

9    the page.  Would you highlight that text.

10   Q.  Special Agent Holbrook, will you read what appears there

11   please?

12   A.  Yes.  "All right.  11:45 a.m. next Wednesday, the 7th.

13   If that doesn't work, I mean, we could find -- I could do

14   coffee in the afternoon or whatever else.  Umm, and then

15   you're gonna deliver the goods before next Tuesday."

16   Q.  At the time you reviewed this call, what was the

17   significance to you of "and then you're gonna deliver the

18   goods before next Tuesday"?

19   A.  He wanted Mr. Ndukwe to provide multiple LLC checks

20   before the issue 13 was voted on, which would have closed that

21   multiple LLC donation loophole.

22   Q.  All right.  Let's turn to the call that occurred three

23   days later on November 2, 2018.  It's been previously

24   admitted, the recording, as USA 14A and the transcript is

25   USA 14B.

1      MS. GAFFNEY PAINTER:  If the Court permits it, I'd

2  like to publish page 4 of USA 14B.

3      THE COURT:  You may do so.

4      MS. GAFFNEY PAINTER:  All right.  Ms. Terry, if you

5  could, please, at the very top of the page highlight those

6  five blocks of text there.

7  Q.  Special Agent Holbrook, will you please read for us what

8  appears here?

9  A.  Yes.  "Sittenfeld:  I mean obv- -- as you know,

10 obviously, nothing can be illegal, like, illegally nothing can

11 be a quid, quid quo pro.  And I know that's not what you're

12 saying either.  But what I --

13      "Ndukwe:  Yeah.

14      "Sittenfeld:  -- can say is that I'm always super

15 pro-development and revitalization of especially our urban

16 core.

17      "Ndukwe:  Okay.  No, I hear ya.  I hear ya.  And so

18 they're -- he'll probably come out --

19      "Sittenfeld:  And we can, we, we, we can discuss that

20 more in person."

21 Q.  At the time that you reviewed this call, what was the

22 significance to you of "we can discuss that more in person"?

23 A.  The development project.

24 Q.  Did an in-person meeting happen after this call?

25 A.  Yes.

HOLBROOK - REDIRECT

1    Q.   And was that the meeting on November 27th, 2018?

2    A.   Yes.

3         MS. GAFFNEY PAINTER:  No further questions, Your

4    Honor.

5         THE COURT:  Thank you, Ms. Gaffney Painter.

6         MR. C. HENRY RITTGERS:  Judge, could we approach for

7    a second?

8         THE COURT:  Sure.

9         MR. C. HENRY RITTGERS:  Could we take like five

10   minutes, because there was a lot that went through, and I need

11   to reorganize those things.

12        THE COURT:  Okay.  Why don't we take a brief break.

13   Just from a planning standpoint, ladies and gentlemen of the

14   jury, it would be my hope to get through this witness before

15   we take our lunch break.

16       And so we'll take a brief break and assess where we're

17   at, and see what the schedule is going to be like for the rest

18   of the day.

19        MR. C. HENRY RITTGERS:  Thank you, Your Honor.

20        THE COURT:  I will remind you, ladies and gentlemen

21   of the jury, in case over the weekend you may have forgotten,

22   you can't discuss this case amongst yourselves.  You cannot

23   attempt to do any research using electronic tools to

24   communicate about this case.  If anyone should attempt to

25   communicate with you about this case, please bring it to the

1    Court's attention immediately.

2        Please do not start to form opinions about this case.

3    The time for that will be deliberations after all the evidence

4    and closing arguments.

5        So with that, let's take our morning break.

6        (Jury out at 11:19 a.m.)

7            THE COURT:  Mr. Rittgers, how long, do you have a

8    sense?

9            MR. C. HENRY RITTGERS:  Hopefully, ten minutes.

10            THE COURT:  Okay.  And let's say we get back in here

11    about 11:35, that will take us to about 11:45.

12        Do we want to break for lunch then, or do we want to

13    start with the next witness?  I'm looking at the government.

14            MS. GAFFNEY PAINTER:  May we have just a moment to

15    confer, Your Honor?

16            THE COURT:  Sure.

17            MS. GAFFNEY PAINTER:  The government would be all

18    right with having a lunch break at that time before calling

19    the next witness.

20            THE COURT:  Okay.  I think that probably makes some

21    sense.  It's going to be a little bit early for lunch, though.

22    Why don't we not be real prompt about bringing the jury back

23    in.  We'll bring them in about 11:40, and then if we go 10,

24    20 minutes, it will be lunch break time, and we can break for

25    lunch then.  So we'll have 10 or 15 minutes before we need to

1    be back in the courtroom.  All right.

2        Anything we need to discuss before we break?

3            MR. C. HENRY RITTGERS:  No, Your Honor.

4            MS. GAFFNEY PAINTER:  Not from the government, Your

5    Honor.

6            THE COURT:  All right.  Why don't we take a recess.

7        (Brief recess.)

8            THE COURT:  Mr. Rittgers, are you ready to proceed?

9            MR. C. HENRY RITTGERS:  I am, Your Honor.

10           THE COURT:  Let's bring in the jury, please.

11           MR. C. HENRY RITTGERS:  Thank you for your time.

12           THE COURT:  Absolutely.

13       (Jury in at 11:44 a.m.)

14           THE COURT:  You may proceed, Mr. Rittgers.

15           MR. C. HENRY RITTGERS:  Thank you, Your Honor.

16                        RECROSS-EXAMINATION

17   BY MR. C. HENRY RITTGERS:

18   Q.  Just a few follow-up questions, Agent Holbrook.

19   A.  Yes, sir.

20   Q.  I'm going to talk about straw donors.

21   A.  Yes, sir.

22   Q.  You can charge someone for accepting straw donations,

23   correct?

24   A.  I believe it's maybe a local -- not federal, but local,

25   state.

*HOLBROOK - RECROSS*

1  Q.  So a person can be charged, and you don't know whether

2  it's federal, but at least under state law, for accepting

3  straw donations, correct?  Yes?

4  A.  I'm sorry.  I didn't hear you.

5  Q.  What I just heard you say is that you're not sure under

6  federal law, but you're sure that under state law, that a

7  person can be charged for accepting straw donations?

8  A.  Right.  Federal it -- not federal, but local campaign

9  violations.

10  Q.  Agent Holbrook, a person receiving straw donations has to

11  be told they're straw donations, correct?

12  A.  They don't have to -- no, they don't have to be told.

13  Q.  They have to know that it's a straw donation in order to

14  be guilty of accepting straw donations, correct?

15  A.  In that situation, they would have to know that it was a

16  straw donation, yes.

17  Q.  And P.G. has not been charged with accepting any straw

18  donations, correct?

19  A.  He has not been charged with that, that is correct.

20  Q.  Now, the prosecutor highlighted one statement where Rob

21  said to P.G. -- this is going back to November 7th of 2018,

22  that related to the money coming from the same source,

23  correct?

24  A.  Yes.

25  Q.  And he was talking about cash, correct?  He was talking

*HOLBROOK - RECROSS*

1    about cash?

2    A.   No, he was talking about the funding of the checks coming

3    from the same source.

4    Q.   Could you look at page 33 of 15C.

5    A.   Counsel, I can't hear you.

6    Q.   I apologize.  I just asked my assistant if he could bring

7    up...

8    A.   Okay.

9    Q.   I apologize.  Now tell me if it's true, checks weren't

10   even discussed on November 7th, correct?  It was just money

11   orders, cash, and cashier's checks?

12   A.   I believe so, yes.

13   Q.   And money orders and cashier's checks and cash, it's all

14   the same.  It's all cash.  Money order's cash, right?

15   A.   It's the equivalent, yes.

16   Q.   Yeah.  And P.G. never accepted cash, did he?

17   A.   He initially agreed to, but he didn't accept, yes.

18   Q.   Oh.  When you say "he initially agreed to," you're

19   talking about he was calling his treasurer to see if it was

20   legal to accept cash from various donors, correct?

21   A.   Yes.

22   Q.   And after talking to his treasurer, he decided it would

23   probably be better, would it not, not to accept the cash?

24   A.   He agreed to accept money orders, which is the

25   equivalence of cash.

1    Q.   Well, at that time, on November 7th?

2    A.   That's right.

3    Q.   And he did not know at that time that a money order was

4    the same as cash?

5    A.   I don't know what his knowledge was at the time.

6    Q.   Well, you do know, though, a week or two later, that he

7    called Rob and said, hey, I can't accept -- I cannot accept

8    money orders because it's the same as cash, right?

9    A.   That's right.

10   Q.   And we can all agree here, can we not, that P.G. did not

11   accept a donation until 40 days after this November 7th

12   meeting, correct?  40 days from November 7th --

13   A.   Yes, approximately.  Approximately.

14   Q.   -- 2017?

15   A.   November 28th was the first time that he accepted

16   anything after November 7th, so it would be 21 days.

17   Q.   I apologize.  I should have said legitimate donations,

18   which you're talking about -- let me finish, please.

19        What you're talking about, on November 28th is when you

20   had Rob give him two corporate checks, correct?

21   A.   Yes.

22   Q.   And those checks, once they were found out by P.G.'s

23   campaign staff that they were corporate checks, he tore those

24   up, and those two checks, along with two more checks, were

25   given to him on December 17th, correct?

*HOLBROOK - RECROSS*

1    A.   That's correct, yes.

2    Q.   So that's the first day he actually had donations to his

3    PAC from Rob?

4    A.   Yes.

5    Q.   Thank you.  And what Rob told P.G. is that his business

6    partners were writing those checks, correct?

7    A.   Which meeting are you referring to?

8    Q.   That was 19B.  Would you turn, please, to USA 19B,

9    please, page 2?

10   A.   I see it on the Elmo.

11   Q.   And the highlighted version that's displayed --

12            MR. C. HENRY RITTGERS:  I'm sorry, what?

13            MR. C. MATTHEW RITTGERS:  Is it displayed?  Okay.

14            THE COURT:  Did you intend to display it for the jury

15   as well?

16            MR. C. HENRY RITTGERS:  Oh, has it been?

17            THE COURT:  What's on yours isn't necessarily on the

18   jurors.  That screen back there is what the jurors are seeing,

19   so right now they're seeing --

20            MR. C. HENRY RITTGERS:  I apologize.  I didn't know

21   that.

22            THE COURT:  That's fine.

23            MR. C. HENRY RITTGERS:  Because I'm an idiot when it

24   comes to technology.

25            COURTROOM DEPUTY:  So are we publishing it to the

*HOLBROOK - RECROSS*

1    jury?

2            MR. C. HENRY RITTGERS:  Can we publish this, Your

3    Honor?

4            THE COURT:  You may.

5            MR. C. HENRY RITTGERS:  Thank you, Your Honor.

6    BY MR. C. HENRY RITTGERS:

7    Q.   Now, the highlighted version, can you read that to us?

8    A.   Yes.  "Yeah, I can.  Umm, the only issue I've got to get,

9    umm, I've got to see if I can get the checks here umm

10   overnighted to me.  So I've got one of our other business

11   partners going to write them out of his, we just sent him the

12   (inaudible)."

13   Q.   Further down, can you read that highlight, please?

14   A.   Yes.  UC Rob says:  "I said, yeah, one of my -- one of

15   our other business partners is going to write them out of his

16   LLC versus one of mine or Brian's companies, just so -- "

17   Q.   So what we're talking about here is what was told to P.G.

18   was that different investors, your group of investors, were

19   writing the checks?

20   A.   No.  In this meeting, he told P.G. that he sent the money

21   orders to Omar, and Omar was going to write the LLCs out of

22   his account.  So the money orders were being funneled to Omar,

23   and then back to Mr. Sittenfeld from Omar's account.

24   Q.   I'm sorry.  There must be a disconnect for me.

25   A.   I can show you where he says that.

*HOLBROOK - RECROSS*

1  Q.  Well, I'm just reading these two highlighted versions,

2  and those tell me, if I'm reading them correctly, that P.G.

3  was told that they were written off of two different accounts

4  or more, correct, and that's what it says?

5  A.  That's taken out of context, which I know is important to

6  you.

7  Q.  It is.  It is.

8  A.  He told P.G. in the same meeting that he sent the money

9  orders to Omar, and Omar wrote the LLC checks out of his

10  account.

11         MR. C. HENRY RITTGERS:  May I have one second, Your

12  Honor?

13         THE COURT:  You may.

14  Q.  You indicated that, during this meeting, that you can

15  show me where these checks were written out of one account,

16  correct?

17  A.  I can show you the statement I was referencing, yes.

18  Would you like me to look for that?

19  Q.  I would, please.

20  A.  Okay.  Can you tell me what exhibit that is again?

21  Q.  I will.  It's 19B.

22  A.  Counselor, we were discussing various meetings, and I

23  was -- I believe you were referencing the November 28, 2018

24  meeting.  This Exhibit 19B is referencing a November 26, 2018

25  telephone call.

*HOLBROOK - RECROSS*

1      The statement I was referring to was in the

2  November 11th -- November 28th, 2018 meeting.

3  Q.  Well, would you agree that on 12/4, P.G. accepted the

4  fact that Rob was fundraising through a network of friends and

5  other investors?  Would you agree to that?

6  A.  I would not.

7      MR. C. HENRY RITTGERS:  May I have one second, Your

8  Honor?

9      THE COURT:  You may.

10  Q.  Refer to USA 21D, page 2.

11     MR. C. HENRY RITTGERS:  May I publish that?

12     THE COURT:  You may.

13     MR. C. HENRY RITTGERS:  Thank you, Your Honor.

14  Q.  Do you have it on your monitor, Agent Holbrook?

15  A.  Yes, I do.  What exhibit is this?

16  Q.  It's, I believe, 21D, page 2.

17  A.  Okay.

18  Q.  And you have it on your monitor.  Could you please read

19  that to the jury?

20  A.  The highlighted portion?

21  Q.  Yes.  What Mr. Sittenfeld said to Rob.

22  A.  Yes.  "Sittenfeld:  And if you had, if you talked to, you

23  know, your universe of buddies and investors, and you want to

24  like, uh, give us the name, because I think those are both

25  incorporated in Illinois as corporations.

*HOLBROOK - RECROSS*

1     "And unfortunately, they can only be limited liability

2    companies. So if you want to run, like, a couple names by us,

3    we can double-check to make sure they're LLCs, but sorry."

4    Q. So here he's telling you that they're checking to make

5    sure that they're legitimate liability companies, correct, and

6    that there's a name associated with it?

7    A. Yes.

8    Q. Thank you. We've been talking a little bit about context

9    is important, correct?

10    A. Correct.

11    Q. So in the very first phone call, that being October 26th

12    of '18, it was Mr. Ndukwe that first mentioned the law change

13    to P.G., correct?

14    A. Yes. I believe so.

15    Q. It was not P.G., it was -- and I assume you instructed

16    him to talk about that name change, correct?

17    A. I did not.

18    Q. Not name change, the law change. You did not? He just

19    brought it up?

20    A. I give -- when I task the undercovers or sources, it's --

21    they're, more or less, kind of bullet-point objectives. I

22    don't give them specific words. And in this instance, I

23    didn't tell him to reference the law change. He knew that

24    from a --

25    Q. He knew about the law change?

```
 1    A.   Well, he knew from Mr. Sittenfeld from back well before
 2    that.
 3    Q.   Was that before this phone call?
 4    A.   Yes, I believe so.
 5    Q.   Was it before September 21, when P.G. asked him to
 6    fundraise $10,000?
 7    A.   I believe so, yes.
 8    Q.   Do you have any idea when?
 9    A.   I believe it was approximately April of 2018.
10    Q.   Okay.  Now -- but, again, the whole point is Mr. Ndukwe
11    brought up the law change to P.G.?
12    A.   Yes.
13    Q.   Okay.  And then later, in later conversations, the fact
14    that the law's going to change is discussed, correct?
15    A.   Later conversations?
16    Q.   Later conversations.
17    A.   Between?
18    Q.   Between Mr. Ndukwe and P.G.
19    A.   Yes.
20    Q.   It was Mr. Ndukwe's choice to bring up the law change,
21    correct?
22    A.   Yes.
23    Q.   Yeah.  And it was the idea of donating through LLCs that
24    was either your choice or Mr. Ndukwe's, correct?
25    A.   No.  The donating through LLCs was coming from
```

*HOLBROOK - RECROSS*

1   Mr. Sittenfeld.

2   Q.   Before when?

3   A.   Well, where are you referencing before?

4   Q.   Let's pick up USA 12B, page 3.  It's on your monitor.

5          THE COURT:  Are you intending to publish it to the

6   jury?

7          MR. C. HENRY RITTGERS:  I apologize.  May I publish

8   it, Your Honor?

9          THE COURT:  Yes.

10  Q.   So you have that, correct?

11  A.   Yes, sir.

12  Q.   And this is -- this conversation occurred on that first

13  phone call of October 26, correct?

14  A.   Yes.

15  Q.   And if you could read what Mr. Ndukwe said to P.G., I

16  would greatly appreciate it.

17  A.   Yes, sir.  Ndukwe says, "And I know that they got a ton

18  of different LLCs, and I was going to talk to Jay about this,

19  but I want to see if there's a way to tee up getting you with

20  them before they change everything in November."

21  Q.   Again, this is Ndukwe's suggestion, not P.G.'s?

22  A.   Yes.

23  Q.   Is it true that P.G. has not been accused of any FEC

24  violation?

25  A.   Indicted, or?

```
1    Q.   Is it true he's not been accused of any FEC violation?
2    A.   By the government, yes.
3    Q.   That is true.  And it's true that it's acceptable to
4    accept PAC donations that are bundled?
5    A.   Yes.
6              MR. C. HENRY RITTGERS:  No further questions, Your
7    Honor.
8              THE COURT:  Thank you, Mr. Rittgers.
9         Ms. Gaffney Painter, anything come up that --
10             MS. GAFFNEY PAINTER:  No re-redirect, Your Honor.
11             THE COURT:  Very good.  All right.  Well, Special
12   Agent Holbrook, you may step down, sir.
13             THE WITNESS:  Thank you, Judge.
14        (Witness excused.)
15             THE COURT:  Well, ladies and gentlemen of the jury,
16   we talked briefly during your absence and decided that rather
17   than put a new witness on the stand, it would probably make
18   sense to break for lunch at this point.
19        So I would just remind you, as I did previously, that you
20   can't discuss this case amongst yourselves.  You can't do any
21   research regarding any of the facts or law associated with
22   this case.  You can't use any electronic device or any other
23   means to communicate with anyone else regarding this case.
24        If anyone should attempt to communicate with you, please
25   bring it to the Court's attention.  And please do not start to
```

 1    form opinions about the matters as to which you are hearing.

 2    That will be appropriate after we've heard the closing

 3    arguments.

 4        So thank you very much for your attention this morning,

 5    and have a good lunch.  We'll be back shortly after 1:00.

 6        (Jury out at 12:07 p.m.)

 7            THE COURT:  Is there anything counsel wish to discuss

 8    before we break for lunch?

 9            MS. GAFFNEY PAINTER:  Yes, sir.  We would like to do

10    so at sidebar, please.

11    SIDEBAR CONFERENCE

12            MS. GAFFNEY PAINTER:  Your Honor, I requested this

13    sidebar because I do not wish to publicly humiliate Charlie M.

14    Rittgers, but during Special Agent Holbrook's testimony, he

15    exclaimed "that's false" loud enough for me to hear it, and

16    surely for the jury to hear it.

17        I know you have a standing order about decorum in the

18    courtroom, and so I wanted to raise this issue, and didn't

19    want to do so in the middle of anyone's testimony.

20            MR. C. MATTHEW RITTGERS:  And I apologize, and that

21    is accurate, what Ms. Painter said, and I appreciate you doing

22    a sidebar.  And I was referring to my dad, but I shouldn't

23    have said it, and I agree that that was wrong.

24            THE COURT:  I didn't hear it so, but I appreciate,

25    Mr. Rittgers, what you said.  And I guess I would just remind

1    counsel that it's inappropriate to offer your own thoughts on

2    the veracity of what a witness says, other than through

3    questions that you might use to elicit that falsity.

4        Thank you for raising it, Ms. Gaffney Painter, and I

5    trust we won't have any more issues of that nature.  Very

6    good.

7            MS. GAFFNEY PAINTER:  Thank you.

8    SIDEBAR CONFERENCE CONCLUDED

9            THE COURT:  Anything further the government wishes to

10   discuss before we break for lunch?

11           MS. GAFFNEY PAINTER:  No, thank you, Your Honor.

12           MR. C. HENRY RITTGERS:  No, Your Honor.

13           THE COURT:  And I would just remind the government to

14   help me remember when we come back what we're going to talk

15   about before the next witness.

16           MS. GAFFNEY PAINTER:  Yes, Your Honor.

17           THE COURT:  Thank you.  All right.  We can break for

18   lunch.  Try to be back around shortly after 1:00.

19       (Lunch recess.)

20           THE COURT:  Is there anything we need to discuss

21   before we bring the jury back in?

22           MS. GLATFELTER:  Yes, Your Honor.  This morning we

23   had raised one issue about the enforcement of the Court's

24   order, so perhaps that's appropriate to do before the jury

25   gets here.

```
 1              THE COURT:  Sure.

 2              MS. GLATFELTER:  And then when the jury gets here, to

 3      instruct them, as we discussed.

 4              THE COURT:  Yes.  Very good.  Thank you,

 5      Ms. Glatfelter.

 6          I don't know if there are any sketch artists in the

 7      courtroom right now or not, but the next witness, at least one

 8      witness, ma'am, the next at least one witness is an undercover

 9      officer, and I would instruct you not to sketch anything

10      depicting his face, you know, for publication of any kind.

11      Some of the undercover officers remain involved in other

12      investigations and it would compromise their safety.

13          I would ask that no one sketch the next witness, and that

14      no one take any pictures.  I already have an order that people

15      not use their electronic devices in the courtroom, but it

16      takes on special significance with regard to this witness and

17      some of the other undercover witnesses, so I would remind

18      everyone that there are no pictures to be taken in the

19      courtroom.

20          Is that what we needed to address, Ms. Glatfelter?

21              MS. GLATFELTER:  Yes.  Thank you very much, Your

22      Honor.

23              THE COURT:  Mr. Rittgers?

24              MR. C. MATTHEW RITTGERS:  Your Honor, I gave you two

25      names this morning in your chambers.
```

 1              THE COURT:  You did.

 2              MR. C. MATTHEW RITTGERS:  I transposed one of the

 3    names.  It's actually Means Cameron.  The first name is Means.

 4              THE COURT:  Oh, okay.  And I promptly forgot to ask

 5    anyway, so we will take care of that.  Any objection to taking

 6    care of that right after the break here?

 7              MS. GLATFELTER:  That's fine with the government,

 8    Your Honor.

 9              THE COURT:  Okay.  Very good.  Means Cameron and

10    Christie Bryant Kuhns?

11              MR. C. MATTHEW RITTGERS:  That's correct.

12              THE COURT:  Very good.  Let's bring in the jury,

13    Scott.

14              COURTROOM DEPUTY:  They're still on their way down.

15              THE COURT:  Oh, okay.  You are calling all three

16    undercovers?

17              MS. GLATFELTER:  Yes.

18              THE COURT:  Who is the first one, Ms. Glatfelter?

19              MS. GLATFELTER:  Vinny.

20              THE COURT:  Thank you.

21              SKETCH ARTIST:  Your Honor, may I sketch the presence

22    but not the face?

23              THE COURT:  Yes.  As long as it's not the face, is it

24    all right?

25              MS. GLATFELTER:  The next UC has some unique

```
 1     characteristics, and so I think...

 2              THE COURT:  Okay.  I'm informed that this UC -- the

 3     first one to testify may have some unique physical

 4     characteristics beyond merely his face that may help identify

 5     him, so I'd ask that you not do so.

 6              SKETCH ARTIST:  I won't sketch at all.

 7              THE COURT:  Thanks very much, ma'am.

 8          (Jury in at 1:19 p.m.)

 9              THE COURT:  Does the government intend to call

10     another witness?

11              MS. GLATFELTER:  Yes, Your Honor.  I thought perhaps

12     you wanted to inquire about the --

13              THE COURT:  Oh, yes.  Thank you.  How quickly they

14     forget.

15         So two more names.  Remember when we started the trial

16     and we were doing that whole voir dire thing and I mentioned a

17     bunch of witnesses who may testify.

18         Although it was a relatively long list at the time,

19     apparently, there are a couple other names that have emerged,

20     and so I want to make sure whether any of the jurors might

21     know either of the two following people.  And if so, please

22     just raise your hand and we can inquire further.

23         Christie Bryant Kuhns, K-u-h-n-s, or Means Cameron?

24     Okay.  I think we're good on that front.

25              MS. GLATFELTER:  Thank you, Your Honor.  The
```

1     government calls Undercover Officer Vinny.

2         THE COURT:  Very good.  So ladies and gentlemen of

3     the jury, I'm going to give you a little explanation about

4     Vinny.  The lawyers told me ahead of time that the government

5     now intends to call this witness.

6         Vinny is one of the undercover agents that you've heard

7     about.  Vinny is not his true name.  It's the name he used as

8     part of this undercover operation.

9         I will say that government agents or law enforcement

10     officers may act in an undercover capacity, and when they do

11     that, they may, of course, use a fictitious name.

12         The actual name of this witness would not contribute

13     anything to your understanding of the case, and so the witness

14     is going to testify under the name that he used during this

15     investigation.

16         That's the name by which you've heard him referred to in

17     other testimony so, in some ways, it makes more sense to do

18     that anyway.

19         But it wouldn't serve any purpose to use his actual name

20     as part of a public trial in this case, and it might

21     compromise his ability to act in other investigations.

22         So I just wanted to let you know up front that the name

23     he's going to be using for him here is Vinny.  That will be

24     true with regard to the other undercover agents as well will

25     be using the names that they used in the investigation.  All

*VINNY - DIRECT*

1    right.  Very good.

2          MS. GLATFELTER:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MS. GLATFELTER:

5    Q.  Good afternoon.

6    A.  Good afternoon.

7    Q.  Sir, can you state and spell your undercover identity,

8    just the first name?

9    A.  Vinny, V-i-n-n-y.

10   Q.  Thank you.  What is your current occupation?

11   A.  I'm a retired FBI agent.

12   Q.  How many years were you an FBI agent?

13   A.  Just under 25.

14   Q.  Can you describe the work that you did for the FBI?

15   A.  I was primarily in full-time undercover agent working

16   various violations.

17   Q.  Did you ever serve in a supervisory or a management

18   position during your career at FBI?

19   A.  Yes.

20   Q.  Okay.  What kind?

21   A.  I was the supervisor of a full-time undercover squad, and

22   was the undercover coordinator for a very large FBI division,

23   which is basically the primary advisor to the special agent in

24   charge on undercover operations.

25   Q.  And, sir, what did you do before the FBI?

*VINNY - DIRECT*

1    A.   I was a full-time special police officer for five years

2    working patrol, and I was in the Army for six and a half

3    years, got out as a major.

4    Q.   Thank you.  You mentioned that you worked as an

5    undercover FBI agent.  How many years did you work in that

6    capacity?

7    A.   23-ish.

8    Q.   How long has the FBI been using undercover operations in

9    its investigations?

10   A.   Since Hoover was the director.

11   Q.   Is that fair to say a long time ago?

12   A.   Yes.  He didn't approve of them.

13   Q.   Do special agents of the FBI -- now taking a step back

14   for a minute.  When I'm talking generally here about to become

15   a special agent of the FBI, do you have to go through

16   training?

17   A.   Yes.

18   Q.   Okay.  And can you generally describe what that training

19   is to the jury?

20   A.   I went through four months of intensive training at

21   Quantico, at the FBI Academy.

22   Q.   And is there some sort of certification that special

23   agents must complete or obtain in order to become an

24   undercover, in addition to a special agent?

25   A.   Yes.

*VINNY - DIRECT*

1    Q.  What is that?

2    A.  Undercover agents are trained in an informal mentorship

3    program.  When we deem that they are probably going to be

4    successful, they attend a two-week undercover course given by

5    the FBI.

6    Q.  And when you make it through that course, do you obtain

7    the certification?

8    A.  Yes.  They give you a certification.

9    Q.  And have you taught at that undercover certification

10    course?

11    A.  Yes.  I taught -- I've been a role player, as well as a

12    counselor.

13    Q.  How many years did you do that, just an estimate?

14    A.  At least 20.

15    Q.  Can you generally explain to the jury what an undercover

16    investigation is?

17    A.  An undercover investigation is a sophisticated

18    investigative technique that the FBI uses to covertly gather

19    evidence.  We first need an approved and predicated

20    investigation.  We write up a proposal.  That proposal is

21    scrutinized at many levels.

22    Once it's approved, we use the undercover agents to meet

23    in various ways predicated subjects of that investigation.

24    Q.  You said it's an investigative technique, kind of like a

25    tool?

*VINNY - DIRECT*

1    A.   Yes.

2    Q.   What are some other tools that case agents can use in

3    their investigations?

4    A.   They use cooperating witnesses, they use wiretaps, they

5    use electronics, surveillance, they check databases, they

6    conduct surveillance; things of that nature.

7    Q.   Now, you said you've been involved in undercover

8    operations for approximately 23 years; is that right?

9    A.   At least, yes.

10   Q.   And how many operations would you estimate that you have

11   been involved in over the course of your career?

12   A.   I don't know an exact number.  I would say in the

13   hundreds.

14   Q.   Are undercover operations used in public corruption

15   investigations?

16   A.   Yes.

17   Q.   And have you worked public corruption undercover

18   investigations during your career?

19   A.   Yes.

20   Q.   How many, would you estimate?

21   A.   Maybe 15 or 20.

22   Q.   And based on your experience participating in those

23   investigations, what are they used for in public corruption

24   investigations?

25   A.   Could you say that again?

*VINNY - DIRECT*

1    Q.   What are undercover operations used for in public

2    corruption investigations?

3    A.   Undercover investigations in respect to public corruption

4    is to -- when the FBI receives information from various

5    avenues of potential public corruption, the undercover

6    technique is used to covertly gather evidence, and either

7    prove or disprove the activity concerning public trust is

8    either happening or not happening.

9    Q.   Okay.  And do you do that through a specific evidence

10   collection technique?

11   A.   Like wearing a video or something?

12   Q.   Yes.

13   A.   Yes.

14   Q.   Okay.  So you're recording your interaction with someone?

15   A.   Every interaction is recorded, if possible, yes.

16   Q.   Okay.  Now, when you work as an undercover FBI agent, do

17   you have a persona that you adopt or use during the

18   investigation?

19   A.   Yes.

20   Q.   Can you generally explain how that works for the jury?

21   A.   What we do is we try to train the undercover agent to

22   stick as closely to their own personality as possible so as to

23   be as realistic as possible when we're engaging subjects.

24        So we build a persona and basically stick to that persona

25   our entire career, and then we just adjust from there the base

1    persona, the little pieces that are appropriate to the

2    investigation at hand.

3    Q.   All right.  Now, let's say that you're working in an

4    undercover investigation and you have to travel.  Does that

5    happen in the course of undercover investigations, you travel

6    from, you know, your home location to another area of the

7    United States?

8    A.   Constantly, yes.

9    Q.   And when you travel to another state, are you in that

10   persona?

11   A.   Yes.

12   Q.   How long do you stay in that persona when you're

13   traveling for work?  So let's say you're going on a two-day

14   trip to California.  How long do you stay in your persona?

15   A.   I personally -- I can't speak for other undercovers, but

16   I personally wake up as that person that day.  I don't have

17   the capacity to switch back and forth and bounce in and out of

18   my undercover persona, so I literally wake up as that guy that

19   day.

20       And if I run into you, that's who you're gonna meet.  And

21   then I drop that persona before I walk back in the house.

22   Q.   Okay.  So when you complete the trip and come home,

23   that's when working under that persona ends for you?

24   A.   At the front door, yes.

25   Q.   Okay.  So in this scenario, when you travel and you go to

*VINNY - DIRECT*

1    the airport, you are using that persona to go through

2    security?

3    A.   That's correct.

4    Q.   Okay.  Now, when you're working an undercover operation,

5    you're working with a case agent; is that right?

6    A.   Yes.

7    Q.   And who decides if a particular meeting will occur?

8    A.   The case agent.

9    Q.   What about the location of that meeting?

10   A.   The location is a little more flexible, depending on the

11   scenario.  The case agent describes to the undercover agent

12   the violation that we're working, the elements of that

13   violation, the discussion of those violations with the

14   U.S. Attorney's Office.

15       They make sure that we understand the elements of the

16   violation, and then we address those elements one by one for

17   each violation.

18       So depending on the element of the violation that we

19   might be concentrating on, the location could be a restaurant,

20   a bar, an apartment.  It's basically negotiated with the case

21   agent for safety and operational ease as well.

22   Q.   When you say safety, or it's negotiated for safety

23   reasons too, what kind of considerations go into that?

24   A.   Depending on the subject, the operation could be

25   physically dangerous to the undercovers, so I have to be

*VINNY - DIRECT*

1    comfortable and convinced that I'm going to be safe,

2    relatively, where the case agent wants me to do the operation.

3        If I'm not, and I don't feel confident in my safety, we

4    typically have an adult conversation about it and come up with

5    something that satisfies the operation.

6    Q.   So when you are preparing for a particular meeting, do

7    you rehearse with a script?

8    A.   No.

9    Q.   What, if anything, do you do to prepare?

10   A.   I review the elements of the violation, and then I go in

11   and say hello.

12   Q.   When does the role of an undercover agent end in an

13   investigation?

14   A.   It ends when the case agent and the U.S. Attorney's

15   Office decide the case is over.

16   Q.   And that's a decision made by the case agent, not by the

17   undercover?

18   A.   Yes.  I have nothing to do with that.

19   Q.   All right.  Now let's talk about this particular case

20   involving Mr. Sittenfeld.  How did you get involved in this

21   investigation?

22   A.   I received a call from one of the other undercovers

23   asking me to participate.

24   Q.   And can you describe for the members of the jury the

25   specifics of the undercover persona you were using in this

*VINNY - DIRECT*

1    case?

2    A.   The specifics of the undercover persona?

3    Q.   A few moments ago you were explaining that you modify it

4    for a particular investigation.  So who were you portraying in

5    this scenario?

6    A.   I have a persona of a highballing kind of developer,

7    rich, a little bit rude, real estate developer investor

8    personality that I use.

9    Q.   Were other undercover agents already involved in this

10   investigation at the time that you joined?

11   A.   Yes.

12   Q.   Okay.  And who were those agents?

13   A.   Rob and Brian.

14   Q.   And can you describe what your role was relative to Rob

15   and Brian?

16   A.   Yes.  Typically, one of the techniques we use is the

17   primary undercover's responsible for the day-to-day contact

18   with subjects and other people, and they have a more intensive

19   day-to-day involvement in the case.

20        I was asked to come in and provide some depth, as well as

21   one of the roles that I play as an older undercover is I

22   provide someone for the other undercovers to blame for things

23   that are not popular with the subjects, or any decisions that

24   are made by the FBI or the U.S. Attorney's Office, to keep the

25   primary undercover in good standing with the subject.  I come

*VINNY - DIRECT*

1    in and play that role; basically, the boss.

2    Q.   Okay.  So if they have to say no, they can use Vinny as

3    an excuse for saying no?

4    A.   Correct.  They blame me.

5    Q.   Okay.  When did you first meet Mr. Sittenfeld, do you

6    recall?

7    A.   I believe it was opening day at a party.

8    Q.   Sometime in the spring of 2019 sound right?

9    A.   Yes.  September.

10   Q.   And can you briefly describe that encounter to the jury?

11   A.   Yes.  I was at the party to engage a different subject of

12   an investigation.  And I met him briefly while speaking with

13   some female undercover agents at a table inside the apartment.

14   Q.   Okay.  And would you describe that conversation as small

15   talk?

16   A.   Small talk, a few minutes.  I think he may have mentioned

17   his wife was pregnant, or had a baby, or something like that

18   around that time.

19   Q.   And did there come a time later in that year where you

20   met with Mr. Sittenfeld again?

21   A.   Yes.

22   Q.   Where did you meet with him?

23   A.   In a hotel room.

24   Q.   Who else was present for that meeting?

25   A.   Rob and Brian and his chief of staff.

*VINNY - DIRECT*

1    Q.   And when you say "his," are you referring to

2    Mr. Sittenfeld?

3    A.   Yes.  Sorry.

4    Q.   And what was your -- what was the role that you were

5    supposed to play that day in terms of was your persona the

6    same as it was for the opening day party?

7    A.   Yes.  I was to have a little bit more conversation with

8    him than just the brief few minutes that we had previously.

9    Q.   Okay.  And what about your relationship to Rob and Brian.

10   What was your relationship relative to them?

11   A.   I was their boss.

12   Q.   Did you have a script for that meeting?

13   A.   No.

14   Q.   Did you rehearse?

15   A.   Me?  No.

16   Q.   Did you end up participating in that meeting?

17   A.   Yes.

18   Q.   In addition to participating in the meeting, have you

19   reviewed the recording of your interactions with

20   Mr. Sittenfeld that day?

21   A.   Yes.  I watched the video.

22        MS. GLATFELTER:  Your Honor, at this time, permission

23   to publish Exhibit 30B, which has been admitted.  I'd like to

24   show him the first page of the transcript.

25        THE COURT:  You may do so.

1    Q.   Sir, do you see the date on the first page?

2    A.   Yes.

3    Q.   What is the date?

4    A.   9/24/2019.

5    Q.   Is that when the meeting occurred?

6    A.   To my recollection, yes.

7    Q.   And do you see your undercover name on the first page of

8    that transcript?

9    A.   Yes.

10   Q.   Okay.  What is it?

11   A.   Vinny.

12   Q.   You mentioned that you received training both on the job

13   and as part of the certification to become an undercover; is

14   that right?

15   A.   That's correct.

16   Q.   Do you learn how to evaluate a subject's body language?

17   A.   Interpreting body language is a pretty informal training

18   in the FBI.  We learn it from each other.  We study each

19   other's videos, as well as our own, for the purpose of

20   assessing our personal safety.

21   Q.   Okay.  So is an important part of the meeting to be

22   cognizant of the body language being displayed by someone?

23   A.   Yes.  If someone's displaying aggressive body language

24   toward me, I need to know that.

25   Q.   Now, were you able to observe Mr. Sittenfeld's body

1    language during this meeting?

2    A.   Yes.

3    Q.   What did you observe?

4         MR. C. MATTHEW RITTGERS:  Your Honor, if he's going

5    to testify as an expert on body language, we would like to

6    just voir dire this witness.

7         THE COURT:  Is he?  Are you intending to have him

8    testify as an expert on body language?  It seems like the

9    direction you were going.

10        MS. GLATFELTER:  No, no.  I was just asking him what

11   he observed, and then that he assesses body language for

12   his -- in all of his meetings, that's all, to lay a foundation

13   for it.

14        THE COURT:  If you're going to ask him based on what

15   Mr. Sittenfeld did with his body, did he take something from

16   that, that would be an opinion that he would be offering as an

17   expert, so I would want to give Mr. Rittgers an opportunity to

18   voir dire him on that.

19       If you're just going to ask what mannerisms did

20   Mr. Sittenfeld display, that's a different thing, so I'm

21   trying to determine what line of questioning we're going down

22   here.

23        MS. GLATFELTER:  My apologies, Your Honor.  It's the

24   latter.

25        THE COURT:  Okay.

1          MR. C. MATTHEW RITTGERS:  On the latter, Your Honor,

2     the video's the best evidence, so the video is what it

3     purports to be, which...

4          THE COURT:  Well, I hear you.  I do believe that

5     Vinny can offer testimony as to specific things he saw

6     Mr. Sittenfeld do, just as we've been pulling out specific

7     parts of the transcripts.

8          But he can't offer opinions that, oh, yes, this is

9     something that people do when, and then offer an opinion about

10    what it means.  Are we clear?

11         MS. GLATFELTER:  Yes.  Very clear, Your Honor.  Thank

12    you.

13         THE COURT:  All right.  Objection overruled, I think.

14    We'll see how it plays out.

15    BY MS. GLATFELTER:

16    Q.  Sir, can you tell us what mannerisms you observed, and

17    describe the conduct you saw without giving us your opinion as

18    to the conduct?

19    A.  You want to know how I felt?

20    Q.  I want to know what you observed.

21    A.  I watched the video of me prior to entering.  I observed

22    him sitting near the window in a chair by himself, kind of

23    leaning backwards.

24    Q.  And then when you entered the room, was there a change in

25    the body language?

*VINNY - DIRECT*

1    A.   Yes.

2    Q.   And can you describe that change for the jury?

3    A.   Yes.  I sat on the couch, we made some small talk, and

4    the defendant moved from the chair near the window next to me

5    on the couch in basically a forward leaning position.

6             MS. GLATFELTER:  Okay.  Your Honor, at this point, I

7    would like to publish a few short clips, and ask the witness a

8    few questions about each clip of --

9             THE COURT:  Are these previously admitted clips?

10            MS. GLATFELTER:  Yes.  So this is --

11            THE COURT:  You may do so.  I'm sorry.  Go ahead.

12            MS. GLATFELTER:  -- regarding the September 24, 2019

13   meeting.

14            THE COURT:  You may do so.

15            MS. GLATFELTER:  Ms. Terry, if we could pull up the

16   first clip, which is approximately four minutes, to 1:14, and

17   it corresponds to page 6 to 8 of the transcript that goes with

18   Exhibit 30A.  So the transcript is 30B.

19            THE COURT:  30B?

20            MS. GLATFELTER:  Yes.  So this clip corresponds to

21   page 6 through 8 of 30B.

22        Ms. Terry, once we play it, I'd ask you to pause it at

23   about five seconds so I can ask the witness a few questions

24   about what we're observing.

25        (Video played.)

```
 1            MS. GLATFELTER:  Okay.  Can you go ahead and pause
 2     it.
 3     Q.   Can you describe who we're seeing on the screen at this
 4     point?
 5     A.   It's myself and the defendant.
 6     Q.   Okay.  And are there other people in the room at this
 7     time, they're just not on the video camera?
 8     A.   That's correct.  They're off to the left.
 9     Q.   Okay.  And who are those people again?
10     A.   Mr. Sittenfeld's chief of staff, Rob, and Brian.
11            MS. GLATFELTER:  Okay.  If we can go ahead and
12     continue playing.
13            THE COURT:  There's no audio.  Is that --
14            MS. GLATFELTER:  Yeah.  There seems to be a problem
15     with the audio.
16        Ms. Terry, if we could try just closing out of the video
17     and then starting it one more time just to make sure it's not
18     on our end.
19        Your Honor, I apologize.  I'm not sure what's wrong with
20     the technology in this room.
21            THE COURT:  No, no.  I'm not sure either.
22            MS. GLATFELTER:  Would it be appropriate to take a
23     brief break and have technological support up here?
24            MR. C. MATTHEW RITTGERS:  It might be fixed.
25            THE COURT:  There it is.
```

*VINNY - DIRECT*

```
 1          (Video played.)

 2     Q.   Vinny, did you hear that?  Were you able to hear this

 3     video clip?

 4     A.   Yes.

 5     Q.   And did you review it before today?

 6     A.   Yes.

 7     Q.   Okay.  At the beginning of this clip, when you say, "What

 8     are you going to do about this guy?" who are you referring to?

 9     A.   Prior to me joining the case in the capacity that I had

10     had, there were some interaction between the primary

11     undercovers and someone who was the -- basically, the face of

12     the deal to the city, and that's who we were referring to.

13     Q.   And when you say "the deal," are you talking about

14     435 Elm?

15     A.   435 Elm, yes.

16     Q.   And so when you say, "What are you going to do about that

17     guy," how does Mr. Sittenfeld respond?

18          Let me ask it this way:  During this discussion in the

19     meeting, was there a discussion about loyalty?

20     A.   Yes.

21     Q.   All right.  And who did Mr. Sittenfeld say his loyalty

22     was to?

23     A.   You guys.

24     Q.   You guys in the room?

25     A.   I thought he meant me.
```

*VINNY - DIRECT*

1 Q. At this time that this meeting occurred, how many times

2 had you spoken with Mr. Sittenfeld?

3 A. I'd have to review the dates.  There was the few minutes

4 at the party, maybe a phone call or two.  I don't remember if

5 the phone calls were before this meeting or after this

6 meeting.

7 Q. Okay.  So you had met in person twice, including this

8 meeting?

9 A. Yes.

10 Q. And what, if any, advice did he provide you regarding the

11 partnership?

12 A. He thought it was not gonna turn out well.

13 Q. All right.

14 A. And that we should cut that guy loose.

15 Q. Now, the next portion corresponds to the transcript pages

16 18 through 21 of this meeting.

17   MS. GLATFELTER:  And with the Court's permission, I'd

18 like to play the portion of the video that corresponds to

19 those pages and ask a few questions.

20   THE COURT:  You may do so.

21   MS. GLATFELTER:  Ms. Terry, if we could play the

22 second portion.

23  (Video played.)

24 Q. Sir, what is the general topic of conversation during

25 this part of the meeting?

VINNY - DIRECT

1   A.   The topic of conversation is --

2        MR. C. MATTHEW RITTGERS:  Objection, Your Honor.  It

3   speaks for itself, the video.

4        THE COURT:  Yeah.  We just listened to the dialogue.

5   What is it you're intending to --

6        MS. GLATFELTER:  I was just asking the question to

7   reorient him.

8   Q.   Are you talking about sports betting?

9   A.   Yes.

10       THE COURT:  You may continue.

11  Q.   And what kind of establishment did you tell

12  Mr. Sittenfeld that you were looking for?

13       MR. C. MATTHEW RITTGERS:  Your Honor, the video's the

14  video.  We'd just object.

15       THE COURT:  What are we hoping to do here?

16       MS. GLATFELTER:  I want to ask this question.  I want

17  to ask this witness about a conversation that he had, and some

18  of the parts that are building to that conversation in terms

19  of who brought what topics up first and what were the

20  suggestions.

21      I think those are valid questions for a participant in a

22  conversation.

23       MR. C. MATTHEW RITTGERS:  Your Honor, the entirety of

24  the video, USA 30F, the government chose not to play the

25  entire video and to stitch this together by taking parts out.

1    If they want to play the entire video, we have no objection.

2            THE COURT:  I'm going to overrule that objection.  If

3    that's your objection, you can continue.

4            MS. GLATFELTER:  Thank you, Your Honor.  May I repeat

5    the question?

6            THE COURT:  You may.

7    Q.   What kind of establishment did you tell Mr. Sittenfeld

8    that you were looking for in terms of a sports betting

9    facility?

10   A.   A boutique hotel with a gaming area.

11   Q.   Did you mention the type of control that you were looking

12   for?

13   A.   Super control.

14   Q.   All right.  And did you pose a question to him regarding

15   his ideas for control?

16   A.   Yes.  I asked him what he thought.

17   Q.   And how did he respond?

18           MR. C. MATTHEW RITTGERS:  Your Honor, same objection.

19           THE COURT:  This video has now been played -- this

20   portion of the video has now been played twice.  I'm not sure

21   I see the point in going through line by line and saying, and

22   then what did he say next and then what did you say next.  The

23   jury has already heard what the people have said.

24           MS. GLATFELTER:  Yes, Your Honor.  I wanted to talk

25   specifically about the zoning conversation and who brought it

```
 1    up first.  I was simply orienting him to the part of the
 2    conversation we're discussing.
 3              THE COURT:  I'll give you a little leeway, but we're
 4    not going to go line by line through this that the jury has
 5    just heard.
 6              MS. GLATFELTER:  Thank you, Your Honor.
 7    BY MS. GLATFELTER:
 8    Q.   I'm sorry.  You asked him, did you favor his ideas?
 9    A.   I asked him what he thought, yes.
10    Q.   Okay.  And what topic did he suggest?
11    A.   Zoning.
12    Q.   Who brought that up first?
13    A.   He did.
14    Q.   And during this portion of the meeting, did you make any
15    request of him?
16    A.   I asked him to keep Rob and Brian informed.
17    Q.   Okay.  Later on in the investigation, did Mr. Sittenfeld
18    follow up on that action?
19    A.   Yes.
20    Q.   We'll come back to that portion in a moment.
21         Were there other discussions in the context of this
22    meeting about creating a controlled environment?
23    A.   In this meeting?
24    Q.   Yes.
25    A.   Yes.
```

*VINNY - DIRECT*

1    Q.   And at some point, did you provide any examples from

2    New Jersey?

3    A.   Yes.

4    Q.   What example did you provide?

5    A.   I provided an example about a big-rig scheme involving

6    trucks that I had sold to a municipality using rigged bid.

7    Q.   And did you describe how you were able to accomplish the

8    bid rigging?

9    A.   Yes.

10   Q.   What did you say?

11   A.   I told him how my friend owned a truck business, and we

12   struck through the bid for the city's contract for the

13   vehicles to only be possible to be purchased from my friend's

14   establishment.

15       It was within a certain number of miles from the city

16   garage for oil changes, stuff needed to be cut out on the fuel

17   tank, and the windshield wipers needed to come down from the

18   top.

19   Q.   Okay.  And what was the point of that story?  Why were

20   you telling that story?

21           MR. C. MATTHEW RITTGERS:  Objection, Your Honor.  His

22   point of the story is, I don't think, relevant to what

23   Mr. Sittenfeld heard if it's not stated on the video.

24           THE COURT:  I'm going to overrule that.  You may

25   answer.

1  A.  The point of that story was to reflect on his suggestion

2  of zoning, that I understood clearly how City Hall could

3  control things without making it apparent.

4  Q.  Okay.  And in your story about the trucks, how many

5  companies could provide those kinds of trucks in your story?

6  A.  One.

7  Q.  Okay.  And so what was the message there?

8  A.  The message there was exclusivity.

9       MR. C. MATTHEW RITTGERS:  Objection, Your Honor.

10  He's testifying what the message was to Mr. Sittenfeld.  It's

11  the words that he stated, though.

12  Q.  I can say what is the message you were trying to convey.

13       THE COURT:  I'm going to overrule it, but we're not

14  going to go very far down this road, Ms. Glatfelter.

15       MS. GLATFELTER:  Thank you, Your Honor.

16  A.  My message was that I understood.

17  Q.  Now, during this meeting, did you provide Mr. Sittenfeld

18  with anything?

19  A.  I'm sorry?

20  Q.  During this meeting, did you provide Mr. Sittenfeld with

21  anything?

22  A.  Yes.

23  Q.  What did you provide him?

24  A.  I gave him an envelope.

25  Q.  Okay.  And what was contained in the envelope?

1    A.   Two checks for $5,000 each.

2    Q.   Did he reject the envelope?

3    A.   No.

4    Q.   Now, after this meeting ended, did you receive any

5    follow-up communication from Mr. Sittenfeld?

6    A.   Yes.

7         MS. GLATFELTER:  If I may publish what's been

8    admitted as Government Exhibit 32C, which is a transcript.

9         THE COURT:  You may.

10   Q.   Sir, do you see the transcript in front of you?

11   A.   Yes.

12   Q.   Okay.  And do you see your name on the first page of that

13   transcript?

14   A.   Yes.

15   Q.   Okay.  And below -- scratch that.

16        What type of thing are we looking at in Government

17   Exhibit USA 32C?

18   A.   This is a voicemail that he left me on my cell phone.

19   Q.   When you say "he," who are you referring to?

20   A.   Mr. Sittenfeld.

21   Q.   Had you called Mr. Sittenfeld prior to receiving this

22   voicemail?

23   A.   No.

24   Q.   All right.  And had you provided him with your telephone

25   number?

*VINNY - DIRECT*

1    A.   No.

2    Q.   Who initiated this contact?

3    A.   He did.

4    Q.   And did this have any investigative significance to you

5    in terms of your actions going forward?

6    A.   Yes.

7    Q.   Okay.  Did it affect your role in the investigation?

8    A.   Yes.

9    Q.   Can you describe that to the jury?

10   A.   When I received the voicemail, I didn't expect a

11   voicemail from him.  I contacted the investigative team, told

12   him what was in the voicemail and asked them for guidance.

13   Q.   And what was the guidance?

14   A.   The guidance was to call him back.

15   Q.   And did you do that?

16   A.   Yes.

17        MS. GLATFELTER:  Your Honor, permission to publish

18   what's been admitted as Government Exhibit 32E?

19        THE COURT:  You may do so.

20   Q.   Sir, do you see the first page of Exhibit 32E on your

21   screen?

22   A.   Yes.

23   Q.   What is the date of this transcript?

24   A.   10/29/2019.

25   Q.   And do you see your name on the first page?

```
 1    A.   Yes.

 2    Q.   And that name is?

 3    A.   UC Vinny.

 4    Q.   Okay.  If we can go to the first page of this transcript.

 5         Who is a party to this conversation?

 6    A.   Myself and Mr. Sittenfeld.

 7    Q.   Was sports betting discussed on this phone call?

 8         Let me ask it this way.  Did this phone call relate to

 9    your discussion on September 24th in any way?

10    A.   Yes.

11    Q.   Okay.  In what way?

12    A.   After we exchanged pleasantries, he described how he

13    contacted the city law department on my behalf, I thought.

14    Q.   Okay.  And was there any topic in this conversation that

15    related to specifically -- any specific topic that related to

16    your conversation on September 24th?

17    A.   Yes.  At the beginning of that conversation, he said

18    there were two ways in which we could regulate sports betting,

19    and it's through the zoning laws.

20    Q.   Was zoning a topic you had discussed on September 24th?

21    A.   Yes.

22    Q.   What about licensing?

23    A.   Licensing was the second one.

24    Q.   All right.  If we --

25              MS. GLATFELTER:  Ms. Terry, if you can blow up on the
```

1   screen the last four sentences on page 2.

2   Q.   Do you see that on your screen, sir?

3   A.   Yes.

4   Q.   Do you see -- can you go ahead and read those four lines

5   for us?

6   A.   "Fraternal, uh fraternal and vet halls, and then on

7   people's individual mobile devices, which would be, you know,

8   if my goal is we want like a classier establishment downtown,

9   you're catching folks with discretionary income who might be

10  in town for a convention or staying at a hotel.  Umm, if

11  that's who we wanted to target, they're not."

12  Q.   Sir, what, if any, notes for the investigation, or what,

13  if any, significance for the investigation does the use of the

14  word "we" here have?

15  A.   To me?

16  Q.   Well, for the investigation.

17  A.   That we were in this project together.

18  Q.   Now, during this phone call, did you reference at all any

19  additional campaign contributions that you would be providing

20  to Mr. Sittenfeld?

21  A.   I'd have to see the transcript.

22          MS. GLATFELTER:  Ms. Terry, if we can go to page 6 of

23  the transcript.

24       And if we can blow up the middle of that portion where it

25  starts, "Yeah yeah."  There you go.

*VINNY - DIRECT*

1    A.  Could you ask me the question again, please?

2    Q.  Yes.  Did you have any discussion about further campaign

3    contributions during this phone call?

4    A.  Yes.

5    Q.  And what was the discussion when you say you had further

6    discussion, do you see that on this transcript?

7    A.  I do.

8    Q.  Okay.  Where?

9    A.  Under UC Vinny, it says, "Rob's bringing two nickels,

10   right?  He told you that?"

11   Q.  Can you read Mr. Sittenfeld's response?

12   A.  "Uh, he did not tell me that but, but thank you.  Your

13   nickels are greatly appreciated as is, uh, you know, the

14   friendship of those guys, and certainly look forward to you

15   and me continuing to get to know each other better too."

16   Q.  All right.  Did you have additional phone contact with

17   Mr. Sittenfeld in November and December of 2019?

18   A.  Yes.

19        MS. GLATFELTER:  Your Honor, permission to publish

20   what's been admitted as 35C, which is a recording?

21        THE COURT:  You may do so.

22        MS. GLATFELTER:  I would ask Ms. Terry -- we'll ask a

23   few questions, and then I would like you to play the specific

24   portions discussed.

25        If we can transition, with the Court's permission, to

 1    35D, which is the transcript.  I'd like to ask a question just

 2    to get the setting of this call.

 3              THE COURT:  You may do so.

 4              MS. GLATFELTER:  Thank you.

 5    Q.  Sir, do you see the first page of this transcript?

 6    A.  Yes.

 7    Q.  Do you see your name on the transcript?

 8    A.  Yes.

 9    Q.  Is this a transcript you reviewed prior to your

10    testimony?

11    A.  It is.

12    Q.  Okay.  And what date did this phone call occur on?

13    A.  11/15/2019.

14    Q.  And is the reference on the first page "Vinny" to you?

15    A.  Yes.

16    Q.  Did you participate in this call?

17    A.  I did.

18              MS. GLATFELTER:  At this point, I'd ask permission to

19    publish a portion of 35C.

20              THE COURT:  You may do so.

21    (Video played.)

22    Q.  Sir, were you able to hear that recording?

23    A.  Yes.

24    Q.  A few moments ago, at the beginning of your direct

25    testimony, we talked about the difference between decisions

*VINNY - DIRECT*

1    made by a case agent and decisions made by an undercover

2    agent, right --

3    A.  Yes.

4    Q.  -- do you remember that?

5        Does that extend to if a subject extends an invitation to

6    you?

7    A.  Especially if he extends an invitation, yes.

8    Q.  And how does that work?

9    A.  I have no authority to set up meetings, or things of that

10   effect, with subjects.  It's up to the case agent and the

11   investigative plan, so I just advise the case agent, and they

12   decide where I go and what I do.

13   Q.  So during this call, is it fair to say that we heard an

14   invitation about meeting in New York?

15   A.  Yes.  It sounded like an invitation to me.

16   Q.  And was that something that you would have to talk to the

17   case agent about whether that was going to occur or not?

18   A.  Absolutely.

19       MS. GLATFELTER:  Okay.  Permission to publish what's

20   been already admitted as Government Exhibit USA 36B?

21       THE COURT:  You may do so.

22   Q.  All right.  Sir, did you have a follow-up call with

23   Mr. Sittenfeld after the one that we just heard?

24   A.  Yes.

25   Q.  And can you tell us when that occurred?

1    A.   11/27/2019.

2    Q.   Do you see a reference to your name on the first page of

3    this transcript?

4    A.   Yes.

5    Q.   Is that a reference to you?

6    A.   It is.

7    Q.   Did you participate in this phone call?

8    A.   Yes.

9    Q.   All right.  And in addition to participating in the call,

10   did you review the recording before your testimony today?

11   A.   Yes.

12        MS. GLATFELTER:  Your Honor, permission to publish a

13   portion of 36A, which has been admitted into evidence,

14   specifically 1:35 to 2:25, which is at the bottom of page 2 --

15        THE COURT:  You may do so.

16        MS. GLATFELTER:  -- and extends to the top of page 3.

17        THE COURT:  Okay.

18   (Audio played.)

19   Q.   All right.  Sir, were you able to hear that portion of

20   the recording?

21   A.   Yes.

22   Q.   Did you hear your voice on the recording?

23   A.   Yes.

24   Q.   At the beginning of that portion, when you used the

25   words -- when you say, "Are you all over that with that guy

VINNY - DIRECT

```
 1    and that thing," what are you referring to in that portion?
 2    A.   I'm referring to his interaction with the lady at the
 3    Port Authority who controls 435 Elm to make the project go
 4    forward.
 5    Q.   And I would say about 10 or 15 minutes ago, when we were
 6    discussing September 24th, the meeting that you had in
 7    Columbus, do you remember that discussion?
 8    A.   Yes.
 9    Q.   Okay.  And you had asked the defendant to do something?
10    A.   Yes.  I asked him to contact those guys and let them know
11    how the meeting with her worked out.
12    Q.   You had talked about -- I believe you had testified a
13    couple minutes ago you were talking about "keep us informed"?
14    A.   Uh-huh.
15    Q.   How did this phone call relate to that discussion?
16    A.   This was him informing me as the results of his work on
17    my behalf.
18    Q.   After this phone call, did you have additional ones in
19    December?
20    A.   Yes.
21         MS. GLATFELTER:  Okay.  Permission to publish what's
22    been admitted as USA 37B.  We'll start with the transcript.
23    It's already previously been admitted.
24         THE COURT:  Okay.
25    Q.   Sir, did you have a follow-up call with Mr. Sittenfeld in
```

*VINNY - DIRECT*

1    December?

2    A.   Yes.

3    Q.   What date was that phone call on?

4    A.   December 9, 2019.

5    Q.   And do you see your name on the first page of this

6    transcript?

7    A.   Yes.

8    Q.   Did you participate in this phone call?

9    A.   Yes.

10   Q.   And were you able to review that recording before your

11   testimony today?

12   A.   Yes.

13        MS. GLATFELTER:  Your Honor, permission to publish a

14   portion of 37A, which has been admitted into evidence,

15   specifically 3:13 to 4:39, which correlates to page 3 to 4 of

16   the transcript of this call.

17        THE COURT:  You may do so.

18        MS. GLATFELTER:  Thank you, Your Honor.

19   (Audio played.)

20   Q.   Sir, were you able to hear that recording?

21   A.   Yes.

22   Q.   What, if any, way did this call relay back to

23   September 24, 2019, the meeting you had in Columbus?

24   A.   It was a continuation of working on my behalf for the

25   project to go through at 435 Elm.

VINNY - DIRECT

1    Q.   And the last phone call I want to discuss with you here

2    today was on December 23, 2019.  Did you have a phone call

3    with the defendant that day?

4    A.   I'd have to see the transcript to see the date.

5         MS. GLATFELTER:  Your Honor, permission to publish

6    what's been admitted as USA 39B?

7         THE COURT:  You may do so.

8         MS. GLATFELTER:  One moment, Your Honor.  We're

9    having a little bit of technical difficulties here.

10        THE COURT:  Sure.

11        MS. GLATFELTER:  Your Honor, if I may show the

12   witness my copy of 39B?

13        THE COURT:  You may.

14        MS. GLATFELTER:  May I approach?

15        THE COURT:  You may.

16   Q.   And, sir, what was the date of the phone call in

17   December, the last phone call in December?

18   A.   The 23rd.

19   Q.   And was this a phone call that you participated in?

20   A.   Yes.

21        MS. GLATFELTER:  All right.  Ms. Terry, are you able

22   to publish?

23        Okay.  If we may publish a portion of 39A, which is the

24   recording that corresponds to this transcript, Your Honor?

25        THE COURT:  You may.

1          MS. GLATFELTER:  Specifically, 2:38, which is the

2     bottom of page 2.  I'm sorry, the beginning of the call to

3     2:38, which is the bottom of page 2.

4          THE COURT:  You want her to start at the beginning?

5          MS. GLATFELTER:  Just page 2, yes.  She's going to

6     start at the beginning, and then...

7     (Audio played.)

8          MS. GLATFELTER:  Sorry, Ms. Terry, can you start at

9     the beginning of the call?  Sorry.  I misspoke.

10    (Audio played.)

11    Q.   Sir, were you able to hear that portion of the

12    conversation?

13    A.   Yes.

14    Q.   Did you hear your voice on that call?

15    A.   Yes, that was me.

16    Q.   All right.  Now, I want to pivot for a moment.  Can you

17    remind us what your role was in relation to the 435 Elm

18    project?  What was your persona?

19    A.   My persona was a high-rolling investor, land developer.

20    Q.   All right.  And to pivot back to this call for a moment.

21    During this call, did you hear the words "RFP"?

22    A.   Yes.

23    Q.   And what would RFP mean for your role as the investor

24    here?

25    A.   That would be bad for me as the investor.  A request for

1    proposal would go out to other bidders and other developers

2    and competition of mine, and RFP is not something I would want

3    as the sole developer.

4    Q.   Now, after this call, did your role as an undercover in

5    this operation end?

6    A.   Yes.

7           MS. GLATFELTER:  One moment, Your Honor.

8        No further questions, Your Honor.

9           THE COURT:  Thank you.  Mr. Rittgers?

10                        CROSS-EXAMINATION

11   BY MR. C. MATTHEW RITTGERS:

12   Q.   Good afternoon.

13   A.   Good afternoon.

14   Q.   You prepared for your testimony today, correct?

15   A.   I'm sorry?

16   Q.   You prepared for your testimony today?

17   A.   Yes.

18   Q.   And in preparing, you met with the prosecution, correct?

19   A.   Yes.

20   Q.   And you read transcripts?

21   A.   Yes.

22   Q.   And I believe you indicated that you also reviewed the

23   entirety of the September 24, 2019 hotel interaction; is that

24   correct?

25   A.   Yes.

1    Q.   And the entirety of that interaction is captured on

2    USA 30F.  And so when I say "the entirety," I mean even the

3    part when you're not in the room, you watched that part as

4    well, correct?

5    A.   Yes.

6    Q.   Your only prior interaction with P.G. -- you had two in

7    this undercover operation in person.  One was opening day,

8    which was actually March or April 2019, and the other was

9    September 24th of 2019; is that correct?

10   A.   Yes.  Opening day, or thereabouts, at a party and in the

11   hotel room, correct.

12   Q.   The opening day party, which you referenced on direct,

13   was in the 580 Building just a block north of here, correct?

14   A.   I don't know the address I was at.

15   Q.   Was it a penthouse?

16   A.   It was a very penthousy, fancy apartment, yes.

17   Q.   A hundred people through the door?

18   A.   I have no idea.

19   Q.   More than 50?

20   A.   I have no idea.

21   Q.   Were you there?

22   A.   Yes.

23   Q.   I mean, was it as many people as this courtroom?

24   A.   No.

25   Q.   Just under?

*VINNY - CROSS*

1    A.   I didn't count.

2    Q.   Okay.  There's liquor, correct?

3    A.   Yes.

4    Q.   Women?

5    A.   Yes.

6    Q.   Not just undercover agents?

7    A.   I have no idea who the other people were.

8    Q.   That's the longest wire of this entire undercover

9    investigation, and one of the only two wires you're captured

10   on in the in-person interaction with P.G., and you haven't

11   heard a minute of it?

12        MS. GLATFELTER:  Your Honor, I'm going to object.  Is

13   there a question?  This is argument.

14        THE COURT:  Sustained.

15   Q.   You were at that opening day party, correct?

16   A.   Yes.

17   Q.   And P.G. left early, didn't he?

18   A.   I don't remember seeing him leave.

19   Q.   There's a reference, and we'll get into it in a minute.

20   One of the reasons why I know that, despite it's an unseen

21   wire, is there's a reference in the September 24th, 2019

22   meeting, which I assumed you watched before you testified

23   today about the opening day party?

24   A.   Which one?

25   Q.   On September 24th of 2019, in the hotel?

*VINNY - CROSS*

1    A.    Uh-huh.

2    Q.    P.G. said that the reason -- one of the reasons why he

3    didn't come back to the party when -- he references you guys

4    asking him about coming back, because he was leaving early,

5    and he talked about his pregnant wife, and that's why he

6    didn't come back to the party.  Do you remember that?

7    A.    Yes, I remember that.

8    Q.    That was cut out.  We don't have that in Government

9    Exhibit USA 30B.  Are you aware of that?

10   A.    I don't know what you have.

11   Q.    Before you testified today, in fact, right behind you, if

12   you don't mind grabbing that three-ring binder right behind

13   you?

14   A.    This one?

15        THE COURT:  Behind you.

16   Q.    Behind.  The top of that document, I believe, should have

17   a Bates stamp, so reference from the government 194B CI

18   2109777, United States Department of Justice, Federal Bureau

19   of Investigation?

20   A.    I see that.

21   Q.    And you're familiar with this type of document, correct?

22   It's a transcript?

23   A.    Yes.

24   Q.    And by looking at it, your name is not on here, but your

25   number is referenced, correct, your undercover number?

VINNY - CROSS

1    A.    That's correct.

2    Q.    And this is a transcript of the September 24th, 2019

3    interaction in that hotel room, correct?

4    A.    Yes.

5    Q.    And so if you flip to the first page, which was actually

6    page 2, the next page --

7            MS. GLATFELTER:  Your Honor, may we approach for a

8    sidebar, please.

9            THE COURT:  Yes.

10   SIDEBAR CONFERENCE

11           MS. GLATFELTER:  Two objections.  One, I object to

12   the continuing mischaracterization of what's in evidence.

13       We have the entirety of the September 24th, 2019 tape in

14   evidence, and defense counsel keeps referencing it's not in

15   evidence.

16       The second objection that I have is that this witness

17   is -- this is one of the transcripts at issue this morning, so

18   this was a preliminary transcript provided to defense, I think

19   two years ago, right, and it is not in evidence.

20       This will confuse this witness.  He hasn't reviewed this

21   transcript, but it looks like the one that's in evidence

22   because there's a portion of it.

23       And so what they're trying to do -- I don't know what

24   they're trying to do, but maybe they're trying to enter it

25   through this witness.  That's confusing.

*VINNY - CROSS*

1      This guy hasn't seen it, and it's unfair to trick him on

2  the stand with something that is similar.  He's reviewed the

3  recording, and they can ask him questions about the recording,

4  but this is...

5          THE COURT:  Thank you, Ms. Glatfelter.

6          MR. C. MATTHEW RITTGERS:  Your Honor, I was going to

7  ask him if he's reviewed it, I just never got the chance in

8  this transcript, and I was going to have him compare it with

9  the government's transcript, which is USA 30B.  And they don't

10  start at the same point, so he would have absolutely none

11  of the -- I don't know what he has and hasn't reviewed, I was

12  going to ask him.

13          THE COURT:  Well, has the government ever represented

14  that the transcript is the transcript of the entirety of

15  the --

16          MR. C. MATTHEW RITTGERS:  They sent it to us, it was

17  the 9/24 --

18          THE COURT:  That isn't my question.  The one that got

19  admitted as evidence, I thought they were pretty clear when

20  they admitted it, that it was transcripts of portions of the

21  meeting.

22          MR. C. MATTHEW RITTGERS:  That's correct.

23          THE COURT:  So what are you hoping to elicit from

24  this?

25          MR. C. MATTHEW RITTGERS:  I was going to quote out of

1    the transcript without having to go to certain points of the

2    video, since he's reviewed the video.  But if you want me to

3    just talk about the video, we can do that.

4          THE COURT:  Yeah, let's do it.  The entire video has

5    been admitted into evidence, right?

6          MR. C. MATTHEW RITTGERS:  Yes.

7          MS. GLATFELTER:  It has.  And I object to this

8    transcript because we actually made changes to --

9          MR. C. MATTHEW RITTGERS:  I'll move on.

10          MS. GLATFELTER:  -- this, based on the defense's

11    objections, so...

12          MR. C. MATTHEW RITTGERS:  I'll move on.

13    SIDEBAR CONFERENCE CONCLUDED

14    Q.   Before the September 24, 2019 meeting in Columbus, you

15    and the other agents, you planned in advance some of the

16    things that had happened before that meeting, correct?  You

17    talked about it?

18    A.   I don't understand what you're asking me, sir.

19    Q.   Well, you didn't walk into that meeting cold.  You had to

20    have some information from them about the background of the

21    undercover investigation and some of the subject matters of

22    that investigation, correct?

23    A.   Yes.

24    Q.   And you planned, I assume you met either by phone, or

25    maybe a zoom conference, or maybe in person to discuss some of

*VINNY - CROSS*

1  the topics that might be presented in that meeting, correct?

2  A.  Yes.  I don't remember exactly, but I'm sure we did meet

3  and discuss.

4  Q.  And you know P.G. -- at the time, you knew he was in

5  Columbus for a meeting with other leaders from around the

6  state.  He didn't just drive from Cincinnati to Columbus to

7  meet you all.  You knew that, right?

8  A.  I did not know that.

9  Q.  You all -- you and other agents planned out where certain

10  cameras would be placed in advance of the meeting, correct?

11  A.  I didn't participate in that.

12  Q.  You knew where the cameras were in the room before you

13  entered, I assume?

14  A.  I don't think I did.

15  Q.  You planned the dollar amounts that you would donate to

16  P.G. or offered to donate in that meeting, correct?

17  A.  I did not know.

18  Q.  You didn't know the amounts of the checks that were going

19  to --

20  A.  I knew the amounts of the checks, I didn't plan the

21  amount.

22  Q.  You had two checks in your pocket, you knew what the

23  amounts were, and you knew when you were going to offer them

24  to P.G.?

25  A.  No.  That's not what happened.

*VINNY - CROSS*

1   Q.   Okay.  We'll go one by one.  Did you have two checks in

2   your pocket?

3   A.   No.

4   Q.   Where were the checks?

5   A.   They were in an envelope that Rob had.

6   Q.   Okay.  At some point, you took an envelope from Rob?

7   A.   Yes.

8   Q.   All right.  And that, you're saying, was not planned at

9   all?

10  A.   I'm saying it wasn't in my pocket.

11  Q.   Okay.  You held it in your hand, and in the envelope, you

12  had two checks, correct?

13  A.   That's correct.

14  Q.   And that was not offered to P.G. until he stood up to

15  shake your hand and leave.  That's when you then said you had

16  some donations for him, correct?

17  A.   No.

18  Q.   We can see that in a minute.  We watched it earlier

19  today, so I'll move on.

20       You planned when you would enter the hotel room?

21  A.   Yes.

22  Q.   And so if you look at USA Exhibit 30B, which is in front

23  of you in one of the white binders.

24           MR. C. MATTHEW RITTGERS:  If I may approach, Your

25  Honor?

VINNY - CROSS

 1          THE COURT:  You may.

 2     Q.   If you could please flip to USA 30B.

 3          MR. C. MATTHEW RITTGERS:  Scott, could I please have

 4     access to be able to display and publish?  Thank you.

 5          And, Your Honor, this has already been admitted.

 6     A.   I'm on it.

 7     Q.   Thank you.

 8          MR. C. MATTHEW RITTGERS:  Your Honor, may I display

 9     this for the ladies and gentlemen of the jury?

10          THE COURT:  You may.

11     Q.   All right.  So 30B, if you scroll down to the second

12     page, or flip to the second page, I should say.

13          The transcript starts with session two, correct?

14     A.   The top of page 2 says, "Begin transcription 7:08,

15     session two."

16     Q.   And there was a session one that's not included here,

17     correct?

18     A.   I'd have to check the transcript.

19     Q.   You reviewed the video, the entirety of the interaction,

20     meaning P.G. in the room on September 24th before you

21     testified, correct?

22     A.   Yes, I did.

23     Q.   On this transcript that you're looking at, which is

24     Government Exhibit 30B --

25          MS. GLATFELTER:  Your Honor, I'm going to object.

1    This actually isn't the transcript that's in evidence.

2         THE COURT:  30B isn't?

3         MS. GLATFELTER:  30B is in evidence.  I don't know.

4    There's some bolding and other things on this transcript that

5    are not in the original, so this is not the transcript that's

6    in evidence.

7         MR. C. MATTHEW RITTGERS:  That's exactly how we were

8    provided it, Your Honor.

9         THE COURT:  I think she's referring, for example, in

10   the first line, it looks like "set everything down for me" is

11   bolded, and it doesn't appear to be that way on 30B.

12        MR. C. MATTHEW RITTGERS:  All I can tell you is I

13   didn't bold it.  It just came off of a thumb drive that they

14   gave us with the transcript.  There should be nothing else in

15   there.

16        THE COURT:  All right.  Was that the bolding you were

17   talking about?

18        MS. GLATFELTER:  Yeah.  It doesn't appear to be the

19   same, and so I wanted to raise it.  We're happy to use our

20   transcript if they want to give us the page numbers.

21        THE COURT:  Are you saying it's different in some way

22   other than the fact that the first sentence is bolded?

23        MS. GLATFELTER:  Because I can only see a portion of

24   the first page, that's what it looks like to me.  But it's not

25   bolded anywhere else in our transcripts, and so I can't tell

*VINNY – CROSS*

1    without reviewing the other pages.

2         THE COURT:  Is this USA 30B as it was produced to

3    you, Mr. Rittgers?

4         MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  This came

5    off of a flash drive that I believe they gave us.  I've just

6    scrolled through it briefly, and I don't see anything else

7    that's bolded in here that would not be otherwise bolded.

8    There's no point in bolding that first statement.

9         THE COURT:  No.  I understand.  I'm going to allow

10   you to use it.  If you see something, Ms. Glatfelter, let me

11   know.

12        MS. GLATFELTER:  Thank you, Your Honor.

13   BY MR. C. MATTHEW RITTGERS:

14   Q.  Before you testified today, you watched the entirety of

15   the interaction, meaning when P.G. actually entered the hotel

16   room, correct?

17   A.  Yes.

18   Q.  Fair to say he was in there before you entered for about

19   15 minutes?

20   A.  I don't know how long he was in there, but he was in

21   there before I got there, yes.

22   Q.  Okay.  And this transcript, USA 30B, begins with you

23   entering the room?

24   A.  That's what it says here, yes.

25   Q.  The first part of the transcript -- sorry.  The first

1 part of the video, which you watched before you testified

2 today that is not in this transcript, I'd like to talk about

3 some of that.

4     The first 15 minutes of the video, the agents, Rob and

5 Brian, are posing questions to P.G. about the sexual assault

6 allegations, correct?

7 A.   I don't know what the allegations are.  I wasn't from

8 here.  I wasn't a part of that.  I knew they were talking

9 about the other guy and his public problems.  I was not party

10 to what those were.  I didn't keep track of them.  I know

11 nothing about them.

12 Q.   I'm not going to get into the nitty-gritty details of the

13 allegations.  What I'm asking you, based on the fact that you

14 saw the entirety of the video, is whether or not Rob and Brian

15 were asking P.G. about the sexual assault allegations and the

16 blowback in Cincinnati, the public outcry?

17 A.   That's what I thought they were talking about, yeah.

18 Q.   Brian asked P.G., "Tell me how bad it is.  We're in

19 Nashville, you're in Cincinnati," correct?

20 A.   Yeah.

21 Q.   And P.G. did voice his concern about the allegations at

22 the beginning of this video, correct?

23 A.   Yes.

24 Q.   P.G. said that Chin deserves the presumption of

25 innocence?

1    A.   I remember him saying that.

2    Q.   And he said that, despite the sexual assault allegations,

3    Chinedum is my friend.  Do you remember him saying Chinedum is

4    his friend?

5    A.   I remember him referring to him as being friends and

6    knowing him a long time.

7    Q.   And this is before you entered the room?

8    A.   They were having conversation about it before I entered

9    the room, yes.

10   Q.   And before you entered the room, Rob and Brian told P.G.

11   that they were going to work to buy Chin out of the 435 Elm

12   development.  Do you remember that?

13   A.   I don't remember if they were going to buy him out.

14   Q.   They said that it would be financially in his best

15   interest, and they were going to make sure that they were fair

16   to him was the connotation of their statement?

17   A.   I remember words to that effect.

18   Q.   You do?

19   A.   Yes.

20   Q.   Thank you.  So they were telling P.G. before you enter

21   the room that they were going to be fair to his friend,

22   Chinedum, and because of these sexual assault allegations that

23   they discussed in a little bit more detail than what we've

24   heard, that it might not be best for him to be involved in the

25   project.  That's before you enter?

*VINNY – CROSS*

1    A.   "He" meaning who?

2    Q.   Mr. Ndukwe.

3    A.   He said that was the topic of conversation, to get him

4    out of the project.

5    Q.   And P.G. said he wants to tell Chin, his friend, to keep

6    his head up.  Despite this being a long road, to keep his head

7    up?

8    A.   I don't remember that.

9            MR. C. MATTHEW RITTGERS:  Are you able to pull up

10   USA 30F for just the witness.  Is that possible?

11           THE COURT:  I don't think we can play audio for just

12   the witness.

13           MR. C. MATTHEW RITTGERS:  Just the audio for him, can

14   he not do that?

15           THE COURT:  I don't think we can do that.

16           MR. C. MATTHEW RITTGERS:  All right.

17   Q.   It's during this discussion about the sexual assault

18   allegations when Rob brings up the sports book to P.G.?

19   A.   I'd have to look at it to see who brought it up.  I

20   didn't memorize it.

21   Q.   Do you remember a conversation where Rob says that things

22   have gotten messy, referring to the sexual assault

23   allegations, "And so we're considering cutting our fucking

24   losses because we wasted a lot of time and money."  Do you

25   remember that quote?

1  A.  There were definitely words to that effect, yeah.

2  Q.  And that was before you entered?

3  A.  They were talking about it before I entered, yes.

4  Q.  And so Rob and Brian are telling P.G. that you, and in

5  turn they, Rob and Brian, might cut their losses and not

6  invest in Cincinnati at 435 Elm because of this messy

7  situation with the sexual assault allegations?

8  A.  I don't remember them saying we weren't going to do the

9  investment.  We were trying to get the other guy out because

10  of his problems.  I don't remember him saying we weren't going

11  to invest in 435.

12  Q.  Does this quote sound -- to refresh your recollection,

13  "If not, the mess it's become and we're not comfortable with

14  it, then it's probably the opposite.  We wasted a lot of

15  fucking time and money, and we're just going to cut our fuck,

16  our losses"?

17  A.  He could have said that.

18  Q.  That is not in the transcript that you have in front of

19  you, which is USA 30B, correct?  I'll help you.  Was that

20  before you entered the hotel room?

21  A.  My transcript starts with, "Begin transcription at 7:08,

22  session two," with Brian saying, "Set everything down for me.

23  Look at this guy."  And then Mr. Sittenfeld said, "Vinny."

24  That's where my transcript begins.

25  Q.  This transcript that's in front of you, if you flip to

VINNY - CROSS

1    the next page, page 3?

2    A.   Would you like me to use the screen or the book?

3    Q.   Whichever you're comfortable with.

4    A.   Are they the same?

5    Q.   They will be the same, yes.

6    A.   I'll just use the screen.

7    Q.   So if you look on your screen, I have already moved this

8    to page 3 of Government Exhibit USA 30B.  And at the top,

9    we're still in session two, but there's a minute and 23

10   seconds clipped out.  That's what that means, end transcript,

11   begin transcript, correct?

12   A.   I don't know why that's there.

13   Q.   You've been an FBI undercover agent for, what, 25 years?

14   A.   23 at least.

15   Q.   And you testified before, I assume?

16   A.   Never as an undercover.

17   Q.   Never as an undercover?

18   A.   Not once.

19   Q.   You've reviewed transcripts before?

20   A.   Of course.

21   Q.   And so there are times when transcripts -- I believe the

22   testimony was that there's a device that sets different

23   sessions, and it's not controlled by a human being, it's just

24   automatic, and so there would be session one, two, three, four

25   throughout an audio or video.  Are you aware of that?

1    A.   Absolutely aware that there are different sessions.  I

2    have no idea how to get there.

3    Q.   Got it.  This USA Exhibit 30B indicates that the end of

4    the transcript was at 7:54 in session two, but we're still in

5    session two, and then it begins again at 9:17 session two.

6    That means that, if my math is correct, that there's a minute

7    and 23 seconds cut out, correct?

8    A.   I don't know if anything's cut out at all.  I don't know

9    what that means.  All I know is what I'm reading here.

10         MR. C. MATTHEW RITTGERS:  Your Honor, I might have to

11   play the video for him so he can see this.

12         THE COURT:  The video has been admitted as evidence,

13   hasn't it?

14         MR. C. MATTHEW RITTGERS:  It has, so I guess I could.

15         THE COURT:  Yeah, you can play the video.

16         MR. C. MATTHEW RITTGERS:  The question is finding

17   that timestamp for him to see it, but we could probably do

18   that.

19         THE COURT:  Well, I would look around 7:54 session

20   two.

21         MR. C. MATTHEW RITTGERS:  It would actually be --

22   because on the video, I think we're going to be around minute

23   mark 16, if I'm correct.  But thank you.  That did help me,

24   actually.  Can you pull up USA 30F.

25         THE COURT:  Shouldn't it be about 48 seconds into it

1    if it begins at 7:08 at session two?

2         MR. C. MATTHEW RITTGERS:  Part of the confusion, that

3    they cut out entirely session one, so that 7:54 is the second

4    session, but session one was about eight minutes.

5         THE COURT:  I see.  Yes, Ms. Glatfelter?

6         MS. GLATFELTER:  Your Honor, just to clarify, we're

7    talking about the United States exhibit of the full video of

8    September 24th that the United Stated entered into evidence?

9         MR. C. MATTHEW RITTGERS:  30F.

10        THE COURT:  I believe we're talking about that.  It's

11   been entered into evidence, hasn't it?

12        MR. C. MATTHEW RITTGERS:  It's been entered, just has

13   not been played.

14        Are you able to find, Elias, the part, "All right.  How

15   are you?  I'm good"?

16        (Video played.)

17   Q.   This next statement, "Vinny, we got to make sure this

18   sports betting thing goes through and the Cincinnati operation

19   happens."

20        If you look at USA 30B, that's the first time that we

21   hear the word sports betting in that transcript 30B, correct?

22   A.   It's not on my screen.

23   Q.   Sorry.  I can scroll for you.  I can even do a control F.

24   Do you know what that function is, where we can -- it might be

25   easier for you to flip through this.

1    A.   In the book, sir?

2    Q.   Yes, 30B.

3    A.   What page?

4    Q.   It would be the first two pages, because the way USA 30B

5    looks right now, it would appear that P.G. was the first to

6    use the term sports betting.

7    A.   Okay.  I'm on the top of page 3, and that's what it says.

8    Q.   But the term "sports betting" had been used by Rob on

9    four occasions in the 15 minutes before you entered the room;

10   is that right?

11   A.   I have no idea.

12   Q.   Do you know Rob talked about sports betting before you

13   entered, right?

14   A.   I would hope so.

15   Q.   And Rob had implied that millions of dollars of

16   investment at 435 Elm might go away if sports betting didn't

17   happen and, in light of these sexual assault allegations,

18   things were getting messy?

19   A.   Is that a question, sir?

20   Q.   Yeah.

21   A.   I don't know what you're asking me.

22   Q.   You're aware that that's what Rob was talking about to

23   P.G. before you entered?

24   A.   Yeah.

25   Q.   Okay.  Sports betting was being considered by the Ohio

1    state legislature, correct?

2    A.   I'm not sure of the status of it in the state house.  I

3    know there was talk about putting gambling in private

4    establishments in Cincinnati.

5    Q.   But the elected officials in Cincinnati, or the elected

6    officials in the county, Hamilton County, they could not make

7    sports betting legal, you knew that, right?  That went through

8    the state?

9    A.   I'm not sure what you're asking me.

10   Q.   Did you know that P.G. Sittenfeld could not make sports

11   betting legal?

12   A.   Yes.

13   Q.   Okay.  And if sports betting was passed on a state level,

14   municipalities and cities then have the right to do zoning

15   regulation for where gambling can occur, correct?

16   A.   That was my understanding at the time, yes.

17   Q.   And that's how sports betting works in other cities and

18   states across the United States, correct?

19   A.   I don't know how it works in other states across the

20   country.

21   Q.   For example, Nevada.  When Nevada legalized gambling,

22   Las Vegas can still set their own zoning regulations on

23   betting sports books?

24   A.   I have no idea.

25   Q.   Okay.  The first time you bring up a controlled

1    environment, you're talking about your concerns about gambling

2    addiction, correct?

3    A.   About what?

4    Q.   Gambling addiction.

5    A.   I'm sure I mention gambling addiction at some point.

6    Q.   That was at the very beginning of this conversation.  If

7    you flip to page 19, or you can look on your screen if that's

8    easier, where this hand is?

9    A.   Yeah.

10   Q.   You're telling P.G. here that there's going to be public

11   outcry when people get addicted to gambling, right?

12   A.   Yes.

13   Q.   And P.G. says he's not convinced the public wants

14   gambling addiction to run rampant, correct?

15   A.   The reference that he made to me was about gambling on

16   every street corner.

17   Q.   That was later.  But in response to you talking about

18   people who can't pay their rent, people who are gambling every

19   ten minutes, betting on the first pass, you saying everyone's

20   going to be pissed off and there's public outcry, P.G. says,

21   "Yeah, but I'm not convinced the public at large wants that

22   version of things"?

23   A.   That's what he says, yes.

24   Q.   And you referenced Rhode Island, which was part of your

25   persona, correct?

*VINNY - CROSS*

1    A.   Yes.

2    Q.   Which is that you had been involved in this previously,

3    the legalizing of sports books in Rhode Island, correct?

4    A.   I explained to him the way that Rhode Island addressed

5    implementing gambling and betting in Rhode Island.

6    Q.   Okay.  And you said that that's why -- immediately after

7    this, that's why it needs to be super controlled, because of

8    the public outcry, people losing their rent money, correct?

9    A.   Yes.

10   Q.   And in part, it's because people lose track of their

11   betting habits, right?

12   A.   That's what I was saying, yes.

13   Q.   So you tell P.G., this is just on the next page and I'm

14   scrolling through it quickly, that that's why you would prefer

15   Cincinnati to have a controlled environment, because it's not

16   real money because people lose track?

17   A.   I wanted them to gamble at my casino.

18   Q.   I'm sorry?

19   A.   I wanted them to gamble at my casino.

20   Q.   You're talking about what might have been in your

21   persona's head, I'm talking about what you actually said.

22   A.   What I said is right there.

23   Q.   Okay.  And so do you agree with me that what you said is

24   the reason you want to have a controlled environment in

25   Cincinnati is because people lose track of their money, and

VINNY - CROSS

1    you're tying it back to this imagery of people losing their

2    rent, gambling on the first pitch, first pass, correct?

3    A.   I'm not trying to be difficult, I just don't see where I

4    said they're losing track.  That's not on the page that I'm

5    on, sir.

6    Q.   It's right here.  Do you see that in blue?  Is that

7    highlighted?

8    A.   Yes.  I see it.

9    Q.   That's what you said?

10   A.   Yeah.

11   Q.   And that's -- right after that, three sentences, that's

12   why you preferred Cincinnati to have a controlled environment?

13   A.   That's what I said.

14   Q.   You never said you wanted a monopoly?

15   A.   I never used that word.

16   Q.   You could have used that word, but you didn't think P.G.

17   would agree to it?

18   A.   I never considered that word.  That's not a word I use.

19   Q.   During this entire meeting, P.G. never asked you for a

20   single donation?

21   A.   No.

22   Q.   P.G. never said that, in exchange for a donation, he

23   would limit your competition or give you a monopoly?

24   A.   He talked about limiting competition, yes.

25   Q.   He talked about a controlled environment after you talked

*VINNY - CROSS*

1    about gambling addictions?

2    A.   He talked about City Hall using zoning and other methods

3    to control it that didn't look like it was controlling it but

4    it was.

5    Q.   You talked about that, he didn't, that wouldn't it be

6    reasonable for a city to want to capture tax dollars if a

7    state legalizes gambling from people from out of town, for

8    example, that was one reference, right?

9    A.   Yeah.

10   Q.   He actually mentioned the Convention Center, didn't he?

11   A.   Yes.

12   Q.   Are you aware with the way in which 435 Elm ties into the

13   Convention Center in this broader tourism in our region?

14   A.   No.

15   Q.   Were you aware that 435 Elm was draining the people of

16   Cincinnati to the tune of $400,000 a year?

17   A.   I would have no idea about that.

18   Q.   Were you aware that it's still draining the people of

19   Cincinnati and the county to the same tune of $400,000 a year,

20   as we sit here today?

21   A.   I wouldn't know that.

22   Q.   When you were on the phone call with P.G., one of the

23   phone calls we just heard from the prosecutor, there was a

24   reference about lawsuits, that we wouldn't -- P.G. was

25   concerned about lawsuits.  Do you remember that reference in

*VINNY - CROSS*

1    one of those phone calls?

2    A.   No, I don't.

3    Q.   On 39B, I believe -- let me see if I can get to it.  I

4    can scroll for you.

5        We saw this exhibit on your direct.  Do you remember

6    this, "I think it would've invited lawsuits"?  I believe this

7    is when we were talking about the RFP process?

8    A.   That's not me saying that.

9    Q.   Yeah.  My question was the phone call that you had with

10   P.G. that is reflected in USA 39B, which was on December 23rd

11   of 2019, you talk to the prosecutor about this RFP process,

12   and P.G. said that this could invite lawsuits, right?

13   A.   I talked to the prosecutor, sir?

14   Q.   When you were on direct.  I apologize.  When you were

15   testifying on direct, this conversation was referenced?

16   A.   Okay.

17   Q.   Do you recall that?

18   A.   Yeah.

19   Q.   And P.G. says to you on this phone call on December 23rd

20   of 2019, that this could invite lawsuits, fair?

21   A.   That's what he said, yeah.

22   Q.   Are you aware that 435 Elm is currently in a lawsuit

23   between Mr. Ndukwe and Ms. Brunner at the port as we sit here

24   today?

25   A.   I have no idea.

1    Q.   Are you aware if it's been developed?

2    A.   I have no idea.

3    Q.   Do you care if it's been developed?

4    A.   I've been retired at 18 months, sir.

5    Q.   In phone calls, subsequent phone calls with P.G., you

6    said things to him to invite him to ask for more donations,

7    correct?

8    A.   I don't know what you're talking about.  I invited him to

9    where?

10   Q.   You made statements to him that would invite a person, if

11   a person were corrupt, to ask for more donations or money,

12   correct?

13   A.   I don't agree with that.

14   Q.   All right.  If we could look at something that you spoke

15   about with the prosecutor on direct.  This is Government

16   Exhibit 36B.

17           MR. C. MATTHEW RITTGERS:  This is not loading.

18   Q.   Do you remember talking to the prosecutor on direct about

19   a phone call that you had with P.G. on November 27, 2019?

20   A.   I don't have the date in front of me, but I talked to her

21   about other phone calls.

22   Q.   If you could, please, flip to USA 36B.

23   A.   In the book?

24   Q.   In the book, just while I try to find this.

25   A.   Say the number again, sir.

1  Q.  36B as in boy.

2  A.  There isn't a 36B in this book.

3       MS. GLATFELTER:  Your Honor, may I approach the

4  witness and provide him the correct book so he can find the

5  exhibit?

6       THE COURT:  Sure.

7  Q.  If you flip to 36B, it would be towards the end.

8  A.  Okay.  I have it.

9  Q.  What I'm looking for is where you say to P.G., "I'm here

10 if you need me for that."  And he's referring to his campaign,

11 which you had asked him about.

12 A.  Do you know what page?

13      MR. DEMEROPOLIS:  Page 5

14      MR. C. MATTHEW RITTGERS:  Thank you, Elias.  This pdf

15 appears to be corrupt, that's why we're doing this in paper.

16 Q.  About two thirds of the way down, you said, "All right.

17 Well, you, uh, you know I'm here if you need me for that,"

18 referring to P.G.'s campaign, right?

19 A.  I'm answering him when he said, "Things are in good shape

20 right now."

21 Q.  And your answer was, "Well, you, uh, you know I'm here if

22 you need me for that," meaning for his campaign, right?

23 A.  Yeah.  He told me he was all set, so I answered him.

24 Q.  Yeah.  And that statement to P.G. was to elicit his

25 request for another donation or a campaign donation, which you

1    never gave him, correct?

2    A.   I wasn't trying to elicit nothing.

3    Q.   All right.

4    A.   I said what I said in response to his answer that he was

5    all set.

6    Q.   All right.  Let's go to December 9th.

7    A.   What number?

8    Q.   This would be 37B.  And I can show you this on your

9    screen, if it's easier for you.

10   A.   I have it, sir.

11   Q.   All right.  And so in this, this is a phone call between

12   P.G. and you on December 9th of 2019.  And towards the end of

13   the call, you say to him, "Well, if there's something that's

14   needed that, you know, I can help out with, you let me know

15   about that."

16        P.G. says, "Okay.  I think we're all good," right?

17   A.   Above that, he says, "Okay.  I'll track this down and see

18   what's needed to move the damn thing forward because, I mean,

19   frankly, I'm getting a little impatient too."

20        And I said, "Yeah.  Well, if there's something that's

21   needed that, you know, I can help you with that."

22   Q.   Right.  He's talking about trying to move 435 Elm forward

23   to a development?

24   A.   Uh-huh.

25   Q.   You then interject, Hey, let me know if you need anything

*VINNY - CROSS*

1    from me, that's what you're telling him, right?

2    A.   On the answer, he said, "Let me see what's needed."

3        And I said, "Let me know what's needed."  I said exactly

4    what I said there in that transcript.  That transcript is

5    exactly correct.

6    Q.   All right.  And then again on December 11th, which would

7    be USA 38B, and this would be towards the end as well, 38B.

8    You again ask P.G. if there's anything that he needs from you.

9    And P.G. says, "Nope.  We're good.  We're good.  Just be in

10   touch."

11   A.   That's exactly what I said, yes.

12   Q.   All right.  And in another phone call, in fact, the phone

13   call we heard partially while you were testifying, on

14   December 23rd, you offer P.G. a plane, said you got a guy

15   that's got a plane, right?

16   A.   Yes, I did.

17   Q.   Didn't take you up on that offer?

18   A.   Nope.

19   Q.   You're aware that in 2019, P.G. told Rob and Brian that

20   they had been generous and not to offer, even after he invited

21   them to a fundraiser, correct?

22   A.   I don't know what you're referring to.  I've never heard

23   that.

24   Q.   You talked to the prosecutor on direct about a woman by

25   the name of Laura Brunner, she's the head of the port.  Do you

*VINNY - CROSS*

1    remember that?

2    A.   That's my understanding that she works for the Port

3    Authority.

4    Q.   And she had been treating Mr. Ndukwe unfairly during this

5    process, correct?

6    A.   I heard she was giving him a hard time.  That's what I

7    heard.

8    Q.   The Port Authority had done deals before this where they

9    gave developers on problem properties deals for one dollar.

10   Were you aware of that?

11   A.   No, sir.

12   Q.   Were you aware that Ms. Brunner wanted Mr. Ndukwe to pay

13   the port $350,000 a year to obtain a ground lease for 435 Elm?

14   A.   I was not aware of that.

15   Q.   Were you aware of what Mr. Ndukwe offered in that

16   negotiation to the port to pay for the ground lease?

17   A.   That was not part of my role.

18   Q.   Okay.  Were you aware that P.G. was trying to mend the

19   relationship so that a deal could get done for the city on

20   435 Elm?

21   A.   The relationship with who, sir?

22   Q.   Mrs. Brunner and Mr. Ndukwe.

23   A.   He did tell me that he was trying to get them together to

24   see eye to eye, or something to that effect.

25   Q.   Were you aware that before this undercover operation

VINNY - CROSS

1    began, that P.G. was involved -- in fact, even with

2    Mr. Ndukwe and one of the holdover tenants, Ryan Goldschmidt

3    and his father, trying to facilitate a development at 435 Elm?

4    A.   I would have no way of knowing that.

5    Q.   Do you think that would be important to know before --

6         MS. GLATFELTER:  Objection, Your Honor.

7         THE COURT:  Well, let him finish the question, first.

8    Q.   -- before you were involved in this operation?

9    A.   Why would that matter to me?  That wouldn't matter to me

10   at all.

11        MR. C. MATTHEW RITTGERS:  May I have one moment, Your

12   Honor?

13        THE COURT:  You may.

14   Q.   You are personally aware, because of your conversations

15   with P.G. that were recorded, where he makes frequent

16   statements about how important this project is for the City of

17   Cincinnati, correct?

18   A.   Absolutely.

19   Q.   And he told you that?

20   A.   Yes, he did.

21   Q.   On a recorded phone call, that this is an important

22   project for the city, correct?

23   A.   More than once, probably.

24   Q.   Another phone call, "It's very important."  Another phone

25   call, "It's important for the city."  He told you that, right?

1   A.  Yeah, of course.

2   Q.  Do you understand why it is so important for the city?

3   A.  Yes, of course, I do.

4   Q.  Because of the drain on the city resources.  Are you

5   aware of that?

6   A.  I'm not aware of the drain for that particular property,

7   but all properties in cities that are vacant are obvious, to

8   the most casual observer, that they're a drain on the

9   community, and I understand that.

10  Q.  This particular property was adjacent to our Convention

11  Center.  Are you aware of that?

12  A.  No.

13  Q.  We have one Convention Center in our region.  This is

14  directly south of it.  And the Convention Center was losing

15  business to other cities.  And this was a blighted property

16  that could have been turned into a hotel to help bring jobs

17  and tax dollars to Cincinnati.  Were you aware of that?

18          MS. GLATFELTER:  Your Honor, objection to the closing

19  argument here.

20          THE COURT:  Yeah.  Sustained.

21          MR. C. MATTHEW RITTGERS:  No further questions, Your

22  Honor.

23          THE COURT:  Do you have a sense of how long your

24  redirect will be?

25          MS. GLATFELTER:  It's brief, but we're also happy to

1    take an afternoon break, if you need to.

2              THE COURT:  What do you mean by "brief"?

3              MS. GLATFELTER:  I said we're also amenable to taking

4    an afternoon break.

5              THE COURT:  No, no.  I don't know how long "brief"

6    is.

7              MS. GLATFELTER:  Like three minutes.

8              THE COURT:  Oh, then, very good.  Is that

9    Mr. Rittgers' book still there or not?

10             MS. GLATFELTER:  This is an exhibit binder.

11             THE COURT:  Oh, okay.

12             MS. GLATFELTER:  May I inquire, Your Honor?

13             THE COURT:  You may.

14                         REDIRECT EXAMINATION

15   BY MS. GLATFELTER:

16   Q.  Sir, you heard of the term "cameo" used in relation to

17   undercover operations?

18   A.  Yes.  Of course.

19   Q.  Can you explain to the jury what that means?

20   A.  A cameo role for an undercover is a role that is a

21   supportive role to support the day-to-day undercovers who have

22   contact with subjects and are responsible for the day-to-day

23   piece of the undercover operation.

24       This role that I was in in this case would be considered

25   a cameo role.

1    Q.   That was my next question.  Does that mean it is more

2    limited than what the lead undercover is?

3    A.   Yeah.  I don't study the whole thing.  I just come in and

4    do my thing and that's it.  I mean, I don't have to know the

5    whole case.

6    Q.   My apologies.  Was that your role for the March opening

7    day party?

8    A.   The opening -- no.  The opening day party, I was at that

9    party to meet someone else.

10   Q.   So you were there to meet someone different than

11   Mr. Sittenfeld?

12   A.   I had no idea who he was.  He introduced himself, or

13   somebody introduced him to me.  I was there for somebody

14   totally different on a different investigation.

15   Q.   And in September 24, 2019, when you did meet

16   Mr. Sittenfeld, were you in that cameo role?

17   A.   Yes.

18   Q.   Okay.  And did that cameo role change after the

19   September 24, 2019 meeting?

20   A.   It changed with his personally calling me.

21   Q.   That affected the decision in terms of what your role

22   would be going forward?

23   A.   Yes.  Initially, I was supposed to just go talk to this

24   other guy when the meeting came up in the hotel room, I was

25   supposed to do that.  And then when he started calling me, it

1    involved me a little bit more.

2    Q.   And to clarify, your role in that cameo was you were the

3    boss of Rob and Brian, right?

4    A.   That's correct.

5    Q.   You were the person with all the money?

6    A.   That's correct.

7         MS. GLATFELTER:   Permission to publish page 3 of

8    USA Exhibit 30B, which is in evidence, Your Honor.

9         THE COURT:   You may do so.

10   Q.   Sir, do you see the page in front of you?

11   A.   I see 1D154.

12   Q.   Yes.  And at the top of that page, do you see where it

13   says, "End transcription and begin transcription"?

14   A.   Yes.

15   Q.   You were asked a series of questions about this on

16   cross-examination, correct?

17   A.   Yes.

18   Q.   And, in fact, defense counsel played for you the portion

19   in between these two sections, right?  Do you recall that?

20   A.   That's what I believe he was playing, yes.

21   Q.   Okay.  And what was the subject matter of that section

22   again?

23   A.   I think it was just us gabbing about nothing.

24   Q.   You're talking about personal matters related to the

25   defendant?

1    A.   Correct.

2    Q.   Was there any discussion about 435 Elm?

3    A.   No.

4         MS. GLATFELTER:  Okay.  If we can turn and publish

5    page 21 of the same exhibit.  Permission, Your Honor?

6         THE COURT:  You may.

7         MS. GLATFELTER:  If we can blow up the top there.

8    Q.   You were asked some questions about creating a controlled

9    environment on cross-examination.  Do you recall that?

10   A.   Yes.

11   Q.   Okay.  And can you read that portion in the middle there

12   by Mr. Sittenfeld that starts, "I think there are"?

13   A.   "I think there are.  I would need to think through what

14   the mechanisms are but, I mean, there are different, like, we

15   can, we can control things in ways that seem totally

16   unrelated.

17        "So like you can use the zoning code, you know, and be

18   like something, you know, we will only let this activity occur

19   in places zoned for X, Y, you know.  I'm just, I'm confident

20   there's some..."

21        MS. GLATFELTER:  All right.  One moment, Your Honor.

22        No further questions, Your Honor.

23        THE COURT:  Thank you.

24        MR. C. MATTHEW RITTGERS:  Your Honor, just briefly.

25                        RECROSS-EXAMINATION

1    BY MR. C. MATTHEW RITTGERS:

2    Q.   You mentioned your cameo role, but in order to speak

3    intelligently to subjects, or someone like P.G.'s chief of

4    staff, Chris Dalton, you had to have background information

5    about the topics that you were going to discuss, correct?

6    A.   About 435 Elm?

7    Q.   Yes.

8    A.   Yes.

9    Q.   And same goes with the phone calls.  When you mentioned a

10   woman named Laura, you knew who she was, that she was the head

11   of the Port Authority, correct?

12   A.   I knew she worked at the Port Authority, yes.

13   Q.   And you prepared before your testimony today, correct?

14   A.   As far as what, sir?

15   Q.   Reviewing transcripts, speaking with the federal

16   prosecutors.

17   A.   Of course.

18   Q.   Before you came into the meeting, before USA 30B begins,

19   there were other details that were discussed related to the

20   sexual assault allegations, were there not?

21   A.   You're talking about the meeting in the hotel?

22   Q.   Yes.

23        MS. GLATFELTER:  Your Honor, I'm going to object.

24   Outside the scope.

25        THE COURT:  Yes, that is outside the scope of the

1    redirect.

2          MR. C. MATTHEW RITTGERS:  She said that there was

3    gabbing that was --

4          THE COURT:  That was for the gap between 7:54 and

5    9:17.  She didn't ask about what transpired before the meeting

6    began.

7          MR. C. MATTHEW RITTGERS:  Okay.

8    Q.   On USA 30B, the prosecutor asked you to reference one of

9    those cut segments on her redirect?

10   A.   Okay.

11   Q.   There are a lot of those in that transcript, correct?

12   A.   A lot?

13   Q.   Yeah.  Go ahead and take a look.

14   A.   What am I looking at?

15   Q.   How many times --

16         MR. C. MATTHEW RITTGERS:  I'll withdraw the question,

17   Your Honor.  I have no further questions.

18         THE COURT:  Okay.  I think we're done with you, sir.

19   You may step down.

20      (Witness excused.)

21         THE COURT:  Would now be an appropriate time for an

22   afternoon break?

23         MS. GLATFELTER:  Yes, Your Honor.  I think that would

24   be fine.

25         THE COURT:  Very good.  Ladies and gentlemen of the

```
 1    jury, standard instruction.  Please don't discuss this case

 2    amongst yourselves.  Please don't do any research on the case.

 3    Please do not discuss or communicate about this case with

 4    anyone.  If anyone should wish to attempt to communicate with

 5    you regarding the case, please let me know immediately.

 6         Please do not begin forming any final opinions about any

 7    of the facts or issues that are presented about this case.

 8         With that, have a pleasant break.  We'll probably call

 9    you back down in about 15 minutes or so, 20 minutes, something

10    like that.

11         (Jury out at 3:10 p.m.)

12              THE COURT:  Is there anything that we need to discuss

13    before we take our afternoon recess?

14              MS. GLATFELTER:  No, Your Honor.  No, we don't.

15              MR. C. MATTHEW RITTGERS:  No, Your Honor.

16              THE COURT:  Very good.  And are you calling another

17    undercover again next?

18              MS. GLATFELTER:  That's what I was going to refer to.

19         Your Honor, I would appreciate the same admonition

20    beforehand, just in case there are new people in the

21    courtroom.

22              THE COURT:  Sure.  Not with regard to the jury

23    instruction, but with regard to the sketch artists and

24    pictures; is that right?

25              MS. GLATFELTER:  Yes, Your Honor, exactly.
```

         1              THE COURT:  Very good.  I think we can recess.

         2         (Brief recess.)

         3              THE COURT:  Is there anything we need to discuss

         4    before we bring the jury back in?

         5              MS. GLATFELTER:  Your Honor, just to remind about the

         6    sketch artist.

         7              THE COURT:  Yes.  Good point.  If there are any

         8    sketch artists in the courtroom, the next witness who is going

         9    to testify is an undercover agent who is still actively

        10    involved in other investigations, and so the Court is going to

        11    order that no sketches be drawn that depict this witness.

        12         Moreover, as I hope everyone in the courtroom knows,

        13    there's already an order in place with regard to the use of

        14    electronic devices, but I do want to stress that no one can

        15    take any pictures or photographs of this witness on the stand.

        16         Mr. Rittgers, anything we need to discuss from your

        17    perspective?

        18              MR. C. MATTHEW RITTGERS:  No, Your Honor.

        19              THE COURT:  Very good.  All right.  Let's bring in

        20    the jury.

        21              COURTROOM DEPUTY:  Judge, they're gathering now.  It

        22    will be a minute.

        23              THE COURT:  It will be a minute.  You may be seated.

        24         Are you hoping you'll be done with the direct of this

        25    next witness by the end of the day or not?

*MILLER - DIRECT*

1          MS. GLATFELTER:  I think there's a good chance.

2     (Jury in at 3:47 p.m.)

3          THE COURT:  Does the government intend to call

4     another witness?

5          MS. GLATFELTER:  Yes, Your Honor.  We call Undercover

6     Agent Rob Miller.

7          THE COURT:  And ladies and gentlemen of the jury,

8     this would be another witness who will be testifying pursuant

9     to the name that was used during the investigation.

10     (Government witness, ROB MILLER, sworn.)

11                    DIRECT EXAMINATION

12     BY MS. GLATFELTER:

13     Q.  Good afternoon, sir.

14     A.  Good afternoon.

15     Q.  Can you please state and spell your undercover name.

16     A.  Rob, R-o-b.

17     Q.  And Miller as well?

18     A.  Yes.  Miller, M-i-l-l-e-r.

19     Q.  Are you currently employed, sir?

20     A.  I am, by the Federal Bureau of Investigations.

21     Q.  And in what capacity do you work there?

22     A.  I'm a supervisory special agent.

23     Q.  Does that mean that you hold a supervisor position?

24     A.  That's correct.

25     Q.  Have you worked for the FBI for more than ten years?

*MILLER - DIRECT*

1    A.   I have.

2    Q.   And what did you do before the FBI?

3    A.   I was an officer in the United States Army.

4    Q.   Now, during your career at at FBI, have you worked as an

5    undercover FBI agent?

6    A.   Yes, I do.

7    Q.   And can you explain to the jury the difference between a

8    case agent and an undercover agent?

9    A.   Sure.  An undercover agent is an employee.  It's either a

10   special agent with the FBI or a task force officer.  Some of

11   our local law enforcement become certified FBI undercovers.

12       And we are used in an FBI investigation when the case

13   agent that's running the case determines that they want to use

14   the undercover technique.

15   Q.   Okay.  And you referred to "case agent."  Have you served

16   as a case agent before?

17   A.   Yes, I have.

18   Q.   When you're in the role of case agent, what are your

19   duties?

20   A.   So as a case agent of an investigation, you are

21   responsible for -- you own that case.  It is your

22   responsibility to decide the direction of that case, what

23   evidence you're trying to collect, the direction of it, and

24   what you do in furtherance of that investigation.

25   Q.   You referred to an undercover operation as a "technique."

*MILLER – DIRECT*

1    What did you mean by that?

2    A.   In an investigation, a case agent has the option of using

3    a lot of different techniques in their investigation.  They

4    can use historical records.  They can use interviews.  They

5    can use search warrants.  They can use Title III, wire

6    intercepts of telephones.  And an undercover operation is just

7    another technique that a case agent can choose to use in the

8    operation or in an investigation.

9    Q.   I'm sorry.  Can any FBI agent become an undercover?

10   A.   Yes.  It's an open canvas that you can apply to, go to

11   the certification course.

12   Q.   And in order to operate, you need to pass the

13   certification course?

14   A.   That's correct.

15   Q.   Have you earned that certification?

16   A.   Yes, I have.

17   Q.   And you've been involved in undercover operations since

18   obtaining that certification?

19   A.   Yes, I have.

20   Q.   Can you tell the jury, over the course of your career at

21   FBI, how many undercover operations you've been involved in?

22   A.   I would estimate that I've been involved in over 30.

23   Q.   Okay.  And how many of those have involved public

24   corruption investigations?

25   A.   That I had a role in, probably 10 to 12.

*MILLER - DIRECT*

1    Q.   Okay.  Generally, how many undercover operations are you

2    involved in at a particular time?

3    A.   It varies.  There's times where there's zero, and there's

4    been times where I've been involved in as many as four at one

5    time, so...

6    Q.   When you're involved in multiple at one time, how does

7    that affect your schedule?

8    A.   It's a balancing act, because the undercover program is,

9    for the most part, considered a collateral duty.  So most of

10   the agents who work undercover also work as normal case

11   agents, so it is a balancing of their case work and their

12   undercover work.  So it's a lot of scheduling, and trying to

13   make sure it works with when you can be at the place that you

14   need to be at any given time, so...

15   Q.   So you mentioned that you are a supervisory special

16   agent; is that correct?

17   A.   That's correct.

18   Q.   That's the right terminology?

19   A.   Yes.

20   Q.   And what particular area do you supervise?

21   A.   So I work in the undercover section for FBI headquarters

22   now in backstopping.  So the backstopping unit for

23   headquarters, they provide undercovers with everything to try

24   to make that undercover look real.

25        That includes their alias identifications, their

1    businesses, their bank accounts, their phones sometimes, their

2    cars; whatever may be necessary to help bolster that

3    undercover's persona.

4    Q.   And so you supervised that unit?

5    A.   I'm one of the supervisors in that unit.

6    Q.   Okay.  And you mentioned collateral duties before.  So

7    that's your day job, so to speak, and you're doing the

8    undercover work in addition to that?

9    A.   I am, correct.

10   Q.   Now, how do you become involved in a specific undercover

11   operation?

12   A.   The primary mechanism is every FBI field office has an

13   undercover coordinator.  Those undercover coordinators meet

14   with the case agents when they decide to start an undercover

15   operation as part of their case.

16        And that undercover coordinator will work with the

17   undercover section to draft what is called a canvas.  And that

18   canvas goes out to every undercover coordinator in the FBI

19   that gives kind of a general here's the type of case, here's

20   the type of person they're looking for, here's kind of the

21   general time commitment that they're estimating, and then it

22   gives a point of contact for the case agent.

23        Then the individual undercovers receive those, and they

24   can reach out directly to the case agent and have that

25   conversation to see, hey, is this the right person that the

*MILLER - DIRECT*

1    case agent chooses to work their investigation.

2    Q.   And you mentioned the term "backstopping" before.  Can

3    you explain to the jury what the purpose of the backstopping

4    is?

5    A.   Sure.  It's to try to -- I mean, obviously, undercovers

6    are not who they are portraying themselves to be when they

7    walk in and meet with the subject of an investigation.

8         So depending on what they need to look like, and the

9    persona they need to present to the subjects and the people

10   they meet will determine what we do as far as backstopping,

11   including, like, where they're from, what their driver's

12   license, where it's from, what kind of car they're driving.

13   All those type of things go into it.

14   Q.   And does that even include things like credit cards in

15   the name of your undercover identity?

16   A.   Yes.  Absolutely.

17   Q.   Okay.  Let's say that you are in town for a multiday

18   operation.  How long do you stay in your undercover persona

19   during that operation?

20   A.   For -- it is case dependent, but for -- especially in a

21   sensitive case.  In a long-term case, usually, you stay in

22   role the entire time you are at the location that you're doing

23   undercover work.

24   Q.   So can you describe to the jury, as a practical matter,

25   what that means when you're coming into a place for an

*MILLER - DIRECT*

1  undercover operation that's going to last a couple of days?

2  A.  Sure.  So from the time of whatever airport I am flying

3  out of, I am flying out as my alias identification.

4  So I'm flying out as Rob Miller.  I have Rob Miller's

5  driver's license.  I'm going through security and TSA as Rob

6  Miller.  I'm using Rob Miller's credit card to book my plane

7  ticket.  Rob Miller is checking into the hotel.  Rob Miller is

8  ringing the car.  Rob Miller is buying gas for that car.

9  Rob Miller is going to Starbucks to get coffee in the

10  morning.  And Rob Miller is the same person on the way out,

11  until I get back to my residence and then switch back.

12  Q.  Okay.  Well, why is it that you don't cut that off --

13  let's say your meeting ends, and your example, you go to

14  Starbucks afterwards.  How come you don't just switch out at

15  that time period?

16  A.  It's -- well, two reasons.  One is, you normally don't

17  have your other identifications and things with you, first of

18  all, because you're going through security under your alias.

19  But the main reason is you never know who you're going to

20  run into, who you're going to meet, especially in a long-term

21  investigation that you know is going -- or is expected to go a

22  long period of time, you just don't know who you're going to

23  meet or run into, so it could compromise the investigation by

24  trying to switch back and forth, and being one person the time

25  you walk into Starbucks and the next time being a different

*MILLER - DIRECT*

1      person, so...

2      Q.  At the same location?

3      A.  Correct.

4      Q.  Okay.  Now, are there skills that you work to cultivate

5      as an undercover agent, just basic skills, I mean?

6      A.  Yes.

7      Q.  What are those?

8      A.  Well, you know, the undercover has to be able to build a

9      relationship with the subjects and investigation, so a lot of

10     that is what we would consider rapport building or

11     ingratiation, building that level of trust.

12         A lot of it is, you know, you are constantly trying to

13     read that person and determine whether they are believing you,

14     whether you have an issue.  So it's a lot of reading the

15     person, developing them, trying to figure out their habits,

16     their likes, and building your plan to kind of mirror what you

17     think they like.

18     Q.  Okay.  And what about active listening?

19     A.  That's huge.

20     Q.  Can you describe how that plays in?

21     A.  Sure.  I mean, active listening is not only listening,

22     but it's taking in what they're saying and responding.

23         So if you, for instance, hear them say that they have a

24     very tight schedule and they've got to be home, then you know,

25     when you ask them for the next meeting, that you're going to

*MILLER - DIRECT*

1    schedule it somewhere that's convenient for them. Those type

2    of things that you're constantly listening, okay, what's going

3    to increase my chances that I will have the next meeting with

4    the subject of this investigation to keep it going and to

5    continue to build that relationship.

6        And a lot of that is you're constantly having to listen

7    to what they say and apply that to what your plan is going

8    forward.

9    Q.   And as an undercover, is it your job to prove the

10   allegations in an investigation?

11   A.   As an undercover, our job is to collect evidence or

12   collect intelligence, depending on the type of case.

13   Sometimes what we end up collecting actually proves that there

14   is not a crime being committed, or at least not one that we

15   can prove.

16       So we go in, like I said, to collect evidence and to

17   collect intelligence.

18   Q.   Now, how are undercover agents introduced in an

19   investigation?

20   A.   It depends. It's normally -- well, I wouldn't say

21   normally. It can go both ways, as an introduction from a

22   confidential human source, or what's commonly referred to as a

23   source, meaning that there is someone who is cooperating with

24   the FBI or with local law enforcement that somehow has access

25   or can make an introduction to the subjects, and that person

1    inserts or helps introduce the undercovers into the case.

2        Sometimes that may mean they just simply make a phone

3    call to set up a meeting, or it could be as much as that

4    person is your partner for the next year in that

5    investigation.

6        On the other side of that is what we would consider going

7    in cold, and that's where the undercover has to truly just

8    initiate the relationship, with no introduction from someone.

9    Q.   Have you done both in your career as an undercover?

10   A.   Yes, I have.

11   Q.   Now, a few minutes ago, you mentioned collecting evidence

12   as your primary duty.  How do you collect that evidence in an

13   undercover investigation?

14   A.   Primarily collected through the recordings that we make,

15   both audio and audio/video recordings when we're meeting with

16   subjects.

17   Q.   So in terms of these meetings, who decides if a meeting

18   occurs?

19   A.   The case agents.

20   Q.   And what about the location of a meeting, how do you

21   figure out where a meeting will take place?

22   A.   Twofold.  I mean, primarily, the case agent has told us

23   where they want the meeting to happen, and part of that would

24   depend on what we're hoping occurs at that meeting or what the

25   plan is for -- the case agent has laid out for that next

MILLER - DIRECT

1    meeting, because what factors into that is our ability to make

2    a recording, whether we need to set up audio/video recording

3    equipment or just audio.

4        So a lot of that will factor into where we have a

5    meeting; but, ultimately, that's the case agent's decision as

6    to where meetings occur.

7    Q.   And you mentioned sometimes it's driven by the subject of

8    the investigation?

9    A.   It is.  It is.

10   Q.   And can you explain what you mean by that?

11   A.   Sure.  If a subject has -- like the example I gave

12   earlier, if we know that they particularly like a certain

13   restaurant, or they -- a certain area of town is more

14   convenient or less convenient for them, then we will try to

15   suggest a meeting happen somewhere that's convenient for them

16   so that they are less likely to cancel on us or not show up

17   or, you know, them show up and be rushed.  We want to maximize

18   the amount of time and opportunity we have when we're meeting

19   with subjects.

20   Q.   So we talked about location.  How about how often are the

21   frequency of meetings?  Who makes that decision?

22   A.   The case agent.  Again, the case agent monitors

23   constantly, you know, every meeting we have.  The case agent

24   goes back and analyzes what happened at the previous meeting,

25   and then they develop the plan for, okay, here's what we want

*MILLER - DIRECT*

1    to do next, here's when we want to do that.  And so it's part

2    of their overall plan is when they tell us to come into town.

3    Q.   Okay.  And for these meetings, do you prepare for the

4    meetings?

5    A.   We do.  The case agent will kind of give us a -- because

6    there's a lot of other pieces of the case happening, other

7    than the undercover operation, which we don't know about.

8         And so the case agent only tells us the pieces he feels

9    like we need to know, and how our piece fits into that overall

10   puzzle of the case that he's investigating.

11        So something may -- for instance, if we talked about

12   being introduced by a source, that source may have a meeting

13   that I need to know about because of something that happened,

14   so the case agent may tell me that information so that we talk

15   about the plan for my next meeting.

16   Q.   Okay.  And on the flip side, are there times where it's

17   better to go into a meeting and not know all of the things

18   happening in the case?

19   A.   There are.  There are times that the case agents don't

20   tell us information, and they shouldn't, because it would

21   be -- we don't want to respond unnaturally, what makes sense

22   for us to know something.

23        So if a subject says something, and I don't respond like

24   a normal person who just heard that for the first time, it can

25   be very -- it can be a very big telling sign to the subject

1      that, hey, something's not right here, like why would he know

2      that?  Why did he respond that way?

3           So there are pieces that the case agents intentionally

4      don't tell us because it wouldn't be natural for us to know

5      that information.

6      Q.   Before a meeting, do you have a script, like a movie?

7      A.   No.  We do not have a script.

8      Q.   Why not?

9      A.   Again, because we want the conversation to be very

10     natural.  So the case agent, prior to a meeting, will tell us

11     the objectives or what information he is trying -- he wants us

12     to -- the evidence he's trying to collect, or intelligence

13     that he's trying to gather, and we will formulate our own plan

14     of how we say that.

15          It's not like we go through a script of, okay, and then I

16     say X, Y, and Z, because that would come off every

17     unnaturally.

18          Every undercover kind of has a different style and a

19     different way they talk, and so for someone to write a script

20     for you would come across as very unnatural.

21     Q.   Who makes decisions about when the undercover operation

22     ends?

23     A.   The case agent and their management above them, as far

24     as -- and in cooperation with the prosecutors of the case,

25     depending on what type of case it is.  They decide, hey,

*MILLER - DIRECT*

1    either the undercover operation is not gaining any evidence of

2    any intelligence value, and so we're going to shut it down.

3        They can say we have collected everything that we think

4    we need to collect and want to collect through the undercover

5    technique.

6        Or they can say, hey, we've decided to go a different

7    route. We're going to use a different technique and,

8    therefore, we're shutting this operation down.

9    Q.   That's a conversation that occurs without you, right?

10   A.   Correct.

11   Q.   All right. Let's talk about this investigation. At some

12   point, did you become involved in an undercover operation

13   involving Mr. Sittenfeld?

14   A.   Yes, I did.

15   Q.   At that time, were you involved in other investigations

16   in the area?

17   A.   I was.

18   Q.   Okay. And did you pivot to this at the case agent's

19   direction?

20   A.   Yes, we did.

21   Q.   Can you describe to the jury what your undercover persona

22   was or was supposed to be?

23   A.   Sure. Myself and another undercover were posing as

24   investors that were working with a confidential human source.

25   The source was doing a real estate development project, and we

1    were helping finance that project.

2    Q.   And what did you do to convey that information to others?

3    A.   We -- I mean, we live that persona.  We make sure we try

4    to present ourselves as investors.  We -- obviously, the

5    source was huge, in that by he kind of bolstered that and told

6    everyone that we were backing his project, and that we had the

7    financial capabilities to do so.  And then we, again, try to

8    live that persona to make them see us in that light, so...

9    Q.   Okay.  Along those lines, where did you stay when you

10   were in town for this operation?

11   A.   Initially -- we ended up getting an apartment at the

12   580 Building, but we initially started, when we were working

13   the other investigations, we were still staying in hotels in

14   Cincinnati.

15   Q.   All right.  You said -- and you mentioned the

16   580 Building?

17   A.   Yes.

18   Q.   At some point, did you begin staying there?

19   A.   We did.  We ended up -- the case agent thought that it

20   would be a better idea for us to get an apartment at the

21   580 Building.

22   Q.   And what, if any, steps did you take regarding the 580 to

23   sort of make it official, make it your place to stay?

24   A.   We looked at several locations around Cincinnati as

25   potential undercover apartments, and we toured them, just like

1   anybody else that would look for an apartment.  We went and

2   met with the building managers in our AFIDs, in our alias IDs,

3   and ended up signing a lease for that unit under my alias ID.

4   Q.  And when you use "AFID," what do you -- do you use that

5   term?

6   A.  Yeah.  It's alias faults identification is the

7   abbreviation for AFID.  It is what we call our alias driver's

8   license or ID.

9   Q.  Now, you said you were staying at the 580 Building.

10  Where did you stay when you were off duty, so to speak?

11  A.  Once we had the apartment at the 580 Building, we always

12  stayed at the 580 Building.  We didn't -- it would look very

13  odd for us to go check into another hotel.

14      We wanted to seem like we -- the point of having the

15  apartment there was to make it look like we were really

16  committed to doing long-term work in the Cincinnati area and,

17  therefore, we wanted to have a presence there and be seen, so

18  we stayed there.  Once we had the apartment, we always stayed

19  there.

20  Q.  And was there any danger of compromising the

21  investigation if you stayed at a hotel after renting the

22  580 Building?

23  A.  In our opinion, definitely.  It could compromise, and it

24  could -- again, it's all those little things that if someone

25  sees you checking into the Marriott or the Hilton, and they

*MILLER - DIRECT*

1   know that you have an apartment, it doesn't make sense.  Why

2   would you be checking into another hotel, so...

3   Q.   Now, when you were in Cincinnati, how did you communicate

4   with people?

5   A.   I had a covert cell phone.

6   Q.   Like an undercover phone?

7   A.   Yes.

8   Q.   How did you obtain that?

9   A.   I went and purchased it covertly.  So I purchased it,

10  again, in my covert identification, and the service was

11  through my covert identification.

12  Q.   Have you heard the term a "consensual T3"?

13  A.   Yes.

14  Q.   What does that mean?

15  A.   So -- I'll back up with just saying what a T3 is.  A

16  Title III, or intercept, is what the FBI uses to monitor the

17  telephone calls and text messages to a particular number.

18      Normally, to get that, you have to have a court order if

19  you're doing it on the subject in an investigation.

20      What we in -- the FBI does for informants and for

21  undercovers is we do what's called sometimes a consensual

22  Title III, which means we are signing a piece of paper that

23  either goes to the court or to the phone company that says we

24  are allowing the FBI to monitor all of the communications,

25  phone calls, or text messages to that particular phone number.

1     And so it's just a mechanism so that if a subject calls

2 your undercover phone, or your -- or texts you, that's

3 automatically captured through an electronic system, versus

4 having to use like a handheld recording device.

5 Q. So you said it was -- it's captured in an electronic

6 system. Is that so a case agent can access it while you're

7 working?

8 A. They can access it while we're working, they can access

9 it while we're out of town. If a subject calls me, and I'm

10 not in Cincinnati, the case agent immediately can go to the

11 system and review that call or text message.

12 Q. All right. As a supervisory FBI agent, I'm not sure I

13 used the right term there, what did you say to call it?

14 A. Yeah, supervisory special agent.

15 Q. So supervisory special agent, do you also have --

16 separate and apart from your undercover phone, do you also

17 have a work phone, like an FBI work phone?

18 A. Yes.

19 Q. Can you explain the difference to that to the jury?

20 A. Sure. Every FBI agent has a phone that is issued by the

21 FBI that is for their official use for communication with

22 work. That means your official FBI email, load stuff on.

23     So that is -- you cannot use that phone when you're doing

24 covert activities because, again, if you give the subject or

25 anyone your phone number, and they run that, it's going to

1   come back associated with the FBI.

2       If they have -- you know, in this day and age, even your

3   Marriott rewards point number is tied to your cell phone

4   number.  So those things all have to be kept separate, and

5   they can't overlap, or else it could compromise an

6   investigation or compromise your alias identification.

7   Q.  And what about just the appearance of the phone.  I mean,

8   do you have a banner on your FBI work phone that says this is

9   the FBI, don't access?

10  A.  Well, there's a -- if you open up an FBI work phone, and

11  you don't have the code, it says if you found this phone, dial

12  202-324-1500, which is the FBI help desk, so yeah.

13  Q.  Okay.  So if you are on an undercover operation, and you

14  had that FBI phone, could that compromise the investigation?

15  A.  Sure.

16  Q.  So what do you do to cope with that situation when you're

17  in town for an undercover operation?

18  A.  When I'm working operationally, I only have my covert

19  operational phone with me.

20  Q.  Does that extend to your office, so to speak?  When

21  you're in town to do an undercover operation at a different

22  location than your home office, do you go to the local FBI

23  office?

24  A.  No.

25  Q.  And why not?

MILLER - DIRECT

1    A.   Again, number one, I don't have FBI credentials that

2    would get me into the FBI, first.  And the second part is you

3    don't want to be seen going or coming from those locations.

4    Q.   So the 580 Building was your central location, for all

5    intents and purposes, when you're in town?

6    A.   Correct.

7    Q.   Now, when did you first meet the defendant?

8    A.   Originally, I met him for a brief meeting in February

9    2018.

10   Q.   Can you briefly describe the context of that meeting?

11   A.   We were -- had an individual in Cincinnati that was

12   introducing us to a lot of people.  At that time,

13   Mr. Sittenfeld was not a subject of the investigation, as far

14   as the undercover portion went.

15       This individual would line up dinner with numerous

16   elected officials in the Cincinnati area, and Mr. Sittenfeld

17   was one of the people that came by the restaurant that night

18   and was introduced to us.

19   Q.   Okay.  And did that change?  Did you start working on an

20   undercover operation related to Mr. Sittenfeld?

21   A.   Yes, we did.

22   Q.   And about what time period was that?

23   A.   The next time I met Mr. Sittenfeld was in November of

24   2018.

25   Q.   And what were the circumstances of that meeting?

*MILLER - DIRECT*

1   A.   The case agents had notified us that their source that

2   was working the case had been requested to make a donation to

3   Mr. Sittenfeld, and he was working on the approval of the

4   435 Elm project, and they wanted us to go and meet with

5   Mr. Sittenfeld.

6   Q.   So going into the meeting, you were aware of those

7   previous phone calls with the source?

8   A.   Yes.

9   Q.   Now, who attended the lunch that you went to?

10  A.   It was myself, the source, Chin, and Mr. Sittenfeld.

11  Q.   And I apologize if I didn't hear it before, where did the

12  meeting take place?

13  A.   The lunch was at Nada, which was directly across the

14  street from the 580 Building.

15  Q.   And I assume Nada is a restaurant?

16  A.   Yes.

17  Q.   Okay.  Did you record this meeting at Nada?

18  A.   Yes, we did.

19  Q.   And were you limited to audio, or were you able to do

20  video at that meeting?

21  A.   The meeting, the portion that happened at Nada, was audio

22  only.  And then from when we finished at Nada, myself and

23  Mr. Sittenfeld walked across the street to the 580 Building,

24  to our apartment, and in that location we had audio and video

25  set up.

*MILLER - DIRECT*

1    Q.  What, if anything, did Mr. Sittenfeld bring to the

2    meeting?

3    A.  To the meeting at Nada, he had a laptop computer with

4    him, which he showed me several slides demonstrating where he

5    felt he stood in the future mayor's race in Cincinnati.

6    Q.  So he came to the meeting prepared?

7    A.  Yes.

8    Q.  Now, did the meeting with Mr. Sittenfeld end at the

9    restaurant?

10   A.  No, it didn't.  We moved across the street to the

11   580 Building.

12   Q.  When you say "we," who are you referring to?

13   A.  Myself and Mr. Sittenfeld.  The source, Chin, did not go

14   with us from the restaurant to the apartment.

15   Q.  What happened -- generally speaking, what happened when

16   you got there?

17   A.  Pretty quickly, as soon as we -- I generally showed him

18   around the apartment.  It was the first time he had been in

19   there, and we immediately went to -- I told him that Chin had

20   told me that he wanted to give Mr. Sittenfeld $20,000.

21          MS. GLATFELTER:  All right.  Your Honor, at this

22   time, I ask the Court's permission to publish a portion of

23   Exhibit 15C, which is already admitted into evidence.  It's a

24   recording.

25          THE COURT:  You may do so.

*MILLER - DIRECT*

1          MS. GLATFELTER:  And we're going to play from the

2    beginning until 2:12.

3          (Video played.)

4    Q.  All right.  The audio and the video were a little off in

5    this clip that we saw, right?

6          MS. GLATFELTER:  And if I may ask my cocounsel, or

7    let me ask Ms. Terry, what is the number of the exhibit for

8    the actual video clip without the transcript, can you tell me?

9          MS. TERRY:  I believe 15B.

10          MS. GLATFELTER:  15B.  All right.  And 15B is in

11    evidence, but I won't replay it here.  I don't want to waste

12    everyone's time here.

13    Q.  Do you recall this meeting?

14    A.  I do.

15    Q.  And where did this portion occur?

16    A.  That is inside the apartment that I rented at the

17    580 Building.

18    Q.  Who was present for the meeting?

19    A.  Myself and Mr. Sittenfeld.

20    Q.  Now, after this meeting, did you meet in person with

21    Mr. Sittenfeld again?

22    A.  After this meeting?

23    Q.  Uh-huh.

24    A.  Yes.  Multiple times.

25    Q.  Okay.  And did you meet with him on November 28th of

1    2018?

2    A.   Yes, I did.

3    Q.   What was the purpose of that meeting?

4    A.   Originally, at that first meeting, the -- we originally

5    said we were going to give him $20,000.  At the first meeting,

6    I only had $10,000, which was in cash.

7         Mr. Sittenfeld wanted it in a different format.  He

8    wanted it -- he had called me and told me to make it into a

9    check.

10        At one point, we discussed money orders.  And he came

11   back and corrected me and said, hey, I want it in a check from

12   an LLC.  And so the purpose of this meeting was to give him

13   two $5,000 checks from LLCs.

14   Q.   All right.  And where did this meeting occur?

15   A.   This meeting also happened in the apartment at the

16   580 Building.

17   Q.   And who was present for that?

18   A.   That meeting was myself, another undercover, and

19   Mr. Sittenfeld.

20   Q.   Who was the other undercover?

21   A.   Brian.

22   Q.   And what role did Brian have in this operation?

23   A.   Brian was essentially my business partner, so he was --

24   had the same role I had, as an investor in the project, or

25   financier of the project.

*MILLER – DIRECT*

1   Q.   Did this meeting relate to the meeting that we just saw

2   on November 7th?

3   A.   Yes.

4        MS. GLATFELTER:   Your Honor, permission to publish a

5   portion of Exhibit 20C, which has been already admitted into

6   evidence?

7        THE COURT:   You may do so.

8   (Video played.)

9   Q.   While it's paused, can you identify who we're seeing on

10  the screen?

11  A.   That is myself on the right, and Mr. Sittenfeld in the

12  center of the screen.

13  Q.   All right.  And during this meeting, after this portion

14  about the voting, did you give anything to Mr. Sittenfeld?

15  A.   Yes.  I gave him two checks for $5,000 each.

16  Q.   And were the form of the checks, as far as you knew, in

17  the format that Mr. Sittenfeld had requested?

18  A.   Yes.

19  Q.   Was there a problem with the checks that you learned

20  later?

21  A.   Yes, there were.

22  Q.   Can you describe that to the jury?

23  A.   Sure.  Mr. Sittenfeld told me to make the checks out to

24  the Progress and Growth PAC, which we did, and that they had

25  to be from registered LLCs.

*MILLER - DIRECT*

1        The problem, the checks, the bank accounts that the

2    undercover unit sent us were actually from registered

3    corporations, not from LLCs and, therefore, I did not know

4    that at the time.

5        Mr. Sittenfeld called me, after he took those checks, and

6    let me know that the person that he had given the checks to

7    looked them up on the Secretary of State's website, and they

8    were actually registered corporations, not LLCs.

9    Q.  All right.  And at that time, when you found out that

10   these were the wrong checks, what did Mr. Sittenfeld request

11   that you do?

12   A.  Just that we correct the checks and send him checks that

13   were from LLCs.

14   Q.  Okay.  Not take back the checks, or turn down the checks,

15   but just change the checks?

16   A.  Correct.

17   Q.  All right.  Did you meet again with Mr. Sittenfeld to do

18   that?

19   A.  We did.

20   Q.  And when was that meeting?

21   A.  It was in the middle of December.

22   Q.  What was the purpose of that meeting?

23   A.  It was to replace the previous two we originally -- the

24   first meeting in November, the original amount was $20,000.

25   Up until that point, we had only given him $10,000.  And the

1    $10,000 we gave him were in checks that were in corporations,

2    not LLCs.

3        So the purpose of this meeting was to give him the total

4    $20,000, which were going to be four checks for $5,000 each,

5    all from registered LLCs.

6    Q.   And was the format of those checks in -- strike that.

7        The checks that you presented, were they in the format

8    that Mr. Sittenfeld had requested?

9    A.   Yes.  These four checks were made out to the PAC, as he

10   had requested.  They were $5,000 each, and they were from

11   registered LLCs.

12   Q.   Who was present for this meeting in December?

13   A.   The meeting in December, again, was myself, the other

14   undercover, Brian, and Mr. Sittenfeld.

15   Q.   Now, how many times had you met with Mr. Sittenfeld in

16   person at this point?

17   A.   At this point, I had met with him -- this was the fourth

18   meeting in person.

19   Q.   And fourth includes that time in February of 2018 that

20   you met him briefly?

21   A.   That's correct.

22   Q.   Now, leading up to this meeting, did you communicate with

23   Mr. Sittenfeld?

24   A.   Yes.

25            MS. GLATFELTER:  Your Honor, permission to publish

1    Exhibit 21E, which are text messages that have already been

2    admitted into evidence?

3         THE COURT:  You may do so.

4    Q.  Sir, can you take a look at Exhibit 21E?

5    A.  Yes.

6    Q.  Do you recognize those messages?

7    A.  I do.

8    Q.  And what are they?

9    A.  They're the text message correspondence between myself

10   and Mr. Sittenfeld.

11   Q.  Okay.  And which side of the page are your messages

12   depicted on?

13   A.  My messages are in blue.

14   Q.  And can you read us the first four?

15   A.  Both sides of the conversation?

16   Q.  Yes.  I'm sorry.  That was vague.

17   A.  I said:  "I will be there on Monday."

18       Mr. Sittenfeld said:  "Great.  Drink after work or after

19   dinner?"

20       I said:  "Whichever one works for you."

21       Mr. Sittenfeld replied:  "How about 5:30, Ruby's?  Sotto?

22   You tell me."

23       I replied:  "Let's do Sotto.  Drinks or dinner?"

24   Q.  All right.  Earlier in your testimony, we had talked

25   about how a location might be selected for a meeting.  How did

*MILLER - DIRECT*

1    these text messages relate to that?

2    A.   They gave us an indication of when Mr. Sittenfeld would

3    be available, and where he would like to meet us, what would

4    be convenient for him.

5    Q.   And based on these text messages, where did he suggest to

6    have the meeting?

7    A.   Ruby's, which refers to Jeff Ruby's restaurant, or Sotto.

8    Both of those are on the same street and in the same general

9    area, downtown Cincinnati.

10   Q.   And did you choose one of the locations that

11   Mr. Sittenfeld had suggested?

12   A.   We did.  I said:  "Let's do Sotto."

13        MS. GLATFELTER:  Okay.  Your Honor, permission to

14   publish a portion of Exhibit 21F, which has already been

15   admitted into evidence?

16        THE COURT:  You may do so.

17        MS. GLATFELTER:  Thank you.

18   (Video played.)

19   Q.   Sir, do you see the video on your screen?

20   A.   Yes.

21   Q.   And can you identify who we're seeing in the video at

22   this point?

23   A.   Right now in the video, you're looking at Brian's back

24   and Mr. Sittenfeld's to the right.

25   Q.   Okay.  And were you pictured in the video earlier?

*MILLER - DIRECT*

1    A.   I was.

2    Q.   What was the paper that you handed to Mr. Sittenfeld?

3    A.   So I handed him four checks for $5,000 each.  And then

4    one of the checks, the bank account still said -- the name of

5    the company said, I think it said C2 or C3, Inc.  But I gave

6    him the paperwork from the Secretary of State website, showing

7    that the company was actually registered as an LLC, the

8    account name just had not been changed.

9    Q.   Now, after this interaction -- you said it was when?

10   A.   This was in December.

11   Q.   So after December, did you stay in contact with

12   Mr. Sittenfeld in the early part of 2019?

13   A.   Yes, I did.

14   Q.   Okay.  And can you give us some examples of the type of

15   contact that you had with Mr. Sittenfeld in, you know, the

16   winter and early spring of 2019?

17   A.   Sure.  Any time I would -- there would be something that

18   would happen with the project, as far as the source, whether

19   he had a meeting or anything, I would usually -- either I

20   would initiate it and text Mr. Sittenfeld, and sometimes he

21   would initiate it and update me on the status of the project

22   at 435 Elm.

23   Q.   Okay.  So you had some phone contact?

24   A.   Yes.

25   Q.   Did you also meet in person?

MILLER - DIRECT

1    A.   We did.

2    Q.   Okay.  And during these times that you met in person, can

3    you briefly describe the type of discussion that you would

4    have about 435 Elm?

5    A.   Which time frame?  Where are we at on the time?

6    Q.   I'm sorry.  My question was vague.  In this early time

7    period of 2019, from January to, let's say April, when you

8    would meet with Mr. Sittenfeld, would you talk about 435 Elm?

9    A.   Yes.

10   Q.   Okay.  And what are the types of things -- can you give

11   the jury some examples of the types of things that you would

12   talk about?

13   A.   Mostly, at that point of it, it was the status of the --

14   Chin, the source, was trying to work out a development

15   agreement with the city.

16        And so it was usually the status, or what meetings he had

17   recently had, or what changes had happened since the last time

18   we had spoken, as far as the status of that project

19   Q.   And during these meetings, was he providing information

20   to you about the 435 Elm status?

21   A.   Yes.

22   Q.   Now, at some point during the spring, was there any

23   discussion of transferring the property?

24   A.   There was.

25   Q.   Okay.  Can you explain what happened to the jury?

1 A. Sure. The property was under the control of the City of

2 Cincinnati, and the discussion was it was going to actually be

3 under the control, or transferred from the city to the Port of

4 Cincinnati, and they would then be the entity that would be

5 controlling a development agreement with a future developer.

6  And so there was a lot of discussions on if that was

7 going to happen, and what our thoughts were about that

8 happening.

9 Q. Okay. Do you recall anything of investigative

10 significance that happened on June 25, 2018?

11 A. I received a -- or I had a phone call with Mr. Sittenfeld

12 where he discussed that project being moved over to the port,

13 and asked me my thoughts on if I was okay with that happening.

14 Q. And what did you tell him?

15 A. Yes. We felt that that was in our best interest.

16 Q. Were there any technical difficulties with this phone

17 call?

18 A. Yes. So like we spoke about earlier, the consensual

19 Title III is designed to capture all the incoming calls and

20 outgoing calls to that phone number.

21  On this date, I believe it captured the initial part of

22 the call, but then I was notified after the call from the case

23 agent, when he went and reviewed it, that there was a

24 technical issue and, for whatever reason, the remainder of

25 that call was not captured.

*MILLER - DIRECT*

1   Q.   All right.  So at the time, you didn't even know that the

2   phone call didn't record?

3   A.   No.  I have no ability to turn on or off the recording to

4   that phone number.

5   Q.   All right.  And so what actions did you take regarding

6   that situation?

7   A.   So when I was notified, I went back and wrote FE 302 in

8   the case management system for the FBI that documented the

9   correspondence during that phone call.

10        MS. GLATFELTER:  Okay.  Your Honor, may I approach

11  the witness to show him what's been marked as USA 27C?

12    I will not be asking for the admission, but I want to

13  make sure we're talking about the same document.

14        THE COURT:  So you just want him to identify it?

15        MS. GLATFELTER:  Yes.

16        THE COURT:  You may do so.

17  Q.   Was this the report that you talked about documenting the

18  phone call in?

19  A.   Yes.

20  Q.   Okay.  And did you have a chance to review that before

21  your testimony today?

22  A.   Yes, I did.

23  Q.   And do you recall when this was documented in relation to

24  the phone call?

25  A.   The -- I think I drafted it the day after the phone call.

MILLER - DIRECT

1    I'd have to look at the actual -- it was either a day or two

2    days after the phone call.  I can't remember exactly.

3    Q.   How about I bring it to you and make sure.

4    A.   Sure.

5           MS. GLATFELTER:  Your Honor, may I approach again?

6           THE COURT:  You may.

7    Q.   Here, I can take it back when you're done.

8        And when did you draft this?

9    A.   Two days after.  So the phone call was on June 25th, and

10   I drafted it on June 27th.

11   Q.   And you said that you were discussing the transfer of the

12   property at the port?

13   A.   Yes.

14   Q.   Okay.  And what did Mr. Sittenfeld ask you?

15   A.   He asked me if I was -- if we were comfortable with that,

16   if we were -- basically, if we were okay and supportive of

17   that transfer happening.

18   Q.   Okay.  And how did you respond?

19   A.   Yes.  We told him we thought that that was basically in

20   our best interest if that happened.

21   Q.   All right.  I want to fast forward to the fall of 2019,

22   to September specifically.

23   A.   Okay.

24   Q.   Did there come a point in time when you met with

25   Mr. Sittenfeld in Columbus, Ohio?

1    A.   Yes.

2    Q.   Where did you meet?

3    A.   We met at a hotel room.  I believe it was a Hilton in

4    Columbus, Ohio.

5    Q.   Do you recall who was present for the meeting?

6    A.   I do.  Myself, two other undercovers, Brian and Vinny,

7    Mr. Sittenfeld, and a member of Mr. Sittenfeld's staff.  I

8    don't recall his name.

9    Q.   Was there anything of investigative significance that

10   occurred during this meeting?

11   A.   During this meeting, we talked extensively about -- the

12   plan for 435 Elm had transitioned to not only a hotel, but

13   also to including a restaurant that would have a sports book,

14   allow sports betting, and that was something that the

15   undercover Vinny was particularly interested in.

16       And during this, it was the conversation of the status of

17   that, and Vinny provided Mr. Sittenfeld with two $5,000

18   checks, and told Mr. Sittenfeld that I would be delivering two

19   more $5,000 checks on his behalf in the future.

20   Q.   Now, after this meeting, did you have communications with

21   Mr. Sittenfeld?

22   A.   I did.

23   Q.   Can you describe to the jury the volume of those

24   communications?

25   A.   During September and October, compared to our previous

 1    correspondence, it was a lot higher volume than we had had in

 2    a previous monthlong period, so...

 3             MS. GLATFELTER:  Your Honor, permission to publish

 4    Exhibit 31A, which has been previously admitted into evidence?

 5             THE COURT:  You may do so.

 6    Q.  Now, when you said the volume -- I'm going to paraphrase

 7    here, but when you said the volume increased during this

 8    meeting?

 9    A.  Yes.

10    Q.  Is this an example of the type of communications you're

11    referring to?

12    A.  Yes, it is.

13    Q.  And were any of the communications that you had after

14    this meeting via text message?

15    A.  Yes, they were.

16             MS. GLATFELTER:  Your Honor, permission to publish

17    Exhibit 31J, which has previously been admitted into evidence?

18             THE COURT:  You may do so.

19             MS. GLATFELTER:  Ms. Terry, this is multiple pages,

20    right?

21             MS. TERRY:  Yes.

22    Q.  So if we can start with the first page.  If you can

23    review the contents of the first page, and let me know when

24    you're finished.

25    A.  Okay.

 1           MS. GLATFELTER:  And the second page, Ms. Terry.

 2     A.   Okay.

 3     Q.   Then the next page.

 4           MS. GLATFELTER:  And you can just leave it right

 5     there.  Thank you.  Oh, can you put that back up on the

 6     screen?  Sorry.  I was going to ask a few questions about

 7     that.

 8     Q.   Now, do these text messages relate to a topic that you

 9     had discussed at the September 24th meeting in Columbus?

10     A.   Yes, it did.

11     Q.   How so?

12     A.   At the meeting in Columbus, we had discussed finding a --

13     replacing the source, Chin, with another developer on the

14     435 Elm project.

15     Q.   Okay.  And on the text message on the screen, which for

16     the record's reference is page 3 of Exhibit 31J, do you see

17     the reference to Dan?

18     A.   Yes.

19     Q.   Who is Dan?

20     A.   Dan is the individual Mr. Sittenfeld thought I should

21     consider partnering with on 435 Elm.

22     Q.   As the replacement for Chin?

23     A.   Yes.

24     Q.   Now, after the meeting in Columbus, did Mr. Sittenfeld

25     ask you for anything with respect to Vinny?

1    A.  He asked me for Vinny's phone number.

2    Q.  How did he request it?

3    A.  By text message.

4        MS. GLATFELTER:  Your Honor, permission to publish

5    Exhibit 32A, which has been previously admitted into evidence?

6        THE COURT:  You may do so.

7    Q.  And, sir, do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is the correspondence between myself and

11   Mr. Sittenfeld where -- again, Mr. Sittenfeld's on the left,

12   my texts are on the right, where he asked me for Vinny's phone

13   number.

14   Q.  And can you read the top text message?

15   A.  "Is there a good number to reach Vinny on?  Have a quick

16   update for him."

17   Q.  And then you respond with a telephone number?

18   A.  Yes.

19   Q.  Did you have to do anything before you responded with

20   Vinny's telephone number?

21   A.  I notified the case agent, and I had to notify Vinny to

22   expect a phone call.

23   Q.  Why?

24   A.  Vinny -- I did not know where he was, or what his

25   schedule was, or whether he had his covert phone with him, so

*MILLER - DIRECT*

1    I had to make sure he was prepared for it and was available.

2         And I don't know whether he had a consensual Title III on

3    his phone, so the case agents had to make arrangements for

4    however they were going to record that call.

5              MS. GLATFELTER:  One moment, Your Honor.

6         Just a few more questions.

7    Q.  Mr. Miller, during the time period of this investigation,

8    did you make a mistake in your personal life?

9    A.  Yes.

10   Q.  Can you just briefly describe that to the jury?

11   A.  Sure.  I had a personal relationship with someone

12   unrelated to the investigation in Cincinnati that was sexual

13   in nature, which caused an issue for the case as far as

14   reputation goes.  And because of that, I received a letter of

15   censure from the FBI.

16   Q.  Were you on duty or off duty at the time?

17   A.  I was off duty.

18   Q.  And is that what the letter you received for?

19   A.  Yes.

20   Q.  Okay.  And what was the title of the -- what was the

21   subject matter of the letter of censure?

22   A.  Unprofessional conduct off duty.

23             MS. GLATFELTER:  All right.  No further questions,

24   Your Honor.

25             THE COURT:  Thank you.  Mr. Rittgers?

1          MR. C. MATTHEW RITTGERS:  Your Honor, depending upon

2     when the Court wants to break for the day, considering it's

3     almost a quarter 'til.

4          I know I told you I was going to be very brief.  It might

5     be a little longer than 15 minutes, so...

6          THE COURT:  Why don't we get started and see how it

7     goes.

8                         CROSS-EXAMINATION

9     BY MR. C. MATTHEW RITTGERS:

10    Q.  Good afternoon.

11    A.  Good afternoon.

12    Q.  I would like to start with 2017.  Were you aware that

13    P.G. had been involved in trying to develop 435 Elm with a man

14    by the name of Ryan Goldschmidt and even Mr. Ndukwe in 2017?

15    A.  I didn't know anything about Mr. Sittenfeld or 435 Elm in

16    2017, I don't believe.

17    Q.  But during your conversations with Agent Holbrook or with

18    Mr. Ndukwe himself, were you ever told that in 2017, P.G. was

19    working to try to get 435 Elm redeveloped?

20    A.  No.

21    Q.  Were you told in conversations with Agent Holbrook or

22    with Mr. Ndukwe that Mr. Ndukwe had been a frequent fundraiser

23    for P.G.?

24    A.  No.  I did not know the status of Mr. Ndukwe's

25    contributions.

MILLER - CROSS

1    Q.   Were you aware that he had asked if he could be on the

2    host level of P.G.'s next fundraiser in January of 2018?

3    A.   No.  I was not aware of that.

4    Q.   Okay.  When you were speaking with the prosecutor, you

5    talked about your persona?

6    A.   Yes.

7    Q.   And the persona was that you and Rob and Vinny had money,

8    and you were ready to invest in Cincinnati?

9    A.   I was Rob.  So Rob, Brian, and Vinny, but yes, sir.

10   Q.   I apologize.

11   A.   No problem.

12   Q.   You and Brian and Vinny had money ready to invest in

13   Cincinnati?

14   A.   Yes, sir.

15   Q.   And the persona that was definitely told to P.G. was that

16   you had the financial capabilities to support Mr. Ndukwe's

17   435 Elm project?

18   A.   Correct.

19   Q.   And part of the persona was also that you were a little

20   bit uncomfortable telling your investors that their investment

21   in Cincinnati was safe, without going around and doing due

22   diligence and talking to people, right?

23   A.   We told them that we wanted to -- I wanted to be able to

24   tell my investors -- I think the word I used that it was

25   Cranley proof, referring to the mayor, because he had a

MILLER - CROSS

1    problem with Chin, with Mr. Ndukwe.

2    Q.  I'm talking at the Nada lunch on November 7th -- by the

3    way, on November 7th at the lunch at Nada, there were no

4    donations discussed at lunch, correct?

5    A.  No.

6    Q.  And at that lunch, P.G. said he could shepherd the votes,

7    right?

8    A.  I'd have to look at the transcript from the lunch.

9           MR. C. MATTHEW RITTGERS:  If you could, Scott.

10   Q.  This has been marked, sir, as USA 15C.  You can see it on

11   your screen, if you'd like.  And the reason we know this is at

12   lunch is because Mr. Ndukwe is there, and it's on page 9,

13   right?

14   A.  Where are we looking?

15   Q.  Here, I'll highlight it.  At the bottom, "You know I can

16   certainly shepherd the votes too," right?

17   A.  Right.

18   Q.  So that was at lunch?

19   A.  That was -- if you scroll to the top so I can see.  I

20   can't see what --

21   Q.  Sure.  I'll help you.  Mr. Ndukwe didn't go to 580?

22   A.  No.  Correct.  I'm just --

23   Q.  You want to know the date?

24   A.  Yes, from the transcript, correct.  Now I can see the

25   top, yeah, the date.  Yes, sir.  Correct.

*MILLER - CROSS*

1    Q.   So at lunch, P.G. vetted the project?

2    A.   I don't know what you mean by he vetted the project.

3    Q.   He asked if there was going to be a hotel that goes on

4    that parcel?

5    A.   Right.

6    Q.   And a hotel was a big deal for the City of Cincinnati

7    because the Convention Center needed hotel space around it,

8    correct?

9    A.   That's what he said, yes.

10   Q.   And Mr. Ndukwe said it too.  He said it would be huge for

11   the convention, right?

12   A.   Correct.

13   Q.   And I think you might have agreed at one point, even

14   finishing P.G.'s sentence or Mr. Ndukwe's sentence using the

15   term "Convention Center," correct?

16   A.   Correct.

17   Q.   And so he also asked about how much money you guys

18   thought you would put in to this problem property, which I

19   believe the response was $75 million?

20   A.   I don't recall exactly what the number was.

21   Q.   If you look on your screen, this is the same transcript,

22   page 8.  This is Mr. Ndukwe talking about how much money would

23   be in the deal, $75 million, right?

24   A.   That's what Mr. Ndukwe says will be required to develop

25   the whole project.

MILLER - CROSS

1    Q.   Sure.

2    A.   We don't say $75 million, but that's what he's saying for

3    the total development cost.

4    Q.   Sure.  And you guys were his backing.  That was your

5    persona --

6    A.   Correct.

7    Q.   -- for this deal.

8         But before that could happen, Mr. Ndukwe and, in turn,

9    you and Brian, had to do due diligence, so architects, zoning,

10   and Mr. Ndukwe talked about how just the due diligence would

11   be $1.8 million?

12   A.   I don't know the number you showed me on the transcript.

13   I can't confirm that, so...

14   Q.   Okay.  Do you see that at the bottom, page 6?

15   A.   Correct.  Yep.  I do.

16   Q.   So you and Mr. Ndukwe are telling P.G., hey, part of your

17   persona is, I believe, you cut your teeth in real estate

18   development deals out of Georgia, right?

19   A.   Correct.

20   Q.   And you've been doing real estate development deals for a

21   long time?

22   A.   Yes.

23   Q.   And you could invest your money anywhere you wanted in

24   any city around the country?

25   A.   Yes.

*MILLER - CROSS*

1    Q.    But you were considering Cincinnati?

2    A.    Correct.

3    Q.    And you were aware, at the time that you were considering

4    Cincinnati -- and this is an actual question.  Were you aware

5    the drain that this building had on the city?

6    A.    No.

7    Q.    You did not know that?

8    A.    No.

9    Q.    As you sit here today, did you know that that building

10   cost our city, actual dollars, $400,000 a year in actual

11   dollars?

12   A.    I have no idea.

13   Q.    You did agree that you talked about the Convention Center

14   to P.G.  Did you know the importance that it was strategically

15   for broader tourism in the area?

16   A.    Can you rephrase the question?  Are you asking me what he

17   told me, or what my understanding was?

18   Q.    Yeah.  Did you understand that that building, because of

19   the proximity to the Convention Center, that that building

20   impacted broader tourism in the entire region here?

21   A.    That topic came up every time we talked about the project

22   with every individual, so...

23   Q.    Were you aware that this had been a problem since

24   2000- -- for a decade?

25   A.    No.

*MILLER - CROSS*

1   Q.   Were you aware that in Cincinnati, the only interested

2   developer in 2018 was Mr. Ndukwe?

3   A.   No.

4   Q.   Were you aware that this building, 435 Elm, was embroiled

5   in litigation?

6   A.   I was aware that there was litigation.  My understanding

7   was that the current occupant was also trying to work through

8   developing it, meaning that Mr. Ndukwe would not have been the

9   only person.

10  Q.   And when Mr. Ndukwe purchased the air rights from

11  U.S. Bank in 2017, that meant the deal had to go through him,

12  right, he had the air rights?

13  A.   He had the air rights, but that did not guarantee a deal

14  had to go through him, was my understanding.

15  Q.   Someone would either have to pay him his air rights, or

16  they'd have to partner with him to do a deal.  There are two

17  choices, right?

18  A.   I don't know the -- I don't know the legal contract of

19  what was on there, or how that would be transferred.  I have

20  no idea.

21  Q.   How aware were you about the negotiations that Mr. Ndukwe

22  was having with Ms. Brunner, the head of the port?

23  A.   From the case agent, we knew generally what Mr. Ndukwe

24  was asking for in his development agreement with the city and

25  then later with the port.

MILLER - CROSS

1    Q.   And you're aware that with the port, and this is on some

2    of the recordings, Ms. Brunner was asking Mr. Ndukwe to pay

3    the port $350,000 a year in ground lease?

4    A.   Later.  So now we're in --

5    Q.   Yeah.

6    A.   -- September, October of -- no, actually, that would have

7    been summer of 2019, that time frame.

8    Q.   Or fall?

9    A.   When it was transferred to the port?

10   Q.   Correct.

11   A.   Yes.  I knew that the original development agreement that

12   Mr. Ndukwe was looking for was a one dollar a year lease, and

13   that number had significantly changed.  I don't remember the

14   exact dollar figure.

15   Q.   And that was -- Mr. Ndukwe told you that was odd to him.

16   That was unusual that the port would be asking for $350,000 a

17   year, correct?

18   A.   I don't know that Mr. Ndukwe told me that.

19   Q.   Let's go back to 2018.  When you were -- after P.G. had

20   vetted the project at Nada, asked about a hotel, how many

21   doors the hotel would have, how many square feet of office,

22   how much money you'd have into the deal, which he did do,

23   correct?

24   A.   He asked how much it would cost to develop it, yes.

25   Q.   And all the other things I just said, the hotel, how many

1    doors?

2    A.   I'd have to review the entire transcript, but he did

3    ask -- we did discuss the project and what the plan was.

4    Q.   Okay.  He said in that meeting at Nada at lunch that he

5    could shepherd the votes, right?

6    A.   Yes.

7    Q.   And part of the reason for your being at that lunch was

8    to talk to someone who had a better insight than you did as to

9    whether or not council or the mayor would support a project at

10   435 Elm?

11   A.   Are you asking me what my purpose for being --

12   Q.   Your persona, yes.  Your persona.

13   A.   My persona's purpose was to get assurances that we could

14   get the votes to make that project go.

15   Q.   And then when you go across the street to 580 --

16   A.   Yes.

17   Q.   -- the prosecutor highlighted a part at the end where

18   you're talking about trying to get a deal.  Do you remember

19   that?

20   A.   No.  I'm not sure which part you're referencing.

21   Q.   All right.  I believe it's on the bottom of page 29.  Can

22   you see this on your screen, sir?

23   A.   Yes.

24   Q.   So I believe that this was highlighted on your direct,

25   "What's the best way, the best way for us to get that deal,

*MILLER - CROSS*

1   you know what I mean, like?"  That was you, correct?

2   A.   That's me.

3   Q.   And P.G. goes back to discussing the development deals,

4   which is what had been discussed for the past hour, including

5   at lunch.  He's saying, "Do you know John Cranley is going to

6   veto it?"  The development deal is what he's referring to,

7   right, on the veto?

8   A.   Yes.

9   Q.   And so you're talking about, in your head -- you didn't

10  say it, but in your head, I believe, correct me if I'm wrong,

11  you're wanting to talk about a quid pro quo, right?

12  A.   I mean, if you scroll up above that, I say that Chin told

13  me we need to get P.G. $20,000, and so yes, right after that

14  is when we're discussing that.

15  Q.   But you didn't say quid pro quo, did you?

16  A.   No.  I didn't say quid pro quo.

17  Q.   You say "that deal," and P.G.'s response is, "I'm just,

18  do you guys know that he's going to try and veto it?"

19      He's going back to the development deal that you said

20  John Cranley might try to veto, right?

21  A.   He asked that question, yes.

22  Q.   And he already told you at the lunch that John loves

23  development, and even though he might have some beef with

24  Mr. Ndukwe, he still thinks that John would support a good

25  deal?

*MILLER - CROSS*

1  A.  Are you referring to a specific part where he said that,

2  or my inference?  I don't know what you're asking.

3  Q.  I mean, I can go to each part of the transcript but,

4  repeatedly, P.G. tells you that John Cranley is going to

5  support a good deal, right?  He's not going to block a

6  project?

7  A.  He says -- I think he refers to something like John

8  Cranley likes guys like you, referring to myself and my

9  business partner, I would assume, and that he did not think

10 that he would -- I don't know that he used the word he won't

11 block the deal.

12 Q.  All right.  And so this is the quote you're referring to.

13 "John loves guys like you.  People who choose to invest here,

14 they believe in it, they're revitalizing," that's what he's

15 referring to, right, revitalizing our downtown urban core?

16 A.  Right.

17 Q.  And that's after P.G. had asked what it was Mr. Ndukwe

18 and you wanted from the city, right?

19 A.  Correct.

20 Q.  And you talked about a CRA, right?

21 A.  Yes.

22 Q.  Which is the Community Reinvestment Act?

23 A.  Yes.

24 Q.  And the CRA that was discussed in this meeting before

25 P.G. said, hey, my colleagues will support this, even John

MILLER - CROSS

1    Cranley who might not like Mr. Ndukwe would support this, he
2    said he knew that because the CRA was normal, nothing abnormal
3    was competitive, right?  That's what he was told?
4    A.   I don't understand what question you're asking me.
5    Q.   I'm asking you if you recall P.G. vetting, asking
6    questions about what it was that you all wanted from the city
7    for this development deal?  Do you remember this conversation?
8    A.   Yes.
9    Q.   And Mr. Ndukwe told P.G., in this meeting at lunch at
10   Nada, that it was going to be a solid CRA, nothing out of the
11   ordinary, just competitive, right?
12   A.   Correct.
13   Q.   So P.G. then talks to you and Mr. Ndukwe about the fact
14   that even though sometimes his colleagues, council, might talk
15   a little crazy about CRAs, that if the deal is what you guys
16   have it teed up to be, meaning what you told him, that it's
17   easy to support.
18        And that's when he said, "Yeah, and I can shepherd the
19   votes too," meaning they'll support it too, right?
20   A.   I can't agree with that.  Like, you're paraphrasing a lot
21   of statements together.  I don't know where he said that.
22   Q.   All right.  Fair to say we hear people all the time,
23   elected officials talking about getting votes, going across
24   the aisle, getting a vote from their left or right?  Fair to
25   say we hear that?  There's nothing wrong with saying "I can

*MILLER - CROSS*

1    get the votes," correct?

2    A.   There's nothing wrong with saying that you support a

3    project, or --

4    Q.   Yeah.  We have people in our state house and U.S.

5    Congress and Senate that we call majority and minority whips.

6    Whips literally count votes.  They're called whips, like

7    whipping the votes, they're logrolling.  We do that every day

8    in our American democracy, right?

9            MS. GLATFELTER:  Your Honor, I was going to object to

10    the question, because we were waiting for the question for a

11    long time.

12            THE COURT:  Right.  What's the objection?

13            MS. GLATFELTER:  Argumentative.

14            THE COURT:  I'll allow it.  If you know.

15    A.   You'd have to re- -- I don't know where we were with the

16    senate.

17    Q.   Saying that you -- having elected officials saying "I can

18    get the votes or shepherd the votes" is something that is a

19    common occurrence that you've heard just by flipping on the TV

20    or the radio, right?

21    A.   It's a very common occurrence.  It's not associated with

22    a payment.

23    Q.   In that condo at the 580 Building on November 7th, you

24    offer P.G. $10,000 in cash, correct?

25    A.   Correct.

MILLER - CROSS

1   Q.   He turned it down?

2   A.   He wanted it in a different format.

3   Q.   He didn't take the cash?

4   A.   He did not take the cash.

5   Q.   All right.  And then he called someone, a compliance

6   person, and asked them questions about how he could accurately

7   report cash, correct?

8   A.   I don't know who he called.  He called someone and asked

9   can I take cash, and had a conversation about the means of how

10  that $10,000 needed to be put into the account.

11  Q.   And you all left that meeting with the impression, and

12  correct me if I'm wrong, that it could be either in money

13  orders or cashier's checks, I forget what it was, but that

14  that might be something that was permissible by law, correct?

15  Like P.G. was saying, hey, that might be all right doing it a

16  different way?

17  A.   P.G. was not comfortable with the cash because he felt

18  that that would raise red flags and didn't look good.  And he

19  thought that a money order would be the same as a check during

20  that meeting on November 7th.

21  Q.   And then he realized later he was wrong, that a money

22  order is the equivalent of cash, and so he called you and

23  said, hey, I can't take a money order?

24  A.   Correct.  He said a money order would go into the

25  account, and it would look just like cash going into the

MILLER - CROSS

1    account.

2    Q.  And that's when you all discussed the LLC checks,

3    correct?

4    A.  Correct.

5    Q.  But the LLC checks were first brought up -- LLCs and this

6    November law change -- in the very first recorded call in this

7    case, which was October 26th of 2018, right?

8    A.  I'm not sure.  I'd have to review the transcript on the

9    dates and what was brought up on that call.

10   Q.  Do you agree with me that the first recorded call on this

11   case was on October 26th of 2018?

12            MS. GLATFELTER:  Your Honor, I would just like him to

13   lay the foundation that this witness knows that call and has

14   seen that call and knows what this is about.

15            MR. C. MATTHEW RITTGERS:  That's where I'm going.

16            THE COURT:  I think we're on the same page.  All

17   right.

18   Q.  Sir, are you aware that the first recorded call in this

19   case and to Mr. Sittenfeld was on October 26, 2018?

20   A.  The first -- am I a part of this call?

21   Q.  It's between Mr. Ndukwe and P.G.

22   A.  Oh, I have no idea when that phone call happened, or the

23   details of it in -- where I could speak to it.

24   Q.  So you have no idea -- you did not know, as you sit here

25   today, that the LLC and the November law change was first

*MILLER - CROSS*

1    brought up by Mr. Ndukwe on that call?  You didn't know that?

2    A.  I don't know the details exactly when that was brought up

3    or who initiated it.

4    Q.  All right.  And so we're now in, I believe, late November

5    when you all discuss -- you tell P.G. that you're writing him

6    checks that are actually from an LLC, but it happens to be

7    from a corporation, correct?

8    A.  In late November, I give him two checks that, at the

9    time, I thought they were from LLCs, and then he checked, and

10   they were actually from corporations.

11   Q.  He had -- as a matter of routine, as part of his campaign

12   compliance, he had a law firm, an accountant, and other

13   compliance people that routinely go through these things, and

14   that's when he called you and said, hey, we checked, meaning

15   his team --

16        MS. GLATFELTER:  Objection, Your Honor.  Facts not in

17   evidence.

18        THE COURT:  Agreed.  Sustained.

19   Q.  Mr. Sittenfeld called you and said, hey, these aren't LLC

20   checks, right?

21   A.  Yes.

22   Q.  And he offered to vet them for you, the new checks that

23   you were going to donate to him.  He said, hey, if you want,

24   we can do that?

25   A.  He did.

*MILLER - CROSS*

1    Q.   And you told him that they were coming from your business

2    partners, correct?

3    A.   Correct.

4    Q.   The checks -- you talked to business partners because

5    business partners, what you're referring to are small

6    businesses which are often incorporated as LLCs, right?

7    That's your persona, that you have business partners in these

8    LLC corporations?

9    A.   I don't really understand the question.

10   Q.   Sorry.  You told P.G. that the new checks -- that you

11   talked to your business partners and would get them LLC

12   checks.  You apologized, correct, for the corporate mistake?

13   A.   Correct.

14   Q.   And you referenced your business partners to P.G. as

15   writing new checks for him?

16   A.   I told him that it was the same $10,000 that I would send

17   to one of my business partners and had him write a check out

18   of his -- one of his LLCs, I think, is the way it was relayed.

19   Q.   You had a phone call with Mr. Sittenfeld on November 26th

20   of 2018, correct?  Do you see that on the screen?

21   A.   Yes.  I see it.

22   Q.   That's USA 19B.  And you said to P.G., this is you:  "So

23   I've got one of our other business partners going to write

24   them out of his, we just sent him the (inaudible)," right?

25   A.   Correct.

1    Q.   And same thing, you're talking here about these LLC

2    checks in this meeting.  "Yeah, one of my, one of our other

3    business partners is going to write them out of his LLC versus

4    one of mine or Brian's companies," right?

5    A.   Correct.

6    Q.   And you know what bundling is in fundraising?

7    A.   Yes.

8    Q.   That a person can go to their universe or network of

9    friends and fundraise for a candidate by collecting checks and

10   handing them to a candidate, correct?

11   A.   Sure.

12   Q.   And they don't have to personally donate, the person who

13   is doing the fundraising or bundling?

14   A.   The person that is doing the bundling does not have to --

15   I don't know campaign finance law enough to make a comment on

16   that.

17   Q.   Okay.  All right.

18        THE COURT:  Mr. Rittgers, do you have a sense of is

19   it going to be a while yet, or --

20        MR. C. MATTHEW RITTGERS:  Your Honor, I think I'll be

21   ten minutes.

22        THE COURT:  Is that going to create a problem for any

23   member of the jury?  All right.  You may continue.

24        MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

25   Q.   In the 18 months of your investigation, you or Brian had

*MILLER - CROSS*

```
 1    offered P.G. numerous invites to travel outside of Ohio,
 2    correct?
 3    A.   Correct.
 4    Q.   And that was Miami, Las Vegas, Nashville, to name a few?
 5    A.   Correct.
 6    Q.   But he never traveled outside of Ohio?
 7    A.   He did not.  Well, he never traveled outside of Ohio with
 8    us.
 9    Q.   Sure.  During that investigation, you all would meet with
10    P.G. in public establishments in the city, correct?
11    A.   Correct.
12    Q.   And he would introduce you to civic leaders, correct?
13    A.   I'm trying to think of -- he introduced us -- anyone we
14    ran into that he knew, he would introduce us to.
15    Q.   And he was not bashful about saying you guys were in town
16    as investors, real estate investors, in 435 Elm, right?
17    A.   Correct.
18    Q.   Do you remember being introduced to the CEO of the Duke
19    Convention Bureau?
20    A.   No.
21    Q.   Do you remember being introduced to Steve Leeper, the
22    head of 3CDC?
23    A.   He introduced us to a couple developers, but I don't
24    remember exactly which ones they were.  That was four years
25    ago, three and a half years ago, so...
```

MILLER – CROSS

1   Q.   And when you all were out at bars and restaurants, P.G.

2   often offered to pay, and at times he actually did pay,

3   correct?

4   A.   There were occasions that he offered to pay for drinks

5   and did.  I could think of one or two times, at least, that he

6   paid for drinks.

7   Q.   He offered Brian and you to stay at his house?

8   A.   He did.

9   Q.   And he even invited you over one time with several other

10  guests, including the U.S. Attorney for the Southern District

11  of Ohio, correct?

12  A.   He did.

13  Q.   In 2019, there was a text, I believe it was to you, where

14  P.G. had invited you to a fundraiser, it might have even been

15  at Via Vite, and he said:  "Don't worry about donating.  You

16  guys have been generous enough."  Do you remember that?

17  A.   I do.

18  Q.   And during the entirety of 2019, he never asked for a

19  single donation, correct?

20  A.   He never asked me for a donation in 2019, no.

21  Q.   In that Columbus meeting on September 24th of 2019, P.G.

22  was already up there, correct?

23  A.   He was.

24  Q.   And his chief of staff, Chris Dalton, was in the meeting

25  the entire time, right?

*MILLER - CROSS*

1    A.   I think he walked out of the room for a minute to go next

2    door and get a Coke, or something to that effect, but

3    basically he was there 90 percent of the meeting.

4    Q.   And the beginning of that meeting, Vinny is not present,

5    right?

6    A.   No, he is not.

7    Q.   And that's -- at the beginning of the meeting is when you

8    brought up the sports betting, sports book?

9    A.   I'd have to look at -- I can't remember the exact order

10   of who brought it up, but...

11   Q.   We don't have a transcript of that part, so we'll have to

12   go from memory.

13        Do you remember when you said that because of the mess

14   that things had become, and you're talking about the sexual

15   assault allegations against Mr. Ndukwe, that you might -- and

16   I'll use the actual language, "Cut your fucking losses."  Do

17   you remember that?

18   A.   I don't remember.

19   Q.   Essentially, what you were telling P.G. is that you're

20   not sure if Vinny would want to stay in Cincinnati because the

21   thing has gotten kind of messy, right?

22   A.   Correct.

23   Q.   And then a hypothetical conversation occurred when Vinny

24   entered the room, hypothetical being that they're zoning

25   around gambling, right, because gambling is not legal in Ohio?

*MILLER - CROSS*

1    A.   Correct.

2    Q.   You mentioned on direct the consensual sexual affair at

3    the taxpayer funded penthouse, right, with a woman?

4    A.   Yes.

5    Q.   And during that relationship, you used your identity as

6    an out-of-town wealthy real estate investor, that's what she

7    believed you were, correct?

8    A.   I kept the same persona with every person I met.

9    Q.   And that was a violation of your oath of office to the

10   FBI?

11   A.   No.

12         MR. C. MATTHEW RITTGERS:  May I have one moment, Your

13   Honor?

14         THE COURT:  You may.

15   Q.   You did not tell her your real identity, correct?

16   A.   Correct.

17   Q.   And so it was a lie to her, the person that you presented

18   yourself to be throughout that relationship?

19   A.   I never told anyone I ever met in Cincinnati anything --

20   my name was anything other than Rob Miller.

21   Q.   And your persona stayed the same, being an out-of-town

22   wealthy real estate investor, including in that relationship

23   that we just discussed?

24   A.   Correct.

25         MR. C. MATTHEW RITTGERS:  No further questions.

 1              THE COURT:  Thank you.  Any redirect?

 2              MS. GLATFELTER:  I do, Your Honor.

 3              THE COURT:  How long?

 4              MS. GLATFELTER:  A couple of minutes.

 5              THE COURT:  Oh, okay.  That still falls within the

 6    10 minutes that Mr. Rittgers mentioned.

 7              MS. GLATFELTER:  Yes.  I certainly don't want to keep

 8    the jury here any longer.

 9                         REDIRECT EXAMINATION

10    BY MS. GLATFELTER:

11    Q.  Mr. Miller, you were asked some questions about the

12    November 7th meeting, right --

13    A.  Yes.

14    Q.  -- do you remember those questions on cross-examination.

15         Mr. Sittenfeld, did he come prepared to the meeting?

16    A.  On November 7th?

17    Q.  Yes.

18    A.  Yes, he did.

19    Q.  And that was the meeting at Nada, right?

20    A.  Correct.

21    Q.  Did he bring anything with him?

22    A.  He brought his laptop, which he showed me slides for what

23    he showed where he thought he stood in the future mayor race

24    for the City of Cincinnati.

25    Q.  So the slides were not about what a great city Cincinnati

MILLER - REDIRECT

1    is, it was about investing in the defendant?

2    A.   Correct.

3    Q.   Did the defendant ever give you the checks back, say

4    nope, you know what, I don't need the money, just let's forget

5    it?

6    A.   No.

7    Q.   Did he accept it?

8    A.   Yes.

9    Q.   How much money total?

10   A.   Over the total course, it was $40,000.

11   Q.   During the November 7th meeting, did you talk about

12   435 Elm --

13   A.   Yes, we did.

14   Q.   -- at the condo.  I'm sorry.  Did you talk about 435 Elm

15   at the condo?

16   A.   Yes, I did.

17   Q.   Did you talk about $20,000 at the condo?

18   A.   Yes.

19   Q.   Estimate how far apart those conversations were or,

20   actually, were they in the same conversation?

21   A.   Same conversation and several minutes apart.

22        MS. GLATFELTER:  One moment, Your Honor.

23   No further questions.  Thank you.

24        THE COURT:  Thank you, Ms. Glatfelter.

25   Mr. Rittgers?

*MILLER - RECROSS*

                    RECROSS-EXAMINATION

1    BY MR. C. MATTHEW RITTGERS:

2    Q.    Rob, there's nothing out of the ordinary or illegal with

3    a candidate proclaiming that he thinks he's going to win the

4    election, correct?

5    A.    No.

6    Q.    And talking about Cincinnati being a great city, P.G.

7    actually tried to get you, I think, married off to keep you

8    here in Cincinnati, didn't he?  Do you remember those

9    comments?

10   A.    He, I think, at one point did offer to maybe look for a

11   wife for me, or something to that effect.

12   Q.    He wanted you guys to be here in the city, right?

13   A.    He at least presented that, it seemed that way.

14   Q.    And he routinely talked about things that were in the

15   best interest of the city?

16   A.    He did routinely talk about the best things about

17   Cincinnati, yes.

18   Q.    In particular, even 435 Elm, talking about how strategic

19   and important this was for the city to get this accomplished,

20   correct?

21   A.    He did talk about the importance of that project.

22              MR. C. MATTHEW RITTGERS:  May I have one moment?

23              THE COURT:  You may.

24   Q.    The donations that you gave to P.G., they were donations

1    that you gratuitously offered to him and gave to him, correct?

2    A.   I was told, through the conversation that he had with

3    Mr. Ndukwe, that he had asked for money, and this was the

4    follow-up for that.  And I reference that Chin had told me

5    that he wanted $20,000.

6    Q.   But you were not aware about Mr. Ndukwe offering to be on

7    the host level of fundraising efforts for P.G.?

8    A.   I was not.

9    Q.   It's not odd, is it, that an elected official or

10   candidate for office, when they get a donation, to accept and

11   publicly report that donation on the FEC website?

12         MS. GLATFELTER:  I'm going to object, Your Honor.

13   This is outside the scope of redirect.

14         MR. C. MATTHEW RITTGERS:  No further questions, Your

15   Honor.

16         THE COURT:  Very good.  All right.  Sir, you may step

17   down.  Thank you for appearing this afternoon.

18         THE WITNESS:  Thank you, sir.

19      (Witness excused.)

20         THE COURT:  Ladies and gentlemen of the jury, I've

21   kept you a little beyond the appointed hour here.  I apologize

22   for that, but thought it made sense to get this witness off

23   the stand and keep this case moving forward.

24      I don't believe there's a lot we need to discuss tomorrow

25   before we start, so if you could try to be here by about 9:00,

1    we'll try to get you down promptly after that.

2        Of course, as I've said at nearly every break, at least

3    when I remember to, please do not discuss this case amongst

4    yourselves.  Please do not discuss this case this evening with

5    any family members, friends, or anyone else.

6        Please do not look at any media accounts, whether

7    newspaper or television or radio about this case.  Please do

8    not do any research or investigation on your own about any of

9    the facts or the law that you've seen presented in court.

10        And please don't begin to form any final opinions about

11    where things stand in the case.  The evidence has not all been

12    presented yet, and it would be unfair to one side or the other

13    to start forming final opinions yet.

14        So please just keep an open mind, and we will see you

15    tomorrow morning at 9:00.

16        (Jury out at 5:15 p.m.)

17        THE COURT:  Is there anything we need to discuss from

18    the government's perspective before we recess for the evening?

19        MS. GLATFELTER:  No, Your Honor.  Thank you.

20        THE COURT:  Mr. Rittgers?

21        MR. C. MATTHEW RITTGERS:  Your Honor, it can be

22    tomorrow morning, if that's better for the Court.

23        THE COURT:  Give me a preview of coming attractions

24    here.

25        MR. C. MATTHEW RITTGERS:  It had to do with the

1    testimony of the summary exhibits.  Mr. Schuett might be a

2    little more articulate than I am about that.

3         MR. SCHUETT:  Also, though, I think there was a

4    question about Mr. Burns, getting him here, so I don't know if

5    Mr. Rittgers wants to address that first.

6         THE COURT:  Oh, the hot potato is passed back,

7    Mr. Rittgers.

8         MR. C. MATTHEW RITTGERS:  To me?

9         THE COURT:  It sounds like it, yes.

10        MR. C. MATTHEW RITTGERS:  I'm going to pass it back

11   to you, Your Honor.  It's on Mr. Burns, the FEC expert.

12        THE COURT:  Yes.  So are you proposing to present him

13   for voir dire at some point?

14        MR. C. MATTHEW RITTGERS:  We can, Your Honor.

15        THE COURT:  When would that be?

16        MR. C. MATTHEW RITTGERS:  If the government is going

17   to be complete, we think in two more days, then it could be

18   Thursday morning.  I don't want to speak for the government,

19   though.  It depends on when they're --

20        THE COURT:  There's no reason necessarily that the

21   voir dire needs to be in order.

22        MR. C. MATTHEW RITTGERS:  Could it be virtual?

23        THE COURT:  No.  I mean, it doesn't need to be

24   necessarily after the government closes its case.  It just has

25   to be before he testifies.

```
 1              MR. C. MATTHEW RITTGERS:  He lives in D.C.

 2              THE COURT:  Oh, I see.  So I think they're proposing

 3    to present Mr. Burns for voir dire on Thursday.  Do you have a

 4    view on that?

 5              MR. SINGER:  No objection, Your Honor.  The only

 6    thing I would add is it was our understanding that there was a

 7    question as to whether or not his testimony was even going to

 8    be relevant based on the case that the government put on.

 9              THE COURT:  Yes.  I agree with that as well.  That's

10    another issue we can address.

11              MR. SINGER:  Okay.

12              THE COURT:  But I guess it would depend, to a certain

13    extent, on the opinions that Mr. Sittenfeld intends to elicit

14    from Mr. Burns, which I had understood to be one of the

15    purposes of the voir dire.

16              MR. SINGER:  But I mean, they should be -- the voir

17    dire should be based on the disclosures that we've been

18    provided.

19              THE COURT:  Absolutely.

20              MR. SINGER:  And so the disclosures, as we've been

21    provided, as has been presented to the Court, and it seems as

22    if, based on what the Court has previously ruled on the

23    subject, the issues that he has been disclosed for are not

24    going to be relevant based on the case that we put on so far.

25              THE COURT:  Okay.  Well, why don't -- I'm not
```

1    completely up to speed on those disclosures, as I sit here

2    right now, so why don't I review Mr. Burns' disclosure this

3    evening, and Mr. Rittgers and Mr. Singer be prepared -- or

4    whomever, be prepared to discuss in the morning why, I guess,

5    Mr. Rittgers, why defense believes Mr. Burns' opinions would

6    be relevant in light of the case that the government has

7    presented.

8         And I think we've seen enough of the government's case to

9    know the general contours with regard to questions relating to

10   campaign finance.

11        I will say, to the extent campaign finance violations

12   have been discussed, it's so far been mostly in response to

13   questions that you've posed to the witnesses, not questions

14   the government has posed so, for what it's worth.

15        And I don't intend to allow you to somehow make it

16   relevant to put opinion testimony on through the questions

17   that you've posed on cross-examination of the government's

18   witnesses, so we can discuss it tomorrow.

19             MR. C. MATTHEW RITTGERS:  Thank you.

20             MR. SINGER:  The only other thing I'd add, Your

21   Honor, and that's subject of many of the disclosures relate to

22   the characterization of the PAC, of the leadership PAC.  And I

23   think it's pretty clear that it's not a leadership PAC.

24             THE COURT:  Who established that?

25             MR. SINGER:  Well, I think the evidence that's been

1    put in shows that it's not a leadership PAC.  I don't know

2    that it's the defense position that it is even a leadership

3    PAC at this point.

4         THE COURT:  Right.  As I understand it, the term

5    "leadership PAC" applies to federal candidates and doesn't

6    apply to state candidates or local candidates.  So that was my

7    understanding of why there was a generalized agreement that it

8    was not a leadership PAC but that, nonetheless, independent of

9    the label, some of the things, like you can have your -- or

10   you can't have your name on it, or you can have control over

11   it, there's things like that, although I don't know if the

12   government is disputing any of those things.

13        MR. SINGER:  I believe that the disclosure themselves

14   say that the topic of his testimony would be about leadership

15   PACs.

16        THE COURT:  Oh, well, as I said, as I sit here right

17   now, I'm not fully apprised of what his testimony would be,

18   so...

19        MR. C. MATTHEW RITTGERS:  It operates the exact same

20   as leadership PAC, the only difference being, as you

21   mentioned, Your Honor, is he's not a federal officer.

22        THE COURT:  I will look at that.  So, Mr. Schuett,

23   now you're back in receipt of the hot potato.  You had

24   something to say about summary exhibits, I think?

25        MR. SCHUETT:  Yes, Your Honor.  I think twofold.  One

1    is the question of, I guess the best way to approach it is

2    that during the testimony of Agent Holbrook during

3    cross-examination, it became apparent that he did not author

4    the summaries.

5        And because this is a hybrid summary, the secondary

6    summary, I guess, just question since the law is clear that

7    for primary summaries in Rule 1006, it is supposed to be a

8    person who at least supervised the production of those

9    summaries who testifies and offers them.

10       So just seeking -- and that is a question of

11   admissibility in the Sixth Circuit, it's not a question of

12   weight.

13       So how we wanted to handle that, because on direct, he

14   said he was familiar and, obviously, he reviewed them.  And

15   then we found out on cross that he wasn't, at least he didn't

16   know who made them, I believe, was his answer.  That was the

17   first question.

18       And then the second, *United States versus Bray* here in

19   the Sixth Circuit does say that an instruction should go back

20   to the jury once those are admitted.

21       Did you want us to file -- just handle that in the

22   charging conference and add any new instruction in a formal

23   filing, or is that something we can talk about?

24           THE COURT:  The latter one is easier, we can talk

25   about that at the charging conference and the jury

1    instruction.

2            MR. SCHUETT:  Right.  And I figured, Your Honor.  I

3    just wanted to address those.

4            THE COURT:  Do you have a view, Ms. Glatfelter?

5            MS. GLATFELTER:  Yes, Your Honor.  We actually

6    submitted the secondary summary instruction along with our

7    proposed jury instruction, so it's already included.

8            THE COURT:  Oh.

9            MS. GLATFELTER:  And the first part of

10   Mr. Schuett's argument is that it is a case agent -- the case

11   agent testified these are fair, these are accurate, he

12   reviewed them, and he doesn't have to be the author.

13       And reviewing them for accuracy and making sure, it

14   doesn't matter who types it in.  It's whether the content is

15   accurate.  And that is what the defendant -- or, I'm sorry,

16   that is what the agent testified to.

17           THE COURT:  Do you have a case site?

18           MR. SCHUETT:  Yes, Your Honor.  The case that I'm

19   referring to is *United States versus Moon.*  It's 513 F.3d 527

20   Sixth Circuit 2008.

21           THE COURT:  I will take a look at that case as well.

22           MR. SCHUETT:  And it does note that the -- again, the

23   reason I was bringing it up is because this is a hybrid

24   situation.  The law is clear in *Bray*, right, that this

25   secondary summary does require some of the elements of 1006.

1    *Moon* is about 1006, which is why I was bringing it up.

2        And part of what wouldn't fit, obviously, is that in the

3    secondary summary, the underlying evidence goes back.  In the

4    primary, the underlying evidence does not go back, but they do

5    discuss that the summary must be properly introduced through

6    the testimony of a witness who supervised its preparation.

7    That's the matter that I was trying to address, and they do

8    say that's an admissibility issue.

9            THE COURT:  Okay.  And just for my edification, I

10   think it's the -- I forget what we're calling it, but the line

11   item document is what is summarized, right?  What was that

12   called, the post --

13           MS. GLATFELTER:  Is it chronology?

14           THE COURT:  That's what the summary is, but the

15   underlying document, I think, was along --

16           MS. GLATFELTER:  Yes.

17           THE COURT:  What was that called?

18           MS. GLATFELTER:  It's a combination of the line

19   sheets.

20           THE COURT:  Line sheets.

21           MS. GLATFELTER:  It's a combination also of the

22   recordings of the meetings and the phone calls.  So this

23   document is a secondary summary of all those things,

24   basically, from all those different sources.

25       So the secondary summary lists the exhibits that they

1    come from, which they've all been admitted, and it's like a

2    table of contents that lists what those items are.

3            THE COURT:  Right.  Okay.  Well, I will take another

4    look at the *Moon* case this evening, and we'll discuss

5    Mr. Burns after I look at his disclosure.

6        Anything else we should discuss before we break for the

7    evening?

8            MR. SCHUETT:  Not from the defense, Your Honor.

9    Thank you.

10           MS. GLATFELTER:  Not from the government either.

11           THE COURT:  Try to be here a little before 9:00

12   tomorrow, since it seems we have some things to talk about,

13   and I prefer to have them addressed before we have the jury

14   wait too long.

15               (Proceedings adjourned at 5:25 p.m.)

16                         -  -  -

17

18               C E R T I F I C A T E

19                         -  -  -

20       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
21   above-entitled matter.

22

23   /s/ M. Sue Lopreato_____                September 30, 2022
     M. SUE LOPREATO, RMR, CRR
24   Official Court Reporter

25

1                                  INDEX

2     GOVERNMENT WITNESS

3

      **NATHAN HOLBROOK**
4
      Continued Cross by Mr. C. Henry Rittgers............. Page 28
5     Redirect by Ms. Gaffney Painter..................... Page 73
      Recross by Mr. C. Henry Rittgers.................... Page 88
6
      **VINNY**
7
      Direct by Ms. Glatfelter............................ Page 106
8     Cross by Mr. C. Matthew Rittgers.................... Page 141
      Redirect by Ms. Glatfelter.......................... Page 174
9     Recross by Mr. C. Matthew Rittgers................. Page 178

10    **ROB MILLER**

11    Direct by Ms. Glatfelter............................ Page 182
      Cross by Mr. C. Matthew Rittgers.................... Page 221
12    Redirect by Ms. Glatfelter.......................... Page 243
      Recross by Mr. C. Matthew Rittgers................. Page 245
13

14
                                 EXHIBITS
15

16    GOVERNMENT EXHIBITS

17
      Exhibit                                         Admitted
18

19                             -   -   -

20

21

22

23

24

25