<pre>
 1                       UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF OHIO
 2                            WESTERN DIVISION
                                 -  -  -
 3

 4    UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                     :
 5              Plaintiff,           : Jury Trial, Day 6
                                     : Tuesday, June 28, 2022
 6         - v -                     :
                                     : 9:00 a.m.
 7    ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"           :
 8                                   :
                Defendant.           : Cincinnati, Ohio
 9
                                 -  -  -
10

11                      TRANSCRIPT OF PROCEEDINGS

          BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE
12
                                 -  -  -
13
      For the Plaintiff:           EMILY N. GLATFELTER, ESQ.
14                                 MATTHEW C. SINGER, ESQ.
                                   MEGAN GAFFNEY PAINTER, ESQ.
15                                 U.S. Department of Justice
                                   U.S. Attorney's Office
16                                 221 E. Fourth Street, Suite 400
                                   Cincinnati, Ohio  45202
17
      For the Defendant:           CHARLES M. RITTGERS, ESQ.
18                                 CHARLES H. RITTGERS, ESQ.
                                   NEAL D. SCHUETT, ESQ.
19                                 Rittgers & Rittgers
                                   12 E. Warren Street
20                                 Lebanon, Ohio  45036

21    Law Clerk:                   Jacob T. Denz, Esq.

22    Courtroom Deputy:            Scott M. Lang

23    Court Reporter:              M. Sue Lopreato, RMR, CRR
                                   513.564.7679
24
                                 -  -  -
25
</pre>

P R O C E E D I N G S

(In open court at 8:59 a.m.)

- - -

THE COURT:  All right.  So we're here this morning in the matter of the United States of America versus Alexander Sittenfeld.  It's case number 1:20-cr-142.  We're here for the continuation of Mr. Sittenfeld's trial.

We have a couple of matters to deal with per the parties' request last night.  I'm happy to take them in either order.  I'm sorry to be looking down, I'm trying to find something in my book here.

So what would we like to start with, the summary exhibit issue or the Mr. Burns issue?

MS. GAFFNEY PAINTER:  Happy to start with the summary exhibits, Your Honor.

THE COURT:  Very good.  Okay.  So as I understand the argument and, Mr. Schuett, correct me if I'm wrong, your concern is that the witness who sponsored, if you will, that exhibit didn't have sufficient foundation.  Is that the idea?

MR. SCHUETT:  Based on the case law, yes, that he was supposed to at least supervise the creation of the document, Your Honor.

THE COURT:  Right.  And you understand supervise to mean to be actively involved somehow in the actual production of the document?

1              MR. SCHUETT:  Well, certainly something more than

2    what he said, which is he didn't know who created it, Your

3    Honor.

4              THE COURT:  He didn't say he didn't know how it was

5    created, he just said he didn't know who created it, right?

6              MR. SCHUETT:  Well, I suppose that's true.  He didn't

7    say how, but he did say he didn't know who.

8              THE COURT:  So we don't know if he gave directions

9    and somebody carried them out, and it's just not known to him

10   or whatever?

11             MR. SCHUETT:  We don't, though I would argue that's

12   the proponents's job to weigh that foundation, Your Honor.

13             THE COURT:  Who would like to speak to it from the

14   government's standpoint?

15             MS. GAFFNEY PAINTER:  I will, Your Honor.

16             THE COURT:  All right.  Ms. Gaffney Painter?

17             MS. GAFFNEY PAINTER:  Mr. Schuett directed us last

18   night to a case, *United States versus Moon*, where the five

19   factors that are required in order to admit a summary exhibit

20   under Federal Rule of Evidence 1006.  This is not a summary

21   offered under 1006.  This is a secondary summary, which is

22   outlined in *United States versus Bray*.

23        And in *Bray* and in subsequent case law, the question is

24   is this summary accurate and reliable.  And to those points,

25   Special Agent Holbrook testified that he had reviewed these

1    exhibits and they were accurate.

2         So to that point, they should remain admitted as they are

3    now.

4              THE COURT:  Thank you.  Mr. Schuett, I guess my

5    concern, and I would actually, in addition to *Bray*, I would

6    point to *United States versus Kerley*.  It's 784 F.3d 327.

7    It's a Sixth Circuit case from 2015 that deals with secondary

8    exhibits.

9         And I think the difference, as I understand it, is with a

10   true summary exhibit, the underlying materials are not

11   submitted into the record, whereas with the secondary exhibit

12   they are.

13        And so in a sense, the secondary exhibit sort of becomes

14   an index, if you will, into the underlying exhibits, and

15   allows the jury to more easily sift through and find materials

16   within those underlying exhibits.

17        And I think, to Ms. Gaffney Painter's point, it looks to

18   me like the Sixth Circuit has said on multiple occasions, or

19   at least a couple of occasions, I think *Bray* would be one and

20   *Kerley*, I think, even more so, that accuracy is the key issue.

21        So I'm quoting here from page 341 of *Kerley*, "The

22   district court properly determined that the government's

23   exhibits were accurate and reliable depictions of the admitted

24   evidence they sought to synthesize for the jury."

25        And then it goes on later, "For the same reason, the

1    district court did not abuse its discretion by allowing Agent

2    McChord to testify because McChord merely explained the

3    summary charts to the jury and was subject to

4    cross-examination about the accuracy of the exhibits, and the

5    district court gave a proper limiting instruction."

6         And I believe, if I understood Ms. Gaffney Painter

7    correctly yesterday, the United States has submitted

8    supplementary instruction about secondary exhibits, which I

9    believe will say something along the lines of, to the

10   extent that you should use this, the index, in the underlying

11   exhibits, you know, this is not the key evidence, the

12   underlying exhibits are.

13        So it seems to me that with regard to secondary exhibits,

14   the real question is reliability and accuracy, and you did

15   have an opportunity to cross-examine the agent with regard to

16   that.  So unless you've got something further to say on that,

17   I'm going to overrule that objection.

18             MR. SCHUETT:  Understood, Your Honor.  I wanted to

19   bring it up.  It says it was a hybrid issue.  It wasn't clear

20   if that was going to be an issue.

21        We understand it was subject to cross-examination.  I

22   guess note our objection.  I understand it will be overruled.

23             THE COURT:  Sure.  Absolutely.

24             MR. SCHUETT:  Thank you.

25             THE COURT:  Okay.  Thank you.  So now let's move on

1    to Mr. Burns.  And I guess it's your motion at some level, or

2    I'm not even sure.  It was the government's motion in limine

3    to preclude Mr. Burns from testifying.  We talked a little bit

4    about the terms under which I would allow Mr. Burns to

5    testify, and I guess that point is kind of upon us, so we

6    should have a more fulsome discussion about that.

7        So, Mr. Rittgers, I've looked at the disclosure that you

8    provided for Mr. Burns and the topics that you set forth in

9    there.  They are, to Mr. Singer's point, I quote, federal

10   leadership PAC issues, which I think we all now agree are not

11   directly relevant to this case.

12       This is a different but arguably similar type of PAC at

13   issue.  But exactly what testimony or topics would you seek to

14   elicit from Mr. Burns?

15           MR. C. MATTHEW RITTGERS:  Your Honor, you did receive

16   the preliminary jury instructions that we submitted?

17           THE COURT:  Yes.

18           MR. C. MATTHEW RITTGERS:  And then there was an

19   affidavit form for Mr. Burns?

20           THE COURT:  Yes.

21           MR. C. MATTHEW RITTGERS:  That would be the outline

22   of his testimony, which would be the proposed preliminary jury

23   instructions and proposed final jury instructions that relate

24   to FEC law.  That is also outlined in Mr. Burns' affidavit.

25       And when we broke yesterday, I don't know if you want me

1    to address this, but you asked about, you know, the opening of

2    the door, and we thought about that a little bit last night.

3            THE COURT:  Yes.

4            MR. C. MATTHEW RITTGERS:  The government, in their

5    case, the way in which they set up cameras and the way in

6    which they operated, I mean, the first recorded call in this

7    case we've heard was October 26th of 2018.

8        The first time the mention of an LLC is mentioned was

9    from the government's cooperating witness.  The government

10    sets up cameras where they show the jury, and they actually

11    highlighted this on direct with multiple witnesses where

12    Mr. Sittenfeld was personally handed checks.

13        So obviously, they think that that might be important for

14    the jury to be able to draw conclusions from those videotapes

15    which they created.

16        And so a person like Mr. Burns, and what he's outlined in

17    his -- in our proposed formal jury instructions, would help

18    the jury understand what is permissible in terms of how a PAC

19    operates.

20        And on the leadership PAC side of things, the checkmark

21    on the -- this is the way I understand it, on the application

22    for the PAC said non-connected committee PACs.      But the

23    FEC broader law, the way in which that PAC has to operate are

24    leadership PACs.  That's why everyone refers to this in the

25    industry, to experts, as leadership PACs.

1          Even though Mr. Sittenfeld is not a federal candidate,

2     everyone in the industry says it has to operate under the

3     leadership PAC compliance regulation.

4          THE COURT: So I guess my concern, what I said at the

5     outset of the trial, I think in the final pretrial, was that I

6     certainly agreed that to the extent the government made an

7     issue out of the fact that PACs were involved here, or in any

8     way suggested there was something inappropriate about the way

9     in which -- the fact that these contributions came in through

10    PACs, if that somehow indicated something about illegality, I

11    thought we would need to address that either with an

12    instruction from the Court or by an expert witness who could

13    sort of set the field right.

14         I guess my concern is, I haven't heard any questions from

15    the government suggesting at any point that there was anything

16    inappropriate about the way in which the campaign

17    contributions occurred here.

18         I think there was some testimony elicited by you, by your

19    team, in which some questions were raised. But other than the

20    questions you yourselves asked, can you point me to any

21    question the government asked that suggested that there was

22    something inappropriate about this?

23         MR. C. MATTHEW RITTGERS: Well, a couple things, Your

24    Honor. One, it doesn't have to be expressly stated. By the

25    mere fact that they are highlighting certain things in their

1    case in chief, one example which I've already given is we gave

2    Mr. Sittenfeld this check in his hand, and we set a video up

3    to capture it.

4         A jury, who has no idea how a PAC operates likely thinks,

5    especially in today's world, that accepting that PAC money is

6    wrong.

7         They also highlighted in their case in chief the fact

8    that P.G. said that his name was not connected to this PAC.

9    They highlighted that. You know, we got about 10 percent of

10   the total recordings, and they chose to include parts of these

11   recordings where Mr. Sittenfeld is telling the agents that his

12   name is not associated with this PAC, which is true, and it

13   cannot be associated with it.

14        But by the fact that they highlighted it, it would be

15   reasonable for us to all believe that the jury thinks that's

16   important. The government highlighted it. Just like the

17   accusation against Mr. Sittenfeld, there doesn't have to be an

18   express statement for the jury to try to draw this nefarious

19   conclusion, which has been what was highlighted here.

20        I did go back, and Sue was nice enough to send me a

21   question, and there was a question on cross, "You agree that

22   the checks that we talked about last week, there were eight of

23   them, but the first four checks that eventually Rob gave to

24   him some six weeks later, you agree that they were properly

25   deposited into his PAC account, right?" That was the

1    question, were they properly deposited in the PAC account.

2    And the answer then runs into all this conduit donation straw

3    donor stuff.  So if --

4           THE COURT:  The question asked that?

5           MR. C. MATTHEW RITTGERS:  The question asked if he

6    properly --

7           THE COURT:  Well, they can't be properly deposited if

8    they're straw donors checks.

9           MR. C. MATTHEW RITTGERS:  I agree.

10          THE COURT:  Well, so that's the answer you got.  I

11   mean, you asked the question, you got an answer you don't

12   like, and now you say I want an expert to fix the problem I

13   created.

14          MR. C. MATTHEW RITTGERS:  Your Honor, on direct, that

15   was a question based on the direct testimony.

16          THE COURT:  But he didn't say on direct there was

17   anything improper about the deposits.  As far as if this is

18   the only question we have, it is, as you point out on cross.

19     So on cross you elicited information that you now think

20   is potentially damaging, and you'd like to have some fix for

21   that, but --

22          MR. C. MATTHEW RITTGERS:  If the government can get

23   up and say in any case that they want, hey, we're going to put

24   in videos of politicians taking PACs, and we're going to talk

25   about, you know, yesterday, were they talking about specific

1    policy positions at the same time as campaign donations?  Yes,

2    that was elicited from Rob on direct.

3        You know, all this discussion from the jury, they don't

4    have to stand up and say that's improper.

5           THE COURT:  I agree with that.  I'm still -- it just

6    seems to me, the testimony we've gotten from the stand so far

7    is that there's nothing inherently wrong with bundling, right?

8           MR. C. MATTHEW RITTGERS:  Correct.

9           THE COURT:  I think multiple witnesses have said

10    that.

11           MR. C. MATTHEW RITTGERS:  Agree.

12           THE COURT:  I've seen no suggestion that there's

13    anything inherently wrong with a PAC.

14           MR. C. MATTHEW RITTGERS:  It hasn't been expressed,

15    but it's been implied, in my opinion, Your Honor.

16           THE COURT:  Well, isn't the easiest and quickest way

17    to shortcut all of this for me to just instruct the jury that

18    there's nothing inherently wrong with contributing money to a

19    PAC.

20      There's nothing inherently wrong with a political

21    candidate accepting checks directly from donors or bundlers

22    who are bringing checks from people.  There's nothing wrong

23    with those checks being accepted by hand.  There's nothing

24    wrong with LLC contributions up to the campaign limit, which

25    everybody agrees in this case for a PAC is $5,000.

1        Isn't it just like three or four points that I think

2   everybody agrees with?

3           MR. C. MATTHEW RITTGERS:  Yes.

4           MR. C. HENRY RITTGERS:  May I?

5           THE COURT:  You may, Mr. Rittgers.

6           MR. C. HENRY RITTGERS:  Thank you, Your Honor.

7           THE COURT:  I appreciate I can always just say

8   Mr. Rittgers.

9           MR. C. HENRY RITTGERS:  The other thing is is that

10  his name was not associated with the PAC.  If the Court clears

11  that up also, then we're fine.

12          THE COURT:  Okay.  And I don't think there's any

13  dispute as to any of those things, is there, from the

14  government, whoever, Mr. Singer?  See, now I've got to pick a

15  name.  Mr. Singer?

16          MR. SINGER:  There isn't, Your Honor.  Of course, the

17  issue is how the language was used.  There isn't generally,

18  and then there are buts, right, depending on how -- the

19  bundling issue.

20          THE COURT:  Sure.  There's nothing wrong with

21  bundling, as long as the other people truly are the sources of

22  the funds.

23          MR. SINGER:  Correct.

24          THE COURT:  But more to the point, there's no

25  allegation in this case that there was straw donors or

1    anything else, so we don't want the jury focused on whether

2    there were straw donors here, right?

3         MR.  SINGER:  Well, I mean, the fact that the

4    names -- the language that the defendant used in discussing

5    the passing of the checks, I think it's relevant.

6      They asked them to hide their names, and he agreed.  And

7    he knew the money was coming from Rob and Brian.  He also knew

8    that it was being paid through other sources that came back.

9    That doesn't have anything to do with the PAC --

10         THE COURT:  I was going to say it doesn't have

11   anything to do with the FEC law or the PAC.

12         MR.  SINGER:  I'm sorry.  I don't mean to talk over

13   you.

14         THE COURT:  I didn't mean to talk over you.  I'm

15   sorry.

16         MR.  SINGER:  It doesn't have anything to do with the

17   PAC, it doesn't have anything to do with campaign finance

18   reform or campaign finance laws, or PAC laws, or the FEC.

19         THE COURT:  Okay.  So here's what I'm going to do.

20   Over lunch today, I'm going to write up what I think of as

21   five or six neutral statements that I believe cover the ground

22   that we're talking about that I would propose including as

23   part of or as a separate jury instruction that will advise the

24   jury on the laws surrounding this issue, because I do believe

25   it is the case that the government is not seeking to prosecute

```
 1    Mr. Sittenfeld for any kind of campaign finance violation,

 2    FEC law-type thing, and I do think we need to make that clear

 3    to the jury that there's no allegation in this case that

 4    campaign finance law was violated, or there's no allegation

 5    that's in any way relevant to the jury's consideration that

 6    campaign finance law was violated. I do want to make that

 7    clear.

 8            MR. SINGER: It is not part of the charges that have

 9    been alleged in the indictment.

10            THE COURT: Okay. And I think I'm going to write

11    that up over lunch, and if we can -- hopefully, it will cover

12    the ground that the Rittgers have raised and that I've already

13    discussed this morning.

14        It will also contain a sufficient proviso, although it's

15    going to be a skinny proviso on the point you've made because

16    straw donors aren't really -- I don't mean to prevent you from

17    arguing that this was all the same money, or whatever, but

18    it's not going to give rise to any kind of campaign violation

19    issue.

20        And I think I can get us to where we need to be. We'll

21    talk about it after lunch, and if we're not better yet, we'll

22    figure out where to go.

23        With that, are there other -- yes, Mr. Singer?

24            MR. SINGER: Sorry. There was one other issue we

25    wanted to raise this morning, Your Honor.
```

```
1              THE COURT:  Sure.

2         MR. SINGER:  Yesterday, on cross-examination of

3    Special Agent Holbrook, the defense attempted to ask the

4    question as to whether or not -- they're discussing a trip to

5    Miami relating to another public official and suggested that

6    there was a hundred thousand dollars that was spent on that

7    trip.

8         Now, there was -- pursuant to the Court's order, we have

9    not turned over anything relating to the cost of the

10   investigation.

11             THE COURT:  Yep.

12        MR. SINGER:  The Court recognized that this was

13   confusing to the jury, and it would potentially mislead the

14   jury.  There was no good faith basis for the question.  There

15   was no evidence, nothing to come from the government.

16        And the government is the party that would know how much

17   that investigation cost, that part of the investigation cost.

18   There's nothing that's been provided that would support that.

19   There's nothing to support it.

20        MR. C. MATTHEW RITTGERS:  Your Honor, the question

21   preceding that was whether or not Mr. Ndukwe's $27,000 in cash

22   payments from the federal government, from the agent, included

23   that trip, and he said it did include his time on that trip.

24        Flying a private jet to anywhere, but let alone to Miami

25   one way is probably $40,000 in today's market, and in 2018,
```

1    $40,000 back.

2        There were statements, and I believe this was part of the

3    third-party discovery that the Court reviewed, where just last

4    week the government and Agent Holbrook had conducted

5    interviews about that trip with Mr. Ndukwe, who is about to

6    take the stand, about whether or not he was using his own

7    money at Tootsies.

8        There were statements about private yachts. There were

9    statements about how long that trip was and what they were

10   doing.

11       A hundred thousand dollars was a question to the agent,

12   which is actually -- the trip could have actually been more

13   than that. I mean, that's with the good faith basis.

14       THE COURT: My understanding, which is admittedly

15   limited, of private jet flight is that it often depends

16   greatly on the aircraft that's used.

17       MR. C. MATTHEW RITTGERS: This was NetJets, which

18   would have been, I think, $40,000.

19       THE COURT: Well, NetJets has a variety of different

20   platforms available, though, doesn't it?

21       MR. C. MATTHEW RITTGERS: If you're on a private jet

22   out of Lunken Airport down to Miami, you're looking at

23   probably 40 or 50,000 dollars one way.

24       THE COURT: Do you have reason to believe that's not

25   the case?

1         MR. SINGER:  I have no idea what kind of deal the FBI

2    gets when they're booking flights.  I have no idea.  But I

3    know that there is no evidence to support the number that they

4    tossed out there.

5         Now, I raised this for two reasons.  One, because there

6    wasn't a good faith basis for it; and two, the Court's

7    addressed this very issue in a written opinion relating to the

8    motion to compel.

9         Page ID 967, the Court said introduction of such evidence

10   would risk confusing and distraction to the jury, as the

11   government, in fairness, would have to be allowed to point

12   more broadly to the fruits of its investigative efforts and

13   the justification for their costs.

14        We had no intention of getting into other investigations,

15   the results.  The fruits of those investigations have now

16   opened the door.

17        THE COURT:  That was the concern the Court had, as we

18   already heard on somebody's redirect, I forget whose, it

19   appears Mr. Ndukwe was on that flight in connection with an

20   investigation for another person.

21        I know that it's been a concern that you've raised that

22   we don't want to broaden this to other actors more generally

23   who, you know, are in the Cincinnati government.  So there is

24   intention here to what you're doing.  You are kind of opening

25   the door.

1        MR. C. MATTHEW RITTGERS:  I don't disagree with that,

2   Your Honor.  But just for the kind of conversation that was

3   just had, and the snippet that was taken out of your order, I

4   believe that in the same order, in another order, this was

5   related to whether or not the government had to provide the

6   exact penny cost of the entire undercover operation.  That's

7   what Mr. Singer had just referred.

8        But I believe you kept the door open for us to

9   potentially inquire about that on cross-examination, and I

10  believe that was --

11       THE COURT:  Do you have anything you could point me

12  to?  I'd be surprised, but... yeah, because what does the cost

13  of the investigation go to, other than some notion of

14  selective prosecution or entrapment, or something that we've

15  already decided are not going to be issues in this case.

16       MR. C. MATTHEW RITTGERS:  When it comes to a witness,

17  I believe the government's next witness, it could go to the

18  bias and motivation of that witness.

19       THE COURT:  Sure.  So to the extent Mr. Ndukwe is

20  being paid or is receiving other benefits as a result of

21  cooperating, I think that's fair griff for cross-examination.

22       But I think, to the extent you're trying to make general

23  allegations about the cost of the investigation, or argument,

24  sort of the nature of was it worth it, or you guys were trying

25  too hard here or whatever, I think that's something I covered,

1    I thought, pretty carefully and clearly in the motion in

2    limine order.

3         MR. C. MATTHEW RITTGERS:  The value of the incentive

4    for the cooperating witness, but it would be like a trip where

5    you walked to, you know, another location and took a bike ride

6    is much different than a hundred thousand dollar trip that a

7    cooperating witness who is about to testify against the

8    defendant might have received.

9         THE COURT:  Sure.  I think my point is merely, if you

10   want to say yeah, as a cooperating witness, you get to do fun

11   things.  You get to fly to Miami, you're sort of the star of

12   the show, that seems fine, but --

13        MR. C. MATTHEW RITTGERS:  Okay.

14        THE COURT:  -- I guess I'd --

15        MR. SINGER:  They didn't ask the cooperating witness

16   that.  They asked the case agent.

17        THE COURT:  I know.  I was coming back around to

18   that.  But that wasn't the way this came up.  I mean, so I

19   don't think there's any fix for it at this point.  But I do

20   note the objection and will be on alert for it going forward,

21   unless you've got something to suggest, Mr. Singer?

22        MR. SINGER:  Your Honor, I think they've opened the

23   door to be able to ask a witness whether or not fruits of that

24   investigation led to any charges.

25        They suggested through their questioning that the

1    government is willy-nilly throwing this money around in

2    pursuit of investigating of elected officials.

3         THE COURT:  I think you've cured that sufficiently by

4    pointing out that Mr. Ndukwe was on a flight in connection

5    with an investigation of another official.

6         I continue to believe it would be prejudicial to

7    Mr. Sittenfeld to turn this into some kind of broad scale

8    attack on, I think what was referred to in the motion in

9    limine filing as culture of corruption or something at City

10   Hall, or something of that nature.

11        I don't intend this trial to become a broader sort of

12   inquiry into how Cincinnati government is run.

13        MR. SINGER:  That's certainly not the intent of the

14   government, Your Honor, but we will ask for this again if they

15   continue to go down that line.

16        THE COURT:  And if they do, we'll talk about more in

17   terms of what we need to do to sort of re-level the playing

18   field.

19        I think, at this point, it's been made clear that

20   Mr. Ndukwe was on a flight in connection with a different

21   investigation.  I would think the jury probably thinks it's

22   some other investigation of a Cincinnati city official, but I

23   don't really know what they think in that regard.  I would

24   steer clear of that.

25        MR. C. HENRY RITTGERS:  Your Honor, I was the one

1      that asked the question.  It was a good faith question based

2      on my knowledge of private air flights, et cetera.  But let's

3      talk -- if I may?

4              THE COURT:  Yes.

5              MR. C. HENRY RITTGERS:  -- about who opened the door.

6      They opened the door when they asked Agent Holbrook about when

7      he rented the 580 penthouse, and he talked about cleaning the

8      floors and cleaning the toilets with Rob and Brian.  I mean, I

9      think they opened the door, but I'm just giving you reasons --

10             THE COURT:  I hear you.

11             MR. C. MATTHEW RITTGERS:  And, Your Honor, just so

12     that I'm clear with Mr. Ndukwe, if he's the next witness, I

13     should not talk about the expenditure, but I can talk about

14     the trip?

15             THE COURT:  Yeah.  To the extent he received benefits

16     in connection with his cooperation with the FBI, I think that

17     fairly goes to bias.

18             MR. C. MATTHEW RITTGERS:  Okay.

19             THE COURT:  If he got comped for hotels, and he got

20     comp'd for drinks, and he got comped for whatever, I think

21     that fairly goes to bias, right?  I mean...

22             MR. C. MATTHEW RITTGERS:  Thank you.

23             THE COURT:  Anything else, Mr. Singer?

24             MR. SINGER:  The last thing I want to mention, that

25     they're making a deal about the fact that they went to a strip

1     club pursuant to the investigation.

2        Questions relating to -- an attempt to impeach Mr. Ndukwe

3     for going to a strip club, we would argue, is improper.

4          THE COURT:  Well, and I guess the other thing that

5     we've got to keep in mind is it wasn't this investigation,

6     right?

7          MR. C. MATTHEW RITTGERS:  Correct.

8          THE COURT:  Okay.  And so I think you should be

9     careful because -- so if Mr. Ndukwe receives benefits as a

10    result of cooperating with the FBI on another investigation,

11    that's somehow intertwined, I guess, with this investigation

12    or not?

13         MR. SINGER:  It's not intertwined, Your Honor.  I

14    mean, they're intertwined --

15         THE COURT:  They're overlapping in time?

16         MR. SINGER:  They're overlapping in time, and they're

17    the same UCs and the same cooperating witness are involved in

18    both, but --

19         THE COURT:  That sounds a little intertwined.

20         MR. SINGER:  -- the charges do not overlap.  There's

21    not conduct by the defendant that overlap.

22         THE COURT:  Because Mr. Sittenfeld declined to go

23    along on the trip, I take it?

24         MR. SINGER:  He was not invited on the --

25         THE COURT:  Oh, this trip he wasn't invited on?

1          MR. SINGER:  He was not invited on.

2          MR. C. MATTHEW RITTGERS:  He was invited on a lot of

3     trips but never went.  But I don't know what trip, if this was

4     one or not.  He was invited to Miami, I know that.

5          THE COURT:  Okay.  Well, you know, I think it's fair

6     to say that he's received benefits as a result of his

7     cooperation with the FBI.  I still think that does go to bias.

8     It may go to reasons why he wants to continue that

9     relationship.

10      I'm going to allow it, but don't elicit testimony

11     about -- unless you know how much things cost, don't --

12          MR. C. MATTHEW RITTGERS:  I understand.

13          THE COURT:  Don't be asking him to guess what --

14          MR. C. MATTHEW RITTGERS:  I won't.  Sorry.

15          THE COURT:  -- things cost.

16          MR. C. MATTHEW RITTGERS:  All right.

17          MR. SINGER:  The only other thing I would say, Your

18     Honor, and then I'll sit down and be quiet about this.

19      To the extent that a public official that is a target and

20     is on a trip, and requests to do something on that trip, and

21     they do it in furtherance of the investigation, the

22     cooperating witness should not be impeached by that when he's

23     working at the direction of the FBI.

24          THE COURT:  Yeah.  Well, I think he can bring out

25     that he was working at the direction of the FBI, if they raise

1    that, and he can bring out -- I mean, I think he can say,

2    yeah, a target of an investigation was on the trip, and did

3    you understand that you were going to a strip club because the

4    target in the investigation wanted to.

5        I think, if they weren't going to talk about this trip,

6    it's going to open the door to the fact that there was a

7    target involved in that trip.

8        I don't want to go into the identity of who that target

9    is.  I don't think that's appropriate.  But yeah, right, this

10   was the target.  The target -- if the target wanted to go to

11   Miami, the target wanted to go to Miami.  If the target wanted

12   to go to a strip club, I think that's fair to bring out that

13   it wasn't Mr. Ndukwe, and then the FBI just bankrolling

14   Mr. Ndukwe's good time in Miami; but, rather, this was a

15   legitimate, investigative effort that was, you know, largely

16   done at the direction of the target, that's fine.

17            MR. SINGER:  Thank you, Your Honor.

18            THE COURT:  All right.  Anything else, Mr. Rittgers?

19            MR. C. MATTHEW RITTGERS:  No, Your Honor.

20            THE COURT:  Mr. Singer?

21            MR. SINGER:  No, Your Honor.

22        (Jury in at 9:27 a.m.)

23            THE COURT:  Welcome back, ladies and gentlemen of the

24   jury.  When we left off yesterday, we had just finished one

25   witness, I believe.

1          So does the government intend to call another witness?

2              MR. SINGER:  Yes, Your Honor.  The government calls

3    Chinedum Ndukwe.

4              THE COURT:  Very good.

5          (Government witness, CHINEDUM K. NDUKWE, sworn.)

6              THE COURT:  Good morning, Mr. Ndukwe.

7              THE WITNESS:  Good morning

8              MR. SINGER:  Your Honor, may I approach to begin the

9    examination?

10             THE COURT:  You may.

11                         DIRECT EXAMINATION

12   BY MR. SINGER:

13   Q.   Good morning.

14   A.   Good morning.

15   Q.   Can you state your full name and spell it for the record,

16   please?

17   A.   Yes.  My name is Chinedum Kingsley Ndukwe,

18   C-h-i-n-e-d-u-m, K-i-n-g-s-l-e-y.  Last name is N-d-u-k-w-e.

19   Q.   Mr. Ndukwe, what do you do for a living?

20   A.   So I'm a real estate developer.

21   Q.   And can you describe what you do as a real estate

22   developer?

23   A.   Yeah.  Our company is Kingsley and Co.  I started that

24   back in, I want to say 2009.  We primarily -- I primarily find

25   underutilized pieces of real estate within the urban core,

1    primarily Columbus, Ohio and Cincinnati, Ohio.

2        And we create value by repositioning them and

3    redeveloping them into either limited service hotels, market

4    rate housing, affordable housing.  And that's what I've been

5    doing since I retired from the National Football League.

6    Q.   We'll get into that in a second.  Who owns Kingsley?

7    A.   I do.

8    Q.   And can you tell us about the company a little bit?

9    A.   Absolutely.  So I'm one of the few black owned real

10   estate developers in the State of Ohio.  We're a hundred

11   percent owned by myself and my family.

12       And I started it, you know, investing in single-family

13   homes and transitioned to larger, a little bit more

14   complicated mixed-use development deals.

15   Q.   Where did the name Kingsley come from?

16   A.   Obviously, it's my middle name, and it's a family name,

17   and it's been in my family for years.

18   Q.   Can you kind of walk through your background a little

19   bit?

20   A.   Absolutely.  So my parents are West African.  We're

21   Nigerian.  And they came over, I want to say in '74.  My

22   father was 30 years old, mother was 29, your classic immigrant

23   story.  They came to this country with absolutely nothing,

24   worked multiple jobs to provide for myself and my siblings.

25       My father is a mechanical engineer by trade, and my

1    mother is a registered nurse.  Both are now retired.

2        I'm one of four.  My oldest brother is a commander in the

3    U.S. Navy.  My older brother is a retired NFL veteran as well,

4    National Football League veteran.  He works in commercial real

5    estate in Columbus, Ohio.  And my baby sister is a public

6    health professional.  She's based in Virginia.

7        And for me, you know, I met my wife at the University of

8    Notre Dame.  We have three kids, and we are based here in

9    Cincinnati.

10   Q.   How about your professional background?

11   A.   Sure.  Well, I was fortunate enough to earn a scholarship

12   to the University of Notre Dame.  I originally grew up in the

13   west suburbs of Columbus, Ohio.

14       I studied business management and psychology at Notre

15   Dame and was drafted in the seventh round in 2007 to the

16   Cincinnati Bengals.  I was a lot skinnier then.  I played

17   defensive back.

18       And every year, really, you know, as a seventh round

19   pick, you have to make the team every single year, and so

20   that's what I did.  Every single year, I had to compete.  And

21   I was fortunate enough to play four seasons with the

22   Cincinnati Bengals.  I had a cup of coffee or five games with

23   the Oakland Raiders.

24       And towards the end of my career, I started investing in

25   real estate because I knew that being a professional athlete

1    was not a long-term career.

2        And one of the things as a pro-athlete in Cincinnati, you

3    know, oftentimes you just get, you know, presented

4    opportunities to go to different events.  You'd be asked to go

5    to different fundraisers both for non-profits and political.

6        And I just made it a habit and a focus to really try to

7    build my network in Cincinnati because I knew I wanted to stay

8    here long-term.  And that's what I did.

9        So even as tired as I might have been after a practice, I

10   just decided to go and expand my network.  And, you know,

11   undoubtedly, at any kind of event, any kind of an opportunity

12   there was in the community, I always ended up finding myself

13   talking to commercial real estate developers.

14       And, you know, I began to grow my network and grow some

15   close friends that I have to this day and developed some good

16   mentors.

17   Q.   So when did you retire from the NFL?

18   A.   So I want to say my last year was that 2010, 2011 season,

19   I believe.  So, yeah, a total of five seasons in the NFL.

20   Q.   You touched on this a bit.  Can you kind of walk through

21   when you started getting into real estate?

22   A.   Yeah.  So I was first exposed to real estate through my

23   father, who worked a 9:00 to 5:00 job.  He worked for General

24   Electric and then an old car company called Saturn that's not

25   around anymore, and then was transferred up to Marysville,

1    Ohio, where he worked for Honda.

2        And, you know, in every place that we went, he always

3    worked a full day, but then he had a side hustle of investing

4    in real estate, single-family homes.

5        And so, you know, after my first year in the NFL, I made

6    a decision that, you know -- and honestly, getting run over a

7    couple of times by my teammates, I made the decision that, you

8    know, I really needed to build up another opportunity.

9        And I'd always studied and understood, you know, real

10   estate, and so I started investing in single-family homes

11   while I was still playing.  And then that's where we

12   transitioned to two-family homes, multifamily properties.

13       And then at that time, I really felt confident and had

14   some really good mentors that opened my eyes up to commercial

15   real estate, and so that's what I spend my time doing now.

16   Q.  How old were you when you first went full on into real

17   estate?

18   A.  You know, full on, I want to say 26, 27, in that age

19   range, I want to say.

20   Q.  And how old were you when you retired from football?

21   A.  You know, yeah, 26, 27.

22   Q.  Okay.  Pro football players make good money, right?

23   A.  Yeah.  The first round picks are the ones that are

24   typically quarterbacks, but yeah.

25   Q.  Did you make enough money playing football to retire and

1   not work anymore?

2   A.   No.   No.

3   Q.   Do you have any other job right now, other than as a

4   full-time real estate developer?

5   A.   No.   I mean, that's what I do to feed my family, and

6   that's what I've been doing for the last few years.

7   Q.   So I think you touched on this a bit, but explain how you

8   went from transitioning from an NFL football player to a

9   full-time real estate developer.

10  A.   Yeah.   So, you know, real estate development, it really

11  is about getting out there and talking to people and really

12  cultivating good relationships.

13      Ultimately, those relationships would lead to

14  opportunities, and you talk to people.   I mean, so as a

15  developer, my primary role is really to find the opportunities

16  within real estate.

17      And so you have to have vision.   And, you know, those are

18  some of the traits that, you know, made me successful as a

19  player is that I could -- as a football player is that I could

20  find opportunities and see things as they developed.   And that

21  really transitioned me over to commercial real estate.

22      And so I primarily focused on distressed single-family

23  homes, properties that might have had, you know, issues or, I

24  guess you'd call them harrier properties, properties that

25  have, you know, difficulties; taxes, liens, or estate issues

1    with them.

2         And my strategy around that was because larger, more

3    established development companies really didn't spend the time

4    that it takes to really dig in and have conversations that

5    really would lead to getting in a position to have a clean

6    title.

7         And so that's what I spent time doing.  And I had success

8    at that.  And so that's what I did, for the most part.

9    Q.   Can you describe where Kingsley placed in the real estate

10   development community?

11   A.   Yeah.  I mean, we're a startup, I mean, by all stretch of

12   the imagination.  I mean, a lot of the people that we are now

13   competing against today -- we weren't competing against these

14   guys years ago, but now today have been around for

15   generations, for decades.

16        And, you know, what we do now is we do compete against

17   some of the larger commercial real estate development

18   companies.  But, you know, when I first got started, it was

19   myself and essentially a finance administrative assistant.

20        Now today our company's probably roughly six full-time

21   employees, including myself, so not a big organization, by any

22   means.

23        Typically, a lot of the legacy development companies in

24   Cincinnati have 30, 40, 50 plus employees but, you know, we

25   still do our best to hold our own.

1   Q.   How would you describe the real estate community in

2   Cincinnati?

3   A.   I mean, it's a close community, but it's also extremely

4   cutthroat, extremely competitive; and, you know, that

5   competitiveness is what has always driven me and intrigued me

6   about commercial real estate.

7        And it's just, you know, it's kind of a good old boys

8   network, to be honest with you.  A lot of the same developers

9   that have been here in Cincinnati have -- their families were

10  in it, their families before them were in it and, you know...

11  Q.   Did you have to interact at all with public officials

12  when you began your career in real estate development?

13  A.   Absolutely.  I mean, it was one of the things that I

14  learned very early on is that, you know, city councilmen,

15  politicians, county commissioners really have a direct impact

16  in, you know, real estate development through economic

17  development, really.  I mean, that's really where it is.

18       And so I learned early that, you know, it wasn't my

19  rules, but it was my understanding that in order to be, you

20  know, considered an impactful developer, to be in the know in

21  the community, you had to donate to politicians.  I mean,

22  that's a --

23  Q.   In your experience, why would public officials in

24  Cincinnati be so involved in real estate development deals?

25  A.   Well, I mean, honestly, the real estate developers in

1    Cincinnati, some of the bigger campaign contributors, I mean,

2    if you look at any of the lists, or if you're at any of those

3    fundraisers, the majority of the people that are there are

4    subcontractors, contractors, and developers, larger

5    institutions.  And they're influencing, you know, policies and

6    driving agendas, and that's what you see.

7    Q.   And did that impact you in any way as you were starting

8    your career in real estate development?

9    A.   Absolutely.  I mean, for me, you know, like I said, I

10   think I got started at 26, 27 full-time and, you know, you

11   look back and you see all these things that, you know, I was

12   doing then.  And, you know, it was just because of the way

13   that things were being done.

14       And, you know, it's tough to reflect on that and see

15   that.  And understanding and knowing what I know now, it's

16   just unfortunate that that was just the climate that I was

17   brought up in.

18   Q.   At some point, did the FBI approach you?

19   A.   Yes, they did.

20   Q.   Why did the FBI say they were reaching out to you?

21   A.   Well, they wanted to ask me about my campaign donations

22   and, you know, they initially reached out to me.  You know, I

23   had had a friend of mine who lived in Northern Kentucky at the

24   time, and I asked them, I said, hey, I just got this random

25   email from an fbi.gov address.  What do you think about this?

1     And he said, hey, listen, you know, whatever it is, you

2     don't want to go and talk to the FBI by yourself.

3     And so I asked him, well, who should I reach out to?  And

4     he said reach out to Scott Crosswell, who I did reach out to.

5     And I said, hey, Mr. Crosswell, would you mind, you know,

6     following up on this.

7     And Scott, from that point on, has been my family

8     attorney for years.  But yeah, that was initially what led us

9     to have an initial meeting.

10    Q.  And do you recall when this was?

11    A.  I don't.  Probably I want to say, you know, '17, maybe.

12    But if you have anything that can refresh my memory, I...

13    Q.  Absolutely.  Would a source report from around the same

14    time that you -- relating to a conversation you had with a

15    special agent refresh your recollection as to when you first

16    met with the government?

17    A.  It would.

18          MR. SINGER:  May I approach, Your Honor?

19          THE COURT:  You may.

20    Q.  If you can just review this and then hand it back.

21    Does that refresh your recollection around the time you

22    first met with the government?

23    A.  It does.  April 2018.

24    Q.  And you would have met with the government a little

25    before this initial source report; is that correct?

NDUKWE – DIRECT

1     A.   That's correct.

2     Q.   So possibly March 2018?

3     A.   Yeah.

4     Q.   Did you enter any agreement with the government at the

5     time that you first met?

6     A.   Yeah.  So Scott Crosswell had insisted I sign a proffer

7     letter, I believe it's called and, you know, that was

8     something that he worked out with the attorneys that were

9     present at the time.

10    Q.   And what were the terms of the proffer?

11    A.   Well, as I interpreted them, you know, one, you know, you

12    had to tell the truth; and, two, if you didn't tell the truth,

13    you'd be prosecuted for those lies.

14    Q.   And was the other rule that if you said anything that

15    incriminated you directly, that the government couldn't use

16    that against you; is that right?

17    A.   Correct.  Yeah.

18    Q.   Okay.  So what did you tell the government during that

19    proffer?

20    A.   Well, I told the government the truth.  They asked about

21    campaign donations, and I told them that I had withdrawn

22    money, my own money into friends -- put them in the names of

23    friends and family and made donations to local politicians.

24    You know, I was very forthright about it.

25         I understand now that that was a mistake.  But that's

1    what I shared with the FBI, and that's what I shared with the

2    attorneys at the time.

3    Q.   And why did you do that?

4    A.   Well, honestly, that was just really how I understood

5    things were done, and that's how I understood that, you know,

6    campaign donations were made.

7         And, you know, again, I told you at the time it was just

8    myself, an employee.  But, you know, a lot of these other

9    developers and companies, I mean, they have their family

10   members, they have their employees.  They donate.  They all

11   donate.  They have, you know, siblings and children donate to

12   campaigns and politicians.

13        And, you know, at the time it was just me and -- you

14   know, I still get grief from my older brother that he would

15   receive, you know, Cranley For Mayor in the mail.  And he

16   said, you know, what is this?  I didn't do this.  And so I

17   shared that with the FBI, and they asked me, well, what did

18   you get in return?

19        And I think at the time, in 2018, you know, my thought

20   and feedback was I didn't get anything in return.  If

21   anything, my life has been significantly harder simply because

22   I just supported this lady by the name of Yvette Simpson.

23        And I supported Yvette Simpson because she was a friendly

24   acquaintance, and because it just seemed like the current

25   mayor at the time, who was John Cranley, Mayor Cranley was

1    really going out of his way to make things difficult for me.

2         And so at that point, when the government asked about,

3    well, you know, what you're describing to us and what's

4    happening, it's not right.  It's corrupt.

5         And, you know, reflecting back now and kind of going

6    through everything and just being a little bit more wiser than

7    I am today, and learning from all that experience, I mean, I

8    really felt like I was being preyed on and that, you know, my

9    ambition to be successful transitioning out of the NFL, you

10   know, I think, you know, you hear about this all the time with

11   athletes.

12        But I think this scenario, you know, it's so difficult

13   being an African American in this country, it's so difficult

14   being an entrepreneur in this country.

15        In Cincinnati, what I've learned is that being a black

16   man and being a businessman in commercial real estate, the

17   policies and the procedures and the challenges in the City of

18   Cincinnati to be successful, it's stacked against you.

19        And really, at the time, when I was asked would you be

20   willing to assist the government, I said absolutely.  And I

21   made the decision, and I did it willingly.  I wanted to fully

22   assist where I could.

23        And I just felt like, at the end of the day, the last

24   thing I wanted to do was have another small business person go

25   through what I did, get exposed to things I was exposed to.

1      And then, you know, at the end of the day, the last thing

2  that, you know, I wanted to make sure what happened is that,

3  you know, they wouldn't be able to do those things and try to

4  shake people down the way that they shook me down.  Yeah,

5  that's my opinion.

6  Q.  So before we get into your cooperation with the

7  government, following up on these checks.  So by putting these

8  checks in the names of friends and family, were you able to

9  exceed the limits that you could otherwise provide to these

10 public officials; is that right?

11 A.  Yes.  That's correct.

12 Q.  So this was an attempt to evade restrictions on how much

13 you could personally contribute; is that right?

14 A.  That's correct.

15 Q.  Okay.  And did you meet with these public officials at

16 the time that you gave them the checks?

17 A.  Yes, I did.  Multiple times.  I mean, I know that, you

18 know, one meeting in particular that always stands out to me

19 is that, you know, I met with, you know, John Cranley, who was

20 now the current -- who was now the former mayor.  He was

21 running for his first election.

22      I still remember giving him thousands of dollars of

23 contributions from my friends and family.  And he knew good

24 and well that all that money came from me directly and, you

25 know, so much that his aid and himself followed back up and

1    say we need names, we need address- -- or we need addresses,

2    we need occupations, you know.  And, you know, it's jarring to

3    really think about that at this stage today, yeah.

4    Q.   Did you describe anything else to the government when you

5    met with them in the proffer?

6    A.   Yeah, I did.  I mean, for me, you know, sitting down and

7    having a conversation with the federal government and the FBI,

8    and so I think I might have told -- I know I told them pretty

9    much everything I've ever even thought was remotely wrong in

10   my life.  I mean, I think I told them about parking tickets.

11       But one thing that I know stood out is that, you know,

12   I'd used my IRA in an improper way.  And I did that in a

13   situation where I needed funds to renovate my house.  I think

14   I -- or renovate an investment property.  I think I had been

15   turned down for a loan to do so.

16       And a buddy of mine needed money, and so I transferred

17   money through a self-directed IRA to a buddy of mine, and he

18   then sent money my way, which violates the rules and regs of

19   the IRA.

20       But I was very forthright with that when I met with the

21   FBI, and I -- you know, anything I thought remotely could have

22   been illegal, I shared with them at that time.

23   Q.   All right.  So what happened after the meeting with the

24   government in 2018?

25   A.   I left.  I mean, I know that a couple days later we

NDUKWE - DIRECT

1    had -- Scott had followed back up with someone and, you know,

2    they had contacted me and said, hey, would you be willing to

3    work with us to rid out public corruption.  And I ended up,

4    you know, assisting on this case and other cases.

5    Q.  Was your work voluntary?

6    A.  A hundred percent.

7    Q.  Did you enter into any sort of agreement with the

8    government that required you to cooperate in exchange for not

9    being prosecuted for anything?

10    A.  No.

11    Q.  All right.  So why did you work with the FBI?

12    A.  Well, honestly, I just -- like I just shared with you, I

13    just felt like my experience as a small businessman trying to

14    make it in the City of Cincinnati as a minority business,

15    trying to make it and be successful that, you know, the way

16    that the politicians had impact on that, I wanted to -- you

17    know, at the end of the day, when I had the choice to do, you

18    know, do the right thing and I did it, and I wanted to make

19    sure that, you know, I was in a position to have an impact,

20    and I did.

21    Q.  Was there any particular agent with whom you worked?

22    A.  Nathan Holbrook was really the main point of contact.

23    Q.  And were you given any instructions at the time that you

24    started working at the direction of the FBI?

25    A.  Yeah.  He would advise us on -- advise me on who exactly

1    to record and record certain conversations.

2    Q.   Were you compensated for your work?

3    A.   Yeah, I was.  Yeah.

4    Q.   How much did you get paid over the course of the time

5    that you worked with the FBI?

6    A.   I believe it was roughly like $27,000.

7    Q.   Can you describe how that worked?

8    A.   Honestly, it was really sporadic.  I mean, you know,

9    Officer Nate would -- or Special Agent Holbrook would just

10   kind of pay me money.  I mean, that was pretty much it.

11   Q.   Did you ever ask to get paid?

12   A.   No, I didn't.

13   Q.   Did you ever expect to get paid?

14   A.   No, I didn't.

15   Q.   Were you ever told that you were going to get paid?

16   A.   No.  No, I never was.

17   Q.   Did you report these payments to the IRS at the time that

18   you received the payments?

19   A.   No, I did not.

20   Q.   Why is that?

21   A.   Well, it was under pretty strict direction that my

22   involvement wasn't to be disclosed publicly, it wasn't to be

23   disclosed privately; and, you know, I didn't disclose that to

24   my accountant.  I didn't disclose that to anybody except for

25   my attorney.

NDUKWE - DIRECT

1    Q.   After the time that it became public that you had been

2    cooperating with the FBI, had you taken any steps to address

3    that?

4    A.   No.   My taxes have been amended, and since it became

5    public, myself and my accountant updated our -- my 2018 and

6    2019 tax returns to show that income.

7    Q.   Now, can you describe the work that you performed at the

8    direction of the FBI?

9    A.   Yeah.   I mean, for the most part, it was recording

10   conversations and discussions in and around specific real

11   estate projects that I was working on.   That was primarily it.

12   Q.   Was it difficult?

13   A.   Yeah.   I mean, you talk about the money.   I mean, at this

14   point, you know, the -- I didn't realize it was $27,000.   I

15   should have asked for significantly more money.   I mean, it

16   was extremely stressful, extremely difficult.

17        You know, at this time, I was trying to grow my business.

18   I was trying to manage my real investors.   You know, over the

19   period of time I was working with the FBI, I had gotten

20   married, I started a family so, yes, it was very difficult.

21   Q.   Were you told anything about the status of the

22   investigations that you were working on?

23   A.   No.

24   Q.   What were you told about the investigations?

25   A.   Honestly, I just knew that we were working on public

1    corruption cases, and that was pretty much it.

2    Q.   Were you provided instruction as to who to record?

3    A.   Yes.

4    Q.   Can you describe how that worked?

5    A.   Yeah.  Officer -- or Special Agent Holbrook would advise

6    me on, you know, who to record, what conversations to record.

7    It was pretty much, you know, record those conversations and

8    that was it.

9    Q.   At the time that you were working at the direction of the

10   FBI, did you have any concerns about the impact that this work

11   that you were doing would have on your life if it ever became

12   public?

13   A.   Absolutely.  Absolutely.  And, you know, for me as a

14   small business owner and, you know, it's kind of an unwritten

15   rule as an African American as well in business is that you

16   want to try to stay away from controversy.  You want to try to

17   avoid pissing people off.

18        And, you know, I knew that, you know, when this became

19   public, you know, it would do that.  It was very controversial

20   and, obviously, it's had an effect on people.

21        But, you know, I felt like it was the right thing to do.

22   I felt like it was the right thing to do for not just my

23   business, but other businesses that were being faced -- or

24   other business owners that were being faced to make those

25   decisions, those difficult decisions.

1     You know, at the end of the day, at the time when I was

2     donating a lot of money, it's not like I was -- you know,

3     yeah, I played in the National Football League, but I wasn't

4     rich.  You know, I wasn't -- I didn't have all this money to

5     throw around so much.  I just told you I had to use my IRA to

6     renovate an investment property.

7         But, you know, I felt like that was my understanding

8     about how things worked within the real estate development

9     space in Cincinnati, and I just wanted to be able to do

10    something about it.

11    Q.   At some point, did you begin pursuing development of a

12    property located at 435 Elm Street?

13    A.   I did.

14    Q.   Can you describe that?

15    A.   Yeah.  So, you know, I think I touched on my business

16    model of going after projects that were challenging from the

17    standpoint of, you know, complicated title issues, liens.

18        And, you know, 435 Elm is really, at the end of the day,

19    no different than a single-family home, from the standpoint of

20    it had all those issues.  It had complicated title issues.  It

21    had significant state, you know, title issues.

22        And at the end of the day, you know, after understanding

23    in the -- knowing that the motivation of the city was, at some

24    point in time over the next five, ten years that, you know,

25    the convention center block, what is now being called the

1    convention district, is going to be a priority of the current

2    administration and future administrations, I decided it was

3    worth the risk to explore acquiring a leasehold mortgage note.

4        And in its simplest terms -- and I don't know if I should

5    talk about that.

6    Q.   My next question was, what's the nature of your interest

7    in 435 Elm Street?

8    A.   Okay.  So 435 Elm -- and, again, it was a pretty

9    complicated situation but, at the end of the day, real estate,

10   high level, seems complicated but it's always in the details.

11       And after doing some due diligence on 435 Elm, I learned

12   that U.S. Bank, who was the leasehold mortgage note carrier,

13   so essentially they had a loan on the property, that they had

14   in their loan covenants, in their loan documents, they had

15   that if at any point the tenant, who was Ron Goldschmidt at

16   the time, at any point he had defaulted on his lease with the

17   City of Cincinnati, then U.S. Bank really had two things that

18   they could do.

19       They could step in into Ron Goldschmidt's position with

20   the lease and cure whatever was owed to the City of Cincinnati

21   and then negotiate a new lease.

22       And the period of the lease -- I think that Frost Brown

23   Todd represented U.S. Bank at the time, they had calculated

24   the years left on the lease was close to 37, 38 years.

25       And then they counted -- they calculated the total money

1    that was still owed to the city was in the $250,000 range.

2         So after I learned that, I believe I paid -- and I raised

3    money from friends and family like I typically do in all our

4    projects, close to I want to say $1.2, $1.3 million to

5    purchase that note.  And then I anticipated another $150,000

6    that we're going to have to pay the city to renegotiate that

7    lease.

8         And so to be in the position to actually have a seat at

9    the table as an African American man in the City of

10   Cincinnati -- that I just told you it is very challenging to

11   be successful in business here.  It's even more challenging to

12   be successful in commercial real estate development here.

13        And to be in a position that you would have an actual

14   seat at the table because, you know, that lease was just to

15   lease the building as is, but I was confident that when I was

16   in that position, the motivation of the city and the county

17   wouldn't be to release that.  It was to put together a new

18   development deal, which is what I wanted to do.

19   Q.   So can you just describe what rights that you believed

20   came with the interest that you had purchased?

21   A.   Yeah.  So we had the right -- U.S. Bank had the right to

22   cure and negotiate a new lease for the building at 435 Elm.

23   So there's an existing lease in place, and those were the

24   rights, and that leasehold mortgage note also controlled the

25   air rights above 435 Elm.

1    So it's rarely -- it is rare here and rare like type of

2    project in the City of Cincinnati to have air rights

3    associated with long-term leases but, at the end of the day,

4    it is pretty basic when it comes to real estate.

5    Q.   Do you recall when you purchased that interest?

6    A.   I believe in 2017, I want to say.

7    Q.   And ultimately, what was your plan for the property?

8    A.   Yeah.  So we had a plan of -- and taking a step back.  My

9    business model related to larger commercial projects that I

10   couldn't do independently.

11   It was really try to find out about these opportunities,

12   these public private opportunities, get an element of site

13   control in the project, and then, you know, bring in another

14   development partner after I had true site control to be able

15   to create value for Kingsley, for my company.

16   And so that was my plan was to tie up the property in a

17   new development agreement or a new long-term lease, and then

18   strategically bring in an experienced development partner and

19   put together a mixed-use development project made up of

20   retail, office, hotel and apartments.  And those apartments

21   would be workforce housing, and really make that a true

22   destination for the City of Cincinnati, and actually have a

23   major mixed-use development in downtown Cincinnati developed

24   by an African American.

25   Q.   Did you take any steps to pursue development?

1    A.   I did.

2    Q.   Can you describe those?

3    A.   Yeah.  After we had -- after my company had purchased the

4    leasehold mortgage note, I had reached out to, I think Oscar

5    Bedolla at the time of that.  He was the economic development

6    director at the City of Cincinnati at the time.

7         And, you know, it was Oscar's opinion that, you know, we

8    were in a really good position to be a logical candidate to

9    redevelop that site.

10        I reached out to Harry Black, who was the -- at the time,

11   the city manager, who was no longer there, who was no longer

12   there after that.  But yeah, we engaged the city quite a bit.

13   Q.   Do you recall when that was?

14   A.   I want to say it was early 2017.  As soon as we closed on

15   that mortgage note, I want to say we started letting the city

16   know that -- of our interest and our desire to redevelop it.

17   Q.   Do you recall submitting a letter to the city expressing

18   your desires?

19   A.   I believe so.

20   Q.   If you reviewed that letter, would it refresh your

21   recollection as to the precise date that you first reached out

22   to the city?

23   A.   Absolutely.

24             MR. SINGER:  May I approach, Your Honor?

25             THE COURT:  You may.

1    Q.   Did this refresh your recollection?

2    A.   It did.

3    Q.   So what was the date that you first reached out to the

4    city related to development?

5    A.   That was July 7th in 2017.

6    Q.   So can you kind of describe the significance of this

7    interest that you had purchased to your company?

8    A.   So at the time, it was one of the biggest risks that I

9    had taken personally, professionally, to make this investment.

10        And it was a very big deal.  And honestly, it still is to

11   this day and, you know, it's just -- it's disappointing, as we

12   sit right now, it's still in litigation.  But for me and my

13   company, it was a significant investment at the time.

14   Q.   All right.  So starting with 2017, can you describe your

15   negotiations with the city relating to the development at 435?

16   A.   Honestly, it just always seemed like, you know, I was

17   given the runaround.  It just seemed like the goalpost, no pun

18   intended, kept moving.  They were asking me to do things that

19   I don't believe they would have asked other developers.  It

20   just seemed that every time we met, it was something different

21   that they wanted and, you know, it just wasn't -- there wasn't

22   real progress that was being made.

23   Q.   Were there any specific terms that you were seeking from

24   the city relating to the development agreement?

25   A.   Well, for us, for me it was I want to -- I want the same

1    type of terms that any other person in a position to redevelop

2    a blighted building in downtown Cincinnati would have wanted.

3         Typically, there was a practice of selling a project or a

4    property -- as long as there was an economic impact of

5    creating jobs for Cincinnatians, you know, you would often see

6    that properties were sold to developers for a dollar.

7         Or if they weren't sold to a developer for a dollar,

8    they'd be sold for -- or there would be a long-term minimal

9    lease in the spirit of just redeveloping property.  And so

10   that was what I was thinking.

11        You know, I don't recall the exact terms at this very

12   moment, but I think those were the conversations that, hey, we

13   want to do what's been done in other downtown properties.

14   Q.   Do you believe a particular public official was hampering

15   your ability to reach an agreement with the city?

16   A.   Absolutely.

17   Q.   Can you describe that?

18   A.   I just think that -- for whatever reason, I think that

19   Mayor John Cranley at the time was making it very difficult,

20   for whatever reasons, you would have to ask him, but it just

21   seemed like he had his pulse or he had his hand on the -- you

22   know, he was very involved in every single real estate

23   development deal during this time that went on in the City of

24   Cincinnati.

25   Q.   Now, ultimately, this property was transferred from the

1    city to the port; is that right?

2    A.   That's right.

3    Q.   We'll get into that later, but did the plans for how you

4    wanted to develop 435 materially change from the time you

5    first started seeking negotiations with the city until it was

6    transferred to the port?

7    A.   No.

8    Q.   All right.  Do you know an individual named Alexander

9    P.G. Sittenfeld?

10   A.   I do.

11   Q.   How long have you known Mr. Sittenfeld?

12   A.   For a while.  I've known him for a while.  Exactly when

13   we first met, I couldn't tell you right now.

14   Q.   Can you describe the nature of your relationship with

15   Sittenfeld?

16   A.   Yeah.  I would call it a friendly acquaintance as well.

17   I mean, I -- you know, yeah, I would call it a friendly

18   acquaintance.  That's really what it was.

19        You know, we weren't -- we didn't hang out.  You know, I

20   think he might have been over to my house for a Super Bowl

21   party once.  I think I might have been over to his apartment

22   maybe once with a group of people, but we weren't -- by no

23   means were we, you know, best friends.

24   Q.   Prior to 2019, did you support Sittenfeld through

25   campaign contributions?

1    A.   I did.

2    Q.   Why?

3    A.   P.G. was young and, you know, seemed hungry and

4    ambitious, and he seemed like a likeable guy.  You know, for

5    me, I was young and hungry and ambitious in business, so I

6    think that it made sense to support him.

7         And like I said, the political climate at the time was

8    that, you know, you would be well served to have, you know,

9    city councilmen on your side, so I supported him as well as

10   some others.

11   Q.   Did you discuss your development projects with

12   Sittenfeld?

13   A.   Yeah, I did.  I did.

14   Q.   Why did you do that?

15   A.   Just in order to put things on city councilmembers'

16   radar.  I wanted to be sure that, you know, my projects were

17   on his radar.  It's not like I was doing tons of projects but,

18   obviously, I wanted to share with him projects from time to

19   time.

20   Q.   At any point in 2018, did Sittenfeld invite you to a

21   fundraiser?

22   A.   Yes.

23   Q.   Do you see those binders in front of you?

24   A.   Yeah.

25        MR. SINGER:  May I approach, Your Honor --

```
1              THE COURT:  You may.

2              MR. SINGER:  -- so I can show him which binder to

3    look through.

4    Q.   If you could turn to Tab 4A and 4B.

5    A.   Okay.

6    Q.   Are you there?

7    A.   Yeah.  4A?

8    Q.   4A.  Do you recognize this?

9    A.   I do.

10   Q.   And what is it?

11   A.   It's an email that was sent from P.G. to me, an invite

12   for a fundraiser.

13   Q.   And how do you recognize it?

14   A.   Because it came from P.G.'s email.

15             MR. SINGER:  The government moves for admission of

16   USA 4A.

17             MR. C. MATTHEW RITTGERS:  I'm looking it up.  I

18   apologize.  No objection, Your Honor.

19             THE COURT:  USA 4A is admitted without objection.

20   Q.   Could you turn to 4B?

21   A.   Okay.

22   Q.   Do you recognize that?

23   A.   I do.

24   Q.   And what is it?

25   A.   It's an official invite to a P.G. Sittenfeld fundraiser.
```

1    Q.   Could you turn back to 4A.

2         Do you see the attachment at the bottom of that?

3    A.   Yep.

4    Q.   Turn back to 4B.

5         Do you recognize that as an attachment to the email that

6    was in 4A?

7    A.   Yes.

8              MR. SINGER:  Government moves for admission of

9    USA 4B.

10             MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

11             THE COURT:  USA 4B is admitted without objection.

12             MR. SINGER:  Permission to publish 4A and 4B to the

13   jury, Your Honor?

14             THE COURT:  You may do so.

15   Q.   Mr. Ndukwe, can you please read the email from

16   Mr. Sittenfeld?

17   A.   "Hey, Chin, looking forward to catching up with you soon.

18   Let me know if there's a good day if I can take you out to

19   breakfast or lunch or dinner.

20        "I'm having my annual breakfast fundraiser for business

21   leaders, developers, and other civic leaders later this month,

22   on April 24th, at the Queen City Club.  An invitation is

23   attached, and I count on you to join us, and would you

24   consider supporting at the $2,200 level or a $5,000 level.

25        "In the new term at City Hall, I'm pretty squarely in the

1    middle of the council and in the middle of the action, so I'm

2    looking forward to sharing an update with everyone.

3        "I'll give you a call to follow up later this week.

4    How's the wedding planning coming?  Thanks, P.G."

5    Q.  Did you attend the April 24th Queen City fundraiser?

6    A.  I did.

7    Q.  And did you contribute to Sittenfeld in April of 2018?

8    A.  So I actually -- based on my experience, I actually

9    pulled my personal money again and gave that to a guy in my

10   office, who wrote a check in his name to P.G. Sittenfeld.

11       MR. SINGER:  Your Honor, at this point, we would move

12   for admission into evidence of a campaign finance report that

13   is currently listed at USA Exhibit 46C.  The parties have

14   stipulated to the authenticity of the document, and the

15   government is asserting that it's a public record.

16       MR. C. MATTHEW RITTGERS:  No objection.

17       THE COURT:  USA 46C is admitted without objection.

18       MR. SINGER:  Permission to publish to the jury,

19   Your Honor?

20       THE COURT:  You may do so.

21       MR. SINGER:  Miss Terry, can you please turn to

22   page 3 of this document.

23   Q.  All right.  Do you see that first line on that document,

24   at the very top, under "Full Name of Contributor"?

25   A.  Yes.  It's Tung Nguyen.

1    Q.   And who do you recognize Tung Nguyen to be?

2    A.   He was a former employee of mine.  He was a financial

3    analyst.

4    Q.   Is this the contribution that you were just discussing?

5    A.   It is.

6    Q.   If you work your way across to under "Name of Employer

7    Occupation," do you see that box?

8    A.   Yes.

9    Q.   Can you read that, please?

10   A.   "Associate, Kingsley Properties."

11   Q.   Did you tell Sittenfeld that you were contributing to him

12   through your employee?

13   A.   I did.

14   Q.   And was this contribution made in any way at the

15   direction of the FBI?

16   A.   No, it was not.

17   Q.   Did you report to Special Agent Holbrook after you

18   contributed to Sittenfeld in the name of your employee?

19   A.   I did.

20   Q.   Did you have any discussions with Sittenfeld about his

21   intention to run for any other office?

22   A.   I did.

23   Q.   Can you describe those?

24   A.   Well, you know, P.G. -- and I'm not sure if he had

25   announced at that point in time or if he was talking about

1    announcing, but he had discussed his intention to run for

2    mayor of the City of Cincinnati.

3    Q.   Had you discussed with Sittenfeld the 435 Elm Street

4    project in 2018?

5    A.   I did.

6    Q.   What do you remember about that?

7    A.   So, you know, what I can recall now is that Ron

8    Goldschmidt, the gentleman that was in the lease with the City

9    of Cincinnati, who had defaulted on that lease, I had learned

10   that him -- his son had a relationship with P.G.

11       And so I had reached out to P.G. to see if he couldn't

12   assist in expediting the Goldschmidt family in stepping aside

13   to help facilitate a development.

14   Q.   Following that fundraiser in 2018 -- by the way, can you

15   just describe the fundraiser a little bit.  What do you recall

16   about that fundraiser?

17   A.   Yeah.  I mean -- first of all, the reason why -- and,

18   again, this is just to say it.  You know, I was so paranoid

19   about the keeping donations out of my name based on the blow

20   back that I had received from Mayor John Cranley for donating

21   to Councilwoman Yvette Simpson, so that was the motivation for

22   that.

23       And at that fundraiser, you know, it seemed like every

24   single major developer was in that room at the Queen City

25   Club.  And I brought Tung along, and we listened and heard the

1    vision and the plan that he had for the City of Cincinnati.

2    Q.   Following that fundraiser, do you recall any other

3    discussions with Sittenfeld relating to contributions?

4    A.   Yeah.  Yeah, I do.

5    Q.   Can you describe those?

6    A.   Well, I mean, you know, it was always around -- he was

7    always talking about, you know, raising money.  Is there a

8    specific conversation you're referencing?

9    Q.   Do you recall a time in the summer of 2018 where you

10   discussed contributions for Mr. Sittenfeld?

11   A.   Yes.

12   Q.   Can you describe that?

13   A.   Well, you know, on multiple occasions, he had talked

14   about raising money.  You know, I did receive a call on one

15   occasion about the fact that, hey, you know, my expectation is

16   that every developer -- and it's understanding that every

17   single developer was going to donate at least $10,000.  That's

18   one thing that, you know, I remembered.

19        And also about the fact that the campaign laws were

20   changing related to the giving limits and the LLCs.  I do

21   remember that.

22   Q.   Do you recall a meeting in which you represented a slide

23   deck or some data showing Mr. Sittenfeld's prospects in the

24   city?

25   A.   Yeah, I do.  I think that -- yeah, either someone on his

NDUKWE - DIRECT

1    team or one of his fundraisers had put this almost like a

2    strategic plan together that -- excuse me.  Had put almost

3    like a strategic plan together that essentially showed that it

4    was not possible -- based on the data, that he wasn't going to

5    be the next mayor of Cincinnati, so yeah.

6    Q.   And did Sittenfeld solicit contributions from you at that

7    meeting?

8    A.   Yes.

9    Q.   All right.  So you mentioned a phone call that you

10   received.  Do you recall when that was?

11   A.   Not specifically, but in that year, though.

12           MR. SINGER:  Your Honor, permission to publish what's

13   already been introduced into evidence as USA Exhibit 6?

14           THE COURT:  You may do so.

15   Q.   Do you recognize this?

16   A.   Yes.

17   Q.   What is it?

18   A.   It's my phone bill.

19           MR. SINGER:  Miss Terry, could you please go to

20   page 13 of the document.  Ms. Terry, do you mind blowing up

21   maybe the bottom third.

22   Q.   Do you see the very top phone call?

23   A.   Yes.

24   Q.   What is the date on that phone call?

25   A.   9/21.

1    Q.   And do you recognize that phone number?

2    A.   Yeah.  I believe that's P.G.'s.

3    Q.   And if you go all the way to the right, what's that

4    number?

5    A.   Three.

6         MR. SINGER:  Miss Terry, could you highlight the top

7    row.

8    Q.   Do you see the column that has the numbers?

9    A.   Yes.

10   Q.   What does that represent?

11   A.   The number of minutes.

12   Q.   Okay.  Does this refresh your recollection as to the time

13   that you had the phone call with Mr. Sittenfeld that you've

14   just described?

15   A.   Yeah, I do remember getting this call.  And that was when

16   I was at my architect's office at the time.  I actually

17   stepped out to take that call.

18        And I know that, you know, at the time, P.G. was going to

19   be brief.  He said, hey, I'm just going to need a second.  You

20   know, I just want to let you know that, you know, the majority

21   of the developers in Cincinnati are going to be giving me ten

22   grand.  You know, can I count on you for ten?  And I said

23   yeah.  Yeah.  Yeah, I'll figure it out.

24        So I mean for me, you know -- and, again, I know that I

25   was already assisting with the FBI, but that was just, again,

1    pretty jarring to hear that.

2         And I -- you know, after that call, I had let

3    Agent Holbrook know that, hey, I did get a call from P.G.

4    He's talking about, you know, the majority of the developers

5    in the City of Cincinnati are going to be raising money or are

6    going to be contributing $10,000.  And so I let him know about

7    that.

8    Q.   Can you describe what raising $10,000 meant for you?

9    A.   Well, honestly, the only thing it did is it brought back

10   my memories of essentially being in this whole space of

11   contributions.  I mean, it wasn't a good feeling.

12        You know, I'm focused on growing my business.  Like I

13   said, I was in my architect's office.  You know, as a small

14   business owner, and then having that additional layer of,

15   essentially, responsibility to contribute in order to make

16   developments happen in the city, I mean, it's not a good

17   feeling.

18   Q.   And so how did it make you feel in relation to 435

19   specifically?

20   A.   Well, obviously, I was like, I'm going to have to make

21   sure I get this done.  You know, that's what I mean.  I mean,

22   that was my interpretation is that if all these developers are

23   doing this, I have to also do this as well.

24   Q.   Were there any other likely candidates for mayor at that

25   time?

1   A.   There were.  I believe it had been rumored that

2   Christopher Smitherman was going to run.

3   Q.   And had you received any solicitations for contributions

4   from Mr. Smitherman?

5   A.   I did.

6   Q.   Can you describe that?

7   A.   Yeah.  I very much donated to Christopher Smitherman in

8   the same capacity.  You know, one of those mentors that I

9   referenced was Albert Smitherman.  You know, he's another

10  local businessman that I had met during that transition.

11       And really, you know, along with other developers, I

12  mean, they really talked through how to go about donating to

13  these people in other people's names and LLCs and all of that.

14  Q.   Now, you mentioned you were, at that time, recording

15  conversations at the direction of the FBI; is that right?

16  A.   That's right.

17  Q.   Had you been instructed to record calls with Sittenfeld

18  at that time?

19  A.   No, I had not.

20  Q.   So you mentioned you reached out to Special Agent

21  Holbrook.  What happened next?

22  A.   Well, he had said to go ahead and start recording phone

23  calls.

24  Q.   And did you do that?

25  A.   I did.

1    Q.   And when did that start?

2    A.   Right away.  I mean, moving forward, I started recording

3    calls.

4         MR. SINGER:  Your Honor, permission to publish what

5    the jury has already been -- what's already been admitted to

6    the jury as USA 13A?

7         THE COURT:  You may do so.

8    (Audio played.)

9    Q.   Do you recall this conversation?

10   A.   I do.

11   Q.   Who were the participants in this phone call?

12   A.   Myself and P.G.

13   Q.   There's a reference to Rob.  Who is Rob a reference to?

14   A.   Rob is a reference to the undercover agent.

15   Q.   And had you met Rob before?

16   A.   I had.

17   Q.   What was the context of that?

18   A.   It was on a couple other investigations.

19   Q.   You made a reference to Cranley "fucking you left and

20   right."  What's that a reference to?

21   A.   It was a reference to some of the challenges that were

22   pretty much known within the city that, you know, he really

23   didn't want to see 435 Elm move forward with me, and he was

24   going out of his way to, in my opinion, to discourage me and

25   my abilities in certain circles that were important.

1          (Audio played.)

2     Q.   What did you understand the statement you referenced in

3     your network would round up a bunch of LLC checks to mean?

4     A.   That I needed to go out and get people to put money into

5     LLCs.

6     Q.   And what did you understand the statement, "You don't

7     want me to be like, sorry, Chin, love you but can't"?

8     A.   When I hear that statement, it's the epitome of my

9     motivation to assist.  It is that whether you donate or don't

10    donate, that it's going to have an impact on my advocacy for

11    you.  I mean, that's it.  I mean, to me that was very clear

12    that if I donated, he was going to support and be supportive

13    in my efforts, and if I didn't, he wasn't going to be

14    supportive.

15         (Audio played.)

16    Q.   Who did you understand North American to be a reference

17    to?

18    A.   It's North American Properties.  It's one of probably the

19    largest developer in the City of Cincinnati, one of the

20    largest developers in the country.

21    Q.   Who did you understand Uptown to be in reference to?

22    A.   Uptown Properties is owned by Dan Schimberg, is a pretty

23    significant developer in the City of Cincinnati.

24    Q.   Who do you believe Medpace was a reference to?

25    A.   That's a pretty significant corporation that's based in

1    Madisonville.

2    Q.  Is that in the City of Cincinnati?

3    A.  City of Cincinnati.

4    Q.  And who do you believe Healy was in reference to?

5    A.  Mike Healy, he's a local investor as well.

6    Q.  City of Cincinnati?

7    A.  City of Cincinnati.

8        (Audio played.)

9    Q.  What does the statement, "And then you're going to

10   deliver the goods before next Tuesday" mean to you?

11   A.  That I needed to have those LLCs before next Tuesday.

12   Q.  Now --

13   A.  Those contributions.  Sorry.

14   Q.  Now, did you continue to record telephone calls with

15   Sittenfeld moving forward?

16   A.  I did.

17       MR. SINGER:  Your Honor, permission to publish what's

18   previously been admitted into evidence as USA 21J.

19       THE COURT:  You may do so.

20       (Audio played.)

21   Q.  First of all, do you recall receiving that voicemail?

22   A.  No, but it's been a while.

23   Q.  And did you provide the recordings that you received to

24   Special Agent Holbrook?

25   A.  I did.

1    Q.   Okay.  At this time, were you aware whether or not Rob

2    and Brian had paid any contributions to Mr. Sittenfeld?

3    A.   No.

4    Q.   All right.  So what was the status of the 435 Elm Street

5    project as you entered 2019?

6    A.   It was, I mean, pretty much the same.  Not a lot had gone

7    on, and it was dragging.

8    Q.   Did there come a time that there was discussion about

9    moving the property from the city to the port?

10   A.   Yes.

11   Q.   Can you describe that?

12   A.   Yeah.  I believe I had gotten either a text or a call

13   from Laura Brunner, who was the CEO of the Port Authority.

14   She had said that she knew of my interest at 435 Elm, and she

15   wanted to work with me.  And I had known Laura for a few years

16   before that.

17       And that she assured me that she would be very, very

18   cooperative and, essentially, not -- I would be in a position,

19   because she knew that the city was asking me to get a partner,

20   and she alluded to the fact that the port would be that

21   partner for me.

22       And so, obviously, because of the complicated nuances

23   with the title of 435 Elm, the ultimate pathway to

24   redevelopment had -- for me had always been going through the

25   port to utilize their vehicles as a quasi public entity that

1   would help facilitate redevelopment.

2       So when she reached out to me and really urged me not to

3   contact city council people in opposition of the transfer, I

4   trusted in what she told me, and I didn't really engage

5   anybody to stop the transfer from the city to the

6   Port Authority.

7           MR. SINGER:  Your Honor, permission to publish what

8   has previously been admitted into evidence as 26A.

9           THE COURT:  You may do so.

10      (Audio played.)

11  Q.   Do you recall this conversation?

12  A.   I do.

13  Q.   Around what time do you recall that this conversation

14  occurred?

15  A.   I don't.  But after, obviously, I had started working

16  with the FBI.

17  Q.   Around what time did you start discussing with

18  Ms. Brunner transfer of the property from the city to the

19  port?

20  A.   Honestly, if you had something that could help refresh my

21  memory, that would be much appreciated.

22  Q.   Turn in your binder to 26B.

23  A.   You said 26?

24  Q.   26B.

25          MR. SINGER:  May I approach, Your Honor?

1          THE COURT:  You may.

2     Q.   Did that refresh your recollection as to the time you had

3     this conversation with Mr. Sittenfeld?

4     A.   It did.

5     Q.   When was it?

6     A.   So it was May of 2019.

7     Q.   Who were the participants in this call?

8     A.   Myself and P.G.

9     Q.   And was this around the time that you began considering

10    your support for transfer of the project from the city to the

11    port?

12    A.   That's correct.

13         (Audio played.)

14    Q.   There was a reference to, "From where we were with

15    Cranley."  What did you mean by that?

16    A.   Just referencing the challenges that I've had with the

17    mayor and the administration.

18    Q.   And then what did you mean by, "From where we are now,

19    we're hoping you'd help us out"?

20    A.   Well, there had just been progress.  It just seemed that

21    things had started to move forward.  Laura Brunner was

22    extremely engaging.  She wasn't before.  It just seemed like

23    things were starting to move.

24    Q.   Was it your understanding that Sittenfeld was helping

25    advance that progress in the city?

1    A.   Yes.  That was my understanding.

2    Q.   Now, prior to recording phone calls with Sittenfeld in

3    2018, was he involved at all in advancing the development

4    agreement of 435 in the city?

5    A.   No.

6         (Audio played.)

7    Q.   Was the 435 Elm ultimately transferred to the port?

8    A.   It was.

9    Q.   And what happened after the transfer?

10   A.   So after that transfer, I think that following week, I

11   had a meeting set up with Laura Brunner.  And at that time,

12   she -- in that meeting, she had handed me a paper that was a

13   mortgage release, it was a lien release.  And then she wanted

14   me to sign over my interest in 435 Elm.

15   Q.   Can you describe today whether or not you ever reached an

16   agreement with the port to develop 435?

17   A.   So this agreement hasn't been reached.  There's been no

18   agreements.  It's been -- it still continues to be litigated.

19        We just received -- my company's just received a

20   supportive ruling from a judge magistrate.  It's waiting in

21   the judge magistrate's office to be reaffirmed by the judge.

22        But honestly, you know, until there's a change in

23   leadership of the board -- I think Charlie Luken is the board

24   chair, and his law firm is Calfee, and they billed probably

25   $5 million of billable hours on this project.  I mean, there's

1    no incentive for them to settle anytime soon, so until that

2    board changes over, I don't see an agreement happening.

3            MR. SINGER:  No further questions at this time, Your

4    Honor.

5            THE COURT:  Thank you.  Would you like to take our

6    morning break now?

7            MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  Sounds

8    good.

9            THE COURT:  Ladies and gentlemen of the jury, it's

10   10:45.  Why don't you try to be back and ready to go by 11:05.

11     As I reminded you during all our breaks, please do not

12   discuss this case with each other.  Please do not do any

13   research about the facts or law at issue here.  Please do not

14   communicate with anyone else about this case, and please do

15   not let anyone else attempt to communicate with you.  If

16   anyone should attempt to do so, please let me know

17   immediately.

18     And please do not begin to form any final opinions on the

19   topics as to which you've been hearing evidence.  The time for

20   that will be after you've heard all of the evidence and heard

21   closing arguments.  So with that, you may take your morning

22   break.

23           (Jury out at 10:45 a.m.)

24           (Brief recess.)

25           THE COURT:  Are you ready to go with your

 1    cross-examination?

 2            MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

 3            THE COURT:  Very good.  All right.  Let's bring in

 4    the jury.

 5            While we're waiting, I'll just remind everyone in the

 6    gallery about the Court's order about no use of electronic

 7    devices in the courtroom.

 8        (Jury in at 11:11 a.m.)

 9            THE COURT:  Mr. Ndukwe, I'll remind you, sir, you

10    remain under oath.

11        Mr. Rittgers, you may proceed.

12            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14    BY MR. C. MATTHEW RITTGERS:

15    Q.  Mr. Ndukwe, you and P.G. first met back in 2010 at a

16    Bruegger's in Clifton.  Do you recall that?

17    A.  I believe so.

18    Q.  And before you ever made a single donation to P.G., you

19    two had become acquaintances back then in 2010 and '11 and

20    even 2012, right?

21    A.  Yeah.  He was an acquaintance.

22    Q.  And when you became interested in more of the commercial

23    real estate development, you had reached out to him, again,

24    before any donation had ever been made, and he introduced you

25    to Laura Brunner, who was then the president and CEO of the

1    Port Authority; is that correct?

2    A.   Honestly, I don't recall.

3    Q.   Would an email that P.G. sent to you and Mrs. Brunner

4    help refresh your recollection?

5    A.   Yeah.  I'm happy to take a look.

6    Q.   Could you, in the exhibit binder -- I might have it back

7    opened, but it's right behind you.

8            MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

9            THE COURT:  You may.

10   Q.   It's the second page of B100.

11       And if you flip to the second page, Mr. Ndukwe, there's

12   an email from P.G. to Laura Brunner, and I believe there's an

13   email address that is associated with you on that email,

14   correct?

15   A.   Yes.

16   Q.   Does that help refresh your recollection that back in

17   June of 2012, P.G. had introduced you to Mrs. Brunner back at

18   the Port Authority?

19   A.   Yes.

20   Q.   And you had never given him a single donation or anything

21   at that point, correct?

22   A.   Not that I recall.

23   Q.   Okay.  And you two, over the past 10 years, you

24   socialized together, correct?

25   A.   Define socialize.

1    Q.   Well, you've been out to drinks with P.G.?

2    A.   Maybe once, twice.

3    Q.   You've been to his apartment downtown?

4    A.   I can recall once.

5    Q.   He's been to your house?

6    A.   Condo for a Super Bowl party, yeah, I believe so.

7    Q.   You sent him pictures of your child right after your

8    child was born?

9    A.   I'm sorry?

10   Q.   You sent P.G. pictures of your child after your child was

11   born, via text?

12   A.   I'm a proud father.  I'm sure if someone connected with

13   me during that time, I shared a photo with them, yeah.

14   Q.   And he did the same thing.  He would send photos to you

15   of his first son George.  He sent pictures of George to you

16   via text?

17   A.   I don't recall that, but...

18   Q.   If you could flip to Defendant's Exhibit 76 in that

19   binder, it might help refresh your recollection a little.

20   A.   D76?

21   Q.   Yes.  Do you recall receiving that picture of the baby in

22   a hospital gown from P.G. about two years ago, two and a half

23   years ago?

24   A.   I do now from seeing the photo, yeah.

25   Q.   And you asked him something.  I think you said something

1    like, "How is mom doing," or something like that?

2    A.   Yeah.

3    Q.   And you had texted him pictures immediately after your

4    son was born too, I believe, on your chest, right?

5    A.   Like I said, I'm a very proud father.

6    Q.   Sure.

7    A.   So I did.

8    Q.   You two had gone to boxing matches together, I believe

9    down to The Banks here in Cincinnati.  Do you remember that?

10   A.   If you say so.

11   Q.   Over the years, you became a personal donor to P.G.,

12   correct?  You personally would donate in your name?

13   A.   Correct.

14   Q.   And even when P.G. ran for U.S. Senate, I think you

15   donated -- personally you donated $5,000, correct?  Do you

16   remember that?

17   A.   I believe so, but if you have anything you can show me

18   that can refresh my memory, I'd appreciate that.

19   Q.   Okay.  I will, if we need that.  You had served as a

20   host, on a host level, for fundraisers for P.G. in the past

21   too as well, right?

22   A.   I believe so.

23   Q.   Do you recall, even as early as March of 2017, being

24   listed as a host, and agreeing to be listed as a host at a

25   person by the name of Doug Groh's apartment for P.G.?

1  A.  I do.

2  Q.  And on that event, you said that you and your father were

3  going to support P.G. at that host level, correct?

4  A.  Honestly, I don't recall that, but...

5        MR. C. MATTHEW RITTGERS:  I'm going to refer to

6  what's been marked as Defense Exhibit 650.  I'm just going to

7  use it just to refresh Mr. Ndukwe's recollection.

8        And I'm going to hand Mr. Ndukwe Defendant's 650 and also

9  Defendant Exhibit 295, which is the attachment of this email.

10       Would you guys like a copy?  Okay.  Your Honor, would you

11 like a copy?  I have one on this one, but they're also in the

12 binders.

13       THE COURT:  They are in the binders?

14       MR. C. MATTHEW RITTGERS:  Yes, they are.  May I

15 approach, Your Honor, the witness?

16       THE COURT:  You may.

17 Q.  I'll give you a moment to review that.

18       THE COURT:  Is it 650, Mr. Rittgers?

19       MR. C. MATTHEW RITTGERS:  Yes, Your Honor, and 295

20 will accompany that.  I don't know why they're so far apart.

21 Q.  Does that help refresh your recollection of what you

22 stated to Mr. Sittenfeld back in March of 2017 about the

23 fundraiser?

24 A.  I do.

25 Q.  And it is true that you told Mr. Sittenfeld that your

1   father and you were going to support him, correct?

2   A.   From that email, yes.

3   Q.   You didn't say, "I'm giving my dad the money.  It's all

4   my money."  You said, "My father and I are going to support

5   you," correct?

6   A.   Yeah.  That email -- should I read the email, or --

7   Q.   You can read it.

8   A.   "I'm playing catchup on my email.  My father and myself

9   will support you at the $1,100 level.  Feel free to place

10  names on invitations but no worries."

11  Q.   Thank you.  And then Defendant's Exhibit 295 is that

12  invitation, I believe, that you're referring to, in which

13  you're listed as a host, "Please join hosts," and there are

14  several names, and you're one of the names, correct?

15  A.   That's correct.

16  Q.   And that was in March of 2017, right?  If the email would

17  help you, I don't know that it's on there.

18  A.   Yeah, the date isn't on this, this document we're

19  reading.

20  Q.   That document, it says March 23rd, but there's not a

21  year, correct?

22  A.   There's no year.

23  Q.   But this corresponds to the email which is dated

24  March 2nd of 2017, right?

25  A.   You want me to read the email?

1    Q.   I'm just asking you if this was back in 2017; if you

2    recall?

3    A.   Yes.  This email thread is 2017.

4    Q.   Thank you.  You had also offered to host in 2018 for

5    P.G., correct?

6    A.   If you have something I can -- that could help refresh my

7    memory, I would greatly appreciate it.

8             MR. C. MATTHEW RITTGERS:  Sure.  Your Honor, this has

9    been previously marked and is in the exhibits as Defendant's

10   Exhibit 54.  May I approach, Your Honor?

11            THE COURT:  You may.

12   Q.   It's at the bottom, and there's a date on this text

13   thread between you and Mr. Sittenfeld.  Does that help refresh

14   your recollection as to you're asking him to be on the host

15   level at his next fundraiser?

16   A.   Yes.

17   Q.   That was January of 2018?

18   A.   Yes.

19   Q.   Was Agent Holbrook aware of that, do you know?  Did you

20   tell Agent Holbrook about that request in January of 2018?

21   A.   I don't recall.

22   Q.   Okay.  The FBI -- you began working with the FBI in

23   March of 2018, right?

24   A.   The specific dates -- that sounds about right, but...

25   Q.   And you referenced a donation to P.G., on direct, from

1   one of your associates, Tung, is it Nguyen?

2   A.   Nguyen, Tung Nguyen.

3   Q.   And Mr. Nguyen -- you indicated that you told P.G. that

4   that was actually your money, despite the donation being from

5   Mr. Nguyen.  Is that what I heard on direct?

6   A.   That's correct.

7   Q.   Did you tell Agent Holbrook that?

8   A.   Yeah, after the fact.

9   Q.   So that was not done at the FBI instruction, you just did

10  that after the proffer agreement that you had discussed with

11  these federal prosecutors?

12  A.   Yeah, I didn't.

13  Q.   What's odd to me about that is that the first phone call,

14  one of the first recorded phone calls -- do you remember when

15  you were testifying on direct, and the prosecutor played that

16  one segment in the October 30th phone call, and you mentioned

17  the fact that Albert Smitherman and Chris Smitherman were

18  telling you that they wanted the same guy to support them,

19  right?

20  A.   That's right.

21  Q.   The language you used with P.G. wasn't that they wanted

22  me to support them through that man.  The language you used

23  was they wanted that man, Mr. Nguyen, to support me too,

24  right?

25            MR. SINGER:  Objection.  Compound.  Multiple

1    questions in there.

2         THE COURT:  Can you rephrase?

3         MR. C. MATTHEW RITTGERS:  Sure.

4    Q.   The language you used with P.G. on a recorded call was

5    that Albert Smitherman and Christopher Smitherman wanted the

6    same guy, that being Mr. Nguyen, to support them too, correct?

7    A.   That's correct.

8    Q.   And P.G. had no idea you were recording his calls on

9    October 26th of 2018 or October 30th of 2018, right?

10   A.   That's correct.

11   Q.   And if there had been any wrongdoing in the past, you

12   could have said, do you remember that time when, and then

13   mentioned some fact that was wrong or corrupt on any recorded

14   call and see what P.G. had to say.  That could have been

15   stated, right?

16   A.   I'm a little confused by the question.  I'm sorry.

17   Q.   If it is true that P.G. actually knew that this money was

18   given to Mr. Nguyen and then donated to P.G. really from you

19   is what I believe I gathered on direct is that that was your

20   money.  It's the first I've heard of that, so I'm delving into

21   that.

22   A.   That's correct.  I did give one of my associates -- I

23   mean, listen, at the time, I was extremely paranoid about

24   putting my name, my personal name, on any contributions moving

25   forward just based on the experience I had had with

1    Mayor Cranley and Yvette Simpson that I disclosed to the

2    Court.

3    Q.   There were times when P.G. had refunded donations that

4    were given to you.  For example, when he ran for senate, he

5    lost that primary campaign, and he repeatedly texted you to

6    try to give you back and did give you back money that you had

7    donated, correct?

8    A.   I don't recall, but I'm happy to look at something if --

9    Q.   If you could look at Defendant's Exhibit 711, please.

10   A.   D711?

11   Q.   D711.

12        MR. C. MATTHEW RITTGERS:  Your Honor, if I may

13   approach, it might be in another binder.

14        THE COURT:  You may.  I don't think mine go up to

15   700.

16        MR. C. MATTHEW RITTGERS:  You know what, I might have

17   to approach.

18        THE COURT:  I'm just suggesting that mine do not go

19   up to 700 --

20        MR. C. MATTHEW RITTGERS:  I agree.  I have an

21   electronic format.  Can I display it for just the witness?

22        THE COURT:  It will show up on counsel table.

23   Q.   Mr. Ndukwe, this is an extraction of text messages

24   between your phone and P.G.'s phone, and I'm going to scroll

25   down to page 7.

 1          THE COURT:  Can you speak up just a little bit,

 2    Mr. Rittgers.

 3          MR. C. MATTHEW RITTGERS:  Yes.  I'm scrolling -- it's

 4    the phone extraction that I'm using to refresh his

 5    recollection that we received from the government in

 6    discovery.

 7          THE COURT:  Very good.

 8          MR. C. MATTHEW RITTGERS:  I'm scrolling down to

 9    page 7.

10    Q.  Mr. Ndukwe, do you see -- I don't know if I can highlight

11    it, but where my hand cursor is, "Hey brother," on April 14th

12    of 2016.  Do you see that text exchange?

13    A.  Yes, I do.

14    Q.  And then even right below that, again, on April 26th,

15    "Hey, man, I still have this $2,300 check for you."

16          Does that refresh your recollection as to P.G. trying to

17    return donations back in 2016 to you that you had donated to

18    him?

19    A.  Yes.  Yeah.

20    Q.  Okay.  You served on other candidates' host committees as

21    well, correct?

22    A.  I believe so.

23    Q.  Mayor John Cranley is one example, right?

24    A.  Yeah.  If you say so.

25    Q.  You don't recall serving on Mayor Cranley's host

```
 1    committees?

 2    A.   I mean, you know, it seems like the host committee

 3    process was, hey, can I put your name on there, and I probably

 4    said yes to a number of people over the years, but... so yeah,

 5    but --

 6    Q.   Okay.

 7    A.   -- honestly, I can't recall which fundraiser that you're

 8    referring to at this moment.

 9    Q.   You support a lot of candidates, some in Kentucky, some

10    in Columbus, some in Cincinnati?

11    A.   I have in the past, yes.

12    Q.   And to the tune -- in Kentucky and Columbus, to the tune

13    of $10,000 to $25,000, correct?

14    A.   If you have a list of my campaign contributions, I'm

15    happy to review.

16    Q.   Okay.  Well, let's talk about early 2018, okay, early

17    2018.

18    A.   Okay.

19    Q.   In January 2018, you were on the other end of a secretly

20    recorded phone call, that the FBI secretly recorded you,

21    correct?

22    A.   If you say so, sure.

23    Q.   Do you not know that, that James Semler had secretly

24    recorded you?

25    A.   Yeah.  No, I knew that.
```

1    Q.   Okay.  And you were ultimately approached, then, in

2    January of 2018 by the FBI, correct?

3    A.   Correct.

4    Q.   And after that secret recording and after you were

5    approached by the FBI, that's when you contacted a criminal

6    defense attorney by the name of Scott Crosswell, correct?

7    A.   So I'd actually reached out to another friend of mine,

8    who referred me to Scott, because he said, hey, if I was you,

9    I would not meet with anyone in the federal government by

10   yourself.  And so that's what I did.

11   Q.   And ultimately, you spoke with Mr. Crosswell, correct?

12   A.   That's correct.

13   Q.   And you consulted with him?

14   A.   That's correct.

15   Q.   And you ended up signing what we've already heard

16   referenced, which is a proffer agreement, correct?

17   A.   I signed a proffer agreement, that's correct.

18   Q.   All right.  And do you remember the date of the proffer

19   agreement?

20   A.   I don't, but if you have a date of it, I'm happy to take

21   a look.

22           MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

23   This has previously been marked as Defendant's Exhibit 652.

24   Q.   All right.  If you'd take a moment just to review this,

25   and if you'd flip to the last page, you can see your signature

1    and the dates on the first page?

2    A.   Yes.  March 12, 2018.

3    Q.   All right.  And this was something that we've discussed.

4    It tells you that the federal government was investigating

5    criminal activity related to structuring banking transactions,

6    money laundering, and aggravated identity theft, correct?

7    A.   I mean, if that's what it says, that's what it says.

8    Q.   Yeah.  It's right in front of you, in the first sentence.

9    Can you just agree and look to refresh your recollection

10   there?

11   A.   Okay.

12   Q.   Is that true?

13   A.   Is what true?

14   Q.   That they were alleging you of criminal activity

15   involving structured banking transactions, money laundering,

16   and aggravated identity theft?

17   A.   Those are all words that I did not hear at the time.

18   Scott Crosswell, my attorney, and the U.S. Attorney had come

19   to this proffer agreement that at the time, you know, I

20   signed.  I mean, so -- I mean, if it's in there, it's in

21   there, so...

22   Q.   Before you signed it -- you read everything before you

23   signed it, right?

24   A.   I mean, honestly, it was a pretty stressful time.  Yeah,

25   I read it but, you know, I signed it.

1  Q.  I have no doubt it was stressful.  And the reason I want

2  to get into this is to talk about how much pressure they

3  exerted over you.  I'm not doing this to embarrass you.

4  A.  That's not really -- that's not the stress I was talking

5  about, but...

6  Q.  Okay.

7  A.  I'm being honest with you.  Scott Crosswell and the

8  U.S. Attorney, they came to an agreement.  They're attorneys,

9  I'm not, and I signed an agreement before I started speaking

10  with them.

11  Q.  Can you look at the last page, please.

12      And above your signature, you actually expressly

13  acknowledge that you read this proffer agreement in its

14  entirety and reviewed every paragraph in this agreement,

15  correct?

16  A.  That's correct.

17  Q.  And that is your signature, correct?

18  A.  That is.

19  Q.  And you dated it March 13th of 2018, correct?

20  A.  That's right.

21  Q.  All right.  If you go back to the very first sentence,

22  the alleged criminal activity that you knew at the time, in

23  March of 2018, was structured banking transactions, money

24  laundering, and aggravated identity theft, correct?

25  A.  Like I said, I'm not an attorney.  Scott Crosswell is the

1 counsel. He was the one that met with the U.S. Attorney's

2 Office and demanded that I have some type of agreement before

3 I started speaking with the FBI.

4 Q. Is that what the document says that's in front of you?

5 A. I mean, you have the document. I mean --

6     MR. SINGER: Asked and answered, Your Honor.

7     MR. C. MATTHEW RITTGERS: He hasn't answered the

8 question, Your Honor.

9     THE COURT: Yeah. He hasn't answered. As I

10 understand the question, the question is what does the

11 document say?

12     MR. C. MATTHEW RITTGERS: Yes, the first sentence.

13     MR. SINGER: Your Honor, the document is not in

14 evidence. He gave it to him to refresh his recollection. It

15 refreshed his recollection. He just needs to ask the

16 question.

17     THE COURT: So that objection is sustained. As we

18 discussed, you can use documents to refresh his recollection,

19 but unless you're admitting this document into evidence, you

20 can't just have him read the document.

21   The question, I think, is does he recall now that the

22 proffer agreement involved whatever you just said.

23     MR. C. MATTHEW RITTGERS: Okay.

24     THE COURT: So you can ask a question about his

25 recollection, unless -- is this document in evidence?

```
 1              MR. C. MATTHEW RITTGERS:  It's not, but I can move
 2     for it to be entered into evidence.
 3              MR. SINGER:  No objection, Your Honor.
 4              THE COURT:  All right.  Defendant's Exhibit D652 is
 5     admitted.
 6              MR. C. MATTHEW RITTGERS:  Your Honor, if I may
 7     display the first paragraph of Defendant's Exhibit D52?
 8              THE COURT:  Did 652?
 9              MR. C. MATTHEW RITTGERS:  652, yes, Your Honor.
10              THE COURT:  You may.
11     Q.  I've highlighted what we've been talking about,
12     Mr. Ndukwe --
13              COURTROOM DEPUTY:  Do you want it published?
14              MR. C. MATTHEW RITTGERS:  If the Court would allow it
15     to be published.
16              THE COURT:  You may.  Yes.  It's admitted.
17     Q.  Mr. Ndukwe, this is what the government told you they
18     were investigating you for, correct, structured banking
19     transactions, money laundering, and aggravated identity theft?
20     A.   Listen, none of that was ever discussed in our
21     discussion.  Scott Crosswell and the U.S. Attorneys had those
22     discussions.
23     Q.  All right.
24     A.  So...
25     Q.  Mr. Crosswell told you, and I assume when you read -- you
```

1    did read this, correct, before you signed it?

2    A.   I mean, I got to be honest, I vaguely remember this

3    document but, yeah, I did sign it.

4    Q.   This is the last page of this document, and that is your

5    signature, correct?

6    A.   That's correct.

7    Q.   And it says that you read it in its entirety and reviewed

8    every paragraph?

9    A.   Correct.  So yeah, that is my signature.  I vaguely

10   remember it, but yeah.

11   Q.   All right.  And in this document, the government is

12   telling you in this agreement that they won't use your

13   statement against you in their case in chief, but at trial, in

14   connection with your activities and offenses, they can use it

15   to cross-examine you, correct, your statements?

16   A.   If that's what it says.

17   Q.   I'm referring to page 2 of the document that you signed.

18   The proffer is, essentially, plea negotiations between your

19   criminal defense lawyer and you and the federal government,

20   correct?

21            MR. SINGER:  Objection, Your Honor.

22            THE COURT:  What's the basis?

23            MR. SINGER:  It's a mischaracterization.  It's not

24   plea negotiations.

25            MR. C. MATTHEW RITTGERS:  Your Honor, if I --

1          THE COURT:  So let's stop.  So I think right now the

2     question is what did he understand it to be.  And you've given

3     him a question about what he understands it to be, so I'll

4     allow him to answer whether he understands it to be plea

5     negotiations.

6     A.   Yeah.  In the many conversations I had with the FBI and

7     the attorneys with my counsel present, never once did anybody

8     say that they were going to prosecute me for anything.

9          They wanted to ask -- they asked me about my donations.

10    They asked about is there anything else you want to tell us,

11    because a part of this is you've got to be truthful.  And if

12    you are truthful, then there's nothing that you say that could

13    be used against you.  So that's what I did.  I told them about

14    that.

15         And I told them -- "that" being the donations.  And I

16    told them about my utilization of the IRA that wasn't

17    according to the standard process.

18    Q.   Would you agree that this document, this is the only

19    right of the agreement between the federal prosecutor's office

20    and FBI and you that outlined --

21    A.   Yeah.  It's the only thing I ever signed.

22    Q.   They have never released you and said in writing anywhere

23    we're not going to prosecute you or any of your friends,

24    correct?

25    A.   Sorry.  I don't understand the question.

1    Q.   This document -- we'll just start with this.  This

2    document is the only thing --

3    A.   Is this the same question?  I'm sorry.

4         THE COURT:  Starting over.  Blank slate.  Ask the

5    question.  Listen to the question, see if you can answer it.

6    Q.   This is the only document that outlines your cooperation

7    with the federal government, correct?

8    A.   That's correct.

9    Q.   And if you look, the document itself says, "This proffer

10   is part of potential plea negotiations between the United

11   States, Mr. Ndukwe, and his counsel."  And I'm referring you

12   to page 2, paragraph 5, the first sentence.

13        MR. C. MATTHEW RITTGERS:  And if I could display it

14   for the jury, Your Honor?

15        THE COURT:  It already is.  But I think you misread

16   that.  I think it's "proffer as part of potential plea

17   discussions --" you said negotiations -- "between the United

18   States, Mr. Ndukwe, and his counsel."

19        MR. C. MATTHEW RITTGERS:  Thank you.

20   Q.   That's what the document says, right?

21   A.   Yes, that's what it says.

22   Q.   And it goes on to say, in the same paragraph, that you

23   understand that it does not bind the federal government or the

24   FBI to even enter into any plea agreement with you, correct?

25   A.   That's what it says.

1    Q.   And paragraph 7 in this document gives the United States,

2    the FBI, and the federal prosecutors, the express right to

3    pursue any and all investigative leads derived from your

4    statements.  And you know what that means, right?

5    A.   Yes.

6    Q.   Meaning if you told them that there was a banking

7    transaction between Fifth Third and yourself, Agent Holbrook,

8    one of the federal prosecutors can then subpoena the records,

9    and they could use those records against you, correct?

10   A.   Honestly, that sounds more like a legal question, and I'm

11   not an attorney.  But I don't know.

12   Q.   The government put in writing, and you agreed, and they

13   felt it important enough to put this in writing, that they

14   reserve the right to charge you with any federal offense,

15   crime, that becomes known to the United States in the course

16   of their investigation, correct?

17   A.   Yeah.  I mean, it looks like that's in there.

18   Q.   And then they tell you that they are also expressly

19   reserving the right to -- in your own trial, to impeach you or

20   cross-examine you with the statements that you gave them

21   pursuant to the proffer, that they can use those statements in

22   your own trial against you, correct?

23   A.   If that's what it says, then that's the case.

24   Q.   So with this agreement, they hold the possibility of

25   prosecution open, over your head, correct?

1    A.   I mean, honestly, like I just said before, Scott

2    Crosswell, my attorney, and the FBI and the state's attorney,

3    they're the ones that put this together.

4    Q.   On March 13th, do you remember sitting down with

5    Mr. Singer, Mrs. Glatfelter, and Agent Holbrook with

6    Mr. Crosswell?

7    A.   I do.  I believe so.

8    Q.   And they had questions for you during that meeting,

9    correct?

10   A.   That's right.

11   Q.   And that's when you talked about the IRA withdrawal,

12   correct?

13   A.   Yeah, using the IRA.

14   Q.   And that was a friend in Columbus received $5,000, and in

15   exchange for that, he gave money back through various banking

16   institutions to you under the reporting requirements of

17   $10,000, correct?

18   A.   Honestly, I don't recall the nuances of it, but I do

19   recall utilizing the IRA improperly.  And my understanding is

20   it's a fine that you have to pay, or something along those

21   lines, but yeah.

22   Q.   Structuring money.  You told the federal government that

23   you were complicit with your friend in structuring that money,

24   correct?

25            MR. SINGER:  Objection.  Mischaracterization.

1          MR. C. MATTHEW RITTGERS:  I'm asking him.

2          THE COURT:  Well, he's asking the question.  He's

3     asking what you told the government.

4     A.   I just told them the truth.  You know, I sat down with

5     them and I told them the truth of what's going on.  No one

6     ever used the word structuring.  No one ever used the word

7     money laundering.  No one ever used those words, but I did

8     tell them the truth.

9     Q.   And that is true.  The truth is is that your friend and

10    you kept the money under the $10,000 reporting requirement

11    limit when it came back to you, right?

12    A.   I don't recall that.

13    Q.   Okay.  When you filled out the IRA withdrawal request,

14    you had to put a stated reason, right?

15    A.   Again, it's been so long, I don't recall that.

16    Q.   Did the federal government or Agent Holbrook indicate

17    that they had gone and used their subpoena power to get that

18    IRA withdrawal request?

19    A.   If they did, you know, I don't remember that.

20    Q.   They talked to you about creating money orders and

21    cashier's checks to look different to hide the source of

22    funds, right?

23    A.   Yeah.  I disclosed that to them, yeah.

24    Q.   And by the way, none of those money orders, I think there

25    were -- and cashier's checks, there are almost 50 of them,

```
1    none of those were to P.G. Sittenfeld, correct?

2    A.   I'm not -- I don't recall.  I really don't.

3    Q.   Fifteen were to John Cranley, correct?

4    A.   That sounds about right.

5    Q.   Some of them were to a governor race down in Kentucky,

6    right?

7    A.   I believe so.

8    Q.   Some of them were to a mayoral race up in Columbus,

9    right?

10   A.   That's right.

11   Q.   Some of them were other elected officials here.  You

12   mentioned something about a J. Alexander's meeting, correct?

13   A.   Correct.  That sounds about right, yeah.

14   Q.   And at that J. Alexander's meeting, the government asked

15   your lawyer and you to follow up with other documentation from

16   that meeting.  There's a picture of you with some elected

17   officials, right?

18   A.   That's correct.

19   Q.   Not P.G.  He was not there, correct?

20   A.   No, he wasn't.

21   Q.   They asked you questions, and you talked to them about

22   wiring money to a habitual gambler in New York who was known

23   to win and lose hundreds of thousands of dollars at once,

24   correct?

25   A.   A friend of a friend, yeah.
```

1    Q.   And you indicated you didn't know what he needed the

2    money for, you thought he bought a house with it, but he wired

3    you money back?

4    A.   Correct.

5    Q.   After all these things were discussed, that's when the

6    FBI asked you if you'd work for them, correct?

7    A.   I don't remember the timing being like that.  You know,

8    they asked about what I was receiving in return for the

9    contributions, and I shared my experience.  And they asked if,

10   you know, I would be willing to assist.

11   Q.   And you started naming names right then in March 2018,

12   correct?

13   A.   What do you mean by naming names?

14   Q.   At that first meeting with these federal prosecutors and

15   Agent Holbrook, you mentioned John Cranley, correct?

16   A.   They actually mentioned the contributions to John

17   Cranley, yeah.

18   Q.   And you talked about John Cranley as well.  That was part

19   of the picture you provided was with you and Mr. Cranley,

20   correct?

21   A.   That's correct, yeah.

22   Q.   And there were other elected officials, names that you

23   also mentioned and that they mentioned, correct?

24   A.   That's correct.

25   Q.   And as we've already discussed, you mentioned elected

1    officials in Columbus, all the way as far south as Kentucky,

2    right?

3    A.  That's correct.

4    Q.  And you mentioned developers who you thought had bad

5    reputations, correct?

6    A.  No.  I don't recall that, but...

7    Q.  Jake and Alex Worm.  Do you remember talking to them

8    about Jake and Alex Worm in that meeting?

9    A.  I did share some experiences with -- they are partners of

10   mine, yes.

11   Q.  They were partners of yours, but that relationship has

12   ended, right?

13   A.  That's correct, yeah.

14   Q.  And you mentioned their names in that meeting, correct?

15   A.  I don't recall the specifics, but yeah.

16   Q.  You mentioned Matt Williams out of Columbus with the IRA

17   thing, right?

18   A.  Yes.

19   Q.  And Alicia Zubikowski, correct?

20   A.  Yes.

21   Q.  Friends of yours?

22   A.  Friends, yeah.

23   Q.  But you mentioned them in connection with this wiring

24   transactions, right?

25   A.  Yeah.  They'd asked me about the transactions, and I was

 1   very transparent about who they went to and how I used the IRA

 2   improperly.

 3   Q.  There were lots of names mentioned with these federal

 4   prosecutors and Agent Holbrook, none of them were P.G.'s, in

 5   that meeting?

 6   A.  Not that I recall.

 7   Q.  And none of those people that were named in that meeting

 8   have been charged, correct?

 9   A.  Not that I can recall.

10   Q.  Nor have you been?

11   A.  Have I been charged?

12   Q.  You have not been charged is what I'm saying, correct?

13   A.  That's correct.

14   Q.  And to this day, the federal government, FBI, they have

15   not given you anything in writing saying, hey, we're not going

16   to charge you, don't worry about it?

17   A.  No.  No.  I've never -- the proffer agreement that I

18   signed way back when was the only document that I recall

19   signing.

20   Q.  Did you know that P.G. became a target of this

21   investigation in October of 2018?

22          MR. SINGER:  Objection, Your Honor.  That's a term of

23   art.

24          THE COURT:  Well, fair point.  You want to explain

25   what you mean by "target"?

1    Q.   Do you know what target means?

2    A.   Please explain.

3    Q.   All right.  It -- I believe it means P.G. has become a

4    person of interest of the FBI, and then when you have

5    communication with him, it's supposed to be recorded, and they

6    set up an entire operation around him?

7    A.   I believe that was the timeline, I believe.

8    Q.   And so that September 21st phone call that the government

9    talked about on direct of 2018, you had been working with the

10   FBI at that point for half of a year, correct?

11   A.   I believe so.

12   Q.   There was -- that call was not recorded, correct?

13   A.   That he called me?  The call that he called me?

14   Q.   September?

15   A.   Yes, that is correct.  That was not recorded.

16   Q.   And you didn't have to record it because he wasn't a

17   target?

18   A.   Correct.

19   Q.   And there were then three calls that you initiated

20   between October 26th and November 7th, which was the Nada

21   lunch when you introduced Rob to P.G., correct?

22   A.   That sounds about right, but if you have anything that

23   can refresh my memory, I'm happy to take a look at it.

24   Q.   Sure.  Before we jump into those calls, the FBI Agent

25   Holbrook, or maybe other agents, they sat down with you, and

1  they talked to you about the personas of the individuals that

2  they wanted you to introduce to P.G., right?

3  A.  I'm sorry.  Persona like the people?  They mentioned that

4  they had undercover agents that were going to be represented

5  as my investors.  Is that what you're referring to?

6  Q.  Yes.  Thank you.  The fake story is Rob and Brian, right?

7  A.  That's correct.

8  Q.  And Rob and Brian were posing as your backers, your

9  financial backers, right?

10  A.  That's correct.

11  Q.  And these guys were from out of the state, correct?

12  A.  That's correct.

13  Q.  Rob, in particular, had cut his teeth in real estate

14  years and years ago down in Georgia, right?  That was the

15  story?

16  A.  I don't recall the specifics, but...

17  Q.  The overall sense is it's your deal, 435 Elm, but it's

18  Rob and Brian's money coming in to support you financially,

19  right?

20  A.  Essentially, yes.

21  Q.  And by the way, you had two other deals that were before

22  council in 2018 and 2019, correct?

23  A.  If you can tell me specifically which ones those were?

24  Q.  You put up a hotel in Mt. Auburn, right?

25  A.  I did.

1    Q.   You did a low-income housing project in Avondale?

2    A.   Yes, I did.

3    Q.   So there were two other projects that required city

4    support in 2018 and 2019, correct?

5    A.   That's correct.

6    Q.   No accusation of any wrongdoing or corruption on those

7    two projects that Rob and Brian were not involved in?

8    A.   So, in my opinion, I think the City of Cincinnati has

9    been extremely corrupt for a very long time, so I'm not sure

10   how to answer that statement other than that.

11   Q.   All right.  So Rob and Brian, out-of-town money, they can

12   invest wherever they want in the country, right?

13   A.   Okay.

14   Q.   I mean, do you agree with that?  That's the story?

15   A.   I guess I'm confused by the question.  Are you -- he's

16   asking the question about what the story of he -- what's the

17   question, I guess?

18            THE COURT:  Could you rephrase.

19            MR. C. MATTHEW RITTGERS:  I'll rephrase.

20   Q.   The story that Agent Holbrook wanted you to partake in is

21   that Rob and Brian were from out of town, and they could

22   invest their money anywhere, but they were considering

23   investing it here in 435 Elm, right?

24   A.   That's correct.

25   Q.   And so on 10/26, October 26th of 2018, and this is

1    corresponding with USA Exhibit 12B, you initiated a phone call

2    to P.G., correct?

3    A.   Is -- should I review, or would you mind pulling up 12B?

4         MR. C. MATTHEW RITTGERS:  Sure.  Could we please pull

5    up 12B.

6    Q.   All right.  You should see 12B, Mr. Ndukwe.  It's an FBI

7    transcript from October 26th of 2018.  I'm going to scroll

8    down, and it will show the participants, your name and

9    Mr. Sittenfeld's name, or both, appearing.  Does that help

10   refresh your recollection of this first phone call?

11   A.   Can we play the call?

12   Q.   Sure.  We can scroll down.  You can read as much as you

13   want.

14        THE COURT:  You should have 12B in one of the white

15   notebooks.

16        THE WITNESS:  I think it's on the screen, I believe.

17        THE COURT:  Yeah, but it's only in pieces.  You said

18   you wanted to see the whole thing.  It's in one of these

19   books, 12B.

20        MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

21        THE COURT:  You may.

22   A.   Please do.  There's like six books here.

23        THE COURT:  There's also one behind you, sir.

24   A.   Yep.

25   Q.   That Exhibit 12B reflects the first recorded call in this

1    undercover operation against P.G., which occurred on

2    October 26th of 2018, okay?

3    A.   Okay.

4    Q.   Before you initiated that call, you had spoken with Agent

5    Holbrook or other FBI agents, correct?

6    A.   That's right.

7    Q.   And that's when they talked about Rob and Brian with you,

8    and who they were going to be to P.G., how you were going to

9    introduce them, right?

10   A.   Well, no.  Actually, I don't know the timing, but what I

11   remember is having -- getting the call from P.G., him talking

12   about every other developer was going to donate $10,000, and

13   that was his expectation of me.

14       And then I also remember having this discussion around

15   LLCs and limits, and along those lines.

16   Q.   And in that call, October 26th, the first person to bring

17   up the term LLC was you to P.G., right?

18   A.   I don't recall that.

19   Q.   Can you take a quick look?  It's a very short call.  I

20   can tell you it's at the bottom of page 3, and you're

21   referring to Rob and Brian.

22   A.   Yeah.  So -- "and I know they have a ton of different

23   LLCs"?

24   Q.   Yeah.

25   A.   Is that what you're talking about?

1   Q.   Yes.

2   A.   Yeah.

3   Q.   You're referring to Rob and Brian, right?

4   A.   Well, I brought that up based on his request to put them

5   in different LLCs.

6   Q.   I'm asking you, though, what you're referring to here, "A

7   ton of different LLCs," that one first, that was brought up by

8   you first on this phone call, right?

9   A.   In this specific call, yes.

10   Q.   Yeah.  And you're referring to your investors, which we

11   know now are undercover FBI agents, which is Rob or Brian,

12   right?

13   A.   That's correct.

14   Q.   And you also brought up a law change in November on this

15   phone call.  P.G. did not bring that up.  You brought that up

16   to P.G. on this very first phone call, "They're going to be

17   involved with 435 Elm, and we want to tee up getting them to

18   you before they change everything in November," right?

19   A.   On this specific call, yes.

20   Q.   And this is the first recorded phone call in this entire

21   case, right?

22   A.   With P.G., yes.

23   Q.   Yes.  And then on October 30th, which is the next tab,

24   it's 13B, four days later you initiated another phone call to

25   P.G. at the request of the FBI, correct?

1    A.   That's correct.

2    Q.   And you, again, tell P.G. that Rob and Brian might be

3    willing to invest in 435 Elm, correct?  It's at the top of

4    page 2, if you want to actually see the quote.

5    A.   That's correct.

6    Q.   And in this call, this is when you talk about John

7    Cranley treating you unfairly, right?

8    A.   I believe so.

9    Q.   And it's in this call that we heard that quote, "Love you

10   but can't," right?

11   A.   Do you know where that quote is?

12   Q.   Yeah.  I can find it for you, sure.  It's at the bottom

13   of page 2.

14   A.   Okay.

15   Q.   So on this call, the call begins with you telling P.G.

16   that the current mayor has been hurting you, correct?

17   A.   Correct.

18   Q.   And it goes into P.G. talking about how he loves what you

19   do as someone revitalizing the city and creating jobs, right?

20   A.   Correct.

21   Q.   And he's also talking about fundraising, and raising

22   money so that he can become a successful candidate, right?

23   A.   That's correct.

24   Q.   And when you tell him on this phone call that your

25   mentor, Albert Smitherman and Christopher Smitherman, had

1    called you to say that they want the same guy to support them

2    too, P.G. said, "That's weird and questionable legality."

3    That was his response?

4    A.   Yes.

5    Q.   And on the same call, you then mention again that these

6    guys, meaning Rob and Brian, they've got a ton of LLCs, right?

7    A.   That's right.

8    Q.   And you asked P.G. again on this call, "When is the drop

9    dead date for this LLC law change," right?

10   A.   That's right.

11   Q.   And that's your right to ask about a law change, correct?

12   A.   Well, he brought it up a number of times before.

13   Q.   On this phone call and the call before it, the person who

14   brought it up was you, right?

15   A.   I don't know about the call before, but...

16   Q.   October 26th?

17   A.   Oh, yeah.  Yeah.  Uh-huh.

18   Q.   And then there's a third phone call before the

19   November 7th meeting, on November 2nd, which corresponds in

20   your exhibit to 14B as in boy.

21   A.   Okay.

22   Q.   And this also was initiated by you at the request of

23   Agent Holbrook or the FBI?

24   A.   That's correct.

25   Q.   And it's on this call that Agent Holbrook told you to

1    make a clear offer to P.G., right?

2    A.   That's correct.

3    Q.   And after you make that offer, P.G. says, "No, there will

4    not be -- there cannot be a quid pro quo," correct?

5    A.   I mean, I think he used those words, but it's pretty

6    clear from that last call that he said "love you, but..." I

7    mean, to me it's clearly outlined there, his true intentions.

8    Q.   Would you agree with me that in order to become a

9    successful candidate, to win you need to raise money?

10   A.   So you're asking me if political candidates need to raise

11   money, I would say yes.

12   Q.   And P.G. was referring to raising money in that phone

13   call, correct?

14   A.   He was referring to raising money, that's correct.

15   Q.   Would you agree with me that if P.G. had not become

16   mayor, that he couldn't help you, that someone like John

17   Cranley could continue to hurt you in your project?

18   A.   Do you mind repeating the question?

19   Q.   Sure.  That if P.G. was not a successful candidate, if he

20   didn't raise money and didn't win his election, he would have

21   no way of helping you because he wouldn't have been the mayor?

22   A.   Okay.

23   Q.   Do you agree with that?

24   A.   I guess I still don't understand the question.

25   Q.   If the mayor's hurting your projects, would you agree

*NDUKWE - CROSS*

1    that he was, right?

2    A.  Mayor Cranley, yes.

3    Q.  Yes.  If P.G. was going to have the ability to help his

4    friend, he would have to be successful and actually become the

5    mayor.  If he wasn't the mayor, he couldn't help you, right?

6    A.  Well, so, again, you're saying we're friends.  I would go

7    on vacations with my friends.  I would have them over for

8    drinks, for beers.  I know, at least, the name of the

9    girlfriend or wife.  I mean, we weren't that type of friend.

10        I mean, I think we're friendly acquaintances is what I've

11    said before but, at the end of the day, I think there's plenty

12    of candidates that have won without raising a ton of money,

13    one being Stephanie Dumas.  She just won -- I think she raised

14    maybe five, ten grand and was elected to county commissioner.

15    Q.  $13,000.  Do you know who supported her?

16    A.  Was that --

17    Q.  It was $13,000 is what she raised.  Do you know who else

18    supported her?  P.G. Sittenfeld out of this Progress and

19    Growth PAC.  Did you know that?

20    A.  No, I didn't.

21    Q.  So the FBI tells you to tell P.G. that these guys are big

22    money out-of-town real estate guys, right?

23    A.  They said to introduce these guys to people as your

24    investors.

25    Q.  P.G.'s always been known as a pro-development guy in the

1    city, right?

2    A.   Yeah, that's what he said.  He said he was squarely in

3    the middle of multiple deals in downtown Cincinnati, that's

4    right.

5    Q.   And the first time you ever met Laura Brunner was through

6    P.G., before you had ever donated, right?  That was ten years

7    ago?

8    A.   I kind of wish I'd never met her, to be honest with you.

9    Sure.

10   Q.   All right.  I understand.  We can talk about Laura

11   Brunner for a second.  P.G., he -- you truly believe that she

12   was treating you differently, right?

13   A.   I just look at past projects with developers.

14   Q.   Yeah.  We can agree on this.  And P.G. heard those

15   concerns, and he went to Laura Brunner and was saying what is

16   going on here, right?  That's what he relayed back to you.

17   Why are you treating him like this?

18   A.   Listen, I wasn't privy to those conversations, so I can

19   only speak to the things that I know directly.

20   Q.   Well, on the phone calls, and we've heard some of them in

21   this courtroom today, P.G. was saying, yeah, when Ms. Brunner

22   said she won a $350,000 ground lease for this problem property

23   that you had the air rights to, P.G. said that's insane.

24   Those were his words, right?  Do you remember that?

25   A.   Was that played in court?  I don't recall hearing that

1    today.

2    Q.   No, not today.  But do you recall it just from your own

3    recollection and memory?

4    A.   If you want to play it, I'm happy to listen to it,

5    but...

6    Q.   All right.  We'll talk a little bit more about her in a

7    minute.

8        This project, 435 Elm, this was a no-brainer project for

9    the city and the county, right?

10   A.   Define no-brainer.

11   Q.   I mean, anyone in the region would want this building to

12   be revitalized?

13   A.   Yeah.  I'm biased because of my interest but, yeah, I

14   think it was in the best interest of the City of Cincinnati,

15   the county, and southwest Ohio.

16   Q.   It was costing the taxpayers $400,000 a year just in

17   maintenance costs, right?

18   A.   Yeah.  I still think it does cost the taxpayers money

19   every year.

20   Q.   I agree with you.  And the taxpayers now are supporting

21   the port, who is holding on to the property, because you guys

22   can't come to an agreement, right?

23   A.   That's correct.

24   Q.   So that $400,000 a year is now shared by the county and

25   the city taxpayers, right?

NDUKWE - CROSS

1   A.   I don't know the nuances but, yeah, someone's paying for

2   it.

3   Q.   And you mentioned the convention center.  What's the area

4   called now?

5   A.   I might have misspoken, but they have a specific name for

6   it.  It's convention block, or...

7   Q.   Yeah, I don't know.  I was literally asking you.  So the

8   convention area or block?

9   A.   That's right.

10  Q.   That's vital for our downtown, right?

11  A.   It is.

12  Q.   And, in part, because of tourism?

13  A.   That's right.

14  Q.   You know, people come here from out of state for these

15  conventions, and they walk out the door and what do they see?

16  They see 435 Elm sitting in that dilapidated state, right?

17  A.   That's right.

18  Q.   That thing's been a problem for years, before you even

19  got involved, right?

20  A.   Listen, I believe so but... yeah.  Yeah, that's right.

21  Q.   Back in 2018, when you had the air rights to 435 Elm, you

22  bought them in 2017 from U.S. Bank, right?

23  A.   I believe so, yes.

24  Q.   There was no other developer that was vying, that was

25  attempting to develop 435 Elm, it was just you, to my

*NDUKWE - CROSS*

1    knowledge?

2    A.   You know, I think a number of developers had looked at

3    it.  And what I had said before was for us being a small

4    business, that we have to take on complex deals in order to be

5    successful.

6         We just -- it's impossible for us to compete with larger

7    developers on some of the easier projects, so I can only speak

8    to that.

9    Q.   Were you aware of anyone in 2018 and 2019 who was

10   interested in helping revitalize that parcel?

11   A.   I think some other developers had looked at it, but I

12   don't recall.

13   Q.   No one else had the rights, the air rights to it, right?

14   A.   That's right.

15   Q.   And was part of the issue, the claimed issue by

16   Mrs. Brunner, she claimed, I believe, that two issues were

17   your experience and financial backing.  That was her claim,

18   right?

19   A.   She -- yeah.  She had said experience capacity as reasons

20   why.  I think she had mentioned some other ones, but yeah.

21   Q.   Did she think that Rob and Brian were able to come up

22   with tens of millions of dollars and help support this

23   redevelopment?

24        MR. SINGER:  Objection, Your Honor.

25        MR. C. MATTHEW RITTGERS:  I'll rephrase it.

1          MR. SINGER:  How would he know what Laura Brunner

2     thinks.

3          THE COURT:  Sustained.  You may rephrase.

4     Q.  Are you aware she was ever told by you or in your

5     presence that Rob and Brian were there to financially support

6     your project to the tune of millions of dollars?

7     A.  I don't believe so.  I wasn't present at whether those

8     were discussions.  I'm not sure what you're referring to.  If

9     you have something that I can review, I'm happy to do that.

10    Q.  I'm just asking you if you ever said to Laura the things

11    that were being said to P.G., which is that you had Rob and

12    Brian, Rob being this real estate developer for a long time,

13    and these investors with millions of dollars ready to support

14    your project.  Did she think that too?  Did she know that?

15    A.  Well, my business plan, which I think I had outlined

16    earlier, was to negotiate a development agreement with the

17    port or the city, and then bring in a strategic partner.  And

18    that's what I communicated to the city, that's what I

19    communicated to the Port Authority, and that's pretty much

20    been my business model for larger projects.

21    Q.  And part of the issue in 2018 and 2019 with Mrs. Brunner,

22    that she wanted you to have that partner at that point, she

23    didn't want to do it at a later point, right?

24    A.  Well, in my opinion, like I said, both with the city and

25    the Port Authority, depending on what the scenario was that

1    day, the goal moved for me to get to a development agreement.

2        So in that scenario, they would want -- they would have

3    rather me had a development partner before they would issue me

4    a development agreement.  I think that's -- is that what

5    you're asking?

6    Q.   That's exactly what I'm asking.

7    A.   Yeah.

8    Q.   So P.G. was told that you had a development partner in

9    Rob and Brian, right?

10   A.   That they're investors.  I've introduced them as

11   investors.

12   Q.   That had done real estate deals all over the country

13   previously?

14   A.   Yeah.  That had experience, yeah.

15   Q.   He was operating on a different set of information than

16   Mrs. Brunner?

17   A.   No.  I'm pretty sure I told P.G. that my goal was to get

18   a development agreement.  And I told anyone and everyone, as

19   I'll tell today, that our business model was to get a

20   development agreement and bring in strategic partners to help

21   fund developments.

22       That wasn't different with P.G., that wasn't different

23   with the City of Cincinnati, and that's not different with the

24   Port Authority.

25   Q.   Staying on Mrs. Brunner for a second.  You had a number

1    of phone calls in mid to late November of 2019 with P.G. about

2    this project, correct, 435 Elm?

3    A.   If you're saying so, yeah.

4    Q.   I can show you some transcripts.  They're not reflected

5    in summaries that we were given, but you do recall a lot of

6    phone calls with P.G. in late November of 2019 talking about

7    435 Elm and Mrs. Brunner?

8    A.   When you say a lot, do you want to just define that?

9    Q.   Yes.  There are four total?

10   A.   Okay.

11   Q.   November 15th, November 16th, November 27th, and then

12   December 10th.  So over about a 24-day period, four calls, all

13   recorded, where you and Mr. Sittenfeld are talking about him

14   trying to help you get 435 Elm developed.  Does that sound

15   about right?

16   A.   Yeah.  If they're recorded, then yeah, that makes sense.

17   Q.   And then the next day, on December 11th, you and P.G.

18   meet with a developer out of Columbus -- Rob and Brian are

19   gone -- and he sits down with a guy by the name of Mike

20   Schiff, right?

21   A.   That's correct.

22   Q.   And he's trying to now help facilitate a development at

23   435 Elm with a partnership that exists between you and Mike

24   Schiff.  Rob and Brian are gone.  They're not even at that

25   meeting, are they?

1    A.   No.

2    Q.   And Mike Schiff was going to be your partner in the

3    development agreement at 435 Elm.  That was the purpose of

4    this December 11th, 2019 meeting, right?

5    A.   Yes.

6    Q.   And that was, I believe, at P.G.'s office at City Hall?

7    A.   That's correct.

8    Q.   And that was recorded?

9    A.   I believe so.

10    Q.   He never expresses any concern about Rob and Brian being

11    gone.  He's sitting down with you, Mike Schiff, this guy out

12    of Columbus, who is a reputable developer and trying to get

13    the deal done here in the city with Laura Brunner, right?

14    A.   So I think the way that you're characterizing Rob and

15    Brian, I mean, to me they're investors.  That's how I

16    introduced Rob and Brian to people, were investors.

17        Mike Schiff has been a part of multiple, multiple

18    projects in the City of Columbus, complicated

19    mixed-development projects that I thought could be of value to

20    make an actual development happen.  So I just want to make

21    sure we're clear on that.

22    Q.   Sure.  And Mike Schiff's never supported P.G., correct?

23    A.   You'd have to ask Mike.

24    Q.   And he says, "Absolutely.  Let's get 435 Elm done.  Come

25    to my office."  P.G. Sittenfeld says this to you and Mike

1  Schiff, and you sit down in December 2019 to try to continue

2  to get progress on 435 Elm, right?

3  A.  That's correct.  We did visit P.G. at his office.

4  Q.  Jay Kincaid, he's a lobbyist that you had paid at one

5  time to lobby for you, right?

6  A.  That's correct.

7  Q.  And Jay Kincaid, you had paid him probably through

8  Kingsley, right?

9  A.  I believe so.

10  Q.  And at some point in time, I believe, you learned that he

11  was also being paid as a lobbyist for the Port Authority,

12  right?

13  A.  Yes.

14  Q.  So Jay Kincaid was taking Kingsley money as a lobbyist?

15  A.  Yeah.

16  Q.  And also being paid by the port to be the lobbyist for

17  you, Mr. Ndukwe and Kingsley, and the port, while you two are

18  in negotiations about a development deal; is that right?

19  A.  I guess he had a pretty good gig.

20          MR. C. MATTHEW RITTGERS:  May I have one moment, Your

21  Honor?

22          THE COURT:  You may.

23  Q.  Mr. Ndukwe, just a few more questions.  I'm sorry to go

24  back to this.

25      When you talked to Scott Crosswell, he advised you as to

 1    what crimes you were facing before you walked in that meeting,

 2    I assume, right?

 3            MR. SINGER:  Objection.  He's asking what his

 4    attorney advised him.

 5            THE COURT:  Yeah.  Sustained.

 6    Q.  The government mentioned on your direct that they paid

 7    you $27,000 in cash between 2018 and 2020, right?

 8    A.  That's correct.

 9    Q.  And there's nothing in writing as to how you get paid or

10    why, right?

11    A.  That's correct.

12    Q.  And two years ago, in November of 2020, your name was in

13    the paper because the federal prosecutor's office said that

14    you were the cooperating witness in this case, right?

15    A.  That's correct.

16    Q.  So for two years now, your name has been out there in the

17    public domain, correct?

18    A.  That's correct.

19    Q.  And it was not until last week that Agent Holbrook did an

20    interview or interviewed you about the tax payments on the

21    $27,000, right?

22    A.  That's correct.

23    Q.  And it wasn't until last week that Agent Holbrook

24    interviewed you about the trip that Rob and Brian and you and

25    another elected official took down to Miami, correct?

1 A. Define interview. I don't recall having an interview

2 about a trip to Miami.

3 Q. They didn't sit you down and ask you -- you guys were in

4 a VIP room at that place called Tootsies?

5 A. That's correct, yeah.

6 Q. And he was asking you questions about what money was

7 spent there?

8 A. That's correct.

9 Q. Last week?

10 A. I believe so.

11 Q. And that you guys flew down on a private jet and back,

12 right?

13 A. That's correct.

14 Q. And went out on a yacht?

15 A. That's correct.

16 Q. Stayed at nice hotels?

17 A. I believe it was an apartment building, but yeah.

18 Q. Stayed at a nice apartment. Before P.G. was ever a

19 target in August of 2018, you were talking to Chris

20 Smitherman, and he says he doesn't want another white mayor,

21 and you said, "Absolutely. I'm right there with you." Do you

22 recall that?

23 A. I don't recall that, but if you -- do you have something

24 I can refresh my memory?

25    MR. C. MATTHEW RITTGERS: Sure. I can refresh or

 1   play, Your Honor.

 2          THE COURT:  Has it been admitted?

 3          MR. SINGER:  It's not been admitted into evidence,

 4   Your Honor.

 5          THE COURT:  Well, then, you're not playing it if it's

 6   not been admitted.

 7          MR. C. MATTHEW RITTGERS:  Can I refresh?

 8          THE COURT:  You may.

 9          MR. C. MATTHEW RITTGERS:  They didn't transcribe

10   this, but it's an audio, so I can play it on my computer with

11   headphones, which I believe we have.

12          MR. SINGER:  Your Honor, this is a recording from a

13   completely separate investigation.

14          THE COURT:  Well, I think he's using it to refresh

15   his recollection.  As to what, I'm not entirely clear, but...

16          MR. C. MATTHEW RITTGERS:  He doesn't recall if he

17   said he doesn't want another white mayor in August of 2018.

18          THE COURT:  Okay.  Well, not hearing an objection to

19   the question, so if you can refresh his recollection with

20   computer and headphones, I guess you can.

21          THE WITNESS:  Can I ask a question?

22          THE COURT:  Sure.

23          THE WITNESS:  So I'm trying to be very protected --

24   you're saying I'm putting headphones on?

25          THE COURT:  I guess.  I don't know.

```
 1            MR. C. MATTHEW RITTGERS:  I was trying to do ear pods

 2     or something, but it might not fit --

 3            THE WITNESS:  Yeah.  I can't put someone else's ear

 4     pods in my ears.  I'm sorry.

 5     Q.  All right.  Do you recall saying that?

 6     A.  I mean, if you're saying that I said it on a recorded

 7     call, then I'm going to assume that that's the case.  So I'll

 8     say yes, just to -- yeah.

 9            MR. C. MATTHEW RITTGERS:  Okay.  All right.  I don't

10     have any further questions.

11            THE WITNESS:  But can I -- I mean, am I able to kind

12     of expand on that yes?

13            THE COURT:  You can if the government asks you to.  I

14     think you've answered the question.

15            THE WITNESS:  Okay.  All right.

16            THE COURT:  Mr. Rittgers, did you say you're done?

17            MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

18            THE COURT:  We do want to break, Mr. Singer, by

19     12:30.  So are you going to be able to be done in seven

20     minutes, or should we break now?

21            MR.  SINGER:  We can break now, Your Honor.

22            THE COURT:  Okay.  So we need to break by 12:30

23     today.  It sounds like we're not going to get the redirect

24     done before then; is that right?

25            MR.  SINGER:  Your Honor, I just have a couple
```

1    questions, whatever the Court prefers.

2              THE COURT:  I want to break by 12:30 today, so if you

3    can be done before 12:30, we can do it; if you can't, we

4    should break.

5              MR. SINGER:  I think we can be done before 12:30.

6              THE COURT:  Okay.

7              MR. SINGER:  Sorry.  I misunderstood the question.

8              THE COURT:  That's all right.

9              THE WITNESS:  So is this portion over?

10             THE COURT:  I'm sorry, what?

11             THE WITNESS:  So he's asking me questions now?

12             THE COURT:  Right.  He's going to have an opportunity

13   to ask you some follow-up questions based on what Mr. Rittgers

14   asked you.

15             THE WITNESS:  Okay.  Sorry about that, Judge.

16             THE COURT:  You're good.  All right.

17             MR. SINGER:  Just a couple questions.

18                        REDIRECT EXAMINATION

19   BY MR. SINGER:

20   Q.   So you were asked about a trip to Miami --

21   A.   That's right.

22   Q.   -- do you remember that.  And was that trip taken at the

23   direction of the FBI?

24   A.   It was.

25   Q.   And it related to a completely separate investigation?

1    A.   That's correct.

2    Q.   And were there other individuals there that were part of

3    the investigation there?

4    A.   That's correct.

5    Q.   And that included another elected official?

6    A.   That's correct.

7    Q.   The phone call that you were just asked about with

8    regards to Mr. Smitherman, was that pursuant to a completely

9    separate investigation?

10   A.   That was.

11   Q.   And were you working at the direction of the FBI during

12   that?

13   A.   I was.

14   Q.   Now, you had testified about -- you were asked questions

15   about being on a host committee; is that right?

16   A.   That's correct.

17   Q.   You're a former Bengal player, seen as a celebrity among

18   certain circles; is that right?

19   A.   Quasi celebrity, but yes.

20   Q.   So did people tend to -- did public officials use you and

21   your name to help fundraise?

22   A.   Yes.  And I mentioned this before that I just felt like,

23   you know, now looking back on the years of this that, you

24   know, they took advantage of my motivation to be in this

25   circle so, yeah, that is -- that's correct.

1        MR. SINGER:  May I have one minute, Your Honor?

2        THE COURT:  You may.

3        MR. SINGER:  Nothing further.

4        THE COURT:  Thank you.  Mr. Rittgers?

5                    RECROSS-EXAMINATION

6   BY MR. C. MATTHEW RITTGERS:

7   Q.   Looking back now, this is after you talked to the federal

8   prosecutors and the FBI about all those misdeeds that we've

9   already discussed, right?

10       MR. SINGER:  Outside the scope, Your Honor.

11       THE COURT:  Well, you did ask him -- I'm sorry.  He

12  volunteered, in response to one of your questions, something

13  about looking back, so I'll allow the follow-up on it.

14  Q.   That's after the FBI and federal prosecutors held this

15  proffer agreement out that doesn't give you immunity from

16  prosecution, correct?

17  A.   So what I just said, I believe you're taking out of

18  context.

19       What I was referring to was the fact that, you know,

20  myself, other business people in the City of Cincinnati, you

21  know, there's been a culture of that expectation to give to

22  these politicians, and I think that's something that, at the

23  end of the day, was part of the reason why I wanted to help is

24  to eliminate that.

25       MR. C. MATTHEW RITTGERS:  No further questions, Your

 1    Honor.

 2              THE COURT:  Very good.  Mr. Ndukwe, sir, you can step

 3    down.  Thank you for appearing here this morning.

 4              THE WITNESS:  Thank you.

 5         (Witness excused.)

 6              THE COURT:  So ladies and gentlemen of the jury,

 7    we're now going to take our break for lunch.  I would remind

 8    you, please don't discuss this case amongst yourselves.

 9    Please don't attempt to do any research as to any of the facts

10    or the law we've been discussing.

11         Please don't communicate with anyone else about the case,

12    or allow anyone else to communicate with you.  If anyone

13    should attempt to, please bring it to my attention

14    immediately.

15         Please do not begin to form any final opinions about

16    things until we've heard all the evidence and closing argument

17    and been instructed on the law.

18         With that, please have an enjoyable lunch and try to be

19    back, why don't we say 1:30.

20         (Jury out at 12:26 p.m.)

21              THE COURT:  Does the government have another witness

22    ready to go right after lunch?

23              MR. SINGER:  Yes, Your Honor.

24              THE COURT:  Okay.  And do you anticipate that witness

25    taking the remainder of the day?

```
 1              MR. SINGER:  The remainder of the day?

 2              THE COURT:  Yeah.  I'm just asking.

 3              MR. SINGER:  No.

 4              THE COURT:  Okay.  So do you have multiple witnesses

 5     ready to go?

 6              MR. SINGER:  We have multiple witnesses.  I'm unclear

 7     how long exactly the next two will last, but we have a third

 8     to the extent that there's time.

 9              THE COURT:  Okay.  Very good.  All right.  I just

10     wanted to make sure.

11         Is there anything we need to discuss before we take a

12     break?

13              MR. SINGER:  I would just note that the third

14     undercover witness will be testifying next, so same issues

15     we've been discussing relating to sketch artists.

16              THE COURT:  Ma'am, yeah, you're back on deck.  There

17     will be a witness after lunch who can't be sketched, for

18     similar reasons to the ones that we've discussed previously.

19              SKETCH ARTIST:  Thank you.

20              THE COURT:  Absolutely.  And the first one will be

21     after lunch?

22              MR. SINGER:  Yes, Your Honor.

23              THE COURT:  Anything else we need to discuss from

24     your perspective, Mr. Singer?

25              MR. SINGER:  No, Your Honor.
```

```
 1              THE COURT:  Mr. Rittgers?

 2              MR. C. MATTHEW RITTGERS:  No, Your Honor.

 3              THE COURT:  All right.  Why don't we break for lunch

 4    and try to be back by 1:20, please.

 5         (Lunch recess.)

 6              THE COURT:  So at your leisure, counsel, why don't

 7    you review this and see if it covers the topics that we

 8    addressed.

 9         I guess one other potential inclusion is that -- it could

10    be in the second paragraph, is that it need not be a person,

11    it could be an LLC.  An LLC is also a valid contributor.

12    That's, I think, a topic on which there is no disagreement

13    among the parties, so it could include that too, but take a

14    read.

15              MS. GLATFELTER:  Your Honor, if we could have time to

16    look at the instruction and consult with our appellate group

17    and then maybe get back to you tomorrow morning?

18              THE COURT:  Sure.

19              MS. GLATFELTER:  You think -- or do we have to make a

20    decision by the end of the day?

21              THE COURT:  Well, you could email it to whomever you

22    want.

23              MS. GLATFELTER:  Yes.

24              THE COURT:  Email the document to Scott, the document

25    that we just printed.
```

1      Mr. Singer, do you anticipate the government will rest

2    tomorrow?

3            MR.  SINGER:  Yes.

4            THE COURT:  So when will we need to make a final

5    decision on Mr. Burns here?  The government is going to rest

6    tomorrow.  Would you need to have him here tomorrow or

7    Thursday?

8            MR. C. MATTHEW RITTGERS:  Sooner rather than later,

9    Your Honor.  But, I mean, if we have to work around

10   scheduling, we don't have to call him first.

11           THE COURT:  Okay.

12           MR. C. MATTHEW RITTGERS:  Just for scheduling

13   purpose, will we need to be ready to call a witness tomorrow?

14           MR.  SINGER:  Probably.

15           MR. C. MATTHEW RITTGERS:  Probably?

16           MR. SINGER:  Yes.

17           MR. C. MATTHEW RITTGERS:  Okay.

18           THE COURT:  So as I understand it, the government

19   would like an opportunity to review this for a bit.  I imagine

20   you would like the opportunity to review it for a bit.

21       So maybe we'll talk after we excuse the jury for the day

22   about where we're at here and what additional information, if

23   any, you would like to include in this.

24       I certainly don't want to deprive you of the opportunity

25   to review it before we do that, but I also don't want to leave

1       the jury hanging out too long here.

2               MR. C. HENRY RITTGERS:  Thank you, Your Honor.

3               THE COURT:  Have you had an opportunity to read it

4       all yet, or not really?

5               MR. C. MATTHEW RITTGERS:  I've gotten through two

6       paragraphs.

7               THE COURT:  Okay.  I'll be quiet then.

8               MR. C. MATTHEW RITTGERS:  Your Honor, I do agree that

9       it might be best if we did it at the end of the day because

10      I'm already circling a few things.

11              THE COURT:  Okay.  Well, why don't you take a read,

12      and then you can cogitate.

13          We'll bring in the jury in about five minutes here.

14              MR. C. HENRY RITTGERS:  Judge, since we're waiting.

15      Mr. Singer has just indicated that they're going to call one

16      witness if they get through their three today.  Am I correct?

17      I'm just housekeeping.

18              MR. SINGER:  Yeah.  Depending how many witnesses we

19      get through today, we'll have one witness tomorrow.

20              THE COURT:  So it sounds like four witnesses left is

21      what I'm hearing?

22              MR. SINGER:  Yes.

23              MR. C. HENRY RITTGERS:  So in the event we get

24      through three today, and they have one, I believe we're going

25      to be making a motion after they rest.  What I would like to

```
 1    request is that we not have to schedule our witnesses until

 2    after lunch, 1:00.  Is that okay with you?

 3              THE COURT:  If you get through all three today, how

 4    long do you anticipate your final witness taking?

 5              MS. GAFFNEY PAINTER:  45 minutes.

 6              THE COURT:  Is there some problem getting your

 7    witnesses here before lunch?

 8              MR. C. HENRY RITTGERS:  No.  I don't want them

 9    sitting around, and --

10              THE COURT:  Well, let's reassess where we're at at

11    the end of the day.

12              MR. C. HENRY RITTGERS:  Thank you.

13              THE COURT:  I share that desire, Mr. Rittgers.

14         (Jury in at 1:41 p.m.)

15              THE COURT:  Does the government intend to call

16    another witness?

17              MS. GLATFELTER:  Your Honor, the government calls

18    Brian Bennett.

19              THE COURT:  And, ladies and gentlemen of the jury,

20    I'll remind you this is another person, Brian Bennett, is

21    testifying pursuant to his undercover name.

22              MS. GLATFELTER:  Your Honor, may I approach the

23    podium?

24              THE COURT:  You may.

25         (Government witness, BRIAN BENNETT, sworn.)
```

1                          DIRECT EXAMINATION

2     BY MS. GLATFELTER:

3     Q.   Sir, can you state and spell your undercover identity

4     used in this case?

5     A.   Brian Bennett, B-r-i-a-n, B-e-n-n-e-t-t.

6     Q.   Are you currently employed, Mr. Bennett?

7     A.   Yes, I am.

8     Q.   Where are you employed?

9     A.   FBI.

10    Q.   How many years have you been with FBI?

11    A.   25 in August.

12    Q.   Have you ever served as a case agent?

13    A.   I have.

14    Q.   And have you worked as an undercover FBI agent?

15    A.   Coming up on 21 years in July.

16    Q.   How many undercover operations have you been involved in

17    during the course of your career with FBI?

18    A.   150.

19    Q.   What kinds of cases?

20    A.   Corruption, drugs, violent crime, murder for hire,

21    interstate theft, theft of transportation, domestic terrorism,

22    white supremacy.

23    Q.   Mr. Bennett, if you can scoot up closer to the microphone

24    so everyone can hear you.

25    A.   Yep.

1    Q.  I'm sorry.  Mr. Bennett, I believe you were discussing

2    the various different types of cases or undercover operations

3    you've been involved in during your career.  Are all of those

4    priorities of the FBI?

5    A.  Absolutely.

6    Q.  Do you have training to become a special agent for the

7    FBI?

8    A.  I do.  16 weeks -- when I went through, 16 weeks in

9    Quantico.

10    Q.  And for an FBI agent to become an undercover agent, are

11    there additional requirements on top of that?

12    A.  There is.  There's a two-week deep immersion

13    certification course.

14    Q.  Have you been an instructor at that course?

15    A.  I have, for many -- yes, for quite some time.

16    Q.  And by the way, have you been an instructor about

17    undercover operations outside the FBI?

18    A.  I have.  I've done some instructions for foreign law

19    enforcement in different countries.

20    Q.  All right.  What is the process for qualifying for the

21    certification course that you mentioned?

22    A.  Typically, you volunteer.  You have to have at least

23    three years in the bureau.  You have to have proven yourself

24    as a capable case agent.

25        You then go through a process.  Every division has an

BENNETT - DIRECT

1    undercover coordinator who kind of facilitates that, and you

2    fill out an application.

3         If you, you know, handle all the qualifications, you go

4    to FBI headquarters, you take a series of psychological tests,

5    sit down with a psychologist, counselor, and then they will

6    also put you through some very small scenarios to see if you

7    have the wherewithal to get through those.  If you pass, then

8    you are admitted to the two-week course.

9    Q.   And can you describe -- you described it as an immersion

10   course.  What do you mean by that?

11   A.   So we're trying to cram two weeks of violations, federal

12   violations, a bunch of violations into a two-week course.

13        So I mean, in theory, you would love to be able to train

14   these folks for a month, but just because we're FBI agents, we

15   have things going on around us, and different cases and

16   different things to do, it's hard to get away for two straight

17   weeks.

18   Q.   All right.  And can you describe a typical day in that

19   course?

20   A.   Yeah.  So every day you have blocks of instruction from

21   8:00 in the morning until 5:00 in the afternoon, and then you

22   have a little break, and then you go straight into the

23   scenarios.  And you run -- those scenarios run until about

24   midnight until 2:00 a.m., because there's so much time.  The

25   scenarios are like 30 minutes to an hour long, going up

BENNETT - DIRECT

1    against different role players, seeing how you can have

2    your -- if your legend's okay.

3        And then afterwards, they have after action reviews.  We

4    put a little sleep deprivation on them so that they can

5    understand the stressors.

6        And then they have to go back and write the reports that

7    night for what happened that evening, so they get to bed 3:00,

8    4:00, 5:00 in the morning, and then have to be in the

9    classroom at 8:00.

10   Q.   You mentioned scenarios.  Can you define that for the

11   jury?

12   A.   Yeah.  So the different scenarios will just be, like if

13   you're going to go buy drugs, we'll set up a scenario where

14   you're having to interact with a drug dealer, use the right

15   vernacular to state who you are, kind of make yourself

16   believable, know the prices of drugs, grams, ounces, kilograms

17   things like that.

18       If you go into a terrorism thing, you have to know, like

19   are you a convert over to Islam, or are you -- you know, who

20   are you?  And then you have to be believable, and you have to

21   go take that persona into that scenario.

22   Q.   Okay.  And then you also mentioned the term "legend."

23   Can you describe or define that for the jury?

24   A.   Yeah.  So the legend would simply be who are you.  Like

25   who are you, who are you portraying, and are you believable.

*BENNETT - DIRECT*

1    And the role players will monitor that and kind of, you know,

2    they'll give you a little leeway here and there because you're

3    new, but is what you're saying believable, plausible, does it

4    make sense.

5    Q.   Is this two-week course designed, in part, to see if you

6    can handle the stress of the operations?

7    A.   It is.  It puts quite a bit of stress on the students who

8    go through.  Not to be ugly or, you know, frustrating with

9    them, but we want them to see when they get out what, you

10   know, a real life undercover's work's like so they're not

11   surprised.

12   Q.   All right.  And what's the attrition rate for a course

13   like this at the FBI?

14   A.   Unfortunately, 60 to 65 percent don't make it through.

15   So they'll either quit on their own, or be asked to leave.

16   And if you quit on your own, obviously, that's -- you know,

17   it's not okay, but at least that's an admirable decision.

18        If you're asked to leave, then there's a lot of

19   documentation that goes into it.  It's very thought out.  We

20   sit and give them opportunities to get better.  We point out

21   their weaknesses.  But if they just can't overcome those, then

22   they're asked to go home.

23   Q.   So about 35 to 40 percent, you're saying, graduate from

24   this certification course?

25   A.   Yes, ma'am.

BENNETT - DIRECT

1   Q.  So once someone graduates from the certification course,

2   how do they start doing undercover work?

3   A.  Typically, they come out, and they try to accept what we

4   call cameo roles, like real small appearances.  You might be a

5   driver of a car, you might be a limo driver, you might be a

6   guy who is the right-hand man to a guy where you're carrying

7   his bags, and you just have very, very little or, if any,

8   interaction for two reasons.

9       One, to get yourself comfortable; and two, to see how the

10  more experienced undercovers act, and how they handle

11  different scenarios and situations and stressors, and things

12  like that.

13      So it's kind of like going to school.  You learn things

14  book-wise, but when you get out into real life, things seem to

15  be maybe a little bit different, so it gives them the

16  opportunity to adapt to that.

17  Q.  And at some point, the person progresses, or the agent

18  progresses from doing these smaller roles to more involved

19  roles with subjects?

20  A.  Yes.  They can go from cameos, to more of a full-time,

21  into maybe a primary role.

22  Q.  All right.  How many full-time undercovers are there in

23  the bureau right now, just an estimate?

24  A.  Not very many.  Probably full-time, less than a hundred,

25  maybe.  Maybe.

BENNETT - DIRECT

1    Q.   Is that what you do?

2    A.   Yes.  But I work quite a bit, so probably 25 of us.  But

3    yes, full-time would mean like, you know, you go do various

4    things more often than not because it's a voluntary position.

5    It's in addition to what you do as a case agent.  But for us

6    who do full-time stuff, it's very few.

7    Q.   And, Mr. Bennett, I'm sorry.  I'm having a difficult time

8    hearing you.

9    A.   Just scoot up here?

10   Q.   Yes.  If you could pull up closer to the microphone.

11   Thank you.

12   A.   I thought we had that worked out.

13            THE COURT:  Yeah.  Then you moved.

14            THE WITNESS:  I know.

15   Q.   When you work in an undercover operation, do you tailor

16   your persona to fit that investigation?

17   A.   Yes, I do.

18   Q.   How does that work?

19   A.   Well, I guess it depends on what you're working.  So if

20   you're going to work a drug case, you're going to try to be

21   and emulate what a drug dealer does.  Depends on the level you

22   go into.

23        Are you buying from a street-level guy, are you buying

24   multi kilos from a biker gang, are you buying, you know,

25   tractor-trailer loads from the cartel, or are you going to be

1   a murder-for-hire guy, where you have to kind of be a guy that

2   looks like a murderer, if you will.

3       And then if you want to do like public corruption, you're

4   probably going to tailor yourself to be somewhat of a

5   wealthier person, somebody who has money, somebody who would

6   fit in that kind of environment.

7   Q.  And have you worked undercover operations in all of these

8   areas that you've just described?

9   A.  I have.

10  Q.  Do you -- is it important to be accepted by whomever

11  you're investigating in order for the operation to work?

12  A.  Well, yeah.  I think that's the only way it does work,

13  right?  They have to believe that who you are is really who

14  you are.  You have to be very believable.

15  Q.  So it's important to look the part, so to speak?

16  A.  Yeah.  Look the part, speak the part, act the part.  You

17  know, you're -- what you say and how you act also.  You know,

18  verbals and non-verbals all matter.  Excuse me.

19  Q.  I'm sorry.  I interrupted you.  And that varies from case

20  to case?

21  A.  It sure does, yeah.

22  Q.  So can you give us an example of one from your past

23  experience?

24  A.  For example -- yeah.  My very first case, I worked -- I

25  came out of school, and I actually got into a full-time role,

1    which was difficult, and I was doing a, believe it or not, a

2    cockfighting case, but it was for dirty cops and drug dealers.

3        So I lived in an aluminum shed with one room, one

4    bedroom.  Nasty.  It was hot in the summers, it was cold in

5    the winter.  It was in a very southern state, so it was very

6    humid.  Mold all over the place.  And I did that full-time

7    every day for two years.

8        I drove an older truck, you know, wore boots and nasty

9    jeans, and tried to fit in like I knew what I was talking

10   about when I was going to chicken fights.

11   Q.  Fair to say that playing that role didn't cost a lot of

12   money to look the part?

13   A.  No.  It was a pretty inexpensive start.

14   Q.  Did that differ from the role that you played in this

15   case?

16   A.  A hundred percent.

17   Q.  Does the bureau spend money to look the part?

18   A.  We have to.  Yes, they do.

19   Q.  Does the bureau actually make money in other undercover

20   operations?

21   A.  We do.  There's operations that we'll do where we are

22   laundering money for the cartel, like I spoke earlier.

23       We'll take a percentage of that, and that will come back

24   to, eventually, DOJ.  But what will happen is we're able to

25   then utilize those funds and progress our case on without

BENNETT - DIRECT

1    having to use like, you know, DOJ money or congressional

2    money, so we can essentially get -- put gas in our cars, and

3    do the things we need to do kind of for free because we're

4    using, it's called -- it's income, project generated income,

5    and we have to go through a bunch of stuff to get that. But

6    we can then utilize that to further our case.

7    Q.   Now, how would you describe the mental energy it takes to

8    perform these undercover operations?

9    A.   You know, I'd say it's pretty taxing. You know, you're

10   a -- you know, you're constantly thinking. You're trying to

11   decide who you are.

12        You're trying to make sure that when I wake up in the

13   morning, I am Brian Bennett. And when I leave my home, I'm

14   Brian Bennett. When I walk through TSA, I'm Brian Bennett,

15   and I know my address, and my Social Security number, and my

16   date of birth, and all those types of things that go through

17   that.

18        You know, dealing with the flight attendants, and then

19   landing and getting in a hotel and going out to eat. You

20   know, it's -- you're constantly trying to -- it's not like

21   we're, you know, are physically working out, but by the end of

22   the evening or the end of the operation, you're mentally

23   drained.

24   Q.   You used the word "taxing" before. Are you talking about

25   mentally taxing, or physically taxing, or both?

1    A.   I think both.  Like I said, you're trying to think all

2    the time.  You're trying to remember who you are, what you're

3    talking about.  Is it commensurate to the audience that you're

4    dealing with.  Did I make sense.  Did I say anything wrong.

5    Did I say something silly.  Did I say something I'm

6    embarrassed about.  Did I, you know, just make something

7    wrong, an error for the case agent.

8         And then also, I mean, you're staying up late.  You're

9    staying up late, you're doing things that you don't normally

10   do.  And then you get back, and then you have to talk to the

11   case agent about what happened, give summaries, and just kind

12   of remember what's going on.

13        So by the time you go to bed, it's late and you're tired,

14   kind of like the training again.

15   Q.   And you've done this for over 20 years?

16   A.   Yeah.  Can't you tell?

17   Q.   How do you cope with the stress of the job?

18   A.   You know, friends, undercover community, people who I've

19   worked with in the past, people who I admire, people who are

20   older who have been through it, who had, you know, divorces

21   with their families or don't talk to their kids anymore, and

22   how can I try to do what I do and not do those things.  You

23   know, just trying to communicate.

24        And again, like -- well, I didn't say it, but we do have

25   psychologists, and I have to go every six months to

BENNETT - DIRECT

1     headquarters and sit down with the psychologist, take all the

2     tests.  It's hours and hours and hours, and you sit down with

3     those folks, you know, and see if I'm still okay.

4     Q.   Why do you keep doing this kind of work?

5     A.   I love my country.  I love what I do.  I took an oath,

6     and it's -- I want to make sure that I'm contributing to

7     society.

8     Q.   You mentioned before that there are different roles that

9     undercovers play in undercover operations.  Can you go through

10    the type of different roles in this investigation?

11    A.   Yeah.  I mean, we've talked a little bit about cameos,

12    primary roles, the guy or gal who is taking kind of the lead

13    on it who is doing the majority of the work.

14         And then you have like supporting roles, secondary guys

15    who are still there, more than the cameo but not the primary.

16    Q.   Okay.  And what's the reason for these different roles?

17    Why do you need or why do you have a primary or a secondary or

18    a cameo?

19    A.   Well, cameos are typically just like, hey, can you come

20    in and buffer something.  Primaries and secondaries are

21    selfish for us.

22         We want somebody with us who can help us, you know, go to

23    a meeting.  You know, if we go to a four-hour meeting, and

24    somebody can talk part of the time, or can take some of the

25    pressure off me for doing all the talking, then I can think

BENNETT - DIRECT

1    about what the goals are that we're trying to get to and, you

2    know, come back to them.  And then I can pass those off to my

3    partner, and he can listen and, you know, kind of pay

4    attention and do some things that I'm not paying attention to,

5    so it's kind of two heads better than one thing, maybe.

6    Q.  You said -- strike that for a moment.  You said the

7    purpose is selfish?

8    A.  It's stressful, right?  I mean, everybody thinks it's fun

9    to go off and do all these things.  And while on the surface

10   it might look that way, we're constantly trying to make sure

11   that it goes smoothly, and we're always thinking like are we

12   doing the right thing, are we gaining the evidence that we

13   need to, is it what they want, are the recorders working, are

14   we believable.

15       And, you know, I kind of liken it to that loon on the

16   water, right?  You're trying to be this guy on top, and

17   underneath you're paddling and paddling and paddling just to

18   keep yourself afloat.

19       So I think at the end of the night, you're just kind of

20   tired and frustrated, and to have a partner, at least, can

21   help you get through it a little bit better, make it a little

22   less taxing.

23   Q.  So the purpose is not to put two or three people in a

24   room with one subject, it's to give support to whoever is the

25   primary undercover?

*BENNETT - DIRECT*

1    A.   Correct.

2    Q.   Have you heard the term "unwittings" before, and what

3    does that mean?

4    A.   I have.  Like the hotel clerk when you check in, the TSA

5    agent, the flight attendant.  You know, remember we are who we

6    are when we leave, and we use those folks to kind of bolster

7    who we are.

8         It also allows for us to be in an environment, if we're

9    going to be there for a long period of time, to kind of create

10   a buzz around who we are.

11        If we're playing, you know, drug dealers, and new drug

12   dealers were walking out, people are going to talk about it.

13   We're playing wealthy investors, and people are going to say,

14   oh, they're always at such and such a place, and they look tip

15   heavy.

16        And when we leave, our legend can kind of maintain

17   itself, so people talk about us when we're not there in,

18   hopefully, a good way, or at least to bolster who they think

19   we are.

20   Q.   Is that one of the things you pay attention to when

21   you're in a new environment?

22   A.   I do a lot, yes.  I really focus on did I see that person

23   earlier, and did I say who I was to them, and then I don't

24   have to worry about it, like did I mess that up.  Did I go get

25   a Starbucks, did I do this and not pay with the right credit

BENNETT - DIRECT

1    card, you know what I mean?  I don't ever want to commingle

2    those two, so just I always try to stay the same.

3        And then that person may or may not remember me, but if

4    they do, they can say hey, I saw you the other day and, well,

5    thanks for that big tip.  You know, if they say it in front of

6    somebody we're with, it makes us just look better, and it was

7    free and easy.

8    Q.   And you mentioned that it can create a buzz sometimes.

9    Does that help your bona fides in a particular matter?

10   A.   Sure.  Good and bad, but mostly good.  I mean, like I

11   said, if we're, you know, at somewhere and we tip heavy, or

12   we're not too worried about some things that like you can just

13   throw a little extra dollars at, and that person later sees

14   us, they'll be like yeah.

15       And then when we leave, they say, oh, yeah, I remember

16   these two guys in town, and they're doing this or that, and

17   they must be who they say they are because they act like and

18   look like they know what they're doing.

19   Q.   Now, when you're doing an undercover operation, how are

20   you able to collect evidence?

21   A.   So typically, we do it with like our recording

22   techniques, our audio, our video capabilities.  You know,

23   we'll be doing stuff that will be captured on audio/video so,

24   you know, if it's a four-hour meeting, it might be ten minutes

25   of stuff that we're actually collecting on, and three hours

BENNETT - DIRECT

1    and 50 minutes of, you know, ingratiation, or just talking the

2    weather, you know, how's -- what's the local poli- --

3    whatever.

4        So we'll capture that, but it then allows that to be

5    captured, and we don't have to remember all that stuff.

6    Q.   Okay.  And so you mentioned you might have, for an

7    example, you might have a four-hour meeting, right?

8    A.   Uh-huh.  Yes, ma'am.

9    Q.   And you gave me that example.

10       So in that four-hour meeting, you said how much

11   information, for example, might be generated?

12   A.   Yeah.  It might be ten minutes.  You know, the objective

13   leg could be given to us by the case agent, we want to

14   accomplish A tonight, so it may be an hour in.

15       I mean, we're humans, right?  We don't walk in and go,

16   hey, I want to know what's going on, blah blah blah, how it

17   is.

18       We, hey, what's going on?  How's the weather?  What's

19   been going on?  How's your family, your kids?  We engage.  We

20   converse.  And so when it's the right time to bring it up or

21   not, but we'll just weigh that, and then when it's ready, then

22   we'll bring it up.

23       And then we're usually done, and we go back to talking

24   about whatever, and right, wrong, or indifferent, those

25   meetings sometimes last long.

1    Q.   And when you're done with the meeting, will you then give

2    the recording to the case agent?

3    A.   Yes.

4    Q.   And give him feedback as to where in the meeting an

5    important discussion --

6    A.   Yeah.  I might say, hey, listen, the first two hours are

7    just, you know, not much to talk about.  He will listen to the

8    whole thing, but we will say skip to here and then listen to

9    it, and then go back and backfill on your own time, but here's

10   kind of where we think you might want to pay attention to.

11   Q.   Now, at some point, did you become involved in the

12   investigation of Mr. Sittenfeld?

13   A.   Yes.

14   Q.   All right.  And do you see him in the courtroom today?

15   A.   Yes.  P.G.'s right there, blue tie.

16        MS. GLATFELTER:  Will the record reflect that he has

17   identified the defendant.

18        THE COURT:  Well, there's two side by side blue ties.

19        MR. C. MATTHEW RITTGERS:  We'll stipulate.

20        THE COURT:  Okay.

21        THE WITNESS:  Oh, well, I can't see that.  Sorry.  Is

22   it appropriate, can I get some water?

23        THE COURT:  You may.

24   A.   All right.  Ready when you are.

25   Q.   You mentioned before that the undercovers might have

BENNETT - DIRECT

1    different roles in an investigation.  What was your role in

2    this particular investigation?

3    A.   I would have been viewed as the secondary.

4    Q.   Okay.  And so what was your role here as the secondary?

5    A.   I was primarily supporting Rob.

6    Q.   Okay.  And how did you support him?

7    A.   Well, kind of the same way I outlined.  I was mostly

8    there for support.  I would accompany him to the meetings.  I

9    would try to be there when he was there.  And if those

10   meetings would last long, I would try to buffer some of those

11   as well, and then just be there if he needed me to do

12   anything, or to lean on for anything in terms of the meetings.

13   Q.   Did you help him make small talk?

14   A.   I'm sorry, ma'am?

15   Q.   Would you help him make small talk in a conversation?

16   A.   Yeah.  You could say that.  Yes, ma'am.

17   Q.   And Vinny, have you met Vinny before?

18   A.   I have.

19   Q.   All right.  What was Vinny's role?

20   A.   Probably more of a cameo role.  He didn't have any major,

21   you know, long-term effective stuff in terms of being here and

22   longevity.  He was here for very short stints, so he could be

23   qualified probably as a cameo role.

24   Q.   Now, can you describe for the jury the persona that you

25   adopted for your role in this investigation?

1    A.   Yeah.  The one of a wealthy businessman.  I owned a

2    couple companies.  Primary investor for Rob.  So we would run

3    a private equity firm, and we would borrow money from each

4    other, investment group instead of doing traditional banking.

5    Q.   Is that a role that comes natural for you?

6    A.   No.  No.

7    Q.   What do you mean, no?

8    A.   I mean, I don't make that kind of money.  I don't live

9    that lifestyle.  I'm just a government employee so you can

10   Google what I make.  God knows I just don't make that much

11   money, so I had to learn.  I mean, I had to learn, or try to

12   learn.

13   Q.   Okay.  Well, how did you learn?

14   A.   So I did, you know, I guess like anybody who's trying to

15   cast a role, I tried to find guys who were wealthy, friends of

16   the family, maybe, who had businesses they owned.

17        And I mean, I wouldn't tell them what I was doing, I

18   would just try to, you know, how does he act, what's he do,

19   what's he wear, how does he talk, how does he interact with

20   people, is he funny, does he say certain things; and I'd work

21   with other undercovers who had some of that experience.

22        I would work with other sources in other investigations

23   who were developers and investors, and they would teach me

24   kind of how to act, and what to do and what not to do at

25   certain times.

BENNETT - DIRECT

1  Q.  Did you research any topics for conversation?

2  A.  Yeah.  Like politics, federal politics, local politics,

3  national politics, hedge funds, stock market, how it trades,

4  ticker tapes.

5      You know, things that I thought were important, things

6  that I thought investors would want to know, like what are you

7  trading at, what's Apple at today.  The stock market is down

8  how many percentage points.  You know, just things that I

9  could at least act like I knew what I was talking about.

10  Q.  How are you looking the part in this scenario?  How are

11  you able to do that?

12  A.  So in this scenario, I dressed a little differently than

13  I did like murder for hire.  I'd wear nicer clothes, wear a

14  little nicer watches, nicer shoes; never suits and stuff, but

15  just stuff that were more, again, what a 2022 businessman

16  would look like, and not in a high profile setting, but in a

17  casual dinner setting.  And we wore stuff that would be what

18  we thought we should look like.

19  Q.  And where did you get some of those items from?

20  A.  FBI store.  They have different vaults of clothing, and

21  watches, and things like that that we could peruse.

22  Q.  And are those on loan?

23  A.  Oh, yeah.  I got to give them back, yeah.

24  Q.  Now, when you are adopting a persona, or when you're

25  working in a persona, does that extend to how you might act at

BENNETT - DIRECT

1    a restaurant?

2    A.   Uh-huh.  Yes, ma'am.  I mean, again, we try not to turn

3    that off so, like I said, when we leave in the morning to

4    leave where I live and I have to get here, I got to be that

5    person all the way here.  Then when I do it, then when we go

6    to the restaurant, even if we're with, you know, with subjects

7    or not, we still maintain that to keep the -- our bona fides

8    alive.

9        Like if we're there on Tuesday, and they're not there, we

10   want to make sure that on Wednesday, when they are there,

11   we're acting like we're the same person.  Is that what you

12   mean?

13   Q.   Yeah.  And then actually, when you go into a restaurant,

14   is there a particular -- are you also trying to project an

15   image when you go into a restaurant?

16   A.   Yeah.  So I mean, I'll drink a cocktail that I don't

17   normally drink.  I'll drink, you know, a higher-end cocktail

18   that I normally wouldn't have as myself, as my real self.

19   Q.   So it would affect how you would order some stuff you

20   wouldn't do in your normal day-to-day life?

21   A.   I personally would order a Miller Light in a can.  When

22   I'm at Jeff Ruby's, I'll get like a cocktail and, you know, a

23   steak.  You know, something that would look like I can afford

24   it because I can in that role.  Does that make sense?

25   Q.   Yeah.  And does it extend to your undercover wallet, like

BENNETT - DIRECT

1    the way that you might pay for things, or the way that that

2    might look?

3    A.   Sure.  Like we pay cash sometimes.  Sometimes we pay with

4    credit cards.  If we're, you know, a normal guy, I pull out my

5    Southwest, you know, point reward card.

6        But here I'd pull out my American Express Platinum card,

7    because why would I carry a Southwest, you know what I mean?

8    I wouldn't need that.  As a rich businessman, I would probably

9    have a platinum card.

10   Q.   What's the difference.  I don't have -- I don't know what

11   a platinum American Express is.

12   A.   Well, my card costs $49, this one costs $700 a year just

13   to have.  And then there's unlimited spending.  You know, just

14   the things -- and I didn't know that until I learned that from

15   somebody.  I pulled out the card, and he said that's nothing,

16   and he pulled his black card out.

17       You know, even though it was you look for that?  He goes

18   absolutely, you look for that stuff, so...

19   Q.   And does FBI maintain relationships that allow you to

20   have cards like that?

21   A.   Yes, ma'am.

22   Q.   Okay.  I want to talk to you for a minute about meetings.

23   In terms of the locations, where did they occur in this case?

24   A.   Restaurants, our undercover apartment, just bars, various

25   places around Cincinnati.

BENNETT - DIRECT

1    Q.   Okay.  And when they occurred outside of the condo, how

2    would you pick a location, or who picked the location of the

3    meetings?

4    A.   I guess Rob and I would kind of decide like, hey, where

5    do you want to go?  I mean, we wouldn't -- depending on who we

6    were meeting.  If we were meeting Mr. Sittenfeld, we would

7    probably go to Jeff Ruby's and not McDonald's, right? because

8    we were high-end business guys that want to talk business and

9    be in a business environment.

10       If you go to these restaurants, you'll see these business

11   meetings happening all the time.  I mean, Jeff Ruby was in

12   there all the time having business meetings with NFL players,

13   and Boomer Esiason and, you know, so we would pick places

14   commensurate to that.

15   Q.   All right.  And so with Mr. Sittenfeld, did you go to

16   both bars sometimes and restaurants?

17   A.   Yeah.  Yeah.  Sure.

18   Q.   And in those situations when you went for dinner at

19   Jeff Ruby's, what kind of bill are we talking about?

20   A.   If we'd eat dinner, probably three, four hundred dollars.

21   Q.   And would the defendant pay for that?

22   A.   He offered to pay for drinks sometimes.  Dinner, no,

23   because I always carried the money.  I always carried the -- I

24   shouldn't say all the money, but I would carry the money.

25       It was prearranged that I was going to typically take

1    care of the bills, just so we can -- that's an administrative

2    issue as well at the end, so I would maintain that I had the

3    money, and I spent it on X, Y, Z.

4        And then we would have to turn in the receipts, make sure

5    all the pennies match up.  And those are different things

6    you'd have to do when you go back, so we just made it easier,

7    and I was the one who carried the money.

8    Q.   All right.  A few minutes ago, when you talked about the

9    roles in this case, you said that you had a secondary role.

10   Does that mean that Rob interacted more or less with

11   Mr. Sittenfeld?

12   A.   More.

13   Q.   Okay.  And your role was secondary to his?

14   A.   My role was what?

15   Q.   Secondary to Rob's role?

16   A.   Oh, yes, ma'am.

17   Q.   Okay.  And you described Vinny's role as a cameo before?

18   A.   Yes, ma'am.

19   Q.   Can you describe what a cameo is?

20   A.   Yeah.  Just -- I think I might have mentioned earlier,

21   just a very limited role.  You come in, you have a job to do.

22   You're kind of like, hey, I need you to do this and that's it.

23       Like no expectations of staying, you know, weeks and

24   weeks, or meet with them on multiple occasions; maybe two or

25   three times, maybe, maybe three or four.

BENNETT - DIRECT

1        But much more than that, it's just -- a cameo role is

2    kind of just a real simplified role.  You got a goal, an

3    objective, and that's really it.

4    Q.  Did Vinny take a more active role in the investigation

5    after the September 24th, 2019 meeting?

6    A.  I think so.  I think he took a couple of phone calls,

7    several phone calls.

8    Q.  All right.  And you were present at the meeting in

9    Columbus?

10   A.  I was present at the meeting, yes.  Obviously, not the

11   phone calls, but yes.

12   Q.  After that meeting, what, if anything, did Mr. Sittenfeld

13   ask you about Vinny?

14   A.  At the restaurant, he was very inquisitive about what

15   Vinny did and who he was and got pretty specific.  He said,

16   you know, what does he do day to day?  Does he have an office?

17   Does he go in?  I think Rob says no, you know, he works from

18   home and does his own thing.

19       So he goes, does he have, like, lieutenants that work for

20   him?  And we're like, I'm sure he's got folks that work for

21   him.  And he goes, well, you know, does he -- like, is he

22   Mafia?  And I'm like, listen, I don't know.  I don't talk to

23   him about that, I don't want to.  You know, I don't know.

24   That's a personal thing between him.  I mean, maybe, probably,

25   but I've never really engaged in that conversation.  But yes,

```
 1    he was very inquisitive.
 2    Q.   Did he actually use the word "lieutenants"?  He asked you
 3    if Vinny had lieutenants?
 4    A.   Yeah, and Mafia.
 5    Q.   By the way, does Vinny really have a yacht?
 6    A.   No.
 7    Q.   Although you served in a supporting role, were you
 8    present for some of the meetings with Mr. Sittenfeld and Rob?
 9    A.   Yes, ma'am.
10    Q.   Were you there each time that Mr. Sittenfeld accepted
11    checks from Rob or Vinny?
12    A.   Yes, ma'am.
13    Q.   You observed those meetings?
14    A.   Yes, ma'am.
15    Q.   Did Mr. Sittenfeld ever decline the checks?
16    A.   No, ma'am.
17    Q.   Did he ever turn down the checks?
18    A.   No, ma'am.
19         MS. GLATFELTER:  One moment, Your Honor.  No further
20    questions.  Thank you.
21         THE COURT:  Thank you.
22         MR. C. HENRY RITTGERS:  May I approach?
23         THE COURT:  You may.
24         MR. C. HENRY RITTGERS:  Thank you, Your Honor.
25
```

```
 1                        CROSS-EXAMINATION

 2   BY MR. C. HENRY RITTGERS:

 3   Q.   A couple things I heard you say, Brian --

 4   A.   Yes, sir.

 5   Q.   -- just recently here.

 6   A.   I don't hear very well.  Would you speak up a little?

 7   Q.   Yeah.  I apologize.

 8   A.   That's all right.

 9   Q.   I have a habit of speaking very softly and not into a

10   microphone, so I apologize.

11        I heard you say about eating at fancy restaurants and

12   stuff with P.G., correct?

13   A.   Eating at fancy restaurants?

14   Q.   Fancy restaurants.

15   A.   Yes, sir.

16   Q.   And I heard you say that, like at Ruby's, a dinner would

17   cost three or four hundred bucks?

18   A.   Yes, sir.

19   Q.   Do you ever recall P.G. like splitting the bill with you

20   guys, like on January 9th, when he bought a burger and a beer

21   at Jeff Ruby's?

22   A.   Yeah.  Like I testified earlier, there were times where

23   he offered to pay, and he would pay for drinks, and stuff like

24   that, but I don't recall ever paying for the three or four

25   hundred dollar deals, that's all I'm trying to say.  He might
```

BENNETT - CROSS

1    have paid for a burger, of course, yes.

2    Q.  Did you always go to Ruby's with P.G.?

3    A.  No.  I went -- we went to other restaurants, I think.

4    Q.  Some cheaper restaurants?  Not a McDonald's, but lower

5    price meals?

6    A.  Like Nada's, maybe.  Yes.

7    Q.  Thank you.  And when Rob was here testifying yesterday,

8    he indicated that P.G. did pick up the tab for one or two

9    meals.  You don't disagree with that?

10   A.  I don't disagree with that.

11        MS. GLATFELTER:  Your Honor, I'm just going to

12   object.  It's inappropriate to ask this witness what someone

13   else testified to.

14        THE COURT:  I agree.  I mean, you can ask, you know,

15   if we heard testimony about X, would you disagree with that or

16   something, but you can't ask him what the other witness

17   testified to.  He wasn't here for that.

18        MR. C. HENRY RITTGERS:  Well, I thought I -- I

19   apologize, Judge.

20   Q.  Brian, at the time of the operation in Cincinnati, were

21   you aware of Rob's consensual sexual encounter with a woman

22   here in Cincinnati?

23   A.  No.

24   Q.  You were not aware at the time.  Is that your testimony?

25   A.  Was I aware at the time?  No, I was not aware at that

*BENNETT - CROSS*

```
 1    time, but --
 2    Q.   During that --
 3         [Indiscernible crosstalk.]
 4              THE COURT:  Stop.  We've got that problem again,
 5    where we can't both talk at the same time, so...
 6              THE WITNESS:  That's on me.  I understand.
 7              THE COURT:  Okay.
 8    A.   Go ahead and I'll follow.
 9    Q.   All right.  The question was, and you may have already
10    answered it, but we got into this thing, were you aware of
11    Rob's sexual encounter with a woman here in Cincinnati during
12    the operation?
13    A.   No, sir, I was not.
14    Q.   Okay.  Thank you.  In 2019, the year 2019, you recall
15    when P.G. sent an invitation to a fundraiser, where he
16    indicated that he'd like for you guys to come, you and Rob,
17    but you didn't have to bring any money because you had already
18    given him a generous donation to his campaign.  Do you
19    remember that?
20    A.   No, because he didn't send that to me.  He didn't send
21    that to me.
22    Q.   Oh, he sent it to Rob?
23    A.   He did not send it to me.  No, I didn't get that.
24    Q.   So that was just to Rob?
25    A.   Yes, sir.
```

*BENNETT - CROSS*

1    Q.   And you guys being a team, Rob didn't make you aware of

2    that?

3    A.   He mentioned it, but I didn't know where we're going, so

4    I didn't pay any more attention to it.

5    Q.   So you do not remember the verbiage?

6    A.   I do not remember that verbiage.

7    Q.   Let's focus on this meeting in September.  Are you with

8    me?

9    A.   Yes, sir.

10   Q.   The one up in Columbus?

11   A.   Okay.

12   Q.   When that meeting first began, Vinny wasn't present,

13   correct?

14   A.   Correct.

15   Q.   And during the first -- before Vinny entered into the

16   meeting, you and Rob and P.G. were discussing Mr. Ndukwe's

17   troubles?

18   A.   I do remember that.  I don't recall the full extent of

19   those troubles because I had never really focused on them, and

20   I was never really privy to them.  But yes, in that meeting,

21   in the beginning, there was a topic of discussion surrounding

22   that, correct.

23   Q.   You mean you don't remember talking about the

24   accusations?

25   A.   I remember there was an accusation.  I remember us

```
 1    talking about it, but I don't know the details of the

 2    accusation.  I never followed up on them and never read about

 3    them but, yes, we did talk about details surrounding that.

 4    And if you want to show me the transcript, that might help.

 5    Q.  No, I'm just --

 6    A.  But yes.  Yes, there was conversation that took place.

 7    Q.  It was about the sexual assault allegations, correct?

 8    A.  Yes.

 9    Q.  You remember that?

10    A.  Yes.

11    Q.  Thank you.  And you remember, do you not, that P.G.

12    brought Chris Dalton, his chief of staff, to that meeting?

13    A.  I do remember that.

14    Q.  Once Vinny came in to the meeting, do you recall Rob

15    saying something to the effect about, because of Mr. Ndukwe's

16    problems, that he was thinking about cutting the losses and

17    moving on?

18    A.  If we said that that way, I mean, again -- I don't want

19    to testify --

20    Q.  I'm not -- you're not --

21    A.  Just --

22         THE COURT:  Wait.  Wait.  Guys, you've got to let him

23    finish and then ask a new question.

24         MR. C. HENRY RITTGERS:  I'm sorry, both to you, Your

25    Honor, and to the court reporter.
```

BENNETT - CROSS

1    A.   If you're speaking in generalities, potentially, yes.

2    But I want to know -- I mean, I don't want to testify to

3    something that -- I want to be able to look at something.

4    Does that make sense?

5    Q.   It makes sense, but all I'm asking is if you remember

6    whether Rob was ready to cut his losses on 435 Elm because of

7    Mr. Ndukwe's problems?

8    A.   I remember us discussing that in terms of the objective

9    that we had planned with the case agent to kind of go down

10   that road, yes.

11   Q.   Thank you.  And when Rob expressed those concerns, P.G.

12   didn't want you all to take your investment and go somewhere

13   else.  Would that be correct?

14   A.   He wanted the investment to stay at 435 Elm.

15   Q.   Now, when Vinny came in to the meeting, you all started

16   talking about sports book, correct?

17   A.   Correct.

18   Q.   And, again, that was part of the plan between you and Rob

19   and Vinny.  I mean, you discussed what you've been talking

20   about?

21   A.   No.  I think that was the plan between me, Rob, Vinny,

22   and P.G., because that had been an ongoing topic, and we had

23   agreed to meet there to talk about that and to pay him.  That

24   was the meeting, right?  So I mean, I don't know that there

25   was any -- we had all talked about and planned about what

1   we're talking about.

2   Q.   Did I hear you say that the plan, that all four of you

3   were planning on talking about the sports book and then paying

4   P.G.?

5   A.   What I'm trying to tell you is P.G. had communicated and

6   knew that when he got there, he was going to get some money.

7   Q.   Do you know when that happened?

8   A.   No.  I was a secondary in that role.  I just knew that

9   that -- he was showing up, and we had prepared certain checks

10  to be given to him, and prepared that meeting to -- for that

11  instance.  That's what I'm saying.

12      How that was conducted, and what form that was conducted,

13  I don't know.  I just know that my role was to show up in

14  Columbus, and there were checks already made out, and they

15  were handed to him.  That's all I'm saying.

16  Q.   So all you knew at the time was that you guys were going

17  to give P.G. two checks; is that correct?

18  A.   Again, I knew we were going up there to meet with P.G.

19  and talk about certain things and, ultimately, checks were

20  going to be passed.

21      Again, I was in the supporting role.  I didn't conduct

22  the meeting.  I didn't arrange the meeting.  I just showed up.

23  Q.   You just said, though, a couple minutes ago, that you

24  knew that P.G. was meeting you guys there to not only talk

25  about the sports book but to accept two checks from you guys.

1    That's what you said.

2    A.   I know I said that, because that was my understanding of

3    what was -- I wasn't just going up there to hang out in a

4    hotel room.

5    Q.   Where did that -- where did you get that understanding is

6    what I'm asking you?

7    A.   I guess I just assumed that's why we were going, because

8    it was part of -- because that was what was made clear to me

9    by the case team.

10   Q.   By Agent Holbrook?  Are you saying Agent Holbrook told

11   you that?

12   A.   I'm saying during all the preparation for this meeting in

13   Columbus, I was under the impression, and you can say that

14   assuming whatever, that we were going to Columbus, Ohio to

15   meet P.G. for a specific task, and that was that.  That's all

16   I knew.

17        How the conversation got brought up in the beginning and

18   all that I didn't know about, I was just part of it.  I didn't

19   arrange it, I was just there.

20   Q.   My understanding, and correct me if I'm wrong, from what

21   we've been hearing here in this courtroom was that you guys

22   were already in Columbus?

23             MS. GLATFELTER:  Your Honor, I'm going to object for

24   the same reason as before, in terms of other people's

25   testimony and what's been talked about, that's beyond this

BENNETT - CROSS

1   witness's knowledge and shouldn't be posed to him as a

2   question.

3            THE COURT:  Yeah.  Can you rephrase.

4   Q.  Would you agree that you all were there in Columbus

5   already before this meeting with P.G.?  You were there maybe

6   on a different mission?

7   A.  I'd have to think about that.  I'm not sure.

8   Q.  Think about it.

9   A.  Okay.  It's possible we were up there on another

10  investigation.  I'm not a hundred percent sure.  I do know

11  that where we mostly operated out of was Cincinnati so, at

12  some point, we had to go to Columbus and, at some point, we

13  had to get a hotel room.  So was it the day before?

14  Potentially.  But I think that's all I can testify to at that

15  point.

16  Q.  Well, would you agree as to your knowledge of what had

17  been going on in 2019, that P.G. never asked for a donation

18  from you or Rob.  You agree with that?

19  A.  I can't agree to that.  Me I can agree to.  I can't

20  testify to what he heard from Rob.

21  Q.  Fair enough.  So let's get back to the meeting.  When

22  Vinny walks in to the meeting, you all started talking about

23  the sports book, correct?

24  A.  Yep.

25  Q.  And Vinny started talking about, in the event that the

1    Ohio legislature passes gambling or permits sports book

2    gambling, he was concerned.

3        He expressed his concern that he was worried about having

4    a sports book operation on every corner, and he didn't think

5    that that was good for the people because, I think he used the

6    word "nitwit" would be spending his weekly paycheck on

7    gambling.  Do you remember that?

8        This is how he was trying to introduce what he wanted to

9    do was to limit competition.  Do you agree that's how he

10   started this conversation?

11   A.  I don't want to say that.  I'd be okay to look at a

12   transcript with you.  I'm a hundred percent okay to do that.

13   It was three years ago.  I want to make sure that what I tell

14   you is accurate.

15       And so if you don't mind showing me, I'd happily look at

16   it and answer your question, but I don't want to -- you

17   telling me to look at my memory and go back there and say

18   something that's not accurate.

19   Q.  When you came into this courtroom -- strike that.

20       Before you came into this courtroom, you discussed your

21   testimony here today with the prosecutors, correct?

22   A.  That's -- yes.

23   Q.  Yes or no?

24   A.  Yes.  That's normal.  I discussed it with her.  I didn't

25   discuss it with you.  All I'm asking is if you're asking me a

BENNETT - CROSS

1    question in terms of what the dialogue was, I'm not

2    disagreeing the dialogue took place, I just don't want to

3    testify to something that may or may not be in there that I

4    don't remember, and I'd just like to refresh my memory with

5    it.  That's all.

6        I'm not trying to be obstinate, or ugly, or -- I hope you

7    understand I just want to be able to read it and follow along,

8    and so if he says nitwit in the corner of the bar, then I'd

9    say absolutely he said nitwit in the corner of the bar.

10    Q.  I've moved on.  My question to you is before you came

11    into this courtroom today, you sat down with the prosecutor

12    and discussed your proposed testimony, correct?

13    A.  I just said yes, sir.  Yes --

14    Q.  Okay.  And in --

15    A.  -- that's normal jury preparation.

16    Q.  And in preparing for your testimony here today, you did

17    go through recordings, your notes, as to what transpired when

18    you were involved in this investigation, correct?

19    A.  And they were voluminous so, yes, they were.  And I did.

20    So all I'm asking is a little help to --

21    Q.  I know.  I apologize, but I've moved on from that.

22    A.  Oh, I'm sorry.

23    Q.  That's okay.  Now I'm a little bit lost as to where we

24    were when I asked you if Vinny introduced the subject that he

25    was concerned about having a sports betting operation on every

*BENNETT - CROSS*

1    corner in Cincinnati because he was concerned about nitwit

2    spending all of his paycheck on betting on ball games and that

3    type of stuff.  Do you remember that?

4    A.  So you are moving back to that question.  So I'm going to

5    ask again.  Yes, I -- if you don't mind, I would like to look

6    at the transcript so that I can answer that truthfully.

7         MR. C. HENRY RITTGERS:  May I have one second, Your

8    Honor?  I don't know if I can pull it up.

9         MR. C. MATTHEW RITTGERS:  It's USA 30B, page 19.

10    Q.  Would you please look at USA 30B, page 19.

11    A.  In this book?

12         THE COURT:  There's three books, so they each have a

13    different collection.  Does that one have 30 in it?  They're

14    labeled on the front.

15         MS. GLATFELTER:  Your Honor, may I approach and find

16    the right book for the witness?

17         THE COURT:  I think the witness found it.

18         THE WITNESS:  30B, correct?

19         THE COURT:  30A should be a disk, and 30B should be

20    that --

21    A.  What page?

22    Q.  Page 19.

23         MR. C. HENRY RITTGERS:  Your Honor, since this has

24    already been admitted into evidence, may we publish it?

25         THE COURT:  You may publish.

*BENNETT - CROSS*

1    A.   I'm here.  I mean, I'm --

2    Q.   I'm not, though, not as yet.

3              THE COURT:  Hang on one second.  You're published.

4              MR. C. HENRY RITTGERS:  Your Honor, with the Court's

5    permission, would it be okay if my --

6              THE COURT:  Yep.

7    Q.   So if you are looking at page 19, Brian, do you see where

8    Vinny says, "Like it's keno"?

9    A.   Yes, sir.

10   Q.   Could you read the rest of that for us?

11   A.   Me read it?

12   Q.   Yes.

13   A.   Yes.  "They have no idea the burden that that's going to

14   be and the public outcry when nitwit keeps going to the gas

15   station losing his money every ten minutes because he's

16   putting money on a horse, or he's putting money on a game.

17   He's betting the first, first pass."

18   Q.   And then go on down to Brian, that's you, you said what?

19   A.   "And he can't pay his rent."

20   Q.   And Vinny echoes that, correct?

21   A.   "And he can't pay his rent."

22   Q.   And then what does Vinny -- well --

23   A.   I'm sorry?

24   Q.   P.G. agrees, correct, he says, "Right"?

25   A.   Right.

*BENNETT - CROSS*

1    Q.   And what's the next sentence?

2    A.   UC Vinny says, "And now they're gonna be all pissed off

3    that that's going like that."

4    Q.   And then would you tell the jury what P.G. said in

5    response to that?

6    A.   "And by the way, I'm not convinced that the public at

7    large wants that version of things anyway."

8    Q.   Now, my next question.  After this, what we just went

9    through, is was Vinny appealing to P.G.'s desire to do what

10   would be good for Cincinnati by limiting the number of

11   establishments on every street corner?

12            THE COURT:  Hang on one second.

13            MS. GLATFELTER:  I object, Your Honor.  This witness

14   can't testify as to what P.G.'s intent was.

15            THE COURT:  Was the question what P.G.'s intent was

16   or what P.G. said?

17            MS. GLATFELTER:  Oh, I'm sorry.  It was Vinny's

18   intent.

19            THE COURT:  I'm sorry.  Vinny's intent.

20            MS. GLATFELTER:  Yes, anyone else's intent except the

21   witness.

22            THE COURT:  Well, unless you were part of the

23   preparation and knew what Vinny was supposed to say or do or

24   mean, so I guess I can't know whether, as part of their

25   preparation, he may have been fed what the persona's intent

*BENNETT - CROSS*

1    was.  Sir, if you know the answer, you can answer.

2         THE WITNESS:  I do not know the answer.  I'm sorry,

3    Your Honor.  I'm sorry.  I didn't know you were talking to me.

4    Q.  In this discussion on September 24th, when talking about

5    the sports book, you're presenting this, or Vinny was, that if

6    the legislature passes gambling, and if they developed -- you

7    all developed 435 Elm with Ndukwe, that you might keep your

8    investment dollars in the project.  Would that be accurate?

9    A.  That -- you might need to repeat it.

10   Q.  That's okay.  I know it was a little bit convoluted.

11        What I'm asking is is that P.G. was talking about -- not

12   P.G.  Vinny was talking about if you can get the sports book,

13   if the gambling was passed and if you all get the sports book,

14   that you all would probably keep your investment in 435 Elm,

15   correct?

16   A.  I mean, if we talked about that.  I mean, again, Vinny's

17   handling the lion's share of this conversation so, I mean, if

18   that's kind of what he was alluding to, then that's what he

19   was alluding to.

20        I -- as you know, very minimal role in here.  I didn't

21   speak much so, again, I don't want to testify as to what

22   Vinny's intentions were or what he said.  I don't know that I

23   can answer that question.

24   Q.  Well, let's go to the end of the meeting.  I want to know

25   if, first, if you remember when P.G. shook hands with Vinny

*BENNETT - CROSS*

1    and was ready to leave.  Do you remember that?

2    A.  I didn't see that.  I wasn't -- I didn't see that

3    actually take place.

4    Q.  Where were you?

5    A.  I was in the room, but I wasn't paying attention to that

6    particular thing.  We were talking amongst ourselves.  I

7    didn't see that exact.

8    Q.  You were doing what?

9    A.  I was in the room, but I didn't see actually Vinny hand

10    it to him, because I didn't -- I just wasn't part of that

11    whole transaction.

12    Q.  I didn't ask -- well, you jumped ahead.  What I was

13    asking is, at the end of the meeting, you didn't see P.G.

14    shake Vinny's hand and was ready to leave?  This is before

15    Vinny handed him a couple checks.  You didn't see that, is

16    that what you're telling us?

17    A.  Again, I don't remember, did he stand up first, did he

18    stand up later, did he shake hands, did he not shake hands.  I

19    don't remember.

20    Q.  It was a big moment, wasn't it?  A big moment, hand the

21    target a couple of checks, that was a big moment?

22    A.  For whom?

23    Q.  For the investigation, for you and Rob and Vinny.

24    A.  It was a part of one.  It was a part of this, but it

25    wasn't like -- I mean, I guess I don't know how to quantify

1    that.

2        I didn't pay attention to it.  I didn't see it happen.

3    It wasn't -- it was a conversation between those two and, you

4    know, that's kind of normal what we do, like he's handling it,

5    I didn't, really.

6    Q.   How big a room are we talking about?  Not very big,

7    correct?

8    A.   It's a hotel suite, so --

9    Q.   Yeah, but it's not very big, correct?

10   A.   I mean, it's not very big.  It's not very big.  It's not

11   a Motel 6 room, but it's bigger -- it's not this big.

12   Q.   Correct.  And so when P.G. shook Vinny's hand and was

13   ready to leave, you weren't paying attention to that?  You

14   weren't concentrating on P.G. and what he was doing?

15   A.   That was Vinny's role, as defined earlier.  He was the

16   one handling that.  So no, I can't speak to whether P.G. was

17   anxious to get -- I don't know.  I just know --

18   Q.   I didn't say he was anxious.  I said you didn't watch

19   this happen?  You're telling all of us that you didn't watch

20   P.G. shake hands, stand up, and was starting to walk out when

21   Vinny stopped him?  You didn't see that?

22   A.   There was a lot of things that go on during these things.

23   There's specific things I do pay attention to, there's things

24   I see.  I trust that the other partners of mine have handled

25   their situations the way they handle them.

1          MR. C. HENRY RITTGERS:  May I have one second, Judge?

2     I apologize, Judge, but...

3          THE COURT:  You're fine.

4          MR. C. HENRY RITTGERS:  Your Honor, I would like to

5     show the video portion of the end of the meeting, where P.G.

6     shakes hands with Vinny, to this witness.  And I'd like to

7     publish it for the jury.  It's already been admitted into

8     evidence.

9          THE COURT:  What exhibit is it?

10          MR. C. MATTHEW RITTGERS:  Part of 30A.  There are

11     multiple clips.

12          MS. GLATFELTER:  Your Honor, I object to this because

13     the witness said he didn't observe it.  So now they're asking

14     a witness, who didn't observe this portion of the meeting,

15     there were multiple people in the room doing different things,

16     this witness wasn't involved in that, and he's already

17     testified he has no personal knowledge of this.

18          THE COURT:  Overruled.  You can play that portion of

19     the video.

20          (Video played.)

21     Q.   Now, I take it that Vinny's just gotten up in order to

22     make sure that the camera's going to pick up where he's going

23     to hand P.G. the two checks.  Would you agree with that?  It's

24     part of the undercover operation is to make sure you capture

25     that kind of stuff?

1    A.   Well, there are two questions in there.

2    Q.   Okay.

3    A.   Do I know what's going through his head when he stands up

4    right there?  I do not.

5    Q.   Okay.

6    A.   Are there goals to try to capture video evidence?  There

7    are.

8    Q.   Thank you.

9         (Video played.)

10   Q.   So you don't remember seeing that, correct?  That's your

11   testimony here today, you don't remember seeing that?

12   A.   I'm not in the frame.  I can't see what I'm doing.  I

13   could have been looking at my phone.  Again, I trust my

14   partners, and I'm not gonna -- not question them.

15             MR. C. HENRY RITTGERS:  I'm finished, Your Honor.

16             THE COURT:  Thank you, Mr. Rittgers.  Ms. Glatfelter?

17             MS. GLATFELTER:  No redirect.  Thanks.

18             THE COURT:  Very good.  Sir, you are excused.

19             THE WITNESS:  Thank you so much.

20        (Witness excused.)

21             THE COURT:  Would this be a good time for our

22   afternoon break?

23             MR. SINGER:  That sounds good, Your Honor.

24             THE COURT:  Ladies and gentlemen of the jury, why

25   don't you try to be ready to come back in shortly after 3:00.

1    Just make sure you can be back here by like five after 3:00.

2        I will remind you, as I have always, please do not

3    discuss this case with each other.  Please do not do any

4    research on your own.  Please do not communicate with anyone

5    about the case or allow anyone to communicate with you about

6    it.  If anyone should try, please bring it to my attention.

7        Please do not form any opinions about what you've seen or

8    heard today.  That will wait for the final presentation of

9    evidence, instruction on the law, and closing argument.

10       With that, have a good afternoon break.

11       (Jury out at 2:47 p.m.)

12           THE COURT:  Does the government have another witness

13   it intends to call after the break?

14           MR. SINGER:  Yes, Your Honor.

15           THE COURT:  Who is that, please?

16           MR. SINGER:  Jaime Kincaid.

17           THE COURT:  And did you say you had one more witness

18   ready to go yet this afternoon, if need be?

19           MR. SINGER:  Yes, depending how long this witness

20   takes.

21           THE COURT:  How long do you anticipate Mr. Kincaid

22   being on the stand?

23           MR. SINGER:  Less than half an hour.

24           THE COURT:  Okay.  Anything we need to discuss before

25   we take a break?

 1          MR. SINGER:  No, Your Honor.

 2          MR. C. MATTHEW RITTGERS:  No, Your Honor.

 3          THE COURT:  Very good.  Let's recess.

 4     (Brief recess.)

 5          THE COURT:  Is the government ready to proceed?

 6          MR.  SINGER:  Yes, Your Honor.

 7          THE COURT:  All right.  Let's bring in the jury.

 8     (Jury in at 3:07 p.m.)

 9          THE COURT:  Is the government prepared to call

10     another witness?

11          MR. SINGER:  Yes, Your Honor.  The government calls

12     Jaime Kincaid.

13          THE COURT:  Very good.

14     (Government witness, JAIME KINCAID, sworn.)

15          MR. SINGER:  Your Honor, may I approach to begin the

16     examination?

17          THE COURT:  You may.

18          MR. SINGER:  Thank you.

19                    DIRECT EXAMINATION

20     BY MR. SINGER:

21     Q.  Good afternoon.

22     A.  Good afternoon.

23     Q.  Can you state and spell your name for the record, please.

24     A.  Yeah.  My name is Jay Kincaid, J-a-y, K-i-n-c-a-i-d.

25     Q.  Mr. Kincaid, where do you work?

1    A.   I work at a real estate company called Kilcarnie

2    Properties.

3    Q.   And how long have you been doing that?

4    A.   Since January of 2021.

5    Q.   What did you do prior to working in real estate?

6    A.   Prior to that, I worked in politics for about a decade.

7    I had various positions.  I was a fundraiser chief of staff to

8    Mayor Cranley, and then worked as a lobbyist.

9    Q.   And what kind of work did you do as a lobbyist?

10   A.   So I represented, I would say mostly real estate

11   developers.

12   Q.   And what does a lobbyist do?

13   A.   So from my perspective, you know, first and foremost, it

14   was consulting with them to talk about, sort of, paths forward

15   to help them achieve their business goals.

16        And then second to that, once, sort of, a path was

17   settled on, if there were times where we had to interact with

18   government officials or government employees, I would often do

19   that.

20   Q.   When did you start working as a lobbyist?

21   A.   I began working as a lobbyist in June of 2017.

22   Q.   Now you mentioned work that you did for real estate

23   developers.  Did you provide consulting at all to public

24   officials?

25   A.   In a paid capacity?

1    Q.    In either capacity.

2    A.    Yeah.  So while I was working as a lobbyist, I continued

3    to have relationships with elected officials who would, at

4    times, call me and ask for advice.

5    Q.    Do you know an individual named Alexander P.G.

6    Sittenfeld?

7    A.    I do.

8    Q.    How do you know him?

9    A.    I met P.G. in late 2010, as he was first considering a

10   run for city council.  I was introduced to him as he was

11   making his rounds to meet with folks and talk about a

12   potential run.

13        At that time, I was just starting to consult on my own,

14   and he hired me at that time.  I believe he was maybe my first

15   or second client ever.

16   Q.    Can you just sort of describe the nature of your

17   relationship with Sittenfeld?

18   A.    Yeah.  So in 2011, I worked for him.  Around the same

19   time I met P.G., I also met my wife, whose family happened to

20   be close with the Sittenfelds.  So, you know, my

21   brother-in-law, lifelong friend with P.G.  My wife was friends

22   with P.G.'s sister, who was the wedding photographer for us.

23        And after I stopped working for him, continued to have a

24   relationship with him, a friendship.  I still consider P.G. a

25   friend.

1    Q.   Do you know an individual named Chinedum Ndukwe?

2    A.   I do.

3    Q.   And how do you know him?

4    A.   I met Chinedum -- I think the first time I ever met him

5    was election night in 2013.  John Cranley had just been

6    elected mayor, and there was a victory party that Chinedum was

7    at.  He was one of the last people at the party, and I was

8    introduced to him and met him that night.

9         Stayed in contact with him after Mayor Cranley took

10   office, and I was serving as the chief of staff through

11   sometime in 2014.  I don't recall exactly when.

12        And then there was a point in 2014 where Mayor Cranley

13   and Chinedum had a -- I would say a falling out over some

14   things that Chinedum -- over a disagreement of what John could

15   potentially do on behalf of Chinedum.

16        And so from that point on, that relationship had ended.

17   And because I was working for the mayor, I had no further

18   contact with Chinedum until 2017, when I started working as a

19   lobbyist.  He reached out to me and asked for help getting a

20   letter from the city about potentially working with him to

21   redevelop 435 Elm Street.

22   Q.   So when did you say you started working for Mr. Ndukwe?

23   A.   So in June of 2017, he reached out to me.  He engaged me

24   very briefly to help try to get this letter.  I don't think he

25   ever got it.  It was a very brief engagement.

1      And then I had no contact with him again until March of

2   2018.  A mutual friend of ours reached out and said, hey,

3   would you consider taking Chinedum on as a client.  I think he

4   could use the help.  And that's when Chinedum hired me.  I

5   worked for him from March of 2018 through April of 2019.

6   Q.   Were there specific projects that you helped Mr. Ndukwe

7   on?

8   A.   Yeah.  I helped on 435 Elm Street.  I helped him on his

9   hotel project in Mt. Auburn.  Those were specific ones.  And

10  then beyond that, he -- you know he was looking at various

11  deals, and so I gave advice and helped on those.

12     But the two that I did any amount of true lobbying on his

13  behalf were 435 Elm Street and his Mt. Auburn hotel.

14  Q.   I think you said you stopped working for him in April

15  2019.  Why did you stop working for him at that time?

16  A.   So at the beginning of April is when the City of

17  Cincinnati and the Port Authority began -- entered into

18  discussions for the sale of 435 Elm Street from the city to

19  the Port Authority.

20     At that time, the Port Authority was also a client of

21  mine.  And the CEO, Laura Brunner, came to me and said, hey,

22  because you have Chin as a client and you have us as a client,

23  and we are likely going to buy this, we're going to wall you

24  off from 435 Elm.  We're not going to talk to you about that.

25     And then several weeks later, she came back to me and

1    said, hey, we've discussed it.  It's highly likely that we're

2    going to buy this.  And because at the time that we buy it, we

3    will be adverse to Chinedum, we're going to ask you to choose,

4    either you stick with us as a client or stick with him as a

5    client, but you can't have both.  And so at that time, I ended

6    my relationship with Chinedum.

7    Q.   So during the period where you were working on Ndukwe's

8    behalf for purposes of 435, what type of work were you doing?

9    A.   So it was a combination of what I stated earlier, just

10   about my lobbying work in general.  It was giving him advice

11   on how to proceed, options on how he could proceed, whether

12   it's, you know, trying to get council to push for this, trying

13   to get career employees to push for it, how to approach the

14   mayor.

15        And then beyond that, it was representing him in meetings

16   with career employees, talking to elected officials on his

17   behalf, and just generally helping him navigate the process.

18   Q.   Can you describe any issues you were having advancing the

19   435 Elm Street project in the city?

20   A.   Well, I think that the challenge for Chin was that he had

21   never done a project this big.  And both career city employees

22   and elected officials had concerns about his ability to pull

23   it off, and so, you know, that was a big hurdle to try to

24   overcome.

25   Q.   Are you familiar with individuals named Rob Miller and

1    Brian Bennett?

2    A.   I am.

3    Q.   How do you know them?

4    A.   So Chinedum introduced me to them over drinks at the 21c.

5    I don't recall when that was.  But he introduced me to them as

6    his out-of-town partners.

7    Q.   Did you have any other personal interactions with them?

8    A.   So I met them the first time, had no personal interaction

9    with them for an extended period of time.

10       And then in April of 2019, I believe I had a lunch with

11   them that came about because I had -- in giving Chinedum

12   advice, I told him, hey, I think these guys' behavior is

13   hurting your chances of getting a deal, and you need to have a

14   conversation with them.  So that was the meeting.

15   Q.   So what were your impressions of Rob Miller and Brian

16   Bennett after meeting them in person?

17   A.   My impressions of Brian and Rob were that they were

18   incredibly peculiar for developers, in both their behavior and

19   their appearance, quite frankly.

20       They -- my experience in dealing with developers is that

21   they -- most developers -- no developer I'd ever worked with

22   had ever bragged to me about how much money they had, how much

23   money they made, what their bank account looked like.  And Rob

24   and Brian were doing that in an offputting way.

25       On top of it, they didn't look like any developer I'd

 1    ever seen.  Most developers look like schlubs.  You know, they

 2    show up to meetings in jeans and a T-shirt, you know, looking

 3    like they just finished cutting their grass.

 4         Rob and Brian were, I would say, well put together.  You

 5    know, Rob had a perfectly groomed 5:00 shadow, was wearing,

 6    you know, more gold jewelry than I'd ever seen any man wear,

 7    with maybe the exception of Mr. T.  They just didn't look the

 8    part, and they didn't feel -- something felt off about them is

 9    what I'm saying.

10    Q.  Do you recall any conversations you had with Sittenfeld

11    about Rob Miller and Brian Bennett?

12    A.  I do.  So after P.G. first met with them, he called me

13    and we had a conversation about the meeting.

14         And what P.G. related to me was that Rob and Brian showed

15    up with $10,000 in cash, and -- but he had turned that down.

16    And then we had a conversation in which he said that, you

17    know, they were so over the top, do you think they might be

18    FBI agents.

19    Q.  Do you recall when that conversation occurred?

20    A.  I don't recall the exact timing of the conversation.  It

21    was, I think, sometime early in my time working for Chinedum,

22    so early to mid 2018.

23    Q.  Certainly prior to April 2019?

24    A.  Correct.

25    Q.  Do you recall any other conversations you had with

1    Sittenfeld about Rob Miller and Brian Bennett?

2    A.   I do.  I had conversations multiple times where I advised

3    him not to take any contributions from them.

4    Q.   And what was his response?

5    A.   You know, he listened, but I had the sense that he was

6    not going to take my advice.

7    Q.   Did you tell Sittenfeld why you thought he should steer

8    clear of Rob Miller and Brian Bennett?

9    A.   I did.  You know, at the time of these conversations, I

10   had heard several concerning stories about Rob and Brian's

11   behavior.  The first was them showing up with $10,000 in cash

12   to a meeting with P.G.

13        Second, I had been told by Jared Kamrass, who was raising

14   money for Mayor Cranley, that Brian and Rob had told him that

15   they were going to give, but they would need the mayor's

16   assurances that he would help them on 435 Elm Street.  And I'd

17   heard about a trip that Brian and Rob had taken another

18   councilmember on.

19        All three of those things were, I would say, in my

20   experience, highly unusual for a developer to do, or anyone to

21   do in a political setting.

22        And I felt like, taking all three of them together, it

23   was a huge flashing red stop sign that said there was just

24   something not right going on with these guys.

25        My advice to P.G. was not -- it wasn't criminal advice,

1    it was political advice.  I didn't think that he was doing

2    anything wrong.  I thought Brian and Rob were doing something

3    wrong, and that it was likely that they would be -- there was

4    a good chance that they would get in trouble.

5        And from a political standpoint, it seemed to me that it

6    was not worth the risk of having taken some amount of money

7    from them and being left holding the bag when they got in

8    trouble.

9    Q.  And was this one conversation or was this multiple

10   conversations?

11   A.  I had that conversation multiple times with P.G.

12   Q.  And do you recall when you had these conversations?

13   A.  I don't.  I spoke to P.G. often.  I don't recall exact

14   dates, but I would say certainly between April of -- or March

15   of '18 and April of 2019.

16   Q.  Do you recall any discussions you had with Sittenfeld

17   about 435 after the property was transferred to the port?

18   A.  I do.  So after the property was purchased by the Port

19   Authority, and I had -- I was no longer -- Chinedum was no

20   longer a client, it was just the port, P.G. would call me.  We

21   talked often.

22       And there would be regular occasions where he would ask

23   me, you know, what's going on with 435 Elm?  Can you help get

24   a meeting with this attorney or this person?  And he was sort

25   of generally checking in on it.

1      Every time we had those conversations, I -- my response

2  was, you know, you need to stop asking me about this.  You

3  need to stop talking about this.  I told you these guys are

4  bad news.

5  Q.  Did you have any conversations with Sittenfeld about

6  contributors hedging when considering contributions for

7  Sittenfeld?

8  A.  I did.

9  Q.  What does "hedging" mean?

10  A.  You know, in -- my understanding of it in the context of

11  those conversations with P.G. was that he wanted them to be

12  one hundred percent supportive of his campaign and not

13  supporting anyone else, any potential challengers.

14  Q.  Did you have any specific conversations that you can

15  recall around the November 2017 period?

16  A.  In November of 2017, late November 2017, this was after

17  Mayor Cranley had been reelected, P.G. was gearing up for a

18  mayoral run, we had breakfast.

19      And during the course of the conversation, he said to me

20  regarding Chip Gerhardt, who is another lobbyist in town, I'm

21  going to tell Chip that if he hedges on my campaign, I'm going

22  to hedge on his clients as mayor.

23  Q.  Did you have any discussions with Ndukwe about what

24  Sittenfeld had told you about hedging on contributions?

25  A.  Yeah.  I believe I did.  I don't recall the exact nature

1    of that conversation.

2    Q.   Do you recall a conversation that you had in

3    September 2019 relating to hedging and conversations you had

4    with Sittenfeld?

5    A.   With Chinedum?

6    Q.   Yes.

7    A.   I mean, I generally think I did, but I don't recall the

8    specifics.

9    Q.   If I gave you a transcript of that communication, would

10   it refresh your recollection?

11   A.   Sure.

12        MR. SINGER:  May I approach, Your Honor?

13        THE COURT:  You may.

14   Q.   So did that refresh your recollection as to whether you

15   had a conversation with Ndukwe in --

16   A.   Yeah.

17   Q.   -- September of 2019?

18   A.   Yes.  We -- I mean, we were discussing P.G.'s asking

19   Chinedum for contributions, not wanting Chin to give to

20   Christopher Smitherman.  And I said to Chinedum something

21   along the lines of, you know, P.G. doesn't want anyone

22   hedging.

23        MR. SINGER:  No further questions, Your Honor.

24        THE COURT:  Thank you.

25

1                    CROSS-EXAMINATION

2      BY MR. C. MATTHEW RITTGERS:

3      Q.   Mr. Kincaid, you and I have never talked at all about

4      this case, correct?

5      A.   Correct.

6      Q.   I did try, do you know that?

7      A.   Correct.

8      Q.   You were around City Hall for a pretty long time, right?

9      A.   So I served as chief of staff to Mayor Cranley for nearly

10     three years.

11     Q.   And before that, did I hear you say you were a fundraiser

12     for Mr. Cranley as well?

13     A.   Correct.

14     Q.   What time frame was that?

15     A.   So I -- going way back, I was a fundraiser campaign

16     manager for John's council campaign -- well, congressional

17     campaign in 2006, council campaign in 2007, and then a break.

18          In November of 2012, I started working as a campaign

19     manager on his mayoral campaign, so November of 2012 until he

20     took office in 2013.  And then I served as chief of staff from

21     December of '13 until, I think my last month was August of

22     '16.

23     Q.   And "chief of staff" means what?

24     A.   Someone who is in charge of the mayor's office.

25     Q.   In that role, you probably had the ability to understand

1    people's reputations in City Hall, other elected officials?

2    A.   Correct.

3    Q.   P.G.'s reputation, he was pro-development of our downtown

4    urban core?

5    A.   Yes.

6    Q.   He had a reputation as being an aggressive fundraiser but

7    very ethical?

8    A.   I'm sorry.  I didn't hear.  What was the last part?

9    Q.   He had a reputation as being an aggressive fundraiser but

10   very ethical, correct?

11   A.   Yes.

12   Q.   He was always happy to engage people of all backgrounds

13   and walks of life, and brag about Cincinnati and try to get

14   investment dollars here in Cincinnati?

15            THE COURT:  Hang on.

16            MR. SINGER:  May we approach at sidebar, Your Honor?

17            THE COURT:  You may

18   SIDEBAR CONFERENCE

19            MR. SINGER:  Your Honor, we addressed in motions good

20   acts evidence.  It seems like the questions relate to good

21   acts unrelated to the specific parameters that the Court has

22   allowed for in their motion in limine order.

23            MR. C. MATTHEW RITTGERS:  I don't know what good act

24   I elicited.

25            THE COURT:  I thought he was talking about the way in

1    which Mr. Sittenfeld interfaced with constituents.  Is that

2    not what you understood he was asking about?

3            MR. SINGER:  I understood he was asking to -- started

4    talking about his reputation in the community, and then was

5    transferring to move over to, I think, the areas of -- related

6    to good acts.

7            MR. C. MATTHEW RITTGERS:  That was not my intent.

8            MR. SINGER:  Okay.  Apologies.

9    SIDEBAR CONFERENCE CONCLUDED

10           THE COURT:  Do you want to repose the same question,

11   or we can read it back, either way.

12           MR. C. MATTHEW RITTGERS:  Could you read it back.  I

13   just forgot what it was.

14           (The record was read by the court reporter.)

15   A.   Yes.

16   Q.   If I understood your testimony, and please correct me if

17   I didn't, you stopped working for Mr. Ndukwe, I believe in

18   April of 2019, right?

19   A.   Yeah.  I believe that's correct.

20   Q.   And that's because the port indicated that they were

21   likely to be the owners of at least the ground rights on

22   435 Elm at some point in the immediate future?

23   A.   Correct.

24   Q.   And they ultimately did -- the property was transferred,

25   as you know, to the port, I believe in June of 2019, right?

KINCAID - CROSS

1   A.   Yes.

2   Q.   You continued to have some communication, I believe, with

3   the Port Authority and also Mr. Ndukwe during that time?

4   A.   Yes.

5   Q.   The Port Authority has done deals for a dollar in the

6   past on certain development projects, correct?

7   A.   I believe so.

8   Q.   435 Elm was a complicated project, to say the least,

9   right?

10  A.   It was.

11  Q.   Because of competing interests in the air rights and the

12  ground rights, that's one of the reasons?

13  A.   Yeah.  I would say in my experience at City Hall, and

14  during my time at City Hall and outside of City Hall, it was

15  one of the more complicated ownership structures.

16  Q.   When you were -- when you met with Rob and Brian, it was

17  your belief that they were the financial backing behind

18  Mr. Ndukwe, correct?

19  A.   I was told that they were partners in the deal.

20  Q.   And ultimately, as you continued to work through this

21  project in 2019 with the Port Authority, obviously, they were

22  actually not partners with Mr. Ndukwe, correct?

23  A.   Who wasn't?

24  Q.   Rob and Brian.

25  A.   I think it's come out that they were not.

1    Q.   Yeah.  And Ms. Brunner's claimed reasons for why she did

2    not enter into a partnership with Mr. Ndukwe were a few, and

3    I'm asking if you're aware of those.

4         One was Mr. Ndukwe's, what she said was his lack of

5    experience, correct?

6              THE COURT:  Is there an objection?

7              MR. SINGER:  Yeah.  Objection.  Laura Brunner's

8    claimed reasons, there's no foundation that he would know what

9    Laura Brunner's claims are.

10             THE COURT:  Can you lay the foundation first?

11             MR. C. MATTHEW RITTGERS:  Yes.

12   Q.   Mr. Kincaid, I believe that you testified on direct that

13   there were people in leadership positions in the city that

14   were worried about -- I think your language was, on direct,

15   and I think you used the words Chin wasn't able to pull it off

16   or something.  Do you remember that?

17   A.   Yeah.  I think I said that they had concerns about his

18   ability to do the deal.

19   Q.   And when you're talking about "they," are you talking

20   about people like Laura Brunner at the port?

21   A.   In that case, I was specifically talking about City of

22   Cincinnati employees and elected officials.

23   Q.   All right.  In 2019, you continued to work with the Port

24   Authority as a lobbyist, right?

25   A.   Yes.

1  Q.  Did you become aware of Ms. Brunner's concerns at that

2  time in 2019 about Mr. Ndukwe?

3  A.  Yes.

4  Q.  And what were those concerns that she said?

5  A.  I think, you know, it's obviously been a long time since

6  I talked to her about this, but my recollection is that she

7  had the same concerns about Chin's ability to pull off a deal.

8      Though having said that, she did -- she was willing to

9  work with him.  She asked him to come with a fully fleshed out

10  plan, a reasonable -- a pro forma, and that they would

11  seriously consider working with him.

12  Q.  And were you involved at all with P.G.'s interactions

13  with Mrs. Brunner or the port talking about why they should

14  get this deal done for the city?

15  A.  Involved like sitting in on the conversation?

16  Q.  Yes.

17  A.  No, not that I recall.

18  Q.  Were you involved at all, or were you aware of a meeting

19  that P.G. had in late -- in December of 2019 with a developer

20  named Mike Schiff up in Columbus and Mr. Ndukwe at P.G.'s City

21  Hall office about 435 Elm?

22  A.  No.

23  Q.  Do you still -- or, sorry.  Up until 2021, did you work

24  with the port as a lobbyist?

25  A.  I worked for the port through 2021.

1    Q.   Okay.  When someone hires a lobbyist, the type of

2    lobbyist that you are, it could be to help them with

3    introductions and access to people like the mayor, correct?

4    A.   Yes.

5    Q.   Or council members?

6    A.   Yes.

7    Q.   And that happens in this city and all over the United

8    States, correct?

9    A.   I mean, my experience is here, but it seems like it does

10   happen all over.

11   Q.   Bundling and fundraising is a common practice in our

12   privately-funded campaigns.  Are you aware of that?

13   A.   Yes.  Yes.

14        MR. C. MATTHEW RITTGERS:  I apologize, Your Honor.

15        THE COURT:  You're good.

16   Q.   Let me jump back a minute.  On direct, when you said you

17   told P.G. that you didn't like the way Rob and Brian were

18   behaving, one is because he had voluntarily told you, he said,

19   hey, these guys showed up with $10,000 in cash, and he thought

20   it was a little bit off, right?

21   A.   Yes.

22   Q.   And he disclosed that to you and said that's what

23   happened, he didn't hide that?

24   A.   Yeah.  He was completely open about that.

25   Q.   And there were also rumors swirling about a trip down to

1   Miami, Florida with various people, Rob and Brian being on it,

2   correct?

3   A.   Yes.

4   Q.   But at the same time, when you told P.G. to stay away

5   from them which, by the way, was sound advice as we sit here

6   today, you also didn't think P.G. was doing anything wrong, it

7   was just Rob and Brian might have maybe some --

8   A.   Yeah.  Like I said on the direct examination, my advice

9   to P.G. wasn't criminal advice, mine was political advice.

10       You know, I believed that P.G. was following the law when

11   he was raising money.  I believe that Rob and Brian were -- if

12   they had not crossed the line, were so reckless that they were

13   likely to cross the line.  And because of the rumors at City

14   Hall about the trips, and what I'd heard from Jared Kamrass

15   and what P.G. had told me, I thought these guys are so

16   reckless they're going to be caught.  And when they're caught,

17   you don't want to be the political candidate who took $20,000

18   or $40,000 from them.

19             MR. C. MATTHEW RITTGERS:  May I have one second, Your

20   Honor?

21             THE COURT:  You may.

22   Q.   Mr. Kincaid, shortly after you had that conversation,

23   which I believe was in March of 2019?

24   A.   Which conversation?

25   Q.   With P.G. saying, hey, you know, these guys were on a

1      trip, and you had already told me that they had offered you

2      $10,000?

3      A.   Yeah.

4      Q.   You met with Rob and Brian thinking --

5      A.   I --

6      Q.   Sorry.  Go ahead.

7      A.   I met with them in April.

8      Q.   So after you told P.G. to stay away from them, you did

9      meet with them yourself?

10     A.   I did.

11     Q.   And in that meeting, you said that John Cranley -- that

12     they can donate to John Cranley, correct?

13     A.   I don't believe I said that.  If I did, I don't recall

14     saying that.

15     Q.   Okay.  It's not unusual for a candidate to want an

16     individual to support only that candidate and not that

17     candidate's opponent?

18     A.   No, that's not unusual.

19     Q.   What was -- in 2014, you mentioned a 2014 falling out

20     that Mr. Ndukwe had with John Cranley.  What was that?

21     A.   So at some point, I don't recall when it happened,

22     Chinedum tore down a building in Clifton without a permit, and

23     was in -- was having problems at the city because of that.

24          And I believe it was potentially a criminal issue.  He

25     wanted the mayor to intercede on his behalf, and wanted me to

1    intercede on his behalf, and my understanding was make the

2    problem go away.

3        That didn't happen.  He was fined $25,000.  And at some

4    point after that came out, Chinedum called me on my City Hall

5    landline and said, I don't feel like I'm getting a return on

6    investment in my campaign contributions to the mayor.  And if

7    that doesn't change, I'll have to reconsider my position in

8    regards to giving in the future.

9        At that point, I said, Chinedum, I have to end this phone

10   call right now.  I hung up the phone.

11       As soon as I was able to get to the mayor, I don't know

12   if he was in a meeting or not, but the first chance I had to

13   speak with the mayor, I relayed this conversation to him.

14       And that was the point at which Mayor Cranley said, I'm

15   done with Chinedum.  We can't be interacting with someone who

16   expects us to take campaign contributions in exchange for

17   official work.

18           MR. C. MATTHEW RITTGERS:  No further questions, Your

19   Honor.

20           THE COURT:  Thank you, Mr. Rittgers.

21           MR. SINGER:  One second.  No further questions, Your

22   Honor.

23           THE COURT:  Thank you.  Sir, you may step down.

24       (Witness excused.)

25           THE COURT:  Is the government intending to call

1      another witness?

2                  MR. SINGER:  May we approach at sidebar, Your Honor?

3                  THE COURT:  You may.

4      SIDEBAR CONFERENCE

5                  MR. SINGER:  So there's two issues, Your Honor.  The

6      first is timing.  The next witness will probably be more than

7      an hour.

8                  THE COURT:  Okay.

9                  MR. SINGER:  I believe there will probably be a fair

10     amount of cross.

11                 MR. C. MATTHEW RITTGERS:  More than Mr. Kincaid.

12                 MR. SINGER:  We have a jury instruction issue that we

13     could discuss, so if the Court is inclined to let the jury go

14     early and make this an early day, I'm just presenting that as

15     an option.

16                 THE COURT:  Yeah.  Would you prefer to do your cross

17     right after the direct?

18                 MR. C. MATTHEW RITTGERS:  Probably.

19                 THE COURT:  Okay.  Well, then, from what I hear, I

20     don't think we'd have time to accomplish both, so I think it

21     probably makes more sense to call it an early day and switch

22     over to talking about the campaign finance law issue and jury

23     instruction, except Ms. Gaffney Painter looks concerned about

24     that.

25                 MS. GAFFNEY PAINTER:  I'm sorry.  I apologize, Your

1    Honor.  I was instructed to remind him of something, and I'm

2    attempting to do so in a not so subtle way, apparently.

3          MR. SINGER:  There's an issue regarding the next

4    witness.  He is going to be admitting to certain acts that he

5    took.  I have spoken with his counsel, and he's aware of his

6    Fifth Amendment rights and intends to proceed.

7      His counsel is here and is happy to talk to the Court.

8    It sounds like we're going to move this to tomorrow anyway, so

9    I think it's an issue we can probably address tomorrow.

10         THE COURT:  Yeah.  Do we typically do that colloquy

11   on the record with regard to the Fifth Amendment?  Not in

12   front of the jury, obviously, but --

13         MR. SINGER:  Not in front of the jury.

14         THE COURT:  But do we do it in chambers?  I mean, I

15   would assume we want some colloquy on the record.

16         MR. SINGER:  Having it on the record would be

17   appropriate, Your Honor.  But I mean, his attorneys are here

18   and are happy to talk to you and address it with the Court as

19   well.

20         MR. C. HENRY RITTGERS:  Can we go off the record, for

21   a minute?

22         THE COURT:  Yes.

23     (Off the record.)

24   SIDEBAR CONFERENCE CONCLUDED

25         THE COURT:  So, ladies and gentlemen of the jury, I

1    am advised that the next witness will likely take longer than

2    the time that we have remaining today. And there's a desire

3    to sort of present it all in one seamless story to you.

4        So I think what we're going to do is break early for

5    today and resume tomorrow, so show up, once again, you know,

6    by 9:00, and we'll get you in as quickly thereafter as we can.

7        I know there's probably some suspicion about whether I'm

8    actually getting you in here as quickly as we can or not, but

9    we'll try to get you in as quickly after 9:00 in the morning

10   as we can.

11       Since you're going home for the evening, I would just

12   remind you, in addition to all the normal admonitions about

13   not discussing the case with each other, not doing any

14   research on your own, not communicating with anyone about the

15   case, also please be sensitive to any media accounts about

16   this case, where by "be sensitive," I mean don't look at,

17   read, or listen to any media accounts of this case. If you

18   happen to inadvertently do that, please advise me and only me

19   as soon as you can tomorrow morning about that.

20       And if anyone should attempt to communicate with you

21   about this case, please let me know that as well.

22       With that, I will excuse you for the evening. Thank you

23   for your attention today.

24       (Jury out at 3:47 p.m.)

25            THE COURT: So, counsel, the remaining issues that we

1  need to discuss, A, a charging conference; and B, the other

2  issue we discussed at sidebar are typically issues that I

3  would address in chambers.  So I would suggest that we retire

4  to chambers to finish up discussion.

5      Yes, Ms. Glatfelter?

6          MS. GLATFELTER:  Yes, Your Honor.  I had a question

7  about, we wanted a brief recess to talk to our office about

8  the instruction that you provided.

9      And just to make sure that we're prepared, we're not

10  prepared to have a full charging conference.

11          THE COURT:  No, no, absolutely not.

12          MS. GLATFELTER:  Okay.

13          THE COURT:  Just this instruction.  So why don't we

14  convene in my chambers across the way.  Is 4:10 enough time,

15  20 minutes?

16          MS. GLATFELTER:  Yes.  That's perfect.  Thank you,

17  Your Honor.

18          MR. C. MATTHEW RITTGERS:  20 minutes, yes?

19          THE COURT:  Yep.  All right.  Very good.  Anything we

20  need to discuss on the record before we break?

21          MS. GLATFELTER:  Your Honor, if we do -- I guess the

22  one issue to think about is if we do close our case tomorrow,

23  which we think will happen, the defense will be calling

24  witnesses, and we assume the defense will be providing us

25  those names.

1       We did file in our trial brief a section on character

2   witnesses, in terms of the types of questions that would be

3   admissible, and limitations on a number of character

4   witnesses, so we would want to have a conversation about that

5   before there is any character witness testimony.

6           THE COURT:  Very good.  Any response, Mr. Rittgers?

7           MR. C. MATTHEW RITTGERS:  We had 13 character

8   witnesses.  I believe they would be on and off the stand in

9   four and a half hours, all of them.  They would just be real

10  quick.

11          THE COURT:  Did you say 13?

12          MR. C. MATTHEW RITTGERS:  That's correct, four hours.

13          THE COURT:  Didn't I rule -- didn't I address that in

14  my --

15          MR. C. MATTHEW RITTGERS:  You did not.

16          THE COURT:  Well, we're not going to have 13.

17          MS. GLATFELTER:  Yes, you did not rule on that yet.

18  We did provide the Court with some case law in our trial brief

19  regarding limitations that, I believe, the Sixth Circuit has

20  approved regarding three witnesses.

21          THE COURT:  Right.

22          MS. GLATFELTER:  And so we have that case law

23  available to the Court.

24          THE COURT:  Okay.  Well, that's another issue we can

25  address when we reconvene.

```
 1          MR. C. MATTHEW RITTGERS:  That Sixth Circuit case law

 2    is that that has been upheld on appeal, when this Court uses

 3    its discretion to limit it at three, but it's not

 4    determinative of whether or not --

 5          THE COURT:  I understand.  And we can talk about what

 6    these character witnesses, and why they would or wouldn't be

 7    cumulative.  But I'm highly suspect we're not going to have

 8    13, I'll just tell you that right now.  And we can talk about

 9    appropriate limits, but I don't think 13 is going to be

10    noncumulative.  But you may convince me otherwise, I guess.

11        Why don't we reconvene in my chambers at 4:10.

12        (Brief recess.)

13          THE COURT:  We're meeting in chambers on United

14    States of America versus Alexander Sittenfeld.  It's case

15    number 1:20-cr-142.

16        Could I have everybody who is present please enter their

17    appearances for the record.

18          MR. SINGER:  Matt Singer for the United States.

19          MS. GLATFELTER:  Emily Glatfelter for the United

20    States.

21          MS. GAFFNEY PAINTER:  Megan Gaffney Painter for the

22    United States.

23          MR. SCHUETT:  Neil Schuett for Mr. Sittenfeld.

24          MR. C. MATTHEW RITTGERS:  Charlie M. Rittgers for

25    Mr. Sittenfeld.
```

1          MR. C. HENRY RITTGERS:  Charlie H. Rittgers for

2    Mr. Sittenfeld.

3          MR. PINALES:  Marty Pinales for Mr. Jared Kamrass.

4          MR. ECKES:  Eric Eckes on behalf of Jared Kamrass.

5          THE COURT:  So there's two matters I want to discuss

6    and not in open court.  One of them is it's my understanding

7    that somebody is calling Mr. Kamrass tomorrow.  Is it the

8    government?

9          MR. SINGER:  The government is calling Mr. Kamrass.

10          THE COURT:  The government is calling Mr. Kamrass,

11    and Mr. Singer raised an issue with regard to potential for

12    Fifth Amendment issue.  And I wanted to just establish a

13    record that Mr. Kamrass is aware of his Fifth Amendment right,

14    and my understanding is he's intending to waive it, but I

15    certainly don't want to put words in his mouth.

16       So, Mr. Pinales, would you like to maybe address first,

17    and then I'll have a brief colloquy with Mr. Kamrass?

18          MR. PINALES:  Yes, Your Honor.  My client has been

19    advised of his Fifth Amendment privilege by us several times

20    in our office.  And after that advice, he has weighed the

21    consequences and has decided to waive that privilege.

22          THE COURT:  Thank you, Mr. Pinales.

23       Mr. Kamrass, have you had an opportunity to discuss with

24    your counsel the rights that you have under the Fifth

25    Amendment, sir?

1           MR. KAMRASS:  I have.

2           THE COURT:  And do you understand that that includes

3    the right not to testify in a manner that might incriminate

4    you?

5           MR. KAMRASS:  I understand, yes.

6           THE COURT:  And are you intending to waive that right

7    and offer testimony, even if it may expose you to criminal

8    liability?

9           MR. KAMRASS:  Yes, I am.

10          THE COURT:  And is there any further information that

11   you believe you need, or any further conversation you believe

12   you need to have with your counsel in order to come to a final

13   decision on that?

14          MR. KAMRASS:  No.  I don't believe so.

15          THE COURT:  You believe you have all the information

16   you need in order to make a determination as to whether or not

17   to waive your Fifth Amendment right; is that correct?

18          MR. KAMRASS:  I do.

19          THE COURT:  All right.  I think that's all I need

20   from Mr. Kamrass.  I appreciate you stopping in today, and

21   we'll see you tomorrow, I guess.

22          MR. KAMRASS:  Sounds good.

23          MR. PINALES:  Thank you, Your Honor.  Have a good

24   day.

25          THE COURT:  Yep.  You too, Mr. Pinales.

1          So the other issue that we needed to discuss was the

2     campaign finance jury instruction, or the Court's intent to

3     include some kind of jury instruction about campaign finance

4     issues in lieu of calling an expert to testify about them.

5          Have both parties had an opportunity to review the

6     material that the Court prepared over the lunch hour?

7               MS. GLATFELTER:  Yes, we have.  Thank you, Your

8     Honor.

9               MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

10              THE COURT:  Okay.  Well, I'm happy to start either

11    way.  Ms. Glatfelter, do you want to...

12              MS. GLATFELTER:  Sure.  Well, we appreciate the

13    Court's effort, and we understand the intent here is to come

14    up with a neutral instruction, and we've done our best to do

15    that.

16         And so we think this instruction is pretty close, and

17    there are a couple of points we would note for the Court's

18    consideration.

19              THE COURT:  Thank you.

20              MS. GLATFELTER:  So the first is in the second

21    paragraph, the last sentence, we think that this sort of tips

22    the balance of the instruction from being neutral to not being

23    neutral.

24         Both sides have elicited testimony -- I wouldn't say both

25    sides have elicited testimony, but there's been a lot of

1       testimony about bundling.  There's also been some testimony

2       about straw purchases.

3           And the jury should be able to -- I think both sides are

4       going to -- or at least maybe the defense is going to talk

5       about it, and I think that last sentence tips the balance of

6       what inference they should draw from that.

7           There's testimony about Mr. Ndukwe and his --

8               THE COURT:  Are we talking about the sentence "in any

9       event, Mr. Sittenfeld is not charged with any campaign finance

10      violation involving bundled contributions"?

11              MS. GLATFELTER:  Yes.

12              THE COURT:  Is he charged with a campaign finance

13      violation?

14              MS. GLATFELTER:  He's not.  We repeat that sentence

15      in all three paragraphs, sometimes twice, the idea that he's

16      not charged.

17          And coming after the Court's explanation that bundling is

18      permissible so long as each contribution accurately reflects

19      the true source of funds is really the key there, and so --

20              THE COURT:  Hang on a second.

21              MS. GLATFELTER:  So anyway, that's our proposal, that

22      that sentence is not necessary because it's repeated

23      elsewhere.  If you would like me to go to the other two

24      suggestions?

25              MR. C. MATTHEW RITTGERS:  I might be able to help

1    with that on that paragraph, only because the two sentences

2    that come before it, we would just recommend striking.

3         So if that is part of the government's concern, the

4    "bundling is permissible so long as each contribution

5    accurately reflects the true source of funds," in the next

6    sentence, in other words, there is nothing wrong, for example.

7         And the reason for this, Judge, is that we believe that

8    then you're starting to get into intent as to who knew what

9    about source of funds, so we just struck those two sentences

10   to make this even shorter instructions, which is the first

11   sentence and maybe the last.  If the government and the Court

12   are okay with that, we could just strike those first two

13   sentences.

14        THE COURT:  The first two?  You mean the middle two?

15        MR. C. MATTHEW RITTGERS:  I'm sorry, Your Honor.

16   That's what I meant.

17        THE COURT:  I didn't think there was a

18   disagreement -- and maybe I'm wrong.  But I didn't think there

19   was a disagreement that bundling is not permissible if the

20   checks that are being given to the candidate do not reflect

21   the true source of funds.

22        So in other words, if Person A delivers a check in the

23   name of Person B and Person C to a candidate and, in fact,

24   Person A is the source of funds, then I thought we all agreed

25   that would be a campaign finance violation.

1          MR. C. MATTHEW RITTGERS:  My fear is the way this

2   reads is that the jury now knows that these source of funds

3   actually came from FBI agents, and it was really one set of

4   the same source.

5       But really the knowledge -- and I mean, I have a sentence

6   that I drafted about knowledge, but the knowledge is if a

7   donor or bundler misrepresents the source of funds given to a

8   candidate, and the candidate is unaware of that

9   misrepresentation, the candidate is not responsible for the

10  misrepresentation.

11         THE COURT:  Oh, and so you would want to say so long

12  as the candidate honestly believes that Person B and Person C

13  are the true source of the funds?

14         MR. C. MATTHEW RITTGERS:  Something like that.  So we

15  could either strike it or add a sentence just so that it's

16  clear that the candidate would have the knowledge, because

17  right now the jury knows that these funds were not the true

18  source.

19         THE COURT:  I see what you're saying.  Okay.

20  Thoughts on that, Ms. Glatfelter?  I think that's actually

21  correct, as a matter of law.  I think knowledge is a

22  requirement, but...

23         MS. GLATFELTER:  Your Honor, I would not strike -- I

24  disagree with striking the sentence "bundling is permissible

25  so long as each contribution accurately reflects the true

1   source of the funds." I think that is essential. And so by

2   taking that part out, it becomes inaccurate.

3           THE COURT: No, but I think what Mr. Rittgers is

4   maybe correctly suggesting is some way to build a knowledge

5   component into that so that, you know, so long as the

6   candidate believes that each contribution accurately reflects

7   the true source of funds, or something along those lines.

8   There is a knowledge element to this.

9           MS. GLATFELTER: Sure. We understand this.

10          THE COURT: And so I think Mr. Rittgers is correct

11  that, as written, this is incredibly -- now that I'm looking

12  at it -- vague on the question of if it just happens to be

13  that Person A is represented as being Person B and Person C's

14  money, and the candidate believes that, and it nonetheless

15  happens that it is Person A's, the way this is written, that

16  could give rise to a finding that, you know, that would be

17  violation. I don't think that's what the law is, so I believe

18  we need to address the knowledge issue, and we'll figure out

19  how to do that.

20          MS. GLATFELTER: Sure.

21          THE COURT: So one question is the knowledge issue.

22  All right.

23          MS. GLATFELTER: And we don't object to that.

24          THE COURT: Okay. I understand that. I'll address

25  that in a second. Are there two other issues?

1      MS. GLATFELTER:  Yes.  In the third paragraph, the

2  sentence campaign finance law also required Mr. Sittenfeld to

3  control his PAC, so there is nothing improper about him

4  exercising control over the PAC.

5    We would ask for this modification.  We have no objection

6  to -- I just want to preface this by saying we don't object to

7  this concept in this instruction for this case, but I don't

8  know that it's a correct statement of law to say that it's

9  always permissible for a candidate to control a PAC.  I don't

10  believe that's true.

11    And so I just -- I think we have to be careful about what

12  we're agreeing to.  I would propose that we say there is

13  nothing improper about Mr. Sittenfeld exercising control over

14  the PAC in this case.

15      MR. C. MATTHEW RITTGERS:  No objection.

16      THE COURT:  Okay.  So we'll strike --

17      MS. GLATFELTER:  Before the comma.

18      THE COURT:  Before the comma, and we'll say there is

19  nothing improper about Mr. Sittenfeld exercising control over

20  the PAC in this case?

21      MS. GLATFELTER:  Yes.

22      THE COURT:  Okay.  Third one?

23      MS. GLATFELTER:  The third one, up at the top, we

24  would suggest adding to the third sentence.  So the third

25  sentence is about solicitation.  And we would add may solicit

1    and accept contributions, and then just strike the last

2    sentence there.

3          MR. C. MATTHEW RITTGERS:  No objection.  Striking the

4    including contributions to the PAC in this case?

5          THE COURT:  No.  I think she said striking the last

6    sentence.

7          MR. C. MATTHEW RITTGERS:  Oh, last sentence?

8          MS. GLATFELTER:  So you're putting the concept of

9    accept right up there with solicit.

10         THE COURT:  Right.  So the third sentence dealt with

11   solicit, the fourth was accept, and she said just put solicit

12   and accept.

13         MR. C. MATTHEW RITTGERS:  You should understand that

14   in our system of privately funded political campaigns --

15         THE COURT:  Candidates for office may solicit and

16   accept contributions, including contributions to the PAC in

17   this case.

18         MS. GLATFELTER:  And I can give the Court a reason

19   for that too, but if he agrees to it, then I don't need to.

20         MR. SCHUETT:  Did you say solicit or accept or

21   solicit and accept?

22         MS. GLATFELTER:  I had suggested and, but if it needs

23   to be or, I don't have a strong --

24         MR. C. MATTHEW RITTGERS:  And is --

25         MS. GLATFELTER:  And is fine.

1          MR. SCHUETT:  I just didn't hear your conjunction.

2     Sorry.

3          THE COURT:  All right.  So where are you at on

4     solicit and accept, Mr. Rittgers?

5          MR. C. MATTHEW RITTGERS:  I think that's fine, Your

6     Honor.

7          THE COURT:  And we'll strike the last sentence, then.

8          MR. C. MATTHEW RITTGERS:  Yes.  No objection.

9          THE COURT:  All right.  So I think we've dealt with

10    the first and third.  We still have to deal with the knowledge

11    issue, but, Mr. Rittgers, did you have additional issues that

12    you wanted to address?

13         MR. C. MATTHEW RITTGERS:  It was just the two middle

14    sentences in paragraph 2, Your Honor.  I have a suggestion for

15    a sentence.

16         THE COURT:  Okay.  Do you have it that you can show

17    it to me?

18         MR. C. MATTHEW RITTGERS:  I can show you.  It's my

19    email.

20         THE COURT:  Oh, I get the email.  Oh, and you would

21    just propose adding this sentence?

22         MR. C. MATTHEW RITTGERS:  Yeah.  Somewhere just so

23    that we include this knowledge element.  Maybe --

24         THE COURT:  So what Mr. Rittgers proposes adding is a

25    sentence that says if a donor or bundler misrepresents the

1   source of funds given to a candidate, and the candidate is

2   unaware of that misrepresentation, the candidate is not

3   responsible for the misrepresentation.

4          MS. GLATFELTER:  We can agree with that.

5          MR. C. MATTHEW RITTGERS:  I'm okay if you want to

6   wordsmith it.  I was just trying to put something together.

7          MS. GLATFELTER:  Can you email it, just so I can see

8   it?  I'm visual.

9          MR. C. MATTHEW RITTGERS:  Yes.

10          MS. GLATFELTER:  I think, without seeing the sentence

11  again, I don't think we have a problem with the concept at

12  all, and we're committed to that, but I think the wording of

13  that sentence might be a little confusing.  I'm not sure about

14  the wording.

15          THE COURT:  Let's go off the record for a second.

16       (Off the record.)

17          THE COURT:  Let's go back on the record.  Mr. Singer?

18          MR. SINGER:  One thing that pops out, Your Honor, if

19  a donor or bundler misrepresents the source of funds can be

20  the candidate.

21       I mean, given the nature of this case, it's undercover

22  agents necessarily misrepresenting what the source of funds

23  are.

24          THE COURT:  Well, right.  But Mr. Sittenfeld -- if

25  the FBI represented the source of those funds to be separate

1    LLCs, and he was unaware of that, I think that's right, that

2    wouldn't violate campaign finance laws.

3            MR. SINGER:  But if they were -- so anything that

4    they said would have been a misrepresentation of the true

5    source because this is a covert undercover investigation, so

6    they're necessarily lying about the source of funds.

7            THE COURT:  Oh.

8            MR. C. MATTHEW RITTGERS:  But there's nothing in here

9    that says that there's any fault for doing that.  It's just

10   you can't place it on the candidate if the candidate wasn't

11   aware.

12           MR. SINGER:  But if the undercover says this is from

13   me, and the candidate accepts that and actually receives it

14   from Candidate C, he's still misrepresenting the source of the

15   funds.

16           MR. C. MATTHEW RITTGERS:  Oh, I see.  I understand

17   what you're saying.  I didn't even think about it like that.

18           THE COURT:  I didn't either.

19           MR. C. MATTHEW RITTGERS:  But they didn't say it was

20   from them.  They said it was from those four individuals.

21           MS. GLATFELTER:  Right.  But this would allow the

22   jury to infer that you would never -- the easiest way to say

23   it is you could never have a sting operation involving a straw

24   donor, which is not true, because they would be

25   misrepresenting that these were FBI funds.

1          And so I think what I would say, Your Honor, is that the

2     government is okay with this instruction and principle.  And

3     if we could just take some time to consider how to word that

4     so that we take care of that, we're okay with -- we understand

5     the knowledge, and it needs to be in there, but we just need

6     to think about how to phrase that.

7          MR. SINGER:  Yeah.  I think, at the end of the day,

8     the government wants to be able to argue that these actions

9     reflect the defendant's intent in a certain way.  You want it

10    to argue that the way he handled the checks reflected the

11    defendant's intent in a certain way.

12         And so so long as the instructions allow both of that

13    without confusing issues relating to campaign finance, I think

14    everyone's going to be on the same page.

15         MR. C. MATTHEW RITTGERS:  We can try to tweak it

16    tonight.

17         THE COURT:  Okay.  Are there any other issues that

18    needed to be added, in anyone's view?

19         MR. C. MATTHEW RITTGERS:  I don't think so.

20         MS. GLATFELTER:  I think -- just for that last

21    sentence, and it may change based on the recommendation, but I

22    think it should clarify for purposes of campaign finance law,

23    because there are going to be a lot of knowledge and intent

24    instructions that the Court is giving, and want to make sure

25    that they're not going to take that as that relates to some

```
 1     other substantive instruction.

 2          THE COURT:  And so you would say the candidate is not

 3     responsible as a matter of campaign finance law for the

 4     misrepresentation?

 5          MS. GLATFELTER:  Yes.

 6          THE COURT:  I think that's appropriate, yes.  We're

 7     going to wordsmith that a little bit anyway.

 8          MS. GLATFELTER:  But we're comfortable with all of

 9     the concepts in the second paragraph, we just need to work on

10     the misrepresentation language.

11          THE COURT:  And I'm also going to add, in the second

12     sentence of the third paragraph, the word likewise.  It's

13     going to say there's likewise nothing improper because, as I

14     was reading it, it just kind of butted up oddly against -- it

15     wasn't clearly transitioned to a new thought, so there's

16     likewise nothing improper about it.

17        Mr. Rittgers, you had another?

18          MR. C. MATTHEW RITTGERS:  Just on the campaign

19     finance.  And I don't want to litigate this all right now, but

20     the candidate would still have to be aware under any law, so

21     it's just --

22          THE COURT:  Right.  They understand that, and we're

23     committed to leaving the notion of knowledge in.

24          MR. C. MATTHEW RITTGERS:  Okay.

25          THE COURT:  They just want to make it clear that when
```

```
 1    you say the candidate's not responsible, we don't mean for in

 2    any criminal setting.  They just mean not criminally

 3    responsible as a matter of campaign finance law.  They might

 4    still be responsible for something else.  I don't know what

 5    else, but...

 6              MR. C. MATTHEW RITTGERS:  We'll work on it.

 7              THE COURT:  But accepting whoever's point that if the

 8    misrepresentation is about the FBI thing, that's different

 9    than --

10              MR. C. MATTHEW RITTGERS:  Sure.

11              THE COURT:  Right?  They misrepresented that it was

12    from --

13         Let me put it this way.  If -- what's the guy's name,

14    Ray?

15              MS. GAFFNEY PAINTER:  Rob.

16              THE COURT:  Rob.  If Rob says, hey, P.G., these are

17    all from me, but I've made them out in these three other LLCs'

18    names --

19              MR. C. MATTHEW RITTGERS:  Right.

20              THE COURT:  These are all from me is also a

21    misrepresentation.

22              MR. C. MATTHEW RITTGERS:  Yeah.

23              THE COURT:  But that wouldn't trigger this sentence,

24    is what --

25              MR. C. MATTHEW RITTGERS:  Correct.
```

1          THE COURT:  -- they're saying, and I think is right.

2          MR. C. MATTHEW RITTGERS:  I agree.

3          THE COURT:  And so we need to fix this sentence to

4     take care of that hypothetical.

5          MR. C. MATTHEW RITTGERS:  I agree.

6          THE COURT:  Which didn't occur to me and probably

7     wouldn't occur to the jury, but now that it's out there, I

8     figure with this many people working on it, we should be able

9     to come up with a sentence to fix it.  So I'll give you guys

10    tonight to figure that out.  That's your take home work.

11         MR. C. MATTHEW RITTGERS:  Okay.  And, Your Honor, you

12    know when we were talking on the record about the character

13    witnesses?

14       I'm not intending to call these people as character

15    witnesses to say P.G. was good and his reputation was good.

16    It's more to show his modus operandi that we've heard now for

17    six, five -- or, I don't know what day it is, five or six days

18    of trial about the frequency of contact, communication that he

19    had, the accessibility that the agents had with P.G., and the

20    implication of that is that it was because of a donation.

21       And so my intention with these witnesses, and I would

22    love to call in 200, but I've paired it down to 13 to say,

23    yeah, during 2017, '18, '19, I had something in front of the

24    city, red-tape issues, concerns, and P.G., I could text him, I

25    could email him, he would meet me boots on the ground, or I

1    could meet and have meals with him, and he'd talk to me about

2    his confidences in his colleagues.  It's not to say that his

3    reputation is to be good.

4         THE COURT:  Well, so now you've created a different

5    problem for yourself.  So before it was character witnesses,

6    which, okay, that's 404 and 405.

7      Now it seems like you want to say that to counter

8    allegations that he accepted a bribe on occasion one, I want

9    to offer occasions two, three, four, five, and six where he

10   did the same things without taking a bribe, and under Sixth

11   Circuit law, I don't believe you get to do that.

12        MR. C. MATTHEW RITTGERS:  I'm not saying that it

13   wasn't taking a bribe.  I'm just showing how he operates as an

14   elected official, so the jury can see like who he was in the

15   day to day in terms of talking to people, having meals with

16   people, talking about his colleagues, talking about his

17   confidence in the vote, going through and passing legislation.

18        MS. GLATFELTER:  Your Honor, given this new argument,

19   we will need time to think about this, but this is precisely,

20   I think, 405(b) evidence, and the Sixth Circuit, I believe

21   *Terry* but I don't want to misquote it.  But I believe they

22   also talk about how that's also 404(b), both of which are

23   improper.

24      And because there is not a character issue -- because

25   character is not at issue via entrapment defense, which the

1    defendant has explicitly rejected, it is improper to offer

2    that evidence.

3         THE COURT:  I had thought you were going to offer

4    reputation evidence regarding his reputation for honesty or

5    truthfulness, for which 13 witnesses would be way more than I

6    would allow.

7       But then there are the constraints that they can only

8    offer reputation or opinion and not specific instances.  And

9    it opens them up on cross-examination to the government

10   saying, oh, you say he has this reputation, were you aware

11   that he did this and were you aware that he did that.

12      Now, they can't prove them up, but they can ask about

13   them as long as they have a good faith basis shown.

14         MR. C. MATTHEW RITTGERS:  Sure.

15         THE COURT:  So you'd be opening up an account on a

16   true character witness, but now you're saying it's not a

17   character witness, now you're saying it's something else, and

18   so I'm not entirely sure what the something else is because,

19   as Ms. Glatfelter said, I'm not sure it's *Terry*, but I believe

20   the Sixth Circuit has said that in -- I think it was even in

21   an honest services wire fraud case, that the fact that a given

22   person did something without taking a bribe in one instance is

23   not relevant to whether that person took a bribe in another

24   instance.  And so I would need to go back and review that case

25   law.

1          MS. GLATFELTER:  *Dimora*.

2          THE COURT:  *Dimora*.  Okay

3          MR. C. MATTHEW RITTGERS:  Your Honor, again, this

4     isn't to say that he did this without taking a bribe or he

5     didn't take a bribe in this. It's just to show that he was

6     very accessible.  Anyone who would want to meet with him, he

7     would meet with them.

8        When someone said they wanted something, he would

9     communicate to them immediately and effectively, just as he

10    did with these undercover agents.

11         THE COURT:  Well, I think we should all read *Dimora*

12    again and talk about it, but it sounds perilously close to me

13    as to what the Court was talking about in *Dimora* as

14    non-admissible evidence, but I could be wrong so I will reread

15    that case tonight.

16        Anybody happen to have a cite handy?

17         MR. SCHUETT:  I think this is the section of *Dimora*

18    is --

19         MR. SINGER:  No, it's the 2014 version of *Dimora*.

20         MS. GLATFELTER:  I don't have the right motion on my

21    phone.  I'm sorry.  I was thinking we were talking about

22    character witnesses.

23         THE COURT:  Okay.  We can go off the record again.

24        (Off the record.)

25         THE COURT:  I guess what I would say is to the extent

1    that the government has suggested that it was not in keeping

2    with Mr. Sittenfeld's ordinary course, and from that, they

3    want the jury to draw an inference that he was doing something

4    different here, and that the reason for the difference was

5    because of the campaign contribution, it seems like

6    Mr. Sittenfeld should be able to offer some evidence in

7    response to that.

8        So I'll look again at the contours of *Dimora*, but I will

9    tell you it's not going to be 13, because that would be, in my

10   mind, dramatically cumulative of whatever point you're trying

11   to make.

12       MR. C. MATTHEW RITTGERS:  They're just different

13   examples, so it's like --

14       THE COURT:  Boy, every time -- so the word I wanted

15   to avoid was "specific instances," and now you've gone even

16   closer to specific instances.

17       So you're suggesting you're going to offer specific

18   instances of conduct in which he didn't take a bribe to prove

19   that, in this case, he acted in conformance with that, it's a

20   problem.

21       MR. C. MATTHEW RITTGERS:  It wouldn't be the latter

22   part.  I'm not offering it to prove that he did or didn't act

23   in conformity with it in this case with these agents.  It's

24   just to show how he acted on an everyday basis.

25       THE COURT:  I think that's awfully close to another

1    way of saying the same thing, but I will read *Dimora* again.

2          MR. SCHUETT:  Your Honor, if this is the 2014

3    version, it's 750 F.3d 619.

4       And then, Your Honor, the only other thing, since I've

5    not practiced in front of you, how do you prefer Rule 29?

6          THE COURT:  You can make oral motion at the close of

7    the government's case in chief, and you can do -- you know, if

8    the motion ends up not being granted and if you put on a case,

9    you can move again after the jury verdict.

10      And I would think that motion, you may want -- if the

11   jury verdict were to go against you -- that's a lot of ifs

12   built into that, I'm not suggesting anything else.

13      But if a subsequent Rule 29 motion were necessary, I

14   would think a written one after post-verdict would be --

15          MR. SCHUETT:  Written?

16          THE COURT:  -- written, yeah, appropriate.

17          MR. SCHUETT:  Understood.  Thank you, Your Honor.

18          THE COURT:  Yep.  Anything else?

19          MS. GLATFELTER:  No.  Do we know who our witnesses

20   are going to be tomorrow?

21          MR. C. MATTHEW RITTGERS:  Oh, well, a lot depends on

22   the judge's ruling.  My hope, and I texted these people --

23          THE COURT:  We can go off the record for this.

24      (Off the record.)

25          (Proceedings adjourned at 4:52 p.m.)

```
1                    C E R T I F I C A T E

2                         -  -  -

3        I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
4    above-entitled matter.

5

6    /s/ M. Sue Lopreato_____          ___September 30, 2022___
     M. SUE LOPREATO, RMR, CRR
7    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2    GOVERNMENT WITNESSES

3    **CHINEDUM NDUKWE**

4    Direct by Mr. Singer.............................. Page 25
     Cross by Mr. C. Matthew Rittgers.................. Page 71
5    Redirect by Mr. Singer........................... Page 121
     Recross by Mr. C. Matthew Rittgers............... Page 123

6
     **BRIAN BENNETT**
7
     Direct by Ms. Glatfelter......................... Page 130
8    Cross by Mr. C. Henry Rittgers................... Page 156

9
     **JAIME KINCAID**
10
     Direct by Mr. Singer............................. Page 176
11   Cross by Mr. C. Matthew Rittgers................. Page 188

12

13

14                         EXHIBITS

15   GOVERNMENT EXHIBITS

16   Exhibit                                    Admitted

17      4A                                          53
        4B                                          54
18      46C                                         55

19

20
     DEFENSE EXHIBITS
21
     Exhibit                                    Admitted
22
        D652                                        87
23

24

25