<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             -  -  -
 3

 4     UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                      :
 5              Plaintiff,            : Jury Trial, Day 7
                                      : Wednesday, June 29, 2022
 6              - v -                 :
                                      : 9:00 a.m.
 7     ALEXANDER SITTENFELD, a/k/a    :
         "P.G. Sittenfeld,"           :
 8                                    :
                Defendant.            : Cincinnati, Ohio
 9
                             -  -  -
10
                      TRANSCRIPT OF PROCEEDINGS
11
       BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE
12
                             -  -  -
13
       For the Plaintiff:          EMILY N. GLATFELTER, ESQ.
14                                 MATTHEW C. SINGER, ESQ.
                                   MEGAN GAFFNEY PAINTER, ESQ.
15                                 U.S. Department of Justice
                                   U.S. Attorney's Office
16                                 221 E. Fourth Street, Suite 400
                                   Cincinnati, Ohio  45202
17
       For the Defendant:          CHARLES M. RITTGERS, ESQ.
18                                 CHARLES H. RITTGERS, ESQ.
                                   NEAL D. SCHUETT, ESQ.
19                                 Rittgers & Rittgers
                                   12 E. Warren Street
20                                 Lebanon, Ohio  45036

21     Law Clerk:                  Jacob T. Denz, Esq.

22     Courtroom Deputy:           Scott M. Lang

23     Court Reporter:             M. Sue Lopreato, RMR, CRR
                                   513.564.7679
24
                             -  -  -
25
</pre>

```
 1                      P R O C E E D I N G S

 2              (In open court at 8:57 a.m.)

 3                            -  -  -

 4         THE COURT:  A couple preliminary matters first.

 5         Mr. Rittgers, did you have an opportunity to review the

 6    sentence that the government has proposed adding?

 7         MR. C. MATTHEW RITTGERS:  We did, Your Honor.  It

 8    looks okay to us.  I'd just like to see the total.

 9         THE COURT:  Yep.

10         MR. C. MATTHEW RITTGERS:  Thank you.  Your Honor, I

11    should have brought this up yesterday.

12         One of the things that -- well, one of the many other

13    things for Mr. Burns is that there's nothing inherently

14    improper about discussing specific or general policy positions

15    at the same time donations or fundraising is discussed, in our

16    American democracy.

17         I mean, you don't have to put the American democracy, but

18    there is nothing inherently improper about that.  That would

19    be something else the jury might not know.

20         MS. GLATFELTER:  We believe that's beyond the scope

21    of this, and that is a factually specific question the jury is

22    going to answer about how close in time, and what they're

23    really talking about.

24         I don't think it's an appropriate instruction in terms of

25    what is FEC law.  There's nothing in FEC law about that.
```

```
 1              THE COURT:  Yeah.  If you have a case cite, or

 2     something that's interpreting campaign law and making the

 3     point you're making, I'd be willing to consider if that's an

 4     undisputed errant to law.

 5         I think my concern is that communications about policy

 6     positions -- just as communications about policy positions, I

 7     think you're correct, there's nothing improper about stating

 8     that.

 9         But if it's stated in the form of some kind of tacit

10     promise, or something along those lines, it does, you know,

11     kind of cross the line.

12         So I would want to find some case law, or something that

13     clearly delineates what that line is, if such line exists,

14     because I'm afraid that Ms. Glatfelter is correct, because it

15     ends up depending a lot on unstated assumptions about what's

16     behind a particular comment.

17         So I think it's going to be, I think, hard to craft a

18     jury instruction, although the parties, I think, are free to

19     argue that point.

20              MR. C. MATTHEW RITTGERS:  Thank you.

21              THE COURT:  But if you have case law, I'm glad to

22     take a look at it.

23              MR. C. MATTHEW RITTGERS:  Thank you.

24              THE COURT:  And then the other issue that we

25     discussed was Mr. Sittenfeld's desire to present certain other
```

1  witnesses, which were referred to originally as character

2  witnesses, but I think, upon further discussion, ended up

3  being what I would call other acts witnesses.

4      And there are a couple of concerns I have about that.

5      First, Mr. Sittenfeld moved in limine to prevent the

6  government from putting on other acts evidence with regard to

7  other people with whom Mr. Sittenfeld allegedly had

8  interactions during the campaign, and in which he may have

9  solicited contributions from those other persons.

10      And in limine, Mr. Sittenfeld's team moved to exclude all

11  such evidence on the ground that it was either irrelevant, or

12  that the prejudicial effect outweighed any potential probative

13  value.

14      And yet now it appears Mr. Sittenfeld intends to or would

15  like to put on exactly the same kinds of evidence, only going

16  in the opposite direction.

17      And it seems odd to me that the Court would allow

18  Mr. Sittenfeld to put on the very type of evidence, although

19  pointing in the other direction, that Mr. Sittenfeld sought to

20  exclude from this trial.

21      That being said -- well, I should also move on to the

22  other problem.  The other problem is that in the *United States*

23  *versus Dimora*, 750 F.3d 619, a Sixth Circuit case from 2014,

24  that also involved allegations, or I should say charges of

25  public corruption.

1          There was a discussion of other acts evidence, in which

2     Mr. Dimora, according to Sixth Circuit, quote, hoped to

3     present evidence of other good acts that, on several

4     occasions, he helped constituents without asking for or

5     receiving anything of value.

6          And the district court there excluded the evidence from

7     trial, ruling that it did not satisfy the requirements of

8     Federal Rule of Evidence 404(b), which is the other-acts rule.

9     And the Sixth Circuit affirms that holding.

10         According to the Sixth Circuit, Rule 404(b) precludes the

11     use of other-acts evidence to prove a person's character, but

12     it allows such evidence for other purposes, such as proving

13     intent.

14         But before admitting other-acts evidence for such a

15     non-character purpose, the Court must decide whether the

16     evidence is probative of that limited purpose.

17         The Court concluded in *Dimora* that it was not, because

18     the other-acts evidence was situations unrelated to the

19     charges in which *Dimora* intended to show that he did favors

20     for people who did not pay him bribes.

21         And, you know, the Court goes back to the Latin maxim

22     falsus in uno, falsus in omnibus -- false in one, false in

23     all -- does not have an inverse corollary true in one, true in

24     all.

25         And so the idea, I would hope, that the government

1    officials act in their constituents' interest on all

2    occasions, and the fact that Mr. Sittenfeld may be able to

3    show situations in which he acted in his constituents'

4    interest, other situations wouldn't necessarily prove that he

5    didn't act pursuant to some kind of improper motive in this

6    case.

7        Now, that being said, I do think what's different about

8    this case is that the government is suggesting that the jury

9    may be able to draw inferences from certain ways in which

10   Mr. Sittenfeld acted with respect to the particular

11   participants in the 435 Elm project.

12       And the government is arguing that that conduct, I think

13   it's all tacit yet because we haven't heard closing arguments,

14   but I think the suggestion has been raised, or at least an

15   inference could be drawn that meeting with these people in

16   restaurants, and the condo, and the frequent telephone

17   communications, and the reaching out to other city officials,

18   that's sort of taken as a whole, that type of conduct is

19   suggestive that he may have been acting pursuant to an

20   improper motive.

21       And I think that the defendant should have some ability

22   to rebut that.  And so I think what I'm inclined to do -- you

23   know, I think what drove *Dimora* was the fact that the Court

24   said situations unrelated to the charges.

25       So what I take from all this is sort of the same line

1     that I tried to draw in my opinion in limine, which is that to

2     the extent the other acts are substantially similar to the

3     acts at issue here, that it may be probative or sufficiently

4     probative with regard to intent to allow the evidence.

5          So what I mean by that is, to the extent Mr. Sittenfeld

6     intends to put on other witnesses who had some kind of major

7     economic development program pending before the city for

8     approval, or that needed some interaction from the city, and

9     in which he then, like in this case, or like the evidence is

10    starting to show in this case, met with the proponents of that

11    economic development project on multiple occasions, said

12    things like, you know, I'd be -- I forget all the quotes we've

13    seen so far, but things like "I'd shepherd the votes," or

14    "I'll get this through council," or whatever the -- I forget

15    all the exact statements and/or reached out to other city

16    officials to push them to act in a certain way.

17         If there are other incidents that are substantially

18    similar in that regard, in which the person is going to say,

19    yeah, I wasn't a contributor, or there was never any request

20    for a contribution, I would be inclined to allow that type of

21    testimony.

22         However, if Mr. Sittenfeld puts on any such testimony --

23    and I think we're going to first need to have a kind of a

24    proffer from the witness to make sure there is a substantial

25    similarity.

1          If Mr. Sittenfeld puts on such evidence, I intend to

2     allow the government, in rebuttal, to put on the type of

3     evidence that it requested the ability to put the evidence on

4     before trial, the sort of the 404(b) evidence, and the

5     categories of information that I identified in my opinion as

6     permissible.

7          And whatever we end up using as substantially similar for

8     purposes of allowing witnesses to testify here will be the

9     same test that I allow law for substantial similarity for the

10    government's rebuttal in its rebuttal case, and whatever

11    evidence gets put on.

12         Now, I know that was a lot, and I know you probably need

13    to think about that, and whether the witnesses who are

14    identified would fall into the category of substantially

15    similar we've been talking about now, but I wanted to give you

16    time to start thinking about that.

17         So that's where the Court is.  Notwithstanding *Dimora*, I

18    will allow other-acts evidence, both good and bad, but only

19    with regard to substantially similar types of situations.

20         So, for example, you know, if Mr. Sittenfeld was great

21    about sending birthday cards to the kids of his constituents,

22    that's to me irrelevant to the charges here.

23         If Mr. Sittenfeld had -- I want to be very clear to

24    everyone in the courtroom that I'm not suggesting any of these

25    things happened.  I'm just trying to throw out hypotheticals.

1     If Mr. Sittenfeld said, oh, I'll help you fix a parking

2     ticket or something, that's not related.

3     We're talking about economic development programs,

4     because I just think that's what this case is about.

5     MR. C. MATTHEW RITTGERS:  Your Honor, could it also

6     be the legislative process?  So a constituent reaching out

7     saying, hey, there's legislation that I don't like.

8     Mr. Sittenfeld then describing the communications over the

9     course of six or twelve months, where he's communicating his

10    confidence in his colleagues, trying to -- telling that

11    person, hey, you know, I've reached out to so and so, and we

12    think it's going to get through committee.

13    It could be legislation about something that might not be

14    a development, but it's legislative process with the --

15    THE COURT:  Well, I think what's unique about this

16    case is the economic aspect and the $75 million investment and

17    all that.

18    So it's going to have to have some kind of economic

19    overlay, because I think we can -- I don't want to say that.

20    I think an argument could be made that situations that

21    involve substantial economic development dollars and

22    substantial investments, whether from in city or out of city,

23    or in state or out of state people, create different types of

24    incentives around some of the types of charges at issue here.

25    So if legislation doesn't have an economic impact, I

1       think it less likely, at the margins, to think there may be

2       some kind of illicit payments involved.

3           So I think we need to see some kind of economic

4       development activity that's going to involve substantial flows

5       of money, which is, I think, the construct that's been created

6       and is at issue here.

7               MR. C. MATTHEW RITTGERS:  We would be trying to offer

8       this evidence not for propensity, Your Honor.  It's to show

9       how Mr. Sittenfeld would act and respond to any constituent

10      coming to him, and working through, being proactive in his

11      communication, relaying discussions that he had had with

12      colleagues, saying, hey, this is the next step of the process.

13      You should be here or do this.

14          Mr. Sittenfeld saying to an individual who might have a

15      small business and is worried about legislation that is

16      currently sitting in a committee in council, and him meeting

17      with them.

18          And in over the course of 12 months, similar to this

19      undercover operation, we've heard from four different

20      witnesses now repeatedly highlighted having communication with

21      that person who could be impacted by the legislation, and

22      talking about what he has been doing behind the scenes at the

23      city to help that person.

24          You know, I went back and looked last night.  It was not

25      even our intention to say that there wasn't a donation offer.

1    Some of these people did give donations before or after, but

2    some of them did not.

3        I wasn't planning on eliciting like whether did you give

4    a donation or not.  If the Court permits, then I might.  But

5    that was not even the intention.

6        It was just to show the modus operandi as an elected

7    official, because the government for six days has highlighted

8    the ways in which Mr. Sittenfeld was proactive and accessible

9    with four undercover agents who repeated the same testimony of

10   constant communication for six days.

11        THE COURT:  Yeah.  I just fear that -- I go back to

12   *Dimora*, and I have this one sentence here.

13        So in *Dimora*, the allegation was that in exchange for

14   certain payments, Mr. Dimora and others up in, I believe it

15   was Cleveland, provided business opportunities and other

16   things to people in the area.

17        And Mr. Dimora wanted to put on evidence that he had also

18   done good acts, or had done things for people who didn't pay

19   him any bribes.

20        And what the Court said is all it would have shown is

21   that in situations unrelated to the charges, *Dimora* did favors

22   for people who did not pay him bribes.

23        And my concern is that -- and then the Court goes on to

24   say, "For the same reason that prior bad acts may not be used

25   to show a previous disposition to commit crimes, prior good

1    acts generally may not be used to show a predisposition not to

2    commit crimes."

3        So I understand what you're saying, but you're trying to

4    undercut the government any inference that could arise from

5    the way in which Mr. Sittenfeld acted in this case because

6    you're going to say, well, he also acted similarly in other

7    cases.

8        But what I'm saying is the other cases -- for that to

9    interfere with the inference, the other cases need to be

10   substantially similar to this case because, otherwise, the

11   fact that he acted the same way in case two that he did in

12   case one, if case one and case two are different, the fact

13   that he acted the same way in two different cases doesn't

14   necessarily undercut the inference here.

15       So I'm willing to consider, but I'm suggesting to you

16   that, you know, it may behoove you to put together a

17   description, or something of the sort, as to why you believe a

18   given other situation is substantially similar.

19       And I'm telling you that I'm predisposed, to use a word

20   that's now coming up with some frequency under 404(b), but I'm

21   predisposed to think of substantially similar in terms of some

22   kind of economic development aspect, not just the notion of

23   legislation writ large, or the notion of constituent

24   communications writ large, or anything that tied to a project

25   of some kind.

1       And I guess it could maybe be a legislative project,

2   maybe, but I'd like to know more about the specific

3   legislation at issue here.

4       But, you know, if it's legislation about getting the

5   street closed for a Fourth of July party in a particular

6   neighborhood, that doesn't seem the same to me as some kind of

7   major legislative thing, so I just don't know enough in the

8   abstract. I'm just trying to tell you where I'm at and the

9   line I'm going to try to police.

10          MR. C. MATTHEW RITTGERS: I understand. And, Your

11  Honor, in *Dimora*, I believe he was trying to link the favors

12  to not asking or receiving a thing of value, *Dimora* was trying

13  to do that, which we are not attempting to do here.

14      To get out of the abstract, you know, a legislation that

15  would impact small Airbnb businesses in the city, it took

16  12 months to work through.

17      P.G. was working hand in hand with one of the

18  constituents who reached out to him, telling him every step of

19  the process, when it was going through committee, who he was

20  speaking with, for a 12-month period, frequently.

21      Another potential person was someone who had a small

22  business, and it had to do with vendor licenses, reached out

23  to many council members, didn't get a response.

24      Mr. Sittenfeld immediately met with him, proactively

25  reached out, kept in touch with him over the course of, again,

1    about 12 months, while he worked through legislation that

2    would not impact the small businesses that would sell peanuts

3    at the stadium.

4        It would be people who had problems in the city who were

5    not getting help, similar to Mr. Ndukwe saying, hey, look,

6    this is stalled, what's going on, and --

7            THE COURT:  But Mr. Ndukwe did it in the context of a

8    real estate development project that involved $75 million of

9    outside investment into -- at least was being portrayed as

10   involving $75 million of outside investment.

11       And I just think that gives rise to a different potential

12   inference with regard to a possibility or likelihood of some

13   kind of illicit payment around that.

14           MR. C. MATTHEW RITTGERS:  It could, but to show the

15   way in which he operated, P.G. operated, this is how he

16   interacted with constituents.

17       And what we've seen throughout this entire trial is the

18   interaction with governmental agents who say P.G. was

19   proactive, communicated all the time.  After something would

20   happen at council or with an administrator, he'd call them and

21   update them.  I mean, we've heard highlights of that for truly

22   six or seven days right now.

23       And if that's the same thing he's doing with other

24   constituents, frequently calling and updating them, hey, this

25   is now through this subcommittee, or --

1          THE COURT:  And meeting in bars and restaurants and

2     condos and hotel rooms, and other things?  I mean --

3          MR. C. MATTHEW RITTGERS:  Yeah, with some of them,

4     but not all of them.  But some of them, breakfast meetings.

5     They would talk about this, and they'd show plans of a

6     development, or some of them were not drinking with them.

7          THE COURT:  Yeah.  I mean, I guess my point is, I

8     think I've outlined the framework.

9          So if you want to -- and we can do it now or we can do it

10    later, but I'm going to want to go through witness by witness,

11    and talk about whether it's substantially similar under the

12    line that I've just drawn.

13         And I'm willing to hear your argument on it.  But you're

14    going -- in my view, you're going to need to show that

15    substantial similarity before we're going to allow a given

16    witness to testify about his experiences.

17         And I want to be clear, as I said, that same substantial

18    similarity, the government's going to be allowed to put on

19    other-acts evidence similarly from witnesses going the other

20    direction.

21         MR. C. MATTHEW RITTGERS:  I believe you told the

22    government they could do that.

23         THE COURT:  Yep.

24         MR. C. MATTHEW RITTGERS:  That will be in their case

25    in chief already.

```
1              THE COURT:  Yep.  And my sense is they're not taking

2     me up on that offer, if I'm understanding, but maybe I'm

3     wrong.

4         But yeah, certainly.  My point is, I think I'm remaining

5     consistent to the motion in limine ruling, and saying that the

6     other-acts evidence needs to involve substantially similar

7     situations.

8         I'm willing to hear argument about whether a given

9     witness falls within that substantially similar, but that's

10    the task before we're going to put the witness in front of a

11    jury.  And I'm happy to have that either in the form of

12    writing, or in the form of an oral presentation.

13        And I'm also happy to allow a proffer, if you want to

14    proffer of what a given witness would have testified, to

15    preserve the issue, I have no problem about that.  But that's

16    the line I'm going to try and enforce.

17             MR. C. MATTHEW RITTGERS:  Your Honor, given the

18    government's likely finishing their case today, and some of

19    those discussions, do you think it might behoove everyone if

20    we did the charging conference on Thursday, just so that we

21    can get our affairs in order?  You mentioned that earlier as a

22    potential.

23             THE COURT:  I thought I mentioned on Friday.

24             MR. C. MATTHEW RITTGERS:  I thought you gave us the

25    choice, and then we went back to Friday, but...
```

```
1          MS. GLATFELTER:  Your Honor, we would prefer to do

2    the charging conference when we're near the end of close of

3    evidence, because I assume there are going to be evidentiary

4    issues that could come up that would impact that.

5          THE COURT:  Yeah.  My concern is, I think usually we

6    do the charging conference when the evidence is about to

7    close, just because some of the charge is tied to given

8    evidence that was elicited and, as of right now, I don't know

9    what evidence you are or are not putting on in your case.

10       I would generally be inclined, and has always been my

11   practice, to do a charging conference nearly at the end, if

12   not at the very end, of all the evidence that's been

13   presented.

14         MR. C. MATTHEW RITTGERS:  Okay.  If we finish our

15   case on Thursday, would the charging conference then be

16   Friday?

17         THE COURT:  The charging conference would be Friday.

18   I do not intend to do a situation where one or both parties

19   close before a long weekend, and then we expect the jury to

20   come back and start deliberating cold without having any --

21   after having been gone for three days and, you know, without

22   some kind of overview from the parties.

23       I think, given where we're at, that's most likely in the

24   Court's mind that what we're going to do is wrap up the case,

25   the presentation of evidence this week, have a charging
```

1    conference sometime on Friday, probably, and then do closings

2    on Tuesday.  And however long the closings take, they take.

3         Well, I should be careful.  We'll do initial charge on

4    Tuesday, closings, final charge, and then begin deliberations

5    either on Tuesday or on Wednesday, depending how long the

6    closings go.  But that would be the Court's plan.

7              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

8              MS. GLATFELTER:  We had one other issue to raise, and

9    I wanted to flag the issue, and it doesn't matter to the

10   government if we address it now, or the Court wants time to

11   think about it, and defense counsel.

12        Yesterday defendant gave us notice that they would be

13   calling John Curp and Luke Blocher as defense witnesses this

14   afternoon.

15        These first two witnesses are attorneys.  The first is

16   the former city solicitor and current city manager.  He's also

17   served as a person -- he served as a personal attorney for the

18   defendant.

19        The second witness is also someone who has served as a

20   city solicitor in the past.  We have not received any notice

21   of any sort of advice of counsel.  Advice of counsel is not a

22   defense to the charges in this case.

23        And so if there's any intention of eliciting that the

24   defendant sought advice, and that he received this advice,

25   we'd like to be heard on that, because we think that's a

```
 1    misleading and confusion of the issues and should be excluded.

 2            THE COURT:  I don't believe there is the intent to do

 3    that, but...

 4            MR. C. MATTHEW RITTGERS:  That's correct.

 5            THE COURT:  Yep.

 6            MS. GLATFELTER:  Okay.  Thank you, Your Honor.

 7            THE COURT:  Anything else we need to address before

 8    we bring in the jury?  Let's bring in the jury.

 9        (Jury in at 9:28 a.m.)

10            THE COURT:  Welcome back, ladies and gentlemen of the

11    jury.  As you know, we left off yesterday with the

12    government's case.

13        And the question this morning is does the government

14    intend to call another witness?

15            MR. SINGER:  Yes, Your Honor.  The government calls

16    Jared Kamrass.

17            THE COURT:  Very good.

18        (Government witness JARED KAMRASS, sworn.)

19            MR. SINGER:  Your Honor, may I approach to begin the

20    examination?

21            THE COURT:  You may.

22            MR. SINGER:  Thank you.

23                            DIRECT EXAMINATION

24    BY MR. SINGER:

25    Q.   Good morning.
```

KAMRASS - DIRECT

1    A.   Good morning.

2    Q.   Can you please state your name and spell it.

3    A.   Jared Kamrass, J-a-r-e-d.  Kamrass, K-a-m-r-a-s-s.

4    Q.   What do you do for a living, Mr. Kamrass?

5    A.   I'm a political strategist and consultant.

6    Q.   And how long have you been doing that?

7    A.   Nine years.

8    Q.   Can you walk us through your background as a political

9    strategist and a consultant?

10   A.   Sure.

11            THE COURT:  Could you move just a little closer to

12   the mic.

13   A.   Yeah, I started working on campaigns in college, and came

14   back -- I didn't go to school in Cincinnati, but grew up here.

15   Came back to Cincinnati to work on campaigns, and about eight

16   years ago started doing consulting work.

17   Q.   So do you do work as a political consultant?

18   A.   Advise candidates on the best way to win whatever

19   election they're running in, as well as help with fundraising

20   strategy and so they have the funds to run the race they need.

21   Q.   Can you describe how it is you would raise funds for

22   political candidates?

23   A.   Sure.  Typically, look at public records to see

24   individuals or entities that have contributed to similar types

25   of races, or folks that are in the candidate's family and

1    friends network, and then create, essentially, an internal

2    database that you use to kind of gauge your progress as you go

3    about raising funds from those individuals.

4         MR. C. MATTHEW RITTGERS:  Your Honor, I apologize to

5    interrupt.  Could we approach very briefly at sidebar?

6         THE COURT:  Okay.

7    SIDEBAR CONFERENCE

8         MR. C. MATTHEW RITTGERS:  Judge, I didn't want to

9    interrupt at every question, but I want to make sure that our

10   objection, it is preserved in case there's a need for appeal,

11   that we object to this testimony, based on our motions in

12   limine that we filed, and that the government is not going to

13   argue waiver later if we don't object to every question about

14   targeting people that was in front us, and that he used

15   fundraising techniques which we think is improper to elicit.

16        MR. SINGER:  Standing objection is fine with the

17   government, Your Honor.

18      I'm not going to argue waiver.  I mean, he preserved it

19   in pretrial, and he's preserving it now.

20        THE COURT:  And you're going to examine this witness

21   consistent with whatever I said in my order about that?

22        MR. SINGER:  Yes, sir.

23        THE COURT:  Okay.

24        MR. C. MATTHEW RITTGERS:  Thank you.

25   SIDEBAR CONFERENCE CONCLUDED

KAMRASS - DIRECT

1    BY MR. SINGER:

2    Q.   You're talking about fundraising.  Are there different

3    types of fundraising that you did for candidates when you were

4    a political consultant?

5    A.   Yes.  Sometimes candidates would fundraise directly into

6    a candidate campaign account that's used for the express

7    purpose of getting elected to a certain office, or to a

8    political action committee, which can be used for other

9    political costs not associated with actually running for

10   office.

11   Q.   Is a political action committee, does that have an

12   acronym that we use?

13   A.   Yes.  It's commonly referred to as a PAC.

14   Q.   Did there come a time when you met with Special Agent

15   Nathan Holbrook of the FBI?

16   A.   Yes.

17   Q.   When was that?

18   A.   July 2020.

19   Q.   And did you do something that caused you to speak with

20   him in July of 2020?

21   A.   Yes.  A couple years prior to that, I had been given

22   $15,000 by other undercover agents that was meant for

23   something else, and I stole it and kept it for myself.

24   Q.   Can you describe those circumstances?

25   A.   Yes.  I was offered that money to be given directly to

KAMRASS - DIRECT

1    me, in lieu of a contribution to another elected official's

2    PAC.

3         The expectation was that the money that was given to me

4    would be used to offset the regular compensation I received

5    for consulting for that PAC.

6         Additionally, the expectation was that that elected

7    official would then support or not stand in the way or impede

8    the progress of the project that they were advocating for.

9         I told them that all would happen and, in fact, none of

10   it happened. I never had a conversation with the elected

11   official afterward, and just kept the money for myself.

12   Q.   Is this an elected official that you were working for as

13   a political consultant?

14   A.   Yes, that's correct.

15   Q.   And you managed that public official's PAC?

16   A.   That's correct, yes.

17   Q.   Did the elected official know anything about the conduct?

18   A.   No. He knew nothing about it, and it was something I

19   knew I shouldn't have done, and to this day remains the

20   biggest mistake I've ever made, and I regret it every day.

21   Q.   What, if anything, did you do to make amends for this?

22   A.   I immediately took ownership of what I'd done, and

23   offered to repay the money back immediately. It wasn't money

24   that I was supposed to have. And then also subsequently began

25   cooperating with the FBI.

KAMRASS - DIRECT

1    Q.   As you sit here today, how do you feel about your

2    actions?

3    A.   I can't change what I did, but there's not a day that

4    goes by where I don't regret it.  It's not something I've ever

5    done before or certainly have done since, but it remains the

6    biggest mistake I've ever made in my entire life.

7    Q.   Did this conduct result in you meeting with the

8    government?

9    A.   It did, yes.

10   Q.   And did you meet pursuant to what's called a proffer

11   agreement?

12   A.   I did, yes.

13   Q.   What did the proffer agreement require of you?

14   A.   It required me to provide truthful information, as I knew

15   it, to the government, based on information that I knew.

16   Q.   And what would happen if the information that you

17   provided was not truthful?

18   A.   I would be subject to any of the penalties or

19   consequences of being dishonest with the government.

20   Q.   Have you been made any promise whatsoever as to whether

21   or not you will or will not be charged relating to the $15,000

22   that you took?

23   A.   No, I've not.

24   Q.   Did you begin assisting law enforcement related to public

25   corruption after you were approached by agents in July 2020?

1    A.   Yes, I did.

2    Q.   Were you working with law enforcement prior to July 2020?

3    A.   No, I was not.

4    Q.   So to be clear, were you working for the FBI during the

5    years 2018 and 2019?

6    A.   No, I was not.

7    Q.   In the context of providing truthful information to the

8    government, did you come clean about any other incidents that

9    you were involved in, illegal or legal?

10   A.   Yes, I did.

11   Q.   Can you describe that?

12   A.   I'm sorry, can you -- I don't quite understand.  Can you

13   clarify the question?

14   Q.   Yeah.  Did you tell the government anything else that you

15   weren't necessarily proud of that you had done in your past

16   during the course of your proffer discussions with the

17   government?

18   A.   Yeah.  I discussed with the government times where I

19   hadn't been fully honest or truthful with current or former

20   clients.

21   Q.   Can you describe that?

22   A.   Sure.  There have been a couple times, where by being

23   dishonest, I've been fired by clients, rightfully.  I mean,

24   and, you know, I was fully upfront about that immediately.

25   Q.   Can you describe those circumstances?

KAMRASS - DIRECT

1    A.   Sure.  So, you know, in an instance with Mr. Sittenfeld,

2    I sent him an email that I'd written to look like it had come

3    from someone else, when, in fact, it hadn't.  The email was

4    fake.  I created it myself and sent it to him.

5        And he obviously immediately noticed it, and saw that it

6    wasn't real, and fired me immediately, as he should have.

7    Q.   So you were working for Mr. Sittenfeld at the time?

8    A.   I was, yes.

9    Q.   And in what capacity were you working for Sittenfeld?

10   A.   Consulting for fundraising for his campaign and for his

11   PAC.

12   Q.   When was that?  When did that occur?

13   A.   That was October 2019.

14   Q.   And what was your relationship with Sittenfeld after you

15   stopped working for him in October 2019?

16   A.   Friendly.  I mean, cordial.  We saw each other socially

17   or professionally at times afterward.  He came to my wedding a

18   few months later.  Yeah, generally, fine.

19   Q.   Was that the only time you had been fired based on your

20   conduct?

21   A.   No.  There was one other time where I have as well.  That

22   was a little more than a year prior, in 2018, while working

23   for another elected official, had been asked by someone who

24   was interested in contributing to that person's campaign to

25   help arrange a tour of a facility that they were working in.

1      And I had told that individual that I was working with

2   that elected official's office staff to help organize it, and

3   I wasn't.

4      And so when that became -- when that was made aware to

5   the office staff, they also fired me and let me go.

6   Q.   As you sit here today, how do you feel about your

7   actions?

8   A.   It's incredibly embarrassing.  I'm certainly not a

9   perfect person and, you know, those three incidents are, I

10   think, the lowest three moments certainly in my professional

11   life but probably of my life in general.

12      The only thing I can do is just move forward and tell the

13   truth today, and moving forward, and that's what I hope to do.

14   Q.   All right.  So you testified that you worked as a

15   consultant for Mr. Sittenfeld; is that right?

16   A.   Yes, sir.

17   Q.   When did you first meet Sittenfeld?

18   A.   I believe we first met in around 2013.

19   Q.   Can you describe how it is you started having a

20   professional relationship with Sittenfeld?

21   A.   Shortly after he was reelected to Cincinnati City Council

22   in 2017, I began working for him in his capacity to raise

23   funds to gear up to run for mayor of Cincinnati in 2021.

24   Q.   And can you describe what you were hired to do?

25   A.   Yeah.  My primary responsibility was to organize and

1    maintain fundraising database for both his campaign account

2    and political action committee.

3    Q.   And what did that entail?

4    A.   Working with him to identify potential donors,

5    maintaining progress that he made on soliciting funds from

6    those donors.

7         And then once contributions were received, processing

8    them, depositing them into the bank, and then preparing the,

9    you know, regular reports that were required either for the

10   Hamilton County Board of Elections or the Federal Election

11   Commission.

12   Q.   Did you serve in the role as a political consultant at

13   all for Mr. Sittenfeld?

14   A.   I did, yes.

15   Q.   Can you describe that?

16   A.   Would just give advice on what I thought made sense to

17   help him advance his ability to get elected mayor in 2021.

18   Q.   You mentioned a PAC.  Can you describe the PAC that you

19   were working with on behalf of Sittenfeld?

20   A.   Sure.  It's called the Progress and Growth PAC,

21   registered with the Federal Election Commission.

22   Q.   Do you know the significance of the name the Progress and

23   Growth PAC?

24   A.   As an acronym, it would be PG PAC.

25   Q.   And how did it get that name?

7-29

KAMRASS - DIRECT

1    A.   My recollection is that Mr. Sittenfeld came up with the

2    name.

3    Q.   And based on your conversations with Sittenfeld, what was

4    the PAC's purpose?

5    A.   To defray any costs that he might incur that weren't

6    directly related to aggregating for himself to get elected

7    mayor, so that could be travel costs, meal costs, donating to

8    other political candidates; just generally shoring up his, you

9    know, own political support.

10   Q.   Can you describe, to the extent there's any benefit,

11   what's the purpose of donating to other candidates?

12   A.   It's a -- the main purpose would be to create political

13   allies.  If there are candidates for office running for

14   something, and they knew that you supported them when they

15   were running, the thought is that they'd be more likely to

16   support you when you're running.

17   Q.   And who benefitted from the contributions into the

18   Progress and Growth PAC?

19   A.   Mr. Sittenfeld.

20   Q.   Was Sittenfeld involved in fundraising for the PAC?

21   A.   Yes.

22   Q.   Can you describe his level of involvement in fundraising?

23   A.   Very involved.  Would look through spreadsheets he would

24   maintain regularly, daily, and would oftentimes directly input

25   information that he had about conversations that he had with

KAMRASS - DIRECT

```
1    potential donors into that spreadsheet.

2        And then as contributions were received, was adamant

3    about getting them processed and deposited as quickly as

4    possible.

5            MR. SINGER:  Your Honor, permission to publish what

6    has already been introduced into evidence as USA 40A?

7            THE COURT:  You may do so.

8    Q.   Do you see it on your screen there?

9    A.   I do.

10   Q.   Do you recognize this?

11   A.   Yes.  This is the document filed with the FEC creating

12   the Progress and Growth PAC.

13   Q.   Can you just read the name of committee right there,

14   paragraph 1, Section 1?

15   A.   Progress and Growth PAC.

16   Q.   And then Number 2, can you read the date?

17   A.   February 5, 2018.

18   Q.   Is that consistent with when you remember starting the

19   PAC for Mr. Sittenfeld?

20   A.   It is.

21   Q.   And then 4, can you read Section 4?

22   A.   "I certify that I have examined the statement, and to the

23   best of my knowledge and belief it is true, correct, and

24   complete."

25   Q.   And is that signed by anyone?
```

KAMRASS - DIRECT

1    A.   Yes.  It's signed by me.

2    Q.   And what does it say your role is in Section 4?

3    A.   I served as the treasurer for the PAC.

4    Q.   Can you describe what it meant for you to be the

5    treasurer of the PAC?

6    A.   It meant that I would be responsible for keeping the

7    information that had to be filed with the FEC.  You know,

8    there are regular reporting requirements, and I was the one

9    that was responsible for maintaining that.

10        MR. SINGER:  Ms. Terry, would you mind moving to

11   page 4.

12   Q.   Do you see paragraph 9?

13   A.   Yes.

14   Q.   What does that indicate?

15   A.   The bank at which the checking account for the PAC was

16   registered.

17   Q.   And were you involved in opening the bank account for the

18   PAC?

19   A.   I was, yes.

20        MR. SINGER:  Permission to publish, Your Honor,

21   what's already been introduced into evidence as USA 41C?

22        THE COURT:  You may do so.

23   Q.   Do you recognize this?

24   A.   I do.

25   Q.   What is it?

KAMRASS - DIRECT

```
1    A.   Receipt from Fifth Third Bank showing the creation of the

2    bank account for Progress and Growth PAC that I signed.

3    Q.   Does this indicate that you are a signator on the

4    account?

5    A.   Yes, it does.

6         MR. SINGER:  You can put that down, Ms. Terry.

7    Q.   Who was responsible for tracking money into the PAC?

8    A.   I was.

9    Q.   Did anyone else track the contributions?

10   A.   Mr. Sittenfeld did as well, yes.

11   Q.   Can you describe Sittenfeld's level of involvement in the

12   work that you were doing?

13   A.   Yeah.  He was very granularly involved, more involved

14   certainly than most other clients I had.  Would check records

15   every day, and make sure checks had been deposited.  Would

16   want to know about if there had been any mail received that

17   had contributions on any given day, and would kind of

18   micromanage the process of receiving a check, giving the check

19   to me, and then having the check be deposited within the bank

20   account.

21   Q.   Based on your conversations with Sittenfeld, what was his

22   strategy for raising money into the PAC?

23   A.   Raised from donors who had given either to him before or

24   to other candidates for mayor, or folks who had interest

25   before the city.
```

KAMRASS - DIRECT

1    Q.  Can you describe the conversations that you had with

2    Sittenfeld about raising money from individuals with business

3    before the city?

4    A.  Yeah.  He was very interested in anyone that was either

5    meeting with him in his office.  He instructed -- as I recall,

6    he instructed his office staff to make a list of anyone who

7    had scheduled an appointment in his office, as well as to make

8    lists of anyone that had an ongoing contract for some service

9    with the city.

10        And there had also been discussions about finding out who

11   all had replied to requests for proposals that the city had

12   put out over the course of some time, to see who had wanted to

13   do business with the city.

14   Q.  Did you track at all those types of individuals with

15   business before the city as far as reaching out to them for

16   donations?

17   A.  Yeah.  Those individuals were kept in a spreadsheet that

18   we shared.  And then Mr. Sittenfeld or I would essentially put

19   a number next to each of them that he hoped to ask or solicit

20   funds from.

21   Q.  Did Mr. Sittenfeld use a name to describe these types of

22   donors?

23   A.  These donors were described as transactional donors.

24   Q.  Was that a term used by Sittenfeld?

25   A.  It was, yes.

KAMRASS - DIRECT

1    Q.   Did Sittenfeld say why he used that particular term?

2    A.   As I recall, it was just meant to signify these were

3    folks who were trying to get something out of the city, and so

4    that was why the term transactional was used.

5    Q.   Was this transactional donor list, was it created after

6    the PAC was incorporated?

7    A.   I believe it was, yes.

8    Q.   Did you discuss with Mr. Sittenfeld any other possible

9    candidates for the mayor of Cincinnati in 2018?

10   A.   Yes.

11   Q.   Can you describe who some of those potential individuals

12   would be?

13   A.   Alicia Reece, Christopher Smitherman, Mark Mallory.  I'm

14   sure there were others.  Those are the only ones I recall at

15   the time.

16   Q.   Do you see there's a series of binders in front of you?

17        MR. SINGER:  May I approach, Your Honor?

18        THE COURT:  You may.

19        MR. SINGER:  I just want to direct him to the correct

20   binder.

21        THE COURT:  Sure.

22   Q.   The binder's in front of you.  I'm going to tell you

23   exactly which one to turn to.

24   A.   Okay.

25   Q.   Can you flip to 41H please, for identification?

1    A.   Yes.

2    Q.   Do you recognize this?

3    A.   I do.

4    Q.   And what is this?

5    A.   This is an email sent from Mr. Sittenfeld to myself in

6    2018.

7    Q.   And how do you recognize it as such?

8    A.   The sender is Mr. Sittenfeld's personal gmail account,

9    and I'm the recipient.

10        MR. SINGER:  Your Honor, permission to move USA 41H

11   into evidence at at this time.

12        THE COURT:  Mr. Rittgers?

13        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

14        MR. SINGER:  Permission to publish to the jury?

15        THE COURT:  41H is admitted without objection and may

16   be published to the jury.

17        MR. SINGER:  Ms. Terry, could you please blow up the

18   portion that starts "forwarded message."

19   Q.   Mr. Kamrass, can you please read the subject matter of

20   this email?

21   A.   "CS report findings."

22   Q.   Who did you understand CS to be?

23   A.   Christopher Smitherman.

24   Q.   And who is Christopher Smitherman?

25   A.   He was a member of city council at the time, and was

1    thought to be a potential candidate for mayor.

2    Q.   Then do you see, about a third of the way down, the

3    bolded and underlined.  Do you see that?

4    A.   Yes.

5    Q.   Can you read that, please?

6    A.   "People who gave to both of us."

7    Q.   Based on the context of this email, and your own personal

8    understanding, what did that mean?

9    A.   Those were donors who had given to both Mr. Sittenfeld,

10   his campaign, as well as to Mr. Smitherman's campaign.

11   Q.   Can you please read the subject matter of the email,

12   starting with "I did," until the second tab on the email?

13   A.   "I did a very quick look through of the reports and

14   pulled the stuff below, sure I missed a few, but here are my

15   general findings.

16        "Obviously need to and will make sure labor doesn't

17   support him.  Should stop the developers like Bastos, Neyer,

18   Medpace, et cetera, from supporting both of us, i.e., the

19   reason for the deck we've created, and probably reach those

20   audiences sooner rather than later."

21   Q.   Based on your understanding as the recipient of the

22   email, who is Bastos?

23   A.   My understanding is it was an individual named David

24   Bastos.

25   Q.   Did David Bastos regularly conduct business with the

KAMRASS - DIRECT

1    city?

2    A.  Yes, I believe he did.

3    Q.  And who is he?  What is the nature of his work?

4    A.  I believe in real estate development.

5    Q.  And do you know, based on your understanding, who Neyer

6    is?

7    A.  Yeah.  I believe that's referencing Dan Neyer, or his

8    company, Neyer Properties, also a developer in the city.

9    Q.  Neyer Properties does business in the city?

10   A.  Yeah.  I believe so, yes.

11   Q.  The last one, is it Medpace?

12   A.  I understood it to be Medpace, yes.

13   Q.  Who is Medpace?

14   A.  A company based in the city, that also was doing a lot of

15   development in the city as well.

16   Q.  Had you had conversations with Sittenfeld about raising

17   money from Bastos?

18   A.  Yes.

19   Q.  Do you recall anything specific about that?

20   A.  Just that he suspected he would be a high volume giver,

21   and had given to other races like this in the past.

22   Q.  Did you have conversation with Sittenfeld about raising

23   money from Neyer?

24   A.  Yes.  Same concept.  He had given in the past and was a

25   high potential volume giver.

1   Q.   Did you have conversation with Sittenfeld about raising

2   money from Medpace?

3   A.   Yes.  Similarly, the leadership of Medpace had given to

4   other candidates for mayor in the past.

5   Q.   Do you see where he says, "Should stop the developers --"

6   and then lists those three names -- "from supporting both of

7   us."  What did you understand that to mean?

8   A.   His intention was to make clear to those individuals or

9   entities that he didn't want them to support Mr. Smitherman,

10  as well as supporting him.  He wanted them to solely support

11  him.

12  Q.   And in your experience, how did Sittenfeld intend to stop

13  the developers from supporting both him and Smitherman?

14  A.   By convincing them that he was overwhelmingly likely to

15  be elected mayor, based on his own electoral history in the

16  city, and the overwhelming democratic leaning of the city,

17  that he thought that it would be unlikely that there would

18  be -- that a non-democratic candidate could get elected mayor.

19       So by convincing them that he was likely to win, he --

20  his hope or expectation for them was that they would only back

21  him.

22  Q.   Did he ever indicate to you whether he was paying

23  attention as to whether individuals supported both him and an

24  opponent?

25  A.   Yes, frequently.

1    Q.   Can you describe that?

2    A.   Just that he took note of folks who gave to both, and

3    that, you know, it wasn't something he was likely to forget.

4    Q.   What do you mean "it wasn't something that he was likely

5    to forget"?

6    A.   I understood it to mean when he was mayor, that if he

7    were to be elected mayor, that --

8         MR. C. MATTHEW RITTGERS:  Your Honor, this is --

9    objection.

10        THE COURT:  You can stand and make an objection.

11        MR. C. MATTHEW RITTGERS:  Objection, Your Honor.

12        THE COURT:  Basis?

13        MR. C. MATTHEW RITTGERS:  Speculation.

14        THE COURT:  Sustained.

15   Q.   Did you have any conversations with Sittenfeld in which

16   he expressed what he intended -- if he ever expressed to you

17   whether or not he would treat favorably or unfavorably people

18   who contributed to his campaign?

19   A.   Yes.

20   Q.   Can you describe those?

21   A.   Again, my understanding from those conversations was that

22   he would look more favorably upon those who contributed to him

23   and only him.

24   Q.   There's a reference in the email to the "deck we've

25   created."  What do you understand that to mean?

1    A.   I believe that's referencing a presentation that he had

2    that demonstrated why he was the overwhelmingly likely favor

3    to be elected mayor in 2021.

4    Q.   And based on your personal experience, how did Sittenfeld

5    use that deck?

6    A.   To persuade potential donors why they should give to him.

7    Q.   All right.  Do you know an individual named Chinedum

8    Ndukwe?

9    A.   I do, yes.

10   Q.   During the time you worked for the PAC, did Sittenfeld

11   ever mention a project involving Ndukwe?

12   A.   Yes, he did.

13   Q.   What do you recall about that?

14   A.   Just that there was a project on Elm Street that he was

15   working on, and that he met with Mr. Ndukwe about it, and some

16   people he thought were investors in the project as well.

17   Q.   All right.  Did Sittenfeld request money from Ndukwe in

18   2018?

19   A.   Yes, he did.

20   Q.   And do you recall whether Ndukwe contributed to

21   Sittenfeld in 2018?

22   A.   My recollection is that an associate of Mr. Ndukwe's

23   contributed.

24   Q.   Did you have any understanding as to who the actual

25   source of the donation was?

1    A.   My understanding was that the source was Mr. Ndukwe.

2              MR. C. MATTHEW RITTGERS:  Your Honor, there's no

3    basis for that.

4              THE COURT:  Yeah.  So is that moving to strike, or

5    what are you doing?

6              MR. C. MATTHEW RITTGERS:  Yes, Your Honor, move to

7    strike.

8              THE COURT:  That will be stricken.  If you want to

9    try and establish a foundation, you can do so.

10             MR. SINGER:  Thank you, Your Honor.

11             THE COURT:  The jury shall disregard the answer he

12   gave to the previous question.

13   Q.   Can you please turn in your binder to USA 41G.

14   A.   Yes.

15   Q.   Do you recognize this?

16   A.   I do, yes.

17   Q.   What is it?

18   A.   A series of text messages sent from Mr. Sittenfeld to me.

19   Q.   And how do you recognize it as such?

20   A.   The phone number from which it was sent is

21   Mr. Sittenfeld's, and it was sent to my cell phone.

22             MR. SINGER:  Your Honor, government moves USA 41G

23   into evidence at this time.

24             MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

25             THE COURT:  USA 41G is admitted without objection.

KAMRASS - DIRECT

1      MR. SINGER:  Permission to publish to the jury, Your

2   Honor?

3      THE COURT:  You may do so.

4   Q.  All right.  Can you describe for the jury what we're

5   looking at, Mr. Kamrass?

6   A.  Yes.  These are text messages between Mr. Sittenfeld and

7   myself.

8   Q.  And which of the boxes indicate text messages from you?

9   A.  From me?

10  Q.  From you.

11  A.  Those are in green.

12  Q.  And which indicate messages from Sittenfeld?

13  A.  Those are in blue.

14  Q.  Can you please read the first blue message from

15  Sittenfeld?

16  A.  "Just trying to stay organized on everything.  Did Chin's

17  associate deliver check yet?  And how about Goodin or

18  Graydon?"

19  Q.  Can you read your response, please?

20  A.  "He didn't text me back to meet up today.  And nothing

21  from Goodin."

22  Q.  And then the last message?

23  A.  "Okay.  Just so long as we don't let these people flake."

24  Q.  Did you have any conversations with Sittenfeld as to who

25  was the source of the contribution referenced in this message?

1    A.   My understanding was that Mr. Ndukwe was the source, yes.

2    Q.   In 2018, were you aware of a ballot initiative that could

3    potentially impact your ability to raise contributions from

4    limited liability companies on behalf of candidates?

5    A.   Yes.

6    Q.   Can you describe that, please?

7    A.   The initiative would create an amendment to the city

8    charter in Cincinnati to, essentially, close a loophole that

9    existed, in which any LLC, regardless of who owned it or was

10   responsible for it, could also contribute as an individual.

11        So prior to that ballot initiative, individuals who owned

12   several, ten, I don't know, several LLCs could contribute up

13   to $1,100 each from their LLCs.

14        The charter amendment would close that loophole and say

15   that individuals could only give once, regardless if it was

16   through themselves or through any relevant LLC.

17   Q.   You mentioned LLCs.  Is that an acronym?

18   A.   Yeah, for limited liability corporation.

19   Q.   Do you know whether Mr. Sittenfeld made any public

20   statements about whether he supported the ballot initiative?

21   A.   Yes.  He was publicly supportive of it.

22   Q.   And did Mr. Sittenfeld make any statements indicating

23   whether he thought it would pass?

24   A.   Yeah.  He believed that it would pass easily.

25   Q.   And did the potential change in the law impact

KAMRASS - DIRECT

1    fundraising on behalf of the campaign, in your experience?

2    A.   Yes.  Significantly, yes.

3    Q.   Can you describe that?

4    A.   Individuals who had the capacity to contribute, you know,

5    money orders in magnitude more than the $1,100 maximum, who

6    had been able to do so through LLCs, now could only give

7    $1,100 in total.

8    Q.   Did Sittenfeld ever mention individuals named Brian

9    Bennett and Rob Miller?

10   A.   He did, yes.

11   Q.   And when did you first discuss these individuals with

12   Sittenfeld?

13   A.   I believe it was the second half of 2018.

14   Q.   Were you aware whether Sittenfeld ever met with these

15   individuals?

16   A.   Yes.  I believe he did several times.

17   Q.   How is it that you're aware of that?

18   A.   He relayed to me that he talked with them or met with

19   them.

20   Q.   And what do you remember about the conversation?

21   A.   He solicited funds from them for the Progress and Growth

22   PAC.

23   Q.   And did Sittenfeld receive checks from Mr. Miller and

24   Mr. Bennett?

25   A.   Yes, he did.

KAMRASS - DIRECT

```
 1    Q.   How do you know that?

 2    A.   He told me that he had.

 3    Q.   Did you receive those checks?

 4    A.   Yes.  Mr. Sittenfeld gave them to me.

 5    Q.   And why did you receive them?

 6    A.   For the purposes of processing them, and then enter- --

 7    and then depositing them into the account.

 8              MR. SINGER:  Your Honor, permission to publish what's

 9    previously been admitted as USA 20F?

10              THE COURT:  You may do so.

11    Q.   Do you recognize this?

12    A.   I do, yes.

13    Q.   And what is it?

14    A.   A contribution made out to Progress and Growth PAC for

15    $5,000.

16    Q.   And what is the date on that check?

17    A.   November 27, 2018.

18              MR. SINGER:  Your Honor, permission to publish what's

19    previously been admitted as USA 20G?

20              THE COURT:  You may.

21    Q.   Do you recognize this?

22    A.   Yes.  This is another check, a contribution to Progress

23    and Growth PAC for $5,000 on the same day.

24    Q.   Are these the checks that you received from Sittenfeld?

25    A.   Yes.
```

KAMRASS - DIRECT

1    Q.   And what did you do with these checks after you received

2    them?

3    A.   Began the process of making sure that the PAC had

4    received them.  For both of these checks, I discovered that

5    they were coming from corporations, which my understanding of

6    FEC law was that a PAC could not receive contributions from

7    corporations.

8    Q.   So were you able to deposit these checks?

9    A.   No, I did not deposit them.

10    Q.   Did you receive any additional checks to the PAC from

11    Sittenfeld in 2018?

12    A.   Yes, I believe so.

13    Q.   Were these checks from Rob Miller and Brian Bennett?

14    A.   Yes, that's how it was described to me.

15         MR. SINGER:  Your Honor, permission to publish what's

16    previously been admitted as USA 41A?

17         THE COURT:  You may do so.

18    Q.   Do you recognize this check on the first page of USA 41A?

19    A.   I do, yes.

20    Q.   And what is it?

21    A.   Contribution for $5,000 to Progress and Growth PAC,

22    December 11, 2018.

23    Q.   Can you please read the name on the check?

24    A.   Stirling Securities.

25    Q.   And is that signed by an individual?

KAMRASS - DIRECT

1    A.   I believe Kelly Harrison is the signatory.

2    Q.   And how much is the check for?

3    A.   $5,000.

4        MR. SINGER:  Can you go to page 2, Ms. Terry.

5    Q.   Can you tell whether this check was deposited?

6    A.   Yes.  This is the receipt from Fifth Third showing that

7    it was deposited.

8        MR. SINGER:  Page 3, please.

9    Q.   Do you recognize this?

10   A.   I do, yes.

11   Q.   What is it?

12   A.   Contribution to Progress and Growth PAC for $5,000 on

13   December 11, 2018.

14   Q.   And do you know who provided this check?

15   A.   It's from the Orion Group, signed by, I think, Nathan

16   Baker.

17   Q.   Is this a check you received from Sittenfeld?

18   A.   That's correct, yes.

19   Q.   And where did he say he got the check?

20   A.   He received this check from Mr. Miller and Mr. Bennett.

21   Q.   Okay.  And how much is this check for?

22   A.   $5,000.

23   Q.   And can you tell when this check was deposited?

24   A.   Yes.  This is from Fifth Third showing that the check was

25   accepted into the account.

*KAMRASS - DIRECT*

```
 1    Q.   Do you recognize this check?

 2    A.   I do.

 3    Q.   What is it?

 4    A.   Contribution of $5,000 to Progress and Growth PAC on

 5    December 11, 2018, from CII, Inc., signed by Kate Collins.

 6    Q.   How much is the check for?

 7    A.   $5,000.

 8    Q.   Did Mr. Sittenfeld make any statements as to where he got

 9    this check?

10    A.   This check was also provided by Mr. Bennett and

11    Mr. Miller.

12    Q.   Can you tell whether this was deposited?

13    A.   Yes, it was.  This is from Fifth Third showing it was

14    accepted.

15    Q.   Do you recognize this check?

16    A.   I do.

17    Q.   And what is it?

18    A.   Contribution to Progress and Growth PAC, $5,000, on

19    December 11, 2018.

20    Q.   And who signed it?

21    A.   Mark Davis.

22    Q.   And did Mr. Sittenfeld make any statements as to where he

23    got the check?

24    A.   Yes.  Again, this was provided by Mr. Bennett and

25    Mr. Miller.
```

1    Q.    Who deposited these checks into the Fifth Third account?

2    A.    I did, sir.

3    Q.    Based on your experience working for Sittenfeld, did he

4    pay attention to whether PAC or campaign contributions were

5    deposited into accounts in a timely manner?

6    A.    Yes, he did.

7          MR. SINGER:  Your Honor, permission to publish what's

8    previously been admitted as 40B?

9          THE COURT:  You may do so.

10   Q.    Do you recognize this?

11   A.    I do, yes.

12   Q.    And what is it?

13   A.    This is a campaign finance re- -- or a finance report for

14   Progress and Growth PAC filed with the FEC in January of 2019.

15   Q.    And was this -- you see at the bottom of the page,

16   Section 5, is that your signature?

17   A.    It is, yes.

18   Q.    All right.  Prior to filing this, did you have any

19   discussions with Sittenfeld about who to attribute the checks

20   to on FEC forms?

21   A.    Yes.

22   Q.    Could you describe that?

23   A.    For an LLC to contribute to a PAC, it also has to be

24   associated with an individual.  And so when we received checks

25   for the PAC from an LLC, it would -- Mr. Sittenfeld needed to

KAMRASS - DIRECT

```
 1    get the name of the individual for whom that could be
 2    attributed as part of the report.
 3    Q.   And did you have any conversations with Sittenfeld about
 4    who these checks were attributed to?
 5    A.   Yes.
 6    Q.   Could you describe that?
 7    A.   Once I verified that the entities from those four checks
 8    had come from LLCs and thus could be accepted, under my
 9    understanding, we discussed that there needed to be four
10    separate individuals, since the individual maximum is $5,000.
11         And we discussed that the registered agents and
12    signatories of those checks were those four individuals shown
13    on the checks, and that he would confirm with Mr. Miller or
14    Mr. Bennett that those names were correct.
15    Q.   Can you turn to page 6, please.
16         Before we get to page 6, did Mr. Sittenfeld make any
17    statements as to whether or not Miller or Bennett's name
18    should be attributed on the filing?
19    A.   He had told me that they had indicated they did not want
20    their names on any public report.
21    Q.   All right.  Turning to page 6, sorry, page 7, do you see
22    paragraphs 7A?
23    A.   I do, yes.
24    Q.   Do you recognize the name Mark Davis?
25    A.   I do.
```

1   Q.   Is that the name that was on one of the checks from Brian

2   Bennett and Rob Miller?

3   A.   Yes.

4   Q.   And what is the amount of that check?

5   A.   $5,000.

6   Q.   Do you recognize on the same page in Section C?

7   A.   I do, yes.

8   Q.   Do you recognize that name?

9   A.   Yes, I do, Kate Collins.

10   Q.   Is that a name that was on the check from Rob Miller and

11   Brian Bennett?

12   A.   Yes.

13   Q.   And what is the amount of that?

14   A.   $5,000.

15   Q.   Turn to page 9, please.

16       Do you see 9A?

17   A.   Yes.

18   Q.   Do you recognize that name?

19   A.   I do.

20   Q.   Is this a name on a check that was received by Sittenfeld

21   from Rob Miller and Brian Bennett?

22   A.   Yes.

23   Q.   What is the amount of that check?

24   A.   $5,000.

25   Q.   And then 9C, do you recognize that name?

1    A.   Yes.

2    Q.   Is this the name on a check Sittenfeld received from Rob

3    Miller and Brian Bennett?

4    A.   Yes.

5    Q.   And what is the amount of that?

6    A.   $5,000.

7         MR. SINGER:  Your Honor, may we approach at sidebar?

8         THE COURT:  You may.

9    SIDEBAR CONFERENCE

10        MR. SINGER:  Your Honor, we have a PAC filing that

11   comes from a period that we had neglected to include on our

12   exhibit list.

13        We would ask to introduce it through this witness.  He

14   can authenticate it and testify to its admissibility, but we

15   wanted to raise it.

16        MR. C. MATTHEW RITTGERS:  Is it what you just went

17   through?

18        MR. SINGER:  No.  It's the period from January to

19   July 2019.

20        MR. C. MATTHEW RITTGERS:  Do I have that?

21        MR. SINGER:  You don't, no.

22        MR. C. MATTHEW RITTGERS:  I would need to have this.

23   What's the purpose of the admission?

24        MR. SINGER:  We just want to make sure that the full

25   PAC documents are included in the record.

```
 1              THE COURT:  So have you provided this?

 2              MR. SINGER:  We just pulled it from the FEC website

 3    today.

 4              MR. C. MATTHEW RITTGERS:  I would have to look at

 5    this, Your Honor.

 6              THE COURT:  Yeah.  Mr. Rittgers would, at least, need

 7    the opportunity to consider it.

 8              MR. SINGER:  Absolutely, Your Honor.  Absolutely.

 9              THE COURT:  Maybe we should take a morning break?

10              MR. SINGER:  No objection to that.  I apologize.

11              THE COURT:  One other issue.  Could you refer to him

12    as Mr. Sittenfeld rather than Sittenfeld?

13              MR. SINGER:  Absolutely.

14              THE COURT:  Thank you.

15              MS. GLATFELTER:  I would just note, Your Honor, we

16    want to make sure we're abiding by the Court's instruction.

17       We're not introducing anything about the current status

18    of the PAC.  There's nothing in there that shows --

19              THE COURT:  I understand.  I think Mr. Rittgers

20    should have an opportunity to review it and consider whether

21    he wants to make any objections, and what objections he wants

22    to make, since he's just now receiving this document, so...

23              MS. GLATFELTER:  Absolutely.  I just wanted to make

24    that clear.

25              THE COURT:  Thank you.
```

KAMRASS - DIRECT

1          MR. C. MATTHEW RITTGERS:  And since we're on the

2     record, Your Honor, you know, we just now heard a lot of stuff

3     about straw donor, and FEC, and it's just more reason why we

4     need Caleb Burns.

5          Almost everything that Mr. Kamrass has testified to is

6     legal, except for the straw donor stuff, which is news to us.

7     It's not in the indictment, we were not noticed of straw

8     donors coming into this trial, one.  And two, it's all legal

9     and permissible, but the jury probably thinks that it's all

10     nefarious conduct now.

11          THE COURT:  I think the jury instructions should

12     address those concerns, and the Court will tell them that it

13     is legal, and --

14          MR. C. MATTHEW RITTGERS:  That's fine.  He's been

15     testifying, it was about an hour and half, about targeting

16     people's business in front of the city, that's not in the

17     preliminary instructions.

18          There's nothing in the preliminary instructions, or the

19     jury instructions, I should say, that a candidate can target

20     people who have business in front of the city, including

21     developers.

22          You can have a target list, and it's not prohibited in

23     Cincinnati.  It's not prohibited right now at all.  It wasn't

24     at the time, in 2018 or 2019.

25          A lot of testimony was just elicited that the jurors are

1    going to think is improper and illegal that's, frankly, not,

2    and now we're going to have to go hunting with the defense

3    witness, who is in a proffer agreement, to try to clean this

4    up.

5              MR. SINGER:  Your Honor, this is the subject matter

6    that we briefed in our motion in response to the JK motion to

7    exclude him.  We said this was what he was going to testify

8    about, and the Court found it admissible.

9              THE COURT:  Yeah.  Well, so that's why I asked last

10   evening whether there were other topics that we needed to

11   address in that instruction.

12        And, again, I want to be very clear that I don't think

13   that legal conduct -- that the government should be able to

14   create an appearance of impropriety surrounding illegal

15   conduct.

16        And, you know, I think a lot of aspects of campaign

17   finance law are somewhat foreign to lay juries, and things

18   that sound illicit or nefarious, to use the term Mr. Rittgers

19   just used, in fact are legal under our system of campaign

20   finance.

21        And I do want to make sure that the jury is instructed on

22   the law, and I don't care if the instruction gets long, or if

23   it seems to be a focus.  At this point, it's the government

24   that's making these campaign finance issues somewhat of a

25   focus in this litigation.

1      So I will entertain requests from the defense to expand

2  the instruction to include further descriptions of things that

3  are legal under campaign finance law, because I don't think

4  it's appropriate that you illicit this testimony and make it

5  sound like there's something nefarious going on if when, in

6  fact, what's going on is perfectly legal under campaign

7  finance law.

8      MR. SINGER:  I don't think that anything that we

9  described was inconsistent with the instruction that's already

10  there.  The jury's going to determine whether it was bundling,

11  or they were trying to hide the source.

12      THE COURT:  I think the description of a target list

13  may end up creating some suggestion in the jury's mind, and

14  even the use of the word "target" is somewhat suggestive of

15  something illicit.

16      And I think Mr. Rittgers, at least based on my

17  understanding of campaign finance law, and I'm not an expert

18  on all that but, you know, the jury needs to be instructed on

19  it.

20      If target lists are perfectly permissible conduct, you

21  don't want the jury to have an inference that there was

22  something untoward about the use of a target list.

23      And my understanding of campaign finance law is that

24  there's nothing inappropriate about soliciting contributions

25  from people who have business in front of the office, so long

1    as there is nothing tying the contribution to favorable

2    treatment, or no threat that a lack of contribution will lead

3    to unfavorable treatment.  And, you know, I think the jury

4    needs to be told that.

5            MR. SINGER:  That was the purpose of the testimony,

6    though.  There's a list, and then he went and said that

7    certain -- if they didn't contribute to him, then they would

8    get favorable treatment, unfavorable treatment, so that's the

9    whole point of the testimony.  And it shows intent.  So when

10   he did the same thing with Ndukwe, that that was his intent

11   there.

12           MR. C. MATTHEW RITTGERS:  That wasn't the testimony,

13   I don't believe.

14           THE COURT:  No.  He did testify that his

15   understanding was that the people would receive less favorable

16   treatment if they had not contributed.

17       My only point is if you want to make that argument, I

18   have no problem with that.  But I don't want the jury thinking

19   that merely soliciting contributions from people who happen to

20   have business in front of the city is somehow inappropriate,

21   because I don't believe it is.

22       So I would be willing to expand the instruction to make

23   it clear that the Court is going to tell the jury that there's

24   nothing inherently inappropriate about soliciting

25   contributions from people who happen to have business pending

1    in front of the city.

2              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

3              THE COURT:  We'll have to figure out how to add that.

4              MR. C. MATTHEW RITTGERS:  Thank you.

5              THE COURT:  Do we want to take a break now so we

6    could go through that, Mr. Rittgers?

7              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

8    SIDEBAR CONFERENCE CONCLUDED

9              THE COURT:  Ladies and gentlemen of the jury, we've

10   decided that this would be an appropriate time -- it's a

11   little early, but this would be an appropriate time to take a

12   break to allow us to address a couple matters.

13        I am hoping to keep it to 15 minutes, but probably

14   20 minutes is my realistic, just given the way things are

15   going.

16        So please be ready to come back down in about 15 minutes

17   or so.  As always, please do not discuss this case amongst

18   yourselves.  Please do not do any research about any of the

19   facts that are at issue here.

20        Please do not communicate with anyone about the case.  If

21   anyone attempts to communicate with you, please bring it to my

22   attention immediately.  Please do not begin to form any

23   opinions about the matters at issue in this case.

24        With that, we can take a break.

25        (Jury out at 10:22 a.m.)

```
1              THE COURT:  Anything else we need to discuss before
2    we take our break?
3              MR. SINGER:  No, Your Honor.
4              MR. C. MATTHEW RITTGERS:  No, Your Honor.
5              THE COURT:  Why don't we take about a 15- or
6    20-minute break.  If you need more time, Mr. Rittgers, to
7    review the materials, please let me know.
8          (Brief recess.)
9              THE COURT:  Mr. Rittgers, did you have an opportunity
10   to review that exhibit?
11             MR. C. MATTHEW RITTGERS:  Yes, Your Honor.
12             THE COURT:  Are you prepared to proceed?
13             MR. C. MATTHEW RITTGERS:  Yes.
14             THE COURT:  Do you have any objection to the exhibit?
15             MR. C. MATTHEW RITTGERS:  No, Your Honor.
16             THE COURT:  Very good.  Let's bring the jury in.
17             MR. SINGER:  May I approach to continue, Your Honor?
18             THE COURT:  Yes, although the continued part should
19   wait until the jury gets here.
20             MR. C. MATTHEW RITTGERS:  Your Honor, so long as the
21   non-objection to that exhibit does not, again, waive our
22   objection to the entirety of his testimony.
23             THE COURT:  Absolutely.  Understand.  That is
24   preserved.
25         Do you know approximately how much time you're going to
```

1    be with this witness?

2            MR. SINGER:  Less than five minutes.

3            THE COURT:  Okay.

4        (Jury in at 10:52 a.m.)

5            THE COURT:  Mr. Singer, you may continue.

6            MR. SINGER:  Thank you, Your Honor.

7            THE COURT:  Mr. Kamrass, I'll remind you you remain

8    under oath.

9            THE WITNESS:  Yes.

10           MR. SINGER:  Your Honor, may I approach the witness?

11           THE COURT:  You may.

12   BY MR. SINGER:

13   Q.   I've handed the witness, for purposes of identification,

14   United States Exhibit USA 40F.

15       Do you recognize United States Exhibit 40F, Mr. Kamrass?

16   A.   Appears to be a midyear report filed by Progress and

17   Growth PAC to the FEC in 2019.

18   Q.   Do you see your signature at the bottom?

19   A.   I do, yes.

20   Q.   So can you describe what this document is?

21   A.   One of the periodic reports to the FEC detailing

22   contributions and expenditures.

23   Q.   And how is it that you recognize it as such?

24   A.   This is the form that you put that information on to

25   submit to the FEC.

1          MR. SINGER:  Your Honor, at this time, the government

2     moves for admission into evidence of USA Exhibit 40F.

3          MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

4          THE COURT:  USA 40F is admitted without objection.

5     Q.  Mr. Kamrass, I'm not going to ask you about 40F at this

6     time.

7          How would you describe your interactions with

8     Mr. Sittenfeld about the checks he received from Brian Bennett

9     and Rob Miller?

10    A.  He described that the checks had come from them, and they

11    had given them to him personally and then gave them to me.

12    Q.  Did you have any discussions with Sittenfeld about

13    raising money into the PAC in 2019?

14    A.  Yes.  My understanding was that FEC contribution limits

15    reset every calendar year, so anyone who contributed in 2018,

16    even if it was the max, the maximum allowed, could then

17    contribute again in 2019.

18    Q.  And did you have any discussions with Sittenfeld about

19    raising money to the PAC from Brian Bennett and Rob Miller?

20    A.  Yes.

21    Q.  Can you describe that?

22    A.  He intended to solicit contributions from them to the PAC

23    again in 2019.

24    Q.  Did you have any further discussions with Sittenfeld

25    about Rob Miller and Brian Bennett in 2019?

KAMRASS - DIRECT

1    A.   Yeah.  He had mentioned to me, described them, he thought

2    they might be undercover FBI agents.  He thought there was

3    something not normal about them, and not normal relative to

4    how other developers typically interact.

5    Q.   Did he say anything about what he thought of them

6    personally?

7    A.   He thought they were sleazy.

8    Q.   Can you please look in your binder at USA 41E?

9    A.   Yes.

10   Q.   Do you recognize this?

11   A.   I do.

12   Q.   What is it?

13   A.   An email from Mr. Sittenfeld to me.

14   Q.   How do you recognize it as such?

15   A.   Sent from his personal gmail to me.

16         MR. SINGER:  Your Honor, at this time, the government

17   moves for admission of USA 41E.

18         MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

19         THE COURT:  USA 41E is admitted without objection.

20         MR. SINGER:  Permission to publish to the jury, Your

21   Honor?

22         THE COURT:  You may.

23   Q.   Can you read the date on this email?

24   A.   February 6, 2019.

25   Q.   Do you recall receiving this email?

KAMRASS - DIRECT

```
1    A.   I do, yes.

2    Q.   Did you click on that link?

3    A.   I did.

4    Q.   Embedded in the link are -- is a description of where

5    it's going to go.  Can you describe that?

6    A.   It's a story published by the New York Times the day

7    before about FBI corruption investigations in cities.

8    Q.   Did you click on the link?

9    A.   I did, yes.

10   Q.   Did you read the article?

11   A.   I did, yes.

12   Q.   Do you recall what the article was about?

13   A.   Just that the FBI was prioritizing public corruption in

14   cities across the country.

15   Q.   Did you discuss this email with Mr. Sittenfeld?

16   A.   I did, yes.

17   Q.   What do you recall about that conversation?

18   A.   Obviously, it was something he was concerned about, and

19   then subsequently asked that we move our electronic

20   communication or text messages to a different encrypted act.

21   Q.   Can you describe that?

22   A.   The app that was used was called Signal, and there's

23   settings on it to where you can set the messages to

24   automatically delete after a certain amount of time.

25        And it's also encrypted.  My understanding is that means
```

1    it can't be accessed from anyone else except to the users.

2    Q.   And do you recall any conversations with Mr. Sittenfeld

3    about why he wanted an encrypted app to use for

4    communications?

5    A.   Just that he was concerned about anyone other than the

6    two of us being able to read the content of our conversations.

7    Q.   And this was in response to the email that was in 41E?

8    A.   I believe so, yes.  That's my recollection, yes.

9    Q.   Mr. Kamrass, previously we discussed donor lists.  Do you

10   recall that?

11   A.   I do, yes.

12   Q.   Do you recall whether Mr. Ndukwe was included on the

13   donor list that we previously discussed?

14   A.   He was.

15        MR. SINGER:  No further questions at this time, Your

16   Honor.

17        THE COURT:  Thank you, Mr. Singer.

18                   CROSS-EXAMINATION

19   BY MR. C. MATTHEW RITTGERS:

20   Q.   Mr. Kamrass --

21        MR. C. MATTHEW RITTGERS:  This is not published,

22   correct, Scott?  It's just for me?  Okay.

23   Q.   -- you and I have never met?

24   A.   Sorry?

25   Q.   You and I have never talked about this case, correct?

KAMRASS - CROSS

1    A.    That's correct.

2    Q.    I have an outline list of questions, but before I do

3    that, I just want to go through what I think I heard on

4    direct, because I think a lot of people in this courtroom

5    might not understand PAC and campaign law and fundraising.

6          And I just want to make sure we are on the same page as

7    to what is permissible, legal, and typical in that world,

8    okay?

9    A.    Sure.

10   Q.    Did you prepare with the prosecution before you testified

11   today?

12   A.    I met with the prosecutors, yes.

13   Q.    And they told you what questions they were going to ask

14   you, correct?

15   A.    Not necessarily, no.

16   Q.    You didn't go through an outline as to what they were

17   going to ask you?

18   A.    Generically, yes, but nothing specific.

19   Q.    You didn't review these documents that you've --

20   A.    I did review the documents, yes.

21   Q.    And they generically told you, hey, we're going to talk

22   about this, we're going to talk about this?

23   A.    Correct, yes.

24   Q.    They asked you questions, so they knew how your answers

25   were going to be on the stand, correct?

1    A.   Yes.

2    Q.   All right.  I hear, I believe when you first started, and

3    correct me if I'm wrong during any of this, that you said that

4    when you first, as a campaign strategist, which you are,

5    correct?

6    A.   Correct.

7    Q.   Are you still to this day?

8    A.   I am, yes.

9    Q.   You would ask a potential candidate to go through their

10   phone, potentially, look for friends and family to create a

11   list of target donors, right?

12   A.   That's correct.

13   Q.   You call those donors targets, right?

14   A.   Correct.

15   Q.   And friends and family, you call them targets, right?

16   A.   Anyone, yes.

17   Q.   All right.  And you also look at people who have donated

18   in the past to that individual candidate, they're targets,

19   right?

20   A.   Yes.

21   Q.   And you also look at people who had donated, or

22   fundraised, or bundled to other similar candidates in the

23   past, correct?

24   A.   Correct.

25   Q.   And they're targets?

1    A.   Correct.

2    Q.   You, I believe, testified that your three primary roles

3    as a strategist are to maintain a fundraising database, right?

4    A.   Yes.

5    Q.   A PAC compliance was one of them, correct?

6    A.   There was also compliance council, but I maintained the

7    day-to-day transactions of the account, yes.

8    Q.   And part of how you hold yourself out to the public,

9    specifically people that are going to run for office, is that

10   you can help them with compliance, correct?

11   A.   That's correct.

12   Q.   And you're paid to do that, to help people with

13   compliance?

14   A.   Correct.

15   Q.   And you also, I think, you said the third thing was

16   you're a political consultant?

17   A.   Correct.

18   Q.   When did you say you started working with P.G. as a paid

19   consultant?

20   A.   2018, I believe.

21   Q.   You sent P.G. an email on July 12th of 2017, with an

22   Excel sheet in it?

23   A.   Yes.

24   Q.   Do you recall that?

25   A.   I see it here in front of me.

```
 1              THE COURT:  It's not published to the jury.  I think
 2     it's published to the witness.
 3              MR. C. MATTHEW RITTGERS:  Oh, that might not even be
 4     the email.
 5              THE COURT:  Okay.
 6     Q.   There's a July 2017 email that you sent to P.G. with an
 7     Excel sheet that had -- the title of the Excel sheet was "CBC
 8     and CRBC," this is before you even worked for P.G., right?
 9     A.   Can you tell the date again?
10     Q.   July of 2017.
11     A.   Correct.  Yes.
12     Q.   You were not being paid consultant for P.G., correct?
13     A.   That's right.
14     Q.   At that time, you were working for John Cranley?
15     A.   That's correct.
16     Q.   And so CBC and CRBC stands for Cincinnati Business
17     Committee and Cincinnati Regional Business Committee, correct?
18     A.   Correct.  Yes.
19     Q.   And you created that Excel sheet?
20     A.   I believe so, yes.  I'm not looking at it, but I believe
21     so.
22     Q.   And you created that Excel sheet while you were working
23     for Mayor John Cranley, to determine who he could target for
24     solicitations, correct?
25     A.   Among others, yes.  Yes.
```

1    Q.   Nothing wrong with that, correct?

2    A.   Not as far as I know, no.

3    Q.   It's a common practice in our American democracy,

4    correct?

5    A.   As far as I know, yes.

6    Q.   And you've worked for Nan Whaley, who is currently

7    running for governor, right?

8    A.   Yes.  That was in 2000- -- I don't remember the exact

9    year but, yes, a few years ago.

10   Q.   You've worked for John Cranley?

11   A.   Yes.

12   Q.   You have worked for Greg Landsman's campaign?

13   A.   In the past, yes.

14   Q.   David Mann?

15   A.   Yes.

16   Q.   By the way, David Mann was P.G.'s primary competitor,

17   correct?  I didn't hear that name for mayor.

18   A.   At what time?  At the time we were discussing it, I don't

19   know if David's name had come up.  It might have, I just don't

20   recall in particular.

21   Q.   You've worked for attorney general candidates in the

22   past?

23   A.   Yes.

24   Q.   You've worked for people down in Kentucky?

25   A.   Yes.

KAMRASS - CROSS

```
 1    Q.   Even down in Tennessee?

 2    A.   Yes.

 3    Q.   Aftab Pureval --

 4              THE COURT:  Hang on one second.  Yes, Mr. Singer?

 5              MR. SINGER:  Can we approach, Your Honor?

 6              THE COURT:  Yes.

 7    SIDEBAR CONFERENCE

 8              MR. SINGER:  Your Honor, we briefed in our pretrial

 9    filings that "everybody else does it" is a jury nullification

10    argument, and it seems to be going down that road.

11              THE COURT:  It does seem to be going down that road.

12              MR. C. MATTHEW RITTGERS:  I'm going to ask him if

13    it's legal and permissible.

14              THE COURT:  Well, that's a different question from is

15    everybody else doing it.

16              MR. C. MATTHEW RITTGERS:  Okay.  I'll ask him that,

17    is it legal, and permissible.

18              THE COURT:  Yeah, to the extent he knows.

19              MR. C. MATTHEW RITTGERS:  Sure.

20              THE COURT:  I'm going to allow that, given what's

21    happened on direct.

22              MR. C. MATTHEW RITTGERS:  I understand.

23    SIDEBAR CONFERENCE CONCLUDED

24    Q.   I believe my last question was you also worked for Aftab

25    Pureval, correct?
```

1    A.   Yes.

2    Q.   The Excel sheet that you created that you sent around, it

3    talked about people who have business in front of the city,

4    right, this is the Cincinnati business community, right?

5    A.   I assume many of them had business in front of the city.

6    I don't know if all of them or what it was like, but yes.

7    Q.   Your label, I think, in one of your theme sections was

8    "biz trans," that's your term, right?

9    A.   Uh-huh.

10   Q.   Nothing impermissible or illegal about that, correct?

11   A.   Not as far as I know.

12   Q.   You mentioned on your direct, I believe, that P.G. had

13   direct input in the Excel sheet about donor information

14   contributions, right?

15   A.   That's correct, yes.

16   Q.   Permissible, right?

17   A.   Yes.

18   Q.   In fact, not only is it permissible, it's advisable.  You

19   would want to do that as a candidate, correct?

20   A.   I think so, yeah.

21   Q.   Make sure that you're PAC is in compliance, make sure

22   your eyes are on the actual Excel sheets?

23   A.   Correct.

24   Q.   This PAC was set up, I believe you testified on direct,

25   in February of 2018?

*KAMRASS - CROSS*

1   A.   That's correct.

2   Q.   And it was set up by the help of a couple of lawyers, one

3   is Paul DeMarco, correct?

4   A.   I don't remember explicitly, but that's very possible,

5   yes.

6   Q.   Do you remember the law firm of Manley Burke?

7   A.   Yes.

8   Q.   Manley Burke is a reputable law firm?

9   A.   Yes.

10  Q.   And, in fact, that was an added layer that P.G. had, in

11  addition to you, to make sure that PAC stayed in compliance,

12  correct?

13  A.   That's correct.

14  Q.   Everything went through Manley Burke.  If Manley Burke

15  had a question, you were being paid, they call you and ask you

16  a question about the PAC, correct?

17       THE COURT:  Hang on.  Yes, Mr. Singer?

18       MR. SINGER:  Objection, Your Honor.  He's talking

19  about legal advice that was provided to Kamrass related to the

20  PAC.

21       THE COURT:  So what's the objection?

22       MR. SINGER:  There is some sort of attorney

23  relationship relating to this law firm, and Mr. Kamrass and

24  the work he was doing.

25       MR. C. MATTHEW RITTGERS:  They weren't giving him

KAMRASS - CROSS

1    legal advice, Your Honor.

2              THE COURT:  If you're suggesting he was the client, I

3    assume he could waive whatever privilege he wants to, but...

4    I'm not sure I follow, but I think objection overruled is

5    where I end up.

6         So objection overruled.  You can answer the question.

7    Q.   Do you recall the question?

8    A.   Can you repeat it?

9    Q.   Sure.  I believe what I'm asking is P.G. had an added

10   layer of compliance protection, so that you were not the sole

11   person in charge of compliance.  He was also paying a local

12   law firm to also be in charge of it, correct?

13   A.   That's correct.

14   Q.   Those filings that the prosecution gave you on your

15   direct to admit, those ran through that local law firm,

16   correct?

17   A.   That's correct.

18   Q.   And if they had questions about the way in which you

19   filled out that FEC paperwork, they would call you directly

20   and ask you, correct?

21   A.   That's correct.

22   Q.   Because that was one of your roles, which is to make sure

23   the PAC stayed in compliance, correct?

24   A.   Correct.

25   Q.   Ultimately, when P.G. found out in 2019 that you had been

1    dishonest about something, it was actually about compliance,

2    and that's when he said you got to go, and he let you go?

3    A.   That's correct.

4    Q.   So he took compliance very seriously?

5    A.   I think that's fair.

6    Q.   You mentioned the word that P.G. micromanaged the process

7    when you were speaking on direct.

8        Again, that would be advisable, for a candidate to be

9    very involved in the process of his campaign or PAC, correct?

10   A.   Yes.  I don't think it's not advisable or not advisable,

11   it was just unusual.

12   Q.   Well, if he hadn't micromanaged it, he might not have

13   caught your fake email that you sent him, correct?

14   A.   Very possible, yes.

15   Q.   And you could potentially still be working for him today,

16   and he would be an unknowing, unknowingly receiving input from

17   you that was not honest, right?

18   A.   I don't know.

19   Q.   I believe, when you're working with candidates, and this

20   is legal and permissible, for people to go through their

21   calendar to look for any meetings that they've had in the past

22   or coming up, to find out people who they want to ask

23   donations from, correct?

24   A.   Yes.

25   Q.   And if people don't want to donate, they can just say I

KAMRASS - CROSS

1    don't want to donate, right?

2    A.    Correct.

3    Q.    Including people who had request for proposals in front

4    of the city, that's legal to do as well, correct?

5    A.    It's legal to -- sorry?

6    Q.    Sorry.  Bad question.  It is permissible by law for

7    candidates for office to solicit people who had business

8    before the city, and who have had business before the city in

9    the past, correct?

10   A.    As far as I know, yes.

11   Q.    The deck that the prosecution mentioned on direct, I

12   believe we've heard about that.  That was a two- or three-page

13   piece of information indicating past polling data saying that

14   P.G. was almost certainly going to be the mayor of Cincinnati,

15   correct?

16   A.    Yeah, I don't remember exactly those, the content, but I

17   remember overall the takeaway was that he was overwhelmingly

18   likely to win.

19   Q.    Nothing illegal about that either?

20   A.    Not as far as I know.

21   Q.    Telling a potential donor, hey, you might not want to

22   support my opponent, and showing the donor why the candidate

23   believes that he or she will be successful is legal, and

24   permissible under law, correct?

25   A.    As far as I know, yes.

KAMRASS - CROSS

1    Q.   And that was what the prosecutor mentioned as hedging.

2    That was the conversation you were talking about with deck?

3    A.   Relative to giving to other potential candidates, yes.

4    Q.   In fact, on that email the prosecutor showed you --

5              MR. C. MATTHEW RITTGERS:  And I believe, Your Honor,

6    it was 41H.

7    Q.   Mr. Kamrass, can you see that on your screen?

8    A.   I can, yes.

9    Q.   I'm showing you what has been previously admitted as 41H.

10   The prosecutor asked you about some developer names in here.

11             There are a lot of names on this email, aren't there?

12   A.   Yeah, there are.

13   Q.   And if we look at some of the names, this is 41H, and

14   this is the email that you were discussing the hedging on,

15   correct?

16   A.   Correct.  Yes.

17   Q.   Do you know who Margot Stoehr is?

18   A.   I don't know.

19   Q.   That name's on here, right?

20   A.   It is.

21   Q.   Family friend of P.G.'s?

22   A.   I don't know.

23   Q.   Do you know who the name Greenwald is, Anne Greenwald?

24   A.   I don't know.

25   Q.   P.G.'s second grade teacher.  Top Shepard, do you know

1    that name?

2    A.   I recognize the name, I don't know who that is.

3    Q.   Shepherd Chemicals, family friends.  I mean, the

4    prosecutor, I believe, highlighted three names on this email.

5    Is my memory correct, do you recall that?

6    A.   Correct, yes.

7    Q.   And one of them was Medpace?

8    A.   Right.

9    Q.   Medpace gets drugs through trials, pharmaceutical trials,

10   correct?

11   A.   I don't know what their business is like.

12   Q.   Okay.  And these were some of the people where P.G.

13   wanted to make sure that they didn't hedge, and he wanted to

14   go show them his deck that would say that he was likely to

15   become the next mayor, right?

16   A.   Correct.

17   Q.   And there are a lot of other names on this list as well,

18   and I don't want to bore everybody by going through them, but

19   I listed the first four in this bold block, and we have

20   something called "Code, Pat Crowley."  Do you know who that

21   is?

22   A.   I do.

23   Q.   Pat Crowley is a former reporter, I believe, right?

24   A.   I think that's right, yes.

25   Q.   Turned political lobbyist or something?

```
 1    A.   I think that's right.
 2    Q.   Okay.  There was an email -- sorry.  The text that you
 3    were shown when you were on direct by the government, USA 41G,
 4    do you remember that?
 5    A.   I do.
 6    Q.   And the text said, "Just trying to stay organized on
 7    everything.  Did Chin's associate deliver check yet?  And how
 8    about Goodin slash Graydon?"  Goodin is a local law firm,
 9    right?
10    A.   I believe Graydon is the local law firm.
11    Q.   Thank you.  I misspoke.  Graydon is the local law firm,
12    and Steve Goodin is a lawyer that works there?
13    A.   Correct.
14    Q.   And so he's asking about a law firm donation, and Steve
15    Goodin, a lawyer at that law firm donating?
16    A.   That's how I understood it, yes.
17    Q.   In the same text as Mr. Ndukwe?
18    A.   Yes.
19    Q.   And he says, expressly states, "Did Chin's associate
20    deliver check yet," right?
21    A.   Correct.
22    Q.   You wore a wire after the FBI had you sign a proffer?
23    A.   Correct.
24    Q.   While you had communications with P.G., correct?
25    A.   Correct.
```

1   Q.   And at any point, did you ever say, hey, remember when

2   Mr. Ndukwe's associate gave you that check, that was really --

3   we all knew that was Mr. Ndukwe's money.  Did you ever say

4   anything like that on the wire?

5   A.   That doesn't sound familiar to me, no.

6   Q.   Anything said on the wire, after you were instructed to

7   wear a wire and meet with P.G., which you were, correct?

8   A.   I'm sorry?

9   Q.   You were instructed to meet with P.G. the FBI instructed

10  you to wear that wire and meet with him, correct?

11  A.   I don't remember explicitly if that was an instruction I

12  was given.

13  Q.   But you did wear a wire while you met with him?

14  A.   Yeah.

15  Q.   After you -- after that proffer?

16  A.   Correct, yes.

17  Q.   On more than one occasion?

18  A.   It's been a couple years but, sure, yes.

19  Q.   And nothing illegal, impermissible, or untoward was

20  discussed on that wire, correct?

21  A.   Not as far as I can recall.

22  Q.   And, to your knowledge, P.G. had no idea you were wearing

23  a wire speaking with him, correct?

24  A.   I assume he did not.

25  Q.   And you mentioned Signal.  There was nothing illegal

1    stated on Signal, correct?

2    A.   Not as far as I know.

3    Q.   I'm assuming the FBI asked you those questions, correct?

4    A.   The question -- which question?

5    Q.   About Signal.  Was there anything illegally stated on

6    Signal?

7    A.   Yes.

8    Q.   And your answer was no, there was not, right?

9    A.   I turned over my -- the content of it, yes.

10   Q.   Oh, you turned over the Signal to them?

11   A.   Yes.

12   Q.   Oh, all right.  So they have that, the communication

13   between you and P.G. on Signal?

14   A.   Yes.

15   Q.   Okay.  So if there was something illegal, we can assume

16   they would have presented it to us?

17   A.   I assume so, yes.  I don't know.

18   Q.   The LLC law change, the ballot initiative that occurred

19   in November of 2018?

20   A.   Yes.

21   Q.   Do you remember who sponsored that?

22   A.   The -- on city council, I don't remember who sponsored

23   it.

24   Q.   You mentioned, when the prosecutor had you on direct,

25   about P.G. indicating that the persons who gave him the checks

1   were Rob and Brian.  Do you remember that?

2   A.   I do.

3   Q.   That would be also standard legal practice, to say these

4   are the people who fundraised or bundled for me in giving you,

5   the person in charge of writing the stuff down, those names,

6   right?

7   A.   As far as I know, yes.

8   Q.   And that's legal, to bundle and fundraise?

9   A.   As far as I know, yes.

10  Q.   And in addition to that, it was your job, Manley Burke's

11  job, and maybe others, to find out what individual name was to

12  be attributed to each LLC check, correct?

13  A.   Among others, yes.

14  Q.   And so you are on wires, unknowingly at this point,

15  asking Rob and Brian for names on those checks.  Do you

16  remember that?

17  A.   I do.

18  Q.   And so Rob and Brian gave you the names of those people

19  that we just discussed on that FEC website, right?

20  A.   That's correct.

21  Q.   They said that that's their checks, LLC are attributed to

22  these individuals?

23  A.   That's correct.

24  Q.   And so that's what you put down on that form?

25  A.   That's correct.

KAMRASS - CROSS

1    Q.   And that was your job?

2    A.   Correct.

3    Q.   And Manley Burke then went out and, I believe -- did

4    Manley Burke actually file the --

5    A.   That's correct.

6    Q.   Just to be clear.  I mean, P.G. and you, you didn't even

7    make up those names.  Those came from Brian and Rob, and those

8    friends?

9    A.   That's correct.

10   Q.   The prosecutor asked you a question about whether or not

11   you knew P.G.'s intent to ask for more contributions from Rob

12   and Brian in 2019.  Do you recall that?

13   A.   I do.

14   Q.   Are you aware that he never asked for a single donation

15   from Rob or Brian in 2019 at all?

16   A.   I'm not aware, no.

17   Q.   You think it would be normal, for someone who is running

18   for office, especially when he's talking about -- talking to

19   his campaign and PAC compliance person, to send an article and

20   say, hey, the FBI is looking around at public corruption, and

21   we need to make sure everything is straight and orderly and

22   recorded?

23   A.   Sure.  Yes.

24   Q.   Now I'm jumping into my outline.  I'm going to skip over

25   some stuff that we've already talked about.

KAMRASS - CROSS

1     Part of the reason you sent P.G. the target list in 2017

2  was because you had just done that target list for John

3  Cranley when he ran for mayor in 2017, right?

4  A.   Correct.

5  Q.   And, again, there's nothing illegal about targeting

6  business people in Cincinnati for donations, right?

7  A.   Not as far as I know donations.

8  Q.   Given you're a campaign strategist?

9  A.   Yes.

10  Q.   You're aware that people who often come before or

11  interact with candidates, are often the number one donor base

12  for those candidates, correct?

13  A.   Yeah.  They are frequent donors, yes.

14  Q.   Like, for example, lawyers are the biggest donor base for

15  judges who run for office -- not Judge Cole, he's appointed,

16  but...

17  A.   Yes, that's correct.

18  Q.   I mean, lawyers give the most of any industry to judges,

19  right?

20  A.   I believe that's correct, yes.

21  Q.   In California, it's Hollywood, movie industry?

22  A.   That sounds likely, yes.

23  Q.   Texas, big oil's probably top one, top three, right?

24  A.   That sounds likely.

25  Q.   And in Cincinnati, it has been for a very long time, real

1    estate developers, correct?

2    A.   I believe that's correct.

3    Q.   And so when candidates and consultants go back and look

4    at who are the biggest donors historically over decades, the

5    target lists naturally include real estate developers?

6    A.   Yes.

7    Q.   Including that candidate's friends and family, correct?

8    A.   That's correct.

9    Q.   And candidates need to raise money in order to be

10   successful and run.  We don't have public finance campaigns,

11   correct?

12   A.   Correct.

13   Q.   In your time -- and I'm not talking about with P.G., just

14   in your time with other candidates, you've heard of people

15   being on the host level of fundraisers?

16   A.   I have, yes.

17   Q.   And host level is like a higher fundraising level,

18   typically?

19   A.   Correct.

20   Q.   And I assume that you've -- and that's legal, to host?

21   A.   As far as I know, yes.

22   Q.   Legal to ask somebody to host a fundraiser?

23   A.   Correct.

24   Q.   Legal to ask someone if they want to bundle $50,000?

25   A.   As far as I know, yes.

1    Q.   You keep your ear to the ground here, I assume, with

2    politics in Cincinnati, right?

3    A.   Correct.

4    Q.   Head prosecutor for the county, he raised $600,000 in his

5    first -- remember that?

6    A.   I do, yes.

7    Q.   $600,000, first fundraiser, three families fundraising

8    for him.  Do you remember that?

9    A.   I do.

10   Q.   Nothing illegal about that?

11   A.   Not as far as I know.

12   Q.   You've been -- I assume you've been to nice country

13   clubs, maybe candidates do big fundraisers there, correct?

14   A.   Yes.

15   Q.   I don't believe you were ever at a country club with

16   P.G., correct?

17        MR. SINGER:  Objection, Your Honor.  The sidebar we

18   had previously.

19        THE COURT:  Yeah.  I'm going to allow a little bit of

20   this, but not too much.

21        MR. SINGER:  Thank you, Your Honor.

22   Q.   There's nothing illegal about having a fundraising event

23   over dinner, correct?

24   A.   Correct.

25   Q.   The FBI agents, and I believe the federal prosecutors,

KAMRASS - CROSS

```
1    they were asking you questions around the time of that proffer
2    about bundling.  Do you recall that?
3    A.   Correct.  Yes.
4    Q.   They were asking you questions like is it unusual for a
5    candidate to ask certain individuals to bundle donations?
6    A.   Correct.
7    Q.   Do you remember that?
8    A.   I do.
9    Q.   And you told them that it's not unusual, that candidates
10   can bundle donation?
11   A.   That's correct.
12   Q.   That would have been in what, late 2019?
13   A.   Which?
14   Q.   The conversation with these federal prosecutors and that
15   agent when they're asking these questions.
16   A.   I believe it was likely 2020.
17   Q.   2020?
18   A.   Yes.
19   Q.   And they were asking you questions about bundling and
20   fundraising?
21   A.   That's correct.
22   Q.   And they asked you if a donation was greater than the
23   maximum contribution, in referring to fundraising, what is the
24   assumption then that is made?  They asked you that question,
25   do you recall that?
```

1    A.   I don't recall explicitly, but yes.

2    Q.   That the assumption is that it was bundled, right?

3    A.   Correct.

4    Q.   Bundled and fundraised?

5    A.   Yes.

6    Q.   On direct, you talked about PACs like P.G.'s?

7    A.   Correct.

8    Q.   And you mentioned that you can use some of the money for

9    travel and meals?

10   A.   Correct.

11   Q.   But that would not be travel and meals that are directly

12   related to campaigning?

13   A.   That's correct.

14   Q.   And you can give money to other like minded cam- -- any

15   candidate you want, correct?

16   A.   That's correct.

17   Q.   And you can give money to charities, correct?

18   A.   Correct.

19   Q.   Are you familiar with any charities that P.G. gave money

20   to out of his PAC?

21   A.   I know that he did.  I don't remember which ones

22   explicitly.  I know that he did.

23   Q.   Okay.

24   A.   I believe Easter Seals may be one that he contributed to,

25   but I don't --

1    Q.   Yeah.

2    A.   That's my recollection.

3    Q.   Or Lincoln Wares Walking Club, or --

4    A.   Correct.

5    Q.   I mean, there's not just one, correct?  There's more than

6    one charity that he gave to?

7    A.   I assume that's correct, yes.

8    Q.   And it's for that reason that campaign donations are much

9    more valuable to a candidate than a leadership style PAC

10   donation, correct?

11   A.   I would agree with that, yes.

12   Q.   That's because a campaign donation can be used for a

13   candidate's actual campaign, right?

14   A.   Correct.

15   Q.   Where a PAC donation cannot?

16   A.   That's correct.

17   Q.   So a campaign donation can be used for things like

18   mailers, TV advertising?

19   A.   Yes.

20   Q.   But a PAC donation cannot be used for those things in

21   terms of a candidate's own campaign?

22   A.   That's correct.

23   Q.   And P.G. never used the PAC donations for his own

24   campaign?

25   A.   Not as far as I know.

1    Q.   Or for his own personal gain?

2    A.   Not as far as I know.

3    Q.   He was very strict with not commingling funds between the

4    PAC account and the campaign account?

5    A.   Correct.

6    Q.   The prosecutor, I believe, on direct said that -- or

7    maybe you just testified to this, that P.G. had personally

8    accepted donations from Rob and Brian, or fundraising

9    bundling.  Do you remember that?

10   A.   I do.  Correct.

11   Q.   Completely permissible, right, legal?

12   A.   Yes, as far as I know.

13   Q.   You can go to a fundraiser at a dinner party, or

14   wherever, and get checks from people.  That happens all the

15   time, right?

16   A.   That's correct.

17   Q.   You mentioned some of the compliance, and one of the

18   things that is not required by law but P.G. had set up, and I

19   believe you were involved in this, was to check when someone

20   gave an LLC check to actually make sure it actually was an

21   LLC.  Do you recall that?

22   A.   Yes.

23   Q.   And so I believe you, or someone else on his staff, and

24   this was at his request, would go through and check to make

25   sure that these checks were actually what they purported to

1  be, correct?

2  A.   Correct.

3  Q.   But you can't find on the Secretary of State website

4  every single, individual owner in those small businesses,

5  correct?

6  A.   That's correct.

7  Q.   So all that you'd be able to see would be the designated

8  lawyer or statutory agent, right?

9  A.   In Ohio, it's typically called the registered agent, but

10  yes.

11  Q.   And so that was something that was routine.  It wasn't

12  just with the checks that Rob and Brian gave him.  That was

13  routine.  Any time you guys got checks, P.G. would have you go

14  look, make sure it was appropriate, that it was an LLC,

15  correct?

16  A.   Correct.

17  Q.   And were you involved when P.G. said, you know, they said

18  these are LLCs checks, were you involved when you guys found

19  out that it was not?

20  A.   Correct.

21  Q.   Manley Burke, who helps do the compliance, they're a

22  local law firm here in Cincinnati?

23  A.   That's correct.

24  Q.   A good reputation?

25  A.   I think so, yes.

KAMRASS - CROSS

1    Q.   They do work with corporations and local governments and
2    non-profits?
3    A.   I believe so.
4    Q.   I believe you said this, but whenever someone bundled or
5    fundraised for P.G., not only would he tell you who the checks
6    were attributable to, but he'd also say, hey, note the person
7    who fundraised it, correct?
8    A.   That's correct.
9    Q.   Which is good for recordkeeping for you for future
10   campaigns?
11   A.   Correct.  Yes.
12   Q.   And a fundraiser bundler, they don't have to personally
13   donate, they can just fundraise and bundle and not donate
14   personally, correct?
15   A.   Yes, I believe that's correct.
16   Q.   That's their choice.  Campaign can't force them to
17   donate?
18   A.   Correct.
19   Q.   And it was you and P.G.'s other staff, it was you were
20   relying on the names that people would give you if they had
21   given you LLC checks to attribute to those checks, correct?
22   A.   That's correct.
23   Q.   And that's, in part, because you couldn't find that on
24   some public website.  You could check to see if it was, in
25   fact, a limited liability company, but you had to rely solely

1    on the names that you were given by the people who fundraised

2    and bundled in terms of what you wrote down, correct?

3    A.   Correct.

4    Q.   The prosecutor asked you if you knew the -- I forget the

5    exact question, but he said progress and growth, that had

6    something to do with like P.G.?

7    A.   As an acronym, it would be P.G., yes.

8    Q.   Sherrod Brown has a similar PAC called the Canary PAC?

9    A.   Yes.

10          MR. SINGER:  Judge, objection.

11   Q.   Rob Portman PAC --

12          THE COURT:  Objection.  Sustained, yes

13          MR. C. MATTHEW RITTGERS:  Sustained?

14          THE COURT:  His objection is sustained, yes.

15          MR. C. MATTHEW RITTGERS:  May I ask him about other

16   candidates who used their name in the PAC, like acronyms,

17   or...

18          THE COURT:  So let's go to sidebar.

19   SIDEBAR CONFERENCE

20          THE COURT:  I said in my ruling on the motion in

21   limine we're not going to do a thing where we ask whether

22   every other candidate has done it.

23       It doesn't matter whether other candidates are doing X,

24   Y, or Z.  If you want to, I guess, ask him whether it's a

25   common practice for politicians, in his experience, to name

KAMRASS - CROSS

1     their PACs in ways that reflect them, I'm less concerned about

2     this, because I don't think there's any allegation that it's

3     illegal in any way to name your PAC in a way that the

4     initials -- I'm willing to give you a little more free rein

5     here than things that involve soliciting contributions.

6              MR. C. MATTHEW RITTGERS:  Okay.  Yeah, I'm just

7     bringing it up because that was highlighted on direct that it

8     was progress and growth for P.G.

9         If there's no point for the jury thinking that that came

10    out of the prosecutor's, I want them to know that that's

11    normal and legal.

12             THE COURT:  Okay.  I'll give you some leeway on that,

13    but not on how other candidates solicit funds or solicit

14    campaign contributions, or make promises, or whatever.

15             MR. C. MATTHEW RITTGERS:  Specific to a specific

16    candidate?

17             THE COURT:  Yeah.  We're not going down the other

18    people are doing it road.  I've already said that.

19             MR. C. MATTHEW RITTGERS:  Understand.

20    SIDEBAR CONFERENCE CONCLUDED

21             THE COURT:  You may continue.

22    BY MR. C. MATTHEWS RITTGERS:

23    Q.  Mr. Kamrass, you're aware, and part of your role as being

24    involved in compliance with these PACs, that this type of PAC,

25    candidates are not permitted to put their name in the FEC

*KAMRASS - CROSS*

1    filings of the PAC, correct?

2    A.   Correct.  Yes.

3    Q.   And so it's common for candidates to try to create

4    something where it could be known, the using their name in

5    certain other ways, but not -- they can't write their actual

6    full name in this PAC filing, correct?

7    A.   My understanding is their name cannot be the name of the

8    PAC.  That's my understanding.

9    Q.   But some candidates will use something like --

10        THE COURT:  You may give an example.

11   Q.   Like Rob Portman's PAC.  It's called The Port PAC,

12   correct?

13   A.   The what?  I'm sorry.

14   Q.   The Port PAC?

15   A.   Yes.

16   Q.   And so that would be an example of something similar as

17   P.G.'s Progress and Growth, right?

18   A.   Yes.

19   Q.   And so if we look at that filing, we can assume that his

20   name is not -- Rob Portman's would not be associated in the

21   FEC filing because it's not allowed to be?

22   A.   That's my assumption, yes.

23   Q.   The FBI and the federal prosecutors, there was a proffer

24   agreement, correct?

25   A.   That's correct.

1    Q.   And you reviewed it with your lawyer before you signed

2    it?

3    A.   That's correct.

4    Q.   And read it?

5    A.   Correct.

6    Q.   And it was after -- there's nothing else in writing about

7    promises being made to you from the FBI or the federal

8    prosecutors, correct?

9    A.   That's correct.

10   Q.   And it was after that that you said you would work for

11   the FBI?

12   A.   After the -- are you asking about after the proffered

13   agreement?

14   Q.   After the proffer.

15   A.   I think it may have been before.  I can't remember if it

16   was before or after, around the same time.

17   Q.   They might have interviewed you, and then you got the

18   lawyer, and then you signed the proffer?

19   A.   Correct.  Yes.

20   Q.   And then you began working as an --

21   A.   Correct.

22   Q.   -- undercover, I would assume, right?

23   A.   I don't know what the term is, but yes.

24   Q.   And when you met with the federal prosecutors and the

25   agent, you started -- you talked to them about names of

1    people.

2        I'm not going to get into the names, but there were

3    candidates that you named, there were developers that you

4    named, correct?

5    A.   Correct.

6    Q.   And none of those names were P.G., correct?

7    A.   I don't remember.  It was two years ago at this point.  I

8    don't remember exactly, but -- I don't remember.

9    Q.   Well, you remember talking to them about even specific

10   deals that you thought might have been off?

11   A.   I do recall that, yes.

12   Q.   None of those deals had anything to do with P.G.,

13   correct?

14   A.   Not that I can remember, no.

15   Q.   Before you knew, when you -- you didn't know you were on

16   a wire, but you had interactions with Rob and Brian on many

17   occasions, right?

18   A.   Correct.  Yes.

19   Q.   And because in your capacity working for other elected

20   officials, not just P.G., right?

21   A.   Correct.

22   Q.   And before you even knew when you were on a wire, you

23   talked about P.G. and you said, "Look, he doesn't have any

24   shit in his background, no skeletons whatsoever"?

25   A.   That sounds -- I don't remember exactly, but that sounds

1    correct, yes.

2    Q.   That's what you were saying when you didn't even know you

3    were being recorded on a wire with Rob and Brian?

4    A.   Okay.  Yes.

5    Q.   The prosecutor mentioned something about P.G. and you

6    saying, hey, you know -- actually, I think it was after

7    another indictment, where you guys had a conversation, and you

8    said, "Hey, those guys are probably FBI agents," do you

9    remember that?

10   A.   I do, yes.

11   Q.   And P.G. said he didn't do anything wrong.  He publicly

12   reported all the donations.  And he said it is weird, but he

13   didn't do anything wrong, right?

14   A.   That is what he said to me, yes.

15   Q.   Were you involved at all with P.G.'s, or were you aware

16   of P.G.'s attempts to help Mr. Ndukwe as late as 2020 with a

17   developer named Rob Schiff out of Columbus, when Rob and Brian

18   were long gone?

19   A.   I was not aware of that, no.

20   Q.   I might have said Rob Schiff.  Mike Schiff, does that

21   name ring a bell?

22   A.   I know the name, but I was not aware of that interaction.

23          MR. C. MATTHEW RITTGERS:  May I have one moment, Your

24   Honor?

25          THE COURT:  You may.

1    MR. C. MATTHEW RITTGERS:  No further questions, Your

2  Honor.

3    THE COURT:  Very good.  Mr. Singer, any redirect?

4    MR.  SINGER:  Yes, very briefly, Your Honor.

5    THE COURT:  Very good.

6    REDIRECT EXAMINATION

7  BY MR. SINGER:

8  Q.   Mr. Kamrass, you were asked a series of questions about

9  whether you thought certain things were legal or illegal.  Do

10  you remember that?

11  A.   I do.

12  Q.   Are you a lawyer?

13  A.   I'm not.

14  Q.   Were your answers related to your knowledge in campaign

15  finance?

16  A.   That's correct.

17  Q.   Do you know anything about bribery?

18  A.   I'm not a lawyer.  I don't know.

19  Q.   You're not an expert in bribery?

20  A.   I don't think I am, no.

21  Q.   Same with compliance.  You didn't do the legal part of

22  the compliance; is that right?

23  A.   Correct.

24  Q.   Were you present when Mr. Sittenfeld received the checks

25  from Rob Miller and Brian Bennett?

KAMRASS - REDIRECT

1    A.   I was not.

2    Q.   So did you have any idea what the conversations were

3    surrounding the receipt of those checks?

4    A.   No, I don't.

5    Q.   Do you have any idea of the conversations relating to the

6    acceptance of those checks?

7    A.   I don't.

8            MR. SINGER:  No further questions, Your Honor.

9            THE COURT:  Thank you.

10           MR. C. MATTHEW RITTGERS:  None, Your Honor.

11           THE COURT:  Mr. Kamrass, you may step down.  Thank

12   you, sir.

13           THE WITNESS:  Thank you, Your Honor.

14       (Witness excused.)

15           THE COURT:  Does the government intend to call

16   another witness?

17           MS. GAFFNEY PAINTER:  Yes, Your Honor.  The

18   government will call Laura Brunner.

19           THE COURT:  Very good.

20       (Government witness, LAURA BRUNNER, sworn.)

21           MS. GAFFNEY PAINTER:  May I proceed, Your Honor?

22           THE COURT:  You may, Ms. Gaffney Painter.

23                    DIRECT EXAMINATION

24   BY MS. GAFFNEY PAINTER:

25   Q.   Ms. Brunner, will you please state and spell your name

BRUNNER - DIRECT

1   for the record.

2   A.   Laura Brunner, L-a-u-r-a, B-r-u-n-n-e-r.

3   Q.   Ms. Brunner, where do you work?

4   A.   At the Port of Greater Cincinnati Development Authority,

5   otherwise known as the port.

6   Q.   What is the port?

7   A.   We are a quasi-governmental economic development

8   organization, so we are created under the Ohio Revised Code as

9   a Port Authority, and we have broad economic development

10  powers.  There are about -- probably about 60 port authorities

11  in the State of Ohio.  Ours was created jointly by the City of

12  Cincinnati and Hamilton County.

13  Q.   Now, you mentioned the word "quasi-governmental."  What

14  do you mean by that?

15  A.   So authorities -- if you think of something like a

16  housing authority or transportation authority, authorities are

17  meant to be separate and independent from the government, from

18  either a state or local government, but they're formed by

19  governments to execute on behalf of the public good similarly

20  to government.

21  Q.   What is your title at the port?

22  A.   I'm the president and CEO.

23  Q.   Is that an elected position?

24  A.   No.

25  Q.   How did you get that position?

BRUNNER - DIRECT

1    A.   I applied for the job almost a little more than ten and a

2    half years ago.

3    Q.   Prior to working at the port, what did you do?

4    A.   Most recently, I was the executive vice president at

5    Al Neyer, which is a commercial real estate development firm.

6    Q.   What is your educational background?

7    A.   I have an undergraduate degree in accounting from Indiana

8    University.

9    Q.   Now, generally speaking, what are your responsibilities

10   as the port's president and chief executive officer?

11   A.   Well, it starts with setting a strategy, deciding what

12   our organization is going to do.  We have very broad powers,

13   so we have the opportunity to use those in different ways.

14        We have specifically gotten into the real estate business

15   since I took over ten and a half years ago.  There are other

16   port authorities that run ports, like in Cleveland and Toledo,

17   they actually have ports on the lake.

18        Other port authorities manage bus systems.  Some of them

19   manage airports, and some of them -- probably the vast

20   majority in the State of Ohio are focused just on public

21   finance but, years ago, we decided to focus on real estate

22   revitalization.

23        So my primary job is to set the strategy, and then to

24   hire the people, manage the people to do the work, report to

25   the board.

BRUNNER - DIRECT

1    Q.   You mentioned a board.  What is the board?

2    A.   So in a quasi-governmental and an authority like ours, as

3    I mentioned, the city and the county have established our

4    organization, and they each appoint five members to the board.

5        So I report directly to a board, specifically to the

6    chairman of the board.  There are five appointments, like,

7    citified by the county, and they each have four-year terms.

8    Q.   Who appoints the members of the board?

9    A.   The mayor makes the recommendation to city council, who

10   votes on the members there being appointed by the city.  And

11   then for -- the county commissioner president makes

12   recommendation to the other two county commissioners for their

13   election as well.

14   Q.   What is the mission of the port?

15   A.   So we are focused on what we call broken real estate.  In

16   our county, we have hundreds, probably thousands of acres of

17   property that is being underutilized, and that's for a variety

18   of reasons.

19       It could be that there's contamination on the property.

20   It could be that it's vacant and blighted, been abandoned by a

21   previous owner.  It could be that there are tax liens on it

22   that make it unattractive for the private sector.

23       So we're in the process of taking title to real estate

24   that is in bad condition, for a number of different reasons,

25   and returning it to productive use so that it returns back to

BRUNNER - DIRECT

1    the tax rolls.

2         And while we're doing that, we're focused in a couple of

3    different ways.  We are focused on bringing back residents

4    into the city and the county, filling the neighborhoods back

5    up with people living in the vacant homes, and we're focused

6    in neighborhood business districts to revitalize those that

7    have had many buildings that have been empty for a long time.

8         And then we also are focused on -- within our industrial

9    strategy, we are focused on taking old, sometimes abandoned,

10   very often just underutilized contaminant real estate and

11   getting it all cleaned up so we can attract new manufacturing

12   companies here with really good jobs.

13   Q.   You used the expression, when you just spoke, "tax

14   rolls."  What is that?

15   A.   So different jurisdictions, whether it's the city or a

16   village or the county, rely on different kinds of revenue to

17   support the services that they provide to the citizens.

18        Specifically, in the City of Cincinnati, income tax is a

19   very significant part of the tax of the revenue of the city,

20   so having more people live here and pay income tax, or people

21   working in the city at a manufacturing company pay income tax

22   helps the city.

23        And then also, when we have people -- when we fix up

24   property, whether it's a house or a commercial business

25   property or a manufacturing company with -- a manufacturing

7-104

BRUNNER - DIRECT

1    site, when there's capital investment back in there, then

2    there's going to be property taxes paid again, which then

3    helps the county and all the jurisdictions that rely on

4    property taxes to help fund their work.

5    Q.    What is the relationship of the port to the City of

6    Cincinnati?

7    A.    That's -- it's complicated.  So I -- as I mentioned, I

8    work directly for a board, but we've got a lot of different

9    stakeholders that we're responsible to and accountable to and

10   partner with, so the city is obviously one of our most

11   significant, I'll use the word partnerships, even though there

12   isn't a direct line of authority from me to anybody at the

13   city.

14        The city does make, as I mentioned, appointments to my

15   board, so that's a very important part of my -- of our

16   operations, and then they provide funding.

17        When I started, the funding that the city provided, the

18   city and the county each provided to my organization, was over

19   75 percent of our operating funds.

20        But over time, over the last ten and a half years, I've

21   diversified the revenue in a number of different ways, so now

22   it's about ten percent.

23        So we're not relying on them as much for our operating

24   revenue, but we are a -- we do receive grants for our real

25   estate investments from both the city and the county as well.

BRUNNER - DIRECT

1    Q.   Again, generally speaking, what is the relationship of

2    the port to Cincinnati City Council?

3    A.   So I would say we spend more of our time with -- my staff

4    and me with the administration than we do with the elected

5    officials.

6         We're working through planning and zoning and economic

7    development and the legal department, so we work with a lot of

8    different departments.  I meet monthly with the city manager,

9    so we spend a lot of time on -- at the administration level.

10        And then I have monthly meetings.  I have, over the last

11   decade, generally, monthly meetings with the mayor as to

12   updates of what's happening there.

13        With regard to the city council, I generally have

14   quarterly meetings with city council members, updating them on

15   what's happening.  That's one layer of activity.

16        I also -- we always invite all the council members to

17   ribbon cuttings and ground breakings and other forums and

18   events that we have to, you know, A, help them see what we're

19   doing; and, B, show signs of appreciation and give them

20   speaking opportunities because of the funding that they

21   provide to us.

22        I give presentations, or members of my staff give

23   presentations at council committee meetings, I would say, you

24   know, on average three times a year.  And then we often make

25   presentations during budget hearings, asking -- showing

1    appreciation for previous funding and asking for continued

2    funding.

3         And then on a -- I would say other conversations with

4    council members are really on an ad hoc basis and not

5    especially frequent.

6    Q.  Now, you mentioned the mayor.  What is the relationship

7    of the port to the mayor, again, generally speaking?

8    A.  Well, the mayor is a more important relationship than the

9    members of the council because the mayor is the one that

10   presents his budget to the council, so you really have to

11   start with having funding inside of the mayor's budget before

12   it will go to council for approval.  And the mayor is the one

13   that takes forward board appointments to the council members

14   for consideration.

15        And other than that, the -- it's really, you know, my

16   meetings with the mayor are generally update meetings, making

17   sure that there's alignment on our strategy and the areas that

18   we're focusing on, answering questions.

19   Q.  Now, you mentioned earlier in your testimony that the

20   port has a number of tools available to it to foster

21   development.  What are some of those tools?

22   A.  So the -- all the port authorities in the State of Ohio

23   have a broad set of public finance tools.  One of those is

24   that when we own real estate, we are not subject to sales tax

25   on construction materials, so we often work with private

*BRUNNER - DIRECT*

1    developers.

2         And if you look on the auditor's website, we own, for

3    example, many buildings downtown.  So the developer, the owner

4    of the real estate, will transfer title to us, and we will

5    hire them to do the work, the renovation project, or sometimes

6    a new build like the Kroger Building.  And we will confer,

7    based on that, tax exemption certificates.

8         And then we require that they hold it for at least four

9    years so that they don't flip it quickly.  Those are -- there

10   are other tools like that, a bond bond, we can issue TIF debt,

11   and all of those collectively are meant to encourage economic

12   development.

13        Project -- big economic development projects, especially

14   when you get to the downtown area, have what we always call a

15   gap, that the money that the -- the equity and debt that the

16   project can support exceeds or is less than the cost there

17   would be required.

18        So often, developers will go to a number of sources,

19   whether it's getting tax credits or tax abatements, they're

20   always looking for ways to fill a gap in financing, and we are

21   one of those tools.  We provide a layer.

22        And so to the extent we are saving a developer $500,000

23   in tax, that's less money that the city, for example, would

24   have to put in if they were really motivated to encourage this

25   project to go forward.

BRUNNER - DIRECT

1    Q.    You mentioned TIF debt.  What does that mean?

2    A.    So there's something called tax increment financing that

3    is often used in real estate development and, generally

4    speaking, if you take a piece of property that's worth a

5    hundred thousand dollars right now, and you're going to put a

6    million dollars investment in it, if you put it into a tax

7    increment financing transaction, you're agreeing that the

8    valuation for property tax stays at $100,000.  So the county

9    is just going to get taxed on $100,000, not $1,100,000, for a

10   period of time.

11         So that saves the owner money, that difference that

12   they're not paying in property tax, and they can use that as

13   part of their capital stock to pay for the construction costs.

14   And we will issue debt to cover that.

15         That's a -- not a, you know, very detailed explanation,

16   but it's a way to, once again, take -- nobody's writing a

17   check.  It's just that people are saying we agree we'll make

18   less money for a few years on this project in order to help

19   pay for the cost of it so that it happens later, and we'll get

20   our money later.

21   Q.    You mentioned the transfer of title.  What are the

22   practical effects of the city transferring a property to the

23   port?

24   A.    Our ownership means we take full responsibility for

25   maintenance.  You know, it depends on what kind of property it

```
 1   is; all the responsibilities of real estate ownership, you

 2   know, including deciding what to do with it from that time on.

 3   Q.   Are you familiar with a property at 435 Elm in

 4   Cincinnati?

 5   A.   Yes, I am.

 6   Q.   Now, back in the summer of 2019, what happened with

 7   respect to 435 Elm and the port?

 8   A.   The city transferred title of that property to the port.

 9   Q.   Prior to the transfer of 435 Elm to the port, did you

10   have any conversations with anyone in community and economic

11   development about 435 Elm?

12   A.   Yes.

13   Q.   With whom did you have those conversations?

14   A.   I think the only person I spoke with about it was Phil

15   Denning.

16   Q.   What did you discuss with Mr. Denning about 435 Elm prior

17   to its transfer?

18   A.   He asked me if I would be willing to take control of this

19   property and manage its redevelopment going forward.

20   Q.   What did you say in response to that?

21   A.   I said that I would have to do some due diligence before

22   I could answer that question.

23   Q.   At the time that 435 Elm was transferred to the port,

24   what was your understanding of its status?

25   A.   That it was in horrible shape physically; that the
```

BRUNNER - DIRECT

1    building itself was in horrible shape; that it would have to

2    be demolished for future development.  At that time, there

3    were squatters in the building.  There were two different

4    pieces of litigation that surround it.

5        It is attached to three other properties, so I knew that

6    future demolition would require the negotiation of cooperative

7    agreements with three other property owners.

8    Q.  At the time that 435 Elm was transferred to the port, did

9    anyone have any ideas for redevelopment?

10   A.  I -- I'm sure -- I'm sure they did.

11   Q.  Were you aware of anyone who had ideas about

12   redevelopment for 435 Elm at the time it was transferred to

13   the port?

14   A.  I knew, at or around the time that it was transferred to

15   the port, that one's -- at least one developer was -- had

16   drawings done for -- with ideas for the redevelopment.

17   Q.  Who was that developer?

18   A.  Chinedum Ndukwe.

19   Q.  After 435 Elm was transferred to the port, did you review

20   these materials from Mr. Ndukwe?

21   A.  Yes.

22   Q.  What was your assessment of his plan at the time you

23   first reviewed it?

24   A.  Well, over the course of months, I saw many different

25   iterations of plans from him, but they were never satisfactory

BRUNNER - DIRECT

1    and complete.

2    Q.   Can you explain what you mean by that?

3    A.   Well to -- so when we transfer any property, if I can

4    explain this, maybe.  Whether we're selling a house in

5    Evanston or Avondale, or a vacant piece of ground in a

6    business district, or a big 20-acre manufacturing site, no

7    matter what real estate we own, we have a very thorough review

8    process, because we take very seriously our mission, our goal

9    to return property to its highest and best use.

10        And we want neighborhoods to have quality houses built in

11   the neighborhood.  We want the community to accept what's

12   going to be built there, so we're really very choosey.  So

13   we -- in a plan that's presented to us, we have to know what

14   is going to be built there with quality design that is -- that

15   the neighborhood would approve of.

16        We have to know how much it would cost, and whether those

17   costs have been estimated by a quality contractor.

18        We have to know that the developer or the potential buyer

19   of the property has a financing in place, and we need to know

20   a timeline for the completion.

21        And depending on the use, we want to know how they reach

22   their assumptions.  If you're going to tell me you're going to

23   build a hotel, I want to know how -- why you're so confident

24   that a hotel would be successful, and at what rates you could

25   charge for that hotel.  So there are market studies that would

7-112

*BRUNNER - DIRECT*

```
1    have to be done to help out and get that.
2        And then all of those things go into a financial pro
3    forma that gets presented to us that helps us evaluate the
4    quality of the proposal.
5    Q.   And coming back to Mr. Ndukwe's proposal at this time,
6    and under those factors you evaluated, what was your initial,
7    sort of, assessment of his proposal?
8    A.   I think, throughout the whole process, he had pretty
9    pictures, and he never had costs that I was confident in.  He
10   never had rental rates that I was confident in, hotel rents
11   that I was -- rates that I was confident in.
12       He never shared who a contractor would be.  He never
13   shared who a hotel, if it was going to be a hotel, who that
14   flag would be.  He never shared where the money was coming
15   from, either the debt or the equity.  I never knew how much
16   money he was putting in.
17       And the financial pro formas that he showed me over a
18   period of months changed very dramatically.
19   Q.   Did you discuss Mr. Ndukwe's plan with anyone who worked
20   at the port?
21   A.   Yes.
22   Q.   Who, do you recall?
23   A.   Well, it would have been quite a few people.  At the
24   beginning, probably Melissa Johnson, Todd Castellini, Chris
25   Rucht.  I'll start with those three, at the vice president
```

BRUNNER - DIRECT

1    level.

2        And then later Phil Denning joined the port, and he was

3    involved in conversations with them as well.

4    Q.   Did you discuss Mr. Ndukwe's plan with anyone outside of

5    the port?

6    A.   Well, he had -- I would have discussed it with my

7    attorneys, and then he had a host of parties that he brought

8    to multiple meetings over a period of months.

9    Q.   Do you recall any of those parties that attended those

10   meetings?

11   A.   Yes.  Jim McGraw was the first one, John Curp at one

12   point, Andy Brossart, Richard Hatton.  He had an attorney at

13   Frost Brown named Fred.  I can't remember his last name.  He

14   had members of his staff that could have changed over time.

15   He had Tom Fernandez, the architect.  And that's all I can

16   recall right now.

17   Q.   What did you tell Mr. Ndukwe about his proposed plan for

18   435 Elm at the beginning, after you had assessed it?

19   A.   That he needed -- he was missing the very first

20   fundamental piece of the puzzle, which was a qualified

21   development team.

22       I told him from the very beginning, you cannot build an

23   80 or 100 million dollar project here.  You have no experience

24   here.  You have to find development partners to come to the

25   table with you.

BRUNNER - DIRECT

1   Q.   What are development partners?

2   A.   So there are -- it would be him approaching a qualified,

3   experienced development firm, either in town or bringing one

4   in from another city, that had done projects of this size in

5   an urban environment.

6       And that would have required him to negotiate what was in

7   it for him and what was in it for them, how much money was he

8   putting in, how much money were they putting in.

9       And I didn't care so much about that, what percentage

10  interest he would have.  I was entirely focused on we have to

11  have -- I've got a responsibility that this building is going

12  to be redeveloped in a quality way.

13      Whatever we build here is going to be here for another

14  hundred years.  It has to be the right product and built at a

15  really high quality.  And he had no experience to give me

16  confidence that he could do that himself.

17  Q.   Let's turn now to Mr. Sittenfeld.  Did you ever have

18  conversations with Mr. Sittenfeld about the 435 Elm project?

19  A.   Yes, I did.

20  Q.   If you could, there are multiple white binders in front

21  of you on the table.  We're looking for the binder that has

22  tab USA 44B in it.

23          MS. GAFFNEY PAINTER:  May I approach to assist the

24  witness?

25          THE COURT:  You may.

*BRUNNER - DIRECT*

1    A.   I have it.

2    Q.   Thank you.  Ms. Brunner, we're looking at what's been

3    marked for identification as USA 44B.  Do you recognize this?

4    A.   Yes.

5    Q.   What is it?

6    A.   It is a printout of my AT&T phone bill log.

7    Q.   And how do you know that?

8    A.   Because I'm the one that went through the very difficult

9    task of figuring out how to print it.

10        MS. GAFFNEY PAINTER:  Your Honor, the government

11   moves for the admission of Government Exhibit USA 44B.

12        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

13        THE COURT:  USA 44B is admitted without objection.

14   Q.   The conversations that you had with Mr. Sittenfeld about

15   435 Elm, did you have one conversation or many conversations?

16   A.   Many.

17   Q.   What did you and Mr. Sittenfeld discuss about 435 Elm?

18   A.   Well, I think there was really just one very simple

19   theme, which was that he wanted me to enter into some kind of

20   agreement with Mr. Ndukwe, and he wanted me to do it at as

21   close to one dollar as I possibly -- wanted me to do it for a

22   dollar.

23   Q.   What did Mr. Sittenfeld tell you about 435 Elm and

24   Mr. Ndukwe's proposed project?

25   A.   That he felt that this was an important corner for

BRUNNER - DIRECT

1   redevelopment, and he thought it was very important for our
2   city to have a black developer do the project.
3   Q.   Now, you mentioned the property for a dollar.  Is this
4   something that the port does or has done, provide property for
5   a single dollar?
6   A.   No.  In the course of ten and a half years, I think we've
7   sold 20 -- we've sold over a thousand parcels in Hamilton
8   County in the last ten and a half years, and I think we've
9   sold 22 of them or so for a dollar.
10       And those are single-family lots in the Mill Creek
11  corridor that we have sold to neighboring homeowners who are
12  taking care of vacant land.  So we set up a dollar a lot
13  program for that community, where there really was no market
14  value, and -- to help them have ownership of the property they
15  were already taking care of.
16  Q.   And for those deals, where you offered the property for a
17  dollar, what were the considerations that you weighed before
18  engaging in those transactions?
19  A.   That there would -- there had been no market activity in
20  those communities for a very long time, and that we could hold
21  the properties for another ten years and nobody would buy them
22  from us, so that it was -- we worked with the community in
23  the -- actually, they're the ones that approached us to ask
24  for consideration of this so that they could have more
25  ownership of their neighborhood.

BRUNNER - DIRECT

1    Q.   Going back to the considerations that you weigh on the

2    port before you engage in transactions, is sort of these

3    community values something that is considered when you are

4    evaluating a transaction on behalf of the port?

5    A.   Very much so.

6    Q.   Returning to your communications with Mr. Sittenfeld

7    about 435 Elm, what was your reaction to these communications?

8    A.   I think, probably, in the first couple of times, it was

9    fine, and I just assured him, yes, I'm talking to Chin.  He is

10   not in a place where I'm comfortable moving forward.  I've got

11   this.  You know, like, I'm on it.

12        But then over time, they became more frequent and perhaps

13   more aggressive, and my reaction was I -- once again, I have

14   this.  This is my responsibility to determine the highest and

15   best use, and I'm doing my best.

16   Q.   When you say "aggressive," what do you mean?

17   A.   They're just too frequent, and too long, and too direct.

18   Q.   After 435 Elm was with the port, what options did you

19   consider with regards to a development deal for that property?

20   A.   Well, I told Chin from the beginning -- when he came to

21   me and he had purchased a note, and he felt that that gave him

22   the rights to get this property at such a discounted price,

23   and I told him from the very beginning, I'm sorry that you

24   paid so much money for this note.  It has no value.  And

25   that's unfortunate for you.  I will give you an opportunity to

BRUNNER - DIRECT

1    make money on this project, to be a part of the development

2    team.

3        I will not start engaging with anybody else and give you

4    time to put together -- you know, to find partners and put

5    together an adequate proposal.

6        So that was one track that was going on throughout this

7    whole time frame was just basically meeting with him and

8    hoping that he would come through.

9        Meanwhile, as I mentioned, we had a lot of other things

10   to consider with the property, including getting the squatters

11   out of it, and resolving litigation with a previous -- that we

12   inherited from the City of Cincinnati with a previous tenant.

13       And the other piece of litigation surrounding this

14   property was with Chin himself.  And I tried to get him to

15   sign a waiver on that, which he refused to do, so his

16   litigation itself has stood in the way of our redevelopment so

17   far.

18       At the beginning, when he first came to me, he was going

19   to demolish the property himself, which surprised me, because

20   he does not have a demolition company.  And I had explained to

21   him the bonding for a project of that size would be very

22   significant.

23       And he said that he had identified another demolition

24   contractor somewhere in the country that he was going to

25   purchase and bring to town.

 1          And then even as recently as the last couple of months,

 2     he's now filed -- or maybe the last month, he's now filed an

 3     injunction to prevent us from the demolition of the building.

 4          So the litigation with him has slowed the progress, but

 5     we have continued to work on the cooperative agreements that

 6     are necessary for demolition with the other three property

 7     owners.

 8          We have written the bid specs for demolition, as soon as

 9     we're able to move forward with those, and we've applied for a

10     grant from the State of Ohio to assist us in paying for the

11     demolition.

12     Q.  When you were considering the different options for

13     435 Elm, did you consider, at any point, an RFP?

14     A.  Yes, I did.  I did.  And I know, to your earlier

15     question, I did also met with Steve Leeper from 3CDC to ask

16     him if he'd be willing to review responsive to an RFP once I

17     got to that point, and he agreed that he would do that.  So

18     that's one other person I did talk to.

19          But we were never in a position to move that far ahead

20     because no -- we would not do an RFP until we had that

21     property demolished.  That is a very significant part of the

22     work that we do is the horizontal, we call it cleanup, of a

23     property to do the demolition.

24          I'm sure the building has asbestos in it.  We have to do

25     remediation and demolition and in-site clearance, and then

BRUNNER - DIRECT

1    you've got a nice, clean piece of property that you're more

2    likely to have success with when you do an RFP, rather than

3    sending out this lovely building in its current condition,

4    saying, hey, who the heck wants to come in and take a swipe at

5    this.

6    Q.  What is an RFP?

7    A.  It's a request for proposal that would be sent to

8    qualified developers, developers that had experience in this

9    size, a project in urban environments, in other cities.

10   Q.  And what is the goal of an RFP?

11   A.  Competition, and in getting the best ideas possible.

12   Q.  Now, during your conversations with Mr. Sittenfeld about

13   435 Elm, did you communicate that you were considering an RFP?

14   A.  I do not recall that.

15   Q.  While you were considering Mr. Ndukwe's proposal for

16   435 Elm, what were some of the other ideas you had to move the

17   project forward?

18   A.  Well, we were focused on the physical asset and, like I

19   said, resolving litigation, getting the property -- getting

20   the squatters out, which we did, resolving the other piece of

21   litigation, which we did.

22       We emptied the building.  We worked with non-profits, and

23   donated a significant amount of the personal property that was

24   in the building to non-profits, and secured the building.

25       And we spent an awful lot of time working on these

BRUNNER - DIRECT

1    cooperative agreements, especially with Whex Garage, which is

2    immediately adjacent.

3        And then the garage has two skywalks, one to the Hyatt

4    Regency and one to the Convention Center, so those are the

5    other two agreements we had to have in place that would allow

6    us to demolish the skywalk when we demolished the building

7    itself.

8        So we did not spend very much time -- I probably had a

9    few people, over the course of three years, reach out to us

10   expressing interest in being the developer, but we've never

11   moved forward on putting that at the highest priority because

12   we had to focus on litigation before we could do that.

13   Q.   At any point in your conversations with Mr. Ndukwe, did

14   you discuss a ground lease?

15   A.   Yes.

16   Q.   What's a ground lease?

17   A.   So a ground lease would allow the port -- under a ground

18   lease, the port would retain ownership of the land for the

19   future, and then lease the property aboveground for the

20   construction of a new building to a private party.

21       So they would own the building, and then pay rent for the

22   ground.  That is important in places -- on properties that are

23   so significant to our city.

24       And I felt that with the Convention Center District

25   there, that it was important for the public sector.  And we

BRUNNER - DIRECT

1    are part of the public sector and, you know, working

2    collaboratively with the city and the county and the

3    Convention of Visitors Bureau, and now 3CDC and others,

4    that -- it's going to be a bigger group of people that, for

5    the long-term, are going to decide what we want these

6    properties around the Convention Center to look like, so

7    having ownership of that property for the long-term would be

8    important.

9    Q.  What was Mr. Ndukwe's reaction to the proposal of a

10   ground lease?

11   A.  Very unfavorable.

12   Q.  Did you ever discuss the possibility of a ground lease

13   for 435 Elm with Mr. Sittenfeld?

14   A.  I'm sure I did, because I know, over the course of these

15   months with Chin, he at one point -- like I said, he presented

16   many different options and kind of crazy proposals.

17       And at one point, he did say, I'll pay $66,000 a year,

18   instead of my proposed, I think, $330,000.  And so part of my

19   conversations with Mr. Sittenfeld regarded what I was going to

20   charge him and what he -- whether he deemed that to be fair.

21   Q.  What was Mr. Sittenfeld's reaction to the ground lease

22   proposal; if you recall?

23   A.  I don't recall specifically.

24   Q.  How does the port generally, under your leadership,

25   balance the community interest, the highest and best use of

1    the property, with any sort of profit motivation?

2    A.   It's always a challenge, but what we often do is -- it's

3    not easy to determine the value of property that we own

4    because it's often in places where there hasn't been a lot of

5    market activity.

6         So what we often do is say to the person that wants to

7    buy property from us, whether it's a house, or a small

8    commercial property, or something large like this, we say put

9    a financing proposal to give us a -- give us a financing

10   proposal.  We want you, the private sector, to make money.

11        We want -- don't want to charge you so much that it is

12   not a good transaction for you; but yet, on the other hand, we

13   cannot unjustly enrich you and just start giving property

14   away, because that is favoring the few instead of the many,

15   and where we can charge more, what we would call market value,

16   then we're able to take those proceeds and invest in our work.

17        So we're trying to -- we know we lose a lot on some

18   properties, and we're going to lose less on other properties,

19   so we rely on the financial proposals that are given to us to

20   have a conversation about reasonable profit for the private

21   sector versus what we think.  You know, we're often debating

22   those two things against each other.

23             MS. GAFFNEY PAINTER:  May I have just a moment, Your

24   Honor?

25             THE COURT:  You may.

1    Q.   Ms. Brunner, returning to your communications with

2    Mr. Sittenfeld about 435 Elm, what was your perception of

3    those communications?

4    A.   That he wanted me to enter into an agreement with

5    Mr. Ndukwe, regardless of whether I thought it was a good idea

6    or not.

7              MS. GAFFNEY PAINTER:  No further questions, Your

8    Honor.

9              THE COURT:  Thank you.  Mr. Rittgers, I'll note the

10   time is 12:20.  Do you have a sense of how long your

11   cross-examination will be?

12             MR. C. MATTHEW RITTGERS:  It might be best to break,

13   Your Honor, for lunch.  I just don't want to hold people up.

14             THE COURT:  Sure.  Very good.  You'll be able to

15   return after lunch?

16             THE WITNESS:  Yes.

17             THE COURT:  Ladies and gentlemen of the jury, I

18   think, at this point, we're going to take our lunch break.

19   We'll try to start by 1:30.  It's 12:20 right now.  Please be

20   back by 1:20 so we can summon you down and try and get started

21   by 1:30.

22      As I've mentioned on multiple occasions, and I'm sure

23   you're probably sick of hearing, please do not do any research

24   on this case.  Please do not discuss with each other the

25   testimony or evidence that you see.

1      Please do not communicate with anyone about the case.

2    Please do not allow anyone to communicate with you about the

3    case.  If anyone should attempt to, please let me know

4    immediately.

5      And please do not start to form any final opinions about

6    the facts or evidence that you've heard to date.  That will

7    await all of the evidence, instruction on the law, and the

8    closing argument.

9      And with that, have a good lunch.

10    (Jury out at 12:20 p.m.)

11      THE COURT:  Is there anything we need to discuss

12    before we break for lunch?

13      MS. GAFFNEY PAINTER:  I don't believe so, Your Honor.

14      MR. C. MATTHEW RITTGERS:  I don't think so, Your

15    Honor.

16      THE COURT:  All right.  Please try to be back by

17    1:15, 1:20, so if there's anything we need to talk about, we

18    can get the jury in by 1:30 and get started.

19      All right.  We can break.

20    (Lunch recess.)

21      THE COURT:  Is there anything we need to discuss

22    before we bring the jury in?

23      MS. GAFFNEY PAINTER:  Not from the government, Your

24    Honor.

25      MR. C. MATTHEW RITTGERS:  Not from the defense, Your

*BRUNNER - CROSS*

1      Honor.

2              THE COURT:  Okay.  Is the jury assembled?

3          (Jury in at 1:28 p.m.)

4              THE COURT:  Ladies and gentlemen of the jury, I hope

5      you had an enjoyable lunch.

6          I think, when we left, we were getting ready for

7      Mr. Rittgers' cross-examination.  Mr. Rittgers, you can

8      proceed.

9              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

10                     CROSS-EXAMINATION

11     BY MR. C. MATTHEW RITTGERS:

12     Q.   Good afternoon, Mrs. Brunner.

13     A.   Good afternoon.

14     Q.   You and I have never talked about this case or your

15     testimony, correct?

16     A.   Correct.

17     Q.   On direct examination, when the prosecutor was asking you

18     some questions, I just wanted to highlight a couple things,

19     and correct me if I'm wrong.

20         The City of Cincinnati and the port have -- that's the

21     most significant partnership that the port has is with the

22     City of Cincinnati, correct?  I know it's not a technical

23     partnership, but...

24     A.   No.  I can't say it's more important than the

25     relationship I have with the county.

*BRUNNER - CROSS*

1    Q.   Okay.  I thought maybe it's one of the most significant

2    partnerships that the port has --

3    A.   Clearly, among some other --

4    Q.   -- is with the city?

5    A.   Clearly, one of the most significant relationships is

6    with the city.

7    Q.   And there's no direct line that you have with someone in

8    particular with the city, although you do meet with people

9    like the economic development director and some of the

10   individual council members directly at times?

11   A.   There is no direct -- I have no accountability to anybody

12   at City Hall.

13   Q.   In 2019, when this property was transferred to the Port

14   Authority for a dollar, there was, to your knowledge, one

15   developer interested in redevelopment of 435 Elm, correct?

16   A.   I was aware of one.

17   Q.   And that was Mr. Ndukwe?

18   A.   Yes.

19   Q.   And I believe you went through a list of factors, when

20   you were talking on direct -- do you need water?  Sorry.  I

21   thought you --

22   A.   Huh-uh.

23   Q.   Okay.  Sorry -- that you wanted to see before you could

24   approve a development.  Do you recall that?

25   A.   Yes.

*BRUNNER - CROSS*

1    Q.   And one of them was reputable contractor, right?

2    A.   Yes.

3    Q.   One of them was financing in place?

4    A.   Yes, of that, and equity.

5    Q.   And equity.  The third, I believe, was -- you mentioned a

6    hotel, and you mentioned that it shouldn't have just been like

7    saying a hotel.  You wanted to know if there was an actual

8    flag, like what type of hotel would agree to come there?

9    A.   Yes.

10   Q.   Architect was mentioned, correct?

11   A.   Yes.

12   Q.   And you already mentioned equity, which I have later in

13   my list.

14        Were you aware about these guys named Rob and Brian?

15   A.   I knew that Chin had investors.  I never knew their

16   names.  He never shared with me who his partners were.

17        I never knew whether the initial purchase of this note

18   that he made was just him or other people.  I never knew

19   exactly what the relationship was with Mike Schiff so, no, he

20   never shared with me any of his partnerships, if you will.

21   Q.   Is it -- were you ever told that he had the backing of an

22   out-of-town real estate developer named Rob, who had the

23   ability to come up with millions of dollars to invest in

24   435 Elm?

25   A.   Honestly, I thought that these two out-of-town

1      individuals were investors.  I was never told they were

2      developers.

3          He had other -- like this Mike Schiff from Columbus that

4      he brought in, claiming that he was a developer.  But the

5      out-of-towners that I heard of, I always heard referred to as

6      investors, never as developers.  Certainly, never with any --

7      I was never presented with any qualifications that they had as

8      developers, and he never represented they were to be his

9      development partners.

10     Q.  Were you ever told that Turner Construction was likely to

11     be the contractor?

12     A.  I was told that by Chin, and was told by Dave Spaulding

13     of Turner that he had not made -- that Chin was

14     overrepresenting the conversations that they had had.

15     Q.  Had you been told that IHG Hotels wanted to put an indigo

16     hotel in at 435 Elm?

17     A.  I don't recall if he ever gave me the brand of a hotel, a

18     flag.

19     Q.  And I believe you might have mentioned this, but on the

20     equity piece, you were never told that Rob and Brian had a big

21     group of out-of-town --

22     A.  No, because frankly, he never --

23     Q.  -- investors, for lack of --

24     A.  In the pro formas that he gave me, that changed

25     dramatically, he changed the amount of equity.  And it wasn't

1    that much.  I mean, he was relying on tax credits, the TIF --

2    well, not really tax credits.  The TIF I mentioned earlier, I

3    think he was relying on that for $15 million.

4        But, I guess, to answer your question, the amount of

5    equity he was going to put in this changed with each of his

6    different pro formas he gave to me, and he never, ever shared

7    with me who those parties were.

8    Q.   During your conversations with P.G., did you ever become

9    aware of the fact that he, P.G., and you were operating on two

10   different sets of information?

11   A.   I specifically asked P.G. at one point in a text

12   whether -- Mr. Ndukwe called me and said that his investors

13   were friends of P.G.'s, and they were calling -- I can't

14   remember if they were calling P.G., I'm sorry, Mr. Sittenfeld,

15   or if he was calling them.

16       I asked him to clarify whether he was friends with these

17   investors, because that's what I was hearing from Mr. Ndukwe,

18   but I never knew what those relationships were.

19       And to your bigger question, I never had conversations

20   with Mr. Sittenfeld about the substance of what Mr. Ndukwe was

21   proposing to me.  It was simply he wanted him in control, and

22   then let him go do his thing and get his whole team in place.

23       And I kept saying I have to have a plan.  It all has to

24   be done before I give him control.

25   Q.   Because you didn't think that there was a team in place

*BRUNNER - CROSS*

1    at the time?

2    A.   I knew there wasn't a team in place.  I went as late as

3    January to Columbus with Chin and Mike Schiff, and I was told

4    that that -- I think that was in January, I could be wrong.  I

5    was told then that that was his development partner.

6        And we went up there to tour, and I figured out that,

7    really, he's not a developer, he also is an investor.  He has

8    a stake in a lot of real estate investment in downtown

9    Columbus, but he wasn't the developer.

10       So then I pushed Mike Schiff on who would the developer

11   be, and he said he would get a local development partner.  And

12   to my knowledge, he approached at least two or three local

13   developers that declined to partner with him.

14       So, you know, I don't think that there was separate sets

15   of information.  I think it was, A, the information was

16   changing a lot, and it was never very clear.

17   Q.   On the separate sets of information, you don't know what

18   P.G. was told by Rob or Mr. Ndukwe, correct?

19   A.   No.  I was never a party to any conversations.

20   Q.   You don't know if he was told that it was an indigo

21   hotel, you don't know if he was told there was a $75 million

22   deal, you don't know if he was told that Turner Construction

23   was going to be the contractor for this project, correct?

24   A.   No.  But I know that I told him I did not have a plan

25   that was satisfactory, and that the financing was all over the

BRUNNER - CROSS

1   place.

2   Q.   Okay.  I believe you ended your direct talking about P.G.

3   calling you many times about 435 Elm, correct?

4   A.   Yes.

5   Q.   You and P.G., in 2018 and 2019, you talked on the phone

6   about various topics, correct?

7   A.   Not so -- well, yes.

8   Q.   And you text on occasion?

9   A.   Yes.  It was more on the phone than it was by text, yes.

10  Q.   Sometimes you'd email?

11  A.   Probably.  I don't have direct --

12  Q.   But you talked on the phone more than email and text?

13  A.   With him in particular, yes.  I think there was more

14  phone conversation than there was written.

15  Q.   And you had known P.G. for many years?

16  A.   Yes.

17  Q.   In fact, back in the summer of 2018, you and P.G. were

18  emailing about opportunity zone funding and planning for the

19  region.  Do you recall that?

20  A.   I'm sorry, we were emailing about what?

21  Q.   Opportunity zone funding and planning for our region.

22  A.   Oh, I don't remember the opportunity zone conversation in

23  particular, but that doesn't surprise me that we would have,

24  or -- that summer, there were a lot of conversations with a

25  lot of different people talking about that.

7-133

*BRUNNER - CROSS*

1    Q.   All right.  And that summer, you invited leaders and

2    council members to do a port tour, correct, tour industrial

3    sites?

4    A.   We did tours every month or six weeks for a couple years,

5    and we invited administration and elected officials from the

6    city and the county, and a lot of other dignitaries.

7    Q.   Do you recall an email that P.G. included you on, where

8    he was encouraging other council members to go on the port

9    tour because he was the only one that went?

10   A.   I recall him, after he came on our tour -- I don't know

11   if it was that social media post or an email from the council

12   members, but I remember him saying something positive about

13   the results of the tour and encouraging others to participate.

14          MR. C. MATTHEW RITTGERS:  Your Honor, if I may

15   approach?  This is Defendant's Exhibit 105.

16          THE COURT:  You may.

17   Q.   Mrs. Brunner, if you could take a look at that.

18   A.   Yes.  As I said, I remember he did something positive

19   after that.

20   Q.   And so after looking at that document, Defendant's

21   Exhibit 105, you can now say that P.G. emailed council, and I

22   believe you were on the email, encouraging them to do that

23   tour so they can actually put their feet on the ground or eyes

24   on the port's property projects, correct?

25   A.   Yes.

1    Q.   There were also times in 2019 where you would email P.G.

2    about development deals on port sites, and tell him your

3    thoughts about tax abatements and CRAs, correct?

4    A.   I don't remember anything specific on those subjects.

5         MR. C. MATTHEW RITTGERS:  Your Honor, if I may

6    approach?

7         THE COURT:  You may.

8         MR. C. MATTHEW RITTGERS:  This has been previously

9    marked as Defendant's Exhibit 103.

10   Q.   Ms. Brunner, have you had a moment to review that?

11   A.   Yes.

12   Q.   And so this is an email, you to P.G., talking about TIF

13   funding and a CRA, correct?

14   A.   Yes.  It doesn't reference what project it was, so I --

15   but it's a pretty general statement, but yeah.

16   Q.   It might have been the Brown field, which the old

17   brewery -- I forget which one, but the --

18   A.   I don't think it would have been Hudepohl, but...

19   Q.   Hudepohl, that's what I was thinking about.

20   A.   I don't know.

21   Q.   But the timing, this was January 2019?

22   A.   Yes.

23   Q.   And just so that we're clear, you are emailing P.G.

24   discussing the TIF being for 20 years, CRA for 65 percent at

25   15 years?

1    A.   I can't -- so I'm emailing him, and I can't tell what's

2    at the top there, if that's -- that looks like that's him

3    emailing me.

4    Q.   Oh, he forwarded this email from me to you, so...

5    A.   Oh, oh, that's right.  Yes.  Yes, it's an email to me.  I

6    don't know if it was following -- it would have been initiated

7    by something, either a phone call or an email.  I'm obviously

8    answering some kind of question.  I just don't recall the

9    question.

10   Q.   And you tell him that you're going to circle back with

11   him after you have a couple more council meetings, and you

12   thank him for his input and guidance, correct?

13   A.   Uh-huh.  Yes.

14   Q.   And this was not about 435 Elm, correct?

15   A.   No.

16   Q.   You would, on occasion, schedule meetings with P.G.

17   proactively, and other council members, to update them on port

18   projects, correct?

19   A.   Yes.

20   Q.   Do you remember when Bruce Katz came to town?  Who is

21   Bruce Katz?

22   A.   Bruce Katz is an international author and thought leader

23   that I brought to town for three days for a series of meetings

24   and presentations, and invited a number of different elected

25   officials and business leaders and community leaders.  P.G.

BRUNNER - CROSS

1    was one of those I invited for, at least, one of the sessions.

2    Q.   And even for a small breakfast with you, Mr. Denning,

3    Bruce Katz, and P.G., it was just the four of you, correct?

4    A.   Was it?  Okay.  I don't recall that being that makeup,

5    but that doesn't surprise me.

6    Q.   Okay.  And there were times where he would invite you to

7    meet with other civic leaders in town to collaborate and then

8    talk about the region, correct?

9    A.   Yes.

10   Q.   He proactively reached out to you and someone at the

11   Regional Chamber of Commerce to help facilitate a meeting for

12   leaders all around the region, correct?

13   A.   Yes.

14   Q.   And there were times when P.G. would even email you when

15   he thought things were moving too slowly with the port or

16   responsiveness, correct?

17   A.   I do not recall that on any kind of regular basis, other

18   than two specific projects.  That was not a normal course for

19   him to say I'm moving too slowly.

20   Q.   Was one of them the Mt. Airy Homeless Veterans Project?

21   A.   No, that was not my project.  He was asking for sites,

22   suggestions of sites for a project he was spearheading.

23   Q.   And in that --

24   A.   Unless you're saying he thought I wasn't replying to his

25   question fast enough?

```
1    Q.   Yes.  Do you recall that?
2    A.   No.  But I'm assuming that's what he's saying.
3    Q.   Okay.  I'll show it to you.
4    A.   Because it was not our project, it was his.
5              MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?
6              THE COURT:  You may.  Thank you.
7              MR. C. MATTHEW RITTGERS:  May I approach the witness?
8              THE COURT:  Yes.
9    Q.   Ms. Brunner, I handed you what's been marked as
10   Defendant's Exhibit 716.
11        Let me know when you've taken a look at that.
12   A.   Yes.
13   Q.   There's an email from P.G. to you about his desire to go
14   look at certain site locations, and then there's another email
15   three days later, where he follows up on top of that email,
16   and you said, "Shoot, I missed this.  I'll get back to you on
17   Monday"?
18   A.   Yes.
19   Q.   So P.G. was -- he didn't have a response email on top of
20   his own email before your response, correct?
21   A.   Yes.
22   Q.   And he also texted you about this.  Do you recall him
23   texting you about this Sedamsville and Mt. Airy?
24   A.   I know I have a text regarding, like, number of sites or
25   acres or something, yes.
```

BRUNNER - CROSS

1   Q.   Yeah.  In fact, in that email, I think it might even be
2   referenced, 8.3 acres and 2.5?
3   A.   Uh-huh.
4   Q.   And that's also -- P.G. would text you about that, and
5   that was -- you were aware that that was for a non-profit
6   Veterans Community Project, correct?
7   A.   Yes.  I would say, you know, not following up in three
8   days isn't exactly being delinquent, but...
9   Q.   I'm not saying that you were.  I'm just saying that P.G.
10  was just persistent with his request for a response?
11  A.   In this case, yes, he was.
12  Q.   And this had nothing to do with 435 Elm, correct?
13  A.   No.
14  Q.   And P.G. emailed you months after this email, following
15  back up, asking these folks from the Veterans Community
16  Project to come tour themselves these projects, and he was
17  just doing it to give them other options.  He wasn't asking
18  for a partnership from the port, he just wanted them to see it
19  for options; is that correct?
20  A.   I believe so, yes.
21  Q.   Even emailing you the day after Christmas, December 26th,
22  on that project?
23  A.   I do not recall.
24  Q.   Is it fair to say that P.G. and you, during 2018 and
25  2019, had conversations about a lot of different topics?

BRUNNER - CROSS

1    A.   I would say -- I don't know what "a lot" is.  That's a --

2    I'm gonna say a hard thing to answer.

3    Q.   Would you say that, in terms of the importance for the

4    region, 435 Elm was high on the list?

5    A.   I think that 435 is a very important part of our downtown

6    and our Convention Center District.

7    Q.   Another reason P.G. was contacting you many times, that

8    you're aware of, is because he believed -- you were aware that

9    P.G. believed you might have been treating Mr. Ndukwe

10   differently?

11   A.   He accused me of treating him differently.

12   Q.   Who is "he"?

13   A.   Both Mr. Ndukwe and Mr. Sittenfeld.

14   Q.   Okay.  And so that could be another reason why

15   Mr. Sittenfeld was reaching out to you during that time,

16   correct?

17   A.   To accuse me of not treating Mr. Ndukwe fairly?

18   Q.   I mean, yeah.  I'm asking you if you were aware of that.

19   A.   Yes.  I think that was part of the theme of his phone

20   calls to me.

21   Q.   In 2019, and even in 2020, it was still your preference

22   to work a development agreement with Mr. Ndukwe and not do a

23   request for proposal, correct?

24   A.   No.  As we moved into late 2019 and then in early '20,

25   after we went -- we went through a few -- we had some bumps in

 1    the road there.

 2        One of them was the challenges with Mike Schiff, and the

 3    other was my concerns with Chin, and comments he was making in

 4    the community accusing me of being racist.

 5    Q.   And P.G. was trying to mend that relationship?

 6    A.   I don't know if he was trying to mend it, or he was

 7    trying to pressure me into overlooking the differences and

 8    moving forward.

 9        MR. C. MATTHEW RITTGERS:   May I approach the witness,

10    Your Honor?

11        THE COURT:   You may.

12    Q.   This is Defendant's Exhibit 717.

13        Ms. Brunner, can you look at the line just above your

14    signature.  You were indicating to Mr. Ndukwe and Mr. Schiff

15    that working with, as you said, Chin, has always been

16    preferable, correct?

17    A.   Are you saying that it says that on here somewhere?

18    Q.   Right above -- you see the signature that says "Laura"?

19    A.   Oh, uh-huh.

20    Q.   You see the sentence right above that?

21    A.   Uh-huh.

22    Q.   That's what you're telling Mike Schiff and cc'ing

23    Mr. Ndukwe?

24    A.   I think that's consistent with what I've been saying

25    today, that from the very beginning, from the moment I had

*BRUNNER - CROSS*

1    this property, the perfect world would have been to have Chin

2    be a part of a development team.

3        It would have been an opportunity for him to recover some

4    of the investment that he made, if not more than his

5    investment, and it would be great to have a significant -- a

6    black developer play a significant role in a significant

7    project.

8        But -- and that's what I'm saying 'til the end.  It would

9    have been preferable, but he didn't do anything I asked him to

10   do.

11   Q.   That email was in late 2019, correct?

12   A.   Yes.

13   Q.   You were unaware -- in 2019, you were trying to negotiate

14   a partnership between the port and Mr. Ndukwe, correct?

15   A.   It wasn't going to be a partnership.  There would have

16   never been joint ownership.  I'm using partnership as joint

17   ownership.

18   Q.   Okay.

19   A.   What we talked about from the very beginning is the

20   potential of me agreeing to lease this property to him under

21   this ground lease, and have him with a group of developers

22   who -- obviously, would have to have the equity partners there

23   too -- would do the development.

24   Q.   And he had offered you, at least at one point, $66,000

25   per year for that ground lease, correct?

*BRUNNER - CROSS*

1    A.   Yes.

2    Q.   You were unaware of any legal issues that he had with the

3    FBI during this time, correct?

4    A.   I was -- well, by this time, in December, I was aware of

5    his other criminal charges.

6    Q.   He wasn't charged.  Are you talking about the sexual

7    assault allegations?

8    A.   Yes.

9    Q.   You were aware of the sexual assault allegations in

10   September of 2019?

11   A.   Yes.

12   Q.   But you were unaware of any admissions that he gave the

13   prosecutors or the FBI related to federal criminal charges?

14   A.   Correct.

15   Q.   Would you have been spending that time and energy trying

16   to negotiate a joint ownership agreement had you been aware of

17   that?

18   A.   If I had known he had approached the FB- --

19        MS. GAFFNEY PAINTER:  Objection, Your Honor.  It's

20   hypothetical, and she also testified earlier that there was no

21   joint ownership.

22        THE COURT:  Sustained.

23   Q.   435 Elm cost the City of Cincinnati, before the transfer,

24   $400,000 per year in maintenance costs.  Did you know that?

25   A.   I don't know the precise number.  It was a significant

1    amount, and that excludes the delinquent real estate taxes

2    that were on the property as well.

3    Q.   Which were over a million dollars?

4    A.   Yes.

5    Q.   So when the property gets transferred to the port, you

6    all at the port have the ability to do things with the

7    delinquent real estate taxes, correct?

8    A.   We managed the county land bank, and the land bank has

9    the authority to clear delinquent taxes when it takes title to

10   property.

11   Q.   But the maintenance costs, which you are now, I assume,

12   aware of, they continue to drain now the port's finances.

13   That hasn't gone away just because it was transferred to the

14   port, correct?

15   A.   Correct.

16   Q.   So that's to the tune of $400,000 a year, as we sit here

17   today?

18   A.   I'm not going to speculate as to the exact amount

19   because, obviously, the building's vacant now, there isn't

20   electricity.  We've managed the costs down from the time we

21   took ownership, so I cannot tell you the exact amount, but

22   it's not $400,000 a year.

23   Q.   Property's blighted, you would agree with me?

24   A.   Yes.

25   Q.   In disrepair?

1    A.   Yes.

2    Q.   It is directly across the street from our Convention

3    Center?

4    A.   Yes.

5    Q.   So any time someone comes in from out of town to go

6    there, they see this property with paper and boarded up?

7    A.   Well aware of it.

8    Q.   I'm just making sure everyone else is aware.  As we sit

9    here today, if we walked west, we would see all this, correct?

10   A.   Correct.

11   Q.   And you're in litigation currently in Hamilton County

12   Common Pleas Court with Mr. Ndukwe's company, Kingsley, about

13   this property, 435 Elm, correct?

14   A.   Yes.

15   Q.   And there's a dispute over whether or not he has the air

16   rights.  I believe you claim that -- go ahead.

17   A.   I do not think I can answer that.  I don't think I should

18   answer that question.  We have a dispute as to his interest in

19   the property.  I don't think I should say anything more than

20   that, due to the litigation.

21        MR. C. MATTHEW RITTGERS:  Thank you.  May I have one

22   minute, Your Honor?

23        THE COURT:  You may.

24        MR. C. MATTHEW RITTGERS:  I have no further

25   questions, Your Honor.

*BRUNNER - CROSS/REDIRECT*

1           THE COURT:  Thank you, Mr. Rittgers.  Ms. Gaffney

2    Painter?

3           MS. GAFFNEY PAINTER:  Just a brief redirect, Your

4    Honor.

5           THE COURT:  Very good.

6           MS. GAFFNEY PAINTER:  May I approach the podium?

7           THE COURT:  You may.

8                   REDIRECT EXAMINATION

9    BY MS. GAFFNEY PAINTER:

10   Q.  Ms. Brunner, you were asked a series of questions about

11   Rob and Brian, and I believe you testified there was a

12   distinction between a developer versus an investor.  Can you

13   please explain that distinction to us?

14   A.  Yes.  This morning, when I listed some of the activities

15   that a developer undertakes for property, you have to find a

16   piece of property.  You have to get title to the property.

17         You have to do environmental assessments of the property.

18   You have to do a design.  You have to cost it.  You have to do

19   this financial pro forma and test all these assumptions.  You

20   have to raise debt and equity, and hire a contractor.  Those

21   are all activities of a developer that are completely separate

22   from who owns the project.

23         The developer that I just described that did all of those

24   things may not have any equity in it.  They don't own it at

25   all.  They just get paid a developer fee, or they might put

1    $2 million of their money in and they own all of it.

2        Or if the equity that's required for that project is

3    $4 million, and they only have $2 million, then they find

4    somebody else to invest with them, and they share the

5    ownership 50/50, each putting in $2 million.

6        So the ownership of the project, which means the share of

7    the profits in the future, and the way you split the money

8    when you sell it, that all depends on equity, who's got the

9    money in it.

10       Now, sometimes one of those partners might have a -- more

11   money personally, and so they can sign a guarantee for the

12   debt, so they get paid some for that.  So there are other ways

13   in which you kind of split responsibilities and benefits, but

14   all of that, those are just equity partners.

15       You know, and nowhere in this, you know, discussion, in

16   these discussions with Mr. Sittenfeld were we talking about

17   who the developer was, and that was my concern from the very

18   beginning is who actually has the skill to do this.

19   Q.  You referenced, on cross-examination, changes to the

20   pro forma.  Can you give us just some examples of how

21   Mr. Ndukwe's pro forma was changing?

22   A.  Yes.  The first, most complete pro forma that he gave to

23   me was multiple pages, and he showed what the costs were going

24   to be, the debt, equity had already been put in there, not who

25   the parties were, so I didn't know any -- if there were any

*BRUNNER - REDIRECT*

1       commitments behind it.

2           But then the pro forma said, okay, I think it was about

3       $88 million.  This project is going to cost $88 million.

4       We're going to sell it year nine.

5           And mister -- Kingsley, Chinedum's profit, his profit was

6       going to be $27.6 million.  So I said to him, well, if you're

7       going to make $27.6 million when you sell this in nine years,

8       you can surely afford to pay me the $330,000 of ground payment

9       that I'm asking for.

10          So he said, oh, hmmm.  That didn't go so well.  He came

11      back eight days later with a pro forma that magically now said

12      that he was going to make $4.6 million instead of

13      $27.6 million.  And then a few months later, I got one from

14      him that says he was going to make $5.8 million.

15          So all of the numbers were changing to such a great

16      degree, I had no confidence in them.

17  Q.  You were asked a series of questions on cross-examination

18      about contact you had with Mr. Sittenfeld in 2018, 2019, 2020.

19          Was the communication you had with Mr. Sittenfeld about

20      435 Elm different in kind from those communications?

21  A.  Yes.

22  Q.  How so?

23  A.  I had -- Mr. Sittenfeld was one of the many council

24      members I had a good relationship with.  And we talked.  You

25      know, we cared a lot about the city.  We talked a lot about

1    different things.  He's a big picture thinker and cared

2    deeply, so we had a lot of very productive conversations.

3        And I will say these conversations about 435 Elm were

4    completely out of context with the rest of my communication

5    with him.

6            MS. GAFFNEY PAINTER:  No further questions, Your

7    Honor.

8            THE COURT:  Thank you.

9            MR. C. MATTHEW RITTGERS:  Very briefly.  May I

10   approach, Your Honor?

11           THE COURT:  You may.

12           MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

13                    RECROSS-EXAMINATION

14   BY MR. C. MATTHEW RITTGERS:

15   Q.  Ms. Brunner, were you aware that Rob cut his teeth in

16   Georgia doing real estate development decades ago?

17   A.  I never heard these names.  Never heard of Rob until the

18   newspapers, you know, whenever this all -- this whole case

19   came out in the newspapers.

20       I did not know he -- I just knew there were investors.  I

21   never knew their names.  I was never told anything about them.

22   Q.  In that first pro forma that you mentioned on redirect,

23   you mentioned that there was no commitment behind him in that

24   pro forma.  You're referring to money, correct?

25   A.  I'm saying that -- well, that he had -- it was an Excel

BRUNNER - RECROSS

1    spreadsheet.  It did not give any details of where the -- if

2    he had bank financing, if he had equity commitments or not.

3    Q.  Equity commitments could be somebody like out-of-town

4    investors with --

5    A.  Oh, yes.

6    Q.  -- millions of dollars?

7    A.  Yes.  But he never shared that with me.  He never said I

8    have investors.  He never told me.  When Mike Schiff came to

9    town, you know, it was just like "my partners."  I said what

10   is he doing?  And he kept telling me he's a developer.  And

11   I'm, like, no, he's not a developer.  It sounds like he's an

12   investor.

13       So then I didn't know what these other two guys were.

14   And, honestly, I didn't know if those other two guys were

15   investors in 435, or -- because Chin was buying up multiple

16   properties in different locations.  I didn't know what was

17   going on, honestly.

18   Q.  In all your communications with P.G., you could tell that

19   he cared deeply about the City of Cincinnati?

20   A.  Yes.

21           MR. C. MATTHEW RITTGERS:  Thank you.  I have no

22   further questions Your Honor.

23           MS. GAFFNEY PAINTER:  No re-redirect, Your Honor.

24           THE COURT:  Very good.  Ma'am, you may step down.

25   Thank you.

BRUNNER - RECROSS

1        (Witness excused.)

2        THE COURT:  Does the government intend to call

3   another witness?

4        MR. SINGER:  No, Your Honor.

5        THE COURT:  So you're resting?

6        MR. SINGER:  Yes, Your Honor.

7        THE COURT:  So should we take a brief break?

8        MR. C. MATTHEW RITTGERS:  Just a brief one.

9        THE COURT:  Ladies and gentlemen of the jury, the

10   government is resting its case, which means it's not calling

11   any further witnesses at this time.

12      There's usually a little work that we need to do before

13   the defense starts to put on its case, so we need to have a

14   little conversation, and that will give you an opportunity to

15   have a break.

16      We will be in contact when we're ready to go.  It may

17   take a little longer than usual, just because we're switching

18   from one case to another here.  I imagine you would be back by

19   2:30.

20      I would remind you not to discuss -- the government's

21   case has rested.  The case is certainly not over, so please do

22   not discuss it amongst yourselves.  Please do not do any

23   research.  Please do not communicate with anyone on the case.

24      If anyone attempts to communicate with you, please let me

25   know.  And please do not form any final opinions.  While the

1    government has rested its case, Mr. Sittenfeld still has to

2    put on his.  The time for deliberating and forming opinions

3    will be after all that is done.  So have a good afternoon

4    break.

5         (Jury out at 2:03 p.m.)

6              THE COURT:  Mr. Rittgers, do you have a motion to

7    make?

8              MR. C. MATTHEW RITTGERS:  I believe it's Mr. Schuett,

9    Your Honor.

10             THE COURT:  Very well.  Mr. Schuett?

11             MR. SCHUETT:  May I approach?

12             THE COURT:  You may.  Is the jury clear, Scott?

13             COURTROOM DEPUTY:  Yes.

14             MR. SCHUETT:  May I proceed, Your Honor?

15             THE COURT:  You may.

16             MR. SCHUETT:  Your Honor, at this time we would make

17   a motion for judgment of acquittal pursuant to Rule 29 on all

18   six counts.

19        As part of our arguments, my thought was to go through it

20   how it was grouped on the indictment 1, 2, 3, 5, 4, 6.

21             THE COURT:  Very good.

22             MR. SCHUETT:  I also intended to probably refer to

23   things like in the indictment as phase one and phase two, if

24   that makes sense to the Court as well.

25             THE COURT:  It does.

1          MR. SCHUETT:  I intended to walk through the six

2     counts separately in those bundles before addressing the

3     underlying quid pro quo that kind of is at the foundation of

4     all six, Your Honor.

5          THE COURT:  Very good.

6          MR. SCHUETT:  Your Honor, we believe that the motion

7     for acquittal should be granted on all six counts to start

8     because, aside from the stipulations, there's not sufficient

9     evidence presented by the government to meet the standard,

10    even though it is a lower standard here in Rule 29.

11         On Counts 1 and 2, the issue to address, to begin with,

12    would be that the scheme or artifice to defraud in this case

13    as it relates to honest services, Your Honor, the government

14    has failed to provide sufficient evidence, even on a Rule 29

15    standard, that there was this scheme or artifice to deprive

16    another of honest services by Mr. Sittenfeld.

17         As we heard, he published through the FEC the checks that

18    he received.  Those were publicly disclosed checks.  He did

19    not conceal those checks in any way.

20         The names that were provided on those checks are the ones

21    that were assigned on the FEC website.  If there was a scheme

22    to defraud, one would assume that he would have just taken the

23    cash that was offered to him.  He did not accept that.

24         There was discussions of cashier's checks that would have

25    been the equivalent of cash, and he did not accept that.  Then

1        there was the issue with the corporation checks versus the LLC

2        checks.  Again, if there was some sort of scheme to defraud, a

3        scheme to materially conceal, none of those were taken.

4            Mr. Sittenfeld, on multiple occasions, asked for the

5        names of real people and real LLCs, which were then provided

6        to the FEC and the --

7                THE COURT:  Mr. Schuett, let me ask you a question,

8        if I could.

9            So if he took even a legal contribution in exchange for a

10       tacit agreement to provide some specific official action,

11       would that not suffice to show a scheme to defraud for

12       purposes of Counts 1 and 2?

13               MR. SCHUETT:  If I'm understanding what you're

14       saying, if there's a tacit bribery argument or agreement, that

15       that would constitute a scheme to defraud.  Is that the

16       question?

17               THE COURT:  That's what I'm asking.  Is that

18       sufficient scheme to defraud for purposes of an honest

19       services violation?

20               MR. SCHUETT:  I think the law is pretty clear that if

21       that existed, yes, that that would -- bribery can be a scheme

22       to defraud.  Obviously, we believe that that has not been

23       proven, which I was going to discuss later, but --

24               THE COURT:  Sure.

25               MR. SCHUETT:  -- if I understand what the Court's

1    asking, yes, bribery could constitute a scheme to defraud.  I

2    think the law is pretty clear on that.

3              THE COURT:  Okay.  I just wanted to make sure that I

4    was understanding correctly.  Thank you.

5              MR. SCHUETT:  Your Honor, he's not charged with any,

6    as we've discussed at great length at times, any FEC

7    violations, certainly nothing related to straw donors.

8         And I mean, if you look at the evidence that has been

9    presented, it wasn't exactly clear.  There was discussion at

10   one point of the cash, but then Rob later said that someone --

11   that he was giving him a check that was written from his

12   partner and his partner's LLC.

13        So on that point, we would argue that that scheme to

14   defraud has not been established.  Again, we'll address the

15   quid pro quo later, Your Honor.

16             THE COURT:  Even on a scheme to defraud front, I

17   think you'd agree, we have to take the evidence, at this

18   stage, in the light most favorable to the government; isn't

19   that right?

20             MR. SCHUETT:  We do, Your Honor, whether or not any

21   rational trier of fact would believe that the element had been

22   met, yes, sir.

23             THE COURT:  Hasn't there been testimony that he was

24   aware that the names on the checks didn't match the actual

25   source of funds, at least on a couple of occasions?  I thought

1    Mr. Ndukwe testified to that, didn't he?

2         MR. SCHUETT:  I don't remember Mr. Ndukwe -- I

3    remember discussion from Rob that at least that had been

4    asserted.  I mean, if you looked at the transcripts or watched

5    the video, that it's not exactly that clear.

6      There are discussions of going to his network to retrieve

7    LLC checks, not that it was some sort of the same cash, per

8    se, but that they were going to their network funds to present

9    these LLCs.

10         THE COURT:  I guess, with regard to Mr. Ndukwe, it

11   was that Mr. Sittenfeld knew that the money that Mr. Ndukwe's

12   associate at work provided was, in fact, the source of that

13   funds of Mr. Ndukwe.  That's what Mr. Ndukwe testified, I

14   think, right?

15         MR. SCHUETT:  We're talking about Tung Nguyen?

16         THE COURT:  Yes.

17         MR. SCHUETT:  Sorry, Your Honor.  That's not before

18   the Court on these charges, Your Honor.  That's not part of

19   the scheme for Count 1 or Count 2.  And whatever the jury

20   wants to give that weight for intent certainly doesn't allow

21   the government to meet their Rule 29 obligations for Counts 1

22   and 2, Your Honor.

23         THE COURT:  Okay.

24         MR. SCHUETT:  Moving on to Counts 4 and 6 for the

25   extortion.  Again, separate from quid pro quo bribery, to

1    discuss just generally.

2        We would submit there's no evidence offered that he used

3    any sort of threats or violence towards the undercover agents

4    to have them hand over donations.

5        I understand that when you're in a position, an official

6    elected position, there could be, perhaps, an undertone of

7    coercion when it's connected to that office.

8        But if you look at the conversations between

9    Mr. Sittenfeld and Rob, there is not some sort of element of

10   do this or else.  There is not a coercive environment.

11       Most of the time, Mr. Sittenfeld is very collegial,

12   they're joking, they're laughing.  There is not an effort by

13   Mr. Sittenfeld, nor evidence has been presented of an effort

14   by Mr. Sittenfeld, to create a coercive environment.  In fact,

15   in 20- --

16           THE COURT:  What about the statement, "I don't want

17   you to be in a situation where I'm like no, Chin, I love you

18   but can't"?  How is that not coercive?

19       I mean, how can it be that a rational trier of fact

20   couldn't maybe find that to be coercive?  Not saying that I

21   find it to be coercive, but that isn't the standard, right?

22           MR. SCHUETT:  Understood, Your Honor.  On that

23   particular call and statement, if I understand correctly,

24   Counts 4 and 6 relate to the exchange between Rob and the UCEs

25   and Mr. Sittenfeld, not Mr. Ndukwe.

1          So that statement, for whatever value it may or may not

2     carry, does not inform the Court on the sufficiency of

3     evidence that would be needed for an extortive charge with the

4     agents, Your Honor.

5              THE COURT:  So you're saying that statement can't

6     form the basis for the charges that are set forth in 4 and 6;

7     is that right?

8              MR. SCHUETT:  As written in the indictment, correct,

9     Your Honor.

10             THE COURT:  Okay.

11             MR. SCHUETT:  It's certainly listed in the general

12    scheme, but it's not listed in the actual Counts 4 and 6,

13    those related to the UCE donations.  Mr. Ndukwe, in that

14    conversation, no money was exchanged, there wasn't any

15    official acts, there wouldn't --

16             THE COURT:  Well, but what if Mr. Ndukwe had shared

17    with Rob and Brian that statement, couldn't you have the

18    indirect effect of --

19             MR. SCHUETT:  Potentially, I suppose.  But the burden

20    was on the government to present that evidence.  We certainly

21    didn't hear that, Your Honor.

22         So I would -- again, I would say there's not a nexus to

23    connect that statement from Mr. Sittenfeld to Mr. Ndukwe to

24    the extortion charges that exist in Counts 4 and 6, Your

25    Honor.

1          THE COURT:  Okay.

2          MR. SCHUETT:  As I was stating, in 2019,

3     Mr. Sittenfeld doesn't even solicit donations.  I think it was

4     pretty clear that Vinny, in September of 2019, he wasn't

5     solicited to provide donations.

6          Later, Rob volunteered again that they were going to give

7     donations.  There was not solicitation.  There was no coercive

8     environment.  And so for those reasons, we would suggest to

9     the Court that, again, discussing quid pro quo later, that the

10    extortive element there is not present.

11         There was no fear.  And even just because he is an

12    elected official, he wasn't taking any action as that elected

13    official to create an extortion-type environment, Your Honor.

14         THE COURT:  So with regard to phase one, phase two,

15    do you think there has to be a separate threat in phase -- I

16    guess what you're calling phase two, or I guess Count 6, there

17    has to be a separate threat to form a basis for liability

18    under Count 6?

19         MR. SCHUETT:  The dates within the indictment are

20    separate, Your Honor.  It's not a continuing course of -- and

21    they give two very different dates that these charges are

22    supposed to have occurred.

23         So I would argue that, given the different scope of dates

24    that they've presented that, yes, there would need to be a

25    separate extortive action or environment.

1          THE COURT:  I have too many books.

2          MR. SCHUETT:  Your Honor, if I may also grab the

3    indictment?  I didn't bring it up here.

4          THE COURT:  I've got the indictment.  That's what I

5    was looking for.

6      You're pointing out that in Count 6, for example, it says

7    from July 8, 2019, to on or about February 5, 2020,

8    Mr. Sittenfeld knowingly, and then goes on.

9      So you're saying they have to point to some conduct that

10   occurred between those two dates?

11         MR. SCHUETT:  As I understand the notice they

12   provided, yes, sir.

13         THE COURT:  Okay.  As opposed to Count 4, which is

14   predicated on conduct that occurred from on or about

15   September 21, 2019, to on or about September 17, 2019?

16         MR. SCHUETT:  That is correct, Your Honor.  That's

17   our position.

18         THE COURT:  Very good.  All right.  I can understand

19   that.

20         MR. SCHUETT:  Moving on, then, to the last coupling

21   of Counts 3 and 5, which lead to the program with federal

22   funds.

23     I wanted to reassert at this point, I know it hadn't been

24   decided earlier that, given that this is a campaign donation

25   case, that for these particular charges, there is going to

1       need to be an explicit quid pro quo.

2           Even as the statute is written, it does say there needs

3       to be a specific intent to act corruptly and be influenced by,

4       because there's a presumptive idea and legitimacy to campaign

5       donations in order for that to be corrupt, and the influence

6       by should be read as an explicit quid pro quo.

7               THE COURT:  But not express, you'd agree?  He's being

8       explicit but not express, right?

9               MR. SCHUETT:  Correct, Your Honor.  It's my

10      understanding that between the Sixth Circuit and Supreme Court

11      has made it very clear that it does not need to be express.

12      It does need to be explicit, though, Your Honor.

13              THE COURT:  Okay.

14              MR. SCHUETT:  And so I did want to turn to the

15      concept, then, of the quid pro quo.

16          Your Honor, obviously, there are profound constitutional

17      implications in this case when we are dealing with free

18      speech, political speech, something that has been the hallmark

19      of this country, one of the first protected right that we list

20      in the Bill of Rights, and the chilling effect that it can

21      have if politicians are not allowed to engage with

22      constituents.

23          Donations are seen as, on innuendo or vague statements,

24      to be corrupt.  There's also federalism concerns, with

25      the U.S. Government coming in and telling local officials,

1    based on vague inferences, that they are committing federal

2    crimes.

3         It's obviously clear that not every donation, as the

4    Court said in *Terry*, is a bribe in sheep's clothing.

5         There is a general expectation in this country that some

6    future favorable action is not enough to prove quid pro quo.

7    Seeking donations from donors and individuals with businesses

8    in front of the legislative body that you happen to be on is

9    not, in itself, enough to be quid pro quo.

10        It's not a crime, even if there's temporal proximity, in

11   and of itself.  The fact that there was a donation, and then

12   an act close in time, without more, is not quid pro quo.

13        We want our politicians to be serving their constituents

14   and supporting legislation.  They want to be able to talk with

15   them about their policy considerations and, obviously, those

16   campaigns need to be financed.

17        So there's obviously a danger here, and it's unrealistic

18   to believe that a legislator can commit a crime when they lay

19   out the benefits for their constituents, when they hear from

20   donors that may have business in front of the legislative

21   body --

22            THE COURT:  What about the statement "I'll shepherd

23   the votes"?

24            MR. SCHUETT:  Yes, Your Honor.  We would argue that,

25   as noted by this Court, could be read in multiple different

```
1    ways.

2              THE COURT:  But isn't that exactly the point?  It

3    could be read in multiple different ways, so then isn't it the

4    jury's job to --

5              MR. SCHUETT:  Your Honor, at this point, I would

6    actually argue that is a failure of the state to provide

7    sufficient evidence.  There was a specific official act

8    discussed because the specific official act has to be

9    pressure, convincing someone to vote, as opposed to expressing

10   support.

11       And if it was just expressing support, then they haven't

12   met their burden, right?  Because if it's just I support a

13   project, or I support a policy, or I support crossing the

14   aisle to shake hands in a bipartisan way --

15             THE COURT:  Well, but it's enough if it's just even

16   an "I'll vote yes."  It doesn't have to be I'll get the whole

17   council to agree, right?  Wouldn't it be an official act --

18   and I'm not saying that the evidence shows this.

19       But if Mr. Sittenfeld were to agree to vote himself in a

20   particular way, he doesn't have to be able to deliver the

21   whole council in order for it to be an official act, does he?

22             MR. SCHUETT:  Well, no.  If he had said I will vote,

23   but he didn't, one, Your Honor; and two, that it has to be in

24   exchange for the money, which also, we would argue, has not

25   been linked.
```

1      So I think the vagueness in this situation actually, it

2  goes against -- the government had the burden to prove

3  sufficient evidence that this was a specific official act, and

4  they haven't done so.  And --

5      THE COURT:  Isn't it that one conversation where it's

6  like, well, I don't know if it's going to come in front of you

7  in six months, or a year, or two years, but we need to know

8  it's a yes when it does type thing?  You know the comment to

9  which I'm alluding?

10      MR. SCHUETT:  Yes, Your Honor.  And I mean, again,

11  "can deliver the votes" is unclear.  Again, the nexus to be

12  controlled by money is lacking as well.  And so, you know,

13  again, somewhat of a team, this is like you take out a

14  context, maybe, right, but they need to provide that nexus.

15  They haven't done so.

16      And we would argue that those vague statements in 2018,

17  about delivering votes and shepherding votes, do not rise to

18  the level of sufficient evidence to prove, even at this

19  juncture, even with a Rule 29 threshold, to send that matter

20  to the jury.

21      As far as 2019, there's no statements being made by

22  Mr. Sittenfeld regarding official acts.  Again, it was he

23  stood up to leave, or while he got up, he shook hands.  It

24  sounded like he was leaving.  It was, hey, come over here.

25  There was not a nexus.  There wasn't an official act, or even

1    a specific official act that was discussed.

2        At that meeting, there was general discussion of how

3    government works, and how zoning works, and when a city can

4    handle certain things through licensing.

5        Though if you look at the entirety of that, that video, I

6    believe it's 30F, as in Frank, while we only saw truncated

7    versions, there's an entire discussion in session one that

8    we've heard about multiple times but we didn't hear.

9        And in that, Rob and Brian are priming that concept of

10   sports betting, and their concerns about Mr. Ndukwe as the

11   face.  And then they come in, and they start talking about it

12   again.

13       And Vinny starts talking about how he's frustrated that

14   it's going to be on a statewide level, which Mr. Sittenfeld

15   then discusses he has no power in that, the way it works, and

16   explains the mechanics of how it works; state, local, when

17   they can zone and when they can't.  But there's no commitment

18   to any official act.

19       The most that you get is that Mr. Sittenfeld says he can

20   put them in touch with Dan, which would just be setting up a

21   meeting, which is not a specific official act.

22       And Vinny, when he says, hey, we're going to take care of

23   you, which isn't illicit, in and of itself.  That just means

24   we want to donate.

25       He says what I want you to do is keep Rob updated.

1    Again, that's not a specific official act.  That's just

2    relaying information.

3        And so we would submit there's not a specific official

4    act at all.  It was in the indictment for Counts 2, 5, and 6,

5    but that are in that phase two that would rise to the level --

6    even on a Rule 29 level to go to the jury, Your Honor.

7        As far as the in exchange for, we would also argue that

8    there is not, one, an explicit quid pro quo, in that the

9    agreement would be clear and understanding, unambiguous, that

10   Mr. Sittenfeld expressed a manifest -- or manifested an intent

11   to be controlled by the money for a specific official act.

12       And on that level would argue that then, because the quid

13   pro quo is sort of the foundation for all six, that not

14   showing the explicit clear understanding, and the fact that

15   we're talking about what does deliver the votes means goes to

16   that point, Your Honor, that there's not an explicit

17   understanding on what it means.

18       And the government hasn't shown enough evidence to rise

19   to that level.

20       For that reason, Your Honor, we would ask that you grant

21   the motion on all six counts.

22           THE COURT:  Thank you, Mr. Schuett.

23       Would the government like to respond?

24           MR.  SINGER:  Yes, Your Honor.

25           If I may, I'm just going to address the topics as

```
 1     they were raised by the defense.

 2             THE COURT:  Sounds good.

 3             MR. SINGER:  As to the honest services fraud relating

 4     to a scheme to defraud in Counts 1 and 2, that is rolled up in

 5     the quid pro quo.  If there is a quid pro quo, then it

 6     necessarily is a concealment from the public, and that in

 7     itself indicates that intent to defraud.

 8         As for Counts 4 and 6, the defense raised a lack of

 9     threats or inducement.  That's the holding of the Evans case,

10     Your Honor.

11         Supreme Court said in Evans that there is no inducement

12     element for extortion under color of official right.

13         The Court said this is the holding, where a public

14     official knowingly receives a bribe, that satisfies the Hobbs

15     Act under color of official right.  There is no inducement

16     element.  It's not like the other prongs, the other types of

17     extortion.

18             THE COURT:  So are you saying the elements for 4 and

19     6 are identical to 1 and 2 or what?

20             MR. SINGER:  For purposes of bribery, yes.  Honest

21     services bribery and extortion under color of official right,

22     that's why the case law -- there's so much overlap on the case

23     law for color of official right bribery cases and honest

24     services bribery cases.

25             THE COURT:  I thought that was a problem, if you have
```

1      two crimes that have exactly the same elements.

2              MR. SINGER:  They don't have -- the bribery prong is

3      the same.  They have different jurisdictional elements.

4              THE COURT:  Oh, I see.  Okay.

5              MR. SINGER:  So for honest services fraud, there must

6      be a wire, or there must be some affect on interstate commerce

7      for the Hobbs Act.

8              THE COURT:  Okay.

9              MR. SINGER:  But the Supreme Court is very clear that

10     there is no inducement.  The inducement comes by the fact that

11     they're public officials, and so there is an innate presence

12     and authority over the decisionmaking that creates an

13     imbalance.

14             THE COURT:  In the presence of a quid pro quo?

15             MR. SINGER:  Yes.  Yes.

16             THE COURT:  Okay.

17             MR. SINGER:  And so wherever a public official

18     knowingly receives a bribe, that's enough to satisfy the

19     elements both for honest services fraud and the extortion

20     count.

21         For Counts 3 and 5, the 666 charges, the Sixth Circuit is

22     clear that there is no quid pro quo requirement, that the

23     Sixth Circuit looks at the elements of the -- the statutory

24     language when determining the elements, and the statutory

25     language includes a corrupt intent to either be influenced or

1    rewarded in connection with business that's before the city.

2         Now, this is a campaign contribution case, so as the

3    Court has recognized in the jury instructions that we filed,

4    the business has to be specific business.  So it would mirror

5    the -- sort of the specific official action in that regard

6    that has to relate to a specific project or a specific

7    business, otherwise, it would be a more general business that

8    would be allowable under 666.

9         But that element is satisfied here, Your Honor, because

10   the 435 Elm Street project is the subject matter of both

11   Counts 3 and Count 5.

12        So all of the conversations relating to money in exchange

13   for some business before the city, it all relates to the

14   specific business that is advancing the 435 Elm Street

15   project.

16             THE COURT:  With respect to Count 5 and the 2019/'20

17   time frame, where are you getting -- I'm looking at, I guess

18   it's Count 3, but I assume the elements are the same,

19   corruptly solicited and demanded.

20        So are you saying that what occurred in the hotel room,

21   where in the video it appeared Mr. Sittenfeld was getting up

22   to leave, and then Vinny raised the two checks, are you saying

23   something -- where am I going to find the soliciting or

24   demanding in that -- well, let me start with this.

25        Is that what you're saying was the soliciting or

1    demanding, was that vignette?

2          MR. SINGER:  No, Your Honor.  I don't believe Count 5

3    has solicitation language.  The solicitation comes from -- is

4    in Count --

5          THE COURT:  Count 5, corruptly solicited and demanded

6    for his own benefit, and accepted and agreed to accept a thing

7    of value from a person intended to be influenced and rewarded

8    in connection.

9          MR. SINGER:  So we charged in the conjunctive, Your

10   Honor.  I think the evidence will show that he accepted and

11   received the money corruptly and in exchange or in connection

12   with the business of the city.

13         THE COURT:  Oh, it says "and" in the indictment.  It

14   says, Corruptly solicited and demanded for his own benefit and

15   accepted and agreed to accept, so you're saying it's an "or"?

16         MR. SINGER:  Well, when it goes to the jury, it will

17   be an "or."

18         THE COURT:  Oh.  Okay.  Why is that?  This isn't the

19   quote from the statute, or what?

20         MR.  SINGER:  Well, it is a quote from the statute,

21   Your Honor, but we include more language in the indictment.

22         THE COURT:  Oh, I see.

23         MR. SINGER:  The jury can decide any one of those.

24   They don't have to find that each one of them occurs.

25         THE COURT:  So you're saying he did A and B, and both

1    A and B are wrong, but if either A or B happened, that would

2    be --

3              MR. SINGER:  Correct.

4              THE COURT:  So you're focused on the intending to be

5    influenced and rewarded?

6              MR. SINGER:  Correct.

7              THE COURT:  Okay.

8              MR. SINGER:  And the corrupt intent when it's

9    accepted or agreed to accept.

10             THE COURT:  Okay.

11             MR. SINGER:  So there is no quid pro quo requirement,

12   and so I'll address the --

13             THE COURT:  For Count 5?

14             MR. SINGER:  For Counts 3 and 5, Your Honor.

15             THE COURT:  But for 1, 2, 4, and 6, there is?

16             MR. SINGER:  Correct.

17             THE COURT:  Okay.

18             MR. SINGER:  And I think the Court's analysis in

19   denying the motion to dismiss, this is instructive here.  As

20   you know, the speaking indictment, with a lot of the same

21   recordings that were played here, are contained in the

22   indictment.  The Court found that based on just the limited --

23   that the lesser amount of evidence that was provided in the

24   indictment, that a reasonable jury could find that there was a

25   quid pro quo both for the 2018 exchange in Counts 1, 3, and 5,

1    and the 2019 exchange for 2, 4, and 6.

2              THE COURT:  Okay.

3              MR. SINGER:  I'm happy to answer any questions the

4    Court has relating to that, otherwise, I will sit down.

5              THE COURT:  Very good.

6              MR. SINGER:  Thank you, Your Honor.

7              THE COURT:  Mr. Schuett, anything further?

8              MR. SCHUETT:  Yes, Your Honor, if I may?

9              THE COURT:  You may.

10             MR. SCHUETT:  I'll address the matter that Mr. Singer

11   just left on.  Corrupt intent, or corrupt intent to be

12   influenced by, when read in the lens of a campaign donation,

13   can only mean one thing, which is explicit quid pro quo,

14   because there's a presumption of legitimacy for campaign

15   donations and speech.  And so to cross the line, the courts

16   have been clear you need explicit quid pro quo.

17        So while the statute -- and *Abbey* certainly addressed is

18   it a requirement in all cases?  No.  But in this case, it is,

19   because their own -- this isn't a plus factor case, Your

20   Honor.  We don't have gifts.

21        And on all of the cases that have been cited by the

22   government so far have been plus factor cases.  And so we

23   don't have that.  And at the close of their evidence, we don't

24   have that.

25        And so inherently, it must be an explicit quid pro quo in

1    this particular case, under these particular facts, and with

2    the law being what it is for campaign donations, that they can

3    only have a corrupt intent to be influenced by with campaign

4    donations if it's an explicit quid pro quo.

5        As far as the Hobbs Act, I would note that it was as if

6    they knowingly received a bribe, and which would call back to

7    they haven't shown that he knowingly received a bribe.

8        There are two -- there's a lot to unpack there in that

9    phrase that they still haven't shown, so even if they haven't

10   shown generalized extortion, they also haven't shown that he

11   knowingly received a bribe for all of the reasons that I've

12   already articulated, Your Honor.

13       If there's no further questions, again, we would ask that

14   you dismiss all counts.

15            THE COURT:  Thank you, Mr. Schuett.

16            MR. SCHUETT:  Thank you, Your Honor.

17            THE COURT:  Well, I think, at the end of the day, I

18   knew this motion was coming, not surprisingly, and I think, as

19   things stand right now, the statements that we've heard from

20   the various witnesses, there's sufficient ambiguity in them

21   that a jury could find -- certainly, I don't think is

22   compelled to find, but could find that a quid pro quo exists.

23       And I think, if that is the case, that would defeat the

24   motion as to all six of the counts, so the Court, on the

25   record right now, is denying the request for a Rule 29 motion.

1          I think the government has presented sufficient evidence

2     to go to the jury on all six counts.  I'll note that, unlike

3     *Dimora*, or a lot of the other cases, certainly, the conduct

4     here that's been presented by the government doesn't seem as

5     explicitly egregious as some of the conduct that has occurred

6     in other cases.  But as the parties are also aware, there is

7     case law there suggesting that wink wink nudge nudge is enough

8     to suggest the existence of an agreement.

9          And in light of where the case law is on what's necessary

10    to show an agreement, I believe that, at least right now, the

11    government has shown enough to get to the jury, so I'm going

12    to deny the motion.

13         So with that, we can take a very brief break.  How long

14    do you need to be in a position to start with your case,

15    Mr. Rittgers?

16         MR. C. MATTHEW RITTGERS:  Should not be long, Your

17    Honor.  Have to take a quick break and make sure the witness

18    is here.

19         THE COURT:  So can we try to get started by 2:45?

20    That will only be about 10 minutes.  Is that enough for

21    everybody?  Okay.  Very good.  Let's take a recess.

22         (Brief recess.)

23         THE COURT:  And I should make clear on the record, I

24    realized I hadn't before I left, Mr. Schuett, that the Court's

25    denial -- it comes up mid-trial, oral motions.  The Court's

CURP - DIRECT

1    denial of the Rule 29 is not prejudiced, of course, to the

2    defendant's ability to renew the motion at the end of the

3    trial.

4            MR. SCHUETT:  Understood, Your Honor.  Thank you very

5    much.

6            THE COURT:  All right.  Are we ready to bring the

7    jury in?

8        Mr. Rittgers, are you ready to proceed?

9            MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

10           THE COURT:  All right.  Let's bring the jury in.

11       (Jury in at 2:47 p.m.)

12           THE COURT:  Mr. Rittgers, does the defense intend to

13   call a witness?

14           MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  John

15   Curp.

16       (Defense witness, JOHN CURP, sworn.)

17           THE COURT:  You may proceed, Mr. Rittgers.

18                      DIRECT EXAMINATION

19   BY MR. C. MATTHEW RITTGERS:

20   Q.  Good afternoon, Mr. Curp.

21   A.  Good afternoon.

22   Q.  Could you please state your name for the record.

23   A.  John Phillip Curp.

24   Q.  What do you do for a living?

25   A.  I am the interim city manager for the City of Cincinnati.

CURP - DIRECT

1    Q.   Since when?

2    A.   January 19th, I think, of 2021 -- or, 2022 of this year.

3    Q.   Let's go back to 2008.  What was your job at that point

4    in time?

5    A.   In 2008, I was appointed the city solicitor for the City

6    of Cincinnati.

7    Q.   And what is the city solicitor?

8    A.   The city solicitor is the chief legal counsel for the

9    City of Cincinnati.  Part of my responsibilities were that I

10   was the chief prosecutor for the city, in addition to being

11   the general counsel for the city.

12        As a part of that responsibility, I advised the city

13   manager, the mayor, and the council individually.  And part of

14   city council's rules gave me a direct attorney/client

15   relationship with each member of council.

16   Q.   How long did you serve in that role as city solicitor?

17   A.   Until approximately February of 2014.

18   Q.   And without getting into any specific legal advice, what

19   were the primary sources of law that you would rely on when

20   giving legal advice to council members or the mayor?

21   A.   The City of Cincinnati is a home-ruled community governed

22   by its own charter, which is our city's constitution, also

23   relied upon the laws or statutes of the State of Ohio and the

24   United States Constitution.

25   Q.   During those years, 2008 to 2014, when you were the city

*CURP - DIRECT*

1    solicitor, were you aware of conversations that occurred

2    between individual council members and developers?

3    A.   Yes.   The developers, or any interested party working

4    with council members was part of the business at City Hall.

5    Q.   How were you aware that those conversations were

6    occurring?

7    A.   Depending on the legislation in front of council,

8    interested parties, including developers, would present to

9    council in the form of committee hearings.

10        They would interact directly with council members.  You

11   would see them in the hallways, you know, on the third floor,

12   which is where council chambers are.

13   Q.   Do you know what the Port Authority is?

14   A.   Yes.

15   Q.   Who was the head of the Port Authority back in 2011 and

16   2014?

17   A.   Laura Brunner.

18   Q.   Were you aware of interactions that Mrs. Brunner had with

19   individual council members back at that time?

20   A.   Yeah.   The Port Authority is created by a creature of the

21   county and the city.   We formed the Port Authority many years

22   ago.

23        Ms. Brunner would routinely appear before council to

24   discuss projects that the port was working on, and would

25   interact with council members and provide them briefings of

CURP - DIRECT

1   projects that the port had that was with the city.

2   Q.   How common was it for Ms. Brunner to interact with

3   council members on an individual, one-on-one basis?

4   A.   You know, I wasn't in all the individual meetings, but

5   she was -- you know, you would see her frequently on the third

6   floor of council.

7   Q.   After 2014, what did you do for employment between your

8   job now as interim city manager and after you left the city

9   solicitor office?

10  A.   So I was a partner at the law firm of Blank Rome.

11  Q.   And in that role at a private law firm, did you continue,

12  on occasion, to have ongoing involvement related to developers

13  and city council members?

14  A.   Yes.  My role at the firm was to handle most of the local

15  government work that came in the office.

16  Q.   During that time, were you involved -- and I'm not asking

17  specific people or projects, but were you involved in small

18  meetings outside of the council floor with developers and

19  council members?

20  A.   Yes.

21  Q.   How frequent or common was that, in your experience?

22  A.   It just depended on the nature of the project and how

23  much, you know, work or information that individual

24  legislators would need.

25  Q.   In your experience both as city solicitor and also as a

1    private attorney, how common was it for developers to seek

2    specific individual council members' advice, maybe with their

3    lawyer or maybe with a lobbyist?

4    A.   I'd say it's fairly common.  Nearly every development

5    project required some form of legislation to pass through city

6    council, so I think it was very common.

7    Q.   In your experience as a solicitor and also on the other

8    side, on the private side, how common was it for council

9    members to express whether or not there were enough votes to

10   pass certain development deals?

11   A.   Yeah.  In my role as the solicitor, depending on the

12   project and if I was, kind of, the lead executive on the

13   project, it would be common for me to talk to council members

14   and, on behalf of the administration, essentially count votes

15   to see what support the legislation would have in passing

16   through council.

17       So I would frequently have conversations with individual

18   members of council to ask them if the votes were here for this

19   project; and, if not, what issues were of concern that might

20   help the administration advance the legislation.

21   Q.   How common was it, in your experience both in private

22   practice and also as a solicitor, to hear council members

23   express their confidence in getting votes?

24   A.   Especially if asked, they would tell me how many votes

25   they thought they had and, depending on the issue, how they

CURP - DIRECT

1   could get one or two more votes, depending on what they

2   thought were the crucial elements of the legislation that you

3   needed more or less support.

4   Q.   When did 435 Elm first become on your radar in your

5   capacity at any point?

6   A.   Sure.  When I came to the city in 2008, the property was

7   already a trouble spot in the city.  The city convention

8   facilities have been long believed to be kind of obsolete or

9   losing its competitiveness, mostly because of the Millennium

10  Hotel that was across the street that was not meeting

11  standards that was necessary to attract conventions to the

12  city.

13      435 Elm was across the street from there and considered

14  to be a prime development site.  It had a problem tenant in

15  the building that had property rights that the city couldn't

16  control.

17      So we were always working, looking for partnerships or

18  development opportunities to assist the current occupant to

19  move on, or find some way to take control of the property so

20  we could make it a part of the development portfolio around

21  the Convention Center.

22  Q.   Do you recall when P.G. was first elected to council?  Do

23  you remember the year?

24  A.   I believe probably around 2011.

25  Q.   During that time, 2011 through when you left in 2014, was

1    435 Elm on your radar in the city?

2    A.   Yes.

3    Q.   How often would you interact with or brief P.G. when you

4    were the solicitor during that time, 2011 to '14?

5    A.   Sure.  Councilmember Sittenfeld was one of our more

6    engaged council members, so we probably had a regular weekly

7    standing meeting where I would update him on all the issues

8    that were affecting the city to the law department.

9    Q.   And relative to his colleagues, how was he in terms of

10   his proactiveness and interest in legislation?

11   A.   I would say that probably two or three council members

12   out of nine that I had regular standing meetings with.  And

13   some council members had limited interest in, you know, law

14   departments, what we were working on, what our agenda was at

15   the moment.  Others would direct me to just contact them if

16   there were issues that I thought they should be aware of.

17   Q.   How frequently would council members come to you, and I'm

18   talking about any council members, complaining about

19   bureaucratic red tape or delays that constituents might be

20   feeling?

21   A.   Yeah.  I think that was a regular part of being a

22   director of a department at the city.  Council members had

23   direct access to all the department directors.

24        Because I was the attorney for council and for individual

25   council members, I would on a, you know, daily, weekly basis

*CURP - DIRECT*

1    be in contact with council members who had constituent issues

2    or questions about any given project I was working on.

3    Q.   Who else could council members or did council members go

4    to if there were projects that were stalled, that they

5    believed were stalled?

6    A.   Usually dependent on where council members thought where

7    the project was tied up.  So there was a city manager and two

8    assistant city managers, each of them had responsibilities for

9    different projects in the city.  I worked with all three of

10   them on different projects, so it was, again, a regular part

11   of our interaction.

12        Communications could come through those three

13   administrators, or the development director would bring issues

14   to us.  And sometimes the complaints were if the law

15   department was working too slow on a particular contractor

16   issue, and they would come directly to me.

17   Q.   How common was it for the city to -- and I'm using the

18   term "partnership" loosely, but partner with the Port

19   Authority?

20   A.   I would say that the city and the port are partners.

21   Again, they are our commercial and industrial economic

22   development arm of the city, in partnership with the county,

23   so I think, you know, we were in regular contact with them on

24   projects that were important for the city.

25   Q.   How frequently was it for council members, on a small

*CURP - DIRECT/CROSS*

1    group sort of basis or individual basis, to reach out directly

2    to the head of the port, like Laura Brunner?

3    A.   You know, I don't know individual conversations, but I

4    would expect that they were contacting the port and other --

5    our other development partners, 3CDC, on a regular basis to

6    get updates on projects.  And those organizations engaged

7    council members directly.  Anyway, so a lot of those

8    conversations would be around the administration.

9    Q.   So you mentioned 3CDC and the port.  People at 3CDC and

10   the port would regularly engage council members directly, is

11   that what --

12   A.   That was customary.

13         MR. C. MATTHEW RITTGERS:  I have no further

14   questions, Your Honor.

15         THE COURT:  Thank you, Mr. Rittgers.  Ms. Glatfelter?

16         MS. GLATFELTER:  Thank you.  Yes.  May I inquire?

17         THE COURT:  You may.

18                    CROSS-EXAMINATION

19   BY MS. GLATFELTER:

20   Q.   Good afternoon, Mr. Curp.

21   A.   Good afternoon.

22   Q.   We've never met before.  My name is Emily Glatfelter.

23        You are the interim city manager for the City of

24   Cincinnati?

25   A.   Correct.

CURP - CROSS

```
 1    Q.    And before that, you worked as a private attorney, I
 2    think you said, at a law firm?
 3    A.    Yes.
 4    Q.    And the city has an economic development department,
 5    right?
 6    A.    Yes.
 7    Q.    And it's staffed with career public servants?
 8    A.    Correct.
 9    Q.    And by "career public servants," we mean people that work
10    there, they're not elected officials?
11    A.    Yes.  The city administration is civil service outside
12    the political arm of the city, which is council.
13    Q.    And you depend on those career employees to evaluate
14    development projects in that economic development department?
15    A.    Correct.
16    Q.    And those career employees make assessments of what's in
17    the city's best interest based on a number of factors, right?
18    A.    Yes.
19    Q.    They vet proposed deals?
20    A.    Yes.
21    Q.    The city has tools for trying to find the best developer
22    for projects; for example, in your work for the city, you've
23    heard of the term RFP before, I assume?
24    A.    Yes.
25    Q.    That means a request for proposal, right?
```

1    A.   Correct.

2    Q.   And in the context of development projects, government

3    entities can put out an RFP to interested parties to submit

4    proposals, right?

5    A.   Yes.

6    Q.   And one of the purposes of an RFP is to increase the

7    competition, right?

8    A.   Yes.

9    Q.   So the government can get the best deal for the city --

10   A.   Correct.

11   Q.   -- right.  Whether that's price, or maybe that's the idea

12   of the development, the purpose of the RFP is so the

13   government can make a choice about what's best; is that right?

14   A.   Correct.

15   Q.   And those RFPs, essentially, result in competition

16   amongst the developers in the context of a development

17   project?

18   A.   Yes.

19   Q.   Would you agree it's in the government's interest to use

20   RFPs?

21   A.   Yes.

22   Q.   And, in fact, this year, the city was planning to do an

23   RFP for a third-party vendor to find a permanent city manager

24   position, right?

25   A.   I have -- because of my role in the city as the interim

CURP - CROSS

1    city manager, I've been excluded from that process.

2    Q.   Okay.  Are you aware that they were going to put out an

3    RFP for that, though?

4    A.   Yes, I'm aware.  I've been following it closely.

5    Q.   Thank you.  Now, you're familiar, you said on direct

6    examination, with the 435 Elm location in general, correct?

7    A.   Yes.

8    Q.   And is it true that you represented Mr. Ndukwe in

9    meetings with Ms. Brunner?

10   A.   Correct.

11   Q.   And you've also represented the defendant personally?

12   A.   Yes.

13   Q.   And you consider him a friend?

14   A.   Yes.

15   Q.   One of those meetings where you represented Mr. Ndukwe in

16   front of Ms. Brunner happened in December of 2019.  Does that

17   sound about right?

18   A.   That sounds about right.

19   Q.   Okay.  And after that meeting, you typically would

20   provide Mr. Ndukwe feedback regarding the meeting; is that

21   right?

22   A.   Correct.  I believe, yes.

23   Q.   And regarding this meeting that happened on December 19,

24   2019, you actually sent him an email regarding what happened

25   at the meeting?

CURP - CROSS

1    A.   At this point, you know, Mr. Ndukwe was a client of

2    myself and the firm, and I'm not able to disclose

3    attorney/client information.

4    Q.   Sure.  Would an email that Mr. Ndukwe provided to the

5    government refresh your memory regarding this?

6    A.   Without a waiver from the client to myself and to the

7    firm, I'm uncomfortable answering any attorney/client

8    communications.

9         MS. GLATFELTER:  Your Honor may we approach at

10   sidebar?

11        THE COURT:  You may.

12   SIDEBAR CONFERENCE

13        MS. GLATFELTER:  Thank you, Your Honor.  I have

14   copies.  Mr. Ndukwe provided us with communications a while

15   back regarding his interactions with Mr. Curp.  He wasn't even

16   sure he understood their relationship.

17        But in the context of that meeting, he said he doesn't

18   believe Ms. Brunner has any -- first of all, I don't think

19   this information is privileged here.  He's reporting on his

20   meeting with Ms. Brunner.

21        And he said, "I do not believe that she has any interest

22   in pursuing an RFP.  The politcos have boxed her in to dealing

23   with us exclusively for the foreseeable future."

24        THE COURT:  Has Mr. Ndukwe waived whatever privilege

25   he has in this letter?

 1          MS. GLATFELTER:  With -- for this letter, yes.

 2          THE COURT:  And how would I know that?

 3          MS. GLATFELTER:  We could -- I guess we could ask

 4     him.

 5          MR. SINGER:  Call Scott Croswell.

 6          MS. GLATFELTER:  Yeah.  We can contact his attorney,

 7     and --

 8          MR. SINGER:  We specifically asked him.  He provided

 9     these documents to us.  We said there's some material in here

10     that's got attorney/client labeled on top, and he told me that

11     he was waiving privileges for purposes of this.  But we could

12     take a recess and call.

13          THE COURT:  So I'm a little uncomfortable -- I'm not

14     suggesting anyone is misrepresenting anything to me.  I'm a

15     little uncomfortable not hearing directly from the client.

16      And I think the witness may also be a little

17     uncomfortable.  And I don't know what he believes he needs in

18     order to feel that there's a valid waiver of the

19     attorney/client privilege.

20      I'm not inclined, without something further, to instruct

21     him to answer a question based on the representation that the

22     government has just made.

23      So I'm happy to explore the issue further.  I do believe

24     Mr. Ndukwe can waive the privilege.  I believe this witness

25     could be convinced that he has waived the privilege, but I'm

1    not inclined to tell him to answer the question.

2         MS. GLATFELTER:  Could we take a brief recess to get

3    Mr. Ndukwe's attorney on the phone to speak with the Court and

4    also Mr. Curp?

5         THE COURT:  It would be better if Mr. Ndukwe himself,

6    I think.

7         MS. GLATFELTER:  Sure.

8         THE COURT:  That would be up to the attorney.  I

9    mean, whatever he's comfortable with, in terms of the

10   privilege being waived, I'm going to end up being comfortable

11   with, because I believe he's raised a legitimate concern, and

12   I think it needs to be addressed.

13        MS. GLATFELTER:  Okay.

14        THE COURT:  So in terms of the flow of your

15   examination, you think we should do this now?  We can do that.

16   That's fine.

17      Or if there are other things you can do -- I don't want

18   to tell you how to do your cross-examination, I'm just looking

19   to you for direction.  Would you like to take a break now,

20   or --

21        MS. GLATFELTER:  I would like to take a break.  I

22   think this is important.  I actually do not think this part of

23   -- I don't think this communication is privileged.

24      We can get Mr. Ndukwe and Mr. Croswell, or whatever will

25   satisfy him.  I think this directly goes towards what we've

CURP - CROSS

1    been talking about this morning, and the idea about limiting

2    competition, and who it was that was boxing Ms. Brunner in on

3    a deal in the year 20- --

4          THE COURT:  Again, if you don't believe it's

5    privileged, and if you believe he's going to agree with you

6    it's not privileged, I don't object to you showing him that

7    and asking him whether the part you want to solicit

8    information on would be privileged.  But if he says yes, then

9    we're going to need to do something.

10          MS. GLATFELTER:  Sure.  Maybe we could take a brief

11    break.  I can show him the communication, ask him, and we

12    could, in the meantime, get Mr. Ndukwe on the phone.  Whatever

13    would satisfy him.  I don't want him to be uncomfortable, and

14    I certainly understand the Court's concern.

15          THE COURT:  Okay.  Well, then, it sounds like we're,

16    unfortunately, going to need to take a brief break.

17      Are there other -- well, I assume you believe Mr. Ndukwe

18    will just give a blanket waiver of any privilege issues, or is

19    this the only --

20          MS. GLATFELTER:  This is the only one I want to show

21    him, and this is the email that he provided to our case agent.

22          THE COURT:  Okay.  All right.  So I think we need to

23    take a break, then.

24    SIDEBAR CONFERENCE CONCLUDED

25          THE COURT:  Ladies and gentlemen, as I mentioned at

 1     the beginning of the trial, sometimes issues come up

 2     unexpectedly that need to be addressed outside the presence of

 3     the jury.  One such issue has just arisen.

 4          And so while I know we were just on a break,

 5     unfortunately, I'm going to need to ask you to go back up to

 6     the jury room.  And I don't think it will take too long to

 7     address, but I'm not entirely certain.  So we will summon you

 8     back down when we can proceed.

 9          As I mention every time we take a break, please don't

10     discuss this case amongst yourselves.  Please don't

11     communicate with anybody about the case, or let anyone

12     communicate with you.

13          Please do not do any research on any aspect of the case.

14     Please don't look at any media accounts regarding the case,

15     and please don't begin to form any final opinions about the

16     case until all the evidence at closing.

17          So with that, we're going to, unfortunately, take another

18     brief recess.

19          (Jury out at 3:09 p.m.)

20          THE COURT:  So you raised an issue of attorney/client

21     privilege.  The government has represented to me that they

22     believe Mr. Ndukwe has waived the privilege, but I don't

23     intend to force you to answer a question without you being

24     able to have an opportunity to ascertain that to whatever

25     level of satisfaction you need.

```
1          So I think the way we're going to proceed is
2   Ms. Glatfelter is going to show you the document to which she
3   was referring.
4          She intends to, as I understand it, elicit your testimony
5   only with respect to one small part, and it may be that you
6   believe that part is not subject to privilege.
7          If you believe it may be, and would like to confer with
8   Mr. Ndukwe and/or his counsel in this case, we can address
9   that separately, so it's sort of a two-step procedure.  Does
10  that make sense to you, sir?
11               THE WITNESS:  Yes.
12               MS. GLATFELTER:  I left my document there.
13               THE COURT:  You may grab your document.
14               MS. GLATFELTER:  I don't know if your client -- I'm
15  happy to provide him -- I made a copy, but I didn't know if we
16  needed to wait until his determination before I handed out
17  copies?
18               THE COURT:  I think it's probably smart to do that.
19               MS. GLATFELTER:  Yes.
20               THE WITNESS:  So this is a communication I would have
21  only had with him, with the client.
22               THE COURT:  The only question I'm asking you -- I'm
23  not asking you right now to reveal the contents of that, or
24  say anything about it.
25          The only question that's pending right now is the one
```

1    from me to you, which is you raised concerns, without having

2    seen the statement, about the possibility of attorney/client

3    privilege.

4         Now having seen the statement, do you remain concerned

5    about attorney/client privilege?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  So then I think what we need to do

8    is take a break to allow Mr. Curp to confer with Mr. Ndukwe.

9         Is Mr. Ndukwe's counsel all right, or do you need to

10   confer with Mr. Ndukwe directly?

11             THE WITNESS:  Well, I guess, from my view, Blank

12   Rome's counsel is not here.  I'm no longer with the firm, and

13   so the privilege obviously belongs to the client.

14        And I think, from my perspective, the informed consent of

15   a client that he's waiving the privilege is what I need.

16             THE COURT:  Okay.  So I think we need to take a break

17   and see if we can arrange some communications.

18             THE WITNESS:  And with all due respect, there's

19   another lawyer in my firm that is on this communication too,

20   so his involvement is likely necessary as well, since he's

21   remaining partner at the firm.

22             THE COURT:  Very good.

23             MS. GLATFELTER:  Yes.  I believe that doesn't change

24   the fact that it's Mr. Ndukwe's call in terms of whether he

25   waives the privilege.

```
1                THE COURT:  Oh, absolutely.  I don't want to speak

2        for -- Mr. Curp's decisions about attorney/client privilege

3        are very personal.

4                THE WITNESS:  I agree the privilege belongs to the

5        client.

6                THE COURT:  So why don't we take a break, and you see

7        if you can arrange whatever communications need to occur with

8        Mr. Ndukwe.

9                THE WITNESS:  And, again, with all due respect,

10       there's another party on the phone, which is his development

11       partner, who was working within the context of that

12       attorney/client relationship as well, Mr. Schiff.

13               THE COURT:  Your firm had an attorney/client

14       relationship with him as well?

15               THE WITNESS:  They were co-developers on the project,

16       yes.

17               THE COURT:  That wasn't my question.  My question

18       was, did your firm have an attorney/client relationship with

19       Mr. Schiff?

20               THE WITNESS:  We did not have a contract with

21       Mr. Schiff.  I don't think we did.

22               THE COURT:  Okay.  All right.

23               MS. GLATFELTER:  Your Honor, we have a witness room

24       outside.  I don't know how you'd like us -- what would be the

25       best way, or Mr. Curp's preference, for facilitating this?
```

1          We're happy to get Mr. Croswell and Mr. Ndukwe on the

2     phone and let Mr. Curp have that conversation.  I just don't

3     know if -- whatever he's amenable to.  If he'd like --

4          THE COURT:  Is that going to be sufficient, if

5     Mr. Ndukwe waives it, or do you now have concerns about

6     Mr. Schiff as well?

7          THE WITNESS:  Mr. Schiff as well, yes.

8          THE COURT:  So you're saying that the relationship

9     wasn't just with Mr. Ndukwe?

10          THE WITNESS:  The contract with the firm was with

11     Kingsley Development, and Mr. Schiff was the co-developer

12     participating in the project with Kingsley as -- and I don't

13     know how they've divided fees, but I believe that I was

14     working with both of them as co-developers on the project.

15          THE COURT:  I see.  Do you know who Blank Rome's

16     general counsel is?

17          THE WITNESS:  In Philadelphia at the moment.  I don't

18     know a name, in particular.

19          THE COURT:  Oh, okay.  Well, how would you suggest we

20     proceed, Ms. Glatfelter?

21          MS. GLATFELTER:  Yes, Your Honor.  As we mentioned,

22     Mr. Ndukwe has waived the privilege related to this email.

23     We're happy to get him on the phone and facilitate that.

24          I believe that the witness has said that Blank Rome

25     didn't have a contract separately with Mr. Schiff and the

1    privilege related to Kingsley, which is Mr. Ndukwe's sole

2    company.

3        And so I think Mr. Ndukwe is in the position to waive

4    that privilege.  And I believe that Mr. Curp's relationship

5    with Mr. Ndukwe extended before and after Mr. Schiff's

6    participation in this project.

7        THE COURT:  Okay.  All right.  So what I would

8    suggest is we take a recess.  Mr. Curp, you can use these

9    chambers right over here.  I think Ms. Glatfelter can arrange

10   for you to make a phone call to someone, and we can see if we

11   can get to somewhere where you're comfortable.

12       As I said, I'm not going to sit here and order you to

13   provide testimony that you believe would infringe the

14   attorney/client privilege, and I appreciate that's a decision

15   the attorneys have to make.

16           Let's take a brief recess.

17       (Brief recess.)

18           THE COURT:  So it's the Court's understanding that

19   we've not been able to completely resolve the potential

20   privilege issue with regard to the question that's pending

21   before Mr. Curp.

22       Is that the government's understanding as well,

23   Ms. Glatfelter?

24           MS. GLATFELTER:  Yes, based on our discussion.

25           THE COURT:  Mr. Rittgers?

1          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  I wasn't

2     privy to it, but...

3          THE COURT:  Okay.  So I think the prudent thing to do

4     at this juncture is to dismiss the jury for the day to see if

5     we can resolve the outstanding issue with regard to privilege

6     before we move forward with Mr. Curp's further examination.

7          It would be the Court's intent, since the last thing I

8     did before they left the room was admonish them anyway, to

9     just release them and bring them back at 9:00.

10         Mr. Rittgers, yes?

11         MR. C. HENRY RITTGERS:  Judge, there is another

12     issue.  Even if the waiver of the conflict comes about, it's a

13     hearsay issue.

14         THE COURT:  Well, I mean, he can testify as to what

15     his impression was at the meeting.  He can sit on the stand

16     and testify as to what his impression was at the meeting.  And

17     then if he reports a different impression than was in the

18     document, he can be impeached using the document, I think.

19         Ms. Glatfelter?

20         MS. GLATFELTER:  Yes.  I also believe this is a

21     recorded recollection that could be introduced into evidence

22     if we chose.  It could also be read to the jury.

23         THE COURT:  Yeah.  Well, we can talk about that,

24     possibly.

25         All right.  So I think what we're going to do is send the

1    jury home.  That's where I was.

2        Last thing I did before they left was admonish them.  If

3    either side wishes, I could bring them back and admonish them

4    again, but they've been admonished a lot already, so...

5            MR. C. HENRY RITTGERS:  We're not interested in that.

6    I think they get the picture.

7            THE COURT:  Okay.  Scott, we can release the jury.

8    Please ask them to be back at the normal time tomorrow.

9            Mr. Curp, sir, you can step down.  The one thing I

10   would tell you is that you remain on the stand, so please do

11   not confer with anybody regarding your testimony, other than

12   as needed to confer with general counsel at the firm if you

13   have a privilege issue, or something of that nature.

14           THE WITNESS:  Okay.

15           THE COURT:  And you may step down, sir.

16           THE WITNESS:  Okay.

17           THE COURT:  Mr. Rittgers?

18           MR. C. MATTHEW RITTGERS:  What time would you like

19   him back tomorrow?

20           THE COURT:  If you could be back by, say, 9:00 in the

21   morning.  Can you do that?

22           THE WITNESS:  Yes.

23           THE COURT:  That would be great.  Thank you.

24           THE WITNESS:  Thank you.

25       (Witness temporarily excused.)

 1             THE COURT:    Let's talk a little bit about

 2     scheduling for tomorrow.

 3        Mr. Rittgers, I think you mentioned that you might have

 4     some interest in going through the prior acts witnesses that

 5     you intend to put on, and talk about them a little bit more,

 6     is that right?  I don't want to put words in your mouth.

 7        Are there any issues you'd like to discuss before we

 8     recess for the evening?

 9             MR. C. MATTHEW RITTGERS:   Your Honor, the

10     government -- I don't want to relitigate everything but, you

11     know, the government has talked about different donations and,

12     you know, they've alluded to straw donors, pointed to

13     different things to highlight testimony, you know, for

14     example, Medpace.

15        These are non-development stuff.  And they're asking the

16     jurors to draw conclusions or infer from this, you know, what

17     they think is bad intent in testimony unrelated to development

18     deals.

19        So I just -- what I'm asking you before I do that is if I

20     could show the jury the way in which P.G. interacted with many

21     people in terms of legislation, the stalled project or stalled

22     legislation that was going on in the city over the course of

23     several months with a single constituent, not necessarily just

24     the development deals.

25        And without the all-encompassing picture there, I mean, I

```
 1    don't -- I'll be very frank.  I don't have an out-of-town

 2    developer who is willing to invest millions of dollars in

 3    Cincinnati to do the exact parallel.

 4        I do have some, very few, who were actually doing

 5    development deals, but I don't -- without the broader picture

 6    of individuals, I think that it would be ill advised of me to

 7    just put two or three of these people on, and to just talk --

 8    because the whole picture, you know, if you look at the group

 9    as a whole of ten, you would see --

10            THE COURT:  I thought there was 13.

11            MR. C. MATTHEW RITTGERS:  Okay.  Was it 13?  Yeah, I

12    mean, 13 if I could, yeah.

13            THE COURT:  What were the ten to which you just

14    referred?

15            MR. C. MATTHEW RITTGERS:  I'm just trying to pare it

16    down a little bit more.

17        But as a trial lawyer, if I'm limited to just, you know,

18    two who had or three who had some development issues over the

19    course of six or twelve months, and interactions with P.G.,

20    those two might not also have been at dinner and drinks with

21    P.G., so -- but the person who was worried about Airbnb

22    legislation worked with P.G. for 12 months, might have had

23    drinks with P.G.

24        And so like to just present two or three versus the ten,

25    I would probably feel compelled not to present any.  And
```

1    that's just why I brought that up.

2           MR. SINGER:  Your Honor, this is the type of evidence

3    that we addressed pretrial in our motions.  We litigated the

4    different sides.  The Court ruled on the law relating to this

5    issue.

6        It's my understanding that you were providing some leeway

7    within the confines of your order.  I mean, the order is what

8    the order is at this point

9           THE COURT:  Yeah.  You know, I think what I'd say

10   is -- I've got my order here.

11       At your request, Mr. Rittgers, I addressed other-acts

12   evidence under Rule 404(b).  And I think you would agree that

13   the evidence here you're intending to elicit is other-acts

14   evidence?

15          MR. C. MATTHEW RITTGERS:  It goes to his modus

16   operandi, how and which he interacted with --

17          THE COURT:  But it goes to proving it through other

18   acts, right?

19          MR. C. MATTHEW RITTGERS:  Yes.

20          THE COURT:  Okay.  So that's, I think, other-acts

21   evidence covered under 404(b).

22       And according to Sixth Circuit, concerning the

23   admissibility of such evidence requires a three part test,

24   whether there's sufficient evidence the defendant, in fact,

25   performed the other acts, I don't have a real issue with that

1    here.

2        If so, whether the other acts are probative of material

3    issue other than character, and if so, whether the evidence

4    should be excluded under 403.

5        So the real issues with respect to steps two and three,

6    and what, you know, your concern was with regard to the

7    other-acts evidence the government wanted to put on was that

8    it wasn't sufficiently probative, and this was going to be

9    Mr. Sittenfeld's other interactions with other donors, which I

10   think a lot of the same things you're saying about the

11   other-acts evidence you want to put on, his interactions with

12   other constituents could also be -- the government could say,

13   well, they're true, and also we want to show how he interacted

14   with other potential donors.

15       And what the Court said was that I'm not going to allow

16   people to put on evidence unrelated to, essentially, the sort

17   of specific nature of the allegations here.  And, you know,

18   part of it was -- and this would be true of any witnesses you

19   put on as well.

20       I'm not going to allow witnesses to testify to their own

21   subjective perception about, oh, this is what I thought he

22   meant, or that type of thing.

23       But what I said was, third, the Court concludes that the

24   items of potential evidence specified above, and I was talking

25   about a certain subset, would not be unfairly prejudicial to

1    Sittenfeld, that is because the other acts at issue are of the
2    same general kind as the conduct charged in this case, namely,
3    an alleged exchange of official actions beneficial to a
4    particular donor for campaign contributions.

5        So I limited the other-acts evidence that the government
6    would be able to put on to some kind of official actions,
7    alleged exchange of official actions beneficial to a
8    particular donor for campaign contributions, which is related
9    to this here.

10       Now, of course, you're trying to put on the converse,
11   so -- what I call good-acts evidence.

12       But I think the point of this order was that there needs
13   to be some similarity between -- as I said earlier today, some
14   similarity between the conduct at issue as to which you intend
15   to elicit testimony, and the sort of nature of the factual
16   allegations here.

17       And I'm not saying it needs to be solely limited to real
18   estate development, but I think it does need, in some way, to
19   be -- arise in the kind of setting where the possibility for
20   economic return to the people involved is in some way at
21   issue.

22       So that, you know, this notion of exchanging influence
23   for money -- where Person A stands to make a lot of money, and
24   some governmental official holds the keys to Person A making a
25   lot money, that to me seems to raise different issues or

1    implications or inferences about what's meant by the conduct

2    in that case.  That's what I'm sort of trying to limit it to.

3        I mean, if you're saying there was some -- it sounds

4    like, if you're talking about Airbnb legislation, there may

5    have been an economic import to that, so I'm willing to hear

6    what you have to say, but that's what I'm looking for.

7        MR. C. MATTHEW RITTGERS:  Understood, Your Honor.

8    And so, yeah, one witness, he ran a small business, Airbnb

9    business.

10        There was legislation that was put into a subcommittee

11    that was introduced at the, I believe to push the hotel lobby.

12    He reached out to a number of council members, ended up

13    getting the most fastest and most responsiveness, and sat down

14    with P.G., in addition to a couple other Airbnb small business

15    owners, and then had communication with P.G. over the course

16    of 12 months while legislation was being worked through in

17    various subcommittees.

18        Ultimately, legislation passed that, I think, was, you

19    know, kind of a consensus for both sides that wouldn't kill

20    the Airbnb business, but these guys had to pay taxes, which I

21    think they weren't paying before.

22        The crux of the testimony would be P.G.'s communication,

23    accessibility, willingness to talk to this constituent, who

24    had financial interest on the line, about the different

25    processes that were happening behind the scenes at City Hall.

```
 1    That would be one witness.

 2            THE COURT:  And there were no campaign contributions

 3    involved in any way?

 4            MR. C. MATTHEW RITTGERS:  That witness, I have all

 5    their donor history, donated $100 in 2019.  He donated $1,000,

 6    I believe, after this.  This was in October 28th of 2020, he

 7    donated $1,000.

 8            THE COURT:  Okay.

 9            MR. C. MATTHEW RITTGERS:  Another witness, he started

10    a business about 30 years ago.  He was a vendor.  He still

11    runs the same business.  He sells peanuts and water outside

12    the stadiums.

13        And there was an issue with whether or not these small

14    business vendors would have to go through a lottery process in

15    order to get their certain location set, and it would rotate

16    and change each year.

17        One of the small business owners ended up suing the city

18    for this legislation.  This individual reached out to multiple

19    council members, seeking help, so that he didn't have to get

20    involved in a lawsuit.

21        He would testify that Mr. Sittenfeld and his team, over

22    the course of, I believe at least a year on that, 12 months or

23    more, would proactively keep him updated as they worked

24    through the process.

25        Again, it's a legislative process that ultimately would
```

1    prevent this lottery system legislation from happening, and

2    these business owners could then not worry about their product

3    and merchandise by waiting to see if they were going to be at

4    a certain location where they could sell product.

5        His donor history, I believe he would testify that he

6    donated afterwards, and his $25, $50, $25, $25, $50, $50.  I'm

7    not sure -- I mean, if I can elicit it, maybe I would, but I

8    wasn't planning on it.  I just wanted to have it for each one

9    of these individuals is why I have it.

10            THE COURT:  I appreciate that.

11            MR. C. MATTHEW RITTGERS:  A police officer who is the

12    community liaison officer in Avondale, he was having problems.

13    He created a few programs to help with violence, which was his

14    job as a community liaison officer, building relationships in

15    the community.

16        He recalls reaching out to at least another council

17    member.  The council member said that's not my thing to help

18    him try to get ball fields, and get funding to get these ball

19    fields cleaned and prepped to go for this Pitching For Peace

20    program that he had.

21        He immediately had responsiveness from P.G.  P.G. was

22    actually there multiple times during this program.  He's been

23    to P.G.'s house subsequent to that for parties, they text each

24    other.  They've essentially become friends after that

25    interaction.

1      Clare Blankemeyer, this would be one of the people that I
2  believe is fairly in line with development projects.  She was
3  really working as a volunteer advocate at the time, but there
4  was a development project that was stalled in the city, and
5  she and other advocates were reaching out to various council
6  members.  Ultimately, they received help from P.G. for the
7  stalled project.
8      The mayor was trying to torpedo this project.  She
9  donated in 2017 $50, and in 2020 $50.
10          THE COURT:  What kind of development project?
11          MR. C. MATTHEW RITTGERS:  It was a low-income housing
12  development project that she believed, based on information
13  she had, that the mayor was refusing to push through council.
14  It was a $15 million from a housing development project.
15          THE COURT:  $15 million?
16          MR. C. MATTHEW RITTGERS:  That's my belief.
17          THE COURT:  That was stalled, and then the logjam was
18  broken with Mr. Sittenfeld's assistance; is that right?
19          MR. C. MATTHEW RITTGERS:  The process that it took --
20  she would testify that it took to work through City Hall after
21  she got involved.  So she was involved as just a personal
22  advocate, I believe.
23      Another advocacy group said, hey, can you help.  She said
24  her involvement directly with Mr. Sittenfeld was a six-month
25  period to try to get this un-stalled in the city.

1          Did we talk about the Airbnb guy?

2               THE COURT:  Yes.

3               MR. C. MATTHEW RITTGERS:  An individual who needed

4     help -- he was starting a business and needed help with zoning

5     ordinances, law changes, in order to, what he would call, cut

6     through the red tape.  It's slow-moving vehicles on the

7     roadways, which is the business of the golf carts.

8          He would testify that he and P.G. -- P.G. would express

9     his confidences in his colleagues.  They would have text

10    messages, calls.  These two have socialized at times and in

11    interactions.

12              THE COURT:  What do you mean "express confidence in

13    his colleagues"?

14              MR. C. MATTHEW RITTGERS:  Like hey, we got the votes

15    to be able to get this passed.

16         And I believe some of the other witnesses I've already

17    said would say the same thing.

18              THE COURT:  No, you haven't said that.

19              MR. C. MATTHEW RITTGERS:  I know I haven't said that.

20    But I mean, I'm going through as fast as I can but, yes,

21    expressing confidence in colleagues.

22              THE COURT:  Whereby "expressing confidence in

23    colleagues," you mean expressing that his colleagues on city

24    council would vote for a particular project?

25              MR. C. MATTHEW RITTGERS:  Yes.  That's my

1       understanding.  And not all of the witnesses, but I believe I

2       know some of the witnesses would say that his confidences in

3       his colleagues were expressed.

4          This individual had a development project -- I don't know

5       if I'm going to be able to get him in anymore.  But he had a

6       development project.  I believe he would also say that P.G.

7       did express his confidence in his colleagues for the difficult

8       project expansion.

9          And he met with P.G., he believes, two to three times in

10      person over the course of 12 months.  He brought in someone

11      else on his team who would show him higher level schematics

12      that his, P.G.'s involvement, in helping pass this complex

13      project, he was the most proactive on council.

14         There are two potential witnesses who would testify that

15      during COVID restrictions, that when they needed certain

16      things to happen for their small businesses to stay open, one

17      is the pastor -- I don't know if that's a small business, but

18      Pastor Tome is one.  I don't know if that's a small business.

19         But there needed to be -- you know, there were issues

20      with noise ordinances, and the contracts with the city for

21      public land so that services could be held outside and both

22      inside, and reached out directly to P.G.

23         P.G., you know, cut through that red tape and helped him

24      with that by directly notifying administrators within the city

25      to get those things done without some formal legislative

1        process.

2                THE COURT:  You said there were two.  Pastor Tome is

3        one.

4                MR. C. MATTHEW RITTGERS:  The other one had to do

5        with parking.  He had never conducted a carry-out business.

6        He wanted to try to keep his restaurant open, and reached out

7        directly to P.G. to say, hey, can you get someone in an

8        administrative position to designate three spots in front of

9        our business that are actually metered parking, so that no one

10       can park there during COVID, so that I can conduct a carry-out

11       business.

12          This individual, he is like a serial entrepreneur startup

13       guy, lives in the city.  I believe -- and I haven't really

14       fully baked his testimony yet, Your Honor, but I believe he's

15       going to say had frequent interaction both social and about

16       business with Mr. Sittenfeld, always accessible, engaging.

17          He would go to him with problems like potentially -- he

18       lives in a neighborhood that isn't -- wasn't always the

19       safest, he would go to him with safety issues.

20          They would text, have meals together.  They'd have beers

21       on occasion, talk about topics related to bringing tax dollars

22       to Cincinnati, the startup community, and the tech ecosystem

23       issues that he was seeing within his world, and how Cincinnati

24       could help businesses like that in the city both who were

25       already here and attracting businesses here.

1       I'm trying to do this from my notes, Your Honor.  I

2   apologize.

3           THE COURT:  That's fine.  You're at nine witnesses

4   now, so...

5           MR. C. MATTHEW RITTGERS:  One potential witness, Your

6   Honor, I don't know if I would call her, but maybe.  There's a

7   grocery store that was receiving -- there was a potential bill

8   for a grocery store that was receiving issues --

9           THE COURT:  A potential?

10          MR. C. MATTHEW RITTGERS:  A build for a grocery store

11  that had some hurdles that had to be cleared.  Potentially, I

12  don't know, but there's an issue within the city, and this

13  testimony would be that, you know, P.G. helped un-stall this

14  project so that it could continue to go through and pass, this

15  grocery store, the development.

16      This individual is -- some of the meetings that were

17  referenced in court.  One, I believe, was the cozy meeting

18  that these individuals, Rob and Brian, had been invited to.

19  This individual was actually at that meeting.  I believe that

20  that's the meeting that was held at Via Vite.  Maybe.  I might

21  be wrong on that.

22      But this individual would talk about the coalition

23  building.  This guy is a firefighter, and he's the head of a

24  firefighter PAC, and P.G. introducing him to various leaders.

25          In fact, at one time, it was Mrs. Brunner trying to get

1    people together.  He said, you know, P.G. was the guy that he

2    would go to when they had any issues, small or big, to try to

3    get things undone or stuck in the city.

4        This guy had competing interests between his chief, his

5    union members, and he mentioned two or three more to me that I

6    forget right now.  And he could go to P.G. and get his ideas

7    about the city, and help him cut through any issues that he

8    had.

9        How many is that, Your Honor?

10            THE COURT:  That's 11.  I think my concern,

11   Mr. Rittgers, remains the same with regard to a lot of these,

12   which is, and then do you want the government to trot in

13   13 people who, you know, found Mr. Sittenfeld to not be

14   responsive in some way when they called with a concern?

15       It just seems like it's focusing on a lot of the -- it's

16   changing the focus of the case from the interactions that

17   occurred in this case, to interactions that occurred on

18   others.

19       And with respect to like when you say things as broad as

20   coalition building, or Mr. Sittenfeld helped with ensuring

21   that religious services could go forward during COVID, that

22   all sounds laudable, but I don't see how it has probative

23   effect with regard to the allegations here, which is that, in

24   connection with the 7,400 or whatever it was million dollar

25   deal, that there was some kind of tacit quid pro quo with

1    regard to arranging votes in exchange for campaign

2    contributions.

3        You know, the -- and somebody that generally he engaged

4    with a serial entrepreneur, and talked about good ways to get

5    tax dollars in Cincinnati, I think a lot of the witnesses who

6    have testified already have said that Mr. Sittenfeld was

7    always open to discussing ways to improve Cincinnati.

8        So it seems cumulative of that, and doesn't seem in any

9    way to me necessarily directly related to the allegations that

10   the government's making in this case.

11       I mean, some of these seem maybe a little bit closer, the

12   Blankemeyer incident that you mentioned.  I mean, the police

13   officer incident, you know, if we're talking about how

14   Mr. Sittenfeld jumped in to help make sure that ball fields

15   were cleaned up, it seems to me that's exactly the concern

16   that I raised.

17       I'm sure Mr. Sittenfeld has done a lot of laudable

18   things, but that isn't really the question that's presented to

19   the jury here, and I'm afraid it's going to be more seen as a

20   ploy for sympathy or empathy than it is as a rebuttal of the

21   case the government's put on.

22       Some of your other ones, I agree, are closer.  I'd be

23   willing to talk about those but, I mean, that's my initial

24   reaction.  I'd be happy to hear from the government about it,

25   though, too.

1            MR. SINGER:  Your Honor, they seem to fall square on

2      *Dimora*, and the Court's order on 2948 from the motion in

3      limine order.

4        They seem like a combination of testimony that would be

5      good access maybe under *Dimora* or 405 character evidence,

6      which can only be brought in based on reputation or opinion,

7      not specific instances.  They seem like a combination of those

8      two.

9            THE COURT:  Well, but in fairness, Mr. Rittgers

10     originally said character witness, but then the last time we

11     discussed this, it seemed to transition from character

12     witnesses to kind of good acts witness.  I agree with you

13     that --

14           MR. SINGER:  Some of the topics, there's some overlap

15     on.

16           THE COURT:  Right.

17           MR. SINGER:  They don't seem necessarily as relevant

18     to anything other than the fact that it's a positive witness

19     for the defendant's character.

20           THE COURT:  Yeah.  What about the Clare Blankemeyer

21     thing, though?  $15 million lower-income housing department.

22     It was stalled, and Mr. Sittenfeld interacted with her on a

23     proactive basis to un-stall the program.

24        Of the ones we've seen, that one seems to me -- and then

25     there was some development project, witness seven.  I wasn't

1    really clear on what the development project was.  But those

2    seem to me to be the closest analogues.

3            MR. SINGER:  It does, Your Honor.  But *Dimora* did

4    say, just because there is a specific instance of a time that

5    you did something on behalf of the public's interest and did

6    not receive a bribe for it, does not make it -- does not make

7    it -- that it's still subject to 404, and *Dimora* excluded that

8    type of evidence, or affirmed the exclusion of that type of

9    evidence.

10           THE COURT:  Yeah.  I'm really struggling to see how

11   this would come in under *Dimora*.  I mean, we concluded that

12   the evidence of this totally different incident demonstrated

13   little or nothing about the person's intent on the charges

14   made in the indictment.  Are you bringing it in as intent?  Or

15   what's the permissible use you think you can make of it?

16           MR. C. MATTHEW RITTGERS:  To show the elected

17   official's modus operandi.

18       You know, part of the problem with the case law, Your

19   Honor, including *Dimora*, is that these cases all have plus

20   factors, or they're express quid pro quo cases.  This is not

21   that case, and this case goes to intent.

22       The acts that the prosecution put forth in the past six

23   days of testimony were to show that P.G. had constant

24   communication and interaction, and he would update Rob and

25   Brian after things would go through council or subcommittee,

1      or he would speak with an administrator.

2          And so *Dimora*, and all the cases which don't have plus

3      factors, and lots of them are express quid pro quo cases, is

4      not what we have before us here, and so the jury is going to

5      have to determine --

6              THE COURT:  But *Dimora* wasn't an express quid quo pro

7      case.

8              MR. C. MATTHEW RITTGERS:  It had plus factors.  So

9      we're not offering it for intent.  I mean, we would even be

10     fine with just a little limited instruction.  The offer is not

11     for intent.  It's for P.G.'s modus operandi, how he

12     interacted, how he would proactively tell people that he had

13     made communications with different people within the city

14     administration and outside of it.

15         His proactive nature, accessibility, everything that the

16     government showed in six days of trial.

17             MR. SINGER:  Your Honor, may I address the plus

18     factor?  It keeps coming up.

19             THE COURT:  Yes.

20             MR. SINGER:  This is a district court case out of the

21     Eastern District of Michigan.  The jury instructions did not

22     include any plus factor.

23         After the case, there was a hung jury as to one count,

24     acquittal as to a 1001, and the district court did not allow

25     the government to retry the campaign contribution case and

1    created this plus factor.

2        It's currently on appeal.  It's been argued.  It's

3    pending before the Sixth Circuit.

4        The Sixth Circuit has never embraced this.  The law for

5    campaign contributions as set forth in the Sixth Circuit is

6    best set forth in *Terry*, which relied on *McCormick* and *Evans*.

7        The Sixth Circuit has never embraced any plus factor, and

8    it should not be part of the Court's consideration,

9    particularly when dealing with a separate issue relating to

10   good acts.

11       The Court in *Dimora* was not assessing it in terms of the

12   quid pro quo, the type of quid pro quo that was at issue.

13       It was as to whether the evidence is relevant to his

14   intent, and good act evidence on a completely separate

15   occasion is not relevant to whether on a different occasion

16   they had different intent.

17           THE COURT:  Yeah.  You run perilously close to the

18   situation where someone accused of robbing a bank wants to

19   bring in bank managers from five other banks, and they all

20   say, well, he didn't rob ours.  I mean, you know, you can't do

21   that.

22       But I guess the difference, in the Court's mind here, is

23   that the government is pointing to specific conduct as being

24   inferentially related to or inferentially showing some kind of

25   intent on Mr. Sittenfeld's part, or inferentially showing the

```
1    existence of an agreement.

2        And I think the argument would be, yeah, this is the kind

3    of -- and we heard some from Ms. Brunner today, that she felt

4    like he was pushing differently or harder in this case.

5        And so there does seem to be some kind of suggestion that

6    the way in which he approached 435 Elm was different or

7    unique.  I mean, is that not part of what the government is

8    arguing, Mr. Singer?

9            MR.  SINGER:  Your Honor, I think -- the quid pro quo

10   for the two main incidents is set forth in the incident on

11   November 7th and the incident on September 24th.

12       Now, the surrounding circumstances can be evidence of his

13   intent at the time that the quid pro quo occurred.  And I

14   think Ms. Brunner's testimony, Ms. Brunner's testimony goes to

15   the fact that she was receiving pressure.  The fact that it

16   was pressure is relevant to whether there was official action,

17   so that is evidence that we would cite to.  The fact that she

18   was pressured relating to other projects, not as relevant.

19           THE COURT:  But are you going to argue that the fact

20   that Mr. Sittenfeld was willing to pressure her suggests that

21   he was being motivated by the contributions that he'd

22   received?

23       If you are, it seems to me that a rebuttal of that is no,

24   Mr. Sittenfeld just pressured a lot of the people a lot of the

25   time.  I mean, how is that not a rebuttal of the suggestion
```

1    that there's a linkage between the two?

2           MR. SINGER:  Well, then, I mean, that goes to the

3    argument that any other non-criminal act is going to be

4    relevant to intent.  But those are separate acts.  This is the

5    act that's charged here.

6           THE COURT:  Yeah.  Well, tell me more about the

7    development project for witness number seven.

8           MR. C. MATTHEW RITTGERS:  That was Children's

9    Hospital, Your Honor, I believe.

10          THE COURT:  Children's Hospital?

11          MR. C. MATTHEW RITTGERS:  I believe.  I believe that

12   was witness number seven.  I didn't do it in order.  It was an

13   expansion of Children's Hospital, I believe.  That wasn't the

14   grocery store one?

15          THE COURT:  No.  You said it was, you said, a

16   development project.  He expressed confidence in his

17   colleagues.  He met in person.  And this witness would testify

18   that he was the most proactive of the city council people.

19          MR. C. MATTHEW RITTGERS:  Yeah.

20          THE COURT:  Is that somehow involved -- it's a

21   development project in connection with the Children's Hospital

22   project?

23          MR. C. MATTHEW RITTGERS:  Yeah, an expansion.

24          THE COURT:  And what was the business at issue with

25   respect to where zoning changes were needed, and that he

1    expressed we got the votes?

2         MR. C. MATTHEW RITTGERS:  That one I don't know if

3    there's an I got the vote expression, if we're talking about

4    the same thing, but was it the low-speed vehicles?

5         THE COURT:  I don't know.  What you said was you had

6    someone who would testify that they needed help starting a

7    business that required zoning changes; that he socialized from

8    time to time with Mr. Sittenfeld, and that Mr. Sittenfeld at

9    some point expressed we got the votes.

10        MR. C. MATTHEW RITTGERS:  I don't know if it was that

11   exact verbiage, Your Honor, just to be -- because I'm looking

12   at my outline of the questions.

13      But that would be a low speed -- they're like golf carts.

14   They get money from advertising revenue on the golf carts, and

15   they give people rides around the city.  And they needed the

16   city to change ordinances to let these things be on the roads.

17      In that particular case, I also know that P.G. was making

18   introductions for that person as well, similar to the

19   introductions that we've heard were offered here with these

20   agents.

21        THE COURT:  I thought you thought -- well, you've

22   been the one making the point about the introductions, which I

23   thought you said were indicative of lack of intent because he

24   was introducing people.

25        MR. C. MATTHEW RITTGERS:  There are two sets of

1        introductions.  We have talked about introductions of civic

2        leaders.

3            They, I believe, elicited testimony where P.G. offered,

4        then, to introduce Rob and Brian to different developers.  And

5        we heard all this stuff about Dan Schimberg, and how P.G.'s

6        like oh, yeah, I'll get you to other people, like my people

7        that can help you with the development deal, just

8        introductions in general, I think, were also introduced by the

9        customer.

10            THE COURT:  Well, I think, consistent with what I

11        said earlier today, based on what you told me so far, I would

12        be inclined to allow testimony with regard to Ms. Blankemeyer,

13        the development project for Children's Hospital, and that's

14        about it on the list that you've given me.

15            I think those are close enough that they may have some

16        probative value of Mr. Sittenfeld was engaging in similar

17        conduct with regard to his willingness to advance those

18        projects, but I still think there needs to be --

19            I'm assuming you're going to be able to elicit testimony

20        that he did things similar to what the evidence has suggested

21        he did here, similar statement, similar meeting, similar text

22        messaging of meetings and updates, and potentially interfacing

23        with other city officials to push the projects, that type of

24        thing?  I mean --

25            MR. C. MATTHEW RITTGERS:  I mean, with those two

1      individuals, I don't believe that there were text messages

2      about city business.  I don't believe that.

3              THE COURT:  Oh, well --

4              MR. C. MATTHEW RITTGERS:  Go ahead.  I'm sorry.

5              THE COURT:  No.  I'm sorry.  I'm interrupting you.

6      But did he intercede with other city officials on behalf of

7      these people and do those kind of things?

8              MR. C. MATTHEW RITTGERS:  That's their understanding

9      that, yes.  Their understanding of it based on what he told

10     them.  I mean, I don't think they were there for it, but yes.

11             THE COURT:  I'm assuming that the government would

12     probably object to that based on hearsay?

13             MR. C. MATTHEW RITTGERS:  I mean, how else would you

14     show that they knew that that was happening?  He was telling

15     them where to be, when --

16             THE COURT:  Well, maybe I'm wrong.  Would the

17     government object to that on hearsay grounds?

18             MR. SINGER:  Yes, Your Honor.

19             MR. C. MATTHEW RITTGERS:  I mean, I guess, I would --

20             THE COURT:  I mean, Mr. Sittenfeld can take the stand

21     and say, yeah, I did this in a lot of other situations, and

22     he -- you know, I guess he could give some examples like that.

23         But I don't know how they could test -- I don't know how

24     he could elicit testimony from them where the foundation of

25     the testimony is out-of-court statements that Mr. Sittenfeld

1    made to them, which they're treating as true, and thus want to

2    testify.

3         I think it probably lacks foundation.  It's speculation.

4    It's --

5              MR. C. MATTHEW RITTGERS:  And the foundation would,

6    Your Honor, would be that they had these issues before the

7    city, they reached out to council members.

8         They then are describing the type of responsiveness and

9    proactive nature of Mr. Sittenfeld's communications to them

10   throughout whatever period of time that process was, where

11   their issues was logged inside the walls of City Hall.

12             THE COURT:  Well, I'm still where I was every time

13   we've talked about this, which is the ones that are

14   sufficiently close, I believe, would be that Children's

15   Hospital expansion one, and the low-income development

16   project, and assistance he provided in connection with those.

17   If it's similar in nature to the assistance he provided in

18   connection with the project here, I would be inclined to allow

19   it.

20        I will, as I've said, I will allow the government, in

21   rebuttal, to put on other developers who believe that

22   Mr. Sittenfeld was eliciting or soliciting campaign

23   contributions in exchange for promoting their projects,

24   because I think it's only fair if we're going to go in one

25   direction, we've got to go to the other.

1          So I hear what you're saying, Mr. Rittgers, I just -- in

2    light of the *Dimora* case, and the fact that the Court pretty

3    explicitly said that evidence about unrelated incidents is not

4    relevant to the intent on the charges of the indictment, I

5    just -- that's about as far as I think I can go, so that's

6    where I'm at on that.

7          Is there anything else we need to discuss?

8               MR.  SINGER:  Nothing from the government.

9               MR. C. MATTHEW RITTGERS:  No, not from the defense,

10   Your Honor.

11              THE COURT:  Okay.  So in light of what I said, I know

12   you're probably still planning and reconfiguring, but do you

13   have an idea of what witnesses you intend to call tomorrow?

14              MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

15              THE COURT:  And have you shared that with the

16   government?

17              MR. C. MATTHEW RITTGERS:  I will do that right now

18   via email.  I'll give the government a list of five witnesses.

19              THE COURT:  Five witnesses?

20              MR. C. MATTHEW RITTGERS:  Five.

21              THE COURT:  Do you believe we'll get through all five

22   witnesses tomorrow?

23              MR. C. MATTHEW RITTGERS:  I think that it's a very

24   good chance, yes.

25              THE COURT:  Do you believe that you'll be resting,

1    then, tomorrow, or do you believe we'll go into the next --

2              MR. C. MATTHEW RITTGERS:  I think there's a very good

3    chance.

4              THE COURT:  Okay.  So then I think the Court's

5    intention, per our earlier conversation, would be to give the

6    jury -- assuming you get to where you rest, give the jury

7    Friday off so we can address jury instructions.  All right.

8        Okay.  So I think we got a plan.  We'll see you a little

9    before 9:00 tomorrow.  Very good.

10             (Proceedings adjourned 4:51 p.m.)

11                        -  -  -

12             C E R T I F I C A T E.

13                        -  -  -

14       I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in the
15   above-entitled matter.

16

17   /s/ M. Sue Lopreato_____              September 30, 2022
     M. SUE LOPREATO, RMR, CRR
18   Official Court Reporter

19

20

21

22

23

24

25

INDEX

GOVERNMENT WITNESS

JARED KAMRASS

Direct by Mr. Singer................................. Page 19
Cross by Mr. C. Matthew Rittgers.................... Page 64
Redirect by Mr. Singer............................. Page 98

LAURA BRUNNER

Direct by Ms. Gaffney Painter....................... Page 99
Cross by Mr. C. Matthew Rittgers.................... Page 126
Redirect by Ms. Gaffney Painter.................... Page 146
Recross by Mr. C. Matthew Rittgers................. Page 148


JOHN CURP

Direct examination by Mr. C. Matthews Rittgers....... Page 174
Cross by Ms. Glatfelter............................ Page 182



EXHIBITS

GOVERNMENT EXHIBITS

Exhibit                                          Admitted

41H                                                 35
41G                                                 41
40F                                                 61
41E                                                 62
44B                                                115


DEFENSE EXHIBITS

Exhibit                                          Admitted


- - -