```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                            -  -  -
 3

 4   UNITED STATES OF AMERICA,      : Case No. 1:20-cr-00142-1
                                    :
 5             Plaintiff,           : Jury Trial, Day 10
                                    : Tuesday, July 5, 2022
 6             - v -                :
                                    : 9:00 a.m.
 7   ALEXANDER SITTENFELD, a/k/a    :
        "P.G. Sittenfeld,"          :
 8                                  :
               Defendant.           : Cincinnati, Ohio
 9
                            -  -  -
10

11                    TRANSCRIPT OF PROCEEDINGS

     BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE
12
                            -  -  -
13

14   For the Plaintiff:       EMILY N. GLATFELTER, ESQ.
                              MATTHEW C. SINGER, ESQ.
15                            MEGAN GAFFNEY PAINTER, ESQ.
                              U.S. Department of Justice
16                            U.S. Attorney's Office
                              221 E. Fourth Street, Suite 400
17                            Cincinnati, Ohio  45202

18   For the Defendant:       CHARLES M. RITTGERS, ESQ.
                              CHARLES H. RITTGERS, ESQ.
19                            NEAL D. SCHUETT, ESQ.
                              Rittgers & Rittgers
20                            12 E. Warren Street
                              Lebanon, Ohio  45036
21
     Law Clerk:               Jacob T. Denz, Esq.
22
     Courtroom Deputy:        Scott M. Lang
23
     Court Reporter:          M. Sue Lopreato, RMR, CRR
24                            513.564.7679

25                            -  -  -
```

Proceedings recorded in stenotype.
Transcript produced with computer-aided transcription.

1
P R O C E E D I N G S

2
(In open court at 9:52 a.m.)

3
- - -

4
THE COURT: We're here this morning in the matter of

5
the United States of America versus Alexander Sittenfeld.

6
It's case number 1:20-cr-142. We're here this morning for the

7
continuation of the trial in this matter.

8
Is there anything counsel wish to place upon the record

9
before we bring in the jury?

10
MR. SINGER: No, Your Honor.

11
MR. C. MATTHEW RITTGERS: No, Your Honor.

12
THE COURT: I'm not sure the jury is here yet, so it

13
may be a minute or two.

14
COURTROOM DEPUTY: They are not.

15
THE COURT: They're not all here yet.

16
As you know, we try to get here early so that if we've

17
got anything we need to take of before the jury comes in, we

18
can. It appears we don't need to so why don't we just take a

19
brief recess until the jury is ready.

20
(Brief recess.)

21
THE COURT: I'm informed the jury is assembling and

22
should be in here shortly.

23
(Jury in at 10:13 a.m.)

24
THE COURT: Ladies and gentlemen of the jury, first

25
of all, I hope you had an enjoyable Fourth of July weekend.

1      There have been some things that have occurred in this

2    trial that have led to delays that I hope you won't attribute

3    to any party, just some unexpected things have come up.

4      We are trying to do the best we can, given the current

5    situation, and try to make this as convenient and efficient

6    and safe for all of you as we possibly can.

7      I very much appreciate the patience that you've

8    demonstrated to date, and your attention to the trial, and we

9    will move forward here in trying to keep things moving along

10   for you as best we can.

11     So I think when we left off, Ms. Glatfelter was

12   cross-examining Mr. Curp, and I believe the government is

13   ready to proceed this morning with cross-examination.

14   Ms. Glatfelter?

15        MS. GLATFELTER:  Yes, Your Honor, we are.  May I

16   proceed?

17        THE COURT:  You may.

18        MS. GLATFELTER:  Thank you.

19     (JOHN CURP, previously sworn, resumes witness stand.)

20         CONTINUED CROSS-EXAMINATION

21   BY MS. GLATFELTER:

22   Q.  Good morning, Mr. Curp.

23   A.  Good morning.

24   Q.  So when we left off, I'd like to take maybe 30 seconds to

25   ask you a few questions to go back to where we left off on

1    Wednesday.

2        So I believe, on Wednesday, you were talking about your

3    experience working for the City of Cincinnati?

4    A.   Yes.  If I may, Your Honor, I believe our understanding

5    was you were going to make a statement on the record regarding

6    the attorney/client privilege issue.

7    Q.   Yes.  And I will get to that.

8    A.   Okay.  Thank you.  I just want to be sure that's covered

9    before we get there.

10   Q.   Yes.  Certainly.  So you were talking about your

11   experience with the City of Cincinnati; is that right?

12   A.   Correct.

13   Q.   Okay.  And you currently are the interim city manager,

14   right?

15   A.   Yes.

16   Q.   And one of the departments you oversee is the economic

17   development department?

18   A.   Correct.

19   Q.   And we talked about how that's staffed with career public

20   servants, meaning they're not elected officials?

21   A.   Correct.

22   Q.   Okay.  And one of the tools that the city can use in the

23   economic development department is an RFP, right?

24   A.   Yes.

25   Q.   An RFP is something that the city might use to increase

1    competition?

2    A.   Yes.  An RFP is not competitive bidding in the context of

3    buying or, you know, building a bridge or a road, but it's a

4    process used to get proposals.

5    Q.   Right.  And so you might get different ideas for the

6    project through the RFP --

7    A.   Yes.

8    Q.   -- generally.  Or you might get a difference in --

9    because of those ideas, a difference in price for the city?

10   A.   You know, it depends.  Yes.

11   Q.   Just generally speaking?

12   A.   Generally, right.

13   Q.   Okay.  And so outside of city council, you left in

14   around -- I'm sorry, city council -- City of Cincinnati, you

15   left in around 2014; is that right?

16   A.   Yes.

17   Q.   And during that time, you worked in private practice

18   until you became the interim city manager, right?

19   A.   Yes.

20   Q.   And you've represented Mr. Sittenfeld before?

21   A.   Yes.

22   Q.   He's a close friend?

23   A.   Yes.

24   Q.   And in 2019, you were working for a law firm, right?

25   A.   Yes.

1   Q.   Okay.  And in that capacity, you represented Mr. Ndukwe

2   and his company, Kingsley?

3   A.   Yes.  I don't recall what year exactly, but I did

4   represent him.

5   Q.   Okay.  And specifically, that representation encompassed

6   aspects of 435 Elm?

7   A.   Yes.

8   Q.   All right.  Now, we left off on Wednesday when I had

9   showed you an email, and you had expressed concerns about

10  attorney/client privilege.

11      So I'm representing to you that I have received, in

12  writing, Mr. Ndukwe's waiver of his company, Kingsley, and

13  himself.  He has waived attorney/client privilege with respect

14  to that email.

15      I've also spoken to counsel for Mr. Schiff.  Mr. Schiff

16  and his company, Schiff Capital, have likewise raised [sic]

17  any claim of privilege relating to that email, to the extent

18  that they had one.

19          THE COURT:  You said "raised."  Did you mean waived?

20  Q.   Waived.  Sorry.

21  A.   Yes.

22  Q.   And that's the representation that you wanted me to make

23  on the record?

24  A.   Yes.  Thank you.

25  Q.   Okay.  And you recognize that the client, in this case

1    Mr. Ndukwe and his company, and to the extent applicable

2    Mr. Schiff and his company, they are the holders of the

3    privilege?

4    A.   Yes.

5    Q.   Okay.  So if they waive privilege, you can discuss what

6    they authorized you to talk about?

7    A.   Yes.

8    Q.   All right.  Now, the email I had shown you was about some

9    discussions involving the port, specifically Ms. Brunner,

10   right?

11   A.   Yes.

12   Q.   We'll get to the specifics in a minute.

13        And you relayed information from the port back to

14   Mr. Ndukwe?

15   A.   Yes.

16   Q.   Okay.  Now -- so the email, I see you have a copy in

17   front of you.

18        Do you recall sending this email in 2019?

19   A.   I have not seen my emails.  I left the firm, and I have

20   not seen my emails, so I'm, I guess, relying on the fact that

21   you have these, so...

22   Q.   Okay.  Well, let's start --

23   A.   I remember this meeting, and I remember generally what it

24   was about --

25   Q.   Okay.  But --

1    A.    -- but --

2    Q.    So do you see your email address on the email?

3    A.    Yes.

4    Q.    Okay.  That was your email address in December of 2019?

5    A.    Yes.

6    Q.    All right.  And you see the email address of Mr. Ndukwe

7    and Mr. Schiff?

8    A.    Yes.

9    Q.    Those were their email addresses that you used to

10   communicate with them?

11   A.    Yes.

12   Q.    Okay.  And was it your practice to keep your clients

13   informed of things related to their -- to your representation

14   of them?

15   A.    Yes.

16   Q.    Okay.  And with respect to this meeting, you see it was

17   sent on December 19, 2019?

18   A.    Yes.

19   Q.    And the email references the meeting that you had on that

20   date?

21   A.    Yes.

22   Q.    So the contents of this email were made around the same

23   time of the meeting?

24   A.    Yes.

25   Q.    All right.  And would this email accurately reflect your

1    impressions and your information regarding that meeting?

2    A.   Generally, yes.

3        MS. GLATFELTER:  Your Honor, at this time, I'd move

4    to admit the email as the next Government's Exhibit USA 49,

5    under Rule 803, as either a present sense impression or a

6    recorded recollection.

7        MR. C. MATTHEW RITTGERS:  No objection, Your Honor.

8        THE COURT:  What number is it, USA 49?  USA 49 is

9    admitted without objection.

10       MS. GLATFELTER:  Your Honor, permission to publish?

11       THE COURT:  You may do so.

12   Q.   Mr. Curp, do you see the email that we were discussing on

13   your screen?

14   A.   Yes.

15   Q.   What is the date of this email?

16   A.   December 19, 2019.

17   Q.   And this email recounts your conversation with

18   Ms. Brunner?

19   A.   Yes.

20   Q.   Can you read the two sentences -- the second paragraph,

21   starting with the sentence "I do not believe"?

22   A.   "I do not believe that she has any interest in pursuing

23   an RFP.  The politicos have boxed her into dealing with us

24   exclusively for the foreseeable future."

25   Q.   Okay.  And by "politicos," you're referencing elected

*CURP – CONT'D CROSS*

```
 1    officials?

 2    A.   Yes.

 3    Q.   By "boxing her in," is that synonymous with, you know,

 4    putting her in a corner or backing her into a corner?

 5    A.   Well, that fits with our litigation strategy and with our

 6    development strategy.  So I believe, at that time, if we had

 7    given both strategy we were employing at that time, that we

 8    had forced her to deal with Mr. Ndukwe.

 9    Q.   Exclusively?

10    A.   Hopefully exclusive in our RFP process.

11         MS. GLATFELTER:  All right.  Your Honor, permission

12    to publish to the witness and the jury what has previously

13    been admitted as USA 11A?

14         THE COURT:  You may do so.

15         MS. GLATFELTER:  Ms. Terry, if we could go to the

16    last page, and the bottom three entries right there.

17    Q.   Sir, do you see the date of these entries are December of

18    2019?

19    A.   Yes.

20    Q.   And that middle entry is December 23, 2019, "Sittenfeld

21    contacts Laura Brunner."  Do you see that?

22    A.   Yes.

23    Q.   This email that we were talking about, can you tell us

24    where that fits in time-wise with this chronology?

25    A.   The email that I sent was December 19.
```

CURP - CONT'D CROSS/REDIRECT

1    Q.   All right.  So it would be between the December 11th and

2    December 23rd entry?

3    A.   Yes.

4         MS. GLATFELTER:  One moment, Your Honor?

5         THE COURT:  Yes.

6         MS. GLATFELTER:  Those are all my questions.  Thank

7    you.

8         THE COURT:  Thank you.

9                     REDIRECT EXAMINATION

10   BY MR. C. MATTHEW RITTGERS:

11   Q.   Mr. Curp, now that privilege has been waived, can you

12   tell us the concerns that your client and you had about why

13   Mrs. Brunner was treating him unfairly?

14        MS. GLATFELTER:  Your Honor, I just want to clarify,

15   for this witness, the privilege has been waived with respect

16   to this email only.

17        THE COURT:  Very good.

18   Q.   Were you -- I'm sorry.

19   A.   And so, again, my understanding, when we discussed this,

20   was that the business and litigation strategy that was

21   encompassed in this entire message was part of the waived

22   privilege.

23        MR. C. MATTHEW RITTGERS:  That's what I heard on

24   direct, Your Honor.

25        THE COURT:  I'm not going to order you to answer, as

1    I have not ordered you to answer any question all along.

2        I think the privilege, and your understanding of your

3    obligations as an attorney, should guide your willingness to

4    answer this question.

5    Q.  Are you comfortable in answering that question, Mr. Curp?

6    A.  Yes.  My understanding of the waiver, as represented by

7    Ms. Glatfelter, is that I could speak to the litigation and

8    real estate strategy that's related to the full content of

9    that email.

10   Q.  Can you give us a little bit more context about that

11   email, and the ways in which you had concerns about

12   Mrs. Brunner's treatment of Mr. Ndukwe at that time?

13   A.  Certainly.  So this property -- Mr. Ndukwe owned a

14   mortgage interest, and essentially two to three floors of the

15   building, so we had two strategies.

16       One was that the port could not proceed without

17   acknowledging that right that he had in that air space.  And

18   if they were to issue an RFP, that would mean that they were

19   challenging that right and would give us the basis to pursue

20   litigation against the Port Authority.

21       The other part is that Mr. Ndukwe believed that the port

22   was prejudiced against black developers, and especially

23   against Mr. Ndukwe.

24       So at the same time we were pursuing the development

25   strategy of convincing council members on two fronts; one,

1    that it was a good project, one that he had indisputable

2    rights to the space.  And third, that the port's history of

3    black developers deserved the port to favor him to develop

4    this project.

5        The litigation strategy was very simple, which was we

6    were going to challenge the legal right that he had in the

7    mortgage rights to that -- the floor, as well as the federal

8    civil rights claim against the port for their discrimination

9    against black developers.

10   Q.   And I assume that you talked to more than just one

11   council member.  There were other civic leaders that you

12   talked to about this during that time, correct?

13   A.   Correct.

14   Q.   Can you tell us -- the prosecutor mentioned on direct

15   [sic] that there was one tool, RFPs are one tool that can be

16   used.  Can you describe situations, I mean back when you were

17   a city solicitor, when RFPs were not used?

18   A.   Well, I wouldn't -- an RFP issued where there are

19   disputed property rights is not a productive exercise --

20   Q.   Why?

21   A.   -- and that was my position.

22       Because a developer is not going to waste the time and

23   energy to put together a proposal, build out costs, build out

24   project specs, prepare a development if they don't have a

25   clear property right that they are going to be able to pursue

 1    at the end of the process.

 2    Q.   As we sit here today, three years later, three years

 3    later, are you familiar with any RFP that has been issued for

 4    435 Elm?

 5    A.   No, I'm not.

 6    Q.   When did Mr. Ndukwe purchase the air rights to 435 Elm?

 7    A.   I don't know the exact time.  It was prior to him seeking

 8    our representation on the case.

 9    Q.   Back on -- this email was dated in December of 2019, I

10    believe, correct?

11    A.   Yes.

12    Q.   Mr. Ndukwe had what -- for what we've learned in here, a

13    new partner.  Who was that?

14    A.   Michael Schiff was the only other person I worked with on

15    this project.

16    Q.   So at this time -- do you recall a meeting where

17    Mr. Schiff and Mr. Ndukwe sat down in the City Hall office

18    with Mr. Sittenfeld?

19    A.   I wasn't at that meeting.

20    Q.   Okay.  Were you aware that that meeting occurred?

21    A.   I don't recall.

22    Q.   Did Mrs. Brunner express her interests to you at that

23    time, in terms of whether or not she actually wanted to issue

24    an RFP or work with the person who had the air rights?

25    A.   Can you state that again?  I'm sorry.

1    Q.   Sure.  Did she express to you her desire to work with

2    Mr. Ndukwe as a partner and Mr. Schiff as a partner?

3    A.   Yes.  At the time that we received this case in our firm,

4    we were perceived as a litigation firm.  And Ms. Brunner

5    mentioned to me the fact that she was disappointed that

6    Mr. Ndukwe was taking a litigation track on this case, and

7    that she was interested in working with them.

8        And we, again, took the threat of an RFP as a lever in a

9    business negotiation of the case.

10            MR. C. MATTHEW RITTGERS:  May I have one moment, Your

11   Honor?

12            THE COURT:  You may.

13            MR. C. MATTHEW RITTGERS:  I have no further

14   questions, Your Honor.

15            MS. GLATFELTER:  No recross, Your Honor.  Thank you.

16            THE COURT:  Very good.  Mr. Curp, you're free to step

17   down.  Thank you.

18       (Witness excused.)

19            MR. C. MATTHEW RITTGERS:  Your Honor, Luke Blocher,

20   who I believe is here.  May I check to see if he's in the

21   hall?

22            THE COURT:  You may.

23            MR. C. MATTHEW RITTGERS:  Thank you.

24       (Defense witness, LUKE BLOCHER, sworn.)

25            THE COURT:  You may proceed.

```
 1                    DIRECT EXAMINATION

 2   BY MR. C. MATTHEW RITTGERS:

 3   Q.   Good morning.  What is your full name for the record?

 4   A.   My full name is Lucas Rames Blocher.

 5   Q.   Where do you currently work?

 6   A.   The Taft law firm.

 7   Q.   And where did you work back in 2018 and 2019?

 8   A.   I worked in the law department for the City of

 9   Cincinnati.

10   Q.   In what role?

11   A.   I was the deputy city solicitor.

12   Q.   And can you tell us what duties the deputy city solicitor

13   had, especially in relation to the economic development

14   department?

15   A.   So my duties included general management of the

16   department, but then also sort of oversight of all of the

17   transactional parts of the office, which included all the work

18   around economic development and real estate.

19   Q.   How common was it for a council member to come to you and

20   discuss legislation back when you were a deputy city

21   solicitor?

22   A.   Well, I think there's two parts to that question.  One

23   is, I think council members can request legislation, like any

24   member, like mayor or city manager.

25        And then from time to time, because I was, sort of, the
```

1     main person to discuss economic development-related issues,

2     and I was the person who explained at the public meetings the

3     terms of the deals and how they worked, I would, from time to

4     time, get questions about them from people and house members.

5     Q.    Outside of council floor individually?

6     A.    Yes.  It was more common in council, but it happened

7     outside of council too.

8     Q.    Back in 2018 and 2019, can you tell us who the head of

9     the economic development department was?

10    A.    Yes.  It was Philip Denning.

11    Q.    What role did you have in reviewing or drafting something

12    called a transmittal or an ordinance?

13    A.    I think the easiest way to explain that is that for every

14    ordinance that comes before the council, there's an ordinance

15    which is the actual legal document, and the law department

16    drafts that.

17         And my staff would -- you know, if it was an economic

18    development-related ordinance, my staff would draft it and I

19    would review it.  Sometimes I would draft it but, in general,

20    I would review it and approve it.

21         And then a transmittal would be drafted by the department

22    who was putting forward the ordinance, usually in a

23    development context, was the development department, and that

24    was -- that came together with the ordinance when it was put

25    forth to council.

```
1         MR. C. MATTHEW RITTGERS:  Your Honor, may I approach

2    the witness?

3         THE COURT:  You may.

4         MR. C. MATTHEW RITTGERS:  And I'm showing you what's

5    been previously marked as Defendant's Exhibit D4, which is a

6    transmittal, and Defendant's Exhibit D2, which is the

7    ordinance.

8    Q.   Do you recognize those two documents?

9    A.   I do.

10   Q.   And could you tell us what D4 is?

11   A.   D4 is the transmittal that accompanied the D2 ordinance.

12   Q.   Is that a fair and accurate copy of the transmittal for

13   435 Elm to the port?

14   A.   As far as I can tell, it looks to be, yes.

15   Q.   On that transmittal, is that something that you would

16   have reviewed?

17   A.   The transmittal, I would have reviewed in the context of

18   presenting -- being a part of the council meetings which would

19   discuss it.  And so I would review it to be able to discuss

20   what was inside of it, and also I would have reviewed it when

21   it went final to be submitted.

22   Q.   On the transmittal, can you tell who sponsored the

23   transfer to the port?

24   A.   When you say sponsor, I'm not sure exactly what you mean

25   by that.
```

*BLOCHER - DIRECT*

1    Q.   What does it mean to sponsor legislation?

2    A.   Okay.  I guess, when I would use that term, any piece of

3    legislations that comes through the city, there's some

4    constituent part of the city that's saying I want this to

5    happen and puts it forward, whether it be a council member,

6    whether it be a mayor, whether it be the city manager.

7         And then within the city manager, you have all the

8    departments that report up to the city manager so, oftentimes,

9    they'll come from a specific department through the city

10   manager.

11   Q.   By looking at D4, can you tell who sponsored that

12   transfer to the port?

13   A.   I think this was -- this came from the city manager,

14   which is indicated at the top of the document.  And by the

15   nature of the way it's -- the final page, there's a copy to

16   Philip Denning, the director of the department, and that would

17   have been a common practice to note that this came, sort of

18   through the development department, came up through -- up from

19   the development department, up to the city manager's office,

20   to city council for consideration.

21        MR. C. MATTHEW RITTGERS:  Your Honor, may I approach

22   the witness stand again just to take back the document?

23        THE COURT:  You may.

24        MR. C. MATTHEW RITTGERS:  May I have permission to

25   publish D4, Your Honor?

1          THE COURT:  Are you moving to admit it?

2          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

3          MS. GLATFELTER:  No objection.

4          THE COURT:  Defendant's Exhibit D4 is admitted

5     without objection and may be published to the jury.

6     Q.   Can you see that on your screen up there, Mr. Blocher?

7     A.   Yes.

8     Q.   And so can you tell us who the city manager was at the

9     time?

10    A.   Yes.  It was Patrick Duhaney.

11    Q.   And by looking at this document, can you tell us who

12    sponsored this transfer to the port?

13    A.   I guess, using the terminology of sponsor that we just

14    discussed, I would say the city manager has put forward this

15    legislation to propose transferring this property.

16    Q.   And then after the transmittal, what part -- what's the

17    law called, the actual transfer, the legal document?

18    A.   Generally, I think -- well, generally, it's either

19    purchase, or sale, or sale agreement.

20    Q.   And what does the ordinance stand for that you have up

21    there marked as Defendant's Exhibit D2?

22    A.   The ordinance is the actual legal agreement -- the legal

23    authorization from the city council authorizing the city to

24    transfer property --

25    Q.   And --

```
 1    A.   -- in this case.

 2    Q.   Oh, sorry.

 3    A.   No.  I'm sorry.

 4    Q.   Go ahead.

 5    A.   No.  I just said in this case.  That's all I said.

 6    Q.   Oh.  Is this something that you would have also reviewed

 7    in your role as a deputy city solicitor?

 8    A.   Yes.

 9    Q.   Do you see your initials anywhere on that document?

10    A.   Yes.  My initials are on the upper right-hand corner.

11    Q.   And what is that?

12    A.   The practice, at the time I was in the city solicitor's

13    office, was the solicitor's office would draft all the

14    ordinances, and the city solicitor, herself or himself, or a

15    deputy would initial it before they send it off to be

16    submitted for final -- you know, to be considered final.

17    There would be a wet ink initialing of the ordinance as a,

18    sort of, final signoff.

19    Q.   Is that a fair and accurate copy of the ordinance that

20    transferred 435 Elm from the city to the port?

21    A.   Yes.  I believe, yes, it is.

22    Q.   And inside that document, is there a discussion as to the

23    reasons why this property was transferred to the port?

24    A.   I believe there is.  And if you could let me review it

25    quickly, I can --
```

1    Q.   It's the top of page 2, I believe.

2    A.   Okay.  Yes.  In the top of page 2, yes, it describes --

3    it gives one of the reasons for transferring property.

4         MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

5         THE COURT:  You may.

6         MR. C. MATTHEW RITTGERS:  I'll move to admit this

7    exhibit and publish, Your Honor.

8         MS. GLATFELTER:  No objection.

9         THE COURT:  Defendant's Exhibit D2 is admitted

10   without objection and may be published for the jury.

11   Q.   Mr. Blocher, I'm going to show you what is on the top of

12   page 2 on this document that you testified you reviewed.

13       Is that what you were referring to in terms of some of

14   the reasons why the property at 435 Elm was transferred from

15   the city to the port?

16   A.   Yes.

17   Q.   Is that common, ordinary practice of the city to put the

18   reasons in the actual ordinance for transfers?

19   A.   Yes.  It was a normal practice to -- and, again, this is

20   the, sort of, official legislative action of the city saying

21   why they're doing something, and so it was common practice to

22   say in the ordinance this is why we did this.

23   Q.   And these reasons that were stated here, in part, on the

24   top of page 2, those facts, that would have come from the city

25   economic development department, I assume?

1    A.   Correct.

2    Q.   Was there anything unusual, back in 2019, when this was

3    transferred from the city to the port?

4    A.   I don't really know exactly how to answer that question,

5    but nothing -- I suppose I can say nothing is coming to mind.

6    Q.   Okay.  Was it unusual to transfer properties for a dollar

7    from the city to the port back when you were deputy city

8    solicitor?

9    A.   I don't know how -- I would say that it wasn't unusual to

10   transfer properties for a dollar, as a general matter, in

11   economic development transactions in which there was a larger

12   value involved than the value of the property that was -- the

13   city was trying to achieve.

14   Q.   And can you state some of those reasons why the city

15   would do that?

16   A.   Again, I think, as a general matter, the city either --

17   in the sense like this, the city has property that has its

18   own, sort of, negative value in some ways, and then -- but it

19   could be redeveloped by another party.

20        Or there's a larger redevelopment project that's

21   happening that requires a significant amount of city incentive

22   to be possible, and one of those incentives is transferring

23   the property for a dollar.

24   Q.   Just because a property is transferred to the port, do

25   the maintenance costs go away?

1    A.   Can you read that last part again?

2    Q.   The maintenance cost that we looked at on page 2 of this

3    document were $400,000 a year.  Do those costs go away when it

4    gets transferred to the port?

5    A.   I wouldn't think so.

6    Q.   If we could talk about P.G. relative to other council

7    members briefly.  How is he in terms of his communication and

8    involvement relative to the other council members with you as

9    the deputy city solicitor?

10            THE COURT:  Hang on one second.

11            MS. GLATFELTER:  Your Honor, objection.  May we have

12   a quick sidebar, please?

13   SIDEBAR CONFERENCE

14            MS. GLATFELTER:  Your Honor, I believe this is

15   irrelevant, given the pretrial rulings and the discussion

16   we've had over the last few days in terms of what evidence

17   would be relevant for the defendant to put on.

18       This is essentially 404(b) evidence -- on one side, it

19   could be 404(b) evidence.  On the other side, it's comparison

20   to other legislators.  What's relevant here is what the

21   defendant did in this case relative to 435.

22            MR. C. MATTHEW RITTGERS:  Your Honor, we just heard

23   the government's case in chief that P.G. was very involved,

24   and all I'm asking this witness is to testify to how involved

25   he was in the past with other deals.

1          THE COURT:  Are you going to go through specific

2    instances?

3          MR. C. MATTHEW RITTGERS:  I was not going to go into

4    specific deals.

5          THE COURT:  Okay.  I mean, I think it's consistent

6    with some of the testimony we've already heard from other

7    witnesses about the extent to which Mr. Sittenfeld was

8    involved in economic development activities.  I'm going to

9    allow you a little leeway, but I'm assuming you're not going

10   to go into --

11         MR. C. MATTHEW RITTGERS:  Into a specific deal, I'm

12   not.

13         THE COURT:  And this is going to be relatively --

14         MR. C. MATTHEW RITTGERS:  Yes.

15         THE COURT:  Okay.

16         MS. GLATFELTER:  Your Honor, that's what makes it

17   relevant, if it's related to a specific economic development

18   similar to this one, just generally how he was -- just

19   generally how he is as a legislator is irrelevant.

20         THE COURT:  Well, I'm going to allow it in.

21         MR. C. MATTHEW RITTGERS:  Thank you.

22   SIDEBAR CONFERENCE CONCLUDED

23         THE COURT:  You may proceed.

24   BY MR. RITTGERS:

25   Q.  Mr. Blocher, relative to other counsel members, how

BLOCHER - DIRECT

1    active was P.G. in terms of his communication and questions to

2    you related to legislation development?

3    A.   I would say that -- I mentioned earlier there was a

4    couple settings which I engaged with people, there was at

5    council meetings, at committee meetings, and then occasionally

6    outside of those.

7         I think, in both settings, he was, as a general matter,

8    more active than most of his colleagues, during the time that

9    I was there, at least.

10   Q.   How common was it for a council member to come to you and

11   inquire about complaints that they might have been receiving

12   related to delays, or what we might refer to as bureaucratic

13   red tape?

14   A.   It was not as uncommon as I would like, because it was my

15   people who were doing that work, in a lot of instances, but it

16   did happen from time to time.  We tried to improve on that

17   over time, but it would still happen from time to time

18   Q.   How frequent was it for the city to partner with the port

19   on difficult developments?

20   A.   I can say that the Port Authority has pretty unique

21   powers under state law, and so it was not uncommon for the

22   city, and is not uncommon even today for the city, to partner

23   with the Port Authority in ways that both parties can use

24   their unique authority to help make a project happen.

25         MR. C. MATTHEW RITTGERS:  I have no further

1    questions, Your Honor.

2              THE COURT:  Thank you, Mr. Rittgers.

3              MS. GLATFELTER:  May I inquire, Your Honor?

4              THE COURT:  You may, Ms. Glatfelter.

5              MS. GLATFELTER:  Thank you.

6                        CROSS-EXAMINATION

7    BY MS. GLATFELTER:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   You said that you worked for the city in 2018 and 2019?

11   A.   Correct.

12   Q.   And that was a career position, right, a career public

13   servant position, as opposed to an elected official?

14   A.   Correct.

15   Q.   And that was as the deputy solicitor general?

16   A.   Deputy city solicitor was the title.

17   Q.   Deputy city solicitor.  Your responsibilities in that

18   role included economic development, I believe, we heard?

19   A.   Yeah.  My staff and me were involved in the drafting and

20   negotiating of economic development agreements.

21   Q.   All right.  And in that role in working with economic

22   development, as a general matter, your job is to serve the

23   city, do what's in the best interest of the city?

24   A.   The city is my client, so yes.

25   Q.   So you're working to serve the city in the best way that

1    you can?

2    A.   I certainly thought I was doing that, yes.

3    Q.   You said you worked with economic development, including

4    people like Phil Denning, right?

5    A.   Yes.

6    Q.   And Phil Denning is also someone who is a career public

7    servant, distinguishable from elected officials?

8    A.   Yes.

9    Q.   All right.  And the economic development department,

10   their role was evaluating -- part of their role was evaluating

11   proposed projects?

12   A.   Yes.

13   Q.   And in evaluating those proposed projects, they would

14   determine what was in the city's best interest?

15   A.   I believe that's an accurate way to describe it.

16   Q.   And one of the projects that they evaluated in 2019, as

17   we just heard with the ordinance, was 435 Elm, right?

18   A.   Correct.

19   Q.   So you were aware, at the time when that property was

20   transferred, that Mr. Ndukwe was interested in developing

21   435 Elm, right?

22   A.   I was aware, yes.

23   Q.   All right.  And you were aware at that time that

24   Mr. Ndukwe, in developing that project, sought certain things,

25   like he wanted the property for a dollar, right?

*BLOCHER - CROSS*

```
 1    A.   I don't know that.  I wasn't involved in those
 2    discussions with him directly.
 3    Q.   Okay.  Mr. Blocher, were you interviewed by the FBI in
 4    relation to this matter?
 5    A.   Yes.
 6    Q.   Would it help refresh your memory to review a report of
 7    that interview?
 8    A.   Sure.
 9         MS. GLATFELTER:  May I approach, Your Honor?
10         THE COURT:  You may.
11    Q.   I'm not trying to be tricky here.
12    A.   No.  Sure.
13    Q.   I'm just asking you, at the time that property was
14    transferred, you were aware that Mr. Ndukwe wanted that
15    property for a dollar?
16    A.   After having that refresh my memory, I do recall that
17    he -- I had heard that that was happening, he was out there
18    advocating for that.
19    Q.   And he did not want a competitive process, right?
20    A.   That was what I had heard, yes.
21    Q.   And despite having an interested developer interested in
22    435 Elm, the city made the decision to transfer the property
23    to the port, right?
24    A.   Yes.
25    Q.   And that was because it was public servants' belief that
```

1    was in the best interest of the city?

2    A.   I think that reflected the best judgment of the city

3    administration, yes.

4         MS. GLATFELTER:  One moment, Your Honor.

5       No further questions.

6         THE COURT:  Thank you, Ms. Glatfelter.

7         MR. C. MATTHEW RITTGERS:  No questions, Your Honor.

8         THE COURT:  Very good.  Mr. Blocher, you're free to

9    step down.

10      (Witness excused.)

11        THE COURT:  Does the defense intend to call another

12   witness, Mr. Rittgers?

13        MR. C. MATTHEW RITTGERS:  Yes, Your Honor.  Chris

14   Seelbach.  May I go get him?

15        THE COURT:  You may.

16      (Defense witness, CHRIS SEELBACH, sworn.)

17              DIRECT EXAMINATION

18   BY MR. C. MATTHEW RITTGERS:

19   Q.   Will you please state your name for the record.

20   A.   Chris Seelbach.

21   Q.   Could you spell your last name?

22   A.   S as in Sam, I've done this a lot, E as in Edward, E as

23   in Edward, L, B as in boy, a-c-h.

24   Q.   And where do you live?

25   A.   I live in downtown Over-the-Rhine for almost 20 years.

1    Q.   When were you first elected to Cincinnati City Council?

2    A.   In November 2011.

3    Q.   And how long did you serve as a council member?

4    A.   A little over ten years as a member of council, and the

5    last two years as the president of council.

6    Q.   How many times did you run for office during that time?

7    A.   Three times.

8    Q.   What sorts of things did you have to do in order to be a

9    successful candidate?

10   A.   Yeah.  So I served ten years on council, but in the ten

11   years before that, I worked helping other people run for

12   office.

13        And so I've met with hundreds of people who consider

14   running for office.  And every time I'd say, you know, what do

15   you think that this journey looks like for you?  And

16   oftentimes they'd say, you know, going to parades, shaking

17   hands, going door to door.

18        And I said, well, that's great.  If you do that, you will

19   lose.  How you run for office and win in our country today is

20   by raising a lot of money and spending it well.

21        So you have to raise the right amount of money to

22   communicate the right message to the right voters at the right

23   time.

24        And so if you don't spend 75 percent of your time or more

25   asking people you know and don't know to donate to your

1    campaign, you will lose in this country.

2         And, you know, my parents are like, Christopher, that

3    doesn't make sense.  You know, you should meet people, that's

4    how you connect and get someone to support you.

5         And I get it, like that's how we think it works in this

6    country, but the Supreme Court has only expanded the role that

7    money plays, and it's part of it.

8         If you want to have a voice, if you want to be at that

9    table, to run a successful campaign, you've got to raise a lot

10   of money, and then not spend it until, you know, six weeks or

11   a month, two months before the election.

12   Q.   Sounds like you've got a lot of experience in

13   fundraising?

14   A.   Correct.

15   Q.   Can you explain the process of fundraising for us?

16   A.   Yeah.  So there's different types of fundraising.  You

17   know, obviously, you have some that's very far out, like an

18   email, it's not very personal.  A phone call is somewhat more

19   personal.

20        But I tell my clients and myself the absolute best way to

21   raise money is to get someone to meet with you in a coffee

22   shop for breakfast, and make your case to them one on one,

23   look each other in the eye, and say this is why I'm running

24   for office.  This is why I'd like for you to support me.

25        And then you also over-ask in how much you're asking for

1    in donations.  If you think they can give $500, you ask for

2    $1,000, because they can always come down, but you can't go up

3    after you've already made the request.  So the absolute best

4    way is those one-on-one conversations.

5    Q.  When you're fundraising and campaigning, can you tell us

6    about the importance of relaying as a candidate your thoughts

7    about success, whether or not you will actually win?

8    A.  Yeah.  No one wants to invest in a loser, right?  So when

9    someone is making a donation, they're investing in you,

10    they're investing in what they think you can bring to the

11    table.

12        And so every meeting, or every organization that's

13    considering endorsing you, the first questions they would ask

14    is how much money have you raised.  How much money do you have

15    on hand.

16        And then, you know, what is your goal to raise enough

17    money to win.  Or do you have polling that shows that you have

18    a good chance at winning.

19        So people don't want to give money to someone who is

20    going to lose.  So naturally, questions would always be asked

21    about the viability of your candidacy.

22    Q.  And you just mentioned, I think you were referring to

23    questions that you would get in writing from certain

24    organizations?

25    A.  Yes.  So there's these things called PACs, which stands

1      for political action committee.  And almost every interest

2      group has them, from realtors, to Equality Cincinnati, to law

3      firms, to -- just other interested parties.  And so, you know,

4      you want to get as many endorsements as possible from these

5      political action committees.

6          And so they send you a questionnaire.  And it's many

7      questions.  Most of the time, the first question is the

8      viability of your candidacy, how much money you've raised.

9          And then you fill out the questionnaire and, oftentimes,

10     there is a one-on-one interview.  And then if they endorse

11     you, most of those organizations will then write you a check.

12         And unlike individuals, PACs can give, in city council

13     and mayoral races, up to $2,700.  So that's significantly more

14     than an individual.  So that's why PACs are important, and you

15     want their support, because they can give more money.

16             MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

17             THE COURT:  You may.

18             MR. C. MATTHEW RITTGERS:  This is Defendant's

19     Exhibit D84.

20     Q.  I just handed you what's been marked as D84.  Can you

21     describe that in the context of what you just said?

22     A.  Yes.  So this is a questionnaire from a PAC, so asking

23     for the candidate's full name, the campaign manager, the

24     treasurer, the current position.

25         And then the first question is how much money have you

1    raised for this campaign?  What is the amount of money you

2    currently have on hand?  And then how much do you expect to

3    spend?  Do you accept PAC funds?  So very typical

4    questionnaire from a PAC.

5    Q.   And also within a typical form like that, do they ask

6    candidates about their specific and general policy positions?

7    A.   Yeah.  I'm sure if I turn the page, yeah, describe -- the

8    first question, Describe your vision for Cincinnati.  What are

9    your immediate long-term goals?  What do you see as a view of

10   the top challenges?  Despite several years of redevelopment,

11   the City of Cincinnati continues to experience budgetary

12   pressures.

13        So yes.  I mean, they're trying to get a sense of who you

14   are, what your values are, and if they align with the values

15   of this particular PAC.  If they do, then they will endorse

16   you and give you a check.

17   Q.   Is that a fair and accurate copy of --

18   A.   Yes.  I mean, it looks -- yes.  It looks like a standard

19   PAC questionnaire.

20           MR. C. MATTHEW RITTGERS:  Your Honor, move to admit

21   Defendant's Exhibit D84.

22           MS. GAFFNEY PAINTER:  Your Honor, the government

23   objects.  There's been no foundation laid that Mr. Seelbach is

24   a member of the Cincinnati Area Board of Realtor PAC, so I

25   don't know how he can authenticate this document.

1          THE COURT:  Can you do a little more foundation,

2    Mr. Rittgers?

3          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

4    Q.   Do you recall if you received that particular

5    questionnaire when you were running back back in 2017?

6    A.   Yes.  I received it 2011, 2013, and 2017.

7    Q.   And is that a fair and accurate copy of the questionnaire

8    that you received from this realtor PAC?

9    A.   Yes.

10         MR. C. MATTHEW RITTGERS:  Your Honor, move to admit

11   Defendant's Exhibit D84.

12         MS. GAFFNEY PAINTER:  Your Honor, it's hearsay, so we

13   object to its admission.

14         MR. C. MATTHEW RITTGERS:  They're just questions.

15   Inherently, that's not hearsay.

16         THE COURT:  Wait.  I'm not sure I understand the

17   objection.  So you're saying the document is hearsay?

18         MS. GAFFNEY PAINTER:  Yes.  The document contains

19   hearsay.  It's being offered for the truth.

20         THE COURT:  Is it being offered for the truth of the

21   matter asserted?

22         MR. C. MATTHEW RITTGERS:  It's not, Your Honor.

23   They're just questions.

24         THE COURT:  Yeah.  I'm going to overrule the

25   objection.

1          MR. C. MATTHEW RITTGERS:  Thank you.

2          THE COURT:  D84 is admitted over the government's

3   objection.

4   Q.  Mr. Seelbach, are you familiar with a fundraising

5   technique called bundling?

6   A.  Yes.

7   Q.  What is that?

8   A.  This is something that is used by candidates for local,

9   state, federal office, the presidency.  And it's legal,

10  ethical, common.  It's where you ask someone who is usually

11  wealthy or well connected to raise a certain amount for your

12  campaign.

13      So say, you know, you talk to someone that is very

14  connected to the city and is more wealthy, and say can you

15  raise $10,000 for my campaign?

16      And what that means is that they hold a fundraiser at

17  their house, they make phone calls, they send text messages or

18  emails, and they ask their friends and family to donate the

19  legal amount that you can give to a candidate.

20      So, you know, if they committed to raising $10,000, they

21  could do that through 20 $500 donations from specific people,

22  or around eight and a half single individuals.

23      So it's something that every one of every party of every

24  state, local, federal government does.

25  Q.  Can you tell us about how you typically pick a

SEELBACH - DIRECT

1    fundraising amount from a friendly fundraiser?

2    A.   Yeah.  I mean, so it depends on that specific person.  As

3    I said, you always over ask, so you take a look at what

4    they've given in the past.

5         So every time someone gives a political donation, it's

6    recorded, and it's for the public to view.  So my campaign

7    manager, my campaign staff can do research and find out what

8    has this person typically given to other candidates in the

9    past, or what have they typically bundled for other

10   candidate's in the past.  All of that is public record.

11        And then you can go to them and make your pitch on why

12   you think the amount you're asking is appropriate, based on

13   past donations.

14   Q.   How common was it, in your three times as running for

15   council, for you to have meals or drinks with donors?

16   A.   That is -- that's what you want.  I mean, as I said, the

17   best way to get a donation is to sit across from someone over

18   a meal, over coffee, and ask them.

19        So incredibly common, but also -- you know, raising

20   money, especially when you don't know the person and you're

21   not friends or family with them, you get a lot of voice mails

22   and you get a lot of not returned calls.

23        So when you get someone that not only returns your call,

24   but agrees to actually meet with you, that's a very successful

25   part of fundraising.

1    Q.   Why do you talk about your policy positions when you're

2    out on the campaign trail and fundraising?

3    A.   I mean, because, you know, someone wants to invest in

4    someone that's going to do good, in their opinion.

5         So I wouldn't want to invest in someone that's going to

6    get elected and do something contrary to what I believe or

7    value.

8         And so, you know, you have a message, a fundraising

9    message that is this is why I'm a good investment.  And then

10   you also have a message to voters, to persuadable voters of

11   this is why you should vote for me.

12        But your fundraising message is this is why it would make

13   sense for you to give me money, because once I'm -- because of

14   who I am, what I value, what I've fought for and what I want

15   to fight for, it will be beneficial to you.

16   Q.   Back --

17   A.   And I know that seems weird.  And I get that that seems

18   like that's not the way it should be, but it is legal,

19   ethical, and common.

20        And all of us, I think every person who has ever run for

21   office, wish that money was less important in politics, but

22   it's not.  And if you want a seat at the table, if you want to

23   be heard, if you want to be able to fight for what you believe

24   in, it's just part of it.

25   Q.   When you were running -- all three times when you ran

SEELBACH - DIRECT

1    over the past decade, was there any prohibition about against

2    soliciting campaign donations from folks who had business

3    before the city?

4    A.   No.  And, again, I get that that seems like it shouldn't

5    be that way.  My parents say, Christopher, that doesn't make

6    sense, but it is completely legal, ethical, and common.

7         You can absolutely ask for donations with people with

8    business before the city, and it's perfectly legal.

9    Q.   During your time as a Cincinnati City Council member, did

10   you ever sponsor legislation?

11   A.   Yes.

12   Q.   What does it means to sponsor legislation?

13   A.   So legislation comes before us in several different ways.

14   The most common is that our administration, meaning the city

15   manager through our law department, brings us legislation.

16        That goes into a committee.  It has to be heard in

17   committee.  That's where the main discussion is, changes can

18   be made.

19        And then the mayor, after it is heard in committee,

20   brings it forth to full council, where it gets the final vote.

21   The most common, as I said, is that it's done through the

22   administration.

23        The other ways it could come is through the mayor himself

24   or herself.  The mayor can sponsor legislation working with

25   the law department and bring it to a committee, then goes to

1    full council.

2        The other way is through a council member.  So that comes

3    by through an idea of our own, through someone in our office

4    or a constituent with an idea, and we reach out to the law

5    department.  And we meet and we say here's this idea, how do

6    we turn this idea into legislation.  And that takes between

7    weeks or sometimes months if it's complex.

8        And then that legislation is referred to a committee.

9    It's heard in a committee.  Changes can be made.  There can be

10   more than one hearing.  People testify in support or against

11   the legislation.  And then it goes to full council, where it's

12   voted for a final vote.

13   Q.  And that process, which one did you just describe?

14   A.  I just described how a council member would bring forth

15   legislation.

16   Q.  And when that happens, is it incumbent upon a council

17   member to then go to his or her colleagues to gauge their

18   interest, or how does that work?

19   A.  Yeah.  We all have offices right beside each other on the

20   third floor of City Hall, and so oftentimes -- especially on

21   motions.  We have two different types of legislation, a motion

22   and an ordinance.

23       So a motion is -- it's just a suggestion.  It's kind of

24   this is where we stand.  This is the policy that we believe

25   in, where an ordinance is actually a law.  So oftentimes, we

1    would have a single piece of paper that would say what the

2    legislation is, and our teams would then put nine lines under

3    that legislation.

4         And sometimes, if there's multiple sponsors, you'd

5    actually have the names under the lines.  And so I would go

6    around to my colleagues usually -- so we had committees on

7    Monday and Tuesday, full council on Wednesday.

8         So usually Monday and Tuesday, I'd walk around to the

9    different offices and say, here's my idea, here's it in

10   legislation, would you sign it?

11        And, you know -- you know, I was on for ten years with a

12   lot of the same people and, you know, you get to know these

13   people.  They become, many of them, your friends, because

14   you're working with them, you ran on the campaign together,

15   you were with each other.  You know, there's forums for

16   running for council almost every day from like August to

17   November.

18        So you get to know who these people are, what they

19   believe, what they stand for, and what likely they will

20   support or not support.

21        And so when I draft legislation, I'm not going to draft

22   legislation I think will get no one to support it.  I'm

23   drafting legislation based on knowing who my colleagues are,

24   and knowing whether I think they will likely support or not

25   support.

1      And, you know, there's one political -- a main political

2  party at City Hall, and so we all -- so most of us are part of

3  that party and, you know, we have a pretty good idea if we're

4  going to get support or not.

5  Q.   You mentioned nine lines?

6  A.   Yep.

7  Q.   What is the significance of that?

8  A.   There's nine members of council.

9  Q.   And what is the objective when you create the nine lines

10  on a motion?

11  A.   That all nine members of council would sign the motion.

12  Q.   Can you explain to us times when you would express your

13  confidences in your colleagues as it relates to a development

14  agreement or a specific piece of legislation to people outside

15  council?

16  A.   Yeah.  I mean, split votes on council are actually very

17  unusual.  I would say 95 percent of all of our votes were

18  unanimous.  So on almost every vote, I'm going to know that we

19  have support.

20      And then when there were controversial votes, usually, it

21  was a majority with me and the minority on the other side, so

22  I would know that I still would have enough votes to be

23  successful.

24  Q.   Back when you were a council member for that decade, were

25  there times when you would say I can get the votes for

1    something?

2    A.   Absolutely, because, you know, we don't want to waste

3    people's time.  So, you know, if I'm talking to an interested

4    party or an interested organization and, you know, they want

5    the legislation to pass, they would say, you know, do we need

6    to organize a campaign.  Do we need to get 50 people to come

7    to City Hall to testify in order to make this legislation

8    pass.  I would say no, I know the votes are there.  I can get

9    the votes.

10        And I can do that because I know my colleagues very well

11   and, you know, I know whether or not they're going to support

12   something.  And as I said, 95 percent or more, it's always

13   unanimous.

14        I mean, our administration doesn't bring us bad laws, and

15   so it will be very common for me to say don't waste your time

16   organizing 50 people to come to City Hall, I can get the votes

17   on this.

18   Q.   What does shepherding votes mean?

19   A.   Shepherding votes just means trying to convince your

20   colleagues that it's a good ordinance, it's a good vote so,

21   you know, as I said, that didn't happen very often.

22        I mean, I can think of very few instances where I had to

23   like really convince my colleagues that -- maybe they were in

24   the middle or a little leery, and very few times that I would

25   have to like actually sit down and make my case.

*SEELBACH - DIRECT*

1    Q.   On development deals, how frequent was it for a developer

2    or his or her lawyer or lobbyist to sit down with an

3    individual council member?

4    A.   We would do these meetings up to maybe ten a week.

5    Q.   I want to talk to you about legislation that you did

6    propose.  Do you recall legislation related to LLC donations?

7    A.   Yes.

8    Q.   Can you describe the legislation?  We've already heard in

9    the courtroom about a law change that occurred in November of

10   2018.

11   A.   Yes.

12   Q.   Does that ring a bell?

13   A.   Yes.

14   Q.   Tell us about that.

15   A.   So that was my ordinance or, actually, it was a ballot

16   initiative.  So, you know, as I mentioned earlier, none of us

17   like the role that money plays in politics.

18        We'd much rather be shaking hands at parades, and

19   knocking on doors, and being with people.  I think, you know,

20   if you run for office, you have to, to some extent, like

21   people.

22        So this was an attempt to help take money out of

23   politics.  And from the moment that I proposed it,

24   Mr. Sittenfeld was a hundred percent supportive, never any

25   questions.

SEELBACH - DIRECT

1      So what it did was say that as a person, you can give up

2  to $1,100 per candidate, but if you have separate LLCs that

3  are in your name, you can also give up to $1,100 per LLC, and

4  that was completely legal.

5      What I did was put a charter amendment on the ballot to

6  say that if you're a single person, regardless of the number

7  of LLCs, you can only give up to $1,100.

8  Q.   And did that also change the way in which a PAC,

9  political action committee, could fundraise and bundle?

10 A.   No, it didn't affect political action committees.  They

11 could still give up to $2,700.

12 Q.   Okay.  After the law change, was it still legal for

13 individuals to give through LLCs?

14 A.   Yes, as long as they only gave through the one LLC and

15 not a personal check.

16 Q.   Each LLC had to be attributed to a single individual?

17 A.   Correct.  But it would still be totally legal to bundle

18 different LLC checks, as long as they were assigned to

19 different people's names.

20 Q.   Prior to the law change that you had sponsored, did you

21 yourself solicit donations through an individual that had

22 multiple LLCs?

23 A.   Yes.  That would be a very smart thing to do.  I mean, it

24 was legal to get someone to give through their person and

25 through multiple LLCs.  So as I said, if you want to be

1    successful, you got to raise a lot of money.  It was a hundred

2    percent legal to do that, so it would be very smart to do

3    that.

4    Q.   Who is Laura Brunner?

5    A.   Laura Brunner is the president of the Port Authority.

6    Q.   Did you have interactions with her back in the past

7    decade?

8    A.   Since she's been president of the Port Authority, regular

9    interactions.

10   Q.   About what?

11   A.   Development deals.  The port, funded through the City of

12   Cincinnati, is one of our largest developers in the city.

13   Q.   During your time on council, were certain council members

14   known for certain things?

15   A.   Yeah.  I mean, it's funny, so -- yes, because of why you

16   run, why you say you're running, and then what you do on

17   council.

18       For instance, you know, if someone lives in

19   Over-the-Rhine -- even though we don't have districts in the

20   City of Cincinnati, we represent the entire city.

21       But if someone who lives in Over-the-Rhine has any type

22   of problem, from a pothole to the trash not getting collected,

23   they'd likely call me, because I'm kind of known as the

24   OTR downtown council member.

25       If somebody saw a dog being chained up for weeks on end

1    and tethered in the backyard, they'd likely call me because

2    I'm known as caring about animals and sponsoring legislation

3    about animals.

4        P.G. absolutely was the pro-development, pro bringing

5    jobs to our city person on council.  That is what he was known

6    for.  He didn't vote against a single development deal in the

7    decade that we were on council together.

8        This was a guy who was -- you know, we're going to change

9    our city.  We're going to bring more population to our city

10    for the first time in 70 years, which we have, actually, by

11    bringing good development deals, good jobs to our city.

12    Q.  Was there a time when -- who is Phil Denning?

13    A.  Phil Denning is the former -- he worked in our economic

14    development department.  He eventually became the director,

15    and now he works for the Port Authority.

16    Q.  Do you recall a time when, in 2018, Mr. Denning and P.G.

17    were both appointed to a committee related to the uptown

18    innovation corridor?

19    A.  Yes.  We appoint people to committees and groups like

20    this weekly, but I remember this specifically.

21    Q.  And were there any other people out of the administration

22    or council appointed to that committee?

23    A.  No.

24    Q.  Do you recall the 435 Elm transfer to the port?

25    A.  I recall it now, but I didn't recall it then.  I mean,

1    this deal was a no-brainer.  I have gone back and looked --

2    all of our meetings are recorded, and so I've gone back and

3    looked at the committee and the council meeting that this deal

4    came about.

5        Not a single person had a single question about this

6    deal, not in committee, not in council.  It passed in a matter

7    of ten seconds.

8        And it did that because the city was spending $400,000 a

9    month on this abandoned property in a very important part of

10   our city.  And we trusted the port that this deal was a

11   no-brainer; that the port is a trusted partner in development,

12   and if we're giving this property to the port, that's a great

13   deal for the city.  And it takes $400,000 times 12 a year off

14   the city taxpayers books.

15       So I didn't recall the deal, but because of all of this,

16   I've gone back, and it was as regular as a deal -- you know,

17   there are some of us on council who are not as pro-development

18   as P.G. has been, and we often ask questions, tough questions

19   about development deals, and sometimes we vote against them.

20       Not a single one of those people, including me, had a

21   single question about this deal.  It was that good.

22   Q.   The cost might have been $400,000 annually?

23   A.   Oh, maybe it's -- I remember $400,000.

24   Q.   When you transfer something to the port, what is the

25   expectation for what will then happen to that property?

1    A.   That the port will work with our building community,

2    development community to bring that property back to life, and

3    with good paying jobs, with good, you know, above minimum wage

4    jobs that will help support Cincinnati families.

5         MR. C. MATTHEW RITTGERS:  No further questions, Your

6    Honor.

7         THE COURT:  Thank you, Mr. Rittgers.

8         MS. GAFFNEY PAINTER:  May I inquire, Your Honor?

9         THE COURT:  You may.

10                        CROSS-EXAMINATION

11   BY MS. GAFFNEY PAINTER:

12   Q.   Good morning, Mr. Seelbach.

13   A.   Good morning.

14   Q.   So on February 28, 2018, you announced in city council

15   that you would introduce a charter amendment seeking to limit

16   contributions from LLCs; is that right?

17   A.   I don't know the exact date, but that sounds around the

18   date.

19   Q.   Would an article about your announcement and a copy of

20   the transmittal and ordinance refresh your recollection as to

21   the date?

22   A.   Sure.

23        MS. GAFFNEY PAINTER:  May I approach, Your Honor?

24        THE COURT:  You may.

25   A.   Well, this news article from City Beat is dated March 1,

1    2018, and it says, "Also in council yesterday, Councilmember

2    Chris Seelbach announced he will introduce legislations

3    seeking to limit campaign contributions from LLCs."  I guess

4    that would be February 28th.  I'm forgetting there's only

5    28 days.  Yes, that sounds correct.

6    Q.   That same day, February 28, 2018, you received the

7    emergency ordinance from the city solicitor's office, correct?

8    A.   Yes.

9    Q.   And what you introduced became ballot initiative known as

10   Issue 13; is that right?

11   A.   Correct.

12   Q.   And Issue 13 was designed to address this LLC loophole

13   you were talking about?

14   A.   Well, I mean, it wasn't a loophole.  It was the law of

15   the land.  It was legal to give multiple contributions through

16   LLCs in the same name, so it wasn't a loophole but, yes.

17   Q.   It was designed to address this phenomenon of people

18   using multiple LLCs to go around the individual campaign

19   donation limit.  Is that fair to say?

20   A.   Yeah.  As I mentioned, none of us like the role that

21   money has in elected office, so it was meant to try to limit

22   legally that role.

23   Q.   Now before Issue 13 passed, the campaign donation limits

24   were $1,1 00 per individual, right?

25   A.   Correct.

1  Q.  And $1,100 per as many LLCs as that individual had,

2  correct?

3  A.  That was what was legal.

4  Q.  Right.  So then after Issue 13 passed and went into

5  effect, individuals could donate $1,100 from themselves or

6  from one of their LLCs, but not both and not from multiple

7  LLCs; is that right?

8  A.  Correct.  And it was the most widely passed charter

9  amendment the city has ever seen.  The voters definitely liked

10  it.

11  Q.  Right.  It was approved by a large margin of the voters?

12  A.  Correct.

13  Q.  85.92 percent of the voters voted yes on that, right?

14  A.  That sounds about right.

15  Q.  And Issue 13 was voted on in November of 2018; is that

16  right?

17  A.  Correct.

18  Q.  Now, you mentioned in your testimony that before you

19  would introduce an ordinance, say, or some document that was

20  drafted by the law department, you had to meet with the law

21  department in advance; is that right?

22  A.  Correct.

23  Q.  Do you recall --

24  A.  Well, you do not have to.  For instance, a former member

25  of council was also an attorney and sometimes wrote his own

1    ordinances.

2        But for the majority of us, we would meet with the law

3    department, they would draft the legislation.

4    Q.   Are you an attorney?

5    A.   I'm not a licensed attorney, but I graduated law school.

6    Q.   Okay.  When you were introducing what became Issue 13,

7    did you draft it yourself?

8    A.   I did not.

9    Q.   So you met with the law department before they

10   transmitted it to you on February 28, 2018?

11   A.   Correct.  Me or one of my staff.

12   Q.   So you don't recall --

13   A.   I don't --

14   Q.   -- yourself meeting with the law department?

15   A.   I recall conversations, but my chief of staff and I, he

16   was with me for a decade, we interchangeably worked together

17   with the law department, so I'm sure I had some interaction,

18   but I'm not for sure the extent.

19   Q.   Do you have any recollection as to the approximate date

20   that you or your chief of staff would have met with the law

21   department to draft the emergency ordinance there from

22   February 28, 2018?

23   A.   It would have been the months leading up to it, so

24   December, January.

25   Q.   You mentioned that you had an office on the third floor

1    of City Hall with the other council members; is that right?

2    A.    Correct.

3    Q.    And that included Mr. Sittenfeld; is that right?

4    A.    Correct.

5    Q.    And you mentioned that you would often walk down the hall

6    to discuss ideas that you had for ordinances or other efforts

7    before council; is that right?

8    A.    Yeah.  Once we drafted legislation, we would often, with

9    the nine lines, we would take a pen and go around.  And often,

10   it was, oh, yes, this is -- because I know who my colleagues

11   are and what they would support.  It was just usually a

12   signature within 30 seconds.

13   Q.    So when you introduced that proposed charter amendment in

14   February of 2018, you had discussed it with your colleagues

15   before you brought it to the floor.  Is that fair to say?

16   A.    Yes.

17   Q.    Do you recall speaking with Mr. Sittenfeld about it

18   specifically?

19   A.    Yes.

20   Q.    Do you recall when those conversations occurred?

21   A.    They would have occurred in the months leading up to the

22   legislation, and then after the legislation was introduced.

23   And as I said, Mr. Sittenfeld was a hundred percent supportive

24   from the moment I mentioned it.

25   Q.    Now, in September of 2017, Councilmen Wendell Young sued

1  the Cincinnati Elections Commission.  Do you recall this?

2  A.  I don't.

3  Q.  Who is Wendell Young?

4  A.  He's a former member of council that I served with the

5  entire time I was on council.

6  Q.  And you do not recall that in September 2017, he sued the

7  Cincinnati Elections Commission over their permission allowing

8  Mayor Cranley at the time to use this LLC loophole --

9  A.  I don't.

10  Q.  -- to raise money?

11  A.  I don't.  I don't remember that.

12  Q.  Do you recall that in that same month, September of 2017,

13  you accused Mayor Cranley of doing pay-to-play politics?

14  A.  I don't remember the specific month and time frame, but I

15  definitely have made that allegation before.

16  Q.  Would an article quoting you --

17  A.  Sure.

18  Q.  -- refresh your recollection?

19  A.  Sure.

20        MS. GAFFNEY PAINTER:  May I approach, Your Honor?

21        THE COURT:  You may.

22  A.  So this is a little bit hard to read, but...

23  Q.  I can assist you, if possible.  If you look at the bottom

24  of the first column into the top of the second column, that

25  may help you.

1    A.   Yes.  Yes.

2    Q.   So having reviewed this document, you recall accusing

3    Mayor Cranley of pay-to-play politics?

4    A.   Yes.  Most people in the city think that that's true.

5    Q.   Now, when voting in city council, a council member may

6    abstain from a vote, right?

7    A.   You cannot abstain from an ordinance.  You can abstain

8    from a motion, but you cannot abstain from an ordinance.

9    Q.   Can you explain to us what abstaining means?

10   A.   It means that you don't want to vote.  That you are not

11   going to vote yes or no.

12   Q.   And during your time in city council, you abstained from

13   some votes, right?

14   A.   From motions, I may have, or -- you know, you can abstain

15   on an ordinance in committee, but once it becomes before full

16   council, you have to vote.  But I'm sure I've abstained, yes.

17   Q.   Generally, how would you make your decision about whether

18   you were going to abstain from a vote?

19   A.   It totally depends on the vote.  I mean, it just depends

20   on what the vote is.  If it's in committee, and I have more

21   questions, then I would abstain and say I'll get those

22   questions answered between committee and full council, but it

23   would just depend on what the vote is.

24   Q.   Would a conflict of interest be something that you would

25   consider in deciding whether or not to abstain from a vote?

1    A.   Not only do you have to abstain if there's a conflict of

2    interest, you actually have to leave the room.  You can't even

3    be in the room when the vote is being discussed.

4    Q.   Now, in your time at city council, you voted with

5    Mr. Sittenfeld a majority of the time, correct?

6    A.   There were probably less than a handful of votes where we

7    voted in opposition of each other.

8    Q.   And you consider Mr. Sittenfeld a friend, correct?

9    A.   Mr. Sittenfeld, and Sarah, and George, and their dog

10   Oakley are friends.  P.G. and I met 13 years ago serving on a

11   young professional board and ran for council at the same time.

12        He was 27 at the time and is often credited as the

13   youngest person ever elected, but I was only four years behind

14   him, so I was also one of the youngest people ever elected.

15   But we became good friends, and their family is important to

16   us.

17   Q.   How many times did you meet with the defense before you

18   came to testify here today?

19   A.   Less than ten times in the last year, but probably ten

20   times.

21   Q.   Was that what you were referring to when you told people

22   you were rehearsing for your testimony today?

23   A.   I don't remember -- I don't know who I was telling I was

24   rehearsing my testimony, but I have thought very intently

25   about what my answers to questions would be.

1   Q.   Back in 2018, Mayor John Cranley asked city manager Harry

2   Black to resign, right?

3   A.   Yes, his handpicked city manager.  They no longer could

4   get along with each other, with bickering and fighting, and he

5   asked his handpicked city manager to resign.

6   Q.   You, Mr. Sittenfeld, and three other members of council

7   put out a press release that you did not support firing the

8   city manager, right?

9   A.   Yes.  We believe that Mayor Cranley wanted to do the job

10  of the city manager.  Our charter is very clear that we are a

11  council manager form of government, that the mayor has a

12  limited role, not like most mayors of cities.

13       And we believe -- I believed at the time that if he got

14  rid of the city manager, he would get a person into that role

15  that would do exactly what he said, and that would not lend to

16  what the charter of our city calls for.

17  Q.   So I'm not clear.  Is the answer to my question yes, that

18  you put out a press release with four other members of council

19  opposing the firing?

20  A.   Yes.

21  Q.   In response to that press release, an individual named

22  Mark Miller filed a public records request for the five of

23  your council members' text messages, emails, and other

24  communications, correct?

25  A.   Correct.  This is a guy who makes his living off suing

1    city council.

2            THE COURT:  Hang on.  Mr. Rittgers?

3            MR. C. MATTHEW RITTGERS:  Your Honor, this was

4    subject to a motion in limine.  May we approach?

5            THE COURT:  Yes.

6    SIDEBAR CONFERENCE

7            MR. C. MATTHEW RITTGERS:  This line of questioning is

8    getting into the what Judge Cole ruled as improper regarding

9    Open Meetings Act violation, commonly referred to as "gang of

10   five," which I think is what we might have mentioned in our

11   motion in limine.  That's our objection.

12           THE COURT:  Is that where you're going?

13           MS. GAFFNEY PAINTER:  Yes, Your Honor, but as the

14   order made clear, that was referring to our case in chief, and

15   we reserved the right to go into that when it came to

16   questioning on defense case or in rebuttal case.

17      Here it goes to credibility.  The judge in the gang of

18   five case found that both Mr. Sittenfeld and Mr. Seelbach lied

19   to the people of Cincinnati.  That's directly relevant to his

20   testimony here today.

21           MR. C. MATTHEW RITTGERS:  If you're referring to

22   Judge Ruehlman's statements off the record in the courtroom as

23   a lecture to two Democrats, I mean, I don't -- it wasn't like

24   a part of the litigation.  There's an open meetings request

25   that -- that there was an offer made because they get

```
 1    attorneys fees when they do this.

 2        I mean, I could call other witnesses back in.  These guys

 3    were given legal advice by people like the deputy city

 4    solicitor and city solicitor's office that text messages did

 5    not qualify.

 6        Ultimately, the city settled, I believe.  This was not a

 7    ruling by a court or a jury, and they settled this Open

 8    Meetings Act violation so that the fees didn't continue to

 9    tick.

10        And these guys were basing their decisions on advice that

11    they had been given from the city solicitor's office, which

12    happened -- may have been incorrect, I don't know if it was or

13    was not.

14            THE COURT:  But I just want to be clear.  You're not

15    using this to -- well, what are you trying to use it for with

16    regard to this witness?

17            MS. GAFFNEY PAINTER:  I'm going to his bias and

18    credibility.

19            THE COURT:  And where are you going with regard to

20    that?

21            MS. GAFFNEY PAINTER:  The judge, at accepting of the

22    settlement said, quote, you essentially lied to the people of

23    the city, the trust is gone, unquote, and suggested that

24    Mr. Sittenfeld and Mr. Seelbach should resign, along with the

25    other three council members who are implicated in this.
```

1        That goes directly to his credibility, and that is at

2    issue when he testifies.

3        MR. C. MATTHEW RITTGERS:  A couple things.  One, it

4    was Judge Ruehlman, who I personally get along with, but he's

5    a Republican, and he has to run for office, and he was in

6    front of the press making a statement to the media that is

7    hearsay, one.

8        And two, it's just -- it's something he ruled on.  I

9    would have to get into all this Open Meetings Act stuff.

10        THE COURT:  How are you going to get around the

11    hearsay problem with regard to the statement?

12        MS. GAFFNEY PAINTER:  I'm sure it won't be to the

13    truth of it but personally, to the effect of a listener.

14        MR. C. MATTHEW RITTGERS:  That a judge that has to

15    run for office made a statement to him to resign based on a

16    settlement that the city made.  It wasn't these guys' decision

17    to fight it or not.

18        MS. GAFFNEY PAINTER:  A judge made a credibility

19    determination about a witness.  This is directly --

20        MR. C. MATTHEW RITTGERS:  It wasn't --

21        MS. GAFFNEY PAINTER:  Excuse me.

22        MR. C. MATTHEW RITTGERS:  Sorry.

23        MS. GAFFNEY PAINTER:  This is directly relevant.

24    They have put him on as a character witness, and I am allowed

25    to inquire about the impeachment that is potential to him, his

1    bias, all of that.  It seems --

2              THE COURT:  So he's on as a character witness, you

3    said?

4              MS. GAFFNEY PAINTER:  Well, slash pseudo expert that

5    was unnoticed.

6              THE COURT:  That I may have sustained, if you'd made

7    that objection.

8              MR. C. MATTHEW RITTGERS:  Well, the statements about

9    the friendship were brought out on cross, Your Honor.  It

10   wasn't me asking about his family or anything.  It was

11   cross-examination brought out, and friendship.  I did not put

12   him on as a character witness.  I didn't ask about P.G.'s

13   reputation as being honest and ethical.

14      The reason why we did this motion is because it is

15   fraught with complexities.  This is an Open Meetings Act

16   violation that, again --

17             THE COURT:  But I don't think they're trying to use

18   the settlement of the Open Meetings Act, as I understand it.

19   They're trying to use some statement that was made in

20   connection with the settlement of that case.  In other words,

21   you're not saying that case itself is indicative of anything,

22   right?

23             MS. GAFFNEY PAINTER:  No, but I have to lay a

24   foundation.  I can't just announce Judge Ruehlman said you're

25   a liar without laying a foundation that gets us to the

```
1    settlement, which is the proceeding where the judge made the
2    declaration about his credibility.
3              THE COURT:  Okay.  My concern is that hearsay nature
4    of the statement.  I sense this is a relatively important
5    issue.
6         I would like to take 10 minutes to go dig around a little
7    bit and see what I come up with in terms of what the law is
8    around the use of a statement like this from someone who is
9    not going to testify and isn't subject to cross-examination,
10   and you want to use it for the truth of the matter asserted
11   that this person is, in fact, a liar because somebody else
12   said they were a liar; is that right?
13             MS. GAFFNEY PAINTER:  Well, the foundation here is
14   that the lawsuit was brought, the city fought the lawsuit.
15   Then, of course, they decided to settle the lawsuit, and all
16   of the five council members implicated attended the hearing
17   for the settlement.
18             THE COURT:  None of that goes to credibility so far,
19   I don't think.
20             MS. GAFFNEY PAINTER:  Right, but it's foundational to
21   what was ultimately concluded, that the city agreed to certain
22   facts, and the judge had to accept those facts and accept the
23   settlement, and in accepting the settlement, he made a
24   determination about the credibility of the five council
25   members.
```

1          THE COURT:  Made a determination in a written order
2    of some kind, or just...
3          MS. GAFFNEY PAINTER:  In a statement at the hearing
4    accepting the settlement, while these members were present in
5    the courtroom, this is what he said to them.
6          THE COURT:  Do you have any case law that suggests
7    that statements made by judges in open court are -- I mean, I
8    could see potentially exceptions to the hearsay rule, but do
9    you have any case law I could look at on that topic?
10          MS. GAFFNEY PAINTER:  I can try to find something in
11    10 minutes.
12          MR. C. HENRY RITTGERS:  It's also a 403 and 404 for
13    all that stuff too.  I mean, we're talking about she wants to
14    say that a judge said that he and Mr. Sittenfeld, and whoever
15    else was a part of that gang of five, were liars.  I mean, how
16    prejudicial can they get?
17          MR. C. MATTHEW RITTGERS:  Credibility.  The
18    statement, that's a judge who was actually speaking to the
19    media in the back, because he has to run campaigns and he's
20    talking to progressive Democrats.
21          THE COURT:  I understand.  Yeah, I think this is
22    important enough that I'd like to try and do some research.
23      This was an issue that wasn't briefed by the parties in
24    the motion in limine exactly.  The Open Meetings Act part of
25    it was, but this question about whether a judge's statement in

1    open court is somehow an exception to the hearsay rule, I just

2    don't know.  If it's important enough that you want to suspend

3    and I'll take a look, I'm happy to do that.

4          MS. GAFFNEY PAINTER:  May I confer with my colleagues

5    just briefly?

6          THE COURT:  Sure.

7          MS. GAFFNEY PAINTER:  Another way we could do it is

8    the city admitted in the settlement that the council members

9    had violated the Open Meetings Act, and we could get into

10   Mr. Seelbach -- it was a finding by the city, an admission by

11   the city that he had violated Ohio law.

12     We could leave Mr. Sittenfeld out of it, and that would

13   go specifically to Mr. Seelbach's credibility, bias, when it

14   comes to his assertions about what Ohio law says, what's

15   permissible, what's not permissible.

16     Here we have the city saying he violated the law, and we

17   could remove the quote from the judge, and --

18         THE COURT:  I'm not sure that an Open Meetings Act

19   violation goes to credibility.  I mean, obviously, felony

20   convictions, things like that go to credibility.

21     But do you have any case law that suggests that Open

22   Meetings Act violations are admissible as a form of

23   impeachment on credibility?  I'm not familiar with that law.

24         MS. GAFFNEY PAINTER:  I would have to find some.  I

25   don't have it offhand.

1          THE COURT:  Yeah.  I mean, look, I'm willing to allow

2     you to do whatever the rules of evidence allow you to do.

3          But I'm just -- there are certain types of legal

4     proceedings that can be used to attack the credibility of the

5     witness.  A felony conviction is the easiest example.  I don't

6     believe misdemeanor convictions can be.

7          An Open Meetings Act isn't even a criminal violation, nor

8     is it like a civil lawsuit for fraud, if you had found to be

9     liable for having committed fraud, that would be a basis for

10     impeachment credibility.

11          Just as I stand here right now, since this hasn't been

12     briefed, I don't know -- to me an Open Meetings Act thing

13     doesn't sound necessarily in fraud or deceit, so I would want

14     to see some case law suggesting that an Open Meetings Act

15     violation is a basis for impeaching the credibility of a

16     witness.

17          If you have that, I'm glad to review it, but I don't

18     think that -- and I'll go look for it too, but as I stand here

19     right now, I'm not going to allow that to go forward.

20          So what we need to decide is whether you want to take a

21     break to look for this?

22          MS. GAFFNEY PAINTER:  Take a break.  But this would

23     be the last bit of questioning.  So once this question is

24     resolved, either if it's resolved against us, then questioning

25     would end.  And if it is not -- well, again, if it's resolved

1    in our favor, that would be the exploration.

2         THE COURT:  So why don't we tell the jury we're going

3    to take about a 15-minute break and then do a later lunch

4    today so we can keep going.

5         MR. C. HENRY RITTGERS:  May I suggest maybe have

6    lunch now?

7         THE COURT:  So it sounds like the next witness may be

8    Mr. Sittenfeld, who would be a longer witness.  So it may make

9    some sense to break for lunch now to try and figure out the

10   answer to the remaining question, and then just move into

11   Mr. Sittenfeld after lunch.  Does that make sense?

12        MS. GLATFELTER:  Yes.  Is the defense not calling the

13   other two witnesses?

14        MR. C. MATTHEW RITTGERS:  Probably not.

15        MS. GLATFELTER:  Okay.

16        THE COURT:  Does that make sense to everybody?  Okay.

17   So why don't we break for lunch.

18      You've only got one more witness, then?  I'm going to

19   give them until 1:00 for lunch.  Is that fair?  Maybe I'll

20   tell them to be back by 12:45 so we can start at 1:00.

21   SIDEBAR CONFERENCE CONCLUDED

22        THE COURT:  So ladies and gentlemen of the jury, an

23   issue has come up that requires a little bit of additional

24   research.  We're going to take our lunch break a little

25   earlier today.  We're going to break now, and if I could ask

1    you to be back by no later than, say, 10 'til 1:00 so that we

2    can start promptly at 1:00, that would be great.

3         As I've mentioned, although it's been a few days so you

4    may have forgotten, please do not discuss this case amongst

5    yourselves over lunch.  Please do not do any research.

6         Please do not communicate with anyone about this case.

7    Please do not allow anyone to communicate with you about the

8    case.  And if anyone should attempt to do so, please bring it

9    to my attention immediately.

10        With that said, have a great lunch, and we'll see you at

11   ten to 1:00.

12        (Jury out at 11:37 a.m.)

13            THE COURT:  Mr. Seelbach, like I feared, that means

14   I'm going to have to ask you to return by about ten 'til 1:00

15   or five 'til 1:00.  You may stand down.

16            THE WITNESS:  Thank you.

17            THE COURT:  Is there anything we need to discuss

18   before we take a break?

19            MS. GAFFNEY PAINTER:  No, Your Honor.

20            MR. C. MATTHEW RITTGERS:  No, Your Honor.

21            THE COURT:  Very good.  We're in recess, and try to

22   be back about quarter 'til 1:00.

23        If anybody has case law they want to submit on the issue

24   we've been discussing, do so as promptly as possible.

25            (Lunch recess.)

1          THE COURT:  I think some members of the jury may be

2     assembling in the hallway, so could I see counsel at sidebar

3     to pick up on our conversation.

4     SIDEBAR CONFERENCE

5          THE COURT:  Go ahead, Ms. Gaffney Painter.

6          MS. GAFFNEY PAINTER:  Your Honor, if I may.  We are

7     not going to pursue the line of questioning that led to us

8     having the sidebar before lunch, so I will move on to other

9     topics.

10          THE COURT:  Very good.  Thank you.

11     SIDEBAR CONFERENCE CONCLUDED

12          THE COURT:  Are we ready to bring in the jury?

13          MS. GAFFNEY PAINTER:  Yes.  Thank you.

14          MR. C. MATTHEW RITTGERS:  Yes, Your Honor.

15          THE COURT:  All right.  Let's bring in the jury.

16       (Jury in at 12:57 p.m.)

17          THE COURT:  Ms. Gaffney Painter, are you ready to

18     proceed?

19          MS. GAFFNEY PAINTER:  I am, Your Honor.  Thank you.

20          THE COURT:  You may.

21          MS. GAFFNEY PAINTER:  May I proceed?

22          THE COURT:  You may.

23     BY MS. GAFFNEY PAINTER:

24     Q.  Mr. Seelbach, I believe you've testified on direct that

25     you served in city council for ten years; is that right?

1  A.  A little over ten years.

2  Q.  Over ten years.  So 2011 to 2021; is that correct?

3  A.  2022.  I was sworn in December 1, 2011.  I left office

4  January 4, 2022.

5  Q.  During your little more than ten years in council, you

6  had to fill out financial disclosure forms; is that correct?

7  A.  Correct.

8  Q.  And so you are familiar with financial disclosure forms

9  from the Ohio Elections Commission; is that correct?

10 A.  Yes.

11 Q.  During direct, you testified about going to meals with

12 donors.

13     When do you have to disclose meals with donors on the

14 Ohio Elections Commission financial disclosure forms?

15 A.  So, you know, there's a phrase, something like a great

16 amount, or something like that, that I think has been

17 interpreted by our attorneys to be something around $100.

18 That if it's more than that, then we should report.

19     But I don't think that there's a specific number that is

20 in the law.  It's just like a substantial amount.

21 Q.  Would reviewing the Ohio Elections Commission 2019

22 financial disclosure forms refresh you --

23 A.  Sure.

24 Q.  -- as to whether there's a dollar amount?

25 A.  Yeah.  If there is, yes.

1  Q.  In front of you is a government binder there.

2      If you could turn to the tab marked USA 45C.

3  A.  Okay.

4  Q.  If you could turn to page 12 of this document.  It's

5  marked counter intuitively as page 8 on the bottom of the

6  form, but it is actually the twelfth page in that collection

7  of documents.

8  A.  Okay.

9  Q.  Now, if you could review that, and see if that refreshes

10  your recollection as to when an elected official has to

11  disclose dinners from donors on the financial form?

12  A.  Yes.  And I was right.  It's $100.

13  Q.  Now, you testified on direct about bundlers.  Are you

14  familiar with the term "straw donor"?

15  A.  No.

16  Q.  Mr. Seelbach, you would not accept a campaign check if

17  you knew the person who gave it to you was doing so in

18  exchange for votes, correct?

19  A.  Of course.

20      MS. GAFFNEY PAINTER:  No further questions, Your

21  Honor.

22      THE COURT:  Thank you, Ms. Gaffney Painter.

23  Mr. Rittgers?

24      MR. C. MATTHEW RITTGERS:  No further questions, Your

25  Honor.

1          THE COURT:  Sir, you're free to step down.  Thank

2     you.

3          THE WITNESS:  Thank you.

4        (Witness excused.)

5          THE COURT:  Mr. Rittgers does the defense intend to

6     call another witness?

7          MR. C. MATTHEW RITTGERS:  P.G. Sittenfeld, Your

8     Honor.

9        (Defense witness, ALEXANDER P.G. SITTENFELD, sworn.)

10         THE COURT:  You may begin, Mr. Rittgers.

11                    DIRECT EXAMINATION

12    BY MR. C. MATTHEW RITTGERS:

13    Q.   Could you please state your name for the record.

14    A.   My full name is Alexander Paul George Sittenfeld.  The

15    middle names are after my father, and I've gone by P.G. for my

16    entire life.

17    Q.   Where did you grow up?

18    A.   I grew up here in Cincinnati.

19    Q.   So that we can have a little bit of background, what did

20    your folks do for a living?

21    A.   My father first came to Cincinnati -- our family first

22    ended up in Cincinnati for my father to work at Procter &

23    Gamble.

24        He then later went on to work for the organization that's

25    now known as ArtsWave, and then became a financial advisor for

1    the remaining part of his career.

2       My mother was a career school teacher, a librarian, and

3    she also taught APR history.

4    Q.   When did you first get interested in politics?

5    A.   Probably different ways at different stages.  My parents

6    were very civically involved.

7       A lot of their discretionary time went towards

8    volunteering for things like educational causes and arts

9    organizations, and our family dinner table, when we were being

10   nice to each other, we would talk about civic affairs and what

11   was going on in the world.  So I think, sort of, a loose

12   foundation was established at that time.

13      As I got into high school and college, and just was

14   trying to pay attention to the world around me, got

15   increasingly interested, and then ultimately decided to run

16   for office.

17   Q.   Where did you go to high school and college?

18   A.   I went to Seven Hills High School for high school, the

19   school where my mother was a teacher, and I had her as my

20   teacher, and then I went to Princeton University for college.

21   Q.   When did you come back to Cincinnati?

22   A.   I came back to Cincinnati after graduate school, in -- it

23   was either July or August of 2009.

24   Q.   Can you tell us about your immediate family?

25   A.   My chosen family?

SITTENFELD – DIRECT

1   Q.   Yes.

2   A.   My wife Sarah, she and I have been married for a little

3   over six years and have been together for about a decade.  We

4   have a three-year-old son named George.  Mr. Seelbach

5   mentioned we have a dog named Oakley, who is very much a part

6   of the family, and we'll be welcoming our second child in

7   about two months.

8   Q.   What does Sarah do?

9   A.   Sarah is an oncologist.  Specifically, she's a radiation

10  oncologist, so she works for the University of Cincinnati's

11  Cancer Center.  She also teaches in the med school, or she's

12  faculty at the medical school for the University of

13  Cincinnati.  She is kind of above my pay grade, but she is --

14  she is cross-credentialed with Cincinnati Children's Hospital

15  Proton Center.

16  Q.   Was there a reason, back in 2018 and 2019, that you would

17  have had more time on weekday nights?

18  A.   Sure.  I'll try and, Your Honor, keep this relatively

19  brief.

20       When my wife was finishing medical school at the

21  University of Cincinnati, she wanted to train someplace that

22  she thought was world class, and near the top of her list was

23  the Cleveland Clinic.

24       My life, because of public service, was obviously very

25  much geographically rooted and anchored here in Cincinnati.  I

1    also wanted to support my wife in pursuing her professional

2    dreams and aspirations.

3         So she ranked the Cleveland Clinic at the top of her

4    match list.  When you go to match for residency, you don't

5    have control over where you're necessarily going to end up.

6    She ended up matching at the Cleveland Clinic.

7         We were already married by that point, so we said we

8    will, for several years here, have a dual-city marriage, where

9    we're both immersed in our professional obligations during the

10   week, and then one of us is getting in the car and driving

11   four hours up or down I-71 to be with each other every single

12   weekend.

13        I think, in four years, we maybe missed two, maybe three

14   weekends together because of things like, you know, blizzardy

15   snow so... sorry.  To answer your actual question, because

16   Sarah was working in Cleveland during the week, yeah, I would

17   have had -- sort of evenings would have been more open.  If

18   we're in the same place, we have family dinner every single

19   night.

20   Q.   Where do you live now?

21   A.   We live here in Cincinnati.

22   Q.   And is it a home that you've known?

23   A.   Yeah.  We bought my childhood home, so that's where we

24   live.

25   Q.   When you got back to Cincinnati, what year was that, '09,

1    is that what you said?

2    A.    Yeah, the summer of 2009.

3    Q.    What did you do when you came back to Cincinnati in 2009?

4    A.    There was a woman who had been a magistrate in juvenile

5    court, and through that, she had worked a lot with kids and

6    students and young people.

7         By that point, she was working as a consultant for

8    Cincinnati Public Schools, and with her in the lead and me as

9    her deputy, we cofounded an education not-for-profit

10   organization focused on bringing additional partnerships into

11   some Cincinnati schools.

12   Q.    When did you first run for office?

13   A.    I first ran for office in the 2011 city election, and I

14   believe I would have announced that campaign, announced my

15   candidacy late in 2010.

16   Q.    How many times, ultimately, did you run?

17   A.    For city council?

18   Q.    Yes.

19   A.    I ran for city council three different times.

20   Q.    What is your least favorite part of campaigning?

21   A.    I mean, probably fundraising.  I think it's a tie

22   between -- and, again, I love public service and getting to,

23   you know, be there for people, but it is also an

24   around-the-clock endeavor.

25        You know, if I'm going to the grocery store to get paper

*SITTENFELD - DIRECT*

1    towels, most of the time you can count on a constituent being

2    there to totally, rightly and understandably, talk to you

3    about a pothole or an issue in their neighborhood.

4        So the days are long, and it squeezes your time with

5    family a little bit more than one might like, so that was not

6    my favorite part.

7        And then, as we heard a little bit ago, the fundraising

8    demands are significant. Nobody runs for office because they

9    say I just love raising money so much. You run because, you

10    know, you think you can help do something good for your

11    community.

12    Q. Who, if you recall, helped you set up and register the

13    Progress and Growth PAC that we've heard about?

14    A. Three people. From my recollection, three people were

15    involved kind of from the beginning with that.

16        One was a lawyer named Micah Kamrass, another was his

17    brother, Jared Kamrass, and then another attorney named Paul

18    De Marco, so two lawyers and one campaign compliance expert.

19    Q. What procedures did you have in place that were related

20    to compliance for that PAC?

21    A. Well, both for the PAC and, I think, for all my campaign

22    accounts too, there would almost always be some blend or some

23    combination of a professional fundraising expert/compliance

24    expert, and then also an attorney, a lawyer at a reputable law

25    firm, in this case, Manley Burke.

*SITTENFELD – DIRECT*

1        And, you know, at one point, I had a professional CPA, so

2     I always tried to have, sort of, multiple balanced experts who

3     could make sure we were doing everything correctly.

4     Q.   Who was your professional CPA?

5     A.   A woman named Claire Fisher McKenna.

6     Q.   Who did she take over for?

7     A.   She took over for Mr. Kamrass.  I call him Jared.

8     Q.   Can you tell us why you fired him?

9     A.   In the fall of 2019, it came to my attention that he had

10    fabricated an email in this case.  It was an email that he had

11    sent to the individual we've known as Rob.

12        I found out that he had fabri- -- sort of concocted the

13    whole email, and it was a fake.  Talked to him about it.  He

14    acknowledged that's what happened, and I fired him for

15    dishonesty.

16    Q.   We heard a quote about the PAC, something to the effect

17    of the PAC benefits you.  Can you tell us how the PAC benefits

18    you?

19    A.   I think maybe around 110 people total, give or take a

20    few, made contributions to that PAC.  And anybody who would

21    make a contribution, from my vantage point, was helping the

22    PAC to do what it was set up to do.

23        And, again, the lion's share of what it was set up to do

24    was to make contributions to other candidates who I agreed

25    with and believed in, and also causes, charities,

1     not-for-profits that I believed in their mission.

2     Q.  Can you give us some examples of ways you could use it,

3     if you wanted to, for eat or travel?  What was that

4     requirement if you wanted to eat or travel?

5     A.  So I'll start by saying what the PAC couldn't do.  The

6     PAC could not directly support your own election hearing for a

7     particular office.  So if somebody wanted to run for mayor or

8     city council, that PAC could in no way, by yard signs or

9     advertisements or T-shirts or whatever that say, you know,

10    P.G. for city council or, you know, whoever for mayor.  What

11    it can do is support other candidates and causes.

12        And then you asked, I know, about travel and meals.  So

13    if I was going to Washington -- I'm trying to do two examples

14    that come to mind.

15        If I was flying to Washington, D.C. to speak at a

16    conference of other elected officials on sustainable energy,

17    the PAC could buy my plane ticket there.  If I then went out

18    for lunch with other elected officials, the PAC could pay for

19    that.

20        I recall also, I think there was an entrepreneurship

21    conference hosted by the Kauffman Foundation in Kansas City.

22    So that was another -- I mean, I don't recall very often it --

23    purchasing plane tickets.  I mean, those were the minority of

24    the overall expenses.

25    Q.  Back in 2018 and 2019, when your wife was in Cleveland,

SITTENFELD - DIRECT

1    how many meetings do you think you would hold on any given day

2    with a potential donor or constituent or other civic leader?

3    A.   It would definitely depend on the day.  But I like to

4    keep very busy, so both of my own volition, it's also what I

5    directed my staff to do.  I mean, I didn't like to have, sort

6    of, idle or empty days, so it would vary from day to day.

7        But for me to have a day where my first breakfast meeting

8    was at 7:30 a.m. with somebody, and my last event activity of

9    the day was having a beer with someone at -- again, this is

10   when my wife was not here, to be clear, was, you know, at

11   8:00 p.m.

12       And there might literally be, between meetings at City

13   Hall and meetings in the community outside of City Hall, a

14   dozen different meetings with one or multiple different people

15   at each one of those meetings, in as many different locations.

16       So -- and that wasn't every single day, but that was also

17   a pretty -- that was fairly typical, where there might be

18   eight, ten, twelve meetings in a single day.

19   Q.   What is a campaign house party?

20   A.   A campaign house party -- I know a lot of this might

21   sound weird to people who aren't as political, but this is

22   sort of, you know, so routine for people who are in politics.

23       A campaign house party is where somebody -- so this could

24   be a person who you go to church with.  It could be someone

25   who -- it could be an old family friend, it could be a

1    business colleague, says you're running for this office, and I

2    want to help you be successful.

3        So what I'm going to do is I'm going to -- I, the person

4    hosting a house party for you, is going to invite everyone in

5    my network.  I'm going to invite the people who go to my

6    church or synagogue.  I'm going to invite the people that I

7    work with.  I'm going to invite my neighbors.

8        All of those -- well, not all of those people, some of

9    those people then come to attend.  They usually -- you know,

10   you'll be sitting around someone's living room.  People that

11   don't want to stand will sit on the couches.  Other people

12   stand and lean against the walls.  There could be six people

13   in the living room, there could be 80 people packed into the

14   living room.

15       And you as the candidate will get up there -- and first,

16   the host might introduce and say some nice things about you,

17   why they decided to host a house party on your behalf.

18       You'll then get up and share here's my vision, here are

19   my policy views.  Here are the specific things that I'd like

20   to do if I'm fortunate enough to get elected to this office or

21   to stay in this office.

22       There's then a Q and A, where individual people who have

23   come there will raise their hand and say, you know, P.G., I

24   wanted to ask you about, you know, development, crime and

25   safety, neighborhood issues, maybe even an issue that a body

1    like city council doesn't directly address.  You then answer

2    their question to the best of your ability.

3         And then at the end of all of that because, hopefully,

4    you're getting -- you're trying to earn new supporters and

5    create new supporters, people who agree with the things you

6    said and liked you, will then write a campaign contribution in

7    support of your candidacy, and people who didn't like you will

8    quietly slip out the door, I guess.

9    Q.   Since the charges in this case, what jobs have you had?

10   A.   I have done a few assignments, several different

11   assignments as an independent contractor.  I've also pursued

12   several full-time positions that were very close to happening

13   but, ultimately, didn't, and the reason given was the pending

14   charges.

15   Q.   When did you first meet Mr. Ndukwe?

16   A.   I think I would have remembered this anyway but,

17   obviously, sitting here, like everybody else for the last two

18   weeks, has refreshed a lot too.

19        We were put in touch by a woman who I had known from

20   growing up.  She did an email introduction saying, hey, I

21   think you're both trying to do good things for the city.  You

22   should get to know each other.

23        She sent that email in the fa- -- I believe it was the

24   fall of 2010.  And then I do remember we met at that

25   Bruegger's Bagel in Clifton, I'm pretty sure it's still there,

 1    in 2010 for the first time.

 2    Q.   How would you describe your relationship over the past

 3    10 years, 12 years?

 4    A.   I regarded Chinedum as a friend.  You know, we were both

 5    plenty busy, so we weren't see- -- it's not like with a

 6    neighbor where, you know, you're waving over the fence to each

 7    other.

 8         But he would invite me to -- this is after he retired,

 9    hey, do you want to go and watch the Bengals scrimmage

10    tonight?  Another time we did go catch a boxing match.  We

11    would get one-on-one meals that included breakfast, lunch,

12    dinner, drinks.

13         He did once ask me, hey, do you want to go and catch a

14    Cleveland Cavalier's basketball game together?  So he had said

15    you want to travel together to go do something social.  I

16    couldn't do it for scheduling reasons.

17         And then, as you've seen, as people have seen, we sent

18    each other pictures of our newborn sons, so a little bit

19    strange and difficult to hear some of what was said, but I

20    regarded him as a friend of mine.

21    Q.   How frequently did he donate or fundraise for your

22    campaigns?

23    A.   Chinedum donated -- so I first ran for office in 2011.

24    And I guess -- it was a new relationship at the time, but

25    after that, Chinedum donated, I believe, every single other

1    time I ran for office.

2       And it was -- I think sometimes it was at my request, and

3    other times it was him proactively saying P.G., I believe in

4    you. I want to be there for you. How can I help? So him

5    proactively donating, and he was always an incredibly generous

6    donor.

7    Q. Do you recall a time when he put in writing proactively

8    his request to donate on a host level?

9    A. I think there were multiple times. I can't remember. In

10    2017, I had -- I might have invited him to an event. I can't

11    remember if I asked him to be a host or not, but he wrote back

12    saying put me down as a host. And something I hadn't asked

13    him for, he said, by the way, my dad -- I think he said list

14    my dad as a host too.

15       And then in 2018, un-requested, unsolicited from me, he

16    texted me and said, hey, let me know -- I'm paraphrasing, so

17    if you want to refresh.

18           MR. C. MATTHEW RITTGERS: May I approach with a text?

19           THE COURT: You may.

20           MR. C. MATTHEW RITTGERS: It's been marked as

21    Defendant's Exhibit D54.

22    A. Do you want me to read this, or...

23    Q. Do you recognize that?

24    A. I do.

25    Q. May I have it back?

*SITTENFELD - DIRECT*

1   A.   Yes.  So this is him proactively saying to me, I want to

2   be a host for your future fundraisers.

3   Q.   Is this Exhibit D54 an accurate depiction of the text

4   messages between Mr. Ndukwe and you back in late 2017, up

5   through early 2018?

6   A.   Yes.  That's text messages between the two of us.

7          MR. C. MATTHEW RITTGERS:  Your Honor, we move to

8   admit this exhibit and publish for the jury.

9          MR. SINGER:  No objection.

10          THE COURT:  54?

11          MR. C. MATTHEW RITTGERS:  D54, Your Honor.

12          THE COURT:  Exhibit D54 is admitted without objection

13   and may be published to the jury.

14          MR. C. MATTHEW RITTGERS:  Thank you.

15   Q.   Can you see that on your screen?

16   A.   That's on my screen, yes.

17   Q.   So on what date in 2018 did he ask to be on a host level

18   of your next fundraiser?

19   A.   January 10th of 2018.

20   Q.   Who is the blue bubble and who is the gray bubble?

21   A.   I am the blue, and Chinedum would be the gray bubble,

22   sort of left aligned.

23   Q.   Do you recall a time when Mr. Ndukwe had donated to you,

24   but you wanted to give some of the money back after the

25   donation?

*SITTENFELD - DIRECT*

1    A.   Yes.  Chinedum -- it might have been 2015, it might have

2    been 2016, I don't recall the exact year.  He gave -- he made

3    a donation of $5,000.  I then, after the primary campaign,

4    went to give him $2,300 back.

5    Q.   And are those captured in text messages as well?

6    A.   Those are in text messages as well, yeah.  I think I

7    followed up with him.  He didn't respond immediately about my

8    wanting to give him $2,300 back, so I think there are two

9    texts in a row where I say, hey, I still have this $2,300 I'd

10   love to give back to you.

11   Q.   You heard testimony where Mr. Ndukwe had indicated that

12   you knew that his analyst who supported you was donating

13   Mr. Ndukwe's money, and it wasn't the analyst's money.  Do you

14   remember that?

15   A.   I remember him saying that.  It's absolutely not what I

16   remember happening in reality.

17   Q.   Do you remember something expressly and explicitly stated

18   in a recorded call about that analyst's donation?

19   A.   Yeah.  I remember him saying something along the lines of

20   remember when my analyst --

21   Q.   As opposed to guessing --

22   A.   Sure.

23        MR. C. MATTHEW RITTGERS:  If I may, Your Honor, this

24   has been previously admitted as USA 13B.  If I may display

25   that for him to see?

1          THE COURT:  You may.

2     Q.  This is page 2 of USA 13B, which is a recorded phone call

3     between Mr. Ndukwe and you on October 30th of 2018.  I've

4     highlighted a statement that he made to you in this phone call

5     about that analyst.

6          Did you know you were being recorded on October 30th of

7     2018?

8     A.  I didn't know I was being recorded on October 30th, or

9     any other time I was being recorded.

10    Q.  In this phone call, is it pretty explicit as to who

11    actually supported you in relation to that analyst?

12    A.  Yeah.  I mean, again, I regarded Chinedum as an old

13    friend and somebody I absolutely trusted.  I could not have

14    imagined in any universe that I was being recorded.

15         So I would have assumed, if he was -- you know, I think

16    probably Mr. Holbrook said something along the lines of, you

17    know, working off his debt or his exposure for things he had

18    done to the FBI, that he would have said on that call, hey

19    P.G., remember when I gave an analyst money to then give to

20    you?  And my response would have been no, I don't, and if

21    that's what happened, you know, let's refund that money.  But

22    that's explicitly not what he said.  He said "my analyst that

23    supported you."

24    Q.  Do you know when you first met Laura Brunner?

25    A.  It's possible, it's actually likely that I would have met

1    Laura Brunner informally sort of years back.  But I think any
2    sort of formal establishment of a relationship would have most
3    likely happened around the time that I got to city council, so
4    I'm assuming about a decade ago.
5    Q.   What type of relationship did you have with Mrs. Brunner?
6    A.   I think mutually supportive, collaborative.  She struck
7    me as a hard worker.  I think she thought I was a hard worker.
8        I think we both wanted to help the city grow, develop,
9    create jobs, so it was a good one, and one where we both
10   engaged each other pretty frequently.
11   Q.   What type of communications did you have with her over
12   the course of the past decade?
13   A.   She would, on a regular basis, ask for my feedback.  She
14   would come to my City Hall office to brief me on things.  She
15   would sometimes pull me into things that didn't directly have
16   to do with the immediate work of city council.
17       So I do remember, because it was kind of one of the last
18   interactions we had before all this situation, this national
19   urban thought leader and sort of how to create great cities, a
20   guy named Bruce Katz came to town.
21       And she had a big formal -- she had a big, sort of,
22   gathering that a lot of different people came to.  And then
23   she wanted to have one small breakfast.  She asked me to be
24   the only elected official at that one small breakfast.  So
25   there was a lot of engagement between the two of us.

*SITTENFELD - DIRECT*

1    Q.   Do you recall a time when -- and she actually testified

2    to this, when you emailed on top of a prior email to her,

3    persisting in your communication about a project?

4    A.   I do.  I mean, I don't know if it's fair or not fair to

5    say, hey, I haven't heard from you in three days, but that was

6    my level of, sort of, impatience.

7         I was trying to initiate a move forward, this project to

8    house homeless veterans.  We were looking for different sites.

9    We already had a partner non-profit philanthropic funding had

10   merged from it, so I was eager to get going, and after not

11   hearing from her pretty quickly, I sent her follow-ups saying

12   just... yeah.

13           MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

14           THE COURT:  You may.

15           MR. C. MATTHEW RITTGERS:  It's been marked as

16   Defendant's Exhibit D716.  May I approach the bench?

17           THE COURT:  Thank you.

18   Q.   I've handed you what's been marked as Defendant's

19   Exhibit 716.  Is that a fair and accurate depiction of the

20   emails between Mrs. Brunner and you back in September of 2019?

21   A.   Yes.  This is an email from my email to Laura Brunner's

22   email.

23           MR. C. MATTHEW RITTGERS:  Your Honor, move to admit

24   this exhibit.

25           MR. SINGER:  No objection, Your Honor.

*SITTENFELD - DIRECT*

1      THE COURT:  D716 is admitted without objection.  You

2   may publish it to the jury, please.

3      MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

4   Q.  So we can see on Defendant's Exhibit 716 that you had

5   emailed Mrs. Brunner on September 3rd about some sites.  And

6   what's that in relation to?

7   A.  These were sites for -- the name of the organization I

8   was partnering with is the Veterans Community Project, so it

9   was in regard to that.

10  Q.  And then how many days later, I believe you testified to

11  this, but looking at the email, did you follow up with her?

12  A.  The difference between September 3rd and September 6th,

13  so three days.

14  Q.  Did you also have text messages with Mrs. Brunner about

15  this project?

16  A.  I did.

17      MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

18      THE COURT:  You may.

19      MR. C. MATTHEW RITTGERS:  And hand him what is marked

20  as Defendant's Exhibit 654.

21  Q.  Is Defendant's Exhibit 654 a fair and accurate depiction

22  of text messages between Mrs. Brunner and you back in August

23  of 2019?

24  A.  It is.

25      MR. C. MATTHEW RITTGERS:  Your Honor, move to admit

 1    this exhibit.

 2            THE COURT:  And the number again was?

 3            MR. C. MATTHEW RITTGERS:  654, Your Honor.

 4            THE COURT:  Is there any objection to Defendant's

 5    Exhibit 654?

 6            MR. SINGER:  Do you have a copy?

 7            MR. C. MATTHEW RITTGERS:  We gave it to you.  It's in

 8    the binder.

 9            MR. SINGER:  No objection, Your Honor.

10            THE COURT:  D654 is admitted without objection.

11            MR. C. MATTHEW RITTGERS:  Permission to publish, Your

12    Honor?

13            THE COURT:  You may.

14    Q.   Are there things echoed in this text similar to the email

15    that we just referenced?

16    A.   Yes.  Laura Brunner saying the, "Hi.  We have 8.3 --"

17    that would be acres -- "in Mt. Airy, and 2.5 acres in

18    Sedamsville" was in reference to the same veterans project.

19    Q.   Did you have any big donors in that non-profit that were

20    donating to you?

21    A.   I don't believe there was a single donor involved in that

22    project that -- involved with that organization that ever made

23    a donation to me.

24    Q.   Why were you texting and emailing Mrs. Brunner about it

25    back in 2019?

1    A.   I thought it was important.  I thought it was good -- I

2    thought it was what -- that constituency that we wanted to

3    serve.  I thought it was what they were owed and deserved, and

4    I thought it was a positive good thing for the city.

5    Q.   Do you recall offering or introducing Rob and Brian to

6    Mrs. Brunner?

7    A.   I don't believe I introduced them to her, but I did offer

8    or suggest that they meet with her, yeah.

9    Q.   What other civic leaders did you introduce Rob and/or

10   Brian to when they were in Cincinnati?

11   A.   The very first time that we met was actually February of

12   2018, a former city council member had asked me to get

13   together with people whom he described as out-of-town

14   investors interested in projects in Cincinnati.  Sounded great

15   to me.  You know, we want to attract investment to our great

16   community and region, not lose investment.

17        So I went to that meeting at the former council member's

18   request, met Rob and Brian.  I think the meeting was maybe

19   around an hour.  It might have been more like 45 minutes.  I

20   needed to leave early to go visit my father, who was having

21   some health issues.

22        And while we were there -- I believe that meeting was at

23   J. Alexander's, a restaurant in Rookwood.  And while we were

24   there, the president of Xavier University walked by, so I

25   didn't hesitate to make sure everybody knew each other and

1    facilitate introductions.

2        Fast forwarding, we were in, I think, January of 2019, I

3    was meeting with Rob and Brian, and the person who runs the

4    Convention Center walked by.  I immediately sprung to my feet

5    and said, hey, person who runs the Convention Center, these

6    are people who want to bring what I think is a great asset

7    that our region desperately needs.  You guys meet each other.

8        There were other times when I suggested introducing them

9    to people and, for whatever reason, it didn't happen.  Maybe

10   they didn't take me up on it.  One person is Steve Leeper,

11   so -- who's probably the biggest -- who is the head of the

12   organization that might be the biggest developer in terms of

13   doing development in the city.  I thought he would be a great

14   person for them to meet.

15       Another time I was meeting with them, another of the most

16   successful and respected developers in town and beyond

17   Cincinnati, a guy named Dan Schimberg went by, so I did an

18   introduction to them.

19       So I would never hesitate to introduce them to civic

20   leaders when they crossed our paths, or suggest that they

21   should meet with them on their own time.

22   Q.   What was the name of the head of the Convention Center or

23   Convention Bureau?

24   A.   Rick Booth.

25   Q.   Is that on tape?

*SITTENFELD – DIRECT*

1    A.   That is on tape.  It's in one of the recordings, correct.

2    Q.   Did we hear it in this courtroom?

3    A.   It has not been played in this courtroom.

4    Q.   Do you recall inviting them to dinner at your house with

5    other civic leaders?

6    A.   Some of this -- it's weird to have both lived this and

7    then relived it being as engaged in this case as a person

8    might expect I would be, going through the discovery myself,

9    and then sort of re-reliving it sitting in the courtroom for

10   the last couple weeks.

11        So I knew I had invited them to dinner, from sitting in

12   the courtroom and listening to the tapes.  It sounds like I

13   invited them over to family dinner quite a bit, but I also --

14   there was a time when I invited them to dinner with a group

15   that turned out to mostly be attorneys.

16   Q.   And was there an attorney from the U.S. Attorney's Office

17   also invited?

18   A.   Yes.  I had invited the U.S. Attorney for the Southern

19   District of Ohio and his wife to that dinner.  It was a

20   strictly social dinner.  But yes, they were also invited, in

21   addition to Rob and Brian.

22   Q.   Was that on tapes?

23   A.   It is in a recording, not one that the government chose

24   to play.

25   Q.   Let's talk about 435 Elm.  When did you first get

1    involved with attempting to help facilitate a redevelopment of

2    435 Elm?

3    A.   At least 2017, a person who had a claim to the property,

4    the Goldschmidt family, and specifically a gentleman named

5    Ryan Goldschmidt, reached out asking for my assistance, kind

6    of trying to get it out of what was just an overall quagmire

7    of a situation, competing claims to the property, litigation.

8    And this is on top of the fact that this was a pretty derelict

9    building.

10        I don't know if it was already at that point, or as soon

11   as a year later, but dangerous, blighted, squatters, costing

12   the taxpayers of the community $4 million a decade.

13        So he reached out, and I recall pretty promptly saying,

14   hey, here's someone at the city who you can talk to to help

15   kind of move this forward.

16             MR. C. MATTHEW RITTGERS:  Your Honor, may I approach?

17             THE COURT:  You may.

18             MR. C. MATTHEW RITTGERS:  I'm going to approach with

19   Defendant's Exhibit 653.  It's in the binder.  Your Honor,

20   this is in the binder.  Would you like a copy of this?

21             THE COURT:  Fine.

22   Q.   Looking at this text exchange, can you tell us who this

23   text exchange is between?

24   A.   So in what I have here, the only texts are from Ryan

25   Goldschmidt.

*SITTENFELD - DIRECT*

1   Q.   And to whose phone?

2   A.   This is to my phone.

3   Q.   Is this a fair and accurate -- what is the date on this?

4   A.   November of 2017.

5   Q.   Is this a fair and accurate depiction of a text that Ryan

6   would have sent to you back on November 28th of 2017?

7   A.   Yes.

8       MR. C. MATTHEW RITTGERS:  Your Honor, we move to

9   admit this exhibit, Defendant's Exhibit 653.

10      MR. SINGER:  No objection.

11      THE COURT:  Defendant's Exhibit 653 is admitted

12  without objection.

13      MR. C. MATTHEW RITTGERS:  Permission to publish?

14      THE COURT:  You may.

15  Q.   So what is this in reference to?

16  A.   My wife often chides me for the amount of unread text

17  messages I have, so this is a good day for her to be at work

18  and not at court.

19       The reference is to him -- again, we've heard a lot

20  about -- and I was aware of, at the time, what a complicated

21  situation and property this was.

22       So this was him kind of trying to get my help for who he

23  could engage with at the city to -- I know this isn't a

24  word -- to de-quagmire the situation.

25  Q.   Were there also texts in mid 2018 between Mr. Goldschmidt

1    and you about 435 Elm?

2    A.   Yes.  I don't have the text memorized, but the general

3    gist of it was him reaching out.  By that point --

4    Q.   If you -- I apologize for interrupting.

5         MR. C. MATTHEW RITTGERS:  May I approach with the

6    actual text?  It's Defendant's Exhibit 136.  It's in the

7    binder.  Would you like a copy, Your Honor?

8         THE COURT:  Not if it's in the binder.

9    Q.   Looking at Exhibit D136, is this a fair and accurate

10   depiction of text messages between Ryan Goldschmidt and you

11   back in July of 2018?

12   A.   Yes.

13        MR. C. MATTHEW RITTGERS:  Your Honor, we move to

14   admit this exhibit, Defendant's Exhibit 136.

15        MR. SINGER:  No objection.

16        THE COURT:  Defendant's Exhibit 136 is admitted

17   without objection.  You may publish it for the jury.

18        MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

19   Q.   What do you recall from this text exchange that has been

20   marked as D136?

21   A.   I mean, rather than generally summarizing it, since it's

22   now in front of me, this was Ryan reaching out.

23        By this point, Chinedum had purchased the air rights to

24   435 Elm, was asserting those property rights, and I think the

25   two of them were trying to work things out.

1    So Mr. Goldschmidt describes it as an impasse and was

2    wondering if I could help the two of them figure something

3    out, and I responded saying glad to and suggesting a time.

4    Q.  How many months before that Nada meeting was this text

5    exchange?

6    A.  The Nada meeting was on November 7th of 2018, and this is

7    the beginning of July, so count the months; July, August,

8    September, October, four months.

9    Q.  How about Defendant's Exhibit 653, the text message where

10   it appears you and Ryan had discussed 435 Elm.  How long

11   before that Nada meeting was your involvement with Ryan

12   Goldschmidt on this property?

13   A.  About a year before that first meeting, before that

14   meeting at Nada.

15   Q.  Why would you be trying help 435 Elm get developed back

16   in 2017?

17   A.  I mean, it was a no-brainer slam dunk for the city to --

18   if this building had been anywhere, and somebody had tried to

19   engage me or I became aware of it, of course I would have said

20   how can I help fix up a blighted, dangerous building that's

21   incredibly costly to the taxpayers.

22       When you layer on top of that the fact that it is in the

23   heart of our downtown, I would always describe our downtown

24   as, you know, the welcome mat or the living room of the city.

25   People are coming from all different places, this is where

*SITTENFELD - DIRECT*

1    tourists are.

2        And not only was it in the living room of the city

3    downtown, it was also across the street from the Convention

4    Center.  It would never have occurred to me to not try and

5    roll up my sleeves and try and be helpful to a project like

6    435 Elm.

7    Q.  Going to the Nada meeting on November 7th.  Do you recall

8    what plans had been relayed and claimed by Rob, who we now

9    know is an FBI agent, and Mr. Ndukwe, on November 7th?

10   A.  Can you clarify?

11   Q.  Yes.  Do you remember who they said the general

12   contractor was?

13   A.  Sorry.  So yeah -- now I understand what you're asking.

14   They said, I believe, the general contractor was Turner.

15   Q.  Who is Turner?

16   A.  One of the largest general contractors in the country, if

17   not the world.  They said the architect was Elevar, one of the

18   most respected architectural firms, you know, locally and

19   beyond.  They talked about a hotel flag that was very

20   respected.  They talked about --

21   Q.  Who was the hotel?

22   A.  IHG or IGH.

23   Q.  If I showed you a transcript, if I have it, of that

24   November meeting, would that help refresh your recollection

25   about the actual hotel chain?

*SITTENFELD – DIRECT*

1    A.   Sure.

2    Q.   I might not have it.  Oh, yeah, I do.

3         MR. C. MATTHEW RITTGERS:  Your Honor, this has been

4    previously admitted.  It's USA 15C.  It's a transcript of the

5    November 7th meeting.  May I publish it?

6         THE COURT:  You may.

7    Q.   Does this refresh your recollection of what you were told

8    about the hotel?

9    A.   Then it would have been IHG.

10   Q.   And IHG would have built what type of hotel?

11   A.   My understanding was -- oh, sorry, an indigo hotel.

12   Q.   Were you told in this meeting how much money they planned

13   the total redevelopment to be?

14   A.   They represented that they would be able to pull off a

15   $75 million project.

16   Q.   When Mrs. Brunner testified about an equity piece, what

17   does that mean, equity piece?

18   A.   The people bringing the financial resources.

19   Q.   Who were you told would bring in the financial resources

20   throughout this entire sting operation?

21   A.   In that same November 7th luncheon, Rob said,

22   essentially, that they were the equity piece, and he

23   specifically referenced a group of 15 different people that

24   were their business partners, who were the people that would

25   be investing to help make this project happen.

SITTENFELD - DIRECT

1   Q.  Did Rob, in that meeting, express to you his past

2   experience in development?

3   A.  I recall him saying that he had been a developer doing

4   development deals, and a developer for many years and,

5   specifically, like all over the southeast of the United

6   States.  I think there's a line about him, quote, cutting his

7   teeth in Georgia or Savannah.

8   Q.  After you vetted this project on November 7th, you

9   indicated that you could get the votes.  Can you tell us why

10   you would say something like that?

11   A.  The project seemed like such a slam dunk no-brainer that

12   it was just me expressing my confidence to them, especially

13   because Chinedum's concerns about Mayor Cranley trying to

14   block and obstruct him.  I think they thought there were going

15   to be obstacles there that -- and I think I even said

16   something along those lines, even if Cranley had beef with

17   you, Chin, I don't think he's going to try and block a good

18   deal.

19      So my saying -- I mean, I said this is an easy deal to

20   support.  And I think I said, you know, I'm happy to rally my

21   colleagues, or whatever the exact language was during the

22   lunch, because it just -- it didn't occur to me that anybody

23   would be against something that was so clearly and

24   overwhelmingly a positive for the city and the region and the

25   taxpayers.

*SITTENFELD - DIRECT*

1    Q.   After hearing Mrs. Brunner testify in here last week, do

2    you now know what the disconnect was between Mrs. Brunner and

3    you back in 2019?

4    A.   Yeah.  I mean, that was somewhat revelatory sitting there

5    listening to that.

6         The story that I was told, in pretty significant detail,

7    about we've got Turner Construction, we've got Elevar.  We've

8    got a development team and equity partners that have done

9    deals all over the country, people who have been cutting

10   their -- cut their teeth years ago.  To me all of the pieces

11   were in place.  I did not know that this was a fiction from

12   the FBI.

13        Chinedum was, in addition to being my friend, a respected

14   developer, someone in good standing, so it never occurred to

15   me that he would be in a position where he was facilitating

16   this fiction.

17        And what I didn't understand fully, until hearing

18   Ms. Brunner, is that they did not tell that same story to her.

19   Q.   You mentioned a meeting back in February of 2018.  Were

20   there offers to help -- was that meeting recorded; if you

21   know?

22   A.   It was recorded.

23   Q.   Did you make offers to help Rob, and was Rob -- who was

24   at that meeting?

25   A.   It was Rob and Brian, and the former councilman who had

1    introduced us.

2    Q.   Have you listened to that recorded phone call?

3    A.   I have.

4    Q.   Did you make offers to help back in February 2018?

5    A.   Yeah.  In that first meeting that we had, one of the

6    things I said -- again, meeting people who I trusted, I

7    believed when they said we're here to look at opportunities to

8    invest in and make your city better.

9        Anyone who is, I think, doing a good job in their role,

10   that would get them excited.  So I specifically said to them,

11   and if someone wants to pull it up, they can, but close to the

12   exact quote was, let me know how I can help you all with

13   opportunities that you're thinking through.

14       I also offered to make specific introductions to them, I

15   believe, too, at the time, based on things they said they were

16   interested in, to the sheriff's office locally, and to the

17   director of the city's office of environmental quality.

18   Q.   Before that meeting and during that meeting, how many

19   times were campaign donations brought up?

20   A.   Zero.

21   Q.   Going back to the disconnect that you had between -- that

22   existed between Mrs. Brunner and you, do you recall what she

23   and Mr. Ndukwe were attempting to negotiate, and some of what

24   you knew as the sticking points?

25   A.   Yeah.  I mean, they ultimately collided over what they

1    both thought the ground lease for the 435 Elm property should

2    be.

3    Q.   Do you recall where Ms. Brunner's number was compared to

4    Mr. Ndukwe's?

5    A.   I do.

6    Q.   What were those numbers?

7    A.   They moved a little bit over time, but Ms. Brunner wanted

8    a $350,000 a year ground lease, which, from the get-go, struck

9    me as incredibly unusual for the port.

10        To the extent another of the calls that hasn't been

11   played -- that was recorded but has not been shared in this

12   courtroom, I said, that number is insane.  It's ridiculous.  I

13   used the word offensive to describe it.

14        Layered on top of that were concerns, which Ms. Brunner

15   brought up herself, that she might have been treating Chinedum

16   differently because he was black, and he was one of the only

17   black developers in the City of Cincinnati.

18        She offered this number of $350,000 a year.  Chinedum, I

19   think, started around $66,000 a year.  And all along the way,

20   I was saying, you know, just come together.  Let's get a deal

21   done.  This is good for the city.  Let's not let this get

22   stalled out.

23        There was a recorded phone call in which I asked

24   Chinedum, hey, Chinedum, would you go to $275,000 a year for a

25   ground lease?  So I actually went closer to Laura Brunner's

1    number than to a number of Chinedum's and his investors,

2    fictional investors.

3         And the reason I asked to do that was I just wanted to

4    get it across the finish line.  I thought it would be, again,

5    I've said this many times, but just a slam dunk no-brainer for

6    the city.

7         And it struck me that Ms. Brunner might be a little bit

8    more stubborn about the situation than Chinedum.  And when I

9    asked Chinedum would you do that $275,000 number, which is

10   generally in between 66 and 350, he said yes.

11   Q.   We've heard questions about RFPs.  What is an RFP?

12   A.   A request for proposal.

13   Q.   Do you recall a specific statement back in January of

14   2019, on a recorded call between you and Rob, where you

15   actually discussed your brutally honest thoughts about RFPs?

16   Do you remember that statement?

17   A.   I remember it happening.  I don't remember the exact

18   quote.

19        MR. C. MATTHEW RITTGERS:  Your Honor, this has been

20   previously admitted as USA 23C.  It's a transcript of a

21   conversation between P.G. Sittenfeld, UC Rob, UC Brian.

22   Permission to publish?

23        THE COURT:  You may.

24   Q.   This is page 5.  This is on January 30th of 2019.  This

25   is in the recordings.

```
 1              THE COURT:  You lost focus.

 2              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

 3              THE COURT:  I mean on the Elmo.

 4    Q.  Did you know you were being recorded in January of 2019?

 5    A.  No.

 6    Q.  So what did you tell the FBI about the RFP process and

 7    your beliefs about when they should be used or not?

 8    A.  Do you want me to read this, or...

 9    Q.  Sure.  Yeah.

10    A.  "This is what Denning said.  So the one thing he said,

11    and this is where I would be happy to be helpful, but he was

12    like, I'm gonna look, and he was, he was like, I haven't even

13    looked at the redevelopment proposal.

14        "He was like, I'm gonna look at it, and if it's good,

15    like, let's make a deal.  He's like, and if it's not great,

16    the city could consider doing an RFP to see what other

17    developers are interested in it.  I mean, his pos- -- and this

18    is, like, what we want out of our administrator."

19    Q.  So what do you mean by that, that you want that out of

20    your administrator and city?

21    A.  Chinedum had the air rights to 435.  That gave him, sort

22    of, from my understanding, first right of refusal or lead

23    claim to being the developer for it.

24        So that meant that if he could submit a good proposal,

25    and from everything that I had been told, not knowing that
```

SITTENFELD - DIRECT

1    some of it was lies, was like, of course he's putting a good

2    proposal together.

3        The end of that was if he has not put a good proposal

4    together, then -- and Mr. Denning, Phil, puts out an RFP, then

5    the last thing I said is that's what we want out of our

6    administrators; that if you've got a good partner in hand to

7    bring a good project forward, you work with them.  And if you

8    don't, then sure, opening it up to an RFP.

9    Q.   How did Mayor John Cranley's vendetta against Mr. Ndukwe

10   impact you throughout this?

11   A.   It didn't seem fair.  You know, I mean, my motivation was

12   always can we redevelop, in a way that's good for this

13   community, a blighted, dangerous, costly building.  So that

14   was sort of the foundation of everything.

15       But on top of that, several of the concerns we've heard

16   about, nobody should be treated unfairly because someone

17   doesn't like them, as Chinedum had relayed about John

18   Cranley's vendetta and positions.

19       Nobody should be treated unfairly because of the color of

20   their skin, as Chinedum relayed about Ms. Brunner's treatment

21   to him.

22       So I had all the motivation that I needed to move forward

23   something that was good for the community.  But on top of

24   that, there were, sort of, twin additional motivators too.

25   Q.   After Rob and Brian left town and were no longer involved

*SITTENFELD - DIRECT*

1    with you, did you sit down with Mr. Ndukwe and a new partner

2    of his, or new to you, I should say?

3    A.   Yes, on --

4    Q.   Well, why would you do it, and when did that happen?

5    A.   On, I believe it was December 11th, 2019, Chinedum asked

6    if he and his, from what I understood, new development partner

7    could come and meet in my City Hall office.

8        They came and met in my City Hall office.  It was a

9    recorded meeting.  We haven't heard it here.  And I worked

10   with Chinedum and Mike Schiff the same as I would work with

11   Chinedum and Rob and Brian, the same as I would work with

12   Chinedum and Ryan Goldschmidt.  Whoever wanted to do something

13   good for the city, I was game to help.

14   Q.   I want to talk about some of the events we've heard in

15   the case.  I want to start with an unrecorded call, which, I

16   believe, occurred on September 21st of 2018.

17       What do you recall from that call on September 21st of

18   2018?

19   A.   I don't recall that call.

20   Q.   Well, do you believe that you would have asked Mr. Ndukwe

21   to fundraise $10,000?

22   A.   Seems absolutely plausible.  Again, this is a friend, a

23   long-time, very generous donor, and someone who in the same

24   year had said, hey, give me the -- let me know when I can

25   fundraise for you in the future.

*SITTENFELD - DIRECT*

1       So asking someone like that to fundraise and bundle for

2   me seems totally likely.

3   Q.   Did you know at the time that he had business in front of

4   the city, or was likely to?

5   A.   I think there was a sense with Chinedum -- and this is

6   true with a lot of the developers, they kind of always had

7   business in front of the city.

8       So I think, over the course of the time spent we've been

9   talking about here, I think Chinedum had three different total

10  projects.

11      At that exact moment could I have said, hey, he's got

12  this coming, or this just happened?  Not necessarily.  That

13  wouldn't have been on my mind on a call like that.  But the

14  notion that he would have had business before the city, sure.

15  Absolutely.

16  Q.   What date was the first recorded phone call?

17  A.   October 26th, 2018.

18  Q.   And how many recorded phone calls occurred before the

19  Nada lunch on November 7th?

20  A.   Three.

21  Q.   Who initiated all three of those calls?

22  A.   Chinedum, for each call, texted me and said, hey, can we

23  hop on the phone.

24  Q.   I want to jump to the second call on October 30th, where

25  we heard the quote "love you but can't."  Why did you say

SITTENFELD – DIRECT

1    that?

2    A.   Chinedum -- the context of that phone conversation was

3    that Chinedum was sharing with me and complaining, I think

4    justifiably so, that John Cranley, the quote which we've

5    heard, is trying to F me left and right; that John Cranley was

6    trying to block and sabotage him from bringing forward good

7    projects.

8         So that was me saying, Chinedum, you're trying to bring

9    projects forward that are good for the city.  I want to help

10   you bring forward projects that are good for the city, but I'm

11   only going to be around here if I'm successful in this race.

12        And it's actually not come out over the last couple of

13   weeks.  I was -- because of term limits, it was my last term

14   at City Hall so, quite literally, in order for me to be

15   someone that helped advance projects that were good for the

16   city, good for the community, that was only going to happen if

17   I became the next mayor.

18        The other piece is that, you know, Chinedum -- so that

19   call was on October 30th.  On October 26th, Chinedum had

20   proactively brought up, hey, P.G., I have these LLCs.  I want

21   to help fundraise for you.

22        Earlier in the year, before that, he had said, let me

23   know when your next fundraiser is so I can be part of the host

24   committee.

25        From everything I knew and understood, Chinedum was

*SITTENFELD - DIRECT*

1    already strongly and proactively in my corner.  The only thing

2    that he was trying to resolve was his wish, which I respected,

3    that he didn't want to donate in his own name, he wanted to

4    fundraise, and that's what he was trying to sort out.

5    Q.   Do you recall the date of the third and final call before

6    the November lunch?

7    A.   These dates are emblazoned in my brain.  November 2,

8    2018.

9    Q.   And what, if anything, on that call surprised you?

10    A.   A couple things actually surprised me.  Chinedum had

11    said, I want to raise you $10,000.  In that call, he then

12    said, I want to raise you $20,000.

13         That's -- politicians don't usually object when they get

14    responses like that.  I don't know many politicians that have

15    said no, no, no, raise me less money, but that still came as a

16    surprise.

17         He -- I said, you can do that over the next couple years?

18    He said no, the next couple weeks.  That surprised me.

19         And then the biggest surprise of all was him saying, you

20    know, we're going to want it to be a yes vote without a doubt,

21    because I had known Chinedum for eight years.  We had been

22    friends for eight years or, you know, an early introduction

23    had grown into a full-fledged friendship, and I had never once

24    known him to do something that came to my attention that

25    sounded untoward or unethical.

*SITTENFELD - DIRECT*

1    Q.   How did you respond when you heard that explicit

2    statement?

3    A.   I said nothing can be illegal, nothing can be a quid pro

4    quo.

5         And then because I viewed him as my friend and good

6    upstanding person, I believe the next words out of my mouth

7    were, and I know that's not what you meant either.  And I

8    meant that.

9         It never occurred to me the situation that he was in, so

10   I immediately also wanted to give my friend the benefit of the

11   doubt.

12   Q.   Why would you, after that, meet with the out-of-town

13   investor named Rob?

14   A.   After I said to Chinedum that nothing can be a quid pro

15   quo, and I know that's not what you meant either, he agreed.

16   And I kind of thought that put the issue to bed.

17        In retrospect, I obviously wish I had not taken as much

18   comfort from his affirming my comment as I did.

19        I also thought that he was probably misrepresenting the

20   person who I had encountered.  We talked a second ago, I had

21   met Rob nine months earlier.  He was someone who said, I want

22   to come here and invest and help your city.

23        In response to that, I said, let me know how I can be

24   helpful.  Not a single mention of campaign contributions.  And

25   nine months after that, I never called and said, hey, you

1    know, can you donate to me?  Will you come to this event?

2    Never occurred.

3        So the person he was talking about reintroducing me to, I

4    had already encountered, and nothing -- you know, I didn't

5    think he sounded like the person that Chinedum was

6    representing.

7        And then -- I mean, those were all important drivers.

8    But the biggest one might have been the fact that he was

9    talking about someone, and this was the lens through which I

10   always saw Rob and Brian, of people that wanted to back a

11   project that was good and important and needed for our city.

12       You know, if everyone who was, you know, odd or weird or

13   rough around the edges people just wrote off, there's a lot of

14   good stuff that could happen in the city that never would so,

15   of course, I wanted to meet with someone who said, I'm here to

16   make something good happen for Cincinnati.

17   Q.   At that lunch at Nada, how many times were donations

18   discussed at lunch?

19   A.   Specifically, I think zero.  I walked them through that

20   slideshow showing.  I think my quote was something along the

21   lines of -- I didn't know if they were going to be donors or

22   not.

23       So there's one quote where I said, If Chinedum convinces

24   you all to support someone, something like that.  I don't know

25   the exact quote.  But in terms of my saying, you know, like

*SITTENFELD - DIRECT*

1    asking them for a contribution, zero specifically.

2    Q.   During that lunch, you made statements like, "I can

3    deliver the votes.  I can shepherd the votes."  What do those

4    phrases mean in your line of work, or what you used to do for

5    work, I should say?

6    A.   Well, I think, in the specific context of that moment, I

7    was really just trying to express to Rob, who represented

8    himself to be an outsider, who maybe didn't understand how

9    things worked in Cincinnati and seemed jittery about John

10   Cranley blocking this project that I, after asking the

11   questions I asked and getting the answers that I got, almost

12   immediately thought, this thing is going to sail through City

13   Hall.

14       No one -- even the person who might have a vendetta

15   against Chinedum, no one's going to stand in the way of this.

16   They'll look like a fool, frankly, for trying to block an

17   awesome and necessary revitalization.

18       So my saying that was, I think, mostly an expression of

19   this is going to be easy, you guys.  I mean, no one is going

20   to stand in the way of this.

21       I think, more generally, I would say stuff like I can

22   shepherd the votes, I can deliver the votes, all the time.

23   I'm saying, you know, I'm glad to articulate my support for

24   something, and I think other people will see the logic, the

25   same logic that I do.

*SITTENFELD - DIRECT*

1    Q.   Do you remember talking, asking about something that was

2    referred to in that meeting as a CRA, and what you were told

3    about the CRA?

4    A.   Yes.  That they wanted what was a routine, commonplace

5    sort of set of incentives to be able to make the deal work, to

6    pencil the deal.

7         So, in other words, if they -- and sometimes developers

8    would do what I'm about to describe, by the way, and say, hey,

9    we've got this great project, but we're only going to be able

10   to pull it off if we get a huge amount of gap financing from

11   the city.

12        There was one, kind of, infamous project, where I think

13   the city -- and this was not spearheaded by me, but I think

14   the city bridged their gap with like $9 million, $9 million in

15   cash, to help pull off this other downtown project.

16        What Chinedum was saying is we don't need any of that.

17   We just need the same routine package that you all give to

18   other projects all the time.  And he was correct.  We did do

19   it all the time.

20   Q.   Back at the 580 Building, where Rob asked you to go after

21   lunch, do you remember when he said, "What is the best way for

22   us to get that deal"?

23   A.   I remember it from having experienced and reexperienced

24   that quote, yes.

25   Q.   Well, what was your response when he said "get that

*SITTENFELD - DIRECT*

1    deal"?

2    A.   I thought he -- we had been talking about the deal,

3    meaning the project, the development project, for -- you know,

4    off and on for the last hour.  I thought he was talking about

5    the development proposal.  So my immediate response was, do

6    you really think that John Cranley is going to try and veto

7    this.

8    Q.   We've heard innuendo about something called straw donors.

9    What is that?

10   A.   A straw donor is when somebody tries to give their own

11   cash or their own money to another person to then give it to a

12   candidate.

13   Q.   What was the date of the Nada lunch?

14   A.   November 7th, 2018.

15   Q.   When did the FBI agents get it right and donate to you

16   lawfully and legally with LLC checks?

17   A.   December 17, 2018.

18   Q.   So how many days is that?

19   A.   Forty.  Yeah, should be about 40.

20   Q.   All right.  During that time, were there statements made

21   to you -- well, starting on November 7th, what did Rob tell

22   you about his network of investors on November 7th?

23   A.   That there were 15 of them.

24   Q.   And then again -- and this has been previously admitted

25   and marked as USA 19B.

*SITTENFELD - DIRECT*

1    On November 26th, do you remember having a phone call

2  with Rob, where he discussed one or more of his business

3  partners writing you checks from the LLC?

4  A.  Yes.

5  Q.  Do you recall the exact quote?

6  A.  On November 26th?

7  Q.  Yes.

8  A.  I think it was --

9          MR. C. MATTHEW RITTGERS:  Instead of guessing, may I

10  publish, Your Honor, page 2?

11          THE COURT:  Yes.

12  Q.  All right.  Do you remember that phone call back in late

13  November, where Rob tells you -- what does Rob tell you about

14  the LLC checks?

15  A.  He said, "I've got another business partner."  And then

16  he said, "And I've got another business partner."

17  Q.  Do you remember the date when he gave you the LLC checks?

18  A.  December 17, 2018.

19  Q.  Do you remember the prosecutor mentioned something about

20  Omar?

21  A.  I do remember hearing the prosecutors talk about Omar.

22  Q.  What gender is that to you, Omar, male or female?

23  A.  I'm going to assume male.

24  Q.  All right.  On December 17th, this has been previously

25  marked as USA 21G, page 3, when he actually gives you these

*SITTENFELD - DIRECT*

1    checks on that day, who does he say cut the checks?

2    A.  "I had my girl in the office."

3    Q.  So he's referring to a woman in his office who wrote the

4    checks or ran the checks?

5    A.  Yeah.  Yes.

6    Q.  And did you ever make a statement about what you believed

7    Rob was doing in terms of how he was fundraising and bundling

8    and from whom?

9    A.  Yes.  My only comments ever were that these are coming

10   from -- and I'm paraphrasing, but this should be pretty close.

11   Q.  If I may, just so it's the exact.  I apologize for

12   interrupting.

13   A.  No problem.

14   Q.  USA 21D, previously been admitted.  December 3rd, which

15   is really December 4th, actually, we heard, page 2.

16       This is your statement.  Did you know you were being

17   recorded at the time?

18   A.  Again, I never, never knew once that I was being

19   recorded.

20   Q.  All right.  Well, what did you tell them about your offer

21   to help ensure that they actually donated lawfully and

22   legally?

23   A.  My understanding was only ever that this was coming from

24   their, quote, universe of buddies and investors.  That was

25   what I had communicated to Chinedum, who was what Rob had

*SITTENFELD - DIRECT*

1    represented in terms of what their universe of buddies and

2    investors was.  So I repeated that.

3         And then, I think, sort of all throughout emphasized, you

4    know, these need to be real human beings and real LLCs.

5    Q.   What did you offer to do on -- in December, after they

6    had improperly attempted to donate, and said, oh, man, I

7    thought those were LLCs?  What did you offer to do?

8    A.   To have me and my team vet the checks to make sure that

9    they were what they were representing them to be.

10   Q.   Did you continue, in the rest of 2018 and into some of

11   2019, to have communications with Mr. Ndukwe, Rob, and Brian?

12   A.   Yes.

13   Q.   Do you recall sending Rob and Brian, do you recall

14   sending them a holiday card?

15   A.   I did.

16   Q.   And this is behind you.  It's been previously marked as

17   Defendant's Exhibit 648.

18           MR. C. MATTHEW RITTGERS:  May I approach, Your Honor?

19           THE COURT:  You may.

20   Q.   I just handed you and took back what was marked as

21   Defendant's Exhibit 648.  What was that?

22   A.   It was a holiday card.

23   Q.   And where did we receive this?

24   A.   The government gave it to us a couple weeks ago.

25   Q.   Is this a fair and accurate depiction of the envelope

SITTENFELD - DIRECT

1     that you would have mailed the actual holiday card, and the

2     note that you wrote to Rob and Brian back in 2018?

3     A.   It is.

4     Q.   Or 2019.

5          MR. C. MATTHEW RITTGERS:  Move to admit Exhibit D648,

6     Your Honor.

7          MR. SINGER:  No objection.

8          THE COURT:  D648 is admitted without objection.

9     Q.   All right.  And so you sent a picture of Oakley and Sarah

10    and you.  Why is George not in that picture?

11         THE COURT:  Do you want that published to the jury,

12    Mr. Rittgers?

13         MR. C. MATTHEW RITTGERS:  Oh, thank you, Your Honor.

14    Yes, please.

15    A.   George is not on the scene yet.

16         MR. C. MATTHEW RITTGERS:  It's been published?

17         THE COURT:  It has now, yes.

18    Q.   Okay.  And then you wrote a note to Rob and Brian.  Is

19    that your handwriting, a note that you wrote to them?

20    A.   It is.

21    Q.   And you said, "It's been a pleasure growing our

22    friendship over '18.  Thanks for believing in Cincinnati's

23    potential"?

24    A.   I did.

25    Q.   I'm going to show you what's been marked as Defendant's

1    Exhibit D48.  It's text messages between Mr. Ndukwe and you.

2        Is Defendant's Exhibit D48 a fair and accurate depiction

3    of text messages between Mr. Ndukwe and you back in June of

4    2019?

5    A.  It is.

6        MR. C. MATTHEW RITTGERS:  Move to admit Defendant's

7    Exhibit D48, Your Honor.

8        MR. SINGER:  No objection.

9        THE COURT:  D48 is admitted without objection.

10   Q.  These guys, they presented some red flags, as you sat in

11   this courtroom for the past couple of weeks, fair?

12   A.  Yes.

13   Q.  Why did you continue to deal with them?

14   A.  The lens through which I viewed them was people who are

15   backing something that was good for the city, good for my

16   constituents, was going to be an indisputable positive for the

17   City of Cincinnati.

18       I also -- this is kind of a point of pride for me, across

19   nine years at City Hall is I engage with everybody from all

20   walks of life.

21       So if someone had minimal formal education, or if they

22   had fancy degrees, it didn't matter to me.  If somebody was

23   incredibly polished with their words, or was more rough around

24   the edges, I wasn't gonna write them off.

25       And then probably the biggest reason of all was Chinedum

SITTENFELD - DIRECT

1    re-facilitated, reintroduced this relationship.  I trusted him

2    as a person.  I trusted him as a friend.  I believed he was a

3    respected, reputable developer, and he took his credibility

4    and his trust and conferred it on them.

5        So that colored the lens through which I looked at them.

6    A respected, reputable friend of mine is saying you can trust

7    these guys, they're here to help your city.  They're here to

8    help turn around a blighted project.  That's why I stayed

9    engaged.

10   Q.   Why were you in Columbus on September 24th of 2019?

11   A.   There was a statewide -- there was a dinner of statewide

12   elected officials in Columbus that night.

13   Q.   Do you recall talking about zoning and regulation related

14   to legalized gambling?

15   A.   I do.

16   Q.   Why did you have that conversation?

17   A.   Vinny brought up his concerns about basically turning a

18   lot of people into gambling addicts.

19       So he said -- and I'm paraphrasing a little bit here, but

20   he said this, if you have it all over the city, you get in a

21   situation where people lose track, they forget that the money

22   is real, and they end up in a situation where they can't pay

23   their rent.

24       I always supported the notion of lawful, regulated sports

25   betting, but I never -- for reasons that align with what Vinny

SITTENFELD - DIRECT

```
 1    said, about people turning into gambling addicts, I never

 2    thought it should be on every street corner, in every gas

 3    station, in every neighborhood.

 4        And the way that you make sure that there's not sports

 5    betting on every neighborhood, on every street corner, on

 6    every gas station all throughout the city, is the zoning code.

 7  Q.  You remember, and we heard it in this courtroom, Vinny

 8    telling a story about mack trucks, right?

 9  A.  I remember from having heard it last week.

10  Q.  I mean, you heard that, yet you still had a conversation

11    with him about zoning and regulation even though you heard

12    that.  Why?

13  A.  I wasn't -- in the moment, I wasn't totally clear what he

14    was saying or intending, but I knew what was motivating me,

15    which was I think lawful, regulated sports betting could be a

16    good amenity for the City of Cincinnati if the state regulates

17    it, but I do not support it popping up all across the city and

18    running rampant.

19  Q.  Whose decision was that to legalize gambling?

20  A.  The State of Ohio.

21  Q.  Do you recall the approximate last contact that you would

22    have had with Rob or Brian or Vinny?

23  A.  It was different times for each of them.

24  Q.  Approximately when did they kind of leave the scene?

25  A.  End of 2019, beginning of 2020.
```

*SITTENFELD - DIRECT*

1    Q.  Back in by the end of 2020, how many different donations

2    had you received to your campaign account and your Progress

3    and Growth PAC account?

4    A.  About 1,800.

5    Q.  And what cycle would that have been over?  How many years

6    would that have been to get 1,800 different donations?

7    A.  So that would have been starting from the day after

8    election day in 2017, so from the very end of 2017 through

9    2020.

10   Q.  All 1,800 of those donations we had in discovery, you

11   know the FBI has those, correct?

12   A.  Correct.

13   Q.  How much money did you raise between the PAC and the

14   campaign account?

15   A.  Over a million dollars.  I don't have the exact number.

16   Q.  Were there times that you voted against big donors?

17   A.  Yes.

18   Q.  Were there times when you asked someone to donate to your

19   campaign, he or she declined, and yet you still helped them

20   when they had business before the city?

21   A.  Yeah.  Of course.  I mean, we heard a little bit of this

22   earlier.  Getting rejected by donors is a pretty common thing

23   for anyone who is a candidate, but I would always -- no matter

24   what a person's position on supporting my candidacy or not

25   was, if they were doing something that was good for the city,

1    I would always vote with them.

2    Q.   Do you know what percentage of the donations that we just

3    discussed were under $250?

4    A.   More than half.

5    Q.   And how do you know that?

6    A.   You asked me to look it up.

7    Q.   How many were under $50?

8    A.   Twenty to 25 percent of them.

9    Q.   So about 400?

10   A.   A little less, but yeah.

11   Q.   What would you have done if someone said, hey, we're

12   donating to you, but this is for your -- this is -- explicitly

13   tells you, hey, this is for your official action.  You have to

14   then do what we say?

15   A.   I would have done the same thing that I did the only time

16   across all these interactions and conversations that I did

17   here, which is saying no.  I did never, and I would never,

18   under any circumstance, sell my vote or trade my vote for a

19   campaign donation.

20   Q.   Who is Mike Schiff?

21   A.   A developer out of Columbus.

22   Q.   And why would you agree to sit down with Mr. Ndukwe and

23   Mr. Schiff to help 435 get developed when Rob and Brian were

24   out of the picture entirely?

25   A.   Again, I mean, I was appreciative for anybody who wanted

1    to help move a good project forward, so I don't want to

2    discount my understanding at the time of Rob and Brian saying

3    we're here to back something that's good for your city.

4         At the end of the day, I didn't care who wanted to help

5    make this happen, as long as somebody said my focus -- their

6    focus is I'm getting this across the finish line for your

7    city.

8              MR. C. MATTHEW RITTGERS:  I have no further

9    questions, Your Honor.

10             THE COURT:  Thank you, Mr. Rittgers.  It's about

11   2:25.  Would this be an appropriate time for our afternoon

12   break, Mr. Singer?

13             MR. SINGER:  Yes, Your Honor.

14             THE COURT:  Very good.  So ladies and gentlemen of

15   the jury, we'll try to resume trial -- it's probably going to

16   be around 2:50, I would think, by the time we resume trial.

17        So at about 2:45, if you could assemble in the hallway,

18   and we'll try to get you in at about 2:50.

19        As I've mentioned repeatedly now, please don't discuss

20   this case amongst yourselves.  Please don't do any research

21   regarding the facts or law.

22        Please don't communicate with anyone about this case or

23   allow anyone to communicate with you about it.  If anyone

24   should attempt to, please let me know immediately.

25        Other than that, please have an enjoyable afternoon

```
 1    break.

 2         (Jury out at 2:24 p.m.)

 3              THE COURT:  Anything we need to discuss before we

 4    take a break, Mr. Singer?

 5              MR. SINGER:  No, Your Honor.

 6              THE COURT:  Mr. Rittgers?

 7              MR. C. MATTHEW RITTGERS:  Your Honor, could we

 8    approach at sidebar for a second?

 9              THE COURT:  Sure.

10    SIDEBAR CONFERENCE

11              MR. C. MATTHEW RITTGERS:  We've kind of leaned into

12    the straw donor donation stuff, but I did want to put on

13    record that we were not on notice during indictment or 404(b)

14    notice that there was going to be some argument in this trial

15    about straw donations, but I felt like I had to deal with this

16    on direct.

17         I also -- it dawned on me today that there might be some

18    argument about an Ohio Ethics Commission violation related to

19    meals, and this is based on the cross-examination of

20    Mr. Seelbach.

21         And so we've not been put on notice of that either,

22    404(b) or in the indictment.  And so I don't know what their

23    inquiry might be, but if it has something to do with Ohio

24    ethics violation related to meals, I am objecting in advance

25    now, and I just want to put that on the record.
```

*SITTENFELD - DIRECT*

1          MR. SINGER:  I think it's fair game on cross, Your

2     Honor.  He had multiple meals with these people at expensive

3     steakhouses, and he signed his ethics disclosure forms

4     without -- swearing that they were true and accurate without

5     listing those meals.  That's proper impeachment.

6          THE COURT:  I believe that would be proper

7     impeachment, and I would tend to allow it as impeachment.

8     Overruled on the objection.

9      Yes, Mr. Rittgers?

10          MR. C. HENRY RITTGERS:  Is the government going to

11     produce the receipts to those meals, and show what was --

12          MR. SINGER:  I'm going to ask him --

13          MR. C. HENRY RITTGERS:  -- who paid what?

14          THE COURT:  Okay.  One at a time.

15          MR. SINGER:  I'm going to ask him questions about it.

16          THE COURT:  Okay.

17          MR. SINGER:  Your Honor, since we're here.  We

18     discussed the issue relating to -- the civil ruling relating

19     to the text messages with regards to Mr. Seelbach, that the

20     attempted cross-examination of Mr. Seelbach related to these.

21          THE COURT:  Right.

22          MR. SINGER:  I would submit, Your Honor, that the

23     circumstances are different for this witness.  I think he

24     testified under oath that he was going to follow the laws of

25     the State of Ohio when he was sworn in.

*SITTENFELD – DIRECT*

1      The violation -- the city admitted that he violated Ohio

2   laws, Ohio Ethics Law or Ohio Sunshine Laws and, in doing so,

3   prevented information from being -- to the public.

4      And in his role as a public official, I think that that

5   would be inconsistent with the oath that he took when he was

6   sworn in as a public official.

7         THE COURT:  What oath did he take when he was sworn

8   in?

9         MR. SINGER:  That he would follow the laws of the

10   United States, the State of Ohio, and the city charter.

11         MR. C. MATTHEW RITTGERS:  I mean, Your Honor, this

12   goes back to what we discussed with Mr. Seelbach.

13      We actually looked, at lunch.  I mean, this is not a

14   crime of dishonesty.  These council members, five of them,

15   were relying on advice given to them by lawyers at the time,

16   that they were permitted to text, and that it was not a quorum

17   or a text message was the actual issue.

18      It was not their decision, the council members, as to

19   whether or not there was going to be a settlement.  This was

20   not litigated by a trier of fact like a judge or a jury, and

21   it's not a felony, it's not a crime of dishonesty, it's what

22   it is, an Open Meetings Act violation.

23      And I think it's highly prejudicial to start talking

24   about that with the defendant on the stand, especially after

25   the motion in limine was granted, Your Honor.

*SITTENFELD - CROSS*

```
 1              THE COURT:  I agree.  I'm not going to let you go

 2      into that.  All right.

 3              Anything else we need to do?  Okay.

 4              MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

 5      SIDEBAR CONFERENCE CONCLUDED

 6              THE COURT:  We're going to recess, Scott.

 7              MR. C. MATTHEW RITTGERS:  You can step down.

 8              THE COURT:  You are still on the stand, though.

 9          (Brief recess.)

10              THE COURT:  Are you ready to proceed, Mr. Singer?

11              MR.  SINGER:  Yes, Your Honor.

12              THE COURT:  Very good.  Let's bring in the jury.

13          (Jury in at 2:47 p.m.)

14              THE COURT:  Mr. Singer, are you prepared to proceed?

15              MR.  SINGER:  I am, Your Honor.  May I?

16              THE COURT:  Yes.

17                          CROSS-EXAMINATION

18      BY MR. SINGER:

19      Q.  Good afternoon.

20      A.  Good afternoon.

21      Q.  So you were a city council member for over nine years; is

22      that right?

23      A.  Around there, yes.

24      Q.  And I think you'd agree that being a public servant means

25      you have certain responsibilities; is that right?
```

SITTENFELD - CROSS

1    A.  Yes.

2    Q.  And democracy's proper functioning requires elected

3    officials to serve the common good; is that right?

4    A.  Yes.

5    Q.  Citizens put their faith in democracy, or in the honesty

6    of public officials, right?

7    A.  Yes.

8    Q.  And they put their faith in the integrity of public

9    officials?

10   A.  Yes.

11   Q.  The public's trust in elected officials, it's necessary

12   for democracies to properly function.  Is that fair to say?

13   A.  I agree with that.

14   Q.  Now, citizens in a democracy have a right to know how the

15   government operates; is that right?

16   A.  I agree with that.

17   Q.  You've heard the saying that "sunshine is the best

18   disinfectant"?  You've heard that saying before?

19   A.  I have heard that.

20   Q.  It generally means it's in the public's interest to know

21   what the government is doing; is that right?

22   A.  Yes.

23   Q.  And that's a correct statement.  You believe in that,

24   right?

25   A.  I do.

SITTENFELD - CROSS

1   Q.   And that includes the public having the right to know who

2   is contributing to public officials; is that right?

3   A.   Yes.

4   Q.   So if the public -- the public, if the citizens had no

5   clue who was funding political campaigns, the public would

6   lose trust in the system; is that right?

7   A.   I think that's probably right, yeah.

8   Q.   And --

9   A.   And it's why we have the system of reporting

10  contributions that we do, I suspect.

11  Q.   And secret contributions that are outside of the eyes of

12  the public, it's a recipe for corruption.  Is that fair to

13  say?

14  A.   I personally think that there should be transparency

15  around contributions.  I -- it's also why I, frankly, disagree

16  with rulings like *Citizens United*, where somebody can

17  anonymously give millions and tens of millions of dollars.

18  Q.   And it's city council's job to serve the interest of the

19  people of Cincinnati, right?

20  A.   Absolutely.

21  Q.   And city council should put the interests of the citizens

22  before their own interests, right?

23  A.   Yes.

24  Q.   Now, you took an oath before you were elected as a city

25  council member; is that right?

*SITTENFELD - CROSS*

1    A.   I did.

2    Q.   Do you remember what that oath is?

3    A.   Essentially, it was an oath to the city charter, the

4    state constitution, and the Constitution of the United States

5    of America.

6    Q.   And that oath was important, right?

7    A.   It was.  It is.

8    Q.   You took an oath before you testified today; is that

9    right?

10   A.   Correct.

11   Q.   The oath tells the public that you're -- when you were

12   sworn in as a city council member, your oath told the public

13   you will be a faithful servant; is that right?

14   A.   Yes.

15   Q.   All right.  You spent some time testifying about 435 Elm.

16   Before we get there, I just want to ask you a question.  I

17   want to make sure I understand.

18        Was it your testimony that you were not aware that when

19   Mr. Ndukwe's financial analyst contributed to you in 2018, you

20   were not aware that that was from Mr. Ndukwe; is that right?

21   A.   That's correct.

22   Q.   Now, this contribution was part of the fundraiser at the

23   Queen City Club; is that right?

24   A.   That's correct.

25   Q.   And you recall that?

1  A.  I do.

2  Q.  And Mr. Ndukwe was present at the Queen City Club; is

3  that right?

4  A.  Correct.

5  Q.  But his name is not on any contributions during that

6  time.  Are you aware of that?

7  A.  Yes.  He did what ample oxygen has gone towards

8  explaining.  He fundraised rather than donating.  And I, as a

9  candidate, don't get to tell someone which of those options

10  they want to do.

11  Q.  So as part of the fundraising, it was your understanding

12  that he contributed in the name of his employee; is that

13  right?

14  A.  No.  My understanding was that he asked his employee to

15  fundraise --

16  Q.  I understand.

17  A.  -- on my behalf.  Yeah, so kind of the opposite of what

18  you said.

19  Q.  Okay.  I understand.  So you knew, in October 2018, that

20  Ndukwe was -- he was having problems getting the deal with the

21  city for 435; is that right?

22  A.  I think it was kind of -- again, that October 26, 2018

23  phone call.  He called -- it was either that one or the next

24  one, and had the line of, Mayor Cranley is trying to F me left

25  and right, and my reaction to that was not surprised.  I knew

*SITTENFELD - CROSS*

1    that they had been sort of colliding and butting heads.

2    Q.   You say you knew a pretty good amount about that, or

3    something along those lines; is that right?

4    A.   Yeah.  I was aware of it.

5    Q.   So you were aware that he was struggling getting any

6    traction in the city; is that right?

7    A.   Well, so I was aware that he and Mr. Ndukwe -- or, sorry,

8    that he and John Cranley were butting heads.

9        The struggling getting traction in the city, I probably

10    wouldn't agree with that because, concurrently, he had another

11    deal, a Mt. Auburn hotel project that was kind of zipping

12    through council.

13        Interestingly, the mayor, I think, was against that one

14    and kind of tried to obstruct it, and it still went forward.

15    So probably not the case that he was having trouble getting

16    traction.

17    Q.   He was having trouble getting traction with 435, though,

18    right?

19    A.   Yeah.  That's what he had shared.

20    Q.   Right.  So you were aware of that at the time that you

21    were asking him to raise money from his network of folks in

22    Columbus.  Is that fair to say?

23    A.   That he and John Cranley were butting heads?

24    Q.   You were aware that 435 was running into some

25    difficulties?

*SITTENFELD - CROSS*

1   A.  I think, yeah.

2   Q.  Okay.  Now, you mentioned the October 30th call on

3   direct.  Now, I think you said you raised 1,800 donations; is

4   that right?

5   A.  So over that particular cycle, so this is both campaign

6   contributions plus PAC contributions, which were totally

7   separate, of course, but the total volume over that three-year

8   period was very close to 1,800 individual contributions.

9   Q.  Totaling over a million dollars?

10   A.  The total, yes, would have been over that amount.

11   Q.  Now, in October 2018, the mayor's election was three

12   years away?

13   A.  It was a spring 2021 primary, so depending on where you

14   start the clock in 2018, anywhere from two and a half to more

15   years away, correct.

16   Q.  And you had not even -- you had not announced your

17   candidacy at that time?

18   A.  I had not.  Not official- -- I hadn't done like a

19   campaign kickoff.

20   Q.  You had intended to run, but it wasn't official?

21   A.  Correct.

22   Q.  Because it was really early in the process.  Is that fair

23   to say?

24   A.  You know, I know someone lamented a little bit -- it was

25   earlier in the process.  I know someone lamented a little bit

 1    earlier the role that campaign fundraising plays in our

 2    democracy.

 3        I would add to that list of lamentations that things

 4    start really early.  You know, you run a campaign because you

 5    want to get in there and govern, and do all the stuff that you

 6    talked about on the campaign trail, but everything kind of

 7    gets ratcheted up, so yeah, things do start very early.

 8    Q.  Now, you mentioned the statement that you made to Ndukwe,

 9    you don't want to be "like love you but can't," but you didn't

10    need to be mayor to help on 435, right?

11    A.  I guess, if you're going to help a project in the ways

12    that City Hall can help a project, and you are not a person

13    who is in some capacity at City Hall, it would be impossible

14    to help in those ways.

15    Q.  Well, you could have helped as a city council member when

16    the development agreement was put before the city, right?

17    A.  Yeah, and would have enthusiastically done so.  There was

18    never a development agreement put before the city.

19    Q.  So you didn't need to be mayor to help him with the

20    project?

21    A.  Correct.  What I was saying to him, given his sharing,

22    again, very justifiable frustration of the mayor, John Cranley

23    at the time, is trying to block and obstruct me, that's what I

24    was responding to.

25            MR. SINGER:  Can we pull up, it's 13B, please.

```
 1              MS. TERRY:  13B?

 2              MR. SINGER:  Yes.  Your Honor, permission to publish

 3     13B?  It's already been admitted.

 4              THE COURT:  You may.

 5              MR. SINGER:  Page 3.  I'm sorry.  Page 2.

 6     Q.  So I think what you told him, and I'm looking at that

 7     bottom paragraph there, and I'm just going to read it.

 8          "If you say look, I don't want to support you in the name

 9     of Chinedum Ndukwe, but some guy I've never met from Columbus

10     is going to use a coup, you know, you know your network are

11     going to round up a bunch of LLC checks, like, that's great.

12     I actually don't care.

13          "But I mean, the one thing I will say is, you know, I

14     mean, you don't want me to be like 'hey, Chin, like love you

15     but can't'."  Did I read that correctly?

16     A.  You read that correctly.

17     Q.  Now, you could have helped him as a city council member,

18     correct?

19     A.  Yeah.  And did on this and other things, yes.

20     Q.  And he needed help -- he was going to need help soon,

21     right?  He said he was going to be presenting the development

22     agreement before the city; is that right?

23     A.  I think it was somewhat vague in terms of when he needed

24     help, but I also think, given our long relationship, given my

25     backing other good projects, I think he understood me to be at
```

*SITTENFELD - CROSS*

1    the ready to help him do something good for the city at any

2    juncture.

3    Q.   All right.  So there was some discussion about the

4    Issue 13, the November ballot initiative.  Do you recall the

5    November ballot initiative, Issue 13?

6    A.   I do.

7    Q.   And this is the initiative where the campaign donates --

8    donation laws previously allowed an individual to give both

9    $1,100 individually and in however many LLCs they wanted to

10   contribute; is that right?

11   A.   That's what it was before the change, correct.

12   Q.   And the new change would mean that an individual could

13   either give from themselves individually or from one LLC, but

14   not both?

15   A.   Correct.  Or go fundraise from their network.

16   Q.   Correct.  Just so as long as it was attributed to the

17   true source of the payor; is that right?

18   A.   Absolutely.

19   Q.   Now, this was, obviously, pretty popular in the city.  Is

20   that fair to say?

21   A.   I voted for it.

22   Q.   And you publicly supported it, right?

23   A.   Yeah.  So Mr. Seelbach was the sponsor of the legislation

24   to advance this reform.  I, at the time, chaired the committee

25   at City Hall that actually had to vote on any charter

SITTENFELD - CROSS

1      amendment that would be put forward.

2          So it needed my support to be put up before the

3      committee, and was glad to sponsor it.  I thought it was smart

4      legislation.

5      Q.   And one of the reasons it was good legislation is because

6      prior to the ballot initiative, a rich guy could just give

7      tons of money to a campaign, right?

8      A.   Yes.

9      Q.   And it would be really hard to figure out who gave what

10     money if they're all in different LLCs.  Is that fair to say?

11     A.   Probably that's not accurate.  So some of the people, I

12     hope they don't object to my naming their names, but people

13     like Dan Schimberg, Tom Fernandez, Tom Williams, people who --

14     by the way, all people who contributed in enormous ways to the

15     civic and economic fabric of Cincinnati.

16         If one of them had five or ten, or even more LLCs, and

17     they would donate from those LLCs, it wasn't -- it was clear

18     to anyone who was or wanted to pay attention, oh, these five

19     people -- or, sorry, these five LLCs are connected to one of

20     the individuals I just met, or plenty of other people.  So no,

21     it actually -- it wasn't some big mystery.

22     Q.   So it was less the mystery than the fact that certain

23     people had the ability to just flood a lot of money into the

24     campaigns.  Is that the opposition to the pre-Issue 13 law?

25     A.   I don't want to speak for Mr. Seelbach, but I think the

*SITTENFELD - CROSS*

1    sense was, just because somebody has 20 LLCs doesn't

2    necessarily mean they should be able to give 20 times the

3    amount of somebody with -- who is just themselves.

4        That being said, like so much in our system of democracy,

5    things that I would like to reform and I would have changed,

6    including my support of the very reform we're talking about,

7    what was in place at the time was lawful.

8    Q.  So you were behind this ballot initiative.  You thought

9    it was good policy, right?

10   A.  I voted for it, yes.

11   Q.  But at the same time, you were trying to raise as much

12   money from LLC checks before that November law change as you

13   could.  Is that fair to say?

14   A.  Absolutely.

15   Q.  You wanted to take advantage of that loophole before it

16   closed.  Is that fair to say?

17   A.  I guess your characterization of take advantage, I think

18   candidates lawfully trying to fundraise as much as they can,

19   given the system that we have and live in, I would say is

20   pretty standard.

21   Q.  All right.  Let's -- can you pull up --

22           MR. C. MATTHEW RITTGERS:  Your Honor, permission to

23   publish USA 14B?

24           THE COURT:  You may.

25   Q.  All right.  You testified about the November 2nd call

*SITTENFELD - CROSS*

 1    that was recorded that you had with Mr. Ndukwe, right?

 2    A.   Yes, sir.

 3    Q.   And I think, before we get to that, on direct you

 4    testified about how, although at the time, Rob and Brian --

 5    well, were Rob and Brian, sort of, your typical investors that

 6    you ran through in City Hall?

 7    A.   So as you know, the only prior time I had ever met them

 8    was, I believe, February 26th of 2018, so nine months earlier.

 9    People who represented themselves as people who wanted to

10    invest in the City of Cincinnati, that's just not where my

11    brain went, could have ever thought, oh, these guys are

12    undercover FBI agents.

13         They came to town.  We sat down.  I remember some of the

14    things we talked about, as I mentioned earlier.  I remember

15    saying, hey, Brian, you've mentioned you have a green energy

16    business.  Can I help introduce you to the sheriff's office?

17    Can I help introduce you to a city department, because it

18    sounds like you might have something to contribute.  Never

19    once asked for donation.  Never came up.  They didn't discuss

20    it.

21         So, one, it did feel pretty routine, my hour-long

22    exposure to them; and, two, this is one of the things I really

23    liked about politics and public service.  People are weird.

24    I'm weird.  You know, you get to see the whole spectrum of

25    humanity.

*SITTENFELD - CROSS*

1    So to pinpoint and isolate one group of people and be

2    like, I'm never going to talk to them again because they're

3    too weird, like, you would never get to talk to another human

4    being, right?  So yeah, nothing about that prior encounter

5    seemed out of the ordinary to me.

6    Q.   I think you testified that one of the reasons that you

7    trusted them is because of Mr. Ndukwe's relationship with

8    them; is that right?

9    A.   Yeah.  I mean, one of the things, among lots of things,

10   that's been really hard about this situation is how are any of

11   us supposed to, sort of, go through the world and navigate

12   life if the people that we believe are friends, the people

13   we're excited to share pictures of our newborn child with,

14   might be spinning a total, sort of, fictional story and

15   universe to you.  I could have never imagined that.

16        MR. SINGER:  So let's -- can we go to page 3 of USA

17   14B, please.

18   Q.   Now, about a third of the way down the page, Mr. Ndukwe

19   says:  "But good news is, I'll be able to get you close to

20   $20,000 over the next couple."

21        And then he says:  "You know, and these guys that are

22   doing the deal on 435 Elm, you know, they're, they're, you

23   know, they don't really fuck around.  They're very specific."

24        So this is in reference to Rob and Brian, right?

25   A.   Yes.

SITTENFELD - CROSS

1    Q.   So then at the bottom of the page, he -- Mr. Ndukwe says

2    what he means by "they're very specific," doesn't he?

3    A.   Yes.

4         MR. SINGER:  Can you blow up just that last

5    paragraph, please?  Thank you, Ms. Terry.

6    Q.   He says:  "So and then for, for, and then for this

7    meeting with Rob next week."

8         Now he's talking about the in-person meeting that you had

9    already scheduled to sit down with Rob; is that right?

10   A.   That is what he's talking about.  I can't remember if it

11   was already scheduled or not scheduled on this call.

12   Q.   He says:  "And then for this meeting with Rob next week,

13   I'm pretty sure he can get you ten this week."

14        And he says:  "You know, the biggest thing is, you know,

15   if we do the ten, I mean, they're gonna want to know that when

16   it comes time to vote on 435, like whenever that, I don't know

17   if it's a year, two years, three years, that it's gonna be a

18   yes vote, you know, without, without a doubt."

19        That is a very express tie between what Rob wants to do

20   next week and give you $10,000, and a yes vote without a

21   doubt; is that right?

22   A.   I think it's the only express thing of that nature across

23   all of the recordings, both those played and unplayed.

24   Q.   All right.  So at this time, at least one thing is very

25   clear.  When you meet with Rob, he's going to offer you money

*SITTENFELD - CROSS*

```
 1    for a yes vote on 435 Elm.  That's what Ndukwe is saying; is
 2    that right?
 3    A.   I know I can't ask Ms. Terry to go to the next page, but
 4    no- --
 5    Q.   We'll get there.
 6    A.   My answer to your question is not at all.  It was so
 7    aberrant and unusual for someone who -- again, like forget
 8    just the friend piece, and all of the trust and mutual respect
 9    that goes into a friendship.
10         This was also -- and I think the government has kind of
11    conveyed and shared some of this -- a developer, respected,
12    reputable, in good standing.
13         So when you hear someone say something that seems so out
14    of character with who you believe you know them to be, you
15    say, wait a minute, I'm paraphrasing a little bit, like, you
16    don't sound like the Chinedum whom I know and admire and
17    respect and want to help flourish in this city.
18         So when I then said to him no on the express comment that
19    you just made, again, I've some of this committed to mind but
20    not all of it.
21         The next line, "And I know that's not what you're saying
22    either," that's me saying to my friend, like, you sound like
23    you just misspoke in some really strange way.
24         If he had then said no, no, no, P.G., let's cook up some
25    corrupt- -- oh, what's going on here?  He said:  "Okay.  I
```

*SITTENFELD - CROSS*

1    hear ya.  I hear ya."  I wish to God that had not given me as

2    much comfort and clarity as it did, but I thought I had just

3    resolved that with him.

4    Q.  So this was Ndukwe delivering a message on behalf of Rob,

5    right?

6    A.  I knew Rob from one one-hour meeting.

7    Q.  Sure.

8    A.  He seemed completely normal.  The person I was talking to

9    was my friend.  It all sounded like there was a disconnect.

10   Q.  He said these guys are very specific.  And then Ndukwe

11   said, Then for this meeting with Rob next week, he's going to

12   have $10,000 for you, but he is going to want to know that

13   it's gonna be a yes vote without a doubt?

14   A.  I think -- may I, Mr. Singer?

15   Q.  Can I just ask my question real quick.  That's what he

16   said.  Does that -- well, I guess I will ask you, is that your

17   understanding of what the words say?

18   A.  I think the thing that it feels like you're sort of

19   separating is you make it seem like here's Chinedum, this

20   upstanding, respected pillar of a developer, and then across,

21   you know, the ocean, are these corrupt, sketchy guys.

22       That's not how it was presented.  This is I, Chinedum,

23   respected person, old trusted friend, these are my chosen

24   partners.  These are the people I am bringing in to help fix

25   and revitalize your city.

*SITTENFELD - CROSS*

1     So because of my knowledge of who Chin was, because of my

2    belief in him, part of my brain was also Chinedum doesn't want

3    to be connected and attached to corrupt people.  You can

4    understand why someone would think that about an old respected

5    friend.

6     And, again, I had no clue, and I don't think any member

7    of this community or the public did, that Chinedum wasn't

8    really getting to act of his own volition.  He was under

9    enormous pressure because of a situation that I was not aware

10   of.

11   Q.  What I'm asking you about is what Chinedum actually said.

12   He said, When Rob meets you next week, he's going to have

13   $10,000, and he's gonna want to know it's a yes vote without a

14   doubt.  That set off alarm bells; did it not?

15   A.  That's absolutely what he said.  And what I'm telling you

16   is both what I understand now and also what I understood and

17   felt and believed in the moment, which was Chinedum, I know

18   that's not what you meant either.  This isn't who you are.

19   Q.  But you understood what those words meant at the time

20   that you heard them; is that right?

21   A.  Clearly, that's why I said, "Nothing can be illegal.

22   Nothing can be a quid pro quo."

23      MR. SINGER:  Okay.  Let's -- can we move to the next

24   page, please.

25    And, Ms. Terry, can you please just blow up maybe the

SITTENFELD - CROSS

1    first -- yeah, right there is good.

2    Q.   So you say nothing -- you are offered a very express

3    $10,000 for votes.  And your response is: "Obviously, nothing

4    can be illegal, like nothing can be a quid pro quo, and I know

5    that's not what you're saying either.  But what I --"

6         And he cuts you off, "Yeah," in the middle of your

7    sentence -- "can say is that I'm super pro-development and

8    revitalization of especially our urban core"; is that correct?

9    A.   That is true.  I would never, did never, would never

10   accept a quid pro quo or some illegal bargain, but I'm proud

11   of my voting record and my service to the city, and that

12   included those public policy decisions of wanting to do

13   projects just like 435 Elm.

14   Q.   And 435 is a development project, right?

15   A.   Correct.

16   Q.   And the aim of 435 was to revitalize the urban core of

17   downtown; is that right?

18   A.   Absolutely.

19   Q.   And what Mr. Ndukwe was saying that Rob was asking was

20   $10,000 for help with this development project to revitalize

21   our urban core, 435; is that right?

22   A.   Yes.  And I realize we're retracing some ground.  But

23   when I say to him, "I know that's not what you're saying

24   either," I guess, the direction they're going, I don't -- and

25   what we've heard about these being scripted lines, scripted

SITTENFELD - CROSS

1   phone conversations, why his follow-up, instead of being,

2   "Okay, no.  I hear ya.  I hear ya," wasn't no, no, no, I

3   really do mean a quid pro quo.  I said -- I clarified what did

4   surprise me, and he then agreed with that.

5   Q.   He said:  "Yeah."

6        And then you say:  "I'm super pro-development and

7   revitalization of especially our urban core," which is

8   435 Elm.  And then he says: "I hear ya.  I hear ya," right?

9   A.   My understanding was only ever that he was saying, "Okay,

10  no.  I hear ya.  I hear ya" in response to the totality of

11  what I had just said one second before.

12  Q.   And then you quickly transition to, "And we can discuss

13  that more in person"; is that right?

14  A.   Uh-huh.

15  Q.   And then he says:  "Okay.  Okay, my guy, perfect,

16  perfect."  He didn't ask you another question, and then you

17  say:  "But I'm not, I'm not sure.  I'm not there.  I, in seven

18  years, have voted in favor of every single development deal

19  that's ever been put in front of me"; is that right?

20  A.   I did say that.

21  Q.   So Mr. Ndukwe says that Rob is going to offer you $10,000

22  for a development deal, but he wants a yes vote.

23       And seconds later, you say: "I voted in favor of every

24  development deal that's ever been put in front of me"; is that

25  right?

1    A.   I stated what my long-time public policy positions were,

2    yes.

3         MR. C. MATTHEW RITTGERS:  Okay.  Can we get rid of

4    this one and then blow up maybe just the bottom third.

5    Actually, just the statement just above that.  I'm sorry.

6    Q.   So from there, you guys discussed -- you set up the

7    meeting, right?  You talk about when we're going to meet, is

8    that fair to say, just prior to this blowup?

9    A.   I believe so, as I read it.

10   Q.   You offered to come downtown and -- or to Rookwood, and

11   Ndukwe says no, we can meet downtown.

12        And then you offer, without a question:  "Okay.  Let

13   me -- do you think -- I think also meeting these guys, I

14   should, I should -- if we can take five minutes and walk them

15   through some of the voting data just so they can appreciate

16   the starting point that I'm beginning this endeavor in."  Is

17   that a fair reading of that?

18   A.   I did say -- it's an exact reading, yes.

19   Q.   Thank you.  So you had just been offered a very expressed

20   quid pro quo, and your intention was to meet with these guys

21   and spend some time showing what your starting point is; is

22   that right?

23   A.   Yes.  I would say, once again, I think you're kind of

24   skipping over a pretty significant piece, which is someone

25   saying something very unusual for them, my rejecting it, my

*SITTENFELD - CROSS*

```
 1    saying to them I don't believe that's what you meant, and them
 2    agreeing, so kind of skipping over the baloney of the
 3    sandwich.
 4    Q.   We didn't skip over that.  We went through that, and now
 5    we're going through what you said after that; is that correct?
 6    A.   After those things, yes.  The comment you just read, I
 7    absolutely said.
 8    Q.   Okay.  And then this last statement, "Look, these guys,
 9    these guys want to know.  I mean, look, people want to invest
10    in a winning endeavor, right?  And I want to give them the
11    confidence and the comfort that that's what they're doing"; is
12    that right?
13    A.   Yes.
14    Q.   So what you're saying there is you want to give Rob
15    confidence and comfort that he is going to be investing in a
16    winning endeavor, right?
17    A.   Yes.
18    Q.   And the winning endeavor would be the 435 Elm Street
19    project; is that right?
20    A.   In that particular context, yeah, that looks right.
21    Q.   Now, you believe these guys, you believe Rob and Brian
22    were out-of-town investors, right?
23    A.   Yes.
24    Q.   And I think you'll agree that it's not in the city's
25    interest to do business with corrupt businessmen.  Is that
```

*SITTENFELD - CROSS*

1    fair to say?

2    A.   Correct.

3    Q.   And you had a choice at this point.  You could have gone

4    ahead and met with Rob on November 7th, right?

5    A.   Yes.

6    Q.   Or you could have declined, right?

7    A.   I didn't believe them to be corrupt businessmen, both

8    from my own direct interaction and from mister -- from

9    Chinedum conferring his trust on them, and from Chinedum sort

10   of correcting and backing away from what he said.

11   Q.   All right.  So you have that lunch on November 7th; is

12   that right?

13   A.   We did have that lunch.

14   Q.   And during that lunch, you talked about 435?

15   A.   We did.

16        MS. SINGER:  Ms. Terry, would you mind pulling up

17   15C, please.

18        Your Honor, permission to publish to the jury?

19        THE COURT:  You may.

20        MR. SINGER:  Can you scroll down to page 6.  All

21   right.

22   Q.   So at the bottom of the page, let's go to the middle.  Do

23   you see where you say: "So what's the latest on 435?"  Do you

24   see that?

25   A.   I do.

1    Q.   That was sort of the initiation of your lunch

2    conversation about the 435 Elm deal; is that right?

3    A.   Yes.

4    Q.   Okay.  And then Chin says -- Mr. Ndukwe says, I think the

5    last to second comment that he makes in the last sentence,

6    "And then at that point, we're going to make our proposal for

7    a development agreement."  Do you see that?

8    A.   I apologize.  Can you orient me?

9    Q.   Sure.  It's --

10   A.   I see it.  I see it.

11   Q.   Okay.  Now, at this point, Mr. Ndukwe had not submitted

12   any development agreement to the city; is that right?

13   A.   Not to my knowledge.

14   Q.   Okay.  So you didn't have the opportunity to review any

15   filing or documents that they presented to the city because

16   they hadn't been presented; is that right?

17   A.   That's correct.

18   Q.   So you're basing your knowledge on what Mr. Ndukwe is

19   telling you right now?

20   A.   Yes, when -- whether it was Mr. Ndukwe or any number of

21   other respected developers who had done other good projects

22   for the city, if someone sits down with me in my office over

23   breakfast, over a drink, and they say Turner Construction is

24   my GC, IHG is going to be my hotel flag, Elevar is going to be

25   my architect, I've got these great equity partners who are

SITTENFELD - CROSS

1    going to help us finance the deal, I would never think this

2    person is lying to me.

3    Q.   All right.  Let's look at that last paragraph.  He says:

4    "We're gonna make a proposal to the city, basically, to them,

5    hey, we wanna get this for a dollar, or work out some

6    long-term lease of some sort for a minimal amount, or we're

7    gonna need X, Y, and Z"; is that right?

8    A.   That's what's on the transcript.

9    Q.   So you know at this point he wants this for cheap.  He

10   wants either a sale for a dollar, or he wants a minimal lease,

11   or a lease with a minimal payment; is that right?

12   A.   That's what he said, yes.

13   Q.   All right.  And then you proceeded to discuss the

14   development deal in a little more detail; is that right?

15   A.   You're referring to the CRA gap financing, anything else

16   that they might need to be able to pull the project off?

17   Q.   That's what I'm talking about, yes.

18   A.   Yes, I asked those.  You know, was it a demolition or

19   not, those were all things I asked.

20   Q.   Okay.  So now let's --

21        MR. SINGER:  Can we go to page 9, please.

22   Q.   And so after that discussion, this is when you say: "I

23   can shepherd the votes"; is that right?

24   A.   Yes.  After asking -- meetings like this were actually so

25   common, sometimes they'd happen in your City Hall office,

*SITTENFELD - CROSS*

1    sometimes they would happen over a meal or a lunch at Nada,

2    even.

3        After -- so there were probably, I don't know, maybe a

4    dozen questions you would ask to basically glean does this

5    person have their stuff together.  Are they bringing forward a

6    project that's good for the city and in the city's interest,

7    and can they pull it off, especially if you're a respected,

8    reputable developer.

9        If someone, you know, is a yes across the board to those

10   dozen questions, I would imagine nearly a hundred out of a

11   hundred times that my answer would be great.  You know, I'm

12   supportive of this, happy to express my support to my

13   colleagues so that they know where I stand, things like that.

14   Q.  And just to reflect back on the conversation you had with

15   Ndukwe on November 2nd, votes is what Rob was gonna want to

16   know about at this meeting; is that right?

17   A.  Playing this back in slow motion now, and the -- sort of

18   the nature to which things are scripted, I absolutely believe

19   you.  That's not what I understood.

20   Q.  Well, I think you testified just a couple minutes ago

21   that you recognized that when Chin said Rob was going to want

22   a yes vote without a doubt for $10,000, is that that was a

23   very express quid pro quo offer, correct?

24   A.  Yes.  Which I then rejected, clarified, and clarified

25   that it was not, in fact, what he meant.

*SITTENFELD - CROSS*

1   Q.   What they wanted, what Rob was going to want was votes

2   for 435 Elm; is that right?

3   A.   No.  That's what I clarified.

4   Q.   What Ndukwe said was that Rob was gonna want votes for

5   435 Elm, right?

6   A.   I apologize, Your Honor.  Yes, they said that.  That is

7   the comment that I clarified.

8   Q.   I understand your position.

9   A.   Thank you.

10  Q.   Now, Ndukwe had a real interest in 435, right?

11  A.   My understanding was always that he had the air rights to

12  the building, which, I mean, when you're talking about

13  downtown, there's only one way to go so, yes, that is a very

14  important property claim.

15  Q.   And your discussion, would it surprise you -- I know you

16  probably have not stop-watched it, but would it surprise you

17  to know that from the time you first said, "Let's talk about

18  435," until the time that you said, "I can shepherd the

19  votes," is about 6:20.  Would that surprise you?

20  A.   Depending on how -- no, that wouldn't surprise me at all.

21  I guess, depending on how fast someone talks, how slow they

22  speak, how longwinded they are, how not, somebody could answer

23  the key -- I mean, there were probably developers who would

24  come into your City Hall office, they knew everything that you

25  would ask before you would even ask it.

1    They would run down -- you would have scheduled a

2    15-minute meeting, and three minutes later you'd be looking

3    about and say, well, we can talk about the weather for the

4    next 12.

5    People could usually -- especially a seasoned, respected

6    person like Mr. Ndukwe, could communicate the vitals and the

7    essentials pretty quickly.

8    Q.   Okay.  But 6:20 seconds seems reasonable.  Is that fair

9    to say?

10   A.   I definitely take your word for it, that that's how long

11   this was.

12   Q.   Now, the development agreement ultimately was presented

13   to the city in January of 2019; is that right?

14   A.   That sounds right.

15   Q.   And so at that point, the economic development department

16   would have all the information that was provided, correct?

17   A.   Yes.  That sounds right.

18   Q.   And they would make an assessment of the project based on

19   that information; is that right?

20   A.   I think so, yeah.

21   Q.   And then when the project is presented to the port, they

22   would receive a packet of information relating to the project,

23   right?

24   A.   Yes.

25   Q.   And then they would assess that.  Is that fair to say?

SITTENFELD - CROSS

1    A.   I believe so.

2    Q.   Okay.  And these are the professionals in the city --

3    economic development professionals in the city that are most

4    equipped to assess development projects; is that right?

5    A.   So yes and no.  I have great respect for people like

6    Mr. Denning, but one example, which is probably pretty

7    relevant to this very case, is during the same period of the

8    sting, one of Mr. Ndukwe's other projects was a Mt. Auburn

9    hotel deal.

10        The professionals who you've referenced, who I have the

11   utmost respect for the work they do to try and do the kind of

12   stuff I wanted to do, revitalize the city, they brought

13   forward a plan, an incentive plan for Mr. Ndukwe's hotel

14   project that the elected leadership disagreed with.

15        So a majority of city council, and I believe it was

16   bipartisan if not tripartisan, said we respectfully hear the

17   advice that the professionals you're referencing are giving,

18   but we disagree.  We don't think it's in the best interest of

19   the city.

20        You know, Mr. Flynn, whose testimony started this trial,

21   he was kind of known at City Hall for disagreeing with the

22   professional civil servants, so -- always respected their hard

23   work.  I think they mostly got it right, but, as is the case

24   with all of us, they weren't right a hundred percent of the

25   time.

*SITTENFELD - CROSS*

1    Q.   Is it fair to say that economic development's assessment

2    lasted longer than 6:20 seconds?

3    A.   Yeah.   I would expect Phil Denning, or one of Phil

4    Denning's deputies, to be going, you know, line by line

5    looking at a pro forma, doing other stuff, thinking, you know;

6    but yeah, so I assessed it in a way that was how I always

7    assessed things as an elected official.

8         The civil servants were probably much more so in the

9    weeds, but I also can't speak for them.   There might have been

10   projects where they looked at it from -- if something from

11   North American Properties came through, they might have been

12   able to do their vetting of them in two minutes.   I don't

13   know.   That would be a question for someone like Mr. Denning.

14   Q.   But based on this, what you said is that you would

15   shepherd the votes, right, and that's votes before city

16   council?

17   A.   This project sounded like a home run to me.   Yes.

18   Q.   Okay.   So after you talked about 435, that's when you

19   broke out the political data; is that right?

20   A.   There might have been some stuff in between there, but

21   that happened in the same lunch, absolutely.

22   Q.   Okay.   You called it "the political stuff"; is that

23   right?

24   A.   You'll have to show me the quote, Mr. Singer.

25   Q.   Sure.

SITTENFELD - CROSS

1    A.   But I believe you.

2         MR. SINGER:  Can we go down to page 20, please.  And

3    then if we could blow up the top third.

4    Q.   You see there, you say:  "This this, this is political

5    stuff."  Do you see that?

6    A.   Yes.

7    Q.   And then you say:  "In the event Chinedum is successful

8    in twisting your arm to be supportive of someone, I want you

9    to know that I think it's a -- you like making good bets and

10   good investments."  Do you see that, that's what you said?

11   A.   I did say that.

12   Q.   And when you said "supportive of someone," you're talking

13   about support with contributions; is that right?

14   A.   Yeah.  So on the October 26, 2018 phone call, Chinedum

15   had brought up, I want to raise money for you.  I want to

16   raise money for you from LLCs.  I want to do it from my

17   business partners and from my network.

18        I did not go into this meeting -- I didn't know if his

19   network of people ultimately would be supportive or not, so

20   that's why it wasn't when Chinedum is successful, it was in

21   the event.

22        I didn't know, but as was mentioned earlier, very few

23   donors say, oh, this person's headed towards a losing

24   election, how can -- let me back them with campaign support.

25   So you want to try and communicate to people that you have a

SITTENFELD - CROSS

1    good shot at winning the office that you're pursuing.

2    Q.   Chinedum had already told you five days prior that they

3    were going to get you $20,000, right?

4    A.   I clearly was unsure, that's why I said in the event.

5    Q.   And then he said: "And they'll give you $10,000 next

6    week," right?

7    A.   He said that.

8    Q.   "And you will get a yes vote without a doubt"?

9    A.   He said that, yes.

10   Q.   And that was five days prior?

11   A.   November -- yeah.

12   Q.   So you had some expectation that you were going to get

13   some money; isn't that right?

14   A.   When you're in an early relationship with potential

15   donors, it doesn't -- being presumptuous in that way doesn't

16   really make sense.

17   Q.   This is not your typical, potential donor.  Is that fair

18   to say?

19   A.   I guess you would have to clarify what you mean by that.

20   Q.   This is a potential donor that had just offered you a

21   very specific quid pro quo, right?

22   A.   That was not my understanding of either of these donors.

23   I mean, as you know, Mr. Ndukwe had been a long time

24   enthusiastic proactive donor, and I had never, ever once known

25   him to do or intend anything corrupt.

SITTENFELD - CROSS

1          MR. SINGER:  All right.  So in the middle of your

2     presentation -- can we move down to page 23, please.

3     Q.  This is during the presentation in which you're trying to

4     convince Rob to be supportive of someone; is that right?

5     A.  Yes.

6          MR. SINGER:  Can you please blow up maybe the top

7     half of this page, please.

8     Q.  It got cut off at the top, and I can show you the top

9     part if you think it's helpful.

10         Do you see this is the tail end of Rob's conversation,

11    where he says: "So we wanna try to get 435 up being

12    veto-proof, you know."  Do you recall that?

13    A.  I mean, I recall it from having heard the recordings many

14    times, and having read this.

15    Q.  Okay.

16    A.  And just to your comment one moment ago, if there's a

17    question about something that needs the full context, I'm more

18    context better than less.

19    Q.  So he talks to you about 435 being veto proof.  You said

20    you don't have a machine.  But then your fourth statement

21    down, you say: "But, like, I can move more votes than any

22    single other person"; is that right?

23    A.  I did say that.

24    Q.  So in the context of Rob saying we're going to need -- at

25    least they perceive that they're going to need a lot of votes

SITTENFELD - CROSS

1  for this, your response was, "I can move more votes than

2  anybody"; is that right?

3  A.   Yes.  If -- really of anybody.  It doesn't matter if

4  they're an out-of-town investor who wants to revitalize a

5  major downtown property, or anything else that I thought was

6  good for the city and would have believed in.

7      If somebody came to me and said, hey, we're concerned

8  that the mayor, or whoever else, is going to try and block and

9  obstruct them, and I believe their project was good and would

10  have the support of the majority of elected officials at City

11  Hall, I would absolutely try and give them that confidence and

12  to say to them, you know, I hope that by using my own voice

13  and expressing my own reason for supporting something, other

14  people will take that logic too.

15  Q.   All right.  You wrap up the meeting.  You guys walk

16  across the street to the condo; is that right?

17  A.   Again, I mean, you would have to tell me how much stuff

18  happened in between.  But after lunch -- because there was

19  kind of a lot of skipping around rather than offering all the

20  recordings in the full context; but, ultimately, after we left

21  the restaurant, yes, we went across the street to the

22  580 Building.

23  Q.   So you go across the street to the 580 Building.

24      MR. SINGER:  Can you pull that up, page 29, please.

25  Q.   Do you see, at the top of the page there, Rob says: "So

SITTENFELD - CROSS

1    he doesn't want his name on anything," he's talking about Chin

2    there, right?

3    A.   Sorry.  How many lines down are you?

4    Q.   Sure.  There, you got it.

5    A.   Got it.  Got it.

6    Q.   "So he doesn't want his name on anything," he's talking

7    about Chin, right?

8    A.   "So he doesn't want his name on anything?

9         "Right.

10        "And, umm, and we typically don't either."

11        Yeah, my understanding would have been that that was

12   Chinedum and Rob and Brian.

13   Q.   So nobody wants their names on any contributions.  Is

14   that fair to say?

15   A.   That's my understanding.

16   Q.   And you say, "Right right"; is that right?

17   A.   Yes.  I probably -- I definitely say it here.  I might

18   have even been doing -- I probably say right right as a filler

19   in sort of, you know, the interpersonal back and forth when

20   human beings are talking to each other.  Right right is, you

21   know, you're talking, and I'm still in front of you.

22   Sometimes it might mean yes, and sometimes it might mean I'm

23   still here, you know, there's no wax in my ears.

24   Q.   You weren't necessarily affirming what they were saying,

25   you were just acknowledging that they made a statement?

1    A.   Yes.  Mr. Singer, I'm sure you know what I mean.

2    Sometimes when you're engaging with someone, they might

3    actually be saying something you disagree with, and you say

4    right right, I'm hearing you, right?

5    Q.   Yeah.  I understand.

6    A.   Right.

7         MR. SINGER:  Could you go back, same page.  All

8    right.  Let's just blow up until, "Right.  Understood."

9         MS. TERRY:  Can you say that one more time?

10        MR. SINGER:  Yes.  How about the first half of the

11   page, please.

12   Q.   All right.  So this includes the same two lines, "So he

13   doesn't want his name on anything, and typically we don't

14   either."

15        And then Rob says:  "You know, we usually try to figure

16   out creative ways to do something."

17        And you say:  "Right.  Understood."

18        Now, the creative way to do something is to have

19   contributions that don't have their names on them, right?

20   A.   No.  I presume that meant fundraising, bundling, going to

21   your universe of investors and buddies to raise -- to

22   fundraise.

23   Q.   He had never said anything about bundling during your

24   conversation at lunch; is that right?

25   A.   Maybe not.  That didn't impact my understanding of it,

1    except also where Chinedum started the whole conversation.

2    Q.   And there is a difference between not putting your name

3    on something and bundling, right?

4    A.   What I understood them to be saying was, as we've heard,

5    Chinedum, and by extension Rob, felt like they were being

6    punished, obstructed, blocked by Mayor Cranley.  That had them

7    feeling skittish, from what they communicated to me at the

8    time.

9        So the lawful way, in our democratic system of privately

10   financed campaigns, is rather than, you know, you, Matt

11   Singer, need to write a contribution, you can say I'm going to

12   go to my colleagues, I'm going to go to my neighbors.  That

13   was always my understanding of what they were -- the intent

14   was.

15   Q.   That wouldn't necessarily be a creative way for someone

16   who wants to support you to pay you money, though, right?

17   A.   I'm not sure I follow what you're saying.

18   Q.   So I think what he says here is, "He doesn't want his

19   name on anything, and typically we don't either," saying we

20   don't want our name on any contributions, right?

21   A.   Correct.

22   Q.   And then he says: "But usually, we try to figure out a

23   creative way to do something," right?  That's not bundling,

24   that's finding a way to get you money without their name on

25   it, right?

*SITTENFELD - CROSS*

1    A.  I guess you're asking me a question about what Rob

2    believed to be creative.  I don't know what Rob thought was

3    creative.  It sounds --

4    Q.  Fair enough.

5    A.  My understanding was he thought -- you know, my mother

6    always had liked the expression "fools' names and fools' faces

7    often appear in public places."

8        Having a donor want privacy, not want their name to end

9    up in the newspaper, that was actually pretty common and

10   pretty typical.  So nothing he was saying about wanting to

11   raise from his network but not make the contributions himself,

12   none of that sounded very surprising or out of step with the

13   past experiences.

14   Q.  I think you testified earlier that it's in the public's

15   interest to know who is contributing to campaigns, right?

16   A.  Yeah, so you do know who contributed.  If somebody goes

17   to -- if I go to my neighbor Phil, and I say Phil, I'm --

18   we're saving for Georgia's kindergarten, or we want to take a

19   vacation, but I know someone who I think would be a great

20   candidate for public office, will you write them a check for

21   $50?

22       Phil is the donor, and Phil's name appears in what gets

23   reported, whether it's with the FEC or local filings.  And

24   that's what always happened in this situation.

25   Q.  Well, let's get back to that.  We'll get back to that.

*SITTENFELD - CROSS*

1    MR. SINGER:  Can we pull up the second half of this

2    conversation?  All right.

3    Q.  So Rob says: "Like, we want to help.  We want to make

4    sure, we want to really get this Cranley thing.  I would feel

5    comfortable telling my guys, like, hey, we're in this deal

6    with Chin if I know we're Cranley proof."

7         Now, that's a reference to the veto proof number of votes

8    for 435 that you previously talked about at the lunch; is that

9    right?

10   A.  Yes.

11   Q.  All right.  And then he says: "So with that, like Chin

12   told me hey, you know, I want to try and get P.G. $20,000.

13        "And I'm like, hey man, I I'm I'm, if if if we can get

14   this deal done, like let's fuckin' do it."

15        So that $20,000, that's the same number that Chin brought

16   up in the November 2nd call, right?

17   A.  That's correct.

18   Q.  And in the November 2nd call, it was Chin presented an

19   offer where Rob was going to offer money in return for a yes

20   vote on 435, right?

21   A.  That is what Chinedum was trying to convey.

22   Q.  Well, he made a very express quid pro quo offer, right?

23   A.  Yeah.  It's not where the understanding between him and

24   me ended, but it was what was intended to be scripted.

25   Q.  I'm just talking about what Chinedum said to you.

SITTENFELD - CROSS

1    A.   That's what he said, yes.

2    Q.   So Rob says:  "Chin told me I want to try and get P.G.

3    $20,000, and I'm like, hey, if we can get this deal done,

4    let's do it."

5         And then he says:  "What's the best way, what's the best

6    way for us to get that to you to get that deal?"

7         Now, this is, again, $20,000 to get the deal done; is

8    that right?

9    A.   That is played back, yes, that is what I understand Rob

10   to have meant from the moment of now.

11   Q.   Well, so this is the second time in five days that you

12   are offered a very express $20,000 to get a deal done; is that

13   right?

14   A.   I didn't -- when he said deal, I didn't think he was

15   talking about a deal of campaign contributions for some sort

16   of official action --

17   Q.   He was asking --

18   A.   -- which is why I responded as I did.

19   Q.   He was asking for $20,000 because they need votes to make

20   it Cranley proof, right?

21   A.   You're saying what his intent was.

22   Q.   I'm saying what his words said.

23   A.   That seems to be right.  That's not what I understood.  I

24   understood him to be talking about, you know, are we going to

25   get blocked by Cranley.  So I then say:  "Do you guys actually

SITTENFELD - CROSS

1    think that John Cranley is going to try and veto it?"

2    Q.  So $20,000 for votes to make it Cranley proof is a quid

3    pro quo, and your response is, "Are you sure he's going to

4    veto it," right?

5    A.  I did not understand him to be trying to offer money for

6    votes.

7    Q.  I think you just testified that his words were that he

8    wanted $20,000 for a deal that would make 435 Cranley proof;

9    is that right?

10   A.  I'm saying what I understand your scripters of this, sort

11   of, intent to be from this moment.

12       When I heard in the context of this conversation, no,

13   that's absolutely not what I understood or I would have

14   responded to that directly.

15   Q.  Well, you recognized it directly the first time you heard

16   it, right, on November 2nd?

17   A.  I did.

18   Q.  And then the same deal was made to you in person, right?

19   A.  That was what you're conveying about Rob's intent, yes.

20   Q.  And then your response was, "Are you sure he's going to

21   veto it," right?

22   A.  That's what I thought we were talking about.

23   Q.  "Are you sure you're going to need six votes," right?

24   That's what your question is?

25   A.  My question was -- so he's talking about this deal and

SITTENFELD - CROSS

1    their fear that John Cranley was going to try and obstruct

2    them. And my response was directly to that.

3        If I had ever understood what you're saying the intent

4    was, I would have instantly said the exact same thing to Rob

5    that I'd said to Chinedum.

6    Q. But that's not what you said. You asked him if he was

7    going to veto it, and then when he said, "Well, we don't

8    really know," then you said, "I can deliver the votes," right?

9    A. Is that --

10        MR. SINGER: Ms. Terry, can you go on to the next

11    one, please.

12    Q. Rob explains, in response to your question, "Are you sure

13    he's going to veto it?" Rob explains, "I don't know. Maybe."

14        And then you respond, "Honestly, I can sit here and say I

15    can deliver the votes."

16    A. I think the word "deal" had been referenced, I don't

17    know, more than two dozen times over the last hour.

18        I understood them to be talking about a development deal

19    that I believe was a slam dunk for the city. So when he's

20    raising concerns about is the mayor going to block us because

21    of his vendetta against Chinedum, that's what I'm responding

22    to.

23    Q. So you're responding to the $20,000 for the development

24    deal?

25    A. No. Absolutely not. I was in no way conflating, or

1    understanding those two things to be conflated. I know this

2    is going back and for- -- fast forwarding a little bit, but

3    Chinedum was a long-time friend, an incredibly generous donor

4    to me, and somebody who I trusted and respected.

5        And in the fall of 2019, nearly one year later, when

6    there were accusations or allegations of sexual assault

7    against my long-time friend, my incredibly generous donor,

8    somebody who I trusted, I immediately said, I think we need to

9    pause his projects with his involvement.

10       I mention that to say any -- and that was just based on

11   an allegation. If I had in any way understood what, you know,

12   with a year and a half of, sort of, reliving some of this in

13   slow motion, I understand where you're coming from.

14       But if in that instant, if I'd at all believed that there

15   was some corrupt bargain that they were trying to pull me

16   into, I would have said the same thing I said to Chinedum,

17   book-ending that entire year.

18   Q.  So after you say you will deliver the votes --

19       MR. SINGER:  You can take that down. Can you blow

20   that up.

21   Q.  Do you see the bottom of the page, you talk about, "John,

22   John loves guys like you."

23       And then you say: "You know, like people who choose to

24   invest here, they believe in it, they're revitalizing, so I

25   can get it done"; is that right?

*SITTENFELD - CROSS*

1    A.   That's what I said.

2    Q.   You can deliver the votes, right?

3    A.   I think it was a re-articulating what had kind of been

4    the theme throughout the conversation of you all are even with

5    the beef between Chinedum and John Cranley.  I think you all

6    are fretting and worrying about something that's not an actual

7    worry; that even the person who might personally dislike

8    Chinedum isn't going to stand in the way of this deal, being

9    the development deal.

10   Q.   And so in response to you saying:  "I can get it done,"

11   Rob says:  "So what's the best way to get -- so like, I mean,

12   I brought $10,000 cash with me because Chin was like, hey, I

13   was like buddy, I'm not going to be able to pull $20,000 out

14   of the bank this week, but..."

15        So Rob is saying here, "I've got $10,000 here in cash,"

16   right?

17   A.   That seems to be the case.

18   Q.   And that also is consistent with what Ndukwe offered on

19   November 2nd.  He was going to have $10,000 with him when you

20   guys meet on November 7th, right?

21   A.   You would have to go back to it.  I'm not sure.  I think

22   he said we're going to try and raise $20,000 over the next

23   couple weeks.  I'm not sure if they sort of talked through the

24   logistics of the fundraising they wanted to do.

25   Q.   We can go back to it.

*SITTENFELD - CROSS*

```
 1          MR. SINGER:  14B, please, page 3, bottom paragraph.
 2   Q.  Ndukwe says:  "For this meeting with Rob next week, I'm
 3   pretty sure he can get you ten this week," right?
 4   A.  Yes.
 5          MR. SINGER:  So can we go back to 15C.  Blow up the
 6   bottom, please.
 7   Q.  Rob says:  "I've got $10,000 in cash with me."  That's
 8   consistent with what Chin said on November 2nd, correct?
 9   A.  Yes.
10   Q.  The $10,000 that Chin told you he was going to bring for
11   yes votes without a doubt; is that right?
12   A.  Yes.
13          MR. SINGER:  Can we go to the next page, please.
14   Let's blow up your response.
15   Q.  "Well, whose name can stuff be in?"  That's your
16   response, right?
17   A.  Yes.
18   Q.  So he's got $10,000 in cash that he wants to give you,
19   and your response is, "Whose name can stuff be in"; is that
20   right?
21   A.  Yes.
22   Q.  You didn't say why do you have $10,000 in cash?  You
23   didn't say that, did you?
24   A.  I did not say that.  I obviously ended up declining to
25   take the cash.  I think people have a lot of confusion
```

*SITTENFELD - CROSS*

1    sometimes over campaign finance rules.

2       So people would do things like give over the legal limit,

3    people would give for the primary and the general when they

4    were only supposed to give for the primary -- when they were

5    only supposed to give for one of those.  They would give from

6    corporate checks when they were supposed to only give from

7    LLCs.

8       So I understood him to be someone trying to, you know,

9    maybe not very sophisticated about campaign finance rules,

10    which put him in good stead, which is why I then called my

11    campaign finance expert to say what volume of cash is a

12    campaign allowed to accept.  And then when it seemed not

13    compliant, not allowable, obviously declined it.

14    Q.  So you're saying it's typical for a donor to come with a

15    bag of $10,000 in cash and offer you that as a campaign

16    contribution; is that right?

17    A.  No.  I mean, I've certainly had donors who have made

18    contributions in cash but in much, much lower amounts.  It is

19    normal for individuals to be confused about how to properly

20    donate.

21    Q.  In the context of someone who had just offered you money

22    for -- to get a deal, to have $10,000 in cash is outrageous

23    behavior.  Is that fair to say?

24    A.  There's a -- I thought Rob wanted -- and this was -- my

25    own language reflects this, wanted to make a campaign

*SITTENFELD - CROSS*

1  contribution.

2      Wanting to make it in cash was absolutely unusual.  It

3  didn't sound like something I was used to, which is why I call

4  and check with my campaign finance compliance person,

5  ultimately decide this is not a compliant way of making a

6  contribution and declining to accept it.

7  Q.  You took the money, just in a different form, right?

8  A.  No.  Absolutely not.

9  Q.  You took $10,000 in cash -- or you took $10,000 in PAC

10  checks on November 28th, right?

11  A.  No.  As you recall, we were given two checks.

12  Conversation all the way through had been real individuals,

13  real LLCs, people from your universe of buddies and investors.

14      And as part of the vetting of -- our vetting process,

15  including campaign fundraising compliance person, fundraising

16  experts, lawyers at a law firm, when we found out that those

17  were corporate checks, not allowable to accept, that was the

18  next in a series of things we turned down because they were

19  not made in a compliant way.

20  Q.  So let's walk through this thing.  He offers you $10,000

21  in cash on November 7th, right?

22  A.  Correct.

23  Q.  You then determine that maybe we can do it in money

24  orders, right, $10,000 in money orders?

25  A.  Thought that, and then realized that that was also not

1    allowable.

2    Q.   Okay.  And this $10,000 was the first installment of the

3    $20,000, right?

4    A.   It was $10,000 that they wanted to contribute.

5    Q.   Right.  So for money orders.  Then they wrote you the

6    checks on November 28th, which were in corporations names

7    rather than LLCs, right?

8    A.   My understanding is that they had raised this money from

9    their universe of people.

10   Q.   That's not what I asked.  They handed you checks on

11   November 28th, right?

12   A.   They did.  They did.

13   Q.   $10,000?

14   A.   Correct.

15   Q.   You couldn't cash them because they weren't into LLCs,

16   right?

17   A.   Well, you could have cashed them, but it --

18   Q.   You couldn't deposit them in your PAC account?  I'm

19   sorry.

20   A.   You could have deposited them in the PAC account, but it

21   wouldn't have been lawful and compliant, so we shredded them.

22   Q.   So you ended up getting the $20,000 on September 17th,

23   correct?

24   A.   Yes.

25   Q.   In LLC checks?

1    A.   Correct.

2    Q.   To your PAC?

3    A.   Correct.  From my understanding, affirmed by Rob, their

4    universe of buddies and investors.

5    Q.   Rob handed them to you, right?

6    A.   Yes.

7    Q.   So getting back to the $10,000 in cash.  He tried to give

8    you $10,000 in cash, you didn't just walk out of the condo at

9    that time, right?

10   A.   I did not.

11   Q.   You didn't try to cut off all ties with Rob?

12   A.   I did not.

13   Q.   You didn't separate yourself completely from the whole

14   situation?

15   A.   I did not.

16   Q.   You began trying to figure out how they can get you

17   checks, or get you the $10,000 in a way that's not cash,

18   right?

19   A.   I saw them as individuals who are trying to back a

20   project that was good for the city.  They seemed, again, and

21   this was -- there were a lot of people like this, didn't know

22   all the details of proper campaign finance compliance, so

23   trying to walk them through how they could make appropriate

24   lawful donations.

25   Q.   You had never had a conversation about campaign finance

*SITTENFELD - CROSS*

1    compliance with Rob, up to the time you -- your entire

2    experience with them, you never had a campaign finance

3    conversation with Rob up to this point; is that right?

4    A.   Before November 7th?

5    Q.   Yes.

6    A.   This is the first time I'd met him, so this is the first

7    time -- sorry, this is the first time he tried to donate.

8         So when a donor tries to make a contribution, and they're

9    not doing it in a compliant way, you walk them through.  You

10   know, an example of this --

11   Q.   Sure.

12   A.   -- I would have had donors who -- the contribution limit

13   for local city elections was $1,100.  Somebody might not have

14   known that, and they give me a check for $1,500.  So you walk

15   them through and say, hey, we can either refund you $400, or

16   we can shred this check, and then you can make a new

17   contribution for $1,100.

18        So things like that happened, again, not infrequently,

19   just because these rules can be confusing.  And as the

20   candidate, my team, we were happy to walk people through how

21   to do it the proper way.

22   Q.   Sure.

23            MR. SINGER:  Could we go to page 31, please.

24   Q.   Right in the middle of the page, you say: "Umm, I mean,

25   honestly, the easiest thing would probably be, uh, the easiest

*SITTENFELD - CROSS*

1    thing would probably be, you know, 18 hopefully.  Yeah, like

2    18.  I don't know if there are 18 LLCs, if there are 18 LLCs

3    checks"; is that right?

4    A.   Correct.

5    Q.   All right.  So 18 LLC checks times $1,100, that's about

6    $20,000 to your campaign; is that right?

7    A.   Yeah.  So the legislation that Mr. Seelbach sponsored,

8    had the voters passed it overwhelmingly on whatever election

9    day that year was, November 6th, November 7th, it didn't then,

10   is my recollection.

11        It didn't then take effect until December 1st, meaning

12   that if Rob wanted to donate $20,000, he could lawfully do so

13   if he and his universe of development partners had 18 LLC

14   checks.

15        That was kind of the common practice of what developers

16   would do under the old set of rules.

17   Q.   Sure.  So your next comment, about three quarters of the

18   way down, "I don't know if that's doable.  One thing, there

19   is, it's, I mean, obviously, like money directly into a

20   campaign is the most valuable thing."

21        You'd rather have money directly to your campaign, right?

22   A.   Yes.  I can't remember if this came up with you or with

23   Charlie.  Money that is a direct campaign contribution, it can

24   support your direct pursuit of an office that you might be

25   running for.

1      A PAC contribution cannot do that.  So I think most

2  candidates would probably pretty much overwhelmingly prefer

3  campaign contributions.

4  Q.   Well, timely mention of the PAC.  So your next sentence

5  is, "I do have a PAC that, one, no one's like snooping around

6  in who's giving there, that Jo.  I mean, I think, frankly, a

7  lot of people don't even know that I have it."

8      So this is the first time you introduce the process of

9  contributing to the PAC, right?

10 A.   Right.  So both Chinedum and Rob had made clear that they

11 wanted to be able to fundraise without their -- not doing so

12 in their name; again, a totally lawful practice.

13     So this is me responding to their desire for not having

14 their name end up in the newspaper.  There's a lot I recognize

15 that's strange and weird about politics.

16     One of the things that's kind of strange and weird about

17 politics is that journalists will often review the list of

18 people who donate directly to a campaign but, for whatever

19 reason, it's much less common for them to review a list of

20 people who are donating to a PAC.  The same information is

21 equally public and out there.

22     Every -- so even as I say I had this PAC, but no one is

23 snooping around about us giving there, it's not because that

24 information wasn't in any way not public.

25     Any individual could have gone on the Federal Election

SITTENFELD - CROSS

1    Commission website, maybe three clicks of a mouse, and see

2    every single cent into and out of the PAC.

3        So it was mostly my responding to their desire to be able

4    to fundraise not in their own name.

5    Q.   It wouldn't be on that website if the contribution wasn't

6    attributed to them, right?

7    A.   The contribution that's on the website is the person who

8    the donation is from.

9    Q.   It's the person who whoever filed the filing attributes

10   the payment to, right?  It's supposed to be who it's from; is

11   that right?

12   A.   No.  So if you raised money for someone, if your neighbor

13   was also named Phil, and you said Phil, will you write a check

14   for a hundred dollars?  Phil's name is in the filing because

15   the donation is from Phil.

16   Q.   All right.  So let's go back to 31.  Then you ask at the

17   bottom, "What are you, what what's what are you guys most

18   comfortable with," right?

19   A.   Yeah.  They seemed very skittish about making

20   contributions in their own name.

21       MR. SINGER:  Okay.  Let's go to 32 now.  Can you blow

22   up the top third.

23   Q.   And then Rob says again, "The easiest thing for us is to,

24   you know, to do cash," right?  Do you see that?

25   A.   I do.

SITTENFELD - CROSS

1    Q.   And then about the middle of the page, you say:  "I mean,

2    if an individual, if if as a technicality it is attributed to

3    that individual, and they agree that that's where it came

4    from, then that's, you know, yeah."

5         So there's two things there.  It has to be attributed to

6    someone, right?

7    A.   Yes.

8    Q.   And then they have to -- you're saying they have to agree

9    that that's where the money came from, right?

10   A.   Yeah.  If a person donates, they need to say and take

11   ownership of the fact this donation is from me.

12   Q.   But someone agreeing, when asked it came from you, is

13   different than them actually being the true source; is that

14   right?

15   A.   If someone lied, yeah, that would be them -- you might

16   know this better, but I would assume that would be them

17   committing some sort of straw donor violation.

18        So yeah, I would absolutely expect that every donation

19   that was reported, the person who agreed and said yes, this

20   donation is from me, or the fundraiser who is bundling those

21   monies, would tell the truth.

22             MR. SINGER:  Okay.  All right.  Let's get out of

23   that.  Can you move to the next page?  I'm sorry.

24   Q.   On the top of the page there, that's when you make a

25   phone call, right?

SITTENFELD - CROSS

1    A.   Yes.

2    Q.   All right.  And you have conversation.  And then after

3    you -- it says or phone call ended, the last sentence is, "If

4    you had like, you know, like John Doe as a person that

5    something could be attributed to, could they do a check, or?"

6         And Rob says:  "I mean, ultimately, it's gonna be the

7    same $10,000 or $20,000," right?

8    A.   That's what it says.

9    Q.   So roughly, the $10,000 is the $10,000 in cash that he

10   has with him, right?

11   A.   Yes, which, as we've discussed, I obviously didn't

12   accept.

13            MR. SINGER:  Let's go to 34, please.  Can we just do

14   the bottom half of this page.

15   Q.   So here again, Rob says:  "We can do the first quicker

16   probably if we do just money orders from, you know, John Doe

17   and get you ten of those."

18        And you say:  "But a real, real person," right?

19   A.   Yes.

20   Q.   It has to be more than a real person; is that right?

21   It's got to be the true source of the funds?

22   A.   Yes.

23   Q.   It can't be just any real person, it has to be the true

24   source of the funds; is that right?

25   A.   Correct.

1    Q.   Okay.  And then you say:  "Who is part of your guys'

2    network"?

3    A.   Correct.

4    Q.   And then Rob says:  "Yeah.  Well, yeah, yeah.  I mean,

5    it's our collective, you know.  I mean, it's that same $10,000

6    that will just get converted into names," right?  He's talking

7    about the same $10,000 he's got right there?

8    A.   He says that.  As you can tell, I'm accepting a phone

9    call at that moment.

10        It was never my understanding, and nothing that was ever

11   communicated by me, other than that this was them lawfully

12   fundraising from their universe of buddies and investors.

13        And that also seemed to be what Rob echoed in prior

14   conversations, after I had declined the offer to contribute to

15   the campaign or the PAC via cash or money orders.

16             MR. SINGER:  Can we drop down to page 38, please.

17   Q.   All right.  So you talked about -- you discussed ways

18   that they can get you the $10,000 in another form.  Do you

19   recall that?

20   A.   Yeah.  I very much wanted to make sure that they were

21   doing it in a proper, compliant way.  So in the midst of that

22   interaction with Chinedum's fellow investor and backer of the

23   435 project, I called my campaign fundraising and compliance

24   person to see what worked.

25        And in that interaction, I'm -- well, I misunderstood, as

1    did my compliance person, and left that meeting thinking that

2    you actually were allowed to donate, you can tell me, I think

3    it was maybe cashier's checks to the campaign.

4        Found out that wasn't true, so called Rob to explain,

5    hey, you can't make lawful compliant contributions in that way

6    either.

7    Q.   Now, ultimately, you set up a meeting that we're going to

8    get together at the end of November, right?

9    A.   That sounds right, yeah.

10   Q.   Do you recall that?

11   A.   That sounds right, yeah.

12   Q.   And then as you're leaving the meeting, the part that's

13   blown up, you say:  "Yeah, no --"

14       Oh, at the top, it says, "It doesn't have to be mailed."

15   There's a discussion about whether they could give it to you

16   in person, or whether they could just mail you the checks,

17   right?

18   A.   Correct.

19   Q.   And you say:  "Yeah.  No, I appreciate it."

20       And Rob says:  "Because like I said, Chin wants to get

21   that development agreement, you know, and so if we can --"

22       And your response is:  "We're gonna make, we're gonna

23   make it happen"; is that right?

24   A.   Yes.

25   Q.   Now, again, Mr. Ndukwe had not submitted his development

SITTENFELD - CROSS

1    agreement to the city; is that right?

2    A.   At that point, not to my knowledge.

3    Q.   You had seen no finalized pro forma?

4    A.   I'm not sure I would ever have seen a finalized pro

5    forma.  As we kind of discussed the separate roles of the

6    elected officials and the professional staff of the economic

7    development department, you know, council members reviewing

8    the pro formas wasn't our role.

9    Q.   All right.  So you had a number of other conversations

10   with Rob.  Let's focus on a telephone call you had on

11   November 21, 2018.  Do you recall that?

12   A.   Yeah.  I mean, you can refresh me, but I think I mostly

13   recall it.

14        MR. SINGER:  Pull that up.  I'm sorry.  18B, page 2,

15   please.  All right.  So that first paragraph, yeah, can you

16   just blow that up.

17   Q.   Then you see in the middle, on the far right, you talk

18   about Rob killing it with the ladies.  And then you say:

19   "So even the money orders --" do you see that?

20   A.   Yes.

21   Q.   "So even the money orders, the money orders are,

22   obviously, like the equivalent of cash, and there's caps on

23   the amount of cash that the campaign can take.  So tell me if

24   this will be doable.  There is a PAC, the Progress and Growth

25   PAC," right?

*SITTENFELD - CROSS*

1    A.   Yes.  Again, I had not understood at the time that money

2    orders were the equivalent of cash, couldn't be donated above

3    certain limits.  So my team and I wanted to make sure this was

4    all compliant, called, let him know to correct that

5    understanding from where we left things a couple weeks

6    earlier.

7    Q.   And that Progress and Growth PAC was the PAC that we were

8    referencing that we just talked about on November 7th; is that

9    right?

10   A.   Yes, that's my PAC.

11        MR. SINGER:  All right.  And then that big paragraph

12   in the middle, can you blow that up, please.

13   Q.   So then you explain, "It needs to either be a check from

14   a human being or a check from an LLC.  Now, that said, if it

15   goes to the Progress and Growth PAC instead of to Sittenfeld

16   for Cincinnati, nothing about it in any way will ever be

17   connected to me, and no one will, umm, you know, no one's

18   going to be poking around for it to find your names on it"; is

19   that right?

20   A.   Yes.  I did say that.  That, again, was this sort of

21   weird quirkiness of journalists not digging through a list of

22   who gives to PACs the same way that they do who gives directly

23   to a campaign, and their wish for as much, sort of, anonymity

24   was lawful.

25        And the -- again, I think some of this has been discussed

*SITTENFELD - CROSS*

1    a little bit already, this sort of weird rule but the rule

2    nonetheless, that my name, it's actually not allowed to be on

3    the PAC.  I mean, if it was lawful to call it the P.G.

4    Sittenfeld PAC, I probably would have done so.  That wasn't

5    allowed.

6        And then I also wasn't the treasurer.  So in the

7    statement of incorporation, or statement of organization, my

8    name's not on that anywhere.

9    Q.  But this is something that you are affirmatively telling

10   Rob, "Nothing about the payments into the PAC will ever be

11   connected to me"; is that right?

12   A.  Yeah.  I think what I was trying to communicate was their

13   desire to not, you know, end up with their names in the

14   newspaper.  That was the main point I was trying to make.

15   Q.  You knew that they didn't want their names on anything,

16   right?

17   A.  Yeah.  They, along with Chinedum, had repeatedly, and I

18   think understandably, stressed that they did not want to

19   continue to be on the receiving end of a vendetta, and that

20   made them prefer fundraising route to the direct making

21   donations from them.

22   Q.  Although Rob told you it was going to be the same

23   $10,000, right, the same $20,000?

24   A.  I mean, he said that.  As we've said in the last one, I'm

25   receiving and already on the phone by the time he makes that

SITTENFELD - CROSS

1  last comment.

2     It's also in direct contradiction both to the

3  contributions that I actually ultimately received, and Rob's

4  comments November 26th, saying I've got one business partner,

5  and then I've got another business partner.  My saying on

6  December 4th, this is from your universe of buddies and

7  investors, et cetera.

8           MR. SINGER:  20D, please.

9  Q.  Do you recall meeting with Rob and Brian on

10 November 28th, right?

11 A.  I do.

12 Q.  This is the meeting where they gave you the checks, the

13 $10,000 in checks that were not from LLCs; is that right?

14 A.  Yes.  I mean, they thought they were from LLCs.  I

15 believed them when they said it, but my team, my compliance

16 and legal team vetted them and found out they weren't.

17           MR. SINGER:  Okay.  Can we go to page 2, please.  And

18 then about just under the "much at all," can you blow that up.

19 Q.  So you raised 435 Elm, right?  You say:  "Anything new on

20 the 435 front," right?

21 A.  Yes.

22 Q.  And then Rob and Brian says -- Rob says:  "I mean, Chin

23 seems to think --"

24     And Brian says:  "He's very positive."

25     And then you say:  "Look, I'm ready to shepherd the votes

*SITTENFELD - CROSS*

1    as soon as it gets to us at council." You brought that up on

2    your own, right?

3    A.   Yeah.  I know the conversation earlier on direct with

4    Ms. Brunner, anytime I believed in a project, I was pretty

5    impatient about things, so my following up to say, hey, you

6    all are trying to do this thing, it's going to be awesome for

7    Cincinnati, what's the status of things.

8    Q.   And the purpose of this meeting was for Rob to give you

9    the $10,000, right?

10   A.   I mean, that's at least part of the purpose of them

11   wanting to meet up, yes.

12        MR. SINGER:  Okay.  Can we move down to page 3.  The

13   bottom third of the page, please.  Just a little bit more up.

14   Q.   So then you continue to have a conversation until,

15   ultimately, you say: "Umm, were you guys able to get stuff

16   sorted out?"  That's a reference to getting sorted out the

17   payment of the $10,000, right?

18   A.   Yeah.  My -- I mean, it was kind of an ongoing dialogue

19   across these calls, some of which you're showing, some of

20   which you're not, in terms of my walking them through, as I

21   would do for a lot of donors, here's how you are allowed to

22   make a proper campaign contribution or PAC contribution.

23   Q.   And then you say:  "I want to make sure no headaches for

24   me, but also make sure there are no headaches for you," right?

25   A.   Correct.  Yeah.  I mean, if you don't make a proper

1    contribution, absolutely.

2    Q.   And then again you repeat, "And this way, as I told him,

3    this PAC, my name is not -- I mean, this will -- can certainly

4    support and benefit me, but my name is not connected to me in

5    any way."

6         So you repeat the same thing you told them on the prior

7    call, right?

8    A.   Yeah.  And I didn't get into reason why but, as you and I

9    just discussed, my name was not allowed to be on the PAC.

10   Q.   So then Brian says:  "Right."

11        Then you say:  "No one will ever know this," right?

12   A.   Yes.

13   Q.   No one will ever know that they just gave you $10,000; is

14   that right?

15   A.   Yeah.  Absolutely.  Sorry.  I didn't know you were

16   waiting.  It's written right there.

17   Q.   So there ultimately were PAC filings, right, related to

18   these contributions?

19   A.   Yes.

20   Q.   The $20,000 you received from Brian and Rob, and then the

21   $20,000 you received in September and October of 2019, right?

22   A.   All reported on the FEC website.

23   Q.   And none of those contributions reported Rob Miller,

24   right?

25   A.   The contributions weren't from them.

*SITTENFELD - CROSS*

1   Q.   Rob Miller's name is not on those contributions, right?

2   A.   It would be improper, and I presume not lawful, to report

3   the name of somebody who the donation wasn't from.

4   Q.   Rob gave you the checks in December 2017?

5   A.   He handed me the checks.  It would have -- if Rob had

6   said this check is from me with my money, then that's what

7   would have been put in the thing.  If that's not the case, and

8   you do that, that would be unlawful.

9             MR. SINGER:  All right.  So let's talk about -- you

10  can pull it down, Ms. Terry.  Thank you.

11  Q.   I think we discussed that in January 2019, 435 Elm was

12  finally presented to the economic development department,

13  right?

14  A.   That's my understanding.

15  Q.   Formally presented to the city.  And then you had a

16  series of conversations with Rob about conversations that you

17  were having with other public officials relating to 435; is

18  that right?

19  A.   I think it was mostly -- that sounds right.  I think the

20  main ones that I recall were since they were very freaked out

21  about Cranley trying to sabotage the project, I think I had

22  one conversation with Cranley.  I think I had another

23  conversation with Phil Denning, the one that was referenced

24  earlier.

25  Q.   Okay.  And then you met with Rob and Brian on

SITTENFELD - CROSS

1    January 30th; is that right?

2    A.   Yes.  There was -- I met with them that month on

3    January 9th, and then we met again on January 30th.

4    Q.   Okay.  And at that January 30th meeting, they gave you a

5    gift, right?

6    A.   They did give me a gift.

7    Q.   It was a bottle of scotch, right?

8    A.   Yeah.

9    Q.   And a box of cigars?

10   A.   They did.

11        MR. SINGER:  Can you please pull up for

12   identification purposes USA 23D.

13   Q.   Do you recognize this?

14   A.   I do.  This is probably the interaction and the moment

15   from the sting that hurts the most, or kind of gets my blood

16   boiling a little bit.

17        I had shared with them that my wife was expecting our

18   first child.  And Brian then says how is your wife doing?  How

19   is her pregnancy going?  And they say, This is our little

20   congratulations over the fact that you are an expectant

21   father.

22        I've never smoked a cigar in my life, and I don't drink

23   scotch.  If someone invites me to a dinner party, and I bring

24   a bottle of wine, it's costing 20 bucks, at the most.  The

25   only time I ever see cigars are in the gas station.

1       This gift was given to intentionally try and get me to

2    accept something that cost over the 70 dollar limit for

3    reporting gifts.

4       You know, my wife and I have gotten married in the past,

5    we've had children, people are allowed to give gifts.  It's

6    just as simple as reporting it.  Because they gave me two

7    things that I've never consumed and don't enjoy, I didn't

8    include them on my financial disclosure.

9       I wish I had, because it would have been no big deal.

10   But the fact that these gifts were given to me deceptively,

11   using a celebration of fatherhood and becoming a dad, I had

12   talked -- we had all talked about -- they talked to me about

13   their kids.

14      I remember one particular thing from a recording we

15   haven't heard, where Brian is talking about his son being a

16   baseball player, and having aspirations to go to the majors or

17   the minors, or play college baseball, but he had gotten an

18   injury, and how tough that is as a father to see your kid, you

19   know, not fulfilling their dreams.

20      Rob had talked to me about stuff like taking his kids

21   camping or hunting.  And I was really excited about becoming a

22   dad.

23      I also, four months after these charges were brought, I

24   lost my own father to cancer quickly.  There is not a single

25   day I don't wish I could hear his voice, talk to him.  I know

SITTENFELD - CROSS

1   he's here with me, but the notion that the role of fatherhood

2   was used to try and do this, it's something that's hard for me

3   to understand.

4   Q.   Well, you agree that you have an obligation to disclose

5   gifts over 75 dollars; is that right?

6   A.   Absolutely.  And I should have -- rather than politely

7   accepting something that I didn't actually want, I should have

8   asked and said, you know, can I see a receipt, or can you tell

9   me what these are.  It didn't occur to me that these things

10  would cost over that amount.

11  Q.   You're aware that scotch can be expensive, right?

12  A.   I guess it's sort of like a book, you know.  A book can

13  cost a dollar ninety-nine on Amazon, or you can have the

14  Gutenberg bible.

15      I'm not familiar with scotch at all.  I don't think I've

16  ever consumed scotch in my life, so the notion that scotch

17  would cost over 70 dollars, that's incredibly foreign to me.

18  Q.   You consume an expensive whiskey, though, right?

19  A.   No.

20  Q.   Isn't your favorite drink at Jeff Ruby's an old fashioned

21  sweet?

22  A.   Sure.

23  Q.   With Bulleit whiskey?

24  A.   I would -- yes.

25  Q.   That's a pretty expensive drink, isn't it?

1    A.   To get -- I mean, yes, that is expensive.  But to drink

2    one, I would assume that drink would cost ten bucks, and that

3    would be a bit of an indulgence.

4    Q.   So you have an obligation under Ohio law to -- it's your

5    burden under Ohio law, is it not, to determine whether a gift

6    exceeds the maximum; is that right?

7    A.   Absolutely.  Rather than getting caught up in the moment,

8    thinking this is a nice gesture to celebrate the coming role

9    of fatherhood, I should have paused and slowed down and

10   confirmed the cost of these gifts and then reported them.

11   Q.   And they were -- I mean, the gifts, you now know, were

12   $482, right?

13   A.   We learned in discovery, when the government gave the

14   receipt, that these were way over the 70-dollar limit.

15   Q.   And you didn't file your financial disclosures until July

16   of 2020, right?

17   A.   Until July of 2020?

18   Q.   Yes.  July 2020.

19   A.   I would need to go back -- yeah, for July of 2020 for the

20   prior 2019, that sounds right.

21   Q.   Okay.  And in those disclosures, you have to swear or

22   affirm that they're correct; is that right?

23   A.   Yeah.  I think there's some word in there, I think,

24   that's knowingly.  So I absolutely did not know that I had

25   received -- I didn't know I had received gifts that cost over

*SITTENFELD - CROSS*

1      that reporting limit until the government turned over that

2      receipt in discovery.

3      Q.   But, again, you know that you have an obligation and a

4      burden to determine what gifts exceed that dollar amount,

5      right?

6      A.   Yes.

7      Q.   And you didn't do it?

8      A.   I should have asked for a receipt.

9      Q.   And then you swore that your disclosures were correct; is

10     that right?

11     A.   Knowingly that it was -- that based on what I knew at the

12     time, yes, it was accurate at the time.

13     Q.   Well, you can't put your head in the sand, right?  That's

14     not consistent with Ohio law?

15     A.   So what you do is, you're allowed to receive gifts, you

16     just need to report them, is you file an amended report.  My

17     counsel said, you know, resolve this case and then file an

18     amended report.  We included that in one of our pretrial

19     motions.

20          The other thing, I know we're maybe getting a little bit

21     far afield here, is I have to accurately report the source of

22     a gift.

23          In this case, I thought this was a celebration of the

24     role of -- the role that I think is sacred, of becoming a

25     father.  And I thought it was them, the people who were

1    celebrating that coming role were Rob Miller and Brian

2    Bennett.  Those are fictional characters.

3        So when we filed this amended report with the Ohio Ethics

4    Commission, we're going to need to somehow resolve how I can

5    make sure I'm telling the truth, and saying these were

6    reported -- sorry.  These were gifts from people, but I

7    can't -- you have to tell the truth about who gave them to

8    you.

9    Q.  You didn't know they were fictional characters at the

10   time that you filed your financial disclosures, right?

11   A.  Correct.  I also didn't know these were over 70 dollars,

12   and I should have absolutely followed up to ask.

13   Q.  And if you'd attributed it correctly, you would have had

14   to put Rob Miller and Brian Bennett on your disclosures,

15   right?

16   A.  Absolutely.  And I wouldn't have hesitated to do so.

17   Again, receiving gifts, you know, it's allowable, but as you

18   said starting out, Mr. Singer, you know, transparency is

19   important, so you just say I received a gift.  These were who

20   I got it from.  It would have been a very easy resolution.  I

21   just didn't know what the costs were.

22       And, you know, not once in all the recorded conversations

23   do I say, oh, I love cigars.  I love scotch.  These were given

24   with the particular design -- I wish I'd slowed down to

25   clarify the costs, because they're not -- I took them, I

1    received them to be polite, not out of -- and because I

2    thought this was a moment of human kindness and connection and

3    celebrating fatherhood. I didn't know what it was actually

4    intended to do.

5    Q. Now, you had multiple dinners at Jeff Ruby's steakhouse,

6    right, with Rob and Brian?

7    A. Yeah.

8    Q. It's fair to characterize Jeff Ruby's is a fancy

9    steakhouse?

10    A. It is a fancy steakhouse.

11    Q. Pretty expensive?

12    A. Yes, I think so.

13    Q. Steaks are expensive?

14    A. Steaks are expensive.

15    Q. Most expensive steaks, probably a hundred bucks, right?

16    A. I'll take your word for it, yeah.

17    Q. Close to it?

18    A. I haven't been there in a very long time, but I believe

19    you.

20    Q. Drinks are expensive, sides are expensive, right?

21    A. Yes.

22    Q. And you've been there on multiple occasions with Brian

23    and Rob, right?

24    A. Yeah. So we went to -- I think this was usually at their

25    suggestion or places Mr. Holbrook thought would sort of be

1    strategic.

2        We ate at Jeff Ruby's.  We ate at Branch, a place in East

3    Walnut Hills.  We went to a dive bar called Knockback Nats.  I

4    got a beer with maybe Rob at one point at Woodburn, Woodburn

5    Brewery.

6        So yeah, I think in almost every interaction, I either

7    paid, offered and tried to pay.  Sometimes there was splitting

8    of bills.  There were also other instances, including the very

9    first one, where they might have been ordering nicer stuff or

10   fancy stuff; and, you know, again, this is our very first

11   interaction, I had an ice water and then left.

12   Q.  Do you recall going to Jeff Ruby's on February 18, 2019?

13   A.  I know that interaction happened, yeah.

14   Q.  Okay.  You didn't order ice water that night, right?

15   A.  You could refresh me on what I ordered.

16   Q.  Well, you sat there for two hours and had dinner, right?

17   A.  I don't -- I remember one interaction with them where I

18   think we ordered sushi, and then I think maybe I picked up the

19   bill or maybe we split the bill.  So you can tell me what I

20   ordered.

21   Q.  You had dinner at least one time in 2019 at Jeff Ruby's

22   where you didn't pay the bill.  Is that fair to say?

23   A.  Yeah.  That's definitely possible.

24   Q.  And do you -- I think Brian testified that the bills were

25   generally around $300 when you guys went to Jeff Ruby's?

*SITTENFELD - CROSS*

1      A.   He testified to that, that the government -- we were

2      interested in information around the cost of the sting

3      operation.   The government didn't turn anything over.

4           What I do recall was that there would be instances, and I

5      also know this -- again, I want to fight for myself in this

6      case and in this situation as much as I possibly can, so I've

7      listened to every recording where they would say, We're going

8      to get together at Jeff Ruby's, and we're going to start with

9      a meeting with P.G. Sittenfeld.

10          So let's say I went, and I had a ten dollar old fashioned

11     or Manhattan, as you said.   And then I leave, and Brian and

12     Rob stay, and they have an expensive steak with Chinedum or

13     other individuals around Cincinnati.

14          So when Brian talks about $400 bills, I don't know if I

15     was an ice water that night, or if Brian and I split a steak,

16     as we did one night.

17     Q.   You've ordered steaks with Rob and Brian at Ruby's

18     before, right?

19     A.   Yeah.   I'm sure I did.

20     Q.   Did you ever disclose a meal on your ethics form that

21     cost over $100?

22     A.   I don't recall a meal where my consumption would have

23     been over that.   I'm glad to look at a receipt, or something

24     like that; but, again, I remember either paying for meals,

25     splitting meals.   There might have been one where I had it

SITTENFELD - CROSS

1    again.  I'd welcome you refreshing me.

2    Q.  Did you ever ask how much was that?

3    A.  Well, I think you try and be mindful, as -- if I order a

4    cheeseburger, look at the bill, said this is a really

5    expensive cheeseburger, not one I would usually eat on my own,

6    cost 22 bucks.

7        I mean, one, I tried to either pay or always offered to

8    pay and be mindful of what was being ordered.  And I don't

9    know who else was joining them later that contributed to the

10   ultimate tabs.

11   Q.  But you are aware that if you had a meal with Rob and

12   Brian that was over a hundred dollars, you would have had to

13   have reported that, right?

14   A.  That's correct.

15   Q.  And you never did anything to determine whether or not

16   your bill exceeded that amount; is that right?

17   A.  No, that's not what I said.  I tried to be mindful of

18   looking at what was being ordered as you go.

19   Q.  Including when you order expensive steaks?

20   A.  Sure.  And, again, I'm sincerely glad for you to refresh.

21   I remember one occasion when Brian and I got a steak and, you

22   know, this sounds like Lady and The Tramp splitting a noodle

23   or something, but he and I split a steak.  I don't think a lot

24   of men do that at Jeff Ruby's.  So yeah, I mean, I did try and

25   be pretty mindful.  If you order -- and inflation has driven

*SITTENFELD - CROSS*

1    things crazy too so I haven't been to Jeff Ruby's in a very

2    long time.

3         But if at the time you order a $60 steak, and Brian and I

4    split that steak, I think it was probably on separate plates,

5    my share would be $30.  And I may well have paid for that $30

6    too, including often picking up the tab for them.

7         I recall paying for them and their orders at Jeff Ruby's,

8    Knockback Nats, Sotto, and Woodburn, and that may well be

9    close to half of the total interactions.

10   Q.   You're talking about picking up some drinks, right?

11   A.   And food.  It was drinks and/or food.

12   Q.   You remember meeting Vinny at the opening day party,

13   right?

14   A.   Yeah.  As he said, kind of a fleeting interaction amongst

15   a pretty large group of people flowing in and out, other

16   elected officials, people who I thought were part of their

17   network that were FBI undercover actors, but -- so he was one

18   of the folks there.

19   Q.   And you've talked about Vinny, he's a colorful character,

20   right?

21   A.   Yeah.

22   Q.   And you've talked about Vinny on a number of occasions in

23   your meetings with Rob and Brian after opening day; is that

24   right?

25   A.   Yeah.  He was -- he, like them, was represented to me as

*SITTENFELD - CROSS*

1    a real estate investor who was backing 435, a project I

2    thought was great for the city.

3         We would joke around a lot about, you know, what Vinny's

4    past was.  It kind of felt to me like a persona or a schtick,

5    so -- and I said some of this too, but Rob -- Brian more would

6    be like oh, yeah, he's like out of The Sopranos, or like out

7    of GoodFellas, so it was kind of almost joking as we went

8    about this person almost being like a character out of a TV

9    show.

10        MR. SINGER:  Let's look at a couple of those.  Can

11   you pull up 26D, please, page 3.

12   Q.   So right under "Begin Transcript."

13        "And Brian was saying that Vinny was like, you know, used

14   to make his money in the dark arts and cleaned it up," right?

15   A.   I did say that, yeah.

16   Q.   It's a pretty straightforward statement, right?

17   A.   Yeah.

18   Q.   And then Rob says:  "Yeah."  And you say:  "I don't

19   care," right?

20   A.   That if somebody used -- again, a lot of this stuff that

21   you all have not shared, so there's a lot of, sort of like a

22   joking tenor.  Sometimes, admittedly, there was locker room

23   banter and humor, and things like that.

24        But if somebody used to do something that was not

25   aboveboard and legitimate, but now they have cleaned up their

*SITTENFELD - CROSS*

1    act, they are doing things in an aboveboard by-the-book way,

2    and on top of that they say, hey, I'm here to help make a

3    blighted, condemned, dangerous building come back to life in a

4    positive way for your city, I'm not going to hold their

5    however many years ago their past might have been against

6    them.

7            MR. SINGER:  Let's blow up the bottom of the page

8    there.  I'm sorry.  Not this part.  Just that whole middle

9    section, please.  That's fine.

10    Q.  So this is where you talk about he works out of Newark,

11    he's in a lot of real estate deals.  And Rob says:  "A lot of

12    union stuff.  A lot of guys, a lot of --" and you say:  "Waxed

13    a few guys," right?

14    A.  I think I probably meant whacked.  Waxed sounds odd,

15    right, in retrospect, but I also -- and, again, you can play

16    the tape if you want to.

17        This is clearly a joke.  If I thought I was sitting down

18    with someone who actually murdered people, I would get out of

19    there faster -- I mean, I like to think I'm brave and have

20    backbone in certain regards, but I don't want to be around

21    murderers, so this was a sort of like Sopranos like style

22    joke.

23    Q.  One would hope, right?

24    A.  Absolutely.  I mean, Mr. Singer, you encounter different

25    people sort of than I do, but I would never break bread with,

1    invite to meet my wife and my baby son, someone who I believed

2    had ever been a murderer.  You can absolutely say P.G., you

3    have a bad sense of humor, you're making bad jokes, but this

4    is a joke.

5              MR. SINGER:  Okay.  28B, please.

6              THE WITNESS:  Your Honor, I don't want to be a diva

7    here.  I don't know if my attorney can give me a bottle of

8    water.  He probably wants me to talk less so that I need less

9    water.

10             THE COURT:  You may approach.

11             THE WITNESS:  Is that okay?  Thank you.  Thank you

12   very much.

13             MR. SINGER:  Ms. Terry, can you blow up maybe two

14   thirds of the -- the top two thirds, please.

15   Q.  So this is another instance where you're talking about

16   Vinny, right?

17   A.  Yes.

18   Q.  Brian says:  "He's really driving the sports book money

19   side of it," right?

20   A.  Yes.

21   Q.  Then sort of describe Vinny's persona.  And then, again,

22   you say:  "Waxing people in the '80s," right?

23   A.  Again, whacking, not waxing, I would assume conjures very

24   odd imagery but, again, also clearly a joke.  Maybe a dumb

25   one, maybe a stupid one, but this is me joking.

1          THE COURT:  Mr. Singer, are you anticipating these

2     being published to the jury?  Just ask if you want it and

3     we'll review that.

4          MR. SINGER:  Thank you, Your Honor.

5          THE COURT:  Yep.

6     Q.  Now, at this point, going back to 435, the project had

7     been transferred from the city to the port, right?

8     A.  Yes.  I believe June 26, 2019.

9     Q.  And economic development had determined that a

10    development agreement directly with -- relating to 435, it

11    just wasn't in the public's interest, right, that's one of the

12    reasons that they transferred it to the port?

13    A.  I think that's maybe not quite right.  I think they

14    understood Chinedum to kind of be in the driver's seat because

15    of the air rights.

16         And many of us -- if you want to be a city where you're

17    saying we're a city of opportunity for everybody, you can't be

18    a city where you only have white people developing big

19    projects.

20         So I think the fact that he represented the diversity

21    that we strive for in terms of creating a prosperous growing

22    city, the fact that he had the air rights, I think the

23    expectation -- actually, I know this was the expectation from

24    other recordings that I've listened to that the government

25    made and shared with us.

SITTENFELD - CROSS

1          The expectation was that the property would be

2     transferred to the port so that they could wipe the more than

3     $1 million in back taxes and tax liens, but that it was

4     absolutely Mr. Ndukwe who would still be the partner.

5          There was a recording where Laura Brunner and Chinedum

6     Ndukwe are like, it's the two of us, we're moving forward, and

7     that's going to be the arrangement.

8     Q.   Well, Phil Denning, in economic development, they

9     assessed the development agreement that was submitted to the

10    city, right?

11    A.   And I think they thought that the combination of Chinedum

12    plus the port, and the tools that they can bring to clearing

13    tax liens, that's the combination.

14    Q.   Well, they just transfer the money to the port or the

15    line to the port, right?

16    A.   No, Mr. Singer, there was a conversation between Laura

17    Brunner and Chinedum, where Laura specifically references her

18    conversations with Phil Denning.

19    Q.   Ultimately, though, Phil Denning testified here that the

20    economic development department was not going to enter into a

21    development agreement with Mr. Ndukwe, right?

22    A.   Again, I think they thought there was a better

23    arrangement because of the role that the port can play

24    clearing back taxes.

25         It wasn't saying no to Chinedum; and, you know, there are

 1    other instances in discovery where Phil Denning goes to

 2    Mayor Cranley and says, hey, how about doing this process

 3    without an RFP.

 4        So no, the city did not deem Chinedum to not be up to the

 5    task of doing this, they just thought the combination of a

 6    partnership with a port, with the port, and the tools that

 7    they could bring would create a more successful outcome.  And

 8    I agreed with that.

 9    Q.   All right.  So September 24, 2019, you met with Rob,

10    Brian, Vinny, right?

11    A.   Yes.  I did meet with them.  I told them I was coming up

12    for a dinner of other elected officials from around the state,

13    and they asked if we could meet before I went off to my

14    dinner.

15    Q.   And they gave you two $5,000 checks, and promised two

16    more, right?

17    A.   Yes.  Vinny gave me two checks to the PAC for $5,000

18    each.

19    Q.   And after that, you started calling Vinny, right?

20    A.   Yes.

21    Q.   You started calling Vinny directly?

22    A.   Yes.  We had a number of phone conversations.

23    Q.   Okay.  And then October 29, 2019, you met with Brian and

24    Rob, and they gave you those two extra checks, right?

25    A.   Correct.

*SITTENFELD - CROSS*

```
 1            MR. SINGER:  All right.  Can you pull up 33B, please,
 2   page 4.  Actually, can you go back to page 3.  I'm sorry.
 3   Bottom of the page there, if you can just blow that up.
 4        Your Honor, permission to publish to the jury?
 5            THE COURT:  You may.
 6   Q.  Do you see where Rob says:  "Oh, I need to give you those
 7   checks"?  Do you see that?
 8   A.  Yes.  Fourth from the bottom, yes.
 9   Q.  And he says, "Vinny will fuckin' run me over with a car
10   if I don't," right?
11   A.  Rob said that.
12   Q.  Rob said that.
13   A.  Because it's in a recording, I did not believe that Vinny
14   would literally run him over with a car if he didn't give him
15   the checks.  I took that to be joking, jocular, bantery
16   language.
17   Q.  A reference to what you knew about Vinny as being in the
18   dark arts, maybe?
19   A.  No.  I thought it was a joke.  I've never met and can't
20   fathom somebody running someone over with a car because they
21   don't hand over lawful PAC contributions.  That's beyond my
22   imagination.
23   Q.  It was a joke because of Vinny's reputation.  Is that
24   fair to say?
25   A.  It was a joke because of the kind of jokes that happened
```

*SITTENFELD - CROSS*

1    about Vinny and, you know, his sort of, you know, Joe Pesci,

2    Tony Soprano, sort of like his schtick.

3    Q.   But you'd only met Vinny really -- well, at the opening

4    day party, and then on September 24th, right?

5    A.   Yes.  And from those two interactions, it never once

6    occurred to me that he would run somebody over with his car.

7    Q.   It didn't once occur to you that he had ties to organized

8    crime?

9    A.   It just -- it was -- in my conversations with him, he

10   never said anything along those lines.  He represented himself

11   as an investor in a project that was great for the community

12   that I represented.

13       Again, it's just hard for me to -- I love my wife, I love

14   my son, I love my chief of staff.  I would not have taken my

15   chief of staff in to a place where I thought somebody might

16   run you over with a car if things don't go right.  It was --

17   we were joking.  It was a schtick.  I mean, I can't imagine

18   Rob was being serious when he said this.

19   Q.   It was a joke based on his reputation.  Is that fair to

20   say?

21   A.   It was a -- yeah.  I think it was a -- yeah.  I think it

22   was a joke based on the sort of, like, schtick persona of his

23   reputation.

24            MR. SINGER:  Can you go to page 3, please, at the

25   top.  I'm sorry.  Page 4 at the top.

*SITTENFELD - CROSS*

1    Q.   This is when they give you the checks, right?

2    A.   Yeah.

3    Q.   They give you two more checks.  You say:  "Thank you,

4    guys."

5         Rob says:  "I'll send you the names.  I forgot to ask him

6    which LLC."

7         You said:  "Yeah."  And then you say:  "Where do you guys

8    find these LLCs?  Do I not want to know?"

9         And Brian says:  "Yeah, you probably don't."

10        And you say:  "As long as it's like --"

11        And Brian says:  "Yeah, it'll pass.  It'll pass the

12   muster test."

13        And you say:  "As long as it passes muster and like a

14   person with a name," right?

15   A.   Yes.  So there might be a theme of my making bad jokes

16   here.  I think they thought that I was, uptight might be the

17   right word, because they had, again, always what I understood

18   to be donations that would be compliant, lawful contributions

19   to a campaign or to a PAC.

20        They tried to make them in cash, that wasn't compliant,

21   so I turned it down.  They tried to donate in money orders.  I

22   turned that down.  They tried to donate in cashier's checks.

23   I turned that down.  They tried to donate in corporate checks

24   that they didn't even know were corporate checks.  We caught

25   those, shredded the checks, vetted them.

SITTENFELD - CROSS

1        Because all of that had happened one year earlier, I

2    think they thought, oh, this guy is really into making sure

3    that he's accepting lawful, compliant, allowable

4    contributions.

5        So it was sort of like, do I not want to know?  They

6    understood not only did I want to know, I did know and I had

7    to know.  We followed up to say who is the individual from

8    your universe of buddies and investors which each one of these

9    LLCs is attributable to, and then reported all of that in

10   public filings transparently to the Federal Elections

11   Commission.

12       So joking here precisely because I did the opposite, I

13   did want to know, we did know, and we reported it.

14   Q.  You followed up with Rob, right?

15   A.  Correct.

16            MR. SINGER:  All right.  Can you go to 33D, please,

17   page 2, the bottom half of the page, please.

18            Permission to publish to the jury, Your Honor?

19            THE COURT:  You may.

20   Q.  All right.  Your first line here:  "I mean, is he like,

21   is he like, I mean, I've got a sister in Providence.  Like, is

22   he, is it like, you know, Mafia type?"

23       And Brian says:  "So it's funny, umm, as close as we are,

24   I've always kind of respected that."

25       You say:  "Yeah."

SITTENFELD - CROSS

1      Brian says:  "I'm gonna say yes."

2      You say:  "By the way, I don't, I don't really care."

3      You asked straightforward, is this guy in the Mafia.  He

4  says yeah, and you say "I don't really care"; is that right?

5  A.   That's definitely what's said here.  Again, I would say

6  if you were to play and include the totality of times we kind

7  of talked about and joked about Vinny, might see and read a

8  little bit differently but, yeah, that's what I say right

9  here.

10  Q.   Do you want to listen to it?

11  A.   I defer to you, Mr. Singer.

12      MR. SINGER:  Let's listen to it.  Can you pull up

13  33C, please.  Actually, would you mind pulling the transcript

14  up again.

15      Can you pull up 33C and play it starting at 54:24.

16      It's the first session that was admitted into evidence.

17      (Audio played.)

18  Q.   That was sort of the tenor of the conversation, right?

19  A.   Okay.

20  Q.   You were just having a regular conversation about Vinny.

21  Is that fair to say?

22  A.   Yeah.  And I guess I was also saying, like so much in

23  this, this was after two other examples where I think you

24  might have agreed with me, we're joking about who he was and

25  how he seemed.  Again, not --

*SITTENFELD - CROSS*

```
1    Q.   This was a pretty straightforward, "Is he in the Mafia?"
2    And they said "yeah," and you said "I don't care"; is that
3    right?
4    A.   I think, by that point -- again, going back to the did he
5    wax, wax guys in the '80s, I think I thought this was like a
6    schtick that we must have joked around about; and, again, I
7    just can't emphasize enough, I would never take my chief of
8    staff, who is like a surrogate little brother to me.
9         And later in the calls we might yet get to, I think I
10   talk about him, like, visiting my family in Providence.  I
11   would not expose my family to someone who I thought might put
12   them in danger in any way.
13            MR. SINGER:  Your Honor, may we approach at sidebar?
14        (Sidebar held off the record.)
15            THE COURT:  Ladies and gentlemen of the jury, I'm
16   advised there are about another 30 minutes of questions left.
17        So there's a couple of possibilities.  We could just
18   power through and do another 30 minutes of questions, or we
19   could take a brief break and resume, or we could suspend and
20   start again tomorrow.
21        In some ways, it probably makes more sense to try to get
22   through this witness and have him done, if people are all
23   right.
24        So is there anyone who could not go right now for another
25   30 minutes and would like to take a break?
```

1          A JUROR:  I would like a break.

2          THE COURT:  You're fine, you're saying?  I don't know

3     what you're saying.

4          A JUROR:  No.  I was just saying five minutes.

5          THE COURT:  Oh, yes, we can take a very, very brief

6     break.  So just take a break and try and resume, line back up

7     in the hallway as soon as you can, and we will try and knock

8     out this last 30 minutes.

9          As always, all the standard admonitions.  Don't discuss

10    the case amongst yourself.  Don't communicate or do any

11    research.  We'll get you back in here as quickly as we can.

12         (Jury out at 4:56 p.m.)

13         (Brief recess.)

14         THE COURT:  Let's bring the jury in.

15         (Jury in at 5:05 p.m.)

16         THE COURT:  Thank you, members of the jury, for

17    keeping that brief.  I appreciate that.

18         Mr. Singer, you may continue.

19         MR. SINGER:  Thank you, Your Honor.

20    BY MR. SINGER:

21    Q.  Let's go to the fall of 2019.  You received the $10,000

22    from Vinny in September, right?

23    A.  Correct.

24    Q.  I think you testified after that $10,000, you started

25    reaching out to Vinny directly, right?

SITTENFELD - CROSS

1    A.   That's correct.

2    Q.   Do you remember placing a call on November 15, 2019,

3    asking to meet up with Vinny in New York?

4    A.   I do remember that call, mostly from hearing it last

5    week, or a week or two weeks ago.

6         MR. SINGER:  Can you please pull up 35D, please.

7         Permission to publish, Your Honor?

8         THE COURT:  You may.

9         MR. SINGER:  Page 2.

10   Q.   So Vinny -- you recall in the conversation, Vinny's

11   talking about -- well, you ask him if he was going to be

12   around in early December, and you wanted to meet up in

13   New York; is that right?

14   A.   That's correct.

15   Q.   And Vinny mentions a yacht, and you say -- this is at the

16   bottom.

17        MR. SINGER:  Will you blow up the bottom third.

18   Q.   -- "I wanna be, I wanna, I wanna, I wanna be you when I

19   grow up."

20        And he says:  "You want to be old, fat, and bald?"

21        And you say:  "No.  I want to be a baller like you,"

22   right?

23   A.   I absolutely said that.  I'm like kind of a dork, right.

24   Like when you're having an interplay with someone, and they're

25   self-effacing you, so "I'm old and fat and bald."

1          "No.  I want to be a baller like you."

2          I mean, there are a lot of ways in which I'm probably a

3     weird or unusual person, but that sort of banter and interplay

4     I've had with ten thousand people in my life.

5     Q.   You thought that --

6     A.   If --

7     Q.   Go ahead.

8     A.   If I really wanted to be a baller, you don't become a

9     wonky city councilperson.  No one has ever accused a dorky

10    policy geeky city councilman of being a baller so, again,

11    there was just an ongoing sort of banter, I think, in a lot of

12    these communications.

13    Q.   You were a candidate for the U.S. Senate, right?

14    A.   I was, a quite unsuccessful one.

15    Q.   You thought Vinny was the boss, though, right?

16    A.   No.  I think I thought he was the -- another of the

17    backers of the 435 Elm redevelopment property.

18    Q.   So it's your testimony that Brian and Rob did not portray

19    Vinny as the boss?

20    A.   I guess they kind of did.  It was very -- especially in

21    the moment -- again, dissecting these beat by beat, I think I

22    kind of understand where you're headed.  But in the moment,

23    no.  Rob -- and I guess I also don't know exactly what you

24    mean by "the boss."

25         Rob said I do real estate deals all over the country and

1    especially in the southeast, and I'm -- I Rob, am getting on a

2    plane to Hawaii, and then I'm going over to Budapest.

3         Brian owned his own -- as these fictions were represented

4    to me and I believed them, Brian owned his own green energy

5    company.  He did a ton of work for the federal government.

6         Vinny used to have a sports book, and now he's into real

7    estate investment.  They each kind of seemed like their own

8    person.

9    Q.  But you started reporting to Vinny rather than Rob,

10   right?

11   A.  I would pretty strongly disagree with the reporting to.

12   Across nearly a decade at City Hall, I think the majority of

13   the things I sponsored, and the things I fought for, were for

14   people who were never political donors, things like

15   increasing -- expanding bus access, things like increasing

16   affordable housing.

17        I would report to those stakeholders as frequently and as

18   thoroughly and as passionately, despite them never being any

19   donor anywhere in sight, as my follow-up was to Vinny.

20   Q.  But you would tell Vinny about how you were pressuring

21   Laura Brunner, right?

22   A.  I think I would relay to him the dispute between Laura

23   and Chinedum, and my pushing all parties to get what I

24   believed to be a really good project across the finish line.

25   Q.  Well, you recall saying, "I am putting pressure on Laura

1  Brunner," right?

2  A.  I'm happy for you to show me the exact thing.  I think I

3  was very clear with everybody, Vinny, Laura herself, Chinedum,

4  and anybody else that would ask me, I have real concern that

5  two things might foil a home run no-brainer project.

6      One was her treating him differently because of the color

7  of his skin.  That should cause a person to be alarmed and

8  extra engaged.

9      Two, I was worried that if she, for that reason or for

10  another reason, tried to go in a different direction, that

11  things would end up embroiled in litigation.  And, you know,

12  I'm no longer in politics.  I'm sure I'll never be in politics

13  again.  I still love this city.  This is still where my wife

14  and I are raising our family.

15      I lament that that prediction was correct, by her trying

16  to obstruct and not come to a reasonable middle ground,

17  actually even closer to Laura's side than to Chinedum, Rob,

18  Brian, and Vinny's side.

19      By her declining to do that, the exact litigation

20  scenario that I predicted unfolded and, as we sit here today,

21  there is still a blighted, condemned, vacant building that

22  should be a gleaming tower that created jobs, and it's not.

23  Q.  Now, I think you testified on direct that you had a

24  meeting with Mr. Ndukwe and Mike Schiff on December 11th; is

25  that right?

SITTENFELD - CROSS

1    A.   Chinedum asked to come to my office.  I think it was kind

2    of a spur of the moment thing, which -- this is when you are

3    friends with someone, it's not a big surprise when they give

4    you a buzz and say, hey, can I stop by?  The days are very

5    full, which is why the meeting was, I believe, only

6    15 minutes.

7         So with very little warning, on December 11th of 2019,

8    Chinedum, Mike Schiff, and somebody named Mr. Patel, I

9    believe, came by my office, where it was me, as well as a

10   couple of City Hall aids.

11   Q.   And I think you testified on direct that Rob and Vinny

12   were out of the picture at this point, but you continued to be

13   engaged because of your belief in the project; is that right?

14   A.   Well, Chinedum represents -- so Rob and Vinny -- sorry.

15   Rob, Brian, and Vinny had represented themselves as people who

16   were in deals all over the country.  They did seem a little

17   bit like people who kind of had short attention spans, so if

18   they had on a dime said, hey, we're going to remove ourselves

19   from this deal and now be in something else, that wouldn't

20   have surprised me.

21        I think the thing that was murky or confusing was that

22   Chinedum very much represented in that meeting that sort of,

23   you know, Mike is in now.  He's the guy.  He's the capital,

24   and he's the development partner.

25   Q.   And you called Vinny that day, right?

SITTENFELD - CROSS

1   A.   December 11th?

2   Q.   Yeah.

3   A.   Possibly.

4   Q.   And then you called him again on December 23rd, right?

5   A.   Yeah.  I think we had maybe December 9th, December 11th,

6   and December 23rd, we had conversations that month.

7   Q.   Now, those checks that you received in September from

8   Vinny and October from Brian and Rob, you reported those to

9   the FEC, right?

10  A.   All of the checks from them were reported to the Federal

11  Elections Commission.

12  Q.   And Rob's name was not reported, right?

13  A.   Again, you're not allowed to report a check that's not

14  from that person and say it is.

15  Q.   It's a simple question.  Rob's name was not recorded?

16  A.   Correct, because he wasn't the donor.

17  Q.   Brian's name was not recorded?

18  A.   Definitely not.

19  Q.   And Vinny was not recorded?

20  A.   Nope.  Yep, you're correct.

21         MR. SINGER:  No further questions, Your Honor.

22         THE COURT:  Thank you, Mr. Singer.

23       Any redirect, Mr. Rittgers?

24         MR. C. MATTHEW RITTGERS:  Very briefly, Your Honor.

25         THE COURT:  All right.

```
 1                    REDIRECT EXAMINATION
 2   BY MR. C. MATTHEW RITTGERS:
 3   Q.   Is there a section on the FEC website that says who
 4   fundraised or bundled this money for you?
 5   A.   There is not.
 6   Q.   If you had put Rob's name on the FEC website, would that
 7   have been a federal offense?
 8   A.   Yes.  You can't misrepresent who the actual donor is, so
 9   my understanding of Rob -- again, we've sort of hit all of
10   those different beats but, repeatedly, both things I said and
11   things he said, saying this is fundraising from my universe of
12   buddies and investors.  If I had attributed a check from
13   someone in their network to him, and it wasn't from him,
14   that's a violation.  You're not allowed to do that.
15   Q.   You hired a CPA, you testified to.  What was her name?
16   A.   Her name is Claire Fisher McKenna, her maiden name,
17   married name.
18   Q.   What was her role when you hired her as a certified CPA?
19   A.   Her -- so this was after I fired Jared.  I thought let's,
20   you know, sort of increase the compliance operation and
21   efforts even more, someone who is a professional CPA,
22   obviously excellent credentialed background, it was to sort of
23   do what Jared had previously been doing in a -- separate from
24   but in collaboration with the law firm, which was also hired
25   to make sure everything was compliant, lawful.
```

1    Q.   What was her title in relation to the PAC and campaign?

2    A.   I believe she became the treasurer for the PAC.

3    Q.   And as a matter of procedure and course, were there

4    things that she did, no matter who donated to you or

5    fundraised and bundled, in terms of follow-up to confirm who

6    should be attributed to each LLC check?

7    A.   Yes.  Yes, there were things she would do if we

8    received -- if somebody went out and did lawful fundraising,

9    and they're raising from their network of neighbors, business

10   partners, fellow churchgoers, and we obviously don't know

11   those people.

12        So if we get a check from, you know, Main Street, LLC,

13   she would follow-up -- sometimes I would follow-up to say,

14   hey, who is the person, the person who is doing the bundling,

15   doing the fundraising?  Who is the person who this donation is

16   actually from?  Who is it attributable to?  And she and the

17   law firm would both do that.

18   Q.   How did she do that with respect to the 2019 checks that

19   you were just asked about?

20   A.   So Claire, incredibly credentialed, very smart, but was

21   new to politics.  I actually didn't think that was a bad

22   thing.  I thought teaming up with a professional CPA was a

23   good idea for me too.

24        So I think I drafted some language for her to sort of,

25   you know, here's how you can follow up with a donor.  She then

SITTENFELD - REDIRECT

1    did reach out to Rob directly, in no uncertain terms to say,

2    you know, thank you for these donations that we've received.

3    P.G. is very appreciative.  We're very appreciative.  I'm

4    paraphrasing.  Can you please confirm who each check is from

5    so that we can make a lawful, appropriate, accurate filing

6    with the FEC, which is what we then did.

7    Q.   Are you aware of whether or not Rob actually responded to

8    your CPA treasurer with names?

9    A.   He responded -- if you wanted to show me the email, but

10   he responded saying here's who -- I can't remember if he had

11   maybe mentioned it to me or if he hadn't yet.  But he either

12   followed up or confirmed this LLC contribution is from this

13   real individual human being.

14   Q.   Was Claire interviewed by the FBI, to your knowledge?

15   A.   Claire was interviewed by the FBI.

16   Q.   How do you know that?

17   A.   Because I read her 302, which is -- sorry.  I mean, I've

18   been living in this bizarre world.  That's -- I believe a 302

19   is the name when somebody gives -- sits down for a formal

20   interview with the prosecutors and the FBI.  The FBI

21   interviewers' recording of that is called a 302.

22   Q.   What job opportunities did you have post college?

23   A.   The most immediate one --

24            MR. SINGER:  Objection, Your Honor.  Outside the

25   scope.

*SITTENFELD - REDIRECT*

1              THE COURT:  I agree.

2              MR. C. MATTHEW RITTGERS:  He was asking about the

3     baller stuff, and I just -- he had opportunities to go make

4     money, and he came back here.  That was the only point of it

5     about the baller stuff.

6              THE COURT:  You can answer that question.

7              THE WITNESS:  Thank you, Your Honor.  It's a very

8     short answer.  I mean, I knew I wanted to come back to my

9     hometown.  I think there was an eye towards getting involved

10    in public service.  But when I was in graduate school, I won a

11    scholarship to go to graduate school in the United Kingdom.

12      There was a program that Google had for people who were

13    on my scholarship.  And I participated -- the summers between

14    my two years of graduate school, I participated in this

15    program at Google.  They offered me employment to stay on

16    there.

17      I think I said something along the lines of, you know, if

18    you guys want to open Google Cincinnati, I'd be very tempted

19    but, short of that, I want to be back in my hometown, so I

20    turned that down and came back and got involved with the

21    education and non-profit we talked about earlier.

22              MR. C. MATTHEW RITTGERS:  I have no further

23    questions, Your Honor.

24              THE COURT:  Thank you, Mr. Rittgers.

25              MR. SINGER:  Nothing from me, Your Honor.

1              THE COURT:  Very good.  Mr. Sittenfeld, you can step

2       down.

3              THE WITNESS:  Thank you, Your Honor.

4          (Witness excused.)

5              THE COURT:  I think, with that, we should break for

6       the evening, reconvene tomorrow, see where we're at.

7          Ladies and gentlemen of the jury, if you can try to be

8       here shortly before 9:00.  So aim for 8:50, and if it's not

9       until 8:55, that will work, and we'll pick up tomorrow.

10         Standard admonition.  Please don't discuss this case with

11      your fellow jurors.  Please don't do any research.  Please

12      don't communicate with anyone about the case.  If anyone

13      should attempt to communicate, please let me know.

14         Since we're going into the evening, please do not look at

15      any media accounts, whether on television, radio, on the

16      internet or otherwise, about this case.  It's important that

17      the case be decided only based on the information that you've

18      seen presented in the courtroom.

19         And with that, please have a pleasant evening, and we

20      will see you shortly before 9:00 tomorrow.

21         (Jury out at 5:22 p.m.)

22             THE COURT:  Anything we need to discuss before we

23      break for the evening?

24             MR. SINGER:  Nothing, Your Honor.

25             MR. C. MATTHEW RITTGERS:  Your Honor, just briefly.

1      You know, the indictment in this case, there was nothing in

2      the indictment of 404(b) -- oh, sorry -- about conduit

3      donation, which is a federal offense.  I believe we've

4      preserved our objection at sidebar.

5          But this is a prejudicial variation from the indictment.

6      I mean, we just heard an hour of cross-examination on it.  I

7      assume that the government intends to, and we object again to

8      arguments that -- in closing argument about straw donations

9      which, frankly, are not true.

10          But now the jury has heard from the government for two

11      weeks about some argument about straw donations that he's not

12      charged with.

13          It's a federal offense.  If they thought they had enough

14      information on it, they would have indicted him, and we've

15      been forced to deal with it on directs and crosses.

16          And, you know, I think that they might say it goes to

17      intent, but like they're trying to prove that a straw donation

18      occurred.  A straw donation did not occur.  We were never on

19      notice of this at all.

20          THE COURT:  Mr. Singer?

21          MR. SINGER:  Your Honor, I think they raised bundling

22      early, for one.  And for two, so they want to say that this

23      was just bundling, but we should not be able to get into what

24      he knew about what the actual source of the funds were.

25          And the actual source of the funds were, while it doesn't

1    go to whether there was a quid pro quo, it goes to his intent,

2    and his intent to conceal the fact that he did have a quid pro

3    quo.

4        I think the jury instructions are clear.  This is not a

5    straw donor case, but if the source was not -- was the true

6    source, then it's fine; if it was not the true source, then it

7    wasn't.  This is in the Court's instructions.

8            MR. C. MATTHEW RITTGERS:  I agree that it is in the

9    instructions, Your Honor.  However, if they believe that there

10   was a conduit donation or straw donor, if they believe that

11   they had evidence that would lend a jury to be able to come to

12   the conclusion that P.G. was aware that these were straw

13   donations, they could have indicted him for it, and they did

14   not.  You know, this is a prejudicial defect on the

15   indictment.

16           THE COURT:  Well, I think the concern I have,

17   Mr. Rittgers, is I think that the defense is the side that

18   sort of introduced the bundling question.

19       And I think you had some concern that, without some

20   explanation, the jury may be of the view that bundling is, in

21   and of itself, inherently bad.

22       And so you wanted, I think with some wisdom, to try to

23   get out in front of that and make it clear that bundling

24   inherently is not a campaign finance violation, as we have

25   discussed in some detail throughout this trial.

1    But having put in the fact that bundling is not

2    inherently bad, that only goes so far.  I mean, if the

3    bundling is done not as pure bundling, but as a way of

4    obscuring who the actual source of the funds is, then that

5    could be indicative of something.

6        And I think, once you've put -- once you've said we want

7    to make clear that bundling isn't inherently bad, I think it

8    is fair, at some level, for the government to respond by

9    saying, well, not all bundling or pure bundling is bad, but

10   there are limitations on that principle.  And I think that's

11   what they've done.  And so I'm comfortable with where things

12   stand.

13       I think Mr. Sittenfeld has had every opportunity to

14   explain his view that he believed the source of the funds was

15   what he believed the source of the funds was.

16       He didn't believe it was misattribution and, in fact, he

17   believed it would have been misattribution to report it any

18   other way than he did, and I think he made that point to the

19   jury.

20       I think the jury instructions are going to make it very

21   clear to the jury that Mr. Sittenfeld is not on trial for any

22   form of campaign finance violation, and that the only question

23   is going to be whether or not the government has proven the

24   crimes that they've charged.

25       And, you know, at this point, you have preserved your

```
 1    objection, I understand that, but I'm pretty comfortable with

 2    where things are on the record on this issue right now.

 3                 Yes, Mr. Rittgers?

 4                 MR. C. HENRY RITTGERS:  I would like to know if the

 5    government is going to call any witnesses tomorrow.

 6                 THE COURT:  Has the government decided if it's going

 7    to call any witnesses tomorrow?

 8                 MS. GLATFELTER:  Your Honor, we haven't.  We intend

 9    to go back and discuss the matter, and we can let the Court

10    and defense counsel know, probably within the next hour, which

11    would be by 6:30.

12                 THE COURT:  Sounds like you'll know by 6:30,

13    Mr. Rittgers.

14                 MR. C. HENRY RITTGERS:  Thank you.

15                 THE COURT:  Sounds like I will know by 6:30 as well.

16                 MS. GLATFELTER:  Assuming we leave shortly, that is.

17                 MR. C. MATTHEW RITTGERS:  Your Honor, my

18    understanding of the rebuttal would be, I mean, if it's

19    reputational evidence but not specific bad acts, that would

20    have been in their case in chief, correct?

21                 THE COURT:  So I think it depends, to a certain

22    extent, on the order of presentation we've had, and whether

23    you've introduced some new subject matter to which they could

24    elicit rebuttal testimony.  If it's -- I believe, if it's

25    fairly anticipated reputation evidence, then it should have
```

 1    been put on in the case in chief, but I will do my level best

 2    to confirm the scope of that this evening.

 3            MR. C. MATTHEW RITTGERS:  Thank you, Your Honor.

 4            THE COURT:  All right.  So you're going to let us

 5    know by 6:30.  If you're not putting on a rebuttal case, we'll

 6    move immediately into jury instructions and closings in the

 7    morning, otherwise, we'll have a rebuttal case.

 8        Mr. Schuett, it appears, had a question.  No?

 9            MR. C. MATTHEW RITTGERS:  Just a reminder to me, Your

10    Honor, would you like us to rest the case now or in front of

11    the jury?

12            THE COURT:  Well, so I want you to rest it in front

13    of the jury, but I didn't want the jury wondering what we were

14    going to be doing tomorrow, since the government hasn't

15    decided whether or not they're going to put on --

16        So I anticipate we'll start tomorrow by me asking you

17    whether you intend to call any additional witnesses.  You will

18    say, I presume, but I don't want to speak for you, that you

19    intend to rest your case.

20        And then I'll ask the government whether they intend to

21    put on a rebuttal case, or whether we should move to jury

22    instructions.  And that's how I anticipate it going.

23        I just felt like if you rested your case tonight, there

24    might be some confusion about what we're doing in the morning.

25            MR. C. MATTHEW RITTGERS:  Understood.  Thank you.

1        THE COURT:  Anything else?  Seeing nothing, why don't

2  we recess for the evening.

3        (Proceedings adjourned at 5:30 p.m.)

4                -   -   -

5          C E R T I F I C A T E

6                -   -   -

7     I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
   is a correct transcript from the record of proceedings in the
8  above-entitled matter.

9

10  /s/ M. Sue Lopreato_____         September 30, 2022
    M. SUE LOPREATO, RMR, CRR
11  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2      DEFENSE WITNESSES

3      JOHN CURP

4      Cont'd cross by Ms. Glatfelter...................... Page 3
       Redirect by Mr. C. Matthew Rittgers................ Page 11
5
       LUKE BLOCHER
6
       Direct by Mr. C. Matthew Rittgers...................  Page 16
7      Cross by Ms. Glatfelter...........................  Page 27

8
       CHRIS SEELBACH
9
       Direct by Mr. C. Matthew Rittgers...................  Page 30
10     Cross by Ms. Gaffney Painter.......................  Page 50

11
       ALEXANDER P.G. SITTENFELD
12
       Direct by Mr. C. Matthew Rittgers...................  Page 72
13     Cross by Mr. Singer................................  Page 130
       Redirect by Mr. C. Matthew Rittgers................  Page 224
14

15                            EXHIBITS

16     GOVERNMENT EXHIBITS

17     Exhibit                                          Admitted

18     49                                                  9

19     DEFENSE EXHIBITS

20     Exhibit                                          Admitted

21     D84                                                37
       54                                                 85
22     716                                                90
       654                                                91
23     653                                                96
       136                                                97
24     648                                               120
       48                                                 51
25
                          -   -   -