## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1-20-cr-142 |
| Plaintiff, | Hon. Douglas R. Cole |
| v. | DEFENDANT'S MOTION FOR ACQUITTAL |
| ALEXANDER SITTENFELD, a/k/a "P.G. Sittenfeld," | ORAL ARGUMENT REQUESTED |
| Defendant. | |

Now comes Defendant, Alexander "P.G." Sittenfeld, by and through counsel, and pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, respectfully requests the Court enter a judgment of acquittal. A memorandum with law and argument in support of Mr. Sittenfeld's motion follows. Mr. Sittenfeld requests that the Court hold oral argument on the motion because it raises novel issues regarding the reach of the federal public corruption laws.

Respectfully submitted,

*/s/ Neal D. Schuett*

| | |
|---|---|
| James M. Burnham | Charles H. Rittgers |
| Harry S. Graver | Charles M. Rittgers |
| Thomas E. Hopson | Gus J. Lazares |
| Jones Day | Rittgers & Rittgers |
| 51 Louisiana Ave. N.W. | 12 East Warren Street |
| Washington, DC 20001 | Lebanon, OH 45036 |
| (202) 879-3939 | (513) 932-2115 |
| jburnham@jonesday.com | neal@rittgers.com |
| | |
| Alexander V. Maugeri | *Counsel for the Defendant* |
| Jones Day | |
| 250 Vesey St. | |
| New York, NY 10281 | |
| (202) 326-3939 | |
| amaugeri@jonesday.com | |

## MEMORANDUM

People do not give money to politicians because of their personal qualities. People give money to politicians because they support the politicians' priorities or—often and inevitably—because they want the politician to support *them* and *their* priorities. That desired support ranges from "clean energy" tycoons supporting a presidential candidate[1] who promises to deliver enormous sums to their businesses,[2] to prosperous investment managers backing a U.S. Senator who singlehandedly protects a treasured tax break,[3] to one of the wealthiest people in the world boosting candidates[4] who specifically pledge to support Israel.[5] These exchanges are endemic—indeed, they are "unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *McCormick v. United States*, 500 U.S. 257, 272 (1991). Deep constitutional values—the First Amendment, federalism, and due process—demand that this conduct be given the widest possible berth. And although the Constitution does not shield true *quid pro quo* corruption, it does create broad space for political interactions to occur without hordes of ambitious federal prosecutors superintending the process.

---

[1] Eliana Miller, *Green Energy Interests Boosted Biden, Dems*, Opensecrets.org (Dec. 18, 2020) ("In hopes of protecting these subsidies, the alternative energy industry gives primarily to Democratic candidates."), available at https://tinyurl.com/bdhmdz2j.

[2] JoeBiden.com, *Clean Energy* ("A major focus of Biden's commitment to increase federal procurement by $400 billion in his first term will be purchasing the key clean energy inputs …."), available at https://tinyurl.com/y2xscbch. This page indeed opens with a link to "Donate now to help elect Democrats up and down the ballot."

[3] The Associated Press, *Krysten Sinema's Donations from Investors Surged to Nearly $1 Million in the Year Before She Killed a Huge New Tax on Private Equity and Hedge Funds* (Aug. 13, 2022), available at https://tinyurl.com/yt4fa2a8.

[4] Elena Schneider, *Sheldon Adelson's Super PAC Spending Spree Shaped GOP Politics*, Politico (January 12, 2021) ("Even in a political world now over-stuffed with million-dollar donors, their pull was clear from the pilgrimages presidential candidates made to his Venetian resort in Las Vegas, meeting in his office just off the casino floor."), available at https://tinyurl.com/2p8bktvc.

[5] Eliana Johnson, *Sheldon Adelson: The Megadonor Who Underwrote the GOP's Pro-Israel Shift*, Politico Magazine (Dec. 27, 2021) ("He cared about few political issues save the U.S.-Israel relationship, using his money and influence to prod for the changes he wanted to see …."), available at https://tinyurl.com/a28v5xue.

1

This prosecution falls squarely within that protected sphere—affixing criminal liability to constitutionally protected campaign contributions and pushing the line of criminal corruption closer to workaday politics than it has ever been before. And it does so in the most troubling context imaginable—a multi-year federal investigation that sent undercover agents and wired informants to ply a city councilman with campaign donations while seeking his support for the sort of urban development he had always supported and had indeed made the centerpiece of his mayoral campaign. In ruling on Mr. Sittenfeld's motion to dismiss the indictment, this Court recognized the need for tremendous care in this constitutionally sensitive space. *See* ECF 53 at pp. 25–27. Having now seen the Government's evidence—distilled from dozens of hours of stage-managed recordings painstakingly dissected at trial for any implication of corrupt intent—the Court should rule that the Government's proof fails to satisfy the law's demands.[6]

## **Standard of Review**

The Court must enter a judgment of acquittal when the Government's evidence does not suffice to establish a federal crime. Fed. R. Crim. P. 29(a). The standard is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt the essential elements of a crime, as properly understood under the law. *United States v. Gibson*, 409 F.3d 325, 332 (6th Cir. 2005). Courts conducting this inquiry must first reckon with the law (how the crime is defined and what sorts of evidence legally suffice to establish it) and then apply the law to the Government's proof (whether the Government provided sufficient evidence). *See United States v. Blandford*, 33 F.3d 685, 693–99 (6th Cir. 1994) (analyzing a sufficiency question this way).

---

[6] Mr. Sittenfeld requests that the Court incorporate the facts and arguments presented in his Supplemental Motion for a New Trial, filed under seal, herein by reference.

## Argument

The Government's evidence in this campaign-contribution case was not sufficient to support the two charges on which the jury convicted. The Supreme Court has been clear that when the alleged bribes are campaign donations, any *quid pro quo* must be "explicit." *McCormick*, 500 U.S. at 273. And the recordings the Government amassed—replete with Mr. Sittenfeld insisting on legalities and politely rebuffing efforts by undercover agents to cajole him into lavish vacations —do not meet that standard. To the contrary, they tell the story of an elected official doing everything he can to entice valuable investment into his city, as well as raise the campaign funds needed to run for mayor on a pro-development platform. Promising a smooth municipal path to a developer who is contemplating a multi-million-dollar investment in Cincinnati—guaranteeing to "deliver the votes" needed to make the investment succeed, Gov't Ex. 15C at p. 30—is how municipal officials like Mr. Sittenfeld do their jobs. If lay juries are free to hand out corruption convictions whenever policy goals and political interests inevitably align—because that alignment is close-in-time or features in a single conversation—the constitutional chill will be frigid. The Court should accordingly grant a judgment of acquittal on the two remaining counts.

**A. The Government's Proof of a *Quid pro Quo* Was Legally Deficient.**

**1. The Government Was Required to Prove an Explicit *Quid Pro Quo*.**

As this Court has recognized, the corruption laws require clear and specific evidence of a *quid pro quo* when the alleged bribes are otherwise-lawful campaign contributions. There is "a very real line between legitimate solicitation and bribery," and the "courts have articulated requirements designed to ensure that those statutes do not (even inadvertently) sweep a wide swath of routine political behavior into their purview." ECF 53 at p. 25.

The most important such requirement comes from *McCormick*, which provides that any alleged *quid pro quo* involving a campaign contribution must be "explicit," 500 U.S. at 273. That

standard does not require a signed contract, *see Evans v. United States*, 504 U.S. 255, 268 (1992), but it does require that the defendant explicitly agree to take or withhold a specific official action in exchange for a contribution, *see McCormick*, 500 U.S. at 273; *Evans*, 504 U.S. at 258; *United States v. Siegelman*, 640 F.3d 1159, 1172 (11th Cir. 2011). In other words, the defendant must agree "his official conduct will be controlled by the terms of [a certain] promise or undertaking." *McCormick*, 500 U.S. at 273; *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("What is needed is an agreement, full stop …."). That standard is substantially more demanding than the one used *outside* the campaign-contribution context. *See United States v. Abbey*, 560 F.3d 513, 517–18 (6th Cir. 2009); *Blandford*, 33 F.3d at 697.

The requirement of an explicit *quid pro quo* in the campaign-contribution context is grounded foremost in the First Amendment. The Supreme Court has long held that the Government "may not target … the political access" that financial support for candidates "may afford." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014). "Ingratiation and access … are not corruption," but rather "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Id.* "[M]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *McCormick*, 500 U.S. at 272. The Constitution protects that conduct, and forbids the Government from prosecuting candidates who eat with, meet with, or make policy commitments to their campaign contributors—even if those acts come "shortly before or after campaign contributions are solicited and received from those beneficiaries." *Id.* In the campaign-contribution context, the Government may only target payments made to "control the exercise of an officeholder's official duties." *Id.* at 1450. This established constitutional guardrail stops the

4

corruption laws from reaching anything other than "explicit" payoffs, just as *McCormick* held.

The "explicitness" requirement for campaign-contribution cases is rooted in the Due Process Clause, too. Due process requires that criminal statutes supply "sufficient definiteness" for "ordinary people" to "understand what conduct is prohibited." *Skilling*, 561 U.S. at 402. It thus mandates that ambiguous criminal statutes "be construed in favor of the accused," *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994)—a vital principle that both ensures citizens have "fair warning," *United States v. Lanier*, 520 U.S. 259, 266 (1997), and reduces the risk of prosecutors enforcing the law in an "arbitrary and discriminatory" way, *Skilling*, 561 U.S. at 412. Neither of the statutes at issue even *mention* campaign contributions, and the extent of those statutes' application to political fundraising (as opposed to cash bribes) is accordingly ambiguous. *See* 18 U.S.C. §§ 666(a)(1)(B), 1951(a), (b)(2). Lenity requires reading those statutes to intrude on the political process only to the extent that "clear and definite" statutory text command it. *McNally v. United States*, 483 U.S. 350, 360 (1987); *Hamilton*, 2022 WL 3593974, at *6 n.2.

Federalism points the same way. Last summer, the Supreme Court reiterated that Congress must "speak clearly" to "intrude[] into an area that is the particular domain of state law." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). That longstanding rule applies to the regulation of state and local elections, as "[a] State defines itself as a sovereign through the structure of its government, and the character of those who exercise government authority." *McDonnell v. United States*, 579 U.S. 550, 576 (2016). The Court has thus declined to construe the federal corruption laws in a manner that would leave their "outer boundaries ambiguous and involve[] the Federal Government in setting standards" of "good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 (1987). That caution applies here. Local officials typically lack the protective bubble of professional fundraisers and other intermediaries

5

that surround their federal counterparts, making them especially vulnerable to targeting by federal prosecutors who do not understand local politics or the conventions of running for local office.

Finally, the "major questions" doctrine reinforces the importance of a strict explicitness requirement. The Constitution vests "[a]ll" legislative power in Congress, U.S. Const. Art. I, § 1, and the executive branch must accordingly possess "clear congressional authorization" before it can resolve significant policy questions. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). This principle applies fully—indeed, with particular force—to the "inherently legislative task" of determining which activities "should be punished as crimes." *United States v. Kozminski*, 487 U.S. 931, 949 (1988). As the Supreme Court long ago recognized in *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (criminal case), Congress cannot "endow" a "prosecutor with the power to write his own criminal code," *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting)—and courts should not lightly assume that it has tried to do so. Here, extending the corruption laws to campaign contributions in municipal races outside the context of clear-and-explicit *quid pro quos* would effect a "transformative expansion" of federal regulatory power, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)—raising constitutional concerns, invading the traditional domain of state and local regulation, and massively expanding the Justice Department's top-to-bottom control of the political process. There is "every reason to hesitate before concluding that Congress" gave the thousands of federal prosecutors across the country such vast, intrusive authority. *West Virginia*, 142 S. Ct. at 2610. It is thus not enough for the government to claim "a colorable textual basis" for Mr. Sittenfeld's prosecution under the statutes at issue. *Id.* at 2609. Had Congress wanted to encompass the workaday politics at issue here, it would have needed "to speak clearly." *Id.* (citation omitted). It did not.

## 2. The Explicitness Requirement Is A Demanding One.

The same principles that compel the explicitness requirement in the first instance also

confirm that it demands the clearest possible proof. As this Court has explained, an agreement is "explicit" only if it is "[c]lear in understanding" and lacking any "disguised meaning or reservation." ECF 53 at p. 26 (quoting *Blandford*, 33 F.3d at 696 n.13). In short, the agreement must be *unambiguous*. The requirement of an unambiguous agreement does not exempt clear misdirection, such as coded language, the misappropriation of funds, or visible "winks and nods," *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part). But the whole point of *McCormick*— the very reason the Court adopted a heightened standard—is that ordinary political conduct is *not* enough to prove public corruption. Only an *explicit* agreement—one for which the evidence is "*not*" "ambiguous" and susceptible to an innocuous explanation—adequately accounts for the constitutional interests at stake. *Blandford*, 33 F.3d at 696 n.13 (quoting Black's Law Dictionary 579 (6th ed. 1990)). Thus, when the evidence permits a plausible explanation of the defendant's conduct that sounds in politics instead of corruption, *McCormick* is not satisfied.

Courts have accordingly recognized that certain evidence cannot establish a *quid pro quo* in the campaign context as a matter of law. That is because such evidence is *necessarily* susceptible to a plausible, legitimate explanation given the realities of American politics. For example, the Government may not prove an explicit agreement solely through the temporal proximity of a political contribution and an official act. That rule comes from *McCormick*, which held that legislators do not commit extortion "when they act for the benefit of constituents . . . shortly before or after campaign contributions are solicited and received from those" constituents. 500 U.S. at 272. And that makes good sense: Acting "for the benefit of constituents" is precisely (and principally) what fuels legitimate campaign donations. Juries are thus forbidden from inferring a *quid pro quo* involving campaign contributions based on timing alone. *See Terry*, 707 F.3d at 615; *Siegelman*, 640 F.3d at 1171; ECF 53 at p. 34. And as a corollary, the courts must set

7

aside any conviction that is supported solely by timing-based evidence. *See* Fed. R. Crim. P. 29(a). In that respect, *McCormick* gives federal judges a vital gatekeeping role in "policing" permissible inferences of an explicit agreement. ECF 53 at p. 25.

For much the same reasons, an elected official does not violate the corruption laws by touting his policy priorities and political prowess while raising money. That sort of core political speech is (again) an ordinary and necessary element of electoral politics, *see McCormick*, 500 U.S. at 272, which the First Amendment protects, *see Buckley v. Valeo*, 424 U.S. 1, 54 (1976) ("freedom of a candidate to speak without legislative limit on behalf of his own candidacy"). Candidates *always* tout their policy priorities and political prowess when raising money; that is *how* candidates convince people to support their campaigns. Putting those actions at the mercy of aggressive prosecutors and skeptical juries would "criminalize conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures." ECF 53 at pp. 24–25 (quoting *McCormick*, 500 U.S. at 272). Neither of the corruption provisions here speaks with sufficient clarity to require that extraordinary result.

For all these reasons, proving an "explicit" agreement regarding campaign contributions requires *unambiguous* evidence of a corrupt agreement—evidence that *cannot* be explained as day-to-day electoral politics. This sort of unambiguous evidence pervades past corruption cases involving campaign contributions. For example, the Government introduced evidence that the defendant-judge in *Terry* agreed to (and then did) follow a donor's directions regarding specific pending cases, *see* 707 F.3d at 610; that the defendant-legislator in *Blandford* accepted cash payments from a lobbyist to which he could not "make any legitimate claim of entitlement," *see* 33 F.3d at 698–99, that the defendant-governor in *Siegelman* expressly acknowledged his agreement to sell a seat on a board and arranged for the (massive) donations to come through

8

intermediaries, *see* 640 F.3d at 1166–67; and that the defendant-commissioner in *Evans* received $7,000 in cash from a purported donor and failed to report that amount on either his campaign-finance disclosures or his income tax return, *see* 504 U.S. at 257. The evidence in each case had no plausible explanation sounding in politics. Each thus involved an "explicit" agreement.

### 3. The Government's Proof Falls Short of the Legal Line.

This case, in contrast, contains no unambiguous evidence of a corrupt bargain. As discussed below, the Government's case rests on inferences drawn from ordinary political conduct: meeting with potential donors, discussing pending policy issues, and requesting political contributions. Upholding Mr. Sittenfeld's convictions based on such evidence would contravene *McCormick*, the First Amendment, the Due Process Clause, basic federalism principles, and the major questions doctrine.[7]

Having observed the trial, the Court is familiar with the Government's case and its shortcomings. Same for the jury, which acquitted on most charges and issued an inconsistent verdict to the extent it convicted at all. For count three (federal program bribery) and count four (Hobbs Act bribery) of the indictment, the Court's instructions required the jury to find that an explicit *quid pro quo* agreement existed from around September 21, 2018 to around December 17, 2018. *See* ECF 202 at pp. 32–43. Count one (honest services fraud) required the jury to make a near identical finding—that Mr. Sittenfeld entered an explicit *quid pro quo* agreement that used wire communications between September 21, 2018 and February 4, 2020. *See id.* at pp. 22–31. There were no material differences between these three charges. Yet the jury acquitted on count one, while convicting on the other counts keyed to the same conduct. *See* ECF 207 (Jury Verdict).

---

[7] As to 18 U.S.C. § 666 specifically, Mr. Sittenfeld incorporates by reference pages 18–19 of his Amended Motion to Dismiss, ECF 25, which explain why § 666 requires a *quid pro quo* in cases based on campaign contributions. *See also Siegelman*, 640 F.3d at 1169–72; *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993); *United States v. Hamilton*, 46 F.4th 389, 399 (5th Cir. 2022).

9

The jury's obvious confusion both confirms that a new trial is necessary at the least, *see* Def.'s Mot. for a New Trial at 5–9, and highlights the failure of the Government's proof. Counts one, three, and four each turned on the *same* supposed bribe—the first $20,000 that Rob provided to Mr. Sittenfeld's PAC. *See* ECF 3 (Indictment) at ¶¶ 39, 42, 44. None of these charges are based on contributions by Mr. Ndukwe or anyone else. Mr. Sittenfeld's interactions with others—Mr. Ndukwe, in particular—are accordingly relevant only to the extent that they shed light on whether Mr. Sittenfeld *separately* reached an explicit agreement with Rob. Nothing in over two years of surreptitious surveillance comes close to establishing an explicit agreement with Rob and the jury never found one existed.

a.      To start, the Government presented no evidence of any relevant scheme, action, bargain, or benefit *separate* from the receipt of campaign contributions. Unlike virtually every precedent the Government has invoked, *e.g.*, *Evans*, 504 U.S. at 257; *Terry*, 707 F.3d 610; *Blandford*, 33 F.3d at 698–99, Mr. Sittenfeld was prosecuted *solely* for accepting political donations from individuals whom he believed had a legitimate interest in redeveloping a long-blighted property as part of revitalizing downtown Cincinnati. There is no evidence—none—of non-campaign schemes that corroborate the inference of a corrupt bargain.

b.      The Government thus had to prove an explicit agreement with Rob based *solely* on Mr. Sittenfeld's fundraising conduct—a burden it failed to carry. Most plainly, Mr. Sittenfeld consistently made clear that he would not take a bribe. Begin with Mr. Ndukwe. Not every donor is as sophisticated as the CEO who donates to a presidential candidate, knowing his investment will be rewarded in due course. Some donors accost officials with clumsy attempts at confirming that their contributions will be met with reciprocal support. The law does not require that every official who encounters such a donor race to the FBI field office to report attempted bribery. To

10

the contrary, it requires that these officials refuse to enter a corrupt agreement—*precisely* what Mr. Sittenfeld did when Mr. Ndukwe arguably proposed a *quid pro quo* to him at the Government's behest. *See* Gov't Ex. 14B (Nov. 2, 2018 transcript) at p. 3. In doing so, Mr. Sittenfeld made clear, first, that he would not accept a bribe, *see id.* at p. 4 ("nothing can be a quid, quid pro quo"); and second, that he did not understand Mr. Ndukwe to be offering one, *see id.* ("I know that's not what you're saying either")—a point to which Mr. Ndukwe assented, *see id.* ("Okay, no, I hear ya"). Mr. Sittenfeld thus navigated Mr. Ndukwe away from an attempt at bribery. And he did this in a phone call with someone he had known for almost a decade that he did not know was being taped—a context in which Mr. Sittenfeld was clearly being maximally candid.

Nor did Mr. Sittenfeld enter an explicit corrupt bargain in his conversations with Rob, the only person from whom Mr. Sittenfeld was alleged to have accepted a bribe. *See* ECF 3 at ¶¶ 42, 44. For example, Mr. Sittenfeld's conversation with Rob at their November 7, 2018 lunch focused largely on Rob's concerns about Mayor Cranley's bias against Mr. Ndukwe. *See* Gov't Ex. 15C (Nov. 7, 2018 transcript) at pp. 6–10, 15–16, 22–24. The conversation addressed Rob's worry that the Mayor's vindictive behavior towards Mr. Ndukwe would undermine Rob's potential investment in the 435 Elm project. Mr. Sittenfeld did not respond to these concerns with demands for cash or suggestive winks. He instead embarked on an extended effort to persuade Rob that any issues with Mayor Cranley should not stop him from investing in Cincinnati. *See, e.g.*, *id.* at p. 24 (Mayor Cranley is "not going to stand in the way of a good deal"). Mr. Sittenfeld also devoted a substantial portion of that conversation to probing the merits of the development project and asking what support the developers "would want from the City." *Id.* at pp. 6–9. Upon understanding those issues, Mr. Sittenfeld announced his support for the project. *See id.* at p. 9 ("If that, if it was all of that it's got my support … and you know I can certainly shepherd the votes too."). He

reiterated his support for the project as soon as Mr. Ndukwe next mentioned it. *See id.* at 15 ("The deal that you guys talked about, easy to support."). It was only *after* those expressions of support that the conversation turned to campaign contributions. *See id.* at p. 20. And because Mr. Sittenfeld committed to the project before even *discussing* contributions, the jury could not lawfully conclude those contributions "controlled" his commitment. *McCormick*, 500 U.S. at 273.

The recorded conversation in Rob's apartment later that day is likewise bereft of any explicit agreement. Rob began his conversation with Mr. Sittenfeld by reiterating his concern about Mayor Cranley's hostility to Mr. Ndukwe. *See id.* at p. 29. Rob then interjected an arguable offer of a *quid pro quo*: "[Mr. Ndukwe] told me like hey you know I want to try to get uh P.G. 20,000 ... and I'm like ... if we can get this get this deal done, like fuckin let's do it." *Id.* But it is clear from context that Mr. Sittenfeld did not understand the "deal" Rob referenced to be a *bribery scheme*; Mr. Sittenfeld plainly thought Rob was referencing *the real estate deal* they had been discussing all day. In the next exchange, Rob tries to bait Mr. Sittenfeld again—asking "what's the best way for us to get that to you, to get that deal?" *Id.* To which Mr. Sittenfeld— clearly not getting the message—responded: "Yeah yeah yeah. I'm just, do you guys know that he's gonna try and veto it?" *Id.* Mayor Cranley was not going to "veto" a bribery agreement and it is accordingly apparent that Mr. Sittenfeld had in mind only the proposed real estate "deal." It is only in *that* context—the context of Mr. Sittenfeld pursuing a development that would help transform downtown Cincinnati—that Mr. Sittenfeld said, "I can deliver the votes." *Id.* at p. 30.

The Government argued at trial that the temporal proximity of the November 7 discussions established an explicit *quid pro quo*. The terms of this inferential "agreement" were apparently that Rob would donate $10,000 to Mr. Sittenfeld's PAC in exchange for various official actions to support his nascent real estate deal. But temporal proximity is not sufficient as a matter of law to

allow an inference of an explicit agreement.  *See* Section A.2, *supra*.  And there is nothing on the video or the recordings that suggests knowing winks, conspiratorial nudges, coded language, or any other objective conduct that establishes an unambiguous corrupt agreement.  *See* Gov't's Ex. 15B.  Rather, throughout his conversations on November 7, 2018, Mr. Sittenfeld is simply talking through the political prospects of a real estate deal that he had already committed to support on the merits, *see id.* at 6–9—*before* any discussion of contributions.

Nor did Mr. Sittenfeld enter an explicit agreement in the days and months after November 7, 2018.  The Government's case on counts three and four hinged on the November 7 lunch and meeting with Rob.  And because those interactions—as understood in the context of Mr. Sittenfeld's earlier and subsequent actions—failed to supply unambiguous evidence of a corrupt agreement, the record lacks a legally sufficient basis for Mr. Sittenfeld's convictions.

**c.**     Besides the Government not carrying its burden, the record is replete with evidence of Mr. Sittenfeld behaving in ways that are irreconcilable with any supposed bribery scheme.

Most plainly, Mr. Sittenfeld was punctilious about complying with campaign finance law.  In the face of the undercover agents repeatedly pressing him to accept improper contributions—efforts that spanned practically every medium of value before landing on the lawful one—Mr. Sittenfeld consistently refused.  He rejected cash, *see* Gov't's Ex. 15C at pp. 32–34; he rebuffed cashier's checks, *see* Gov't's Ex. 18D (Nov. 21, 2018 transcript) at pp. 2–3; he said no to money orders, *see id.*; and he declined noncompliant corporate checks, *see* Gov't's Ex. 21D (Dec. 3, 2018 transcript) at p. 2.  He insisted that Rob raise individual donations only from "real human beings."  Gov't's Ex. 15C at p. 35.  He said that he "want[s] to be thorough" in his compliance with campaign-finance law, "make sure [he's] doing it right," and "protect" Rob and Mr. Ndukwe "too."  Gov't's Ex. 18D at pp. 2–3; *see also, e.g.*, Gov't's Ex. 15C at p. 35 ("I always like to proceed out

of an abundance of caution.").  He noted that he always consults "multiple balanced experts who could make sure we were doing everything correctly."  ECF 238 (Sittenfeld Direct), at p. 8; Gov't's Ex. 15C at p. 32–33.  And he proactively contacted Rob to ensure his campaign contributions were lawful.  *See* Gov't Ex. 21D.  Rapacious bribe-takers are not sticklers for the niceties of election law.  And it is not plausible that Mr. Sittenfeld sold his office for a $20,000 donation only to spend weeks rejecting myriad efforts to deliver the "bribe" in non-compliant forms.

Moreover, at no point in this tortured process did Mr. Sittenfeld make any reference to any prior agreement or suggest that further blundering with non-compliant donations could scuttle some secret deal.  After rejecting Rob's efforts to make non-compliant donations, *see, e.g.*, Gov't's Ex. 19B (Nov. 26, 2018 transcript) at pp. 1–2 (money orders), Mr. Sittenfeld did not rush over to Rob's apartment to demand that he uphold his end of the bargain.  Far from it.  Mr. Sittenfeld instead did the hard work of raising money the legal way from someone whom he thought was an unsophisticated donor that could boost both his campaign and the fortunes of his city.  Even viewing this evidence in the light most favorable to the Government, these exchanges cannot establish an unambiguous corrupt bargain.

**d.**     There also was no evidence that Mr. Sittenfeld understood himself to have embarked on a corrupt relationship with Rob.  In addition to ensuring that any donations came in a legal form, Mr. Sittenfeld handled Rob as he would any other donor—with careful cultivation and personal attention but no promise to reward monetary political support with specific official support.  Far from badger Rob for cash, Mr. Sittenfeld tried to recruit him to Cincinnati.  He invited Rob to dinner with the then-US Attorney for the Southern District of Ohio, he proactively offered to introduce Rob to other civic leaders, he tried to sell Rob on the city as a place to invest money and put down roots, and he even offered to help find Rob a local girlfriend.  *See, e.g.*, ECF 238 at

14

pp. 22–24; Gov't's Ex. 15C at pp. 17–18. Mr. Sittenfeld's promotion of development generally and Rob's investment in Cincinnati specifically was all part of his political brand—a councilman who wanted to grow his city. That is (no surprise) an exceedingly common political strategy for young-and-ambitious municipal officials.[8]

While it is not a defense that an official would have taken the same action absent the bribe, the fact that the "bribe" was to obtain something the official reflexively did absent bribes—and broadly extolled as the main reason to support his campaign—certainly *undermines* any inference of a corrupt argument, just as proof of "unusual official actions" can *support* such an inference. *Terry*, 707 F.3d at 615. That is particularly true where, as here, the Government launched a sting operation against a pro-development official that sought to bribe him to continue promoting development. Over "seven years," Mr. Sittenfeld had "voted in favor of every single development deal that [had] ever been put in front" of him. Gov't's Ex. 14B at p. 4. Nobody needed to bribe Mr. Sittenfeld to "deliver the votes" for investment in Cincinnati—and everybody knew it. *See id.* ("I'm always super pro-development."). In these circumstances, only concrete, unambiguous evidence could show that Mr. Sittenfeld was "controlled" by bribes. *McCormick*, 500 U.S. at 273. And despite orchestrating this entire scheme, employing multiple undercover agents, and taping dozens of hours of conversations, the Government amassed nothing of the sort.

**e.** Nor did Mr. Sittenfeld's effort to raise money for his PAC rather than his campaign suggest something nefarious. The Government emphasized Mr. Sittenfeld's statements that his

---

[8] *See, e.g.*, Ralph Ortega, *Mayor Cory Booker to Focus on Newark Economic Development*, Empowerment, NJ.com (Feb. 9, 2009) ("Newark Mayor Cory Booker's third state-of-the-city address tonight envisions a 24-hour downtown with 700 additional housing units in two high-rises and an added Seton Hall Law School dorm, the city's first recreational boat dock in half a century, and the state's first community court for low-level offenders."), *available at* https://tinyurl.com/2874z7ca; Sue Halpern, *Mayor of Rust*, New York Times (Feb. 11, 2011) ("The million and a half dollars Levi's offered in exchange went to John [Fetterman's] Nonprofit, for John's Church and community center, rather than the town's coffers."), *available at* tinyurl.com/2presmpj.

Progress and Growth PAC was not publicly known to be tied to him.  But like so much in the Government's case, these statements were prompted *by Government agents* and are most naturally explained as serving a legitimate political goal—*allaying the fake developers' concerns about investing in Cincinnati*.  Regarding the leadership PAC, it was *Rob*, not Mr. Sittenfeld, who asked for a way to donate money in a low-profile way.  *See* Gov't's Ex. 15C at p. 29 (Mr. Ndukwe "doesn't want his name on anything" and "we typically don't either").  And it was *Rob*, not Mr. Sittenfeld, who expressed concern that publicly affiliating with Mr. Ndukwe would spark political retribution.  *See id.* ("I just don't want [Mr. Ndukwe] to be the face of it.").  Finally, Mr. Sittenfeld first mentioned the PAC in a conversation that was about the contribution limits associated with different political entities—*not* secrecy.  *See id.* at p. 31 (contribution limit for his PAC is higher than that for his campaign).  It was thus illogical to argue at trial—and would be illogical to infer now—that Mr. Sittenfeld mentioned his leadership PAC because *he* had an interest in secrecy.

Far from pursuing secrecy, Mr. Sittenfeld emphasized in his November 7 conversation with Rob that contributing directly to his mayoral campaign was "the most valuable thing."  Gov't's Ex. 15C at p. 31.  But even if he had not, raising funds for a PAC is just as legitimate as raising funds for a political campaign.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (First Amendment protects anonymous political advocacy); *FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 494 (1985) (rejecting view that "PACs' form of organization or method of solicitation diminishes their entitlement to First Amendment protection").  The usage of Mr. Sittenfeld's PAC thus provided no evidentiary basis to infer a corrupt bargain.

      **f.**      Other than recordings, the only direct evidence of Mr. Sittenfeld's understanding was his own testimony.  In that testimony, Mr. Sittenfeld denied having a corrupt intent to be influenced by Rob's donations or entering into any explicit *quid pro quo* agreement regarding PAC

16

contributions.  *See* ECF 238 at pp. 31, 39–42, 102.  And it is clear that the jury found Mr. Sittenfeld's testimony broadly credible because it acquitted him on four of the six counts.

  **g.**  Against all this, the Government emphasized Mr. Sittenfeld's opaque statement to Mr. Ndukwe—in the context of a broader conversation about Mr. Ndukwe's problems with Mayor Cranley—that "you don't want me to be like love you but can't."  Gov't's Ex. 13B (Oct. 30, 2018 transcript) at pp. 2–3.  But the statement has a straightforward, innocuous explanation.  Far from threatening to withhold support for the 435 Elm project if Mr. Ndukwe did not support him, Mr. Sittenfeld conveyed that he *could best support that project if he became mayor*.  In other words, his statement was a *political prediction* about what an underfunded mayoral campaign would mean for Mr. Ndukwe's project—*not* a threat of retribution for lack of campaign support.

  The context of Mr. Sittenfeld's statement makes this clear.  The relevant conversation began with Mr. Ndukwe lamenting his poor treatment at the hands of Mayor Cranley, whom Mr. Ndukwe complained "is just trying to fuck me left and [right]."  *Id.* at p. 2.  As Mr. Sittenfeld testified, he explained that the best way for Mr. Ndukwe to improve his situation was to help ensure the election of a new mayor (Mr. Sittenfeld) who (unlike Mayor Cranley) would not oppose Mr. Ndukwe at every turn.  *See* ECF 238 at pp. 40–41.  That is why Mr. Sittenfeld proceeded to extol Mr. Ndukwe's persuasiveness in convincing others to support his campaign, *see* Gov't's Ex. 13B at 3 ("you're a persuasive guy Chin")—persuasiveness that would be *irrelevant* if Mr. Sittenfeld had just agreed to sell his office to Mr. Ndukwe's friends.  Moreover, although the Government suggested that Mr. Sittenfeld could support the 435 Elm project without becoming the mayor, *see* ECF 238 at p. 67, that was false.  Mr. Sittenfeld had reached his "term limit[]" as a councilman and could only continue to provide support from City Hall if he were elected to higher office.  *Id.* at 40, 67.  Nor would it make sense for Mr. Sittenfeld to attempt to extort Mr. Ndukwe on October

30, 2018, only to reject a *quid pro quo* from him four days later. *See* Gov't's Ex. 14B at p. 4.

But regardless, the Government never alleged a bribery agreement *with Mr. Ndukwe*, *see* ECF 3 at ¶¶ 42, 44—so the above statement is only relevant insofar as it suggests that Mr. Sittenfeld later entered a corrupt bargain *with Rob*. Yet Mr. Sittenfeld never made any statements to Rob that remotely resembled this one. Nor did any witness testify that Mr. Ndukwe conveyed this statement to Rob or did anything to link this statement to Mr. Sittenfeld's later discussions with Rob about potential political support. Indeed, nowhere in the dozens of hours of recordings does *anyone* directly or indirectly reference this statement. In the exacting context of campaign contributions, the Government cannot prove that a bribe occurred through inferences that leap over multiple people and multiple days. For all those reasons, Mr. Sittenfeld's statement does not establish an "explicit" agreement within the meaning of *McCormick*, 500 U.S. at 273.

\*     \*     \*

Whatever the Court thinks more likely, it is doubtless that the uncontested evidence permits an account of Mr. Sittenfeld's behavior that is above board—that of a young, ambitious politician laying the groundwork for a pro-development mayoral run. Given that plausible alternative interpretation of the uncontested evidence, there was no explicit agreement as a matter of law. The Court should thus enter a judgment of acquittal.

### B. The Government's Proof of an Agreed-Upon "Official Act" Was Legally Deficient.

Exacerbating its failure to show an explicit agreement, the Government likewise failed to prove that this non-existent agreement involved a specific official act. An "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." *McDonnell*, 579 U.S. at 574. The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power and "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* Even though an official's specific "*act* of

18

influence need not be identified at the time of [his] promise, the particular *question* or *matter* to be influenced must be." *United States v. Silver*, 948 F.3d 538, 553 (2d Cir. 2020). "[A] mere promise to perform some or any official action to 'benefit the payor'" does not create an unlawful *quid pro quo*. *Id.* at 558.

Here, at all times relevant to counts three and four, no question, matter, cause, suit, proceeding or controversy existed regarding the 435 Elm project. The project was in its infantile stages and there was no concrete "question, matter, cause, suit, proceeding or controversy" pending before city council. Without evidence of a concrete "question, matter, cause, suit, proceeding or controversy," a rational trier of fact could not have found beyond a reasonable doubt that the Government proved Mr. Sittenfeld promised to perform an official act. Similarly, although Rob expressed concerns to Mr. Sittenfeld about Mayor Cranley's behavior towards Mr. Ndukwe, those concerns teed up no "official action." Rather than pledge to impeach the mayor or engage in other official conduct, Mr. Sittenfeld explained that he did not think Mayor Cranley would stand in the way of a development deal that was beneficial to the City. He never discussed an actual occasion in which he would use his official powers. For that reason, too, acquittal is warranted.

**C. If 18 U.S.C. § 666 and 18 U.S.C. § 1951 Apply Here, Then Both Are Unconstitutional.**

To the extent the Court concludes that one or both statutes are best read as reaching Mr. Sittenfeld's acceptance of campaign donations, those statutes are unconstitutional on two bases.

First, as explained above, donors have a constitutional right to give money to their preferred candidates and petition their elected officials, *McCutcheon v. FEC*, 572 U.S. at 191 (2014), while candidates have a constitutional right to solicit those funds and trumpet their policy views, *Buckley v. Valeo*, 424 U.S. at 54. The First Amendment demands sufficient "breathing space" from the criminal law for those activities. *NAACP v. Button*, 371 U.S. 415, 433 (1963). It also demands that the rules regarding those activities be clear to "avoid any chilling" of protected speech.

*Citizens United v. FEC*, 558 U.S. 310, 334 (2010).  Candidates cannot campaign for office and donors cannot participate in politics if everyone must be on perpetual lookout for undercover agents wielding campaign checks.  The Constitution thus forbids the prosecution of Mr. Sittenfeld for taking lawful campaign contributions while repeating his usual refrain that he is pro-development—both in general and on the merits of 435 Elm.  To the extent either 18 U.S.C. § 666 or 18 U.S.C. § 1951 do not make that clear, the First Amendment does.

Second, both statutes are unconstitutionally vague as applied to Mr. Sittenfeld's conduct. Congress may not cast a "net large enough to catch all possible offenders," while leaving "it to the courts to step inside and say who could be rightfully detained."  *United States v. Reese*, 92 U.S. 214, 221 (1876).  It is thus imperative for corruption laws to provide sufficient notice about what conduct they prohibit.  *See, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  But when it comes to the clarity of agreement required to convert lawful fundraising to criminal corruption— or how fundraising fits into the amorphous rules of bribery—neither § 666 nor the Hobbs Act provide an iota of practical guidance.  It would have been impossible for Mr. Sittenfeld to anticipate that his conduct in this case would be deemed criminal by the federal government.  That is constitutionally unacceptable—*particularly* in public corruption cases, whose high-profile nature, political backdrop, and reputational benefits for prosecutors provide substantial incentive toward "arbitrary and discriminatory" prosecutions, *Skilling*, 561 U.S. at 412.  The Court should accordingly deem both provisions unconstitutionally vague as-applied to Mr. Sittenfeld—to the extent they apply at all—and leave it to Congress to craft a clear and workable rule that can properly "police" the "line between legitimate solicitation and bribery."  ECF 53 at p. 25.

## Conclusion

This Court should grant this motion for judgment of acquittal and vacate the convictions.

Respectfully submitted,

*/s/ Neal D. Schuett*

| | |
|---|---|
| James M. Burnham | Charles H. Rittgers |
| Harry S. Graver | Charles M. Rittgers |
| Thomas E. Hopson | Gus J. Lazares |
| Jones Day | Rittgers & Rittgers |
| 51 Louisiana Ave. N.W. | 12 East Warren Street |
| Washington, DC 20001 | Lebanon, OH 45036 |
| (202) 879-3939 | (513) 932-2115 |
| jburnham@jonesday.com | neal@rittgers.com |

Alexander V. Maugeri
Jones Day
250 Vesey St.
New York, NY 10281
(212) 326-3939
amaugeri@jonesday.com

*Counsel for the Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Court's CM/ECF System provided to on this 30th day of September, 2022, which provides electronic notice to all parties.

*/s/ Neal D. Schuett*
Neal D. Schuett
*Counsel for the Defendant*