**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-142** |
| | : | |
| **v.** | : | **JUDGE COLE** |
| | : | |
| **ALEXANDER SITTENFELD,** | : | **GOVERNMENT SENTENCING** |
| a/k/a "P.G. Sittenfeld," | : | **MEMORANDUM** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |

On October 10, 2023, Defendant Alexander Sittenfeld will stand before the Court for sentencing having been convicted by a jury of his peers for bribery. As a Cincinnati City Councilmember, Sittenfeld targeted, solicited contributions from, and then extorted a developer who Sittenfeld knew needed a deal with the city for a development project. Sittenfeld ultimately accepted $20,000 in bribe payments to his PAC from undercover FBI agents ("UCEs") posing as corrupt businessmen working with the developer.

This was not a single event, one-off deal, or momentary lapse in judgment. Sittenfeld's actions were part of a broader strategy to use his position of power within local government and his prospects for higher office to extract financial contributions out of individuals who regularly conducted city business. In doing so, Sittenfeld made clear that his support for their city business was tied directly to their contributions to him. This is not faithful public service or even "politics as usual"—this is corruption.

Based on this conduct, and for the reasons as set forth below, the United States requests that the Court impose a Guideline sentence.

## I.      THE COURT'S TASK AT SENTENCING

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory, and judges must impose sentences in accordance with 18 U.S.C. § 3553(a), which describes the factors to be considered.  A district court must use the Guidelines to calculate a defendant's sentencing range and consider the range when devising a sentence.  *Gall v. United States*, 552 U.S. 38, 49–50 (2007).  After calculating the advisory Guidelines range, the Court must consider that range along with all the factors listed in § 3553(a) before arriving at the sentence.

## II.     THE SENTENCING GUIDELINE RANGE

The Probation Office calculated the defendant's Guidelines as follows:

- Pursuant to U.S.S.G. § 2C1.1(a)(1), the base offense level is 14 because the defendant was a public official at the time of the offense.

- Pursuant to U.S.S.G. § 2C1.1(b)(2), 4 levels are added because the payment exceeded $15,000 but was not more than $40,000.

- Pursuant to U.S.S.G. § 2C1.1(b)(3), 4 levels are added because the defendant was an elected public official at the time of the offense.

(Doc. 289, Presentence Investigation Report ("PSR") ¶¶ 53–59.)  The government agrees that these adjustments are applicable.  Based on this calculation, the total offense level is 22.  (*Id*. ¶ 62.) Sittenfeld is in Criminal History Category I, leaving a Guideline range of 41 to 51 months imprisonment.  (*Id*. ¶ 108.)

The government recognizes that proposed U.S.S.G. amendment § 4C1.1 would be applicable if the amendment was effective at this time and will be applied retroactively as of February 1, 2024.  This amendment would provide a 2-level reduction to Sittenfeld's offense level

calculation. The government does not object to the Court applying the 2-level reduction when calculating the Guidelines range at sentencing. Applying the 2-level reduction would result in a total offense level 20 and a Guideline range of 33 to 41 months.

### III. OBJECTIONS TO THE PSR

Sittenfeld set forth several objections to the PSR. The Court should deny the objections as set forth below.

**Acquitted Conduct.** Sittenfeld objects to the PSR's inclusion of facts relating to acquitted conduct, arguing that "any reference" to acquitted conduct is "inflammatory" and casts "undue judgment" on Sittenfeld. (Doc. 289, PageID 7225.)

This argument is baseless. Under Federal Rule of Criminal Procedure 32(d), "[t]he presentence report must:"

- "identify any factor relevant to: (i) the appropriate kind of sentence, or (ii) the appropriate sentence within the applicable sentencing range . . . ";

- contain facts relevant to "the defendant's history and characteristics, including: . . . any circumstances affecting the defendant's behavior that may be helpful in imposing sentence . . .";

- contain "information relevant to the factors under 18 U.S.C. § 3553(a)."

Fed. R. Crim. P. 32(d)(1)–(2).

The facts in the PSR relating to acquitted conduct are relevant to each of these factors. The jury convicted the defendant of receiving bribe payments. The facts relating to acquitted conduct are relevant to Sittenfeld's relationship with the bribe payors and are contained on recordings that have already been presented to the Court. Sittenfeld's continued interactions with the UCEs after knowingly receiving bribe payments—*i.e.*, his decision to deepen his personal relationship with corrupt businessmen and continue to receive payments from them—are directly relevant to the Court's task at sentencing regardless of whether the jury determined these actions also amounted

to an explicit quid pro quo.  *See United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc) (holding that "[s]o long as the defendant receives a sentence at or below the statutory ceiling . . .  the district court does not abridge the defendant's right[s] . . . by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range"); *United States v. Williams*, 214 F. App'x 552, 555 (6th Cir. 2007) (noting that it is "well-settled that relevant unconvicted conduct, even acquitted conduct, may be considered in determining a defendant's sentence"); *see also* Proposed Amendments to the Sentencing Guidelines, Proposed Amendment: Acquitted Conduct, at 223–24 (Feb. 2, 2023) ("[a]cquitted conduct may be considered in determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted.").

**"Other Act" Conduct.**  Sittenfeld similarly objects to the inclusion of PSR paragraphs 103(a)–(d) on the grounds that they "are not relevant to the guideline range," "evince[] an unfair bias against Mr. Sittenfeld," and are "irrelevant and inflammatory."  (Doc. 289, PageID 7226.)

This argument also fails.  Sittenfeld's behavior as an elected official—specifically, soliciting donations by tying contributions to action; or by making donors feel like they must contribute or their business in the city would suffer—is relevant to the defendant's history and characteristics and the § 3553(a) factors.  *See Williams*, 214 F. App'x at 555; *United States v. Brown*, 557 F.3d 297, 299–300 (6th Cir. 2009) ("[t]he purpose of a presentence report is to inform the judge of the facts relevant to sentencing.").

Further, these facts have already been presented through the Rule 404(b) briefing before the Court.  (*See* Doc. 143, Exhibit A to Gov. Rule 404(b) Response.)  The facts in paragraph 103(a)–(d) are a sample of interactions Sittenfeld had with donors and potential donors that bear directly on the way Sittenfeld solicited contributions.  As set forth below, these interactions show

4

the evidence presented at trial was part of a pattern—Sittenfeld's modus operandi—when soliciting contributions. Although the Court excluded some of the government's proposed Rule 404(b) evidence from trial "on cumulativeness and Rule 403 grounds," (Doc. 190, PageID 2929–30 (Opinion)), those limitations are not applicable at sentencing. *See* 18 U.S.C. § 3553(a); Fed. R. Crim. P. 32(d); *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) ("[T]he Rules of Evidence do not apply at sentencing hearings."). Unlike at trial, character evidence is always relevant to the Court's task at sentencing under § 3553(a). Further, the touchstone for sentencing is reliability, and Sittenfeld does not contest object to the PSR's inclusion of the evidence on this ground. *Graham-Wright*, 715 F.3d at 601 ("Sentencing hearings may include evidence otherwise inadmissible at trial so long as the evidence is reliable."). So Sittenfeld presents no valid basis for excluding the facts in paragraphs 103(a)–(d) from the PSR.

**PSR Paragraphs 10 and 54.** Sittenfeld objects to the $40,000 forfeiture request as set forth in the Indictment and re-stated in paragraph 10 of the PSR. The government agrees that the amount subject to forfeiture is $20,000, which reflects the bribe payments the jury convicted Sittenfeld of receiving. The Court need not resolve whether the acquitted conduct should be considered for purposes of paragraph 54 because the 4-level adjustment applies in either case. (*See* Doc. 289, PageID 7226.) But the $40,000 total remains relevant to sentencing, as set forth above.

**Acceptance of Responsibility.** Sittenfeld argues he should receive a two-level reduction for "acceptance of responsibility" under U.S.S.G. § 3E1.1 because he "made a constitutional challenge to a statute and challenges to the applicability of a statute to his conduct." (Doc. 289, PageID 7226.)

The § 3E1.1 acceptance reduction is inapplicable and unwarranted. The Application Notes to this section state, "[t]his adjustment is not intended to apply to a defendant who puts the

government to its burden of proof at trial by denying the essential factual elements of guilt." U.S.S.G. § 3E1.1 cmt. n.2; *accord United States v. Reaume*, 338 F.3d 577, 583 (6th Cir. 2003). A defendant may only receive this reduction after trial in "rare situations" where a defendant "demonstrate[s] an acceptance of responsibility for his criminal conduct" but challenges "issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." U.S.S.G. § 3E1.1 cmt. n.2. The Sixth Circuit "has held repeatedly that admitting the actus reus while denying the mens rea element of an offense does not entitle a defendant to a reduction under § 3E1.1." *United States v. El Sayed*, 470 F. App'x 491, 494–95 (6th Cir. 2012) (citing cases); *United States v. Christopher*, 91 F. App'x 471, 474 (6th Cir. 2004) ("Contesting intent . . . is sufficient grounds for denying [the defendant] a reduction for acceptance of responsibility.").

The same goes here. Sittenfeld has challenged factual sufficiency and his criminal intent throughout these proceedings. Pretrial, he moved to dismiss on the ground that the "factual allegations" did not show a quid pro quo agreement or official action. (Doc. 24, PageID 106.) His defense at trial was that he lacked criminal intent to enter a bribery agreement—he testified that he did not intend to enter a quid pro quo (*see, e.g.,* Doc. 269, PageID 6745–49, PageID 6805–08); and he made clear his defense in closing, arguing this case "comes down to whether or not he intended to be corrupt." (Doc. 251, PageID 5040.) In post-trial briefing, Sittenfeld continued to challenge the government's evidence of criminal intent and official action. (*See* Doc. 270, PageID 6882–91.)

At no point—pretrial, during trial, or after the jury's verdict—has Sittenfeld accepted any responsibility for his conduct. His conduct does not show acceptance of responsibility under § 3E1.1 or otherwise. *See United States v. Blagojevich*, 794 F.3d 729, 743 (7th Cir. 2015)

(explaining that pleading not guilty, denying culpability at trial, and challenging the sufficiency of trial evidence post-trial is "the antithesis of accepting responsibility" under § 3E1.1).

**Elected Public Official Enhancement.** Finally, Sittenfeld argues that the 4-level increase under U.S.S.G. § 2C1.1(b)(3) for bribery by an elected official is double counting on the ground that § 2C1.1(a)(1) accounts for the same conduct.

"[I]mpermissible 'double counting' occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Eversole*, 487 F.3d 1024, 1030 (6th Cir. 2007) (quoting *United States v. Farrow,* 198 F.3d 179, 193 (6th Cir.1999)). "On the other hand, where separate enhancements 'penalize distinct aspects' of the defendant's conduct, no double counting will be found." *Id*. (quoting *United States v. Perkins,* 89 F.3d 303, 307-10 (6th Cir. 1996)); *United States v. Allen*, 712 F. App'x 527, 539 (6th Cir. 2017).

Here, § 2C1.1(a)(1) sets the base offense level at 14 for a "public official"; and § 2C1.1(b)(3) increases 4 levels "[i]f the offense involved an elected public official or any public official in a high-level decision-making or sensitive position[.]" Through § 2C1.1(b)(3), the Guidelines recognize that Sittenfeld's criminal conduct as an *elected* public official is more serious and distinct from the same conduct by an *unelected* public official. As the Eleventh Circuit explained:

> [b]ecause of the critical importance of representative self-government, a guideline that applies to any public official who betrays the public trust does not fully account for the harm that is inflicted when the trust that the official betrays was conferred on him in an election. *Being a bribe-taking 'elected public official' is different from being a run-of-the-mill, bribe-taking, non-elected 'public official*.'"

*United States v. White*, 663 F.3d 1207, 1217 (11th Cir. 2011) (internal quotation marks and brackets omitted; emphasis added); *accord United States v. Stevenson*, 834 F.3d 80, 84 (2d Cir. 2016); *United States v. Barraza*, 655 F.3d 375, 384 (5th Cir. 2011); *United States v. Conley*, 3:13-

CR-00028-GFVT-REW-1, 2018 WL 2275231, at *3 (E.D. Ky. May 17, 2018); *see United States v. Householder et al.*, 1:20-cr-00077, Doc. 285, 286 (S.D. Ohio); *United States v. Dennard*, 1:20-cr-00042 (S.D. Ohio). Because the Guideline provisions apply to distinct aspects of his offense, the four-level increase applies.

## IV. SECTION 3553(a) FACTORS

After calculating the Guidelines range, the Court must analyze the § 3553(a) factors to determine an appropriate sentence. Those factors include the nature and seriousness of the offense, the history and characteristics of the defendant, deterrence, and the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a). These factors support a Guideline sentence, as calculated above.

### The Nature and Seriousness of the Offense

"This country['s] . . . proper functioning requires elected officials to serve the common good, not illicit personal gain. Our citizens place faith in the honesty and integrity of elected officials." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015). As one court explained, corruption by a public official:

> demean[s] the integrity and work ethic of the many public servants in his community who strive each day to improve life and governance . . . . And [the corrupt official] has damaged the political morale of his constituency . . . and of all Americans. The deviant acts of the corrupt public official are of course horrific, "*but a hundred times worse is the demoralization of our people which results.*"

*United States v. Sorenson*, 233 F. Supp. 3d 690, 700 (S.D. Iowa), *aff'd*, 705 F. App'x 481 (8th Cir. 2017) (quoting Justice Louis Brandeis, *Speech to the Good Government Association* (1903)) (emphasis added).

More pointedly, President Theodore Roosevelt explained to Congress in 1903 the effect of corruption on society: "*There can be no crime more serious than bribery*. Other offenses violate one law while *corruption strikes at the foundation of all law*." Theodore Roosevelt, *Third Annual Message to the Senate and House of Representatives* (Dec. 7, 1903) (emphasis added). Roosevelt's words remain all too relevant today. *See, e.g., Sorenson*, 233 F. Supp. 3d at 703 ("There's so much money sloshing around government right now that it's very difficult to have confidence that any decision is being made on the merits. That doubt about whether our public servants are operating in our interests or whether their vote is available for purchase to the highest bidder is magnified every time we see another politician exposed as corrupt.") (quoting *United States v. Silver*, No. 1:15–cr–00093, Dkt. No. 300 at 58 (S.D.N.Y.)).

Here, Sittenfeld knowingly received $20,000 in bribe payments in return for guaranteeing votes for the 435 Elm St. development project. But this, in itself, does not illustrate the full scope of Sittenfeld's corruption. The investigation began following a series of phone calls between Sittenfeld and real estate developer, Chinedum Ndukwe, including a recorded call on October 30, 2018. Knowing Ndukwe's project was floundering in the city bureaucracy and would ultimately need City Council approval, Sittenfeld solicited Ndukwe to collect $10,000 in contributions prior to a local ordinance change that would occur weeks later. After Ndukwe indicated he would try to raise the money for Sittenfeld from his investment partners, Sittenfeld responded during the October 30 call:

| Sittenfeld: | Just so, just so you know like, look I have, you know I, I love what you do as someone revitalizing our city creating jobs. I am fond of you as a friend. I also have like you know obligations to do the things I need to do to be a successful candidate so. |
| --- | --- |
| Ndukwe: | Absolutely. |

| Sittenfeld: | So, but what that means is I don't really get like, if you say look I don't want to support you in the name of Chinedum Ndukwe, but some guy I've never met from Columbus is going to use a coup, you know, you know you're network are going to a, round up a bunch of LLC checks. Like that's great. I actually don't care. But I mean the one thing I will say is like, you know I mean, *you don't want me to like be like 'hey Chin like love you but can't' you know like,* you know, I mean like, you know like. I, I, I want people to support me, that's like… |
| --- | --- |
| Ndukwe: | Absolutely. |
| Sittenfeld: | …if a candidate doesn't want people to support them, they're a shitty dumb candidate… |
| Ndukwe: | Yeah, right, yeah, right. |
| Sittenfeld: | …and you know I've been (UI) a lot of people have come through in a really big way that's been awesome so far and I would love, I would love for you to be one of those people too. |

USA Ex. 13B at 2–3. Sittenfeld knew that Ndukwe needed help with 435 Elm St.—they had discussed Ndukwe's issues with the project and the city earlier in the call; and Sittenfeld knew the pressure these statements would put on Ndukwe to raise money. And, yet, Sittenfeld threatened Ndukwe, his friend, explicitly. Ndukwe testified that Sittenfeld's ultimatum made it "very clear that if I donated, he was going to support and be supportive in my efforts, and if I didn't, he wasn't going to be supportive." (Doc. 266, PageID 6247.)

This exchange with Ndukwe was not an isolated incident, but rather was consistent with Sittenfeld's modus operandi. The trial evidence showed that Sittenfeld's fundraising strategy was to use his power over city business to extract campaign contributions from individuals who regularly conducted business with the city. He instructed his staff to create a list and track individuals with business before the city so he could identify and target "transactional donors"— "folks who were trying to get something out of the city"—for contributions. (Doc. 267, PageID 6442–43 (Kamrass testimony).) Sittenfeld indicated to his staff he "would look more favorably

10

upon those who contributed to him and only him." (*Id*. at PageID 6448.) Similarly, lobbyist Jay Kincaid testified at trial that Sittenfeld warned him that if a specific Cincinnati lobbyist "hedges on my campaign, I'm going to hedge on his clients as mayor." (Doc. 266, PageID 6369.)

These are not the acts of a faithful public servant, but instead the machinations of someone abusing his public office to further his own agenda. This evidence shows that if Ndukwe did not raise Sittenfeld money, or if the local lobbyist or other donors "hedged" by supporting another candidate, Sittenfeld would assess the projects—not based on their merits or what's in the public's best interests—but based on his own self-interests. Making policy decisions based on a donation ledger is the antithesis of public service. *See United States v. Smith*, 13-cr-297, Doc. 461 at 21–22 (Court: "It is that we are entitled to expect our public officials to only engage in selfless good deeds and to *only legislate in the best interests of their constituents* and to act in a way that is exemplary.") (sentencing transcript) (emphasis added).

Sittenfeld's actions after he agreed to accept the $20,000 bribes from the UCEs also illustrate his corruption. Following his initial corrupt interactions with the UCEs—where he promised to "deliver the votes" in return for $20,000—Sittenfeld continued to meet and cultivate a relationship with the UCEs over drinks and steak dinners, discussed ways the UCEs could make the contributions without disclosing their names, and re-affirmed in multiple meetings that he intended to ensure that the 435 Elm agreement passed through City Council. Sittenfeld leaned into their relationship even after learning that a third UCE, "Vinny," had ties to organized crime. (USA Ex. 26D at 3 (Sittenfeld: "Vinny was like, you know, used to make his money in the dark arts and cleaned it up. . . . I don't care."); USA Ex. 33D at 2 (Sittenfeld telling UCEs, "I don't, I don't really care" that Vinny was a "mafia type"). After receiving another $20,000 from the UCEs in 2019 for help with their sports book, Sittenfeld repeatedly reached out directly to Vinny and proposed

11

meeting him in New York until the FBI cut off the operation. (*See, e.g.,* USA Ex. 32B, 32D, 35A, 38A.)

The public was unaware of any of these interactions, and that was by design. Sittenfeld's PAC records do not list the UCEs as the source of the $40,000 that Sittenfeld received directly from the UCEs; his ethics disclosures failed to list the expensive gifts and dinners from the UCEs; and, of course, the public had no idea that Sittenfeld promised to "deliver the votes" for a development project seconds after receiving a corrupt offer within the walls of a private condo. *See United States v. Kilpatrick*, 2:10-CR-20403, Doc. 492, PageID 16230 (E.D. Mich.) ("Without accountability and transparency, democracy is impossible. In their absence, elections and the notion of the will of the people have no meaning, and the government has the potential to become arbitrary and self-serving.") (sentencing transcript).

This type of corruption damages democratic governance, as courts have recognized.

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabricate of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, 3:01cr263 (JBA), 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (order denying resentencing of former mayor of Bridgeport) (internal citation omitted); *United States v. Kruger*, No. 1:11-CR-300, Doc.264-2, p. 46-47 (S.D.N.Y. 2012) (Court: "When a legislator accepts bribes, he not only betrays his constituents' trust, he strikes a blow against every principle on which a democracy is founded.") (sentencing transcript related to state senator). The fact that Sittenfeld used his public position to further his political interests rather than increase his personal wealth has little significance to the seriousness of the offense. *United States v. Blagojevich*, 1:08-

cr-00888, Doc. 1255 at PageID 28263 (N.D. Ill. Oct. 17, 2016) (court rejecting argument that the defendant was "less morally culpable" because he received contributions rather than cash: "I don't draw such a clear[] moral distinction between the abuse of offer for personal gain and the abuse of office for political purposes, like campaign raising.") (sentencing transcript).

Sentencing courts properly consider these effects on democratic governance in determining an appropriate sentence in corruption cases. *See United States v. Fattah*, 813 F. App'x 808, 813–14 (3d Cir. 2020) (district court properly supported sentence in finding defendant's "flagrant conduct undermines the confidence of the citizenry in the integrity of all public institutions and public officials. This cynicism saps the strength of our democracy.") (internal brackets omitted); *Sorenson,* 705 F. App'x at 483 (affirming district court consideration of "los[t] confidence in the integrity of its system of government" when an official "abuses his position by using it to facilitate the offense"); *Morgan*, 635 F. App'x at 448–52 (noting the proper consideration at sentencing for bribery offenses of the "harm to the reputation of honest public servants and the public faith in legitimate state government"); *United States v. Ganim*, 256 F. App'x 399, 402–03 (2d Cir. 2007) (holding sentence reasonable because the "elected municipal official . . . criminally and shamelessly flouts his lawful authority and the public trust").

The defendant's corruption undermined democracy in the city and the public's confidence in the integrity of our system of governance, and the defendant should be sentenced accordingly.

## History and Characteristics of the Defendant

The Supreme Court has defined corruption involving campaign contributions as an explicit quid pro quo bribery agreement. But this "narrow view of what constitutes corruption"[1]— what is required for a criminal bribery conviction in federal court—does not set the parameters for what this Court may consider relevant to the history and characteristics of a public official at sentencing.

Legal scholars have defined corruption broadly. For example, public officials act corruptly when they "exercise public power in a way that serves selfish ends"[2]; or take official action "on account of an illicitly private benefit."[3] From a historical perspective, "[t]he Framers were obsessed with corruption."[4] "[C]orruption was defined in terms of an attitude toward public service, not in relation to a set of criminal laws."[5] Their understanding of corruption—the "self-serving use of public power for private ends"—included quid pro quo bribery, but also "public decisions to serve private wealth made because of dependent relationships, public decisions to serve executive power made because of dependent relationships, and use by public officials of their positions of power to become wealthy," among other things.[6] The Federalist Papers described

---

[1] George D. Brown, *Applying* Citizens United *to Ordinary Corruption: With A Note on* Blagojevich, McDonnell, *and the Criminalization of Politics*, 91 Notre Dame L. Rev. 177, 233 (2015).

[2] Zephyr Teachout, *The Problem of Monopolies & Corporate Public Corruption*, 147 Daedalus 111, 112 (2018), available at: https://ir.lawnet.fordham.edu/faculty_scholarship/954.

[3] Jacob Eisler, *The Unspoken Institutional Battle over Anticorruption:* Citizens United, *Honest Services, and the Legislative-Judicial Divide*, 9 First Amend. L. Rev. 363, 410 (2010).

[4] Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 348 (2009).

[5] *Id.* at 374.

[6] *Id.* at 373–74.

14

corruption in terms of an interest that would "bias [one's] judgment."[7]

So, separate from concerns relating to federalism, vagueness, or what is or is not "explicit," these definitions recognize that a public official must make decisions affecting the public with *only* the public's best interest in mind—and certainly not substituting their own or those of wealthy contributors. Indeed, as the Supreme Court recognized in *McDonnell*, although "distasteful" and "tawdry" actions might be insufficient "without more" to sustain a federal bribery conviction, they may still evidence corruption. *McDonnell v. United States*, 579 U.S. 550, 573–74, 580–81 (2016).

Through this lens, Sittenfeld's actions as a public official exemplify corruption. Even aside from the thousands of dollars in bribe payments, the trial evidence shows that Sittenfeld's actions with regards to the 435 Elm Street project were legally corrupt. But other evidence before the Court similarly shows that Sittenfeld's modus operandi was to use his power as a public officeholder as a tool to financially support his personal ambitions.

The government attached to its response brief relating to Rule 404(b) evidence witness reports from the FBI detailing several corrupt interactions between Sittenfeld and individuals who had business before the City or would likely have business before the city in the future. (*See* Doc. 143, PageID 2445–2501). For example:

- Sittenfeld's solicitations of contributions from an executive of a local construction company expressed "a subtle message of extortion." (Doc. 143, PageID 2449.)

- Sittenfeld made clear to a Cincinnati lobbyist that the lobbyist needed to support Sittenfeld because he "could make it difficult for [the lobbyist] to conduct business at city hall." (*Id*. at PageID 2453.)

- Sittenfeld suggested through a text message to an individual attempting to purchase city property that Sittenfeld would not help the individual with the property purchase because the individual had not contributed to Sittenfeld. (*Id*. at 2479–80).

---

[7] The Federalist Papers No. 10 (James Madison).

- Sittenfeld told an executive of a local company that he would not vote to support a zoning change that would allow for construction on a major project unless a substantial payment was made to a separate, private entity. (*Id*. at 2475–78).

In addition, individuals interviewed by agents described meetings where Sittenfeld used his mayoral ambitions and polling to solicit contributions during the same meetings in which they discussed city business. (*See, e.g., id.* at PageID 2448–50, 2452, 2459–60, 2466–68, 2470–71, 2473, 2487, 2493.) Sittenfeld knew that individuals with business before the city would feel pressure to contribute to the next mayor and he used that pressure to his advantage. With the trial evidence, these interactions paint a clear picture—as Ndukwe testified and consistent with the trial evidence noted above, Sittenfeld was going to help those who helped him; and withhold support from those who did not.[8] Although not amounting to explicit quid pro quo corruption in every instance, these self-serving interactions were corrupt—in the eyes of the founders, and as the term is reasonably understood—and should be considered by the Court at sentencing.

The defense has argued throughout these proceedings that the charges in the case were the result of government agents "who controlled the script" and "attempted to create a crime that never existed," suggesting Sittenfeld was an upstanding public official who was somehow tricked by aggressive government agents. (Doc. 104, PageID 1136; *see also id*. at PageID 1119 ("There was no prior suggestion of corrupt conduct before the Government targeted him. . . . Mr. Sittenfeld has had no incentive to be corrupt. He was a prodigious fundraiser of lawful campaign and PAC contributions."); Doc. 241, PageID 5065 (defense closing argument noting 1,800 donations and arguing "if there was anyone that would come in here and say something different than what you heard from PG, or that could hurt PG in any way, you would have heard from them").

---

[8] The government intends to offer additional witness testimony supporting this at the sentencing hearing.

The trial evidence and interactions described above cut squarely against these characterizations. As a public servant, time and again, Sittenfeld attempted to use his public position and leverage over city business for his personal benefit—to fill his campaign coffers, to further his next electoral run, to strengthen his grip on local politics—all while threatening individuals who failed to "come through . . . big" or who "hedged" by supporting another candidate (consistent with *their* First Amendment right). In other words, Sittenfeld "exercise[d] his public power in a way that serve[d] selfish ends."[9] The Court should consider this pervasive corruption when assessing the history and characteristics of this defendant.

### Need to Deter Criminal Conduct

Along with seriousness of the offense, general deterrence may be the most important factor in sentencing defendants in a public corruption case. As the above makes clear, corruption crimes are serious offenses that threaten the core values of our country. For this reason, courts have found general deterrence to be a particularly important factor in sentencing corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *Sorenson*, 705 F. App'x at 483. "[T]he need for a general deterrence is a priority, and a significant sentence would likely deter those in high places . . . from abusing the public trust." *Fattah*, 813 F. App'x at 813–14 (internal quotation marks and brackets omitted); *Morgan*, 635 F. App'x at 450 ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes") (citing Senate Report No. 98-225, at 76 (1983)). "'[O]ne of the primary objectives' of sentencing elected officials convicted of bribery is 'to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Morgan*, 635 F. App'x at 450–51 (quoting *United States v. Kuhlman,* 711 F.3d

---

[9] *See supra* n.2.

1321, 1328 (11th Cir. 2013)) (internal brackets omitted); *Sorenson*, 233 F. Supp. 3d at 699 ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.").

This is particularly true in Cincinnati. Two other city councilmembers have pleaded guilty to bribery offenses[10] in the last three years, representing, with the defendant, a full third of Cincinnati City Council. In addition, the recent state-level corruption in Ohio is well documented. The Court should consider the need to deter similar behavior by local public officials in determining its sentence in this case. *See Watkins*, 691 F.3d at 853 ("Regarding general deterrence, the court additionally explained that the widespread corruption problem facing the county and surrounding areas called for a harsher sentence."); *Anderson*, 517 F.3d 953, 966 (affirming district court's reference "to a number of recent public corruption scandals" as an appropriate sentencing consideration given the need for general deterrence); *United States v. Krause,* No. 1:10CR235, 2011 WL 2637184, at *4 (N.D. Ohio July 6, 2011), *aff'd*, 513 F. App'x 482 (6th Cir. 2013) (sentence appropriate "given the rampant corruption scandal that still plagues Cuyahoga County").

---

[10] One of those City Councilmembers, Tamaya Dennard, has also been sentenced. *See United States v. Dennard*, 1:20-cr-00042, Doc. 43 (S.D. Ohio). She received 18 months' imprisonment after a plea, which she entered three months after indictment.

**Need to Avoid Unwarranted Sentencing Disparities**

The last factor the Court must consider when fashioning a sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). This need is particularly acute for public officials convicted of violating the public trust. In such cases, the "entire public suffers as a result" of the official's misconduct, and they "ought not be requested to tolerate a sentence amount grossly at odds with the sentencing guidelines and amounting to little more than a slap on the wrist." *Morgan*, 635 F. App'x at 448–52 (rejecting five-year probationary sentence for a state senator as "grossly inappropriate" and substantively unreasonable).

The district court in *United States v. Sorenson* eloquently explicated these principles while rejecting the prosecution and defense's joint request to sentence a public official to a term of probation. 233 F. Supp. 3d 690 (S.D. Iowa 2017). In the court's view, the parties' proposed probationary sentence "would in no way reflect the seriousness of the Defendant's offenses" and "[i]t would simultaneously erode, if only by an increment, America's foundational, utter rejection of tolerance for corrupt governance." *Id*. at 699 (internal quotation marks omitted). "When it comes to political corruption, the community—historically and presently—requires that real, tangible, and severe consequences meet those who gain a position of public trust and then abuse that trust for personal gain." *Id*. The district court ultimately sentenced the state senator to 15 months' incarceration, which was the bottom end of the Guidelines after granting the Government's request for a departure based on substantial assistance. *Id*. at 704-05.

As the *Sorenson* court recognized, sentencing a defendant within the range recommended by the Guidelines addresses the concern of unwarranted disparities. *See Gall v*, 552 U.S. at 54 (noting that "avoidance of unwarranted disparities was clearly considered by the Sentencing

Commission when setting the Guidelines ranges"); *United States v. Sanchez*, 989 F.3d 523, 541 (7th Cir. 2021) ("A sentence within a Guideline range necessarily complies with § 3553(a)(6)." (alteration and quotation marks omitted)).  Multiple circuits, including our own, have affirmed Guidelines sentences for public officials convicted of bribery.  In *United States v. Jones*, the Sixth Circuit affirmed a sentence of 60 months' imprisonment for a state driver's licensing clerk who received approximately $20,000 in bribes, which was a within-Guidelines sentence.  260 F. App'x 873, 876, 879 (6th Cir. 2008).  In *United States v. Arroyo*, the Seventh Circuit affirmed a sentence of 57 months' imprisonment for a state representative who received approximately $32,500 in bribes, which was the top of the Guidelines range after a plea.  75 F.4th 705, 708–09 (7th Cir. 2023).  In *United States v. Salesman*, the Eleventh Circuit affirmed a sentence of 51 months' imprisonment for a city commissioner who received approximately $3,340 in bribes, which was a within-Guidelines sentence.  467 F. App'x 835, 849–50 (11th Cir. 2012).  In *United States v. Abate*, the Third Circuit affirmed a sentence of 51 months' imprisonment for a utilities director who received kickbacks, which was a within-Guidelines sentence.  302 F. App'x 99, 104 (3rd Cir. 2008); *see also Morgan*, 635 F. App'x at 463 (J. Holmes, concurring) (noting "district courts have generally imposed *some* prison time in § 666 bribery cases, no matter how small the dollar amount of the bribes" and citing cases) (emphasis in original).

Sentencing the defendant within the recommended Guidelines range will avoid unwarranted disparities between similarly situated defendants.

## V.    CONCLUSION

For these reasons, the United States submits that a Guideline sentence is appropriate.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
MEGAN GAFFNEY PAINTER (NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov
E-mail: Megan.Painter@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum was filed electronically this 26th of September, 2023, and served upon all counsel of record via the Court's CM/ECF system.

*s/Matthew C. Singer*
MATTHEW C. SINGER
Assistant United States Attorney